**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

This document relates to:
*Ashton et al. v. al Qaeda Islamic Army*, *et al.*, 02-cv-6977 (GBD)(SN)

### The *Ashton 37* Motion for Final Damages for Solatium Plaintiffs and Functional Equivalents of Solatium Plaintiffs Without Prior Judgments

For the reasons set forth below, and the statements contained in the declaration of James P. Kreindler, Esq. ("Kreindler Declaration") and exhibits filed in connection with this motion, those *Ashton 37* Plaintiffs set forth in Exhibits B and C filed with the proposed order by and through their counsel, Kreindler & Kreindler LLP, respectfully move this Court for an Order:

1) Awarding those plaintiffs set forth on Exhibit B, all of whom are U.S. nationals, solatium damages for the losses they suffered as a result of the deaths of their immediate family members in the September 11, 2001 terrorist attacks in the amounts previously awarded by this Court;

2) Awarding those plaintiffs set forth on Exhibit C, all of whom are U.S. nationals, solatium damages for the losses they suffered as a result of the deaths of individuals who were, as established by their declarations, the functional equivalents of immediate family members, based on the framework and amounts previously awarded by this Court;

3) Awarding the *Ashton 37* Plaintiffs pre-judgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages;

4) Finding that service of process was properly effected upon the Islamic Republic of Iran ("Iran") in accordance with 28 U.S.C. § 1608(a) for sovereign defendants;

5) Certifying that these awards are final pursuant to Fed.R.Civ.P. 54; and

6) Granting permission for all other plaintiffs in this action not appearing on Exhibits B and C to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed, and for all plaintiffs to

1

move at a later time for other categories of damages if facts and circumstances so warrant.

This motion is made on behalf of the claimants listed in Exhibits B and C attached to the proposed order ("*Ashton 37* Plaintiffs"), in light of this Court's previous order granting permission to allow remaining plaintiffs in the case to move for this relief. *See* ECF No. 3300.[1]

As the awards set forth in the proposed order represent the only direct recovery against Iran on behalf of the *Ashton 37* Plaintiffs listed in Exhibits B and C to the proposed order, the proposed order will constitute final awards and judgments against Iran for those plaintiffs listed in Exhibits B and C to it and the *Ashton 37* Plaintiffs therefore request that this Court certify the awards and judgments as final pursuant to Fed.R.Civ.P. 54.

## I.    Procedural Background

On September 4, 2002, the *Ashton* Plaintiffs filed their first complaint against the sponsors of the September 11, 2001 terrorist attacks, which included allegations against Iran. *See* 02-cv-6977 (S.D.N.Y.) ECF No. 1.  Plaintiffs asserted federal jurisdiction pursuant to, among other things, the Foreign Sovereign Immunities Act (28 U.S.C. § 1605(a)) ("FSIA"). *Id.* at 28, 39 – 40, 43, 48.  Iran was listed as a named defendant in the *Ashton* Plaintiffs' Consolidated Amended Complaint, filed on March 6, 2003, with the same jurisdictional assertions. *See* 02-cv-6977 (S.D.N.Y.) ECF No. 11-2 at 17, ECF No. 11-5 at 45 - 49.  This Consolidated Amended Complaint (the "CAC") was served in compliance with FSIA requirements through diplomatic channels, but Iran has never answered. *See* 02-cv-6977 (S.D.N.Y.), ECF No. 424 at 2; *see also*

---

[1] References to the 03-md-1570 docket entries are noted only by the ECF document number. Any reference to a prior Order or filing on a different docket will include that docket number as well as the ECF document number.

02-cv-6977 (S.D.N.Y.) ECF No. 358.  The *Ashton* Plaintiffs moved for a Certificate of Default, which the Clerk of the Court issued. *See* 02-cv-6977 (S.D.N.Y.), ECF No. 651.

At the time that the CAC was first filed against Iran, the FSIA functioned as a pass-through statute, denying immunity for claims arising from certain acts of terrorism or material support for terrorism if the United States had designated the foreign sovereign a state sponsor of terrorism, thus allowing a plaintiff to pursue a claim in the federal courts in suits against a nation-state that had been officially designated a state-sponsor of terrorism, such as Iran. *See* Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221(a), 110 Stat. 1214, 1241.  In 2008, Congress amended the FSIA with the passage of a new terrorism exception, codified at 28 U.S.C. § 1605A, and again in 2016 with the passage of the Justice Against Sponsors of Terrorism Act ("JASTA"), codified at 28 U.S.C. § 1605B.  Section 1605A removed the sovereign immunity from suit in the U.S. for nations that had been formally designated state sponsors of terrorism, allowing U.S. nationals to pursue a substantive claim under the FSIA against a formally designated state-sponsor of terrorism.  Section 1605B removed the sovereign immunity from suit in the U.S. of *any* nation for death or injuries caused by an act of terrorism in the U.S. and the tortious acts of the nation state (28 U.S.C. § 1605B(b)) without reference to a plaintiff's nationality and allowed U.S. nationals to pursue substantive claims against that foreign state based on the federal Anti-Terrorism Act, 28 U.S.C. § 2333 (28 U.S.C. § 1605B(c)).

The substantive causes of action detailed in the CAC were for common-law wrongful death based on intentional murder, survival damages and injuries and assault and battery; violation of the Anti-Terrorism Act (18 U.S.C. § 2333); violation of the TVPA; and violation of the FSIA. *See* 02-cv-6977 (S.D.N.Y.) ECF No. 11-5 at 245 – 50.

Based on evidence and arguments submitted by various plaintiffs in this consolidated multi-district litigation arising out of the September 11, 2001 terror attacks, the *Ashton* Plaintiffs moved for a judgment of liability against Iran for claims arising out of the deaths of the plaintiffs' decedents. ECF No. 3008.  In their motion for a liability default judgment, the *Ashton* Plaintiffs relied on the Certificate of Default entered in the *Ashton* case, which was premised on the CAC that Iran had never answered. ECF No. 2970 at 2.  They then moved for a default judgment of liability against Iran. ECF No. 2970 at 2, 10 – 18.  This Court granted that motion for a default judgment of liability. ECF No. 3014.[2]

Thereafter, the *Ashton* Plaintiffs moved for partial summary judgment for the conscious pain and suffering that victims murdered on September 11, 2001 suffered before death, which this Court granted, and certain *Ashton* Plaintiffs moved for default judgments on economic damages suffered as a result of their decedents' wrongful deaths as well.  This Court granted those motions. *See* ECF No. 3229 (adopting December 28, 2015 Report and Recommendation awarding damages for conscious pain and suffering) and No. 3356 (awarding damages for economic loss).  In addition, certain *Ashton* Plaintiffs moved for solatium damages suffered by immediate family members and those non-immediate family members who were the "functional equivalent" of immediate family members eligible to recover under the terrorism exception to the FSIA as well as for the economic loss suffered on behalf of the estates of some of those

---

[2] The *Ashton* Plaintiffs at the same time also moved for permission to file an Amended Consolidated Complaint against Iran, asserting the same jurisdictional allegations as in the prior complaints, adding a claim based on the new provision of the FSIA enacted subsequent to the filing of the original suits against Iran and adopting and incorporating by reference the prior *Ashton* allegations against Iran. ECF Nos. 2968, 2968-1 at 1 - 2 (adding allegations under 28 U.S.C. § 1605A).  The Court issued an Opinion and Order allowing the *Ashton* Plaintiffs to amend their pleadings as to Iran without requiring service of the amended pleadings. ECF No. 3227.  Plaintiffs thereafter filed the Amended Consolidated Complaint on the docket. ECF. No. 3237.

killed on September 11, 2001. *See, e.g.,* ECF Nos. 3295 (Motion for Final Judgment for *Ashton I* claimants including claims for solatium damages); 4058 (Motion for Final Judgment for *Ashton V* claimants, the "functional equivalent" of immediate family members, solely for solatium damages); 5535 (Motion for Final Judgment for *Ashton XVII* and *Betru VI* claimants seeking economic damages and final judgments for estates).

This Court granted these motions, finding that an award to the immediate family members (or functional equivalent) of each decedent was proper, that economic damages and final judgments for estates were warranted and that prejudgment interest on the solatium loss amounts was warranted. *See, e.g.,* ECF Nos. 3300; 4106; 5926.

For the reasons below as well as those set forth in the prior motions for summary judgment on liability and prior motions for judgment the *Ashton 37* Plaintiffs listed in Exhibits B and C to the proposed Order now move this Court to grant the proposed Order awarding solatium damages in the same amounts previously awarded to other plaintiffs with the same relationships to those killed in the September 11, 2001 Terrorist Attacks and based on the framework this Court established for claims brought by the functional equivalents of immediate family members.

All *Ashton 37* Plaintiffs ask this Court to further direct that pre-judgment interest be assessed at 4.96 percent per annum and find that service of process was properly effected on Iran pursuant to the FSIA (28 U.S.C. § 1608(a)), as this Court has previously held in prior similar applications.  The *Ashton* Plaintiffs also ask for permission to continue to submit applications in subsequent stages on behalf of those claimants not included in the exhibits attached to the proposed Order and to potentially move for other categories of damages, should any other applications be warranted.

## II. Damages

Under 28 U.S.C. § 1605A ("Section 1605A"), which, among other claims, applies to the suit against Iran, available damages include "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(a)(1) and (c)(4). That is, the "estates of those who [died] can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52, 83 (D.D.C. 2010). Under the ATA, a "national of the United States injured in his or her person … by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees. 18 U.S.C.A. § 2333.

Those *Ashton 37* Plaintiffs set forth on Exhibit B to the proposed Order are all immediate family members of the 9/11 Decedents listed on Exhibit B and they and the 9/11 Decedents were United States nationals as of September 11, 2001 and they therefore are entitled to compensation for the solatium losses suffered as a result of the wrongful death of their 9/11 Decedents as well as trebled damages under the ATA.

Those *Ashton 37* Plaintiffs set forth on Exhibit C to the proposed Order fit within the framework this Court previously established for the "functional equivalent" of an immediate family member, as described in more detail below, and they and the 9/11 Decedents were United States nationals as of September 11, 2001 and they therefore are entitled to compensation for the solatium losses suffered as a result of the wrongful death of their 9/11 Decedents as well as trebled damages under the ATA.

As liability has been established in this matter, each moving plaintiff is now entitled to damages in the amounts set forth on Exhibits B and C attached to the proposed Order which reflect (1) the damages amounts previously awarded by this Court for solatium damages to other immediate family members of 9/11 Decedents (Exhibit B) or the functional equivalent of immediate family members of 9/11 Decedents (Exhibit C).

### A. Solatium Damages

The Foreign Sovereign Immunities Act (28 U.S.C. § 1605A) specifically provides for solatium damages.  Under that provision, family members of the decedents may recover for "the mental anguish, bereavement, and grief that those with a close relationship to the decedent experience as a result of the decedent's death, as well as the harm caused by the loss of decedent's society and comfort." *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 196 (D.D.C. 2003), *vacated on other grounds*, 404 F. Supp. 2d 261 (D.D.C. 2005).  Other courts have previously noted that "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress."  *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).  Given that, in FSIA cases solatium claims have been treated as comparable to claims for intentional infliction of emotional distress, in which the immediate family members of the decedent are treated as direct victims.  *See, e.g. Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005)("[c]ourts have uniformly held that a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families."); *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (treating solatium claim as "'indistinguishable' from the claim of intentional infliction of emotional distress.") (quoting *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001)).  Thus, this Court has previously awarded solatium damages to "immediate family members" who, though not physically present at the site of the terrorist

7

attacks, were nevertheless intended victims of the terrorist activities. *See* ECF No. 3358; *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-1570 (GBD)(SN), 2015 WL 9468813 (S.D.N.Y. Dec. 28, 2015); *In re Terrorist Attacks on Sept. 11, 2001*, No. 03-MDL-1570 (GBD)(SN), 2012 WL 4711407 (S.D.N.Y. Oct. 3, 2012).

### i.     Immediate Family Members

In defining those family members eligible to make a claim for solatium damages, this Court previously determined that spouses, parents, children and siblings who survived a victim killed in the September 11 terrorist attacks were entitled to recover for their losses, and set forth a framework for other family relationships that fell outside of those four categories, such as intimate partners, aunts and uncles and step-relationships, who, based on the particular factual circumstances in each case, may be considered the functional equivalent of immediate family members. *See* ECF No. 3363 (Report & Recommendation).  The four established categories of family relationships – spouses, parents, children and siblings – do not require any additional showing of the nature of the underlying relationship.

To fashion a solatium award adequately compensating the surviving immediate family members in the litigation against Iran, this Court previously looked to the analysis undertaken by District Court Judge Royce Lambert in the case of *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).  There, Judge Lamberth concluded that solatium damages should be awarded to each spouse of a deceased victim in the amount of $8 million, to each parent in the amount of $5 million, and to each sibling in the amount of $2.5 million.  *Id*.[3]

---

[3] This formula may be adjusted upward or downward when circumstances warrant.  *See, e.g., Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 156 (D.D.C. 2011); *Valore*, 700 F. Supp. 2d at 85.

Magistrate Judge Frank Maas previously recognized that the immediate family members of those killed in the September 11 terrorist attacks suffered and continue to suffer "profound agony and grief" and, "[w]orse yet, … are faced with frequent reminders of the events of that day." *See* ECF No. 2618 at 10 – 12.  Given the "extraordinarily tragic circumstances surrounding the September 11th attacks, and their indelible impact on the lives of the victims' families," Magistrate Judge Maas in his Report and Recommendation concluded that an upward departure from the *Heiser* framework was appropriate and recommended solatium damages in the following amounts:

| Relationship to Decedent | Solatium Award |
| --- | --- |
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

Subsequently, Magistrate Judge Maas and then Magistrate Judge Sarah Netburn issued orders awarding solatium damages in the amounts set forth above to various groups of plaintiffs.

The losses claimed in this motion are legally and factually comparable to those suffered by the prior *Ashton* claimants, and the other claimants involved in this litigation.  Each of the deaths in this case were sudden and unexpected and were the result of the terrorism defendants' extreme acts of malice.  The decedents were civilians whose deaths were intended to create an environment of fear and terror.  The claimants here were not attenuated victims but the immediate family members of the decedents and were directly and irrevocably harmed by the terrorist acts and consequences.  Many family members can visit no private cemetery plot or gravestone to visit their loved ones but are instead resigned to never have the closure that might

9

otherwise be expected after the death of an immediate family member.  The amount of solatium damages previously adopted by the District Court in the other *Ashton* cases as well as the other claimants involved in this litigation should apply equally to the *Ashton 37* Plaintiffs set forth on Exhibit B to the proposed Order.

The relationships between the decedent and the *Ashton 37* Plaintiffs are identified on Exhibit B accompanying the proposed Order.  As described in the Kreindler Declaration, all of the *Ashton 37* Plaintiffs listed in Exhibit B have direct relationships previously recognized as being presumptively qualified for solatium damages; the relationships between the *Ashton 37* Plaintiffs and their immediate family members, who were killed in the September 11, 2001 terrorist attacks, have been verified; all of the *Ashton 37* Plaintiffs survived the death of their immediate family member on September 11, 2001; and none of the *Ashton 37* Plaintiffs has another known claim pending before this Court for compensation against Iran.  The *Ashton* Plaintiffs therefore respectfully request that this Court issue a final judgment ordering payment of solatium damages to the *Ashton 37* Plaintiffs, listed in Exhibit B, in the same amounts set forth above, based on their relationship with their decedent and as described in the Kreindler Declaration and set forth in Exhibit B.

### ii.    "Functional Equivalent" of Immediate Family Members

In considering who is eligible to make a claim for solatium damages, this Court previously set forth a framework for relationships that fell outside of the four presumptively eligible categories of spouse, child, parent and sibling. *See* 03-md01570 (S.D.N.Y.) (GBD) (SN), ECF 3363, Entered 10/14/2016.

The October 14, 2016 Report and Recommendation, adopted by the District Judge, recommended that in addition to those individuals who are considered traditional "family members," damages could also be awarded to non-immediate family members who met certain

10

criteria establishing that she or he had the "functional equivalent" of an immediate family member relationship with the September 11, 2001 decedent.  These categories of non-immediate family members included fiancées and domestic partners, step-relatives, aunts, uncles, nieces, nephews and cousins. *Id.*

In that report, three factors were identified as especially relevant to the determination of whether a close non-immediate family member was the "functional equivalent" of a traditional immediate family member.  Those factors are: 1) long-term residence or co-habitation in the decedent's household; 2) whether the non-immediate family member ever played a guardian or custodian-like role in the decedent's life or vice versa; and 3) whether the biological family member whose role the "functional equivalent" individual played was absent from the family life (*i.e.* did the non-immediate family member step in to play a "functionally equivalent" role because of the death or long-term absence of the biological family member). *Id.*, pp. 10-12.  In weighing these different factors, the Court stated it would consider whether the non-immediate family member supported the decedent financially and emotionally, or vice versa, and whether the decedent and claimant shared in typical family activities like doing homework, eating dinner and vacationing together. *Id*.  In previous cases, the Court relied on the statements from the claimant about the nature and quality of the relationship with decedents. *Id*., pp. 17-28.  For "functional equivalent" relationships

The information below, based on the declarations of the individuals for whom solatium damages are sought in this motion (submitted exhibits to the Kreindler Declaration), confirms that the claimants listed in Exhibit C to the Proposed Order had the "functional equivalent" of a biological relationship to the 9/11 Decedents and they are therefore entitled to an award for solatium damages.

a. ***Joshua J. McMiller, "Functional Equivalent" of son of 9/11 Decedent Larry Bowman.***
   **Presumptive Award: $8.5 million**
   **Requested Award: $8.5 million**

Joshua J. McMiller seeks a solatium damages judgment based on the death of his step-father Larry Bowman in the September 11, 2001 terrorist attacks of the full amount presumptively awarded to children of 9/11 Decedents.

Joshua's relationship with his stepfather, Larry Bowman, began in 1987. *See* Kreindler Decl., Exhibit 1 (declaration of Joshua J. McMillar), ¶ 2. Joshua was eight years old when Larry and Joshua's mother began dating. *Id.*, ¶ 3. That same year, when Joshua was still eight years old, he, his mother and his sister moved in with Larry, making Larry a daily and formative presence in Joshua's life. *Id.*, ¶ 3. Larry and Joshua's mother married in May 1994, when Joshua was fourteen. *Id.*, ¶ 4. The family then lived together continuously in Florida before they relocated together to Brooklyn in February 2000. *Id.*, ¶ 3.

Joshua's biological father was entirely absent and played no role in Joshua's life. *Id.*, ¶ 5. Larry Bowman was the only father-figure that Josh ever knew. *Id.*, ¶ 5. Larry taught Joshua to drive, played basketball with him, and supported his emotional development. *Id.*, ¶ 5. Beyond his work as a security guard, Larry served as a minister and played a central role in nurturing Joshua's spiritual growth. *Id.*, ¶ 5. To Joshua, Larry was his father in every meaningful sense. *Id.*, ¶ 5.

Larry Bowman's murder on September 11, 2001 had a profound and lasting impact on Joshua and his family. *Id.*, ¶ 6. In the aftermath of the attacks, Joshua temporarily left the Army to care for his mother and sister. *Id.*, ¶ 6. The loss created a deep and enduring void, and Joshua continues to feel the effects of Larry's absence in both significant and subtle ways. *Id.*, ¶ 6.

Joshua McMiller's relationship with Larry Bowman was indistinguishable from that of a biological father and son. Larry Bowman provided Joshua with financial support, emotional guidance and abundant moral and spiritual support from the time Joshua was eight years old until Larry's death, when Joshua was 22 years old.

Under this Court's previously established criteria, "[s]tepparents … who became part of the family when the decedent was in early childhood (roughly until the age of eight) may be deemed fully functional equivalent to biological parents … and would be entitled to full solatium damages, and stepchildren who were in the same range when the decedent became part of their family would be deemed fully equivalent to biological children." ECF 3363, p. 13.

Given Joshua's young age when Larry Bowman became a part of his family (eight when he first met Larry and then moved in with him and thus became part of the same family), the close, father–son relationship that developed over many years and the absence of Joshua's biological father from his life, Joshua J. McMiller should be awarded the full $8.5 million presumptive solatium damages award for children of the victims murdered on September 11, 2001.

> ### b. Melinda Monk, "Functional Equivalent" of daughter of 9/11 Decedent Alfred G. Marchand
> ### Presumptive Award: $8.5 million
> ### Requested Award: $8.5 million

Melinda Monk seeks a solatium damages judgment based on the death of her mother's former spouse Alfred G. Marchand in the September 11, 2001 terrorist attacks of the full amount presumptively awarded to children of 9/11 Decedents. Though Mr. Marchand was not, as a legal matter, her step-father, as set forth below and in her declaration, he was the functional equivalent of a biological father from the time that she was born; Melissa lived with Mr. Marchand for significant periods during her childhood; and he was the only father figure she had.

Melinda Monk's mother Kimberly Edmonson was married to Alfred G. "Al" Marchand for nine years. *See* Kreindler Decl., Exhibit 2 (Declaration of Melinda Monk), ¶ 1. Ms. Edmonson and Mr. Marchand had one child together but divorced in 1985. *Id.*, ¶ 2. Two years later, Ms. Edmonson gave birth to Melinda. *Id.* Even though Mr. Marchand and Melinda's mother had divorced prior to Melinda's birth, Al Marchand embraced the role of Melinda's father from the time she was born. *Id.* ("Though I was not born until 1987, Al was essentially the only father I had from that time until his death in the September 11, 2001 terrorist attacks.") Melinda's biological father was absent throughout her childhood and appeared only sporadically. *Id.*, ¶ 3. As a result, Al became the only father figure she knew. *Id.* From infancy through adolescence, Al provided the physical, emotional, and mental support that shaped Melinda's daily life and development.

Al had served in the United States Army and spent twenty-one years as a police officer with the Alamogordo Police Department, retiring as a lieutenant. *Id.*, ¶ 1. After retiring from law enforcement, Al trained to become a flight attendant and was hired by United Airlines in November 2000. *Id.* Throughout Melinda's whole life, Al was deeply involved in Melinda's upbringing. Beginning when she was an infant, Melinda stayed with Al on most of his days off from the Alamogordo Police Department. *Id.*, ¶ 4. Al wanted Melinda with him whenever possible, and she spent substantial periods of her childhood living in his home even though her mother maintained a separate household. *Id.* Not only did Melinda cohabitate with Al from the time he was an infant, Al was even listed as an additional parent on her medical and school records, reflecting the parental role he assumed in every meaningful respect. *Id.*, ¶ 6.

Al's presence in Melinda's life was constant and vital. He regularly dropped her off at school, picked her up from school when she was sick and attended school lunches and other

14

events. *Id.*, ¶7.  Melinda attended church with Al; the two of them read together, went on walks together, visited parks together, and shared meals together. *Id.*, ¶ 8.  Melinda traveled with Al and other family members, taking trips with Al and her half-brother (Al's biological son) to North Dakota and Canada and even traveling to California with Al, her half-brother and her mother after her mother and Al. *Id.*, ¶ 9. Melinda went frequently to a spot that Al loved at Elephant Butte Lake in New Mexico. *Id.*, ¶ 9.  Melinda spent every Thanksgiving and Christmas with Al, as well as other important holidays. *Id.*, ¶ 10  The relationship between Melinda and Al was such that the outside world too, saw them as child and parent, with friends, teachers, pastors, and extended family all understanding Al to be Melinda's father. *Id.*, ¶ 10.

Al's death has left a permanent void in Melinda's life, losing the only father she had from the time she was born until she was fourteen years old. *Id.*, ¶¶ 11-14.  As Melinda explains, "though our family arrangement was somewhat unconventional, Al was the only father I ever knew from the time I was born until his death … ; he is still, in my heard and my mind, my father." *Id.*, ¶ 14.

This Court's previously established framework requires proof of three objective factors for a finding of the functional equivalent of a child-parent relationship: (1) cohabitation; (2) decedent having played a custodian-like role in the child's life; and (3) the absence of the biological parent in the child's life. ECF 3363, pp. 11-12.  This Court further explained that cohabitation has to have been continuous for "a significant period of time" before the child turned 18, and that the "period of time is presumptively at least two years." ECF 3676, p. 13.

Melinda lived with Al as much as she would have had Al been her biological father, given his work schedule from the time she was born until his death.  As Melinda explained, she stayed with Al nearly all of the days when he was not working with the Alamagordo Police

Department. Monk Decl., ¶ 4. Even though Melinda's mother maintained her own home, Melinda lived with Al even as an infant. *Id.* Melinda not only lived with Al "frequently" but also spent many weekends and all important holidays with him. *Id.*, ¶¶ 8-10. Indeed, even had Al been part of Melinda's mother's household, Melinda may not have had the chance to cohabitate with Al to any greater degree, given his work schedule first with law enforcement shifts and then with flight attendant travel. That Melinda had a foot in both the home of her biological mother and Al should not interfere with her claim here – had Al been Melinda's biological father, she would not have seen him any more. And the underlying purpose of the functional equivalent framework should be to provide guarantees that the claimant has all of the objective indicia of the immediate family member relationship, not to jettison a claim that falls nearly entirely within the framework, with some unorthodox elements, where the evidence, effectively satisfies the Court's test. Here, Melinda and Al lived together for significant periods of time that, collectively certainly, adds up to more than two full years between the time that Melinda was born and Al's death in the September 11, 2001 terrorist attacks.[4]

Al Marchand was, for all intents and purposes, a father to Melinda Monk from the time she was born, and was the only father she ever knew. He became part of her family from her infancy, he acted and behaved in such a way that the world around them understood Al to be Melinda's father and Melinda Monk therefore asks this Court to issue her a damages judgment in the presumptive amount awarded to other children of the victims murdered on September 11, 2001.

---

[4] Should the Court have further questions about any of the elements of the framework as applied here, Ms. Monk is ready to supply additional information or details.

16

## B. Punitive Damages

Plaintiffs are also entitled to punitive damages. *See* 28 U.S.C. § 1605A(c)(4).  Previously in this case, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases arising out of' terrorist attacks."  ECF No. 2618 at 13 (quoting *Estate of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011)).  This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory). ECF No. 2623 at 2.  The Court has applied that ratio to awards for plaintiffs in other related cases. *See, e.g.*, ECF No. 3175 at 3 (Magistrate Judge Maas Report and Recommendation to apply a 3.44 punitive multiplier); ECF No. 3229 at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply a 3.44 multiplier); ECF No. 3300 at 1 (Judge Daniels applying 3.44 punitive multiplier).

However, in another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, a different magistrate judge recommended that the plaintiffs' request for punitive damages be denied without prejudice. ECF No. 3363 at 28.  Judge Daniels adopted that recommendation, denying without prejudice the plaintiffs' request for punitive damages. ECF No. 3384 at 6.

In light of recent events, however, the *Ashton* Plaintiffs expect that this Court will, consistent with its practice in all other similarly situated cases, deny the motion for punitive damages without prejudice, staying the deadline for filing of any Rule 60(b) motion of such dismissal. ECF 11824 at 12-13.

## C. Prejudgment Interest

On the issue of prejudgment interest, a December 28, 2015 Report and Recommendation, adopted by this Court, concluded that to the extent the *Ashton* wrongful death plaintiffs' claims

17

arose out of injuries in New York State, the rate of prejudgment interest was 9 percent per annum from September 11, 2001 until the date judgment was entered, and to the extent the injuries arose elsewhere, 4.96 percent interest per annum compounded annually was appropriate.  *See* ECF No. 3175 at 1 – 2.  Subsequently, however, this Court concluded that the rate of prejudgment interest of 4.96 percent was more appropriate. ECF No. 3384 at 6.

Accordingly, the *Ashton 37* Plaintiffs asks that this Court direct that prejudgment interest of 4.96 percent per annum on their awards running from September 11, 2001 until the date of judgment, as was done previously for other *Ashton* Plaintiffs, as well as for other plaintiffs in this consolidated litigation.

### D.  Certification of Final Under Rule 54(b)

The *Ashton 37* Plaintiffs further request that this Court certify any judgment as final under Fed.R.Civ.P 54(b), pursuant to the reasoning set forth in the Report and Recommendation of Judge Netburn on March 3, 2026. *See* ECF 11824.

### III.   Conclusion

For all of the reasons herein, as well as those set forth in the previous submissions of the *Ashton* Plaintiffs and other plaintiffs, the *Ashton 37* Plaintiffs respectfully request that this Court grant the proposed order and:

1)      Award the Plaintiffs set forth on Exhibit B of the proposed Order solatium damages based on the deaths of their immediate family members, all of whom were killed on September 11, 2001 in the terrorist attacks;

2)      Award the plaintiffs set forth on Exhibit C, all of whom are U.S. nationals, solatium damages for the losses they suffered as a result of the deaths of individuals who were,

as established by their declarations, the functional equivalents of immediate family members, based on the framework and amounts previously awarded by this Court;

3)      Award all *Ashton 37* Plaintiffs pre-judgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages;

4)      Grant all *Ashton 37* Plaintiffs permission to seek any other appropriate damages at a later date;

5)      Find that service of process was properly effected upon Iran in accordance with 28 U.S.C. § 1608(a) for sovereign defendants;

6)      Certify these judgments as final under Federal Rule of Civil Procedure 54(b); and

7)      Grant permission for all other plaintiffs in this action not appearing on Exhibits B and C to the proposed Order to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed.

Dated:  April 23, 2026
        New York, New York

Respectfully submitted,

KREINDLER & KREINDLER LLP

BY:    /s/ James P. Kreindler
James P. Kreindler, Esq.
485 Lexington Avenue, 28th Floor
New York, New York 10017
Tel: (212) 687-8181
*Counsel for Ashton Plaintiffs*

19