USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __5/22/2026__

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

In re:

   **TERRORIST ATTACKS ON**
   **SEPTEMBER 11, 2001**


-------------------------------------------------------------------X

**03-MD-01570 (GBD)(SN)**

**REPORT &**
**RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE GEORGE B. DANIELS:**

This document relates to:

> Ashton v. Al Qaeda Islamic Army, No. 02-cv-06977 (GBD)(SN)
> Burnett v. Islamic Republic of Iran, No. 15-cv-09903 (GBD)(SN)
> Don Kim v. Islamic Republic of Iran, No. 18-cv-11870 (GBD)(SN)
> Rivelli v. Islamic Republic of Iran, No. 18-cv-11878 (GBD)(SN)
> Johnson v. Islamic Republic of Iran, No. 18-cv-12344 (GBD)(SN)
> Chairnoff v. Islamic Republic of Iran, No. 18-cv-12370 (GBD)(SN)
> Bodner v. Islamic Republic of Iran, No. 19-cv-11776 (GBD)(SN)
> Accardi v. Islamic Republic of Iran, No. 21-cv-06247 (GBD)(SN)
> King v. Islamic Republic of Iran, No. 22-cv-05193 (GBD)(SN)
> Kone v. Islamic Republic of Iran, No. 23-cv-05790 (GBD)(SN)
> Kelly v. Islamic Republic of Iran, No. 23-cv-07283 (GBD)(SN)
> Jelnek v. Islamic Republic of Iran, No. 24-cv-05520 (GBD)(SN)
> Lum v. Islamic Republic of Iran, No. 24-cv-07824 (GBD)(SN)

Thirty-nine plaintiffs in the above-captioned cases (the "Plaintiffs") seek partial default judgments against the Islamic Republic of Iran ("Iran") and, in some cases, the Islamic Revolutionary Guard Corps. ("IRGC") and the Central Bank of Iran ("CBI") (together, the "Iranian Defendants"). All of the Plaintiffs were United States nationals on September 11, 2001, and bring claims under § 1605A of the Foreign Sovereign Immunities Act ("FSIA"). They collectively assert claims for four types of damages: (1) pain and suffering damages for estates, (2) economic damages for estates, (3) pain and suffering damages for fatal or non-fatal latent

conditions, and (4) solatium damages for immediate family members of 9/11 decedents or their functional equivalents. See ECF Nos. 11762 (Johnson), 11837 (Burnett), 11846 (Burnett), 11883 (Ashton), 11906 (Chairnoff), 12007 (Don Kim et al.), 12029 (Ashton), 12042 (Accardi).[1] A subset of the Plaintiffs also request that the Court expedite finality and certify their default judgments as "final judgment[s]" pursuant to Federal Rule of Civil Procedure 54(b).

The Court recommends granting the Plaintiffs' motions and awarding damages for each type of claim consistent with the Court's established frameworks. For the subset of Plaintiffs seeking final judgments, the Court further recommends (1) denying without prejudice these Plaintiffs' outstanding requests for additional damages, (2) certifying all of these Plaintiffs' default judgments as "final" judgments against Iran pursuant to Rule 54(b), and (3) finding good cause for the immediate registration of these Plaintiffs' final judgments.

## BACKGROUND

The Court assumes familiarity with this multidistrict litigation and summarizes only the relevant factual and procedural background.

The Plaintiffs have sued Iran and the Iranian Defendants and alleged that they provided material support to Al Qaeda for the 9/11 Attacks. All of the Plaintiffs bring their claims under the FSIA as U.S. nationals. See 28 U.S.C. § 1605A(c). Because this Report & Recommendation addresses eight separate default judgment motions by the Plaintiffs, the table below summarizes the motions by member case.

| Member Case(s) | Motion ECF | Defendants | Types of FSIA Claims |
| --- | --- | --- | --- |
| Ashton, No. 02-cv-06977 | 11883 | Iran | • Estate economic damages (**3** plaintiffs)<br>• Solatium damages (**5** plaintiffs) |

---

[1] Unless otherwise noted, all ECF numbers refer to the main MDL docket, No. 03-md-01570.

| Member Case(s) | Motion ECF | Defendants | Types of FSIA Claims |
|---|---|---|---|
| Ashton, No. 02-cv-06977 | 12029 | Iran | • Solatium damages (**7** plaintiffs) |
| Burnett, No. 15-cv-09903 | 11837 | Iran, IRGC, CBI | • Solatium damages (**1** plaintiff) |
| Burnett, No. 15-cv-09903 | 11846 | Iran, IRGC, CBI | • Pain & suffering damages for latent condition (**1** plaintiff) |
| Don Kim, No. 18-cv-11870<br>Rivelli, No. 18-cv-11878<br>Bodner, No. 19-cv-11776<br>King, No. 22-cv-05193<br>Kone, No. 23-cv-05790<br>Kelly, No. 23-cv-07283<br>Jelnek, No. 24-cv-05520<br>Lum, No. 24-cv-07824 | 12007 | Iran | • Estate pain & suffering damages (**3** plaintiffs)<br>• Solatium damages (**16** plaintiffs) |
| Johnson, No. 18-cv-12344 | 11762 | Iran | • Estate pain & suffering damages (**1** plaintiff) |
| Chairnoff, No. 18-cv-12370 | 11906 | Iran | • Solatium damages (**1** plaintiff) |
| Accardi, No. 21-cv-06247 | 12042 | Iran | • Estate pain & suffering damages (**1** plaintiff) |

The Plaintiffs' motion collectively raise four distinct types of claims: (1) pain and suffering damages for estates, (2) economic damages for estates, (3) pain and suffering damages for fatal or non-fatal latent conditions, and (4) solatium damages for immediate family members of 9/11 decedents or their functional equivalents. The attached Exhibits A, B, C, and D consolidate, by claim type, a list of the Plaintiffs and key details related to their claims.[2]

---

[2] The attached Exhibits consolidate the information from the Plaintiffs' exhibits attached to their proposed orders. See ECF Nos. 11765-2, 11840-2, 11849-2, 11885-2, 11885-3, 11909-2, 12010-2, 12010-3, 12031-2, 12031-3, 12045-2. These Exhibits note to which default judgment motion each Plaintiff belongs. And these Exhibits include the final damages amounts that the Court recommends awarding in this Report &

Finally, counsel informed the Court that the U.S. Victims of State Sponsored Terrorism Fund ("VSSTF") recently set a June 1, 2026 application deadline for new claimants to participate in a possible future distribution of funds on January 1, 2027. See, e.g., ECF No. 12015 at 1 (citing Special Master's Announcement Regarding June 1st Filing Deadline for New Applicants, U.S. V.S.S.T. Fund (Feb. 20, 2026), https://usvsst.com/Home/Announcementsid=20260220). Under the statutes and regulations application to the VSSTF, "[n]ew claimants must have an eligible terrorism judgment against a designated state sponsor of terrorism prior to that deadline to be eligible to participate" in the upcoming distribution. Id.; see 34 U.S.C. § 20144(c)(1)–(3), (j)(4) (providing the eligibility requirements and application deadlines for the VSSTF). Many Plaintiff thus asked the Court to expedite consideration of their pending default judgment motions against Iran and the Iranian Defendants so that the Plaintiffs could obtain a judgment from the Court before the June 1, 2026 deadline. See ECF Nos. 12015 (Ashton, Burnett, and Don Kim Plaintiffs), 12025 (Chairnoff).

---

Recommendation. Additionally, these Exhibits include the following corrections based on the Court's review of the Plaintiffs' filings:

    **Exhibit A**, for all three Plaintiffs, notes the Court's order at ECF No. 12012 granting the substitutions requested in ECF No. 11979.

    **Exhibit B**, for all three Plaintiffs, states that prejudgment interest should be calculated for the period starting with the "Date of Report" and ending with the date of judgment.

    **Exhibit C**, Row #3, adds the Court's order at ECF No. 12040 granting the requested substitution in ECF No. 12035.

    In **Exhibit D**, (1) Rows #8, 11, and 13 note the Court's order at ECF No. 12012 granting the substitutions requested in ECF No. 11979; (2) Row #12 adds the Court's order at ECF No. 12014 granting the correction requested in ECF No. 12004; (3) Row #14 deletes "Sr." and "Jr." from the claimant and decedent names, respectively, because No. 24-cv-07824, ECF No. 1 and ECF No. 11978 do not match; (4) Row #28 corrects the pincite for the applicable complaint to ECF No. 1463 at 38; and (5) Rows #14–23 now include the correct pincites to the operative complaints.

    Finally, for all Exhibits, no treble damages should be awarded to the Plaintiffs because they bring their claims under the FSIA § 1605A(c), which *does not* permit the recovery of treble damages, unlike the Anti-Terrorism Act, 18 U.S.C. § 2333(a), which *does* permit treble damages.

## DISCUSSION

The Plaintiffs are all United States nationals who seek to hold Iran and the Iranian Defendants liable for 9/11-related deaths or injuries pursuant to § 1605A. To establish their "claim[s] or right to relief by evidence satisfactory to the court," they have filed (as applicable) individual declarations; expert declarations; letters from the Victim Compensation Fund ("VCF")[3]; citizenship records; and medical records detailing their injuries, conditions, or deaths. 28 U.S.C. § 1608(e); see ECF Nos. 11764 (Johnson), 11839 (Burnett), 11848 (Burnett), 11884 (Ashton), 11908 (Chairnoff), 12009 (Don Kim), 12030 (Ashton), 12044 (Accardi). In evaluating this record, the Court may "accept as true the plaintiffs' uncontroverted evidence," including their affidavits. Elahi v. Islamic Republic of Iran, 124 F. Supp. 2d 97, 100 (D.D.C. 2000); see Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 16–17 (D.D.C. 2002).

To grant the Plaintiffs relief, the Court must resolve (1) whether it has jurisdiction over their claims; (2) whether Iran and the Iranian Defendants defaulted; (3) whether Iran and the Iranian Defendants are liable; and (4) if all else is true, what damages are appropriate.

## I.    The Court Has Jurisdiction Under the FSIA

The Foreign Sovereign Immunities Act ("FSIA") "supplies the ground rules for 'obtaining jurisdiction over a foreign state in the courts of this country.'" Federal Republic of Germany v. Philipp, 592 U.S. 169, 175 (2021) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989)). As its name suggests, the FSIA makes foreign states

---

[3] Congress created the current Victim Compensation Fund ("VCF") to provide compensation to those injured because of the 9/11 Attacks and has reauthorized it several times. See ECF No. 11400 at 2–3 (providing background on the VCF and WTCHP). VCF regulations determine whether claimants are eligible for compensation for their injuries. See id. at 3–4. To qualify, a claimant must be examined by the WTCHP or a private physician, obtain a certification that 9/11-related exposures likely caused their injuries, and receive a VCF letter confirming their eligibility for compensation. See id. at 3 n.2, 4.

immune from suit by default and confers jurisdiction over actions only if they meet strict requirements. The Plaintiffs' claims clear these hurdles, so the Court has jurisdiction over them.

### A.    Subject Matter Jurisdiction

Under the FSIA, district courts have subject matter jurisdiction over nonjury civil actions brought *in personam* against foreign states[4] if "one of several enumerated exceptions to immunity applies." Republic of Sudan v. Harrison, 587 U.S. 1, 4 (2019); see 28 U.S.C. §§ 1330(a), 1604. The nature of the Plaintiffs' claims against Iran and the Iranian Defendants satisfies all elements except immunity. See, e.g., In re Terrorist Attacks on Sept. 11, 2001 ("In re 9/11"), No. 03-md-1570 (GBD)(SN), 2023 WL 2529061, at *3 (Mar. 3, 2023) ("Latent Injury I R&R"), report and recommendation adopted, 2023 WL 5109691 (S.D.N.Y. Aug. 9, 2023) ("Latent Injury I Opinion"). The Plaintiffs all rely on the immunity exception codified at 28 U.S.C. § 1605A(a),[5] which allows U.S. nationals to hold a foreign state sponsor of terrorism accountable for "acts of terrorism or the provision of material support or resources for acts of terrorism" when those acts are undertaken "by an official, employee, or agent of the foreign state while acting within the scope of his or her office, employment, or agency." ECF No. 5879 at 2

---

[4] In the FSIA, a "foreign state" typically includes "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). The one exception is "foreign state" as used in § 1608. In that section, service methods differ for, on the one hand, a foreign state and their political subdivisions and, on the other hand, agencies or instrumentalities of foreign states. See 28 U.S.C. § 1608(a), (b). The Court previously found that the IRGC and CBI were each, at all relevant times, an agency or instrumentality of Iran and therefore part of the "foreign state" of Iran under the FSIA § 1603(a). See In re 9/11, No. 03-md-01570, 2011 WL 13244047, at *7, 41 (S.D.N.Y. Dec. 22, 2011) ("Havlish I"). The Court addresses service methods under FSIA § 1608 below.

[5] As the Court has previously explained, the elements of § 1605A(a) "almost total[ly] overlap" with the § 1605A(c) cause of action that all the Plaintiffs assert here. Latent Injury II R&R at *3 (quoting Force v. Islamic Republic of Iran, 464 F. Supp. 3d 323, 369 (D.D.C. 2020)). The only relevant distinction is that § 1605A(c) applies to a more limited set of plaintiffs than § 1605A(a). See Force, 464 F. Supp. 3d at 369. But a qualifying "plaintiff that offers proof" of one "has also established" the other. Id. The Court has accordingly collapsed the jurisdictional and liability inquiries for § 1605A and discusses both below. It exercises jurisdiction over claims for which it finds the liability requirements satisfied.

("Burnett I") (citing 28 U.S.C. § 1605A(a)(1)). The Court has found that it possesses subject matter jurisdiction under § 1605A because plaintiffs' deaths, latent injuries, or immediate family members' deaths "occurred either as a direct result of the 9/11 attacks, the ensuing chaos from the attacks in the immediate aftermath, or as a result of first responders attempting to assist the injured or endangered fleeing from the scene." Burnett I at 3; see, e.g., ECF No. 10988 at 2 (personal injuries); In re 9/11, No. 03-md-1570 (GBD)(SN), 2025 WL 2166082, at *5 (Feb. 28, 2025) ("Latent Injury II R&R"), report and recommendation adopted, 2025 WL 949547, at *2 (S.D.N.Y. Mar. 28, 2025) ("Latent Injury II Opinion"). Section 1605A further details that damages are available "for personal injury or death" and allows for "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4). In their motions, the Plaintiffs collectively seek economic, solatium, and pain and suffering damages related to deaths caused by, or latent conditions sustained as a result of, the 9/11 Attacks. Accordingly, the Court has subject matter jurisdiction over the Plaintiffs' claims under § 1605A.

### B. Personal Jurisdiction

With subject matter jurisdiction established, personal jurisdiction is simply a matter of showing "valid service of process." Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela, 863 F.3d 96, 104 (2d Cir. 2017) (cleaned up); accord 28 U.S.C. § 1330(b).

All of the Plaintiffs ask for partial default judgments against Iran. The FSIA specifies four methods of serving foreign states in descending order of preference. See 28 U.S.C. § 1608(a). The first, service by "special arrangement," was impossible because the Plaintiffs have no such arrangement with Iran. Id. § 1608(a)(1); see, e.g., ECF No. 11763 at 11 (Johnson). The second, service according to an "international convention on service of judicial documents," was unavailable because there is no service convention between the United States and Iran. 28 U.S.C. § 1608(a)(2); see e.g., ECF No. 11763 at 11 (Johnson). The third, service by registered

7

"mail," proved ineffective; the Clerk of Court mailed the requisite documents, but Iran failed to acknowledge receipt or refused service. 28 U.S.C. § 1608(a)(3); see, e.g., ECF No. 11763 at 11; No. 18-cv-12344, ECF No. 11 (Johnson). The fourth, service via "diplomatic channels," finally succeeded. 28 U.S.C. § 1608(a)(4). In each member case, the Plaintiffs filed an affidavit confirming proper service on Iran. See ECF Nos. 1238 (Ashton), 4690 (Don Kim), 4692 (Rivelli), 6897 (Bodner), 8887 (King), 10070 (Kone), 10094 (Kelly), 10826 (Jelnek), 11088 (Lum); No. 15-cv-9903, ECF No. 64 (Burnett); No. 18-cv-12344, ECF No. 40, 45 (Johnson); No. 18-cv-12370, ECF No. 46 (Chairnoff); No. 21-cv-6247, ECF No. 40 (Accardi).

The Burnett Plaintiffs are the only subset of the Plaintiffs that request partial default judgments against the Iranian Defendants, in addition to Iran itself. The same four methods stated in § 1608(a) also applies to service on the Iranian Defendants. See In re 9/11, No. 03-md-01570, 2011 WL 13244047, at *38 (S.D.N.Y. Dec. 22, 2011) ("Havlish I") (finding that the IRGC and CBI were properly served pursuant to § 1608(a)). The Burnett Plaintiffs succeeded in serving the CBI by registered "mail." 28 U.S.C. § 1608(a)(3); see No. 15-cv-9903, ECF Nos. 64 ¶ 9, 64-1 at 2. And their service on the IRGC, like their service on Iran, occurred through "diplomatic channels." 28 U.S.C. § 1608(a)(4); see No. 15-cv-9903, ECF Nos. 64 ¶ 13, 64-3 at 2.

Accordingly, because the Plaintiffs properly effectuated service under 28 U.S.C. § 1608(a) on claims within the Court's subject matter jurisdiction, the Court has personal jurisdiction over Iran and the Iranian Defendants.

## II.    Iran and the Iranian Defendants Defaulted

After the Plaintiffs effectuated service, Iran and the Iranian Defendants had "sixty days" to "serve an answer or other responsive pleading" in each member case. 28 U.S.C. § 1608(d). Iran and the Iranian Defendants did not respond or otherwise appear within that time (or since) in any member case. The Clerk of Court therefore entered Certificates of Default against Iran

between 2011 and 2025. See ECF Nos. 2510 (Ashton; Dec. 22, 2011), 4817 (Don Kim; Aug. 13, 2019), 6934 (Bodner; July 9, 2021), 8928 (King; Mar. 5, 2023), 10113 (Kelly; July 17, 2024), 10119 (Kone; July 18, 2024), 10861 (Jelnek; Apr. 14, 2025), 11092 (Lum; July 22, 2025); No. 18-cv-11878, ECF No. 23 (Rivelli; Aug. 14, 2019); No. 18-cv-12344, ECF No. 48 (Johnson; Sept. 6, 2022); No. 18-cv-12370, ECF No. 47 (Chairnoff; Nov. 6, 2020); No. 21-cv-6247, ECF No. 43 (Accardi; Feb. 6, 2023). In Burnett, the Clerk of Court entered a Certificate of Default against Iran and the Iranian Defendants on December 5, 2016. See No. 15-cv-9903, ECF No. 67.

### III.    The Plaintiffs Establish Liability Under § 1605A and the Court Awards Appropriate Damages Under Existing Frameworks

In all of the above-captioned member cases, the Court previously found Iran or the Iranian Defendants liable under § 1605A of the FSIA. These prior liability findings applied to some or all plaintiffs in the member cases. See ECF Nos. 3021 at 1 (Ashton), 5047 at 1 (Rivelli), 5049 at 1 (Don Kim), 7522 at 1–2 (Bodner), 9416 at 2 (King), 10306 at 2 (Kone, Kelly), 10997 at 2 (Jelnek), 11661 at 2 (Lum), 11877 at 8 (Johnson); No. 15-cv-9903, ECF No. 85 at 1 (Burnett); No. 18-cv-12370, ECF No. 64 at 2 (Chairnoff); Latent Injury II Opinion at *2 (Accardi). With the exception of three Plaintiffs in Ashton, who seek supplemental economic damages, see ECF No. 11883 at 5, these prior liability findings have not specifically applied to these Plaintiffs. The Plaintiffs thus ask the Court to extend the liability findings in their respective member cases, find Iran or the Iranian Defendants liable to them, and award specific damages. See ECF Nos. 11762 at 1 (Johnson), 11838 at 2 (Burnett), 11847 at 2 (Burnett), 11883 at 6–7 (Ashton), 11907 at 1 (Chairnoff), 12008 at 6 (Don Kim), 12029 at 4 (Ashton), 12043 at 3 (Accardi). The Court first assesses whether the Plaintiffs, as a group, meet all elements of Section 1605A. It then addresses the Plaintiffs' claims by type.

9

Section 1605A(c) of the FSIA provides a cause of action for claims (1) brought by a United States national or her representative (2) against a designated foreign state sponsor of terrorism that (3) directly, or through a state official, employee, or agent, committed or provided material support or resources for (4) "an act of torture, extrajudicial killing, aircraft sabotage, or hostage taking" that (5) caused (6) personal injury or death.[6] 28 U.S.C. § 1605A(a)(1), (c).

The Plaintiffs' claims plainly meet five of these six elements. First, the Plaintiffs were all U.S. nationals on September 11, 2001. See ECF Nos. 11764 at 2 (Johnson), 11839 at 3 (Burnett), 11848 at 2 (Burnett), 11884 at 4 (Ashton), 11908 at 2 (Chairnoff), 12009 at 4–5 (Don Kim), 12030 at 4 (Ashton), 12044 at 4 (Accardi) (declarations from counsel confirming the Plaintiffs' nationalities). Second, Iran has been a designated state sponsor of terrorism since 1984. State Sponsors of Terrorism, Bureau of Counterterrorism, U.S. Dep't of State, https://www.state.gov/state-sponsors-of-terrorism (last visited Jan. 15, 2026). Third, the Court held a hearing on the adequacy of the evidence of Iran and the Iranian Defendants' culpability and found that "Iran provided direct support to Al Qaeda specifically for the [9/11 Attacks]." Havlish I at *40; see also id. at *41–42 (finding that the IRGC was "legally identical to

---

[6] The courts are split as to the requirements of § 1605A(c). Some say that the provision requires plaintiffs to articulate a claim sounding in tort. In Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran, 313 F. Supp. 3d 50 (D.D.C. 2018), for example, the district court explained that "[i]n order to satisfy the statutory elements of causation and injury, plaintiffs in actions arising under companion [§] 1605A(c) 'must articulate the justification for such recovery, generally through the lens of civil tort liability.'" Id. at 61 (quoting Rimkus v. Islamic Republic of Iran, 750 F. Supp. 2d 163, 176 (D.D.C. 2010)). On this interpretation, "a claimant 'must identify a particular theory of tort liability—e.g., intentional infliction of emotional distress, wrongful death, [or] battery'"—to properly pursue a § 1605A(c) claim. Id. (quoting Stansell v. Republic of Cuba, 217 F. Supp. 3d 320, 341 (D.D.C. 2016)). Other courts simply analyze the elements of § 1605A(c) as written in the statute, using background tort principles where necessary or useful. See, e.g., Roberts v. Islamic Republic of Iran, 581 F. Supp. 3d 152, 173 (D.D.C. 2022) (analyzing § 1605A(c) claims without referencing theory of tort liability).

As in prior decisions, the Court declines to recommend one or the other approach at this time because the choice is not outcome determinative. See, e.g., Latent Injury II R&R at *3 & n.3. Out of caution and where helpful, the Court draws on both approaches to analyze liability.

Defendant Iran" for purposes of liability and that the CBI acted as an "agent[] of Iran under § 1605A(c)"). The Court then held that the evidence satisfied 28 U.S.C. § 1608(e)'s requirements for a default judgment. See id. at *39. All of the motions except the Accardi Plaintiffs' motion incorporate that evidence. See ECF Nos. 12042, 12043. But in any event, the Court previously granted numerous default judgment motions based on this evidence in the above-captioned member cases (as listed above) or for similarly situated plaintiffs. See ECF Nos. 2618, 3795; Latent Injury I Opinion at *2 (adopting Latent Injury I R&R at *4); Latent Injury II Opinion at *2 (adopting Latent Injury II R&R at *4); see also Anderson v. Islamic Republic of Iran, 753 F. Supp. 2d 68, 75 (D.D.C. 2010) (permitting courts "in subsequent related cases to rely upon the evidence presented in earlier litigation . . . without necessitating the formality of having that evidence reproduced" (quoting Rimkus, 750 F. Supp. 2d at 172)). Fourth, "the 9/11 attacks and the resulting death[s] constitute 'extra judicial killings.'" Havlish I at *39 (quoting 28 U.S.C. § 1605A(c)). As to the sixth element, the Plaintiffs perished in the 9/11 Attacks, suffered the non-fatal latent injuries documented in their declaration and exhibits, or lost immediate family members. See ECF Nos. 11848 (Burnett), 11884 (Ashton), 11908 (Chairnoff), 12009 (Don Kim et al.), 12030 (Ashton). Two estates seek recovery for the Plaintiffs' fatal latent conditions. See ECF Nos. 11764 (Johnson); 12044 (Accardi). And three Plaintiffs seek recovery for the death of those "functionally equivalent" to immediate family members. See ECF Nos. 11839 (Burnett), 12030 (Ashton).

The main question for liability is whether all Plaintiffs establish causation under § 1605A. Courts interpret § 1605A(c) causation using "well-established principles of law, such as those found in [the] Restatement (Second) of Torts and other leading treatises." Bodoff v. Islamic Republic of Iran, 907 F. Supp. 2d 93, 103 (D.D.C. 2012) (cleaned up). Those principles

11

require plaintiffs to demonstrate "proximate cause," Roberts, 581 F. Supp. 3d at 170, a characteristically opaque term for "scope of liability," Restatement (Third) of Torts: Liab. for Physical & Emotional Harm Ch. 6, Special Note on Proximate Cause (Am. Law Inst. 2010).

Because the Plaintiffs assert four distinct types of claims, the appliable prior decisions and established damages frameworks differ by claim. In the following sub-sections, the Court (1) reviews prior decisions on the scope of liability; (2) evaluates the causation element for each claim type; and (2) if all elements of liability are met, determines the appropriate damages owed by Iran and/or the Iranian Defendants under the established damages frameworks.

### A.    Pain & Suffering Damages for Estates

Three estate Plaintiffs seek compensation for the conscious pain and suffering they suffered before their deaths. See ECF No. 12007 at 2 (Don Kim). The Court has routinely awarded $2 million in pain and suffering damages to the estates of 9/11 decedents, based on its Havlish I findings and expert evidence previously submitted by the PECs. See, e.g., ECF No. 2623 at 3 (establishing framework). These Plaintiffs' claims thus plainly satisfy the causation element of § 1605A. The Court should award damages of $2 million to each estate listed in Exhibit A consistent with its damages framework.

### B.    Economic Damages for Estates

Three estate Plaintiffs seek economic damages as permitted by § 1605A. See ECF No. 11883 at 1 (Ashton). All three Plaintiffs previously received awards of $2 million in pain and suffering damages. See ECF No. 11883 at 5. The Court has awarded the estates of 9/11 decedents supplemental economic damages based on its Havlish I findings and expert reports tailored to individual plaintiffs. See, e.g., ECF Nos. 2623 at 3, 2618 at 6–7. These Plaintiffs also plainly satisfy the causation element of § 1605A, especially because the Court already entered liability judgments against Iran and awarded pain and suffering damages to them.

The main issue is what economic damages are appropriate. The economic damages provision is "designed to compensate [a] decedent's heirs-at-law for economic losses which result from [the] decedent's premature death." Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 27 (D.D.C. 1998). These economic losses may include "(a) the past and future lost wages and benefits of each decedent; (b) the estate's loss of household services; (c) its loss of advice, counsel, guidance, instruction, and training services; (d) its loss of accompaniment services; and (e) prejudgment interest." ECF No. 2618 at 6. These Plaintiffs have each submitted an expert report from John E. Beauzile evaluating the present value of the economic losses resulting from the decedents' death during the 9/11 Attacks. See ECF Nos. 11887-1 (T. Griffin), 11887-2 (K. Moorthy), 11887-3 (J. Velazquez). The Court accepts Beauzile's calculations and recommends awarding the economic damages listed for all Plaintiffs in Exhibit B.

C.    **Pain & Suffering Damages for Latent Conditions**

Three Plaintiffs seek compensation from Iran and the Iranian Defendants from the latent conditions they developed linked to their exposures at the 9/11 sites. These Plaintiffs were among the first responders and civilians who inhaled a toxic combination of fumes, smoke, and particulates at the 9/11 crash sites on September 11, 2001, and in the days, weeks, and months that followed. See Toxins and Health Impacts, 9.11 World Trade Ctr. Health Program, Ctrs. For Disease Control & Prevention (July 30, 2024), https://www.cdc.gov/wtc/exhibition/toxins-and-health-impacts.html. For two Plaintiffs, their latent conditions proved fatal. See ECF Nos. 11764 (M. Lederer), 12044 (G. Borello). One other Plaintiff still suffers from multiple latent conditions. See ECF No. 11848 (A. Retundie). As support for their claims, these Plaintiffs all submitted VCF letters and declarations from family members or themselves confirming their exposure at the WTC site and subsequent latent conditions. See ECF Nos. 11764-2 to -5 (M. Lederer), 12044-3 (G. Borello), 11848-2 (A. Retundie). Some, but not all, of these Plaintiffs filed medical

records describing their latent conditions and, if necessary, confirming their death. See ECF Nos. 11765-5 (M. Lederer), 11848-2 at 10–28 (A. Retundie).

Section 1605A makes damages available "for personal injury" and specifically permits the recovery of "pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4). In 2023, the Court determined for the first time that Iran was liable to a group of U.S. nationals that each succumbed to their injuries from latent conditions. See Latent Injury I R&R at *10; Latent Injury I Opinion at *3–4; see also ECF No. 9216 (addressing supplemental evidence for a subset of latent-injury plaintiffs). The Court then awarded damages to another group of plaintiffs that developed chronic and ultimately fatal medical conditions after 9/11-related environmental exposures. See Latent Injury II R&R at *9; Latent Injury II Opinion at *5. Late last year, the Court extended these decisions to hold Iran liable to a group of plaintiffs that suffered non-fatal latent injuries. See ECF Nos. 11400 at 20 ("Latent Injury III R&R"), 11464 at 15 ("Latent Injury IV R&R"), reports and recommendations adopted, In re 9/11, No. 03-md-1570 (GBD)(SN), 2026 WL 751171, at *4 (S.D.N.Y. Mar. 17, 2026) ("Latent Injury III/IV Opinion").

In each of these decisions, the Court held that Iran proximately caused the latent injuries and deaths that flowed from the 9/11 Attacks. See Latent Injury I Opinion at *2; Latent Injury II Opinion at *2; Latent Injury III/IV Opinion at *3–4. Applying the two-pronged test from Owens v. Republic of Sudan, the Court explained that proximate cause exists where the plaintiffs show that (1) the defendant's actions were a "'substantial factor' in the sequence of events that led to" their latent injuries, and (2) their latent injuries were "reasonably foreseeable or anticipated as a natural consequence" of the defendant's conduct. 864 F.3d 751, 794 (D.C. Cir. 2017) (quoting Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir. 2013)), vacated and remanded on other grounds by Opati v. Republic of Sudan, 590 U.S. 418 (2020).

14

Under the Owens test, these Plaintiffs establish that Iran and the Iranian Defendants proximately caused their latent injuries. First, the Plaintiffs must show that Iran and the Iranian Defendants' tortious conduct was a "substantial factor" in the events leading to their deaths or injuries. The Court already found that Iran's "provision of material support to al Qaeda" was a substantial factor leading to the 9/11 Attacks. Havlish I at *41. The critical step is connecting the 9/11 Attacks to the Plaintiffs' deaths or injuries. These Plaintiffs make this connection by submitting VCF letters stating that each Plaintiff was "found eligible for the following injuries" and listing out the latent conditions. See ECF Nos. 11764-3 at 2 (M. Lederer), 12044-3 at 4 (G. Borello), 11848-2 at 8 (A. Retundie) (attaching VCF letters for each Plaintiff to their declaration). These letters demonstrate that, under the laws and regulations applicable to the VCF, each Plaintiff suffered "physical harm . . . as a direct result of the [9/11] crashes or the rescue and recovery efforts or debris removal." 28 C.F.R. § 104.2(b)(1). As the Court has concluded several times, these letters are necessary evidence for the "substantial factor" prong. See Latent Injury I Opinion at *2; Latent Injury II Opinion at *2; Latent Injury III/IV Opinion at *2; Latent Injury III R&R at 14 (reaffirming that "[t]he VCF and WTC Health Program remain the best positioned entities for evaluating medical facts related to the Plaintiffs' conditions").

Moreover, for the Plaintiffs with fatal latent conditions, their family members' declarations show "that 9/11 was a substantial factor also in [the decedents'] deaths" by demonstrating "in moving detail how those conditions eventually cut [the decedents'] lives short." Latent Injury I R&R at *5–6; Latent Injury II R&R at *5. The Court credits one Plaintiff's medical records, ECF No. 11764-5 (M. Lederer), and another's "Award Detail" letters[7] confirming that the Plaintiff received a VCF award for both a "personal injury" claim and

---

[7] When a plaintiff's VCF letter does not indicate what type of claim—a "personal injury claim" or a "deceased claim"—for which the VCF found the plaintiff eligible, the Court has required additional

a "deceased claim." See ECF No. 12044-3 at 6–11 (G. Borello). This evidence buttresses the Plaintiffs' substantial-factor argument. See Latent Injury II R&R at *5.

Second, these Plaintiffs' latent conditions were a "reasonably foreseeable" consequence of Iran and the Iranian Defendants' material support to al Qaeda. Because "Iran's material support for al Qaeda proximately caused the 9/11 Attacks and resulting deaths," the Court has found that plaintiffs' deaths from latent conditions, as well as injuries from non-fatal latent conditions, are "necessarily" reasonably foreseeable. Latent Injury I R&R at *6 (citing Havlish I at *41); Latent Injury I Opinion at *2; Latent Injury III/IV Opinion at *2–3. The Plaintiffs' declarations likewise confirm that they (1) were exposed to toxins at the WTC site starting on September 11, 2001 and (2) subsequently developed fatal or non-fatal latent conditions. See ECF Nos. 11764-2 ¶¶ 6–7 (M. Lederer), 12044-3 at 15, 20 (G. Borello), 11848-2 ¶¶ 4–7 (A. Retundie). This evidence is sufficient to conclude that their latent injuries "occurred either as a direct result of the 9/11 attacks, the ensuring chaos from the attacks in the immediate aftermath, or as a result of first responders attempting to assist the injured or endangered fleeing from the scene." Burnett I at 3; see Latent Injury I R&R at *9–10 (recommending awards to plaintiffs that suffered devastating or severe, and ultimately fatal, latent conditions stemming from their rescue work at Ground Zero on 9/11); Latent Injury III R&R at 17 (finding that plaintiffs "that escaped from the [World Trade Center ("WTC")] site, or aided in the rescue and recovery efforts there, on September 11 plainly clear the 'reasonably foreseeable' bar"). Causation is therefore satisfied.

---

evidence to connect the plaintiff's VCF-certified conditions to their death, such as a surviving family member's affidavit and a death certificate. See Latent Injury I R&R at *6; Latent Injury II R&R at *5 & n.4. Moshe Lederer's VCF letter does not specify whether he was found eligible for a "deceased claim," but the declaration from Lisa Lederer (his surviving spouse and the personal representative of his estate) and the attached death certificate for Moshe are sufficient for connecting Moshe's 9/11-related latent condition to his death. See ECF Nos. 11764-2, 11764-4.

16

The Court recommends granting these Plaintiffs' motions for default judgment against Iran and the Iranian Defendants.

With liability established, the next issue is assessing damages for these Plaintiffs. The Court's prior decisions have established and elaborated a damages framework for latent injuries by drawing on the Court's framework for personal injury damages. This framework uses a three-pronged system: a baseline award ($7,000,000) for "severe" injuries, a downward departure ($5,000,000) for "significant" injuries, and an upward departure ($10,000,000) for "devastating" injuries. See Burnett I at 6–10; Latent Injury I R&R at *8–10; Latent Injury III R&R at 20–21. For rare individuals with exceptionally traumatic injuries, the Court has recommended damages above $10 million. See, e.g., ECF No. 5909 at 11–13 (awarding damages of $25,000,000 to a plaintiff whose injuries were "beyond devastating"). Conversely, "[t]he absence of medical records supporting and providing further information regarding an affiant's claims may support a downward departure in an award determination." Burnett I at 9; see also ECF No. 11465 (reiterating evidentiary requirements for default judgment motions). This same damages framework applies whether the latent injuries are fatal or non-fatal. Even non-fatal latent injuries are "serious and painful health conditions that require extensive treatment" and "force the [p]laintiffs to carry the physical and emotional consequences of the 9/11 Attacks." Latent Injury III R&R at 21.

The Plaintiffs propose that the Estates of Moshe Lederer and Gaetano Borello each receive $7 million in pain and suffering damages. See ECF Nos. 11765-2 at 2, 12045-2 at 1. Alfred Retundie did not propose a damages award but characterized his latent injuries as "severe." See ECF No. 11849-2 at 1. The Court therefore analyzes each of these Plaintiffs' claims for pain and suffering damages individually under this damages framework.

17

### 1.     Estate of Moshe Lederer

On 9/11, Moshe Lederer ("Moshe") was a first responder with Queens Hatzolah, a Jewish volunteer emergency medical service. See ECF No. 11764-2 ("Lederer Decl.") ¶ 6. While he was a bookbinder by trade, Moshe was also a "long-time member" of Hatzolah, who arrived at Ground Zero after the second tower collapsed. Id. ¶ 5–7. He rendered emergency medical aid and assisted firefighters at the site until "around midnight of the first day." Id. ¶ 7. For the next two days, and several days during the following week, Moshe returned "to continue to assist and care for the firefighters and other first responders." Id. After his time at Ground Zero, Moshe "developed a terrible hacking cough" that "persisted for years and never resolved." Id. ¶ 8.

In 2011, Moshe was suddenly hospitalized "with a very high fever," and his "internal organs began to shut down." Id. ¶ 9. Doctors advised his family that "they did not believe he would survive more than forty-eight hours." Id. Moshe, however, pulled through this initial hospital visit and eventually returned home. He was eventually diagnosed with an extremely rare form of blood cancer (cutaneous and peripheral T-cell lymphomas) "linked to exposure to toxins." Id. ¶ 10. Moshe's doctors attributed the cause of his cancer to his exposure to toxins at Ground Zero. See id.

Moshe's condition steadily worsened in the months after his initial hospitalization. Despite doctors informing them that no cure or treatment could address Moshe's illness, his family cared for him through multiple hospital visits, as "[h]e became very weak and needed help with his most basic needs." Id. ¶ 11. Moshe passed away on February 13, 2012, at the age of 49. His medical records document Moshe's hospital stay leading up to his death. See ECF No. 11764-5 at 5. Moshe's death certificate confirms the causes of his death were non-Hodgkin's lymphoma, liver metastases, liver failure, and respiratory failure. See Lederer Decl. ¶ 2; ECF No.

18

11764-4. Lisa Lederer, Moshe's surviving spouse, is the lawfully appointed administrator of Moshe's estate. See Lederer Decl. ¶ 4. Before his death, Lisa applied on Moshe's behalf to the VCF. Moshe's VCF letter confirms his eligibility for compensation for peripheral and cutaneous T-cell lymphomas. See id. ¶ 12; ECF No. 11764-3 at 1. As explained above, Lisa's declaration and its attachments connect Moshe's exposure at the WTC site on 9/11 to his cancer and his cancer to his eventual death.

The main damages question is whether Moshe's injuries fall into the "significant" or "severe" category in the Burnett framework. Although this framework did not originally apply to cancers, the Court has typically categorized VCF-certified cancer as a "significant" injury and awarded $5 million in pain and suffering damages. See Latent Injury III R&R at 36–37 (N. Dousmanis); id. at 31–32 (J. Barnes); Latent Injury IV R&R at 33–34 (M. Kelly). In one decision, the Court characterized a plaintiffs' injuries, including cancer, as "severe" and awarded $7 million. See Latent Injury IV R&R at 27–29 (A. Filosa). But that 9/11 decedent saw his cancer metastasize throughout his body; also suffered from a combination of latent conditions, including respiratory illnesses; and underwent multiple treatments and surgeries (with painful side effects) for a period of more than ten years. See id. at 28–29; ECF No. 11039-12 ¶¶ 8–14 (recounting plaintiffs' experience from roughly 2012 to his death in 2023). While Moshe underwent crippling treatments and his death was undoubtedly a terrible loss for his family, he lived "for only seven months after his initial hospitalization" and seeks compensation for VCF-certified lymphoma only. Lederer Decl. ¶ 11. The Court therefore recommends awarding Moshe's Estate $5 million for his "significant" injuries, as listed in Exhibit C.

19

### 2.    Estate of Gaetano Borello

On September 11, 2001, Gaetano Borello was a retired Battalion Chief and 30-year veteran of the FDNY. See ECF No. 12044-3 at 14–17 ("Christine Decl.") ¶ 5; ECF No. 12044-3 at 24–25 ("Thomas Decl.") ¶ 5 (declarations from Gaetano's family members). When he heard of the Attacks, he went to the WTC site along with several other retired firefighters to help with the rescue and recovery effort. Christine Decl. ¶ 6; ECF No. 12044-3 at 19–22 ("Michael Decl.") ¶ 7. Gaetano spent several days at the WTC site assisting with what became a recovery effort. During that time, "he was exposed to dust and debris . . . now know[n] to have been toxic." Michael Decl. ¶ 7. Gaetano "lost multiple friends and former colleagues" in those days. Christine Decl. ¶ 6; Thomas Decl. ¶ 6. He visited various firehouses to "console and counsel the men and women of the FDNY," "made a point of attending every funeral possible," and took on responsibilities as the "secretary or treasurer in the FDNY Officer association." Christine Decl. ¶ 6; Thomas Decl. ¶ 6.

Gaetano's health problems began when his doctors found a "shadow/spot on a Lung x-ray" in 2003 or 2004. Christine Decl. ¶ 7. He was subsequently diagnosed with multiple myeloma following a biopsy that found atypical plasma cells. See Michael Decl. ¶ 8. Over the next eight years, he underwent multiple rounds of treatment for his cancer. These included taking medication that caused him to lose his senses of tase and smell, gave him back pain, and led to neuropathy in his feet. See id. ¶ 8; Christine Decl. ¶ 7. He underwent a bone marrow transfer and quarantine at the hospital, and he received regular blood transfusions to keep up his platelet count. See Christine Decl. ¶ 7; Thomas Decl. ¶ 7. Despite this treatment, Gaetano suffered from cardiopulmonary arrest due to his multiple myeloma and passed away on February 12, 2012. He was 72 years old. See Christine Decl. ¶ 4; Thomas Decl. ¶ 4.

Gaetano's VCF letter confirms (1) his eligibility for compensation for multiple myeloma, and (2) that he received an award for both a "Personal Injury Claim" and a "Deceased Claim." See ECF No. 12044-3 at 4, 9–11. Affidavits from multiple immediate family members state that Gaetano's multiple myeloma caused his death, and that his cancer was "causally connected to his exposure to the toxins resulting from the [9/11 Attacks] at the [WTC] site." Christine Decl. ¶ 4; see also Michael Decl. ¶ 4; Thomas Decl. ¶ 4. They also recount, in moving detail, the loss of their father's love and support, and the many family milestones and moments that Gaetano has sadly missed because of his cancer and death. See Christine Decl. ¶ 8; see also Michael Decl. ¶ 6, 9; Thomas Decl. ¶ 8.

Similar to Moshe Lederer's situation, Gaetano's facts present a close question of whether his injuries fall into the "significant" or "severe" category. His VCF-certified multiple myeloma is similar to other cancers for which the Court has awarded $5 million. See Latent Injury III R&R at 36–37 (N. Dousmanis); id. at 31–32 (J. Barnes); Latent Injury IV R&R at 33–34 (M. Kelly). While Gaetano's debilitating cancer treatment stretched for "eight years," see Christine Decl. ¶ 7, he was not simultaneously battling other respiratory conditions, and his cancer did not metastasize to other parts of his body. Cf. Latent Injury IV R&R at 27–29 (A. Filosa) (awarding $7 million for "severe" injuries). Moreover, the declarations from Gaetano's family members do not provide medical records (besides his VCF letters) "supporting and providing further information regarding [Gaetano's] claims." Burnett I at 9. The Court therefore recommends awarding Gaetano's Estate $5 million for his "significant" injuries, as listed in Exhibit C.

### 3.    Alfred Retundie, Jr.

Alfred Retundie, Jr. was a firefighter with the Fire Department of New York ("FDNY") on 9/11. He held the rank of Lieutenant and worked with Engine Company 292. See ECF No.

11848-2 ("Retundie Decl.") ¶ 3. When Retundie heard the news of the Attacks, he immediately made his way from to the WTC site—first in his personal car, then on foot. Id. ¶¶ 4–5. He arrived just as the North Tower began to collapse. The force of the tower's collapse "created a massive cloud of toxic dust and debris that spread for several blocks and washed over [Retundie]," causing him to "inhale[] enormous quantities of dust and debris in [his] lungs and airways" because he was not wearing a mask or other protection. Id. ¶ 5. After the dust settled, Retundie worked with his fellow firefighters to conduct rescue and recovery operations. The scene was "horrific" and "unforgettable"; with "body parts and dead bodies everywhere," it looked "like a war zone." Id. ¶ 6. Retundie continued to work around the Ground Zero, including near 7 WTC and the remains of the New York Marriot World Trade Center hotel, through the rest of the day and into that night—without any breathing or communications equipment. See id. ¶¶ 7–8. He continued to return to Ground Zero "for several days" after the attacks as part of the FDNY's recovery efforts. Id. ¶ 8.

Retundie provides medical records confirming that following his time at Ground Zero, he suffered from a variety of latent conditions. These include asthma, chronic rhinitis/sinusitis, esophageal reflux, upper respiratory disease, and obstructive sleep apnea. Id. ¶ 9 & nn.2–6 (citing specific medical records attached to declaration). Retundie was also diagnosed with post-traumatic stress disorder. ECF No. 11848-2 at 10. Retundie's VCF letter confirms his eligibility for compensation for asthma, obstructive sleep apnea, chronic rhinitis, esophageal reflux, reflux esophagitis, gastritis and gastroduoditis. Id. at 8. His medical records also attribute his latent conditions to "9/11-WTC exposures." See, e.g., id. at 12. Because Retundie suffered VCF-certified "respiratory ailments including nasal irritations, chest pain, and asthma" from inhaling "smoke, soot, and dust," the Court recommends a $5 million award for his significant injuries, as

22

listed in Exhibit C. Burnett I, ECF No. 5879 at 6–7; see, e.g., Latent Injury III R&R at 22 (K. Bastible).

> ### D. Solatium Damages for Immediate Family Members & Functional Equivalents

Section 1605A permits plaintiffs to recover damages for "death" and specifically allows the award of "solatium . . . and punitive damages." 28 U.S.C. § 1605A(c)(4). The Court consistently awards solatium damages to those who lost loved ones in the 9/11 Attacks. See, e.g., ECF Nos. 2618, adopted at 2623. These damages are typically restricted to immediate family: spouses, parents, children, and siblings. See, e.g., ECF Nos. 2623 at 3, 2618 at 6–7. Most of the Plaintiffs in the attached Exhibit D belong to this category of immediate family members. Counsel has verified the direct family relationships noted in Exhibit D. See ECF Nos. 11884 ¶ 5 (Ashton), 11908 ¶ 7 (Chairnoff), 12009 ¶ 5 (Don Kim), 12030 ¶ 5 (Ashton). The Court therefore finds that Iran is liable to all of the Plaintiffs listed in Exhibit D (except for the functional equivalents discussed below) and assesses the appropriate damages. The Court's framework for solatium damages awards $12,500,000 to spouses of 9/11 decedents, $8,500,000 to parents and children, and $4,250,000 to siblings. See ECF No. 2623. The Plaintiffs who are immediate family members of 9/11 decedents should thus receive damages consistent with this framework, as listed in Exhibit D.

In limited circumstances, the Court also awards damages to people who are "functionally equivalent" to immediate family members. The Court uses the Hoglan IV framework to determine whether a plaintiff's relationship is functionally equivalent to that of an immediate family member. See ECF Nos. 3363, adopted at 3384 (Hoglan II, setting out functional equivalence standards); ECF Nos. 3676, adopted at 3795 (Hoglan IV, refining functional equivalence framework). That framework requires a fact-intensive, plaintiff-by-plaintiff analysis.

The Court weighs (1) how long the plaintiff and decedent lived together; (2) their degree of emotional, financial, and social connection; and (3) factors particular to certain relationships, such as how long a couple was together, whether they were engaged to be married, the age of a child when a relationship formed, or the continued involvement of a biological parent in a child's life. See ECF No. 3363 at 10–12, 14–16; ECF No. 3676 at 7–8, 11, 13–14.

If the Court finds a functionally equivalent relationship, it must determine the appropriate amount of damages. In most cases, it awards the same amount of solatium damages awarded to immediate family members. Plaintiffs who are functionally equivalent to spouses receive $12,500,000; those functionally equivalent to parents and children receive $8,500,000; and functionally equivalent siblings receive $4,250,000. See ECF No. 3363 at 16 (applying these immediate-family amounts to functionally equivalent family members); ECF Nos. 4175 at 7 (same), 5483 at 21–23 (same). In some cases, however, the Court reduces damages for plaintiffs whose relationships are functionally equivalent but not fully comparable to those of immediate family. See, e.g., ECF No. 3363 at 22 (recommending a stepmother receive half the normal award because she entered the decedent's life when he was 11 years old); ECF No. 5387 at 7 (recommending a stepsibling receive half the normal award because he began living with the decedent at age 14).

For the three Plaintiffs asserting functional-equivalent claims, the Court first applies the Hoglan IV framework to their evidence below. See, e.g., ECF No. 4175 (applying Hoglan IV); ECF Nos. 5387, adopted at 5950 (same). If the Court determines that a functionally equivalent relationship exists, it assesses damages consistent with past cases. Each of these Plaintiffs requests solatium damages awards of $8.5 million, the typical award for the child of a 9/11 decedent. See ECF Nos. 11840-2 (F. Jerez-DeVito), 12031-3 (J. McMiller, M. Monk).

### 1.    Francesca Jerez-DeVito

Francesca Jerez-DeVito is the stepdaughter of Robert D. Cirri, Sr., who was killed during the 9/11 Attacks. See ECF No. 11839-2 ¶ 3. Jerez-DeVito was 13 years old at the time. Id. ¶ 4. Cirri was a lieutenant with the Port Authority of New York and New Jersey, and he perished "with four other officers as they attempted to carry a woman to safety when the North Tower collapsed." Id. ¶ 3.

At the time of Cirri's death, he and Jerez-DeVito had been living continuously in the same home for "about eleven years" (since Jerez-DeVito was two years old). Id. ¶ 4. Jerez-DeVito's biological mother had married Cirri about two years prior in 1999. Id. ¶ 5. Cirri raised Jerez-DeVito, her sisters, and her stepsiblings as if "we were all his biological children." Id. ¶ 7. Jerez-DeVito's biological father moved out of her family home when she was a baby, "did not provide any emotional or financial support" to her, and "played no role whatsoever in [her] life." Id. ¶ 6. Jerez-DeVito considered Cirri to be her father and called him "Dad." Id. ¶ 5.

Additionally, from when Jerez-Devito was two years old until the time of his death, Cirri was Jerez-DeVito's "primary guardian," "protector," and the "breadwinner of [her] family." Id. ¶¶ 9, 13. Importantly, Jerez-DeVito was born with congenital heart defects that required several surgeries, medication, and specialized care. Cirri drove Jerez-DeVito to doctor's appointments, administered her medications, and carried her on his medical insurance (which allowed her family to afford her care). He literally "kept [her] alive." Id. ¶¶ 10, 13. Moreover, Jerez-DeVito dealt with dyslexia and ADHD, and Cirri was "[her] fiercest advocate," whether attending IEP meetings at her school, driving her to occupational or physical therapy, or helping her with homework. Id. ¶¶ 11–12. Cirri "took on the full weight and responsibility of providing for [Jerez-DeVito's] every need as his daughter." Id. ¶ 14.

Jerez-DeVito also explains that she and Cirri "spoke every single day, without exception." Id. ¶ 15. They shared several hobbies: watching baseball and wrestling, working on HAM radios, or practicing for Jerez-DeVito's baseball games, Scottish dancing, or karate tournaments. See id. ¶ 16. Jerez-DeVito's traces her career (as a "master mechanic") and advocacy (for special education and mental healthcare) to Cirri's influence. Id. ¶¶ 17–18. Finally, as "a testament to the depth of bond" she shared with Cirri, Jerez-DeVito has continued to honor his memory by speaking around the country about his legacy and heroic actions on 9/11. Id. ¶ 19. She writes that "even decades later, [Cirri] is still the most influential person in my life, and I miss him every day with every fiber of my soul." Id.

Jerez-DeVito establishes that she was functionally Cirri's child. She had "an intimate father-daughter relationship" with Cirri and was "directly and irrevocably harmed by the terrorist acts and consequences." ECF No. 11838 at 8. The Court also found that DeVito's two biological siblings and Cirri's stepchildren (Kara Lydia Jerez and Bianca Jerez) were each functionally a child of Cirri. See ECF Nos. 5949 at 8 (K. Jerez), 8293 at 6 (B. Jerez). The Court recommends finding that Iran and the Iranian Defendants are liable to Jerez-DeVito. Moreover, because Jerez-DeVito and Cirri became part of the same family when Jerez-DeVito was roughly two years old, and they continuously lived together for about 11 years, Jerez-DeVito is entitled to a full solatium damages award. See ECF Nos. 3363 at 15–16, 3676 at 13–14. Both of Jerez-DeVito's biological siblings received $8.5 million in solatium damages due to Cirri's death. See ECF Nos. 5949 at 8, 8293 at 6. The Court should likewise award Jerez-DeVito solatium damages of $8.5 million, the typical award for the child of a 9/11 decedent, as listed in Exhibit D.

26

### 2. Joshua McMiller

Joshua McMiller is the stepson of Larry Bowman, who was killed during the 9/11 Attacks. See ECF No. 12030-1 ¶ 1. Bowman was a security guard living in Brooklyn, NY. Id. ¶¶ 3, 5. At the time, McMiller was 22 years old. See ECF No. 12029 at 13.

Bowman entered McMiller's life in 1987, when Bowman became romantically involved with McMiller's mother, Linda Bowman. McMiller, his mother, and his sister moved in with Bowman that same year; McMiller was eight years old. See ECF No. 12030-1 ¶¶ 2–3. Linda and Larry Bowman married in 1994, when McMiller was 14 years old. Id. ¶ 4. From 1987 until 2000 (about 13 years), McMiller and Bowman lived together in Florida. See id. ¶ 3; ECF No. 12029 at 12. McMiller's biological father "was absent from [his] life entirely." ECF No. 12030-1 ¶ 5. Instead, Bowman was the "only father figure [he] knew," and Bowman was "crucial" to McMiller's emotional and spiritual development. Id. ¶ 5. After Bowman's passing, McMiller left the army to care for his mother and sister. He writes that Bowman's death had a "painful, profound impact" on him. Id. ¶ 6.

McMiller establishes that he was functionally Bowman's child. Under the Hoglan IV factors, McMiller's relatively young age when Bowman became part of his family (eight years old), the absence of McMiller's biological father from his life, and the close social and emotional relationship between McMiller and Bowman all favor granting McMiller the full solatium damages award for children. See ECF Nos. 3363 at 9–11, 15–16, 3795 at 5. The Court should award McMiller solatium damages of $8.5 million, the typical award for the child of a 9/11 decedent, as listed in Exhibit D.

27

### 3.     Melinda Monk

Alfred Marchand is the ex-husband of Melinda Monk's mother. See ECF No. 12030-2 ¶ 1. At the time of his death during the 9/11 Attacks, Marchand was working as a flight attendant with United Airlines. Id. He was a retired lieutenant with the Alamogordo, NM Police Department and former member of the U.S. Army. Id. On 9/11, Monk was around 14 years old. See id. ¶ 12.

Marchand and Kimberly Edmundson (Monk's mother) married in 1976. They had one child together, Monk's half-brother Joshua, and then divorced in 1985. Monk was born two years after their divorce. See id. ¶ 2. Although Monk's mother "maintained a separate household," Monk had lived with Marchand for "substantial periods" of her childhood and otherwise spent "consistent" time with him. Id. ¶¶ 4, 5. This time included, when Monk was an infant, staying with Marchand on "most of his days off from work" and, when Monk was older, traveling to and from school, activities, and church with Marchand. Id. ¶¶ 4, 7. Monk spent "every Christmas, Thanksgiving, and other important holiday" with Marchand, and she traveled and vacationed with Marchand, her mother, and her half-brother. Id. ¶¶ 9–10.

Monk's biological father "was absent throughout [her] childhood and only appeared sporadically." Id. ¶ 3. Marchand stepped into this gap and "filled the role of a father in [Monk's] life physically, emotionally, and mentally." Id. Marchand was involved in "all aspects of [her] upbringing and daily care" and "officially listed as an additional parent on all of [her] important paperwork, including medical and school records." Id. ¶ 5. Monk's friends, teachers, pasters and other family members considered Marchand to be her father. See id. ¶ 10. He was "fully integrated into [her] life as a parent, and [she] was fully integrated into his life as his child." Id.

28

Marchand's death caused "profound and permanent damages to [Monk's] life and family." Id. ¶ 11. Following his death, Monk was diagnosed with severe depression and prescribed antidepressant medication. Id. ¶ 12. She has "struggled significantly as a result of losing such a central figure in [her] life" and writes that "[h]is loss continues to affect [her] to this day." Id. ¶ 13. In Marchand's memory, Monk has 9/11 tattoos on her wrists. Id.

While Marchand was not Monk's step-father or biological father, they functionally had a parent-child relationship. Marchand stepped into the parenting gap left by Monk's biological father, who made only sporadic appearances during Monk's childhood. See id. ¶ 3. Marchand was emotionally and socially integrated into Monk's life from a young age—to the point that Marchand represented himself as an additional parent to those outside their family, and third parties considered him to be Monk's father. See id. ¶ 10. Monk, Marchand, and their biological family members spent holidays, vacations, and regular weekdays together. See id. ¶¶ 4, 7, 9–10. Monk's emotional reaction to Marchand's death, and the severity of her struggles thereafter, see id. ¶¶ 11–13, are consistent with those of a child losing their parent.

Within the Hoglan IV framework, Monk certainly had an unconventional living arrangement. She lived partly in her mother's separate household but spent "substantial periods" living with Marchand. Id. ¶¶ 4, 5. To find a functionally equivalent relationship, the Court has typically required that cohabitation have been "continuous" and for "a significant period of time" that is "presumptively at least two years." ECF No. 3676 at 13. Because Monk and Marchand's relationship extends from around Monk's birth through Marchand's death, when Monk was 14 years old, the Plaintiffs argue that their time living together "collectively certainly, adds up to more than two full years." ECF No. 12029 at 16. Given that all other factors support a functionally equivalent relationship, and the that the cohabitation period likely exceeded the

29

Court's minimum threshold, Monk still establishes a parent-child relationship. Accordingly, Iran is liable to Monk for Marchand's death.

The Court should award Monk the full solatium damages typically awarded to the child of a 9/11 decedent. When the Court has reduced damages for relationships that are functionally equivalent, but not fully comparable, to immediate-family relationships, the parties formed a relationship when the child was much older than Monk. See ECF No. 3363 at 22 (half the normal award because the stepmother entered the decedent's life when he was 11 years old); ECF No. 5387 at 7 (half the normal award because stepsibling began living with the decedent at age 14). Monk and Marchand had a nearly 14 year relationship that began around Monk's birth. See ECF No. 12030-2 ¶¶ 4, 5, 7. Moreover, all other factors indicate that Monk and Marchand had a relationship fully comparable to a parent-child relationship. Monk should receive solatium damages of $8.5 million, the typical award for children of 9/11 decedents, as listed in Exhibit D.

\* \* \*

Accordingly, the Plaintiffs' claims, across the above four categories, satisfy all elements of § 1605A, including causation. The Court concludes that Iran and the Iranian Defendants proximately caused the deaths and injuries related to the Plaintiffs' claims. The Court therefore has subject matter jurisdiction under § 1605A(a) and personal jurisdiction over Iran. As a result, Iran and the Iranian Defendants are liable for the Plaintiffs' 9/11-related deaths and injuries under § 1605A(c). The Court recommends granting all of the Plaintiffs' motions for default judgment and, as explained above, awarding pain and suffering, economic, and solatium damages consistent with the Court's existing frameworks. The attached Exhibits list the recommended damages awards by claim type.

30

**IV.      The Court Should Certify Certain Plaintiffs Judgments as Final Under Rule 54(b)**

The majority of the Plaintiffs ask the Court to expedite finality and certify their default judgments as "final" under Rule 54(b). See ECF Nos. 11883 (Ashton), 11906 (Chairnoff), 12007 (Don Kim), 12029 (Ashton). These Plaintiffs seeking Rule 54(b) final judgments (the "FJ Plaintiffs") are noted with an asterisk (*) in the attached Exhibits.[8] At the Court's request, the FJ Plaintiffs filed supplemental letters addressing why Rule 54(b) authorizes certification of their requested judgments as final. See ECF Nos. 12041 (order requesting additional briefing), 12060 (Don Kim response), 12069 (Ashton response). The Chairnoff Plaintiffs request a Rule 54(b) certification for one Plaintiff but did not file a supplemental letter. See ECF No. 11909 at 1–2. Based on the Court's prior orders and the parties' submissions, however, the Court still recommends (1) denying without prejudice the FJ Plaintiffs' outstanding requests for additional damages, (2) certifying all of FJ Plaintiffs' default judgments as "final" judgments against Iran pursuant to Rule 54(b), and (3) finding good cause for the immediate registration of the FJ Plaintiffs' final judgments in the U.S. District Court for the Eastern District of New York (E.D.N.Y.).

Earlier this year, the Court acted in the interest of justice to expedite finality for thousands of plaintiffs in this litigation. The United States Government seized 127,271 Bitcoin and related proceeds (the "Bitcoin"), which are worth approximately $11 billion and are allegedly Iranian assets. The Government then initiated a civil forfeiture action in the E.D.N.Y., where the Bitcoin are currently held. United States v. Approximately 127,271 Bitcoin, No. 25-cv-05745 (E.D.N.Y.) (the "Forfeiture Case"). Victims of Iranian terrorist attacks around the

---

[8] Conversely, only four Plaintiffs are *not* seeking Rule 54(b) final judgments: in Exhibit C, Moshe Lederer, Alfred Retundie, Jr., and Gaetano Borello; and in Exhibit D, Francesca Jerez-DeVito. See ECF Nos. 11762 (Johnson), 11837 (Burnett), 11846 (Burnett), 12042 (Accardi).

31

world are asserting claims to the Bitcoin in the Forfeiture Case or in separate post-judgment turnover proceedings in the E.D.N.Y. See Fritz v. Iran & China Inv. Dev. Grp., No. 25-cv-07093 (E.D.N.Y.); Relvas v. Iran & China Inv. Dev. Grp., No. 26-cv-00642 (E.D.N.Y.) (together with the Forfeiture Case, the "E.D.N.Y. Proceedings").

Plaintiffs in this litigation with partial default judgments against Iran sought to execute on the Bitcoin and asked the Court to permit the registration of their Iran judgments in the E.D.N.Y. Given the unique and exceptional circumstances presented by the E.D.N.Y. Proceedings, and in the interest of justice, the Court (1) denied without prejudice the plaintiffs' outstanding requests for damages; (2) certified the plaintiffs' Iran Judgments as final judgments under Rule 54(b), *nunc pro tunc* to their filing date; and (3) directed the Clerk of Court to immediately process the plaintiffs' requests to register their now-final judgments in the E.D.N.Y. See In re 9/11, No. 03-md-1570 (GBD)(SN), 2026 WL 704750, at *8–9 (Mar. 3, 2026) ("Finality R&R"), report and recommendation adopted, 2026 WL 765458, at *6–7 (S.D.N.Y. Mar. 18, 2026) ("Finality Opinion"). The FJ Plaintiffs here also seek final judgments under Rule 54(b) so that they can register their judgments in the E.D.N.Y. and assert claims to the Bitcoin in the Forfeiture Case. See ECF No. 12060 at 1 (Don Kim), 12069 at 1 (Ashton).

Rule 54(b) addresses judgments involving multiple parties or claims. It permits the Court in such complex cases to "direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). This Rule was adopted "specifically 'to avoid the possible injustice' of 'delay[ing] judgment o[n] a distinctly separate claim [pending] adjudication of the entire case.'" Gelboim v. Bank of America Corp., 574 U.S. 405, 409 (2015) (quoting Report of Advisory Committee on Proposed Amendments to Rules of Civil Procedure 70 (1946)). Specifically, Rule

32

54(b) authorizes a district court to enter partial final judgment when three element are satisfied: (1) "there are multiple claims or parties;" (2) "at least one claim or the rights and liabilities of at least one party has been finally determined;" and (3) "the court makes an 'express determination that there is no just reason for delay' of entry of final judgment as to fewer than all of the claims or parties involved in the action." Linde v. Arab Bank, PLC, 882 F.3d 314, 322–23 (2d Cir. 2018) (quoting Fed. R. Civ. P. 54(b)) (alterations in original).

First, this litigation involves many claims, filed by the FJ Plaintiffs and others, against Iran and many other sovereign and non-sovereign defendants. The FJ Plaintiffs are a subset of plaintiffs seeking default judgment on their claims against only one defendant, Iran. As the Court has explained, "each of the Plaintiffs' causes of action under the FSIA represents a single 'claim' for the purpose of Rule 54." Finality R&R at *7. The first requirements is plainly met.

Second, the Court may act to finally determine the rights and liabilities as to the FJ Plaintiffs and Iran. Rule 41(a)(2) provides that at a plaintiff's request, a court may dismiss an action without prejudice "on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). Granting a voluntary dismissal "lies within the sound discretion of the court." Fareportal Inc. v. Travana, Inc., No. 16-cv-09882 (ALC), 2019 WL 4141878, at *2 (S.D.N.Y. Aug. 30, 2019) (citing Catanzano v. Wing, 277 F.3d 99, 109 (2d Cir. 2001)). When faced with the analogous situation of thousands of MDL plaintiffs seeking to register in the E.D.N.Y. their partial default judgment against Iran, the Court denied the plaintiffs' outstanding requests for damages (namely punitive damages) and stayed the deadline for the plaintiffs to seek relief from their final judgments under Rule 60(b). See Finality Opinion at *4–5, 5 n.7. The FJ Plaintiffs support the Court taking the same approach here and dismissing without prejudice their requests for additional damages. See ECF Nos. 12060 at 2, 12069 at 2. This approach is justified for the same

33

reasons. It balances the litigants' competing interests in finality as to Iran and in the fair and efficient adjudication of the punitive-damages issue for all plaintiffs in this complex case. See Finality Opinion at *4; see Hoglan, ECF No. 3905 at 3, 9. Moreover, it would permit the FJ Plaintiffs to proceed to registering their judgments in the E.D.N.Y. without undue delay, which would directly affect the plaintiffs' prospects of attaching or executing on the Bitcoin. See Finality R&R at *6; Finality Opinion at *4. The Court thus recommends exercising its discretion to dismiss the FJ Plaintiffs' outstanding claims for additional damages without prejudice pursuant to Rule 41(a)(2). Given this dismissal, the Court will have fully disposed of the FJ Plaintiffs' FSIA claims against Iran because "all damages stemming from [these] claim[s] [will] be fixed." Int'l Controls Corp. v. Vesco, 535 F.2d 742, 748 (2d Cir. 1976). As such, the second requirement would be satisfied.

Finally, the third requirement is "left to the sound discretion of the district court" and should be exercised "in the interest of sound judicial administration." Ginnett v. Computer Task Grp., Inc., 962 F.2d 1085, 1092 (2d Cir. 1992) (quoting Curtiss-Wright Corp. v. Gen. Elec. Co., 446 U.S. 1, 9 (1980)). Certifying the FJ Plaintiffs' judgments as final "enables the[se] Plaintiffs to move expeditiously for enforcement of their compensatory damages awards in the judicial district where purportedly Iranian assets are held." Finality R&R at *7. This approach accounts for the equities among the plaintiffs in this litigation, because timing is critical for post-judgment enforcement, and the minimal interest of Iran as a defendant in default. See id. at *7–8; ECF Nos. 12060 at 2, 12069 at 2. Moreover, the "likelihood of piecemeal appeals is small and, in any event, outweighed by the importance of the[se] Plaintiffs' timely registration of final[] Judgments." Id. at *7.

34

Accordingly, the Court recommends (1) expressly determining that there is no just reason for delay, and (2) certifying the default judgments issued to the FJ Plaintiffs (as noted in the attached Exhibits A, B, C, and D) as final judgments on the FJ Plaintiffs' claims against Iran. See ECF Nos. 11883 (Ashton), 11906 (Chairnoff), 12007 (Don Kim), 12029 (Ashton) (seeking final default judgments against Iran only).

Lastly, the FJ Plaintiffs intend to register their judgments in the E.D.N.Y pursuant to 28 U.S.C. § 1963. See ECF Nos. 12060 at 1, 12069 at 2. Upon entry of the final judgments for the FJ Plaintiffs, the Court recommends finding good cause for the immediate registration of those judgments. A judgment in a district court may be registered and enforced in another judicial district when it "become[s] final by appeal or expiration of the time for appeal or when ordered by the court that entered the judgment for good cause shown." 28 U.S.C. § 1963. This registration provision presupposes the entry of a *final* judgment, including those certified as "final" pursuant to Rule 54(b). See Finality R&R at *4–5; Finality Opinion at *3–4. But "a mere showing that the [judgment debtor] has substantial property in th[at] other . . . district and insufficient [property] in the rendering district to satisfy the judgment" may constitute "good cause." G&A Strategic Invs. I LLC v. Petroleos de Venezuela, S.A., No. 23-cv-10766 (JSR), 2025 WL 3237166, at *2 (S.D.N.Y. Nov. 20, 2025) (quoting Coudert v. Hokin, No. 12-cv-110 (ALC), 2018 WL 4278332 at *2 (S.D.N.Y. July 30, 2018)). The allegedly Iranian Bitcoin are present in the E.D.N.Y., and Iran has insufficient property in this judicial district that might satisfy the FJ Plaintiffs' now-final judgments. Consistent with prior orders, the Court should permit the immediate registration of the FJ Plaintiffs' judgments under the "good cause" language of § 1963. See Finality R&R at *8; Finality Opinion at *6; ECF No. 11940.

35

**CONCLUSION**

Accordingly, the Court recommends making the following rulings on the Plaintiffs'

motions for default judgment:

- Finding that service of process was effected on Iran and the Iranian Defendants in accordance with 28 U.S.C. § 1608(a).

- GRANTING the Plaintiffs' motions for partial default judgments as to the Plaintiffs in Exhibit A and awarding them their requested pain & suffering damages. See ECF No. 12010-3.

- GRANTING the Plaintiffs' motions for partial default judgments as to the Plaintiffs in Exhibit B and awarding them the listed economic damages. See ECF No. 11885-2.

- GRANTING the Plaintiffs' motions for partial default judgment as to the Estate of Moshe Lederer, the Estate of Gaetano Borello, and Alfred Retundie, Jr. and awarding them pain and suffering damages for their latent conditions as listed below and in Exhibit C.

| Plaintiff | Defendant(s) | Motion ECF | Pain & Suffering Damages |
|---|---|---|---|
| Estate of Moshe Lederer | Iran | 11762 | $5 million |
| Estate of Gaetano Borello | Iran | 12042 | $5 million |
| Alfred Retundie, Jr. | Iran, IRGC, CBI | 11846 | $5 million |

- GRANTING the Plaintiffs' motions for partial default judgments as to the Plaintiffs in Exhibit D—other than the three "functional equivalent" Plaintiffs listed below—and awarding them their requested solatium damages. See ECF Nos. 11885-3, 11909-2, 12010-2, 12031-2.

- GRANTING the Plaintiffs' motions for partial default judgment as to Francesca Jerez-DeVito, Joshua McMiller, and Melinda Monk and awarding them solatium damages for their functionally equivalent family relationships as listed below and in Exhibit D.

| Plaintiff | Defendant(s) | Motion ECF | Solatium Damages |
|---|---|---|---|
| Francesca Jerez-DeVito | Iran, IRGC, CBI | 11837 | $8.5 million |
| Joshua McMiller | Iran | 12029 | $8.5 million |
| Melinda Monk | Iran | 12029 | $8.5 million |

- Awarding the Plaintiffs in Exhibits A, C, and D prejudgment interest at a rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001, until the date of the judgment.

- Awarding the Plaintiffs in Exhibit B prejudgment interest at a rate of 4.96 percent per annum, compounded annually for the period from the "Date of Report" listed in Exhibit B until the date of the judgment.

For the Plaintiffs who request final judgments from the Court pursuant to Rule 54(b) (the "FJ Plaintiffs"), noted with an asterisk (*) in the attached Exhibits, the Court recommends making the following additional rulings:

- Denying without prejudice the FJ Plaintiffs' outstanding requests for additional damages related to their FSIA § 1605A claims and, relatedly, staying the deadline for the FJ Plaintiffs to move for relief from final judgment until further order of the Court. See Fed. R. Civ. P. 60(b).

- Pursuant to Rule 54(b), expressly determining that there is not just reason for delay and certifying the FJ Plaintiffs' default judgments as final judgments on all of the FJ Plaintiffs' claims against Iran.

- Pursuant to 28 U.S.C. § 1963, and upon entry of the final default judgments for the FJ Plaintiffs, finding good cause for the immediate registration in the E.D.N.Y. of certified copies of the FJ Plaintiffs' judgments.

All Plaintiffs *other than* the FJ Plaintiffs should be permitted to submit additional applications for damages, including punitive damages, consistent with any future rulings of the Court. See ECF Nos. 11765-2, 11840-2, 11849-2, 12045-2.

Finally, in light of the impending June 1, 2026 deadline for the VSSTF, the parties must notify the Court by no later than **Wednesday, May 27, 2026**, if they intend to file any objections to this Report & Recommendation (as provided below). If no objections will be filed, the Court will issue a final decision by Friday, May 29, 2026.

SARAH NETBURN
United States Magistrate Judge

DATED:      May 22, 2026
            New York, New York

\*          \*          \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS**
**TO THIS REPORT AND RECOMMENDATION**

The parties shall have 14 days from the service of this Report & Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 6(a), 6(d). A party may respond to another party's objections within 14 days after being served with a copy. Fed. R. Civ. P. 72(b)(2); see Fed. R. Civ. P. 6(a), 6(d). These objections shall be filed with the Court and served on any opposing parties. See Fed. R. Civ. P. 72(b)(2). Courtesy copies shall be delivered to the Honorable George B. Daniels if required by that judge's Individual Rules and Practices. Any requests for an extension of time for filing objections must be addressed to Judge Daniels. See Fed. R. Civ. P. 6(b). The failure to file timely objections will waive those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. James, 712 F.3d 79, 105 (2d Cir. 2013).

Exhibit A: Estates - Pain and Suffering Damages

| Personal Representative | | | | 9/11 Decedent | | | | | | | Claim Information | | | | Pain & Suffering Damages | | | | Judgment | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| First | Middle | Last | Suffix | First | Middle | Last | Suffix | Nationality on 9/11 | Date of Death | 9/11 Site | Case | Complaint | Amendments & Substitutions | Default Judgment Motion | Prior Award | Amount | Treble | | Principal | Start Date | End Date |
| 1 Stacy | | Paolozzi | | Franklin | Allan | Pershep | | US | 9/11/2001 | NY | 23cv05790 | 23cv05790, 10 at 6 | Motion to substitute pending at ECF No. 11979 - *granted 12012* | 12007 | * N/A | $ 2,000,000.00 | N/A | | $ 2,000,000.00 | 9/11/2001 | |
| 2 Ken aka Calvin | | Reibman aka Louie | | Chet | Dek | Louie | | US | 9/11/2001 | NY | 24cv05520 | 24cv05520, 1 at 2 | Motion to substitute pending at ECF No. 11979 - *granted 12012* | 12007 | * N/A | $ 2,000,000.00 | N/A | | $ 2,000,000.00 | 9/11/2001 | |
| 3 Pamela | | Bittner-Conley | | Jeffrey | Donald | Bittner | | US | 9/11/2001 | NY | 24cv05520 | 24cv05520, 1 at 3 | Motion to substitute pending at ECF No. 11979 - *granted 12012* | 12007 | * N/A | $ 2,000,000.00 | N/A | | $ 2,000,000.00 | 9/11/2001 | |

Exhibit B: Estates - Economic Damages

| Personal Representative | | | | 9/11 Decedent | | | | | | | Claim Information | | | | Economic Damages | | | | | Judgment | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| First | Middle | Last | Suffix | First | Middle | Last | Suffix | Nationality on 9/11 | Date of Death | 9/11 Site | Case | Complaint | Amendments & Substitutions | Default Judgment Motion | Report | Date of Report | Prior Award | Amount | Treble | Principal | Start Date | End Date |
| Bobby | | Griffin | | Tawanna | | Griffin | | US | 9/11/01 | NY | 02cv06977 | 1463 at 50 | | 11883 | * | 3/4/26 | | $ 1,954,125.00 | N/A | $ 1,954,125.00 | 3/4/2026 | |
| Saradha | | Moorthy | | Krishna | | Moorthy | | US | 9/11/01 | NY | 02cv06977 | 1463 at 18 | | 11883 | * | 3/4/26 | | $ 2,028,832.00 | N/A | $ 2,028,832.00 | 3/4/2026 | |
| Consuelo | | Velazquez | | Jorge | | Velazquez | | US | 9/11/01 | NY | 02cv06977 | 1463 at 60 | | 11883 | * | 3/4/26 | | $ 1,600,207.00 | N/A | $ 1,600,207.00 | 3/4/2026 | |

Exhibit C: Latent Injuries - Pain and Suffering Damages

| Personal Representative | | | | Claimant | | | | | | Claim Information | | | | Pain & Suffering Damages | | | | Judgment | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| First | Middle | Last | Suffix | First | Middle | Last | Suffix | Nationality on 9/11 | 9/11 Site | Case | Complaint | Amendments & Substitutions | Default Judgment Motion | Documentation | Prior Award | Amount | Treble | Principal | Start Date | End Date |
| Lisa | | Lederer | | Moshe | | Lederer | | US | NY | 18cv12344 | 18cv12344,1 at Allegation 48 of Appendix 1 | | 11762 | | | $ 5,000,000.00 | N/A | $ 5,000,000.00 | 9/11/2001 | |
| | | | | Alfred | William | Retundie | Jr. | U.S. | NY | 15cv9903 | 1:15-cv-09903, 53, at 4639 | | 11846 | | | $ 5,000,000.00 | N/A | $ 5,000,000.00 | 9/11/2001 | |
| Thomas | | Borello | | Gaetano | | Borello | | U.S. | NY | 21-cv-06247 | 21-cv-06247, 1 at 2 | 12040 at 3 | 12042 | | | $ 5,000,000.00 | N/A | $ 5,000,000.00 | 9/11/2001 | |

Exhibit D: Solatium Damages

| Personal Representative | | | | Claimant | | | | | 9/11 Decedent | | | | | Date of Death | 9/11 Site | Claim Information | | | | Solatium Damages | | | | | Judgment | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| First | Middle | Last | Suffix | First | Middle | Last | Suffix | Nationality on 9/11 | First | Middle | Last | Suffix | Nationality on 9/11 | | | Case | Complaint | Amendments & Substitutions | Default Judgment Motion | Relationship | Documentation | Prior Award | Amount | Treble | Principal | Start Date | End Date |
| | | | | Francesca | Marie | Jerez-DeVito | | U.S. | Robert | D. | Cirri | Sr. | U.S. | 9/11/01 | NY | 15cv9903 | 15cv9903, 53 at 2220 | 1:15-cv-09903, 1143, at 1 | 11837 | Child (functional equivalent) | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |
| | | | | John | | Clark | | U.S. | Gregory | A. | Clark | | US | 9/11/01 | NY | 02cv06977 | 1463 at 5 | 02cv06977, 2475 | 11883 | Child | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |
| Megan | | Schaeffer | | John | F. | McDowell | Sr. | U.S. | John | F. | McDowell | Jr. | US | 9/11/01 | NY | 02cv06977 | 1463 at 17 | 02cv06977, 2475 | 11883 | Parent | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |
| | | | | Ivette | | Ortiz | | U.S. | Alexander | | Ortiz | | US | 9/11/01 | NY | 02cv06977 | 1463 at 59 | 02cv06977, 2475 | 11883 | Sibling | | | $ 4,250,000.00 | N/A | $ 4,250,000.00 | 9/11/2001 | |
| | | | | Evelyn | | Ortiz | | U.S. | Alexander | | Ortiz | | US | 9/11/01 | NY | 02cv06977 | 1463 at 59 | 02cv06977, 2475 | 11883 | Sibling | | | $ 4,250,000.00 | N/A | $ 4,250,000.00 | 9/11/2001 | |
| | | | | Edwin | | Ortiz | | U.S. | Alexander | | Ortiz | | US | 9/11/01 | NY | 02cv06977 | 1463 at 59 | 02cv06977, 2475 | 11883 | Sibling | | | $ 4,250,000.00 | N/A | $ 4,250,000.00 | 9/11/2001 | |
| | | | | Michele | M. | Nimbley | | US | Paul | Richard | Nimbley | | US | 9/11/01 | | 18-cv-12370 | 18-cv-12370, 1-1 at line 14 | | 11906 | Child | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |
| Zeshan | | Hamdani | | Mohammad | Saleem | Hamdani | | US | Mohammad | S. | Hamdani | | US | 9/11/01 | NY | 18cv11870 | 18cv11870, 1 at 6 | Motion to substitute pending at ECF No. 11979 - granted 12012 | 12007 | Parent (Deceased) | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |
| Judith | | Knight | | Vincent | | Wisniewski | | US | Frank | | Wisniewski | | US | 9/11/01 | NY | 22cv05193 | 22cv05193, 1 at 2 | | 12007 | Parent (Deceased) | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |
| | | | | Lea | | McKenzie | | US | Molly | Lou | McKenzie | | US | 9/11/01 | VA | 23cv05790 | 23cv05790, 10 at 4 | | 12007 | Child | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |
| Brian | | Fine | | Sharyn | Dawn | Fine | | US | Franklin | Allan | Pershep | | US | 9/11/01 | NY | 23cv05790 | 23cv05790, 10 at 6 | Motion to substitute pending at ECF No. 11979 - granted 12012 | 12007 | Child (Deceased) | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |
| | | | | Quawana | | Bowden | | US | Lacey | Bernard | Ivory | | US | 9/11/01 | VA | 23cv05790 | 23cv05790, 10 at 7 | ECF 12014 (granting ECF 12004 corrections) | 12007 | Child | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |
| Andrew | C. | Kelly | | Sean | | Kelly | | US | Maurice | Patrick | Kelly | | US | 9/11/01 | NY | 23cv07283 | 23cv07283, 19 at 1 | Motion to substitute pending at ECF No. 11979 - granted 12012 | 12007 | Child (Deceased) | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |
| Kenneth | | Lum | | Grace | | Lum | | US | William | | Lum | | US | 9/11/01 | NY | 24cv07824 | 24cv07824, ECF 1, Appx 1 | ECF No. 11978 | 12007 | Parent (Deceased) | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |
| | | | | Michelle | C. | Fallon | | US | David | | Ruddle | | US | 9/11/01 | NY | 22cv05193 | 22cv05193 - ECF 1, Appx 31 | ECF No. 11976 | 12007 | Sibling | | | $ 4,250,000.00 | N/A | $ 4,250,000.00 | 9/11/2001 | |
| | | | | David | Anthony | Kuo | | US | Frederick | | Kuo | Jr. | US | 9/11/01 | NY | 22cv05193 | 22cv05193 - ECF 1, Appx 82 | ECF No. 11976 | 12007 | Child | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |
| | | | | Melissa | Kuo | Wallace | | US | Frederick | | Kuo | Jr. | US | 9/11/01 | NY | 22cv05193 | 22cv05193 - ECF 1, Appx 82 | ECF No. 11976 | 12007 | Child | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |
| | | | | Frederick | James | Kuo | | US | Frederick | | Kuo | Jr. | US | 9/11/01 | NY | 22cv05193 | 22cv05193 - ECF 1, Appx 82 | ECF No. 11976 | 12007 | Child | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |
| | | | | John | C. | McShane | | US | Terence | Augustine | McShane | | US | 9/11/01 | NY | 19cv11776 | 19cv11776 - ECF 1, Appx 82 | ECF No. 11975 | 12007 | Sibling | | | $ 4,250,000.00 | N/A | $ 4,250,000.00 | 9/11/2001 | |
| | | | | Kieran | Michael | McShane | | US | Terence | Augustine | McShane | | US | 9/11/01 | NY | 19cv11776 | 19cv11776 - ECF 1, Appx 82 | ECF No. 11975 | 12007 | Sibling | | | $ 4,250,000.00 | N/A | $ 4,250,000.00 | 9/11/2001 | |
| George | O. | Taylor | | Donald | | Stafford | | US | Hilda | E. | Taylor | | US | 9/11/01 | VA | 18cv11878 | 18cv11878 - ECF 1, Appx 96 | ECF No. 11974 | 12007 | Child (Deceased) | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |
| | | | | Geraldine | | Mechutan | | US | David | | Ruddle | | US | 9/11/01 | NY | 22cv05193 | 22cv05193 - ECF 1, Appx 31 | ECF No. 11976 | 12007 | Sibling | | | $ 4,250,000.00 | N/A | $ 4,250,000.00 | 9/11/2001 | |
| | | | | Patricia | Ruddle | Gallagher | | US | David | | Ruddle | | US | 9/11/01 | NY | 22cv05193 | 22cv05193 - ECF 1, Appx 31 | ECF No. 11976 | 12007 | Sibling | | | $ 4,250,000.00 | N/A | $ 4,250,000.00 | 9/11/2001 | |
| | | | | Antione | P. | Johnson | | US | Tawanna | | Griffin | | US | 9/11/01 | NY | 02cv06977 | 1463 at 50 | 02cv06977, 2513 | 12029 | Sibling | | | $ 4,250,000.00 | N/A | $ 4,250,000.00 | 9/11/2001 | |
| | | | | Damien | | Johnson | | US | Tawanna | | Griffin | | US | 9/11/01 | NY | 02cv06977 | 1463 at 50 | 02cv06977, 2513 | 12029 | Sibling | | | $ 4,250,000.00 | N/A | $ 4,250,000.00 | 9/11/2001 | |
| | | | | Donell | A. | Johnson | | US | Tawanna | | Griffin | | US | 9/11/01 | NY | 02cv06977 | 1463 at 50 | 02cv06977, 2513 | 12029 | Sibling | | | $ 4,250,000.00 | N/A | $ 4,250,000.00 | 9/11/2001 | |
| | | | | Tawaneese | S. | Johnson | | US | Tawanna | | Griffin | | US | 9/11/01 | NY | 02cv06977 | 1463 at 50 | 02cv06977, 2513 | 12029 | Sibling | | | $ 4,250,000.00 | N/A | $ 4,250,000.00 | 9/11/2001 | |
| Shawn | | Kelly | | Kathleen | | Kelly | | US | Timothy | C. | Kelly | Jr. | US | 9/11/01 | NY | 02cv06977 | 1463 at 38 | 02cv06977, 2503 | 12029 | Parent | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |
| | | | | Joshua | | McMiller | | US | Larry | | Bowman | | US | 9/11/01 | NY | 02cv06977 | 1463 at 56 | 02cv06977, 2475 | 12029 | Child (functional equivalent) | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |
| | | | | Melinda | | Monk | | US | Alfred | | Marchand | | US | 9/11/01 | NY | 02cv06977 | 1463 at 16 | 02cv06977, 2503 | 12029 | Child (functional equivalent) | | | $ 8,500,000.00 | N/A | $ 8,500,000.00 | 9/11/2001 | |