P2SL911O

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

In Re Terrorist Attacks on                    03 MD 1570(GBD)(SN)
September 11, 2001

------------------------------x

                                        New York, N.Y.
                                        February 28, 2025
                                        10:00 a.m.

Before:

                    HON. SARAH NETBURN,

                                U.S. Chief Magistrate Judge

                          APPEARANCES

COZEN O'CONNOR
     Attorneys for Executive Committee Plaintiffs
BY:  SEAN P. CARTER

KREINDLER & KREINDLER LLP
     Attorneys for Bauer and Ashton Plaintiffs
BY:  STEVEN R. POUNIAN
     JAMES GAVIN SIMPSON

MOTLEY RICE LLC
     Attorneys for Executive Committee Plaintiffs
BY:  ROBERT T. HAEFELE

ANDERSON KILL, P.C.
     Attorneys for Executive Committee Plaintiffs
BY:  JERRY S. GOLDMAN
     BRUCE STRONG
     ALEXANDER GREENE

LAW FIRM OF OMAR T. MOHAMMEDI
     Attorneys for Defendant World Assembly of Muslim Youth
BY:  OMAR T. MOHAMMEDI

GOETZ & ECKLAND P.A.
     Attorneys for Defendant World Assembly of Muslim Youth
BY:  FREDERICK GOETZ

Also Present:  Marcus Asner
               Benjamin Wolverton

                SOUTHERN DISTRICT REPORTERS, P.C.
                       (212) 805-0300

P2SL911O

(Case called)

THE COURT:  All right.  This is In Re:  Terrorist Attacks, 03 MD 1570.  May I ask counsel for the plaintiffs to state their appearance.

MR. GOLDMAN:  Jerry Goldman for the Plaintiff's Executive Committee and Anderson Kill.  With me are Bruce Strong and Alexander Greene.

MR. HAEFELE:  Good morning, your Honor.  Robert Haefele from Motley Rice for the Plaintiff's Executive Committee and the Burnett Plaintiffs.

MR. POUNIAN:  Good morning.  Steve Pounian for the Ashton Plaintiffs.  I am here today with James Gavin Simpson, your Honor.

THE COURT:  Thank you.

MR. GOETZ:  Thank you, your Honor.  Frederick Goetz on behalf of the World Assembly of Muslim Youth, World Assembly of Muslim Youth International, collectively WAMY.

THE COURT:  Thank you.

MR. MOHAMMEDI:  Good morning, your Honor.  Omar Mohammedi from OTM Law on behalf of World Assembly of Muslim Youth.

THE COURT:  Great.  Thank you.

And do we have counsel -- is Mr. Asner here?

MR. ASNER:  Yes, your Honor.  Good morning.  I am here with Ben Wolverton, who lead the investigation.

P2SL911O

THE COURT:  Thank you.  Mr. Asner, I may call on you to summarize, if that's all right.  I am glad you are here.  I realize that I didn't make clear that I wanted you here, so I am glad you figured that out on your own.

Thank you, everybody, for being here.  We are here in connection with an application that was made in October by the Plaintiff's Executive Committee indicating that it had received an anonymous letter earlier that summer that there had been some misconduct involving the deposition of Jonathan Marks, who was the expert witness offered by WAMY.  That letter resulted in a series of letters from the parties.  I am not going to go over each of them.

But I think where I want to start today is that WAMY retained its own counsel to review the issues, both as to whether or not that organization engaged in any misconduct, and Baker Tilly, the accounting firm that was hired by WAMY to be an expert witness also retained counsel to conduct its own investigation.  Those investigations took a period of weeks.  There were a series of interviews that were conducted.  The investigation by WAMY, done by the law firm Arnold & Porter, resulted in a letter that was filed on the docket on November 12.  The Baker Tilly entity, which hired Godfrey & Kahn, also submitted a report to the Court.  That report was filed ex parte.  I have reviewed those reports, obviously, in preparation for today's hearing.

I will begin by saying, and stating the obvious, that this is not our first time having a conference related to a violation of the various orders in this case.  Obviously, the Yahoo news leak was the biggest one that we faced.  In connection with that investigation, it was determined that there were individuals in a deposition room who had not put their name on the record, which was a violation of the deposition protocol.  And I acknowledge that violation and admonish the parties that the purpose of these orders is to make sure that there is full transparency in every process.  And I think that's particularly important as we have now moved into a remote deposition practice, not just in this case, but more generally.

It seems clear at this point that that part of the deposition protocol was violated, that there were two individuals that were in the deposition room during the Marks deposition.  I don't think there is a dispute about that at this point.  So the question is, what, if anything, is the impact of that and how we should proceed going forward.

So Mr. Asner, if I can call upon you, I would appreciate it if you could just state for the record, sort of, how your investigation played out.  Obviously, your report is on the public docket, but if you could just describe so we could set the stage about what you did and what your conclusions were.

MR. ASNER:  Sure, your Honor.  Marcus Asner with Arnold & Porter.  I am here with Ben Wolverton.  We did the investigation together, so some of the work was done directly by me, but some of it was done by Ben as well, including watching the entire deposition video to look at the allegations.

So we were engaged for a very limited purpose.  We know very little about the underlying allegations in the case, but we started with the whistleblower -- what I will call the whistleblower letter, the allegations.  And what we had received was initially a redacted version of that, and then subsequently, after some, I believe, letter writing, your Honor ruled that we could, meaning Arnold & Porter, could view the unredacted version of that.  And, you know, I won't put into the record what it was, but effectively there was some identification information of people who the anonymous author had indicated would have information.  And so that was --

THE COURT:  So we are speaking about the same thing, that, what you are calling the whistleblower letter, was the letter that was, I believe, sent to Sean Carter in July?

MR. ASNER:  That's correct, your Honor.  That's right.

THE COURT:  OK.

MR. ASNER:  So what we did was, essentially, start with the allegations, and we categorized the allegations into different buckets, and based on the information that was

P2SL911O

available to us, tried to ascertain what had happened.  And that involved, of course, reading the deposition, which I myself didn't read all of it, but Mr. Wolverton did, and pointed me to various portions along the way.

In addition, we interviewed the people that were available to us, and that was Mr. Mohammedi, Mr. Goetz, the associate who was working on this -- I believe she was of counsel, actually -- Jill Mandell, who is no longer with the firm.  And then we worked very closely with Godfrey & Kahn, who were representing Baker Tilly.  Working with them, we obtained authority to interview Mr. Guzman and Mr. Goldberg.  We were able to interview Mr. Guzman, although, he no longer works at Baker Tilly.  And in addition, we tried multiple times to contact Mr. Goldberg.  That proved unsuccessful.

THE COURT:  Is Mr. Goldberg still at Baker Tilly?

MR. ASNER:  No, he is not at Baker Tilly.

THE COURT:  He just refused your outreach?

MR. ASNER:  Yes.  It was somewhat frustrating.  We tried over and over again.  I think nine times we reached out to him to try and get a response.  So that -- you know, obviously, there is a gap in the investigation.

We also, because plaintiffs' counsel had made allegations about specific instances in the deposition, we asked them to identify what the specific instances were, hoping to use their work to target what we were trying to do.

P2SL911O

Regrettably, they didn't respond to that in providing that information, although, I think subsequently, after we put in our letter, they did put in a letter identifying a number of instances that they said were problematic. So I think your Honor then reviewed all those. I think we subsequently reviewed them as well but, you know, effectively echo what your Honor had done.

So we understand that Godfrey & Kahn also did their own internal investigation. I understand that that was under privilege, your Honor, and that they then put in to the Court the results of that investigation, essentially, their equivalent of the letter that -- I assume, the letter that I submitted to the Court. And we have not seen that, although, we have spoken on multiple times to both Dan Flaherty and Dan Blinka, who were the partners at Godfrey & Kahn who were conducting the investigation.

THE COURT: And are those lawyers in the courtroom?

MR. ASNER: They are not, but I believe counsel for Baker Tilly is here.

AUDIENCE MEMBER: We are New York local counsel.

THE COURT: Thank you. OK.

MR. ASNER: So, your Honor, the investigation relied on both what we at Arnold & Porter could do, based on the information available to us, and also the information that Godfrey & Kahn provided to us. And certain things came out of

P2SL911O

the investigation. You know, I didn't make findings in the sense of being a judge about the credibility of people or being a jury, but what I did try and do is cast it as, Here is evidence that I was able to obtain and substantiate, and here is evidence that I was unable to find evidence of, and then laid that out for the Court so that you have it.

The allegations of there being two people involved in the deposition room who were not announced, that proved to be true. And we looked at, obviously, what was the evidence about whether that was intentional in a sense of trying to, one, intentionally violate your Honor's order, or -- really, the crux of what the focus of our investigation was, is, was there improper coaching, was there a white board, etc., and was this really part of a scheme to coach Marks. And what we found was, at least from the interviews and the evidence that we were able to gather, was that it looked like it was a mistake. And we found other instances in the case where -- that also violated your Honor's order.

I went back and looked -- Mr. Wolverton and I had finished a recent litigation. We went back and looked about that case just to compare it with respect to the practices during the height of Covid, and one thing we found is that in some of those instances, the court reporter had asked for everybody to identify who was in the deposition room. It looked like that was not happening in this case. And so there

P2SL911O

were a number of instances, in addition to the deposition of Mr. Marks, where neither side nor the court reporter had asked for everybody in the deposition room to identify themselves. So that was a flaw.

THE COURT:  Can I ask you what evidence you looked at to form the view that their presence was, I think your word was, a mistake?  Did you look at contemporaneous e-mails to evaluate whether or not there was, sort of, a coordinated plan, or anything like that?

MR. ASNER:  May I, your Honor?

(Conferring)

MR. ASNER:  So, your Honor, Mr. Wolverton, who did the document review, tells me that we reviewed all of the e-mails with counsel and Baker Tilly at the time of the -- leading up to the deposition and the preparation of the report and the preparation period leading up to the deposition, and then also the deposition itself, and then, of course, interviewed everybody who was available to us involved in the preparation.

So, look, what I can report is that we looked at whether there was evidence of this being intentional, and we did not find evidence that supported that it was intentional. You know, I can't crawl into the minds of people, but I looked for evidence to see whether, in fact, this was part of an effort to conceal.  And neither plaintiffs' counsel nor defense counsel nor the court reporter asked anybody to list who was in

P2SL911O

the deposition room.  That was a mistake, at least from my view, because your Honor's order is very plain that that was required in practice.  It was not followed in the case, as it appears.

In addition, there was the allegation about billing disputes that appears to have been substantiated.  Mainly, I had to rely on two things.  One is Baker Tilly's own investigation and the reports that we had from Baker Tilly orally from Godfrey & Kahn.  And, in addition, Mr. Guzman himself appeared to have complaints about this.

Now, we saw zero evidence that those issues about Mr. Marks' billing practices ever were escalated to counsel for WAMY, so neither Mr. Goetz nor Ms. Mandell nor Mr. Mohammedi.  We have seen zero evidence that they were aware of this.  This appears to have been an internal Baker Tilly issue that we understand was investigated by Baker Tilly and resolved.  And there was some disagreement within the Baker Tilly team about this.  We did -- from the evidence available from the WAMY litigation team, the description is that Mr. Marks was actively involved both in the preparation of the report and in his own preparation for his deposition.

THE COURT:  Did you interview Mr. Marks?

MR. ASNER:  We did not.  He was not available to me. He was available to Baker Tilly, unfortunately.

But with respect to what the Court called the two

most -- I forget what was the word --

THE COURT:  Explosive.

MR. ASNER -- the two most explosive allegations, plainly, we pressed very hard on that.  My instructions were to -- you know, plainly, I am hired by WAMY -- but to try and get to the bottom of the allegations.  We were unable to find any evidence that substantiated that.

Mr. Wolverton, for example, looked at the entire deposition, saw, similar to your Honor's findings, saw nothing that appeared to be coaching.  We uncovered no evidence that there was writing on a white board.  People didn't really remember a white board, if I recall correctly.  And there was -- definitely, there was -- to the left of Mr. Marks, Mr. Goetz was defending the deposition.  Mr. Mohammedi was there, but he was in and out of the deposition room, and you see that because he is not wearing a jacket, and you see someone with a white shirt, and it is him.  He gets up and then leaves periodically because, given the camera angle, there was a glass wall behind Mr. Marks, and you could see Mr. Mohammedi leaving and taking phone calls and coming back in.

So, you know, while I can never negate everything one thousand percent, we did not uncover evidence that substantiated the two explosive allegations in what we are calling the whistleblower letter.

THE COURT:  Did you ever review -- I believe that

P2SL911O

there was, I think, a ten-page letter that was sent to Baker Tilly, and I think there was also something sent to a complaint hotline. It is not clear to me whether that is something that would have been in writing or if it was a phone call. But did you ever recover either of those things?

MR. ASNER: No, your Honor. Those were not available to me. You know, as the Court knows, Baker Tilly was separately represented. And I understand -- but I have never seen those. I understand that those were documents that were submitted by Mr. Guzman and Mr. Goldberg, I believe together, but it may have been others involved in that. A portion -- I have not seen it. I believe it's with the Court under seal or in camera. But I understand a portion of that concerned Mr. Marks' billing practices and a dispute that occurred internally. We understand, but have no independent evidence of it, that Baker Tilly itself investigated those allegations, and ultimately decided that internally they were resolved in the way that they wanted to resolve them. But I don't have independent verification of that.

THE COURT: Were you able to ask Mr. Guzman about that allegation?

MR. ASNER: Yes, and that is reflected in my letter, where I say that there is a dispute between -- you know, about that in the record. And I am trying to find out where I have got it in my letter. Hold on one second.

P2SL911O

Yes, so on page 8 of my letter, I have that in the, I guess, the third full paragraph, or the second paragraph below the bullets, where there were internal disputes with Baker Tilly. And it appears that Mr. Guzman -- I am guessing that Mr. Guzman was one of the authors of that ten-page letter, but that that was then escalated within Baker Tilly. And all I know is that it was resolved internally. I have not seen the letter. I don't know the allegations. You know, we were aware that Mr. Guzman has made these allegations.

I will say that Mr. Guzman is very clear that the coaching allegation during the deposition did not occur, or he has no recollection of that ever occurring, and so we were unable to substantiate that component of it. I think there were some internal disputes about who was doing the bulk of the work within Baker Tilly. I think there were some internal disputes about, you know, how prepared Mr. Marks was. But it was also clear from our own investigation that Mr. Marks had conversations with counsel for WAMY that his team were not on.

So I kind of came away from it saying this is an unknown. And so I tried to lay out for the Court that this is effectively an unknown, from our perspectives, and this is a -- you know, the investigation was unable to come up with any more definitive evidence other than what I laid out in that paragraph.

THE COURT: Let me ask the question a different way,

P2SL911O

just so I can be clear.

Is it your understanding that this ten-page letter that, I believe, was submitted to Baker Tilly, I think jointly authored by Guzman and Goldberg, that you have not seen, is it your understanding that that letter is about Mr. Marks' billing practices and preparation?

MR. ASNER:  I believe just in part, but let me -- I don't believe that the whole thing is, but I am not sure.  I mean, you know, I am shooting in the dark because I have never seen the letter, but let me make sure.

Our understanding, not having seen the letter, is that it concerned Mr. Marks' billing practices generally, including with other clients, and not just with WAMY.  You know, we have never seen the letter, so I am reluctant to be too definitive about it because it was something that was always just a black box for us.

THE COURT:  OK.  Great.  Thank you.  This is very helpful.

Mr. Haefele, I am happy to have you start wherever you would like to start, and I am sure I will interrupt you at some point.

MR. HAEFELE:  The first point is, thank you for clearing up the microphone thing because I was having trouble hearing you, so I appreciate that.

Robert Haefele from Motley Rice.  Thank you, Your

Honor, for taking the time to address this issue.

At the outset, I want to underscore that the plaintiffs, the Plaintiff's Executive Committee and all the plaintiffs' lawyers, share the Court's concern about the unnecessary and preventing unnecessary expenditures of time and resources in the litigation.  We do want to join the Court in being -- and I think the defense counsel, in being good stewards with the resources, and we want to make sure that other very important issues in the litigation get the proper amount of attention.  So we are not trying to use this as something to either draw the Court's attention away from other very important issues in the litigation or -- importantly, I think there is a sense on the WAMY counsel side that we are trying to use this to be some kind of sword against them as a personal matter.  In fact, there seems to be some personal animosity directed at us, and I want to underscore that that is not the purpose that we have raised this to the Court.  We got an anonymous letter that we understood to be very serious allegations, and brought those allegations to the Court's attention.  And I think that that was a responsible approach rather than something that should be taken as a personal attack on the defense lawyers.  It's not intended as a personal attack on the defense lawyers.

But with all of that said, we are keenly aware that the letter does raise some serious allegations.  And the

P2SL911O

plaintiffs in the litigation have been very concerned about making sure that the allegations are properly vetted and that we get to the bottom of what happened at that deposition. The allegations that were raised in the anonymous letter came to the plaintiffs' lawyers, and they have been, to some extent at least, substantiated. So they are serious. They are at least partially substantiated. To the extent that they are not substantiated, they are just left pending out there. The plaintiffs are eager to make sure that the information that is before the Court is vetted and we understand what happened.

As your Honor knows -- I think we went through what some of the allegations are. Essentially, there were five people in the deposition room: The two lawyers for WAMY, the one witness, and the two additional individuals. For example, we don't even know -- what we have heard is that those witnesses -- there is no evidence that those witnesses helped the witness. If they were not there to help the witness, we don't know any reason, any other reason why those two individuals were in the room, and we haven't heard anything to indicate one way or the other. One of the ways that we would know what happened and why those folks were in the room at all is to hear from them individually. We have heard --

THE COURT: You are saying the fact that they were there is itself suspicious?

MR. HAEFELE: The fact that they were there, yes.

THE COURT:  When you take a deposition, in the 9/11 case or otherwise, don't you have your associate in the room or a co-counsel in the room who is not going to be asking questions?

I mean, the fact that the staff people were there doesn't strike me at all as suspicious.  I mean, these reports are the product of more than one person.  I think everybody's expert report in this case is the product of more than the person who is actually going to do the talking.  And so the notion that WAMY would hire an institution like Baker Tilly and then present their expert for deposition without having other people as part of the Baker Tilly team in the room doesn't strike me as surprising in the slightest.

MR. HAEFELE:  Well, my response to that is twofold, your Honor.  First off, yes, we do have folks in the room, but they are typically there to help.  They are there to feed us questions.  They are there to be additional ears and help us work through the deposition.  They are not there just to be potted plants and do nothing.  They are there for a purpose.  When we have other folks in the room during the deposition, they are usually there to help us get through the deposition.

THE COURT:  I am not suggesting they wouldn't be there for a purpose, because, presumably, Mr. Marks one day is going to testify in a trial, and so the idea that his staff might be there to see the types of questions that are being asked, and

P2SL911O

then ultimately help him prepare for trial testimony, that doesn't -- that particular fact does not strike me as particularly unusual.

MR. HAEFELE:  And the other unusual aspect is, we do have allegations that they were there for an improper purpose. We have outstanding allegations that have never been fully vetted, never been fully addressed, never been fully explained as to the fact that these individuals were in the room not only for an improper purpose, but they were doing something improper; that something improper in that room was happening, whether it was the two witnesses doing it or witnessing other folks doing it, that there was assistance.  A particularly egregious one would be the allegation that there was feeding answers to the witness on a white board.  That information -- there is at least one witness, Mr. Goldberg, who has not had his testimony taken.  And in none of the circumstances has anybody been required to submit sworn testimony to resolve these issues.

Your Honor has alluded to the fact that this is not the first time that we have had some kind of allegations of impropriety.  And in the last instance where that happened, what your Honor -- many of the folks submitted declarations quickly, and some folks that didn't, your Honor required them to submit declarations to explain what happened, and we got to the bottom of what happened, and your Honor resolved the

issues.  That is not what happened here.

What happened here is, the defense lawyers retained outside counsel to defend them in the allegations.  The outside counsel were not retained as independent investigators for the Court.  They are not special masters.  They were here, retained to defend, in a proceeding that was adversarial, to defend WAMY and to defend the allegations related to BT.  And they did their job.  I am not suggesting that they did anything -- that the lawyers, the outside counsel, did anything inappropriate.  They defended their clients.  But that still doesn't -- and they essentially acknowledge, it did not get to the bottom of some of the allegations.  The allegations have been left undetermined.  They came to the conclusion that they couldn't come to conclusions on certain information.

And in addition to Mr. Goldberg not having his testimony taken -- and underscoring, nobody has had their testimony taken.  Nobody has given sworn statements.  But Mr. Marks apparently -- and we just learned this today -- Mr. Marks hasn't even been interviewed.  So we have now two witnesses in the deposition that -- as to what happened, and their statements have not been taken, and none of them have had sworn testimony provided.

THE COURT:  I don't think it's correct that Mr. Marks hasn't been interviewed.  I think it's that the outside counsel to WAMY did not interview Mr. Marks.  I believe outside counsel

P2SL911O

to Baker Tilly did.

MR. HAEFELE:  OK.  Maybe I misunderstood that.  But regardless, we still don't have any sworn statements from anybody as to what happened in the deposition.  And there may be a difference between -- there is a vast difference between knowing what was actually asked of the witnesses during the interviews.  Sometimes questions can be framed in a way to not reach a particular piece of information, and then the end result of their questioning is, it's inconclusive.  If a little bit more questions get put to the witness, maybe it could be conclusive one way or another.  But it's also vastly different whether those questions and answers are under oath.  And I think that you can find either a witness is more forthcoming or refusing to do declarations, which may be an answer in and of itself.

So I think, your Honor -- first off, the idea that it was a problem for the plaintiffs' lawyers to bring this issue to the Court, which -- at every turn throughout this whole process, the defense lawyers have turned it and tried to -- including in the letter that came to your Honor yesterday, they have tried to turn it that the plaintiffs' lawyers did something inappropriate by raising this issue to the Court.  It is not an attack on the defendants.  It is not an attack.  We received an anonymous letter, had serious allegations.

The PEC understood it would be problematic not to

P2SL911O

raise these concerns to the Court, and we have brought it to the Court. And we have been conservative at every step of the process in making sure that we are not overstepping ourselves. We didn't run out and reach out to these witnesses individually because we wanted your Honor's permission, authority, to go and do this. And we understood that after we raised these concerns to the Court, the likelihood, we had hoped, was that we would be able to do some sort of short depositions, be able to notice or subpoena these folks for short depositions to find out. Your Honor didn't want to do that, and I respect your Honor on that, but a shorter step of that might be requiring declarations from these individuals so that we can find out under oath what their answers are to the information.

Just a few short --

THE COURT: May I ask a question?

MR. HAEFELE: Yes, your Honor. Of course.

THE COURT: I don't know where Goldberg is, and we may never find that person. It sounds like Guzman is at least participating.

You know, if Guzman were to testify in a declaration that, you know, during the deposition he would speak with Mr. Marks about his testimony, you know, that they would take breaks and they would talk about questions and answers, what do you think the next step would be?

MR. HAEFELE: I mean, I guess it depends on

P2SL911O

specifically what that was because, first off, that is a violation, and it's a violation for anybody to be speaking substantively about how to answer questions during the break. I guess it depends on what was actually discussed during the breaks. But it would be inappropriate.

It would be inappropriate for the defense lawyers to allow that sort of access to the witness to change his testimony during the process of the deposition. So it would be problematic. And I think the next steps would be depending on what information we learned. But I think --

THE COURT: Is the best then to strike the deposition? You have his expert report, so you know what his opinion is. There's already been a Daubert motion on that. So his opinion is his opinion. The case will move forward and, you know, he may be required to take the stand and testify.

MR. HAEFELE: Well, your Honor --

THE COURT: I guess my question is, what happens? The deposition gets struck?

MR. HAEFELE: But I am not sure your Honor is right with the premise there that we know what his opinions are, because what we do know, perhaps, is what the opinions are of the people that were actually behind -- theoretically, if the allegations are right, we never actually got to depose Mr. Marks as to what his opinions were because he wasn't answering the questions. Somebody else was feeding him the

answers.  So to say to strike the deposition and we just run with what his report is, that means we have a report that we never got to depose him on.

THE COURT:  It seems to me unlikely that an entire deposition, a multi-hour deposition, with a court reporter in the room, was conducted where every single answer was fed to the witness from two people in the room.  That seems unlikely.

MR. HAEFELE:  I agree with your Honor on that, but --

MR. POUNIAN:  Your Honor, if I may.  I don't think the court reporter was in the room for the deposition.  Maybe the attorneys who were there could correct that.

MR. HAEFELE:  The court reporter was not in the room. The only people that were in the room, now we know, were the two WAMY lawyers, the witness, and the two additional people. The court reporter was remote.  The technologist that put up the documents was remote.  And, of course, the plaintiffs' lawyers and the other defense lawyers were remote, including, importantly, I suppose, defense lawyers who were not questioning, who put themselves on the record, and I think at least one paralegal who was from one of the other defense firms that put her appearance or her presence at the deposition on the record.

And that's another important thing that was raised earlier.  It is not true that the practice in this litigation has been for the court reporter to ask the witnesses -- or ask

P2SL911O

the lawyers at the start of the deposition whether there are other folks. The appearances happened before we went on the record. Everybody submitted their -- who was in the room, or virtually in the room, for each of the depositions to the court reporter beforehand. And it is not the court reporter's obligation to fulfill the requirements of the deposition protocols. It is not the plaintiffs' obligation to fulfill the defendants' lawyers' obligations under the protocols. It is each lawyer's obligation, and it is the people in the room who presumably sign off on being in the room to meet the requirements of the protocol.

So there seem to be steps throughout the reports and throughout the dialogue with the defense lawyers that blame the plaintiffs' lawyers' and what happened. They are the ones that are blaming us inappropriately or blame the court reporter or blame the other lawyers in the room. The fact is, they had an obligation to fulfill the obligations under the deposition protocol, and they failed.

And I think if you go through the deposition, to get back to what your Honor had asked about observing conduct during the deposition, and saying that it didn't happen throughout the deposition, it may not have been every question, but if you watch this deposition and you watch -- I think we had identified over 800 instances throughout the deposition where Mr. Marks looked for help. That's a substantial amount,

and it happened throughout the entire deposition.  There were not many pages in the deposition where there wasn't some glance from Mr. Marks for help.

I think there was some description about the setting in the room.  Mr. Marks was seated at the head of a long table.  In front of him was one computer monitor.  Slightly to his left was a second computer monitor.  Behind the computer monitor, slightly to his left, was Mr. Goetz, on the left side of the long table, left side of Mr. Marks.  On the right side of Mr. Marks, somebody else was seated, either Mr. -- one of the two witnesses.  On the far end of the table, you can see in images, on the far end of the long table was Mr. Mohammedi, and seated next to Mr. Mohammedi was one of the other witnesses.

In some of the images, although I agree that it is not absolutely distinct and clear because the reflection in the glass behind the witness, behind Mr. Marks, it's not entirely clear because it's blurred, it was not focused on, but you can see images that appear consistent with a white board in the room.  I cannot be certain, and that's part -- because we cannot be certain is the reason why it's so important that we take written statements that go to specifically what the allegations were, rather than general denials and "Nothing inappropriate happened."  Because when we first started this whole process, there was anger from Mr. Mohammedi towards me that we would even utter anything had inappropriately happened

P2SL911O

at the deposition, and he absolutely assured me that nothing inappropriate happened in this deposition, but something -- they have acknowledged now that something at least inappropriate happened in the deposition. There were two witnesses that were there that weren't supposed to be there, or two individuals who were there that weren't supposed to be there.

THE COURT:  I am glad that you brought the whistleblower letter to my attention.

MR. HAEFELE:  Pardon me, your Honor?

THE COURT:  I am glad you brought the whistleblower letter to my attention.  I think this was the appropriate thing to do.

MR. HAEFELE:  Thank you.

THE COURT:  I recognize that your allegations are, you know, the lawyers in the room would have to be complicit with this.  And so I also appreciate why, you know, the nature of the allegation is taken personally, because in order -- if you are correct, then these two officers of the court allowed this type of very surprising conduct to take place in their presence and did nothing to stop it.

So it is a pretty significant accusation, not just that Mr. Marks was getting help from his team, but that two officers of the court, who have been in this case for over a decade, decided to sit back and watch as, you know, coaching

P2SL911O

happened. So I understand why they take it personally, because it is a personal attack, because you are attacking their integrity by saying that they sat there and allowed this to happen.

MR. HAEFELE: Just to be clear, it was not my personal attack. There were allegations raised to us. I am not attacking them. I am just trying to get to the bottom of what the allegations are.

THE COURT: Understood.

So your view is that the appropriate next steps would be to require Guzman -- I don't know if we even know where Goldberg is -- but to require Guzman to submit a sworn declaration, stating whether or not he was involved in inappropriate coaching during the deposition?

MR. HAEFELE: Your Honor, I would like to add Mr. Goldberg. I don't want to leave him out. If we are able to locate him, and I think we may, I would like to have him as well. So I am not leaving off the table --

THE COURT: I don't know where he is. I don't know if I have any authority over this person. These are non-parties who -- I don't know where they live. I don't know who they are. I don't believe Mr. Goldberg works at Baker Tilly. I actually don't think that --

MR. HAEFELE: Neither of them do, your Honor.

THE COURT: I don't think Guzman works at Baker Tilly

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

P2SL911O

anymore.  I am not sure what the scope of my authority is.

MR. HAEFELE:  It's my understanding neither Mr. Marks, Mr. Guzman, or Mr. Goldberg -- all three people who were in the deposition do not work at Baker Tilly anymore.  I am not sure what you make out of that, but all three of them are no longer at Baker Tilly.

So, yes, your Honor, I think we would like to have the opportunity to seek sworn testimony from those three -- from those three individuals, but particularly Guzman and Goldberg.

THE COURT:  OK.  You have never seen this ten-page complaint that was filed with Baker Tilly; is that correct?

MR. HAEFELE:  No.  It's one of the things -- another thing that we have asked for as well.  We would like to see the ten-page letter to see whether or not it includes any of the other allegations that are -- what we have heard is that they include concerns related to the billing practices, but I am not sure that we have ever heard that it didn't include any of the other allegations.

I think it would make sense for us to be able to clarify that issue by actually seeing it ourselves.  And if there is a protective order that needs to be in place, you know, I think we would be open to that.  But I think it's important that we are able to see --

THE COURT:  Please speak closer to the microphone.

MR. HAEFELE:  I think it's important that we are able

P2SL911O

to see what the allegations were that were raised in the ten-page letter as well.

THE COURT: OK. It sounds like this letter is going to include billing problems by Mr. Marks. It also sounds like those billing issues were never something that the client, meaning WAMY, was privy to.

Assuming that those records do reveal that there was billing issues with Mr. Marks, do you think you are entitled to any relief or remedy as to that particular issue?

MR. HAEFELE: To be clear, to the extent -- and I think there was some reference that there may be some billing issues unrelated to WAMY. I am not sure. To the extent it related to anything other than the relationship with -- any billing-related issues other than WAMY, we are not interested in those.

THE COURT: I assume you are not interested in non-WAMY stuff. But my question is, even if it's WAMY, why would you be entitled to that?

MR. HAEFELE: I think it's relevant to the extent that it supports some of the allegations in the whistleblower letter. To the extent that it's only that, it's probably less of a concern for us. But to the extent that it is that and other things -- they all make consistent -- or they all underscore the veracity of the whistleblower letter, the allegations letter that was sent to plaintiffs' counsel.

P2SL911O

MR. GOLDMAN:  Your Honor, may I speak for a second?

THE COURT:  Sure.

MR. GOLDMAN:  You had raised the issue what was the proper remedy if this misconduct took place.  One of the critical issues, and one of the main purposes of a deposition of an expert is to test his theories, test his ability, test his methodology, test his expertise, as well as present a record for the finders of fact or, ultimately, when it goes in front of a jury, to test that person's credibility.  If the person had engaged in misconduct, for example, in billing, it might very well go to that witness's ultimate credibility.  That's why I think these types of inquiries are material and appropriate in this case.  Thank you.

THE COURT:  Anything further?

MR. HAEFELE:  No, your Honor, unless you have other questions for us.

THE COURT:  I don't think so at this moment.

MR. HAEFELE:  Thank you.

THE COURT:  Thank you.

Counsel for WAMY.

MR. GOETZ:  Good morning, your Honor.  Frederick Goetz, Goetz & Eckland, on behalf of WAMY.

Your Honor, Plaintiffs are simply asking this Court to reverse the ruling that you made on January 13, 2025, and to reopen expert discovery in light of unfounded allegations in

P2SL911O

this anonymous letter. And what they are asking is unwarranted, it's abnormal, and it is without authority.

The proposal to collect sworn statements in particular from persons present at Marks' deposition, and the proposal that was not discussed so much, but also to review the sensitive materials that this Court specifically allowed Baker Tilly to submit ex parte, we ask that you reject those proposals. They are punitive and not substantive, and will at the end of the day add nothing to the thorough review already conducted by the Court.

Counsel indicates, well, there's stuff just left hanging out there. There isn't. There isn't, and nothing they are proposing is going to change that. This is simply, your Honor, a back-door attempt to reopen expert discovery and to challenge Marks again, where this Court has thoroughly reviewed his qualifications, his background, and the work he did on this case.

Sworn statements, your Honor, are unwarranted in this case. The explosive allegations, as the Court has correctly termed them, came through an anonymous letter of unknown providence. We don't know where it came from. Plaintiffs took these allegations seriously. We have no quarrel with that. The Court took these allegations seriously. We have no quarrel with that. That's absolutely what should have happened. But also, WAMY took those allegations very, very seriously.

In your order of October 11, 2024, you directed WAMY to provide a response to the allegations that included a complete description of any related investigation conducted by Baker Tilly. Respectfully, WAMY followed your directive, and then some. Baker Tilly, that investigation we have heard about, a little bit about, and the Court has more information on that than I do because I haven't seen the ex parte submission. But there was a second investigation that the Court has heard about extensively that Arnold & Porter conducted, and that investigation, your Honor, counsel suggests, well, this was just a retained work of advocacy. We did that to shed light, to provide transparency, to look at everything because, as the Court indicated, these allegations are personal. Meant that way or not, they go directly to our standing as lawyers, and so we absolutely took them seriously and gave that charge to Arnold & Porter, and I think they have fulfilled that comprehensively and thoroughly.

The end result, your Honor, is that when you get to the nub of what is, I submit, most important -- I am not putting anything aside about the people being in the room. They should have been disclosed, full stop. We accept responsibility for that. But when it comes to providing answers to pending questions and coaching Mr. Marks during his deposition, that is unfounded.

When it comes to Baker Tilly burying evidence that

P2SL911O

WAMY supported the terroristic attacks of 9/11, that allegation is unfounded.  WAMY's counsel, your Honor, were interviewed as part of that investigation.  In that capacity as interviewees, but also in the capacity when we submitted the separate submission to the Court that was at ECF 10533, we acted, as we do anytime we are before your Honor to do anything in this case, as officers of the court.  And respectfully, your Honor, as you know, that means something.

So when counsel talked about declarations, they, respectfully, trivialize the responsibility of officers of the court to tell the truth.  We have an ethical obligation to have candor to this tribunal.  We had an ethical obligation, anything that we said during the course of the investigation by Arnold & Porter because that was going to be transmitted, and it was transmitted directly to your Honor.

Both the Arnold & Porter report and the letter from WAMY counsel have been publicly filed.  Plaintiffs' counsel are free to do with those public filings whatever they want, to disseminate them as they will.  Nothing has been left hanging out there, your Honor.  Sworn declarations are not warranted at this point.

The abnormality of Plaintiffs' proposal comes down to when I think what they are proposing as a practical matter. They are asking you to allow opposing counsel to basically conduct an investigation of members or interviews of members of

P2SL911O

our expert's litigation team.  That is going to open the door to all kinds of work product issues, mental impressions issues, among other things.  And if you are talking about specifically interviewing Guzman and Goldberg, I can't speak for Baker Tilly -- counsel is here for Baker Tilly -- but whether there is nondisclosure agreements, noncompete agreements, I don't know what employment issues would be triggered or what that might entail, but there's significant concerns, your Honor.  And to simply give opposing counsel unfettered access to those witnesses I think is abnormal, to say the least.

When it comes to then the other proposal, to allow counsel to review the ex parte submissions, I think that would defeat the very purpose that the Court put in place, to allow that frank communication by Baker Tilly, because it was going to be in camera, and it was going to be reviewed -- or submitted simply on an ex parte basis.  My understanding -- I haven't seen it, but that's what Baker Tilly did.  And that submission to the Court included certain attorney/work product concerning Baker Tilly's internal investigation, information provided by their in-house counsel to outside counsel, as well as sensitive employment information.  All of that was submitted to the Court under the understanding that it would be ex parte, and to now allow Plaintiffs' counsel to access that would defeat the very protections the Court put in place.

And finally, your Honor, respectfully, I don't believe

P2SL911O

there is any legal authority or precedent that supports what Plaintiffs are asking you to give them permission to do in this specific instance.  There is nothing in the Federal Rules of Civil Procedure that would allow one party to obtain declarations from an opposing counsel's -- from opposing counsel or non-party members of opposing experts' litigation team.

Where declarations have previously been allowed, including in this case, it is because there was an acknowledged and admitted breach of the confidentiality order, and the question is, where did the leak come from?  That was the case before this Court.  There was no question that the alleged impropriety occurred, the breach.  Here, the alleged impropriety, the providing answers to pending questions during the deposition live, that did not happen.  The alleged impropriety, burying evidence, that did not happen.

*Schiller v. City of New York* is a case that was cited previously in the other litigation this Court has had on this issue.  There, the Court declined to require counsel to attest to their innocence in breach of a confidentiality order were opposing counsel not able to produce some evidence that they were the source of the leak.  That's at 207 WL 1623108.  And the *Schiller* court cited the case from Arkansas, *Jones v. Clinton*, with real concerns that really bring us to and point out where we are today or what's happening today.  Courts are

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

understandably reluctant to authorize wide-ranging discovery unrelated to the merits of an action simply to ferret out the source of a leak.  The Court in Arkansas noted, "The history of this case suggests that such additional discovery, rather than being limited, would be contentious and time consuming."  And that is exactly what has gone on.  I am not saying it was not warranted, but at some point it must stop.

There have been thorough investigations before your Honor on this issue, and the explosive allegations have been unsubstantiated.  Plaintiffs have been litigating this issue for five months now.  On October 9, 2024, they represented to this Court that they would provide you with evidence corroborative of the explosive allegations.  They didn't do that.  On November 26, 2024, they claim to identify multiple indicia consistent with the explosive allegations, these 800 screen shots.  This Court independently reviewed for itself Marks' deposition and did not view his performance as indicative of cheating, because it wasn't.

In conclusion, your Honor, the parties and the Court have spent significant time and resources litigating this issue.  It's a serious issue, and those expenditure of resources were warranted, but I want to advise the Court that this has been, obviously, a very expensive endeavor for our client.  They have taken it, and it's happened, but rather than focusing on the merits of the case and defending this lawsuit

P2SL911O

like no other, they have been dealing with this issue.

THE COURT:  I don't know whether you have a view or not, but one question that I have is, what is in this ten-page complaint that, I believe, Guzman and Goldberg submitted to their employer, Baker Tilly?  That document I haven't seen, and I am curious if you have a view on that.

MR. GOETZ:  My view would be this, your Honor:  That if there is going to be a submission of that document, it should go to the Court in camera.  I think that's the place to start.  And again, I don't know what Baker Tilly submitted, whether they described that for you.  I know we have second-hand descriptions, or possibly third-hand descriptions of what that contained, as represented by Mr. Asner.  But if there is any -- given the sensitive nature of it, it concerns a lot of other issues that have nothing to do with this case whatsoever, I think if it is going to be submitted, it should simply be first to the Court in camera.

THE COURT:  Thank you.

Can I just ask you one other slightly unrelated question, which is, can you refresh my recollection where the claims against WAMY are right now.  What is the status of the claims?

MR. GOETZ:  Well, I believe expert discovery is concluded.  We have argued Daubert issues.  Some of those are still pending before your Honor.  I think we have Rule 72

P2SL911O

objections up before Judge Daniels.

THE COURT:  You have some that are pending before me?

MR. GOETZ:  Some Daubert issues, yes.  You had the bellwether rulings, but then --

THE COURT:  The recent letters.

MR. GOETZ:  Yes, there was the Round 2 of that.

So, frankly, I think our position is we are waiting for Judge Daniels' ruling on the experts, then your ruling on the experts, and then whether we intend to bring the summary judgment motion.

MR. HAEFELE:  Your Honor, may I address that, just to clarify that one question?

What's pending before your Honor is the supplemental Daubert motions that the defendants had done regarding a few of the plaintiffs' experts.

THE COURT:  Right.  The letters, not full-blown motions but, sort of, five-page letter motions.

MR. HAEFELE:  I think that's right.

THE COURT:  OK.

MR. GOETZ:  In sum, your Honor -- and these attacks -- again, the letter, we have no issue that that should not have been brought to the Court's attention, but there is a question of how it was handled after that, and particularly when you look at the November 26, 2024 submissions.  There are personal attacks against Mr. Mohammedi.  Mr. Haefele, in particular, has

P2SL911O

created an unduly litigious environment, making it very difficult, if not impossible, for this matter to proceed in the ordinary course, and that's what we are asking that you do today.  Have this stop and let us proceed with the litigation in the ordinary course.

The allegations were serious, needed to be thoroughly investigated, and that has happened.  The Court has carefully considered the volumes of evidence on this issue before it, and found that the allegations that Baker Tilly buried evidence, that Marks was coached in real time at his deposition, and that he was otherwise unqualified were not substantiated.  The Court has concluded that PEC's request for discovery is overbroad and not justified, and nothing has changed, your Honor, since you issued your ruling in January to today, and we ask that you affirm your prior ruling.  Thank you.

THE COURT:  Thank you.

MR. HAEFELE:  Your Honor, may I?

THE COURT:  Before you do, just one second.

I know there are Baker Tilly lawyers, in-house counsel, here.  I know you are not outside counsel.  I may -- I am going to take all of this under advisement, but I may ask to see in camera that ten-page complaint that was filed.

Do you wish to be heard now?  Again, I don't mean to put you on the spot.  I know you are intentionally sitting many rows away from me.  So if that's ultimately my conclusion, I am

P2SL911O

happy to issue an order and allow your outside counsel to respond appropriately.

You are nodding yes, that's what you would like.  OK. All right.  Thank you.

Mr. Haefele.

MR. HAEFELE:  Thank you again, your Honor.

First off, there is nothing abnormal about what the plaintiffs have requested here.  In other words, this is essentially -- in fact, it's happened in this litigation previously, where the Court has required sworn statements from lawyers in the litigation, and in that instance, went so far as actually to allow the defense lawyers to question the lawyers, the plaintiffs' lawyers, under oath.  So we are not asking for that, but we are asking for sworn testimony to resolve these particular issues that continue to be outstanding.

Mr. Goetz said there is nothing that's out there still, but again, there is no sworn testimony.  There is nothing from Mr. Goldberg, and there is nothing about the ten-page letter that your Honor has identified as well.  So there are things that continue to be hanging out there.

Mr. Goetz says that the allegations of coaching and the allegations related to the evidence are unfounded, and I think what has happened is that the investigation that has been done by WAMY's lawyers, it's not that they are unfounded; it's just that they didn't, perhaps, ask the right questions or get

P2SL911O

to the right information.  What they have come back saying is, "We haven't determined whether or not they are true."  So it's not that they are unfounded; they just haven't found the answers.

THE COURT:  I think that's an overstatement.  I mean --

MR. HAEFELE:  Pardon me?

THE COURT:  I think that's an overstatement.  I mean, the Arnold & Porter firm said that they interviewed Guzman.  I assume that they asked the question, "Did you coach this witness," since that was the assignment that they were retained for.  And the report that you have seen is that the answer was, obviously, No, because there is no evidence that it happened. I appreciate that they have not interviewed Goldberg, but at least, you know -- I assume Mr. Asner and his colleague did a thorough job interviewing on this particular question, "Was there improper coaching going on," and the answer was, No, because that's what the evidence has.  Now, maybe --

MR. HAEFELE:  That's not what the report says.  If you read the report, there is ample -- nowhere does it say that question was asked and what the answer was, so I don't know. It may have been done.  I don't know.  But what we don't have is a question and answer under oath from Mr. Guzman, knowing for sure that he was asked the question and that his answer was presumably honest because it was under oath.  So we don't have

P2SL911O

that, and that's what we are asking for.

And to the extent that, you know, as Mr. Goetz indicated, that they have this ethical obligation, which I don't dispute, that should make their declaration very, very simple for them to answer. They have an obligation to be honest with the Court, and to the extent they are answering the questions honestly, it shouldn't be a problem. And certainly, that same ethical obligation that they are talking about doesn't -- as officers of the court, doesn't extend to the additional witnesses they are asking for declarations from.

And finally, your Honor, there were no personal attacks. At every turn throughout this whole process the defense has tried to turn this on the plaintiffs, that we are being the aggressors here. We aren't. In fact, we have been very conservative throughout this whole process. We haven't even -- I mean, we have intentionally not gotten to the notion of what the sanctions should be that should be imposed because the first thing we want to do is we want to know what the answers are, what the evidence is before we actually level the notion that there should be sanctions imposed.

Might there be sanctions that ought to be imposed? Your Honor would have to figure that out. You would have to decide those. Maybe. But the first thing that needs to happen is we need to get to the bottom of what happened. And the plaintiffs are watching this, and they are clamoring for

P2SL911O

answers because they see that there was indications of impropriety that have never been addressed. Thank you, your Honor.

THE COURT: Thank you.

Anything further from any of the counsel?

MR. GOETZ: May I take just one moment?

THE COURT: Sure.

(Conferring)

MR. ASNER: Your Honor, Mr. Goetz asked me to address the issue about whether the witnesses were asked pointblank about whether there was any coaching during the deposition or whether there was any evidence that was buried.

The terminology that we settled on in our report was that it was unsubstantiated. And I point the Court to, I guess it was page 5, under "Second": "No witness substantiated that allegation." We went through it thoroughly. This is my job. This is what I do. And we asked the witnesses in every way we could imagine about whether the allegations in the anonymous whistleblower complaint were accurate. We went through each of the allegations one by one, and no witness substantiated the explosive allegations, your Honor.

THE COURT: Thank you.

All right. Thank you, everybody. I will take all of this under advisement and issue my ruling shortly.

(Adjourned)