**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br><br>ECF Case |

This document relates to:

*Underwriting Members of Lloyd's Syndicate 2, et al., v. Al Rajhi Bank, et al.*, 16-cv-07853

**NOTICE OF APPEAL**

NOTICE is hereby given that Plaintiffs The Underwriting Members Of Lloyd's Syndicates 2, 53, 55, 205, 228, 271, 376, 510, 529, 535, 557, 588, 672, 807, 861, 991, 1003, 1121, 1209, 1236, 1243, 1308, 2003, and 2020; Marlon Insurance Company Limited; The Copenhagen Reinsurance Company (U.K.) Limited; Unionamerica Insurance Company Limited; SCOR Global P&C SE; SCOR UK Company Limited; SCOR Reinsurance Asia-Pacific Pte Limited; SCOR Reinsurance Company (Asia) Limited; SCOR Reinsurance Company; General Security National Insurance Company; General Security Indemnity Company of Arizona; SCOR Canada Reinsurance Company; Liberty Mutual Insurance Company; American Economy Insurance Company; American Fire and Casualty Company; Employers Insurance Company of Wausau; Excelsior Insurance Company; The First Liberty Insurance Corporation; General Insurance Company of America; Indiana Insurance Company; Liberty Insurance Corporation; Liberty Insurance Underwriters, Inc.; Liberty Life Assurance Company of Boston; Liberty Lloyds of Texas Insurance Company; Liberty Mutual Fire Insurance Company; LM Insurance Corporation; LM Property and Casualty Insurance Company; Liberty Managing Agency Limited for and on behalf of the Lloyd's Underwriting Members from time to time of Lloyd's Syndicates 4472, 190 and 282; Liberty Mutual Insurance Europe Limited; The Midwestern Indemnity Company; The Netherlands

Insurance Company; The Ohio Casualty Insurance Company; Peerless Insurance Company; Safeco Insurance Company of America; Wausau Business Insurance Company; Wausau Underwriters Insurance Company; West American Insurance Company; American Safety Indemnity Company; American Safety Casualty Insurance Company; Odyssey Reinsurance Company; and QBE Insurance (International) Ltd., hereby appeal to the United States Court of Appeals for the Second Circuit from each and every part of the Memorandum Decision and Order entered on August 19, 2026 (ECF No. 12247), a copy of which is attached as Exhibit A, in favor of defendant Al Rajhi Bank.

Respectfully submitted,

COZEN O'CONNOR

*/s/ Sean P. Carter*

Sean P. Carter, Esq.
J. Scott Tarbutton, Esq.
Abby J. Sher, Esq.
COZEN O'CONNOR
1650 Market Street, 28th Floor
Philadelphia, PA 19103
(215) 665-2000

Dated: September 16, 2026

*Attorneys for Plaintiffs/Appellants*

## CERTIFICATE OF SERVICE

I, Coleen D. Williams, do hereby certify that I am over 18 years of age, am not a party to the instant action, and that a true and correct copy of this Notice of Appeal, was served on all counsel of record via the Court's Electronic Case Filing System on this 16th day of September, 2026.

*/s/ Coleen D. Williams*
Coleen D. Williams, Paralegal
Cozen O'Connor
One Liberty Place
1650 Market Street, 28th Floor
Philadelphia, PA 19103

# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re Terrorist Attacks on September 11, 2001

MEMORANDUM DECISION AND ORDER

03 MDL 1570 (GBD) (SN)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

This document relates to:

*Underwriting Members of Lloyd's Syndicate 2, et al., v. Al Rajhi Bank, et al.*, No. 16-cv-07853
*Aguilar, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09663
*Addesso, et al. v. Kingdom of Saudi Arabia, et al.*, No. 16-cv-09937
*Aiken, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00450
*Hodges, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-00117
*Charter Oak Fire Ins. Co., et al. v. Al Rajhi Bank, et al.*, No. 17-cv-02651
*Abarca, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03887
*Arrowood Indemnity Co., et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-03908
*Abedhajajreh, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-06123
*Muenchener Rueckversicherungs-Gesellschaft Aktiengesellschaft, et al. v. Kingdom of Saudi Arabia, et al.*, No. 17-cv-07914

**GEORGE B. DANIELS, United States District Judge:**

This multi-district litigation ("MDL") arises from the injuries and losses caused by the September 11, 2001 terrorist attacks ("9/11 Attacks"). In the instant action, certain Plaintiffs within the MDL filed an amended complaint against Defendant Al Rajhi Banking & Investment Corporation ("ARB"), arguing that ARB knowingly participated, conspired, sponsored, aided and abetted, or materially supported Osama bin Laden and the terrorist organization known as Al Qaeda prior to the 9/11 Attacks. (*See* First Am. Compl. ("FAC"), *Underwriting Members of Lloyd's Syndicate 2, et al., v. Al Rajhi Bank, et al.* ("*Lloyd's*") (No. 16-cv-07853), ECF No. 56.)[1]

[1] Unless otherwise stated as is here, all ECF citations included herein refer to documents filed on the 9/11 multidistrict litigation docket. *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03-md-1570 (GBD) (SN).

Before this Court is ARB's renewed motion to dismiss Plaintiffs' claims for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). (ARB Mot. to Dismiss ("ARB Mot."), ECF No. 9785.) In the alternative, ARB requests that this court enter summary judgment pursuant to Fed. R. Civ. P. 56, hold an evidentiary hearing for adjudication of any disputed jurisdictional facts, or grant ARB's pending objections to Magistrate Judge Netburn's March 26, 2021 order. (ARB Memo. in Supp. Of Mot. to Dismiss ("ARB Memo."), ECF No. 9786, at 7.) ARB's motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) is GRANTED.[2]

## I. PROCEDURAL BACKGROUND[3]

On March 28, 2018, this Court granted ARB's motion to dismiss pursuant to Rule 12(b), holding that Plaintiffs had failed to establish specific personal jurisdiction over ARB. (*See* Memorandum Decision and Order (the "Order"), ECF No. 3947, at 13 ("[ARB's] provision of funds and services to charities and individuals who supported Al Qaeda do not, under the circumstances presented here, render them subject to the jurisdiction of this Court.").)

On October 15, 2019, the Second Circuit reversed and remanded the Order for jurisdictional discovery as to "(1) when the alleged support was given to Al Qaeda, (2) what support was given, (3) whether the support was 'earmarked' for use in specific schemes or attacks not directed at the United States, or (4) specifically how these defendants were involved in the

---

[2] Because this Court finds that it lacks jurisdiction over ARB pursuant to Rule 12(b)(2), it does not reach the parties' alternative requests for summary judgment, an evidentiary hearing, or consideration of ARB's Objections. *See In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 133 (S.D.N.Y. 2021) (citing *Darden v. DaimlerChrysler N. Am. Holding Corp.*, 191 F. Supp. 2d 382, 386 (S.D.N.Y. 2002)) (noting that the court "considers the jurisdictional issues first, because a dismissal for lack of jurisdiction renders all other claims moot."); *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 397 (2d Cir. 2009) ("Because of the primacy of jurisdiction, jurisdictional questions ordinarily must precede merits determinations in dispositional order.") (citation and quotation marks omitted).

[3] The relevant procedural background of this multidistrict litigation was discussed at length in this Court's opinions dated June 17, 2010, (ECF No. 2252), September 13, 2010, (ECF No. 2312), and January 11, 2012, (ECF No. 2527), among others, and is incorporated by reference herein. This Court will only restate relevant factual background as necessary to address the pending motions.

process of providing support to Al Qaeda." *Lloyd's*, 779 F. App'x 66, 69 (2d Cir. 2019) (quoting *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks VII*"), 714 F.3d 659, 678–79 (2d Cir. 2013)). On remand, ARB requested that its pending Rule 12(b)(6) motion be addressed before jurisdictional discovery. (ARB Mot.) Magistrate Judge Netburn denied this request, and jurisdictional discovery proceeded under her supervision. (ECF No. 6681.) ARB objected. (ECF No. 6724.)

After three years of jurisdictional discovery between April 2021 and February 2024, Plaintiffs filed an original averment on March 8, 2024, and a corrected averment on May 7, 2024. (*See* Pl. Original Averment of Jurisdictional Facts, ECF No. 9624; Pl's Corrected Averment ("Pl.'s CA"), ECF No. 9764.) ARB filed an averment on May 7, 2024. (*See* ARB's Averment of Jurisdictional Facts ("ARB Aver."), ECF No. 9787.) ARB subsequently moved to dismiss under seal on May 7, 2024. (ARB Mot., ARB Memo., ARB Declarations in Supp. of Mot. to Dis. ("ARB Decl.'s"), ECF Nos. 9788, 9789, 9870, 9871.) Plaintiffs filed their opposition on July 22, 2024. (Pl.'s Opp. of Def.'s Mot. to Dismiss ("Pl's Opp."), ECF No. 10152; Pl.'s Declarations in Support of Pl.'s Opp. ("Pl.'s Decl.'s"), ECF Nos. 10153, 10401). ARB filed a reply on September 30, 2024. (Def.'s Reply ("Reply"), ECF No. 10403; Reply Decl.'s, ECF Nos. 10404, 10405.) The parties later refiled their submissions publicly. (*See, e.g.*, ECF Nos. 10587, 10590, 10591.) This Court heard oral argument on December 10, 2024. (ECF Entry 12/10/2024.) Since oral argument, the parties have filed various letters regarding this motion. (*See* ECF Nos. 11035, 11043, 11047, 11163, 11164, 11171, 11190, 11349, 11354, 11905, 11926, 11942.) All of the parties' submissions have been considered by this Court.

## II. FACTUAL BACKGROUND

### A. ARB, the Sulaiman Al Rajhi ("SAR") Charity Committee, and the Sulaiman Abdul Aziz Al Rajhi ("SAAR") Foundation.

ARB, one of the largest banks in Saudi Arabia, was founded by Sulaiman bin Abdul Aziz al Rajhi ("Sulaiman") and his three brothers. (*See* Pl.'s Affirmation, ("Pl.'s Aff."), Abdullah Dep., Ex. 1, at 24:12–25.) ARB was the only fully Sharia-compliant bank in Saudi Arabia until 2004. (ARB Aver., ¶ 13.) Between 1998 and 2001, ARB maintained a Payable Through Account ("PTA") with Chase Manhattan Bank in New York. (Pl.'s CA, ¶¶ 35–36.)

According to ARB's Annual Reports, Sulaiman served as Chairman and Managing Director of ARB in 1998, 1999, and 2002. (*See* 1998-2000 ARB Annual Reports, ECF No. 105946, Exs. 6-8.) Sulaiman continued to serve as Chairman of ARB until 2014. (Abdullah Dep. at 42:4–5.) From 1998 to 2002, Abdullah bin Sulaiman Al Rajhi ("Abdullah"), Sulaiman's son, served as the general manager of ARB, which involved overseeing day-to-day operations and reporting to the board of directors. (*Id.* at 36:6–17.) In 2023, Abdullah served as both Chairman of the board of directors and Chairman of the executive committee. (*Id.* at 18:5–19:14.)

From 1998 to 2000, beyond serving as the Chairman of ARB, Sulaiman also engaged in charity work donating funds to Islamic causes. Sulaiman did this first through the "SAR Charity Committee," without formal licensing and or an official charity designation, until 2000. (*id.* at 257:9–19.) The SAR Charity Committee was later licensed by the Ministry of Social Affairs and thereafter began to officially operate as the Sulaiman Abdul Aziz Al Rajhi Charitable Foundation in 2000. (SAAR Website; ECF No. 10594, Ex. 13.) The Foundation also included other charities, including the SANA-BELL, Inc. and Humana Charitable Trust (collectively, the "SAAR Foundation"). (Pl.'s CA, ¶¶ 45-46; SANA-BELL Articles of Inc., ECF 10594, Ex. 24, at 2.) The

SAAR Foundation "supports charities and nonprofit foundations registered in Saudi Arabia in the fields of: education social, health and media, in addition to building mosques[.]" (SAAR Website.)

The SAAR Foundation was eventually incorporated in the U.S.. (SAAR Articles of Inc., ECF No. 10594, Ex. 19, at 16.) Its Certificate of Incorporation listed the names and addresses of the initial board of trustees, which included "Mr. Abdullah S. al-Abdul Aziz" and "Mr. Sulayman A. al-Salih." (*Id.* at 15.) Abdullah confirmed that the "Abdullah S. al-Abdulaziz" listed in the U.S. SAAR Foundation Annual Reports was referring to himself, and the "Sulayman A. Al-Saleh" listed in the Reports was referring to his father, Sulaiman. (Abdullah Dep. at 311:5–314:15.) He also confirmed that neither he nor his father had ever resided at the addresses listed alongside their pseudonyms in the Certificate of Incorporation and the Annual Reports. (*Id.* at 314:16–315:6.) An anonymously supplied document purported that, as of December 28, 2000, the charity office was managed by "Abdul Rahman Bin Abdullah Al Rajhi, Saleh Bin Sulaiman Al-Habdan, and Abdullah I. Al-Misfer." (SAAR Donor Letter, ECF No. 10594, Ex. 14.)[4]

A Federal Bureau of Investigations ("FBI") and Central Intelligence Agency ("CIA") Joint Intelligence Report ("Joint Report") described these charities as "a complex web of overlapping companies with parallel ideologies, personal relationships, and financial associations that has exhibited numerous affiliations with entities known to support terrorism." (Joint Report, ECF No. 10594, Ex. 26, at 24.) According to the Joint Report, "the SAAR Foundation, in concert with its subsidiary companies, provided monetary support and other assistance to organizations linked to the Palestinian Islamic Jihad and HAMAS." (*Id.*) U.S. Customs Special Agent David Kane

[4] Despite this information, ARB's Chief Strategy Officer James Galloway claimed in 2023 that Abdullah "had no involvement" in the SAAR Foundation's activities. (Galloway Dep., ECF No. 10594, Ex. 3, at 280:22–281:12.) Abdullah also maintained that he was not involved in the activities of his father's charity office at the time of its existence other than "some contact" with the office's personnel and "general discussion" with Sulaiman regarding the office's charitable work. (Abdullah Dep. at 259:4–263:15.)

similarly asserted that the SAAR Foundation was involved in a web of companies and charities controlled by "a group of individuals that are suspected of providing material support to terrorists, money laundering, and tax evasion[.]" (Kane Affidavit, ECF No. 10594, Ex. 27, at 2.)

Special Agent Kane also claimed that the SAAR Foundation transferred funds to entities in the Isle of Man in order to "disguise the origin and ultimate destination of the moneys." (*Id.* at 52.) For example, Kane alleged that M. Yacub Mirz, an officer and/or director of the SAAR Foundation, "told auditors that he had set up Humana Charitable Trust in the Isle of Man to receive transferred assets from SAAR, due to publicity tying SAAR to terrorist organizations." (*Id.* at 57.) In a letter dated October 18, 1999, Sulaiman stated that "Humana Charitable Trust will join in and pay part of these [charitable] contributions." (Humana Charitable Trust Letter, ECF No. 10594, Ex. 29, at 3.) The letter attached a three-page list of contributions and their beneficiaries, but did not provide the origin of the funds. (*Id.*) A series of email communications between an anonymous individual, Abdullah Al Rajhi, and Bushra Ahmed (through Abdullah's email account), also referenced contributions to various charities. (Humana Contribution Emails, ECF No. 10594, Exs. 30–37.) In an email to Abdullah on February 14, 2001, the sender suggested that Abdullah "make contributions from Humana's account directly to charities of choice, rather than thru Shaikh Sulaiman's account which may be questioned as IRS is raising doubts if Humana is really a charitable organization." (2001 Humana Email, ECF No. 10594, Ex. 37.) Another anonymous letter claimed that "SAAR Foundation then made a charitable contribution of assets to Humana to be used solely for charitable purposes." (SAAR Donor Letter.) That same letter stated that, "[i]n accordance with the established practice of the Charity office . . . the checks are processed without showing the contributor's name. These are processed by Al Rajhi Banking and Investment Corporation, having its account with Chase Manhattan[.]" (*Id.*)

**B. <u>Al Haramain Islamic Foundation ("AHIF") and International Islamic Relief Organization ("IIRO")</u>**

Plaintiffs aver that ARB served as the "bank of choice" for "front charities" involved in the financing of Al Qaeda's global operations. (ARB Aver., ¶ 204.) The alleged "front charities" examined during jurisdictional discovery include the Al Haramain Islamic Foundation ("AHIF") and International Islamic Relief Organization ("IIRO"). (*id.* at ¶ 218.)

The AHIF was a Saudi Arabia-based nonprofit organization established in the 1990s which "exist[ed] to promote Wahhabi Islam by funding religious education, mosques, and humanitarian projects around the world." (National Commission Report, ECF No. 10594, Ex. 44, at 114.) Although the organization was headquartered in Saudi Arabia, it maintained branch offices in multiple regions with a presence in at least 50 countries at the height of its operations. (*Id.* at 114–115.) Multiple institutions and individuals have previously recognized the humanitarian efforts of the AHIF. (*See id.* at 115 ("HIF provides meals and assistance to Muslims around the world, distributes books and pamphlets, pays for potable water projects, sets up and equips medical facilities, and operates more than 20 orphanages."); Letters from AHIF's KYC Files, ECF No. 9871, Ex. 5, (AHIF "sponsors over three thousand five hundred orphans in many poor Muslim countries, and for this purpose, the Foundation has opened orphanages in which orphans can find everything they need such as accommodation, food, and medical treatment in addition to education."); Dean Report, ECF No. 9871, Ex. 1, at 20 ("[AHIF], IIRO, and WAMY were known as among the most prestigious charities. These organizations were regulated by the government, and regarded as ideal recipients of charitable giving by Saudi Muslims in fulfilment of religious duty.")) Plaintiffs describe AHIF as "dedicated to propagating an extreme and intolerant form of Islam throughout the world." (ARB Aver., ¶ 74.)

During the relevant discovery period, AHIF was licensed, approved, and supervised by the Kingdom of Saudi Arabian ("KSA") government. (1997 Letter from Dep. Min. of Islamic Affairs, ECF No. 9871, Ex. 42 ("Please note that it is fine to keep [AHIF's] Account No. (10555/9) at your branch No. [166]."); National Commission Report, ECF No. 10594, Ex. 44, at 12 ("At least two Saudi government officials have supervisory roles (nominal or otherwise) over al Haramain.") ARB's maintenance of at least some of AHIF's accounts was approved by the Saudi government. (1999 Commercial Office License at 3, ECF No. 9871, Ex. 44; Letter from the Ministry of Islamic Affairs, ECF No. 9871, Ex. 26, at 2 ("This is with reference to your letter . . . about opening an account for Al-Haramain Islamic Foundation. Please note that Al-Haramain Islamic Foundation is authorized to practice charity work."); Letter from the Ministry of Justice, ECF No. 9871, Ex. 27, at 3 ("[T]he following organizations are legally established in Saudi Arabia and are permitted to operate under its laws and regulations . . . Al-Haramain Islamic Foundation.".) A January 4, 2003 letter signed by Abdullah Al Rajhi, then Director General of ARB, indicates ARB's understanding that AHIF "is licensed according to His Highness the Minister of Interior's letter[.]" (2003 Letter to SAMA Governor, ECF No. 9871, Ex. 24, at 2.)

Prior to the 9/11 Attacks, neither AHIF headquarters nor its branches were designated for supporting terrorism. However, multiple AHIF branches and officials were designated in the years following the 9/11 Attacks, and the entirety of the AHIF including their Saudi headquarters was designated on June 19, 2008.[5]

---

[5] (Treasury Secretary Remarks, ECF No. 10594, Ex. 56 (on March 11, 2002, the U.S. Department of the Treasury made its "first joint designation of a financial supporter of terrorism," and blocked the accounts of "the Somalia and Bosnia-Herzegovina branches of [AHIF]"; the Treasury Department also stated that, "the Saudi headquarters for this private charitable entity is dedicated to promoting Islamic teachings."); January 2004 Treasury Secretary Remarks, ECF No. 10594-7, Ex. 57 (January 22, 2024 designation of the Indonesia, Kenya, Tanzania, and Pakistan AHIF branches); June 2004 Treasury Secretary Remarks, ECF No. 10594, Ex. 48 (June 2, 2004 designation of "the former leader of Al-Haramain, Aqeel Abdulaziz Al-Aqil . . . and the branches of AHF located in Afghanistan, Albania, Bangladesh, Ethiopia and the Netherlands."); September 2004 Treasury Secretary Remarks, ECF No. 10594, Ex. 50 (September 9, 2004 designation of a director of the U.S. AHIF branch, Suliman Al-Buthe, and the AHIF branches

CIA Reports dated both before and after the 9/11 Attacks expressed concern over AHIF's ties to Al Qaeda or contended that AHIF supported terrorist activities in various ways. (*See e.g.*, January 11, 1999 CIA Intelligence Report, ECF No. 10594-16, Ex. 66, at 817; January 27, 1999 CIA Intelligence Report, ECF No. 10594-4, Ex. 54, at 7 ("Employees of the Azerbaijan-based al-Haramayn office . . . have regularly diverted resources to Bin Ladin and his associates since 1995."); March 22, 2002 CIA Intelligence Report, ECF No. 10594-17, Ex. 67, at 675 ("Most of Al-Haramain's field office directors in East Africa are aware of and support the organization's aid to militant extremists, and at least some top-level officials from HIF's headquarters condone the funding of extremist groups.").) A January 9, 1999 New York Times article also discussed AHIF's potential involvement in plotting terrorist attacks against Americans in AHIF's Kenya branch. (Winer Report, ECF No. 10594, Ex. 4, at 36 n.85.)

ARB maintained 94 accounts for the local Saudi Arabia branch of AHIF during the relevant discovery period. (Abdullah Dep. at 104:4–15; List of AHIF accounts maintained by ARB, ECF No. 10594-48, Ex. 98.) ARB did not maintain any account for AHIF branches outside of Saudi Arabia. (Galloway Dep. at 350:5–351:1.) An August 28, 2002 CIA Intelligence Report alleged that "HIF employees' accounts in Albania previously received money from an HIF official account at al-Rajhi bank" and "funds were transferred from an HIF headquarters account in Saudi Arabia at al-Rajhi bank to an al-Ansar Welfare Trust in Kashmir." (ECF No. 10595-19, Al-Haramain: Support for Extremists and Terrorists, Ex. 69, at 4, 9.) In 2004, Abdullah contacted the Governor of the Saudi Central Bank, previously known as the Saudi Arabian Money Authority ("SAMA"),

located in the U.S. and the Union of the Comoros); June 2008 Treasury Secretary Remarks, ECF No. 10594-10, Ex. 60 (June 19, 2008 designation of "the entirety of the AHF organization, including its headquarters in Saudi Arabia.").)

to confirm that ARB should continue doing business with the Saudi branch of AHIF. (January 4, 2003 Letter to SAMA Governor, ECF No. 9871, Ex. 24, at 2.)

The IIRO was a similar Saudi-based charity founded in 1978 as an offshoot of the Muslim World League ("MWL"). (IIRO 1999–2000 Annual Report, ECF No. 10599, Ex. 158, at IIRO–215.) The IIRO supplied "food to the hungry, clothes to the unclothed, medical care for the sick, shelter for thousands of orphans, the homeless and tens of thousands of refugees worldwide." (*Id.*) Prior to the 9/11 Attacks, IIRO was also approved by multiple departments of KSA government. (*See* 1978 Certificate from Ministry of Foreign Affairs, ECF No. 9871, Ex. 29, at 34 (the IIRO "is a humanitarian non-governmental body recognized by the government of the kingdom of Saudi Arabia and is based in jeddah."); Letter from Deputy Prince of Asir Province, ECF No. 9871, Ex. 40, at 12 (approving the opening of an IIRO office in the Province); Jubai Municipality Shop License, ECF No. 9871, Ex. 38, at 3.) A letter dated January 4, 2003 and signed by Abdullah, then Director General of ARB, disclosed the opening of IIRO bank accounts at ARB and stated that the IIRO in KSA was "licensed according to the directive of His Majesty the King." (Abdulla Letter, ECF No. 9871, Ex. 24, at 2.)

None of the IIRO branches were designated for ties to Al Qaeda or terrorism generally until 2006, and the Saudi branch of the IIRO was never designated. (August 3, 2006 IIRO Branch Designation, ECF No. 10599, Ex. 170, at 1 (designation of the Philippine and Indonesian branch offices of the IIRO as well as Abd al Hamid Sulaiman al-Mujil, the Executive Director of the Eastern Province Branch of the IIRO in Saudi Arabia.); Specially Designated Nationals and Blocked Persons List, ECF No. 9871, Ex. 59.) Galloway also indicated that the charities were subject to annual audits at "branches where accounts for [AHIF] or IIRO had been opened," which included checking "the account-opening documentation for a sample of accounts[,] compliance

with onboarding requirements[,] [and] compliance with SAMA regulations." (*See* Errata, ECF No. 10594, Ex. 3, at 108:16, 112:5, 113:1–9.)

### C. Anti-Money Laundering ("AML"), Combatting the Financing of Terrorism ("CFT"), and Know Your Customer ("KYC") Compliance

Prior to the 9/11 Attacks, ARB's operations were overseen and regulated by the SAMA. (Winer Report at 130; Galloway Dep. at 344:21–345:3.) As a part of its role, SAMA issued guidelines on best banking practices and binding regulations on banks in Saudi Arabia. (SAMA Guidelines, ECF No. 10595, Ex. 8.) This included SAMA's *Guidelines for Prevention and Control of Money Laundering Activities* ("the 1995 Guidelines"), which included AML policies for internal control systems, KYC practices, external auditing, and detailed money laundering indicators. (*Id.* at 5.) All banks engaged in international financial activities, including ARB, were required to comply with international AML and KYC standards as adopted by the United Nations and developed by the Financial Action Task Force ("FATF"), which were standards consistent with those of the 1995 Guidelines. (ARB Resp. ¶ 278; Winer Report at 42–48; Hobayb Report at 8–13.)

All banks were also required to appoint two external government–approved auditors for the examination of "the bank's policies, procedures and internal control systems aimed at combating money laundering activities," and "the enforcement of such policies." (SAMA Banking Control Law, ECF No. 9871, Ex. 22, at 11–12; SAMA Guidelines for Prevention of Money Laundering, ECF No. 10595-8, Ex. 58, at 15.) ARB drafted and produced internal audit plans for the 1999 and 2001 fiscal years. (1999 ARB Internal Audit Plan; ECF No. 9871, Ex. 19; 2001 ARB Internal Audit Plan, ECF No. 9871, Ex. 20.) An auditors' findings included in ARB's 1999 Annual Report confirmed that an external audit of ARB was performed, and that ARB's financial

statements "[c]ompl[ied] with the requirements of the Regulations for Companies, the Banking Control Law and the Corporation's articles of association[.]" (1999 ARB Annual Report, at 78.)

ARB avers that prior to the 9/11 Attacks, ARB maintained, "a strong, robust, well-managed, and inspected risk framework" meant to ensure compliance with various laws and regulations. (ARB Aver. at 6–7.) This structure, outlined in ARB's *General Policies and Authorization Guide* ("ARB Guide"), included specialized committees including the "Upper Management Committee, International Credit Committee, Assets and Liabilities Committee, General Purchases Committee, Computer Purchases Committee," and more. (ARB Guide, ECF No. 9871, Ex. 17, at 70.) The ARB Guide also included policies related to financial authorizations, contract signing authorization, credit card fraud, and general work procedures. (*Id.* at 61.)

The AML and KYC policies adopted by ARB through their 1997 Branch Instructions Manual share multiple similarities with the 1996 FATF Recommendations and 1995 Guidelines. (ARB Resp., ¶ 281; ARB Aver., ¶ 24) For example, when opening a personal account or providing any service to clients, the ARB Branch Manual required "recognizing the true identity of the client, knowing the type of the client's business or career . . . knowing the source of the deposited funds when opening the account . . . determining the identity of the client through his relationship with other banks he deals with . . . completing identification procedures if the client is known by a branch clerk, knowing the reason for opening the account if the client's address is far from that branch," among other requirements. (ARB Branch Manual, ECF No. 10594, Ex. 4, at 139.) When opening an account for institutions or companies, the Manual mandated a variety of information about the institution's business including "the company's financial structure and annual financial statements, a description of the services and businesses the company provides, [and] a list of the most important suppliers, dealers, and business locations." (*Id.* at 140.) Branch Manual further

required that client identification should be based on "official identification documents." (*Id.* at 159.)

**D. ARB's U.S. Correspondent Account**

ARB maintained a correspondent banking account with Chase Manhattan during the relevant discovery period. (Galloway Dep. at 293:21–295:21.) Chase Bank's March 2005 account analysis statement for ARB's correspondent banking account documents thousands of transactions, including deposit services, ACH services, and U.S. dollar clearing. (Chase U.S. Correspondent Account Records, Pl. Ex. 138, at JPMC–198–JPMC–199.) An expert report by Germany's Federal Office of Criminal Investigation also shows transactions made by ARB on behalf of the Third World Relief Agency ("TRWA") through the correspondent account at Chase Manhattan on May 27, 1992, December 17, 1992, and March 10, 1993. (TRWA Report, ECF No. 10597-13, Ex. 113, at 36–37.) ARB had also provided IIRO with check writing privileges through ARB's U.S. correspondent account. (IIRO U.S. Correspondent Account Check, ECF No. 10597-39, Ex. 139, at IIRO–109118–19.)

**E. Al Qaeda, Osama bin Laden, the Hijackers, and Others Involved in the 9/11 Attacks**

Al Qaeda is an international terrorist organization founded by Osama bin Laden in approximately 1988. (Kohlmann Expert Report, ECF No. 10594, Ex. 38, at 7.) Al Qaeda planned and executed the 9/11 Attacks against the U.S. (9/11 Commission Report, ECF No. 3669, Ex. 1, at 47–70.) The Saudi government froze Osama bin Laden's assets and revoked his citizenship by 1994. (*Id.*)

Abdullah testified that neither he nor his father supported Al Qaeda, knew or supported Osama bin Laden, or supported terrorism generally. (Abdullah Dep. at 350:22–355:8.) Despite bin Laden having an ARB account, a November 16, 2002 letter issued by ARB to SAMA reflected that bin Laden's accounts at ARB had been blocked. (ARB Letter to SAMA, ECF No. 9871, Ex.

8.) Bin Laden's account statements dated from January 1, 1998 to December 12, 2002 also showed that no activity took place in his accounts throughout this time. (*See generally* ECF No. 9871, Exs. 30–35 Osama bin Laden ARB Account Statements.)

Seven of the hijackers who carried out the 9/11 Attacks also held accounts at ARB. (ARB Resp., ¶ 265; ARB Aver., ¶ 96; Hijacker Account Statements, ECF No. 9871, Exs. 79–84.) Only one of the hijackers, Abdulaziz Al-Omari, made transactions after arriving in the U.S.—a credit of 706.86 SAR on September 8, 2001 and a debit of 168.76 SAR on September 12, 2001. (Al-Omari Account Statement, ECF No. 9871, at 10.) There was no activity in the accounts of the other hijackers after November 2000. (*See generally* Hijacker Account Statements.)

ARB avers that the hijackers only engaged in routine banking services through their accounts at ARB and that they had "no reason to know of any involvement in Al Qaeda or terrorism by any of the hijackers who held accounts at the Bank." (ARB Aver., ¶¶ 94, 100.) The 9/11 Commission similarly stated that, "[n]o one at. . .any [] financial institution thought, or had any reason to think, that the hijackers were criminals, let alone terrorists bent on mass murder." (Lormel Exhibit, ECF No. 10594, Ex. 44, at 140–141.) The Commission also stated that "[t]he hijackers' transactions were not extraordinary or remarkable," and "[n]o one monitoring their transactions alone would have had any basis for concern." (*Id.* at 141.) The Commission found that the failure of financial institutions to file SARs against the hijackers' accounts prior to the 9/11 Attacks was therefore "not unreasonable," and that AML standards prior to the 9/11 Attacks were primarily focused on drug trafficking and financial fraud and were not designed to detect the hijackers' financial activities. (*Id.* at 3.)

**F. Saleh Al Hussayen and Towayan Al Towayan**

Saleh Al Hussayen was a former KSA official who served as an advisor on ARB's Sharia Committee. (Abdullah Dep. at 268:3–269:17.) Al Hussayen served on ARB's Sharia Committee

from 1988 until 1999, after which he had no further affiliation with ARB. (ARB Letter to Pl., ECF No. 9871, Ex. 47, at 3.) In 1995, Al Hussayen also served as a delegate to Tanzania on behalf of the IIRO. (IIRO Letter to Ministry of Foreign Affairs, ECF No. 10594, Ex. 18.) Abdullah similarly noted that it was possible that Al Hussayen served as a member of one of ARB's charity committees. (Abdullah Dep. at 271:12–271:21.)

According to the Washington Post, Al Hussayen visited the U.S. prior to the 9/11 Attacks on August 20, 2001 to meet with "officials of several Saudi-sponsored charities." (Washington Post: Spreading Saudi Fundamentalism in U.S., ECF No. 10599-14, Ex. 164, at 1.) Ibrahim Abdullah, director of a WAMY office in Virginia, testified to meeting with Al Hussayen during his visit. (Ibrahim Abdullah Dep., Pl. Ex. 165, at 207–209, 46–47.) Al Hussayen stayed at the same hotel as three of the 9/11 hijackers throughout his visit as well. (Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001 ("Joint Inquiry"), ECF No. 10599-16, Ex. 166, at 430–431.)

Following the 9/11 Attacks, the FBI interviewed Al Hussayen, and he claimed not to know the hijackers associated with the attacks. (*Id.*) During the interview, Al Hussayen eventually "either passed out or feigned a seizure," causing the interview to end abruptly. He then "managed to depart the United States despite law enforcement efforts to locate and re-interview him." (*Id.*) Al Hussayen was never designated or charged in connection with the 9/11 Attacks. (May 27, 2021 FBI Report, ECF No. 9871, Ex. 7, at 11 ("the FBI has not identified additional groups or individuals responsible for the attacks other than those currently charged"); ECF No. 10594, Ex. 44 Lormel Exhibit at 138 ("No credible evidence exists that the hijackers received any substantial funding from any person in the United States.").)

Another individual, Towayan Al Towayan, was the Chief Supervisor of ARB's Sharia Supervision Division. (ARB Resp., ¶ 491; ARB Mot. to Dis. at 34–36.) Al Towayan was in the U.S. prior to the 9/11 Attacks because he had requested leave from his position at ARB "to study English for a period of six months on a full time basis." (2000 Al Towayan Request for Leave Approval; ECF No. 10599-11, Ex. 161.) Al Towayan's request for leave was approved on August 6, 2000, "provided that all costs related to travel, accommodation, living, and study [were] at his personal expense." (*Id.*)

Prior to this approval, Al Towayan's supervisor credited 90,000 SAR to Al Towayan's ARB account, which Al Towayan paid back four days later. (Al Towayan Account Statement, ECF No. 10599-13, Ex. 163, at ARB–42217.) Al Towayan's supervisor again credited 100,000 SAR to Al Towayan's ARB account after Al Towayan's request for leave was approved, which Al Towayan withdrew a day later. (Al Aswaq Branch Towayan Account Statement, ECF No. 10599-12, Ex. 162, at ARB–42194.) The following year on February 18, 2001, Al Towayan had 100,000 SAR transferred into his account which he then transferred to his supervisor on March 10, 2001. (Al Towayan Account Statement, ECF No. 10599-13, Ex. 163, at ARB–42217.)

An FBI report determined that Al Towayan lived in the same apartment complex which previously housed Omar Al Bayoumi, an alleged supporter of the 9/11 hijackers, as well as the two 9/11 hijackers Nawaf Al Hazmi and Khalid Al Mihdhar. (2001 FBI Report, ECF No. 10602-20, Ex. 209, at EO–2858.) The FBI report also stated that a witness observed one of the 9/11 hijackers, Hani Hanjour, helping Towayan move a desk from Al-Bayoumi's apartment to Towayan's. (*Id.* at EO–2859.) The report, however, also stated that "[n]o records have been found that confirm Hanjour's presence at the apartment complex," although other residents report having seen Hanjour visit the area. (*Id.* at EO–2858.) Towayan was never designated or charged for

involvement in the 9/11 Attacks. (FBI Report, ECF No. 9871, Ex. 7, at 11 ("the FBI has not identified additional groups or individuals responsible for the attacks other than those currently charged"); *see also* Lormel Exhibit at 138–139.)

## III. LEGAL STANDARDS

### A. Standard of Review

"On a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2), 'the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant.'" *Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 250 (S.D.N.Y. 2020) (quoting *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001)). A district court has "considerable procedural leeway" in making its determination. *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)). "It may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Id.*

The procedural posture of the litigation determines the showing a plaintiff must make to satisfy their burden of proof. *See id.* (citing *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). "If the defendant is content to challenge only the sufficiency of the plaintiff's factual allegation, in effect demurring by filing a Rule 12(b)(2) motion, the plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d Cir. 2013).

When a defendant files a 12(b)(2) motion following jurisdictional discovery, however, the standard changes. The plaintiff's *prima facie* showing must include "an averment of facts that, if credited by trier would suffice to establish jurisdiction over the defendant." *Overseas Media, Inc. v. Skvortsov*, 277 Fed. Appx. 92, 94 (2d Cir. 2008) (citation omitted). In other words, "[a]t that

point, the *prima facie* showing must be factually supported." *Ball*, 902 F.2d at 197. Legally sufficient allegations, even if pleaded "in good faith," are insufficient. *See Dorchester*, 722 F.3d 81, 85 (2d Cir. 2013). A defendant may respond to a plaintiff's averments "(1) by a Rule 12(b)(2) motion, which assumes the truth of the plaintiff's factual allegations for purposes of the motion and challenges their sufficiency, (2) by a Rule 56 motion, which asserts that there are undisputed facts demonstrating the absence of jurisdiction, or (3) by a request for an adjudication of disputed jurisdictional facts, either at a hearing on the issue of jurisdiction or in the course of trial on the merits." *Id.*

Because ARB's motion to dismiss comes at the culmination of various years of discovery, Plaintiffs are held to the higher standard. To determine whether Plaintiffs have met their burden following jurisdictional discovery, "the court applies a standard . . . akin to that on a motion for summary judgment, construing the pleadings documents, and other evidentiary materials . . . in the light most favorable to the plaintiff[s] and all doubts are resolved in [their] favor." *Vasquez*, 477 F. Supp. 3d at 250 (ellipses in original) (internal quotation marks and citation omitted).

**B. <u>Personal Jurisdiction</u>**

"Generally, personal jurisdiction has both statutory and constitutional components." *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 396 (2d Cir. 2009). "A court must have a statutory basis for asserting jurisdiction over a defendant, and the Due Process Clause typically also demands that the defendant, if not present within the territory of the forum, have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (citation modified or omitted).

To determine whether due process is satisfied, courts apply a two-step analysis. *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d 560, 567–68 (2d Cir.1996). First, we determine whether the defendant has sufficient minimum contacts with the forum to establish

personal jurisdiction. *Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008). "A court's *general* jurisdiction over a non-resident is based on a defendant's general business contacts with the forum, and 'permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts.'" *Id.* (quoting *Metro. Life*, 84 F.3d at 568). On the other hand, "[*s*]*pecific* jurisdiction exists where a forum exercises personal jurisdiction over a defendant 'in a suit arising out of or related to the defendant's contacts with the forum.'" *Id.* at 128 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8 (1984)).

The second prong considers whether the exercise of personal jurisdiction comports with "traditional notions of fair play and substantial justice"—meaning whether it "is reasonable under the circumstances of the particular case." *Metro. Life*, 84 F.3d. at 568. Reasonableness depends on factors including "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *Asahi Metal Indus. Co. v. Superior Ct. of California, Solano Cnty.*, 480 U.S. 102, 113 (1987).

## IV. EVIDENTIARY DISPUTES

On a motion to dismiss for lack of jurisdiction pursuant to Rule 12(b)(2), this Court "may consider only admissible evidence." *In re Terrorist Attacks on Sept. 11, 2001* ("*DIB Decision*"), No. 03-CV-06978, 2023 WL 2430381, at *6 (S.D.N.Y. Mar. 9, 2023). This Court addresses the evidentiary disputes first.

### A. ARB's Expert Reports are Admissible

Plaintiffs move to strike ARB's expert reports, arguing that ARB's experts did not "identify which documents were reviewed or considered," and that Fed. R. Civ. P. Rule 26 requires that

expert reports contain the facts or data considered by the witness in forming them. (Pl. Opp. at 57–58.)

Plaintiffs mischaracterize the testimony from ARB's experts and misconstrue Rule 26. Rule 26 also does not necessitate that ARB's experts review every document referenced by Plaintiffs' experts, nor that an expert be able to recall every single document they utilized in their report while testifying. And contrary to Plaintiffs' assertions, ARB's experts do in fact identify documents used in drafting their report during their testimonies. (*See, e.g.*, Hobayb Dep., Pl. Ex. 184, at 18 ("for example . . . in Winer's report, when he was talking about certain account openings or something . . . I referred to the document."); Dean Dep., Pl. Ex. 159, at 106 ("I reviewed the 9/11 Commission report. I reviewed the CIA report cited as well as some of the articles were cited."))

Each of ARB's experts also testified that they did not review every document referenced by Plaintiffs' experts, but reviewed only those they thought were necessary. (*See* Pl. Ex. 184, Hobayb Dep., at 17–18; Pl. Ex. 159, Dean Dep., at 103–106.) The expert reports also contain appendices detailing the documents relied upon in forming their opinions. Plaintiffs had access to the "specific documents that [ARB's experts] considered in drafting [their] report[s]" and had all materials necessary to "test the reliability of the [experts'] opinions and conclusions." *Allen v. Koenigsmann*, No. 19-cv-8173 (LAP), 2023 WL 11803060, at *4, *5 (S.D.N.Y. 2023). Accordingly, Plaintiffs' request to exclude ARB's experts is denied.

### B. <u>Plaintiffs' CIA Intelligence Reports are Admissible</u>

ARB argues that Plaintiffs' CIA reports are inadmissible because they are untrustworthy and hearsay. (ARB Resp. at 206–214.) For the same reasons this Court held previously, the CIA files are admissible. *See DIB Decision*, 2023 WL 2430381, at *6–7.

Fed. R. Evid. 803(8) provides a hearsay exception for government records that (1) provide "factual findings from a legally authorized investigation" and if (2) "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." (*Id.* at *6–7.) The CIA files here are publicly available factual findings written based on investigations conducted by the CIA. (*See id.* (citing *United States v. Gluk*, 831 F.3d 608, 614 (5th Cir. 2016); *see also* ARB Resp., ¶¶ 135–37 (listing relevant CIA intelligence reports).)

As to the second prong, this Court determines the trustworthiness of the CIA reports based on "(a) the timeliness of the investigation, (b) the special skills or experience of the official, (c) whether a hearing was held and the level at which it was conducted, and (d) possible motivation problems." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000). These CIA reports were submitted in the years leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely. (ARB Resp., ¶¶ 135–37.) They were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other CIA specialists with expertise in counterterrorism. The 9/11 Commission also held hearings regarding the reports. (*Id.* ¶¶ 144–51.) Because this Court does not see any apparent improper motives throughout the reports, the reports are admissible.

Although the CIA reports are admissible, this Court is not required to credit all of the conclusions drawn within. This Court will instead focus on the primary sources these reports present. *See e.g. DIB Decision*, 2023 WL 2430381, at *12 (noting that this Court did not credit the conclusions of CIA intelligence where plaintiffs offered "no other support" for those conclusions); *Barhoumi v. Obama*, 609 F.3d 416 (D.C. Cir. 2010) (internal quotation marks

omitted) (noting that evidence "must be presented in a form, or with sufficient additional information, that permits . . . [the] court to assess its reliability.").[6]

### C. ARB's Errata Sheet is Admissible

Plaintiffs seek to exclude ARB's errata sheet to the testimony of James Galloway, ARB's Rule 30(b)(6) representative. (Pl. Opp. at 58.) Plaintiffs argue that the voluminous alterations are a circuitous effort by ARB to introduce into evidence testimony that had not been challenged by cross-examinations. (*Id.*) ARB counters that Plaintiffs had ample time to reexamine Galloway after the errata submission, but declined to do so. (ARB Reply at 25.)

Rule 30(e)(1) provides that on request by the deponent or a party before a deposition is completed, the deponent must be allowed 30 days to review the transcript, and if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them. Fed. R. Civ. P. 30(e)(1). "[T]he language of the Rule places no limitations on the type of changes that may be made . . . nor does the Rule require a judge to examine the sufficiency, reasonableness, or legitimacy of the reasons for the changes—even if those reasons are unconvincing." *Podell v. Citicorp Diners Club, Inc.*, 112 F.3d 98, 103 (2d Cir. 1997) (citations and internal quotation marks omitted). Given that Plaintiffs were allowed to change the transcript but only made generalized objections, this Court declines to exclude ARB's errata sheet.[7]

[6] ARB cites to the expert report of Dennis Lormel that "[his FBI] investigative team could not substantiate allegations involving Al Rajhi Bank." (Lormel Report, ECF No. 9871, Ex. 4, at 18–20.) To the extent Plaintiffs seek to exclude Lormel's testimony, that argument is denied. An FBI supplemental search "did not reveal information suggesting that the Bank or Sulaiman," as opposed to, as discussed previously, third parties who had accounts at ARB, "were the focus of an investigation or investigative steps by the FBI during the time period Mr. Lormel described." (Decl. of J. Scott Tarbutton, ECF No. 10592, at 8.) These findings do not constitute a disavowal of Lormel's testimony. Accordingly, this Court will consider Lormel's findings insofar as they are not conclusory and are substantiated by external evidence.

[7] As to Plaintiffs' complaint that they have not been afforded the opportunity to cross-examine the content in the errata sheet, the Court declines to opine on this issue at this stage of the litigation. *See e.g. Thompson v. Workmen's Circle Multicare Ctr.*, No. 11-cv-6885, 2015 WL 4591907, at *6 (S.D.N.Y. June 9, 2015) (at trial, "defendant remains free to submit plaintiff's original deposition testimony into evidence; however, whether the deposition transcript or the errata sheets are controlling will be an issue for the fact finder and is not a basis for striking plaintiff's errata sheets.").

## V. THIS COURT LACKS GENERAL PERSONAL JURISDICTION

"A court may assert general jurisdiction over foreign (sister-state or foreign country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum state." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). For a corporation, the place of incorporation and principal place of business are "paradigm bases for general jurisdiction." *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014) (citation modified). Outside of these "paradigm bases," general jurisdiction is only permitted in exceptional cases, and a defendant's "continuous activity of some sorts within a state . . . is not enough to support the demand that the corporation be amenable to suits unrelated to that activity." *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) (internal citations omitted). When assessing a corporation's contacts in a state for general jurisdiction, courts consider those contacts in the context of the company's overall activity. *Daimler*, 571 U.S. at 139 n.19.

It is undisputed that ARB "is a Saudi-based international financial institution, with a principal place of business located at Olaya, Riyadh, Saudi Arabia." (ARB Aver. ¶ 8; Am. Compl. ¶ 67, 16-cv-07853, ECF No. 56.) Because ARB has never been incorporated or maintained its principal place of business in the U.S., general jurisdiction may not be established by those paradigm bases. ABR's other contacts with the United States are also insufficient to be rendered "exceptional" for the purposes of general jurisdiction.

ARB did not have any branches or representative offices in the U.S. The only banking activity which ARB conducted in the U.S. took place through its U.S. correspondent account with Chase Manhattan. ARB also maintained an average daily balance of $14,691,150 in its U.S. correspondent account in June 2001, amounting to approximately .1% of ARB's total assets in the previous year. The routine banking services conducted through ARB's U.S. correspondent

account, the presence of ARB associates in the U.S., and the U.S. activities of the SAAR Foundation are therefore insignificant in comparison to ARB's overall activity and unlikely to add up to an "exceptional case." *See Goodyear*, 814 F.3d at 629 ("when a corporation is neither incorporated nor maintains its principal place of business in a state, mere contacts, no matter how 'systematic and continuous,' are extraordinarily unlikely to add up to an 'exceptional case."). This Court therefore declines to exercise general jurisdiction over ARB.

## VI. THIS COURT LACKS SPECIFIC PERSONAL JURISDICTION

Under specific jurisdiction, minimum contacts sufficient to satisfy due process exist if (1) a defendant "expressly aimed" or "purposefully directed" intentional tortious acts at residents of the U.S, and (2) plaintiffs' injuries "arise out of or relate to those activities." *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks IV*"), 718 F. Supp. 2d 456, 478–79 (S.D.N.Y. 2010), aff'd on other grounds, 714 F.3d 109 (2d Cir. 2013) (citations omitted).[8]

Plaintiffs argue that: (1) ARB committed tortious acts directed at the United States by knowingly supporting Al Qaeda; (2) ARB was a co-conspirator and aider and abettor of Al Qaeda; and (3) ARB's correspondent U.S. bank account was used to facilitate fund transfers to Al Qaeda. (Pl. Opp. at 6.) This Court addresses each argument in turn.

[8] Plaintiffs have reserved their argument that the Justice Against Sponsors of Terrorism Act (JASTA) authorizes the exercise of jurisdiction over ARB under the Fifth Amendment. (Pls. Opp at 36–37.) JASTA's only section purporting to establish jurisdictional predicates provides: "persons, entities, or countries that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism . . . necessarily direct their conduct at the United States, and should reasonably anticipate being brought to court in the United States." JASTA § 2(a)(6), Pub. L. No. 114–222, 130 Stat. 852, 852 (2016). This mirrors the minimum contact standard for non-resident defendants engaged in out-of-state conduct where the exercise of jurisdiction is only authorized when the defendant took "intentional, and allegedly tortious, actions . . . expressly aimed" at the forum. *Terrorist Attacks VII*, 714 F.3d at 674 (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)). Because both standards require that the defendant act intentionally in aiming their conduct at the U.S., this Court finds that JASTA does not import jurisdictional authority greater than the minimum contacts standard.

**A. <u>ARB did not Commit Tortious Acts Directed at the United States</u>**

As a preliminary matter, this Court has previously held that "alleged acts of rendering support to Al Qaeda during its formative years, performing routine banking services for customers having terrorist ties, and having investors or shareholders who purportedly are sponsors of terrorism, are too remote and attenuated to support the exercise of specific jurisdiction." *Terrorist Attacks IV*, 718 F. Supp. 2d at 486–87. Instead, in order to fulfill the "purposeful direction" test, Plaintiffs must show that ARB "specifically intended . . . to aid Al Qaeda in the commission of a terrorist attack against the United States and its citizens." *DIB Decision*, 2023 WL 2430381, at *10 (citations and alterations omitted). ARB's support of Al Qaeda must also have a "reasonable . . . temporal, geographical or causal connection, or proximity to the 9/11 attacks." *Id.* at *11. It is insufficient for the harm to be foreseeable—ARB must have known that the brunt of the injuries stemming from its support of Al Qaeda would be felt on American soil. *Id.* at *10.

Here, Plaintiffs allege that ARB knowingly committed tortious acts by providing essential, substantial, and knowing assistance to Al Qaeda through three general groups: (1) the Al Rajhi family and its charities; (2) other charities including the AHIF and IIRO; and (3) various other Al Qaeda members. These allegations are factually unsupported by the record.

**1. The Al Rajhi Family, SAR Charity Committee, and SAAR Foundation**

ARB's leadership, which included Suleiman Al Rajhi and his son Abdullah, along with the al Raji family's related charities and foundations, are insufficient to confer jurisdiction over ARB. Plaintiffs aver that Suleiman had a "long history" of supporting Islamic extremists, maintained high level relationships with Al Qaeda's charities, and established his own charities "to launder funds in support of Al Qaeda." (Pl. Opp. at 2–3; *see* Pl.'s CA at 43–45.) As such, Plaintiffs argue that the alleged knowledge of Suleiman and the Al Rajhi family should be imputed onto ARB. (Pl. Opp. at 50.) However, the evidence shows that Sulaiman donated billions of dollars to charities

around the word, and that none of his donations, processed through ARB or otherwise, were in furtherance of the 9/11 attacks. (Reply at 6; Reply Decl., ¶¶ 130, 136.)

The primary support for Plaintiffs' claims that ARB's principals supported terrorism is through various CIA intelligence reports. For example, a November 20, 1997 CIA report claims that ARB and the Al Rajhi family had previously supported Islamic extremists such as the Afghan Mujahaddin in Pakistan. (Nov. 20, 1997 CIA Report, at 16.) The report did not provide the basis for its findings, however, and it failed to identify members of the Al Rajhi family involved in the alleged support for terrorism. (*Id.*) The same report also claimed that "the Al Rajhis were routinely contacted by officials of the World Assembly of Muslim Youth (WAMY)—a Saudi NGO whose personnel often pursue an extremist agenda." (*Id.* at 17.) A mere connection to a well-reputed, government licensed charity without further evidence that the principal had knowledge of the charity's covert support for terrorism is insufficient to constitute knowingly supporting terrorism. Furthermore, the CIA report itself concluded that "Al Rajhi financial ties to Islamists are inconclusive." (*Id.*) The CIA reports Plaintiffs rely on do not provide adequate factual support for the claim that ARB's principals were "longstanding supporters of the terrorist organization." (Pl. Opp. at 50.)

Nor has the U.S. government designated, charged, sanctioned, or taken any other punitive action against either ARB or the Al Rajhi family despite various government investigations.[9] And this Court has previously dismissed all claims against Sulaiman and Abdullah for lack of personal jurisdiction, holding that Plaintiffs failed to show that Sulaiman and Abdullah "personally engaged

[9] Plaintiffs rely on the Second Circuit's holding in *Kaplan v. Lebanese Canadian Bank, SAL*, which finds that a designation is not necessary to establish knowledge of another individual's or entity's association with a terrorist organization. 999 F.3d 842, 864 (2d Cir. 2021). The Second Circuit also states that, "it would defy common sense to hold that such knowledge could be gained in no other way." *Id.* Although this proposition is correct, Plaintiffs fail to allege any other way in which ARB could have gained such knowledge.

in tortious conduct expressly aimed at the [U.S.]" *Terrorist Attacks IV*, 718 F. Supp. 2d at 485. Because the conduct of the Al Rajhi family was insufficient to establish specific personal jurisdiction over them as individuals, that same conduct is insufficient to establish specific personal jurisdiction over ARB.

Plaintiffs alternatively argue that the alleged activities or knowledge of Suleiman's SAAR Foundation should be imputed onto ARB. But "[b]eing a founder, officer, director or administrator of a foreign or domestic charitable organization that allegedly provides material support to Al Qaeda, cannot alone serve as a basis to impute the acts of the organization upon the individual defendant himself, and certainly not upon a company owned by a defendant having no direct relationship to the charity." *Terrorist Attacks IV*, 718 F. Supp. 2d at 483–84. This is especially true because Sulaiman was not "acting in furtherance of Al Rajhi Bank business" in his role as the founder of the SAAR Foundation. *In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks I*"), 349 F. Supp. 2d 765, 833 (S.D.N.Y.), on reconsideration in part, 392 F. Supp. 2d 539 (S.D.N.Y. 2005), and aff'd, 538 F.3d 71 (2d Cir. 2008), and aff'd, 538 F.3d 71 (2d Cir. 2008), and aff'd, 714 F.3d 118 (2d Cir. 2013).

From record evidence, it seems that ARB's role in the SAAR Foundation consisted solely of maintaining accounts for the charity and its officials and processing transactions through those accounts. The Second Circuit has made clear that "(1) knowingly maintain[ing] bank accounts for individuals associated with Al Qaeda as well as for purported front charities that aided Al Qaeda, and (2) that those accounts were used for Al Qaeda operations" is insufficient for personal jurisdiction purposes. *Terrorist Attacks VII*, 714 F.3d at 676. Without more, such routine banking services cannot constitute intentional tortious acts since they do not reflect extraordinary or unusual treatment of the SAAR Foundation compared to any of ARB's other clients. The SAAR

Foundation was also neither designated nor charged in connection with the 9/11 Attacks, further discrediting any inference that ARB intended to support terrorism through the services provided to the Foundation.[10]

Plaintiffs alternatively allege that "ARB often facilitated transfers when [Sulaiman Al Rajhi's Charity Committee Account] was in arrears, to the tune of millions of SR, indicating that ARB fulfilled those transfers with its own funds." (Pl. Opp. at 52.) This claim is also unsupported by record evidence. Evidence suggests that ARB processed transfers through SAR Charity Committee account and ARB's U.S. correspondent account, but does not suggest that those transfers involved ARB's own funds. (SAAR Donor Letter.) And even if the funds were tied to ARB, providing "indirect funding of Al Qaeda" through charities does not constitute expressly aiming intentional tortious acts at residents of the United States. *See In re Terrorist Attacks on Sept. 11, 2001* ("*Terrorist Attacks III*"), 538 F.3d 71, 94–95 (2d Cir. 2008), abrogated by *Samantar v. Yousuf*, 560 U.S. 305 (2010); *see also Terrorist Attacks IV*, 718 F. Supp. 2d at 487.

Overall, there is no credible evidence that ARB knew and intended to support Al Qaeda through its connections to the Al Rajhi family. Therefore, these averments fail to establish specific personal jurisdiction.

**2. The AHIF and IIRO**

The banking services ARB provided to the AHIF, the IIRO, and charity officials are insufficient to establish specific personal jurisdiction over ARB. A bank is not liable for "injuries

---

[10] The SAAR Foundation's own conduct and knowledge are also insufficient to establish minimum contacts over ARB. Plaintiffs base their averment about the SAAR Foundation's "complex web" affiliated with terrorism solely on a joint FBI-CIA report titled "Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States." (Pls. Ex. 26.) Although the report alleged that the SAAR Foundation "provided monetary support and other assistance to organizations linked to the Palestinian Islamic Jihad and HAMAS," it did not substantiate further detail the Foundation's "complex web." (*Id.* at 3438.) Indeed, the report also failed to identify which organizations the Foundation supported, nor did it specifically mention any organizations involved in the 9/11 Attacks. These averments are too attenuated to justify this Court's exercise of jurisdiction. Moreover, all claims against the SAAR foundation have been dismissed by this court. *See Terrorist Attacks VII*, 714 F.3d at 682.

done with money that passes through its hands in the form of deposits, withdrawals, check clearing services, or any other routine banking service." *Terrorist Attacks I*, 349 F. Supp. 2d at 830 (citation and internal quotation marks omitted). As established above, Plaintiffs must demonstrate that ARB provided banking services to these charities "with knowledge of and intent to further violent acts, which must be a reasonably foreseeable result" of those services. *Burnett v. Al Baraka Inv. & Dev. Corp.*, 274 F. Supp. 2d 86, 106 (D.D.C. 2003) (citation omitted).

Plaintiffs fail to demonstrate that ARB intended to provide improper banking services to AHIF. Although ARB maintained accounts for the Saudi branch of AHIF during the relevant period, the vast majority of ARB's conduct only amounted to routine banking services, insufficient to establish knowledge or intent. Although Plaintiffs originally alleged on appeal that,"[ARB] provided . . . donations to charities that it knew financially supported al Qaeda," *Lloyd's*, 779 F. App'x at 68, Plaintiffs no longer aver that such donations exist. The record similarly does not reflect any donations from ARB to AHIF.

The only non-routine banking services which ARB provided to AHIF were the openings of accounts without copies of a government-issued license, in violation of ARB's internal policy.[11] It is unreasonable to infer that ARB had knowledge of AHIF's support for terrorism or intended to support terrorism based solely on their violation of an internal bank policy. Although some accounts did not have the necessary license, others did. In any case, the policy is not substantially related to the prevention of terrorism, and an act of terrorism is not a reasonably foreseeable result of violating the policy. Any violations of ARB's unrelated administrative policy fail to provide sufficient minimum contacts for jurisdictional purposes.

[11] Fawzi Al-Hobayb, one of ARB's experts, found it "plausible that, considering that some branches had many accounts for Al-Haramain or IIRO, a branch manager could have issued a waiver for acquiring licenses every time an account was opened." (Hobayb Report, ECF No. 9871, Ex. 2, at 26–27.) The record does not reflect any such waiver of ARB's licensing policy by a branch manager.

The evidence demonstrates that any potential AHIF support for terrorism was conducted privately, only revealed following the 9/11 Attacks, not conclusively proven, or isolated to AHIF branches outside of KSA. For example, to demonstrate AHIF's alleged extensive collaboration with Al Qaeda, Plaintiffs point to "a broad spectrum of intelligence assessments, United States and United Nations terrorism designations and related government counterterrorism actions, and Plaintiffs' experts' reports." (Pl. Opp. at 17.) However, any intelligence assessments regarding AHIF's support for terrorism were only made public or completed following the 9/11 Attacks, meaning that ARB could not have learned of AHIF's alleged support through these assessments. Similarly, the U.S. and U.N. designations of AHIF only took place following the 9/11 Attacks.[12]

Moreover, the only public reporting of AHIF's support for terrorism *prior* to the 9/11 Attacks was isolated to the AHIF branch in Kenya and unrelated to the 9/11 Attacks. (Winer Report at 36–37, n.85.) From Winer's report, it is unclear whether ARB even maintained accounts for this AHIF branch to begin with. ARB also did not process any unusual transactions on behalf of AHIF, nor donate its own funds to the charity. The fact that transactions took place between AHIF's Saudi ARB accounts and accounts in Albania and Kashmir alone does not suffice by itself to demonstrate knowing support, especially considering that these transactions were not ultimately traced to terrorist activities.[13]

---

[12] Plaintiffs note that even the Kingdom of Saudi Arabia was compelled to admit that Al Haramain, which operated under supervision of the Saudi government's own Ministry of Islamic Affairs, was "one of the biggest terror-financing operations in the world." (Pl.'s CA, ¶ 107.) Based on record evidence, however, the Saudi government also made that admission following the 9/11 Attacks, undermining Plaintiffs' assertion of ARB's prior knowledge and intent.

[13] Plaintiffs point out that various ARB charity accounts were created under fictitious names, but the individual accounts identified by Plaintiffs' expert Winer included "the photographed IDs of the signatories." (Winer Report at 147.) Plaintiffs also contend that ARB only sought limited information when opening accounts for charities, and that such "vague and identical descriptions" confirmed that these accounts were being used to support terrorism. (Pls. Opp. at 27.) The record shows the opposite. For example, one such AHIF account is accompanied by a statement which lists the account's purpose which includes "[g]eneral donation; provision of water; surplus money; religious expiation payments; vows; and provision of food," along with the account's assigned AHIF committee. (AHIF Account Numbers, ECF No. 10595-49, Ex. 99.)

Finally, it is undisputed that AHIF was licensed, approved, and supervised by the Saudi government during the relevant period. The Saudi government's endorsement of the charity leads to the reasonable inferences that: (1) any AHIF support for terrorism was thoroughly concealed and (2) ARB had little reason to doubt the legitimacy of AHIF's Saudi branches. If government supervision did not discover AHIF's support for terrorism, it is unlikely that ARB's due diligence of the charity would have revealed such support.

ARB's relationship with the IIRO similarly fails to establish a sufficient minimum contact for jurisdictional purposes. Unlike AHIF, IIRO in Saudi Arabia was never designated. Furthermore, the IIRO was approved by the Saudi government, weighing against a finding of knowledge or intent for reasons similar to AHIF's government approval. Lastly, ARB conducted routine audits of branches with AHIF and IIRO accounts, ensuring that the maintenance and opening of those accounts followed the relevant banking standards.

**3. ARB's Financial Services to other Al Qaeda Members**

ARB's alleged relationships with Al Qaeda, Osama bin Laden, the 9/11 hijackers, and others involved in the 9/11 Attacks are insufficient to establish specific personal jurisdiction over ARB.

Plaintiffs note that Osama bin Laden, founder of Al Qaeda, opened an ARB account in his name in 1991. A customer opening an account with a bank does not indicate that the bank is ideologically aligned with the customer, especially considering that SAMA required ARB and other banks to open customer accounts as long as certain documentation requirements were met. (Hobayb Report at 15.) Moreover, ARB prevented bin Laden's access to the account after the KSA government revoked his citizenship and froze his assets. (9/11 Commission Report at 57; ARB Letter to SAMA at ARB–39559.) Plaintiffs argue that this "is precisely why bin Laden

needed to use the accounts of charity fronts and financial facilitators to move money for Al Qaeda." (Pl. Opp. at 56.) Plaintiffs' speculation, however, is devoid of factual support and insufficient to show "longstanding alignment with" bin Laden, as Plaintiffs contend. (*Id.*) The financial services provided to the seven 9/11 hijackers also fail to establish a sufficient minimum contacts for jurisdictional purposes. The hijackers only engaged in routine banking services through their accounts with ARB, and there is no record evidence to show that ARB knew that the hijackers were engaging in terrorist activities prior to the 9/11 Attacks.

Al Hussayen 's conduct is also insufficient to establish specific personal jurisdiction over ARB. Prior to his resignation from ARB's Sharia Committee in 1999, there is no evidence that Al Hussayen was involved in or investigated for terrorist activities. Plaintiffs point to Al Hussayen's visit to the U.S. in 2001, approximately two years after his resignation from the Sharia Committee, averring that "his trip related to the U.S.-based SAAR Foundation." (Pl.'s CA, ¶ 503–504.) This averment is unsupported. At the time of his trip, Al Hussayen no longer held a role at ARB, and was therefore not acting on behalf of ARB. In addition to the temporal remoteness between this visit and Al Hussayen's lack of association with ARB, the investigation of Al Hussayen's visit to the U.S. was inconclusive and did not result in any adverse action against him.

Al Towayan's conduct is also insufficient to impose personal jurisdiction upon ARB. The evidence demonstrates that Al Towayan's visit to the U.S. was considered as a period of leave from his role and responsibilities at ARB. (2000 Al Towayan Request for Leave Approval.) It does not appear in the record that ARB was aware that Al Towayan's studies would take place in the U.S., as he did not mention it in his request. Because the visit was not in furtherance of Al Towayan's role at ARB, any incidents occurring during this visit are irrelevant. Al Towayan was also never charged or designated in connection with the 9/11 Attacks, further attenuating any

allegations of his involvement and their potency to support jurisdiction. Plaintiffs alternatively point to multiple transactions between Al Towayan and his supervisor to support their claim that Towayan was receiving "back-channel funding" from ARB. (Pl. Opp. at 32.) Al Towayan's account statements do not provide information as to the purpose and context of the transactions between the two employees, meaning that there is no evidence that the funds were in any way related to ARB. Finally, according to FBI's reporting on Al Towayan, he never lived in the apartment complex at the same time as Bayoumi, Hazmi, and Mihdhar. The latter had moved out of the complex prior to Towayan's arrival. (2001 FBI Report at EO–2858.) This Court cannot therefore assert jurisdiction based on the mere fact that they lived in the same apartment complex at different times.

Plaintiffs assert that ARB's banking services weren't routine, but instead "highly irregular," rendering ARB "Al Qaeda's bank of choice." (Pl.'s CA, ¶¶ 204–275). This is unsupported by the record. And even if the services ARB provided *were* irregular, discovery shows that ARB's "role was more akin to a 'passive conduit' through which funds were 'indirectly channeled to and from Al Qaeda.'" *DIB Decision*, 2023 WL 2430381, at *13.[14]

Finally, Plaintiffs fail to show that their injuries "arose from" ARB's conduct because the record does not show that ARB's alleged "support of Al Qaeda" had a "reasonable . . . temporal, geographical, or causal connections, or proximity to the 9/11 attacks." *DIB Decision*, 2023 WL 2430381, at *10–11.

[14] Plaintiffs contend that "ARB broadly violated international AML, CFT, and KYC standards" because "ARB knew that its accounts were being used to launder funds for al Qaeda and associated terrorists." (Pls. Opp. at 26.) The evidence suggests that ARB was largely compliant with the international standards. (*See, e.g.*, Hobayb Report at 8–13 (listing the similarities between the FATF Recommendations, the 1995 SAMA Guidelines, and the ARB Branch Manual).)

**B. <u>ARB was not a Co-Conspirator or Aider and Abettor of Al Qaeda</u>**

To assert a conspiracy theory of personal jurisdiction, a plaintiff must plausibly allege that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 87 (2d Cir. 2018). Plaintiffs allege that ARB was a co-conspirator to Al Qaeda, arguing that ARB took actions in furtherance of the conspiracy to target the U.S. through violent acts, rendering them subject to this Court's jurisdiction. (Pl. Opp. at 41-43.) As discussed above, the evidence does not show a longstanding relationship between ARB and Al Qaeda or that ARB participated in any way at all in Al Qaeda's terrorist activities. There is no basis for the Court to conclude that a conspiracy between ARB and Al Qaeda existed, or that ARB participated by taking overt acts to further that conspiracy.

Plaintiffs alternatively allege that ARB aided and abetted Al Qaeda. (Pl. Opp. 41–43). This Court has declined to endorse an aiding-and-abetting theory as basis for personal jurisdiction. *See DIB Decision*, 2023 WL 2430381, at *15 (holding that it "would violate due process for a district court to reach foreign aiders-and-abettors that lacked any contacts with the United States."). Plaintiffs do not present any case law that convinces this Court to depart from its previous holding.

Even assuming, *arguendo*, that aiding-and-abetting claims could establish jurisdiction over ARB, Plaintiffs must show "knowing and substantial assistance" through ARB's "conscious, voluntary, and culpable participation" in "the act of international terrorism that injured the plaintiffs." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 493, 497 (2023); *see also DIB Decision*, 2023 WL 2430381, at *11 ("Aiding and abetting requires the secondary actor to be aware that, by assisting the principal, it is itself assuming a role in terrorist activity." (citation and internal quotation marks omitted)).

Here, record evidence does not show any knowledge or substantial assistance by ARB for Al Qaeda's activities, and the Court cannot base its conclusions on Plaintiffs' conclusory assertions alone. *See Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (holding plaintiffs not entitled to "unreasonable inferences, or inferences at war with undisputed facts" (quoting *Cnty. of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)). Accordingly, Plaintiffs' aiding and abetting theory also fails on its merits.

### C. <u>ARB's U.S. Bank did not Facilitate Funds Into Al Qaeda</u>

The banking services provided through ARB's U.S. correspondent account, however, are insufficient to establish specific personal jurisdiction. Under a correspondent bank theory, it must first be shown that personal jurisdiction is proper under the New York State Long-Arm Statute which provides for the exercise of jurisdiction over a non-resident defendant for causes of action that arise out of "transact[ing] any business within the state." N.Y. C.P.L.R. 302(a)(1).

*Licci's* correspondent bank theory provides that courts may exercise personal jurisdiction over foreign banks that repeatedly use correspondent bank accounts when those transactions are substantially connected to the plaintiffs' underlying claims. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013). Plaintiffs argue that the consistent, long-term use of ARB's correspondent banking account for deposits, ACH payments, and U.S. dollar clearing in New York constitutes "transact[ing] any business within the state." *Id.* at 168.

Plaintiffs fail, however, to demonstrate how the instant cause of action arises out ARB's transactions. The "arising from" requirement is satisfied "when there exists an articulable nexus or substantial relationship between transactions occurring within the state and the cause of action sued upon." *Sunward Elecs., Inc. v. McDonald*, 362 F.3d 17, 23 (2d Cir. 2004) (internal quotation marks omitted). Here, this Court fails to find how the transactions in ARB's correspondent bank account are related to the 9/11 Attacks.

Plaintiffs cite *Spetner* to argue that the use of the New York financial system to facilitate terrorism subjects a non-domiciliary bank to jurisdiction. (Pl. Opp. at 46 (citing *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 643 (2d Cir. 2023)).) Each of the factors in *Spetner* are lacking here. First, the plaintiffs' causes of action in *Spetner* arose out of the defendant's business in New York. *Id.* at 643. The defendants were "processing payments bearing indicia of terrorism" and "knowingly providing material support to a customer linked to . . . a designated Foreign Terrorist Organization." *Id.* Second, the plaintiffs in *Spetner* "produced copies of checks and receipt vouchers from ALF to families of terrorists." *Id.* at 644.

Here, ARB did not process any payments through their correspondent account "bearing indicia of terrorism." *Id.* at 643. And although Plaintiffs here aver that "ARB and its Chairman themselves used the correspondent account to launder funds in support of Al Qaeda," (Pl. Opp. at 46,) there is no factual support showing that funds processed through the account reached any terrorist entities or individuals, or that ARB knowingly permitted use of the correspondent account for such purposes.

Accordingly, Plaintiffs' legal claims are "completely unmoored" from the transactions completed through the U.S. correspondent account, and this Court declines to exercise jurisdiction over ARB based on Plaintiffs' correspondent banking theory. *Licci*, 732 F.3d at 168–169.

* * *

This Court has considered the rest of Plaintiffs' arguments and concludes that they are without merit. Plaintiffs' averments are insufficient to establish that ARB purposefully directed tortious conduct into the United States.

## VII. CONCLUSION

The evidence compiled throughout the past three years of jurisdictional discovery proves that ARB's conduct "is no more intentional or direct than that of the banks this Court dismissed

from this litigation." *DIB Decision*, 2023 WL 2430381, at *12. Moreover, the facts that Plaintiffs aver here are "materially different" from the allegations in which the Second Circuit premised jurisdiction over in 2019. *Lloyd's*, 779 F. App'x 66.

Accordingly, because none of Plaintiffs' arguments make a *prima facie* case that ARB "expressly aimed" intentional tortious acts at residents of the U.S., this Court declines to exercise specific personal jurisdiction over ARB. ARB's Renewed Motion to Dismiss is **GRANTED** and the Objections at ECF No. 6724 are **DENIED** as moot. The Clerk of Court is directed to terminate the motions at ECF Nos. 6424, 9772, 9785, and 9786.

**Dated:** August 19, 2026
New York, New York

**SO ORDERED.**

George B. Daniels

GEORGE B. DANIELS
United States District Judge