# Exhibit A

# Corrected Rule 56.1 Statement of Material Facts in Support of Defendant Muslim World League's Motion for Summary Judgment

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03-MD-01570 (GBD)(SN)<br>ECF Case<br>**ORAL ARGUMENT REQUESTED** |

This document relates to:

*Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.*, 02-cv-06977
*Gladys H. Salvo, et al. v. Al Qaeda Islamic Army, et al.*, 03-cv-05071
*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279
*Maher, et al. v. Islamic Emirate of Afghanistan a/k/a The Taliban, et al.*, 1:23-cv-02845

# CORRECTED
# RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT MUSLIM WORLD LEAGUE'S MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS


**Page**

MWL ..... 1
IIRO ..... 14
MWL and IIRO: Independent and Separate Organizations ..... 20
Rabita Trust ..... 27
Wael Jelaidan ..... 36
Mohammad Jamaal Khalifa ..... 39
Missionaries ..... 43
Moro Islamic Liberation Front ("MILF") ..... 45
Abu Sayyaf Group ("ASG") ..... 47
Services Bureau ..... 50
Al Qaeda ..... 51
Bin Laden Publicly Opposed the Saudi Government and Twice Called on Individuals Not to Donate to Saudi-Affiliated Charities ..... 56
1993 World Trade Center Bombing ..... 59
Bojinka Plot ..... 60
1998 Embassy Bombings ..... 62
Indian Consulate Plot ..... 62
USS Cole Bombing ..... 63
September 11, 2001 Attacks ..... 63
MWL Journal Reveals No Support to Al Qaeda, Much Less 9/11 ..... 64
Intelligence Reporting ..... 66
CIA Reports ..... 67
Treasury Department Designations ..... 80
Treasury Designation Memoranda ..... 82
Memorandum Concerning Designation of Jelaidan ..... 82
Jamal Al Fadl ..... 83
Discovery ..... 88

In accordance with Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Defendant Muslim World League ("MWL") submits the following statement of material facts,[1] as to which there is no genuine issue to be tried:

**MWL**

1. Plaintiffs have no evidence that MWL employees or agents, MWL Head Office in Makkah, or MWL Secretaries General had any foreknowledge of or were involved in the planning or execution of the 9/11 Attacks. Ex. #, FBI Report Administratively Closing Case (May 27, 2021), at EO14040-000011 ("After nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 Commission Report which stated that [there was] 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks'"); *see generally* 9/11 Commission Report;[2] Monograph on Terrorist Financing: Staff Report to the Commission ("Monograph");[3] *see also* Ex. # 1, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda).

2. Plaintiffs have no evidence tracing MWL funds to the planning or execution of the 9/11 Attacks. Ex. # 2, May 27, 2021 FBI Report Administratively Closing Case, at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from MWL to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1) ; Kohlmann Rpt. ¶¶ 27-70 (same) (ECF No. 9250-2); Levitt

[1] Numbered exhibits cited herein refer to the numbered exhibits to the Declaration of Aisha Bembry filed in support of this motion.
[2] The 9/11 Commission Report, Final Report of the National Commission on Terrorist Attacks upon the United States (2004), *available at* http://www.9-11commission.gov/report/911Report.pdf.
[3] Nat'l Comm'n on Terrorist Attacks Upon the U.S., Monograph on Terrorist Financing: Staff Report to the Commission (2004), *available at* https://govinfo.library.unt.edu/911/staff_statements/911_TerrFin_Monograph.pdf.

Rpt. at 29-35 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3) ; Ex. #3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see also* Ex. # 4, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); *see generally* 9/11 Commission Report; Monograph; *see also* Ex. # 1, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda).

3. Plaintiffs have no evidence tracing in-kind support from MWL to the planning or for the execution of the 9/11 Attacks. Ex. # 2, May 27, 2021 FBI Report Administratively Closing Case, at EO14040-000011; Winer Rpt. at 112-22 (failing to show any in-kind support from MWL to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 27-70 (same) (ECF No. 9250-2); Levitt Rpt. at 29-35 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph.

4. Plaintiffs have no evidence tracing MWL funds to Al Qaeda. *See generally* 9/11 Commission Report; Monograph; *see* Ex. # 4, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); *see also* Ex. # 1, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda).

5. Plaintiffs have no evidence tracing in-kind support from MWL to Al Qaeda. *See generally* 9/11 Commission Report; Monograph; *see also* Ex. # 1, Winer Dep. Tr. at 143:20-145:19

(acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda).

6. The 9/11 Commission Report did not conclude that MWL, directly or indirectly through any other charity or entity, provided funds to Al Qaeda. *See generally* 9/11 Commission Report; Monograph; *see also* Ex. # 1, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda).

7. MWL is based in Saudi Arabia and is an international Islamic non-governmental organization involved in charitable projects around the world. Ex. # 38, Second Turki Decl. ¶ 4; Ex. # 6, Obaid Decl. ¶ 4; Ex. # 65, Second Basha Decl. ¶ 4; Ex. # 8, Al-Thaqafi Decl. ¶ 3; Ex. # 9, Al-Hassani Decl. ¶ 3.

8. MWL was founded in 1962, is headquartered in Makkah, Kingdom of Saudi Arabia, and operates approximately 30 offices and cultural centers throughout the world. Ex. #38, Second Turki Decl. ¶ 4; Ex. #6, Obaid Decl. ¶ 4; Ex. #65, Second Basha Decl. ¶ 4; Ex. #9, Al-Hassani Decl. ¶ 9; Ex. #10, MWL 2002 Statute, at JT-MWL00040. In the 1990s, MWL employed approximately 200 individuals. Ex. #11, Fawzi Decl. ¶ 11.

9. MWL promotes dialogue across cultures and religions, seeks to spread moderate Islamic values, and counters extremist ideology via a message of peace and harmony through education, religious, and cultural projects (Ex. # 38, Second Turki Decl. ¶ 5; Ex. # 6, Obaid Decl. ¶ 4; Ex. # 65, Second Basha Decl. ¶ 4; Ex. # 8, Al- Thaqafi Decl. ¶ 4; Ex. # 9, Al-Hassani Decl. ¶¶ 4, 10), including by giving assistance to other organizations (Ex. # 12, Daguit Dep. Tr. at 74:5-75:21). Its employees worked tirelessly to accomplish its mission. Ex. # 8, Al- Thaqafi Decl. ¶ 4.

10. MWL's mission is to promote awareness and understanding of Islam, and to educate Muslims across the world in accordance with the Qur'an and the Prophetic Sunnah. It seeks to

uphold the values of peace, justice, and human rights, while fostering mutual understanding and cooperation among Muslim communities and raising awareness of shared concerns. Ex. # 10, MWL 2002 Statute at JT-MWL 00041.

11. MWL is committed to addressing challenges facing Muslims, providing support where needed, resolving conflicts, and promoting virtue and societal reform, with the overarching aim of elevating the conditions of Muslims worldwide. To achieve these objectives, MWL coordinates the efforts of those engaged in religious outreach such as Islamic organizations and strengthens the role and development of mosques. It leverages key occasions such as the *Hajj* season to facilitate dialogue and collaboration among scholars, thinkers, and opinion leaders, fostering solutions to common challenges; organizes conferences and events addressing Islamic matters, and establishes, operates and supports centers dedicated to education, cultural development, humanitarian assistance, and the teaching of the Arabic language; and cooperates with local and international governmental and non-governmental entities to further its mission and expand its impact. Ex. # 10, MWL 2002 Statute at JT-MWL 00041.

12. MWL established foreign offices and centers across the globe, to engage effectively with Muslim communities worldwide, gain a comprehensive understanding of their religious, educational, healthcare, cultural, and social conditions, and provide appropriate support. Ex. # 13, MWL Secretariat General Report (1997) at IIRO017075.

13. MWL Foreign Offices carried out MWL's goals and objectives, advising the MWL Secretariat General on proposed projects, such as the establishment of education programs and the building of mosques, and performed functions in support of these projects. Ex. # 9, Al-Hassani Decl. ¶ 10.

14. Foreign offices supervised the organization's local activities, implemented MWL's plans and programs, promoted Islamic teachings, monitored media content relating to Muslims and their affairs, articulated its positions, advocated for the protection of Muslim rights, delivered educational services, and coordinated with relevant organizations in their respective regions with a view to bridging divergent viewpoints. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017075.

15. MWL had foreign offices in the following locations: Argentina, Australia (and the Pacific), Bangladesh, Burundi, Canada, Comoros, Denmark, Ethiopia, France, Indonesia, Jordan, Kenya, Malaysia, Maldives, Mauritania, Mozambique, Nigeria, Pakistan, Philippines, Republic of Congo, Russia, Senegal, Somalia, South Africa, Tanzania, Togo, Trinidad, Uganda, United Kingdom, and United States of America. Ex. # 13, MWL Secretariat General Report (1997), at IIRO016982, IIRO016983,), (Ex. # 14, MWL Secretariat General Report (2004), IIRO017952, IIRO017953.

16. MWL also established cultural centers in Austria, Belgium, Benin, Brazil, Denmark, Italy, Niger, Nigeria, Spain, and Switzerland. Ex. # 13, MWL Secretariat General Report (1997), at IIRO016982; IIRO016983; Ex. # 14, MWL Secretariat General Report (2004) at IIRO017952; IIRO017953.

17. MWL provided donations to achieve the organization's various missions. For example, in 1997, MWL's office in Australia distributed approximately $86,938.67 to Islamic associations and $9,780 to associations in the Pacific Islands during Iftar (Ex. # 13, MWL Secretariat General Report (1997), at IIRO017077) and the director of MWL's office in Uganda distributed $74,198 in donations from MWL's Secretariat General to local associations (Ex. # 13, MWL's 1997 Annual Report, at IIRO017078).

18. MWL prioritized education by supporting schools, committees, and teachers:

a. It assisted students seeking higher education in Saudi Arabia by providing letters of recommendation (Ex. # 13, MWL Secretariat General Report (1997), at IIRO017085).

b. Granted many scholarships, including to approximately 30 students in Jordan in a single year (Ex. # 13, MWL Secretariat General Report (1997), at IIRO017079 and IIRO017083).

c. In Ethiopia, the local MWL office established a school committee to manage the school that it operated, and graduated students who continued their college education at Addis Ababa University. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017098–IIRO017099.

d. In Spain, students of all backgrounds benefited from MWL libraries, and the organization organized religious competitions and events such as Quran memorization contests and Iftars. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017092 and IIRO017093.

19. MWL conducted visits to its offices and undertook activities to evaluate local needs, raised awareness via different means, and encouraged communities to maintain impartiality and unity particularly in war-affected or disadvantaged areas. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017047 *et seq*.

20. In Uganda, MWL oversaw the United Islamic Schools, comprising 180 Qur'anic schools during the late 90s. Ex. # 13, MWL Secretariat General Report (1997) IIRO017078.

21. MWL supervised translation projects on Hajj, prayer and Fasting in Burundi, and worked to unify fragmented Islamic organizations through dedicated committees. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017079.

22. In Jordan, MWL distributed books and research articles on contemporary Islamic issues. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017083.

23. MWL's Canada office distributed religious sermons (Khutbah) in English, visited Muslim centers, provided Islamic literature, recorded and distributed translations of the Qur'an. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017083.

24. In Malaysia, MWL distributed religious books to universities, Islamic organizations, and committees, and monitored its school for orphans. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017084 and IIRO017085.

25. In various countries, such as in Denmark, MWL responded to inquiries on Islamic practices including women's roles, halal food, Hajj, attire, and holidays, and supported local organizations in educational and celebratory events. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017085 to IIRO017087.

26. MWL answered numerous inquiries from the public on Islamic matters and conducted over 50 radio programs on Islam in the Maldives in 1997. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017087-IIRO017088.

27. MWL also supervised Qur'anic institutions, distributed copies of the Qur'an and translations (Ex. # 13, MWL Secretariat General Report (1997), at IIRO017089) conducted research on Muslim minority populations, and distributed schoolbooks in Arabic Islamic schools, such as over 10,000 of them in one year in Benin. Ex. # 13, MWL Secretariat General Report (1997) at IIRO017090.

28. MWL also supervised halal certification processes for meat exported to the Kingdom of Saudi Arabia and conducted site visits to slaughterhouses to ensure proper operations. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017077.

29. MWL worked with other non-governmental organizations, governments, and international governing bodies, like the United Nations and enjoyed a sterling reputation as a force for good in the world and was often called upon for its expertise in troubling times. Ex. # 8, Al-Thaqafi Decl. ¶ 3; Ex. # 9, Al-Hassani Decl. ¶ 3.

30. Since 1979, MWL has been in general consultative status with the United Nations Economic and Social Council. Ex. # 38, Second Turki Decl. ¶ 6; Ex. # 6, Obaid Decl. ¶ 4; Ex. # 65, Second Basha Decl. ¶ 4. It was the fourteenth organization to be granted that status, *see* Ex. # 15, U.N. Sec. Gen., *List of non-governmental organizations in consultative status with the Economic and Social Council as of 31 December 2022*, at 3-7, U.N. Doc. E/2022/INF/5 (Apr. 4, 2023), which status is reserved for non-governmental organizations that are sufficiently representative of major segments of society in many countries and that "can demonstrate to the satisfaction of the Council that they have substantive and sustained contributions to make to the achievement of the objectives of the United Nations in [the] fields" of "international economic, social, cultural, educational, health, and related matters" and "promoting respect for, and observance of, human rights and fundamental freedoms for all" (Ex. # 16, Economic and Social Council Res. 1996/31, Part III, ¶ 22 (July 25, 1996); Ex. # 17, U.N. Charter, art. 62(1)-(2)), as well as helping advise the U.N. Peacebuilding Commission in supporting development in countries emerging from conflict. *See* Ex. # 18, G.A. Res. 60/180, The Peacebuilding Commission, ¶¶ 12(b), 17 (Dec. 20, 2005); Ex. # 19, G.A. Res. 61/16, Strengthening the Economic and Social Council, ¶¶ 20-23 (Jan. 9, 2007).

31. The position of Secretary General is the most senior role within MWL. Ex. # 8, Al-Thaqafi Decl. ¶ 3; Ex. # 9, Al-Hassani Decl. ¶ 3; Ex. # 10, MWL's 2002 Statute, at JT-MWL-00044 ("The Secretary General is the primary executive and administrative officer in charge at the League, and he assumes the administration of the work and its facilitation in a manner that ensures the achievement of the objectives of the League, its statute, and its regulations.").

32. Abdullah Naseef served as Secretary General of MWL from 1983 to 1993. Ex. # 11, Fawzi Decl. ¶ 10; Ex. # 20, Naseef End of Service Order as of 26/1/1414H (corresponding to July 16, 1993), MWL 059188.

33. Ahmed Mohamed Ali, Ph.D. served as Secretary General of MWL from 1994 to 1995. He was the Secretary General between Naseef and Obaid. Ex.# 21, Letter re Dr. Ali beginning his service as of 2/9/1414H (corresponding to February 13, 1994), MWL 059171; Ex.# 22, Dr. Ali End of Service Order as of 10/7/1416H (corresponding to December 3, 1995), MWL 059173; Ex. # 11, Fawzi Decl. ¶ 10.

34. Abdullah bin Saleh Al-Obaid, Ph.D., served as Secretary General of MWL from 1996 to 2000. Ex. # 6, Obaid Decl. ¶ 3.

35. Abdullah bin Abdul Mohsen Al-Turki, Ph.D., served as Secretary General of MWL from 2000 to 2016. Ex. # 38, Second Turki Decl. ¶ 3; Ex. # 23, Turki Dep. Tr. at 66:4-9 (*Errata*).

36. Adnan Basha, Ph.D. worked for MWL from 1977 to 1997 and again from 2013 until his retirement in 2016. Ex. # 65, Second Basha Decl. ¶ 3.

37. The Secretary General, Assistant Secretary General, and various directors of the organization's foreign offices regularly attended meetings, conferences, dialogues, and other events related to Islamic matters worldwide. These engagements aimed to strengthen relations with Islamic countries or those with Muslim populations, spread awareness and build diplomatic ties

with governmental and non-governmental entities for peace-building purposes, assess the conditions of Muslims globally, and provide them with the needed support. Ex. # 13, MWL Secretariat General Report (1997) at IIRO017047 *et seq*.

38. For example, in July 1996, the Secretary General attended a convention in Cairo, Egypt, titled "Islam and the Future of Civilized Dialogue," where he emphasized that religious extremism, fanaticism, terrorism, and narrow-mindedness have no basis in religion. In interviews that followed during that visit, he highlighted the importance of moderation, balance, and avoiding bias to achieve solidarity within the Muslim community. Ex. # 13, MWL Secretariat General Report (1997) at IIRO017050.

39. In October 1996, the Secretary General attended the 10th Convention for Peace in Italy, and participated in the session dedicated to Muslim-Christian relations. Ex. # 13, MWL Secretariat General Report (1997) at IIRO017051.

40. In the 1990s, the Secretary General participated in the signing ceremony of the convention of peace between the Philippines government and the Moro Islamic Liberation Front ("MILF"), an agreement that MWL had exerted efforts to achieve. Ex. # 13, MWL Secretariat General Report (1997) at IIRO017051.

41. During a visit to Bosnia and Herzegovina in April 1997, the Secretary General met with several heads of state to address post-war concerns, visited educational, and health centers, and promoted awareness of Islam's stance on human rights while encouraging peaceful resolution of conflicts. Ex. # 13, MWL Secretariat General Report (1997) at IIRO017054.

42. The Assistant Secretary General made comparable efforts. Some examples include travelling to Kampala, Uganda in the late 90s to oversee the handing over between the former and newly appointed director of the local office there, as well as visiting mosques, Islamic institutions,

and orphanages, and attending meetings and conferences. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017063 to IIRO017071.

43. During this same period, the Assistant Secretary General conducted similar visits in dozens of countries, leading prayers and dialogues with the heads of various organizations to discuss the conditions of local Muslims. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017064 *et seq*.

44. MWL regulations and directives issued by the Secretary General governed employee conduct and related to the hiring, promoting, and dismissing of employees. These regulations and directives, along with the principles undergirding them, remained consistent throughout the relevant timeframe. Ex. # 8, Al-Thaqafi Decl. ¶¶ 2, 5; Ex. # 9, Al-Hassani Decl. ¶¶ 2, 5; Ex. # 24, 1987 MWL Employee Regulations, JT-MWL00194-207; *see* Ex. # 25, 2003 MWL Employee Regulations, JT-MWL00169-193; Ex. # 26, 2003 MWL Guidelines for Employment & Appendices, JT-MWL00227-267.

45. MWL employees were required to understand and follow all MWL regulations and the directives and understand their position's responsibilities, duties, and authorities; expected to conduct their jobs with integrity, which meant protecting MWL money and resources and respecting guidelines and orders from organizational superiors and supervisors; prohibited from participating in activities that contradicted MWL values or taking directions from other entities; and barred from accepting personal gifts or donations. Ex. # 8, Al-Thaqafi Decl. ¶¶ 6-8; Ex. # 9, Al-Hassani Decl. ¶¶ 6-8; Ex. # 24, 1987 MWL Employee Regulations at JT-MWL00196; Ex. # 25, 2003 MWL Employee Regulations at JT-MWL00176-77.

46. Financial Officers were governed by MWL financial bylaws and Secretary General directives, which bylaws, and the principles undergirding them, remained consistent throughout

the relevant timeframe. Ex. # 8, Al-Thaqafi Decl. ¶¶ 2, 17; Ex. # 27, 1986 MWL Financial Regulations, JT-MWL00125-156; Ex. # 28, 2001/2002 MWL Financial Regulations, JT-MWL00157-167; Ex. # 29, 2001/2002 MWL Executive Regulations of the Financial Bylaws, JT-MWL00208-226.

47. Expenditures were tied to specific budgetary allocations and were not authorized for other purposes, meaning that no other MWL body, office or department was permitted to take actions that did not correspond to items allocated in the budget. Ex. # 8, Al-Thaqafi Decl. ¶ 18; Ex. # 9, Al-Hassani Decl. ¶ 17 ("Foreign Office directors were prohibited from taking decisions creating financial liabilities not previously approved in the budget."); Ex. # 27, 1986 MWL Financial Regulations at JT-MWL00129 and JT-MWL00156; Ex. # 28, 2001/2002 MWL Financial Regulations at JT-MWL00161 and JT-MWL00167.

48. MWL adopted regulations to ensure effective supervision of projects and programs implemented by Foreign Offices, including the requirement that Foreign Office personnel submit project progress reports, project completion reports, and photographs of finished projects to the relevant department at the Secretariat General. Ex. # 9, Al-Hassani Decl. ¶¶ 2, 11.

49. Foreign Office employees were required to understand and follow the Secretariat General's rules and regulations, to perform their duties without violation, to protect MWL's resources, and were prohibited from performing activities that contradicted MWL objectives. Ex. # 9, Al-Hassani Decl. ¶ 12; Ex. # 30, 1997 MWL Regulations for External Offices and Centers, JT-MWL00268-305 at JT-MWL00280-81.

50. Foreign Office directors and employees had to follow the laws of their host country and not interfere with politics or participate in political activities, and they were not permitted to engage in or to use MWL resources for personal commercial ventures, political activities, or

violent, extremist, or terrorist activities. Ex. # 9, Al-Hassani Decl. ¶¶ 15, 18; Ex. # 24, 1986 MWL Employee Regulations at JT-MWL00196; Ex. # 25, 2003 MWL Employee Regulations at JT-MWL00176-77; Ex. # 30, 1997 MWL Regulations for External Offices and Centers at JT-MWL00280-81.

51. MWL aimed to hire competent personnel with experience and integrity: new hires had to have a respectable reputation in the local community and no criminal record. Foreign offices could not create new positions without prior approval from the Secretariat General, and new hires were subject to approval from the Secretariat General. Ex. # 9, Al-Hassani Decl. ¶¶ 13-14; Ex. # 30, 1997 MWL Regulations for External Offices and Centers at JT-MWL00281-82.

52. Foreign Office directors were prohibited from making financial decisions for their own benefit or for the benefit of any other MWL employee. Ex. # 9, Al-Hassani Decl. ¶ 16; Ex. # 30, 1997 MWL Regulations for External Offices and Centers at JT-MWL00287.

53. MWL employed internal and external auditors. Ex. # 8, Al- Thaqafi Decl. ¶ 19; Ex. # 27, 1986 MWL Financial Regulations at JT-MWL00152-55; Ex. # 28, 2001/2002 MWL Financial Regulations at JT-MWL00166-67; Ex. # 29, 2001/2002 MWL Executive Regulations for the Financial Bylaws at JT-MWL00224-25.

54. The MWL Internal Auditor supervised and audited financial accounts, reviewed inventory records, verified that financial and administrative regulations were being adhered to, submitted quarterly reports, reviewed instances of financial and regulatory misconduct, and issued recommendations to prevent future misconduct. Ex. # 8, Al-Thaqafi Decl. ¶¶ 20-21; Ex. # 27, 1986 MWL Financial Regulations at JT-MWL00152-54; Ex. # 28, 2001/2002 MWL Financial Regulations at JT-MWL00166-67; Ex. # 29, 2001/2002 MWL Executive Regulations for the Financial Bylaws at JT-MWL00224.

55. External auditors provided an additional level of financial control; inspected all books and records to ensure that the correct procedures were followed; verified MWL's assets and liabilities; examined final accounting statements; and compared transactions with the work done to ensure their regularity and disclose any misconduct. Ex. # 8, Al-Thaqafi Decl. ¶ 22; Ex. # 27, 1986 MWL Financial Regulations at JT-MWL00154-55; Ex. # 28, 2001/2002 MWL Financial Regulations at JT-MWL00167; Ex. # 29, 2001/2002 MWL Executive Regulations for the Financial Bylaws at JT-MWL00225.

56. MWL received its funding in the form of a grant from the Saudi government. Ex. # 11, Fawzi Decl. ¶ 14; Ex. # 31, Obaid Dep. Tr. 133:2-133:13 (*Errata*); 133:23-134:3 (*Errata*).

57. MWL disbursed funds via issued checks or bank authorization letters and did not use the hawala system. Ex. # 11, Fawzi Decl. ¶ 15; Ex. # 29, 2001/2002 MWL Executive Regulations for the Financial Bylaws at JT-MWL00213; Ex. # 27, 1986 MWL Financial Regulations at JT-MWL00131.

**IIRO**

58. MWL established the International Islamic Relief Organization ("IIRO") in 1978. Ex. # 5, First Turki Decl. ¶ 14; Ex. # 6, Obaid Decl. ¶ 12.

59. IIRO's Head Offices are in Jeddah, Saudi Arabia. Ex. # 65, Second Basha Decl. ¶ 3; Ex. # 32, Helles Decl. ¶ 2.

60. IIRO was established to provide general humanitarian aid to impoverished people and to provide emergency aid in response to crises and natural disasters. Ex. # 38, Second Turki Decl. ¶ 14; Ex. # 6, Obaid Decl. ¶ 12; Ex. # 65, Second Basha Decl. ¶ 5; Ex. # 32, Helles Decl. ¶ 3; *see* Ex. # 33, 2000-2001 Annual Report at IIRO-004447 (noting over 1.7 million patients visited IIRO health facilities worldwide in 2000-2001).

61. IIRO was frequently brought into large-scale humanitarian disaster areas and enjoyed an outstanding reputation for its work. Ex. # 32, Helles Decl. ¶ 3; Ex. # 34, 1999-2000 Annual Report, at IIRO-003622 (describing IIRO's response in Turkey following devastating earthquake); Ex. # 35, 1998 Annual Report, at IIRO-004254 (describing IIRO's response in refugee camps in Azerbaijan for persons displaced by the Nagorno-Karabakh conflict).

62. IIRO, an international aid organization affiliated with the United Nations, provided humanitarian relief all over the world and emergency relief and sustainable development in various countries. Ex. # 65, Second Basha Decl. ¶ 5; Ex. # 32, Helles Decl. ¶ 3; Ex. # 33 2000-2001 Annual Report, at IIRO-004483-84 (reflecting UN cooperation), IIRO-004489-4504 (describing relief work all over the world, including, for example, in Uganda).

63. IIRO worked with other international relief organizations, including the United Nations High Commission on Refugees ("UNHCR") and the International Conference of Red Cross ("ICRC") and Red Crescent Societies. Ex. # 6, Obaid Decl. ¶ 13; Ex. # 38, Second Turki Decl. ¶ 15; Ex. # 33, 2000-2001 Annual Report, at IIRO-004483-84 (reflecting UN cooperation).

64. Secretaries General of MWL served as the *ex officio* Chair of the IIRO Board of Directors. Ex. # 38, Second Turki Decl. ¶ 14; Ex. # 6, Obaid Decl. ¶ 12; Ex. # 36, IIRO 2002 Constitution, at IIRO-000024; Ex. # 37, IIRO 1998 Constitution, at MWL 039326.

65. When serving as the *ex officio* Chair of the IIRO Board of Directors, the MWL Secretary General was one member of the IIRO board, which board's membership ranged from 12 to 24 individuals over the years. Ex. # 5, First Turki Decl. ¶ 18; Ex. # 37, 1998 IIRO Constitution, at MWL-039328; Ex. # 35, 1998 IIRO Annual Report, at IIRO-004246; Ex. # 34, 1999-2000 IIRO Annual Report, at IIRO-003597; Ex. # 40, IIRO BOD Meeting in 2000, at MWLIIRO-16243-44;

Ex. # 33, 2000-2001 IIRO Annual Report, at IIRO-004407; Ex. # 36, 2002 IIRO Constitution, at IIRO-000033.

66. The MWL Secretary General did not control, supervise, or have a role in IIRO's day-to-day operations, was only involved at a high-level with IIRO's operations via his capacity as Chairman of the Board, and had limited powers as Board Chair, such as casting a vote when the IIRO Board tied and appointing the IIRO SG and issuing financial and administrative regulations. Ex. # 5, First Turki Decl. ¶ 18; Ex. # 39, Obaid PJ Decl. ¶ 10; Ex. #65, Second Basha Decl. ¶ 7; Ex. # 31, Obaid Dep. Tr. at 311:18-312:2; Ex. # 37, 1998 IIRO Constitution, at MWL 039326-47; Ex. # 36, 2002 IIRO Constitution, at IIRO-000033.

67. The IIRO Board of Directors considered and addressed issues that were escalated to it, and provided recommendations that were implemented by IIRO's Secretariat General. In instances where any type of misconduct was escalated, the Board always recommended a thorough investigation. Ex. # 38, Second Turki Decl. ¶ 16; Ex. # 6, Obaid Decl. ¶ 14.

68. The position of Secretary General is the most senior role in IIRO. (Ex. # 65, Second Basha Decl. ¶ 3; Ex. # 36, IIRO 2002 Constitution, at IIRO-000042-43; Ex. # 37, 1998 Constitution, at MWL 039326-47.

69. The Secretary General and his advisors, Assistant Secretaries General, and the various departments and their directors formed the Secretariat General/Head Office. The Secretariat General was the main executive body of IIRO. Ex. # 32, Helles Decl. ¶ 5; Ex. # 36, IIRO 2002 Constitution, at IIRO-000042-43.

70. Adnan Basha served as Secretary General of IIRO from 1997 until 2013. Ex. # 65, Second Basha Decl. ¶ 3.

71. No IIRO office was designated by the OFAC as a Specially Designated Terrorist. U.S. Dept. of Treas., Office of Foreign Assets Control before September 11, 2001, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list.

72. IIRO's Head Offices in Jeddah, Saudi Arabia has never been designated by the OFAC as a Specially Designated Terrorist. U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list.

73. During Adnan Basha's tenure, IIRO employed approximately 1,000 employees across its offices. Ex. # 65, Second Basha Decl. ¶¶ 3, 6.

74. IIRO had 18 Local Offices in Saudi Arabia. Ex. # 41, 2001-2002 Annual Report, at IIRO-004518. The domestic branch offices had sub-offices. *Id.* Prominent branch offices included the ones for Al-Baha; Gizan; Al-Jouf; Riyadh; the Eastern Region; the Asir Region; Buraidah, Unaiza, Madina; Yanbu; Makkah; Jeddah; Taif; Najran; and finally, the Women's Committee based in Jeddah. (Ex. # 35, 1998 Annual Report at IIRO-003720; Ex. # 34, 1999-2000 Annual Report at IIRO-003600-IIRO-003608; Ex. # 33, 2000-2001 Annual Report at IIRO-004410-16; Ex. # 41, 2001-2002 Annual Report at IIRO-004518-IIRO-004523).

75. IIRO had 32 Foreign Offices, one each in Albania, Austria, Azerbaijan, Bangladesh, Benin, Bosnia Herzegovina, Burkina Faso, Chad, Croatia, Djibouti, Egypt, Ethiopia, Indonesia, Iraqi Kurdistan, Jordan, Kenya, Lebanon, Mali, Mauritania, Niger, Nigeria, Pakistan, the Philippines, Senegal, Somalia, Sri Lanka, Sudan, Tanzania, Thailand, Turkey, UAE, and Uganda. Ex. # 35, 1998 Annual Report, at IIRO-003743, IIRO-003745 and IIRO-003747; Ex. # 34, 1999-

2000 Annual Report, at IIRO-003685, IIRO-003697 and IIRO-003703; Ex. # 42, IIRO Secretariat General Report 1421/1422H at IIRO341009.

76. Of these 32 foreign branch offices, eight were located at the same address as an MWL foreign office. They were located in Djibouti, Ethiopia, Indonesia, Jordan, Kenya, Pakistan, Philippines, and Tanzania. Ex. # 42, IIRO Secretariat General Report 1421/1422H at IIRO341007-09.

77. Plaintiffs have no evidence that IIRO had any foreknowledge of or were involved in the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021), at E014040-000011; *see generally* 9/11 Commission Report; Monograph; , Winer Rpt. at 82-100, 116-22 (failing to trace any funds from IIRO to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 71-157 (same) (ECF No. 9250-2); Levitt Rpt. at 32-39 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves").

78. Plaintiffs have no evidence tracing IIRO funds to the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021), at E014040-000011; Plaintiffs' Second Supplemental Responses to Defendant Dubai Islamic Bank's Second Set of Requests for Admission dated April 23, 2022, Request No. 8, at 27 (ECF No. 8129-22) ("Plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from the International Islamic Relief Organization's account at DIB to specific operational expenditures incurred in carrying out the 9/11 operation."); March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 9 ("Plaintiffs present no evidence that individuals or entities [including IIRO] used money from these DIB accounts to fund al Qaeda or carry out 9/11. Indeed, Plaintiffs have

no evidence that funds in any account at Dubai Islamic Bank were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 terrorist attacks.") (internal citations and quotation marks omitted); *see also* Ex. # 4, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); Winer Rpt. at 82-100, 116-22 (failing to trace any funds from IIRO to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 71-157 (same) (ECF No. 9250-2); Levitt Rpt. at 32-39 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 9 ("Plaintiffs present no evidence that individuals or entities used money from these DIB accounts to fund al Qaeda or carry out 9/11. Indeed, Plaintiffs have no evidence that funds in any account at Dubai Islamic Bank were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 terrorist attacks.") (internal citations and quotation marks omitted); *see generally* 9/11 Commission Report; Monograph.; *see also* Ex. # 1, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda).

79. Plaintiffs have no evidence tracing in-kind support from IIRO to the planning or for the execution of the 9/11 Attacks. Ex. # 2, May 27, 2021 FBI Report Administratively Closing Case at E014040-000011; Winer Rpt. at 82-100, 116-22 (failing to show any in-kind support from IIRO to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 71-157 (same) (ECF No. 9250-2); Levitt Rpt. at 32-39 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally*

9/11 Commission Report; Monograph; *see also* Ex. # 1, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda).

80. No IIRO employee or IIRO Secretary General was designated by OFAC as a Specifically Designated Terrorist prior to September 11, 2001. Ex. # 65, Second Basha Decl. ¶ 79; U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list.

**MWL and IIRO: Independent and Separate Organizations**

81. MWL and IIRO operated independently, and were administratively, financially, and structurally independent from each other. Ex. # 65, Second Basha Decl. ¶ 8; Ex. # 38, Second Turki Decl. ¶ 18; Ex. # 6, Obaid Decl. ¶ 15; Ex. # 31, Obaid Dep. Tr. at 310:4-24, 311:11-312:2); Ex. # 36, IIRO 2002 Constitution at IIRO-000025; Ex. # 10, MWL Statute, JT-MWL-00037 to JT-MWL-0003746.

82. MWL maintained separate corporate governance, functions, identities, and operations from IIRO and did not operate through IIRO or declare to others that it did so. Ex. # 38, Second Turki Decl. ¶ 19; Ex. # 6, Obaid Decl. ¶ 16; Ex. # 65, Second Basha Decl. ¶ 8; Ex. # 8, Al-Thaqafi Decl. ¶¶ 12, 14; Ex. # 36, IIRO 2002 Constitution at IIRO-000025 and Ex. # 10, MWL Statute, JT-MWL-00037 to JT-MWL-0003746.

83. MWL and IIRO conducted separate board meetings, kept separate minutes of those board meetings, and maintained separate files. Ex. # 65, Second Basha Decl. ¶ 8; Ex. # 40, IIRO Board of Directors Meeting in 2000, MWLIIRO-00016243 to MWLIIRO-00016246; Ex. # 8, Al-Thaqafi Decl. ¶ 12; Ex. # 43, Chaout Decl. ¶ 54.

84. MWL and IIRO had separate headquarters/head offices. Ex. # 38, Second Turki Decl. ¶¶ 4, 15; Ex. # 5, First Turki Decl. ¶¶ 14, 18; Ex. # 65, Second Basha Decl. ¶ 8; Ex. # 6, Obaid Decl. ¶ 12; Ex. # 39, Obaid PJ Decl. ¶¶ 7, 10; Ex. # 8, Al-Thaqafi Decl. ¶ 12.

85. MWL and IIRO had separate payrolls, bank accounts, budgets, and document management systems. Ex. # 38, Second Turki Decl. ¶ 19; Ex. # 6, Obaid Decl. ¶ 16; Ex. # 65, Second Basha Decl. ¶¶ 8, 10; Ex. # 8, Al-Thaqafi Decl. ¶ 12; Ex. # 43, Chaout Decl. ¶ 54 ("In 2016, Plaintiffs provided LBKM attorneys with a list of bank accounts allegedly belonging to IIRO and MWL offices in Pakistan. I contacted the current Pakistan director to inquire about these accounts, and he contacted the banks in Pakistan to request statements for the accounts belonging to MWL and IIRO. The banks could not provide the statements as the accounts were either dormant, or were opened by individuals in their personal capacity, and therefore not accessible to IIRO.").

86. When necessary in dealings between MWL and IIRO, MWL and IIRO engaged their own legal representation to clarify their respective legal positions and to protect their respective interests and rights. Ex. # 65, Second Basha Decl. ¶ 9; # 8, Al-Thaqafi Decl. ¶ 11.

87. IIRO had its own legal department. Ex. # 65, Second Basha Decl. ¶ 16.

88. MWL and IIRO did not comingle funds. Ex. # 65, Second Basha Decl. ¶ 10; Ex. # 8, Al-Thaqafi Decl. ¶ 16.

89. MWL and IIRO had separate finances, taxes, and properties, and neither used the others' funds. Ex. # 8, Al-Thaqafi Decl. ¶ 13; Ex. # 65, Second Basha Decl. ¶¶ 17, 19 ("MWL and IIRO did not file joint tax returns…. IIRO's funds were not used by MWL. MWL's funds were not used by IIRO. For example, IIRO did not use MWL's funds to pay for IIRO's operating costs and

expenses or vice versa. IIRO did not pay the salaries of MWL employees or vice versa. MWL did not transfer funds in and out of IIRO for MWL's purposes.").

90. IIRO did not use MWL's funds to pay for IIRO's operating costs and expenses or vice versa. Ex. # 65, Second Basha Decl. ¶ 19; Ex. # 8, Al- Thaqafi Decl. ¶ 13.

91. Neither IIRO nor MWL paid the salaries of the others' employees or vice versa. Ex. # 65, Second Basha Decl. ¶ 19.

92. MWL did not transfer funds to IIRO for MWL's operations. MWL did not control IIRO bank accounts and did not transfer funds from IIRO. Ex. # 65, Second Basha Decl. ¶ 19 ("IIRO's funds were not used by MWL. MWL's funds were not used by IIRO. For example, IIRO did not use MWL's funds to pay for IIRO's operating costs and expenses or vice versa. IIRO did not pay the salaries of MWL employees or vice versa. MWL did not transfer funds in and out of IIRO for MWL's purposes."); Ex. # 8, Al-Thaqafi Decl. ¶¶ 13-14 ("MWL and IIRO had separate finances, taxes, and properties, and neither used the others' funds. MWL handled its own operations and did not operate through IIRO or declare to others that it did so.").

93. MWL and IIRO issued their own independent financial statements. Ex. # 44, MWL Financial Statements prepared by certified public accountant El Sayed El Ayouty & Co. for year ending in 2001, JT-MWL-00001 to JT-MWL-00034; Ex. # 45, KPMG Audits of IIRO, IIRO-000868 to IIRO-000943.

94. MWL and IIRO employed separate internal auditors and engaged separate external auditors. Ex. # 65, Second Basha Decl. ¶¶ 47, 53, 75; Ex. # 8, Al-Thaqafi Decl. ¶¶ 19-22; Ex. # 45, MWL Financial Statements prepared by certified public accountant El Sayed El Ayouty & Co. for year ending in 2001, JT-MWL-00001 to JT-MWL-00034; Ex. # 44, KPMG Audits of IIRO, IIRO-000868 to IIRO-000943.

95. The Saudi General Auditing Bureau routinely audited MWL. Ex. # 46, KSA Auditing Bureau records, JT-MWL-04518 to JT-MWL-04522; Ex. # 27, 1986 MWL Financial Regulations at JT-MWL00154.

96. MWL was responsible for its own capitalization and debts, and IIRO was responsible for its own capitalization and debts. Ex. # 65, Second Basha Decl. ¶ 10; Ex. # 8, Al-Thaqafi Decl. ¶ 16.

97. Some employees held posts at both IIRO and MWL in foreign branch offices. Ex. # 38, Second Turki Decl. ¶ 18; Ex. # 6, Obaid Decl. ¶ 16; Ex. # 65, Second Basha Decl. ¶ 11.

98. Employees who held posts at foreign branch offices of both IIRO and MWL: (a) received separate compensation from IIRO and MWL (Ex. # 38, Second Turki Decl. ¶ 18; Ex. # 6, Obaid Decl. ¶ 16; Ex. # 65, Second Basha Decl. ¶ 11; Ex. # 47, Al-Harbi Dep. Tr. at 168:5-168:9, 276:4-13); (b) received separate instructions from IIRO and MWL (Ex. # 38, Second Turki Decl. ¶ 18; Ex. # 6, Obaid Decl. ¶ 16; Ex. # 65, Second Basha Decl. ¶ 11; Ex. # 48, Letter to Gari from IIRO Offices Department, IIRO 094570; Ex. # 49, Letter to Gari from IIIRO Emergency Relief Department, IIRO 50804; Ex. # 50, Letter to Gari from IIRO Social Welfare Department, IIRO 51398; Ex. # 51, Letters from MWL Head Office to MWL-Pakistan Director, MWL 018804 to MWL 018807); and (c) had separate budgets for their IIRO and MWL projects (Ex. # 38, Second Turki Decl. ¶ 18; Ex. # 6, Obaid Decl. ¶ 16; Ex. # 65, Second Basha Decl. ¶ 11; Ex. # 47, Al-Harbi Dep. Tr. at 278:23-279:1).

99. MWL and IIRO sometimes worked together on specific projects in host countries. Ex. # 65, Second Basha Decl. ¶ 12.

100. MWL could not and did not control IIRO's activities or its management. Ex. # 65, Second Basha Decl. ¶ 12.

101. MWL could not and did not exercise control over IIRO's day-to-day operations. (Ex. # 38, Second Turki Decl. ¶¶ 17, 19; Ex. # 6, Obaid Decl. ¶¶ 15, 17; Ex. # 65, Second Basha Decl. ¶ 7; Ex. # 31, Obaid Dep. Tr. at 311:18-312:2).

102. MWL could not and did not tell IIRO to perform acts on behalf of MWL, and, in any case, IIRO could not and did not act on MWL's behalf and did not seek or otherwise agree to operate on MWL's behalf. Ex. # 65, Second Basha Decl. ¶¶ 12-13; Ex. # 38, Second Turki Decl. ¶ 19; Ex. # 6, Obaid Decl. ¶ 17; Ex. # 31, Obaid Dep. Tr. at 78:9-79:2 (*Errata*).

103. IIRO was not engaged or entrusted to or given the authority to take decisions or act on MWL's behalf. Ex. # 65, Second Basha Decl. ¶ 12.

104. MWL did not indicate or represent to others that IIRO was performing acts on MWL's behalf or with MWL's consent. Ex. # 65, Second Basha Decl. ¶ 13; Ex. # 8, Al-Thaqafi Decl. ¶ 14.

105. IIRO did not indicate or represent to others that it was performing acts on MWL's behalf or with MWL's consent. Ex. # 65, Second Basha Decl. ¶ 13.

106. MWL did not rely on IIRO to carry out MWL's operations, goals, or processes. MWL acted independently of IIRO in carrying out MWL's operations, goals, and processes. Ex. # 65, Second Basha Decl. ¶ 14; Ex. # 8, Al-Thaqafi Decl. ¶ 14.

107. IIRO did not hold any MWL property, including property in trust. Ex. # 65, Second Basha Decl. ¶ 14 ("IIRO did not hold any property of MWL in trust."); Ex. # 8, Al-Thaqafi Decl. ¶ 13 ("MWL and IIRO had separate finances, taxes, and properties, and neither used the others' funds.").

108. MWL could not and did not dictate to IIRO how or where IIRO was to operate, and MWL was not required to approve IIRO's operations, actions, or processes. Ex. # 65, Second

Basha Decl. ¶ 15 ("MWL could not and did not dictate to IIRO how or where IIRO was to operate. For example, IIRO had sole decision-making authority on matters such as how to manage employees, finances, or processes . . . . MWL could not and was not required to approve IIRO's operations, actions, or processes.").

109. IIRO had sole decision-making authority on matters such as how to manage employees, finances, or processes, where to open local or foreign offices, where to deliver relief and aid, or which programs and projects IIRO pursued. Ex. # 65, Second Basha Decl. ¶ 15.

110. IIRO and MWL had separate hiring processes and practices and distinct employee policies: MWL could not and did not dictate whom IIRO could hire; IIRO could not and did not hire employees for MWL; and IIRO and MWL had separate codes of conduct for their employees, separate compliance policies, and separate human resources departments. Ex. # 65, Second Basha Decl. ¶¶ 15-16 ("IIRO could not and did not hire employees on MWL's behalf for MWL"); Ex. # 8, Al-Thaqafi Decl. ¶ 5 ("When I joined MWL, it had in place regulations, in addition to directives issued by the secretary general, governing employee conduct and relating to the hiring, promoting, and dismissing of employees. These regulations and directives, along with the principles undergirding them, have remained consistent throughout my tenure at MWL.").

111. IIRO could not and did not: sign contracts or enter into agreements on MWL's behalf or purchase goods or services on MWL's behalf. Ex. # 65, Second Basha Decl. ¶ 16 ; Ex. # 8, Al-Thaqafi Decl. ¶ 14 ("MWL handled its own operations and did not operate through IIRO or declare to others that it did so").

112. MWL and IIRO did not file joint tax returns. Ex. # 65, Second Basha Decl. ¶ 17; Ex. # 8, Al- Thaqafi Decl. ¶ 13.

113. IIRO's liabilities never exceeded its assets, and MWL's liabilities never exceeded its assets. Ex. # 65, Second Basha Decl. ¶ 18; Ex. # 8, Al- Thaqafi Decl. ¶ 15.

114. MWL did not loan money to IIRO. Ex. # 65, Second Basha Decl. ¶ 20.

115. Past declarations submitted in this case mistranslated an Arabic word as "subsidiary" rather than "affiliate" when describing the relationship between MWL and IIRO. Ex. # 39, Obaid PJ Decl. ¶ 11.

116. IIRO was an affiliate, not a subsidiary, of MWL. Ex. # 39, Obaid PJ Decl. ¶ 11; Ex. # 31, Obaid Dep. Tr. at 78:3-8, 311:11-16.

117. The work of individuals with roles in MWL and IIRO did not overlap, and their roles were not combined. Ex. # 52, Gari Dep. Tr. at 67:15-68:21; Ex. # 48, Letter to Gari from IIRO Offices Department, IIRO 094570; Ex. # 49, Letter to Gari from IIIRO Emergency Relief Department, IIRO 50804; Ex. # 50, Letter to Gari from IIRO Social Welfare Department, IIRO 51398; Ex. # 51, Letters from MWL Head Office to MWL-Pakistan Director, MWL 018804 to MWL 018807.

118. In Pakistan, the IIRO-Pakistan office director did not receive a salary for his voluntary position as director of MWL's Pakistan. Ex. # 52, Gari Dep. Tr. at 67:15-68:21.

119. Even where MWL and IIRO had offices in the same or similar locations, the work, operations, and accounts/finances of those offices were distinct and not combined. Ex. # 53, Daguit Decl. ¶ 11; Ex. # 52, Gari Dep. Tr. at 67:15-68:21; Ex. # 54, Wardi Decl. ¶ 8.

120. In the Philippines, MWL and IIRO operated out of different office spaces and maintained their own activities and operational funding. Ex. # 52, Daguit Decl. ¶ 11; Ex. # 12, Daguit Dep. Tr. at 19:14-20.

121. In Indonesia, MWL and IIRO operated out of the same office building but in different office spaces and on different floors, and each had its own employees, each stored its files apart from the other's, each had its own sign in the office building reception, and IIRO auditors had no right to access MWL accounts. Ex. # 54, Wardi Decl. ¶ 8; Ex. # 47, Al-Harbi Dep. Tr. at 275:10-15, 275:21-276:1, 298:3-300:9, 301:2-10 (*Errata*), 332:23-333:9, 334:2-18.

**Rabita Trust**

122. MWL and the Government of Pakistan jointly established the Rabita Trust in Islamabad, Pakistan in 1988 with the purpose of repatriating Biharis (Pakistanis living in Bangladesh following the Indo-Pakistani War) from Bangladesh to Pakistan. Ex. # 55, Deed at Preamble ¶ 2, IIRO-111693; Ex. # 38, Second Turki Decl. ¶ 21; Ex. # 23, Turki Dep. Tr. at 295:3-10 (*Errata*); Ex. # 6, Obaid Decl. ¶¶ 19-20; Ex. # 56, Appeal for Donation to the Rabita Trust for Repatriation of Stranded Pakistanis from Bangladesh (Dec. 26, 1997), IIRO 149661; Ex. # 31, Obaid Dep. Tr. at 81:21-82:5 (*Errata*).

123. Plaintiffs have no evidence that Rabita Trust had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; *see generally* 9/11 Commission Report; Monograph.

124. Plaintiffs have no evidence tracing Rabita Trust funds to the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph.

125. Plaintiffs have no evidence tracing in-kind support from Rabita Trust to the planning or for the execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing

Case (May 27, 2021) at E014040-000011; Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally*, 9/11 Commission Report; Monograph.

126. Plaintiffs have no evidence tracing funds from MWL through Rabita Trust to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. # 2, E014040-000011 (May 27, 2021 FBI Report Administratively Closing Case); Kohlmann Rpt. ¶¶ 27-70 (same) (ECF No. 9250-2); Levitt Rpt. at 29-35 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. #3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph.

127. Rabita Trust completed the construction of 1000 residential units in Mian Channu and approximately 70 Bihari families were repatriated in or around 1993. Ex. # 57, M. Aslam Tariq letter dated 29 October 1992 titled "Repatriation of 3000 Families from Bangladesh to Pakistan by the End of December, 1992" (MWL 008691); Ex. # 58, Letter from Ass. Sec. Gen. Amin Aqeel Attas to external party dated January 4, 1993, MWL-030813 (informing the external party that Rabita Trust has selected the location and started to build the residential units in the Punjab region); Ex. # 59, Letter from Ass. SG Amin Aqeel Attas to MWL-Pakistan director dated 26 November 1996, MWL 030810 (stating that the residences were built three years ago); Ex. # 60, Letter from Pakistan Citizens' National Committee for Repatriation of Stranded Pakistanis dated Sept. 30, 2003, MWL 008694-97 (stating that the "trust has successfully completed the construction of 1000 housing units at Mian Channoo [*sic*] way back in 93-94. Out of these, only 68 housing units have been under occupation…by the Pakistanis who were repatriated from Bangladesh in Jan. 1993.").

128. The lack of government support for the project and the vacancies caused the residential units to dilapidate over time. Ex. # 60, Letter from Pakistan Citizens' National Committee for Repatriation of Stranded Pakistanis dated 30 Sep 2003 stating that the "remaining 932 units have been lying vacant and sustaining the onslaughts of the extreme summers & winter over all these yr [*sic*]", MWL 008694-97 (attached and in English); Ex. # 52, Gari Dep. Tr. at 136:14-16, 140:21-141:1 (*Errata*).

129. MWL provided a "token sum" of 50 million Pakistani Rupees to the trust upon its establishment. Ex. # 55, Deed at Preamble ¶ 8, IIRO-111697. This equaled approximately $2.5 million. Ex. # 59, Letter from Ass. SG Amin Aqeel Attas to MWL-Pakistan director dated 26 November 1996, MWL 030810 (estimating MWL's contribution to be $2.5 million). The Government of Pakistan provided 250 million Pakistani Rupees to the trust upon its establishment. Ex. # 55, Deed at Preamble ¶ 8, IIRO-111698.

130. The Government of Pakistan and the MWL each nominated half of the members of the Rabita Trust Board. Ex. # 55, Deed at Preamble ¶ 3(a), IIRO-111693 to IIRO-111694; Ex. # 61, IIRO-149643 to IIRO-149644 (Oct. 11, 2001 notification of the reconstitution of Rabita Trust's Board); Ex. # 61, Oct. 13, 2001 Letter from Pakistani Brigadier General, IIRO-149621 (noting a revised list of Board members representing Pakistan); *see* Ex. # 62, March 14, 2000 GOP Circular regarding the "Composition of Rabita Trust Board," ECF No. 7608-13 at 2-3).

131. The President or Prime Minister of Pakistan served as Chairman of the Rabita Trust Board until October 2001. Ex. # 38, Second Turki Decl. ¶ 21; Ex. # 6, Obaid Decl. ¶ 19; Ex. # 31, Obaid Dep. Tr. at 82:7-20 (*Errata*); Ex. # 23, Turki Dep. Tr. at 294:2-295:2 (*Errata*); Ex. # 63, List of members of the Rabita Trust Board, MWL-030817; Ex. # 55, Deed at Preamble ¶ 3(b), IIRO-111694; Ex. # 56, Appeal for Donation to the Rabita Trust, IIRO 149661.

132. For most, and perhaps all of the period between its founding and October 2001, the Pakistani Finance Minister served on the Board of the Rabita Trust and was responsible for the Trust's finances. Ex. # 23, Turki Dep. Tr. at 294:2-295:2 (*Errata*); Ex. # 31, Obaid Dep. Tr. at 82:7-20 (*Errata*) (noting "financial responsible person is the finance minister of Pakistan"); Ex. # 62, Composition of Rabita Trust Board, MWL-031819; Ex. # 63, List of members of the Rabita Trust Board, MWL-03187; Ex. # 56, Appeal for Donation to the Rabita Trust, IIRO 149661; Ex. # 61, IIRO-149644 (2001 replacement of Rabita Trust board members).

133. The Government of Pakistan supervised and attended to the Rabita Trust (Ex. # 64, Letter From Abdullah Al-Turki to Ambassador Abdul Mirza of Pakistan, ECF No. 7608-13 at 18 ("thank you and the Government of Pakistan for looking after the Trust")), and made changes to the Board's membership multiple times. Ex. # 55, Deed at Preamble ¶ 3(b), IIRO-111694; Ex. # 62, Composition of Rabita Trust Board, MWL-031819; Ex. # 63, List of members of the Rabita Trust Board, MWL-03187; Ex. # 61, Notification re: Rabita Trust Board, IIRO 149644 (2001 replacement of Rabita Trust board members); Ex. # 61, Notification re: Rabita Trust Board, IIRO-149643 to IIRO149644 (Government of Pakistan appointing Retired Brigadier General Muhammad Ilyas Khan, Director General of the ERC, to the Rabita Trust Board in October 2001).

134. The MWL Secretary General served *ex officio* as an officer of the Rabita Trust (Ex. # 38, Second Turki Decl. ¶ 21; Ex. # 6, Obaid Decl. ¶ 19; Ex. # 31, Obaid Dep. Tr. at 80:20-81:8), and was one of two Vice-Chairmen on the Rabita Trust Board, Ex. # 55, Deed at Preamble ¶ 3(b), IIRO-111694; Ex. # 62,Composition of Rabita Trust Board, MWL-031819; Ex. # 56, Appeal for Donation to the Rabita Trust, IIRO 149661.

135. The other Vice-Chairman of the Rabita Trust Board was a member of the Government of Pakistan and included, at various times, the Foreign Minister, the Minister of

Finance & Economic Affairs, the Minister for Finance, Revenue, Economic Affairs, Planning & Development and Statistics, and the Additional Chief Secretary, Punjab. Ex. # 55, Deed at Preamble ¶ 3(b), IIRO-111694; Ex. # 63, List of members of the Rabita Trust Board, MWL-030817; Ex. # 62, Composition of Rabita Trust Board, MWL 030819; Ex. # 56, Appeal for Donation to the Rabita Trust, IIRO-149661; Ex. # 61, Notification re: Rabita Trust Board, IIRO-149644.

136. The Rabita Trust Board required a quorum of six members to act, provided that at least three of the Board members present were from amongst the representatives of MWL or the Government of Pakistan. Ex. # 55, Deed at Preamble ¶ 6, IIRO-111697.

137. The Rabita Trust's bank account was operated jointly by an MWL and Government of Pakistan Rabita Trust Board member. Ex. # 55, Deed at Preamble ¶ 10, IIRO-111698; Ex. # 56, Appeal for Donation to the Rabita Trust, IIRO 149661 (directing donations payable to the Habib Bank account of the Secretary General of Rabita Trust).

138. The Rabita Trust's accounts were to be audited by the Auditor General of Pakistan. Ex. # 55, Deed at Preamble ¶ 10, IIRO-111698.

139. Winding up the Rabita Trust requires a two-thirds vote of all Board members. Ex. # 55, Deed at Preamble ¶ 15, IIRO-111699.

140. During the time that MWL Secretary General Abdullah bin Saleh Al-Obaid served on the Board of Trustees of the Rabita Trust, between 1996 and 2000, he understands that the Rabita Trust was not engaged in any work and was defunct. Ex. # 39, Obaid PJ Decl. ¶ 15; Ex. # 31, Obaid Dep. Tr. at 80:20-81:8, 82:7-20 (*Errata*), 97:4-98:9 (*Errata*).

141. In 1998, Adnan Basha, Secretary General of the IIRO was appointed to the Rabita Trust Board, and, to his knowledge, the Rabita Trust board held no meetings and the Rabita Trust conducted no work while he was an appointed board member. Ex. # 7, Basha Decl. ¶¶ 6-7.

142. On October 29, 1992, Aslam Tariq, Deputy Secretary in the Government of Pakistan, ordered the establishment of the Rabita Trust's office in Lahore, Pakistan. Ex. # 57, Letter from Aslam Tariq to Wael Jelaidan (Oct. 29, 1992), MWL 008691.

143. Adnan Basha did not order the closure of the Rabita Trust's Lahore, Pakistan office. Ex. # 7, Basha Decl. ¶ 8.

144. Rahmatullah Nazir Khan Gari, in his capacity as the Rabita Trust Project Director, closed Rabita Trust's Lahore, Pakistan office based on instructions from the Government of Pakistan and notified Adnan Basha of the Lahore, Pakistan office's closure in Basha's capacity as a Rabita Trust board member. Ex. # 7, Basha Decl. ¶ 8; Ex. # 66, Letter to Basha from Gari, IIRO-149640 (attaching IIRO 149642-43).

145. One of the powers and functions of the Rabita Trust Board was to "launch a fund-raising campaign . . . to meet the financial liabilities in respect of the Rehabilitation Project," referring to the project of repatriation. Ex. # 55, Deed at Preamble ¶ 4(c), IIRO-111695.

146. In 1997, a fundraising appeal was sent by the Rabita Trust over the signatures of Vice-Chairmen Abdullah Obaid and Sartaj Aziz, Minister for Finance & Economic Affairs, Government of Pakistan. Ex. # 56, Appeal for Donation to the Rabita Trust, IIRO 149661.

147. Upon his return to government in the late 1990s, Nawaz Sharif worked to revitalize the project. Ex. # 31, Obaid Dep. Tr. at 111:23-112:11 (*Errata*); Ex. # 67, 9 January 1998 Okaz article, IIRO 111679-701 at IIRO111701 (discussing governmental shift and revitalization of project).

148. In March 2000, the Government of Pakistan supplied a list of new members it nominated to the Board. Ex. # 62, March 2000 Circular re the Composition of the Rabita Trust Board.

149. In 2000, MWL Secretary General Abdullah bin Saleh Al-Obaid completed his term as Secretary General of MWL and thus also left his board position at the Rabita Trust. Ex. # 39, Obaid PJ Decl. ¶ 16.

150. MWL Secretary General Abdullah bin Abdul Mohsen Al-Turki assumed his post as MWL Secretary General in November 2000. Ex. # 38, Second Turki Decl. ¶ 3; Ex. # 23, Turki Dep. Tr. at 66:4-9 (*Errata*).

151. In 2016, MWL Secretary General Abdullah bin Abdul Mohsen Al-Turki completed his term as Secretary General of MWL and thus also left his board position at the Rabita Trust. Ex. # 5, First Turki Decl. ¶ 23.

152. By the time MWL Secretary General Abdullah bin Abdul Mohsen Al-Turki assumed his post as MWL Secretary General and became an officer of the Rabita Trust, Rabita Trust was a defunct organization; Ex. # 5, First Turki Decl. ¶ 22; Ex. # 23, Turki Dep. Tr. at 294:2-295:2 (*Errata*), 295:19-296:6 (*Errata*) and after Rabita Trust's designation in October 2001, Al-Turki responded to the Pakistani Ambassador's request to replace Jelaidan as Secretary General of the Rabita Trust that the GOP and MWL should first re-activate the Trust and simultaneously seek to have Rabita Trust delisted by OFAC for the "baseless accusation," and then discuss reconstituting the Trust board and replacing the then-Secretary General, Jelaidan. Ex. # 68, BUR-PEC-0175890.

153. MWL Secretary General Abdullah bin Abdul Mohsen Al-Turki does not recall attending any meetings of the Rabita Trust board. Ex. # 5, First Turki Decl. ¶ 22.

154. The Rabita Trust project director from 2001 to 2007 did not interact with the Rabita Trust Board and explained that "there was no board" when asked whether he interacted with the Rabita Trust Board. Ex. # 52, Gari Dep. Tr. at 140:21-141:1 (*Errata*).

155. He "found all the villas destroyed, destroyed as a result of the time passing" when he visited the city built for stranded Biharis. Ex. # 52, Gari Dep. Tr. at 136:14-16.

156. By the time Rahmatullah Nazir Khan Gari became the volunteer head of the MWL Pakistan office, the individual holding that post automatically became the director of the Rabita Trust office or project. Ex. # 52, Gari Dep. Tr. at 134:24-135:6.

157. The Rabita Trust and MWL did not share offices in Pakistan. Ex. # 52, Gari Dep. Tr. at 135:7-14.

158. The Rabita Trust had two offices: head office in Lahore and a sub office in Mian Channu. Ex. # 69, Aslam Khan and Company Auditor's Report at A4.

159. The Rabita Trust was an independent organization and not a part of MWL (Ex. # 5, First Turki Decl. ¶ 22; Ex. # 39, Obaid PJ Decl. ¶ 13; Ex. # 23, Turki Dep. Tr. at 294:2-295:2 (*Errata*)) that managed its own assets in coordination with the Government of Pakistan. Ex. # 38, Second Turki Decl. ¶ 22; Ex. # 6, Obaid Decl. ¶ 21; Ex. # 56, Fundraising Appeal (IIRO 149661) (directing donations payable to Habib Bank account of Rabita Trust Secretary General); *see generally* Ex. # 55, Deed at Preamble, IIRO-111692 to IIRO-111699.

160. The Rabita Trust maintained its own corporate governance, functions, identities, operations, payrolls, and budgets, distinct from those of MWL or IIRO. Ex. # 38, Second Turki Decl. ¶ 22; Ex. # 6, Obaid Decl. ¶ 21; *see generally* Ex. # 55, Deed at Preamble, IIRO-111692 to IIRO-111699.

161. The Rabita Trust maintained independent operational and document management systems from those of MWL. Ex. # 70, Fawzi Decl. ¶ 36.

162. MWL could not and did not control the Rabita Trust's day-to-day activities or management. Ex. # 38, Second Turki Decl. ¶ 24; Ex. # 6, Obaid Decl. ¶ 22.

163. The Rabita Trust could not and did not act on MWL's behalf. Ex. # 38, Second Turki Decl. ¶ 24; Ex. # 6, Obaid Decl. ¶ 22.

164. MWL did not pay the salaries of Rabita Trust employees. Ex. # 69, Aslam Khan and Company Auditor's Report at 59; Ex. # 68, Jelaidan, Ltr. from Al-Turki to Pakistani Ambassador to Saudi Arabia (discussing fact that Rabita Trust employees had not been paid since its accounts were frozen).

165. Rabita Trust fundraised on its own behalf. Ex. # 56, Appeal for Donation to the Rabita Trust, IIRO 149661 (requesting donations be made to Rabita Trust's bank accounts).

166. Neither MWL Secretary General Abdullah bin Abdul Mohsen Al-Turki nor Secretary General Abdullah bin Saleh Al-Obaid is aware of any activities conducted or financing provided by the Rabita Trust in support of Al Qaeda or any other terrorist organization. Ex. # 38, Second Turki Decl. ¶ 24; Ex. # 6, Obaid Decl. ¶ 23; 66 Fed. Reg. 54,404, 54,408.

167. If Rabita Trust conducted any activity or provided any financing in support of Al Qaeda or any other terrorist organization, it was not approved tacitly or explicitly by MWL, by Secretary General Abdullah bin Abdul Mohsen Al-Turki or by MWL Secretary General Abdullah bin Saleh Al-Obaid. Ex. # 38, Second Turki Decl. ¶ 24; Ex. # 6, Obaid Decl. ¶ 23.

168. Plaintiffs have no evidence that MWL was aware or had knowledge before 9/11 of any connection between Rabita Trust and Al Qaeda. Ex. # 38, Second Turki Decl. ¶ 24; Ex. # 6, Obaid Decl. ¶ 23; 66 Fed. Reg. 54,404, 54,408.

169. Rabita Trust was designated by OFAC on October 12, 2001 pursuant to Executive Order 13244. 66 Fed. Reg. 54,404, 54,408.

170. Member of the Board, Retired Pakistani Brigadier General Muhammad Ilyas Khan, ordered an audit of the Rabita Trust in October 2001. Ex. # 56, 2001 Letter from Muhammad Ilyas Khan to Rahmat Ullah Nazir Khan, IIRO 149642 ¶ 2.

**Wael Jelaidan**

171. Plaintiffs have no evidence that Wael Jelaidan had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; *see generally* 9/11 Commission Report; Monograph.

172. Plaintiffs have no evidence tracing Wael Jelaidan funds to the planning or execution of 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; see generally 9/11 Commission Report; Monograph.

173. Plaintiffs have no evidence tracing in-kind support from Wael Jelaidan to the planning or for the execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; see generally 9/11 Commission Report; Monograph.

174. Plaintiffs have no evidence tracing funds from MWL through Wael Jelaidan to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. # 2, May 27, 2021 FBI Report Administratively Closing Case, at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from MWL to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 27-70 (same) (ECF No. 9250-2); Levitt Rpt. at 29-35 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see*

*also* Ex. # 4, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); *see generally* 9/11 Commission Report; Monograph.

175. Wael Jelaidan was appointed MWL office director in Islamabad in 1990, and he remained there until he was transferred to MWL Head Office in Makkah, Saudi Arabia on September 22, 1994. Ex. # 70, Fawzi 2018 Decl. ¶ 38.

176. Wael Jelaidan resigned from MWL on November 1, 1995 and held no further employment with MWL. Ex. # 70, Fawzi 2018 Decl. ¶ 38.

177. Wael Jelaidan held multiple roles at Rabita Trust. In October 1992, the Pakistani government—the Prime Minister specifically—approved Jelaidan's appointment as Project Director and to the Rabita Trust Board. Ex. # 57, Ltr. from Tariq to WJ MWL 008691.

178. Later that decade, after he left MWL, the government of Pakistan proposed Wael Jelaidan's appointment as Director General-cum-Secretary General of the Rabita Trust, as Jelaidan was well known to the then-Prime Minister of Pakistan, Nawaz Sharif. And on February 15, 1999, Wael Jelaidan was appointed Director General-cum-Secretary General of the Rabita Trust, in connection with the Pakistani government's attempt to resurrect the Trust's activities. Ex. # 31, Obaid Dep. Tr. at 92:12-93:19 (*Errata*); Ex. # 39, Obaid PJ Decl. ¶ 18; Ex. # 71, MWL 30814 (February 15, 1999 MWL administrative order signed by Al Obaid canceling the order appointing Sameer Radhi as RT SG and appointing WJ instead).

179. The MWL Secretary General, as Trust Vice-Chairman, appointed the Director General-cum-Secretary General of the Rabita Trust, on the proposal from the government of Pakistan. Ex. # 31, Obaid Dep. Tr. at 91:5-24, 92:12-93:19 (*Errata*); *see also id.* at 89:1-8 (*Errata*); Ex. # 39, Obaid PJ Decl. ¶ 18.

180. The appointing MWL Secretary General and then-Rabita Trust Vice-Chairman, Abdullah Al-Obaid, had not met Wael Jelaidan at the time of the appointment and did not know Jelaidan personally. Ex. # 31, Obaid Dep. Tr. at 92:12-93:19 (*Errata*); Ex. # 39, Obaid PJ Decl. ¶ 17.

181. Due to his relationship with Prime Minister Sharif, Wael Jelaidan's appointment was a fait accompli when presented to Dr. Al-Obaid. Ex. # 39, Obaid PJ Decl. ¶ 18.

182. Prior to his designation by OFAC in September 2002, MWL was not aware of any allegations that Wael Jelaidan provided any support, whether financial or otherwise, to Al Qaeda. *See* Ex. # 4, Brown Rpt. at 5, 20, 43, 87-88, 87 n.396, 90; Ex.# 72, Roy Dep. Tr. at 143:9-145:4 (*Errata*); Ex. # 36, Obaid Decl. ¶ 11; Ex. # 38, Second Turki Decl. ¶ 13; 67 Fed. Reg. 66,6707, 66,708 (Nov. 1, 2002).

183. Wael Jelaidan was designated by OFAC on September 6, 2002 pursuant to Executive Order 13224. 67 Fed. Reg. 66,6707, 66,708 (Nov. 1, 2002).

184. OFAC's designation rests on circular logic: Jelaidan was designated for running an organization that supported Al Qaeda, the Rabita Trust, and the Rabita Trust was designated because Jelaidan ran it. Ex. # 4, Brown Rpt. at 90-91.

185. Wael Jelaidan was designated by the United Nations Security Council in September 2002. Ex. # 73, UN Delisting.

186. The United Nations Security Council removed Wael Jelaidan from its sanctions list on August 26, 2014. Ex. # 73, UN Delisting; Ex. # 4, Brown Rpt. at 93.

187. Wael Jelaidan, a member of the Services Bureau, was not known publicly as a member or founder of Al Qaeda and broke with Bin Laden and stayed with the Services Bureau

when Bin Laden left the Services Bureau to form Al Qaeda. Ex. # 4, Brown Rpt. at 5, 20, 87-88, 90; Ex. # 72, Roy Dep. Tr. at 143:9-145:4 (*Errata*).

188. Jelaidan's "name does not appear on either of the two internal lists of [Al Qaeda] members from the late 1990s captured in Afghanistan," and "Jamal al-Fadl, an informant that Plaintiffs' experts rely on for many of their allegations, himself stated in an interview with the FBI that [Jelaidan] was not a member of [Al Qaeda]." Ex. # 4, Brown Rpt. at 43, 87 n.396.

189. Plaintiffs have no evidence that MWL was aware of or had knowledge before 9/11 of any connection between Wael Jelaidan and Al Qaeda. *See* Ex. # 4, Brown Rpt. at 5, 20, 43, 87-88, 87 n.396, 90; Ex. # 72, Roy Dep. Tr. at 143:9-145:4 (*Errata*); Ex. # 6, Obaid Decl. ¶ 11; Ex. # 38, Second Turki Decl. ¶ 13; 67 Fed. Reg. 66,6707, 66,708 (Nov. 1, 2002).

**<u>Mohammad Jamaal Khalifa</u>**

190. Plaintiffs have no evidence that Muhammad Jamal Khalifa had any foreknowledge or was involved in the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; *see generally* 9/11 Commission Report; Monograph.

191. Plaintiffs have no evidence tracing funds from Muhammad Jamal Khalifa to the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; *see generally* 9/11 Commission Report; Monograph.

192. Plaintiffs have no evidence tracing in-kind support from Muhammad Jamal Khalifa to the planning or for the execution of the 9/11 Attacks. Ex. # 2, E014040-000011 (May 27, 2021 FBI Report Administratively Closing Case); Winer Rpt. at 82-100, 116-22 (failing to show any in-kind support from MWL or other charities to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 31-32, 107-21 (same) (ECF No. 9250-2); Levitt Rpt. (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20

(acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves").

193. Plaintiffs have no evidence tracing funds from MWL through Jamal Khalifa to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. # 2, May 27, 2021 FBI Report Administratively Closing Case, at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from MWL to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 27-70 (same) (ECF No. 9250-2); Levitt Rpt. at 29-35 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see also* Ex. # 4, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); *see generally* 9/11 Commission Report; Monograph.

194. Muhammad Jamal Khalifa was Director, and then Supervisor, of IIRO-Philippines from 1988 to 1993. Ex. # 43, Chaouat Decl. ¶ 64; Ex. # 53, Daguit Decl. ¶ 20.

195. Muhammad Jamal Khalifa also served as MWL office director in the Philippines. Ex. # 11, Fawzi Decl. ¶ 18.

196. Muhammad Jamal Khalifa was demoted from Director of the IIRO-Philippines office to Supervisor in September 1992. Ex. # 53, Daguit Decl. ¶ 20.

197. Muhammad Jamal Khalifa resigned from IIRO in the fall of 1993. Ex. # 43, Chaouat Decl. ¶ 64; Ex. # 53, Daguit Decl. ¶ 20; Ex. # 74, IIRO 287370 (Ltr. Accepting Muhammad Jamal Khalifa resignation on x/4/1414H, which converts to late September/early October 1993).

198. Arrested in 1994 in the United States and extradited to Jordan, where he had been tried in absentia for his alleged involvement in the bombing of a theater there, Khalifa was then acquitted and freed. When arrested in 1994, Muhammad Jamal Khalifa had no relationship whatsoever to IIRO-Philippines or to MWL. Ex. # 53, Daguit Decl. ¶ 21; Ex. # 4. Brown Rpt. at 43; Ex. # 75 IIRO-002997.

199. The Islamic Research and Information Center ("IRIC"), which focused on proselytization to non-Muslim Filipinos, was one of Muhammad Jamal Khalifa's independent business projects. Ex. # 53, Daguit Decl. ¶ 24; Ex. # 76, IIRO-003014 to IIRO-003017.

200. Neither MWL nor IIRO staff worked for Khalifa's independent business projects, including KTI, IRIC, or Dar Ul-Imam Al-Shafee Center, and no MWL or IIRO funds were disbursed to any of Khalifa's independent business projects, including KTI, IRIC, or Dar Ul-Imam Al-Shafee Center. Ex. # 53, Daguit Decl. ¶ 27; Ex. # 75, IIRO-002997; Ex. # 76, IIRO-003014 to IIRO-003017.

201. From his resignation in fall 1993 until his death in 2007, Muhammad Jamal Khalifa had no relationship to MWL. Ex. # 43, Chaouat Decl. ¶ 64; Ex. # 12, Daguit Dep. Tr. at 23:1-12; 28:5-10; Ex. # 65, Second Basha Decl. ¶ 78; Ex.# 53, Daguit Decl. ¶ 21.

202. Muhammad Jamal Khalifa was never designated by or subject to sanctions administered by the U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list.

203. In the latter half of the 1980s Muhammad Jamal Khalifa went to Pakistan to support the Services Bureau where he opposed Bin Laden's decision to split from the Services Bureau and

confronted him about the same, leading to the two men's separation." Ex. # 4, Brown Rpt. at 42-43.

204. Muhammad Jamal Khalifa's "name does not appear on either of the two internal lists of [Al Qaeda] members from the late 1990s captured in Afghanistan. The only items that mention his name in [Bin Laden's] Abbottabad compound are two newspaper articles about his death in 2007 and a letter from an uncertain author to one Shaykh Yunis where at one point, discussing the deteriorating security conditions and the prevalence of gangs and robberies in some African countries, the letter says 'perhaps you heard about the murder of Jamal Khalifa in Madagascar, God have mercy on him, at the hands of a gang of armed robbers, as mentioned in the media.'" Ex. # 4, Brown Rpt. at 42-43.

205. Plaintiffs have no evidence that MWL was aware of or had knowledge before 9/11 of any connection between Muhammad Jamal Khalifa and Al Qaeda. *See* Ex. #4, Brown Rpt. 42-43; U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list (reflecting that OFAC never designated Khalifa).

206. Plaintiffs have no evidence that MWL was aware of or had knowledge before 9/11 of any connection between Muhammad Jamal Khalifa and the MILF. *See* U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list (reflecting that MILF was never designated by OFAC); Ex. # 6, Obaid Decl. ¶ 5; Ex. # 38, Second Turki Decl. ¶ 7. Ex. # 4, Brown Rpt. at 40.

207. Plaintiffs have no evidence that MWL was aware of or had knowledge before 9/11 of any connection between Muhammad Jamal Khalifa and ASG. *See* Ex. # 31, Obaid Dep. Tr. at 251:20-23 (*Errata*); Exec. Order 13,224, 66 Fed. Reg. 49,079, 49,081, 49,083 (Sept. 25, 2001); U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list (reflecting that OFAC never designated Khalifa).

**<u>Missionaries</u>**

208. Plaintiffs have no evidence that missionaries who coordinated with MWL had any foreknowledge of or were involved in the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; *see generally* 9/11 Commission Report; Monograph.

209. Plaintiffs have no evidence tracing funds from missionaries who coordinated with MWL to the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; *see generally* 9/11 Commission Report; Monograph.

210. Plaintiffs have no evidence tracing in-kind support from missionaries who coordinated with MWL to the planning or for the execution of the 9/11 Attacks. Ex. # 2, E014040-000011 (May 27, 2021 FBI Report Administratively Closing Case); Winer Rpt. at 112-22 (failing to show any in-kind support from MWL to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 27-70 (same) (ECF No. 9250-2); Levitt Rpt. at 29-35 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves").

211. Plaintiffs have no evidence tracing funds from MWL through missionaries to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. # 2, May 27, 2021 FBI Report Administratively Closing Case, at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from MWL to the planning or execution of the 9/11 Attacks) ) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 27-70 (same) (ECF No. 9250-2); Levitt Rpt. at 29-35 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see also* Ex. # 4, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); *see generally* 9/11 Commission Report; Monograph.

212. Plaintiffs have no evidence that MWL was aware or had knowledge before 9/11 of any connection between missionaries that coordinated with MWL and Al Qaeda. *See* Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list; Ex. # 54, Wardi Decl. ¶ 11 (MWL never received any allegation that the sermons delivered by missionaries that cooperated with it in Indonesia were inappropriate or extremist.); Ex. # 53, Daguit Decl. ¶ 14 (the missionaries mainly gave sermons, the contents of which they were free to choose and were not provided by MWL, and neither MWL nor IIRO trained the missionaries, nor did they oversee or supervise their activities).

213. MWL did not employ missionaries that coordinated with it, and the missionaries were not precluded from seeking and obtaining employment elsewhere. Ex. # 8, Al-Thaqafi Decl. ¶ 9; Ex. # 9, Al-Hassani Decl. ¶ 19.

214. MWL did not provide missionaries with any benefits apart from a small stipend. Ex. # 8, Al-Thaqafi Decl. ¶ 10; Ex. # 9, Al-Hassani Decl. ¶ 22.

215. MWL did not set working schedules for missionaries. Ex. # 9, Al-Hassani Decl. ¶ 20.

216. MWL did not have the authority to dictate nor did it dictate how missionaries carried out their activities, including how the missionaries preached. Ex. # 9, Al-Hassani Decl. ¶ 21.

217. Missionaries who coordinated with MWL in the Philippines did not have employment contracts with either MWL or IIRO, and unlike employees who were paid monthly, received their de minimis stipends on a yearly or bi-annual basis. Ex. # 53, Daguit Decl. ¶ 13; Ex # 8, Al-Thaqafi Decl. ¶¶ 9-10; Ex. # 9, Al-Hassani Decl. ¶¶ 19-22.

**Moro Islamic Liberation Front ("MILF")**

218. Plaintiffs have no evidence that the MILF had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Winer Rpt. (failing to provide evidence that MILF had any knowledge or was involved in the planning or execution of the 9/11 Attacks) (ECF No. 7344-1), *see generally* 9/11 Commission Report; Monograph.

219. Plaintiffs have no evidence tracing MILF funds to the planning or execution of the 9/11 Attacks. Ex. # 2, E014040-000011 (May 27, 2021 FBI Report Administratively Closing Case); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report. Plaintiffs have no evidence tracing funds from MWL through MILF to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. # 2, E014040-000011 (May 27, 2021 FBI Report Administratively Closing Case); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging

that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph.

220. Plaintiffs have no evidence tracing in-kind support from MILF to the planning or for the execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph.

221. The MILF has never been designated by OFAC. Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list; Ex. # 4, Brown Rpt. at 40 ("The MILF has never been listed by the US government as a designated terrorist group.").

222. Plaintiffs have no evidence that MWL provided funding to the MILF before the 9/11 Attacks. Winer Rpt. at 96-99 (discussing the separatist group, MILF, and failing to provide evidence of funding from MWL to MILF) (ECF No. 7344-1).

223. Plaintiffs have no evidence that MWL was aware or had knowledge before 9/11 of any connection between the MILF and Al Qaeda. Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list; Ex. # 4, Brown Rpt. at 40.

224. The Moro National Liberation Front ("MNLF") emerged in the 1970s in the Philippines. Sidel Rpt. ¶¶ 41-42 (ECF No. 7351-5).

225. The MILF—an Islamist, separatist group in the Philippines—was formed in 1984 when its founder broke away from the MNLF. Sidel Rpt. ¶¶ 50-51 (ECF No. 7351-5).

226. MWL participated in peace negotiations between the Philippines Government and the MILF. Ex. # 6, Obaid Decl. ¶ 5; Ex. # 38, Second Turki Decl. ¶ 7.

227. MWL assisted the Philippines Government and the MILF, who had been in conflict for many years, in reaching a peaceful resolution. Ex. # 6, Obaid Decl. ¶ 5; Ex. # 38, Second Turki Decl. ¶ 7.

228. During Abdullah bin Saleh Al-Obaid's tenure as Secretary General of MWL, from 1996 to 2000, the MWL had contacts with the MILF "to establish peace between the government and the front." Ex. # 6, Obaid Dep. Tr. at 251:8-16 (*Errata*).

229. Abdullah bin Saleh Al-Obaid had no contact with the MILF, but he did attend a peace ceremony between the MILF and the government of the Philippines at the government's invitation in the 1990s. Ex. # 31, Obaid Dep. Tr. at 250:20-251:7; Ex. # 6, Obaid Decl. ¶ 5; Ex. # 38, Second Turki Decl. ¶ 7. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017051.

230. The MILF employed a strategy of engaging with the secular Filipino state in order to win concessions for autonomy, which was at odds with the ideological and strategic orientation of Al Qaeda. Ex. # 4, Brown Rpt. at 40.

**<u>Abu Sayyaf Group ("ASG")</u>**

231. Plaintiffs have no evidence that ASG had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. # 4, Brown Rpt. at 41 (Apart from a visit by one Al Qaeda member who videotaped his journey, no "primary sources indicate any pre-9/11 relationship between [Al Qaeda] and ASG in terms of funding, cooperation, or the carrying out of attacks."); *id.* at 41-42 (explaining that only two relevant documents in Osama Bin Laden's Abbottabad compound mention ASG: one criticizes the MILF for its political efforts and perceived

abandonment of jihad in contrast with ASG's commitment to jihad; the other is an essay from a Jordanian professor that notes that ASG has "no organizational connection with [Al Qaeda].").

232. Plaintiffs have no evidence tracing ASG funds to the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); Ex. # 4, Brown Rpt. at 41 (Apart from a visit by one Al Qaeda member who videotaped his journey, no "primary sources indicate any pre-9/11 relationship between [Al Qaeda] and ASG in terms of funding, cooperation, or the carrying out of attacks."); *id.* at 41-42 (explaining that only two relevant documents in Osama Bin Laden's Abbottabad compound mention ASG: one criticizes the MILF for its political efforts and perceived abandonment of jihad in contrast with ASG's commitment to jihad; the other is an essay from a Jordanian professor that notes that ASG has "no organizational connection with [Al Qaeda].") s*ee generally* 9/11 Commission Report; Monograph.

233. Plaintiffs have no evidence tracing in-kind support from ASG to the planning or for the execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. # 4, Brown Rpt. at 41 (Apart from a visit by one Al Qaeda member who videotaped his journey, no "primary sources indicate any pre-9/11 relationship between [Al Qaeda] and ASG in terms of funding, cooperation, or the carrying out of attacks."); *id.* at 41-42 (explaining that only two relevant documents in Osama Bin Laden's Abbottabad compound mention ASG: one criticizes the MILF for its political efforts and perceived abandonment of jihad in contrast with ASG's commitment to jihad; the other is an essay from a Jordanian professor that notes that ASG has "no organizational connection with [Al Qaeda].").

234. Plaintiffs have no evidence tracing funds from MWL through ASG to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. # 2, May 27, 2021 FBI Report Administratively Closing Case, at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from MWL to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 27-70 (same) (ECF No. 9250-2); Levitt Rpt. at 29-35 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see also* Ex. # 4, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); *see generally* 9/11 Commission Report; Monograph.

235. MWL did not have a relationship with ASG. Ex. # 31, Obaid Dep. Tr. at 251:20-23 (*Errata*).

236. Plaintiffs have no evidence that MWL provided funding to ASG before the 9/11 Attacks. Winer Rpt. at 80-81, 96-99 (discussing the ASG, but failing to provide evidence of funding from MWL to ASG) (ECF No. 7344-1); Levitt Rpt. at 35, 37-38 (same) (ECF No. 9250-33); Kohlmann Rpt. at 36-39 (same) (ECF No. 9250-2).

237. Plaintiffs have no evidence that MWL was aware or had knowledge before 9/11 of any connection between ASG and Al Qaeda. *See* Ex. # 31, Obaid Dep. Tr. at 251:20-23 (*Errata*); Exec. Order 13,224, 66 Fed. Reg. 49,079, 49,081, 49,083 (Sept. 25, 2001).

238. The ASG was designated as a Foreign Terrorist Organization by the Secretary of State on October 8, 1997. 62 Fed. Reg. 52650 (Oct. 8, 1997).

239. The ASG was designated by OFAC pursuant to Executive Order 13224, effective September 24, 2001. Exec. Order 13,224, 66 Fed. Reg. 49,079, 49,081, 49,083 (Sept. 25, 2001).

240. The ASG emerged in the Philippines in the early-mid-1990s by attacking Christian missionaries and committing robberies and kidnappings around the Sulu Archipelago, the Zamboanga Peninsula, and elsewhere. Sidel Rpt. ¶¶ 60-61 (ECF No. 7351-5).

241. ASG is "a largely criminal organization that has engaged in episodic acts of criminality, and that eventually morphed into—at least some of its members, into groups affiliated with the so-called Islamic State." Ex. # 77, Sidel Dep. Tr. at 42:11-17.

242. ASG was not focused on the United States or the West but enmeshed in local politics and local power structures. Sidel Rpt. ¶¶ 4-5, 65, 83, 99 (ECF No. 7351-5); Ex. # 77, Sidel Dep. Tr. at 40:14-41:6.

**Services Bureau**

243. Founded in the mid-1980s by Abdullah Azzam, the Services Bureau aimed to attract young Arab volunteers, train them and turn them into a military vanguard in the Afghan Jihad against the Soviet invasion of Afghanistan, doing so openly and even with the U.S.'s favor, which even provided Azzam visas to tour the U.S. in the late 1980s to further this goal. Ex. # 78, Roy Rpt. at 15; Ex. # 4, Brown Rpt. at 11.

244. Abdullah Azzam founded the Services Bureau with Abd al-Rabb Rasul Sayyaf, then the leader of the union of Afghan Mujahidin parties, and Osama Bin Laden, who agreed to fund the organization. And Azzam led the Services Bureau until his assassination in November 1989, and the Bureau continued even after Azzam's death. Ex. # 4, Brown Rpt. at 11-13.

245. Western nations, including the U.S., strongly supported the mujahideen with hundreds of millions of dollars, advanced weaponry, and American military advisers. Ex. # 78, Roy Rpt. at 10-13.

246. The United States supported the mujahideen fighting the Soviet Union invasion of Afghanistan under Presidents Carter, Reagan, and Bush. Ex. # 78, Roy Rpt. at 10-13; Ex. # 1, Winer Dep. Tr. at 358:5-18, 362:21-25.

247. During the Soviet invasion of Afghanistan, MWL participated in relief efforts and called for peace in Afghanistan. Ex. # 31, Obaid Dep. Tr. at 265:19-266:17 (*Errata*), 267:24-268:10 (*Errata*) (discussing Ex. # 79, *His Highness Secretary General of the Muslim World League: Dialogue with others is the means to repel oppression and introduce Islam* (National Guard Journal: Islamic Horizons, Nov. 1, 2000), FED-PEC0242816 to FED-PEC0242821).

248. During the Soviet invasion of Afghanistan, MWL did not provide arms or money to the Mujahideen. *Id.*

**<u>Al Qaeda</u>**

249. Plaintiffs have no evidence that MWL knowingly or tacitly employed members of Al Qaeda or individuals known as Al Qaeda sympathizers. Ex. # 8, Al-Thaqafi Decl. ¶ 23; Ex. # 9, Al-Hassani Decl. ¶ 23; Ex. # 4, Brown Rpt. at 42, 90; Ex. # 6, Obaid Decl. ¶¶ 6-7, 9; Ex. # 38, Second Turki Decl. ¶¶ 8-9, 11.

250. MWL did not support, whether financial or otherwise, Al Qaeda or any other terrorist organization. Ex. # 6, Obaid Decl. ¶ 8; Ex. # 38, Second Turki Decl. ¶ 10; Ex. # 4, Brown Rpt. at 7-8, 63 (review of primary sources shows no evidence that IIRO or MWL supported Al Qaeda); Ex. # 8, Al-Thaqafi Decl. ¶ 23 ("I did not observe any support, tacit or explicit, provided by MWL to terror organizations, including Al Qaeda."); Ex. # 9, Al-Hassani Decl. ¶ 23 ("I did not observe any support, tacit or explicit, provided by MWL to terror organizations, including Al Qaeda.").

251. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki authorized, explicitly or implicitly, or has knowledge of, activities conducted or financing provided

by MWL in support of Al Qaeda or any other terrorist organization. Ex. # 6, Obaid Decl. ¶ 6; Ex. # 38, Second Turki Decl. ¶ 8.

252. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki are aware of any person within MWL who authorized or instructed, explicitly or implicitly, MWL employees to provide any form of support, whether financial or otherwise, to Al Qaeda or any other terrorist organization. Ex. # 6, Obaid Decl. ¶ 7; Ex. # 38, Second Turki Decl. ¶ 9.

253. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki are aware of any member of MWL's management who agreed with Al Qaeda's aims or acts. Ex. # 6, Obaid Decl. ¶ 9; Ex. # 38, Second Turki Decl. ¶ 11.

254. Indeed, as the most senior officials in the organization, Abdullah bin Saleh Al-Obaid and Abdullah bin Abdul Mohsen Al-Turki "worked actively with others at MWL to counter Al Qaeda's ideologies." Ex. # 6, Obaid Decl. ¶ 9; Ex. # 38, Second Turki Decl. ¶ 11.

255. Adnan Basha never met or communicated with Osama Bin Laden and has never agreed with Al Qaeda's aims or acts and has worked actively to counter Al Qaeda's ideology. Ex. # 65, Second Basha Decl. ¶ 28; Ex. # 7, Basha Decl. ¶ 21.

256. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha participated in nor directed anyone to participate in any activities intended to support Al Qaeda or any other terrorist organization. Ex. # 39, Obaid PJ Decl. ¶ 19; Ex. # 5, First Turki Decl. ¶ 24; Ex. # 7, Basha Decl. ¶ 12.

257. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha has ever provided or directed anyone to provide any financing to or in support of Al Qaeda or any other terrorist organization. Ex. # 39, Obaid PJ Decl. ¶ 20; Ex. # 5, First Turki Decl. ¶ 25; Ex. # 7, Basha Decl. ¶ 13.

258. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha has ever supported or instructed anyone else to support, explicitly or implicitly, Al Qaeda or any other terrorist organization. Ex. # 39, Obaid PJ Decl. ¶ 21; Ex. # 5, First Turki Decl. ¶ 26; Ex. # 7, Basha Decl. ¶ 14.

259. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha ever intended to aid a terrorist attack or to support Al Qaeda. Ex. # 39, Obaid PJ Decl. ¶ 22; Ex. # 5, First Turki Decl. ¶ 27; Ex. # 7, Basha Decl. ¶ 18.

260. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha agrees with, or have ever agreed with, Al Qaeda's or its affiliated terrorist organizations' aims or acts. Ex. # 39, Obaid PJ Decl. ¶ 24; Ex. # 5, First Turki Decl. ¶ 29; Ex. # 7, Basha Decl. ¶ 20.

261. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki knew Bin Laden. Ex. # 39, Obaid PJ Decl. ¶ 25; Ex. # 5, First Turki Decl. ¶ 30.

262. Abdullah bin Saleh Al-Obaid, Abdullah bin Abdul Mohsen Al-Turki, and Adnan Basha worked actively to counter Osama Bin Laden's and Al Qaeda's and its affiliated terrorist organizations' ideologies and have denounced acts of terrorism, including those of September 11, 2001. Ex. # 39, Obaid PJ Decl. ¶ 26; Ex. # 5, First Turki Decl. ¶ 31; Ex. # 7, Basha Decl. ¶ 22.

263. After the September 11 attacks, in his capacity as Secretary General of the MWL, Abdullah bin Abdul Mohsen Al-Turki published several statements condemning the attacks. Ex. # 5, First Turki Decl. ¶ 31; Ex. # 38, Second Turki Decl. ¶ 25.

264. Shortly after September 11, 2001, Abdullah bin Saleh Al-Obaid and Adnan Basha appeared on Saudi television to condemn the 9/11 attacks. Ex. # 39, Obaid PJ Decl. ¶ 26; Ex. # 7, Basha Decl. ¶ 22.

265. Al Qaeda was founded in the late 1980s after Osama Bin Laden split from the Services Bureau, pulling his funding from the Services Bureau in 1988; Al Qaeda made no official claim at the time of its intention to attack the United States. Ex. # 4, Brown Rpt. at 13, 21.

266. Bin Laden self-financed his activities at least until 1992. Ex. # 78, Roy Rpt. at 2, 17.

267. Saudi Arabia took away Bin Laden's passport and, in 1994, revoked his citizenship. 9/11 Commission Report at 57.

268. Al Qaeda viewed the Saudi government as an apostate and enemy of the global Muslim community. Ex. # 4, Brown Rpt. at 23-31.

269. In August 1996, Bin Laden released a lengthy message addressed to Muslims worldwide, and "particularly those in the Arabian peninsula," entitled "A declaration of jihad against the Americans occupying the Land of the Two Holy Sanctuaries [Saudi Arabia]." Ex. # 4, Brown Rpt. at 54; Ex. # 80, 1996 Osama Bin Laden Fatwa, BUR-PEC-026957-82.

270. The August 1996 message does not declare a jihad by Al Qaeda against Americans and is not a declaration of jihad against America. Ex. # 4, Brown Rpt. at 55; Ex. # 80, 1996 Osama Bin Laden Fatwa, BUR-PEC-026957-82.

271. The August 1996 message is focused on removing American troops from Saudi Arabia and criticizing the Saudi government for that presence, for failing to liberate Palestine, and for abandoning Islam. Ex. # 4, Brown Rpt. at 55; Levitt Rpt. at 12 (ECF No. 9250-33); Ex. # 80, 1996 Osama Bin Laden Fatwa, BUR-PEC-026957-82, at 26960 ("the regime has torn off its legitimacy [through] [s]uspension of the Islamic Shari'ah law and exchanging it with man made civil law…[and] [t]he inability of the regime to protect the country, and allowing…the American crusader forces[] to occupy the land"), 26964 ("there is no more important duty than pushing the

American enemy out of the holy land), 26970-71 (calling for boycott of American goods in response to occupation of Palestine).

272. In February 1998, Al Qaeda publicly declared from Afghanistan the "World Islamic Front" and called for the killing of Americans. Ex. # 4, Brown Rpt. at 58; Levitt Rpt. at 12 (ECF No. 9250-33); Ex. # 81, FED-PEC0279093-95.

273. The February 1998 statement declared that "to kill the Americans and their allies—civilian and military—is an individual duty incumbent upon every Muslim in all the countries, in order to liberate the al-Aqsa Mosque and the Holy Mosque from their grip, so that their armies leave all the territory of Islam, defeated, broken, and unable to threaten any Muslim." Ex. # 4, Brown Rpt. at 58; Ex. # 81, FED-PEC0279093-95 at 279094.

274. Al Qaeda developed its interest in attacking the U.S. in 1998. Ex. # 77, Sidel Dep. Tr. at 117:7-10; Levitt Rpt. at 12 (ECF No. 9250-33); Ex. # 81, FED-PEC0279093-95 at 279094.

275. Al Qaeda was designated as a Foreign Terrorist Organization by the Secretary of State on October 8, 1999. Designation of Foreign Terrorist Organizations, 64 Fed. Reg. 55112 (Oct. 8, 1999).

276. No document has come to light from the nearly 500,000 documents collected in the Bin Laden Abbottabad raid suggesting the use of charities for raising or moving money. Ex. # 4, Brown Rpt. at 62.

277. A comprehensive search of the names of IIRO and MWL within the Bin Laden Abbottabad compound documents—using their Arabic names, as well as popular short-hand Arabic versions of their names—turned up no significant hits beyond mentions of these organizations in general publications or newspapers found in Bin Laden's compound. Ex. # 4, Brown Rpt. at 91.

**Bin Laden Publicly Opposed the Saudi Government and Twice Called on Individuals Not to Donate to Saudi-Affiliated Charities**

278. In the years before September 11, 2001, Osama Bin Ladin stridently opposed the Saudi Royal family, the government of the Kingdom of Saudi Arabia, and government-affiliated charities such as IIRO and MWL. Ex. # 4, Brown Rpt. at 24, 63.

279. Bin Laden "made a definitive turn toward enmity with the Saudi regime" after the first Gulf War, when Saudi Arabia accepted the deployment of U.S. troops on its territory. He declared Saudi Arabia an apostate regime. Ex. # 4, Brown Rpt. at 24-25.

280. In March 1994, he created the Committee for the Advice and Defence of Legitimate Rights, re-named in April 1994 as the Advice and Reform Committee (ARC). Ex. # 4, Brown Rpt. at 26.

281. The ARC issued 21 public communiqués between March 1994 and May 1998, all of them to denounce Saudi Arabia and in some cases Saudi charities. Ex. # 4, Brown Rpt. at 26; Ex. # 82, West Point's Combatting Terrorism Center's ("CTC") Harmony Database ("HD"), document AFGP-2002-003345 (Ex. 908 to Winer Dep.).

282. In an April 1994 ARC statement, Bin Ladin writes of the actions the Saudi government had taken against him: "we were prevented from traveling, our money was frozen in foreign bank accounts, a defamation campaign was waged against us in the local and international press, and finally, you attempted to cut our ties with the homeland by confiscating our passports. Your actions indicate to us what your intentions are for us." Ex. # 82, West Point's CTC HD document AFGP-2002-003345 (Ex. 908 to Winer Dep.) at 1-3 (Statement 2 of 12 April 1994).

283. In a June 7, 1994 ARC statement, Bin Ladin directly denounced King Fahd and Prince Sultan for supporting Yemeni communists in the 1994 civil war in Yemen. He accused the King of "us[ing] Islam and some of its tenets to cover up the secret and overt anti-Islamic policies

that he pursues," claimed the Saudi regime extended "blind loyalty to the enemies of Islam" and made a "habit of supporting the enemies of Islam." Ex. # 82, West Point's CTC HD document AFGP-2002-003345 (Ex. 908 to Winer Dep.) at 7 (Statement 3 of 7 June 1994).

284. On July 19, 1994, referring to the Saudi government's alleged persecution of critical religious scholars, Bin Ladin stated that "the Saudi government has used all the witchcraft powers it has and the full deception powers of the media to justify its shameless stands against Islam and its preachers, while supporting the unbelievers and their guardians." Ex # 82, West Point's CTC HD document AFGP-2002-003345 (Ex. 908 to Winer Dep.) at 13-14 (Statement 5 of 19 July 1994).

285. In the following statement, a letter to "the Saudi government, headed by King Fahd," Bin Ladin accuses the King of having left the faith: "These blatant attacks and irresponsible behavior do not leave any pretense for being a Muslim, they take it away. . . . Therefore, you will be responsible before God and your people for anything that will result from these events and matters." Ex # 82, West Point's CTC HD document AFGP-2002-003345 (Ex. 908 to Winer Dep.) at 17-18 (Statement 6 of 12 September 1994).

286. The seventh and eighth ARC communiqués, addressed to employees of the Saudi security services and the military, respectively, warn them against implementing the directives of the regime, for to do so would damn their souls to hell. Ex # 4, Brown Rpt. at 27-28; Ex # 82, West Point's CTC HD document AFGP-2002-003345 (Ex. 908 to Winer Dep.) at 22-22 (Statement 7 of 16 September 1994) and 25-26 (Statement 8 of 19 September 1994).

287. In a December 29, 1994 letter to 'Abdullah Bin Baz, Saudi Arabia's Grand Mufti, Bin Ladin accused the Bin Baz of permitting King Fahad to perform an "abomination" by appearing in public with a cross pendant on his chest. Further, Bin Ladin denounced the Grand

Mufti for issuing a fatwa permitting "the crusader and the Jewish alliance . . . to occupy the country in the name of liberating Kuwait." Ex # 82, West Point's CTC HD document AFGP-2002-003345 (Ex. 908 to Winer Dep.) at 35-38 (Statement 11 of 29 December 1994).

288. On February 12, 1995, Bin Laden publicly encouraged donors *not* to donate to official Saudi-affiliated charities, citing the illegitimacy of the Saudi Government and its alleged misappropriation of funds donated to the people of Bosnia:

> Beside the Regime's political and ideological blockade, it also exercised a harsh economic and financial (policy) as well. Part of this blockade was dissolving charitable organizations that used to deliver donations from citizens to the many needy people inside and outside the country. It replaced them with organizations and foundations subservient to royal family members and particularly, Prince Salman.
>
> …
>
> 3) The reason behind this procedure does not encourage good deeds, as the regime claims, but rather the following: 1) Prevents these funds from being delivered to areas where they could be used to serve Islam and Muslims following the principle "Do not spend on those who are with the messenger of Allah till they desist."
>
> . . .
>
> Based on what was stated, we at the Reform and Advice Foundation, while celebrating this blessed month as a month of giving for Allah's sake, wish to draw the attention of all donors to the danger of donating funds or *zakat* to these foundations and organizations. The regime is using them against Allah and His messenger. We are asking the donors to provide these funds directly to the needy, whether, inside or outside the country. They could also provide it to those trusted individuals who will deliver them. … It is known that these [Saudi] leaders cannot be trusted. There are other safe ways you can assist in delivering funds to those who deserve them. Among them are, benevolence foundations in Qatar, Kuwait, Jordan, Yemen, Sudan, and others. To assure that the funds transfer to these foundations' bank accounts, we draw your attention to the importance of transferring these funds outside the Peninsula, away of the pursuing regime's spies.

Ex. # 82, West Point's CTC HD document AFGP-2002-003345 (Ex. 908 to Winer Dep.) at 51-52 (Statement 13 of 12 February 1995).

289. Bin Ladin reiterated this call to avoid official Saudi-affiliated charities on August 11, 1995:

> It is no longer hidden that the Saudi regime persistently sought to block all the abilities and capabilities of the ummah by placing control over it. But the regime was not satisfied with its unjust policies; it had to go further by imposing control on the minds and politics of the nation. Moreover, the regime sought to impose economic control. This resulted in the closure of charitable organizations that delivered the contributions of the benefactors from this country to its deserving lawful owners. The regime replaced these charitable organizations with associations and organizations that were supervised by members of the ruling family, such as Prince Sultan and Prince Salman. This revealed a scheme by which they monopolized the charitable contributions in such a way that it prevented Islam and the Muslims from benefiting from them. The regime used the contributions the same way it used the money of the afghani mujahidin. That money was used to pressure the mujahidin and influence their policies in a way that would benefit the interests of the West. Sometimes these contributions were used for the private interests of the princes.
>
> . . .
>
> We are drawing their attention to the risk of forwarding these contributions through the ruling regime and its organizations. We are advising them to deliver their contributions directly to the people or through safe hands of individuals, organizations, and societies that are trusted, such as the charitable societies in Qatar, Kuwait, Sudan, Yemen, and Jordan. We are advising them to be careful that their contributions stay far from the pursuit of the Servant of the Two Holy Mosques [the Saudi King] and his agents, and to make sure that the money will reach the people it is intended for. They must be sure that the money does not fall into the hands of the shameless members of the Saudi family.

Ex. # 82, West Point's CTC HD document AFGP-2002-003345 (Ex. 908 to Winer Dep.) at 91-92 (Statement 18 of 11 August 1995).

**<u>1993 World Trade Center Bombing</u>**

290. Plaintiffs have no evidence showing that MWL was involved in the planning or execution of the 1993 World Trade Center bombing. Jenkins Rpt. at 13-15 (discussing the 1993 World Trade Center bombing but failing to provide evidence of MWL's involvement) (ECF No. 7344-3); Kohlmann Rpt. at 10, 34, 51, 58, 61 (citing to various individuals who were involved in

the 1993 World Trade Center bombing but failing to provide evidence of MWL's involvement) (ECF No. 9250-2).

291. On February 26, 1993, the parking garage of the World Trade Center in New York, New York was bombed in an attack masterminded by Ramzi Yousef. 9/11 Commission Report, at 279-80; Sidel Rpt. ¶ 104 (ECF No. 7351-5).

292. Al Qaeda was not involved in the 1993 World Trade Center bombing. Ex. # 77, Sidel Dep. Tr. at 140:11-141:12; Ex. # 83, Jenkins Dep. Tr. at 233:10-234:14 (no evidence to suggest local volunteers were Al Qaeda members or Al Qaeda affiliates and "fair inference" that Ramzi Yousef lacked the support of Al Qaeda in connection with the 1993 World Trade Center bombing); Ex. # 4, Brown Rpt. at 43-44 (reviewing evidence that Ramzi Yousef and KSM belonged to "independent cell" based in Philippines at time of 1993 WTC attack); Ex. # 77, Sidel Dep. Tr. at 116:10-14 (neither Ramzi Yousef nor Khalid Sheikh Mohamed members of Al Qaeda); Ex. # 78, Roy Rpt. at 21.

**<u>Bojinka Plot</u>**

293. Plaintiffs have no evidence that MWL supported or was involved in the planning or execution of the Bojinka Plot. Winer Rpt. at 27, 98, 100 (discussing the Bojinka plot, but failing to provide evidence of MWL's support or involvement in the plot) (ECF No. 7344-1).

294. The Bojinka Plot refers to a collection of plans to be executed in 1995, including a multi-plane bombing initiative where individuals would sneak bombs aboard American planes and detonate them over the Pacific, bomb cargo carriers, and assassinate President Clinton and the Pope. Ex. # 77, Sidel Dep. Tr. at 104:21-105:22.

295. Defense and Plaintiffs' experts agree that the Bojinka Plot was not an Al Qaeda-directed attack. Ex. # 83, Jenkins Dep. Tr. at 93:20-94:17 (Bojinka "was not an Al Qaeda operation"); *see id* at 229:4-19 (no opinion as to whether Bin Laden or Al Qaeda financed Bojinka

plot); 232:17-233:3 (only evidence linking Al Qaeda and Bojinka was "reported financing, and with the operative word being reported"); Ex. # 77, Sidel Dep. Tr. at 113:11-23, 140:11-141:12; 9/11 Commission Report at 153-54 (noting that, prior to greenlighting of 9/11 Attacks, Al Qaeda believed a plan "paralleling the Bojinka concept" "did not fit the needs of al Qaeda," and even KSM's initial proposal for a plane attack "received a lukewarm response from al Qaeda leaders skeptical of its scale and complexity"); *id.* at 154 (KSM joins Al Qaeda in late 1998 or 1999); Ex. # 4, Brown Rpt. at 43-44 (group including KSM, Yousef, and Shah was independent from Al Qaeda).

296. Ramzi Yousef, Khalid Sheik Muhamad, and Wali Khan Amin Shah were involved in the Bojinka plot. 9/11 Commission Report at 147.

297. Ramzi Yousef was not an Al Qaeda member. Ex. # 4, Brown Rpt. at 43-44; Ex. # 77, Sidel Dep. Tr. at 116:10-14; Ex. # 83, Jenkins Dep. Tr. at 217:16-225:11 (revising opinion to state that Yousef was recruiter for "groups coalescing around Al Qaeda" yet unable to recall or locate source for opinion); Ex. # 1, Winer Dep. Tr. at 558:1-21 (opining that Yousef was not a member of Al Qaeda and not affiliated with Al Qaeda but associated with Al Qaeda and noting that Yousef's Al Qaeda status was not the subject of his opinion).

298. Khalid Sheikh Muhammad had not even met with Bin Laden, let alone begun working with Al Qaeda, until after Bojinka, and was neither a member of Al Qaeda nor had he pledged allegiance to Osama Bin Laden at the time of the Bojinka Plot. Ex. # 4, Brown Rpt. at 41, 43-44; Ex. # 77, Sidel Dep. Tr. at 116:1-117:20; Ex. # 83, Jenkins Dep. Tr. at 75:2-76:8 (KSM refused to join Al Qaeda in 1996, which was after Bojinka Plot); Kohlmann Rbtl. Rpt. ¶ 84 (ECF No. 9250-5); Jenkins Rpt. at 16 (describing the first meeting between Khalid Sheikh Mohmmed and Osama Bin Laden and noting that "[i]n 1996, [KSM] traveled to Afghanistan to meet Osama

bin Laden."), 23 ("accepted bin Laden's invitation to join [Al Qaeda] sometime in late 1998 or early 1999.") (ECF No. 7344-3); Jenkins Rpt. at 21-22 (opining KSM refused to join Al Qaeda after Manila plot) (ECF No. 7344-3); Ex. # 1, Winer Dep. Tr. at 556:15-557:25 (refusing to opine whether KSM was a member of Al Qaeda during Bojinka plot).

299. Wali Khan Amin Shah broke from Osama Bin Laden in March 1989 and was not a member of Al Qaeda. Ex. #84, Sageman Dep. Tr. at 684:5-21; Ex. # 85, Sageman Rpt. at 29 n.103; 9/11 Commission Report at 59 (Wali Khan "worked with Bin Ladin in the early 1980s"); Ex. # 4, Brown Rpt. at 40, 43-44.

**1998 Embassy Bombings**

300. Plaintiffs have no evidence showing that MWL had any foreknowledge or was involved in the planning or execution of the 1998 African Embassy bombings. Winer Rpt. at 47-48, 61-62, 79, 83, 87, 122 (discussing the African Embassy Attacks, but failing to provide evidence of involvement by MWL in those attacks) (ECF No. 7344-1); Kohlmann Rpt. at 28, 34 (same) (ECF No. 9250-2); Ex. # 11, Fawzi Decl. ¶ 17 (There is no evidence that Wadih El Hage or Ihab Ali were ever employed by MWL).

301. In August 1998, Al Qaeda bombed the American embassies in Dar Es Salaam, Tanzania and Nairobi, Kenya. 9/11 Commission Report at 70.

**Indian Consulate Plot**

302. Plaintiffs have no evidence showing that MWL was involved in the planning to attack U.S. consulates in Madras and Calcutta. Winer Rpt. at 47-48, 83, 86 (ECF No. 7344-1); Kohlmann Rpt. at 28 (ECF No. 9250-2); Levitt Rpt. at 39 (discussing the plans to attack the U.S. consulates in Madras and Calcutta, but failing to provide evidence of MWL's involvement in those plans) (ECF No. 9250-33).

303. The 9/11 Commission Report does not mention this plot. 9/11 Commission Report.

304. Plaintiffs have no evidence that MWL had any knowledge of or involvement in the Indian Consulate plot.

**USS Cole Bombing**

305. Plaintiffs have no evidence that MWL was involved in the planning or execution of the attack on the U.S.S. Cole. Winer Rpt. at 13-14, 50, 53 (discussing the U.S.S. Cole attacks, but failing to provide evidence of MWL's involvement in those attacks) (ECF No. 7344-1).

306. Plaintiffs have no evidence that MWL had any foreknowledge of the attack on the U.S.S. Cole. Winer Rpt. at 13-14, 50, 53 (discussing the U.S.S. Cole attacks, but failing to provide evidence of MWL's involvement in those attacks) (ECF No. 7344-1).

307. In December 2000, terrorists in a bomb-laden boat rammed into the U.S.S. Cole, with the goal of forcing U.S. forces to withdraw from Saudi Arabia. Jenkins Rpt. at 29 (ECF No. 7344-3); Ex. # 86, BUR-PEC-078442 *et seq*. at BUR-PEC-078470; Ex. # 87, Brown Dep. Tr. at 252:7-20.

**September 11, 2001 Attacks**

308. The general idea of the 9/11 attacks had been developed by Khalid Sheikh Muhammad independently of Al Qaeda. Ex. # 4, Brown Rpt. at 58; 9/11 Commission Report at 153-54.

309. Bin Laden approved the 9/11 plot in Spring 1999. 9/11 Commission Report at 154 ("Bin Ladin summoned KSM to Kandahar in March or April 1999 to tell him that Al Qaeda would support his proposal.").

310. According to Khalid Sheikh Muhammad, this meeting between Bin Laden and Khalid Sheikh Muhammad is when the conspiracy started. Ex. # 85, Sageman Rpt. at 97; Ex. # 4, Brown Rpt. at 56 (plans and preparations for the 9/11 attacks began in Spring 1999).

311. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha knew at any time prior to September 11, 2001 that Al Qaeda was planning a terrorist attack against the United States. Ex. # 39, Obaid PJ Decl. ¶ 23; Ex. # 5, First Turki Decl. ¶ 28; Ex. # 7, Basha Decl. ¶ 19.

312. Abdullah bin Saleh Al-Obaid, Abdullah bin Abdul Mohsen Al-Turki, and Adnan Basha were disgusted by the terrorist attacks on September 11, 2001. Ex. # 39, Obaid PJ Decl. ¶ 24; Ex. # 5, First Turki Decl. ¶ 29; Ex. # 7, Basha Decl. ¶ 20.

313. Abdullah bin Saleh Al-Obaid, Abdullah bin Abdul Mohsen Al-Turki, and Adnan Basha each describe the terror attacks as "criminal" and note that their "faith prohibits" the attacks. Ex. # 39, Obaid PJ Decl. ¶ 24; Ex. # 5, First Turki Decl. ¶ 29; Ex. # 7, Basha Decl. ¶ 20.

314. None of the 9/11 hijackers was an agent or employee of MWL. Ex. # 88, Kohlmann Dep. Tr. at 434:23-439:15 (admitting that the only supposed "hijacker" named in his report as a potential MWL or IIRO employee, Fayez Ahmed Alsehri, was identified in error and was not a 9/11 hijacker); Ex. # 38, Second Turki Decl. ¶¶ 8-11 (denying that MWL authorized or instructed employees to provide support for Al Qaeda); 9/11 Commission Report, at 225-227, 231-240 (no mention of MWL or IIRO connection in background given on each hijacker).

**MWL Journal Reveals No Support to Al Qaeda, Much Less 9/11**

315. Plaintiffs' experts cite a handful of articles in the Muslim World League Journal between 1981 and 1995. Kohlmann Rpt. ¶¶ 30, 36-48 (citing various publications dating between 1981 to 1995) (ECF No. 9250-2); Levitt Rpt. at 28 (same) (ECF No. 9250-33).

316. One of the MWL publications is a 1981 article titled *Rabita-Sponsored Auqaf Conference Resolutions*; it predates the founding of Al Qaeda by nearly a decade. Kohlmann Rpt. ¶ 37 n. 43 (ECF No. 9250-2); Ex. 89, Sept. 1981 MWL Journal at FED-PEC0260167-72.

317. Plaintiffs' experts also cite a 1991 article titled *Jihad With Money in the Way of Allah* arguing that the author explains that the participation in jihad with one's wealth and one's life is essential to the teachings of Islam. Kohlman Rpt. ¶ 38 (ECF No. 9250-2); Levitt Rpt. at 28 (ECF No. 9250-33).

318. The conclusion ascribed by Plaintiffs' strips the article of its context, which states that jihad's objective, to uphold the word of God, "encompasses all the noble human values, such as defense of one's homeland, honour and dignity, and ensuring truth, justice and peace," and that jihad is about deterrence. Ex. # 90, July/Aug 1991 MWL Journal at FED-PEC0265171.

319. Plaintiffs also argue that a February 1994 piece, *Child Upbringing in Islam,* advocates children participating in jihad. *See* Kohlmann Rpt. ¶ 42, 42 n.49 (ECF No. 9250-2); Levitt Rpt. at 28 (ECF No. 9250-33).

320. The relevant section of the February 1994 piece, *Child Upbringing in Islam,* is about children's education, and the specific subsection Plaintiffs focus on closes with the exhortation that a child "should be taught how to live in peace with non Muslims in so far as they have not prevented him from following his religion interact with them with respect and help them just as the Noble Prophet and his companions treated them during their period." Ex. # 91, Feb. 1994 MWL Journal at FED-PEC0266481-85.

321. The rest of the February 1994 piece, *Child Upbringing in Islam,* contains a mélange of instructions on child-rearing, including encouraging children to love and avoid selfishness, instructing them not to use the radio while parents sleep, detailing the posture a child should assume while eating, and noting how to cover one's mouth when yawning. Ex. # 91, Feb. 1994 MWL Journal at FED-PEC0266481-85.

322. MWL explained that it did not expressly adopt the views in the February 1994 piece, *Child Upbringing in Islam*, writing that the "Views expressed in the columns of The MWL Journal do not necessarily represent those of the Editorial Board or the Muslim World League." Ex. # 91, Feb. 1994 MWL Journal at FED-PEC0266452.

323. The author of the February 1994 piece, *Child Upbringing in Islam*, Abdul Malik Bappa Mahmud, is not listed on the journal masthead. Ex. # 91, Feb. 1994 MWL Journal at FED-PEC0266452.

324. The remaining articles Plaintiffs' experts cite date between 1992 and 1995 and cover topics from Muhammad's journey from Makkah to Medina in 622 (Kohlmann Rpt. ¶ 42 n.49; (ECF No. 9250-2)), the Afghani Ambassador to Egypt's views on the Afghani Jihad against the U.S.S.R. (Kohlmann Rpt. ¶ 30 n.31 (ECF No. 9250-2); Ex. # 92, Aug. 31, 1992 Al Alam Al Islami article), calls for support to be given to Muslims in Bosnia against the Serbs (Kohlmann Rpt. ¶¶ 45-46 (ECF No. 9250-2); Levitt Rpt. at 28, 28 n.93 (ECF No. 9250-33); Ex. # 93, Sept. 1995 MWL Journal at FED-PEC0267571-79) and news updates concerning the Bosnian and Kashmiri conflicts and the Gulf Cooperation Counsil Summit, which discussed Bosnia (Kohlman Rpt. ¶¶ 46 n.53, 47 n.54 (ECF No. 9250-2); Ex. # 94, Jan. 1994 MWL Journal at BUR-PEC-035607-08; Ex. # 95, *Imam of Holy Haram Calls for assistance to Kashmiris*, FED-PEC0231562).

325. Often, the publications contain the disclaimer that the views therein "do not necessarily represent those of the Editorial Board of the Muslim World League," or the named authors are not listed as a Journal editor or otherwise on the masthead. *See, e.g.,* Ex. # 94, Jan. 1994 MWL Journal at BUR-PEC-035591; Ex. # 91, Feb. 1994 MWL Journal at FED-PEC0266452.

**<u>Intelligence Reporting</u>**

326. According to the 9/11 Commission Staff, "Terrorist financing was not a priority for either domestic or foreign intelligence collection. As a result, intelligence reporting on the issue was episodic, insufficient, and often inaccurate." *Monograph* at 4.

327. According to the 9/11 Commission Staff, the "U.S. intelligence community largely failed to comprehend al Qaeda's methods of raising, moving, and storing money, because it devoted relatively few resources to collecting [] strategic financial intelligence." *Id.* at 5; *see also id.* at 18 (explaining that even in March 2002, "the head of the [U.S.] government's terrorist-financing coordination effort" stated that U.S. officials could not answer "[w]ho finances al Qaeda, "[h]ow," or "[w]here").

**<u>CIA Reports</u>**

328. The sections of the 9/11 Commission Report discussing financing of Al Qaeda cite CIA reports pre-dating the 9/11 Attacks. *Id.* at 169-172 & nn. 118, 126; 185-186 & nn. 84, 86. These reports did not conclude that IIRO or MWL, or their foreign branch offices, directly or indirectly provided funds to Al Qaeda. *Id.*

329. The chapter of the 9/11 Commission Report discussing Al Qaeda's founding and its return to Afghanistan in 1996 cite several CIA reports. *Id.* at 47-63 & nn. 37, 59, 67, 77, 78. These reports did not conclude that IIRO or MWL, or their foreign branch offices, directly or indirectly provided funds to Al Qaeda. *Id.*

330. The 9/11 Commission's "Monograph on Terrorist Financing" Staff Report did not conclude that IIRO or MWL, or any of their foreign branch offices, directly or indirectly provided funds to Al Qaeda. *See generally* Monograph.

331. The 9/11 Commission Report addresses charities in connection with the financing of Al Qaeda in two sections. *See* 9/11 Commission Report, at 169-72, 185-86.

332. The 9/11 Commission Report's section on "General Financing" (pp. 169-72) mentions only the "al Haramain Islamic Foundation" as an example of "large, international charities" with "lax external oversight and ineffective internal controls," whose foreign branch offices have "al Qaeda sympathizers" diverting money to Al Qaeda. 9/11 Commission Report, at 170 & n.118 (citing CIA report, "How Bin Ladin Commands a Global Terrorist Network," CTC 99-40003, Jan. 27, 1999). Furthermore, it mentions only "the al Wafa organization" as an example of "entire charities" who "may have wittingly participated in funneling money to al Qaeda." *Id.*

333. This portion of the 9/11 Commission Report does not mention IIRO or MWL, or conclude that IIRO or MWL, or any of their branch offices, directly or indirectly, provided funds to Al Qaeda. 9/11 Commission Report, at 170. *See also* Ex. # 1, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda).

334. The January 27, 1999, CIA report, cited by the 9/11 Commission Report, notes Bin Ladin's exploitation of some international Islamic nongovernmental organizations for financial and logistical support. Ex. # 96, CIA report, "How Bin Ladin Commands a Global Terrorist Network," CTC 99-40003 (Jan. 27, 1999) at CIA_000007.

335. The unredacted sections of the January 27, 1999, CIA report do not include IIRO or MWL, any IIRO or MWL official, or any IIRO or MWL employee, as part of Bin Ladin's terrorist network. Nor do they conclude that IIRO or MWL, or any of their branch offices, directly or indirectly, provided funds to Al Qaeda. *Id.*

336. The 9/11 Commission Report's section on "General Financing" (pp. 169-72) cites another CIA report, "Pursuing the Bin Laden Financial Target," CTC 01-40003HCS, Apr. 12, 2001. *See* 9/11 Commission Report, at 171 n.126. This report states that, in the case of NGO

financing of terrorism, "the majority of the money moving through the NGOs is for legitimate humanitarian needs," and these funds are "co-mingled with those slated for nefarious purposes, making it extremely difficult to identify and seize funds directly linked to terrorist activities." Ex. #97, CIA report, "Pursuing the Bin Laden Financial Target," CTC 01-400003HCS (Apr. 12, 2001) at CIA_00381.

337. This CIA report, "Pursuing the Bin Laden Financial Target," does not conclude that any IIRO or MWL funds were diverted to terrorist activities. Nor does it otherwise make any finding that IIRO or MWL, or any of their branch offices, directly or indirectly, provided funds to Al Qaeda. *See generally id.*

338. The 9/11 Commission Report's section on "Terrorist Financing" (pp. 185-86) states that the CIA "knew relatively early" about the "loose affiliation of financial institutions, businesses, and wealthy individuals who supported extremist Islamic activities." 9/11 Commission Report, at 185 & n.84 (citing CIA report, "Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions," OTI 97-10035CX, (Dec. 1997).

339. This "Terrorist Financing" section of the 9/11 Commission Report does not conclude that IIRO or MWL, or any of their branch offices, directly or indirectly, provided funds to Al Qaeda. *Id.* at 185-86.

340. The cited December 1997 CIA report claims:

> *Saudi Arabia, as well as other Gulf states, has long been a source of financial support for Islamic causes; at least some of these funds are diverted to militants and terrorists. Riyadh provides official funding to various groups to promote Sunni Islam and to counter regional Iranian influence; other funding emanates from semiofficial charities, such as the Muslim World League and IIRO, and from private donations that are often difficult to track. Funds collected from individuals are often made in cash and disguised as religious offerings; NGO funds, on the other hand, are usually diverted by unregulated offices located abroad.*

Ex. #98, CIA report, "Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions," OTI 97-10035CX (Dec. 1997) at CIA_000744. While mentioning MWL and IIRO as examples of charities and discussing the diversion of charitable funds in the abstract, the report does not conclude, assert, or prove that any MWL or IIRO funds were actually diverted to terrorists, let alone to Al Qaeda. *See generally id.*

341. The 9/11 Commission Report section on "Terrorist Financing" continues: "although the intelligence community devoted more resources to the issue [of Al Qaeda funding] and produced somewhat more intelligence, it remained difficult to distinguish al Qaeda's financial transactions among the vast sums moving in the international financial system." 9/11 Commission Report, at 186 & n.86 (citing two CIA reports, "Usama Bin Ladin: Some Saudi Financial Ties Probably Intact," OTI IR 99-005CX (Jan. 11, 1999), and "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999)).

342. The January 11, 1999 CIA report, cited by the 9/11 Commission Report, discusses the supervision and funding of "two al-Qa'ida training camps in Afghanistan." Ex. # 99, CIA report, "Usama Bin Ladin: Some Saudi Financial Ties Probably Intact," at CIA_000808. It does not allege that MWL or IIRO funds or is otherwise affiliated with these camps.

343. Later, the January 11, 1999 CIA report claims that IIRO "funds a military camp associated with Usama [Bin Laden]." *Id.* The report does not indicate that these "military camps" are the same as the "two al-Qa'ida training camps in Afghanistan," which it discussed previously and separately. *Id.* In any event, the unredacted portions of the report do not provide the factual basis for this assertion or otherwise source the claim that IIRO funds the "military camp." *See generally id.*

344. The January 11, 1999 CIA report also claims that Bin Laden "apparently" has "extensive contact with Afghani and Pakistani offices of the IIRO," but "it is not clear that IIRO headquarters in Jeddah is witting of these contacts." *Id.* at CIA_000817. The report does not conclude that Bin Ladin in fact has extensive contact with these IIRO offices, nor do the unredacted portions of the report indicate the source or factual basis for the claim that he "apparently" does so. *See generally id.*

345. The January 11, 1999 CIA report describes MWL as an example of an NGO with "[p]ossible" ties to "Usama Bin Ladin" that are "questionable, though less direct." *Id.* at CIA_000822. The report does not conclude that MWL has actual ties with Bin Ladin, nor do the unredacted portions of the report indicate the source or factual basis for the claim that it has "[p]possible" ties. *See generally id.*

346. The January 11, 1999 CIA report states that MWL has "apparently" been "used as a cover organization for several of Usama's associates." *Id.* at CIA_000823. The report does not conclude that MWL in fact has been used as a cover organization, nor do the unredacted portions of the report indicate the source or factual basis for the claim that it "apparently" has been so used. *See generally id.*

347. The April 9, 1999 CIA report, cited by the 9/11 Commission, notes that "large, internationally active NGOs based in Saudi Arabia" can be "exploited by individual employees," but "[t]errorist abuse of such NGOs takes place at the local branch office rather than at the organizations' headquarters. Senior NGO leaders usually are unwitting of the activity and willing to take corrective action when apprised of the abuse." Ex. # 100, CIA report, "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999) at CIA_000213.

348. The April 9, 1999 CIA report then asserts, "Although the MWL headquarters, for example, avoids extremist causes, sympathizers within several MWL affiliate organizations—including the International Islamic Relief Organization (IIRO)—have provided terrorists with funding and cover employment, documentation, and training, according to [redacted] press reporting." *Id*. This allegation cites only "[redacted] press reporting," without identifying the source or nature of the press reporting. *Id.*

349. The April 9, 1999 CIA report on three subsequent occasions mentions IIRO in connection with support to terrorist groups (other than Al Qaeda).

350. First, the April 9, 1999 CIA report states that "Usama Bin Ladin's brother-in-law, Muhammad Jamal Khalifah, who directed the IIRO in in the Philippines, provided funding and some logistical support to [World Trade Center Bomber Ramzi] Yousef and his associates ***in 1995*** as they plotted to bomb at least 12 airliners in East Asia." *Id.* at CIA_000216 (emphasis added).

351. Second, the April 9, 1999 CIA report alleges, "The director of the IIRO office in Baku, Az[erbaijan] diverted a[pproximat]ely $1.5 million to the Egyptian Islamic Jihad." Ex. # 100, CIA report, "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999) at CIA_000220.

352. The unredacted portions of the report do not provide the source or factual basis for this assertion. *See generally id.*

353. The alleged diverted amount of $1.5 million (or 5.6 million Saudi Riyals at the prevailing exchange rate of 3.75 SAR/USD) would exceed the entire budget of IIRO's Azerbaijan office of 3,923,239 million Saudi Riyals. *See* Ex. # 35, IIRO 1998 Annual Report, at IIRO_004274.

354. Third, the April 9, 1999 CIA report alleges, "IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate more towards extremist activities." Ex. # 100,

CIA Analytic Report "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999) at CIA_000221.

355. The unredacted portions of the report do not provide a source or factual basis for this assertion. *See generally id.*

356. In fact, IIRO did not have an "office" in Afghanistan. *See* Ex. #35, IIRO 1998 Annual Report at IIRO_004275; *see also* Ex. # 101, Basha Dep. Tr. (106:6-8) ("The projects in Afghanistan were managed by the office from Islamabad in Pakistan.").

357. The April 9, 1999 CIA report finally notes, "IIRO operations include running or supporting schools, orphanages, medical clinics and hospitals in more than 90 countries, [redacted]. Accredited by the UNHCR, the IIRO also runs programs in UN-sponsored camps for war refugees in Afghanistan, Pakistan, and in locations in Africa." Ex. # 100, CIA report, "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999) at CIA_000221.

358. The April 9, 1999 CIA report does not conclude that any foreign branch office of IIRO or MWL provided funds to *Al Qaeda*, directly or indirectly. *See generally id.*

359. The chapter of the 9/11 Commission Report discussing Al Qaeda's founding and its return to Afghanistan in 1996 does not conclude that IIRO or MWL directly or indirectly, provided funds to Al Qaeda. *See* 9/11 Commission Report at 47-67.

360. This chapter cites several CIA reports. *Id.* at 47-67 & nn.37 (citing CIA report, "Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia," CTC 2002-40066CH (June 6, 2002)), 59 (citing CIA report, "Usama Bin Ladin: Al-Qa'ida's Financial Facilitators," OTI iA 2001-134-HXC (Oct. 18, 2001)), 77 (citing CIA report, "Saudi-Based Financial Support for Terrorist Organizations [Redacted]," CTC 2002-40117CH (Nov. 14, 2002)),

and CIA report, "Al Qa'ida Still Well Positioned To Recruit Terrorists [Redacted]," CTC 2002-40081CH (July 1, 2002)). These reports do not conclude that IIRO or MWL, or their foreign branch offices, directly or indirectly provided funds to Al Qaeda.

361. Intentionally left blank.

362. The 9/11 Commission Report distinguishes Maktab al-Khidamat from Al Qaeda. Maktab al-Khidamat, known as the "Bureau of Services" or the Services Bureau (9/11 Commission Report at 56), "provided logistical support to mujahideen in Afghanistan" in the late 1980s. *Id.* at 434. Bin Laden did not lead Maktab al-Khidamat, which did not seek to act outside of Afghanistan. Bin Laden created Al Qaeda and split it off from Maktab al-Khidamat because he wanted to pursue global violent jihad. *Id.* at 55-56.

363. Intentionally left blank.

364. Intentionally left blank.

365. The October 2001 CIA report, cited in the 9/11 Commission Report, "Usama Bin Ladin: Al-Qa'ida's Financial Facilitators," OTI iA 2001-134-HXC, Oct. 18, 2001, incorporates information through September 30, 2001. Ex. # 102, CIA report, "Usama Bin Ladin: Al-Qa'ida's Financial Facilitators," OTI iA 2001-134-HXC (Oct. 18, 2001) at CIA_000501.

366. The section of the October 2001 CIA report entitled, "The Origin of Funds" identifies seventeen "Islamic charities" from whom "Bin Ladin derives much of his funds." *Id.* at CIA_000502, CIA_000521 to CIA_000527 (listing and describing Afghan Support Committee, Health and Education Project International, Human Care Afghanistan, Islamic Relief Agency, Sudan, Jam'iyat al-Ta'awun al-Islamiyya, Kuwaiti Joint Relief Committee, Lajnat al-Birr al-Islami, Lajnat al-Dawa al-Islamia, Maktab al-Khidamat, Munazzamat al-Birr al-Islami, Muslim Scholar's Union, Al-Muwafaq Foundation, Qatar Islamic Call Charitable Society, Rabita Trust for

the Rehabilitation of Stranded Pakistanis, Al-Rashid Trust Institution, Revival of Islamic Heritage Society, Wafa al-Igatha al-Islamiya). IIRO and MWL are not among them.[4] *Id.*

367. Later, the October 2001 CIA report notes that "[l]ongtime Bin Ladin associate . . . Wa'el Hamza Julaydan [Jelaidan] . . . a veteran of the Islamic charity circuit, has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL), the Saudi Red Crescent Society (SRCS), and lately at two Bin-Ladin affiliated charities, al-Waqf al-Islami, and as secretary general of Rabita Trust coordinating financial activities and overseeing the budget. Julaydan has provided support since the 1990s to Muslims in Bosnia and Chechnya-hotbeds of *mujahidin* activity-and may be using his position and influence at these organizations to divert funds and resources to al-Qa'ida." *Id.* at CIA_000544.

368. This October 2001 CIA report quotation explicitly distinguishes IIRO and MWL from "bin-Ladin affiliated charities." *Id.*

369. The October 2001 CIA asserts that Jelaidan "may be" *currently* diverting funds and resources to Al Qaeda, and that he "held" positions at IIRO and MWL in the past. *Id.*

370. This report does not conclude that IIRO, MWL or any of their branch offices, directly or indirectly, provided funds to Al Qaeda. *See generally id.*

371. The June 2002 CIA report, cited in the 9/11 Commission Report, "Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia," CTC 2002-40066CH, June 6, 2002, does not conclude that IIRO or any of its branch offices directly or indirectly provided

[4] Another page of the report, entitled, "Islamic Charities Supporting Al Qa'eda," contains a list of seventeen charities that is identical to the charities identified in the foregoing discussion, except it includes IIRO and excludes Munazzamat al-Birr al-Islami. *Id. at* CIA_000525. There is no elaboration on the nature of alleged "support" (including whether it consists of the provision of funds), no factual basis provided for the composition of this list, and no explanation for the discrepancy between this list and the 17 charities previously identified described as funders of Bin Laden.

funds to Al Qaeda. Ex. # 103, CIA report, "Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia," CTC 2002-40066CH (June 6, 2001), CIA_000450 to CIA_000480.

372. The June 2002 CIA report states that "Gulf NGOs with branch offices in the Philippines—including . . . the International Islamic Relief Organization—maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates." *Id.* at CIA_000455. It does not explain the nature or extent of this "contact," nor provide a factual basis or source for this assertion. *Id.*

373. The June 2002 CIA report goes on to identify "[f]our Saudi NGOs that have been connected to Bin Ladin in other locations" besides the Philippines. It does not identify IIRO or MWL. *Id.*

374. Furthermore, the June 2002 CIA report then lists "Al Qa'ida-linked Islamic NGOs." *Id.* This list does not include IIRO or MWL. *Id.*

375. The November 14, 2002 CIA report, cited in the 9/11 Commission Report, "Saudi-Based Financial Support for Terrorist Organizations [Redacted]," CTC 2002-40117CH (Nov. 14, 2002), does not conclude that IIRO or any of its branch offices directly or indirectly provided funds to Al Qaeda. Ex. # 104, "Saudi-Based Financial Support for Terrorist Organizations [redacted]," CTC 2002-40117CH (Nov. 14, 2002), CIA_000143 to CIA_000158.

376. The November 14, 2002 CIA report notes that SAMA, Saudi Arabia's central bank and chief financial agency, has "overseen Saudi banks' efforts to freeze and seize terrorist-linked assets." *Id.* at CIA_000145.

377. The November 14, 2002 CIA report lists individuals who it claims are part of the "Key Financial Base for Al-Qa'ida." One of the individuals is Muhammad Jamal Khalifah. The report notes that Khalifah founded several Islamic charities and "served" in the past as "director

of the International Islamic Relief Organization (IIRO) NGO in Manila." The report does not state that Khalifah provided funds to or supported Al Qaeda during or as part of his employment for IIRO-Philippines. On the contrary, the report states that Khalifah "currently" has several private business ventures like "Asian and African construction and gem businesses," and that he is using those ventures to "launder money for al-Qa'ida." *Id.* at CIA_000148 to CIA_000149.

378. The November 14, 2002 CIA report describes five "Saudi-based NGOs that al-Qaida has been able to exploit by diverting funds from legitimate activities to finance al-Qa'ida." *Id.* at CIA_000150 to CIA_000151. IIRO is not among these five NGOs. *Id.*

379. The November 14, 2002 CIA report later asserts that Abu Sayyaf Group "probably" receives funds from "Saudi-based NGOs, including . . . IIRO." *Id.* at CIA_000152. However, the report explicitly describes Abu Sayyaf Group as a terrorist group "other than al-Qa'ida." *Id.* at CIA_000151. In any event, the report does not assert that Abu Sayyaf Group "actually" receives funds from IIRO, nor do the unredacted portions of the report provide a factual basis or source for the assertion that it "probably" does so. *See generally id.*

380. The November 14, 2002 CIA report includes MWL among the five Saudi-based NGOs whose funds were allegedly diverted to Al Qaeda, based on its observation that "[s]everal of Bin Ladin's associates, including Wa'il [Jelaidan] and Muhammad Jamal Khalifah, were MWL representatives, according to [redacted] press reporting." *Id.* at CIA_000150.

381. However, the November 14, 2002 CIA report does not state that Jelaidan and Khalifa were associates of Bin Ladin at the time they were affiliated with MWL, nor does it identify the "press reporting" cited.

382. The November 14, 2002 CIA report then states, "[Redacted] funds destined for al-Ittihad al-Islamiyya (AIAI) were funneled through several Saudi NGOs, including MWL." *Id.*

383. The November 14, 2002 CIA report does not provide a factual basis or source for this assertion, with the redaction further obscuring the nature or credibility thereof. *Id.*

384. The November 14, 2002 CIA report closes the discussion of MWL by stating, "[Redacted] does not indicate whether Saudi officials or the head office is complicit in terrorist support." *Id.*

385. Finally, a 2004 CIA-FBI Collaborative Intelligence Assessment concludes that "[t]here is no evidence that either the Saudi Government or members of the Saudi Royal family knowingly provided support for the attacks of 11 September 2001." Ex. # 105, "Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States," (Dec. 2004) at EO14040-003416-UPDATED.

386. The assessment further notes that the Government of Saudi Arabia suspected that Bin Jiluwi, a "leader" of the Eastern Province office of IIRO, "embezzled" more than $3 million from IIRO. *Id.* at EO14040-003419-UPDATED. The assessment does not state that the embezzled funds were diverted to Al Qaeda. *See generally id.*

387. The assessment then states that in October 2004 the Government of Saudi Arabia decided to assume control over the assets of the al-Haramain Islamic Foundation (whose U.S. branch the United States designated as a foreign terrorist organization), but the Government of Saudi Arabia did not feel that such action was warranted in the case of IIRO. *Id.* at EO14040-003420-UPDATED, EO14040-003430-UPDATED.

388. The 2004 assessment does not conclude that IIRO or MWL, directly or indirectly through any other charity or entity, provided funds to Al Qaeda. *See generally id.*

389. The 9/11 Commission's "Monograph on Terrorist Financing" recognized the challenges in determining Al Qaeda's actual funding sources and urged caution in accepting a funding theory as fact:

> *In many cases, one or two threads of information make such theories tantalizing; but after careful review of all of the evidence available to us, including some of the most sensitive information held by the U.S. government, we have judged that such theories cannot be substantiated.*

Monograph at 19.

390. The Monograph also warned of the "perils" of relying on "custodial interviews of captured al Qaeda members," because "[d]etainees may provide misinformation and may misrepresent or mischaracterize their roles or the roles of others. As a result, corroborating their information, through other custodial interviews, documentary evidence, or other intelligence collection, is critical in assessing what we know about al Qaeda financing." *Id.*

391. While the Monograph notes charities were a source of Al Qaeda funding, it clarified:

> *Al Qaeda's charities' strategy before 9/11 had two prongs. In some instances, al Qaeda penetrated specific foreign branch offices of large, internationally recognized charities. In many cases, lax oversight and the charities' own ineffective financial controls, particularly over transactions in remote regions of the world, made it easy for al Qaeda operatives to divert money from charitable uses. These large international Gulf charities donated money to end recipients, usually smaller in-country charities, whose employees may have siphoned off money for al Qaeda. In the second class of cases, entire charities from the top down may have known of and even participated in the funneling of money to al Qaeda. In those cases, al Qaeda operatives had control over the entire organization, including access to bank accounts.*

*Id.* at 21.

392. According to this portion of the Monograph, employees of "smaller in-country charities" diverted funds to Al Qaeda, or entire charities ***other than*** "large international Gulf charities" were controlled by Al Qaeda. *Id.*

393. The Monograph further urged that the role of Saudi charities must be assessed in the context in which they exist.

> *Much has been made of the role of charities, particularly Saudi charities, in terrorist financing. A little context is necessary here. Charitable giving, known as zakat, is one of the five pillars of Islamic faith. It is broader and more pervasive than Western ideas of charity, in that it also functions as a form of income tax, educational assistance, foreign aid, and political influence. The Western notion of the separation of civic and religious duty does not exist in Islamic cultures. The Saudi government has declared that the Koran and the Sunna (tradition) of Muhammad are the country's constitution, and the clergy within Saudi Arabia wield enormous influence over the cultural and social life of the country.*
>
> *Funding charitable works is ingrained into Saudi Arabia's culture, and Saudi zakat has long provided much-needed humanitarian relief in the Islamic world. In addition, a major goal of Saudi charities is to spread Wahhabi beliefs and culture throughout the world. Thus Saudi efforts have funded mosques and schools in other parts of the world, including Pakistan, Central Asia, Europe, and even the United States. In some poor areas these schools alone provide education; and even in affluent countries, Saudi-funded Wahhabi schools are often the only Islamic schools available.*

*Id.* at 21.

394. The Monograph did not identify IIRO or MWL as a charity identified as providing funds to Al Qaeda, directly or indirectly, or one suspected of doing so. *See generally id.*

**<u>Treasury Department Designations</u>**

395. After the 9/11 Attacks, President George W. Bush signed Executive Order 13224 ("E.O. 13224"). Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 25, 2001). Sanctions and a designation as a specially designated global terrorist ("SDGT") under EO 13224 are administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"). Ex. # 4, Brown Rpt., at 92.

396. The standard for designations is not articulated in Executive Order 13224 or the International Emergency Economic Powers Act ("IEEPA"). Ex. # 106, Gurule Dep. Tr. at

89:23-91:6, 93:21-94:9 The Executive Order also does not specify standards or evidence of proof. Ex. # 4, Brown Rpt at 92.

397. EO 13224 "seeks to cast a wide net so as to disrupt the channels of terrorist financing to save lives." Ex. # 106, Gurule Dep. Tr. at 88:5-10. Persons who unknowingly, unwittingly, or inadvertently finance terrorism may be subject to designation under EO 13224. *Id.* at 87:14-88:4 ("Q. So your understanding is that an individual who may be unknowingly providing or financing terrorist activity could be subject to designation under Executive Order 13224, is that right? A. Yes. Q. And by the same token, an individual who may be unwittingly financing terrorism activity could be subject to designation under Executive Order 13224, is that fair to say? A. Yes; so it's both, someone could be doing it intentionally, knowingly, willfully, or inadvertently, unknowingly.").

398. Designation under EO 13224 as an SDGT is an administrative action, not a criminal or civil action. The designation process is not an adjudication of the guilt or innocence of the target of the SDGT designation. Ex. # 106, Gurule Dep. Tr. at 83:19 – 84:7.

399. There is no requirement that the U.S. government establish the existence of evidence that an actual act of terrorism was committed by a target that is being considered for designation pursuant to EO 13224. Nor is there any requirement that the government demonstrate that a target intended to support terrorism in any way. *Id.* at 84:8 – 86:6.

400. The types of evidence that can be considered in the SDGT designation process is very broad and can include hearsay statements from an article or the internet or other material that would have no evidentiary value in a civil litigation. *Id.* at 96:3-23.

401. Subjects of designations are not permitted to rebut a designation prior to the designation. Ex. # 106, Gurule Dep. Tr. at 119:23-121:18 ("Q. Is the individual or entity who is

the potential target, is that individual or entity afforded the opportunity to participate in any way in the designation process predesignate? A. No… Q. They're not asked to submit any evidence of any kind in terms of a basis for or against the designation predesignation, is that right? A. That's correct….").

402. According to Vahid Brown, an OFAC designation "only documents the fact of a US government suspicion of such an association and does not itself constitute evidence of such an association, nor does it prove the existence of any such evidence." Ex. # 4, Brown Report at 91-92.

**Treasury Designation Memoranda**

**Memorandum Concerning Designation of Jelaidan**

403. The Memorandum concerning the designation of Jelaidan does not mention IIRO or MWL. *See* Ex. # 107, TREASURY 00001-8.

404. Under the heading "Links to SDGTs [Specially Designated Global Terrorists]," the Memorandum cites Osama Bin Laden's interview in 1999 to Al-Jazeera TV:

> When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, Usama bin Ladin stated that "We were all in one boat, as is known to you, including our brother, Wa'il JALADIN (sic). A plot was concocted to assassinate all. We were careful not to be together all the time." According to press reports, JULAIDAN is identified as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief. JULAIDAN, along with fellow Saudis Usama bin Laden and Abdullah Azzam, head of the Pakistan Muslim Brotherhood, established the basis of the organization in the 1980s, as they helped to recruit volunteers to fight in the Afghan resistance.

Ex. # 107, TREASURY00004.

405. This does not conclude that there is a relationship between Bin Ladin and Jelaidan in the decade before the 9/11 Attacks, or any relationship related to terrorism against the United States. *Id.*

406. The quotation itself speaks of Jelaidan's activity "in the 1980s," and it connects Bin Ladin's statement of being "all in one boat" to the assassination of Abdullah Azzam and to the risk of assassination faced by each individual, not to any joint planning of terrorism. *Id.*

407. Abdullah Azzam was assassinated on November 24, 1989. *See* 9/11 Commission Report at 56.

408. During this time period of the 1980s until Azzam's assassination, the United States supported the Afghan resistance against the Soviet invasion. Ex. # 78, Roy Rpt. at 10-12.

409. The Services Bureau organization had no aims to act outside of Afghanistan, let alone against the United States. *See* Ex. # 4, Brown Rpt. at 2-4, 9.

410. As for the "press reports" describing Jelaidan as Bin Ladin's logistics chief, the Memorandum does not identify them or provide a basis to assess their reliability. Ex. # 107, TREASURY00004.

411. The list of sources cited in this Memorandum are redacted, except for the above Al-Jazeera interview, and an Associated Press article from October 2001 about the U.S. Government's anti-terrorism efforts. Ex. # 107, TREASURY00008.

412. Under the heading "Basis for Designation," the Memorandum lists (1) Julaidan's position as Executive Director of the Rabita Trust; (2) his "contact with Ayman al Zawahri during the early 1990s"; and (3) his "contact with representatives of extremist groups" other than al Qa'eda. Ex. # 107, TREASURY00006-7.

**<u>Jamal Al Fadl</u>**

413. Jamal al Fadl was a Sudanese member of Al Qaeda. Ex. # 4, Brown Rpt. at 72.

414. Jamal al Fadl was a minor figure in Bin Laden's circle. Ex. # 4, Brown Rpt. at 77.

415. Jamal al Fadl also approached the U.S. Government, in 1996, falsely portraying himself as a Sudanese dissident before disclosing his association with Al Qaeda. Ex. # 4, Brown Rpt. at 73.

416. Jamal al Fadl became a paid informant for the U.S. government in 1996, receiving living expenses for himself and his family. Ex. # 4, Brown Rpt. at 73.

417. Jamal al Fadl became a paid informant for the U.S. government only after Bin Laden discovered that he was embezzling funds. 9/11 Commission Report at 62 ("Then Bin Ladin discovered that Fadl had skimmed about $110,000, and he asked for restitution. Fadl resented receiving a salary of only $500 a month while some of the Egyptians in al Qaeda were given $1,200 a month. He defected and became a star informant for the United States."); *see also* Ex. # 4, Brown Rpt. at 72 (stating that, in the mid-1990s, a joint audit by the Bin Ladin organization and the National Islamic Front (NIF) government of Sudan discovered that Jamal al Fadl had embezzled funds from both entities).

418. Jamal al Fadl offered false information to U.S. agents and others, including:

a. Claiming to have trained with Ramzi Yousef before admitting that he never met Ramzi Yousef (Ex. # 4, Brown Rpt. at 73);

b. Describing Al Qaeda in Sudan as a distinct entity, the Islamic Army, and later explaining that it was just one of two names for Al Qaeda and that Al Qaeda ultimately was chosen (Ex. # 4, Brown Rpt. at 74);

c. Misidentifying members of Al Qaeda's shura council (Ex. # 4, Brown Rpt. at 75);

d. Falsely claiming to witness the death of Abu'l-Abbas al-Madani by gunshot wound to the head in Afghanistan when Abu'l-Abbas al-Madani actually died in Bosnia (Ex. # 4, Brown Rpt. at 79);

e. Falsely claiming that Abdallah Anas was a member of Al Qaeda (Ex. # 4, Brown Rpt. at 79-80);

f. Making a series of erroneous claims during testimony claiming other militant groups were part of Al Qaeda, such as al-Gama'a al-Islamiyya in Egypt, which announced a cessation of military activity in Egypt in 1995 and abandoned violence altogether in 1999, the non-existent al-Gama'a al-Islamiyya in Algeria, Libyan Islamic Fighting Group, which focused on toppling the Gaddhafi regime, and Yemeni Jannubi (Ex. # 4, Brown Rpt. at 75-77); and

g. Falsely claiming that Jalaluddin Haqqani—a commander of Yunis Khales who joined the Taliban in the late 1990s—was a commander under Gulbuddin Hekmatyar even though Khales and Hekmatyar were rivals and fought against each other after Khales joined the Taliban (Ex. # 85, Sageman Rpt. at 223-224).

419. The 9/11 Commission reported, in 2004, that the CIA obtained a general understanding of how Al Qaeda raised money from Jamal al Fadl. 9/11 Commission Report at 185. It reported that the CIA "knew relatively early, for example, about the loose affiliation of financial institutions, businesses, and wealthy individuals who supported extremist Islamic activities. *Much of the early reporting on al Qaeda's financial situation and its structure came from Jamal Ahmed al Fadl….*" *Id.*

420. Plaintiffs rely on Jamal al Fadl's assertion that "bin Ladin and al Qaeda used Wael Julaidan as the head of IIRO in Peshawar, Pakistan, to create ID cards for al Qaeda people so that they could cross the Pakistan-Afghanistan border without a problem." Winer Rpt. ¶ 12.19.3 (ECF No. 7344-1).

421. Plaintiffs rely on a 1996 document that states "a clandestine source" provided information that "IIRO helps fund six militant training camps in Afghanistan." *See* Winer Rpt. ¶¶ 6.6.10.3 (quoting 1996 document), 7.3.4.3 (referring to same document but altering statement to refer to "*terrorist* training camps") (ECF No. 7344-1); *see also* Kohlmann Rpt. ¶ 83 (referring to same document and altering reference to refer to "7 Al-Qaida training camps") (ECF No. 9250-2); Levitt Rpt. at 36 (referring to same document and altering reference to refer to "six al-Qa'ida training camps") (ECF No. 9250-33).

422. Jamal al Fadl is believed to be the "clandestine" informant who is quoted in the 1996 document as stating that "IIRO helps fund six militant training camps in Afghanistan." *See* Winer Rpt. ¶¶ 6.6.10.3, 7.3.4.3 (drawing connection between Jamal al Fadl and clandestine source) (ECF No. 7344-1).

423. Plaintiffs rely on Jamal al Fadl's assertion that described the "involvement of Islamic charities as interwoven into al Qaeda." Winer Rpt. ¶ 7.4.6 (ECF No. 7344-1).

424. Plaintiffs rely on Jamal al Fadl's assertion that "the head of IIRO in Peshawar as a 'good friend' of bin Ladin who 'would contribute funds or contacts' to specific al Qaeda operations." Winer Rpt. ¶ 7.4.6 (ECF No. 7344-1).

425. Plaintiffs rely on Jamal al Fadl's assertion that "IIRO was used to provide cover documents for al Qaeda by giving them documentation falsely stating that they were relief workers,

so that they could get visas to travel 'to England, or if you want to go to anywhere in the world." Winer Rpt. ¶ 7.4.6 (ECF No. 7344-1).

426. Plaintiffs rely on Jamal al Fadl's assertion that stated that "Usama Bin Laden identified several prominent international Muslim charities as the primary sources of Al-Qaida financial and fundraising activity." Kohlmann Rpt. ¶ 21 (ECF No. 9250-2).

427. Plaintiffs rely on Jamal al Fadl's assertion that "IIRO ran an Al-Qaida guesthouse in Peshawar, Pakistan." Kohlman Rpt. ¶ 77 (ECF No. 9250-2).

428. Plaintiffs rely on Jamal al Fadl's assertion that a scrap of paper was the "Golden Chain" list, which included IIRO personnel, of "wealthy individuals…who provided Bin Laden and Al Qaeda with money on a regular basis." Kohlmann Rpt. ¶ 156 (ECF No. 9250-2).

429. Plaintiffs rely on Jamal al Fadl's assertion that the "manager and person who ran the IRO [sic] at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani… Julidan was one of Bin Laden's closest friends at the time." Kohlmann Rpt. ¶ 77 (citations omitted) (ECF No. 9250-2).

430. Plaintiffs rely on Jamal al Fadl's assertion that "Julaidan also went by the name Abu Hassan al Madani. … While working for the IIRO, Julaidan funded al Qaeda via the hawala system, with cash transferred from the IIRO HQ in Saudi Arabia and via the Peshawar branch of the Habib Bank." *See* Comras Rpt. at 24 (ECF No. 9251-1).

431. Jamal al Fadl's deposition in this MDL was noticed for October 11, 2019. Ex. # 108, Jamal al Fadl Subpoena, dated August 7, 2019.

432. The deposition was placed on hold, and Jamal al Fadl did not appear for his noticed deposition. Ex. # 109, Email from Andrew Krause to Bruce Strong *et al*., dated September 17, 2019 (confirming service of deposition subpoena).

**Discovery**

433. In this course of this litigation, MWL and IIRO produced nearly 500,000 pages of responsive records to Plaintiffs. January 5, 2018 Declaration of Waleed Nassar, ECF No. 3857-3, ¶ 3.

434. This production includes:

a. Hundreds of thousands of pages of financial records, including financial reports, internal financial records, balance sheets, budgets, banking records, donors, aid recipients, audits, and underlying documents. *Id.* ¶ 16.

b. Over 64,000 pages of bank records. *Id.* ¶ 17.

c. Fifty audits covering the time period 1992-2004. *Id.* ¶ 18.

d. Over 100,000 pages of audit records. *Id.* ¶ 21.

e. Approximately 9,500 pages of documents related to Abd Al Hamid Sulaiman Al-Mujil. *Id.* ¶ 23.

f. Approximately 5,000 pages of documents relating to Wael Jelaidan and Muhamad Jamal Khalifa. *Id.* ¶ 23.

g. Over 21,000 pages of documents relating to the government of the Kingdom of Saudi Arabia. *Id.* ¶ 26.

435. Plaintiffs deposed 8 facts witnesses, including Al-Turki, Al-Obaid, and Basha.

436. Plaintiffs and MWL and IIRO proffered 11 experts who produced reports, rebuttal reports, and declarations, and were deposed.

437. Plaintiffs did not take any 30(b)(6) depositions of MWL or IIRO.