# Exhibit B

# Corrected Rule 56.1 Statement of Material Facts in Support of Defendant International Islamic Relief Organization's Motion for Summary Judgment (Redlined)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03-MD-01570 (GBD)(SN)<br>ECF Case<br>**ORAL ARGUMENT REQUESTED** |

This document relates to:

*Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.*, 02-cv-06977
*Gladys H. Salvo, et al. v. Al Qaeda Islamic Army, et al.*, 03-cv-05071
*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279
*Maher, et al. v. Islamic Emirate of Afghanistan a/k/a The Taliban, et al.*, 1:23-cv-02845

**CORRECTED**
**RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF DEFENDANT INTERNATIONAL ISLAMIC RELIEF ORGANIZATION'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

**International Islamic Relief Organization ("IIRO")** ... 1
**Muslim World League ("MWL")** ... 10
**Muhammad Jamal Khalifa ("Khalifa")** ... 12
**Abdul Hamid al-Mujil ("al-Mujil")** ... 21
**Wael Jelaidan** ... 24
**Jamal Al Fadl** ... 24
**Moro Islamic Liberation Front ("MILF")** ... 28
**Abu Sayyaf Group ("ASG")** ... 31
**Jemaah Islamiyah** ... 35
**Services Bureau** ... 37
**Al Qaeda** ... 38
**IIRO-Philippines** ... 44
**IIRO-Indonesia** ... 47
**IIRO Eastern Provinces** ... 52
**IIRO in the Balkans (IIRO-Sarajevo and IIRO-Kosovo)** ... 54
**IIRO-Pakistan** ... 62
**Employee Standards** ... 65
**IIRO Local and Foreign Offices and their Oversight** ... 66
- **IIRO Local Offices** ... 66
- **IIRO Foreign Offices** ... 67
- **Oversight of Local and Foreign Offices** ... 70

**IIRO Financial Controls and Audits** ... 72
**Identification Cards** ... 75
**1993 World Trade Center Bombing** ... 76
**Bojinka Plot** ... 77
**1998 Embassy Bombings** ... 79
**Indian Consulate Plot** ... 81
**USS Cole Bombing** ... 81
**September 11, 2001 Attacks** ... 82
**The Taliban** ... 82
**Bin Laden Publicly Opposed the Saudi Government and Twice Called on Individuals Not to Donate to Saudi-Affiliated Charities** ... 84
**Intelligence Reporting** ... 87

**Allegation IIRO Funded Training Camps** ........ 88
**9/11 Commission Report, 9/11 Commission Staff Monograph, and CIA Reports** ........ 89
**Treasury Department Designations** ........ 103
**Treasury Designation Memoranda** ........ 106
**Memorandum Concerning Designation of Adbul Hamid Al-Mujil ("Mujil")** ........ 106
**Memorandum Concerning Designation of IIRO-Philippines** ........ 107
**Memorandum Concerning Designation of IIRO-Indonesia** ........ 108
**Plaintiffs' Experts Rely on Press Releases Issued by the Office of Foreign Assets Control** ........ 108

In accordance with Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Defendant International Islamic Relief Organization ("IIRO") submits the following statement of material facts,[1] as to all of which there is no genuine issue to be tried:

**International Islamic Relief Organization ("IIRO")**

1. Plaintiffs have no evidence that IIRO had any foreknowledge of or were involved in the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011 ("After nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 Commission Report[2] which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'"); *see generally* 9/11 Commission Report.

2. Plaintiffs have no evidence tracing IIRO funds to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Plaintiffs' Second Supplemental Responses to Defendant Dubai Islamic Bank's Second Set of Requests for Admission dated April 23, 2022 (ECF No. 8129-22) at 27 (Request No. 8) ("Plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from the International Islamic Relief Organization's account at DIB to specific operational expenditures incurred in carrying out the 9/11 operation."); March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 9 ("Plaintiffs present no evidence that individuals or entities [including IIRO] used money from these DIB accounts to fund al Qaeda or carry out 9/11. Indeed, Plaintiffs have

[1] Numbered exhibits cited herein refer to the numbered exhibits to the Declaration of Aisha Bembry filed in support of this motion.

[2] The 9/11 Commission Report, Final Report of the National Commission on Terrorist Attacks upon the United States (2004), *available at* http://www.9-11commission.gov/report/911Report.pdf.

no evidence that funds in any account at Dubai Islamic Bank were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 terrorist attacks.") (internal citations and quotation marks omitted); *see also* Ex. 18, Expert Report of Vahid Brown ("Brown Rpt.") at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); Expert Report of Jonathan M. Winer ("Winer Rpt.") (ECF No. 7344-1) at 82-100, 116-22 (failing to trace any funds from IIRO to the planning, carrying out, or financing of the 9/11 Attacks); Expert Report of Evan Francois Kohlmann ("Kohlmann Rpt.") (ECF No. 9250-2) ¶¶ 71-157 (same); Expert Report of Dr. Matthew Levitt ("Levitt Rpt.") (ECF 9250-33) at 32-39 (same); *The Road to 9/11: The September 11 Terrorist Attack on the World Trade Center* ("Jenkins Rpt.") (ECF No. 7344-3) (same); Ex. 19, Kohlmann Dep. Tr. at 434:23-439:15 (admitting his report erroneously stated that "Fayez Ahmed Alshehri, one of the September 11 airline hijackers, reportedly told his father he was going to go work for the IIRO and never saw his family again," and that the identified individual was not even a 9/11 hijacker); Ex. 20, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph on Terrorist Financing: Staff Report to the Commission ("Monograph");[3] *see also* Ex. 21, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the 9/11 Commission Report does not name IIRO or MWL as charities which supported al Qaeda).

3. Plaintiffs have no evidence tracing in-kind support from IIRO to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Winer Rpt. at 82-100, 116-22 (failing to trace any in-kind support from IIRO to the planning or execution of the 9/11 Attacks); Kohlmann Rpt. ¶¶ 71-157 (same); Levitt Rpt. at

[3] Nat'l Comm'n on Terrorist Attacks Upon the U.S., Monograph on Terrorist Financing: Staff Report to the Commission (2004), *available at* https://govinfo.library.unt.edu/911/staff_statements/911_TerrFin_Monograph.pdf.

32-39 (same); Jenkins Rpt. (same); Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* Ex. 9/11 Commission Report; Monograph; *see also* Ex. 21, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the 9/11 Commission Report does not name IIRO or MWL as charities which supported al Qaeda).

4. Plaintiffs have no evidence tracing funds from IIRO to Al Qaeda. *See generally* 9/11 Commission Report; Monograph; *see* ECF No. 8129-22 at 27; ECF No. 8911 at 9; *see also* Ex. 18, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); Ex. 21, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda).

5. Plaintiffs have no evidence tracing in-kind support from IIRO to Al Qaeda. *See generally* 9/11 Commission Report; Monograph; *see also* Ex. 21, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda).

6. The 9/11 Commission Report did not conclude that IIRO, directly or indirectly through any other charity or entity, provided funds to Al Qaeda. *See generally* 9/11 Commission Report; Monograph; *see also* Ex. 21, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda).

7. The Muslim World League ("MWL") established IIRO in 1978, Saudi Arabia. Ex. 2, First Turki Decl. ¶ 14; Ex. ~~3~~11, ~~First~~ Second Obaid Decl. ¶ 12; Ex. 47, 1998 IIRO Constitution, at MWL 039326; Ex. 39, 2002 IIRO Constitution, at IIRO-000025.

8. IIRO's Head Office (or headquarters) is in Jeddah, Saudi Arabia. Ex. 4, May 21, 2024 Basha Decl. ¶ 3; Ex. 5, Helles Decl. ¶ 2; Ex. 6, Sarhan Decl. ¶ 2.

9. IIRO was established to provide general humanitarian aid to impoverished people, regardless of race or creed, and to provide emergency aid in response to crises and natural disasters. Ex. ~~2~~10, ~~First~~ Second Turki Decl. ¶ 14; Ex. ~~3~~11, Second ~~First~~ Obaid Decl. ¶ 12; Ex. 4, May 21, 2024 Basha Decl. ¶ 5; Ex. 5, Helles Decl. ¶ 3; *see* Ex. 42, 2000-2001 Annual Report at IIRO-004447 (noting over 1.7 million patients visited IIRO health facilities worldwide in 2000-2001); ); Ex. 41, 2001-2002 Annual Report at IIRO-004516 ("[IIRO] has always insisted on extending health care, emergency relief, and social welfare assistance to people from all walks of life, regardless of race or creed. In fact, IIROSA has been acclaimed internationally, for not using creed or race as a basis of discriminating between people in need.").

10. IIRO was frequently brought into large-scale humanitarian disaster areas and enjoyed an outstanding reputation for its work. Ex. 5, Helles Decl. ¶ 3; Ex. 6, Sarhan Decl. ¶ 4. Ex. 43, 1999-2000 Annual Report, at IIRO-003622 (describing IIRO's response in Turkey following devastating earthquake); Ex. 44, 1998 Annual Report, at IIRO-003726 (describing IIRO's response in refugee camps in Azerbaijan for persons displaced by the Nagorno-Karabakh conflict).

11. At all relevant times, IIRO, an international aid organization affiliated with the United Nations, provided humanitarian relief all over the world and emergency relief and sustainable development in various countries. Ex. 4, May 21, 2024 Basha Decl. ¶ 5; Ex. 5, Helles Decl. ¶ 3; Ex. 6, Sarhan Decl. ¶ 4. Ex. 42, 2000-2001 Annual Report, at IIRO-004483-84 (reflecting UN cooperation), IIRO-004489-4504. (describing relief work all over the world, including, for example, in Uganda). Since 1995 IIRO has been in special consultative status with

the United Nations Economic and Social Council. Ex. 4, May 21, 2024 Basha Decl. ¶ 5; Ex. 79, U.N. Sec. Gen., List of non-governmental *organizations in consultative status with the Economic and Social Council as of 31 December 2022*, U.N. Doc. E/2023/INF/5 (Apr. 4, 2023), at 85. Special consultative status is reserved for non-governmental organizations that "have a special competence in, and are concerned specifically with . . . a few of the fields of activity covered by the Council and its subsidiary bodies, and…are known within the fields…." Ex. 80, U.N. Economic and Social Council Res. 1996/31, Part III, ¶ 23 (July 25, 1996). These fields are "international economic, social, cultural, educational, health, and related matters" and "promoting respect for, and observance of, human rights and fundamental freedoms for all," Ex. 81, U.N. Charter, art. 62, ¶¶ 1-2, as well as helping advise the U.N. Peacebuilding Commission in supporting development in countries emerging from conflict. *See* Ex. 82, G.A. Res. 60/180, The Peacebuilding Commission, ¶¶ 12(b), 17 (Dec. 20, 2005); Ex. 83, G.A. Res. 61/16, Strengthening the Economic and Social Council, ¶¶ 20-23 (Jan. 9, 2007).

12. To meet its mission to provide services to individuals impacted by natural disasters, IIRO provided emergency relief, including clothing, medicine, and shelter, care for orphaned children, educational support, health care, vocational training, and mosque construction. Ex. 4, May 21, 2024 Basha Decl. ¶ 5; Ex. 5, Helles Decl. ¶ 3; Ex. 6, Sarhan Decl. ¶ 4; Ex. 43, 1999-2000 Annual Report, at IIRO-003596-97; Ex. 44, 1998 Annual Report, at IIRO-003718; Ex. 39, 2002 IIRO Constitution, at IIRO-000027.

13. For example, after the devastating earthquake that struck northwestern Turkey on August 17, 1999, IIRO worked with the Saudi Arabian Red Crescent Society to ship 112,145 kg (or 123 tons) of rice, blankets, water canisters, medicine, and wheelchairs to the victims. Ex. 43, 1999-2000 Annual Report, at IIRO-003622.

14. In partnership with the German charity HELP, IIRO operated three refugee camps in Azerbaijan for persons displaced by the Nagorno-Karabakh conflict since the early 1990s. It paid 189 teachers to provide daily schooling to approximately 2,279 children in these camps. Ex. 44, 1998 Annual Report, at IIRO-003726-27. IIRO also cooperated with the American charity VISION to renovate residential buildings at the camps, and provided 88,690 kg (or 97 tons) of food, blankets, and other relief items to refugees in Azerbaijan. *Id.* at IIRO-003726.

15. IIRO also maintained ongoing relief and human development operations in poverty-stricken areas unconnected with particular natural disasters or wars. For example, in Uganda IIRO ran two dispensaries and a medical institute, built the Al-Afia polyclinic, sponsored 2,295 orphans, funded a sewing center and computer center to provide vocational training to local students, and distributed free meals during the holy month of Ramadan to 20,000 people. Ex. 42, 2000-2001 Annual Report, at IIRO-004447, IIRO-004478, IIRO-004494. Below is a photo of a doctor handing medicine to a patient at the IIRO-built Al-Afia polyclinic:




Ex. 42, 2000-2001 Annual Report at IIRO-004447.

16. About 1,711,938 patients visited IIRO health facilities worldwide in 2000-2001. *Id.*

17. In Afghanistan, IIRO operated the Al-Bukhari orphanage in Jalalabad which housed 500 orphans of both sexes, operated hospitals in Khost and Jalalabad and ten clinics, and implemented inoculation and anti-malaria programs and established a center for tuberculosis. Ex. 44, 1998 Annual Report, at IIRO-003744; Ex. 43, 1999-2000 Annual Report, at IIRO-003658-59; Ex. 42, 2000-2001 Annual Report, at IIRO-004489-90. In 2000-2001 these health care programs benefitted 251,825 people in Afghanistan. *Id.* at IIRO-004449. That year IIRO also provided free meals at Ramadan to 95,000 people in Afghanistan. *Id.* at IIRO-004479. The following year, IIRO dug 23 surface wells for a nearby population of 46,000 people. Ex. 41, 2001-2002 Annual Report, at IIRO-004604.

18. In the Philippines, IIRO operated the Jabir bin Abdullah orphanage which housed 120 orphans, and it ran two dispensaries and a clinic, subsidized a maternity home in Manila, and dug eight surface wells. Ex. 44, 1998 Annual Report, at IIRO-003745; Ex. 41, 2001-2002 Annual Report, at IIRO-004609.

19. In Bangladesh in 2000-2001, IIRO sponsored five orphanages and 1,513 orphans; dug 147 wells benefitting 97,800 people; operated seven health care programs benefiting 32,257 people; subsidized the Asma Abu Bakr tailoring center in Dhaka to provide vocational training to poor students; and distributed free food to over 60,000 persons. Ex. 42, 2000-2001 Annual Report, at IIRO-004435, IIRO-004443, IIRO-004449, IIRO-004474, IIRO-004479, IIRO-004490. Below is a photo of the IIRO-subsidized tailoring center:



A tailoring center established by IIROSA in Bangladesh.

*Id.* at 4474.

20. IIRO fundraised on its own behalf, and individual donors supplied IIRO with its primary source of funding. Ex. 4, May 21, 2024 Basha Decl. ¶ 5; Ex. 5, Helles Decl. ¶ 37.

21. IIRO did not use the hawala system. Ex. 6, Sarhan Decl. ¶ 29.

22. IIRO established offices within and outside of Saudi Arabia. IIRO local offices were located inside of Saudi Arabia, and IIRO foreign offices were located outside of Saudi Arabia. IIRO had approximately 50 offices within the Kingdom of Saudi Arabia and abroad and engaged in humanitarian activities in more than 120 countries. Ex. ~~3~~11, Second ~~First~~ Obaid Decl. ¶ 13; Turki Decl. ¶ 15; Ex. 5, Helles Decl. ¶ 6.

23. IIRO had 18 branch offices in Saudi Arabia. Ex. 41, 2001-2002 Annual Report at IIRO-004518. The domestic branch offices in turn created sub-offices. *Id.* Prominent branch offices included the ones for Al-Baha; Gizan; Al-Jouf; Riyadh; the Eastern Region;, the Asir Region; Buraidah, Unaiza, Madina; Yanbu; Makkah; Jeddah; Taif; Najran; and finally the Women's Committee based in Jeddah. 1998 Annual Report, at IIRO-003722, IIRO-003752; Ex. 43, 1999-2000 Annual Report, at IIRO-003600-08; Ex. 42, 2000-2001 Annual Report, at IIRO-004410-16; Ex. 41, 2001-2002 Annual Report, at IIRO-004518-23).

24. IIRO had 32 foreign offices, one each in Mauritania, Senegal, Burkina Faso, Benin, Nigeria, Mali, Niger, Chad, Sudan, Egypt, Ethiopia, Uganda, Kenya, Tanzania, Somalia, Djibouti,

Iraqi Kurdistan, Lebanon, Jordan, UAE, Azerbaijan, Turkey, Pakistan, Bangladesh, Thailand, Sri Lanka, Indonesia, the Philippines, Albania, Croatia, Austria, and Bosnia Herzegovina. Ex. 44, 1998 Annual Report, at IIRO-003740-41, IIRO-003743-47; Ex. 43, 1999-2000 Annual Report at IIRO-003682-85, IIRO-003697). Multiple representative offices could form a single foreign office in a country; for instance, IIRO-Philippines had a main office in Manila and three regional offices. Daguit Decl. ¶ 8.

25. Of IIRO's 32 foreign offices, eight were located at the same address as an MWL foreign office. They were located in Djibouti, Ethiopia, Indonesia, Jordan, Kenya, Pakistan, Philippines, and Tanzania. Ex. 48, IIRO Secretariat General Report 1421/1422H at IIRO341007-09.

26. IIRO worked with other international relief organizations, including the United Nations High Commission on Refugees ("UNHCR") and the International Conference of Red Cross ("ICRC") and Red Crescent Societies. Ex. 311, Second First Obaid Decl. ¶ 13; Ex. 210, Second First Turki Decl. ¶ 15; Ex. 42, 2000-2001 Annual Report, at IIRO-004483-84 (reflecting UN cooperation), IIRO-004485 (reflecting participation in conference of International Federation of Red Crescent and Red Cross Societies).

27. The position of Secretary General was the most senior role in IIRO. Ex. 4, May 21, 2024 Basha Decl. ¶ 3; Ex. 47, 1998 IIRO Constitution, at MWL 039329 (Secretary General is "the chief of the executive body of organization and responsible for its performance"); Ex. 39, 2002 IIRO Constitution, at IIRO-000042 (same).

28. The Secretary General and his advisors, Assistant Secretaries General, and the various departments and their directors formed the Secretariat General/Head Office. The

Secretariat General was the main executive body of IIRO. Ex. 5, Helles Decl. ¶ 5; Ex. 6, Sarhan Decl. ¶ 2.

29. Adnan Basha, Ph.D., served as Secretary General of IIRO from 1997 until 2013. Ex. 4, May 21, 2024 Basha Decl. ¶ 3.

30. As Secretary General of IIRO, Adnan Basha managed IIRO's operations, supervised all department directors, and exercised oversight and control over IIRO through his oversight of the directors of IIRO's various departments. During Adnan Basha's tenure, IIRO employed approximately 1,000 employees across its offices. Ex. 4, May 21, 2024 Basha Decl. ¶ 6.

31. While very familiar with IIRO's activities and operations, Adnan Basha was not involved in every single aspect of IIRO's day-to-day operations due to IIRO's large size and variety of work. Ex. 4, May 21, 2024 Basha Decl. ¶ 6.

32. Of the items found in Bin Laden's compound, a comprehensive search of the names of IIRO and MWL in their Arabic names, as well as popular short-hand Arabic versions of their names, turned up no significant hits beyond mentions of these organizations in general publications or newspapers. Ex. 18, Brown Rpt. at 91.

**Muslim World League ("MWL")**

33. An international Islamic non-governmental organization involved in charitable projects around the world, MWL is, and was at all relevant times, based in Saudi Arabia. Ex. ~~2~~10, Second ~~First~~ Turki Decl. ¶ 4; Ex. ~~3~~11, Second ~~First~~ Obaid Decl. ¶ 4; Ex. 4, May 21, 2024 Basha Decl. ¶ 4; Ex. 9, Al-Hassani Decl. ¶ 3; Ex. 40, 2002 MWL Statute, at JT-MWL 00040.

34. MWL was founded in 1962, is headquartered in Makkah, Kingdom of Saudi Arabia, and operates approximately 30 offices and cultural centers throughout the world. Ex. ~~2~~10, Second ~~First~~ Turki Decl. ¶ 4; Ex. ~~3~~11, Second ~~First~~ Obaid Decl. ¶ 4; Ex. 4, May 21, 2024 Basha Decl. ¶ 4;

Ex. 9, Al-Hassani Decl. ¶ 9 ("The Secretariat General established offices outside of the Kingdom of Saudi Arabia ('Foreign Offices') as needed to pursue MWL's objectives."); Ex. 40, 2002 MWL Statute, at JT-MWL 00040.

35. Secretaries General of MWL served as the *ex officio* Chair of the IIRO Board of Directors. Ex. 210, Second First Turki Decl. ¶ 14; Ex. 311, Second First Obaid Decl. ¶ 12; Ex. 4, May 21, 2024 Basha Decl. ¶ 7; Ex. 39, 2002 IIRO Constitution, at IIRO-000024; Ex. 47, 1998 IIRO Constitution, at MWL 039326.

36. When serving as the *ex officio* Chair of the IIRO Board of Directors, the MWL Secretary General was one of many members of the board, ranging from 12 to 24 over the years. Ex. 102, Second First Turki Decl. ¶ 18; Ex. 47, 1998 IIRO Constitution at MWL-039328; Ex. 44, 1998 Annual Report at IIRO-003718; Ex. 43, 1999-2000 Annual Report at IIRO-003597; Ex. 70, IIRO BOD Meeting in 2000, at MWLIIRO-16243-44; Ex. 42, 2000-2001 Annual Report at IIRO-004407; Ex. 39, 2002 IIRO Constitution at IIRO-000033.

37. Abdullah Naseef, Ph.D. served as Secretary General of MWL from 1983 to 1993. Ex. 7, 2026 Fawzi Decl. ¶ 10; Ex. 63, Decision Ending Secondment of Abdullah Naseef (Aug. 1993), MWL-059188.

38. Abdullah bin Saleh Al-Obaid, Ph.D, served as Secretary General of MWL from 1996 to 2000. Ex. 311, Second First Obaid Decl. ¶ 3.

39. In 2000, MWL Secretary General Abdullah bin Saleh Al-Obaid completed his term as Secretary General of MWL and thus left his board position at IIRO. Ex. 113, Second First Obaid Decl. ¶ 16.

40. Abdullah bin Abdul Mohsen Al-Turki, Ph.D, served as Secretary General of MWL from 2000 to 2016. Ex. 210, Second First Turki Decl. ¶ 3; Ex. 22, Turki Dep. Tr. at 66:4-9 (*Errata*).

41. In 2016, MWL Secretary General Abdullah bin Abdul Mohsen Al-Turki completed his term as Secretary General of MWL and thus left his board position at IIRO. Ex. ~~10~~2, First ~~Second~~ Turki Decl. ¶ 23.

42. Despite being Chairman of the IIRO Board, the MWL Secretary General did not control or supervise IIRO's day-to-day operations, had only a high-level of involvement with IIRO's operations, and did not have a role in IIRO's day-to-day operations. Ex. ~~10~~2, First ~~Second~~ Turki Decl. ¶ 18; Ex. ~~11~~3, First ~~Second~~ Obaid Decl. ¶ 10; Ex. 4, May 21, 2024 Basha Decl. ¶ 7; Ex. 23, Obaid Dep. Tr. at 311:18-312:2.

**Muhammad Jamal Khalifa ("Khalifa")**

43. Plaintiffs have no evidence that Muhammad Jamal Khalifa had any foreknowledge or was involved in the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; *see generally* 9/11 Commission Report; Monograph.

44. Plaintiffs have no evidence tracing funds from Muhammad Jamal Khalifa for the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at EO14040-000011; Ex. 20, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph.

45. Plaintiffs have no evidence tracing in-kind support from Muhammad Jamal Khalifa to the planning or for the execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Winer Rpt. at 82-100, 116-22 (failing to show any in-kind support from IIRO or other charities to the planning or execution of the 9/11 Attacks); Kohlmann Rpt. ¶¶ 31-32, 107-21 (same); Levitt Rpt. (same); Jenkins Rpt. (same); Ex. 20, Levitt

Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph.

46. Plaintiffs have no evidence tracing funds from IIRO through Jamal Khalifa to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021), at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from IIRO to the planning or execution of the 9/11 Attacks); Kohlmann Rpt. ¶¶ 27-70 (same); Levitt Rpt. at 29-35 (same); Jenkins Rpt. (same); Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see also* Ex. 18, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); ECF No. 8911 at 9; ECF No. 8129-22 at 27; *see generally* 9/11 Commission Report; Monograph.

47. Plaintiffs have no evidence that IIRO was aware of or had knowledge before 9/11 of any connection between Muhammad Jamal Khalifa and Al Qaeda. *See* Ex. 4, May 21, 2024 Basha Decl. ¶¶ 23-27, 29, 32-33; Ex. 6, Sarhan Decl. ¶ 30; Ex. 5, Helles Decl. ¶¶ 24-25, 28-32, 34-35, 38-43; *id.* ¶ 43 (no knowledge of any support by IIRO or anyone within IIRO to Al Qaeda or other terrorist organizations); Ex. 6, Sarhan Decl. ¶ 30; Ex. 18, Brown Rpt. at 7-8, 63 (review of primary sources shows no evidence that IIRO or MWL supported Al Qaeda); *id.* ¶ 40; U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list (reflecting that OFAC never designated Khalifa).

48. Plaintiffs have no evidence that IIRO was aware of or had knowledge before 9/11 of any connection between Muhammad Jamal Khalifa and the Moro Islamic Liberation Front ("MILF"). *See* Ex. 4, May 21, 2024 Basha Decl. ¶ 41 (no knowledge of assistance by IIRO/IIRO Philippines to MILF); Ex. 8, Daguit Decl ¶ 34 (no knowledge of connection between IIRO Philippines and MILF); Ex. 5, Helles Decl. ¶ 43 (no knowledge of any support by IIRO or anyone within IIRO to Al Qaeda or other terrorist organizations); Ex. 18, Brown Rpt. at 40; U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list (reflecting that OFAC never designated Khalifa).

49. Plaintiffs have no evidence that IIRO was aware of or had knowledge before 9/11 of any connection between Muhammad Jamal Khalifa and Abu Sayyaf Group ("ASG"). Ex. 8, Daguit Decl ¶ 33 (no connection between IIRO Philippines and ASG); Ex. 5, Helles Decl. ¶ 43 (no knowledge of any support by IIRO or anyone within IIRO to Al Qaeda or other terrorist organizations); U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list (reflecting that OFAC never designated Khalifa).

50. Muhammad Jamal Khalifa was Director then Supervisor of IIRO-Philippines from 1988 to 1993; he did not return to IIRO or have any association with IIRO after his departure. Ex. 69, Letter accepting MJK resignation, IIRO 287370; Ex. 12, Chaouat Decl. ¶ 64; Ex. 8, Daguit Decl. ¶ 20, Ex. 4, May 21, 2024 Basha Decl. ¶ 78.

51. Muhammad Jamal Khalifa was demoted from Director of the IIRO-Philippines office to Supervisor in September 1992. Ex. 8, Daguit Decl. ¶ 20.

52. After 1992, Mr. Khalifa was no longer a signatory on the IIRO-Philippines financial accounts and he had no authority to disburse funds. Ex. 8, Daguit Decl. ¶ 20.

53. Muhammad Jamal Khalifa resigned from IIRO in the fall of 1993. Ex. 12, Chaouat Decl. ¶ 64; Ex. 8, Daguit Decl. ¶ 20; Ex. 69, Letter accepting MJK resignation, IIRO 287370 (Date is [illegible]/4/1414, which converts to September/October 1993); Ex. 4, May 21, 2024 Basha Decl. ¶ 78.

54. While working for IIRO, Muhammad Jamal Khalifa had several independent, purely private side business projects that had no relationship to IIRO. Ex. 8, Daguit Decl. ¶ 23; Ex. 58, Letter from IIRO Supervisor to MWL Secretary General and President of the IIRO Founding Council providing Khalifa's employment history with IIRO and distinguishing between Khalifa's personal projects and IIRO, IIRO-003014-17; Ex. 59, Letter from Zakaria Mohamed Shaikh to IIRO Supervisor noting lack of a relationship between IIRO and Khalifa's Dar-ul-Imam Al-Shafi'i and his employees and distinguishing between that institute and IIRO's similarly named orphanage, IIRO-002997.

55. For those projects, Muhammad Jamal Khalifa operated his own businesses, employed his own staff, and utilized his own funds. Ex. 8, Daguit Decl. ¶ 23.

56. These projects were not part of Muhammad Jamal Khalifa's duties as a director at IIRO. Ex. 8, Daguit Decl. ¶ 23.

57. These projects were not carried out with the authorization, direction, or participation of, at the behest of, or on behalf of IIRO. Ex. 8, Daguit Decl. ¶ 23.

58. One of Muhammad Jamal Khalifa's personal projects was the Islamic Research and Information Center ("IRIC"). Ex. 8, Daguit Decl. ¶ 24; Ex. 58, Letter from IIRO Supervisor to MWL Secretary General and President of the IIRO Founding Council providing Khalifa's

employment history with IIRO and distinguishing between Khalifa's personal projects and IIRO, IIRO-003014-17; Ex. 59, Letter from Zakaria Mohamed Shaikh to IIRO Supervisor noting lack of a relationship between IIRO and Khalifa's Dar-ul-Imam Al-Shafi'i and his employees and distinguishing between that institute and IIRO's similarly named orphanage, IIRO-002997.

59. IRIC focused on proselytization to non-Muslim Filipinos. Ex. 8, Daguit Decl. ¶ 24; Ex. 58, Letter from IIRO Supervisor to MWL Secretary General and President of the IIRO Founding Council providing Khalifa's employment history with IIRO and distinguishing between Khalifa's personal projects and IIRO, IIRO-003014-17.

60. IRIC's propagation work differed from that of MWL, which restricted itself to general propagation of Islam to Muslim populations, not attempted conversion of non-Muslims like the IRIC. Ex. 8, Daguit Decl. ¶ 24.

61. As part of the IRIC, Muhammad Jamal Khalifa operated an educational institute called the Dar Ul-Imam Al-Shafee Center in Marawi. Ex. 8, Daguit Decl. ¶ 25.

62. The Dar Ul-Imam Al-Shafee Center in Marawi shares a similar name with the IIRO-funded and operated Dar Ul-Imam Al-Shafee Orphanage in Zamboanga City, but the two organizations are completely separate, and IIRO did not fund or sponsor Dar Ul-Imam Al-Shafee Center. Ex. 8, Daguit Decl. ¶ 25; Ex. 57, Letter describing the difference between IIRO's Dar Ul Imam Al Shafi'i Orphanage and MJK's Dar Ul Imam Al Shafi'i Center for preachers, IIRO-001954-55; Ex. 49, Report on IIRO Philippines Accomplishments, MWL 8434-53.

63. The IIRO provided support for the education of orphans at the Dar Ul-Imam Al-Shafee Orphanage in Zamboanga City. Ex. 24, Daguit Dep. Tr. at 46:10-48:1; Ex. 49, Report on IIRO Philippines Accomplishments, MWL 8434-8453.

64. Dar Ul-Imam Al-Shafee was named after a local imam who passed away. Ex. 24, Daguit Dep. Tr. at 57:5-16.

65. Another of Muhammad Jamal Khalifa's personal projects was Khalifa Trading Industry ("KTI"), which manufactured Ratan chairs and tables. Ex. 8, Daguit Decl. ¶ 26.

66. This separate business occupied much of Khalifa's time and took him on many international trips. He sold furniture to Indonesia, Singapore, Thailand, and many other countries. Ex. 8, Daguit Decl. ¶ 26.

67. Muhammad Jamal Khalifa's side projects did not support or further IIRO's operations in the Philippines. Ex. 8, Daguit Decl. ¶ 28.

68. IIRO did not claim or represent that Muhammad Jamal Khalifa's side projects were IIRO-related, IIRO-supported, or IIRO-authorized. Ex. 8, Daguit Decl. ¶ 28.

69. There was no cross utilization of staff between IIRO and any of Khalifa's personal organizations, including KTI, IRIC, or Dar Ul-Imam Al-Shafee Center. Ex. 8, Daguit Decl. ¶ 27; Ex. 58, Letter from IIRO Supervisor to MWL Secretary General and President of the IIRO Founding Council providing Khalifa's employment history with IIRO and distinguishing between Khalifa's personal projects and IIRO, IIRO-003014-17; Ex. 59, Letter from Zakaria Mohamed Shaikh to IIRO Supervisor noting lack of a relationship between IIRO and Khalifa's Dar-ul-Imam Al-Shafi'i and his employees and distinguishing between that institute and IIRO's similarly named orphanage, IIRO-002997.

70. There was no cross utilization of personnel between MWL and any of Khalifa's personal organizations, including KTI, IRIC, or Dar Ul-Imam Al-Shafee Center. Ex. 8, Daguit Decl. ¶ 27.

71. No MWL or IIRO funds were disbursed to any of Khalifa's personal projects, including KTI, IRIC, or Dar Ul-Imam Al-Shafee Center. Ex. 8, Daguit Decl. ¶ 27.

72. Daguit did not recall Muhammad Jamal Khalifa advocating that Muslims in the Philippines should engage in armed jihad or discussing issues relating to armed jihad during the period that Abdulhadi Daguit knew Muhammad Jamal Khalifa. Ex. 24, Daguit Dep. Tr. at 28:23-29:6.

73. From his resignation in 1993 until his death in 2007, Muhammad Jamal Khalifa did not return to IIRO and had no connection whatsoever with IIRO, through IIRO-Philippines, or otherwise. Ex. 12, Chaouat Decl. ¶ 64; Ex. 69, Letter accepting MJK resignation, IIRO 287370 (Date is [illegible]#/4/1414, which converts to September/ October 1993); Ex. 24, Daguit Dep. Tr. at 23:1-12; 28:5-10; Expert Report of Professor John T. Sidel ("Sidel Rpt.") (ECF No. 7351-5) ¶ 15; Ex. 4, May 21, 2024 Basha Decl. ¶ 78; Ex. 8, Daguit Decl. ¶ 21.

74. Muhammad Jamal Khalifa was not designated by or subject to sanctions administered by the U.S. Office of Foreign Assets Control or the United Nations Security Council. U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 10, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list.

75. Muhammad Jamal Khalifa was friends with Osama Bin Laden in their youths, married one of Bin Laden's sisters, and went to Pakistan in the late 1980s. Ex. 18, Brown Rpt. at 42.

76. In the latter half of the 1980s Muhammad Jamal Khalifa went to Pakistan to support the Services Bureau where he opposed Bin Laden's decision to split from the Services Bureau and confronted him about the same, leading to the two men's separation." Ex. 18, Brown Rpt. at 42.

77. Muhammad Jamal Khalifa's "name does not appear on either of the two internal lists of [Al Qaeda] members from the late 1990s captured in Afghanistan. The only items that mention his name in [Bin Laden's] Abbottabad compound are two newspaper articles about his death in 2007 and a letter from an uncertain author to one Shaykh Yunis where at one point, discussing the deteriorating security conditions and the prevalence of gangs and robberies in some African countries, the letter says 'perhaps you heard about the murder of Jamal Khalifa in Madagascar, God have mercy on him, at the hands of a gang of armed robbers, as mentioned in the media.'" Ex. 18, Brown Rpt. at 43.

78. The primary sources identified in the expert report of Vahid Brown do not evidence a relationship between Al Qaeda and Muhammad Jamal Khalifa in the Philippines. Ex. 18, Brown Rpt. at 40, 42; see also *id.* at 7-8 (discussing methodology and describing primary sources).

79. After his tenure with IIRO, Muhammed Jamal Khalifa was arrested in the United States in 1994. Ex. 69, Letter accepting MJK resignation, IIRO 287370 (Date is [illegible]#/4/1414, which converts to September/ October 1993); Ex. 18, Brown Rpt. at 43; Ex. 8, Daguit Decl. ¶ 21.

80. When arrested in 1994 in the United States, Muhammad Jamal Khalifa was not employed by IIRO and he had no connection whatsoever to IIRO-Philippines. Ex. 8, Daguit Decl. ¶ 21; Ex. 69, Letter accepting MJK resignation, IIRO 287370.

81. The Jordanian individuals, including Abdullah Hashaikeh, allegedly implicated in 1993 bombings in Jordan were never IIRO-Philippines employees. Ex. 8, Daguit Decl. ¶ 29; Ex. 58, Letter from IIRO Supervisor to MWL Secretary General and President of the IIRO Founding Council providing Khalifa's employment history with IIRO and distinguishing between Khalifa's personal projects and IIRO, IIRO-003014-17; Ex. 59, Letter from Zakaria Mohamed Shaikh to

IIRO Supervisor noting lack of a relationship between IIRO and Khalifa's Dar-ul-Imam Al-Shafi'i and his employees and distinguishing between that institute and IIRO's similarly named orphanage, IIRO-002997.

82. After his 1994 arrest in the United States, Muhammed Jamal Khalifa was deported to Jordan. Ex. 8, Daguit Decl. ¶ 21.

83. Muhammed Jamal Khalifa had been tried in absentia and convicted for involvement in a theater bombing in Jordan. Ex. 18, Brown Rpt. at 43.

84. After his deportation to Jordan, Muhammed Jamal Khalifa was then retried and acquitted. Ex. 18, Brown Rpt. at 43.

85. Muhammed Jamal Khalifa has never been charged or convicted of any crime in any country, terrorism related or otherwise, other than the Jordanian conviction and acquittal. Ex. 18, Brown Rpt. at 43.

86. Muhammed Jamal Khalifa was never designated by or subject to sanctions administered by OFAC. U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 10, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list.

87. Abdulhadi Daguit had a purely professional, not a personal relationship with Muhammad Jamal Khalifa and has no knowledge as to the basis of OFAC's characterization of himself as a trusted associate of Muhammad Jamal Khalifa. Ex. 8, Daguit Decl. ¶ 22.

88. Abdulhadi Daguit did not have a relationship with Khalifa apart from their work at IIRO. Ex. 8, Daguit Decl. ¶ 22.

89. To Abdulhadi Daguit's knowledge, Muhammad Jamal Khalifa never returned to the IIRO-Philippines after the reversal of his conviction and release from custody in Jordan. Ex. 8, Daguit Decl. ¶ 21.

**Abdul Hamid al-Mujil ("al-Mujil")**

90. Plaintiffs have no evidence showing that Abdul Hamid al-Mujil had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; *see generally* 9/11 Commission Report; Monograph.

91. Plaintiffs have no evidence tracing funds from Abdul Hamid al-Mujil to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph.

92. Plaintiffs have no evidence tracing in-kind support from Abdul Hamid al-Mujil to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; *see generally* 9/11 Commission Report; Monograph.

93. Plaintiffs have no evidence tracing funds from IIRO through Abdul Hamid al-Mujil to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021), at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from IIRO to the planning or execution of the 9/11 Attacks); Kohlmann Rpt. ¶¶ 27-70 (same); Levitt Rpt. at 29-35 (same); Jenkins Rpt. (same); Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see also* Ex. 18, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising

or moving money."); ECF No. 8911 at 9; ECF No. 8129-22 at 27; *see generally* 9/11 Commission Report; Monograph.

94. Plaintiffs have no evidence that IIRO was aware of or had knowledge before 9/11 of any connection between Abdul Hamid Al-Mujil and Al Qaeda. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 23-27, 29, 32-33, 80; Ex. 6, Sarhan Decl. ¶ 30; Ex. 5, Helles Decl. ¶¶ 24-25, 28-32, 34-35, 38-43; *id.* ¶ 38 ("During my tenure [at IIRO]…. I did not observe and was not made aware of any behavior by Dr. Abdul Hamid al-Mujil that suggested he supported Al Qaeda's mission or that he was assisting Al Qaeda in any way, financially or otherwise."); *id.* ¶ 43 (no knowledge of any support by IIRO or anyone within IIRO to Al Qaeda or other terrorist organizations). *See* Additional Designation of Individuals and Entities Pursuant to Executive Order 13224, 71 Fed. Reg. 45,599 (Aug. 9, 2006).

95. Plaintiffs have no evidence that IIRO was aware of or had knowledge before 9/11 of any connection between Abdul Hamid Al-Mujil and MILF. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 23-27, 29, 32-33, 80; Ex. 6, Sarhan Decl. ¶ 30; Ex. 5, Helles Decl. ¶¶ 24-25, 28-32, 34-35, 38-43; *id.* ¶ 43 (no knowledge of any support by IIRO or anyone within IIRO to Al Qaeda or other terrorist organizations). *See* Additional Designation of Individuals and Entities Pursuant to Executive Order 13224, 71 Fed. Reg. 45,599 (Aug. 9, 2006).

96. Plaintiffs have no evidence that IIRO was aware of or had knowledge before 9/11 of any connection between Abdul Hamid Al-Mujil and ASG. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 23-27, 29, 32-33, 80; Ex. 6, Sarhan Decl. ¶ 30; Ex. 5, Helles Decl. ¶¶ 24-25, 28-32, 34-35, 38-43; *id.* ¶ 43 (no knowledge of any support by IIRO or anyone within IIRO to Al Qaeda or other terrorist organizations). *See* Additional Designation of Individuals and Entities Pursuant to Executive Order 13224, 71 Fed. Reg. 45,599 (Aug. 9, 2006).

97. Abdul Hamid al-Mujil worked in IIRO's Eastern Province branch office in Saudi Arabia ("IIRO-EP") from 1989 to 2006. Ex. 13, May 4, 2023 Basha Decl. ¶ 10; Ex. 5, Helles Decl. ¶ 38.

98. During most of his tenure, Abdul Hamid al-Mujil was the office's Executive Director, working under Prince Turki bin Fahad bin Jalawi. Ex. 13, May 4, 2023 Basha Decl. ¶ 10.

99. Prince Turki bin Fahad bin Jalawi was the IIRO-EP office's General (or Regional) Supervisor, and he oversaw the IIRO-EP office until June 29, 2003. Ex. 4, May 21, 2024 Basha Decl. ¶ 63; Ex. 13, May 4, 2023 Basha Decl. ¶ 10; Ex. 25, Basha Dep. Tr. at 271:7-18; Ex. 64, Administrative Decision No. 5 dated 28/6/1424 AH, IIRO 287391.

100. Abdul Hamid al-Mujil became acting manager or the Acting Director of IIRO-EP on June 29, 2003 by administrative order. Ex. 25, Basha Dep. Tr. at 272:21-273:12; Ex. 64, Administrative Decision No. 5 dated 28/6/1424 AH, IIRO 287391; Ex. 13, May 4, 2023 Basha Decl. ¶¶ 10-11; Ex. 4, May 21, 2024 Basha Decl. ¶ 63.

101. Abdul Hamid al-Mujil was designated by OFAC on July 20, 2006. *See* Additional Designation of Individuals and Entities Pursuant to Executive Order 13224, 71 Fed. Reg. 45,599 (Aug. 9, 2006).

102. After Abdul Hamid al-Mujil's designation, IIRO investigated the publicly available allegations accompanying the 2006 designation. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 81-82.

103. For the investigation, IIRO reviewed all internal records relating to IIRO-EP., reviewed all of IIRO-EP's administrative files, financial statements, and other papers, and reviewed all staff files, including Abdul Hamid al-Mujil's file. Ex. 22, Al-Turki Dep. Tr. at 280:15-281:14 (*Errata*); Ex. 25, Basha Dep. Tr. at 276:21-277:12; Ex. 4, May 21, 2024 Basha Decl. ¶ 82.

104. The IIRO investigation could not verify, or find any support for, the publicly available allegations concerning purported funding for or support to Al Qaeda or any other terrorist organization by Abdul Hamid al-Mujil. Ex. 4, May 21, 2024 Basha Decl. ¶ 83; Ex. 25, Basha Dep. Tr. at 277:3-12.

105. When IIRO questioned Abdul Hamid al-Mujil, he denied the publicly available allegations, including that he provided donor funds to Al Qaeda. Ex. 25, Basha Dep. Tr. at 276:21-277:12, 278:7-13.

106. None of the more than 500,000 documents captured in the raid on Bin Laden's compound in Abbottabad, reference or mention Abdul Hamid al-Mujil or the "million dollar man." Ex. 18, Brown Rpt. at 91.

107. Abdul Hamid al-Mujil is not named in either of the internal lists of Al Qaeda members from the late 1990s. *Id.*

108. Abddul Hamid Al-Mujil was delisted by the United Nations Security Council in 2013. Ex. 4, May 21, 2024 Basha Decl. ¶ 81.

**<u>Wael Jelaidan</u>**

109. Wael Jelaidan was never an IIRO employee. Ex. 4, May 21, 2024 Basha Decl. ¶ 77.

**<u>Jamal Al Fadl</u>**

110. Jamal al Fadl was a Sudanese member of Al Qaeda. Ex. 18, Brown Rpt. at 72.

111. Jamal al Fadl was a minor figure in Bin Laden's circle. *Id.* at 77. Al Fadl approached the U.S. Government, in 1996, falsely portraying himself as a Sudanese dissident before disclosing his association with Al Qaeda. *Id.* at 73.

112. Jamal al Fadl became a paid informant for the U.S. government in 1996, receiving living expenses for himself and his family. *Id.*

113. Jamal al Fadl became a paid informant for the U.S. government only after Bin Laden discovered that he was embezzling funds. 9/11 Commission Report at 62 ("Then Bin Ladin discovered that Fadl had skimmed about $110,000, and he asked for restitution. Fadl resented receiving a salary of only $500 a month while some of the Egyptians in al Qaeda were given $1,200 a month. He defected and became a star informant for the United States."); *see also* Ex. 18, Brown Rpt. at 72 (stating that, in the mid-1990s, a joint audit by the Bin Ladin organization and the National Islamic Front (NIF) government of Sudan discovered that Al Fadl had embezzled funds from both entities).

114. Jamal al Fadl offered false information to U.S. agents and others, including:

a. Claiming to have trained with Ramzi Yousef before admitting that he never met Ramzi Yousef (*id.* at 73);

b. Describing Al Qaeda in Sudan as a distinct entity, the Islamic Army, and later explaining that it was just one of two names for Al Qaeda and that Al Qaeda ultimately was chosen (*id.* at 74);

c. Misidentifying members of Al Qaeda's shura council (*id.* at 75);

d. Falsely claiming to witness the death of Abu'l-Abbas al-Madani by gunshot wound to the head in Afghanistan when Abu'l-Abbas al-Madani actually died in Bosnia (*id*. at 79);

e. Falsely claiming that Abdallah Anas was a member of Al Qaeda (*id*. at 79-80);

f. Making a series of erroneous claims during testimony claiming other militant groups were part of Al Qaeda, such as al-Gama'a al-Islamiyya in Egypt, which announced a cessation of military activity in Egypt in 1995

and abandoned violence altogether in 1999, the non-existent al-Gama'a al-Islamiyya in Algeria, Libyan Islamic Fighting Group, which focused on toppling the Gaddhafi regime, and Yemeni Jannubi (*id*. at 75-77); and

g. Falsely claiming that Jalaluddin Haqqani – a commander of Yunis Khales who joined the Taliban in the late 1990s – was a commander under Gulbuddin Hekmatyar even though Khales and Hekmatyar were rivals and fought against each other after Khales joined the Taliban. (Ex. 17, Expert Report of Marc Sageman ("Sageman Rpt.") at 223-224).

115. The 9/11 Commission reported, in 2004, that the CIA obtained much of the early reporting on al Qaeda's financial situation and its structure from Jamal al Fadl. 9/11 Commission Report at 185. It reported that the CIA "knew relatively early, for example, about the loose affiliation of financial institutions, businesses, and wealthy individuals who supported extremist Islamic activities. *Much of the early reporting on al Qaeda's financial situation and its structure came from Jamal Ahmed al Fadl*…." *Id*.

116. Plaintiffs rely on Jamal al Fadl's assertion that "bin Ladin and al Qaeda used Wael Julaidan as the head of IIRO in Peshawar, Pakistan, to create ID cards for al Qaeda people so that they could cross the Pakistan-Afghanistan border without a problem." Winer Rpt. ¶ 12.19.3.

117. Plaintiffs rely on a 1996 document stating that "a clandestine source" alleged that "IIRO helps fund six militant training camps in Afghanistan." *See* Winer Rpt. ¶¶ 6.6.10.3 (quoting 1996 document), 7.3.4.3 (referring to same document but altering statement to refer to "*terrorist* training camps"); *see also* Kohlmann Rpt. ¶ 83 (referring to same document and altering reference to refer to "7 Al-Qaida training camps"); Levitt Rpt. at 36 (referring to same document and altering reference to refer to "six al-Qa'ida training camps").

118. Jamal al Fadl is believed to be the "clandestine" informant who is quoted in the 1996 document as stating that "IIRO helps fund six militant training camps in Afghanistan." *See* Winer Rpt. ¶¶ 6.6.10.3, 7.3.4.3 (drawing connection between al Fadl and clandestine source).

119. Plaintiffs rely on Jamal al Fadl's assertion that described the "involvement of Islamic charities as interwoven into al Qaeda." Winer Rpt. ¶ 7.4.6.

120. Plaintiffs rely on Jamal al Fadl's accusation that "the head of IIRO in Peshawar as a 'good friend' of bin Ladin who 'would contribute funds or contacts' to specific al Qaeda operations." Winer Rpt. ¶ 7.4.6.

121. Plaintiffs rely on Jamal al Fadl's accusation that "IIRO was used to provide cover documents for al Qaeda by giving them documentation falsely stating that they were relief workers, so that they could get visas to travel 'to England, or if you want to go to anywhere in the world." Winer Rpt. ¶ 7.4.6.

122. Plaintiffs rely on Jamal al Fadl's assertion that "Usama Bin Laden identified several prominent international Muslim charities as the primary sources of Al-Qaida financial and fundraising activity." Kohlmann Rpt. ¶ 21.

123. Plaintiffs rely on Jamal al Fadl's accusation that "IIRO ran an Al-Qaida guesthouse in Peshawar, Pakistan." Kohlman Rpt. ¶ 77.

124. Plaintiffs rely on Jamal al Fadl's assertion that a scrap of paper was the "Golden Chain" list, which included IIRO personnel, of "wealthy individuals…who provided Bin Laden and Al Qaeda with money on a regular basis." Kohlmann Rpt. ¶ 156.

125. Plaintiffs rely on Jamal al Fadl's accusation that the "manager and person who ran the IRO [sic] at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani… Julidan was one of Bin Laden's closest friends at the time." Kohlmann Rpt. ¶ 77 (citations omitted).

126. Plaintiffs rely on Jamal al Fadl's accusation that "Julaidan also went by the name Abu Hassan al Madani. … While working for the IIRO, Julaidan funded al Qaeda via the hawala system, with cash transferred from the IIRO HQ in Saudi Arabia and via the Peshawar branch of the Habib Bank." *See* Expert Report of Victor D. Comras ("Comras Rpt.") (ECF No. 9251-1) at 24.

127. Plaintiffs rely on accusations made by Jamal al Fadl in his more than 10 interviews, which are summarized in various FBI 302 reports that are cited by Plaintiffs' experts. *See* Winer Rpt. at footnotes 49-51 (citing FBI 302 reports and Transcript Excerpts from Videotape Interviews of Jamal al Fadl); *see also* Kohlmann Rpt. at footnotes 105-106 (citing FBI 302 reports).

128. Jamal al Fadl's deposition in this MDL was noticed for October 11, 2019. The deposition was placed on hold, and al Fadl did not appear for his noticed deposition. Ex. 91, Al Fadl Subpoena, dated August 7, 2019; *see also* Ex. 92, Email from Andrew Krause to Bruce Strong *et al*., dated September 17, 2019 (confirming service of deposition subpoena).

**Moro Islamic Liberation Front ("MILF")**

129. Plaintiffs have no evidence that the Moro Islamic Liberation Fund ("MILF") had any foreknowledge of or were involved in the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Winer Rpt. (failing to provide evidence that MILF had any knowledge or was involved in the planning or execution of the 9/11 Attacks); *see generally* 9/11 Commission Report; Monograph.

130. Plaintiffs have no evidence tracing MILF funds to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021), at EO14040-000011; Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph.

131. Plaintiffs have no evidence tracing in-kind support from MILF to the planning or for the execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph.

132. Plaintiffs have no evidence tracing funds from IIRO through MILF to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021), at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from IIRO to the planning or execution of the 9/11 Attacks); Kohlmann Rpt. ¶¶ 27-70 (same); Levitt Rpt. at 29-35 (same); Jenkins Rpt. (same); Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see also* Ex. 18, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); ECF No. 8911 at 9; ECF No. 8129-22 at 27; *see generally* 9/11 Commission Report; Monograph; Ex. 8, Daguit Decl. ¶ 34; Ex. 4, May 21, 2024 Basha Decl. ¶ 41.

133. The primary sources identified in the expert report of Vahid Brown do not indicate any connection between Al Qaeda and MILF, and there is no evidence that the MILF sought to promote Al Qaeda's agenda or support its activities in any way. Ex. 18, Brown Rpt. at 7-8, 40-41.

134. Plaintiffs have no evidence that IIRO was aware or had knowledge before 9/11 of any connection between the MILF and Al Qaeda. Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list; Ex. 18, Brown Rpt. at 40.

135. The MILF has never been designated by OFAC or as a Foreign Terrorist Organization by the Secretary of State. U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 10, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list; Ex. 18, Brown Rpt. at 40 ("The MILF has never been listed by the US government as a designated terrorist group.").

136. The primary sources identified in the expert report of Vahid Brown do not indicate any connection between Al Qaeda and the MILF, and MILF has long denied any connection to Al Qaeda. Ex. 18, Brown Rpt. at 7-8, 40.

137. The Moro National Liberation Front ("MNLF") emerged in the 1970s in the Philippines. Sidel Rpt. ¶¶ 41-42.

138. The MILF—an Islamist, separatist group in the Philippines—was formed in 1984 when its founder broke away from the MNLF. Sidel Rpt. ¶¶ 50-51.

139. Neither Adnan Basha nor IIRO has knowledge of any assistance (financial or otherwise) provided by IIRO Head Office or IIRO-Philippines to the MILF. Ex. 4, May 21, 2024 Basha Decl. ¶ 41.

140. During his tenure with IIRO-Philippines, from 1986 to 2006, Abdulhadi Daguit was not aware of any assistance provided by IIRO-Philippines to the MILF. Ex. 8, Daguit Decl. ¶¶ 3, 34.

141. During Abdulhadi Daguit's tenure with IIRO-Philippines, from 1986 to 2006, IIRO-Philippines did not implement projects with the MILF. Ex. 8, Daguit Decl. ¶¶ 3, 34.

142. Until the November 7, 1993 interim ceasefire agreement between the MNLF and the Government of the Philippines, the MILF had been the preferred and peaceful negotiating

partner of the Government. *See* Sidel Rpt. ¶¶ 54-55 ("Thus from the late 1980s through the early 1990s, an informal set of accommodations and understandings – if not a formal alliance – between the MILF and the Philippine government prevailed, with only occasional episodes of violence."); *see also* Interim Ceasefire Agreement Between the Government of the Republic of the Philippines and the Moro National Liberation Front with the Participation of the Organization of the Islamic Conference, UN Peacemaker (Nov. 7, 1993), https://peacemaker.un.org/en/node/9193.

143. MILF's more militant activities, including the establishment of armed groups and "camps," began after the 1993 reconciliation between MNLF and the Government. Sidel Rpt. ¶¶ 55-56.

144. The MILF employed a strategy of engaging with the secular Filipino state in order to win concessions for autonomy, which was at odds with the ideological and strategic orientation of Al Qaeda. Ex. 18, Brown Rpt. at 40.

**<u>Abu Sayyaf Group ("ASG")</u>**

145. Plaintiffs have no evidence that the Abu Sayyaf Group ("ASG") had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case, E014040-000011; Ex. 18, Brown Rpt. at 41 (Apart from a single visit to the Philippines by one al Qaeda member who videotaped his journey, no "primary sources indicate any pre-9/11 relationship between [al Qaeda] and ASG in terms of funding, cooperation, or the carrying out of attacks."); *id.* at 41-42 (explaining that only two relevant documents in Osama Bin Laden's Abbottabad compound mention ASG: one criticizes the MILF for its political efforts and perceived abandonment of jihad in contrast with ASG's commitment to jihad; the other is an essay from a Jordanian professor that notes that ASG has "no organizational connection with [Al Qaeda].").

146. Plaintiffs have no evidence tracing ASG funds to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case, (May 27, 2021) at E014040-000011; s*ee generally* 9/11 Commission Report; Monograph; Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); Ex. 18, Brown Rpt. at 41 (Apart from a visit by one al Qaeda member who videotaped his journey, no "primary sources indicate any pre-9/11 relationship between [al Qaeda] and ASG in terms of funding, cooperation, or the carrying out of attacks."); *id.* at 41-42 (explaining that only two relevant documents in Osama Bin Laden's Abbottabad compound mention ASG: one criticizes the MILF for its political efforts and perceived abandonment of jihad in contrast with ASG's commitment to jihad; the other is an essay from a Jordanian professor that notes that ASG has "no organizational connection with [Al Qaeda].").

147. Plaintiffs have no evidence tracing in-kind support from the ASG to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case, E014040-000011 (May 27, 2021); Ex. 18, Brown Rpt. at 41 (Apart from a visit by one Al Qaeda member who videotaped his journey, no "primary sources indicate any pre-9/11 relationship between [Al Qaeda] and ASG in terms of funding, cooperation, or the carrying out of attacks."); *id.* at 41-42 (explaining that only two relevant documents in Osama Bin Laden's Abbottabad compound mention ASG: one criticizes the MILF for its political efforts and perceived abandonment of jihad in contrast with ASG's commitment to jihad; the other is an essay from a Jordanian professor that notes that ASG has "no organizational connection with [Al Qaeda].").

148. Plaintiffs have no evidence tracing funds from IIRO through ASG to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021), at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from IIRO

to the planning or execution of the 9/11 Attacks); Kohlmann Rpt. ¶¶ 27-70 (same); Levitt Rpt. at 29-35 (same); Jenkins Rpt. (same); Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); ECF No. 8911 at 9; ECF No. 8129-22 at 27; *see also* Ex. 18, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); *see generally* 9/11 Commission Report; Monograph.

149. Plaintiffs have no evidence that IIRO was aware or had knowledge before 9/11 of any connection between ASG and Al Qaeda. Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list; Ex. 18, Brown Rpt. at 40.

150. Neither Adnan Basha nor IIRO had knowledge of any assistance (financial or otherwise) provided by either the IIRO Head Office or IIRO-Philippines to the Abu Sayyaf Group. Ex. 4, May 21, 2024 Basha Decl. ¶ 86.

151. The ASG was designated by OFAC pursuant to Executive Order 13224, effective September 24, 2001. *See* Exec. Order 13,224, 66 Fed. Reg. 49,079, 49,081, 49,083 (Sept. 25, 2001). The ASG was designated as a Foreign Terrorist Organization by the Secretary of State on October 8, 1997. 62 Fed. Reg. 52650 (Oct. 8, 1997).

152. The ASG was a local, religious sectarian group that emerged in the Philippines in the early-mid-1990s by attacking Christian missionaries and committing robberies and kidnappings around the Sulu Archipelago, the Zamboanga Peninsula, and elsewhere. Sidel Rpt. ¶¶ 60-62; Ex. 18, Brown Rpt. at 40.

153. ASG developed into a criminal gang, becoming "a largely criminal organization that has engaged in episodic acts of criminality, and that eventually morphed into – at least some of its members, into groups affiliated with the so-called Islamic State." Ex. 26, Sidel Dep. Tr. at 42:11-17; Sidel Rpt. ¶¶ 60-62; Ex. 18, Brown Rpt. at 40.

154. ASG was not focused on the United States or the West but enmeshed in local politics and local power structures. Sidel Rpt. ¶¶ 4-5, 65, 83, 99; Ex. 26, Sidel Dep. Tr. at 40:14-41:6.

155. There is considerable evidence of collusion and protection by Philippine government officials and evidence of involvement and of pecuniary gain on the part of Philippine military and intelligence officials regarding ASG. Ex. 26, Sidel Dep. Tr. at 99:15-100:2; *see* Sidel Rpt. ¶¶ 62, 97.

156. IIRO-Philippines did not have an office in the Tawi-Tawi region of the Philippines and thus could not employ an ASG intelligence officer as the provincial director of IIRO-Philippines there. Ex. 24, Daguit Dep. Tr. at 161:14-24.

157. IIRO-Philippines did not work with any individual associated with the ASG, and to Abdulhadi Daguit's knowledge, no individual connected with the ASG was ever employed or connected in any manner to IIRO-Philippines. Ex. 8, Daguit Decl. ¶ 33.

158. IIRO-Philippines did not provide any assistance to militants affiliated with the ASG or Al Qaeda in the Philippines. Ex. 8, Daguit Decl. ¶ 32.

159. To Abdulhadi Daguit's knowledge, no employee or IIRO branch (or representative) in the Philippines provided any assistance to any militants affiliated with the ASG or Al Qaeda in the Philippines. Ex. 8, Daguit Decl. ¶ 32.

**Jemaah Islamiyah**

160. Plaintiffs have no evidence that Jemaah Islamiyah had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. 18, Brown Rpt. at 7-8, 41 (Apart from a visit by one al Qaeda member who videotaped his journey, no "primary sources indicate any pre-9/11 relationship between [al Qaeda] and ASG in terms of funding, cooperation, or the carrying out of attacks."); *id.* at 41-42 (explaining that only two relevant documents in Osama Bin Laden's Abbottabad compound mention ASG: one criticizes the MILF for its political efforts and perceived abandonment of jihad in contrast with ASG's commitment to jihad; the other is an essay from a Jordanian professor that notes that ASG has "no organizational connection with [Al Qaeda].").

161. Plaintiffs have no evidence tracing Jemaah Islamiyah funds to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021), at EO14040-000011; Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph.

162. Plaintiffs have no evidence tracing in-kind support from Jemaah Islamiyah to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. 18, Brown Rpt. at 7-8, 41 (Apart from a visit by one al Qaeda member who videotaped his journey, no "primary sources indicate any pre-9/11 relationship between [al Qaeda] and ASG in terms of funding, cooperation, or the carrying out of attacks."); *id.* at 41-42.

163. Plaintiffs have no evidence tracing funds from IIRO through Jemaah Islamiyah funds to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021), at EO14040-000011; Winer Rpt. at 112-22 (failing

to trace any funds from IIRO to the planning or execution of the 9/11 Attacks); Kohlmann Rpt. ¶¶ 27-70 (same); Levitt Rpt. at 29-35 (same); Jenkins Rpt. (same); Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see also* Ex. 18, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); ECF No. 8911 at 9; ECF No. 8129-22 at 27; *see generally* 9/11 Commission Report; Monograph.

164. Plaintiffs have no evidence that MWL was aware or had knowledge before 9/11 of any connection between JI and Al Qaeda. Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list; Ex. 18, Brown Rpt. at 40.

165. Jemaah Islamiyah maintained an underground existence in Indonesia until 1999, and for the first time in 2002 internationalized its terrorist bombings. Sidel Rpt. ¶¶ 8, 78.

166. Jemaah Islamiyah was a Muslim separatist network based in Indonesia aimed at establishing an Islamic state and which used terrorist tactics. Sidel Rpt. ¶¶ 76-79.

167. Jemaah Islamiyah was not focused on the United States or the West. Sidel Rpt. ¶¶ 4-5, 83. As of early 2000, the Jemaah Islamiyah network's activities were focused on struggles, conflicts, and targets within Indonesia, and it was only in the aftermath of 11 September 2001 and amidst a dramatic downturn in Islamist fortunes in Indonesia and a US-inspired government crackdown on Islamist groups in the country that Jemaah Islamiyah turned to terrorist attacks focused on Western targets. Sidel Rpt. ¶¶ 77-79, 82, 113.

168. IIRO-Indonesia never provided any support to Jemaah Islamiyah. Ex. 14, Wardi Decl. ¶ 15; Ex. 27, Harbi Dep. Tr. at 49:18-50:8.

169. IIRO-Indonesia has never supported Jemaah Islamiyah, including by providing assistance with recruitment, transportation, logistics, and safe-havens, and did not work with any individual associated with Jemaah Islamiyah. Ex. 14, Wardi Decl. ¶ 15.

170. Neither Adnan Basha nor IIRO had knowledge of any assistance (financial or otherwise) provided by either the IIRO Head Office or IIRO-Indonesia to the Jemaah Islamiyah. Basha Decl. ¶ 87.

171. To Faiz Wardi's knowledge, no individual connected with Jemaah Islamiyah was employed by IIRO-Indonesia. Ex. 14, Wardi Decl. ¶ 15.

172. IIRO-Indonesia did not work with any individual associated with Jemaah Islamiyah and no individual connected with Jemaah Islamiyah was ever employed by IIRO-Indonesia. Ex. 14, Wardi Decl. ¶ 15.

173. Jemaah Islamiyah was designated by OFAC pursuant to Executive Order 13224, on October 17, 2002. Determination Pursuant to Section 1(b) of Executive Order 13224 Relating to Jemaah Islamiya (JI), 67 Fed. Reg. 66,034 (Oct. 29, 2002).

174. Jemaah Islamiyah was designated as a Foreign Terrorist Organization by the Secretary of State on October 16, 2002. Designation of Foreign Terrorist Organizations, 67 Fed. Reg. 65,168 (Oct. 23, 2002).

**Services Bureau**

175. Founded in the mid-1980s by Abdullah Azzam, the Services Bureau aimed to attract young Arab volunteers, train them and turn them into a military vanguard in the Afghan Jihad against the Soviet invasion of Afghanistan, doing so openly and even with the U.S.'s favor, which even provided Azzam for visas to tour the US in the late 1980s to further this goal. Ex. 16, Expert Report of Professor Olivier Roy ("Roy Rpt.") at 15; Ex. 18, Brown Rpt. at 11.

176. Abdullah Azzam founded the Services Bureau with Abd al-Rabb Rasul Sayyaf, then the leader of the union of Afghan Mujahidin parties, and Osama Bin Laden, who agreed to fund the organization. And Azzam led the Services Bureau until his assassination in November 1989, and the Bureau continued even after Azzam's death. *Id.* at 11-13.

177. Western nations, including the U.S., strongly supported the mujahideen with hundreds of millions of dollars, advanced weaponry, and American military advisers. Ex. 16, Roy Rpt. at 10-13.

178. The United States supported the mujahideen fighting the Soviet Union invasion of Afghanistan under Presidents Carter, Reagan, and Bush. Ex. 16, Roy Rpt. at 10-13; Ex. 21, Winer Dep. Tr. at 358:5-18, 362:21-25.

179. Wael Jelaidan, a member of the Services Bureau, was not known publicly as a member or founder of Al Qaeda, and broke with Bin Laden and stayed with the Services Bureau when Bin Laden left the Services Bureau to form Al Qaeda. Ex. 18, Brown Rpt. at 5, 20, 87-88, 90; Ex. 34, Roy Dep. Tr. at 143:9-145:4 (*Errata*).

180. Wael Jelaidan "was a prominent figure in the US-supported anti-Soviet war in Afghanistan in the 1980s, during which he worked with [the] Services Bureau – as did, for a time, Bin Lad[e]n and other people who would go on to hold leadership positions in al-Qa'ida." Ex. 18, Brown Rpt. at 88. Jelaidan remained with the Services Bureau after Osama Bin Laden split from the group. *Id.* at 90.

**Al Qaeda**

181. Neither Adnan Basha nor IIRO knowingly or tacitly employed members of Al Qaeda or individuals known as Al Qaeda sympathizers to work for or within IIRO. Ex. 4, May 21, 2024 Basha Decl. ¶ 27; Ex. 5, Helles Decl. ¶ 43; Ex. 6, Sarhan Decl. ¶ 30.

182. IIRO did not knowingly work with or employ any individual known to be associated with Al Qaeda or its affiliates. Ex. 4, May 21, 2024 Basha Decl. ¶ 32; Ex. 5, Helles Decl. ¶ 43; Ex. 6, Sarhan Decl. ¶ 30.

183. Applicants for employment with IIRO had to have a "clear history" certificate from the relevant government security entity. This certificate was required to ensure that IIRO's relief and humanitarian activities were not politicized by idealogues, parties, or political or Islamic groups, be they regional or international. Ex. 4, May 21, 2024 Basha Decl. ¶ 33.

184. IIRO did not have a relationship with Al Qaeda and did not support Al Qaeda or any other terrorist organization. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 25-26; Ex. 18, Brown Rpt. at 7-8, 63 (review of primary sources shows no evidence that IIRO or MWL supported Al Qaeda); Ex. 5, Helles Decl. ¶ 43.

185. Adnan Basha did not have a relationship with Al Qaeda and did not support Al Qaeda or any other terrorist organization. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 25-26; Ex. 18, Brown Rpt. at 7-8, 63 (review of primary sources shows no evidence that IIRO or MWL supported Al Qaeda); Ex. 5, Helles Decl. ¶ 43.

186. Neither IIRO nor Adnan Basha authorized or instructed, explicitly or implicitly, IIRO employees to provide any form of support, whether financial or otherwise, to Al Qaeda or any other terrorist organization. Ex. 4, May 21, 2024 Basha Decl. ¶ 24; Ex. 5, Helles Decl. ¶¶ 24-25, 28-32, 34- 35, 38-43.

187. Neither Adnan Basha nor IIRO has knowledge of any activities or financing that IIRO allegedly conducted or provided in support of Al Qaeda or any other terrorist organization. Ex. 4, May 21, 2024 Basha Decl. ¶ 23.

188. Adnan Basha has never agreed with Al Qaeda's aims or acts and has worked actively to counter Al Qaeda's ideology. Ex. 4, May 21, 2024 Basha Decl. ¶ 28.

189. Adnan Basha was never aware of any action taken by or behalf of IIRO to facilitate or support any terrorist organization or any acts of terrorism. Ex. 4, May 21, 2024 Basha Decl. ¶ 29.

190. Neither Adnan Basha nor IIRO has financed or supported Al Qaeda or its affiliates. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 30-31.

191. IIRO did not finance the establishment or operation of training facilities for use by al Qaeda or its associates, and IIRO did not provide Al Qaeda with assistance in recruitment, transportation, logistics, or safe havens. Ex. 4, May 21, 2024 Basha Decl. ¶ 32.

192. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha participated in nor directed anyone to participate in any activities intended to support Al Qaeda or any other terrorist organization. Ex. ~~11~~3, First ~~Second~~ Obaid Decl. ¶ 19; Ex. ~~10~~2, First ~~Second~~ Turki Decl. ¶ 24; Ex. 13, May 4, 2023 Basha Decl. ¶ 12.

193. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha has ever provided or directed anyone to provide any financing to or in support of Al Qaeda or any other terrorist organization. Ex. ~~11~~3, First ~~Second~~ Obaid Decl. ¶ 20; Ex. ~~10~~2, First ~~Second~~ Turki Decl. ¶ 25; Ex. 13, May 4, 2023 Basha Decl. ¶ 13.

194. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha has ever supported or instructed anyone else to support, explicitly or implicitly, Al Qaeda or any other terrorist organization. Ex. ~~11~~3, First ~~Second~~ Obaid Decl. ¶ 21; Ex. ~~10~~2, First ~~Second~~ Turki Decl. ¶ 26; Ex. 13, May 4, 2023 Basha Decl. ¶ 14.

195. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha have ever intended to aid a terrorist attack or to support Al Qaeda. Ex. 113, Second First Obaid Decl. ¶ 22; Ex. 102, First Second Turki Decl. ¶ 27; Ex. 13, May 4, 2023 Basha Decl. ¶ 18.

196. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha agrees with, or have ever agreed with, Al Qaeda's or its affiliated terrorist organization's aims or acts. Ex. 113, First Second Obaid Decl. ¶ 24; Ex. 102, First Second Turki Decl. ¶ 29; Ex. 13, May 4, 2023 Basha Decl. ¶ 20.

197. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha knew Bin Laden. Ex. 113, First Second Obaid Decl. ¶ 25; Ex. 102, First Second Turki Decl. ¶ 30; Ex. 13, May 4, 2023 Basha Decl. ¶ 21.

198. Abdullah bin Saleh Al-Obaid, Abdullah bin Abdul Mohsen Al-Turki, and Adnan Basha worked actively to counter Osama Bin Laden's and Al Qaeda's and its affiliated terrorist organizations' ideologies and have denounced acts of terrorism, including those of September 11, 2001. Ex. 113, First Second Obaid Decl. ¶ 26; Ex. 102, First Second Turki Decl. ¶ 31; Ex. 13, May 4, 2023 Basha Decl. ¶ 22.

199. Shortly after September 11, 2001, Abdullah bin Saleh Al-Obaid and Adnan Basha appeared on Saudi television to condemn the 9/11 attacks. Ex. 113, First Second Obaid Decl. ¶ 26; Ex. 13, May 4, 2023 Basha Decl. ¶ 22.

200. Al Qaeda was founded in the late 1980s after Osama Bin Laden split from the Services Bureau, pulling his funding from the Services Bureau in 1988; Al Qaeda made no official claim at the time of its intention to attack the United States. Ex. 18, Brown Rpt. at 13, 21.

201. Bin Laden self-financed his activities at least until 1992. Ex. 16, Roy Rpt. at 2, 17.

202. In August 1996, Bin Laden released a lengthy message addressed to Muslims worldwide, "and particularly those in the Arabian peninsula" entitled "A declaration of jihad against the Americans occupying the Land of the Two Holy Sanctuaries [Saudi Arabia]." Ex. 18, Brown Rpt. at 54; Ex. 76, 1996 Osama Bin Laden Declaration of Jihad, BUR-PEC-026957-82.

203. The August 1996 message does not declare a jihad by Al Qaeda against Americans and is not a declaration of jihad against America. Ex. 18, Brown Rpt. at 55; Ex. 76, 1996 Osama Bin Laden Declaration of Jihad, BUR-PEC-026957-82.

204. The August 1996 message is focused on removing American troops from Saudi Arabia and criticizing the Saudi government for that presence, for failing to liberate Palestine, and for abandoning Islam. Ex. 18, Brown Rpt. at 55; Levitt Rpt. at 12; Ex. 76, 1996 Osama Bin Laden Declaration of Jihad, BUR-PEC-026957-82, at 026960 ("the regime has torn off its legitimacy [through] [s]uspension of the Islamic Shari'ah law and exchanging it with man made civil law…[and] [t]he inability of the regime to protect the country, and allowing…the American crusader forces[] to occupy the land"), 026964 ("there is no more important duty than pushing the American enemy out of the holy land"), 026970-71 (calling for boycott of American goods in response to occupation of Palestine).

205. In February 1998, Al Qaeda publicly declared from Afghanistan the "World Islamic Front" and called for the killing of Americans. Ex. 18, Brown Rpt. at 58; Levitt Rpt. at 12; Ex. 77, Bin Laden, Others Sign Fatwa to *"Kill Americans Everywhere",* Al Quds al-Arabi (Feb. 23, 1998), FED-PEC0279093-95.

206. The February 1998 statement declared that "to kill the Americans and their allies – civilian and military – is an individual duty incumbent upon every Muslim in all the countries, in order to liberate the al-Aqsa Mosque and the Holy Mosque from their grip, so that their armies

leave all the territory of Islam, defeated, broken, and unable to threaten any Muslim." Ex. 18, Brown Rpt. at 58; Ex. 77, FED-PEC0279093-95 at 279094.

207. Al Qaeda developed its interest in attacking the U.S. in 1998. Ex. 26, Sidel Dep. Tr. at 117:7-10; Levitt Rpt. at 12; Ex. 77, FED-PEC0279093-95 at 279094.

208. Al Qaeda was designated as a Foreign Terrorist Organization by the Secretary of State on October 8, 1999. Designation of Foreign Terrorist Organizations, 64 Fed. Reg. 55112 (Oct. 8, 1999).

209. The primary sources identified in the expert report of Vahid Brown do not provide evidence that IIRO supported Al Qaeda in any way. Ex. 18, Brown Rpt. at 7-8, 63.

210. Samir al-Hasan was never an employee of IIRO. Ex. 5, Helles Decl. ¶ 39.

211. Neither MWL nor IIRO had contacts with Arabs who went to fight in Bosnia. Ex. 23, Obaid Dep. Tr. at 268:23-270:7 (*Errata*).

212. IIRO and Al Qaeda have very different ideologies. Ex. 28, Gari Dep. Tr. 125:10-23.

213. No document has come to light from the nearly 500,000 documents collected in the Bin Laden Abbottabad raid suggesting the use of charities by Al Qaeda for raising or moving money. Ex. 18, Brown Rpt. at 62.

214. A comprehensive search of the names of IIRO and MWL within the Bin Laden Abbottabad compound documents – using their Arabic names, as well as popular short-hand Arabic versions of their names – turned up no significant hits beyond mentions of these organizations in general publications or newspapers found in Bin Laden's compound. Ex. 18, Brown Rpt. at 91.

**IIRO-Philippines**

215. IIRO-Philippines was established in Manila in 1986 and operated until 2006. Ex. 8, Daguit Decl. ¶ 2; Ex. 4, May 21, 2024 Basha Decl. ¶ 85.

216. Abdulhadi Daguit began working at IIRO-Philippines in 1986 as office secretary, was made acting director of IIRO-Philippines in 2005, and remained in that role until the office's closure in 2006. Ex. 8, Daguit Decl. ¶ 3.

217. Plaintiffs have no evidence that MWL was aware or had knowledge before 9/11 of any connection between Abdulhadi Daguit and Al Qaeda. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 23-27, 29, 32-33; Ex. 6, Sarhan Decl. ¶ 30; Ex. 5, Helles Decl. ¶¶ 24-25, 28-32, 34-35, 38-43; *id.* ¶ 43 (no knowledge of any support by IIRO or anyone within IIRO to Al Qaeda or other terrorist organizations); Ex. 6, Sarhan Decl. ¶ 30; Ex. 18, Brown Rpt. at 7-8, 63 (review of primary sources shows no evidence that IIRO or MWL supported Al Qaeda); *id.* ¶ 40; Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list.

218. Abdulhadi Daguit is now a governmental commissioner in the National Commission on Muslim Filipinos, which oversees the welfare of Muslims in the Philippines and reports to the Office of the President and has been a member, and a chairperson, of various governmental commissions in the Philippines. Ex. 8, Daguit Decl. ¶ 38; Ex. 24, Daguit Dep. Tr. at 9:6-10:15 (*Errata*).

219. Abdulhadi Daguit saw no evidence to support the notion that IIRO or its employees helped militants in the Philippines, and no similar allegation of support to militants in the Philippines by IIRO or its employees, including Mahmoud Afif or Mohammed Sabri Salamah, was brought to the attention of Abdulhadi Daguit by local authorities. Ex. 8, Daguit Decl. ¶ 32.

220. IIRO-Philippines granted scholarships to students. Ex. 24, Daguit Dep. Tr. at 32:3-33:5 (*Errata*).

221. IIRO-Philippines provided assistance by paying teacher salaries at a school in Zamboanga City. However, this school was not operated by the IIRO and was registered with the Department of Education of the Philippines. Ex. 24, Daguit Dep. Tr. at 32:3-33:5 (*Errata*).

222. IIRO's humanitarian efforts in the Philippines focused primarily on the provision of health clinics, orphanages, education scholarships (mostly secular in nature), emergency relief programs, and Ramadan meals, as well as the construction of mosques and wells. Ex. 8, Daguit Decl. ¶ 6.

223. IIRO-Philippines operated three main orphanages, one in Zamboanga City, one in Cotabato City, and one in Marawi City, all of which served hundreds of orphans. Ex. 8, Daguit Decl. ¶ 7.

224. There is no evidence in the primary sources identified in the expert report of Vahid Brown of any relationship between IIRO-Philippines and Al Qaeda. Ex. 18, Brown Rpt. at 5, 7-8, 90-91.

225. In 2006, the IIRO-Philippines office was designated by OFAC. Additional Designation of Individuals and Entities Pursuant to Executive Order 13224, 71 Fed. Reg. 45599, 45600 (Aug. 9, 2006).

226. OFAC de-designated the IIRO-Philippines office, effective August 16, 2016. Sanctions Actions Pursuant to Executive Order 13224, 81 Fed. Reg. 67431 (Sept. 30, 2016); Ex. 4, May 21, 2024 Basha Decl. ¶ 90.

227. The United Nations Security Council, the European Union, and the United Kingdom delisted the IIRO-Philippines office in January 2014. Ex. 4, May 21, 2024 Basha Decl. ¶ 90.

228. After the IIRO-Philippines office's designation, IIRO investigated the publicly available allegations accompanying the 2006 designation. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 81-82.

229. For the investigation, IIRO reviewed internal records relating to IIRO-Philippines, reviewed administrative files, financial statements, and other papers from the IIRO-Philippines, and reviewed IIRO-Philippines staff files. Ex. 22, Al-Turki Dep. Tr. at 280:15-281:14 (*Errata*); Ex. 25, Basha Dep. Tr. at 276:21-277:12; Ex. 4, May 21, 2024 Basha Decl. ¶ 82.

230. The IIRO investigation could not verify, or find any support for, the publicly available allegations concerning purported funding for or support to Al Qaeda or any other terrorist organization by IIRO-Philippines. Ex. 4, May 21, 2024 Basha Decl. ¶ 83; *see* Ex. 25, Basha Dep. Tr. at 277:3-12; Ex. 22, Al-Turki Dep. Tr. at 280:15-281:14 (*Errata*).

231. Mahmoud Abd al-Jalil Afif was never an IIRO-Philippines director. He was an IIRO representative who "did not control finances [or] have any access to IIRO's bank accounts." Ex. 5, Helles Decl. ¶ 41.

232. IIRO-Philippines remained operational after its designation and continued its operations before closing later in 2006. No one at either the IIRO Head Office, SA or IIRO-Philippines was ever approached by Philippine authorities concerning OFAC's allegations. Ex. 25, Basha Dep. Tr. at 276:21-277:17; Ex. 4, May 21, 2024 Basha Decl. ¶¶ 83, 85. IIRO-Philippines was registered with the government and opened again in 2011 but then closed on March 17, 2013. Ex. 4, May 21, 2024 Basha Decl. ¶ 85.

233. No allegations of support for terrorism were ever made by the authorities in relation to IIRO-Philippines during Abdulhadi Daguit's tenure at IIRO-Philippines. Ex. 8, Daguit Decl. ¶ 17.

234. Daguit is not aware of any instance when an IIRO-Philippines employee was ever arrested during his employment for any reason, be it for suspicion of terrorism or otherwise, prior to 9/11. Ex. 8, Daguit Decl. ¶ 18.

235. IIRO's Head Office took perceived accounting discrepancies or minor procedural deviations seriously and investigated all issues, ascertaining whether wrongdoing occurred and helping IIRO-Philippines to ensure that such issues would not repeat. Ex. 8, Daguit Decl. ¶ 16.

236. There is no evidence that the instances *of* non-compliance by IIRO-Philippines with Head Office protocols resulted in IIRO funds being diverted to Al Qaeda. Ex. 4, May 21, 2024 Basha Decl. ¶ 74.

237. Neither Adnan Basha nor IIRO was aware of or had knowledge of any evidence that IIRO-Philippines funded or supported Al Qaeda, its affiliates, or other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 23-27, 29, 32-33, 74; Ex. 6, Sarhan Decl. ¶ 30; Ex. 5, Helles Decl. ¶¶ 24-25, 28-32, 34-35, 38-43; *id.* ¶ 43 (no knowledge of any support by IIRO or anyone within IIRO to Al Qaeda or other terrorist organizations); Ex. 6, Sarhan Decl. ¶ 30; Ex. 18, Brown Rpt. at 5, 7-8, 63 (review of primary sources shows no evidence that IIRO or MWL supported Al Qaeda); *id.* at 90-91 (primary sources include no indication of a relationship between IIRO-Indonesia and Al Qaeda).

**<u>IIRO-Indonesia</u>**

238. IIRO Head Office audits of IIRO-Indonesia covering the years before and after 9/11 reveal no evidence of funding or support of Al Qaeda, its affiliates, or other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 68-69.

239. These IIRO Head Office audits were standard practice. Ex. 27, Harbi Dep. Tr. at 318:13-24 (*Errata*) ("The IIRO sends accountants and auditors to make sure that work at the office is going the way it should.").

240. While the audit results identified certain infractions and made some procedural recommendations as corrective actions, the results of the audits did not reveal any evidence of funding or support of Al Qaeda, its affiliates, or other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶ 69.

241. There is no evidence that the instances of non-compliance by IIRO-Indonesia with Head Office protocols resulted in IIRO funds being diverted to Al Qaeda. Ex. 4, May 21, 2024 Basha Decl. ¶ 70.

242. Neither Adnan Basha nor IIRO was aware or had knowledge of any evidence that IIRO-Indonesia funded or supported Al Qaeda, its affiliates, or other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶ 70; Ex. 18, Brown Rpt. at 5, 7-8, (review of primary sources shows no evidence that IIRO or MWL supported Al Qaeda); *id.* at 90-91 (primary sources include no indication of a relationship between IIRO-Indonesia and Al Qaeda).

243. IIRO-Indonesia was established in Jakarta, Indonesia, in 1990. Ex. 14, Wardi Decl. ¶ 2.

244. IIRO-Indonesia's humanitarian efforts in Indonesia focused primarily on the provision of health clinics, orphanages, emergency relief programs, and Ramadan meals, as well as the construction of mosques and wells. Ex. 14, Wardi Decl. ¶ 5.

245. During the period of 1992-2001, IIRO-Indonesia operated and funded over ten orphanages, which served approximately 1,500 orphans. Ex. 14, Wardi Decl. ¶ 6.

246. IIRO-Indonesia entered into a Memorandum of Understanding with the Indonesian Ministry of Religious Affairs in 2002, which was charged with ensuring that IIRO (and other NGOs) did not provide support for any political or sectarian activities. Ex. 14, Wardi Decl. ¶ 12.

247. The IIRO-Indonesia office often cooperated with the Indonesian government in the provision of relief projects, and IIRO-Indonesia officials worked with the appropriate Indonesian government offices and cooperated with them on aid distribution. Ex. 14, Wardi Decl. ¶ 21 .

248. No allegations of terrorism or support of militants were ever made by the authorities in relation to the IIRO office in Indonesia since Faiz Wardi's tenure began in 1992. Ex. 14, Wardi Decl. ¶ 13.

249. Faiz Wardi saw no evidence to support the notion that IIRO-Indonesia or its employees have helped militants, and no similar allegation has been brought to his attention regarding IIRO or its employees. Ex. 14, Wardi Decl. ¶ 16.

250. Faiz Wardi has personally experienced no legal issues with the Indonesian government since the office's closure; Faiz Wardi was neither interviewed nor arrested; and he can travel as he wishes, locally and internationally. Ex. 14, Wardi Decl. ¶ 23.

251. In 2006, the IIRO-Indonesia office was designated by OFAC. Additional Designation of Individuals and Entities Pursuant to Executive Order 13224, 71 Fed. Reg. 45599, 45600 (Aug. 9, 2006).

252. OFAC de-designated the IIRO-Indonesia office, effective August 16, 2016. Sanctions Actions Pursuant to Executive Order 13224, 81 Fed. Reg. 67431 (Sept. 30, 2016); Ex. 4, May 21, 2024 Basha Decl. ¶ 90.

253. The United Nations Security Council, the European Union, and the United Kingdom delisted the IIRO-Indonesia office in January 2014. Ex. 4, May 21, 2024 Basha Decl. ¶ 90.

254. After the IIRO-Indonesia office's designation, IIRO investigated the publicly available allegations accompanying the 2006 designation. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 81-82.

255. For the investigation, IIRO reviewed internal records relating to IIRO-Indonesia, reviewed administrative files, financial statements, and other papers from the IIRO-Indonesia, and reviewed IIRO-Indonesia staff files. Ex. 22, Al-Turki Dep. Tr. at 280:15-281:14 (*Errata*); Ex. 25, Basha Dep. Tr. at 276:21-277:12; Ex. 4, May 21, 2024 Basha Decl. ¶ 82.

256. The IIRO investigation could not verify, or find any support for, the publicly available allegations concerning purported funding for or support to Al Qaeda or any other terrorist organization by IIRO-Indonesia. Ex. 4, May 21, 2024 Basha Decl. ¶ 83; *see* Ex. 25, Basha Dep. Tr. at 277:3-12; Ex. 22, Al-Turki Dep. Tr. at 280:15-281:14 (*Errata*).

257. As a result of the OFAC designations, no penalties or adverse action was taken by the local Indonesian authorities. Ex. 4, May 21, 2024 Basha Decl. ¶ 83 ("As a result of the OFAC designations, no penalties or adverse action was taken by the local authorities and the Indonesia and Philippines offices remained opened and operational.").

258. After the 2006 designation of IIRO-Indonesia by OFAC, the office remained open because the government did not order its closure. No interviews, investigations, or arrests were ordered by the Indonesian government after the 2006 OFAC designation. Ex. 14, Wardi Decl. ¶ 22.

259. IIRO-Indonesia continued operating after the OFAC designation and was not approached by Indonesian authorities concerning the allegations in the OFAC designations. Ex. 25, Basha Dep. Tr. at 276:21-277:17; Ex. 4, May 21, 2024 Basha Decl. ¶¶ 83-84.

260. While IIRO-Indonesia continued to operate following the 2006 designations, it received two letters from high-ranking Indonesian officials in 2007, including from the Head of the Popular Shura Council in the Republic of Indonesia, indicating that since 1992 there have been no issues or allegations of impropriety against IIRO-Indonesia. Ex. 4, May 21, 2024 Basha Decl. ¶ 84; Ex. 60, Letter from Head of the Popular Shura Council in the Republic of Indonesia, IIRO35575.

261. The IIRO-Indonesia office closed in 2013. Ex. 14, Wardi Decl. ¶ 22.

262. The office closed because the memorandum of understanding with the Indonesian government expired. Ex. 27, Harbi Dep. Tr. at 355:15-356:3.

263. Audits of IIRO-Indonesia covering the years before and after 9/11 reveal no evidence of funding or support of Al Qaeda, its affiliates, or other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶ 68.

264. Audits of IIRO-Indonesia for FY 2002-2003, FY 2003-2004, and FY 2005-2006 reveal no evidence of funding or support of Al Qaeda, its affiliates, or other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶ 68; Ex. 86, Independent Auditor's Report for year ending June 30, 2003, IIRO-34944-82; Ex. 50, IIRO-Indonesia Review Report Period From May 1, 2005 to July 31, 2006, IIRO-004057-69; Ex. 65, Internal Auditor's report for FY 2003-2004, IIRO158082 to IIRO158091.

265. The FY 2002-2003 IIRO-Indonesia audit shows some violations of IIRO protocols such as using single rather than double entries in accounting, recording receipts from Head Office

in USD and not local currency, and failing to record currency differences. Ex. 66, FY 2002-2003 IIRO-Indonesia audit, IIRO 34989-35007.

266. The FY 2003-2004 IIRO-Indonesia audit shows violations of IIRO protocols such as not attaching official exchange rates, not translating bills, and some missing signatures. *See e.g.*, Ex. 45, FY 2003-2004 IIRO-Indonesia audit, IIRO151720-39; Ex. 65, Internal Auditor's report for FY 2003-2004, IIRO158082-91.

**IIRO Eastern Provinces**

267. IIRO maintained a branch office, the Eastern Province office ("IIRO-EP") in Dammam, Saudi Arabia. Ex. 4, May 21, 2024 Basha Decl. ¶ 63.

268. Through the IIRO Head Office's routine financial and administrative processes, it was revealed that IIRO-EP implemented certain projects in foreign countries without prior approval from Head Office, which was a violation of protocol requiring local and foreign offices to provide the Head Office departments of programs, sponsorships and finances with reports on all field projects that the local and foreign offices implemented. Ex. 4, May 21, 2024 Basha Decl. ¶ 64.

269. After identifying these violations, the Head Office warned the individuals involved and insisted that IIRO-EP seek prior approval as required by IIRO protocols. Ex. 4, May 21, 2024 Basha Decl. ¶ 64.

270. IIRO also commissioned external accountants to review IIRO-EP's operations, and they concluded that IIRO-EP was implementing and funding foreign projects without IIRO Head Office's prior approval, and that, in some circumstances, IIRO-EP failed to comply with various IIRO financial regulations, including that the foreign office receive funds from the Head Office and the requirement that the transactions be accompanied by all supporting documentation. Ex. 4, May 21, 2024 Basha Decl. ¶ 66.

271. There is no evidence that the instances of non-compliance by IIRO-EP with Head Office protocols resulted in IIRO funds being diverted to Al Qaeda. Ex. 4, May 21, 2024 Basha Decl. ¶ 67.

272. Neither Adnan Basha nor IIRO has knowledge of any evidence that IIRO-EP funded or supported Al Qaeda, its affiliates, or other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶ 67.

273. The investigation by the external accountants into IIRO-EP's operations did not reveal any evidence that the identified instances of non-compliance with Head Office protocols resulted in funds being diverted to Al Qaeda, its affiliates, or other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶ 66.

274. An IIRO internal audit of IIRO-EP, concluded that IIRO-EP acted independently without the IIRO Secretariat General's knowledge and in violation of IIRO's administrative and financial regulations by implementing projects abroad. Expert Report of John Barron ("Barron Rpt.") (ECF No. 9250-21) ¶¶ 41.2, 41.2.2; Ex. 25, Basha Dep. Tr. at 268:3-23, 271:24-273:8 (*Errata*).

275. IIRO-EP wanted to implement projects quickly to please donors and to avoid IIRO directives and regulations, which IIRO-EP considered bureaucratic and slow. Ex. 25, Basha Dep. Tr. at 265:21-267:5.

276. Prince Turki bin Fahad bin Jiluwi refused to comply with IIRO directives and to implement auditor recommendations. He therefore resigned from his position as Regional Supervisor, which resignation became effective on June 29, 2023. Ex. 25, Basha Dep. Tr. at 268:3-23, 271:24-273:8 (*Errata*); Ex. 64, Administrative Decision No. 5 dated 28/6/1424 AH, IIRO 287391; Ex. 4, May 21, 2024 Basha Decl. ¶¶ 63, 75.

277. Had Prince Turki bin Fahad bin Jiluwi not resigned, Adnan Basha would have terminated Prince Turki bin Fahad bin Jiluwi's employment. Ex. 4, May 21, 2024 Basha Decl. ¶ 63.

278. Abdul Hamid al-Mujil was assigned as the office's Acting Director after Prince Turki Bin Jalawi's departure. Ex. 4, May 21, 2024 Basha Decl. ¶ 63.

279. An audit concluded that Abdul Hamid al-Mujil had no role in IIRO-EP's violations of IIRO regulations that occurred under former Regional Supervisor Prince Turki bin Fahad bin Jiluwi. Ex. 25, Basha Dep. Tr. at 273:15-274:1.

**IIRO in the Balkans (IIRO-Sarajevo and IIRO-Kosovo)**

280. The Sarajevo office of the IIRO was established in December 1992, as were many other IIRO offices in the Balkans region. Ex. 29, Al-Shorman Decl. ¶ 2.

281. The offices in the region operated under a Balkans Regional Office. Ex. 29, Al-Shorman Decl. ¶¶ 7, 10, 12.

282. IIRO's humanitarian efforts in the Balkans focused primarily on orphan sponsorships and general aid distribution, such as food, clothing, and medicinal supplies, both in refugee camps and to the general public. Ex. 29, Al-Shorman Decl. ¶ 5.

283. IIRO-Sarajevo generally distributed in kind aid, except for orphan sponsorships of 50 Marks per person per month (approximately 30 US Dollars at the time). For ease of aid distribution, it was done from central locations, such as mosques, city halls, schools or even directly out of the warehouses. Ex. 29, Al-Shorman Decl. ¶ 6.

284. In April 1992, war broke out in Sarajevo and left the city under siege, cut off from the outside world. Ex. 30, Al-Shorman Dep. Tr. at 312:22-313:17; Ex. 29, Al-Shorman Decl. ¶ 10.

285. During the conflict, access to resources including food, water, and electricity in the city of Sarajevo was frequently interrupted and the city was subject to regular bombing. Ex. 30, Al-Shorman Dep. Tr. at 311:19-312:13, 312:22-313:2.

286. People in Sarajevo had limited contact with those outside of Sarajevo during the siege. Ex. 30, Al-Shorman Dep. Tr. at 352:15-22.

287. Travelling to and/or sending goods to Sarajevo was impossible at the beginning of the war because the "siege was from all directions." Ex. 30, Al-Shorman Dep. Tr. at 313:3-8.

288. Throughout the war, travel within Sarajevo was difficult and limited because one attempting travel could "face the snipers or bombs." Ex. 30, Al-Shorman Dep. Tr. at 315:10-15.

289. The siege made it extremely difficult to receive aid to distribute, as well as to communicate with the outside world, including with the Balkans Regional Office and its Supervisor and IIRO Head Office. Ex. 29, Al-Shorman Decl. ¶ 10.

290. Since the Serbian forces almost completely surrounded the city of Sarajevo during the war, aid was either brought in through a humanitarian tunnel or by the United Nations. Ex. 29, Al-Shorman Decl. ¶ 5.

291. The practical realities of aid distribution during wartime meant that at times certain Head Office protocols were impossible to follow. For example, when electricity was cut off in besieged Sarajevo, the employees could not use the office's computers to prepare or back up financial reports to the Head Office. Ex. 29, Al-Shorman Decl. ¶ 11; Ex. 30, Al-Shorman Dep. Tr. at 126:2-15. *See also id.* at 352:1-22 (*Errata*) (testifying that the siege of Sarajevo prevented IIRO-Sarajevo from coordinating with other IIRO operations in Bosnia-Herzegovina).

292. That such protocols were not followed at all times reflects the reality of relief work in war-torn countries. Ex. 29, Al-Shorman Decl. ¶ 11; *see also* Expert Report of Jonathan Benthall

On Behalf of Yassin Abdullah Kadi ("Benthall Rpt.") (ECF No. 7351-2) at 27 (Among the "practical management challenges faced by diversified international NGOs" which "operated in numerous countries, and carried out a wide variety of humanitarian services" was that "[c]ommunications were particularly challenging in war zones," and "any organization working with [so] many offices, and in [so] many countries…in the early and mid-1990s would have had difficulty in maintaining full control of its finances and operations.").

293. After the siege ended, however, IIRO-Sarajevo was able to resume normal communications with the Head Office, the Balkans Regional Office, as well as with other local operations both in Bosnia and in neighboring countries. Ex. 29, Al-Shorman Decl. ¶ 10.

294. IIRO-Sarajevo maintained a great relationship with the Bosnian government and worked closely with the Ministry of Social Welfare and Displaced Persons and Refugees ("Ministry of Social Welfare") during Abderraouf Khalaf Al Shorman's time with the organization. The Bosnian government always welcomed IIRO's operations in Sarajevo, especially during the war when it routinely asked for humanitarian assistance. IIRO-Sarajevo would provide aid after receiving the approval and the funds or items from the Head Office, sometimes distributing it with the help of the Bosnian Ministry of Social Welfare. After the war, IIRO-Sarajevo received the Golden Shield award from the Bosnian government for its role in serving the people of Bosnia during the war. Ex. 29, Al-Shorman Decl. ¶¶ 13-14.

295. The Sarajevo office was always keen on meeting the standards set by Bosnian law and never had any negative encounters with Bosnian officials. IIRO-Sarajevo always complied with the registration requirements in Bosnia, as was mandated by IIRO Head Office. Ex. 29, Al-Shorman Decl. ¶¶ 13, 15.

296. By 1996, charitable organizations in Bosnia were required to submit requests to the Ministry of Social Welfare in order to receive permits for their various projects. After the implementation of the projects, charitable organizations were also required to submit a report on the projects implemented. IIRO-Sarajevo complied with these requirements on a consistent basis. Ex. 29, Al-Shorman Decl. ¶ 16.

297. In addition to requiring the submission of reports, the Ministry of Social Welfare's Department of Control and Inspection also made surprise visits to the offices of NGOs. The surprise visits were random, but routine, and the information that was requested concerned whether organizations were complying with the laws requiring employers to provide benefits to their employees. IIRO was visited in 2000, 2001 and 2002 and always found in compliance. Ex. 29, Al-Shorman Decl. ¶ 17.

298. IIRO-Sarajevo also cooperated with the Ministry of Health on healthcare projects in the late 1990s and early 2000s. Ex. 29, Al-Shorman Decl. ¶ 18.

299. IIRO-Sarajevo and the Bosnian Ministry of Health entered into an agreement regarding a medical center in the mid-90s, whereby the government would provide the facilities and the salaries of the doctors and nurses, and IIRO-Sarajevo would provide the necessary equipment and medicinal supplies. This center offered many services, including in the specialties of ophthalmology, dentistry, internal medicine, pediatrics, and obstetrics and gynecology. Ex. 29, Al-Shorman Decl. ¶ 18.

300. IIRO-Sarajevo enjoyed a very strong regional reputation and a great working relationship with the Bosnian government. The Bosnian government repeatedly reached out to IIRO-Sarajevo for assistance before and after the 9/11 attacks. Ex. 29, Al-Shorman Decl. ¶ 19.

301. No IIRO-Sarajevo employee was ever arrested during their employment for any reason, be it for suspicion of terrorism or otherwise. Ex. 29, Al-Shorman Decl. ¶ 13.

302. The IIRO-Sarajevo office did not provide any assistance to the Arab foreign fighters—or to any fighters—engaged in the Bosnian conflict. Ex. 29, Al-Shorman Decl. ¶ 24.

303. To Abderraouf Khalaf Al Shorman's knowledge, no other IIRO Balkans office provided any assistance to Arab foreign fighters—or to any fighters—engaged in the Bosnian conflict. Ex. 29, Al-Shorman Decl. ¶ 24.

304. There is no evidence to support the claim that IIRO helped mujahideen enter Bosnia by paying for transportation and lodging or by masking them as its "employees." In fact, IIRO did not cover these expenses even for its own employees during this time. Ex. 29, Al-Shorman Decl. ¶ 24.

305. If there had been such an attempt to bring in fighters as "employees," it would have been an issue raised by the local authorities to the IIRO-Sarajevo office. During my tenure, the government raised no such concerns. Ex. 29, Al-Shorman Decl. ¶ 24.

306. At no time did the IIRO-Sarajevo office: (1) transport, or assist in the transport of, Al- Qaeda members whether in vehicles bearing the United Nations High Commissioner for Refugees license plates or otherwise; (2) engage in or assist in weapons smuggling into Bosnia; (3) provide employment for mujahideen or Al Qaeda members; (4) provide identification cards for mujahadeen or Al Qaeda members; or (5) support Maktab al-Khidamat. Nor is Abderraouf Khalaf Al Shorman aware of any other IIRO-Balkans office or employee having done so. Ex. 29, Al-Shorman Decl. ¶ 25.

307. Abderraouf Khalaf Al Shorman is unaware of MWL having any activities in Bosnia during the war. Ex. 29, Al-Shorman Decl. ¶ 23.

308. Neither the MWL nor IIRO had contacts with Arabs who went to fight in Bosnia. Ex. 23, Obaid Dep. Tr. at 268:23-270:7 (*Errata*).

309. The Federation of Bosnia and Herzegovina Ministry of Finance financial police undertook an investigation into a transfer of 80,000 German marks from IIRO to a Sarajevo bank account. Ex. 30, Al-Shorman Dep. Tr. at 284:17-285:16 (*Errata*).

310. This transfer was reportedly in connection with the purchase of a Jeep. Ex. 30, Al-Shorman Dep. Tr. at 284:17-285:16 (*Errata*).

311. The Bosnian financial police visited IIRO's office in Sarajevo to discuss a person of interest related to the Jeep investigation. Ex. 30, Al-Shorman Dep. Tr. at 285:2-16 (*Errata*).

312. Representatives from IIRO's Sarajevo office told the financial police that IIRO was not involved in nor aware of the transfer. Ex. 30, Al-Shorman Dep. Tr. at 285:13-16 (*Errata*).

313. Plaintiffs rely on a document to assert that nine Bosnian Serbs were arrested in July 2003 for allegedly smuggling weapons to IIRO. Kohlmann Rpt. ¶ 101; Ex. 30, Al-Shorman Dep. Tr. at 334:5-21.

314. Neither IIRO-Sarajevo nor the Bosnian authorities investigated these smuggling allegations, because they did not find the allegations sufficiently credible to warrant an investigation. Ex. 30, Al-Shorman Dep. Tr. at 335:16-336:11.

315. During the Kosovo war in the late 1990s, the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC") was established by the Government of the Kingdom of Saudi Arabia to consolidate and coordinate the collection of donations in Saudi Arabia–both from government and private entities–and the charitable work and disbursement of those donations to the people in need in the relevant region. Ex. 4, May 21, 2024 Basha Decl. ¶ 43.

316. The role of SJRC was to accept requests for assistance from the local government and to distribute the requests to the members of the SJRC so that the members may coordinate their humanitarian efforts amongst themselves so that there is no duplication in the assistance provided. Ex. 4, May 21, 2024 Basha Decl. ¶ 43.

317. All Saudi NGOs operating in Kosovo, including IIRO, were required to join this coordinating body to ensure that aid was being allocated evenly in the affected areas, and to reduce duplication of efforts by the Saudi NGOs. Ex. 4, May 21, 2024 Basha Decl. ¶ 44.

318. While the SJRC, in its coordinating role, at times assigned specific types of projects in specific locations to Saudi NGOs, including IIRO, it did not control the projects or operations of IIRO, nor did it interfere in IIRO's operations. Ex. 4, May 21, 2024 Basha Decl. ¶ 44.

319. The SJRC did not have the authority to bind IIRO to specific assignments. Ex. 4, May 21, 2024 Basha Decl. ¶ 44.

320. The SJRC routinely forwarded project requests from the local government to its member organizations with the capability to assist in that project. Ex. 4, May 21, 2024 Basha Decl. ¶ 30.

321. The IIRO office in Kosovo was located in the SJRC building, along with other NGOs, but the various organizations operated out of different sections of the building. Ex. 4, May 21, 2024 Basha Decl. ¶ 45.

322. As a tenant, IIRO paid rent to the SJRC for its lease of the offices. Ex. 4, May 21, 2024 Basha Decl. ¶ 45.

323. IIRO and the SJRC did not share common areas, and their offices had separate entrances. Ex. 31, Obaidi Dep. Tr. at 70:5-11.

324. Neither Adnan Basha nor IIRO had knowledge of any alleged activities or financing that the SJRC conducted or provided in support of Al Qaeda or any other terrorist organization. If any occurred, they were not approved tacitly or explicitly by either IIRO or Adnan Basha, who in any event did not have authority to approve or direct SJRC's spending and behavior. Ex. 4, May 21, 2024 Basha Decl. ¶ 42

325. In 2001, IIRO-Kosovo, based in Pristina, had a number of projects underway, including construction, building, humanitarian relief, IT, and language trainings. Ex. 31, Obaidi Dep. Tr. at 49:23-50:9.

326. IIRO-Kosovo provided urgent relief, emergency, health care, sanitary supplies, and for the reconstruction of schools. Ex. 31, Obaidi Dep. Tr. at 49:23-50:9.

327. IIRO-Kosovo coordinated with NATO. Ex. 31, Obaidi Dep. Tr. at 49:23-50:9.

328. IIRO-Kosovo had an internal accountant who performed audits. Ex. 31, Obaidi Dep. Tr. at 83:4-19.

329. IIRO-Kosovo sent all its reports to its internal accountant and to UNMIK, the United Nations Mission in Kosovo. Ex. 31, Obaidi Dep. Tr. at 83:25-84:4.

330. Zaher Abdelaziz was the Executive Director of the Balkans region for IIRO between 1993 and his resignation in 1996. Ex. 12, Chaouat Decl. ¶ 62.

331. The U.S. Congress supported the Bosnian Muslims. Ex. 32, Benthall Dep. Tr. at 261:24-262:14.

332. The Al Qaeda organization did not have any direct involvement in the Bosnian War; it was not physically, militarily involved in the Bosnian War. Ex. 33, Brown Dep. Tr. at 257:21-259:1.

333. Al Qaeda therefore did not use the resources of Islamic charities or NGOs in Bosnia to aid in its separate jihad that it would declare years later. Ex. 33, Brown Dep. Tr. at 259:2-7.

334. The Islamic militants involved in Bosnia were on the same side as the Western troops. Ex. 34, Roy Dep. Tr. at 166:8-11.

**IIRO-Pakistan**

335. Prior to 2001, IIRO's branch office in Pakistan ("IIRO-Pakistan") was defrauded by its director, Moayad Al-Butairi, and its financial officer, Amir Jasim. They embezzled IIRO funds and used the funds for their own personal gain. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 54-55, 58; Ex. 25, Basha Dep. Tr. at 240:4-17 (*Errata*).

336. Moayad Al-Butairi and Amir Jasim used cash from a successful and approved IIRO medical clinic to create three medical clinics for themselves. They did not enter the cash into IIRO accounts. Ex. 25, Basha Dep. Tr. at 240:4-17 (*Errata*); Ex. 4, May 21, 2024 Basha Decl. ¶ 58.

337. Prior to the discovery of the fraud, Moayad Al-Butairi and Amir Jasim occupied important positions within IIRO-Pakistan and neither had ever been involved in any wrongdoing or accused of misappropriation of IIRO funds. Ex. 4, May 21, 2024 Basha Decl. ¶ 54.

338. Moayad Al-Butairi was the IIRO-Pakistan Director beginning in 1995; he managed the office until he was replaced early 2001, during the fraud investigation into the IIRO-Pakistan office. Ex. 4, May 21, 2024 Basha Decl. ¶ 55; Ex. 61, Administrative Decision Terminating Al-Butairi, IIRO031186.

339. Moayad Al-Butairi was terminated in 2002. Ex. 4, May 21, 2024 Basha Decl. ¶ 58; Ex. 61, Administrative Decision Terminating Al-Butairi, IIRO031186.

340. Amir Jasim was IIRO-Pakistan financial officer from 1991 to 2001. Ex. 62, Order Terminating Jasim's services effective February 10, 2001, IIRO 131368.

341. In late 2000, Adnan Basha learned of a suspicion that fraud was occurring in the Pakistan office and sent financial investigators from the Head Office to the Pakistan office to investigate the matter. Ex. 4, May 21, 2024 Basha Decl. ¶ 55.

342. Rahmatullah Nazir Khan Gari, then-head of the IIRO Bangladesh office, was appointed to take over the management of the Pakistan office during the investigation. Ex. 4, May 21, 2024 Basha Decl. ¶ 55.

343. During the course of its internal investigation, IIRO investigated Moayad Al-Butairi and discovered that he was complicit. Ex. 4, May 21, 2024 Basha Decl. ¶ 58; Ex. 25, Basha Dep. Tr. at 216:3-7, 237:16-22.

344. At first, Moayad Al-Butairi was not cooperative with IIRO's investigation. ultimately decided to cooperate with IIRO's investigators and provided information that assisted IIRO in its efforts to track the embezzled funds. Ex. 4, May 21, 2024 Basha Decl. ¶ 58.

345. Moayad Al-Butairi turned over the three clinics that he established with IIRO funds to IIRO; the combined value of the clinics was equivalent to the value of the stolen funds. Ex. 4, May 21, 2024 Basha Decl. ¶ 58; Ex. 25, Basha Dep. Tr. at 216:3-218:4.

346. IIRO terminated Amir Jasim for his role in the embezzlement. Ex. 25, Basha Dep. Tr. at 218:5-15.

347. Moayad Al-Butairi and Amir Jasim were trusted employees, and Amir Jasim trained newly joined personnel at IIRO Head Office's financial department. Barron Rpt. ¶ 24.2; Ex. 25, Basha Dep. Tr. at 221:12-16.

348. Soon after the fraud was discovered, IIRO filed a criminal complaint, and Amir Jasim was arrested. The case floundered for years, with no tangible progress, moving slowly for a

number of reasons, including the constant changing of judges, resetting of hearings, and inadequate role of the investigating officer. Ex. 4, May 21, 2024 Basha Decl. ¶ 57.

349. Actions taken by IIRO senior management in response to suspected fraud in the Pakistan branch office show that: IIRO took the matter seriously, in a manner that one would not expect if senior management knew about, was indifferent to, or wished to cover up or prevent detection of the improper diversion of IIRO assets from the Pakistan branch office. And IIRO senior management's efforts to determine how the fraud occurred and the steps it took to keep fraud from recurring are inconsistent with prior knowledge on senior management's part or intent for there to be weaknesses in internal controls by design. Barron Rpt. ¶¶ 37-37.5.

350. John Barron, an accounting expert, reviewed IIRO records and witness testimony concerning the suspected fraud in the Pakistan branch office and found nothing showing that IIRO senior management had knowledge of the fraud prior to the time the fraud was discovered. Barron Rpt. ¶¶ 9, 37-37.5; Ex. 35, Barron Dep. Tr. at 132:21-134:2.

351. Upon learning of the suspected fraud in the Pakistan office, IIRO (A) dispatched a delegation from Head Office to commence an investigation; (B) created a committee to oversee the investigation; (C) relieved the parties believed to be responsible from their duties; (D) assigned a new Pakistan director; (E) retained a Pakistani auditing firm to investigate the matter and report to IIRO; and (F) recovered the estimated amount of embezzled funds. Barron Rpt. ¶ 37.3.

352. Neither Adnan Basha nor IIRO had knowledge of or was provided with any evidence that the Pakistan office ever funded or supported Al Qaeda, its affiliates, or any other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶ 61.

353. There is no evidence that the fraud committed by Moayad Al-Butairi and Amir Jasim resulted in IIRO's funds being diverted to Al Qaeda. Ex. 4, May 21, 2024 Basha Decl. ¶ 61;

Ex. 33, Brown Dep. Tr. at 313:17-315:8, 322:16-21 (no indication of IIRO funds being used to support terrorism in the documents that Vahid Brown reviewed with regards to this case).; Ex. 19, Kohlmann Dep. Tr. at 384:11-385:2 ( "Q: Do you have any evidence that the fraud that was carried on by the head of the [IIRO] Pakistan office and chief accountant was done in order to funnel money for terrorism? A. That particular incident I don't. However, I am aware of the fact that the U.S. government and U.S. Treasury Department has multiple times said that the entire IIRO network was used to fund Al Qaeda's organization. And *based on that inference*, I have to say that either it was graph [sic] or it was terrorist funding, I don't know which one it was, but clearly it was illicit." (emphasis added); ECF No. 11157 at 28 (citing the same and noting, "This kind of speculation, unsupported by his own analysis, undermines the reliability of his report.").

**Employee Standards**

354. IIRO required employees to adhere to certain ethical standards, including understanding their job descriptions, following IIRO's Protocols and Directives, and complying with instructions from superiors, and that requirement remained consistent from 1993 until at least 2004. Ex. 5, Helles Decl. ¶¶ 2, 34.

355. These ethical standards prohibited IIRO employees from undertaking acts like: (i) exploiting their positions for personal profit; (ii) participating in or interfering in political activities in their host country; or (iii) engaging in activities that may create conflicts of interest. Ex. 5, Helles Decl. ¶¶ 8, 25, 34.

356. IIRO established guidelines and regulations that were applicable to all employees. The Head Office supplemented these Protocols, including via circulars and resolutions that it distributed from time to time. Ex. 5, Helles Decl. ¶ 22; Ex. 6, Sarhan Decl. ¶ 16; Ex. 71, The Working Mechanism between the General Secretariat and local offices, IIRO-000111-119; Ex. 51,

Circular to Foreign Office Directors Dated 27/11/1419H, IIRO 130281-85; Ex. 68, Financial & Accounting Guide for IIROSA's Foreign Offices, IIRO 130659-814.

**IIRO Local and Foreign Offices and their Oversight**

357. Not a single instance of non-compliance with Head Office protocols or procedures resulted in IIRO's funds being diverted to Al Qaeda, and Adnan Basha is not aware of a single instance of non-compliance that revealed evidence that an IIRO office funded or supported terrorist organizations or militants or other violent acts. Ex. 4, May 21, 2024 Basha Decl. ¶ 48.

358. IIRO employees, including local and foreign office directors, were prohibited from engaging in personal commercial ventures, political activities, or violent, extremist, or terrorist activities or using IIRO resources for these purposes. Ex. 5, Helles Decl. ¶ 8; Ex. 6, Sarhan Decl. ¶ 8.

**IIRO Local Offices**

359. Local offices handled the collection of donations and reported monthly to the Head Office's Financial Department and the relevant Head Office welfare departments. Ex. 5, Helles Decl. ¶¶ 12, 13; Ex. 6, Sarhan Decl. ¶ 9; Ex. 71, The Working Mechanism between the General Secretariat and local offices, at IIRO-000116.

360. In conjunction with the Head Office, local offices participated in planning IIRO's programs, drafting annual budgets. Ex. 5, Helles Decl. ¶ 12; Ex. 6, Sarhan Decl. ¶ 9.

361. Local offices were prohibited from sending funds directly to foreign offices or other affiliates. Ex. 71, The Working Mechanism between the General Secretariat and local offices, at IIRO-000117; Ex. 5, Helles Decl. ¶ 14; Ex. 6, Sarhan Decl. ¶ 11.

362. IIRO local offices transferred collected funds to the Head Office, which in turn sent money to foreign offices for funding programs and projects previously adopted in their approved budget. Ex. 67, The Working Mechanism of Programs and Projects, IIRO-000209-247 at IIRO-

000240 (Procedure of Supervision of Programs by Domestic Offices); Ex. 5, Helles Decl. ¶ 15; Ex. 6, Sarhan Decl. ¶ 12.

363. IIRO donor funds earmarked for specific locations could not be transferred to another location except with the approval of the donor and the Secretariat General. Ex. 71, The Working Mechanism between the General Secretariat and local offices, at IIRO-000116; Ex. 5, Helles Decl. ¶ 28.

**IIRO Foreign Offices**

364. IIRO established guidelines and protocols applicable to all foreign offices. These guidelines and protocols remained consistent from at least 1993, with Dr. Adnan Basha implementing more comprehensive versions when he became Secretary General. Ex. 5, Helles Decl. ¶¶ 2, 22.

365. IIRO Foreign offices were tasked with implementing projects under specific programs developed by the Head Office. Programs covered areas such as health and social welfare and were comprised of designated projects to be implemented by IIRO foreign offices. Projects referred to the type of assistance provided by IIRO under each program; for example, the operation of vaccination and health clinics and the digging of wells. Ex. 5, Helles Decl. ¶ 17. Foreign offices were responsible for managing IIRO projects and programs that were being undertaken in their host country within the confines of the previously approved budget. *Id.* ¶ 18.

366. Foreign offices coordinated with the Head Office to determine which programs and projects to implement, proposed budgets for programs and projects, and reported periodically on the status of those programs and projects. Ex. 5, Helles Decl. ¶ 21.

367. IIRO foreign offices were required to conduct field visits to supervise the implementation of their programs and projects. IIRO foreign offices were also required to submit

periodic reports to the Head Office regarding the progress of the operations and activities of the office. Ex. 4, May 21, 2024 Basha Decl. ¶ 50.

368. IIRO foreign offices were required to submit a yearly work plan and proposed budget for the following year, which plan and budget required approval by the Head Office. Ex. 4, May 21, 2024 Basha Decl. ¶ 51.

369. IIRO foreign offices were required to obtain approval from the Head Office regarding various matters, including making any structural or administrative changes to the office, opening a bank account, participating in any conferences, workshops or activities, and entering into any contracts or agreements on behalf of IIRO. Ex. 4, May 21, 2024 Basha Decl. ¶ 49.

370. IIRO foreign offices were permitted to disburse funds only for approved projects covering or supporting humanitarian relief, emergency relief, and sustainable development through services and emergency relief like clothing, medicine, and shelter, care for orphaned children, educational support, health care, vocational training, and mosque construction. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 5, 51.

371. IIRO foreign offices were also required to submit original receipts, invoices, and other financial documentation to the IIRO Head Office to support its disbursements on approved projects. The Head Office would then inspect and review the disbursements of the foreign office to ensure implementation of the financial protocols and distribution of funds for their intended purpose. Ex. 4, May 21, 2024 Basha Decl. ¶ 51.

372. IIRO foreign offices were not permitted to fund or otherwise support terrorist organizations or militants or other violent acts. Ex. 4, May 21, 2024 Basha Decl. ¶ 52.

373. IIRO foreign offices were not permitted to intervene in the internal affairs of the host country or support any specific political party in the country. Ex. 4, May 21, 2024 Basha Decl. ¶ 52; Ex. 5, Helles Decl. ¶ 25.

374. IIRO foreign offices were accountable to local authorities under applicable local laws and to the Secretariat General of IIRO. Ex. 5, Helles Decl. ¶¶ 19-20.

375. IIRO foreign office directors ran and managed foreign office affairs, including by applying IIRO's financial and accounting guidelines, resolutions, and financial instructions. Ex. 68, IIRO Financial Guide for Foreign Offices, 1998, IIRO 130659-814; Ex. 51, Circular to foreign office directors, 1999, IIRO-130281, ¶1; Ex. 5, Helles Decl. ¶¶ 23-24.

376. Under IIRO guidelines, foreign office directors were, among other things, prohibited from: (i) exploiting their position at IIRO for personal gain or advancing their personal interests at IIRO's financial or reputational expense; (ii) opening bank accounts without the Secretary General's prior approval; (iii) transferring funds between projects or using funds for purposes other than those previously approved absent the Secretary General's prior approval; (iv) committing or promising funding to others; (v) borrowing IIRO money for personal or others' use; ( (vi) selling, renting, or gifting IIRO assets or property; (vii) taking business trips without Head Office's approval; (viii) interfering in the politics of the host country or favoring a particular group; or (ix) participating in events or conferences without prior approval from the Secretary General. Ex. 51, Circular to Foreign Office Directors Dated 27/11/1419H, IIRO 130281-85; IIRO Financial Guide for Foreign Offices, 1998, IIRO 130684-85; Ex. 52, Circular to Foreign Office Directors Dated 1/6/1419H, IIRO 280804-05; *see also* Ex. 5, Helles Decl. ¶ 25.

377. Under IIRO guidelines, foreign office directors were, among other things, required to: (i) safeguard IIRO interests and preserve IIRO property, investments, and funds; (ii) provide

regular reports to Head Office regarding the office's performance, projects, programs, and employees; (iii) facilitate and assist with field visits by other IIRO representatives, including by answering any questions; and (iv) safeguard funds transferred by the Secretariat General to the foreign office and provide receipts and other documentation of expenditures. Ex. 5, Helles Decl. ¶ 24.

378. To hire new employees, foreign office directors had to present candidates to the Secretariat General. Each new hire presentation had to include certain documents, including their educational credentials, their identification, a letter of recommendation, a health certification, and a criminal background check, and the candidates' declaration that they are not members of political organizations or parties. These employees are only appointed with the approval of the Secretary General. Ex. 51, Circular to Foreign Office Directors Dated 27/11/1419H at IIRO 130282; Ex. 5, Helles Decl. ¶ 26.

379. IIRO foreign offices employed a Financial Officer, who served as the office's accountant or treasurer. IIRO established regulations and protocols applicable to all financial officers. Ex. 5, Helles Decl. ¶ 27. These regulations and protocols were supplemented through circulars distributed from Head Office Ex. 5, Helles Decl. ¶ 22

**Oversight of Local and Foreign Offices**

380. The Secretariat General, including through the Local and Foreign Offices Department (later the Department of Offices), conducted oversight of IIRO local and IIRO foreign offices. Ex. 5, Helles Decl. ¶ 9.

381. Given IIRO's size and the locations of some of the branches in third world countries often affected by civil strife or natural disasters, it was not always possible for branch offices to perfect their implementation of the financial and administrative regulations. Head Office strived

with great effort to consistently follow-up with these branch offices to improve their compliance. Ex. 4, May 21, 2024 Basha Decl. ¶ 46.

382. IIRO Head Office regularly performed audits of its branch offices to enforce its regulations and to ensure that branch offices followed Head Office protocols and sent staff from Head Office to supervise and inspect projects in order to increase and maintain compliance with Head Office financial and administrative protocols. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 47, 69; Ex. 27, Harbi Dep. Tr. at 318:13-24 (*Errata*).

383. Head Office took perceived accounting discrepancies or minor procedural deviations seriously and investigated all issues, ascertaining whether wrongdoing occurred and helping branch offices to ensure that such issues would not repeat. Ex. 29, Al-Shorman Decl. ¶ 9.

384. In conjunction with the Head Office, certain local offices were assigned oversight of specific foreign offices. In some instances, multiple local offices oversaw certain foreign offices in conjunction with the Head Office. Ex. 67, The Working Mechanism of Programs and Projects, IIRO-000209-247 at IIRO-000246 (Chart of Assignments of Foreign Offices to Local Offices); Ex. 5, Helles Decl. ¶ 10.

385. IIRO local offices and IIRO Head Office conducted field visits to foreign offices. Ex. 5, Helles Decl. ¶¶ 12, 29.

386. During field visits to foreign offices, visiting IIRO representatives coordinated with foreign office directors and reported to the relevant Head Office department on their visit. Ex. 5, Helles Decl. ¶ 31.

387. Visiting local office representatives had no discretion to approve the implementation of new programs, projects, or new funding. Ex. 5, Helles Decl. ¶ 32.

388. The visiting delegation prepared a report and submitted it to the Head Office. Ex. 5, Helles Decl. ¶ 33.

389. The main purpose of these field visits was to verify that IIRO's regulations, decisions, and instructions were being implemented and to perform oversight of foreign offices, programs, and projects and determine program and project effectiveness. Ex. 5, Helles Decl. ¶¶ 9, 11, 12, 30.

390. Although local offices oversaw foreign offices in conjunction with the Head Office, foreign office directors fell under the Secretariat General's supervision. Ex. 71, *The Working Mechanism between the General Secretariat and local office*, at IIRO-000115; Ex. 5, Helles Decl. ¶¶ 10, 11, 19.

**<u>IIRO Financial Controls and Audits</u>**

391. As Secretary General, Adnan Basha worked to increase IIRO Head Office supervision and control over the organization, including requiring all project funding to flow through the Head Office. Ex. 4, May 21, 2024 Basha Decl. ¶ 65; Ex. 24, Daguit Dep. Tr. at 64:8-14 (IIRO protocol required assistance from one office to be sent through the IIRO Head Office in Jeddah).

392. IIRO subjected its financial and administrative protocols to periodic review and evaluation to make sure they were compliant with industry-standard best practices, and required its departments and branches to comply with them to enhance its financial and administrative standards. Ex. 4, May 21, 2024 Basha Decl. ¶ 46; Ex. 5, Helles Decl. ¶ 35.

393. IIRO built auditing into its financial processes. Ex. 4, May 21, 2024 Basha Decl. ¶ 53; Ex. 25, Basha Dep. Tr. at 232:11-14 (*Errata*), 232:21-233:6 (*Errata*).

394. IIRO's internal auditing department and the Financial Oversight Department periodically conducted field visits to IIRO's offices and operations worldwide to ensure

compliance with its financial and administrative regulations and supervise distribution of humanitarian assistance and project implementation. These unannounced visits and the internal audits occasionally identified partial non-compliance with technical financial and administrative protocols, typically due to local conditions and prevailing work cultures, which were mostly in underdeveloped countries. In instances where non-compliance was identified, it was investigated and corrective action taken. Ex. 4, May 21, 2024 Basha Decl. ¶ 47.

395. IIRO appointed an internal auditor who (i) verified compliance with record keeping requirements and financial regulations and procedures; (ii) verified the accuracy of accounting records and financial, accounting, and statistical information; and (iii) certified year-end closing statements. The internal auditor was appointed by the Chairman of the Board and reported to the Chairman of the Board and the IIRO Secretary General. Ex. 6, Sarhan Decl. ¶ 25.

396. IIRO's internal auditing department periodically produced auditing reports of IIRO's foreign offices. Ex. 4, May 21, 2024 Basha Decl. ¶ 47.

397. IIRO's internal auditing department placed a priority on certain foreign offices operating on a large scale, as those offices typically had sizeable budgets or higher than average petty cash balances. Ex. 4, May 21, 2024 Basha Decl. ¶ 47.

398. IIRO did not leave weaknesses in its internal controls of foreign offices. Ex. 35, Barron Dep. Tr. at 373:9-22.

399. IIRO also assigned an independent external auditor to audit IIRO's accounts. The external auditor reviewed books, records, and documents to prepare IIRO's end-of-year financial statements and the Statement of Activities. Ex. 6, Sarhan Decl. ¶ 26.

400. External auditors conducted yearly audits of IIRO Head Office accounts and sampled external offices on a periodic basis. Ex. 4, May 21, 2024 Basha Decl. ¶ 53; Ex. 25, Basha Dep. Tr. at 91:7-92:7, 232:18-233:6 (*Errata*); Barron Rpt. ¶ 22.2 & n.13.

401. IIRO's external auditors were international companies, including Arthur Anderson and KPMG and Ernst & Young. Ex. 4, May 21, 2024 Basha Decl. ¶ 53; Ex. 25, Basha Dep. Tr. at 232:18-10.

402. IIRO's external audits covered its foreign offices, including IIRO-Pakistan, because the audits encompassed the entire organization. Ex. 35, Barron Dep. Tr. at 208:3-13, 280:3-11, Ex. 25, Basha Dep. Tr. at 91:2-92:7, 232:21-233:6 (*Errata*); Barron Rpt. ¶ 22.2 n.13.

403. Single versus double entry accounting are bookkeeping errors, and a lack of documentation is not unusual. Ex. 35, Barron Dep. Tr. at 316:6-317:12.

404. John Barron, an accounting expert, concludes that nothing he reviewed indicates that IIRO (including any of its foreign offices) misused charitable funds to support terrorism and that he saw no evidence of such support. Ex. 35, Barron Dep. Tr. at 316:6-317:12, 380:16-381:13.

405. IIRO did not use irregular or atypical accounting practices that would increase the risk of diverting funds to terror. Barron Rpt. ¶ 11.

406. The activities and actions of IIRO senior management show that senior management sought to identify and rectify any deficiencies in IIRO accounting practices and internal controls. Barron Rpt. ¶ 40.2.

407. IIRO had monitoring controls in place, which controls included, *inter alia*: (A) an annual budgeting process; (B) the hiring of external auditors, which sampled external offices; (C) a committee, chaired by Adnan Basha, responsible for the general blueprint of policies and procedures in the local and external offices and how to develop them; (D) the establishment of

committees to manage affairs of offices whenever the position of office manager became vacant; (E) the requirement of joint involvement of a delegation from the General Secretariat and local IIRO office to go into the field to oversee funding for disaster relief to local governments to prevent any misuse or suspicion of misuse or resale; (F) the approval by the Urgent Relief Department of IIRO of distribution of gifts from the Saudi government in coordination with the Saudi Embassy; (G) pre-expenditure and post-expenditure controls; (H) the in-house retention of chartered auditors assigned by the board of directors to control the financial performance of the organization; (I) internal audits; and (J) inspections related to orphanages. Barron Rpt. ¶¶ 22.2-22.3; Ex. 35, Barron Dep. Tr. at 269:8-24.

**Identification Cards**

408. IIRO did not issue identification (or "ID") cards to Al Qaeda members. Ex. 4, May 21, 2024 Basha Decl. ¶ 38.

409. IIRO would never have authorized the issuance of ID cards to Al Qaeda members, members of other terrorist organizations, or anyone who was not an IIRO employee. Ex. 4, May 21, 2024 Basha Decl. ¶ 38.

410. IIRO-Sarajevo did not provide identification cards for mujahadeen or Al Qaeda members. Ex. 29, Al-Shorman Decl. ¶ 25.

411. IIRO-Philippines did not issue identity cards. Ex. 8, Daguit Decl. ¶ 30.

412. Adnan Basha is aware of instances when individuals who had been arrested would claim to be an employee of IIRO or another NGO. In all instances that Adnan Basha can recall, IIRO's investigation regarding these allegations would reveal that the individual claiming to be an IIRO employee was not in fact an IIRO employee. Ex. 4, May 21, 2024 Basha Decl. ¶ 38.

413. Al Qaeda had its own forgery operation to forge travel documents. Ex. 21, Winer Dep. Tr. at 388:16-24.

414. Plaintiffs rely on al Fadl's assertion that "bin Ladin and al Qaeda used Wael Julaidan as the head of IIRO in Peshawar, Pakistan, to create ID cards for al Qaeda people so that they could cross the Pakistan-Afghanistan border without a problem" (Winer Rpt. at 117; Kohlmann Rpt. ¶ 78 n.107), but the assertion described events from "[b]efore the Al-Qaeda start, Bin Laden people . . ." and Al Fadl's interviewers confirmed that "this is pre-Al Qaeda." Ex. 21, Winer Dep. Tr. at 386:12-388:1.

**1993 World Trade Center Bombing**

415. Plaintiffs have no evidence showing that IIRO was involved in the planning or execution of the 1993 World Trade Center bombing. Jenkins Rpt. at 13-15 (discussing the 1993 World Trade Center bombing but failing to provide evidence of IIRO's involvement); Kohlmann Rpt. at 10, 34, 51, 58, 61 (citing to various individuals who were involved in the 1993 World Trade Center bombing but failing to provide evidence of IIRO's involvement).

416. Plaintiffs have no evidence that IIRO had any foreknowledge of the planning or execution of the 1993 World Trade Center bombing. Jenkins Rpt. at 13-15 (discussing the 1993 World Trade Center bombing but failing to provide evidence of IIRO's foreknowledge or involvement); Kohlmann Rpt. at 10, 34, 51, 58, 61 (citing to various individuals who were involved in the 1993 World Trade Center bombing but failing to provide evidence of IIRO's foreknowledge or involvement); Ex. 24, Daguit Dep. Tr. at 164:6-24 (*Errata*); Ex. 8, Daguit Decl. ¶ 3 (Abdulhadi Daguit, who worked at IIRO-Philippines from 1986 until its closure in 2006, was only aware of Ramzi Yousef's presence in the Philippines through newspaper reports).

417. On February 26, 1993, the parking garage of the World Trade Center in New York, New York was bombed in an attack masterminded by Ramzi Yousef. 9/11 Commission Report, at 279-80; Sidel Rpt. ¶ 104.

418. Al Qaeda was not involved in the 1993 World Trade Center bombing. Ex. 26, Sidel Dep. Tr. at 141:5-8; Ex. 36, Jenkins Dep. Tr. at 233:10–234:14 (no evidence to suggest local volunteers were Al Qaeda members or Al Qaeda affiliates, and "fair inference" that Ramzi Yousef lacked the support of Al Qaeda in connection with the 1993 World Trade Center bombing); Sidel Dep. Tr. at 116:10-14 (neither Ramzi Yousef nor Khalid Sheikh Mohamed members of Al Qaeda); Ex. 18, Brown Rpt. at 43-44 (reviewing evidence that Ramzi Yousef and KSM belonged to "independent cell" based in Philippines at time of 1993 WTC attack); Ex. 16, Roy Rpt. at 21 (Osama Bin Laden was not directly involved in any international terrorist activities prior to 1996. The World Trade Center terrorist attack in 1993 was carried out by a different network).

419. Osama Bin Laden was not directly involved in any international terrorist activities prior to 1996. The World Trade Center terrorist attack in 1993 was carried out by a different network. Ex. 16, Roy Rpt. at 21.

**Bojinka Plot**

420. Plaintiffs have no evidence that IIRO had any foreknowledge of or was involved in the planning or execution of the Bojinka Plot. Winer Rpt. at 27, 98, 100 (discussing the Bojinka plot, but failing to provide evidence of IIRO's involvement in the plot).

421. The Bojinka Plot refers to a collection of plans to be executed in 1995, including a multi-plane bombing initiative where individuals would sneak bombs aboard American planes and detonate them over the Pacific, bomb cargo carriers, and assassinate President Clinton and the Pope. Ex. 26, Sidel Dep. Tr. at 104:21-105:22; Ex. 17, Sageman Rpt. at 95-96.

422. Defense and Plaintiffs' experts agree that the Bojinka Plot was not an Al Qaeda-directed attack. Ex. 36, Jenkins Dep. Tr. at 93:20-94:17 (Bojinka "was not an Al Qaeda operation"); *see id.* at 229:4-19 (no opinion as to whether Bin Laden or Al Qaeda financed Bojinka plot); 232:17-233:3 (only evidence linking Al Qaeda and Bojinka was "reported financing, and with the

operative word being reported"); Ex. 26, Sidel Dep. Tr. at 113:11-23, 140:11-141:12; 9/11 Commission Rpt. at 153-54 (noting that, prior to greenlighting of 9/11 Attacks, Al Qaeda believed a plan "paralleling the Bojinka concept" "did not fit the needs of al Qaeda," and even KSM's initial proposal for a plane attack "received a lukewarm response from al Qaeda leaders skeptical of its scale and complexity"); *id.* at 154 (KSM joined Al Qaeda in late 1998 or 1999); Ex. 18, Brown Rpt. at 43-44 (group including KSM, Yousef, and Shah was independent from Al Qaeda).

423. Ramzi Yousef, Khalid Sheik Muhamad, and Wali Khan Amin Shah were involved in the Bojinka plot. 9/11 Commission Rpt. at 147.

424. Ramzi Yousef was not an Al Qaeda member. Ex. 36, Jenkins Dep. Tr. at 233:10-20 (no evidence to suggest local volunteers were Al Qaeda members or Al Qaeda affiliates); Ex. 26, Sidel Dep. Tr. at 116:10-14; Ex. 36, Jenkins Dep. Tr. at 217:16-225:11 (revising opinion to state that Yousef was recruiter for "groups coalescing around Al Qaeda" yet unable to recall or locate source for opinion); Ex. 21, Winer Dep. Tr. at 558:1-21 (opining that Yousef was not a member of Al Qaeda and not affiliated with Al Qaeda but associated with Al Qaeda and noting that Yousef's Al Qaeda status was not the subject of his opinion).

425. Khalid Sheikh Muhammad had not even met with Bin Laden, let alone begun working with Al Qaeda, until after Bojinka, and was neither a member of Al Qaeda nor had pledged allegiance to Osama Bin Laden at the time of the Bojinka Plot. Ex. 18, Brown Rpt. at 41, 43-44; Ex. 26, Sidel Dep. Tr. at 116:1-117:20; Ex. 36, Jenkins Dep. Tr. at 75:2-76:8 (KSM refused to join Al Qaeda in 1996, which was after Bojinka Plot); Kohlmann Rebuttal. Rpt. (ECF No. 9250-5) ¶ 84; Jenkins Rpt. at 16 (describing the first meeting between Khalid Sheikh Mohmmed and Osama Bin Laden and noting that "[i]n 1996, [KSM] traveled to Afghanistan to meet Osama bin Laden."), 23 ("accepted bin Laden's invitation to join [Al Qaeda] sometime in late 1998 or early 1999."),

21-22 (opining KSM refused to join Al Qaeda after Manila plot); Ex. 21, Winer Dep. Tr. at 556:15-557:25 (refusing to opine whether KSM was a member of Al Qaeda during Bojinka plot).

426. Wali Khan Amin Shah broke from Osama Bin Laden in March 1989 and was not a member of Al Qaeda. Ex. 37, Sageman Dep. Tr. at 684:5-21; Ex. 17, Sageman Rpt. at 29 n.103; 9/11 Commission Report at 59 (Wali Khan "worked with Bin Ladin in the early 1980s"); Ex. 18, Brown Rpt. at 40, 43-44.

427. Muhammad Jamaal Khalifa's network in the Philippines would have been irrelevant to Ramzi Yousef, Khalid Sheikh Muhammad, and Wali Khan as they planned the Bojinka plot, given the geographic divide between his network in the Southern Philippines and their planning in Manila. Ex. 26, Sidel Dep. Tr. at 137:21-138:16.

**1998 Embassy Bombings**

428. Plaintiffs have no evidence that IIRO had any foreknowledge of the 1998 African Embassy bombings. Kohlmann Rpt. ¶ 87 (discussing 1998 African Embassy bombings and failing to show IIRO's foreknowledge or involvement in the same); Ex. 4, May 21, 2024 Basha Decl. ¶ 39.

429. Plaintiffs have no evidence that IIRO had any involvement in the planning or execution of the 1998 African Embassy bombings. Kohlmann Rpt. ¶ 87 (discussing 1998 African Embassy bombings and failing to show IIRO's foreknowledge or involvement in the same); Ex. 4, May 21, 2024 Basha Decl. ¶ 39.

430. IIRO did not support and was not involved in the August 1998 East African Embassy bombings in Dar Es Salaam, Tanzania and Nairobi, Kenya. Ex. 4, May 21, 2024 Basha Decl. ¶ 39.

431. No IIRO employee was charged in connection with the embassy bombings, and there was no contact between the U.S. and Kenya with regards to the closure of the charities. Ex.

21, Winer Dep. Tr. at 455:1-6 ("I don't know that any [IIRO employees] were" charged in connection with the bombing in Dar Es Salaam, Tanzania); Ex. 4, May 21, 2024 Basha Decl. ¶ 40.

432. In August 1998, Al Qaeda bombed the American embassies in Dar Es Salaam, Tanzania and Nairobi, Kenya. 9/11 Commission Report at 70.

433. Wadih El Hage was convicted for his role in the bombings. Ex. 18, Brown Rpt. at 57.

434. The Kenyan government temporarily closed the IIRO office in Nairobi (along with other NGOs in Kenya) in the aftermath of the bombing, although the closure did not include the IIRO-World Food Program joint project in Elwak, on the Somali border. Ex. 4, May 21, 2024 Basha Decl. ¶ 40; Ex. 25, Basha Dep. Tr. at 254:21-255:4.

435. The Kenyan Non-Governmental Organizations Bureau withdrew its decision to cancel IIRO's registration, following an investigation by a committee appointed by the President of Kenya. Ex. 72, "Kenya Papers," at IIRO285554-56.

436. A Kenyan government committee investigated the closure of the IIRO Kenyan office and cleared the office, permitting it to reopen in December 1998, returning all seized items, and issuing a polite apology to IIRO. Ex. 4, May 21, 2024 Basha Decl. ¶ 40; Ex. 25, Basha Dep. Tr. at 254:21-255:4.

437. After reopening in December 1998, the IIRO Kenyan office continued to operate without closure and was operating at the time of Dr. Basha's departure from IIRO in 2013. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 3, 40.

438. IIRO initiated an investigation into the bombing, given the serious nature of the allegations. That investigation found no involvement by IIRO or IIRO employees in the attacks. Ex. 4, May 21, 2024 Basha Decl. ¶ 40; Ex. 25, Basha Dep. Tr. at 255:5-24.

**Indian Consulate Plot**

439. Plaintiffs have no evidence showing that IIRO was involved in the planning to attack U.S. consulates in Madras and Calcutta. Winer Rpt. at 47-48, 83, 86 (discussing the plans to attack the U.S. consulates in Madras and Calcutta, but failing to provide evidence of IIRO's involvement in those plans); Kohlmann Rpt. at 28 (same); Levitt Rpt. at 39 (same)

440. Plaintiffs have no evidence that IIRO had any foreknowledge of the planning attack U.S. consulates in Madras and Calcutta. Winer Rpt. at 47-48, 83, 86 (discussing the plans to attack the U.S. consulates in Madras and Calcutta, but failing to provide specific evidence of IIRO's involvement in those plans); Kohlmann Rpt. at 28 (same); Levitt Rpt. at 39 (same).

441. The 9/11 Commission Report does not mention this plot. *See generally* 9/11 Commission Report.

**USS Cole Bombing**

442. Plaintiffs have no evidence that IIRO was involved in the planning or execution of the attack on the U.S.S. Cole. Winer Rpt. at 13-14, 50, 53 (discussing the U.S.S. Cole attacks, but failing to provide evidence of IIRO's involvement in those attacks).

443. Plaintiffs have no evidence that IIRO had any foreknowledge of the attack on the U.S.S. Cole. Winer Rpt. at 13-14, 50, 53 (discussing the U.S.S. Cole attacks, but failing to provide evidence of IIRO's involvement in those attacks).

444. In December 2000, terrorists in a bomb-laden boat rammed into the U.S.S. Cole, with the goal of forcing U.S. forces to withdraw from Saudi Arabia. Jenkins Rpt. at 29; Ex. 89, Unclassified U.S. Department of State Document, at BUR-PEC-078470; Ex. 33, Brown Dep. Tr. at 252:7-20.

**September 11, 2001 Attacks**

445. The general idea of the 9/11 attacks had been developed by Khalid Sheikh Muhammad independently of Al Qaeda. Ex. 18, Brown Rpt. at 58; 9/11 Commission Rpt. at 153-54.

446. Bin Laden approved the 9/11 plot in Spring 1999. 9/11 Commission Rpt. at 154 ("Bin Ladin summoned KSM to Kandahar in March or April 1999 to tell him that Al Qaeda would support his proposal.").

447. According to Khalid Sheikh Muhammad, this meeting between Bin Laden and Khalid Sheikh Muhammad is when the conspiracy started. Ex. 17, Sageman Rpt. at 97; Ex. 18, Brown Rpt. at 56 (plans and preparations for the 9/11 attacks began in Spring 1999).

448. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha knew at any time prior to September 11, 2001 that Al Qaeda was planning a terrorist attack against the United States. Ex. ~~11~~3, First ~~Second~~ Obaid Decl. ¶ 23; Ex. ~~10~~2, First ~~Second~~ Turki Decl. ¶ 28; Ex. 13, May 4, 2023 Basha Decl. ¶ 19.

449. Abdullah bin Saleh Al-Obaid, Abdullah bin Abdul Mohsen Al-Turki, and Adnan Basha were disgusted by the terrorist attacks on September 11, 2001. Ex. ~~11~~3, First ~~Second~~ Obaid Decl. ¶ 24; Ex. ~~10~~2, First ~~Second~~ Turki Decl. ¶ 29; Ex. 13, May 4, 2023 Basha Decl. ¶ 20.

450. Abdullah bin Saleh Al-Obaid, Abdullah bin Abdul Mohsen Al-Turki, and Adnan Basha each describe the terror attacks as "criminal" and note that their faith prohibits the attacks. Ex. ~~11~~3, First ~~Second~~ Obaid Decl. ¶ 24; Ex. ~~10~~2, First ~~Second~~ Turki Decl. ¶ 29; Ex. 13, May 4, 2023 Basha Decl. ¶ 20.

**The Taliban**

451. A Washington Post article dated September 29, 2001 stated, "The IIRO alone has given more than $60 million to the Taliban and people under its control, according to its secretary

general, Adnan Basha." Winer Rpt. ¶ 12.6.3 & n.149 (citing "Muslim Charities Under Scrutiny," Washington Post, September 29, 2001).

452. The Washington Post article dated September 29, 2001, does not purport to quote Adnan Basha, but rather to paraphrase him. Ex. 78, "Muslim Charities Under Scrutiny (Sept. 29, 2001), at FED-PEC0002217.

453. Adnan Basha did not state that IIRO provided sixty million dollars to the Taliban. Adnan Basha has previously spoken about the humanitarian aid IIRO historically provided directly to the Afghan people on the ground, particularly in the wake of the Soviet invasion and retreat from Afghanistan. Ex. 13, May 4, 2023 Basha Decl. ¶ 17.

454. IIRO has never provided funds to the Taliban. Ex. 13, May 4, 2023 Basha Decl. ¶ 17.

455. Nor did IIRO spend remotely near sixty million dollars in Afghanistan during Taliban rule from 1996 to 2001. For example, during the three-year period from 1998 to 2001, the total amount of money that IIRO spent on its projects in Afghanistan was 14,581,128 SR. *See* Ex. 44, 1998 Annual Report, at IIRO-003744 (2,930,310 SR); Ex. 43, 1999-2000 Annual Report, at IIRO-003704 (6,533,185 SR); Ex. 42, 2000-2001 Annual Report, at IIRO-004489 (5,117,633 SR). At the prevailing exchange rate of 3.75 SR/USD, this is under four million dollars. *See U.S. Dollar/ Saudi Riyal Historical Reference Rates from Bank of England for 1997*, PoundSterling LIVE, https://www.poundsterlinglive.com/bank-of-england-spot/historical-spot-exchange-rates/usd/USD-to-SAR-1997 (last accessed Apr. 12, 2026).

456. The Taliban attempted to interfere with several IIRO projects, including an orphanage and university, which were both closed as a result of that interference in the summer of 2001. Ex. 4, May 21, 2024 Basha Decl. ¶ 34.

457. In early to mid-2000, the Taliban attempted to interfere with two hospital projects in Afghanistan, where IIRO treated both genders in the same facility. IIRO refused to relent to the Taliban's interference and stopped supporting the hospital. Ex. 4, May 21, 2024 Basha Decl. ¶ 34.

**Bin Laden Publicly Opposed the Saudi Government and Twice Called on Individuals Not to Donate to Saudi-Affiliated Charities**

458. In the years before September 11, 2001, Osama Bin Ladin stridently opposed the Saudi Royal family, the government of the Kingdom of Saudi Arabia, and government-affiliated charities such as IIRO and MWL. Ex. 18, Brown Rpt. at 24, 63.

459. Bin Laden "made a definitive turn toward enmity with the Saudi regime" after the first Gulf War, when Saudi Arabia accepted the deployment of U.S. troops on its territory. He declared Saudi Arabia an apostate regime. Ex. 18, Brown Rpt. at 24-25.

460. In March 1994, he created the Committee for the Advice and Defence of Legitimate Rights, re-named in April 1994 as the Advice and Reform Committee (ARC). Ex. 18, Brown Rpt. at 26.

461. The ARC issued 21 public communiqués between March 1994 and May 1998, all of them to denounce Saudi Arabia and in some cases Saudi charities. Ex. 18, Brown Rpt. at 26; Ex. 90, West Point's Combatting Terrorism Center's ("CTC") Harmony Database ("HD") document AFGP-2002-003345.

462. In an April 1994 ARC statement, Bin Ladin writes of the actions the Saudi government had taken against him: "we were prevented from traveling, our money was frozen in foreign bank accounts, a defamation campaign was waged against us in the local and international press, and finally, you attempted to cut our ties with the homeland by confiscating our passports. Your actions indicate to us what your intentions are for us." Ex. 90, West Point's CTC HD document AFGP-2002-003345, at 1-3 (Statement 2 of 12 April 1994).

463. In a June 7, 1994 ARC statement, Bin Ladin directly denounced King Fahd and Prince Sultan for supporting Yemeni communists in the 1994 civil war in Yemen. He accused the King of "us[ing] Islam and some of its tenets to cover up the secret and overt anti-Islamic policies that he pursues," claimed the Saudi regime extended "blind loyalty to the enemies of Islam" and made a "habit of supporting the enemies of Islam." Ex. 90, West Point's CTC HD document AFGP-2002-003345, at 7 (Statement 3 of 7 June 1994).

464. On July 19, 1994, referring to the Saudi government's alleged persecution of critical religious scholars, Bin Ladin stated that "the Saudi government has used all the witchcraft powers it has and the full deception powers of the media to justify its shameless stands against Islam and its preachers while supporting the unbelievers and their guardians." Ex. 90, West Point's CTC HD document AFGP-2002-003345, at 13-14 (Statement 5 of 19 July 1994).

465. In the following statement, a letter to "the Saudi government, headed by King Fahd," Bin Ladin accuses the King of having left the faith: "These blatant attacks and irresponsible behavior do not leave any pretense for being a Muslim, they take it away. . . . Therefore, you will be responsible before God and your people for anything that will result from these events and matters." Ex. 90, West Point's CTC HD document AFGP-2002-003345, at 17-18 (Statement 6 of 12 September 1994).

466. The seventh and eighth ARC communiqués, addressed to employees of the Saudi security services and the military, respectively, warn them against implementing the directives of the regime, for to do so would damn their souls to hell. Ex. 18, Brown Rpt. at 27-28; Ex. 90, West Point's CTC HD document AFGP-2002-003345, at 22-22 (Statement 7 of 16 September 1994) and 25-26 (Statement 8 of 19 September 1994).

467. In a December 29, 1994 letter to 'Abdullah bin Baz, Saudi Arabia's Grand Mufti, Bin Ladin accused the latter of permitting King Fahad to perform an "abomination" by appearing in public with a cross pendant on his chest. Further, Bin Ladin denounced the Grand Mufti for issuing a fatwa permitting "the crusader and the Jewish alliance . . . to occupy the country in the name of liberating Kuwait." Ex. 90, West Point's CTC HD document AFGP-2002-003345, at 35-38 (Statement 11 of 29 December 1994).

468. On February 12, 1995, Bin Laden publicly encouraged donors *not* to donate to official Saudi-affiliated charities, citing the illegitimacy of the Saudi Government and its alleged misappropriation of funds donated to the people of Bosnia:

> Beside the Regime's political and ideological blockade, it also exercised a harsh economic and financial (policy) as well. Part of this blockade was dissolving charitable organizations that used to deliver donations from citizens to the many needy people inside and outside the country. It replaced them with organizations and foundations subservient to royal family members and particularly, Prince Salman.
>
> …
>
> 3) The reason behind this procedure does not encourage good deeds, as the regime claims, but rather the following: 1) Prevents these funds from being delivered to areas where they could be used to serve Islam and Muslims following the principle, "Do not spend on those who are with the messenger of Allah till they desist."
>
> . . .
>
> Based on what was stated, we at the Advice and Reform Committee, while celebrating this blessed month as a month of giving for God's sake, wish to draw the attention of all donors to the danger of donating funds or *zakat* to these foundations and organizations. The regime is using them against God and His messenger. We are asking the donors to provide these funds directly to the needy, whether inside or outside the country. They could also provide it to those trusted individuals who will deliver them. … It is known that these [Saudi] leaders cannot be trusted. There are other safe ways you can assist in delivering funds to those who deserve them. Among them are the benevolence foundations in Qatar, Kuwait, Jordan, Yemen, Sudan, and others. To assure that the funds transfer to these foundations' bank accounts, we draw your attention to the importance of transferring these funds outside the Peninsula, away from the pursuing regime's spies.

Ex. 90, West Point's CTC HD document AFGP-2002-003345, at 51-52 (Statement 13 of 12 February 1995).

469. Bin Ladin reiterated this call to avoid official Saudi-affiliated charities on August 11, 1995:

> It is no longer hidden that the Saudi regime persistently sought to block all the abilities and capabilities of the ummah by placing control over it, but the regime was not satisfied with its unjust policies; it had to go further by imposing control on the minds and politics of the nation. Moreover, the regime sought to impose economic control. This resulted in the closure of charitable organizations that delivered the contributions of the benefactors from this country to its deserving lawful owners. The regime replaced these charitable organizations with associations and organizations that were supervised by members of the ruling family, such as Prince Sultan and Prince Salman. This revealed a scheme by which they monopolized the charitable contributions in such a way that it prevented Islam and the Muslims from benefiting from them. The regime used the contributions the same way it used the money of the afghani mujahidin. That money was used to pressure the mujahidin and influence their policies in a way that would benefit the interests of the West. Sometimes these contributions were used for private interests of the princes.
>
> . . .
>
> We are drawing their attention to the risk of forwarding these contributions through the ruling regime and its organizations. We are advising them to deliver their contributions directly to the people or to the safe hands of individuals, organizations, and societies that are trusted, such as the charitable societies in Qatar, Kuwait, Sudan, Yemen, and Jordan. We are advising them to be careful that their contributions stay far from the pursuit of the Servant of the Two Holy Places [the Saudi King] and his agents, and to make sure that the money will reach the people it is intended for. They must be sure that the money does not fall into the hands of the shameless members of the Saudi family.

Ex. 90, West Point's CTC HD document AFGP-2002-003345, at 91-92 (Statement 18 of 11 August 1995).

**<u>Intelligence Reporting</u>**

470. According to the 9/11 Commission Staff, prior to September 2001, "Terrorist financing was not a priority for either domestic or foreign intelligence collection. As a result,

intelligence reporting on the issue was episodic, insufficient, and often inaccurate." Monograph at 4.

471. According to the 9/11 Commission Staff, the "U.S. intelligence community largely failed to comprehend al Qaeda's methods of fundraising, moving, and storing money, because it devoted relatively few resources to collecting the strategic financial intelligence." *Id.* at 5; *see also id.* at 18 (explaining that even in March 2002, "the head of the [U.S.] government's terrorist-financing coordination effort" stated that U.S. officials could not answer "[w]ho finances al Qaeda," "[h]ow," or "[w]here").

**Allegation IIRO Funded Training Camps**

472. Plaintiffs have no evidence showing IIRO funded or supported any Al Qaeda training camps. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 35-36; Ex. 18, Brown Rpt. at 98.

473. Plaintiffs rely on a 1996 document that states "a clandestine source" provided information that "IIRO helps fund six militant training camps in Afghanistan." *See* Winer Rpt. ¶¶ 6.6.10.3 (quoting 1996 document), 7.3.4.3 (referring to same document but altering statement to refer to "*terrorist* training camps"); *see also* Kohlmann Rpt. ¶ 83 (referring to same document and altering reference to refer to "7 Al-Qaida training camps"); Levitt Rpt. at 36 (referring to same document and altering reference to refer to "six al-Qa'ida training camps").

474. In December 2003, the UN, citing the same 1996 document, changed the allegation to: "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001." Ex. 84, UN Monitoring Rpt. ¶ 42.

475. The 1996 document refers to "militant training camps in Afghanistan," not "Al Qaeda training camps" or "terrorist training camps." *See* Winer Rpt. ¶¶ 6.6.10.3 (quoting 1996 document), 7.3.4.3 (referring to same document but altering statement to refer to "*terrorist* training camps") (emphasis added); *see also* Kohlmann Rpt. ¶ 83 (referring to same document and altering

reference to refer to "7 Al-Qaida training camps"); Levitt Rpt. at 36 (referring to same document and altering reference to refer to "six al-Qa'ida training camps").

476. The implication or allegation that IIRO funded six "Al Qaeda" training camps are false. IIRO did not fund any training camps, extremist or not extremist, for any group, Al Qaeda or otherwise. Ex. 4, May 21, 2024 Basha Decl. ¶ 35.

477. IIRO funded orphan camps in Pakistan after the Afghan jihad with the USSR ended. Ex. 28, Gari Dep. Tr. 20:7-23.

478. Sayed Nasir's allegation that 40-50% of IIRO's funds were being diverted to terrorist training camps in Afghanistan and Kashmir is false. Ex. 4, May 21, 2024 Basha Decl. ¶ 36. IIRO did not fund or have training camps in Afghanistan or Kashmir (or anywhere else). Ex. 4, May 21, 2024 Basha Decl. ¶¶ 35-36.

479. When Adnan Basha first heard Sayed Abu Nasir's name in connection with this allegation, he verified that Sayed Nasir was not an IIRO employee, finding no evidence of his employment in IIRO's personnel files. Ex. 4, May 21, 2024 Basha Decl. ¶ 36.

480. IIRO-Indonesia did not finance the establishment or operations of training facilities for use by Al Qaeda, Al Qaeda affiliates, or Al Qaeda associates. Ex. 4, May 21, 2024 Basha Decl. ¶ 89; Ex. 14, Wardi Decl. ¶ 15.

**<u>9/11 Commission Report, 9/11 Commission Staff Monograph, and CIA Reports</u>**

481. The sections of the 9/11 Commission Report discussing financing of al Qaeda cite CIA reports pre-dating the 9/11 Attacks. 9/11 Commission Report at 169-172 & nn. 118, 126; 185-186 & nn. 84, 86. These reports did not conclude that IIRO or MWL, or their foreign offices, directly or indirectly provided funds to al Qaeda. *Id.*

482. The chapter of the 9/11 Commission Report discussing al Qaeda's founding and its return to Afghanistan in 1996 cites several CIA reports. *Id.* at 47-63 & nn. 37, 59, 67, 77, 78. These

reports did not conclude that IIRO or MWL, or their foreign offices, directly or indirectly provided funds to al Qaeda. *Id.*

483. The 9/11 Commission's "Monograph on Terrorist Financing" did not conclude that IIRO or MWL, or any of their foreign offices, directly or indirectly provided funds to al Qaeda. *See generally* Monograph.

484. The 9/11 Commission Report addresses charities in connection with the financing of al Qaeda in two sections. *See* 9/11 Commission Report, at 169-72, 185-86.

485. The 9/11 Commission Report's section on "General Financing" (pp. 169-72) mentions only the "al Haramain Islamic Foundation" as an example of "large, international charities" with "lax external oversight and ineffective internal controls," whose foreign branch offices have "al Qaeda sympathizers" diverting money to Al Qaeda. 9/11 Commission Report, at 170 & n.118 (citing CIA report, "How Bin Ladin Commands a Global Terrorist Network," CTC 99-40003, Jan. 27, 1999). Furthermore, it mentions only "the al Wafa organization" as an example of "entire charities" who "may have wittingly participated in funneling money to al Qaeda." *Id.*

486. This portion of the 9/11 Commission Report does not mention IIRO or MWL, or conclude that IIRO or MWL, or any of their branch offices, directly or indirectly, provided funds to al Qaeda. 9/11 Commission Report at 170. *See also* Ex. 21, Winer Dep. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported al Qaeda).

487. The January 27, 1999, CIA report, cited by the 9/11 Commission Report, notes Bin Ladin's exploitation of some international Islamic nongovernmental organizations for financial and logistical support. Ex. 53, CIA report, "How Bin Ladin Commands a Global Terrorist Network," CTC 99-40003 (Jan. 27, 1999) at CIA_000007.

488. The unredacted sections of the January 27, 1999 CIA report do not include IIRO or MWL, any IIRO or MWL official, or any IIRO or MWL employee as part of Bin Ladin's terrorist network. Nor do they conclude that IIRO or MWL, or any of their branch offices, directly or indirectly, provided funds to al Qaeda. *Id.*

489. The 9/11 Commission Report's section on "General Financing" (pp. 169-72) cites another CIA report, Pursuing the Bin Laden Financial Target," CTC 01-40003HCS, Apr. 12, 2001. *See* 9/11 Commission Report, at 171 n.126. This report states that, in the case of NGO financing of terrorism, "the majority of the money moving through the NGOs is for legitimate humanitarian needs," and these funds are "co-mingled with those slated for nefarious purposes, making it extremely difficult to identify and seize funds directly linked to terrorist activities." Ex. 54, CIA report, "Pursuing the Bin Laden Financial Target," CTC 01-400003HCS (Apr. 12, 2001) at CIA_00381.

490. This CIA report, "Pursuing the Bin Laden Financial Target," does not conclude that any IIRO or MWL funds were diverted to terrorist activities. Nor does it otherwise make any finding that IIRO or MWL, or any of their branch offices, directly or indirectly, provided funds to al Qaeda. *See generally id.*

491. The 9/11 Commission Report's section on "Terrorist Financing" (pp. 185-86) states that the CIA knew relatively early about the "loose affiliation of financial institutions, business, and wealthy individuals who supported extremist Islamic activities." 9/11 Commission Report, at 185 & n.84 (citing CIA report, "Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions," OTI 97-10035CX (Dec. 1997)).

492. This "Terrorist Financing" section of the 9/11 Commission Report does not conclude that IIRO or MWL, or any of their branch offices, directly or indirectly, provided funds to al Qaeda. *Id.* at 185-86.

493. The cited December 1997 CIA report claims:

> Saudi Arabia, as well as other Gulf States, has long been a source of financial support for Islamic causes; at least some of these funds are diverted to militants and terrorists. Riyadh provides official funding to various groups to promote Sunni Islam and to counter regional Iranian influence; other funding emanates from semiofficial charities, such as the Muslim World League and IIRO, and from private donations that are often difficult to track. Funds collected from individuals are often made in cash and disguised as religious offerings; NGO funds, on the other hand, are usually diverted by unregulated offices located abroad.

Ex. 55, CIA report, "Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions," OTI 97-10035CX (Dec. 1997) at CIA_000744. While mentioning MWL and IIRO as examples of charities and discussing the diversion of charitable funds in the abstract, the report does not conclude, assert, or prove that any MWL or IIRO funds were actually diverted to terrorists, let alone to Al Qaeda. *See generally id.*

494. The 9/11 Commission Report section on "Terrorist Financing" continues: "although the intelligence community devoted more resources to the issue [of Al Qaeda funding] and produced somewhat more intelligence, it remained difficult to distinguish al Qaeda's financial transactions among the vast sums moving in the international financial system." 9/11 Commission Report, p. 186 & n.86 (citing two CIA reports, "Usama Bin Ladin: Some Saudi Financial Ties Probably Intact," OTI IR 99-005CX (Jan. 11, 1999), and "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999)).

495. The January 11, 1999 CIA report, cited by the 9/11 Commission Report discusses the supervision and funding of "two al-Qa'ida training camps in Afghanistan." Ex. 56, CIA report,

"Usama Bin Ladin: Some Saudi Financial Ties Probably Intact," at CIA_000808. It does not allege that MWL or IIRO funds or is otherwise affiliated with these camps.

496. Later, the January 11, 1999 CIA report claims that IIRO "funds a military camp associated with Usama [Bin Laden]." *Id.* The report does not indicate that these "military camps" are the same as the "two al-Qa'ida training camps in Afghanistan," which it discussed previously and separately. *Id.* In any event, the unredacted portions of the report do not provide the factual basis for this assertion or otherwise source the claim that IIRO funds the "military camp." *See generally id.*

497. The January 11, 1999 CIA report also claims that Bin Laden "apparently" has "extensive contact with Afghani and Pakistani offices of the IIRO," but "it is not clear that IIRO headquarters in Jeddah is witting of these contacts." *Id.* at CIA_000817. The report does not conclude that Bin Ladin in fact has extensive contact with these IIRO offices, nor do the unredacted portions of the report indicate the source or factual basis for the claim that he "apparently" does so. *See generally id.*

498. The January 11, 1999 CIA report describes MWL as an example of an NGO with "[p]ossible" ties to "Usama Bin Ladin" that are "questionable, though less direct." *Id.* at CIA_000822. The report does not conclude that MWL has actual ties with Bin Ladin, nor do the unredacted portions of the report indicate the source or factual basis for the claim that it has "[p]ossible" ties. *See generally id.*

499. The January 11, 1999 CIA report states that MWL has "apparently" been "used as a cover organization for several of Usama's associates." *Id.* at CIA_000823. The report does not conclude that MWL in fact has been used as a cover organization, nor do the unredacted portions

of the report indicate the source or factual basis for the claim that it "apparently" has been so used. *See generally id.*

500. Without factual support or attribution, the January 11, 1999 CIA report states, inaccurately, that MWL is the "parent organization of the IIRO and WAMY." *Id.* at CIA_000823.

501. The April 9, 1999 CIA report cited by the 9/11 Commission notes that "large, internationally active NGOs based in Saudi Arabia" can be "exploited by individual employees," but "[t]errorist abuse of such NGOs takes place at the local branch office rather than at the organizations' headquarters. Senior NGO leaders usually are unwitting of the activity and willing to take corrective action when apprised of the abuse." Ex. 74, CIA report, "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999) at CIA_000213.

502. The April 9, 1999 CIA report then asserts, "Although the MWL headquarters, for example, avoids extremist causes, sympathizers within several MWL affiliate organizations – including the International Islamic Relief Organization (IIRO) – have provided terrorists with funding and cover employment, documentation, and training, according to [redacted] press reporting." *Id*.

503. This allegation in the April 9, 1999 CIA report cites only "[redacted] press reporting," without identifying the source or nature of the press reporting. *Id*.

504. The April 9, 1999 CIA report on three subsequent occasions mentions IIRO in connection with support to terrorist groups (other than Al Qa'eda).

505. The April 9, 1999 CIA report states that "Usama Bin Ladin's brother-in-law, Muhammad Jamal Khalifah, who directed the IIRO in in the Philippines, provided funding and

some logistics support to [World Trade Center Bomber Ramzi] Yousef and his associates ***in 1995*** as they plotted to bomb at least 12 airliners in East Asia." *Id.* at CIA_000216 (emphasis added).

506. The April 9, 1999 CIA report asserts, "The director of the IIRO office in Baku, Az[erbaijan] diverted a[pproximat]ely $1.5 million to the Egyptian Islamic Jihad." Ex. 74, CIA report, "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999) at CIA_000220.

507. The unredacted portions of the report do not provide the source or factual basis for this assertion. *See generally id.*

508. The alleged amount of $1.5 million (or 5.6 million Saudi Riyals at the prevailing exchange rate of 3.75 SAR/USD) that is alleged to have been diverted in the April 9, 1999 CIA report would exceed the entire budget of IIRO's Azerbaijan office of 3,923,239 million Saudi Riyals. *See* Ex. 44, 1998 Annual Report, at IIRO-003746.

509. The April 9, 1999 CIA report asserts, "IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate more towards extremist activities." Ex. 74, CIA report "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999) at CIA_000221.

510. The unredacted portions of the report do not provide a source or factual basis for this assertion. *See generally id.*

511. IIRO did not have an "office" in Afghanistan. *See* Ex. 44, 1998 Annual Report at IIRO-003747; *see also* Ex. 25, Basha Dep. Tr. at 106:6-8 ("The projects in Afghanistan were managed by the office from Islamabad in Pakistan.").

512. The April 9, 1999 CIA report notes, "IIRO operations include running or supporting schools, orphanages, medical clinics and hospitals in more than 90 countries, [redacted].

Accredited by the UNHCR, the IIRO also runs programs in UN-sponsored camps for war refugees in Afghanistan, Pakistan, and in locations in Africa." Ex. 74, CIA report, "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999) at CIA_000221.

513. The April 9, 1999 CIA report does not conclude that any foreign office of IIRO or MWL provided funds to Al Qa'ida, directly or indirectly. *See generally id.*

514. The chapter of the 9/11 Commission Report discussing al Qaeda's founding and its return to Afghanistan in 1996 does not conclude that IIRO or MWL directly or indirectly, provided funds to Al Qaeda. *See* 9/11 Commission Report at 47-67.

515. This chapter cites several CIA reports. 9/11 Commission Report at 47-67 & n.37 (citing CIA report, "Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia," CTC 2002-40066CH (June 6, 2002)), at 59 (citing CIA report, "Usama Bin Ladin: Al-Qa'ida's Financial Facilitators," OTI iA 2001-134-HXC (Oct. 18, 2001)), at 77 (citing CIA report, "Saudi-Based Financial Support for Terrorist Organizations [Redacted]," CTC 2002-40117CH (Nov. 14, 2002)), and CIA report, "Al Qa'ida Still Well Positioned To Recruit Terrorists [Redacted]," CTC 2002-40081CH (July 1, 2002)). These reports do not conclude that IIRO or MWL, or their foreign offices, directly or indirectly provided funds to Al Qaeda.

516. Intentionally left blank.

517. The 9/11 Commission Report distinguishes Maktab al-Khidamat from Al Qaeda. Maktab al-Khidamat, known as the "Bureau of Services" or the Services Bureau (9/11 Commission Report at 56), "provided logistical support to mujahideen in Afghanistan" in the late 1980s. *Id.* at 434. Bin Laden did not lead Maktab al-Khidamat, which did not seek to act outside of Afghanistan. Bin Laden created al Qaeda and split it off from Maktab al-Khidamat because he wanted to pursue global violent jihad. *Id.* at 55-56.

518. Intentionally left blank.

519. Intentionally left blank.

520. The October 2001 CIA report, cited in the 9/11 Commission Report, "Usama Bin Ladin: Al-Qa'ida's Financial Facilitators," OTI iA 2001-134-HXC (Oct. 18, 2001), incorporates information through September 30, 2001. Ex. 85, CIA report, "Usama Bin Ladin: Al-Qa'ida's Financial Facilitators," OTI iA 2001-134-HXC (Oct. 18, 2001) at CIA_000501.

521. The section of the October 2001 CIA report entitled, "The Origin of Funds" identifies seventeen "Islamic charities" from whom "Bin Ladin derives much of his funds." *Id.* at CIA_000502, CIA_000521 to CIA_000527 (listing and describing Afghan Support Committee, Health and Education Project International, Human Care Afghanistan, Islamic Relief Agency, Sudan, Jam'iyat al-Ta'awun al-Islamiyya, Kuwaiti Joint Relief Committee, Lajnat al-Birr al-Islami, Lajnat al-Dawa al-Islamia, Maktab al-Khidamat, Munazzamat al-Birr al-Islami, Muslim Scholar's Union, Al-Muwafaq Foundation, Qatar Islamic Call Charitable Society, Rabita Trust for the Rehabilitation of Stranded Pakistanis, Al-Rashid Trust Institution, Revival of Islamic Heritage Society, Wafa al-Igatha al-Islamiya). IIRO and MWL are not among them.[4] *Id.*

522. Later, the October 2001 CIA report notes that "[l]ongtime Bin Ladin associate . . . Wa'el Hamza Julaydan [Jelaidan] . . . a veteran of the Islamic charity circuit, has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL), the Saudi Red Crescent Society (SRCS), and lately at two Bin-Ladin affiliated charities, al-Waqf al-Islami, and as secretary general of Rabita Trust coordinating financial activities and overseeing

---

[4] Another page of the report, entitled, "Islamic Charities Supporting Al Qa'eda," contains a list of seventeen charities that is identical to the charities identified in the foregoing discussion, except it includes IIRO and excludes Munazzamat al-Birr al-Islami. *Id. at* CIA_000525. There is no elaboration on the nature of alleged "support" (including whether it consists of the provision of funds), no factual basis provided for the composition of this list, and no explanation for the discrepancy between this list and the 17 charities previously identified described as funders of Bin Laden.

the budget. Julaydan has provided support since the 1990s to Muslims in Bosnia and Chechnya–hotbeds of *mujahidin* activity–and may be using his position and influence at these organizations to divert funds and resources to al-Qa'ida." *Id.* at CIA_000544.

523. This October 2001 CIA report quotation explicitly distinguishes IIRO and MWL from "bin-Ladin affiliated charities." *Id.*

524. The October 2001 CIA asserts that Jelaidan "may be" *currently* diverting funds and resources to al-Qa'ida, he "held" positions at IIRO and MWL in the past. *Id.*

525. This report does not conclude that IIRO, MWL, or any of their branch offices, directly or indirectly, provided funds to al Qaeda. *See generally id.*

526. The June 2002 CIA report, cited in the 9/11 Commission Report, "Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia," CTC 2002-40066CH (June 6, 2002), does not conclude that IIRO or any of its branch offices directly or indirectly provided funds to al Qaeda. Ex. 46, CIA report, "Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia," CTC 2002-40066CH (June 6, 2002), CIA_000450 to CIA_000480.

527. The June 2002 CIA report states that "Gulf NGOs with branch offices in the Philippines – including . . . the International Islamic Relief Organization – maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates." *Id.* at CIA_000455. It does not explain the nature or extent of this "contact," nor provide a factual basis or source for this assertion. *Id.*

528. The June 2002 CIA report goes on to identify "[f]our Saudi NGOs that have been connected to Bin Ladin in other locations" besides the Philippines. It does not identify IIRO or MWL. *Id.*

529. The June 2002 CIA report then lists "Al Qa'ida-linked Islamic NGOs." *Id.* This list does not include IIRO or MWL. *Id.*

530. The November 14, 2002 CIA report, cited in the 9/11 Commission Report, "Saudi-Based Financial Support for Terrorist Organizations [Redacted]," CTC 2002-40117CH (Nov. 14, 2002), does not conclude that IIRO or any of its branch offices directly or indirectly provided funds to al Qaeda. Ex. 87, "Saudi-Based Financial Support for Terrorist Organizations [redacted]," CTC 2002-40117CH (Nov. 14, 2002), CIA_000143 to CIA_000158.

531. The November 14, 2002 CIA report notes that SAMA, Saudi Arabia's central bank and chief financial agency, has "overseen Saudi banks' efforts to freeze and seize terrorist-linked assets." *Id.* at CIA_000145.

532. The November 14, 2002 CIA report lists individuals who it claims are part of the "Key Financial Base for Al-Qa'ida." One of the individuals is Muhammad Jamal Khalifa. The report notes that Khalifa founded several Islamic charities and "served" in the past as "director of the International Islamic Relief Organization (IIRO) NGO in Manila." The report does not state that Khalifa provided funds to or supported al-Qa'ida during or as part of his employment for IIRO-Philippines. On the contrary, the report states that Khalifah "currently" has several private business ventures like "Asian and African construction and gem businesses," and that he is using those ventures to "launder money for al-Qa'ida." *Id.* at CIA_000148 to CIA_000149.

533. The November 14, 2002 CIA report describes five "Saudi-based NGOs that al-Qaida has been able to exploit by diverting funds from legitimate activities to finance al-Qa'ida." *Id.* at CIA_000150 to CIA_000151. IIRO is not among these five NGOs. *Id.*

534. The November 14, 2002 CIA report later asserts that Abu Sayyaf Group "probably" receives funds from "Saudi-based NGOs, including . . . IIRO." *Id.* at CIA_000152. However, the

report explicitly describes Abu Sayyaf Group as a terrorist group "other than al-Qa'ida." *Id.* at CIA_000151. In any event, the report does not assert that Abu Sayyaf Group "actually" receives funds from IIRO, nor do the unredacted portions of the report provide a factual basis or source for the assertion that it "probably" does so. *See generally id.*

535. The November 14, 2002 CIA report includes MWL among the five Saudi-based NGOs whose funds were allegedly diverted to al-Qa'ida, based on its observation that "[s]everal of Bin Ladin's associates, including Wa'il [Jelaidan] and Muhammad Jamal Khalifah, were MWL representatives, according to [redacted] press reporting." *Id.* at CIA_000150.

536. However, the November 14, 2002 CIA report does not state that Jelaidan and Khalifa were associates of Bin Ladin at the time they were affiliated with MWL, nor does it identify the "press reporting" cited. *Id.*

537. The November 14, 2002 CIA report then states, "[Redacted] funds destined for al-Ittihad al-Islamiyya (AIAI) in were funneled through several Saudi NGOs, including MWL." *Id.*

538. The November 14, 2002 CIA report does not provide a factual basis or source for this assertion, with the redactions further obscuring the nature or credibility thereof. *Id.*

539. The November 14, 2002 CIA report closes the discussion of MWL by stating, "[Redacted] does not indicate whether Saudi officials or the head office is complicit in terrorist support." *Id.*

540. A 2004 CIA-FBI Collaborative Intelligence Assessment concludes that "[t]here is no evidence that either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001." Ex. 75, "Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States," (Dec. 2004) at EO14040-003416-UPDATED.

541. The assessment further notes that the Government of Saudi Arabia suspected that Bin Jiluwi, a "leader" of the Eastern Province office of IIRO, "embezzled" more than $3 million from IIRO. *Id.* at EO14040-003419-UPDATED. The assessment does not state that the embezzled funds were diverted to Al Qaeda. *See generally id.*

542. The assessment then states that in October 2004 the Government of Saudi Arabia decided to assume control over the assets of the al-Haramain Islamic Foundation (whose U.S. branch the United States designated as a foreign terrorist organization), but the Government of Saudi Arabia did not feel that such action was warranted in the case of IIRO. *Id.* at EO14040-003420-UPDATED, EO14040-003430-UPDATED .

543. The 2004 assessment does not conclude that IIRO or MWL, directly or indirectly through any other charity or entity, provided funds to al Qaeda. *See generally id.*

544. The 9/11 Commission's "Monograph on Terrorist Financing" recognized the challenges in determining al Qaeda's actual funding sources and urged caution in accepting a funding theory as fact:

> In many cases, one or two threads of information make such theories tantalizing; but after careful review of all of the evidence available to us, including some of the most sensitive information held by the U.S. government, we have judged that such theories cannot be substantiated.

Monograph at 19.

545. The Monograph also warned of the "perils" of relying on "custodial interviews of captured al Qaeda members," because "[d]etainees may provide misinformation and may misrepresent or mischaracterize their roles or the roles of others. As a result, corroborating their information, through other custodial interviews, documentary evidence, or other intelligence collection, is critical in assessing what we know about al Qaeda financing." Monograph at 19.

546. While the Monograph notes charities were a source of Al Qaeda funding, it clarified:

> Al Qaeda's charities' strategy before 9/11 had two prongs. In some instances, al Qaeda penetrated specific foreign branch offices of large, internationally recognized charities. In many cases, lax oversight and the charities' own ineffective financial controls, particularly over transactions in remote regions of the world, made it easy for al Qaeda operatives to divert money from charitable uses. These large international Gulf charities donated money to end recipients, usually smaller in-country charities, whose employees may have siphoned off money for al Qaeda. In the second class of cases, entire charities from the top down may have known of and even participated in the funneling of money to al Qaeda. In those cases, al Qaeda operatives had control over the entire organization, including access to bank accounts.

Monograph at 21.

547. According to this portion of the Monograph, employees of "smaller in-country charities" diverted funds to al Qaeda, or entire charities *other than* "large international Gulf charities" were controlled by al Qaeda. *Id.*

548. The Monograph further urged that the role of Saudi charities must be assessed in the context in which they exist.

> Much has been made of the role of charities, particularly Saudi charities, in terrorist financing. A little context is necessary here. Charitable giving, known as zakat, is one of the five pillars of Islamic faith. It is broader and more pervasive than Western ideas of charity, in that it also functions as a form of income tax, educational assistance, foreign aid, and political influence. The Western notion of the separation of civic and religious duty does not exist in Islamic cultures. The Saudi government has declared that the Koran and the Sunna (tradition) of Muhammad are the country's constitution, and the clergy within Saudi Arabia wield enormous influence over the cultural and social life of the country.
>
> Funding charitable works is ingrained into Saudi Arabia's culture, and Saudi zakat has long provided much-needed humanitarian relief in the Islamic world. In addition, a major goal of Saudi charities is to spread Wahhabi beliefs and culture throughout the world. Thus Saudi efforts have funded mosques and schools in other parts of the world, including Pakistan, Central Asia, Europe, and even the United States. In some poor areas these schools alone provide education; and even in affluent countries, Saudi-funded Wahhabi schools are often the only Islamic schools available.

Monograph at 21.

549. The Monograph did not identify IIRO or MWL as a charity providing funds to al Qaeda, directly or indirectly, or one suspected of doing so. *See generally* Monograph.

550. The Monograph did not mention IIRO at all. *Id.*

551. The Monograph mentioned MWL only with respect to Enaam Arnaout, who the Monograph notes "allegedly provided military and logistical support to the mujahideen in the late 1980s and early 1990s, as an employee of LBI and another Saudi NGO, the Muslim World League." *Id.* at 95.

**Treasury Department Designations**

552. After the 9/11 Attacks, President George W. Bush signed Executive Order 13224 ("E.O. 13224"). Exec. Order No. 13,224, 66 Fed. Reg. 49079 (Sept. 25, 2001). Sanctions and a designation as a specially designated global terrorist ("SDGT") under EO 13224 are administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"). Ex. 18, Brown Rpt. at 92.

553. The standard for designations is not articulated in Executive Order 13224 or the International Emergency Economic Powers Act ("IEEPA"). Ex. 38, Gurule Dep. Tr. at 89:23-91:6, 93:21-94:9. The Executive Order also does not specify standards or evidence of proof. Ex. 18, Brown Rpt. at 92.

554. The unarticulated standard for designations under EO 13224 and the IEEPA falls below the civil litigation "preponderance of the evidence" standard. Ex. 38, Gurule Dep. Tr. at 93:13-96:2.

555. EO 13224 "seeks to cast a wide net so as to disrupt the channels of terrorist financing to save lives." Ex. 38, Gurule Dep. Tr. at 88:5-10. Persons who unknowingly, unwittingly, or inadvertently finance terrorism may be subject to designation under EO 13224. *Id.*

at 87:14-88:4 ("Q. So your understanding is that an individual who may be unknowingly providing or financing terrorist activity could be subject to designation under Executive Order 13224, is that right? A. Yes. Q. And by the same token, an individual who may be unwittingly financing terrorism activity could be subject to designation under Executive Order 13224, is that fair to say? A. Yes; so it's both, someone could be doing it intentionally, knowingly, willfully, or inadvertently, unknowingly.").

556. Designation under EO 13224 as an SDGT is an administrative action, not a criminal or civil action. The designation process is not an adjudication of the guilt of innocence of the target of the SDGT designation. Ex. 38, Gurule Dep. Tr. at 83:19 – 84:7.

557. There is no requirement that the U.S. government establish the existence of evidence that an actual act of terrorism was committed by a target that is being considered for designation pursuant to EO 13224. Nor is there any requirement that the government demonstrate that a target intended to support terrorism in any way. Ex. 38, Gurule Dep. Tr. at 84:8 – 86:6.

558. The types of evidence that can be considered in the SDGT designation process is very broad and can include hearsay statements from an article or the internet or other material that would no evidentiary value in a civil litigation. Ex. 38, Gurule Dep. Tr. at 96:3-23.

559. Subjects of designations are not permitted to rebut a designation prior to the designation. Ex. 38, Gurule Dep. Tr. at 119:23-121:18 ("Q. Is the individual or entity who is the potential target, is that individual or entity afforded the opportunity to participate in any way in the designation process predesignate? A. No… Q. They're not asked to submit any evidence of any kind in terms of a basis for or against the designation predesignation, is that right? A. That's correct….").

560. According to Vahid Brown, an OFAC designation "only documents the fact of a US government suspicion of such an association and does not itself constitute evidence of such an association, nor does it prove the existence of any such evidence." Ex. 18, Brown Rpt. at 91-92.

561. Neither IIRO nor IIRO's Head Offices in Jeddah, Saudi Arabia has ever been designated by the OFAC as a Specifically Designated Terrorist. U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 10, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list.

562. No IIRO employee, member of management, or office was designated by the US Treasury Department's Office of Foreign Assets Control ("OFAC") as a Specially Designated Terrorist prior to September 11, 2001. Ex. 4, May 21, 2024 Basha Decl. ¶ 79; U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 10, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list.

563. Neither IIRO Head Office nor its Secretaries General has ever been designated by OFAC. U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 10, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list.

564. Neither IIRO, nor its Secretaries General, nor any IIRO branch office has ever been designated a Foreign Terrorist Organization by the Secretary of State. U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 10, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list.

**Treasury Designation Memoranda**

**Memorandum Concerning Designation of Adbul Hamid Al-Mujil ("Mujil")**

565. The Memorandum designating Adbul Hamid Al-Mujil is heavily redacted. Ex. 88, Treasury Department Memorandum File, at TREASURY00102.

566. For example, citing 16 exhibits, the Memorandum designating Al-Mujil asserts that IIRO "is one of the primary the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL, the Taliban, and Hamas, as well as al Qaida affiliates, *inter alia*, the Abu Sayyaf Group (ASG), Jemaah Islamiyah (JI), and Al Ittihad Al Islamiya (AIAI)." *Id.* at TREASURY000106 (internal citations omitted). The names of these exhibits are all redacted from the list of exhibits at the end of the memorandum. *Id.* at TREASURY00115-17.

567. The Memorandum designating Al-Mujil asserts that "AL-MUJIL provided donor funds directly to al Qaida, particularly for Islamic fighters, according to a report…" *Id.* at TREASURY00107. The remainder of the paragraph and following page are all redacted. *Id.* at TREASURY00107-08. The unredacted portions do not provide the factual basis or the source for this allegation.

568. Similarly, the allegation in the Memornadum designating Al-Mujil asserts that, "In the late 1990s, AL-MUJIL provided direct financial assistance to ASG leaders" and is followed by several redacted paragraphs. *Id.* at TREASURY00108-09.

569. To the extent the Memorandum cites Al-Mujil's conduct purportedly in his capacity with IIRO, it cites alleged conduct post-dating the 9/11 Attacks by over four years. *Id.* at TREASURY00109 ("In line with Al-Mujil's decision-making responsibilities, in February 2006, IIRO-EP's Al-Mujil planned to inspect IIRO-THA, [redacted]. In addition, Al-Mujil often

'adjudicated' (possibly meaning authorized) payment transfers, mosque and well construction, school curricula and orphan care programs for these branches, [redacted] in January 2006.").

**Memorandum Concerning Designation of IIRO-Philippines**

570. The Treasury Memorandum concerning the designation of IIRO-Philippines office asserts that the office:

> was founded some time in the early 1990s by UBL's brother-in-law and senior al Qaida member Muhammad Jamal Khalifah. While working as the director of IIRO-PHL, Khalifah maintained close ties to senior al Qaida figures Abdullah Azzam and Abdulhassan al-Midani a.k.a. Wa'el Hamza Julaidan, a long-time senior official of the IIRO (and the Muslim World League).

*Id.* at TREASURY00110 (cleaned up).

571. Muhammad Jamaal Khalifa could not have "maintained close ties [with] Abdullah Azzam" "while working as the director of IIRO-PHL," because (i) IIRO-Philippines was founded "in the early 1990s" (per the Memorandum, *id.*); and (ii) Azzam was assassinated in ***1989***. *See* 9/11 Commission Rpt. at 56.

572. Wael Jelaidan was never an employee of IIRO. Ex. 4, May 21, 2024 Basha Decl. ¶ 77.

573. Wael Jelaidan was not a "long-time" official of MWL. He resigned from MWL on November 1, 1995 and held no further employment with MWL. Ex. 15, 2018 Fawzi Decl. ¶ 38.

574. The remainder of the Memorandum designating the IIRO-Philippines office is heavily redacted. Ex. 88 at TREASURY00111-14. However, the unredacted portions assert that the IIRO-Philippines office "provided support for recent ASG terrorist attack" (*id.* at TREASURY00111), but there is no factual basis or source cited for this allegation.

575. The unredacted portions of the Memorandum asserts that the IIRO-Philippines office, "under the direction of Khalifah, also sent ASG and MILF members to Afghanistan to train with the 'mujahidin.'" *Id.* at TREASURY00113. Khalifah left the office in 1993. Ex. 12, Chaouat

Decl. ¶ 64; Ex. 8, Daguit Decl. ¶ 20; Ex. 4, May 21, 2024 Basha Decl. ¶ 78. The unredacted portions do not provide the factual basis or the source for this allegation, which, even if true, has no connection to Al Qa'eda or the 9/11 Attacks nearly a decade later.

576. The Memorandum concludes with its "Bases for Designation," which rely on the above allegations. Ex. 88 at TREASURY00113.

**Memorandum Concerning Designation of IIRO-Indonesia**

577. The Treasury Memorandum concerning the designation of IIRO-Philippines office is one page and is heavily redacted. Ex. 88 at TREASURY00114. Aside from its header, the one-paragraph section, "IIRO-IND Support for al Qaida" is entirely redacted. Ex. 88 at TREASURY00114.

578. The sole unredacted portion of the Memorandum designating the IIRO-Philippines office reprises the allegations against Adbul Hamid Al-Mujil concerning conduct in 2006. *Id.* ("Al-Muji reportedly has decision-making authority over a number of offices in Southeast Asia, including IIRO-IND. Al-Mujil often 'adjudicates' (possibly meaning authorized) payment transfers, mosque and well construction, school curricula and orphan care programs for these branches, [redacted] in January 2006.").

579. The conclusion of the Memorandum designating the IIRO-Philippines office, setting forth the three reasons for the designation of the office, asserts that the office "financ[es] the creation of training facilities to be used by al Qaida associates in Indonesia." *Id.* It does not provide the factual basis or the source for this allegation.

**Plaintiffs' Experts Rely on Press Releases Issued by the Office of Foreign Assets Control**

580. Reports authored by Plaintiffs' experts rely on the press releases issued by OFAC when it designated IIRO-Philippines, IIRO-Indonesia, Abdul Hamid al-Mujil, and Wael Jelaidan, which press releases contain unsourced assertions. *See, e.g.,* Kohlmann Rpt. ¶ 34 (citing Treasury

Department Statement on the Designation of Wa'el Hamza Julidan); *id* ¶ 121 (citing OFAC press release concerning designation of Mujil, IIRO-PHL, and IIRO-IND); *id.* ¶ 123 (same); Winer Rpt. ¶ 12.17 (citing Treasury Department Statement on the Designation of Wa'el Hamza Julidan); *id.* ¶ 11.8.1 (citing press OFAC press statement concerning designation of Mujil, IIRO-PHL, and IIRO-IND); *id.* ¶ 12.9.2 (same)

581. Reports authored by Plaintiffs' experts quote OFAC press releases:

a. Regarding IIRO-PHL:

> "The IIRO-PHL is a source of funding for the al Qaida-affiliated ASG [Abu Sayyaf Group]. IIRO-PHL has served as a liaison for the ASG with other Islamic extremist groups. A former ASG member in the Philippines familiar with IIRO operations in the country reported that a limited amount of foreign IIRO funding goes to legitimate projects and the rest is directed to terrorist operations. The Philippine branches of the IIRO were founded sometime in the late 1980s or early 1990s by Muhammad Jamal Khalifah, who is Usama bin Laden's brother-in-law and has been identified as a senior al Qaida member. IIRO-PHL's director, Abd al-Hadi Daguit, is a trusted associate of Khalifah. While working as the director of IIRO-PHL, Khalifah maintained close connections with al Qaida through his relations with senior al Qaida supporters, including Specially Designated Global Terrorist (SDGT) Wa'el Hamza Julaidan. At the time Khalifah directed the IIRO-PHL, he employed an ASG intelligence officer as the provincial director of the IIRO-PHL in the Tawi-Tawi region of the Southern Philippines until that officer's death in 1994. In the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-PHL and used the organization to funnel money to terrorist groups including the ASG. Afif was implicated in the assassination of Father Salvatore Carzeda in San Jose Gusu, Zamboanga City, Philippines on June 20, 1992...."

Kohlmann Rpt. ¶ 121 (quoting OFAC press release concerning designation of Mujil, IIRO-PHL, and IIRO-IND).

b. Regarding IIRO-IND:

> "The IIRO Indonesia director has channeled money to two Indonesia-based, JI-affiliated Islamic foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed the establishment of training facilities for use by al Qaida associates."

Kohlmann Rpt. ¶ 121 (quoting OFAC press release concerning designation of Mujil, IIRO-PHL, and IIRO-IND); Winer Rpt. ¶ 12.9.2 (same).

c. Regarding Abdul Hamid al-Mujil:

> "Al-Mujil has been called the 'million dollar man 'for supporting Islamic militant groups. Al-Mujil provided donor funds directly to al Qaida and is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI)… In 2004, Al-Mujil invited a Philippines-based JI supporter to Saudi Arabia under the cover of traveling for the hajj (the Muslim pilgrimage), and planned to provide him with cash to carry back to the Philippines to support organizations including JI. Al-Mujil was also present in Afghanistan in the late 1990s and personally knew Usama Bin Ladin and deceased al Qaida co-founder Abdallah Azzam. Al-Mujil traveled continuously to meet with members of Bin Ladin's organization in Arab countries. In the 1990s, Al-Mujil established a relationship with senior al Qaida operational planner Khalid Shaykh Muhammad. Al-Mujil has a long history of providing support to terrorist organizations. He has contributed direct financial assistance to ASG leaders, including Abdurajak Janjalani (deceased). The Indonesian and Philippines branches of IIRO have received support from IIRO-EP, which in turn is controlled by Al- Mujil. Indeed, he is often responsible for authorizing payment transfers for IIRO Philippines (IIRO-PHL) and IIRO Indonesia (IIRO-IDN)."

Kohlmann Rpt. ¶ 123 (quoting OFAC press release concerning designation of Mujil, IIRO-PHL, and IIRO-IND).