# EXHIBIT R

# MEMORANDUM FOR THE RECORD

Event: **Samuel R. Berger**
Type of Event: Interview
Date: January 14, 2004
Time: 10 a.m.-5:30 p.m.
Special Access Issues: Treat as ~~TOP SECRET/~~25X1 ; a TS version is also available
Prepared by: Warren Bass
Reviewed by: Michael Hurley, Alexis Albion
Team Number: Three (Counterterrorism Policy)
Location: 2100 K Street NW
Participants – Commission: Commissioner Richard Ben-Veniste, Commissioner Jamie Gorelick, Commissioner Tim Roemer, Philip Zelikow, Chris Kojm, Dan Marcus, Michael Hurley, Warren Bass, Alexis Albion, Ernest May

**Background**

Samuel ("Sandy") Berger was national security adviser during President Clinton's second term, from 1997-2000. (U)

Berger graduated from Harvard Law School in 1971. He worked on Capitol Hill and Democratic political campaigns in 1971-72 before joining the law firm Hogan & Hartson in 1973. In 1977, he joined the Policy Planning staff at the State Department. In 1981, he returned to Hogan & Hartson. In 1991, he was involved with the Clinton campaign for president. He was the national security and foreign policy director of the Clinton-Gore transition team and served as deputy national security adviser during the administration's first term, from 1993-96. (U)

Berger first met Bill Clinton while both men were working for the 1972 McGovern presidential campaign; they have a close personal relationship. (U)

**Berger's Cautions**

Berger urged the Commission not to rely excessively on documents to tell the whole policy story. Much of the administration's business was done in person, on the phone, or in conversations and meetings—not on paper. "Reconstructing this as a paper exercise is insufficient," Berger said. (U)

He also cautioned the Commission—whose work he said he supported—to try not to see a pre-9/11 world through post-9/11 eyes. We now know far more about UBL and al-Qa'ida, he noted. History is seen through a rearview mirror, Berger said, but "history is lived through a foggy windshield." (U)

Declassified Under Authority of the Interagency
Security Classification Appeals Panel,
E.O. 13526, sec. 5.3(b)(3)
NSC-directed ISCAP Review, Document 1
Declassification Date: September 8, 2026

Berger also cautioned the Commission not to rely too heavily on documents in writing its report. "Government doesn't run by documents," he said. "Government runs by conversations." (U)

**First Encounters with Terrorism**

"Terrorism was thrust upon us early," Berger said. Shortly after the inauguration in 1993, Mir Amal Kansi assassinated two CIA agents; then came the February 1993 WTC bombing; then Kuwait broke up the Iraqi plot to assassinate former President George H.W. Bush. Terrorism was then seen as a much broader phenomenon than just al-Qa'ida and included Iraq, the perpetrators of the 1983 Marine barracks attack, and so on. It became a higher priority "earlier than I would have expected," Berger said. The June 1993 efforts to thwart the jihadist "day of terror" further intensified the focus. (U)

**Organizing CT Policymaking**

The usual administration policy process ran from an interagency working group (IWG), to the DC, to the PC, (which usually met twice a week and had a significant degree of responsibility for terrorism), to President Clinton. As such, Berger had significant CT responsibilities during the first term, when he was National Security Adviser Anthony Lake's deputy. The administration energized the CSG early on as the "chief operational arm of the terrorism apparatus," Berger said, and it became more active as time went on. (U)

Berger resisted the notion that the CSG was a low-level body. CSG meetings were held at an assistant secretary level, bringing together what he called very senior representation—indeed, the highest-ranking people in their agencies working on CT issues. The DC met three to four times per week to cover the world, from Iraq to North Korea to the Middle East peace process to international trade; it was, in Berger's words, "the workhorse" of the foreign policy process. You cannot expect people at the deputies' level to be chief operating officers for a particular issue, Berger said. Nobody ever said that CSG representation was too low. Moreover, CSG representatives could report to their agencies and principals. "We took the CSG very seriously," Berger said. (U)

In the first term, the CSG's issues sometimes went to the DC or to the PC. The CSG was not an organization for high policy, like US overall stances on Pakistan, the Taliban, or Saudi Arabia. Rather, CSG's initial purview was assessing threat information, dispatching NEST teams, and so on. It became an extraordinarily active coordinating mechanism, Berger said, especially in the second term. By the 1997-2000 period, the CSG more often reported directly to the principals. Berger's deputy, James Steinberg, became the instrument steering issues to the PC or DC. (U)

Attorney General Reno was concerned that, on policy matters, the CSG was sometimes skipping the DC step. (DCs did still sometimes tackle the policy issues at play, such as Pakistan, Berger said.) By 1997-98, Berger had a concern of his own: the number of people seeing top-secret documents intended for PCs. He estimated that close to a thousand people might see such highly sensitive documents, including close to 70 staffers at the NSC alone. So Berger moved to establish a UBL "Small Group," a body of key

national security principals whose meetings tended not to be accompanied by much paper. This not only limited the amount of information spillage, Berger noted, but might encourage openness and frankness from the CIA and FBI. ~~(C)~~

In what he called a highly congenial administration, a great deal of business was also transacted in phone calls and smaller, informal meetings, Berger pointed out. He had a weekly breakfast with top policymakers including the DCI, Albright, Cohen, CJCS, and Fuerth. He also attended the weekly "ABC" lunch—Albright, Berger, and Cohen. Berger spoke by phone with Albright and Cohen about six times daily, and he had two or three calls per day with Tenet. (U)

The Small Group met every two weeks or so, Berger said. It would usually start by having the DCI explain current threats. (U)

Berger said he was "fairly proud" of the operation of the administration in procedural terms. "We were not at war with each other in the pages of the *Washington Post*... except on Thursdays," he joked. (U)

**Berger's NSC**

Berger said he ran a more operational NSC than Condoleezza Rice currently does. There was a philosophical disagreement here. He saw it as his job to reach the "highest common denominator." Berger said that if he could get interagency consensus on about 80 percent of what was needed, he'd take it. But he also was wary of weak consensuses. If a national security adviser couldn't get that type of 80 percent agreement, they should give the president three sharp options and fairly present the positions of the agencies. Berger added that the current NSC is not as good at bringing agencies together or laying out options for the president to choose. (U)

Beyond that, Berger said his job was to do deconfliction and keep the president informed. The APNSA was also foreign policy chief of staff for the president. (U)

**Three Phases: Grappling with the UBL Threat**

Berger identified three main phases in the Clinton administration's views of UBL. In the first phase, from the early 1990s up to about 1996, UBL was not high on their radar. State referred to him as a "terrorist financier." They knew of no UBL footprints on WTC I, OPM-SANG, or Khobar Towers. He'd taken some credit for OPM-SANG, but Berger said he knew of no intel saying that UBL was responsible for the attack. UBL was one of a cluster of terrorist blips on the radar screen—"and not even a flashing red light"—including Mugniyah, EIJ, GIA, Hezbollah, and so on. (U)

In the second phase, from 1996-97 until August 1998, UBL was of greater concern to us, Berger said. UBL's own language was becoming far more strident, and he had released his original fatwa calling for the death of Americans. Moreover, intel reporting warned about his interest in WMD and captured a variety of threat information, some of it quite specific (for example, a walk-in warning of designs on a specific embassy). UBL's name was familiar to the administration before the term al-Qa'ida was, Berger said. In June

1998, Berger said on *Nightline* that UBL "may be the most dangerous non-state terrorist in the world..." UBL was more than a blip on a radar screen; he was a real inspiration to jihadists. (U)

The third phase stretched from the August 1998 embassy bombings onward. The East Africa attacks marked the first time that DCI Tenet came to us definitively—and rather quickly, Berger added—and called a terrorist attack an al-Qa'ida operation for which UBL was responsible. From this point on, CT efforts ramped up significantly. They didn't know about UBL's links to the 1993 WTC attack until they left office; the link to Ramzi Yousef was unclear, as was the link to the Bojinka plot. Al-Qa'ida was "never a hierarchical organization like Exxon," Berger said. Rather, they thought of the organization as including UBL and his senior lieutenants (including some names they knew quite well at the time, such as Zawahiri and Abu Hafs), but things got fuzzy beyond UBL and his immediate coterie. ~~(C)~~

**The Bojinka Plot**

The USG heard about the Bojinka plot quickly, after Philippine police's suspicions were aroused. APNSA Lake called the FAA, which grounded planes flying from the Pacific to the United States until they were sure that the situation had played itself out. The plot was intended to blow up 12 or more planes bound for America. Ramzi Yousef or someone else in his group did a trial run on a Japanese plane, Berger recalled; the operative left a bomb on a plane touching down at multiple destinations and got off at the next stop. The USG took this plot very seriously. ~~(C)~~

**Sudan: A Dead End**

Berger saw no chance that Sudan would have handed over UBL and noted that the USG's lack of an indictment against UBL was not the obstacle. "This was a terror state, run by Turabi and Bashir," Berger said. Their regime was willing to leave 2 million of its own people dead in its war with the south, bomb food centers, try to kill Mubarak, and offer sanctuary to terrorists. (U)

The USG was very interested in trying to stop Sudan from engaging in terror. Sudan was put on the list of state sponsors of terrorism in 1993. Thereafter, the USG held ongoing conversations with the Sudanese about getting them off the list, Berger said. Among the items that Sudan was supposed to undertake was expelling UBL, who had a fairly substantial business and financial infrastructure there that the USG wanted to separate him from. In 1996, we still didn't know of any UBL attacks on US citizens. (U)

The USG and Sudan started to discuss the idea of turning UBL over to someone who would deal with him—an issue raised by the US side, Berger said. CIA seems to have asked 25X1 [redacted] if they would take UBL; all said no. This was handled by the CIA; White House involvement was probably at the CSG level. ~~(S)~~

Moreover, the Sudanese said they wouldn't turn UBL over, and there was a sense that this was never likely; indeed, the Sudanese kept up ties with him even after they asked him to leave the country. (Berger did not know whether the Saudis encouraged them).

Berger stressed that he has spoken to everyone involved in this business, save General Erwa, since 9/11, and no one in the process recalls a Sudanese offer to give up UBL. He's told there was a hypothetical CSG discussion about bringing UBL to the US in which DOJ said there was no basis for this, arguing that we can't hold him here. (U)

Berger was never briefed on a UBL rendition from Sudan at the time, he said. "Tenet, Clarke—no one brought to me such a plan," Berger added. He noted again that by 1996 there was no intelligence assessment that said that UBL was responsible for any act against an American citizen. Neither Tenet, Clarke, nor Susan Rice have ever claimed that the USG could get UBL. Berger thinks there was no Sudanese intent whatsoever to turn UBL over to any hostile country. He knows of nobody who claims Sudan ever made such an offer, except for Erwa, a "known pathological liar." (U)

**KSM in Qatar**

In 1996, Berger was informed that the terrorist Khalid Shaykh Muhammad was in Qatar. They then asked the military for a capture plan. DOD came back with a plan that was quite elaborate. Berger, who was then Lake's deputy, recalls a DC on the subject that decided that DOD's plan was "unworkable." Without a good option from DOD, the USG decided to ask the Qataris to cooperate on a rendition. *[Commission note: Commissioner Gorelick, who was deputy attorney general in this period, also remembers a DC on a KSM rendition; she also recalls the DOD plan as having been unworkably large.]* ~~(TS/~~25X1 )

KSM was gone when the US and Qataris arrived, Berger said. They heard that someone in the Qatari government had tipped him off (which had been the original concern about trusting the Qataris to do the rendition in the first place). The Qataris were our allies, Berger said, but he thinks we preferred to try to capture KSM on our own. Unfortunately, the Deputies thought that a unilateral rendition wasn't feasible, so they used the FBI—Berger thinks—to ask the Qataris to catch KSM instead. A CIA rendition was discussed, but they made a judgment call to go with the FBI. Moreover, Berger isn't sure about what paramilitary capacity CIA had at the time (though he noted that some of what CIA did after 9/11 was very impressive). He doesn't know why they considered military options here, but their plan was simply too big, and it would have been seen coming. Berger also wanted to be clear that renditions did not just mean asking any country to capture the terrorist and did not mean that the USG was uninvolved. "Someone else knocks down the door," Berger said, "but the brains of the operation almost invariably is the United States." ~~(TS/~~25X1 )

Berger called renditions an important CT tool and an innovation of the Clinton administration. He recalls only one rendition before the Clinton administration; a PDD then greatly expanded the use of renditions. This tactic caught more than 50 senior terrorists—mostly but not exclusively al-Qa'ida—including Ramzi Yousef. Renditions were innovative because they let the USG skip the extradition process, and they were done quietly, often without the cooperation of the host government. ~~(TS/~~25X1

In 1996-97, the USG started a program of rolling up as many al-Qa'ida cells around the world25X1 This was successful 25X1 25X1 from 1996-97 to the end of the administration. ~~(TS~~25X1 )

**Khobar Towers**
Berger said there was no doubt in his mind that the attack had links to the Iranian government, but he was never sure how high up it went inside the regime in Tehran. Berger blamed the attack on indigenous Saudis with some level of backing by Iran. There were certainly sufficient high-level Iranian officials involved for Reno and her deputy, Eric Holder, to say so publicly. But he stressed that the administration had evidence of Iranian involvement, rather than a definitive intel judgment. They had to rely on the judgment of the heads of the FBI and CIA. The White House shouldn't manipulate intelligence, Berger said. ~~(S)~~

Berger called the Khobar investigation a "rather bizarre chapter." The USG wanted access to Saudi suspects, and Berger recalled that the president met in the Oval Office with Saudi Crown Prince Abdullah on this topic. President Clinton was far tougher than his talking points, warning that the US-Saudi relationship was on the line here. The president also met on Khobar with Vice President Gore, who was even tougher. (U)

But the Saudis barred US access to the suspects, for fear that we would find evidence of Iranian government involvement and attack Iran, whereupon Iran would attack Saudi Arabia. (U)

Freeh, however, felt that the White House did not care about Khobar, Berger said. The Saudi ambassador, Prince Bandar bin Sultan, would came to the White House and ask Berger and NSC staffer Bruce Riedel repeatedly—Berger thought perhaps three to five times—what the US would do if it found out that Iran was behind the Khobar bombing. Berger would refuse to take the use of force off the table. Berger would always say the same thing: I can only assure you that we will not take action with absolute, complete, full consultation with the Saudi government. "It was like Groundhog Day," Berger added. (U)

It was only later, Berger said, that he understood the "scam" that Bandar was working on Khobar, as laid out in Elsa Walsh's piece in *The New Yorker*. (Berger later asked to soften the word "scam.") From the article, he gathered that, after Bandar left his Khobar-response conversations with Berger, the Saudi ambassador was then telling Freeh that the White House wasn't pushing him on Khobar and didn't care about the case. Freeh bought this, Berger said, and thus did not ask for an indictment. Only later, Berger said, did he realize that Bandar was playing the White House off against Freeh so as to take pressure off the Saudis, who in turn wouldn't have to turn over suspects from the bombing to the United States. Berger said it was just his thesis in hindsight—"a very clever stratagem by the very sophisticated Saudi ambassador to the US"—but he had a "eureka" moment when he read the Walsh piece. He called Bandar's ploy successful to the extent that they never got closure on Khobar. (U)

Berger personally met with Bandar about Khobar, and both President Clinton and Vice President Gore spoke to Abdullah on several occasions. One time, Berger recalled, President Clinton received a weak set of talking points for a meeting with Abdullah which were rewritten because they were clearly not what they wanted; the president then went on to deliver an even tougher message. But Freeh reported that we threw out the FBI's talking points, much to his displeasure. Berger conceded that, in this instance, maybe he should've called Freeh to clear up the misunderstanding. (U)

Freeh was more fixated on Khobar than al-Qa'ida, Berger said, adding that when Freeh left office in 2001, he said the Khobar case still wasn't solved. During his discussion of Freeh and CT policy, Berger briefly described the case of Hani el-Sayegh, a Saudi extremist apprehended by the Canadians. Freeh argued strongly that the USG should get him to the U.S., pressure him, and threaten to send him back to Saudi Arabia, which Freeh insisted would make him squeal at some point. Berger, Albright, and President Clinton all eventually agreed to Freeh's plan, although many were skeptical of this scenario. Sayegh was brought here and taken to the airport to be returned to Saudi Arabia, whereupon he waved goodbye and left. The others were left unimpressed with Freeh's certainty that deportation to Saudi Arabia would get Sayegh to talk. ~~(S)~~

Berger said he was unaware of information linking Khobar to al-Qa'ida or UBL. Rather, the Khobar attack indicated to Berger that the U.S. had multiple terrorist enemies. (U)

On the question of Iranian culpability, Berger added that, on two or three occasions, Clarke reached conclusions that the IC hadn't yet reached. Berger said that Tenet never had clear evidence on responsibility for Khobar and did not believe that Iran was involved with the same degree of certainty that Clarke did. I almost always agreed with Dick, Berger said, but not always. Moreover, Berger pointed out, the DCI is the chief intelligence adviser to the president; the NSC senior director for counterterrorism is not. (U)

There's no question about Iran's involvement on Khobar, Berger repeated, but he didn't know about high-level Iranian government involvement. Moreover, he thinks they were never presented with the conclusion from the IC that this was a high-level Iranian government operation. ~~(S)~~

Khobar was a tough US call, given Iranian politics at the time, including the election of President Khatami. Bombing Iran at this time would kill the Iranian reform movement, Berger said. Moreover, the IC warned that they could expect multiple retaliatory Iranian strikes on US targets. If the IC had told them that Khobar was an Iranian government operation, they would've had to face up to a painful choice, Berger said, but the president would have taken the appropriate action. In the weekly "ABC" lunches, Albright, Berger, and Cohen discussed the dilemma. What was safer for the US over the long term—striking back or having a reformist regime in Tehran? If the objective of military action was to prevent a future attack on the US, it was tough to decide to whether a military strike or regime change would better achieve this. A military option against Iran was

Case 1:03-md-01570-GBD-SN Document 12365-4 Filed 10/13/26 Page 9 of 27



never ripe for decision, Berger said. But it was not because the US was afraid to use force.(U)

In the end, the administration chose the 25X1 covert program as a response. There was no Iraqi terrorism against the US after the 1993 strike on Mukhabarat headquarters in Baghdad, Berger noted, and there was no Iranian terrorism against the US after 25X1 He's not sure if there was a causal nexus there. 25X1 25X1 but the USG hadn't ruled out further steps if the determination was ever made that the highest levels of the Iranian government had been involved with Khobar. But the consequences of military action were so large that they wanted a high standard of proof to justify an attack. The world would want to know about Ayatollah Khameini's response if we bombed amid what was thought to be the Iranian counterrevolution. (~~TS~~25X1 )

**The Attempted Assassination of Former President Bush**

In 1993, the Kuwaitis arrested a group of bomb plotters hoping to kill former President Bush on his trip to the emirate. A small US cell tried to establish Iraqi complicity. The bomb's forensics turned out to show signature identical to bombs used in the 1991 Gulf War by Iraqi intel. Berger doesn't recall whether or not this evidence came from the Kuwaitis. ~~(C)~~

The president was very involved in the decision to retaliate against Iraq. CJCS Powell recommended targeting Iraqi Mukhabarat headquarters for a reprisal, Berger said; he assumes Defense Secretary Aspin did so as well. Berger did not consider such a strike a mere pinprick; rather, it was the equivalent of wiping out Langley, Virginia. They did decide to bomb the Mukhabarat's headquarters at a time when it was not populated, unlike in August 1998, when the USG deliberately tried to hit the camps when people were there. The purpose here was to deter and retaliate, Berger said, not to kill perpetrators, as was the case in 1998. ~~(TS)~~

The former president was informed, perhaps as late as the day of the strike, Berger said (or perhaps they informed former APNSA Scowcroft). They received absolutely no disagreement from former President Bush. Operational secrecy was paramount. Nobody at the White House knew except for the president, Lake, Berger, and perhaps Chief of Staff McLarty and perhaps someone in TNT. (Berger added that ideas that this strike emboldened Saddam Hussein to complete his WMD program are "inventions of 2003.")

**The 1993 "Day of Terror" Plot**

Berger thinks he was aware of the plot at the time but said he is not a great expert on it. The FBI-led operation to respond was called "TerrStop," he recalled. But it was not FBI practice to share operations with the White House. (U)

**The May 1998 Capture Plan**

Berger said that he did not think he was aware of this proposed rendition, but believes it was killed by and at CIA, Berger said. The capture op was "not a big deal at the White House," but it was a big deal at CIA. The operation was never presented to the White

House for a decision. Berger said; he said it was quite conceivable that Tenet told him about the operation, though he has no specific recollection of this. (He added that Clarke has said that he's checked since 9/11, and a decision on the plan never came over to the White House). Berger does not remember ever being given estimates of the plan's chances for success. He does recall that CIA was planning an operation, that Clarke and others were briefed on the plan at CIA, and that it was never approved by the DCI. (TS25X1 )

Berger noted that it's important to understand that there were a lot of things going on, and NSC and the IC were involved in all of them. For Berger, terrorism was the highest priority, he said—but there was a much larger canvas. He held weekly or twice-weekly meetings with the DCI, as well as DDCI McLaughlin and DAPNSA Steinberg. Berger would often do a half-hour one-on-one session alone with Tenet afterwards, where they'd frequently talk about UBL and al-Qa'ida. He'd ask the DCI, George, are you doing all that you can? Do you need more money to go after UBL? They would discuss operational details that the DCI wanted to keep very closely held. Berger was convinced that Tenet "got it" on UBL. (U)

**The Saudis and the Taliban**

Berger said that the Taliban were initially perceived in the USG as "a mixed bag": they were bringing order out of chaos in Afghanistan, but the more they learned, the more brutal they saw the regime to be. The USG had a carrot-and-stick approach to the Taliban, which involved pressure from other states who presumably had influence over the Taliban on the UBL issue. The Saudi record on this was "mixed at best", Berger said. In an al-Qa'ida plot around 1997 or so, jihadists smuggled TOW missiles in to Saudi Arabia to destroy palaces, so there's no love lost between UBL and the House of Saud. (Berger added that Crown Prince Abdullah was no fan of UBL's). (S)

At various point throughout this period, the Saudis went to the Taliban and the Pakistanis and asked them to rein in or turn over UBL, to no avail. Prince Turki told us he went to Afghanistan, met Mullah Omar, and asked for UBL—but also failed. The Saudis later cut off money, issued sanctions, and stopped issuing visas to the Taliban. The Saudis were useful to us on the intel side. Berger said—except information about things inside Saudi Arabia. (U)

The UAE also later withdrew their recognition of the Taliban, Berger added. (U)

For a carrot, the USG offered a dialogue with the Taliban, as conducted via diplomats such as A/S Inderfurth and S/CT Mike Sheehan. They also held out the prospects of possible recognition of the Taliban with a seat in the UN (via Bill Richardson's efforts in April 1998) and decent ties with the US. Moreover, there were streams of intelligence indicating dissension within the Taliban; the relatively moderate Rabbani saw UBL as a millstone around the Taliban's neck. But it was clear by early 1999 that the Taliban were unlikely to hand UBL over voluntarily, Berger said. The USG did not realize how intense the link between UBL and Mullah Omar actually was. Indeed, after 9/11, the Taliban let themselves be bombed into oblivion rather than hand UBL over. (U)

From this 1999 realization onward, the USG moved on to unilateral and multilateral sanctions, including cutting off Ariana Airlines and freezing Taliban assets that former NSC staffer Will Wechsler estimates at around $250 million. From 1999 onward, the USG was putting economic pressure on the Taliban. ~~(S)~~

In January 2000, S/CT Sheehan and A/S Inderfurth went to Afghanistan to meet with top Taliban leaders. They delivered a blunt message: the USG will hold you directly and personally responsible for further al-Qa'ida attacks on the US. This was the exact message that President Bush delivered in public after 9/11, Berger said. Sheehan was extremely clear, Berger said. He asked the Taliban bluntly if they understood what he was telling them. Sheehan translated the warning into "Threat for Dummies," Berger noted. (U)

Berger dismissed reports that Prince Turki has claimed that the Saudis almost had UBL in 1998 and then lost him after the USG bombed Afghanistan after the East Africa bombings. This was just not true, said Berger, who dismissed such reports as inaccurate revisionism. (U)

Zelikow mentioned documentary evidence that, in spring-summer 1999, Pickering and Indyk wanted to try to get the Saudis to give the Taliban a 25X1 bribe for UBL. Berger said it would have been natural for Clarke to oppose this and argue against giving money to bad guys like the Taliban. But Berger can't remember how this all converged; he said that it may have been that money flowing from the Saudis for an opposite purpose (i.e., a separate peace with the Taliban) vitiated this plan. He remembers Turki coming back from Kandahar empty-handed and saying the Taliban were crazy. Berger has no doubt that the Saudis did make a real effort at one point to try to get the Taliban to give UBL up. ~~(S)~~

Berger never saw evidence that Saudi Arabia had made its own deal with UBL. Nor did he see any intelligence showing Saudi government money going to UBL or al-Qa'ida, as opposed to money from individual Saudis. (Berger suggested the Commission talk to former NSC staffer Bruce Riedel about this). If they'd had word about Saudi government funds going to UBL, "The president would've gone into orbit," Berger said. "He would've been pretty berserk about this." President Clinton was very concerned and often asked about terrorism in private. Evidence of a Saudi deal with UBL would've been a presidential issue very quickly, Berger said. (He added that there is no doubt in his mind—although this was just a surmise—that the Saudis had made a separate deal with the Iranians along the lines of: if you don't hit us again, we won't help the Americans pin Khobar on you). (U)

**Dick Clarke**

As the new Clinton-Gore administration's transition director, Berger chose Madeleine Albright to oversee the NSC transition, and she recommended retaining Clarke, Rand Beers, and the rest of their little group, Berger said. Berger called Clarke enormously determined and focused—someone who sometimes overstates matters but with a purpose.

For Clarke, blunt speaking was a bureaucratic technique to get attention. No NSC senior director had a more loyal staff, Berger said. Clarke played well down and (often) up but not sideways. He was sometimes gratuitously offensive to colleagues, Berger said, and sometimes cut them out of the loop. Clarke was terrible with his fellow senior directors, clashed often with principals, got along well with Lake, Berger and senior working-level colleagues (e.g. Dale Watson, Randy Beers), and proved himself a great boss. "He was gonna break a lot of china," Berger said, and some of it didn't deserve to be broken. But Berger was willing to make that trade-off. (U)

Most of the principals found Clarke troubling over time, Berger said. DOD was particularly worried that he'd deploy US forces on his own. Clarke was contentious but respected and treated seriously. (U)

It was no accident that Berger chose the hard-charging Clarke. "I wanted a pile-driver," Berger said. The national security adviser was "perfectly prepared to fly air cover for Dick," but he wanted someone who would push the interagency process. Not only did Berger not give in to the monthly high-level requests to fire Clarke, he made him national coordinator under PDD-62. In Berger's opinion, Clarke served his country well, and there were many areas (such as during the Millennium period) where he was invaluable. (U)

"If I had a dollar for everyone who asked me to get rid of Dick," Berger said, "I wouldn't have to work." Rarely a month went by when someone did not come to Berger and ask him to get rid of Clarke; most of the principals complained to Berger about Clarke. Albright, Cohen, and perhaps Reno all asked Berger to fire Clarke; Berger doesn't recall if Tenet also wanted Clarke sacked. There was no love lost between Tenet and Clarke, Berger said. The attorney general so disliked working with Clarke that Reno eventually asked Berger to name Jamie Baker as a de facto ambassador ("a peacemaker") so that she didn't have to deal with Clarke. Berger added that this was a great decision. There was never a time when Reno disagreed with use of military force on legal grounds (although she sometimes dissented on policy grounds), and all these decisions were preceded by a Baker mission to Reno's office. (U)

His lone major policy disagreement with Clarke was over bombing al-Qa'ida camps in Afghanistan, Berger said. Berger said that there was nothing else "of a serious nature" that Clarke recommended that we did not do. ~~(TS)~~

Clarke's communications broke down with the FBI, Berger said. Clarke also strongly felt that the DO was not aggressive enough. ~~(C)~~

Berger cautioned the Commission to remember that he responded personally to Clarke's emails, either by notes from his EAs, phone calls, or conversations. Seeing just Clarke's emails is akin to "one hand clapping," Berger warned. Berger spoke to Clarke almost every day. Clarke wouldn't even deal with Berger's EAs; he sometimes slid a folded, stapled note under Berger's door. (U)

President Clinton had a great deal of confidence in Clarke, Berger said. He respected what Clarke was doing, was honest and forthright with Clarke on his views, and never complained about Clarke. Berger would sometimes bring Clarke with him to meetings with the president to brief on specific issues. Two days after the crash of TWA 800, when everyone else thought terrorists had downed the plane, Clarke drew a picture of the oil vents on the plane for Berger, and President Clinton was also told about Clarke's conclusions that terrorism was not involved. Clarke had access to President Clinton only via Berger. (U)

Moreover, the president gave impetus to the idea of Predator, which was dying in 2000, because he wanted actionable intelligence. Clarke used President Clinton's marginal note—"We have to do better"—on a memo about UBL written in March 2000 as a direct order from the president, as if the president had called him and had a four-hour meeting with him, Berger said appreciatively. Clarke immediately convened a meeting with CIA and FBI. ~~(TS)~~

Clarke sat at PC meetings and made the most of it, though he was not a principal himself, Berger said. (U)

Berger remembered Delenda as Clarke's codeword for who got to see CT documents; he does not remember Clarke's September 1998 pol-mil plan. ~~(S)~~

**The East Africa Bombings**

After the attacks on August 7, 1998, they immediately convened a PC and met with the president. They simultaneously handled public response, dispatched rescue and relief units, sent CIA and FBI teams to investigate, drafted President Clinton's speech, and handled other immediate responses. Within a few days, Tenet said that there was no doubt that the attacks were UBL-directed operations. This was based on **25X1** **25X1** Berger recalled, as well as **25X1** They then asked DOD for targets to strike in Afghanistan. ~~(TS)~~

A month or so earlier, a CIA soil sample taken from next to the al-Shifa plant in Khartoum tested positive for EMPTA, a precursor chemical whose lone use is VX, whose lone use is killing lots of people. ~~(S)~~

A week after the attacks, Tenet brought in what he considered very reliable information of an upcoming conference at the Khost camp, which would convene some 200-300 UBL associates as well as the terrorist mastermind himself. The gathering would plan future attacks. The information on Khost continued to hold up and, if anything, got more solid; a retaliation target set was built around the Khost meeting. The strike's purpose was to get UBL and his chief lieutenants, Berger said. ~~(TS)~~

On August 18, at a meeting in Berger's office, CJCS Shelton briefed on targets. The meeting lasted late into the night. Sixty TLAMs were targeted on a cluster of buildings at Khost. Then the discussion turned to Sudan. Hitting a second country was a controversial decision. He's looked at the evidence about al-Shifa and still thinks it was

an appropriate target. In our system, Berger said, there are lots of people further down in the stovepipes. The system relies not on someone five levels down but on the DCI at the top of the IC, and policymakers rightly listen carefully to his judgments. Al-Shifa was part of the military-industrial corporation of Sudan; UBL gave at least $10 million to that corporation and was known to be working to help the Sudanese regime get CW. Iraq was also helping the Sudanese with WMD. It would have been irresponsible not to hit, Berger said. What if gas was used on the New York City subway two weeks later? Attacking al-Shifa also sent a clear message: the USG was fully prepared to go after known WMD. ~~(TS)~~

All of the principals were in favor of striking Khost. Both Shelton and Cohen recommended the TLAM option, and the principals unanimously agreed. Berger recalled the president going around the room and asking for dissent. AG Reno was against attacking al-Shifa, not for legal but for policy reasons. She thought there would be a backlash from hitting two Muslim countries at the same time. President Clinton personally took another Sudanese target off the list, a UBL-owned tannery. It would have been hard to justify hitting the tannery just because UBL owned it, and it was hard enough to explain the strike on a second country beyond Afghanistan as it was. An after-action review by the DCI reported that they probably killed 20-30 al-Qa'ida operatives with the TLAM strikes and probably missed UBL by two to three hours. ~~(TS)~~

"We took unmerciful crap for this," Berger said. The criticism was not because the USG did too little but because it did too much. The British magazine *The Economist* wrote that Infinite Reach had created 10,000 bin Ladens, Berger recalled with some irritation. *[Commission note: In fact, a leader in the magazine on Aug. 29, 1998 entitled "The perils of over-hasty military reaction" said, "If they have created 10,000 new fanatics where there would have been none, they will be judged a mistake, but that will not be known for years, if ever."]* (U)

The plant's owner, Idris, paid a lot of money putting out the line that al-Shifa was a toothpaste factory, Berger said. He repeatedly called the DCI, noting the bad press stories, and asked Tenet to go back and check the evidence. Tenet came back and said he was quite confident that al-Shifa was an appropriate target. Asked if a second possible CW site in Sudan was considered, Berger said he thinks they had better intelligence on a linkage between UBL and al-Shifa than with this other 25X1 [redacted] ~~(S)~~

**The Lewinsky Scandal**

Berger dismissed any "wag the dog" allegations as utterly spurious. He and President Clinton agreed that—given the president's political woes—they needed a "total separation of church and state" (i.e. between foreign policy and domestic politics) in order to function as a government during the Monica Lewinsky scandal, and this belief was completely operational throughout this period. The president told Berger that they were going to get crap either way, so they should do the right thing—then we can defend it. Moreover, the president was not reluctant to act militarily during the scandal, in Afghanistan, Iraq, or Kosovo. (U)

Berger remembered a few "wag the dog" voices in Congress, including Sen. Arlen Specter (R-PA). In general, though, Infinite Reach got congressional support. On the other hand, he noted, the House voted against the Kosovo campaign to stop a million people from being exterminated or driven from their homes, so you can gauge how much support the administration would have gotten for a wider military campaign. (U)

**Follow-On Strikes**

President Clinton was eager for military options that went beyond cruise missiles, Berger said. From August 1998 on, there were authorities to get UBL through covert action. Meanwhile, over DOD's objections, the administration stationed two submarines in the "kill box" until the time they left office in January 2001 to provide an option for hitting UBL if they got actionable intelligence. They got the response time down **25X1, X4** Berger said, from the time UBL was reliably spotted to the time of a TLAM strike to try to kill him. *[Commission note: Clarke says it might have taken* **25X1, X4** *if everything went right.]* (TS)

According to Berger, there was "eagerness" on the part of the president for military options beyond TLAM strikes. The president was interested in boots on the ground, Berger said. After a meeting in the Cabinet room, President Clinton mentioned his interest in options with commandos to Shelton. *[Commission note: this episode is pungently related on p. 318 of* The Age of Sacred Terror, *wherein President Clinton tells an ashen Gen. Shelton, "You know, it would scare the shit out of al-Qaeda if suddenly a bunch of black ninjas rappelled out of helicopters into the middle of their camp."]* Berger knew JSOC was planning for some options. Toward the end of 2000, they came back most dramatically with a set of options. (TS)

But there was a Catch-22 afoot, Berger said. Stealthy options to capture or kill UBL were seen as highly risky by the Pentagon; non-stealthy options to go to war in Afghanistan were virtually inconceivable in a pre-9/11 world. (U)

Berger first discussed the stealthy options, designed to catch or kill UBL. In fall 2000, after seeing Cohen and Shelton on election day at DOD, there was a meeting in Berger's office *[presumably in November 2000]*. The Pentagon aides did a PowerPoint presentation on a series of potential actions ranging from bombing and commandos to AC-130 options. But Shelton and Cohen warned that these options were extremely risky, involving moving large numbers of troops far afield with limited CSAR, landing in unfamiliar terrain, getting UBL, and leaving undetected. Both Shelton and Cohen said they were willing to take these risks but recommended against these options without reliable actionable intel. ("If there are two words that stick in my craw," Berger said earlier, "it's 'actionable intelligence.'") Berger vividly remembers Cohen saying that without actionable intel, we would have another Desert One, with consequences that would set us back years. Berger said that this meeting was representative of similar discussions they had with the military from 1998 to 2000. He also recalls a meeting with the president in the Cabinet Room for similar discussions. (TS)

There was also a non-stealthy option, Berger said: in effect, to go to war in Afghanistan, sending an aircraft carrier battle group and thousands of troops. The military never said they could not do this, but there was no enthusiasm for this option; they would argue strenuously, before 9/11, that war with Afghanistan was "inconceivable." Less than 70 Americans had been killed by al-Qa'ida during the Clinton presidency; the 1980s had been the decade of terror, with 500 Americans killed in more than 20 terrorist attacks on President Reagan's watch—and his administration used force only once, against Libya. In the 1990s, the toll was far lower. Seventy people was the toll that would die in car crashes tonight, Berger said. No president could have rallied the American people for war. Moreover, the Middle East was already in flames, and the Pakistani government could have fallen. The U.S. military had no basing rights in countries neighboring Afghanistan. There was serious discussion about a boots-on-the-ground option, but no one argued that war was feasible—in the administration, on the Hill, or in the press. In Berger's opinion, no president could have rallied the American people—without pretext—to invade Afghanistan at this point. For war, you needed a galvanized public, a world that didn't think America had gone crazy, and a place to base. ~~(TS)~~

So the talk centered far more on the stealthy options to get UBL; the larger options weren't doable. By fall 2000, DOD was giving its best options and had developed plans conceptually but not operationally. Berger said it was not unreasonable to not go in the absence of actionable intel. The military clearly didn't want to do this, but they didn't want to do Kosovo or Bosnia either, he noted. Berger said he and the president were enormously frustrated, but DOD's position was not unreasonable. After all, two-and-a-half years after 9/11, we still haven't gotten UBL. Two hundred soldiers in Afghanistan before 9/11 were not likely to get him. ~~(TS)~~

They were also suspicious of CIA's Afghan sources 25X1 That's why he was so excited about Predator, Berger said. ~~(TS~~25X1 )

DOD options came because the White House asked for them, Berger said, including direct presidential conversations with Shelton. (U)

Berger doesn't recall hearing about forward-basing AC-130s as an option to reduce the risk of collateral damage present in attempts to kill UBL with TLAMs. This is something he would have discussed with Shelton and Cohen. He remembers CINCENTCOM Zinni as being unenthusiastic about military options. Berger suspects that he raised forward-basing AC-130s as part of the White House's attempts to prod the military to think out of the box. He suspects DOD disagreed about using AC-130s, but the basic problem was the lack of actionable intel. ~~(TS)~~

Berger did not seem to have been enthusiastic about the idea of using U-2s to spot UBL. A U-2 25X1, X4 Berger said, and was no substitute for Predator. DOD was strongly opposed to using U-2s, and the case for their value hadn't been made very well. ~~(TS)~~

**Attacks on al-Qa'ida's Camps?**

Clarke wanted a third set of military options, Berger said: strikes on UBL's camps. Clarke shifted on whether to hit them intermittently or not. But the PC consensus was that hitting the camps was counterproductive. They already had a serious covert program to get UBL, Berger said. The camps were not very sophisticated, and consisted of what the military called "jungle gyms." They'd already missed UBL once; to hit the camps and miss UBL again would look bad. In an interview, CBS News anchor Dan Rather had already accused them of glorifying UBL by missing the terrorist leader in August 1998. Moreover, Berger felt that you'd inflame the region with strikes on al-Qa'ida infrastructure. For 12 Americans dead, Berger said, to hit the camps again, kill a handful of Taliban, and have the camps reemerge the next day on the other side of a mountain would have made UBL seem a larger figure and make us look "weak and feckless." ~~(TS)~~

Berger said he didn't know whether the IC had ever reached a conclusion about the possible presence of CW at Derunta camp. To blow up a building in Afghanistan before 9/11 would've created a backlash, Berger argued, and would have done more harm than good. So they kept searching for other options. ~~(S)~~

**The TLAM Option: Deciding Whether to Launch**

Berger remembers three episodes when the USG had to decide whether to fire TLAMs to possibly hit UBL. Everybody knew that the president was seized by the UBL issue and "wanted very much to get UBL," Berger said. Each episode began with a call from Clarke or Tenet saying they had some pretty good information on where UBL may be in the next 48 hours. 25X1 [redacted] Only three times did they have good enough predictive intel to go to the principals and the president, either via a meeting or a SVTS. ~~(TS~~ 25X1 [redacted] )

Each of the three times, Tenet said that they were onto something but it was not enough, Berger said. "George would call and say, 'We just don't have it.'" Berger recalled. One time, Tenet called from a secure phone in a van while the DCI was trying to watch his son play in a soccer game. ~~(TS~~ 25X1 [redacted] )

It was really Tenet's call, Berger said. There was no dissent in the PC, including from Clarke—though Berger noted that he was sure there were people "down the stovepipe" who will say that we had enough information to fire. But the president relied on his top people to make judgments. In none of the three cases did we have the reliable intel that was needed. In Berger's opinion, this did not reflect risk aversion or a lack of desire to act on Tenet's part. Tenet was just as stoked up as Berger was, but the DCI didn't think the intel was enough. The 25X1 [redacted] were not fully reliable; during Operation Enduring Freedom, they would bring down airstrikes on their rivals, Berger noted. These were "not exactly nuns and priests." ~~(TS~~ 25X1 [redacted] )

There was never a circumstance where we thought we had good intelligence but declined to go after UBL for fear of possible collateral damage, Berger said. Collateral damage issues were briefed to the president, but they weren't dispositive. A 50-50 shot at getting

UBL wasn't enough; they were looking for the level of confidence they'd had on August 20, 1998. If we missed, we'd look weak and UBL would look strong. (~~TS~~25X1 )

The president was relying on Tenet as the action officer here. If Tenet said UBL was in a given compound and we put enough TLAMs into it to have a pretty high chance of killing him, and we were wrong and we killed a lot of people, well, we'd kill a lot of people, Berger said. We wouldn't be happy about it, but we'd deal with it. But the DCI said UBL wasn't there. Killing 500 people and missing UBL would have been a problem, Berger said. That problem was relevant but never dispositive. Berger had no doubt that the president would have taken the shot if the DCI had said we had good locational intelligence. (~~TS~~25X1 )

Zelikow asked about the March 1999 episode involving a possible UBL sighting near a UAE hunting camp in Afghanistan, noting that CIA officials have accused Clarke of tipping the UAE off before a decision was made about whether to strike, thereby blowing the op. If I'd heard that Clarke had tipped them off, Berger said, he'd have fired Clarke on the spot. Berger later retracted that and said that unless Clarke had gotten Tenet's approval to call the UAE during the decision-making window, that call would have made Berger very unhappy. Clarke has testified that he made the call only after the decision not to fire had been made; Berger said that such a call—made after the fact—would have bothered him much less. But it would have been inappropriate for Clarke to have placed a call to his friend in the UAE without the DCI's—or Berger's—approval. Berger said this was the first he's heard of the charge that Clarke called the UAE. He did recall that in this case, they subsequently found out that UAE princes were indeed at the camp, making it a good thing that they didn't decide to launch a strike. (~~TS~~25X1 )

**Covert Action: The Clinton MONs**

Berger said the five Clinton-era MONs were on a trajectory. The first came on the day of Infinite Reach, August 20, 1998; it authorized a capture operation and did not specifically authorize lethal force. They felt that an MON was appropriate because there was thought to be such a substantial probability that in the course of capturing UBL, he would be killed. (~~TS~~25X1 )

After August 20, 1998, Berger said that there was, in his judgment, "absolutely no confusion whatsoever that what was contemplated here was likely to be kill". If anyone doubted the president's intent, look at the TLAMs: the USG sent in cruise missiles to kill UBL, not to arrest him. "If we wanted to kill him with cruise missiles from six hours away, why would we not want to kill him if we had a gun four feet away?" Berger asked. "Our intent here was clear, which was: kill if necessary." (~~TS~~25X1 )

At one point, clarification was sought on this issue, and Berger sent some very specific language to the DCI which said: you may kill UBL. This was in the talking points for use in the field, Berger said. Asked about claims that CIA was confused about what the MONs authorized, Berger replied, "It's just bullshit." "Never once did anybody raise this issue with me while I was in the government." Berger said. He said he was stunned by assertions from CIA staff that the authorities were not clear; C/CTC Black (or his

predecessor, Geoff O'Connell) was in every single meeting on this topic. The MONs contained explicit language saying UBL could be killed. "No one ever raised with me any question as to whether they were permitted to kill him if that was the way to get him," Berger said. They were not supposed to wave goodbye to UBL and say, "Nice to see you." He noted that on at least one episode, UBL's motorcade was fired upon. ~~(TS~~ 25X1 )

"At no point did anybody from the CIA ever ask for any authority that they were not granted," Berger said. If CIA officers thought that they could not do their job, "why did they not come to us and say, 'We need new authority?'" Nobody from the IC, either directly or indirectly, came to Berger asking for more explicit authorities. The question of whether or not CIA officers were discontent with the authorities they had been given presumably would have been raised up the line, communicated to the DCI or his deputy, and passed on from there to the NSC. Berger suggested that the Commission ask DCI Tenet this question. ~~(TS~~ 25X1 )

There was also some advantage to capturing UBL rather than killing him. First, Berger noted that they had done 25X1, X5 so they knew that they could catch these guys. Second, if they captured him, he wouldn't be a martyr, and the USG could get intel from him (Berger cited the current-day example of Saddam Hussein). There was no question that the most likely scenario was an exchange of fire in which UBL would be killed, but it was rational to leave open the possibility of a capture. ~~(TS~~ 25X1 )

Still, they were dealing with inherently unreliable tribals who had all kinds of agendas; this was not Delta Force. They didn't want to give the tribals a "license for indiscriminate massacres," Berger said. Thus the capture/kill language was meant to let the tribals know that UBL or another specified person was the target, rather than something wider. Berger speculated that the DCI may have wanted to keep these proxies on a string, but again, everyone thought UBL would most likely be killed in a firefight. ~~(TS~~ 25X1 )

Berger argued that President Clinton's hand-written edits to the February 1999 MON made the authorities stronger—as if to say, "You don't have to wait to capture this guy. We know you may have to kill him." In Berger's opinion, what the president was saying was, "You don't have to check the capture box if you think kill is a better option." Asked whether the president had authorized CIA to plan a kill operation—using, for example, a sniper or an RPG attack—Berger said yes, although he added that you could argue that this was unclear in the August 1998 MON. ~~(TS~~ 25X1 )

Berger explained that MONs are a particularly stylized type of document. They are written largely at the CIA, with some input from the NSC, and are written to some degree to cover people's behinds and get the attorney general to sign off. For all these reasons, the capture/kill language was used, "but I don't believe there was confusion about intent, and I don't believe there was confusion that you had to try to capture and only if you couldn't capture did you have to kill." According to Berger, we never considered EO 12333 to apply to UBL, and Reno explicitly agreed with this at the time. If she had not,

Reno would surely have called Berger after he publicly said that the EO didn't apply to UBL. ~~(TS~~25X1 )

"As far as I'm concerned, we were trying to kill Usama bin Ladin and his chief lieutenants," Berger said. "That's what we sent 60 Tomahawk missiles to do it. We were not trying to send him a message; we were trying to kill him. We would have done it again had we had another shot." The president would not have been unhappy if UBL was killed. There was not much relish for a trial. ~~(TS~~25X1 )

**Diplomacy with Pakistan and the Taliban**

Pakistan was the only country that the administration thought had some sway over the Taliban, Berger said, calling Pakistan the Taliban's "midwife." If anyone could get the Taliban to surrender UBL, it was the Pakistanis. But Sharif was weak and afraid of his Islamist flank, and the USG had carrots but was out of sticks after all those sanctions. We implored the Pakistanis to help, using emissaries such as Inderfurth, Sheehan, Albright, and even the president, who made two very strong interventions in person with Sharif. (U)

But Sharif insisted that moving the Taliban was beyond his capacity. Instead, trying to be helpful, Sharif suggested sending 25X1 —something Berger called "an oxymoron"—25X1 for an attempt to get UBL. The administration was dubious but agreed to try because there seemed to be little downside. ~~(TS~~25X1 )

The administration was more hopeful about Musharraf; he was stronger than Sharif, had military credibility, and might have the ability to cut a deal on the Taliban and survive. So the USG offered him a lot of carrots—"a whole bushel full"—including IMF loans and rekindled military-to-military contacts. (U)

Musharraf personally promised President Clinton that he would go to see Mullah Omar and try to influence him. By mid-1999, however, the administration was increasingly skeptical that carrot-based diplomacy could work. There was just one lever that we didn't pull: the USG abstained on international financial institution (IFI) loans to Pakistan, fearing that a US vote against IFI loans would crater Pakistan, collapse the Pakistani government, and perhaps bring the Islamists to power in a country with nuclear weapons. Berger noted that the possibility of an India-Pakistan nuclear war was not an abstraction; we came closer to nuclear war at this time than at any point since the 1962 Cuban missile crisis. In Pakistan, Berger was sure that any replacement government would be worse than Musharraf, not better; the Pakistani government would surely have collapsed if the US had cut off IFI loans. (U)

Berger was not sure if they had discussed the idea of cutting off the flow of Saudi oil to the Taliban via Pakistan, but he thought they may have. ~~(C)~~

We used all the sticks we could with the Taliban, Berger said. One time, Pickering even gave Taliban representatives a copy of the indictment against UBL; Berger, incidentally,

says he never knew of the indictment's existence. Until 9/11, he noted, we didn't know the full extent of Omar's bond with UBL; after all, Omar lost his country rather than give up UBL. (U)

The administration discussed aiding Masood and the Northern Alliance (NA) in the Afghan civil war. They also talked about lethal CA aid to the NA. CIA, DOD, and State were strongly opposed. The NA was already being armed by Russia and Iran; moreover, backing Masood would lose us all chance of using Pakistan to push the Taliban. Finally, it was unlikely to make any difference. (Berger thinks this assertion has been justified by the NA's lackluster performance during Operation Enduring Freedom in fall 2001). Berger thought Clarke, who backed more aid to Masood, was wrong here. ~~(TS~~25X1 [redacted])

In March 2000, President Clinton visited South Asia. The USSS was vehemently opposed to a presidential visit to Islamabad; it took the extraordinary step of meeting twice with President Clinton and offering very serious warnings. 25X1, X7 [redacted] But President Clinton said he had to go in order to talk to Musharraf about nuclear weapons and UBL—even at the risk of his own life. (Berger, who was also on the trip, wryly remembered that he'd encouraged the president to make the trip and got to go along for the ride.) ~~(TS)~~

On the March 2000 trip, President Clinton didn't want to raise UBL at the larger meeting he held with Musharraf, which included 25X1 [redacted] at that meeting, Musharraf played to his audience by asking President Clinton for evidence about UBL's guilt. Berger considered ISI complicit with the Taliban. Rather, the president raised UBL issues at a side meeting with just Musharraf and Berger. In that private session, President Clinton gave Musharraf a stark warning about jihadist terror: you'll be destroyed from within unless you deal with this. Musharraf, unlike Sharif, did not plead weakness, and he may have offered to see Mullah Omar again. ~~(TS)~~

Berger doesn't recall US efforts to push Musharraf to get Abu Zubaydah or UBL during the Millennium period. ~~(TS~~25X1 [redacted])

The administration also had to contend with a powerful pro-India lobby on Capitol Hill, which complicated its Pakistan diplomacy. From the mid-1990s onward, President Clinton felt that the USG should either return the damn F-16s to Pakistan or give them their money back, Berger said. "We couldn't get two inches on the Hill on this," Berger noted. The India lobby made moves on the F-16s DOA. Berger is convinced that the administration couldn't have gotten carrots for Pakistan from Congress. (U)

**The Millennium Plot**

The DCI warned that CIA believed with a high degree of certainty that 5-15 attacks were pending during the Millennium. The SG became operational under the unique circumstances of the Millennium, Berger said; the DCI said the situation was that serious. This was a qualitatively different threat experience. Berger convened Tenet, Reno, Fuerth, Cohen or Slocombe, Albright or Pickering, Clarke, and someone at a high level

from the JCS, and they met in the Sit Room almost daily for a month. They were giving great care to small details; he recalls having very reliable information on a blue van in the south that the USG went looking for. ~~(LES)~~

Berger repeated that this was not the way things generally worked, but he considered these unusual steps a unique, useful, and appropriate response to this period of heightened threat. At 4 a.m. on New Year's Eve, Berger called Clarke and asked. Can we go to sleep now? (U)

Afterward, Berger asked the CSG to do an AAR. All the new recommendations were approved by the PC. The president got a $300 million supplement for CT. (U)

During the Millennium, they got more FISAs in less time than in any CT operation before 9/11. This worked because Reno would turn to Fran Townsend in the SG and ask for a FISA, thereby cutting out multiple bureaucratic steps. This short-circuited a great deal of time; it could have taken a week for a FISA. ~~(LES)~~

Freeh didn't come to SG meetings, except for a very few; Watson came. But we still elicited information from the FBI. It was hard for them to hold back when they were in front of that group. (U)

After the Millennium, the administration proposed a roving-wiretap law to Congress, but it was not enacted. ~~(LES)~~

**Frustrations with the FBI**

Berger's biggest CT frustration was the FBI. The bureau wasn't dishing out info or developing much; it simply listened to others' information. Even after the Millennium and the Ressam episode, the FBI still said there was no major al-Qa'ida threat inside America, insisting that they were surveilling whatever cells UBL had here. "I don't think they took the al-Qa'ida threat seriously," Berger said of the FBI. (U)

Starting in the late 1990s, Berger, Steinberg, Reno, and Freeh began holding biweekly meetings. He continued to detect an insensitivity from Freeh on matters where FBI operations intersected with foreign policy issues; once, they were on the verge of arresting a major Latin American leader who was about to land the next day in Miami—without informing Secretary of State Albright. (U)

Early on in the first Clinton term, Lake and Berger met with the attorney general and asked for an MOU on what the FBI could and should tell White House staff. Reno favored this, but it never got done; the FBI would never have bought it, Berger said. (U)

FBI's CT resources rose 350 percent under the Clinton administration, Berger said. He doesn't know where the money went. The FBI didn't share information we needed, Berger said. Americans are concerned about having political leaders "messing around in law enforcement," but domestic matters were increasingly intersecting with CT issues. (U)

Freeh was very focused on the Iranian threat, Berger noted. There was some tension between the State Department and Freeh over giving visas to Iranian sports teams visiting the US. In Berger's opinion, Freeh simply was not focused on the al-Qa'ida threat. (U)

After the Millennium AAR, the FBI's SACs were told that al-Qa'ida was their number one priority, Berger said. Washington tried to sensitize people in the field to the threat; for example, Clarke briefed the field offices. (U)

Berger recommended creating a new domestic intel agency, rather than fixing the FBI. He added that he understands the problems at the FBI better today than he did at the time. (U)

**Predator**

Berger asked Clarke for ideas on getting better actionable intel. Clarke produced two ideas: a telescope inserted into Afghanistan and Predator drones. The telescope was a "cockamamie" notion that went nowhere, Berger said. But Predator had been used successfully to spot Serb troop concentrations in Kosovo. They didn't know if Predator could identify a single person like UBL but thought it was worth trying. There was not much enthusiasm at CIA at first, Berger said. (TS25X1 )

In September 2000, CIA wanted to fly Predator over Afghanistan as a trial concept not linked to action back on the ground; they weren't yet wired up for a response. About two or three days into the flights, C/CTC Cofer Black and perhaps Tenet came in with a tape of one big tall guy surrounded by a bunch of short guys, Berger said. Berger couldn't tell if it was UBL, but the analysts could. He did recognize that this was a great second thread and that Predator could be used to produce actionable intelligence. (TS25X1

CIA became quite enthused about using Predator as an intel platform, Berger said. But then, after about ten days, one of the drones had a bad landing and was damaged. 25X1, X4 [redacted] Still, Berger was quite excited about using Predator to triangulate eyes-on with the USG's increasing stable of human assets. There was good reason for optimism, he said. (TS25X1 )

**The Attack on the USS *Cole***

Zelikow mentioned Richard Miniter's book *Losing Bin Ladin: How Bill Clinton's Failures Unleashed Global Terror* (Washington, DC: Regnery, 2003). Berger grimaced at the mention of Miniter's name. "Miniter's book is a crock," he said. The PC meeting Miniter describes in the book, in the aftermath of the *Cole* bombing, never took place, Berger said. The notion that Secretary of Defense Cohen said that 17 dead American soldiers was not a provocation was "a defamation," Berger continued. He's also wrong to say that Albright argued that a strike would screw up American diplomacy. Nor was there a vote on retaliation in which only Clarke voted for it. (U)

The FBI had huge problems with the Yemenis, Berger said. President Clinton called his Yemeni counterpart, Salah, twice; Albright also called to ask for Yemeni cooperation. The FBI was also ham-handed when it arrived. (U)

Everyone suspected al-Qa'ida from the start. But it was important to establish responsibility for the attack before using force. There was strong intel suspicions that it was al-Qa'ida, but they received no IC conclusion that al-Qa'ida was the culprit before they left office, Berger said. Attacking without a judgment from the DCI, attorney general, or FBI director was not sufficient and would have been a mistake. Clarke's judgment was not enough. With some asperity, Berger said he could just see the president explaining military strikes to the nation on the basis of Clarke's assessment. (U)

Berger said they were certainly exploring military options in November 2000, although he was not certain that this was connected with the *Cole;* this was all part of being ready with military options just in case. Zelikow asked Berger about a November 22, 2000 memo under Berger's name for President Clinton that Zelikow said concluded that al-Qa'ida was responsible for the *Cole* attack. Berger did not remember the memo, which he said was undoubtedly drafted by Clarke and not the IC. Having heard it characterized, Berger said that perhaps he should have written back Clarke's draft language. Berger added that if the memo went forward under his name, the responsibility for it was his. (U)

In December 2000, Berger said, a CIA slide-show offered a preliminary conclusion that al-Qa'ida was the culprit. Berger added that the first official USG mention of al-Qa'ida responsibility for the *Cole* attack came in remarks by President Bush shortly after 9/11. *[Commission note: This echoes an observation made by in a Commission interview with former TNT Senior Director Roger Cressey.]* (U)

In August 1998, by contrast, the DCI was definite. The question, Berger said, is what do you need to justify going to war to the American people and the world? What do you need to use force? You need to say that your senior intel and law enforcement advisers have come to the conclusion that al-Qa'ida was the culprit. Berger said he's been told that FBI doesn't give a ruling on the *Cole* until a February 2001 session with Vice President Cheney. (U)

Berger said he didn't think anyone decided to delay a decision on the *Cole* until the new administration came in; the CIA would not make a political judgment of this type. (U)

**Intel Issues: The PDB and Warning**

Berger said that he was not a great fan of the PDB. The CIA was in the business of finding out secrets, not information, and that showed up in the briefings. The PDBs turned out to be "snapshots" of the best intelligence that day, but with no context to indicate whether the information was valid or consonant with other information. Berger often told the DCI that the PDBs needed to be presented with more context. (By contrast, INR's assessments were often better at providing context, though less restricted in circulation). Berger hastened to add that he didn't mean to be flip; PDBs were extraordinarily important, and they were taken very seriously. They stimulated

conversations between the principals for the day and got you to pick up the phone and make follow-up moves. But his critique was that PDB items did not contain enough context; they could have been better and more useful if they were a bit longer—say, 14 pages rather than 8. Generically, it was also easy for the IC to pass threats on because analysts feared being blamed if they missed something, especially after such blunders as missing India's nuclear tests and the Soviet Union's collapse. Somehow, you need to free people to make judgments that might be wrong so that people feel free to make judgments. ~~(S)~~

The president was a voracious reader of intelligence. He got the PDB, SEIB, and INR updates daily, as well as other products episodically. He did not receive the daily UBL updates sent by Washfax to Berger, Clarke, and Podesta. Berger got the daily sitreps on UBL, and Berger would tell the president if there was anything he needed to know. ~~(S)~~

Some 1,800 people got the SEIB, Berger said. It was so over-circulated that you might as well have just sent it to *The Washington Post*. He was not concerned about the information gap between the PDB and the SEIB. ~~(S)~~

On the question of whether the senior decisionmakers were getting strategic intelligence on the al-Qa'ida threat, Berger called it the responsibility of the assistant secretaries for terrorism to make sure that their secretary was knowledgeable about the subject. Berger said he didn't know why the IC did not do an NIE on al-Qa'ida; in retrospect, he thinks it would have been useful. That being said, he reiterated that the government runs by conversations. The Small Group met every two weeks or so specifically to talk about the threat, and Berger felt that there were mechanisms for senior officials to be informed. There's only so much you can communicate by paper, he said. "Government is a contact sport, it's not a card game." ~~(S)~~

The NSC doesn't run the IC, Berger noted; it coordinates policymaking and policy implementation. (U)

In our hybrid intel system, we have someone called the DCI, but he is not really the DCI. He has 15 cents on the intel dollar to spend; the rest is set by others in the IC. PDD-35 was the first to set IC priorities; terrorism came in the third level. You need one person to set intel priorities, Berger said. You need the DCI (probably not the CIA director) with budget authority over the whole intel dollar, even if the DCI has to co-sign with the secretary of defense. You need someone to lead the process of setting priorities and keeping to them. ~~(S)~~

"You're over-warned." Berger said. The constant litany of alarms devalues warning. Berger speculated that this problem has probably only gotten worse since 9/11. Nobody ever got fired for warning about something that didn't end up happening; he used to talk to Mary McCarthy about this all the time). You need to absolve people of risks for making judgments, because if one percent of the things described in the PDB happened, "you're screwed." (U)

## The Clinton-Bush Transition

*[Commission note: Commission General Counsel Dan Marcus took over the questioning for this section, noting that Executive Director Philip Zelikow had worked for the Bush transition team. Zelikow remained in the room; no objection to his presence was raised by Berger or Commissioners Gorelick, Roemer, or Ben-Veniste.]*

Berger said he was particularly sensitive to transition issues because he led the NSC transition team for the Clinton-Gore team. His lone contact with Brent Scowcroft consisted of the outgoing APNSA telling him that the George H.W. Bush administration was invading Somalia but not to worry because they'd be out of Somalia by the inauguration. Hoping to handle things better, Berger asked each senior director to prepare a tight memo on their areas; the NSC worked hard on the resultant book, which was turned over as soon as the election was resolved. (U)

Berger had at least two meetings with his successor, Condoleezza Rice. He recalled having two conversations with her on CT. Berger went to Clarke's terrorism briefing for Rice, which he thinks was quite detailed. He did not stay for the whole briefing but came in at the beginning and said that he wanted to make a point of coming to this briefing in particular to underscore how important this issue was. He only went to one such briefing. (U)

Later, in a one-on-one meeting with Rice in his office, Berger said, I believe that the Bush administration will spend more time on terrorism in general and al-Qa'ida in particular than any other issue that they deal with. "She was in a listening mode," Berger added, rather than commenting on or evaluating his advice. (U)

DAPNSA Jim Steinberg told Hadley to keep Clarke, which Berger found a bit surprising since Clarke and Steinberg's relationship had not always been the easiest. Berger doesn't recall recommending to Rice that the new team keep Clarke. But Berger wasn't surprised that Clarke was kept on; after all, the Clinton team had kept Clarke on from the first Bush administration. Berger does think he and Rice may have gone down the list of NSC directors. Clarke had so much institutional memory and knowledge of ongoing operations that it'd have been crazy to have terminated him without a lengthy transition period. If Rice had asked his advice, he'd have told her that. (U)

Berger probably discussed the CSG with Rice, telling her how it worked and calling it a very effective mechanism. He now felt that a new DAPNSA should be given the CT portfolio. Berger considered the CSG primarily an operational body. He suspects he also told Rice that he'd collapsed the PC into the SG on CT for operational security and freer exchange of views. (U)

He didn't go through the Millennium episode with Rice, Berger said. While the SG had become operational during that period of unprecedented threat, he said that had to rely on the CSG to be the executive committee on CT policy; you just couldn't rely on the PC or DC. (U)

Berger doesn't recall specific discussions with Rice about the organization of CT policymaking. Nor does he remember raising the prospect of al-Qa'ida attacks on American soil or discussing al-Qa'ida and WMD. Berger noted that it was hard for people who'd been out of government during the 1990s to understand stateless terrorism. The older forms of terrorism were at least potentially deterrable if a state was involved. (U)

**The Bush CT Record: The Predator Grounded**

Berger said he preferred not to testify about the Bush period. He did, however, say that he was disappointed about the failure to use the promising Predator again. "I was very surprised that the Predator wasn't put back in the sky when the clouds broke in the spring," Berger said. They could have flown two recon Predators while debating the armed Predator. (~~TS~~25X1 )