# EXHIBIT "27"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - -

IN RE: TERRORIST :
ATTACKS ON : 03-MDL-1570
SEPTEMBER 11, 2001 : (GBD)(SN)

-----------------------------------------

- - -

Thursday, February 21, 2019

- - -

THIS TRANSCRIPT CONTAINS CONFIDENTIAL MATERIAL

- - -

Day 2 of the videotaped deposition of ADNAN BASHA, taken pursuant to notice, was held at the Park Hyatt Jeddah, Al Hamra District, Southern Corniche, Jeddah, Saudi Arabia, 21432, beginning at 3:03 p.m., on the above date, before Lisa V. Feissner, RDR, CRR, Notary Public.

- - -

GOLKOW LITIGATION SERVICES
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

handover and taking between the managers of the IIRO offices, the organization had difficulties in applying the mechanism -- the mechanism for the handover and taking of the managers. And this led to an issue in the office.

And the rest of the letter explains the developments in this matter. And therefore we have requested the office of Osama El Khereiji, who is a chartered auditor, to audit the documents of the Pakistan office. And he presented a quotation for the fees, and therefore we have requested the opinion of Dr. Mohammed Fedaa al Din Bahgat in this matter because the financial comptroller and the follow-up manager, they disagreed about the rate.

Q. Do I understand from this letter that around the time this letter issued, Mr. Butairi was being replaced as the manager of the IIRO's Pakistan office?

A. Yes.

Q. And when a manager is replaced, there is some sort of process in place to turn over control of the office, correct?

A. Yes. There is a mechanism.
Q. And in the context of the replacement of Mr. Butairi, there was a problem, correct?
A. Yes.
Q. And as a result of the problem, this letter indicates that the IIRO established a delegation to look into the office, correct?
A. Yes.
Q. And the inquiry performed by that delegation, according to this letter, found evidence indicating the existence of cheating, forgery, and misuse of the IIRO's funds, correct?
A. Yes.
Q. And as a result of those discoveries, the letter indicates that the financial officer of the Pakistan office was arrested and was under investigation, correct?
A. Yes.
Q. And do you recall the name of that person?
A. Yes.
Q. Who was that?

A. Amir Jasim.

Q. According to the English translation I have of this draft letter, it indicates that Mr. Jasim was arrested and is under investigation with the reservation of the office's director, who is of a Saudi origin.

What does that language indicating that he was arrested under the reservation of the office's director mean?

A. The financial officer was arrested by the Pakistani police based on a complaint from the IIRO. The complaint was prepared by a lawyer who was appointed for this purpose, and the -- but for the office manager, he was called to Jeddah to answer to the legal department and its requirements.

Q. So as I understand this, the Pakistani financial officer was arrested in Pakistan, correct?

MR. LEWIS: Objection, lack of foundation. He's not Pakistani.

Q. Do you know Mr. Jasim's nationality?

A. Iraqi.

Q. Okay. So Mr. Jasim, who is an Iraqi, was arrested in Pakistan, correct?

A. Yes.

Q. And when the IIRO discovered the cheating, forgery, and misuse of funds, it called Mr. Butairi back to Saudi Arabia?

A. Because he was claiming that the only person responsible for this cheating is Amir Jasim in his capacity as the financial officer.

Q. And it was the preference of the IIRO that the inquiry concerning Mr. Butairi and his possible involvement be conducted in Saudi Arabia, correct?

A. For two reasons. The first reason is Moayad Al-Butairi, he held Amir Jasim accountable for that, and he declined any form of responsibility -- sorry, he denied any form of responsibility. And the second reason is that he remained in Pakistan for one week during the stay of the delegation from the IIRO, and he was not arrested by the Pakistani police. And therefore, we preferred to bring him to Saudi Arabia in order not to lose our

cards. And therefore, at that time, the conclusive evidences were incomplete.

Q. Did you later receive evidence indicating that Mr. Butairi was himself involved in the cheating, forgery, and misuse of IIRO funds?

A. Yes.

Q. Did the IIRO request that he be prosecuted?

A. In order to have the conclusive evidences, this took some time from us. And it required a lot of patience. And therefore when Moayad Al-Butairi found that he has -- in front of him he has the chance of being arrested, just that, he wrote a waiver -- he wrote a waiver or an assignment of the three clinics he had [unclear words], which he operated from the embezzled funds from the IIRO.

And therefore, in comparison to the long period of time that was consumed with Amir Jasim, in this case the IIRO, in a very short period of time, was able to retrieve its funds, to know -- or to discover how the theft happened, and who stole the money, and to which

bank the money was deposited.

Q. Are you saying that the IIRO recovered all of the money that was stolen from its Pakistan branch?

A. After the IIRO examined all the documents -- financial documents and the money transfers, and given the absence of documents that were incinerated by Amir Jasim, the IIRO found that what has been stolen equals to the value of the three clinics that were owned by Amir Jasim and Moayad Butairi from the money they embezzled.

Q. So evidence was destroyed, correct?

A. Yes, incinerated.

Q. And the --

MR. LEWIS: Hang on, he hasn't finished his answer.

A. And Amir Jasim admitted in writing that he was the primary responsible person for all the forgery of documents and cheating. Regardless of that, we did not relieve even Moayad Al-Butairi from the responsibility, and when he knew that we will bring him to justice in Saudi Arabia, he had no option other than

that only option. So he confessed that he owns the three clinics, and he expressed in writing that he's ready to hand them over, and this is what happened.

Q. I take it this was a relatively significant controversy for the IIRO?

MR. LEWIS: Objection to form.

A. For the IIRO, it was a financial problem, but we have managed to contain it and to precisely identify it, and to prevent its recurrence by adopting some mechanisms, and to set an example for other employees that whoever dares to conduct such act will meet the fate of dismissal. And this is what happened to Amir Jasim and Moayad Al-Butairi.

Q. Did the IIRO document all of its analysis of the losses incurred as a result of this activity and valuation of the three clinics that were transferred to it?

MR. LEWIS: Objection to form.

(Witness answers.)

MR. LEWIS: Let the translator --

A. Yes. And this leads me to say something that I did not mention. As soon as

delivering the documents to the court under signature.

So all these adverse circumstances did not deter the IIRO from obtaining its legitimate rights.

Q. So as I understand it, the IIRO decided to have its own internal committee analyze the extent of the losses and their disposition, correct?

A. Yes. And the committee was given all the powers to take the wide decision.

Q. And in the end, Mr. Butairi was not prosecuted, correct?

A. We found it sufficient, based on the advice of the lawyers, to retrieve our funds -- to recover, sorry, to recover our funds, and we considered it closed.

Q. How much did you recover?

A. I do not recall now, but it was based on the estimations of the value of the three clinics.

Q. So you recovered the three clinics, correct?

A. Yes. One in Peshawar, one in

Islamabad, and another one in Karachi.

Q. And based on the transfer of those three committees [sic], you resolved your issues with Mr. Butairi?

MR. LEWIS: Objection to form.

A. It's not that we settled, but we have recovered our funds. And actually, this allowed us to conduct a thorough review of the rules and regulations that we had because they contained some gaps that allowed Amir Jasim to do what he did.

Amir Jasim was one of the most efficient accountants and one of the oldest employees in the IIRO, and Moayad Al-Butairi also was receiving the title of the ideal manager. And with all that, they have managed to take advantage of the gaps, but with a review, we have closed them.

Q. So as I understand it, there should be documents reflecting the IIRO's valuation of the three clinics, correct?

MR. LEWIS: Objection to form.

A. This is for sure. These were procedures for the committee, and the committee

some of the evidences were incinerated, some of them were lost, and Amir Jasim started to manipulate with the Pakistani judiciary. And we have acted based on an advice from the chief judge in Pakistan. He told us that if you continue this course and you request a full imprisonment of the person, the process may take between 15 to 20 years.

Q. So from that do I understand you decided not to pursue the full prosecution of Mr. Jasim?

A. Yes. Based on the advice from the chief judge.

Q. And as a result, Mr. Jasim was released?

A. Amir Jasim had family problems. His wife was divorced, and he was expelled from Pakistan.

Q. But he was released from jail in Pakistan, correct?

A. On the condition that he is expelled from Pakistan, yes.

MR. CARTER: I'd like the reporter to mark as Basha-149 [sic] a document

work was restricted to verification of certain areas for the last three years only.

Do you see that?

A. Yes.

Q. Do you know who sent that July 16, 2001 letter changing the scope of the auditor's work?

A. No.

Q. Do you know if --

MR. LEWIS: He's not finished.

A. It is supposed to mention the number of this letter and the name of the person and the department that approved that.

Q. Based on that, is it your understanding that the directive would have come from the IIRO?

MR. LEWIS: Objection to form.

A. It is supposed to be issued from the IIRO and have a number and a date. And not verbal.

Q. Do you know whether or not the IIRO established a special file related to the investigation of the Pakistan office?

A. What I know is that the IIRO, under

documents and obtaining the results. That's it. But I do not get involved in invoices and stuff like that.

Q. And in your role receiving the results of the investigation, did anyone convey to you that the Pakistan office had fabricated receipts for construction projects?

A. The assignment given to the office was related to the imprisonment that took place in the Pakistan office within the time period mentioned in the report, and then when the committee concluded that the stolen funds can be recovered by seizing the three clinics, the assignment was over then. But nothing has been mentioned to me in relation to mosques.

Q. It's your understanding that funds were misappropriated by people at the IIRO Pakistan branch, correct?

A. It is a proven fact for me, based on the documents, that the embezzled funds were stolen by Amir Jasim, with the knowledge of Moayad Al-Butairi.

Q. And as part of its investigation, did the IIRO discover that those individuals

had fabricated receipts as part of their misappropriation?

A. I have said before that Amir Jasim had made written admissions in this respect, yes. And it was explicit that there was fabrication in invoices, fabrication of documents.

Q. Did Mr. Jasim provide a document to the IIRO making those acknowledgments?

A. Yes, a written document signed by him.

Q. Turning to page 9 of this audit report, under the heading, Conclusion.

A. Yes.

Q. The first sentence indicates that the auditors found, The net unreported amount of US $3,071,659 is unaccounted for and represents the expenditure which was either not recorded and for which no vouchers and supporting documentation is available and/or the amounts which have been misused or misappropriated locally.

Do you see that?

A. Yes, I see this text.

THE WITNESS: Yes.
BY MR. CARTER:
Q. Dr. Basha, is this a letter sent to you in 2003 by the then-director of the IIRO's Pakistan branch?
A. Yes.
Q. And the letter indicates that, Given the lack of banks until now in Afghanistan and the fact that we previously used to transfer the funds in cash, and due to the risks we could be exposed to.
Do you see that language?
A. Yes.
Q. Am I correct in understanding from this letter that prior to the 2003 date of this letter, the IIRO Pakistan branch transferred funds to Afghanistan in cash?
A. What I understood the process that was followed is that the manager of the IIRO office in Afghanistan -- sorry, the representative of the IIRO in Afghanistan will be called to come to Pakistan to receive the monthly salaries of the workers and to receive the rental payments of the buildings and the

operational expenses. That's it. And then he goes to Afghanistan to make these disbursements and comes back with the documents, because there weren't official banks operating in Afghanistan at that time. And therefore, I see that the expression to stop all projects is not an accurate expression, and the office found that it is -- this step is risky.

Q. Dr. Basha, during the period that Mr. Butairi was the director of the IIRO's Pakistan branch, was the Pakistan branch responsible for the IIRO's activities in Afghanistan?

A. Yes.

Q. Dr. Basha, do you recognize a person named Mohammed Jamal Khalifa?

A. Yes.

Q. Have you ever met him personally?

(Reporter interruption.)

Q. Have you ever met him in person?

A. One time.

Q. When was that?

A. I do not recall the year exactly, but this was based on a request from the

some kind of facilitation or assistance.

Q. Do you know whether Ambassador Waly ever intervened to get members of IIRO who had been arrested in the Philippines out of prison?

A. This is the first time I hear that members of the IIRO were arrested in Philippines.

Q. So just to clarify, you don't know whether Ambassador Waly ever intervened to help IIRO employees in the Philippines get out of prison?

A. I do not know that at all.

Q. Dr. Basha, earlier we talked a little bit about the bombings of the U.S. Embassies in Kenya and Tanzania, and you were -- you indicated you were familiar with those attacks, correct?

A. Yes, because sadly, as soon as I joined the IIRO, we had these sad incidents, this sad terrorist attack.

Q. Do you know whether Kenyan authorities closed the IIRO office in Kenya in connection with the investigation of those attacks?

A. Yes, they have closed the office and confiscated all the computers. But a week or so after that, everything was reinstated with a polite apology.

Q. Did the IIRO conduct any internal investigation to determine if its branch in Kenya was involved in the attacks?

A. For any problem that arises regarding any of the offices of the IIRO, a thorough inquiry is conducted, administrative, financial, and for the workers in it, and if necessary, the manager of the office will be called for investigation.

Q. So did that process occur with regard to the IIRO office in Kenya or Tanzania after the bombings?

A. Yes.

Q. Do you know whether any documents were created relating to that internal investigation?

A. The investigation is conducted by the relevant departments. In this case it is the legal department. And the conclusions are presented to me only.

Q. Do you recall receiving a report from the legal department relating to an inquiry of the Kenya or Tanzania offices?

MR. LEWIS: Objection. You used the term "report." Do you mean to suggest a written report or any sort of report?

MR. CARTER: Any kind of report. He said that the findings would be reported to him.

A. In most of the cases, the findings are discussed in a brief meeting in the office of the Secretary General in the presence of the manager of the concerned office and the manager of the legal department.

(Cross-talk.)

MR. NASSAR: I think he also said, "as well as the financial department."

(The witness and interpreter conferred in Arabic.)

INTERPRETER: Sorry. "And the financial department."

Q. Do you know whether or not the legal department typically creates documents as

part of such an inquiry?
A. If it is required, yes.
MR. CARTER: I'd like the reporter to mark as Basha-156 a document produced at IIRO 287007 through 287013.
(Exhibit Basha-156 marked for identification and attached to the transcript.)
MR. LEWIS: Yeah, we've gone about another hour and a half, so if this is a quick document, we can do that, or we can break now. It's really a function -- I think our witness feels fine; it's our translator and our court reporter.
THE WITNESS: (In English.) Let's do this one. It's okay.
MR. CARTER: I'll defer to you guys.
MR. LEWIS: Is this a quick document, Sean?
MR. CARTER: That's not entirely under my control.
MR. LEWIS: Well, I understand

Q. Did you know him by reputation prior to this meeting?

A. As a justification for his nomination to be a member of the urgent relief committee, it was said to us in this meeting that he has an experience in the relief operations.

Q. But prior to receiving his credentials for the urgent relief committee, had you ever received information about Mr. Jelaidan previously?

A. I do not recall.

Q. At the time this meeting occurred, had you ever heard that Mr. Jelaidan had a relationship with Osama bin Laden dating to the fighting in Afghanistan against the Soviet Union?

A. For me personally, had I knew that, I would have made reservations against this decision or I would have rejected it.

Q. So based on that, do I understand that your testimony is that you had not received such information as of the time of this meeting?

document that the IIRO approved the nomination of Jelaidan to serve as the head of that committee?

A. As a secretary for the committee.

Q. As the Secretary General, correct?

A. As a secretary only.

Q. And do you recall who proposed Mr. Jelaidan for that nomination?

A. I do not recall now, but it should be one member of the executive committee.

Q. But you do not recall who that was?

A. I do not recall now.

Q. Turning to the sixth term, it identifies an issue that was discussed regarding the approval of an additional budget for projects of the Eastern district office.

Do you see that?

A. Yes.

Q. And do you recall the discussion?

A. To some extent, yes.

Q. It indicates that there were projects being financed directly by the Eastern district office without the Care entity and the Secretariat General knowing about it.

Do I understand from that that the Eastern district was independently financing activities outside of Saudi Arabia?

A. Well, in fact, the relationship between the Eastern district office and the General Secretariat is a relationship that is marked by different opinions. The Eastern district office view was that having the project implementation and affiliation to the General Secretariat is something that is bureaucratic. And they justify that by saying the donor wants a quick implementation of the project.

And therefore, their opinion is that having the project go through the General Secretariat and the validation process would take long time. And therefore they implemented the project, but they implemented in the regions where the external IIRO offices are operating.

And therefore, the external offices of the IIRO are the other eye for the General Secretariat. So even if the project is implemented directly by the Eastern district

office, the external office would include the project in its reports presented to the General Secretariat.

So this was the point of difference between us and them.

Q. So as I understand it, the office in the Eastern district was sending money overseas on its own to implement projects.

MR. LEWIS: Objection to form.

A. As I said, projects are implemented by the external offices of the IIRO. And therefore, the representative to that project, rather than being sent by the General Secretariat, he or she is sent by the Eastern district office.

Q. Dr. Basha, it's a simple question. Was the Eastern district office sending money overseas on its own for projects?

A. It would send the funds from the accounts of the Eastern district office to the accounts of the external office.

Q. So the Eastern district office was initiating funds transfers from its accounts to offices outside Saudi Arabia, correct?

A. Yes, to the external offices of the IIRO outside Saudi Arabia.

Q. And further down in this document, it indicates that the projects of the Eastern district office were being carried out in Thailand, Indonesia, Jordan, Pakistan, Baltistan, Palestine, Lebanon, India, Sudan, Egypt, Philippines, and Ethiopia, correct?

A. Yes.

Q. And who was the head of the Eastern district office at that time?

A. A person named Turki bin Fahad bin Jiluwi.

Q. Was he a member of the Saudi Royal Family?

A. Yes.

Q. Did you ask him to cut it out?

MR. NASSAR: By "cut it out," I think he means "stop."

MR. LEWIS: Objection to form.

A. Yes.

Q. Did he comply with your request?

A. No.

Q. And during the period that this

discussion occurred, Mr. Butairi was the head of the Pakistan branch, correct?
A. Yes.
Q. And during that same period, Mr. Jasim was the financial officer of the Pakistan office, correct?
A. Yes.
Q. And Pakistan was one of the areas where the Eastern district office was carrying out these projects, correct?
A. Yes.
MR. CARTER: I'd like the court reporter to mark as Basha-157 a document produced at IIRO 49708. It's actually three related documents, I'm sorry, that were produced at 49708, 49709, and 49710.
(Exhibit Basha-157 marked for identification and attached to the transcript.)
BY MR. CARTER:
Q. Dr. Basha, I want to look first at the top document, 49708.
A. Yes.

Q. And is this a letter that you sent from -- or you sent to the Secretary General of the Muslim World League concerning a meeting about the Eastern district office?
A. Yes.
Q. Do you know what precipitated this meeting?
A. A report of the auditor contained some remarks about the office. And therefore, the executive manager and the follow-up manager were summoned to the General Secretariat to discuss these issues. These are payments that were made without the supporting documents.
Q. So does this document indicate that an audit discovered that Mr. Khalil Ibrahim of the Eastern district office had made payments without supporting vouchers?
A. Yes.
Q. And do you recall the amount of the payments that were made by Mr. Ibrahim without supporting documentation?
A. No, I do not remember.
Q. Are you able to provide any estimate whatsoever?

A. It will be an improvised estimation.
Q. Are you able to provide any fair estimation?
A. I apologize doing that because it has been 19 years.
Q. What was Mr. Ibrahim's position in the Eastern district office?
A. The office manager for the previous regional supervisor.
Q. Do you know who he reported to in that role?
A. The regional supervisor.
Q. And who was that?
A. Prince Turki.
Q. And that's Prince Turki bin Fahad bin Jiluwi, correct?
A. Yes.
Q. And further down in the document, it references that the committee that was studying this issue met with Prince Turki bin Fahad bin Jiluwi before his resignation and discussed the auditor's report.
Do you recall what prompted Prince

A. Yes.
Q. And through this same administrative decision, was an individual named Dr. Abdul-Hamid bin Sulaiman Al-Mujil appointed the new executive director of the Eastern district office?
A. He was already the executive director. When Prince Turki was the general supervisor, this person was the executive director. And therefore, he was assigned to be the acting manager or in charge of the office sine die.
(Reporter interruption.)
(Cross-talk.)
Q. Before deciding that Mr. Al-Mujil should be designated to be in charge of managing the Eastern district office going forward, did the IIRO conduct an inquiry to determine whether he was also involved in the problems reflected in the auditor's report?
A. I rely now on my memory. I recall that the auditor's report connected all the violations to requests from the Prince. And therefore Abdul-Hamid Al-Mujil did not have any

role in these violations.

Q. Was there a written auditor's report that you're referring to?

A. Yes.

MR. CARTER: I'll ask the reporter to mark as Basha-159 a document produced at FED-PEC0202110 through 0202112.

A. But before that I want to mention something important now, that the auditor's report was handed over to the chairman of the board of directors.

Q. And that would have been the Secretary General of the Muslim World League?

A. Yes.

Q. And the IIRO didn't keep a copy of its own auditing department's report?

A. I do not remember receiving a copy of it.

Q. But the report would have been delivered to the Secretary General of the Muslim World League in 2003?

A. Yes, it was delivered to him, but I do not recall the year exactly. It was after the conclusion of the inquiry.

Q. And the Secretary General of the Muslim World League at that time was Abdullah bin Abdul Mohsin Al-Turki, correct?

A. I remember that his name was Abdullah Obaid.

Q. Okay. Just turning back to Basha-157, that document is a letter from you concerning the audit addressed to His Highness Dr. Abdullah bin Abdul Mohsin Al-Turki, Secretary General of the Muslim World League. So based on that --

A. Yes.

Q. Okay. So based on that, can you tell me whether, in fact, Dr. Al-Turki was the Secretary General at the time of the audit?

A. I think the report was issued during the tenure of Dr. Abdullah bin Obaid. And he was then replaced by Dr. Abdullah Al-Turki. I'm here relying on my memory.

Q. Okay. But based on the document we marked as Basha-157, you obviously communicated with Dr. Al-Turki about this precise issue, correct?

A. Yes.

Q. Dr. Basha, before we pivoted, I had marked a document as Basha-159. And it's in English.

(Reporter interruption.)

(Exhibit Basha-159 marked for identification and attached to the transcript.)

BY MR. CARTER:

Q. Dr. Basha, this is an August 3, 2006 press release from the United States Department of the Treasury relating to the United States' designation of the Philippine and Indonesian branches of the IIRO, and Abdul-Hamid Sulaiman Al-Majil, for facilitating fundraising for Al Qaida.

Were you aware that the U.S. government took those actions against the branches of the IIRO and Mr. Mujil?

A. This is what I was told by the lawyer.

Q. Did the IIRO conduct an investigation, following these designations, into the U.S. claim that the offices referenced and Mr. Mujil were involved in supporting Al

Qaida?

A. Yes.

Q. And did the IIRO prepare any written reports as a result of that investigation?

A. The actions taken by the IIRO are that the papers of all these offices were reviewed, the administrative and financial papers, and the files of the staff members who were working in these offices. And the conclusion was that all the procedures were sound for us, but it was not in writing.

The most important thing here is that our office in Indonesia was operating during this designation, and furthermore, it was receiving letters of appreciation in relation to its operations.

As far as the Philippines office is concerned, we had only a mission there --

(In English.) A representative.

INTERPRETER: "A representative," sorry.

A. (Through interpreter.)

-- a representative there who was

responsible for supervising projects, and these projects did not stop.

And this indicates that the responsible governments in these two countries did not have comments on the operations of these offices.

Q. Okay. Well, let's stick to what I'm asking you for the moment. Did -- the document indicates that the U.S. government had concluded that Al-Mujil provided donor funds directly to Al Qaida.

A. We have confronted him by this claim, and he absolutely denied this.

Q. Okay. But you did determine that there were financial improprieties occurring in the Eastern district office, correct?

MR. LEWIS: Objection to the form.

A. Yes. The financial improprieties were there in the office.

Q. Dr. Basha, we obtained information in our investigation indicating that the Saudi Ministry of Interior conducted an investigation of the IIRO Eastern Province branch. Were you aware of that?