# EXHIBIT

# “244”

# EXPERT OPINION REPORT
# Of
# Jimmy Gurulé

I have been retained by plaintiffs in *In re: Terrorists Attacks on September 11, 2001*, 03-MDL-1570 (GBD) (SN) and related cases. Plaintiffs have asked me to give my expert opinion on the significance of economic sanctions in combatting the threat of international terrorism, specifically, economic sanctions under Executive Order 13224 (E.O. 13224). I was also asked to explain the process used to designate individuals and entities as Specially Designated Global Terrorists (SDGTs) under E.O. 13224, and express my opinion on the significance of being designated an SDGT. Finally, I was asked to explain why the integrity and credibility of the SDGT designation process is essential to securing international cooperation in curtailing terrorist financing, including the blocking of terrorist assets under United Nations Security Council Resolutions (UNSC) 1267 and 1333, and related Security Council resolutions.

As a preliminary matter, although this Report refers to various laws, Executive Orders, and UNSC resolutions, I have included these materials in my expert opinion report solely for the purpose of (1) identifying information that I considered and relied upon in setting forth my opinions and (2) providing general background and context for my opinions. However, I emphasize that my intent was not to offer explicit or implicit legal opinions regarding the proper scope, application or interpretation of U.S. laws, regulations, or UNSC resolutions.

My rate of compensation for my time is $500.00 per hour.

## I.
## Expert Qualifications

I have attached a copy of my curriculum vitae to this Report as Exhibit A.

I have extensive experience in anti-money laundering and counter-terrorist financing. From 2001-2003, I served as Under Secretary (Enforcement), U.S. Department of Treasury. In that capacity, I had oversight responsibility for several major federal law enforcement agencies, including the U.S. Secret Service; U.S. Customs Service; Bureau of Alcohol, Tobacco and Firearms; Financial Crimes Enforcement Network (FinCEN); Office of Foreign Assets Control (OFAC); and Executive Office of Asset Forfeiture. The U.S. Customs Service (now part of the Department of Homeland Security and known as Immigration and Customs Enforcement) conducts complex money laundering investigations. FinCEN is the federal agency responsible for enforcing the Bank Secrecy Act (31 U.S.C. §§ 5311 et seq.), which imposes legal duties on banks and other financial institutions to prevent money laundering and terrorist financing. Additionally, OFAC administers and enforces U.S. economic sanctions policies and programs, including E.O. 13224, blocking property and prohibiting financial transactions with persons who commit, threaten to commit, or support terrorism.

While serving as Under Secretary of the Treasury Department, I played a central role in developing and implementing the U.S. Government's counter-terrorist financing strategy. Among other things, I attended meetings at the White House to discuss early drafts of E.O. 13224. I was also responsible for drafting the 2001 and 2002 National Money Laundering Strategy (NMLS). The purpose of the NMLS is to prioritize, focus, and coordinate U.S. Government resources to combat money laundering and terrorist financing. Several federal agencies, bureaus and offices were involved in developing and implementing the NMLS, including the U.S. Department of the Treasury; U.S. Department of Justice; U.S. Department of State; Federal Bureau of Investigation; Drug Enforcement Administration; Federal Deposit Insurance Corporation; Federal Reserve Board; FinCEN; OFAC; Internal Revenue Service; Office of the Comptroller of the Currency; Office of Thrift Supervision; U.S. Customs Service (now ICE); U.S. Postal Inspection Service; U.S. Secret Service; U.S. Security and Exchange Commission; and the Treasury Department of Executive Office of Asset Forfeiture.

As a component of my role in developing and implementing the U.S. Government's counter-terrorist financing strategy, I had responsibility for coordinating the E.O. 13224 designation program with other complementary programs of our international partners, including the designation and sanctions programs administered by the United Nations Security Council Committee established pursuant to Resolution 1267, known as the UN 1267 Committee. Among other duties, the UN 1267 Committee overseas the implementation by UN Member States of three sanctions measures – assets freeze, travel ban, and arms embargo, imposed by the Security Council on individuals and entities associated with the al Qaeda terrorist organization.

As Under Secretary, I gave two presentations to the UN 1267 Committee on the Treasury Department designation process implementing E.O. 13224. In late 2001, I gave a presentation discussing the process employed by the U.S. Government for placing the names of individuals and entities on the OFAC list pursuant to E.O. 13224. Further, in February 2002, I explained to members of the Committee the delisting process for removing names from the OFAC list.

While serving as Under Secretary, I also supervised the promulgation of the Treasury Department regulations implementing the anti-money laundering and counter-terrorist financing provisions of the USA PATRIOT Act, P.L. 107-56, 115 Stat. 272 (2001).

Additionally, I have conducted extensive research on money laundering and terrorist financing. I am the author of numerous books, law review articles, and other publications on money laundering and terrorist financing, including: ADVANCED INTRODUCTION TO COUNTER-TERRORISM LAW (Edward Elgar, forthcoming 2021); NATIONAL SECURITY LAW AND THE CONSTITUTION (Wolters Kluwer, 2d ed. 2020) (co-author); NATIONAL SECURITY LAW: PRINCIPLES AND POLICY (Wolters Kluwer, 2d ed. 2019) (co-author); COMPLEX CRIMINAL LITIGATION: PROSECUTING DRUG ENTERPRISES AND ORGANIZED CRIME (Juris Publ., 4th ed. 2019) (co-author); HANDBOOK OF CRIMINAL AND TERRORISM FINANCING LAW (Palgrave McMillan 2018) (co-editor); INTERNATIONAL CRIMINAL LAW, CASES AND MATERIALS (Carolina Academic Press 4th ed., 2013) (co-author); PRINCIPLES OF

COUNTER-TERRORISM LAW (Thomson-West 2011) (co-author); UNFUNDING TERROR: THE LEGAL RESPONSE TO THE FINANCING OF GLOBAL TERRORISM (Edward Elgar Publ. 2008; and THE LAW OF ASSET FORFEITURE (Lexis, 2d ed. 2004) (co-author).

I am also the author of the following law review articles: *The Failure to Prosecute ISIS's Foreign Financiers under the Material Support Statute*, THE HANDBOOK OF CRIMINAL AND TERRORISM FINANCING LAW (Palgrave McMillan 2018) (co-author); *Utilizing Secondary Sanctions to Curtail the Financing of the Islamic State*, GEORGETOWN JOURNAL OF INTERNATIONAL AFFAIRS (2017); *The Need to Refocus the Government's Post-9/11 Counter-Terrorist Financing Strategy Directed at Al Qaeda to Target the Funding of ISIS*, 50 Valparaiso L. R. 493 (2016) (symposium article); *Holding Banks Liable Under the Anti-Terrorism Act for Providing Financial Services to Terrorists: An Ineffective Legal Remedy in Need of Reform,* 41 N.D. J. Leg. 184 (2015); *The Demise of the U.N. Economic Sanctions Regime to Deprive Terrorists of Funding*, 41 Case W. Res. J. Int'l L. 19 (2009) (symposium article); *Does "Proceeds" Really Mean "Net Profits"? The Supreme Court's Efforts to Diminish the Utility of the Federal Money Laundering Statute,* 7 Ave Maria L. Rev. 339 (2009); HOW TO COMBAT MONEY LAUNDERING AND TERRORIST FINANCING (chapter 13) (Central Banking Publ. Ltd. 2005); and *Unfunding Terror,* 17 THE TRANSNATIONAL LAWYER 113 (2004) ("Bordering on Terror" Symposium, McGeorge School of Law).

Finally, I have delivered lectures on terrorist financing and money laundering at international conferences, universities, before international bankers associations, and other venues abroad, including: London and Manchester, England; Tilburg, Netherlands; Milan, Rome, and Naples, Italy; Vienna, Austria; Brussels, Belgium; Madrid and Barcelona, Spain; Davos, Switzerland (World Economic Forum); Luxembourg, Luxembourg; Mumbai, New Delhi, Pune, and Calcutta, India; Asuncion Paraguay; and Tirana, Albania.

I have not testified as an expert at trial or by deposition in the previous four years.

## II.
## The Importance of Economic Sanctions in Combatting International Terrorism

Combatting the financing of terrorism is a central component of the U.S. government's counter-terrorism strategy. Money is the "lifeblood" of international terrorist organizations. "Money is critical to financing terrorist operations (operational costs) as well as sustaining the organizational infrastructure of the terrorists groups (organizational costs)."[1] Stopping the flow of funds to international terrorists can disrupt their short-term operations and undermine their long-term capabilities.[2] Foreign terrorist organizations cannot pursue sophisticated operations

[1] JIMMY GURULÉ & GEOFFREY S. CORN, PRINCIPLES OF COUNTER-TERRORISM LAW 295 (West 2010).
[2] *See* NATIONAL COMMISSION ON TERRORIST ATTACKS, THE 9/11 COMMISSION REPORT: FINAL REPORT OF THE NATIONAL COMMISSION ON TERRORIST ATTACKS UPON THE UNITED STATES 382 (W.W. Norton & Company 2004), http://www.9-11commission.gov/report/911Report.pdf ("The government has

like the 9/11 terror attacks without adequate funding.[3] Furthermore, terrorists need money to finance their organizational activities, including recruiting and training new members, paying travel, housing and communication expenses, acquiring weapons and explosives, and developing, translating and distributing propaganda materials. Simply stated, "terrorists need money to terrorize."[4]

Attacking the financial infrastructure of foreign terrorist organizations is fundamentally a preventive strategy. "The ultimate goal is to save lives by preventing the use of funds to fuel terrorist attacks."[5] While starving terrorist organizations of funding is critical to preventing terrorist attacks, going after the money is important for other reasons. Investigating the financial networks of terrorists may "expose terrorist financing 'money trails' that may generate leads to previously unknown terrorist cells and financiers."[6] Furthermore, blocking the assets of terrorists, shutting down corrupt charities, and investigating and prosecuting terrorist financiers may deter terrorist sympathizers from providing financial assistance to foreign terrorist organizations.[7] Disrupting the channels of terrorist financing may also force terrorists to use more risky and less efficient and reliable means to move money globally to finance terrorist-related activities.[8] Simply stated, depriving international terrorist organizations of funding is "as important as targeting the operational terror cells themselves."[9]

"The U.S government uses targeted economic sanctions as an impactful tool against international terrorists and terrorist organizations."[10] The Treasury Department's Office of Foreign Assets Control (OFAC) is the lead U.S. Government agency responsible for implementing sanctions against the assets of international terrorist organizations and their financial sponsors and facilitators. Publicly designating individuals and organizations for asset freeze "notifies the U.S. public and the world that these parties are either actively engaged in or supporting terrorism or that they are being used by terrorists and their organizations."[11] "Sanctions also expose and isolate terrorists and their organizations, help protect the

---

recognized that information about terrorist money helps us to understand their networks, search them out, and disrupt their operations.") [hereinafter "THE 9/11 COMMISSION REPORT"].

[3] *See* JIMMY GURULÉ, UNFUNDING TERROR: THE LEGAL RESPONSE TO THE FINANCING OF GLOBAL TERRORISM 21 (Edward Elgar 2008) [hereinafter "UNFUNDING TERROR"].

[4] UNFUNDING TERROR, *supra* note 3, at 21.

[5] *Id.*

[6] U.S. Dep't of Treasury, National Money Laundering Strategy 7 (2003), http://www.treasury.gov/offices/enforcement/publications/ml2003.pdf.

[7] *See* UNFUNDING TERROR, *supra* note 3, at 22.

[8] *Id. See also* THE 9/11 COMMISSION REPORT, *supra* note 2, at 382.

[9] UNFUNDING TERROR, *supra* note 3, at 22.

[10] *Terrorist Assets Report, Twenty-Seventh Annual Report to the Congress on Assets in the United States Relating to Terrorist Countries and Organizations Engaged in International Terrorism* 6, Office of Foreign Assets Control, U.S. Dep't of Treasury (2018) [hereinafter "TERRORIST ASSETS REPORT (2018)"].

[11] *Terrorist Assets Report, Eighteenth Annual Report to the Congress on Assets in the United States of Terrorist Countries and International Terrorism Program Designees* 4, Office of Foreign Assets Control, U.S. Dep't of Treasury (2009).

international financial system from abuse, and can assist or complement the law enforcement actions of other U.S. agencies and other governments."[12]

## III.
## Specially Designated Global Terrorist –Background

On September 23, 2001, President George W. Bush issued Executive Order 13224, invoking his authority under the International Emergency Economic Powers Act, 50 U.S.C. § 1702. E.O. 13224 declared a "national emergency" with respect to "grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the terror attack … committed on September 11, 2001 … and the continuing and immediate threat of further attacks on United States nationals or the United States."[13] At the time, I was Under Secretary (Enforcement), U.S. Department of Treasury, and participated in meetings at the White House to review and discuss early drafts of E.O. 13224. The Order designated 12 individuals and 15 entities as "Specially Designated Global Terrorists" and identified them in the Annex to the Order.

E.O. 13224 authorizes the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to designate and block all property and interests in property of persons who (1) are "owned or controlled by" or "act for or on behalf of " designated terrorists; (2) "assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to" SDGTs; or (3) are "otherwise associated with SDGTs.[14]

E.O. 13224 also authorizes the Secretary of State, in consultation with the Secretary of Treasury and the Attorney General, to designate as SDGTs persons determined "to have committed, or to pose a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals, or the national security, foreign policy, or economy of the United States."[15]

The Office of Foreign Assets Control (OFAC), an agency within the Treasury Department, is responsible for recommending individuals and entities for designation under E.O 13224, §§ 1(c)-(d). As Under Secretary, my responsibilities included oversight of OFAC, and the Director of OFAC reported directly to me. I was also responsible for approving the designation of individuals and entities under E.O. 13224, including the original 27 names designated on September 23, 2001, and the names added to the OFAC list thereafter.

Designation under E.O. 13224 has important legal consequences. First, all "property and interests in property" of SDGTs located within the jurisdiction of the United States are blocked.[16] Second, § 2(a) prohibits U.S. persons from engaging in any transaction or dealing in

---

[12] TERRORIST ASSETS REPORT (2018), *supra* note 8, at 2.
[13] Exec. Order No. 13224, Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, 66 Fed. Reg. 49,079 (Sept. 23, 2001).
[14] *Id.* §§ 1(c)-(d) (i)-(ii).
[15] *Id.* § 1(b).
[16] *Id.* § 1.

property of interests in property blocked pursuant to the Order.[17] Third, the Order prohibits any U.S. person from "making or receiving … any contribution of funds, goods or services to or for the benefit of" persons determined to be subject to the Order.[18] Fourth, any transaction by a U.S. person that evades or attempts to violate any of the prohibitions set forth in the Order is prohibited.[19] Finally, severe civil and criminal penalties may be imposed for a violation of E.O. 13224.[20]

Designation as a SDGT is an administrative rather than a criminal action. Thus, there is no requirement that the Government charge or convict the designated individual of a crime. Furthermore, the Government is not required to satisfy the "beyond a reasonable" doubt standard of proof. Instead, OFAC may designate an individual or entity as an SDGT if there is a "reasonable basis" to believe that the designee is "owned or controlled by," "act[s] for or on behalf of," "assist[s] in … or provide[s] financial, material, or technological support for of financial or other services to" or is "otherwise associated with" an SDGT.[21] Additionally, the Secretary of State may designate a person if there is a "reasonable basis" to believe that the individual has "committed, or … pose[s] a significant risk of committing, acts of terrorism that threaten … the national security, foreign policy, or economy of the United States."[22]

Since September 11, 2001 terrorist attacks, over 1,411 individuals and entities have been designated under E.O. 13224 and determined to be owned or controlled by, acting for or on behalf of, sponsoring, providing material support or services to, or otherwise associated with, suspected terrorists or terrorist organizations.[23]

## IV.
## SDGT Designation Process

OFAC administers sanctions programs targeting, among others, international terrorists and terrorist organizations and their supporters, including under E.O. 13224. Specifically, the designation of individuals and entities as SDGTs, and subsequent blocking actions, begin with OFAC. First, OFAC collects evidence to support the SDGT designation. This evidence may include a broad range of evidence, including open-source information such as news and media reports, internet sites, court documents, property records, bank records, birth certificates, criminal indictments, hearsay declarations, as well as information generated from criminal

---

[17] *Id.* § 2(a).
[18] *Id*.
[19] *Id.* § 2(b).
[20] A maximum civil penalty of $50,000 may be imposed for each violation of E.O. 13224. *See* 31 C.F.R. § 594.701(a)(1). Furthermore, a person who "willfully" violates the executive order may be sentenced to a maximum term of 20 years. *See* § 594.701(a)(2).
[21] E.O. 13224, *supra* note 13, §§ 1(c), (d)(i)-(ii).
[22] *Id.* § 1(b).
[23] TERRORIST ASSETS REPORT (2018), *supra* note 8 ("As of December 31, 2018, a total of 1,411 individuals and entities had been designated and remained listed as 'Specially Designated Global Terrorists' or 'SDGTs' for having met one or more of the criteria for designation set forth in E.O. 13224 and are therefore blocked.").

investigations and classified intelligence reports, including materials collected, analyzed, and reported by State, Treasury, Defense, and other U.S. intelligence resources.

Second, the evidence collected by OFAC is reviewed by senior-level Treasury Department officials to determine whether there is a "reasonable basis" for designation under E.O. 13224. In fact, when serving as Under Secretary (Enforcement), I would regularly meet with the Director of OFAC to discuss proposed SDGT designations and review the underlying evidence. Because of the serious nature of the allegations and legal implications of SDGT designation, I was aware that any person designated as a SDGT could seek to challenge the designation in federal court. Moreover, if the court overturned the SDGT designation, this would jeopardize the credibility and effectiveness of the U.S. Government's counter-terrorist financing program under E.O. 13224. Thus, it was essential to ensure that there was credible and reliable evidence for these designations to withstand judicial scrutiny.

Third, after review and approval by high-ranking officials at the Treasury Department, the proposed designations were reviewed at a government interagency meeting. The designation of particular individuals and entities were proposed by OFAC and other federal agencies based on their internal investigations. The purpose of the interagency meeting was to discuss the proposed designees to determine whether other federal agencies were in possession of information to support their designation under E.O. 13224. Additionally, the interagency meeting provided a forum to consider any conflicting interests and reasons for delaying the public designation. For example, the proposed SDGT designee might be the target of an ongoing FBI investigation of the target and publicly designating the individual could jeopardize or compromise the criminal investigation. In such a case, after fully discussing the matter, government officials would decide whether to postpone the designation. If the designation were delayed, an agreement would be reached to reconsider the matter at a future interagency meeting. Ultimately, a decision to proceed with the SDGT designation required unanimous approval by the interagency representatives. Finally, SDGT designations were based solely on evidence and the merits of the case. Simply stated, OFAC never affirmatively designated an individual or entity based on political considerations.

Fourth, once the Secretary of the Treasury designated an individual or entity, OFAC proceeded to block the assets of the designee located in the United States or in the possession or control of U.S. persons. OFAC also published notice of the designation in the *Federal Register*. Furthermore, OFAC added the individual or entity to its list of Specially Designated Nationals, by identifying such individuals or entities as SDGTs and posted a notice of this addition on the OFAC website. Finally, designations remained in effect until OFAC revoked the designation or the Executive Order lapsed or terminated in accordance with U.S. law.

The fact that OFAC has not designated a particular individual or entity under E.O. 13224 does not mean that such party is not subject to designation. Instead, a decision could have been made by OFAC and other interested federal agencies to postpone or delay the designation to accommodate competing agency interests. Likewise, removing an entity from the OFAC list

does not mean that OFAC wrongfully designated the party in the first instance. OFAC could agree to delist a party if the basis for designation changed. For example, OFAC might designate a person serving on the board of directors of an entity associated with al Qaeda. If the designated party severed that relationship, OFAC could delist the individual and remove him from the OFAC list.

In my opinion, the SDGT designation process is rigorous, reliable, and comprehensive. Multiple federal agencies review the proposed designations before approval to ensure that the designations are based on credible and reliable evidence. As Under Secretary, I understood that the designated party could seek judicial review of the OFAC designation and therefore it was imperative that every designation withstand judicial scrutiny. Moreover, it was my experience that other government officials involved in the designation process took their responsibilities very seriously.

Finally, during my tenure at the Treasury Department, OFAC used the designation process discussed above for all designations under E.O. 13224. Furthermore, I believe that OFAC continued to employ this designation process after my departure.

Designations under E.O. 13224 are significant for several reasons. First, designation as an SDGT means that Treasury Department, State Department, and Department of Justice officials have determined that the individual or entity is assisting, sponsoring or supporting international terrorists or associated with them, or has committed or poses a significant risk of committing acts of terrorism. Second, because of these serious allegations and determination, such individuals are subject to severe economic sanctions, including freezing their assets located in the United States, and prohibiting U.S. persons from engaging in any financial transactions with them. A blocking order effectively shuts down the private entity. Third, persons and entities designated as an SDGT may be designated by the U.N. 1267 Committee, resulting in a global asset freeze.

## V.
## SDGT Designations and International Cooperation

While the integrity and credibility of the SDGT designation process is critical to ensure that the designations withstand judicial scrutiny, the process that is responsible for over 1,400 designations is important for one other reason. While E.O. 13224 is critical to combatting terrorist financing, its application is limited domestically. In order to prevent terrorists from collecting money and transferring it around the globe requires the support of our allies and the international community. To that end, when individuals and entities are designated under E.O. 13224, the names of individuals and organizations associated with al Qaeda, Osama bin Laden, and associated foreign terrorists are forwarded to the U.N. 1267 Committee for inclusion on the Consolidated list.

In 1999, the Security Council decided that the threat posed by al Qaeda merited an international response. Accustomed to dealing with States, the Security Council decided to confront al Qaeda by imposing sanctions on the Taliban, who represented the *de facto* government of Afghanistan. The Security Council adopted Resolution 1267, which imposed various obligations on Member States, including the duty to freeze funds and other financial resources owned or controlled by the Taliban. Paragraph 4(b) requires countries to "[f]reeze funds and other financial resources, including funds derived or generated from property owned or controlled, directly or indirectly by the Taliban, or by any undertaking owned or controlled by the Taliban."[24] Resolution 1267 further created a committee, consisting of members of the Security Council, to monitor actions taken by States to implement the measures imposed by the resolution ("Al-Qaida and Taliban Sanctions Committee" or "U.N. 1267 Committee").

In December 2000, the Security Council adopted Resolution 1333, calling on the Taliban to comply with the sanctions imposed by Resolution 1267.[25] However, the Resolution went beyond imposing sanctions on the Taliban. Resolution 1333 imposed measures on individuals and non-state entities, mandating a freeze on the financial assets of Osama bin Laden, al Qaeda, and their associates, including sympathetic donors.[26] Paragraph 8(c) requires the Sanctions Committee established pursuant to Resolution 1267 "to [establish and] maintain an updated list, based on the information provided by States and regional organizations, of individuals and entities designated as being associated with Osama bin Laden, including those in the Al-Qaida organization."[27] After inclusion on the list, Member States would be obliged to "freeze without delay" the funds and other financial assets of those individuals and entities.

The sanctions programs overseen by the U.N. 1267 Committee serve the same goals as E.O. 13224, by requiring U.N. Member States to undertake the following steps with respect to any individuals or organization included on the U.N. Consolidated list:

(1) freeze without delay the funds and other financial assets or economic resources of designated individuals and entities [asset freeze];

(2) prevent the entry into or transit through their territories by designated individuals [travel ban]; and

(3) prevent the direct or indirect supply, sale and transfer from their territories or by their nationals outside territories, or using their flag vessels or aircraft, of arms and related material of all types, spare parts, and technical advice, assistance, or training related to military activities, to designated individuals and entities [arms embargo].[28]

---

[24] S.C 1267, U.N. Doc. S/RES/1267 (1999), ¶ 4(b).
[25] S.C. 1333, U.N. Doc. S/RES/1333 (2000).
[26] *Id.*
[27] *Id*. ¶ 8(c).
[28] *See* S.C. 1267, ¶ 4(a)-(b), S.C. 1333, ¶ 5(a).

The Al-Qaida and Taliban Sanctions Committee is responsible for overseeing implementation by States of the sanctions measures (assets freeze, travel ban, and arms embargo) imposed by the Security Council on individuals and entities belonging to or associated with the Taliban, Osama bin Laden, and the Taliban.[29]

In order to add the names of individuals and entities designated under E.O. 13224 to the U.N. 1267 Committee Consolidated List, the Treasury Department has a strong incentive to ensure that these designations are based on credible and reliable evidence. Otherwise, the U.N. 1267 Committee would be reluctant and unwilling to consider imposing global economic sanctions against these individuals and organizations.

In December 2001, in my capacity as Treasury Under Secretary, I delivered a presentation to the members of the U.N. 1267 Committee at the United Nations. I went to great efforts to ensure the members of the Committee that the SDGT designation process was fair and comprehensive—that the evidence supporting the designations was carefully reviewed by multiple federal agencies. Furthermore, I explained that these designations were based on credible and reliable evidence and we were confident that these designations would be upheld upon judicial review. After my presentation, I answered questions raised by the Committee members, which further bolstered their confidence in the integrity and credibility of the SDGT designation process.

In February 2002, I gave a second presentation to the U.N. 1267 Committee to explain the process that OFAC had established for removing names from the OFAC list. This presentation was positively received by members of the Committee. It further added credibility to the OFAC designation process and enhanced their confidence in the SDGT designations.

Jimmy Gurulé
Professor of Law

February 1, 2021
Date

[29] *See* Al-Qaida and Taliban Sanctions Committee, http://www.un.org/sc/committees/1267/index.shtml.

**JIMMY GURULÉ**
**Notre Dame Law School**
**Notre Dame, IN 46556**
**(574) 631-5917**
**Gurule.1@nd.edu**

## EDUCATION:

S.J. Quinney College of Law, University of Utah, J.D. (1980)
University of Utah, B.A. English (1974)

## EXPERIENCE:

**PROFESSOR OF LAW, NOTRE DAME LAW SCHOOL (1989 to present)** Teaching courses in Criminal Law, International Criminal Law, National Security Law, Death Penalty, and the Wrongful Conviction Externship.

Served as Associate Dean from 1998-99.

Concurrent Professor, Department of Political Science
Institute for Latino Studies, Fellow

**UNDER SECRETARY (ENFORCEMENT), U.S. DEPARTMENT OF THE TREASURY (2001-2003)** - Nominated by President George W. Bush and unanimously confirmed by the United States Senate.

Served as the top Treasury Department law enforcement official, provided oversight, policy guidance to and coordinated the activities of the United States Customs Service, United States Secret Service, Bureau of Alcohol, Tobacco and Firearms (BATF), Financial Crimes Enforcement Network (FinCEN), Federal Law Enforcement Training Center (FLETC), Office of Foreign Assets Control (OFAC), and Executive Office of Asset Forfeiture.

The Treasury enforcement bureaus comprised over 10,000 employees with a proposed fiscal year 2003 budget of over $5 billion.

Played a pivotal role in developing and implementing the Treasury Department=s global strategy to combat terrorist financing, meeting regularly with foreign finance and justice ministers, and overseeing Treasury=s participation in the Financial Action Task Force (FATF). Responsible for developing the 2001 and 2002 National Money Laundering Strategy and supervising publication of the regulations implementing the anti-money laundering provisions of the USA PATRIOT Act.

Responsible for coordinating the security plan for the 2002 Salt Lake City Winter Olympics and establishing the U.S. Customs-led terrorist financing task force "Operation Green Quest."

As Under Secretary (Enforcement), featured in *Newsweek* (Oct. 29, 2001), *U.S. News & World Report* (Dec. 31, 2001), *The Washington Diplomat* (March 2003), *Bank Systems & Technology* (May 2002) *Luxembourg Business* (Sept. 2002), and *Notre Dame Magazine* (Autumn 2002).

**ASSISTANT ATTORNEY GENERAL, U.S. DEPARTMENT OF JUSTICE (1990-1992) -**
Nominated by former President George H.W. Bush and unanimously confirmed by the United States Senate.

Provided oversight, policy guidance to and coordinated the activities of the Bureau of Justice Assistance (BJA), Bureau of Justice Statistics (BJS), National Institute of Justice (NIJ), Office of Juvenile Justice and Delinquency Prevention (OJJDP), and Office of Victims of Crime (OVC).

Responsible for administering an office with a combined fiscal year budget of over three-quarters of a billion dollars. Also, testified before various congressional committees on a wide range of criminal justice issues.

**ASSISTANT UNITED STATES ATTORNEY, U.S. ATTORNEY'S OFFICE, CENTRAL DISTRICT OF CALIFORNIA (1985-1989) -**
Served as the Deputy Chief of the Major Narcotics Section and prosecuted high-profile international narcotics, organized crime, money laundering, and tax fraud cases, and conducted complex grand jury investigations. Supervised the three-year investigation and prosecution of defendants responsible for the kidnapping and murder of a DEA Special Agent in Mexico.

**DEPUTY COUNTY ATTORNEY, SALT LAKE COUNTY ATTORNEY=S OFFICE (1982-1985) -**
Served as Chief of Major Drug Section, prosecuting major felony cases.

**TRIAL ATTORNEY, U.S. DEPARTMENT OF JUSTICE, CRIMINAL DIVISION (1980-1982) -**
Hired through the DOJ Honors Program. Prosecuted major narcotics cases and investigated money laundering cases.

**EXPERT WITNESS -** Served as an expert witness or consultant in over 15 high profile money laundering and terrorist financing cases.

**ADVISED FOREIGN GOVERNMENTS**: Armenia (2018) (investigating and prosecuting public corruption), Bahrain (2012) (investigating and prosecuting torture), Belize (2011) (Prosecutorial Reform Index) and Armenia (2010) (Detention Procedure Assessment Tool).

**ADVISED THE WORLD BANK AND U.N. OFFICE ON DRUGS & CRIME**: Stolen Asset Recovery Initiative (2010).

**Advisory Board Member, Chicago-Kent College of Law, Center for National Security and Human Rights Law** (2019-present).

**FULBRIGHT SCHOLAR -** Universidad Diego Portales, Facultad de Derecho, Santiago, Chile (2011)

**BOOKS:**

ADVANCED INTRODUCTION TO COUNTER-TERRORISM LAW (Elgar Publ., manuscript due March 2021);

NATIONAL SECURITY LAW AND THE CONSTITUTION (Wolters Kluwer, 2d ed., forthcoming 2020) (co-author);

NATIONAL SECURITY LAW: PRINCIPLES AND POLICY (Wolters Kluwer, 2d ed. 2019) (co-author);

COMPLEX CRIMINAL LITIGATION: PROSECUTING DRUG ENTERPRISES AND ORGANIZED CRIME (Juris Publ., 4th ed. 2019);

HANDBOOK OF CRIMINAL AND TERRORISM FINANCING LAW (Palgrave McMillan 2018) (co-editor);

CRIMINAL AND FORENSIC EVIDENCE: CASES, MATERIALS, PROBLEMS (LexisNexis 4th ed., 2014) (co-author);

INTERNATIONAL CRIMINAL LAW, CASES AND MATERIALS (Carolina Academic Press 4th ed., 2012) (co-author);

PRINCIPLES OF COUNTER-TERRORISM LAW (Thomson-West 2011) (co-author);

UNFUNDING TERROR: THE LEGAL RESPONSE TO THE FINANCING OF GLOBAL TERRORISM (Edward Elgar Publ. 2008);

INTERNATIONAL CRIMINAL LAW DOCUMENTS SUPPLEMENT (Carolina Academic Press 4th ed., 2012) (co-author);

HUMAN RIGHTS MODULE ON CRIMES AGAINST HUMANITY, GENOCIDE, OTHER CRIMES AGAINST HUMANITY, AND WAR CRIMES (Carolina Academic Press 2d ed. 2007) (co-author); and

THE LAW OF ASSET FORFEITURE (LexisNexis) (2d ed., 2004) (co-author).

**LAW ARTICLES:**

*The Failure to Prosecute ISIS's Foreign Financiers under the Material Support Statute*, THE HANDBOOK OF CRIMINAL AND TERRORISM FINANCING LAW. (Palgrave McMillan 2018) (co-author);

*Utilizing Secondary Sanctions to Curtail the Financing of the Islamic State*, GEORGETOWN JOURNAL OF INTERNATIONAL AFFAIRS (2017);

*The Need to Refocus the Government's Post-9/11 Counter-Terrorist Financing Strategy Directed at Al Qaeda to Target the Funding of ISIS*, 50 Valparaiso L. R. 493 (2016) (symposium article);

*Holding Banks Liable Under the Anti-Terrorism Act for Providing Financial Services to Terrorists: An Ineffective Legal Remedy in Need of Reform,* 41 N.D. J. Leg. 184 (2015);

*The Demise of the U.N. Economic Sanctions Regime to Deprive Terrorists of Funding*, 41 Case W. Res. J. Int'l L. 19 (2009) (symposium article);

*Does "Proceeds" Really Mean "Net Profits"? The Supreme Court's Efforts to Diminish the Utility of the Federal Money Laundering Statute,* 7 Ave Maria L. Rev. 339 (2009);

*Unfunding Terror,* 17 THE TRANSNATIONAL LAWYER 113 (2004) (ABordering on Terror@ Symposium B McGeorge School of Law);

*U.S. Opposition to the 1998 Rome Statute Establishing an International Criminal Court: Is the Court's Jurisdiction Truly Complementary to National Criminal Jurisdictions?,* 35 Cornell Int'l Law Journal 1 (2002);

*The International Criminal Court: Complementarity with National Criminal Jurisdiction*, 33 AMICUS CURIAE, Journal of the Society for Advanced Legal Studies (2001);

*The 1988 U.N. Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances B A Ten Year Perspective: Is International Cooperation Merely Illusory?,* 22 Fordham Int'l Law Journal 74 (1998);

*The Money Laundering Control Act of 1986: Creating a New Federal Offense or Merely Affording Federal Prosecutors an Alternative Means of Punishing Specified Unlawful Activity?* 32 Am. Crim. L. Rev. 823 (1996);

*The Ancient Roots of Modern Forfeiture,* 21 NOTRE DAME JOUR. OF LEG. 155 (1995); and

*Terrorism, Territorial Sovereignty, and the Forcible Apprehension of International Criminals Abroad,* 17 Hastings Int'l and Comp. L. Rev. 457 (1994).

**MISCELLANEOUS PUBLICATIONS**:

*The American People Must See the Mueller Report with Few Redactions,* The Hill Opinion (April 17, 2019);

*Deploying U.S. Armed Forces in Niger Is Unlawful*, CNN Opinion (Oct. 24, 2017);

*Could Trump Have Obstructed Justice?*, CNN Opinion (May 11, 2017);

*Supreme Court Strikes Blow Against Terror,* CNN Opinion (April 21, 2016);

Drafted Amicus Brief in *Bank Markazi v. Peterson,* No. 14-770 (U.S.S.C. 2016);

*Prosecuting the Financiers of Terror,* in HOMELAND SECURITY HANDBOOK, 99-120 (David Kamien, ed., McGraw-Hill 2d ed., 2012);

*Are Some Banks Too Big to Fail?,* CNN Opinion (Aug. 16, 2012);

*FISA and the Battle between National Security and Privacy, available at* http://jurist.pitt.edu/forum/2012/02/jimmy-gurule-fisa.php.

PROSECUTORIAL REFORM INDEX FOR BELIZE, American Bar Association Rule of Law Initiative (March 2011);

HOW TO COMBAT MONEY LAUNDERING AND TERRORIST FINANCING, *Evaluating the Progress in the Global War on Terrorist Financing*, 221-231(Central Banking Publ. Ltd.) (2005);

*Who Is Winning The War on Terror Financing?,* 10 FINANCIAL REGULATOR 25 (2005);

THE RIGHT TO A FAIR TRIAL, *The Right to a Fair Trial in the United States* (Council of Europe Publ.) (1999) (Report presented at UniDem Seminar in Brno by European Commission for Democracy).

**CONGRESSIONAL TESTIMONY:**

**Testified before the following Congressional committees on terrorist financing issues**:

House Judiciary Committee, Subcommittee on the Constitution and Civil Justice (7/14/16);

House Committee on Financial Services, Task Force to Investigate Terrorism Financing (6/23/16);
House Financial Services Committee (11/13/14);
Senate Judiciary Committee (11/20/02);
House Committee on Ways and Means (6/26/02);
Senate Appropriations Subcommittee on Treasury and General Government (4/17-18/02);
House Appropriations Subcommittee on Treasury, Postal Service and General Government (3/06/02, 2/27-28/02);
Senate Select Committee on Intelligence (2/04/02);
House Committee on Financial Services (10/03/01);
Senate Committee on Banking, Housing, and Urban Affairs (9/26/01);
House Permanent Select Committee on Intelligence (9/18/01); and
Senate Committee on Finance (5/16/01).

Testified before the U.S. Commission on Security and Cooperation in Europe (5/8/02).

**LECTURES:**

Mexico City (2019); Sao Paolo, Brazil (2017); Toronto, Canada (2017); Tilburg, The Netherlands (2015); ABA Business Law Section Annual Meeting Chicago, Illinois (2015); London, England (ND London Global Gateway 2019, 2015); Kuala Lumpur, Malaysia (2014); Manchester, England (2014); Seoul, South Korea (2014 and 2013); Geneva, Switzerland (2013); Belize City, Belize (2011); Tirana, Albania (2008); London, England (Chatham House) (2008); Mumbai, New Delhi, Calcutta, and Puna, India (2006), Milan, Rome and Naples, Italy (2005) (Guardia de Finanza, National Anti-Mafia Agency, Carabinieri, Banca Intesa, Italian Bankers Association, CEISS B Military Center for Strategic Studies); Catholic University, Research Center on TransCrime, Milan, Italy (2005); Economic Forum Series, U.S. Embassy, Brussels, Belgium(2005); Amerika Haus, Vienna, Austria (2004, 2005); Austrian Defense Academy, Vienna, Austria (2005); Asuncion, Paraguay (Catholic University School of Law, Comandancia de la Policia Nacional, SEPRELAD, Senators of Finance Committee) (2005); Raiffeisenlandesbank, Linz, Austria (2004); The Hague, Conference for Iraqi Judges (2004); International Organization of Securities Commissions (IOSCO), New York City (2004); World Economic Forum, Davos, Switzerland (2003); Euroforum, Madrid, Spain (2003); Conference on Money Laundering and Financial Crimes, Central Banking Publications Ltd., Windsor, England (2003); Institute of International Bankers, New York City (2003); Florida International Bankers Association, Miami, Florida (2003); Heritage Foundation (2002); McGeorge School of Law (2003); S.J. Quinney School of Law, University of Utah (2003); Columbus School of Law, Catholic University, Washington, D.C. (2002); Notre Dame Law School (2002); Florida State University School of Law (2000); University of London, Center for Advanced International Studies (1999); University of Mendoza School of Law, Mendoza, Argentina (1999); University of Kentucky Law School (1997); and Harvard Law School (1993).

Addressed a nationwide meeting of high-ranking Russian federal prosecutors at a conference on money laundering sponsored by the U.S. Embassy in Moscow, Russia (1997).

Participated in a conference on money laundering held in Yerevan, Armenia, sponsored by the ABA Central and East Europe Law Initiative (CEELI) (1998).

Addressed the United Nations Security Council 1267 and 1373 Sanctions Committee on freezing terrorist assets (Feb. and Sept. 2002)

Delivered the law school commencement address at the S.J. Quinney School of Law, University of Utah (2002)

February 2, 2021 - Jimmy Gurule Expert Report

Reliance Materials and Materials Considered List

| |
|---|
| 31 C.F.R. § 594.701(a)(1) |
| Al-Qaida and Taliban Sanctions Committee, http://www.un.org/sc/committees/1267/index.shtml. |
| Exec. Order No. 13224, Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, 66 Fed. Reg. 49,079 (Sept. 23, 2001). |
| Expert Report of Connie Fenchel |
| Expert Report of Dennis Lormel |
| Expert Report of John Sidel |
| Expert Report of Jonathan Benthall |
| Expert Report of Marc Sageman |
| Expert Report of Martha Crenshaw |
| Expert Report of Vahid Brown |
| Jimmy Gurulé & Geoffrey S. Corn, Principles of Counter-Terrorism Law 295 (West 2010) |
| Jimmy Gurulé, Unfunding Terror: The Legal Response to the Financing of Global Terrorism 21 (Edward Elgar 2008) |
| National Commission on Terrorist Attacks, The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States 382 (W.W. Norton & Company 2004), http://www.9-11commission.gov/report/911Report.pdf |
| S.C. 1267, U.N. Doc. S/RES/1267 (1999) |
| S.C. 1333, U.N. Doc. S/RES/1333 (2000). |
| Terrorist Assets Report, Eighteenth Annual Report to the Congress on Assets in the United States of Terrorist Countries and International Terrorism Program Designees 4, Office of Foreign Assets Control, U.S. Dep't of Treasury (2009). |
| Terrorist Assets Report, Twenty-Seventh Annual Report to the Congress on Assets in the United States Relating to Terrorist Countries and Organizations Engaged in International Terrorism 6, Office of Foreign Assets Control, U.S. Dep't of Treasury (2018) |
| U.S. Dep't of Treasury, National Money Laundering Strategy 7 (2003), http://www.treasury.gov/offices/enforcement/publications/ml2003.pdf. |