# EXHIBIT

# "246"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.*, 02-cv-06977
*Gladys H. Salvo, et al. v. Al Qaeda Islamic Army, et al.*, 03-cv-05071
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Maher, et al. v. Islamic Emirate of Afghanistan a/k/a The Taliban, et al.*, 23-cv-02845

# PLAINTIFFS' CONSOLIDATED STATEMENT OF MATERIAL FACTS PURSUANT TO RULE 56.1 AS TO DEFENDANTS MUSLIM WORLD LEAGUE AND THE INTERNATIONAL ISLAMIC RELIEF ORGANIZATION

Plaintiffs in the above-referenced actions ("Plaintiffs") submit this Consolidated Statement of Material Facts Pursuant to Fed. R. Civ. P. 56.1, in further support of their claims against defendants Muslim World League ("MWL") and International Islamic Relief Organization ("IIRO").

## I. OVERVIEW OF THE MWL'S AND IIRO'S KNOWING, INTENTIONAL, EXTENSIVE, AND CRITICAL SUPPORT TO AL QAEDA

1. Plaintiffs have developed a diverse body of evidence clearly establishing that the MWL, IIRO, and their officials, employees, advisors, and representatives were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad.

2. Intending to foster al Qaeda's terrorist agenda, the MWL and IIRO provided substantial financial assistance and other resources to bin Laden and al Qaeda knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks. Accordingly, the 9/11 attacks were a predictable and inevitable product of that sustained and knowing support. For example:

3. The MWL and IIRO worked in concert with Osama bin Laden's Maktab al Khidmat ("MAK") (a/k/a the "Office of Services) to provide travel documents, funds, transportation,

training, facilities, arms, physical assets, and other support to the mujahideen during the Soviet-Afghan war in the 1980s.

4. Internal al Qaeda documents chronicling the formation of al Qaeda following the conclusion of the Soviet-Afghan war confirm that al Qaeda planned from its inception to use the MWL and IIRO to provide support and cover for al Qaeda's operations. One such document on MWL/IIRO letterhead, details an agreement between MWL Secretary General Omar Abdullah Naseef and "Abu Abdullah" (a/k/a Osama bin Laden), that al Qaeda attacks would be launched from MWL offices.

5. MWL Secretary General Naseef endorsed the appointment of Wa'el Hamza Jelaidan, a founding member of al Qaeda and close associate of bin Laden, as the director of the MWL/IIRO offices in Peshawar, Pakistan in 1989, thereby ensuring a direct channel for coordinating MWL/IIRO collaboration with al Qaeda. Jelaidan is an E.O. 13224 Specially Designated Global Terrorist ("SDGT").

6. MWL Secretary General Naseef also appointed Jelaidan to head the MWL-affiliated Rabita Trust, which was designated following the 9/11 attacks for "providing logistical and financial support to al Qaida."

7. Jelaidan also served as a board member of the MWL's Al-Haramain Al Masjed Al-Aqsa Charity Foundation ("AHAMAA") in Bosnia. AHAMAA was designated pursuant to E.O. 13224 for its significant financial ties to al Qaeda.

8. MWL Secretary General Naseef also approved the appointment of Mohammed Jamal Khalifa, a founding al Qaeda member and Osama bin Laden's brother-in-law, to lead a joint MWL/IIRO branch office in the Philippines. Khalifa used the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia, and a source of funding for al Qaeda affiliated terrorist organizations such as the Abu Sayyaf Group ("ASG"), Moro Islamic Liberation Front ("MILF"), and Jemaah Islamiyah ("JI").

9. As the head of the MWL/IIRO branch office in the Philippines, Khalifa personally orchestrated the IIRO's funding and support for the 1995 Philippines-based plot to attack U.S. flag airliners mid-flight (the "Operation Bojinka" terrorist plot conceived by 9/11 mastermind Khalid Sheikh Mohammed), the precursor to the 9/11 attacks.

10. Important al Qaeda financiers were also inserted into prominent positions within the MWL and IIRO, including IIRO-Eastern Province official Abd al Hamid Sulaiman al Mujil (al Qaeda's "million dollar man"), and IIRO-Eastern Province director Prince Turki bin Jalawi al Saudi (identified by the U.S. government as "an important al-Qa'ida donor"). Mujil was designated under E.O. 13224 for "bankroll[ing] the al Qaida network in Southeast Asia."

11. Members of the "Golden Chain," al Qaeda's elite financial sponsors and facilitators, served on the IIRO's Board of Directors, including Ibrahim Mohammad Afandi, Abdurahman Abdul-Qader Faqih, Saleh Kamel, and Suleiman al Rajhi.

12. Al Qaeda operatives and members of associated terrorist organizations were inserted into MWL and IIRO overseas offices, including Abu Hammam al Saudi (served as al

Qaeda's "Emir of finance" and was in charge of military affairs for al Qaeda while leading the IIRO-Pakistan office); Mahmud Abd Al-Jalil Afif (director of IIRO-Philippines who used his position to divert money to the Abu Sayyaf Group and other terrorist groups in the region); Abdul Asmad (IIRO branch manager and Abu Sayyaf Group intelligence chief who used his position at the IIRO to fund the Abu Sayyaf and Moro Islamic Liberation Front ("MILF") terrorist organizations); Abdelaziz Zaher (supervisor of the IIRO's offices in Bosnia-Herzegovina, Croatia, and Slovenia who provided funds and logistical aid to armed fundamentalist militant groups in the Balkans); and Jamal Al-Jibouri (IIRO employee with Zaher who was personally responsible for oversight of a massive logistical operation to provide al Qaeda and al Qaeda affiliated Islamic militants in the Balkans with weapons and ammunition).

13. Simultaneously, the MWL published and distributed numerous booklets, newsletters, and periodicals in multiple languages promoting violent jihad and called on Muslims to "commit to sacrificing their souls, money, family members, and children for the sake of Allah."

14. Declassified U.S. government records and finished analytical intelligence reports originating from the CIA, FBI, State Department, and Treasury Department document the MWL's and IIRO's knowing involvement in directing massive funding to al Qaeda and associated terror groups, and the broad use of their organizations and resources to advance al Qaeda's terrorist agenda.

15. More specifically, those reports detail and describe how the MWL and IIRO: (1) advocated for young Muslims to take up arms against the United States and Western societies; (2) worked to spread al Qaeda's jihadist ideology throughout the world, including by disseminating publications designed to legitimize violent jihad against the United States and the West; (3) raised, laundered, and channeled extensive sums of money to al Qaeda and associated terrorist organizations; (4) provided extensive financial and logistical support and physical assets to al Qaeda and associated terrorist organizations; (5) permitted al Qaeda members, Islamic fighters, and other terrorists to use ostensible employment with their organizations as a vehicle for gaining access to conflict regions around the globe, thereby allowing those individuals to conduct terrorist operations in foreign countries; (6) conducted reconnaissance within those conflict regions on behalf of al Qaeda and associated terrorist organizations; (7) directly participated in al Qaeda's terrorist operations, including the planning, coordination, funding, and execution of those attacks; (8) served as liaisons to ideologically aligned terrorist groups in the Philippines, Bosnia, Chechnya, Kenya, Sudan, and other regions to expand the al Qaeda footprint and its ability to conduct attacks against the United States and its interests abroad; (9) funded and facilitated shipments of arms and needed supplies to al Qaeda and associated terrorist organizations; (10) actively recruited new members for al Qaeda and associated terrorist organizations; and (11) funded terrorist training camps for al Qaeda and associated terrorist organizations.

16. According to CIA reporting and other credible sources, the IIRO provided substantial funding for at least six al Qaeda training camps in Afghanistan, including camps from which al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training.

17. The U.S. government has assessed that "Usama bin Ladin used the entire IIRO network for his terrorist activities."

18. Finally, the United States-based operations of the MWL and IIRO have been a target of FBI investigations for their connections to Saudi intelligence and key members of the Saudi government network established to provide critical support to the 9/11 hijackers upon their arrival in the United States, including Omar al Bayoumi, Mutaib al Sudairy, and Musaed al Jarrah.

## II. THE ESTABLISHMENT OF THE MWL AND IIRO BY THE KINGDOM AND THEIR PROSELYTIZING ACTIVITIES

19. As set forth in Plaintiffs' complaints, pleadings, and other submissions to this Court, the Kingdom established certain charities to serve as the principal instruments for conducting proselytizing and operational activities in furtherance of it across the globe, including but not limited to the Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO"), World Assembly of Muslim Youth ("WAMY"), and Al Haramain Islamic Foundation.

20. From the formation of al Qaeda in 1988 through the attacks of September 11, 2001, and even beyond that tragic day, these proselytizing organizations established, funded, and directed by the Kingdom were responsible for providing extensive financial, material, logistical, ideological, and other forms of support that were essential to al Qaeda's development and transformation into a sophisticated, global terrorist organization with the ability to carry out large-scale attacks in countries around the world.

21. The tortious acts of these charities in support of Osama bin Laden, al Qaeda, Islamic militants, and associated terrorist organizations, aided and abetted al Qaeda's attack of the United States on September 11, 2001.

### A. MWL

22. Established by the Kingdom of Saudi Arabia in 1962, the Muslim World League ("MWL") has for many years served as an important instrument through which the Kingdom has conducted proselytizing activities throughout the Islamic world, and simultaneously served as a conduit for channeling financial, logistical, operational, and ideological support to al Qaeda's global jihad. *See* Ex. 32, FBI Report, *Connections to the Attacks of September 11, 2001*, July 23, 2021, EO14040-003478-3608-UPDATED at 3541-3542 ("Saudi Arabia has financed many charity projects through MWL and other Non-Governmental Organizations (NGO's) in order to gain leadership over the Islamic community. Many of these charities were known to have supported AQ and related groups both financially and operationally throughout the world. MWL was the organization under which the International Islamic Relief Organization (IIRO) and others such as World Assembly of Muslim Youth (WAMY) operated at an international level.").

23. Documents produced in the MDL litigation demonstrate that the Kingdom appoints MWL leadership (who are themselves high-ranking government officials with years of service to the Kingdom), provides the MWL with nearly all of its funding, and oversees and directs the MWL's operations and activities in accordance with the policies of the Saudi government.

24. Senior officials of the MWL have acknowledged that the MWL receives virtually all of its funding from the Saudi government. Dr. Abdullah al Turki, who served as Secretary General of the MWL from 2000 through 2016, acknowledged that the MWL received 80,000,000.00 Saudi riyals ("SR") annually from the Saudi government. *See* Ex. 24, Transcript,

September 15, 2018 Deposition of Dr. Abdullah al Turki at 223-225; Ex. 90, Turki Exhibit 44, IIRO 17415-17453 at 17453 (MWL Secretariat General report indicating the MWL received an annual 80,000,000.00 subsidy from the Saudi government). *See also* Ex. 189, Transcript, September 14, 2018 Deposition of Dr. Abdullah al Turki at 91 (confirming that the Saudi government provided funding for the MWL).

25. The CIA has also assessed that the MWL "is funded exclusively by the Saudi government and has served as an umbrella for other Saudi-based NGOs." *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999 (CIA_000210-236 at 213).

26. The Ministry of Defense and Aviation has also financed the activities of the MWL and International Islamic Relief Organization. *See* Ex. 32, FBI Report, *Connections to the Attacks of September 11, 2001*, July 23, 2021, EO14040-003478-3608-UPDATED at 3580-3581.

27. Dr. Abdullah al Turki further testified that as Secretary General of the MWL, he and other officials of the MWL were issued Saudi diplomatic passports for travel outside of the Kingdom in support of MWL activities. *See* Ex. 189, Transcript, September 14, 2018 Deposition of Dr. Abdullah al Turki at 75-76; *id.* at 79 (Turki asked the Saudi king to grant diplomatic passports for seven officials of the MWL). *See also* Ex. 23, Transcript, September 17, 2018 Deposition of Dr. Abdullah al Obaid at 120-123 (Dr. Obaid traveled with a diplomatic passport during his tenure as MWL Secretary General.); Ex. 190, Transcript, September 18, 2018 Deposition of Dr. Abdullah al Obaid at 174-175 (testifying that former MWL Secretary General Abdullah Omar Naseef submitted requests to the Saudi government to issue diplomatic passports to representatives of the MWL).

28. Dr. Abdullah al Obaid, who served as Secretary General of the MWL from 1995 through 2000, testified that King Fahd bin Abdul Aziz al Saud nominated him for the Secretary General position. *See* Ex. 23, Transcript, September 17, 2018 Deposition of Dr. Abdullah al Obaid at 26 (when asked who nominated him to serve as Secretary General of the MWL, Obaid responded "the Saudi government, King Fahd.").

29. During his tenure as MWL Secretary General, Dr. Obaid testified that he simultaneously served as a member of the Supreme Council of Islamic Affairs, which has the "responsibility for Saudi Arabia's Islamic policies in other countries." *See* Ex. 23, Transcript, September 17, 2018 Deposition of Dr. Abdullah al Obaid at 27; Ex. 147, Declaration of Abdullah bin Saleh al Obaid at ¶ 5. In particular, the Supreme Council for Islamic Affairs makes recommendations to the Saudi government concerning the provision of financial support to Islamic organizations operating outside of the Kingdom. *See* Ex. 23, Transcript, September 17, 2018 Deposition of Dr. Abdullah al Obaid at 37. *See also* Ex. 191, Declaration of Abdulaziz H. al Fahad at ¶ 8 (describing the Supreme Council of Islamic Affairs as "an arm of the government of Saudi Arabia, which carries out part of the foreign policy of the Kingdom"). As a member of the Supreme Council of Islamic Affairs, "an arm of the government of Saudi Arabia," Dr. Obaid oversaw and directed the activities of the MWL, IIRO, Al Haramain, and other Saudi-based charities in support of the foreign policies of the Kingdom.

30. Dr. Obaid confirmed that the MWL received 80,000,000.00 SR annually from the

Saudi government, acknowledging that the annual grant was "the principal source of funding for the Muslim World League." *See* Ex. 23, Transcript, September 17, 2018 Deposition of Dr. Abdullah al Obaid at 132-133. Obaid testified that the 80,000,000.00 SR was "everything to the League," and indicated that any other sources of money received by the MWL were de minimus. *Id.* at 133-134.

31. Dr. Obaid additionally confirmed that the MWL had received more than 5 billion SR from the Saudi government since it was established. *See* Ex. 23, Transcript, September 17, 2018 Deposition of Dr. Abdullah al Obaid at 135-137; Ex. 192, Al Alam Al Islami, *Hailing the Kingdom's Ongoing Generous Support for the League*, FED-PEC 237301. *See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 30 ("David Aufhauser, former General Counsel at the U.S. Treasury Department, stated in Congressional testimony to the Senate Committee on Homeland Security and Governmental Affairs, that by some estimates … Saudi funding for the MWL had exceeded $75 billion.").

32. The MWL has for many years published and distributed numerous booklets, newsletters, and periodicals in multiple languages, including English and Arabic, that have promoted violent jihad and called on Muslims to "commit to sacrificing their souls, money, family members, and children for the sake of Allah." *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 36-49; Ex. 37, March 9, 2020 Expert Report of Dr. Matthew Levitt at 28.

33. For instance, in the September 1981 edition of The Muslim World League Journal at Ex. 194, an article titled *Rabita-Sponsored Auqaf Conference Resolutions*, *see* 59-64, reports on the MWL's third annual conference held jointly with the Ministers of Auqaf and Islamic Affairs in Mecca, Saudi Arabia. The participants in the conference adopted multiple resolutions memorialized in writing by the MWL, including calling on "Muslim countries to promote the spirit of Jihad in the Muslim armies, determine ways and means of coordinating among themselves in the field of joint military industries, so that the Muslim Ummah may be able to defend itself against any aggression." According to the MWL:

> The Conference appeals to all Islamic governments to prepare all sections of the Ummah for Jihad, with special reference to the youth who must be given special training in Jihad in all its aspects, i.e. Jihad through self-sacrifice, sacrifice of property and life. To achieve this aim, scientific methods should be adopted and applied with the help of experts in this field.
>
> The Conference appeals to all Islamic governments to extend assistance and support to Ulema and teachers so as to enable them to play an effective role in mobilizing the Ummah for Jihad and to lead the Ummah back to the fold of Allah through wisdom and good exhortation.
>
> Appeals to all Muslim countries to establish training camps for Mujahideen in countries that are capable of organizing these camps. Camps belonging to the Palestine Liberation Organization and other

> Islamic Jihad organizations may be utilized in this regard and Muslim youth exhorted upon to join these camps which should be provided with adequate number of qualified Dawah workers for religious orientation and guidance.
>
> ***
>
> Appeals to Muslim countries to encourage preparation of in-depth studies on Jihad and other Islamic military theories as a comparative study with modern military system. Military terminology must be unified so also the methods of military training and coordination in all Muslim countries. This factor is indispensable for a unified Islamic Jihad.
>
> ***
>
> Appeals to Islamic countries to extend their support to Muslim "Mujahideen" who are struggling against colonialism, aggression, and tyranny and also to provide them with all that may be required to help in achieving their Islamic goals through every possible and legitimate means. Special emphasis should be given to Mujahideen in Palestine, Afghanistan, Western Somalia, Eritrea, Moro, Patani, etc., etc.
>
> Appeals to Islamic countries to intensify mass-media programmes on the obligation of Jihad and its methods. Efforts should also be made by the mass-media to highlight the activities of the Mujahideen.

*See id.* at 62-63; Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 37.

34. In the July/August 1991 edition of The Muslim World League Journal at Ex. 195, an article titled *Jihad With Money in the Way of Allah*, *see* 62-63, the author explains that the participation in jihad with one's wealth and one's life is essential to the teachings of Islam.

> This doctrine of "Jihad" is characterized by its clear objective, which is "for God" and "for upholding the word of God"…. Jihad with wealth and lives is emphasized in the Holy Qur'an and Hadith (Tradition) (quoting verses).
>
> ***
>
> It is thus quite clear that Jihad with one's wealth and with one's life is an essential part of the teachings of Islam. Yet Jihad with one's wealth "takes precedence" over Jihad with life in several verses of the Holy Qur'an, calling the Believers to Jihad, because of finance being indispensable for supplying the army with its needs (and on many occasions its requirements may far exceed its demand for

> manpower). Hence, in view of the unlimited material needs of war, a person may contribute money towards Jihad if he does not personally join it for reasons of physical weakness, illness or distance from the scene of confrontation with the enemy.
>
> ***
>
> Since Jihad with wealth and life is an obligatory duty, the believers will respond to the call to Jihad by offering their wealth and lives and will not take leave from performing what is incumbent on them by virtue of their faith.

*See id.* at 62-63; Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 38.

35. In the June 29, 1992 edition of the Al Alam Al Islami, an Arabic publication of the MWL at Ex. 196, an article titled *The Lessons to be Learned from the Migration of the Prophet*, authored by Sheikh Abdullah al Aqeel who served as the MWL Deputy Secretary General and the Secretary General of the MWL Supreme Mosque Council, also calls on Muslims to "commit to sacrificing their souls, money, family members, and children for the sake of Allah." *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 42.

36. Soon thereafter, in the August 31, 1992 edition of the Al Alam Al Islami, the MWL acknowledged the role it and other Saudi charities played in providing weapons and ammunition in support of the jihad during Soviet-Afghan conflict. *See More than a Million and a Half a Million of Martyrs and Thousands of Widows are the Price of Victory in Afghanistan*, at Ex. 197:

> Through the Saudi Red Crescent, the Islamic Relief Organization, and the Muslim World League, the government and people of Saudi Arabia provided in-kind and financial support to the Afghani mujahideen, purchased arms and ammunition, and paid the costs of transporting them even inside Afghanistan.

37. The February 1994 edition of The Muslim World League Journal at Ex. 212, in an article titled *Child Upbringing in Islam*, *see* 30-34, advocates for children participating in jihad.

> A child should be made to be aware that participating in Jihad is worship in itself and running away from the battle field is a great sin. Taking part in the battle fought in Allah's cause can be done by sacrificing one's life and wealth.

*See id.* at 34; Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 42, n. 49. *See also Palestine: The Blessed Land*, *see* 40-43 at 43 ("When the enemy occupies the land of Islam, Jihad becomes obligatory on every Muslim.").

38. In the November 2, 1992 edition of the Al Alam Al Islami at Ex. 198, an article titled *Calling For Their Victory in Their Jihad Against the Serbs: Bin Baz Called to the Islamic Governments and Peoples to Support the Muslims in Bosnia and Herzegovina*, Sheikh Abdul Aziz bin Baz, Grand Mufti of the Kingdom of Saudi Arabia and Chairman of the Councils of the Muslim

World League in Mecca, calls for all Islamic governments and Muslims around the world "to support Muslims in Bosnia and Herzegovina so that they are enabled to strike their enemy, the Serbs, and their enemy's supporters with men, money, arms, and supplication."

> There are so many verses and hadiths about the obligation of exercising Jihad against the enemies and about supporting the oppressed. It is the duty of all Islamic governments and peoples to support the oppressed with men, arms, money, and supplication as much as possible.

*See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 43.

39. Sheikh Abdul Aziz bin Baz issued a similar call in 1994 for money and arms for Bosnian Muslims. *See* the January 1994 edition of The Muslim World League Journal at Ex. 199, *Bosnia Issue Top of the Agenda, GCC Summit, MWL Meeting and Bosnia Solidarity Day*, *see* 17-20 at 19 ("A similar appeal was made by Sheikh Abdul Aziz bin Baz, Chairman of the 60 member MWL Constituent Assembly. It is the duty of Muslims to support the Bosnian Muslima with arms, money, and whatever they can provide, he said.").

40. In the September 1995 edition of The Muslim World League Journal at Ex. 200, *Latest Developments in Bosnia, Croatia's Stunning Success and its Implication*, *see* 26-31, a MWL spokesman echoed Sheikh Abdul Aziz bin Baz's call to help the Muslims of Bosnia-Herzegovina with money and arms.

> A spokesman of the MWL called on the Muslim states to rush to the support of the Bosnia people who were facing single-handed the barbaric Serb aggression abandoned by the world and its organizations to receive the barbaric bloody blows alone from the Serb aggressors. It supported the call of Shaikh Abdul Aziz bin Baz, Chief Mufti of Saudi Arabia, urging the Muslims to back the Bosnian people with whatever means they can by way of money, arms and prayers.

*See id.* at 27; Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 45.

41. In the August-September 1993 edition of Al Alam Al Islami at Ex. 201, *Imam of Holy Haram Calls for Assistance to Kashmiris*, the MWL called on the Islamic world to provide all out support to the Muslims in Kashmir. "The Muslims should supply the Kashmiris with material and moral support, including money, military hardware and men in order to protect themselves against the heretic Indian occupation and regain all their legitimate rights." *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 47, n. 54.

42. In addition, the MWL maintains a subsidiary organization known as the "Fiqh Council," which was established in 1977 by the MWL Constituent Council. Overseen by the Secretary General of the MWL, the Fiqh Council is comprised of Sunni clerics who are responsible for parsing religious rulings and issuing resolutions and recommendations. Like the MWL Journal and the Al Alam Al Islami publications, the MWL Fiqh Council has also endorsed both the concept of armed jihad generally, as well as specifically the obligation to support armed fighters with

financial support through charitable channels. *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 49.

43. The Fiqh Council's *Fourth Resolution on Collection and Distribution of Zakah and Oshr in Pakistan* at Ex. 202, admonishes readers to carry out "armed jihad" in the face of an "ideological and intellectual onslaught by athiests, Jews, Christians, and other enemies… It is the duty of Muslims as well to confront them with the same arms and equipments that are used against Islam… Since the purpose of armed Jihad is to raise the word of Almighty Allah high as this purpose is achieved through fighting in the cause of Allah, it is also achieved through the work of Da'wah to the religion of Almighty Allah, and preparation of preachers and their assistance in order to carry out their mission, so both words would be considered as Jihad." *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 49.

44. Other MWL Fiqh Council resolutions emphasize the importance of aiding refugees who "so that Mujahideen are assured that their families behind them are not lost and they can continue their Jihad with strength and steadfastness. No doubt, any disturbance or weakness on this front will have a damaging impact of Jihad." *See* the Fiqh Council's *Seventh Resolution on Payment of Zakah's Portion of Mujahideen for Their Education, Health and Media Projects* at Ex. 203. *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 49.

## B. IIRO

45. Defendant International Islamic Relief Organization ("IIRO") is a subsidiary body of the Muslim World League ("MWL"), and has similarly served as an instrument for conducting global proselytizing activities on behalf of the Kingdom. *See* Ex. 23, Transcript, September 17, 2018 Deposition of Dr. Abdullah al Obaid at 75-76 (explaining that the IIRO works under the umbrella of the MWL); Ex. 147, Declaration of Abdullah bin Saleh al Obaid at ¶ 12; *see also* Ex. 139, MWL 19138 (MWL hierarchical chart identifying "The International Islamic Relief Organization" as part of the Muslim World League).

46. The MWL sought approval from the Saudi government to establish the IIRO in 1978. *See* Ex. 23, Transcript, September 17, 2018 Deposition of Abdullah al Obaid at 73-74; Ex. 82, IIRO Annual Report 1999/2000, IIRO 212-330 at 215 (stating that Royal Approval No. 4834 was issued on January 29, 1979). The Constitution of the IIRO was later approved during the 35th session of the MWL Constituent Council, the legislating council of the MWL, held between October 7-10, 1997. *Id. See also* Ex. 83, IIRO Annual Report 2000-2001, IIRO 331-441 at 336 (same); Ex. 85, IIRO Annual Report 2001-2002, IIRO 442-552 at 445 (same).

47. The MWL Secretary General is designated to serve as the Chairman of the IIRO Board of Directors, and also serves as the Chairman of the IIRO General Assembly. *See* Ex. 23, Transcript, September 17, 2018 Deposition of Abdullah al Obaid at 70-71; Ex. 26, Transcript, February 20, 2019 Deposition of Adnan Basha at 54, 99.

48. As Chairman of the Board of Directors, the MWL Secretary General exercised his influence over issues relating to the IIRO's budget, operations, and activities, is inaccurate and misleading. *See, e.g.*, Ex. 144, August 5, 1999 IIRO Board of Directors Meeting Minutes, MWLIIRO-00016270-16276 (MWL Secretary General Obaid attending and presenting speech);

Ex. 141, May 27, 2001 IIRO Board of Directors Meeting Minutes, MWLIIRO-00016233-16237 (MWL Secretary General Turki attending and discussing proposed statute of the IIRO); Ex. 143, MWLIIRO-00016260-16267 (MWL Secretary General Obaid attending, presenting speech, and discussing issues relating to the IIRO Investment Committee, budget, etc.).

49. The Secretary General of the MWL, a position equivalent to that of a Saudi government "minister," is also responsible for nominating individuals to serve as the IIRO Secretary General. *See, e.g.*, Ex. 213, MWL 59176; Ex. 26 at 100.

50. The IIRO Board of Directors is the highest policy-making body of the IIRO and its decisions are binding upon the executive body. *See* Ex. 82, IIRO Annual Report 1999/2000, IIRO 212-330 at 216. MWL officials, including the MWL Secretary General, hold a number of seats on the IIRO Board of Directors and directly influence the policies and activities of the IIRO. *See* Ex. 26, Basha Transcript at 128-130. *See also* Ex. 131, September 20, 2000 Minutes of the Sixth Meeting of the IIROSA Board of Directors, MWLIIRO-00016243-16246 at 1-2 (identifying 7 MWL officials serving on the IIRO Board of Directors, including the MWL Secretary General, the Assistant MWL Secretary General, the MWL Director General of Finance and Administration, and four members of the MWL Constituent Council).

51. The Council of Ministers, advisors to the Saudi king, also hold seats on the IIRO Board of Directors. *See* Ex. 131, September 20, 2000 Minutes of the Sixth Meeting of the IIROSA Board of Directors at 2 (Sheikh Mostafa bin Mohamed Idris, identified as "Royal Court Advisor, Acting head of the Special Committee of the Council of Ministers," served as an IIRO board member from at least 1998-2001.).

52. The IIRO's domestic offices in Saudi Arabia are headed by members of the Saudi royal family, who are themselves officials of the Saudi government. *See* Ex. 82, IIRO Annual Report 1999/2000, IIRO 212-330 at 220-226; Ex. 81, IIRO Annual Report 1998, IIRO 171-211 at 179-180. As heads of those offices, Saudi royal family members directed and supervised the operations and activities of the IIRO.

53. As heads of those offices, Saudi Royal Family members directed and supervised the operations and activities of the IIRO, and provided annual generous donations to the offices. *See, e.g.*, Ex. 81, IIRO 171-211 at 179 (Prince Saud bin Abdul Mohsin contributed 11,000,000.00 SR); *id.* at 200 (Prince Sultan bin Abdul Aziz al Saud provided 5,000,000.00 SR to the IIRO office in Somalia, more than half of the total funds earmarked for projects in Somalia that year).

54. Prince Sultan provided 500,000.00 SR to the IIRO every six months. *See* Ex. 26, Transcript, February 20, 2019 Deposition of Adnan Basha at 78.

55. IIRO overseas branch offices and their employees have also received diplomatic immunity in the host country. *See* Ex. 81, IIRO 171-211 at 199 ("Some of the external offices of the IIRO enjoy diplomatic immunity and exemption from customs and excise.").

56. The IIRO has been clear that the central focus of the organization since its establishment has been Islamic propagation. *See* Ex. 193, IIRO 285019 (IIRO Secretary General Adnan Basha stating that the IIRO "has placed at the top of its priorities since its establishment to make the Islamic propagation a central foundation of its activities and a targeted goal of its

programs."

57. Secretary General Basha explained that all of the activities of the IIRO are directly connected to the "propagation mission," including supporting 1,000 propagators in countries around the world.

> Therefore, all the activities of the Organization, such as supporting of the orphans, relief of the affected, sheltering of the refugees, as well as providing health and educational care and seasonal programs, etc., were connected with the propagation mission. This also applies to the Organization's programs of supporting the propagators, which now included about 1,000 propagators in more than 20 countries.

*See id.* at IIRO 285019.

58. Indeed, the MWL and IIRO trained and financially supported Islamic propagators in the Philippines, Bangladesh, Indonesia, and other countries. *See, e.g.*, Ex. 220, MWL 8516 (December 21, 1993 letter from Abdulhadi Daguit to the Director of the MWL's office in the Philippines concerning an Islamic propagation organization and recommending financial assistance to encourage them to conduct more work in the field of Islamic Da'wah.); Ex. 221, IIRO 34942-34943 (September 29, 1992 letter from IIRO-Philippines Supervisor of Social Care and Mosques, Abdulhadi Daguit, identifying an Islamic organization that undertakes "significant Islamic propagation activities in the region" and recommending financial assistance to build an office for the organization "to be a center for Islamic Da'wah in the region."); Ex. 222, IIRO 120381-120384 (May 12, 2002 letter from Fahd Mohamed Sanad al Harbi, manager of the IIRO-Bangladesh office, to the head of the MWL/IIRO Holy Quran and Da'wah Committee, transmitting "periodic reports about propagators (58 propagators and 3 supervisors)" affiliated with IIRO-Bangladesh.); Ex. 223, IIRO 54530-54533 (August 25, 2003 letter from Fahd Mohamed Sanad al Harbi, manager of the IIRO-Bangladesh office, to the head of the MWL/IIRO Holy Quran and Da'wah Committee, indicating that IIRO-Bangladesh has 59 propagators and 3 supervisors affiliated with the office "who have not received their salaries for 7 months and they are in desperate need to receive their dues," and asks "the required employee to send their salaries for this period."); Ex. 224, 120385-120396 (2001 letters between the IIRO-Bangladesh office and the MWL/IIRO Committee for Propagation and Propagators concerning a shariah course for training imams and propagators to be held at the IIRO-Bangladesh office, the Committee's agreement to provide 25,000 Saudi riyals ("SR") for the ten-day course (participants to include 100 propagators, 61 from the IIRO), the anticipated expenses, a request to have two scholars from the Committee for Propagation in Riyadh supervise the course, etc.); Ex. 225, IIRO 68126-68127 (December 15, 2004 letter from Fahd Mohamed Sanad al Harbi, office manager of IIRO-Indonesia, to IIRO Secretary General Adnan Basha, concerning Basha's request for "the required documents for the hiring of propagators" and requesting authorization to hire a supervisor for the propagators.); Ex. 226, IIRO 68128-68129 (December 20, 2004 letter from Fahd Mohamed Sanad al Harbi, office manager of IIRO-Indonesia, to the Supervisor of the Holy Quran and Da'wah Program requesting the outstanding salary payment for one of the propagators who has not received his salary for more than four months).

59. Notably, the IIRO-Eastern Province branch office, under the leadership of E.O. 13224 Specially Designated Global Terrorist ("SDGT") Abd al Hamid Sulaiman al Mujil (al Qaeda's "million dollar man") was sending funds to financially support propagators attached to the IIRO-Indonesia office, itself an E.O. 13224 SDGT. *See* Ex. 227, IIRO 125906 (November 4, 2004 letter from Fahd Mohamed Sanad al Harbi, office manager of IIRO-Indonesia, to the Holy Quran and Propagation Department identifying funds sent from the IIRO-Eastern Province branch office to sponsor 52 propagators in Indonesia (124,800 SR)); Ex. 228, IIRO 98574-98579 (November 30, 2004 letter from Abd al Hamid Sulaiman al Mujil of the IIRO-Eastern Province to Fahd Mohamed Sanad al Harbi, office manager of IIRO-Indonesia, confirming that the 124,800 SR "constitutes the financial guarantees for propagators in Indonesia.").

60. The MWL appears to have provided financial support to propagators associated with the Moro Islamic Liberation Front terrorist organization in the Philippines. *See* Ex. 104, IIRO 93332-93333 (August 25, 2003 letter from the successor to the deceased Moro Islamic Liberation Front chairman to MWL Secretary General Abdullal al Turki asking him to "open a bank account with the League at one of the accredited banks to receive special assistance and donations for them from their brothers in creed and faith," and stating that the assistance will "benefit[] the propagators, teachers, orphans and all our Muslim people.").

61. IIRO employee Abdulhadi Daguit testified that the Moro Islamic Liberation Front was engaged in military activities at the same time that MILF asked MWL Secretary General Turki to open the bank account for donations. *See* Ex. 29, Transcript, June 27, 2019 Deposition of Abdulhadi T. Daguit, at 144-145 (testifying that MILF was "engaging [in] fighting with the Philippine government").

## III. AL QAEDA, ITS PRE-9/11 FUNDING, AND THE CRITICAL ROLE OF THE SAUDI CHARITIES IN AL QAEDA'S FINANCIAL AND LOGISTICAL SUPPORT INFRASTRUCTURE

62. Al Qaeda is an international terrorist organization, founded in approximately September 1988, by Osama bin Laden and other foreign fighters who participated in the "jihad" against the Soviet Union in Afghanistan. *See* Ex. 1, 9/11 Commission Final Report, Chapter 2.

63. As is undisputed, al Qaeda planned, funded, and carried out the 9/11 attacks. *See id.* at 47-70, 145-173, 215-253, 365-366.

64. The MWL's and IIRO's ties to terrorism and religious extremism, and later to al Qaeda and associated terrorist groups, go back to the Soviet-Afghan war in the 1980s, which served as a rallying point for Islamic extremists in the Middle East.

65. Osama bin Laden traveled to Afghanistan in 1980 to participate in the jihad, and gained prominence during this period for his role in establishing the financial and logistical infrastructure that sustained the Arab-Afghan fighters (a/k/a mujahideen).

66. Together with Abdullah Azzam, bin Laden founded the Maktab al Khidmat ("MAK") (a/k/a the "Office of Services) to facilitate the provision of financial and logistical support to the mujahideen. *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 214 (stating that MAK was "[e]stablished in

Peshawar in 1984 by Usama Bin Ladin and Palestinian Abdallah Azzam to facilitate the travel and training of Arab volunteers to fight with the mujahidin in Afghanistan"); Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 58 ("Maktab al-Khidamat (MAK)" played a central role in the terrorist training and logistic network "by arranging for travel, documentation, legal help, and introductions to other organizations that aid Islamic militants."); *id.* at 60 (stating that "MAK established several offices in Pakistan and also in New York, London, Casablanca, Amman, Khartoum, Kuwait, Riyadh, Jiddah, Damman, Qatar, Bahrain, and Iran," and in "Zagreb and Sarajevo").

67. Throughout the Soviet-Afghan war, MAK worked in concert with a network of purported charities and relief organizations to provide travel documents, funds, transportation, training, facilities, arms, physical assets, and other support to the mujahideen. Those organizations included the MWL and IIRO. Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that "the MAK is funded by the Saudi-based Muslim World League and International Islamic Relief Organization, the Muwafaq Foundation, and Saudi-born financier Usama Bin Ladin."). *See also* Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 30-31 (discussing Maktab al Khidmat's connection to the IIRO and MWL).

68. Many of the Arab fighters traveling to participate in the Afghan jihad had connections to the MWL. *See* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 31-32. *See also* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA 965-978 at 975 (stating that "MAK is suspected have having links to the Muslim World League").

69. Notably, individuals convicted of the 1993 World Trade Center bombing were recruited through the MAK branch in New York (the Al Kifah center in Brooklyn). *See* Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 58.

70. At the conclusion of the Soviet-Afghan war, bin Laden determined that the network that supported the mujahideen in Afghanistan should not be abandoned, but rather adapted to serve as a foundation for waging a global jihad or "holy war" against all of the perceived enemies of Islam, and in particular, the United States. As the 9/11 Commission explained:

> April 1988 brought victory for the Afghan jihad. Moscow declared it would pull its military forces out of Afghanistan within the next nine months. As the Soviets began their withdrawal, the jihad's leaders debated what to do next.
>
> Bin Ladin and [Abdullah] Azzam agreed that the organization successfully created for Afghanistan should not be allowed to dissolve. They established what they called a base or foundation (al Qaeda) as a potential general headquarters for future jihad.

*See* Ex. 1, 9/11 Commission Final Report at 56.

71. Following Abdullah Azzam's death on November 24, 1989, bin Laden assumed full control of MAK, and MAK was absorbed into al Qaeda. Importantly, the charities that funded

and supported MAK during the 1980s, including the MWL and IIRO, continued to serve as the primary conduits for channeling financial, logistical, operational, and ideological support to al Qaeda's global jihad for years leading up to the 9/11 attacks. *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 20-26 (describing the history of al Qaeda's terrorist financing infrastructure during the Soviet-Afghan conflict; the use of Saudi charities under the guise of humanitarian relief work for money and the provision of weapons, guesthouses, and travel papers to the mujahideen and jihadist recruits; the use of the Saudi charities to launder money originating from bank accounts belonging to Osama bin Laden and wealthy supporters in the Gulf; and the critical role the MWL, IIRO, and WAMY would play in al Qaeda's global financial infrastructure following the end of the Soviet-Afghan war); Ex. 37, Expert Report of Dr. Matthew Levitt ("Levitt Report"), March 9, 2020 at 6-13 (discussing the formation and growth of al Qaeda and financing received from individuals and charities in Saudi Arabia).

72. Prior to Azzam's death, bin Laden had returned to Saudi Arabia in 1988 and made clear in his statements his continuing dedication to jihad against the enemies of Islam. Bin Laden expressly affirmed what he believed to be the personal obligation of all Muslims to wage jihad against the enemies of Islam, stating as follows:

> [T]he blessing of jihad in the cause of God – the peak of true Islam, which people in this age have forgotten is a religious duty….Praise be to God for allowing us to perform jihad in Afghanistan as he did for the best of men, our Prophet, may God's peace and prayers be upon him…I would like to advise my brother Muslims in all parts of the East and West to take the initiative and leave what they are doing to assist in raising the banner of jihad for the cause of God. This banner is the best banner and the mujahidin are the best people…May God accept our and your prayers and our urging of believers to perform jihad in order to deter the infidel forces and be truthful.

*See* Ex. 151, Michael Scheuer, *Osama Bin Laden*, 2011, PEC-KSA 224-226 at 225-226.

73. Later, in 1990, speaking to an audience of hundreds in the Bin Laden family mosque in Jeddah, bin Laden singled out the United States as the primary target of this global jihad, asserting that "[t]he Americans won't stop their support of Jews in Palestine until we give them a lot of blows. They won't stop until we do jihad against them." *See* Ex. 152, Lawrence Wright, *The Looming Tower: Al-Qaeda and the Road to 9/11*, 2011, PEC-KSA 227-230 at 229. "Bin Laden would later say that the United States had always been his enemy. He dates his hatred for America to 1982, 'when America permitted the Israelis to invade Lebanon and the American Sixth Fleet helped them.'" *Id.* at 229.

74. Throughout the ensuing years preceding the 9/11 attacks, bin Laden made clear to his supporters, allies, and others that al Qaeda's primary goal and mission was to carry out attacks against the United States:

> Bin Ladin began delivering diatribes against the United States before he left Saudi Arabia. He continued to do so after he arrived

> in Sudan. In early 1992, the al Qaeda leadership issued a fatwa calling for jihad against the Western "occupation" of Islamic lands. Specifically singling out U.S. forces for attack, the language resembled that which would appear in Bin Ladin's public fatwa in August 1996. In ensuing weeks, Bin Ladin delivered an oft-repeated lecture on the need to cut off "the head of the snake."

*See* Ex. 1, 9/11 Commission Final Report at 59; *see also id.* ("Bin Ladin concentrated [from al Qaeda's early years] on attacking the 'far enemy' – the United States").

75. In 1993, bin Laden issued a fatwa advocating violence against Americans based in Somalia. U.S. forces were subsequently attacked during the battle of Mogadishu on October 3-4, 1993. Eighteen U.S. soldiers were killed and eighty-four were wounded. *See also* Ex. 15, *Terrorism: Usama Bin Ladin's Activities in Somalia and Sudanese NIF Support*, CIA_000347-350 at 349 ("Islamic Army members were sent to Somalia, with the NIF's knowledge and encouragement, in order to kill U.S. troops, incite violence against U.S. personnel, and undermine the success of the U.S. mission. Most of the Islamic Army activity involved inciting the Somali public. Bin Ladin's specific orders to Islamic Army members sent to Somalia was to defeat the U.S. forces. [REDACTED] The code name of the operation may have been 'Head of the Snake.'").

76. On August 23, 1996, bin Laden issued his fatwa, *Declaration of War Against the Americans Occupying the Land of the Two Holy Places*, calling on Muslims to drive U.S. soldiers out of Saudi Arabia, celebrating recent suicide bombings of U.S. military facilities in the Kingdom, and praising the 1983 suicide bombing in Beirut that killed 241 U.S. Marines, the 1992 Aden hotel bombings, and the 1993 Battle of Mogadishu after which the United States "left the area carrying disappointment humiliation, defeat and your dead with you." *See* Ex. 1, 9/11 Commission Final Report at 48.

77. On February 23, 1998, bin Laden, Ayman al Zawahiri, and leaders of other militant groups issued the fatwa, *World Islamic Front Statement Urging Jihad Against Jews and Crusaders*, calling for the murder of any American, anywhere on earth, as the "individual duty for every Muslim who can do it in any country in which it is possible to do it." *See id.* at 47. *See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020, at 11 (discussing bin Laden's 1996 and 1998 fatwas).

78. To support and enhance its opportunities to attack the United States, al Qaeda established fronts and footholds in a variety of jurisdictions:

> Bin Ladin's impressive array of offices covertly provided financial and other support for terrorist activities. The network included a major business enterprise in Cyprus; a "services" branch in Zagreb; an office of the Benevolence International Foundation in Sarajevo, which supported the Bosnian Muslims in their conflict with Serbia and Croatia; and an NGO in Baku, Azerbaijan, that was employed as well by Egyptian Islamic Jihad both as a source and conduit for finances and as a support center for the Muslim rebels in Chechnya. He also made use of the already-established Third World Relief

> Agency (TWRA) headquartered in Vienna, whose branch office locations included Zagreb and Budapest. (Bin Ladin later set up an NGO in Nairobi as a cover for operatives there.)
>
> Bin Ladin now had a vision of himself as head of an international jihad confederation. In Sudan, he established an "Islamic Army Shura" that was to serve as the coordinating body for the consortium of terrorist groups with which he was forging alliances. It was composed of his own al Qaeda Shura together with leaders or representatives of terrorist organizations that were still independent. In building this Islamic army, he enlisted groups from Saudi Arabia, Egypt, Jordan, Lebanon, Iraq, Oman, Algeria, Libya, Tunisia, Morocco, Somalia, and Eritrea. Al Qaeda also established cooperative but less formal relationships with other extremist groups from these same countries; from the African states of Chad, Mali, Niger, Nigeria, and Uganda; and from the Southeast Asian states of Burma, Thailand, Malaysia, and Indonesia. Bin Ladin maintained connections in the Bosnian conflict as well. The groundwork for a true global terrorist network was being laid.
>
> Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders. Al Qaeda helped Jemaah Islamiya (JI), a nascent organization headed by Indonesian Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the Philippines. It also aided a Pakistani group engaged in insurrectionist attacks in Kashmir. In mid-1991, Bin Ladin dispatched a band of supporters to the northern Afghanistan border to assist the Tajikistan Islamists in the ethnic conflicts that had been boiling there even before the Central Asian departments of the Soviet Union became independent states.
>
> This pattern of expansion through building alliances extended to the United States. A Muslim organization called al Khifa had numerous branch offices, the largest of which was in the Farouq mosque in Brooklyn. In the mid 1980s, it had been set up as one of the first outposts of Azzam and Bin Ladin's MAK. Other cities with branches of al Khifa included Atlanta, Boston, Chicago, Pittsburgh, and Tucson. Al Khifa recruited American Muslims to fight in Afghanistan; some of them would participate in terrorist actions in the United States in the early 1990s and in al Qaeda operations elsewhere, including the 1998 attacks on U.S. embassies in East Africa.

*See* Ex. 1, 9/11 Commission Report at 57-58; *see also* Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 77-81 (describing how al Qaeda used its relationships with the Saudi charities

to facilitate the building of relationships with, and channel money and resources to, aligned terrorist organizations and causes in the Philippines, Bosnia, Chechnya, Kenya, Sudan, and other regions, thereby creating dozens of affiliates around the globe and the ability to launch attacks against the United States and its interests abroad); Ex. 37, March 9, 2020 Expert Report of Dr. Matthew Levitt at 10 ("Al Qaeda developed a strategy of expansion through building alliances with likeminded militant groups around the world. This strategy enabled the group to spot new recruits, raise funds, export its ideology, gain military and terrorist experience fighting in other conflict zones, and develop the interpersonal relationships that would prove critical to the development of a truly transnational terrorist organization.").

79. Al Qaeda's participation in the jihads in Bosnia, Chechnya, and elsewhere was directly aimed at facilitating and enhancing its opportunities to attack the United States. *See, e.g.*, Ex. 183, PEC-KSA 2014-2114 at 2036 (Al Qaeda member Abdel Rahman al Dosari stated that "al Qaeda was seeking to establish training camps in Bosnia, forge relations with relief agencies in Bosnia and establish businesses to support al Qaeda economically," and "to establish a base of operations in Europe against al Qaeda's true enemy, the United States."); *id.* at 2030 (stating that "actions taken in Afghanistan, the Sudan, Bosnia, and Chechnya should not be viewed as disparate conduct but should instead be viewed as the conduct of an evolving enterprise"); Ex. 1, 9/11 Commission Final Report at 466, n. 21; 467, n. 25 and 26; 470, n. 79 and 80 (citing to PEC-KSA 2014-2114); Ex. 153, August 29, 2002 Interview with Jamal al Fadl, PEC-KSA 329-352 at 344 ("Bin Laden felt it was important for Al Qaeda to assist the Bosnians in an effort to establish an Al Qaeda base of operations or presence in Europe from which they would have easy access to other European countries as well as the western nations."); Ex. 204, United Nations Sanctions Committee designation summary for the Islamic International Brigade (indicating that Osama bin Laden met with leaders of the IIB and "agreed to provide substantial military assistance and financial aid, including by making arrangement to send to Chechnya several hundred fighters to fight against Russian troops and perpetrate acts of terrorism").

80. Relying on this infrastructure and operational footprint, "[p]lans to attack the United States were developed with unwavering singlemindedness throughout the 1990s." *See* Ex. 1, 9/11 Commission Final Report at 48.

81. Among other plots, al Qaeda provided support for the aforementioned 1993 attacks against U.S. soldiers in the battle of Mogadishu and was further responsible for the 1998 bombings of the U.S. Embassies in Kenya and Tanzania, the 2000 attack on the U.S.S. Cole, and, of course, the 9/11 attacks. *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020, at ¶¶ 87, 109; Ex. 37, March 9, 2020 Expert Report of Dr. Matthew Levitt at 9, 11, 12, 13, 36. *See also* Ex. 1, 9/11 Commission Final Report at 68-70, 97, 147-148, 190-191, 215-253.

82. Al Qaeda also provided support through Mohammed Jamal Khalifa and the IIRO-Philippines branch office to the 1995 Philippine-based plot to attack U.S. flag airliners mid-flight (the "Bojinka" plot, the precursor to the 9/11 attacks). *See, e.g.*, Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 109; Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 27 ("[T]he 1996 CIA Report finds that one of Saudi Arabia's largest charities, IIRO, was being used by the [Bojinka] plotters to provide cover for their activities."); *id.* at 98 (concluding that "the Bojinka plot would not have been possible without the building of the relationships between al Qaeda and its operatives in the Philippines supported by IIRO."); Ex. 37,

March 9, 2020 Expert Report of Dr. Matthew Levitt at 11 (stating that Khalid Sheikh Mohammed received funding through Khalifa and the IIRO during his time in the Philippines); Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12, 24 (discussing the Bojinka plot).

83. As a global terrorist organization dedicated to carrying out jihad against the United States throughout the world, al Qaeda had extensive funding and fundraising needs.

84. According to the 9/11 Commission Staff Monograph on Terrorist Financing, al Qaeda required $30 million in annual funding to support its operations in the years leading up to the September 11th attacks, an assessment that has been broadly endorsed by experts in the field. *See* Ex. 3, *Monograph on Terrorist Financing*, Staff Report to the 9/11 Commission ("Monograph") at 4; Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 7, 15, 16.

85. To meet these fundraising needs, al Qaeda relied primarily on contributions from donors (primarily in the Gulf region) who supported al Qaeda's global jihad, well-placed financial facilitators who raised funds for al Qaeda, and diversions of funds by Islamic charities that supported al Qaeda's cause. *See, e.g.*, Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 12-37; Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at 7-11; Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 19-21 (discussing al Qaeda's pre-9/11 reliance on charities for funding); Ex. 3, Monograph at 4 ("al Qaeda was funded, to the tune of approximately $30 million per year, by diversions of money from Islamic charities and the use of well-placed financial facilitators who gathered money from both witting and un-witting donors, primarily in the Gulf region."). *See also* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 147 ("[REDACTED] al-Qa'ida and several other terrorist and militant groups consider Saudi Arabia a key base of financial support. [REDACTED] we estimate that since the mid-1990s terrorist groups have received tens of millions of dollars a year from Saudi Arabia. Most of the money originates from wealthy donors, fundraisers who solicit smaller donations, and non-governmental organizations (NGOs)."); Ex. 11, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199 at 194 (stating that "wealthy individuals in the Arabian Peninsula and grassroots supporters from around the world are critical sources for al-Qa'ida"); Ex. 209, *[REDACTED] Spectrum of Al-Qa'ida's Donors*, October 30, 2003, CIA_000659-667 at 661 ("[REDACTED] other donors are close to al-Qa'ida operatives and are witting that their funds are destined for operational purposes. Such donors often demand confirmation that their contributions reach the hands of al-Qa'ida's top leadership or that their donations fund attacks against specific targets.").

86. As the 9/11 Commission explained, bin Laden's organization "included a financial support network that came to be known as 'the Golden Chain,' put together mainly by financiers in Saudi Arabia and Persian Gulf states. Donations flowed through charities and other non-governmental organizations (NGOs)." *See* Ex. 1, 9/11 Commission Final Report at 55; Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 16, 22, 71; Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at 46-47; *See* Ex. 153, August 29, 2002 Interview with Jamal al Fadl, PEC-KSA 329-352 at 351 (stating that the "'Golden Chain' consisted of wealthy individuals from the Gulf region who provided Bin Laden and Al Qaeda with money on a regular basis.").

87. Following al Qaeda's move from Sudan to Afghanistan in 1996, "Bin Laden

eventually enjoyed a strong financial position in Afghanistan, thanks to support from Saudi and other financiers associated with the Golden Chain." *See* Ex. 1, 9/11 Commission Final Report at 66; *id.* at 70 ("Al Qaeda appears to have relied on a core group of financial facilitators who raised money from a variety of donors and other fund-raisers, primarily in the Gulf countries and particularly in Saudi Arabia. Some individual donors knew, and others did not, the ultimate destination of their donations."). *See also* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 148-149 (describing the support provided to the al Qaeda network by individuals identified on the Golden Chain, including Wa'el Jelaidan, Adel Batterjee, Bin Mahfouz, and al Rajhi); Ex. 45, FED-PEC 134953-134955 (the "Golden Chain" listing of al Qaeda's elite financial sponsors and facilitators, including Wa'el Jelaidan (IIRO/MWL official designated to receive financial contributions from Suleiman al Rashid, Abdel Qader Bakri, Salah al Din Abdel Jawad, and Abdel Hadi Taher); Ibrahim Afandi (member of IIRO's Board of Directors), Abdurahman Abdul-Qader Faqih (member of IIRO's Board of Directors), Saleh Kamel (advisor to the IIRO board members concerning financial investments), and Suleiman al Rajhi (member of the IIRO's board and permanent committee)).

88. Members of the Golden Chain served on the IIRO's Board of Directors and participated in board meetings, including Ibrahim Mohammad Afandi and Abdurahman Abdul-Qader Faqih. *See* Ex. 144, August 5, 1999 IIRO Board of Directors Meeting Minutes, MWLIIRO 16270-16276 (Afandi and Faqih attending as board members); Ex. 143, MWLIIRO 16260-16267 (Afandi and Faqih attending as board members). *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 156 (discussing the discovery and significance of the list of "Golden Chain" terrorism financiers, including members of the IIRO's Board of Directors and Executive Committee – Ibrahim Mohammad Afandi, Abdurahman Abdul-Qader Faqih, and Saleh Kamel).

89. Saleh Kamel, a known al Qaeda financier and Golden Chain member, also advised the IIRO's Board of Directors on the organization's financial matters. *See* Ex. 142, MWLIIRO-00016247-16255 (al Qaeda financier and member of "Golden Chain," Saleh Kamel, advising the IIRO board members on financial investments). *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 156 (Saleh Kamel).

90. Suleiman al Rajhi, the chairman of Al Rajhi Bank and a member of the IIRO's board and permanent committee, was also identified on the Golden Chain list. *See, e.g.*, Ex. 11, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199 at 198 ("As of [REDACTED] 2000, Sulaiman al-Rajhi was also one of the 128 permanent members of International Islamic Relief Organization (IIRO), [REDACTED] al-Qa'ida has infiltrated some of IIRO's branches."); Ex. 153, August 29, 2002 Interview with Jamal al Fadl, PEC-KSA000329-352 at 352 (Al Fadl "noted that the name AL RAJHI listed next to number 7 on this document is the name of a bank in which Al QAEDA had funds on deposit.").

91. CIA reporting has corroborated Al Rajhi Bank's use by al Qaeda, terrorist financiers, and Islamic extremists. *See, e.g.*, Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149-150 ("Al-Rajhi Bank has maintained accounts for individuals linked to Usama Bin Ladin, [Redacted] and individuals with ties to the Egyptian Islamic Jihad. Islamic extremists in Yemen named Al Rajhi Bank as a preferred bank for transactions."); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11,

1999, CIA_00807-848 at 809 ("[Redacted] al-Qa'ida members have held accounts at the Al Rajhi Banking and Investment Company."); *id.* at 831 ("[REDACTED] some Al Rajhi branches in Saudi Arabia have been used by members of the al Qa'ida organization."); Ex. 21, *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 3 ("Several al-Qa'ida-linked individuals and organizations have held accounts at Al-Rajhi.");.

92. Suleiman al Rajhi and Al Rajhi Bank maintained hundreds of accounts for the MWL, IIRO, WAMY, Al Haramain Islamic Foundation, Saudi Joint Committee for Relief of the Muslims of Bosnia and Herzegovina and Somalia, and Saudi Joint Committee for the Relief of Muslims of Kosovo and Chechnya. In particular, during the five-year period of January 1, 1998-December 31, 2002, Al Rajhi Bank maintained at least 94 accounts for Al Haramain and 308 accounts for the IIRO. *See* MDL ECF No. 10582 at ¶¶ 206-217. Between those accounts, Al Rajhi Bank facilitated the movement of approximately $1.3 billion (corresponding to roughly $2.3 billion in 2023 dollars) between 1998-2002, when those two purported charities were operating as al Qaeda's most important fronts and financial engines. *Id.* at ¶ 215.

93. As indicated above, the Saudi charities played critical roles in collecting and facilitating transfers of funds to al Qaeda, including donations provided by al Qaeda's most prominent individual supporters, and in otherwise providing financial, material, logistical, and operational support to al Qaeda.

94. Internal al Qaeda documents chronicling the formation of the organization, seized during a 2002 raid of the Sarajevo office of an al Qaeda front, the Benevolence International Foundation ("BIF"), confirm that al Qaeda planned from its inception to use the MWL and its subsidiary bodies, to include the IIRO, to provide support and cover for al Qaeda's operations. A BIF computer file named "Tareekh Osama" (or "Osama's History") contained numerous documents regarding al Qaeda's formation and the participation of purported Islamic charities in al Qaeda's support infrastructure, including the IIRO and MWL. The files include a document on MWL/IIRO letterhead detailing a meeting between "Abu Abdullah" (a/k/a Osama bin Laden), Dr. Abdullah Omar Naseef, in his capacity as the Secretary General of the MWL, and others where it was agreed that al Qaeda attacks would be launched from MWL offices: "And if he is being subjected to any pressures, let it be a secret (*agreement*), in a way that [Muslim World] League offices will be opened as (*illegible*) for the Pakistanis, and the attacks will be launched from them (*these offices*) …"). *See* Ex. 61, FED-PEC0212276-212281 at 212276. The document further indicates that it was recommended to use "the name of the "League" as "an umbrella which you can stay under … because Dr. Naseef is one of the brothers, and the government knows who Abu Al-Hasan [Wa'el Hamza Jelaidan] is." *Id.* at 212278. Investigators also recovered a list of orders from Osama bin Laden regarding the management of Islamic charities. At point 10 of his list, bin Laden urges the creation of a committee to receive and distribute donations to al Qaeda, and recommends participation of the MWL ("the Muslim World League"), and IIRO ("Hayaat Al-Ighata"). *See* Ex. 60, FED-PEC0212268-212275 at 212268. *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 29.

95. Consistent with his agreement with bin Laden, Naseef endorsed the appointment of Wa'el Hamza Jelaidan, a founding member of al Qaeda, as the director of the MWL/IIRO offices in Peshawar, Pakistan in 1989, thereby ensuring a direct channel for coordinating MWL/IIRO's collaboration with Osama bin Laden and al Qaeda. Jelaidan's role with the MWL allowed al Qaeda

to use the MWL as an "umbrella" under which the terror group's members could operate, including using MWL offices for launching terrorist attacks. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150 (indicating that Jelaidan and Mohammed Jamal Khalifa (also an al Qaeda member) served in official roles with the MWL). *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 33; Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 33-34 ("Secretary General of the MWL informing Osama bin Laden's representatives that IIRO was offering its services in support of the mujahedeen."); Ex. 243, October 29, 2020 Expert Report of Victor D. Comras at 19-29 (discussing Wa'el Jelaidan and his connections to Makhtab al Khidamat, MWL, IIRO, Saudi Red Crescent ("SRC"), Saudi Joint Relief Committee ("SJRC"), Rabita Trust, and Al Haramain Al Masjed Al Aqsa Charity Foundation ("AHAMAA")).

96. Jelaidan was a close associate of Osama bin Laden, and one of the most significant figures in the history of al Qaeda and its development into a global terrorist organization. *See* Ex. 53, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2002, FED-PEC 203469-203470 at 203469 ("Julaidan has been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network."); *id.* at 203470 ("In February 2000, Julaidan was appointed to the Board of Trustees of the Rabita Trust and served as its Director General. The Rabita Trust is an NGO designated under President Bush's Executive Order as an organization that provided logistical and financial support to al-Qa'ida."); *id.* ("Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that 'We are all in one boat, as is known to you, including our brother, Wa'el Julaidan.'"). *See also* Ex. 180, *Additional Designation Pursuant to E.O. 13224*, TREASURY00001-8 at 4-5 (stating that "Julaidan is identified as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief," and also served on al Qaeda's shura council). *See also* Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 ("By way of background, Usama Bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ('MK') (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al Madani") of the International Islamic Relief Organization (hereafter "IIRO," sometimes referred to as "Igatha" based upon its Arabic name "*Hay'at al-Igatha al-Islamiya al-'Alamtyaa*"), which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL'). In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*.").

97. In addition to his roles with the IIRO and MWL, Naseef also appointed Jelaidan to head the Rabita Trust, a subsidiary of the MWL. *See* Ex. 136, Wa'el Jelaidan CV, Jelaidan 022. Rabita Trust was designated by the U.S. government as a Specially Designated Global Terrorist ("SDGT") on October 12, 2001 for "its close ties to senior al Qaida leadership and providing

logistical and financial support to al Qaida." *See* Ex. 68, FED-PEC 215391-215394 at 215391. *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 50-63; Ex. 243, October 29, 2020 Expert Report of Victor D. Comras at 23-24 (discussing Wa'el Jelaidan and his connection to Rabita Trust).

98. As al Qaeda was establishing its operations in Kosovo and Chechnya, Jelaidan further assumed the position as director of the joint IIRO/Saudi Joint Relief Committee ("SJRC") office in Pristina, Kosovo. *See* Ex. 98, Memorandum of Understanding between the IIRO and SJRC, IIRO 41030; Ex. 130, IIRO 39085, 39086, 39278 (shared office expenses). More than a year before the 9/11 attacks, U.S. officials sent a written request to the U.N. Peace Keeping Force in Pristina, requesting that U.N. police undertake surveillance of the office. In that document, marked "Secret: U.S. Office Only – Release to UNMIK," the U.S. government asserted that Jelaidan and SJRC official Adel Muhammad Sadi Bin Kazam were "associates of Osama bin Laden" and that Jelaidan was actively involved in helping bin Laden "move money and men to and from the Balkans." *See* Ex. 43, BBC News, *U.S. Fears Terrorist Attack in Kosovo*, April 3, 2000, FED-PEC0097363-97365 at 97364. Acting on that information, the U.N. Mission in Kosovo ("UNMIK") raided the building and declared that the IIRO/SJRC office served as a cover for several al Qaeda operatives, including Jelaidan and Kazem. *Id. See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 33; Ex. 243, October 29, 2020 Expert Report of Victor D. Comras at 27-29 (discussing Wa'el Jelaidan and his connection to the Saudi Joint Relief Committee).

99. Jelaidan also served as a board member of the Al-Haramain & Al Masjed Al-Aqsa Charity Foundation ("AHAMAA"), an integral part of the MWL organizational structure located in the Bosnia, *see* Ex. 139, MWL 19138, and held signatory authority over AHAMAA's bank accounts which he used to fund terrorist operations. AHAMAA was designated as a Specially Designated Global Terrorist ("SDGT") by the U.S. government on May 6, 2004 for its significant financial ties to al Qaeda. *See* Ex. 63, May 6, 2004 E.O. 13224 Designation of Al Haramain al Masjed al Aqsa, FED-PEC 213972-213977; Ex. 64**,** May 6, 2004 U.S. Treasury Department Press Center, *Treasury Designates Bosnian Charities Funneling Dollars to Al Qaida*, FED-PEC 213978-213979; Ex. 148, U.S. Diplomatic Cable, *Terrorist Finance: Bosnia's Dirty Dozen*, November 2002, PECFOIA0004499-4503 at 4500 (identifying AHAMAA as one of a least a dozen Islamic charities "currently involved in providing financial support to known terrorist organizations"); Ex. 149, U.S. Diplomatic Cable, *Terrorist Finance: Dirty Dozen's Web of Deceit*, August 2003, PECFOIA049927-49932 at 49928 ("Documentation was provided to EUR/SCE demonstrating control over Al Haramayn al Masjid Al Aqsa by top Al Qa'ida financier Wa'el Julaidan (designated on E.O. 13224 in 2002)."). *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 64-67; Ex. 243, October 29, 2020 Expert Report of Victor D. Comras at 26-27 (discussing Wa'el Jelaidan and his connection to AHAMAA).

100. Jelaidan was a close associate of Yassin al Qadi, an important al Qaeda donor and financial facilitator, with whom Jelaidan partnered on numerous commercial and ostensible charity enterprises, including Muwafaq Foundation. *See, e.g.*, Ex. 229, *Designation Pursuant to E.O. 13224 of Yasin Al-Qadi*, TREASURY00055-86 at 61 ("Al-Qadi hired Chafiq Ayadi, an SDGT designated at the same time as Al-Qadi on October 12, 2001, to head Muwafaq's European operations upon the recommendation of Wa'el Julaidan in late 1992."); *id.* at 57, 61-63, 68 (detailing Qadi's relationship with Jelaidan); Ex. 154, 1996 Central Intelligence Agency Report,

PEC-KSA000965-978 at 975 (stating that the Muwafaq Foundation "helps fund the Egyptian Mujahedin Battalion in Bosnia," and "also funds at least one training camp in Afghanistan"); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 148 ("In 1992, al-Qadi founded the Muwafaq Islamic charity, through which he funneled funds to al-Qaida and other extremist groups."). *See also* Ex. 230, November 29, 2001 letter from David D. Aufhauser, Treasury Department General Counsel, PEC-KSA 4356-4359 at 4356 (stating that "Mr. Kadi has a long history of financing and facilitating the activities of terrorists and terrorist-related organizations"); *id.* at 4357 ("The leader of the terrorist organization, Al-Gama'at Al-Islamiya, Talad Fuad Kassem, has said that the Muwafaq Foundation provided logistical and financial support for a mujahadin battalion in Bosnia."); *id.* at 4358 ("The Muwafaq Foundation also provided support to HAMAS and the Abu Sayyaf Organization in the Philippines."); *id.* ("Following the dissolution of MK [Makhtab Al-Khidamat] in early June 2001 and its absorption into Al-Qa'ida, a number of NGOs formerly associated with MK, including Muwafaq, also merged with Al-Qa'ida."); *id.* ("The pattern of activity displayed by Mr. Kadi, and his foundation and businesses, is typical of the financial support network of Qa'ida and other terrorist organizations."). *See also* Ex. 243, October 29, 2020 Expert Report of Victor D. Comras at 30-32 (discussing Wa'el Jelaidan's relationship with Yassin al Qadi).

101. Like Jelaidan, the United States designated al Qadi for his role in providing material support to al Qaeda. *See* Ex. 229, *Designation Pursuant to E.O. 13224 of Yasin Al-Qadi*, TREASURY00055-86 at 56 ("Al-Qadi, a Saudi businessman whose companies span the Middle East, Europe, North America and South Asia, has been consistently identified as a financial supporter of Usama bin Laden and other known Islamic extremists for nearly a decade."); *id.* at 57 ("Al-Qadi repeatedly used Muwafaq, as well as his own corporations and employees, to divert funds to Islamic extremists, supporting their terrorist and extremist activities."); *id.* ("Through Muwafaq, Al-Qadi provided funds or otherwise assisted the Egyptian Islamic Jihad, HAMAS, the Abu Sayyaf Group, the Revival of Islamic Heritage Society, and Al-Haramayn (Bosnia), each of which has been designated an SDGT pursuant to E.O. 13224."). *See also* Ex. 161, FBI Report, *Co-operating Witness Interview*, June 2, 2004 at 1 ("Al-Kadi would bring donated money from the Gulf areas, mainly Saudi Arabia, to Al-Qaida which was used to purchase weapons in Jalalabad, Afghanistan."); *id.* ("Al-Kadi also brought money to Khartoum for Al-Qaida."); *id.* at 1-2 ("Al-Kadi also supported Al-Haramain in Zagreb, Croatia during the conflict in Bosnia. Like Afghanistan and Sudan, Al-Kadi brought donations from Saudi Arabia and other Gulf countries to Croatia to support the jihad.").

102. Naseef, in his capacity as the MWL Secretary General and IIRO Chairman, also approved the appointment of Mohammed Jamal Khalifa, a founding al Qaeda member and Osama bin Laden's brother-in-law, to lead a joint MWL/IIRO branch office in the Philippines contemporaneous with the formation of al Qaeda. *See* Ex. 51, FED-PEC 202846-202847 (June 5, 1988). As a result of that appointment, Khalifa was able to use the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia, and a source of funding for al Qaeda affiliated terrorist organizations such as the Abu Sayyaf Group ("ASG"), Moro Islamic Liberation Front ("MILF"), and Jemaah Islamiyah ("JI"). *See* Ex. 50, August 3, 2006 designation of IIRO's branches in the Philippines and Indonesia and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-202112. According to the U.S. government, while working as the director of the office, Khalifah maintained close connections with al Qaida through his relations with "senior al Qaida figures Abdullah Azzam and Abdulhassan al-Midani a.k.a Wa'el Hamza Julaidan, a long-

time senior official of the IIRO (and the Muslim World League)." *See* Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 110. *See also* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 (stating that the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149-152 (indicating that al Qaeda member Mohammed Jamal Khalifa served in an official role with the MWL, and used the IIRO branch office in the Philippines to fund the Abu Sayyaf Group, an al Qaeda associated terrorist organization, and recruit Muslims for military training). *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶¶ 31-32, 107-120; Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 34.

103. Several other of al Qaeda's most important financial facilitators also served as officials of these Saudi charities, including but not limited to Abd al Hamid Sulaiman al Mujil (IIRO), Prince Turki bin Jalawi al Saudi (IIRO), WAMY Secretary General Maneh al Johani, Aqil al Aqil (Al Haramain), and Soliman al Buthe (al Haramain). *See, e.g.*, Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 93, 94, 97, 98 (discussing Abd al Hamid Sulaiman al Mujil, Executive Director of IIRO's Eastern Province branch, and his E.O. 13224 designation for using his position "to bankroll the al Qaida network in Southeast Asia"); Ex. 31, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004, EO14040-003414-3442-UPDATED at 3419 (reporting that Khalid Sheikh Mohammed identified Prince Turki bin Jalawi, "a key leader of the Eastern Province office of the International Islamic Relief Organization (IIRO)," as "an important al-Qa'ida donor"); Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at 49-51 (WAMY Secretary General Maneh al Johani advocated for jihad in Kashmir and Chechnya and asked Muslims to provide "their moral, physical, and financial support [to] the cause of Jihad," including "money to buy weapons and gear."); Ex. 217, *Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters, Treasury Marks Latest Action in Joint Designation with Saudi Arabia*, June 2, 2004, FED-PEC 56730-56734 at 56732 ("Under Al Aqil's leadership of AHF, numerous AHF field offices and representatives operating throughout Africa, Asia, Europe and North America appeared to be providing financial and material support to the al Qaida network. Terrorist organizations designated by the U.S. including Jemmah Islammiya, Al-Ittihad Al-Islamiya, Egyptian Islamic Jihad, HAMAS and Lashkar E-Taibah received funding from AHF and used AHF as a front for fundraising and operational activities."); Ex. 218, *U.S.-Based Branch of Al Haramain Foundation Linked to Terror, Treasury Designates U.S. Branch, Director*, September 9, 2004, at 1 (indicating that under Soliman al Buthe's leadership of Al Haramain, "funds that were donated to AHF with the intention of supporting Chechen refugees were diverted to support mujahideen, as well as Chechen leaders affiliated with the al Qaida network");

104. In addition, al Qaeda operatives and members of associated terrorist organizations were frequently employed by offices of these charities.

105. For instance, Abu Hammam al Saudi, a member of al Qaeda and very close associate to bin Laden, served as al Qaeda's "Emir of finance," was in charge of military affairs for al Qaeda, and further served as the head of the IIRO's office in Peshawar, Pakistan. *See, e.g.*, Ex. 153, Testimony of Jamal al Fadl, August 29, 2002, PEC-KSA 329-352; Ex. 160, FBI 302 Cooperating Witness Statement of Jamal al Fadl, November 1996, PEC-KSA 2115-2132; Ex. 161, FBI 302 Cooperating Witness Statement of Jamal al Fadl, June 2, 2004, PEC-KSA 2133-2134; Ex. 163, FBI 302 Cooperating Witness Statement of Jamal al Fadl, January-February 1998, PEC-KSA 2144-2157; Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143. *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 77-80 (detailing Jamal al Fadl's testimony concerning (1) IIRO's al Qaeda guesthouse in Peshawar, Pakistan; (2) al Qaeda members Abu Unaith al Saudi and Abu Hammam al Saudi working in the IIRO offices in Peshawar to purchase weapons; (3) Wa'el Jelaidan ("Abu Hassan al Madani") headed the IIRO-Pakistan office; (4) al Qaeda member Abu Hammam al Saudi's tenure as the head of the IIRO-Pakistan office and using the office's resources to provide false IIRO identification cards to Islamic fighters for travel; and (5) al Qaeda's financial chief, Saidi Madani al Tayyib, working under the direction of Abu Hammam, and later ascending to al Qaeda's emir of finance); Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 34 (discussing Jamal al Fadl's testimony concerning the IIRO's ties to al Qaeda, including al Qaeda member Abu Hammam's tenure as head of IIRO-Pakistan, Hammam's role in collecting donations from a very rich Saudi, and Hamam's role in helping Osama bin Laden establish businesses in Sudan).

106. Mahmud Abd Al-Jalil Afif, a prominent supporter and financier of the Abu Sayyaf Group ("ASG") terrorist organization, served as the director of the IIRO-Philippines and used his position to divert funnel money to ASG and other terrorist groups in the region. *See, e.g.*, Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202111 ("In the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-PHL, and used the organization to funnel money to terrorist groups including the ASG.").

107. Abdul Asmad, an intelligence chief for ASG, served as the head of IIRO's branch office in Tawi Tawi, Mindanao and used his position to fund the al Qaeda-affiliated ASG and Moro Islamic Liberation Front ("MILF") terrorist organizations. *See* Ex. 33, European Parliament, *The Involvement of Salafism/Wahhabism in the Support and Supply of Arms to Rebel Groups Around the World*, June 2013, at 9 ("Declassified intelligence reports from the FNP revealed that in 1988 Bin Laden sent his brother-in-law Mohammad Jamal Khalifa to the Philippines to set up Al Qaeda's branches in Southeast Asia. The so-called Khalifa network counted at least twelve charitable organizations and front companies that provided funds to both the Moro Islamic Liberation Front (MILF) and Abu Sayyaf. One of the most active organizations in this sense was the IIRO. In fact, IIRO-funded facilities were mainly built in Mindanao, a region under the control of the aforementioned rebel groups. For instance, the head of IIRO's branch office in Tawi Tawi, Mindanao, was Abdul Asmad, former Abu Sayyaf's intelligence chief until 1994 when he died (Abuza, 2003, p. 27). The office was used by Al Qaeda to siphon money on behalf of the MILF and Abu Sayyaf. According to defectors' interrogations, this practice was very effective considering that Al Qaeda was able to divert the 70-90 percent of funds for arms acquisition destined to the rebel groups. This means that only the 10-30 percent of the money remained

available for legitimate purposes.”).

108. Abdelhadi Daguit, a twenty-year employee of the IIRO in the Philippines, was a close associate of al Qaeda member Mohammed Jamal Khalifa, maintained contact with the leadership of the Moro Islamic Liberation Front (“MILF”) terrorist organization, and was implicated in an al Qaeda bombing plot in 2004. *See, e.g.*, Ex. 50, August 3, 2006 designation of IIRO’s branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202111 (indicating that the IIRO-Philippines office “is a source of funding for the al Qaida-affiliated [Abu Sayyef Group],” and IIRO funding “is directed to terrorist operations”); *id.* (“IIRO-PHL’s director, Abd al-Hadid Daguit, is a trusted associate of Khalifa,” “who is Usama bin Laden’s brother-in-law and has been identified as a senior al Qaida member.”); Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211445 (identifying Daguit as a “known associate of Khalifa,” “presently connected with IIRO Manila,” and in “constant contact with Yusop Alongan @Ustadz Duli/Abdullah, Chairman of MILF Finance Committee”); *id.* at 211429 (stating that Daguit and others “are known associates of Mohammad Jamal Khalifa involved in establishing the NGO network in the country”); Ex. 58, *Alleged Al Qaida Bombing Plot in Manila*, FED-PEC 210866-210867 at 210866 (identifying “Abdulhadi Daguit (Filipino) of MWL-IIRO Manila office” as an associate of two al Qaeda members who were allegedly tasked to conduct a bombing attack on the Saudi Embassy in the Philippines for “being an American ally in the Iraqi issue”).

109. Abdelaziz Zaher (a/k/a Abu Anas, Abu Enes), the supervisor of the IIRO’s offices in Bosnia-Herzegovina, Croatia, and Slovenia, also served as the chairman of a coordination council established by the IIRO. *See* Ex. 89, IIRO 13287-13292. *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at 29. Zaher was expelled from his former residence in Belgrade at the beginning of 1993 after being tied by Serbian authorities to various organizations suspected of aiding armed fundamentalist militant groups, including the IIRO. *Id.* Zaher’s top lieutenant at the IIRO, Jamal Al-Jibouri, was personally responsible for oversight of a massive logistical operation to provide al Qaeda and al Qaeda affiliated Islamic militants in the Balkans with weapons and ammunition. *See* MDL ECF No. 3463-1 at ¶ 411; *see also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 90-99 (discussing IIRO’s connections to Abdelaziz Zaher and Djamel Lamrani).

110. This arrangement of employing al Qaeda operatives and members of associated terrorist organizations provided salaries to fund their terrorist activities, cover for those activities, and credentials and employment papers that enabled them to travel on behalf of al Qaeda, including to al Qaeda operational hubs in conflict zones. *See, e.g.*, Ex. 32, FBI Report, *Connections to the Attacks of September 11, 2001*, July 23, 2021, EO14040-003478-3608-UPDATED at 3532 (“AQ members were employed with these organizations and utilized funding for terrorism support and used the offices for cover for movement of personnel.”); Ex. 7, *How Bin Ladin Commands a Global Terrorist Network [REDACTED]*, January 27, 1999, CIA_00002-16 at 7 (“Bin Ladin exploits these NGO ties to channel funds and obtain cover employment and travel assistance for his associates.”); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 210 (“The availability of funds, cover, and logistics networks makes NGOs an appealing resource for terrorist groups. NGOs typically are awash in money – the Muslim World League’s budget is more than $26 million annually, and the annual budget of the

International Islamic Relief Organization has never dipped below $50 million – and tapping into the funds offers terrorist some independence from traditional state sponsors, who often attempt to control such groups for their own purposes. The logistical support NGOs offer includes cover employment, false documentation, travel facilitation, training, and in some cases, weapons."); *id.* at 213 ("sympathizers within several affiliate organizations – including the International Islamic Relief Organization (IIRO) – have provided terrorists with funding and cover employment, documentation, and training"); *id.* at 220 ("Despite Saudi efforts to curb terrorist use of the IIRO, its personnel in local branch offices continue to channel funds to terrorists and provide them with logistical support – such as cover employment, documentation, travel assistance and access to training – [REDACTED]."); Ex. 210, *Al-Haramayn Islamic Foundation–Bosnia-Herzegovina*, TREASURY00009-11 at 11 ("HIF offices in Bosnia-Herzegovina have employed personnel with affiliations to or membership in an SDGT (Gama'at Al Islamiyya), indicating that the offices of HIF are widely infiltrated by terrorist elements."); Ex. 181, *Al-Haramain Islamic Foundation, Somalia*, TREASURY00030-36 at 30-31 ("The U.S. has assembled evidence that shows a history of ties between Al-Haramain Somalia and Usama bin Laden's al-Qaida network, Al-Itihaad al-Islamiya (AIAI), and other associated entities and individuals. For example, over the past few years, Al-Haramain Somalia has provided a means of funneling money to AIAI by disguising funds as intended to be used for orphanage projects or the construction of Islamic schools and mosques. The organization has also employed and provided salaries to AIAI members.").

111. Moreover, notwithstanding the fact that the domestic and overseas branch offices of the charities may have undertaken genuine humanitarian relief work, these relief activities were used to fundraise and distribute funds for al Qaeda's operational support, recruit terrorists and provide space for their training and operations, and to provide a cover so that al Qaeda operatives could undertake terrorist activities under the guise of being humanitarian relief workers. *See, e.g.*, Ex. 171, U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Abdallah Ibrahim al Rushaydan (September 10, 2004), PEC-KSA002477-2488 at 2486 ("Since 1996, the IIRO has been linked with providing financial assistance, funds transfers, and legitimate cover for moving money in support of Al-Qaida and Usama Bin Ladin (UBL), under the cover of humanitarian relief."); *id.* at 2488 ("The IIRO is a Tier 1 NGO that has been directly linked to Al-Qaida and Usama Bin Ladin. The IIRO has provided financial assistance, funds transfers and legitimate cover for moving money under the pretense of humanitarian relief to Al-Qaida."); Ex. 69, Department of Defense JTF-GTMO Matrix of Threat Indicators, FEDPEC0216815-216831 at 216829-216831(U.S. govt. identifying IIRO, MWL, and WAMY as "terrorist and terrorist support entities"); Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 (identifying the IIRO as "one of the major Saudi Arabian humanitarian organizations suspected of maintaining links with al-Qaeda"); Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at 24 (stating that the U.S. government concluded that the IIRO provided financial assistance, funds transfers, and legitimate cover for moving money to al Qaeda under the pretense of humanitarian relief); Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143 (Fadl testifying that al Qaeda used Wa'el Jelaidan as head of the IIRO office in Peshawar, Pakistan, to create ID cards for al Qaeda members so that they could cross the Pakistan-Afghanistan border without a problem, under the guise that they were teachers or other relief workers.); Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 20 (asserting that "while the Islamic charities that provided support to

extremism and terrorism engaged in some humanitarian activities, their support for terrorism was substantial, and the humanitarian activities which did take place helped to legitimize and provide a cover for, the extremist and terrorist activities"); Ex. 37, March 9, 2020 Expert Report of Dr. Matthew Levitt at 13-14 ("Charities offer a veil of legitimacy for terrorist fundraising, attracting unwitting donors who are unaware that monies they donate for humanitarian purposes instead fund terror."); *id.* at 14 ("Through charities, transnational terrorist groups have been able to move personnel, funds, and material to and from high-risk areas under cover of humanitarian or charity work."); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (stating that Adel Batterjee, who headed the MWL subsidiary Lajant al Birr al Islamiyya, "has directed NGOs where some officers finance extremists or militants under the guise of rendering humanitarian aid and support"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 218 (stating that Islamic charities accredited with the UNHCR "gives them credentials terrorists can use to travel more freely across borders and to establish cells in new areas under the guise of pursuing a humanitarian mission"); Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 965 ("Where Muslims are engaged in armed conflict, some Islamic organizations provide military aid as part of a 'humanitarian' package."); Ex. 1, 9/11 Commission Final Report at 170-171 ("Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization."); Ex. 150, U.N. Security Council, Second Report of the Monitoring Group on Sanctions Against Al-Qaida, the Taliban and Individuals and Entities Associated With Them ("Second Report"), December 2, 2003, PEC-KSA000108-190 at 120-121 ("Charities provide Al-Qaida with a very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support. These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programmes.").

112. Within this framework – the MWL, IIRO, WAMY, and Al Haramain – were four of al Qaeda's most important charity fronts and partners. *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at 11-23 (MWL), 23-47 (IIRO), 47-62 (WAMY); Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 82-118 (IIRO, WAMY, MWL); Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 30-32 (MWL), 32-39 (IIRO), 39-45 (Al Haramain). *See also* U.S. Department of the Treasury press releases detailing the E.O. 13224 designations of Al Haramain and IIRO at Ex. 215, March 11, 2002 designation of Al Haramain's branches in Somalia and Bosnia-Herzegovina, FED-PEC 211887-211888; Ex. 216, January 22, 2004 designation of Al Haramain's branches in Indonesia, Kenya, Tanzania, and Pakistan, FED-PEC 211876-211880; Ex. 217, June 2, 2004 designation of Al Haramain's branches in Afghanistan, Albania, Bangladesh, Ethiopia, and the Netherlands, including Aqil al Aqil, FED-PEC 56730-56734; Ex. 218, September 9, 2004 designation of Al Haramain's branches in the United States and Union of Comoros, including Soliman al Buthe, FED-PEC 211873-211875; Ex. 219, June 19, 2008 designation of Al Haramain's Saudi headquarters and the entirety of the Al Haramain organization, FED-PEC 211881; Ex. 50, August 3, 2006 designation of IIRO's branches in the Philippines and Indonesia and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-202112.

## X. U.S. INTELLIGENCE REPORTING AND OTHER SOURCES CONFIRM THE SAUDI CHARITIES' EXTENSIVE AND WITTING SUPPORT FOR AL QAEDA WITH THE INTENT TO ADVANCE ITS TARGETING OF THE UNITED STATES

113. Declassified U.S. government investigation records and finished analytical intelligence reports originating from the Central Intelligence Agency ("CIA"), Federal Bureau of Investigation ("FBI"), U.S. Department of State, U.S. Department of the Treasury and the Office of Foreign Assets Control ("OFAC"), and other sources document the Saudi charities' massive funding of al Qaeda, intimate involvement in all aspects of al Qaeda's operations, and the broad use of their infrastructures and resources to advance al Qaeda's terrorist agenda.

### A. MWL

114. In the CIA report at Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network [REDACTED]*, CIA_000058-62 at 60, the CIA states that "the MAK [Maktab al-Khidmat] is funded by the Saudi-based Muslim World League and International Islamic Relief Organization, the Muwafaq Foundation, and Saudi-born financier Usama Bin Ladin." MAK, also known as the "Bureau of Services," was established by Osama bin Laden and Abdullah Azzam to provide logistical support to mujahideen forces in Afghanistan and channel recruits into the country during the Soviet-Afghan conflict. *See also* Ex. 1, 9/11 Commission Final Report at pp. 56, 434; Ex. 3, *Monograph on Terrorist Financing*, Staff Report to the 9/11 Commission ("Monograph") at 95 (stating that Osama bin Laden confidant Enaam Arnaout provided military and logistical support to the mujahideen in the late 1980s and early 1990s as an employee of "Saudi NGO, the Muslim World League").

115. A November 14, 2002 CIA report, *Saudi-Based Financial Support for Terrorist Organizations [REDACTED]*, CIA_000143-158, at Ex. 10, indicates that al Qaeda members Wa'el Hamza Jelaidan and Mohammed Jamal Khalifa served in official roles with the MWL.

> Some reporting indicated the MWL is the parent organization of the International Islamic Relief Organization (IIRO) and the World Assembly of Muslim Youth (WAMY), is affiliated with more than a dozen other NGOs worldwide, and has its own offices in more than 30 countries. Several of Bin Ladin's associates, including Wa'il Julaydan and Muhammad Jamal Khalifah, were MWL representatives, according to [REDACTED] press reporting. [REDACTED] funds destined for al-Ittihad al-Islamiyya (AIAI) in Somalia were funneled through several Saudi NGOs, including MWL.

*See* CIA_000150. *See also id.* at 149 (Shaykh Adil Batterjee, a close associate of Osama bin Laden and "a long-time al-Qa'ida donor and fundraiser," used the Saudi-based Lajnat al Birr al Islamiyya charity, a subsidiary of the Muslim World League (MWL), to raise funds on behalf of bin Laden.).

116. In another CIA report at Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236, the CIA describes the resources that

charities like the MWL can provide to a terrorist organization.

> The availability of funds, cover, and logistics networks makes NGOs an appealing resource for terrorist groups. NGOs typically are awash in money – the Muslim World League's budget is more than $26 million annually, and the annual budget of the International Islamic Relief Organization has never dipped below $50 million – and tapping into the funds offers terrorist some independence from traditional state sponsors, who often attempt to control such groups for their own purposes. The logistical support NGOs offer includes cover employment, false documentation, travel facilitation, training, and in some cases, weapons.

*See* CIA_000210. *See also id.* at 213 (stating that "several MWL affiliate organizations—including the International Islamic Relief Organization (IIRO)—have provided terrorists with funding and cover employment, documentation, and training").

117. In the CIA report at Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563, the CIA describes how al Qaeda member Wa'el Hamza Jelaidan used his high-ranking positions in the Saudi charities like the MWL and IIRO to divert money to al Qaeda.

> *Wa'el Hama A. Julaydan.* Longtime Bin Ladin associate and IFTSC senior official *Wa'el Hamza Julaydan* (alias Abu Hasan al-Madani), a veteran of the Islamic charity circuit, has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL), the Saudi Joint Relief Committee (SJRC), the Saudi Red Crescent Society (SRCS), and lately at two Bin Ladin-affiliated charities, al-Waqf al-Islami, and as secretary general of Rabita Trust coordinating financial activities and overseeing the budget. Julaydan has provided support since the 1990s to Muslims in Bosnia and Chechnya – hotbeds of mujahidin activity – and may be using his position and influence at these organizations to divert funds and resources to al-Qa'ida.

*See* CIA_000544.

118. Lastly, at Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, CIA_000807-848 at 823, the CIA assessed that the MWL was "used as a cover organization for several of Usama's associates: [REDACTED]." *See id.* at 809 (stating that Saudi-backed NGOs have ties to Osama bin Laden, including the Muslim World League, World Assembly of Muslim Youth, and others).

119. Notably, CIA investigations assessed that Ahmed Mohammed Ali, who served as MWL Secretary General for only two years immediately following Omar Abdullah Naseef's tenure as Secretary General, experienced an unhappy and challenging period at the MWL because he found it difficult to deal with Islamic fundamentalist clerics who dominated the MWL's

leadership positions. *See* Ex. 19, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 746; *id.* at 784 (indicating that Ali purportedly left the MWL "over continuous disagreements with Islamic fundamentalist clerics").

120. Dr. Matthew Levitt, a former counterterrorism intelligence analyst with the FBI and Deputy Assistant Secretary for Intelligence and Analysis at the Department of the Treasury, has offered additional details concerning the MWL's material and financial support for Osama bin Laden, Islamic militants, and terror organizations around the globe.

> • According to an unclassified CIA document released in 1996, the MWL has been tied to supporting a variety of terrorist groups. This report stated that the head of the MWL office in Pakistan supplied Muslim World League documentation and arms to Afghani and Tajik militants.
>
> • The Somali terrorist group Al Itihaad Al Islaami, designated under Executive Order 13224, derived part of its revenue from the MWL and its subsidiary, the IIRO.
>
> • The MWL has sent cash to Islamic guerillas in the Philippines.
>
> • Osama bin Laden himself covertly funded several terrorist organizations through the MWL.
>
> • The MWL also provided non-financial material support such as arms and documents to "militants in Afghanistan and Tajikistan," according to a CIA report.

*See* Ex. 37, March 9, 2020 Expert Report of Dr. Matthew Levitt at 31-32.

121. The MWL was directly responsible for and involved in the establishment of the Rabita Trust for the Repatriation of the Pakistanis Stranded in Bangladesh ("Rabita Trust"), which was designated as an Executive Order 13224 Specially Designated Global Terrorist ("SDGT") entity by the U.S. government immediately following the September 11 attacks. *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 50-63.

122. U.S. government diplomatic cables have described the MWL's associations with international terrorist organizations and activities. For instance, an August 21, 2008 cable originating from the U.S. Embassy in Jakarta, Indonesia advises that Muhammad Thalib, "a commission member with the Muslim World League since 1989," was selected as the supreme leader of the Majelis Mujahiddin Council ("MMI"), "the political wing of the terrorist organization Jemaah Islamiyah. *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 68.

123. A March 24, 2008 U.S. State Department diplomatic cable identifies the MWL and World Assembly of Muslim Youth ("WAMY") as having ties to terrorist organizations. *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 69.

124. A June 1, 2005 diplomatic cable from the U.S. Embassy in Madrid, Spain describes a joint investigation conducted by the Department of Justice and Spanish authorities linking the MWL to several million dollars in payments to accounts held by the Islamic Cultural Center in Madrid "between 1998 and 2003 that may have been diverted to persons suspected of supporting international jihadist activities." *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 70.

125. Documents produced in this litigation by defendants MWL, IIRO, and Wa'el Hamza Jelaidan make clear that the MWL appointed senior MWL and IIRO officials to serve as Rabita Trust's corporate officers and Board of Trustees, held significant oversight and control over Rabita Trust's operations and activities, and exerted executive authority over Rabita Trust's leaders, including Jelaidan, an Executive Order 13224 designee. *Id.* at ¶ 51.

126. The founding "deed" of the Rabita Trust indicates that the initial Board of Trustees for the organization included: Saudi Prince Talal bin Abdul Aziz al Saud (Co-Chairman), MWL Secretary General Dr. Abdullah Omar Naseef (Vice-Chairman), and MWL Assistant Secretary General Syed Amin Aqeel Attas (Director General). *See* Ex. 134, Jelaidan 017 (Rabita Trust deed identifying senior leaders of the "Rabita al Alam al Islami" (a/k/a MWL) who populated the initial Board of Trustees when it was formed in 1988). *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 52.

127. An amendment in March 2000 included MWL Secretary General Dr. Abdullah bin Saleh al Obaid and International Islamic Relief Organization (IIRO) Secretary General Dr. Adnan Khalil Basha to leadership roles. *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 52. *See also* Ex. 133, Jelaidan 016 (March 14, 2000 Circular regarding the "revised and up-dated composition of Rabita Trust Board," including MWL Secretary General Abdullah al Obaid and IIRO Secretary General Adnan Basha).

128. An October 14, 2000 letter from Wa'el Jelaidan issued on Rabita Trust letterhead lists the following individuals as board members of the organization: Prince Talal bin Abdul Aziz al Saud (Co-Chairman), MWL Secretary General Dr. Abdullah bin Saleh al Obaid (Vice Chairman), Wa'el Jelaidan (Director General), IIRO Secretary General Dr. Adnan Khalil Basha, IIRO Eastern Province office Supervisor General Prince Turki bin Fahd bin Jalawy al Saud, and MWL Riyadh Office chief Mohammed bin Abdallah al Dubaiban. *See* Ex. 140, MWL 30817-30819. *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 53.

129. MWL Secretary General Dr. Abdullah bin Saleh al Obaid acknowledged his role as an officer of Rabita Trust, which he described as "as a charity that is partly owned by the Muslim World League, and partly owned by the government of Pakistan." *See* Ex. 147, Declaration of Abdullah bin Saleh al Obaid at ¶ 5. Compare with Obaid's declaration testimony submitted in support of the MWL's April 15, 2026 motion for summary judgment stating that "[t]he Rabita Trust is an independent organization and not a part of MWL." *See* MWL Exhibit 39, Declaration of Dr. Abdullah bin Saleh al Obaid at ¶ 13.

130. Jelaidan's resume, produced in this litigation, acknowledges in 1992 becoming a "Project Director of the Rabita Trust... As a Project Director, I supervised the construction of 1000 residential units in the province of Punjab." According to Jelaidan's account, "in 1998, I was

appointed as the Secretary General of the Rabita Trust by the Muslim World League." In February 2000, Jelaidan was appointed to the Rabita Trust Board of Trustees. *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 54; Ex. 136, Jelaidan 022, Wael Jelaidan CV (stating that he started working for the MWL in 1989, became a project director of the Rabita Trust in 1992, and was appointed as head of the Rabita Trust in 1998). *See also* Ex. 132, Affidavit of Wael Hamza Jelaidan, MDL ECF No. 2702 at ¶ 4 ("I have been the Secretary-General of the Rabita Trust since 1999 till this date"). The affidavit was signed on October 29, 2011.

131. Rabita Trust and its employees operated out of the MWL's office in Mecca, Saudi Arabia and the MWL's branch office in Pakistan. For instance, an October 29, 1992 letter concerning a Rabita Trust office in Lahore is addressed to "*Mr. Wa'el H. Jelaidan, Project Director, Rabita Trust, Muslim World League, H-8/1, Islamabad*." A December 29, 1997 letter co-authored by MWL Secretary General Abdullah al Obaid on Rabita Trust letterhead identifies Rabita Trust offices operating from the MWL offices in Mecca, Saudi Arabia and Islamabad, Pakistan: *Makkah Office: c/o Muslim World League, P.O. Box 537, Makkah*; and *Islamabad Office: c/o Muslim World League, H-8/1, Islamabad*. Finally, a series of letters dated October 22, 2001 letter concerning Rabita Trust account balances are addressed to "*The Secretary General, Rabita Trust for Stranded Pakistanis, World Muslim League, P.O. Box 1030, Makkah Al Mukrmah, Saudi Arabia*." *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 55.

132. Rabita Trust and its employees also operated out of the IIRO's branch office in Islamabad, Pakistan. A series of letters dated October 11, 2001 concerning Rabita Trust are addressed to "*Mr. Rahmat Ullah Nazir Kahn, Project Director, Rabita Trust for Rehabilitation of Stranded Pakistanis, Pitrus Bokari Road, H-8/1, Islamabad*." An October 12, 2001 letter authored by Mr. Khan in his capacity as the office director of the IIRO branch office in Islamabad identifies the same address as "*H-8/1- Pitrus Bokari Road*." *Id.* at ¶ 56.

133. On October 12, 2001, the U.S. government designated Rabita Trust as a SDGT "for its close ties to senior al Qaida leadership and for providing logistical and financial support to al Qaida." *Id.* at ¶ 57. *See also id.* at ¶¶ 58-62 (describing Rabita Trust's coordinated efforts with the MWL and IIRO to limit its exposure following the 9/11 attacks, including IIRO Secretary General Adana Basha's orders to close the Lahore office of Rabita Trust); Ex. 68, FED-PEC 215391-215394 at 215391; Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (identifying "the Bin Ladin-backed Rabita Trust for Stranded Pakistanis" as one of several NGOs that have been infiltrated by Osama bin Laden); *id.* at 544 (identifying Wa'el Jelaidan as the "secretary general of Rabita Trust," one of the "Bin Ladin-affiliated charities").

134. The MWL and its senior leadership also played key roles in facilitating the activities of another Executive Order 13224 SDGT known as the Al Haramain Al Masjed Al Aqsa Foundation, which the MWL acknowledged in its 2002 annual report was founded in 1990 and "started its activities under the banner of the Muslim World League in 1419 AH" [corresponding to 1998]. *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 64.

135. Officials of Al Haramain Al Masjed Al Aqsa Foundation simultaneously served as members of IIRO's Board of Directors. Minutes of the 8th Session of the IIRO's Board of Directors held on May 27, 2001 indicate that Al Haramain Al Masjed Al Aqsa Foundation officials

Mohammed bin Abdullah al Debyban and Mohammed bin Abdullah Taibah were IIRO board members along with IIRO Secretary General Adnan Basha. Debyban and Taibah were also serving as IIRO board members in 1999, as indicated in the Minutes of the 2nd Meeting of the IIRO Board of Directors held on May 8, 1999. *Id.* at ¶ 65. *See also* Ex. 141, MWLIIRO 16233-16237; Ex. 144, MWLIIRO 16270-16276.

136. An undated organizational chart of the MWL lists six key sub-entities within the MWL umbrella that report directly to the MWL Secretary General, including the Al Haramain Al Masjed Al Aqsa Foundation. *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 66. *See also* Ex. 139, MWL 19138.

137. In May 2004, the U.S. government designated Al Haramain Al Masjed Al Aqsa Foundation pursuant to Executive Order 13224 for "funneling dollars to Al-Qaida." According to the Treasury Department:

> The Al-Haramain & Al Masjed Al-Aqsa Charity Foundation (AHAMAA) has significant financial ties to the Bosnia-based NGO Al Furqan, and al Qaida financier Wael Hamza Julaidan… As a member of the Board of Directors for AHAMAA, Julaidan opened three bank accounts on behalf of the NGO between 1997 and 2001 and continued to have authorization to handle two of their accounts as a signatory on two the NGO's Bosnian accounts.

*See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 67. *See also* Ex. 63, May 6, 2004 E.O. 13224 Designation of Al Haramain al Masjed al Aqsa, FED-PEC 213972-213977 at 213973; Ex. 148, U.S. Diplomatic Cable, *Terrorist Finance: Bosnia's Dirty Dozen*, November 2002, PECFOIA0004499-4503 at 4500 (identifying Al Haramain al Masjed al Aqsa as one of a least a dozen Islamic charities "currently involved in providing financial support to known terrorist organizations"); Ex. 149, U.S. Diplomatic Cable, *Terrorist Finance: Dirty Dozen's Web of Deceit*, August 2003, PECFOIA049927-49932 at 49928 ("Documentation was provided to EUR/SCE demonstrating control over Al Haramayn al Masjid Al Aqsa by top Al Qa'ida financier Wa'el Julaidan (designated on E.O. 13224 in 2002).")

138. According to U.S. Department of Defense documents, the "Muslim World League is listed as a Tier 2 NGO. Tier 2 NGO is defined [by the U.S. government] as having demonstrated the intent and willingness to support terrorist organizations willing to attack US persons or interests." The Department of Defense has classified MWL as among the "Associated forces" of Al-Qaida, "with which al-Qaida, the al-Qaida network, or the Taliban had or has an established working, supportive, or beneficiary relationship for the achievement of common goals…Through associations with these groups and organizations a detainee may have provided support to al-Qaida or the Taliban, or engaged in hostilities against U.S. or Coalition forces." *See* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 28.

139. The Department of Defense has further designated the MWL, IIRO, World Assembly of Muslim Youth ("WAMY"), and Al Haramain Islamic Foundation as "terrorist and terrorist support entities." See Ex. 69, Department of Defense JTF-GTMO Matrix of Threat Indicators, FEDPEC 216815-216831 at 216829-216831.

140. MWL officials have publicly acknowledged the organization's funds were being funneled to terrorist organizations. In an interview with Dr. Abdullah bin Saleh al Obaid, Secretary General of the MWL, published in *The Muslim World* magazine on July 21-27, 1997, Obaid was asked about reports that the MWL's funds were being funneled to extremist groups. Obaid responded: "This is a closed chapter …. It has already been proven that there were people who exploited the situation and misused some funds …." *See* Ex. 214, Interview with Dr. Abdullah bin Saleh al Obaid, Excerpt from the Muslim World League magazine, July 21-27, 1997, PEC-KSA 1796-1806 at 1800.

**B. IIRO**

141. Usama bin Laden and al Qaeda used the entire IIRO network for al Qaeda's terrorist activities. *See* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA 1451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities."); Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 106 ("The International Islamic Relief Organization [IIRO], which is headquartered in Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL … the Taliban … Hamas … as well as a Qaida affiliates, inter alia, the Abu Sayyaf Group (ASG) … Jemaah Islamiyah (JI) … and Al Ittihad Al Islamiya (AIAI)…. The IIRO's parent organization is the Muslim World League [MWL], also headquartered in Saudi Arabia."). *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 71, 78-157. *See id.* ¶ 72 (indicating that U.S. Department of Defense documents has designated the IIRO has a "National Intelligence Priority Framework (NIPF) Counter-Terrorism (CT) Priority 2 Terrorist Support Entity (TSE)," which have demonstrated sustained and active financial support for terrorist organizations willing to attack U.S. persons or interests, or provide witting operational support to Priority 2 terrorist groups"); ¶ 73 (describing U.S. Department of Defense documents acknowledging that the IIRO "has been directly linked to Al-Qaida and Usama Bin Ladin," has "provided financial assistance, funds transfers and legitimate cover for moving money under the pretense of humanitarian relief to Al-Qaida;" "has connections to terrorist organizations and has channeled funds to Islamic extremists from Afghanistan;" has a network of "field offices worldwide, many of which are staffed by or support terrorists or mujahidin," and is linked to … other extremist NGOs."); ¶ 74 (U.S. State Department diplomatic cable identifying the IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime").

142. Among other support, the IIRO provided substantial funding for al Qaeda's training camps in Afghanistan, including camps from which al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training. *See, e.g.*, Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); Ex. 159, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably*

*Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 38, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo military training himself at one of the camps, where he met Usama Bin Laden."). *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 74, 81, 117; *id.* ¶ 83 ("IIRO operations in Pakistan were allegedly responsible for sponsoring [6] Al-Qaida training camps in the region. Following the 9/11 attacks, the government of Pakistan 'identified and expelled some two dozen Al-Qaida supporters who has been working for the IIRO-sponsored organizations in Pakistan.'"); Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 49-54 (discussing IIRO's funding of al Qaeda's training camps in Afghanistan "which were used to train fighters for Islamic insurgencies in a number of countries, including Algeria, Chechnya, Kashmir, Indonesia, Iraq, Palestine, the Philippines and Tajikistan, and as of early 1992, Bosnia."); Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 28.

143. In *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*, November 17, 1998, CIA_00317-338, the CIA states that "Bin Ladin and his associates make extensive use of non-governmental charitable organizations (NGOs) to transfer funds. Bin-Ladin-affiliated Islamic NGOs – such as … the International Islamic Relief Organization (IIRO); Al-Haramayn; … and others – are convenient money couriers because they maintain offices in Afghanistan, Albania, Pakistan, and other locations where Bin Ladin associates are prevalent."). *See* Ex. 14 at 325; *see id.* at 330 ("Bin Ladin and Al-Qa'ida probably receive Gulf funding diverted from offices of Islamic NGOs, particularly the MK, IIRO, Al Haramayn … and others.").

144. In *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, CIA_000807-848 at Ex. 20, the CIA assessed that al Qaeda infiltrated and used

IIRO overseas offices in Afghanistan, Pakistan, Yemen, Azerbaijan, and other countries for funding, travel documents, and other resources for years leading to the 9/11.

> [REDACTED] foreign offices of several Saudi-based NGOs have been infiltrated by al-Qa'ida operatives. [REDACTED]. As a result, funds from several Saudi NGOs continue to be diverted to al-Qa'ida and other Islamic extremists. Saudi NGOs with the strongest links to Usama include:
>
> • The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama, [REDACTED].
>
> ***
>
> [REDACTED] al-Qa'ida has infiltrated offices of several Saudi-based nongovernmental organizations – especially NGOs in Afghan and Pakistan offices. Usama's familiarity with NGOs in this region no doubt stems from his operation of the Maktab al-Khidamat in Pakistan, which probably had numerous contacts with Saudi and other Gulf charities with respect to aiding Arabs in Afghanistan.… All-source intelligence suggests that several Saudi NGOs are funding conduits for al-Qa'ida or have been penetrated by Usama's network. Those of greatest concern include the International Islamic Relief Organization (IIRO), Al-Haramayn Islamic Foundation, Lajnat Al-Birr Al-Islamiya (LBI), and the Muwafaq Foundation.
>
> ***
>
> [REDACTED] offices of Al Haramayn in Albania, Azerbaijan, Bosnia, Kenya, and Tanzania have been used by al-Qa'ida.
>
> ***
>
> International Islamic Relief Organization. Based in Jeddah, IIRO is a subsidiary of the Muslim World League (MWL) and one of the most prominent Islamic NGOs based in the Gulf…. Usama Bin Ladin apparently has extensive contact with Afghani and Pakistani offices of the IIRO.
>
> • [REDACTED] 1997, [REDACTED], Usama employed an Algerian named Abu Zayid who worked at an IIRO office, presumably in Yemen.
>
> • Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahedin to fight in Chechnya.

*Id.* at 808, 817; 818. *See also id.* at 811 (*Usama Bin Ladin: Possible Saudi Contacts and Financial Links*, identifying the IIRO as one of the Saudi-backed charities "of primary concern," along with

Al Haramain, Muslim World League, and World Assembly of Muslim Youth.); *id.* at 824 (stating that the Islamic Relief Agency (ISRA), a Khartoum-based NGO with offices in Afghanistan and Pakistan, have been infiltrated by al Qaeda and work closely with personnel from the IIRO); *id.* at 827 (stating that the IIRO and Al Haramain were channeling funds "to spread Islamic fundamentalism throughout Macedonia").

145. In a subsequent report titled, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at Ex. 13, the CIA further describes the use of purported charitable organizations, like IIRO, by al Qaeda and other terrorists for material, financial and logistical assistance in support of their extremist activities.

> Usama Bin Ladin's brother-in-law, Muhammad Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associate in 1995 as they plotted to bomb at least 12 U.S. airliners in East Asia.
>
> ***
>
> Despite Saudi efforts to curb terrorist use of the IIRO, its personnel in local branch offices continue to channel funds to terrorists and provide them with logistical support – such as cover employment, documentation, travel assistance and access to training – [REDACTED]. The director of the IIRO office in Baku, Azerbaijan diverted approximately $1.5 million to the Egyptian Islamic Jihad, acted after Riyadh had adopted control measures over the IIRO.
>
> **A Closer Look: IIRO's Ties to Terrorism** – Individuals with militant sympathies are exploiting their positions in the Saudi-based IIRO to provide financial and logistical support to terrorists and other extremists, [REDACTED]…. IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate toward more extremist activities, [REDACTED]…. Most IIRO funding is drawn from private donations, collections campaigns in mosques and schools, and small IIRO-run retail shops throughout Saudi Arabia, according to [REDACTED. Major donors include members of the Saudi royal family, [REDACTED]…. A few IIRO branches have turned to illegitimate means of financing their operations – including narcotics trafficking and counterfeiting – further increasing their independence and ability to support terrorism, [REDACTED].

*Id. at* 216, 220, 221.

146. In the CIA report, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at Ex. 17, the CIA describes the IIRO as one of the "Islamic Charities Supporting Al-Qa'ida," and further indicates that al Qaeda member and financier, Wa'el Hamza Jelaidan, used his position at the IIRO and other charities to fund al Qaeda.

*See id.* at 525, 544.

147. In a November 14, 2002 CIA report, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at Ex. 10, the CIA assessed that the IIRO-Philippines office, under the leadership of al Qaeda member Mohammed Jamal Khalifa, recruited Muslims for terrorist training in Pakistan. *See id.* at 149 (Mohammed Jamal Khalifa, Osama bin Laden's brother-in-law, and close associate of World Trade Center bomber Ramzi Yousef, served as the director of the International Islamic Relief Organization (IIRO) in the Philippines, and "was involved in recruiting Muslims for training in Pakistan as mujahidin fighters."); *id.* at 151 (describing IIRO, WAMY, and Al Haramain as having "tie[s] to terrorist and mujahidin activity").

148. In the January 17, 2003 CIA report, *Al-Qa'ida's Financial Ties to Islamic Youth Programs*, CIA_00681-701 at Ex. 18, the CIA concludes that "Gulf charities like the Saudi International Islamic Relief Organization (IIRO) and Al-Haramain … are well aware of the radical Wahhabi and Salafist doctrines being taught at institutions they fund." *Id.* at 692.

149. Finally, in the CIA report, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at Ex. 19, the CIA states that the Sudanese National Islamic Front ("NIF") works "with hardline Islamic fundamentalists employed by the Saudi International Islamic Relief Organization." *Id.* at 741.

150. Underscoring the reliability of these finished intelligence assessments, the 9/11 Commission specifically cited to the CIA reports in support of its findings concerning al Qaeda's finances and financial network, and directed readers of its Final Report to a number of them for more information on those topics. *See, e.g.*, Ex. 1, 9/11 Commission Report at 469 (citing to Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62); *id.* at 470 (citing to Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158); *id.* at 498 (citing to Ex. 11, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199); *id.* at 504 (citing to Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236); *id.* at 499 (citing to Ex. 14, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*, November 17, 1998, CIA_00317-338); *id.* at 469 (citing to Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563); *id.* at 498 (citing to Ex. 18, *Al-Qa'ida's Financial Ties to Islamic Youth Programs*, January 17, 2003, CIA_00681-701); *id.* at 504 (citing to Ex. 19, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804); *id.* at 504 (citing to Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848).

151. More generally, the 9/11 Commission cited broadly to finished CIA and U.S. government intelligence reports in support of its findings and conclusions concerning al Qaeda's financing, history, objectives, and a range of other topics. *See, e.g.*, Ex. 1, 9/11 Commission Report at 466-471, Notes to Chapter 2 (citing "Intelligence reports" at n. 18, 22, 25, 31, 33, 35-37, 42-49, 52, 54-56, 59, 62, 63, 67-69, 71-76, 79, 80, 82, 85); *id.* at 500-513, Notes to Chapter 6 ("Intelligence reports" at n. 5, 8, 41-43, 50, 122, 123, 125-127).

152. On August 3, 2006, the United States formally designated the Philippines and

Indonesia branch offices of the IIRO and a senior IIRO official from IIRO's Eastern Province Office in Saudi Arabia, Abd Al Hamid Sulaiman al Mujil, based on their roles in funding and providing support to al Qaeda. *See* Ex. 50, August 3, 2006 designation of IIRO's branches in the Philippines and Indonesia, including Abd al Hamid Sulaiman al Mujil; Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121. *See also* Ex. 36, Winer Report at 122-125 (explaining the purpose of the E.O. 13224 designation program); *id.* at 125-128 (discussing the development of evidence in support of designation sanctions packages to counter terrorist threats, including the use of finished analytical intelligence (CIA reports), U.S. diplomatic cables, information collected by U.S. law enforcement agencies (FBI), and open-source information (media reporting )); *id.* at 128-131 (implications of the U.S. government refraining from designation under E.O. 13224 and what that means); Ex. 244, Expert Opinion Report of Jimmy Gurulė (discussing the significance of economic sanctions under E.O. 13224 in combatting the threat of international terrorism).

153. In issuing the designation, the United States confirmed that "Al-Mujil has a long record of supporting Islamic militant groups, and he has maintained a cell of regular financial donors in the Middle East who support extremist causes." Further:

> Abd Al Hamid Sulaiman Al-Mujil (Al-Mujil) is the Executive Director of the IIRO Eastern Province (IIRO-EP) branch office in the Kingdom of Saudi Arabia. Al-Mujil has been called the million dollar man for supporting Islamic militant groups.
>
> Al-Mujil provided donor funds directly to al Qaida and is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI). Both ASG and JI are al Qaida-associated terrorist groups in Southeast Asia designated pursuant to the authorities of E.O. 13224. These terrorist groups are also on the United Nations 1267 Committee's consolidated list of individuals and entities associated with the Taliban, al Qaida and/or Usama Bin Ladin.
>
> In 2004, Al-Mujil invited a Philippines-based JI supporter to Saudi Arabia under the cover of traveling for the hajj (the Muslim pilgrimage), and planned to provide him with cash to carry back to the Philippines to support organizations including JI.
>
> Al-Mujil was also present in Afghanistan in the late 1990s and personally knew Usama Bin Ladin and deceased al Qaida co-founder Abdallah Azzam. Al-Mujil traveled continuously to meet with members of Bin Ladin's organization in Arab countries. In the 1990s, Al-Mujil established a relationship with senior al Qaida operational planner Khalid Shaykh Muhammad.
>
> Al-Mujil has a long history of providing support to terrorist organizations. He has contributed direct financial assistance to ASG leaders, including Abdurajak Janjalani (deceased).

> The Indonesian and Philippines branches of IIRO have received support from IIRO-EP, which in turn is controlled by Al-Mujil. Indeed, he is often responsible for authorizing payment transfers for IIRO Philippines (IIRO-PHL) and IIRO Indonesia (IIRO-IDN).

*See* Ex. 50 at 1-2.

154. The designation further describes the IIRO-Philippines office's intimate ties with al Qaeda and the Abu Sayyaf Group terrorist organization:

> The IIRO-PHL is a source of funding for the al Qaida-affiliated ASG. IIRO-PHL has served as a liaison for the ASG with other Islamic extremist groups. A former ASG member in the Philippines familiar with IIRO operations in the country reported that a limited amount of foreign IIRO funding goes to legitimate projects and the rest is directed to terrorist operations.
>
> The Philippine branches of the IIRO were founded sometime in the late 1980s or early 1990s by Muhammad Jamal Khalifah, who is Usama bin Laden's brother-in-law and has been identified as a senior al Qaida member. IIRO-PHL's director, Abd al-Hadi Daguit, is a trusted associate of Khalifah.
>
> While working as the director of IIRO-PHL, Khalifah maintained close connections with al Qaida through his relations with senior al Qaida supporters, including Specially Designated Global Terrorist (SDGT) Wa'el Hamza Julaidan. At the time Khalifah directed the IIRO-PHL, he employed an ASG intelligence officer as the provincial director of the IIRO-PHL in the Tawi-Tawi region of the Southern Philippines until that officer's death in 1994.
>
> In the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-PHL and used the organization to funnel money to terrorist groups including the ASG. Afif was implicated in the assassination of Father Salvatore Carzeda in San Jose Gusu, Zamboanga City, Philippines on June 20, 1992.

*See* Ex. 50 at 2.

155. The IIRO-Indonesia office was also closely linked to al Qaeda and the Jemaah Islamiyah terrorist group.

> The IIRO Indonesia director has channeled money to two Indonesia-based, JI affiliated foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment,

> transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed the establishment of training facilities for use by al Qaida associates.

*See* Ex. 50 at 3.

156. Declassified documents originating from the U.S. Department of the Treasury and the Office of Foreign Assets Control ("OFAC"), released pursuant to Executive Order 14040, detail previously classified evidence relied upon by the U.S. government in support of its determination to designate the IIRO's branch offices in the Philippines and Indonesia, and the IIRO Executive Director of the IIRO's Eastern Province branch, Abd al Hamid Sulaiman al Mujil, as Specially Designated Global Terrorists ("SDGTs") pursuant to Executive Order 13224. This new evidence not only describes IIRO's provision of material, financial, logistical, and ideological support directly to al Qaeda, associated terrorist organizations, and Islamic extremists across the globe, but makes clear that IIRO's support was essential to al Qaeda's development and transformation into a sophisticated global terrorist organization and its ability to carry out global attacks.

157. In a Treasury Department memorandum concerning *the Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches, see* TREASURY00102-121 at Ex. 182, the U.S. government explains the bases for the designations of Mujil and the branch offices as SDGTs pursuant to Executive Order 13224.

> Bases for Designation of Individual and Two Entities – Background Information – The International Islamic Relief Organization [IIRO], which is headquartered in Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL, the Taliban, and Hamas, as well as al Qaida affiliates, *inter alia,* the Abu Sayyaf Group (ASG), Jemaah Islamiyah (JI), and Al Ittihad Al Islamiya (AIAI). The IIRO's parent organization is the Muslim World League [MWL], also headquartered in Saudi Arabia.
>
> ***
>
> [REDACTED] with its official activities to support Muslims in need, the IIRO provides assistance to radical Islamic movements. Indeed, IIRO's support for terrorist organizations began in the early 1990s and continues through to at least the first half of 2006, as discussed below.
>
> ***

> Bases for Designation of Dr. Abd Al-Hamid Al-Mujil – Dr. Abd Al-Hamid Al-Mujil [Al-Mujil] has served as director of the IIRO Eastern Province branch [IIRO-EP] since at least April 2004.
>
> ***
>
> **Al-Mujil Provides Financial Support to Al Qaida, JI, and the ASG** – [REDACTED] Al-Mujil has a long history of providing support to terrorist groups. Al-Mujil provided donor finds directly to al Qaida, particularly for Islamic fighters, according to a report [REDACTED].
>
> In the late 1990s, Al-Mujil provided direct financial assistance to ASG leaders Abdurajak Janjalani and Ustadz Ibrahim Ali [Ali] via ASG supporter Mahmoud Abd Al-Jalil Afif.

*See* TREASURY00106-108.

158. The memorandum further describes Mujil's control over the Philippines and Indonesia branch offices and their support for terrorist organizations Abu Sayyaf Group and Jemaah Islamiyah.

> **Al-Mujil Asserts Control Over IIRO Southeast Asia Branches** – [REDACTED] IIRO-EP's Al-Mujil reportedly has exercised decision-making authority over a number of IIRO offices, including IIRO-PHL, IIRO-IND, proposed for designation herein, and IIRO's Thailand branch [IIRO-THA]. These offices supported by Al-Mujil are implicated in supporting the ASG and/or JI. In line with Al-Mujil's decision-making responsibilities, in Feb 2006 IIRO-EP's Al-Mujil planned to visit Thailand in order to inspect IIRO-THA, [REDACTED]. In addition, Al-Mujil often "adjudicated" (possibly meaning authorize payment transfers, mosque and well construction, school curricula and orphan care programs for these branches, [REDACTED] in January 2006.

*See* TREASURY00109.

159. According to the U.S. government, IIRO's branch in the Philippines was (1) headed by Osama bin Laden's brother-in-law and al Qaeda official, Mohammed Jamal Khalifa, who maintained closed relationships with other senior al Qaeda members and financiers; (2) provided Abu Sayyaf Group members with transit assistance to Afghanistan for military training; and (3) additionally provided support for terrorist attacks conducted by Abu Sayyaf Group.

> **Bases for Designation of the IIRO Philippines Branch [IIRO-PHL] – Background on Al Qaida Control of IIRO-PHL** – [REDACTED] The Philippine branch of the IIRO [IIRO-PHL] was founded some time in the [blank]ly 1990s by UBL's brother-in-law and senior al Qaida member Muhammad Jamal Khalifah [Khalifah].

> While working as the director of IIRO-PHL, Khalifah maintained close relations with UBL and al Qaida and has maintained close ties to senior al Qaida figures Abdullah Azzam and Abdulhassan al-Midani a.k.a. Wa'el Hamza Julaidan, a long-time senior official of the IIRO (and the Muslim World League). [REDACTED] Khalifah came to the Philippines from Afghanistan to establish the IIRO office there at the suggestion and facilitation of Julaidan.
>
> [REDACTED] Khalifah also maintained ties to ASG officials while in the Philippines [REDACTED].
>
> ***
>
> [REDACTED] as of 2005, the IIRO-PHL, maintained offices in Manila and in various cities in the Mindanao region of the Philippines.
>
> [REDACTED] **IIRO-PHL Senior Official Provided Support for Recent ASG Terrorist Attack** – [REDACTED]. This bombing killed three people and wounded 41.
>
> [REDACTED] **IIRO-PHL Provides Financial and Material Support to ASG** – [REDACTED] According to July 2004 Department of Defense reporting, IIRO was believed to have [illegible] [REDACTED] in the Southern Philippines for extremists transiting to and from Indonesia. The IIRO also provided documentation and other aid to assist these extremists.
>
> ***
>
> According to the Umog interrogation report, IIRO-PHL, under the direction of Khalifah, also sent ASG and MILF members to Afghanistan to train with the "mujahidin." Khalifah stated that he wanted the ASG and the MILF to train together to establish alliances among the groups.

*See* TREASURY00110-113.

160. According to Department of Defense documents, "the IIRO has been linked with providing financial assistance, funds transfers, and legitimate cover for moving money in support of Al-Qaida and Usama Bin Ladin (UBL), under the cover of humanitarian relief." *See* Ex. 171, U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Abdallah Ibrahim al Rushaydan (September 10, 2004), PEC-KSA002477-2488 at 2486. *See id.* at 2488 ("The IIRO is a Tier 1 NGO that has been directly linked to Al-Qaida and Usama Bin Ladin. The IIRO has provided financial assistance, funds transfers and legitimate cover for moving money under the pretense of humanitarian relief to Al-Qaida."). *See also* Ex. 69, Department of Defense JTF-GTMO Matrix of Threat Indicators, FEDPEC0216815-216831 at 216831(identifying the IIRO as a terrorist and terrorist support entity, along with al Qaeda).

161. Department of Defense records further indicate that Guantanamo Bay detainee Samir N. Al Hasan traveled to Afghanistan from Yemen in the 1999-2000 timeframe, attended the al Farouq training camp, and became a bodyguard in August 2001. Hasan told U.S. authorities that he was an IIRO relief worker in Afghanistan, and that he obtained the position from the head of the IIRO. *See* Ex. 170, U.S. Department of Defense Unclassified Summaries of Evidence for Detainee Samir N. al Hasan (ISN No. 043), October 13, 2006, March 4, 2008, PEC-KSA 2437-2450 at 2437 ("The detainee stated he was in Afghanistan as a relief worker for the Islamic Relief Organization and that he received the position from the head of the Islamic Relief Organization.").

162. The United States gained considerable insights into al Qaeda's financial infrastructure and the involvement of the Saudi charities from Jamal Ahmed al Fadl, an al Qaeda financial manager who joined al Qaeda in 1988 and dealt directly with bin Laden and the al Qaeda leadership, until he defected and became a cooperating witness for the United States in 1996. *See* Ex. 1, 9/11 Commission Final Report at 62 (explaining that al Fadl, who had taken the oath of fealty to bin Laden and served as one of his business agents, "defected and became a star informant for the United States"); *id.* at 109 (stating that al Fadl "provided a major breakthrough of intelligence on the creation, character, direction, and intentions of al Qaeda"); *id.* at 185 ("[The CIA] knew relativity early, for example, about the loose affiliation of financial institutions, businesses, and wealthy individuals who supported extremist Islamic activities. Much of the earlier reporting on al Qaeda's financial situation and its structure came from Jamal Ahmed al Fadl."). *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at 8, 9, 8, 9, 25, 26, 42, 46; Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 43, 44, 47, 104, 116, 117;

163. Fadl joined al Qaeda in 1988, trained at al Qaeda training camps in Afghanistan, fought on the front lines in Afghanistan and Pakistan, was tasked by al Qaeda leadership with distributing money to families of martyrs and families of individuals in jail for terrorist activities, and was trusted with large amounts of money to purchase and/or rent al Qaeda guesthouses, farms, and offices in Sudan. Fadl also worked closely with, and dealt directly with, Osama bin Laden and senior al Qaeda leadership, including but not limited to Muhammad Loay Bayazid (a/k/a Abu Rida al Suri) (a member of al Qaeda's Shura Council who was responsible for purchasing weapons and explosives for al Qaeda, helped set up training camps, helped establish and run al Qaeda companies in Sudan, and traveled to Iran for training); Abu Ubaidah al Banshiri (a member of al Qaeda's Shura Council and the head of al Qaeda's military committee); Saidi Madani al Tayyib (a member of al Qaeda's Shura Council who served as the overall supervisor of al Qaeda's Financial and Administrative Committee, held numerous accounts at banks around the world on behalf of Osama bin Laden and al Qaeda, and was reportedly bin Laden's brother-in-law); and Abu Hammam al Saudi (a member of al Qaeda and very close associate to bin Laden, served as al Qaeda's "Emir of finance," was in charge of military affairs for al Qaeda, and further served as the head of the IIRO's office in Peshawar, Pakistan). *See, e.g.*, Ex. 153, Testimony of Jamal al Fadl, August 29, 2002, PEC-KSA 329-352; Ex. 160, FBI 302 Cooperating Witness Statement of Jamal al Fadl, November 1996, PEC-KSA 2115-2132; Ex. 161, FBI 302 Cooperating Witness Statement of Jamal al Fadl, June 2, 2004, PEC-KSA 2133-2134; Ex. 163, FBI 302 Cooperating Witness Statement of Jamal al Fadl, January-February 1998, PEC-KSA 2144-2157; Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143.

164. Fadl provided extensive information concerning the IIRO's close relationship with al Qaeda to U.S. investigators. *See, e.g.*, Ex. 153, Testimony of Jamal al Fadl, August 29, 2002, PEC-KSA 329-352 at 335 ("Abu Al Hassan listed under the title 'Jihad support' … referred to him as Abu Al Hassan Al Madani … Abu Al Hassan's true name was Wael Julaidan…. Source explained that Abu Al Hassan Al Madani ran the Pakistan office of the International Islamic Relief Organization which Source also referred to as IGASA. Source explained that the International Islamic Relief Organization fell under the Rabita Al Islami organization which Source also knew to use the name MWLKA."); Ex. 160, FBI 302 Cooperating Witness Statement of Jamal al Fadl, November 1996, PEC-KSA 2115-2132 at 2120-2121 (Jamal al Fadl stated that al Qaeda member Abu Hammam was the manager of the IIRO office in Peshawar, Pakistan, and "would provide false IIRO identification for people to travel"); *id.* at 2121 (Fadl stated that Abu Hammam, the head of the IIRO in Peshawar, was "close" with Osama bin Laden and "would contribute funds or contacts to an [al Qaeda] operation."); Ex. 161, FBI 302 Cooperating Witness Statement of Jamal al Fadl, June 2, 2004, PEC-KSA 2133-2134 at 2133 ("The source advised that [Yassin] Al-Kadi was friends with two Al-Qaida members who were involved in the financial aspects of the group. These two individuals were Abu Unaith Al-Saudi (of Moroccan roots) and Abu Hammam Al-Saudi. The source advised that both these individuals purchased weapons for Al-Qaida during the war in Afghanistan and maintained an office in Peshawar, Pakistan circa 1989. According to the source, this office was located in the offices of the Islamic Relief Organization (IRO). The source further advised that the manager and person who ran the IRO at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani. According to the source, Julidan was one of Bin Laden's closest friends at the time."); Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143. *See* PEC-KSA 2137 (Fadl testified that Wa'el Jelaidan ran the Peshawar branch of the IIRO, which made ID cards for "the Al-Qaeda people" so "you can enter the border between Pakistan, Afghanistan easily with – with no problem."); *id.* at 2138 (Fadl testified that the IIRO would also provide letters to al Qaeda members so that they could get visas from Pakistan immigration and stay in Pakistan); *id.* at 2141-2143 (Fadl further testified that the IIRO falls under the Saudi Rabita al Alam al Islamiya (a/k/a the Muslim World League), which is the "mother of all NGOs."); Ex. 163, FBI 302 Cooperating Witness Statement of Jamal al Fadl, January-February 1998, PEC-KSA 2144-2157 at 2145-2146 (stating that Abu Hammam al Saudi, "the individual who ran the Islamic International Islamic Relief Organization in Peshawar, Pakistan," was the "Emir of finance," and would give money to al Qaeda members who "were in charge of salary, travel, and health benefits for Al-Qaida"); *id.* at 2146 (discussing an "Islamic Relief" guesthouse in Peshawar used by al Qaeda members).

165. The 9/11 Commission Final Report cites extensively to FBI interviews of Fadl, and Fadl's trial testimony in *United States v. Usama bin Laden*, No. S(7), 98 Cr. 1023 (S.D.N.Y.), in support of its findings. *See* Ex. 1, 9/11 Commission Final Report at 467-471, 479. *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 77-80 (detailing Jamal al Fadl's testimony concerning (1) IIRO's al Qaeda guesthouse in Peshawar, Pakistan; (2) al Qaeda members Abu Unaith al Saudi and Abu Hammam al Saudi working in the IIRO offices in Peshawar to purchase weapons; (3) Wa'el Jelaidan ("Abu Hassan al Madani") headed the IIRO-Pakistan office; (4) al Qaeda member Abu Hammam al Saudi's tenure as the head of the IIRO-Pakistan office and using the office's resources to provide false IIRO identification cards to Islamic fighters for travel; and (5) al Qaeda's financial chief, Saidi Madani al Tayyib, working under the direction

of Abu Hammam, and later ascending to al Qaeda's emir of finance); Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 34 (discussing Jamal al Fadl's testimony concerning the IIRO's ties to al Qaeda, including al Qaeda member Abu Hammam's tenure as head of IIRO-Pakistan, Hammam's role in collecting donations from a very rich Saudi, and Hamam's role in helping Osama bin Laden establish businesses in Sudan).

166. Other IIRO offices were also providing financial support to al Qaeda in support of its global terrorist ambitions in the years leading to the 9/11 attacks. For instance, the IIRO-Skopje branch office was closed and its members expelled by the Macedonian government in March 1995 amid concerns of terrorism financing. *See* Ex. 74, U.S. Diplomatic cable, *Macedonia: A/S O'Brien Visit Highlights Terrorism and Financing Issues*, August 22, 2007, FED-PEC 220506-220510 at 220509.

167. The IIRO-Kenya branch office was implicated in the funding of the 1998 U.S. Embassy bombings in Africa. *See* Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940.

168. The IIRO provided funding to the Fatima al Zahraa Hospital operating in Jalalabad, Afghanistan, an asset of the IIRO/MWL, through the IIRO-Pakistan branch office. *See* Ex. 128, IIRO 109118-109119; Ex. 129, IIRO 215526-215529, IIRO 126173-126176, IIRO 112761-112762, IIRO 112745-112748, IIRO 59410-59411, IIRO 108937, IIRO 105986. *See also* Ex. 82, IIRO Annual Report 1999/2000, IIRO 212-330 at 278 (indicating IIRO medical projects around the world, including Fatima al Zahra Hospital in Jalalabad, Afghanistan (expenditures of 181,186 riyals)). Confirming this close connection between the IIRO and al Qaeda, senior al Qaeda leader Ayman al Zawahiri conducted eye surgeries at Fatima al Zahraa Hospital, which was located in close proximity to an al Qaeda funded jihad camp, at some point after 1996. *See* Ex. 28, Transcript, February 8, 2024 Deposition of Aimen Dean at 308-309.

169. In 2002, the U.S. government identified IIRO and other purported charitable organizations operating in Bosnia-Herzegovina as "currently involved in providing financial support to known terrorist organizations." *See* Ex. 148, U.S. Diplomatic Cable, *Terrorist Finance: Bosnia's Dirty Dozen*, November 2002, PECFOIA 4499-4503 at 4500. *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 100.

170. In July 2003, nine Bosnian Serbs were arrested for smuggling weapons to the IIRO in Bosnia-Herzegovina. *See* Ex. 149, U.S. Diplomatic Cable, *Terrorist Finance: Dirty Dozen's Web of Deceit*, August 2003, PECFOIA 49927-49932. *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 101.

171. In 2006, the IIRO continued to fund and welcome radical Islamic clerics to IIRO summer camps to spread their extremist ideology to the participating children. *See* Ex. 77, U.S. Diplomatic cable, *IIRO Secretary General Talks of Saudi Programs and Expansions*, October 9, 2006, FED-PEC 220554-220557 at 220555-220556 (IIRO Secretary Adnan Basha admitting that no one can "guarantee 100 percent of the time" that no extremists will enter the camps and attempt to pass their ideologies on to the youth, and adding that while the Ministry of Islamic Affairs vets

both the programs and the lecturers for all of IIRO's summer camps inside Saudi Arabia, no such vetting process occurs in summer camps outside Saudi Arabia.). *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 157.

172. Sheikh Saleh al Buraik, who has issued anti-American lectures and advocated for violent jihad, has stated that the IIRO is involved in all areas of jihad which can be trusted with money "to buy a thousand missiles."

> May the peace and blessings of Allah be upon him. I hope that you will reach an understanding with the company's management in order to state the good, beneficial Islamic point of view. Praise be to Allah, we know that the Islamic Relief Organization is an official agency under the command, care, and sponsorship of the country. It has big, clear, and strong projects in all areas of Jihad, in addition to the relief projects and orphan sponsorship projects. This also applies to the trusted people whom we know. This means that if someone comes to you and gives you money saying, 'Oh, brother, take this. You are going to Afghanistan,' just take it and hand it over to Sayyaf, or hand it over to Hekmatyar. Or, use it to buy a thousand missiles and take them there. If you can hold the trust, we say, 'May Allah reward you with goodness'. And if you come and hand it over to the Islamic Relief Organization, it is a reliable and well-known agency and we do not doubt about it.

*See* Ex. 245, The Islamic Library, Lessons of Sheikh Saad Buraik, *Explaining the Meaning of Jihad for Support,* at 3095.

173. In 2009, the U.S government concluded that the IIRO and MWL were continuing to fund Islamic extremism. *See* Ex. 56, U.S. Diplomatic Cable, *Terrorist Finance: Action Request for Senior Level Engagement on Terrorism Finance*, December 30, 2009, FED-PEC 210113-210118 at 4500 (stating that "the International Islamic Relief Organization (IIRO), Muslim World League (MWL) and the World Assembly of Muslim Youth (WAMY) … continue to send money overseas and, at times, fund extremism overseas").

174. During Adnan Basha's leadership of the IIRO as Secretary General from 1997 through 2013, (1) Basha collaborated and worked closely with MWL, IIRO, Rabita Trust, and Al Haramain al Masjed al Aqsa ("AHAMAA") officials who directed substantial financial, material, logistical, and ideological support to al Qaeda (e.g., Omar Abdullah Naseef, Wa'el Hamza Jelaidan, Abd al Hamid Sulaiman al Mujil, Prince Turki bin Fahad bin Jalawi al Saud, Mohammad bin Abdullah al Taibah (Chairman/President of AHAMAA), Mohammad bin Abdullah al Dubayban (Board Member of AHAMAA), and others); (2) the IIRO's Philippines and Indonesian branch offices, and IIRO official Abd al Hamid Sulaiman al Mujil, were designated by the U.S. government as Specially Designated Global Terrorists ("SDGT") for providing extensive support to al Qaeda and associated terror groups; (3) an audit of the IIRO-Pakistan's branch office, dated just a few months before the 9/11 attacks, uncovered the apparent diversion of millions of dollars of funds by that branch, and the wholesale fabrication of invoices, receipts and entire projects to conceal that activity (the same branch office that was used by the IIRO to fund six al Qaeda training

camps, according to the 1996 CIA Report); (4) the IIRO's branch office Bosnia-Herzegovina was investigated for "providing financial support to known terrorist organizations;" and (5) the IIRO's branch office in Nairobi, Kenya, was implicated in the 1998 U.S. Embassy bombings in Africa and the IIRO office was deregistered.

175. Moreover, there were multiple raids of IIRO branch offices, arrests of IIRO employees, and seizures of IIRO bank accounts during Basha's tenure as IIRO Secretary General. *See, e.g.*, Ex. 111, IIRO 122003 (October 7, 2003 raid of IIRO branch office in Tirana, Albania); Ex. 100, IIRO 42373 (October 4, 2001 raid of IIRO branch office in Albania); Ex. 99, IIRO 42360 (reporting that the Saudi Embassy intervened to retrieve IIRO documents seized during raid); Ex. 72, U.S. Diplomatic Cable, *Treasury Undersecretary Stuart Levey Visits Bahrain to Discuss AML/CFT Efforts*, February 20, 2006, FED-PEC 220490-220491 (stating that authorities in Bahrain closed an IIRO bank account "which is not registered as a charity in Bahrain but had opened an account illegally and was using the account to circumvent Saudi restrictions on sending money abroad"); Ex. 57, FED-PEC 210514-210517 (reporting that authorities in Bahrain closed IIRO accounts as a result of irregular transactions which circumvented Bahraini regulations on charities and their financial transactions and stating: "[D]uring the first half of 2005, IIRO headquarters provided over $7 million from an account in Shamil Bank of Bahrain in Manama to 18 different IIRO satellite offices. Among these transactions, IIRO provided funds from the Bahrain account to three Saudi Embassies. Director Werner noted that the second largest single recipient of these funds was IIRO's Djibouti office."); Ex. 75, U.S. Diplomatic cable, *International Islamic Relief Organization (IIRO) Seeks to Access Funds Frozen by Islami Bank Bangladesh*, November 3, 2008, FED-PEC 220511-220513 (Islami Bank of Bangladesh froze the IIRO's accounts in 2006); Ex. 154, PEC-KSA 965-978 at 972 ("The regional financial accountant for the IIRO, an Egyptian named Hossam Meawad Mohammad Ali, was detained by Croatian authorities in a raid in Zagreb in April 1995 and has relocated to Ljubljana."); Ex. 55, FED-PEC 203706-203709 (reporting on the arrest of IIRO employee, Syed Abu Nasir, for his involvement in an attempted terrorist operation to bomb the U.S. Consulates in Chennai and Calcutta); Ex. 43, FED-PEC0097363-97365 (reporting on the K-FOR military police raid on the joint IIRO-Saudi Joint Relief Committee office in Kosovo in 2000 because Osama bin Laden associates Wa'el Hamza Jelaidan and Adel Muhammad Sadiq Bin Kazem were using the office to help bin Laden "move money and men to and from the Balkans;"); Ex. 112, IIRO 122181-122182 (2003 letter from IIRO Secretary General Basha informing that K-FOR military police continue to surveil the IIRO in Kosovo.); Ex. 74, U.S. Diplomatic cable, *Macedonia: A/S O'Brien Visit Highlights Terrorism and Financing Issues*, August 22, 2007, FED-PEC 220506-220510 (reporting that the IIRO branch office in Macedonia was closed and its members were expelled from the country in March 1995); Ex. 154, PEC-KSA 965-978 at 972 ("The Macedonian government closed the IIRO office in Skopje in March 1995 for aiding Albanian ethnic political parties and the Albanian Islamic Youth Organization."); Ex. 121, IIRO 284675 (discussing the 1999 closure of the IIRO's branch office in Makhachkala, Russa, and the confiscation of the IIRO's assets); Ex. 46, FED-PEC 144926-145008 (U.N. indicating that following the 9/11 attacks, the government of Pakistan identified and expelled some two dozen al Qaeda supporters who had been working for IIRO-sponsored organizations in Pakistan); Ex. 138, MWL 15876-25877 (August 6, 1993 letters from Roberto R. Romulo, the Philippine Secretary of Foreign Affairs, addressing a July 22, 1993 raid of the MWL branch office in Makati by agents of the Bureau of Immigration and Deportation with arrest warrants for the MWL staff for operating without a license.); Ex. 123, IIRO 285529-285530 (October 16, 2002 letter from Sulaiman al Ali, former IIRO office manager in the United States,

to IIRO Secretary General Adnan Basha, concerning the FBI's raid of the IIRO office in 1997.)

176. In addition to their direct witting involvement in providing substantial financial assistance and other resources to bin Laden and al Qaeda, as documented herein, MWL and IIRO leadership were also expressly aware (prior to the 9/11 attacks) of the organizations' ongoing support for international terrorism and Osama bin Laden, and the involvement of its branch offices and officials in terrorist activities, by virtue of extensive international media reporting. *See, e.g.*, Exs. 5, 41-44, 48, 49, 54, 55: (1) Daily News, *It's More than Just Who Plants the Explosives*, July 31, 1996 (reporting that the IIRO is a major conduit of financial support to the Hamas terrorist group); (2) The Age, *Filipino Muslims Linked to Holy Warrior's Global Terror*, May 20, 1995 (reporting on the discovery of al Qaeda's terrorist plot in the Philippines ("Bojinka") and explaining that Mohammed Jamal Khalifa of the IIRO, a "key figure in the network of Islamic extremists," was funding Islamic militants in the Philippines); (3) Frontline, *A Terrorist Plot Unearthed*, March 12, 1999 (discussing the IIRO's connections to an terrorist operation to bomb U.S. Consulates in India, and describing the IIRO as being "closely associated with the billionaire terrorist Osama bin Laden"); (4) University of Pennsylvania-African Studies Center, *Horn of Africa: The Monthly Review, 19-10/98* (reporting that the IIRO was one of five relief organizations banned by the Kenyan government following the August 1998 U.S. Embassy bombings); (5) IPS-Inter Press Service, *Kenya: Gov't Shuts down Five Islamic Relief Agencies*, September 10, 1998 (reporting that the Kenyan government banned the IIRO for supporting terrorism following the August 1998 U.S. Embassy bombings); (6) ITAR-TASS, *Russian Troops Find Arab, Bosnian Passports in Chechnya*, February 21, 2000 (reporting that that IIRO, with its main office in Saudi Arabia, arranged for the transportation of Islamic fighters to participate in the conflict in Chechnya); (7) Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report*, February 13, 1999 (reporting that the IIRO's Mohammed Jamal Khalifa "is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group," and further stating that the "IIRO is suspected by Western intelligence agencies to be bin Laden's conduit to various terrorist organizations in Islamic countries"); (8) Philippine Daily Inquirer, *Front Page: Bin Laden Funds Abu Sayyaf Through Muslim Relief Group*, August 9, 2000 (indicating that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League) is a conduit of funds for the Abu Sayyaf Group, a terrorist organization in the Philippines); (9) Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000 (reporting that the IIRO is a front to finance the operations of the Abu Sayyaf Group and Moro Islamic Liberation Front terrorist organizations); (10) The U.N. Refugee Agency, *Human Rights Watch World Report 1999 – Kenya*, January 1, 1999 (stating that the Kenyan government cancelled the registration of the IIRO and other Islamic relief agencies for supporting terrorism); (11) New York Times, *Some Charities Suspected of Terrorist Role*, February 19, 2000 (reporting on the 1998 U.S. Embassy attacks and that the Kenyan government said the charities "'posed a serious threat' to Kenya's security"); (12) The Times, *Terror by Degree*, October 18, 1997 (reporting on the "Bojinka" terrorist plot and stating that Mohammed Jamal Khalifa was funding the Abu Sayyaf Group); (13) The Indian Ocean Newsletter, *Banned Islamic NGOs*, September 12, 1998 (reporting that Kenya banned the IIRO and other NGOs following their investigation into the August 1998 attacks on U.S. embassies in Nairobi and Dar es Salaam); (14) U.S. News & World Report, *A Helping Hand From Saudi Arabia*, July 8, 1996 (reporting that the IIRO is a major clearinghouse for funds to aid Islamic extremism and terror in Gaza and the West Bank); (15) The Straits Times, *Osama Gave Funds to Abu Sayyaf: Manila*, August 10, 2000 (reporting that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League), "in the guise of giving charity to local Muslim

communities, provided funds to Abu Sayyaf for acquiring arms"); (16) Overseas Immigration News, *Immigration Claims Teacher Linked to Terrorists Alleged Al-Jihad Member: Egyptian Denies Allegations, is Appealing Legal Proceedings*, May 21, 1999 (reporting that the IIRO "secretly funds terrorism").

177. Both the MWL and IIRO operated media departments that were responsible for collecting news reports concerning the organizations. *See* Ex. 80, IIRO 147 ("IIRO Administrative Structure" chart identifying a "Department of Media and Information."); Ex. 65, FED-PEC 214874-214875 (MWL structural chart identifying "The General Department for Media and Culture").

### C. Al Haramain Islamic Foundation

178. Al Haramain was also a Saudi Arabia–based da'wa organization, dedicated to propagating an extreme and intolerant form of Islam throughout the world. Al Haramain had a presence in at least 50 countries. *See* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 11.

179. The MWL and IIRO worked extensively with Al Haramain and its overseas offices in the years prior to the 9/11 attacks. *See, e.g.*, Ex. 173, PEC-KSA 3910-3913 (MWL, IIRO, WAMY, and Al Haramain conducted relief activities in Kosovo and Chechnya under the umbrella of the Saudi Joint Relief Committee ("SJRC") in 1999); Ex. 96, IIRO 35077-35081 (IIRO and Al Haramain worked together to distribute aid to flood victims in Indonesia); Ex. 232, MWL 62668-62669 (MWL, IIRO, WAMY, and Al Haramain worked together on a committee in Kenya). *See also* Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 827 (stating that the IIRO and Al Haramain were channeling funds "to spread Islamic fundamentalism throughout Macedonia").

180. According to the U.S. government, "[w]hen viewed as a single entity, Al-Haramain was one of the principal NGOs active throughout the world providing support for the Al-Qaida network." *See* Ex. 217, *Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters, Treasury Marks Latest Action in Joint Designation with Saudi Arabia*, June 2, 2004, FED-PEC 56730-56734 at 56732.

181. Declassified documents originating from the U.S. Department of the Treasury and the Office of Foreign Assets Control ("OFAC"), released pursuant to E.O. 14040, detail previously classified evidence relied upon by the U.S. government in support of the designations of Al Haramain's Saudi headquarters and multiple overseas branch offices as Specially Designated Global Terrorist ("SDGT") entities pursuant to E.O. 13224. The evidence describes Al Haramain's provision of material, financial, logistical, and ideological support directly to al Qaeda, associated terrorist organizations, and Islamic extremists across the globe, but also makes clear that Al Haramain's support for Osama bin Laden and al Qaeda was essential to al Qaeda's development and transformation into a sophisticated terrorist organization and its ability to carry out large-scale global attacks, including attacking the United States on September 11, 2001.

182. First, in a Treasury Department document titled, *Al-Haramayn Islamic Foundation – Bosnia-Herzegovina*, TREASURY00009-11 at Ex. 210, the U.S. government explains that both

confidential and unclassified information provided clear linkages between Al Haramain and terrorist groups and their activities in the Balkans region, thereby supporting the decision to designate Al Haramain in Bosnia-Herzegovina as an SDGT pursuant to Executive Order 13224.

> Statement of the Case: Based upon information available to the United States government, there is a reasonable basis to believe that the Al-Haramayn Islamic Foundation in Bosnia-Herzegovina (HIF) receives financial support from, and is acting for or on behalf of, is providing financial and material support for, or financial or other services to or in support of, or is otherwise associated with, terrorists and terrorist-related organizations listed in the Annex to Executive Order 13224. While much of the information concerning HIF comes from sensitive sources that cannot be disclosed, the following unclassified information clearly establishes HIF's links to terrorist activity. We believe that this information is generally reliable and, taken as a whole, supports the decisions to block the assets of the Al-Haramayn Islamic Foundation in Bosnia-Herzegovina (and its directors).

*See* TREASURY00009.

183. According to the U.S. government, Al Haramain's offices in Bosnia-Herzegovina were infiltrated by terrorist elements, which in turn provided financial and material aid to terrorist activities and terrorist organizations in the region, often with the active support of Al Haramain's leadership.

> *Al-Haramayn Islamic Foundation's Ties to Terrorists:* [REDACTED] Additionally, HIF offices in Bosnia-Herzegovina have employed personnel with affiliations to or membership in an SDGT (Gama'at Al Islamiyya), indicating that the offices of HIF are widely infiltrated by terrorist elements.
>
> Given our understanding of the relationship between the Al-Haramayn Islamic Foundation and Specially Designated Global Terrorists (SDGT) and its potential for exploitation by employees with affiliations to or membership in SDGTs, it is reasonable to believe the Al-Haramayn Islamic Foundation is acting for or on behalf of, and providing financial and material support for, or financial or other services to or in support of terrorist activities and terrorist-related organizations, and doing so with the consent if not active support, of the NGO's leadership.

*See* TREASURY00011.

184. Second, in a Treasury Department memorandum concerning the *Designation of Al-Haramain Foundation-Pakistan*, *see* TREASURY00012-16 at Ex. 233, the U.S. government describes Al Haramain's global support for Osama bin Laden, al Qaeda, and related terrorist

organizations via its branch offices and representatives in Africa, Asia, Europe, and North America.

> The Al-Haramayn Foundation (AHF) is one of the principal Islamic NGOs active throughout the world. AHF has been infiltrated by Al-Qaeda and has been used by al-Qaeda for cover and concealment of assets and material, according to military reporting. AHF "belongs to" the Usamah Bin Ladin-established "World Front of the Jihad Against Jews and Christians," which includes the Egyptian Gama Al-Islamiya, the Egyptian Islamic Jihad (EIJ), the Abu Sayyaf Group (ASG) and the Harakat Ul Ansar of Pakistan, according to military reporting. All these organizations are Specially Designated Global Terrorists pursuant to E.O. 13224.
>
> Prior to the removal of the Taliban from power in Afghanistan, AHF had links to the UBL-financed Makhtab al-Khidemat (MK). [REDACTED] MK is a Specially Designated Global Terrorist pursuant to E.O. 13224.
>
> As of January 2003, it appears that numerous AHF field offices and representatives operating throughout Africa, Asia, Europe, and North America appeared to be providing financial and logistical support to Al-Qaeda. Terrorist organizations including Al-Itihaad Al-Islamiya, Egyptian Islamic Jihad, Lashkar I-Tayyiba were receiving funding from AHF and using AHF as a front for fundraising and operational activities.
>
> In one instance later in 2003, a journalist suspected of meeting with Al-Qaeda and Taliban members in Afghanistan was also suspected of transferring funds on behalf of the Al-Qaeda-affiliated AHF, and forwarding videotapes from Al-Qaeda leaders to Al-Jazeera TV for broadcast.

*See* TREASURY00013.

185. According to the United States, Al Haramain's office in Pakistan employed individuals with ties to al Qaeda and provided financial support to E.O. 13224 SDGTs Jamiat al Dawa ("JUD") and Laskhar E-Taibah ("LET").

> At least two former AHF employees that worked in Pakistan are suspected of Al-Qaeda ties. One AHF employee in Pakistan is detained at Guantanamo Bay on "suspicion of financing Al-Qaeda operations."
>
> ***
>
> AHF in Pakistan also supports Jamiat al Dawa (JUD) and Lashkar E-Taibah (LET), both Specially Designated Global Terrorist

> organizations pursuant to the authorities of E.O. 13224. After LET was officially banned in Pakistan on January 12, 2002, LET began using the name JUD to continue operating in Pakistan, [REDACTED].
>
> A detained political official and admitted member of JUD, identifying AHF as one of three Non Governmental Organizations (NGO) financially supporting JUD, provided details about how JUD receives financial support, according to Department of Defense reporting. When JUD requires financial assistance, an estimate is sent to one of the three NGO's, among then AHF. Funds are then provided to JUD either in personal meetings, in which representatives from the NGO and JUD discuss the proposed estimate and reach an agreement, or by wire transfers, to a bank account in the name of the Sheikh in charge of JUD, according to Department of Defense reporting. During 1998-2001, the JUD detainee conducted four or five meetings with representatives from AHF.

*See* TREASURY00014-15.

186. The Treasury memorandum concludes that the designation of Al Haramain's offices in Pakistan pursuant to Executive Order 13224 is warranted based on the following:

> • Directed by an individual that is an Al-Qaeda facilitator, AHF in Pakistan is controlled by Al Qaeda.
>
> • By employing Al-Qaeda members suspected of supporting Al-Qaeda operations, AHF in Pakistan is controlled by or acting on behalf of, or is assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of Al-Qaeda.
>
> • By financially supporting LET in Pakistan, AHF is assisting, sponsoring or providing financial, material, or technological support for, or financial or other services to or in support of LET.
>
> • By maintaining bank accounts controlled by the MK Director, AHF in Pakistan is controlled by or acting on behalf of, or is assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of MK.

*See* TREASURY00015-16.

187. Third, in a Treasury Department memorandum concerning the *Designation of Al-Haramain Foundation (AHF) branches in Afghanistan, Albania, Bangladesh, Ethiopia, and The Netherlands, and the AHF's leader Al-Aqil pursuant to the authorities of E.O. 13224*, *see*

TREASURY00017-29 at Ex. 234, the United States describes the support for al Qaeda and associated terror groups provided by Al Haramain's Saudi headquarters and its branch offices.

> As of March 2004, information set forth below provides reason to believe that AHF, including its headquarters and all its branch offices, is one of the principal Islamic NGO's active throughout the world providing support for the Al Qaida network and promoting militant Islamic doctrine worldwide. AHF has been infiltrated by Al Qaida and has been used by al Qaida for cover and concealment of assets and material, according to military reporting.
>
> ***
>
> Prior to the removal of the Taliban from power in Afghanistan, AHF was linked to Makhtab al-Khidemat (MK), [REDACTED]. MK, co-founded and financed by Usama bin Ladin (UBL), is an SDGT pursuant to the authorities of E.O. 13224 and the pre-cursor organization of Al Qaida. [REDACTED].
>
> ***
>
> [REDACTED] In mid-April, AHF was "involved with" a group of sixty Afghan persons "trained to attack Westerners, [REDACTED]. Reportedly, one AHF employee believed to belong to Al Qaida is currently detained in Guantanamo, Cuba, [REDACTED].

*See* TREASURY00019-20.

188. Al Haramain also established an office in Iran to move weapons into Afghanistan in 2001.

> An AHF official that reportedly coordinated arms deals with the Al Qaida-affiliated Al-Zarqawi, was instrumental in establishing a branch of AHF in Iran [REDACTED]. The AHF branch in Iran was linked to efforts by "WAFA" to move weapons related items through Pakistan into Afghanistan during the conflict in Afghanistan in late 2001. [REDACTED] WAFA Humanitarian Organization is a Specially Designated Global Terrorist pursuant to the authorities of E.O. 13224.

*See* TREASURY00024.

189. The Treasury memorandum also reports that Al Haramain's branch office in Albania was directly linked to Osama bin Laden and Egyptian Islamic Jihad ("EIJ").

> UBL reportedly financed the establishment of AHF in Albania, which has been used as cover for terrorist activity in Albania and in Europe, [REDACTED]. In 1998, the head of Egyptian Islamic Jihad

> (EIJ) in Albania was reportedly also the "accountant" for AHF in Albania, according to a French news report. This individual, Ahmed Ibrahim al-Nagar, was reportedly extradited from Albania to Egypt in 1998. At this trial in Egypt, al-Nager reportedly voiced his support for UBL and Al Qaida's terrorist attacks against the U.S. Embassies in Tanzania and Kenya.

*See* TREASURY00025.

190. In a fourth Treasury Department document, *Al-Haramayn Islamic Foundation – Somalia*, *see* TREASURY00030-36 at Ex. 181, the U.S. government discusses Al Haramain's ties to al Qaeda and the Al Ittihad Al Islamiya ("AIAI") terrorist organization in Somalia.

> The U.S. has assembled evidence that shows a history of ties between Al-Haramain Somalia and Usama bin Laden's al-Qaida network, Al-Itihaad al-Islamiya (AIAI), and other associated entities and individuals. For example, over the past few years, Al-Haramain Somalia has provided a means of funneling money to AIAI by disguising funds as intended to be used for orphanage projects or the construction of Islamic schools and mosques. The organization has also employed and provided salaries to AIAI members. [REDACTED].
>
> The evidence indicates that even after AIAI was named in the Annex to E.O. 13224 and subsequently designated by the United Nations under UNSCR 1333, Al-Haramain Somalia has continued to provide financial support and cover for AIAI operatives, and conceal their activities.

*See* TREASURY00030.

191. In a fifth Treasury Department memorandum concerning the *Designation of Al-Haramain Foundation (AHF) locations in the United States, the Comoros Islands, and AHF official Soliman Al-Buthe pursuant to the authorities of E.O. 13224*, *see* TREASURY00037-54 at Ex. 235, the United States reveals that in 1998 it had received a list of seven suspected al Qaeda members in the Comoros, two of which were associated with Al Haramain. *See* TREASURY00043.

192. Next, a Treasury Department memorandum concerning *Additional Designations Pursuant to E.O. 13224: Al-Haramain, Indonesia*, *see* TREASURY00087-92 at Ex. 236, the U.S. government states that "Al-Haramain, Indonesia provides financial support to the Indonesian NGO KOMPAK which, as described below, has multiple links to Jemaah Islamiyah (SDGT)." "KOMPAK was founded by senior Jemaah Islamiyah (JI) leader Agus Dwikarna (SDGT)." *See* TREASURY00091.

193. Finally, a Treasury Department memorandum concerning *Additional Designations Pursuant to E.O. 13224: Al-Haramayn Kenya and Tanzania*, *see* TREASURY00094-101 at Ex. 237, states that "[t]he entire Al-Haramayn organization has long been suspected of providing

various types of support to terrorist groups including Al-Qaeda, and its offices in Bosnia and Somalia were designated on March 11, 2002, pursuant to E.O. 13224, for providing support to Al-Qaeda. Al-Haramayn's offices in Kenya and Tanzania are similarly being recommended for designation for providing financial and material support to Al-Qaeda and Al-Itihaad Al-Islamiya, both of which were designated on September 23, 2001 as part of the Annex to E.O. 13224." *See* TREASURY00095.

194. The memorandum further indicates that "AHF officials in Kenya and Tanzania have been actively involved in supporting the planning and carrying out of terrorist attacks against US and Western targets, as well as other acts of violence. AHF's role appears to be to provide financial and logistical assistance to those who intend to conduct the attacks." *See* TREASURY00097.

195. According to the U.S. government, Al Haramain employees affiliated with the branch office in Kenya, were arrested in November 1997 for plotting an attack on the U.S. Embassy in Nairobi (prior to the 1998 U.S. Embassy bombings).

> In late November 1997, based on information that Islamic activists associated with AHF were planning to an attack on the U.S. Embassy in Nairobi, Kenyan authorities arrested ten AHF staff members and deported them. The ten, including Abu Abdul Malik, an Algerian serving as an AHF project manager, were reportedly suspected of aiding the Al Itihaad Al Islamiya (AIAI), an organization designated as a Specially Designated Global Terrorist pursuant to E.O. 13224. According to Embassy contacts, AHF's numerous charitable activities in northeast Kenya provide a useful cover for sending funds and supplies to AIAI. These activities included the use of mosques in Garissa and Mandera where the imam or other officials allegedly have ties to AIAI. One Embassy contact was told by [REDACTED] AHF sent weapons and ammunition to AIAI during the August 1996 fighting near the town of Luuq in Somalia. AHF allegedly transported the material on board relief flights that took off from Nairobi's Wilson Airport.

*See* TREASURY00099.

196. CIA reporting released pursuant to E.O. 14040, dating to both prior to and after the 9/11 attacks, also provides new evidence demonstrating Al Haramain's global support for al Qaeda.

197. For instance, in *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, CIA_000807-848, at Ex. 20, the CIA assessed that al Qaeda infiltrated and used Al Haramain's overseas offices for funding and other resources for years prior to the 9/11 attacks.

> [REDACTED] al-Qa'ida has infiltrated offices of several Saudi-based nongovernmental organizations – especially NGOs in Afghan

> and Pakistan offices. Usama's familiarity with NGOs in this region no doubt stems from his operation of the Maktab al-Khidamat in Pakistan, which probably had numerous contacts with Saudi and other Gulf charities with respect to aiding Arabs in Afghanistan.… All-source intelligence suggests that several Saudi NGOs are funding conduits for al-Qa'ida or have been penetrated by Usama's network. Those of greatest concern include … Al-Haramayn Islamic Foundation.
>
> ***
>
> [REDACTED] offices of Al Haramayn in Albania, Azerbaijan, Bosnia, Kenya, and Tanzania have been used by al-Qa'ida.

*See* CIA_000808, 817.

198. The CIA report further details Al Haramain's support for Osama bin Laden, certain terror groups, and the mujahideen in the Balkans.

> Employees at Al Haramayn offices in Albania, Azerbaijan, Kenya, and possibly Tanzania, have been funded by or have acted on behalf of Usama Bin Ladin: [REDACTED].
>
> ***
>
> [REDACTED] the Al-Haramayn office in Nairobi was a front for the Al-Ittihad Al-Islami, an Usama Bin Ladin-backed Islamic insurgent group engaged in politically motivated violence in Somalia and Ethiopia.
>
> ***
>
> Al Haramayn offices have supported other terrorist groups. [REDACTED] for example, it has been particularly involved in providing financial and logistical support to the Bosnian mujahedin. [REDACTED] the NGO also has associated with Egyptian terrorists. Ayman Al-Zawahiri – the [blank] was a onetime Al Haramayn leader.

*See* CIA_000819-820.

199. In a report titled, *How Bin Ladin Commands a Global Terrorist Network [REDACTED]*, January 27, 1999, CIA_00002-16, at Ex. 7, the CIA describes how Osama bin Laden and al Qaeda used Al Haramain and other purported charities for funding, travel assistance, covert employment, and weapons smuggling.

> In addition to support from other groups, Bin Ladin taps into the resources of some international Islamic nongovernmental

> organizations (NGOs) for financial and logistical support. Employees—ranging from accountants to directors—of a few NGO branch offices have diverted resources to benefit Bin Ladin and his associates, although we are unable to determine if the organizations' home offices are witting. Bin Ladin exploits these NGO ties to channel funds and obtain cover employment and travel assistance for his associates. He also uses the NGOs' distribution network to move weapons and supplies.
>
> • Employees of the Azerbaijan-based al-Haramayn office, for example, have regularly diverted resources to Bin Ladin and his associates since 1995, [REDACTED]. The former head of the Baku office and its logistical chief, both associated with Bin Ladin, directed much of this activity, including channeling funds and weapons.

*See* CIA_000007.

200. In a subsequent report, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236, at Ex. 13, the CIA further describes the use of purported charitable organizations, like Al Haramain, by Osama bin Laden for critical resources in support of terrorist activities.

> The logistical support NGOs offer includes cover employment, false documentation, travel facilitation, training, and in some cases, weapons. Most Islamic terrorist groups maintain relationships with several NGOs, which protects them from the closure of any one organization. Terrorists typically penetrate NGOS by finding individual sympathizers who divert resources in support of the group, but in a few instances, entire NGO offices, including senior management positions, are staffed by extremists.
>
> ***
>
> Usama Bin Ladin has established close relationships with employees in several al-Haramayn offices, [REDACTED] and has used these ties to divert resources to support his terrorist agenda, [REDACTED]. Some of these employees probably [blank] either planted or coopted by Bin Ladin after they began working for the NGO.

*See* CIA_000210-211, 217.

201. In *Al Haramain in Africa: Supporting Al-Ittihad Al-Islami and Other Terrorists*, March 22, 2002, CIA_000675-679, at Ex, 238, the CIA details Al Haramain's extensive support for terror groups in Africa.

> In Africa, HIF maintains a presence in about a dozen countries and

> supports several extremist groups, particularly Somalia's al-Ittihad al-Islami (AIAI), [REDACTED]. Al-Haramain employees also provide cover and logistic support for al-Qa'ida cells, including those involved in the 1998 U.S. Embassy bombings in Kenya and Tanzania. Most of Al-Haramain's field office directors in East Africa are aware of and support the organization's aid to militant extremists, and at least some top-level officials from HIF's headquarters condone the funding of extremist groups.
>
> ***
>
> **Backing Somalia-Based AIAI** – Al-Haramain's top priority in Africa is supporting the Somali AIAI faction, [REDACTED]. AIAI—designated by the U.S. Government as a foreign terrorist group—seeks to establish an Islamic state in "Greater Somalia" including parts of Ethiopia, Djibouti, and Kenya. HIF offices worldwide collect funds to provide AIAI with financial support to establish Islamic schools, courts, and other institutions in AIAI-influenced territory. HIF has also helped the faction develop its insurgent and terrorist capabilities.
>
> • In 2002, HIF arranged travel for AIAI members to Saudi Arabia, probably to help them avoid anticipated U.S. military action in Somalia.
>
> • In 2001, HIF provided humanitarian cover for unidentified Arabs traveling to Somalia to train AIAI military recruits, [REDACTED].
>
> • In 1999, HIF maintained villas in Somalia used to store explosives and train AIAI members for jihad operations, [REDACTED].
>
> Al-Haramain also supports AIAI from its offices and refugees camps in Kenya.

*See* CIA_000675-676.

202. The CIA report further explains Al Haramain's role in the 1998 U.S. Embassy bombings and the aid it provided to al Qaeda fighters.

> **Providing Cover for al-Qaida** – In addition to its support of African Islamic terrorist groups, Al-Haramain's field offices in Tanzania and Kenya have aided al-Qa'ida cells, including those responsible for the 1998 U.S. Embassy bombings.
>
> • In 2002, Al-Haramain's office in Tanzania hid 14 extremists—at least some of whom were probably al-Qa'ida fighters fleeing Afghanistan—in the Kiwalani mosque in Dar es Salaam, [REDACTED]. While staying at the mosque, the fighters provided

> training to local extremists.
>
> • In 1998, the Kenyan Government deregistered HIF for providing support to the terrorist cells that planned and carried out the bombing of the US Embassy in Nairobi, [REDACTED]. HIF and other NGOs diverted funds and helped import materials needed to build the bombs.

*See* CIA_000676.

203. The CIA also discloses that Al Haramain's humanitarian activities in Africa were undertaken with the goal of recruiting young men for jihad.

> **Humanitarian, but With a Militant Agenda** – Even Al-Haramain's ostensibly legitimate activities in Africa, such as building mosques and Islamic schools, are undertaken with the goal of creating an environment conducive to militancy.
>
> • HIF's limited relief operations and infrastructure construction projects in Africa are targeted to help only Muslim communities and propagate the fundamentalist Salafist brand of Sunni Islam.
>
> • HIF's schools, mosques, and publications espouse Salafism's rigid orthodoxy and attack opposing secular and religious—including other Islamic doctrines—[REDACTED]. These efforts complement HIF employees' efforts to recruit young Africans for the jihad against the enemies of Islam.

*See* CIA_000675.

204. In *Al-Qa'ida Still Well Positioned to Recruit Terrorists [REDACTED]*, July 1, 2002, CIA_000178-189, at Ex. 239, the CIA assessed that Al Haramain was also recruiting young men for jihad and terrorist activities in the Balkans region.

> In the Balkans, local offices of NGOs such as the World Assembly of Muslim Youth, al-Haramayn, Society for the Revival and Islamic Heritage, and al-Waqf al-Islamiya were actively involved in spotting and assessing suitable terrorist recruits from among young men who seek assistance from humanitarian organizations, [REDACTED].

*See* CIA_000186.

205. In an August 28, 2002 CIA report, *Al-Haramain: Support for Extremists and Terrorists [REDACTED]*, CIA-SUB 0007-19, at Ex. 240, the CIA provides extensive evidence of Al Haramain's support for Islamic extremists and terrorists, and connections to al Qaeda and other militant groups.

**Ties to al-Qa'ida** – [REDACTED] at least 20 al-Haramain field offices and representatives operating in 50 countries in Africa, Asia, Europe, and North America, as well as its headquarters in Saudi Arabia, appear to be providing financial and logistic support to al-Qa'ida. In some cases, [REDACTED] financial support or collusion in terrorist plots. [REDACTED].

Some of the ties are to key al-Qa'ida officials or ongoing plots.

• [REDACTED] November 2001, unspecified al-Haramain officials met with the leadership of Wafa, an NGO with close ties to al-Qa'ida.

[REDACTED] HIF offices in Indonesia and Pakistan support al-Qa'ida and other extremist groups [REDACTED].

Documents seized during SFOR raids in the Balkans [REDACTED] suggest that employees at HIF offices in Albania, Bosnia, Croatia, and Kosovo support al-Qa'ida and affiliated groups. Individuals in each of these offices have been funded by or worked with Bin Ladin, [REDACTED].

• Bosnian authorities found e-mails in June 2002 from al-Qa'ida members on computers confiscated from the al-Haramain office in Travnik, Croatia. The e-mails contained instructions to attack an SFOR base in Tuzla, according to press reporting.

Al-Haramain offices in at least five African countries—Comoros Islands, Djibouti, Kenya, Somalia, Tanzania, and probably in Ghana—support al-Qa'ida and affiliated terrorist groups.

• [REDACTED] former HIF director in Tanzania Mummar al-Turki Abdul Wahab Dahil helped coordinate involvement in the 1998 US Embassy bombing in that country.

• [REDACTED] Dr. Omar Shams Idris, the HIF director in Tanzania, may have provided funds for a possible terrorist attack in Mombasa, Kenya, as of April 2002.

• Al-Haramain's Saudi headquarters delivered [REDACTED] cash [REDACTED] to Ramzi ben Mizauni Benfraj, the head of the Tanga, Tanzania office. Mizauni reportedly threw a party in Dar es Salaam to celebrate the 11 September attacks and, as of May, was attempting to gain Tanzanian citizenship illegally through the purchase of false documents.

• Elias Ali Noor, a Somali employee of Al-Haramain in Somalia, may have ties to USS Cole suspects, [REDACTED].

*See* CIA-SUB_0010-11.

206. Al Haramain provided financial and logistic support to other terrorist groups, such as al-Ittihad al-Islamiya ("AIAI"), an Islamic terror group in Somalia, HAMAS, and Egyptian Islamic Jihad. *See* CIA-SUB_0011.

207. Al Haramain provided similar support to Islamic extremists and foreign fighters in Bosnia and Chechnya.

> • The HIF in Bosnia during the 1990s funded and supported the foreign *mujahidin* battalion in Zenica, transported *mujahidin,* provided logistic and financial support for its members, and conducted propaganda activities, [REDACTED].
>
> • [REDACTED] HIF provided about one-third of the total funds being funneled from the Persian Gulf to support the Chechen insurgency in the Caucuses.

*See* CIA-SUB_0012.

208. The CIA report provides additional details concerning Al Haramain's activities in Africa, Asia, and Europe.

> • [REDACTED] al-Haramain's top priority in Africa is supporting the AIAI faction, [REDACTED]. AIAI—designated by the US Department of Treasury under Executive Order 13224 as a foreign terrorist group—seeks to establish an Islamic state in "Greater Somalia" including parts of Ethiopia, Djibouti, and Kenya. HIF offices worldwide collect funds to provide AIAI financial support to establish Islamic schools, courts, and other institutions in AIAI-influenced territory. HIF has also helped the faction develop its insurgent and terrorist capabilities. [REDACTED]. *See* CIA-SUB_0017.
>
> • In addition to its support of African Islamic terrorist groups, al-Haramain's field offices in Tanzania and Kenya have aided al-Qa'ida cells, including those responsible for the 1998 US Embassy bombings. *Id.*
>
> • Al-Haramain also misuses its status as a charitable organization to fund Islamist political parties and civic groups in East African countries—including Tanzania, Djibouti, and Comoros Islands. In some instances, the funding extends to supporting sectarian violence, [REDACTED]. *See* CIA-SUB_0018.
>
> • Al-Haramain uses its presence in Indonesia to support extremist groups and is poised for expansion in the region. [REDACTED]. *Id.*

• [REDACTED] Ahmad al-Amoudi—the Jakarta office director who served tours for al-Haramain in Pakistan, Bangladesh, and Azerbaijan in the 1990s—may have been involved in *mujahidin* recruitment. *Id.*

• [REDACTED] al-Amoudi met [REDACTED] with Jafar Umar Thalib, leader of the Indonesian extremist group Laskar Jihad; al-Amoudi also noted that al-Haramain was working with Thalib on several ongoing "projects." *Id.*

• Al-Haramain has built 25 mosques and schools in Indonesia and asserted control over mosque leadership positions to radicalize the local population. *Id.*

• [REDACTED] funds were transferred from an HIF headquarters account in Saudi Arabia at al-Rajhi bank to an al-Ansar Welfare Trust in Kashmir. [REDACTED] al-Ansar Welfare Trust is a front for Lashkar-e-Tayyiba (LT) and Tehrik ul-Mujandin, which have been listed by the United States as terrorist groups. *Id.*

• [REDACTED] individuals in the HIF offices in the Balkans are supporting extremist groups. *Id.*

• Employees at HIF offices in Albania, Bosnia, Croatia, and Kosovo have been funded by or have acted on behalf of Usama Bin Ladin, [REDACTED]. *Id.*

• Employees at al-Haramain have a long history of supporting the Chechens and foreign *mujihidin* movement … an al-Haramain employee, provided funds and supplies to Chechen *mujahidin* leaders. including several individuals tied to al-Qa'ida. *See* CIA-SUB_0019.

• [REDACTED] al-Haramain officials have couriered funds to Chechnya for both World Assembly for Muslim Youth and the International Islamic Relief Organization. *Id.*

209. A November 14, 2002 CIA report, *Saudi-Based Financial Support for Terrorist Organizations [REDACTED]*, CIA_000143-158, at Ex. 10, indicates that an Al Haramain official served on a committee of Jemaah Islamiyah, an al Qaeda linked terrorist group in Indonesia, dedicated to funding the training of jihadists and amassing weapons to wage a religious war that will create an Islamic state in Indonesia. *See* CIA_000152.

210. More recent intelligence reporting by the U.S. government, declassified and released pursuant to E.O. 14040, further reinforces the findings of U.S. and international investigations that Al Haramain's support for Osama bin Laden and al Qaeda was essential to al Qaeda's development into a sophisticated global terrorist.

211. For instance, a July 23, 2021 FBI report, *Connections to the Attacks of September 11, 2001*, EO14040-003478-3608-UPDATED, at Ex. 32, asserts the following about Al Haramain.

> Alharamain foundation is a Saudi Arabian Islamic "NGO" or "charity" who had multiple offices worldwide designated as terrorist supporting entities by the United States for their support of AQ related groups. Within the U.S. the Alharamain office was located in Portland, Oregon and was later specifically designated along with its primary operator Suliman Albouthe.
>
> The Al Haramayn or Al Haramain Islamic Foundation (AIF) has been reported as a Saudi Arabian funded Islamic charitable organization that distributes books, video/cassette tapes and leaflets which espouse radical Islamic thoughts. AIF has been utilized as a front organization for supporting and facilitating the movement of Islamic Mujahadin into areas of Kosovo, Chechnya, Pakistan, Afghanistan and Bosnia. [REDACTED].
>
> In [REDACTED] is identified as [REDACTED] of the Al Haramain Foundation. It is further stated in [REDACTED] that "an African chapter of the Jeddah, based group was identified in a 1999 State Department report as one of the suspect terrorist groups operating in Nairobi, Kenya, before the bombing of the U.S. Embassy there in 1998.

*See* EO14040-003567-3568.

212. The Kingdom of Saudi Arabia validated the U.S. government's investigative findings concerning Al Haramain's global support for terrorism, describing the Saudi-based charity as "one of the biggest terror-financing operations in the world."

> After the terrorist attacks on September 11, 2001, the U.S. Department of the Treasury initiated the Terrorist Finance Tracking Program (TFTP) to identify, track, and pursue terrorists and their networks. By 2004, the U.S. Department of the Treasury and Saudi Arabia eliminated four branches of the Al-Haramain charity, one of the biggest terror-financing operations in the world and the funding organ and channel for the Nairobi, Kenya and Dar es Salaam bombings in 1998.
>
> ***
>
> Saudi Arabia, in joint investigations with the U.S., has identified 17 prominent financial facilitators that are directly associated with Daesh. These sources, and others like them, are being shut down. We have also succeeded in dissolving groups such as Al-Furqan, a charity that was a major conduit of financial and material support for terrorist groups, and the charity front Al-Haramain Islamic

> Foundation, notoriously tied to Osama bin Laden, the Taliban and Al Qaeda's terror campaigns.

*See* Ex. 241, *The Kingdom of Saudi Arabia and Counterterrorism*, at 13, 86.

213. Al Haramain's financial and material support for al Qaeda and terrorism were carried out under the direction and leadership of its senior officials, including Al Haramain Director Aqil al Aqil, Mansour al Kadi, Soliman al Buthe, and Perouz Sedaghaty. *See* Ex. 234, TREASURY00017-29 at 21 ("As of January 2003, the U.S. judged that AHF's Director Al-Aqil, who at the time managed AHF's business on a day-to-day basis, was providing funds to offices with terrorist ties in ways that avoided foreign government scrutiny, such as using personal bank accounts to transfer official AHF funds, according to diplomatic reporting."); *id.* (stating that Kadi, "al-Aqil's deputy and one of AHF's main leaders," is "implicated in working with al Aqil to support al Qaida terrorist activity"); *id.* at 27 (stating that Aqil was an "Al Qaida supporter that handled the collection of funds for 'freedom fighters' in areas including Afghanistan, Bosnia, Chechnya, Kosovo, and Somalia, [REDACTED]").

214. The CIA has assessed that Aqil was aware of, condoned, and participated in Al Haramain's ongoing material, financial, logistical, and ideological support for terror groups and Islamic extremists. According to the CIA:

> We judge that HIF Director Shaykh Aqil Ibn 'Abdul-'Aziz al-'Aqil, who manages al-Haramain's business on a day-to-day basis, is aware that funds in several field offices are being used to support terrorist and militant groups. [REDACTED] he almost certainly has been involved in suspicious money movements since 11 September.
>
> • [REDACTED] April 1999, al-Haramain used a centralized system that prohibits individuals from allocating funds without the personal approval of the foundation's director.
>
> • [REDACTED] Shaykh Aqil, other senior managers, and individuals at branch offices are at least aware that several branch offices provide logistic support to Islamic extremists.
>
> • [REDACTED] Shaykh Aqil may have received funds from an unspecified organization [REDACTED] with extremist ties in the last few months. [REDACTED].
>
> *Mujahidin* leaders frequently have coordinated funding support with senior al-Haramain managers, who were aware that their donations were being used for military support, [REDACTED]. The organization reportedly also has issued visas and identity papers to *mujahidin*, funded their recruitment and travel, and provided health care for wounded *mujahidin*, [REDACTED]. [REDACTED] 2001, Chechen *mujahidin* [REDACTED] received about [REDACTED] from al-Haramain, [REDACTED].

*See* Ex. 240, *Al-Haramain: Support for Extremists and Terrorists [REDACTED]*, August 28, 2002, CIA-SUB 0007-19 at 14. *See also* Ex. 238, *Al Haramain in Africa: Supporting Al-Ittihad Al-Islami and Other Terrorists*, March 22, 2002, CIA_000675-679 at 675 ("Most of Al-Haramain's field office directors in East Africa are aware of and support the organization's aid to militant extremists, and at least some top-level officials from HIF's headquarters condone the funding of extremist groups.").

215. As to Soliman al Buthe (Treasurer of Al Haramain's office in Ashland, Oregon, and chairman of Al Haramain's U.S. Committee with broad legal authority to act on behalf of Al Haramain in the United States), the U.S. government concluded that al Buthe (1) worked closely with individuals providing material support for terrorism, (2) provided support to Islamic extremists advocating jihad, (3) served as a "clearinghouse" for moving Al Haramain funds from Saudi Arabia to the United States, and (4) engaged in activities to prevent the dissolution of Al Haramain notwithstanding multiple Executive Order 13224 designations of Al Haramain branch offices and officials.

> FBI investigation revealed that Al-Buthe, on behalf of AHF, entered into agreements to work closely with alleged terrorist supporter Sami Omar Al-Hussayen, who was charged by Federal prosecutors in Idaho with material support for terrorism. According to the Superseding Indictment, Al-Hussayen allegedly provided Internet and computer expertise to support and recruit for violent Jihad. This support was allegedly provided to AHF, Hamas, and a list of extremist websites, one or more of which contained explicit calls for violence against non-Muslims and urged visitors to participate in, or make financial contributions to support violent Jihad.
>
> ***
>
> FBI investigation of one of the extremist websites revealed that Al-Buthe provided support to radical Saudi Shaykh Salman Al-Awdah. A government exhibit entered into evidence in the Idaho trial identifies al Buthe as the owner, Chairman/Managing Director, and billing contact for islamtoday.com. This website is identified as "owned" and "under the supervision of" Al-Awdah, according to public Internet sources.
>
> ***
>
> As of April 2004, Al-Buthe appeared to be functioning as a clearinghouse for moving AHF funds from Saudi Arabia to the U.S. [REDACTED] Al-Buthe has been acting as the conduit for sending funds on behalf of AHF to the U.S. to pay at least $515,316 in legal fees between June 2003 and April 2004. These funds reportedly were to assist in the legal defense of himself, AHF, AHF leader Aqeel Al-Aqil and others, including Muhammad Jumal Khalifa.

***

> As of mid-March 2004, Al-Buthe was working hard to prevent the "total dissolution" of AHF, [REDACTED].

*See* Ex. 235, TREASURY00037-54 at 47-50. *See also* Ex. 31, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004, EO14040-003414-3442 at 3435 (stating that al Buthe "provided over $700,000 to the US-based offices of HIF," and that "[a]pproximately $600,000 of these funds came from al-But'he's personal account at the al-Rajhi Bank and Trust").

216. According to the U.S. government, Perouz Sedaghaty, who worked in Al Haramain's U.S. branch office in Ashland, Oregon, admitted to the FBI that he had received $500,000.00 from Osama bin Laden.

> In late 2001, the senior AHF official in the U.S., Perouz [Seda] Ghaty, sought a license from OFAC to purportedly assist Afghan refugees in border camps in Iran on the Iranian/Afghanistan border. Following the dual-U.S. Embassy bombing attacks in East Africa in August 1998, Seda reportedly confided to an FBI source that he was "in trouble." When asked by the FBI source to elaborate, Seda said that he received $500,000 from UBL--"through Bosnia." Seda was described as a "fundamentalist" who has sought to convert prison inmates to the Islamic faith.
>
> As part of Seda's request to OFAC in November 2001, he reported that Shaykh Al-Aqil, identified as the President of AHF, agreed to Seda's proposal to fund $500,000 for assistance to Afghan refugees in border camps in Iran. On the U.S. AFH's tax form 990 for 2001 filed with the IRS, Al-Aqil is identified as the President, Al-Kadi as the Vice President, Al-Buthe as the Treasurer, and Seda as the Secretary. The U.S. AHF branch's Articles of Incorporation and application to the IRS for tax-exempt status also list Al-Aqil and Al-Kadi as members of the board of directors.
>
> As of March 2003, due to pressure from the U.S. on Saudi authorities to close AHF, Al-Aqil and Al-Kadi reportedly resigned from the U.S. AHF office, [REDACTED].

*See* Ex. 234, TREASURY00017-29 at 24.

217. Based on their roles in supporting al Qaeda, the United States government designated both Aqil al Aqil and Soliman al Buthe pursuant to E.O. 13224, and additionally indicted al Buthe for terrorist financing activities undertaken in connection with Al Haramain's U.S. branch. *See* Ex. 217, June 2, 2004 designation of Aqil al Aqil; Ex. 218, September 9, 2004 designation of Soliman al Buthe.

## IV. FINANCIAL IMPROPRIETIES AND IRREGULARITIES PLAGUED IIRO OFFICES LINKED TO TERRORISM

218. IIRO auditing records and financial documents produced in discovery confirm a pattern of significant financial irregularities and deficiencies in accounting practices across a number of IIRO overseas offices that operated under the oversight of, and received funding from, the IIRO-Eastern Province branch office.

219. Plaintiffs' experts have concluded that the financial improprieties and irregularities documented in the audits demonstrate that conditions within the IIRO and its branches were ideal for individuals to direct massive amounts of IIRO funds and resources to Osama bin Laden, al Qaeda, and their terrorist activities. *See, e.g.*, Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 77 ("I conclude that the financial improprieties and irregularities documented in the limited number of audits and financial documents of IIRO that have been made available to me reflect conditions within IIRO that made it possible for persons within IIRO, as well as others such as Julaidan to misdirect IIRO resources to support Islamic jihad, al Qaeda, and terrorism. This support included the funding of Islamic fighters in prominent zones of conflict such as Afghanistan, Bosnia, and Chechnya, as well as in lesser-known conflicts between Islamic resistance groups and terrorists against secular governments, such as in Indonesia, the Philippines, and Thailand, and in areas of complex armed conflict between Muslims and non-Muslims such as Lebanon, Palestine, and Sudan, as well as elsewhere.").

### A. IIRO-Pakistan

220. The IIRO-Pakistan branch office was the focus of an intense investigation conducted by both Pakistani authorities and IIRO headquarters following the discovery that millions of dollars had gone missing and unaccounted for as a result of the actions of the Director General of IIRO-Pakistan, Moayad al Butairi, and the IIRO-Pakistan accountant/financial officer, Amir Jasim. Pakistani authorities arrested Jasim for his role and Butairi was recalled to Saudi Arabia.

221. An IIRO delegation was formed to conduct a review of the IIRO-Pakistan office's financial records and found that "[t]he collected evidence indicated the existence of cheating, forgery and misuse of the IIRO's funds, which were used for the disbursement of private projects." *See* Ex. 93, IIRO 31022-31023. *See also* Ex. 92, IIRO 31006-31007 ("For example, certain invoices are forged with names of unreal companies. The team went to the addresses of these companies and shops and confirmed that they are unreal."). A formal audit of the IIRO-Pakistan branch office was ordered by IIRO's senior leadership in Saudi Arabia for the 1996-2001 timeframe. *See* Ex. 108, IIRO 111020.

222. The investigation into Jasim's actions "found tremendous financial embezzlement; roughly millions according to the local currency. The bail applicant [Jasim] was the Head of Accounting Department in the IIRO. He was responsible for and beneficiary of such embezzlements. Large amounts of money were embezzled by him. He, sometimes, forged the accounts or provided the higher management with wrong accounts." *See* Ex. 94, IIRO 31160-31166 at 31161. The investigation further determined that Jasim "never bought medicines or food, but forged the documents and authorities and pretended to achieve the required actions. He

transferred the gained amounts into his own account or pocket. There are 185 authenticated copies of the documents and invoices (attached herewith) that include non-small amounts, and the material mentioned and registered therein were not bought. The concerned shops and storehouses were communicated, and they confirmed that such documents are forged and not issued by them and that the signatures shown thereon are irrelevant. Accordingly, they are not real." *Id.* at IIRO 31164. Jasim's application for bail was denied, finding that "the general nature of the events confirm that the bail applicant / accused manipulated the funds. Whilst such manipulation, he was able to embezzle tremendous amounts of money by preparing forged documents and authorities. Such embezzled funds were allocated for orphans and other charitable purposes." *Id.*

223. Butairi, was also implicated in the cheating, forgery, and misuse of IIRO funds. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 212-216 (testifying that the IIRO received evidence that Butairi was involved in the cheating, forgery, and misuse of IIRO funds); *id.* at 237-238 (confirming that the "funds were stolen by Amir Jasim, with the knowledge of Moayad al Butairi," and "it was explicit that there was fabrication in invoices, fabrication of documents").

224. It was also determined that Butairi ordered Jasim to burn the IIRO financial records to conceal their acts. *See* Ex. 116, IIRO 168291 (stating that "Amir Jasim burnt the record of IIRO on the orders of Moayad Al Butairi the then Director General of the office").

225. Additionally, the "audit" of the IIRO-Pakistan branch, dated just a few months before the 9/11 attacks, uncovered the diversion of millions of dollars of funds by that branch office, and the wholesale fabrication of invoices, receipts and entire projects to conceal that activity. *See* Ex. 91, International Islamic Relief Organization Pakistan Branch, Verification of Receipts and Payments for the Period From 1 January 1996 to 22 February 2001, IIRO 26468-26490. As an initial matter, although the auditors were retained to conduct an audit of the Pakistan branch and verify all payments and underlying documents for the period January 1996 through January 2001, the scope of the audit was later "restricted to verification" of certain areas "for the last three years only," as directed by a July 16, 2001 letter from the IIRO. *Id.* at 26471. Basha testified that he did not know who at the IIRO was responsible for approving that directive. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 229.

226. The audit determined *inter alia* that: (1) "internal controls relating to proper monitoring and funding to Pakistan was not in place at H.O." (headquarters); (2) headquarters' "management had neither established any system or mechanism for financial discipline nor required proper reporting from Pakistan office relating to disbursements or activities carried out at Pakistan branch; (3) "no internal or external audit was ever carried out for Pakistan branch and H.O. management never asked local management to provide them audit report on some fixed internal/periodic basis; (4) construction projects' invoices and supporting documents (i.e., bills, acknowledgment receipts, etc.) "are self-made, as no construction company/companies seem to exist;" (5) "[t]he net unreported amount of US $3,071,659 is unaccounted for and represents the expenditure which was either not recorded and for which no vouchers and supporting documentation is available and/or the amounts have been misused or misappropriated locally…. We consider it appropriate to state that there is a complete mess at the organizational level as none of the persons either at H.O. or in Pakistan is aware about the outstanding expenses details due to lack of proper communication and absence of internal controls."). *See* Ex. 91, International Islamic

Relief Organization Pakistan Branch, Verification of Receipts and Payments for the Period From 1 January 1996 to 22 February 2001, IIRO 26468-26490 at 26475-26482. *See also* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 238 ("The net unreported amount of US $3,071,659 is unaccounted for and represents the expenditure which was either not recorded and for which no vouchers and supporting documentation is available and/or the amounts which have been misused or misappropriated locally."); *id.* at 249-250 (testifying that prior to 2003, IIRO-Pakistan transferred all funds to Afghanistan in cash, during the time Butairi was the head of IIRO-Pakistan office, and during the time IIRO-Pakistan was responsible for the IIRO's activities in Afghanistan).

227. The audit additionally focused on the IIRO-Pakistan office's funding of orphanages in Pakistan and Afghanistan. *Id.* at 26480. IIRO funding was purportedly dedicated to the operations and administration of the orphanages, as well as for the purchases of necessities such as clothing, blankets, school supplies, books, and daily consumption items. *Id.* When the auditors conducted verification of orphanage-related invoices and underlying documents, and interviewed suppliers, they discovered that the suppliers provided multiple quotes and bills for goods to Jasim at his request, with the understanding that IIRO headquarters would approve and release funds, and the orders would be placed. However, the suppliers confirmed to the auditors that they never received any money for the proposed purchases and they never supplied any goods to the IIRO-Pakistan office. *Id.* The auditors additionally discovered that "the signatures on goods receipt acknowledgments are fake/forged." *Id.* at 26480.

228. Notwithstanding the serious findings by the investigation and audit, the IIRO never held Butairi and Jasim accountable for stealing millions of dollars. IIRO did not prosecute Butairi for his actions, and eventually settled the case with Jasim who was released from custody. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 220-221 (testifying that the IIRO chose not to prosecute Butairi); *id.* at 224 (testifying that IIRO decided not to pursue the full prosecution of Jasim).

229. The IIRO-Pakistan branch office is the same branch office that was used by the IIRO to fund six al Qaeda training camps, according to the CIA. *See* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001").

## B. IIRO-Eastern Province

230. IIRO Secretary General Adnan Basha confirmed that there were also significant financial improprieties and irregularities occurring in the IIRO-Eastern Province branch office while under the leadership of Prince Turki bin Jalawi al Saud and Abd al Hamid Sulaiman al Mujil. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 278. According to Basha's deposition testimony, upon learning of these financial improprieties, the IIRO formed a committee to conduct a review. The investigation discovered that IIRO-Eastern Province was implementing and funding projects in overseas IIRO branch offices without advising or seeking authorization

from the IIRO General Secretariat, thereby avoiding the required validation process. *Id.* at 265-267. IIRO-Eastern Province would send funds from its accounts to the accounts of overseas IIRO branch offices, including the Philippines, Indonesia, Pakistan, Jordan, India, Sudan, and others. *Id.* at 267-268. *See also* Ex. 101, IIRO 49708-49710.

231. An audit of the IIRO-Eastern Province further discovered that IIRO officials were paying cash for projects without expense vouchers or receipts in violation of IIRO regulations. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 270 (testifying that the office manager, Khalil Ibrahim, made payments without supporting vouchers). Prince Turki bin Jalawi al Saud was Ibrahaim's supervisor at the time. *Id.* at 271.

232. Notably, these financial irregularities occurring in the IIRO-Eastern Province office were taking place at the same time that IIRO-Pakistan officials were misappropriating millions of dollars. *Id.* at 268-269. According to Basha, Pakistan was one of the areas where the IIRO-Eastern Province was carrying out these projects without informing the IIRO General Secretariat. *Id.* at. 269.

233. Basha further testified that he contacted Prince Turki bin Jalawi al Saud and asked him to cease these practices, but the Prince refused to comply with Basha's request. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 268. Prince Turki subsequently resigned as the head of the IIRO-Eastern Province branch following the disclosure of the auditor's findings. According to Basha, Prince Turki resigned "[b]ecause he did not wish to implement the recommendations of the auditor." *Id.* at 271; *see also id.* at 273 ("I recall that the auditor's report connected all the violations to requests from the Prince.").

234. The auditor's report detailing the financial improprieties and irregularities concerning the IIRO-Eastern Province branch office and Prince Turki was provided to the MWL Secretary General. *Id.* at 274.

235. The FBI and CIA assessed that Prince Turki "had contact with individuals tied to al-Qaida and other terrorist organizations," and that 9/11 mastermind Khalid Sheikh Mohammed ("KSM") identified Prince Turki "as an important al-Qa'ida donor." *See* Ex. 31, December 2004 Joint *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States* EO14040 3414-3442-UPDATED at 3418-3419. *See also* Ex. 1, 9/11 Commission Final Report at 145 (describing KSM as "the principal architect of the 9/11 attacks").

236. Prince Turki was also one of the senior IIRO leaders that sat on the Rabita Trust Board of Trustees with E.O. 13442 Specially Designated Terrorist ("SDGT") Wa'el Jelaidan. *See* Ex. 140, MWL 30817-30819. Rabita Trust was designated by the U.S. government as a Specially Designated Global Terrorist ("SDGT") on October 12, 2001 for "its close ties to senior al Qaida leadership and providing logistical and financial support to al Qaida." *See* Ex. 68, FED-PEC 215391-215394.

237. Mujil was designated as a SDGT on August 3, 2006 for using "his position to bankroll the al Qaida network in Southeast Asia." *See* Ex. 50, August 3, 2006 designation, FED-PEC 202110-202112.

238. Notably, the Saudi Ministry of Interior conducted its own investigation relating to

the 2006 U.S. designation and allegations concerning the IIRO-Eastern Province branch. *See* Ex. 70, U.S. Diplomatic Cable, *Terrorism Finance; Saudi Response of IIRO's Al-Mua'jjil Under 1267 Designation*, August 14, 2006, FED-PEC 220473-220474 at 220473. The IIRO-Eastern Province office was shut down and the Saudi government froze Mujil's bank account at Al Rajhi Bank. *Id.* Remarkably, Basha testified that he was unaware of the investigation conducted by the Ministry of Interior. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 277-278.

239. Notwithstanding assurances from Saudi Ambassador Prince Turki bin Faisal al Saud that the IIRO-Eastern Province office had been shut down, the U.S. government warned in 2009 "that money continued to be funneled overseas from the Eastern Province Branch." *See* Ex. 76, U.S. Diplomatic Cable, *International Islamic Relief Organization – Designated by UN 1267 and US Treasury – Issues Letter of Congratulations to President Obama*, March 3, 2009, FED-PEC 220514-220517 at 220516. *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 127.

## C. IIRO-Philippines

240. The financial misconduct occurring in the IIRO-Eastern Province office was similarly taking place at the same time that Mujil was sending millions of dollars to the IIRO-Philippines and IIRO-Indonesia branch offices, which were also directly linked to al Qaeda and associated terrorist groups and supervised and funded by the IIRO-Eastern Province branch.

241. Documents produced by the IIRO reveal that the IIRO-Philippines office also suffered from significant financial improprieties and irregularities. In 1998, the Director of the IIRO's Social Care Department, Dr. Saleh Marzouk al Harbi, visited the IIRO-Philippines branch and discovered a number of serious issues concerning the reporting and distribution of IIRO funds to orphans in that country, including the fact that the IIRO-Eastern Province was financially supporting an Islamic institute without informing IIRO headquarters. *See* Ex. 109, Report on the Visit of the Supervisor of the Social Care Department to the Philippines Between July 19-25, 1998, IIRO 111421-111431.

242. The report describes the lack of financial controls by the IIRO-Philippines branch office with respect to the distribution of financial aid to orphans in the Philippines, and determined *inter alia* that: (1) there was no prior preparation for the distribution of the orphans' allowances; (2) the IIRO-Philippines office failed to carry out the instructions of the Social Care Department to form a committee for the distribution of the allowances to the orphans; (3) the orphans' allowances were distributed "without scrutiny or control;" (4) orphan files were incomplete and lacked the required documentation; (5) records at the IIRO's Social Care Department in Saudi Arabia indicated there were 80 male and female orphans at a certain orphanage, but it was determined there were really only 22 female orphans and 23 male orphans; and (6) certain orphans did not receive financial assistance despite the fact that IIRO headquarters had sent the funds earlier in the year. *Id.*

243. Specifically, the report revealed that "[t]he Office did not carry out the instructions of the Social Care Department to form the Tripartite Committee for the delivery of the allowances to the orphans," and "the orphan's allowances were received by any person who would attend, whether an orphan, a provider, a friend, or a neighbor without scrutiny or control." *See* Ex. 109,

Report on the Visit of the Supervisor of the Social Care Department to the Philippines Between July 19-25, 1998, IIRO 111421-111431 at 111423. Abdulhadi Daguit, an IIRO-Philippines employee and trusted associate of Mohammed Jamal Khalifa, confirmed that the IIRO did not form the Tripartite Committee. *See* Ex. 29, Transcript June 27, 2019 Deposition of Abdulhadi T. Daguit at 122.

244. The report further discusses the visit to the Jaber bin Abdullah Orphanage, sponsored by the IIRO, stating that "the files of the orphans in the Orphanage are incomplete and lack the documentation for the birth of the orphans, the death of their parents, and pictures of the orphans." *See* Ex. 109, IIRO 111421 111431 at 111424.

245. According to the report, the Jaber bin Abdullah Orphanage records at the Secretariat General's Social Care Department indicated there were 80 male and female orphans, but there were actually only 22 female orphans and 23 male orphans after matching the files with the male and female orphans in the Orphanage. *Id.* at 11424 ("Where are the others? Who was receiving their allowances? And where are their payments? Financially?"). Daguit confirmed that the funding provided by the IIRO in Saudi Arabia to the IIRO-Philippines for distribution to orphans would be based on the number of orphans. *See* Ex. 29, Transcript June 27, 2019 Deposition of Abdulhadi T. Daguit at 128-129.

246. The report also indicated that "there are no completed files for the orphans at the IIRO's Office except for a small number of the orphans' files in Cotabato." *See* Ex. 109, IIRO 111421 111431 at 111425. Daguit testified that Harbi was concerned about a lack of documentation for the orphans affiliated with families. *See* Ex. 29, Transcript June 27, 2019 Deposition of Abdulhadi T. Daguit at 130-131.

247. Finally, the report stated that "the orphans affiliated with families in Marawi and Zamboanga did not receive their allowances from year 1417 AH (1996 AD), although the allowances were sent to the Office" in February and August 1997. *See* Ex. 109, IIRO 111421 111431 at 111425. Daguit testified that Harbi also raised concerns that the funds had not been distributed. *See* Ex. 29, Transcript June 27, 2019 Deposition of Abdulhadi T. Daguit at 131.

248. Saudi charities have diverted millions of dollars ostensibly earmarked for supporting orphans to al Qaeda terrorists. In many cases, the charities claimed their expenditures were dedicated to supporting orphanages and related education programs in overseas countries. In reality, the charities were fraudulently padding their lists with names of non-existent or deceased children. Funds allocated and sent to care for these "ghost orphans" were instead funneled to al Qaeda to bankroll its global terrorist operations. *See, e.g.*, Ex. 12, *Pursuing the Bin Laden Financial Target*, April 12, 2001, CIA_00201-208 at 206 (indicating that "donations that arrived under the auspices of charity for orphans and widows" were turned over "to al-Qa'ida's finance committee"); Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 522 (reporting that al Qaeda's fundraising coordinator, Abu Bakr al Jaziri, took funds originating from charities and earmarked for Afghan orphans and widows, and diverted them to al Qaeda); Ex. 18, *Al-Qa'ida's Financial Ties to Islamic Youth Programs*, January 17, 2003, CIA_00681-701 at 682 (stating that NGO contributions for orphans and education were siphoned off by al Qaeda for its own terrorist purposes); *id.* at 683 (indicating that "Al-Qa'ida has found it easy to divert money because private donors provide millions of

dollars a year for orphan care and Islamic education programs"); *id.* at 684 ("Saudi NGOs have provided significant funding to orphanages and madrassas in Bosnia, some of which have been in contact with facilities associated with al-Qa'ida."); *id.* at 691 ("Al-Qa'ida's modest financial support for orphanages and madrassas has paid off for it by providing opportunities to divert larger amounts of money for its expenses. Once founded, many orphanages and Islamic schools receive large sums from charitable donors and al-Qa'ida diverted orphan and educational donations to its own budget. Individual Al-Qa'ida members gained employment and operational cover by working at the schools and orphanages and with the donors funding them."). *See also* Ex. 181, *Al-Haramain Islamic Foundation, Somalia*, TREASURY00030-36 at 30-31 ("The U.S. has assembled evidence that shows a history of ties between Al-Haramain Somalia and Usama bin Laden's al-Qaida network, Al-Itihaad al-Islamiya (AIAI), and other associated entities and individuals. For example, over the past few years, Al-Haramain Somalia has provided a means of funneling money to AIAI by disguising funds as intended to be used for orphanage projects or the construction of Islamic schools and mosques. The organization has also employed and provided salaries to AIAI members.").

249. Prior to the 9/11 attacks, media outlets in the Philippines were reporting that orphanages in that country "are being investigated as possible conduits for funding terrorism," including an orphanage linked to the IIRO and MWL. *See* Ex. 42, Gulf News, *Orphanages in Southern Philippines Under Probe*, February 10, 2001 (reporting that one of the orphanages under investigation "has been pinpointed to have received funding from the International Islamic Relief Organizations (IIRO)," which "is part of the Muslim World League").

250. Concerns about the financial integrity of the IIRO-Philippines branch office persisted for years after the 1998 visit. In late 2003/early 2004, the Director of IIRO's Social Care Department, Dr. Saleh Marzouk al Harbi, again raised concerns with IIRO headquarters about "a lack of clarity in the Philippines Office about the balances of custodies recorded on it." *See* Ex. 102, IIRO 59754. In a letter to IIRO Secretary General Basha, Harbi recommended that a committee should be formed to investigate "all the custodies including the last five transactions and to issue a statement detailing the custodies recorded on the Philippines Office" from October 22, 1998 through January 15, 2002. *Id.* "I suggest that these custodies should be liquidated as soon as possible so that the problem of the Pakistan Office is not repeated." *Id.*

251. When asked about the formation of this special committee recommended by Harbi and its subsequent investigation, Daguit claimed not to remember anything, suggesting the committee was never established and an investigation never occurred. *See* Ex. 29, Transcript June 27, 2019 Deposition of Abdulhadi T. Daguit at 140-142.

252. On August 3, 2005, the IIRO-Philippines office was designated as a Specially Designated Global Terrorist ("SDGT") for its ties to al Qaeda and funding for the al Qaeda-affiliated Abu Sayyaf Group. *See* Ex. 50, August 3, 2006 designation, FED-PEC 202110-202112.

253. Daguit acknowledged at his June 27, 2019 deposition that there were several instances during his employment with the IIRO-Philippines branch office that he learned of terrorism allegations concerning Mohammed Jamal Khalifa and the IIRO, but failed to conduct any inquiry to determine the veracity of those reports. Despite being a twenty-year employee of the IIRO, including acting director of the IIRO-Philippines office, at the time of very public

accusations in the international media that the IIRO was "facilitating fundraising for al Qaida and affiliated terrorist groups," Daguit showed a complete lack of curiosity and did not initiate any inquiries with the IIRO or the Philippines authorities to determine if there was any credibility to those reports.

254. For example, Daguit did not conduct any inquiries within his own office or IIRO headquarters to ask about Khalifa's relationship with Osama bin Laden, or to determine why Khalifa (his immediate boss) had been arrested in the United States in December 1994. *See* Ex. 29, Transcript June 27, 2019 Deposition of Abdulhadi T. Daguit at 153 (testifying that he did not "ask anyone in the IIRO Philippine office whether they knew anything about Mohammed Jamal Khalifa's ties to Osama bin Laden," nor did he "ever ask anyone at the IIRO in Saudi Arabia about Mohammed Jamal Khalifa's relationship to Osama bin Laden"); *id.* at 167 (testifying that he did not conduct any inquiry to try to determine why Khalifa had been arrested in the United States).

255. When media reports circulated alleging that the IIRO-Philippines office was supporting a terrorist cell in the Philippines that included Khalid Sheikh Mohammed and Ramzi Yousef (the "Bojinka" plot), Daguit testified that he did not conduct any inquiries with the IIRO or Philippines authorities to assess the credibility of those reports. *See id.* at 165-166.

256. Additionally, when Philippines newspapers reported that the IIRO-Philippines office was "a conduit for funds to the Abu Sayyaf from Saudi billionaire, Osama Bin Laden, … and his brother-in-law, Mohammed Jamal Khalifa," and was being "used by Bin Laden and Khalifa to distribute funds for the purchase of arms and other logistical requirements of the Abu Sayyaf in the guise of relief and livelihood projects for Muslim communities in Mindanao," Daguit testified there was no discussion of this reporting in the IIRO-Philippines office "because it is not our business," and he did not ask anyone about it. *See id.* at 151-153. *See also* Ex. 48, Philippine Daily Inquirer, *Bin Laden Funds Abu Sayyef Through Muslim Relief Group*, August 9, 2000, FED-PEC 201975-201978.

257. Daguit further testified that he was never questioned or interviewed by any government authority concerning terrorism allegations, and could not recall if any IIRO employees had been arrested during his tenure with the IIRO. *See* Ex. 29, Transcript June 27, 2019 Deposition of Abdulhadi T. Daguit at 191-92.

258. Moreover, when the U.S. government designated the IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, "for facilitating fundraising for al Qaida and affiliated terrorist groups," Daguit was still employed with the IIRO, but did not undertake any inquiry to determine whether the designations were proper. *See id.* at 156.

259. Daguit also testified that he was aware of the designation of Abd al Hamid Sulaiman al Mujil from the IIRO-Eastern Province office through the newspaper reports, but did not conduct an inquiry with any of people he worked with in the IIRO office to determine if they had any information that Mujil was tied to terrorists. *See id.* at 157.

260. Relatedly, the IIRO-Philippines office's bank accounts were frozen following the August 2006 designation, but Daguit testified that he did not conduct any inquiries to find out why

the accounts had been frozen. *See id.* at 157-158.

261. Finally, when asked if the IIRO suspended its operations in the Philippines after the August 2006 designation, Daguit testified that IIRO's operations were stopped in the Philippines but he was unaware if the closure had anything to do with the designation "because nobody informed me about that." *See id.* at 158-159 (testifying that "I am not informed about the closure"); *id.* at 160 (testifying that his salary stopped too, but "didn't ask anyone why that happened"). According to Daguit, he was still waiting for some instruction from the IIRO and payment of his salary. *See id.* at 159-161 ("That's why, for how many years I'm waiting for any communication from head office, because as far as I know, I am still the -- I am still the employee of the office, because I did not receive any letter saying or indicating that the office was closed…. I am just waiting, even my salary until now I'm waiting for my salaries, but there is no information about why it was stopped.").

### D. IIRO-Indonesia

262. In June 2004, the IIRO Offices Services Department notified the IIRO-Indonesia branch manager, Fahd Mohammed Sanad al Harbi, that the organization intended to send an IIRO accountant to IIRO-Indonesia to audit the office. *See* Ex. 97, IIRO 36875. The audit occurred between September 30, 2004 and October 11, 2004, and the internal auditor sent an initial draft of the auditing report to Harbi on November 1, 2004. *See* Ex. 95, IIRO 34989-35007 (November 1, 2004 letter from the IIRO internal auditor, Mr. Ismail bin Hasan Mandoura, to Mr. Fahd bin Mohamed Sanad al Harbi, Manager of the Organization's Office in Indonesia, attaching "the initial draft of the report on the results of auditing and field inspection."). Harbi is asked to "express your opinions" so that they can "prepare the final report, and submit it on the scheduled time." *Id.* at IIRO 34989.

263. The audit discovered a number of critical financial irregularities and problems with the accounting practices of the IIRO-Indonesia office, including inter alia the office's failure to use sound accounting practices; failure to use daily ledgers, failure to use an accounting system that was compatible with that used by the IIRO's financial department and other IIRO local and foreign offices; financial expenditures missing any reference to the "source of fund[ing];" and significant balance discrepancies. *See* Ex. 95, IIRO 34990-35007.

264. The auditor's report further detailed that the auditor was unable to match IIRO-Indonesia's debit balance of 3,277,546 Saudi riyals ("SR"); the excesses in expenditures on administrative affairs amounted to 110,045 SR; the office spent 25,869 SR from the currency exchange differences without authorization from IIRO headquarters; and there was a deficit of $6,001.21 in the IIRO-Eastern Province account.

265. The audit also raised concerns about the direct transfer of $383,663.76 from the IIRO-Eastern Province to IIRO-Indonesia "for the implementation of the projects of mosques, wells, organs, and charitable organizations in Indonesia," without informing or seeking authorization from the IIRO Secretary General. *See* Ex. 95 at IIRO 34998-34999; *see also* Ex. 30, Transcript, March 27, 2019 Deposition of Fahd Mohammad Sanad Al Harbi at 322-323 (testifying that the proper protocol is for the IIRO-Eastern Province to send the money to the IIRO headquarters, the General Secretariat, which would then send the money to IIRO-Indonesia).

266. When initially asked about the auditor's report and its findings, Harbi denied ever seeing the report or knowing anything about it, despite affirming that he was present in the office when the audit took place. *See* Ex. 30, Transcript, March 27, 2019 Deposition of Fahd Mohammad Sanad Al Harbi at 319-321. Later in the deposition, Harbi admitted to seeing the auditor's report, but then reversed course again and continued to testify that he didn't know anything about the report. *Id.* at 335, 338, 348.

267. Notwithstanding the discovery of serious financial irregularities described in the auditor's report, including clear violations of IIRO procedures and protocols concerning the transfers of funds to IIRO overseas branch offices, Harbi testified that the IIRO never asked him to undertake any efforts to address those deficiencies. *Id.* at 350.

268. The IIRO's unwillingness to undertake corrective measures to put an end to these violations in IIRO-Indonesia and other offices allowed the IIRO-Eastern Province and its leadership to continue to send millions of dollars to IIRO overseas offices directly linked to al Qaeda and associated terrorist organizations, including Jemaah Islamiyah.

269. On August 3, 2006, the U.S. government formally designated the IIRO-Indonesia branch office "for facilitating fundraising for al Qaida" and Jemaah Islamiyah. *See* Ex. 50, August 3, 2006 designation, FED-PEC 202110-212112.

270. According to U.S. Treasury Department officials, Mujil used his position at the IIRO-Eastern Province office to direct funds directly to al Qaeda and "is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI). Both ASG and JI are al Qaida-associated terrorist groups in Southeast Asia designated pursuant to the authorities of E.O. 13224." *Id.* at 202110; *see also id.* at 202111 ("The Indonesian and Philippines branches of IIRO have received support from IIRO-EP, which in turn is controlled by Al-Mujil. Indeed, he is often responsible for authorizing payment transfers for IIRO Philippines (IIRO-PHL) and IIRO Indonesia (IIRO-IDN)."

271. The 2006 designation further added that "[t]he IIRO Indonesia director has channeled money to two Indonesia-based, JI-affiliated foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed the establishment of training facilities for use by al Qaida associates." *Id.* at 202112. *See also* Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 106 ("The International Islamic Relief Organization [IIRO], which is headquartered in Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL, … the Taliban, … and Hamas, … as well as al Qaida affiliates, *inter alia*, the Abu Sayyaf Group (ASG), … Jemaah Islamiya (JI), … and Al Ittihad Al Islamiya (AIAI)…. The IIRO's parent organization is the Muslim World League [MWL] also headquartered in Saudi Arabia."); *id.* at 107 ("Jemaah Islamiya [JI] is an al Qaida-linked terrorist group with cells operating in several countries in Southeast Asia. It was founded in 1993 with the ultimate goal of establishing, through violent jihad, a pan-Islamic caliphate in Southeast Asia. JI was designated as a Specially Designated Global Terrorist (SDGT)

pursuant to E.O. 13224 on October 23, 2002."); *id.* ("Al-Mujil has provided support to terrorist organizations including ASG and JI."); *id.* at 109 ("IRO-EP's Al-Mujil reportedly has exercised decision-making authority over a number of IIRO offices, including the IIRO-PHL, IIRO-IND, proposed for designation herein, and IIRO's Thailand branch [IIRO-THA]…. These offices supported by Al-Mujil are implicated in supporting the ASG and/or JI."); *id.* at 114 ("By financing JI and organizations associated with JI, IIRO-IND assists in, sponsors, or provides financial and material support for, or financial or other services to or in support of JI, an entity listed on the Annex to E.O. 13224.").

272. Harbi acknowledged at his March 27, 2019 deposition that when IIRO-Indonesia was designated, he never spoke to IIRO Secretary General Adnan Basha, Abd al Hamid Sulaiman al Mujil, or any representatives of the local Saudi Embassy about the designation, nor was anyone in the Indonesia office terminated or disciplined following the designation. *See* Ex. 30, Transcript, March 27, 2019 Deposition of Fahd Mohammad Sanad Al Harbi at 352, 356.

### E. IIRO-Sarajevo

273. Following the 9/11 attacks, the IIRO was a target of a terrorism-related investigation by the Bosnian government's Federation Financial Police. Upon learning of the investigation in November 2001, the IIRO conducted an internal investigation of its own concerning the IIRO-Eastern Province office and the transfer of 83,000 Deutsche Mark from the IIRO's office in Kosovo. Per the investigation, the 83,000 Deutsche Mark was transferred from IIRO-Kosovo in the name of Ali Meisar to purchase a Jeep, and deposited into the MEB Bank in Sarajevo for Zayed Alaqi. That internal investigation raised concerns of financial improprieties and irregularities.

274. Pursuant to the investigation, it was discovered that the IIRO-Kosovo office did not have financial or other records documenting the transfer of 83,000 Deutsche for the purchase of a jeep, Ali Meisar had only worked at the IIRO-Kosovo office for a short time, and IIRO-Kosovo did not know anything about the recipient of the funds, Zayed Alaqi. *See* Ex. 106, IIRO 97328-97330. Moreover, the IIRO determined that statements made by the IIRO manager in Bosnia-Herzegovina were contradicted by the Criminal Policy investigation. *Id.* It is unclear what actions were taken by the IIRO as a result of that investigation.

275. In 2002, the Bosnian government, with the assistance of the U.S., was investigating the IIRO and other purported charitable organizations in that country (referred to as "Bosnia's Dirty Dozen") for "providing financial support to known terrorist organizations," including the Al Haramain Islamic Foundation, Saudi High Commission, Benevolence International Foundation, and Al Haramain al Masjed al Aqsa charities. *See* Ex. 148, U.S. Diplomatic Cable, *Terrorist Finance: Bosnia's Dirty Dozen*, November 2002, PECFOIA 4499-4503 at 4500. *See also* Ex. 25, Transcript, June 21, 2019 Deposition of Abderraouf Khalaf al Shorman at 289-290 (confirming that the IIRO and other charitable organizations were under investigation).

276. As part of those investigations, the Bosnian government's Financial Police conducted an audit of the IIRO-Sarajevo office and discovered accounting deficiencies occurring in that office. The Bosnian Financial Police's May 27, 2002 report indicates that for the period from January 1, 1996 to December 31, 1998, "there were no business books prescribed by the Law

on Accounting, including "general ledger, journal, and analytic entries, cashier and other auxiliary books." *See* Ex. 62, FED-PEC 212644-212646 at 212645-212646. The Financial Police also found that The IIRO "has not been balancing bookkeeping positions of assets and liabilities and the sources of the funds" … "did not have documentation available with reference to the securing and acquisition of financial funds, nor the records about its use for the period of 1996, 1997, and 1998" … and "has not been preparing annual and semi-annual accounting statements and financial reports." *Id.* at 212646.

277. A further report by the Bosnian Financial Police, issued on July 25, 2002, revealed the following: "In the course of supervision and researches of disposing documents and records of business legality and the way of obtaining and spending money means by the [IIRO], it was found that it did not have constituted Business books prescribed by the Law of Accountancy … and it did not contain annual, half annual accountancy reports i.e. financial reports (balance of statement and balance of success) for the period in which the supervision and research works were done … and it did not have documents concerning to obtaining and providing financial means as well as records of their spending, the could be the basis for establishing the sources from which the [IIRO] provided money means…." *See* Ex. 117, IIRO 270967-2701042 at 270970.

278. In 2003, the Bosnia government arrested nine Bosnian Serbs for smuggling weapons to the IIRO in Bosnia-Herzegovina. *See* Ex. 149, U.S. Diplomatic Cable, *Terrorist Finance: Dirty Dozen's Web of Deceit*, August 2003, PECFOIA 49927-49932.

279. Notably, Abderraouf Khalaf al Shorman, a ten-year representative of the IIRO-Sarajevo office and the head of the IIRO-Sarajevo office at the time of the public accusations in the local media concerning the arrests, showed a complete lack of curiosity and did not initiate any inquiries with the IIRO or the local authorities to determine if there was any credibility to those reports. *See* Ex. 25, Transcript, June 21, 2019 Deposition of Abderraouf Khalaf al Shorman at 309-310 (Shorman testifying that even though he was a representative of the IIRO at the time of the newspaper reports, he did not ask any questions about it, did not know if any of the individuals arrested were IIRO employees, and did not know if the IIRO headquarters investigate the incident). *See id.* at 356-359 (claiming that the IIRO is innocent of the acts despite simultaneously testifying that he did not do anything to investigate the allegations, he did not instruct anyone to look into the allegations, and couldn't recall if he asked the IIRO headquarters or any other IIRO office about the allegations).

### F. IIRO-Jordan

280. An audit of the IIRO-Jordan branch office found similar financial improprieties and irregularities occurring in that office, again linked to the IIRO-Eastern Province branch office. *See* Ex. 185, IIRO 287559-287561. For instance, the audit revealed (1) "violations of the financial regulations and instructions such as the use of personal accounts and checks for the payment of projects and programs there;" (2) "a procedural defect in the flow of funds from the local organization's office in the eastern region to implement the organization's projects that are overseen by the organization's office in Jordan;" (3) "a lack of clarity in the mechanism of project and program implementation;" and (4) "the absence of oversight of these projects and programs by the organization's office in Jordan." *Id.* at IIRO 287560.

## V. THE MWL'S AND IIRO'S CONNECTIONS TO THE 9/11 HIJACKERS' SAUDI SUPPORT NETWORK IN THE UNITED STATES

281. The United States-based operations of the MWL and IIRO have been a target of FBI investigations for their links to al Qaeda and Hamas, advocacy of jihad, and connections to Saudi intelligence and key members of the Saudi government network established to provide critical support to the 9/11 hijackers upon their arrival in the United States.

282. A telephone directory from the Saudi Embassy in Washington, D.C. obtained by the FBI in 2002 lists the New York office of the MWL as one of its "additional offices under the title 'Saudi Arabian Offices:' Muslim World League (MWL), 134 26th Street, New York NY." *See* Ex. 32, FBI Report, *Connections to the Attacks of September 11, 2001*, July 23, 2021, EO14040-003478-3608-UPDATED at 3532-3533.

283. The registered president of the MWL in the United States was Abdullah al Noshan. Noshan is connected through monetary transactions and telephone calls to an FBI subject in Kentucky whose name, address, and telephone number were found in an al Qaeda safehouse in Karachi. *See* Ex. 31, *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, December 2004, EO14040-003414-3442-UPDATED at 3437.

284. Noshan was also associated with the Saudi government funded Institute of Islamic and Arabic Sciences of America ("IIASA") in the United States. *See* Ex. 32, FBI Report, *Connections to the Attacks of September 11, 2001*, July 23, 2021, EO14040-003478-3608-UPDATED at 3536. IIASA, which received financial support from Ambassador Bandar bin Sultan bin Abdul Aziz al Saud and the Saudi Embassy in Washington, D.C., operated as a satellite campus of the Al Imam Muhammad Ibn Saud University in Riyadh, Saudi Arabia ("Imam University"). *Id.* at 3534 (stating that "IIASA was one of the many pieces of Saudi proselytizing activity in the U.S.").

285. According to the FBI, IIASA "maintains links to suspected terrorist organizations and their supporters," *see* EO14040-003414-3442-UPDATED at 3437, and individuals that worked at IIASA were "recruiting individuals into extremist views." *See* Ex. 31, EO14040-003414-3442-UPDATED at 3437; Ex. 32, EO14040-003478-3608 at 3535.

286. During a search of MWL's office space in New York in 2005, the FBI discovered a document titled *First Annual Ijtima of Mujahideen and Jhaad Conference*, dated 1991. This document was from Tehreek-E-Jihaad, Sherpur House, Karachi, Pakistan, and included sign-up sheets. The conference was: "To publicize Jihad on an international and inter-Islamic level." *See* Ex. 32, EO14040-003478-3608 at 3542; *id.* at 3565-3566 (indicating that the MWL office in Falls Church, VA is also home to several Hamas front organizations).

287. According to the FBI, Noshan was an associate of Musaed al Jarrah from the Ministry of Islamic Affairs division in the Saudi Embassy in Washington, D.C., and was known to have been a "purchasing agent" for the Saudi Embassy. *See* Ex. 32, EO14040-003478-3608 at 3542. Jarrah was a known Saudi intelligence officer in the Islamic Affairs division, *id.* at 3488,

and "provided substantial assistance to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Midhar during their time in California, prior to the attacks" along with Saudi government agents Fahad al Thumairy and Omar al Bayoumi. *See* Ex. 211, 2012 FBI Summary Report at 3-4 (ECF No. 6292-1).

288. FBI investigators also concluded that Noshan was also connected to Mutaib al Sudairy, a Ministry of Islamic Affairs propagator assigned to the Saudi Embassy in Washington, D.C., who lived in Missouri in 2000 with a key al Qaeda operative, Ziyad Khaleel, and further played a key role in the Saudi government network that provided essential financial and logistical support to the 9/11 hijackers in the United States. *See* Ex. 32, EO14040-003478-3608 at 3536. That network consisted of Saudi government agents Musaed al Jarrah, Fahad al Thumairy, Omar al Bayoumi, and others. *See* Ex. 211, 2012 FBI Summary Report at 3-4 (ECF No. 6292-1).

289. Noshan was "observed by FBI surveillance acting in a manner consistent with a foreign intelligence officer." *See* Ex. 31, EO14040-003414-3442-UPDATED at 3437. *See also id.* at 3487 ("One of the roles of the Islamic Affairs office was to provide intelligence on local Islamic populations and to provide cover for the movement of [REDACTED]. Saudi Arabian 'non-governmental organizations' (NGO), i.e. 'charities', supplemented this activity with large funding streams as well as cover for personnel.").

290. Sulaiman al Ali, who served as the director of the IIRO office in Northern Virginia, has also been linked to members of the Saudi government network that supported the 9/11 hijackers, including Omar al Bayoumi. According to the U.S. government, Bayoumi "provided substantial assistance to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Midhar during their time in California, prior to the attacks." *See* Ex. 211, 2012 FBI Summary Report at 3-4 (ECF No. 6292-1).

> Sulaiman Alali – Summary: Sulaiman Alali was associated with IIRO and other charities" and global investment entities such as Global Chemical [REDACTED]. Alali was paid by Sanabell and had a physical and financial connection to Omar Albayoumi. Alali returned to Saudi Arabia prior to 9/11 but has at least one son, Amro, who joined Alqaeda. According to open source, Alali was the president of IRO and a major shareholder of Global Chemical. Alali's son Amro is a known AQAP member.
>
> Sulaiman Al-Ali, who is the Director of the International Islamic Relief Organization's (IIRO) in the United States. Al-Ali is believed to be a friend of Al-Gama al-Islamiyya supporter Zahir 'Abd Al-'Aziz, who reportedly has ties to Islamic extremist circles throughout the Balkans. Al-Ali reportedly maintains a telephone number of [REDACTED], which is subscribed to by the "International Relief Organization," [REDACTED] Falls Church, VA 22046-4417. A corporate record for International Relief Organization, Inc., at [REDACTED] Falls Church, VA 22041 with [REDACTED] (Alali) listed as President.

*See* Ex. 32, FBI Report, *Connections to the Attacks of September 11, 2001*, July 23, 2021, EO14040-003478-3608-UPDATED at 3552-3553.

291. FBI records further describe the close relationship between Sulaiman al Ali and Omar al Bayoumi, including payments to Bayoumi.

> Alali used an address associated with Albayoumi on banking information in 1998. At a business in La Jolla, CA Alali listed Albayoumi (Omar Baymi) as his emergency POC. While residing in California at one address Albayoumi was listed as Alali's rental application as a co-tenant/friend. During this time Albayoumi and Alali listed their employment with Dalla Company, Saudi Arabia.
>
> Banking records from 10/21/1998 to 08/05/1999 noted that Alali deposited 32 checks from Sanabell totaling over $128,000. Sanabell also directly paid rent and other expenses. During the same period Alali paid Albayoumi almost $7000.

*See* Ex. 32, FBI Report, *Connections to the Attacks of September 11, 2001*, July 23, 2021, EO14040-003478-3608-UPDATED at 3553.

Dated: October 16, 2026

Respectfully submitted,

By: /s/ *Sean P. Carter*
Sean P. Carter, Esq.
J. Scott Tarbutton, Esq.
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel: (215) 665-2000
Email: scarter1@cozen.com

Counsel for the *Federal Insurance* Plaintiffs

By: /s/ *Robert T. Haefele*
Robert T. Haefele, Esq.
Jodi Westbrook Flowers, Esq.
Donald A. Migliori
MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel: (843) 216-9000
Email: rhaefele@motleyrice.com

Counsel for the *Burnett* and *Euro Brokers* Plaintiffs

By: */s/ Steven R. Pounian*
Steven R. Pounian, Esq.
Andrew J. Maloney, III, Esq.
James Gavin Simpson, Esq.
KREINDLER & KREINDLER, LLP
485 Lexington Avenue, 28th Floor
New York, NY 10017
Tel: (212) 804-6935
Email: spounian@kreindler.com

Counsel for the *Ashton* Plaintiffs

By: */s/ Jerry S. Goldman*
Jerry S. Goldman, Esq.
Ethan Greenberg, Esq.
Bruce Strong, Esq.
ANDERSON KILL P.C.
7 Times Square, 15th Floor
New York, NY 10036
Tel: (212) 278-1000
Email: jgoldman@andersonkill.com

Counsel for the *O'Neill* Plaintiffs

By: */s/ Edward M. Pinter*
Edward M. Pinter, Esq.
Janine A. Balzofiore, Esq.
FORD MARRIN ESPOSITO WITMEYER & GLESER, LLP
Wall Street Plaza
88 Pine Street, 16th Floor
New York, NY 10005
Tel: (212) 269-4900
Email: epinter@fordmarrin.com

Counsel for the *Continental Casualty* Plaintiffs

By: <u>*/s/ David A. Paul*</u>
David A. Paul, Esq.
CANTOR FITZGERALD
110 East 59th Street, 7th Floor
New York, NY 10022
Tel: (212) 610-2298
Email: dpaul@cantor.com

Counsel for the *Cantor Fitzgerald* Plaintiffs

LEGAL\115765726\1