# EXHIBIT "247"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |
|---|---|

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.*, 02-cv-06977
*Gladys H. Salvo, et al. v. Al Qaeda Islamic Army, et al.*, 03-cv-05071
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Maher, et al. v. Islamic Emirate of Afghanistan a/k/a The Taliban, et al.*, 23-cv-02845

**PLAINTIFFS' COUNTERSTATEMENT TO DEFENDANT INTERNATIONAL ISLAMIC RELIEF ORGANIZATION'S RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Plaintiffs respectfully submit this Counterstatement to Defendant International Islamic Relief Organization's Rule 56.1 Statement of Material Facts in Support of its Motion for Summary Judgment at ECF No. 11990. Plaintiffs cannot here set forth all of the evidence in response to each assertion, many of which are quite wide-ranging. We therefore refer Defendant International Islamic Relief Organization to Plaintiffs' Statement of Material Facts Pursuant to Fed. R. Civ. P. 56.1.[1]

[1] The numbered exhibits ("Ex.") cited herein are similarly identified in (1) Plaintiffs' Rule 56.1 Statement of Material Facts as to Defendants Muslim World League and International Islamic Relief Organization; (2) Plaintiffs' Counterstatement to Defendant Muslim World League's Rule 56.1 Statement of Material Facts; and (3) Plaintiffs' Opposition to the Defendants' April 15, 2026 Motions for Summary Judgment at ECF Nos. 11984-11987, 11988-11990, and 11992.

| IIRO RULE 56.1 STATEMENT | PLAINTIFFS' COUNTERSTATEMENT |
|---|---|
| **International Islamic Relief Organization ("IIRO")** | No response necessary. |
| 1. Plaintiffs have no evidence that IIRO had any foreknowledge of or were involved in the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011 ("After nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks.'"); *see generally* 9/11 Commission Report. | Disputed. The IIRO's claim that there is no evidence that IIRO had any foreknowledge of or were involved in the planning or execution of the 9/11 attacks, is inaccurate and misleading. As discussed further herein, the IIRO and its leadership (*e.g.*, IIRO Secretary General Adnan Basha), including its parent organization the Muslim World League ("MWL") and its officials (*e.g.*, MWL Secretaries General Dr. Abdullah Omar Naseef, Abdullah bin Saleh al Obaid, Abdul Mohsen al Turki); members of the IIRO's Board of Directors and Executive Committee, and their advisors, who have been identified as al Qaeda's most important financiers (*e.g.*, Ibrahim Mohammad Afandi, Abdurahman Abdul-Qader Faqih, Saleh al Kamel, Suleiman al Rajhi); members of the Saudi Royal family who held high-ranking leadership and supervisory positions with the IIRO while simultaneously serving as officials of the Saudi government (*e.g.*, Prince Muhammad bin Fahd bin Abdul Aziz, Prince Turki bin Jalawi al Saud); and IIRO officials, employees, advisors, and representatives (*e.g.*, Wa'el Hamza Jelaidan, Mohammed Jamal Khalifa, Abu Hammam al Saudi, Abd al Hamid Sulaiman al Mujil, Sulaiman al Ali, Abdelhadi Daguit, Mahmud Abd Al-Jalil Afif, Abdul Asmad, Abdelaziz Zaher, Jamal Al-Jibouri), were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad.<br><br>Indeed, these individuals were quintessential al Qaeda insiders, operating at the very center of al Qaeda's leadership, operations, and financial and logistical support structure during the critical period leading up to the 9/11 attacks, and were well aware of al Qaeda's terrorist intentions at all relevant times.<br><br>For instance, internal al Qaeda documents chronicling the formation of the organization, seized during a 2002 raid of the Sarajevo office of an al Qaeda front, the Benevolence International Foundation ("BIF"), confirm that al Qaeda planned from its inception to use the MWL and its subsidiary bodies, to include the IIRO, to provide support and cover for al Qaeda's operations. A BIF computer file named "Tareekh Osama" (or "Osama's History") contained numerous documents regarding al Qaeda's formation and the participation of purported Islamic charities in al Qaeda's support infrastructure, including the IIRO and MWL. The files include a document on MWL/IIRO letterhead detailing a |

| | |
|---|---|
| | meeting between "Abu Abdullah" (a/k/a Osama bin Laden), Dr. Abdullah Omar Naseef, in his capacity as the Secretary General of the MWL, and others where it was agreed that al Qaeda attacks would be launched from MWL offices: "And if he is being subjected to any pressures, let it be a secret (*agreement*), in a way that [Muslim World] League offices will be opened as (*illegible*) for the Pakistanis, and the attacks will be launched from them (*these offices*) …"). *See* Ex. 61, FED-PEC0212276-212281 at 212276. The document further suggests using the name of the "League" as "an umbrella which you can stay under … because Dr. Naseef is one of the brothers, and the government knows who Abu Al-Hasan [Wa'el Hamza Jelaidan] is." *Id.* at 212278. Investigators also recovered a list of orders from Osama bin Laden regarding the management of Islamic charities. At point 10 of his list, bin Laden urges the creation of a committee to receive and distribute donations to al Qaeda, and recommends participation of the MWL ("the Muslim World League"), and IIRO ("Hayaat Al-Ighata"). *See* Ex. 60, FED-PEC0212268-212275 at 212268.<br><br>Consistent with this plan, Dr. Naseef endorsed the appointment of Wa'el Hamza Jelaidan, a founding member of al Qaeda, as the director of the MWL/IIRO offices in Peshawar, Pakistan in 1989, thereby ensuring a direct channel for coordinating MWL/IIRO's collaboration with Osama bin Laden and al Qaeda. Jelaidan's role with the MWL allowed al Qaeda to use the MWL as an "umbrella" under which the terror group's members could operate, including using MWL offices for launching terrorist attacks. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150 (indicating that Jelaidan and Mohammed Jamal Khalifa (also an al Qaeda member) served in official roles with the MWL). *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 33; Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 33-34 ("Secretary General of the MWL informing Osama bin Laden's representatives that IIRO was offering its services in support of the mujahedeen.").<br><br>Jelaidan was a close associate of Osama bin Laden, and one of the most significant figures in the history of al Qaeda and its development into a global terrorist organization. *See* Ex. 53, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2002, FED-PEC 203469-203470 at 203470 ("Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that 'We are all in one boat, as is known to you, including our brother, Wa'el Julaidan.'"); Ex. 180, *Additional Designation Pursuant to E.O.* |

| | |
|---|---|
| | *13224*, TREASURY00001-8 at 4-5 (stating that "Julaidan is identified as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief," and also served on al Qaeda's shura council). *See also* Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 ("By way of background, Usama Bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ('MK') (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al Madani") of the International Islamic Relief Organization (hereafter "IIRO," sometimes referred to as "Igatha" based upon its Arabic name "*Hay'at al-Igatha al-Islamiya al-'Alamtyaa*"), which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL'). In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*.").<br><br>In addition to his roles with the IIRO and MWL, Dr. Naseef also appointed Jelaidan to head the Rabita Trust, a subsidiary of the MWL. *See* Ex. 136, Wa'el Jelaidan CV, Jelaidan 022. Rabita Trust was designated by the U.S. government as a Specially Designated Global Terrorist ("SDGT") on October 12, 2001 for "its close ties to senior al Qaida leadership and providing logistical and financial support to al Qaida." *See* Ex. 68, FED-PEC 215391-215394 at 215391. *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 50-63.<br><br>Jelaidan also served as a board member of the Al-Haramain & Al Masjed Al-Aqsa Charity Foundation ("AHAMAA"), an integral part of the MWL organizational structure, *see* Ex. 139, MWL 19138, and held signatory authority over AHAMAA's bank accounts which he used to fund terrorist operations. AHAMAA was designated as a Specially Designated Global Terrorist ("SDGT") by the U.S. government on May 6, 2004 for its significant financial ties to al Qaeda. *See* Ex. 63, May 6, 2004 E.O. 13224 Designation of Al Haramain al Masjed al Aqsa, FED-PEC 213972-213977; Ex. 64**,** May 6, 2004 U.S. |

| | |
|---|---|
| | Treasury Department Press Center, *Treasury Designates Bosnian Charities Funneling Dollars to Al Qaida*, FED-PEC 213978-213979; Ex. 148, U.S. Diplomatic Cable, *Terrorist Finance: Bosnia's Dirty Dozen*, November 2002, PECFOIA0004499-4503 at 4500 (identifying AHAMAA as one of a least a dozen Islamic charities "currently involved in providing financial support to known terrorist organizations"); Ex. 149, U.S. Diplomatic Cable, *Terrorist Finance: Dirty Dozen's Web of Deceit*, August 2003, PECFOIA049927-49932 at 49928 ("Documentation was provided to EUR/SCE demonstrating control over Al Haramayn al Masjid Al Aqsa by top Al Qa'ida financier Wa'el Julaidan (designated on E.O. 13224 in 2002)."). *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 64-67.<br><br>As al Qaeda was establishing its operations in Kosovo and Chechnya, Jelaidan further assumed the position as director of the joint IIRO/Saudi Joint Relief Committee ("SJRC") office in Pristina, Kosovo. *See* Ex. 98, Memorandum of Understanding between the IIRO and SJRC, IIRO 41030; Ex. 130, IIRO 39085, 39086, 39278 (shared office expenses). More than a year before the 9/11 attacks, U.S. officials sent a written request to the U.N. Peace Keeping Force in Pristina, requesting that U.N. police undertake surveillance of the office. In that document, marked "Secret: U.S. Office Only – Release to UNMIK," the U.S. government asserted that Jelaidan and SJRC official Adel Muhammad Sadi Bin Kazam were "associates of Osama bin Laden" and that Jelaidan was actively involved in helping bin Laden "move money and men to and from the Balkans." *See* Ex. 43, BBC News, *U.S. Fears Terrorist Attack in Kosovo*, April 3, 2000, FED-PEC0097363-97365 at 97364. Acting on that information, the U.N. Mission in Kosovo ("UNMIK") raided the building and declared that the IIRO/SJRC office served as a cover for several al Qaeda operatives, including Jelaidan and Kazem. *Id. See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 33.<br><br>Dr. Naseef, in his capacity as the MWL Secretary General and IIRO Chairman, also approved the appointment of Mohammed Jamal Khalifa, a founding al Qaeda member and Osama bin Laden's brother-in-law, to open a joint MWL/IIRO branch office in the Philippines contemporaneous with the formation of al Qaeda. *See* Ex. 51, FED-PEC 202846-202847 (June 5, 1988). As a result of that appointment, Khalifa was able to use the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia, and a source of funding for al Qaeda affiliated terrorist organizations such as the Abu Sayyaf Group ("ASG"), Moro Islamic Liberation Front ("MILF"), and Jemaah Islamiyah ("JI"). *See* Ex. 50, August 3, 2006 designation of IIRO's branches in the Philippines and |

| | |
|---|---|
| | Indonesia and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-202112. According to the U.S. government, while working as the director of the office, Khalifah maintained close connections with al Qaida through his relations with "senior al Qaida figures Abdullah Azzam and Abdulhassan al-Midani a.k.a Wa'el Hamza Julaidan, a long-time senior official of the IIRO (and the Muslim World League)." *See* Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 110. *See also* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 (stating that the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149-152 (indicating that al Qaeda member Mohammed Jamal Khalifa served in an official role with the MWL, and used the IIRO branch office in the Philippines to fund the Abu Sayyaf Group, an al Qaeda associated terrorist organization, and recruit Muslims for military training). *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶¶ 31-32, 107-120; Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 34.<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 20-26 (describing the history of al Qaeda's terrorist financing infrastructure during the Soviet-Afghan conflict; the use of Saudi charities under the guise of humanitarian relief work for money and the provision of weapons, guesthouses, and travel papers to the mujahideen and jihadist recruits; the use of the Saudi charities to launder money originating from bank accounts belonging to Osama bin Laden and wealthy supporters in the Gulf; and the critical role the MWL, IIRO, and WAMY would play in al Qaeda's global financial infrastructure following the end of the Soviet-Afghan war).<br><br>In addition to inserting al Qaeda members into strategic IIRO and MWL offices around the globe as part of its financial, ideological, and operational support for al Qaeda, IIRO provided substantial funding for al Qaeda's training camps in Afghanistan, including camps from which al Qaeda planned, |

| | |
|---|---|
| | approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training. *See, e.g.*, Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); Ex. 159, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 38, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo |

| | |
|---|---|
| | military training himself at one of the camps, where he met Usama Bin Laden.”).<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 83 (“IIRO operations in Pakistan were allegedly responsible for sponsoring [6] Al-Qaida training camps in the region. Following the 9/11 attacks, the government of Pakistan ‘identified and expelled some two dozen Al-Qaida supporters who has been working for the IIRO-sponsored organizations in Pakistan.’”).<br><br>Moreover, prior to the 9/11 attacks, IIRO leadership was expressly aware of the organization’s ongoing support for international terrorism and Osama bin Laden, and the involvement of its branch offices and officials in terrorist activities, by virtue of extensive international media reporting. Any assertion that the IIRO, and/or its parent organization MWL, was unaware of its substantial support for al Qaeda and terrorist activities is duplicitous. *See, e.g.*, (1) Daily News, *It’s More than Just Who Plants the Explosives*, July 31, 1996 (reporting that the IIRO is a major conduit of financial support to the Hamas terrorist group); (2) The Age, *Filipino Muslims Linked to Holy Warrior’s Global Terror*, May 20, 1995 (reporting on the discovery of al Qaeda’s terrorist plot in the Philippines (“Bojinka”) and explaining that Mohammed Jamal Khalifa of the IIRO, a “key figure in the network of Islamic extremists,” was funding Islamic militants in the Philippines); (3) Frontline, *A Terrorist Plot Unearthed*, March 12, 1999 (discussing the IIRO’s connections to an terrorist operation to bomb U.S. Consulates in India, and describing the IIRO as being “closely associated with the billionaire terrorist Osama bin Laden”); (4) University of Pennsylvania-African Studies Center, *Horn of Africa: The Monthly Review, 19-10/98* (reporting that the IIRO was one of five relief organizations banned by the Kenyan government following the August 1998 U.S. Embassy bombings); (5) IPS-Inter Press Service, *Kenya: Gov’t Shuts down Five Islamic Relief Agencies*, September 10, 1998 (reporting that the Kenyan government banned the IIRO for supporting terrorism following the August 1998 U.S. Embassy bombings); (6) ITAR-TASS, *Russian Troops Find Arab, Bosnian Passports in Chechnya*, February 21, 2000 (reporting that that IIRO, with its main office in Saudi Arabia, arranged for the transportation of Islamic fighters to participate in the conflict in Chechnya); (7) Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report*, February 13, 1999 (reporting that the IIRO’s Mohammed Jamal Khalifa “is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group,” and further stating that the “IIRO is suspected by Western intelligence agencies to be bin Laden’s conduit to various terrorist organizations in Islamic countries”); (8) Philippine Daily Inquirer, *Front Page: Bin* |

| | |
|---|---|
| | *Laden Funds Abu Sayyaf Through Muslim Relief Group*, August 9, 2000 (indicating that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League) is a conduit of funds for the Abu Sayyaf Group, a terrorist organization in the Philippines); (9) Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000 (reporting that the IIRO is a front to finance the operations of the Abu Sayyaf Group and Moro Islamic Liberation Front terrorist organizations); (10) The U.N. Refugee Agency, *Human Rights Watch World Report 1999 – Kenya*, January 1, 1999 (stating that the Kenyan government cancelled the registration of the IIRO and other Islamic relief agencies for supporting terrorism); (11) New York Times, *Some Charities Suspected of Terrorist Role*, February 19, 2000 (reporting on the 1998 U.S. Embassy attacks and that the Kenyan government said the charities "'posed a serious threat' to Kenya's security"); (12) The Times, *Terror by Degree*, October 18, 1997 (reporting on the "Bojinka" terrorist plot and stating that Mohammed Jamal Khalifa was funding the Abu Sayyaf Group); (13) The Indian Ocean Newsletter, *Banned Islamic NGOs*, September 12, 1998 (reporting that Kenya banned the IIRO and other NGOs following their investigation into the August 1998 attacks on U.S. embassies in Nairobi and Dar es Salaam); (14) U.S. News & World Report, *A Helping Hand From Saudi Arabia*, July 8, 1996 (reporting that the IIRO is a major clearinghouse for funds to aid Islamic extremism and terror in Gaza and the West Bank); (15) The Straits Times, *Osama Gave Funds to Abu Sayyaf: Manila*, August 10, 2000 (reporting that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League), "in the guise of giving charity to local Muslim communities, provided funds to Abu Sayyaf for acquiring arms"); (16) Overseas Immigration News, *Immigration Claims Teacher Linked to Terrorists Alleged Al-Jihad Member: Egyptian Denies Allegations, is Appealing Legal Proceedings*, May 21, 1999 (reporting that the IIRO "secretly funds terrorism"). *See* Ex. 5. *See also* Ex. 80, IIRO 147 ("IIRO Administrative Structure" chart identifying a "Department of Media and Information."); Ex. 65, FED-PEC 214874-214875 (MWL structural chart identifying "The General Department for Media and Culture").<br><br>*See also* Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 82-118 (detailing the specific roles of the IIRO, MWL, and WAMY in providing material support to al Qaeda prior to the 9/11 attacks, and in its immediate aftermath).<br><br>Finally, the IIRO's representation that the 9/11 Commission concluded that "no new information would alter its original findings" concerning the individuals responsible for the 9/11 attacks, or those who supported the individuals responsible for the attacks, is also disputed as inaccurate and misleading. |

| | |
|---|---|
| | Members of the 9/11 Commission have publicly stated that their investigation and findings were not "exhaustive" and that further inquiry and fact-finding was necessary. *See* Ex. 2, Affirmation of Joseph Robert "Bob" Kerrey (stating it is "fundamentally inaccurate" to characterize the Commission's investigation and findings as "exhaustive or conclusive," and that "significant questions remain unanswered concerning the possible involvement of Saudi government institutions and actors in the financing and sponsorship of al Qaeda"); Affirmation of John F. Lehman (stating that the allegations and claims advanced by the 9/11 plaintiffs were never considered and rejected as factually untrue); Declaration of Richard Ben-Veniste (stating that "further fact-finding was appropriate").<br><br>*See also* Plaintiffs' responses to Nos. 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577. |
| 2. Plaintiffs have no evidence tracing IIRO funds to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Plaintiffs' Second Supplemental Responses to Defendant Dubai Islamic Bank's Second Set of Requests for Admission dated April 23, 2022 (ECF No. 8129-22) at 27 (Request No. 8) ("Plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from the International Islamic Relief Organization's account at DIB to specific operational expenditures incurred in carrying out the 9/11 operation."); March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 9 ("Plaintiffs present no evidence that individuals or entities [including IIRO] used money from these DIB accounts to fund al Qaeda or carry out 9/11. Indeed, Plaintiffs have no evidence that funds in any account at Dubai Islamic Bank were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 terrorist attacks.") (internal citations and quotation marks omitted); *see also* Ex. 18, Expert Report of Vahid Brown ("Brown Rpt.") at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); Expert Report of Jonathan M. Winer ("Winer Rpt.") (ECF No. 7344-1) at 82-100, 116-22 (failing to trace any funds from IIRO to the planning, carrying out, or financing of the 9/11 Attacks); Expert Report of Evan Francois Kohlmann | Disputed. The IIRO's claim that there is no evidence tracing IIRO funds or other in-kind support to al Qaeda and/or the planning and execution of the 9/11 attacks, is inaccurate and misleading. As described herein, the IIRO, MWL, and their officials, employees, advisors, and representatives were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks. Accordingly, the 9/11 attacks were a predictable, inevitable product of that sustained, knowing support. Plaintiffs need not prove that the funds or other in-kind support provided to al Qaeda were traced to the terrorist plot or the attack itself.<br><br>By way of further response, and described in Plaintiffs' response to No. 1, in an agreement between MWL Secretary General Abdullah Omar Naseef and Osama bin Laden contemporaneous with the formation of al Qaeda, al Qaeda members Wa'el Hamza Jelaidan and Mohammed Jamal Khalifa were strategically placed in IIRO/MWL offices to |

| | |
|---|---|
| ("Kohlmann Rpt.") (ECF No. 9250-2) ¶¶ 71-157 (same); Expert Report of Dr. Matthew Levitt ("Levitt Rpt.") (ECF 9250-33) at 32-39 (same); *The Road to 9/11: The September 11 Terrorist Attack on the World Trade Center* ("Jenkins Rpt.") (ECF No. 7344-3) (same); Ex. 19, Kohlmann Dep. Tr. at 434:23-439:15 (admitting his report erroneously stated that "Fayez Ahmed Alshehri, one of the September 11 airline hijackers, reportedly told his father he was going to go work for the IIRO and never saw his family again," and that the identified individual was not even a 9/11 hijacker); Ex. 20, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph on Terrorist Financing: Staff Report to the Commission ("Monograph"); *see also* Ex. 21, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the 9/11 Commission Report does not name IIRO or MWL as charities which supported al Qaeda). | guarantee a direct channel for coordinating MWL/IIRO's collaboration with Osama bin Laden and al Qaeda. Jelaidan's appointed positions to the IIRO, MWL, Rabita Trust, Al-Haramain & Al Masjed Al-Aqsa Charity Foundation ("AHAMAA"), and Saudi Joint Relief Committee ("SJRC"), allowed him to direct extensive financial and logistical support to al Qaeda for years leading up to the 9/11 attacks. *See, e.g.*, Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"); Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 ("In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*.").<br><br>As the Regional Director for the IIRO in South-East Asia, Khalifa used the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia, and a source of funding for al Qaeda affiliated terrorist organizations such as the Abu Sayyaf Group ("ASG"), Moro Islamic Liberation Front ("MILF"), Jemaah Islamiyah ("JI"), Hamas, and other terrorist groups. Moreover, Khalifa personally orchestrated the use of IIRO funds and resources to support the terrorist activities of 9/11 mastermind Khalid Sheikh Mohammed ("KSM"), Ramzi Yousef (1993 World Trade Center bomber), and Wali Khan Amin Shah (Afghan jihad veteran and Osama bin Laden/al Qaeda associate) in the Philippines, and the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations of twelve U.S. flag commercial airplanes as they flew from Asia to the United States. That very plot, often referred to as "Operation Bojinka," was adapted into the 9/11 terrorist plot by KSM, using the knowledge he had acquired during its development about vulnerabilities in the aviation security system. *See* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 (stating that the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations* |

| | |
|---|---|
| | *Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."). *See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 34 (citing excerpt from *Ghost Wars* by Steve Coll stating that the IIRO and MWL provided "important resources" to Ramzi Yousef: "The FBI analysis listed the huge semiofficial Saudi Arabian charity, the International Islamic Relief Organization, and the largest government-sponsored Saudi religious proselytizing organization, the Muslim World League, as important resources for the new terrorist.").<br><br>Other IIRO offices were also providing financial support to al Qaeda in support of its global terrorist ambitions in the years leading to the 9/11 attacks. For instance, the IIRO-Skopje branch office was closed and its members expelled by the Macedonian government in March 1995 amid concerns of terrorism financing. *See* Ex. 74, U.S. Diplomatic cable, *Macedonia: A/S O'Brien Visit Highlights Terrorism and Financing Issues*, August 22, 2007, FED-PEC 220506-220510 at 220509.<br><br>The joint IIRO/Saudi Joint Relief Committee ("SJRC") office in Pristina, Kosovo, headed by Wa'el Jelaidan was actively involved in helping Osama bin Laden "move money and men to and from the Balkans." *See* Ex. 43, BBC News, *U.S. Fears Terrorist Attack in Kosovo*, April 3, 2000, FED-PEC0097363-97365. *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 33.<br><br>The IIRO-Kenya branch office was implicated in the funding of the 1998 U.S. Embassy bombings in Africa. *See* Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940.<br><br>Additionally, a U.S. investigation uncovered information indicating that the IIRO office in the U.S. transferred funds to Sana-Bell, Inc., a U.S. corporation established for investment and business purposes, and that those funds were subsequently transferred through various channels to al Qaeda operatives and al Qaeda financier Yassin al Kadi. *See* Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed |

| | |
|---|---|
| | to the President of the Security Council, FED-PEC 144926-145008 at 144941.<br><br>The IIRO additionally provided substantial funding for al Qaeda's training camps in Afghanistan, including camps from which al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training. *See, e.g.*, Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); Ex. 159, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 38, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was |

| | |
|---|---|
| | being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo military training himself at one of the camps, where he met Usama Bin Laden.").<br><br>Following the 9/11 attacks, the IIRO continued to provide substantial financial and material assistance to al Qaeda and Islamic extremists and were often implicated in foreign government investigations relating to terrorism. For example, in 2002, the U.S. government identified IIRO and other purported charitable organizations operating in Bosnia-Herzegovina as "currently involved in providing financial support to known terrorist organizations." *See* Ex. 148, U.S. Diplomatic Cable, *Terrorist Finance: Bosnia's Dirty Dozen*, November 2002, PECFOIA0004499-4503 at 4500.<br><br>In July 2003, nine Bosnian Serbs were arrested for smuggling weapons to the IIRO in Bosnia-Herzegovina. *See* Ex. 149, U.S. Diplomatic Cable, *Terrorist Finance: Dirty Dozen's Web of Deceit*, August 2003, PECFOIA049927-49932.<br><br>In 2006, the U.S. government formally designated IIRO official Abd al Hamid Sulaiman al Mujil and the IIRO-Philippines and IIRO-Indonesia branch offices "for facilitating fundraising for al Qaida and affiliated terrorist groups." *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112. According to U.S. Treasury Department officials, "Abd Al Hamid Sulaiman Al-Mujil, a high-ranking IIRO official in Saudi Arabia, has used his position to bankroll the al Qaida network … has a long record of supporting Islamic militant groups, and … has maintained a cell of regular financial donors in the Middle East who support extremist causes." *Id.* at 202110. *See also* Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 106 ("The International Islamic Relief Organization [IIRO], which is headquartered in Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL, … the Taliban, … and Hamas, … as well as al Qaida affiliates, *inter alia*, the Abu Sayyaf Group (ASG), … Jemaah Islamiya (JI), … and Al Ittihad Al Islamiya (AIAI)…. The IIRO's parent organization is the Muslim |

| | |
|---|---|
| | World League [MWL] also headquartered in Saudi Arabia."). *See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 35 (August 3, 2006 designation of the IIRO).<br><br>Also in 2006, IIRO continued to fund and welcome radical Islamic clerics to IIRO summer camps to spread their extremist ideology to the participating children. *See* Ex. 77, U.S. Diplomatic cable, *IIRO Secretary General Talks of Saudi Programs and Expansions*, October 9, 2006, FED-PEC 220554-220557 at 220555-220556 (IIRO Secretary Adnan Basha admitting that no one can "guarantee 100 percent of the time" that no extremists will enter the camps and attempt to pass their ideologies on to the youth, and adding that while the Ministry of Islamic Affairs vets both the programs and the lecturers for all of IIRO's summer camps inside Saudi Arabia, no such vetting process occurs in summer camps outside Saudi Arabia.). *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 157).<br><br>Later, in 2009, the U.S government concluded that the IIRO and MWL were continuing to fund Islamic extremism. *See* Ex. 56, U.S. Diplomatic Cable, *Terrorist Finance: Action Request for Senior Level Engagement on Terrorism Finance*, December 30, 2009, FED-PEC 210113-210118 at 4500 (stating that "the International Islamic Relief Organization (IIRO), Muslim World League (MWL) and the World Assembly of Muslim Youth (WAMY) … continue to send money overseas and, at times, fund extremism overseas").<br><br>As the foregoing demonstrates, the IIRO was specifically aware of al Qaeda's terrorist nature and intent to attack the United States, and intentionally provided substantial financial assistance and other resources to Osama bin Laden and al Qaeda knowing that the funds would be used to support al Qaeda's planning and execution of terrorist attacks around the globe, including the 9/11 attacks.<br><br>*See also* Plaintiffs' responses to Nos. 1, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577. |
| 3. Plaintiffs have no evidence tracing in-kind support from IIRO to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Winer Rpt. at 82- | Disputed. *See, e.g.*, Plaintiffs' response to No. 2. |

| | |
|---|---|
| 100, 116-22 (failing to trace any in-kind support from IIRO to the planning or execution of the 9/11 Attacks); Kohlmann Rpt. ¶¶ 71-157 (same); Levitt Rpt. at 32-39 (same); Jenkins Rpt. (same); Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* Ex. 9/11 Commission Report; Monograph; *see also* Ex. 21, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the 9/11 Commission Report does not name IIRO or MWL as charities which supported al Qaeda). | |
| 4. Plaintiffs have no evidence tracing funds from IIRO to Al Qaeda. *See generally* 9/11 Commission Report; Monograph; *see* ECF No. 8129-22 at 27; ECF No. 8911 at 9; *see also* Ex. 18, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); Ex. 21, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda). | Disputed. *See, e.g.*, Plaintiffs' response to No. 2. |
| 5. Plaintiffs have no evidence tracing in-kind support from IIRO to Al Qaeda. *See generally* 9/11 Commission Report; Monograph; *see also* Ex. 21, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda). | Disputed. *See, e.g.*, Plaintiffs' response to No. 2. |
| 6. The 9/11 Commission Report did not conclude that IIRO, directly or indirectly through any other charity or entity, provided funds to Al Qaeda. *See generally* 9/11 Commission Report; Monograph; *see also* Ex. 21, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda). | Disputed as stated. Plaintiffs acknowledge that the IIRO is not specifically named in the 9/11 Commission Final Report. However, to the extent IIRO suggests that it has been exonerated by the 9/11 Commission from any accountability for the extensive financial, material, and logistical support it provided to al Qaeda in the decade leading to the 9/11 attacks, that is inaccurate and misleading. *See* Ex. 2, Affirmation of Joseph Robert "Bob" Kerrey (stating that any "proposition that the 9/11 Commission fully exonerated Saudi Arabia and any Saudi government charities for any potential culpability for the financing and emergence of al Qaeda or the events of September 11, 2001" is "incorrect"); Affirmation of John F. Lehman (stating that the allegations and claims advanced by the 9/11 plaintiffs were never considered and rejected as factually untrue); Declaration of Richard Ben-Veniste (stating that "further fact-finding was appropriate"). Indeed, Plaintiffs' claims against the IIRO, MWL, and WAMY based on their funding and material sponsorship of al Qaeda are fully supported by the 9/11 Commission's findings that there was a substantial "likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda." *See* Ex. 1, 9/11 Commission Final Report at 171. |

| | |
|---|---|
| | Moreover, CIA intelligence reports cited by the 9/11 Commission in its Final Report confirm that the IIRO served as a key financial conduit for al Qaeda and played a central role in providing critical support to the terrorist organization, including but not limited to appointing al Qaeda members to leadership positions within the IIRO, recruiting Islamic fighters, facilitating the training and travel of Islamic militants with employment papers and other documentation, engaging in narcotics trafficking and counterfeiting, and funding terrorist training camps. *See* Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that the Maktab al-Khidamat, a Pakistan-based nongovernmental organization financed by Osama bin Laden, played a key role in facilitating the training and travel of Islamic militants, and received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization"); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Mohammed Jamal Khalifa, Osama bin Laden's brother-in-law, and close associate of World Trade Center bomber Ramzi Yousef, served as the director of the International Islamic Relief Organization (IIRO) in the Philippines, and "was involved in recruiting Muslims for training in Pakistan as mujahidin fighters."); *id.* at 151 (describing IIRO, WAMY, and Al Haramain as having "tie[s] to terrorist and mujahidin activity"); Ex. 11, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199 at 198 (stating that "al-Qa'ida has infiltrated some of IIRO's branches"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."); *id.* at 221 ("IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate toward more extremist activities."); *id.* ("A few IIRO branches have turned to illegitimate means of financing their operations—including narcotics trafficking and counterfeiting—further increasing their independence and ability to support terrorism."); Ex. 14, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*, November 17, 1998, CIA_00317-338 at 325 ("Bin Ladin and his associates make extensive use of non-governmental charitable organizations (NGOs) to transfer funds. Bin-Ladin-affiliated Islamic NGOs – such as … the International Islamic Relief Organization (IIRO); Al-Haramayn; … and others – are convenient money couriers because they maintain offices in Afghanistan, Albania, |

| | |
|---|---|
| | Pakistan, and other locations where Bin Ladin associates are prevalent."); *id.* at 330 ("Bin Ladin and Al-Qa'ida probably receive Gulf funding diverted from offices of Islamic NGOs, particularly the MK, IIRO, Al Haramayn … and others."); Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (stating that al Qaeda financial committee member Abdul Islam, who was "authorized to disburse funds for salaries and transportation expenses of al-Qa'ida members, and for donations to widows and orphans," worked for the International Islamic Relief Organization); *id.* at 525 (listing of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization"); *id.* at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"); Ex. 18, *Al-Qa'ida's Financial Ties to Islamic Youth Programs*, January 17, 2003, CIA_00681-701 at 692 (stating that "Gulf charities like the Saudi International Islamic Relief Organization (IIRO) and Al-Haramain … are well aware of the radical Wahhabi and Salafist doctrines being taught at institutions they fund"); Ex. 19, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 741 (stating that the Sudanese National Islamic Front ("NIF") works "with hardline Islamic fundamentalists employed by the Saudi International Islamic Relief Organization"); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama, [REDACTED]."); *id.* at 817 (stating that "several Saudi NGOs are funding conduits for al-Qa'ida or have penetrated by Usama's network" and "[t]hose of greatest concern include the International Islamic Relief Organization (IIRO)" and "Al-Haramayn Islamic Foundation"); *id.* at 818 ("Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahed to fight in Chechnya."); *id.* at 824 (stating that the Islamic Relief Agency (ISRA), a Khartoum-based NGO with offices in Afghanistan and Pakistan, have been infiltrated by al Qaeda and work closely with personnel from the IIRO); *id.* at 827 (stating that the IIRO and Al Haramain were channeling funds "to spread Islamic fundamentalism throughout Macedonia").<br><br>Indeed, the U.S. government concluded that bin Laden and al Qaeda used the entire IIRO network for al Qaeda's terrorist activities. *See* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, |

| | |
|---|---|
| | February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities.").<br><br>CIA intelligence reports cited in the 9/11 Commission Final Report similarly confirm that the MWL, IIRO's parent organization, played a central role in al Qaeda's support infrastructure. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Shaykh Adil Batterjee, a close associate of Osama bin Laden and "a long-time al-Qa'ida donor and fundraiser," used the Saudi-based Lajnat al Birr al Islamiyya charity, a subsidiary of the Muslim World League (MWL), to raise funds on behalf of bin Laden.); *id.* at 150 (indicating that "[s]everal of Bin Ladin's associates, including Wa'il Julaydan and Muhammad Jamal Khalifa, were MWL representatives"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 213 (stating that "several MWL affiliate organizations—including the International Islamic Relief Organization (IIRO)—have provided terrorists with funding and cover employment, documentation, and training"); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 809 (stating that Saudi-backed NGOs have ties to Osama bin Laden, including the Muslim World League, World Assembly of Muslim Youth, and others); *id.* at 822 (indicating that the MWL "has been used as a cover organization for several of Usama's associates"). *See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 95 (stating that Osama bin Laden confidant Enaam Arnaout provided military and logistical support to the mujahideen in the late 1980s and early 1990s as an employee of "Saudi NGO, the Muslim World League"). |
| 7. The Muslim World League ("MWL") established IIRO in 1978, Saudi Arabia. Ex. 2, First Turki Decl. ¶ 14; Ex. 3, First Obaid Decl. ¶ 12; Ex. 47, 1998 IIRO Constitution, at MWL 039326; Ex. 39, 2002 IIRO Constitution, at IIRO-000025. | Undisputed as a general matter for purposes of this motion.<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 32 ("In 1978, the Muslim World League established the International Islamic Relief Organization (IIRO) to serve as its humanitarian branch. Headquartered in Jeddah, IIRO is a global organization, with offices in Africa, Asia, Europe, Latin America and North America."); *id.* ("IIRO was tasked with running orphanages, building mosques, and operating Islamic schools around the world."). |
| 8. IIRO's Head Office (or headquarters) is in Jeddah, Saudi Arabia. Ex. 4, May 21, 2024 Basha Decl. ¶ 3; Ex. 5, Helles Decl. ¶ 2; Ex. 6, Sarhan Decl. ¶ 2. | Undisputed as a general matter for purposes of this motion. |

| | |
|---|---|
| 9. IIRO was established to provide general humanitarian aid to impoverished people, regardless of race or creed, and to provide emergency aid in response to crises and natural disasters. Ex. 2, First Turki Decl. ¶ 14; Ex. 3, First Obaid Decl. ¶ 12; Ex. 4, May 21, 2024 Basha Decl. ¶ 5; Ex. 5, Helles Decl. ¶ 3; *see* Ex. 42, 2000-2001 Annual Report at IIRO-004447 (noting over 1.7 million patients visited IIRO health facilities worldwide in 2000-2001); ); Ex. 41, 2001-2002 Annual Report at IIRO-004516 ("[IIRO] has always insisted on extending health care, emergency relief, and social welfare assistance to people from all walks of life, regardless of race or creed. In fact, IIROSA has been acclaimed internationally, for not using creed or race as a basis of discriminating between people in need."). | Disputed. Notwithstanding the fact that IIRO and its domestic and overseas branch offices may have undertaken genuine humanitarian relief work, these relief activities were also used to fundraise and distribute funds for al Qaeda's operational support, recruit terrorists, to provide space for their training and operations, and to provide a cover so that al Qaeda operatives could undertake terrorist activities under the guise of being humanitarian relief workers. *See* Ex. 171, U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Abdallah Ibrahim al Rushaydan (September 10, 2004), PEC-KSA002477-2488 at 2486 ("Since 1996, the IIRO has been linked with providing financial assistance, funds transfers, and legitimate cover for moving money in support of Al-Qaida and Usama Bin Ladin (UBL), under the cover of humanitarian relief."); *id.* at 2488 ("The IIRO is a Tier 1 NGO that has been directly linked to Al-Qaida and Usama Bin Ladin. The IIRO has provided financial assistance, funds transfers and legitimate cover for moving money under the pretense of humanitarian relief to Al-Qaida."); Ex. 69, Department of Defense JTF-GTMO Matrix of Threat Indicators, FED-PEC 216815-216831 at 216829-216831(U.S. govt. identifying IIRO, MWL, and WAMY as "terrorist and terrorist support entities"); Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 (identifying the IIRO as "one of the major Saudi Arabian humanitarian organizations suspected of maintaining links with al-Qaeda"); Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at 24 (stating that the U.S. government concluded that the IIRO provided financial assistance, funds transfers, and legitimate cover for moving money to al Qaeda under the pretense of humanitarian relief); Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143 (Fadl testifying that al Qaeda used Wa'el Jelaidan as head of the IIRO office in Peshawar, Pakistan, to create ID cards for al Qaeda members so that they could cross the Pakistan-Afghanistan border without a problem, under the guise that they were teachers or other relief workers.); Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 20 (asserting that "while the Islamic charities that provided support to extremism and terrorism engaged in some humanitarian activities, their support for terrorism was substantial, and the humanitarian activities which did take place helped to legitimize and provide a cover for, the extremist and terrorist activities"); Ex. 37, March 9, 2020 Expert Report of Dr. Matthew Levitt at 13-14 ("Charities offer a veil of legitimacy for terrorist fundraising, attracting |

| | |
|---|---|
| | unwitting donors who are unaware that monies they donate for humanitarian purposes instead fund terror."); *id.* at 14 ("Through charities, transnational terrorist groups have been able to move personnel, funds, and material to and from high-risk areas under cover of humanitarian or charity work."); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (stating that Adel Batterjee, who headed the MWL subsidiary Lajant al Birr al Islamiyya, "has directed NGOs where some officers finance extremists or militants under the guise of rendering humanitarian aid and support"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 218 (stating that Islamic charities accredited with the UNHCR "gives them credentials terrorists can use to travel more freely across borders and to establish cells in new areas under the guise of pursuing a humanitarian mission"); Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 965 ("Where Muslims are engaged in armed conflict, some Islamic organizations provide military aid as part of a 'humanitarian' package."); Ex. 1, 9/11 Commission Final Report at 170-171 ("Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization."); Ex. 150, U.N. Security Council, Second Report of the Monitoring Group on Sanctions Against Al-Qaida, the Taliban and Individuals and Entities Associated With Them ("Second Report"), December 2, 2003, PEC-KSA000108-190 at 120-121 ("Charities provide Al-Qaida with a very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support. These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programmes.").<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 72 (indicating that U.S. Department of Defense documents has designated the IIRO has a "National Intelligence Priority Framework (NIPF) Counter-Terrorism (CT) Priority 2 Terrorist Support Entity (TSE)," which have demonstrated sustained and active financial support for terrorist organizations willing to attack U.S. persons or interests, or provide witting operational support to Priority 2 terrorist groups"); ¶ 73 (describing U.S. Department of Defense documents acknowledging that the IIRO "has been directly linked to Al-Qaida and Usama Bin Ladin," has "provided financial assistance, funds transfers and legitimate cover for moving money under the pretense of humanitarian relief to Al-Qaida;" "has connections to terrorist organizations and has channeled funds to Islamic extremists from |

| | |
|---|---|
| | Afghanistan;" has a network of "field offices worldwide, many of which are staffed by or support terrorists or mujahidin," and is linked to … other extremist NGOs."); ¶ 74 (U.S. State Department diplomatic cable identifying the IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); ¶¶ 81-82 (describing Guantanamo Bay detainee testimony from an IIRO employee insisting that al Qaeda's al Farouq training camp in Afghanistan—where at least seven of the 9/11 hijackers were trained—was a "charity funded camp"). |
| 10. IIRO was frequently brought into large-scale humanitarian disaster areas and enjoyed an outstanding reputation for its work. Ex. 5, Helles Decl. ¶ 3; Ex. 6, Sarhan Decl. ¶ 4. Ex. 43, 1999-2000 Annual Report, at IIRO-003622 (describing IIRO's response in Turkey following devastating earthquake); Ex. 44, 1998 Annual Report, at IIRO-003726 (describing IIRO's response in refugee camps in Azerbaijan for persons displaced by the Nagorno-Karabakh conflict). | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 11. At all relevant times, IIRO, an international aid organization affiliated with the United Nations, provided humanitarian relief all over the world and emergency relief and sustainable development in various countries. Ex. 4, May 21, 2024 Basha Decl. ¶ 5; Ex. 5, Helles Decl. ¶ 3; Ex. 6, Sarhan Decl. ¶ 4. Ex. 42, 2000-2001 Annual Report, at IIRO-004483-84 (reflecting UN cooperation), IIRO-004489-4504. (describing relief work all over the world, including, for example, in Uganda). Since 1995 IIRO has been in special consultative status with the United Nations Economic and Social Council. Ex. 4, May 21, 2024 Basha Decl. ¶ 5; Ex. 79, U.N. Sec. Gen., List of non-governmental *organizations in consultative status with the Economic and Social Council as of 31 December 2022*, U.N. Doc. E/2023/INF/5 (Apr. 4, 2023), at 85. Special consultative status is reserved for non-governmental organizations that "have a special competence in, and are concerned specifically with . . . a few of the fields of activity covered by the Council and its subsidiary bodies, and…are known within the fields…." Ex. 80, U.N. Economic and Social Council Res. 1996/31, Part III, ¶ 23 (July 25, 1996). These fields are "international economic, social, cultural, educational, health, and related matters" and "promoting respect for, and observance of, human rights and fundamental freedoms for all," Ex. 81, U.N. Charter, art. 62, ¶¶ 1-2, as well as helping advise the U.N. Peacebuilding Commission in supporting development in countries emerging from conflict. *See* Ex. 82, G.A. Res. 60/180, The Peacebuilding Commission, ¶¶ 12(b), 17 (Dec. 20, 2005); | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |

| | |
|---|---|
| Ex. 83, G.A. Res. 61/16, Strengthening the Economic and Social Council, ¶¶ 20-23 (Jan. 9, 2007). | |
| 12. To meet its mission to provide services to individuals impacted by natural disasters, IIRO provided emergency relief, including clothing, medicine, and shelter, care for orphaned children, educational support, health care, vocational training, and mosque construction. Ex. 4, May 21, 2024 Basha Decl. ¶ 5; Ex. 5, Helles Decl. ¶ 3; Ex. 6, Sarhan Decl. ¶ 4; Ex. 43, 1999-2000 Annual Report, at IIRO-003596-97; Ex. 44, 1998 Annual Report, at IIRO-003718; Ex. 39, 2002 IIRO Constitution, at IIRO-000027. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 13. For example, after the devastating earthquake that struck northwestern Turkey on August 17, 1999, IIRO worked with the Saudi Arabian Red Crescent Society to ship 112,145 kg (or 123 tons) of rice, blankets, water canisters, medicine, and wheelchairs to the victims. Ex. 43, 1999-2000 Annual Report, at IIRO-003622. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9.<br><br>By way of further response, the Saudi Red Crescent Society ("SRC") was an additional Saudi government charity that provided substantial financial assistance and other resources to Osama bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>Internal al Qaeda documents chronicling the formation of the organization, seized during a 2002 raid of the Sarajevo office of an al Qaeda front, the Benevolence International Foundation ("BIF"), confirm that al Qaeda planned from its inception to use the SRC to provide support and cover for al Qaeda's operations. A BIF computer file named "Tareekh Osama" (or "Osama's History") contained numerous documents regarding al Qaeda's formation and the participation of purported Islamic charities in al Qaeda's support infrastructure, including the SRC. The files include a document, on MWL/IIRO letterhead, cautioning that the SRC may no longer represent a safe "umbrella" for al Qaeda members, because Wa'el Hamza Jelaidan ("Abu Al-Hasan") was being recalled to Saudi Arabia. *See* Ex. 61, FED-PEC0212276- 212281 at 212278. The statement makes clear that the SRC, under Jelaidan's leadership and direction, was serving as a front for al Qaeda. During that same search, investigators found a letter on SRC stationary to Abu Rida, another founding member of al Qaeda, requesting that "all weapons" need to "be inventoried." *See* Ex. 66, FED-PEC0215309-215312 at 215309. At the bottom of the letter is a note from bin Laden to Jelaidan ("Abu Al-Hasan"), then the SRC's director, stating "we have an extreme need for weapons." *Id.* |

| | |
|---|---|
| 14. In partnership with the German charity HELP, IIRO operated three refugee camps in Azerbaijan for persons displaced by the Nagorno-Karabakh conflict since the early 1990s. It paid 189 teachers to provide daily schooling to approximately 2,279 children in these camps. Ex. 44, 1998 Annual Report, at IIRO-003726-27. IIRO also cooperated with the American charity VISION to renovate residential buildings at the camps, and provided 88,690 kg (or 97 tons) of food, blankets, and other relief items to refugees in Azerbaijan. *Id.* at IIRO-003726. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 15. IIRO also maintained ongoing relief and human development operations in poverty-stricken areas unconnected with particular natural disasters or wars. For example, in Uganda IIRO ran two dispensaries and a medical institute, built the Al-Afia polyclinic, sponsored 2,295 orphans, funded a sewing center and computer center to provide vocational training to local students, and distributed free meals during the holy month of Ramadan to 20,000 people. Ex. 42, 2000-2001 Annual Report, at IIRO-004447, IIRO-004478, IIRO-004494. Below is a photo of a doctor handing medicine to a patient at the IIRO-built Al-Afia polyclinic: Ex. 42, 2000-2001 Annual Report at IIRO-004447. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 16. About 1,711,938 patients visited IIRO health facilities worldwide in 2000-2001. *Id.* | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 17. In Afghanistan, IIRO operated the Al-Bukhari orphanage in Jalalabad which housed 500 orphans of both sexes, operated hospitals in Khost and Jalalabad and ten clinics, and implemented inoculation and anti-malaria programs and established a center for tuberculosis. Ex. 44, 1998 Annual Report, at IIRO-003744; Ex. 43, 1999-2000 Annual Report, at IIRO-003658-59; Ex. 42, 2000-2001 Annual Report, at IIRO-004489-90. In 2000-2001 these health care programs benefitted 251,825 people in Afghanistan. *Id.* at IIRO-004449. That year IIRO also provided free meals at Ramadan to 95,000 people in Afghanistan. *Id.* at IIRO-004479. The following year, IIRO dug 23 surface wells for a nearby population of 46,000 people. Ex. 41, 2001-2002 Annual Report, at IIRO-004604. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9.<br><br>By way of further response, the IIRO provided funding to the Fatima al Zahraa Hospital operating in Jalalabad, Afghanistan, an asset of the IIRO/MWL, through the IIRO-Pakistan branch office. *See* Ex. 128, IIRO 109118-109119; Ex. 129, IIRO 215526-215529, IIRO 126173-126176, IIRO 112761-112762, IIRO 112745-112748, IIRO 59410-59411, IIRO 108937, IIRO 105986. *See also* Ex. 82, IIRO Annual Report 1999/2000, IIRO 212-330 at 278 (indicating IIRO medical projects around the world, including Fatima al Zahra Hospital in Jalalabad, Afghanistan (expenditures of 181,186 riyals)).<br><br>Recall that the IIRO's offices in Pakistan/Afghanistan were deeply tied to al Qaeda operations. *See* Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 818 (stating that Osama bin Laden "has extensive contact with Afghani and Pakistani offices of the IIRO"); Ex. 161, FBI Report, *Co-operating Witness Interview*, June 2, 2004, PEC-KSA002133-2134 at 2133 (indicating that al Qaeda members in the IIRO office in |

| | |
|---|---|
| | Peshawar, Pakistan, headed by Wa'el Jelaidan, were responsible for purchasing weapons).<br><br>Confirming this close connection between the IIRO and al Qaeda, senior al Qaeda leader Ayman al Zawahiri conducted eye surgeries at Fatima al Zahraa Hospital, which was located in close proximity to an al Qaeda funded jihad camp, at some point after 1996. *See* Ex. 28, Transcript, February 8, 2024 Deposition of Aimen Dean ("Dean Deposition"), at 308-309. |
| 18. In the Philippines, IIRO operated the Jabir bin Abdullah orphanage which housed 120 orphans, and it ran two dispensaries and a clinic, subsidized a maternity home in Manila, and dug eight surface wells. Ex. 44, 1998 Annual Report, at IIRO-003745; Ex. 41, 2001-2002 Annual Report, at IIRO-004609. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 19. In Bangladesh in 2000-2001, IIRO sponsored five orphanages and 1,513 orphans; dug 147 wells benefitting 97,800 people; operated seven health care programs benefiting 32,257 people; subsidized the Asma Abu Bakr tailoring center in Dhaka to provide vocational training to poor students; and distributed free food to over 60,000 persons. Ex. 42, 2000-2001 Annual Report, at IIRO-004435, IIRO-004443, IIRO-004449, IIRO-004474, IIRO-004479, IIRO-004490. Below is a photo of the IIRO-subsidized tailoring center: *Id. at 4474.* | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 20. IIRO fundraised on its own behalf, and individual donors supplied IIRO with its primary source of funding. Ex. 4, May 21, 2024 Basha Decl. ¶ 5; Ex. 5, Helles Decl. ¶ 37. | Disputed. To the extent that the IIRO argues that it relied primarily on its annual funding from public donors, that is inaccurate and misleading. The IIRO, and the MWL, received extensive funding from the Saudi government, including members of the Saudi royal family who were themselves acting government officials during all relevant times. *See* Ex. 32, FBI Report, *Connections to the Attacks of September 11, 2001*, July 23, 2021, EO14040-003478-3608-UPDATED at 3580-3581 ("It should also be noted that the Ministry of Defense and Aviation has been associated with the financing of other 'charities' such as MWL and IIRO … which provides more evidence against the Saudi claim that these organizations are Non-Governmental Organizations (NGOs)."); Ex. 26, Transcript, February 20, 2019 Deposition of Adnan Basha ("Basha Transcript") at 78 (testifying that Prince Sultan bin Abdul Aziz, Second Deputy Premier and Minister of Defense and Aviation, provided 500,000.00 Saudi Riyals ("SR") to the IIRO every six months); Ex. 81, IIRO Annual Report 1998, IIRO 171-211 at 179 (11,000,000.00 received from Prince Saud bin Abdul Mohsin, Deputy Governor of the Makkah region); *id.* at 200 (Prince Sultan bin Abdul Aziz provided 5,000,000.00 SR to the IIRO office in Somalia, more than half of the total funds earmarked for projects in Somalia that year.). |

| | |
|---|---|
| | Senior officials of the MWL have acknowledged that the MWL receives virtually all of its funding from the Saudi government. Dr. Abdullah al Turki, who served as Secretary General of the MWL from approximately 2000 through 2016, acknowledged that the MWL received 80,000,000.00 Saudi riyals ("SR") annually from the Saudi government. *See* Ex. 24, Transcript, September 15, 2018 Deposition of Dr. Abdullah al Turki, at 223-224; Ex. 90, Report by the Secretariat General of the Muslim World League, October 31, 2000-November 2, 2000, IIRO 17415-17453 at 17453. *See* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 30 ("Saudi funding for the MWL had exceeded $75 billion"); *id.* ("the Saudi government has funded 99% of the MWL's money").<br><br>In addition to receiving financial backing from the Saudi government, the IIRO engaged in illegal activities such as narcotics trafficking and counterfeiting to fund their operations. *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 221 (indicating that "IIRO branches have turned to illegitimate means of financing their operations—including narcotics trafficking and counterfeiting—further increasing their independence and ability to support terrorism"). |
| 21. IIRO did not use the hawala system. Ex. 6, Sarhan Decl. ¶ 29. | Disputed. Sarhan's statement lacks foundational evidence. |
| 22. IIRO established offices within and outside of Saudi Arabia. IIRO local offices were located inside of Saudi Arabia, and IIRO foreign offices were located outside of Saudi Arabia. IIRO had approximately 50 offices within the Kingdom of Saudi Arabia and abroad and engaged in humanitarian activities in more than 120 countries. Ex. 3, First Obaid Decl. ¶ 13; Turki Decl. ¶ 15; Ex. 5, Helles Decl. ¶ 6. | Undisputed as a general matter for purposes of this motion. |
| 23. IIRO had 18 branch offices in Saudi Arabia. Ex. 41, 2001-2002 Annual Report at IIRO-004518. The domestic branch offices in turn created sub-offices. *Id.* Prominent branch offices included the ones for Al-Baha; Gizan; Al-Jouf; Riyadh; the Eastern Region;, the Asir Region; Buraidah, Unaiza, Madina; Yanbu; Makkah; Jeddah; Taif; Najran; and finally the Women's Committee based in Jeddah. 1998 Annual Report, at IIRO-003722, IIRO-003752; Ex. 43, 1999-2000 Annual Report, at IIRO-003600-08; Ex. 42, 2000-2001 Annual Report, at IIRO-004410-16; Ex. 41, 2001-2002 Annual Report, at IIRO-004518-23). | Undisputed as a general matter for purposes of this motion. |

| | |
|---|---|
| 24. IIRO had 32 foreign offices, one each in Mauritania, Senegal, Burkina Faso, Benin, Nigeria, Mali, Niger, Chad, Sudan, Egypt, Ethiopia, Uganda, Kenya, Tanzania, Somalia, Djibouti, Iraqi Kurdistan, Lebanon, Jordan, UAE, Azerbaijan, Turkey, Pakistan, Bangladesh, Thailand, Sri Lanka, Indonesia, the Philippines, Albania, Croatia, Austria, and Bosnia Herzegovina. Ex. 44, 1998 Annual Report, at IIRO-003740-41, IIRO-003743-47; Ex. 43, 1999-2000 Annual Report at IIRO-003682-85, IIRO-003697). Multiple representative offices could form a single foreign office in a country; for instance, IIRO-Philippines had a main office in Manila and three regional offices. Daguit Decl. ¶ 8. | Disputed. IIRO fails to identify the joint IIRO/Saudi Joint Relief Committee ("SJRC") office in Pristina, Kosovo, headed by al Qaeda financier Wa'el Hamza Jelaidan as al Qaeda was establishing its operations in Kosovo and Chechnya. *See* Ex. 98, Memorandum of Understanding between the IIRO and SJRC, IIRO 41030; Ex. 130, IIRO 39085, 39086, 39278 (shared office expenses). More than a year before the 9/11 attacks, U.S. officials sent a written request to the U.N. Peace Keeping Force in Pristina, requesting that U.N. police undertake surveillance of the office. In that document, marked "Secret: U.S. Office Only – Release to UNMIK," the U.S. government asserted that Jelaidan and SJRC official Adel Muhammad Sadi Bin Kazam were "associates of Osama bin Laden" and that Jelaidan was actively involved in helping bin Laden "move money and men to and from the Balkans." *See* Ex. 43, BBC News, *U.S. Fears Terrorist Attack in Kosovo*, April 3, 2000, FED-PEC0097363-97365 at 97364. Acting on that information, the U.N. Mission in Kosovo ("UNMIK") raided the building and declared that the IIRO/SJRC office served as a cover for several al Qaeda operatives, including Jelaidan and Kazem. *Id. See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 33. |
| 25. Of IIRO's 32 foreign offices, eight were located at the same address as an MWL foreign office. They were located in Djibouti, Ethiopia, Indonesia, Jordan, Kenya, Pakistan, Philippines, and Tanzania. Ex. 48, IIRO Secretariat General Report 1421/1422H at IIRO341007-09. | Undisputed as a general matter for purposes of this motion. |
| 26. IIRO worked with other international relief organizations, including the United Nations High Commission on Refugees ("UNHCR") and the International Conference of Red Cross ("ICRC") and Red Crescent Societies. Ex. 3, First Obaid Decl. ¶ 13; Ex. 2, First Turki Decl. ¶ 15; Ex. 42, 2000-2001 Annual Report, at IIRO-004483-84 (reflecting UN cooperation), IIRO-004485 (reflecting participation in conference of International Federation of Red Crescent and Red Cross Societies). | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 27. The position of Secretary General was the most senior role in IIRO. Ex. 4, May 21, 2024 Basha Decl. ¶ 3; Ex. 47, 1998 IIRO Constitution, at MWL 039329 (Secretary General is "the chief of the executive body of organization and responsible for its performance"); Ex. 39, 2002 IIRO Constitution, at IIRO-000042 (same). | Disputed. To the extent that the IIRO argues that the Secretary General is the sole individual that exercises supervisory control over the IIRO's budget, operations, activities, and performance, that is inaccurate and misleading.<br><br>For instance, the MWL sought approval from the Saudi government to establish the IIRO in 1978. *See* Ex. 23, Transcript, September 17, 2018 Deposition of Abdullah al Obaid ("Obaid Transcript") at 73-74; Ex. 82, IIRO Annual |

| | |
|---|---|
| | Report 1999/2000, IIRO 212-330 at 215 (stating that Royal Approval No. 4834 was issued on January 29, 1979). The Constitution of the IIRO was later approved during the 35th session of the MWL Constituent Council, the legislating council of the MWL, held between October 7-10, 1997. *Id.*<br><br>The MWL Secretary General is designated to serve as the Chairman of the IIRO Board of Directors and also serves as the Chairman of the IIRO General Assembly. *See* Ex. 23, Obaid Transcript at 70-71; Ex. 26, Transcript, February 20, 2019 Deposition of Adnan Basha ("Basha Transcript") at 54, 99. The Secretary General of the MWL, a position equivalent to that of a Saudi government "minister," is also responsible for nominating individuals to serve as the IIRO Secretary General. *See, e.g.*, Ex. 231, MWL 59176; Ex. 26, Basha Transcript at 100.<br><br>The IIRO Board of Directors is the highest policy-making body of the IIRO, and its decisions are binding upon the executive body. *See* Ex. 82, IIRO Annual Report 1999/2000, IIRO 212-330 at 216. MWL officials, including the MWL Secretary General, hold a number of seats on the IIRO Board of Directors and directly influence the policies and activities of the IIRO. *See* Ex. 26, Basha Transcript at 128-130. *See also* Ex. 131, September 20, 2000 Minutes of the Sixth Meeting of the IIROSA Board of Directors, MWLIIRO-00016243-16246 at 1-2 (identifying 7 MWL officials serving on the IIRO Board of Directors, including the MWL Secretary General, the Assistant MWL Secretary General, the MWL Director General of Finance and Administration, and four members of the MWL Constituent Council).<br><br>The IIRO's domestic offices in Saudi Arabia are further headed by members of the Saudi royal family, who are themselves officials of the Saudi government. *See* Ex. 82, IIRO Annual Report 1999/2000, IIRO 212-330 at 220-226; Ex. 81, IIRO Annual Report 1998, IIRO 171-211 at 179-180. As heads of those offices, Saudi royal family members directed and supervised the operations and activities of the IIRO.<br><br>Moreover, during his tenure as MWL Secretary General, Dr. Obaid testified that he simultaneously served as a member of the Supreme Council of Islamic Affairs, which has the "responsibility for Saudi Arabia's Islamic policies in other countries." *See* Ex. 23, Transcript, September 17, 2018 Deposition of Dr. Abdullah al Obaid at 27; Ex. 147, Declaration of Abdullah bin Saleh al Obaid at ¶ 5. In particular, the Supreme Council for Islamic Affairs makes recommendations to the Saudi government concerning the provision of financial support to Islamic organizations |

| | |
|---|---|
| | operating outside of the Kingdom. *See* Ex. 23, Transcript, September 17, 2018 Deposition of Dr. Abdullah al Obaid at 37. *See also* Ex. 191, Declaration of Abdulaziz H. al Fahad at ¶ 8 (describing the Supreme Council of Islamic Affairs as "an arm of the government of Saudi Arabia, which carries out part of the foreign policy of the Kingdom"). As a member of the Supreme Council of Islamic Affairs, "an arm of the government of Saudi Arabia," Dr. Obaid oversaw and directed the activities of the MWL, IIRO, Al Haramain, and other Saudi-based da'wah organizations in support of the foreign policies of the Kingdom. |
| 28. The Secretary General and his advisors, Assistant Secretaries General, and the various departments and their directors formed the Secretariat General/Head Office. The Secretariat General was the main executive body of IIRO. Ex. 5, Helles Decl. ¶ 5; Ex. 6, Sarhan Decl. ¶ 2. | Undisputed as a general matter for purposes of this motion. |
| 29. Adnan Basha, Ph.D., served as Secretary General of IIRO from 1997 until 2013. Ex. 4, May 21, 2024 Basha Decl. ¶ 3. | Disputed. Plaintiffs acknowledge that Basha stepped down as IIRO Secretary General in January 2013. However, Basha continued to serve as an advisor to the MWL, the IIRO's parent organization, through at least 2019. *See* Ex. 184, Resume of Adnan Khalil Basha (Basha 0001); MDL ECF No. 3024 at 9. |
| 30. As Secretary General of IIRO, Adnan Basha managed IIRO's operations, supervised all department directors, and exercised oversight and control over IIRO through his oversight of the directors of IIRO's various departments. During Adnan Basha's tenure, IIRO employed approximately 1,000 employees across its offices. Ex. 4, May 21, 2024 Basha Decl. ¶ 6. | Disputed. *See, e.g.*, Plaintiffs' response to No. 27. |
| 31. While very familiar with IIRO's activities and operations, Adnan Basha was not involved in every single aspect of IIRO's day-to-day operations due to IIRO's large size and variety of work. Ex. 4, May 21, 2024 Basha Decl. ¶ 6. | Disputed. Basha, who served as IIRO Secretary General and a member of the IIRO Board of Directors, exerted significant control and influence over the operations of the domestic and overseas branch offices of the IIRO. By way of example, Basha authored and distributed a 50-point memorandum to all IIRO branch managers outside of Saudi Arabia in 1999, advising the branch managers that he is their direct source of authority, and instructing them to follow all procedures, regulations, and rules issued by the office of the Secretary General. *See* Ex. 86, IIRO 1219-1223. The memorandum details the protocols and procedures the branch managers are obligated to follow, including but not limited to: (1) requiring the periodic transmission of reports to the IIRO headquarters concerning office finances and assets, employee performance, projects and field visits, misappropriation and embezzlement of funds, and office raids; (2) requiring branch offices to cooperate and coordinate with the Saudi embassy in the host country; (3) requiring written approval for opening bank |

| | |
|---|---|
| | accounts and withdrawing funds; (4) requiring written approval to receive delegations; (5) requiring written approval to participate in any conference, course, or activity; and (6) requiring written approval to enter into contracts or agreements on behalf of the IIRO. Basha advises the branch managers that there should be "full compliance with the financial and administrative regulations and instructions issued by the Secretary General Office." *Id. See also* Ex. 84, IIRO 383 (April 29, 2000 letter from IIRO Secretary General Dr. Adnan Basha to Prince Turki bin Fahd bin Jalawi and other IIRO local offices, directing that expense vouchers for salaries and operational expenses be sent to headquarters on a regular basis.); Ex. 77, U.S. Diplomatic cable, *IIRO Secretary General Talks of Saudi Programs and Expansions*, October 9, 2006, FED-PEC 220554-220557 (Basha told political officials that "all 28 country branches report directly to the Jeddah office" and that IIRO "headquarters (HQ) controls all budgets, programs, and personnel in countries of operation – even data entry of individual orphans is done at the HQ level.").<br><br>Basha was also directly involved in coordination with Saudi embassies and ambassadors concerning the activities of the IIRO branch offices. *See, e.g.*, Ex. 119, IIRO 284660 (September 25, 2001 letter from Basha, consulting with the Saudi Ambassador to Jordan concerning the opening of an IIRO branch office in Palestine and the potential placement of two Palestinian nationals in the office); Ex. 121, IIRO 284675 (July 12, 2000 letter from Basha to the Saudi Ambassador in Moscow concerning the closure of the IIRO's office in Makhachkala and confiscation of the IIRO's assets); Ex. 122, IIRO 284963 (September 20, 1998 letter from Basha to the Undersecretary at the Ministry of Foreign Affairs requesting the Saudi embassies supervise the delivery of the orphans' benefits in Ghana, Tanzania, Mali, and Mauritania through the committees formed by the IIRO's offices in those countries).<br><br>By way of further response, to the extent the IIRO is arguing that Basha is exonerated from the nefarious and terrorist activities of the IIRO because he was detached or uninvolved in the "day-to-day" activities of the IIRO organization and its branch offices, that is preposterous. During Basha's leadership of the IIRO as Secretary General from 1997 through 2013, (1) Basha collaborated and worked closely with MWL, IIRO, Rabita Trust, and Al Haramain al Masjed al Aqsa ("AHAMAA") officials who directed substantial financial, material, logistical, and ideological support to al Qaeda (e.g., Omar Abdullah Naseef, Wa'el Hamza Jelaidan, Abd al Hamid Sulaiman al Mujil, Prince Turki bin Fahad bin Jalawi al Saud, Mohammad bin Abdullah al Taibah (Chairman/President of AHAMAA), Mohammad bin Abdullah al Dubayban (Board Member of AHAMAA), and others); (2) the IIRO's |

| | |
|---|---|
| | Philippines and Indonesian branch offices, and IIRO official Abd al Hamid Sulaiman al Mujil, were designated by the U.S. government as Specially Designated Global Terrorists ("SDGT") for providing extensive support to al Qaeda and associated terror groups; (3) an audit of the IIRO-Pakistan's branch office, dated just a few months before the 9/11 attacks, uncovered the apparent diversion of millions of dollars of funds by that branch, and the wholesale fabrication of invoices, receipts and entire projects to conceal that activity (the same branch office that was used by the IIRO to fund 6 al Qaeda training camps, according to the 1996 CIA Report); (4) the IIRO's branch office Bosnia-Herzegovina was investigated for "providing financial support to known terrorist organizations;" and (5) the IIRO's branch office in Nairobi, Kenya, was implicated in the 1998 U.S. Embassy bombings in Africa and the IIRO office was deregistered.<br><br>Moreover, there were multiple raids of IIRO branch offices, arrests of IIRO employees, and seizures of IIRO bank accounts during Basha's tenure as IIRO Secretary General. *See, e.g.*, Ex. 111, IIRO 122003 (October 7, 2003 raid of IIRO branch office in Tirana, Albania); Ex. 100, IIRO 42373 (October 4, 2001 raid of IIRO branch office in Albania); Ex. 99, IIRO 42360 (reporting that the Saudi Embassy intervened to retrieve IIRO documents seized during raid); Ex. 72, U.S. Diplomatic Cable, *Treasury Undersecretary Stuart Levey Visits Bahrain to Discuss AML/CFT Efforts*, February 20, 2006, FED-PEC 220490-220491 (stating that authorities in Bahrain closed an IIRO bank account "which is not registered as a charity in Bahrain but had opened an account illegally and was using the account to circumvent Saudi restrictions on sending money abroad"); Ex. 57, FED-PEC 210514-210517 (reporting that authorities in Bahrain closed IIRO accounts as a result of irregular transactions which circumvented Bahraini regulations on charities and their financial transactions and stating: "[D]uring the first half of 2005, IIRO headquarters provided over $7 million from an account in Shamil Bank of Bahrain in Manama to 18 different IIRO satellite offices. Among these transactions, IIRO provided funds from the Bahrain account to three Saudi Embassies. Director Werner noted that the second largest single recipient of these funds was IIRO's Djibouti office."); Ex. 75, U.S. Diplomatic cable, *International Islamic Relief Organization (IIRO) Seeks to Access Funds Frozen by Islami Bank Bangladesh*, November 3, 2008, FED-PEC 220511-220513 (Islami Bank of Bangladesh froze the IIRO's accounts in 2006); Ex. 154, PEC-KSA 965-978 at 972 ("The regional financial accountant for the IIRO, an Egyptian named Hossam Meawad Mohammad Ali, was detained by Croatian authorities in a raid in Zagreb in April 1995 and has relocated to Ljubljana."); Ex. 55, FED-PEC 203706-203709 (reporting on the arrest of IIRO |

| | |
|---|---|
| | employee, Syed Abu Nasir, for his involvement in an attempted terrorist operation to bomb the U.S. Consulates in Chennai and Calcutta); Ex. 43, FED-PEC0097363-97365 (reporting on the K-FOR military police raid on the joint IIRO-Saudi Joint Relief Committee office in Kosovo in 2000 because Osama bin Laden associates Wa'el Hamza Jelaidan and Adel Muhammad Sadiq Bin Kazem were using the office to help bin Laden "move money and men to and from the Balkans;"); Ex. 112, IIRO 122181-122182 (2003 letter from IIRO Secretary General Basha informing that K-FOR military police continue to surveil the IIRO in Kosovo.); Ex. 74, U.S. Diplomatic cable, *Macedonia: A/S O'Brien Visit Highlights Terrorism and Financing Issues*, August 22, 2007, FED-PEC 220506-220510 (reporting that the IIRO branch office in Macedonia was closed and its members were expelled from the country in March 1995); Ex. 154, PEC-KSA 965-978 at 972 ("The Macedonian government closed the IIRO office in Skopje in March 1995 for aiding Albanian ethnic political parties and the Albanian Islamic Youth Organization."); Ex. 121, IIRO 284675 (discussing the 1999 closure of the IIRO's branch office in Makhachkala, Russa, and the confiscation of the IIRO's assets); Ex. 46, FED-PEC 144926-145008 (U.N. indicating that following the 9/11 attacks, the government of Pakistan identified and expelled some two dozen al Qaeda supporters who had been working for IIRO-sponsored organizations in Pakistan); Ex. 138, MWL 15876-25877 (August 6, 1993 letters from Roberto R. Romulo, the Philippine Secretary of Foreign Affairs, addressing a July 22, 1993 raid of the MWL branch office in Makati by agents of the Bureau of Immigration and Deportation with arrest warrants for the MWL staff for operating without a license.); Ex. 123, IIRO 285529-285530 (October 16, 2002 letter from Sulaiman al Ali, former IIRO office manager in the United States, to IIRO Secretary General Adnan Basha, concerning the FBI's raid of the IIRO office in 1997.).<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 84-88 (detailing (1) the freezing of IIRO bank accounts by the government of Bangladesh in 2005 based on concerns that IIRO has ties to al Qaeda; (2) an IIRO bank account was closed by the government of Bahrain in 2005 for circumventing Saudi restrictions on sending money abroad; (3) the government of Makhachkala closing IIRO's branch office in 199 and confiscating the IIRO's assets; (4) the IIRO-Kenaya's connection to the 1998 U.S. Embassy bombings in Africa; (5) a 1995 raid of the IIRO-Vienna office by a German and Austrian counterterrorism task force; and (5) a 2000 raid of the joint IIRO-Saudi Joint Relief Committee office in an attempt to thwart potential U.S. attacks on U.S. interests). |

| | |
|---|---|
| 32. Of the items found in Bin Laden's compound, a comprehensive search of the names of IIRO and MWL in their Arabic names, as well as popular short-hand Arabic versions of their names, turned up no significant hits beyond mentions of these organizations in general publications or newspapers. Ex. 18, Brown Rpt. at 91. | To the extent that the IIRO argues that the absence of any "significant hits" is equivalent to a finding that the IIRO and MWL are innocent of terrorism charges, that is baseless and disputed. *See* Plaintiffs' responses to Nos. 1, 2, and 6. |
| **Muslim World League ("MWL")** | No response necessary. |
| 33. An international Islamic non-governmental organization involved in charitable projects around the world, MWL is, and was at all relevant times, based in Saudi Arabia. Ex. 2, First Turki Decl. ¶ 4; Ex. 3, First Obaid Decl. ¶ 4; Ex. 4, May 21, 2024 Basha Decl. ¶ 4; Ex. 9, Al-Hassani Decl. ¶ 3; Ex. 40, 2002 MWL Statute, at JT-MWL 00040. | Undisputed as a general matter for purposes of this motion. |
| 34. MWL was founded in 1962, is headquartered in Makkah, Kingdom of Saudi Arabia, and operates approximately 30 offices and cultural centers throughout the world. Ex. 2, First Turki Decl. ¶ 4; Ex. 3, First Obaid Decl. ¶ 4; Ex. 4, May 21, 2024 Basha Decl. ¶ 4; Ex. 9, Al-Hassani Decl. ¶ 9 ("The Secretariat General established offices outside of the Kingdom of Saudi Arabia ('Foreign Offices') as needed to pursue MWL's objectives."); Ex. 40, 2002 MWL Statute, at JT-MWL 00040. | Undisputed as a general matter for purposes of this motion. |
| 35. Secretaries General of MWL served as the *ex officio* Chair of the IIRO Board of Directors. Ex. 2, First Turki Decl. ¶ 14; Ex. 3, First Obaid Decl. ¶ 12; Ex. 4, May 21, 2024 Basha Decl. ¶ 7; Ex. 39, 2002 IIRO Constitution, at IIRO-000024; Ex. 47, 1998 IIRO Constitution, at MWL 039326. | Disputed as stated. Plaintiffs acknowledge that the MWL Secretaries General may have served as the Chair of the IIRO Board of Directors by virtue of their appointments as Secretary General. However, to the extent that IIRO suggests that the MWL Secretaries General did not participate in those Board of Directors meetings and/or exercise their influence over issues relating to the IIRO's budget, operations, and activities, that is inaccurate and misleading. *See, e.g.*, Ex. 144, August 5, 1999 IIRO Board of Directors Meeting Minutes, MWLIIRO-00016270-16276 (MWL Secretary General Obaid attending and presenting speech); Ex. 141, May 27, 2001 IIRO Board of Directors Meeting Minutes, MWLIIRO-00016233-16237 (MWL Secretary General Turki attending and discussing proposed statute of the IIRO); Ex. 143, MWLIIRO-00016260-16267 (MWL Secretary General Obaid attending, presenting speech, and discussing issues relating to the IIRO Investment Committee, budget, etc.). |
| 36. When serving as the *ex officio* Chair of the IIRO Board of Directors, the MWL Secretary General was one of many members of the board, ranging from 12 to 24 over the years. Ex. 10, Second Turki Decl. ¶ 18; Ex. 47, 1998 IIRO Constitution at MWL-039328; Ex. 44, 1998 Annual | Disputed. Plaintiffs acknowledge there were many members of the IIRO Board of Directors. However, IIRO fails to inform that members of the Board of Directors included al Qaeda's most important financiers, including but not limited to Ibrahim Mohammad Afandi and Abdurahman Abdul-Qader Faqih |

| | |
|---|---|
| Report at IIRO-003718; Ex. 43, 1999-2000 Annual Report at IIRO-003597; Ex. 70, IIRO BOD Meeting in 2000, at MWLIIRO-16243-44; Ex. 42, 2000-2001 Annual Report at IIRO-004407; Ex. 39, 2002 IIRO Constitution at IIRO-000033. | (members of Al Qaeda's "Golden Chain" of financial donors). *See* Ex. 144, August 5, 1999 IIRO Board of Directors Meeting Minutes, MWLIIRO-00016270-16276 (Afandi and Faqih attending as board members); Ex. 143, MWLIIRO-00016260-16267 (Afandi and Faqih attending as board members); Ex. 142, MWLIIRO-00016247-16255 (al Qaeda financier and member of "Golden Chain," Saleh Kamel, advising the IIRO board members concerning financial investments); Ex. 153, August 29, 2002 Interview with Jamal al Fadl, PEC-KSA000329-352 at 351 (Fadl explained to the FBI that the "'Golden Chain' consisted of wealthy individuals from the Gulf region who provided BIN LADEN and Al QAEDA with money on a regular basis."); Ex. 1, 9/11 Commission Final Report at 55 (stating that Osama bin Laden's organization "included a financial support network that came to be known as 'the Golden Chain,' put together mainly by financiers in Saudi Arabia and Persian Gulf states.").<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 20, 2020 at ¶ 156 (discussing the discovery and significance of the list of "Golden Chain" terrorism financiers, including members of the IIRO's Board of Directors and Executive Committee – Ibrahim Mohammad Afandi, Abdurahman Abdul-Qader Faqih, and Saleh Kamel). |
| 37. Abdullah Naseef, Ph.D. served as Secretary General of MWL from 1983 to 1993. Ex. 7, 2026 Fawzi Decl. ¶ 10; Ex. 63, Decision Ending Secondment of Abdullah Naseef (Aug. 1993), MWL-059188. | Disputed as stated. Plaintiffs acknowledge that Naseef stepped down as MWL Secretary General in or around 1993. However, IIRO fails to inform that Naseef maintained significant contacts with the MWL and IIRO long after he left that position. For example, on February 24, 2015, Naseef was a featured speaker at a MWL conference in Mecca discussing the war on terrorism. In March 2014, Naseef presided over a Pakistan Repatriation Council event held in Jeddah in which the former MWL Secretary-General urged for the reactivation of the Rabita Trust, which had been shut down following its 2001 designation by the U.S. government for providing material support to al Qaeda. In September 2014, Naseef attended a meeting of the IIRO's General Assembly to discuss the IIRO's humanitarian and relief efforts. According to media reports, Naseef (a member of the IIRO General Assembly) was one of several "leading participants." On October 21, 2012, Naseef delivered a speech at a MWL conference. In December 2008, Naseef chaired a panel discussion at an Islamic religious conference organized by the MWL. In June 2008, in his capacity as Secretary-General of the International Islamic Council for Da'wa and Relief ("IICDR"), Naseef was a featured speaker at an Islamic conference hosted by the MWL at its headquarters in Mecca. In April 2003, the MWL weekly magazine, Al Alaam Al Islami, reported that the Holy Mecca Institution ("Mecca al Mukaramah"), an integral part of the MWL, held a Board of Trustees meeting. The meeting was led |

| | |
|---|---|
| | by MWL Secretary General Abdullah bin Abdul Mohsen Turki, who simultaneously served as the Chairman of the Holy Mecca Institution's Board of Trustees. Naseef participated in that meeting as Deputy Chairman of the Board of Trustees. *See* MDL ECF No. 3024 at 7-8. |
| 38. Abdullah bin Saleh Al-Obaid, Ph.D, served as Secretary General of MWL from 1996 to 2000. Ex. 3, First Obaid Decl. ¶ 3. | Disputed as stated. Plaintiffs acknowledge that Obaid stepped down as MWL Secretary General in or around 2000 or 2001. *See* Ex. 22, Declaration of Abdullah bin Saleh al Obaid (indicating that he served as MWL Secretary General until 2000), Ex. 146, Biography of Abdullah bin Saleh al Obaid, Al-Obaid 0001-0005 at 0002 (indicating that he served as the MWL Secretary General until 2001). However, IIRO fails to inform that Obaid maintained a continuing relationship with the MWL and IIRO, serving in several high-level positions since 2002. For instance, in a May 21, 2015 report posted on the MWL's website, Secretary-General Turki presided over a meeting of representatives from numerous MWL bodies and affiliated organizations. Obaid attended in his official role as the head of the MWL Monitoring Committee and was responsible for presenting the resolutions of the conference to the attendees. In December 2014, Obaid is identified in media reports as a member of the MWL Supreme Council. In September 2014, Obaid attended the meeting of the IIRO's General Assembly. A member of the General Assembly like Omar Abdullah Naseef, Obaid was reported to be one of several "leading participants." In August 2008, Obaid was responsible for chairing a panel discussion at a conference organized by the MWL. Obaid has also served as Vice-President of the International Islamic Council for Da'wa and Relief ("IICDR"), mentioned above. Member organizations include the MWL, IIRO and WAMY. As of April 2003, Obaid served as a member of the Holy Mecca Institution's Board of Trustees, closely associated with the MWL and Abdullah bin Abdul Mohsen Al-Turki and Omar Abdullah Naseef. Finally, following his tenure as MWL Secretary-General, Obaid served as a member of the MWL Constituent Council. *See* MDL ECF No. 3024 at 8. |
| 39. In 2000, MWL Secretary General Abdullah bin Saleh Al-Obaid completed his term as Secretary General of MWL and thus left his board position at IIRO. Ex. 11, Second Obaid Decl. ¶ 16. | Disputed. *See, e.g.*, Plaintiffs' response to No. 38. |
| 40. Abdullah bin Abdul Mohsen Al-Turki, Ph.D, served as Secretary General of MWL from 2000 to 2016. Ex. 2, First Turki Decl. ¶ 3; Ex. 22, Turki Dep. Tr. at 66:4-9 (*Errata*). | Undisputed as a general matter for purposes of this motion. |
| 41. In 2016, MWL Secretary General Abdullah bin Abdul Mohsen Al-Turki completed his term as Secretary | Undisputed as a general matter for purposes of this motion. |

| | |
|---|---|
| General of MWL and thus left his board position at IIRO. Ex. 10, Second Turki Decl. ¶ 23. | |
| 42. Despite being Chairman of the IIRO Board, the MWL Secretary General did not control or supervise IIRO's day-to-day operations, had only a high-level of involvement with IIRO's operations, and did not have a role in IIRO's day-to-day operations. Ex. 10, Second Turki Decl. ¶ 18; Ex. 11, Second Obaid Decl. ¶ 10; Ex. 4, May 21, 2024 Basha Decl. ¶ 7; Ex. 23, Obaid Dep. Tr. at 311:18-312:2. | Disputed as stated. Plaintiffs acknowledge that the MWL Secretaries General may not have been involved in every single aspect of IIRO's daily operations. However, to the extent that IIRO suggests the MWL Secretaries General did not exercise their influence over issues relating to the IIRO's budget, operations, and activities, that is inaccurate and misleading. *See, e.g.*, Ex. 144, August 5, 1999 IIRO Board of Directors Meeting Minutes, MWLIIRO-00016270-16276 (MWL Secretary General Obaid attending and presenting speech); Ex. 141, May 27, 2001 IIRO Board of Directors Meeting Minutes, MWLIIRO-00016233-16237 (MWL Secretary General Turki attending and discussing proposed statute of the IIRO); Ex. 143, MWLIIRO-00016260-16267 (MWL Secretary General Obaid attending, presenting speech, and discussing issues relating to the IIRO Investment Committee, budget, etc.).<br><br>By way of further response, to the extent the IIRO is arguing that the MWL Secretaries General are exonerated from the nefarious and terrorist activities of the IIRO because they were detached or uninvolved in the "day-to-day" activities of the IIRO organization and its branch offices, that is preposterous. During their leadership: (1) they collaborated and worked closely with MWL, IIRO, Rabita Trust, and Al Haramain al Masjed al Aqsa ("AHAMAA") officials who directed substantial financial, material, logistical, and ideological support to al Qaeda (e.g., Omar Abdullah Naseef, Wa'el Hamza Jelaidan, Abd al Hamid Sulaiman al Mujil, Prince Turki bin Fahad bin Jalawi al Saud, Mohammad bin Abdullah al Taibah (Chairman/President of AHAMAA), Mohammad bin Abdullah al Dubayban (Board Member of AHAMAA)); (2) the IIRO's Philippines and Indonesian branch offices, and IIRO official Abd al Hamid Sulaiman al Mujil, were designated by the U.S. government as Specially Designated Global Terrorists ("SDGT") for providing extensive support to al Qaeda and associated terror groups; (3) an audit of the IIRO-Pakistan's branch office, dated just a few months before the 9/11 attacks, uncovered the apparent diversion of millions of dollars of funds by that branch, and the wholesale fabrication of invoices, receipts and entire projects to conceal that activity (the same branch office that was used by the IIRO to fund 6 al Qaeda training camps, according to the 1996 CIA Report); (4) the IIRO's branch office Bosnia-Herzegovina was investigated for "providing financial support to known terrorist organizations;" (5) the IIRO's branch office in Nairobi, Kenya, was implicated in the 1998 U.S. Embassy bombings in Africa and the IIRO office was deregistered; (6) the joint IIRO/SJRC office in Pristina, Kosovo, run by Osama bin Laden associates |

| | |
|---|---|
| | Wa'el Hamza Jelaidan and Adel Muhammad Sadiq Bin Kazem, was raided by K-FOR military police because they were using the office to help bin Laden "move money and men to and from the Balkans;" and (7) additional raids and closures were conducted on IIRO branch offices in the United States, Albania, Macedonia, and Russia.<br><br>*See also* Plaintiffs' responses to Nos. 37 and 38 (detailing MWL Secretary General Naseef and MWL Secretary General Obaid's continuing work on behalf of, and influence over, the MWL and IIRO after their terms as Secretary General had been completed). |
| **Muhammad Jamal Khalifa ("Khalifa")** | No response necessary. |
| 43. Plaintiffs have no evidence that Muhammad Jamal Khalifa had any foreknowledge or was involved in the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; *see generally* 9/11 Commission Report; Monograph. | Disputed. The IIRO's claim that there is no evidence that Muhammad Jamal Khalifa had any foreknowledge of or was involved in the planning or execution of the 9/11 attacks, is inaccurate and misleading. The IIRO, Khalifa, and the IIRO-Philippines branch office were witting supporters of Osama bin Laden, al Qaeda, and associated terrorist organizations (Abu Sayyaf Group, Moro Islamic Liberation Front) for more than a decade leading up to the 9/11 attacks and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States. Khalifa, a founding member of al Qaeda and Osama bin Laden's brother-in-law, operated at the very center of al Qaeda's leadership, operations, and financial and logistical support structure during the critical period leading up to the 9/11 attacks, and was well aware of al Qaeda's terrorist intentions at all relevant times. As the head of the IIRO branch office in the Philippines, Khalifa personally orchestrated IIRO's funding and support for the Bojinka terrorist plot conceived by 9/11 mastermind Khalid Sheikh Mohammed, the precursor to the 9/11 attacks. *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶¶ 31-32, 107-120; Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12, 24.<br><br>As referenced herein, Dr. Omar Abdullah Naseef, in his capacity as the MWL Secretary General and IIRO Chairman, approved the appointment of Khalifa to open a joint MWL/IIRO branch office in the Philippines, contemporaneous with the formation of al Qaeda, on June 5, 1988. *See* Ex. 51, FED-PEC 202846-202847. At the time of his appointment, the MWL and IIRO were fully aware that Khalifa was a prominent veteran of the Afghan jihad, a close associate of bin Laden, and member of al Qaeda. Shortly after assuming that post, Khalifa used the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia, and a source of funding for al Qaeda affiliated terrorist organizations such as the Abu Sayyaf Group ("ASG"). *See* Ex. 37, Expert Report of |

| | |
|---|---|
| | Dr. Matthew Levitt, March 9, 2020, at 11 (Southeast Asia became a "major center for operations" for al Qaeda for several reasons. One of these was "the network of Islamic charities, the spread of poorly regulated Islamic banks, business-friendly environments, and economies that already had records of extensive money laundering.").<br><br>Using IIRO funds, Khalifa established a network of charities, businesses, and Islamic institutions in the Philippines (e.g., Dar al Imam al Shafi'e, Khalifa Trading Industries, ET Dizon Travel Pyramid Trading, and Manpower Services), to support international terrorism and fund the ASG. *See* Ex. 6, Center for Contemporary Conflict, *Al Qaeda Finances and Funding to Affiliated Groups*, January 2005, PEC-KSA001998-2013 at 2003; Ex. 156, U.S. Diplomatic Cable, *Islamic NGOs in the Philippines*, May 23, 2005, PEC-KSA 1461-1463 at 1462 ("Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 ("IIRO has also been cited as the conduit for funds from Usama Bin Laden to terrorist organizations, specifically that the Abu Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO."); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149-152 (indicating that al Qaeda member Mohammed Jamal Khalifa served in an official role with the MWL, and used the IIRO branch office in the Philippines to fund the Abu Sayyaf Group, an al Qaeda associated terrorist organization, and recruit Muslims for military training); Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 110-113 (According to the U.S. government, IIRO's branch in the Philippines was (i) headed by Osama bin Laden's brother-in-law and al Qaeda official, Mohammed Jamal Khalifa, who maintained close relationships with other senior al Qaeda members and financiers; (ii) provided ASG members with transit assistance to Afghanistan for military training; and (iii) additionally provided support for terrorist attacks conducted by ASG); *id.* at 107 ("The Abu Sayyaf Group [ASG] is the most violent of the separatist groups operating in the Southern Philippines and was designated as an SDGT pursuant to E.O. 13224 on September 24, 2001. It was formed in the early 1990's and received support and seed money from al Qaida."). *See also* |

| | |
|---|---|
| | Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶¶ 31-32, 107-120.<br><br>Beyond his role in establishing and supporting ASG, Khalifa personally orchestrated the use of IIRO funds and resources to support the terrorist activities of 9/11 mastermind Khalid Sheikh Mohammed ("KSM"), Ramzi Yousef (1993 World Trade Center bomber), and Wali Khan Amin Shah (Afghan jihad veteran and Osama bin Laden/al Qaeda associate) in the Philippines, and the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations of twelve U.S. flag commercial airplanes as they flew from Asia to the United States. That very plot, often referred to as "Operation Bojinka," was adapted into the 9/11 terrorist plot by KSM, using the knowledge he had acquired during its development about vulnerabilities in the aviation security system. *See* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 (stating that the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."). *See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020, at 11-12 (discussing IIRO and Khalifa's connections to Khalid Sheikh Mohammed, Ramzi Yousef, and the Operation Bojinka plot); *See* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 30-31 (discussing 1996 CIA Report); Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12, 24 (discussing the Bojinka plot).<br><br>In 2006, the United States formally designated the IIRO-Philippines branch office "for facilitating fundraising for al Qaida and affiliated terrorist groups." *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112. *See id.* ("The IIRO-PHL is a source of funding for the al Qaida affiliated ASG. IIRO-PHL has served as a liaison for the ASG with other Islamic extremist groups. A former ASG member in the Philippines familiar with IIRO operations in the country reported that a limited amount of foreign IIRO funding goes to legitimate projects and the rest is directed to terrorist operations."). *id.* ("The Philippine branches of the IIRO were founded sometime in the late 1980s or early 1990s by Muhammad Jamal Khalifah, who is Usama bin Laden's brother-in-law and has been identified as a senior al Qaida member. IIRO-PHL's |

| | |
|---|---|
| | director, Abd al-Hadi Daguit, is a trusted associate of Khalifah."); *id.* ("While working as the director of IIRO-PHL, Khalifah maintained close connections with al Qaida through his relations with senior al Qaida supporters, including Specially Designated Global Terrorist (SDGT) Wa'el Hamza Julaidan. At the time Khalifah directed the IIRO-PHL, he employed an ASG intelligence officer as the provincial director of the IIRO-PHL in the Tawi-Tawi region of the Southern Philippines until that officer's death in 1994."); *id.* ("In the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-PHL and used the organization to funnel money to terrorist groups including the ASG. Afif was implicated in the assassination of Father Salvatore Carzeda in San Jose Gusu, Zamboanga City, Philippines on June 20, 1992."). *See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 35 (August 3, 2006 designation of the IIRO).<br><br>*See also* Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 110 ("Bases for Designation of the IIRO Philippines Branch [IIRO-PHL] – Background on Al Qaida Control of IIRO-PHL – [REDACTED] The Philippine branch of the IIRO [IIRO-PHL] was founded some time in the [blank]ly 1990s by UBL's brother-in-law and senior al Qaida member Muhammad Jamal Khalifah [Khalifah]. While working as the director of IIRO-PHL, Khalifah maintained close relations with UBL and al Qaida and has maintained close ties to senior al Qaida figures Abdullah Azzam and Abdulhassan al-Midani a.k.a. Wa'el Hamza Julaidan, a long-time senior official of the IIRO (and the Muslim World League). [REDACTED] Khalifah came to the Philippines from Afghanistan to establish the IIRO office there at the suggestion and facilitation of Julaidan. [REDACTED] Khalifah also maintained ties to ASG officials while in the Philippines [REDACTED]."); *id.* at 111 ("IIRO-PHL Senior Official Provided Support for Recent ASG Terrorist Attack – [REDACTED]. This bombing killed three people and wounded 41."); *id.* at 111-112 ("IIRO-PHL Provides Financial and Material Support to ASG – [REDACTED] According to July 2004 Department of Defense reporting, IIRO was believed to have [illegible] [REDACTED] in the Southern Philippines for extremists transiting to and from Indonesia. The IIRO also provided documentation and other aid to assist these extremists."); *id.* at 113 ("According to the Umog interrogation report, IIRO-PHL, under the direction of Khalifah, also sent ASG and MILF members to Afghanistan to train with the 'mujahidin.' Khalifah stated that he wanted the ASG and the MILF to train together to establish alliances among the groups."). |

| | |
|---|---|
| | *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211425 ("It has been further monitored that MWL, which generates funding for a number of relief programs in Afghanistan, Bosnia, and Chechnya, has been infiltrated by a number of key strategist and financiers of international terrorism. International terrorist financier Mohammad Khalifa (Brother-in-law to Bin Laden) is affiliated with the MWL and is in fact suspected of providing financing to the World Trade Center bombers through the auspices of the MWL.").<br><br>Moreover, U.S. State Department communications and diplomatic cables describe the involvement of the IIRO, Khalifa, and the IIRO-Philippines branch office in supporting al Qaeda, Abu Sayyaf Group, Moro Islamic Liberation Front, Hamas, and other terrorist groups in the region. *See, e.g.*, Ex. 164, December 16, 1994 State Department Letter, PEC-KSA 2260-2261 (Philip C. Wilcox, Jr., the Department of State's Coordinator for Counterterrorism, advises that Khalifa financed a 1994 attack on a Jordanian movie theater, and that "the United States Government has evidence that Muhammad Jamal Khalifa, who has lived in the Philippines for a number of years, has provided financial support to the Philippine terrorist group Abu Sayyaf."); Ex. 165, December 20, 1994 State Department Letter, PEC-KSA 2262-2263 (Philip C. Wilcox, Jr., the Department of State's Coordinator for Counterterrorism, states that (1) Khalifa has provided support to terrorist groups in the Philippines; (2) Khalifa has helped organize efforts by former fighters in Afghanistan to provide training and assistance to terrorists in the Philippines; (3) Khalifa has extensive ties to Hamas; and (4) Khalifa has ties to the terrorist organization Gama't Islamiya.); Ex. 166, December 1994 U.S. Diplomatic Cable, PEC-KSA 2264-2274 (Secretary of State Warren Christopher's office states: "Khalifa is an officer of an Islamic NGO in the Philippines that is a known Hamas front and has financed terrorist operations. Khalifa is reported to be the brother in law of Usama Bin Laden, the Sudan-based financier of Islamic extremists. Khalifa is believed to have provided support to the Philippine terrorist group Abu Sayyaf."); Ex. 167, December 1994 U.S. Diplomatic Cable, PEC-KSA 2275-2276 (stating that Khalifa is a "known financier of terrorist operations and an officer of an Islamic NGO in the Philippines that is a known Hamas front"); Ex. 168, April 1995 U.S. Diplomatic Cable, PEC-KSA 2277-2280 (stating that Khalifa "is a principal financier of Abu Sayyaf"); Ex. 169, October 2001 U.S. Diplomatic Cable, PEC-KSA 2281-2304 (Secretary of State Colin Powell's office stating that "Philippine authorities reported that Saudi national Muhammad Jamal Khalifa who ran two Islamic |

| | |
|---|---|
| | nongovernmental organizations in Manila was the major financier of the terrorists arrested there. Khalifa who has also been implicated in terrorist activities in Jordan is Bin Ladin's brother-in-law."); Ex. 159, April 2004 U.S. Diplomatic Cable, PEC-KSA 1467-1470 (Secretary of State Colin Powell's office stating that the "IIRO has also been cited as the conduit for funds from Usama Bin Laden to terrorist organizations, specifically that the Abu Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO."); Ex. 158, June 2004 U.S. Diplomatic Cable, PEC-KSA 1464-1466 (Secretary of State Colin Powell's office detailing the IIRO's support for al Qaeda and the Abu Sayyaf terrorist group, and stating: "The USG believes that some elements of the International Islamic Relief Organization (IIRO) have been exploited by terrorists and their financiers as a means of transferring assets, providing organizational cover, or otherwise supporting extremist, violent operations."); Ex. 71, U.S. Diplomatic Cable, *Islamic NGOs in the Philippines*, May 23, 2005, FED-PEC 220479-220481 ("The International Islamic Relief Organization (IIRO) -- a subsidiary of the Saudi-based and funded Muslim World League (MWL) -- was active here in the late 1980s and early 1990s. Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines."); Ex. 73, U.S. Diplomatic Cable, *APHSCI Townsend February 6 Meeting With Foreign Minister Prince Saud Al-Faisal*, February 24, 2007, FED-PEC 220503-220505 (reporting that the U.S. government raised concerns with Saudi officials concerning the potential involvement of the Saudi Ambassador to the Philippines in terrorism facilitation, particularly his involvement to get two members of IIRO out of prison).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 37 ("Hamas, the Palestinian terrorist group, has also benefited from IIRO support."); *id.* (stating that when Mohammed Jamal Khalifa was detained in the United States in December 1994, materials seized included "information and contacts for Hamas and Palestinian Islamic Jihad"); *id.* ("[I]n in the Philippines, the IIRO employed 'the majority of Hamas members,' and there, the Hamas meetings were led by a 'high ranking' IIRO official.").<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 36 ("The IIRO has provided extensive support to Jemaah Islamiyya, the militant Southeast Asian organization tied to al Qaeda. According to U.S. Treasury Department, Abd |

| | |
|---|---|
| | Al Hamid Sulaiman Al-Mujil, Executive Director of an IIRO office who was named a specially designated individual, invited a Philippines-based JI supporter to travel to Saudi Arabia in 2004. This supporter used the guise of undertaking the hajj pilgrimage for his travel, and al-Mujil planned for him to carry cash back to the JI in the Philippines. Treasury also revealed that an IIRO office supported JI by providing assistance with recruitment of members, transportation and logistics, and provided a safe-haven.").<br><br>*See also* Ex. 33, European Parliament, *The Involvement of Salafism/Wahhabism in the Support and Supply of Arms to Rebel Groups Around the World*, June 2013, at 9 ("Declassified intelligence reports from the FNP revealed that in 1988 Bin Laden sent his brother-in-law Mohammad Jamal Khalifa to the Philippines to set up Al Qaeda's branches in Southeast Asia. The so-called Khalifa network counted at least twelve charitable organizations and front companies that provided funds to both the Moro Islamic Liberation Front (MILF) and Abu Sayyaf. One of the most active organizations in this sense was the IIRO. In fact, IIRO-funded facilities were mainly built in Mindanao, a region under the control of the aforementioned rebel groups. For instance, the head of IIRO's branch office in Tawi Tawi, Mindanao, was Abdul Asmad, former Abu Sayyaf's intelligence chief until 1994 when he died (Abuza, 2003, p. 27). The office was used by Al Qaeda to siphon money on behalf of the MILF and Abu Sayyaf. According to defectors' interrogations, this practice was very effective considering that Al Qaeda was able to divert the 70-90 percent of funds for arms acquisition destined to the rebel groups. This means that only the 10-30 percent of the money remained available for legitimate purposes."). |
| 44. Plaintiffs have no evidence that Muhammad Jamal Khalifa had any foreknowledge or was involved in the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; see generally 9/11 Commission Report; Monograph. | Duplicative and disputed. *See, e.g.*, Plaintiffs' response to No. 43. |
| 45. Plaintiffs have no evidence tracing funds from Muhammad Jamal Khalifa for the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at EO14040-000011; Ex. 20, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); see generally 9/11 Commission Report; Monograph. | Disputed. The IIRO's claim that there is no evidence tracing funds or other in-kind support from Khalifa to the planning and execution of the 9/11 attacks, is inaccurate and misleading. As described herein, the IIRO, Khalifa, and the IIRO-Philippines branch office were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance and other resources to bin Laden, al Qaeda, and associated terrorist organizations |

| | |
|---|---|
| | (Abu Sayyaf Group, Moro Islamic Liberation Front) for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks. Accordingly, the 9/11 attacks were a predictable, inevitable product of that sustained, knowing support. Plaintiffs need not prove that the funds or other in-kind support provided to al Qaeda were traced to the terrorist plot or the attack itself.<br><br>By way of further response, Khalifa personally orchestrated the use of IIRO funds and resources to support the terrorist activities of 9/11 mastermind Khalid Sheikh Mohammed ("KSM"), Ramzi Yousef (1993 World Trade Center bomber), and Wali Khan Amin Shah (Afghan jihad veteran and Osama bin Laden/al Qaeda associate) in the Philippines, and the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations of twelve U.S. flag commercial airplanes as they flew from Asia to the United States. That very plot, often referred to as "Operation Bojinka," was adapted into the 9/11 terrorist plot by KSM, using the knowledge he had acquired during its development about vulnerabilities in the aviation security system. *See* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 (stating that the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."). *See also* Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12, 24 (discussing the Bojinka plot). |
| **46.** Plaintiffs have no evidence tracing funds from IIRO through Jamal Khalifa to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021), at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from IIRO to the planning or execution of the 9/11 Attacks); Kohlmann Rpt. ¶¶ 27-70 (same); Levitt Rpt. at 29-35 (same); Jenkins Rpt. (same); Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); see also Ex. 18, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting | Disputed. The IIRO's claim that there is no evidence tracing funds or other in-kind support from IIRO through Khalifa for the planning and execution of the 9/11 attacks, is inaccurate and misleading. As described herein, the IIRO, Khalifa, and the IIRO-Philippines branch office were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance and other resources to bin Laden, al Qaeda, and associated terrorist organizations (Abu Sayyaf Group, Moro Islamic Liberation Front) for years knowing that the funds |

| | |
|---|---|
| the use of charities for raising or moving money."); ECF No. 8911 at 9; ECF No. 8129-22 at 27; see generally 9/11 Commission Report; Monograph. | would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks. Accordingly, the 9/11 attacks were a predictable, inevitable product of that sustained, knowing support. Plaintiffs need not prove that the funds or other in-kind support provided to al Qaeda were traced to the terrorist plot or the attack itself.<br><br>By way of further response, Khalifa personally orchestrated the use of IIRO funds and resources to support the terrorist activities of 9/11 mastermind Khalid Sheikh Mohammed ("KSM"), Ramzi Yousef (1993 World Trade Center bomber), and Wali Khan Amin Shah (Afghan jihad veteran and Osama bin Laden/al Qaeda associate) in the Philippines, and the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations of twelve U.S. flag commercial airplanes as they flew from Asia to the United States. That very plot, often referred to as "Operation Bojinka," was adapted into the 9/11 terrorist plot by KSM, using the knowledge he had acquired during its development about vulnerabilities in the aviation security system. *See* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 (stating that the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."). *See also* Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12 (discussing the Bojinka plot). |
| 47. Plaintiffs have no evidence that IIRO was aware of or had knowledge before 9/11 of any connection between Muhammad Jamal Khalifa and Al Qaeda. See Ex. 4, May 21, 2024 Basha Decl. ¶¶ 23-27, 29, 32-33; Ex. 6, Sarhan Decl. ¶ 30; Ex. 5, Helles Decl. ¶¶ 24-25, 28-32, 34-35, 38-43; *id.* ¶ 43 (no knowledge of any support by IIRO or anyone within IIRO to Al Qaeda or other terrorist organizations); Ex. 6, Sarhan Decl. ¶ 30; Ex. 18, Brown Rpt. at 7-8, 63 (review of primary sources shows no evidence that IIRO or MWL supported Al Qaeda); *id.* ¶ 40; U.S. Dept. of Treas., Office of Foreign Assets Control, Archive of Changes to OFAC's Sanctions Lists (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn- list/archive-of-changes-to- | Disputed. The IIRO's claim that it was unaware of any connection between Khalifa and al Qaeda prior to 9/11, is inaccurate and misleading. As discussed herein, MWL Secretary General Dr. Abdullah Omar Naseef participated in a meeting with Osama bin Laden and others during the formation of al Qaeda and entered into an agreement with bin Laden that the MWL and IIRO would be used to provide support and cover for al Qaeda's operations. *See* Ex. 61, FED-PEC0212276-212281. The document suggests using the name of the "League" as "an umbrella which you can stay under … because Dr. Naseef is one of the brothers, and the government knows who Abu Al-Hasan [Wa'el Hamza Jelaidan] is." *Id.* at 212276, 212278. |

| | |
|---|---|
| the-sdn-list (reflecting that OFAC never designated Khalifa). | At the time of this meeting, Khalifa was serving as the director of the MWL's office in Peshawar, Pakistan. Dr. Naseef had known Khalifa for a number of years at this time, and was aware, like many others, that Khalifa was a veteran of the Afghan jihad, a close associate of bin Laden, and a member of al Qaeda. *See* Ex. 145, BUR-PEC 25755 (October 17, 1994 letter from Dr. Naseef attesting that "I have known Mohammed Gamal Khalifah when he was a student at the university, and then when he was working as a director of the Muslim World League's office in Pakistan, and director of the Muslim World League's office in the Philippines and director of the Islamic Relief Organization's office in the Philippines."). Given his relationship with Khalifa, and knowing Khalifa's background, Naseef knew he could trust Khalifa to oversee the IIRO and MWL in the Philippines and use those resources to provide financial, ideological, and operational support for al Qaeda and associated terrorist groups, as he had planned and agreed to with bin Laden. |
| 48. Plaintiffs have no evidence that IIRO was aware of or had knowledge before 9/11 of any connection between Muhammad Jamal Khalifa and the Moro Islamic Liberation Front ("MILF"). See Ex. 4, May 21, 2024 Basha Decl. ¶ 41 (no knowledge of assistance by IIRO/IIRO Philippines to MILF); Ex. 8, Daguit Decl ¶ 34 (no knowledge of connection between IIRO Philippines and MILF); Ex. 5, Helles Decl. ¶ 43 (no knowledge of any support by IIRO or anyone within IIRO to Al Qaeda or other terrorist organizations); Ex. 18, Brown Rpt. at 40; U.S. Dept. of Treas., Office of Foreign Assets Control, Archive of Changes to OFAC's Sanctions Lists (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list (reflecting that OFAC never designated Khalifa). | Disputed. Prior to the 9/11 attacks, IIRO leadership was expressly aware of the organization's ongoing support for international terrorism and Osama bin Laden, and the involvement of its branch offices and officials in terrorist activities, including the IIRO-Philippines office and Mohammed Jamal Khalifa, by virtue of extensive international media reporting. Any assertion that the IIRO, and/or its parent organization MWL, was unaware of its substantial support for al Qaeda and terrorist activities, including Khalifa's connections to MILF, is duplicitous. *See, e.g.*, Ex. 44, Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000, FED-PEC 10813-10815 (reporting that the IIRO was "being used by accused international terrorists Osama bin Laden and his brother-in-law, Mohammad Jamal Khalifa as a front to finance the operations of the Abu Sayyaf and the Moro Islamic Liberation Front," and that the bulk of IIRO "fund[s] goes to terrorist operations of the Abu Sayyaf and the MILF"); Ex. 79, The Age, *Filipino Muslims Linked to Holy Warrior's Global Terror*, May 20, 1995 (reporting on the discovery of al Qaeda's terrorist plot in the Philippines ("Bojinka") and explaining that Mohammed Jamal Khalifa of the IIRO, a "key figure in the network of Islamic extremists," was funding Islamic militants in the Philippines); Ex. 54, Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report*, February 13, 1999, FED-PEC 203704-203705 (reporting that the IIRO's Mohammed Jamal Khalifa "is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group," and further stating that the "IIRO is suspected by Western intelligence agencies to be bin Laden's conduit to various terrorist organizations in Islamic |

| | |
|---|---|
| | countries"). *See also* Ex. 80, IIRO 147 ("IIRO Administrative Structure" chart identifying a "Department of Media and Information."); Ex. 65, FED-PEC 214874-214875 (MWL structural chart identifying "The General Department for Media and Culture").<br><br>Moreover, to the extent that IIRO argues that the absence of any designation of Khalifa by the U.S. government and OFAC demonstrates that the IIRO and MWL were not aware of Khalifa's connections to, and financial support for, al Qaeda and associated terrorist organizations such as MILF, that is disputed. *See Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (holding that "it would defy common sense" to require a designation to serve as a prerequisite for knowledge that certain individuals or entities were associated with a terrorist organization, or to conclude that such knowledge "could be gained in no other way").<br><br>*See also* Plaintiffs' response to Nos. 1. MWL/IIRO leadership specifically appointed Khalifa to oversee the IIRO and MWL in the Philippines as part of a deliberate plan to insert al Qaeda members into strategic IIRO and MWL offices around the globe as part of its financial, ideological, and operational support for al Qaeda and associated terrorist organizations like Moro Islamic Liberation Front.<br><br>By way of further response, the Daguit Declaration, attached as Exhibit 8 to the IIRO's April 15, 2026 Motion for Summary Judgment, was never produced to Plaintiffs during the discovery phase of the litigation, and was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition. Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony, which appears to be inconsistent with his prior deposition testimony. Moreover, Daguit's Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony. Plaintiffs respectfully submit that the IIRO has submitted the Daguit Declaration in bad faith.<br><br>Notwithstanding those issues, Daguit alleges at ¶ 34 of his Declaration that he is not aware of any connections between the IIRO-Philippines and the Moro Islamic Liberation Front. *But see* the Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211445 (identifying Daguit as a "known associate of Khalifa," "presently connected with IIRO Manila," and in "constant contact with Yusop Alongan @Ustadz Duli/Abdullah, Chairman of MILF Finance Committee"); *id.* at 211429 (identifying former IIRO Director Mahmud Afifi (Mahmud Abdul Jalil Afif-Aburahim) as a financier of two |

| | |
|---|---|
| | Malaysian demolition experts (Habibe and Kadir) who reportedly arrived in Zamboanga City on or around October 10, 1998 for terrorist activities.).<br><br>*See also* Ex. 16, *Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia*," CIA_000450-480 at 455 ("Gulf NGOs with branch offices in the Philippines—including Dal al Hijra Foundation and the International Islamic Relief Organization—maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates."). |
| 49. Plaintiffs have no evidence that IIRO was aware of or had knowledge before 9/11 of any connection between Muhammad Jamal Khalifa and Abu Sayyaf Group ("ASG"). Ex. 8, Daguit Decl ¶ 33 (no connection between IIRO Philippines and ASG); Ex. 5, Helles Decl. ¶ 43 (no knowledge of any support by IIRO or anyone within IIRO to Al Qaeda or other terrorist organizations); U.S. Dept. of Treas., Office of Foreign Assets Control, Archive of Changes to OFAC's Sanctions Lists (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated- nationals-list-sdn-list/archive-of-changes-to-the-sdn-list (reflecting that OFAC never designated Khalifa). | Disputed. Prior to the 9/11 attacks, IIRO leadership was expressly aware of the organization's ongoing support for international terrorism and Osama bin Laden, and the involvement of its branch offices and officials in terrorist activities, including the IIRO-Philippines office and Mohammed Jamal Khalifa, by virtue of extensive international media reporting. Any assertion that the IIRO, and/or its parent organization MWL, was unaware of its substantial support for al Qaeda and terrorist activities is duplicitous. *See, e.g.*, Ex. 44, Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000, FED-PEC 10813-10815 (reporting that the IIRO was "being used by accused international terrorists Osama bin Laden and his brother-in-law, Mohammad Jamal Khalifa as a front to finance the operations of the Abu Sayyaf and the Moro Islamic Liberation Front," and that the bulk of IIRO "fund[s] goes to terrorist operations of the Abu Sayyaf and the MILF"); Ex. 48, Philippine Daily Inquirer, *Bin Laden Funds Abu Sayyef Through Muslim Relief Group*, August 9, 2000, FED-PEC 201975-201978 (reporting that "the IIRO was used by Bin Laden and Khalifa to distribute funds for the purchase of arms and other logistical requirements of the Abu Sayyaf in the guise of relief and livelihood projects for Muslim communities in Mindanao"); Ex. 54, Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report*, February 13, 1999, FED-PEC 203704-203705 (reporting that the IIRO's Mohammed Jamal Khalifa "is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group," and further stating that the "IIRO is suspected by Western intelligence agencies to be bin Laden's conduit to various terrorist organizations in Islamic countries"); Ex. 178, The Times, Terror by Degree, October 18, 1997 (reporting on the "Bojinka" terrorist plot and stating that Mohammed Jamal Khalifa was funding the Abu Sayyaf Group); Ex. 41, The Straits Times, *Osama Gave Funds to Abu Sayyaf: Manila*, August 10, 2000, FED-PEC 90732-90733 (reporting that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League), "in the guise of giving charity to local |

| | |
|---|---|
| | Muslim communities, provided funds to Abu Sayyaf for acquiring arms”).<br><br>Moreover, to the extent that IIRO argues that the absence of any designation of Khalifa by the U.S. government and OFAC demonstrates that the IIRO and MWL were not aware of Khalifa’s connections to, and financial support for, al Qaeda and associated terrorist organizations, that is disputed. *See Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (holding that “it would defy common sense” to require a designation to serve as a prerequisite for knowledge that certain individuals or entities were associated with a terrorist organization, or to conclude that such knowledge “could be gained in no other way”).<br><br>*See also* Plaintiffs’ response to No. 1. MWL/IIRO leadership specifically appointed Khalifa to oversee the IIRO and MWL in the Philippines as part of a deliberate plan to insert al Qaeda members into strategic IIRO and MWL offices around the globe as part of its financial, ideological, and operational support for al Qaeda and associated terrorist organizations like Abu Sayyaf Group. |
| 50. Muhammad Jamal Khalifa was Director then Supervisor of IIRO-Philippines from 1988 to 1993; he did not return to IIRO or have any association with IIRO after his departure. Ex. 69, Letter accepting MJK resignation, IIRO 287370; Ex. 12, Chaouat Decl. ¶ 64; Ex. 8, Daguit Decl. ¶ 20, Ex. 4, May 21, 2024 Basha Decl. ¶ 78. | Disputed. IIRO has failed to provide any credible evidence that Khalifa left his position as the supervisor of the IIRO-Philippines branch in 1993, or that Khalifa did not have any association with the IIRO after his departure.<br><br>First, the letter identified as IIRO 287370 purports to show IIRO accepting Khalifa’s resignation, but the date of the document is illegible.<br><br>Second, the Chaouat Declaration fails to cite to any documentation or evidence supporting his assertion that Khalifa had no connection to the IIRO after 1993.<br><br>Third, the December 29, 2022 Daguit Declaration, attached as Exhibit 8 to the IIRO’s April 15, 2026 Motion for Summary Judgment, was never produced to Plaintiffs during the discovery phase of the litigation, and was never produced to Plaintiffs during or after Daguit’s June 27, 2019 deposition. Plaintiffs have not been afforded an opportunity to cross-examine Daguit’s new testimony, which appears to be inconsistent with his prior deposition testimony. Moreover, Daguit’s Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony. Plaintiffs respectfully submit that the IIRO has submitted the Daguit Declaration in bad faith.<br><br>Fourth, the same is true as to the May 21, 2024 Basha Declaration attached as Exhibit 4 to the IIRO’s April 15, 2026 |

| | |
|---|---|
| | Motion for Summary Judgment, as well as the May 4, 2023 Basha Declaration attached as Exhibit 13. Neither of the declarations were produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition. Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony, which appears to be inconsistent with his prior deposition testimony. Moreover, Basha's Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony. Plaintiffs respectfully submit that the IIRO has submitted the Basha Declarations in bad faith.<br><br>Furthermore, the IIRO and Basha's assertion that Khalifa left the IIRO-Philippines office in 1993, as well as the purported letter accepting Khalifa's resignation in 1993, is contradicted by Basha's own public statements that he left the office in 1994. *See* Ex. 118, *Islamic NGO Defends its Record of International Aid*, Dr. Adnan Khalil Basha, Secretary-General of IIROSA, IIRO 279459-279460 ("Regarding Mohammed Jamal Khalifa, he is no longer associated with IIROSA and left office in 1994.").<br><br>But even that is questionable in light of an October 13, 1994 letter from Khalifa to Dr. Farid Qurashi, IIRO Director General, explaining that he is in the Philippines conducting da'wah activities and is prepared to provide assistance to the IIRO. *See* Ex. 88, IIRO 3018-3019. *See also* Ex. 51, FED-PEC 202846 (Dr. Qurashi's 1988 letter advising of Khalifa's appointment as the Regional Director for the IIRO in South-East Asia and asking to "[p]lease facilitate his important task and cooperate with him.").<br><br>In sum, IIRO has failed to submit any credible underlying documentation or evidence supporting the IIRO's claim that Khalifa resigned in 1993 and thereafter had no connection to the IIRO.<br><br>*See also* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Khalifa "was based in the Philippines from 1988 to 1995 and was involved in recruiting Muslims for training in Pakistan as mujahidin fighters."). |
| 51. Muhammad Jamal Khalifa was demoted from Director of the IIRO-Philippines office to Supervisor in September 1992. Ex. 8, Daguit Decl. ¶ 20. | Disputed. *See, e.g.*, Plaintiffs' response to No. 50.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the |

| | |
|---|---|
| | Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Daguit never raised any issue or provided any information during his June 27, 2019 deposition concerning an alleged demotion of Khalifa in 1992. |
| 52. After 1992, Mr. Khalifa was no longer a signatory on the IIRO-Philippines financial accounts and he had no authority to disburse funds. Ex. 8, Daguit Decl. ¶ 20. | Disputed. *See, e.g.*, Plaintiffs' response to No. 50.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Daguit never raised any issue or provided any information during his June 27, 2019 deposition concerning an allegation that Khalifa was no longer a signatory on the IIRO-Philippines financial accounts and that he had no authority to disburse funds after 1992. |
| 53. Muhammad Jamal Khalifa resigned from IIRO in the fall of 1993. Ex. 12, Chaouat Decl. ¶ 64; Ex. 8, Daguit Decl. ¶ 20; Ex. 69, Letter accepting MJK resignation, IIRO 287370 (Date is [illegible]/4/1414, which converts to September/October 1993); Ex. 4, May 21, 2024 Basha Decl. ¶ 78. | Disputed. *See, e.g.*, Plaintiffs' response to No. 50.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Daguit never raised any issue or provided any information during his June 27, 2019 deposition concerning an |

| | |
|---|---|
| | allegation that Khalifa resigned from the IIRO in the fall of 1993. |
| 54. While working for IIRO, Muhammad Jamal Khalifa had several independent, purely private side business projects that had no relationship to IIRO. Ex. 8, Daguit Decl. ¶ 23; Ex. 58, Letter from IIRO Supervisor to MWL Secretary General and President of the IIRO Founding Council providing Khalifa's employment history with IIRO and distinguishing between Khalifa's personal projects and IIRO, IIRO-003014-17; Ex. 59, Letter from Zakaria Mohamed Shaikh to IIRO Supervisor noting lack of a relationship between IIRO and Khalifa's Dar-ul-Imam Al-Shafi'i and his employees and distinguishing between that institute and IIRO's similarly named orphanage, IIRO-002997. | Disputed. *See, e.g.*, Plaintiffs' response to No. 50.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Daguit never raised any issue or provided any information during his June 27, 2019 deposition concerning Khalifa's "side business projects."<br><br>By way of further response, Khalifa stated that his work in the Philippines was conducted pursuant to the oversight of the Saudi embassy in that country. *See* Ex. 87, IIRO 3010-3011 (Khalifa asserting that the "[IIRO's] office and my work in the Philippines were entirely legal and they were under the oversight of the Saudi Embassy."). |
| 55. For those projects, Muhammad Jamal Khalifa operated his own businesses, employed his own staff, and utilized his own funds. Ex. 8, Daguit Decl. ¶ 23. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 50 and 54.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Daguit never raised any issue or provided any information during his June 27, 2019 deposition concerning any alleged business projects that Khalifa may have operated. |
| 56. These projects were not part of Muhammad Jamal Khalifa's duties as a director at IIRO. Ex. 8, Daguit Decl. ¶ 23. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 50 and 54. |

| | |
|---|---|
| | Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Daguit never raised any issue or provided any information during his June 27, 2019 deposition concerning any alleged business projects that Khalifa may have operated. |
| 57. These projects were not carried out with the authorization, direction, or participation of, at the behest of, or on behalf of IIRO. Ex. 8, Daguit Decl. ¶ 23 | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 50 and 54.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Daguit never raised any issue or provided any information during his June 27, 2019 deposition concerning any alleged business projects that Khalifa may have operated. |
| 58. One of Muhammad Jamal Khalifa's personal projects was the Islamic Research and Information Center ("IRIC"). Ex. 8, Daguit Decl. ¶ 24; Ex. 58, Letter from IIRO Supervisor to MWL Secretary General and President of the IIRO Founding Council providing Khalifa's employment history with IIRO and distinguishing between Khalifa's personal projects and IIRO, IIRO-003014-17; Ex. 59, Letter from Zakaria Mohamed Shaikh to IIRO Supervisor noting lack of a relationship between IIRO and Khalifa's Dar-ul-Imam Al-Shafi'i and his employees and distinguishing between that institute and IIRO's similarly named orphanage, IIRO-002997. | Disputed. *See, e.g.*, Plaintiffs' responses to No. 50 and 54.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |

| | |
|---|---|
| | In particular, Daguit never raised any issue or provided any information during his June 27, 2019 deposition concerning any alleged business projects that Khalifa may have operated, including the Islamic Research and Information Center ("IRIC"). *See* Ex. 49, FED-PEC 201984-201985 (stating that Khalifa's International Resources Information Center (IRIC) "was 'used as cover' by Ramzi Yousef, Abdulhakim Murad and four other radicals believed assigned to assassinate Pope John Paul in Manila in 1995"). |
| 59. IRIC focused on proselytization to non-Muslim Filipinos. Ex. 8, Daguit Decl. ¶ 24; Ex. 58, Letter from IIRO Supervisor to MWL Secretary General and President of the IIRO Founding Council providing Khalifa's employment history with IIRO and distinguishing between Khalifa's personal projects and IIRO, IIRO-003014-17. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 50, 54, and 58.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Daguit never raised any issue or provided any information during his June 27, 2019 deposition concerning any alleged business projects that Khalifa may have operated, including the Islamic Research and Information Center ("IRIC"). |
| 60. IRIC's propagation work differed from that of MWL, which restricted itself to general propagation of Islam to Muslim populations, not attempted conversion of non-Muslims like the IRIC. Ex. 8, Daguit Decl. ¶ 24. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 50, 54, and 58.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Daguit never raised any issue or provided any information during his June 27, 2019 deposition concerning |

| | |
|---|---|
| | any alleged business projects that Khalifa may have operated, including the Islamic Research and Information Center ("IRIC"). |
| 61. As part of the IRIC, Muhammad Jamal Khalifa operated an educational institute called the Dar Ul-Imam Al-Shafee Center in Marawi. Ex. 8, Daguit Decl. ¶ 25. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 50, 54, and 58.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Daguit never raised any issue or provided any information during his June 27, 2019 deposition concerning any alleged business projects that Khalifa may have operated, including the Islamic Research and Information Center ("IRIC"). |
| 62. The Dar Ul-Imam Al-Shafee Center in Marawi shares a similar name with the IIRO-funded and operated Dar Ul-Imam Al-Shafee Orphanage in Zamboanga City, but the two organizations are completely separate, and IIRO did not fund or sponsor Dar Ul-Imam Al-Shafee Center. Ex. 8, Daguit Decl. ¶ 25; Ex. 57, Letter describing the difference between IIRO's Dar Ul Imam Al Shafi'i Orphanage and MJK's Dar Ul Imam Al Shafi'i Center for preachers, IIRO- 001954-55; Ex. 49, Report on IIRO Philippines Accomplishments, MWL 8434-53. | Disputed. *See, e.g.*, Plaintiffs' response to No. 50.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, when Daguit was asked during his deposition if there was an additional Dar al Imam al Shafi'e orphanage or school other than the one in Zamboanga City, Daguit replied he was only aware of the Dar al Imam al Shafi'e in Zamboanga. Daguit never raised any distinction between the Dar al Imam al Shafi'e in Zamboanga and a Dar al Imam al Shafi'e in Marawi during the deposition. He only does so now several years after his deposition. |

| | |
|---|---|
| | By way of further response, Philippines Intelligence confirmed that the IIRO's Dar al Imam al Shafi'e in Zamboanga was under investigation for terrorism, stating that the staff and teachers at Dar al Imam al Shafi'e had undergone training at a terrorist training camp named "Abu Haidar," which was used to train members of the Moro Islamic Liberation Front and the IIRO. *See* Ex. 59, Philippines Intelligence Report, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428. *See also* Ex. 137, MWL 8434-8453 at 8443 (IIRO publication identifying the Dar al Imam al Shafi'e in Zamboanga City as one of the three orphanages maintained by the IIRO Social Services Division.); Ex. 177, Statement of Abdullah Al-Hashayka, PEC-KSA 1771 (Hashayka, a co-defendant with Khalifa in a terrorism trial in Jordan for their involvement in a terrorist cell attack on a movie theater in Amman, testified that he worked at Dar al Imam al Shafi'e as a teacher.). When Khalifa was detained by U.S. authorities on December 16, 1994, as he was returning to the Philippines from San Francisco, CA, FBI discovered a trove of information in Khalifa's possession including documents referring to the "Bojinka" plot, as well as documentation identifying the curriculum for Dar al Imam al Shafi'e. These documents confirmed that students at the school received training in assassination, kidnapping, bombing churches, martyrdom operations, methods of torture, explosives and weapons. *See* Ex. 52, FED-PEC 202848-202852 (curriculum).<br><br>In addition, Khalifa stated that his work in the Philippines was conducted pursuant to the oversight of the Saudi embassy in that country. *See* Ex. 87, IIRO 3010-3011 (Khalifa asserting that the "[IIRO's] office and my work in the Philippines were entirely legal and they were under the oversight of the Saudi Embassy."). |
| 63. The IIRO provided support for the education of orphans at the Dar Ul-Imam Al- Shafee Orphanage in Zamboanga City. Ex. 24, Daguit Dep. Tr. at 46:10-48:1; Ex. 49, Report on IIRO Philippines Accomplishments, MWL 8434-8453. | Disputed as stated. *See, e.g.*, Plaintiffs' response to No. 62. |
| 64. Dar Ul-Imam Al-Shafee was named after a local imam who passed away. Ex. 24, Daguit Dep. Tr. at 57:5-16. | Undisputed as a general matter for purposes of this motion. |
| 65. Another of Muhammad Jamal Khalifa's personal projects was Khalifa Trading Industry ("KTI"), which manufactured Ratan chairs and tables. Ex. 8, Daguit Decl. ¶ 26. | Disputed. *See, e.g.*, Plaintiffs' response to No. 50.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the |

| | |
|---|---|
| | December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Daguit never raised any issue or provided any information during his June 27, 2019 deposition concerning any alleged business projects that Khalifa may have operated, including the Khalifa Trading Company (a/k/a Khalifa Trading Industry ("KTI").<br><br>By way of further response, *see* Ex. 6, Center for Contemporary Conflict, *Al Qaeda Finances and Funding to Affiliated Groups*, January 2005, PEC-KSA001998-2013 at 2003 ("In a report submitted to the United Nations Al Qaeda and Taliban Sanctions Committee this Government of the Philippines indicated that Mohammed Jamal Khalifa, the brother-in-law of Osama bin Laden, had established numerous businesses, corporations and charitable extremist institutions there which had served as a network to fund the Abu Sayyaf group as well as other extremist organizations. These reportedly included the Khalifa Trading Industries, ET Dizon Travel Pyramid Trading, Manpower Services, and Daw al-Imam al-Shafee."). Khalifa stated that his work in the Philippines was conducted pursuant to the oversight of the Saudi embassy in that country. *See* Ex. 87, IIRO 3010-3011 (Khalifa asserting that the "[IIRO's] office and my work in the Philippines were entirely legal and they were under the oversight of the Saudi Embassy."). |
| 66. This separate business occupied much of Khalifa's time and took him on many international trips. He sold furniture to Indonesia, Singapore, Thailand, and many other countries. Ex. 8, Daguit Decl. ¶ 26. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 50, 54, and 65.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |

| | |
|---|---|
| 67. Muhammad Jamal Khalifa's side projects did not support or further IIRO's operations in the Philippines. Ex. 8, Daguit Decl. ¶ 28. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 50 and 54.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 68. IIRO did not claim or represent that Muhammad Jamal Khalifa's side projects were IIRO-related, IIRO-supported, or IIRO-authorized. Ex. 8, Daguit Decl. ¶ 28. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 50 and 54.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 69. There was no cross utilization of staff between IIRO and any of Khalifa's personal organizations, including KTI, IRIC, or Dar Ul-Imam Al-Shafee Center. Ex. 8, Daguit Decl. ¶ 27; Ex. 58, Letter from IIRO Supervisor to MWL Secretary General and President of the IIRO Founding Council providing Khalifa's employment history with IIRO and distinguishing between Khalifa's personal projects and IIRO, IIRO-003014-17; Ex. 59, Letter from Zakaria Mohamed Shaikh to IIRO Supervisor noting lack of a relationship between IIRO and Khalifa's Dar-ul-Imam Al-Shafi'i and his employees and distinguishing between that institute and IIRO's similarly named orphanage, IIRO-002997. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 50, 54, and 62.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 70. There was no cross utilization of personnel between MWL and any of Khalifa's personal organizations, including KTI, IRIC, or Dar Ul-Imam Al-Shafee Center. Ex. 8, Daguit Decl. ¶ 27. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 50, 54, and 62. |

| | |
|---|---|
| | Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 71. No MWL or IIRO funds were disbursed to any of Khalifa's personal projects, including KTI, IRIC, or Dar Ul-Imam Al-Shafee Center. Ex. 8, Daguit Decl. ¶ 27. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 50, 54, and 62.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 72. Daguit did not recall Muhammad Jamal Khalifa advocating that Muslims in the Philippines should engage in armed jihad or discussing issues relating to armed jihad during the period that Abdulhadi Daguit knew Muhammad Jamal Khalifa. Ex. 24, Daguit Dep. Tr. at 28:23-29:6. | Disputed. To the extent the IIRO suggests that Daguit was unaware of any connection between Khalifa and Osama bin Laden, al Qaeda, Abu Sayyaf Group, Moro Islamic Liberation Front, and armed conflict or jihad, that is inaccurate and misleading. Daguit worked closely with Khalifa at the IIRO during the 1988-1994 timeframe and was well aware of Khalifa's use of the IIRO-Philippines office to provide significant financial and material support to Abu Sayyaf Group and Moro Islamic Liberation Front, fund other Islamic militants and extremists groups, and recruit and train Muslims for jihad. *See also* <u>Ex. 50</u>, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202111 (indicating that the IIRO-Philippines office "is a source of funding for the al Qaida-affiliated [Abu Sayyef Group]," and IIRO funding "is directed to terrorist operations"); *id.* ("IIRO-PHL's director, Abd al-Hadid Daguit, is a trusted associate of Khalifa," "who is Usama bin Laden's brother-in-law and has been identified as a senior al Qaida member."). *See also* <u>Ex. 37</u>, Expert Report |

| | |
|---|---|
| | of Dr. Matthew Levitt, March 9, 2020 at 35 (August 3, 2006 designation of the IIRO).<br><br>In addition, investigations conducted by Philippines Intelligence determined that Daguit was in constant contact with leaders of the Moro Islamic Liberation Front while working with the IIRO and Khalifa. *See* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211445 (identifying Daguit as a "known associate of Khalifa," "presently connected with IIRO Manila," and in "constant contact with Yusop Alongan @Ustadz Duli/Abdullah, Chairman of MILF Finance Committee"); *id.* at 211429 (stating that Daguit and others "are known associates of Mohammad Jamal Khalifa involved in establishing the NGO network in the country").<br><br>Moreover, Philippines Intelligence identified Daguit as a conspirator in an al Qaeda bombing plot to take place in the Philippines in 2004. *See* Ex. 58, FED-PEC 210866-210867. In the intelligence report, Daguit is identified ("Abdulhadi Daguit (Filipino) of MWL-IIRO Manila office"), as an associate of two al Qaeda members who were allegedly tasked to conduct a bombing attack on the Saudi Embassy in the Philippines for "being an American ally in the Iraqi issue." The attack on the embassy was to take place "within the time frame of before or after the national election on 10 May 2004." |
| 73. From his resignation in 1993 until his death in 2007, Muhammad Jamal Khalifa did not return to IIRO and had no connection whatsoever with IIRO, through IIRO-Philippines, or otherwise. Ex. 12, Chaouat Decl. ¶ 64; Ex. 69, Letter accepting MJK resignation, IIRO 287370 (Date is [illegible]#/4/1414, which converts to September/ October 1993); Ex. 24, Daguit Dep. Tr. at 23:1-12; 28:5-10; Expert Report of Professor John T. Sidel ("Sidel Rpt.") (ECF No. 7351-5) ¶ 15; Ex. 4, May 21, 2024 Basha Decl. ¶ 78; Ex. 8, Daguit Decl. ¶ 21. | Duplicative and disputed. *See, e.g.*, Plaintiffs' Response to No. 50.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 74. Muhammad Jamal Khalifa was not designated by or subject to sanctions administered by the U.S. Office of Foreign Assets Control or the United Nations Security Council. U.S. Dept. of Treas., Office of Foreign Assets Control, Archive of Changes to OFAC's Sanctions Lists (last visited April 10, 2026), | It is not disputed that Khalifa was not designated by the U.S. government's OFAC or the United Nations. However, to the extent that the IIRO argues that the absence of any designation is equivalent to a finding that the person or entity is innocent |

| | |
|---|---|
| https://ofac.treasury.gov/specially-designated-nationals-list-sdn- list/archive-of-changes-to-the-sdn-list. | of terrorism charges, that is baseless and disputed. *See* Plaintiffs' responses to Nos. 43, 45-49.<br><br>Moreover, to the extent that IIRO argues that the absence of any designation of Khalifa by OFAC or the United Nations demonstrates that the IIRO and MWL were not aware of Khalifa's connections to, and financial support for, al Qaeda and associated terrorist organizations, that is disputed. *See* Plaintiffs' responses to Nos. 47-49. *See also Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (holding that "it would defy common sense" to require a designation to serve as a prerequisite for knowledge that certain individuals or entities were associated with a terrorist organization, or to conclude that such knowledge "could be gained in no other way").<br><br>*See also* Plaintiffs' response to No. 1. MWL/IIRO leadership specifically appointed Khalifa, a founding member of al Qaeda, to oversee the IIRO and MWL operations in the Philippines as part of a deliberate plan to insert al Qaeda members into strategic IIRO and MWL offices around the globe contemporaneous with the formation of al Qaeda. With the knowledge and blessing of the IIRO and MWL leadership, Khalifa used the IIRO and MWL to provide financial, ideological, and operational support for al Qaeda and associated terrorist organizations Abu Sayyaf Group and Moro Islamic Liberation Front. |
| 75. Muhammad Jamal Khalifa was friends with Osama Bin Laden in their youths, married one of Bin Laden's sisters, and went to Pakistan in the late 1980s. Ex. 18, Brown Rpt. at 42. | Undisputed as a general matter for purposes of this motion. *See also* Plaintiffs' response to No. 43. |
| 76. In the latter half of the 1980s Muhammad Jamal Khalifa went to Pakistan to support the Services Bureau where he opposed Bin Laden's decision to split from the Services Bureau and confronted him about the same, leading to the two men's separation." Ex. 18, Brown Rpt. at 42. | Disputed. The IIRO's claim that Mohammed Jamal Khalifa separated or broke from Osama bin Laden is inaccurate and misleading.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 43, and 47. Contemporaneous with the formation of al Qaeda, MWL Secretary General Abdullah Omar Naseef and Osama bin Laden entered into an agreement whereby al Qaeda members would be strategically placed in MWL/IIRO offices to guarantee a direct channel for coordinating MWL/IIRO's collaboration with Osama bin Laden and al Qaeda. Naseef subsequently approved the appointment of Khalifa, a founding al Qaeda member and Osama bin Laden's brother-in-law, to open a joint MWL/IIRO branch office in the Philippines contemporaneous with the formation of al Qaeda. *See* Ex. 51, FED-PEC 202846-202847 (June 5, 1988). |

| | |
|---|---|
| | As a result of that appointment, Khalifa used the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia, and a source of funding for al Qaeda affiliated terrorist organizations such as the Abu Sayyaf Group ("ASG"), Moro Islamic Liberation Front ("MILF") and Jemaah Islamiyah ("JI"). This was consistent with bin Laden's plan, and Khalifa worked with bin Laden during the early to mid-1990s in support of those objectives. *See, e.g.*, Ex. 159, April 2004 U.S. Diplomatic Cable, PEC-KSA 1467-1470 (Secretary of State Colin Powell's office stating that the "IIRO has also been cited as the conduit for funds from Usama Bin Laden to terrorist organizations, specifically that the Abu Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO."); Ex. 71, U.S. Diplomatic Cable, *Islamic NGOs in the Philippines*, May 23, 2005, FED-PEC 220479-220481 ("The International Islamic Relief Organization (IIRO) -- a subsidiary of the Saudi-based and funded Muslim World League (MWL) -- was active here in the late 1980s and early 1990s. Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines."). *See also* Ex. 1, 9/11 Commission Final Report at 58 ("Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders. Al Qaeda helped Jemaah Islamiya ("JI"), a nascent organization headed by Indonesian Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the Philippines."). Any claim by the IIRO that bin Laden and Khalifa separated is baseless and without merit.<br><br>Moreover, the IIRO's claim that bin Laden split from the Services Bureau is without merit. *See* Plaintiff's response to No. 517 (explaining that after Azzam's death, Osama bin Laden assumed full control of MAK, and MAK was absorbed into al Qaeda, and further noting that the da'wa organizations that funded and supported MAK during the 1980s—MWL, IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Red Crescent Society, and Benevolence International Foundation—continued to serve as the primary conduits for channeling financial, logistical, operational, and ideological support to al Qaeda's global jihad for years leading up to the 9/11 attacks). |

| | |
|---|---|
| 77. Muhammad Jamal Khalifa's "name does not appear on either of the two internal lists of [Al Qaeda] members from the late 1990s captured in Afghanistan. The only items that mention his name in [Bin Laden's] Abbottabad compound are two newspaper articles about his death in 2007 and a letter from an uncertain author to one Shaykh Yunis where at one point, discussing the deteriorating security conditions and the prevalence of gangs and robberies in some African countries, the letter says 'perhaps you heard about the murder of Jamal Khalifa in Madagascar, God have mercy on him, at the hands of a gang of armed robbers, as mentioned in the media.'" Ex. 18, Brown Rpt. at 43. | Disputed. IIRO's expert Vahid Brown does not identify or describe "either of the existing internal lists of al-Qa'ida members from the late 1990s." *See* IIRO Exhibit 18, Expert Report of Vahid Brown at 91. |
| 78. The primary sources identified in the expert report of Vahid Brown do not evidence a relationship between Al Qaeda and Muhammad Jamal Khalifa in the Philippines. Ex. 18, Brown Rpt. at 40, 42; see also *id.* at 7-8 (discussing methodology and describing primary sources). | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 43, 45-49, 62, 65, 72. |
| 79. After his tenure with IIRO, Muhammed Jamal Khalifa was arrested in the United States in 1994. Ex. 69, Letter accepting MJK resignation, IIRO 287370 (Date is [illegible]#/4/1414, which converts to September/ October 1993); Ex. 18, Brown Rpt. at 43; Ex. 8, Daguit Decl. ¶ 21. | It is not disputed that Khalifa was arrested in the United States in 1994. However, IIRO's statement "[a]fter his tenure with the IIRO," suggesting that Khalifa no longer had any association with the IIRO following a purported resignation in 1993, is disputed. *See* Plaintiffs' response to No. 50. IIRO has failed to provide any credible evidence that Khalifa left his position as the supervisor of the IIRO-Philippines branch in 1993, or that Khalifa did not have any association with the IIRO after his departure. |
| 80. When arrested in 1994 in the United States, Muhammad Jamal Khalifa was not employed by IIRO and he had no connection whatsoever to IIRO-Philippines. Ex. 8, Daguit Decl. ¶ 21; Ex. 69, Letter accepting MJK resignation, IIRO 287370. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 50 and 77.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 81. The Jordanian individuals, including Abdullah Hashaikeh, allegedly implicated in 1993 bombings in Jordan were never IIRO-Philippines employees. Ex. 8, Daguit Decl. ¶ 29; Ex. 58, Letter from IIRO Supervisor to MWL Secretary General and President of the IIRO | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 50 and 62.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the |

| | |
|---|---|
| Founding Council providing Khalifa's employment history with IIRO and distinguishing between Khalifa's personal projects and IIRO, IIRO-003014-17; Ex. 59, Letter from Zakaria Mohamed Shaikh to IIRO Supervisor noting lack of a relationship between IIRO and Khalifa's Dar-ul-Imam Al-Shafi'i and his employees and distinguishing between that institute and IIRO's similarly named orphanage, IIRO-002997. | December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 82. After his 1994 arrest in the United States, Muhammed Jamal Khalifa was deported to Jordan. Ex. 8, Daguit Decl. ¶ 21. | It is not disputed that Khalifa was deported to Jordan following his arrest in the United States.<br><br>However, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 83. Muhammed Jamal Khalifa had been tried in absentia and convicted for involvement in a theater bombing in Jordan. Ex. 18, Brown Rpt. at 43. | Undisputed as a general matter for purposes of this motion. |
| 84. After his deportation to Jordan, Muhammed Jamal Khalifa was then retried and acquitted. Ex. 18, Brown Rpt. at 43. | Undisputed as a general matter for purposes of this motion. |
| 85. Muhammed Jamal Khalifa has never been charged or convicted of any crime in any country, terrorism related or otherwise, other than the Jordanian conviction and acquittal. Ex. 18, Brown Rpt. at 43. | Disputed to the extent that IIRO argues that the absence of any formal charges or conviction is (1) a sign of Khalifa's innocence; (2) that Khalifa has been exonerated from any accountability for the extensive financial, material, and logistical support he and the IIRO provided to al Qaeda in the decade leading to the 9/11 attacks; and/or (3) that the IIRO and MWL were not aware of Khalifa's connections to, and financial support for, al Qaeda and associated terrorist organizations. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 43, 45-49, 62, 65, 72. |
| 86. Muhammed Jamal Khalifa was never designated by or subject to sanctions administered by OFAC. U.S. Dept. of Treas., Office of Foreign Assets Control, Archive of Changes to OFAC's Sanctions Lists (last visited April 10, 2026), https://ofac.treasury.gov/specially- designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list. | Duplicative and disputed. *See, e.g.*, Plaintiffs' response to No. 74. |

| | |
|---|---|
| 87. Abdulhadi Daguit had a purely professional, not a personal relationship with Muhammad Jamal Khalifa and has no knowledge as to the basis of OFAC's characterization of himself as a trusted associate of Muhammad Jamal Khalifa. Ex. 8, Daguit Decl. ¶ 22. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 50 and 72.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 88. Abdulhadi Daguit did not have a relationship with Khalifa apart from their work at IIRO. Ex. 8, Daguit Decl. ¶ 22. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 50 and 72.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 89. To Abdulhadi Daguit's knowledge, Muhammad Jamal Khalifa never returned to the IIRO-Philippines after the reversal of his conviction and release from custody in Jordan. Ex. 8, Daguit Decl. ¶ 21. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 50 and 72.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| **Abdul Hamid al-Mujil ("al-Mujil")** | No response necessary. |
| 90. Plaintiffs have no evidence showing that Abdul Hamid al-Mujil had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. Ex. 1, FBI | Disputed. The IIRO's claim that there is no evidence that Abd al Hamid Sulaiman al Mujil had any foreknowledge of or was involved in the planning or execution of the 9/11 attacks, is |

| | |
|---|---|
| Report Administratively Closing Case (May 27, 2021) at E014040-000011; see generally 9/11 Commission Report; Monograph. | inaccurate and misleading. The IIRO, Mujil, and the IIRO-Eastern Province branch office under the leadership of Prince Muhammad bin Fahd bin Abdul Aziz and Prince Turki bin Jalawi al Saud, were witting supporters of Osama bin Laden, al Qaeda, and associated terrorist organizations for more than a decade leading up to the 9/11 attacks, and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States. Mujil, a high-ranking IIRO official who personally knew Osama bin Laden and 9/11 mastermind Khalid Sheikh Mohammed, played a prominent role in al Qaeda's financial support structure during the critical period leading up to the 9/11 attacks, and was well aware of al Qaeda's terrorist intentions at all relevant times. As the Executive Director of the IIRO-Eastern Province branch office, Mujil used his authority and control over the IIRO-Philippines and IIRO-Indonesia branch offices to orchestrate IIRO's funding and support for al Qaeda, Abu Sayyaf Group, Jemaah Islamiyah, and associated terrorist groups. The IIRO-Philippines branch office, under the leadership of al Qaeda member Mohammed Jamal Khalifa, provided funding for the Bojinka terrorist plot conceived by 9/11 mastermind Khalid Sheikh Mohammed, the precursor to the 9/11 attacks. *See also* Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12, 24 (discussing the Bojinka plot).<br><br>In 2006, the United States formally designated Abd al Hamid Sulaiman al Mujil and the IIRO-Philippines and IIRO-Indonesia branch offices "for facilitating fundraising for al Qaida and affiliated terrorist groups." *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112. According to U.S. Treasury Department officials, "Abd Al Hamid Sulaiman Al-Mujil, a high-ranking IIRO official in Saudi Arabia, has used his position to bankroll the al Qaida network in Southeast Asia. Al Mujil has a long record of supporting Islamic militant groups, and he has maintained a cell of regular financial donors in the Middle East who support extremist causes." *Id.* at 202110.<br><br>The August 2006 designation details Mujil's long record of supporting terrorist organizations such as al Qaeda, Abu Sayyaf and Jemaah Islamiyah through the IIRO as follows:<br><br>"Abd Al Hamid Sulaiman Al-Mujil (Al-Mujil) is the Executive Director of the IIRO Eastern Province (IIRO-EP) branch office in the Kingdom of Saudi Arabia. Al-Mujil has been called the 'million dollar man' for supporting Islamic militant groups.<br><br>Al-Mujil provided donor funds directly to al Qaida and is identified as a major fundraiser for the Abu Sayyaf Group |

| | |
|---|---|
| | (ASG) and Jemaah Islamiyah (JI). Both ASG and JI are al Qaida-associated terrorist groups in Southeast Asia designated pursuant to the authorities of E.O. 13224. These terrorist groups are also on the United Nations 1267 Committee's consolidated list of individuals and entities associated with the Taliban, al Qaida and/or Usama Bin Ladin.<br><br>In 2004, Al-Mujil invited a Philippines-based JI supporter to Saudi Arabia under the cover of traveling for the hajj (the Muslim pilgrimage), and planned to provide him with cash to carry back to the Philippines to support organizations including JI.<br><br>Al-Mujil was also present in Afghanistan in the late 1990s and personally knew Usama Bin Ladin and deceased al Qaida cofounder Abdallah Azzam. Al-Mujil traveled continuously to meet with members of Bin Ladin's organization in Arab countries. In the 1990s, Al-Mujil established a relationship with senior al Qaida operational planner Khalid Shaykh Muhammad.<br><br>Al-Mujil has a long history of providing support to terrorist organizations. He has contributed direct financial assistance to ASG leaders, including Abdurajak Janjalani (deceased).<br><br>The Indonesian and Philippines branches of IIRO have received support from IIRO-EP, which in turn is controlled by Al-Mujil. Indeed, he is often responsible for authorizing payment transfers for IIRO Philippines (IIRO-PHL) and IIRO Indonesia (IIRO-IDN)." *Id.* at 202110-202111.<br><br>A U.S. Treasury Department memorandum further explains the bases for the designations of Mujil and the IIRO branch offices. *See* Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121. According to Treasury: "Al-Mujil Provides Financial Support to Al Qaida, JI, and the ASG – [REDACTED] Al-Mujil has a long history of providing support to terrorist groups. Al-Mujil provided donor funds directly to al Qaida, particularly for Islamic fighters, according to a report [REDACTED]…. In the late 1990s, Al-Mujil provided direct financial assistance to ASG leaders Abdurajak Janjalani and Ustadz Ibrahim Ali [Ali] via ASG supporter Mahmoud Abd Al-Jalil Afif." *Id.* at 107-108. "Al-Mujil Asserts Control Over IIRO Southeast Asia Branches – [REDACTED] IIRO-EP's Al-Mujil reportedly has exercised decision-making authority over a number of IIRO offices, including IIRO-PHL, IIRO-IND, proposed for designation herein, and IIRO's Thailand branch [IIRO-THA]. These offices supported by Al-Mujil are implicated in |

| | |
|---|---|
| | supporting the ASG and/or JI. In line with Al-Mujil's decision-making responsibilities, in Feb 2006 IIRO-EP's Al-Mujil planned to visit Thailand in order to inspect IIRO-THA, [REDACTED]. In addition, Al-Mujil often "adjudicated" (possibly meaning authorized) payment transfers, mosque and well construction, school curricula and orphan care programs for these branches, [REDACTED] in January 2006." *Id.* at 109.<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 35 (August 3, 2006 designation of the IIRO). |
| 91. Plaintiffs have no evidence tracing funds from Abdul Hamid al-Mujil to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); see generally 9/11 Commission Report; Monograph. | Disputed. The IIRO's claim that there is no evidence tracing funds or other in-kind support from Mujil to the planning and execution of the 9/11 attacks, is inaccurate and misleading. As described herein, the IIRO, Mujil, and the IIRO-Eastern Province branch office under the leadership of Prince Turki bin Jalawi al Saud, were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance and other resources to bin Laden, al Qaeda, and associated terrorist organizations (e.g., Abu Sayyaf Group and Jemaah Islamiyah) for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks. Accordingly, the 9/11 attacks were a predictable, inevitable product of that sustained, knowing support. Plaintiffs need not prove that the funds or other in-kind support provided to al Qaeda were traced to the terrorist plot or the attack itself.<br><br>By way of further response, IIRO Secretary General Adnan Basha confirmed that there were significant "financial improprieties" and irregularities occurring in the IIRO-Eastern Province branch office while under the leadership of Prince Turki bin Jalawi al Saud and Mujil. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 278. According to Basha's deposition testimony, upon learning of these financial improprieties, the IIRO formed a committee to conduct a review. The investigation discovered that IIRO-Eastern Province was implementing and funding projects in overseas IIRO branch offices without advising or seeking authorization from the IIRO General Secretariat, thereby avoiding the required validation process. *Id.* at 265-267. IIRO-Eastern Province would send funds from its accounts to the accounts of overseas IIRO branch offices, including the |

Philippines, Indonesia, Pakistan, Jordan, India, Sudan, and others. *Id.* at 267-268. *See also* Ex. 101, IIRO 49708-49710.

An audit of the IIRO-Eastern Province further discovered that IIRO officials were paying cash for projects without expense vouchers or receipts in violation of IIRO regulations. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 270 (testifying that the office manager, Khalil Ibrahim, made payments without supporting vouchers). Prince Turki bin Jalawi al Saud was Ibrahaim's supervisor at the time. *Id.* at 271.

Notably, the financial improprieties and irregularities occurring in the IIRO-Eastern Province office were taking place at the same time that millions of dollars had gone missing and unaccounted for as a result of the actions of IIRO-Pakistan officials Moayad al Butairi (the Director General of IIRO-Pakistan), and Amir Jasim (the IIRO-Pakistan accountant/financial officer). *Id.* at 268-269. According to Basha, Pakistan was one of the areas where the Eastern Province was carrying out these projects without informing the IIRO General Secretariat. *Id.* at. 269. *See also* Plaintiffs' response to No. 335.

This financial misconduct occurring in the IIRO-Eastern Province office was similarly taking place at the same time that Mujil was sending millions of dollars to the IIRO-Philippines and IIRO-Indonesia branch offices, which were also directly linked to al Qaeda and associated terrorist groups and supervised and funded by the IIRO-Eastern Province branch. *See* Plaintiffs' responses to Nos. 230 and 238.

Additional audits of the IIRO-Sarajevo and IIRO-Jordan branch offices also discovered serious financial improprieties and irregularities. *See* Plaintiffs' responses to Nos. 268 and 294.

Plaintiffs' experts have concluded that the financial improprieties and irregularities documented in the audits demonstrate that conditions within the IIRO and its branches were ideal for individuals to direct massive amounts of IIRO funds and resources to Osama bin Laden, al Qaeda, and their terrorist activities. *See* Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 77 ("I conclude that the financial improprieties and irregularities documented in the limited number of audits and financial documents of IIRO that have been made available to me reflect conditions within IIRO that made it possible for persons within IIRO, as well as others such as Julaidan to misdirect IIRO resources to support Islamic jihad, al Qaeda, and terrorism. This support included the funding of Islamic fighters in prominent zones of conflict such

| | |
|---|---|
| | as Afghanistan, Bosnia, and Chechnya, as well as in lesser-known conflicts between Islamic resistance groups and terrorists against secular governments, such as in Indonesia, the Philippines, and Thailand, and in areas of complex armed conflict between Muslims and non-Muslims such as Lebanon, Palestine, and Sudan, as well as elsewhere.").<br><br>Basha further testified that he contacted Prince Turki bin Jalawi al Saud and asked him to cease these practices, but the Prince refused to comply with Basha's request. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 268. Prince Jalawi subsequently resigned as the head of the IIRO-Eastern Province branch following the disclosure of the auditor's findings. According to Basha, Prince Jalawi resigned "[b]ecause he did not wish to implement the recommendations of the auditor." *Id.* at 271; *see also id.* at 273 ("I recall that the auditor's report connected all the violations to requests from the Prince.").<br><br>The auditor's report concerning the financial improprieties and irregularities concerning the IIRO-Eastern Province branch office and Prince Jalawi was provided to the MWL Secretary General. *Id.* at 274.<br><br>The FBI and CIA concluded in their December 2004 Joint *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, that 9/11 mastermind Khalid Sheikh Mohammed ("KSM") identified Prince Jalawi as an important donor to al Qaeda. *See* Ex. 31, EO14040 3414-3442-UPDATED at 3418 ("A limited body of uncorroborated CIA reporting from [REDACTED] separate sources suggest [REDACTED] the youngest of [REDACTED] full brothers, and Turki Bin Fahd Jiluwi, have had contact with individuals tied to al-Qaida and other terrorist organizations."); *id.* at 3419 ("In early 2003, KSM identified an individual named Bin Jiluwi, who may be identifiable with Turki Bin Fahd Jiluwi, an important al-Qa'ida donor who hails from a minor line in the Saudi royal family. Separate sensitive reporting indicates that Bin Jiluwi is a key leader of the Eastern Province office of the International Islamic Relief Organization (IIRO), an NGO."). *See also* Ex. 1, 9/11 Commission Final Report at 145 (describing KSM as "the principal architect of the 9/11 attacks").<br><br>Prince Jalawi was also one of the senior IIRO leaders that sat on the Rabita Trust Board of Trustees with E.O. 13442 Specially Designated Terrorist ("SDGT") Wa'el Jelaidan. *See* Ex. 140, MWL 30817-30819. Rabita Trust was designated by the U.S. government as a Specially Designated Global Terrorist ("SDGT") on October 12, 2001 for "its close ties to senior al Qaida leadership and providing logistical and |

| | |
|---|---|
| | financial support to al Qaida." *See* Ex. 68, FED-PEC 215391-215394. *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 50-63.<br><br>Following the August 3, 2006 designation of Mujil for using "his position to bankroll the al Qaida network in Southeast Asia," Saudi Ambassador Prince Turki bin Faisal al Saud assured U.S. officials that the IIRO-Eastern Province office had been shut down. Despite those assurances, however, the U.S. government warned in 2009 "that money continued to be funneled overseas from the Eastern Province Branch." *See* Ex. 76, U.S. Diplomatic Cable, *International Islamic Relief Organization – Designated by UN 1267 and US Treasury – Issues Letter of Congratulations to President Obama*, March 3, 2009, FED-PEC 220514-220517 at 220516. *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 127. |
| 92. Plaintiffs have no evidence tracing in-kind support from Abdul Hamid al-Mujil to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; see generally 9/11 Commission Report; Monograph. | Disputed. *See, e.g.*, Plaintiffs' responses to No. 2 and 91. |
| 93. Plaintiffs have no evidence tracing funds from IIRO through Abdul Hamid al-Mujil to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021), at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from IIRO to the planning or execution of the 9/11 Attacks); Kohlmann Rpt. ¶¶ 27-70 (same); Levitt Rpt. at 29-35 (same); Jenkins Rpt. (same); Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); see also Ex. 18, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); ECF No. 8911 at 9; ECF No. 8129-22 at 27; see generally 9/11 Commission Report; Monograph. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 2 and 91. |
| 94. Plaintiffs have no evidence that IIRO was aware of or had knowledge before 9/11 of any connection between Abdul Hamid Al-Mujil and Al Qaeda. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 23-27, 29, 32-33, 80; Ex. 6, Sarhan Decl. ¶ 30; Ex. 5, Helles Decl. ¶¶ 24-25, 28-32, 34-35, 38- 43; *id.* ¶ 38 ("During my tenure [at IIRO]…. I did not observe and was not made aware of any behavior by Dr. Abdul Hamid al-Mujil that suggested he supported Al Qaeda's mission or that he was assisting Al Qaeda in any | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, and 90.<br><br>By way of further response, the U.S. government expressed its concerns to the Saudi government on several occasions about the IIRO's involvement in terrorism. The Saudi government, IIRO, and MWL were thus aware of IIRO connections to al Qaeda and terrorism both prior to and after the 9/11 attacks. *See* Ex. 78, U.S. Diplomatic Cable, *Terrorism Finance; International Islamic Relief Organization*, June 2006, FED- |

| | |
|---|---|
| way, financially or otherwise."); *id.* ¶ 43 (no knowledge of any support by IIRO or anyone within IIRO to Al Qaeda or other terrorist organizations). See Additional Designation of Individuals and Entities Pursuant to Executive Order 13224, 71 Fed. Reg. 45,599 (Aug. 9, 2006). | PEC 220571-220572 (discussing Treasury Undersecretary Stuart Levey meeting with Saudi Ambassador Turki concerning the U.S. government's intention to designate the IIRO and stating: "The United States is also aware of IIRO's significant illegitimate and illegal activities that fund terrorist activity. We have been concerned about IIRO for many years now and have shared our concerns and information with the Government of Saudi Arabia on a regular basis.").<br><br>Moreover, prior to the 9/11 attacks, IIRO leadership was expressly aware of the organization's ongoing support for international terrorism and Osama bin Laden, and the involvement of its branch offices and officials in terrorist activities, by virtue of extensive international media reporting. Indeed, those media reports detailed and described the funding and other support to al Qaeda and affiliated terrorist groups provided by the IIRO branch offices in the Philippines, Indonesia, India, and others. The IIRO-Eastern Province branch, under the leadership of Prince Muhammad bin Fahd bin Abdul Aziz, Prince Turki bin Jalawi al Saud, and Mujil, closely controlled and supervised the IIRO branches in those countries. *See* Ex. 81, IIRO Annual Report 1998, IIRO 171-211 at 180; Ex. 82, IIRO Annual Report 1999/2000, IIRO 212-330 at 226 (indicating that the IIRO-Eastern Province branch offices are supervised by Prince Turki bin Jalawi al Saud, and the beneficiaries of support from IIRO-Eastern Province include Indonesia, India, the Philippines, and others); Ex. 83, IIRO Annual Report 2000/2001, IIRO 331-441 at 343 (same); Ex. 85, IIRO Annual Report 2001/2002, IIRO 442-552 at 450 (same). Any assertion that the IIRO, and/or its parent organization MWL, was unaware of its substantial support for al Qaeda and terrorist activities is duplicitous. *See, e.g.*, (1) Daily News, *It's More than Just Who Plants the Explosives*, July 31, 1996 (reporting that the IIRO is a major conduit of financial support to the Hamas terrorist group); (2) The Age, *Filipino Muslims Linked to Holy Warrior's Global Terror*, May 20, 1995 (reporting on the discovery of al Qaeda's terrorist plot in the Philippines ("Bojinka") and explaining that Mohammed Jamal Khalifa of the IIRO, a "key figure in the network of Islamic extremists," was funding Islamic militants in the Philippines); (3) Frontline, *A Terrorist Plot Unearthed*, March 12, 1999 (discussing the IIRO's connections to an terrorist operation to bomb U.S. Consulates in India, and describing the IIRO as being "closely associated with the billionaire terrorist Osama bin Laden"); (4) University of Pennsylvania-African Studies Center, *Horn of Africa: The Monthly Review, 19-10/98* (reporting that the IIRO was one of five relief organizations banned by the Kenyan government following the August 1998 U.S. Embassy bombings); (5) IPS-Inter Press Service, *Kenya: Gov't Shuts down Five Islamic Relief Agencies*, September 10, 1998 (reporting that the |

| | |
|---|---|
| | Kenyan government banned the IIRO for supporting terrorism following the August 1998 U.S. Embassy bombings); (6) ITAR-TASS, *Russian Troops Find Arab, Bosnian Passports in Chechnya*, February 21, 2000 (reporting that that IIRO, with its main office in Saudi Arabia, arranged for the transportation of Islamic fighters to participate in the conflict in Chechnya); (7) Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report*, February 13, 1999 (reporting that the IIRO's Mohammed Jamal Khalifa "is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group," and further stating that the "IIRO is suspected by Western intelligence agencies to be bin Laden's conduit to various terrorist organizations in Islamic countries"); (8) Philippine Daily Inquirer, *Front Page: Bin Laden Funds Abu Sayyaf Through Muslim Relief Group*, August 9, 2000 (indicating that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League) is a conduit of funds for the Abu Sayyaf Group, a terrorist organization in the Philippines); (9) Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000 (reporting that the IIRO is a front to finance the operations of the Abu Sayyaf Group and Moro Islamic Liberation Front terrorist organizations); (10) The U.N. Refugee Agency, *Human Rights Watch World Report 1999 – Kenya*, January 1, 1999 (stating that the Kenyan government cancelled the registration of the IIRO and other Islamic relief agencies for supporting terrorism); (11) New York Times, *Some Charities Suspected of Terrorist Role*, February 19, 2000 (reporting on the 1998 U.S. Embassy attacks and that the Kenyan government said the charities "'posed a serious threat' to Kenya's security"); (12) The Times, *Terror by Degree*, October 18, 1997 (reporting on the "Bojinka" terrorist plot and stating that Mohammed Jamal Khalifa was funding the Abu Sayyaf Group); (13) The Indian Ocean Newsletter, *Banned Islamic NGOs*, September 12, 1998 (reporting that Kenya banned the IIRO and other NGOs following their investigation into the August 1998 attacks on U.S. embassies in Nairobi and Dar es Salaam); (14) U.S. News & World Report, *A Helping Hand From Saudi Arabia*, July 8, 1996 (reporting that the IIRO is a major clearinghouse for funds to aid Islamic extremism and terror in Gaza and the West Bank); (15) The Straits Times, *Osama Gave Funds to Abu Sayyaf: Manila*, August 10, 2000 (reporting that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League), "in the guise of giving charity to local Muslim communities, provided funds to Abu Sayyaf for acquiring arms"); (16) Overseas Immigration News, *Immigration Claims Teacher Linked to Terrorists Alleged Al-Jihad Member: Egyptian Denies Allegations, is Appealing Legal Proceedings*, May 21, 1999 (reporting that the IIRO "secretly funds terrorism"). *See also* Ex. 80, IIRO 147 ("IIRO Administrative Structure" chart |

| | |
|---|---|
| | identifying a "Department of Media and Information."); Ex. 65, FED-PEC 214874-214875 (MWL structural chart identifying "The General Department for Media and Culture").<br><br>Finally, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 95. Plaintiffs have no evidence that IIRO was aware of or had knowledge before 9/11 of any connection between Abdul Hamid Al-Mujil and MILF. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 23-27, 29, 32-33, 80; Ex. 6, Sarhan Decl. ¶ 30; Ex. 5, Helles Decl. ¶¶ 24-25, 28-32, 34-35, 38-43; *id.* ¶ 43 (no knowledge of any support by IIRO or anyone within IIRO to Al Qaeda or other terrorist organizations). See Additional Designation of Individuals and Entities Pursuant to Executive Order 13224, 71 Fed. Reg. 45,599 (Aug. 9, 2006). | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 90, and 94.<br><br>By way of further response, investigations conducted by Philippines Intelligence determined that Mujil met with Moro Islamic Liberation Front officials in December 1998 concerning financial support. *See* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211430 (identifying IIRO officials "Al Saif Othoman A O and Almojil Abdul Hamdi S" meeting with MILF Chairman Salamat Hashim at Camp Abubakar in the Southern Philippines concerning a $192,197.00 contribution).<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 Basha Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declaration was never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 96. Plaintiffs have no evidence that IIRO was aware of or had knowledge before 9/11 of any connection between Abdul Hamid Al-Mujil and ASG. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 23-27, 29, 32-33, 80; Ex. 6, Sarhan Decl. ¶ 30; Ex. 5, Helles Decl. ¶¶ 24-25, 28-32, 34-35, 38- | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 90, and 94.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. |

| | |
|---|---|
| 43; *id.* ¶ 43 (no knowledge of any support by IIRO or anyone within IIRO to Al Qaeda or other terrorist organizations). See Additional Designation of Individuals and Entities Pursuant to Executive Order 13224, 71 Fed. Reg. 45,599 (Aug. 9, 2006). | *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 Basha Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declaration was never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 97. Abdul Hamid al-Mujil worked in IIRO's Eastern Province branch office in Saudi Arabia ("IIRO-EP") from 1989 to 2006. Ex. 13, May 4, 2023 Basha Decl. ¶ 10; Ex. 5, Helles Decl. ¶ 38. | Undisputed as a general matter for purposes of this motion. |
| 98. During most of his tenure, Abdul Hamid al-Mujil was the office's Executive Director, working under Prince Turki bin Fahad bin Jalawi. Ex. 13, May 4, 2023 Basha Decl. ¶ 10. | Undisputed as a general matter for purposes of this motion. |
| 99. Prince Turki bin Fahad bin Jalawi was the IIRO-EP office's General (or Regional) Supervisor, and he oversaw the IIRO-EP office until June 29, 2003. Ex. 4, May 21, 2024 Basha Decl. ¶ 63; Ex. 13, May 4, 2023 Basha Decl. ¶ 10; Ex. 25, Basha Dep. Tr. at 271:7-18; Ex. 64, Administrative Decision No. 5 dated 28/6/1424 AH, IIRO 287391. | Undisputed as a general matter for purposes of this motion. *See also* Plaintiffs' response to No. 91. |
| 100. Abdul Hamid al-Mujil became acting manager or the Acting Director of IIRO-EP on June 29, 2003 by administrative order. Ex. 25, Basha Dep. Tr. at 272:21-273:12; Ex. 64, Administrative Decision No. 5 dated 28/6/1424 AH, IIRO 287391; Ex. 13, May 4, 2023 Basha Decl. ¶¶ 10-11; Ex. 4, May 21, 2024 Basha Decl. ¶ 63. | Undisputed as a general matter for purposes of this motion. |
| 101. Abdul Hamid al-Mujil was designated by OFAC on July 20, 2006. See Additional Designation of Individuals and Entities Pursuant to Executive Order 13224, 71 Fed. Reg. 45,599 (Aug. 9, 2006). | Disputed. Mujil was designated by OFAC on August 3, 2006. *See, e.g.*, Ex. 50; Plaintiffs' response to No. 90.<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 125 (indicating that then-U.S. Homeland Security advisor Frances Townsend met with Saudi officials to announce the U.S. government's decision to designated Mujil and the Philippines and Indonesia branches, and expressed that the U.S. government is "aware of IIRO's significant illegitimate and illegal activities that fund terrorist activity," and that "[w]e have been concerned about IIRO for many years now and have shared our concerns and information with the Government of Saudi Arabia on a regular basis"). |

| | |
|---|---|
| | *See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 35 (August 3, 2006 designation of the IIRO). |
| 102. After Abdul Hamid al-Mujil's designation, IIRO investigated the publicly available allegations accompanying the 2006 designation. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 81-82. | It is not disputed that Basha testified that the IIRO conducted an investigation following the August 3, 2006 designation of Mujil and the Philippines and Indonesia branch offices. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 276-277. |
| 103. For the investigation, IIRO reviewed all internal records relating to IIRO-EP, reviewed all of IIRO-EP's administrative files, financial statements, and other papers, and reviewed all staff files, including Abdul Hamid al-Mujil's file. Ex. 22, Al-Turki Dep. Tr. at 280:15- 281:14 (*Errata*); Ex. 25, Basha Dep. Tr. at 276:21-277:12; Ex. 4, May 21, 2024 Basha Decl. ¶ 82. | It is not disputed that Basha testified that the IIRO reviewed "the papers of all these offices," "the administrative and financial papers, and the files of the staff members who were working in these offices." *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 277.<br><br>However, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 Basha Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declaration was never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Basha did not testify that they reviewed Mujil's staff or personnel file during his deposition. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 276-277. |
| 104. The IIRO investigation could not verify, or find any support for, the publicly available allegations concerning purported funding for or support to Al Qaeda or any other terrorist organization by Abdul Hamid al-Mujil. Ex. 4, May 21, 2024 Basha Decl. ¶ 83; Ex. 25, Basha Dep. Tr. at 277:3-12. | It is not disputed that Basha testified that the IIRO's investigation concluded that "all of the procedures were sound for us," notwithstanding the fact that Basha and the IIRO determined that there were significant financial improprieties and irregularities occurring in the IIRO-Eastern Province branch office while under Mujil's leadership. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 277-278; *see also* Plaintiffs' response to No. 91.<br><br>However, to the extent that the IIRO argues that its internal investigation could not verify allegations that Mujil funded al Qaeda or other terrorist organizations, that is baseless and disputed. Notably, the Saudi Ministry of Interior conducted its own investigation relating to the 2006 U.S. designation and allegations, and detained Mujil and froze his bank account at Al Rajhi Bank. *See* Ex. 70, U.S. Diplomatic Cable, *Terrorism Finance; Saudi Response of IIRO's Al-Mua'jjil Under 1267* |

| | |
|---|---|
| | *Designation*, August 14, 2006, FED-PEC 220473-220474 at 220473. The IIRO-Eastern Province office was also shut down. *Id.* Remarkably, Basha testified that he was unaware of the investigation conducted by the Ministry of Interior. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 277-278. The IIRO has never produced any documents relating to the IIRO's internal investigation and/or the investigation conducted by the Ministry of the Interior.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 Basha Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declaration was never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 105. When IIRO questioned Abdul Hamid al-Mujil, he denied the publicly available allegations, including that he provided donor funds to Al Qaeda. Ex. 25, Basha Dep. Tr. at 276:21- 277:12, 278:7-13. | It is not disputed that Basha testified that Mujil denied providing donor funds to al Qaeda, notwithstanding the fact that Basha and the IIRO determined that there were significant financial improprieties occurring in the IIRO-Eastern Province branch office while under Mujil's leadership. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 278; *see also* Plaintiffs' response to No. 91. |
| 106. None of the more than 500,000 documents captured in the raid on Bin Laden's compound in Abbottabad, reference or mention Abdul Hamid al-Mujil or the "million dollar man." Ex. 18, Brown Rpt. at 91. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 107. Abdul Hamid al-Mujil is not named in either of the internal lists of Al Qaeda members from the late 1990s. *Id.* | Disputed. IIRO's expert Vahid Brown does not identify or describe "either of the existing internal lists of al-Qa'ida members from the late 1990s." *See* IIRO Exhibit 18, Expert Report of Vahid Brown at 91. |
| 108. Abdul Hamid Al-Mujil was delisted by the United Nations Security Council in 2013. Ex. 4, May 21, 2024 Basha Decl. ¶ 81. | It is not disputed that Mujil was delisted by the U.N. Security Council on June 30, 2013. However, to the extent the IIRO argues that the U.N.'s delisting exonerates Mujil from any accountability for the extensive financial, material, and logistical support he and the IIRO provided to al Qaeda in the decade leading to the 9/11 attacks, that is disputed as inaccurate and misleading. |
| **Wael Jelaidan** | No response necessary. |

| | |
|---|---|
| 109. Wael Jelaidan was never an IIRO employee. Ex. 4, May 21, 2024 Basha Decl. ¶ 77. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 6, 9, 17, 24, and 31. *See also* Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 ("By way of background, Usama Bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ('MK') (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al Madani") of the International Islamic Relief Organization (hereafter "IIRO," sometimes referred to as "Igatha" based upon its Arabic name "*Hay'at al-Igatha al-Islamiya al-'Alamtyaa*"), which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL'). In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*."); Ex. 161, FBI Report, *Co-operating Witness Interview*, June 2, 2004, PEC-KSA002133-2134 at 2133 (indicating that al Qaeda members in the IIRO office in Peshawar, Pakistan, headed by Wa'el Jelaidan, were responsible for purchasing weapons); Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"); Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143 (Fadl testifying that al Qaeda used Wa'el Jelaidan as head of the IIRO office in Peshawar, Pakistan, to create ID cards for al Qaeda members so that they could cross the Pakistan-Afghanistan border without a problem, under the guise that they were teachers or other relief workers.). |

| | |
|---|---|
| | By way of further response, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| **Jamal Al Fadl** | No response necessary. |
| 110. Jamal al Fadl was a Sudanese member of Al Qaeda. Ex. 18, Brown Rpt. at 72. | Undisputed as a general matter for purposes of this motion. |
| 111. Jamal al Fadl was a minor figure in Bin Laden's circle. *Id.* at 77. Al Fadl approached the U.S. Government, in 1996, falsely portraying himself as a Sudanese dissident before disclosing his association with Al Qaeda. *Id.* at 73. | Disputed. The IIRO's claim that Jamal al Fadl was a minor figure in Osama bin Laden's circle is inaccurate and misleading. Fadl joined al Qaeda in 1988, trained at al Qaeda training camps in Afghanistan, fought on the front lines in Afghanistan and Pakistan, was tasked by al Qaeda leadership with distributing money to families of martyrs and families of individuals in jail for terrorist activities, and was trusted with large amounts of money to purchase and/or rent al Qaeda guesthouses, farms, and offices in Sudan. Fadl also worked closely with, and dealt directly with, Osama bin Laden and senior al Qaeda leadership, including but not limited to, Muhammad Loay Bayazid (a/k/a Abu Rida al Suri) (a member of al Qaeda's Shura Council who was responsible for purchasing weapons and explosives for al Qaeda, helped set up training camps, helped establish and run al Qaeda companies in Sudan, and traveled to Iran for training); Abu Ubaidah al Banshiri (a member of al Qaeda's Shura Council and the head of al Qaeda's military committee); Saidi Madani al Tayyib (a member of al Qaeda's Shura Council who served as the overall supervisor of al Qaeda's Financial and Administrative Committee, held numerous accounts at banks around the world on behalf of Osama bin Laden and al Qaeda, and was reportedly bin Laden's brother-in-law); and Abu Hammam al Saudi (a member of al Qaeda and very close associate to bin Laden, served as al Qaeda's "Emir of finance," was in charge of military affairs for al Qaeda, and further served as the head of the IIRO's office in Peshawar, Pakistan). *See, e.g.*, Ex. 153, Testimony of Jamal al Fadl, August 29, 2002, PEC-KSA 329-352; Ex. 160, FBI 302 Cooperating Witness Statement of Jamal al Fadl, November 1996, PEC-KSA 2115-2132; Ex. 161, FBI 302 Cooperating Witness |

| | |
|---|---|
| | Statement of Jamal al Fadl, June 2, 2004, PEC-KSA 2133-2134; Ex. 163, FBI 302 Cooperating Witness Statement of Jamal al Fadl, January-February 1998, PEC-KSA 2144-2157; Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143.<br><br>The United States government gained considerable insights into al Qaeda's financial infrastructure from Fadl. *See* Ex. 1, 9/11 Commission Final Report at 62 (explaining that Fadl, who had taken the oath of fealty to bin Laden and served as one of his business agents, "defected and became a star informant for the United States"); *id.* at 109 (stating that Fadl "provided a major breakthrough of intelligence on the creation, character, direction, and intentions of al Qaeda"); *id.* at 185 ("[The CIA] knew relatively early, for example, about the loose affiliation of financial institutions, businesses, and wealthy individuals who supported extremist Islamic activities. Much of the earlier reporting on al Qaeda's financial situation and its structure came from Jamal Ahmed al Fadl.").<br><br>Moreover, the 9/11 Commission Final Report cites extensively to FBI interviews of Fadl, and Fadl's trial testimony in *United States v. Usama bin Laden*, No. S(7), 98 Cr. 1023 (S.D.N.Y.), in support of its findings. *See* 9/11 Commission Final Report at 467-471, 479.<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 77-80 (detailing Jamal al Fadl's testimony concerning (1) IIRO's al Qaeda guesthouse in Peshawar, Pakistan; (2) al Qaeda members Abu Unaith al Saudi and Abu Hammam al Saudi working in the IIRO offices in Peshawar to purchase weapons; (3) Wa'el Jelaidan ("Abu Hassan al Madani") headed the IIRO-Pakistan office; (4) al Qaeda member Abu Hammam al Saudi's tenure as the head of the IIRO-Pakistan office and using the office's resources to provide false IIRO identification cards to Islamic fighters for travel; and (5) al Qaeda's financial chief, Saidi Madani al Tayyib, working under the direction of Abu Hammam, and later ascending to al Qaeda's emir of finance).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 34 (discussing Jamal al Fadl's testimony concerning the IIRO's ties to al Qaeda, including al Qaeda member Abu Hammam's tenure as head of IIRO-Pakistan, Hammam's role in collecting donations from a very rich Saudi, and Hamam's role in helping Osama bin Laden establish businesses in Sudan). |

| | |
|---|---|
| 112. Jamal al Fadl became a paid informant for the U.S. government in 1996, receiving living expenses for himself and his family. *Id.* | Undisputed as a general matter for purposes of this motion. |
| 113. Jamal al Fadl became a paid informant for the U.S. government only after Bin Laden discovered that he was embezzling funds. 9/11 Commission Report at 62 ("Then Bin Ladin discovered that Fadl had skimmed about $110,000, and he asked for restitution. Fadl resented receiving a salary of only $500 a month while some of the Egyptians in al Qaeda were given $1,200 a month. He defected and became a star informant for the United States."); see also Ex. 18, Brown Rpt. at 72 (stating that, in the mid-1990s, a joint audit by the Bin Ladin organization and the National Islamic Front (NIF) government of Sudan discovered that Al Fadl had embezzled funds from both entities). | It is not disputed that the 9/11 Commission Final Report makes the quoted statement at 62. *See also* Plaintiffs' response to No. 111. |
| 114. Jamal al Fadl offered false information to U.S. agents and others, including:<br><br>a. Claiming to have trained with Ramzi Yousef before admitting that he never met Ramzi Yousef (*id.* at 73);<br><br>b. Describing Al Qaeda in Sudan as a distinct entity, the Islamic Army, and later explaining that it was just one of two names for Al Qaeda and that Al Qaeda ultimately was chosen (*id.* at 74);<br><br>c. Misidentifying members of Al Qaeda's shura council (*id.* at 75);<br><br>d. Falsely claiming to witness the death of Abu'l-Abbas al-Madani by gunshot wound to the head in Afghanistan when Abu'l-Abbas al-Madani actually died in Bosnia (*id.* at 79);<br><br>e. Falsely claiming that Abdallah Anas was a member of Al Qaeda (*id.* at 79- 80);<br><br>f. Making a series of erroneous claims during testimony claiming other militant groups were part of Al Qaeda, such as al-Gama'a al-Islamiyya in Egypt, which announced a cessation of military activity in Egypt in 1995 and abandoned violence altogether in 1999, the non-existent al-Gama'a al- Islamiyya in Algeria, Libyan Islamic Fighting Group, which focused on toppling the Gaddhafi regime, and Yemeni Jannubi (*id.* at 75-77); and | Disputed. The information provided by Jamal al Fadl concerning Osama bin Laden, al Qaeda, and associated terrorist organizations has been tested and accepted in U.S. court proceedings and frequently corroborated by other source information. *See also* Plaintiffs' response to No. 111.<br><br>By way of further response, the IIRO does not challenge Fadl's statements concerning the IIRO, including but not limited to the following. *See, e.g.*, Ex. 153, Testimony of Jamal al Fadl, August 29, 2002, PEC-KSA 329-352 at 335 ("Abu Al Hassan listed under the title 'Jihad support' … referred to him as Abu Al Hassan Al Madani … Abu Al Hassan's true name was Wael Julaidan…. Source explained that Abu Al Hassan Al Madani ran the Pakistan office of the International Islamic Relief Organization which Source also referred to as IGASA. Source explained that the International Islamic Relief Organization fell under the Rabita Al Islami organization which Source also knew to use the name MWLKA."); Ex. 160, FBI 302 Cooperating Witness Statement of Jamal al Fadl, November 1996, PEC-KSA 2115-2132 at 2120-2121 (Jamal al Fadl stated that al Qaeda member Abu Hammam was the manager of the IIRO office in Peshawar, Pakistan, and "would provide false IIRO identification for people to travel"); *id.* at 2121 (Fadl stated that Abu Hammam, the head of the IIRO in Peshawar, was "close" with Osama bin Laden and "would contribute funds or contacts to an [al Qaeda] operation."); Ex. 161, FBI 302 Cooperating Witness Statement of Jamal al Fadl, June 2, 2004, PEC-KSA 2133-2134 at 2133 ("The source advised that [Yassin] Al-Kadi was friends with two Al-Qaida members who were involved in the financial aspects of the group. These two individuals were Abu Unaith Al-Saudi (of Moroccan roots) and Abu Hammam Al-Saudi. The source |

| | |
|---|---|
| g. Falsely claiming that Jalaluddin Haqqani – a commander of Yunis Khales who joined the Taliban in the late 1990s – was a commander under Gulbuddin Hekmatyar even though Khales and Hekmatyar were rivals and fought against each other after Khales joined the Taliban. (Ex. 17, Expert Report of Marc Sageman ("Sageman Rpt.") at 223-224). | advised that both these individuals purchased weapons for Al-Qaida during the war in Afghanistan and maintained an office in Peshawar, Pakistan circa 1989. According to the source, this office was located in the offices of the Islamic Relief Organization (IRO). The source further advised that the manager and person who ran the IRO at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani. According to the source, Julidan was one of Bin Laden's closest friends at the time."); Ex. 163, FBI 302 Cooperating Witness Statement of Jamal al Fadl, January-February 1998, PEC-KSA 2144-2157 at 2145-2146 (stating that Abu Hammam al Saudi, "the individual who ran the Islamic International Islamic Relief Organization in Peshawar, Pakistan," was the "Emir of finance," and would give money to al Qaeda members who "were in charge of salary, travel, and health benefits for Al-Qaida"); *id.* at 2146 (discussing an "Islamic Relief" guesthouse in Peshawar used by al Qaeda members).<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 77-80. |
| 115. The 9/11 Commission reported, in 2004, that the CIA obtained much of the early reporting on al Qaeda's financial situation and its structure from Jamal al Fadl. 9/11 Commission Report at 185. It reported that the CIA "knew relatively early, for example, about the loose affiliation of financial institutions, businesses, and wealthy individuals who supported extremist Islamic activities. Much of the early reporting on al Qaeda's financial situation and its structure came from Jamal Ahmed al Fadl…." *Id.* | It is not disputed that the 9/11 Commission Final Report makes the quoted statement at 185. *See also* Plaintiffs' response to No. 111. |
| 116. Plaintiffs rely on Jamal al Fadl's assertion that "bin Ladin and al Qaeda used Wael Julaidan as the head of IIRO in Peshawar, Pakistan, to create ID cards for al Qaeda people so that they could cross the Pakistan-Afghanistan border without a problem." Winer Rpt. ¶ 12.19.3. | Disputed as stated. Mr. Winer cites to Jamal al Fadl's testimony at Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143. *See* PEC-KSA 2137 (Fadl testified that Wa'el Jelaidan ran the Peshawar branch of the IIRO, which made ID cards for "the Al-Qaeda people" so "you can enter the border between Pakistan, Afghanistan easily with – with no problem."); *id.* at 2138 (Fadl testified that the IIRO would also provide letters to al Qaeda members so that they could get visas from Pakistan immigration and stay in Pakistan); *id.* at 2141-2143 (Fadl further testified that the IIRO falls under the Saudi Rabita al Alam al Islamiya (a/k/a the Muslim World League), which is the "mother of all NGOs."). |

| | |
|---|---|
| 117. Plaintiffs rely on a 1996 document stating that "a clandestine source" alleged that "IIRO helps fund six militant training camps in Afghanistan." See Winer Rpt. ¶¶ 6.6.10.3 (quoting 1996 document), 7.3.4.3 (referring to same document but altering statement to refer to "terrorist training camps"); see also Kohlmann Rpt. ¶ 83 (referring to same document and altering reference to refer to "7 Al-Qaida training camps"); Levitt Rpt. at 36 (referring to same document and altering reference to refer to "six al-Qa'ida training camps"). | It is not disputed that Plaintiffs' experts cite to the 1996 CIA Report in their reports. To the extent that the IIRO criticizes the experts' use of "militant training camp" vs. "Al-Qaida training camp" when describing the IIRO's financial support of camps in Afghanistan that were established solely for terrorist training, that criticism is without merit. Plaintiffs note that the 1996 CIA report uses the term "militant training camps," but the U.N. Monitoring Committee added that these were believed to be "Al-Qa'ida training camps."<br><br>By way of further response, the IIRO provided substantial funding for al Qaeda's training camps in Afghanistan, including camps from which al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training. *See, e.g.*, Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); Ex. 159, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 38, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates |

| | |
|---|---|
| | in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo military training himself at one of the camps, where he met Usama Bin Laden."). |
| 118. Jamal al Fadl is believed to be the "clandestine" informant who is quoted in the 1996 document as stating that "IIRO helps fund six militant training camps in Afghanistan." See Winer Rpt. ¶¶ 6.6.10.3, 7.3.4.3 (drawing connection between al Fadl and clandestine source). | Disputed as stated. Although Mr. Winer cites to two Jamal al Fadl-related documents at ¶ 7.3.4.3 – Ex. 161, FBI 302 Cooperating Witness Statement of Jamal al Fadl, June 2, 2004, PEC-KSA 2133-2134; Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143 – there is no discussion of training camps in those documents, and there is no connection asserted between Fadl and the "clandestine" informant. The identity of the "clandestine" informant is unknown. |
| 119. Plaintiffs rely on Jamal al Fadl's assertion that described the "involvement of Islamic charities as interwoven into al Qaeda." Winer Rpt. ¶ 7.4.6. | Disputed as stated. Mr. Winer cites to Ex. 160, FBI 302 Cooperating Witness Statement of Jamal al Fadl, November 1996, PEC-KSA 2115-2132 at 2121 (Fadl stated that Abu Hammam, the head of the IIRO in Peshawar, was "close" with Osama bin Laden and "would contribute funds or contacts to an [al Qaeda] operation."); and Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143 at 2139 (Fadl explained that the IIRO provided cover documentation to al Qaeda members falsely identifying them as IIRO workers so they "can get visa easy" and "go to anywhere in the world."). |
| 120. Plaintiffs rely on Jamal al Fadl's accusation that "the head of IIRO in Peshawar as a 'good friend' of bin Ladin who 'would contribute funds or contacts' to specific al Qaeda operations." Winer Rpt. ¶ 7.4.6. | Disputed as stated. Mr. Winer cites to Ex. 160, FBI 302 Cooperating Witness Statement of Jamal al Fadl, November 1996, PEC-KSA 2115-2132 at 2121 (Fadl stated that Abu Hammam, the head of the IIRO in Peshawar, was "close" with Osama bin Laden and "would contribute funds or contacts to an [al Qaeda] operation."). |

| | |
|---|---|
| 121. Plaintiffs rely on Jamal al Fadl's accusation that "IIRO was used to provide cover documents for al Qaeda by giving them documentation falsely stating that they were relief workers, so that they could get visas to travel 'to England, or if you want to go to anywhere in the world." Winer Rpt. ¶ 7.4.6. | Disputed as stated. Mr. Winer cites to Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143 at 2139 (Fadl explained that the IIRO provided cover documentation to al Qaeda members falsely identifying them as IIRO workers so they "can get visa easy" and "go to anywhere in the world."). |
| 122. Plaintiffs rely on Jamal al Fadl's assertion that "Usama Bin Laden identified several prominent international Muslim charities as the primary sources of Al-Qaida financial and fundraising activity." Kohlmann Rpt. ¶ 21. | Disputed as stated. Mr. Kohlmann cites to Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114. *See id.* at 2031 ("By way of background, Usama Bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ('MK') (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al Madani") of the International Islamic Relief Organization (hereafter "IIRO," sometimes referred to as "Igatha" based upon its Arabic name "*Hay'at al-Igatha al-Islamiya al-'Alamtyaa*"), which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL'). In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*."). |
| 123. Plaintiffs rely on Jamal al Fadl's accusation that "IIRO ran an Al-Qaida guesthouse in Peshawar, Pakistan." Kohlman Rpt. ¶ 77. | Disputed as stated. Mr. Kohlmann cites to Ex. 163, FBI 302 Cooperating Witness Statement of Jamal al Fadl, January-February 1998, PEC-KSA 2144-2157 at 2146 (Fadl recalls a meeting with senior al Qaeda members at an "Islamic Relief guesthouse" in Peshawar, Pakistan.). |
| 124. Plaintiffs rely on Jamal al Fadl's assertion that a scrap of paper was the "Golden Chain" list, which included IIRO personnel, of "wealthy individuals…who provided Bin Laden and Al Qaeda with money on a regular basis." Kohlmann Rpt. ¶ 156. | Disputed as stated. Mr. Kohlmann cites to Ex. 45, FED-PEC 134953-134955 ("Golden Chain" listing of al Qaeda's elite financial sponsors and facilitators, including Wa'el Jelaidan (IIRO/MWL official designated to receive financial contributions from Suleiman al Rashid, Abdel Qader Bakri, Salah al Din Abdel Jawad, and Abdel Hadi Taher); Ibrahim Afandi (member of IIRO's Board of Directors), Abdurahman |

| | |
|---|---|
| | Abdul-Qader Faqih (member of IIRO's Board of Directors), Saleh Kamel (advisor to the IIRO board members concerning financial investments), and Suleiman al Rajhi (member of the IIRO's board and permanent committee)); Ex. 153, August 29, 2002 Interview with Jamal al Fadl, PEC-KSA000329-352 at 351 (Fadl explained that "the 'Golden Chain' consisted of wealthy individuals from the Gulf region who provided Bin Laden and Al Qaeda with money on a regular basis.").<br><br>*See also* Ex. 1, 9/11 Commission Final Report at 55 (stating that Osama bin Laden's organization "included a financial support network that came to be known as 'the Golden Chain,' put together mainly by financiers in Saudi Arabia and Persian Gulf states."). |
| 125. Plaintiffs rely on Jamal al Fadl's accusation that the "manager and person who ran the IRO [sic] at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani… Julidan was one of Bin Laden's closest friends at the time." Kohlmann Rpt. ¶ 77 (citations omitted). | Disputed as stated. Mr. Kohlmann cites to Ex. 161, FBI 302 Cooperating Witness Statement of Jamal al Fadl, June 2, 2004, PEC-KSA 2133-2134 at 2133 ("The source advised that [Yassin] Al-Kadi was friends with two Al-Qaida members who were involved in the financial aspects of the group. These two individuals were Abu Unaith Al-Saudi (of Moroccan roots) and Abu Hammam Al-Saudi. The source advised that both these individuals purchased weapons for Al-Qaida during the war in Afghanistan and maintained an office in Peshawar, Pakistan circa 1989. According to the source, this office was located in the offices of the Islamic Relief Organization (IRO). The source further advised that the manager and person who ran the IRO at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani. According to the source, Julidan was one of Bin Laden's closest friends at the time."). |
| 126. Plaintiffs rely on Jamal al Fadl's accusation that "Julaidan also went by the name Abu Hassan al Madani. … While working for the IIRO, Julaidan funded al Qaeda via the hawala system, with cash transferred from the IIRO HQ in Saudi Arabia and via the Peshawar branch of the Habib Bank." See Expert Report of Victor D. Comras ("Comras Rpt.") (ECF No. 9251-1) at 24. | Disputed as stated. Mr. Comras makes the following statement in his expert report at 24: "Al-Fadl stated that Julaidan also went by the name Abu Hassan al Madani. While working for the Saudi Red Crescent, Julaidan provided funds to bin Laden before and after the creation of al Qaeda. He also supplied al Qaeda with Saudi Red Crescent ID cards and medical supplies. While working for the IIRO, Julaidan funded al Qaeda via the hawala system, with cash transferred from the IIRO HQ in Saudi Arabia and via the Peshawar branch of the Habib Bank. Approximately 30% of the funds originated with the Saudi Government. Al-Fadl was not aware that Julaidan ever stopped supporting al Qaeda." *See* Expert Report of Victor D. Comras at MDL ECF No. 9251-1. |
| 127. Plaintiffs rely on accusations made by Jamal al Fadl in his more than 10 interviews, which are summarized in various FBI 302 reports that are cited by Plaintiffs' experts. See Winer Rpt. at footnotes 49-51 (citing FBI 302 reports and Transcript Excerpts from Videotape | It is not disputed that Mr. Winer cites to the following documents at footnotes 49-51 of his March 10, 2020 Expert Report: Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114. *See id.* at 2031 ("By way of background, Usama Bin Laden and Abdallah Azzam formed |

| | |
|---|---|
| Interviews of Jamal al Fadl); see also Kohlmann Rpt. at footnotes 105-106 (citing FBI 302 reports). | *Mekhtab al Khidemat* ('MK') (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al Madani") of the International Islamic Relief Organization (hereafter "IIRO," sometimes referred to as "Igatha" based upon its Arabic name "*Hay'at al-Igatha al-Islamiya al-'Alamtyaa*"), which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL'). In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*."); Ex. 161, FBI 302 Cooperating Witness Statement of Jamal al Fadl, June 2, 2004, PEC-KSA 2133-2134 at 2133 ("The source advised that [Yassin] Al-Kadi was friends with two Al-Qaida members who were involved in the financial aspects of the group. These two individuals were Abu Unaith Al-Saudi (of Moroccan roots) and Abu Hammam Al-Saudi. The source advised that both these individuals purchased weapons for Al-Qaida during the war in Afghanistan and maintained an office in Peshawar, Pakistan circa 1989. According to the source, this office was located in the offices of the Islamic Relief Organization (IRO). The source further advised that the manager and person who ran the IRO at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani. According to the source, Julidan was one of Bin Laden's closest friends at the time."); Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143 at 2137 (Fadl testified that Wa'el Jelaidan ran the Peshawar branch of the IIRO, which made ID cards for "the Al-Qaeda people" so "you can enter the border between Pakistan, Afghanistan easily with – with no problem."); *id.* at 2138 (Fadl testified that the IIRO would also provide letters to al Qaeda members so that they could get visas from Pakistan immigration and stay in Pakistan); *id.* at 2141-2143 (Fadl further testified that the IIRO falls under the Saudi Rabita al Alam al Islamiya (a/k/a the Muslim World League), which is the "mother of all NGOs."); Ex. 160, FBI 302 Cooperating Witness Statement of Jamal al Fadl, November 1996, PEC- |

| | |
|---|---|
| | KSA 2115-2132 at 2120-2121 (Jamal al Fadl stated that al Qaeda member Abu Hammam was the manager of the IIRO office in Peshawar, Pakistan, and "would provide false IIRO identification for people to travel"); *id.* at 2121 (Fadl stated that Abu Hammam, the head of the IIRO in Peshawar, was "close" with Osama bin Laden and "would contribute funds or contacts to an [al Qaeda] operation.").<br><br>It is also not disputed that Mr. Kohlmann cites to the following documents at footnotes 105-106 of his March 2020 Expert Report: <u>Ex. 163</u>, FBI 302 Cooperating Witness Statement of Jamal al Fadl, January-February 1998, PEC-KSA 2144-2157 at 2145-2146 (stating that Abu Hammam al Saudi, "the individual who ran the Islamic International Islamic Relief Organization in Peshawar, Pakistan," was the "Emir of finance," and would give money to al Qaeda members who "were in charge of salary, travel, and health benefits for Al-Qaida"); *id.* at 2146 (discussing an "Islamic Relief" guesthouse in Peshawar used by al Qaeda members); <u>Ex. 161</u>, FBI 302 Cooperating Witness Statement of Jamal al Fadl, June 2, 2004, PEC-KSA 2133-2134 at 2133 ("The source advised that [Yassin] Al-Kadi was friends with two Al-Qaida members who were involved in the financial aspects of the group. These two individuals were Abu Unaith Al-Saudi (of Moroccan roots) and Abu Hammam Al-Saudi. The source advised that both these individuals purchased weapons for Al-Qaida during the war in Afghanistan and maintained an office in Peshawar, Pakistan circa 1989. According to the source, this office was located in the offices of the Islamic Relief Organization (IRO). The source further advised that the manager and person who ran the IRO at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani. According to the source, Julidan was one of Bin Laden's closest friends at the time."). |
| 128. Jamal al Fadl's deposition in this MDL was noticed for October 11, 2019. The deposition was placed on hold, and al Fadl did not appear for his noticed deposition. Ex. 91, Al Fadl Subpoena, dated August 7, 2019; see also Ex. 92, Email from Andrew Krause to Bruce Strong et al., dated September 17, 2019 (confirming service of deposition subpoena). | Undisputed as a general matter for purposes of this motion, and immaterial. |
| **<u>Moro Islamic Liberation Front ("MILF")</u>** | No response necessary. |
| 129. Plaintiffs have no evidence that the Moro Islamic Liberation Fund ("MILF") had any foreknowledge of or were involved in the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Winer Rpt. (failing to provide evidence that MILF had any knowledge or was | Disputed. The IIRO's claim that there is no evidence that the Moro Islamic Liberation Fund ("MILF") had any foreknowledge of or was involved in the planning or execution of the 9/11 attacks is inaccurate and misleading.<br><br>As set forth in Plaintiffs' response to No. 1, Dr. Omar Abdullah Naseef, in his capacity as the MWL Secretary |

| | |
|---|---|
| involved in the planning or execution of the 9/11 Attacks); see generally 9/11 Commission Report; Monograph. | General and IIRO Chairman, approved the appointment of Mohammed Jamal Khalifa, a founding al Qaeda member and Osama bin Laden's brother-in-law, to open a joint MWL/IIRO branch office in the Philippines contemporaneous with the formation of al Qaeda. *See* Ex. 51, FED-PEC 202846-202847 (June 5, 1988). As a result of that appointment, Khalifa was able to use the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia and provide substantial assistance for al Qaeda affiliated terrorist organizations Abu Sayyaf Group ("ASG"), Moro Islamic Liberation Front, and Jemaah Islamiyah ("JI"). *See* Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 77-81 (describing how al Qaeda used its relationships with the Saudi charities to facilitate the building of relationships with, and channel money and resources to, aligned terrorist organizations and causes in the Philippines, Bosnia, Chechnya, Kenya, Sudan, and other regions, thereby creating dozens of affiliates around the globe and the ability to launch attacks against the United States and its interests abroad).<br><br>Those terrorist groups became an integral part of Osama bin Laden and al Qaeda's Southeast Asian network and received extensive funding and resources from the IIRO. *See, e.g.,* Ex. 156, U.S. Diplomatic Cable, *Islamic NGOs in the Philippines*, May 23, 2005, PEC-KSA 1461-1463 at 1462 ("Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines."); Ex. 44, Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000, FED-PEC 10813-10815 (reporting that the IIRO was "being used by accused international terrorists Osama bin Laden and his brother-in-law, Mohammad Jamal Khalifa as a front to finance the operations of the Abu Sayyaf and the Moro Islamic Liberation Front," and that the bulk of IIRO "fund[s] goes to terrorist operations of the Abu Sayyaf and the MILF"); Ex. 16, *Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia*," CIA_000450-480 at 455 ("Gulf NGOs with branch offices in the Philippines—including Dal al Hijra Foundation and the International Islamic Relief Organization—maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates.").<br><br>*See also* Ex. 59, Philippines Intelligence Report, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the |

| | |
|---|---|
| | Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 113 ("According to the Umog interrogation report, IIRO-PHL, under the direction of Khalifah, also sent ASG and MILF members to Afghanistan to train with the 'mujahidin.' Khalifah stated that he wanted the ASG and the MILF to train together to establish alliances among the groups."); Ex. 33, European Parliament, *The Involvement of Salafism/Wahhabism in the Support and Supply of Arms to Rebel Groups Around the World*, June 2013, at 9 ("Declassified intelligence reports from the FNP revealed that in 1988 Bin Laden sent his brother-in-law Mohammad Jamal Khalifa to the Philippines to set up Al Qaeda's branches in Southeast Asia. The so-called Khalifa network counted at least twelve charitable organizations and front companies that provided funds to both the Moro Islamic Liberation Front (MILF) and Abu Sayyaf. One of the most active organizations in this sense was the IIRO. In fact, IIRO-funded facilities were mainly built in Mindanao, a region under the control of the aforementioned rebel groups. For instance, the head of IIRO's branch office in Tawi Tawi, Mindanao, was Abdul Asmad, former Abu Sayyaf's intelligence chief until 1994 when he died (Abuza, 2003, p. 27). The office was used by Al Qaeda to siphon money on behalf of the MILF and Abu Sayyaf. According to defectors' interrogations, this practice was very effective considering that Al Qaeda was able to divert the 70-90 percent of funds for arms acquisition destined to the rebel groups. This means that only the 10-30 percent of the money remained available for legitimate purposes.").<br><br>The Abu Sayyaf Group, Moro Islamic Liberation Front, and Jemaah Islamiyah also received extensive funding and resources from the IIRO-Eastern Province and Abd al Hamid Sulaiman al Mujil, as well as the IIRO-Indonesia branch office. *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202110 ("Al-Mujil provided donor funds directly to al Qaida and is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI). Both ASG and JI are al Qaida-associated terrorist groups in Southeast Asia designated pursuant to the authorities of E.O. 13224."); *id.* at 202112 ("The IIRO Indonesia director has channeled money to two Indonesia-based, JI-affiliated foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, |

| | |
|---|---|
| | logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed the establishment of training facilities for use by al Qaida associates.").<br><br>In addition, investigations conducted by Philippines Intelligence determined that Mujil met with Moro Islamic Liberation Front officials in December 1998 concerning financial support. *See* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211430 (identifying IIRO officials "Al Saif Othoman A O and Almojil Abdul Hamdi S" meeting with MILF Chairman Salamat Hashim at Camp Abubakar in the Southern Philippines concerning a $192,197.00 contribution).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 38 ("Likewise, the IIRO's Philippines office is tied to funding of the Philippines based Moro Islamic Liberation Front. According to a *Wall Street Journal* article, from November to December 2001, Philippine police arrested four Arabs associated with this group; one of these men, Mohammad Sabri, was an IIRO employee and directly linked to Mohammad Jamal Khalifa.").<br><br>Moreover, in his pursuit of al Qaeda's global expansion, bin Laden directed critical material and logistical support to ASG, MILF, and JI. *See* Ex. 1, 9/11 Commission Final Report at 58 ("Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders. Al Qaeda helped Jemaah Islamiya ("JI"), a nascent organization headed by Indonesian Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the Philippines.").<br><br>As the foregoing evidence demonstrates, Abu Sayyaf Group, Moro Islamic Liberation Front, and Jemaah Islamiyah were closely aligned with Osama bin Laden and al Qaeda for years leading up to the 9/11 attacks and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States at all relevant times. |
| 130. Plaintiffs have no evidence tracing MILF funds to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021), at EO14040- 000011; Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); see generally 9/11 Commission Report; Monograph. | Disputed as stated. The IIRO's claim that there is no evidence tracing MILF funds or other in-kind support to al Qaeda and/or the planning and execution of the 9/11 attacks mischaracterizes the Plaintiffs' claims. As described herein, the IIRO, MWL, and their officials, employees, advisors, and representatives were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist |

| | |
|---|---|
| | nature, mission, and intent to attack the United States and its interests abroad. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks. That substantial assistance included extensive financial, material, logistical, and ideological support directed to al Qaeda's Southeast Asian network, consisting of the Abu Sayyaf Group, Moro Islamic Liberation Front, Jemaah Islamiyah, and other terrorist organizations.<br><br>Any financial and/or in-kind support provided to those terrorist groups, in turn, directly supported al Qaeda's global terrorist ambitions to wage jihad against the United States. Accordingly, the 9/11 attacks were a predictable, inevitable product of that sustained, knowing support. Plaintiffs need not prove that the funds or other in-kind support provided to al Qaeda were traced to the terrorist plot or the attack itself.<br><br>By way of further response, *see* Plaintiffs' response to No. 129. |
| 131. Plaintiffs have no evidence tracing in-kind support from MILF to the planning or for the execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); see generally 9/11 Commission Report; Monograph. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 129 and 130. |
| 132. Plaintiffs have no evidence tracing funds from IIRO through MILF to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021), at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from IIRO to the planning or execution of the 9/11 Attacks); Kohlmann Rpt. ¶¶ 27-70 (same); Levitt Rpt. at 29-35 (same); Jenkins Rpt. (same); Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); see also Ex. 18, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); ECF No. 8911 at 9; ECF No. 8129-22 at 27; see generally 9/11 Commission Report; Monograph; Ex. 8, Daguit Decl. ¶ 34; Ex. 4, May 21, 2024 Basha Decl. ¶ 41. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 129 and 130. *See also* Ex. 16, *Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia*," CIA_000450-480 at 455 ("Gulf NGOs with branch offices in the Philippines—including Dal al Hijra Foundation and the International Islamic Relief Organization—maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates."); Ex. 33, European Parliament, *The Involvement of Salafism/Wahhabism in the Support and Supply of Arms to Rebel Groups Around the World*, June 2013, at 9 ("Declassified intelligence reports from the FNP revealed that in 1988 Bin Laden sent his brother-in-law Mohammad Jamal Khalifa to the Philippines to set up Al Qaeda's branches in Southeast Asia. The so-called Khalifa network counted at least twelve charitable organizations and front companies that provided funds to both the Moro Islamic Liberation Front (MILF) and Abu Sayyaf. One of the most active organizations |

| | |
|---|---|
| | in this sense was the IIRO. In fact, IIRO-funded facilities were mainly built in Mindanao, a region under the control of the aforementioned rebel groups. For instance, the head of IIRO's branch office in Tawi Tawi, Mindanao, was Abdul Asmad, former Abu Sayyaf's intelligence chief until 1994 when he died (Abuza, 2003, p. 27). The office was used by Al Qaeda to siphon money on behalf of the MILF and Abu Sayyaf. According to defectors' interrogations, this practice was very effective considering that Al Qaeda was able to divert the 70-90 percent of funds for arms acquisition destined to the rebel groups. This means that only the 10-30 percent of the money remained available for legitimate purposes."); Ex. 44, Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000, FED-PEC 10813-10815 (reporting that the IIRO was "being used by accused international terrorists Osama bin Laden and his brother-in-law, Mohammad Jamal Khalifa as a front to finance the operations of the Abu Sayyaf and the Moro Islamic Liberation Front," and that the bulk of IIRO "fund[s] goes to terrorist operations of the Abu Sayyaf and the MILF"); Ex. 54, Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report*, February 13, 1999, FED-PEC 203704-203705 (reporting that the IIRO's Mohammed Jamal Khalifa "is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group," and further stating that the "IIRO is suspected by Western intelligence agencies to be bin Laden's conduit to various terrorist organizations in Islamic countries"). |
| 133. The primary sources identified in the expert report of Vahid Brown do not indicate any connection between Al Qaeda and MILF, and there is no evidence that the MILF sought to promote Al Qaeda's agenda or support its activities in any way. Ex. 18, Brown Rpt. at 7-8, 40-41. | Disputed. IIRO's expert Vahid Brown does not identify "the al-Qa'ida primary sources" he specifically reviewed in support of his assertion that there is no connection between al Qaeda and MILF and therefore lacks foundation. *See* IIRO Exhibit 18, Expert Report of Vahid Brown at 40.<br><br>By way of further response, the 9/11 Commission Final Report clearly describes a connection between Osama bin Laden and MILF. *See* Ex. 1, 9/11 Commission Final Report at 58 ("Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders. Al Qaeda helped Jemaah Islamiya ("JI"), a nascent organization headed by Indonesian Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the Philippines.").<br><br>*See also* Plaintiffs' responses to Nos. 129, 130, and 132. |
| 134. Plaintiffs have no evidence that IIRO was aware or had knowledge before 9/11 of any connection between | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 129, 130, and 132. |

| | |
|---|---|
| the MILF and Al Qaeda. Office of Foreign Assets Control, Archive of Changes to OFAC's Sanctions Lists (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list; Ex. 18, Brown Rpt. at 40. | By way of further response, prior to the 9/11 attacks, IIRO leadership was expressly aware of the organization's ongoing support for international terrorism and Osama bin Laden, and the involvement of its branch offices and officials in terrorist activities, by virtue of extensive international media reporting. That reporting includes a number of public news articles discussing the terrorist activities of the Abu Sayyaf Group, Moro Islamic Liberation Front, and Jemaah Islamiyah, and/or their connections to international terrorism and al Qaeda. Any assertion that the IIRO, and/or its parent organization MWL, was unaware of these connections is duplicitous. *See, e.g.,* Ex. 54, Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report*, February 13, 1999, FED-PEC 203704-203795 (reporting that the IIRO's Mohammed Jamal Khalifa "is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group," and further stating that the "IIRO is suspected by Western intelligence agencies to be bin Laden's conduit to various terrorist organizations in Islamic countries"); Philippine Daily Inquirer, *Front Page: Bin Laden Funds Abu Sayyaf Through Muslim Relief Group*, August 9, 2000 (indicating that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League) is a conduit of funds for the Abu Sayyaf Group, a terrorist organization in the Philippines); Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000 (reporting that the IIRO is a front to finance the operations of the Abu Sayyaf Group and Moro Islamic Liberation Front terrorist organizations); The Straits Times, *Osama Gave Funds to Abu Sayyaf: Manila*, August 10, 2000 (reporting that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League), "in the guise of giving charity to local Muslim communities, provided funds to Abu Sayyaf for acquiring arms"); Associated Press, *Terrorists Train for Seaborne Attacks* (reporting that "[t]wo of the most dangerous al-Qaida-linked groups in Southeast Asia," Abu Sayyaf Group and Jemaah Islamiyah, are working together to train militants for seaborne terrorist attacks"). *See also* Ex. 80, IIRO 147 ("IIRO Administrative Structure" chart identifying a "Department of Media and Information."); Ex. 65, FED-PEC 214874-214875 (MWL structural chart identifying "The General Department for Media and Culture"). |
| 135. The MILF has never been designated by OFAC or as a Foreign Terrorist Organization by the Secretary of State. U.S. Dept. of Treas., Office of Foreign Assets Control, Archive of Changes to OFAC's Sanctions Lists (last visited April 10, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the- sdn-list; Ex. 18, | It is not disputed that MILF was not designated by the U.S. government's OFAC or State Department. However, to the extent that the IIRO argues that the absence of any designation is equivalent to a finding that the person or entity is innocent of terrorism charges, that is baseless and disputed. *See* Plaintiffs' responses to Nos. 129, 132, and 133. |

| | |
|---|---|
| Brown Rpt. at 40 ("The MILF has never been listed by the US government as a designated terrorist group."). | Moreover, to the extent that IIRO argues that the absence of any designation of MILF by OFAC or the State Department demonstrates that the IIRO and MWL were not aware of MILF's terrorist activities and/or connections to Osama bin Laden, al Qaeda, or other terrorist organizations, that is disputed. *See* Plaintiffs' responses to Nos. 129, 130, 132, 134. *See also Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (holding that "it would defy common sense" to require a designation to serve as a prerequisite for knowledge that certain individuals or entities were associated with a terrorist organization, or to conclude that such knowledge "could be gained in no other way").<br><br>*See also* Plaintiffs' responses to Nos. 1, 129. MWL/IIRO leadership specifically appointed Mohammed Jamal Khalifa, a founding member of al Qaeda, to oversee the IIRO and MWL operations in the Philippines as part of a deliberate plan to insert al Qaeda members into strategic IIRO and MWL offices around the globe contemporaneous with the formation of al Qaeda. With the knowledge and blessing of the IIRO and MWL leadership, Khalifa used the IIRO and MWL to provide financial, ideological, and operational support for al Qaeda and associated terrorist organizations Abu Sayyaf Group and Moro Islamic Liberation Front. |
| 136. The primary sources identified in the expert report of Vahid Brown do not indicate any connection between Al Qaeda and the MILF, and MILF has long denied any connection to Al Qaeda. Ex. 18, Brown Rpt. at 7-8, 40. | Duplicative and disputed. *See, e.g.*, Plaintiffs' response to No. 133. |
| 137. The Moro National Liberation Front ("MNLF") emerged in the 1970s in the Philippines. Sidel Rpt. ¶¶ 41-42. | Undisputed as a general matter for purposes of this motion. |
| 138. The MILF—an Islamist, separatist group in the Philippines—was formed in 1984 when its founder broke away from the MNLF. Sidel Rpt. ¶¶ 50-51. | Undisputed as a general matter for purposes of this motion. |
| 139. Neither Adnan Basha nor IIRO has knowledge of any assistance (financial or otherwise) provided by IIRO Head Office or IIRO-Philippines to the MILF. Ex. 4, May 21, 2024 Basha Decl. ¶ 41. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 129, 130, 132, 134, and 135.<br><br>By way of further response, and contrary to his new declaration testimony, IIRO Secretary General Adnan Basha met with a delegation from the Moro Islamic Liberation Front at the Saudi headquarters of the IIRO concerning the implementation of project in the Philippines. *See* Ex. 107, IIRO 97450 (January 10, 2002 letter from IIRO Secretary General Basha to the Supervisor of the Human Development Program concerning the IIRO's support for the Moro Islamic Liberation Front). |

| | |
|---|---|
| | In addition, MWL Secretary General Abdullah al Turki received a request from the chairman of the Moro Islamic Liberation Front for financial assistance. *See* Ex. 104, IIRO 93332-93333 (August 25, 2003 letter from the successor to the deceased MILF chairman to the MWL Secretary General asking him to "open a bank account with the League at one of the accredited banks to receive special assistance and donations for them from their brothers in creed and faith."). In a related communication, a MWL representative contacted the IIRO-Philippines office and asked for assistance concerning this "important" request. *See* Ex. 103, IIRO 93331 (October 4, 2003 letter from Fouad bin Abdullah Akbar, Director of the Emergency Relief Department, to the "Director of the International Islamic Relief Organization Office in the Philippines," concerning MILF's request to MWL Secretary General Turki and asking to "[k]indly review and provide us with the necessary study and your opinion on this request, as it is important to us.").<br><br>IIRO employee Abdulhadi Daguit testified that the Moro Islamic Liberation Front was engaged in military activities during the same time that MILF asked MWL Secretary General Turki to open a bank account so they could receive donations. *See* Ex. 29, Transcript, June 27, 2019 Deposition of Abdulhadi T. Daguit, at 144-145.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 140. During his tenure with IIRO-Philippines, from 1986 to 2006, Abdulhadi Daguit was not aware of any assistance provided by IIRO-Philippines to the MILF. Ex. 8, Daguit Decl. ¶¶ 3, 34. | Disputed. The IIRO's contention that Daguit was unaware of any assistance the IIRO-Philippines branch office provided to MILF is inaccurate and misleading. Daguit worked closely with Khalifa at the IIRO during the 1988-1994 timeframe and was well aware of Khalifa's use of the IIRO-Philippines office to provide significant financial and material support to Abu Sayyaf Group and Moro Islamic Liberation Front, fund other Islamic militants and extremists groups, and recruit and train Muslims for jihad. *See also* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and |

| | |
|---|---|
| | IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202111 (indicating that the IIRO-Philippines office "is a source of funding for the al Qaida-affiliated [Abu Sayyef Group]," and IIRO funding "is directed to terrorist operations"); *id.* ("IIRO-PHL's director, Abd al-Hadid Daguit, is a trusted associate of Khalifa," "who is Usama bin Laden's brother-in-law and has been identified as a senior al Qaida member.").<br><br>In addition, investigations conducted by Philippines Intelligence determined that Daguit was in constant contact with leaders of the Moro Islamic Liberation Front while working with the IIRO and Khalifa. *See* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211445 (identifying Daguit as a "known associate of Khalifa," "presently connected with IIRO Manila," and in "constant contact with Yusop Alongan @Ustadz Duli/Abdullah, Chairman of MILF Finance Committee"); *id.* at 211429 (stating that Daguit and others "are known associates of Mohammad Jamal Khalifa involved in establishing the NGO network in the country").<br><br>Notably, when asked during his June 27, 2019 deposition whether he met with representatives of the Moro Islamic Liberation Front while he was working with the IIRO, Daguit denied that he did. *See* Ex. 29, Transcript June 27, 2019 Deposition of Abdulhadi T. Daguit, at 117-118.<br><br>Moreover, Philippines Intelligence identified Daguit as a conspirator in an al Qaeda bombing plot to take place in the Philippines in 2004. *See* Ex. 58, FED-PEC 210866-210867. In the intelligence report, Daguit is identified ("Abdulhadi Daguit (Filipino) of MWL-IIRO Manila office"), as an associate of two al Qaeda members who were allegedly tasked to conduct a bombing attack on the Saudi Embassy in the Philippines for "being an American ally in the Iraqi issue." The attack on the embassy was to take place "within the time frame of before or after the national election on 10 May 2004."<br><br>Finally, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and |

| | |
|---|---|
| | (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 141. During Abdulhadi Daguit's tenure with IIRO-Philippines, from 1986 to 2006, IIRO-Philippines did not implement projects with the MILF. Ex. 8, Daguit Decl. ¶¶ 3, 34. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 139 and 140.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to2 No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 142. Until the November 7, 1993 interim ceasefire agreement between the MNLF and the Government of the Philippines, the MILF had been the preferred and peaceful negotiating partner of the Government. See Sidel Rpt. ¶¶ 54-55 ("Thus from the late 1980s through the early 1990s, an informal set of accommodations and understandings – if not a formal alliance – between the MILF and the Philippine government prevailed, with only occasional episodes of violence."); see also Interim Ceasefire Agreement Between the Government of the Republic of the Philippines and the Moro National Liberation Front with the Participation of the Organization of the Islamic Conference, UN Peacemaker (Nov. 7, 1993) . | Disputed. The IIRO's claim that MILF was a "peaceful" partner and did not engage in militant or terrorist activities until November 1993 is inaccurate and misleading. Prior to that time frame, MILF was already aligned with al Qaeda and receiving equipment and training assistance from Osama bin Laden, was receiving training at a camp named "Abu Haidar" associated with Mohammed Jamal Khalifa and the IIRO, was receiving funding from an IIRO office being used by al Qaeda. *See, e.g.*, Ex. 1, 9/11 Commission Final Report at 58; Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428; Ex. 33, European Parliament, *The Involvement of Salafism/Wahhabism in the Support and Supply of Arms to Rebel Groups Around the World*, June 2013, at 9. |
| 143. MILF's more militant activities, including the establishment of armed groups and "camps," began after the 1993 reconciliation between MNLF and the Government. Sidel Rpt. ¶¶ 55-56. | Disputed. *See, e.g.*, Plaintiffs' response to No. 142. |
| 144. The MILF employed a strategy of engaging with the secular Filipino state in order to win concessions for autonomy, which was at odds with the ideological and strategic orientation of Al Qaeda. Ex. 18, Brown Rpt. at 40. | Disputed. Mr. Brown's statement lacks foundational evidence. |
| **Abu Sayyaf Group ("ASG")** | No response necessary. |
| 145. Plaintiffs have no evidence that the Abu Sayyaf Group ("ASG") had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case, | Disputed. The IIRO's claim that there is no evidence that the Abu Sayyaf Group ("ASG") had any foreknowledge of or was involved in the planning or execution of the 9/11 attacks, is inaccurate and misleading. |

| | |
|---|---|
| E014040-000011; Ex. 18, Brown Rpt. at 41 (Apart from a single visit to the Philippines by one al Qaeda member who videotaped his journey, no "primary sources indicate any pre-9/11 relationship between [al Qaeda] and ASG in terms of funding, cooperation, or the carrying out of attacks."); *id.* at 41-42 (explaining that only two relevant documents in Osama Bin Laden's Abbottabad compound mention ASG: one criticizes the MILF for its political efforts and perceived abandonment of jihad in contrast with ASG's commitment to jihad; the other is an essay from a Jordanian professor that notes that ASG has "no organizational connection with [Al Qaeda]."). | As set forth in Plaintiffs' response to No. 1, Dr. Omar Abdullah Naseef, in his capacity as the MWL Secretary General and IIRO Chairman, approved the appointment of Mohammed Jamal Khalifa, a founding al Qaeda member and Osama bin Laden's brother-in-law, to open a joint MWL/IIRO branch office in the Philippines contemporaneous with the formation of al Qaeda. *See* Ex. 51, FED-PEC 202846-202847 (June 5, 1988). As a result of that appointment, Khalifa was able to use the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia and provide substantial assistance for al Qaeda affiliated terrorist organizations Abu Sayyaf Group ("ASG"), Moro Islamic Liberation Front, and Jemaah Islamiyah ("JI"). *See also* Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 77-81 (describing how al Qaeda used its relationships with the Saudi charities to facilitate the building of relationships with, and channel money and resources to, aligned terrorist organizations and causes in the Philippines, Bosnia, Chechnya, Kenya, Sudan, and other regions, thereby creating dozens of affiliates around the globe and the ability to launch attacks against the United States and its interests abroad).<br><br>Those terrorist groups became an integral part of Osama bin Laden and al Qaeda's Southeast Asian network and received extensive funding and resources from the IIRO. *See, e.g.,* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149-152 (indicating that al Qaeda member Mohammed Jamal Khalifa served in an official role with the MWL, and used the IIRO branch office in the Philippines to fund the Abu Sayyaf Group, an al Qaeda associated terrorist organization, and recruit Muslims for military training); Ex. 16, *Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia*," CIA_000450-480 at 455 ("Gulf NGOs with branch offices in the Philippines—including Dal al Hijra Foundation and the International Islamic Relief Organization—maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates."); Ex. 59, Philippines Intelligence Report, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO.").<br><br>*See also* Ex. 44, Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000, FED-PEC 10813-10815 (reporting that the IIRO was "being |

| | |
|---|---|
| | used by accused international terrorists Osama bin Laden and his brother-in-law, Mohammad Jamal Khalifa as a front to finance the operations of the Abu Sayyaf and the Moro Islamic Liberation Front," and that the bulk of IIRO "fund[s] goes to terrorist operations of the Abu Sayyaf and the MILF"); Ex. 33, European Parliament, *The Involvement of Salafism/Wahhabism in the Support and Supply of Arms to Rebel Groups Around the World*, June 2013, at 9 ("Declassified intelligence reports from the FNP revealed that in 1988 Bin Laden sent his brother-in-law Mohammad Jamal Khalifa to the Philippines to set up Al Qaeda's branches in Southeast Asia. The so-called Khalifa network counted at least twelve charitable organizations and front companies that provided funds to both the Moro Islamic Liberation Front (MILF) and Abu Sayyaf. One of the most active organizations in this sense was the IIRO. In fact, IIRO-funded facilities were mainly built in Mindanao, a region under the control of the aforementioned rebel groups. For instance, the head of IIRO's branch office in Tawi Tawi, Mindanao, was Abdul Asmad, former Abu Sayyaf's intelligence chief until 1994 when he died (Abuza, 2003, p. 27). The office was used by Al Qaeda to siphon money on behalf of the MILF and Abu Sayyaf. According to defectors' interrogations, this practice was very effective considering that Al Qaeda was able to divert the 70-90 percent of funds for arms acquisition destined to the rebel groups. This means that only the 10-30 percent of the money remained available for legitimate purposes."); Ex. 6, Center for Contemporary Conflict, *Al Qaeda Finances and Funding to Affiliated Groups*, January 2005, PEC-KSA001998-2013 at 2003 ("In a report submitted to the United Nations Al Qaeda and Taliban Sanctions Committee this Government of the Philippines indicated that Mohammed Jamal Khalifa, the brother-in-law of Osama bin Laden, had established numerous businesses, corporations and charitable extremist institutions there which had served as a network to fund the Abu Sayyaf group as well as other extremist organizations. These reportedly included the Khalifa Trading Industries, ET Dizon Travel Pyramid Trading, Manpower Services, and Daw al-Imam al-Shafee."). <br><br> U.S. State Department communications and diplomatic cables further describe the involvement of the IIRO, Mohammed Jamal Khalifa, and the IIRO-Philippines branch office in supporting the Abu Sayyaf Group. *See, e.g.*, Ex. 164, December 16, 1994 State Department Letter, PEC-KSA 2260-2261 (Philip C. Wilcox, Jr., the Department of State's Coordinator for Counterterrorism, advises that Khalifa financed a 1994 attack on a Jordanian movie theater, and that "the United States Government has evidence that Muhammad Jamal Khalifa, who has lived in the Philippines for a number of years, has provided financial support to the Philippine |

| | |
|---|---|
| | terrorist group Abu Sayyaf."); Ex. 166, December 1994 U.S. Diplomatic Cable, PEC-KSA 2264-2274 (Secretary of State Warren Christopher's office states: "Khalifa is an officer of an Islamic NGO in the Philippines that is a known Hamas front and has financed terrorist operations. Khalifa is reported to be the brother in law of Usama Bin Laden, the Sudan-based financier of Islamic extremists. Khalifa is believed to have provided support to the Philippine terrorist group Abu Sayyaf."); Ex. 168, April 1995 U.S. Diplomatic Cable, PEC-KSA 2277-2280 (stating that Khalifa "is a principal financier of Abu Sayyaf"); Ex. 159, April 2004 U.S. Diplomatic Cable, PEC-KSA 1467-1470 (Secretary of State Colin Powell's office stating that the "IIRO has also been cited as the conduit for funds from Usama Bin Laden to terrorist organizations, specifically that the Abu Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO."); Ex. 158, June 2004 U.S. Diplomatic Cable, PEC-KSA 1464-1466 (Secretary of State Colin Powell's office detailing the IIRO's support for al Qaeda and the Abu Sayyaf terrorist group, and stating: "The USG believes that some elements of the International Islamic Relief Organization (IIRO) have been exploited by terrorists and their financiers as a means of transferring assets, providing organizational cover, or otherwise supporting extremist, violent operations."); Ex. 71, U.S. Diplomatic Cable, *Islamic NGOs in the Philippines*, May 23, 2005, FED-PEC 220479-220481 ("The International Islamic Relief Organization (IIRO) -- a subsidiary of the Saudi-based and funded Muslim World League (MWL) -- was active here in the late 1980s and early 1990s. Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines.").<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 37-38 (stating that IIRO-Philippines "has also served as a liaison to other extremist groups on behalf of the Abu Sayyaf Group").<br><br>The Abu Sayyaf Group, Moro Islamic Liberation Front, and Jemaah Islamiyah also received extensive funding and resources from the IIRO-Eastern Province and Abd al Hamid Sulaiman al Mujil, as well as the IIRO-Indonesia branch office. *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202110 ("Al-Mujil provided donor funds directly to al Qaida and is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI). Both ASG |

| | |
|---|---|
| | and JI are al Qaida-associated terrorist groups in Southeast Asia designated pursuant to the authorities of E.O. 13224."); Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 107 ("The Abu Sayyaf Group [ASG] is the most violent of the separatist groups operating in the Southern Philippines and was designated as an SDGT pursuant to E.O. 13224 on September 24, 2001. It was formed in the early 1990's and received support and seed money from al Qaida."); *id.* at 113 ("According to the Umog interrogation report, IIRO-PHL, under the direction of Khalifah, also sent ASG and MILF members to Afghanistan to train with the 'mujahidin.' Khalifah stated that he wanted the ASG and the MILF to train together to establish alliances among the groups.").<br><br>Moreover, in his pursuit of al Qaeda's global expansion, bin Laden directed critical material and logistical support to ASG, MILF, and JI. *See* Ex. 1, 9/11 Commission Final Report at 58 ("Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders. Al Qaeda helped Jemaah Islamiya ("JI"), a nascent organization headed by Indonesian Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the Philippines.").<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 35 ("Mohammed Jamal Khalifah, bin Laden's brother-in-law, for example, once worked for the World Muslim League and then ran an IIRO branch in Manila in the early 1990s that Philippine military authorities have identified as a 'conduit of Arab financiers for money to the Abu Sayyef [terrorist group].'").<br><br>As the foregoing evidence demonstrates, Abu Sayyaf Group, Moro Islamic Liberation Front, and Jemaah Islamiyah were closely aligned with Osama bin Laden and al Qaeda for years leading up to the 9/11 attacks and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States at all relevant times. |
| 146. Plaintiffs have no evidence tracing ASG funds to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case, (May 27, 2021) at E014040- 000011; see generally 9/11 Commission Report; Monograph; Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers | Disputed as stated. The IIRO's claim that there is no evidence tracing ASG funds or other in-kind support to al Qaeda and/or the planning and execution of the 9/11 attacks mischaracterizes the Plaintiffs' claims. As described herein, the IIRO, MWL, and their officials, employees, advisors, and representatives were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 |

| | |
|---|---|
| themselves"); Ex. 18, Brown Rpt. at 41 (Apart from a visit by one al Qaeda member who videotaped his journey, no "primary sources indicate any pre-9/11 relationship between [al Qaeda] and ASG in terms of funding, cooperation, or the carrying out of attacks."); *id.* at 41-42 (explaining that only two relevant documents in Osama Bin Laden's Abbottabad compound mention ASG: one criticizes the MILF for its political efforts and perceived abandonment of jihad in contrast with ASG's commitment to jihad; the other is an essay from a Jordanian professor that notes that ASG has "no organizational connection with [Al Qaeda]."). | attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks. That substantial assistance included extensive financial, material, logistical, and ideological support directed to al Qaeda's Southeast Asian network, consisting of the Abu Sayyaf Group, Moro Islamic Liberation Front, Jemaah Islamiyah, and other terrorist organizations.<br><br>Any financial and/or in-kind support provided to those terrorist groups, in turn, directly supported al Qaeda's global terrorist ambitions to wage jihad against the United States. Accordingly, the 9/11 attacks were a predictable, inevitable product of that sustained, knowing support. Plaintiffs need not prove that the funds or other in-kind support provided to al Qaeda were traced to the terrorist plot or the attack itself.<br><br>By way of further response, *see* Plaintiffs' response to No. 145. |
| 147. Plaintiffs have no evidence tracing in-kind support from the ASG to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case, E014040- 000011 (May 27, 2021); Ex. 18, Brown Rpt. at 41 (Apart from a visit by one Al Qaeda member who videotaped his journey, no "primary sources indicate any pre-9/11 relationship between [Al Qaeda] and ASG in terms of funding, cooperation, or the carrying out of attacks."); *id.* at 41-42 (explaining that only two relevant documents in Osama Bin Laden's Abbottabad compound mention ASG: one criticizes the MILF for its political efforts and perceived abandonment of jihad in contrast with ASG's commitment to jihad; the other is an essay from a Jordanian professor that notes that ASG has "no organizational connection with [Al Qaeda]."). | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 145 and 146. |
| 148. Plaintiffs have no evidence tracing funds from IIRO through ASG to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021), at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from IIRO to the planning or execution of the 9/11 Attacks); Kohlmann Rpt. ¶¶ 27-70 (same); Levitt Rpt. at 29-35 (same); Jenkins Rpt. (same); Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing | Disputed. *See* Plaintiffs' responses to Nos. 145 and 146. *See also* Ex. 16, *Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia*," CIA_000450-480 at 455 ("Gulf NGOs with branch offices in the Philippines—including Dal al Hijra Foundation and the International Islamic Relief Organization—maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates."); Ex. 33, European Parliament, *The Involvement of Salafism/Wahhabism in the Support and Supply of Arms to* |

| | |
|---|---|
| of the 9/11 hijackers themselves"); ECF No. 8911 at 9; ECF No. 8129-22 at 27; see also Ex. 18, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); see generally 9/11 Commission Report; Monograph. | *Rebel Groups Around the World*, June 2013, at 9 ("Declassified intelligence reports from the FNP revealed that in 1988 Bin Laden sent his brother-in-law Mohammad Jamal Khalifa to the Philippines to set up Al Qaeda's branches in Southeast Asia. The so-called Khalifa network counted at least twelve charitable organizations and front companies that provided funds to both the Moro Islamic Liberation Front (MILF) and Abu Sayyaf. One of the most active organizations in this sense was the IIRO. In fact, IIRO-funded facilities were mainly built in Mindanao, a region under the control of the aforementioned rebel groups. For instance, the head of IIRO's branch office in Tawi Tawi, Mindanao, was Abdul Asmad, former Abu Sayyaf's intelligence chief until 1994 when he died (Abuza, 2003, p. 27). The office was used by Al Qaeda to siphon money on behalf of the MILF and Abu Sayyaf. According to defectors' interrogations, this practice was very effective considering that Al Qaeda was able to divert the 70-90 percent of funds for arms acquisition destined to the rebel groups. This means that only the 10-30 percent of the money remained available for legitimate purposes."); Ex. 44, Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000, FED-PEC 10813-10815 (reporting that the IIRO was "being used by accused international terrorists Osama bin Laden and his brother-in-law, Mohammad Jamal Khalifa as a front to finance the operations of the Abu Sayyaf and the Moro Islamic Liberation Front," and that the bulk of IIRO "fund[s] goes to terrorist operations of the Abu Sayyaf and the MILF"); Ex. 54, Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report*, February 13, 1999, FED-PEC 203704-203705 (reporting that the IIRO's Mohammed Jamal Khalifa "is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group," and further stating that the "IIRO is suspected by Western intelligence agencies to be bin Laden's conduit to various terrorist organizations in Islamic countries"). |
| 149. Plaintiffs have no evidence that IIRO was aware or had knowledge before 9/11 of any connection between ASG and Al Qaeda. Office of Foreign Assets Control, Archive of Changes to OFAC's Sanctions Lists (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list; Ex. 18, Brown Rpt. at 40. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 145, 146, 148.<br><br>By way of further response, prior to the 9/11 attacks, IIRO leadership was expressly aware of the organization's ongoing support for international terrorism and Osama bin Laden, and the involvement of its branch offices and officials in terrorist activities, by virtue of extensive international media reporting. That reporting includes a number of public news articles discussing the terrorist activities of the Abu Sayyaf Group, Moro Islamic Liberation Front, and Jemaah Islamiyah, and/or their connections to international terrorism and al Qaeda. Any assertion that the IIRO, and/or its parent organization MWL, was unaware of these connections is duplicitous. *See, e.g.,* Ex. 54, Japan Economic Newswire, *Bin Laden Providing Money,* |

| | |
|---|---|
| | *Military Aid to MILF: Report*, February 13, 1999, FED-PEC 203704-203705 (reporting that the IIRO's Mohammed Jamal Khalifa "is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group," and further stating that the "IIRO is suspected by Western intelligence agencies to be bin Laden's conduit to various terrorist organizations in Islamic countries"); Philippine Daily Inquirer, *Front Page: Bin Laden Funds Abu Sayyaf Through Muslim Relief Group*, August 9, 2000 (indicating that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League) is a conduit of funds for the Abu Sayyaf Group, a terrorist organization in the Philippines); Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000 (reporting that the IIRO is a front to finance the operations of the Abu Sayyaf Group and Moro Islamic Liberation Front terrorist organizations); The Straits Times, *Osama Gave Funds to Abu Sayyaf: Manila*, August 10, 2000 (reporting that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League), "in the guise of giving charity to local Muslim communities, provided funds to Abu Sayyaf for acquiring arms"); The Times, *Terror by Degree*, October 18, 1997 (reporting on the "Bojinka" terrorist plot and stating that Mohammed Jamal Khalifa was funding the Abu Sayyaf Group); Overseas Immigration News, *Immigration Claims Teacher Linked to Terrorists Alleged Al-Jihad Member: Egyptian Denies Allegations, is Appealing Legal Proceedings*, May 21, 1999 (reporting that the IIRO "secretly funds terrorism"). *See also* Ex. 80, IIRO 147 ("IIRO Administrative Structure" chart identifying a "Department of Media and Information."); Ex. 65, FED-PEC 214874-214875 (MWL structural chart identifying "The General Department for Media and Culture"). |
| 150. Neither Adnan Basha nor IIRO had knowledge of any assistance (financial or otherwise) provided by either the IIRO Head Office or IIRO-Philippines to the Abu Sayyaf Group. Ex. 4, May 21, 2024 Basha Decl. ¶ 86. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 145, 146, 148, 149. |
| 151. The ASG was designated by OFAC pursuant to Executive Order 13224, effective September 24, 2001. See Exec. Order 13,224, 66 Fed. Reg. 49,079, 49,081, 49,083 (Sept. 25, 2001). The ASG was designated as a Foreign Terrorist Organization by the Secretary of State on October 8, 1997. 62 Fed. Reg. 52650 (Oct. 8, 1997). | It is not disputed that ASG was designated as a Foreign Terrorist Organization by the State Department on October 8, 1997, *see* https://www.state.gov/foreign-terrorist-organizations, and was further designated by OFAC on September 25, 2001. |
| 152. The ASG was a local, religious sectarian group that emerged in the Philippines in the early-mid-1990s by attacking Christian missionaries and committing robberies and kidnappings around the Sulu Archipelago, the Zamboanga Peninsula, and elsewhere. Sidel Rpt. ¶¶ 60-62; Ex. 18, Brown Rpt. at 40. | Disputed. The U.S. government was describing the Abu Sayyaf Group as a "terrorist group" in the early to mid-1990s, not some "religious sectarian group" or "gang" as the IIRO claims. *See, e.g.*, Ex. 164, December 16, 1994 State Department Letter, PEC-KSA 2260-2261 (Philip C. Wilcox, Jr., the Department of State's Coordinator for |

| | |
|---|---|
| | Counterterrorism, advises that Khalifa financed a 1994 attack on a Jordanian movie theater, and that "the United States Government has evidence that Muhammad Jamal Khalifa, who has lived in the Philippines for a number of years, has provided financial support to the Philippine terrorist group Abu Sayyaf."); Ex. 166, December 1994 U.S. Diplomatic Cable, PEC-KSA 2264-2274 (Secretary of State Warren Christopher's office states: "Khalifa is an officer of an Islamic NGO in the Philippines that is a known Hamas front and has financed terrorist operations. Khalifa is reported to be the brother in law of Usama Bin Laden, the Sudan-based financier of Islamic extremists. Khalifa is believed to have provided support to the Philippine terrorist group Abu Sayyaf."). |
| 153. ASG developed into a criminal gang, becoming "a largely criminal organization that has engaged in episodic acts of criminality, and that eventually morphed into – at least some of its members, into groups affiliated with the so-called Islamic State." Ex. 26, Sidel Dep. Tr. at 42:11-17; Sidel Rpt. ¶¶ 60-62; Ex. 18, Brown Rpt. at 40. | Disputed. *See, e.g.*, Plaintiffs' response to No. 152. |
| 154. ASG was not focused on the United States or the West but enmeshed in local politics and local power structures. Sidel Rpt. ¶¶ 4-5, 65, 83, 99; Ex. 26, Sidel Dep. Tr. at 40:14-41:6. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 145 and 146. The Abu Sayyaf Group was closely aligned with Osama bin Laden and al Qaeda in the early 1990s. |
| 155. There is considerable evidence of collusion and protection by Philippine government officials and evidence of involvement and of pecuniary gain on the part of Philippine military and intelligence officials regarding ASG. Ex. 26, Sidel Dep. Tr. at 99:15-100:2; see Sidel Rpt. ¶¶ 62, 97. | Disputed. *See* Plaintiffs' responses to Nos. 72 and 95. |
| 156. IIRO-Philippines did not have an office in the Tawi-Tawi region of the Philippines and thus could not employ an ASG intelligence officer as the provincial director of IIRO-Philippines there. Ex. 24, Daguit Dep. Tr. at 161:14-24. | Disputed. *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202111 ("At the time Khalifa directed the IIRO-PHL, he employed an ASG intelligence officer as the provincial director of the IIRO-PHL in the Tawi-Tawi region of the Southern Philippines until that officer's death in 1994."); *id.* ("In the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-PHL, and used the organization to funnel money to terrorist groups including the ASG."); Ex. 33, European Parliament, *The Involvement of Salafism/Wahhabism in the Support and Supply of Arms to Rebel Groups Around the World*, June 2013, at 9 (stating that the IIRO's branch office in Tawi Tawi, Mindanao, headed by Abu Sayyaf's intelligence chief, was used by Al Qaeda to siphon money on behalf of the Abu Sayyef Group and Moro Islamic Liberation Front). |

| | |
|---|---|
| 157. IIRO-Philippines did not work with any individual associated with the ASG, and to Abdulhadi Daguit's knowledge, no individual connected with the ASG was ever employed or connected in any manner to IIRO-Philippines. Ex. 8, Daguit Decl. ¶ 33. | Disputed. *See, e.g.*, Plaintiffs' response to No. 156.<br><br>To the extent the IIRO argues that Daguit was unaware of any connection between the IIRO, IIRO-Philippines branch office, Mohammed Jamal Khalifa, Osama bin Laden, al Qaeda, and Abu Sayyaf Group, that is inaccurate and misleading. Daguit worked closely with Khalifa at the IIRO during the 1988-1994 timeframe and was well aware of Khalifa's use of the IIRO-Philippines office to provide significant financial and material support to Abu Sayyaf Group and Moro Islamic Liberation Front, fund other Islamic militants and extremists groups, and recruit and train Muslims for jihad. *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202111 (indicating that the IIRO-Philippines office "is a source of funding for the al Qaida-affiliated [Abu Sayyef Group]," and IIRO funding "is directed to terrorist operations"); *id.* ("IIRO-PHL's director, Abd al-Hadid Daguit, is a trusted associate of Khalifa," "who is Usama bin Laden's brother-in-law and has been identified as a senior al Qaida member."); Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211429 (stating that Daguit and others "are known associates of Mohammad Jamal Khalifa involved in establishing the NGO network in the country").<br><br>Moreover, Philippines Intelligence identified Daguit as a conspirator in an al Qaeda bombing plot to take place in the Philippines in 2004. *See* Ex. 58, FED-PEC 210866-210867. In the intelligence report, Daguit is identified ("Abdulhadi Daguit (Filipino) of MWL-IIRO Manila office"), as an associate of two al Qaeda members who were allegedly tasked to conduct a bombing attack on the Saudi Embassy in the Philippines for "being an American ally in the Iraqi issue." The attack on the embassy was to take place "within the time frame of before or after the national election on 10 May 2004."<br><br>Finally, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |

| | |
|---|---|
| 158. IIRO-Philippines did not provide any assistance to militants affiliated with the ASG or Al Qaeda in the Philippines. Ex. 8, Daguit Decl. ¶ 32. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 145, 146, 148, 149, 156, and 157. |
| 159. To Abdulhadi Daguit's knowledge, no employee or IIRO branch (or representative) in the Philippines provided any assistance to any militants affiliated with the ASG or Al Qaeda in the Philippines. Ex. 8, Daguit Decl. ¶ 32. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 145, 146, 148, 149, 156, and 157. |
| **Jemaah Islamiyah** | No response necessary. |
| 160. Plaintiffs have no evidence that Jemaah Islamiyah had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. 18, Brown Rpt. at 7-8, 41 (Apart from a visit by one al Qaeda member who videotaped his journey, no "primary sources indicate any pre- 9/11 relationship between [al Qaeda] and ASG in terms of funding, cooperation, or the carrying out of attacks."); *id.* at 41-42 (explaining that only two relevant documents in Osama Bin Laden's Abbottabad compound mention ASG: one criticizes the MILF for its political efforts and perceived abandonment of jihad in contrast with ASG's commitment to jihad; the other is an essay from a Jordanian professor that notes that ASG has "no organizational connection with [Al Qaeda]."). | Disputed. The IIRO's claim that there is no evidence that Jemaah Islamiyah had any foreknowledge of or was involved in the planning or execution of the 9/11 attacks, is inaccurate and misleading.<br><br>As set forth in Plaintiffs' response to No. 1, Dr. Omar Abdullah Naseef, in his capacity as the MWL Secretary General and IIRO Chairman, approved the appointment of Mohammed Jamal Khalifa, a founding al Qaeda member and Osama bin Laden's brother-in-law, to open a joint MWL/IIRO branch office in the Philippines contemporaneous with the formation of al Qaeda. *See* Ex. 51, FED-PEC 202846-202847 (June 5, 1988). As a result of that appointment, Khalifa was able to use the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia and provide substantial assistance for al Qaeda affiliated terrorist organizations Abu Sayyaf Group ("ASG"), Moro Islamic Liberation Front, and Jemaah Islamiyah ("JI"). *See also* Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 77-81 (describing how al Qaeda used its relationships with the Saudi charities to facilitate the building of relationships with, and channel money and resources to, aligned terrorist organizations and causes in the Philippines, Bosnia, Chechnya, Kenya, Sudan, and other regions, thereby creating dozens of affiliates around the globe and the ability to launch attacks against the United States and its interests abroad).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020, at 10 ("Al Qaeda developed a strategy of expansion through building alliances with likeminded militant groups around the world. This strategy enabled the group to spot new recruits, raise funds, export its ideology, gain military and terrorist experience fighting in other conflict zones, and develop the interpersonal relationships that would prove critical to the development of a truly transnational terrorist organization. Al Qaeda would coopt far-flung conflicts and local grievances and superimpose its own worldview and ideology on them, bringing al Qaeda's view of the world to |

| | |
|---|---|
| | conflicts in Africa and Asia. Some of these local groups were fully absorbed into al Qaeda's larger structure over time, such as Jemaah Islamiyah in Indonesia and the Algerian Armed Islamic Group (GIA).").<br><br>Those terrorist groups became an integral part of Osama bin Laden and al Qaeda's Southeast Asian network and received extensive funding and resources from the IIRO-Eastern Province and Abd al Hamid Sulaiman al Mujil, as well as the IIRO-Indonesia branch office. *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202110 ("Al-Mujil provided donor funds directly to al Qaida and is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI). Both ASG and JI are al Qaida-associated terrorist groups in Southeast Asia designated pursuant to the authorities of E.O. 13224."); *id.* at 202112 ("The IIRO Indonesia director has channeled money to two Indonesia-based, JI-affiliated foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed the establishment of training facilities for use by al Qaida associates.").<br><br>*See also* Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 106 ("The International Islamic Relief Organization [IIRO], which is headquartered in Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL, … the Taliban, … and Hamas, … as well as al Qaida affiliates, *inter alia*, the Abu Sayyaf Group (ASG), … Jemaah Islamiya (JI), … and Al Ittihad Al Islamiya (AIAI)…. The IIRO's parent organization is the Muslim World League [MWL] also headquartered in Saudi Arabia."); *id.* at 107 ("Jemaah Islamiya [JI] is an al Qaida-linked terrorist group with cells operating in several countries in Southeast Asia. It was founded in 1993 with the ultimate goal of establishing, through violent jihad, a pan-Islamic caliphate in Southeast Asia. JI was designated as a Specially Designated Global Terrorist (SDGT) pursuant to E.O. 13224 on October 23, 2002."); *id.* ("Al-Mujil has provided support to terrorist organizations including ASG and JI."); *id.* at 109 ("IRO-EP's Al-Mujil reportedly has exercised decision-making authority over a number of IIRO offices, including the IIRO-PHL, IIRO-IND, proposed for designation herein, and IIRO's Thailand |

| | |
|---|---|
| | branch [IIRO-THA]…. These offices supported by Al-Mujil are implicated in supporting the ASG and/or JI."); *id.* at 114 ("By financing JI and organizations associated with JI, IIRO-IND assists in, sponsors, or provides financial and material support for, or financial or other services to or in support of JI, an entity listed on the Annex to E.O. 13224.").<br><br>Moreover, in his pursuit of al Qaeda's global expansion, bin Laden directed critical material and logistical support to ASG, MILF, and JI. *See* Ex. 1, 9/11 Commission Final Report at 58 ("Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders. Al Qaeda helped Jemaah Islamiya ("JI"), a nascent organization headed by Indonesian Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the Philippines.").<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 36 ("The IIRO has provided extensive support to Jemaah Islamiyya, the militant Southeast Asian organization tied to al Qaeda. According to U.S. Treasury Department, Abd Al Hamid Sulaiman Al-Mujil, Executive Director of an IIRO office who was named a specially designated individual, invited a Philippines-based JI supporter to travel to Saudi Arabia in 2004. This supporter used the guise of undertaking the hajj pilgrimage for his travel, and al-Mujil planned for him to carry cash back to the JI in the Philippines. Treasury also revealed that an IIRO office supported JI by providing assistance with recruitment of members, transportation and logistics, and provided a safe-haven.").<br><br>As the foregoing evidence demonstrates, Abu Sayyaf Group, Moro Islamic Liberation Front, and Jemaah Islamiyah were closely aligned with Osama bin Laden and al Qaeda for years leading up to the 9/11 attacks and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States at all relevant times. |
| 161. Plaintiffs have no evidence tracing Jemaah Islamiyah funds to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021), at EO14040-000011; Ex. 20, Levitt Dep. Tr. at 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); see generally 9/11 Commission Report; Monograph. | Disputed as stated. The IIRO's claim that there is no evidence tracing Jemaah Islamiyah funds or other in-kind support to al Qaeda and/or the planning and execution of the 9/11 attacks mischaracterizes the Plaintiffs' claims. As described herein, the IIRO, MWL, and their officials, employees, advisors, and representatives were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance and |

| | |
|---|---|
| | other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks. That substantial assistance included extensive financial, material, logistical, and ideological support directed to al Qaeda's Southeast Asian network, consisting of the Abu Sayyaf Group, Moro Islamic Liberation Front, Jemaah Islamiyah, and other terrorist organizations.<br><br>Any financial and/or in-kind support provided to those terrorist groups, in turn, directly supported al Qaeda's global terrorist ambitions to wage jihad against the United States. Accordingly, the 9/11 attacks were a predictable, inevitable product of that sustained, knowing support. Plaintiffs need not prove that the funds or other in-kind support provided to al Qaeda were traced to the terrorist plot or the attack itself.<br><br>By way of further response, *see* Plaintiffs' response to No. 160. |
| 162. Plaintiffs have no evidence tracing in-kind support from Jemaah Islamiyah to the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. 18, Brown Rpt. at 7-8, 41 (Apart from a visit by one al Qaeda member who videotaped his journey, no "primary sources indicate any pre-9/11 relationship between [al Qaeda] and ASG in terms of funding, cooperation, or the carrying out of attacks."); *id.* at 41-42. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 160 and 161. |
| 163. Plaintiffs have no evidence tracing funds from IIRO through Jemaah Islamiyah funds to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. 1, FBI Report Administratively Closing Case (May 27, 2021), at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from IIRO to the planning or execution of the 9/11 Attacks); Kohlmann Rpt. ¶¶ 27-70 (same); Levitt Rpt. at 29-35 (same); Jenkins Rpt. (same); Ex. 20, Levitt Dep. Tr. at 425:10- 20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); see also Ex. 18, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); ECF No. 8911 at 9; ECF No. 8129-22 at 27; see generally 9/11 Commission Report; Monograph. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 160 and 161. |
| 164. Plaintiffs have no evidence that MWL was aware or had knowledge before 9/11 of any connection between JI and Al Qaeda. Office of Foreign Assets Control, *Archive* | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 160 and 161. |

| | |
|---|---|
| *of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list; Ex. 18, Brown Rpt. at 40. | |
| 165. Jemaah Islamiyah maintained an underground existence in Indonesia until 1999, and for the first time in 2002 internationalized its terrorist bombings. Sidel Rpt. ¶¶ 8, 78. | Disputed. The IIRO's claim that Jemaah Islamiyah maintained an underground existence in Indonesia until 1999, and internationalized its terrorist bombings for the first time in 2002, is inaccurate and misleading. Prior to that time frame, in the early 1990s, Jemaah Islamiyah was already aligned with al Qaeda and receiving equipment and training assistance from Osama bin Laden. *See, e.g.*, Ex. 1, 9/11 Commission Final Report at 58. |
| 166. Jemaah Islamiyah was a Muslim separatist network based in Indonesia aimed at establishing an Islamic state and which used terrorist tactics. Sidel Rpt. ¶¶ 76-79. | It is not disputed that Jemaah Islamiyah's goal was to establish a pan-Islamic caliphate. *See* Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 107 ("Jemaah Islamiya [JI] is an al Qaida-linked terrorist group with cells operating in several countries in Southeast Asia. It was founded in 1993 with the ultimate goal of establishing, through violent jihad, a pan-Islamic caliphate in Southeast Asia."). |
| 167. Jemaah Islamiyah was not focused on the United States or the West. Sidel Rpt. ¶¶ 4-5, 83. As of early 2000, the Jemaah Islamiyah network's activities were focused on struggles, conflicts, and targets within Indonesia, and it was only in the aftermath of 11 September 2001 and amidst a dramatic downturn in Islamist fortunes in Indonesia and a US-inspired government crackdown on Islamist groups in the country that Jemaah Islamiyah turned to terrorist attacks focused on Western targets. Sidel Rpt. ¶¶ 77-79, 82, 113. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 160 and 161. Jemaah Islamiyah was closely aligned with Osama bin Laden and al Qaeda in the early 1990s. |
| 168. IIRO-Indonesia never provided any support to Jemaah Islamiyah. Ex. 14, Wardi Decl. ¶ 15; Ex. 27, Harbi Dep. Tr. at 49:18-50:8. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 160 and 161.<br><br>By way of further response, to the extent the IIRO is relying upon the Faiz Wardi Declaration, dated January 12, 2023, attached as Exhibit 14 to the IIRO's April 15, 2026 Motion for Summary Judgment, the statement is disputed. The Wardi Declaration was never produced to Plaintiffs during the discovery phase of the litigation. Plaintiffs have not been afforded an opportunity to cross-examine Mr. Wardi's testimony. Moreover, Mr. Wardi's Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony. Plaintiffs respectfully submit that the IIRO has submitted the Wardi Declaration in bad faith. |
| 169. IIRO-Indonesia has never supported Jemaah Islamiyah, including by providing assistance with | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 160 and 161. *See also* Ex. 50, August 3, 2006 designation of IIRO's branch |

| | |
|---|---|
| recruitment, transportation, logistics, and safe-havens, and did not work with any individual associated with Jemaah Islamiyah. Ex. 14, Wardi Decl. ¶ 15. | offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202112 ("The IIRO Indonesia director has channeled money to two Indonesia-based, JI-affiliated foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed the establishment of training facilities for use by al Qaida associates.").<br><br>By way of further response, to the extent the IIRO is relying upon Wardi's new declaration testimony at Exhibit 14, the statement is disputed. *See* Plaintiffs' response to No. 168 (stating that (1) the January 12, 2023 Wardi Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) Plaintiffs have not been afforded an opportunity to cross-examine Wardi's new testimony in the Declaration; and (3) the Wardi Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 170. Neither Adnan Basha nor IIRO had knowledge of any assistance (financial or otherwise) provided by either the IIRO Head Office or IIRO-Indonesia to the Jemaah Islamiyah. Basha Decl. ¶ 87. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 160 and 161.<br><br>By way of further response, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 171. To Faiz Wardi's knowledge, no individual connected with Jemaah Islamiyah was employed by IIRO-Indonesia. Ex. 14, Wardi Decl. ¶ 15. | Disputed. Wardi's statement lacks foundational evidence.<br><br>By way of further response, to the extent the IIRO is relying upon Wardi's new declaration testimony at Exhibit 14, the statement is disputed. *See* Plaintiffs' response to No. 168 (stating that (1) the January 12, 2023 Wardi Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) Plaintiffs have not been afforded an opportunity to cross-examine Wardi's new testimony in the Declaration; and (3) the Wardi Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 172. IIRO-Indonesia did not work with any individual associated with Jemaah Islamiyah and no individual | Disputed. Wardi's statement lacks foundational evidence. |

| | |
|---|---|
| connected with Jemaah Islamiyah was ever employed by IIRO-Indonesia. Ex. 14, Wardi Decl. ¶ 15. | By way of further response, to the extent the IIRO is relying upon Wardi's new declaration testimony at Exhibit 14, the statement is disputed. *See* Plaintiffs' response to No. 168 (stating that (1) the January 12, 2023 Wardi Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) Plaintiffs have not been afforded an opportunity to cross-examine Wardi's new testimony in the Declaration; and (3) the Wardi Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 173. Jemaah Islamiyah was designated by OFAC pursuant to Executive Order 13224, on October 17, 2002. Determination Pursuant to Section 1(b) of Executive Order 13224 Relating to Jemaah Islamiya (JI), 67 Fed. Reg. 66,034 (Oct. 29, 2002). | Disputed. Jemaah Islamiyah was designated by OFAC on October 23, 2002. *See* https://ofac.treasury.gov/recent-actions/20021023. *See also* the September 5, 2003 OFAC designation of ten members of Jemaah Islamiyah at https://home.treasury.gov/news/press-releases/js700 (identifying Jemaah Islamiyah as "a South Asian terrorist group with significant links to al-Qaida"). |
| 174. Jemaah Islamiyah was designated as a Foreign Terrorist Organization by the Secretary of State on October 16, 2002. Designation of Foreign Terrorist Organizations, 67 Fed. Reg. 65,168 (Oct. 23, 2002). | Disputed. Jemaah Islamiyah was designated as a Foreign Terrorist Organization by the State Department on October 23, 2002. *See* https://www.state.gov/foreign-terrorist-organizations. |
| **Services Bureau** | No response necessary. |
| 175. Founded in the mid-1980s by Abdullah Azzam, the Services Bureau aimed to attract young Arab volunteers, train them and turn them into a military vanguard in the Afghan Jihad against the Soviet invasion of Afghanistan, doing so openly and even with the U.S.'s favor, which even provided Azzam for visas to tour the US in the late 1980s to further this goal. Ex. 16, Expert Report of Professor Olivier Roy ("Roy Rpt.") at 15; Ex. 18, Brown Rpt. at 11. | Undisputed as a general matter for purposes of this motion, and immaterial.<br><br>*See also* Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that the Maktab al-Khidamat, a Pakistan-based nongovernmental organization financed by Osama bin Laden, played a key role in facilitating the training and travel of Islamic militants, and received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization").<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 31 ("The MWL's ties to terrorism and religious extremism go back to the Afghan jihad against the Soviets in the 1980s. Together with Osama bin Laden, Sheikh Abdullah Azzam co-founded Maktab al-Khidmat (MAK)—also known as the Afghan Services Bureau or the Human Services Office."); *id.* at 32 ("Most of the early Arab fighters in Afghanistan had links to either the Muslim Brotherhood or the Muslim World League."); *id.* (indicating that "Sheikh Abdullah Azzam's salary at the International Islamic University in Islamabad, where he propagated his violent extremist ideology, was paid by the Muslim World League from 1981 to 1986"). |

| | |
|---|---|
| | *See also* Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 30 (discussing Maktab al Khidmat's connection to the IIRO and MWL). |
| 176. Abdullah Azzam founded the Services Bureau with Abd al-Rabb Rasul Sayyaf, then the leader of the union of Afghan Mujahidin parties, and Osama Bin Laden, who agreed to fund the organization. And Azzam led the Services Bureau until his assassination in November 1989, and the Bureau continued even after Azzam's death. *Id.* at 11-13. | Disputed as stated. The IIRO's claim that the Services Bureau (a/k/a Maktab al Khidamat ("MAK")), continued after Abdullah Azzam's death is inaccurate and misleading. *See* Plaintiffs' response to No. 517 (explaining that after Azzam's death, Osama bin Laden assumed full control of MAK, and MAK was absorbed into al Qaeda, and further noting that the da'wa organizations that funded and supported MAK during the 1980s—MWL, IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Red Crescent Society, and Benevolence International Foundation—continued to serve as the primary conduits for channeling financial, logistical, operational, and ideological support to al Qaeda's global jihad for years leading up to the 9/11 attacks). |
| 177. Western nations, including the U.S., strongly supported the mujahideen with hundreds of millions of dollars, advanced weaponry, and American military advisers. Ex. 16, Roy Rpt. at 10-13. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 178. The United States supported the mujahideen fighting the Soviet Union invasion of Afghanistan under Presidents Carter, Reagan, and Bush. Ex. 16, Roy Rpt. at 10-13; Ex. 21, Winer Dep. Tr. at 358:5-18, 362:21-25. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 179. Wael Jelaidan, a member of the Services Bureau, was not known publicly as a member or founder of Al Qaeda, and broke with Bin Laden and stayed with the Services Bureau when Bin Laden left the Services Bureau to form Al Qaeda. Ex. 18, Brown Rpt. at 5, 20, 87-88, 90; Ex. 34, Roy Dep. Tr. at 143:9-145:4 (*Errata*). | Disputed. The IIRO's claim that Wa'el Jelaidan was not a member or founder of al Qaeda, and further that Jelaidan broke with Osama bin Laden after he left the Services Bureau to form al Qaeda, is inaccurate and misleading.<br><br>As an initial matter, it is well-documented that Jelaidan was a founding member of al Qaeda. *See, e.g.*, Plaintiffs' response to No. 1. Internal al Qaeda documents chronicling the formation of the organization, seized during a 2002 raid of the Sarajevo office of an al Qaeda front, the Benevolence International Foundation ("BIF"), confirm that al Qaeda planned from its inception to use the MWL and its subsidiary bodies, to include the IIRO, to provide support and cover for al Qaeda's operations. A BIF computer file named "Tareekh Osama" (or "Osama's History") contained numerous documents describing al Qaeda's formation and Jelaidan's significant role in the nascent organization. *See, e.g.*, *See* Ex. 61, FED-PEC0212276-212281 at 212278 (a document on MWL/IIRO letterhead detailing a meeting between "Abu Abdullah" (a/k/a Osama bin Laden), Dr. Abdullah Omar Naseef, in his capacity as the Secretary General of the MWL, and others where it was agreed that al Qaeda attacks would be launched from MWL |

| | |
|---|---|
| | offices, and further suggesting using the name of the "League" as "an umbrella which you can stay under … because Dr. Naseef is one of the brothers, and the government knows who Abu Al-Hasan [Wa'el Hamza Jelaidan] is."); Ex. 67, FED-PEC 215313-215314 at 215313 ("Forming a committee to take care of the brothers' problems, and of the financial matters," and indicating "Brother Wael Jleidan" was a member of that committee); Ex. 66, FED-PEC 215309-215312 at 215309 (letter from Osama bin Laden to al Qaeda member Abu al Ridha with a directive to Wa'el Jelaidan (a/k/a Abu al Hassan al Madani) concerning weapons: "Brother Abu Al Hasan we have an extreme need for weapons so I urge that you not provide them with more than 25% of the existing weapons.").<br><br>Notably, members of terrorist organizations like al Qaeda typically do not want to be "known publicly" and strategically use cover employment, aliases, and front organizations to obscure their terrorist activities, secure financing and other resources, and blend into civilian populations. Indeed, Jelaidan used several aliases and alternative spellings to his name, and cover employment with various purported charitable organizations, to secure and provide substantial financial assistance to the Services Bureau (a/k/a Maktab al Khidamat ("MAK")), al Qaeda, and associated terror groups in the years leading up to the 9/11 attacks..<br><br>By way of further response, *see* Plaintiffs' response to No. 517 (explaining that after Azzam's death, Osama bin Laden assumed full control of MAK, and MAK was absorbed into al Qaeda, and further noting that the da'wa organizations that funded and supported MAK during the 1980s—MWL, IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Red Crescent Society, and Benevolence International Foundation—continued to serve as the primary conduits for channeling financial, logistical, operational, and ideological support to al Qaeda's global jihad for years leading up to the 9/11 attacks). Contemporaneous with the formation of al Qaeda, Jelaidan was appointed as the director of the MWL/IIRO offices in Peshawar, Pakistan, thereby guaranteeing a direct channel for coordinating MWL/IIRO's collaboration with Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 1.<br><br>And contrary to the IIRO's claim that Jelaidan "broke with Bin Laden," Jelaidan remained a close associate of bin Laden for years, and became one of the more significant figures in the history of al Qaeda and its development into a global terrorist organization. In 1999, bin Laden acknowledged Jelaidan as "our brother." *See* Ex. 53, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2002, FED-PEC 203469-203470 at 203470 ("Bin Laden himself acknowledged his close ties to Julaidan during a 1999 |

| | |
|---|---|
| | interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that 'We are all in one boat, as is known to you, including our brother, Wa'el Julaidan.'"). *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 33. |
| 180. Wael Jelaidan "was a prominent figure in the US-supported anti-Soviet war in Afghanistan in the 1980s, during which he worked with [the] Services Bureau – as did, for a time, Bin Lad[e]n and other people who would go on to hold leadership positions in al-Qa'ida." Ex. 18, Brown Rpt. at 88. Jelaidan remained with the Services Bureau after Osama Bin Laden split from the group. *Id.* at 90. | Disputed. *See, e.g.*, Plaintiffs' response to No. 179. |
| **Al Qaeda** | No response necessary. |
| 181. Neither Adnan Basha nor IIRO knowingly or tacitly employed members of Al Qaeda or individuals known as Al Qaeda sympathizers to work for or within IIRO. Ex. 4, May 21, 2024 Basha Decl. ¶ 27; Ex. 5, Helles Decl. ¶ 43; Ex. 6, Sarhan Decl. ¶ 30. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 36, 43, 45, 46, 47, 48, 49, 50, 72, 90, 91, 94, 109, 111, 114, 124, 127, 129, 132, 140, 145, 157, 160, 179, 238, 315, 324, and 497 (discussing Wa'el Hamza Jelaidan, Mohammed Jamal Khalifa, Abdelhadi Daguit, Mahmoud Abd al Jalil Afif, Abdul Asmad, Abd al Hamid Sulaiman al Mujil, Prince Turki bin Jalawi al Saud, Prince Muhammad bin Fahd bin Abdul Aziz, Ibrahim Mohammad Afandi, Abdurahman Abdul-Qader Faqih, Suleiman al Rajhi, Saleh al Kamel, Abu Hammam al Saud, and others). |
| 182. IIRO did not knowingly work with or employ any individual known to be associated with Al Qaeda or its affiliates. Ex. 4, May 21, 2024 Basha Decl. ¶ 32; Ex. 5, Helles Decl. ¶ 43; Ex. 6, Sarhan Decl. ¶ 30. | Disputed. *See, e.g.*, Plaintiffs' response to No. 181. |
| 183. Applicants for employment with IIRO had to have a "clear history" certificate from the relevant government security entity. This certificate was required to ensure that IIRO's relief and humanitarian activities were not politicized by idealogues, parties, or political or Islamic groups, be they regional or international. Ex. 4, May 21, 2024 Basha Decl. ¶ 33. | To the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Basha never raised any issue or provided any information during his February 20-21, 2019 deposition concerning IIRO applicants or a required "clear history" |

| | |
|---|---|
| | certificate. Notably, Basha does not cite to or provide documentation or evidence in support of that statement. Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony. |
| 184. IIRO did not have a relationship with Al Qaeda and did not support Al Qaeda or any other terrorist organization. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 25-26; Ex. 18, Brown Rpt. at 7-8, 63 (review of primary sources shows no evidence that IIRO or MWL supported Al Qaeda); Ex. 5, Helles Decl. ¶ 43. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577.<br><br>*See also* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities."). |
| 185. Adnan Basha did not have a relationship with Al Qaeda and did not support Al Qaeda or any other terrorist organization. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 25-26; Ex. 18, Brown Rpt. at 7-8, 63 (review of primary sources shows no evidence that IIRO or MWL supported Al Qaeda); Ex. 5, Helles Decl. ¶ 43. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577.<br><br>*See also* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities."). |
| 186. Neither IIRO nor Adnan Basha authorized or instructed, explicitly or implicitly, IIRO employees to provide any form of support, whether financial or otherwise, to Al Qaeda or any other terrorist organization. Ex. 4, May 21, 2024 Basha Decl. ¶ 24; Ex. 5, Helles Decl. ¶¶ 24-25, 28-32, 34- 35, 38-43. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577.<br><br>*See also* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities."). |

| | |
|---|---|
| 187. Neither Adnan Basha nor IIRO has knowledge of any activities or financing that IIRO allegedly conducted or provided in support of Al Qaeda or any other terrorist organization. Ex. 4, May 21, 2024 Basha Decl. ¶ 23. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577.<br><br>*See also* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities.").<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 188. Adnan Basha has never agreed with Al Qaeda's aims or acts and has worked actively to counter Al Qaeda's ideology. Ex. 4, May 21, 2024 Basha Decl. ¶ 28. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577.<br><br>*See also* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities.").<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to |

| | |
|---|---|
| | Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 189. Adnan Basha was never aware of any action taken by or behalf of IIRO to facilitate or support any terrorist organization or any acts of terrorism. Ex. 4, May 21, 2024 Basha Decl. ¶ 29. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577.<br><br>*See also* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities.").<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 190. Neither Adnan Basha nor IIRO has financed or supported Al Qaeda or its affiliates. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 30-31. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577.<br><br>*See also* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities."). |

| | |
|---|---|
| | Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 191. IIRO did not finance the establishment or operation of training facilities for use by al Qaeda or its associates, and IIRO did not provide Al Qaeda with assistance in recruitment, transportation, logistics, or safe havens. Ex. 4, May 21, 2024 Basha Decl. ¶ 32. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577.<br><br>*See also* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities.").<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 192. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha participated in nor directed anyone to participate in any activities intended to support Al Qaeda or any other terrorist organization. Ex. 11, Second Obaid Decl. ¶ 19; Ex. 10, Second Turki Decl. ¶ 24; Ex. 13, May 4, 2023 Basha Decl. ¶ 12. | Disputed. MWL Secretaries General Naseef, Obaid, and Turki, and IIRO Secretary General Basha, were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. Intending to foster al Qaeda's terrorist agenda, they |

| | |
|---|---|
| | directed the MWL and IIRO to provide substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>Moreover, MWL officials have publicly acknowledged the organization's funds were being funneled to terrorist organizations. In an interview with MWL Secretary General Obaid, published in *The Muslim World* magazine on July 21-27, 1997, Obaid was asked about reports that the MWL's funds were being funneled to extremist groups. Obaid responded: "This is a closed chapter …. It has already been proven that there were people who exploited the situation and misused some funds …." *See* Ex. 214, Interview with Dr. Abdullah bin Saleh al Obaid, Excerpt from the Muslim World League magazine, July 21-27, 1997, PEC-KSA 1796-1806 at 1800.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577. |
| 193. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha has ever provided or directed anyone to provide any financing to or in support of Al Qaeda or any other terrorist organization. Ex. 11, Second Obaid Decl. ¶ 20; Ex. 10, Second Turki Decl. ¶ 25; Ex. 13, May 4, 2023 Basha Decl. ¶ 13. | Disputed. MWL Secretaries General Naseef, Obaid, and Turki, and IIRO Secretary General Basha, were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. Intending to foster al Qaeda's terrorist agenda, they directed the MWL and IIRO to provide substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>Moreover, MWL officials have publicly acknowledged the organization's funds were being funneled to terrorist organizations. In an interview with MWL Secretary General Obaid, published in *The Muslim World* magazine on July 21-27, 1997, Obaid was asked about reports that the MWL's funds |

| | |
|---|---|
| | were being funneled to extremist groups. Obaid responded: "This is a closed chapter …. It has already been proven that there were people who exploited the situation and misused some funds …." *See* Ex. 214, Interview with Dr. Abdullah bin Saleh al Obaid, Excerpt from the Muslim World League magazine, July 21-27, 1997, PEC-KSA 1796-1806 at 1800.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577. |
| 194. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha has ever supported or instructed anyone else to support, explicitly or implicitly, Al Qaeda or any other terrorist organization. Ex. 11, Second Obaid Decl. ¶ 21; Ex. 10, Second Turki Decl. ¶ 26; Ex. 13, May 4, 2023 Basha Decl. ¶ 14. | Disputed. MWL Secretaries General Naseef, Obaid, and Turki, and IIRO Secretary General Basha, were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. Intending to foster al Qaeda's terrorist agenda, they directed the MWL and IIRO to provide substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577. |
| 195. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha have ever intended to aid a terrorist attack or to support Al Qaeda. Ex. 11, Second Obaid Decl. ¶ 22; Ex. 10, Second Turki Decl. ¶ 27; Ex. 13, May 4, 2023 Basha Decl. ¶ 18. | Disputed. MWL Secretaries General Naseef, Obaid, and Turki, and IIRO Secretary General Basha, were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. Intending to foster al Qaeda's terrorist agenda, they |

| | |
|---|---|
| | directed the MWL and IIRO to provide substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577. |
| 196. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha agrees with, or have ever agreed with, Al Qaeda's or its affiliated terrorist organization's aims or acts. Ex. 11, Second Obaid Decl. ¶ 24; Ex. 10, Second Turki Decl. ¶ 29; Ex. 13, May 4, 2023 Basha Decl. ¶ 20. | Disputed. MWL Secretaries General Naseef, Obaid, and Turki, and IIRO Secretary General Basha, were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. Intending to foster al Qaeda's terrorist agenda, they directed the MWL and IIRO to provide substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>Moreover, MWL officials have publicly acknowledged the organization's funds were being funneled to terrorist organizations. In an interview with MWL Secretary General Obaid, published in *The Muslim World* magazine on July 21-27, 1997, Obaid was asked about reports that the MWL's funds were being funneled to extremist groups. Obaid responded: "This is a closed chapter …. It has already been proven that there were people who exploited the situation and misused some funds …." *See* Ex. 214, Interview with Dr. Abdullah bin Saleh al Obaid, Excerpt from the Muslim World League magazine, July 21-27, 1997, PEC-KSA 1796-1806 at 1800.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, |

| | |
|---|---|
| | 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577. |
| 197. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha knew Bin Laden. Ex. 11, Second Obaid Decl. ¶ 25; Ex. 10, Second Turki Decl. ¶ 30; Ex. 13, May 4, 2023 Basha Decl. ¶ 21. | Disputed. MWL Secretaries General Naseef, Obaid, and Turki, and IIRO Secretary General Basha, were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. Intending to foster al Qaeda's terrorist agenda, they directed the MWL and IIRO to provide substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577. |
| 198. Abdullah bin Saleh Al-Obaid, Abdullah bin Abdul Mohsen Al-Turki, and Adnan Basha worked actively to counter Osama Bin Laden's and Al Qaeda's and its affiliated terrorist organizations' ideologies and have denounced acts of terrorism, including those of September 11, 2001. Ex. 11, Second Obaid Decl. ¶ 26; Ex. 10, Second Turki Decl. ¶ 31; Ex. 13, May 4, 2023 Basha Decl. ¶ 22. | Disputed. MWL Secretaries General Naseef, Obaid, and Turki, and IIRO Secretary General Basha, were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. Intending to foster al Qaeda's terrorist agenda, they directed the MWL and IIRO to provide substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>Moreover, MWL officials have publicly acknowledged the organization's funds were being funneled to terrorist organizations. In an interview with MWL Secretary General Obaid, published in *The Muslim World* magazine on July 21- |

| | |
|---|---|
| | 27, 1997, Obaid was asked about reports that the MWL's funds were being funneled to extremist groups. Obaid responded: "This is a closed chapter …. It has already been proven that there were people who exploited the situation and misused some funds …." *See* Ex. 214, Interview with Dr. Abdullah bin Saleh al Obaid, Excerpt from the Muslim World League magazine, July 21-27, 1997, PEC-KSA 1796-1806 at 1800.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577. |
| 199. Shortly after September 11, 2001, Abdullah bin Saleh Al-Obaid and Adnan Basha appeared on Saudi television to condemn the 9/11 attacks. Ex. 11, Second Obaid Decl. ¶ 26; Ex. 13, May 4, 2023 Basha Decl. ¶ 22. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 200. Al Qaeda was founded in the late 1980s after Osama Bin Laden split from the Services Bureau, pulling his funding from the Services Bureau in 1988; Al Qaeda made no official claim at the time of its intention to attack the United States. Ex. 18, Brown Rpt. at 13, 21. | Disputed. *See, e.g.*, Plaintiffs' response to No. 517 (explaining that after Azzam's death, Osama bin Laden assumed full control of MAK, and MAK was absorbed into al Qaeda, and further noting that the da'wa organizations that funded and supported MAK during the 1980s—MWL, IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Red Crescent Society, and Benevolence International Foundation—continued to serve as the primary conduits for channeling financial, logistical, operational, and ideological support to al Qaeda's global jihad for years leading up to the 9/11 attacks).<br><br>Following the end of the Soviet-Afghan conflict, bin Laden returned to Saudi Arabia and made clear in his statements his continuing dedication to jihad against the perceived enemies of Islam. Speaking in 1988, bin Laden expressly affirmed what he believed to be the personal obligation of all Muslims to wage jihad against the enemies of Islam, stating as follows:<br><br>[T]he blessing of jihad in the cause of God – the peak of true Islam, which people in this age have forgotten is a religious duty….Praise be to God for allowing us to perform jihad in Afghanistan as he did for the best of men, our Prophet, may God's peace and prayers be upon him…I would like to advise my brother Muslims in all parts of the East and West to take the initiative and leave what they are doing to assist in raising the banner of jihad for the cause of God. This banner is the best banner and the mujahidin are the best people…May God |

| | |
|---|---|
| | accept our and your prayers and our urging of believers to perform jihad in order to deter the infidel forces and be truthful.<br><br>*See* Ex. 151, Michael Scheuer, *Osama Bin Laden*, 2011, PEC-KSA 224-226 at 225-226.<br><br>Thereafter, in 1990, speaking to an audience of hundreds in the Bin Laden family mosque in Jeddah, bin Laden singled out the United States as the primary target of this global jihad, asserting that "[t]he Americans won't stop their support of Jews in Palestine until we give them a lot of blows. They won't stop until we do jihad against them." *See* Ex. 152, Lawrence Wright, *The Looming Tower: Al-Qaeda and the Road to 9/11*, 2007, PEC-KSA 227-230 at 229. "Bin Laden would later say that the United States had always been his enemy. He dates his hatred for America to 1982, 'when America permitted the Israelis to invade Lebanon and the American Sixth Fleet helped them.'" *Id.* at 229.<br><br>*See also* Ex. 1, 9/11 Commission Final Report at 48 (confirming that bin Laden was delivering speeches calling for attacks against the United States no later than 1992).<br><br>In 1993, the bin Laden family and the Saudi Binladin Group ("SBG") disassociated themselves from bin Laden as a result of media reporting of his extremist and terrorist ties, and formally removed him from SBG's ownership by documents executed in June 1993. *See* MDL ECF No. 44 at 2. The family and SBG's efforts to sever ties with bin Laden make clear that his terrorist activities were well known to the public in Saudi Arabia in 1993.<br><br>Later that same year, bin Laden issued a fatwa advocating violence against Americans based in Mogadishu, Somalia. U.S. forces were subsequently attacked during the "Battle of Mogadishu" on October 3-4, 1993. Eighteen U.S. soldiers were killed and eighty-four were wounded. *See also* Ex. 15, *Terrorism: Usama Bin Ladin's Activities in Somalia and Sudanese NIF Support*, CIA_000347-350 at 349 ("Islamic Army members were sent to Somalia, with the NIF's knowledge and encouragement, in order to kill U.S. troops, incite violence against U.S. personnel, and undermine the success of the U.S. mission. Most of the Islamic Army activity involved inciting the Somali public. Bin Ladin's specific orders to Islamic Army members sent to Somalia was to defeat the U.S. forces. [REDACTED] The code name of the operation may have been 'Head of the Snake.'").<br><br>On August 23, 1996, bin Laden issued his fatwa, *Declaration of War Against the Americans Occupying the Land of the Two* |

| | |
|---|---|
| | *Holy Places*, calling on Muslims to drive U.S. soldiers out of Saudi Arabia, celebrating recent suicide bombings of U.S. military facilities in the Kingdom, and praising the 1983 suicide bombing in Beirut that killed 241 U.S. Marines, the 1992 Aden hotel bombings, and the 1993 Battle of Mogadishu after which the United States "left the area carrying disappointment humiliation, defeat and your dead with you." *See* Ex. 1, 9/11 Commission Final Report at 48.<br><br>On February 23, 1998, bin Laden, Ayman al Zawahiri, and leaders of other militant groups issued the fatwa, *World Islamic Front Statement Urging Jihad Against Jews and Crusaders*, calling for the murder of any American, anywhere on earth, as the "individual duty for every Muslim who can do it in any country in which it is possible to do it." *See id.* at 47.<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020, at 11 (discussing bin Laden's 1996 and 1998 fatwas). |
| 201. Bin Laden self-financed his activities at least until 1992. Ex. 16, Roy Rpt. at 2, 17. | Disputed. *See, e.g.*, Plaintiffs' response to No. 517 (explaining that after Azzam's death, Osama bin Laden assumed full control of MAK, and MAK was absorbed into al Qaeda, and further noting that the da'wa organizations that funded and supported MAK during the 1980s—MWL, IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Red Crescent Society, and Benevolence International Foundation—continued to serve as the primary conduits for channeling financial, logistical, operational, and ideological support to al Qaeda's global jihad for years leading up to the 9/11 attacks). |
| 202. In August 1996, Bin Laden released a lengthy message addressed to Muslims worldwide, "and particularly those in the Arabian peninsula" entitled "A declaration of jihad against the Americans occupying the Land of the Two Holy Sanctuaries [Saudi Arabia]." Ex. 18, Brown Rpt. at 54; Ex. 76, 1996 Osama Bin Laden Declaration of Jihad, BUR-PEC-026957-82. | Undisputed as a general matter for purposes of this motion. |
| 203. The August 1996 message does not declare a jihad by Al Qaeda against Americans and is not a declaration of jihad against America. Ex. 18, Brown Rpt. at 55; Ex. 76, 1996 Osama Bin Laden Declaration of Jihad, BUR-PEC-026957-82. | Disputed. *See, e.g.*, Plaintiffs' response to No. 200. |
| 204. The August 1996 message is focused on removing American troops from Saudi Arabia and criticizing the Saudi government for that presence, for failing to liberate Palestine, and for abandoning Islam. Ex. 18, Brown Rpt. at 55; Levitt Rpt. at 12; Ex. 76, 1996 Osama Bin Laden Declaration of Jihad, BUR-PEC-026957-82, at 026960 | Disputed. *See, e.g.*, Plaintiffs' response to No. 200. |

| | |
|---|---|
| ("the regime has torn off its legitimacy [through] [s]uspension of the Islamic Shari'ah law and exchanging it with man made civil law…[and] [t]he inability of the regime to protect the country, and allowing…the American crusader forces[] to occupy the land"), 026964 ("there is no more important duty than pushing the American enemy out of the holy land"), 026970-71 (calling for boycott of American goods in response to occupation of Palestine). | |
| 205. In February 1998, Al Qaeda publicly declared from Afghanistan the "World Islamic Front" and called for the killing of Americans. Ex. 18, Brown Rpt. at 58; Levitt Rpt. at 12; Ex. 77, Bin Laden, Others Sign Fatwa to "*Kill Americans Everywhere*", Al Quds al-Arabi (Feb. 23, 1998), FED-PEC0279093-95. | Undisputed as a general matter for purposes of this motion. |
| 206. The February 1998 statement declared that "to kill the Americans and their allies – civilian and military – is an individual duty incumbent upon every Muslim in all the countries, in order to liberate the al-Aqsa Mosque and the Holy Mosque from their grip, so that their armies leave all the territory of Islam, defeated, broken, and unable to threaten any Muslim." Ex. 18, Brown Rpt. at 58; Ex. 77, FED-PEC0279093-95 at 279094. | Undisputed as a general matter for purposes of this motion. |
| 207. Al Qaeda developed its interest in attacking the U.S. in 1998. Ex. 26, Sidel Dep. Tr. at 117:7-10; Levitt Rpt. at 12; Ex. 77, FED-PEC0279093-95 at 279094. | Disputed. *See, e.g.*, Plaintiffs' response to No. 200. |
| 208. Al Qaeda was designated as a Foreign Terrorist Organization by the Secretary of State on October 8, 1999. Designation of Foreign Terrorist Organizations, 64 Fed. Reg. 55112 (Oct. 8, 1999). | It is not disputed that al Qaeda was designated as a Foreign Terrorist Organization by the State Department on October 8, 1999, *see* https://www.state.gov/foreign-terrorist-organizations, and was further designated by OFAC on September 23, 2001. |
| 209. The primary sources identified in the expert report of Vahid Brown do not provide evidence that IIRO supported Al Qaeda in any way. Ex. 18, Brown Rpt. at 7-8, 63. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 36, 43, 45, 46, 47, 48, 49, 50, 62, 65, 72, 90, 91, 94, 109, 111, 114, 124, 127, 129, 132, 140, 145, 157, 160, 179, 238, 315, 324, and 497.<br><br>By way of further response, IIRO's expert Vahid Brown does not identify the "primary sources" he specifically reviewed in support of his assertion that there is no evidence that IIRO supported al Qaeda in any way, and therefore lacks foundation. *See* IIRO Exhibit 18, Expert Report of Vahid Brown at 5, 7-8, 90-91. |
| 210. Samir al-Hasan was never an employee of IIRO. Ex. 5, Helles Decl. ¶ 39. | Disputed. Samir N. Al Hasan traveled to Afghanistan from Yemen in the 1999-2000 timeframe, attended the al Farouq training camp, and became a bodyguard in August 2001. Hasan told U.S. authorities that he was in Afghanistan as a |

| | |
|---|---|
| | relief worker for the IIRO, and that he received the position from the head of the IIRO. *See* Ex. 170, U.S. Department of Defense Unclassified Summaries of Evidence for Detainee Samir N. al Hasan (ISN No. 043), October 13, 2006, March 4, 2008, PEC-KSA 2437-2450 at 2437 ("The detainee stated he was in Afghanistan as a relief worker for the Islamic Relief Organization and that he received the position from the head of the Islamic Relief Organization."); *id.* (stating that "the International Islamic Relief Organization is an Islamic humanitarian organization with headquarters in Mecca, Saudi Arabia, and is financed by Usama bin Laden"); *id.* at 2444 ("IIRO aka (Hay'at al-Igatha al_islamiyya al-Alamiyah), is a National Intelligence Priority Framework (NIPF) Counter-Terrorism (CT) Priority 2 Terrorist Support Entity (TSE). Priority 2 TSEs have demonstrated sustained and active financial support for terrorist organizations willing to attack U.S. persons or interests, or provide witting operational support to Priority 2 terrorist groups."). |
| 211. Neither MWL nor IIRO had contacts with Arabs who went to fight in Bosnia. Ex.23, Obaid Dep. Tr. at 268:23-270:7 (*Errata*). | Duplicative and disputed. *See, e.g.*, Plaintiffs' response to No. 294. |
| 212. IIRO and Al Qaeda have very different ideologies. Ex. 28, Gari Dep. Tr. 125:10-23. | Disputed. The leaders of the MWL and IIRO—MWL Secretaries General Naseef, Obaid, and Turki, and IIRO Secretary General Basha—were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. Intending to foster al Qaeda's terrorist agenda, they directed the MWL and IIRO to provide substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577. |

| | |
|---|---|
| 213. No document has come to light from the nearly 500,000 documents collected in the Bin Laden Abbottabad raid suggesting the use of charities by Al Qaeda for raising or moving money. Ex. 18, Brown Rpt. at 62. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 214. A comprehensive search of the names of IIRO and MWL within the Bin Laden Abbottabad compound documents – using their Arabic names, as well as popular short-hand Arabic versions of their names – turned up no significant hits beyond mentions of these organizations in general publications or newspapers found in Bin Laden's compound. Ex. 18, Brown Rpt. at 91. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| **IIRO-Philippines** | No response necessary. |
| 215. IIRO-Philippines was established in Manila in 1986 and operated until 2006. Ex. 8, Daguit Decl. ¶ 2; Ex. 4, May 21, 2024 Basha Decl. ¶ 85. | Undisputed as a general matter for purposes of this motion. |
| 216. Abdulhadi Daguit began working at IIRO-Philippines in 1986 as office secretary, was made acting director of IIRO-Philippines in 2005, and remained in that role until the office's closure in 2006. Ex. 8, Daguit Decl. ¶ 3. | Undisputed as a general matter for purposes of this motion. |
| 217. Plaintiffs have no evidence that MWL was aware or had knowledge before 9/11 of any connection between Abdulhadi Daguit and Al Qaeda. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 23- 27, 29, 32-33; Ex. 6, Sarhan Decl. ¶ 30; Ex. 5, Helles Decl. ¶¶ 24-25, 28-32, 34-35, 38-43; *id.* ¶ 43 (no knowledge of any support by IIRO or anyone within IIRO to Al Qaeda or other terrorist organizations); Ex. 6, Sarhan Decl. ¶ 30; Ex. 18, Brown Rpt. at 7-8, 63 (review of primary sources shows no evidence that IIRO or MWL supported Al Qaeda); *id.* ¶ 40; Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the- sdn-list. | Disputed. The IIRO's claims that the MWL and IIRO were unaware or had knowledge of any connection between Abdulhadi Daguit and al Qaeda is inaccurate and misleading.<br><br>As set forth in Plaintiffs' response to No. 1, Dr. Omar Abdullah Naseef, in his capacity as the MWL Secretary General and IIRO Chairman, approved the appointment of Mohammed Jamal Khalifa, a founding al Qaeda member and Osama bin Laden's brother-in-law, to open a joint MWL/IIRO branch office in the Philippines contemporaneous with the formation of al Qaeda. *See* <u>Ex. 51</u>, FED-PEC 202846-202847 (June 5, 1988). As a result of that appointment, Khalifa used the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia, and provided substantial assistance for al Qaeda affiliated terrorist organizations Abu Sayyaf Group ("ASG"), Moro Islamic Liberation Front, and Jemaah Islamiyah ("JI"). *See* <u>Ex. 37</u>, Expert Report of Dr. Matthew Levitt, March 9, 2020, at 11 (Southeast Asia became a "major center for operations" for al Qaeda for several reasons. One of these was "the network of Islamic charities, the spread of poorly regulated Islamic banks, business-friendly environments, and economies that already had records of extensive money laundering."). |

| | |
|---|---|
| | Daguit worked with Khalifa at the IIRO-Philippines office from 1988-1994 and was a trusted employee and advisor to Khalifa. *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202111 ("IIRO-PHL's director, Abd al-Hadid Daguit, is a trusted associate of Khalifa," "who is Usama bin Laden's brother-in-law and has been identified as a senior al Qaida member.").<br><br>During Daguit's tenure at the IIRO-Philippines office with Khalifa, media outlets in the Philippines often reported on the IIRO-Philippines office's connections to Osama bin Laden and al Qaeda and the office's involvement in funding the operations of the Abu Sayyaf and the Moro Islamic Liberation Front terrorist organizations. *See, e.g.*, Ex. 44, Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000, FED-PEC 10813-10815 (reporting that the IIRO was "being used by accused international terrorists Osama bin Laden and his brother-in-law, Mohammad Jamal Khalifa as a front to finance the operations of the Abu Sayyaf and the Moro Islamic Liberation Front," and that the bulk of IIRO "fund[s] goes to terrorist operations of the Abu Sayyaf and the MILF"); Ex. 48, Philippine Daily Inquirer, *Bin Laden Funds Abu Sayyef Through Muslim Relief Group*, August 9, 2000, FED-PEC 201975-201978 (reporting that "the IIRO was used by Bin Laden and Khalifa to distribute funds for the purchase of arms and other logistical requirements of the Abu Sayyaf in the guise of relief and livelihood projects for Muslim communities in Mindanao").<br><br>The MWL and IIRO were fully aware that the IIRO-Philippines branch office and its officials, Khalifa and Daguit, were closely aligned with al Qaeda at all relevant times. |
| 218. Abdulhadi Daguit is now a governmental commissioner in the National Commission on Muslim Filipinos, which oversees the welfare of Muslims in the Philippines and reports to the Office of the President and has been a member, and a chairperson, of various governmental commissions in the Philippines. Ex. 8, Daguit Decl. ¶ 38; Ex. 24, Daguit Dep. Tr. at 9:6-10:15 (*Errata*). | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 219. Abdulhadi Daguit saw no evidence to support the notion that IIRO or its employees helped militants in the Philippines, and no similar allegation of support to militants in the Philippines by IIRO or its employees, including Mahmoud Afif or Mohammed Sabri Salamah, was brought to the attention of Abdulhadi Daguit by local authorities. Ex. 8, Daguit Decl. ¶ 32. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 72, 140, 145, 146, 148, 149, 156, 157, and 159.<br><br>By way of further response, Daguit acknowledged at his June 27, 2019 deposition that there were several instances during his employment with the IIRO-Philippines branch office that he learned of terrorism allegations concerning Khalifa and the |

| | |
|---|---|
| | IIRO, but failed to conduct any inquiry to determine the veracity of those reports. Despite being a twenty-year employee of the IIRO, including acting director of the IIRO-Philippines office, at the time of very public accusations in the international media that the IIRO was "facilitating fundraising for al Qaida and affiliated terrorist groups," and bankroll[ing] the al Qaida network in Southeast Asia," Daguit showed a complete lack of curiosity and did not initiate any inquiries with the IIRO or the Philippines authorities to determine if there was any credibility to those reports.<br><br>For example, Daguit did not conduct any inquiries within his own office or IIRO headquarters to ask about Khalifa's relationship with Osama bin Laden, or to determine why Khalifa (his immediate boss) had been arrested in the United States in 1994. *See* Ex. 29, Transcript June 27, 2019 Deposition of Abdulhadi T. Daguit at 153 (testifying that he did not "ask anyone in the IIRO Philippine office whether they knew anything about Mohammed Jamal Khalifa's ties to Osama bin Laden," nor did he "ever ask anyone at the IIRO in Saudi Arabia about Mohammed Jamal Khalifa's relationship to Osama bin Laden"); *id.* at 167 (testifying that he did not conduct any inquiry to try to determine why Khalifa had been arrested in the United States).<br><br>When media reports circulated in the Philippines alleging that the IIRO-Philippines office was supporting a terrorist cell in the Philippines that included Khalid Sheikh Mohammed and Ramzi Yousef (the "Bojinka" plot), Daguit testified that he did not conduct any inquiries with the IIRO or Philippines authorities to assess the credibility of those reports. *See id.* at 165-166.<br><br>Additionally, when Philippines newspapers reported that the IIRO-Philippines office was "a conduit for funds to the Abu Sayyaf from Saudi billionaire, Osama Bin Laden, … and his brother-in-law, Mohammed Jamal Khalifa," and was being "used by Bin Laden and Khalifa to distribute funds for the purchase of arms and other logistical requirements of the Abu Sayyaf in the guise of relief and livelihood projects for Muslim communities in Mindanao," Daguit testified there was no discussion of this reporting in the IIRO-Philippines office "because it is not our business," and he did not ask anyone about it. *See id.* at 151-153. *See also* Ex. 48, Philippine Daily Inquirer, *Bin Laden Funds Abu Sayyef Through Muslim Relief Group*, August 9, 2000, FED-PEC 201975-201978.<br><br>Daguit further testified that he was never questioned or interviewed by any government authority concerning terrorism allegations, and could not recall if any IIRO employees had been arrested during his tenure with the IIRO. *See* Ex. 29, |

| | |
|---|---|
| | Transcript June 27, 2019 Deposition of Abdulhadi T. Daguit at 191-92.<br><br>Moreover, when the U.S. government designated the IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, "for facilitating fundraising for al Qaida and affiliated terrorist groups," Daguit was still employed with the IIRO, but did not undertake any inquiry to determine whether the designation was proper. *See id.* at 156.<br><br>Daguit also testified that he was aware of the designation of Abd al Hamid Sulaiman al Mujil from the IIRO-Eastern Province office through the newspaper reports, but did not conduct an inquiry with people he worked with at the IIRO to determine if they had any information that Mujil was tied to terrorists. *See id.* at 157.<br><br>Relatedly, the IIRO-Philippines office's bank accounts were frozen following the August 2006 designation, but Daguit testified that he did not conduct any inquiries to find out why the accounts had been frozen. *See id.* at 157-158.<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 129 (discussing Daguit's failure to conduct any inquiries relating to the designation of the IIRO-Philippines branch office).<br><br>Moreover, when asked if the IIRO suspended its operations in the Philippines after the August 2006 designation, Daguit testified that IIRO's operations were stopped in the Philippines but he was unaware if the closure had anything to do with the designation "because nobody informed me about that." *See id.* at 158-159 (testifying that "I am not informed about the closure."); *id.* at 160 (testifying that his salary stopped too, but did not ask anyone why that happened"). According to Daguit, he was still waiting for some instruction from the IIRO and payment of his salary. *See id.* at 159-161 ("That's why, for how many years I'm waiting for any communication from head office, because as far as I know, I am still the -- I am still the employee of the office, because I did not receive any letter saying or indicating that the office was closed.… I am just waiting, even my salary until now I'm waiting for my salaries, but there is no information about why it was stopped.").<br><br>Finally, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or |

| | |
|---|---|
| | after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 220. IIRO-Philippines granted scholarships to students. Ex. 24, Daguit Dep. Tr. at 32:3- 33:5 (*Errata*). | Disputed as stated. Notwithstanding the fact that IIRO and its domestic and overseas branch offices may have undertaken genuine humanitarian work, including offering scholarships to students, these relief activities were also used to fundraise and distribute funds for al Qaeda's operational support, recruit terrorists, to provide space for their training and operations, and to provide a cover so that al Qaeda operatives could undertake terrorist activities under the guise of being humanitarian relief workers. *See* Ex. 171, U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Abdallah Ibrahim al Rushaydan (September 10, 2004), PEC-KSA002477-2488 at 2486 ("Since 1996, the IIRO has been linked with providing financial assistance, funds transfers, and legitimate cover for moving money in support of Al-Qaida and Usama Bin Ladin (UBL), under the cover of humanitarian relief."); *id.* at 2488 ("The IIRO is a Tier 1 NGO that has been directly linked to Al-Qaida and Usama Bin Ladin. The IIRO has provided financial assistance, funds transfers and legitimate cover for moving money under the pretense of humanitarian relief to Al-Qaida."); Ex. 69, Department of Defense JTF-GTMO Matrix of Threat Indicators, FED-PEC 216815-216831 at 216829-216831(U.S. govt. identifying IIRO, MWL, and WAMY as "terrorist and terrorist support entities"); Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 (identifying the IIRO as "one of the major Saudi Arabian humanitarian organizations suspected of maintaining links with al-Qaeda"); Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann ("Kohlmann Report") at 24 (stating that the U.S. government concluded that the IIRO provided moved money to al Qaeda under the pretense of humanitarian relief); Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143 (Fadl testifying that al Qaeda used Wa'el Jelaidan as head of the IIRO office in Peshawar, Pakistan, to create ID cards for al Qaeda members so that they could cross the Pakistan-Afghanistan border without a problem, under the guise that they were teachers or other relief workers.); Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer ("Winer Report") at 20 (asserting that "while the Islamic charities that provided support to extremism and terrorism engaged in some |

| | |
|---|---|
| | humanitarian activities, their support for terrorism was substantial, and the humanitarian activities which did take place helped to legitimize and provide a cover for, the extremist and terrorist activities"); Ex. 37, March 9, 2020 Expert Report of Dr. Matthew Levitt ("Levitt Report") at 13-14 ("Charities offer a veil of legitimacy for terrorist fundraising, attracting unwitting donors who are unaware that monies they donate for humanitarian purposes instead fund terror."); *id.* at 14 ("Through charities, transnational terrorist groups have been able to move personnel, funds, and material to and from high-risk areas under cover of humanitarian or charity work."); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (stating that Adel Batterjee, who headed the MWL subsidiary Lajant al Birr al Islamiyya, "has directed NGOs where some officers finance extremists or militants under the guise of rendering humanitarian aid and support"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 218 (stating that Islamic charities accredited with the UNHCR "gives them credentials terrorists can use to travel more freely across borders and to establish cells in new areas under the guise of pursuing a humanitarian mission"); Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 965 ("Where Muslims are engaged in armed conflict, some Islamic organizations provide military aid as part of a 'humanitarian' package."); Ex. 1, 9/11 Commission Final Report at 170-171 ("Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization."); Ex. 150, U.N. Security Council, Second Report of the Monitoring Group on Sanctions Against Al-Qaida, the Taliban and Individuals and Entities Associated With Them ("Second Report"), December 2, 2003, PEC-KSA000108-190 at 120-121 ("Charities provide Al-Qaida with a very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support. These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programmes."). |
| 221. IIRO-Philippines provided assistance by paying teacher salaries at a school in Zamboanga City. However, this school was not operated by the IIRO and was registered with the Department of Education of the Philippines. Ex. 24, Daguit Dep. Tr. at 32:3-33:5 (*Errata*). | Disputed as stated. Notwithstanding the fact that IIRO and its domestic and overseas branch offices may have undertaken genuine humanitarian work, including paying teacher salaries, these relief activities were also used to fundraise and distribute funds for al Qaeda's operational support, recruit terrorists, to provide space for their training and operations, and to provide a cover so that al Qaeda operatives could undertake terrorist activities under the guise of being humanitarian relief workers. *See* Plaintiffs' response to No. 220. |

| | |
|---|---|
| 222. IIRO's humanitarian efforts in the Philippines focused primarily on the provision of health clinics, orphanages, education scholarships (mostly secular in nature), emergency relief programs, and Ramadan meals, as well as the construction of mosques and wells. Ex. 8, Daguit Decl. ¶ 6. | Disputed as stated. *See, e.g.*, Plaintiffs' response to No. 220.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 223. IIRO-Philippines operated three main orphanages, one in Zamboanga City, one in Cotabato City, and one in Marawi City, all of which served hundreds of orphans. Ex. 8, Daguit Decl. ¶ 7. | Disputed as stated. *See, e.g.*, Plaintiffs' response to No. 220.<br><br>By way of further response, Philippines Intelligence confirmed that the IIRO's Dar al Imam al Shafi'e in Zamboanga was under investigation for terrorism, stating that the staff and teachers at Dar al Imam al Shafi'e had undergone training at a terrorist training camp named "Abu Haidar," which was used to train members of the Moro Islamic Liberation Front and the IIRO. *See* Ex. 59, Philippines Intelligence Report, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428. *See also* Ex. 137, MWL 8434-8453 at 8443 (IIRO publication identifying the Dar al Imam al Safi'e in Zamboanga City as one of the three orphanages maintained by the IIRO Social Services Division.); Ex. 177, Statement of Abdullah Al-Hashayka, PEC-KSA 1771 (Hashayka, a co-defendant with Khalifa in a terrorism trial in Jordan for their involvement in a terrorist cell attack on a movie theater in Amman, testified that he worked at Dar al Imam al Shafi'e as a teacher.).<br><br>When Mohammed Jamal Khalifa was detained by U.S. authorities on December 16, 1994, as he was returning to the Philippines from San Francisco, CA, FBI discovered a trove of information in Khalifa's possession including documents referring to the "Bojinka" plot, as well as documentation identifying the curriculum for Dar al Imam al Shafi'e. These documents confirmed that students at the school received training in assassination, kidnapping, bombing churches, martyrdom operations, methods of torture, explosives and weapons. *See* Ex. 52, FED-PEC 202848-202852 (curriculum).<br><br>Finally, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the |

| | |
|---|---|
| | December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 224. There is no evidence in the primary sources identified in the expert report of Vahid Brown of any relationship between IIRO-Philippines and Al Qaeda. Ex. 18, Brown Rpt. at 5, 7-8, 90-91. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 43, 45-49, 62, 65, and 72.<br><br>By way of further response, IIRO's expert Vahid Brown does not identify the "primary sources" he specifically reviewed in support of his assertion that there is no connection between the IIRO-Philippines and al Qaeda, and therefore lacks foundation. *See* IIRO Exhibit 18, Expert Report of Vahid Brown at 5, 7-8, 90-91. |
| 225. In 2006, the IIRO-Philippines office was designated by OFAC. Additional Designation of Individuals and Entities Pursuant to Executive Order 13224, 71 Fed. Reg. 45599, 45600 (Aug. 9, 2006). | Undisputed as a general matter for purposes of this motion. |
| 226. OFAC de-designated the IIRO-Philippines office, effective August 16, 2016. Sanctions Actions Pursuant to Executive Order 13224, 81 Fed. Reg. 67431 (Sept. 30, 2016); Ex. 4, May 21, 2024 Basha Decl. ¶ 90. | It is not disputed that the IIRO-Philippines office was de-designated by OFAC on August 16, 2016. However, to the extent the IIRO argues that the de-designation exonerates the IIRO-Philippines office and its employees from any accountability for the extensive financial, material, and logistical support the IIRO provided to al Qaeda in the decade leading to the 9/11 attacks, that is disputed as inaccurate and misleading. *See* Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 132 ("The withdrawal of a designation of a person or entity under EO 13224 is a normal and natural part of the sanctions program, and has happened many times over the years, as it has with other U.S. sanctions programs. Sanctions are not intended to last forever, but only so long as the U.S. government considers them necessary to carry out the purpose of the sanctions. A withdrawal should never be considered an exoneration unless the U.S. government has publicly stated that the original listing was undertaken in error."); *id.* at 133 ("When it is no longer necessary for the U.S. government to sanction a person or entity under EO 13224 or any other sanctions program, it [lifts] the sanctions or delists the person or entity. The change of status does not imply any reconsideration of whether the sanctions were proper at the outset, let alone an exoneration. The delisting merely reflects changes in current conditions, making the sanctions of that person or entity no longer needed to fulfill the U.S. national security objectives that led to the original listing."). |

| | |
|---|---|
| 227. The United Nations Security Council, the European Union, and the United Kingdom delisted the IIRO-Philippines office in January 2014. Ex. 4, May 21, 2024 Basha Decl. ¶ 90. | It is not disputed that the IIRO-Philippines office was delisted by the U.N. Security Council in January 2014. However, to the extent the IIRO argues that the U.N.'s delisting exonerates the IIRO-Philippines office and its employees from any accountability for the extensive financial, material, and logistical support the IIRO provided to al Qaeda in the decade leading to the 9/11 attacks, that is disputed as inaccurate and misleading. |
| 228. After the IIRO-Philippines office's designation, IIRO investigated the publicly available allegations accompanying the 2006 designation. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 81-82. | It is not disputed that Basha testified the IIRO conducted an investigation following the August 3, 2006 designation of Mujil and the Philippines and Indonesia branch offices. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 276-277. |
| 229. For the investigation, IIRO reviewed internal records relating to IIRO-Philippines, reviewed administrative files, financial statements, and other papers from the IIRO-Philippines, and reviewed IIRO-Philippines staff files. Ex. 22, Al-Turki Dep. Tr. at 280:15-281:14 (*Errata*); Ex. 25, Basha Dep. Tr. at 276:21-277:12; Ex. 4, May 21, 2024 Basha Decl. ¶ 82. | It is not disputed that Basha testified that the IIRO reviewed "the papers of all these offices," "the administrative and financial papers, and the files of the staff members who were working in these offices." *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 277.<br><br>However, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 Basha Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declaration was never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 230. The IIRO investigation could not verify, or find any support for, the publicly available allegations concerning purported funding for or support to Al Qaeda or any other terrorist organization by IIRO-Philippines. Ex. 4, May 21, 2024 Basha Decl. ¶ 83; see Ex. 25, Basha Dep. Tr. at 277:3-12; Ex. 22, Al-Turki Dep. Tr. at 280:15-281:14 (*Errata*). | It is not disputed that Basha testified that the IIRO's investigation concluded that "all of the procedures were sound for us," notwithstanding the fact that Basha and the IIRO determined that there were significant financial improprieties and irregularities occurring in the IIRO-Eastern Province branch office. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 277-278; *see also* Plaintiffs' response to No. 91. However, to the extent that the IIRO argues that its internal investigation could not verify allegations that that the IIRO-Philippines provided funding and other support to al Qaeda or other terrorist organizations, that is disputed.<br><br>Notably, the Saudi Ministry of Interior conducted its own investigation relating to the 2006 U.S. designation and allegations concerning the IIRO-Eastern Province branch, |

| | |
|---|---|
| | Abd al Hamid Sulaiman al Mujil, and the Philippines and Indonesia offices. *See* Ex. 70, U.S. Diplomatic Cable, *Terrorism Finance; Saudi Response of IIRO's Al-Mua'jjil Under 1267 Designation*, August 14, 2006, FED-PEC 220473-220474 at 220473. The IIRO-Eastern Province office was shut down and the Saudi government froze Mujil's bank account at Al Rajhi Bank. *Id.* Remarkably, Basha testified that he was unaware of the investigation conducted by the Ministry of Interior. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 277-278. The IIRO has never produced any documents relating to the IIRO's internal investigation and/or the investigation conducted by the Ministry of the Interior.<br><br>Documents produced by the IIRO reveal that the IIRO-Philippines office similarly suffered from significant financial improprieties and irregularities. In 1998, the Director of the IIRO's Social Care Department, Dr. Saleh Marzouk al Harbi, visited the IIRO-Philippines branch and discovered a number of serious issues concerning the reporting and distribution of IIRO funds to orphans in that country, including the fact that the IIRO-Eastern Province was financially supporting an Islamic institute without informing IIRO headquarters. *See* Ex. 109, Report on the Visit of the Supervisor of the Social Care Department to the Philippines Between July 19-25, 1998, IIRO 111421-111431. The report describes the lack of financial controls by the IIRO-Philippines branch office with respect to the distribution of financial aid to orphans in the Philippines, and determined *inter alia* that: (1) there was no prior preparation for the distribution of the orphans' allowances; (2) the IIRO-Philippines office failed to carry out the instructions of the Social Care Department to form a committee for the distribution of the allowances to the orphans; (3) the orphans' allowances were distributed "without scrutiny or control;" (4) orphan files were incomplete and lacked the required documentation; (5) records at the IIRO's Social Care Department in Saudi Arabia indicated there were 80 male and female orphans at a certain orphanage, but it was determined there were really only 22 female orphans and 23 male orphans; and (6) certain orphans did not receive financial assistance despite the fact that IIRO headquarters had sent the funds earlier in the year. *Id. See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann ("Kohlmann Report") at ¶¶ 145-149; Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 67-77 (discussing the implications of financial improprieties and irregularities discovered in the audits and financial documents of the IIRO, and how they indicate conditions that made it possible for IIRO officials and employees to direct IIRO funds and resources to support al Qaeda, Islamic jihad, and terrorism). |

| | |
|---|---|
| | Specifically, the report revealed that "[t]he Office did not carry out the instructions of the Social Care Department to form the Tripartite Committee for the delivery of the allowances to the orphans," and "the orphan's allowances were received by any person who would attend, whether an orphan, a provider, a friend, or a neighbor without scrutiny or control." *See* Ex. 109, Report on the Visit of the Supervisor of the Social Care Department to the Philippines Between July 19-25, 1998, IIRO 111421-111431 at 111423. Daguit confirmed that the IIRO did not form the Tripartite Committee. *See* Ex. 29, Transcript June 27, 2019 Deposition of Abdulhadi T. Daguit at 122.<br><br>The report further discusses the visit to the Jaber bin Abdullah Orphanage, sponsored by the IIRO, stating that "the files of the orphans in the Orphanage are incomplete and lack the documentation for the birth of the orphans, the death of their parents, and pictures of the orphans." *See* Ex. 109, IIRO 111421 111431 at 111424.<br><br>The report further indicates that the Jaber bin Abdullah Orphanage records at the Secretariat General's Social Care Department indicates there are 80 male and female orphans, but there are actually only 22 female orphans and 23 male orphans after matching the files with the male and female orphans in the Orphanage. *Id.* at 11424 ("Where are the others? Who was receiving their allowances? And where are their payments? Financially?"). Daguit confirmed that the funding provided by the IIRO in Saudi Arabia to the IIRO-Philippines for distribution to orphans would be based on the number of orphans. *See* Ex. 29, Transcript June 27, 2019 Deposition of Abdulhadi T. Daguit at 128-129.<br><br>The report also indicates that "there are no completed files for the orphans at the IIRO's Office except for a small number of the orphans' files in Cotabato." *See* Ex. 109, IIRO 111421 111431 at 111425. Daguit testified that Harbi was concerned about a lack of documentation for the orphans affiliated with families. *See* Ex. 29, Transcript June 27, 2019 Deposition of Abdulhadi T. Daguit at 130-131.<br><br>Finally, the report stated that "the orphans affiliated with families in Marawi and Zamboanga did not receive their allowances from year 1417 AH (1996 AD), although the allowances were sent to the Office" in February and August 1997. *See* Ex. 109, IIRO 111421 111431 at 111425. Daguit testified that Harbi also raised concerns that the funds had not been distributed. *See* Ex. 29, Transcript June 27, 2019 Deposition of Abdulhadi T. Daguit at 131. |

| | |
|---|---|
| | Historically, the Saudi charities have diverted millions of dollars ostensibly earmarked for supporting orphans to Al Qaeda terrorists. In many cases, the charities claimed their expenditures were dedicated to supporting orphanages and related education programs in overseas countries. In reality, the charities were fraudulently padding their lists with names of non-existent or deceased children. Funds allocated and sent to care for these "ghost orphans" were instead funneled to al Qaeda to bankroll its global terrorist operations. *See, e.g.*, Ex. 12, *Pursuing the Bin Laden Financial Target*, April 12, 2001, CIA_00201-208 at 206 (indicating that "donations that arrived under the auspices of charity for orphans and widows" were turned over "to al-Qa'ida's finance committee"); Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 522 (reporting that al Qaeda's fundraising coordinator, Abu Bakr al Jaziri, took funds originating from charities and earmarked for Afghan orphans and widows, and diverted them to al Qaeda); Ex. 18, *Al-Qa'ida's Financial Ties to Islamic Youth Programs*, January 17, 2003, CIA_00681-701 at 682 (stating that NGO contributions for orphans and education were siphoned off by al Qaeda for its own terrorist purposes); *id.* at 683 (indicating that "Al-Qa'ida has found it easy to divert money because private donors provide millions of dollars a year for orphan care and Islamic education programs"); *id.* at 684 ("Saudi NGOs have provided significant funding to orphanages and madrassas in Bosnia, some of which have been in contact with facilities associated with al-Qa'ida."); *id.* at 691 ("Al-Qa'ida's modest financial support for orphanages and madrassas has paid off for it by providing opportunities to divert larger amounts of money for its expenses. Once founded, many orphanages and Islamic schools receive large sums from charitable donors and al-Qa'ida diverted orphan and educational donations to its own budget. Individual Al-Qa'ida members gained employment and operational cover by working at the schools and orphanages and with the donors funding them."). *See also* Ex. 181, *Al-Haramain Islamic Foundation, Somalia*, TREASURY00030-36 at 30-31 ("The U.S. has assembled evidence that shows a history of ties between Al-Haramain Somalia and Usama bin Laden's al-Qaida network, Al-Itihaad al-Islamiya (AIAI), and other associated entities and individuals. For example, over the past few years, Al-Haramain Somalia has provided a means of funneling money to AIAI by disguising funds as intended to be used for orphanage projects or the construction of Islamic schools and mosques. The organization has also employed and provided salaries to AIAI members."). <br><br> Prior to the 9/11 attacks, media outlets in the Philippines were reporting that orphanages in that country "are being investigated as possible conduits for funding terrorism," |

| | |
|---|---|
| | including an orphanage linked to the IIRO and MWL. *See* Ex. 42, Gulf News, *Orphanages in Southern Philippines Under Probe*, February 10, 2001 (reporting that one of the orphanages under investigation "has been pinpointed to have received funding from the International Islamic Relief Organizations (IIRO)," which "is part of the Muslim World League").<br><br>Concerns about the financial integrity of the IIRO-Philippines branch office persisted for years after the 1998 visit. In late 2003/early 2004, the Director of IIRO's Social Care Department, Dr. Saleh Marzouk al Harbi, again raised concerns with IIRO headquarters about "a lack of clarity in the Philippines Office about the balances of custodies recorded on it." *See* Ex. 102, IIRO 59754. In a letter to IIRO Secretary General Basha, Harbi recommended that a committee should be formed to investigate "all the custodies including the last five transactions and to issue a statement detailing the custodies recorded on the Philippines Office" from October 22, 1998 through January 15, 2002. *Id.* "I suggest that these custodies should be liquidated as soon as possible so that the problem of the Pakistan Office is not repeated." *Id.*<br><br>Additional audits of the IIRO-Pakistan, IIRO-Eastern Province, IIRO-Indonesia, IIRO-Sarajevo, and IIRO-Jordan branch offices similarly discovered serious financial improprieties and irregularities. *See* Plaintiffs' responses to Nos. 91, 238, 269, 294, and 335.<br><br>Plaintiffs' experts have concluded that the financial improprieties and irregularities documented in the audits demonstrate that conditions within the IIRO and its branches were ideal for individuals to direct massive amounts of IIRO funds and resources to Osama bin Laden, al Qaeda, and their terrorist activities. *See* Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 77 ("I conclude that the financial improprieties and irregularities documented in the limited number of audits and financial documents of IIRO that have been made available to me reflect conditions within IIRO that made it possible for persons within IIRO, as well as others such as Julaidan to misdirect IIRO resources to support Islamic jihad, al Qaeda, and terrorism. This support included the funding of Islamic fighters in prominent zones of conflict such as Afghanistan, Bosnia, and Chechnya, as well as in lesser-known conflicts between Islamic resistance groups and terrorists against secular governments, such as in Indonesia, the Philippines, and Thailand, and in areas of complex armed conflict between Muslims and non-Muslims such as Lebanon, Palestine, and Sudan, as well as elsewhere."). |

| | |
|---|---|
| | Finally, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 Basha Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declaration was never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 231. Mahmoud Abd al-Jalil Afif was never an IIRO-Philippines director. He was an IIRO representative who "did not control finances [or] have any access to IIRO's bank accounts." Ex. 5, Helles Decl. ¶ 41. | Disputed. *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202111 ("At the time Khalifa directed the IIRO-PHL, he employed an ASG intelligence officer as the provincial director of the IIRO-PHL in the Tawi-Tawi region of the Southern Philippines until that officer's death in 1994."); *id.* ("In the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-PHL, and used the organization to funnel money to terrorist groups including the ASG."); Ex. 33, European Parliament, *The Involvement of Salafism/Wahhabism in the Support and Supply of Arms to Rebel Groups Around the World*, June 2013, at 9 (stating that the IIRO's branch office in Tawi Tawi, Mindanao, headed by Abu Sayyaf's intelligence chief, was used by Al Qaeda to siphon money on behalf of the Abu Sayyef Group and Moro Islamic Liberation Front). |
| 232. IIRO-Philippines remained operational after its designation and continued its operations before closing later in 2006. No one at either the IIRO Head Office, SA or IIRO-Philippines was ever approached by Philippine authorities concerning OFAC's allegations. Ex. 25, Basha Dep. Tr. at 276:21-277:17; Ex. 4, May 21, 2024 Basha Decl. ¶¶ 83, 85. IIRO-Philippines was registered with the government and opened again in 2011 but then closed on March 17, 2013. Ex. 4, May 21, 2024 Basha Decl. ¶ 85. | Disputed. Basha's deposition testimony, cited by the IIRO at 276:21-277:17, does not mention anything about the IIRO-Philippines office.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 Basha Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declaration was never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 233. No allegations of support for terrorism were ever made by the authorities in relation to IIRO-Philippines | Disputed. The Philippines government was actively investigating the activities of the IIRO-Philippines office and |

| | |
|---|---|
| during Abdulhadi Daguit's tenure at IIRO-Philippines. Ex. 8, Daguit Decl. ¶ 17. | its officials, including Daguit, during his tenure with the IIRO. For example, Philippines Intelligence confirmed that the IIRO's Dar al Imam al Shafi'e orphanage in Zamboanga was under investigation for terrorism, stating that the staff and teachers at Dar al Imam al Shafi'e had undergone training at a terrorist training camp named "Abu Haidar," which was used to train members of the Moro Islamic Liberation Front and the IIRO. *See* Ex. 59, Philippines Intelligence Report, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428.<br><br>Philippines Intelligence also determined that Daguit was in constant contact with leaders of the Moro Islamic Liberation Front while working with the IIRO and Khalifa. *See* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211445 (identifying Daguit as a "known associate of Khalifa," "presently connected with IIRO Manila," and in "constant contact with Yusop Alongan @Ustadz Duli/Abdullah, Chairman of MILF Finance Committee"); *id.* at 211429 (stating that Daguit and others "are known associates of Mohammad Jamal Khalifa involved in establishing the NGO network in the country").<br><br>Philippines Intelligence further identified Daguit as a conspirator in an al Qaeda bombing plot to take place in the Philippines in 2004. *See* Ex. 58, FED-PEC 210866-210867. In the intelligence report, Daguit is identified ("Abdulhadi Daguit (Filipino) of MWL-IIRO Manila office"), as an associate of two al Qaeda members who were allegedly tasked to conduct a bombing attack on the Saudi Embassy in the Philippines for "being an American ally in the Iraqi issue." The attack on the embassy was to take place "within the time frame of before or after the national election on 10 May 2004."<br><br>Investigations conducted by Philippines Intelligence also determined that Abd al Hamid Sulaiman al Mujil from the IIRO-Eastern Province met with Moro Islamic Liberation Front officials in December 1998 concerning financial support. *See* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211430 (identifying IIRO officials "Al Saif Othoman A O and Almojil Abdul Hamdi S" meeting with MILF Chairman Salamat Hashim at Camp Abubakar in the Southern Philippines concerning a $192,197.00 contribution).<br><br>Also during Daguit's tenure with the IIRO, media outlets in the Philippines often reported on the IIRO-Philippines office's |

| | |
|---|---|
| | connections to Osama bin Laden and al Qaeda and the office's involvement in funding the operations of the Abu Sayyaf and the Moro Islamic Liberation Front terrorist organizations. *See, e.g.*, Ex. 44, Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000, FED-PEC 10813-10815 (reporting that the IIRO was "being used by accused international terrorists Osama bin Laden and his brother-in-law, Mohammad Jamal Khalifa as a front to finance the operations of the Abu Sayyaf and the Moro Islamic Liberation Front," and that the bulk of IIRO "fund[s] goes to terrorist operations of the Abu Sayyaf and the MILF"); Ex. 48, Philippine Daily Inquirer, *Bin Laden Funds Abu Sayyef Through Muslim Relief Group*, August 9, 2000, FED-PEC 201975-201978 (reporting that "the IIRO was used by Bin Laden and Khalifa to distribute funds for the purchase of arms and other logistical requirements of the Abu Sayyaf in the guise of relief and livelihood projects for Muslim communities in Mindanao").<br><br>By way of further response, *see, e.g.*, Plaintiffs' response to No. 234.<br><br>Finally, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 234. Daguit is not aware of any instance when an IIRO-Philippines employee was ever arrested during his employment for any reason, be it for suspicion of terrorism or otherwise, prior to 9/11. Ex. 8, Daguit Decl. ¶ 18. | Disputed. U.S. State Department reporting indicates that the U.S. government raised terrorism-related concerns with the Saudi Foreign Minister regarding the arrest of two IIRO employees in the Philippines and the involvement of the Saudi Ambassador Muhammad Amin Waly. *See* Ex. 73, U.S. Diplomatic Cable, *APHSCI Townsend February 6 Meeting With Foreign Minister Prince Saud Al-Faisal*, February 24, 2007, FED-PEC 220503-220505 at 220505 ("In a following private meeting with Saud, attended only by the Ambassador, APHSCT Townsend raised US concerns with the potential involvement of the Saudi ambassador to the Philippines Muhammad Amin Waly in terrorism facilitation, particularly his intervention to get two members of IIRO out of prison."). *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 126. |

| | |
|---|---|
| | Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 235. IIRO's Head Office took perceived accounting discrepancies or minor procedural deviations seriously and investigated all issues, ascertaining whether wrongdoing occurred and helping IIRO-Philippines to ensure that such issues would not repeat. Ex. 8, Daguit Decl. ¶ 16. | Disputed. *See, e.g.*, Plaintiffs' response to No. 230.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 236. There is no evidence that the instances *of* non-compliance by IIRO-Philippines with Head Office protocols resulted in IIRO funds being diverted to Al Qaeda. Ex. 4, May 21, 2024 Basha Decl. ¶ 74. | Disputed. *See, e.g.*, Plaintiffs' response to No. 230.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 Basha Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declaration was never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 237. Neither Adnan Basha nor IIRO was aware of or had knowledge of any evidence that IIRO-Philippines funded or supported Al Qaeda, its affiliates, or other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 23-27, 29, 32-33, 74; Ex. 6, Sarhan Decl. ¶ 30; Ex. 5, Helles Decl. ¶¶ 24-25, 28-32, 34-35, 38-43; *id.* ¶ 43 (no knowledge of any support by IIRO or anyone within IIRO to Al Qaeda or | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 43, 47, 48, 49, 94, 95, 96, 134, and 149.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 Basha Declaration was never produced to Plaintiffs |

| | |
|---|---|
| other terrorist organizations); Ex. 6, Sarhan Decl. ¶ 30; Ex. 18, Brown Rpt. at 5, 7-8, 63 (review of primary sources shows no evidence that IIRO or MWL supported Al Qaeda); *id.* at 90-91 (primary sources include no indication of a relationship between IIRO- Indonesia and Al Qaeda). | during the discovery phase of the litigation; (2) the Basha Declaration was never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| **IIRO-Indonesia** | No response necessary. |
| 238. IIRO Head Office audits of IIRO-Indonesia covering the years before and after 9/11 reveal no evidence of funding or support of Al Qaeda, its affiliates, or other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 68-69. | Disputed. The IIRO's claim that the audits of the IIRO-Indonesia office before and after the 9/11 attacks reveal no evidence of funding and support of al Qaeda and other terror groups is inaccurate and misleading. Although the IIRO asserts that the IIRO-Indonesia office underwent audits before and after the 9/11 attacks, the IIRO failed to produce pre-9/11 auditing reports in discovery, and only a few post-9/11 audit reports.<br><br>In June 2004, the IIRO Offices Services Department notified the IIRO-Indonesia branch manager, Fahd Mohammed Sanad al Harbi, that the organization intended to send an IIRO accountant to IIRO-Indonesia to audit the office. *See* Ex. 97, IIRO 36875. The audit occurred between September 30, 2004 and October 11, 2004, and the internal auditor sent an initial draft of the auditing report to Harbi on November 1, 2004. *See* Ex. 95, IIRO 34989-35007, November 1, 2004 letter from the IIRO internal auditor, Mr. Ismail bin Hasan Mandoura, to Mr. Fahd bin Mohamed Sanad al Harbi, Manager of the Organization's Office in Indonesia, attaching "the initial draft of the report on the results of auditing and field inspection." Harbi is asked to "express your opinions" so that they can "prepare the final report, and submit it on the scheduled time." *Id.* at IIRO 34989.<br><br>The audit discovered a number of critical financial irregularities and problems with the accounting practices of the IIRO-Indonesia office, including inter alia the office's failure to use sound accounting practices; failure to use daily ledgers, failure to use an accounting system that was compatible with that used by the IIRO's financial department and other IIRO local and foreign offices; financial expenditures missing any reference to the "source of fund[ing];" and significant balance discrepancies. *See* Ex. 95, IIRO 34990-35007.<br><br>The auditor's report further detailed that the auditor was unable to match IIRO-Indonesia's debit balance of 3,277,546 Saudi riyals ("SR"); the excesses in expenditures on administrative affairs amounted to 110,045 SR; the office spent 25,869 SR from the currency exchange differences |

| | |
|---|---|
| | without authorization from IIRO headquarters; and there was a deficit of $6,001.21 in the IIRO-Eastern Province account. *Id.*<br><br>The audit also raised concerns about the direct transfer of $383,663.76 from the IIRO-Eastern Province to IIRO-Indonesia "for the implementation of the projects of mosques, wells, organs, and charitable organizations in Indonesia," without informing or seeking authorization from the IIRO Secretary General. *See* Ex. 95 at IIRO 34998-34999; *see also* Ex. 30, Transcript, March 27, 2019 Deposition of Fahd Mohammad Sanad Al Harbi at 322-323 (testifying that the proper protocol is for the IIRO-Eastern Province to send the money to the IIRO headquarters, the General Secretariat, which would then send the money to IIRO-Indonesia); Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 67-77 (discussing the implications of financial improprieties and irregularities discovered in the audits and financial documents of the IIRO, and how they indicate conditions that made it possible for IIRO officials and employees to direct IIRO funds and resources to support al Qaeda, Islamic jihad, and terrorism).<br><br>When initially asked about the auditor's report and its findings, Harbi denied ever seeing the report or knowing anything about it, despite affirming that he was present in the office when the audit took place. *See* Ex. 30, Transcript, March 27, 2019 Deposition of Fahd Mohammad Sanad Al Harbi at 319-321. Later in the deposition, Harbi admitted to seeing the auditor's report, but then reversed course again and continued to testify that he did not know anything about the report. *Id.* at 335, 338, 348.<br><br>Notwithstanding the discovery of serious financial irregularities described in the auditor's report, including clear violations of IIRO procedures and protocols concerning the transfers of funds to IIRO overseas branch offices, Harbi testified that the IIRO never asked him to undertake any efforts to address those deficiencies. *Id.* at 350. *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 128 (indicating that when the IIRO-Indonesia office was designated by the United States in 2006, Harbi testified that he never spoke to IIRO Secretary General Adnan Basha, Abd al Hamid Sulaiman al Mujil, or any representatives of the local Saudi Embassy about the designation, nor was anyone in the Indonesia office terminated or disciplined following the designation).<br><br>The purposeful unwillingness of the IIRO to undertake corrective measures to put an end to these violations in IIRO-Indonesia and other offices, allowed the IIRO-Eastern |

| | |
|---|---|
| | Province and its leadership to continue to send millions of dollars to IIRO overseas offices directly linked to al Qaeda and associated terrorist organizations, including Jemaah Islamiyah.<br><br>Additional audits of the IIRO-Pakistan, IIRO-Eastern Province, IIRO-Philippines, IIRO-Sarajevo, and IIRO-Jordan branch offices similarly discovered serious financial improprieties and irregularities. *See* Plaintiffs' responses to Nos. 91, 230, 268, 294, and 335.<br><br>Plaintiffs' experts have concluded that the financial improprieties and irregularities documented in the audits demonstrate that conditions within the IIRO and its branches were ideal for individuals to direct massive amounts of IIRO funds and resources to Osama bin Laden, al Qaeda, and their terrorist activities. *See* Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 77 ("I conclude that the financial improprieties and irregularities documented in the limited number of audits and financial documents of IIRO that have been made available to me reflect conditions within IIRO that made it possible for persons within IIRO, as well as others such as Julaidan to misdirect IIRO resources to support Islamic jihad, al Qaeda, and terrorism. This support included the funding of Islamic fighters in prominent zones of conflict such as Afghanistan, Bosnia, and Chechnya, as well as in lesser-known conflicts between Islamic resistance groups and terrorists against secular governments, such as in Indonesia, the Philippines, and Thailand, and in areas of complex armed conflict between Muslims and non-Muslims such as Lebanon, Palestine, and Sudan, as well as elsewhere.").<br><br>In 2006, the U.S. government formally designated the IIRO-Indonesia branch office "for facilitating fundraising for al Qaida" and Jemaah Islamiyah. *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112.<br><br>According to U.S. Treasury Department officials, Mujil used his position at the IIRO-Eastern Province office to direct funds directly to al Qaeda and "is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI). Both ASG and JI are al Qaida-associated terrorist groups in Southeast Asia designated pursuant to the authorities of E.O. 13224." *Id.* at 202110; *see also id.* at 202111 ("The Indonesian and Philippines branches of IIRO have received support from IIRO-EP, which in turn is controlled by Al-Mujil. Indeed, he is often responsible for authorizing payment transfers for IIRO Philippines (IIRO-PHL) and IIRO Indonesia (IIRO-IDN)." *Id.* |

| | |
|---|---|
| | The 2006 designation further added that "[t]he IIRO Indonesia director has channeled money to two Indonesia-based, JI-affiliated foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed the establishment of training facilities for use by al Qaida associates." *Id.* at 202112.<br><br>*See also* Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 106 ("The International Islamic Relief Organization [IIRO], which is headquartered in Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL, … the Taliban, … and Hamas, … as well as al Qaida affiliates, *inter alia*, the Abu Sayyaf Group (ASG), … Jemaah Islamiya (JI), … and Al Ittihad Al Islamiya (AIAI)…. The IIRO's parent organization is the Muslim World League [MWL] also headquartered in Saudi Arabia."); *id.* at 107 ("Jemaah Islamiya [JI] is an al Qaida-linked terrorist group with cells operating in several countries in Southeast Asia. It was founded in 1993 with the ultimate goal of establishing, through violent jihad, a pan-Islamic caliphate in Southeast Asia. JI was designated as a Specially Designated Global Terrorist (SDGT) pursuant to E.O. 13224 on October 23, 2002."); *id.* ("Al-Mujil has provided support to terrorist organizations including ASG and JI."); *id.* at 109 ("IRO-EP's Al-Mujil reportedly has exercised decision-making authority over a number of IIRO offices, including the IIRO-PHL, IIRO-IND, proposed for designation herein, and IIRO's Thailand branch [IIRO-THA]…. These offices supported by Al-Mujil are implicated in supporting the ASG and/or JI."); *id.* at 114 ("By financing JI and organizations associated with JI, IIRO-IND assists in, sponsors, or provides financial and material support for, or financial or other services to or in support of JI, an entity listed on the Annex to E.O. 13224.").<br><br>Finally, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the |

| | |
|---|---|
| | Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 239. These IIRO Head Office audits were standard practice. Ex. 27, Harbi Dep. Tr. at 318:13-24 (*Errata*) ("The IIRO sends accountants and auditors to make sure that work at the office is going the way it should."). | Disputed. *See, e.g.*, Plaintiffs' response to No. 238. |
| 240. While the audit results identified certain infractions and made some procedural recommendations as corrective actions, the results of the audits did not reveal any evidence of funding or support of Al Qaeda, its affiliates, or other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶ 69. | Disputed. *See, e.g.*, Plaintiffs' response to No. 238.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 241. There is no evidence that the instances of non-compliance by IIRO-Indonesia with Head Office protocols resulted in IIRO funds being diverted to Al Qaeda. Ex. 4, May 21, 2024 Basha Decl. ¶ 70. | Disputed. *See, e.g.*, Plaintiffs' response to No. 238.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 242. Neither Adnan Basha nor IIRO was aware or had knowledge of any evidence that IIRO-Indonesia funded or supported Al Qaeda, its affiliates, or other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶ 70; Ex. 18, Brown Rpt. at 5, 7-8, (review of primary sources shows no evidence that IIRO or MWL supported Al Qaeda); *id.* at 90-91 (primary sources include no indication of a relationship between IIRO-Indonesia and Al Qaeda). | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 90, 129, 160, 161, and 165.<br><br>Finally, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to |

| | |
|---|---|
| | Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 243. IIRO-Indonesia was established in Jakarta, Indonesia, in 1990. Ex. 14, Wardi Decl. ¶ 2. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 244. IIRO-Indonesia's humanitarian efforts in Indonesia focused primarily on the provision of health clinics, orphanages, emergency relief programs, and Ramadan meals, as well as the construction of mosques and wells. Ex. 14, Wardi Decl. ¶ 5. | Undisputed as a general matter for purposes of this motion. *See also* Plaintiffs' response to No. 9. |
| 245. During the period of 1992-2001, IIRO-Indonesia operated and funded over ten orphanages, which served approximately 1,500 orphans. Ex. 14, Wardi Decl. ¶ 6. | Undisputed as a general matter for purposes of this motion. *See also* Plaintiffs' response to No. 230. |
| 246. IIRO-Indonesia entered into a Memorandum of Understanding with the Indonesian Ministry of Religious Affairs in 2002, which was charged with ensuring that IIRO (and other NGOs) did not provide support for any political or sectarian activities. Ex. 14, Wardi Decl. ¶ 12. | Disputed. Wardi's statement lacks foundational evidence. To the best of Plaintiffs' knowledge, the IIRO has not produced the cited Memorandum of Understanding.<br><br>Moreover, to the extent the IIRO is relying upon Wardi's new declaration testimony at Exhibit 14, the statement is disputed. *See* Plaintiffs' response to No. 168 (stating that (1) the January 12, 2023 Wardi Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) Plaintiffs have not been afforded an opportunity to cross-examine Wardi's new testimony in the Declaration; and (3) the Wardi Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony, including the Memorandum of Understanding). |
| 247. The IIRO-Indonesia office often cooperated with the Indonesian government in the provision of relief projects, and IIRO-Indonesia officials worked with the appropriate Indonesian government offices and cooperated with them on aid distribution. Ex. 14, Wardi Decl. ¶ 21 . | Disputed. Wardi's statement lacks foundational evidence.<br><br>Moreover, to the extent the IIRO is relying upon Wardi's new declaration testimony at Exhibit 14, the statement is disputed. *See* Plaintiffs' response to No. 168 (stating that (1) the January 12, 2023 Wardi Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) Plaintiffs have not been afforded an opportunity to cross-examine Wardi's new testimony in the Declaration; and (3) the Wardi Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 248. No allegations of terrorism or support of militants were ever made by the authorities in relation to the IIRO | Disputed. Wardi's statement lacks foundational evidence. |

| | |
|---|---|
| office in Indonesia since Faiz Wardi's tenure began in 1992. Ex. 14, Wardi Decl. ¶ 13. | Moreover, to the extent the IIRO is relying upon Wardi's new declaration testimony at Exhibit 14, the statement is disputed. *See* Plaintiffs' response to No. 168 (stating that (1) the January 12, 2023 Wardi Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) Plaintiffs have not been afforded an opportunity to cross-examine Wardi's new testimony in the Declaration; and (3) the Wardi Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 249. Faiz Wardi saw no evidence to support the notion that IIRO-Indonesia or its employees have helped militants, and no similar allegation has been brought to his attention regarding IIRO or its employees. Ex. 14, Wardi Decl. ¶ 16. | Disputed. Wardi's statement lacks foundational evidence.<br><br>Moreover, to the extent the IIRO is relying upon Wardi's new declaration testimony at Exhibit 14, the statement is disputed. *See* Plaintiffs' response to No. 168 (stating that (1) the January 12, 2023 Wardi Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) Plaintiffs have not been afforded an opportunity to cross-examine Wardi's new testimony in the Declaration; and (3) the Wardi Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 250. Faiz Wardi has personally experienced no legal issues with the Indonesian government since the office's closure; Faiz Wardi was neither interviewed nor arrested; and he can travel as he wishes, locally and internationally. Ex. 14, Wardi Decl. ¶ 23. | Disputed. Wardi's statement lacks foundational evidence.<br><br>Moreover, to the extent the IIRO is relying upon Wardi's new declaration testimony at Exhibit 14, the statement is disputed. *See* Plaintiffs' response to No. 168 (stating that (1) the January 12, 2023 Wardi Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) Plaintiffs have not been afforded an opportunity to cross-examine Wardi's new testimony in the Declaration; and (3) the Wardi Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 251. In 2006, the IIRO-Indonesia office was designated by OFAC. Additional Designation of Individuals and Entities Pursuant to Executive Order 13224, 71 Fed. Reg. 45599, 45600 (Aug. 9, 2006). | Undisputed as a general matter for purposes of this motion. *See also* Plaintiffs' response to Nos. 160 and 238. |
| 252. OFAC de-designated the IIRO-Indonesia office, effective August 16, 2016. Sanctions Actions Pursuant to Executive Order 13224, 81 Fed. Reg. 67431 (Sept. 30, 2016); Ex. 4, May 21, 2024 Basha Decl. ¶ 90. | It is not disputed that the IIRO-Indonesia office was de-designated by OFAC on August 16, 2016. However, to the extent the IIRO argues that the de-designation exonerates the IIRO-Indonesia office and its employees from any accountability for the extensive financial, material, and logistical support the IIRO provided to al Qaeda and associated terrorist organizations in the decade leading to the 9/11 attacks, that is disputed as inaccurate and misleading. *See* Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 132 ("The withdrawal of a designation of a person or entity under EO 13224 is a normal and natural part of the sanctions |

| | |
|---|---|
| | program, and has happened many times over the years, as it has with other U.S. sanctions programs. Sanctions are not intended to last forever, but only so long as the U.S. government considers them necessary to carry out the purpose of the sanctions. A withdrawal should never be considered an exoneration unless the U.S. government has publicly stated that the original listing was undertaken in error."); *id.* at 133 ("When it is no longer necessary for the U.S. government to sanction a person or entity under EO 13224 or any other sanctions program, it [lifts] the sanctions or delists the person or entity. The change of status does not imply any reconsideration of whether the sanctions were proper at the outset, let alone an exoneration. The delisting merely reflects changes in current conditions, making the sanctions of that person or entity no longer needed to fulfill the U.S. national security objectives that led to the original listing.").<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 253. The United Nations Security Council, the European Union, and the United Kingdom delisted the IIRO-Indonesia office in January 2014. Ex. 4, May 21, 2024 Basha Decl. ¶ 90. | It is not disputed that the IIRO-Indonesia office was delisted by the U.N. Security Council in January 2014. However, to the extent the IIRO argues that the U.N.'s delisting exonerates the IIRO-Indonesia office and its employees from any accountability for the extensive financial, material, and logistical support the IIRO provided to al Qaeda in the decade leading to the 9/11 attacks, that is disputed as inaccurate and misleading.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha |

| | |
|---|---|
| | Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 254. After the IIRO-Indonesia office's designation, IIRO investigated the publicly available allegations accompanying the 2006 designation. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 81-82. | It is not disputed that Basha testified the IIRO conducted an investigation following the August 3, 2006 designation of Mujil and the Philippines and Indonesia branch offices. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 276-277. |
| 255. For the investigation, IIRO reviewed internal records relating to IIRO-Indonesia, reviewed administrative files, financial statements, and other papers from the IIRO-Indonesia, and reviewed IIRO-Indonesia staff files. Ex. 22, Al-Turki Dep. Tr. at 280:15-281:14 (*Errata*); Ex. 25, Basha Dep. Tr. at 276:21-277:12; Ex. 4, May 21, 2024 Basha Decl. ¶ 82. | It is not disputed that Basha testified that the IIRO reviewed "the papers of all these offices," "the administrative and financial papers, and the files of the staff members who were working in these offices." *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 277.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 256. The IIRO investigation could not verify, or find any support for, the publicly available allegations concerning purported funding for or support to Al Qaeda or any other terrorist organization by IIRO-Indonesia. Ex. 4, May 21, 2024 Basha Decl. ¶ 83; see Ex. 25, Basha Dep. Tr. at 277:3-12; Ex. 22, Al-Turki Dep. Tr. at 280:15-281:14 (*Errata*). | It is not disputed that Basha testified that the IIRO's investigation concluded that "all of the procedures were sound for us," notwithstanding the fact that Basha and the IIRO determined that there were significant financial improprieties and irregularities occurring in the IIRO-Eastern Province branch office. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 277-278; *see also* Plaintiffs' response to No. 91. However, to the extent that the IIRO argues that its internal investigation could not verify allegations that that the IIRO-Philippines provided funding and other support to al Qaeda or other terrorist organizations, that is disputed.<br><br>Notably, the Saudi Ministry of Interior conducted its own investigation relating to the 2006 U.S. designation and allegations concerning the IIRO-Eastern Province branch, Abd al Hamid Sulaiman al Mujil, and the Philippines and Indonesia offices. *See* Ex. 70, U.S. Diplomatic Cable, *Terrorism Finance; Saudi Response of IIRO's Al-Mua'jjil Under 1267 Designation*, August 14, 2006, FED-PEC 220473-220474 at 220473. The IIRO-Eastern Province office was shut down and the Saudi government froze Mujil's bank account at |

| | |
|---|---|
| | Al Rajhi Bank. *Id.* Remarkably, Basha testified that he was unaware of the investigation conducted by the Ministry of Interior. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 277-278. The IIRO has never produced any documents relating to the IIRO's internal investigation and/or the investigation conducted by the Ministry of the Interior.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 257. As a result of the OFAC designations, no penalties or adverse action was taken by the local Indonesian authorities. Ex. 4, May 21, 2024 Basha Decl. ¶ 83 ("As a result of the OFAC designations, no penalties or adverse action was taken by the local authorities and the Indonesia and Philippines offices remained opened and operational."). | To the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 258. After the 2006 designation of IIRO-Indonesia by OFAC, the office remained open because the government did not order its closure. No interviews, investigations, or arrests were ordered by the Indonesian government after the 2006 OFAC designation. Ex. 14, Wardi Decl. ¶ 22. | To the extent the IIRO is relying upon Wardi's new declaration testimony at Exhibit 14, the statement is disputed. *See* Plaintiffs' response to No. 168 (stating that (1) the January 12, 2023 Wardi Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) Plaintiffs have not been afforded an opportunity to cross-examine Wardi's new testimony in the Declaration; and (3) the Wardi Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 259. IIRO-Indonesia continued operating after the OFAC designation and was not approached by Indonesian authorities concerning the allegations in the OFAC designations. Ex. 25, Basha Dep. Tr. at 276:21-277:17; Ex. 4, May 21, 2024 Basha Decl. ¶¶ 83-84. | To the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during |

| | |
|---|---|
| | or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 260. While IIRO-Indonesia continued to operate following the 2006 designations, it received two letters from high-ranking Indonesian officials in 2007, including from the Head of the Popular Shura Council in the Republic of Indonesia, indicating that since 1992 there have been no issues or allegations of impropriety against IIRO-Indonesia. Ex. 4, May 21, 2024 Basha Decl. ¶ 84; Ex. 60, Letter from Head of the Popular Shura Council in the Republic of Indonesia, IIRO35575. | To the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 261. The IIRO-Indonesia office closed in 2013. Ex. 14, Wardi Decl. ¶ 22. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 262. The office closed because the memorandum of understanding with the Indonesian government expired. Ex. 27, Harbi Dep. Tr. at 355:15-356:3. | Disputed. To the best of Plaintiffs' knowledge, the IIRO has not produced the cited Memorandum of Understanding. |
| 263. Audits of IIRO-Indonesia covering the years before and after 9/11 reveal no evidence of funding or support of Al Qaeda, its affiliates, or other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶ 68. | Disputed. *See, e.g.*, Plaintiffs' response to No. 238.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 Basha Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declaration was never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 264. Audits of IIRO-Indonesia for FY 2002-2003, FY 2003-2004, and FY 2005-2006 reveal no evidence of funding or support of Al Qaeda, its affiliates, or other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶ 68; Ex. 86, Independent Auditor's Report for year ending June 30, 2003, IIRO-34944-82; Ex. 50, IIRO-Indonesia Review Report Period From May 1, 2005 to July 31, 2006, IIRO- | Disputed. *See, e.g.*, Plaintiffs' response to No. 238.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 Basha Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha |

| | |
|---|---|
| 004057-69; Ex. 65, Internal Auditor's report for FY 2003-2004, IIRO158082 to IIRO158091. | Declaration was never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 265. The FY 2002-2003 IIRO-Indonesia audit shows some violations of IIRO protocols such as using single rather than double entries in accounting, recording receipts from Head Office in USD and not local currency, and failing to record currency differences. Ex. 66, FY 2002-2003 IIRO-Indonesia audit, IIRO 34989-35007. | Disputed. *See, e.g.*, Plaintiffs' response to No. 238. |
| 266. The FY 2003-2004 IIRO-Indonesia audit shows violations of IIRO protocols such as not attaching official exchange rates, not translating bills, and some missing signatures. *See e.g.*, Ex. 45, FY 2003-2004 IIRO-Indonesia audit, IIRO151720-39; Ex. 65, Internal Auditor's report for FY 2003-2004, IIRO158082-91. | Disputed. The 2003-2004 auditor's report discovered a number of financial improprieties and irregularities, more than the few cited by the IIRO in No. 266, including but not limited to (1) a failure to have an accounting protocol in place that complied with the procedures and protocols used by the IIRO General Secretariat and financial department; (2) a failure to explain and account for significant financial discrepancies, including a discrepancy of thousands of dollars relating to the IIRO-Eastern Province's account balance; and (3) a failure to inform the IIRO Secretariat General of any funds transferred directly from the IIRO-Eastern Province. Notably, these are the very same deficiencies detailed in the auditor's report at IIRO 34989-35007. |
| **<u>IIRO Eastern Province</u>** | No response necessary. |
| 267. IIRO maintained a branch office, the Eastern Province office ("IIRO-EP") in Dammam, Saudi Arabia. Ex. 4, May 21, 2024 Basha Decl. ¶ 63. | Undisputed as a general matter for purposes of this motion. |
| 268. Through the IIRO Head Office's routine financial and administrative processes, it was revealed that IIRO-EP implemented certain projects in foreign countries without prior approval from Head Office, which was a violation of protocol requiring local and foreign offices to provide the Head Office departments of programs, sponsorships and finances with reports on all field projects that the local and foreign offices implemented. Ex. 4, May 21, 2024 Basha Decl. ¶ 64. | Disputed. To the extent that IIRO argues that it discovered the financial improprieties and irregularities in the IIRO-Eastern Province branch office as a result of "routine financial and administrative processes," that is inaccurate and misleading. IIRO officials, including IIRO Secretary Basha, ordered a financial examination of the IIRO-Eastern Province as a result of growing concerns that the IIRO-Eastern Province was sending millions of dollars to overseas IIRO branch offices linked to al Qaeda and associated terrorist groups, and the money simply vanishing.<br><br>For instance, the IIRO's internal investigation of the IIRO-Eastern Province was directly related to the discovery that over $3 million it transferred to the IIRO-Pakistan branch office had gone missing and unaccounted for. *See, e.g.*, <u>Ex. 91</u>, International Islamic Relief Organization Pakistan Branch, |

| | |
|---|---|
| | Verification of Receipts and Payments for the Period From 1 January 1996 to 22 February 2001, IIRO 26468-26490 at 26478 (stating that "[t]he net unreported amount of US $3,071,659 is unaccounted for and represents the expenditure which was either not recorded and for which no vouchers and supporting documentation is available and/or the amounts have been misused or misappropriated locally"); Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 269 (confirming that Pakistan was one of the areas where the Eastern Province was carrying out these projects without informing the IIRO General Secretariat); Ex. 124, Meeting Minutes, Third Meeting of the IIRO's Executive Committee, March 8, 1999, IIRO 287007-287013 at 287010 (stating that IIRO-Eastern Province was financing a number of projects "without the Secretariat General knowing about it.").<br><br>The IIRO-Pakistan branch office is the same branch office that was used by the IIRO to fund 6 al Qaeda training camps, according to the 1996 CIA Report. *See* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001").<br><br>The investigation of the IIRO-Eastern Province was also prompted following the discovery of significant financial improprieties and irregularities in the IIRO-Philippines office in 1998, another IIRO overseas office directly linked to al Qaeda and supervised and funded by the IIRO-Eastern Province branch. *See* Ex. 109, Report on the Visit of the Supervisor of the Social Care Department to the Philippines Between July 19-25, 1998, IIRO 111421-111431. The report describes the lack of financial controls by the IIRO-Philippines branch office with respect to the distribution of financial aid to orphans in the Philippines, and determined *inter alia* that: (1) there was no prior preparation for the distribution of the orphans' allowances; (2) the IIRO-Philippines office failed to carry out the instructions of the Social Care Department to form a committee for the distribution of the allowances to the orphans; (3) the orphans' allowances were distributed "without scrutiny or control;" (4) orphan files were incomplete and lacked the required documentation; (5) records at the IIRO's Social Care Department in Saudi Arabia indicated there were 80 male and female orphans at a certain orphanage, but it was determined there were really only 22 female orphans |

| | |
|---|---|
| | and 23 male orphans; and (6) certain orphans did not receive financial assistance despite the fact that IIRO headquarters had sent the funds earlier in the year. *Id.*<br><br>Around this same time, an audit of the IIRO-Jordan branch office found similar financial improprieties and irregularities occurring in that office, again linked to the IIRO-Eastern Province branch office. *See* Ex. 185, IIRO 287559-287561. For instance, the audit revealed (1) "violations of the financial regulations and instructions such as the use of personal accounts and checks for the payment of projects and programs there;" (2) "a procedural defect in the flow of funds from the local organization's office in the eastern region to implement the organization's projects that are overseen by the organization's office in Jordan;" (3) "a lack of clarity in the mechanism of project and program implementation;" and (4) "the absence of oversight of these projects and programs by the organization's office in Jordan." *Id.* at IIRO 287560.<br><br>*See also* Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 67-77 (discussing the implications of financial improprieties and irregularities discovered in the audits and financial documents of the IIRO, and how they indicate conditions that made it possible for IIRO officials and employees to direct IIRO funds and resources to support al Qaeda, Islamic jihad, and terrorism).<br><br>By way of further response, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 269. After identifying these violations, the Head Office warned the individuals involved and insisted that IIRO-EP seek prior approval as required by IIRO protocols. Ex. 4, May 21, 2024 Basha Decl. ¶ 64. | Disputed. *See, e.g.*, Plaintiffs' response to No. 91.<br><br>By way of further response, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been |

| | |
|---|---|
| | afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 270. IIRO also commissioned external accountants to review IIRO-EP's operations, and they concluded that IIRO-EP was implementing and funding foreign projects without IIRO Head Office's prior approval, and that, in some circumstances, IIRO-EP failed to comply with various IIRO financial regulations, including that the foreign office receive funds from the Head Office and the requirement that the transactions be accompanied by all supporting documentation. Ex. 4, May 21, 2024 Basha Decl. ¶ 66. | Disputed. *See, e.g.*, Plaintiffs' response to No. 91.<br><br>By way of further response, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 271. There is no evidence that the instances of non-compliance by IIRO-EP with Head Office protocols resulted in IIRO funds being diverted to Al Qaeda. Ex. 4, May 21, 2024 Basha Decl. ¶ 67. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 90 and 91.<br><br>By way of further response, Basha confirmed during his deposition testimony that the auditing team investigating the IIRO-Eastern Province had prepared a written report with their findings. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 273-274. According to Basha, the auditor's report was also provided to MWL Secretary General Abdullah bin Abdul Mohsin al Turki. *Id.* at 274-275. Neither the MWL nor the IIRO produced the audit in discovery, and the auditor's conclusions cannot be verified.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 272. Neither Adnan Basha nor IIRO has knowledge of any evidence that IIRO-EP funded or supported Al Qaeda, | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 90, 94, and 95. |

| | |
|---|---|
| its affiliates, or other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶ 67. | By way of further response, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 273. The investigation by the external accountants into IIRO-EP's operations did not reveal any evidence that the identified instances of non-compliance with Head Office protocols resulted in funds being diverted to Al Qaeda, its affiliates, or other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶ 66. | Disputed. The IIRO's claim that an audit did not reveal any evidence that the identified instances of non-compliance with Head Office protocols resulted in funds being diverted to Al Qaeda or other terror groups is inaccurate and misleading. During his deposition testimony, Basha confirmed that the auditing team investigating the IIRO-Eastern Province had prepared a written report with their findings. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 273-274. According to Basha, the auditor's report was also provided to MWL Secretary General Abdullah bin Abdul Mohsin al Turki. *Id.* at 274-275. Neither the MWL nor the IIRO produced the audit in discovery, and the auditor's conclusions cannot be verified.<br><br>By way of further response, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 274. An IIRO internal audit of IIRO-EP, concluded that IIRO-EP acted independently without the IIRO Secretariat General's knowledge and in violation of IIRO's administrative and financial regulations by implementing projects abroad. Expert Report of John Barron ("Barron Rpt.") (ECF No. 9250-21) ¶¶ 41.2, 41.2.2; Ex. 25, Basha Dep. Tr. at 268:3-23, 271:24-273:8 (*Errata*). | Disputed. The IIRO's claim that an audit concluded that the IIRO-Eastern Province branch office acted independently without the IIRO Secretariat General's knowledge and in violation of IIRO's administrative and financial regulations by implementing projects abroad, is inaccurate and misleading. During his deposition testimony, Basha confirmed that the auditing team investigating the IIRO-Eastern Province had prepared a written report with their findings. *See* Ex. 27, |

| | |
|---|---|
| | Transcript, February 21, 2019 Deposition of Adnan Basha at 273-274. According to Basha, the auditor's report was also provided to MWL Secretary General Abdullah bin Abdul Mohsin al Turki. *Id.* at 274-275. Neither the MWL nor the IIRO produced the audit in discovery, and the auditor's conclusions cannot be verified. |
| 275. IIRO-EP wanted to implement projects quickly to please donors and to avoid IIRO directives and regulations, which IIRO-EP considered bureaucratic and slow. Ex. 25, Basha Dep. Tr. at 265:21-267:5. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 90, 91, 94, 95, 157, and 268. |
| 276. Prince Turki bin Fahad bin Jiluwi refused to comply with IIRO directives and to implement auditor recommendations. He therefore resigned from his position as Regional Supervisor, which resignation became effective on June 29, 2023. Ex. 25, Basha Dep. Tr. at 268:3- 23, 271:24-273:8 (*Errata*); Ex. 64, Administrative Decision No. 5 dated 28/6/1424 AH, IIRO 287391; Ex. 4, May 21, 2024 Basha Decl. ¶¶ 63, 75. | Undisputed as a general matter for purposes of this motion. |
| 277. Had Prince Turki bin Fahad bin Jiluwi not resigned, Adnan Basha would have terminated Prince Turki bin Fahad bin Jiluwi's employment. Ex. 4, May 21, 2024 Basha Decl. ¶ 63. | Disputed. Neither the IIRO nor Basha have provided any evidence confirming that Basha (a non-royal) had the authority to terminate the employment of a Saudi prince and member of the royal family.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 278. Abdul Hamid al-Mujil was assigned as the office's Acting Director after Prince Turki Bin Jalawi's departure. Ex. 4, May 21, 2024 Basha Decl. ¶ 63. | Undisputed as a general matter for purposes of this motion. |
| 279. An audit concluded that Abdul Hamid al-Mujil had no role in IIRO-EP's violations of IIRO regulations that occurred under former Regional Supervisor Prince Turki bin Fahad bin Jiluwi. Ex. 25, Basha Dep. Tr. at 273:15-274:1. | Disputed. To the extent that the IIRO argues that Mujil was cleared of any wrongdoing during his tenure with the IIRO-Eastern Province branch office, that is inaccurate and misleading. During his deposition testimony, Basha confirmed that the auditing team investigating the IIRO-Eastern Province had prepared a written report with their findings, allegedly including an assessment that Mujil "did not have any role in |

| | |
|---|---|
| | these violations." *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 273-274. According to Basha, the auditor's report was also provided to MWL Secretary General Abdullah bin Abdul Mohsin al Turki. Id. at 274-275. Neither the MWL nor the IIRO produced the audit in discovery, and the auditor's conclusions cannot be verified. |
| **IIRO in the Balkans (IIRO-Sarajevo and IIRO-Kosovo)** | No response necessary. |
| 280. The Sarajevo office of the IIRO was established in December 1992, as were many other IIRO offices in the Balkans region. Ex. 29, Al-Shorman Decl. ¶ 2. | Undisputed as a general matter for purposes of this motion.<br><br>By way of further response, the April 6, 2026 Abdulrauf Khalaf al Shorman Declaration, attached as Exhibit 29 to the IIRO's April 15, 2026 Motion for Summary Judgment, was never produced to Plaintiffs during the discovery phase of the litigation, and was never produced to Plaintiffs during or after Shorman's June 20-21, 2019 deposition. Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony, which appears to be inconsistent with his prior deposition testimony. Moreover, Shorman's Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony. Plaintiffs respectfully submit that the IIRO has submitted the Shorman Declaration in bad faith. |
| 281. The offices in the region operated under a Balkans Regional Office. Ex. 29, Al- Shorman Decl. ¶¶ 7, 10, 12. | To the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29 the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during or after Shorman's June 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) ) the Shorman Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Shorman did not identify or provide any testimony concerning a "Balkans Regional Office" during his June 20-21, 2019 deposition. |
| 282. IIRO's humanitarian efforts in the Balkans focused primarily on orphan sponsorships and general aid distribution, such as food, clothing, and medicinal supplies, both in refugee camps and to the general public. Ex. 29, Al-Shorman Decl. ¶ 5. | Undisputed as a general matter for purposes of this motion. *See also* Plaintiffs' response to No. 9. |
| 283. IIRO-Sarajevo generally distributed in kind aid, except for orphan sponsorships of 50 Marks per person per month (approximately 30 US Dollars at the time). For ease | To the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29 the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, |

| | |
|---|---|
| of aid distribution, it was done from central locations, such as mosques, city halls, schools or even directly out of the warehouses. Ex. 29, Al-Shorman Decl. ¶ 6. | 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during or after Shorman's June 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) ) the Shorman Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Shorman did not provide any testimony concerning the payment of 50 Marks per person and/or orphan during his June 20-21, 2019 deposition. Shorman testified generally about financial aid, health care, education, and money cards, but never testified about the amounts of money provided to orphans. Moreover, per the directives from the IIRO headquarters, the IIRO-Sarajevo office was not permitted to keep more than 200 Marks in the office. *See* Ex. 110, IIRO115124-11525. |
| 284. In April 1992, war broke out in Sarajevo and left the city under siege, cut off from the outside world. Ex. 30, Al-Shorman Dep. Tr. at 312:22-313:17; Ex. 29, Al-Shorman Decl. ¶ 10. | Undisputed as a general matter for purposes of this motion. |
| 285. During the conflict, access to resources including food, water, and electricity in the city of Sarajevo was frequently interrupted and the city was subject to regular bombing. Ex. 30, Al-Shorman Dep. Tr. at 311:19-312:13, 312:22-313:2. | Undisputed as a general matter for purposes of this motion. |
| 286. People in Sarajevo had limited contact with those outside of Sarajevo during the siege. Ex. 30, Al-Shorman Dep. Tr. at 352:15-22. | Undisputed as a general matter for purposes of this motion. |
| 287. Travelling to and/or sending goods to Sarajevo was impossible at the beginning of the war because the "siege was from all directions." Ex. 30, Al-Shorman Dep. Tr. at 313:3-8. | Undisputed as a general matter for purposes of this motion. |
| 288. Throughout the war, travel within Sarajevo was difficult and limited because one attempting travel could "face the snipers or bombs." Ex. 30, Al-Shorman Dep. Tr. at 315:10-15. | Undisputed as a general matter for purposes of this motion. |
| 289. The siege made it extremely difficult to receive aid to distribute, as well as to communicate with the outside world, including with the Balkans Regional Office and its Supervisor and IIRO Head Office. Ex. 29, Al-Shorman Decl. ¶ 10. | Disputed. *See, e.g.*, Plaintiffs' response to No. 281. |

| | |
|---|---|
| 290. Since the Serbian forces almost completely surrounded the city of Sarajevo during the war, aid was either brought in through a humanitarian tunnel or by the United Nations. Ex. 29, Al-Shorman Decl. ¶ 5. | To the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29 the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during or after Shorman's June 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) ) the Shorman Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 291. The practical realities of aid distribution during wartime meant that at times certain Head Office protocols were impossible to follow. For example, when electricity was cut off in besieged Sarajevo, the employees could not use the office's computers to prepare or back up financial reports to the Head Office. Ex. 29, Al-Shorman Decl. ¶ 11; Ex. 30, Al-Shorman Dep. Tr. at 126:2-15. See also *id.* at 352:1-22 (*Errata*) (testifying that the siege of Sarajevo prevented IIRO-Sarajevo from coordinating with other IIRO operations in Bosnia-Herzegovina). | To the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29 the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during or after Shorman's June 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) ) the Shorman Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 292. That such protocols were not followed at all times reflects the reality of relief work in war-torn countries. Ex. 29, Al-Shorman Decl. ¶ 11; see also Expert Report of Jonathan Benthall On Behalf of Yassin Abdullah Kadi ("Benthall Rpt.") (ECF No. 7351-2) at 27 (Among the "practical management challenges faced by diversified international NGOs" which "operated in numerous countries, and carried out a wide variety of humanitarian services" was that "[c]ommunications were particularly challenging in war zones," and "any organization working with [so] many offices, and in [so] many countries…in the early and mid-1990s would have had difficulty in maintaining full control of its finances and operations."). | To the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29 the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during or after Shorman's June 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) ) the Shorman Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 293. After the siege ended, however, IIRO-Sarajevo was able to resume normal communications with the Head Office, the Balkans Regional Office, as well as with other local operations both in Bosnia and in neighboring countries. Ex. 29, Al-Shorman Decl. ¶ 10. | To the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29 the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during or after Shorman's June 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and |

| | |
|---|---|
| | (4) fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 294. IIRO-Sarajevo maintained a great relationship with the Bosnian government and worked closely with the Ministry of Social Welfare and Displaced Persons and Refugees ("Ministry of Social Welfare") during Abderraouf Khalaf Al Shorman's time with the organization. The Bosnian government always welcomed IIRO's operations in Sarajevo, especially during the war when it routinely asked for humanitarian assistance. IIRO-Sarajevo would provide aid after receiving the approval and the funds or items from the Head Office, sometimes distributing it with the help of the Bosnian Ministry of Social Welfare. After the war, IIRO-Sarajevo received the Golden Shield award from the Bosnian government for its role in serving the people of Bosnia during the war. Ex. 29, Al-Shorman Decl. ¶¶ 13-14. | Disputed. The IIRO's claim that the IIRO-Sarajevo branch office maintained a great relationship with the Bosnian government is inaccurate and misleading.<br><br>By way of further response, the IIRO and its leadership in the Balkans were the targets of government investigations linked to criminal and terrorist activities since the early 1990s, particularly during the Bosnian War. For instance, Dr. Farid Qurashi, IIRO's general supervisor," publicly boasted that the "IIRO was the first relief organization to enter Bosnia-Herzegovina and the Balkan region. From the very beginning of the Bosnia war, we were there to help." *See* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at 28. According to the Bosnian Muslim Army's Military Intelligence Service, IIRO's employees seemed to oddly "fluctuate…in and out of the humanitarian organization. They successively communicate with the members of the squad 'El-Mudzahidin' (Tesanj) and are the bearers of a so-called Pan-Arabian idea….They tend to change traditional living and religious norms of behavior of Bosnians-Moslems. This culminates through various reactions and confrontations, fights within the community." *Id.* at 28.<br><br>Former American mujahideen recruit Randall Todd Royer (a.k.a. Ismail Royer), who participated in the Bosnian jihad, acknowledged that IIRO's reputation was "well-known" in the Balkans: "it was well known that they helped get 'people' into Bosnia." Royer explained that another mujahideen fighter in Zenica had openly discussed his efforts to use IIRO in order to obtain identity cards for fellow jihadis. *Id.* at 28-29. Guantanamo Bay detainee Mustafa Ait Idr, a member of an Algerian Armed Islamic Group ("GIA") and a participant in an al Qaeda linked plot to attack the U.S. Embassy in Sarajevo, arrived in Split, Croatia to participate in the Bosnian War in 1993 under the cover of employment with the IIRO. *See* Ex. 47, JTF-GTMO Detainee Assessment, Mustafa Ait Idr, June 30, 2008, FED-PEC 197535-197548 at 197537 ("The Islamic World Relief Organization, aka (International Islamic Relief Organization (IIRO)) is a NIPF CT Priority 2 Terrorist Support Entity (TSE). Priority 2 TSEs have demonstrated sustained and active financial support for terrorist organizations willing to attack US persons or interests, or provide witting operational support to Priority 2 terrorist groups."); *id.* at 12 ("The IIRO was known to support extremist/terrorist groups in the Balkans from 1992 to 1996.").<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 89 (Former American mujahideen recruit |

| | |
|---|---|
| | Randall Todd Royer, who participated in the Bosnian jihad, acknowledged that the IIRO's reputation was "well-known" in the Balkans and IIRO provided identification cards to jihadists.).<br><br>A U.N. Security Council report noted that, in the summer of 1992, "troops from Saudi Arabia allegedly killed three Serbian Territorial Defence members and placed the victims' severed heads on poles near the 'Tesanj turret.'" *See* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at 29. In September 1992, Balkan press agencies published photos depicting the severed heads of Serb soldiers killed by foreign mujahideen collected in boxes. The photos had been seized from the belongings of fallen Saudi Arabian nationals fighting with local Muslim forces in July and August near Tesanj. Also confiscated alongside the images were business cards for companies in the Persian Gulf and an IIRO humanitarian worker identification card. The recovered card was labeled with the name and photo of "Khalil Abdel Aziz," a teacher from Saudi Arabia, and indicated that it had been printed by the Peshawar, Pakistan office of the IIRO. The discovery of the identification card in Bosnia was no coincidence: until he moved to Europe in the early 1990s, the Egyptian Islamic radical Abu Talal al-Qasimy had personally been in charge of the very same IIRO issuing office in Peshawar. *Id.*<br><br>*See also* Ex. 176, Transcript, International Criminal Tribunal for the Former Yugoslavia, Testimony of Ajman Awad, February 8, 2008, PEC-KSA 4364-4439 (Awad testified that he went to Bosnia-Herzegovina in December 1992 intending to fight on the side of Bosnian Muslims. To do so, Awad states that he joined Muwafaq: "In late 1992, I joined the Mowafaq Foundation, humanitarian organisation, and that is the organisation I was a member of when I entered Bosnia and Herzegovina." Awad further testified that there were several "humanitarian organizations" he was working with in Rijeka in 1992, including IGASA [International Islamic Relief Organization].").<br><br>By mid-1993, the operations of the IIRO in Bosnia-Herzegovina were under the primary oversight of a Palestinian national known as Abdelaziz Zaher (a/k/a Abu Anas, Abu Enes), and his deputy, an Algerian national, Djamel Lamrani (a/k/a Abu Musab al Djazairi). Zaher, the supervisor of the IIRO's offices in Bosnia-Herzegovina, Croatia, and Slovenia, also served as the chairman of a coordination council established by the IIRO and approximately twenty organizations to prevent conflicts and duplication in the work intended to serve immigrants and Muslims in Bosnia. *See* Ex. 89, IIRO 13287-13292. *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at 29. Zaher was |

| | |
|---|---|
| | expelled from his former residence in Belgrade at the beginning of 1993 after being tied by Serbian authorities to various organizations suspected of aiding armed fundamentalist militant groups, including the IIRO. *Id.* Zaher's top lieutenant at the IIRO, Jamal Al-Jibouri, was personally responsible for oversight of a massive logistical operation to provide al Qaeda and al Qaeda affiliated Islamic militants in the Balkans with weapons and ammunition. *See* MDL ECF No. 3463-1 at ¶ 411.<br><br>One of the IIRO's initial management team in Vienna in 1992, Sukarno Ali Hassanein (brother of Third World Relief Agency ["TWRA"] chief El Fatih Hassanein, recalled during an interview with Austrian police, "I know him as Zaher Abdelaziz, [he] works for IGASA/IIRO. He might be the boss for Vienna or Zagreb. He is one of our successors at IGASA." As to what he mean by successors, Sukarno explained "we haven't been representing this organization for a year and half already since the Main Office in Saudi Arabia sent their own people to Vienna." *Id.* at 29-20.<br><br>While working for the IIRO, Zaher participated in the 1994 murder of British aid worker Paul Goodall near Zenica—acknowledged by the Bosnian Muslim Army at the time as "one of the most serious incidents caused by members of the [El-Mujahidin] unit." *Id.* at 30. Two days following the murder, Bosnian police arrested Saudi national Abdul Hadi al Qahtani, Abdu Khulud al Yemeni and Abu Enes (a/k/a IIRO chief Abdelaziz Zaher). At the time of his arrest, al Qahtani was carrying an identification card issued by the Zenica office of the Saudi High Commission. *Id.* at 30-31. Following the arrest of the three men, Dr. Abdul Harith al Liby, deputy commander of the mujahideen, sent a letter to "authorized individuals" in the Bosnia-Herzegovina Military Police and security services requesting the release of the two "mujahideen" arrested alongside al Qahtani. Al Liby's letter identified both "Abu Enes" (Zaher) and al Qahtani interchangeably as "mujahideen" and as "employees" of "IGASE" (IIRO), who were detained by authorities while traveling in an IIRO employee-owned vehicle. *Id.* at 31.<br><br>During his deposition, Shorman confirmed that Zaher "was the supervisor" of IIRO's offices in Bosnia-Herzegovina, Croatia, and Slovenia: "The offices of the IIRO, yes." *See* Ex. 25, Transcript, June 21, 2019 Deposition of Abderraouf Khalaf al Shorman at 229. Shorman also confirmed that Zaher was known to him by his pseudonym Abu Anas: "Yes, of course. It's a name, it's a nickname, because his son is Anas, so he is Abu Anas, father of Anas." *Id.* at 269. Shorman testified that "the first time I saw him, in his first visit to Sarajevo in 1994, back then I was an employee with the orphans." Shorman also |

| | |
|---|---|
| | recalled meeting Zaher on two separate occasions, "[p]robably '95 or even '94, same year…. He visited the office and he came to greet the employees…. He was the executive director of the offices." *Id.* at 270-271.<br><br>Shorman also confirmed that Zaher's associate Djamel Lamrani had served as the "orphans coordinator" at IIRO's office in Split, Croatia. *Id.* at 272.<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 90-99 (discussing IIRO's connections to Abdelaziz Zaher, Djamel Lamrani, and the deposition testimony of Abdulrauf Khalaf al Shorman).<br><br>International law enforcement and intelligence investigations of the IIRO's operations in the Balkans continued. In April 1995, "the regional financial accountant for the IIRO, an Egyptian named Hossam Meawad Mohammad Ali, was detained by Croatian authorities in a raid in Zagreb" for his involvement in alleged criminal activity. *See* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972.<br><br>Following the 9/11 attacks, the IIRO continued to be the target of Bosnian government investigations relating to terrorism. In 2002, the Bosnian government, with the assistance of the U.S., was investigating the IIRO and other purported charitable organizations in that country (referred to as "Bosnia's Dirty Dozen") for "providing financial support to known terrorist organizations," including the Al Haramain Islamic Foundation, Saudi High Commission, Benevolence International Foundation, Al Haramain al Masjed al Aqsa, and others. *See* Ex. 148, U.S. Diplomatic Cable, *Terrorist Finance: Bosnia's Dirty Dozen*, November 2002, PECFOIA0004499-4503 at 4500. *See also* Ex. 25, Transcript, June 21, 2019 Deposition of Abderraouf Khalaf al Shorman at 289-290 (confirming that the IIRO and other charitable organizations were under investigation).<br><br>In 2003, the Bosnia government arrested nine Bosnian Serbs for smuggling weapons to the IIRO in Bosnia-Herzegovina. *See* Ex. 149, U.S. Diplomatic Cable, *Terrorist Finance: Dirty Dozen's Web of Deceit*, August 2003, PECFOIA049927-49932.<br><br>As part of those investigations, the Bosnian government's Financial Police conducted an audit of the IIRO-Sarajevo office and discovered financial irregularities and deficiencies occurring in that office. The Bosnian Financial Police's May 27, 2002 report indicates that for the period from January 1, 1996 to December 31, 1998, "there were no business books |

| | |
|---|---|
| | prescribed by the Law on Accounting, including "general ledger, journal, and analytic entries, cashier and other auxiliary books." *See* Ex. 62, FED-PEC 212644-212646 at 212645-212646. The Financial Police also found that The IIRO "has not been balancing bookkeeping positions of assets and liabilities and the sources of the funds" … "did not have documentation available with reference to the securing and acquisition of financial funds, nor the records about its use for the period of 1996, 1997, and 1998" … and "has not been preparing annual and semi-annual accounting statements and financial reports." *Id.* at 212646.<br><br>A further report by the Bosnian Financial Police, issued on July 25, 2002, revealed the following: "In the course of supervision and researches of disposing documents and records of business legality and the way of obtaining and spending money means by the [IIRO], it was found that it did not have constituted Business books prescribed by the Law of Accountancy … and it did not contain annual, half annual accountancy reports i.e. financial reports (balance of statement and balance of success) for the period in which the supervision and research works were done … and it did not have documents concerning to obtaining and providing financial means as well as records of their spending, the could be the basis for establishing the sources from which the [IIRO] provided money means…." *See* Ex. 117, IIRO 270967-2701042 at 270970.<br><br>Additional audits of the IIRO-Pakistan, IIRO-Eastern Province, IIRO-Philippines, IIRO-Indonesia., and IIRO-Jordan branch offices similarly discovered serious financial improprieties and irregularities. *See* Plaintiffs' responses to Nos. 91, 230, 238, 268, and 335.<br><br>Plaintiffs' experts have concluded that the financial improprieties and irregularities documented in the audits demonstrate that conditions within the IIRO and its branches were ideal for individuals to direct massive amounts of IIRO funds and resources to Osama bin Laden, al Qaeda, and their terrorist activities. *See* Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 77 ("I conclude that the financial improprieties and irregularities documented in the limited number of audits and financial documents of IIRO that have been made available to me reflect conditions within IIRO that made it possible for persons within IIRO, as well as others such as Julaidan to misdirect IIRO resources to support Islamic jihad, al Qaeda, and terrorism. This support included the funding of Islamic fighters in prominent zones of conflict such as Afghanistan, Bosnia, and Chechnya, as well as in lesser-known conflicts between Islamic resistance groups and terrorists against secular governments, such as in Indonesia, |

| | |
|---|---|
| | the Philippines, and Thailand, and in areas of complex armed conflict between Muslims and non-Muslims such as Lebanon, Palestine, and Sudan, as well as elsewhere.”).<br><br>*See* Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 67-77 (discussing the implications of financial improprieties and irregularities discovered in the audits and financial documents of the IIRO, and how they indicate conditions that made it possible for IIRO officials and employees to direct IIRO funds and resources to support al Qaeda, Islamic jihad, and terrorism).<br><br>Finally, to the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29 the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during or after Shorman's June 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Shorman Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 295. The Sarajevo office was always keen on meeting the standards set by Bosnian law and never had any negative encounters with Bosnian officials. IIRO-Sarajevo always complied with the registration requirements in Bosnia, as was mandated by IIRO Head Office. Ex. 29, Al-Shorman Decl. ¶¶ 13, 15. | Disputed. *See, e.g.*, Plaintiffs' response to No. 294.<br><br>Moreover, to the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29 the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during or after Shorman's June 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Shorman Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 296. By 1996, charitable organizations in Bosnia were required to submit requests to the Ministry of Social Welfare in order to receive permits for their various projects. After the implementation of the projects, charitable organizations were also required to submit a report on the projects implemented. IIRO-Sarajevo complied with these requirements on a consistent basis. Ex. 29, Al-Shorman Decl. ¶ 16. | Disputed. *See, e.g.*, Plaintiffs' response to No. 294.<br><br>Moreover, to the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29 the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during or after Shorman's June 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine |

| | |
|---|---|
| | Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Shorman Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 297. In addition to requiring the submission of reports, the Ministry of Social Welfare's Department of Control and Inspection also made surprise visits to the offices of NGOs. The surprise visits were random, but routine, and the information that was requested concerned whether organizations were complying with the laws requiring employers to provide benefits to their employees. IIRO was visited in 2000, 2001 and 2002 and always found in compliance. Ex. 29, Al- Shorman Decl. ¶ 17. | Disputed. *See, e.g.*, Plaintiffs' response to No. 294.<br><br>Moreover, to the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29 the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during or after Shorman's June 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Shorman Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 298. IIRO-Sarajevo also cooperated with the Ministry of Health on healthcare projects in the late 1990s and early 2000s. Ex. 29, Al-Shorman Decl. ¶ 18. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 299. IIRO-Sarajevo and the Bosnian Ministry of Health entered into an agreement regarding a medical center in the mid-90s, whereby the government would provide the facilities and the salaries of the doctors and nurses, and IIRO-Sarajevo would provide the necessary equipment and medicinal supplies. This center offered many services, including in the specialties of ophthalmology, dentistry, internal medicine, pediatrics, and obstetrics and gynecology. Ex. 29, Al-Shorman Decl. ¶ 18. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 300. IIRO-Sarajevo enjoyed a very strong regional reputation and a great working relationship with the Bosnian government. The Bosnian government repeatedly reached out to IIRO-Sarajevo for assistance before and after the 9/11 attacks. Ex. 29, Al-Shorman Decl. ¶ 19. | Disputed. *See, e.g.*, Plaintiffs' response to No. 294. |
| 301. No IIRO-Sarajevo employee was ever arrested during their employment for any reason, be it for suspicion of terrorism or otherwise. Ex. 29, Al-Shorman Decl. ¶ 13. | Disputed. *See, e.g.*, Plaintiffs' response to No. 294.<br><br>Moreover, to the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29 the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during |

| | |
|---|---|
| | or after Shorman's June 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Shorman Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 302. The IIRO-Sarajevo office did not provide any assistance to the Arab foreign fighters—or to any fighters—engaged in the Bosnian conflict. Ex. 29, Al-Shorman Decl. ¶ 24. | Disputed. *See, e.g.*, Plaintiffs' response to No. 294.<br><br>Moreover, to the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29 the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during or after Shorman's June 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Shorman Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 303. To Abderraouf Khalaf Al Shorman's knowledge, no other IIRO Balkans office provided any assistance to Arab foreign fighters—or to any fighters—engaged in the Bosnian conflict. Ex. 29, Al-Shorman Decl. ¶ 24. | Disputed. *See, e.g.*, Plaintiffs' response to No. 294.<br><br>Moreover, to the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29 the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during or after Shorman's June 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 304. There is no evidence to support the claim that IIRO helped mujahideen enter Bosnia by paying for transportation and lodging or by masking them as its "employees." In fact, IIRO did not cover these expenses even for its own employees during this time. Ex. 29, Al-Shorman Decl. ¶ 24. | Disputed. *See, e.g.*, Plaintiffs' response to No. 294.<br><br>Moreover, to the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29 the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during or after Shorman's June 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony |

| | |
|---|---|
| | in 2019; and (4) the Shorman Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 305. If there had been such an attempt to bring in fighters as "employees," it would have been an issue raised by the local authorities to the IIRO-Sarajevo office. During my tenure, the government raised no such concerns. Ex. 29, Al-Shorman Decl. ¶ 24. | Disputed. *See, e.g.*, Plaintiffs' response to No. 294.<br><br>Moreover, to the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29 the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during or after Shorman's June 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Shorman Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 306. At no time did the IIRO-Sarajevo office: (1) transport, or assist in the transport of, Al-Qaeda members whether in vehicles bearing the United Nations High Commissioner for Refugees license plates or otherwise; (2) engage in or assist in weapons smuggling into Bosnia; (3) provide employment for mujahideen or Al Qaeda members; (4) provide identification cards for mujahadeen or Al Qaeda members; or (5) support Maktab al-Khidamat. Nor is Abderraouf Khalaf Al Shorman aware of any other IIRO-Balkans office or employee having done so. Ex. 29, Al- Shorman Decl. ¶ 25. | Disputed. *See, e.g.*, Plaintiffs' response to No. 294.<br><br>Moreover, to the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29 the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during or after Shorman's June 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Shorman Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 307. Abderraouf Khalaf Al Shorman is unaware of MWL having any activities in Bosnia during the war. Ex. 29, Al-Shorman Decl. ¶ 23. | To the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29 the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during or after Shorman's June 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Shorman Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |

| | |
|---|---|
| 308. Neither the MWL nor IIRO had contacts with Arabs who went to fight in Bosnia. Ex. 23, Obaid Dep. Tr. at 268:23-270:7 (*Errata*). | Disputed. *See, e.g.*, Plaintiffs' response to No. 294. |
| 309. The Federation of Bosnia and Herzegovina Ministry of Finance financial police undertook an investigation into a transfer of 80,000 German marks from IIRO to a Sarajevo bank account. Ex. 30, Al-Shorman Dep. Tr. at 284:17-285:16 (*Errata*). | Undisputed as a general matter for purposes of this motion. |
| 310. This transfer was reportedly in connection with the purchase of a Jeep. Ex. 30, Al- Shorman Dep. Tr. at 284:17-285:16 (*Errata*). | Undisputed as a general matter for purposes of this motion. |
| 311. The Bosnian financial police visited IIRO's office in Sarajevo to discuss a person of interest related to the Jeep investigation. Ex. 30, Al-Shorman Dep. Tr. at 285:2-16 (*Errata*). | Undisputed as a general matter for purposes of this motion. |
| 312. Representatives from IIRO's Sarajevo office told the financial police that IIRO was not involved in nor aware of the transfer. Ex. 30, Al-Shorman Dep. Tr. at 285:13-16 (*Errata*). | Undisputed as a general matter for purposes of this motion.<br><br>By way of further response, upon learning of the Federation Financial Police's investigation in November 2001, the IIRO conducted an internal investigation concerning the IIRO-Eastern Province office and the transfer of 83,000 Deutsche Mark from the IIRO's office in Kosovo in the name of Ali Meisar to purchase a Jeep, and deposited into the MEB Bank in Sarajevo for Zayed Alaqi. That internal investigation raised concerns of financial improprieties and irregularities.<br><br>Pursuant to the investigation, it was discovered that the IIRO-Kosovo office did not have financial or other records documenting the transfer of 83,000 Deutsche for the purchase of a jeep, Ali Meisar had only worked at the IIRO-Kosovo office for a short time, and IIRO-Kosovo did not know anything about the recipient of the funds, Zayed Alaqi. *See* Ex. 106, IIRO 97328-97330. Moreover, the IIRO determined that statements made by the IIRO manager in Bosnia-Herzegovina were contradicted by the Criminal Policy investigation. *Id.* It is unclear what actions were taken by the IIRO as a result of that investigation. |
| 313. Plaintiffs rely on a document to assert that nine Bosnian Serbs were arrested in July 2003 for allegedly smuggling weapons to IIRO. Kohlmann Rpt. ¶ 101; Ex. 30, Al-Shorman Dep. Tr. at 334:5-21. | It is not disputed that a U.S. State Department cable states that "[p]olice arrested 9 Bosnian Serbs in July 2003 for allegedly smuggling weapons to the International Islamic Relief Organization (IIRO), known locally as Igassa." *See* Ex. 149, U.S. Diplomatic Cable, *Terrorist Finance: Dirty Dozen's Web of Deceit*, August 2003, PECFOIA049927-49932 at 49930. |

| | |
|---|---|
| | *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at 32.<br><br>Notably, despite being a ten-year representative of the IIRO-Sarajevo office, and the head of the IIRO-Sarajevo office at the time of the public accusations in the local media concerning the arrests, Shorman showed a complete lack of curiosity and did not initiate any inquiries with the IIRO or the local authorities to determine if there was any credibility to those reports. *See* Ex. 25, Transcript, June 21, 2019 Deposition of Abderraouf Khalaf al Shorman at 309-310 (Shorman testifying that even though he was a representative of the IIRO at the time of the newspaper reports, he did not ask any questions about it, did not know if any of the individuals arrested were IIRO employees, and did not know if the IIRO headquarters investigate the incident). *See id.* at 356-359 (claiming that the IIRO is innocent of the acts despite simultaneously testifying that he did not do anything to investigate the allegations, he did not instruct anyone to look into the allegations, and couldn't recall if he asked the IIRO headquarters or any other IIRO office about the allegations). *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at 32. |
| 314. Neither IIRO-Sarajevo nor the Bosnian authorities investigated these smuggling allegations, because they did not find the allegations sufficiently credible to warrant an investigation. Ex. 30, Al-Shorman Dep. Tr. at 335:16-336:11. | Disputed. The IIRO's claim that the Bosnian authorities did not investigate the smuggling allegations because it did not find them credible, is inaccurate and misleading.<br><br>As an initial matter, the IIRO's description of Shorman's deposition testimony at the cited pages is misleading. Shorman simply testified that the Bosnian government did not investigate the IIRO-Sarajevo office, but never asserted it was because the government did not find the allegations credible. *See* Ex. 25, Transcript, June 21, 2019 Deposition of Abderraouf Khalaf al Shorman at 335-336.<br><br>Importantly, the State Department cable identified in No. 313 reports that an investigation was in fact being conducted by Bosnian government authorities, but the investigation had been hampered because of an apparent lack of cooperation between the Federal Ministry of Internal Affairs in Bosnia-Herzegovina ("Federation MUP") and the Ministry of Internal Affairs of the Republika Srpska ("RS MUP"), not because the allegations were not credible. *See* Ex. 149, U.S. Diplomatic Cable, *Terrorist Finance: Dirty Dozen's Web of Deceit*, August 2003, PECFOIA049927-49932 at 49930-49931.<br><br>Moreover, the Bosnian government, with the assistance of the U.S., had been conducting an investigation of the IIRO and other purported charitable organizations in that country (referred to as "Bosnia's Dirty Dozen") as early as 2002 for |

| | |
|---|---|
| | "providing financial support to known terrorist organizations." *See* Ex. 148, U.S. Diplomatic Cable, *Terrorist Finance: Bosnia's Dirty Dozen*, November 2002, PECFOIA0004499-4503 at 4500. *See also* Ex. 25, Transcript, June 21, 2019 Deposition of Abderraouf Khalaf al Shorman at 289-290 (confirming that the IIRO and other charitable organizations were under investigation). |
| 315. During the Kosovo war in the late 1990s, the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC") was established by the Government of the Kingdom of Saudi Arabia to consolidate and coordinate the collection of donations in Saudi Arabia–both from government and private entities–and the charitable work and disbursement of those donations to the people in need in the relevant region. Ex. 4, May 21, 2024 Basha Decl. ¶ 43. | It is not disputed that the Saudi Joint Relief Committee for Kosovo and Chechnya ("SJRC") was established by the Saudi government on May 19, 1999 pursuant to High order 7/B/1863 (the "Albanian High Order" and "Chechnya High Order"). *See* Ex. 173, PEC-KSA 3910-3913. In accordance with that order, the SJRC was endowed with the responsibility for coordinating and carrying out the operations of constituent charities in Kosovo and Chechnya, including the MWL, IIRO, WAMY, and Al Haramain Islamic Foundation. *See also* Ex. 174, Declaration of Dr. Abdulrahman A. Al-Suwailem, PEC-KSA 3914-3964; Ex. 175, Fusion Taskforce, *Financing of Terrorism and Charities*, July 2003, PEC-KSA 3973-3997 at 3987.<br><br>Notably, Suleiman al Rajhi, the former chairman of Al Rajhi Bank, managed the budget of the SJRC. *Id.* at 3987 ("Sulaiman Abdulaziz Al-Rajhi, Al-Rajhi Banking & Investment Corporation director, managed the National Commercial Bank budget of the SJRC. Sulaiman Abdulaziz Al-Rajhi has a history of financially supporting al Qaida terrorists. His bank was used by Al Haramein, IIRO and Muslim World League, to funnel funds to support terrorism.").<br><br>Suleiman al Rajhi also served as a member of the IIRO's board and permanent committee. *See* Ex. 11, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199 at 198 ("As of [REDACTED] 2000, Sulaiman al-Rajhi was also one of the 128 permanent members of International Islamic Relief Organization (IIRO), [REDACTED] al-Qa'ida has infiltrated some of IIRO's branches.").<br><br>Suleiman al Rajhi and his family were financial supporters of Osama bin Laden and his organization ("Maktab al-Khidamat" or "MAK"), and the mujahideen during the Afghan-Soviet conflict. *See, e.g.*, Ex. 19 – *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, undated, CIA_00720-804 at 723 ("The religiously ultraconservative Al Rajhi family – owners of the Al Rajhi Banking & Investment Company, with $8.6 billion of total assets – appears to be a key financial backer of the Afghan Mujahideen, [REDACTED]."); *id.* at 743 ("[REDACTED] 1997, [REDACTED] a "Sheikh Rajhi" deposited |

| | |
|---|---|
| | [REDACTED] into [REDACTED] bank accounts held by the director of Maktab-ul Khedamat (MK) and another NGO [REDACTED]."); *id.* ("In addition, an unspecified member of the Al Rajhi family is charged with overseeing financial support to the Afghan Mujahideen along with the IIRO Director in Kabul, [REDACTED]. ARBIC apparently has been a conduit for funding the Mujahadin since the early 1990s."); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, CIA_000807-848 at 830 ("Members of the ultra-wealthy Al Rajhi family, which owns the Riyadh-based Al Rajhi Banking and Investment Company, probably are a source of financial support for Usama's al-Qa'ida organization. [REDACTED] a "shaykh Rajhi" – [REDACTED] deposited [REDACTED] into the [REDACTED] bank accounts of the Maktab al-Khidamat."); Ex. 14, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*, November 17, 1998, CIA_00317-338 at 338 ("[REDACTED] 'Sheikh Rajhi,' [REDACTED] deposited [REDACTED] into a [REDACTED] bank account controlled by Maktab al-Khidamat, an Islamic charity closely associated with Usama Bin Ladin since the early 1980s.").<br><br>Following the Soviet-Afghan conflict and the subsequent formation of al Qaeda, Suleiman al Rajhi and his family directed their financial support to Osama bin Laden in Sudan, at a time when al Qaeda was developing and transforming into a sophisticated, global terrorist organization with the ability to carry out large-scale attacks in countries around the world. *See* Ex. 8, *Al-Qa'ida in Sudan, 1992-1996: Old School Ties Lead Down Dangerous Paths*, March 10, 2003, CIA_00038-52 at 45 ("Al-Qa'ida benefited from an influx of Saudi investment in Sudan's new government in the early 1990s…. Other merchants in Saudi Arabia who built business ties to Bin Ladin's companies in Sudan, and who also finance extremists, include Ibrahim Said Badaoud, Adil Batargi, Yassin Qadi, and members of the Jamjun and al-Rajhi families.").<br><br>CIA reporting has corroborated Al Rajhi Bank's use by al Qaeda, terrorist financiers, and Islamic extremists. *See, e.g.*, Ex. 21, *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 3 ("Several al-Qa'ida-linked individuals and organizations have held accounts at Al-Rajhi."); *id.* ("Muhammad Ghaleb Kalaje Zouyadi,[REDACTED] arrested in 2002 for his role as the financial planner for the Barakat Yarkas' al-Qa'ida cell, used his Al-Rajhi account [REDACTED] from 1993-1999."); *id.* at 4 ("Haji Wali Mohammed Trading Establishment maintained an Al-Rajhi account for business transactions as of August 2000. [REDACTED]. Afghan hawaladar Haji Wali Mohammed transferred money for Usama Bin Laden."); *id.* |

| | |
|---|---|
| | ("In 2002, Syrian supporters of Islamic extremists sent donations to Majid Abdallah al Turki's account at Al-Rajhi Bank."). *See also* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149-150 ("Al-Rajhi Bank has maintained accounts for individuals linked to Usama Bin Ladin, [Redacted] and individuals with ties to the Egyptian Islamic Jihad. Islamic extremists in Yemen named Al Rajhi Bank as a preferred bank for transactions."); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 809 ("[Redacted] al-Qa'ida members have held accounts at the Al Rajhi Banking and Investment Company."); *id.* at 831 ("[REDACTED] some Al Rajhi branches in Saudi Arabia have been used by members of the al Qa'ida organization.").<br><br>Moreover, CIA reports confirm that Suleiman al Rajhi's Al Rajhi was the "bank of choice" for al Qaeda, Islamic extremists, and other terror groups. As described in the following CIA reports, Al Rajhi Bank was attractive to Islamic extremists/terrorists because they believed their financial activities and transactions would avoid government or law enforcement scrutiny, Al Rajhi Bank had correspondent banking relationships abroad that could be utilized, and there were personal relationships in place to help facilitate these activities. Accordingly, al Qaeda and other Islamic militants and extremists were ordering their operatives to use Al Rajhi Bank for their banking needs because they understood that the Bank was a willing and knowing collaborator. *See* Ex. 19, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, undated, CIA_00720-804 at 736 (al Qaeda's choice of banks based on "personal contacts at the banks and security concerns."); *id.* at 746 ("Islamic militants similarly bank with financial institutions that provide assurance that their deposits and financial activities will not be scrutinized by government or enforcement authorities."). *See* Ex. 21, *Al-Rajhi Bank: Conduit for Extremist Finance*, May 28, 2003, CIA-SUB_0001-6 at 2 ("Islamic extremists have used Al-Rajhi Banking and Investment Corporation (ARABIC) since at least the mid-1990s as a conduit for terrorist transactions, probably because they find the bank's vast network and adherence to Islamic principles both convenient and ideologically sound."); *id.* at 3 ("Extremists' bank of choice. [REDACTED] since the mid-1990s [REDACTED] several extremists ordered operatives in Afghanistan, Indonesia, Pakistan, Saudi Arabia, Turkey, and Yemen to used ARABIC."); *id.* ("Extremists' accounts. Extremists use ARABIC because its Islamic banking principles appeal to them and because it is one of the few banks with branches in outlying areas of Saudi Arabia, as well as good correspondent connections to remote locations abroad."). |

| | |
|---|---|
| | *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150 ("Islamic extremists in Yemen named Al Rajhi Bank as a preferred bank for transactions.").<br><br>Suleiman al Rajhi and Al Rajhi Bank maintained hundreds of accounts for the Muslim World League, International Islamic Relief Organization, Al Haramain Islamic Foundation, World Assembly of Muslim Youth, Saudi Joint Committee for Relief of the Muslims of Bosnia and Herzegovina and Somalia, and Saudi Joint Committee for the Relief of Muslims of Kosovo and Chechnya. In particular, during the five-year period of January 1, 1998-December 31, 2002, ARB maintained at least 94 accounts for Al Haramain and 308 accounts for the IIRO. *See* MDL ECF No. 10582 at ¶¶ 206-217. Between those accounts, Al Rajhi Bank facilitated the movement of approximately $1.3 billion (corresponding to roughly $2.3 billion in 2023 dollars) between 1998-2002, when those two purported charities were operating as al Qaeda's most important fronts and financial engines. *Id.* at ¶ 215. |
| 316. The role of SJRC was to accept requests for assistance from the local government and to distribute the requests to the members of the SJRC so that the members may coordinate their humanitarian efforts amongst themselves so that there is no duplication in the assistance provided. Ex. 4, May 21, 2024 Basha Decl. ¶ 43. | To the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, when asked about the SJRC during his deposition, Basha did not provide any information concerning the role and duties of the SJRC. Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony concerning the SJRC. |
| 317. All Saudi NGOs operating in Kosovo, including IIRO, were required to join this coordinating body to ensure that aid was being allocated evenly in the affected areas, and to reduce duplication of efforts by the Saudi NGOs. Ex. 4, May 21, 2024 Basha Decl. ¶ 44. | To the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition |

| | |
|---|---|
| | testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, when asked about the SJRC during his deposition, Basha did not provide any information concerning the role and duties of the SJRC. Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony concerning the SJRC. |
| 318. While the SJRC, in its coordinating role, at times assigned specific types of projects in specific locations to Saudi NGOs, including IIRO, it did not control the projects or operations of IIRO, nor did it interfere in IIRO's operations. Ex. 4, May 21, 2024 Basha Decl. ¶ 44. | To the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, when asked about the SJRC during his deposition, Basha did not provide any information concerning the role and duties of the SJRC, nor its relationship with the IIRO in Kosovo. Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony concerning the SJRC. |
| 319. The SJRC did not have the authority to bind IIRO to specific assignments. Ex. 4, May 21, 2024 Basha Decl. ¶ 44. | To the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, when asked about the SJRC during his deposition, Basha did not provide any information concerning the role and duties of the SJRC, nor its relationship with the IIRO in Kosovo. Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony concerning the SJRC. |

| | |
|---|---|
| 320. The SJRC routinely forwarded project requests from the local government to its member organizations with the capability to assist in that project. Ex. 4, May 21, 2024 Basha Decl. ¶ 30. | To the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, when asked about the SJRC during his deposition, Basha did not provide any information concerning the role and duties of the SJRC. Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony concerning the SJRC. |
| 321. The IIRO office in Kosovo was located in the SJRC building, along with other NGOs, but the various organizations operated out of different sections of the building. Ex. 4, May 21, 2024 Basha Decl. ¶ 45. | To the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, when asked about the SJRC during his deposition, Basha did not provide any information concerning the locations in the building where the IIRO and SJRC worked. Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony concerning the SJRC. |
| 322. As a tenant, IIRO paid rent to the SJRC for its lease of the offices. Ex. 4, May 21, 2024 Basha Decl. ¶ 45. | To the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition |

| | |
|---|---|
| | testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, when asked about the SJRC during his deposition, Basha did not provide any information concerning the payment of rent. Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony concerning the SJRC. |
| 323. IIRO and the SJRC did not share common areas, and their offices had separate entrances. Ex. 31, Obaidi Dep. Tr. at 70:5-11. | It is not disputed that was Obaidi's testimony during his January 21, 2019 deposition. |
| 324. Neither Adnan Basha nor IIRO had knowledge of any alleged activities or financing that the SJRC conducted or provided in support of Al Qaeda or any other terrorist organization. If any occurred, they were not approved tacitly or explicitly by either IIRO or Adnan Basha, who in any event did not have authority to approve or direct SJRC's spending and behavior. Ex. 4, May 21, 2024 Basha Decl. ¶ 42 | Disputed. The IIRO, MWL, IIRO Secretary General Basha, and MWL Secretary General Obaid were fully aware at all times that the joint IIRO/SJRC office in Pristina, Kosovo was actively involved in helping bin Laden "move money and men to and from the Balkans." *See* Ex. 43, BBC News, *U.S. Fears Terrorist Attack in Kosovo*, April 3, 2000, FED-PEC0097363-97365 at 97364. Indeed, when the IIRO Executive Committee met on March 8, 1999 to discuss Wa'el Hamza Jelaidan's nomination as Secretary-General of the SJRC, they knew he was an al Qaeda member and close associate of Osama bin Laden dating back to the Afghan-Soviet conflict in the 1980s. *See* Ex. 124, Minutes of the Third Meeting of the Organization's Executive Committee, March 8, 1999, IIRO 287007-287013 (MWL-Secretary General Abdullah Saleh al Obaid, IIRO Secretary General Adnan Basha, Sheikh Ibrahim Mihammad Afandi (member of Al Qaeda's "Golden Chain" of financial donors), and others approved Jelaidan's nomination.). Moreover, just a few months later in a June 1999 interview with Al Jazeera, Osama bin Laden publicly acknowledged his close ties to Julaidan, stating: "We are all in one boat, as is known to you, including our brother, Wa'el Julaidan." *See* Ex. 53, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2002, FED-PEC 203469-20370 at 203470. *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 33.<br><br>Despite knowing of Jelaidan's relationship with bin Laden, the IIRO and Basha approved Jelaidan as the Secretary General of the SJRC. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 261 (Basha testifying that if he had heard that Jelaidan had a relationship with Osama bin Laden dating back to the fighting in Afghanistan against the Soviet Union, he would have rejected the nomination). Thereafter, Jelaidan took control of the joint IIRO-SJRC office in Pristina, Kosovo, and a year later, the U.N. Mission in Kosovo ("UNMIK") raided the building and declared that the IIRO/SJRC office served as a cover for several al Qaeda |

| | |
|---|---|
| | operatives, including Jelaidan and SJRC official Adel Muhammad Sadi Bin Kazam. *See* Ex. 43, BBC News, *U.S. Fears Terrorist Attack in Kosovo*, April 3, 2000, FED-PEC0097363-97365 at 97364. |
| 325. In 2001, IIRO-Kosovo, based in Pristina, had a number of projects underway, including construction, building, humanitarian relief, IT, and language trainings. Ex. 31, Obaidi Dep. Tr. at 49:23-50:9. | It is not disputed that was Obaidi's testimony during his January 21, 2019 deposition. |
| 326. IIRO-Kosovo provided urgent relief, emergency, health care, sanitary supplies, and for the reconstruction of schools. Ex. 31, Obaidi Dep. Tr. at 49:23-50:9. | It is not disputed that was Obaidi's testimony during his January 21, 2019 deposition. |
| 327. IIRO-Kosovo coordinated with NATO. Ex. 31, Obaidi Dep. Tr. at 49:23-50:9. | It is not disputed that was Obaidi's testimony during his January 21, 2019 deposition. |
| 328. IIRO-Kosovo had an internal accountant who performed audits. Ex. 31, Obaidi Dep. Tr. at 83:4-19. | It is not disputed that was Obaidi's testimony during his January 21, 2019 deposition. |
| 329. IIRO-Kosovo sent all its reports to its internal accountant and to UNMIK, the United Nations Mission in Kosovo. Ex. 31, Obaidi Dep. Tr. at 83:25-84:4. | It is not disputed that was Obaidi's testimony during his January 21, 2019 deposition. |
| 330. Zaher Abdelaziz was the Executive Director of the Balkans region for IIRO between 1993 and his resignation in 1996. Ex. 12, Chaouat Decl. ¶ 62. | Undisputed as a general matter for purposes of this motion. *See, e.g.*, Plaintiffs' response to No. 294. |
| 331. The U.S. Congress supported the Bosnian Muslims. Ex. 32, Benthall Dep. Tr. at 261:24-262:14. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 332. The Al Qaeda organization did not have any direct involvement in the Bosnian War; it was not physically, militarily involved in the Bosnian War. Ex. 33, Brown Dep. Tr. at 257:21-259:1. | Disputed. Osama bin Laden formed al Qaeda to carry out jihad throughout the globe, and participation in military conflicts involving Muslim communities (as the mujahideen had done in Afghanistan) was a central pillar of its strategy to establish Islamic regimes throughout the world. The Bosnian War presented a timely opportunity for al Qaeda, because waging jihad in Bosnia offered al Qaeda an opportunity to establish a base of operations in Europe, from which it could launch future terrorist attacks against the West. At the same time, the Arab veterans of the Afghan jihad were being expelled from Pakistan. For many of these jihadists, return to their home countries was impossible, as they were viewed as extremists and faced potential imprisonment. Finding a new jihad front for these fighters was therefore essential to maintaining the nascent al Qaeda army. Beyond these strategic considerations, as an Islamist organization deriving its ideological foundation from the teachings of Wahhabi Islam and the Western Cultural Attack theory, al Qaeda believed Muslims owed a personal |

| | |
|---|---|
| | obligation to carry out jihad in defense of the Bosnian Muslims, a view that was shared by the Saudi Ulema.<br><br>In 1992, bin Laden, who was by then residing in Sudan under the protection of the National Islamic Front ("NIF"), sent a delegation of senior al Qaeda members to Bosnia to assess the situation and evaluate the logistical needs for waging jihad in the region. The delegation was led by Abu Abdel Aziz, a Saudi veteran of the Afghan jihad and senior al Qaeda member. Abu Adbel Aziz, also known by the aliases Barabarossa (Red Beard), Abdelrahman al-Dosari, and Hown (for his proficiency during the Afghan jihad with Russian made "Hound" artillery), succinctly explained in an August 1994 interview the circumstances under which al Qaeda sent him to Bosnia following the conclusion of the Afghan jihad, as part of al Qaeda's broader efforts to find new regions for waging jihad:<br><br>Then the conquest of Kabul came, and we thanked Allah, praised be He. The joy of Jihad overwhelmed our hearts. The Prophet, peace be upon him, said, "The highest peak of Islam is Jihad." We were looking for Jihad (after Afghanistan). We found it in the Philippines, and in Kashmir. Only fifteen days lapsed (after the conquest of Kabul) and the crisis of Bosnia began. This confirmed the saying of the Prophet (of Islam), peace and blessings be upon him, who said, "Indeed Jihad will continue till the day of Judgment." A new Jihad started in Bosnia, (we moved there), and we are with it, if Allah wills…. [W]hen Jihad in Afghanistan was over, with the conquest of Kabul, I went with four of those who participated in Afghanistan to Bosnia to check out the landscape.<br><br>*See* Ex. 186, Al-Sirat Al-Mustaqeem, *Interview with Sheikh al-Mujahideen Abu Abdel Aziz*, August 1994, PEC-KSA 894-906 at 895, 896.<br><br>In that same interview Abu Abdel Aziz confirmed the convergence of interests between al Qaeda and the Saudi Ulema in relation to the Bosnian War, and the importance as a religious matter of the latter's specific authorization for al Qaeda's proposed jihad in Bosnia:<br><br>Interviewer: We heard, and many brothers heard, that you met with prominent Ulema and scholars in the Muslim World and discussed with them the question of Jihad in Bosnia. Can you tell us some of their views and the issues you discussed?<br><br>Abu Abdel Aziz: First, we consider our scholars the light and guidance of Islam. They are the heirs of prophets (as the Hadith says, "warathat al-Anbiya"). Our duty is to seek knowledge from them and guidance from their scholarly light |

| | |
|---|---|
| | (sic). I - alhamdulillah - met several prominent Ulema. Among them Sheikh Nasir ad-Din al-Albani, Sheikh Abdel Aziz Bin Baz and Sheikh Muhammad Bin Otheimin and others in the Gulf area. Alhamdulillah, all grace be to Allah, they all support the religious dictum that "the fighting in Bosnia is a fight to make the word of Allah supreme and protect the chastity of Muslims." It is because Allah said (in his holy book), "Yet, if they ask you for succor against religious persecution, it is your duty to give [them] this succor." (Lit. "to succor them in religion", Qur'an, al-Anfal, 8:72). It is then our (religious) duty to defend our Muslim brethren wherever they are, as long as they are persecuted because they are Muslims and not for any other reason.<br><br>*See id.* at 896-897.<br><br>At the time he endorsed al Qaeda's jihad in Bosnia, Sheikh bin Baz was both Saudi Arabia's Grand Mufti and a senior Saudi official with the rank of Minister. Thus, Abu Abdel Aziz's statements confirm that al Qaeda's jihad in Bosnia was formally sanctioned by the Saudi government.<br><br>Bin Baz used his governmental post as the Kingdom's highest religious authority to encourage public support for al Qaeda's Bosnian jihad as well, issuing a fatwa calling on Muslims to support that jihad by any means available to them, including by way of "money, arms and prayers." *See* MDL ECF No. 3463-1 at ¶¶ 291-295.<br><br>*See also* Ex. 172, Declaration of Ali Ahmad Ali Hamad, March 4, 2008, PEC-KSA 3501-3510 at ¶ 17 ("At the inception of the Bosnian war, Osama bin Laden and the al Qaida leadership decided that al Qaida should actively participate in that conflict, and began sending al Qaida members, including myself, to Bosnia to fight as mujihadeen."); ¶ 18 ("Throughout the Bosnian War, the mujihadeen forces in Bosnia operated under the direction of al Qaida leadership."); ¶ 19 (stating that al Qaeda's primary objective in the Bosnian War was "to establish a base of operations in Bosnia to support al Qaida operations in Europe and the West"); ¶ 32 ("I personally knew Ebu Abdel Aziz as one of the leaders of al Qaida."); ¶ 34 ("From the date I reached the mujihadeen forces in 1992 until the signing of the Dayton Accord in 1995, I fought as a member of the mujihadeen forces in the Bosnian War. Throughout that time, I was a member of al Qaida, acting in accordance with the directives of that terrorist organization."). |
| 333. Al Qaeda therefore did not use the resources of Islamic charities or NGOs in Bosnia to aid in its separate jihad that it would declare years later. Ex. 33, Brown Dep. Tr. at 259:2-7. | Disputed. In accordance with the fatwas issued by its senior religious leaders, the Kingdom aggressively deployed its da'awa infrastructure to support the Bosnian jihad. Existing Saudi da'awa organizations such as the IIRO, Al Haramain |

| | |
|---|---|
| | Islamic Foundation, WAMY, and Al Haramain Al Masjed Al Aqsa (part of the Muslim World League), promptly established physical operations in Bosnia and the surrounding region to support the jihad. In addition, the Kingdom established a new da'awa organization under the leadership of Prince Salman bin Abdul Aziz al Saud, called the Saudi High Commission for Relief to Bosnia and Herzegovina ("SHC"), to steward and centralize the Kingdom's Bosnian efforts.<br><br>Throughout the Bosnian war, the Saudi government da'awa organizations, including the IIRO, Al Haramain, WAMY, and SHC, provided money, food, shelter and supplies to al Qaeda fighters. In many cases, this support was coordinated by senior al Qaeda members who were embedded in the da'awa organizations themselves as directors, managers and officials. These organizations also transported al Qaeda members throughout the region in their vehicles bearing UNHCR plates, thereby allowing al Qaeda to circumvent UN checkpoints. After the conclusion of the war, the Saudi da'awa organizations provided ostensible employment to many al Qaeda members, so that they could remain in Bosnia in furtherance of al Qaeda's operational goals. Several of those al Qaeda members planned and carried out terrorist attacks from offices of the SHC, while ostensibly employed by that organization. *See* MDL ECF No. 3463-1 at ¶¶ 296, 298.<br><br>*See also* Ex. 172, Declaration of Ali Ahmad Ali Hamad, March 4, 2008, PEC-KSA 3501-3510 at ¶ 37 (stating that "I can attest on the basis of personal knowledge that al Qaida's operations in Bosnia, including the activities of the al Qaida fighters who participated in the Bosnian War, were funded and otherwise supported by purported Islamic charitable organizations"). |
| 334. The Islamic militants involved in Bosnia were on the same side as the Western troops. Ex. 34, Roy Dep. Tr. at 166:8-11. | It is not disputed that was Roy's testimony during his April 20, 2021 deposition. |
| **IIRO-Pakistan** | No response necessary. |
| 335. Prior to 2001, IIRO's branch office in Pakistan ("IIRO-Pakistan") was defrauded by its director, Moayad Al-Butairi, and its financial officer, Amir Jasim. They embezzled IIRO funds and used the funds for their own personal gain. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 54-55, 58; Ex. 25, Basha Dep. Tr. at 240:4-17 (*Errata*). | Disputed. The IIRO's claim that the IIRO-Pakistan branch office was defrauded by Moayad al Butairi and Amir Jasim, and used the funds for personal gain, is misleading. As set forth in discovery documents and deposition testimony, the IIRO-Pakistan branch office was the focus of an intense investigation conducted by both Pakistani authorities and IIRO headquarters following the discovery that millions of dollars had gone missing and unaccounted for as a result of the actions of Butairi (the Director General of IIRO-Pakistan), and Jasim (the IIRO-Pakistan accountant/financial officer). Pakistani authorities arrested Jasim for his role. |

| | |
|---|---|
| | An IIRO delegation was formed to conduct a review of the IIRO-Pakistan office's financial records and found that "[t]he collected evidence indicated the existence of cheating, forgery and misuse of the IIRO's funds, which were used for the disbursement of private projects." *See* Ex. 93, IIRO 31022-31023. *See also* Ex. 92, IIRO 31006-31007 ("For example, certain invoices are forged with names of unreal companies. The team went to the addresses of these companies and shops and confirmed that they are unreal."). A formal audit of the IIRO-Pakistan branch office was ordered by IIRO's senior leadership in Saudi Arabia for the 1996-2001 timeframe. *See* Ex. 108, IIRO 111020.<br><br>The investigation into Jasim's actions "found tremendous financial embezzlement; roughly millions according to the local currency. The bail applicant [Jasim] was the Head of Accounting Department in the IIRO. He was responsible for and beneficiary of such embezzlements. Large amounts of money were embezzled by him. He, sometimes, forged the accounts or provided the higher management with wrong accounts." *See* Ex. 94, IIRO 31160-31166 at 31161. The investigation further determined that Jasim "never bought medicines or food, but forged the documents and authorities and pretended to achieve the required actions. He transferred the gained amounts into his own account or pocket. There are 185 authenticated copies of the documents and invoices (attached herewith) that include non-small amounts, and the material mentioned and registered therein were not bought. The concerned shops and storehouses were communicated, and they confirmed that such documents are forged and not issued by them and that the signatures shown thereon are irrelevant. Accordingly, they are not real." *Id.* at IIRO 31164. Jasim's application for bail was denied, finding that "the general nature of the events confirm that the bail applicant / accused manipulated the funds. Whilst such manipulation, he was able to embezzle tremendous amounts of money by preparing forged documents and authorities. Such embezzled funds were allocated for orphans and other charitable purposes." *Id.*<br><br>The Director-General of IIRO-Pakistan, Butairi, was also implicated in the cheating, forgery, and misuse of IIRO funds. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 212-216 (Basha testifies that the IIRO received evidence that Butairi was involved in the cheating, forgery, and misuse of IIRO funds); *id.* at 237-238 (Basha confirms that the "funds were stolen by Amir Jasim, with the knowledge of Moayad al Butairi," and "it was explicit that there was fabrication in invoices, fabrication of documents."). It was also determined that Butairi ordered Jasim to burn the |

| | |
|---|---|
| | IIRO financial records to conceal their acts. *See* Ex. 116, IIRO 168291 (stating that "Amir Jasim burnt the record of IIRO on the orders of Moayad Al Butairi the then Director General of the office"). Butairi was replaced as the Director General of IIRO-Pakistan.<br><br>Additionally, the "audit" of the IIRO-Pakistan branch, dated just a few months before the 9/11 attacks, uncovered the diversion of millions of dollars of funds by that branch office, and the wholesale fabrication of invoices, receipts and entire projects to conceal that activity. *See* Ex. 91, International Islamic Relief Organization Pakistan Branch, Verification of Receipts and Payments for the Period From 1 January 1996 to 22 February 2001, IIRO 26468-26490. As an initial matter, although the auditors were retained to conduct an audit of the Pakistan branch and verify all payments and underlying documents for the period January 1996 through January 2001, the scope of the audit was later "restricted to verification" of certain areas "for the last three years only," as directed by a July 16, 2001 letter from the IIRO. *Id.* at 26471. Basha testified that he did not know who at the IIRO was responsible for approving that directive. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 229.<br><br>The audit determined *inter alia* that: (1) "internal controls relating to proper monitoring and funding to Pakistan was not in place at H.O." (headquarters); (2) headquarters' "management had neither established any system or mechanism for financial discipline nor required proper reporting from Pakistan office relating to disbursements or activities carried out at Pakistan branch; (3) "no internal or external audit was ever carried out for Pakistan branch and H.O. management never asked local management to provide them audit report on some fixed internal/periodic basis; (4) construction projects' invoices and supporting documents (i.e., bills, acknowledgment receipts, etc.) "are self-made, as no construction company/companies seem to exist;" (5) "[t]he net unreported amount of US $3,071,659 is unaccounted for and represents the expenditure which was either not recorded and for which no vouchers and supporting documentation is available and/or the amounts have been misused or misappropriated locally…. We consider it appropriate to state that there is a complete mess at the organizational level as none of the persons either at H.O. or in Pakistan is aware about the outstanding expenses details due to lack of proper communication and absence of internal controls."). *See* Ex. 91, International Islamic Relief Organization Pakistan Branch, Verification of Receipts and Payments for the Period From 1 January 1996 to 22 February 2001, IIRO 26468-26490 at 26475-26482. *See also* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 238 ("The net unreported |

| | |
|---|---|
| | amount of US $3,071,659 is unaccounted for and represents the expenditure which was either not recorded and for which no vouchers and supporting documentation is available and/or the amounts which have been misused or misappropriated locally."); *id.* at 249-250 (Basha testified that prior to 2003, IIRO-Pakistan transferred all funds to Afghanistan in cash, during the time Butairi was the head of IIRO-Pakistan office, and during the time IIRO-Pakistan was responsible for the IIRO's activities in Afghanistan.).<br><br>The audit additionally focused on the IIRO-Pakistan office's funding of orphanages in Pakistan and Afghanistan. *Id.* at 26480. IIRO funding was purportedly dedicated to the operations and administration of the orphanages, as well as for the purchases of necessities such as clothing, blankets, school supplies, books, and daily consumption items. *Id.* When the auditors conducted verification of orphanage-related invoices and underlying documents, and interviewed suppliers, they discovered that the suppliers provided multiple quotes and bills for goods to Jasim at his request, with the understanding that IIRO headquarters would approve and release funds, and the orders would be placed. However, the suppliers confirmed to the auditors that they never received any money for the proposed purchases and they never supplied any goods to the IIRO-Pakistan office. *Id.* The auditors additionally discovered that "the signatures on goods receipt acknowledgments are fake/forged." *Id.* at 26480.<br><br>*See also* Plaintiffs' response to No. 230 (discussing the use of orphanages by charities, including the IIRO, to divert millions of dollars to bankroll al Qaeda's global terrorist operations).<br><br>*See* Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 67-77 (discussing the implications of financial improprieties and irregularities discovered in the audits and financial documents of the IIRO, and how they indicate conditions that made it possible for IIRO officials and employees to direct IIRO funds and resources to support al Qaeda, Islamic jihad, and terrorism).<br><br>Notwithstanding the serious findings by the investigation and audit, the IIRO never held Butairi and Jasim accountable for stealing millions of dollars. IIRO did not prosecute Butairi for his actions, and eventually settled the case with Jasim who was released from custody. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 220-221 (testifying that the IIRO chose not to prosecute Butairi); *id.* at 224 (testifying that IIRO decided not to pursue the full prosecution of Jasim).<br><br>The IIRO-Pakistan branch office is the same branch office that was used by the IIRO to fund 6 al Qaeda training camps, |

| | |
|---|---|
| | according to the 1996 CIA Report. *See* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001").<br><br>Additional audits of the IIRO-Eastern Province, IIRO-Philippines, IIRO-Indonesia, IIRO-Sarajevo, and IIRO-Jordan branch offices similarly discovered serious financial improprieties and irregularities. *See* Plaintiffs' responses to Nos. 91, 230, 238, 268, and 294.<br><br>Plaintiffs' experts have concluded that the financial improprieties and irregularities documented in the audits demonstrate that conditions within the IIRO and its branches were ideal for individuals to direct massive amounts of IIRO funds and resources to Osama bin Laden, al Qaeda, and their terrorist activities. *See* Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 77 ("I conclude that the financial improprieties and irregularities documented in the limited number of audits and financial documents of IIRO that have been made available to me reflect conditions within IIRO that made it possible for persons within IIRO, as well as others such as Julaidan to misdirect IIRO resources to support Islamic jihad, al Qaeda, and terrorism. This support included the funding of Islamic fighters in prominent zones of conflict such as Afghanistan, Bosnia, and Chechnya, as well as in lesser-known conflicts between Islamic resistance groups and terrorists against secular governments, such as in Indonesia, the Philippines, and Thailand, and in areas of complex armed conflict between Muslims and non-Muslims such as Lebanon, Palestine, and Sudan, as well as elsewhere.").<br><br>Finally, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha |

| | |
|---|---|
| | Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 2336. Moayad Al-Butairi and Amir Jasim used cash from a successful and approved IIRO medical clinic to create three medical clinics for themselves. They did not enter the cash into IIRO accounts. Ex. 25, Basha Dep. Tr. at 240:4-17 (*Errata*); Ex. 4, May 21, 2024 Basha Decl. ¶ 58. | Disputed. *See* Plaintiffs' response to No. 335.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 337. Prior to the discovery of the fraud, Moayad Al-Butairi and Amir Jasim occupied important positions within IIRO-Pakistan and neither had ever been involved in any wrongdoing or accused of misappropriation of IIRO funds. Ex. 4, May 21, 2024 Basha Decl. ¶ 54. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 338. Moayad Al-Butairi was the IIRO-Pakistan Director beginning in 1995; he managed the office until he was replaced early 2001, during the fraud investigation into the IIRO-Pakistan office. Ex. 4, May 21, 2024 Basha Decl. ¶ 55; Ex. 61, Administrative Decision Terminating Al- Butairi, IIRO031186. | Undisputed as a general matter for purposes of this motion. |
| 339. Moayad Al-Butairi was terminated in 2002. Ex. 4, May 21, 2024 Basha Decl. ¶ 58; Ex. 61, Administrative Decision Terminating Al-Butairi, IIRO031186. | Undisputed as a general matter for purposes of this motion. |
| 340. Amir Jasim was IIRO-Pakistan financial officer from 1991 to 2001. Ex. 62, Order Terminating Jasim's services effective February 10, 2001, IIRO 131368. | Undisputed as a general matter for purposes of this motion. |
| 341. In late 2000, Adnan Basha learned of a suspicion that fraud was occurring in the Pakistan office and sent financial investigators from the Head Office to the Pakistan office to investigate the matter. Ex. 4, May 21, 2024 Basha Decl. ¶ 55. | To the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite |

| | |
|---|---|
| | to or provide a single document or piece of evidence supporting his testimony). |
| 342. Rahmatullah Nazir Khan Gari, then-head of the IIRO Bangladesh office, was appointed to take over the management of the Pakistan office during the investigation. Ex. 4, May 21, 2024 Basha Decl. ¶ 55. | To the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 343. During the course of its internal investigation, IIRO investigated Moayad Al- Butairi and discovered that he was complicit. Ex. 4, May 21, 2024 Basha Decl. ¶ 58; Ex. 25, Basha Dep. Tr. at 216:3-7, 237:16-22. | To the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 344. At first, Moayad Al-Butairi was not cooperative with IIRO's investigation. ultimately decided to cooperate with IIRO's investigators and provided information that assisted IIRO in its efforts to track the embezzled funds. Ex. 4, May 21, 2024 Basha Decl. ¶ 58. | To the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 345. Moayad Al-Butairi turned over the three clinics that he established with IIRO funds to IIRO; the combined value of the clinics was equivalent to the value of the stolen funds. Ex. 4, May 21, 2024 Basha Decl. ¶ 58; Ex. 25, Basha Dep. Tr. at 216:3-218:4. | Disputed. The IIRO's claim that it recovered the estimated amount of misappropriated funds is misleading and unsupported by evidence. Basha testified that "the IIRO found what had been stolen equals to the value of the three clinics that were owned by Amir Jasim and Moayad Butairi." *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha |

| | |
|---|---|
| | at 217. Basha further testified that the IIRO documented all of its losses incurred as a result of the actions of Butairi and Jasim, including the valuation of the three clinics that were allegedly transferred to the IIRO. *Id.* at 218. IIRO has never produced that documentation supporting Basha's claims.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 346. IIRO terminated Amir Jasim for his role in the embezzlement. Ex. 25, Basha Dep. Tr. at 218:5-15. | Undisputed as a general matter for purposes of this motion. |
| 347. Moayad Al-Butairi and Amir Jasim were trusted employees, and Amir Jasim trained newly joined personnel at IIRO Head Office's financial department. Barron Rpt. ¶ 24.2; Ex. 25, Basha Dep. Tr. at 221:12-16. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 348. Soon after the fraud was discovered, IIRO filed a criminal complaint, and Amir Jasim was arrested. The case floundered for years, with no tangible progress, moving slowly for a number of reasons, including the constant changing of judges, resetting of hearings, and inadequate role of the investigating officer. Ex. 4, May 21, 2024 Basha Decl. ¶ 57. | Disputed. Notwithstanding the serious findings by the investigation and audit, the IIRO never held Butairi and Jasim accountable for stealing millions of dollars. IIRO did not prosecute Butairi for his actions, and eventually settled the case with Jasim who was released from custody. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 220-221 (testifying that the IIRO chose not to prosecute Butairi); *id.* at 224 (testifying that IIRO decided not to pursue the full prosecution of Jasim).<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |

| | |
|---|---|
| 349. Actions taken by IIRO senior management in response to suspected fraud in the Pakistan branch office show that: IIRO took the matter seriously, in a manner that one would not expect if senior management knew about, was indifferent to, or wished to cover up or prevent detection of the improper diversion of IIRO assets from the Pakistan branch office. And IIRO senior management's efforts to determine how the fraud occurred and the steps it took to keep fraud from recurring are inconsistent with prior knowledge on senior management's part or intent for there to be weaknesses in internal controls by design. Barron Rpt. ¶¶ 37-37.5. | Disputed. The IIRO's characterization of the investigation into the "suspected" fraud in the IIRO-Pakistan office is inaccurate and misleading. *See* Plaintiffs' response to No. 335.<br><br>By way of further response, notwithstanding the serious findings by the investigation and audit, the IIRO never held Butairi and Jasim accountable for stealing millions of dollars. IIRO did not prosecute Butairi for his actions, and eventually settled the case with Jasim who was released from custody. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 220-221 (testifying that the IIRO chose not to prosecute Butairi); *id.* at 224 (testifying that IIRO decided not to pursue the full prosecution of Jasim). |
| 350. John Barron, an accounting expert, reviewed IIRO records and witness testimony concerning the suspected fraud in the Pakistan branch office and found nothing showing that IIRO senior management had knowledge of the fraud prior to the time the fraud was discovered. Barron Rpt. ¶¶ 9, 37-37.5; Ex. 35, Barron Dep. Tr. at 132:21-134:2. | Disputed. The IIRO's characterization of the investigation into the "suspected" fraud in the IIRO-Pakistan office is inaccurate and misleading. *See, e.g.*, Plaintiffs' response to No. 335. |
| 351. Upon learning of the suspected fraud in the Pakistan office, IIRO (A) dispatched a delegation from Head Office to commence an investigation; (B) created a committee to oversee the investigation; (C) relieved the parties believed to be responsible from their duties; (D) assigned a new Pakistan director; (E) retained a Pakistani auditing firm to investigate the matter and report to IIRO; and (F) recovered the estimated amount of embezzled funds. Barron Rpt. ¶ 37.3. | Disputed. The IIRO's claim that it recovered the estimated amount of misappropriated funds is misleading and unsupported by evidence. Basha testified that "the IIRO found what had been stolen equals to the value of the three clinics that were owned by Amir Jasim and Moayad Butairi." *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 217. Basha further testified that the IIRO documented all of its losses incurred as a result of the actions of Butairi and Jasim, including the valuation of the three clinics that were allegedly transferred to the IIRO. *Id.* at 218. IIRO has never produced that documentation supporting Basha's claims. |
| 352. Neither Adnan Basha nor IIRO had knowledge of or was provided with any evidence that the Pakistan office ever funded or supported Al Qaeda, its affiliates, or any other terror groups. Ex. 4, May 21, 2024 Basha Decl. ¶ 61. | Disputed. *See, e.g.*, Plaintiffs' response to No. 335.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |

| | |
|---|---|
| 353. There is no evidence that the fraud committed by Moayad Al-Butairi and Amir Jasim resulted in IIRO's funds being diverted to Al Qaeda. Ex. 4, May 21, 2024 Basha Decl. ¶ 61; Ex. 33, Brown Dep. Tr. at 313:17-315:8, 322:16-21 (no indication of IIRO funds being used to support terrorism in the documents that Vahid Brown reviewed with regards to this case).; Ex. 19, Kohlmann Dep. Tr. at 384:11-385:2 ( "Q: Do you have any evidence that the fraud that was carried on by the head of the [IIRO] Pakistan office and chief accountant was done in order to funnel money for terrorism? A. That particular incident I don't. However, I am aware of the fact that the U.S. government and U.S. Treasury Department has multiple times said that the entire IIRO network was used to fund Al Qaeda's organization. And based on that inference, I have to say that either it was graph [sic] or it was terrorist funding, I don't know which one it was, but clearly it was illicit." (emphasis added); ECF No. 11157 at 28 (citing the same and noting, "This kind of speculation, unsupported by his own analysis, undermines the reliability of his report."). | Disputed. *See, e.g.*, Plaintiffs' response to No. 335.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| **Employee Standards** | No response necessary. |
| 354. IIRO required employees to adhere to certain ethical standards, including understanding their job descriptions, following IIRO's Protocols and Directives, and complying with instructions from superiors, and that requirement remained consistent from 1993 until at least 2004. Ex. 5, Helles Decl. ¶¶ 2, 34. | It is not disputed that the IIRO and MWL established certain procedures, protocols, regulations, directives, and rules concerning employee conduct and ethical standards; implementation and funding of overseas projects; banking, accounting, and auditing; collection and disbursements of funds; financial and activity/project reporting to headquarters; cooperation and coordination with Saudi embassies in host countries; and other issues.<br><br>However, to the extent the IIRO and MWL claim that these controls prevented IIRO and MWL officials, employees, advisors, and representatives from providing substantial financial assistance and other resources to Osama bin Laden, al Qaeda, and associated terror groups, and/or engaging in terrorist activities and operations themselves, that is inaccurate and misleading.<br><br>The evidence—including the IIRO and MWL's own documents and deposition testimony from their officials and employees—plainly demonstrates that those controls were routinely disregarded by individuals within the IIRO and MWL who were closely aligned with al Qaeda and intended to foster bin Laden's global terrorist agenda, including Prince Turki bin Jalawi al Saud, Wa'el Hamza Jelaidan, Mohammed Jamal Khalifa, Abu Hammam al Saudi, Abd al Hamid Sulaiman al Mujil, Abdelhadi Daguit, Mahmud Abd Al-Jalil |

| | |
|---|---|
| | Afif, Abdul Asmad, Amir Jasim, Moayad al Butairi, and others. For more than a decade, these individuals (some of them al Qaeda members), deliberately ignored IIRO and MWL protocols and directed extensive financial, material, and logistical support to bin Laden and al Qaeda around the world. Accordingly, the 9/11 attacks were a predictable, inevitable product of that sustained, knowing support received from the IIRO and MWL.<br><br>*See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577.<br><br>Moreover, the evidence indicates that the inaction of the IIRO and MWL to take corrective measures when violations of the protocols were discovered, not only rendered those controls meaningless, but also demonstrated a willingness within those organizations to overlook violations even when they raised legitimate concerns that IIRO and MWL offices and employees may be involved in terrorist activities.<br><br>By way of example, notwithstanding the serious findings by the IIRO investigation and audit of the IIRO-Pakistan office, the IIRO never held Moayad al Butairi and Amir Jasim accountable for stealing millions of dollars. IIRO did not prosecute Butairi for his actions, and eventually settled the case with Jasim who was released from custody. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 220-221 (testifying that the IIRO chose not to prosecute Butairi); *id.* at 224 (testifying that IIRO decided not to pursue the full prosecution of Jasim). *See also* Plaintiffs' response to No. 335.<br><br>Additionally, after the discovery of significant financial improprieties and irregularities in the IIRO-Philippines office in 1998, including extensive violations of protocols relating to the reporting and distribution of IIRO funds to orphans in that country, the IIRO failed to take corrective measures and the financial integrity of the IIRO-Philippines branch office persisted for years. *See* Plaintiffs' response to No. 230. In 2004, concerns were raised again about violations of IIRO financial protocols by the IIRO-Philippines office, and it was recommended that a special committee be formed to conduct an investigation. *Id.* Deposition testimony obtained from a twenty-year employee of that office indicates the special |

| | |
|---|---|
| | committee was never established and an investigation never occurred. *Id.*<br><br>Finally, when the IIRO-Philippines and IIRO-Sarajevo offices were publicly implicated in supporting terrorism, the mangers of those offices failed to initiate any inquiries with the IIRO concerning the allegations, failed to initiate any inquiries with the host country governments to assess the credibility of those reports, and failed to conduct any internal investigation themselves. *See* Plaintiffs' responses to Nos. 219 and 313. |
| 355. These ethical standards prohibited IIRO employees from undertaking acts like: (i) exploiting their positions for personal profit; (ii) participating in or interfering in political activities in their host country; or (iii) engaging in activities that may create conflicts of interest. Ex. 5, Helles Decl. ¶¶ 8, 25, 34. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 356. IIRO established guidelines and regulations that were applicable to all employees. The Head Office supplemented these Protocols, including via circulars and resolutions that it distributed from time to time. Ex. 5, Helles Decl. ¶ 22; Ex. 6, Sarhan Decl. ¶ 16; Ex. 71, The Working Mechanism between the General Secretariat and local offices, IIRO-000111-119; Ex. 51, Circular to Foreign Office Directors Dated 27/11/1419H, IIRO 130281-85; Ex. 68, Financial & Accounting Guide for IIROSA's Foreign Offices, IIRO 130659-814 | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| **<u>IIRO Local and Foreign Offices and their Oversight</u>** | No response necessary. |
| 357. Not a single instance of non-compliance with Head Office protocols or procedures resulted in IIRO's funds being diverted to Al Qaeda, and Adnan Basha is not aware of a single instance of non-compliance that revealed evidence that an IIRO office funded or supported terrorist organizations or militants or other violent acts. Ex. 4, May 21, 2024 Basha Decl. ¶ 48. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 358. IIRO employees, including local and foreign office directors, were prohibited from engaging in personal commercial ventures, political activities, or violent, extremist, or terrorist activities or using IIRO resources for these purposes. Ex. 5, Helles Decl. ¶ 8; Ex. 6, Sarhan Decl. ¶ 8. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| **<u>IIRO Local Offices</u>** | No response necessary. |
| 359. Local offices handled the collection of donations and reported monthly to the Head Office's Financial Department and the relevant Head Office welfare | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |

| | |
|---|---|
| departments. Ex. 5, Helles Decl. ¶¶ 12, 13; Ex. 6, Sarhan Decl. ¶ 9; Ex. 71, The Working Mechanism between the General Secretariat and local offices, at IIRO-000116. | |
| 360. In conjunction with the Head Office, local offices participated in planning IIRO's programs, drafting annual budgets. Ex. 5, Helles Decl. ¶ 12; Ex. 6, Sarhan Decl. ¶ 9. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 361. Local offices were prohibited from sending funds directly to foreign offices or other affiliates. Ex. 71, The Working Mechanism between the General Secretariat and local offices, at IIRO-000117; Ex. 5, Helles Decl. ¶ 14; Ex. 6, Sarhan Decl. ¶ 11. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 362. IIRO local offices transferred collected funds to the Head Office, which in turn sent money to foreign offices for funding programs and projects previously adopted in their approved budget. Ex. 67, The Working Mechanism of Programs and Projects, IIRO-000209-247 at IIRO-000240 (Procedure of Supervision of Programs by Domestic Offices); Ex. 5, Helles Decl. ¶ 15; Ex. 6, Sarhan Decl. ¶ 12. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 363. IIRO donor funds earmarked for specific locations could not be transferred to another location except with the approval of the donor and the Secretariat General. Ex. 71, The Working Mechanism between the General Secretariat and local offices, at IIRO-000116; Ex. 5, Helles Decl. ¶ 28. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| **IIRO Foreign Offices** | No response necessary. |
| 364. IIRO established guidelines and protocols applicable to all foreign offices. These guidelines and protocols remained consistent from at least 1993, with Dr. Adnan Basha implementing more comprehensive versions when he became Secretary General. Ex. 5, Helles Decl. ¶¶ 2, 22. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 365. IIRO Foreign offices were tasked with implementing projects under specific programs developed by the Head Office. Programs covered areas such as health and social welfare and were comprised of designated projects to be implemented by IIRO foreign offices. Projects referred to the type of assistance provided by IIRO under each program; for example, the operation of vaccination and health clinics and the digging of wells. Ex. 5, Helles Decl. ¶ 17. Foreign offices were responsible for managing IIRO projects and programs that were being undertaken in their host country within the confines of the previously approved budget. *Id.* ¶ 18. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |

| | |
|---|---|
| 366. Foreign offices coordinated with the Head Office to determine which programs and projects to implement, proposed budgets for programs and projects, and reported periodically on the status of those programs and projects. Ex. 5, Helles Decl. ¶ 21. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 367. IIRO foreign offices were required to conduct field visits to supervise the implementation of their programs and projects. IIRO foreign offices were also required to submit periodic reports to the Head Office regarding the progress of the operations and activities of the office. Ex. 4, May 21, 2024 Basha Decl. ¶ 50. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 368. IIRO foreign offices were required to submit a yearly work plan and proposed budget for the following year, which plan and budget required approval by the Head Office. Ex. 4, May 21, 2024 Basha Decl. ¶ 51. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 369. IIRO foreign offices were required to obtain approval from the Head Office regarding various matters, including making any structural or administrative changes to the office, opening a bank account, participating in any conferences, workshops or activities, and entering into any contracts or agreements on behalf of IIRO. Ex. 4, May 21, 2024 Basha Decl. ¶ 49. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 370. IIRO foreign offices were permitted to disburse funds only for approved projects covering or supporting humanitarian relief, emergency relief, and sustainable development through services and emergency relief like clothing, medicine, and shelter, care for orphaned children, educational support, health care, vocational training, and mosque construction. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 5, 51. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 371. IIRO foreign offices were also required to submit original receipts, invoices, and other financial documentation to the IIRO Head Office to support its disbursements on approved projects. The Head Office would then inspect and review the disbursements of the foreign office to ensure implementation of the financial protocols and distribution of funds for their intended purpose. Ex. 4, May 21, 2024 Basha Decl. ¶ 51. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 372. IIRO foreign offices were not permitted to fund or otherwise support terrorist organizations or militants or other violent acts. Ex. 4, May 21, 2024 Basha Decl. ¶ 52. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 373. IIRO foreign offices were not permitted to intervene in the internal affairs of the host country or | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |

| | |
|---|---|
| support any specific political party in the country. Ex. 4, May 21, 2024 Basha Decl. ¶ 52; Ex. 5, Helles Decl. ¶ 25. | |
| 374. IIRO foreign offices were accountable to local authorities under applicable local laws and to the Secretariat General of IIRO. Ex. 5, Helles Decl. ¶¶ 19-20. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 375. IIRO foreign office directors ran and managed foreign office affairs, including by applying IIRO's financial and accounting guidelines, resolutions, and financial instructions. Ex. 68, IIRO Financial Guide for Foreign Offices, 1998, IIRO 130659-814; Ex. 51, Circular to foreign office directors, 1999, IIRO-130281, ¶1; Ex. 5, Helles Decl. ¶¶ 23-24. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 376. Under IIRO guidelines, foreign office directors were, among other things, prohibited from: (i) exploiting their position at IIRO for personal gain or advancing their personal interests at IIRO's financial or reputational expense; (ii) opening bank accounts without the Secretary General's prior approval; (iii) transferring funds between projects or using funds for purposes other than those previously approved absent the Secretary General's prior approval; (iv) committing or promising funding to others; (v) borrowing IIRO money for personal or others' use; ( (vi) selling, renting, or gifting IIRO assets or property; (vii) taking business trips without Head Office's approval; (viii) interfering in the politics of the host country or favoring a particular group; or (ix) participating in events or conferences without prior approval from the Secretary General. Ex. 51, Circular to Foreign Office Directors Dated 27/11/1419H, IIRO 130281-85; IIRO Financial Guide for Foreign Offices, 1998, IIRO 130684-85; Ex. 52, Circular to Foreign Office Directors Dated 1/6/1419H, IIRO 280804-05; see also Ex. 5, Helles Decl. ¶ 25. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 377. Under IIRO guidelines, foreign office directors were, among other things, required to: (i) safeguard IIRO interests and preserve IIRO property, investments, and funds; (ii) provide regular reports to Head Office regarding the office's performance, projects, programs, and employees; (iii) facilitate and assist with field visits by other IIRO representatives, including by answering any questions; and (iv) safeguard funds transferred by the Secretariat General to the foreign office and provide receipts and other documentation of expenditures. Ex. 5, Helles Decl. ¶ 24. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 378. To hire new employees, foreign office directors had to present candidates to the Secretariat General. Each new hire presentation had to include certain documents, | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |

| | |
|---|---|
| including their educational credentials, their identification, a letter of recommendation, a health certification, and a criminal background check, and the candidates' declaration that they are not members of political organizations or parties. These employees are only appointed with the approval of the Secretary General. Ex. 51, Circular to Foreign Office Directors Dated 27/11/1419H at IIRO 130282; Ex. 5, Helles Decl. ¶ 26. | |
| 379. IIRO foreign offices employed a Financial Officer, who served as the office's accountant or treasurer. IIRO established regulations and protocols applicable to all financial officers. Ex. 5, Helles Decl. ¶ 27. These regulations and protocols were supplemented through circulars distributed from Head Office Ex. 5, Helles Decl. ¶ 22 | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| **<u>Oversight of Local and Foreign Offices</u>** | No response necessary. |
| 380. The Secretariat General, including through the Local and Foreign Offices Department (later the Department of Offices), conducted oversight of IIRO local and IIRO foreign offices. Ex. 5, Helles Decl. ¶ 9. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 381. Given IIRO's size and the locations of some of the branches in third world countries often affected by civil strife or natural disasters, it was not always possible for branch offices to perfect their implementation of the financial and administrative regulations. Head Office strived with great effort to consistently follow-up with these branch offices to improve their compliance. Ex. 4, May 21, 2024 Basha Decl. ¶ 46. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 382. IIRO Head Office regularly performed audits of its branch offices to enforce its regulations and to ensure that branch offices followed Head Office protocols and sent staff from Head Office to supervise and inspect projects in order to increase and maintain compliance with Head Office financial and administrative protocols. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 47, 69; Ex. 27, Harbi Dep. Tr. at 318:13-24 (*Errata*). | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 383. Head Office took perceived accounting discrepancies or minor procedural deviations seriously and investigated all issues, ascertaining whether wrongdoing occurred and helping branch offices to ensure that such issues would not repeat. Ex. 29, Al-Shorman Decl. ¶ 9. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 384. In conjunction with the Head Office, certain local offices were assigned oversight of specific foreign offices. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |

| | |
|---|---|
| In some instances, multiple local offices oversaw certain foreign offices in conjunction with the Head Office. Ex. 67, The Working Mechanism of Programs and Projects, IIRO-000209-247 at IIRO-000246 (Chart of Assignments of Foreign Offices to Local Offices); Ex. 5, Helles Decl. ¶ 10. | |
| 385. IIRO local offices and IIRO Head Office conducted field visits to foreign offices. Ex. 5, Helles Decl. ¶¶ 12, 29. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 386. During field visits to foreign offices, visiting IIRO representatives coordinated with foreign office directors and reported to the relevant Head Office department on their visit. Ex. 5, Helles Decl. ¶ 31. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 387. Visiting local office representatives had no discretion to approve the implementation of new programs, projects, or new funding. Ex. 5, Helles Decl. ¶ 32. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 388. The visiting delegation prepared a report and submitted it to the Head Office. Ex. 5, Helles Decl. ¶ 33. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 389. The main purpose of these field visits was to verify that IIRO's regulations, decisions, and instructions were being implemented and to perform oversight of foreign offices, programs, and projects and determine program and project effectiveness. Ex. 5, Helles Decl. ¶¶ 9, 11, 12, 30. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 390. Although local offices oversaw foreign offices in conjunction with the Head Office, foreign office directors fell under the Secretariat General's supervision. Ex. 71, *The Working Mechanism between the General Secretariat and local office, at IIRO-000115*; Ex. 5, Helles Decl. ¶¶ 10, 11, 19. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| **<u>IIRO Financial Controls and Audits</u>** | No response necessary. |
| 391. As Secretary General, Adnan Basha worked to increase IIRO Head Office supervision and control over the organization, including requiring all project funding to flow through the Head Office. Ex. 4, May 21, 2024 Basha Decl. ¶ 65; Ex. 24, Daguit Dep. Tr. at 64:8- 14 (IIRO protocol required assistance from one office to be sent through the IIRO Head Office in Jeddah). | Disputed. *See, e.g.*, Plaintiffs' response to No. 354.<br><br>*See also* Plaintiffs' response to No. 31. During Basha's leadership of the IIRO as Secretary General from 1997 through 2013, (1) Basha collaborated and worked closely with MWL, IIRO, Rabita Trust, and Al Haramain al Masjed al Aqsa ("AHAMAA") officials who directed substantial financial, material, logistical, and ideological support to al Qaeda (e.g., Omar Abdullah Naseef, Wa'el Hamza Jelaidan, Abd al Hamid Sulaiman al Mujil, Prince Turki bin Fahad bin Jalawi al Saud, Mohammad bin Abdullah al Taibah (Chairman/President of |

| | |
|---|---|
| | AHAMAA), Mohammad bin Abdullah al Dubayban (Board Member of AHAMAA), and others); (2) the IIRO's Philippines and Indonesian branch offices, and IIRO official Abd al Hamid Sulaiman al Mujil, were designated by the U.S. government as Specially Designated Global Terrorists ("SDGT") for providing extensive support to al Qaeda and associated terror groups; (3) an audit of the IIRO-Pakistan's branch office, dated just a few months before the 9/11 attacks, uncovered the apparent diversion of millions of dollars of funds by that branch, and the wholesale fabrication of invoices, receipts and entire projects to conceal that activity (the same branch office that was used by the IIRO to fund 6 al Qaeda training camps, according to the 1996 CIA Report); (4) the IIRO's branch office Bosnia-Herzegovina was investigated for "providing financial support to known terrorist organizations;" and (5) the IIRO's branch office in Nairobi, Kenya, was implicated in the 1998 U.S. Embassy bombings in Africa and the IIRO office was deregistered.<br><br>Moreover, there were multiple raids of IIRO branch offices, arrests of IIRO employees, and seizures of IIRO bank accounts during Basha's tenure as IIRO Secretary General. *See, e.g.*, Ex. 111, IIRO 122003 (October 7, 2003 raid of IIRO branch office in Tirana, Albania); Ex. 100, IIRO 42373 (October 4, 2001 raid of IIRO branch office in Albania); Ex. 99, IIRO 42360 (reporting that the Saudi Embassy intervened to retrieve IIRO documents seized during raid); Ex. 72, U.S. Diplomatic Cable, *Treasury Undersecretary Stuart Levey Visits Bahrain to Discuss AML/CFT Efforts*, February 20, 2006, FED-PEC 220490-220491 (stating that authorities in Bahrain closed an IIRO bank account "which is not registered as a charity in Bahrain but had opened an account illegally and was using the account to circumvent Saudi restrictions on sending money abroad"); Ex. 57, FED-PEC 210514-210517 (reporting that authorities in Bahrain closed IIRO accounts as a result of irregular transactions which circumvented Bahraini regulations on charities and their financial transactions and stating: "[D]uring the first half of 2005, IIRO headquarters provided over $7 million from an account in Shamil Bank of Bahrain in Manama to 18 different IIRO satellite offices. Among these transactions, IIRO provided funds from the Bahrain account to three Saudi Embassies. Director Werner noted that the second largest single recipient of these funds was IIRO's Djibouti office."); Ex. 75, U.S. Diplomatic cable, *International Islamic Relief Organization (IIRO) Seeks to Access Funds Frozen by Islami Bank Bangladesh*, November 3, 2008, FED-PEC 220511-220513 (Islami Bank of Bangladesh froze the IIRO's accounts in 2006); Ex. 154, PEC-KSA 965-978 at 972 ("The regional financial accountant for the IIRO, an Egyptian named Hossam Meawad Mohammad Ali, was detained by Croatian authorities in a raid in Zagreb in |

| | |
|---|---|
| | April 1995 and has relocated to Ljubljana."); Ex. 55, FED-PEC 203706-203709 (reporting on the arrest of IIRO employee, Syed Abu Nasir, for his involvement in an attempted terrorist operation to bomb the U.S. Consulates in Chennai and Calcutta); Ex. 43, FED-PEC0097363-97365 (reporting on the K-FOR military police raid on the joint IIRO-Saudi Joint Relief Committee office in Kosovo in 2000 because Osama bin Laden associates Wa'el Hamza Jelaidan and Adel Muhammad Sadiq Bin Kazem were using the office to help bin Laden "move money and men to and from the Balkans;"); Ex. 112, IIRO 122181-122182 (2003 letter from IIRO Secretary General Basha informing that K-FOR military police continue to surveil the IIRO in Kosovo.); Ex. 74, U.S. Diplomatic cable, *Macedonia: A/S O'Brien Visit Highlights Terrorism and Financing Issues*, August 22, 2007, FED-PEC 220506-220510 (reporting that the IIRO branch office in Macedonia was closed and its members were expelled from the country in March 1995); Ex. 154, PEC-KSA 965-978 at 972 ("The Macedonian government closed the IIRO office in Skopje in March 1995 for aiding Albanian ethnic political parties and the Albanian Islamic Youth Organization."); Ex. 121, IIRO 284675 (discussing the 1999 closure of the IIRO's branch office in Makhachkala, Russa, and the confiscation of the IIRO's assets); Ex. 46, FED-PEC 144926-145008 (U.N. indicating that following the 9/11 attacks, the government of Pakistan identified and expelled some two dozen al Qaeda supporters who had been working for IIRO-sponsored organizations in Pakistan); Ex. 138, MWL 15876-25877 (August 6, 1993 letters from Roberto R. Romulo, the Philippine Secretary of Foreign Affairs, addressing a July 22, 1993 raid of the MWL branch office in Makati by agents of the Bureau of Immigration and Deportation with arrest warrants for the MWL staff for operating without a license.); Ex. 123, IIRO 285529-285530 (October 16, 2002 letter from Sulaiman al Ali, former IIRO office manager in the United States, to IIRO Secretary General Adnan Basha, concerning the FBI's raid of the IIRO office in 1997.).<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 84-88 (detailing (1) the freezing of IIRO bank accounts by the government of Bangladesh in 2005 based on concerns that IIRO has ties to al Qaeda; (2) an IIRO bank account was closed by the government of Bahrain in 2005 for circumventing Saudi restrictions on sending money abroad; (3) the government of Makhachkala closing IIRO's branch office in 199 and confiscating the IIRO's assets; (4) the IIRO-Kenaya's connection to the 1998 U.S. Embassy bombings in Africa; (5) a 1995 raid of the IIRO-Vienna office by a German and Austrian counterterrorism task force; and (5) a 2000 raid of the joint IIRO-Saudi Joint Relief Committee office in an attempt to thwart potential U.S. attacks on U.S. interests). |

| | |
|---|---|
| | *See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 35 (citing to the 1996 CIA Report and stating: "Croatian authorities conducted a raid and detained Hossam Meawad Mohammad Ali, an Egyptian who served as the IIRO's accountant. The Agency reported that the Macedonians shut the IIRO office in Skopje in March 1995, and noted Mohammad Jamal Khalifa's ties to plots targeting the Pope and American airlines when he headed the IIRO office in Manila. 'Another high-ranking [IIRO] official in the Philippines leads Hamas meetings,' the report stated, adding that 'the majority of Hamas members in the Philippines are employed by the organization.'"). |
| 392. IIRO subjected its financial and administrative protocols to periodic review and evaluation to make sure they were compliant with industry-standard best practices, and required its departments and branches to comply with them to enhance its financial and administrative standards. Ex. 4, May 21, 2024 Basha Decl. ¶ 46; Ex. 5, Helles Decl. ¶ 35. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 393. IIRO built auditing into its financial processes. Ex. 4, May 21, 2024 Basha Decl. ¶ 53; Ex. 25, Basha Dep. Tr. at 232:11-14 (*Errata*), 232:21-233:6 (*Errata*). | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 394. IIRO's internal auditing department and the Financial Oversight Department periodically conducted field visits to IIRO's offices and operations worldwide to ensure compliance with its financial and administrative regulations and supervise distribution of humanitarian assistance and project implementation. These unannounced visits and the internal audits occasionally identified partial non-compliance with technical financial and administrative protocols, typically due to local conditions and prevailing work cultures, which were mostly in underdeveloped countries. In instances where non-compliance was identified, it was investigated and corrective action taken. Ex. 4, May 21, 2024 Basha Decl. ¶ 47. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 395. IIRO appointed an internal auditor who (i) verified compliance with record keeping requirements and financial regulations and procedures; (ii) verified the accuracy of accounting records and financial, accounting, and statistical information; and (iii) certified year-end closing statements. The internal auditor was appointed by the Chairman of the Board and reported to the Chairman of the Board and the IIRO Secretary General. Ex. 6, Sarhan Decl. ¶ 25. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |

| | |
|---|---|
| 396. IIRO's internal auditing department periodically produced auditing reports of IIRO's foreign offices. Ex. 4, May 21, 2024 Basha Decl. ¶ 47. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 397. IIRO's internal auditing department placed a priority on certain foreign offices operating on a large scale, as those offices typically had sizeable budgets or higher than average petty cash balances. Ex. 4, May 21, 2024 Basha Decl. ¶ 47. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 398. IIRO did not leave weaknesses in its internal controls of foreign offices. Ex. 35, Barron Dep. Tr. at 373:9-22. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 399. IIRO also assigned an independent external auditor to audit IIRO's accounts. The external auditor reviewed books, records, and documents to prepare IIRO's end-of-year financial statements and the Statement of Activities. Ex. 6, Sarhan Decl. ¶ 26. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 400. External auditors conducted yearly audits of IIRO Head Office accounts and sampled external offices on a periodic basis. Ex. 4, May 21, 2024 Basha Decl. ¶ 53; Ex. 25, Basha Dep. Tr. at 91:7-92:7, 232:18-233:6 (*Errata*); Barron Rpt. ¶ 22.2 & n.13. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 401. IIRO's external auditors were international companies, including Arthur Anderson and KPMG and Ernst & Young. Ex. 4, May 21, 2024 Basha Decl. ¶ 53; Ex. 25, Basha Dep. Tr. at 232:18-10. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 402. IIRO's external audits covered its foreign offices, including IIRO-Pakistan, because the audits encompassed the entire organization. Ex. 35, Barron Dep. Tr. at 208:3-13, 280:3-11, Ex. 25, Basha Dep. Tr. at 91:2-92:7, 232:21-233:6 (*Errata*); Barron Rpt. ¶ 22.2 n.13. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 403. Single versus double entry accounting are bookkeeping errors, and a lack of documentation is not unusual. Ex. 35, Barron Dep. Tr. at 316:6-317:12. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 404. John Barron, an accounting expert, concludes that nothing he reviewed indicates that IIRO (including any of its foreign offices) misused charitable funds to support terrorism and that he saw no evidence of such support. Ex. 35, Barron Dep. Tr. at 316:6-317:12, 380:16-381:13. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 405. IIRO did not use irregular or atypical accounting practices that would increase the risk of diverting funds to terror. Barron Rpt. ¶ 11. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |

| | |
|---|---|
| 406. The activities and actions of IIRO senior management show that senior management sought to identify and rectify any deficiencies in IIRO accounting practices and internal controls. Barron Rpt. ¶ 40.2. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| 407. IIRO had monitoring controls in place, which controls included, *inter alia*: (A) an annual budgeting process; (B) the hiring of external auditors, which sampled external offices; (C) a committee, chaired by Adnan Basha, responsible for the general blueprint of policies and procedures in the local and external offices and how to develop them; (D) the establishment of committees to manage affairs of offices whenever the position of office manager became vacant; (E) the requirement of joint involvement of a delegation from the General Secretariat and local IIRO office to go into the field to oversee funding for disaster relief to local governments to prevent any misuse or suspicion of misuse or resale; (F) the approval by the Urgent Relief Department of IIRO of distribution of gifts from the Saudi government in coordination with the Saudi Embassy; (G) pre-expenditure and post-expenditure controls; (H) the in-house retention of chartered auditors assigned by the board of directors to control the financial performance of the organization; (I) internal audits; and (J) inspections related to orphanages. Barron Rpt. ¶¶ 22.2-22.3; Ex. 35, Barron Dep. Tr. at 269:8-24. | Disputed. *See, e.g.*, Plaintiffs' response to No. 354. |
| <u>**Identification Cards**</u> | No response necessary. |
| 408. IIRO did not issue identification (or "ID") cards to Al Qaeda members. Ex. 4, May 21, 2024 Basha Decl. ¶ 38. | Disputed. The IIRO's claim that the IIRO and MWL did not provide extensive support to members of al Qaeda and associated terrorist organizations in the form of identification cards, cover employment, false documentation, travel assistance, and other similar forms of support is inaccurate and misleading. *See, e.g.*, <u>Ex. 7</u>, *How Bin Ladin Commands a Global Terrorist Network [REDACTED]*, January 27, 1999, CIA_00002-16 at 7 ("Bin Ladin exploits these NGO ties to channel funds and obtain cover employment and travel assistance for his associates."); <u>Ex. 13</u>, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 210 ("The availability of funds, cover, and logistics networks makes NGOs an appealing resource for terrorist groups. NGOs typically are awash in money – the Muslim World League's budget is more than $26 million annually, and the annual budget of the International Islamic Relief Organization has never dipped below $50 million – and tapping into the funds offers terrorist some independence from traditional state sponsors, who often attempt to control such groups for their own purposes. The |

| | |
|---|---|
| | logistical support NGOs offer includes cover employment, false documentation, travel facilitation, training, and in some cases, weapons."); *id.* at 213 (stating that "several MWL affiliate organizations—including the International Islamic Relief Organization (IIRO)—have provided terrorists with funding and cover employment, documentation, and training"); *id.* at 220 ("Despite Saudi efforts to curb terrorist use of the IIRO, its personnel in local branch offices continue to channel funds to terrorists and provide them with logistical support – such as cover employment, documentation, travel assistance and access to training – [REDACTED]."); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 822 (indicating that the MWL "has been used as a cover organization for several of Usama's associates").<br><br>Al Qaeda member Jamal al Fadl testified that the IIRO-Pakistan branch office, under the leadership of Abu Hammam al Saudi and Wa'el Hamza Jelaidan, provided identification cards and papers to al Qaeda members. *See* Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143 at 2137 (Fadl testified that Wa'el Jelaidan ran the Peshawar branch of the IIRO, which made ID cards for "the Al-Qaeda people" so "you can enter the border between Pakistan, Afghanistan easily with – with no problem."); *id.* at 2138 (Fadl testified that the IIRO would also provide letters to al Qaeda members so that they could get visas from Pakistan immigration and stay in Pakistan); *id.* at 2141-2143 (Fadl further testified that the IIRO falls under the Saudi Rabita al Alam al Islamiya (a/k/a the Muslim World League), which is the "mother of all NGOs."); Ex. 160, FBI 302 Cooperating Witness Statement of Jamal al Fadl, November 1996, PEC-KSA 2115-2132 at 2120-2121 (Fadl stated that al Qaeda member Abu Hammam was the manager of the IIRO office in Peshawar, Pakistan, and "would provide false IIRO identifications for people to travel").<br><br>*See also* Ex. 1, 9/11 Commission Final Report at 170-171 ("Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization."); Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer ("Winer Report") at 88-89 (stating that an IIRO identification card was found on the body of a killed Arab-Afghan guerilla in Bosnia); Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann ("Kohlmann Report") at 26 (stating that IIRO provided false identification to al Qaeda members). |

| | |
|---|---|
| | Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 409. IIRO would never have authorized the issuance of ID cards to Al Qaeda members, members of other terrorist organizations, or anyone who was not an IIRO employee. Ex. 4, May 21, 2024 Basha Decl. ¶ 38. | Disputed. *See, e.g.*, Plaintiffs' response to No. 408. |
| 410. IIRO-Sarajevo did not provide identification cards for mujahadeen or Al Qaeda members. Ex. 29, Al-Shorman Decl. ¶ 25. | Disputed. *See, e.g.*, Plaintiffs' response to No. 408.<br><br>Moreover, to the extent the IIRO is relying upon Shorman's new declaration testimony at Exhibit 29, the statement is disputed. *See* Plaintiffs' response to No. 280 (stating that (1) the April 6, 2026 Shorman Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Shorman Declaration was never produced to Plaintiffs during or after Shorman's June 20, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Shorman's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Shorman Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 411. IIRO-Philippines did not issue identity cards. Ex. 8, Daguit Decl. ¶ 30. | Disputed. *See, e.g.*, Plaintiffs' response to No. 408.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |

| | |
|---|---|
| 412. Adnan Basha is aware of instances when individuals who had been arrested would claim to be an employee of IIRO or another NGO. In all instances that Adnan Basha can recall, IIRO's investigation regarding these allegations would reveal that the individual claiming to be an IIRO employee was not in fact an IIRO employee. Ex. 4, May 21, 2024 Basha Decl. ¶ 38. | To the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Basha never raised any issue or provided any information during his February 20-21, 2019 deposition concerning arrested individuals claiming to be an employee of the IIRO. In his new declaration testimony, Basha states: "I am aware of instances when individuals who had been arrested would claim to be an employee of IIRO or another NGO. In all such instances of which I am aware, the investigations IIRO conducted confirmed that these individuals were not employed by IIRO." Notably, Basha does not provide any credible examples or supporting evidence to support that statement. |
| 413. Al Qaeda had its own forgery operation to forge travel documents. Ex. 21, Winer Dep. Tr. at 388:16-24. | Undisputed as a general matter for purposes of this motion.<br><br>By way of further response, *see* Plaintiffs' response to No. 335 (discussing the investigation of the IIRO-Pakistan branch office and its financial records and finding that "[t]he collected evidence indicated the existence of cheating, forgery and misuse of the IIRO's funds").<br><br>*See also* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 212-216 (Basha testifies that the IIRO received evidence that two IIRO officials in the IIRO-Pakistan office were involved in the cheating, forgery, and misuse of IIRO funds); Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 75-76 (discussing same). |
| 414. Plaintiffs rely on al Fadl's assertion that "bin Ladin and al Qaeda used Wael Julaidan as the head of IIRO in Peshawar, Pakistan, to create ID cards for al Qaeda people so that they could cross the Pakistan-Afghanistan border without a problem" (Winer Rpt. at 117; Kohlmann Rpt. ¶ 78 n.107), but the assertion described events from "[b]efore the Al-Qaeda start, Bin Laden people . . ." and Al Fadl's interviewers confirmed that "this is pre-Al Qaeda." Ex. 21, Winer Dep. Tr. at 386:12-388:1. | Disputed. *See* Plaintiffs' response to No. 408, including Ex. 7, *How Bin Ladin Commands a Global Terrorist Network [REDACTED]*, January 27, 1999, CIA_00002-16 at 7 ("Bin Ladin exploits these NGO ties to channel funds and obtain cover employment and travel assistance for his associates."); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 210 ("The availability of funds, cover, and logistics networks makes NGOs an appealing resource for terrorist groups. NGOs typically are awash in money – the Muslim World League's |

| | |
|---|---|
| | budget is more than $26 million annually, and the annual budget of the International Islamic Relief Organization has never dipped below $50 million – and tapping into the funds offers terrorist some independence from traditional state sponsors, who often attempt to control such groups for their own purposes. The logistical support NGOs offer includes cover employment, false documentation, travel facilitation, training, and in some cases, weapons."); *id.* at 213 (stating that "several MWL affiliate organizations—including the International Islamic Relief Organization (IIRO)—have provided terrorists with funding and cover employment, documentation, and training"); *id.* at 220 ("Despite Saudi efforts to curb terrorist use of the IIRO, its personnel in local branch offices continue to channel funds to terrorists and provide them with logistical support – such as cover employment, documentation, travel assistance and access to training – [REDACTED]."); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 822 (indicating that the MWL "has been used as a cover organization for several of Usama's associates"). |
| **1993 World Trade Center Bombing** | No response necessary. |
| 415. Plaintiffs have no evidence showing that IIRO was involved in the planning or execution of the 1993 World Trade Center bombing. Jenkins Rpt. at 13-15 (discussing the 1993 World Trade Center bombing but failing to provide evidence of IIRO's involvement); Kohlmann Rpt. at 10, 34, 51, 58, 61 (citing to various individuals who were involved in the 1993 World Trade Center bombing but failing to provide evidence of IIRO's involvement). | Disputed. The IIRO's claim that there is no evidence that the IIRO had any foreknowledge of the 1993 World Trade Center bombing is inaccurate and misleading. Ramzi Yousef, the mastermind of the 1993 World Trade Center bombing, received funding from Mohammed Jamal Khalifa (a founding member of al Qaeda) and the IIRO (one of the Saudi charities that served as a primary conduit for channeling financial, material, logistical, operational, and ideological support to al Qaeda's global jihad in the decade leading up to the 9/11 attacks). *See, e.g.,* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities."); Ex. 79, The Age, *Filipino Muslims Linked to Holy Warrior's Global Terror*, May 20, 1995 (reporting that Mohammed Jamal Khalifa of the IIRO, a "key figure in the network of Islamic extremists," was funding Ramzi Yousef). *See also* Ex. 1, 9/11 Commission Final Report at 59 (stating that Ramzi Yousef and Khalid Sheikh Mohammed "were traveling around the world and joining in projects that were supported by or linked to Bin Ladin, the Blind Sheikh, or their associates").<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 34 (citing excerpt from *Ghost Wars* by Steve Coll stating that the IIRO and MWL provided "important resources" to Ramzi Yousef: "The FBI analysis listed the huge |

| | |
|---|---|
| | semiofficial Saudi Arabian charity, the International Islamic Relief Organization, and the largest government-sponsored Saudi religious proselytizing organization, the Muslim World League, as important resources for the new terrorist."). |
| 416. Plaintiffs have no evidence that IIRO had any foreknowledge of the planning or execution of the 1993 World Trade Center bombing. Jenkins Rpt. at 13-15 (discussing the 1993 World Trade Center bombing but failing to provide evidence of IIRO's foreknowledge or involvement); Kohlmann Rpt. at 10, 34, 51, 58, 61 (citing to various individuals who were involved in the 1993 World Trade Center bombing but failing to provide evidence of IIRO's foreknowledge or involvement); Ex. 24, Daguit Dep. Tr. at 164:6-24 (*Errata*); Ex. 8, Daguit Decl. ¶ 3 (Abdulhadi Daguit, who worked at IIRO-Philippines from 1986 until its closure in 2006, was only aware of Ramzi Yousef's presence in the Philippines through newspaper reports). | Disputed. The IIRO's claim that there is no evidence that the IIRO had any foreknowledge of the 1993 World Trade Center bombing is inaccurate and misleading. As discussed further herein, the IIRO and its leadership (*e.g.*, IIRO Secretary General Adnan Basha), including its parent organization the Muslim World League ("MWL") and its officials (*e.g.*, MWL Secretaries General Dr. Abdullah Omar Naseef, Abdullah bin Saleh al Obaid, Abdul Mohsen al Turki); members of the IIRO's Board of Directors and Executive Committee, and their advisors, who have been identified as al Qaeda's most important financiers (*e.g.*, Ibrahim Mohammad Afandi, Abdurahman Abdul-Qader Faqih, Saleh al Kamel, Suleiman al Rajhi); members of the Saudi Royal family who held high-ranking leadership and supervisory positions with the IIRO while simultaneously serving as officials of the Saudi government (*e.g.*, Prince Muhammad bin Fahd bin Abdul Aziz, Prince Turki bin Jalawi al Saud); and IIRO officials, employees, advisors, and representatives (*e.g.*, Wa'el Hamza Jelaidan, Mohammed Jamal Khalifa, Abu Hammam al Saudi, Abd al Hamid Sulaiman al Mujil, Sulaiman al Ali, Abdelhadi Daguit, Mahmud Abd Al-Jalil Afif, Abdul Asmad, Abdelaziz Zaher, Jamal Al-Jibouri), were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad.<br><br>These individuals were quintessential al Qaeda insiders, operating at the very center of al Qaeda's leadership, operations, and financial and logistical support structure during the critical period leading up to the 9/11 attacks, and were well aware of al Qaeda's terrorist intentions at all relevant times, including al Qaeda's publicized desire to conduct violent attacks against U.S. citizens, U.S. embassies and consulates, and U.S. military assets and personnel wherever they could be found (both in the U.S. and abroad).<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 6, 43, 90, 109, 415.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 8, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or |

| | |
|---|---|
| | after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 417. On February 26, 1993, the parking garage of the World Trade Center in New York, New York was bombed in an attack masterminded by Ramzi Yousef. 9/11 Commission Report, at 279-80; Sidel Rpt. ¶ 104. | Undisputed as a general matter for purposes of this motion. |
| 418. Al Qaeda was not involved in the 1993 World Trade Center bombing. Ex. 26, Sidel Dep. Tr. at 141:5-8; Ex. 36, Jenkins Dep. Tr. at 233:10–234:14 (no evidence to suggest local volunteers were Al Qaeda members or Al Qaeda affiliates, and "fair inference" that Ramzi Yousef lacked the support of Al Qaeda in connection with the 1993 World Trade Center bombing); Sidel Dep. Tr. at 116:10-14 (neither Ramzi Yousef nor Khalid Sheikh Mohamed members of Al Qaeda); Ex. 18, Brown Rpt. at 43-44 (reviewing evidence that Ramzi Yousef and KSM belonged to "independent cell" based in Philippines at time of 1993 WTC attack); Ex. 16, Roy Rpt. at 21 (Osama Bin Laden was not directly involved in any international terrorist activities prior to 1996. The World Trade Center terrorist attack in 1993 was carried out by a different network). | Disputed. Ramzi Yousef, the mastermind of the 1993 World Trade Center bombing, received funding from Mohammed Jamal Khalifa (a founding member of al Qaeda) and the IIRO (one of the Saudi charities that served as a primary conduit for channeling financial, material, logistical, operational, and ideological support to al Qaeda's global jihad in the decade leading up to the 9/11 attacks). *See, e.g.,* <u>Ex. 155</u>, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities."); <u>Ex. 79</u>, The Age, *Filipino Muslims Linked to Holy Warrior's Global Terror*, May 20, 1995 (reporting that Mohammed Jamal Khalifa of the IIRO, a "key figure in the network of Islamic extremists," was funding Ramzi Yousef). *See also* <u>Ex. 1</u>, 9/11 Commission Final Report at 59 (stating that Ramzi Yousef and Khalid Sheikh Mohammed "were traveling around the world and joining in projects that were supported by or linked to Bin Ladin, the Blind Sheikh, or their associates"). |
| 419. Osama Bin Laden was not directly involved in any international terrorist activities prior to 1996. The World Trade Center terrorist attack in 1993 was carried out by a different network. Ex. 16, Roy Rpt. at 21. | Disputed. The IIRO's claim that Osama bin Laden was not directly involved in any international terrorist activities prior to 1996, is inaccurate and misleading. Osama bin Laden issued a fatwa in 1993 advocating violence against Americans based in Mogadishu, Somalia. U.S. forces were subsequently attacked during the "Battle of Mogadishu" on October 3-4, 1993. Eighteen U.S. soldiers were killed and eighty-four were wounded. *See also* <u>Ex. 15</u>, *Terrorism: Usama Bin Ladin's Activities in Somalia and Sudanese NIF Support*, CIA_000347-350 at 349 ("Islamic Army members were sent to Somalia, with the NIF's knowledge and encouragement, in order to kill U.S. troops, incite violence against U.S. personnel, and undermine the success of the U.S. mission. Most of the Islamic Army activity involved inciting the Somali public. Bin Ladin's specific orders to Islamic Army members sent to Somalia was to defeat the U.S. forces. [REDACTED] The code name of the operation may have been 'Head of the Snake.'"). |

| | |
|---|---|
| **Bojinka Plot** | No response necessary. |
| 420. Plaintiffs have no evidence that IIRO had any foreknowledge of or was involved in the planning or execution of the Bojinka Plot. Winer Rpt. at 27, 98, 100 (discussing the Bojinka plot, but failing to provide evidence of IIRO's involvement in the plot). | Disputed. The IIRO's claim that there is no evidence that the IIRO had any foreknowledge of or was involved in the planning or execution of the Bojinka Plot is inaccurate and misleading. The IIRO, Mohammed Jamal Khalifa, and the IIRO-Philippines branch office were witting supporters of Osama bin Laden, al Qaeda, and associated terrorist organizations (Abu Sayyaf Group, Moro Islamic Liberation Front) for more than a decade leading up to the 9/11 attacks, and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States. Khalifa, a founding member of al Qaeda and Osama bin Laden's brother-in-law, operated at the very center of al Qaeda's leadership, operations, and financial and logistical support structure during the critical period leading up to the 9/11 attacks, and was well aware of al Qaeda's terrorist intentions at all relevant times.<br><br>As referenced herein, Dr. Omar Abdullah Naseef, in his capacity as the MWL Secretary General and IIRO Chairman, approved the appointment of Khalifa to open a joint MWL/IIRO branch office in the Philippines, contemporaneous with the formation of al Qaeda, on June 5, 1988. *See* Ex. 51, FED-PEC 202846-202847. At the time of his appointment, the MWL and IIRO were fully aware that Khalifa was a prominent veteran of the Afghan jihad, a close associate of bin Laden, and member of al Qaeda. Shortly after assuming that post, Khalifa used the MWL/IIRO office as a platform for al Qaeda's expansion into South-East Asia, and a source of funding for terrorist operations.<br><br>As the Regional Director for the IIRO in South-East Asia, and simultaneously a member of al Qaeda, Khalifa personally orchestrated the use of IIRO funds and resources to support the terrorist activities of 9/11 mastermind Khalid Sheikh Mohammed ("KSM"), Ramzi Yousef (1993 World Trade Center bomber), and Wali Khan Amin Shah (Afghan jihad veteran and Osama bin Laden/al Qaeda associate) in the Philippines, and the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations of twelve U.S. flag commercial airplanes as they flew from Asia to the United States. That very plot, often referred to as "Operation Bojinka," was adapted into the 9/11 terrorist plot by KSM, using the knowledge he had acquired during its development about vulnerabilities in the aviation security system. *See* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 (stating that the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and |

| | |
|---|---|
| | U.S. airlines; his brother-in-law is Usama Bin Ladin"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."). *See also* Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12, 24 (discussing the Bojinka plot).<br><br>When the plot was thwarted by Philippines police in 1995, the local media outlets reported on Khalifa's connection to the plot and Ramzi Yousef. *See* Ex. 79, The Age, *Filipino Muslims Linked to Holy Warrior's Global Terror*, May 20, 1995 (reporting on the discovery of al Qaeda's terrorist plot in the Philippines ("Bojinka") and explaining that Mohammed Jamal Khalifa of the IIRO, a "key figure in the network of Islamic extremists," was funding Ramzi Yousef and Islamic militants in the Philippines).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 34 (citing excerpt from *Ghost Wars* by Steve Coll stating that the IIRO and MWL provided "important resources" to Ramzi Yousef: "The FBI analysis listed the huge semiofficial Saudi Arabian charity, the International Islamic Relief Organization, and the largest government-sponsored Saudi religious proselytizing organization, the Muslim World League, as important resources for the new terrorist."). |
| 421. The Bojinka Plot refers to a collection of plans to be executed in 1995, including a multi-plane bombing initiative where individuals would sneak bombs aboard American planes and detonate them over the Pacific, bomb cargo carriers, and assassinate President Clinton and the Pope. Ex. 26, Sidel Dep. Tr. at 104:21-105:22; Ex. 17, Sageman Rpt. at 95-96. | Undisputed as a general matter for purposes of this motion. |
| 422. Defense and Plaintiffs' experts agree that the Bojinka Plot was not an Al Qaeda- directed attack. Ex. 36, Jenkins Dep. Tr. at 93:20-94:17 (Bojinka "was not an Al Qaeda operation"); see *id.* at 229:4-19 (no opinion as to whether Bin Laden or Al Qaeda financed Bojinka plot); 232:17-233:3 (only evidence linking Al Qaeda and Bojinka was "reported financing, and with the operative word being reported"); Ex. 26, Sidel Dep. Tr. at 113:11-23, 140:11-141:12; 9/11 Commission Rpt. at 153-54 (noting that, prior to greenlighting of 9/11 Attacks, Al Qaeda believed a plan "paralleling the Bojinka concept" "did not fit the needs of al Qaeda," and even KSM's initial proposal for a plane attack "received a lukewarm response from al Qaeda leaders skeptical of its scale and | Disputed. The Bojinka plot was a terrorist operation that received funding and other support from Mohammed Jamal Khalifa (a founding member of al Qaeda) and the IIRO (one of the Saudi charities that served as a primary conduit for channeling financial, material, logistical, operational, and ideological support to al Qaeda's global jihad in the decade leading up to the 9/11 attacks). *See* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities.").<br><br>*See also* Ex. 37, March 9, 2020 Expert Report of Dr. Matthew Levitt at 11 (stating that Khalid Sheikh Mohammed received |

| | |
|---|---|
| complexity"); *id.* at 154 (KSM joined Al Qaeda in late 1998 or 1999); Ex. 18, Brown Rpt. at 43-44 (group including KSM, Yousef, and Shah was independent from Al Qaeda). | funding through Khalifa and the IIRO during his time in the Philippines); Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 27 ("[T]he 1996 CIA Report finds that one of Saudi Arabia's largest charities, IIRO, was being used by the [Bojinka] plotters to provide cover for their activities."); *id.* at 98 (concluding that "the Bojinka plot would not have been possible without the building of the relationships between al Qaeda and its operatives in the Philippines supported by IIRO."); Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12 (discussing the Bojinka plot). |
| 423. Ramzi Yousef, Khalid Sheik Muhamad, and Wali Khan Amin Shah were involved in the Bojinka plot. 9/11 Commission Rpt. at 147. | Disputed. The IIRO's suggestion that Khalid Sheikh Mohammed, Ramzi Yousef, and Wali Khan Amin Shah were the only participants in the Bojinka plot is inaccurate and misleading. *See* Plaintiffs' response to No. 420 (stating that Mohammed Jamal Khalifa personally orchestrated the use of IIRO funds and resources to support the terrorist activities of Khalid Sheikh Mohammed, Ramzi Yousef, and Wali Khan Amin Shah and the development of the Bojinka plot).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 34 (citing excerpt from *Ghost Wars* by Steve Coll stating that the IIRO and MWL provided "important resources" to Ramzi Yousef: "The FBI analysis listed the huge semiofficial Saudi Arabian charity, the International Islamic Relief Organization, and the largest government-sponsored Saudi religious proselytizing organization, the Muslim World League, as important resources for the new terrorist."). |
| 424. Ramzi Yousef was not an Al Qaeda member. Ex. 36, Jenkins Dep. Tr. at 233:10-20 (no evidence to suggest local volunteers were Al Qaeda members or Al Qaeda affiliates); Ex. 26, Sidel Dep. Tr. at 116:10-14; Ex. 36, Jenkins Dep. Tr. at 217:16-225:11 (revising opinion to state that Yousef was recruiter for "groups coalescing around Al Qaeda" yet unable to recall or locate source for opinion); Ex. 21, Winer Dep. Tr. at 558:1-21 (opining that Yousef was not a member of Al Qaeda and not affiliated with Al Qaeda but associated with Al Qaeda and noting that Yousef's Al Qaeda status was not the subject of his opinion). | Disputed. *See* Ex. 1, 9/11 Commission Final Report at 59 (stating that Ramzi Yousef and Khalid Sheikh Mohammed "were traveling around the world and joining in projects that were supported by or linked to Bin Ladin, the Blind Sheikh, or their associates"). |
| 425. Khalid Sheikh Muhammad had not even met with Bin Laden, let alone begun working with Al Qaeda, until after Bojinka, and was neither a member of Al Qaeda nor had pledged allegiance to Osama Bin Laden at the time of the Bojinka Plot. Ex. 18, Brown Rpt. at 41, 43-44; Ex. 26, Sidel Dep. Tr. at 116:1-117:20; Ex. 36, Jenkins Dep. Tr. at 75:2-76:8 (KSM refused to join Al Qaeda in 1996, which was after Bojinka Plot); Kohlmann Rebuttal. Rpt. (ECF No. 9250-5) ¶ 84; Jenkins Rpt. at 16 (describing the first | Disputed. *See, e.g.*, Plaintiffs' response to No. 424. |

| | |
|---|---|
| meeting between Khalid Sheikh Mohmmed and Osama Bin Laden and noting that "[i]n 1996, [KSM] traveled to Afghanistan to meet Osama bin Laden."), 23 ("accepted bin Laden's invitation to join [Al Qaeda] sometime in late 1998 or early 1999."), 21-22 (opining KSM refused to join Al Qaeda after Manila plot); Ex. 21, Winer Dep. Tr. at 556:15- 557:25 (refusing to opine whether KSM was a member of Al Qaeda during Bojinka plot). | |
| 426. Wali Khan Amin Shah broke from Osama Bin Laden in March 1989 and was not a member of Al Qaeda. Ex. 37, Sageman Dep. Tr. at 684:5-21; Ex. 17, Sageman Rpt. at 29 n.103; 9/11 Commission Report at 59 (Wali Khan "worked with Bin Ladin in the early 1980s"); Ex. 18, Brown Rpt. at 40, 43-44. | Disputed. The IIRO's claim that Wali Khan Amin Shah broke from Osama Bin Laden in March 1989 is inaccurate and misleading. The IIRO further misrepresents what the 9/11 Commission said about Wali Khan's relationship with bin Laden. According to the 9/11 Commission: "Some of Bin Ladin's close comrades were more peers than subordinates. For example, Usama Asmurai, also known as Wali Khan, worked with Bin Ladin in the early 1980s and helped him in the Philippines and in Tajikistan." Wali Khan clearly did not break from bin Laden in 1989 if he was conducting operations on behalf of bin Laden in the Philippines in the 1990s.<br><br>*See also* <u>Ex. 208</u>, Rebuttal Expert Report of Evan Francois Kohlmann at ¶¶ 28-30 (detailing Wali Khan's relationship with bin Laden in the 1980s and 1990s). |
| 427. Muhammad Jamaal Khalifa's network in the Philippines would have been irrelevant to Ramzi Yousef, Khalid Sheikh Muhammad, and Wali Khan as they planned the Bojinka plot, given the geographic divide between his network in the Southern Philippines and their planning in Manila. Ex. 26, Sidel Dep. Tr. at 137:21-138:16. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 420, 423, and 426. |
| **<u>1998 Embassy Bombings</u>** | No response necessary. |
| 428. Plaintiffs have no evidence that IIRO had any foreknowledge of the 1998 African Embassy bombings. Kohlmann Rpt. ¶ 87 (discussing 1998 African Embassy bombings and failing to show IIRO's foreknowledge or involvement in the same); Ex. 4, May 21, 2024 Basha Decl. ¶ 39. | Disputed. The IIRO's claim that there is no evidence that IIRO had any foreknowledge of the 1998 African Embassy bombings is inaccurate and misleading. As discussed further herein, the IIRO and its leadership (*e.g.*, IIRO Secretary General Adnan Basha), including its parent organization the Muslim World League ("MWL") and its officials (*e.g.*, MWL Secretaries General Dr. Abdullah Omar Naseef, Abdullah bin Saleh al Obaid, Abdul Mohsen al Turki); members of the IIRO's Board of Directors and Executive Committee, and their advisors, who have been identified as al Qaeda's most important financiers (*e.g.*, Ibrahim Mohammad Afandi, Abdurahman Abdul-Qader Faqih, Saleh al Kamel, Suleiman al Rajhi); members of the Saudi Royal family who held high-ranking leadership and supervisory positions with the IIRO while simultaneously serving as officials of the Saudi government (*e.g.*, Prince Muhammad bin Fahd bin Abdul |

| | |
|---|---|
| | Aziz, Prince Turki bin Jalawi al Saud); and IIRO officials, employees, advisors, and representatives (*e.g.*, Wa'el Hamza Jelaidan, Mohammed Jamal Khalifa, Abu Hammam al Saudi, Abd al Hamid Sulaiman al Mujil, Sulaiman al Ali, Abdelhadi Daguit, Mahmud Abd Al-Jalil Afif, Abdul Asmad, Abdelaziz Zaher, Jamal Al-Jibouri), were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad.<br><br>These individuals were quintessential al Qaeda insiders, operating at the very center of al Qaeda's leadership, operations, and financial and logistical support structure during the critical period leading up to the 9/11 attacks, and were well aware of al Qaeda's terrorist intentions at all relevant times, including al Qaeda's publicized desire to conduct violent attacks against U.S. citizens, U.S. embassies and consulates, and U.S. military assets and personnel wherever they could be found (both in the U.S. and abroad).<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 6, 43, 90, 109, and 429.<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 429. Plaintiffs have no evidence that IIRO had any involvement in the planning or execution of the 1998 African Embassy bombings. Kohlmann Rpt. ¶ 87 (discussing 1998 African Embassy bombings and failing to show IIRO's foreknowledge or involvement in the same); Ex. 4, May 21, 2024 Basha Decl. ¶ 39. | Disputed. The IIRO's claim that there is no evidence that IIRO had any involvement in the planning or execution of the 1998 African Embassy bombings is inaccurate and misleading. The 9/11 Commission concluded that "[m]any of the operatives in the African Embassy and Cole attacks attended training camps in Afghanistan, as did all 19 of the 9/11 hijackers." *See* Ex. 4, 9/11 Commission Staff Statement No. 15, *Overview of the Enemy*, 2004, FED-PEC 66472-66483 at 66480; Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 53-54 (same).<br><br>As detailed herein, the IIRO provided substantial funding for al Qaeda's training camps in Afghanistan, including camps |

| | |
|---|---|
| | from which al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training. *See, e.g.*, Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); Ex. 159, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 38, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo |

| | |
|---|---|
| | military training himself at one of the camps, where he met Usama Bin Laden.”).<br><br>*See also* Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 47-48 (discussing IIRO’s involvement in supporting the terrorists who carried out the 1998 embassy bombings in Dar Es Salaam, Tanzania and Nairobi, Kenya); *id.* at 79 (“The Kenyan government ordered five charities closed for their apparent involvement in the bombings of the U.S. Embassy in Nairobi and the U.S. Embassy in Dar es Salaam in 1998. The five charities ordered closed were: Al Haramain, Mercy Relief International, Help Africa People, IIRO, and the Ibrahim bin Abdul Aziz Al Ibrahim Foundation. In essence, Kenyan authorities had concluded that all of these charities were assisting al Qaeda, with allegations including their involvement in smuggling material for making the bombs that blew up the Embassies in purported relief shipments.”); Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann (“Kohlmann Report”) at 28 (stating that the IIRO’s chapter in Nairobi was deregistered by the Kenyan government for its connection to the terrorists responsible for the 1998 Embassy bombings).<br><br>By way of further response, to the extent the IIRO is relying upon Basha’s new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs’ response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha’s February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha’s new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 430. IIRO did not support and was not involved in the August 1998 East African Embassy bombings in Dar Es Salaam, Tanzania and Nairobi, Kenya. Ex. 4, May 21, 2024 Basha Decl. ¶ 39. | Disputed. *See, e.g.*, Plaintiffs’ response to No. 429. |
| 431. No IIRO employee was charged in connection with the embassy bombings, and there was no contact between the U.S. and Kenya with regards to the closure of the charities. Ex. 21, Winer Dep. Tr. at 455:1-6 (“I don’t know that any [IIRO employees] were” charged in connection with the bombing in Dar Es Salaam, Tanzania); Ex. 4, May 21, 2024 Basha Decl. ¶ 40. | To the extent the IIRO is relying upon Basha’s new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs’ response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha’s February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha’s new testimony in the Declarations, some of |

| | |
|---|---|
| | which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>By way of further response, Basha's 2019 deposition testimony is inconsistent with his new declaration at Exhibit 4. When asked during his deposition whether Kenyan authorities closed the IIRO office in connection with the embassy bombings, Basha responded: "Yes, they have closed the office and confiscated all the computers. But a week or so after that, everything was reinstated with a polite apology." *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 254-255. However, Basha's new declaration testimony indicates that the Kenyan government took approximately four months to conduct their investigation of the IIRO, and the IIRO office was not reopened until December 1998. *See* IIRO Ex. 4, May 21, 2024 Basha Decl. ¶ 40. In addition, Basha's new declaration testimony adds that the IIRO-World Food Program project in Elwak, Kenya was not closed by Kenyan authorities. Notably, Basha never provided this information during his 2019 deposition. |
| 432. In August 1998, Al Qaeda bombed the American embassies in Dar Es Salaam, Tanzania and Nairobi, Kenya. 9/11 Commission Report at 70. | Undisputed as a general matter for purposes of this motion. |
| 433. Wadih El Hage was convicted for his role in the bombings. Ex. 18, Brown Rpt. at 7. | Undisputed as a general matter for purposes of this motion. |
| 434. The Kenyan government temporarily closed the IIRO office in Nairobi (along with other NGOs in Kenya) in the aftermath of the bombing, although the closure did not include the IIRO-World Food Program joint project in Elwak, on the Somali border. Ex. 4, May 21, 2024 Basha Decl. ¶ 40; Ex. 25, Basha Dep. Tr. at 254:21-255:4. | Disputed. *See, e.g.*, Plaintiffs' response to No. 431. |
| 435. The Kenyan Non-Governmental Organizations Bureau withdrew its decision to cancel IIRO's registration, following an investigation by a committee appointed by the President of Kenya. Ex. 72, "Kenya Papers," at IIRO285554-56. | Undisputed as a general matter for purposes of this motion. |
| 436. A Kenyan government committee investigated the closure of the IIRO Kenyan office and cleared the office, permitting it to reopen in December 1998, returning all seized items, and issuing a polite apology to IIRO. Ex. 4, May 21, 2024 Basha Decl. ¶ 40; Ex. 25, Basha Dep. Tr. at 254:21-255:4. | Disputed. *See, e.g.*, Plaintiffs' response to No. 431. |

| | |
|---|---|
| 437. After reopening in December 1998, the IIRO Kenyan office continued to operate without closure and was operating at the time of Dr. Basha's departure from IIRO in 2013. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 3, 40. | To the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 438. IIRO initiated an investigation into the bombing, given the serious nature of the allegations. That investigation found no involvement by IIRO or IIRO employees in the attacks. Ex. 4, May 21, 2024 Basha Decl. ¶ 40; Ex. 25, Basha Dep. Tr. at 255:5-24. | Disputed. The IIRO's claim that its internal investigation found no involvement by the IIRO or its employees in the 1998 U.S. embassy attacks is misleading. During his 2019 deposition, Basha testified that the IIRO legal department conducted the internal investigation, and further explained that the legal department created documents, such as reports, as part of the inquiry. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 255-257. However, the IIRO has failed to produce any reports or other documents from the legal department or other IIRO offices confirming that the internal investigation exonerated the IIRO-Kenya branch office and its employees.<br><br>By way of further response, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| **Indian Consulate Plot** | No response necessary. |
| 439. Plaintiffs have no evidence showing that IIRO was involved in the planning to attack U.S. consulates in Madras and Calcutta. Winer Rpt. at 47-48, 83, 86 (discussing the plans to attack the U.S. consulates in Madras and Calcutta, but failing to provide evidence of IIRO's involvement in those plans); Kohlmann Rpt. at 28 (same); Levitt Rpt. at 39 (same) | Disputed. The IIRO's claim that there is no evidence that IIRO was involved in the planning to attack U.S. consulates in Madras and Calcutta is inaccurate and misleading. *See, e.g.*, Ex. 38, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at |

| | |
|---|---|
| | 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo military training himself at one of the camps, where he met Usama Bin Laden."); Ex. 40, Testimony of Steven Emerson and Jonathan Levine, *Terrorism Financing: Origination, Organization, and Prevention: Saudi Arabia, Terrorist Financing and the War on Terror*, July 31, 2003, FED-PEC 75156-75200 at 75175 (same); Ex. 39, Dore Gold, *Saudi Arabia's Dubious Denials of Involvement in International Terrorism*, FED-PEC 73721-73734 at 73724 (same); Ex. 150, U.N. Security Council, Second Report of the Monitoring Group on Sanctions Against Al-Qaida, the Taliban and Individuals and Entities Associated With Them ("Second Report"), December 2, 2003, PEC-KSA000108-190 at 123 (indicating local IIRO officers and employees were directly implicated in al Qaeda-related terrorist activities, including planned attacks against the U.S. Consulate in Calcutta). |
| 440. Plaintiffs have no evidence that IIRO had any foreknowledge of the planning attack U.S. consulates in Madras and Calcutta. Winer Rpt. at 47-48, 83, 86 (discussing the plans to attack the U.S. consulates in Madras and Calcutta, but failing to provide specific evidence of IIRO's involvement in those plans); Kohlmann Rpt. at 28 (same); Levitt Rpt. at 39 (same). | Disputed. The IIRO's claim that there is no evidence that IIRO had any foreknowledge of the planned attacks on the U.S. consulates in Madras and Calcutta is inaccurate and misleading. As discussed further herein, the IIRO and its leadership (*e.g.*, IIRO Secretary General Adnan Basha), including its parent organization the Muslim World League ("MWL") and its officials (*e.g.*, MWL Secretaries General Dr. Abdullah Omar Naseef, Abdullah bin Saleh al Obaid, Abdul Mohsen al Turki); members of the IIRO's Board of Directors and Executive Committee, and their advisors, who have been identified as al Qaeda's most important financiers (*e.g.*, Ibrahim Mohammad Afandi, Abdurahman Abdul-Qader Faqih, Saleh al Kamel, Suleiman al Rajhi); members of the Saudi Royal family who held high-ranking leadership and supervisory positions with the IIRO while simultaneously serving as officials of the Saudi government (*e.g.*, Prince Muhammad bin Fahd bin Abdul Aziz, Prince Turki bin Jalawi al Saud); and IIRO officials, employees, advisors, and representatives (*e.g.*, Wa'el Hamza Jelaidan, Mohammed |

| | |
|---|---|
| | Jamal Khalifa, Abu Hammam al Saudi, Abd al Hamid Sulaiman al Mujil, Sulaiman al Ali, Abdelhadi Daguit, Mahmud Abd Al-Jalil Afif, Abdul Asmad, Abdelaziz Zaher, Jamal Al-Jibouri), were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad.<br><br>These individuals were quintessential al Qaeda insiders, operating at the very center of al Qaeda's leadership, operations, and financial and logistical support structure during the critical period leading up to the 9/11 attacks, and were well aware of al Qaeda's terrorist intentions at all relevant times, including al Qaeda's publicized desire to conduct violent attacks against U.S. citizens, U.S. embassies and consulates, and U.S. military assets and personnel wherever they could be found (both in the U.S. and abroad).<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 6, 43, 90, and 109. |
| 441. The 9/11 Commission Report does not mention this plot. See generally 9/11 Commission Report. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| **<u>USS Cole Bombing</u>** | No response necessary. |
| 442. Plaintiffs have no evidence that IIRO was involved in the planning or execution of the attack on the U.S.S. Cole. Winer Rpt. at 13-14, 50, 53 (discussing the U.S.S. Cole attacks, but failing to provide evidence of IIRO's involvement in those attacks). | Disputed. The IIRO's claim that there is no evidence that IIRO had any involvement in the planning or execution of the U.S.S. Cole attack is inaccurate and misleading. The 9/11 Commission concluded that "[m]any of the operatives in the African Embassy and Cole attacks attended training camps in Afghanistan, as did all 19 of the 9/11 hijackers." *See* <u>Ex. 4</u>, 9/11 Commission Staff Statement No. 15, *Overview of the Enemy*, 2004, FED-PEC 66472-66483 at 66480; <u>Ex. 36</u>, March 10, 2020 Expert Report of Jonathan M. Winer at 53-54 (same).<br><br>As detailed herein, the IIRO provided substantial funding for al Qaeda's training camps in Afghanistan, including camps from which al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training. *See, e.g.*, <u>Ex. 154</u>, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); <u>Ex. 158</u>, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); <u>Ex. 159</u>, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at |

| | |
|---|---|
| | 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 38, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo military training himself at one of the camps, where he met Usama Bin Laden."). |
| 443. Plaintiffs have no evidence that IIRO had any foreknowledge of the attack on the U.S.S. Cole. Winer Rpt. at 13-14, 50, 53 (discussing the U.S.S. Cole attacks, but failing to provide evidence of IIRO's involvement in those attacks). | Disputed. The IIRO's claim that there is no evidence that IIRO had any foreknowledge of the attack on the U.S.S. Cole is inaccurate and misleading. As discussed further herein, the IIRO and its leadership (*e.g.*, IIRO Secretary General Adnan Basha), including its parent organization the Muslim World League ("MWL") and its officials (*e.g.*, MWL Secretaries General Dr. Abdullah Omar Naseef, Abdullah bin Saleh al Obaid, Abdul Mohsen al Turki); members of the IIRO's Board |

| | |
|---|---|
| | of Directors and Executive Committee, and their advisors, who have been identified as al Qaeda's most important financiers (*e.g.*, Ibrahim Mohammad Afandi, Abdurahman Abdul-Qader Faqih, Saleh al Kamel, Suleiman al Rajhi); members of the Saudi Royal family who held high-ranking leadership and supervisory positions with the IIRO while simultaneously serving as officials of the Saudi government (*e.g.*, Prince Muhammad bin Fahd bin Abdul Aziz, Prince Turki bin Jalawi al Saud); and IIRO officials, employees, advisors, and representatives (*e.g.*, Wa'el Hamza Jelaidan, Mohammed Jamal Khalifa, Abu Hammam al Saudi, Abd al Hamid Sulaiman al Mujil, Sulaiman al Ali, Abdelhadi Daguit, Mahmud Abd Al-Jalil Afif, Abdul Asmad, Abdelaziz Zaher, Jamal Al-Jibouri), were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad.<br><br>These individuals were quintessential al Qaeda insiders, operating at the very center of al Qaeda's leadership, operations, and financial and logistical support structure during the critical period leading up to the 9/11 attacks, and were well aware of al Qaeda's terrorist intentions at all relevant times, including al Qaeda's publicized desire to conduct violent attacks against U.S. citizens, U.S. embassies and consulates, and U.S. military assets and personnel wherever they could be found (both in the U.S. and abroad).<br><br>By way of further response, *see* Plaintiffs' responses to Nos. 1, 6, 43, 90, and 109. |
| 444. In December 2000, terrorists in a bomb-laden boat rammed into the U.S.S. Cole, with the goal of forcing U.S. forces to withdraw from Saudi Arabia. Jenkins Rpt. at 29; Ex. 89, Unclassified U.S. Department of State Document, at BUR-PEC-078470; Ex. 33, Brown Dep. Tr. at 252:7-20. | Undisputed as a general matter for purposes of this motion. |
| **<u>September 11, 2001 Attacks</u>** | No response necessary. |
| 445. The general idea of the 9/11 attacks had been developed by Khalid Sheikh Muhammad independently of Al Qaeda. Ex. 18, Brown Rpt. at 58; 9/11 Commission Rpt. at 153-54. | Disputed as stated. The IIRO's claim that Khalid Sheikh Mohammad developed the idea of the 9/11 attacks independently of al Qaeda is inaccurate and misleading. As described herein, Mohammed Jamal Khalifa, al Qaeda member and close associate of Osama bin Laden, used his position as the Regional Director for the IIRO in South-East Asia to direct IIRO funding and resources in support of the terrorist activities of KSM, Ramzi Yousef (1993 World Trade Center bomber), and Wali Khan Amin Shah (Afghan jihad veteran and Osama bin Laden/al Qaeda associate) in the |

| | |
|---|---|
| | Philippines, including the Bojinka plot, the precursor to the 9/11 attacks. *See, e.g.*, Plaintiffs' responses to Nos. 2 and 43.<br><br>Simultaneously, as explained by the 9/11 Commission, bin Laden and Mohammed Atef (a/k/a Abu Hafs al Masri), al Qaeda's military chief, were in Sudan studying the feasibility of hijacking airplanes and using them as weapons to inflict mass casualties. *See* Ex. 1, 9/11 Commission Final Report at 153. In late 1998 or early 1999, those ideas coalesced to become the 9/11 plot and bin Laden directed KSM to proceed with planning. |
| 446. Bin Laden approved the 9/11 plot in Spring 1999. 9/11 Commission Rpt. at 154 ("Bin Ladin summoned KSM to Kandahar in March or April 1999 to tell him that Al Qaeda would support his proposal."). | Disputed. While the 9/11 Commission makes that statement at 154 ("Bin Ladin summoned KSM to Kandahar in March or April 1999 to tell him that Al Qaeda would support his proposal."), the 9/11 Commission also indicates that bin Laden may have approved the 9/11 plot in late 1998. *See* Ex. 1, 9/11 Commission Final Report at 149 ("Bin Ladin, apparently at Atef's urging, finally decided to give KSM the green light for the 9/11 operation sometime in late 1998 or early 1999."). |
| 447. According to Khalid Sheikh Muhammad, this meeting between Bin Laden and Khalid Sheikh Muhammad is when the conspiracy started. Ex. 17, Sageman Rpt. at 97; Ex. 18, Brown Rpt. at 56 (plans and preparations for the 9/11 attacks began in Spring 1999). | Disputed as stated. The Osama bin Laden and al Qaeda conspiracy to attack the United States commenced no later than 1990 when bin Laden singled out the United States as the primary target of this global jihad, asserting that "[t]he Americans won't stop their support of Jews in Palestine until we give them a lot of blows. They won't stop until we do jihad against them." *See* Ex. 152, Lawrence Wright, *The Looming Tower: Al-Qaeda and the Road to 9/11*, 2007, PEC-KSA 227-230 at 229.<br><br>The conspiracy, or proposal, to attack the United States using airplanes as weapons to inflict mass casualties commenced in the early 1990s when Mohammed Jamal Khalifa used IIRO funds and resources in support of the Bojinka plot. *See* Plaintiffs' response to No. 445. |
| 448. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha knew at any time prior to September 11, 2001 that Al Qaeda was planning a terrorist attack against the United States. Ex. 11, Second Obaid Decl. ¶ 23; Ex. 10, Second Turki Decl. ¶ 28; Ex. 13, May 4, 2023 Basha Decl. ¶ 19. | Disputed. MWL Secretaries General Naseef, Obaid, and Turki, and IIRO Secretary General Basha, were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. Intending to foster al Qaeda's terrorist agenda, they directed the MWL and IIRO to provide substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks. |

| | |
|---|---|
| | Moreover, MWL officials have publicly acknowledged the organization's funds were being funneled to terrorist organizations. In an interview with MWL Secretary General Obaid, published in *The Muslim World* magazine on July 21-27, 1997, Obaid was asked about reports that the MWL's funds were being funneled to extremist groups. Obaid responded: "This is a closed chapter …. It has already been proven that there were people who exploited the situation and misused some funds …." *See* Ex. 214, Interview with Dr. Abdullah bin Saleh al Obaid, Excerpt from the Muslim World League magazine, July 21-27, 1997, PEC-KSA 1796-1806 at 1800.<br><br>*See also* Plaintiffs' responses to Nos. 1, 2, 6, 9, 13, 24, 43, 45, 46, 47, 48, 49, 62, 72, 76, 90, 91, 94, 109, 111, 114, 117, 127, 129, 132, 134, 139, 140, 145, 148, 149, 156, 157, 160, 175, 179, 217, 219, 220, 223, 230, 231, 233, 234, 238, 268, 294, 313, 314, 315, 324, 332, 333, 335, 408, 414, 415, 416, 420, 428, 429, 439, 440, 442, 443, 454, 456, 472, 478, 481, 482, 484, 486, 495, 496, 497, 498, 500, 503, 504, 515, 517, 521, 522, 523, 525, 526, 527, 530, 532, 534, 536, 538, 540, 541, 549, 550, 561, 565, 569, 571, 573, and 577. |
| 449. Abdullah bin Saleh Al-Obaid, Abdullah bin Abdul Mohsen Al-Turki, and Adnan Basha were disgusted by the terrorist attacks on September 11, 2001. Ex. 11, Second Obaid Decl. ¶ 24; Ex. 10, Second Turki Decl. ¶ 29; Ex. 13, May 4, 2023 Basha Decl. ¶ 20. | Disputed. *See, e.g.*, Plaintiffs' response to No. 448. |
| 450. Abdullah bin Saleh Al-Obaid, Abdullah bin Abdul Mohsen Al-Turki, and Adnan Basha each describe the terror attacks as "criminal" and note that their faith prohibits the attacks. Ex. 11, Second Obaid Decl. ¶ 24; Ex. 10, Second Turki Decl. ¶ 29; Ex. 13, May 4, 2023 Basha Decl. ¶ 20. | Disputed. *See, e.g.*, Plaintiffs' response to No. 448. |
| **The Taliban** | No response necessary. |
| 451. A Washington Post article dated September 29, 2001 stated, "The IIRO alone has given more than $60 million to the Taliban and people under its control, according to its secretary general, Adnan Basha." Winer Rpt. ¶ 12.6.3 & n.149 (citing "Muslim Charities Under Scrutiny," Washington Post, September 29, 2001). | It is not disputed that the Washington Post article makes that statement. |
| 452. The Washington Post article dated September 29, 2001, does not purport to quote Adnan Basha, but rather to paraphrase him. Ex. 78, "Muslim Charities Under Scrutiny (Sept. 29, 2001), at FED-PEC0002217. | Disputed. The Washington Post article attributes the statement to Basha. |

| | |
|---|---|
| 453. Adnan Basha did not state that IIRO provided sixty million dollars to the Taliban. Adnan Basha has previously spoken about the humanitarian aid IIRO historically provided directly to the Afghan people on the ground, particularly in the wake of the Soviet invasion and retreat from Afghanistan. Ex. 13, May 4, 2023 Basha Decl. ¶ 17. | Disputed. The Washington Post article attributes the statement to Basha.<br><br>By way of further response, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 13, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 454. IIRO has never provided funds to the Taliban. Ex. 13, May 4, 2023 Basha Decl. ¶ 17. | Disputed. The U.S. government has concluded that the IIRO provided financial, material and logistical support to the Taliban. *See* Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 106 ("The International Islamic Relief Organization [IIRO], which is headquartered in Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL, … the Taliban, … and Hamas, … as well as al Qaida affiliates, *inter alia*, the Abu Sayyaf Group (ASG), … Jemaah Islamiya (JI), … and Al Ittihad Al Islamiya (AIAI)…. The IIRO's parent organization is the Muslim World League [MWL] also headquartered in Saudi Arabia.").<br><br>By way of further response, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 13, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |

| | |
|---|---|
| 455. Nor did IIRO spend remotely near sixty million dollars in Afghanistan during Taliban rule from 1996 to 2001. For example, during the three-year period from 1998 to 2001, the total amount of money that IIRO spent on its projects in Afghanistan was 14,581,128 SR. See Ex. 44, 1998 Annual Report, at IIRO-003744 (2,930,310 SR); Ex. 43, 1999-2000 Annual Report, at IIRO-003704 (6,533,185 SR); Ex. 42, 2000-2001 Annual Report, at IIRO-004489 (5,117,633 SR). At the prevailing exchange rate of 3.75 SR/USD, this is under four million dollars. *See U.S. Dollar/ Saudi Riyal Historical Reference Rates from Bank of England for 1997*, PoundSterling LIVE, erates/usd/USD-to-SAR-1997 (last accessed Apr. 12, 2026). | Disputed. The U.S. government has concluded that the IIRO provided financial, material and logistical support to the Taliban. *See* Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 106 ("The International Islamic Relief Organization [IIRO], which is headquartered in Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL, … the Taliban, … and Hamas, … as well as al Qaida affiliates, *inter alia*, the Abu Sayyaf Group (ASG), … Jemaah Islamiya (JI), … and Al Ittihad Al Islamiya (AIAI)…. The IIRO's parent organization is the Muslim World League [MWL] also headquartered in Saudi Arabia."). |
| 456. The Taliban attempted to interfere with several IIRO projects, including an orphanage and university, which were both closed as a result of that interference in the summer of 2001. Ex. 4, May 21, 2024 Basha Decl. ¶ 34. | Disputed. The IIRO's claim that the Taliban interfered with IIRO projects is inaccurate and misleading.<br><br>The IIRO and MWL maintained good relations with the Taliban for a number of years, implementing Saudi government projects in aid of the Taliban. *See* Ex. 105, IIRO 96108, 96075-76, 96114; *see also* IIRO 96076 (December 16, 2000 letter from the Taliban Deputy Prime Minister and Deputy Chairman of the Executive Council of the Islamic Emirate of Afghanistan, Haj Mulla Muhammad Hasan Akhmad, thanking the IIRO-Pakistan office for the assistance it has provided for a very long time.). The IIRO and MWL have failed to provide any evidence of the alleged interference.<br><br>Moreover, the IIRO provided substantial funding for al Qaeda's training camps in Afghanistan, including camps from which al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training. IIRO has presented no evidence that the Taliban interfered in those projects. *See, e.g.*, Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); Ex. 159, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama |

| | |
|---|---|
| | [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 38, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo military training himself at one of the camps, where he met Usama Bin Laden.").<br><br>Moreover, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha |

| | |
|---|---|
| | Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 457. In early to mid-2000, the Taliban attempted to interfere with two hospital projects in Afghanistan, where IIRO treated both genders in the same facility. IIRO refused to relent to the Taliban's interference and stopped supporting the hospital. Ex. 4, May 21, 2024 Basha Decl. ¶ 34. | Disputed. *See, e.g.*, Plaintiffs' response to No. 456.<br><br>By way of further response, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| **Bin Laden Publicly Opposed the Saudi Government and Twice Called on Individuals Not to Donate to Saudi-Affiliated Charities** | No response necessary. |
| 458. In the years before September 11, 2001, Osama Bin Ladin stridently opposed the Saudi Royal family, the government of the Kingdom of Saudi Arabia, and government-affiliated charities such as IIRO and MWL. Ex. 18, Brown Rpt. at 24, 63. | Disputed. The IIRO's assertion that Osama bin Laden and/or the Advice and Reform Committee ("ARC") stridently opposed "the government-affiliated charities such as IIRO and MWL" is inaccurate and misleading. Mr. Brown's report does not cite to any statement or communication by bin Laden and/or ARC condemning the IIRO and MWL. Elsewhere in his report, Mr. Brown cites to West Point's Combatting Terrorism Center's Harmony Database document AFGP-2002-003345 in support of his contention that bin Laden and/or ARC denounced the Saudi charities, but that is equally misleading. Contrary to Mr. Brown's assessment of that document, the communications make clear that bin Laden and/or ARC's criticisms were directed only at the Saudi government and the way it had controlled "charitable organizations" and managed contributions. Importantly, there is not a single, specific reference in the document to any of the Saudi charities that served as the primary conduits for channeling financial, material, logistical, operational, and ideological support to al Qaeda's global jihad in the decade leading up to the 9/11 attacks, including the MWL, IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Joint Relief Committee, Saudi Red Crescent Society, Benevolence International Foundation, and others. |
| 459. Bin Laden "made a definitive turn toward enmity with the Saudi regime" after the first Gulf War, when Saudi Arabia accepted the deployment of U.S. troops on | Undisputed as a general matter for purposes of this motion. |

| | |
|---|---|
| its territory. He declared Saudi Arabia an apostate regime. Ex. 18, Brown Rpt. at 24-25. | |
| 460. In March 1994, he created the Committee for the Advice and Defence of Legitimate Rights, re-named in April 1994 as the Advice and Reform Committee (ARC). Ex. 18, Brown Rpt. at 26. | Undisputed as a general matter for purposes of this motion. |
| 461. The ARC issued 21 public communiqués between March 1994 and May 1998, all of them to denounce Saudi Arabia and in some cases Saudi charities. Ex. 18, Brown Rpt. at 26; Ex. 90, West Point's Combatting Terrorism Center's ("CTC") Harmony Database ("HD") document AFGP-2002-003345. | Disputed. The IIRO's assertion that Osama bin Laden and/or ARC denounced the Saudi charities is inaccurate and misleading. As an initial matter, Mr. Brown's report at 26 makes no such reference to the Saudi charities or any specific communication condemning the charities. Furthermore, the West Point's Combatting Terrorism Center's Harmony Database document AFGP-2002-003345 does not identify any instances of bin Laden and/or ARC issuing statements of disapproval with the charities themselves. Rather, bin Laden and/or ARC's criticisms were directed at the Saudi government and the way it had controlled "charitable organizations" and managed contributions. Importantly, there is not a single, specific reference in the document to any of the Saudi charities that served as the primary conduits for channeling financial, material, logistical, operational, and ideological support to al Qaeda's global jihad in the decade leading up to the 9/11 attacks, including the MWL, IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Joint Relief Committee, Saudi Red Crescent Society, Benevolence International Foundation, and others. |
| 462. In an April 1994 ARC statement, Bin Ladin writes of the actions the Saudi government had taken against him: "we were prevented from traveling, our money was frozen in foreign bank accounts, a defamation campaign was waged against us in the local and international press, and finally, you attempted to cut our ties with the homeland by confiscating our passports. Your actions indicate to us what your intentions are for us." Ex. 90, West Point's CTC HD document AFGP-2002-003345, at 1-3 (Statement 2 of 12 April 1994). | Undisputed as a general matter for purposes of this motion. |
| 463. In a June 7, 1994 ARC statement, Bin Ladin directly denounced King Fahd and Prince Sultan for supporting Yemeni communists in the 1994 civil war in Yemen. He accused the King of "us[ing] Islam and some of its tenets to cover up the secret and overt anti-Islamic policies that he pursues," claimed the Saudi regime extended "blind loyalty to the enemies of Islam" and made a "habit of supporting the enemies of Islam." Ex. 90, West Point's CTC HD document AFGP- 2002-003345, at 7 (Statement 3 of 7 June 1994). | Undisputed as a general matter for purposes of this motion. |

| | |
|---|---|
| 464. On July 19, 1994, referring to the Saudi government's alleged persecution of critical religious scholars, Bin Ladin stated that "the Saudi government has used all the witchcraft powers it has and the full deception powers of the media to justify its shameless stands against Islam and its preachers while supporting the unbelievers and their guardians." Ex. 90, West Point's CTC HD document AFGP-2002-003345, at 13-14 (Statement 5 of 19 July 1994). | Undisputed as a general matter for purposes of this motion. |
| 465. In the following statement, a letter to "the Saudi government, headed by King Fahd," Bin Ladin accuses the King of having left the faith: "These blatant attacks and irresponsible behavior do not leave any pretense for being a Muslim, they take it away Therefore, you will be responsible before God and your people for anything that will result from these events and matters." Ex. 90, West Point's CTC HD document AFGP-2002-003345, at 17-18 (Statement 6 of 12 September 1994). | Undisputed as a general matter for purposes of this motion. |
| 466. The seventh and eighth ARC communiqués, addressed to employees of the Saudi security services and the military, respectively, warn them against implementing the directives of the regime, for to do so would damn their souls to hell. Ex. 18, Brown Rpt. at 27-28; Ex. 90, West Point's CTC HD document AFGP-2002-003345, at 22-22 (Statement 7 of 16 September 1994) and 25-26 (Statement 8 of 19 September 1994). | Undisputed as a general matter for purposes of this motion. |
| 467. In a December 29, 1994 letter to 'Abdullah bin Baz, Saudi Arabia's Grand Mufti, Bin Ladin accused the latter of permitting King Fahad to perform an "abomination" by appearing in public with a cross pendant on his chest. Further, Bin Ladin denounced the Grand Mufti for issuing a fatwa permitting "the crusader and the Jewish alliance . . . to occupy the country in the name of liberating Kuwait." Ex. 90, West Point's CTC HD document AFGP-2002-003345, at 35- 38 (Statement 11 of 29 December 1994). | Undisputed as a general matter for purposes of this motion. |
| 468. On February 12, 1995, Bin Laden publicly encouraged donors not to donate to official Saudi-affiliated charities, citing the illegitimacy of the Saudi Government and its alleged misappropriation of funds donated to the people of Bosnia:<br><br>Beside the Regime's political and ideological blockade, it also exercised a harsh economic and financial (policy) as well. Part of this blockade was dissolving charitable organizations that used to deliver donations from citizens | Disputed. The West Point's Combatting Terrorism Center's Harmony Database document AFGP-2002-003345 does not identify any instances of Osama bin Laden and/or ARC issuing statements of disapproval with the charities themselves. Rather, bin Laden and/or ARC's criticisms were directed at the Saudi government and the way it had controlled "charitable organizations" and managed contributions. Importantly, there is not a single, specific reference in the document to any of the Saudi charities that served as the primary conduits for channeling financial, material, logistical, operational, and |

| | |
|---|---|
| to the many needy people inside and outside the country. It replaced them with organizations and foundations subservient to royal family members and particularly, Prince Salman.<br><br>…<br><br>3) The reason behind this procedure does not encourage good deeds, as the regime claims, but rather the following: 1) Prevents these funds from being delivered to areas where they could be used to serve Islam and Muslims following the principle, "Do not spend on those who are with the messenger of Allah till they desist."<br><br>. . .<br><br>Based on what was stated, we at the Advice and Reform Committee, while celebrating this blessed month as a month of giving for God's sake, wish to draw the attention of all donors to the danger of donating funds or zakat to these foundations and organizations. The regime is using them against God and His messenger. We are asking the donors to provide these funds directly to the needy, whether inside or outside the country. They could also provide it to those trusted individuals who will deliver them. … It is known that these [Saudi] leaders cannot be trusted. There are other safe ways you can assist in delivering funds to those who deserve them. Among them are the benevolence foundations in Qatar, Kuwait, Jordan, Yemen, Sudan, and others. To assure that the funds transfer to these foundations' bank accounts, we draw your attention to the importance of transferring these funds outside the Peninsula, away from the pursuing regime's spies.<br><br>Ex. 90, West Point's CTC HD document AFGP-2002-003345, at 51-52 (Statement 13 of 12 February 1995). | ideological support to al Qaeda's global jihad in the decade leading up to the 9/11 attacks, including the MWL, IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Joint Relief Committee, Saudi Red Crescent Society, Benevolence International Foundation, and others. |
| 469. Bin Ladin reiterated this call to avoid official Saudi-affiliated charities on August 11, 1995:<br><br>It is no longer hidden that the Saudi regime persistently sought to block all the abilities and capabilities of the ummah by placing control over it, but the regime was not satisfied with its unjust policies; it had to go further by imposing control on the minds and politics of the nation. Moreover, the regime sought to impose economic control. This resulted in the closure of charitable organizations that delivered the contributions of the benefactors from this country to its deserving lawful owners. The regime replaced these charitable organizations with associations | Disputed. *See, e.g.*, Plaintiffs' response to No. 468. |

| | |
|---|---|
| and organizations that were supervised by members of the ruling family, such as Prince Sultan and Prince Salman. This revealed a scheme by which they monopolized the charitable contributions in such a way that it prevented Islam and the Muslims from benefiting from them. The regime used the contributions the same way it used the money of the afghani mujahidin. That money was used to pressure the mujahidin and influence their policies in a way that would benefit the interests of the West. Sometimes these contributions were used for private interests of the princes.<br><br>. . .<br><br>We are drawing their attention to the risk of forwarding these contributions through the ruling regime and its organizations. We are advising them to deliver their contributions directly to the people or to the safe hands of individuals, organizations, and societies that are trusted, such as the charitable societies in Qatar, Kuwait, Sudan, Yemen, and Jordan. We are advising them to be careful that their contributions stay far from the pursuit of the Servant of the Two Holy Places [the Saudi King] and his agents, and to make sure that the money will reach the people it is intended for. They must be sure that the money does not fall into the hands of the shameless members of the Saudi family.<br><br>Ex. 90, West Point's CTC HD document AFGP-2002-003345, at 91-92 (Statement 18 of 11 August 1995). | |
| **<u>Intelligence Reporting</u>** | No response necessary. |
| 470. According to the 9/11 Commission Staff, prior to September 2001, "Terrorist financing was not a priority for either domestic or foreign intelligence collection. As a result, intelligence reporting on the issue was episodic, insufficient, and often inaccurate." Monograph at 4. | It is not disputed that the Monograph on Terrorist Financing makes that statement when providing a historical accounting of the U.S. government's pre-9/11 collection of intelligence concerning terrorism financing. |
| 471. According to the 9/11 Commission Staff, the "U.S. intelligence community largely failed to comprehend al Qaeda's methods of fundraising, moving, and storing money, because it devoted relatively few resources to collecting the strategic financial intelligence." *Id.* at 5; see also *id.* at 18 (explaining that even in March 2002, "the head of the [U.S.] government's terrorist-financing coordination effort" stated that U.S. officials could not answer "[w]ho finances al Qaeda," "[h]ow," or "[w]here"). | It is not disputed that the Monograph on Terrorist Financing makes that statement when providing a historical accounting of the U.S. government's pre-9/11 collection of intelligence concerning terrorism financing. |
| **<u>Allegation IIRO Funded Training Camps</u>** | No response necessary. |

| | |
|---|---|
| 472. Plaintiffs have no evidence showing IIRO funded or supported any Al Qaeda training camps. Ex. 4, May 21, 2024 Basha Decl. ¶¶ 35-36; Ex. 18, Brown Rpt. at 98. | Disputed. The IIRO provided substantial funding for al Qaeda's training camps in Afghanistan, including camps from which al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training. *See, e.g.*, Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); Ex. 159, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 38, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was |

| | |
|---|---|
| | to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo military training himself at one of the camps, where he met Usama Bin Laden.").<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 83 ("IIRO operations in Pakistan were allegedly responsible for sponsoring [6] Al-Qaida training camps in the region. Following the 9/11 attacks, the government of Pakistan 'identified and expelled some two dozen Al-Qaida supporters who has been working for the IIRO-sponsored organizations in Pakistan.'"); Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 49-54 (discussing IIRO's funding of al Qaeda's training camps in Afghanistan "which were used to train fighters for Islamic insurgencies in a number of countries, including Algeria, Chechnya, Kashmir, Indonesia, Iraq, Palestine, the Philippines and Tajikistan, and as of early 1992, Bosnia."); Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 28.<br><br>By way of further response, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 473. Plaintiffs rely on a 1996 document that states "a clandestine source" provided information that "IIRO helps fund six militant training camps in Afghanistan." See Winer Rpt. ¶¶ 6.6.10.3 (quoting 1996 document), 7.3.4.3 (referring to same document but altering statement to refer to "terrorist training camps"); *see also* Kohlmann Rpt. ¶ 83 (referring to same document and altering reference to refer to "7 Al-Qaida training camps"); Levitt Rpt. at 36 (referring to same document and altering reference to refer to "six al-Qa'ida training camps"). | It is not disputed that Plaintiffs' experts cite to the 1996 CIA Report in their reports. To the extent that the IIRO criticizes the experts' use of "militant training camp" vs. "Al-Qaida training camp" when describing the IIRO's financial support of camps in Afghanistan that were established solely for terrorist training, that criticism is without merit. Plaintiffs note that the 1996 CIA report uses the term "militant training camps," but the U.N. Monitoring Committee added that these were believed to be "Al-Qa'ida training camps." |
| 474. In December 2003, the UN, citing the same 1996 document, changed the allegation to: "IIRO funds directly supported six Al-Qaida training camps in Afghanistan | It is not disputed that the U.N. Monitoring Committee makes that statement in the U.N. Security Council, Second Report of the Monitoring Group on Sanctions Against Al-Qaida, the Taliban and Individuals and Entities Associated With Them |

| | |
|---|---|
| prior to 11 September 2001." Ex. 84, UN Monitoring Rpt. ¶ 42. | ("Second Report"), December 2, 2003, PEC-KSA000108-190 at 122. *See* Ex. 150. By way of further response, *see* Plaintiffs' response to No. 473. |
| 475. The 1996 document refers to "militant training camps in Afghanistan," not "Al Qaeda training camps" or "*terrorist* training camps." See Winer Rpt. ¶¶ 6.6.10.3 (quoting 1996 document), 7.3.4.3 (referring to same document but altering statement to refer to "terrorist training camps") (emphasis added); *see also* Kohlmann Rpt. ¶ 83 (referring to same document and altering reference to refer to "7 Al-Qaida training camps"); Levitt Rpt. at 36 (referring to same document and altering reference to refer to "six al-Qa'ida training camps"). | Duplicative and disputed. *See, e.g.*, Plaintiffs' response to No. 473. |
| 476. The implication or allegation that IIRO funded six "Al Qaeda" training camps are false. IIRO did not fund any training camps, extremist or not extremist, for any group, Al Qaeda or otherwise. Ex. 4, May 21, 2024 Basha Decl. ¶ 35. | Disputed. *See, e.g.*, Plaintiffs' response to No. 472.<br><br>By way of further response, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 477. IIRO funded orphan camps in Pakistan after the Afghan jihad with the USSR ended. Ex. 28, Gari Dep. Tr. 20:7-23. | Disputed as stated. The IIRO's characterization of Rahmatullah Nazir Khan Gari's testimony is misleading. Gari testified that while working as an IIRO volunteer, he visited some orphanages "[i]n Pakistan in Islamabad, in a region called Mansehra" *See* Ex. 28, Gari Dep. Tr. 20:7-23. He did not specifically say that those were IIRO orphan funded camps. |
| 478. Sayed Nasir's allegation that 40-50% of IIRO's funds were being diverted to terrorist training camps in Afghanistan and Kashmir is false. Ex. 4, May 21, 2024 Basha Decl. ¶ | Disputed. *See* Ex. 38, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which |

| | |
|---|---|
| | eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo military training himself at one of the camps, where he met Usama Bin Laden."); Ex. 40, Testimony of Steven Emerson and Jonathan Levine, *Terrorism Financing: Origination, Organization, and Prevention: Saudi Arabia, Terrorist Financing and the War on Terror*, July 31, 2003, FED-PEC 75156-75200 at 75175 (same); Ex. 39, Dore Gold, *Saudi Arabia's Dubious Denials of Involvement in International Terrorism*, FED-PEC 73721-73734 at 73724 (same); Ex. 150, U.N. Security Council, Second Report of the Monitoring Group on Sanctions Against Al-Qaida, the Taliban and Individuals and Entities Associated With Them ("Second Report"), December 2, 2003, PEC-KSA000108-190 at 123 (indicating local IIRO officers and employees were directly implicated in al Qaeda-related terrorist activities, including planned attacks against the U.S. Consulate in Calcutta).<br><br>By way of further response, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony). |
| 479. When Adnan Basha first heard Sayed Abu Nasir's name in connection with this allegation, he verified that Sayed Nasir was not an IIRO employee, finding no evidence of his employment in IIRO's personnel files. Ex. 4, May 21, 2024 Basha Decl. ¶ 36. | Disputed. The IIRO's claim that Sayed Abu Nasir was not an employee, is inaccurate and misleading. *See* Ex. 55, *Frontline*, India's National Magazine, March 12, 1999, FED-PEC 203706-203709, reporting that on January 7, 1999, the New Delhi Police arrested Bangladesh national, Syed Abu Nasir, for his alleged involvement in an attempted terrorist operation to bomb the U.S. Consulates in Chennai and Calcutta. According to a Frontline investigation, Syed Abu Nasir began working for the IIRO in 1991. After being transferred from the IIRO office in Bangkok, to the IIRO's office in Lahore, Pakistan, Nasir had made contact with the designated Lashkar-e-Toiba terrorist organization. Frontline's investigation further determined that Nasir had been in contact with the highest |

| | |
|---|---|
| | ranks of Lashkar-e-Toiba, including, with Azzam Cheema, the operations commander for terrorist activity in India, field commander Abdul Karim, and the supreme leader and head of its "patron body" the Markaz Da'awa wal-Irshad, Hafiz Mohammed Sayeed. Furthermore, the article revealed that in 1994, Nasir was sent on behalf of Lashkar-e-Toiba to an arms training course in Kunnad, Afghanistan.<br><br>The investigation asserts that in September 1998, Nasir was called to a meeting by Cheema, where he was instructed to arrange safe passage across the Bangladeshi border for six Lashkar-e-Toiba members. The Frontline investigation reveals that Sheikh Ahmad Al-Gamdo [Gamdin], IIRO's Asia Chairman, was present at that meeting.<br><br>By way of further response, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 Basha Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declaration was never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 480. IIRO-Indonesia did not finance the establishment or operations of training facilities for use by Al Qaeda, Al Qaeda affiliates, or Al Qaeda associates. Ex. 4, May 21, 2024 Basha Decl. ¶ 89; Ex. 14, Wardi Decl. ¶ 15. | Disputed. U.S. government investigations determined that the IIRO-Indonesia branch office "financed the establishment of training facilities for use by al Qaida associates." *See* Ex. 50, August 3, 2006 designation of IIRO's branches in the Philippines and Indonesia and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-202112 at 202112 ("The IIRO Indonesia director has channeled money to two Indonesia-based, JI-affiliated foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed the establishment of training facilities for use by al Qaida associates.").<br><br>By way of further response, to the extent the IIRO is relying upon Basha's new declaration testimony at Exhibit 4, the statement is disputed. *See* Plaintiffs' response to No. 50 (stating that (1) the May 21, 2024 and May 4, 2023 Basha Declarations were never produced to Plaintiffs during the discovery phase of the litigation; (2) the Basha Declarations were never produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Basha's new |

| | |
|---|---|
| | testimony in the Declarations, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Basha Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>Similarly, to the extent the IIRO is relying upon the Faiz Wardi Declaration, dated January 12, 2023, attached as Exhibit 14 to the IIRO's April 15, 2026 Motion for Summary Judgment, the statement is disputed. *See* Plaintiffs' response to No. 168 (stating that (i) the January 12, 2023 Wardi Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (ii) Plaintiffs have not been afforded an opportunity to cross-examine Mr. Wardi's new testimony; and (iii) the Wardi Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| **<u>9/11 Commission Report, 9/11 Commission Staff Monograph, and CIA Reports</u>** | No response necessary. |
| 481. The sections of the 9/11 Commission Report discussing financing of al Qaeda cite CIA reports pre-dating the 9/11 Attacks. 9/11 Commission Report at 169-172 & nn. 118, 126; 185-186 & nn. 84, 86. These reports did not conclude that IIRO or MWL, or their foreign offices, directly or indirectly provided funds to al Qaeda. *Id.* | Disputed. In this section of the IIRO's Rule 56.1 Statement concerning the 9/11 Commission, the IIRO consistently misrepresents the findings and conclusions of the 9/11 Commission Final Report and Staff Monograph on Terrorism Financing ("Staff Monograph"), misrepresents the evidentiary support cited by the 9/11 Commission, and deliberately ignores credible CIA intelligence reports and other U.S. government records supporting Plaintiffs' claims that the IIRO, MWL, and their officials and employees, provided substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>By way of further response, and contrary to the IIRO's assertion at No. 481, the 9/11 Commission Final Report cites to CIA Reports, *dated both pre-9/11 and post-9/11*, describing the financial, material, logistical, and ideological support the IIRO and MWL provided to al Qaeda.<br><br>For example, CIA intelligence reports cited by the 9/11 Commission in its Final Report confirm that the IIRO served as a key financial conduit for al Qaeda and played a central role in providing critical support to the terrorist organization, including but not limited to appointing al Qaeda members to leadership positions within the IIRO, recruiting Islamic fighters, facilitating the training and travel of Islamic militants with employment papers and other documentation, engaging in narcotics trafficking and counterfeiting, and funding terrorist training camps. *See* <u>Ex. 9</u>, *Sketch of a South Asia-* |

| | |
|---|---|
| | *Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that the Maktab al-Khidamat, a Pakistan-based nongovernmental organization financed by Osama bin Laden, played a key role in facilitating the training and travel of Islamic militants, and received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization"); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Mohammed Jamal Khalifa, Osama bin Laden's brother-in-law, and close associate of World Trade Center bomber Ramzi Yousef, served as the director of the International Islamic Relief Organization (IIRO) in the Philippines, and "was involved in recruiting Muslims for training in Pakistan as mujahidin fighters."); *id.* at 151 (describing IIRO, WAMY, and Al Haramain as having "tie[s] to terrorist and mujahidin activity"); Ex. 11, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199 at 198 (stating that "al-Qa'ida has infiltrated some of IIRO's branches"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."); *id.* at 221 ("IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate toward more extremist activities."); *id.* ("A few IIRO branches have turned to illegitimate means of financing their operations—including narcotics trafficking and counterfeiting—further increasing their independence and ability to support terrorism."); Ex. 14, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*, November 17, 1998, CIA_00317-338 at 325 ("Bin Ladin and his associates make extensive use of non-governmental charitable organizations (NGOs) to transfer funds. Bin-Ladin-affiliated Islamic NGOs – such as … the International Islamic Relief Organization (IIRO); Al-Haramayn; … and others – are convenient money couriers because they maintain offices in Afghanistan, Albania, Pakistan, and other locations where Bin Ladin associates are prevalent."); *id.* at 330 ("Bin Ladin and Al-Qa'ida probably receive Gulf funding diverted from offices of Islamic NGOs, particularly the MK, IIRO, Al Haramayn … and others."); Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (stating that al Qaeda financial committee member Abdul Islam, who was "authorized to disburse funds for salaries and transportation expenses of al-Qa'ida members, and for donations to widows and orphans," worked for the International Islamic Relief Organization); *id.* at 525 (listing |

| | |
|---|---|
| | of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization"); *id.* at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"); Ex. 18, *Al-Qa'ida's Financial Ties to Islamic Youth Programs*, January 17, 2003, CIA_00681-701 at 692 (stating that "Gulf charities like the Saudi International Islamic Relief Organization (IIRO) and Al-Haramain … are well aware of the radical Wahhabi and Salafist doctrines being taught at institutions they fund"); Ex. 19, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 741 (stating that the Sudanese National Islamic Front ("NIF") works "with hardline Islamic fundamentalists employed by the Saudi International Islamic Relief Organization"); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama, [REDACTED]."); *id.* at 817 (stating that "several Saudi NGOs are funding conduits for al-Qa'ida or have penetrated by Usama's network" and "[t]hose of greatest concern include the International Islamic Relief Organization (IIRO)" and "Al-Haramayn Islamic Foundation"); *id.* at 818 ("Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahed to fight in Chechnya."); *id.* at 824 (stating that the Islamic Relief Agency (ISRA), a Khartoum-based NGO with offices in Afghanistan and Pakistan, have been infiltrated by al Qaeda and work closely with personnel from the IIRO); *id.* at 827 (stating that the IIRO and Al Haramain were channeling funds "to spread Islamic fundamentalism throughout Macedonia"). Indeed, the U.S. government concluded that bin Laden and al Qaeda used the entire IIRO network for al Qaeda's terrorist activities. *See* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities.").<br><br>CIA intelligence reports cited in the 9/11 Commission Final Report similarly confirm that the MWL, IIRO's parent organization, played a central role in al Qaeda's support infrastructure. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Shaykh Adil Batterjee, a close associate of Osama bin Laden and "a long-time al-Qa'ida donor and fundraiser," used the Saudi-based Lajnat al Birr al Islamiyya charity, a subsidiary of the Muslim World League (MWL), to raise funds |

| | |
|---|---|
| | on behalf of bin Laden.); *id.* at 150 (indicating that "[s]everal of Bin Ladin's associates, including Wa'il Julaydan and Muhammad Jamal Khalifa, were MWL representatives"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 213 (stating that "several MWL affiliate organizations—including the International Islamic Relief Organization (IIRO)—have provided terrorists with funding and cover employment, documentation, and training"); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 809 (stating that Saudi-backed NGOs have ties to Osama bin Laden, including the Muslim World League, World Assembly of Muslim Youth, and others); *id.* at 822 (indicating that the MWL "has been used as a cover organization for several of Usama's associates"). *See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 95 (stating that Osama bin Laden confidant Enaam Arnaout provided military and logistical support to the mujahideen in the late 1980s and early 1990s as an employee of "Saudi NGO, the Muslim World League").<br><br>Lastly, the Court has concluded on two separate occasions in this litigation that the declassified CIA reports are trustworthy and admissible. *See* March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 12 (concluding that "the declassified CIA documents are trustworthy"); *see also* August 19, 2026 Memorandum Decision and Order (ECF No. 12247) at 20-21 (finding the CIA reports are trustworthy because (i) the "CIA reports were submitted in the years leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely;" (ii) the CIA reports "were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other specialists with expertise in counterterrorism;" and (iii) the "9/11 Commission also held hearings regarding the reports." |
| 482. The chapter of the 9/11 Commission Report discussing al Qaeda's founding and its return to Afghanistan in 1996 cites several CIA reports. *Id.* at 47-63 & nn. 37, 59, 67, 77, 78. These reports did not conclude that IIRO or MWL, or their foreign offices, directly or indirectly provided funds to al Qaeda. *Id.* | Disputed. The IIRO's assertion that the CIA reports cited at nn. 37, 59, 67, 77, 78 do not conclude that the IIRO or MWL provided financial assistance to al Qaeda is inaccurate and misleading. *See* 9/11 Commission Final Report, Chapter 2, n. 59, citing to Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (stating that al Qaeda financial committee member Abdul Islam, who was "authorized to disburse funds for salaries and transportation expenses of al-Qa'ida members, and for donations to widows and orphans," worked for the International Islamic Relief Organization); *id.* at 525 (listing of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization"); *id.* at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level |

| | |
|---|---|
| | positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida").<br><br>*See also* 9/11 Commission Final Report, Chapter 2, n. 67, citing to Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that the Maktab al-Khidamat, a Pakistan-based nongovernmental organization financed by Osama bin Laden, played a key role in facilitating the training and travel of Islamic militants, and received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization").<br><br>*See also* 9/11 Commission Final Report, Chapter 2, n. 77, citing to Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Mohammed Jamal Khalifa, Osama bin Laden's brother-in-law, and close associate of World Trade Center bomber Ramzi Yousef, served as the director of the International Islamic Relief Organization (IIRO) in the Philippines, and "was involved in recruiting Muslims for training in Pakistan as mujahidin fighters."); *id.* at 151 (describing IIRO, WAMY, and Al Haramain as having "tie[s] to terrorist and mujahidin activity"). |
| 483. The 9/11 Commission's "Monograph on Terrorist Financing" did not conclude that IIRO or MWL, or any of their foreign offices, directly or indirectly provided funds to al Qaeda. See generally Monograph. | Disputed. The IIRO's assertion that the Staff Monograph did not conclude that the IIRO or MWL provided financial assistance to al Qaeda is inaccurate and misleading. *See* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 95 (stating that Osama bin Laden confidant Enaam Arnaout provided military and logistical support to the mujahideen in the late 1980s and early 1990s as an employee of "Saudi NGO, the Muslim World League"). |
| 484. The 9/11 Commission Report addresses charities in connection with the financing of al Qaeda in two sections. See 9/11 Commission Report, at 169-72, 185-86. | Disputed. The IIRO's selective references to the 9/11 Commission Final Report, and its suggestion that those are the only places in the Final Report discussing the involvement of Saudi charities in the financing of al Qaeda is inaccurate and misleading. *See* 9/11 Commission Final Report at 55 ("Bin Ladin understood better than most of the volunteers to the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization. This organization included a financial support network that came to be known as the 'Golden Chain,' put together mainly by financiers in Saudi Arabia and the Persian Gulf states. Donations flowed through charities or other nongovernmental organizations (NGOs). Bin Ladin and the 'Afghan Arabs' drew largely on funds raised by |

| | |
|---|---|
| | this network, whose agents roamed world markets to buy arms and supplies for the mujahideen, or 'holy warriors.'"").<br><br>In support of that paragraph, the 9/11 Commission cites to Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 ("By way of background, Usama Bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ('MK') (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al Madani") of the International Islamic Relief Organization (hereafter "IIRO," sometimes referred to as "Igatha" based upon its Arabic name "*Hay'at al-Igatha al-Islamiya al-'Alamtyaa*"), which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL'). In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*."). *See* 9/11 Commission Final Report at Chapter 2, n. 21.<br><br>*See also* 9/11 Commission Final Report at 371 (stating that "Saudi Arabia's society was a place where al Qaeda raised money directly from individuals and through charities").<br><br>Moreover, the 9/11 Commission talks extensively in its Staff Monograph how "al Qaeda was funded, to the tune of approximately $30 million per year, by diversions of money from Islamic charities." *See* Ex. 3, 9/11 Commission Monograph on Terrorist Financing (providing case studies on the funding of al Qaeda via charities Al Haramain Islamic Foundation, Global Relief Foundation ("GRF"), and Benevolence International Foundation ("BIF")). |
| 485. The 9/11 Commission Report's section on "General Financing" (pp. 169-72) mentions only the "al Haramain Islamic Foundation" as an example of "large, international charities" with "lax external oversight and ineffective internal controls," whose foreign branch offices have "al Qaeda sympathizers" diverting money to Al Qaeda. 9/11 Commission Report, at 170 & n.118 | Disputed. The IIRO's selective references to the 9/11 Commission Final Report are inaccurate and misleading, and deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 481 (CIA reports cited by the 9/11 Commission Final Report detailing |

| | |
|---|---|
| (citing CIA report, "How Bin Ladin Commands a Global Terrorist Network," CTC 99-40003, Jan. 27, 1999). Furthermore, it mentions only "the al Wafa organization" as an example of "entire charities" who "may have wittingly participated in funneling money to al Qaeda." *Id.* | financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). *See also* Plaintiffs' response to No. 484 (Staff Monograph on Terrorist Financing providing case studies on the funding of al Qaeda via charities Al Haramain Islamic Foundation, Global Relief Foundation ("GRF"), and Benevolence International Foundation ("BIF")). |
| 486. This portion of the 9/11 Commission Report does not mention IIRO or MWL, or conclude that IIRO or MWL, or any of their branch offices, directly or indirectly, provided funds to al Qaeda. 9/11 Commission Report at 170. *See also* Ex. 21, Winer Dep. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported al Qaeda). | Disputed. As an initial matter, to the extent IIRO suggests that the IIRO and MWL have been exonerated by the 9/11 Commission from any accountability for the years of extensive financial and material support they provided to al Qaeda because they are not specifically named in the 9/11 Commission Final Report, that is inaccurate and misleading. *See* Ex. 2, Affirmation of Joseph Robert "Bob" Kerrey (stating that any "proposition that the 9/11 Commission fully exonerated Saudi Arabia and any Saudi government charities for any potential culpability for the financing and emergence of al Qaeda or the events of September 11, 2001" is "incorrect"); Affirmation of John F. Lehman (stating that the allegations and claims advanced by the 9/11 plaintiffs were never considered and rejected as factually untrue); Declaration of Richard Ben-Veniste (stating that "further fact-finding was appropriate"). Indeed, Plaintiffs' claims against the IIRO, MWL, and WAMY based on their funding and material sponsorship of al Qaeda are fully supported by the 9/11 Commission's findings that there was a substantial "likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda." *See* Ex. 1, 9/11 Commission Final Report at 171.<br><br>By way of further response, the IIRO's selective references to the 9/11 Commission Final Report are inaccurate and misleading, and deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 481 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). *See also* Plaintiffs' response to No. 484 (Staff Monograph on Terrorist Financing providing case studies on the funding of al Qaeda via charities Al Haramain Islamic Foundation, Global Relief Foundation ("GRF"), and Benevolence International Foundation ("BIF").)<br><br>*See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 95 (stating that Osama bin Laden confidant Enaam Arnaout provided military and logistical support to the mujahideen in the late 1980s and early 1990s as an employee of "Saudi NGO, the Muslim World League"). |

| | |
|---|---|
| 487. The January 27, 1999, CIA report, cited by the 9/11 Commission Report, notes Bin Ladin's exploitation of some international Islamic nongovernmental organizations for financial and logistical support. Ex. 53, CIA report, "How Bin Ladin Commands a Global Terrorist Network," CTC 99-40003 (Jan. 27, 1999) at CIA_000007. | Disputed as stated. The CIA report specifically states: "In addition to support from other groups, Bin Ladin taps into the resources of some international Islamic nongovernmental organizations (NGOs) for financial and logistical support. Employees – ranging from accountants to directors – of a few NGO branch offices have diverted resources to benefit Bin Ladin and his associates, although we are unable to determine if the organizations' home offices are witting. Bin Ladin exploits these NGO ties to channel funds and obtain cover employment and travel assistance for his associates. He also uses the NGOs' distribution network to move weapons and supplies." *See* Ex. 7, *How Bin Ladin Commands a Global Terrorist Network [REDACTED]*, January 27, 1999, CIA_00002-16. |
| 488. The unredacted sections of the January 27, 1999 CIA report do not include IIRO or MWL, any IIRO or MWL official, or any IIRO or MWL employee as part of Bin Ladin's terrorist network. Nor do they conclude that IIRO or MWL, or any of their branch offices, directly or indirectly, provided funds to al Qaeda. *Id.* | Disputed. To the extent that the IIRO argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because they are not specifically named in a CIA report (one of dozens of CIA reports produced in this litigation), that is inaccurate and misleading.<br><br>Moreover, the IIRO deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 481 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain).<br><br>Lastly, the Court has concluded on two separate occasions in this litigation that the declassified CIA reports are trustworthy and admissible. *See* March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 12 (concluding that "the declassified CIA documents are trustworthy"); *see also* August 19, 2026 Memorandum Decision and Order (ECF No. 12247) at 20-21 (finding the CIA reports are trustworthy because (i) the "CIA reports were submitted in the years leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely;" (ii) the CIA reports "were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other specialists with expertise in counterterrorism;" and (iii) the "9/11 Commission also held hearings regarding the reports." |
| 489. The 9/11 Commission Report's section on "General Financing" (pp. 169-72) cites another CIA report, Pursuing the Bin Laden Financial Target," CTC 01-40003HCS, Apr. 12, 2001. See 9/11 Commission | It is not disputed that the 9/11 Commission Final Report makes those statements. |

| | |
|---|---|
| Report, at 171 n.126. This report states that, in the case of NGO financing of terrorism, "the majority of the money moving through the NGOs is for legitimate humanitarian needs," and these funds are "co-mingled with those slated for nefarious purposes, making it extremely difficult to identify and seize funds directly linked to terrorist activities." Ex. 54, CIA report, "Pursuing the Bin Laden Financial Target," CTC 01-400003HCS (Apr. 12, 2001) at CIA_00381. | |
| 490. This CIA report, "Pursuing the Bin Laden Financial Target," does not conclude that any IIRO or MWL funds were diverted to terrorist activities. Nor does it otherwise make any finding that IIRO or MWL, or any of their branch offices, directly or indirectly, provided funds to al Qaeda. See generally *Id.* | Disputed. To the extent that the IIRO argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because they are not specifically named in a CIA report (one of dozens of CIA reports produced in this litigation), that is inaccurate and misleading.<br><br>Moreover, the IIRO deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 481 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain).<br><br>The Court has concluded on two separate occasions in this litigation that the declassified CIA reports are trustworthy and admissible. *See* March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 12 (concluding that "the declassified CIA documents are trustworthy"); *see also* August 19, 2026 Memorandum Decision and Order (ECF No. 12247) at 20-21 (finding the CIA reports are trustworthy because (i) the "CIA reports were submitted in the years leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely;" (ii) the CIA reports "were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other specialists with expertise in counterterrorism;" and (iii) the "9/11 Commission also held hearings regarding the reports."<br><br>Lastly, a more recent, declassified version of the CIA Report, *Pursuing the Bin Laden Financial Target*, April 12, 2001, CIA_00201-208 is attached as Ex. 12. |
| 491. The 9/11 Commission Report's section on "Terrorist Financing" (pp. 185-86) states that the CIA knew relatively early about the "loose affiliation of financial institutions, business, and wealthy individuals who supported extremist Islamic activities." 9/11 Commission Report, at 185 & n.84 (citing CIA report, | It is not disputed that the 9/11 Commission Final Report makes those statements and cites to CIA Report, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804. *See* Ex. 19. |

| | |
|---|---|
| "Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions," OTI 97-10035CX (Dec. 1997)). | |
| 492. This "Terrorist Financing" section of the 9/11 Commission Report does not conclude that IIRO or MWL, or any of their branch offices, directly or indirectly, provided funds to al Qaeda. *Id.* at 185-86. | Disputed. As an initial matter, to the extent IIRO suggests that the IIRO and MWL have been exonerated by the 9/11 Commission from any accountability for the years of extensive financial and material support they provided to al Qaeda because they are not specifically named in the Final Report, that is inaccurate and misleading. *See* Ex. 2, Affirmation of Joseph Robert "Bob" Kerrey (stating that any "proposition that the 9/11 Commission fully exonerated Saudi Arabia and any Saudi government charities for any potential culpability for the financing and emergence of al Qaeda or the events of September 11, 2001" is "incorrect"); Affirmation of John F. Lehman (stating that the allegations and claims advanced by the 9/11 plaintiffs were never considered and rejected as factually untrue); Declaration of Richard Ben-Veniste (stating that "further fact-finding was appropriate"). Indeed, Plaintiffs' claims against the IIRO, MWL, and WAMY based on their funding and material sponsorship of al Qaeda are fully supported by the 9/11 Commission's findings that there was a substantial "likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda." *See* Ex. 1, 9/11 Commission Final Report at 171.<br><br>By way of further response, the IIRO's selective references to the 9/11 Commission Final Report are inaccurate and misleading, and deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 481 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). |
| 493. The cited December 1997 CIA report claims:<br><br>*Saudi Arabia, as well as other Gulf States, has long been a source of financial support for Islamic causes; at least some of these funds are diverted to militants and terrorists. Riyadh provides official funding to various groups to promote Sunni Islam and to counter regional Iranian influence; other funding emanates from semiofficial charities, such as the Muslim World League and IIRO, and from private donations that are often difficult to track. Funds collected from individuals are often made in cash and disguised as religious offerings; NGO funds, on the other hand, are usually diverted by unregulated offices located abroad.* | Disputed. To the extent that the IIRO argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because this CIA report (one of dozens of CIA reports produced in this litigation) does not specifically say that MWL and IIRO funds were diverted to al Qaeda, that is inaccurate and misleading. The CIA report specifically identifies the MWL and IIRO as conduits of funds for militants and terrorists. *See* Ex. 19, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804.<br><br>Moreover, the IIRO deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the |

| | |
|---|---|
| Ex. 55, CIA report, "Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions," OTI 97-10035CX (Dec. 1997) at CIA_000744. While mentioning MWL and IIRO as examples of charities and discussing the diversion of charitable funds in the abstract, the report does not conclude, assert, or prove that any MWL or IIRO funds were actually diverted to terrorists, let alone to Al Qaeda. See generally *Id.* | substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 481 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain).<br><br>Lastly, the Court has concluded on two separate occasions in this litigation that the declassified CIA reports are trustworthy and admissible. *See* March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 12 (concluding that "the declassified CIA documents are trustworthy"); *see also* August 19, 2026 Memorandum Decision and Order (ECF No. 12247) at 20-21 (finding the CIA reports are trustworthy because (i) the "CIA reports were submitted in the years leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely;" (ii) the CIA reports "were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other specialists with expertise in counterterrorism;" and (iii) the "9/11 Commission also held hearings regarding the reports." |
| 494. The 9/11 Commission Report section on "Terrorist Financing" continues: "although the intelligence community devoted more resources to the issue [of Al Qaeda funding] and produced somewhat more intelligence, it remained difficult to distinguish al Qaeda's financial transactions among the vast sums moving in the international financial system." 9/11 Commission Report, p. 186 & n.86 (citing two CIA reports, "Usama Bin Ladin: Some Saudi Financial Ties Probably Intact," OTI IR 99-005CX (Jan. 11, 1999), and "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999)). | It is not disputed that the 9/11 Commission Final Report makes those statements and cites to CIA Reports, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, CIA_000807-848, at Ex. 20; and *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236, at Ex. 13. |
| 495. The January 11, 1999 CIA report, cited by the 9/11 Commission Report discusses the supervision and funding of "two al-Qa'ida training camps in Afghanistan." Ex. 56, CIA report, "Usama Bin Ladin: Some Saudi Financial Ties Probably Intact," at CIA_000808. It does not allege that MWL or IIRO funds or is otherwise affiliated with these camps. | It is not disputed that the CIA report states that "[h]alf-brother Qasim is a leader of the al-Qa'ida organization" and "reportedly supervises two al-Qa'ida training camps in Afghanistan." *See* Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, CIA_000807-848 at 808.<br><br>However, to the extent the IIRO argues there is no evidence that the IIRO or MWL funded, or was affiliated with, al Qaeda and terrorist training camps, that is disputed as inaccurate and misleading. The IIRO provided substantial funding for al Qaeda's training camps in Afghanistan, including camps from which al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training. *See, e.g.*, Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 |

| | |
|---|---|
| | ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); Ex. 159, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 381, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo military training himself at one of the camps, where he met Usama Bin Laden."). |

| | |
|---|---|
| | Lastly, the Court has concluded on two separate occasions in this litigation that the declassified CIA reports are trustworthy and admissible. *See* March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 12 (concluding that "the declassified CIA documents are trustworthy"); *see also* August 19, 2026 Memorandum Decision and Order (ECF No. 12247) at 20-21 (finding the CIA reports are trustworthy because (i) the "CIA reports were submitted in the years leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely;" (ii) the CIA reports "were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other specialists with expertise in counterterrorism;" and (iii) the "9/11 Commission also held hearings regarding the reports." |
| 496. Later, the January 11, 1999 CIA report claims that IIRO "funds a military camp associated with Usama [Bin Laden]." *Id.* The report does not indicate that these "military camps" are the same as the "two al-Qa'ida training camps in Afghanistan," which it discussed previously and separately. *Id.* In any event, the unredacted portions of the report do not provide the factual basis for this assertion or otherwise source the claim that IIRO funds the "military camp." See generally *Id.* | It is not disputed that the CIA report states that "[t]he International Islamic Relief Organization (IIRO) funds a military camp associated with Usama." *See* Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, CIA_000807-848 at 808.<br><br>However, to the extent the IIRO argues there is no evidence that the IIRO or MWL funded, or was affiliated with, al Qaeda and terrorist training camps, that is disputed as inaccurate and misleading. The IIRO provided substantial funding for al Qaeda's training camps in Afghanistan, including camps from which al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training. *See, e.g.*, Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); Ex. 159, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). *See also* Philippines Intelligence Report at Ex. 59, *MILF* |

| | |
|---|---|
| | *Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO.").<br><br>Lastly, the Court has concluded on two separate occasions in this litigation that the declassified CIA reports are trustworthy and admissible. *See* March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 12 (concluding that "the declassified CIA documents are trustworthy"); *see also* August 19, 2026 Memorandum Decision and Order (ECF No. 12247) at 20-21 (finding the CIA reports are trustworthy because (i) the "CIA reports were submitted in the years leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely;" (ii) the CIA reports "were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other specialists with expertise in counterterrorism;" and (iii) the "9/11 Commission also held hearings regarding the reports." |
| 497. The January 11, 1999 CIA report also claims that Bin Laden "apparently" has "extensive contact with Afghani and Pakistani offices of the IIRO," but "it is not clear that IIRO headquarters in Jeddah is witting of these contacts." *Id.* at CIA_000817. The report does not conclude that Bin Ladin in fact has extensive contact with these IIRO offices, nor do the unredacted portions of the report indicate the source or factual basis for the claim that he "apparently" does so. See generally *Id.* | It is not disputed that the CIA makes that statement in the CIA Report, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 817. *See* Ex. 19. However, to the extent the IIRO argues there is no evidence that Osama bin Laden had contact with the Afghanistan and Pakistan offices of the IIRO, that is disputed as inaccurate and misleading.<br><br>Recall that MWL Secretary General Omar Abdullah Nseef endorsed the appointment of Wa'el Hamza Jelaidan, a founding member of al Qaeda, as the director of the MWL/IIRO offices in Peshawar, Pakistan in 1989, thereby ensuring a direct channel for coordinating MWL/IIRO's collaboration with Osama bin Laden and al Qaeda. Jelaidan's role with the MWL allowed al Qaeda to use the MWL as an "umbrella" under which the terror group's members could operate, including using MWL offices for launching terrorist attacks. *See* Plaintiffs' response to No. 1. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150 (indicating that Jelaidan and Mohammed Jamal Khalifa (also an al Qaeda member) served in official roles with the MWL).<br><br>Jelaidan was a close associate of Osama bin Laden, and one of the most significant figures in the history of al Qaeda and its development into a global terrorist organization. *See* Ex. 53, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2002, FED-PEC 203469-20370 |

| | |
|---|---|
| | at 203470 ("Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that 'We are all in one boat, as is known to you, including our brother, Wa'el Julaidan.'"); Ex. 180, *Additional Designation Pursuant to E.O. 13224*, TREASURY00001-8 at 4-5 (stating that "Julaidan is identified as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief," and also served on al Qaeda's shura council). *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 34.<br><br>*See also* Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 ("By way of background, Usama Bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ('MK') (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al Madani") of the International Islamic Relief Organization (hereafter "IIRO," sometimes referred to as "Igatha" based upon its Arabic name "*Hay'at al-Igatha al-Islamiya al-'Alamtyaa*"), which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL'). In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*.").<br><br>*See also* Ex. 161, FBI Report, *Co-operating Witness Interview*, June 2, 2004, PEC-KSA002133-2134 at 2133 (indicating that al Qaeda members in the IIRO office in Peshawar, Pakistan, headed by Wa'el Jelaidan, were responsible for purchasing weapons); Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143 (Fadl testifying that al Qaeda used Wa'el Jelaidan as head of the IIRO office in Peshawar, Pakistan, to create ID cards for al Qaeda members so that they could cross the Pakistan-Afghanistan border |

| | |
|---|---|
| | without a problem, under the guise that they were teachers or other relief workers.).<br><br>Indeed, the U.S. government concluded that bin Laden and al Qaeda used the entire IIRO network for al Qaeda's terrorist activities. *See* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities.").<br><br>Moreover, the IIRO ignores the CIA's assessment on that very same page stating that the IIRO is a funding conduit for al Qaeda. *See* Ex. 19, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 817 (stating that "several Saudi NGOs are funding conduits for al-Qa'ida or have penetrated by Usama's network" and "[t]hose of greatest concern include the International Islamic Relief Organization (IIRO)" and "Al-Haramayn Islamic Foundation"). *See also id.* at 818 ("Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahed to fight in Chechnya.").<br><br>Lastly, the Court has concluded on two separate occasions in this litigation that the declassified CIA reports are trustworthy and admissible. *See* March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 12 (concluding that "the declassified CIA documents are trustworthy"); *see also* August 19, 2026 Memorandum Decision and Order (ECF No. 12247) at 20-21 (finding the CIA reports are trustworthy because (i) the "CIA reports were submitted in the years leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely;" (ii) the CIA reports "were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other specialists with expertise in counterterrorism;" and (iii) the "9/11 Commission also held hearings regarding the reports." |
| 498. The January 11, 1999 CIA report describes MWL as an example of an NGO with "[p]ossible" ties to "Usama Bin Ladin" that are "questionable, though less direct." *Id.* at CIA_000822. The report does not conclude that MWL has actual ties with Bin Ladin, nor do the unredacted portions of the report indicate the source or factual basis for the claim that it has "[p]ossible" ties. See generally *Id.* | It is not disputed that the CIA makes that statement in the CIA Report, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 817. *See* Ex. 19. However, to the extent the IIRO argues there is no evidence that the MWL has ties to Osama bin Laden, that is disputed as inaccurate and misleading.<br><br>*See, e.g.*, Plaintiffs' response to No. 1, discussing MWL/IIRO letterhead detailing a meeting between "Abu Abdullah" (a/k/a Osama bin Laden), Dr. Abdullah Omar Naseef, in his capacity as the Secretary General of the MWL, and others where it was agreed that al Qaeda attacks would be launched from MWL offices: "And if he is being subjected to any pressures, let it be |

| | |
|---|---|
| | a secret (*agreement*), in a way that [Muslim World] League offices will be opened as (*illegible*) for the Pakistanis, and the attacks will be launched from them (*these offices*) …"). *See* Ex. 61, FED-PEC0212276-212281 at 212276. The document further suggests using the name of the "League" as "an umbrella which you can stay under." *Id.* at 212278. Investigators also recovered a list of orders from Osama bin Laden regarding the management of Islamic charities. At point 10 of his list, bin Laden urges the creation of a committee to receive and distribute donations to al Qaeda, and recommends participation of the MWL ("the Muslim World League"), and IIRO ("Hayaat Al-Ighata"). *See* Ex. 60, FED-PEC0212268-212275 at 212268.<br><br>*See also* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150 (indicating that "[s]everal of Bin Ladin's associates, including Wa'il Julaydan and Muhammad Jamal Khalifa, were MWL representatives"); Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"); Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 95 (stating that Osama bin Laden confidant Enaam Arnaout provided military and logistical support to the mujahideen in the late 1980s and early 1990s as an employee of "Saudi NGO, the Muslim World League").<br><br>Lastly, the Court has concluded on two separate occasions in this litigation that the declassified CIA reports are trustworthy and admissible. *See* March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 12 (concluding that "the declassified CIA documents are trustworthy"); *see also* August 19, 2026 Memorandum Decision and Order (ECF No. 12247) at 20-21 (finding the CIA reports are trustworthy because (i) the "CIA reports were submitted in the years leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely;" (ii) the CIA reports "were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other specialists with expertise in counterterrorism;" and (iii) the "9/11 Commission also held hearings regarding the reports." |
| 499. The January 11, 1999 CIA report states that MWL has "apparently" been "used as a cover organization for several of Usama's associates." *Id.* at CIA_000823. The report does not conclude that MWL in fact has been used | It is not disputed that the CIA makes that statement in the CIA Report, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 823. *See* Ex. 19. However, to the extent the IIRO argues there is no |

| | |
|---|---|
| as a cover organization, nor do the unredacted portions of the report indicate the source or factual basis for the claim that it "apparently" has been so used. See generally *Id.* | evidence that the MWL has ties to Osama bin Laden, that is disputed as inaccurate and misleading. *See, e.g.*, Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 213 (stating that "several MWL affiliate organizations—including the International Islamic Relief Organization (IIRO)—have provided terrorists with funding and cover employment, documentation, and training").<br><br>Lastly, the Court has concluded on two separate occasions in this litigation that the declassified CIA reports are trustworthy and admissible. *See* March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 12 (concluding that "the declassified CIA documents are trustworthy"); *see also* August 19, 2026 Memorandum Decision and Order (ECF No. 12247) at 20-21 (finding the CIA reports are trustworthy because (i) the "CIA reports were submitted in the years leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely;" (ii) the CIA reports "were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other specialists with expertise in counterterrorism;" and (iii) the "9/11 Commission also held hearings regarding the reports." |
| 500. Without factual support or attribution, the January 11, 1999 CIA report states, inaccurately, that MWL is the "parent organization of the IIRO and WAMY." *Id.* at CIA_000823. | Disputed. The IIRO's claim that the MWL is not the parent organization of the IIRO is inaccurate and misleading. Discovery documents and testimony from MWL and IIRO officials confirm that the MWL is the parent organization of the IIRO.<br><br>The MWL sought approval from the Saudi government to establish the IIRO in 1978. *See* Ex. 23, Transcript, September 17, 2018 Deposition of Abdullah al Obaid ("Obaid Transcript") at 73-74 (acknowledging that the MWL sought approval from the Saudi state to establish the IIRO); *see also* Ex. 82, IIRO Annual Report 1999/2000, IIRO 212-330 at 215 (stating that Royal Approval No. 4834 was issued on January 29, 1979). The Constitution of the IIRO was later approved during the 35th session of the MWL Constituent Council, the legislating council of the MWL, held between October 7-10, 1997. *Id.*<br><br>Additionally, the MWL Secretary General is designated to serve as the Chairman of the IIRO Board of Directors and also serves as the Chairman of the IIRO General Assembly. *See* Ex. 23, Obaid Transcript at 70-71; *see also* Ex. 26, Transcript, February 20, 2019 Deposition of Adnan Basha ("Basha Transcript") at 54, 99. The Secretary General of the MWL, a position equivalent to that of a Saudi government "minister," is also responsible for nominating individuals to serve as the |

| | |
|---|---|
| | IIRO Secretary General. *See, e.g.*, Ex. 231, MWL 59176; Ex. 26 at 100.<br><br>The IIRO Board of Directors is the highest policy-making body of the IIRO, and its decisions are binding upon the executive body. *See* Ex. 82, IIRO Annual Report 1999/2000, IIRO 212-330 at 216. MWL officials, including the MWL Secretary General, hold a number of seats on the IIRO Board of Directors and directly influence the policies and activities of the IIRO. *See* Ex. 26, Basha Transcript at 128-130. *See also* Ex. 131, September 20, 2000 Minutes of the Sixth Meeting of the IIROSA Board of Directors at 1-2 (identifying 7 MWL officials serving on the IIRO Board of Directors, including the MWL Secretary General, the Assistant MWL Secretary General, the MWL Director General of Finance and Administration, and four members of the MWL Constituent Council).<br><br>*See also* Ex. 22, Declaration of Abdullah bin Saleh al Obaid, March 29, 2004 at ¶ 12 (stating that "the IIRO is a subsidiary of the Muslim World League").<br><br>*See also* Ex. 71, U.S. Diplomatic Cable, *Islamic NGOs in the Philippines*, May 23, 2005, FED-PEC 220479-220481 ("The International Islamic Relief Organization (IIRO) -- a subsidiary of the Saudi-based and funded Muslim World League (MWL) -- was active here in the late 1980s and early 1990s. Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines."); Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 106 ("The International Islamic Relief Organization [IIRO], which is headquartered in Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL, … the Taliban, … and Hamas, … as well as al Qaida affiliates, *inter alia*, the Abu Sayyaf Group (ASG), … Jemaah Islamiya (JI), … and Al Ittihad Al Islamiya (AIAI)…. The IIRO's parent organization is the Muslim World League [MWL] also headquartered in Saudi Arabia."). |
| 501. The April 9, 1999 CIA report cited by the 9/11 Commission notes that "large, internationally active | It is not disputed that the CIA makes that statement in the CIA Report, *Islamic Terrorists: Using Nongovernmental* |

| | |
|---|---|
| NGOs based in Saudi Arabia" can be "exploited by individual employees," but "[t]errorist abuse of such NGOs takes place at the local branch office rather than at the organizations' headquarters. Senior NGO leaders usually are unwitting of the activity and willing to take corrective action when apprised of the abuse." Ex. 74, CIA report, "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999) at CIA_000213. | *Organizations Extensively*, April 9, 1999, CIA_000210-236 at 213. *See* Ex. 13.<br><br>*See also* Plaintiffs' responses to Nos. 1, 2, 6, 43, 45-49, 62, 65, and 72 (detailing evidence that senior leaders of the IIRO and MWL were well aware of the terrorist activities of those organizations). |
| 502. The April 9, 1999 CIA report then asserts, "Although the MWL headquarters, for example, avoids extremist causes, sympathizers within several MWL affiliate organizations – including the International Islamic Relief Organization (IIRO) – have provided terrorists with funding and cover employment, documentation, and training, according to [redacted] press reporting." *Id.* | It is not disputed that the CIA makes that statement in the CIA Report, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 213. *See* Ex. 13. |
| 503. This allegation in the April 9, 1999 CIA report cites only "[redacted] press reporting," without identifying the source or nature of the press reporting. *Id.* | It is not disputed that the CIA makes that statement without identifying the press reporting. *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 213.<br><br>By way of further response, IIRO leadership was expressly aware of the organization's ongoing support for international terrorism and Osama bin Laden, and the involvement of its branch offices and officials in terrorist activities, by virtue of extensive international media reporting prior to the 9/11 attacks. Any assertion that the IIRO, and/or its parent organization MWL, was unaware of its substantial support for al Qaeda and terrorist activities is duplicitous. *See, e.g.*, (1) Daily News, *It's More than Just Who Plants the Explosives*, July 31, 1996 (reporting that the IIRO is a major conduit of financial support to the Hamas terrorist group); (2) The Age, *Filipino Muslims Linked to Holy Warrior's Global Terror*, May 20, 1995 (reporting on the discovery of al Qaeda's terrorist plot in the Philippines ("Bojinka") and explaining that Mohammed Jamal Khalifa of the IIRO, a "key figure in the network of Islamic extremists," was funding Islamic militants in the Philippines); (3) Frontline, *A Terrorist Plot Unearthed*, March 12, 1999 (discussing the IIRO's connections to an terrorist operation to bomb U.S. Consulates in India, and describing the IIRO as being "closely associated with the billionaire terrorist Osama bin Laden"); (4) University of Pennsylvania-African Studies Center, *Horn of Africa: The Monthly Review, 19-10/98* (reporting that the IIRO was one of five relief organizations banned by the Kenyan government following the August 1998 U.S. Embassy bombings); (5) IPS-Inter Press Service, *Kenya: Gov't Shuts down Five Islamic Relief Agencies*, September 10, 1998 (reporting that the |

| | |
|---|---|
| | Kenyan government banned the IIRO for supporting terrorism following the August 1998 U.S. Embassy bombings); (6) ITAR-TASS, *Russian Troops Find Arab, Bosnian Passports in Chechnya*, February 21, 2000 (reporting that that IIRO, with its main office in Saudi Arabia, arranged for the transportation of Islamic fighters to participate in the conflict in Chechnya); (7) Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report*, February 13, 1999 (reporting that the IIRO's Mohammed Jamal Khalifa "is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group," and further stating that the "IIRO is suspected by Western intelligence agencies to be bin Laden's conduit to various terrorist organizations in Islamic countries"); (8) Philippine Daily Inquirer, *Front Page: Bin Laden Funds Abu Sayyaf Through Muslim Relief Group*, August 9, 2000 (indicating that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League) is a conduit of funds for the Abu Sayyaf Group, a terrorist organization in the Philippines); (9) Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000 (reporting that the IIRO is a front to finance the operations of the Abu Sayyaf Group and Moro Islamic Liberation Front terrorist organizations); (10) The U.N. Refugee Agency, *Human Rights Watch World Report 1999 – Kenya*, January 1, 1999 (stating that the Kenyan government cancelled the registration of the IIRO and other Islamic relief agencies for supporting terrorism); (11) New York Times, *Some Charities Suspected of Terrorist Role*, February 19, 2000 (reporting on the 1998 U.S. Embassy attacks and that the Kenyan government said the charities "'posed a serious threat' to Kenya's security"); (12) The Times, *Terror by Degree*, October 18, 1997 (reporting on the "Bojinka" terrorist plot and stating that Mohammed Jamal Khalifa was funding the Abu Sayyaf Group); (13) The Indian Ocean Newsletter, *Banned Islamic NGOs*, September 12, 1998 (reporting that Kenya banned the IIRO and other NGOs following their investigation into the August 1998 attacks on U.S. embassies in Nairobi and Dar es Salaam); (14) U.S. News & World Report, *A Helping Hand From Saudi Arabia*, July 8, 1996 (reporting that the IIRO is a major clearinghouse for funds to aid Islamic extremism and terror in Gaza and the West Bank); (15) The Straits Times, *Osama Gave Funds to Abu Sayyaf: Manila*, August 10, 2000 (reporting that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League), "in the guise of giving charity to local Muslim communities, provided funds to Abu Sayyaf for acquiring arms"); (16) Overseas Immigration News, *Immigration Claims Teacher Linked to Terrorists Alleged Al-Jihad Member: Egyptian Denies Allegations, is Appealing Legal Proceedings*, May 21, 1999 (reporting that the IIRO "secretly funds terrorism"). *See also* Ex. 80, IIRO 147 ("IIRO Administrative Structure" chart |

| | |
|---|---|
| | identifying a "Department of Media and Information."); Ex. 65, FED-PEC 214874-214875 (MWL structural chart identifying "The General Department for Media and Culture"). |
| 504. The April 9, 1999 CIA report on three subsequent occasions mentions IIRO in connection with support to terrorist groups (other than Al Qa'eda). | It is not disputed that the CIA Report, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 reports that (1) Mohammed Jamal Khalifa and the IIRO provided funding to the 1995 plot to bomb at least 12 U.S. airliners in East Asia; (2) IIRO offices engaged in extremist activities; and (3) IIRO branches have engaged in criminal activities such as narcotics trafficking and counterfeiting for financing their terrorist operations. *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."); *id.* at 220 ("The director of the IIRO office in Baku, Azerbaijan diverted approximately $1.5 million to the Egyptian Islamic Jihad."); *id.* at 221 ("IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate toward more extremist activities."); *id.* ("A few IIRO branches have turned to illegitimate means of financing their operations—including narcotics trafficking and counterfeiting—further increasing their independence and ability to support terrorism.").<br><br>However, to the extent the IIRO argues that the CIA report does not connect IIRO to al Qaeda, that is disputed as inaccurate and misleading. As an example, the 1995 plot to bomb at 12 U.S. airliners in East Asia, referenced at CIA_000216, is the al Qaeda "Bojinka" plot, the precursor to the 9/11 attacks. *See, e.g.*, Plaintiffs' response to No. 43. Khalifa personally orchestrated the use of IIRO funds and resources to support the terrorist activities of 9/11 mastermind Khalid Sheikh Mohammed ("KSM"), Ramzi Yousef (1993 World Trade Center bomber), and Wali Khan Amin Shah (Afghan jihad veteran and Osama bin Laden/al Qaeda associate) in the Philippines, and the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations of twelve U.S. flag commercial airplanes as they flew from Asia to the United States. That very plot, often referred to as "Operation Bojinka," was adapted into the 9/11 terrorist plot by KSM, using the knowledge he had acquired during its development about vulnerabilities in the aviation security system. *See* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 (stating that the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. |

| | |
|---|---|
| | airlines; his brother-in-law is Usama Bin Ladin"). *See also* Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12, 24 (discussing the Bojinka plot).<br><br>By way of further response, a number of CIA reports state that the IIRO served as a key financial conduit for al Qaeda and played a central role in providing critical support to the terrorist organization, including but not limited to appointing al Qaeda members to leadership positions within the IIRO, recruiting Islamic fighters, facilitating the training and travel of Islamic militants with employment papers and other documentation, engaging in narcotics trafficking and counterfeiting, and funding terrorist training camps. *See* Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that the Maktab al-Khidamat, a Pakistan-based nongovernmental organization financed by Osama bin Laden, played a key role in facilitating the training and travel of Islamic militants, and received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization"); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Mohammed Jamal Khalifa, Osama bin Laden's brother-in-law, and close associate of World Trade Center bomber Ramzi Yousef, served as the director of the International Islamic Relief Organization (IIRO) in the Philippines, and "was involved in recruiting Muslims for training in Pakistan as mujahidin fighters."); *id.* at 151 (describing IIRO, WAMY, and Al Haramain as having "tie[s] to terrorist and mujahidin activity"); Ex. 11, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199 at 198 (stating that "al-Qa'ida has infiltrated some of IIRO's branches"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."); *id.* at 221 ("IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate toward more extremist activities."); *id.* ("A few IIRO branches have turned to illegitimate means of financing their operations—including narcotics trafficking and counterfeiting—further increasing their independence and ability to support terrorism."); Ex. 14, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*, November 17, 1998, CIA_00317-338 at 325 ("Bin Ladin and his associates make extensive use of non-governmental charitable organizations (NGOs) to transfer funds. Bin-Ladin-affiliated Islamic NGOs – such as … the International Islamic Relief Organization (IIRO); Al- |

| | |
|---|---|
| | Haramayn; … and others – are convenient money couriers because they maintain offices in Afghanistan, Albania, Pakistan, and other locations where Bin Ladin associates are prevalent."); *id.* at 330 ("Bin Ladin and Al-Qa'ida probably receive Gulf funding diverted from offices of Islamic NGOs, particularly the MK, IIRO, Al Haramayn … and others."); Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (stating that al Qaeda financial committee member Abdul Islam, who was "authorized to disburse funds for salaries and transportation expenses of al-Qa'ida members, and for donations to widows and orphans," worked for the International Islamic Relief Organization); *id.* at 525 (listing of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization"); *id.* at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"); Ex. 18, *Al-Qa'ida's Financial Ties to Islamic Youth Programs*, January 17, 2003, CIA_00681-701 at 692 (stating that "Gulf charities like the Saudi International Islamic Relief Organization (IIRO) and Al-Haramain … are well aware of the radical Wahhabi and Salafist doctrines being taught at institutions they fund"); Ex. 19, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 741 (stating that the Sudanese National Islamic Front ("NIF") works "with hardline Islamic fundamentalists employed by the Saudi International Islamic Relief Organization"); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama, [REDACTED]."); *id.* at 817 (stating that "several Saudi NGOs are funding conduits for al-Qa'ida or have penetrated by Usama's network" and "[t]hose of greatest concern include the International Islamic Relief Organization (IIRO)" and "Al-Haramayn Islamic Foundation"); *id.* at 818 ("Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahed to fight in Chechnya."); *id.* at 824 (stating that the Islamic Relief Agency (ISRA), a Khartoum-based NGO with offices in Afghanistan and Pakistan, have been infiltrated by al Qaeda and work closely with personnel from the IIRO); *id.* at 827 (stating that the IIRO and Al Haramain were channeling funds "to spread Islamic fundamentalism throughout Macedonia").<br><br>The U.S. government concluded that bin Laden and al Qaeda used the entire IIRO network for al Qaeda's terrorist activities. |

| | |
|---|---|
| | *See* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities."). |
| 505. The April 9, 1999 CIA report states that "Usama Bin Ladin's brother-in-law, Muhammad Jamal Khalifah, who directed the IIRO in in the Philippines, provided funding and some logistics support to [World Trade Center Bomber Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 airliners in East Asia." *Id.* at CIA_000216 (emphasis added). | It is not disputed that the CIA makes that statement without identifying the press reporting. *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216.<br><br>By way of further response, *see, e.g.*, Plaintiffs' response to No. 504. |
| 506. The April 9, 1999 CIA report asserts, "The director of the IIRO office in Baku, Az[erbaijan] diverted a[pproximat]ely $1.5 million to the Egyptian Islamic Jihad." Ex. 74, CIA report, "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999) at CIA_000220. | It is not disputed that the CIA makes that statement without identifying the press reporting. *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 220.<br><br>By way of further response, *see also* Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 818 ("Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahed to fight in Chechnya."). |
| 507. The unredacted portions of the report do not provide the source or factual basis for this assertion. See generally *Id.* | It is not disputed that the source or factual basis does not appear in the unredacted portions of the CIA report. |
| 508. The alleged amount of $1.5 million (or 5.6 million Saudi Riyals at the prevailing exchange rate of 3.75 SAR/USD) that is alleged to have been diverted in the April 9, 1999 CIA report would exceed the entire budget of IIRO's Azerbaijan office of 3,923,239 million Saudi Riyals. See Ex. 44, 1998 Annual Report, at IIRO-003746. | Disputed. The CIA report does not identify the specific date and year of the diversion of money to Egyptian Islamic jihad, that would allow for a honest comparison. *See also* Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 818 ("Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahed to fight in Chechnya."). |
| 509. The April 9, 1999 CIA report asserts, "IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate more towards extremist activities." Ex. 74, CIA report "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999) at CIA_000221. | It is not disputed that the CIA makes that statement without identifying the press reporting. *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 221. |
| 510. The unredacted portions of the report do not provide a source or factual basis for this assertion. See generally *Id.* | It is not disputed that the source or factual basis does not appear in the unredacted portions of the CIA report. |
| 511. IIRO did not have an "office" in Afghanistan. See Ex. 44, 1998 Annual Report at IIRO-003747; *see also* Ex. 25, Basha Dep. Tr. at 106:6-8 ("The projects in | Disputed. IIRO's assertion that it did not have an office in Afghanistan is inaccurate and misleading. *See* Ex. 81, IIRO Annual Report 1998, IIRO 171-211 at 203 (identifying the |

| | |
|---|---|
| Afghanistan were managed by the office from Islamabad in Pakistan."). | IIRO-Afghanistan office in 1998, and describing its activities; *id.* at 204 (identifying a separate IIRO-Pakistan office). |
| 512. The April 9, 1999 CIA report notes, "IIRO operations include running or supporting schools, orphanages, medical clinics and hospitals in more than 90 countries, [redacted]. Accredited by the UNHCR, the IIRO also runs programs in UN-sponsored camps for war refugees in Afghanistan, Pakistan, and in locations in Africa." Ex. 74, CIA report, "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999) at CIA_000221. | It is not disputed that the CIA makes that statement without identifying the press reporting. *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 221. |
| 513. The April 9, 1999 CIA report does not conclude that any foreign office of IIRO or MWL provided funds to Al Qa'ida, directly or indirectly. See generally *Id.* | Disputed. *See, e.g.*, Plaintiffs' response to No. 504. |
| 514. The chapter of the 9/11 Commission Report discussing al Qaeda's founding and its return to Afghanistan in 1996 does not conclude that IIRO or MWL directly or indirectly, provided funds to Al Qaeda. See 9/11 Commission Report at 47-67. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 6, 486, and 492. |
| 515. This chapter cites several CIA reports. 9/11 Commission Report at 47-67 & n.37 (citing CIA report, "Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia," CTC 2002-40066CH (June 6, 2002)), at 59 (citing CIA report, "Usama Bin Ladin: Al-Qa'ida's Financial Facilitators," OTI iA 2001-134-HXC (Oct. 18, 2001)), at 77 (citing CIA report, "Saudi-Based Financial Support for Terrorist Organizations [Redacted]," CTC 2002-40117CH (Nov. 14, 2002)), and CIA report, "Al Qa'ida Still Well Positioned To Recruit Terrorists [Redacted]," CTC 2002-40081CH (July 1, 2002)). These reports do not conclude that IIRO or MWL, or their foreign offices, directly or indirectly provided funds to Al Qaeda. | Disputed. The IIRO's assertion that the CIA reports identified in No. 515 do not state or conclude that the IIRO or MWL provided funds to al Qaeda, directly or indirectly, is inaccurate and misleading. *See, e.g.*, Ex. 16, *Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia*, CIA_000450-480. The CIA report talks extensively about Mohammed Jamal Khalifa (the Regional Director for the IIRO in South-East Asia) and how he established a financial network in the Philippines for the benefit of Osama bin Laden and al Qaeda. *See id.* at 454 ("Bin Ladin's brother-in-law Muhammad Jamal Ahmed Mustafa Khalifah established a financial network in the Philippines in 1988"); *id.* ("Al-Qa'ida uses its financial and business links in the region to move operatives, establish staging and operational bases, finance mujahidin training, pay for missionaries and teachers who propagate radical views, recruit students with mujahidin potential, and create grassroots networks to further the cause of creating Islamic states."); *id.* ("Al-Qa'ida also appears to have access to an extensive network of Islamic nongovernmental organizations (NGOs)—and the potential to exploit others—to facilitate money movement in the region."). *id.* at 455 ("Gulf NGOs with branch offices in the Philippines—including Dal al Hijra Foundation and the International Islamic Relief Organization—maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates."). |

| | |
|---|---|
| | *See also* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (stating that al Qaeda financial committee member Abdul Islam, who was "authorized to disburse funds for salaries and transportation expenses of al-Qa'ida members, and for donations to widows and orphans," worked for the International Islamic Relief Organization); *id.* at 525 (listing of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization"); *id.* at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida").<br><br>*See also* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Shaykh Adil Batterjee, a close associate of Osama bin Laden and "a long-time al-Qa'ida donor and fundraiser," used the Saudi-based Lajnat al Birr al Islamiyya charity, a subsidiary of the Muslim World League (MWL), to raise funds on behalf of bin Laden.). |
| 516. Intentionally left blank. | No response necessary. |
| 517. The 9/11 Commission Report distinguishes Maktab al-Khidamat from Al Qaeda. Maktab al-Khidamat, known as the "Bureau of Services" or the Services Bureau (9/11 Commission Report at 56), "provided logistical support to mujahideen in Afghanistan" in the late 1980s. Id. at 434. Bin Laden did not lead Maktab al-Khidamat, which did not seek to act outside of Afghanistan. Bin Laden created al Qaeda and split it off from Maktab al-Khidamat because he wanted to pursue global violent jihad. Id. at 55-56. | Disputed. The IIRO's description and history of Maktab al Khidamat ("MAK") is inaccurate and misleading.<br><br>As an initial matter, MAK was co-founded by Osama bin Laden and Abdullah Azzam in the 1980s to recruit and support mujahideen to fight against the Soviets in Afghanistan. MAK funneled money and fighters to the mujahideen and set up a network of recruiting offices around the world, including in the United States. Throughout the Afghan jihad, MAK worked in concert with a network of purported charities and relief organizations (including the MWL, IIRO, Al Haramain, and others) to provide travel documents, funds, transportation, training, facilities, arms, physical assets, and other support to the mujahideen. *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 214 (stating that MAK was "[e]stablished in Peshawar in 1984 by Usama Bin Ladin and Palestinian Abdallah Azzam to facilitate the travel and training of Arab volunteers to fight with the mujahidin in Afghanistan"); Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that "MAK established several offices in Pakistan and also in New York, London, Casablanca, Amman, Khartoum, Kuwait, Riyadh, Jiddah, Damman, Qatar, Bahrain, and Iran," and in |

| | |
|---|---|
| | "Zagreb and Sarajevo."); *id.* at 60 (stating that the Maktab al-Khidamat, a Pakistan-based nongovernmental organization financed by Osama bin Laden, played a key role in facilitating the training and travel of Islamic militants, and received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization"); Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 ("By way of background, Usama Bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ('MK') (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al Madani") of the International Islamic Relief Organization (hereafter "IIRO," sometimes referred to as "Igatha" based upon its Arabic name "*Hay'at al-Igatha al-Islamiya al-'Alamtyaa*"), which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL'). In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*."). <br><br> At the conclusion of the Afghan jihad bin Laden determined that the network that supported the mujahideen in Afghanistan should not be abandoned, but rather adapted to serve as a foundation for waging a global jihad against all of the perceived enemies of Islam, and in particular, the United States. *See* Ex. 1, 9/11 Commission Final Report at 56 ("April 19, 1988 brought victory for the Afghan jihad. Moscow declared it would pull its military forces out of Afghanistan within the next nine months. As the Soviets began its withdraw, the jihad's leaders debated what to do next. Bin Ladin and Azzam agreed that the organization successfully created for Afghanistan should not be allowed to dissolve. They established what they called a base or foundation (al Qaida) as a potential general headquarters for future jihad."). <br><br> Following Abdullah Azzam's death on November 24, 1989, bin Laden assumed full control of MAK, and MAK was absorbed into al Qaeda. Importantly, the da'wa organizations that funded and supported MAK during the 1980s—MWL, |

| | |
|---|---|
| | IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Red Crescent Society, and Benevolence International Foundation—continued to serve as the primary conduits for channeling financial, logistical, operational, and ideological support to al Qaeda's global jihad for years leading up to the 9/11 attacks.<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 20-26 (describing the history of al Qaeda's terrorist financing infrastructure during the Soviet-Afghan conflict; the use of Saudi charities under the guise of humanitarian relief work for money and the provision of weapons, guesthouses, and travel papers to the mujahideen and jihadist recruits; the use of the Saudi charities to launder money originating from bank accounts belonging to Osama bin Laden and wealthy supporters in the Gulf; and the critical role the MWL, IIRO, and WAMY would play in al Qaeda's global financial infrastructure following the end of the Soviet-Afghan war).<br><br>*See also* Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 30 (discussing Maktab al Khidmat's connection to the IIRO and MWL).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 19-21 (discussing al Qaeda's pre-9/11 reliance on charities for funding). |
| 518. Intentionally left blank. | No response necessary. |
| 519. Intentionally left blank. | No response necessary. |
| 520. The October 2001 CIA report, cited in the 9/11 Commission Report, "Usama Bin Ladin: Al-Qa'ida's Financial Facilitators," OTI iA 2001-134-HXC (Oct. 18, 2001), incorporates information through September 30, 2001. Ex. 85, CIA report, "Usama Bin Ladin: Al-Qa'ida's Financial Facilitators," OTI iA 2001-134-HXC (Oct. 18, 2001) at CIA_000501. | It is not disputed that the CIA report states that "[i]nformation through 30 September 2001 was used in this report." *See* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 501. |
| 521. The section of the October 2001 CIA report entitled, "The Origin of Funds" identifies seventeen "Islamic charities" from whom "Bin Ladin derives much of his funds." *Id.* at CIA_000502, CIA_000521 to CIA_000527 (listing and describing Afghan Support Committee, Health and Education Project International, Human Care Afghanistan, Islamic Relief Agency, Sudan, Jam'iyat al-Ta'awun al-Islamiyya, Kuwaiti Joint Relief Committee, Lajnat al-Birr al- Islami, Lajnat al-Dawa al-Islamia, Maktab al-Khidamat, Munazzamat al-Birr al-Islami, Muslim Scholar's Union, Al-Muwafaq | Disputed. To the extent that the IIRO argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because they are not specifically named in a CIA report (one of dozens of CIA reports produced in this litigation), that is inaccurate and misleading.<br><br>By way of further response, *see* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 525 (listing of "Islamic Charities |

| | |
|---|---|
| Foundation, Qatar Islamic Call Charitable Society, Rabita Trust for the Rehabilitation of Stranded Pakistanis, Al-Rashid Trust Institution, Revival of Islamic Heritage Society, Wafa al-Igatha al-Islamiya). IIRO and MWL are not among them.[4] *Id.* | Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization").<br><br>Moreover, the IIRO deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 481 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). |
| 522. Later, the October 2001 CIA report notes that "[l]ongtime Bin Ladin associate . . . Wa'el Hamza Julaydan [Jelaidan] . . . a veteran of the Islamic charity circuit, has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL), the Saudi Red Crescent Society (SRCS), and lately at two Bin-Ladin affiliated charities, al-Waqf al-Islami, and as secretary general of Rabita Trust coordinating financial activities and overseeing the budget. Julaydan has provided support since the 1990s to Muslims in Bosnia and Chechnya– hotbeds of mujahidin activity–and may be using his position and influence at these organizations to divert funds and resources to al-Qa'ida." *Id.* at CIA_000544. | It is not disputed that the CIA report makes that statement. *See* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 544.<br><br>By way of further response, *see also* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150 (indicating that Jelaidan and Mohammed Jamal Khalifa (also an al Qaeda member) served in official roles with the MWL); Ex. 161, FBI Report, *Co-operating Witness Interview*, June 2, 2004, PEC-KSA002133-2134 at 2133 (indicating that al Qaeda members in the IIRO office in Peshawar, Pakistan, headed by Wa'el Jelaidan, were responsible for purchasing weapons); Ex. 53, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2002, FED-PEC 203469-20370 at 203470 ("Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that 'We are all in one boat, as is known to you, including our brother, Wa'el Julaidan.'"); Ex. 180, *Additional Designation Pursuant to E.O. 13224*, TREASURY00001-8 at 4-5 (stating that "Julaidan is identified as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief," and also served on al Qaeda's shura council); Ex. 45, FED-PEC 134953-134955 ("Golden Chain" listing of al Qaeda's elite financial sponsors and facilitators, including Wa'el Jelaidan (IIRO/MWL official designated to receive financial contributions from Suleiman al Rashid, Abdel Qader Bakri, Salah al Din Abdel Jawad, and Abdel Hadi Taher). |
| 523. This October 2001 CIA report quotation explicitly distinguishes IIRO and MWL from "bin-Ladin affiliated charities." *Id.* | Disputed. To the extent that the IIRO argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because they are not specifically identified with other "Bin-Ladin affiliated charities" in a CIA report (one of dozens of CIA reports produced in this litigation), that is inaccurate and misleading. |

| | |
|---|---|
| | By way of further response, *see* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 525 (listing of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization").<br><br>Moreover, the IIRO deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 481 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). |
| 524. The October 2001 CIA asserts that Jelaidan "may be" currently diverting funds and resources to al-Qa'ida, he "held" positions at IIRO and MWL in the past. *Id.* | It is not disputed that the CIA report makes that statement. *See* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 544.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 13, 24, 109, 497, and 522. |
| 525. This report does not conclude that IIRO, MWL, or any of their branch offices, directly or indirectly, provided funds to al Qaeda. *See generally Id.* | Disputed. That same CIA report specifically says that an IIRO employee distributed "funds for salaries and transportation expenses of al-Qa'ida members, and for donations to widows and orphans." *See* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (stating that al Qaeda financial committee member Abdul Islam, who was "authorized to disburse funds for salaries and transportation expenses of al-Qa'ida members, and for donations to widows and orphans," worked for the International Islamic Relief Organization); *id.* at 525 (listing of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization").<br><br>Moreover, the IIRO deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 481 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). |
| 526. The June 2002 CIA report, cited in the 9/11 Commission Report, "Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia," CTC 2002-40066CH (June 6, 2002), does not conclude that IIRO or any of its branch offices directly or indirectly | Disputed. The IIRO's assertion that the CIA report identified in No. 526 does not state or conclude that the IIRO or MWL provided funds to al Qaeda, directly or indirectly, is inaccurate and misleading. The CIA report talks extensively about Mohammed Jamal Khalifa (the Regional Director for the IIRO |

| | |
|---|---|
| provided funds to al Qaeda. Ex. 46, CIA report, "Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia," CTC 2002-40066CH (June 6, 2002), CIA_000450 to CIA_000480. | in South-East Asia) and how he established a financial network in the Philippines for the benefit of Osama bin Laden and al Qaeda. *See* Ex. 16, *Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia*, CIA_000450-480 at 454 ("Bin Ladin's brother-in-law Muhammad Jamal Ahmed Mustafa Khalifah established a financial network in the Philippines in 1988"); *id.* ("Al-Qa'ida uses its financial and business links in the region to move operatives, establish staging and operational bases, finance mujahidin training, pay for missionaries and teachers who propagate radical views, recruit students with mujahidin potential, and create grassroots networks to further the cause of creating Islamic states."); *id.* ("Al-Qa'ida also appears to have access to an extensive network of Islamic nongovernmental organizations (NGOs)—and the potential to exploit others—to facilitate money movement in the region.").<br><br>The CIA report further confirms that the IIRO-Philippines maintained contact with al Qaeda associated terrorist organizations Abu Sayyaf Group and the Moro Islamic Liberation Front. *See id.* at 455 ("Gulf NGOs with branch offices in the Philippines—including Dal al Hijra Foundation and the International Islamic Relief Organization—maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates.").<br><br>Moreover, the IIRO deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 481 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). |
| 527. The June 2002 CIA report states that "Gulf NGOs with branch offices in the Philippines – including . . . the International Islamic Relief Organization – maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates." *Id.* at CIA_000455. It does not explain the nature or extent of this "contact," nor provide a factual basis or source for this assertion. *Id.* | It is not disputed that the CIA report makes that statement. However, to the extent the IIRO argues there is no evidence of the IIRO's "contact" with the al-Qaeda affiliated terrorist organizations Abu Sayyaf Group and Moro Islamic Liberation Front, that is disputed as inaccurate and misleading.<br><br>Investigations conducted by Philippines Intelligence determined that Abdelhadi Daguit was in constant contact with leaders of the Moro Islamic Liberation Front while working with the IIRO and Mohammed Jamal Khalifa. Ex. 59, Philippines Intelligence Report, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211445 (identifying Daguit as a "known associate of Khalifa," "presently connected with IIRO Manila," and in "constant |

| | |
|---|---|
| | contact with Yusop Alongan @Ustadz Duli/Abdullah, Chairman of MILF Finance Committee").<br><br>In addition, IIRO-Eastern Province official Abd al Hamid Sulaiman al Mujil met with Moro Islamic Liberation Front officials in December 1998 concerning financial support. *See id.* at 211430 (identifying IIRO officials "Al Saif Othoman A O and Almojil Abdul Hamdi S" meeting with MILF Chairman Salamat Hashim at Camp Abubakar in the Southern Philippines concerning a $192,197.00 contribution).<br><br>Moreover, a high-ranking Abu Sayyaf Group leader oversaw the operations of an IIRO office in the Philippines and used the office to direct money to Abu Sayyef Group and Moro Islamic Liberation Front. *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202111 ("At the time Khalifa directed the IIRO-PHL, he employed an ASG intelligence officer as the provincial director of the IIRO-PHL in the Tawi-Tawi region of the Southern Philippines until that officer's death in 1994."); *id.* ("In the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-PHL, and used the organization to funnel money to terrorist groups including the ASG."); Ex. 33, European Parliament, *The Involvement of Salafism/Wahhabism in the Support and Supply of Arms to Rebel Groups Around the World*, June 2013, at 9 (stating that the IIRO's branch office in Tawi Tawi, Mindanao, headed by Abu Sayyaf's intelligence chief, was used by Al Qaeda to siphon money on behalf of the Abu Sayyef Group and Moro Islamic Liberation Front). *See also* Ex. 59, Philippines Intelligence Report, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211429 (identifying former IIRO Director Mahmud Afifi (Mahmud Abdul Jalil Afif-Aburahim) as a financier of two Malaysian demolition experts (Habibe and Kadir) who reportedly arrived in Zamboanga City on or around October 10, 1998 for terrorist activities.). |
| 528. The June 2002 CIA report goes on to identify "[f]our Saudi NGOs that have been connected to Bin Ladin in other locations" besides the Philippines. It does not identify IIRO or MWL. *Id.* | Disputed. To the extent that the IIRO argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because they are not specifically named in a CIA report (one of dozens of CIA reports produced in this litigation), that is inaccurate and misleading.<br><br>Moreover, the IIRO deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* |

| | |
|---|---|
| | Plaintiffs' response to No. 481 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). |
| 529. The June 2002 CIA report then lists "Al Qa'ida-linked Islamic NGOs." *Id.* This list does not include IIRO or MWL. *Id.* | Disputed. *See, e.g.*, Plaintiffs' response to No. 528. |
| 530. The November 14, 2002 CIA report, cited in the 9/11 Commission Report, "Saudi- Based Financial Support for Terrorist Organizations [Redacted]," CTC 2002-40117CH (Nov. 14, 2002), does not conclude that IIRO or any of its branch offices directly or indirectly provided funds to al Qaeda. Ex. 87, "Saudi-Based Financial Support for Terrorist Organizations [redacted]," CTC 2002-40117CH (Nov. 14, 2002), CIA_000143 to CIA_000158. | Disputed. To the extent that the IIRO argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because they are not specifically named in a CIA report as having provided funds to al Qaeda (one of dozens of CIA reports produced in this litigation), that is inaccurate and misleading. *But see* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Shaykh Adil Batterjee, a close associate of Osama bin Laden and "a long-time al-Qa'ida donor and fundraiser," used the Saudi-based Lajnat al Birr al Islamiyya charity, a subsidiary of the Muslim World League (MWL), to raise funds on behalf of bin Laden.).<br><br>Moreover, the IIRO deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 481 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). |
| 531. The November 14, 2002 CIA report notes that SAMA, Saudi Arabia's central bank and chief financial agency, has "overseen Saudi banks' efforts to freeze and seize terrorist-linked assets." *Id.* at CIA_000145. | It is not disputed that the CIA report makes that statement. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 145. |
| 532. The November 14, 2002 CIA report lists individuals who it claims are part of the "Key Financial Base for Al-Qa'ida." One of the individuals is Muhammad Jamal Khalifa. The report notes that Khalifa founded several Islamic charities and "served" in the past as "director of the International Islamic Relief Organization (IIRO) NGO in Manila." The report does not state that Khalifa provided funds to or supported al-Qa'ida during or as part of his employment for IIRO-Philippines. On the contrary, the report states that Khalifah "currently" has several private business ventures like "Asian and African construction and gem businesses," and that he is using those ventures to "launder money for al-Qa'ida." *Id.* at CIA_000148 to CIA_000149. | Disputed. To the extent that the IIRO argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because a CIA report (one of dozens of CIA reports produced in this litigation), does not specifically state that Khalifa provided funds to al Qaeda while he served as the Regional Director for the IIRO in South-East Asia, that is inaccurate and misleading.<br><br>By way of further response, Khalifa personally orchestrated the use of IIRO funds and resources to support the terrorist activities of 9/11 mastermind Khalid Sheikh Mohammed ("KSM"), Ramzi Yousef (1993 World Trade Center bomber), and Wali Khan Amin Shah (Afghan jihad veteran and Osama |

| | |
|---|---|
| | bin Laden/al Qaeda associate) in the Philippines, and the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations of twelve U.S. flag commercial airplanes as they flew from Asia to the United States. That very plot, often referred to as "Operation Bojinka," was adapted into the 9/11 terrorist plot by KSM, using the knowledge he had acquired during its development about vulnerabilities in the aviation security system. *See* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 (stating that the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."). *See also* Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12, 24 (discussing the Bojinka plot).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 34 (citing excerpt from *Ghost Wars* by Steve Coll stating that the IIRO and MWL provided "important resources" to Ramzi Yousef: "The FBI analysis listed the huge semiofficial Saudi Arabian charity, the International Islamic Relief Organization, and the largest government-sponsored Saudi religious proselytizing organization, the Muslim World League, as important resources for the new terrorist."). |
| 533. The November 14, 2002 CIA report describes five "Saudi-based NGOs that al- Qaida has been able to exploit by diverting funds from legitimate activities to finance al-Qa'ida." *Id.* at CIA_000150 to CIA_000151. IIRO is not among these five NGOs. *Id.* | Disputed. To the extent that the IIRO argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because a CIA report (one of dozens of CIA reports produced in this litigation) does not list the IIRO as one of the "Saudi-based NGOs that al-Qaida has been able to exploit by diverting funds from legitimate activities to finance al-Qa'ida," that is inaccurate and misleading.<br><br>Moreover, the IIRO deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 481 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). |
| 534. The November 14, 2002 CIA report later asserts that Abu Sayyaf Group "probably" receives funds from | It is not disputed that the CIA report makes the statement: "ASG probably also receives funds from Saudi-based NGOs, |

| | |
|---|---|
| "Saudi-based NGOs, including . . . IIRO." *Id.* at CIA_000152. However, the report explicitly describes Abu Sayyaf Group as a terrorist group "other than al-Qa'ida." *Id.* at CIA_000151. In any event, the report does not assert that Abu Sayyaf Group "actually" receives funds from IIRO, nor do the unredacted portions of the report provide a factual basis or source for the assertion that it "probably" does so. See generally *Id.* | including Dar Al-Hijra Foundation and IIRO." *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 152. However, the IIRO omits the CIA's assessment on that same page that "IIRO has used its field offices [for] cover, travel, and funding to support Islamic extremists." *Id.*<br><br>By way of further response, to the extent that the IIRO argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because a CIA report (one of dozens of CIA reports produced in this litigation) does not assert that Abu Sayyaf Group received funds from the IIRO, that is inaccurate and misleading. The U.S. government and other intelligence sources have concluded that the IIRO provided substantial financial assistance to the Abu Sayyaf Group. *See, e.g.*, Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202111 ("At the time Khalifa directed the IIRO-PHL, he employed an ASG intelligence officer as the provincial director of the IIRO-PHL in the Tawi-Tawi region of the Southern Philippines until that officer's death in 1994."); *id.* ("In the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-PHL, and used the organization to funnel money to terrorist groups including the ASG."); Ex. 33, European Parliament, *The Involvement of Salafism/Wahhabism in the Support and Supply of Arms to Rebel Groups Around the World*, June 2013, at 9 (stating that the IIRO's branch office in Tawi Tawi, Mindanao, headed by Abu Sayyaf's intelligence chief, was used by Al Qaeda to siphon money on behalf of the Abu Sayyef Group and Moro Islamic Liberation Front); Ex. 158, June 2004 U.S. Diplomatic Cable, PEC-KSA 1464-1466 (Secretary of State Colin Powell's office detailing the IIRO's support for al Qaeda and the Abu Sayyaf terrorist group, and stating: "The USG believes that some elements of the International Islamic Relief Organization (IIRO) have been exploited by terrorists and their financiers as a means of transferring assets, providing organizational cover, or otherwise supporting extremist, violent operations."); Ex. 71, U.S. Diplomatic Cable, *Islamic NGOs in the Philippines*, March 23, 2005, FED-PEC 220479-220481 ("The International Islamic Relief Organization (IIRO) -- a subsidiary of the Saudi-based and funded Muslim World League (MWL) -- was active here in the late 1980s and early 1990s. Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda |

| | |
|---|---|
| | funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines.”).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 37-38 (stating that IIRO-Philippines “has also served as a liaison to other extremist groups on behalf of the Abu Sayyaf Group”). |
| 535. The November 14, 2002 CIA report includes MWL among the five Saudi-based NGOs whose funds were allegedly diverted to al-Qa’ida, based on its observation that “[s]everal of Bin Ladin’s associates, including Wa’il [Jelaidan] and Muhammad Jamal Khalifah, were MWL representatives, according to [redacted] press reporting.” *Id.* at CIA_000150. | It is not disputed that the CIA report makes the statement. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150. |
| 536. However, the November 14, 2002 CIA report does not state that Jelaidan and Khalifa were associates of Bin Ladin at the time they were affiliated with MWL, nor does it identify the “press reporting” cited. *Id.* | It is not disputed that the unredacted sections of the CIA report do not provide additional detail regarding Jelaidan and Khalifa. However, to the extent that the IIRO suggests that Jelaidan and Khalifa were not associates of Osama bin Laden while they were employed by the MWL and IIRO, that is disputed as inaccurate and misleading.<br><br>By way of further response, Plaintiffs direct the IIRO to their response to No. 1, detailing Jelaidan and Khalifa’s years of employment with the MWL and IIRO beginning in the 1980’s in Pakistan, Jelaidan’s leadership positions with the MWL and IIRO and related da’wa organizations (Rabita Trust and Al Haramain Al Masjed Al Aqsa) through the 9/11 attacks, and Khalifa’s position as Regional Director for the IIRO in South-East Asia during the 1990s.<br><br>As founding members of al Qaeda, Jelaidan and Khalifa maintained contact with bin Laden, senior al Qaeda members, al Qaeda financiers, and each other throughout their tenure with the MWL and IIRO. Indeed, bin Laden admitted that he remained close with Jelaidan as late as 1999, just two years before the 9/11 attacks. *See* Ex. 53, *Treasury Department Statement on the Designation of Wa’el Hamza Julidan*, September 6, 2002, FED-PEC 203469-203470 at 203470 (“Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa’ida co-founder Abdullah Azzam, bin Ladin stated that ‘We are all in one boat, as is known to you, including our brother, Wa’el Julaidan.’”). *See also* Ex. 50, August 3, 2006 designation of IIRO’s branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202111 (“While working as the director of IIRO-PHL, Khalifah maintained close connections with al Qaida through his relations with senior al Qaida supporters, including Specially |

| | |
|---|---|
| | Designated Global Terrorist (SDGT) Wa'el Hamza Julaidan."); Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"). |
| 537. The November 14, 2002 CIA report then states, "[Redacted] funds destined for al-Ittihad al-Islamiyya (AIAI) in were funneled through several Saudi NGOs, including MWL." *Id.* | It is not disputed that the CIA report makes the statement. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150. |
| 538. The November 14, 2002 CIA report does not provide a factual basis or source for this assertion, with the redactions further obscuring the nature or credibility thereof. *Id.* | It is not disputed that the unredacted sections of the CIA report do not provide additional information concerning the use of the MWL as a conduit for funding al-Ittihad al-Islamiyya. However, to the extent that the IIRO argues that the MWL and IIRO do not have a connection to al-Ittihad al-Islamiyya, that is disputed as inaccurate and misleading. *See* Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 106 ("The International Islamic Relief Organization [IIRO], which is headquartered in Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL, … the Taliban, … and Hamas, … as well as al Qaida affiliates, *inter alia*, the Abu Sayyaf Group (ASG), … Jemaah Islamiya (JI), … and Al Ittihad Al Islamiya (AIAI)…. The IIRO's parent organization is the Muslim World League [MWL] also headquartered in Saudi Arabia."). |
| 539. The November 14, 2002 CIA report closes the discussion of MWL by stating, "[Redacted] does not indicate whether Saudi officials or the head office is complicit in terrorist support." *Id.* | It is not disputed that the unredacted sections of the CIA report do not provide additional information concerning whether the MWL is complicit in terrorist support. However, to the extent the IIRO suggests that MWL officials or the head officer were not complicit in terrorist support, that is disputed as inaccurate and misleading.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 43, 45-49, 62, 65, and 72 (detailing evidence that senior leaders of the IIRO and MWL were well aware of the terrorist activities of those organizations). |
| 540. A 2004 CIA-FBI Collaborative Intelligence Assessment concludes that "[t]here is no evidence that | It is not disputed that the Joint FBI-CIA Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence |

| | |
|---|---|
| either the Saudi Government or members of the Saudi royal family knowingly provided support for the attacks of 11 September 2001." Ex. 75, "Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States," (Dec. 2004) at EO14040-003416-UPDATED. | Threat to the United States makes that statement. *See* Ex. 31, Joint *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, EO14040 3414-3442-UPDATED at 3416. *But see id.* ("There is evidence that official Saudi entities, chiefly the Ministry of Islamic Affairs and associated nongovernmental organizations (NGOs), provide financial and logistical support to individuals in the United States and around the world, some of whom are associated with terrorism-related activity."); *id.* ("The Saudi government and many of its agencies have been infiltrated and exploited by individuals associated with or sympathetic to al-Qa'ida."); *id,* ("Suspected Saudi intelligence officers and cooptees appear to be engaged in collecting intelligence in the United States. Saudi-funded clerics have been found to be collecting on Saudi-Americans and other communities in the United States."); *id.* ("Suspected Saudi intelligence officers and cooptees in the United States, including diplomats, are engaged in a campaign to influence public perception and policy."); *id.* ("The Saudi Government and private Saudi individuals support the propagation of the conservative Wahhabi-Salafi sect of Sunni Islam in the United States. Jihadists adhere to this sect's belief to justify their actions."). |
| 541. The assessment further notes that the Government of Saudi Arabia suspected that Bin Jiluwi, a "leader" of the Eastern Province office of IIRO, "embezzled" more than $3 million from IIRO. *Id.* at EO14040-003419-UPDATED. The assessment does not state that the embezzled funds were diverted to Al Qaeda. See generally *Id.* | Disputed as stated. The IIRO's assertion that misappropriated funds from the IIRO under the leadership of Prince Turki bin Jalawi were not diverted to al Qaeda is misleading and selectively omits important text from the Joint FBI-CIA Assessment, including but not limited to (1) the statement that Prince "Turki bin Fahd Jiluwi" "had contact with individuals tied to al-Qa'ida and other terrorist organizations;" and (2) the statement that "Turki bin Fahd Jiuwi" is "an important al-Qa'ida donor." *See* Ex. 31, Joint *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, EO14040 3414-3442-UPDATED at 3417-3418.<br><br>By way of further response, *see, e.g.*, Plaintiffs' response to No. 91. |
| 542. The assessment then states that in October 2004 the Government of Saudi Arabia decided to assume control over the assets of the al-Haramain Islamic Foundation (whose U.S. branch the United States designated as a foreign terrorist organization), but the Government of Saudi Arabia did not feel that such action was warranted in the case of IIRO. *Id.* at EO14040-003420-UPDATED, EO14040-003430-UPDATED . | It is not disputed that the Joint FBI-CIA Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States makes that statement.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 17, 43, 45-49, 62, 72, 90, 91, 99, 109, 481, 482, 495 (detailing MWL and IIRO's extensive connections to Osama bin Laden and al Qaeda (including but not limited to E.O. 13224 Specially Designated Global Terrorists ("SDGT") IIRO officials Wa'el Hamza Jelaidan and Abd al Hamid Sulaiman al Mujil; Prince Turki bin Jalawi al Saud; Mohammed Jamal Khalifa), and the IIRO's provision of |

| | |
|---|---|
| | substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.). |
| 543. The 2004 assessment does not conclude that IIRO or MWL, directly or indirectly through any other charity or entity, provided funds to al Qaeda. See generally *Id.* | Disputed as stated. *See, e.g.*, Plaintiffs' response to No. 541.<br><br>By way of further response, *see* Plaintiffs' responses to Nos. 1, 2, 6, 9, 17, 43, 45-49, 62, 72, 90, 91, 99, 109, 481, 482, 495 (detailing MWL and IIRO's extensive connections to Osama bin Laden and al Qaeda (including but not limited to E.O. 13224 Specially Designated Global Terrorists ("SDGT") IIRO officials Wa'el Hamza Jelaidan and Abd al Hamid Sulaiman al Mujil; Prince Turki bin Jalawi al Saud; Mohammed Jamal Khalifa), and the IIRO's provision of substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.). |
| 544. The 9/11 Commission's "Monograph on Terrorist Financing" recognized the challenges in determining al Qaeda's actual funding sources and urged caution in accepting a funding theory as fact:<br><br>In many cases, one or two threads of information make such theories tantalizing; but after careful review of all of the evidence available to us, including some of the most sensitive information held by the U.S. government, we have judged that such theories cannot be substantiated.<br><br>Monograph at 19. | It is not disputed that the Monograph on Terrorist Financing makes that statement. *See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 19. |
| 545. The Monograph also warned of the "perils" of relying on "custodial interviews of captured al Qaeda members," because "[d]etainees may provide misinformation and may misrepresent or mischaracterize their roles or the roles of others. As a result, corroborating their information, through other custodial interviews, documentary evidence, or other intelligence collection, is critical in assessing what we know about al Qaeda financing." Monograph at 19. | It is not disputed that the Monograph on Terrorist Financing makes that statement. *See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 19. |
| 546. While the Monograph notes charities were a source of Al Qaeda funding, it clarified: | It is not disputed that the Monograph on Terrorist Financing makes that statement. *See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 21. |

| | |
|---|---|
| Al Qaeda's charities' strategy before 9/11 had two prongs. In some instances, al Qaeda penetrated specific foreign branch offices of large, internationally recognized charities. In many cases, lax oversight and the charities' own ineffective financial controls, particularly over transactions in remote regions of the world, made it easy for al Qaeda operatives to divert money from charitable uses. These large international Gulf charities donated money to end recipients, usually smaller in-country charities, whose employees may have siphoned off money for al Qaeda. In the second class of cases, entire charities from the top down may have known of and even participated in the funneling of money to al Qaeda. In those cases, al Qaeda operatives had control over the entire organization, including access to bank accounts.<br><br>Monograph at 21. | |
| 547. According to this portion of the Monograph, employees of "smaller in-country charities" diverted funds to al Qaeda, or entire charities other than "large international Gulf charities" were controlled by al Qaeda. *Id.* | It is not disputed that the Monograph on Terrorist Financing makes that statement. *See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 21. |
| 548. The Monograph further urged that the role of Saudi charities must be assessed in the context in which they exist.<br><br>Much has been made of the role of charities, particularly Saudi charities, in terrorist financing. A little context is necessary here. Charitable giving, known as zakat, is one of the five pillars of Islamic faith. It is broader and more pervasive than Western ideas of charity, in that it also functions as a form of income tax, educational assistance, foreign aid, and political influence. The Western notion of the separation of civic and religious duty does not exist in Islamic cultures. The Saudi government has declared that the Koran and the Sunna (tradition) of Muhammad are the country's constitution, and the clergy within Saudi Arabia wield enormous influence over the cultural and social life of the country.<br><br>Funding charitable works is ingrained into Saudi Arabia's culture, and Saudi zakat has long provided much-needed humanitarian relief in the Islamic world. In addition, a major goal of Saudi charities is to spread Wahhabi beliefs and culture throughout the world. Thus Saudi efforts have funded mosques and schools in other parts of the world, including Pakistan, Central Asia, Europe, and even the United States. In some poor areas these schools alone | It is not disputed that the Monograph on Terrorist Financing makes that statement. *See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 21. |

| | |
|---|---|
| provide education; and even in affluent countries, Saudi-funded Wahhabi schools are often the only Islamic schools available.<br><br>Monograph at 21. | |
| 549. The Monograph did not identify IIRO or MWL as a charity providing funds to al Qaeda, directly or indirectly, or one suspected of doing so. See generally Monograph. | Disputed. As an initial matter, the Monograph on Terrorist Financing specifically states that Enaam Arnaout, "a longtime jihadist supporter, with personal ties to Usama Bin Ladin dating back to the 1980s," provided military and logistical support to the mujahideen during the late 1980s and early 1990s (when al Qaeda had already been established), while working as an employee of the MWL. *See, e.g.*, Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 (confirming that Arnaout "worked with the Muslim World League"); Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 95. *See also* Ex. 213, U.S. Department of the Treasury Press Release, *Treasury Designates Benevolence International Foundation and Related Entities as Financiers of Terrorism*, November 19, 2002, FED-PEC 3630-3631 at 3630 (stating that Arnaout worked with members of al Qaeda "to purchase rockets, mortars, rifles, and offensive and defensive bombs, and to distribute them to various mujahideen camps, including camps operated by al Qaida").<br><br>Furthermore, to the extent IIRO suggests that the IIRO and MWL have been exonerated by the 9/11 Commission from any accountability for the extensive financial, material, and logistical support it provided to al Qaeda in the decade leading to the 9/11 attacks because the Monograph on Terrorist Financing does not specifically state the IIRO or MWL provided funds to al Qaeda, that is inaccurate and misleading. *See* Ex. 2, Affirmation of Joseph Robert "Bob" Kerrey (stating that any "proposition that the 9/11 Commission fully exonerated Saudi Arabia and any Saudi government charities for any potential culpability for the financing and emergence of al Qaeda or the events of September 11, 2001" is "incorrect"); Affirmation of John F. Lehman (stating that the allegations and claims advanced by the 9/11 plaintiffs were never considered and rejected as factually untrue); Declaration of Richard Ben-Veniste (stating that "further fact-finding was appropriate"). Indeed, Plaintiffs' claims against the IIRO, MWL, and WAMY based on their funding and material sponsorship of al Qaeda are fully supported by the 9/11 Commission's findings that there was a substantial "likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda." *See* Ex. 1, 9/11 Commission Final Report at 171. |

| | |
|---|---|
| | Moreover, CIA intelligence reports cited by the 9/11 Commission in its Final Report confirm that the IIRO served as a key financial conduit for al Qaeda and played a central role in providing critical support to the terrorist organization, including but not limited to appointing al Qaeda members to leadership positions within the IIRO, recruiting Islamic fighters, facilitating the training and travel of Islamic militants with employment papers and other documentation, engaging in narcotics trafficking and counterfeiting, and funding terrorist training camps. *See* Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that the Maktab al-Khidamat, a Pakistan-based nongovernmental organization financed by Osama bin Laden, played a key role in facilitating the training and travel of Islamic militants, and received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization"); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Mohammed Jamal Khalifa, Osama bin Laden's brother-in-law, and close associate of World Trade Center bomber Ramzi Yousef, served as the director of the International Islamic Relief Organization (IIRO) in the Philippines, and "was involved in recruiting Muslims for training in Pakistan as mujahidin fighters."); *id.* at 151 (describing IIRO, WAMY, and Al Haramain as having "tie[s] to terrorist and mujahidin activity"); Ex. 11, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199 at 198 (stating that "al-Qa'ida has infiltrated some of IIRO's branches"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."); *id.* at 221 ("IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate toward more extremist activities."); *id.* ("A few IIRO branches have turned to illegitimate means of financing their operations—including narcotics trafficking and counterfeiting—further increasing their independence and ability to support terrorism."); Ex. 14, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*, November 17, 1998, CIA_00317-338 at 325 ("Bin Ladin and his associates make extensive use of non-governmental charitable organizations (NGOs) to transfer funds. Bin-Ladin-affiliated Islamic NGOs – such as … the International Islamic Relief Organization (IIRO); Al-Haramayn; … and others – are convenient money couriers because they maintain offices in Afghanistan, Albania, |

| | |
|---|---|
| | Pakistan, and other locations where Bin Ladin associates are prevalent."); *id.* at 330 ("Bin Ladin and Al-Qa'ida probably receive Gulf funding diverted from offices of Islamic NGOs, particularly the MK, IIRO, Al Haramayn … and others."); Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (stating that al Qaeda financial committee member Abdul Islam, who was "authorized to disburse funds for salaries and transportation expenses of al-Qa'ida members, and for donations to widows and orphans," worked for the International Islamic Relief Organization); *id.* at 525 (listing of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization"); *id.* at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"); Ex. 18, *Al-Qa'ida's Financial Ties to Islamic Youth Programs*, January 17, 2003, CIA_00681-701 at 692 (stating that "Gulf charities like the Saudi International Islamic Relief Organization (IIRO) and Al-Haramain … are well aware of the radical Wahhabi and Salafist doctrines being taught at institutions they fund"); Ex. 19, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 741 (stating that the Sudanese National Islamic Front ("NIF") works "with hardline Islamic fundamentalists employed by the Saudi International Islamic Relief Organization"); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama, [REDACTED]."); *id.* at 817 (stating that "several Saudi NGOs are funding conduits for al-Qa'ida or have penetrated by Usama's network" and "[t]hose of greatest concern include the International Islamic Relief Organization (IIRO)" and "Al-Haramayn Islamic Foundation"); *id.* at 818 ("Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahed to fight in Chechnya."); *id.* at 824 (stating that the Islamic Relief Agency (ISRA), a Khartoum-based NGO with offices in Afghanistan and Pakistan, have been infiltrated by al Qaeda and work closely with personnel from the IIRO); *id.* at 827 (stating that the IIRO and Al Haramain were channeling funds "to spread Islamic fundamentalism throughout Macedonia").<br><br>Indeed, the U.S. government concluded that bin Laden and al Qaeda used the entire IIRO network for al Qaeda's terrorist activities. *See* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, |

| | |
|---|---|
| | February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities.").<br><br>CIA intelligence reports cited in the 9/11 Commission Final Report similarly confirm that the MWL, IIRO's parent organization, played a central role in al Qaeda's support infrastructure. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Shaykh Adil Batterjee, a close associate of Osama bin Laden and "a long-time al-Qa'ida donor and fundraiser," used the Saudi-based Lajnat al Birr al Islamiyya charity, a subsidiary of the Muslim World League (MWL), to raise funds on behalf of bin Laden.); *id.* at 150 (indicating that "[s]everal of Bin Ladin's associates, including Wa'il Julaydan and Muhammad Jamal Khalifa, were MWL representatives"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 213 (stating that "several MWL affiliate organizations—including the International Islamic Relief Organization (IIRO)—have provided terrorists with funding and cover employment, documentation, and training"); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 809 (stating that Saudi-backed NGOs have ties to Osama bin Laden, including the Muslim World League, World Assembly of Muslim Youth, and others); *id.* at 822 (indicating that the MWL "has been used as a cover organization for several of Usama's associates"). *See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 95 (stating that Osama bin Laden confidant Enaam Arnaout provided military and logistical support to the mujahideen in the late 1980s and early 1990s as an employee of "Saudi NGO, the Muslim World League"). |
| 550. The Monograph did not mention IIRO at all. *Id.* | Disputed as stated. Plaintiffs acknowledge that the IIRO is not specifically named in the Monograph on Terrorist Financing. However, to the extent IIRO suggests that the IIRO and MWL have been exonerated by the 9/11 Commission from any accountability for the extensive financial, material, and logistical support it provided to al Qaeda in the decade leading to the 9/11 attacks, because the IIRO is not specifically referenced in the Monograph on Terrorist Financing, that is inaccurate and misleading. *See* Ex. 2, Affirmation of Joseph Robert "Bob" Kerrey (stating that any "proposition that the 9/11 Commission fully exonerated Saudi Arabia and any Saudi government charities for any potential culpability for the financing and emergence of al Qaeda or the events of September 11, 2001" is "incorrect"); Affirmation of John F. Lehman (stating that the allegations and claims advanced by the 9/11 plaintiffs were never considered and rejected as factually untrue); Declaration of Richard Ben-Veniste (stating |

| | |
|---|---|
| | that "further fact-finding was appropriate"). Indeed, Plaintiffs' claims against the IIRO, MWL, and WAMY based on their funding and material sponsorship of al Qaeda are fully supported by the 9/11 Commission's findings that there was a substantial "likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda." *See* Ex. 1, 9/11 Commission Final Report at 171.<br><br>Moreover, CIA intelligence reports cited by the 9/11 Commission in its Final Report confirm that the IIRO served as a key financial conduit for al Qaeda and played a central role in providing critical support to the terrorist organization, including but not limited to appointing al Qaeda members to leadership positions within the IIRO, recruiting Islamic fighters, facilitating the training and travel of Islamic militants with employment papers and other documentation, engaging in narcotics trafficking and counterfeiting, and funding terrorist training camps. *See* Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that the Maktab al-Khidamat, a Pakistan-based nongovernmental organization financed by Osama bin Laden, played a key role in facilitating the training and travel of Islamic militants, and received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization"); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Mohammed Jamal Khalifa, Osama bin Laden's brother-in-law, and close associate of World Trade Center bomber Ramzi Yousef, served as the director of the International Islamic Relief Organization (IIRO) in the Philippines, and "was involved in recruiting Muslims for training in Pakistan as mujahidin fighters."); *id.* at 151 (describing IIRO, WAMY, and Al Haramain as having "tie[s] to terrorist and mujahidin activity"); Ex. 11, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199 at 198 (stating that "al-Qa'ida has infiltrated some of IIRO's branches"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."); *id.* at 221 ("IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate toward more extremist activities."); *id.* ("A few IIRO branches have turned to illegitimate means of financing their operations—including narcotics trafficking and counterfeiting—further increasing their independence and ability to support terrorism."); Ex. 14, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and* |

| | |
|---|---|
| | *Expenditures*, November 17, 1998, CIA_00317-338 at 325 ("Bin Ladin and his associates make extensive use of non-governmental charitable organizations (NGOs) to transfer funds. Bin-Ladin-affiliated Islamic NGOs – such as … the International Islamic Relief Organization (IIRO); Al-Haramayn; … and others – are convenient money couriers because they maintain offices in Afghanistan, Albania, Pakistan, and other locations where Bin Ladin associates are prevalent."); *id.* at 330 ("Bin Ladin and Al-Qa'ida probably receive Gulf funding diverted from offices of Islamic NGOs, particularly the MK, IIRO, Al Haramayn … and others."); Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (stating that al Qaeda financial committee member Abdul Islam, who was "authorized to disburse funds for salaries and transportation expenses of al-Qa'ida members, and for donations to widows and orphans," worked for the International Islamic Relief Organization); *id.* at 525 (listing of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization"); *id.* at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"); Ex. 18, *Al-Qa'ida's Financial Ties to Islamic Youth Programs*, January 17, 2003, CIA_00681-701 at 692 (stating that "Gulf charities like the Saudi International Islamic Relief Organization (IIRO) and Al-Haramain … are well aware of the radical Wahhabi and Salafist doctrines being taught at institutions they fund"); Ex. 19, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 741 (stating that the Sudanese National Islamic Front ("NIF") works "with hardline Islamic fundamentalists employed by the Saudi International Islamic Relief Organization"); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama, [REDACTED]."); *id.* at 817 (stating that "several Saudi NGOs are funding conduits for al-Qa'ida or have penetrated by Usama's network" and "[t]hose of greatest concern include the International Islamic Relief Organization (IIRO)" and "Al-Haramayn Islamic Foundation"); *id.* at 818 ("Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahed to fight in Chechnya."); *id.* at 824 (stating that the Islamic Relief Agency (ISRA), a Khartoum-based NGO with offices in Afghanistan and Pakistan, have been infiltrated by al Qaeda and work closely with personnel from the IIRO); *id.* at 827 (stating that the IIRO |

| | |
|---|---|
| | and Al Haramain were channeling funds "to spread Islamic fundamentalism throughout Macedonia").<br><br>Indeed, the U.S. government concluded that bin Laden and al Qaeda used the entire IIRO network for al Qaeda's terrorist activities. *See* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities.").<br><br>CIA intelligence reports cited in the 9/11 Commission Final Report similarly confirm that the MWL, IIRO's parent organization, played a central role in al Qaeda's support infrastructure. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Shaykh Adil Batterjee, a close associate of Osama bin Laden and "a long-time al-Qa'ida donor and fundraiser," used the Saudi-based Lajnat al Birr al Islamiyya charity, a subsidiary of the Muslim World League (MWL), to raise funds on behalf of bin Laden.); *id.* at 150 (indicating that "[s]everal of Bin Ladin's associates, including Wa'il Julaydan and Muhammad Jamal Khalifa, were MWL representatives"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 213 (stating that "several MWL affiliate organizations—including the International Islamic Relief Organization (IIRO)—have provided terrorists with funding and cover employment, documentation, and training"); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 809 (stating that Saudi-backed NGOs have ties to Osama bin Laden, including the Muslim World League, World Assembly of Muslim Youth, and others); *id.* at 822 (indicating that the MWL "has been used as a cover organization for several of Usama's associates"). *See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 95 (stating that Osama bin Laden confidant Enaam Arnaout provided military and logistical support to the mujahideen in the late 1980s and early 1990s as an employee of "Saudi NGO, the Muslim World League"). |
| 551. The Monograph mentioned MWL only with respect to Enaam Arnaout, who the Monograph notes "allegedly provided military and logistical support to the mujahideen in the late 1980s and early 1990s, as an employee of LBI and another Saudi NGO, the Muslim World League." *Id.* at 95. | Disputed. *See, e.g.*, Plaintiffs' response to No. 549. |
| **Treasury Department Designations** | No response necessary. |

| | |
|---|---|
| 552. After the 9/11 Attacks, President George W. Bush signed Executive Order 13224 ("E.O. 13224"). Exec. Order No. 13,224, 66 Fed. Reg. 49079 (Sept. 25, 2001). Sanctions and a designation as a specially designated global terrorist ("SDGT") under EO 13224 are administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"). Ex. 18, Brown Rpt. at 92. | Undisputed as a general matter for purposes of this motion. |
| 553. The standard for designations is not articulated in Executive Order 13224 or the International Emergency Economic Powers Act ("IEEPA"). Ex. 38, Gurule Dep. Tr. at 89:23-91:6, 93:21-94:9. The Executive Order also does not specify standards or evidence of proof. Ex. 18, Brown Rpt. at 92. | It is not disputed that Professor Gurulé provided the testimony at 89:23-91:6 and 93:21-94:9. |
| 554. The unarticulated standard for designations under EO 13224 and the IEEPA falls below the civil litigation "preponderance of the evidence" standard. Ex. 38, Gurule Dep. Tr. at 93:13-96:2. | It is not disputed that Professor Gurulé provided the testimony at 93:13-96:2. |
| 555. EO 13224 "seeks to cast a wide net so as to disrupt the channels of terrorist financing to save lives." Ex. 38, Gurule Dep. Tr. at 88:5-10. Persons who unknowingly, unwittingly, or inadvertently finance terrorism may be subject to designation under EO 13224. *Id.* at 87:14-88:4 ("Q. So your understanding is that an individual who may be unknowingly providing or financing terrorist activity could be subject to designation under Executive Order 13224, is that right? A. Yes. Q. And by the same token, an individual who may be unwittingly financing terrorism activity could be subject to designation under Executive Order 13224, is that fair to say? A. Yes; so it's both, someone could be doing it intentionally, knowingly, willfully, or inadvertently, unknowingly."). | It is not disputed that Professor Gurulé provided the quoted testimony at 88:5-10 and 87:14-88:4. |
| 556. Designation under EO 13224 as an SDGT is an administrative action, not a criminal or civil action. The designation process is not an adjudication of the guilt of innocence of the target of the SDGT designation. Ex. 38, Gurule Dep. Tr. at 83:19 – 84:7. | It is not disputed that Professor Gurulé provided the testimony at 83:19 – 84:7. |
| 557. There is no requirement that the U.S. government establish the existence of evidence that an actual act of terrorism was committed by a target that is being considered for designation pursuant to EO 13224. Nor is there any requirement that the government demonstrate that a target intended to support terrorism in any way. Ex. 38, Gurule Dep. Tr. at 84:8 – 86:6. | It is not disputed that Professor Gurulé provided the testimony at 84:8 – 86:6. |

| | |
|---|---|
| 558. The types of evidence that can be considered in the SDGT designation process is very broad and can include hearsay statements from an article or the internet or other material that would no evidentiary value in a civil litigation. Ex. 38, Gurule Dep. Tr. at 96:3-23. | It is not disputed that Professor Gurulé provided the testimony at 96:3-23. |
| 559. Subjects of designations are not permitted to rebut a designation prior to the designation. Ex. 38, Gurule Dep. Tr. at 119:23-121:18 ("Q. Is the individual or entity who is the potential target, is that individual or entity afforded the opportunity to participate in any way in the designation process predesignate? A. No… Q. They're not asked to submit any evidence of any kind in terms of a basis for or against the designation predesignation, is that right? A. That's correct….."). | It is not disputed that Professor Gurulé provided the quoted testimony at 119:23-121:18. |
| 560. According to Vahid Brown, an OFAC designation "only documents the fact of a US government suspicion of such an association and does not itself constitute evidence of such an association, nor does it prove the existence of any such evidence." Ex. 18, Brown Rpt. at 91-92. | Disputed. Mr. Brown lacks personal knowledge and the evidence lacks foundation. *See* Ex. 34, February 2, 2021 Rebuttal Expert Report of Jonathan M. Winer at 38-42 (detailing Mr. Brown's lack of experience and knowledge of the U.S. Treasury Department's designation process). |
| 561. Neither IIRO nor IIRO's Head Offices in Jeddah, Saudi Arabia has ever been designated by the OFAC as a Specifically Designated Terrorist. U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 10, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes- to-the-sdn-list. | It is not disputed that IIRO's Head Office in Jeddah was not designated by the U.S. government's OFAC. However, to the extent that the IIRO argues that the absence of any designation is equivalent to a finding that the person or entity is innocent of terrorism charges, that is baseless and disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 17, 43, 45-49, 62, 72, 90, 91, 99, 109, 481, 482, and 495 (detailing IIRO's extensive connections to Osama bin Laden and al Qaeda (including but not limited to E.O. 13224 Specially Designated Global Terrorists ("SDGT") IIRO officials Wa'el Hamza Jelaidan and Abd al Hamid Sulaiman al Mujil; Prince Turki bin Jalawi al Saud; Mohammed Jamal Khalifa), and the IIRO's provision of substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.).<br><br>Moreover, to the extent that IIRO argues that the absence of any designation of IIRO's Head Office in Jeddah by OFAC demonstrates that the IIRO and MWL were not aware of IIRO's connections to, and financial support for, al Qaeda and associated terrorist organizations, that is disputed. *See* Plaintiffs' responses to Nos. 1, 2, 43, 47, 48, 49, 94, 503. *See also Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (holding that "it would defy common sense" to require a designation to serve as a prerequisite for |

| | |
|---|---|
| | knowledge that certain individuals or entities were associated with a terrorist organization, or to conclude that such knowledge "could be gained in no other way").<br><br>By way of further response, Plaintiffs' experts have testified that the U.S. government often deferred formal designations of Saudi charities and other entities, despite having extensive evidence of their support for terrorism, choosing instead to pursue cooperative action with the Saudi government. *See* Ex. 36, Expert Report of Jonathan Winer at 131 (stating that "the U.S. often refrains from designating people and entities under EO 13224 for a variety of national security, political, and policy reasons, including its need to obtain continuing cooperation from other countries in combatting terrorism, as I have seen through my own direct participation in discussions at the National Security Council regarding people and entities who engaged in substantial acts of terrorism as defined under both U.S. and international law who have never been designated, due to other considerations").<br><br>Indeed, the evaluation of whether formal designation of a particular terror sponsor, or some other action, would best serve U.S. national security interests involved a range of equities, including foreign policy, intelligence, diplomatic, law enforcement, and many other considerations. *See* Ex. 179, *Terrorism Financing: Origination, Organization, and Prevention*, Hearing Before the Committee on Governmental Affairs United States Senate (July 31, 2003), at 11 (R. Richard Newcomb, Director of the Office of Foreign Assets Control ("OFAC"), stating that all of the equities of the government come to the table, including law enforcement, intelligence, diplomatic, and military, among others). *See also* Ex. 36, Expert Report of Jonathan Winer at 128-131 (explaining that in addition to the concern that the political and foreign policy costs of designating a person or entity would impair cooperation from a foreign country that is needed by the United States, there are also concerns that a designation could have a negative impact on ongoing law enforcement or intelligence matters.).<br><br>Furthermore, Plaintiffs dispute the IIRO's contention that the IIRO has not been designated by OFAC as a Specially Designated Global Terrorist ("SDGT"). On August 3, 2006, the U.S. government designated the IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, "for facilitating fundraising for al Qaida and affiliated terrorist groups," including Abu Sayyaf Grup and Jemaah Islamiyah. *See* Ex. 50, August 3, 2006 designation of IIRO's branches in the Philippines and Indonesia and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-202112; Ex. 182, *Additional Designations Pursuant to E.O.* |

| | |
|---|---|
| | *13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121. *See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 35 (August 3, 2006 designation of the IIRO).<br><br>Finally, Wa'el Hamza Jelaidan, an IIRO official and a close associate of Osama bin Laden, and one of the most significant figures in the history of al Qaeda and its development into a global terrorist organization, was designated by the U.S. government on September 6, 2002 as a "supporter of al-Qa'ida terror." *See* Ex. 53, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2002, FED-PEC 203469-203470 at 203469 ("Usama bin Laden and a top al-Qa'ida lieutenant, Abu Zubaida, have acknowledged Wa'el Julaidan as a known associate of their operations. Julaidan has been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network."); Ex. 180, *Additional Designation Pursuant to E.O. 13224*, TREASURY00001-8 at 4-5 (stating that "Julaidan is identified as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief," and also served on al Qaeda's shura council). *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 34 (detailing Jelaidan's meeting with Osama bin Laden and al Qaeda military chief Mohammed Atef). |
| 562. No IIRO employee, member of management, or office was designated by the US Treasury Department's Office of Foreign Assets Control ("OFAC") as a Specially Designated Terrorist prior to September 11, 2001. Ex. 4, May 21, 2024 Basha Decl. ¶ 79; U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 10, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of- changes-to-the-sdn-list. | It is not disputed that the U.S. government's OFAC did not designate an IIRO employee, member of IIRO management, or IIRO office prior to the 9/11 attacks. However, to the extent that the IIRO argues that the absence of any designation is equivalent to a finding that the person or entity is innocent of terrorism charges, that is baseless and disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 17, 43, 45-49, 62, 72, 90, 91, 99, 109, 481, 482, 495 (detailing IIRO's extensive pre-9/11 connections to Osama bin Laden and al Qaeda (including but not limited to E.O. 13224 Specially Designated Global Terrorists ("SDGT") IIRO officials Wa'el Hamza Jelaidan and Abd al Hamid Sulaiman al Mujil; Prince Turki bin Jalawi al Saud; Mohammed Jamal Khalifa), and the IIRO's provision of substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.).<br><br>Moreover, to the extent that IIRO argues that the absence of any pre-9/11 designation that the IIRO and MWL were not aware of IIRO's connections to, and financial support for, al Qaeda and associated terrorist organizations, that is disputed. |

| | |
|---|---|
| | *See* Plaintiffs' responses to Nos. 1, 2, 43, 47, 48, 49, 94, 503. *See also Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (holding that "it would defy common sense" to require a designation to serve as a prerequisite for knowledge that certain individuals or entities were associated with a terrorist organization, or to conclude that such knowledge "could be gained in no other way").<br><br>By way of further response, Plaintiffs' experts have testified that the U.S. government often deferred formal designations of Saudi charities and other entities, despite having extensive evidence of their support for terrorism, choosing instead to pursue cooperative action with the Saudi government. *See* Ex. 36, Expert Report of Jonathan Winer at 131 (stating that "the U.S. often refrains from designating people and entities under EO 13224 for a variety of national security, political, and policy reasons, including its need to obtain continuing cooperation from other countries in combatting terrorism, as I have seen through my own direct participation in discussions at the National Security Council regarding people and entities who engaged in substantial acts of terrorism as defined under both U.S. and international law who have never been designated, due to other considerations").<br><br>Indeed, the evaluation of whether formal designation of a particular terror sponsor, or some other action, would best serve U.S. national security interests involved a range of equities, including foreign policy, intelligence, diplomatic, law enforcement, and many other considerations. *See* Ex. 179, *Terrorism Financing: Origination, Organization, and Prevention*, Hearing Before the Committee on Governmental Affairs United States Senate (July 31, 2003), at 11 (R. Richard Newcomb, Director of the Office of Foreign Assets Control ("OFAC"), stating that all of the equities of the government come to the table, including law enforcement, intelligence, diplomatic, and military, among others). *See also* Ex. 36, Expert Report of Jonathan Winer at 128-131 (explaining that in addition to the concern that the political and foreign policy costs of designating a person or entity would impair cooperation from a foreign country that is needed by the United States, there are also concerns that a designation could have a negative impact on ongoing law enforcement or intelligence matters.).<br><br>Finally, Plaintiffs' expert Jonathan Winer has testified in this litigation that the designation process for terrorist sanctioning was in its infancy during the Clinton Administration, and the Executive Order 13224 sanctions regime targeting charities for terrorism related offenses did not exist prior to the September 11, 2001 attacks. *See* MDL ECF No.10592-1 at 38 (testifying that the "designation process for sanctioning was in its |

| | |
|---|---|
| | infancy" during the Clinton administration, and that any charity designations happened after 9/11); *id.* (testifying that that there were no designations of charities prior to 9/11 in part because the U.S. had undertaken other actions, which included direct discussions between the U.S. and Saudi Arabia). |
| 563. Neither IIRO Head Office nor its Secretaries General has ever been designated by OFAC. U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 10, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list. | Disputed as stated. *See, e.g.*, Plaintiffs' responses to Nos. 561 and 562. |
| 564. Neither IIRO, nor its Secretaries General, nor any IIRO branch office has ever been designated a Foreign Terrorist Organization by the Secretary of State. U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 10, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes- to-the-sdn-list. | Disputed as stated. *See, e.g.*, Plaintiffs' response to No. 561. |
| **<u>Treasury Designation Memoranda</u>** | No response necessary. |
| **<u>Memorandum Concerning Designation of Adbul Hamid Al-Mujil ("Mujil")</u>** | No response necessary. |
| 565. The Memorandum designating Adbul Hamid Al-Mujil is heavily redacted. Ex. 88, Treasury Department Memorandum File, at TREASURY00102. | It is not disputed that sections of the Treasury Memorandum are redacted as classified by the U.S. government, and was produced to Plaintiffs during the course of this litigation in this form. *See also* <u>Ex. 50</u>, August 3, 2006 designation of IIRO's branches in the Philippines and Indonesia and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-202112 at 202110-20211:<br><br>"Abd Al Hamid Sulaiman Al-Mujil (Al-Mujil) is the Executive Director of the IIRO Eastern Province (IIRO-EP) branch office in the Kingdom of Saudi Arabia. Al-Mujil has been called the 'million dollar man' for supporting Islamic militant groups.<br><br>Al-Mujil provided donor funds directly to al Qaida and is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI). Both ASG and JI are al Qaida-associated terrorist groups in Southeast Asia designated pursuant to the authorities of E.O. 13224. These terrorist groups are also on the United Nations 1267 Committee's consolidated list of individuals and entities associated with the Taliban, al Qaida and/or Usama Bin Ladin.<br><br>In 2004, Al-Mujil invited a Philippines-based JI supporter to Saudi Arabia under the cover of traveling for the hajj (the |

| | |
|---|---|
| | Muslim pilgrimage), and planned to provide him with cash to carry back to the Philippines to support organizations including JI.<br><br>Al-Mujil was also present in Afghanistan in the late 1990s and personally knew Usama Bin Ladin and deceased al Qaida cofounder Abdallah Azzam. Al-Mujil traveled continuously to meet with members of Bin Ladin's organization in Arab countries. In the 1990s, Al-Mujil established a relationship with senior al Qaida operational planner Khalid Shaykh Muhammad.<br><br>Al-Mujil has a long history of providing support to terrorist organizations. He has contributed direct financial assistance to ASG leaders, including Abdurajak Janjalani (deceased).<br><br>The Indonesian and Philippines branches of IIRO have received support from IIRO-EP, which in turn is controlled by Al-Mujil. Indeed, he is often responsible for authorizing payment transfers for IIRO Philippines (IIRO-PHL) and IIRO Indonesia (IIRO-IDN)." |
| 566. For example, citing 16 exhibits, the Memorandum designating Al-Mujil asserts that IIRO "is one of the primary the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL, the Taliban, and Hamas, as well as al Qaida affiliates, inter alia, the Abu Sayyaf Group (ASG), Jemaah Islamiyah (JI), and Al Ittihad Al Islamiya (AIAI)." *Id.* at TREASURY000106 (internal citations omitted). The names of these exhibits are all redacted from the list of exhibits at the end of the memorandum. *Id.* at TREASURY00115-17. | It is not disputed that sections of the Treasury Memorandum are redacted as classified by the U.S. government, and was produced to Plaintiffs during the course of this litigation in this form. |
| 567. The Memorandum designating Al-Mujil asserts that "AL-MUJIL provided donor funds directly to al Qaida, particularly for Islamic fighters, according to a report…" *Id.* at TREASURY00107. The remainder of the paragraph and following page are all redacted. *Id.* at TREASURY00107-08. The unredacted portions do not provide the factual basis or the source for this allegation. | It is not disputed that sections of the Treasury Memorandum are redacted as classified by the U.S. government, and was produced to Plaintiffs during the course of this litigation in this form. |
| 568. Similarly, the allegation in the Memorandum designating Al-Mujil asserts that, "In the late 1990s, AL-MUJIL provided direct financial assistance to ASG leaders" and is followed by several redacted paragraphs. *Id.* at TREASURY00108-09. | It is not disputed that sections of the Treasury Memorandum are redacted as classified by the U.S. government, and was produced to Plaintiffs during the course of this litigation in this form. |

| | |
|---|---|
| 569. To the extent the Memorandum cites Al-Mujil's conduct purportedly in his capacity with IIRO, it cites alleged conduct post-dating the 9/11 Attacks by over four years. *Id.* at TREASURY00109 ("In line with Al-Mujil's decision-making responsibilities, in February 2006, IIRO-EP's Al-Mujil planned to inspect IIRO-THA, [redacted]. In addition, Al-Mujil often 'adjudicated' (possibly meaning authorized) payment transfers, mosque and well construction, school curricula and orphan care programs for these branches, [redacted] in January 2006."). | Disputed as stated. To the extent that the IIRO argues that Mujil's designation by the U.S. government is based only on post-9/11 conduct, that is inaccurate and misleading. The Treasury Department describes several instances of pre-9/11 conduct attributable to Mujil that supported his August 3, 2006 designation. *See* Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 108 ("In the late 1990s, Al-Mujil provided direct financial assistance to ASG leaders Abdurjak Janjalani and Ustadz Ibrahim Ali [Ali] via ASG supporter, Mahmoud Abd Al-Jalil Afif."). *See also* Ex. 50, August 3, 2006 designation of IIRO's branches in the Philippines and Indonesia and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-202112 at 202110 ("Al-Mujil has a *long record* of supporting Islamic militant groups, and he has maintained a cell of regular financial donors in the Middle East who support extremist causes."); *id.* ("Al-Mujil was also present in Afghanistan *in the late 1990s* and personally knew Usama Bin Ladin and deceased al Qaida co-founder Abdallah Azzam."); *id.* at 202111 ("*In the 1990s*, Al-Mujil established a relationship with senior al Qaida operational planner Khalid Shaykh Muhammad."); *id.* ("Al-Mujil has a *long history* of providing support to terrorist organizations."). (Emphasis added.). |
| **Memorandum Concerning Designation of IIRO-Philippines** | No response necessary. |
| 570. The Treasury Memorandum concerning the designation of IIRO-Philippines office asserts that the office: was founded some time in the early 1990s by UBL's brother-in-law and senior al Qaida member Muhammad Jamal Khalifah. While working as the director of IIRO- PHL, Khalifah maintained close ties to senior al Qaida figures Abdullah Azzam and Abdulhassan al-Midani a.k.a. Wa'el Hamza Julaidan, a long-time senior official of the IIRO (and the Muslim World League). *Id.* at TREASURY00110 (cleaned up). | Undisputed as a general matter for purposes of this motion. |
| 571. Muhammad Jamaal Khalifa could not have "maintained close ties [with] Abdullah Azzam" "while working as the director of IIRO-PHL," because (i) IIRO-Philippines was founded "in the early 1990s" (per the Memorandum, *id.*); and (ii) Azzam was assassinated in ***1989***. See 9/11 Commission Rpt. at 56. | Disputed. IIRO's argument that Khalfa could not have maintained a relationship with Abdullah Azzam because he was assassinated in 1989 is inaccurate and misleading. Khalifa was sent to the Philippines in June 1988. Abdullah Azzam was killed more than a year later in Afghanistan on November 24, 1989. Accordingly, it is more than plausible that Khalifa maintained contact with Azzam during that period as stated by the U.S. Department of the Treasury. *See* Ex. 51, FED-PEC 202846-202847 (June 5, 1988 notices from MWL Secretary General Dr. Abdullah Omar Naseeef, and IIRO Director |

| | |
|---|---|
| | General Dr. Farid Y. Qurashi, advising of Khalifa's appointment as the Regional Director for the IIRO in South-East Asia and asking to "[p]lease facilitate his important task and cooperate with him."). *See also* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Khalifa "was based in the Philippines from 1988 to 1995 and was involved in recruiting Muslims for training in Pakistan as mujahidin fighters."); Ex. 33, European Parliament, *The Involvement of Salafism/Wahhabism in the Support and Supply of Arms to Rebel Groups Around the World*, June 2013, at 9 ("Declassified intelligence reports from the FNP revealed that in 1988 Bin Laden sent his brother-in-law Mohammad Jamal Khalifa to the Philippines to set up Al Qaeda's branches in Southeast Asia."). |
| 572. Wael Jelaidan was never an employee of IIRO. Ex. 4, May 21, 2024 Basha Decl. ¶ 77. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 6, 9, 17, 24, 31, and 109. |
| 573. Wael Jelaidan was not a "long-time" official of MWL. He resigned from MWL on November 1, 1995 and held no further employment with MWL. Ex. 15, 2018 Fawzi Decl. ¶ 38. | Disputed. IIRO's assertion that Jelaidan resigned from the MWL and held no further employment with the MWL is inaccurate and misleading. To the extent that IIRO also argues that Jelaidan had no contact with the MWL following 1995, that is also inaccurate and misleading. As set forth in Plaintiffs' responses to Nos. 1 and 109, Jelaidan served as an IIRO and MWL official starting in the 1980's. *See* Ex. 136, Jelaidan 022, Wael Jelaidan CV (stating that he started working for the MWL in 1989, became a project director of the Rabita Trust in 1992 (formed by the MWL and Pakistan government), was appointed as head of the Rabita Trust in 1998 "by the Muslim World League," and then served as the executive director of the joint IIRO/Saudi Joint Relief Committee office in Kosovo starting in 1999). *See also* Ex. 132, Affidavit of Wael Hamza Jelaidan, MDL ECF No. 2702 at ¶ 4 ("I have been the Secretary-General of the Rabita Trust since 1999 till this date [affidavit signed on October 29, 2011]. |

| | |
|---|---|
| | By way of further response, the MWL exerted significant control and oversight of Rabita Trust while Jelaidan was associated with the E.O. 13224 Specially Designated Global Terrorist ("SDGT") entity.<br><br>Documents produced in discovery by the MWL, IIRO, and Jelaidan demonstrate that the MWL and IIRO: (1) were directly involved in the founding of Rabita Trust, including its initial funding; (2) populated Rabita Trust's Board of Trustees with senior high-ranking officials of the MWL and IIRO; (3) exerted significant oversight and control over Rabita Trust's operations and activities from 1988 through at least 2004; (4) were responsible for appointing the individuals to lead the organization, including the appointment of Executive Order 13224 Specially Designated Global Terrorist ("SDGT") Wa'el Jelaidan as Secretary General of Rabita Trust; (5) permitted Rabita Trust to operate out of MWL-IIRO offices, including the MWL's office in Mecca; (6) coordinated responses and actions following the E.O. 13224 designation of Rabita Trust; (7) ordered the closure of Rabita Trust's office in Lahore and the seizure of all documents in the office; and (8) coordinated efforts to petition the U.S. Treasury Department to remove the Rabita Trust from the designation list. *See, e.g.*, Ex. 134, Jelaidan 017 (Rabita Trust deed identifying senior leaders of the MWL populated the initial Board of Trustees when it was formed in 1988, including MWL Secretary General Abdullah Omar Naseef and other representatives from "Rabita al Alam al Islami" (a/k/a MWL)); Ex. 133, Jelaidan 016 (March 14, 2000 Circular regarding the "revised and up-dated composition of Rabita Trust Board," including MWL Secretary General Abdullah al Obaid and IIRO Secretary General Adnan Basha); Ex. 140, MWL 30817-30819 (October 14, 2000 letter from Wa'el Jelaidan with a list of members of the Rabita Trust Board, including MWL Secretary General Abdullah al Obaid, former MWL Secretary General Abdullah Omar Naseef, Director of the IIRO's Eastern Province branch office Prince Turki bin Fahd bin Jalawy al Saud, IIRO Secretary General Adnan Basha, and MWL official Mohammed bin Abdullah al Dubaiban.); Ex. 115, IIRO 149637-149639 (October 13, 2001 letters to MWL Secretary General Abdullah al Turki, IIRO Secretary General Basha, and Jelaidan concerning questions from journalists following U.S. designation of Rabita Trust); Ex. 114, IIRO 149628, 149630, 149633-149636 (same); Ex. 135, Jelaidan 020 (indicating that the Secretary General issued an order to close the Lahore office of the Rabita Trust following the 9/11 attacks); Ex. 187, Jelaidan 009 (2002 letter concerning efforts to remove Rabita Trust from the U.S. designation list). *See also* Ex. 35, Expert |

| | |
|---|---|
| | Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 50-63.<br><br>*See also* Ex. 188, Arab News, *U.S. Urged to Give Sound Proof in Julaidan's Case*, September 8, 2002, MDL ECF No. 2989-13 at 2 ("Speaking on condition of anonymity, [a source at the Muslim World League] told AFO Julaidan was still working with the Muslim World League. 'He has been with the League for the last 10 to 12 years,' said the source. Julaidan is a businessman from a well-connected family based in Madinah.").<br><br>By way of further response, the cited MWL Ex. 15 is the U.N. Economic and Social Council, List of non-governmental organizations in consultative status with the Economic and Social Council as of 31 December 2022, (Apr. 4, 2023), not the Fawzi Declaration. |
| 574. The remainder of the Memorandum designating the IIRO-Philippines office is heavily redacted. Ex. 88 at TREASURY00111-14. However, the unredacted portions assert that the IIRO-Philippines office "provided support for recent ASG terrorist attack" (*id.* at TREASURY00111), but there is no factual basis or source cited for this allegation. | It is not disputed that sections of the Treasury Memorandum are redacted as classified by the U.S. government, and was produced to Plaintiffs during the course of this litigation in this form. |
| 575. The unredacted portions of the Memorandum asserts that the IIRO-Philippines office, "under the direction of Khalifah, also sent ASG and MILF members to Afghanistan to train with the 'mujahidin.'" *Id.* at TREASURY00113. Khalifah left the office in 1993. Ex. 12, Chaouat Decl. ¶ 64; Ex. 8, Daguit Decl. ¶ 20; Ex. 4, May 21, 2024 Basha Decl. ¶ 78. The unredacted portions do not provide the factual basis or the source for this allegation, which, even if true, has no connection to Al Qa'eda or the 9/11 Attacks nearly a decade later. | It is not disputed that the Treasury Memorandum states that the IIRO-Philippines office, "under the direction of Khalifah, also sent ASG and MILF members to Afghanistan to train with the 'mujahidin.'"<br><br>To the extent that IIRO argues that Khalifa left the IIRO-Philippines office in 1993, that is disputed. *See* Plaintiffs' response to No. 50 (IIRO has failed to submit any credible underlying documentation or evidence supporting the IIRO's claim that Khalifa resigned in 1993 and thereafter had no connection to the IIRO.). |
| 576. The Memorandum concludes with its "Bases for Designation," which rely on the above allegations. Ex. 88 at TREASURY00113. | Undisputed as a general matter for purposes of this motion. |
| **Memorandum Concerning Designation of IIRO Indonesia** | No response necessary. |
| 577. The Treasury Memorandum concerning the designation of IIRO Philippines office is one page and is heavily redacted. Ex. 88 at TREASURY00114. Aside from its header, the one paragraph section, "IIRO IND Support for al Qaida" is entirely redacted. Ex. 88 at TREASURY00114. | It is not disputed that sections of the Treasury Memorandum are redacted as classified by the U.S. government, and was produced to Plaintiffs during the course of this litigation in this form. However, the Memorandum at TREASURY 114 is discussing the IIRO-Indonesia branch office, not the "IIRO Philippines office" as stated in No. 577. *See also* Ex. 50, |

| | |
|---|---|
| | August 3, 2006 designation of IIRO's branches in the Philippines and Indonesia and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-202112 at 202112 ("The IIRO Indonesia director has channeled money to two Indonesia-based, JI-affiliated foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed the establishment of training facilities for use by al Qaida associates."). |
| 578. The sole unredacted portion of the Memorandum designating the IIRO Philippines office reprises the allegations against Adbul Hamid Al Mujil concerning conduct in 2006. *Id.* ("Al Mujil reportedly has decision making authority over a number of offices in Southeast Asia, including IIRO IND. Al Mujil often 'adjudicates' (possibly meaning authorized) payment transfers, mosque and well construction, school curricula and orphan care programs for these branches, [redacted] in January 2006."). | Undisputed as a general matter for purposes of this motion. However, the Memorandum at TREASURY 114 is discussing the IIRO-Indonesia branch office, not the "IIRO Philippines office" as stated in No. 578. |
| 579. The conclusion of the Memorandum designating the IIRO Philippines office, setting forth the three reasons for the designation of the office, asserts that the office "financ[es] the creation of training facilities to be used by al Qaida associates in Indonesia." *Id.* It does not provide the factual basis or the source for this allegation. | Undisputed as a general matter for purposes of this motion. However, the Memorandum at TREASURY 114 is discussing the IIRO-Indonesia branch office, not the "IIRO Philippines office" as stated in No. 579. |
| **<u>Plaintiffs' Experts Rely on Press Releases Issued by the Office of Foreign Assets Control</u>** | No response necessary. |
| 580. Reports authored by Plaintiffs' experts rely on the press releases issued by OFAC when it designated IIRO-Philippines, IIRO-Indonesia, Abdul Hamid al-Mujil, and Wael Jelaidan, which press releases contain unsourced assertions. *See*, *e.g.*, Kohlmann Rpt. ¶ 34 (citing Treasury Department Statement on the Designation of Wa'el Hamza Julidan); id ¶ 121 (citing OFAC press release concerning designation of Mujil, IIRO-PHL, and IIRO-IND); *id.* ¶ 123 (same); Winer Rpt. ¶ 12.17 (citing Treasury Department Statement on the Designation of Wa'el Hamza Julidan); *id.* ¶ 11.8.1 (citing press OFAC press statement concerning designation of Mujil, IIRO-PHL, and IIRO- IND); *id.* ¶ 12.9.2 (same) | Undisputed as a general matter for purposes of this motion. *See* <u>Ex. 50</u>, August 3, 2006 designation of IIRO's branches in the Philippines and Indonesia and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-202112; <u>Ex. 53</u>, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2002, FED-PEC 203469-203470. *See, e.g.*, <u>Ex. 35</u>, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 34 (Wa'el Jelaidan designation); <u>Ex. 36</u>, March 10, 2020 Expert Report of Jonathan M. Winer at 80 (designation of IIRO-Philippines, IIRO-Indonesia, and Abd al Hamid Sulaiman al Mujil), 114-115 (designation of Wa'el Jelaidan and Rabita Trust); *See* <u>Ex. 37</u>, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 30 (Jelaidan's designation as a Specially Designated Global Terrorist ("SDGT")). |
| 581. Reports authored by Plaintiffs' experts quote OFAC press releases:<br><br>a. Regarding IIRO-PHL: | Undisputed as a general matter for purposes of this motion. *See* Plaintiffs' response to No. 580. *See also* <u>Ex. 50</u>, August 3, 2006 designation of IIRO's branches in the Philippines and |

| | |
|---|---|
| "The IIRO-PHL is a source of funding for the al Qaida-affiliated ASG [Abu Sayyaf Group]. IIRO-PHL has served as a liaison for the ASG with other Islamic extremist groups. A former ASG member in the Philippines familiar with IIRO operations in the country reported that a limited amount of foreign IIRO funding goes to legitimate projects and the rest is directed to terrorist operations. The Philippine branches of the IIRO were founded sometime in the late 1980s or early 1990s by Muhammad Jamal Khalifah, who is Usama bin Laden's brother-in-law and has been identified as a senior al Qaida member. IIRO-PHL's director, Abd al-Hadi Daguit, is a trusted associate of Khalifah. While working as the director of IIRO- PHL, Khalifah maintained close connections with al Qaida through his relations with senior al Qaida supporters, including Specially Designated Global Terrorist (SDGT) Wa'el Hamza Julaidan. At the time Khalifah directed the IIRO-PHL, he employed an ASG intelligence officer as the provincial director of the IIRO-PHL in the Tawi-Tawi region of the Southern Philippines until that officer's death in 1994. In the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-PHL and used the organization to funnel money to terrorist groups including the ASG. Afif was implicated in the assassination of Father Salvatore Carzeda in San Jose Gusu, Zamboanga City, Philippines on June 20, 1992. "<br><br>Kohlmann Rpt. ¶ 121 (quoting OFAC press release concerning designation of Mujil, IIRO- PHL, and IIRO-IND).<br><br>b. Regarding IIRO-IND:<br><br>"The IIRO Indonesia director has channeled money to two Indonesia-based, JI- affiliated Islamic foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed the establishment of training facilities for use by al Qaida associates."<br><br>Kohlmann Rpt. ¶ 121 (quoting OFAC press release concerning designation of Mujil, IIRO- PHL, and IIRO-IND); Winer Rpt. ¶ 12.9.2 (same).<br><br>c. Regarding Abdul Hamid al-Mujil:<br><br>"Al-Mujil has been called the 'million dollar man 'for supporting Islamic militant groups. Al-Mujil provided donor funds directly to al Qaida and is identified as a major | Indonesia and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-202112. |

| | |
|---|---|
| fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI)… In 2004, Al-Mujil invited a Philippines-based JI supporter to Saudi Arabia under the cover of traveling for the hajj (the Muslim pilgrimage), and planned to provide him with cash to carry back to the Philippines to support organizations including JI. Al- Mujil was also present in Afghanistan in the late 1990s and personally knew Usama Bin Ladin and deceased al Qaida co-founder Abdallah Azzam. Al-Mujil traveled continuously to meet with members of Bin Ladin's organization in Arab countries. In the 1990s, Al-Mujil established a relationship with senior al Qaida operational planner Khalid Shaykh Muhammad. Al-Mujil has a long history of providing support to terrorist organizations. He has contributed direct financial assistance to ASG leaders, including Abdurajak Janjalani (deceased). The Indonesian and Philippines branches of IIRO have received support from IIRO-EP, which in turn is controlled by Al- Mujil. Indeed, he is often responsible for authorizing payment transfers for IIRO Philippines (IIRO-PHL) and IIRO Indonesia (IIRO-IDN)."<br><br>Kohlmann Rpt. ¶ 123 (quoting OFAC press release concerning designation of Mujil, IIRO- PHL, and IIRO-IND). | |

SIGNATURE BLOCK ON FOLLOWING PAGE

Dated: October 16, 2026

Respectfully submitted,

By: /s/ *Sean P. Carter*
Sean P. Carter, Esq.
J. Scott Tarbutton, Esq.
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel: (215) 665-2000
Email: scarter1@cozen.com

Counsel for the *Federal Insurance* Plaintiffs

By: /s/ *Robert T. Haefele*
Robert T. Haefele, Esq.
Jodi Westbrook Flowers, Esq.
Donald A. Migliori
MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel: (843) 216-9000
Email: rhaefele@motleyrice.com

Counsel for the *Burnett* and *Euro Brokers* Plaintiffs

By: /s/ *Steven R. Pounian*
Steven R. Pounian, Esq.
Andrew J. Maloney, III, Esq.
James Gavin Simpson, Esq.
KREINDLER & KREINDLER, LLP
485 Lexington Avenue, 28th Floor
New York, NY 10017
Tel: (212) 804-6935
Email: spounian@kreindler.com

Counsel for the *Ashton* Plaintiffs

By: /s/ *Jerry S. Goldman*
Jerry S. Goldman, Esq.
Ethan Greenberg, Esq.
Bruce Strong, Esq.
ANDERSON KILL P.C.
7 Times Square, 15th Floor
New York, NY 10036
Tel: (212) 278-1000
Email: jgoldman@andersonkill.com

Counsel for the *O'Neill* Plaintiffs

By: /s/ *Edward M. Pinter*
Edward M. Pinter, Esq.
Janine A. Balzofiore, Esq.
FORD MARRIN ESPOSITO WITMEYER & GLESER, LLP
Wall Street Plaza
88 Pine Street, 16th Floor
New York, NY 10005
Tel: (212) 269-4900
Email: epinter@fordmarrin.com

Counsel for the *Continental Casualty* Plaintiffs

By: /s/ *David A. Paul*
David A. Paul, Esq.
CANTOR FITZGERALD
110 East 59th Street, 7th Floor
New York, NY 10022
Tel: (212) 610-2298
Email: dpaul@cantor.com

Counsel for the *Cantor Fitzgerald* Plaintiffs

LEGAL\119013330\1