# EXHIBIT

# “248”

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

This document relates to:

*Federal Insurance Co., et al. v. Al Qaida, et al.*, 03-cv-06978
*Thomas E. Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 03-cv-09849
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-07279
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-cv-01923
*Kathleen Ashton, et al. v. Al Qaeda Islamic Army, et al.*, 02-cv-06977
*Gladys H. Salvo, et al. v. Al Qaeda Islamic Army, et al.*, 03-cv-05071
*Continental Casualty Co., et al. v. Al Qaeda, et al.*, 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, 04-cv-07065
*Maher, et al. v. Islamic Emirate of Afghanistan a/k/a The Taliban, et al.*, 23-cv-02845

**PLAINTIFFS' COUNTERSTATEMENT TO DEFENDANT MUSLIM WORLD LEAGUE'S RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Plaintiffs respectfully submit this Counterstatement to Defendant Muslim World League's Rule 56.1 Statement of Material Facts in Support of its Motion for Summary Judgment at ECF No. 11986. Plaintiffs cannot here set forth all of the evidence in response to each assertion, many of which are quite wide-ranging. We therefore refer Defendant Muslim World League to Plaintiffs' Statement of Material Facts Pursuant to Fed. R. Civ. P. 56.1.[1]

[1] The numbered exhibits ("Ex.") cited herein are similarly identified in (1) Plaintiffs' Rule 56.1 Statement of Material Facts as to Defendants Muslim World League and International Islamic Relief Organization; (2) Plaintiffs' Counterstatement to Defendant International Islamic Relief Organization's Rule 56.1 Statement of Material Facts; and (3) Plaintiffs' Opposition to the Defendants' April 15, 2026 Motions for Summary Judgment at ECF Nos. 11984-11987, 11988-11990, and 11992.

| MWL RULE 56.1 STATEMENT | PLAINTIFFS' COUNTERSTATEMENT |
|---|---|
| **MWL** | No response necessary. |
| 1. Plaintiffs have no evidence that MWL employees or agents, MWL Head Office in Makkah, or MWL Secretaries General had any foreknowledge of or were involved in the planning or execution of the 9/11 Attacks. Ex. #, FBI Report Administratively Closing Case (May 27, 2021), at EO14040-000011 ("After nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 Commission Report which stated that [there was] 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks or for supporting those responsible for the attacks'"); *see generally* 9/11 Commission Report;[2] Monograph on Terrorist Financing: Staff Report to the Commission ("Monograph");[3] *see also* Ex. # 1, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda). | Disputed. The MWL's claim that there is no evidence that MWL employees or agents, the MWL Head Office in Makkah, or the MWL Secretaries General had any foreknowledge of or were involved in the planning or execution of the 9/11 attacks, is inaccurate and misleading. As discussed further herein, the MWL and its officials (*e.g.*, MWL Secretaries General Dr. Abdullah Omar Naseef, Abdullah bin Saleh al Obaid, Abdul Mohsen al Turki), including its subsidiary organizations the International Islamic Relief Organization ("IIRO"), the Rabita Trust, and Al Haramain Al Masjed Al Aqsa Charity Foundation ("AHAMAA") and its officials (*e.g.*, IIRO Secretary General Adnan Basha); members of the IIRO Board of Directors and Executive Committee (comprised of MWL and IIRO officials), and their advisors, who have been identified as al Qaeda's most important financiers (*e.g.*, Ibrahim Mohammad Afandi, Abdurahman Abdul-Qader Faqih, Saleh al Kamel, Suleiman al Rajhi); members of the Saudi Royal family who held high-ranking leadership and supervisory positions with the IIRO (the MWL's subsidiary) while simultaneously serving as officials of the Saudi government (*e.g.*, Prince Muhammad bin Fahd bin Abdul Aziz, Prince Turki bin Jalawi al Saud); and IIRO officials, employees, advisors, and representatives (*e.g.*, Wa'el Hamza Jelaidan, Mohammed Jamal Khalifa, Abu Hammam al Saudi, Abd al Hamid Sulaiman al Mujil, Sulaiman al Ali, Abdelhadi Daguit, Mahmud Abd Al-Jalil Afif, Abdul Asmad, Abdelaziz Zaher, Jamal Al-Jibouri), were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad.<br><br>Indeed, these individuals were quintessential al Qaeda insiders, operating at the very center of al Qaeda's leadership, operations, and financial and logistical support structure during the critical period leading up to the 9/11 attacks, and were well aware of al Qaeda's terrorist intentions at all relevant times.<br><br>For instance, internal al Qaeda documents chronicling the formation of the organization, seized during a 2002 raid of the Sarajevo office of an al Qaeda front, the Benevolence International Foundation ("BIF"), confirm that al Qaeda planned from its inception to use the MWL and its subsidiary bodies, to include the IIRO, to provide support and cover for al Qaeda's operations. A BIF computer file named "Tareekh |

| | |
|---|---|
| | Osama" (or "Osama's History") contained numerous documents regarding al Qaeda's formation and the participation of purported Islamic charities in al Qaeda's support infrastructure, including the IIRO and MWL. The files include a document on MWL/IIRO letterhead detailing a meeting between "Abu Abdullah" (a/k/a Osama bin Laden), Dr. Abdullah Omar Naseef, in his capacity as the Secretary General of the MWL, and others where it was agreed that al Qaeda attacks would be launched from MWL offices: "And if he is being subjected to any pressures, let it be a secret (*agreement*), in a way that [Muslim World] League offices will be opened as (*illegible*) for the Pakistanis, and the attacks will be launched from the (*these offices*) …"). *See* Ex. 61, FED-PEC0212276-212281 at 212276. The document further suggests using the name of the "League" as "an umbrella which you can stay under … because Dr. Naseef is one of the brothers, and the government knows who Abu Al-Hasan [Wa'el Hamza Jelaidan] is." *Id.* at 212278. Investigators also recovered a list of orders from Osama bin Laden regarding the management of Islamic charities. At point 10 of his list, bin Laden urges the creation of a committee to receive and distribute donations to al Qaeda, and recommends participation of the MWL ("the Muslim World League"), and IIRO ("Hayaat Al-Ighata"). *See* Ex. 60, FED-PEC0212268-212275 at 212268. *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 29.<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 20-26 (describing the history of al Qaeda's terrorist financing infrastructure during the Soviet-Afghan conflict; the use of Saudi charities under the guise of humanitarian relief work for money and the provision of weapons, guesthouses, and travel papers to the mujahideen and jihadist recruits; the use of the Saudi charities to launder money originating from bank accounts belonging to Osama bin Laden and wealthy supporters in the Gulf; and the critical role the MWL, IIRO, and WAMY would play in al Qaeda's global financial infrastructure following the end of the Soviet-Afghan war).<br><br>Consistent with this plan, Dr. Naseef endorsed the appointment of Wa'el Hamza Jelaidan, a founding member of al Qaeda, as the director of the MWL/IIRO offices in Peshawar, Pakistan in 1989, thereby ensuring a direct channel for coordinating MWL/IIRO's collaboration with Osama bin Laden and al Qaeda. Jelaidan's role with the MWL allowed al Qaeda to use the MWL as an "umbrella" under which the terror group's members could operate, including using MWL offices for laundering terrorist attacks. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150 (indicating that Jelaidan and |

| | |
|---|---|
| | Mohammed Jamal Khalifa (also an al Qaeda member) served in official roles with the MWL).<br><br>Jelaidan was a close associate of Osama bin Laden, and one of the most significant figures in the history of al Qaeda and its development into a global terrorist organization. *See* Ex. 53, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2022, FED-PEC 203469-203470 at 203470 ("Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that 'We are all in one boat, as is known to you, including our brother, Wa'el Julaidan.'"); Ex. 180, *Additional Designation Pursuant to E.O. 13224*, TREASURY00001-8 at 4-5 (stating that "Julaidan is identified as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief," and also served on al Qaeda's shura council). *See also* Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 ("By way of background, Usama Bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ('MK') (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al Madani") of the International Islamic Relief Organization (hereafter "IIRO," sometime referred to as "Igatha" based upon its Arabic name "*Hay'at al-Igatha al-Islamiya al-'Alamtyaa*"), which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL'). In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*.").<br><br>In addition to his roles with the IIRO and MWL, Dr. Naseef also appointed Jelaidan to head the Rabita Trust, a subsidiary of the MWL. *See* Ex. 136, Wa'el Jelaidan CV, Jelaidan 022. Rabita Trust was designated by the U.S. government as a Specially Designated Global Terrorist ("SDGT") on October 12, 2001 for "its close ties to senior al Qaida leadership and |

| | |
|---|---|
| | providing logistical and financial support to al Qaida." *See* Ex. 68, FED-PEC 215391-215394 at 215391.<br><br>Jelaidan also served as a board member of the Al-Haramain & Al Masjed Al-Aqsa Charity Foundation ("AHAMAA"), an integral part of the MWL organizational structure, *see* Ex. 139, MWL 19138, and held signatory authority over AHAMAA's bank accounts which he used to fund terrorist operations. AHAMAA was designated as a SDGT by the U.S. government on May 6, 2004 for its significant financial ties to al Qaeda. *See* Ex. 63, May 6, 2004 E.O. 13224 Designation of Al Haramain al Masjed al Aqsa, FED-PEC 213972-213977; Ex. 64**,** May 6, 2004 U.S. Treasury Department Press Center, *Treasury Designates Bosnian Charities Funneling Dollars to Al Qaida*, FED-PEC 213978-213979; Ex. 148, U.S. Diplomatic Cable, *Terrorist Finance: Bosnia's Dirty Dozen*, November 2002, PECFOIA0004499-4503 at 4500 (identifying AHAMAA as one of at least a dozen Islamic charities "currently involved in providing financial support to known terrorist organizations"); Ex. 149, U.S. Diplomatic Cable, *Terrorist Finance: Dirty Dozen's Web of Deceit*, August 2003, PECFOIA049927-49932 at 49928 ("Documentation was provided to EUR/SCE demonstrating control over Al Haramayn al Masjid Al Aqsa by top Al Qa'ida financier Wa'el Julaidan (designated on E.O. 13224 in 2002).").<br><br>As al Qaeda was establishing its operations in Kosovo and Chechnya, Jelaidan further assumed the position as director of the joint IIRO/Saudi Joint Relief Committee ("SJRC") office in Pristina, Kosovo. *See* Ex. 98, Memorandum of Understanding between the IIRO and SJRC, IIRO 41030; Ex. 130, IIRO 39085, 39086, 39278 (shared office expenses). More than a year before the 9/11 attacks, U.S. officials sent a written request to the U.N. Peace Keeping Force in Pristina, requesting that U.N. police undertake surveillance of the office. In that document, marked "Secret: U.S. Office Only – Release to UNMIK," the U.S. government asserted that Jelaidan and SJRC official Adel Muhammad Sadi Bin Kazam were "associates of Osama bin Laden" and that Jelaidan was actively involved in helping bin Laden "move money and men to and from the Balkans." *See* Ex. 43, BBC News, *U.S. Fears Terrorist Attack in Kosovo*, April 3, 2000, FED-PEC0097363-97365 at 97364. Acting on that information, the U.N. Mission in Kosovo ("UNMIK") raided the building and declared that the IIRO/SJRC office served as a cover for several al Qaeda operatives, including Jelaidan and Kazem. *Id.*<br><br>Dr. Naseef, in his capacity as the MWL Secretary General and IIRO Chairman, also approved the appointment of Mohammed Jamal Khalifa, a founding al Qaeda member and Osama bin |

| | |
|---|---|
| | Laden's brother-in-law, to open a joint MWL/IIRO branch office in the Philippines contemporaneous with the formation of al Qaeda. *See* Ex. 51, FED-PEC 202846-202847 (June 5, 1988). As a result of that appointment, Khalifa was able to use the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia, and a source of funding for al Qaeda affiliated terrorist organizations such the Abu Sayyaf Group ("ASG"). *See* Ex. 50, August 3, 2006 designation of IIRO's branches in the Philippines and Indonesia and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-202112. According to the U.S. government, while working as the director of the office, Khalifah maintained close connections with al Qaida through his relations with "senior al Qaida figures Abdullah Azzam and Abdulhassan al-Midani a.k.a Wa'el Hamza Julaidan, a long-time senior official of the IIRO (and the Muslim World League)." *See* Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 110. *See also* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 (stating that the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149-152 (indicating that al Qaeda member Mohammed Jamal Khalifa served in an official role with the MWL, and used the IIRO branch office in the Philippines to fund the Abu Sayyaf Group, an al Qaeda associated terrorist organization, and recruit Muslims for military training). *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶¶ 31-32, 107-120; *See* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 30-31 (discussing 1996 CIA Report and "that the head of the MWL office in Pakistan supplied Muslim World League documentation and arms to Afghani and Tajik militants").<br><br>In addition to inserting al Qaeda members into strategic IIRO and MWL offices around the globe as part of its financial, ideological, and operational support for al Qaeda, IIRO (the MWL's subsidiary) provided substantial funding for al Qaeda's training camps in Afghanistan, including camps from which al Qaeda planned, approved, and coordinated the 9/11 |

| | |
|---|---|
| | attacks, and at which some or all of the 9/11 hijackers received indoctrination and training. *See, e.g.*, Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); Ex. 159, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 38, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo |

| | |
|---|---|
| | military training himself at one of the camps, where he met Usama Bin Laden.”).<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 83 (“IIRO operations in Pakistan were allegedly responsible for sponsoring [6] Al-Qaida training camps in the region. Following the 9/11 attacks, the government of Pakistan ‘identified and expelled some two dozen Al-Qaida supporters who has been working for the IIRO-sponsored organizations in Pakistan.’”).<br><br>*See also* Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 49-54 (discussing IIRO’s funding of al Qaeda’s training camps in Afghanistan “which were used to train fighters for Islamic insurgencies in a number of countries, including Algeria, Chechnya, Kashmir, Indonesia, Iraq, Palestine, the Philippines and Tajikistan, and as of early 1992, Bosnia.”).<br><br>Moreover, prior to the 9/11 attacks, MWL and IIRO leadership were expressly aware of the organizations’ ongoing support for international terrorism and Osama bin Laden, and the involvement of its branch offices and officials in terrorist activities, by virtue of extensive international media reporting. Any assertion that the MWL, and/or its subsidiary IIRO, were unaware of its substantial support for al Qaeda and terrorist activities is duplicitous. *See, e.g.*, (1) Daily News, *It’s More than Just Who Plants the Explosives*, July 31, 1996 (reporting that the IIRO is a major conduit of financial support to the Hamas terrorist group); (2) The Age, *Filipino Muslims Linked to Holy Warrior’s Global Terror*, May 20, 1995 (reporting on the discovery of al Qaeda’s terrorist plot in the Philippines (“Bojinka”) and explaining that Mohammed Jamal Khalifa of the IIRO, a “key figure in the network of Islamic extremists,” was funding Islamic militants in the Philippines); (3) Frontline, *A Terrorist Plot Unearthed*, March 12, 1999 (discussing the IIRO’s connections to an terrorist operation to bomb U.S. Consulates in India, and describing the IIRO as being “closely associated with the billionaire terrorist Osama bin Laden”); (4) University of Pennsylvania-African Studies Center, *Horn of Africa: The Monthly Review, 19-10/98* (reporting that the IIRO was one of five relief organizations banned by the Kenyan government following the August 1998 U.S. Embassy bombings); (5) IPS-Inter Press Service, *Kenya: Gov’t Shuts down Five Islamic Relief Agencies*, September 10, 1998 (reporting that the Kenyan government banned the IIRO for supporting terrorism following the August 1998 U.S. Embassy bombings); (6) ITAR-TASS, Russian Troops Find Arab, Bosnian Passports in Chechnya, February 21, 2000 (reporting that that IIRO, with its main office in Saudi Arabia, arranged for the transportation of Islamic fighters to participate |

| | |
|---|---|
| | in the conflict in Chechnya); (7) Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report*, February 13, 1999 (reporting that the IIRO's Mohammed Jamal Khalifa "is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group," and further stating that the "IIRO is suspected by Western intelligence agencies to be bin Laden's conduit to various terrorist organizations in Islamic countries"); (8) Philippine Daily Inquirer, *Front Page: Bin Laden Funds Abu Sayyaf Through Muslim Relief Group*, August 9, 2000 (indicating that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League) is a conduit of funds for the Abu Sayyaf Group, a terrorist organization in the Philippines); (9) Philippine Daily Inquirer, *Front Page: Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000 (reporting that the IIRO is a front to finance the operations of the Abu Sayyaf Group and Moro Islamic Liberation Front terrorist organizations); (10) The U.N. Refugee Agency, *Human Rights Watch World Report 1999 – Kenya*, January 1, 1999 (stating that the Kenyan government cancelled the registration of the IIRO and other Islamic relief agencies for supporting terrorism); (11) New York Times, *Some Charities Suspected of Terrorist Role*, February 19, 2000 (reporting on the 1998 U.S. Embassy attacks and that the Kenyan government said the charities "'posed a serious threat' to Kenya's security"); (12) The Times, *Terror by Degree*, October 18, 1997 (reporting on the "Bojinka" terrorist plot and stating that Mohammed Jamal Khalifa was funding the Abu Sayyaf Group); (13) The Indian Ocean Newsletter, *Banned Islamic NGOs*, September 12, 1998 (reporting that Kenya banned the IIRO and other NGOs following their investigation into the August 1998 attacks on U.S. embassies in Nairobi and Dar es Salaam); (14) U.S. News & World Report, *A Helping Hand From Saudi Arabia*, July 8, 1996 (reporting that the IIRO is a major clearinghouse for funds to aid Islamic extremism and terror in Gaza and the West Bank); (15) The Straits Times, *Osama Gave Funds to Abu Sayyaf: Manila*, August 10, 2000 (reporting that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League), "in the guise of giving charity to local Muslim communities, provided funds to Abu Sayyaf for acquiring arms"); (16) Overseas Immigration News, *Immigration Claims Teacher Linked to Terrorists Alleged Al-Jihad Member: Egyptian Denies Allegations, is Appealing Legal Proceedings*, May 21, 1999 (reporting that the IIRO "secretly funds terrorism"). *See* Ex. 5. *See also* Ex. 80, IIRO 147 ("IIRO Administrative Structure" chart identifying a "Department of Media and Information."); Ex. 65, FED-PEC 214874-214875 (MWL structural chart identifying "The General Department for Media and Culture"). |

| | |
|---|---|
| | *See also* Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 82-118 (detailing the specific roles of the IIRO, MWL, and WAMY in providing material support to al Qaeda prior to the 9/11 attacks, and in its immediate aftermath).<br><br>Finally, the MWL's representation that the 9/11 Commission concluded that "no new information would alter its original findings" concerning the individuals responsible for the 9/11 attacks, or those who supported the individuals responsible for the attacks, is also disputed as inaccurate and misleading. Members of the 9/11 Commission have publicly stated that their investigation and findings were not "exhaustive" and that further inquiry and fact-finding was necessary. *See* Ex. 2, Affirmation of Joseph Robert "Bob" Kerrey (stating it is "fundamentally inaccurate" to characterize the Commission's investigation and findings as "exhaustive or conclusive," and that "significant questions remain unanswered concerning the possible involvement of Saudi government institutions and actors in the financing and sponsorship of al Qaeda"); Affirmation of John F. Lehman (stating that the allegations and claims advanced by the 9/11 plaintiffs were never considered and rejected as factually untrue); Declaration of Richard Ben-Veniste (stating that "further fact-finding was appropriate").<br><br>*See also* Plaintiffs' responses to Nos. 2, 6, 9, 72, 75, 81, 122, 123, 124, 171, 172, 187, 190, 191, 203, 205, 206, 207, 218, 219, 231, 233, 237, 243, 290, 293, 300, 302, 305, 306, 328, 329, 331, 333, 342, 343, 344, 345, 348, 349, 360, 362, 366, 367, 368, 370, 371, 372, 375, 377, 379, 381, 383, 385, 387, 394, 414, 418, 420, 421, 428, and 430. |
| 2. Plaintiffs have no evidence tracing MWL funds to the planning or execution of the 9/11 Attacks. Ex. # 2, May 27, 2021 FBI Report Administratively Closing Case, at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from MWL to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1) ; Kohlmann Rpt. ¶¶ 27-70 (same) (ECF No. 9250-2); Levitt Rpt. at 29-35 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3) ; Ex. #3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see also* Ex. # 4, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); *see generally* 9/11 Commission Report; Monograph; *see also* Ex. # 1, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda). | Disputed. The MWL's claim that there is no evidence tracing MWL funds or other in-kind support to al Qaeda and/or the planning and execution of the 9/11 attacks, is inaccurate and misleading. As described herein, the MWL, IIRO, and their officials, employees, advisors, and representatives were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks. Accordingly, the 9/11 attacks were a predictable, inevitable product of that sustained, knowing support. Plaintiffs need not |

| | |
|---|---|
| | prove that the funds or other in-kind support provided to al Qaeda were traced to the terrorist plot or the attack itself.<br><br>By way of further response, and described in Plaintiffs' response to No. 1, in an agreement between MWL Secretary General Abdullah Omar Naseef and Osama bin Laden contemporaneous with the formation of al Qaeda, al Qaeda members Wa'el Hamza Jelaidan and Mohammed Jamal Khalifa were strategically placed in IIRO/MWL offices to guarantee a direct channel for coordinating MWL/IIRO's collaboration with Osama bin Laden and al Qaeda. Jelaidan's appointed positions to the IIRO, MWL, Rabita Trust, Al-Haramain & Al Masjed Al-Aqsa Charity Foundation ("AHAMAA"), and Saudi Joint Relief Committee ("SJRC"), allowed him to direct extensive financial and logistical support to al Qaeda for years leading up to the 9/11 attacks. Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"); Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 ("In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*.").<br><br>As the Regional Director for the IIRO in South-East Asia, Khalifa used the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia, and a source of funding for al Qaeda affiliated terrorist organizations such as the Abu Sayyaf Group ("ASG"), Moro Islamic Liberation Front ("MILF"), Jemaah Islamiya ("JI"), Hamas, and other terrorist groups. Moreover, Khalifa personally orchestrated the use of IIRO funds and resources to support the terrorist activities of 9/11 mastermind Khalid Sheikh Mohammed ("KSM"), Ramzi Yousef (1993 World Trade Center bomber), and Wali Khan Amin Shah (Afghan jihad veteran and Osama bin Laden/al Qaeda associate) in the Philippines, and the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations of twelve U.S. flag commercial airplanes as they flew from Asia to the United States. That very plot, often referred to as "Operation |

| | |
|---|---|
| | Bojinka," was adapted by KSM into the 9/11 terrorist plot, using the knowledge he had acquired during its development about vulnerabilities in the aviation security system. *See* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 (stating that the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."). *See also* Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12, 24 (discussing the Bojinka plot).<br><br>The IIRO, as a subsidiary of the MWL, additionally provided substantial funding for al Qaeda's training camps in Afghanistan, including camps from which al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training. *See, e.g.*, Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); Ex. 159, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 38, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-* |

| | |
|---|---|
| | *Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo military training himself at one of the camps, where he met Usama Bin Laden.").<br><br>*See also* Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 49-54 (discussing IIRO's funding of al Qaeda's training camps in Afghanistan "which were used to train fighters for Islamic insurgencies in a number of countries, including Algeria, Chechnya, Kashmir, Indonesia, Iraq, Palestine, the Philippines and Tajikistan, and as of early 1992, Bosnia.").<br><br>Following the 9/11 attacks, IIRO, as a subsidiary of the MWL, continued to provide substantial financial and material assistance to al Qaeda and Islamic extremists, and were often implicated in foreign government investigations relating to terrorism. For example, in 2002, the U.S. government identified IIRO and other purported charitable organizations operating in Bosnia-Herzegovina as "currently involved in providing financial support to known terrorist organizations." *See* Ex. 148, U.S. Diplomatic Cable, *Terrorist Finance: Bosnia's Dirty Dozen*, November 2002, PECFOIA0004499-4503 at 4500.<br><br>In July 2003, nine Bosnian Serbs were arrested for smuggling weapons to the IIRO in Bosnia-Herzegovina. *See* Ex. 149, U.S. Diplomatic Cable, *Terrorist Finance: Dirty Dozen's Web of Deceit*, August 2003, PECFOIA049927-49932. *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 101.<br><br>In 2006, the U.S. government formally designated IIRO official Abd al Hamid Sulaiman al Mujil and the IIRO- |

| | |
|---|---|
| | Philippines and IIRO-Indonesia branch offices "for facilitating fundraising for al Qaida and affiliated terrorist groups." *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112. According to U.S. Treasury Department officials, "Abd Al Hamid Sulaiman Al-Mujil, a high-ranking IIRO official in Saudi Arabia, has used his position to bankroll the al Qaida network … has a long record of supporting Islamic militant groups, and … has maintained a cell of regular financial donors in the Middle East who support extremist causes." *Id.* at 202110. *See also* Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 106 ("The International Islamic Relief Organization [IIRO], which is headquartered in Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL, … the Taliban, … and Hamas, … as well as al Qaida affiliates, *inter alia*, the Abu Sayyaf Group (ASG), … Jemaah Islamiya (JI), … and Al Ittihad Al Islamiya (AIAI)…. The IIRO's parent organization is the Muslim World League [MWL] also headquartered in Saudi Arabia."). *See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 35 (August 3, 2006 designation of the IIRO).<br><br>Also in 2006, MWL's subsidiary, IIRO, continued to fund and welcome radical Islamic clerics to IIRO summer camps to spread their extremist ideology to the participating children. *See* Ex. 77, U.S. Diplomatic cable, *IIRO Secretary General Talks of Saudi Programs and Expansions*, October 9, 2006, FED-PEC 220554-220557 at 220555-220556 (IIRO Secretary Adnan Basha admitting that no one can "guarantee 100 percent of the time" that no extremists will enter the camps and attempt to pass their ideologies on to the youth, and adding that while the Ministry of Islamic Affairs vets both the programs and the lecturers for all of IIRO's summer camps inside Saudi Arabia, no such vetting process occurs in summer camps outside of Saudi Arabia.).<br><br>Finally, in 2009, the U.S. government concluded that the IIRO and MWL were continuing to fund Islamic extremism. *See* Ex. 56, U.S. Diplomatic Cable, *Terrorist Finance: Action Request for Senior Level Engagement on Terrorism Finance*, December 30, 2009, FED-PEC 210113-210118 at 4500 (stating that "the International Islamic Relief Organization (IIRO), Muslim World League (MWL) and the World |

| | |
|---|---|
| | Assembly of Muslim Youth (WAMY) … continue to send money overseas and, at times, fund extremism overseas").<br><br>As the foregoing demonstrates, the IIRO and the MWL were specifically aware of al Qaeda's terrorist nature and intent to attack the United States, and intentionally provided substantial financial assistance and other resources to Osama bin Laden and al Qaeda knowing that the funds would be used to support al Qaeda's planning and execution of terrorist attacks around the globe, including the 9/11 attacks.<br><br>*See also* Plaintiffs' responses to Nos. 1, 6, 9, 72, 75, 81, 122, 123, 124, 171, 172, 187, 190, 191, 203, 205, 206, 207, 218, 219, 231, 233, 237, 243, 290, 293, 300, 302, 305, 306, 328, 329, 331, 333, 342, 343, 344, 345, 348, 349, 360, 362, 366, 367, 368, 370, 371, 372, 375, 377, 379, 381, 383, 385, 387, 394, 414, 418, 420, 421, 428, and 430. |
| 3. Plaintiffs have no evidence tracing in-kind support from MWL to the planning or for the execution of the 9/11 Attacks. Ex. # 2, May 27, 2021 FBI Report Administratively Closing Case, at EO14040-000011; Winer Rpt. at 112-22 (failing to show any in-kind support from MWL to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 27-70 (same) (ECF No. 9250-2); Levitt Rpt. at 29-35 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph. | Disputed. *See, e.g.*, Plaintiffs' response to No. 2. |
| 4. Plaintiffs have no evidence tracing MWL funds to Al Qaeda. *See generally* 9/11 Commission Report; Monograph; *see* Ex. # 4, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); *see also* Ex. # 1, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda). | Disputed. *See, e.g.*, Plaintiffs' response to No. 2. |
| 5. Plaintiffs have no evidence tracing in-kind support from MWL to Al Qaeda. *See generally* 9/11 Commission Report; Monograph; *see also* Ex. # 1, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda). | Disputed. *See, e.g.*, Plaintiffs' response to No. 2. |
| 6. The 9/11 Commission Report did not conclude that MWL, directly or indirectly through any other charity or | Disputed as stated. Plaintiffs acknowledge that the MWL is not specifically named in the 9/11 Commission Final Report. |

| | |
|---|---|
| entity, provided funds to Al Qaeda. *See generally* 9/11 Commission Report; Monograph; *see also* Ex. # 1, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda). | However, to the extent MWL suggests that it has been exonerated by the 9/11 Commission from any accountability for the extensive financial, material, and logistical support it provided to al Qaeda in the decade leading to the 9/11 attacks, that is inaccurate and misleading. *See* Ex. 2, Affirmation of Joseph Robert "Bob" Kerrey (stating that any "proposition that the 9/11 Commission fully exonerated Saudi Arabia and any Saudi government charities for any potential culpability for the financing and emergence of al Qaeda or the events of September 11, 2001" is "incorrect"); Affirmation of John F. Lehman (stating that the allegations and claims advanced by the 9/11 plaintiffs were never considered and rejected as factually untrue); Declaration of Richard Ben-Veniste (stating that "further fact-finding was appropriate"). Indeed, Plaintiffs' claims against the MWL, IIRO, and WAMY based on their funding and material sponsorship of al Qaeda are fully supported by the 9/11 Commission's findings that there was a substantial "likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda." *See* Ex. 1, 9/11 Commission Final Report at 171.<br><br>Moreover, CIA intelligence reports cited by the 9/11 Commission in its Final Report confirm that the MWL and its subsidiary, the IIRO, served as a key financial conduit for al Qaeda and played a central role in providing critical support to the terrorist organization, including but not limited to appointing al Qaeda members to leadership positions within the organizations, recruiting Islamic fighters, facilitating the training and travel of Islamic militants with employment papers and other documentation, engaging in narcotics trafficking and counterfeiting, and funding terrorist training camps. *See* Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that the Maktab al-Khidamat, a Pakistan-based nongovernmental organization financed by Osama bin Laden, played a key role in facilitating the training and travel of Islamic militants, received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization"); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Mohammed Jamal Khalifa, Osama bin Laden's brother-in-law, and close associate of World Trade Center bomber Ramzi Yousef, served as the director of the International Islamic Relief Organization (IIRO) in the Philippines, and "was involved in recruiting Muslims for training in Pakistan as mujahidin fighters."); *id.* at 151 (describing IIRO, WAMY, and Al Haramain as having "tie[s] to terrorist and mujahidin activity"); Ex. 11, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199 at 198 (stating that "al-Qa'ida has infiltrated some of IIRO's branches"); Ex. 13, *Islamic* |

| | |
|---|---|
| | *Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."); *id.* at 221 ("IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate toward more extremist activities."); *id.* ("A few IIRO branches have turned to illegitimate means of financing their operations—including narcotics trafficking and counterfeiting—further increasing their independence and ability to support terrorism."); Ex. 14, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*, November 17, 1998, CIA_00317-338 at 325 ("Bin Ladin and his associates make extensive use of non-governmental charitable organizations (NGOs) to transfer funds. Bin-Ladin-affiliated Islamic NGOs – such as … the International Islamic Relief Organization (IIRO); Al-Haramayn; … and others – are convenient money couriers because they maintain offices in Afghanistan, Albania, Pakistan, and other locations where Bin Ladin associates are prevalent."); *id.* at 330 ("Bin Ladin and Al-Qa'ida probably receive Gulf funding diverted from offices of Islamic NGOs, particularly the MK, IIRO, Al Haramayn … and others."); Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (stating that al Qaeda financial committee member Abdul Islam, who was "authorized to disburse funds for salaries and transportation expenses of al-Qa'ida members, and for donations to widows and orphans," worked for the International Islamic Relief Organization); *id.* at 525 (listing of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization"); *id.* at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"); Ex. 18, *Al-Qa'ida's Financial Ties to Islamic Youth Programs*, January 17, 2003, CIA_00681-701 at 692 (stating that "Gulf charities like the Saudi International Islamic Relief Organization (IIRO) and Al-Haramain … are well aware of the radical Wahhabi and Salafist doctrines being taught at institutions they fund"); Ex. 19, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 741 (stating that the Sudanese National Islamic Front ("NIF") works "with hardline Islamic fundamentalists employed by the Saudi International Islamic Relief Organization"); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, |

| | |
|---|---|
| | CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama, [REDACTED]."); *id.* at 817 (stating that "several Saudi NGOs are funding conduits for al-Qa'ida or have penetrated by Usama's network" and "[t]hose of greatest concern include the International Islamic Relief Organization (IIRO)" and "Al-Haramayn Islamic Foundation"); *id.* at 818 ("Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahed to fight in Chechnya."); *id.* at 824 (stating that the Islamic Relief Agency (ISRA), a Khartoum-based NGO with offices in Afghanistan and Pakistan, have been infiltrated by al Qaeda and work closely with personnel from the IIRO); *id.* at 827 (stating that the IIRO and Al Haramain were channeling funds "to spread Islamic fundamentalism throughout Macedonia").<br><br>Indeed, the U.S. government concluded that bin Laden and al Qaeda used the entire IIRO network for al Qaeda's terrorist activities. *See* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities.").<br><br>CIA intelligence reports cited in the 9/11 Commission Final Report similarly confirm that the MWL, IIRO's parent organization, played a central role in al Qaeda's support infrastructure. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Shaykh Adil Batterjee, a close associate of Osama bin Laden and "a long-time al-Qa'ida donor and fundraiser," used the Saudi-based Lajnat al Birr al Islamiyya charity, a subsidiary of the Muslim World League (MWL), to raise funds on behalf of bin Laden.); *id.* at 150 (indicating that "[s]everal of Bin Ladin's associates, including Wa'il Julaydan and Muhammad Jamal Khalifa, were MWL representatives"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 213 (stating that "several MWL affiliate organizations—including the International Islamic Relief Organization (IIRO)—have provided terrorists with funding and cover employment, documentation, and training"); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 809 (stating that Saudi-backed NGOs have ties to Osama bin Laden, including the Muslim World League, World Assembly of Muslim Youth, and others); *id.* at 822 (indicating that the MWL "has been used as a cover organization for several of Usama's associates"). *See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 95 (stating that Osama bin Laden confidant Enaam Arnaout provided military and logistical support to the mujahideen in |

| | |
|---|---|
| | the late 1980s and early 1990s as an employee of "Saudi NGO, the Muslim World League"). |
| 7. MWL is based in Saudi Arabia and is an international Islamic non-governmental organization involved in charitable projects around the world. Ex. # 5, Turki Decl. ¶ 4; Ex. # 6, Obaid Decl. ¶ 4; Ex. # 7, Basha Decl. ¶ 4; Ex. # 8, Al-Thaqafi Decl. ¶ 3; Ex. # 9, Al-Hassani Decl. ¶ 3. | Undisputed as a general matter for purposes of this motion. |
| 8. MWL was founded in 1962, is headquartered in Makkah, Kingdom of Saudi Arabia, and operates approximately 30 offices and cultural centers throughout the world. Ex. #5, Turki Decl. ¶ 4; Ex. #6, Obaid Decl. ¶ 4; Ex. #7, Basha Decl. ¶ 4; Ex. #9, Al-Hassani Decl. ¶ 9; Ex. #10, MWL 2002 Statute, at JT-MWL00040. In the 1990s, MWL employed approximately 200 individuals. Ex. #11, Fawzi Decl. ¶ 11. | Undisputed as a general matter for purposes of this motion. |
| 9. MWL promotes dialogue across cultures and religions, seeks to spread moderate Islamic values, and counters extremist ideology via a message of peace and harmony through education, religious, and cultural projects (Ex. # 5, Turki Decl. ¶ 5; Ex. # 6, Obaid Decl. ¶ 4; Ex. # 7, Basha Decl. ¶ 4; Ex. # 8, Al- Thaqafi Decl. ¶ 4; Ex. # 9, Al-Hassani Decl. ¶¶ 4, 10), including by giving assistance to other organizations (Ex. # 12, Daguit Dep. Tr. at 74:5-75:21). Its employees worked tirelessly to accomplish its mission. Ex. # 8, Al- Thaqafi Decl. ¶ 4. | Disputed. Notwithstanding the fact that the MWL, IIRO, and their domestic and overseas branch offices may have engaged in education, religious, and cultural projects, these activities were also used to fundraise and distribute funds for al Qaeda's operational support, to recruit terrorists, to provide space for their training and operations, and to provide a cover so that al Qaeda operatives could undertake terrorist activities under the guise of being humanitarian relief workers. *See* Ex. 171, U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Abdallah Ibrahim al Rushaydan (September 10, 2004), PEC-KSA002477-2488 at 2486 ("Since 1996, the IIRO has been linked with providing financial assistance, funds transfers, and legitimate cover for moving money in support of Al-Qaida and Usama Bin Ladin (UBL), under the cover of humanitarian relief."); *id.* at 2488 ("The IIRO is a Tier 1 NGO that has been directly linked to Al-Qaida and Usama Bin Ladin. The IIRO has provided financial assistance, funds transfers and legitimate cover for moving money under the pretense of humanitarian relief to Al-Qaida."); Ex. 69, Department of Defense JTF-GTMO Matrix of Threat Indicators, FEDPEC0216815-216831 at 216829-216831(U.S. govt. identifying IIRO, MWL, and WAMY as "terrorist and terrorist support entities"); Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 (identifying the IIRO as "one of the major Saudi Arabian humanitarian organizations suspected of maintaining links with al-Qaeda"); Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann ("Kohlmann Report") at 24 (stating that the U.S. government concluded that the IIRO provided financial assistance, funds transfers, and legitimate |

| | |
|---|---|
| | cover for moving money to al Qaeda under the pretense of humanitarian relief); Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143 (Fadl testifying that al Qaeda used Wa'el Jelaidan as head of the IIRO office in Peshawar, Pakistan, to create ID cards for al Qaeda members so that they could cross the Pakistan-Afghanistan border without a problem, under the guise that they were teachers or other relief workers.); Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer ("Winer Report") at 20 (asserting that "while the Islamic charities that provided support to extremism and terrorism engaged in some humanitarian activities, their support for terrorism was substantial, and the humanitarian activities which did take place helped to legitimize and provide a cover for, the extremist and terrorist activities"); Ex. 37, March 9, 2020 Expert Report of Dr. Matthew Levitt ("Levitt Report") at 13-14 ("Charities offer a veil of legitimacy for terrorist fundraising, attracting unwitting donors who are unaware that monies they donate for humanitarian purposes instead fund terror."); *id.* at 14 ("Through charities, transnational terrorist groups have been able to move personnel, funds, and material to and from high-risk areas under cover of humanitarian or charity work."); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (stating that Adel Batterjee, who headed the MWL subsidiary Lajant al Birr al Islamiyya, "has directed NGO's where some officers finance extremists or militants under the guise of rendering humanitarian aid and support"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 218 (stating that Islamic charities accredited with the UNHCR "gives them credentials terrorists can use to travel more freely across borders and to establish cells in new areas under the guise of pursuing a humanitarian mission"); Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 965 ("Where Muslims are engaged in armed conflict, some Islamic organizations provide military aid as part of a 'humanitarian' package."); Ex. 1, 9/11 Commission Final Report at 170-171 ("Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization."); Ex. 150, U.N. Security Council, Second Report of the Monitoring Group on Sanctions Against Al-Qaida, the Taliban and Individuals and Entities Associated With Them ("Second Report"), December 2, 2003, PEC-KSA000108-190 at 120-121 ("Charities provide Al-Qaida with a very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for |

| | |
|---|---|
| | indoctrination, recruitment, training, and logistical and operational support. These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programmes.”).<br><br>*See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 28 (“According to U.S. Department of Defense documents, ‘Muslim World League is listed as a Tier 2 NGO. Tier 2 NGO is defined [by the U.S. government] as having demonstrated the intent and willingness to support terrorist organizations willing to attack US persons or interests.’ The Department of Defense has classified MWL as among the ‘Associated forces’ of Al-Qaida, ‘with which al-Qaida, the al-Qaida network, or the Taliban had or has an established working, supportive, or beneficiary relationship for the achievement of common goals…Through associations with these groups and organizations a detainee may have provided support to al-Qaida or the Taliban, or engaged in hostilities against U.S. or Coalition forces.’”).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 30-31 (discussing 1996 CIA Report and “that the head of the MWL office in Pakistan supplied Muslim World League documentation and arms to Afghani and Tajik militants”); 31 (stating that “the MWL has sent cash to Islamic Guerillas in the Philippines;” “Osama bin Laden himself covertly funded several terrorist organizations through the MWL;” and “MWL also provided non-financial material support such as arms and documents to ‘militants in Afghanistan and Tajikistan’”). |
| 10. MWL’s mission is to promote awareness and understanding of Islam, and to educate Muslims across the world in accordance with the Qur’an and the Prophetic Sunnah. It seeks to uphold the values of peace, justice, and human rights, while fostering mutual understanding and cooperation among Muslim communities and raising awareness of shared concerns. Ex. # 10, MWL 2002 Statute at JT-MWL 00041. | Disputed. *See, e.g.*, Plaintiffs’ response to No. 9. |
| 11. MWL is committed to addressing challenges facing Muslims, providing support where needed, resolving conflicts, and promoting virtue and societal reform, with the overarching aim of elevating the conditions of Muslims worldwide. To achieve these objectives, MWL coordinates the efforts of those engaged in religious outreach such as Islamic organizations and strengthens the role and development of mosques. It leverages key occasions such as the *Hajj* season to facilitate dialogue and collaboration among scholars, thinkers, and opinion leaders, fostering solutions to common challenges; organizes conferences and | Disputed. *See, e.g.*, Plaintiffs’ response to No. 9. |

| | |
|---|---|
| events addressing Islamic matters, and establishes, operates and supports centers dedicated to education, cultural development, humanitarian assistance, and the teaching of the Arabic language; and cooperates with local and international governmental and non-governmental entities to further its mission and expand its impact. Ex. # 10, MWL 2002 Statute at JT-MWL 00041. | |
| 12. MWL established foreign offices and centers across the globe, to engage effectively with Muslim communities worldwide, gain a comprehensive understanding of their religious, educational, healthcare, cultural, and social conditions, and provide appropriate support. Ex. # 13, MWL Secretariat General Report (1997) at IIRO017075. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 13. MWL Foreign Offices carried out MWL's goals and objectives, advising the MWL Secretariat General on proposed projects, such as the establishment of education programs and the building of mosques, and performed functions in support of these projects. Ex. # 9, Al-Hassani Decl. ¶ 10. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 14. Foreign offices supervised the organization's local activities, implemented MWL's plans and programs, promoted Islamic teachings, monitored media content relating to Muslims and their affairs, articulated its positions, advocated for the protection of Muslim rights, delivered educational services, and coordinated with relevant organizations in their respective regions with a view to bridging divergent viewpoints. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017075. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 15. MWL had foreign offices in the following locations: Argentina, Australia (and the Pacific), Bangladesh, Burundi, Canada, Comoros, Denmark, Ethiopia, France, Indonesia, Jordan, Kenya, Malaysia, Maldives, Mauritania, Mozambique, Nigeria, Pakistan, Philippines, Republic of Congo, Russia, Senegal, Somalia, South Africa, Tanzania, Togo, Trinidad, Uganda, United Kingdom, and United States of America. Ex. # 13, MWL Secretariat General Report (1997), at IIRO016982, IIRO016983,), (Ex. # 14, MWL Secretariat General Report (2004), IIRO017952, IIRO017953. | Undisputed as a general matter for purposes of this motion. |
| 16. MWL also established cultural centers in Austria, Belgium, Benin, Brazil, Denmark, Italy, Niger, Nigeria, Spain, and Switzerland. Ex. # 13, MWL Secretariat General Report (1997), at IIRO016982; IIRO016983; Ex. # 14, | Undisputed as a general matter for purposes of this motion. |

| | |
|---|---|
| MWL Secretariat General Report (2004) at IIRO017952; IIRO017953. | |
| 17. MWL provided donations to achieve the organization's various missions. For example, in 1997, MWL's office in Australia distributed approximately $86,938.67 to Islamic associations and $9,780 to associations in the Pacific Islands during Iftar (Ex. # 13, MWL Secretariat General Report (1997), at IIRO017077) and the director of MWL's office in Uganda distributed $74,198 in donations from MWL's Secretariat General to local associations (Ex. # 13, MWL's 1997 Annual Report, at IIRO017078). | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 18. MWL prioritized education by supporting schools, committees, and teachers:<br><br>a. It assisted students seeking higher education in Saudi Arabia by providing letters of recommendation (Ex. # 13, MWL Secretariat General Report (1997), at IIRO017085).<br><br>b. Granted many scholarships, including to approximately 30 students in Jordan in a single year (Ex. # 13, MWL Secretariat General Report (1997), at IIRO017079 and IIRO017083).<br><br>c. In Ethiopia, the local MWL office established a school committee to manage the school that it operated, and graduated students who continued their college education at Addis Ababa University. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017098–IIRO017099.<br><br>d. In Spain, students of all backgrounds benefited from MWL libraries, and the organization organized religious competitions and events such as Quran memorization contests and Iftars. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017092 and IIRO017093. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 19. MWL conducted visits to its offices and undertook activities to evaluate local needs, raised awareness via different means, and encouraged communities to maintain impartiality and unity particularly in war-affected or disadvantaged areas. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017047 *et seq*. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |

| | |
|---|---|
| 20. In Uganda, MWL oversaw the United Islamic Schools, comprising 180 Qur'anic schools during the late 90s. Ex. # 13, MWL Secretariat General Report (1997) IIRO017078. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 21. MWL supervised translation projects on Hajj, prayer and Fasting in Burundi, and worked to unify fragmented Islamic organizations through dedicated committees. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017079. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 22. In Jordan, MWL distributed books and research articles on contemporary Islamic issues. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017083. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 23. MWL's Canada office distributed religious sermons (Khutbah) in English, visited Muslim centers, provided Islamic literature, recorded and distributed translations of the Qur'an. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017083. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 24. In Malaysia, MWL distributed religious books to universities, Islamic organizations, and committees, and monitored its school for orphans. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017084 and IIRO017085. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 25. In various countries, such as in Denmark, MWL responded to inquiries on Islamic practices including women's roles, halal food, Hajj, attire, and holidays, and supported local organizations in educational and celebratory events. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017085 to IIRO017087. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 26. MWL answered numerous inquiries from the public on Islamic matters and conducted over 50 radio programs on Islam in the Maldives in 1997. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017087-IIRO017088. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 27. MWL also supervised Qur'anic institutions, distributed copies of the Qur'an and translations (Ex. # 13, MWL Secretariat General Report (1997), at IIRO017089) conducted research on Muslim minority populations, and distributed schoolbooks in Arabic Islamic schools, such as over 10,000 of them in one year in Benin. Ex. # 13, MWL Secretariat General Report (1997) at IIRO017090. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |

| | |
|---|---|
| 28. MWL also supervised halal certification processes for meat exported to the Kingdom of Saudi Arabia and conducted site visits to slaughterhouses to ensure proper operations. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017077. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 29. MWL worked with other non-governmental organizations, governments, and international governing bodies, like the United Nations and enjoyed a sterling reputation as a force for good in the world and was often called upon for its expertise in troubling times. Ex. # 8, Al-Thaqafi Decl. ¶ 3; Ex. # 9, Al-Hassani Decl. ¶ 3. | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 30. Since 1979, MWL has been in general consultative status with the United Nations Economic and Social Council. Ex. # 5, Turki Decl. ¶ 6; Ex. # 6, Obaid Decl. ¶ 4; Ex. # 7, Basha Decl. ¶ 4. It was the fourteenth organization to be granted that status, *see* Ex. # 15, U.N. Sec. Gen., *List of non-governmental organizations in consultative status with the Economic and Social Council as of 31 December 2022*, at 3-7, U.N. Doc. E/2022/INF/5 (Apr. 4, 2023), which status is reserved for non-governmental organizations that are sufficiently representative of major segments of society in many countries and that "can demonstrate to the satisfaction of the Council that they have substantive and sustained contributions to make to the achievement of the objectives of the United Nations in [the] fields" of "international economic, social, cultural, educational, health, and related matters" and "promoting respect for, and observance of, human rights and fundamental freedoms for all" (Ex. # 16, Economic and Social Council Res. 1996/31, Part III, ¶ 22 (July 25, 1996); Ex. # 17, U.N. Charter, art. 62(1)-(2)), as well as helping advise the U.N. Peacebuilding Commission in supporting development in countries emerging from conflict. *See* Ex. # 18, G.A. Res. 60/180, The Peacebuilding Commission, ¶¶ 12(b), 17 (Dec. 20, 2005); Ex. # 19, G.A. Res. 61/16, Strengthening the Economic and Social Council, ¶¶ 20-23 (Jan. 9, 2007). | Disputed. *See, e.g.*, Plaintiffs' response to No. 9. |
| 31. The position of Secretary General is the most senior role within MWL. Ex. # 8, Al-Thaqafi Decl. ¶ 3; Ex. # 9, Al-Hassani Decl. ¶ 3; Ex. # 10, MWL's 2002 Statute, at JT-MWL-00044 ("The Secretary General is the primary executive and administrative officer in charge at the League, and he assumes the administration of the work and its facilitation in a manner that ensures the achievement of the objectives of the League, its statute, and its regulations."). | Disputed. To the extent that the MWL argues that the Secretary General is the sole individual that exercises supervisory control over the MWL's budget, operations, activities, and performance, that is inaccurate and misleading.<br><br>Senior officials of the MWL have acknowledged that the MWL receives virtually all of its funding from the Saudi government. Dr. Abdullah al Turki, who served as Secretary General of the MWL from 2000 through 2016, acknowledged |

| | |
|---|---|
| | that the MWL received 80,000,000.00 Saudi riyals ("SR") annually from the Saudi government. *See* Ex. 24, Transcript, September 15, 2018 Deposition of Dr. Abdullah al Turki at 223-225; Ex. 90, Turki Exhibit 44, IIRO 17415-17453 at 17453 (MWL Secretariat General report indicating the MWL received an annual 80,000,000.00 subsidy from the Saudi government). *See also* Ex. 189, Transcript, September 14, 2018 Deposition of Dr. Abdullah al Turki at 91 (confirming that the Saudi government provided funding for the MWL).<br><br>The CIA has also assessed that the MWL "is funded exclusively by the Saudi government and has served as an umbrella for other Saudi-based NGOs." *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999 (CIA_000210-236 at 213).<br><br>The Ministry of Defense and Aviation has also financed the activities of the MWL and International Islamic Relief Organization. *See* Ex. 32, FBI Report, *Connections to the Attacks of September 11, 2001*, July 23, 2021, EO14040-003478-3608 at 3580-3581.<br><br>Dr. Abdullah al Obaid, who served as Secretary General of the MWL from 1995 through 2000, testified that King Fahd bin Abdul Aziz al Saud nominated him for the Secretary General position. *See* Ex. 23, Transcript, September 17, 2018 Deposition of Dr. Abdullah al Obaid ("Obaid Transcript") at 26 (when asked who nominated him to serve as Secretary General of the MWL, Obaid responded, "the Saudi government, King Fahd.").<br><br>During his tenure as MWL Secretary General, Dr. Obaid testified that he simultaneously served as a member of the Supreme Council of Islamic Affairs, which has the "responsibility for Saudi Arabia's Islamic policies in other countries." *See* Ex. 23, Obaid Transcript at 27; Ex. 147, Declaration of Abdullah bin Saleh al Obaid at ¶ 5. In particular, the Supreme Council for Islamic Affairs makes recommendations to the Saudi government concerning the provision of financial support to Islamic organizations operating outside of the Kingdom. *See* Ex. 23, Obaid Transcript at 37. *See also* Ex. 191, Declaration of Abdulaziz H. al Fahad at ¶ 8 (describing the Supreme Council of Islamic Affairs as "an arm of the government of Saudi Arabia, which carries out part of the foreign policy of the Kingdom"). As a member of the Supreme Council of Islamic Affairs, "an arm of the government of Saudi Arabia," Dr. Obaid oversaw and directed the activities of the MWL, IIRO, Al Haramain, and other Saudi-based da'wah organizations in support of the foreign policies of the Kingdom. |

| | |
|---|---|
| 32. Abdullah Naseef served as Secretary General of MWL from 1983 to 1993. Ex. # 11, Fawzi Decl. ¶ 10; Ex. # 20, Naseef End of Service Order as of 26/1/1414H (corresponding to July 16, 1993), MWL 059188. | Disputed as stated. Plaintiffs acknowledge that Naseef stepped down as MWL Secretary General in or around 1993. However, the MWL fails to inform that Naseef maintained significant contacts with the MWL and IIRO long after he left that position. For example, on February 24, 2015, Naseef was a featured speaker at a MWL conference in Mecca discussing the war on terrorism. In March 2014, Naseef presided over a Pakistan Repatriation Council event held in Jeddah in which the former MWL Secretary-General urged for the reactivation of the Rabita Trust which had been shut down following its 2001 designation by the U.S. government for providing material support to al Qaeda. In September 2014, Naseef attended a meeting of the IIRO's General Assembly to discuss the IIRO's humanitarian and relief efforts. According to media reports, Naseef (a member of the IIRO General Assembly) was one of several "leading participants." On October 21, 2012, Naseef delivered a speech at a MWL conference. In December 2008, Naseef chaired a panel discussion at an Islamic religious conference organized by the MWL. In June 2008, in his capacity as Secretary-General of the International Islamic Council for Da'wa and Relief ("IICDR"), Naseef was a featured speaker at an Islamic conference hosted by the MWL at its headquarters in Mecca. In April 2003, the MWL weekly magazine, Al Alaam Al Islami, reported that the Holy Mecca Institution ("Mecca al Mukaramah"), an integral part of the MWL, held a Board of Trustees meeting. The meeting was led by MWL Secretary General Abdullah bin Abdul Mohsen Turki, who simultaneously served as the Chairman of the Holy Mecca Institution's Board of Trustees. Naseef participated in that meeting as Deputy Chairman of the Board of Trustees. *See* MDL ECF No. 3024 at 7-8. |
| 33. Ahmed Mohamed Ali, Ph.D. served as Secretary General of MWL from 1994 to 1995. He was the Secretary General between Naseef and Obaid. Ex.# 21, Letter re Dr. Ali beginning his service as of 2/9/1414H (corresponding to February 13, 1994), MWL 059171; Ex.# 22, Dr. Ali End of Service Order as of 10/7/1416H (corresponding to December 3, 1995), MWL 059173; Ex. # 11, Fawzi Decl. ¶ 10. | Undisputed as a general matter for purposes of this motion.<br><br>By way of further response, CIA investigations assessed that Ahmed Mohammed Ali, who served as MWL Secretary General immediately following Omar Abdullah Naseef's tenure as Secretary General, experienced an unhappy and challenging period at the MWL because he found it difficult to deal with Islamic fundamentalist clerics who dominated the MWL's leadership positions. *See* Ex. 19, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 746; *id.* at 784 (indicating that Ali purportedly left the MWL "over continuous disagreements with Islamic fundamentalist clerics"). |
| 34. Abdullah bin Saleh Al-Obaid, Ph.D., served as Secretary General of MWL from 1996 to 2000. Ex. # 6, Obaid Decl. ¶ 3. | Disputed as stated. Plaintiffs acknowledge that Obaid stepped down as MWL Secretary General in or around 2000 or 2001. *See* Ex. 22, Declaration of Abdullah bin Saleh al Obaid (indicating that he served as MWL Secretary General until |

| | |
|---|---|
| | 2000), Ex. 146, Biography of Abdullah bin Saleh al Obaid, Al-Obaid 0001-0005 at 0002 (indicating that he served as the MWL Secretary General until 2001). However, IIRO fails to inform that Obaid maintained a continuing relationship with the MWL and IIRO, serving in several high-level positions since 2002. For instance, in a May 21, 2015 report posted on the MWL's website, Secretary-General Turki presided over a meeting of representatives from numerous MWL bodies and affiliated organizations. Obaid attended in his official role as the head of the MWL Monitoring Committee and was responsible for presenting the resolutions of the conference to the attendees. In December 2014, Obaid is identified in media reports as a member of the MWL Supreme Council. In September 2014, Obaid attended the meeting of the IIRO's General Assembly. A member of the General Assembly like Omar Abdullah Naseef, Obaid was reported to be one of several "leading participants." In August 2008, Obaid was responsible for chairing a panel discussion at a conference organized by the MWL. Obaid has also served as Vice-President of the International Islamic Council for Da'wa and Relief ("IICDR"), mentioned above. Member organizations include the MWL, IIRO and WAMY. As of April 2003, Obaid served as a member of the Holy Mecca Institution's Board of Trustees, closely associated with the MWL and Abdullah bin Abdul Mohsen Al-Turki and Omar Abdullah Naseef. Finally, following his tenure as MWL Secretary-General, Obaid served as a member of the MWL Constituent Council. *See* MDL ECF No. 3024 at 8. |
| 35. Abdullah bin Abdul Mohsen Al-Turki, Ph.D., served as Secretary General of MWL from 2000 to 2016. Ex. # 5, Turki Decl. ¶ 3; Ex. # 23, Turki Dep. Tr. at 66:4-9 (*Errata*). | Undisputed as a general matter for purposes of this motion. |
| 36. Adnan Basha, Ph.D. worked for MWL from 1977 to 1997 and again from 2013 until his retirement in 2016. Ex. # 7, Basha Decl. ¶ 3. | Disputed. Basha continued to serve as an advisor to the MWL, through at least 2019. *See* Ex. 184, Resume of Adnan Khalil Basha (Basha 0001); MDL ECF No. 3024 at 9. |
| 37. The Secretary General, Assistant Secretary General, and various directors of the organization's foreign offices regularly attended meetings, conferences, dialogues, and other events related to Islamic matters worldwide. These engagements aimed to strengthen relations with Islamic countries or those with Muslim populations, spread awareness and build diplomatic ties with governmental and non-governmental entities for peace-building purposes, assess the conditions of Muslims globally, and provide them with the needed support. Ex. # 13, MWL Secretariat General Report (1997) at IIRO017047 *et seq*. | Undisputed as a general matter for purposes of this motion, and immaterial. |

| | |
|---|---|
| 38. For example, in July 1996, the Secretary General attended a convention in Cairo, Egypt, titled "Islam and the Future of Civilized Dialogue," where he emphasized that religious extremism, fanaticism, terrorism, and narrow-mindedness have no basis in religion. In interviews that followed during that visit, he highlighted the importance of moderation, balance, and avoiding bias to achieve solidarity within the Muslim community. Ex. # 13, MWL Secretariat General Report (1997) at IIRO017050. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 39. In October 1996, the Secretary General attended the 10th Convention for Peace in Italy, and participated in the session dedicated to Muslim-Christian relations. Ex. # 13, MWL Secretariat General Report (1997) at IIRO017051. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 40. In the 1990s, the Secretary General participated in the signing ceremony of the convention of peace between the Philippines government and the Moro Islamic Liberation Front ("MILF"), an agreement that MWL had exerted efforts to achieve. Ex. # 13, MWL Secretariat General Report (1997) at IIRO017051. | Disputed. To the extent that the MWL claims that it was engaging in peace efforts in the Philippines with respect to the Moro Islamic Liberation Front, that is disputed as inaccurate and misleading.<br><br>For instance, investigations conducted by Philippines Intelligence in 1998 determined that E.O. 13224 Specially Designated Global Terrorist ("SDGT") and IIRO-Eastern Province branch official Abd al Hamid Sulaiman al Mujil (nicknamed the "Million Dollar Man" for supporting Islamic militant groups) met with Moro Islamic Liberation Front officials to provide a significant financial contribution to the terrorist organization. *See* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211430 (identifying IIRO officials "Al Saif Othoman A O and Almojil Abdul Hamdi S" meeting with MILF Chairman Salamat Hashim at Camp Abubakar in the Southern Philippines concerning a $192,197.00 contribution).<br><br>Media reporting in the Philippines in 2000 indicated that the IIRO was funding terrorist operations of the Moro Islamic Liberation Front and Abu Sayyaf Group throughout the 1990s. *See* Ex. 44, Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000, FED-PEC 10813-10815 (reporting that the IIRO was "being used by accused international terrorists Osama bin Laden and his brother-in-law, Mohammad Jamal Khalifa as a front to finance the operations of the Abu Sayyaf and the Moro Islamic Liberation Front," and that the bulk of IIRO "fund[s] goes to terrorist operations of the Abu Sayyaf and the MILF");<br><br>In addition, CIA investigations determined that as of June 2002, the IIRO maintained contact with "Islamic extremists" |

| | |
|---|---|
| | such as the Moro Islamic Liberation Front. *See* Ex. 16, *Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia*," June 2002, CIA_000450-480 at 455 ("Gulf NGOs with branch offices in the Philippines—including Dal al Hijra Foundation and the International Islamic Relief Organization—maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates.").<br><br>Moreover, the MWL and Moro Islamic Liberation Front were conducting meetings in 2003 about setting up bank accounts to direct financial assistance to MILF. *See* Ex. 104, IIRO 93332-93333 (August 25, 2003 letter from the successor to the deceased MILF chairman to the MWL Secretary General asking him to "open a bank account with the League at one of the accredited banks to receive special assistance and donations for them from their brothers in creed and faith."). In a related communication, a MWL representative contacted the IIRO-Philippines office and asked for assistance concerning this "important" request. *See* Ex. 103, IIRO 93331 (October 4, 2003 letter from Fouad bin Abdullah Akbar, Director of the Emergency Relief Department, to the "Director of the International Islamic Relief Organization Office in the Philippines," concerning MILF's request to MWL Secretary General Turki and asking to "[k]indly review and provide us with the necessary study and your opinion on this request, as it is important to us.").<br><br>IIRO employee Abdulhadi Daguit testified that the Moro Islamic Liberation Front was engaged in military activities at the same time that MILF asked MWL Secretary General Turki to open the bank account for donations. *See* Ex. 29, Transcript, June 27, 2019 Deposition of Abdulhadi T. Daguit, at 144-145 (testifying that MILF was "engaging [in] fighting with the Philippine government"). |
| 41. During a visit to Bosnia and Herzegovina in April 1997, the Secretary General met with several heads of state to address post-war concerns, visited educational, and health centers, and promoted awareness of Islam's stance on human rights while encouraging peaceful resolution of conflicts. Ex. # 13, MWL Secretariat General Report (1997) at IIRO017054. | Disputed. To the extent that the MWL claims that it was engaging in efforts to address human rights and peaceful resolution in Bosnia, that is disputed as inaccurate and misleading.<br><br>For instance, the MWL consistently published calls for support for the Bosnian Muslims in the form of men, money, arms, and ammunition during the 1990s. *See, e.g.*, Ex. 198, Al Alam Al Islami, *Calling For Their Victory in Their Jihad Against the Serbs: Bin Baz Called to the Islamic Governments and Peoples to Support the Muslims in Bosnia and Herzegovina*; Ex. 199, Muslim World League Journal, *Bosnia Issue Top of the Agenda, GCC Summit, MWL Meeting and Bosnia Solidarity Day*, January 1994; Ex. 200, Muslim World League Journal, *Latest Developments in Bosnia, Croatia's Stunning* |

| | |
|---|---|
| | *Success and its Implication*, September 1995. *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann ("Kohlmann Report") at ¶¶ 36-49; Ex. 37, March 9, 2020 Expert Report of Dr. Matthew Levitt at 28.<br><br>That nefarious support continued into the 2000s. For example, the MWL's Al-Haramain & Al Masjed Al-Aqsa Charity Foundation ("AHAMAA"), located in Bosnia, was designated as a Specially Designated Global Terrorist ("SDGT") by the U.S. government on May 6, 2004 for its significant financial ties to al Qaeda. *See* Ex. 63, May 6, 2004 E.O. 13224 Designation of Al Haramain al Masjed al Aqsa, FED-PEC 213972-213977; Ex. 64**,** May 6, 2004 U.S. Treasury Department Press Center, *Treasury Designates Bosnian Charities Funneling Dollars to Al Qaida*, FED-PEC 213978-213979; Ex. 148, U.S. Diplomatic Cable, *Terrorist Finance: Bosnia's Dirty Dozen*, November 2002, PECFOIA0004499-4503 at 4500 (identifying AHAMAA as one of at least a dozen Islamic charities "currently involved in providing financial support to known terrorist organizations"); Ex. 149, U.S. Diplomatic Cable, *Terrorist Finance: Dirty Dozen's Web of Deceit*, August 2003, PECFOIA049927-49932 at 49928 ("Documentation was provided to EUR/SCE demonstrating control over Al Haramayn al Masjid Al Aqsa by top Al Qa'ida financier Wa'el Julaidan (designated on E.O. 13224 in 2002)."). |
| 42. The Assistant Secretary General made comparable efforts. Some examples include travelling to Kampala, Uganda in the late 90s to oversee the handing over between the former and newly appointed director of the local office there, as well as visiting mosques, Islamic institutions, and orphanages, and attending meetings and conferences. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017063 to IIRO017071. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 43. During this same period, the Assistant Secretary General conducted similar visits in dozens of countries, leading prayers and dialogues with the heads of various organizations to discuss the conditions of local Muslims. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017064 *et seq*. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 44. MWL regulations and directives issued by the Secretary General governed employee conduct and related to the hiring, promoting, and dismissing of employees. These regulations and directives, along with the principles undergirding them, remained consistent throughout the relevant timeframe. Ex. # 8, Al-Thaqafi Decl. ¶¶ 2, 5; Ex. # 9, Al-Hassani Decl. ¶¶ 2, 5; Ex. # 24, 1987 MWL Employee Regulations, JT-MWL00194-207; see Ex. # 25, 2003 MWL | It is not disputed that the MWL and IIRO established certain procedures, protocols, regulations, directives, and rules concerning employee conduct and ethical standards; implementation and funding of overseas projects; banking, accounting, and auditing; collection and disbursements of funds; financial and activity/project reporting to headquarters; cooperation and coordination with Saudi embassies in host countries; and other issues. |

| | |
|---|---|
| Employee Regulations, JT-MWL00169-193; Ex. # 26, 2003 MWL Guidelines for Employment & Appendices, JT-MWL00227-267. | However, to the extent the MWL and IIRO claim that these controls prevented MWL and IIRO officials, employees, advisors, and representatives from providing substantial financial assistance and other resources to Osama bin Laden, al Qaeda, and associated terror groups, and/or engaging in terrorist activities and operations themselves, that is disputed as inaccurate and misleading.<br><br>The evidence—including the MWL and IIRO's own documents and deposition testimony from their officials and employees—plainly demonstrates that those controls were routinely disregarded by individuals within the MWL and IIRO (the MWL's subsidiary) who were closely aligned with al Qaeda and intended to foster bin Laden's global terrorist agenda, including Prince Turki bin Jalawi al Saud, Wa'el Hamza Jelaidan, Mohammed Jamal Khalifa, Abu Hammam al Saudi, Abd al Hamid Sulaiman al Mujil, Abdelhadi Daguit, Mahmud Abd Al-Jalil Afif, Abdul Asmad, Amir Jasim, Moayad al Butairi, and others. For more than a decade, these individuals (some of them al Qaeda members), deliberately ignored MWL and IIRO protocols and directed extensive financial, material, and logistical support to bin Laden and al Qaeda around the world. Indeed, contemporaneous with the formation of al Qaeda after the Soviet-Afghan conflict, MWL Secretary General Naseef orchestrated a years-long partnership and agreement with Osama bin Laden that the MWL and IIRO would be used to provide substantial financial and logistical support to al Qaeda, thereby empowering individuals within those organizations to provide the critical assistance al Qaeda needed without fear of punishment or retribution. Accordingly, the 9/11 attacks were a predictable, inevitable product of that sustained, knowing support received from the MWL and IIRO.<br><br>*See also* Plaintiffs' responses to Nos. 1, 2, 6, 9, 72, 75, 81, 122, 123, 124, 171, 172, 187, 190, 191, 203, 205, 206, 207, 218, 219, 231, 233, 237, 243, 290, 293, 300, 302, 305, 306, 328, 329, 331, 333, 342, 343, 344, 345, 348, 349, 360, 362, 366, 367, 368, 370, 371, 372, 375, 377, 379, 381, 383, 385, 387, 394, 414, 418, 420, 421, 428, and 430.<br><br>Moreover, the evidence indicates that the inaction of the MWL and IIRO to take corrective measures when violations of the protocols were discovered, not only rendered those controls meaningless, but also demonstrated a willingness within those organizations to overlook violations even when they raised legitimate concerns that MWL and IIRO offices and employees may be involved in terrorist activities. |

| | |
|---|---|
| | By way of example, notwithstanding the serious findings by the IIRO investigation and audit of the IIRO-Pakistan office, the IIRO never held Moayad al Butairi and Amir Jasim accountable for stealing millions of dollars. IIRO did not prosecute Butairi for his actions, and eventually settled the case with Jasim who was released from custody. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 220-221 (testifying that the IIRO chose not to prosecute Butairi); *id.* at 224 (testifying that IIRO decided not to pursue the full prosecution of Jasim). *See also* Plaintiffs' response to No. 335. The MWL Secretary General was fully aware of the investigation and its findings, but took no action. *See, e.g.*, Ex. 206, IIRO 31131 (Letter from IIRO Secretary General Adnan Basha to the MWL Secretary General providing a legal memorandum concerning the investigation into the IIRO-Pakistan office and the misappropriation of IIRO funds by the IIRO-Pakistan Director General Moayad al Butairi.).<br><br>Finally, to the extent the MWL's assertions at Nos. 44-57 rely on the Declarations of Ali al Thaqafi and/or Mohamed al Hassani at MWL Exs. 8 and 9, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation. Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 45. MWL employees were required to understand and follow all MWL regulations and the directives and understand their position's responsibilities, duties, and authorities; expected to conduct their jobs with integrity, which meant protecting MWL money and resources and respecting guidelines and orders from organizational superiors and supervisors; prohibited from participating in activities that contradicted MWL values or taking directions from other entities; and barred from accepting personal gifts or donations. Ex. # 8, Al-Thaqafi Decl. ¶¶ 6-8; Ex. # 9, Al-Hassani Decl. ¶¶ 6-8; Ex. # 24, 1987 MWL Employee Regulations at JT-MWL00196; Ex. # 25, 2003 MWL Employee Regulations at JT-MWL00176-77. | Disputed. *See, e.g.*, Plaintiffs' response to No. 44. |
| 46. Financial Officers were governed by MWL financial bylaws and Secretary General directives, which bylaws, and the principles undergirding them, remained consistent throughout the relevant timeframe. Ex. # 8, Al-Thaqafi Decl. ¶¶ 2, 17; Ex. # 27, 1986 MWL Financial Regulations, JT-MWL00125-156; Ex. # 28, 2001/2002 MWL Financial Regulations, JT-MWL00157-167; Ex. # 29, 2001/2002 MWL Executive Regulations of the Financial Bylaws, JT-MWL00208-226. | Disputed. *See, e.g.*, Plaintiffs' response to No. 44. |

| | |
|---|---|
| 47. Expenditures were tied to specific budgetary allocations and were not authorized for other purposes, meaning that no other MWL body, office or department was permitted to take actions that did not correspond to items allocated in the budget. Ex. # 8, Al-Thaqafi Decl. ¶ 18; Ex. # 9, Al-Hassani Decl. ¶ 17 ("Foreign Office directors were prohibited from taking decisions creating financial liabilities not previously approved in the budget."); Ex. # 27, 1986 MWL Financial Regulations at JT-MWL00129 and JT-MWL00156; Ex. # 28, 2001/2002 MWL Financial Regulations at JT-MWL00161 and JT-MWL00167. | Disputed. *See, e.g.*, Plaintiffs' response to No. 44. |
| 48. MWL adopted regulations to ensure effective supervision of projects and programs implemented by Foreign Offices, including the requirement that Foreign Office personnel submit project progress reports, project completion reports, and photographs of finished projects to the relevant department at the Secretariat General. Ex. # 9, Al-Hassani Decl. ¶¶ 2, 11. | Disputed. *See, e.g.*, Plaintiffs' response to No. 44. |
| 49. Foreign Office employees were required to understand and follow the Secretariat General's rules and regulations, to perform their duties without violation, to protect MWL's resources, and were prohibited from performing activities that contradicted MWL objectives. Ex. # 9, Al-Hassani Decl. ¶ 12; Ex. # 30, 1997 MWL Regulations for External Offices and Centers, JT-MWL00268-305 at JT-MWL00280-81. | Disputed. *See, e.g.*, Plaintiffs' response to No. 44. |
| 50. Foreign Office directors and employees had to follow the laws of their host country and not interfere with politics or participate in political activities, and they were not permitted to engage in or to use MWL resources for personal commercial ventures, political activities, or violent, extremist, or terrorist activities. Ex. # 9, Al-Hassani Decl. ¶¶ 15, 18; Ex. # 24, 1986 MWL Employee Regulations at JT-MWL00196; Ex. # 25, 2003 MWL Employee Regulations at JT-MWL00176-77; Ex. # 30, 1997 MWL Regulations for External Offices and Centers at JT-MWL00280-81. | Disputed. *See, e.g.*, Plaintiffs' response to No. 44. |
| 51. MWL aimed to hire competent personnel with experience and integrity: new hires had to have a respectable reputation in the local community and no criminal record. Foreign offices could not create new positions without prior approval from the Secretariat General, and new hires were subject to approval from the Secretariat General. Ex. # 9, Al-Hassani Decl. ¶¶ 13-14; Ex. | Disputed. *See, e.g.*, Plaintiffs' response to No. 44. |

| | |
|---|---|
| # 30, 1997 MWL Regulations for External Offices and Centers at JT-MWL00281-82. | |
| 52. Foreign Office directors were prohibited from making financial decisions for their own benefit or for the benefit of any other MWL employee. Ex. # 9, Al-Hassani Decl. ¶ 16; Ex. # 30, 1997 MWL Regulations for External Offices and Centers at JT-MWL00287. | Disputed. *See, e.g.*, Plaintiffs' response to No. 44. |
| 53. MWL employed internal and external auditors. Ex. # 8, Al- Thaqafi Decl. ¶ 19; Ex. # 27, 1986 MWL Financial Regulations at JT-MWL00152-55; Ex. # 28, 2001/2002 MWL Financial Regulations at JT-MWL00166-67; Ex. # 29, 2001/2002 MWL Executive Regulations for the Financial Bylaws at JT-MWL00224-25. | Disputed. *See, e.g.*, Plaintiffs' response to No. 44. |
| 54. The MWL Internal Auditor supervised and audited financial accounts, reviewed inventory records, verified that financial and administrative regulations were being adhered to, submitted quarterly reports, reviewed instances of financial and regulatory misconduct, and issued recommendations to prevent future misconduct. Ex. # 8, Al-Thaqafi Decl. ¶¶ 20-21; Ex. # 27, 1986 MWL Financial Regulations at JT-MWL00152-54; Ex. # 28, 2001/2002 MWL Financial Regulations at JT-MWL00166-67; Ex. # 29, 2001/2002 MWL Executive Regulations for the Financial Bylaws at JT-MWL00224. | Disputed. *See, e.g.*, Plaintiffs' response to No. 44. |
| 55. External auditors provided an additional level of financial control; inspected all books and records to ensure that the correct procedures were followed; verified MWL's assets and liabilities; examined final accounting statements; and compared transactions with the work done to ensure their regularity and disclose any misconduct. Ex. # 8, Al-Thaqafi Decl. ¶ 22; Ex. # 27, 1986 MWL Financial Regulations at JT-MWL00154-55; Ex. # 28, 2001/2002 MWL Financial Regulations at JT-MWL00167; Ex. # 29, 2001/2002 MWL Executive Regulations for the Financial Bylaws at JT-MWL00225. | Disputed. *See, e.g.*, Plaintiffs' response to No. 44. |
| 56. MWL received its funding in the form of a grant from the Saudi government. Ex. # 11, Fawzi Decl. ¶ 14; Ex. # 31, Obaid Dep. Tr. 133:2-133:13 (*Errata*); 133:23-134:3 (*Errata*). | Undisputed as a general matter for purposes of this motion.<br><br>By way of further response, Dr. Obaid confirmed that the MWL received 80,000,000.00 SR annually from the Saudi government, acknowledging that the annual grant was "the principal source of funding for the Muslim World League." *See* Ex. 23, Transcript, September 17, 2018 Deposition of Dr. Abdullah al Obaid ("Obaid Transcript") at 132-133. Obaid testified that the 80,000,000.00 SR was "everything to the |

| | |
|---|---|
| | League," and indicated that any other sources of money received by the MWL were de minimus. *Id.* at 133-134.<br><br>Dr. Obaid additionally confirmed that the MWL had received more than 5 billion SR from the Saudi government since it was established. *See* Ex. 23, Obaid Transcript at 135-137; Ex. 192, Al Alam Al Islami, *Hailing the Kingdom's Ongoing Generous Support for the League*, FED-PEC 237301. *See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020, at 30 ("David Aufhauser, former General Counsel at the U.S. Treasury Department, stated in Congressional testimony to the Senate Committee on Homeland Security and Governmental Affairs, that by some estimates … Saudi funding for the MWL had exceeded $75 billion."). |
| 57. MWL disbursed funds via issued checks or bank authorization letters and did not use the hawala system. Ex. # 11, Fawzi Decl. ¶ 15; Ex. # 29, 2001/2002 MWL Executive Regulations for the Financial Bylaws at JT-MWL00213; Ex. # 27, 1986 MWL Financial Regulations at JT-MWL00131. | To the extent the MWL's assertion at No. 57 relies on the Declaration of Mohamed Fawzi at MWL Ex. 11, the statement is disputed. The Fawzi Declaration was never produced to Plaintiffs during the discovery phase of the litigation. Plaintiffs have not been afforded an opportunity to cross-examine Fawzi's new declaration testimony, and the Fawzi Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony. |
| **IIRO** | No response necessary. |
| 58. MWL established the International Islamic Relief Organization ("IIRO") in 1978. Ex. # 5, Turki Decl. ¶ 14; Ex. # 6, Obaid Decl. ¶ 12. | Undisputed as a general matter for purposes of this motion.<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 32 ("In 1978, the Muslim World League established the International Islamic Relief Organization (IIRO) to serve as its humanitarian branch. Headquartered in Jeddah, IIRO is a global organization, with offices in Africa, Asia, Europe, Latin America and North America."); *id.* ("IIRO was tasked with running orphanages, building mosques, and operating Islamic schools around the world."). |
| 59. IIRO's Head Offices are in Jeddah, Saudi Arabia. Ex. # 7, Basha Decl. ¶ 3; Ex. # 32, Helles Decl. ¶ 2. | Undisputed as a general matter for purposes of this motion. |
| 60. IIRO was established to provide general humanitarian aid to impoverished people and to provide emergency aid in response to crises and natural disasters. Ex. # 5, Turki Decl. ¶ 14; Ex. # 6, Obaid Decl. ¶ 12; Ex. # 7, Basha Decl. ¶ 5; Ex. # 32, Helles Decl. ¶ 3; *see* Ex. # 33, 2000-2001 Annual Report at IIRO-004447 (noting over 1.7 million patients visited IIRO health facilities worldwide in 2000-2001). | Disputed. Notwithstanding the fact that IIRO and its domestic and overseas branch offices may have undertaken genuine humanitarian relief work, these relief activities were also used to fundraise and distribute funds for al Qaeda's operational support, recruit terrorists, to provide space for their training and operations, and to provide a cover so that al Qaeda operatives could undertake terrorist activities under the guise of being humanitarian relief workers. *See* Ex. 171, U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Abdallah Ibrahim al Rushaydan (September 10, 2004), PEC-KSA002477-2488 at 2486 ("Since 1996, the IIRO |

| | |
|---|---|
| | has been linked with providing financial assistance, funds transfers, and legitimate cover for moving money in support of Al-Qaida and Usama Bin Ladin (UBL), under the cover of humanitarian relief."); *id.* at 2488 ("The IIRO is a Tier 1 NGO that has been directly linked to Al-Qaida and Usama Bin Ladin. The IIRO has provided financial assistance, funds transfers and legitimate cover for moving money under the pretense of humanitarian relief to Al-Qaida."); Ex. 69, Department of Defense JTF-GTMO Matrix of Threat Indicators, FEDPEC0216815-216831 at 216829-216831(U.S. govt. identifying IIRO, MWL, and WAMY as "terrorist and terrorist support entities"); Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 (identifying the IIRO as "one of the major Saudi Arabian humanitarian organizations suspected of maintaining links with al-Qaeda"); Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann ("Kohlmann Report") at 24 (stating that the U.S. government concluded that the IIRO provided financial assistance, funds transfers, and legitimate cover for moving money to al Qaeda under the pretense of humanitarian relief); Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143 (Fadl testifying that al Qaeda used Wa'el Jelaidan as head of the IIRO office in Peshawar, Pakistan, to create ID cards for al Qaeda members so that they could cross the Pakistan-Afghanistan border without a problem, under the guise that they were teachers or other relief workers.); Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer ("Winer Report") at 20 (asserting that "while the Islamic charities that provided support to extremism and terrorism engaged in some humanitarian activities, their support for terrorism was substantial, and the humanitarian activities which did take place helped to legitimize and provide a cover for, the extremist and terrorist activities"); Ex. 37, March 9, 2020 Expert Report of Dr. Matthew Levitt ("Levitt Report") at 13-14 ("Charities offer a veil of legitimacy for terrorist fundraising, attracting unwitting donors who are unaware that monies they donate for humanitarian purposes instead fund terror."); *id.* at 14 ("Through charities, transnational terrorist groups have been able to move personnel, funds, and material to and from high-risk areas under cover of humanitarian or charity work."); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (stating that Adel Batterjee, who headed the MWL subsidiary Lajant al Birr al Islamiyya, "has directed NGO's where some officers finance extremists or militants under the guise of rendering humanitarian aid and support"); Ex. 13, |

| | |
|---|---|
| | *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 218 (stating that Islamic charities accredited with the UNHCR "gives them credentials terrorists can use to travel more freely across borders and to establish cells in new areas under the guise of pursuing a humanitarian mission"); Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 965 ("Where Muslims are engaged in armed conflict, some Islamic organizations provide military aid as part of a 'humanitarian' package."); Ex. 1, 9/11 Commission Final Report at 170-171 ("Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization."); Ex. 150, U.N. Security Council, Second Report of the Monitoring Group on Sanctions Against Al-Qaida, the Taliban and Individuals and Entities Associated With Them ("Second Report"), December 2, 2003, PEC-KSA000108-190 at 120-121 ("Charities provide Al-Qaida with a very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support. These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programmes.").<br><br>Moreover, to the extent the MWL's assertions at Nos. 58-80 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki, Abdullah bin Saleh al Obaid, Adnan Basha, and Mohamed Helles at MWL Exs. 5, 6, 7, and 32, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2018-2019 (Obaid, Turki, Basha). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 61. IIRO was frequently brought into large-scale humanitarian disaster areas and enjoyed an outstanding reputation for its work. Ex. # 32, Helles Decl. ¶ 3; Ex. # 34, 1999-2000 Annual Report, at IIRO-003622 (describing IIRO's response in Turkey following devastating earthquake); Ex. # 35, 1998 Annual Report, at IIRO-004254 (describing IIRO's response in refugee camps in Azerbaijan for persons displaced by the Nagorno-Karabakh conflict). | Disputed. *See, e.g.*, Plaintiffs' response to No. 60. |
| 62. IIRO, an international aid organization affiliated with the United Nations, provided humanitarian relief all | Disputed. *See, e.g.*, Plaintiffs' response to No. 60. |

| | |
|---|---|
| over the world and emergency relief and sustainable development in various countries. Ex. # 7, Basha Decl. ¶ 5; Ex. # 32, Helles Decl. ¶ 3; Ex. # 33 2000-2001 Annual Report, at IIRO-004483-84 (reflecting UN cooperation), IIRO-004489-4504 (describing relief work all over the world, including, for example, in Uganda). | |
| 63. IIRO worked with other international relief organizations, including the United Nations High Commission on Refugees ("UNHCR") and the International Conference of Red Cross ("ICRC") and Red Crescent Societies. Ex. # 6, Obaid Decl. ¶ 13; Ex. # 5, Turki Decl. ¶ 15; Ex. # 33, 2000-2001 Annual Report, at IIRO-004483-84 (reflecting UN cooperation). | Disputed. *See, e.g.*, Plaintiffs' response to No. 60. |
| 64. Secretaries General of MWL served as the ex officio Chair of the IIRO Board of Directors. Ex. # 5, Turki Decl. ¶ 14; Ex. # 6, Obaid Decl. ¶ 12; Ex. # 36, IIRO 2002 Constitution, at IIRO-000024; Ex. # 37, IIRO 1998 Constitution, at MWL 039326. | Disputed as stated. Plaintiffs acknowledge that the MWL Secretaries General may have served as the Chair of the IIRO Board of Director by virtue of their appointments as Secretary General. However, to the extent that MWL suggests that the MWL Secretary Generals did not participate in those Board of Directors meetings and/or exercise their influence over issues relating to the IIRO's budget, operations, and activities, is inaccurate and misleading. *See, e.g.*, Ex. 144, August 5, 1999 IIRO Board of Directors Meeting Minutes, MWLIIRO-00016270-16276 (MWL Secretary General Obaid attending and presenting speech); Ex. 141, May 27, 2001 IIRO Board of Directors Meeting Minutes, MWLIIRO-00016233-16237 (MWL Secretary General Turki attending and discussing proposed statute of the IIRO); Ex. 143, MWLIIRO-00016260-16267 (MWL Secretary General Obaid attending, presenting speech, and discussing issues relating to the IIRO Investment Committee, budget, etc.). |
| 65. When serving as the ex officio Chair of the IIRO Board of Directors, the MWL Secretary General was one member of the IIRO board, which board's membership ranged from 12 to 24 individuals over the years. Ex. # 38, Turki PJ Decl. ¶ 18; Ex. # 37, 1998 IIRO Constitution, at MWL-039328; Ex. # 35, 1998 IIRO Annual Report, at IIRO-004246; Ex. # 34, 1999-2000 IIRO Annual Report, at IIRO-003597; Ex. # 40, IIRO BOD Meeting in 2000, at MWLIIRO-16243-44; Ex. # 33, 2000-2001 IIRO Annual Report, at IIRO-004407; Ex. # 36, 2002 IIRO Constitution, at IIRO-000033. | Disputed. Plaintiffs acknowledge there were many members of the IIRO Board of Directors. However, MWL fails to inform that members of the Board of Directors included al Qaeda's most important financiers, including but not limited to Ibrahim Mohammad Afandi and Abdurahman Abdul-Qader Faqih (members of Al Qaeda's "Golden Chain" of financial donors). *See* Ex. 144, August 5, 1999 IIRO Board of Directors Meeting Minutes, MWLIIRO-00016270-16276 (Afandi and Faqih attending as board members); Ex. 143, MWLIIRO-00016260-16267 (Afandi and Faqih attending as board members); Ex. 142, MWLIIRO-00016247-16255 (al Qaeda financier and member of "Golden Chain," Saleh Kamel, advising the IIRO board members concerning financial investments); Ex. 153, August 29, 2002 Interview with Jamal al Fadl, PEC-KSA000329-352 at 351 (Fadl explained to the FBI that the "'Golden Chain' consisted of wealthy individuals from the Gulf region who provided BIN LADEN and Al QAEDA with money on a regular basis."); Ex. 1, 9/11 |

| | |
|---|---|
| | Commission Final Report at 55 (stating that Osama bin Laden's organization "included a financial support network that came to be known as 'the Golden Chain,' put together mainly by financiers in Saudi Arabia and Persian Gulf states."). |
| 66. The MWL Secretary General did not control, supervise, or have a role in IIRO's day-to-day operations, was only involved at a high-level with IIRO's operations via his capacity as Chairman of the Board, and had limited powers as Board Chair, such as casting a vote when the IIRO Board tied and appointing the IIRO SG and issuing financial and administrative regulations. Ex. # 38, Turki PJ Decl. ¶ 18; Ex. # 39, Obaid PJ Decl. ¶ 10; Ex. #7, Basha Decl. ¶ 7; Ex. # 31, Obaid Dep. Tr. at 311:18-312:2; Ex. # 37, 1998 IIRO Constitution, at MWL 039326-47; Ex. # 36, 2002 IIRO Constitution, at IIRO-000033. | Disputed as stated. Plaintiffs acknowledge that the MWL Secretary Generals may not have been involved in every single aspect of IIRO's daily operations. However, to the extent that MWL suggests the MWL Secretaries General did not exercise their influence over issues relating to the IIRO's budget, operations, and activities, that is inaccurate and misleading. *See, e.g.*, Ex. 144, August 5, 1999 IIRO Board of Directors Meeting Minutes, MWLIIRO-00016270-16276 (MWL Secretary General Obaid attending and presenting speech); Ex. 141, May 27, 2001 IIRO Board of Directors Meeting Minutes, MWLIIRO-00016233-16237 (MWL Secretary General Turki attending and discussing proposed statute of the IIRO); Ex. 143, MWLIIRO-00016260-16267 (MWL Secretary General Obaid attending, presenting speech, and discussing issues relating to the IIRO Investment Committee, budget, etc.).<br><br>By way of further response, to the extent the MWL is arguing that the MWL Secretaries General are exonerated from the nefarious and terrorist activities of the IIRO because they were detached or uninvolved in the "day-to-day" activities of the IIRO organization and its branch offices, that is preposterous. During their leadership, (1) they collaborated and worked closely with MWL, IIRO, Rabita Trust, and Al Haramain al Masjed al Aqsa ("AHAMAA") officials who directed substantial financial, material, logistical, and ideological support to al Qaeda (e.g., Omar Abdullah Naseef, Wa'el Hamza Jelaidan, Abd al Hamid Sulaiman al Mujil, Prince Turki bin Fahad bin Jalawi al Saud, Mohammad bin Abdullah al Taibah (Chairman/President of AHAMAA), Mohammad bin Abdullah al Dubayban (Board Member of AHAMAA)); (2) the IIRO's Philippines and Indonesian branch offices, and IIRO official Abd al Hamid Sulaiman al Mujil, were designated by the U.S. government as Specially Designated Global Terrorists ("SDGT") for providing extensive support to al Qaeda and associated terror groups; (3) an audit of the IIRO-Pakistan's branch office, dated just a few months before the 9/11 attacks, uncovered the apparent diversion of millions of dollars of funds by that branch, and the wholesale fabrication of invoices, receipts and entire projects to conceal that activity (the same branch office that was used by the IIRO to fund 6 al Qaeda training camps, according to the 1996 CIA Report); (4) the IIRO's branch office Bosnia-Herzegovina was investigated for "providing financial support to known terrorist organizations;" (5) the IIRO's branch office in Nairobi, Kenya, was implicated in the 1998 U.S. Embassy bombings in Africa |

| | |
|---|---|
| | and the IIRO office was deregistered; (6) the joint IIRO/SJRC office in Pristina, Kosovo, run by Osama bin Laden associates Wa'el Hamza Jelaidan and Adel Muhammad Sadiq Bin Kazem, was raided by K-FOR military police because they were using the office to help bin Laden "move money and men to and from the Balkans;" and (7) additional raids and closures were conducted on IIRO branch offices in the United States, Albania, Macedonia, and Russia.<br><br>*See also* Plaintiffs' responses to Nos. 32 and 34 (detailing MWL Secretaries General Naseef and Obaid's continuing work on behalf of, and influence over, the MWL and IIRO after their terms as Secretary General had been completed). |
| 67. The IIRO Board of Directors considered and addressed issues that were escalated to it, and provided recommendations that were implemented by IIRO's Secretariat General. In instances where any type of misconduct was escalated, the Board always recommended a thorough investigation. Ex. # 5, Turki Decl. ¶ 16; Ex. # 6, Obaid Decl. ¶ 14. | To the extent the MWL's assertions at No. 67 relies on the Declarations of Abdullah bin Abdul Mohsen al Turki and Abdullah bin Saleh al Obaid at MWL Exs. 5 and 6, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the Turki and Obaid depositions were completed in these proceedings in 2018. Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony.<br><br>By way of further response, evidence indicates that while internal investigations concerning employee and/or financial misconduct within the IIRO may have been initiated, corrective action was often never taken by the IIRO or MWL. For example, documents produced by the IIRO reveal that the IIRO-Philippines office similarly suffered from significant financial improprieties and irregularities. In 1998, the Director of the IIRO's Social Care Department, Dr. Saleh Marzouk al Harbi, visited the IIRO-Philippines branch and discovered a number of serious issues concerning the reporting and distribution of IIRO funds to orphans in that country, including the fact that the IIRO-Eastern Province was financially supporting an Islamic institute without informing IIRO headquarters. *See* Ex. 109, Report on the Visit of the Supervisor of the Social Care Department to the Philippines Between July 19-25, 1998, IIRO 111421-111431. The report describes the lack of financial controls by the IIRO-Philippines branch office with respect to the distribution of financial aid to orphans in the Philippines, and determined *inter alia* that: (1) there was no prior preparation for the distribution of the orphans' allowances; (2) the IIRO-Philippines office failed to carry out the instructions of the Social Care Department to form a committee for the distribution of the allowances to the orphans; (3) the orphans' allowances were distributed |

| | |
|---|---|
| | "without scrutiny or control;" (4) orphan files were incomplete and lacked the required documentation; (5) records at the IIRO's Social Care Department in Saudi Arabia indicated there were 80 male and female orphans at a certain orphanage, but it was determined there were really only 22 female orphans and 23 male orphans; and (6) certain orphans did not receive financial assistance despite the fact that IIRO headquarters had sent the funds earlier in the year. *Id. See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann ("Kohlmann Report") at 43-45.<br><br>Specifically, the report revealed that "[t]he Office did not carry out the instructions of the Social Care Department to form the Tripartite Committee for the delivery of the allowances to the orphans," and "the orphan's allowances were received by any person who would attend, whether an orphan, a provider, a friend, or a neighbor without scrutiny or control." *See* Ex. 109, Report on the Visit of the Supervisor of the Social Care Department to the Philippines Between July 19-25, 1998, IIRO 111421-111431 at 111423. Daguit confirmed that the IIRO did not form the Tripartite Committee. *See* Ex. 29, Transcript June 27, 2019 Deposition of Abdulhadi T. Daguit at 122.<br><br>Concerns about the financial integrity of the IIRO-Philippines branch office persisted for years after the 1998 visit. In late 2003/early 2004, the Director of IIRO's Social Care Department, Dr. Saleh Marzouk al Harbi, again raised concerns with IIRO headquarters about "a lack of clarity in the Philippines Office about the balances of custodies recorded on it." *See* Ex. 102, IIRO 59754. In a letter to IIRO Secretary General Basha, Harbi recommended that a committee should be formed to investigate "all the custodies including the last five transactions and to issue a statement detailing the custodies recorded on the Philippines Office" from October 22, 1998 through January 15, 2002. *Id.* "I suggest that these custodies should be liquidated as soon as possible so that the problem of the Pakistan Office is not repeated." *Id.*<br><br>Importantly, when asked about the formation of this special committee recommended by Harbi and its subsequent investigation, Daguit claimed not to remember anything, suggesting the committee was never established and an investigation never occurred. *See* Ex. 29, Transcript June 27, 2019 Deposition of Abdulhadi T. Daguit at 140-142.<br><br>Additionally, the "audit" of the IIRO-Pakistan branch, dated just a few months before the 9/11 attacks, uncovered the diversion of millions of dollars of funds by that branch office, and the wholesale fabrication of invoices, receipts and entire projects to conceal that activity. *See* Ex. 91, International Islamic Relief Organization Pakistan Branch, Verification of |

| | |
|---|---|
| | Receipts and Payments for the Period From 1 January 1996 to 22 February 2001, IIRO 26468-26490.<br><br>The audit determined *inter alia* that: (1) "internal controls relating to proper monitoring and funding to Pakistan was not in place at H.O." (headquarters); (2) headquarters' "management had neither established any system or mechanism for financial discipline nor required proper reporting from Pakistan office relating to disbursements or activities carried out at Pakistan branch; (3) "no internal or external audit was ever carried out for Pakistan branch and H.O. management never asked local management to provide them audit report on some fixed internal/periodic basis; (4) construction projects' invoices and supporting documents (i.e., bills, acknowledgment receipts, etc.) "are self-made, as no construction company/companies seem to exist;" (5) "[t]he net unreported amount of US $3,071,659 is unaccounted for and represents the expenditure which was either not recorded and for which no vouchers and supporting documentation is available and/or the amounts have been misused or misappropriated locally…. We consider it appropriate to state that there is a complete mess at the organizational level as none of the persons either at H.O. or in Pakistan is aware about the outstanding expenses details due to lack of proper communication and absence of internal controls."). *See* Ex. 91, International Islamic Relief Organization Pakistan Branch, Verification of Receipts and Payments for the Period From 1 January 1996 to 22 February 2001, IIRO 26468-26490 at 26475-26482. *See also* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 238 ("The net unreported amount of US $3,071,659 is unaccounted for and represents the expenditure which was either not recorded and for which no vouchers and supporting documentation is available and/or the amounts which have been misused or misappropriated locally."); *id.* at 249-250 (Basha testified that prior to 2003, IIRO-Pakistan transferred all funds to Afghanistan in cash, during the time Butairi was the head of IIRO-Pakistan office, and during the time IIRO-Pakistan was responsible for the IIRO's activities in Afghanistan.).<br><br>Notwithstanding the serious findings by the investigation and audit, the IIRO never held Butairi and Jasim accountable for stealing millions of dollars. IIRO did not prosecute Butairi for his actions, and eventually settled the case with Jasim who was released from custody. *See* Ex. 27, Transcript, February 21, 2019 Deposition of Adnan Basha at 220-221 (testifying that the IIRO chose not to prosecute Butairi); *id.* at 224 (testifying that IIRO decided not to pursue the full prosecution of Jasim).<br><br>*See also* Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 49-54 (discussing the implications of financial |

| | |
|---|---|
| | improprieties and irregularities discovered in the audits and financial documents of the IIRO, and how they indicate conditions that made it possible for IIRO officials and employees to direct IIRO funds and resources to support al Qaeda, Islamic jihad, and terrorism). |
| 68. The position of Secretary General is the most senior role in IIRO. (Ex. # 7, Basha Decl. ¶ 3; Ex. # 36, IIRO 2002 Constitution, at IIRO-000042-43; Ex. # 37, 1998 Constitution, at MWL 039326-47. | Disputed. To the extent that the MWL argues that the Secretary General is the sole individual that exercises supervisory control over the IIRO's budget, operations, activities, and performance, that is inaccurate and misleading.<br><br>For instance, the MWL sought approval from the Saudi government to establish the IIRO in 1978. *See* Ex. 23, Transcript, September 17, 2018 Deposition of Abdullah al Obaid ("Obaid Transcript") at 73-74; Ex. 82, IIRO Annual Report 1999/2000, IIRO 212-330 at 215 (stating that Royal Approval No. 4834 was issued on January 29, 1979). The Constitution of the IIRO was later approved during the 35th session of the MWL Constituent Council, the legislating council of the MWL, held between October 7-10, 1997. *Id.*<br><br>The MWL Secretary General is designated to serve as the Chairman of the IIRO Board of Directors, and also serves as the Chairman of the IIRO General Assembly. *See* Ex. 23, Obaid Transcript at 70-71; Ex. 26, Transcript, February 20, 2019 Deposition of Adnan Basha ("Basha Transcript") at 54, 99. The Secretary General of the MWL, a position equivalent to that of a Saudi government "minister," is also responsible for nominating individuals to serve as the IIRO Secretary General. *See* Ex. 26, Basha Transcript at 100.<br><br>The IIRO Board of Directors is the highest policy-making body of the IIRO and its decisions are binding upon the executive body. *See* Ex. 82, IIRO Annual Report 1999/2000, IIRO 212-330 at 216. MWL officials, including the MWL Secretary General, hold a number of seats on the IIRO Board of Directors and directly influence the policies and activities of the IIRO. *See* Ex. 26, Basha Transcript at 128-130. *See also* Ex. 131, September 20, 2000 Minutes of the Sixth Meeting of the IIROSA Board of Directors, MWLIIRO-00016243-16246 at 1-2 (identifying 7 MWL officials serving on the IIRO Board of Directors, including the MWL Secretary General, the Assistant MWL Secretary General, the MWL Director General of Finance and Administration, and four members of the MWL Constituent Council).<br><br>Furthermore, the Council of Ministers, advisors to the Saudi king, also hold seats on the IIRO Board of Directors and exercise control and influence over the IIRO's budget, operations, and activities. *See* Ex. 131, September 20, 2000 Minutes of the Sixth Meeting of the IIROSA Board of |

| | |
|---|---|
| | Directors at 2 (Sheikh Mostafa bin Mohamed Idris, identified as "Royal Court Advisor, Acting head of the Special Committee of the Council of Ministers," served as an IIRO board member from at least 1998-2001.).<br><br>The IIRO's domestic offices in Saudi Arabia are further headed by members of the Saudi royal family, who are themselves officials of the Saudi government. *See* Ex. 82, IIRO Annual Report 1999/2000, IIRO 212-330 at 220-226; Ex. 81, IIRO Annual Report 1998, IIRO 171-211 at 179-180. As heads of those offices, Saudi royal family members directed and supervised the operations and activities of the IIRO.<br><br>Finally, during his tenure as MWL Secretary General, Dr. Obaid testified that he simultaneously served as a member of the Supreme Council of Islamic Affairs, which has the "responsibility for Saudi Arabia's Islamic policies in other countries." *See* Ex. 23, Obaid Transcript at 27; Ex. 147, Declaration of Abdullah bin Saleh al Obaid at ¶ 5. In particular, the Supreme Council for Islamic Affairs makes recommendations to the Saudi government concerning the provision of financial support to Islamic organizations operating outside of the Kingdom. *See* Ex. 23, Obaid Transcript at 37. *See also* Ex. 191, Declaration of Abdulaziz H. al Fahad at ¶ 8 (describing the Supreme Council of Islamic Affairs as "an arm of the government of Saudi Arabia, which carries out part of the foreign policy of the Kingdom"). As a member of the Supreme Council of Islamic Affairs, "an arm of the government of Saudi Arabia," Dr. Obaid oversaw and directed the activities of the MWL, IIRO, Al Haramain, and other Saudi-based da'wah organizations in support of the foreign policies of the Kingdom. |
| 69. The Secretary General and his advisors, Assistant Secretaries General, and the various departments and their directors formed the Secretariat General/Head Office. The Secretariat General was the main executive body of IIRO. Ex. # 32, Helles Decl. ¶ 5; Ex. # 36, IIRO 2002 Constitution, at IIRO-000042-43. | Undisputed as a general matter for purposes of this motion. |
| 70. Adnan Basha served as Secretary General of IIRO from 1997 until 2013. Ex. # 7, Basha Decl. ¶ 3. | Disputed. Plaintiffs acknowledge that Basha stepped down as IIRO Secretary General in January 2013. However, Basha continued to serve as an advisor to the MWL, the IIRO's parent organization, through at least 2019. *See* Ex. 184, Resume of Adnan Khalil Basha (Basha 0001); MDL ECF No. 3024 at 9. |
| 71. No IIRO office was designated by the OFAC as a Specially Designated Terrorist. U.S. Dept. of Treas., Office of Foreign Assets Control before September 11, 2001, | It is not disputed that no IIRO office was designated by the U.S. government's OFAC prior to the 9/11 attacks. However, to the extent that the MWL argues that the absence of any |

| | |
|---|---|
| Archive of Changes to OFAC's Sanctions Lists (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list. | designation is equivalent to a finding that the person or entity is innocent of terrorism charges, that is baseless and disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 171, 190, 191, 205, 206, 207, 328, 329, and 342 (detailing IIRO's extensive connections to Osama bin Laden and al Qaeda (including but not limited to E.O. 13224 Specially Designated Global Terrorists ("SDGT") IIRO officials Wa'el Hamza Jelaidan and Abd al Hamid Sulaiman al Mujil; Prince Turki bin Jalawi al Saud; Mohammed Jamal Khalifa), and the IIRO's provision of substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.).<br><br>Moreover, to the extent that the MWL argues that the absence of any designation of IIRO offices by OFAC demonstrates that the MWL and IIRO were not aware of IIRO's connections to, and financial support for, al Qaeda and associated terrorist organizations, that is disputed. *See* Plaintiffs' responses to Nos. 1, 2, 190, 191, 205, 206, 207, and 348. *See also Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (holding that "it would defy common sense" to require a designation to serve as a prerequisite for knowledge that certain individuals or entities were associated with a terrorist organization, or to conclude that such knowledge "could be gained in no other way").<br><br>By way of further response, Plaintiffs' experts have testified that the U.S. government often deferred formal designations of Saudi charities and other entities, despite having extensive evidence of their support for terrorism, choosing instead to pursue cooperative action with the Saudi government. *See* Ex. 36, Expert Report of Jonathan Winer at 131 (stating that "the U.S. often refrains from designating people and entities under EO 13224 for a variety of national security, political, and policy reasons, including its need to obtain continuing cooperation from other countries in combatting terrorism, as I have seen through my own direct participation in discussions at the National Security Council regarding people and entities who engaged in substantial acts of terrorism as defined under both U.S. and international law who have never been designated, due to other considerations").<br><br>Indeed, the evaluation of whether formal designation of a particular terror sponsor, or other possible action, would best serve U.S. national security interests involved a range of equities, including foreign policy, intelligence, diplomatic, law enforcement, and many other considerations. *See* Ex. 179, *Terrorism Financing: Origination, Organization, and* |

| | |
|---|---|
| | *Prevention*, Hearing Before the Committee on Governmental Affairs United States Senate (July 31, 2003), at 11 (R. Richard Newcomb, Director of the Office of Foreign Assets Control ("OFAC"), stating that all of the equities of the government come to the table, including law enforcement, intelligence, diplomatic, and military, among others). *See also* Ex. 36, Expert Report of Jonathan Winer at 128-131 (explaining that in addition to the concern that the political and foreign policy costs of designating a person or entity would impair cooperation from a foreign country that is needed by the United States, there are also concerns that a designation could have a negative impact on ongoing law enforcement or intelligence matters.).<br><br>By way of further response, on August 3, 2006, the U.S. government designated the IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil as Specially Designated Global Terrorists ("SDGT") "for facilitating fundraising for al Qaida and affiliated terrorist groups," including Abu Sayyaf Grup and Jemaah Islamiya. *See* Ex. 50, August 3, 2006 designation of IIRO's branches in the Philippines and Indonesia and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-202112; Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121. *See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 35 (August 3, 2006 designation of the IIRO).<br><br>Finally, Wa'el Hamza Jelaidan, an IIRO official and a close associate of Osama bin Laden, and one of the most significant figures in the history of al Qaeda and its development into a global terrorist organization, was designated by the U.S. government on September 6, 2002 as a "supporter of al-Qa'ida terror." *See* Ex. 53, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2022, FED-PEC 203469-203470 at 203469 ("Usama bin Laden and a top al-Qa'ida lieutenant, Abu Zubaida, have acknowledges Wa'el Julaidan as a known associate of their operations. Julaidan has been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network."); Ex. 180, *Additional Designation Pursuant to E.O. 13224*, TREASURY00001-8 at 4-5 (stating that "Julaidan is identified as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief," and also served on al Qaeda's shura council). |
| 72. IIRO's Head Offices in Jeddah, Saudi Arabia has never been designated by the OFAC as a Specially Designated Terrorist. U.S. Dept. of Treas., Office of | It is not disputed that the IIRO's head office in Saudi Arabia was not designated by OFAC. By way of further response, *see* Plaintiffs' response to No. 71. |

| | |
|---|---|
| Foreign Assets Control, Archive of Changes to OFAC's Sanctions Lists (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the- sdn-list. | |
| 73. During Adnan Basha's tenure, IIRO employed approximately 1,000 employees across its offices. Ex. # 7, Basha Decl. ¶¶ 3, 6. | Undisputed as a general matter for purposes of this motion. |
| 74. IIRO had 18 Local Offices in Saudi Arabia. Ex. # 41, 2001-2002 Annual Report, at IIRO-004518. The domestic branch offices had sub-offices. *Id.* Prominent branch offices included the ones for Al-Baha; Gizan; Al-Jouf; Riyadh; the Eastern Region; the Asir Region; Buraidah, Unaiza, Madina; Yanbu; Makkah; Jeddah; Taif; Najran; and finally, the Women's Committee based in Jeddah. (Ex. # 35, 1998 Annual Report at IIRO-003720; Ex. # 34, 1999-2000 Annual Report at IIRO-003600-IIRO-003608; Ex. # 33, 2000-2001 Annual Report at IIRO-004410-16; Ex. # 41, 2001-2002 Annual Report at IIRO-004518-IIRO-004523). | Undisputed as a general matter for purposes of this motion. |
| 75. IIRO had 32 Foreign Offices, one each in Albania, Austria, Azerbaijan, Bangladesh, Benin, Bosnia Herzegovina, Burkina Faso, Chad, Croatia, Djibouti, Egypt, Ethiopia, Indonesia, Iraqi Kurdistan, Jordan, Kenya, Lebanon, Mali, Mauritania, Niger, Nigeria, Pakistan, the Philippines, Senegal, Somalia, Sri Lanka, Sudan, Tanzania, Thailand, Turkey, UAE, and Uganda. Ex. # 35, 1998 Annual Report, at IIRO-003743, IIRO-003745 and IIRO-003747; Ex. # 34, 1999-2000 Annual Report, at IIRO-003685, IIRO-003697 and IIRO-003703; Ex. # 42, IIRO Secretariat General Report 1421/1422H at IIRO341009. | Disputed. The MWL fails to identify the joint IIRO/Saudi Joint Relief Committee ("SJRC") office in Pristina, Kosovo, headed by al Qaeda financier Wa'el Hamza Jelaidan as al Qaeda was establishing its operations in Kosovo and Chechnya. *See* Ex. 98, Memorandum of Understanding between the IIRO and SJRC, IIRO 41030; Ex. 130, IIRO 39085, 39086, 39278 (shared office expenses). More than a year before the 9/11 attacks, U.S. officials sent a written request to the U.N. Peace Keeping Force in Pristina, requesting that U.N. police undertake surveillance of the office. In that document, Marked "Secret: U.S. Office Only – Release to UNMIK," the U.S. government asserted that Jelaidan and SJRC official Adel Muhammad Sadi Bin Kazam were "associates of Osama bin Laden" and that Jelaidan was actively involved in helping bin Laden "move money and men to and from the Balkans." *See* Ex. 43, BBC News, *U.S. Fears Terrorist Attack in Kosovo*, April 3, 2000, FED-PEC0097363-97365 at 97364. Acting on that information, the U.N. Mission in Kosovo ("UNMIK") raided the building and declared that the IIRO/SJRC office served as a cover for several al Qaeda operatives, including Jelaidan and Kazem. *Id.* |
| 76. Of these 32 foreign branch offices, eight were located at the same address as an MWL foreign office. They were located in Djibouti, Ethiopia, Indonesia, Jordan, Kenya, Pakistan, Philippines, and Tanzania. Ex. # 42, IIRO Secretariat General Report 1421/1422H at IIRO341007-09. | Undisputed as a general matter for purposes of this motion. |

| | |
|---|---|
| 77. Plaintiffs have no evidence that IIRO had any foreknowledge of or were involved in the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021), at E014040-000011; see generally 9/11 Commission Report; Monograph; , Winer Rpt. at 82-100, 116-22 (failing to trace any funds from IIRO to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 71-157 (same) (ECF No. 9250-2); Levitt Rpt. at 32-39 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"). | Disputed. The MWL's claim that Plaintiffs have no evidence that IIRO had any foreknowledge of or were involved in the planning or execution of the 9/11 attacks, is inaccurate and misleading. *See, e.g.*, Plaintiffs' response to No. 1. |
| 78. Plaintiffs have no evidence tracing IIRO funds to the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021), at E014040- 000011; Plaintiffs' Second Supplemental Responses to Defendant Dubai Islamic Bank's Second Set of Requests for Admission dated April 23, 2022, Request No. 8, at 27 (ECF No. 8129-22) ("Plaintiffs admit that they are not in possession of evidence tracing the use of specific funds from the International Islamic Relief Organization's account at DIB to specific operational expenditures incurred in carrying out the 9/11 operation."); March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 9 ("Plaintiffs present no evidence that individuals or entities [including IIRO] used money from these DIB accounts to fund al Qaeda or carry out 9/11. Indeed, Plaintiffs have no evidence that funds in any account at Dubai Islamic Bank were used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 terrorist attacks.") (internal citations and quotation marks omitted); see also Ex. # 4, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); Winer Rpt. at 82-100, 116-22 (failing to trace any funds from IIRO to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 71-157 (same) (ECF No. 9250-2); Levitt Rpt. at 32-39 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 9 ("Plaintiffs present no evidence that individuals or entities used money from these DIB accounts to fund al Qaeda or carry out 9/11. Indeed, Plaintiffs have no evidence that funds in any account at Dubai Islamic Bank were used by the 9/11 hijackers or other 9/11 plot principals in carrying | Disputed. The MWL's claim that there is no evidence tracing IIRO funds or other in-kind support to al Qaeda and/or the planning and execution of the 9/11 attacks, is inaccurate and misleading. *See, e.g.*, Plaintiffs' response to No. 2. |

| | |
|---|---|
| out the 9/11 terrorist attacks.") (internal citations and quotation marks omitted); see generally 9/11 Commission Report; Monograph.; see also Ex. # 1, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda). | |
| 79. Plaintiffs have no evidence tracing in-kind support from IIRO to the planning or for the execution of the 9/11 Attacks. Ex. # 2, May 27, 2021 FBI Report Administratively Closing Case at E014040-000011; Winer Rpt. at 82-100, 116-22 (failing to show any in-kind support from IIRO to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 71- 157 (same) (ECF No. 9250-2); Levitt Rpt. at 32-39 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); see generally 9/11 Commission Report; Monograph; see also Ex. # 1, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda). | Disputed. *See, e.g.,* Plaintiffs' response to No. 2. |
| 80. No IIRO employee or IIRO Secretary General was designated by OFAC as a Specifically Designated Terrorist prior to September 11, 2001. Ex. # 7, Basha Decl. ¶ 79; U.S. Dept. of Treas., Office of Foreign Assets Control, Archive of Changes to OFAC's Sanctions Lists (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn- list/archive-of-changes-to-the-sdn-list. | It is not disputed that the U.S. government's OFAC did not designate an IIRO employee or IIRO Secretary General prior to the 9/11 attacks. However, to the extent that the MWL argues that the absence of any designation is equivalent to a finding that the person or entity is innocent of terrorism charges, that is baseless and disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 171, 190, 191, 205, 206, 207, 328, 329, and 342 (detailing IIRO's extensive pre-9/11 connections to Osama bin Laden and al Qaeda (including but not limited to E.O. 13224 Specially Designated Global Terrorists ("SDGT") IIRO officials Wa'el Hamza Jelaidan and Abd al Hamid Sulaiman al Mujil; Prince Turki bin Jalawi al Saud; Mohammed Jamal Khalifa), and the IIRO's provision of substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.).<br><br>Moreover, to the extent that the MWL argues that the absence of any pre-9/11 designation that the IIRO and MWL were not aware of IIRO's connections to, and financial support for, al Qaeda and associated terrorist organizations, that is disputed. *See* Plaintiffs' responses to Nos. 1, 2, 190, 205, 206, 207, and 348. *See also Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (holding that "it would defy |

| | |
|---|---|
| | common sense" to require a designation to serve as a prerequisite for knowledge that certain individuals or entities were associated with a terrorist organization, or to conclude that such knowledge "could be gained in no other way").<br><br>By way of further response, Plaintiffs' experts have testified that the U.S. government often deferred formal designations of Saudi charities and other entities, despite having extensive evidence of their support for terrorism, choosing instead to pursue cooperative action with the Saudi government. *See* Ex. 36, Expert Report of Jonathan Winer at 131 (stating that "the U.S. often refrains from designating people and entities under EO 13224 for a variety of national security, political, and policy reasons, including its need to obtain continuing cooperation from other countries in combatting terrorism, as I have seen through my own direct participation in discussions at the National Security Council regarding people and entities who engaged in substantial acts of terrorism as defined under both U.S. and international law who have never been designated, due to other considerations").<br><br>Indeed, the evaluation of whether formal designation of a particular terror sponsor, or other possible action, would best serve U.S. national security interests involved a range of equities, including foreign policy, intelligence, diplomatic, law enforcement, and many other considerations. *See* Ex. 179, *Terrorism Financing: Origination, Organization, and Prevention*, Hearing Before the Committee on Governmental Affairs United States Senate (July 31, 2003), at 11 (R. Richard Newcomb, Director of the Office of Foreign Assets Control ("OFAC"), stating that all of the equities of the government come to the table, including law enforcement, intelligence, diplomatic, and military, among others). *See also* Ex. 36, Expert Report of Jonathan Winer at 128-131 (explaining that in addition to the concern that the political and foreign policy costs of designating a person or entity would impair cooperation from a foreign country that is needed by the United States, there are also concerns that a designation could have a negative impact on ongoing law enforcement or intelligence matters.).<br><br>Finally, Plaintiffs' expert Jonathan Winer has testified in this litigation that the designation process for terrorist sanctioning was in its infancy during the Clinton Administration, and the Executive Order 13224 sanctions regime targeting charities for terrorism related offenses did not exist prior to the September 11, 2001 attacks. *See* MDL ECF No.10592-1 at 38 (testifying that the "designation process for sanctioning was in its infancy" during the Clinton administration, and that any charity designations happened after 9/11); *id.* (testifying that that there were no designations of charities prior to 9/11 in part |

| | |
|---|---|
| | because the U.S. had undertaken other actions, which included direct discussions between the U.S. and Saudi Arabia). |
| **<u>MWL and IIRO: Independent and Separate Organizations</u>** | No response necessary. |
| 81. MWL and IIRO operated independently, and were administratively, financially, and structurally independent from each other. Ex. # 7, Basha Decl. ¶ 8; Ex. # 5, Turki Decl. ¶ 18; Ex. # 6, Obaid Decl. ¶ 15; Ex. # 31, Obaid Dep. Tr. at 310:4-24, 311:11-312:2); Ex. # 36, IIRO 2002 Constitution at IIRO-000025; Ex. # 10, MWL Statute, JT-MWL-00037 to JT-MWL- 0003746. | Disputed. The MWL's claim that the MWL and IIRO are independent from each other is inaccurate and misleading. As an initial matter, the MWL sought approval from the Saudi government to establish the IIRO in 1978. *See* <u>Ex. 23</u>, Transcript, September 17, 2018 Deposition of Abdullah al Obaid ("Obaid Transcript") at 73-74; <u>Ex. 82</u>, IIRO Annual Report 1999/2000, IIRO 212-330 at 215 (stating that "[t]he IIROSA of Saudi Arabia is an offshoot of the Muslim World League," that it came into existence on October 29, 1978, and Royal Approval No. 4834 was issued on January 29, 1979). The Constitution of the IIRO was later approved during the 35th session of the MWL Constituent Council, the legislating council of the MWL, held between October 7-10, 1997. *Id. See also* <u>Ex. 83</u>, IIRO Annual Report 2000-2001, IIRO 331-441 at 336 (same); Ex. 85, IIRO Annual Report 2001-2002, IIRO 442-552 at 445 (same).<br><br>Furthermore, the MWL Secretary General is designated to serve as the Chairman of the IIRO Board of Directors, and also serves as the Chairman of the IIRO General Assembly. *See* <u>Ex. 23</u>, Obaid Transcript at 70-71; <u>Ex. 26</u>, Transcript, February 20, 2019 Deposition of Adnan Basha ("Basha Transcript") at 54, 99. As Chairman of the Board of Directors, the MWL Secretary General exercised his influence over issues relating to the IIRO's budget, operations, and activities. *See, e.g.*, <u>Ex. 144</u>, August 5, 1999 IIRO Board of Directors Meeting Minutes, MWLIIRO-00016270-16276 (MWL Secretary General Obaid attending and presenting speech); <u>Ex. 141</u>, May 27, 2001 IIRO Board of Directors Meeting Minutes, MWLIIRO-00016233-16237 (MWL Secretary General Turki attending and discussing proposed statute of the IIRO); <u>Ex. 143</u>, MWLIIRO-00016260-16267 (MWL Secretary General Obaid attending, presenting speech, and discussing issues relating to the IIRO Investment Committee, budget, etc.).<br><br>The MWL Secretary General, a position equivalent to that of a Saudi government "minister," is also responsible for nominating individuals to serve as the IIRO Secretary General. *See, e.g.*, <u>Ex. 213</u>, MWL 59176; <u>Ex. 26</u>, Basha Transcript at 100 (Basha testifying that the "Secretary Geneal of the League" nominated him to serve as the IIRO Secretary General).<br><br>Notably, and contrary to the MWL's assertion that the organizations are independent of each other, former MWL |

| | |
|---|---|
| | Secretary General Abdullah bin Saleh al Obaid provided testimony in this litigation confirming that "the IIRO is a subsidiary of the Muslim World League." *See* Ex. 147, Declaration of Abdullah bin Saleh al Obaid at ¶ 12. *See also* Ex. 23, Obaid Transcript at 75-76 (explaining that the IIRO works under the umbrella of the MWL).<br><br>The MWL's own documents also confirm that the IIRO is an integral part of the MWL. *See* Ex. 139, MWL 19138 (MWL hierarchical chart identifying "The International Islamic Relief Organization" as part of the Muslim World League).<br><br>In addition, terrorism investigations conducted by the U.S. government have verified that the IIRO is the "operating arm" or "subsidiary" of the MWL. *See, e.g.*, Ex. 32, FBI Report, *Connections to the Attacks of September 11, 2001*, July 23, 2021, EO14040-003478-3608-UPDATED at 3547 ("IIRO was established in Jeddah, Saudi Arabia, in 1978. The IIRO has been identified as the 'social arm' or 'operating arm' of the Muslim World League. The Secretary General of the Muslim World League said it provides 'humanitarian assistance' through the IIRO."); Ex. 71, May 23, 2005 U.S. Diplomatic Cable, FED-PEC 220479-220481 ("The International Islamic Relief Organization (IIRO) -- a subsidiary of the Saudi-based and funded Muslim World League (MWL) -- was active here in the late 1980s and early 1990s. Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines."); Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 106 ("The International Islamic Relief Organization [IIRO], which is headquartered in Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL, … the Taliban, … and Hamas, … as well as al Qaida affiliates, *inter alia*, the Abu Sayyaf Group (ASG), … Jemaah Islamiya (JI), … and Al Ittihad Al Islamiya (AIAI)…. The IIRO's parent organization is the Muslim World League [MWL] also headquartered in Saudi Arabia.").<br><br>As part of their parent-subsidiary relationship, the MWL and IIRO operated joint overseas branch offices around the globe. For example, the MWL and IIRO operated a joint office in |

| | |
|---|---|
| | Peshawar, Pakistan. *See, e.g.*, Ex. 61, FED-PEC0212276-212281 (MWL/IIRO-Pakistan letterhead detailing a meeting between "Abu Abdullah" (a/k/a Osama bin Laden), Dr. Abdullah Omar Naseef, in his capacity as the Secretary General of the MWL, and others where it was agreed that al Qaeda attacks would be launched from MWL offices: "And if he is being subjected to any pressures, let it be a secret (*agreement*), in a way that [Muslim World] League offices will be opened as (*illegible*) for the Pakistanis, and the attacks will be launched from the (*these offices*) …"); *id.* at 212276 (recommending using the name of the "League" as "an umbrella which you can stay under … because Dr. Naseef is one of the brothers, and the government knows who Abu Al-Hasan [Wa'el Hamza Jelaidan] is." *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 29.<br><br>The MWL and IIRO also operated a joint office in the Philippines, headed by al Qaeda member and Osama bin Laden's brother-in-law, Mohammed Jamal Khalifa. *See* Ex. 51, FED-PEC 202846-202847 (Dr. Omar Abdullah Naseef, in his capacity as the MWL Secretary General and IIRO Chairman, and Dr. Farid Qurashi, in his capacity as IIRO Director General, announcing the appointment of Khalifa to open a joint MWL/IIRO branch office in the Philippines, contemporaneous with the formation of al Qaeda); *id.* at 202847 (stating that Khalifa "is authorized to sign any agreement between the governments of South-East Asia Countries and the Muslim World League and the International Islamic Relief Organization"). *See also* Ex. 29, Transcript, June 27, 2019 Deposition of Abdulhadi T. Daguit at 38 (testifying that the MWL and IIRO operated a joint office in the same building between 1993 and 2001).<br><br>The MWL and IIRO also coordinated together on overseas projects. For example, the MWL/IIRO Health Care Division funded and oversaw the operations of the Fatima al Zahraa Hospital operating in Jalalabad, Afghanistan, an asset of the IIRO/MWL, through the joint MWL/IIRO Pakistan branch office. *See* Ex. 128, IIRO 109118-109119 (IIRO sending $34,000 to the MWL in Pakistan via the IIRO's bank account at Al Rajhi Bank for medical supplies and equipment); Ex. 129, IIRO 215526-215529 (MWL/IIRO/Fatima al Zahraa Hospital letterhead identifying daily meals service), IIRO 126173-126176, IIRO 112761-112762, IIRO 112745-112748, IIRO 59410-59411, IIRO 108937, IIRO 105986. *See also* Ex. 82, IIRO Annual Report 1999/2000, IIRO 212-330 at 278 (indicating IIRO medical projects around the world, including Fatima al Zahra Hospital in Jalalabad, Afghanistan). Senior al Qaeda leader Ayman al Zawahiri conducted eye surgeries at Fatima al Zahraa Hospital, which was located in close proximity to an al Qaeda funded jihad camp. *See* Ex. 28, |

| | |
|---|---|
| | Transcript, February 8, 2024 Deposition of Aimen Dean at 308-309.<br><br>Furthermore, as the subordinate entity, the IIRO consistently reported to the MWL Secretary General about terrorism investigations, misappropriated funds, and other financial irregularities occurring in IIRO overseas branch offices. *See, e.g.*, Ex. 205, IIRO 122181-122182 (April 11, 2003 letter from IIRO Secretary General Adnan Basha to the MWL Secretary General informing him of the continued surveillance of the IIRO's facilities in Kosovo by KFOR and Italian forces, several years after the KFOR raid on the joint IIRO-SJRC office in Pristina for terrorist activities linked to Osama bin Laden.); Ex. 206, IIRO 31131 (Letter from IIRO Secretary General Adnan Basha to the MWL Secretary General providing a legal memorandum concerning the investigation into the IIRO-Pakistan office and the misappropriation of IIRO funds by the IIRO-Pakistan Director General Moayad al Butairi.); Ex. 207, IIRO 59709 (September 21, 2003 "Strictly Confidential and Top Urgent" letter from the MWL Secretary General's office to IIRO Secretary General Adnan Basha requesting a detailed report on the director of the IIRO-Indonesia branch office, at the same time a number of critical financial irregularities and problems with the accounting practices of the IIRO-Indonesia office were being discovered.).<br><br>Finally, to the extent the MWL's assertions at Nos. 81-121 rely on the Declarations of Adnan Basha, Abdullah bin Abdul Mohsen al Turki, Abdullah bin Saleh al Obaid, Ali al Thaqafi, Abdulhadi Daguit, and Faiz Wardi at MWL Exs. 5, 6, 8, 38, 39, 52, 53, 54, and 65, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2018-2019 (Obaid, Turki, Basha, Daguit). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 82. MWL maintained separate corporate governance, functions, identities, and operations from IIRO and did not operate through IIRO or declare to others that it did so. Ex. # 5, Turki Decl. ¶ 19; Ex. # 6, Obaid Decl. ¶ 16; Ex. # 7, Basha Decl. ¶ 8; Ex. # 8, Al-Thaqafi Decl. ¶¶ 12, 14; Ex. # 36, IIRO 2002 Constitution at IIRO-000025 and Ex. # 10, MWL Statute, JT-MWL- 00037 to JT-MWL-0003746. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |

| | |
|---|---|
| 83. MWL and IIRO conducted separate board meetings, kept separate minutes of those board meetings, and maintained separate files. Ex. # 7, Basha Decl. ¶ 8; Ex. # 40, IIRO Board of Directors Meeting in 2000, MWLIIRO-00016243 to MWLIIRO-00016246; Ex. # 8, Al-Thaqafi Decl. ¶ 12; Ex. # 43, Chaout Decl. ¶ 54. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 84. MWL and IIRO had separate headquarters/head offices. Ex. # 5, Turki Decl. ¶¶ 4, 15; Ex. # 38, Turki PJ Decl. ¶¶ 14, 18; Ex. # 7, Basha Decl. ¶ 8; Ex. # 6, Obaid Decl. ¶ 12; Ex. # 39, Obaid PJ Decl. ¶¶ 7, 10; Ex. # 8, Al-Thaqafi Decl. ¶ 12. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 85. MWL and IIRO had separate payrolls, bank accounts, budgets, and document management systems. Ex. # 5, Turki Decl. ¶ 19; Ex. # 6, Obaid Decl. ¶ 16; Ex. # 7, Basha Decl. ¶¶ 8, 10; Ex. # 8, Al-Thaqafi Decl. ¶ 12; Ex. # 43, Chaout Decl. ¶ 54 ("In 2016, Plaintiffs provided LBKM attorneys with a list of bank accounts allegedly belonging to IIRO and MWL offices in Pakistan. I contacted the current Pakistan director to inquire about these accounts, and he contacted the banks in Pakistan to request statements for the accounts belonging to MWL and IIRO. The banks could not provide the statements as the accounts were either dormant, or were opened by individuals in their personal capacity, and therefore not accessible to IIRO."). | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 86. When necessary in dealings between MWL and IIRO, MWL and IIRO engaged their own legal representation to clarify their respective legal positions and to protect their respective interests and rights. Ex. # 7, Basha Decl. ¶ 9; # 8, Al-Thaqafi Decl. ¶ 11. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 87. IIRO had its own legal department. Ex. # 7, Basha Decl. ¶ 16. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 88. MWL and IIRO did not comingle funds. Ex. # 7, Basha Decl. ¶ 10; Ex. # 8, Al- Thaqafi Decl. ¶ 16. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 89. MWL and IIRO had separate finances, taxes, and properties, and neither used the others' funds. Ex. # 8, Al-Thaqafi Decl. ¶ 13; Ex. # 7, Basha Decl. ¶¶ 17, 19 ("MWL and IIRO did not file joint tax returns…. IIRO's funds were not used by MWL. MWL's funds were not used by IIRO. For example, IIRO did not use MWL's funds to pay for IIRO's operating costs and expenses or vice versa. IIRO did not pay the salaries of MWL employees or vice versa. MWL did not transfer funds in and out of IIRO for MWL's purposes."). | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |

| | |
|---|---|
| 90. IIRO did not use MWL's funds to pay for IIRO's operating costs and expenses or vice versa. Ex. # 7, Basha Decl. ¶ 19; Ex. # 8, Al- Thaqafi Decl. ¶ 13. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 91. Neither IIRO nor MWL paid the salaries of the others' employees or vice versa. Ex. # 7, Basha Decl. ¶ 19. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 92. MWL did not transfer funds to IIRO for MWL's operations. MWL did not control IIRO bank accounts and did not transfer funds from IIRO. Ex. # 7, Basha Decl. ¶ 19 ("IIRO's funds were not used by MWL. MWL's funds were not used by IIRO. For example, IIRO did not use MWL's funds to pay for IIRO's operating costs and expenses or vice versa. IIRO did not pay the salaries of MWL employees or vice versa. MWL did not transfer funds in and out of IIRO for MWL's purposes."); Ex. # 8, Al-Thaqafi Decl. ¶¶ 13-14 ("MWL and IIRO had separate finances, taxes, and properties, and neither used the others' funds. MWL handled its own operations and did not operate through IIRO or declare to others that it did so."). | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 93. MWL and IIRO issued their own independent financial statements. Ex. # 44, MWL Financial Statements prepared by certified public accountant El Sayed El Ayouty & Co. for year ending in 2001, JT-MWL-00001 to JT-MWL-00034; Ex. # 45, KPMG Audits of IIRO, IIRO-000868 to IIRO-000943. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 94. MWL and IIRO employed separate internal auditors and engaged separate external auditors. Ex. # 7, Basha Decl. ¶¶ 47, 53, 75; Ex. # 8, Al-Thaqafi Decl. ¶¶ 19-22; Ex. # 45, MWL Financial Statements prepared by certified public accountant El Sayed El Ayouty & Co. for year ending in 2001, JT-MWL-00001 to JT-MWL-00034; Ex. # 44, KPMG Audits of IIRO, IIRO- 000868 to IIRO-000943. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 95. The Saudi General Auditing Bureau routinely audited MWL. Ex. # 46, KSA Auditing Bureau records, JT-MWL-04518 to JT-MWL-04522; Ex. # 27, 1986 MWL Financial Regulations at JT-MWL00154. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 96. MWL was responsible for its own capitalization and debts, and IIRO was responsible for its own capitalization and debts. Ex. # 7, Basha Decl. ¶ 10; Ex. # 8, Al-Thaqafi Decl. ¶ 16. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 97. Some employees held posts at both IIRO and MWL in foreign branch offices. Ex. # 5, Turki Decl. ¶ 18; Ex. # 6, Obaid Decl. ¶ 16; Ex. # 7, Basha Decl. ¶ 11. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |

| | |
|---|---|
| 98. Employees who held posts at foreign branch offices of both IIRO and MWL: (a) received separate compensation from IIRO and MWL (Ex. # 5, Turki Decl. ¶ 18; Ex. # 6, Obaid Decl. ¶ 16; Ex. # 7, Basha Decl. ¶ 11; Ex. # 47, Al-Harbi Dep. Tr. at 168:5-168:9, 276:4-13); (b) received separate instructions from IIRO and MWL (Ex. # 5, Turki Decl. ¶ 18; Ex. # 6, Obaid Decl. ¶ 16; Ex. # 7, Basha Decl. ¶ 11; Ex. # 48, Letter to Gari from IIRO Offices Department, IIRO 094570; Ex. # 49, Letter to Gari from IIIRO Emergency Relief Department, IIRO 50804; Ex. # 50, Letter to Gari from IIRO Social Welfare Department, IIRO 51398; Ex. # 51, Letters from MWL Head Office to MWL-Pakistan Director, MWL 018804 to MWL 018807); and (c) had separate budgets for their IIRO and MWL projects (Ex. # 5, Turki Decl. ¶ 18; Ex. # 6, Obaid Decl. ¶ 16; Ex. # 7, Basha Decl. ¶ 11; Ex. # 47, Al-Harbi Dep. Tr. at 278:23-279:1). | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 99. MWL and IIRO sometimes worked together on specific projects in host countries. Ex. # 7, Basha Decl. ¶ 12. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 100. MWL could not and did not control IIRO's activities or its management. Ex. # 7, Basha Decl. ¶ 12. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 101. MWL could not and did not exercise control over IIRO's day-to-day operations. (Ex. # 5, Turki Decl. ¶¶ 17, 19; Ex. # 6, Obaid Decl. ¶¶ 15, 17; Ex. # 7, Basha Decl. ¶ 7; Ex. # 31, Obaid Dep. Tr. at 311:18-312:2). | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 102. MWL could not and did not tell IIRO to perform acts on behalf of MWL, and, in any case, IIRO could not and did not act on MWL's behalf and did not seek or otherwise agree to operate on MWL's behalf. Ex. # 7, Basha Decl. ¶¶ 12-13; Ex. # 5, Turki Decl. ¶ 19; Ex. # 6, Obaid Decl. ¶ 17; Ex. # 31, Obaid Dep. Tr. at 78:9-79:2 (*Errata*). | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 103. IIRO was not engaged or entrusted to or given the authority to take decisions or act on MWL's behalf. Ex. # 7, Basha Decl. ¶ 12. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 104. MWL did not indicate or represent to others that IIRO was performing acts on MWL's behalf or with MWL's consent. Ex. # 7, Basha Decl. ¶ 13; Ex. # 8, Al-Thaqafi Decl. ¶ 14. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 105. IIRO did not indicate or represent to others that it was performing acts on MWL's behalf or with MWL's consent. Ex. # 7, Basha Decl. ¶ 13. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |

| | |
|---|---|
| 106. MWL did not rely on IIRO to carry out MWL's operations, goals, or processes. MWL acted independently of IIRO in carrying out MWL's operations, goals, and processes. Ex. # 7, Basha Decl. ¶ 14; Ex. # 8, Al-Thaqafi Decl. ¶ 14. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 107. IIRO did not hold any MWL property, including property in trust. Ex. # 7, Basha Decl. ¶ 14 ("IIRO did not hold any property of MWL in trust."); Ex. # 8, Al-Thaqafi Decl. ¶ 13 ("MWL and IIRO had separate finances, taxes, and properties, and neither used the others' funds."). | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 108. MWL could not and did not dictate to IIRO how or where IIRO was to operate, and MWL was not required to approve IIRO's operations, actions, or processes. Ex. # 7, Basha Decl. ¶ 15 ("MWL could not and did not dictate to IIRO how or where IIRO was to operate. For example, IIRO had sole decision-making authority on matters such as how to manage employees, finances, or processes MWL could not and was not required to approve IIRO's operations, actions, or processes."). | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 109. IIRO had sole decision-making authority on matters such as how to manage employees, finances, or processes, where to open local or foreign offices, where to deliver relief and aid, or which programs and projects IIRO pursued. Ex. # 7, Basha Decl. ¶ 15. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 110. IIRO and MWL had separate hiring processes and practices and distinct employee policies: MWL could not and did not dictate whom IIRO could hire; IIRO could not and did not hire employees for MWL; and IIRO and MWL had separate codes of conduct for their employees, separate compliance policies, and separate human resources departments. Ex. # 7, Basha Decl. ¶¶ 15-16 ("IIRO could not and did not hire employees on MWL's behalf for MWL"); Ex. # 8, Al- Thaqafi Decl. ¶ 5 ("When I joined MWL, it had in place regulations, in addition to directives issued by the secretary general, governing employee conduct and relating to the hiring, promoting, and dismissing of employees. These regulations and directives, along with the principles undergirding them, have remained consistent throughout my tenure at MWL."). | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 111. IIRO could not and did not: sign contracts or enter into agreements on MWL's behalf or purchase goods or services on MWL's behalf. Ex. # 7, Basha Decl. ¶ 16 ; Ex. # 8, Al- Thaqafi Decl. ¶ 14 ("MWL handled its own operations and did not operate through IIRO or declare to others that it did so"). | Disputed. *See, e.g.,* Plaintiffs' response to No. 81.<br><br>By way of further response, when MWL Secretary General appointed Mohammed Jamal Khalifa to head the IIRO branch office in the Philippines, he authorized Khalifa to enter into any agreement on behalf of both the MWL and IIRO with any |

| | |
|---|---|
| | of the foreign governments in South-East Asia. *See* Ex. 51, FED-PEC 202846-202847 (Dr. Omar Abdullah Naseef, in his capacity as the MWL Secretary General and IIRO Chairman, and Dr. Farid Qurashi, in his capacity as IIRO Director General, announcing the appointment of Khalifa to open a joint MWL/IIRO branch office in the Philippines, contemporaneous with the formation of al Qaeda); *id.* at 202847 (stating that Khalifa "is authorized to sign any agreement between the governments of South-East Asia Countries and the Muslim World League and the International Islamic Relief Organization"). |
| 112. MWL and IIRO did not file joint tax returns. Ex. # 7, Basha Decl. ¶ 17; Ex. # 8, Al- Thaqafi Decl. ¶ 13. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 113. IIRO's liabilities never exceeded its assets, and MWL's liabilities never exceeded its assets. Ex. # 7, Basha Decl. ¶ 18; Ex. # 8, Al- Thaqafi Decl. ¶ 15. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 114. MWL did not loan money to IIRO. Ex. # 7, Basha Decl. ¶ 20. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 115. Past declarations submitted in this case mistranslated an Arabic word as "subsidiary" rather than "affiliate" when describing the relationship between MWL and IIRO. Ex. # 39, Obaid PJ Decl. ¶ 11. | Disputed. The MWL's claim that a mistranslation during a single deposition proves that the IIRO is not a subsidiary of the MWL, is inaccurate and misleading. MWL Secretary General Abdullah bin Saleh al Obaid and his counsel were fully aware of what he was saying when he testified that "the IIRO is a subsidiary of the Muslim World League," and approved the filing of his declaration with the court. *See* Ex. 147, Declaration of Abdullah bin Saleh al Obaid at ¶ 12. *See also* Ex. 23, Transcript, September 17, 2018 Deposition of Dr. Abdullah al Obaid at 75-76 (explaining that the IIRO works under the umbrella of the MWL).<br><br>Moreover, the MWL's own documents confirm that the IIRO is an integral part of the MWL. *See* Ex. 139, MWL 19138 (MWL hierarchical chart identifying "The International Islamic Relief Organization" as part of the Muslim World League).<br><br>In addition, terrorism investigations conducted by the U.S. government have verified that the IIRO is the "operating arm" or "subsidiary" of the MWL. *See, e.g.*, Ex. 32, FBI Report, *Connections to the Attacks of September 11, 2001*, July 23, 2021, EO14040-003478-3608-UPDATED at 3547 ("IIRO was established in Jeddah, Saudi Arabia, in 1978. The IIRO has been identified as the 'social arm' or 'operating arm' of the Muslim World League. The Secretary General of the Muslim World League said it provides 'humanitarian assistance' through the IIRO."); Ex. 71, May 23, 2005 U.S. Diplomatic Cable, FED-PEC 220479-220481 ("The International Islamic |

| | |
|---|---|
| | Relief Organization (IIRO) -- a subsidiary of the Saudi-based and funded Muslim World League (MWL) -- was active here in the late 1980s and early 1990s. Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines."); Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 106 ("The International Islamic Relief Organization [IIRO], which is headquartered in Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL, … the Taliban, … and Hamas, … as well as al Qaida affiliates, *inter alia*, the Abu Sayyaf Group (ASG), … Jemaah Islamiya (JI), … and Al Ittihad Al Islamiya (AIAI)…. The IIRO's parent organization is the Muslim World League [MWL] also headquartered in Saudi Arabia.").<br><br>*See also* Plaintiffs' response to No. 81. |
| 116. IIRO was an affiliate, not a subsidiary, of MWL. Ex. # 39, Obaid PJ Decl. ¶ 11; Ex. # 31, Obaid Dep. Tr. at 78:3-8, 311:11-16. | Disputed. *See, e.g.,* Plaintiffs' responses to Nos. 81 and 115. |
| 117. The work of individuals with roles in MWL and IIRO did not overlap, and their roles were not combined. Ex. # 52, Gari Dep. Tr. at 67:15-68:21; Ex. # 48, Letter to Gari from IIRO Offices Department, IIRO 094570; Ex. # 49, Letter to Gari from IIIRO Emergency Relief Department, IIRO 50804; Ex. # 50, Letter to Gari from IIRO Social Welfare Department, IIRO 51398; Ex. # 51, Letters from MWL Head Office to MWL-Pakistan Director, MWL 018804 to MWL 018807. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 118. In Pakistan, the IIRO-Pakistan office director did not receive a salary for his voluntary position as director of MWL's Pakistan. Ex. # 52, Gari Dep. Tr. at 67:15-68:21. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 119. Even where MWL and IIRO had offices in the same or similar locations, the work, operations, and accounts/finances of those offices were distinct and not combined. Ex. # 53, Daguit Decl. ¶ 11; Ex. # 52, Gari Dep. Tr. at 67:15-68:21; Ex. # 54, Wardi Decl. ¶ 8. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |

| | |
|---|---|
| 120. In the Philippines, MWL and IIRO operated out of different office spaces and maintained their own activities and operational funding. Ex. # 52, Daguit Decl. ¶ 11; Ex. # 12, Daguit Dep. Tr. at 19:14-20. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| 121. In Indonesia, MWL and IIRO operated out of the same office building but in different office spaces and on different floors, and each had its own employees, each stored its files apart from the other's, each had its own sign in the office building reception, and IIRO auditors had no right to access MWL accounts. Ex. # 54, Wardi Decl. ¶ 8; Ex. # 47, Al-Harbi Dep. Tr. at 275:10-15, 275:21-276:1, 298:3-300:9, 301:2-10 (*Errata*), 332:23-333:9, 334:2-18. | Disputed. *See, e.g.,* Plaintiffs' response to No. 81. |
| **Rabita Trust** | No response necessary. |
| 122. MWL and the Government of Pakistan jointly established the Rabita Trust in Islamabad, Pakistan in 1988 with the purpose of repatriating Biharis (Pakistanis living in Bangladesh following the Indo-Pakistani War) from Bangladesh to Pakistan. Ex. # 55, Deed at Preamble ¶ 2, IIRO-111693; Ex. # 5, Turki Decl. ¶ 21; Ex. # 23, Turki Dep. Tr. at 295:3-10 (*Errata*); Ex. # 6, Obaid Decl. ¶¶ 19-20; Ex. # 56, Appeal for Donation to the Rabita Trust for Repatriation of Stranded Pakistanis from Bangladesh (Dec. 26, 1997), IIRO 149661; Ex. # 31, Obaid Dep. Tr. at 81:21-82:5 (*Errata*). | Disputed. Notwithstanding the fact that the Rabita Trust may have undertaken genuine humanitarian relief work, those relief activities were also used to fundraise and distribute funds for al Qaeda's operational support, to recruit terrorists, to provide space for their training and operations, and to provide a cover so that al Qaeda operatives could undertake terrorist activities under the guise of being humanitarian relief workers. *See, e.g.*, Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 20 (asserting that "while the Islamic charities that provided support to extremism and terrorism engaged in some humanitarian activities, their support for terrorism was substantial, and the humanitarian activities which did take place helped to legitimize and provide a cover for, the extremist and terrorist activities"); Ex. 37, March 9, 2020 Expert Report of Dr. Matthew Levitt at 13-14 ("Charities offer a veil of legitimacy for terrorist fundraising, attracting unwitting donors who are unaware that monies they donate for humanitarian purposes instead fund terror."); *id.* at 14 ("Through charities, transnational terrorist groups have been able to move personnel, funds, and material to and from high-risk areas under cover of humanitarian or charity work."); Ex. 1, 9/11 Commission Final Report at 170-171 ("Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization."); Ex. 150, U.N. Security Council, Second Report of the Monitoring Group on Sanctions Against Al-Qaida, the Taliban and Individuals and Entities Associated With Them ("Second Report"), December 2, 2003, PEC-KSA000108-190 at 120-121 ("Charities provide Al-Qaida with a very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support. These funds are often merged with |

| | |
|---|---|
| | and hidden among funds used for other legitimate humanitarian or social programmes.").<br><br>Indeed, contemporaneous with the formation of al Qaeda and his agreement with Osama bin Laden to use the MWL and its subsidiary bodies, including the IIRO, to provide support and cover for al Qaeda's operations, MWL Secretary General Omar Abdullah Naseef spearheaded efforts to create the Rabita Trust in 1988 with the Pakistani government. *See* Ex. 134, Jelaidan 017 (July 9, 1988 Rabita Trust Deed identifying senior leaders of the MWL populated the Board of Trustees when it was formed in 1988, including MWL Secretary General Abdullah Omar Naseef, MWL Assistant Secretary General Syed Amin Aqeel Attas, and an additional three representatives from "Rabita al Alam al Islami" (a/k/a MWL)).<br><br>In addition to Naseef, the Rabita Trust Board of Trustees was comprised of E.O. 13224 Specially Designated Global Terrorists ("SDGT") and other individuals linked to terrorism financing, including but not limited to Wa'el Hamza Jelaidan (E.O. 13224 SDGT), IIRO Secretary General Adnan Basha, MWL Secretary General Abdullah Mohsin al Obaid, Prince Turki bin Jalawi al Saud ("an important al-Qa'ida donor" who "had contact with individuals tied to al-Qa'ida and other terrorist organizations"), Mohammad bin Abdullah al Dubayban (board member of E.O 13224 SDGT Al Haramain Al Masjed Al Aqsa Charity Foundation), Moayad al Butairi (IIRO-Pakistan), and others. *See, e.g.*, Plaintiffs' responses to Nos. 1 (Naseef, Jelaidan), 44 (Butairi), 66 (Dubayban), 171 (Al Haramain Al Masjed Al Aqsa), 386 (Prince Turki bin Jalawi al Saud). *See also* Ex. 133, Jelaidan 016 (March 14, 2000 Circular regarding the "revised and up-dated composition of Rabita Trust Board"); Ex. 140, MWL 30817-30819 (October 14, 2000 letter from Wa'el Jelaidan with a list of members of the Rabita Trust Board, including MWL Secretary General Abdullah al Obaid, former MWL Secretary General Abdullah Omar Naseef, Director of the IIRO's Eastern Province branch office Prince Turki bin Fahd bin Jalawy al Saud, IIRO Secretary General Adnan Basha, and MWL official Mohammed bin Abdullah al Dubaiban.). *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 50-63.<br><br>The Rabita Trust was designated by the U.S. government as a Specially Designated Global Terrorist ("SDGT") on October 12, 2001 for "its close ties to senior al Qaida leadership and providing logistical and financial support to al Qaida." *See* Ex. 68, FED-PEC 215391-215394 at 215391. *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 57. |

| | |
|---|---|
| | *See also* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (identifying "the Bin Ladin-backed Rabita Trust for Stranded Pakistanis" as one of several NGOs that have been infiltrated by Osama bin Laden); *id.* at 544 (identifying Wa'el Jelaidan as the "secretary general of Rabita Trust," one of the "Bin Ladin-affiliated charities").<br><br>Finally, to the extent the MWL's assertions at Nos. 122-170 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki, Abdullah bin Saleh al Obaid, Adnan Basha, and Mohamed Fawzi at MWL Exs. 5, 6, 38, 39, 65, and 70, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2018-2019 (Obaid, Turki, Basha). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, some of which appears to be inconsistent with their prior deposition testimony in 2018-2019, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 123. Plaintiffs have no evidence that Rabita Trust had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; *see generally* 9/11 Commission Report; Monograph. | Disputed. The MWL's claim that there is no evidence that Rabita Trust had any foreknowledge of or was involved in the planning or execution of the 9/11 attacks, is inaccurate and misleading.<br><br>As set forth in Plaintiffs' response to No. 122, MWL Secretary General Omar Abdullah Naseef spearheaded efforts to create the Rabita Trust in 1988, contemporaneous with the formation of al Qaeda and his agreement with Osama bin Laden to use the MWL and its subsidiary bodies, including the IIRO, to provide support and cover for al Qaeda's operations. Nassef and other leaders of the MWL and IIRO oversaw the installation of al Qaeda members and financiers onto Rabita Trust's Board of Trustees, including al Qaeda member Wa'el Hamza Jelaidan and Prince Turki bin Jalawi al Saud ("an important al-Qa'ida donor" who "had contact with individuals tied to al-Qa'ida and other terrorist organizations").<br><br>Indeed, Naseef, Jelaidan, Prince Turki, and other board members were quintessential al Qaeda insiders, operating at the very center of al Qaeda's leadership, operations, and financial and logistical support structure during the critical period leading up to the 9/11 attacks, and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. |

| | |
|---|---|
| | *See also* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (identifying "the Bin Ladin-backed Rabita Trust for Stranded Pakistanis" as one of several NGOs that have been infiltrated by Osama bin Laden); *id.* at 544 (identifying Wa'el Jelaidan as the "secretary general of Rabita Trust," one of the "Bin Ladin-affiliated charities"). *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 57. |
| 124. Plaintiffs have no evidence tracing Rabita Trust funds to the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph. | Disputed. The MWL's claim that there is no evidence tracing Rabita Trust funds or other in-kind support to al Qaeda and/or the planning and execution of the 9/11 attacks, is inaccurate and misleading. As described herein, the Rabita Trust and its leaders and board members were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks. Accordingly, the 9/11 attacks were a predictable, inevitable product of that sustained, knowing support. Plaintiffs need not prove that the funds or other in-kind support provided to al Qaeda were traced to the terrorist plot or the attack itself.<br><br>*See also* Ex. 68, October 12, 2001 U.S. Department of the Treasury Designation of Rabita Trust, FED-PEC 215391-215394 (stating that Rabita Trust was designated "for its closes ties to senior al Qaida leadership and for providing logistical and financial support to al Qaida"). *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 57. |
| 125. Plaintiffs have no evidence tracing in-kind support from Rabita Trust to the planning or for the execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally*, 9/11 Commission Report; Monograph. | Disputed. *See* Plaintiffs' response to No. 124. |
| 126. Plaintiffs have no evidence tracing funds from MWL through Rabita Trust to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. # 2, E014040-000011 (May 27, 2021 FBI Report Administratively Closing Case); | Disputed. *See* Plaintiffs' responses to Nos. 122-124. |

| | |
|---|---|
| Kohlmann Rpt. ¶¶ 27-70 (same) (ECF No. 9250-2); Levitt Rpt. at 29-35 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. #3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph. | |
| 127. Rabita Trust completed the construction of 1000 residential units in Mian Channu and approximately 70 Bihari families were repatriated in or around 1993. Ex. # 57, M. Aslam Tariq letter dated 29 October 1992 titled "Repatriation of 3000 Families from Bangladesh to Pakistan by the End of December, 1992" (MWL 008691); Ex. # 58, Letter from Ass. Sec. Gen. Amin Aqeel Attas to external party dated January 4, 1993, MWL-030813 (informing the external party that Rabita Trust has selected the location and started to build the residential units in the Punjab region); Ex. # 59, Letter from Ass. SG Amin Aqeel Attas to MWL-Pakistan director dated 26 November 1996, MWL 030810 (stating that the residences were built three years ago); Ex. # 60, Letter from Pakistan Citizens' National Committee for Repatriation of Stranded Pakistanis dated Sept. 30, 2003, MWL 008694-97 (stating that the "trust has successfully completed the construction of 1000 housing units at Mian Channoo [sic] way back in 93-94. Out of these, only 68 housing units have been under occupation…by the Pakistanis who were repatriated from Bangladesh in Jan. 1993."). | Undisputed as a general matter for purposes of this motion. |
| 128. The lack of government support for the project and the vacancies caused the residential units to dilapidate over time. Ex. # 60, Letter from Pakistan Citizens' National Committee for Repatriation of Stranded Pakistanis dated 30 Sep 2003 stating that the "remaining 932 units have been lying vacant and sustaining the onslaughts of the extreme summers & winter over all these yr [sic]", MWL 008694-97 (attached and in English); Ex. # 52, Gari Dep. Tr. at 136:14-16, 140:21-141:1 (Errata). | Undisputed as a general matter for purposes of this motion. |
| 129. MWL provided a "token sum" of 50 million Pakistani Rupees to the trust upon its establishment. Ex. # 55, Deed at Preamble ¶ 8, IIRO-111697. This equaled approximately $2.5 million. Ex. # 59, Letter from Ass. SG Amin Aqeel Attas to MWL-Pakistan director dated 26 November 1996, MWL 030810 (estimating MWL's contribution to be $2.5 million). The Government of Pakistan provided 250 million Pakistani Rupees to the trust upon its establishment. Ex. # 55, Deed at Preamble ¶ 8, IIRO-111698. | Undisputed as a general matter for purposes of this motion.<br><br>By way of further response, Rabita Trust and its employees operated out of the MWL's office in Mecca, Saudi Arabia and the MWL's branch office in Pakistan. For instance, an October 29, 1992 letter concerning a Rabita Trust office in Lahore is addressed to "*Mr. Wa'el H. Jelaidan, Project Director, Rabita Trust, Muslim World League, H-8/1, Islamabad*." A December 29, 1997 letter co-authored by MWL Secretary General Abdullah al Obaid on Rabita Trust letterhead identifies Rabita Trust offices operating from the MWL offices in Mecca, Saudi |

| | |
|---|---|
| | Arabia and Islamabad, Pakistan: *Makkah Office: c/o Muslim World League, P.O. Box 537, Makkah*; and *Islamabad Office: c/o Muslim World League, H-8/1, Islamabad*. Finally, a series of letters dated October 22, 2001 letter concerning Rabita Trust account balances are addressed to "*The Secretary General, Rabita Trust for Stranded Pakistanis, World Muslim League, P.O. Box 1030, Makkah Al Mukrmah, Saudi Arabia*." *See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 55.<br><br>Rabita Trust and its employees also operated out of the IIRO's branch office in Islamabad, Pakistan. A series of letters dated October 11, 2001 concerning Rabita Trust are addressed to "*Mr. Rahmat Ullah Nazir Kahn, Project Director, Rabita Trust for Rehabilitation of Stranded Pakistanis, Pitrus Bokari Road, H-8/1, Islamabad*." An October 12, 2001 letter authored by Mr. Khan in his capacity as the office director of the IIRO branch office in Islamabad identifies the same address as "*H-8/1- Pitrus Bokari Road*." *Id.* at ¶ 56. |
| 130. The Government of Pakistan and the MWL each nominated half of the members of the Rabita Trust Board. Ex. # 55, Deed at Preamble ¶ 3(a), IIRO-111693 to IIRO-111694; Ex. # 61, IIRO-149643 to IIRO-149644 (Oct. 11, 2001 notification of the reconstitution of Rabita Trust's Board); Ex. # 61, Oct. 13, 2001 Letter from Pakistani Brigadier General, IIRO-149621 (noting a revised list of Board members representing Pakistan); see Ex. # 62, March 14, 2000 GOP Circular regarding the "Composition of Rabita Trust Board," ECF No. 7608-13 at 2-3). | Undisputed as a general matter for purposes of this motion. |
| 131. The President or Prime Minister of Pakistan served as Chairman of the Rabita Trust Board until October 2001. Ex. # 5, Turki Decl. ¶ 21; Ex. # 6, Obaid Decl. ¶ 19; Ex. # 31, Obaid Dep. Tr. at 82:7-20 (*Errata*); Ex. # 23, Turki Dep. Tr. at 294:2-295:2 (*Errata*); Ex. # 63, List of members of the Rabita Trust Board, MWL-030817; Ex. # 55, Deed at Preamble ¶ 3(b), IIRO-111694; Ex. # 56, Appeal for Donation to the Rabita Trust, IIRO 149661. | Undisputed as a general matter for purposes of this motion.<br><br>By way of further response, Chairman of the Rabita Trust Board of Trustees, Pakistan's President Pervez Musharraf, immediately resigned from the Rabita Trust Board following the October 12, 2001 designation of Rabita Trust "for providing logistical and financial support to al Qaida." |
| 132. For most, and perhaps all of the period between its founding and October 2001, the Pakistani Finance Minister served on the Board of the Rabita Trust and was responsible for the Trust's finances. Ex. # 23, Turki Dep. Tr. at 294:2-295:2 (*Errata*); Ex. # 31, Obaid Dep. Tr. at 82:7- 20 (*Errata*) (noting "financial responsible person is the finance minister of Pakistan"); Ex. # 62, Composition of Rabita Trust Board, MWL-031819; Ex. # 63, List of members of the Rabita Trust Board, MWL-03187; Ex. # 56, Appeal for Donation to the Rabita Trust, IIRO 149661; Ex. # 61, IIRO- | Disputed. *See* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 544 (identifying Wa'el Jelaidan as the "secretary general of Rabita Trust coordinating financial activities and overseeing the budget"). |

| | |
|---|---|
| 149644 (2001 replacement of Rabita Trust board members). | |
| 133. The Government of Pakistan supervised and attended to the Rabita Trust (Ex. # 64, Letter From Abdullah Al-Turki to Ambassador Abdul Mirza of Pakistan, ECF No. 7608-13 at 18 ("thank you and the Government of Pakistan for looking after the Trust")), and made changes to the Board's membership multiple times. Ex. # 55, Deed at Preamble ¶ 3(b), IIRO-111694; Ex. # 62, Composition of Rabita Trust Board, MWL-031819; Ex. # 63, List of members of the Rabita Trust Board, MWL-03187; Ex. # 61, Notification re: Rabita Trust Board, IIRO 149644 (2001 replacement of Rabita Trust board members); Ex. # 61, Notification re: Rabita Trust Board, IIRO- 149643 to IIRO149644 (Government of Pakistan appointing Retired Brigadier General Muhammad Ilyas Khan, Director General of the ERC, to the Rabita Trust Board in October 2001). | Disputed as stated. To the extent the MWL asserts that the Pakistani government had sole authority to make changes to the Rabita Trust Board of Trustees, that is inaccurate and misleading. According to MWL Secretary General Obaid, the regulations of the Rabita Trust require that the parties (the MWL and Pakistani government) consult with each other concerning nominees to the board. *See* Ex. 23, Transcript, September 17, 2018 Deposition of Abdullah al Obaid at 89-91. |
| 134. The MWL Secretary General served ex officio as an officer of the Rabita Trust (Ex. # 5, Turki Decl. ¶ 21; Ex. # 6, Obaid Decl. ¶ 19; Ex. # 31, Obaid Dep. Tr. at 80:20-81:8), and was one of two Vice-Chairmen on the Rabita Trust Board, Ex. # 55, Deed at Preamble ¶ 3(b), IIRO-111694; Ex. # 62, Composition of Rabita Trust Board, MWL-031819; Ex. # 56, Appeal for Donation to the Rabita Trust, IIRO 149661. | To the extent the MWL's assertion at No. 134 relies on the Declarations of Abdullah bin Abdul Mohsen al Turki and Abdullah bin Saleh al Obaid at MWL Exs. 5 and 6, the statement is disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2018 (Obaid, Turki). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, some of which appears to be inconsistent with their prior deposition testimony in 2018-2019, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 135. The other Vice-Chairman of the Rabita Trust Board was a member of the Government of Pakistan and included, at various times, the Foreign Minister, the Minister of Finance & Economic Affairs, the Minister for Finance, Revenue, Economic Affairs, Planning & Development and Statistics, and the Additional Chief Secretary, Punjab. Ex. # 55, Deed at Preamble ¶ 3(b), IIRO-111694; Ex. # 63, List of members of the Rabita Trust Board, MWL- 030817; Ex. # 62, Composition of Rabita Trust Board, MWL 030819; Ex. # 56, Appeal for Donation to the Rabita Trust, IIRO-149661; Ex. # 61, Notification re: Rabita Trust Board, IIRO- 149644. | Undisputed as a general matter for purposes of this motion. |
| 136. The Rabita Trust Board required a quorum of six members to act, provided that at least three of the Board members present were from amongst the representatives of | Undisputed as a general matter for purposes of this motion. |

| | |
|---|---|
| MWL or the Government of Pakistan. Ex. # 55, Deed at Preamble ¶ 6, IIRO-111697. | |
| 137. The Rabita Trust's bank account was operated jointly by an MWL and Government of Pakistan Rabita Trust Board member. Ex. # 55, Deed at Preamble ¶ 10, IIRO-111698; Ex. # 56, Appeal for Donation to the Rabita Trust, IIRO 149661 (directing donations payable to the Habib Bank account of the Secretary General of Rabita Trust). | It is not disputed that the Rabita Trust Deed at ¶ 10 ("Bank Account") states that "[t] account of the Trust shall be operated jointly by two of four Trustees authorized by the Board who shall sign the cheques: Provided always that one of the two signatories to all cheques shall be a Trustee representing the Founder and the other signatory will be a Trustee representing the Government of Pakistan." *See* Ex. 134. |
| 138. The Rabita Trust's accounts were to be audited by the Auditor General of Pakistan. Ex. # 55, Deed at Preamble ¶ 10, IIRO-111698. | Undisputed as a general matter for purposes of this motion. |
| 139. Winding up the Rabita Trust requires a two-thirds vote of all Board members. Ex. # 55, Deed at Preamble ¶ 15, IIRO-111699. | Undisputed as a general matter for purposes of this motion. |
| 140. During the time that MWL Secretary General Abdullah bin Saleh Al-Obaid served on the Board of Trustees of the Rabita Trust, between 1996 and 2000, he understands that the Rabita Trust was not engaged in any work and was defunct. Ex. # 39, Obaid PJ Decl. ¶ 15; Ex. # 31, Obaid Dep. Tr. at 80:20-81:8, 82:7-20 (*Errata*), 97:4-98:9 (*Errata*). | Disputed. The MWL's claim that Rabita Trust was not engaged in any work and was defunct between 1996 and 2000 is inaccurate and misleading. Contrary to that claim, in December 1997, the Rabita Trust circulated an "Appeal For Donations To The Rabita Trust For Repatriation Of Stranded Pakistanis From Bangladesh" seeking "stupendous financial resources which can only be pooled with the help of the Muslim governments, charitable organizations, and philanthropic individuals" to continue its work to "rehabilitate these Stranded Pakistanis, numbering over 238000." Jointly signed by Dr. Abdullah ibn Salih al Obaid (Secretary General of the Muslim World League, Vice-Chairman Board of the Trustees of Rabita Trust), and Sartaj Aziz (Minister of Finance & Economic Affairs for the Government of Pakistan, Vice-Chairman Board of the Trustees of Rabita Trust), the December 26, 1997 letter directs that donation checks be sent to Rabita Trust Secretary General, payable to Habib Bank, Ltd. *See* Ex. 147, IIRO 149661.<br><br>Moreover, to the extent the MWL's assertion at No. 140 relies on the Declaration of Abdullah bin Saleh al Obaid at MWL Ex. 39, the statement is disputed. The Declaration was never produced to Plaintiffs during the discovery phase of the litigation, nor was it ever produced to Plaintiffs during or after Obaid's deposition was completed in these proceedings in 2018. Plaintiffs have not been afforded an opportunity to cross-examine Obaid's new declaration testimony, some of which appears to be inconsistent with his prior deposition testimony in 2018, and the Declaration fails to cite to or provide a single document or piece of evidence supporting their testimony. |

| | |
|---|---|
| 141. In 1998, Adnan Basha, Secretary General of the IIRO was appointed to the Rabita Trust Board, and, to his knowledge, the Rabita Trust board held no meetings and the Rabita Trust conducted no work while he was an appointed board member. Ex. # 65, Basha PJ Decl. ¶¶ 6-7. | Disputed. *See* Plaintiffs' response to No. 140.<br><br>Moreover, to the extent the MWL's assertions at No. 141 rely on the Declaration of Adnan Basha at MWL Ex. 65, those statements are disputed. The Declaration was never produced to Plaintiffs during the discovery phase of the litigation, nor was it ever produced to Plaintiffs during or after Basha's deposition was completed in these proceedings in 2019. Plaintiffs have not been afforded an opportunity to cross-examine Basha's new declaration testimony, some of which appears to be inconsistent with his prior deposition testimony in 2019, and the Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony. |
| 142. On October 29, 1992, Aslam Tariq, Deputy Secretary in the Government of Pakistan, ordered the establishment of the Rabita Trust's office in Lahore, Pakistan. Ex. # 57, Letter from Aslam Tariq to Wael Jelaidan (Oct. 29, 1992), MWL 008691. | Undisputed as a general matter for purposes of this motion. |
| 143. Adnan Basha did not order the closure of the Rabita Trust's Lahore, Pakistan office. Ex. # 65, Basha PJ Decl. ¶ 8. | Disputed. *See* <u>Ex. 35</u>, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 58-62 (describing Rabita Trust's coordinated efforts with the MWL and IIRO to limit its exposure following the 9/11 attacks, including IIRO Secretary General Adana Basha's orders to close the Lahore office of Rabita Trust).<br><br>Moreover, to the extent the MWL's assertion at No. 143 relies on the Declaration of Adnan Basha at MWL Ex. 65, that statement is disputed. The Declaration was never produced to Plaintiffs during the discovery phase of the litigation, nor was it ever produced to Plaintiffs during or after Basha's deposition was completed in these proceedings in 2019. Plaintiffs have not been afforded an opportunity to cross-examine Basha's new declaration testimony, some of which appears to be inconsistent with his prior deposition testimony in 2019, and the Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony. |
| 144. Rahmatullah Nazir Khan Gari, in his capacity as the Rabita Trust Project Director, closed Rabita Trust's Lahore, Pakistan office based on instructions from the Government of Pakistan and notified Adnan Basha of the Lahore, Pakistan office's closure in Basha's capacity as a Rabita Trust board member. Ex. # 65, Basha PJ Decl. ¶ 8; Ex. # 66, Letter to Basha from Gari, IIRO-149640 (attaching IIRO 149642-43). | Disputed. *See* Plaintiffs' response to No. 143.<br><br>Moreover, to the extent the MWL's assertion at No. 143 relies on the Declaration of Adnan Basha at MWL Ex. 65, that statement is disputed. The Declaration was never produced to Plaintiffs during the discovery phase of the litigation, nor was it ever produced to Plaintiffs during or after Basha's deposition was completed in these proceedings in 2019. Plaintiffs have not been afforded an opportunity to cross-examine Basha's new declaration testimony, some of which appears to be inconsistent with his prior deposition testimony in 2019, and |

| | |
|---|---|
| | the Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony. |
| 145. One of the powers and functions of the Rabita Trust Board was to "launch a fund- raising campaign . . . to meet the financial liabilities in respect of the Rehabilitation Project," referring to the project of repatriation. Ex. # 55, Deed at Preamble ¶ 4(c), IIRO-111695. | Undisputed as a general matter for purposes of this motion. |
| 146. In 1997, a fundraising appeal was sent by the Rabita Trust over the signatures of Vice-Chairmen Abdullah Obaid and Sartaj Aziz, Minister for Finance & Economic Affairs, Government of Pakistan. Ex. # 56, Appeal for Donation to the Rabita Trust, IIRO 149661. | Undisputed as a general matter for purposes of this motion.<br><br>By way of further response, *see* Plaintiffs' response to No. 140 (detailing the Rabita Trust's fundraising effort during the time period that MWL claims Rabita Trust was not engaged in any work and was defunct). |
| 147. Upon his return to government in the late 1990s, Nawaz Sharif worked to revitalize the project. Ex. # 31, Obaid Dep. Tr. at 111:23-112:11 (*Errata*); Ex. # 67, 9 January 1998 Okaz article, IIRO 111679-701 at IIRO111701 (discussing governmental shift and revitalization of project). | Undisputed as a general matter for purposes of this motion. |
| 148. In March 2000, the Government of Pakistan supplied a list of new members it nominated to the Board. Ex. # 62, March 2000 Circular re the Composition of the Rabita Trust Board. | Undisputed as a general matter for purposes of this motion. |
| 149. In 2000, MWL Secretary General Abdullah bin Saleh Al-Obaid completed his term as Secretary General of MWL and thus also left his board position at the Rabita Trust. Ex. # 39, Obaid PJ Decl. ¶ 16 . | Disputed. *See, e.g.*, Plaintiffs' response to No. 34.<br><br>Moreover, to the extent the MWL's assertion at No. 149 relies on the Declaration of Abdullah bin Saleh al Obaid at MWL Ex. 39, that statement is disputed. The Declaration was never produced to Plaintiffs during the discovery phase of the litigation, nor was it ever produced to Plaintiffs during or after Obaid's deposition was completed in these proceedings in 2018. Plaintiffs have not been afforded an opportunity to cross-examine Obaid's new declaration testimony, some of which appears to be inconsistent with his prior deposition testimony in 2018, and the Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony. |
| 150. MWL Secretary General Abdullah bin Abdul Mohsen Al-Turki assumed his post as MWL Secretary General in November 2000. Ex. # 5, Turki Decl. ¶ 3; Ex. # 23, Turki Dep. Tr. at 66:4-9 (*Errata*). | Undisputed as a general matter for purposes of this motion. |
| 151. In 2016, MWL Secretary General Abdullah bin Abdul Mohsen Al-Turki completed his term as Secretary | Undisputed as a general matter for purposes of this motion. |

| | |
|---|---|
| General of MWL and thus also left his board position at the Rabita Trust. Ex. # 38, Turki PJ Decl. ¶ 23. | |
| 152. By the time MWL Secretary General Abdullah bin Abdul Mohsen Al-Turki assumed his post as MWL Secretary General and became an officer of the Rabita Trust, Rabita Trust was a defunct organization; Ex. # 38, Turki PJ Decl. ¶ 22; Ex. # 23, Turki Dep. Tr. at 294:2- 295:2 (*Errata*), 295:19-296:6 (*Errata*) and after Rabita Trust's designation in October 2001, Al-Turki responded to the Pakistani Ambassador's request to replace Jelaidan as Secretary General of the Rabita Trust that the GOP and MWL should first re-activate the Trust and simultaneously seek to have Rabita Trust delisted by OFAC for the "baseless accusation," and then discuss reconstituting the Trust board and replacing the then-Secretary General, Jelaidan. Ex. # 68, BUR- PEC-0175890. | Disputed. *See* Plaintiffs' response to No. 140.<br><br>Moreover, to the extent the MWL's assertions at No. 152 rely on the Declarations of Abdul Mohsen al Turki at MWL Exs. 23 and 38, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after Turki's deposition was completed in these proceedings in 2018. Plaintiffs have not been afforded an opportunity to cross-examine Turki's new declaration testimony, some of which appears to be inconsistent with his prior deposition testimony in 2018, and the Declarations fail to cite to or provide a single document or piece of evidence supporting his testimony. |
| 153. MWL Secretary General Abdullah bin Abdul Mohsen Al-Turki does not recall attending any meetings of the Rabita Trust board. Ex. # 38, Turki PJ Decl. ¶ 22. | Disputed. *See* Plaintiffs' response to No. 140.<br><br>Moreover. to the extent the MWL's assertions at No. 153 rely on the Declaration of Abdul Mohsen al Turki at MWL Ex. 38, those statements are disputed. The Declaration was never produced to Plaintiffs during the discovery phase of the litigation, nor was it ever produced to Plaintiffs during or after Turki's deposition was completed in these proceedings in 2018. Plaintiffs have not been afforded an opportunity to cross-examine Turki's new declaration testimony, some of which appears to be inconsistent with his prior deposition testimony in 2018, and the Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony. |
| 154. The Rabita Trust project director from 2001 to 2007 did not interact with the Rabita Trust Board and explained that "there was no board" when asked whether he interacted with the Rabita Trust Board. Ex. # 52, Gari Dep. Tr. at 140:21-141:1 (*Errata*). | Disputed. The Rabita Trust project director, Rahmatullah Nazir Khan Gari, communicated with several members of the Rabita Trust Board of Trustees following the 9/11 attacks. *See, e.g.*, Ex. 157, IIRO 149637-149639 (October 13, 2001 letters from Rahmatullah Nazir Khan Gari to Rabita Trust Board of Trustee members Wa'el Jelaidan, MWL Secretary General Abdullah al Turki, and IIRO Secretary General Adnan Basha informing of the media's interest in the office following the designation of Rabita Trust the previous day, and explaining the Saudi Ambassador in Pakistan, Ali Awwad Asiri, instructed them to release any statements to the press or television.); Ex. 205, IIRO 149628, 149630, 149633-149636 (October 14, 2001 letters from Rahmatullah Nazir Khan Gari to Rabita Trust Board of Trustee members Wa'el Jelaidan and IIRO Secretary General Adnan Basha advising that some daily newspapers have "published the news of including the Rabita Trust among the organizations that support Osama Bin Laden or Al-Qaeda." |

| | |
|---|---|
| 155. He "found all the villas destroyed, destroyed as a result of the time passing" when he visited the city built for stranded Biharis. Ex. # 52, Gari Dep. Tr. at 136:14-16. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 156. By the time Rahmatullah Nazir Khan Gari became the volunteer head of the MWL Pakistan office, the individual holding that post automatically became the director of the Rabita Trust office or project. Ex. # 52, Gari Dep. Tr. at 134:24-135:6. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 157. The Rabita Trust and MWL did not share offices in Pakistan. Ex. # 52, Gari Dep. Tr. at 135:7-14. | Disputed. Rabita Trust and its employees operated out of the MWL's office in Mecca, Saudi Arabia and the MWL's branch office in Pakistan. For instance, an October 29, 1992 letter concerning a Rabita Trust office in Lahore is addressed to "*Mr. Wa'el H. Jelaidan, Project Director, Rabita Trust, Muslim World League, H-8/1, Islamabad*." A December 29, 1997 letter co-authored by MWL Secretary General Abdullah al Obaid on Rabita Trust letterhead identifies Rabita Trust offices operating from the MWL offices in Mecca, Saudi Arabia and Islamabad, Pakistan: *Makkah Office: c/o Muslim World League, P.O. Box 537, Makkah*; and *Islamabad Office: c/o Muslim World League, H-8/1, Islamabad*. Finally, a series of letters dated October 22, 2001 letter concerning Rabita Trust account balances are addressed to "*The Secretary General, Rabita Trust for Stranded Pakistanis, World Muslim League, P.O. Box 1030, Makkah Al Mukrmah, Saudi Arabia*." *See* <u>Ex. 35</u>, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 55.<br><br>Rabita Trust and its employees also operated out of the IIRO's branch office in Islamabad, Pakistan. A series of letters dated October 11, 2001 concerning Rabita Trust are addressed to "*Mr. Rahmat Ullah Nazir Kahn, Project Director, Rabita Trust for Rehabilitation of Stranded Pakistanis, Pitrus Bokari Road, H-8/1, Islamabad*." An October 12, 2001 letter authored by Mr. Khan in his capacity as the office director of the IIRO branch office in Islamabad identifies the same address as "*H-8/1- Pitrus Bokari Road*." *Id.* at ¶ 56. |
| 158. The Rabita Trust had two offices: head office in Lahore and a sub office in Mian Channu. Ex. # 69, Aslam Khan and Company Auditor's Report at A4. | Disputed. *See, e.g.*, Plaintiffs' response to No. 157. |
| 159. The Rabita Trust was an independent organization and not a part of MWL (Ex. # 38, Turki PJ Decl. ¶ 22; Ex. # 39, Obaid PJ Decl. ¶ 13; Ex. # 23, Turki Dep. Tr. at 294:2-295:2 (*Errata*)) that managed its own assets in coordination with the Government of Pakistan. Ex. # 5, Turki Decl. ¶ 22; Ex. # 6, Obaid Decl. ¶ 21; Ex. # 56, Fundraising Appeal (IIRO 149661) (directing donations payable to Habib Bank | Disputed. The MWL's claim that Rabita was an independent organization and not part of the MWL is inaccurate and misleading.<br><br>By way of further response, the MWL exerted significant control and oversight of Rabita Trust. Documents produced in discovery by the MWL, IIRO, and Jelaidan demonstrate that |

| | |
|---|---|
| account of Rabita Trust Secretary General); *see generally* Ex. # 55, Deed at Preamble, IIRO-111692 to IIRO-111699. | the MWL and IIRO: (1) were directly involved in the founding of Rabita Trust, including its initial funding; (2) populated Rabita Trust's Board of Trustees with senior high-ranking officials of the MWL and IIRO; (3) exerted significant oversight and control over Rabita Trust's operations and activities from 1988 through at least 2004; (4) were responsible for appointing the individuals to lead the organization, including the appointment of Executive Order 13224 Specially Designated Global Terrorist ("SDGT") Wa'el Jelaidan as Secretary General of Rabita Trust; (5) permitted Rabita Trust to operate out of MWL-IIRO offices, including the MWL's office in Mecca; (6) coordinated responses and actions following the E.O. 13224 designation of Rabita Trust; (7) ordered the closure of Rabita Trust's office in Lahore and the seizure of all documents in the office; and (8) coordinated efforts to petition the U.S. Treasury Department to remove the Rabita Trust from the designation list. *See, e.g.*, Ex. 134, Jelaidan 017 (Rabita Trust deed identifying senior leaders of the MWL populated the initial Board of Trustees when it was formed in 1988, including MWL Secretary General Abdullah Omar Naseef and other representatives from "Rabita al Alam al Islami" (a/k/a MWL)); Ex. 133, Jelaidan 016 (March 14, 2000 Circular regarding the "revised and up-dated composition of Rabita Trust Board," including MWL Secretary General Abdullah al Obaid and IIRO Secretary General Adnan Basha); Ex. 140, MWL 30817-30819 (October 14, 2000 letter from Wa'el Jelaidan with a list of members of the Rabita Trust Board, including MWL Secretary General Abdullah al Obaid, former MWL Secretary General Abdullah Omar Naseef, Director of the IIRO's Eastern Province branch office Prince Turki bin Fahd bin Jalawy al Saud, IIRO Secretary General Adnan Basha, and MWL official Mohammed bin Abdullah al Dubaiban.); Ex. 115, IIRO 149637-149639 (October 13, 2001 letters to MWL Secretary General Abdullah al Turki, IIRO Secretary General Basha, and Jelaidan concerning questions from journalists following U.S. designation of Rabita Trust); Ex. 114, IIRO 149628, 149630, 149633-149636 (same); Ex. 135, Jelaidan 020 (indicating that the Secretary General issued an order to close the Lahore office of the Rabita Trust following the 9/11 attacks); Ex. 187, Jelaidan 009 (2002 letter concerning efforts to remove Rabita Trust from the U.S. designation list). *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 50-63.<br><br>*See also* Plaintiffs' responses to Nos. 122-124, and 129.<br><br>Finally, to the extent the MWL's assertion at No. 140 relies on the Declaration of Abdullah bin Saleh al Obaid at MWL Ex. 39, the statement is disputed. The Declaration was never produced to Plaintiffs during the discovery phase of the |

| | |
|---|---|
| | litigation, nor was it ever produced to Plaintiffs during or after Obaid's deposition was completed in these proceedings in 2018. Plaintiffs have not been afforded an opportunity to cross-examine Obaid's new declaration testimony, some of which appears to be inconsistent with his prior deposition testimony in 2018, and the Declaration fails to cite to or provide a single document or piece of evidence supporting their testimony.<br><br>In particular, MWL Secretary General Abdullah bin Saleh al Obaid submitted a declaration in these proceedings acknowledging his role as an officer of Rabita Trust, which he described as "a charity that is partly owned by the Muslim World League, and partly owned by the government of Pakistan." *See* Ex. 147, Declaration of Abdullah bin Saleh al Obaid at ¶ 5. Compare with Obaid's declaration testimony submitted in support of the MWL's motion for summary judgment stating that "[t]he Rabita Trust is an independent organization and not a part of MWL." *See* MWL Exhibit 39, Declaration of Dr. Abdullah bin Saleh al Obaid at ¶ 13. |
| 160. The Rabita Trust maintained its own corporate governance, functions, identities, operations, payrolls, and budgets, distinct from those of MWL or IIRO. Ex. # 5, Turki Decl. ¶ 22; Ex. # 6, Obaid Decl. ¶ 21; *see generally* Ex. # 55, Deed at Preamble, IIRO-111692 to IIRO-111699. | Disputed. *See, e.g.*, Plaintiffs' response to No. 157.<br><br>Moreover, to the extent the MWL's assertions at No. 160 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki and Abdullah bin Saleh al Obaid at MWL Exs. 5 and 6, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after their depositions were completed in these proceedings in 2018. Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, some of which appears to be inconsistent with their prior deposition testimony in 2018, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 161. The Rabita Trust maintained independent operational and document management systems from those of MWL. Ex. # 70, Fawzi Decl. ¶ 36. | Disputed. *See, e.g.*, Plaintiffs' response to No. 157. |
| 162. MWL could not and did not control the Rabita Trust's day-to-day activities or management. Ex. # 5, Turki Decl. ¶ 24; Ex. # 6, Obaid Decl. ¶ 22. | Disputed. *See, e.g.*, Plaintiffs' response to No. 157.<br><br>Moreover, to the extent the MWL's assertions at No. 162 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki and Abdullah bin Saleh al Obaid at MWL Exs. 5 and 6, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after their depositions were completed in these proceedings in 2018. Plaintiffs have not been afforded an opportunity to |

| | |
|---|---|
| | cross-examine the individuals' new declaration testimony, some of which appears to be inconsistent with their prior deposition testimony in 2018, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 163. The Rabita Trust could not and did not act on MWL's behalf. Ex. # 5, Turki Decl. ¶ 24; Ex. # 6, Obaid Decl. ¶ 22. | Disputed. *See, e.g.*, Plaintiffs' response to No. 157.<br><br>Moreover, to the extent the MWL's assertions at No. 163 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki and Abdullah bin Saleh al Obaid at MWL Exs. 5 and 6, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after their depositions were completed in these proceedings in 2018. Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, some of which appears to be inconsistent with their prior deposition testimony in 2018, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 164. MWL did not pay the salaries of Rabita Trust employees. Ex. # 69, Aslam Khan and Company Auditor's Report at 59; Ex. # 68, Jelaidan, Ltr. from Al-Turki to Pakistani Ambassador to Saudi Arabia (discussing fact that Rabita Trust employees had not been paid since its accounts were frozen). | Disputed. The documents cited by the MWL offer no support for its assertion at No. 164 that MWL monies did not pay salaries for Rabita Trust employees. *See* Ex. 134, Jelaidan 017 (Rabita Trust Deed indicating that the MWL contributed 50 million rupees to the Rabita Trust that year). |
| 165. Rabita Trust fundraised on its own behalf. Ex. # 56, Appeal for Donation to the Rabita Trust, IIRO 149661 (requesting donations be made to Rabita Trust's bank accounts). | Disputed as stated. It is unclear what the MWL means by "on its own behalf." To the extent the MWL is asserting that Rabita Trust did not receive funding from sources other than the MWL and Government of Pakistan, the MWL has failed to support that assertion with admissible evidence. |
| 166. Neither MWL Secretary General Abdullah bin Abdul Mohsen Al-Turki nor Secretary General Abdullah bin Saleh Al-Obaid is aware of any activities conducted or financing provided by the Rabita Trust in support of Al Qaeda or any other terrorist organization. Ex. # 5, Turki Decl. ¶ 24; Ex. # 6, Obaid Decl. ¶ 23; 66 Fed. Reg. 54,404, 54,408. | Disputed. *See* Plaintiffs' responses to Nos. 122, 123, 124, 129, 132, 159.<br><br>Moreover, to the extent the MWL's assertions at No. 166 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki and Abdullah bin Saleh al Obaid at MWL Exs. 5 and 6, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after their depositions were completed in these proceedings in 2018. Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, some of which appears to be inconsistent with their prior deposition testimony in 2018, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |

| | |
|---|---|
| 167. If Rabita Trust conducted any activity or provided any financing in support of Al Qaeda or any other terrorist organization, it was not approved tacitly or explicitly by MWL, by Secretary General Abdullah bin Abdul Mohsen Al-Turki or by MWL Secretary General Abdullah bin Saleh Al-Obaid. Ex. # 5, Turki Decl. ¶ 24; Ex. # 6, Obaid Decl. ¶ 23. | Disputed. *See* Plaintiffs' responses to Nos. 122, 123, 124, 129, 132, 159.<br><br>Moreover, to the extent the MWL's assertions at No. 167 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki and Abdullah bin Saleh al Obaid at MWL Exs. 5 and 6, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after their depositions were completed in these proceedings in 2018. Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, some of which appears to be inconsistent with their prior deposition testimony in 2018, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 168. Plaintiffs have no evidence that MWL was aware or had knowledge before 9/11 of any connection between Rabita Trust and Al Qaeda. Ex. # 5, Turki Decl. ¶ 24; Ex. # 6, Obaid Decl. ¶ 23; 66 Fed. Reg. 54,404, 54,408. | Disputed. *See* Plaintiffs' responses to Nos. 122, 123, 124, 129, 132, 159.<br><br>Moreover, to the extent the MWL's assertions at No. 168 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki and Abdullah bin Saleh al Obaid at MWL Exs. 5 and 6, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after their depositions were completed in these proceedings in 2018. Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, some of which appears to be inconsistent with their prior deposition testimony in 2018, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 169. Rabita Trust was designated by OFAC on October 12, 2001 pursuant to Executive Order 13244. 66 Fed. Reg. 54,404, 54,408. | Undisputed as a general matter for purposes of this motion. *See also* Ex. 68, October 12, 2001 U.S. Department of the Treasury Designation of Rabita Trust, FED-PEC 215391-215394 (stating that Rabita Trust was designated "for its closes ties to senior al Qaida leadership and for providing logistical and financial support to al Qaida"). *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 57.<br><br>*See also* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (identifying "the Bin Ladin-backed Rabita Trust for Stranded Pakistanis" as one of several NGOs that have been infiltrated by Osama bin Laden); *id.* at 544 (identifying Wa'el Jelaidan as the "secretary general of Rabita Trust," one of the "Bin Ladin-affiliated charities"). |

| | |
|---|---|
| 170. Member of the Board, Retired Pakistani Brigadier General Muhammad Ilyas Khan, ordered an audit of the Rabita Trust in October 2001. Ex. # 56, 2001 Letter from Muhammad Ilyas Khan to Rahmat Ullah Nazir Khan, IIRO 149642 ¶ 2. | It is not disputed that the letter at ¶ 2 states that an "audit of all accounts of the Trust Fund operated by the Head and sub offices" has been authorized. Plaintiffs are unaware that any such audit of the Rabita Trust accounts ever occurred, since those audit findings have never been produced. |
| **Wael Jelaidan** | No response necessary. |
| 171. Plaintiffs have no evidence that Wael Jelaidan had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; *see generally* 9/11 Commission Report; Monograph. | Disputed. The MWL's claim that there is no evidence that Wa'el Hamza Jelaidan had any foreknowledge of or was involved in the planning or execution of the 9/11 attacks is inaccurate and misleading. The MWL, IIRO, and Jelaidan were witting supporters of Osama bin Laden, al Qaeda, and associated terrorist organizations for more than a decade leading up to the 9/11 attacks and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States. Jelaidan, a founding member of al Qaeda, operated at the very center of al Qaeda's leadership, operations, and financial and logistical support structure during the critical period leading up to the 9/11 attacks, and was well aware of al Qaeda's terrorist intentions at all relevant times.<br><br>As referenced herein, Dr. Omar Abdullah Naseef, in his capacity as the MWL Secretary General, endorsed the appointment of Jelaidan, a founding member of al Qaeda, as the director of the MWL/IIRO offices in Peshawar, Pakistan in 1989, thereby ensuring a direct channel for coordinating MWL/IIRO's collaboration with Osama bin Laden and al Qaeda. Jelaidan's role with the MWL allowed al Qaeda to use the MWL as an "umbrella" under which the terror group's members could operate, including using MWL offices for launching terrorist attacks. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150 (indicating that Jelaidan and Mohammed Jamal Khalifa (also an al Qaeda member) served in official roles with the MWL).<br><br>Jelaidan was a close associate of Osama bin Laden, and one of the most significant figures in the history of al Qaeda and its development into a global terrorist organization. *See* Ex. 53, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2002, FED-PEC 203469-203470 at 203470 ("Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that 'We are all in one boat, as is known to you, including our brother, Wa'el Julaidan.'"); Ex. 180, *Additional Designation Pursuant to E.O. 13224*, TREASURY00001-8 at 4-5 (stating that "Julaidan is |

| | |
|---|---|
| | identified as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief," and also served on al Qaeda's shura council). *See also* Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 ("By way of background, Usama Bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ('MK') (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al Madani") of the International Islamic Relief Organization (hereafter "IIRO," sometimes referred to as "Igatha" based upon its Arabic name "*Hay'at al-Igatha al-Islamiya al-'Alamtyaa*"), which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL'). In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*."). <br><br> In addition to his roles with the IIRO and MWL, Dr. Naseef also appointed Jelaidan to head the Rabita Trust, a subsidiary of the MWL. *See* Ex. 136, Wa'el Jelaidan CV, Jelaidan 022. Rabita Trust was designated by the U.S. government as a Specially Designated Global Terrorist ("SDGT") on October 12, 2001 for "its close ties to senior al Qaida leadership and providing logistical and financial support to al Qaida." *See* Ex. 68, FED-PEC 215391-215394 at 215391. <br><br> Jelaidan also served as a board member of the Al-Haramain & Al Masjed Al-Aqsa Charity Foundation ("AHAMAA"), an integral part of the MWL organizational structure, *see* Ex. 139, MWL 19138, and held signatory authority over AHAMAA's bank accounts which he used to fund terrorist operations. AHAMAA was designated as a Specially Designated Global Terrorist ("SDGT") by the U.S. government on May 6, 2004 for its significant financial ties to al Qaeda. *See* Ex. 63, May 6, 2004 E.O. 13224 Designation of Al Haramain al Masjed al Aqsa, FED-PEC 213972-213977; Ex. 64**,** May 6, 2004 U.S. Treasury Department Press Center, *Treasury Designates Bosnian Charities Funneling Dollars to Al Qaida*, FED-PEC 213978-213979; Ex. 148, U.S. Diplomatic Cable, *Terrorist* |

| | |
|---|---|
| | *Finance: Bosnia's Dirty Dozen*, November 2002, PECFOIA0004499-4503 at 4500 (identifying AHAMAA as one of at least a dozen Islamic charities "currently involved in providing financial support to known terrorist organizations"); Ex. 149, U.S. Diplomatic Cable, *Terrorist Finance: Dirty Dozen's Web of Deceit*, August 2003, PECFOIA049927-49932 at 49928 ("Documentation was provided to EUR/SCE demonstrating control over Al Haramayn al Masjid Al Aqsa by top Al Qa'ida financier Wa'el Julaidan (designated on E.O. 13224 in 2002).").<br><br>As al Qaeda was establishing its operations in Kosovo and Chechnya, Jelaidan further assumed the position as director of the joint IIRO/Saudi Joint Relief Committee ("SJRC") office in Pristina, Kosovo. *See* Ex. 98, Memorandum of Understanding between the IIRO and SJRC, IIRO 41030; Ex. 130, IIRO 39085, 39086, 39278 (shared office expenses). More than a year before the 9/11 attacks, U.S. officials sent a written request to the U.N. Peace Keeping Force in Pristina, requesting that U.N. police undertake surveillance of the office. In that document, marked "Secret: U.S. Office Only – Release to UNMIK," the U.S. government asserted that Jelaidan and SJRC official Adel Muhammad Sadi Bin Kazam were "associates of Osama bin Laden" and that Jelaidan was actively involved in helping bin Laden "move money and men to and from the Balkans." *See* Ex. 43, BBC News, *U.S. Fears Terrorist Attack in Kosovo*, April 3, 2000, FED-PEC0097363-97365 at 97364. Acting on that information, the U.N. Mission in Kosovo ("UNMIK") raided the building and declared that the IIRO/SJRC office served as a cover for several al Qaeda operatives, including Jelaidan and Kazem. *Id.*<br><br>*See also* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150 (indicating that "[s]everal of Bin Ladin's associates, including Wa'il Julaydan and Muhammad Jamal Khalifa, were MWL representatives"); Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"). |
| 172. Plaintiffs have no evidence tracing Wael Jelaidan funds to the planning or execution of 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040- 000011; *see generally* 9/11 Commission Report; Monograph. | Disputed. The MWL's claim that there is no evidence tracing funds or other in-kind support from Jelaidan to the planning and execution of the 9/11 attacks, is inaccurate and misleading. As described herein, the MWL, IIRO, and Jelaidan were witting supporters of Osama bin Laden and al Qaeda for more |

| | |
|---|---|
| | than a decade leading up to the 9/11 attacks, and thus were specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance and other resources to bin Laden, al Qaeda, and associated terrorist organizations for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks. Accordingly, the 9/11 attacks were a predictable, inevitable product of that sustained, knowing support. Plaintiffs need not prove that the funds or other in-kind support provided to al Qaeda were traced to the terrorist plot or the attack itself.<br><br>By way of further response, Jelaidan was a close associate of Osama bin Laden, and one of the most significant figures in the history of al Qaeda and its development into a global terrorist organization. Jelaidan's appointed positions to the MWL, IIRO, Rabita Trust, Al-Haramain & Al Masjed Al-Aqsa Charity Foundation ("AHAMAA"), and Saudi Joint Relief Committee ("SJRC"), allowed him to direct extensive financial and logistical support to al Qaeda for years leading up to the 9/11 attacks. *See, e.g.*, Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"); Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 ("In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*."); *See* Ex. 53, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2002, FED-PEC 203469-203470 at 203470 ("Julaidan has directed organizations that have provided financial and logistical support to al-Qa'ida."). |
| 173. Plaintiffs have no evidence tracing in-kind support from Wael Jelaidan to the planning or for the execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 2 and 172. |

| | |
|---|---|
| Closing Case (May 27, 2021) at E014040-000011; *see generally* 9/11 Commission Report; Monograph. | |
| 174. Plaintiffs have no evidence tracing funds from MWL through Wael Jelaidan to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. # 2, May 27, 2021 FBI Report Administratively Closing Case, at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from MWL to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 27-70 (same) (ECF No. 9250-2); Levitt Rpt. at 29-35 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *See also* Ex. # 4, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); *see generally* 9/11 Commission Report; Monograph. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 2 and 172. |
| 175. Wael Jelaidan was appointed MWL office director in Islamabad in 1990, and he remained there until he was transferred to MWL Head Office in Makkah, Saudi Arabia on September 22, 1994. Ex. # 70, Fawzi 2018 Decl. ¶ 38. | To the extent the MWL's assertion at No. 175 relies on the Declaration of Mohamed Fawzi at MWL Ex. 70, the statement is disputed. The Fawzi Declaration was never produced to Plaintiffs during the discovery phase of the litigation. Plaintiffs have not been afforded an opportunity to cross-examine Fawzi's new declaration testimony, and the Fawzi Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony. |
| 176. Wael Jelaidan resigned from MWL on November 1, 1995 and held no further employment with MWL. Ex. # 70, Fawzi 2018 Decl. ¶ 38. | Disputed. The MWL's claim that Jelaidan was not employed with the MWL following November 1, 1995 is inaccurate and misleading.<br><br>As an initial matter, Jelaidan continued to serve and work with the MWL for years following the 9/11 attacks by virtue of his leadership positions with the Rabita Trust. *See* Ex. 136, Jelaidan 022, Wael Jelaidan CV (stating that he started working for the MWL in 1989, became a project director of the Rabita Trust in 1992, and was appointed as head of the Rabita Trust in 1998). *See also* Ex. 132, Affidavit of Wael Hamza Jelaidan, MDL ECF No. 2702 at ¶ 4 ("I have been the Secretary-General of the Rabita Trust since 1999 till this date"). The affidavit was signed on October 29, 2011.<br><br>*See also* Ex. 188, Arab News, *U.S. Urged to Give Sound Proof in Julaidan's Case*, September 8, 2002, MDL ECF No. 2989-13 at 2 ("Speaking on condition of anonymity, [a source at the Muslim World League] told AFO Julaidan was still working with the Muslim World League. 'He has been with the League for the last 10 to 12 years,' said the source. Julaidan is a |

| | |
|---|---|
| | businessman from a well-connected family based in Madinah.”). |
| 177. Wael Jelaidan held multiple roles at Rabita Trust. In October 1992, the Pakistani government—the Prime Minister specifically—approved Jelaidan’s appointment as Project Director and to the Rabita Trust Board. Ex. # 57, Ltr. from Tariq to WJ MWL 008691. | It is not disputed that Jelaidan served as a project director for the Rabita Trust. *See* Ex. 136, Wa’el Jelaidan CV, Jelaidan 022 at 2. |
| 178. Later that decade, after he left MWL, the government of Pakistan proposed Wael Jelaidan’s appointment as Director General-cum-Secretary General of the Rabita Trust, as Jelaidan was well known to the then-Prime Minister of Pakistan, Nawaz Sharif. And on February 15, 1999, Wael Jelaidan was appointed Director General-cum-Secretary General of the Rabita Trust, in connection with the Pakistani government’s attempt to resurrect the Trust’s activities. Ex. # 31, Obaid Dep. Tr. at 92:12-93:19 (*Errata*); Ex. # 39, Obaid PJ Decl. ¶ 18; Ex. # 71, MWL 30814 (February 15, 1999 MWL administrative order signed by Al Obaid canceling the order appointing Sameer Radhi as RT SG and appointing WJ instead). | Disputed. To the extent that the MWL is asserting that the government of Pakistan solely proposed Jelaidan’s appointment as Secretary General of Rabita Trust, that is inaccurate and misleading. MWL Secretary General Abdullah al Obaid testified that the regulations of the Rabita Trust required consultation between the MWL Secretary General and the Pakistani government, and that he was in fact consulted about Jelaidan’s proposed appointment. *See* Ex. 23, Transcript, September 17, 2018 Deposition of Abdullah al Obaid (“Obaid Transcript”) at 91-92.<br><br>Moreover, to the extent that the MWL’s assertions at No. 178 rely on the Declaration of Abdullah bin Saleh al Obaid at MWL Ex. 39, those statements are disputed. The Obaid Declaration was never produced to Plaintiffs during the discovery phase of the litigation, nor was it produced to Plaintiffs during or after Obaid’s deposition was completed in these proceedings on September 17, 2018. Plaintiffs have not been afforded an opportunity to cross-examine Obaid’s new declaration testimony, and the Obaid Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony. |
| 179. The MWL Secretary General, as Trust Vice-Chairman, appointed the Director General-cum-Secretary General of the Rabita Trust, on the proposal from the government of Pakistan. Ex. # 31, Obaid Dep. Tr. at 91:5-24, 92:12-93:19 (*Errata*); *See also Id.* at 89:1-8 (*Errata*); Ex. # 39, Obaid PJ Decl. ¶ 18. | Disputed. *See* Plaintiffs’ response to No. 178. |
| 180. The appointing MWL Secretary General and then-Rabita Trust Vice-Chairman, Abdullah Al-Obaid, had not met Wael Jelaidan at the time of the appointment and did not know Jelaidan personally. Ex. # 31, Obaid Dep. Tr. at 92:12-93:19 (*Errata*); Ex. # 39, Obaid PJ Decl. ¶ 17. | Disputed. *See* Plaintiffs’ responses to Nos. 1, 2, 6, 9, 60, 66, 71, 75, 122, 123, 132, 159, 171, 172, 176, 187, and 188.<br><br>Moreover, to the extent that the MWL’s assertions at No. 180 rely on the Declaration of Abdullah bin Saleh al Obaid at MWL Ex. 39, those statements are disputed. The Obaid Declaration was never produced to Plaintiffs during the discovery phase of the litigation, nor was it produced to Plaintiffs during or after Obaid’s deposition was completed in these proceedings on September 17, 2018. Plaintiffs have not been afforded an opportunity to cross-examine Obaid’s new declaration testimony, and the Obaid Declaration fails to cite |

| | |
|---|---|
| | to or provide a single document or piece of evidence supporting his testimony. |
| 181. Due to his relationship with Prime Minister Sharif, Wael Jelaidan's appointment was a fait accompli when presented to Dr. Al-Obaid. Ex. # 39, Obaid PJ Decl. ¶ 18. | To the extent that the MWL's assertions at No. 181 rely on the Declaration of Abdullah bin Saleh al Obaid at MWL Ex. 39, those statements are disputed. The Obaid Declaration was never produced to Plaintiffs during the discovery phase of the litigation, nor was it produced to Plaintiffs during or after Obaid's deposition was completed in these proceedings on September 17, 2018. Plaintiffs have not been afforded an opportunity to cross-examine Obaid's new declaration testimony, and the Obaid Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony.<br><br>In particular, Obaid never raised any issue or provided any information during his September 17-18, 2019 deposition asserting that Jelaidan's appointment was a fait accompli when it was presented to him. |
| 182. Prior to his designation by OFAC in September 2002, MWL was not aware of any allegations that Wael Jelaidan provided any support, whether financial or otherwise, to Al Qaeda. See Ex. # 4, Brown Rpt. at 5, 20, 43, 87-88, 87 n.396, 90; Ex.# 72, Roy Dep. Tr. at 143:9-145:4 (*Errata*); Ex. # 36, Obaid Decl. ¶ 11; Ex. # 5, Turki Decl. ¶ 13; 67 Fed. Reg. 66,6707, 66,708 (Nov. 1, 2002). | Disputed. *See* Plaintiffs' responses to Nos. 1, 2, 6, 9, 60, 66, 71, 75, 122, 123, 132, 159, 171, 172, 176, 187, and 188.<br><br>Moreover, to the extent the MWL's assertion at No. 182 relies on the Declarations of Abdullah bin Abdul Mohsen al Turki and Abdullah bin Saleh al Obaid at MWL Exs. 5 and 36, that statement is disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after their depositions were completed in these proceedings in 2018. Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, some of which appears to be inconsistent with their prior deposition testimony in 2018, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 183. Wael Jelaidan was designated by OFAC on September 6, 2002 pursuant to Executive Order 13224. 67 Fed. Reg. 66,6707, 66,708 (Nov. 1, 2002). | Undisputed as a general matter for purposes of this motion. |
| 184. OFAC's designation rests on circular logic: Jelaidan was designated for running an organization that supported Al Qaeda, the Rabita Trust, and the Rabita Trust was designated because Jelaidan ran it. Ex. # 4, Brown Rpt. at 90-91. | Disputed. The U.S. Department of the Treasury's press release concerning the designation of Jelaidan as a Specially Designated Global Terrorist ("SDGT") explains the bases for OFAC's determination, including but not limited to (1) Jelaidan is "an associate of Usama bin Laden and a supporter of al-Qa'ida terror;" (2) Osama bin Laden and Abu Zubaida identified Jelaidan "as a known associate of [al Qaeda] operations;" and (3) "Julaidan has been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network." *See* Ex. 53, |

| | |
|---|---|
| | *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2002, FED-PEC 203469-20370. Ex. 180, *Additional Designation Pursuant to E.O. 13224*, TREASURY00001-8 at 4-5 (stating that "Julaidan is identified as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief," and also served on al Qaeda's shura council). |
| 185. Wael Jelaidan was designated by the United Nations Security Council in September 2002. Ex. # 73, UN Delisting. | Undisputed as a general matter for purposes of this motion. |
| 186. The United Nations Security Council removed Wael Jelaidan from its sanctions list on August 26, 2014. Ex. # 73, UN Delisting; Ex. # 4, Brown Rpt. at 93. | It is not disputed that Jelaidan was delisted by the U.N. Security Council on August 26, 2014. However, to the extent the MWL argues that the U.N.'s delisting exonerates Jelaidan from any accountability for the extensive financial, material, and logistical support he and the IIRO provided to al Qaeda in the decade leading to the 9/11 attacks, that is disputed as inaccurate and misleading. |
| 187. Wael Jelaidan, a member of the Services Bureau, was not known publicly as a member or founder of Al Qaeda and broke with Bin Laden and stayed with the Services Bureau when Bin Laden left the Services Bureau to form Al Qaeda. Ex. # 4, Brown Rpt. at 5, 20, 87-88, 90; Ex. # 72, Roy Dep. Tr. at 143:9-145:4 (*Errata*). | Disputed. The MWL's claim that Wa'el Jelaidan was not a member or founder of al Qaeda, and further, that Jelaidan broke with Osama bin Laden after he left the Services Bureau to form al Qaeda, is inaccurate and misleading.<br><br>As an initial matter, it is well-documented that Jelaidan was a founding member of al Qaeda. *See, e.g.*, Plaintiffs' response to No. 1. Internal al Qaeda documents chronicling the formation of the organization, seized during a 2002 raid of the Sarajevo office of an al Qaeda front, the Benevolence International Foundation ("BIF"), confirm that al Qaeda planned from its inception to use the MWL and its subsidiary bodies, to include the IIRO, to provide support and cover for al Qaeda's operations. A BIF computer file named "Tareekh Osama" (or "Osama's History") contained numerous documents describing al Qaeda's formation and Jelaidan's significant role in the nascent organization. *See, e.g.*, *See* Ex. 61, FED-PEC0212276-212281 at 212278 (a document on MWL/IIRO letterhead detailing a meeting between "Abu Abdullah" (a/k/a Osama bin Laden), Dr. Abdullah Omar Naseef, in his capacity as the Secretary General of the MWL, and others where it was agreed that al Qaeda attacks would be launched from MWL offices, and further suggesting using the name of the "League" as "an umbrella which you can stay under … because Dr. Naseef is one of the brothers, and the government knows who Abu Al-Hasan [Wa'el Hamza Jelaidan] is."); Ex. 67, FED-PEC 215313-215314 at 215313 ("Forming a committee to take care of the brothers' problems, and of the financial matters," and indicating "Brother Wael Jleidan" was a member of that committee); Ex. 66, FED-PEC 215309-215312 at 215309 (letter from Osama bin Laden to al Qaeda member Abu al |

| | |
|---|---|
| | Ridha with a directive to Wa'el Jelaidan (a/k/a Abu al Hassan al Madani) concerning weapons: "Brother Abu Al Hasan we have an extreme need for weapons so I urge that you not provide them with more than 25% of the existing weapons."). *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 29.<br><br>Notably, members of terrorist organizations like al Qaeda typically do not want to be "known publicly" and strategically use cover employment, aliases, and front organizations to obscure their terrorist activities, secure financing and other resources, and blend into civilian populations. Indeed, Jelaidan used several aliases and alternative spellings to his name, and cover employment with various purported charitable organizations, to secure and provide substantial financial assistance to the Services Bureau (a/k/a Maktab al Khidamat ("MAK")), al Qaeda, and associated terror groups.<br><br>By way of further response, *see* Plaintiffs' response to No. 362 (explaining that after Azzam's death, Osama bin Laden assumed full control of MAK, and MAK was absorbed into al Qaeda, and further noting that the da'wa organizations that funded and supported MAK during the 1980s—MWL, IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Red Crescent Society, and Benevolence International Foundation—continued to serve as the primary conduits for channeling financial, logistical, operational, and ideological support to al Qaeda's global jihad for years leading up to the 9/11 attacks). Contemporaneous with the formation of al Qaeda, Jelaidan was appointed as the director of the MWL/IIRO offices in Peshawar, Pakistan, thereby guaranteeing a direct channel for coordinating MWL/IIRO's collaboration with Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 1.<br><br>And contrary to the MWL's claim that Jelaidan "broke with Bin Laden," Jelaidan remained a close associate of bin Laden for years, and became one of the more significant figures in the history of al Qaeda and its development into a global terrorist organization. In 1999, bin Laden acknowledged Jelaidan as "our brother." *See* Ex. 53, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2002, FED-PEC 203469-203470 at 203470 ("Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that 'We are all in one boat, as is known to you, including our brother, Wa'el Julaidan.'"). |
| 188. Jelaidan's "name does not appear on either of the two internal lists of [Al Qaeda] members from the late 1990s captured in Afghanistan," and "Jamal al-Fadl, an | Disputed. MWL's expert Vahid Brown does not identify or describe "either of the existing internal lists of al-Qa'ida |

| | |
|---|---|
| informant that Plaintiffs' experts rely on for many of their allegations, himself stated in an interview with the FBI that [Jelaidan] was not a member of [Al Qaeda]." Ex. # 4, Brown Rpt. at 43, 87 n.396. | members from the late 1990s." *See* MWL Exhibit 4, Expert Report of Vahid Brown at 91.<br><br>By way of further response, it is well-documented that Jelaidan was a founding member of al Qaeda. *See, e.g.*, Plaintiffs' response to No. 1. Internal al Qaeda documents chronicling the formation of the organization, seized during a 2002 raid of the Sarajevo office of an al Qaeda front, the Benevolence International Foundation ("BIF"), confirm that al Qaeda planned from its inception to use the MWL and its subsidiary bodies, to include the IIRO, to provide support and cover for al Qaeda's operations. A BIF computer file named "Tareekh Osama" (or "Osama's History") contained numerous documents describing al Qaeda's formation and Jelaidan's significant role in the nascent organization. *See, e.g.*, *See* Ex. 61, FED-PEC0212276-212281 at 212278 (a document on MWL/IIRO letterhead detailing a meeting between "Abu Abdullah" (a/k/a Osama bin Laden), Dr. Abdullah Omar Naseef, in his capacity as the Secretary General of the MWL, and others where it was agreed that al Qaeda attacks would be launched from MWL offices, and further suggesting using the name of the "League" as "an umbrella which you can stay under … because Dr. Naseef is one of the brothers, and the government knows who Abu Al-Hasan [Wa'el Hamza Jelaidan] is."); Ex. 67, FED-PEC 215313-215314 at 215313 ("Forming a committee to take care of the brothers' problems, and of the financial matters," and indicating "Brother Wael Jleidan" was a member of that committee); Ex. 66, FED-PEC 215309-215312 at 215309 (letter from Osama bin Laden to al Qaeda member Abu al Ridha with a directive to Wa'el Jelaidan (a/k/a Abu al Hassan al Madani) concerning weapons: "Brother Abu Al Hasan we have an extreme need for weapons so I urge that you not provide them with more than 25% of the existing weapons.").<br><br>*See also* Ex. 45, FED-PEC 134953-134955 ("Golden Chain" listing of al Qaeda's elite financial sponsors and facilitators, including Wa'el Jelaidan (IIRO/MWL official designated to receive financial contributions from Suleiman al Rashid, Abdel Qader Bakri, Salah al Din Abdel Jawad, and Abdel Hadi Taher). |
| 189. Plaintiffs have no evidence that MWL was aware of or had knowledge before 9/11 of any connection between Wael Jelaidan and Al Qaeda. See Ex. # 4, Brown Rpt. at 5, 20, 43, 87- 88, 87 n.396, 90; Ex. # 72, Roy Dep. Tr. at 143:9-145:4 (*Errata*); Ex. # 6, Obaid Decl. ¶ 11; Ex. # 5, Turki Decl. ¶ 13; 67 Fed. Reg. 66,6707, 66,708 (Nov. 1, 2002). | Disputed. *See* Plaintiffs' responses to Nos. 1, 2, 6, 9, 60, 66, 71, 75, 122, 123, 132, 159, 171, 172, 176, 187, and 188.<br><br>Moreover, to the extent the MWL's assertion at No. 189 relies on the Declarations of Abdullah bin Abdul Mohsen al Turki and Abdullah bin Saleh al Obaid at MWL Exs. 5 and 6, that statement is disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after their |

| | |
|---|---|
| | depositions were completed in these proceedings in 2018. Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, some of which appears to be inconsistent with their prior deposition testimony in 2018, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| **Mohammad Jamaal Khalifa** | No response necessary. |
| 190. Plaintiffs have no evidence that Muhammad Jamal Khalifa had any foreknowledge or was involved in the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; *see generally* 9/11 Commission Report; Monograph. | Disputed. The MWL's claim that there is no evidence that Muhammad Jamal Khalifa had any foreknowledge of or was involved in the planning or execution of the 9/11 attacks, is inaccurate and misleading. The MWL, IIRO (the MWL's subsidiary), Khalifa, and the IIRO-Philippines branch office were witting supporters of Osama bin Laden, al Qaeda, and associated terrorist organizations (Abu Sayyaf Group, Moro Islamic Liberation Front) for more than a decade leading up to the 9/11 attacks, and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States. Khalifa, a founding member of al Qaeda and Osama bin Laden's brother-in-law, operated at the very center of al Qaeda's leadership, operations, and financial and logistical support structure during the critical period leading up to the 9/11 attacks, and was well aware of al Qaeda's terrorist intentions at all relevant times. As the head of the IIRO branch office in the Philippines, Khalifa personally orchestrated the IIRO's funding and support for the Bojinka terrorist plot conceived by 9/11 mastermind Khalid Sheikh Mohammed, the precursor to the 9/11 attacks. *See* Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12, 24 (discussing the Bojinka plot).<br><br>As referenced herein, Dr. Omar Abdullah Naseef, in his capacity as the MWL Secretary General and IIRO Chairman, approved the appointment of Khalifa to open a joint MWL/IIRO branch office in the Philippines, contemporaneous with the formation of al Qaeda, on June 5, 1988. *See* Ex. 51, FED-PEC 202846-202847. At the time of his appointment, the MWL and IIRO were fully aware that Khalifa was a prominent veteran of the Afghan jihad, a close associate of bin Laden, and member of al Qaeda. Shortly after assuming that post, Khalifa used the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia, and a source of funding for al Qaeda affiliated terrorist organizations such as the Abu Sayyaf Group ("ASG").<br><br>Using IIRO funds, Khalifa established a network of charities, businesses, and Islamic institutions in the Philippines (e.g., Dar al Imam al Shafi'e, Khalifa Trading Industries, ET Dizon Travel Pyramid Trading, and Manpower Services), to support |

| | |
|---|---|
| | international terrorism and fund the ASG. *See* Ex. 6, Center for Contemporary Conflict, *Al Qaeda Finances and Funding to Affiliated Groups*, January 2005, PEC-KSA001998-2013 at 2003; Ex. 156, U.S. Diplomatic Cable, *Islamic NGOs in the Philippines*, May 23, 2005, PEC-KSA 1461-1463 at 1462 ("Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 ("IIRO has also been cited as the conduit for funds from Usama Bin Laden to terrorist organizations, specifically that the Abu Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO."); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149-152 (indicating that al Qaeda member Mohammed Jamal Khalifa served in an official role with the MWL, and used the IIRO branch office in the Philippines to fund the Abu Sayyaf Group, an al Qaeda associated terrorist organization, and recruit Muslims for military training); Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 110-113 (According to the U.S. government, IIRO's branch in the Philippines was (i) headed by Osama bin Laden's brother-in-law and al Qaeda official, Mohammed Jamal Khalifa, who maintained close relationships with other senior al Qaeda members and financiers; (ii) provided ASG members with transit assistance to Afghanistan for military training; and (iii) additionally provided support for terrorist attacks conducted by ASG); *id.* at 107 ("The Abu Sayyaf Group [ASG] is the most violent of the separatist groups operating in the Southern Philippines and was designated as an SDGT pursuant to E.O. 13224 on September 24, 2001. It was formed in the early 1990's and received support and seed money from al Qaida.").<br><br>Beyond his role in establishing and supporting ASG, Khalifa personally orchestrated the use of IIRO funds and resources to support the terrorist activities of 9/11 mastermind Khalid Sheikh Mohammed ("KSM"), Ramzi Yousef (1993 World Trade Center bomber), and Wali Khan Amin Shah (Afghan jihad veteran and Osama bin Laden/al Qaeda associate) in the Philippines, and the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations of twelve U.S. flag commercial airplanes as they flew from Asia to the United States. That very plot, often referred to as |

| | |
|---|---|
| | "Operation Bojinka," was adapted into the 9/11 terrorist plot by KSM, using the knowledge he had acquired during its development about vulnerabilities in the aviation security system. *See* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 (stating that the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."). *See also* Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12, 24 (discussing the Bojinka plot).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 34 (citing excerpt from *Ghost Wars* by Steve Coll stating that the IIRO and MWL provided "important resources to Ramzi Yousef: "The FBI analysis listed the huge semiofficial Saudi Arabian charity, the International Islamic Relief Organization, and the largest government-sponsored Saudi religious proselytizing organization, the Muslim World League, as important resources for the new terrorist.").<br><br>In 2006, the United States formally designated the IIRO-Philippines branch office "for facilitating fundraising for al Qaida and affiliated terrorist groups." *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112. *See id.* ("The IIRO-PHL is a source of funding for the al Qaida affiliated ASG. IIRO-PHL has served as a liaison for the ASG with other Islamic extremist groups. A former ASG member in the Philippines familiar with IIRO operations in the country reported that a limited amount of foreign IIRO funding goes to legitimate projects and the rest is directed to terrorist operations."). *id.* ("The Philippine branches of the IIRO were founded sometime in the late 1980s or early 1990s by Muhammad Jamal Khalifah, who is Usama bin Laden's brother-in-law and has been identified as a senior al Qaida member. IIRO-PHL's director, Abd al-Hadi Daguit, is a trusted associate of Khalifah."); *id.* ("While working as the director of IIRO-PHL, Khalifah maintained close connections with al Qaida through his relations with senior al Qaida supporters, including Specially Designated Global Terrorist (SDGT) Wa'el Hamza Julaidan. At the time Khalifah directed the IIRO-PHL, he employed an ASG intelligence officer as the provincial director of the IIRO-PHL in the Tawi-Tawi region of the Southern Philippines until that officer's death in 1994."); *id.* |

| | |
|---|---|
| | ("In the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-PHL and used the organization to funnel money to terrorist groups including the ASG. Afif was implicated in the assassination of Father Salvatore Carzeda in San Jose Gusu, Zamboanga City, Philippines on June 20, 1992."). *See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 35 (discussing August 3, 2006 designation of the IIRO, and "a senior IIRO official … also provided financial support to the Abu Sayyaf Group").<br><br>*See also* Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 110 ("Bases for Designation of the IIRO Philippines Branch [IIRO-PHL] – Background on Al Qaida Control of IIRO-PHL – [REDACTED] The Philippine branch of the IIRO [IIRO-PHL] was founded some time in the [blank]ly 1990s by UBL's brother-in-law and senior al Qaida member Muhammad Jamal Khalifah [Khalifah]. While working as the director of IIRO-PHL, Khalifah maintained close relations with UBL and al Qaida and has maintained close ties to senior al Qaida figures Abdullah Azzam and Abdulhassan al-Midani a.k.a. Wa'el Hamza Julaidan, a long-time senior official of the IIRO (and the Muslim World League). [REDACTED] Khalifah came to the Philippines from Afghanistan to establish the IIRO office there at the suggestion and facilitation of Julaidan. [REDACTED] Khalifah also maintained ties to ASG officials while in the Philippines [REDACTED]."); *id.* at 111 ("IIRO-PHL Senior Official Provided Support for Recent ASG Terrorist Attack – [REDACTED]. This bombing killed three people and wounded 41."); *id.* at 111-112 ("IIRO-PHL Provides Financial and Material Support to ASG – [REDACTED] According to July 2004 Department of Defense reporting, IIRO was believed to have [illegible] [REDACTED] in the Southern Philippines for extremists transiting to and from Indonesia. The IIRO also provided documentation and other aid to assist these extremists."); *id.* at 113 ("According to the Umog interrogation report, IIRO-PHL, under the direction of Khalifah, also sent ASG and MILF members to Afghanistan to train with the 'mujahidin.' Khalifah stated that he wanted the ASG and the MILF to train together to establish alliances among the groups.").<br><br>*See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211425 ("It has been further monitored that MWL, which generates funding for a number of relief programs in Afghanistan, Bosnia, and Chechnya, has been infiltrated by a |

| | |
|---|---|
| | number of key strategist and financiers of international terrorism. International terrorist financier Mohammad Khalifa (Brother-in-law to Bin Laden) is affiliated with the MWL and is in fact suspected of providing financing to the World Trade Center bombers through the auspices of the MWL.").<br><br>Moreover, U.S. State Department communications and diplomatic cables describe the involvement of the IIRO, as MWL's subsidiary, Khalifa, and the IIRO-Philippines branch office in supporting al Qaeda, Abu Sayyaf Group, Moro Islamic Liberation Front, Hamas, and other terrorist groups in the region. *See, e.g.*, Ex. 164, December 16, 1994 State Department Letter, PEC-KSA 2260-2261 (Philip C. Wilcox, Jr., the Department of State's Coordinator for Counterterrorism, advises that Khalifa financed a 1994 attack on a Jordanian movie theater, and that "the United States Government has evidence that Muhammad Jamal Khalifa, who has lived in the Philippines for a number of years, has provided financial support to the Philippine terrorist group Abu Sayyaf."); Ex. 165, December 20, 1994 State Department Letter, PEC-KSA 2262-2263 (Philip C. Wilcox, Jr., the Department of State's Coordinator for Counterterrorism, states that (1) Khalifa has provided support to terrorist groups in the Philippines; (2) Khalifa has helped organize efforts by former fighters in Afghanistan to provide training and assistance to terrorists in the Philippines; (3) Khalifa has extensive ties to Hamas; and (4) Khalifa has ties to the terrorist organization Gama't Islamiya.); Ex. 166, December 1994 U.S. Diplomatic Cable, PEC-KSA 2264-2274 (Secretary of State Warren Christopher's office states: "Khalifa is an officer of an Islamic NGO in the Philippines that is a known Hamas front and has financed terrorist operations. Khalifa is reported to be the brother in law of Usama Bin Laden, the Sudan-based financier of Islamic extremists. Khalifa is believed to have provided support to the Philippine terrorist group Abu Sayyaf."); Ex. 167, December 1994 U.S. Diplomatic Cable, PEC-KSA 2275-2276 (stating that Khalifa is a "known financier of terrorist operations and an officer of an Islamic NGO in the Philippines that is a known Hamas front"); Ex. 168, April 1995 U.S. Diplomatic Cable, PEC-KSA 2277-2280 (stating that Khalifa "is a principal financier of Abu Sayyaf"); Ex. 169, October 2001 U.S. Diplomatic Cable, PEC-KSA 2281-2304 (Secretary of State Colin Powell's office stating that "Philippine authorities reported that Saudi national Muhammad Jamal Khalifa who ran two Islamic nongovernmental organizations in Manila was the major financier of the terrorists arrested there. Khalifa who has also been implicated in terrorist activities in Jordan is Bin Ladin's brother-in-law."); Ex. 159, April 2004 U.S. Diplomatic Cable, PEC-KSA 1467-1470 (Secretary of State Colin Powell's office stating that the "IIRO has also been cited as the conduit for funds from Usama Bin |

| | |
|---|---|
| | Laden to terrorist organizations, specifically that the Abu Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO."); Ex. 158, June 2004 U.S. Diplomatic Cable, PEC-KSA 1464-1466 (Secretary of State Colin Powell's office detailing the IIRO's support for al Qaeda and the Abu Sayyaf terrorist group, and stating: "The USG believes that some elements of the International Islamic Relief Organization (IIRO) have been exploited by terrorists and their financiers as a means of transferring assets, providing organizational cover, or otherwise supporting extremist, violent operations."); Ex. 71, May 23, 2005 U.S. Diplomatic Cable, FED-PEC 220479-220481 ("The International Islamic Relief Organization (IIRO) -- a subsidiary of the Saudi-based and funded Muslim World League (MWL) -- was active here in the late 1980s and early 1990s. Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines."); Ex. 73, February 24, 2007 U.S. Diplomatic Cable, FED-PEC 220503-220505 (reporting that the U.S. government raised concerns with Saudi officials concerning the potential involvement of the Saudi Ambassador to the Philippines in terrorism facilitation, particularly his involvement to get two members of IIRO out of prison).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 37 ("Hamas, the Palestinian terrorist group, has also benefited from IIRO support."); *id.* (stating that when Mohammed Jamal Khalifa was detained in the United States in December 1994, materials seized included "information and contacts for Hamas and Palestinian Islamic Jihad"); *id.* ("{I]n in the Philippines, the IIRO employed 'the majority of Hamas members,' and there, the Hamas meetings were led by a 'high ranking' IIRO official.").<br><br>*See also* Ex. 33, European Parliament, *The Involvement of Salafism/Wahhabism in the Support and Supply of Arms to Rebel Groups Around the World*, June 2013, at 9 ("Declassified intelligence reports from the FNP revealed that in 1988 Bin Laden sent his brother-in-law Mohammad Jamal Khalifa to the Philippines to set up Al Qaeda's branches in Southeast Asia. The so-called Khalifa network counted at least twelve charitable organizations and front companies that provided funds to both the Moro Islamic Liberation Front (MILF) and Abu Sayyaf. One of the most active organizations in this sense was the IIRO. In fact, IIRO-funded facilities were mainly built in Mindanao, a region under the control of the aforementioned rebel groups. For instance, the head of IIRO's |

| | |
|---|---|
| | branch office in Tawi Tawi, Mindanao, was Abdul Asmad, former Abu Sayyaf's intelligence chief until 1994 when he died (Abuza, 2003, p. 27). The office was used by Al Qaeda to siphon money on behalf of the MILF and Abu Sayyaf. According to defectors' interrogations, this practice was very effective considering that Al Qaeda was able to divert the 70-90 percent of funds for arms acquisition destined to the rebel groups. This means that only the 10-30 percent of the money remained available for legitimate purposes."). |
| 191. Plaintiffs have no evidence tracing funds from Muhammad Jamal Khalifa to the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; *see generally* 9/11 Commission Report; Monograph. | Disputed. The MWL's claim that there is no evidence tracing funds or other in-kind support from Khalifa to the planning and execution of the 9/11 attacks is inaccurate and misleading. As described herein, the MWL, IIRO (the MWL's subsidiary), Khalifa, and the IIRO-Philippines branch office were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus were specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance and other resources to bin Laden, al Qaeda, and associated terrorist organizations (Abu Sayyaf Group, Moro Islamic Liberation Front) for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks. Accordingly, the 9/11 attacks were a predictable, inevitable product of that sustained, knowing support. Plaintiffs need not prove that the funds or other in-kind support provided to al Qaeda were traced to the terrorist plot or the attack itself.<br><br>By way of further response, Khalifa personally orchestrated the use of IIRO funds and resources to support the terrorist activities of 9/11 mastermind Khalid Sheikh Mohammed ("KSM"), Ramzi Yousef (1993 World Trade Center bomber), and Wali Khan Amin Shah (Afghan jihad veteran and Osama bin Laden/al Qaeda associate) in the Philippines, and the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations of twelve U.S. flag commercial airplanes as they flew from Asia to the United States. That very plot, often referred to as "Operation Bojinka," was adapted into the 9/11 terrorist plot by KSM, using the knowledge he had acquired during its development about vulnerabilities in the aviation security system. *See* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 (stating that the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin"); Ex. 13, |

| | |
|---|---|
| | *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."). *See also* Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12, 24 (discussing the Bojinka plot).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 34 (citing excerpt from *Ghost Wars* by Steve Coll stating that the IIRO and MWL provided "important resources to Ramzi Yousef: "The FBI analysis listed the huge semiofficial Saudi Arabian charity, the International Islamic Relief Organization, and the largest government-sponsored Saudi religious proselytizing organization, the Muslim World League, as important resources for the new terrorist."). |
| 192. Plaintiffs have no evidence tracing in-kind support from Muhammad Jamal Khalifa to the planning or for the execution of the 9/11 Attacks. Ex. # 2, E014040-000011 (May 27, 2021 FBI Report Administratively Closing Case); Winer Rpt. at 82-100, 116-22 (failing to show any in- kind support from MWL or other charities to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 31-32, 107-21 (same) (ECF No. 9250-2); Levitt Rpt. (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"). | Disputed. *See, e.g.,* Plaintiffs' response to No. 191. |
| 193. Plaintiffs have no evidence tracing funds from MWL through Jamal Khalifa to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. # 2, May 27, 2021 FBI Report Administratively Closing Case, at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from MWL to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 27-70 (same) (ECF No. 9250-2); Levitt Rpt. at 29-35 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see also* Ex. # 4, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); *see generally* 9/11 Commission Report; Monograph. | Disputed. *See, e.g.,* Plaintiffs' response to No. 191. |

| | |
|---|---|
| 194. Muhammad Jamal Khalifa was Director, and then Supervisor, of IIRO-Philippines from 1988 to 1993. Ex. # 43, Chaouat Decl. ¶ 64; Ex. # 53, Daguit Decl. ¶ 20. | Disputed. The MWL and IIRO have failed to provide any credible evidence that Khalifa left his position as the supervisor of the IIRO-Philippines branch in 1993, or that Khalifa did not have any association with the IIRO or MWL after his departure.<br><br>As an initial matter, Chaouat states at ¶ 64 that it is his understanding that Khalifa did not have any "connection whatsoever with the IIRO" from 1993 until his death in 2007 based on "documents produced in this litigation." But Chaouat fails to cite to any documentation or evidence supporting this assertion.<br><br>Second, the December 29, 2022 Daguit Declaration, attached as Exhibit 8 to the IIRO's April 15, 2026 Motion for Summary Judgment, was never produced to Plaintiffs during the discovery phase of the litigation, and was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition. Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony, which appears to be inconsistent with his prior deposition testimony. Moreover, Daguit's Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony. Plaintiffs respectfully submit that the IIRO has submitted the Daguit Declaration in bad faith.<br><br>Furthermore, the MWL and IIRO's assertion that Khalifa left the IIRO-Philippines office in 1993, as well as the purported letter accepting Khalifa's resignation in 1993, is contradicted by IIRO Secretary General Adnan Basha's own public statements that he left the office in 1994. *See* Ex. 118, *Islamic NGO Defends its Record of International Aid*, Dr. Adnan Khalil Basha, Secretary-General of IIROSA, IIRO 279459-279460 ("Regarding Mohammed Jamal Khalifa, he is no longer associated with IIROSA and left office in 1994.").<br><br>But even that is questionable in light of an October 13, 1994 letter from Khalifa to Dr. Farid Qurashi, IIRO Director General, explaining that he is in the Philippines conducting da'wah activities and is prepared to provide assistance to the IIRO. *See* Ex. 88, IIRO 3018-3019. *See also* Ex. 51, FED-PEC 202846 (Dr. Qurashi's 1988 letter advising of Khalifa's appointment as the Regional Director for the IIRO in South-East Asia and asking to "[p]lease facilitate his important task and cooperate with him.").<br><br>In sum, the MWL has failed to submit any credible underlying documentation or evidence supporting its claim that Khalifa resigned in 1993. |

| | |
|---|---|
| | *See also* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Khalifa "was based in the Philippines from 1988 to 1995 and was involved in recruiting Muslims for training in Pakistan as mujahidin fighters."). |
| 195. Muhammad Jamal Khalifa also served as MWL office director in the Philippines. Ex. # 11, Fawzi Decl. ¶ 18. | Undisputed as a general matter for purposes of this motion. |
| 196. Muhammad Jamal Khalifa was demoted from Director of the IIRO-Philippines office to Supervisor in September 1992. Ex. # 53, Daguit Decl. ¶ 20. | Disputed. *See, e.g.*, Plaintiffs' response to No. 194.<br><br>Moreover, to the extent the MWL is relying upon Daguit's new declaration testimony at Exhibit 53 the statement is disputed. *See* Plaintiffs' response to No. 194 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Daguit never raised any issue or provided any information during his June 27, 2019 deposition concerning an alleged demotion of Khalifa in 1992. |
| 197. Muhammad Jamal Khalifa resigned from IIRO in the fall of 1993. Ex. # 43, Chaouat Decl. ¶ 64; Ex. # 53, Daguit Decl. ¶ 20; Ex. # 74, IIRO 287370 (Ltr. Accepting Muhammad Jamal Khalifa resignation on x/4/1414H, which converts to late September/early October 1993). | Disputed. *See, e.g.*, Plaintiffs' response to No. 194.<br><br>Moreover, to the extent the MWL is relying upon Daguit's new declaration testimony at Exhibit 53, the statement is disputed. *See* Plaintiffs' response to No. 194 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Daguit never raised any issue or provided any information during his June 27, 2019 deposition concerning an allegation that Khalifa resigned from the IIRO in the fall of 1993. |

| | |
|---|---|
| 198. Arrested in 1994 in the United States and extradited to Jordan, where he had been tried in absentia for his alleged involvement in the bombing of a theater there, Khalifa was then acquitted and freed. When arrested in 1994, Muhammad Jamal Khalifa had no relationship whatsoever to IIRO-Philippines or to MWL. Ex. # 53, Daguit Decl. ¶ 21; Ex. # 4. Brown Rpt. at 43; Ex. # 75 IIRO-002997. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 194, 204, 205, 206, and 207.<br><br>Moreover, to the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 53, the statement is disputed. *See* Plaintiffs' response to No. 194 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony). |
| 199. The Islamic Research and Information Center ("IRIC"), which focused on proselytization to non-Muslim Filipinos, was one of Muhammad Jamal Khalifa's independent business projects. Ex. # 53, Daguit Decl. ¶ 24; Ex. # 76, IIRO-003014 to IIRO-003017. | Disputed. To the extent the IIRO is relying upon Daguit's new declaration testimony at Exhibit 53, the statement is disputed. *See* Plaintiffs' response to No. 194 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Daguit never raised any issue or provided any information during his June 27, 2019 deposition concerning any alleged business projects that Khalifa may have operated, including the Islamic Research and Information Center ("IRIC"). *See* <u>Ex. 49</u>, FED-PEC 201984-201985 (stating that Khalifa's International Resources Information Center (IRIC) "was 'used as cover' by Ramzi Yousef, Abdulhakim Murad and four other radicals believed assigned to assassinate Pope John Paul in Manila in 1995").<br><br>By way of further response, Khalifa stated that his work in the Philippines was conducted pursuant to the oversight of the Saudi embassy in that country. *See* <u>Ex. 87</u>, IIRO 3010-3011 (Khalifa asserting that the "[IIRO's] office and my work in the Philippines were entirely legal and they were under the oversight of the Saudi Embassy."). |
| 200. Neither MWL nor IIRO staff worked for Khalifa's independent business projects, including KTI, IRIC, or Dar Ul-Imam Al-Shafee Center, and no MWL or IIRO funds were disbursed to any of Khalifa's independent business | Disputed. To the extent the MWL is relying upon Daguit's new declaration testimony at Exhibit 53, the statement is disputed. *See* Plaintiffs' response to No. 194 (stating that (1) the December 29, 2022 Daguit Declaration was never produced to |

| | |
|---|---|
| projects, including KTI, IRIC, or Dar Ul-Imam Al-Shafee Center. Ex. # 53, Daguit Decl. ¶ 27; Ex. # 75, IIRO-002997; Ex. # 76, IIRO-003014 to IIRO-003017. | Plaintiffs during the discovery phase of the litigation; (2) the Daguit Declaration was never produced to Plaintiffs during or after Daguit's June 27, 2019 deposition; (3) Plaintiffs have not been afforded an opportunity to cross-examine Daguit's new testimony in the Declaration, some of which appears to be inconsistent with his prior deposition testimony in 2019; and (4) the Daguit Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony).<br><br>In particular, Daguit never raised any issue or provided any information during his June 27, 2019 deposition concerning any alleged business projects that Khalifa may have operated, including the Khalifa Trading Company (a/k/a Khalifa Trading Industry ("KTI") and the Islamic Research and Information Center ("IRIC").<br><br>*See also* <u>Ex. 6</u>, Center for Contemporary Conflict, *Al Qaeda Finances and Funding to Affiliated Groups*, January 2005, PEC-KSA001998-2013 at 2003 ("In a report submitted to the United Nations Al Qaeda and Taliban Sanctions Committee this Government of the Philippines indicated that Mohammed Jamal Khalifa, the brother-in-law of Osama bin Laden, had established numerous businesses, corporations and charitable extremist institutions there which had served as a network to fund the Abu Sayyaf group as well as other extremist organizations. These reportedly included the Khalifa Trading Industries, ET Dizon Travel Pyramid Trading, Manpower Services, and Daw al-Imam al-Shafee."). Khalifa stated that his work in the Philippines was conducted pursuant to the oversight of the Saudi embassy in that country. *See* <u>Ex. 87</u>, IIRO 3010-3011 (Khalifa asserting that the "[IIRO's] office and my work in the Philippines were entirely legal and they were under the oversight of the Saudi Embassy.").<br><br>By way of further response, Philippines Intelligence confirmed that the IIRO's Dar al Imam al Shafi'e in Zamboanga was under investigation for terrorism, stating that the staff and teachers at Dar al Imam al Shafi'e had undergone training at a terrorist training camp named "Abu Haidar," which was used to train members of the Moro Islamic Liberation Front and the IIRO. *See* <u>Ex. 59</u>, Philippines Intelligence Report, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428. *See also* <u>Ex. 137</u>, MWL 8434-8453 at 8443 (IIRO publication identifying the Dar al Imam al Shafi'e in Zamboanga City as one of the three orphanages maintained by the IIRO Social Services Division.); <u>Ex. 177</u>, Statement of Abdullah Al-Hashayka, PEC-KSA 1771 (Hashayka, a co-defendant with Khalifa in a terrorism trial in Jordan for their involvement in a terrorist cell attack on a movie theater in Amman, testified that he worked at Dar al Imam al Shafi'e as |

| | |
|---|---|
| | a teacher.). When Khalifa was detained by U.S. authorities on December 16, 1994, as he was returning to the Philippines from San Francisco, CA, FBI discovered a trove of information in Khalifa's possession including documents referring to the "Bojinka" plot, as well as documentation identifying the curriculum for Dar al Imam al Shafi'e. These documents confirmed that students at the school received training in assassination, kidnapping, bombing churches, martyrdom operations, methods of torture, explosives and weapons. *See* Ex. 52, FED-PEC 202848-202852 (curriculum). |
| 201. From his resignation in fall 1993 until his death in 2007, Muhammad Jamal Khalifa had no relationship to MWL. Ex. # 43, Chaouat Decl. ¶ 64; Ex. # 12, Daguit Dep. Tr. at 23:1-12; 28:5-10; Ex. # 7, Basha Decl. ¶ 78; Ex.# 53, Daguit Decl. ¶ 21. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 194, 197 and 198. |
| 202. Muhammad Jamal Khalifa was never designated by or subject to sanctions administered by the U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list. | It is not disputed that Khalifa was not designated by the U.S. government's OFAC. However, to the extent that the MWL argues that the absence of any designation is equivalent to a finding that the person or entity is innocent of terrorism charges, that is baseless and disputed. *See* Plaintiffs' responses to Nos. 190-193.<br><br>Moreover, to the extent that the MWL argues that the absence of any designation of Khalifa by OFAC or the United Nations demonstrates that the MWL and IIRO were not aware of Khalifa's connections to, and financial support for, al Qaeda and associated terrorist organizations, that is disputed. *See* Plaintiffs' responses to Nos. 190-193. *See also Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (holding that "it would defy common sense" to require a designation to serve as a prerequisite for knowledge that certain individuals or entities were associated with a terrorist organization, or to conclude that such knowledge "could be gained in no other way").<br><br>*See also* Plaintiffs' responses to Nos. 1, 205, 206, and 207. MWL/IIRO leadership specifically appointed Khalifa, a founding member of al Qaeda, to oversee the IIRO and MWL operations in the Philippines as part of a deliberate plan to insert al Qaeda members into strategic IIRO and MWL offices around the globe contemporaneous with the formation of al Qaeda. With the knowledge and blessing of the IIRO and MWL leadership, Khalifa used the IIRO and MWL to provide financial, ideological, and operational support for al Qaeda and associated terrorist organizations Abu Sayyaf Group and Moro Islamic Liberation Front. |

| | |
|---|---|
| 203. In the latter half of the 1980s Muhammad Jamal Khalifa went to Pakistan to support the Services Bureau where he opposed Bin Laden's decision to split from the Services Bureau and confronted him about the same, leading to the two men's separation." Ex. # 4, Brown Rpt. at 42- 43. | Disputed. The MWL's claim that Mohammed Jamal Khalifa separated or broke from Osama bin Laden, is inaccurate and misleading.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1-2, 190-193. Contemporaneous with the formation of al Qaeda, MWL Secretary General Abdullah Omar Naseef and Osama bin Laden entered into an agreement whereby al Qaeda members would be strategically placed in MWL/IIRO offices to guarantee a direct channel for coordinating MWL/IIRO's collaboration with Osama bin Laden and al Qaeda. Naseef subsequently approved the appointment of Khalifa, a founding al Qaeda member and Osama bin Laden's brother-in-law, to open a joint MWL/IIRO branch office in the Philippines contemporaneous with the formation of al Qaeda. *See* Ex. 51, FED-PEC 202846-202847 (June 5, 1988).<br><br>As a result of that appointment, Khalifa used the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia, and a source of funding for al Qaeda affiliated terrorist organizations such as the Abu Sayyaf Group ("ASG"), Moro Islamic Liberation Front ("MILF") and Jemaah Islamiya ("JI"). This was consistent with bin Laden's plan, and Khalifa worked with bin Laden during the early to mid-1990s in support of those objectives. *See, e.g.*, Ex. 159, April 2004 U.S. Diplomatic Cable, PEC-KSA 1467-1470 (Secretary of State Colin Powell's office stating that the "IIRO has also been cited as the conduit for funds from Usama Bin Laden to terrorist organizations, specifically that the Abu Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO."); Ex. 71, May 23, 2005 U.S. Diplomatic Cable, FED-PEC 220479-220481 ("The International Islamic Relief Organization (IIRO) -- a subsidiary of the Saudi-based and funded Muslim World League (MWL) -- was active here in the late 1980s and early 1990s. Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines."). *See also* Ex. 1, 9/11 Commission Final Report at 58 ("Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders. Al Qaeda helped Jemaah Islamiya ("JI"), a nascent organization headed by Indonesian Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the |

| | |
|---|---|
| | Philippines."). Any claim by the MWL that bin Laden and Khalifa separated is baseless and without merit.<br><br>Moreover, the MWL's claim that bin Laden split from the Services Bureau is without merit. *See* Plaintiff's response to No. 362 (explaining that after Azzam's death, Osama bin Laden assumed full control of MAK, and MAK was absorbed into al Qaeda, and further noting that the da'wa organizations that funded and supported MAK during the 1980s—MWL, IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Red Crescent Society, and Benevolence International Foundation—continued to serve as the primary conduits for channeling financial, logistical, operational, and ideological support to al Qaeda's global jihad for years leading up to the 9/11 attacks). |
| 204. Muhammad Jamal Khalifa's "name does not appear on either of the two internal lists of [Al Qaeda] members from the late 1990s captured in Afghanistan. The only items that mention his name in [Bin Laden's] Abbottabad compound are two newspaper articles about his death in 2007 and a letter from an uncertain author to one Shaykh Yunis where at one point, discussing the deteriorating security conditions and the prevalence of gangs and robberies in some African countries, the letter says 'perhaps you heard about the murder of Jamal Khalifa in Madagascar, God have mercy on him, at the hands of a gang of armed robbers, as mentioned in the media.'" Ex. # 4, Brown Rpt. at 42-43. | Disputed. MWL's expert Vahid Brown does not identify or describe "either of the existing internal lists of al-Qa'ida members from the late 1990s." *See* MWL Exhibit 4, Expert Report of Vahid Brown at 91. |
| 205. Plaintiffs have no evidence that MWL was aware of or had knowledge before 9/11 of any connection between Muhammad Jamal Khalifa and Al Qaeda. See Ex. #4, Brown Rpt. 42- 43; U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated- nationals-list-sdn-list/archive-of-changes-to-the-sdn-list (reflecting that OFAC never designated Khalifa). | Disputed. The MWL's claim that it was unaware of any connection between Khalifa and al Qaeda prior to 9/11 is inaccurate and misleading. As discussed herein, MWL Secretary General Dr. Abdullah Omar Naseef participated in a meeting with Osama bin Laden and others during the formation of al Qaeda and entered into an agreement with bin Laden that the MWL and IIRO would be used provide support and cover for al Qaeda's operations. *See* <u>Ex. 61</u>, FED-PEC0212276-212281. The document suggests using the name of the "League" as "an umbrella which you can stay under … because Dr. Naseef is one of the brothers, and the government knows who Abu Al-Hasan [Wa'el Hamza Jelaidan] is." *Id.* at 212276, 212278. *See also* <u>Ex. 35</u>, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 29.<br><br>At the time of this meeting, Khalifa was serving as the director of the MWL's office in Peshawar, Pakistan. Dr. Naseef had known Khalifa for a number of years at this time, and was aware, like many others, that Khalifa was a veteran of the Afghan jihad, a close associate of bin Laden, and a member of al Qaeda. *See* <u>Ex. 145</u>, BUR-PEC 25755 (October 17, 1994 |

| | |
|---|---|
| | letter from Dr. Naseef attesting that "I have known Mohammed Gamal Khalifah when he was a student at the university, and then when he was working as a director of the Muslim World League's office in Pakistan, and director of the Muslim World League's office in the Philippines and director of the Islamic Relief Organization's office in the Philippines."). Given his relationship with Khalifa, and knowing Khalifa's background, Naseef knew he could trust Khalifa to oversee the IIRO and MWL in the Philippines and use those resources to provide financial, ideological, and operational support for al Qaeda and associated terrorist groups, as he had planned and agreed to with bin Laden. |
| 206. Plaintiffs have no evidence that MWL was aware of or had knowledge before 9/11 of any connection between Muhammad Jamal Khalifa and the MILF. See U.S. Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes- to-the-sdn-list (reflecting that MILF was never designated by OFAC); Ex. # 6, Obaid Decl. ¶ 5; Ex. # 5, Turki Decl. ¶ 7. Ex. # 4, Brown Rpt. at 40. | Disputed. Prior to the 9/11 attacks, the MWL and IIRO were expressly aware of the organization's ongoing support for international terrorism and Osama bin Laden, and the involvement of its subsidiary's branch offices and officials in terrorist activities, including the IIRO-Philippines office and Mohammed Jamal Khalifa, by virtue of extensive international media reporting. Any assertion that the MWL, and/or its subsidiary IIRO, were unaware of the MWL's substantial support for al Qaeda and terrorist activities, including Khalifa's connections to MILF, is duplicitous. *See, e.g.*, Ex. 44, Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000, FED-PEC 10813-10815 (reporting that the IIRO was "being used by accused international terrorists Osama bin Laden and his brother-in-law, Mohammad Jamal Khalifa as a front to finance the operations of the Abu Sayyaf and the Moro Islamic Liberation Front," and that the bulk of IIRO "fund[s] goes to terrorist operations of the Abu Sayyaf and the MILF"); Ex. 79, The Age, *Filipino Muslims Linked to Holy Warrior's Global Terror*, May 20, 1995 (reporting on the discovery of al Qaeda's terrorist plot in the Philippines ("Bojinka") and explaining that Mohammed Jamal Khalifa of the IIRO, a "key figure in the network of Islamic extremists," was funding Islamic militants in the Philippines); Ex. 54, Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report*, February 13, 1999, FED-PEC 203704-203705 (reporting that the IIRO's Mohammed Jamal Khalifa "is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group," and further stating that the "IIRO is suspected by Western intelligence agencies to be bin Laden's conduit to various terrorist organizations in Islamic countries"). *See also* Ex. 80, IIRO 147 ("IIRO Administrative Structure" chart identifying a "Department of Media and Information."); Ex. 65, FED-PEC 214874-214875 (MWL structural chart identifying "The General Department for Media and Culture"). |

| | |
|---|---|
| | Moreover, to the extent the MWL argues that the absence of any designation of Khalifa by the U.S. government and OFAC demonstrates that the MWL and IIRO were not aware of Khalifa's connections to, and financial support for, al Qaeda and associated terrorist organizations such as MILF, that is disputed. *See Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (holding that "it would defy common sense" to require a designation to serve as a prerequisite for knowledge that certain individuals or entities were associated with a terrorist organization, or to conclude that such knowledge "could be gained in no other way").<br><br>*See also* Plaintiffs' response to Nos. 1, 190, and 205. MWL/IIRO leadership specifically appointed Khalifa to oversee the IIRO and MWL in the Philippines as part of a deliberate plan to insert al Qaeda members into strategic IIRO and MWL offices around the globe as part of its financial, ideological, and operational support for al Qaeda and associated terrorist organizations like Moro Islamic Liberation Front.<br><br>By way of further response, Abdulhadi Daguit alleges at ¶ 34 of his Declaration at MWL Exhibit 53 that he is not aware of any connections between the IIRO-Philippines and the Moro Islamic Liberation Front. *But see* the Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211445 (identifying Daguit as a "known associate of Khalifa" and "presently connected with IIRO Manila," is in "constant contact with Yusop Alongan @Ustadz Duli/Abdullah, Chairman of MILF Finance Committee"); *id.* at 211429 (identifying former IIRO Director Mahmud Afifi (Mahmud Abdul Jalil Afif-Aburahim) as a financier of two Malaysian demolition experts (Habibe and Kadir) who reportedly arrived in Zamboanga City on or around October 10, 1998 for terrorist activities.).<br><br>*See also* Ex. 16, *Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia*," April 9, 1999, CIA_000450-480 at 455 ("Gulf NGOs with branch offices in the Philippines—including Dal al Hijra Foundation and the International Islamic Relief Organization—maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates."). |
| 207. Plaintiffs have no evidence that MWL was aware of or had knowledge before 9/11 of any connection between Muhammad Jamal Khalifa and ASG. See Ex. # 31, Obaid Dep. Tr. at 251:20-23 (*Errata*); Exec. Order 13,224, 66 Fed. Reg. 49,079, 49,081, 49,083 (Sept. 25, 2001); U.S. | Disputed. Prior to the 9/11 attacks, MWL was expressly aware of the organization's ongoing support for international terrorism and Osama bin Laden, and the involvement of its branch offices and officials in terrorist activities, including the IIRO-Philippines office and Mohammed Jamal Khalifa, by |

| | |
|---|---|
| Dept. of Treas., Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn- list/archive-of-changes-to-the-sdn-list (reflecting that OFAC never designated Khalifa). | virtue of extensive international media reporting. Any assertion that the MWL, and/or its subsidiary, the IIRO, were unaware of the MWL's substantial support for al Qaeda and terrorist activities, including that of Mohammed Jamal Khalifa, is duplicitous. *See, e.g.*, Ex. 44, Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000, FED-PEC 10813-10815 (reporting that the IIRO was "being used by accused international terrorists Osama bin Laden and his brother-in-law, Mohammad Jamal Khalifa as a front to finance the operations of the Abu Sayyaf and the Moro Islamic Liberation Front," and that the bulk of IIRO "fund[s] goes to terrorist operations of the Abu Sayyaf and the MILF"); Ex. 48, Philippine Daily Inquirer, *Bin Laden Funds Abu Sayyef Through Muslim Relief Group*, August 9, 2000, FED-PEC 201975-201978 (reporting that "the IIRO was used by Bin Laden and Khalifa to distribute funds for the purchase of arms and other logistical requirements of the Abu Sayyaf in the guise of relief and livelihood projects for Muslim communities in Mindanao"); Ex. 54, Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report*, February 13, 1999, FED-PEC 203704-203705 (reporting that the IIRO's Mohammed Jamal Khalifa "is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group," and further stating that the "IIRO is suspected by Western intelligence agencies to be bin Laden's conduit to various terrorist organizations in Islamic countries"); Ex. 178, The Times, Terror by Degree, October 18, 1997 (reporting on the "Bojinka" terrorist plot and stating that Mohammed Jamal Khalifa was funding the Abu Sayyaf Group); Ex. 41, The Straits Times, *Osama Gave Funds to Abu Sayyaf: Manila*, August 10, 2000, FED-PEC 90732-90733 (reporting that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League), "in the guise of giving charity to local Muslim communities, provided funds to Abu Sayyaf for acquiring arms").<br><br>Moreover, to the extent that the MWL argues that the absence of any designation of Khalifa by the U.S. government and OFAC demonstrates that the MWL and IIRO were not aware of Khalifa's connections to, and financial support for, al Qaeda and associated terrorist organizations, that is disputed. *See Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (holding that "it would defy common sense" to require a designation to serve as a prerequisite for knowledge that certain individuals or entities were associated with a terrorist organization, or to conclude that such knowledge "could be gained in no other way").<br><br>*See also* Plaintiffs' responses to Nos. 1, 190, 205, 206 and 207. MWL/IIRO leadership specifically appointed Khalifa to |

| | |
|---|---|
| | oversee the IIRO and MWL in the Philippines as part of a deliberate plan to insert al Qaeda members into strategic IIRO and MWL offices around the globe as part of its financial, ideological, and operational support for al Qaeda and associated terrorist organizations like Abu Sayyaf Group. |
| **Missionaries** | No response necessary. |
| 208. Plaintiffs have no evidence that missionaries who coordinated with MWL had any foreknowledge of or were involved in the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; *see generally* 9/11 Commission Report; Monograph. | Disputed. *See* Plaintiffs' response to No. 1.<br><br>By way of further response, the MWL and IIRO trained and financially supported Islamic propagators (a/k/a missionaries) in other countries, including but not limited to the Philippines, Bangladesh, and Indonesia. *See, e.g.*, Ex. 220, MWL 8516 (December 21, 1993 letter from Abdulhadi Daguit to the Director of the MWL's office in the Philippines concerning an Islamic propagation organization and recommending financial assistance to encourage them to conduct more work in the field of Islamic Da'wah.); Ex. 221, IIRO 34942-34943 (September 29, 1992 letter from IIRO-Philippines Supervisor of Social Care and Mosques, Abdulhadi Daguit, identifying an Islamic organization that undertakes "significant Islamic propagation activities in the region" and recommending financial assistance to build an office for the organization "to be a center for Islamic Da'wah in the region."); Ex. 222, IIRO 120381-120384 (May 12, 2002 letter from Fahd Mohamed Sanad al Harbi, manager of the IIRO-Bangladesh office, to the head of the MWL/IIRO Holy Quran and Da'wah Committee, transmitting "periodic reports about propagators (58 propagators and 3 supervisors)" affiliated with IIRO-Bangladesh.); Ex. 223, IIRO 54530-54533 (August 25, 2003 letter from Fahd Mohamed Sanad al Harbi, manager of the IIRO-Bangladesh office, to the head of the MWL/IIRO Holy Quran and Da'wah Committee, indicating that IIRO-Bangladesh has 59 propagators and 3 supervisors affiliated with the office "who have not received their salaries for 7 months and they are in desperate need to receive their dues," and asks "the required employee to send their salaries for this period."); Ex. 224, 120385-120396 (2001 letters between the IIRO-Bangladesh office and the MWL/IIRO Committee for Propagation and Propagators concerning a shariah course for training imams and propagators to be held at the IIRO-Bangladesh office, the Committee's agreement to provide 25,000 Saudi riyals ("SR") for the ten-day course (participants to include 100 propagators, 61 from the IIRO), the anticipated expenses, a request to have two scholars from the Committee for Propagation in Riyadh supervise the course, etc.); Ex. 225, IIRO 68126-68127 (December 15, 2004 letter from Fahd Mohamed Sanad al Harbi, office manager of IIRO-Indonesia, to IIRO Secretary General Adnan Basha, concerning Basha's request for "the required documents for the hiring of |

| | |
|---|---|
| | propagators" and requesting authorization to hire a supervisor for the propagators.); Ex. 226, IIRO 68128-68129 (December 20, 2004 letter from Fahd Mohamed Sanad al Harbi, office manager of IIRO-Indonesia, to the Supervisor of the Holy Quran and Da'wah Program requesting the outstanding salary payment for one of the propagators who has not received his salary for more than four months).<br><br>Importantly, the IIRO-Eastern Province branch office, under the leadership of E.O. 13224 Specially Designated Global Terrorist ("SDGT") Abd al Hamid Sulaiman al Mujil (al Qaeda's "million dollar man") was sending funds to financially support propagators attached to the IIRO-Indonesia office. *See* Ex. 227, IIRO 125906 (November 4, 2004 letter from Fahd Mohamed Sanad al Harbi, office manager of IIRO-Indonesia, to the Holy Quran and Propagation Department identifying funds sent from the IIRO-Eastern Province branch office to sponsor 52 propagators in Indonesia (124,800 SR)); Ex. 228, IIRO 98574-98579 (November 30, 2004 letter from Abd al Hamid Sulaiman al Mujil of the IIRO-Eastern Province to Fahd Mohamed Sanad al Harbi, office manager of IIRO-Indonesia, confirming that the 124,800 SR "constitutes the financial guarantees for propagators in Indonesia.").<br><br>The IIRO-Indonesia office was designated with Mujil two years later "for facilitating fundraising for al Qaida and affiliated terrorist groups." *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202112 ("The IIRO Indonesia director has channeled money to two Indonesia-based, JI-affiliated foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN allegedly financed the establishment of training facilities for use by al Qaida associates.").<br><br>In addition, the MWL appears to have provided financial support to propagators associated with the Moro Islamic Liberation Front terrorist organization in the Philippines. *See* Ex. 104, IIRO 93332-93333 (August 25, 2003 letter from the successor to the deceased Moro Islamic Liberation Front chairman to MWL Secretary General Abdullal al Turki asking him to "open a bank account with the League at one of the accredited banks to receive special assistance and donations for them from their brothers in creed and faith," and stating that the assistance will "benefit[] the propagators, teachers, orphans and all our Muslim people.").<br><br>IIRO employee Abdulhadi Daguit testified that the Moro Islamic Liberation Front was engaged in military activities at |

| | |
|---|---|
| | the same time that MILF asked MWL Secretary General Turki to open the bank account for donations. *See* Ex. 29, Transcript, June 27, 2019 Deposition of Abdulhadi T. Daguit, at 144-145 (testifying that MILF was "engaging [in] fighting with the Philippine government"). |
| 209. Plaintiffs have no evidence tracing funds from missionaries who coordinated with MWL to the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; *see generally* 9/11 Commission Report; Monograph. | Disputed. *See* Plaintiffs' responses to Nos. 1, 2, and 208. |
| 210. Plaintiffs have no evidence tracing in-kind support from missionaries who coordinated with MWL to the planning or for the execution of the 9/11 Attacks. Ex. # 2, E014040- 000011 (May 27, 2021 FBI Report Administratively Closing Case); Winer Rpt. at 112-22 (failing to show any in-kind support from MWL to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 27-70 (same) (ECF No. 9250-2); Levitt Rpt. at 29-35 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"). | Disputed. *See* Plaintiffs' responses to Nos. 1, 2, and 208. |
| 211. Plaintiffs have no evidence tracing funds from MWL through missionaries to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. # 2, May 27, 2021 FBI Report Administratively Closing Case, at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from MWL to the planning or execution of the 9/11 Attacks) ) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 27-70 (same) (ECF No. 9250-2); Levitt Rpt. at 29-35 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see also* Ex. # 4, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); *see generally* 9/11 Commission Report; Monograph. | Disputed. *See* Plaintiffs' responses to Nos. 1, 2, and 208. |
| 212. Plaintiffs have no evidence that MWL was aware or had knowledge before 9/11 of any connection between missionaries that coordinated with MWL and Al Qaeda. See Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals- | Disputed. *See* Plaintiffs' responses to Nos. 1, 2, and 208.<br><br>Moreover, to the extent the MWL's assertions at Nos. 212-217 rely on the Declarations of Ali al Thaqafi, Mohamed al Hassani, Abdulhadi Daguit, and Faiz Wardi at MWL Exs. 8, 9, 53, and 54, those statements are disputed. The Declarations |

| | |
|---|---|
| list-sdn-list/archive-of-changes-to-the- sdn-list; Ex. # 54, Wardi Decl. ¶ 11 (MWL never received any allegation that the sermons delivered by missionaries that cooperated with it in Indonesia were inappropriate or extremist.); Ex. # 53, Daguit Decl. ¶ 14 (the missionaries mainly gave sermons, the contents of which they were free to choose and were not provided by MWL, and neither MWL nor IIRO trained the missionaries, nor did they oversee or supervise their activities). | were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2019 (Daguit). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 213. MWL did not employ missionaries that coordinated with it, and the missionaries were not precluded from seeking and obtaining employment elsewhere. Ex. # 8, Al-Thaqafi Decl. ¶ 9; Ex. # 9, Al-Hassani Decl. ¶ 19. | Disputed. *See* Plaintiffs' response to No. 208.<br><br>Moreover, to the extent the MWL's assertions at Nos. 212-217 rely on the Declarations of Ali al Thaqafi, Mohamed al Hassani, Abdulhadi Daguit, and Faiz Wardi at MWL Exs. 8, 9, 53, and 54, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2019 (Daguit). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 214. MWL did not provide missionaries with any benefits apart from a small stipend. Ex. # 8, Al-Thaqafi Decl. ¶ 10; Ex. # 9, Al-Hassani Decl. ¶ 22. | Disputed. *See* Plaintiffs' response to No. 208.<br><br>Moreover, to the extent the MWL's assertions at Nos. 212-217 rely on the Declarations of Ali al Thaqafi, Mohamed al Hassani, Abdulhadi Daguit, and Faiz Wardi at MWL Exs. 8, 9, 53, and 54, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2019 (Daguit). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 215. MWL did not set working schedules for missionaries. Ex. # 9, Al-Hassani Decl. ¶20. | Disputed. *See* Plaintiffs' response to No. 208.<br><br>Moreover, to the extent the MWL's assertions at Nos. 212-217 rely on the Declarations of Ali al Thaqafi, Mohamed al Hassani, Abdulhadi Daguit, and Faiz Wardi at MWL Exs. 8, 9, 53, and 54, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2019 (Daguit). Plaintiffs have not been afforded an opportunity to cross-examine the |

| | |
|---|---|
| | individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 216. MWL did not have the authority to dictate nor did it dictate how missionaries carried out their activities, including how the missionaries preached. Ex. # 9, Al-Hassani Decl. ¶ 21. | Disputed. *See* Plaintiffs' response to No. 208.<br><br>Moreover, to the extent the MWL's assertions at Nos. 212-217 rely on the Declarations of Ali al Thaqafi, Mohamed al Hassani, Abdulhadi Daguit, and Faiz Wardi at MWL Exs. 8, 9, 53, and 54, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2019 (Daguit). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 217. Missionaries who coordinated with MWL in the Philippines did not have employment contracts with either MWL or IIRO, and unlike employees who were paid monthly, received their de minimis stipends on a yearly or bi-annual basis. Ex. # 53, Daguit Decl. ¶ 13; Ex # 8, Al-Thaqafi Decl. ¶¶ 9-10; Ex. # 9, Al-Hassani Decl. ¶¶ 19-22. | Disputed. *See* Plaintiffs' response to No. 208.<br><br>Moreover, to the extent the MWL's assertions at Nos. 212-217 rely on the Declarations of Ali al Thaqafi, Mohamed al Hassani, Abdulhadi Daguit, and Faiz Wardi at MWL Exs. 8, 9, 53, and 54, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2019 (Daguit). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| **Moro Islamic Liberation Front ("MILF")** | No response necessary. |
| 218. Plaintiffs have no evidence that the MILF had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Winer Rpt. (failing to provide evidence that MILF had any knowledge or was involved in the planning or execution of the 9/11 Attacks) (ECF No. 7344-1), *see generally* 9/11 Commission Report; Monograph. | Disputed. The MWL's claim that there is no evidence that the MILF had any foreknowledge of or was involved in the planning or execution of the 9/11 attacks is inaccurate and misleading.<br><br>As set forth in Plaintiffs' response to No. 1, Dr. Omar Abdullah Naseef, in his capacity as the MWL Secretary General and IIRO Chairman, approved the appointment of Mohammed Jamal Khalifa, a founding al Qaeda member and Osama bin Laden's brother-in-law, to open a joint MWL/IIRO branch office in the Philippines contemporaneous with the formation of al Qaeda. *See* Ex. 51, FED-PEC 202846-202847 (June 5, 1988). As a result of that appointment, Khalifa was able to use the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia, and provide substantial |

| | |
|---|---|
| | assistance for al Qaeda affiliated terrorist organizations Abu Sayyaf Group ("ASG"), Moro Islamic Liberation Front, and Jemaah Islamiya ("JI"). *See also* Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 77-81 (describing how al Qaeda used its relationships with the Saudi charities to facilitate the building of relationships with, and channel money and resources to, aligned terrorist organizations and causes in the Philippines, Bosnia, Chechnya, Kenya, Sudan, and other regions, thereby creating dozens of affiliates around the globe and the ability to launch attacks against the United States and its interests abroad).<br><br>Those terrorist groups became an integral part of Osama bin Laden and al Qaeda's Southeast Asian network, and received extensive funding and resources from the IIRO, the subsidiary of the MWL. *See, e.g.,* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149-152 (indicating that al Qaeda member Mohammed Jamal Khalifa served in an official role with the MWL, and used the IIRO branch office in the Philippines to fund the Abu Sayyaf Group, an al Qaeda associated terrorist organization, and recruit Muslims for military training); Ex. 156, U.S. Diplomatic Cable, *Islamic NGOs in the Philippines*, May 23, 2005, PEC-KSA 1461-1463 at 1462 ("Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines."); Ex. 44, Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000, FED-PEC 10813-10815 (reporting that the IIRO was "being used by accused international terrorists Osama bin Laden and his brother-in-law, Mohammad Jamal Khalifa as a front to finance the operations of the Abu Sayyaf and the Moro Islamic Liberation Front," and that the bulk of IIRO "fund[s] goes to terrorist operations of the Abu Sayyaf and the MILF"); Ex. 16, *Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia*," April 9, 1999, CIA_000450-480 at 455 ("Gulf NGOs with branch offices in the Philippines—including Dal al Hijra Foundation and the International Islamic Relief Organization—maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates.").<br><br>*See also* Ex. 59, Philippines Intelligence Report, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates |

| | |
|---|---|
| | of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 113 ("According to the Umog interrogation report, IIRO-PHL, under the direction of Khalifah, also sent ASG and MILF members to Afghanistan to train with the 'mujahidin.' Khalifah stated that he wanted the ASG and the MILF to train together to establish alliances among the groups."); Ex. 33, European Parliament, *The Involvement of Salafism/Wahhabism in the Support and Supply of Arms to Rebel Groups Around the World*, June 2013, at 9 ("Declassified intelligence reports from the FNP revealed that in 1988 Bin Laden sent his brother-in-law Mohammad Jamal Khalifa to the Philippines to set up Al Qaeda's branches in Southeast Asia. The so-called Khalifa network counted at least twelve charitable organizations and front companies that provided funds to both the Moro Islamic Liberation Front (MILF) and Abu Sayyaf. One of the most active organizations in this sense was the IIRO. In fact, IIRO-funded facilities were mainly built in Mindanao, a region under the control of the aforementioned rebel groups. For instance, the head of IIRO's branch office in Tawi Tawi, Mindanao, was Abdul Asmad, former Abu Sayyaf's intelligence chief until 1994 when he died (Abuza, 2003, p. 27). The office was used by Al Qaeda to siphon money on behalf of the MILF and Abu Sayyaf. According to defectors' interrogations, this practice was very effective considering that Al Qaeda was able to divert the 70-90 percent of funds for arms acquisition destined to the rebel groups. This means that only the 10-30 percent of the money remained available for legitimate purposes.").<br><br>The Abu Sayyaf Group, Moro Islamic Liberation Front, and Jemaah Islamiya also received extensive funding and resources from the IIRO-Eastern Province and Abd al Hamid Sulaiman al Mujil, as well as the IIRO-Indonesia branch office. *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202110 ("Al-Mujil provided donor funds directly to al Qaida and is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI). Both ASG and JI are al Qaida-associated terrorist groups in Southeast Asia designated pursuant to the authorities of E.O. 13224."); *id.* at 202112 ("The IIRO Indonesia director has channeled money to two Indonesia-based, JI-affiliated foundations. Information from 2006 shows that IIRO-IDN supports JI by providing assistance with recruitment, transportation, logistics, and safe-havens. As of late 2002, IIRO-IDN |

| | |
|---|---|
| | allegedly financed the establishment of training facilities for use by al Qaida associates.").<br><br>In addition, investigations conducted by Philippines Intelligence determined that Mujil met with Moro Islamic Liberation Front officials in December 1998 concerning financial support. *See* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211430 (identifying IIRO officials "Al Saif Othoman A O and Almojil Abdul Hamdi S" meeting with MILF Chairman Salamat Hashim at Camp Abubakar in the Southern Philippines concerning a $192,197.00 contribution).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 38 ("Likewise, the IIRO's Philippines office is tied to funding of the Philippines based Moro Islamic Liberation Front. According to a *Wall Street Journal* article, from November to December 2001, Philippine police arrested four Arabs associated with this group; one of these men, Mohammad Sabri, was an IIRO employee and directly linked to Mohammad Jamal Khalifa.").<br><br>Moreover, in his pursuit of al Qaeda's global expansion, bin Laden directed critical material and logistical support to ASG, MILF, and JI. *See* Ex. 1, 9/11 Commission Final Report at 58 ("Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders. Al Qaeda helped Jemaah Islamiya ("JI"), a nascent organization headed by Indonesian Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the Philippines.").<br><br>As the foregoing evidence demonstrates, Abu Sayyaf Group, Moro Islamic Liberation Front, and Jemaah Islamiya were closely aligned with Osama bin Laden and al Qaeda for years leading up to the 9/11 attacks, and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States at all relevant times. |
| 219. Plaintiffs have no evidence tracing MILF funds to the planning or execution of the 9/11 Attacks. Ex. # 2, E014040-000011 (May 27, 2021 FBI Report Administratively Closing Case); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report. Plaintiffs have no evidence tracing funds from MWL through MILF to Al Qaeda for the planning or | Disputed as stated. The MWL's claim that there is no evidence tracing MILF funds or other in-kind support to al Qaeda and/or the planning and execution of the 9/11 attacks mischaracterizes the Plaintiffs' claims. As described herein, the MWL, IIRO, and their officials, employees, advisors, and representatives were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus were specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its |

| | |
|---|---|
| execution of the 9/11 Attacks. Ex. # 2, E014040-000011 (May 27, 2021 FBI Report Administratively Closing Case); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph. | interests abroad. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks. That substantial assistance included extensive financial, material, logistical, and ideological support directed to al Qaeda's Southeast Asian network, consisting of the Abu Sayyaf Group, Moro Islamic Liberation Front, Jemaah Islamiya, and other terrorist organizations.<br><br>Any financial and/or in-kind support provided to those terrorist groups, in turn, directly supported al Qaeda's global terrorist ambitions to wage jihad against the United States. Accordingly, the 9/11 attacks were a predictable, inevitable product of that sustained, knowing support. Plaintiffs need not prove that the funds or other in-kind support provided to al Qaeda were traced to the terrorist plot or the attack itself.<br><br>By way of further response, *see* Plaintiffs' response to No. 218. |
| 220. Plaintiffs have no evidence tracing in-kind support from MILF to the planning or for the execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see generally* 9/11 Commission Report; Monograph. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 218 and 219. |
| 221. The MILF has never been designated by OFAC. Office of Foreign Assets Control, Archive of Changes to OFAC's Sanctions Lists (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the- sdn-list; Ex. # 4, Brown Rpt. at 40 ("The MILF has never been listed by the US government as a designated terrorist group."). | It is not disputed that MILF was not designated by the U.S. government's OFAC or State Department. However, to the extent that the MWL argues that the absence of any designation is equivalent to a finding that the person or entity is innocent of terrorism charges, that is baseless and disputed. *See* Plaintiffs' responses to Nos. 218 and 219.<br><br>Moreover, to the extent that IIRO argues that the absence of any designation of MILF by OFAC or the State Department demonstrates that the MWL and IIRO were not aware of MILF's terrorist activities and/or connections to Osama bin Laden, al Qaeda, or other terrorist organizations, that is disputed. *See* Plaintiffs' responses to Nos. 218, 219, and 223. *See also Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021) (holding that "it would defy common sense" to require a designation to serve as a prerequisite for knowledge that certain individuals or entities were associated |

| | |
|---|---|
| | with a terrorist organization, or to conclude that such knowledge "could be gained in no other way").<br><br>*See also* Plaintiffs' responses to Nos. 1 and 218. MWL/IIRO leadership specifically appointed Mohammed Jamal Khalifa, a founding member of al Qaeda, to oversee the IIRO and MWL operations in the Philippines as part of a deliberate plan to insert al Qaeda members into strategic IIRO and MWL offices around the globe contemporaneous with the formation of al Qaeda. With the knowledge and blessing of the IIRO and MWL leadership, Khalifa used the IIRO and MWL to provide financial, ideological, and operational support for al Qaeda and associated terrorist organizations Abu Sayyaf Group and Moro Islamic Liberation Front. |
| 222. Plaintiffs have no evidence that MWL provided funding to the MILF before the 9/11 Attacks. Winer Rpt. at 96-99 (discussing the separatist group, MILF, and failing to provide evidence of funding from MWL to MILF) (ECF No. 7344-1). | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 218, 219, and 220. |
| 223. Plaintiffs have no evidence that MWL was aware or had knowledge before 9/11 of any connection between the MILF and Al Qaeda. Office of Foreign Assets Control, *Archive of Changes to OFAC's Sanctions Lists* (last visited April 8, 2026), https://ofac.treasury.gov/specially-designated-nationals-list-sdn-list/archive-of-changes-to-the-sdn-list; Ex. # 4, Brown Rpt. at 40. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 218, 219, and 220.<br><br>By way of further response, prior to the 9/11 attacks, the MWL and its leadership was expressly aware of the organization's ongoing support for international terrorism and Osama bin Laden, and the involvement of its branch offices and officials in terrorist activities, by virtue of extensive international media reporting. That reporting includes a number of public news articles discussing the terrorist activities of the Abu Sayyaf Group, Moro Islamic Liberation Front, and Jemaah Islamiya, and/or their connections to international terrorism and al Qaeda. Any assertion that the MWL, and/or its subsidiary, IIRO, was unaware of these connections is duplicitous. *See, e.g.,* Ex. 54, Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report*, February 13, 1999, FED-PEC 203704-203795 (reporting that the IIRO's Mohammed Jamal Khalifa "is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group," and further stating that the "IIRO is suspected by Western intelligence agencies to be bin Laden's conduit to various terrorist organizations in Islamic countries"); Philippine Daily Inquirer, *Front Page: Bin Laden Funds Abu Sayyaf Through Muslim Relief Group*, August 9, 2000 (indicating that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League) is a conduit of funds for the Abu Sayyaf Group, a terrorist organization in the Philippines); Philippine Daily Inquirer, *Front Page: Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000 (reporting that the IIRO is a front to finance the operations of the Abu Sayyaf |

| | |
|---|---|
| | Group and Moro Islamic Liberation Front terrorist organizations); The Straits Times, *Osama Gave Funds to Abu Sayyaf: Manila*, August 10, 2000 (reporting that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League), "in the guise of giving charity to local Muslim communities, provided funds to Abu Sayyaf for acquiring arms"); Associated Press, *Terrorists Train for Seaborne Attacks* (reporting that "[t]wo of the most dangerous al-Qaida-linked groups in Southeast Asia," Abu Sayyaf Group and Jemaah Islamiya, are working together to train militants for seaborne terrorist attacks"). *See also* Ex. 80, IIRO 147 ("IIRO Administrative Structure" chart identifying a "Department of Media and Information."); Ex. 65, FED-PEC 214874-214875 (MWL structural chart identifying "The General Department for Media and Culture"). |
| 224. The Moro National Liberation Front ("MNLF") emerged in the 1970s in the Philippines. Sidel Rpt. ¶¶ 41-42 (ECF No. 7351-5). | Undisputed as a general matter for purposes of this motion. |
| 225. The MILF—an Islamist, separatist group in the Philippines—was formed in 1984 when its founder broke away from the MNLF. Sidel Rpt. ¶¶ 50-51 (ECF No. 7351-5). | Undisputed as a general matter for purposes of this motion. |
| 226. MWL participated in peace negotiations between the Philippines Government and the MILF. Ex. # 6, Obaid Decl. ¶ 5; Ex. # 5, Turki Decl. ¶ 7. | Disputed. To the extent that the MWL claims that it was engaging in peace efforts in the Philippines with respect to the Moro Islamic Liberation Front, that is disputed as inaccurate and misleading.<br><br>For instance, investigations conducted by Philippines Intelligence in 1998 determined that E.O. 13224 Specially Designated Global Terrorist ("SDGT") and IIRO-Eastern Province branch official Abd al Hamid Sulaiman al Mujil (nicknamed the "Million Dollar Man" for supporting Islamic militant groups) met with Moro Islamic Liberation Front officials to provide a significant financial contribution to the terrorist organization. *See* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211430 (identifying IIRO officials "Al Saif Othoman A O and Almojil Abdul Hamdi S" meeting with MILF Chairman Salamat Hashim at Camp Abubakar in the Southern Philippines concerning a $192,197.00 contribution).<br><br>Media reporting in the Philippines in 2000 indicated that the IIRO was funding terrorist operations of the Moro Islamic Liberation Front and Abu Sayyaf Group throughout the 1990s. *See* Ex. 44, Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000, FED-PEC 10813-10815 (reporting that the IIRO was "being used |

| | |
|---|---|
| | by accused international terrorists Osama bin Laden and his brother-in-law, Mohammad Jamal Khalifa as a front to finance the operations of the Abu Sayyaf and the Moro Islamic Liberation Front," and that the bulk of IIRO "fund[s] goes to terrorist operations of the Abu Sayyaf and the MILF");<br><br>In addition, CIA investigations determined that as of June 2002, the IIRO maintained contact with "Islamic extremists" such as the Moro Islamic Liberation Front. *See* Ex. 16, *Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia*," June 2002, CIA_000450-480 at 455 ("Gulf NGOs with branch offices in the Philippines—including Dal al Hijra Foundation and the International Islamic Relief Organization—maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates.").<br><br>Moreover, the MWL and Moro Islamic Liberation Front were conducting meetings in 2003 about setting up bank accounts to direct financial assistance to MILF. *See* Ex. 104, IIRO 93332-93333 (August 25, 2003 letter from the successor to the deceased MILF chairman to the MWL Secretary General asking him to "open a bank account with the League at one of the accredited banks to receive special assistance and donations for them from their brothers in creed and faith."). In a related communication, a MWL representative contacted the IIRO-Philippines office and asked for assistance concerning this "important" request. *See* Ex. 103, IIRO 93331 (October 4, 2003 letter from Fouad bin Abdullah Akbar, Director of the Emergency Relief Department, to the "Director of the International Islamic Relief Organization Office in the Philippines," concerning MILF's request to MWL Secretary General Turki and asking to "[k]indly review and provide us with the necessary study and your opinion on this request, as it is important to us.").<br><br>IIRO employee Abdulhadi Daguit testified that the Moro Islamic Liberation Front was engaged in military activities at the same time that MILF asked MWL Secretary General Turki to open the bank account for donations. *See* Ex. 29, Transcript, June 27, 2019 Deposition of Abdulhadi T. Daguit, at 144-145 (testifying that MILF was "engaging [in] fighting with the Philippine government").<br><br>Finally, to the extent the MWL's assertions at Nos. 226-229 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki and Abdullah bin Saleh al Obaid at MWL Exs. 5 and 6, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after their depositions were completed in these proceedings in |

| | |
|---|---|
| | 2018. Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 227. MWL assisted the Philippines Government and the MILF, who had been in conflict for many years, in reaching a peaceful resolution. Ex. # 6, Obaid Decl. ¶ 5; Ex. # 5, Turki Decl. ¶ 7. | Disputed. *See* Plaintiffs' response to No. 226. |
| 228. During Abdullah bin Saleh Al-Obaid's tenure as Secretary General of MWL, from 1996 to 2000, the MWL had contacts with the MILF "to establish peace between the government and the front." Ex. # 6, Obaid Dep. Tr. at 251:8-16 (*Errata*). | Disputed. *See* Plaintiffs' response to No. 226. |
| 229. Abdullah bin Saleh Al-Obaid had no contact with the MILF, but he did attend a peace ceremony between the MILF and the government of the Philippines at the government's invitation in the 1990s. Ex. # 31, Obaid Dep. Tr. at 250:20-251:7; Ex. # 6, Obaid Decl. ¶ 5; Ex. # 5, Turki Decl. ¶ 7. Ex. # 13, MWL Secretariat General Report (1997), at IIRO017051. | Disputed. *See* Plaintiffs' response to No. 226. |
| 230. The MILF employed a strategy of engaging with the secular Filipino state in order to win concessions for autonomy, which was at odds with the ideological and strategic orientation of Al Qaeda. Ex. # 4, Brown Rpt. at 40. | Disputed. Mr. Brown's statement lacks foundational evidence. |
| **<u>Abu Sayyaf Group ("ASG")</u>** | No response necessary. |
| 231. Plaintiffs have no evidence that ASG had any foreknowledge of or was involved in the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. # 4, Brown Rpt. at 41 (Apart from a visit by one Al Qaeda member who videotaped his journey, no "primary sources indicate any pre-9/11 relationship between [Al Qaeda] and ASG in terms of funding, cooperation, or the carrying out of attacks."); *Id.* at 41-42 (explaining that only two relevant documents in Osama Bin Laden's Abbottabad compound mention ASG: one criticizes the MILF for its political efforts and perceived abandonment of jihad in contrast with ASG's commitment to jihad; the other is an essay from a Jordanian professor that notes that ASG has "no organizational connection with [Al Qaeda]."). | Disputed. The MWL's claim that there is no evidence that the Abu Sayyaf Group ("ASG") had any foreknowledge of or was involved in the planning or execution of the 9/11 attacks is inaccurate and misleading.<br><br>As set forth in Plaintiffs' response to No. 1, Dr. Omar Abdullah Naseef, in his capacity as the MWL Secretary General and IIRO Chairman, approved the appointment of Mohammed Jamal Khalifa, a founding al Qaeda member and Osama bin Laden's brother-in-law, to open a joint MWL/IIRO branch office in the Philippines contemporaneous with the formation of al Qaeda. *See* <u>Ex. 51</u>, FED-PEC 202846-202847 (June 5, 1988). As a result of that appointment, Khalifa was able to use the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia, and provide substantial assistance for al Qaeda affiliated terrorist organizations Abu Sayyaf Group ("ASG"), Moro Islamic Liberation Front, and Jemaah Islamiya ("JI"). *See also* <u>Ex. 36</u>, Expert Report of Jonathan M. Winer, March 10, 2020 at 77-81 (describing how |

| | |
|---|---|
| | al Qaeda used its relationships with the Saudi charities to facilitate the building of relationships with, and channel money and resources to, aligned terrorist organizations and causes in the Philippines, Bosnia, Chechnya, Kenya, Sudan, and other regions, thereby creating dozens of affiliates around the globe and the ability to launch attacks against the United States and its interests abroad).<br><br>Those terrorist groups became an integral part of Osama bin Laden and al Qaeda's Southeast Asian network, and received extensive funding and resources from the IIRO, the MWL's subsidiary. *See, e.g.,* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149-152 (indicating that al Qaeda member Mohammed Jamal Khalifa served in an official role with the MWL, and used the IIRO branch office in the Philippines to fund the Abu Sayyaf Group, an al Qaeda associated terrorist organization, and recruit Muslims for military training); Ex. 16, *Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia*," April 9, 1999, CIA_000450-480 at 455 ("Gulf NGOs with branch offices in the Philippines—including Dal al Hijra Foundation and the International Islamic Relief Organization—maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates."); Ex. 59, Philippines Intelligence Report, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO.").<br><br>*See also* Ex. 44, Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000, FED-PEC 10813-10815 (reporting that the IIRO was "being used by accused international terrorists Osama bin Laden and his brother-in-law, Mohammad Jamal Khalifa as a front to finance the operations of the Abu Sayyaf and the Moro Islamic Liberation Front," and that the bulk of IIRO "fund[s] goes to terrorist operations of the Abu Sayyaf and the MILF"); Ex. 33, European Parliament, *The Involvement of Salafism/Wahhabism in the Support and Supply of Arms to Rebel Groups Around the World*, June 2013, at 9 ("Declassified intelligence reports from the FNP revealed that in 1988 Bin Laden sent his brother-in-law Mohammad Jamal Khalifa to the Philippines to set up Al Qaeda's branches in Southeast Asia. The so-called Khalifa network counted at least twelve charitable organizations and front companies that provided funds to both the Moro Islamic Liberation Front |

| | |
|---|---|
| | (MILF) and Abu Sayyaf. One of the most active organizations in this sense was the IIRO. In fact, IIRO-funded facilities were mainly built in Mindanao, a region under the control of the aforementioned rebel groups. For instance, the head of IIRO's branch office in Tawi Tawi, Mindanao, was Abdul Asmad, former Abu Sayyaf's intelligence chief until 1994 when he died (Abuza, 2003, p. 27). The office was used by Al Qaeda to siphon money on behalf of the MILF and Abu Sayyaf. According to defectors' interrogations, this practice was very effective considering that Al Qaeda was able to divert the 70-90 percent of funds for arms acquisition destined to the rebel groups. This means that only the 10-30 percent of the money remained available for legitimate purposes."); Ex. 6, Center for Contemporary Conflict, *Al Qaeda Finances and Funding to Affiliated Groups*, January 2005, PEC-KSA001998-2013 at 2003 ("In a report submitted to the United Nations Al Qaeda and Taliban Sanctions Committee this Government of the Philippines indicated that Mohammed Jamal Khalifa, the brother-in-law of Osama bin Laden, had established numerous businesses, corporations and charitable extremist institutions there which had served as a network to fund the Abu Sayyaf group as well as other extremist organizations. These reportedly included the Khalifa Trading Industries, ET Dizon Travel Pyramid Trading, Manpower Services, and Daw al-Imam al-Shafee.").<br><br>U.S. State Department communications and diplomatic cables further describe the involvement of the IIRO, Mohammed Jamal Khalifa, and the IIRO-Philippines branch office in supporting the Abu Sayyaf Group. *See, e.g.*, Ex. 164, December 16, 1994 State Department Letter, PEC-KSA 2260-2261 (Philip C. Wilcox, Jr., the Department of State's Coordinator for Counterterrorism, advises that Khalifa financed a 1994 attack on a Jordanian movie theater, and that "the United States Government has evidence that Muhammad Jamal Khalifa, who has lived in the Philippines for a number of years, has provided financial support to the Philippine terrorist group Abu Sayyaf."); Ex. 166, December 1994 U.S. Diplomatic Cable, PEC-KSA 2264-2274 (Secretary of State Warren Christopher's office states: "Khalifa is an officer of an Islamic NGO in the Philippines that is a known Hamas front and has financed terrorist operations. Khalifa is reported to be the brother in law of Usama Bin Laden, the Sudan-based financier of Islamic extremists. Khalifa is believed to have provided support to the Philippine terrorist group Abu Sayyaf."); Ex. 168, April 1995 U.S. Diplomatic Cable, PEC-KSA 2277-2280 (stating that Khalifa "is a principal financier of Abu Sayyaf"); Ex. 159, April 2004 U.S. Diplomatic Cable, PEC-KSA 1467-1470 (Secretary of State Colin Powell's office stating that the "IIRO has also been cited as the conduit for funds from Usama Bin Laden to terrorist organizations, |

| | |
|---|---|
| | specifically that the Abu Sayyaf cell in Manila was founded with money sent by Bin Laden to Mohamed Jamal Khalifa through IIRO."); Ex. 158, June 2004 U.S. Diplomatic Cable, PEC-KSA 1464-1466 (Secretary of State Colin Powell's office detailing the IIRO's support for al Qaeda and the Abu Sayyaf terrorist group, and stating: "The USG believes that some elements of the International Islamic Relief Organization (IIRO) have been exploited by terrorists and their financiers as a means of transferring assets, providing organizational cover, or otherwise supporting extremist, violent operations."); Ex. 71, May 23, 2005 U.S. Diplomatic Cable, FED-PEC 220479-220481 ("The International Islamic Relief Organization (IIRO) -- a subsidiary of the Saudi-based and funded Muslim World League (MWL) -- was active here in the late 1980s and early 1990s. Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines."). <br><br> *See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 37-38 (stating that IIRO-Philippines "has also served as a liaison to other extremist groups on behalf of the Abu Sayyaf Group"). <br><br> The Abu Sayyaf Group, Moro Islamic Liberation Front, and Jemaah Islamiya also received extensive funding and resources from the IIRO-Eastern Province and Abd al Hamid Sulaiman al Mujil, as well as the IIRO-Indonesia branch office. *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202110 ("Al-Mujil provided donor funds directly to al Qaida and is identified as a major fundraiser for the Abu Sayyaf Group (ASG) and Jemaah Islamiyah (JI). Both ASG and JI are al Qaida-associated terrorist groups in Southeast Asia designated pursuant to the authorities of E.O. 13224."); Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 107 ("The Abu Sayyaf Group [ASG] is the most violent of the separatist groups operating in the Southern Philippines and was designated as an SDGT pursuant to E.O. 13224 on September 24, 2001. It was formed in the early 1990's and received support and seed money from al Qaida."); *id.* at 113 ("According to the Umog interrogation report, IIRO-PHL, under the direction of Khalifah, also sent ASG and MILF members to Afghanistan to train with the 'mujahidin.' Khalifah stated that he wanted the ASG and the |

| | |
|---|---|
| | MILF to train together to establish alliances among the groups.”).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 36 (“The IIRO has provided extensive support to Jemaah Islamiyya, the militant Southeast Asian organization tied to al Qaeda. According to U.S. Treasury Department, Abd Al Hamid Sulaiman Al-Mujil, Executive Director of an IIRO office who was named a specially designated individual, invited a Philippines-based JI supporter to travel to Saudi Arabia in 2004. This supporter used the guise of undertaking the hajj pilgrimage for his travel, and al-Mujil planned for him to carry cash back to the JI in the Philippines. Treasury also revealed that an IIRO office supported JI by providing assistance with recruitment of members, transportation and logistics, and provided a safe-haven.”).<br><br>Moreover, in his pursuit of al Qaeda’s global expansion, bin Laden directed critical material and logistical support to ASG, MILF, and JI. *See* Ex. 1, 9/11 Commission Final Report at 58 (“Bin Ladin also provided equipment and training assistance to the Moro Islamic Liberation Front in the Philippines and also to a newly forming Philippine group that called itself the Abu Sayyaf Brigade, after one of the major Afghan jihadist commanders. Al Qaeda helped Jemaah Islamiya (“JI”), a nascent organization headed by Indonesian Islamists with cells scattered across Malaysia, Singapore, Indonesia, and the Philippines.”).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 35 (“Mohammed Jamal Khalifah, bin Laden’s brother-in-law, for example, once worked for the World Muslim League and then ran an IIRO branch in Manila in the early 1990s that Philippine military authorities have identified as a ‘conduit of Arab financiers for money to the Abu Sayyef [terrorist group].’”).<br><br>As the foregoing evidence demonstrates, Abu Sayyaf Group, Moro Islamic Liberation Front, and Jemaah Islamiya were closely aligned with Osama bin Laden and al Qaeda for years leading up to the 9/11 attacks, and were thus specifically aware of al Qaeda’s terrorist nature, mission, and intent to attack the United States at all relevant times. |
| 232. Plaintiffs have no evidence tracing ASG funds to the planning or execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040- 000011; Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his report “does not include any material about the specific financing of the 9/11 hijackers themselves”); Ex. # 4, Brown Rpt. at 41 (Apart from a visit | Disputed as stated. The MWL’s claim that there is no evidence tracing ASG funds or other in-kind support to al Qaeda and/or the planning and execution of the 9/11 attacks mischaracterizes the Plaintiffs’ claims. As described herein, the IIRO, MWL, and their officials, employees, advisors, and representatives were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 |

| | |
|---|---|
| by one Al Qaeda member who videotaped his journey, no "primary sources indicate any pre-9/11 relationship between [Al Qaeda] and ASG in terms of funding, cooperation, or the carrying out of attacks."); *Id.* at 41-42 (explaining that only two relevant documents in Osama Bin Laden's Abbottabad compound mention ASG: one criticizes the MILF for its political efforts and perceived abandonment of jihad in contrast with ASG's commitment to jihad; the other is an essay from a Jordanian professor that notes that ASG has "no organizational connection with [Al Qaeda].") *see generally* 9/11 Commission Report; Monograph. | attacks, and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad. Intending to foster al Qaeda's terrorist agenda, they provided substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks. That substantial assistance included extensive financial, material, logistical, and ideological support directed to al Qaeda's Southeast Asian network, consisting of the Abu Sayyaf Group, Moro Islamic Liberation Front, Jemaah Islamiya, and other terrorist organizations.<br><br>Any financial and/or in-kind support provided to those terrorist groups, in turn, directly supported al Qaeda's global terrorist ambitions to wage jihad against the United States. Accordingly, the 9/11 attacks were a predictable, inevitable product of that sustained, knowing support. Plaintiffs need not prove that the funds or other in-kind support provided to al Qaeda were traced to the terrorist plot or the attack itself.<br><br>By way of further response, *see* Plaintiffs' response to No. 231. |
| 233. Plaintiffs have no evidence tracing in-kind support from ASG to the planning or for the execution of the 9/11 Attacks. Ex. # 2, FBI Report Administratively Closing Case (May 27, 2021) at E014040-000011; Ex. # 4, Brown Rpt. at 41 (Apart from a visit by one Al Qaeda member who videotaped his journey, no "primary sources indicate any pre-9/11 relationship between [Al Qaeda] and ASG in terms of funding, cooperation, or the carrying out of attacks."); *Id.* at 41-42 (explaining that only two relevant documents in Osama Bin Laden's Abbottabad compound mention ASG: one criticizes the MILF for its political efforts and perceived abandonment of jihad in contrast with ASG's commitment to jihad; the other is an essay from a Jordanian professor that notes that ASG has "no organizational connection with [Al Qaeda]."). | Disputed. *See* Plaintiffs' responses to Nos. 231 and 232. |
| 234. Plaintiffs have no evidence tracing funds from MWL through ASG to Al Qaeda for the planning or execution of the 9/11 Attacks. Ex. # 2, May 27, 2021 FBI Report Administratively Closing Case, at EO14040-000011; Winer Rpt. at 112-22 (failing to trace any funds from MWL to the planning or execution of the 9/11 Attacks) (ECF No. 7344-1); Kohlmann Rpt. ¶¶ 27-70 (same) (ECF No. 9250-2); Levitt Rpt. at 29-35 (same) (ECF No. 9250-33); Jenkins Rpt. (same) (ECF No. 7344-3); Ex. # 3, Levitt Dep. Tr. 425:10-20 (acknowledging that his | Disputed. *See* Plaintiffs' responses to Nos. 231 and 232.<br><br>*See also* Ex. 16, *Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia*," CIA_000450-480 at 455 ("Gulf NGOs with branch offices in the Philippines—including Dal al Hijra Foundation and the International Islamic Relief Organization—maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates."); Ex. 33, European Parliament, *The Involvement of* |

| | |
|---|---|
| report "does not include any material about the specific financing of the 9/11 hijackers themselves"); *see also* Ex. # 4, Brown Rpt. at 62 ("No document has come to light from the nearly 500,000 documents collected in that raid suggesting the use of charities for raising or moving money."); *see generally* 9/11 Commission Report; Monograph. | *Salafism/Wahhabism in the Support and Supply of Arms to Rebel Groups Around the World*, June 2013, at 9 ("Declassified intelligence reports from the FNP revealed that in 1988 Bin Laden sent his brother-in-law Mohammad Jamal Khalifa to the Philippines to set up Al Qaeda's branches in Southeast Asia. The so-called Khalifa network counted at least twelve charitable organizations and front companies that provided funds to both the Moro Islamic Liberation Front (MILF) and Abu Sayyaf. One of the most active organizations in this sense was the IIRO. In fact, IIRO-funded facilities were mainly built in Mindanao, a region under the control of the aforementioned rebel groups. For instance, the head of IIRO's branch office in Tawi Tawi, Mindanao, was Abdul Asmad, former Abu Sayyaf's intelligence chief until 1994 when he died (Abuza, 2003, p. 27). The office was used by Al Qaeda to siphon money on behalf of the MILF and Abu Sayyaf. According to defectors' interrogations, this practice was very effective considering that Al Qaeda was able to divert the 70-90 percent of funds for arms acquisition destined to the rebel groups. This means that only the 10-30 percent of the money remained available for legitimate purposes."); Ex. 44, Philippine Daily Inquirer, *Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000, FED-PEC 10813-10815 (reporting that the IIRO was "being used by accused international terrorists Osama bin Laden and his brother-in-law, Mohammad Jamal Khalifa as a front to finance the operations of the Abu Sayyaf and the Moro Islamic Liberation Front," and that the bulk of IIRO "fund[s] goes to terrorist operations of the Abu Sayyaf and the MILF"); Ex. 54, Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report*, February 13, 1999, FED-PEC 203704-203705 (reporting that the IIRO's Mohammed Jamal Khalifa "is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group," and further stating that the "IIRO is suspected by Western intelligence agencies to be bin Laden's conduit to various terrorist organizations in Islamic countries"). |
| 235. MWL did not have a relationship with ASG. Ex. # 31, Obaid Dep. Tr. at 251:20-23 (*Errata*). | Disputed. *See* Plaintiffs' responses to Nos. 231, 232, and 234.<br><br>*See also* Plaintiffs' response to No. 1, Dr. Omar Abdullah Naseef, in his capacity as the MWL Secretary General and IIRO Chairman, approved the appointment of Mohammed Jamal Khalifa, a founding al Qaeda member and Osama bin Laden's brother-in-law, to open a joint MWL/IIRO branch office in the Philippines contemporaneous with the formation of al Qaeda. *See* Ex. 51, FED-PEC 202846-202847 (June 5, 1988). As a result of that appointment, Khalifa was able to use the MWL/IIRO office as a platform for al Qaeda's expansion into Southeast Asia, and provide substantial assistance for al Qaeda affiliated terrorist organizations Abu Sayyaf Group |

| | |
|---|---|
| | ("ASG"), Moro Islamic Liberation Front, and Jemaah Islamiya ("JI"). |
| 236. Plaintiffs have no evidence that MWL provided funding to ASG before the 9/11 Attacks. Winer Rpt. at 80-81, 96-99 (discussing the ASG, but failing to provide evidence of funding from MWL to ASG) (ECF No. 7344-1); Levitt Rpt. at 35, 37-38 (same) (ECF No. 9250- 33); Kohlmann Rpt. at 36-39 (same) (ECF No. 9250-2). | Disputed. *See* Plaintiffs' responses to Nos. 1, 231, 232, and 234. |
| 237. Plaintiffs have no evidence that MWL was aware or had knowledge before 9/11 of any connection between ASG and Al Qaeda. See Ex. # 31, Obaid Dep. Tr. at 251:20-23 (*Errata*); Exec. Order 13,224, 66 Fed. Reg. 49,079, 49,081, 49,083 (Sept. 25, 2001). | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 231, 232, and 233.<br><br>By way of further response, prior to the 9/11 attacks, the leadership of MWL and its subsidiary IIRO, were expressly aware of the organizations' ongoing support for international terrorism and Osama bin Laden, and the involvement of its branch offices and officials in terrorist activities, by virtue of extensive international media reporting. That reporting includes a number of public news articles discussing the terrorist activities of the Abu Sayyaf Group, Moro Islamic Liberation Front, and Jemaah Islamiya, and/or their connections to international terrorism and al Qaeda. Any assertion that the MWL, and/or its subsidiary, IIRO, were unaware of these connections is duplicitous. *See, e.g.,* Ex. 54, Japan Economic Newswire, *Bin Laden Providing Money, Military Aid to MILF: Report*, February 13, 1999, FED-PEC 203704-203705 (reporting that the IIRO's Mohammed Jamal Khalifa "is instrumental in funneling funds to MILF and the extremist Abu Sayyaf Group," and further stating that the "IIRO is suspected by Western intelligence agencies to be bin Laden's conduit to various terrorist organizations in Islamic countries"); Philippine Daily Inquirer, *Front Page: Bin Laden Funds Abu Sayyaf Through Muslim Relief Group*, August 9, 2000 (indicating that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League) is a conduit of funds for the Abu Sayyaf Group, a terrorist organization in the Philippines); Philippine Daily Inquirer, *Front Page: Gemma Linked to Bin Laden Group Funding Sayyaf, MILF*, August 10, 2000 (reporting that the IIRO is a front to finance the operations of the Abu Sayyaf Group and Moro Islamic Liberation Front terrorist organizations); The Straits Times, *Osama Gave Funds to Abu Sayyaf: Manila*, August 10, 2000 (reporting that Mohammed Jamal Khalifa and the IIRO (working under the Muslim World League), "in the guise of giving charity to local Muslim communities, provided funds to Abu Sayyaf for acquiring arms"); The Times, *Terror by Degree*, October 18, 1997 (reporting on the "Bojinka" terrorist plot and stating that Mohammed Jamal Khalifa was funding the Abu Sayyaf Group); Overseas Immigration News, *Immigration Claims Teacher Linked to Terrorists Alleged Al-* |

| | |
|---|---|
| | *Jihad Member: Egyptian Denies Allegations, is Appealing Legal Proceedings*, May 21, 1999 (reporting that the IIRO "secretly funds terrorism"). *See also* Ex. 80, IIRO 147 ("IIRO Administrative Structure" chart identifying a "Department of Media and Information."); Ex. 65, FED-PEC 214874-214875 (MWL structural chart identifying "The General Department for Media and Culture"). |
| 238. The ASG was designated as a Foreign Terrorist Organization by the Secretary of State on October 8, 1997. 62 Fed. Reg. 52650 (Oct. 8, 1997). | It is not disputed that ASG was designated as a Foreign Terrorist Organization by the State Department on October 8, 1997, *see* https://www.state.gov/foreign-terrorist-organizations, and was further designated by OFAC on September 25, 2001. |
| 239. The ASG was designated by OFAC pursuant to Executive Order 13224, effective September 24, 2001. Exec. Order 13,224, 66 Fed. Reg. 49,079, 49,081, 49,083 (Sept. 25, 2001). | It is not disputed that ASG was designated as a Foreign Terrorist Organization by the State Department on October 8, 1997, *see* https://www.state.gov/foreign-terrorist-organizations, and was further designated by OFAC on September 25, 2001. |
| 240. The ASG emerged in the Philippines in the early-mid-1990s by attacking Christian missionaries and committing robberies and kidnappings around the Sulu Archipelago, the Zamboanga Peninsula, and elsewhere. Sidel Rpt. ¶¶ 60-61 (ECF No. 7351-5). | Disputed. The U.S. government was describing the Abu Sayyaf Group as a "terrorist group" in the early to mid-1990s, not some "religious sectarian group" or "gang" as the IIRO and MWL claim. *See, e.g.*, Ex. 164, December 16, 1994 State Department Letter, PEC-KSA 2260-2261 (Philip C. Wilcox, Jr., the Department of State's Coordinator for Counterterrorism, advises that Khalifa financed a 1994 attack on a Jordanian movie theater, and that "the United States Government has evidence that Muhammad Jamal Khalifa, who has lived in the Philippines for a number of years, has provided financial support to the Philippine terrorist group Abu Sayyaf."); Ex. 166, December 1994 U.S. Diplomatic Cable, PEC-KSA 2264-2274 (Secretary of State Warren Christopher's office states: "Khalifa is an officer of an Islamic NGO in the Philippines that is a known Hamas front and has financed terrorist operations. Khalifa is reported to be the brother in law of Usama Bin Laden, the Sudan-based financier of Islamic extremists. Khalifa is believed to have provided support to the Philippine terrorist group Abu Sayyaf."). |
| 241. ASG is "a largely criminal organization that has engaged in episodic acts of criminality, and that eventually morphed into—at least some of its members, into groups affiliated with the so-called Islamic State." Ex. # 77, Sidel Dep. Tr. at 42:11-17. | Disputed. *See, e.g.*, Plaintiffs' response to No. 240. |
| 242. ASG was not focused on the United States or the West but enmeshed in local politics and local power structures. Sidel Rpt. ¶¶ 4-5, 65, 83, 99 (ECF No. 7351-5); Ex. # 77, Sidel Dep. Tr. at 40:14-41:6. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 231 and 232. The Abu Sayyaf Group was closely aligned with Osama bin Laden and al Qaeda in the early 1990s. |
| **<u>Services Bureau</u>** | No response necessary. |

| | |
|---|---|
| 243. Founded in the mid-1980s by Abdullah Azzam, the Services Bureau aimed to attract young Arab volunteers, train them and turn them into a military vanguard in the Afghan Jihad against the Soviet invasion of Afghanistan, doing so openly and even with the U.S.'s favor, which even provided Azzam visas to tour the U.S. in the late 1980s to further this goal. Ex. # 78, Roy Rpt. at 15; Ex. # 4, Brown Rpt. at 11. | Undisputed as a general matter for purposes of this motion, and immaterial.<br><br>*See also* Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that the Maktab al-Khidamat, a Pakistan-based nongovernmental organization financed by Osama bin Laden, played a key role in facilitating the training and travel of Islamic militants, received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization").<br><br>*See also* Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 30 (discussing Maktab al Khidmat's connection to the IIRO and MWL).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 31 ("The MWL's ties to terrorism and religious extremism go back to the Afghan jihad against the Soviets in the 1980s. Together with Osama bin Laden, Sheikh Abdullah Azzam co-founded Maktab al-Khidmat (MAK)—also known as the Afghan Services Bureau or the Human Services Office."); *id.* at 32 ("Most of the early Arab fighters in Afghanistan had links to either the Muslim Brotherhood or the Muslim World League."); *id.* (indicating that "Sheikh Abdullah Azzam's salary at the International Islamic University in Islamabad, where he propagated his violent extremist ideology, was paid by the Muslim World League from 1981 to 1986"). |
| 244. Abdullah Azzam founded the Services Bureau with Abd al-Rabb Rasul Sayyaf, then the leader of the union of Afghan Mujahidin parties, and Osama Bin Laden, who agreed to fund the organization. And Azzam led the Services Bureau until his assassination in November 1989, and the Bureau continued even after Azzam's death. Ex. # 4, Brown Rpt. at 11-13. | Disputed as stated. The MWL's claim that the Services Bureau (a/k/a Maktab al Khidmat ("MAK")), continued after Abdullah Azzam's death is inaccurate and misleading. *See* Plaintiffs' response to No. 362 (explaining that after Azzam's death, Osama bin Laden assumed full control of MAK, and MAK was absorbed into al Qaeda, and further noting that the da'wa organizations that funded and supported MAK during the 1980s—MWL, IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Red Crescent Society, and Benevolence International Foundation—continued to serve as the primary conduits for channeling financial, logistical, operational, and ideological support to al Qaeda's global jihad for years leading up to the 9/11 attacks). |
| 245. Western nations, including the U.S., strongly supported the mujahideen with hundreds of millions of dollars, advanced weaponry, and American military advisers. Ex. # 78, Roy Rpt. at 10-13. | Undisputed as a general matter for purposes of this motion, and immaterial. |

| | |
|---|---|
| 246. The United States supported the mujahideen fighting the Soviet Union invasion of Afghanistan under Presidents Carter, Reagan, and Bush. Ex. # 78, Roy Rpt. at 10-13; Ex. # 1, Winer Dep. Tr. at 358:5-18, 362:21-25. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 247. During the Soviet invasion of Afghanistan, MWL participated in relief efforts and called for peace in Afghanistan. Ex. # 31, Obaid Dep. Tr. at 265:19-266:17 (*Errata*), 267:24-268:10 (*Errata*) (discussing Ex. # 79, His Highness Secretary General of the Muslim World League: Dialogue with others is the means to repel oppression and introduce Islam (National Guard Journal: Islamic Horizons, Nov. 1, 2000), FED-PEC0242816 to FED-PEC0242821). | Disputed. The MWL's claim that it engaged in relief efforts and advocated for peace is inaccurate and misleading. In the August 31, 1992 edition of the Al Alam Al Islami, the MWL acknowledged the role it and other Saudi charities played in providing weapons and ammunition in support of the jihad during Soviet-Afghan conflict. *See More than a Million and a Half a Million of Martyrs and Thousands of Widows are the Price of Victory in Afghanistan*, at <u>Ex. 197</u>: "Through the Saudi Red Crescent, the Islamic Relief Organization, and the Muslim World League, the government and people of Saudi Arabia provided in-kind and financial support to the Afghani mujahideen, purchased arms and ammunition, and paid the costs of transporting them even inside Afghanistan." |
| 248. During the Soviet invasion of Afghanistan, MWL did not provide arms or money to the Mujahideen. *Id.* | Disputed. *See* Plaintiffs' response to No. 247. |
| **<u>Al Qaeda</u>** | No response necessary. |
| 249. Plaintiffs have no evidence that MWL knowingly or tacitly employed members of Al Qaeda or individuals known as Al Qaeda sympathizers. Ex. # 8, Al-Thaqafi Decl. ¶ 23; Ex. # 9, Al-Hassani Decl. ¶ 23; Ex. # 4, Brown Rpt. at 42, 90; Ex. # 6, Obaid Decl. ¶¶ 6-7, 9; Ex. # 5, Turki Decl. ¶¶ 8-9, 11. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 65, 171, 187, 190, 191, 194, 205, 206, 207, 218, 219, 231, 344, 414, 418, 428, and 430 (discussing MWL Secretary General Omar Abdullah Naseef and MWL/IIRO officials and employees Wa'el Hamza Jelaidan, Mohammed Jamal Khalifa, Abdelhadi Daguit, Mahmoud Abd al Jalil Afif, Abdul Asmad, Abd al Hamid Sulaiman al Mujil, Prince Turki bin Jalawi al Saud, Prince Muhammad bin Fahd bin Abdul Aziz, Ibrahim Mohammad Afandi, Abdurahman Abdul-Qader Faqih, Suleiman al Rajhi, Saleh al Kamel, Abu Hammam al Saud, and others).<br><br>Moreover, to the extent the MWL's assertions at Nos. 249-277 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki, Abdullah bin Saleh al Obaid, Ali al Thaqafi, and Hassani at MWL Exs. 5, 6, 8, and 9, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2018 (Turki, Obaid). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |

| | |
|---|---|
| 250. MWL did not support, whether financial or otherwise, Al Qaeda or any other terrorist organization. Ex. # 6, Obaid Decl. ¶ 8; Ex. # 5, Turki Decl. ¶ 10; Ex. # 4, Brown Rpt. at 7-8, 63 (review of primary sources shows no evidence that IIRO or MWL supported Al Qaeda); Ex. # 8, Al-Thaqafi Decl. ¶ 23 ("I did not observe any support, tacit or explicit, provided by MWL to terror organizations, including Al Qaeda."); Ex. # 9, Al-Hassani Decl. ¶ 23 ("I did not observe any support, tacit or explicit, provided by MWL to terror organizations, including Al Qaeda."). | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 72, 75, 81, 122, 123, 124, 171, 172, 187, 190, 191, 203, 205, 206, 207, 218, 219, 231, 233, 237, 243, 290, 293, 300, 302, 305, 306, 328, 329, 331, 333, 342, 343, 344, 345, 348, 349, 360, 362, 366, 367, 368, 370, 371, 372, 375, 377, 379, 381, 383, 385, 387, 394, 414, 418, 420, 421, 428 and 430. *See also* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities.").<br><br>Moreover, to the extent the MWL's assertions at Nos. 249-277 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki, Abdullah bin Saleh al Obaid, Ali al Thaqafi, and Hassani at MWL Exs. 5, 6, 8, and 9, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2018 (Turki, Obaid). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 251. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki authorized, explicitly or implicitly, or has knowledge of, activities conducted or financing provided by MWL in support of Al Qaeda or any other terrorist organization. Ex. # 6, Obaid Decl. ¶ 6; Ex. # 5, Turki Decl. ¶ 8. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 72, 75, 81, 122, 123, 124, 171, 172, 187, 190, 191, 203, 205, 206, 207, 218, 219, 231, 233, 237, 243, 290, 293, 300, 302, 305, 306, 328, 329, 331, 333, 342, 343, 344, 345, 348, 349, 360, 362, 366, 367, 368, 370, 371, 372, 375, 377, 379, 381, 383, 385, 387, 394, 414, 418, 420, 421, 428 and 430.<br><br>Moreover, to the extent the MWL's assertions at Nos. 249-277 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki and Abdullah bin Saleh al Obaid at MWL Exs. 5 and 6, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2018 (Turki, Obaid). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 252. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki are aware of any person within MWL who authorized or instructed, explicitly or implicitly, MWL employees to provide any form of support, whether financial or otherwise, to Al Qaeda or any other terrorist | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 72, 75, 81, 122, 123, 124, 171, 172, 187, 190, 191, 203, 205, 206, 207, 218, 219, 231, 233, 237, 243, 290, 293, 300, 302, 305, 306, 328, 329, 331, 333, 342, 343, 344, 345, 348, 349, 360, |

| | |
|---|---|
| organization. Ex. # 6, Obaid Decl. ¶ 7; Ex. # 5, Turki Decl. ¶ 9. | 362, 366, 367, 368, 370, 371, 372, 375, 377, 379, 381, 383, 385, 387, 394, 414, 418, 420, 421, 428 and 430.<br><br>Moreover, to the extent the MWL's assertions at Nos. 249-277 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki and Abdullah bin Saleh al Obaid at MWL Exs. 5 and 6, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2018 (Turki, Obaid). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 253. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki are aware of any member of MWL's management who agreed with Al Qaeda's aims or acts. Ex. # 6, Obaid Decl. ¶ 9; Ex. # 5, Turki Decl. ¶ 11. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 72, 75, 81, 122, 123, 124, 171, 172, 187, 190, 191, 203, 205, 206, 207, 218, 219, 231, 233, 237, 243, 290, 293, 300, 302, 305, 306, 328, 329, 331, 333, 342, 343, 344, 345, 348, 349, 360, 362, 366, 367, 368, 370, 371, 372, 375, 377, 379, 381, 383, 385, 387, 394, 414, 418, 420, 421, 428 and 430.<br><br>Moreover, to the extent the MWL's assertions at Nos. 249-277 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki and Abdullah bin Saleh al Obaid at MWL Exs. 5 and 6, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2018 (Turki, Obaid). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 254. Indeed, as the most senior officials in the organization, Abdullah bin Saleh Al- Obaid and Abdullah bin Abdul Mohsen Al-Turki "worked actively with others at MWL to counter Al Qaeda's ideologies." Ex. # 6, Obaid Decl. ¶ 9; Ex. # 5, Turki Decl. ¶ 11. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 72, 75, 81, 122, 123, 124, 171, 172, 187, 190, 191, 203, 205, 206, 207, 218, 219, 231, 233, 237, 243, 290, 293, 300, 302, 305, 306, 328, 329, 331, 333, 342, 343, 344, 345, 348, 349, 360, 362, 366, 367, 368, 370, 371, 372, 375, 377, 379, 381, 383, 385, 387, 394, 414, 418, 420, 421, 428 and 430.<br><br>Moreover, to the extent the MWL's assertions at Nos. 249-277 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki and Abdullah bin Saleh al Obaid at MWL Exs. 5 and 6, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2018 (Turki, Obaid). Plaintiffs have not |

| | |
|---|---|
| | been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 255. Adnan Basha never met or communicated with Osama Bin Laden and has never agreed with Al Qaeda's aims or acts and has worked actively to counter Al Qaeda's ideology. Ex. # 7, Basha Decl. ¶ 28; Ex. # 65, Basha PJ Decl. ¶ 21. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 72, 75, 81, 122, 123, 124, 171, 172, 187, 190, 191, 203, 205, 206, 207, 218, 219, 231, 233, 237, 243, 290, 293, 300, 302, 305, 306, 328, 329, 331, 333, 342, 343, 344, 345, 348, 349, 360, 362, 366, 367, 368, 370, 371, 372, 375, 377, 379, 381, 383, 385, 387, 394, 414, 418, 420, 421, 428 and 430.<br><br>By way of further response, during Basha's leadership of the IIRO as Secretary General from 1997 through 2013, (1) Basha collaborated and worked closely with MWL, IIRO, Rabita Trust, and Al Haramain al Masjed al Aqsa ("AHAMAA") officials who directed substantial financial, material, logistical, and ideological support to al Qaeda (e.g., Omar Abdullah Naseef, Wa'el Hamza Jelaidan, Abd al Hamid Sulaiman al Mujil, Prince Turki bin Fahad bin Jalawi al Saud, Mohammad bin Abdullah al Taibah (Chairman/President of AHAMAA), Mohammad bin Abdullah al Dubayban (Board Member of AHAMAA), and others); (2) the IIRO's Philippines and Indonesian branch offices, and IIRO official Abd al Hamid Sulaiman al Mujil, were designated by the U.S. government as Specially Designated Global Terrorists ("SDGT") for providing extensive support to al Qaeda and associated terror groups; (3) an audit of the IIRO-Pakistan's branch office, dated just a few months before the 9/11 attacks, uncovered the apparent diversion of millions of dollars of funds by that branch, and the wholesale fabrication of invoices, receipts and entire projects to conceal that activity (the same branch office that was used by the IIRO to fund 6 al Qaeda training camps, according to the 1996 CIA Report); (4) the IIRO's branch office Bosnia-Herzegovina was investigated for "providing financial support to known terrorist organizations;" and (5) the IIRO's branch office in Nairobi, Kenya, was implicated in the 1998 U.S. Embassy bombings in Africa and the IIRO office was deregistered.<br><br>Moreover, there were multiple raids of IIRO branch offices, arrests of IIRO employees, and seizures of IIRO bank accounts during Basha's tenure as IIRO Secretary General. *See, e.g.*, Ex. 111, IIRO 122003 (October 7, 2003 raid of IIRO branch office in Tirana, Albania); Ex. 100, IIRO 42373 (October 4, 2001 raid of IIRO branch office in Albania); Ex. 99, IIRO 42360 (reporting that the Saudi Embassy intervened to retrieve IIRO documents seized during raid); Ex. 72, U.S. Diplomatic Cable, *Treasury Undersecretary Stuart Levey Visits Bahrain to Discuss AML/CFT Efforts*, February 20, 2006, FED-PEC 220490-220491 (stating that authorities in Bahrain closed an |

| | |
|---|---|
| | IIRO bank account "which is not registered as a charity in Bahrain but had opened an account illegally and was using the account to circumvent Saudi restrictions on sending money abroad"); Ex. 57, FED-PEC 210514-210517 (reporting that authorities in Bahrain closed IIRO accounts as a result of irregular transactions which circumvented Bahraini regulations on charities and their financial transactions and stating: "[D]uring the first half of 2005, IIRO headquarters provided over $7 million from an account in Shamil Bank of Bahrain in Manama to 18 different IIRO satellite offices. Among these transactions, IIRO provided funds from the Bahrain account to three Saudi Embassies. Director Werner noted that the second largest single recipient of these funds was IIRO's Djibouti office."); Ex. 75, U.S. Diplomatic cable, *International Islamic Relief Organization (IIRO) Seeks to Access Funds Frozen by Islami Bank Bangladesh*, November 3, 2008, FED-PEC 220511-220513 (Islami Bank of Bangladesh froze the IIRO's accounts in 2006); Ex. 154, PEC-KSA 965-978 at 972 ("The regional financial accountant for the IIRO, an Egyptian named Hossam Meawad Mohammad Ali, was detained by Croatian authorities in a raid in Zagreb in April 1995 and has relocated to Ljubljana."); Ex. 55, FED-PEC 203706-203709 (reporting on the arrest of IIRO employee, Syed Abu Nasir, for his involvement in an attempted terrorist operation to bomb the U.S. Consulates in Chennai and Calcutta); Ex. 43, FED-PEC0097363-97365 (reporting on the K-FOR military police raid on the joint IIRO-Saudi Joint Relief Committee office in Kosovo in 2000 because Osama bin Laden associates Wa'el Hamza Jelaidan and Adel Muhammad Sadiq Bin Kazem were using the office to help bin Laden "move money and men to and from the Balkans;"); Ex. 112, IIRO 122181-122182 (2003 letter from IIRO Secretary General Basha informing that K-FOR military police continue to surveil the IIRO in Kosovo.); Ex. 74, U.S. Diplomatic cable, *Macedonia: A/S O'Brien Visit Highlights Terrorism and Financing Issues*, August 22, 2007, FED-PEC 220506-220510 (reporting that the IIRO branch office in Macedonia was closed and its members were expelled from the country in March 1995); Ex. 154, PEC-KSA 965-978 at 972 ("The Macedonian government closed the IIRO office in Skopje in March 1995 for aiding Albanian ethnic political parties and the Albanian Islamic Youth Organization."); Ex. 121, IIRO 284675 (discussing the 1999 closure of the IIRO's branch office in Makhachkala, Russa, and the confiscation of the IIRO's assets); Ex. 46, FED-PEC 144926-145008 (U.N. indicating that following the 9/11 attacks, the government of Pakistan identified and expelled some two dozen al Qaeda supporters who had been working for IIRO-sponsored organizations in Pakistan); Ex. 138, MWL 15876-25877 (August 6, 1993 letters from Roberto R. Romulo, the Philippine Secretary of Foreign Affairs, addressing a July 22, |

| | |
|---|---|
| | 1993 raid of the MWL branch office in Makati by agents of the Bureau of Immigration and Deportation with arrest warrants for the MWL staff for operating without a license.); Ex. 123, IIRO 285529-285530 (October 16, 2002 letter from Sulaiman al Ali, former IIRO office manager in the United States, to IIRO Secretary General Adnan Basha, concerning the FBI's raid of the IIRO office in 1997.); Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 103-105 (detailing Sulaiman al Ali's tenure with the IIRO in the United States, his relationship with MWL Secretary General and IIRO Chairman Abdullah al Obadi, and FBI concerns that money transferred by al Ali may have been used to finance the 1998 U.S. Embassy bombings in Africa).<br><br>*See* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 84-88 (detailing (1) the freezing of IIRO bank accounts by the government of Bangladesh in 2005 based on concerns that IIRO has ties to al Qaeda; (2) an IIRO bank account was closed by the government of Bahrain in 2005 for circumventing Saudi restrictions on sending money abroad; (3) the government of Makhachkala closing IIRO's branch office in 199 and confiscating the IIRO's assets; (4) the IIRO-Kenaya's connection to the 1998 U.S. Embassy bombings in Africa; (5) a 1995 raid of the IIRO-Vienna office by a German and Austrian counterterrorism task force; and (5) a 2000 raid of the joint IIRO-Saudi Joint Relief Committee office in an attempt to thwart potential U.S. attacks on U.S. interests).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 35 (citing to the 1996 CIA Report and stating: "Croatian authorities conducted a raid and detained Hossam Meawad Mohammad Ali, an Egyptian who served as the IIRO's accountant. The Agency reported that the Macedonians shut the IIRO office in Skopje in March 1995, and noted Mohammad Jamal Khalifa's ties to plots targeting the Pope and American airlines when he headed the IIRO office in Manila. 'Another high-ranking [IIRO] official in the Philippines leads Hamas meetings,' the report stated, adding that 'the majority of Hamas members in the Philippines are employed by the organization.'").<br><br>*See also* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities.").<br><br>Moreover, to the extent the MWL is relying upon the May 4, 2023 Basha Declaration attached as Ex. 7, and/or the May 21, 2024 Basha Declaration attached as Ex. 5 to the MWL's April 15, 2026 Motion for Summary Judgment, those statements are disputed. Neither of the declarations were produced to |

| | |
|---|---|
| | Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after Basha's February 20-21, 2019 deposition. Plaintiffs have not been afforded an opportunity to cross-examine Basha's new testimony, which appears to be inconsistent with his prior deposition testimony. Moreover, Basha's Declaration fails to cite to or provide a single document or piece of evidence supporting his testimony. Plaintiffs respectfully submit that the IIRO has submitted the Basha Declarations in bad faith. |
| 256. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha participated in nor directed anyone to participate in any activities intended to support Al Qaeda or any other terrorist organization. Ex. # 39, Obaid PJ Decl. ¶ 19; Ex. # 38, Turki PJ Decl. ¶ 24; Ex. # 65, Basha PJ Decl. ¶ 12. | Disputed. MWL Secretary Generals Naseef, Obaid, and Turki, and IIRO Secretary General Basha were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus were specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. Intending to foster al Qaeda's terrorist agenda, they directed the MWL and IIRO to provide substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 72, 75, 81, 122, 123, 124, 171, 172, 187, 190, 191, 203, 205, 206, 207, 218, 219, 231, 233, 237, 243, 290, 293, 300, 302, 305, 306, 328, 329, 331, 333, 342, 343, 344, 345, 348, 349, 360, 362, 366, 367, 368, 370, 371, 372, 375, 377, 379, 381, 383, 385, 387, 394, 414, 418, 420, 421, 428 and 430.<br><br>Moreover, to the extent the MWL's assertions at Nos. 249-277 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki, Abdullah bin Saleh al Obaid, and Adnan Basha at MWL Exs. 38, 39, and 65, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2018-2019 (Turki, Obaid, Basha). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 257. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha has ever provided or directed anyone to provide any financing to or in support of Al Qaeda or any other terrorist organization. | Disputed. MWL Secretary Generals Naseef, Obaid, and Turki, and IIRO Secretary General Basha were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus were specifically aware of al |

| | |
|---|---|
| Ex. # 39, Obaid PJ Decl. ¶ 20; Ex. # 38, Turki PJ Decl. ¶ 25; Ex. # 65, Basha PJ Decl. ¶ 13. | Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. Intending to foster al Qaeda's terrorist agenda, they directed the MWL and IIRO to provide substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 72, 75, 81, 122, 123, 124, 171, 172, 187, 190, 191, 203, 205, 206, 207, 218, 219, 231, 233, 237, 243, 290, 293, 300, 302, 305, 306, 328, 329, 331, 333, 342, 343, 344, 345, 348, 349, 360, 362, 366, 367, 368, 370, 371, 372, 375, 377, 379, 381, 383, 385, 387, 394, 414, 418, 420, 421, 428 and 430.<br><br>Moreover, to the extent the MWL's assertions at Nos. 249-277 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki, Abdullah bin Saleh al Obaid, and Adnan Basha at MWL Exs. 38, 39, and 65, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2018-2019 (Turki, Obaid, Basha). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 258. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha has ever supported or instructed anyone else to support, explicitly or implicitly, Al Qaeda or any other terrorist organization. Ex. # 39, Obaid PJ Decl. ¶ 21; Ex. # 38, Turki PJ Decl. ¶ 26; Ex. # 65, Basha PJ Decl. ¶ 14. | Disputed. MWL Secretary Generals Naseef, Obaid, and Turki, and IIRO Secretary General Basha were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus were specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. Intending to foster al Qaeda's terrorist agenda, they directed the MWL and IIRO to provide substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 72, 75, 81, 122, 123, 124, 171, 172, 187, 190, 191, 203, 205, 206, 207, 218, 219, 231, 233, 237, 243, 290, |

| | |
|---|---|
| | 293, 300, 302, 305, 306, 328, 329, 331, 333, 342, 343, 344, 345, 348, 349, 360, 362, 366, 367, 368, 370, 371, 372, 375, 377, 379, 381, 383, 385, 387, 394, 414, 418, 420, 421, 428 and 430.<br><br>Moreover, to the extent the MWL's assertions at Nos. 249-277 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki, Abdullah bin Saleh al Obaid, and Adnan Basha at MWL Exs. 38, 39, and 65, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2018-2019 (Turki, Obaid, Basha). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 259. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha ever intended to aid a terrorist attack or to support Al Qaeda. Ex. # 39, Obaid PJ Decl. ¶ 22; Ex. # 38, Turki PJ Decl. ¶ 27; Ex. # 65, Basha PJ Decl. ¶ 18. | Disputed. MWL Secretary Generals Naseef, Obaid, and Turki, and IIRO Secretary General Basha were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus were specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. Intending to foster al Qaeda's terrorist agenda, they directed the MWL and IIRO to provide substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 72, 75, 81, 122, 123, 124, 171, 172, 187, 190, 191, 203, 205, 206, 207, 218, 219, 231, 233, 237, 243, 290, 293, 300, 302, 305, 306, 328, 329, 331, 333, 342, 343, 344, 345, 348, 349, 360, 362, 366, 367, 368, 370, 371, 372, 375, 377, 379, 381, 383, 385, 387, 394, 414, 418, 420, 421, 428 and 430.<br><br>Moreover, to the extent the MWL's assertions at Nos. 249-277 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki, Abdullah bin Saleh al Obaid, and Adnan Basha at MWL Exs. 38, 39, and 65, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2018-2019 (Turki, Obaid, Basha). Plaintiffs have not been afforded an |

| | |
|---|---|
| | opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 260. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha agrees with, or have ever agreed with, Al Qaeda's or its affiliated terrorist organizations' aims or acts. Ex. # 39, Obaid PJ Decl. ¶ 24; Ex. # 38, Turki PJ Decl. ¶ 29; Ex. # 65, Basha PJ Decl. ¶ 20. | Disputed. MWL Secretary Generals Naseef, Obaid, and Turki, and IIRO Secretary General Basha were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus were specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. Intending to foster al Qaeda's terrorist agenda, they directed the MWL and IIRO to provide substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 72, 75, 81, 122, 123, 124, 171, 172, 187, 190, 191, 203, 205, 206, 207, 218, 219, 231, 233, 237, 243, 290, 293, 300, 302, 305, 306, 328, 329, 331, 333, 342, 343, 344, 345, 348, 349, 360, 362, 366, 367, 368, 370, 371, 372, 375, 377, 379, 381, 383, 385, 387, 394, 414, 418, 420, 421, 428 and 430.<br><br>Moreover, to the extent the MWL's assertions at Nos. 249-277 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki, Abdullah bin Saleh al Obaid, and Adnan Basha at MWL Exs. 38, 39, and 65, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2018-2019 (Turki, Obaid, Basha). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 261. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki knew Bin Laden. Ex. # 39, Obaid PJ Decl. ¶ 25; Ex. # 38, Turki PJ Decl. ¶ 30. | Disputed. MWL Secretary Generals Naseef, Obaid, and Turki, and IIRO Secretary General Basha were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus were specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. Intending to foster al Qaeda's terrorist agenda, they directed the MWL and IIRO to provide substantial financial assistance and other resources to bin Laden and al Qaeda for years |

| | |
|---|---|
| | knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 72, 75, 81, 122, 123, 124, 171, 172, 187, 190, 191, 203, 205, 206, 207, 218, 219, 231, 233, 237, 243, 290, 293, 300, 302, 305, 306, 328, 329, 331, 333, 342, 343, 344, 345, 348, 349, 360, 362, 366, 367, 368, 370, 371, 372, 375, 377, 379, 381, 383, 385, 387, 394, 414, 418, 420, 421, 428 and 430.<br><br>Moreover, to the extent the MWL's assertions at Nos. 249-277 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki, Abdullah bin Saleh al Obaid, and Adnan Basha at MWL Exs. 38, 39, and 65, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2018-2019 (Turki, Obaid, Basha). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 262. Abdullah bin Saleh Al-Obaid, Abdullah bin Abdul Mohsen Al-Turki, and Adnan Basha worked actively to counter Osama Bin Laden's and Al Qaeda's and its affiliated terrorist organizations' ideologies and have denounced acts of terrorism, including those of September 11, 2001. Ex. # 39, Obaid PJ Decl. ¶ 26; Ex. # 38, Turki PJ Decl. ¶ 31; Ex. # 65, Basha PJ Decl. ¶ 22. | Disputed. MWL Secretary Generals Naseef, Obaid, and Turki, and IIRO Secretary General Basha were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and thus were specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. Intending to foster al Qaeda's terrorist agenda, they directed the MWL and IIRO to provide substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 72, 75, 81, 122, 123, 124, 171, 172, 187, 190, 191, 203, 205, 206, 207, 218, 219, 231, 233, 237, 243, 290, 293, 300, 302, 305, 306, 328, 329, 331, 333, 342, 343, 344, 345, 348, 349, 360, 362, 366, 367, 368, 370, 371, 372, 375, 377, 379, 381, 383, 385, 387, 394, 414, 418, 420, 421, 428 and 430. |

| | |
|---|---|
| | Moreover, to the extent the MWL's assertions at Nos. 249-277 rely on the Declarations of Abdullah bin Abdul Mohsen al Turki, Abdullah bin Saleh al Obaid, and Adnan Basha at MWL Exs. 38, 39, and 65, those statements are disputed. The Declarations were never produced to Plaintiffs during the discovery phase of the litigation, nor were they ever produced to Plaintiffs during or after certain of the individuals' depositions were completed in these proceedings in 2018-2019 (Turki, Obaid, Basha). Plaintiffs have not been afforded an opportunity to cross-examine the individuals' new declaration testimony, and the Declarations fail to cite to or provide a single document or piece of evidence supporting their testimony. |
| 263. After the September 11 attacks, in his capacity as Secretary General of the MWL, Abdullah bin Abdul Mohsen Al-Turki published several statements condemning the attacks. Ex. # 38, Turki PJ Decl. ¶ 31; Ex. # 5, Turki Decl. ¶ 25. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 264. Shortly after September 11, 2001, Abdullah bin Saleh Al-Obaid and Adnan Basha appeared on Saudi television to condemn the 9/11 attacks. Ex. # 39, Obaid PJ Decl. ¶ 26; Ex. # 65, Basha PJ Decl. ¶ 22. | Undisputed as a general matter for purposes of this motion, and immaterial.<br><br>By way of further response, MWL officials have publicly acknowledged the organization's funds were being funneled to terrorist organizations. In an interview with MWL Secretary General Obaid, published in *The Muslim World* magazine on July 21-27, 1997, Obaid was asked about reports that the MWL's funds were being funneled to extremist groups. Obaid responded: "This is a closed chapter …. It has already been proven that there were people who exploited the situation and misused some funds …." *See* Ex. 214, Interview with Dr. Abdullah bin Saleh al Obaid, Excerpt from the Muslim World League magazine, July 21-27, 1997, PEC-KSA 1796-1806 at 1800. |
| 265. Al Qaeda was founded in the late 1980s after Osama Bin Laden split from the Services Bureau, pulling his funding from the Services Bureau in 1988; Al Qaeda made no official claim at the time of its intention to attack the United States. Ex. # 4, Brown Rpt. at 13, 21. | Disputed. *See, e.g.*, Plaintiffs' response to No. 362 (explaining that after Azzam's death, Osama bin Laden assumed full control of MAK, and MAK was absorbed into al Qaeda, and further noting that the da'wa organizations that funded and supported MAK during the 1980s—MWL, IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Red Crescent Society, and Benevolence International Foundation—continued to serve as the primary conduits for channeling financial, logistical, operational, and ideological support to al Qaeda's global jihad for years leading up to the 9/11 attacks).<br><br>Following the end of the Soviet-Afghan conflict, bin Laden returned to Saudi Arabia and made clear in his statements his continuing dedication to jihad against the perceived enemies |

| | |
|---|---|
| | of Islam. Speaking in 1988, bin Laden expressly affirmed what he believed to be the personal obligation of all Muslims to wage jihad against the enemies of Islam, stating as follows:<br><br>[T]he blessing of jihad in the cause of God – the peak of true Islam, which people in this age have forgotten is a religious duty….Praise be to God for allowing us to perform jihad in Afghanistan as he did for the best of men, our Prophet, may God's peace and prayers be upon him…I would like to advise my brother Muslims in all parts of the East and West to take the initiative and leave what they are doing to assist in raising the banner of jihad for the cause of God. This banner is the best banner and the mujahidin are the best people…May God accept our and your prayers and our urging of believers to perform jihad in order to deter the infidel forces and be truthful.<br><br>*See* Ex. 151, Michael Scheuer, *Osama Bin Laden*, 2011, PEC-KSA 224-226 at 225-226.<br><br>Thereafter, in 1990, speaking to an audience of hundreds in the Bin Laden family mosque in Jeddah, bin Laden singled out the United States as the primary target of this global jihad, asserting that "[t]he Americans won't stop their support of Jews in Palestine until we give them a lot of blows. They won't stop until we do jihad against them." *See* Ex. 152, Lawrence Wright, *The Looming Tower: Al-Qaeda and the Road to 9/11*, 2007, PEC-KSA 227-230 at 229. "Bin Laden would later say that the United States had always been his enemy. He dates his hatred for America to 1982, 'when America permitted the Israelis to invade Lebanon and the American Sixth Fleet helped them.'" *Id.* at 229.<br><br>*See also* Ex. 1, 9/11 Commission Final Report at 48 (confirming that bin Laden was delivering speeches calling for attacks against the United States no later than 1992).<br><br>In 1993, the bin Laden family and the Saudi Binladin Group ("SBG") disassociated themselves from bin Laden as a result of media reporting of his extremist and terrorist ties, and formally removed him from SBG's ownership by documents executed in June 1993. *See* MDL ECF No. 44 at 2. The family and SBG's efforts to sever ties with bin Laden make clear that his terrorist activities were well known to the public in Saudi Arabia in 1993.<br><br>Later that same year, bin Laden issued a fatwa advocating violence against Americans based in Mogadishu, Somalia. U.S. forces were subsequently attacked during the "Battle of Mogadishu" on October 3-4, 1993. Eighteen U.S. soldiers were killed and eighty-four were wounded. *See also* Ex. 15, |

| | |
|---|---|
| | *Terrorism: Usama Bin Ladin's Activities in Somalia and Sudanese NIF Support*, CIA_000347-350 at 349 ("Islamic Army members were sent to Somalia, with the NIF's knowledge and encouragement, in order to kill U.S. troops, incite violence against U.S. personnel, and undermine the success of the U.S. mission. Most of the Islamic Army activity involved inciting the Somali public. Bin Ladin's specific orders to Islamic Army members sent to Somalia was to defeat the U.S. forces. [REDACTED] The code name of the operation may have been 'Head of the Snake.'").<br><br>On August 23, 1996, bin Laden issued his fatwa, *Declaration of War Against the Americans Occupying the Land of the Two Holy Places*, calling on Muslims to drive U.S. soldiers out of Saudi Arabia, celebrating recent suicide bombings of U.S. military facilities in the Kingdom, and praising the 1983 suicide bombing in Beirut that killed 241 U.S. Marines, the 1992 Aden hotel bombings, and the 1993 Battle of Mogadishu after which the United States "left the area carrying disappointment humiliation, defeat and your dead with you." *See* Ex. 1, 9/11 Commission Final Report at 48.<br><br>On February 23, 1998, bin Laden, Ayman al Zawahiri, and leaders of other militant groups issued the fatwa, *World Islamic Front Statement Urging Jihad Against Jews and Crusaders*, calling for the murder of any American, anywhere on earth, as the "individual duty for every Muslim who can do it in any country in which it is possible to do it." *See id.* at 47.<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020, at 11 (discussing bin Laden's 1996 and 1998 fatwas). |
| 266. Bin Laden self-financed his activities at least until 1992. Ex. # 78, Roy Rpt. at 2, 17. | Disputed. *See, e.g.*, Plaintiffs' response to No. 362 (explaining that after Azzam's death, Osama bin Laden assumed full control of MAK, and MAK was absorbed into al Qaeda, and further noting that the da'wa organizations that funded and supported MAK during the 1980s—MWL, IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Red Crescent Society, and Benevolence International Foundation—continued to serve as the primary conduits for channeling financial, logistical, operational, and ideological support to al Qaeda's global jihad for years leading up to the 9/11 attacks). |
| 267. Saudi Arabia took away Bin Laden's passport and, in 1994, revoked his citizenship. 9/11 Commission Report at 57. | It is not disputed that the 9/11 Commission Final Report makes those points at 57. |
| 268. Al Qaeda viewed the Saudi government as an apostate and enemy of the global Muslim community. Ex. # 4, Brown Rpt. at 23-31. | Undisputed as a general matter for purposes of this motion. |

| | |
|---|---|
| 269. In August 1996, Bin Laden released a lengthy message addressed to Muslims worldwide, and "particularly those in the Arabian peninsula," entitled "A declaration of jihad against the Americans occupying the Land of the Two Holy Sanctuaries [Saudi Arabia]." Ex. # 4, Brown Rpt. at 54; Ex. # 80, 1996 Osama Bin Laden Fatwa, BUR-PEC-026957-82. | Undisputed as a general matter for purposes of this motion. |
| 270. The August 1996 message does not declare a jihad by Al Qaeda against Americans and is not a declaration of jihad against America. Ex. # 4, Brown Rpt. at 55; Ex. # 80, 1996 Osama Bin Laden Fatwa, BUR-PEC-026957-82. | Disputed. *See, e.g.*, Plaintiffs' response to No. 265. |
| 271. The August 1996 message is focused on removing American troops from Saudi Arabia and criticizing the Saudi government for that presence, for failing to liberate Palestine, and for abandoning Islam. Ex. # 4, Brown Rpt. at 55; Levitt Rpt. at 12 (ECF No. 9250-33); Ex. # 80, 1996 Osama Bin Laden Fatwa, BUR-PEC-026957-82, at 26960 ("the regime has torn off its legitimacy [through] [s]uspension of the Islamic Shari'ah law and exchanging it with man made civil law…[and] [t]he inability of the regime to protect the country, and allowing…the American crusader forces[] to occupy the land"), 26964 ("there is no more important duty than pushing the American enemy out of the holy land), 26970-71 (calling for boycott of American goods in response to occupation of Palestine). | Disputed. *See, e.g.*, Plaintiffs' response to No. 265. |
| 272. In February 1998, Al Qaeda publicly declared from Afghanistan the "World Islamic Front" and called for the killing of Americans. Ex. # 4, Brown Rpt. at 58; Levitt Rpt. at 12 (ECF No. 9250-33); Ex. # 81, FED-PEC0279093-95. | Undisputed as a general matter for purposes of this motion. |
| 273. The February 1998 statement declared that "to kill the Americans and their allies— civilian and military—is an individual duty incumbent upon every Muslim in all the countries, in order to liberate the al-Aqsa Mosque and the Holy Mosque from their grip, so that their armies leave all the territory of Islam, defeated, broken, and unable to threaten any Muslim." Ex. # 4, Brown Rpt. at 58; Ex. # 81, FED-PEC0279093-95 at 279094. | Undisputed as a general matter for purposes of this motion. |
| 274. Al Qaeda developed its interest in attacking the U.S. in 1998. Ex. # 77, Sidel Dep. Tr. at 117:7-10; Levitt Rpt. at 12 (ECF No. 9250-33); Ex. # 81, FED-PEC0279093-95 at 279094. | Disputed. *See, e.g.*, Plaintiffs' response to No. 265. |
| 275. Al Qaeda was designated as a Foreign Terrorist Organization by the Secretary of State on October 8, 1999. | It is not disputed that al Qaeda was designated as a Foreign Terrorist Organization by the State Department on October 8, |

| | |
|---|---|
| Designation of Foreign Terrorist Organizations, 64 Fed. Reg. 55112 (Oct. 8, 1999). | 1999, *see* https://www.state.gov/foreign-terrorist-organizations, and was further designated by OFAC on September 23, 2001. |
| 276. No document has come to light from the nearly 500,000 documents collected in the Bin Laden Abbottabad raid suggesting the use of charities for raising or moving money. Ex. # 4, Brown Rpt. at 62. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 277. A comprehensive search of the names of IIRO and MWL within the Bin Laden Abbottabad compound documents—using their Arabic names, as well as popular short-hand Arabic versions of their names—turned up no significant hits beyond mentions of these organizations in general publications or newspapers found in Bin Laden's compound. Ex. # 4, Brown Rpt. at 91. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| **Bin Laden Publicly Opposed the Saudi Government and Twice Called on Individuals Not to Donate to Saudi-Affiliated Charities** | No response necessary. |
| 278. In the years before September 11, 2001, Osama Bin Ladin stridently opposed the Saudi Royal family, the government of the Kingdom of Saudi Arabia, and government-affiliated charities such as IIRO and MWL. Ex. # 4, Brown Rpt. at 24, 63. | Disputed. The MWL's assertion that Osama bin Laden and/or the Advice and Reform Committee ("ARC") stridently opposed "the government-affiliated charities such as IIRO and MWL" is inaccurate and misleading. Mr. Brown's report does not cite to any statement or communication by bin Laden and/or ARC condemning the IIRO and MWL. Elsewhere in his report, Mr. Brown cites to West Point's Combatting Terrorism Center's Harmony Database document AFGP-2002-003345 in support of his contention that bin Laden and/or ARC denounced the Saudi charities, but that is equally misleading. Contrary to Mr. Brown's assessment of that document, the communications make clear that bin Laden and/or ARC's criticisms were directed only at the Saudi government and the way it had controlled "charitable organizations" and managed contributions. Importantly, there is not a single, specific reference in the document to any of the Saudi charities that served as the primary conduits for channeling financial, material, logistical, operational, and ideological support to al Qaeda's global jihad in the decade leading up to the 9/11 attacks, including the MWL, IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Joint Relief Committee, Saudi Red Crescent Society, Benevolence International Foundation, and others. |
| 279. Bin Laden "made a definitive turn toward enmity with the Saudi regime" after the first Gulf War, when Saudi Arabia accepted the deployment of U.S. troops on its territory. He declared Saudi Arabia an apostate regime. Ex. # 4, Brown Rpt. at 24-25. | Undisputed as a general matter for purposes of this motion. |

| | |
|---|---|
| 280. In March 1994, he created the Committee for the Advice and Defence of Legitimate Rights, re-named in April 1994 as the Advice and Reform Committee (ARC). Ex. # 4, Brown Rpt. at 26. | Undisputed as a general matter for purposes of this motion. |
| 281. The ARC issued 21 public communiqués between March 1994 and May 1998, all of them to denounce Saudi Arabia and in some cases Saudi charities. Ex. # 4, Brown Rpt. at 26; Ex. # 82, West Point's Combatting Terrorism Center's ("CTC") Harmony Database ("HD"), document AFGP-2002-003345 (Ex. 908 to Winer Dep.). | Disputed. The MWL's assertion that Osama bin Laden and/or ARC denounced the Saudi charities is inaccurate and misleading. As an initial matter, Mr. Brown's report at 26 makes no such reference to the Saudi charities or any specific communication condemning the charities. Furthermore, the West Point's Combatting Terrorism Center's Harmony Database document AFGP-2002-003345 does not identify any instances of bin Laden and/or ARC issuing statements of disapproval with the charities themselves. Rather, bin Laden and/or ARC's criticisms were directed at the Saudi government and the way it had controlled "charitable organizations" and managed contributions. Importantly, there is not a single, specific reference in the document to any of the Saudi charities that served as the primary conduits for channeling financial, material, logistical, operational, and ideological support to al Qaeda's global jihad in the decade leading up to the 9/11 attacks, including the MWL, IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Joint Relief Committee, Saudi Red Crescent Society, Benevolence International Foundation, and others. |
| 282. In an April 1994 ARC statement, Bin Ladin writes of the actions the Saudi government had taken against him: "we were prevented from traveling, our money was frozen in foreign bank accounts, a defamation campaign was waged against us in the local and international press, and finally, you attempted to cut our ties with the homeland by confiscating our passports. Your actions indicate to us what your intentions are for us." Ex. # 82, West Point's CTC HD document AFGP-2002-003345 (Ex. 908 to Winer Dep.) at 1-3 (Statement 2 of 12 April 1994). | Undisputed as a general matter for purposes of this motion. |
| 283. In a June 7, 1994 ARC statement, Bin Ladin directly denounced King Fahd and Prince Sultan for supporting Yemeni communists in the 1994 civil war in Yemen. He accused the King of "us[ing] Islam and some of its tenets to cover up the secret and overt anti-Islamic policies that he pursues," claimed the Saudi regime extended "blind loyalty to the enemies of Islam" and made a "habit of supporting the enemies of Islam." Ex. # 82, West Point's CTC HD document AFGP-2002-003345 (Ex. 908 to Winer Dep.) at 7 (Statement 3 of 7 June 1994). | Undisputed as a general matter for purposes of this motion. |
| 284. On July 19, 1994, referring to the Saudi government's alleged persecution of critical religious | Undisputed as a general matter for purposes of this motion. |

| | |
|---|---|
| scholars, Bin Ladin stated that "the Saudi government has used all the witchcraft powers it has and the full deception powers of the media to justify its shameless stands against Islam and its preachers, while supporting the unbelievers and their guardians." Ex # 82, West Point's CTC HD document AFGP-2002-003345 (Ex. 908 to Winer Dep.) at 13-14 (Statement 5 of 19 July 1994). | |
| 285. In the following statement, a letter to "the Saudi government, headed by King Fahd," Bin Ladin accuses the King of having left the faith: "These blatant attacks and irresponsible behavior do not leave any pretense for being a Muslim, they take it away Therefore, you will be responsible before God and your people for anything that will result from these events and matters." Ex # 82, West Point's CTC HD document AFGP-2002-003345 (Ex. 908 to Winer Dep.) at 17-18 (Statement 6 of 12 September 1994). | Undisputed as a general matter for purposes of this motion. |
| 286. The seventh and eighth ARC communiqués, addressed to employees of the Saudi security services and the military, respectively, warn them against implementing the directives of the regime, for to do so would damn their souls to hell. Ex # 4, Brown Rpt. at 27-28; Ex # 82, West Point's CTC HD document AFGP-2002-003345 (Ex. 908 to Winer Dep.) at 22-22 (Statement 7 of 16 September 1994) and 25-26 (Statement 8 of 19 September 1994). | Undisputed as a general matter for purposes of this motion. |
| 287. In a December 29, 1994 letter to 'Abdullah Bin Baz, Saudi Arabia's Grand Mufti, Bin Ladin accused the Bin Baz of permitting King Fahad to perform an "abomination" by appearing in public with a cross pendant on his chest. Further, Bin Ladin denounced the Grand Mufti for issuing a fatwa permitting "the crusader and the Jewish alliance to occupy the country in the name of liberating Kuwait." Ex # 82, West Point's CTC HD document AFGP-2002-003345 (Ex. 908 to Winer Dep.) at 35-38 (Statement 11 of 29 December 1994). | Undisputed as a general matter for purposes of this motion. |
| 288. On February 12, 1995, Bin Laden publicly encouraged donors not to donate to official Saudi-affiliated charities, citing the illegitimacy of the Saudi Government and its alleged misappropriation of funds donated to the people of Bosnia:<br><br>Beside the Regime's political and ideological blockade, it also exercised a harsh economic and financial (policy) as well. Part of this blockade was dissolving charitable organizations that used to deliver donations from citizens to the many needy people inside and outside the country. It replaced them with organizations and foundations | Disputed. The West Point's Combatting Terrorism Center's Harmony Database document AFGP-2002-003345 does not identify any instances of Osama bin Laden and/or ARC issuing statements of disapproval with the charities themselves. Rather, bin Laden and/or ARC's criticisms were directed at the Saudi government and the way it had controlled "charitable organizations" and managed contributions. Importantly, there is not a single, specific reference in the document to any of the Saudi charities that served as the primary conduits for channeling financial, material, logistical, operational, and ideological support to al Qaeda's global jihad in the decade leading up to the 9/11 attacks, including the MWL, IIRO, Al |

| | |
|---|---|
| subservient to royal family members and particularly, Prince Salman.<br><br>…<br><br>3) The reason behind this procedure does not encourage good deeds, as the regime claims, but rather the following: 1) Prevents these funds from being delivered to areas where they could be used to serve Islam and Muslims following the principle "Do not spend on those who are with the messenger of Allah till they desist."<br><br>. . .<br><br>Based on what was stated, we at the Reform and Advice Foundation, while celebrating this blessed month as a month of giving for Allah's sake, wish to draw the attention of all donors to the danger of donating funds or zakat to these foundations and organizations. The regime is using them against Allah and His messenger. We are asking the donors to provide these funds directly to the needy, whether, inside or outside the country. They could also provide it to those trusted individuals who will deliver them. … It is known that these [Saudi] leaders cannot be trusted. There are other safe ways you can assist in delivering funds to those who deserve them. Among them are, benevolence foundations in Qatar, Kuwait, Jordan, Yemen, Sudan, and others. To assure that the funds transfer to these foundations' bank accounts, we draw your attention to the importance of transferring these funds outside the Peninsula, away of the pursuing regime's spies.<br><br>Ex. # 82, West Point's CTC HD document AFGP-2002-003345 (Ex. 908 to Winer Dep.) at 51-52 (Statement 13 of 12 February 1995). | Haramain, WAMY, Rabita Trust, Saudi Joint Relief Committee, Saudi Red Crescent Society, Benevolence International Foundation, and others. |
| 289. Bin Ladin reiterated this call to avoid official Saudi-affiliated charities on August 11, 1995:<br><br>It is no longer hidden that the Saudi regime persistently sought to block all the abilities and capabilities of the ummah by placing control over it. But the regime was not satisfied with its unjust policies; it had to go further by imposing control on the minds and politics of the nation. Moreover, the regime sought to impose economic control. This resulted in the closure of charitable organizations that delivered the contributions of the benefactors from this country to its deserving lawful owners. The regime replaced these charitable organizations with associations and organizations that were supervised by members of the ruling family, such as Prince Sultan and Prince Salman. | Disputed. *See, e.g.*, Plaintiffs' response to No. 288. |

| | |
|---|---|
| This revealed a scheme by which they monopolized the charitable contributions in such a way that it prevented Islam and the Muslims from benefiting from them. The regime used the contributions the same way it used the money of the afghani mujahidin. That money was used to pressure the mujahidin and influence their policies in a way that would benefit the interests of the West. Sometimes these contributions were used for the private interests of the princes.<br><br>. . .<br><br>We are drawing their attention to the risk of forwarding these contributions through the ruling regime and its organizations. We are advising them to deliver their contributions directly to the people or through safe hands of individuals, organizations, and societies that are trusted, such as the charitable societies in Qatar, Kuwait, Sudan, Yemen, and Jordan. We are advising them to be careful that their contributions stay far from the pursuit of the Servant of the Two Holy Mosques [the Saudi King] and his agents, and to make sure that the money will reach the people it is intended for. They must be sure that the money does not fall into the hands of the shameless members of the Saudi family.<br><br>Ex. # 82, West Point's CTC HD document AFGP-2002-003345 (Ex. 908 to Winer Dep.) at 91-92 (Statement 18 of 11 August 1995). | |
| **<u>1993 World Trade Center Bombing</u>** | No response necessary. |
| 290. Plaintiffs have no evidence showing that MWL was involved in the planning or execution of the 1993 World Trade Center bombing. Jenkins Rpt. at 13-15 (discussing the 1993 World Trade Center bombing but failing to provide evidence of MWL's involvement) (ECF No. 7344-3); Kohlmann Rpt. at 10, 34, 51, 58, 61 (citing to various individuals who were involved in the 1993 World Trade Center bombing but failing to provide evidence of MWL's involvement) (ECF No. 9250-2). | Disputed. The MWL's claim that there is no evidence that the MWL had any foreknowledge of the 1993 World Trade Center bombing is inaccurate and misleading. Ramzi Yousef, the mastermind of the 1993 World Trade Center bombing, received funding from Mohammed Jamal Khalifa (a founding member of al Qaeda) and the IIRO (MWL's subsidiary and one of the Saudi charities that served as a primary conduit for channeling financial, material, logistical, operational, and ideological support to al Qaeda's global jihad in the decade leading up to the 9/11 attacks). *See, e.g.,* <u>Ex. 155</u>, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities."); <u>Ex. 79</u>, The Age, *Filipino Muslims Linked to Holy Warrior's Global Terror*, May 20, 1995 (reporting that Mohammed Jamal Khalifa of the IIRO, a "key figure in the network of Islamic extremists," was funding Ramzi Yousef). *See also* <u>Ex. 1</u>, 9/11 Commission Final Report at 59 (stating that Ramzi Yousef and Khalid |

| | |
|---|---|
| | Sheikh Mohammed "were traveling around the world and joining in projects that were supported by or linked to Bin Ladin, the Blind Sheikh, or their associates").<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 34 (citing excerpt from *Ghost Wars* by Steve Coll stating that the IIRO and MWL provided "important resources to Ramzi Yousef: "The FBI analysis listed the huge semiofficial Saudi Arabian charity, the International Islamic Relief Organization, and the largest government-sponsored Saudi religious proselytizing organization, the Muslim World League, as important resources for the new terrorist."). |
| 291. On February 26, 1993, the parking garage of the World Trade Center in New York, New York was bombed in an attack masterminded by Ramzi Yousef. 9/11 Commission Report, at 279-80; Sidel Rpt. ¶ 104 (ECF No. 7351-5). | Undisputed as a general matter for purposes of this motion. |
| 292. Al Qaeda was not involved in the 1993 World Trade Center bombing. Ex. # 77, Sidel Dep. Tr. at 140:11-141:12; Ex. # 83, Jenkins Dep. Tr. at 233:10-234:14 (no evidence to suggest local volunteers were Al Qaeda members or Al Qaeda affiliates and "fair inference" that Ramzi Yousef lacked the support of Al Qaeda in connection with the 1993 World Trade Center bombing); Ex. # 4, Brown Rpt. at 43-44 (reviewing evidence that Ramzi Yousef and KSM belonged to "independent cell" based in Philippines at time of 1993 WTC attack); Ex. # 77, Sidel Dep. Tr. at 116:10-14 (neither Ramzi Yousef nor Khalid Sheikh Mohamed members of Al Qaeda); Ex. # 78, Roy Rpt. at 21. | Disputed. Ramzi Yousef, the mastermind of the 1993 World Trade Center bombing, received funding from Mohammed Jamal Khalifa (a founding member of al Qaeda) and the IIRO (MWL's subsidiary and one of the Saudi charities that served as a primary conduit for channeling financial, material, logistical, operational, and ideological support to al Qaeda's global jihad in the decade leading up to the 9/11 attacks). *See, e.g.,* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities."); Ex. 79, The Age, *Filipino Muslims Linked to Holy Warrior's Global Terror*, May 20, 1995 (reporting that Mohammed Jamal Khalifa of the IIRO, a "key figure in the network of Islamic extremists," was funding Ramzi Yousef). *See also* Ex. 1, 9/11 Commission Final Report at 59 (stating that Ramzi Yousef and Khalid Sheikh Mohammed "were traveling around the world and joining in projects that were supported by or linked to Bin Ladin, the Blind Sheikh, or their associates"). |
| **Bojinka Plot** | No response necessary. |
| 293. Plaintiffs have no evidence that MWL supported or was involved in the planning or execution of the Bojinka Plot. Winer Rpt. at 27, 98, 100 (discussing the Bojinka plot, but failing to provide evidence of MWL's support or involvement in the plot) (ECF No. 7344-1). | Disputed. The MWL's claim that there is no evidence that the MWL had any foreknowledge of or was involved in the planning or execution of the Bojinka Plot is inaccurate and misleading. The IIRO (the MWL's subsidiary), Mohammed Jamal Khalifa, and the IIRO-Philippines branch office were witting supporters of Osama bin Laden, al Qaeda, and associated terrorist organizations (Abu Sayyaf Group, Moro Islamic Liberation Front) for more than a decade leading up to the 9/11 attacks, and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States. |

| | |
|---|---|
| | Khalifa, a founding member of al Qaeda and Osama bin Laden's brother-in-law, operated at the very center of al Qaeda's leadership, operations, and financial and logistical support structure during the critical period leading up to the 9/11 attacks, and was well aware of al Qaeda's terrorist intentions at all relevant times.<br><br>As referenced herein, Dr. Omar Abdullah Naseef, in his capacity as the MWL Secretary General and IIRO Chairman, approved the appointment of Khalifa to open a joint MWL/IIRO branch office in the Philippines, contemporaneous with the formation of al Qaeda, on June 5, 1988. *See* Ex. 51, FED-PEC 202846-202847. At the time of his appointment, the MWL and IIRO were fully aware that Khalifa was a prominent veteran of the Afghan jihad, a close associate of bin Laden, and member of al Qaeda. Shortly after assuming that post, Khalifa used the MWL/IIRO office as a platform for al Qaeda's expansion into South-East Asia, and a source of funding for terrorist operations.<br><br>As the Regional Director for the IIRO in South-East Asia, and simultaneously a member of al Qaeda, Khalifa personally orchestrated the use of IIRO funds and resources to support the terrorist activities of 9/11 mastermind Khalid Sheikh Mohammed ("KSM"), Ramzi Yousef (1993 World Trade Center bomber), and Wali Khan Amin Shah (Afghan jihad veteran and Osama bin Laden/al Qaeda associate) in the Philippines, and the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations of twelve U.S. flag commercial airplanes as they flew from Asia to the United States. That very plot, often referred to as "Operation Bojinka," was adapted into the 9/11 terrorist plot by KSM, using the knowledge he had acquired during its development about vulnerabilities in the aviation security system. *See* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 (stating that the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."). *See also* Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12, 24 (discussing the Bojinka plot).<br><br>When the plot was thwarted by Philippines police in 1995, the local media outlets reported on Khalifa's connection to the plot and Ramzi Yousef. *See* Ex. 79, The Age, *Filipino Muslims* |

| | |
|---|---|
| | *Linked to Holy Warrior's Global Terror*, May 20, 1995 (reporting on the discovery of al Qaeda's terrorist plot in the Philippines ("Bojinka") and explaining that Mohammed Jamal Khalifa of the IIRO, a "key figure in the network of Islamic extremists," was funding Ramzi Yousef and Islamic militants in the Philippines). |
| 294. The Bojinka Plot refers to a collection of plans to be executed in 1995, including a multi-plane bombing initiative where individuals would sneak bombs aboard American planes and detonate them over the Pacific, bomb cargo carriers, and assassinate President Clinton and the Pope. Ex. # 77, Sidel Dep. Tr. at 104:21-105:22. | Undisputed as a general matter for purposes of this motion. |
| 295. Defense and Plaintiffs' experts agree that the Bojinka Plot was not an Al Qaeda- directed attack. Ex. # 83, Jenkins Dep. Tr. at 93:20-94:17 (Bojinka "was not an Al Qaeda operation"); see id at 229:4-19 (no opinion as to whether Bin Laden or Al Qaeda financed Bojinka plot); 232:17-233:3 (only evidence linking Al Qaeda and Bojinka was "reported financing, and with the operative word being reported"); Ex. # 77, Sidel Dep. Tr. at 113:11-23, 140:11-141:12; 9/11 Commission Report at 153-54 (noting that, prior to greenlighting of 9/11 Attacks, Al Qaeda believed a plan "paralleling the Bojinka concept" "did not fit the needs of al Qaeda," and even KSM's initial proposal for a plane attack "received a lukewarm response from al Qaeda leaders skeptical of its scale and complexity"); *Id.* at 154 (KSM joins Al Qaeda in late 1998 or 1999); Ex. # 4, Brown Rpt. at 43-44 (group including KSM, Yousef, and Shah was independent from Al Qaeda). | Disputed. The Bojinka plot was a terrorist operation that received funding from Mohammed Jamal Khalifa (a founding member of al Qaeda) and the MWL's subsidiary, the IIRO (one of the Saudi charities that served as a primary conduit for channeling financial, material, logistical, operational, and ideological support to al Qaeda's global jihad in the decade leading up to the 9/11 attacks). *See* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities.").<br><br>*See also* Ex. 37, March 9, 2020 Expert Report of Dr. Matthew Levitt at 11 (stating that Khalid Sheikh Mohammed received funding through Khalifa and the IIRO during his time in the Philippines); Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 27 ("[T]he 1996 CIA Report finds that one of Saudi Arabia's largest charities, IIRO, was being used by the [Bojinka] plotters to provide cover for their activities."); *id.* at 98 (concluding that "the Bojinka plot would not have been possible without the building of the relationships between al Qaeda and its operatives in the Philippines supported by IIRO."); Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12, 24 (discussing the Bojinka plot). |
| 296. Ramzi Yousef, Khalid Sheik Muhamad, and Wali Khan Amin Shah were involved in the Bojinka plot. 9/11 Commission Report at 147. | Disputed. The MWL's suggestion that Khalid Sheikh Mohammed, Ramzi Yousef, and Wali Khan Amin Shah were the only participants in the Bojinka plot is inaccurate and misleading. *See* Plaintiffs' response to No. 293 (stating that Mohammed Jamal Khalifa personally orchestrated the use of IIRO funds and resources to support the terrorist activities of Khalid Sheikh Mohammed, Ramzi Yousef, and Wali Khan Amin Shah and the development of the Bojinka plot). |
| 297. Ramzi Yousef was not an Al Qaeda member. Ex. # 4, Brown Rpt. at 43-44; Ex. # 77, Sidel Dep. Tr. at 116:10-14; Ex. # 83, Jenkins Dep. Tr. at 217:16-225:11 (revising | Disputed. *See* Ex. 1, 9/11 Commission Final Report at 59 (stating that Ramzi Yousef and Khalid Sheikh Mohammed "were traveling around the world and joining in projects that |

| | |
|---|---|
| opinion to state that Yousef was recruiter for "groups coalescing around Al Qaeda" yet unable to recall or locate source for opinion); Ex. # 1, Winer Dep. Tr. at 558:1-21 (opining that Yousef was not a member of Al Qaeda and not affiliated with Al Qaeda but associated with Al Qaeda and noting that Yousef's Al Qaeda status was not the subject of his opinion). | were supported by or linked to Bin Ladin, the Blind Sheikh, or their associates"). |
| 298. Khalid Sheikh Muhammad had not even met with Bin Laden, let alone begun working with Al Qaeda, until after Bojinka, and was neither a member of Al Qaeda nor had he pledged allegiance to Osama Bin Laden at the time of the Bojinka Plot. Ex. # 4, Brown Rpt. at 41, 43-44; Ex. # 77, Sidel Dep. Tr. at 116:1-117:20; Ex. # 83, Jenkins Dep. Tr. at 75:2-76:8 (KSM refused to join Al Qaeda in 1996, which was after Bojinka Plot); Kohlmann Rbtl. Rpt. ¶ 84 (ECF No. 9250-5); Jenkins Rpt. at 16 (describing the first meeting between Khalid Sheikh Mohmmed and Osama Bin Laden and noting that "[i]n 1996, [KSM] traveled to Afghanistan to meet Osama bin Laden."), 23 ("accepted bin Laden's invitation to join [Al Qaeda] sometime in late 1998 or early 1999.") (ECF No. 7344-3); Jenkins Rpt. at 21-22 (opining KSM refused to join Al Qaeda after Manila plot) (ECF No. 7344-3); Ex. # 1, Winer Dep. Tr. at 556:15-557:25 (refusing to opine whether KSM was a member of Al Qaeda during Bojinka plot). | Disputed. *See, e.g.*, Plaintiffs' response to No. 297. |
| 299. Wali Khan Amin Shah broke from Osama Bin Laden in March 1989 and was not a member of Al Qaeda. Ex. #84, Sageman Dep. Tr. at 684:5-21; Ex. # 85, Sageman Rpt. at 29 n.103; 9/11 Commission Report at 59 (Wali Khan "worked with Bin Ladin in the early 1980s"); Ex. # 4, Brown Rpt. at 40, 43-44. | Disputed. The MWL's claim that Wali Khan Amin Shah broke from Osama Bin Laden in March 1989 is inaccurate and misleading. The MWL further misrepresents what the 9/11 Commission said about Wali Khan's relationship with bin Laden. According to the 9/11 Commission: "Some of Bin Ladin's close comrades were more peers than subordinates. For example, Usama Asmurai, also known as Wali Khan, worked with Bin Ladin in the early 1980s and helped him in the Philippines and in Tajikistan." Wali Khan clearly did not break from bin Laden in 1989 if he was conducting operations on behalf of bin Laden in the Philippines in the 1990s.<br><br>*See also* <u>Ex. 208</u>, Rebuttal Expert Report of Evan Francois Kohlmann at 11-13 (detailing Wali Khan's relationship with bin Laden in the 1980s and 1990s). |
| **<u>1998 Embassy Bombings</u>** | No response necessary. |
| 300. Plaintiffs have no evidence showing that MWL had any foreknowledge or was involved in the planning or execution of the 1998 African Embassy bombings. Winer Rpt. at 47- 48, 61-62, 79, 83, 87, 122 (discussing the African Embassy Attacks, but failing to provide evidence of involvement by MWL in those attacks) (ECF No. 7344- | Disputed. The MWL's claim that there is no evidence that MWL had any foreknowledge of the 1998 African Embassy bombings is inaccurate and misleading. As discussed further herein, the MWL and its officials (*e.g.*, MWL Secretaries General Dr. Abdullah Omar Naseef, Abdullah bin Saleh al Obaid, Abdul Mohsen al Turki), including its subsidiary |

| | |
|---|---|
| 1); Kohlmann Rpt. at 28, 34 (same) (ECF No. 9250-2); Ex. # 11, Fawzi Decl. ¶ 17 (There is no evidence that Wadih El Hage or Ihab Ali were ever employed by MWL). | organizations the International Islamic Relief Organization ("IIRO"), the Rabita Trust, and Al Haramain Al Masjed Al Aqsa Charity Foundation ("AHAMAA") and its officials (*e.g.*, IIRO Secretary General Adnan Basha); members of the IIRO Board of Directors and Executive Committee (comprised of MWL and IIRO officials), and their advisors, who have been identified as al Qaeda's most important financiers (*e.g.*, Ibrahim Mohammad Afandi, Abdurahman Abdul-Qader Faqih, Saleh al Kamel, Suleiman al Rajhi); members of the Saudi Royal family who held high-ranking leadership and supervisory positions with the IIRO (the MWL's subsidiary) while simultaneously serving as officials of the Saudi government (*e.g.*, Prince Muhammad bin Fahd bin Abdul Aziz, Prince Turki bin Jalawi al Saud); and IIRO officials, employees, advisors, and representatives (*e.g.*, Wa'el Hamza Jelaidan, Mohammed Jamal Khalifa, Abu Hammam al Saudi, Abd al Hamid Sulaiman al Mujil, Sulaiman al Ali, Abdelhadi Daguit, Mahmud Abd Al-Jalil Afif, Abdul Asmad, Abdelaziz Zaher, Jamal Al-Jibouri), were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad.<br><br>These individuals were quintessential al Qaeda insiders, operating at the very center of al Qaeda's leadership, operations, and financial and logistical support structure during the critical period leading up to the 9/11 attacks, and were well aware of al Qaeda's terrorist intentions at all relevant times, including al Qaeda's publicized desire to conduct violent attacks against U.S. citizens, U.S. embassies and consulates, and U.S. military assets and personnel wherever they could be found (both in the U.S. and abroad).<br><br>The MWL's claim that there is no evidence that MWL had any involvement in the planning or execution of the 1998 African Embassy bombings is inaccurate and misleading. The 9/11 Commission concluded that "[m]any of the operatives in the African Embassy and Cole attacks attended training camps in Afghanistan, as did all 19 of the 9/11 hijackers." *See* Ex. 4, 9/11 Commission Staff Statement No. 15, *Overview of the Enemy*, 2004, FED-PEC 66472-66483 at 66480; Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 53-54 (same).<br><br>As detailed herein, the IIRO, as the MWL's subsidiary, provided substantial funding for al Qaeda's training camps in Afghanistan, including camps from which al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training. *See, e.g.*, Ex. 154, 1996 Central Intelligence Agency Report, |

| | |
|---|---|
| | PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); Ex. 159, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 38, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo military training himself at one of the camps, where he met Usama Bin Laden."). |

| | |
|---|---|
| | *See also* Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 49-54 (discussing IIRO's funding of al Qaeda's training camps in Afghanistan "which were used to train fighters for Islamic insurgencies in a number of countries, including Algeria, Chechnya, Kashmir, Indonesia, Iraq, Palestine, the Philippines and Tajikistan, and as of early 1992, Bosnia."). <br><br> *See also* Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 47-48 (discussing IIRO's involvement in supporting the terrorists who carried out the 1998 embassy bombings in Dar Es Salaam, Tanzania and Nairobi, Kenya); *id.* at 79 ("The Kenyan government ordered five charities closed for their apparent involvement in the bombings of the U.S. Embassy in Nairobi and the U.S. Embassy in Dar es Salaam in 1998. The five charities ordered closed were: Al Haramain, Mercy Relief International, Help Africa People, IIRO, and the Ibrahim bin Abdul Aziz Al Ibrahim Foundation. In essence, Kenyan authorities had concluded that all of these charities were assisting al Qaeda, with allegations including their involvement in smuggling material for making the bombs that blew up the Embassies in purported relief shipments."); Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann ("Kohlmann Report") at 28 (stating that the IIRO's chapter in Nairobi was deregistered by the Kenyan government for its connection to the terrorists responsible for the 1998 Embassy bombings). <br><br> By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 6, 171, and 190. |
| 301. In August 1998, Al Qaeda bombed the American embassies in Dar Es Salaam, Tanzania and Nairobi, Kenya. 9/11 Commission Report at 70. | Undisputed as a general matter for purposes of this motion. |
| **Indian Consulate Plot** | No response necessary. |
| 302. Plaintiffs have no evidence showing that MWL was involved in the planning to attack U.S. consulates in Madras and Calcutta. Winer Rpt. at 47-48, 83, 86 (ECF No. 7344-1); Kohlmann Rpt. at 28 (ECF No. 9250-2); Levitt Rpt. at 39 (discussing the plans to attack the U.S. consulates in Madras and Calcutta, but failing to provide evidence of MWL's involvement in those plans) (ECF No. 9250-33). | Disputed. The MWL's claim that there is no evidence that MWL was involved in the planning to attack U.S. consulates in Madras and Calcutta is inaccurate and misleading. The IIRO and its officers and employees in Asia, as MWL's subsidiary, were central figures in the plot to attack the U.S. consulates. *See, e.g.*, Ex. 38, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell |

| | |
|---|---|
| | was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo military training himself at one of the camps, where he met Usama Bin Laden."); Ex. 40, Testimony of Steven Emerson and Jonathan Levine, *Terrorism Financing: Origination, Organization, and Prevention: Saudi Arabia, Terrorist Financing and the War on Terror*, July 31, 2003, FED-PEC 75156-75200 at 75175 (same); Ex. 39, Dore Gold, *Saudi Arabia's Dubious Denials of Involvement in International Terrorism*, FED-PEC 73721-73734 at 73724 (same); Ex. 150, U.N. Security Council, Second Report of the Monitoring Group on Sanctions Against Al-Qaida, the Taliban and Individuals and Entities Associated With Them ("Second Report"), December 2, 2003, PEC-KSA000108-190 at 123 (indicating local IIRO officers and employees were directly implicated in al Qaeda-related terrorist activities, including planned attacks against the U.S. Consulate in Calcutta). |
| 303. The 9/11 Commission Report does not mention this plot. 9/11 Commission Report. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 304. Plaintiffs have no evidence that MWL had any knowledge of or involvement in the Indian Consulate plot. | Disputed. *See, e.g.*, Plaintiffs' response to No. 302. |
| **USS Cole Bombing** | No response necessary. |
| 305. Plaintiffs have no evidence that MWL was involved in the planning or execution of the attack on the U.S.S. Cole. Winer Rpt. at 13-14, 50, 53 (discussing the U.S.S. Cole attacks, but failing to provide evidence of MWL's involvement in those attacks) (ECF No. 7344-1). | Disputed. The MWL's claim that there is no evidence that MWL had any involvement in the planning or execution of the U.S.S. Cole attack is inaccurate and misleading. The 9/11 Commission concluded that "[m]any of the operatives in the African Embassy and Cole attacks attended training camps in Afghanistan, as did all 19 of the 9/11 hijackers." *See* Ex. 4, 9/11 Commission Staff Statement No. 15, *Overview of the Enemy*, 2004, FED-PEC 66472-66483 at 66480; Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 53-54 (same).<br><br>As detailed herein, the IIRO, as MWL's subsidiary, provided substantial funding for al Qaeda's training camps in Afghanistan, including camps from which al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some |

| | |
|---|---|
| | or all of the 9/11 hijackers received indoctrination and training. *See, e.g.*, Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); Ex. 159, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 38, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo military training himself at one of the camps, where he met Usama Bin Laden."). |

| | |
|---|---|
| | *See also* Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 49-54 (discussing IIRO's funding of al Qaeda's training camps in Afghanistan "which were used to train fighters for Islamic insurgencies in a number of countries, including Algeria, Chechnya, Kashmir, Indonesia, Iraq, Palestine, the Philippines and Tajikistan, and as of early 1992, Bosnia."). |
| 306. Plaintiffs have no evidence that MWL had any foreknowledge of the attack on the U.S.S. Cole. Winer Rpt. at 13-14, 50, 53 (discussing the U.S.S. Cole attacks, but failing to provide evidence of MWL's involvement in those attacks) (ECF No. 7344-1). | Disputed. The MWL's claim that there is no evidence that MWL had any foreknowledge of the attack on the U.S.S. Cole is inaccurate and misleading. As discussed further herein, the MWL and its officials (*e.g.*, MWL Secretaries General Dr. Abdullah Omar Naseef, Abdullah bin Saleh al Obaid, Abdul Mohsen al Turki), including its subsidiary organizations the International Islamic Relief Organization ("IIRO"), the Rabita Trust, and Al Haramain Al Masjed Al Aqsa Charity Foundation ("AHAMAA") and its officials (*e.g.*, IIRO Secretary General Adnan Basha); members of the IIRO Board of Directors and Executive Committee (comprised of MWL and IIRO officials), and their advisors, who have been identified as al Qaeda's most important financiers (*e.g.*, Ibrahim Mohammad Afandi, Abdurahman Abdul-Qader Faqih, Saleh al Kamel, Suleiman al Rajhi); members of the Saudi Royal family who held high-ranking leadership and supervisory positions with the IIRO (the MWL's subsidiary) while simultaneously serving as officials of the Saudi government (*e.g.*, Prince Muhammad bin Fahd bin Abdul Aziz, Prince Turki bin Jalawi al Saud); and IIRO officials, employees, advisors, and representatives (*e.g.*, Wa'el Hamza Jelaidan, Mohammed Jamal Khalifa, Abu Hammam al Saudi, Abd al Hamid Sulaiman al Mujil, Sulaiman al Ali, Abdelhadi Daguit, Mahmud Abd Al-Jalil Afif, Abdul Asmad, Abdelaziz Zaher, Jamal Al-Jibouri), were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad.<br><br>These individuals were quintessential al Qaeda insiders, operating at the very center of al Qaeda's leadership, operations, and financial and logistical support structure during the critical period leading up to the 9/11 attacks, and were well aware of al Qaeda's terrorist intentions at all relevant times, including al Qaeda's publicized desire to conduct violent attacks against U.S. citizens, U.S. embassies and consulates, and U.S. military assets and personnel wherever they could be found (both in the U.S. and abroad).<br><br>By way of further response, *see* Plaintiffs' responses to Nos. 1, 6, 171, and 190. |

| | |
|---|---|
| 307. In December 2000, terrorists in a bomb-laden boat rammed into the U.S.S. Cole, with the goal of forcing U.S. forces to withdraw from Saudi Arabia. Jenkins Rpt. at 29 (ECF No. 7344-3); Ex. # 86, BUR-PEC-078442 et seq. at BUR-PEC-078470; Ex. # 87, Brown Dep. Tr. At 252:7-20. | Undisputed as a general matter for purposes of this motion. |
| **<u>September 11, 2001 Attacks</u>** | No response necessary. |
| 308. The general idea of the 9/11 attacks had been developed by Khalid Sheikh Muhammad independently of Al Qaeda. Ex. # 4, Brown Rpt. at 58; 9/11 Commission Report at 153-54. | Disputed as stated. The MWL's claim that Khalid Sheikh Mohammad developed the idea of the 9/11 attacks independently of al Qaeda is inaccurate and misleading. As described herein, Mohammed Jamal Khalifa, al Qaeda member and close associate of Osama bin Laden, used his position as the Regional Director for the IIRO in South-East Asia to direct IIRO funding and resources in support of the terrorist activities of KSM, Ramzi Yousef (1993 World Trade Center bomber), and Wali Khan Amin Shah (Afghan jihad veteran and Osama bin Laden/al Qaeda associate) in the Philippines, including the Bojinka plot, the precursor to the 9/11 attacks. *See, e.g.*, Plaintiffs' responses to Nos. 2 and 190.<br><br>Simultaneously, as explained by the 9/11 Commission, bin Laden and Mohammed Atef (a/k/a Abu Hafs al Masri), al Qaeda's military chief, were in Sudan studying the feasibility of hijacking airplanes and using them as weapons to inflict mass casualties. *See* <u>Ex. 1</u>, 9/11 Commission Final Report at 153. In late 1998 or early 1999, those ideas coalesced to become the 9/11 plot and bin Laden directed KSM to proceed with planning. |
| 309. Bin Laden approved the 9/11 plot in Spring 1999. 9/11 Commission Report at 154 ("Bin Ladin summoned KSM to Kandahar in March or April 1999 to tell him that Al Qaeda would support his proposal."). | Disputed. While the 9/11 Commission makes that statement at 154 ("Bin Ladin summoned KSM to Kandahar in March or April 1999 to tell him that Al Qaeda would support his proposal."), the 9/11 Commission also indicates that bin Laden may have approved the 9/11 plot in late 1998. *See* <u>Ex. 1</u>, 9/11 Commission Final Report at 149 ("Bin Ladin, apparently at Atef's urging, finally decided to give KSM the green light for the 9/11 operation sometime in late 1998 or early 1999."). |
| 310. According to Khalid Sheikh Muhammad, this meeting between Bin Laden and Khalid Sheikh Muhammad is when the conspiracy started. Ex. # 85, Sageman Rpt. at 97; Ex. # 4, Brown Rpt. at 56 (plans and preparations for the 9/11 attacks began in Spring 1999). | Disputed as stated. The Osama bin Laden and al Qaeda conspiracy to attack the United States commenced no later than 1990 when bin Laden singled out the United States as the primary target of this global jihad, asserting that "[t]he Americans won't stop their support of Jews in Palestine until we give them a lot of blows. They won't stop until we do jihad against them." *See* <u>Ex. 152</u>, Lawrence Wright, *The Looming Tower: Al-Qaeda and the Road to 9/11*, 2007, PEC-KSA 227-230 at 229. |

| | |
|---|---|
| | The conspiracy, or proposal, to attack the United States using airplanes as weapons to inflict mass casualties commenced in the early 1990s when Mohammed Jamal Khalifa used IIRO funds and resources in support of the Bojinka plot. *See* Plaintiffs' response to No. 308. |
| 311. Neither Abdullah bin Saleh Al-Obaid nor Abdullah bin Abdul Mohsen Al-Turki nor Adnan Basha knew at any time prior to September 11, 2001 that Al Qaeda was planning a terrorist attack against the United States. Ex. # 39, Obaid PJ Decl. ¶ 23; Ex. # 38, Turki PJ Decl. ¶ 28; Ex. # 65, Basha PJ Decl. ¶ 19. | Disputed. MWL Secretaries General Naseef, Obaid, and Turki, and IIRO Secretary General Basha were witting supporters of Osama bin Laden and al Qaeda for more than a decade leading up to the 9/11 attacks, and were thus specifically aware of al Qaeda's terrorist nature, mission, and intent to attack the United States and its interests abroad at all relevant times. Intending to foster al Qaeda's terrorist agenda, they directed the MWL and IIRO to provide substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>*See also* Plaintiffs' responses to Nos. 1, 2, 6, 9, 72, 75, 81, 122, 123, 124, 171, 172, 187, 190, 191, 203, 205, 206, 207, 218, 219, 231, 233, 237, 243, 290, 293, 300, 302, 305, 306, 328, 329, 331, 333, 342, 343, 344, 345, 348, 349, 360, 362, 366, 367, 368, 370, 371, 372, 375, 377, 379, 381, 383, 385, 387, 394, 414, 418, 420, 421, 428 and 430. |
| 312. Abdullah bin Saleh Al-Obaid, Abdullah bin Abdul Mohsen Al-Turki, and Adnan Basha were disgusted by the terrorist attacks on September 11, 2001. Ex. # 39, Obaid PJ Decl. ¶ 24; Ex. # 38, Turki PJ Decl. ¶ 29; Ex. # 65, Basha PJ Decl. ¶ 20. | Disputed. *See, e.g.*, Plaintiffs' response to No. 311. |
| 313. Abdullah bin Saleh Al-Obaid, Abdullah bin Abdul Mohsen Al-Turki, and Adnan Basha each describe the terror attacks as "criminal" and note that their "faith prohibits" the attacks. Ex. # 39, Obaid PJ Decl. ¶ 24; Ex. # 38, Turki PJ Decl. ¶ 29; Ex. # 65, Basha PJ Decl. ¶ 20. | Disputed. *See, e.g.*, Plaintiffs' response to No. 311. |
| 314. None of the 9/11 hijackers was an agent or employee of MWL. Ex. # 88, Kohlmann Dep. Tr. at 434:23-439:15 (admitting that the only supposed "hijacker" named in his report as a potential MWL or IIRO employee, Fayez Ahmed Alsehri, was identified in error and was not a 9/11 hijacker); Ex. # 5, Turki Decl. ¶¶ 8-11 (denying that MWL authorized or instructed employees to provide support for Al Qaeda); 9/11 Commission Report, at 225-227, 231-240 (no mention of MWL or IIRO connection in background given on each hijacker). | Disputed. The MWL's claim that neither the MWL or IIRO had any connections to the 9/11 hijacker is inaccurate and misleading. The MWL's subsidiary organization, the IIRO, provided substantial funding for al Qaeda's training camps in Afghanistan, including camps from which al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training. *See, e.g.*, Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 158, U.S. |

| | |
|---|---|
| | Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); Ex. 159, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 38, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo military training himself at one of the camps, where he met Usama Bin Laden."). |
| **MWL Journal Reveals No Support to Al Qaeda, Much Less 9/11** | No response necessary. |

| | |
|---|---|
| 315. Plaintiffs' experts cite a handful of articles in the Muslim World League Journal between 1981 and 1995. Kohlmann Rpt. ¶¶ 30, 36-48 (citing various publications dating between 1981 to 1995) (ECF No. 9250-2); Levitt Rpt. at 28 (same) (ECF No. 9250-33). | It is not disputed that Plaintiffs' experts Kohlmann and Levitt cite to certain articles in the Muslim World League Journal and the Al Alam Al Islami. *See, e.g.*, Exs. 194-201, and 212. *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶¶ 36-49; *See also* Ex. 37, March 9, 2020 Expert Report of Dr. Matthew Levitt at 28. |
| 316. One of the MWL publications is a 1981 article titled *Rabita-Sponsored Auqaf Conference Resolutions*; it predates the founding of Al Qaeda by nearly a decade. Kohlmann Rpt. ¶ 37 n. 43 (ECF No. 9250-2); Ex. 89, Sept. 1981 MWL Journal at FED-PEC0260167-72. | Undisputed as a general matter for purposes of this motion. |
| 317. Plaintiffs' experts also cite a 1991 article titled Jihad With Money in the Way of Allah arguing that the author explains that the participation in jihad with one's wealth and one's life is essential to the teachings of Islam. Kohlman Rpt. ¶ 38 (ECF No. 9250-2); Levitt Rpt. at 28 (ECF No. 9250-33). | Disputed. The author of the article, *Jihad With Money in the Way of Allah*, Ex. 195 at 62-63, is very clear that Muslim have a duty to answer the call of jihad with their lives and their money. *See id.* at 62 ("It is thus quite clear that Jihad with one's wealth and with one's life is an essential part of the teachings of Islam. Yet Jihad with one's wealth 'takes precedence' over Jihad with life in several verses of the Holy Qur'an, calling the Believers to Jihad, because of finance being indispensable for supplying the army with its needs (and on many occasions its requirements may far exceed its demand for manpower). Hence, in view of the unlimited material needs of war, a person may contribute money towards Jihad if he does not personally join it for reasons of physical weakness, illness or distance from the scene of confrontation with the enemy."); *id.* at 63 ("Since Jihad with wealth and life is an obligatory duty, the believers will respond to the call to Jihad by offering their wealth and lives and will not take leave from performing what is incumbent on them by virtue of their faith.").<br><br>*See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 38; *See also* Ex. 37, March 9, 2020 Expert Report of Dr. Matthew Levitt at 28. |
| 318. The conclusion ascribed by Plaintiffs' strips the article of its context, which states that jihad's objective, to uphold the word of God, "encompasses all the noble human values, such as defense of one's homeland, honour and dignity, and ensuring truth, justice and peace," and that jihad is about deterrence. Ex. # 90, July/Aug 1991 MWL Journal at FED-PEC0265171. | Disputed. *See* Plaintiffs' response to No. 317.<br><br>*See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 38; *See also* Ex. 37, March 9, 2020 Expert Report of Dr. Matthew Levitt at 28. |
| 319. Plaintiffs also argue that a February 1994 piece, *Child Upbringing in Islam*, advocates children participating in jihad. See Kohlmann Rpt. ¶ 42, 42 n.49 (ECF No. 9250-2); Levitt Rpt. at 28 (ECF No. 9250-33). | Undisputed as a general matter for purposes of this motion. |

| | |
|---|---|
| 320. The relevant section of the February 1994 piece, *Child Upbringing in Islam*, is about children's education, and the specific subsection Plaintiffs focus on closes with the exhortation that a child "should be taught how to live in peace with non Muslims in so far as they have not prevented him from following his religion interact with them with respect and help them just as the Noble Prophet and his companions treated them during their period." Ex. # 91, Feb. 1994 MWL Journal at FED-PEC0266481-85. | Disputed. *See* Ex. 212 at 34 ("A child should be made to be aware that participating in Jihad is worship in itself and running away from the battle field is a great sin. Taking part in the battle fought in Allah's cause can be done by sacrificing one's life and wealth."). |
| 321. The rest of the February 1994 piece, *Child Upbringing in Islam*, contains a mélange of instructions on child-rearing, including encouraging children to love and avoid selfishness, instructing them not to use the radio while parents sleep, detailing the posture a child should assume while eating, and noting how to cover one's mouth when yawning. Ex. # 91, Feb. 1994 MWL Journal at FED-PEC0266481-85. | Disputed. *See* Plaintiffs' response to No. 320. |
| 322. MWL explained that it did not expressly adopt the views in the February 1994 piece, *Child Upbringing in Islam*, writing that the "Views expressed in the columns of The MWL Journal do not necessarily represent those of the Editorial Board or the Muslim World League." Ex. # 91, Feb. 1994 MWL Journal at FED-PEC0266452. | Disputed. The Muslim World League Journal also says at FED-PEC 266452 that "the Editorial Board reserves the right to edit, summarize, or reject any contribution." The Editorial Board of the Muslim World League Journal clearly conducted a review of the article, *Child Upbringing in Islam*, including the section where the author advocates for children to participate in jihad, and determined the article was suitable for publication. *See also Palestine: The Blessed Land*, in the same publication at FED-PEC 266491-266494 at 266494 ("When the enemy occupies the land of Islam, Jihad becomes obligatory on every Muslim."). |
| 323. The author of the February 1994 piece, *Child Upbringing in Islam*, Abdul Malik Bappa Mahmud, is not listed on the journal masthead. Ex. # 91, Feb. 1994 MWL Journal at FED- PEC0266452. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 324. The remaining articles Plaintiffs' experts cite date between 1992 and 1995 and cover topics from Muhammad's journey from Makkah to Medina in 622 (Kohlmann Rpt. ¶ 42 n.49; (ECF No. 9250-2)), the Afghani Ambassador to Egypt's views on the Afghani Jihad against the U.S.S.R. (Kohlmann Rpt. ¶ 30 n.31 (ECF No. 9250-2); Ex. # 92, Aug. 31, 1992 Al Alam Al Islami article), calls for support to be given to Muslims in Bosnia against the Serbs (Kohlmann Rpt. ¶¶ 45-46 (ECF No. 9250-2); Levitt Rpt. at 28, 28 n.93 (ECF No. 9250-33); Ex. # 93, Sept. 1995 MWL Journal at FED-PEC0267571-79) and news updates concerning the Bosnian and Kashmiri conflicts and the Gulf Cooperation Counsil Summit, which discussed Bosnia (Kohlman Rpt. ¶¶ 46 n.53, 47 n.54 (ECF No. 9250-2); Ex. | Disputed as stated. The various editions of the Muslim World League Journal and Al Alam Al Islami do present articles concerning a variety of topics. However, Plaintiffs' experts Kohlmann and Levitt focus on several articles published by the MWL from 1981-1995 which promote support for violent jihad and calls to Muslims to "commit to sacrificing their souls, money, family members, and children for the sake of Allah." |

| | |
|---|---|
| # 94, Jan. 1994 MWL Journal at BUR-PEC-035607-08; Ex. # 95, *Imam of Holy Haram Calls for assistance to Kashmiris*, FED-PEC0231562). | |
| 325. Often, the publications contain the disclaimer that the views therein "do not necessarily represent those of the Editorial Board of the Muslim World League," or the named authors are not listed as a Journal editor or otherwise on the masthead. See, e.g., Ex. # 94, Jan. 1994 MWL Journal at BUR-PEC-035591; Ex. # 91, Feb. 1994 MWL Journal at FED- PEC0266452. | Disputed. *See* Plaintiffs' response to No. 322. The Editorial Board of the Muslim World League Journal conducted a review of the various articles advocating jihad (cited by Kohlmann and Levitt) and determined that those articles were suitable for publication. |
| **<u>Intelligence Reporting</u>** | No response necessary. |
| 326. According to the 9/11 Commission Staff, "Terrorist financing was not a priority for either domestic or foreign intelligence collection. As a result, intelligence reporting on the issue was episodic, insufficient, and often inaccurate." *Monograph* at 4. | It is not disputed that the Monograph on Terrorist Financing makes that statement when providing a historical accounting of the U.S. government's pre-9/11 collection of intelligence concerning terrorism financing. |
| 327. According to the 9/11 Commission Staff, the "U.S. intelligence community largely failed to comprehend al Qaeda's methods of raising, moving, and storing money, because it devoted relatively few resources to collecting [] strategic financial intelligence." *Id.* at 5; see also *Id.* at 18 (explaining that even in March 2002, "the head of the [U.S.] government's terrorist-financing coordination effort" stated that U.S. officials could not answer "[w]ho finances al Qaeda, "[h]ow," or "[w]here"). | It is not disputed that the Monograph on Terrorist Financing makes that statement when providing a historical accounting of the U.S. government's pre-9/11 collection of intelligence concerning terrorism financing. |
| **<u>CIA Reports</u>** | No response necessary. |
| 328. The sections of the 9/11 Commission Report discussing financing of Al Qaeda cite CIA reports pre-dating the 9/11 Attacks. *Id.* at 169-172 & nn. 118, 126; 185-186 & nn. 84, 86. These reports did not conclude that IIRO or MWL, or their foreign branch offices, directly or indirectly provided funds to Al Qaeda. *Id.* | Disputed. In this section of the MWL's Rule 56.1 Statement concerning the 9/11 Commission, the MWL consistently misrepresents the findings and conclusions of the 9/11 Commission Final Report and Staff Monograph on Terrorism Financing ("Staff Monograph"), misrepresents the evidentiary support cited by the 9/11 Commission, and deliberately ignores credible CIA intelligence reports and other U.S. government records supporting Plaintiffs' claims that the MWL, IIRO, and their officials and employees, provided substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.<br><br>By way of further response, and contrary to the MWL's assertion at No. 328, the 9/11 Commission Final Report cites to CIA Reports, *dated both pre-9/11 and post-9/11*, describing |

| | |
|---|---|
| | the financial, material, logistical, and ideological support the IIRO and MWL provided to al Qaeda.<br><br>For example, CIA intelligence reports cited in the 9/11 Commission Final Report confirm that the MWL played a central role in al Qaeda's support infrastructure. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Shaykh Adil Batterjee, a close associate of Osama bin Laden and "a long-time al-Qa'ida donor and fundraiser," used the Saudi-based Lajnat al Birr al Islamiyya charity, a subsidiary of the Muslim World League (MWL), to raise funds on behalf of bin Laden.); *id.* at 150 (indicating that "[s]everal of Bin Ladin's associates, including Wa'il Julaydan and Muhammad Jamal Khalifa, were MWL representatives"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 213 (stating that "several MWL affiliate organizations—including the International Islamic Relief Organization (IIRO)—have provided terrorists with funding and cover employment, documentation, and training"); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 809 (stating that Saudi-backed NGOs have ties to Osama bin Laden, including the Muslim World League, World Assembly of Muslim Youth, and others); *id.* at 822 (indicating that the MWL "has been used as a cover organization for several of Usama's associates"). *See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 95 (stating that Osama bin Laden confidant Enaam Arnaout provided military and logistical support to the mujahideen in the late 1980s and early 1990s as an employee of "Saudi NGO, the Muslim World League").<br><br>CIA intelligence reports cited by the 9/11 Commission in its Final Report similarly confirm that the IIRO served as a key financial conduit for al Qaeda and played a central role in providing critical support to the terrorist organization, including but not limited to appointing al Qaeda members to leadership positions within the IIRO, recruiting Islamic fighters, facilitating the training and travel of Islamic militants with employment papers and other documentation, engaging in narcotics trafficking and counterfeiting, and funding terrorist training camps. *See* Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that the Maktab al-Khidamat, a Pakistan-based nongovernmental organization financed by Osama bin Laden, played a key role in facilitating the training and travel of Islamic militants, and received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization"); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Mohammed |

| | |
|---|---|
| | Jamal Khalifa, Osama bin Laden's brother-in-law, and close associate of World Trade Center bomber Ramzi Yousef, served as the director of the International Islamic Relief Organization (IIRO) in the Philippines, and "was involved in recruiting Muslims for training in Pakistan as mujahidin fighters."); *id.* at 151 (describing IIRO, WAMY, and Al Haramain as having "tie[s] to terrorist and mujahidin activity"); Ex. 11, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199 at 198 (stating that "al-Qa'ida has infiltrated some of IIRO's branches"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."); *id.* at 221 ("IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate toward more extremist activities."); *id.* ("A few IIRO branches have turned to illegitimate means of financing their operations—including narcotics trafficking and counterfeiting—further increasing their independence and ability to support terrorism."); Ex. 14, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*, November 17, 1998, CIA_00317-338 at 325 ("Bin Ladin and his associates make extensive use of non-governmental charitable organizations (NGOs) to transfer funds. Bin-Ladin-affiliated Islamic NGOs – such as … the International Islamic Relief Organization (IIRO); Al-Haramayn; … and others – are convenient money couriers because they maintain offices in Afghanistan, Albania, Pakistan, and other locations where Bin Ladin associates are prevalent."); *id.* at 330 ("Bin Ladin and Al-Qa'ida probably receive Gulf funding diverted from offices of Islamic NGOs, particularly the MK, IIRO, Al Haramayn … and others."); Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (stating that al Qaeda financial committee member Abdul Islam, who was "authorized to disburse funds for salaries and transportation expenses of al-Qa'ida members, and for donations to widows and orphans," worked for the International Islamic Relief Organization); *id.* at 525 (listing of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization"); *id.* at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"); Ex. 18, *Al-Qa'ida's Financial Ties to Islamic Youth Programs*, |

| | |
|---|---|
| | January 17, 2003, CIA_00681-701 at 692 (stating that "Gulf charities like the Saudi International Islamic Relief Organization (IIRO) and Al-Haramain … are well aware of the radical Wahhabi and Salafist doctrines being taught at institutions they fund"); Ex. 19, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 741 (stating that the Sudanese National Islamic Front ("NIF") works "with hardline Islamic fundamentalists employed by the Saudi International Islamic Relief Organization"); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama, [REDACTED]."); *id.* at 817 (stating that "several Saudi NGOs are funding conduits for al-Qa'ida or have penetrated by Usama's network" and "[t]hose of greatest concern include the International Islamic Relief Organization (IIRO)" and "Al-Haramayn Islamic Foundation"); *id.* at 818 ("Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahed to fight in Chechnya."); *id.* at 824 (stating that the Islamic Relief Agency (ISRA), a Khartoum-based NGO with offices in Afghanistan and Pakistan, have been infiltrated by al Qaeda and work closely with personnel from the IIRO); *id.* at 827 (stating that the IIRO and Al Haramain were channeling funds "to spread Islamic fundamentalism throughout Macedonia"). Indeed, the U.S. government concluded that bin Laden and al Qaeda used the entire IIRO network for al Qaeda's terrorist activities. *See* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities.").<br><br>Lastly, the Court has concluded on two separate occasions in this litigation that the declassified CIA reports are trustworthy and admissible. *See* March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 12 (concluding that "the declassified CIA documents are trustworthy"); *see also* August 19, 2026 Memorandum Decision and Order (ECF No. 12247) at 20-21 (finding the CIA reports are trustworthy because (i) the "CIA reports were submitted in the years leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely;" (ii) the CIA reports "were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other specialists with expertise in counterterrorism;" and (iii) the "9/11 Commission also held hearings regarding the reports."). |
| 329. The chapter of the 9/11 Commission Report discussing Al Qaeda's founding and its return to Afghanistan in 1996 cite several CIA reports. *Id.* at 47-63 | Disputed. The MWL's assertion that the CIA reports cited at nn. 37, 59, 67, 77, 78 do not conclude that the MWL or IIRO provided financial assistance to al Qaeda is inaccurate and |

| | |
|---|---|
| & nn. 37, 59, 67, 77, 78. These reports did not conclude that IIRO or MWL, or their foreign branch offices, directly or indirectly provided funds to Al Qaeda. *Id.* | misleading. *See* 9/11 Commission Final Report, Chapter 2, n. 59, citing to Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (stating that al Qaeda financial committee member Abdul Islam, who was "authorized to disburse funds for salaries and transportation expenses of al-Qa'ida members, and for donations to widows and orphans," worked for the International Islamic Relief Organization); *id.* at 525 (listing of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization"); *id.* at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida").<br><br>*See also* 9/11 Commission Final Report, Chapter 2, n. 67, citing to Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that the Maktab al-Khidamat, a Pakistan-based nongovernmental organization financed by Osama bin Laden, played a key role in facilitating the training and travel of Islamic militants, and received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization").<br><br>*See also* 9/11 Commission Final Report, Chapter 2, n. 77, citing to Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Mohammed Jamal Khalifa, Osama bin Laden's brother-in-law, and close associate of World Trade Center bomber Ramzi Yousef, served as the director of the International Islamic Relief Organization (IIRO) in the Philippines, and "was involved in recruiting Muslims for training in Pakistan as mujahidin fighters."); *id.* at 151 (describing IIRO, WAMY, and Al Haramain as having "tie[s] to terrorist and mujahidin activity"). |
| 330. The 9/11 Commission's "Monograph on Terrorist Financing" Staff Report did not conclude that IIRO or MWL, or any of their foreign branch offices, directly or indirectly provided funds to Al Qaeda. *See generally* Monograph. | Disputed. The MWL's assertion that the Staff Monograph did not conclude that the IIRO or MWL provided financial assistance to al Qaeda is inaccurate and misleading. *See* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 95 (stating that Osama bin Laden confidant Enaam Arnaout provided military and logistical support to the mujahideen in the late 1980s and early 1990s as an employee of "Saudi NGO, the Muslim World League"). |
| 331. The 9/11 Commission Report addresses charities in connection with the financing of Al Qaeda in two sections. See 9/11 Commission Report, at 169-72, 185-86. | Disputed. The MWL's selective references to the 9/11 Commission Final Report, and its suggestion that those are the only places in the Final Report discussing the involvement of |

| | |
|---|---|
| | Saudi charities in the financing of al Qaeda is inaccurate and misleading. *See* 9/11 Commission Final Report at 55 ("Bin Ladin understood better than most of the volunteers to the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization. This organization included a financial support network that came to be known as the 'Golden Chain,' put together mainly by financiers in Saudi Arabia and the Persian Gulf states. Donations flowed through charities or other nongovernmental organizations (NGOs). Bin Ladin and the 'Afghan Arabs' drew largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the mujahideen, or 'holy warriors.'").<br><br>In support of that paragraph, the 9/11 Commission cites to Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 ("By way of background, Usama Bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ('MK') (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al Madani") of the International Islamic Relief Organization (hereafter "IIRO," sometimes referred to as "Igatha" based upon its Arabic name "*Hay'at al-Igatha al-Islamiya al-'Alamtyaa*"), which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL'). In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*."). *See* 9/11 Commission Final Report at Chapter 2, n. 21.<br><br>*See also* 9/11 Commission Final Report at 371 (stating that "Saudi Arabia's society was a place where al Qaeda raised money directly from individuals and through charities").<br><br>Moreover, the 9/11 Commission talks extensively in its Staff Monograph how "al Qaeda was funded, to the tune of approximately $30 million per year, by diversions of money from Islamic charities." *See* Ex. 3, 9/11 Commission Monograph on Terrorist Financing (providing case studies on |

| | |
|---|---|
| | the funding of al Qaeda via charities Al Haramain Islamic Foundation, Global Relief Foundation ("GRF"), and Benevolence International Foundation ("BIF")). |
| 332. The 9/11 Commission Report's section on "General Financing" (pp. 169-72) mentions only the "al Haramain Islamic Foundation" as an example of "large, international charities" with "lax external oversight and ineffective internal controls," whose foreign branch offices have "al Qaeda sympathizers" diverting money to Al Qaeda. 9/11 Commission Report, at 170 & n.118 (citing CIA report, "How Bin Ladin Commands a Global Terrorist Network," CTC 99-40003, Jan. 27, 1999). Furthermore, it mentions only "the al Wafa organization" as an example of "entire charities" who "may have wittingly participated in funneling money to al Qaeda." *Id.* | Disputed. The MWL's selective references to the 9/11 Commission Final Report are inaccurate and misleading, and deliberately ignore credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 328 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). *See also* Plaintiffs' response to No. 331 (Staff Monograph on Terrorist Financing providing case studies on the funding of al Qaeda via charities Al Haramain Islamic Foundation, Global Relief Foundation ("GRF"), and Benevolence International Foundation ("BIF")). |
| 333. This portion of the 9/11 Commission Report does not mention IIRO or MWL, or conclude that IIRO or MWL, or any of their branch offices, directly or indirectly, provided funds to Al Qaeda. 9/11 Commission Report, at 170. See also Ex. # 1, Winer Dep. Tr. at 143:20-145:19 (acknowledging that the Report does not name IIRO or MWL as charities which supported Al Qaeda). | Disputed. As an initial matter, to the extent the MWL suggests that the IIRO and MWL have been exonerated by the 9/11 Commission from any accountability for the years of extensive financial and material support they provided to al Qaeda because they are not specifically named in the 9/11 Commission Final Report, that is inaccurate and misleading. *See* Ex. 2, Affirmation of Joseph Robert "Bob" Kerrey (stating that any "proposition that the 9/11 Commission fully exonerated Saudi Arabia and any Saudi government charities for any potential culpability for the financing and emergence of al Qaeda or the events of September 11, 2001" is "incorrect"); Affirmation of John F. Lehman (stating that the allegations and claims advanced by the 9/11 plaintiffs were never considered and rejected as factually untrue); Declaration of Richard Ben-Veniste (stating that "further fact-finding was appropriate"). Indeed, Plaintiffs' claims against the IIRO, MWL, and WAMY based on their funding and material sponsorship of al Qaeda are fully supported by the 9/11 Commission's findings that there was a substantial "likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda." *See* Ex. 1, 9/11 Commission Final Report at 171.<br><br>By way of further response, the MWL's selective references to the 9/11 Commission Final Report are inaccurate and misleading, and deliberately ignore credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 328 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by |

| | |
|---|---|
| | IIRO, MWL, WAMY, and Al Haramain). *See also* Plaintiffs' response to No. 331 (Staff Monograph on Terrorist Financing providing case studies on the funding of al Qaeda via charities Al Haramain Islamic Foundation, Global Relief Foundation ("GRF"), and Benevolence International Foundation ("BIF").)<br><br>*See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 95 (stating that Osama bin Laden confidant Enaam Arnaout provided military and logistical support to the mujahideen in the late 1980s and early 1990s as an employee of "Saudi NGO, the Muslim World League"). |
| 334. The January 27, 1999, CIA report, cited by the 9/11 Commission Report, notes Bin Ladin's exploitation of some international Islamic nongovernmental organizations for financial and logistical support. Ex. # 96, CIA report, "How Bin Ladin Commands a Global Terrorist Network," CTC 99-40003 (Jan. 27, 1999) at CIA_000007. | Disputed as stated. The CIA report specifically states: "In addition to support from other groups, Bin Ladin taps into the resources of some international Islamic nongovernmental organizations (NGOs) for financial and logistical support. Employees – ranging from accountants to directors – of a few NGO branch offices have diverted resources to benefit Bin Ladin and his associates, although we are unable to determine if the organizations' home offices are witting. Bin Ladin exploits these NGO ties to channel funds and obtain cover employment and travel assistance for his associates. He also uses the NGOs' distribution network to move weapons and supplies." *See* Ex. 7, *How Bin Ladin Commands a Global Terrorist Network [REDACTED]*, January 27, 1999, CIA_00002-16. |
| 335. The unredacted sections of the January 27, 1999, CIA report do not include IIRO or MWL, any IIRO or MWL official, or any IIRO or MWL employee, as part of Bin Ladin's terrorist network. Nor do they conclude that IIRO or MWL, or any of their branch offices, directly or indirectly, provided funds to Al Qaeda. *Id.* | Disputed. To the extent that the MWL argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because they are not specifically named in a CIA report (one of dozens of CIA reports produced in this litigation), that is inaccurate and misleading.<br><br>Moreover, the MWL deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 328 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain).<br><br>Lastly, the Court has concluded on two separate occasions in this litigation that the declassified CIA reports are trustworthy and admissible. *See* March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 12 (concluding that "the declassified CIA documents are trustworthy"); *see also* August 19, 2026 Memorandum Decision and Order (ECF No. 12247) at 20-21 (finding the CIA reports are trustworthy because (i) the "CIA reports were submitted in the years |

| | |
|---|---|
| | leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely;" (ii) the CIA reports "were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other specialists with expertise in counterterrorism;" and (iii) the "9/11 Commission also held hearings regarding the reports."). |
| 336. The 9/11 Commission Report's section on "General Financing" (pp. 169-72) cites another CIA report, "Pursuing the Bin Laden Financial Target," CTC 01-40003HCS, Apr. 12, 2001. See 9/11 Commission Report, at 171 n.126. This report states that, in the case of NGO financing of terrorism, "the majority of the money moving through the NGOs is for legitimate humanitarian needs," and these funds are "co-mingled with those slated for nefarious purposes, making it extremely difficult to identify and seize funds directly linked to terrorist activities." Ex. #97, CIA report, "Pursuing the Bin Laden Financial Target," CTC 01-400003HCS (Apr. 12, 2001) at CIA_00381. | It is not disputed that the 9/11 Commission Final Report makes those statements. |
| 337. This CIA report, "Pursuing the Bin Laden Financial Target," does not conclude that any IIRO or MWL funds were diverted to terrorist activities. Nor does it otherwise make any finding that IIRO or MWL, or any of their branch offices, directly or indirectly, provided funds to Al Qaeda. *See generally Id.* | Disputed. To the extent that the MWL argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because they are not specifically named in a CIA report (one of dozens of CIA reports produced in this litigation), that is inaccurate and misleading.<br><br>Moreover, the MWL deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 328 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). |
| 338. The 9/11 Commission Report's section on "Terrorist Financing" (pp. 185-86) states that the CIA "knew relatively early" about the "loose affiliation of financial institutions, businesses, and wealthy individuals who supported extremist Islamic activities." 9/11 Commission Report, at 185 & n.84 (citing CIA report, "Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions," OTI 97-10035CX, (Dec. 1997). | It is not disputed that the 9/11 Commission Final Report makes those statements and cites to CIA Report, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804. *See* Ex. 19. |
| 339. This "Terrorist Financing" section of the 9/11 Commission Report does not conclude that IIRO or MWL, or any of their branch offices, directly or indirectly, provided funds to Al Qaeda. *Id.* at 185-86. | Disputed. As an initial matter, to the extent MWL suggests that the IIRO and MWL have been exonerated by the 9/11 Commission from any accountability for the years of extensive financial and material support they provided to al Qaeda |

| | |
|---|---|
| | because they are not specifically named in the Final Report, that is inaccurate and misleading. *See* Ex. 2, Affirmation of Joseph Robert "Bob" Kerrey (stating that any "proposition that the 9/11 Commission fully exonerated Saudi Arabia and any Saudi government charities for any potential culpability for the financing and emergence of al Qaeda or the events of September 11, 2001" is "incorrect"); Affirmation of John F. Lehman (stating that the allegations and claims advanced by the 9/11 plaintiffs were never considered and rejected as factually untrue); Declaration of Richard Ben-Veniste (stating that "further fact-finding was appropriate"). Indeed, Plaintiffs' claims against the IIRO, MWL, and WAMY based on their funding and material sponsorship of al Qaeda are fully supported by the 9/11 Commission's findings that there was a substantial "likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda." *See* Ex. 1, 9/11 Commission Final Report at 171. |
| 340. The cited December 1997 CIA report claims:<br><br>*Saudi Arabia, as well as other Gulf states, has long been a source of financial support for Islamic causes; at least some of these funds are diverted to militants and terrorists. Riyadh provides official funding to various groups to promote Sunni Islam and to counter regional Iranian influence; other funding emanates from semiofficial charities, such as the Muslim World League and IIRO, and from private donations that are often difficult to track. Funds collected from individuals are often made in cash and disguised as religious offerings; NGO funds, on the other hand, are usually diverted by unregulated offices located abroad.*<br><br>Ex. #98, CIA report, "Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions," OTI 97-10035CX (Dec. 1997) at CIA_000744. While mentioning MWL and IIRO as examples of charities and discussing the diversion of charitable funds in the abstract, the report does not conclude, assert, or prove that any MWL or IIRO funds were actually diverted to terrorists, let alone to Al Qaeda. *See generally Id.* | Disputed. To the extent that the MWL argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because this CIA report (one of dozens of CIA reports produced in this litigation) does not specifically say that MWL and IIRO funds were diverted to al Qaeda, that is inaccurate and misleading. The CIA report specifically identifies the MWL and IIRO as conduits of funds for militants and terrorists. *See* Ex. 19, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804.<br><br>Moreover, the MWL deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 328 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain).<br><br>Lastly, the Court has concluded on two separate occasions in this litigation that the declassified CIA reports are trustworthy and admissible. *See* March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 12 (concluding that "the declassified CIA documents are trustworthy"); *see also* August 19, 2026 Memorandum Decision and Order (ECF No. 12247) at 20-21 (finding the CIA reports are trustworthy because (i) the "CIA reports were submitted in the years leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely;" (ii) the CIA reports "were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other specialists with expertise in |

| | |
|---|---|
| | counterterrorism;" and (iii) the "9/11 Commission also held hearings regarding the reports."). |
| 341. The 9/11 Commission Report section on "Terrorist Financing" continues: "although the intelligence community devoted more resources to the issue [of Al Qaeda funding] and produced somewhat more intelligence, it remained difficult to distinguish al Qaeda's financial transactions among the vast sums moving in the international financial system." 9/11 Commission Report, at 186 & n.86 (citing two CIA reports, "Usama Bin Ladin: Some Saudi Financial Ties Probably Intact," OTI IR 99-005CX (Jan. 11, 1999), and "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999)). | It is not disputed that the 9/11 Commission Final Report makes those statements and cites to CIA Reports, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, CIA_000807-848, at Ex. 20; and *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236, at Ex. 13. |
| 342. The January 11, 1999 CIA report, cited by the 9/11 Commission Report, discusses the supervision and funding of "two al-Qa'ida training camps in Afghanistan." Ex. # 99, CIA report, "Usama Bin Ladin: Some Saudi Financial Ties Probably Intact," at CIA_000808. It does not allege that MWL or IIRO funds or is otherwise affiliated with these camps. | It is not disputed that the CIA report states that "[h]alf-brother Qasim is a leader of the al-Qa'ida organization" and "reportedly supervises two al-Qa'ida training camps in Afghanistan." *See* Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, CIA_000807-848 at 808.<br><br>However, to the extent the MWL argues there is no evidence that the IIRO or MWL funded, or was affiliated with, al Qaeda and terrorist training camps, that is disputed as inaccurate and misleading. The MWL's subsidiary, the IIRO, provided substantial funding for al Qaeda's training camps in Afghanistan, including camps from which al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training. *See, e.g.*, Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); Ex. 159, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). |

| | |
|---|---|
| | *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 381, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo military training himself at one of the camps, where he met Usama Bin Laden.").<br><br>Lastly, the Court has concluded on two separate occasions in this litigation that the declassified CIA reports are trustworthy and admissible. *See* March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 12 (concluding that "the declassified CIA documents are trustworthy"); *see also* August 19, 2026 Memorandum Decision and Order (ECF No. 12247) at 20-21 (finding the CIA reports are trustworthy because (i) the "CIA reports were submitted in the years leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely;" (ii) the CIA reports "were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other specialists with expertise in counterterrorism;" and (iii) the "9/11 Commission also held hearings regarding the reports."). |
| 343. Later, the January 11, 1999 CIA report claims that IIRO "funds a military camp associated with Usama [Bin Laden]." *Id.* The report does not indicate that these "military camps" are the same as the "two al-Qa'ida training camps in Afghanistan," which it discussed | It is not disputed that the CIA report states that "[t]he International Islamic Relief Organization (IIRO) funds a military camp associated with Usama." *See* Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact [REDACTED]*, January 11, 1999, CIA_000807-848 at 808. |

| | |
|---|---|
| previously and separately. *Id.* In any event, the unredacted portions of the report do not provide the factual basis for this assertion or otherwise source the claim that IIRO funds the "military camp." *See generally Id.* | However, to the extent the MWL argues there is no evidence that the IIRO or MWL funded, or was affiliated with, al Qaeda and terrorist training camps, that is disputed as inaccurate and misleading. The MWL's subsidiary, the IIRO, provided substantial funding for al Qaeda's training camps in Afghanistan, including camps from which al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training. *See, e.g.*, Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); Ex. 159, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO.").<br><br>Lastly, the Court has concluded on two separate occasions in this litigation that the declassified CIA reports are trustworthy and admissible. *See* March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 12 (concluding that "the declassified CIA documents are trustworthy"); *see also* August 19, 2026 Memorandum Decision and Order (ECF No. 12247) at 20-21 (finding the CIA reports are trustworthy because (i) the "CIA reports were submitted in the years leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely;" (ii) the CIA reports "were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other specialists with expertise in |

| | |
|---|---|
| | counterterrorism;" and (iii) the "9/11 Commission also held hearings regarding the reports."). |
| 344. The January 11, 1999 CIA report also claims that Bin Laden "apparently" has "extensive contact with Afghani and Pakistani offices of the IIRO," but "it is not clear that IIRO headquarters in Jeddah is witting of these contacts." *Id.* at CIA_000817. The report does not conclude that Bin Ladin in fact has extensive contact with these IIRO offices, nor do the unredacted portions of the report indicate the source or factual basis for the claim that he "apparently" does so. *See generally Id.* | It is not disputed that the CIA makes that statement in the CIA Report, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 817. *See* Ex. 19. However, to the extent the MWL argues there is no evidence that Osama bin Laden had contact with the Afghanistan and Pakistan offices of the IIRO, that is disputed as inaccurate and misleading.<br><br>Recall that MWL Secretary General Omar Abdullah Naseef endorsed the appointment of Wa'el Hamza Jelaidan, a founding member of al Qaeda, as the director of the MWL/IIRO offices in Peshawar, Pakistan in 1989, thereby ensuring a direct channel for coordinating MWL/IIRO's collaboration with Osama bin Laden and al Qaeda. Jelaidan's role with the MWL allowed al Qaeda to use the MWL as an "umbrella" under which the terror group's members could operate, including using MWL offices for launching terrorist attacks. *See* Plaintiffs' response to No. 1. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150 (indicating that Jelaidan and Mohammed Jamal Khalifa (also an al Qaeda member) served in official roles with the MWL).<br><br>Jelaidan was a close associate of Osama bin Laden, and one of the most significant figures in the history of al Qaeda and its development into a global terrorist organization. *See* Ex. 53, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2002, FED-PEC 203469-20370 at 203470 ("Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that 'We are all in one boat, as is known to you, including our brother, Wa'el Julaidan.'"); Ex. 180, *Additional Designation Pursuant to E.O. 13224*, TREASURY00001-8 at 4-5 (stating that "Julaidan is identified as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief," and also served on al Qaeda's shura council).<br><br>*See also* Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 ("By way of background, Usama Bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ('MK') (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] |

| | |
|---|---|
| | forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al Madani") of the International Islamic Relief Organization (hereafter "IIRO," sometimes referred to as "Igatha" based upon its Arabic name "*Hay'at al-Igatha al-Islamiya al-'Alamtyaa*"), which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL'). In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*."). <br><br> *See also* Ex. 161, FBI Report, *Co-operating Witness Interview*, June 2, 2004, PEC-KSA002133-2134 at 2133 (indicating that al Qaeda members in the IIRO office in Peshawar, Pakistan, headed by Wa'el Jelaidan, were responsible for purchasing weapons); Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143 (Fadl testifying that al Qaeda used Wa'el Jelaidan as head of the IIRO office in Peshawar, Pakistan, to create ID cards for al Qaeda members so that they could cross the Pakistan-Afghanistan border without a problem, under the guise that they were teachers or other relief workers.). <br><br> Indeed, the U.S. government concluded that bin Laden and al Qaeda used the entire IIRO network for al Qaeda's terrorist activities. *See* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities."). <br><br> Moreover, the MWL ignores the CIA's assessment on that very same page stating that the IIRO, as a subsidiary of MWL, is a funding conduit for al Qaeda. *See* Ex. 19, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 817 (stating that "several Saudi NGOs are funding conduits for al-Qa'ida or have penetrated by Usama's network" and "[t]hose of greatest concern include the International Islamic Relief Organization (IIRO)" and "Al-Haramayn Islamic Foundation"). *See also id.* at 818 ("Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahed to fight in Chechnya."). |

| | |
|---|---|
| | Lastly, the Court has concluded on two separate occasions in this litigation that the declassified CIA reports are trustworthy and admissible. *See* March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 12 (concluding that "the declassified CIA documents are trustworthy"); *see also* August 19, 2026 Memorandum Decision and Order (ECF No. 12247) at 20-21 (finding the CIA reports are trustworthy because (i) the "CIA reports were submitted in the years leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely;" (ii) the CIA reports "were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other specialists with expertise in counterterrorism;" and (iii) the "9/11 Commission also held hearings regarding the reports."). |
| 345. The January 11, 1999 CIA report describes MWL as an example of an NGO with "[p]ossible" ties to "Usama Bin Ladin" that are "questionable, though less direct." *Id.* at CIA_000822. The report does not conclude that MWL has actual ties with Bin Ladin, nor do the unredacted portions of the report indicate the source or factual basis for the claim that it has "[p]possible" ties. *See generally Id.* | It is not disputed that the CIA makes that statement in the CIA Report, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 817. *See* Ex. 19. However, to the extent the MWL argues there is no evidence that the MWL has ties to Osama bin Laden, that is disputed as inaccurate and misleading.<br><br>*See, e.g.*, Plaintiffs' response to No. 1, discussing MWL/IIRO letterhead detailing a meeting between "Abu Abdullah" (a/k/a Osama bin Laden), Dr. Abdullah Omar Naseef, in his capacity as the Secretary General of the MWL, and others where it was agreed that al Qaeda attacks would be launched from MWL offices: "And if he is being subjected to any pressures, let it be a secret (*agreement*), in a way that [Muslim World] League offices will be opened as (*illegible*) for the Pakistanis, and the attacks will be launched from them (*these offices*) …"). *See* Ex. 61, FED-PEC0212276-212281 at 212276. The document further suggests using the name of the "League" as "an umbrella which you can stay under." *Id.* at 212278. Investigators also recovered a list of orders from Osama bin Laden regarding the management of Islamic charities. At point 10 of his list, bin Laden urges the creation of a committee to receive and distribute donations to al Qaeda, and recommends participation of the MWL ("the Muslim World League"), and IIRO ("Hayaat Al-Ighata"). *See* Ex. 60, FED-PEC0212268-212275 at 212268. *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 29.<br><br>*See also* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150 (indicating that "[s]everal of Bin Ladin's associates, including Wa'il Julaydan and Muhammad Jamal Khalifa, were MWL representatives"); Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 544 (stating that "longtime Bin Ladin |

| | |
|---|---|
| | associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"); Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 95 (stating that Osama bin Laden confidant Enaam Arnaout provided military and logistical support to the mujahideen in the late 1980s and early 1990s as an employee of "Saudi NGO, the Muslim World League").<br><br>Lastly, the Court has concluded on two separate occasions in this litigation that the declassified CIA reports are trustworthy and admissible. *See* March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 12 (concluding that "the declassified CIA documents are trustworthy"); *see also* August 19, 2026 Memorandum Decision and Order (ECF No. 12247) at 20-21 (finding the CIA reports are trustworthy because (i) the "CIA reports were submitted in the years leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely;" (ii) the CIA reports "were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other specialists with expertise in counterterrorism;" and (iii) the "9/11 Commission also held hearings regarding the reports."). |
| 346. The January 11, 1999 CIA report states that MWL has "apparently" been "used as a cover organization for several of Usama's associates." *Id.* at CIA_000823. The report does not conclude that MWL in fact has been used as a cover organization, nor do the unredacted portions of the report indicate the source or factual basis for the claim that it "apparently" has been so used. *See generally Id.* | It is not disputed that the CIA makes that statement in the CIA Report, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 823. *See* Ex. 19. However, to the extent the MWL argues there is no evidence that it has ties to Osama bin Laden, that is disputed as inaccurate and misleading. *See, e.g.*, Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 213 (stating that "several MWL affiliate organizations—including the International Islamic Relief Organization (IIRO)—have provided terrorists with funding and cover employment, documentation, and training").<br><br>Lastly, the Court has concluded on two separate occasions in this litigation that the declassified CIA reports are trustworthy and admissible. *See* March 9, 2023 Memorandum Decision and Order (ECF No. 8911) at 12 (concluding that "the declassified CIA documents are trustworthy"); *see also* August 19, 2026 Memorandum Decision and Order (ECF No. 12247) at 20-21 (finding the CIA reports are trustworthy because (i) the "CIA reports were submitted in the years leading up to and following the 9/11 Attacks ranging from 1998 to 2003 and are therefore timely;" (ii) the CIA reports "were prepared by the Office of Transnational Issues, the CIA Counterterrorist Center, and other specialists with expertise in |

| | |
|---|---|
| | counterterrorism;" and (iii) the "9/11 Commission also held hearings regarding the reports."). |
| 347. The April 9, 1999 CIA report, cited by the 9/11 Commission, notes that "large, internationally active NGOs based in Saudi Arabia" can be "exploited by individual employees," but "[t]errorist abuse of such NGOs takes place at the local branch office rather than at the organizations' headquarters. Senior NGO leaders usually are unwitting of the activity and willing to take corrective action when apprised of the abuse." Ex. # 100, CIA report, "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999) at CIA_000213. | It is not disputed that the CIA makes that statement in the CIA Report, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 213. *See* Ex. 13.<br><br>*See also* Plaintiffs' responses to Nos. 1, 2, 6, 190, 191, 205, 206, and 207 (detailing evidence that senior leaders of the IIRO and MWL were well aware of the terrorist activities of those organizations). |
| 348. The April 9, 1999 CIA report then asserts, "Although the MWL headquarters, for example, avoids extremist causes, sympathizers within several MWL affiliate organizations— including the International Islamic Relief Organization (IIRO)—have provided terrorists with funding and cover employment, documentation, and training, according to [redacted] press reporting." *Id.* This allegation cites only "[redacted] press reporting," without identifying the source or nature of the press reporting. *Id.* | It is not disputed that the CIA makes that statement in the CIA Report, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 213. *See* Ex. 13. |
| 349. The April 9, 1999 CIA report on three subsequent occasions mentions IIRO in connection with support to terrorist groups (other than Al Qaeda). | It is not disputed that the CIA Report, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 reports that (1) Mohammed Jamal Khalifa and the IIRO provided funding to the 1995 plot to bomb at least 12 U.S. airliners in East Asia; (2) IIRO offices engaged in extremist activities; and (3) IIRO branches have engaged in criminal activities such as narcotics trafficking and counterfeiting for financing their terrorist operations. *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."); *id.* at 220 ("The director of the IIRO office in Baku, Azerbaijan diverted approximately $1.5 million to the Egyptian Islamic Jihad."); *id.* at 221 ("IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate toward more extremist activities."); *id.* ("A few IIRO branches have turned to illegitimate means of financing their operations—including narcotics trafficking and counterfeiting—further increasing their independence and ability to support terrorism.").<br><br>However, to the extent the MWL argues that the CIA report does not connect the MWL, or its subsidiary, the IIRO, to al |

| | |
|---|---|
| | Qaeda, that is disputed as inaccurate and misleading. As an example, the 1995 plot to bomb at 12 U.S. airliners in East Asia, referenced at CIA_000216, is the al Qaeda "Bojinka" plot, the precursor to the 9/11 attacks. *See, e.g.*, Plaintiffs' response to No. 190. Khalifa personally orchestrated the use of IIRO funds and resources to support the terrorist activities of 9/11 mastermind Khalid Sheikh Mohammed ("KSM"), Ramzi Yousef (1993 World Trade Center bomber), and Wali Khan Amin Shah (Afghan jihad veteran and Osama bin Laden/al Qaeda associate) in the Philippines, and the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations of twelve U.S. flag commercial airplanes as they flew from Asia to the United States. That very plot, often referred to as "Operation Bojinka," was adapted into the 9/11 terrorist plot by KSM, using the knowledge he had acquired during its development about vulnerabilities in the aviation security system. *See* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 (stating that the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin"). *See also* Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12, 24 (discussing the Bojinka plot).<br><br>By way of further response, a number of CIA reports state that the IIRO served as a key financial conduit for al Qaeda and played a central role in providing critical support to the terrorist organization, including but not limited to appointing al Qaeda members to leadership positions within the IIRO, recruiting Islamic fighters, facilitating the training and travel of Islamic militants with employment papers and other documentation, engaging in narcotics trafficking and counterfeiting, and funding terrorist training camps. *See* Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that the Maktab al-Khidamat, a Pakistan-based nongovernmental organization financed by Osama bin Laden, played a key role in facilitating the training and travel of Islamic militants, and received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization"); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Mohammed Jamal Khalifa, Osama bin Laden's brother-in-law, and close associate of World Trade Center bomber Ramzi Yousef, served as the director of the International Islamic Relief Organization (IIRO) in the Philippines, and "was involved in recruiting Muslims for training in Pakistan as mujahidin fighters."); *id.* at 151 (describing IIRO, WAMY, and Al Haramain as having "tie[s] to terrorist and mujahidin activity"); Ex. 11, *Identifying Al-Qa'ida's Donors and* |

| | |
|---|---|
| | *Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199 at 198 (stating that "al-Qa'ida has infiltrated some of IIRO's branches"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."); *id.* at 221 ("IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate toward more extremist activities."); *id.* ("A few IIRO branches have turned to illegitimate means of financing their operations—including narcotics trafficking and counterfeiting—further increasing their independence and ability to support terrorism."); Ex. 14, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*, November 17, 1998, CIA_00317-338 at 325 ("Bin Ladin and his associates make extensive use of non-governmental charitable organizations (NGOs) to transfer funds. Bin-Ladin-affiliated Islamic NGOs – such as … the International Islamic Relief Organization (IIRO); Al-Haramayn; … and others – are convenient money couriers because they maintain offices in Afghanistan, Albania, Pakistan, and other locations where Bin Ladin associates are prevalent."); *id.* at 330 ("Bin Ladin and Al-Qa'ida probably receive Gulf funding diverted from offices of Islamic NGOs, particularly the MK, IIRO, Al Haramayn … and others."); Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (stating that al Qaeda financial committee member Abdul Islam, who was "authorized to disburse funds for salaries and transportation expenses of al-Qa'ida members, and for donations to widows and orphans," worked for the International Islamic Relief Organization); *id.* at 525 (listing of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization"); *id.* at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"); Ex. 18, *Al-Qa'ida's Financial Ties to Islamic Youth Programs*, January 17, 2003, CIA_00681-701 at 692 (stating that "Gulf charities like the Saudi International Islamic Relief Organization (IIRO) and Al-Haramain … are well aware of the radical Wahhabi and Salafist doctrines being taught at institutions they fund"); Ex. 19, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 741 (stating that the Sudanese National Islamic Front ("NIF") works "with hardline Islamic |

| | |
|---|---|
| | fundamentalists employed by the Saudi International Islamic Relief Organization"); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama, [REDACTED]."); *id.* at 817 (stating that "several Saudi NGOs are funding conduits for al-Qa'ida or have penetrated by Usama's network" and "[t]hose of greatest concern include the International Islamic Relief Organization (IIRO)" and "Al-Haramayn Islamic Foundation"); *id.* at 818 ("Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahed to fight in Chechnya."); *id.* at 824 (stating that the Islamic Relief Agency (ISRA), a Khartoum-based NGO with offices in Afghanistan and Pakistan, have been infiltrated by al Qaeda and work closely with personnel from the IIRO); *id.* at 827 (stating that the IIRO and Al Haramain were channeling funds "to spread Islamic fundamentalism throughout Macedonia").<br><br>The U.S. government concluded that bin Laden and al Qaeda used the entire IIRO network for al Qaeda's terrorist activities. *See* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities."). |
| 350. First, the April 9, 1999 CIA report states that "Usama Bin Ladin's brother-in-law, Muhammad Jamal Khalifah, who directed the IIRO in in the Philippines, provided funding and some logistical support to [World Trade Center Bomber Ramzi] Yousef and his associates ***in 1995*** as they plotted to bomb at least 12 airliners in East Asia." *Id.* at CIA_000216 (emphasis added). | It is not disputed that the CIA makes that statement without identifying the press reporting. *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216.<br><br>By way of further response, *see, e.g.*, Plaintiffs' response to No. 349. |
| 351. Second, the April 9, 1999 CIA report alleges, "The director of the IIRO office in Baku, Az[erbaijan] diverted a[pproximat]ely $1.5 million to the Egyptian Islamic Jihad." Ex. # 100, CIA report, "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999) at CIA_000220. | It is not disputed that the CIA makes that statement without identifying the press reporting. *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 220.<br><br>By way of further response, *see also* Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 818 ("Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahed to fight in Chechnya."). |
| 352. The unredacted portions of the report do not provide the source or factual basis for this assertion. *See generally Id.* | It is not disputed that the source or factual basis does not appear in the unredacted portions of the CIA report. |
| 353. The alleged diverted amount of $1.5 million (or 5.6 million Saudi Riyals at the prevailing exchange rate of 3.75 | Disputed. The CIA report does not identify the specific date and year of the diversion of money to Egyptian Islamic jihad, |

| | |
|---|---|
| SAR/USD) would exceed the entire budget of IIRO's Azerbaijan office of 3,923,239 million Saudi Riyals. See Ex. # 35, IIRO 1998 Annual Report, at IIRO_004274. | that would allow for a honest comparison. *See also* Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 818 ("Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahed to fight in Chechnya."). |
| 354. Third, the April 9, 1999 CIA report alleges, "IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate more towards extremist activities." Ex. # 100, CIA Analytic Report "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999) at CIA_000221. | It is not disputed that the CIA makes that statement without identifying the press reporting. *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 221. |
| 355. The unredacted portions of the report do not provide a source or factual basis for this assertion. *See generally Id.* | It is not disputed that the source or factual basis does not appear in the unredacted portions of the CIA report. |
| 356. In fact, IIRO did not have an "office" in Afghanistan. See Ex. #35, IIRO 1998 Annual Report at IIRO_004275; see also Ex. # 101, Basha Dep. Tr. (106:6-8) ("The projects in Afghanistan were managed by the office from Islamabad in Pakistan."). | Disputed. MWL's assertion that the IIRO did not have an office in Afghanistan is inaccurate and misleading. *See* Ex. 81, IIRO Annual Report 1998, IIRO 171-211 at 203 (identifying the IIRO-Afghanistan office in 1998, and describing its activities; *id.* at 204 (identifying a separate IIRO-Pakistan office). |
| 357. The April 9, 1999 CIA report finally notes, "IIRO operations include running or supporting schools, orphanages, medical clinics and hospitals in more than 90 countries, [redacted]. Accredited by the UNHCR, the IIRO also runs programs in UN-sponsored camps for war refugees in Afghanistan, Pakistan, and in locations in Africa." Ex. # 100, CIA report, "Islamic Terrorists: Using Nongovernmental Organizations Extensively," CTC 99-40007 (Apr. 9, 1999) at CIA_000221. | It is not disputed that the CIA makes that statement without identifying the press reporting. *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 221. |
| 358. The April 9, 1999 CIA report does not conclude that any foreign branch office of IIRO or MWL provided funds to *Al Qaeda*, directly or indirectly. *See generally Id.* | Disputed. *See, e.g.*, Plaintiffs' response to No. 349. |
| 359. The chapter of the 9/11 Commission Report discussing Al Qaeda's founding and its return to Afghanistan in 1996 does not conclude that IIRO or MWL directly or indirectly, provided funds to Al Qaeda. See 9/11 Commission Report at 47-67. | Disputed. *See, e.g.*, Plaintiffs' responses to Nos. 6, 333, and 339. |
| 360. This chapter cites several CIA reports. *Id.* at 47-67 & nn.37 (citing CIA report, "Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia," CTC 2002- 40066CH (June 6, 2002)), 59 (citing CIA report, "Usama Bin Ladin: Al-Qa'ida's Financial Facilitators," OTI iA 2001-134-HXC (Oct. 18, 2001)), 77 (citing CIA | Disputed. The MWL's assertion that the CIA reports identified in No. 360 do not state or conclude that the IIRO or MWL provided funds to al Qaeda, directly or indirectly, is inaccurate and misleading. *See, e.g.*, Ex. 16, *Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia*, April 9, 1999, CIA_000450-480. The CIA report talks |

| | |
|---|---|
| report, "Saudi-Based Financial Support for Terrorist Organizations [Redacted]," CTC 2002-40117CH (Nov. 14, 2002)), and CIA report, "Al Qa'ida Still Well Positioned To Recruit Terrorists [Redacted]," CTC 2002- 40081CH (July 1, 2002)). These reports do not conclude that IIRO or MWL, or their foreign branch offices, directly or indirectly provided funds to Al Qaeda. | extensively about Mohammed Jamal Khalifa (the Regional Director for the IIRO in South-East Asia) and how he established a financial network in the Philippines for the benefit of Osama bin Laden and al Qaeda. *See id.* at 454 ("Bin Ladin's brother-in-law Muhammad Jamal Ahmed Mustafa Khalifah established a financial network in the Philippines in 1988"); *id.* ("Al-Qa'ida uses its financial and business links in the region to move operatives, establish staging and operational bases, finance mujahidin training, pay for missionaries and teachers who propagate radical views, recruit students with mujahidin potential, and create grassroots networks to further the cause of creating Islamic states."); *id.* ("Al-Qa'ida also appears to have access to an extensive network of Islamic nongovernmental organizations (NGOs)—and the potential to exploit others—to facilitate money movement in the region."). *id.* at 455 ("Gulf NGOs with branch offices in the Philippines—including Dal al Hijra Foundation and the International Islamic Relief Organization—maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates.").<br><br>*See also* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (stating that al Qaeda financial committee member Abdul Islam, who was "authorized to disburse funds for salaries and transportation expenses of al-Qa'ida members, and for donations to widows and orphans," worked for the International Islamic Relief Organization); *id.* at 525 (listing of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization"); *id.* at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida").<br><br>*See also* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Shaykh Adil Batterjee, a close associate of Osama bin Laden and "a long-time al-Qa'ida donor and fundraiser," used the Saudi-based Lajnat al Birr al Islamiyya charity, a subsidiary of the Muslim World League (MWL), to raise funds on behalf of bin Laden.). |
| 361. Intentionally left blank. | No response necessary. |
| 362. The 9/11 Commission Report distinguishes Maktab al-Khidamat from Al Qaeda. Maktab al-Khidamat, known as the "Bureau of Services" or the Services Bureau | Disputed. The MWL's description and history of Maktab al-Khidamat ("MAK") is inaccurate and misleading. |

| | |
|---|---|
| (9/11 Commission Report at 56), "provided logistical support to mujahideen in Afghanistan" in the late 1980s. *Id.* At 434. Bin Laden did not lead Maktab al-Khidamat, which did not seek to act outside of Afghanistan. Bin Laden created Al Qaeda and split it off from Maktab al-Khidamat because he wanted to pursue global violent jihad. *Id.* at 55-56. | As an initial matter, MAK was co-founded by Osama bin Laden and Abdullah Azzam in the 1980s to recruit and support mujahideen to fight against the Soviets in Afghanistan. MAK funneled money and fighters to the mujahideen and set up a network of recruiting offices around the world, including in the United States. Throughout the Afghan jihad, MAK worked in concert with a network of purported charities and relief organizations (including the MWL, IIRO, Al Haramain, and others) to provide travel documents, funds, transportation, training, facilities, arms, physical assets, and other support to the mujahideen. *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 214 (stating that MAK was "[e]stablished in Peshawar in 1984 by Usama Bin Ladin and Palestinian Abdallah Azzam to facilitate the travel and training of Arab volunteers to fight with the mujahidin in Afghanistan"); Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that "MAK established several offices in Pakistan and also in New York, London, Casablanca, Amman, Khartoum, Kuwait, Riyadh, Jiddah, Damman, Qatar, Bahrain, and Iran," and in "Zagreb and Sarajevo."); *id.* at 60 (stating that the Maktab al-Khidamat, a Pakistan-based nongovernmental organization financed by Osama bin Laden, played a key role in facilitating the training and travel of Islamic militants, and received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization"); Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 ("By way of background, Usama Bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ('MK') (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al Madani") of the International Islamic Relief Organization (hereafter "IIRO," sometimes referred to as "Igatha" based upon its Arabic name "*Hay'at al-Igatha al-Islamiya al-'Alamtyaa*"), which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL'). In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the |

| | |
|---|---|
| | person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*."). <br><br> At the conclusion of the Afghan jihad bin Laden determined that the network that supported the mujahideen in Afghanistan should not be abandoned, but rather adapted to serve as a foundation for waging a global jihad against all of the perceived enemies of Islam, and in particular, the United States. *See* Ex. 1, 9/11 Commission Final Report at 56 ("April 19, 1988 brought victory for the Afghan jihad. Moscow declared it would pull its military forces out of Afghanistan within the next nine months. As the Soviets began its withdraw, the jihad's leaders debated what to do next. Bin Ladin and Azzam agreed that the organization successfully created for Afghanistan should not be allowed to dissolve. They established what they called a base or foundation (al Qaida) as a potential general headquarters for future jihad."). <br><br> Following Abdullah Azzam's death on November 24, 1989, bin Laden assumed full control of MAK, and MAK was absorbed into al Qaeda. Importantly, the da'wa organizations that funded and supported MAK during the 1980s—MWL, IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Red Crescent Society, and Benevolence International Foundation—continued to serve as the primary conduits for channeling financial, logistical, operational, and ideological support to al Qaeda's global jihad for years leading up to the 9/11 attacks. <br><br> *See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 20-26 (describing the history of al Qaeda's terrorist financing infrastructure during the Soviet-Afghan conflict; the use of Saudi charities under the guise of humanitarian relief work for money and the provision of weapons, guesthouses, and travel papers to the mujahideen and jihadist recruits; the use of the Saudi charities to launder money originating from bank accounts belonging to Osama bin Laden and wealthy supporters in the Gulf; and the critical role the MWL, IIRO, and WAMY would play in al Qaeda's global financial infrastructure following the end of the Soviet-Afghan war). <br><br> *See also* Ex. 36, March 10, 2020 Expert Report of Jonathan M. Winer at 30 (discussing Maktab al Khidmat's connection to the MWL and IIRO). |
| 363. Intentionally left blank. | No response necessary. |
| 364. Intentionally left blank. | No response necessary. |

| | |
|---|---|
| 365. The October 2001 CIA report, cited in the 9/11 Commission Report, "Usama Bin Ladin: Al-Qa'ida's Financial Facilitators," OTI iA 2001-134-HXC, Oct. 18, 2001, incorporates information through September 30, 2001. Ex. # 102, CIA report, "Usama Bin Ladin: Al-Qa'ida's Financial Facilitators," OTI iA 2001-134-HXC (Oct. 18, 2001) at CIA_000501. | It is not disputed that the CIA report states that "[i]nformation through 30 September 2001 was used in this report." *See* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 501. |
| 366. The section of the October 2001 CIA report entitled, "The Origin of Funds" identifies seventeen "Islamic charities" from whom "Bin Ladin derives much of his funds." *Id.* at CIA_000502, CIA_000521 to CIA_000527 (listing and describing Afghan Support Committee, Health and Education Project International, Human Care Afghanistan, Islamic Relief Agency, Sudan, Jam'iyat al-Ta'awun al-Islamiyya, Kuwaiti Joint Relief Committee, Lajnat al-Birr al- Islami, Lajnat al-Dawa al-Islamia, Maktab al-Khidamat, Munazzamat al-Birr al-Islami, Muslim Scholar's Union, Al-Muwafaq Foundation, Qatar Islamic Call Charitable Society, Rabita Trust for the Rehabilitation of Stranded Pakistanis, Al-Rashid Trust Institution, Revival of Islamic Heritage Society, Wafa al-Igatha al-Islamiya). IIRO and MWL are not among them.[4] *Id.* | Disputed. To the extent that the MWL argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because they are not specifically named in a CIA report (one of dozens of CIA reports produced in this litigation), that is inaccurate and misleading.<br><br>By way of further response, *see* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 525 (listing of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization").<br><br>Moreover, the MWL deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 328 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). |
| 367. Later, the October 2001 CIA report notes that "[l]ongtime Bin Ladin associate . . . Wa'el Hamza Julaydan [Jelaidan] . . . a veteran of the Islamic charity circuit, has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL), the Saudi Red Crescent Society (SRCS), and lately at two Bin-Ladin affiliated charities, al-Waqf al-Islami, and as secretary general of Rabita Trust coordinating financial activities and overseeing the budget. Julaydan has provided support since the 1990s to Muslims in Bosnia and Chechnya- hotbeds of mujahidin activity-and may be using his position and influence at these organizations to divert funds and resources to al-Qa'ida." *Id.* at CIA_000544. | It is not disputed that the CIA report makes that statement. *See* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 544.<br><br>By way of further response, *see also* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150 (indicating that Jelaidan and Mohammed Jamal Khalifa (also an al Qaeda member) served in official roles with the MWL); Ex. 161, FBI Report, *Co-operating Witness Interview*, June 2, 2004, PEC-KSA002133-2134 at 2133 (indicating that al Qaeda members in the IIRO office in Peshawar, Pakistan, headed by Wa'el Jelaidan, were responsible for purchasing weapons); Ex. 53, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2002, FED-PEC 203469-20370 at 203470 ("Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah |

| | |
|---|---|
| | Azzam, bin Ladin stated that 'We are all in one boat, as is known to you, including our brother, Wa'el Julaidan.'"); Ex. 180, *Additional Designation Pursuant to E.O. 13224*, TREASURY00001-8 at 4-5 (stating that "Julaidan is identified as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief," and also served on al Qaeda's shura council); Ex. 45, FED-PEC 134953-134955 ("Golden Chain" listing of al Qaeda's elite financial sponsors and facilitators, including Wa'el Jelaidan (IIRO/MWL official designated to receive financial contributions from Suleiman al Rashid, Abdel Qader Bakri, Salah al Din Abdel Jawad, and Abdel Hadi Taher)). |
| 368. This October 2001 CIA report quotation explicitly distinguishes IIRO and MWL from "bin-Ladin affiliated charities." *Id.* | Disputed. To the extent that the MWL argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because they are not specifically identified with other "Bin-Ladin affiliated charities" in a CIA report (one of dozens of CIA reports produced in this litigation), that is inaccurate and misleading.<br><br>By way of further response, *see* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 525 (listing of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization").<br><br>Moreover, the MWL deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 328 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). |
| 369. The October 2001 CIA asserts that Jelaidan "may be" currently diverting funds and resources to Al Qaeda, and that he "held" positions at IIRO and MWL in the past. *Id.* | It is not disputed that the CIA report makes that statement. *See* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 544.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 75, 171, 344, and 367. |
| 370. This report does not conclude that IIRO, MWL or any of their branch offices, directly or indirectly, provided funds to Al Qaeda. *See generally Id.* | Disputed. That same CIA report specifically says that an IIRO employee distributed "funds for salaries and transportation expenses of al-Qa'ida members, and for donations to widows and orphans." *See* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (stating that al Qaeda financial committee member Abdul Islam, who was "authorized to disburse funds for salaries and transportation expenses of al- |

| | |
|---|---|
| | Qa'ida members, and for donations to widows and orphans," worked for the International Islamic Relief Organization); *id.* at 525 (listing of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization").<br><br>Moreover, the MWL deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 328 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). |
| 371. The June 2002 CIA report, cited in the 9/11 Commission Report, "Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia," CTC 2002-40066CH, June 6, 2002, does not conclude that IIRO or any of its branch offices directly or indirectly provided funds to Al Qaeda. Ex. # 103, CIA report, "Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia," CTC 2002-40066CH (June 6, 2001), CIA_000450 to CIA_000480. | Disputed. The MWL's assertion that the CIA report identified in No. 371 does not state or conclude that the IIRO or MWL provided funds to al Qaeda, directly or indirectly, is inaccurate and misleading. The CIA report talks extensively about Mohammed Jamal Khalifa (the Regional Director for the IIRO in South-East Asia) and how he established a financial network in the Philippines for the benefit of Osama bin Laden and al Qaeda. *See* Ex. 16, *Usama Bin Ladin: Al-Qa'ida's Business and Financial Links in Southeast Asia*, April 9, 1999, CIA_000450-480 at 454 ("Bin Ladin's brother-in-law Muhammad Jamal Ahmed Mustafa Khalifah established a financial network in the Philippines in 1988"); *id.* ("Al-Qa'ida uses its financial and business links in the region to move operatives, establish staging and operational bases, finance mujahidin training, pay for missionaries and teachers who propagate radical views, recruit students with mujahidin potential, and create grassroots networks to further the cause of creating Islamic states."); *id.* ("Al-Qa'ida also appears to have access to an extensive network of Islamic nongovernmental organizations (NGOs)—and the potential to exploit others—to facilitate money movement in the region.").<br><br>The CIA report further confirms that the IIRO-Philippines maintained contact with al Qaeda associated terrorist organizations Abu Sayyaf Group and the Moro Islamic Liberation Front. *See id.* at 455 ("Gulf NGOs with branch offices in the Philippines—including Dal al Hijra Foundation and the International Islamic Relief Organization—maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates.").<br><br>Moreover, the MWL deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* |

| | |
|---|---|
| | Plaintiffs' response to No. 328 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). |
| 372. The June 2002 CIA report states that "Gulf NGOs with branch offices in the Philippines—including . . . the International Islamic Relief Organization—maintain contact with Islamic extremists, including the Abu Sayyaf Group (ASG), the Moro Islamic Liberation Front (MILF), and Bin Ladin affiliates." *Id.* at CIA_000455. It does not explain the nature or extent of this "contact," nor provide a factual basis or source for this assertion. *Id.* | It is not disputed that the CIA report makes that statement. However, to the extent the MWL argues there is no evidence of the IIRO's "contact" with the al-Qaeda affiliated terrorist organizations Abu Sayyaf Group and Moro Islamic Liberation Front, that is disputed as inaccurate and misleading.<br><br>Investigations conducted by Philippines Intelligence determined that Abdelhadi Daguit was in constant contact with leaders of the Moro Islamic Liberation Front while working with the IIRO and Mohammed Jamal Khalifa. Ex. 59, Philippines Intelligence Report, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211445 (identifying Daguit as a "known associate of Khalifa," "presently connected with IIRO Manila," and in "constant contact with Yusop Alongan @Ustadz Duli/Abdullah, Chairman of MILF Finance Committee").<br><br>In addition, IIRO-Eastern Province official Abd al Hamid Sulaiman al Mujil met with Moro Islamic Liberation Front officials in December 1998 concerning financial support. *See id.* at 211430 (identifying IIRO officials "Al Saif Othoman A O and Almojil Abdul Hamdi S" meeting with MILF Chairman Salamat Hashim at Camp Abubakar in the Southern Philippines concerning a $192,197.00 contribution).<br><br>Moreover, a high-ranking Abu Sayyaf Group leader oversaw the operations of an IIRO office in the Philippines and used the office to direct money to Abu Sayyef Group and Moro Islamic Liberation Front. *See* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202111 ("At the time Khalifa directed the IIRO-PHL, he employed an ASG intelligence officer as the provincial director of the IIRO-PHL in the Tawi-Tawi region of the Southern Philippines until that officer's death in 1994."); *id.* ("In the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-PHL, and used the organization to funnel money to terrorist groups including the ASG."); Ex. 33, European Parliament, *The Involvement of Salafism/Wahhabism in the Support and Supply of Arms to Rebel Groups Around the World*, June 2013, at 9 (stating that the IIRO's branch office in Tawi Tawi, Mindanao, headed by Abu Sayyaf's intelligence chief, was used by Al Qaeda to siphon money on behalf of the Abu Sayyef Group and Moro Islamic Liberation Front). *See also* |

| | |
|---|---|
| | Ex. 59, Philippines Intelligence Report, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211429 (identifying former IIRO Director Mahmud Afifi (Mahmud Abdul Jalil Afif-Aburahim) as a financier of two Malaysian demolition experts (Habibe and Kadir) who reportedly arrived in Zamboanga City on or around October 10, 1998 for terrorist activities.).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 35 (discussing August 3, 2006 designation of the IIRO, and "a senior IIRO official … also provided financial support to the Abu Sayyaf Group"). |
| 373. The June 2002 CIA report goes on to identify "[f]our Saudi NGOs that have been connected to Bin Ladin in other locations" besides the Philippines. It does not identify IIRO or MWL. *Id.* | Disputed. To the extent that the MWL argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because they are not specifically named in a CIA report (one of dozens of CIA reports produced in this litigation), that is inaccurate and misleading.<br><br>Moreover, the MWL deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 328 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). |
| 374. Furthermore, the June 2002 CIA report then lists "Al Qa'ida-linked Islamic NGOs." *Id.* This list does not include IIRO or MWL. *Id.* | Disputed. *See, e.g.*, Plaintiffs' response to No. 373. |
| 375. The November 14, 2002 CIA report, cited in the 9/11 Commission Report, "Saudi- Based Financial Support for Terrorist Organizations [Redacted]," CTC 2002-40117CH (Nov. 14, 2002), does not conclude that IIRO or any of its branch offices directly or indirectly provided funds to Al Qaeda. Ex. # 104, "Saudi-Based Financial Support for Terrorist Organizations [redacted]," CTC 2002-40117CH (Nov. 14, 2002), CIA_000143 to CIA_000158. | Disputed. To the extent that the MWL argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because they are not specifically named in a CIA report as having provided funds to al Qaeda (one of dozens of CIA reports produced in this litigation), that is inaccurate and misleading. *But see* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Shaykh Adil Batterjee, a close associate of Osama bin Laden and "a long-time al-Qa'ida donor and fundraiser," used the Saudi-based Lajnat al Birr al Islamiyya charity, a subsidiary of the Muslim World League (MWL), to raise funds on behalf of bin Laden.).<br><br>Moreover, the MWL deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO |

| | |
|---|---|
| | and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 328 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). |
| 376. The November 14, 2002 CIA report notes that SAMA, Saudi Arabia's central bank and chief financial agency, has "overseen Saudi banks' efforts to freeze and seize terrorist-linked assets." *Id.* at CIA_000145. | It is not disputed that the CIA report makes that statement. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 145. |
| 377. The November 14, 2002 CIA report lists individuals who it claims are part of the "Key Financial Base for Al-Qa'ida." One of the individuals is Muhammad Jamal Khalifah. The report notes that Khalifah founded several Islamic charities and "served" in the past as "director of the International Islamic Relief Organization (IIRO) NGO in Manila." The report does not state that Khalifah provided funds to or supported Al Qaeda during or as part of his employment for IIRO-Philippines. On the contrary, the report states that Khalifah "currently" has several private business ventures like "Asian and African construction and gem businesses," and that he is using those ventures to "launder money for al-Qa'ida." *Id.* at CIA_000148 to CIA_000149. | Disputed. To the extent that the MWL argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because a CIA report (one of dozens of CIA reports produced in this litigation), does not specifically state that Khalifa provided funds to al Qaeda while he served as the Regional Director for the IIRO in South-East Asia, that is inaccurate and misleading.<br><br>By way of further response, Khalifa personally orchestrated the use of IIRO funds and resources to support the terrorist activities of 9/11 mastermind Khalid Sheikh Mohammed ("KSM"), Ramzi Yousef (1993 World Trade Center bomber), and Wali Khan Amin Shah (Afghan jihad veteran and Osama bin Laden/al Qaeda associate) in the Philippines, and the development of an aviation-based terrorist plot involving the planned simultaneous in-flight detonations of twelve U.S. flag commercial airplanes as they flew from Asia to the United States. That very plot, often referred to as "Operation Bojinka," was adapted into the 9/11 terrorist plot by KSM, using the knowledge he had acquired during its development about vulnerabilities in the aviation security system. *See* Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 (stating that the "former head of the IIRO office in the Philippines, Mohammed Jamal Khalifa, has been linked to Manila-based plots to target the Pope and U.S. airlines; his brother-in-law is Usama Bin Ladin"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."). *See also* Ex. 242, March 10, 2020 Expert Report of Brian M. Jenkins at 11-12, 24 (discussing the Bojinka plot). |
| 378. The November 14, 2002 CIA report describes five "Saudi-based NGOs that al- Qaida has been able to exploit by diverting funds from legitimate activities to finance al- | Disputed. To the extent that the MWL argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because a CIA report (one of dozens of CIA reports |

| | |
|---|---|
| Qa'ida." *Id.* at CIA_000150 to CIA_000151. IIRO is not among these five NGOs. *Id.* | produced in this litigation) does not list the IIRO as one of the "Saudi-based NGOs that al-Qaida has been able to exploit by diverting funds from legitimate activities to finance al-Qa'ida," that is inaccurate and misleading.<br><br>Moreover, the MWL deliberately ignores credible CIA reporting cited by the 9/11 Commission describing the substantial financial assistance and other resources the IIRO and MWL provided to Osama bin Laden and al Qaeda. *See* Plaintiffs' response to No. 328 (CIA reports cited by the 9/11 Commission Final Report detailing financial, material, logistical, and ideological support provided to al Qaeda by IIRO, MWL, WAMY, and Al Haramain). |
| 379. The November 14, 2002 CIA report later asserts that Abu Sayyaf Group "probably" receives funds from "Saudi-based NGOs, including . . . IIRO." *Id.* at CIA_000152. However, the report explicitly describes Abu Sayyaf Group as a terrorist group "other than al-Qa'ida." *Id.* at CIA_000151. In any event, the report does not assert that Abu Sayyaf Group "actually" receives funds from IIRO, nor do the unredacted portions of the report provide a factual basis or source for the assertion that it "probably" does so. *See generally Id.* | It is not disputed that the CIA report makes the statement: "ASG probably also receives funds from Saudi-based NGOs, including Dar Al-Hijra Foundation and IIRO." *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 152. However, the IIRO omits the CIA's assessment on that same page that "IIRO has used its field offices [for] cover, travel, and funding to support Islamic extremists." *Id.*<br><br>By way of further response, to the extent that the MWL argues that the IIRO and MWL have been exonerated from any accountability for the years of extensive financial and material support they provided to al Qaeda because a CIA report (one of dozens of CIA reports produced in this litigation) does not assert that Abu Sayyaf Group received funds from the IIRO, that is inaccurate and misleading. The U.S. government and other intelligence sources have concluded that the IIRO provided substantial financial assistance to the Abu Sayyaf Group. *See, e.g.*, Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202111 ("At the time Khalifa directed the IIRO-PHL, he employed an ASG intelligence officer as the provincial director of the IIRO-PHL in the Tawi-Tawi region of the Southern Philippines until that officer's death in 1994."); *id.* ("In the mid 1990s, a major ASG supporter, Mahmud Abd Al-Jalil Afif, served as the director of the IIRO-PHL, and used the organization to funnel money to terrorist groups including the ASG."); Ex. 33, European Parliament, *The Involvement of Salafism/Wahhabism in the Support and Supply of Arms to Rebel Groups Around the World*, June 2013, at 9 (stating that the IIRO's branch office in Tawi Tawi, Mindanao, headed by Abu Sayyaf's intelligence chief, was used by Al Qaeda to siphon money on behalf of the Abu Sayyef Group and Moro Islamic Liberation Front); Ex. 158, June 2004 U.S. Diplomatic Cable, PEC-KSA 1464-1466 (Secretary of State Colin Powell's office detailing the IIRO's |

| | |
|---|---|
| | support for al Qaeda and the Abu Sayyaf terrorist group, and stating: "The USG believes that some elements of the International Islamic Relief Organization (IIRO) have been exploited by terrorists and their financiers as a means of transferring assets, providing organizational cover, or otherwise supporting extremist, violent operations."); Ex. 71, May 23, 2005 U.S. Diplomatic Cable, FED-PEC 220479-220481 ("The International Islamic Relief Organization (IIRO) -- a subsidiary of the Saudi-based and funded Muslim World League (MWL) -- was active here in the late 1980s and early 1990s. Operated by Usama Bin Laden's brother-in-law, Saudi businessman Mohammed Jamal Khalifa, and with links to captured al-Qaeda lieutenant Khalid Shaikh Mohammed, the IIRO served as a legal front to conceal the transfer of al-Qaeda funding and material to the Abu Sayyaf Group and possibly other insurgents or terrorists operating in the Philippines.").<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 37-38 (stating that IIRO-Philippines "has also served as a liaison to other extremist groups on behalf of the Abu Sayyaf Group"). |
| 380. The November 14, 2002 CIA report includes MWL among the five Saudi-based NGOs whose funds were allegedly diverted to Al Qaeda, based on its observation that "[s]everal of Bin Ladin's associates, including Wa'il [Jelaidan] and Muhammad Jamal Khalifah, were MWL representatives, according to [redacted] press reporting." *Id.* at CIA_000150. | It is not disputed that the CIA report makes the statement. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150. |
| 381. However, the November 14, 2002 CIA report does not state that Jelaidan and Khalifa were associates of Bin Ladin at the time they were affiliated with MWL, nor does it identify the "press reporting" cited. | It is not disputed that the unredacted sections of the CIA report do not provide additional detail regarding Jelaidan and Khalifa. However, to the extent that the MWL suggests that Jelaidan and Khalifa were not associates of Osama bin Laden while they were employed by the MWL and IIRO, that is disputed as inaccurate and misleading.<br><br>By way of further response, Plaintiffs direct the MWL to their response to No. 1, detailing Jelaidan and Khalifa's years of employment with the MWL and IIRO beginning in the 1980's in Pakistan, Jelaidan's leadership positions with the MWL and IIRO and related da'wa organizations (Rabita Trust and Al Haramain Al Masjed Al Aqsa) through the 9/11 attacks, and Khalifa's position as Regional Director for the IIRO in South-East Asia during the 1990s.<br><br>As founding members of al Qaeda, Jelaidan and Khalifa maintained contact with bin Laden, senior al Qaeda members, al Qaeda financiers, and each other throughout their tenure with the MWL and IIRO. Indeed, bin Laden admitted that he |

| | |
|---|---|
| | remained close with Jelaidan as late as 1999, just two years before the 9/11 attacks. *See* Ex. 53, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2002, FED-PEC 203469-203470 at 203470 ("Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that 'We are all in one boat, as is known to you, including our brother, Wa'el Julaidan.'"). *See also* Ex. 50, August 3, 2006 designation of IIRO's branch offices in the Philippines and Indonesia, and IIRO official Abd al Hamid Sulaiman al Mujil, FED-PEC 202110-212112 at 202111 ("While working as the director of IIRO-PHL, Khalifah maintained close connections with al Qaida through his relations with senior al Qaida supporters, including Specially Designated Global Terrorist (SDGT) Wa'el Hamza Julaidan."); Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"). |
| 382. The November 14, 2002 CIA report then states, "[Redacted] funds destined for al- Ittihad al-Islamiyya (AIAI) were funneled through several Saudi NGOs, including MWL." *Id.* | It is not disputed that the CIA report makes the statement. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 150. |
| 383. The November 14, 2002 CIA report does not provide a factual basis or source for this assertion, with the redaction further obscuring the nature or credibility thereof. *Id.* | It is not disputed that the unredacted sections of the CIA report do not provide additional information concerning the use of the MWL as a conduit for funding al-Ittihad al-Islamiyya. However, to the extent that the IIRO argues that the MWL and IIRO do not have a connection to al-Ittihad al-Islamiyya, that is disputed as inaccurate and misleading. *See* Ex. 182, *Additional Designations Pursuant to E.O. 13224: Dr. Abd Al Hamid Sulaiman Al-Mujil and International Islamic Relief Organization Philippines and Indonesia Branches*, TREASURY00102-121 at 106 ("The International Islamic Relief Organization [IIRO], which is headquartered in Jeddah, Saudi Arabia and maintains numerous branch offices, is one of the primary non-governmental organizations [NGOs] active worldwide associated with and providing financial, material and logistical support to designated terrorist organizations, including al Qaida and UBL, … the Taliban, … and Hamas, … as well as al Qaida affiliates, *inter alia*, the Abu Sayyaf Group (ASG), … Jemaah Islamiya (JI), … and Al Ittihad Al Islamiya (AIAI)…. The IIRO's parent organization is the Muslim World League [MWL] also headquartered in Saudi Arabia."). |

| | |
|---|---|
| 384. The November 14, 2002 CIA report closes the discussion of MWL by stating, "[Redacted] does not indicate whether Saudi officials or the head office is complicit in terrorist support." *Id.* | It is not disputed that the unredacted sections of the CIA report do not provide additional information concerning whether the MWL is complicit in terrorist support. However, to the extent the IIRO suggests that MWL officials or the head officer were not complicit in terrorist support, that is disputed as inaccurate and misleading.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 190, 191, 205, 206, and 207 (detailing evidence that senior leaders of the IIRO and MWL were well aware of the terrorist activities of those organizations). |
| 385. Finally, a 2004 CIA-FBI Collaborative Intelligence Assessment concludes that "[t]here is no evidence that either the Saudi Government or members of the Saudi Royal family knowingly provided support for the attacks of 11 September 2001." Ex. # 105, "Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States," (Dec. 2004) at EO14040-003416-UPDATED. | It is not disputed that the Joint FBI-CIA Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States makes that statement. *See* Ex. 31, Joint *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, EO14040 3414-3442-UPDATED at 3416. *But see id.* ("There is evidence that official Saudi entities, chiefly the Ministry of Islamic Affairs and associated nongovernmental organizations (NGOs), provide financial and logistical support to individuals in the United States and around the world, some of whom are associated with terrorism-related activity."); *id.* ("The Saudi government and many of its agencies have been infiltrated and exploited by individuals associated with or sympathetic to al-Qa'ida."); *id,* ("Suspected Saudi intelligence officers and cooptees appear to be engaged in collecting intelligence in the United States. Saudi-funded clerics have been found to be collecting on Saudi-Americans and other communities in the United States."); *id.* ("Suspected Saudi intelligence officers and cooptees in the United States, including diplomats, are engaged in a campaign to influence public perception and policy."). |
| 386. The assessment further notes that the Government of Saudi Arabia suspected that Bin Jiluwi, a "leader" of the Eastern Province office of IIRO, "embezzled" more than $3 million from IIRO. *Id.* at EO14040-003419-UPDATED. The assessment does not state that the embezzled funds were diverted to Al Qaeda. *See generally Id.* | Disputed as stated. The MWL's assertion that misappropriated funds from the IIRO under the leadership of Prince Turki bin Jalawi were not diverted to al Qaeda is misleading and selectively omits important text from the Joint FBI-CIA Assessment, including but not limited to (1) the statement that Prince "Turki bin Fahd Jiluwi" "had contact with individuals tied to al-Qa'ida and other terrorist organizations;" and (2) the statement that "Turki bin Fahd Jiuwi" is "an important al-Qa'ida donor." *See* Ex. 31, Joint *Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States*, EO14040 3414-3442-UPDATED at 3417-3418.<br><br>By way of further response, *see, e.g.*, Plaintiffs' response to No. 122. |

| | |
|---|---|
| 387. The assessment then states that in October 2004 the Government of Saudi Arabia decided to assume control over the assets of the al-Haramain Islamic Foundation (whose U.S. branch the United States designated as a foreign terrorist organization), but the Government of Saudi Arabia did not feel that such action was warranted in the case of IIRO. *Id.* at EO14040- 003420-UPDATED, EO14040-003430-UPDATED. | It is not disputed that the Joint FBI-CIA Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States makes that statement.<br><br>By way of further response, *see, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 171, 190, 191, 205, 206, 207, 328, 329 and 342 (detailing MWL and IIRO's extensive connections to Osama bin Laden and al Qaeda (including but not limited to E.O. 13224 Specially Designated Global Terrorists ("SDGT") IIRO officials Wa'el Hamza Jelaidan and Abd al Hamid Sulaiman al Mujil; Prince Turki bin Jalawi al Saud; Mohammed Jamal Khalifa), and the IIRO's provision of substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.). |
| 388. The 2004 assessment does not conclude that IIRO or MWL, directly or indirectly through any other charity or entity, provided funds to Al Qaeda. *See generally Id.* | Disputed as stated. *See, e.g.*, Plaintiffs' response to No. 386.<br><br>By way of further response, *see* Plaintiffs' responses to Nos. 1, 2, 6, 9, 171, 190, 191, 205, 206, 207, 328, 329 and 342 (detailing MWL and IIRO's extensive connections to Osama bin Laden and al Qaeda (including but not limited to E.O. 13224 Specially Designated Global Terrorists ("SDGT") IIRO officials Wa'el Hamza Jelaidan and Abd al Hamid Sulaiman al Mujil; Prince Turki bin Jalawi al Saud; Mohammed Jamal Khalifa), and the IIRO's provision of substantial financial assistance and other resources to bin Laden and al Qaeda for years knowing that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks.). |
| 389. The 9/11 Commission's "Monograph on Terrorist Financing" recognized the challenges in determining Al Qaeda's actual funding sources and urged caution in accepting a funding theory as fact:<br><br>*In many cases, one or two threads of information make such theories tantalizing; but after careful review of all of the evidence available to us, including some of the most sensitive information held by the U.S. government, we have judged that such theories cannot be substantiated.*<br><br>Monograph at 19. | It is not disputed that the Monograph on Terrorist Financing makes that statement. *See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 19. |

| | |
|---|---|
| 390. The Monograph also warned of the "perils" of relying on "custodial interviews of captured al Qaeda members," because "[d]etainees may provide misinformation and may misrepresent or mischaracterize their roles or the roles of others. As a result, corroborating their information, through other custodial interviews, documentary evidence, or other intelligence collection, is critical in assessing what we know about al Qaeda financing." *Id.* | It is not disputed that the Monograph on Terrorist Financing makes that statement. *See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 19. |
| 391. While the Monograph notes charities were a source of Al Qaeda funding, it clarified:<br><br>*Al Qaeda's charities' strategy before 9/11 had two prongs. In some instances, al Qaeda penetrated specific foreign branch offices of large, internationally recognized charities. In many cases, lax oversight and the charities' own ineffective financial controls, particularly over transactions in remote regions of the world, made it easy for al Qaeda operatives to divert money from charitable uses. These large international Gulf charities donated money to end recipients, usually smaller in-country charities, whose employees may have siphoned off money for al Qaeda. In the second class of cases, entire charities from the top down may have known of and even participated in the funneling of money to al Qaeda. In those cases, al Qaeda operatives had control over the entire organization, including access to bank accounts.*<br><br>*Id.* at 21. | It is not disputed that the Monograph on Terrorist Financing makes that statement. *See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 21. |
| 392. According to this portion of the Monograph, employees of "smaller in-country charities" diverted funds to Al Qaeda, or entire charities ***other than*** "large international Gulf charities" were controlled by Al Qaeda. *Id.* | It is not disputed that the Monograph on Terrorist Financing makes that statement. *See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 21. |
| 393. The Monograph further urged that the role of Saudi charities must be assessed in the context in which they exist.<br><br>*Much has been made of the role of charities, particularly Saudi charities, in terrorist financing. A little context is necessary here. Charitable giving, known as zakat, is one of the five pillars of Islamic faith. It is broader and more pervasive than Western ideas of charity, in that it also functions as a form of income tax, educational assistance, foreign aid, and political influence. The Western notion of the separation of civic and religious duty does not exist in Islamic cultures. The Saudi government has declared that* | It is not disputed that the Monograph on Terrorist Financing makes that statement. *See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 21. |

| | |
|---|---|
| *the Koran and the Sunna (tradition) of Muhammad are the country's constitution, and the clergy within Saudi Arabia wield enormous influence over the cultural and social life of the country.*<br><br>*Funding charitable works is ingrained into Saudi Arabia's culture, and Saudi zakat has long provided much-needed humanitarian relief in the Islamic world. In addition, a major goal of Saudi charities is to spread Wahhabi beliefs and culture throughout the world. Thus Saudi efforts have funded mosques and schools in other parts of the world, including Pakistan, Central Asia, Europe, and even the United States. In some poor areas these schools alone provide education; and even in affluent countries, Saudi-funded Wahhabi schools are often the only Islamic schools available.*<br><br>*Id.* at 21. | |
| 394. The Monograph did not identify IIRO or MWL as a charity identified as providing funds to Al Qaeda, directly or indirectly, or one suspected of doing so. *See generally Id.* | Disputed. As an initial matter, the Monograph on Terrorist Financing specifically states that Enaam Arnaout, "a longtime jihadist supporter, with personal ties to Usama Bin Ladin dating back to the 1980s," provided military and logistical support to the mujahideen during the late 1980s and early 1990s (when al Qaeda had already been established), while working as an employee of the MWL. *See, e.g.*, Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 (confirming that Arnaout "worked with the Muslim World League"); Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 95. *See also* Ex. 38, U.S. Department of the Treasury Press Release, *Treasury Designates Benevolence International Foundation and Related Entities as Financiers of Terrorism*, November 19, 2002, FED-PEC 3630-3631 at 3630 (stating that Arnaout worked with members of al Qaeda "to purchase rockets, mortars, rifles, and offensive and defensive bombs, and to distribute them to various mujahideen camps, including camps operated by al Qaida").<br><br>Furthermore, to the extent the MWL suggests that the IIRO and MWL have been exonerated by the 9/11 Commission from any accountability for the extensive financial, material, and logistical support it provided to al Qaeda in the decade leading to the 9/11 attacks because the Monograph on Terrorist Financing does not specifically state the IIRO or MWL provided funds to al Qaeda, that is inaccurate and misleading. *See* Ex. 2, Affirmation of Joseph Robert "Bob" Kerrey (stating that any "proposition that the 9/11 Commission fully exonerated Saudi Arabia and any Saudi government charities for any potential culpability for the financing and emergence of al Qaeda or the events of September 11, 2001" is |

| | |
|---|---|
| | "incorrect"); Affirmation of John F. Lehman (stating that the allegations and claims advanced by the 9/11 plaintiffs were never considered and rejected as factually untrue); Declaration of Richard Ben-Veniste (stating that "further fact-finding was appropriate"). Indeed, Plaintiffs' claims against the IIRO, MWL, and WAMY based on their funding and material sponsorship of al Qaeda are fully supported by the 9/11 Commission's findings that there was a substantial "likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda." *See* Ex. 1, 9/11 Commission Final Report at 171.<br><br>Moreover, CIA intelligence reports cited by the 9/11 Commission in its Final Report confirm that the MWL and IIRO each served as a key financial conduit for al Qaeda and played a central role in providing critical support to the terrorist organization, including but not limited to appointing al Qaeda members to leadership positions within the IIRO, recruiting Islamic fighters, facilitating the training and travel of Islamic militants with employment papers and other documentation, engaging in narcotics trafficking and counterfeiting, and funding terrorist training camps. *See* Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that the Maktab al-Khidamat, a Pakistan-based nongovernmental organization financed by Osama bin Laden, played a key role in facilitating the training and travel of Islamic militants, and received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization"); Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Mohammed Jamal Khalifa, Osama bin Laden's brother-in-law, and close associate of World Trade Center bomber Ramzi Yousef, served as the director of the International Islamic Relief Organization (IIRO) in the Philippines, and "was involved in recruiting Muslims for training in Pakistan as mujahidin fighters."); *id.* at 151 (describing IIRO, WAMY, and Al Haramain as having "tie[s] to terrorist and mujahidin activity"); Ex. 11, *Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report*, February 27, 2002, CIA_00193-199 at 198 (stating that "al-Qa'ida has infiltrated some of IIRO's branches"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 216 ("Usama Bin Ladin's brother-in-law, Muhammed Jamal Khalifa, who directed the IIRO in the Philippines, provided funding and some logistics support to [Ramzi] Yousef and his associates in 1995 as they plotted to bomb at least 12 US airliners in East Asia."); *id.* at 221 ("IIRO offices in regions with military conflicts, such as Afghanistan and Bosnia, gravitate toward more extremist activities."); *id.* ("A few IIRO branches have turned to illegitimate means of |

| | |
|---|---|
| | financing their operations—including narcotics trafficking and counterfeiting—further increasing their independence and ability to support terrorism."); Ex. 14, *Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures*, November 17, 1998, CIA_00317-338 at 325 ("Bin Ladin and his associates make extensive use of non-governmental charitable organizations (NGOs) to transfer funds. Bin-Ladin-affiliated Islamic NGOs – such as … the International Islamic Relief Organization (IIRO); Al-Haramayn; … and others – are convenient money couriers because they maintain offices in Afghanistan, Albania, Pakistan, and other locations where Bin Ladin associates are prevalent."); *id.* at 330 ("Bin Ladin and Al-Qa'ida probably receive Gulf funding diverted from offices of Islamic NGOs, particularly the MK, IIRO, Al Haramayn … and others."); Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 511 (stating that al Qaeda financial committee member Abdul Islam, who was "authorized to disburse funds for salaries and transportation expenses of al-Qa'ida members, and for donations to widows and orphans," worked for the International Islamic Relief Organization); *id.* at 525 (listing of "Islamic Charities Supporting Al-Qa'ida" which includes the "International Islamic Relief Organization"); *id.* at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"); Ex. 18, *Al-Qa'ida's Financial Ties to Islamic Youth Programs*, January 17, 2003, CIA_00681-701 at 692 (stating that "Gulf charities like the Saudi International Islamic Relief Organization (IIRO) and Al-Haramain … are well aware of the radical Wahhabi and Salafist doctrines being taught at institutions they fund"); Ex. 19, *Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions*, CIA_000720-804 at 741 (stating that the Sudanese National Islamic Front ("NIF") works "with hardline Islamic fundamentalists employed by the Saudi International Islamic Relief Organization"); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama, [REDACTED]."); *id.* at 817 (stating that "several Saudi NGOs are funding conduits for al-Qa'ida or have penetrated by Usama's network" and "[t]hose of greatest concern include the International Islamic Relief Organization (IIRO)" and "Al-Haramayn Islamic Foundation"); *id.* at 818 ("Usama uses the IIRO office in Baku, Azerbaijan to obtain travel documents for mujahed to fight in Chechnya."); *id.* at |

| | |
|---|---|
| | 824 (stating that the Islamic Relief Agency (ISRA), a Khartoum-based NGO with offices in Afghanistan and Pakistan, have been infiltrated by al Qaeda and work closely with personnel from the IIRO); *id.* at 827 (stating that the IIRO and Al Haramain were channeling funds "to spread Islamic fundamentalism throughout Macedonia").<br><br>Indeed, the U.S. government concluded that bin Laden and al Qaeda used the entire IIRO network for al Qaeda's terrorist activities. *See* Ex. 155, U.S. Diplomatic Cable, *Terrorist Finance: Post-Vetting of Human Appeal International (HAI)*, February 13, 2007, PEC-KSA001451-1452 at 1451 ("Usama bin Ladin used the entire IIRO network for his terrorist activities.").<br><br>CIA intelligence reports cited in the 9/11 Commission Final Report similarly confirm that the MWL played a central role in al Qaeda's support infrastructure. *See* Ex. 10, *Saudi-Based Financial Support for Terrorist Organizations*, November 14, 2002, CIA_00143-158 at 149 (Shaykh Adil Batterjee, a close associate of Osama bin Laden and "a long-time al-Qa'ida donor and fundraiser," used the Saudi-based Lajnat al Birr al Islamiyya charity, a subsidiary of the Muslim World League (MWL), to raise funds on behalf of bin Laden.); *id.* at 150 (indicating that "[s]everal of Bin Ladin's associates, including Wa'il Julaydan and Muhammad Jamal Khalifa, were MWL representatives"); Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 213 (stating that "several MWL affiliate organizations—including the International Islamic Relief Organization (IIRO)—have provided terrorists with funding and cover employment, documentation, and training"); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 809 (stating that Saudi-backed NGOs have ties to Osama bin Laden, including the Muslim World League, World Assembly of Muslim Youth, and others); *id.* at 822 (indicating that the MWL "has been used as a cover organization for several of Usama's associates"). *See also* Ex. 3, 9/11 Commission Monograph on Terrorist Financing at 95 (stating that Osama bin Laden confidant Enaam Arnaout provided military and logistical support to the mujahideen in the late 1980s and early 1990s as an employee of "Saudi NGO, the Muslim World League"). |
| **Treasury Department Designations** | No response necessary. |
| 395. After the 9/11 Attacks, President George W. Bush signed Executive Order 13224 ("E.O. 13224"). Exec. Order No. 13,224, 66 Fed. Reg. 49,079 (Sept. 25, 2001). Sanctions and a designation as a specially designated global terrorist ("SDGT") under EO 13224 are administered by the | Undisputed as a general matter for purposes of this motion. |

| | |
|---|---|
| U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"). Ex. # 4, Brown Rpt., at 92. | |
| 396. The standard for designations is not articulated in Executive Order 13224 or the International Emergency Economic Powers Act ("IEEPA"). Ex. # 106, Gurule Dep. Tr. at 89:23-91:6, 93:21-94:9 The Executive Order also does not specify standards or evidence of proof. Ex. # 4, Brown Rpt at 92. | It is not disputed that Professor Gurulé provided the testimony at 89:23-91:6 and 93:21-94:9. |
| 397. EO 13224 "seeks to cast a wide net so as to disrupt the channels of terrorist financing to save lives." Ex. # 106, Gurule Dep. Tr. at 88:5-10. Persons who unknowingly, unwittingly, or inadvertently finance terrorism may be subject to designation under EO 13224. *Id.* at 87:14-88:4 ("Q. So your understanding is that an individual who may be unknowingly providing or financing terrorist activity could be subject to designation under Executive Order 13224, is that right? A. Yes. Q. And by the same token, an individual who may be unwittingly financing terrorism activity could be subject to designation under Executive Order 13224, is that fair to say? A. Yes; so it's both, someone could be doing it intentionally, knowingly, willfully, or inadvertently, unknowingly."). | It is not disputed that Professor Gurulé provided the testimony at 88:5-10 and 87:14-88:4. |
| 398. Designation under EO 13224 as an SDGT is an administrative action, not a criminal or civil action. The designation process is not an adjudication of the guilt or innocence of the target of the SDGT designation. Ex. # 106, Gurule Dep. Tr. at 83:19 – 84:7. | It is not disputed that Professor Gurulé provided the testimony at 83:19 – 84:7. |
| 399. There is no requirement that the U.S. government establish the existence of evidence that an actual act of terrorism was committed by a target that is being considered for designation pursuant to EO 13224. Nor is there any requirement that the government demonstrate that a target intended to support terrorism in any way. *Id.* at 84:8 – 86:6. | It is not disputed that Professor Gurulé provided the testimony at 84:8 – 86:6. |
| 400. The types of evidence that can be considered in the SDGT designation process is very broad and can include hearsay statements from an article or the internet or other material that would have no evidentiary value in a civil litigation. *Id.* at 96:3-23. | It is not disputed that Professor Gurulé provided the testimony at 96:3-23. |
| 401. Subjects of designations are not permitted to rebut a designation prior to the designation. Ex. # 106, Gurule Dep. Tr. at 119:23-121:18 ("Q. Is the individual or entity who is the potential target, is that individual or entity afforded the opportunity to participate in any way in the designation process predesignate? A. No… Q. They're not | It is not disputed that Professor Gurulé provided the quoted testimony at 119:23-121:18. |

| | |
|---|---|
| asked to submit any evidence of any kind in terms of a basis for or against the designation predesignation, is that right? A. That's correct….”). | |
| 402. According to Vahid Brown, an OFAC designation “only documents the fact of a US government suspicion of such an association and does not itself constitute evidence of such an association, nor does it prove the existence of any such evidence.” Ex. # 4, Brown Report at 91- 92. | Disputed. Mr. Brown lacks personal knowledge and the evidence lacks foundation. *See* Ex. 34, February 2, 2021 Rebuttal Expert Report of Jonathan M. Winer at 38-42 (detailing Mr. Brown's lack of experience and knowledge of the U.S. Treasury Department's designation process). |
| **Treasury Designation Memoranda**<br>**Memorandum Concerning Designation of Jelaidan** | No response necessary. |
| 403. The Memorandum concerning the designation of Jelaidan does not mention IIRO or MWL. *See* Ex. # 107, TREASURY 00001-8. | It is not disputed that the unredacted sections of the U.S. Department of the Treasury designation memorandum do not identify the IIRO or MWL. Ex. 180, *Additional Designation Pursuant to E.O. 13224*, TREASURY00001-8 at 4-5 (stating that “Julaidan is identified as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief,” and also served on al Qaeda's shura council). However, to the extent that the MWL asserts that Jelaidan did not have a relationship with MWL or IIRO and/or that it has been exonerated from any accountability for the years of extensive financial and material support the MWL, IIRO, and Jelaidan provided to al Qaeda because they are not specifically named in a heavily redacted Treasury memorandum (one of many Treasury documents produced in this litigation), that is inaccurate and misleading. Plaintiffs have identified a wealth of evidence describing Jelaidan's years-long relationship with the MWL and IIRO both prior to and after the 9/11 attacks.<br><br>*See, e.g.*, Plaintiffs' responses to Nos. 1, 2, 6, 9, 60, 66, 71, 75, 171, 172, 176, 184, 187, and 188. |
| 404. Under the heading “Links to SDGTs [Specially Designated Global Terrorists],” the Memorandum cites Osama Bin Laden's interview in 1999 to Al-Jazeera TV:<br><br>When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, Usama bin Ladin stated that “We were all in one boat, as is known to you, including our brother, Wa'il JALADIN (sic). A plot was concocted to assassinate all. We were careful not to be together all the time.” According to press reports, JULAIDAN is identified as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief. JULAIDAN, along with fellow Saudis Usama bin Laden and Abdullah Azzam, head of the Pakistan Muslim Brotherhood, established the basis of the organization in the 1980s, as they helped to recruit volunteers to fight in the Afghan resistance. | Disputed as stated. It is not disputed that the U.S. Department of the Treasury designation memorandum states the quoted language in No. 404. However, the MWL fails to properly quote the entire paragraph. *See* Ex. 180, *Additional Designation Pursuant to E.O. 13224*, TREASURY00001-8 at 4 (“Usama bin Laden acknowledged his close ties to JULAIDAN during a 1999 interview with al-Jazira TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, Usama bin Ladin stated that ‘We were all in one boat, as is known to you, including our brother, Wa'il JALADIN (sic). A plot was concocted to assassinate all. We were careful not to be together all the time.’ According to press reports, JULAIDAN is identified as one of the original founders of the al-Qa'ida organization and as bin Ladin's logistics chief. JULAIDAN, along with fellow Saudis Usama bin Laden and Abdullah Azzam, head of the Pakistan Muslim Brotherhood, |

| | |
|---|---|
| Ex. # 107, TREASURY00004. | established the basis of the organization in the 1980s, as they helped to recruit volunteers to fight in the Afghan resistance."). |
| 405. This does not conclude that there is a relationship between Bin Ladin and Jelaidan in the decade before the 9/11 Attacks, or any relationship related to terrorism against the United States. *Id.* | Disputed. As discussed herein, Jelaidan was a founding member of al Qaeda and closely aligned with Osama bin Laden. *See, e.g.*, Plaintiffs' response to No. 1. Internal al Qaeda documents chronicling the formation of the organization, seized during a 2002 raid of the Sarajevo office of an al Qaeda front, the Benevolence International Foundation ("BIF"), confirm that al Qaeda planned from its inception to use the MWL and its subsidiary bodies, to include the IIRO, to provide support and cover for al Qaeda's operations. A BIF computer file named "Tareekh Osama" (or "Osama's History") contained numerous documents describing al Qaeda's formation and Jelaidan's significant role in the nascent organization. *See, e.g.*, *See* Ex. 61, FED-PEC0212276-212281 at 212278 (a document on MWL/IIRO letterhead detailing a meeting between "Abu Abdullah" (a/k/a Osama bin Laden), Dr. Abdullah Omar Naseef, in his capacity as the Secretary General of the MWL, and others where it was agreed that al Qaeda attacks would be launched from MWL offices, and further suggesting using the name of the "League" as "an umbrella which you can stay under … because Dr. Naseef is one of the brothers, and the government knows who Abu Al-Hasan [Wa'el Hamza Jelaidan] is."); Ex. 67, FED-PEC 215313-215314 at 215313 ("Forming a committee to take care of the brothers' problems, and of the financial matters," and indicating "Brother Wael Jleidan" was a member of that committee); Ex. 66, FED-PEC 215309-215312 at 215309 (letter from Osama bin Laden to al Qaeda member Abu al Ridha with a directive to Wa'el Jelaidan (a/k/a Abu al Hassan al Madani) concerning weapons: "Brother Abu Al Hasan we have an extreme need for weapons so I urge that you not provide them with more than 25% of the existing weapons."). *See also* Ex. 35, March 10, 2020 Expert Report of Evan Francois Kohlmann at ¶ 29.<br><br>*See also* Ex. 45, FED-PEC 134953-134955 ("Golden Chain" listing of al Qaeda's elite financial sponsors and facilitators, including Wa'el Jelaidan (IIRO/MWL official designated to receive financial contributions from Suleiman al Rashid, Abdel Qader Bakri, Salah al Din Abdel Jawad, and Abdel Hadi Taher)).<br><br>Jelaidan maintained his close relationship with bin Laden for years, and became one of the more significant figures in the history of al Qaeda and its development into a global terrorist organization. Indeed, terrorism investigations conducted by the United States, foreign states, and international bodies overwhelmingly concluded that Jelaidan used the Saudi da'wa organizations he headed to direct substantial financial |

| | |
|---|---|
| | assistance and other resources to bin Laden and al Qaeda for years, intending that the funds would be used to build and sustain al Qaeda's global infrastructure and the terror organization's operational capability to conceive, plan, coordinate, and successfully conduct sophisticated terrorist attacks around the globe, including the 9/11 attacks. *See, e.g.*, Ex. 53, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2002, FED-PEC 203469-203470 (describing Jelaidan as "an associate of Usama bin Laden and a supporter of al-Qa'ida terror," who "has been the head of various non-governmental organizations providing financial and logistical support to the al-Qa'ida network"); Ex. 68, October 12, 2001 E.O 13422 Designation of Rabita Trust, FED-PEC 215391-215394 (describing Jelaidan as "a close associate of Usama bin Laden" and designating Rabita Trust "for providing logistical and financial support to al Qaida"); Ex. 63, May 6, 2004 E.O. 13224 Designation of Al Haramain al Masjed al Aqsa, FED-PEC 213972-213977 (same).<br><br>In 1999, bin Laden acknowledged Jelaidan as "our brother." *See* Ex. 53, *Treasury Department Statement on the Designation of Wa'el Hamza Julidan*, September 6, 2002, FED-PEC 203469-203470 at 203470 ("Bin Laden himself acknowledged his close ties to Julaidan during a 1999 interview with al-Jazeera TV. When referring to the assassination of al-Qa'ida co-founder Abdullah Azzam, bin Ladin stated that 'We are all in one boat, as is known to you, including our brother, Wa'el Julaidan.'").<br><br>In 2000, a year before the 9/11 attacks, U.S. intelligence determined that Jelaidan was using the joint IIRO-Saudi Joint Relief Committee office ("SJRC") in Pristina, Kosovo was helping Osama bin Laden "move money and men to and from the Balkans," leading to a raid of the IIRO/SJRC office by KFOR military police.<br><br>Additionally, the CIA assessed in October 2001 that Jelaidan was a "longtime" associate of bin Laden. *See* Ex. 17, *Usama Bin Ladin: Al-Qa'ida's Financial Facilitators [REDACTED]*, October 18, 2001, CIA_000500-563 at 544 (stating that "longtime Bin Ladin associate" Wa'el Hamza Jelaidan (a/k/a Abu Hasan al Madani) "has held high-level positions at the International Islamic Relief Organization (IIRO), Muslim World League (MWL)" and other charities, and was "using his position and influence at these organizations to divert funds and resources to al-Qa'ida"). |
| 406. The quotation itself speaks of Jelaidan's activity "in the 1980s," and it connects Bin Ladin's statement of being "all in one boat" to the assassination of Abdullah | Disputed. *See* Plaintiffs' responses to Nos. 404 and 405. |

| | |
|---|---|
| Azzam and to the risk of assassination faced by each individual, not to any joint planning of terrorism. *Id.* | |
| 407. Abdullah Azzam was assassinated on November 24, 1989. *See* 9/11 Commission Report at 56. | Undisputed as a general matter for purposes of this motion. |
| 408. During this time period of the 1980s until Azzam's assassination, the United States supported the Afghan resistance against the Soviet invasion. Ex. # 78, Roy Rpt. at 10-12. | Undisputed as a general matter for purposes of this motion. |
| 409. The Services Bureau organization had no aims to act outside of Afghanistan, let alone against the United States. *See* Ex. # 4, Brown Rpt. at 2-4, 9. | Disputed. As an initial matter, the Services Bureau (a/k/a Maktab al-Khidamat; a/k/a MAK) operated a number of global offices. *See* Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that "MAK established several offices in Pakistan and also in New York, London, Casablanca, Amman, Khartoum, Kuwait, Riyadh, Jiddah, Damman, Qatar, Bahrain, and Iran," and in "Zagreb and Sarajevo"); *id.* at 60 (stating that the Maktab al-Khidamat, a Pakistan-based nongovernmental organization financed by Osama bin Laden, played a key role in facilitating the training and travel of Islamic militants, and received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization").<br><br>Individuals convicted of the 1993 World Trade Center bombing were recruited through the MAK branch in New York (the Al Kifah center in Brooklyn). *See* Ex. 9, *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 58.<br><br>Moreover, to the extent the MWL argues that Osama bin Laden created al Qaeda and split it off from MAK because he wanted to pursue global violent jihad, that is disputed as inaccurate and misleading. MAK was co-founded by Osama bin Laden and Abdullah Azzam in the 1980s to recruit and support mujahideen to fight against the Soviets in Afghanistan. MAK funneled money and fighters to the mujahideen and set up a network of recruiting offices around the world, including in the United States. Throughout the Afghan jihad, MAK worked in concert with a network of purported charities and relief organizations (including the MWL, IIRO, Al Haramain, and others) to provide travel documents, funds, transportation, training, facilities, arms, physical assets, and other support to the mujahideen. *See* Ex. 13, *Islamic Terrorists: Using Nongovernmental Organizations Extensively*, April 9, 1999, CIA_000210-236 at 214 (stating that MAK was "[e]stablished in Peshawar in 1984 by Usama Bin Ladin and Palestinian Abdallah Azzam to facilitate the travel and training of Arab volunteers to fight with the mujahidin in Afghanistan"); Ex. 9, |

| | |
|---|---|
| | *Sketch of a South Asia-Based Terrorist Training and Logistic Network*, December 1995, CIA_000058-62 at 60 (stating that "MAK established several offices in Pakistan and also in New York, London, Casablanca, Amman, Khartoum, Kuwait, Riyadh, Jiddah, Damman, Qatar, Bahrain, and Iran," and in "Zagreb and Sarajevo."); *id.* at 60 (stating that the Maktab al-Khidamat, a Pakistan-based nongovernmental organization financed by Osama bin Laden, played a key role in facilitating the training and travel of Islamic militants, and received funding from "the Saudi-based Muslim World League and International Islamic Relief Organization"); Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014-2114 at 2031 ("By way of background, Usama Bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ('MK') (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al Madani") of the International Islamic Relief Organization (hereafter "IIRO," sometimes referred to as "Igatha" based upon its Arabic name "*Hay'at al-Igatha al-Islamiya al-'Alamtyaa*"), which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL'). In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*."). <br><br> At the conclusion of the Afghan jihad bin Laden determined that the network that supported the mujahideen in Afghanistan should not be abandoned, but rather adapted to serve as a foundation for waging a global jihad against all of the perceived enemies of Islam, and in particular, the United States. *See* Ex. 1, 9/11 Commission Final Report at 56 ("April 19, 1988 brought victory for the Afghan jihad. Moscow declared it would pull its military forces out of Afghanistan within the next nine months. As the Soviets began its withdraw, the jihad's leaders debated what to do next. Bin Ladin and Azzam agreed that the organization successfully created for Afghanistan should not be allowed to dissolve. They established what they called a base or foundation (al Qaida) as a potential general headquarters for future jihad."). |

| | |
|---|---|
| | Following Abdullah Azzam's death on November 24, 1989, bin Laden assumed full control of MAK, and MAK was absorbed into al Qaeda. Importantly, the da'wa organizations that funded and supported MAK during the 1980s—MWL, IIRO, Al Haramain, WAMY, Rabita Trust, Saudi Red Crescent Society, and Benevolence International Foundation—continued to serve as the primary conduits for channeling financial, logistical, operational, and ideological support to al Qaeda's global jihad for years leading up to the 9/11 attacks. |
| 410. As for the "press reports" describing Jelaidan as Bin Ladin's logistics chief, the Memorandum does not identify them or provide a basis to assess their reliability. Ex. # 107, TREASURY00004. | Disputed as stated. The U.S. Department of the Treasury memorandum cites to two media reports as "Source: Exhibit P; Exhibit Q," at the end of the paragraph. *See* Ex. 180, *Additional Designation Pursuant to E.O. 13224*, TREASURY00001-8 at 4. Those "press reports" are identified as (1) Al-Jazira TV Interview, Doha in Arabic, June 19, 1999; and (2) Associated Press Online, "Government Widens Financial Dragnet," October 12, 2001. *Id.* at 8. |
| 411. The list of sources cited in this Memorandum are redacted, except for the above Al- Jazeera interview, and an Associated Press article from October 2001 about the U.S. Government's anti-terrorism efforts. Ex. # 107, TREASURY00008. | It is not disputed that sections of the U.S. Department of the Treasury memorandum are highly redacted as classified by the U.S. government, and was produced to Plaintiffs during the course of this litigation in this form. |
| 412. Under the heading "Basis for Designation," the Memorandum lists (1) Julaidan's position as Executive Director of the Rabita Trust; (2) his "contact with Ayman al Zawahri during the early 1990s"; and (3) his "contact with representatives of extremist groups" other than al Qa'eda. Ex. # 107, TREASURY00006-7. | Undisputed as a general matter for purposes of this motion. It is further not disputed that sections of the U.S. Department of the Treasury memorandum are highly redacted as classified by the U.S. government, including the section identified by the MWL at 6-7. |
| **Jamal Al Fadl** | No response necessary. |
| 413. Jamal al Fadl was a Sudanese member of Al Qaeda. Ex. # 4, Brown Rpt. at 72. | Undisputed as a general matter for purposes of this motion. |
| 414. Jamal al Fadl was a minor figure in Bin Laden's circle. Ex. # 4, Brown Rpt. at 77. | Disputed. The MWL's claim that Jamal al Fadl was a minor figure in Osama bin Laden's circle is inaccurate and misleading. Fadl joined al Qaeda in 1988, trained at al Qaeda training camps in Afghanistan, fought on the front lines in Afghanistan and Pakistan, was tasked by al Qaeda leadership with distributing money to families of martyrs and families of individuals in jail for terrorist activities, and was trusted with large amounts of money to purchase and/or rent al Qaeda guesthouses, farms, and offices in Sudan. Fadl also worked closely with, and dealt directly with, Osama bin Laden and |

| | |
|---|---|
| | senior al Qaeda leadership, including but not limited to, Muhammad Loay Bayazid (a/k/a Abu Rida al Suri) (a member of al Qaeda's Shura Council who was responsible for purchasing weapons and explosives for al Qaeda, helped set up training camps, helped establish and run al Qaeda companies in Sudan, and traveled to Iran for training); Abu Ubaidah al Banshiri (a member of al Qaeda's Shura Council and the head of al Qaeda's military committee); Saidi Madani al Tayyib (a member of al Qaeda's Shura Council who served as the overall supervisor of al Qaeda's Financial and Administrative Committee, held numerous accounts at banks around the world on behalf of Osama bin Laden and al Qaeda, and was reportedly bin Laden's brother-in-law); and Abu Hammam al Saudi (a member of al Qaeda and very close associate to bin Laden, served as al Qaeda's "Emir of finance," was in charge of military affairs for al Qaeda, and further served as the head of the IIRO's office in Peshawar, Pakistan). *See, e.g.*, Ex. 153, Testimony of Jamal al Fadl, August 29, 2002, PEC-KSA 329-352; Ex. 160, FBI 302 Cooperating Witness Statement of Jamal al Fadl, November 1996, PEC-KSA 2115-2132; Ex. 161, FBI 302 Cooperating Witness Statement of Jamal al Fadl, June 2, 2004, PEC-KSA 2133-2134; Ex. 163, FBI 302 Cooperating Witness Statement of Jamal al Fadl, January-February 1998, PEC-KSA 2144-2157; Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143.<br><br>The United States government gained considerable insights into al Qaeda's financial infrastructure from Fadl. *See* Ex. 1, 9/11 Commission Final Report at 62 (explaining that Fadl, who had taken the oath of fealty to bin Laden and served as one of his business agents, "defected and became a star informant for the United States"); *id.* at 109 (stating that Fadl "provided a major breakthrough of intelligence on the creation, character, direction, and intentions of al Qaeda"); *id.* at 185 ("[The CIA] knew relatively early, for example, about the loose affiliation of financial institutions, businesses, and wealthy individuals who supported extremist Islamic activities. Much of the earlier reporting on al Qaeda's financial situation and its structure came from Jamal Ahmed al Fadl.").<br><br>Moreover, the 9/11 Commission Final Report cites extensively to FBI interviews of Fadl, and Fadl's trial testimony in *United States v. Usama bin Laden*, No. S(7), 98 Cr. 1023 (S.D.N.Y.), in support of its findings. *See* 9/11 Commission Final Report at 467-471, 479. |

| | |
|---|---|
| 415. Jamal al Fadl also approached the U.S. Government, in 1996, falsely portraying himself as a Sudanese dissident before disclosing his association with Al Qaeda. Ex. # 4, Brown Rpt. at 73. | Disputed. *See, e.g.*, Plaintiffs' responses to No. 414. |
| 416. Jamal al Fadl became a paid informant for the U.S. government in 1996, receiving living expenses for himself and his family. Ex. # 4, Brown Rpt. at 73. | Undisputed as a general matter for purposes of this motion. |
| 417. Jamal al Fadl became a paid informant for the U.S. government only after Bin Laden discovered that he was embezzling funds. 9/11 Commission Report at 62 ("Then Bin Ladin discovered that Fadl had skimmed about $110,000, and he asked for restitution. Fadl resented receiving a salary of only $500 a month while some of the Egyptians in al Qaeda were given $1,200 a month. He defected and became a star informant for the United States."); *See* also Ex. # 4, Brown Rpt. at 72 (stating that, in the mid-1990s, a joint audit by the Bin Ladin organization and the National Islamic Front (NIF) government of Sudan discovered that Jamal al Fadl had embezzled funds from both entities). | It is not disputed that the 9/11 Commission Final Report makes the quoted statement at 62. *See also* Plaintiffs' response to No. 414. |
| 418. Jamal al Fadl offered false information to U.S. agents and others, including:<br><br>a. Claiming to have trained with Ramzi Yousef before admitting that he never met Ramzi Yousef (Ex. # 4, Brown Rpt. at 73);<br><br>b. Describing Al Qaeda in Sudan as a distinct entity, the Islamic Army, and later explaining that it was just one of two names for Al Qaeda and that Al Qaeda ultimately was chosen (Ex. # 4, Brown Rpt. at 74);<br><br>c. Misidentifying members of Al Qaeda's shura council (Ex. # 4, Brown Rpt. at 75);<br><br>d. Falsely claiming to witness the death of Abu'l-Abbas al-Madani by gunshot wound to the head in Afghanistan when Abu'l-Abbas al-Madani actually died in Bosnia (Ex. # 4, Brown Rpt. at 79);<br><br>e. Falsely claiming that Abdallah Anas was a member of Al Qaeda (Ex. # 4, Brown Rpt. at 79-80);<br><br>f. Making a series of erroneous claims during testimony claiming other militant groups were part of Al Qaeda, such as al-Gama'a al-Islamiyya in Egypt, which announced a cessation of military activity in Egypt in 1995 | Disputed. The information provided by Jamal al Fadl concerning Osama bin Laden, al Qaeda, and associated terrorist organizations has been tested and accepted in U.S. court proceedings and frequently corroborated by other source information. *See also* Plaintiffs' response to No. 414.<br><br>By way of further response, the MWL does not challenge Fadl's statements concerning MWL's subsidiary, the IIRO, including but not limited to the following. *See, e.g.*, Ex. 153, Testimony of Jamal al Fadl, August 29, 2002, PEC-KSA 329-352 at 335 ("Abu Al Hassan listed under the title 'Jihad support' … referred to him as Abu Al Hassan Al Madani … Abu Al Hassan's true name was Wael Julaidan…. Source explained that Abu Al Hassan Al Madani ran the Pakistan office of the International Islamic Relief Organization which Source also referred to as IGASA. Source explained that the International Islamic Relief Organization fell under the Rabita Al Islami organization which Source also knew to use the name MWLKA."); Ex. 160, FBI 302 Cooperating Witness Statement of Jamal al Fadl, November 1996, PEC-KSA 2115-2132 at 2120-2121 (Jamal al Fadl stated that al Qaeda member Abu Hammam was the manager of the IIRO office in Peshawar, Pakistan, and "would provide false IIRO identification for people to travel"); *id.* at 2121 (Fadl stated that Abu Hammam, the head of the IIRO in Peshawar, was "close" with Osama bin Laden and "would contribute funds or contacts to an [al Qaeda] operation."); Ex. 161, FBI 302 |

| | |
|---|---|
| and abandoned violence altogether in 1999, the non-existent al-Gama'a al- Islamiyya in Algeria, Libyan Islamic Fighting Group, which focused on toppling the Gaddhafi regime, and Yemeni Jannubi (Ex. # 4, Brown Rpt. at 75-77); and<br><br>g. Falsely claiming that Jalaluddin Haqqani—a commander of Yunis Khales who joined the Taliban in the late 1990s—was a commander under Gulbuddin Hekmatyar even though Khales and Hekmatyar were rivals andfought against each other after Khales joined the Taliban (Ex. # 85, Sageman Rpt. at 223-224). | Cooperating Witness Statement of Jamal al Fadl, June 2, 2004, PEC-KSA 2133-2134 at 2133 ("The source advised that [Yassin] Al-Kadi was friends with two Al-Qaida members who were involved in the financial aspects of the group. These two individuals were Abu Unaith Al-Saudi (of Moroccan roots) and Abu Hammam Al-Saudi. The source advised that both these individuals purchased weapons for Al-Qaida during the war in Afghanistan and maintained an office in Peshawar, Pakistan circa 1989. According to the source, this office was located in the offices of the Islamic Relief Organization (IRO). The source further advised that the manager and person who ran the IRO at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani. According to the source, Julidan was one of Bin Laden's closest friends at the time."); Ex. 163, FBI 302 Cooperating Witness Statement of Jamal al Fadl, January-February 1998, PEC-KSA 2144-2157 at 2145-2146 (stating that Abu Hammam al Saudi, "the individual who ran the Islamic International Islamic Relief Organization in Peshawar, Pakistan," was the "Emir of finance," and would give money to al Qaeda members who "were in charge of salary, travel, and health benefits for Al-Qaida"); *id.* at 2146 (discussing an "Islamic Relief" guesthouse in Peshawar used by al Qaeda members).<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶¶ 77-80 (detailing Jamal al Fadl's testimony concerning (1) IIRO's al Qaeda guesthouse in Peshawar, Pakistan; (2) al Qaeda members Abu Unaith al Saudi and Abu Hammam al Saudi working in the IIRO offices in Peshawar to purchase weapons; (3) Wa'el Jelaidan ("Abu Hassan al Madani") headed the IIRO-Pakistan office; (4) al Qaeda member Abu Hammam al Saudi's tenure as the head of the IIRO-Pakistan office and using the office's resources to provide false IIRO identification cards to Islamic fighters for travel; and (5) al Qaeda's financial chief, Saidi Madani al Tayyib, working under the direction of Abu Hammam, and later ascending to al Qaeda's emir of finance).<br><br>*See also* Ex. 37, Expert Report of Dr. Matthew Levitt, March 9, 2020 at 34 (discussing Jamal al Fadl's testimony concerning the IIRO's ties to al Qaeda, including al Qaeda member Abu Hammam's tenure as head of IIRO-Pakistan, Hammam's role in collecting donations from a very rich Saudi, and Hamam's role in helping Osama bin Laden establish businesses in Sudan). |
| 419. The 9/11 Commission reported, in 2004, that the CIA obtained a general understanding of how Al Qaeda raised money from Jamal al Fadl. 9/11 Commission Report at 185. It reported that the CIA "knew relatively early, for example, about the loose affiliation of financial institutions, | It is not disputed that the 9/11 Commission Final Report makes the quoted statement at 185. *See also* Plaintiffs' response to No. 414. |

| | |
|---|---|
| businesses, and wealthy individuals who supported extremist Islamic activities. *Much of the early reporting on al Qaeda's financial situation and its structure came from Jamal Ahmed al Fadl….*" *Id.* | |
| 420. Plaintiffs rely on Jamal al Fadl's assertion that "bin Ladin and al Qaeda used Wael Julaidan as the head of IIRO in Peshawar, Pakistan, to create ID cards for al Qaeda people so that they could cross the Pakistan-Afghanistan border without a problem." Winer Rpt. ¶ 12.19.3 (ECF No. 7344-1). | Disputed as stated. Mr. Winer cites to Jamal al Fadl's testimony at Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143. *See* PEC-KSA 2137 (Fadl testified that Wa'el Jelaidan ran the Peshawar branch of the IIRO, which made ID cards for "the Al-Qaeda people" so "you can enter the border between Pakistan, Afghanistan easily with – with no problem."); *id.* at 2138 (Fadl testified that the IIRO would also provide letters to al Qaeda members so that they could get visas from Pakistan immigration and stay in Pakistan); *id.* at 2141-2143 (Fadl further testified that the IIRO falls under the Saudi Rabita al Alam al Islamiya (a/k/a the Muslim World League), which is the "mother of all NGOs."). |
| 421. Plaintiffs rely on a 1996 document that states "a clandestine source" provided information that "IIRO helps fund six militant training camps in Afghanistan." *See* Winer Rpt. ¶¶¶ 6.6.10.3 (quoting 1996 document), 7.3.4.3 (referring to same document but altering statement to refer to "*terrorist* training camps") (ECF No. 7344-1); *See* also Kohlmann Rpt. ¶ 83 (referring to same document and altering reference to refer to "7 Al-Qaida training camps") (ECF No. 9250-2); Levitt Rpt. at 36 (referring to same document and altering reference to refer to "six al-Qa'ida training camps") (ECF No. 9250-33). | It is not disputed that Plaintiffs' experts cite to the 1996 CIA Report in their reports. To the extent that the MWL criticizes the experts' use of "militant training camp" vs. "Al-Qaida training camp" when describing the IIRO's financial support of camps in Afghanistan that were established solely for terrorist training, that criticism is without merit. Plaintiffs note that the 1996 CIA report uses the term "militant training camps," but the U.N. Monitoring Committee added that these were believed to be "Al-Qa'ida training camps."<br><br>By way of further response, the IIRO provided substantial funding for al Qaeda's training camps in Afghanistan, including camps from which al Qaeda planned, approved, and coordinated the 9/11 attacks, and at which some or all of the 9/11 hijackers received indoctrination and training. *See, e.g.*, Ex. 154, 1996 Central Intelligence Agency Report, PEC-KSA000965-978 at 972 ("The IIRO helps fund six militant training camps in Afghanistan."); Ex. 158, U.S. Diplomatic Cable, *Terrorist Finance: [REDACTED]*, June 2004, PEC-KSA001464-1466 at 1465 (describing IIRO "as the principal sponsor of terrorist training camps in Afghanistan during the Taliban regime"); Ex. 159, U.S. Diplomatic Cable, *Terrorist Financing – [REDACTED] IIRO*, April 2004, PEC-KSA001467-1470 at 1468 (same); Ex. 20, *Usama Bin Ladin: Some Saudi Financial Ties Probably Intact*, January 11, 1999, CIA_00807-848 at 808 ("The International Islamic Relief Organization (IIRO) funds a military camp associated with Usama [REDACTED]."); Ex. 46, U.N. Security Council Letter dated 1 December 2003 from the Chairman of the |

| | |
|---|---|
| | Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, FED-PEC 144926-145008 at 144940 (stating that "IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001"). *See also* Philippines Intelligence Report at Ex. 59, *MILF Linkages with Domestic and Foreign Non-Government and People Organizations (NGOs/POs)*, FED-PEC 211425-211465 at 211428 (stating that "the staff and teachers of the Daw'l Imam Al Shafe, Inc. in Zamboanga, one of the affiliates of Khalifa's network, have undergone training in a Muslim training camp named 'Abu Haidar.' This camp is allegedly used to train members of the MILF and the IIRO."); Ex. 38, *Arabian Gulf Financial Sponsorship of Al-Qaida via U.S.-Based Banks, Corporations and Charities, March 11, 2003*, House Committee on Financial Services Subcommittee on Oversight and Investigations, FED-PEC 4297-4327 at 4303-4304 ("In the aftermath of the American retaliation for the terror bombings, Indian police arrested a number of suspects in an attempted lightning counterstrike on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, on orders from, among others, Shaykh Ahmed Al-Gamdin, director of IIRO operations in Asia. After graduating from college in Dhaka, Bangladesh, Abu Nasir was employed by IIRO, which eventually transferred him from Thailand to Lahore, Pakistan in 1994. Abu Nasir was informed by his superiors that approximately 40 to 50 percent of IIRO's charitable funds was being diverted to finance terrorist training camps in Afghanistan and Kashmir. As part of his duties, Abu Nasir was to visit the training camps, assess what funding was needed, and make a formal report back at headquarters. Nasir was eventually instructed by Shaykh Al-Gamdin to undergo military training himself at one of the camps, where he met Usama Bin Laden.").<br><br>*See also* Ex. 35, Expert Report of Evan Francois Kohlmann, March 10, 2020 at ¶ 83 ("IIRO operations in Pakistan were allegedly responsible for sponsoring [6] Al-Qaida training camps in the region. Following the 9/11 attacks, the government of Pakistan 'identified and expelled some two dozen Al-Qaida supporters who has been working for the IIRO-sponsored organizations in Pakistan.'").<br><br>*See also* Ex. 36, Expert Report of Jonathan M. Winer, March 10, 2020 at 49-54 (discussing IIRO's funding of al Qaeda's training camps in Afghanistan "which were used to train fighters for Islamic insurgencies in a number of countries, including Algeria, Chechnya, Kashmir, Indonesia, Iraq, |

| | |
|---|---|
| | Palestine, the Philippines and Tajikistan, and as of early 1992, Bosnia."). |
| 422. Jamal al Fadl is believed to be the "clandestine" informant who is quoted in the 1996 document as stating that "IIRO helps fund six militant training camps in Afghanistan." *See* Winer Rpt. ¶¶ 6.6.10.3, 7.3.4.3 (drawing connection between Jamal al Fadl and clandestine source) (ECF No. 7344-1). | Disputed as stated. Although Mr. Winer cites to two Jamal al Fadl-related documents at ¶ 7.3.4.3 – Ex. 161, FBI 302 Cooperating Witness Statement of Jamal al Fadl, June 2, 2004, PEC-KSA 2133-2134; Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143 – there is no discussion of training camps in those documents, and there is no connection asserted between Fadl and the "clandestine" informant. The identity of the "clandestine" informant is unknown. |
| 423. Plaintiffs rely on Jamal al Fadl's assertion that described the "involvement of Islamic charities as interwoven into al Qaeda." Winer Rpt. ¶ 7.4.6 (ECF No. 7344-1). | Disputed as stated. Mr. Winer cites to Ex. 160, FBI 302 Cooperating Witness Statement of Jamal al Fadl, November 1996, PEC-KSA 2115-2132 at 2121 (Fadl stated that Abu Hammam, the head of the IIRO in Peshawar, was "close" with Osama bin Laden and "would contribute funds or contacts to an [al Qaeda] operation."); and Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143 at 2139 (Fadl explained that the IIRO provided cover documentation to al Qaeda members falsely identifying them as IIRO workers so they "can get visa easy" and "go to anywhere in the world."). |
| 424. Plaintiffs rely on Jamal al Fadl's assertion that "the head of IIRO in Peshawar as a 'good friend' of bin Ladin who 'would contribute funds or contacts' to specific al Qaeda operations." Winer Rpt. ¶ 7.4.6 (ECF No. 7344-1). | Disputed as stated. Mr. Winer cites to Ex. 160, FBI 302 Cooperating Witness Statement of Jamal al Fadl, November 1996, PEC-KSA 2115-2132 at 2121 (Fadl stated that Abu Hammam, the head of the IIRO in Peshawar, was "close" with Osama bin Laden and "would contribute funds or contacts to an [al Qaeda] operation."). |
| 425. Plaintiffs rely on Jamal al Fadl's assertion that "IIRO was used to provide cover documents for al Qaeda by giving them documentation falsely stating that they were relief workers, so that they could get visas to travel 'to England, or if you want to go to anywhere in the world." Winer Rpt. ¶ 7.4.6 (ECF No. 7344-1). | Disputed as stated. Mr. Winer cites to Ex. 162, Transcript Excerpts from Videotape Interviews of Jamal al Fadl, submitted as evidence in *United States v. Fazul Abdullah Mohammed, et al.*, Case No. 01-1535-cr(L), United States Second Circuit Court of Appeals, filed June 14, 2007, PEC-KSA 2135-2143 at 2139 (Fadl explained that the IIRO provided cover documentation to al Qaeda members falsely identifying them as IIRO workers so they "can get visa easy" and "go to anywhere in the world."). |
| 426. Plaintiffs rely on Jamal al Fadl's assertion that stated that "Usama Bin Laden identified several prominent international Muslim charities as the primary sources of Al- | Disputed as stated. Mr. Kohlmann cites to Ex. 183, *Government's Evidentiary Proffer Supporting the Admissibility of Coconspirator Statements*, PEC-KSA002014- |

| | |
|---|---|
| Qaida financial and fundraising activity." Kohlmann Rpt. ¶ 21 (ECF No. 9250-2). | 2114. *See id.* at 2031 ("By way of background, Usama Bin Laden and Abdallah Azzam formed *Mekhtab al Khidemat* ('MK') (the 'Office of Services') to support the *mujahideen* in Afghanistan engaged in a conflict with the Soviet Union at a time prior to the Soviet withdrawal in 1989. Various relief organizations – including LBI [Lajnat al Birr al Islamiya], the BIF [Benevolence International Foundation] forerunner – worked with MK to provide travel documents, funds and other logistical support to the *mujahideen*. MK also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ("Abu Hassan al Madani") of the International Islamic Relief Organization (hereafter "IIRO," sometimes referred to as "Igatha" based upon its Arabic name "*Hay'at al-Igatha al-Islamiya al-'Alamtyaa*"), which was under the umbrella of *al Rabita al Alami al Islamiya*, also known as the Muslim World League ('MWL'). In many respects, Wael Julaidan was a leading supporter of the jihad through the relief organization network. Persons affiliated with charities provided logistical support to the *mujahideen* so integral to the success of the *mujahideen* that, as discussed below, Julaidan was featured in organizational charts as the person responsible for 'Jihad Support,' even dating to the time prior to the forming of *al Qaeda*."). |
| 427. Plaintiffs rely on Jamal al Fadl's assertion that "IIRO ran an Al-Qaida guesthouse in Peshawar, Pakistan." Kohlman Rpt. ¶ 77 (ECF No. 9250-2). | Disputed as stated. Mr. Kohlmann cites to <u>Ex. 163</u>, FBI 302 Cooperating Witness Statement of Jamal al Fadl, January-February 1998, PEC-KSA 2144-2157 at 2146 (Fadl recalls a meeting with senior al Qaeda members at an "Islamic Relief guesthouse" in Peshawar, Pakistan.). |
| 428. Plaintiffs rely on Jamal al Fadl's assertion that a scrap of paper was the "Golden Chain" list, which included IIRO personnel, of "wealthy individuals…who provided Bin Laden and Al Qaeda with money on a regular basis." Kohlmann Rpt. ¶ 156 (ECF No. 9250-2). | Disputed as stated. Mr. Kohlmann cites to <u>Ex. 45</u>, FED-PEC 134953-134955 ("Golden Chain" listing of al Qaeda's elite financial sponsors and facilitators, including Wa'el Jelaidan (IIRO/MWL official designated to receive financial contributions from Suleiman al Rashid, Abdel Qader Bakri, Salah al Din Abdel Jawad, and Abdel Hadi Taher)); Ibrahim Afandi (member of IIRO's Board of Directors), Abdurahman Abdul-Qader Faqih (member of IIRO's Board of Directors), Saleh Kamel (advisor to the IIRO board members concerning financial investments), and Suleiman al Rajhi (member of the IIRO's board and permanent committee)); <u>Ex. 153</u>, August 29, 2002 Interview with Jamal al Fadl, PEC-KSA000329-352 at 351 (Fadl explained that "the 'Golden Chain' consisted of wealthy individuals from the Gulf region who provided Bin Laden and Al Qaeda with money on a regular basis.").<br><br>*See also* <u>Ex. 1</u>, 9/11 Commission Final Report at 55 (stating that Osama bin Laden's organization "included a financial support network that came to be known as 'the Golden Chain,' put together mainly by financiers in Saudi Arabia and Persian Gulf states."). |

| | |
|---|---|
| 429. Plaintiffs rely on Jamal al Fadl's assertion that the "manager and person who ran the IRO [sic] at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani… Julidan was one of Bin Laden's closest friends at the time." Kohlmann Rpt. ¶ 77 (citations omitted) (ECF No. 9250-2). | Disputed as stated. Mr. Kohlmann cites to Ex. 161, FBI 302 Cooperating Witness Statement of Jamal al Fadl, June 2, 2004, PEC-KSA 2133-2134 at 2133 ("The source advised that [Yassin] Al-Kadi was friends with two Al-Qaida members who were involved in the financial aspects of the group. These two individuals were Abu Unaith Al-Saudi (of Moroccan roots) and Abu Hammam Al-Saudi. The source advised that both these individuals purchased weapons for Al-Qaida during the war in Afghanistan and maintained an office in Peshawar, Pakistan circa 1989. According to the source, this office was located in the offices of the Islamic Relief Organization (IRO). The source further advised that the manager and person who ran the IRO at the time was Wael Julidan whose alias was Abu Al-Hassan Al-Madani. According to the source, Julidan was one of Bin Laden's closest friends at the time."). |
| 430. Plaintiffs rely on Jamal al Fadl's assertion that "Julaidan also went by the name Abu Hassan al Madani. … While working for the IIRO, Julaidan funded al Qaeda via the hawala system, with cash transferred from the IIRO HQ in Saudi Arabia and via the Peshawar branch of the Habib Bank." *See* Comras Rpt. at 24 (ECF No. 9251-1). | Disputed as stated. Mr. Comras makes the following statement in his expert report at 24: "Al-Fadl stated that Julaidan also went by the name Abu Hassan al Madani. While working for the Saudi Red Crescent, Julaidan provided funds to bin Laden before and after the creation of al Qaeda. He also supplied al Qaeda with Saudi Red Crescent ID cards and medical supplies. While working for the IIRO, Julaidan funded al Qaeda via the hawala system, with cash transferred from the IIRO HQ in Saudi Arabia and via the Peshawar branch of the Habib Bank. Approximately 30% of the funds originated with the Saudi Government. Al-Fadl was not aware that Julaidan ever stopped supporting al Qaeda." *See* Expert Report of Victor D. Comras at MDL ECF No. 9251-1. |
| 431. Jamal al Fadl's deposition in this MDL was noticed for October 11, 2019. Ex. # 108, Jamal al Fadl Subpoena, dated August 7, 2019. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 432. The deposition was placed on hold, and Jamal al Fadl did not appear for his noticed deposition. Ex. # 109, Email from Andrew Krause to Bruce Strong et al., dated September 17, 2019 (confirming service of deposition subpoena). | Undisputed as a general matter for purposes of this motion, and immaterial. |
| **Discovery** | No response necessary. |
| 433. In this course of this litigation, MWL and IIRO produced nearly 500,000 pages of responsive records to Plaintiffs. January 5, 2018 Declaration of Waleed Nassar, ECF No. 3857-3, ¶ 3. | Disputed. The MWL's claim that the MWL and IIRO produced nearly 500,000 pages of "responsive" records is inaccurate and misleading. Both defendants boosted their raw production numbers by including countless documents of little relevance. Plaintiffs were forced to file multiple motions to compel the production of relevant and responsive records from the MWL and IIRO during the course of this litigation. |

| | |
|---|---|
| 434. This production includes:<br><br>a. Hundreds of thousands of pages of financial records, including financial reports, internal financial records, balance sheets, budgets, banking records, donors, aid recipients, audits, and underlying documents. *Id.* ¶ 16.<br><br>b. Over 64,000 pages of bank records. *Id.* ¶ 17.<br><br>c. Fifty audits covering the time period 1992-2004. *Id.* ¶ 18.<br><br>d. Over 100,000 pages of audit records. *Id.* ¶ 21.<br><br>e. Approximately 9,500 pages of documents related to Abd Al Hamid Sulaiman Al-Mujil. *Id.* ¶ 23.<br><br>f. Approximately 5,000 pages of documents relating to Wael Jelaidan and Muhamad Jamal Khalifa. *Id.* ¶ 23.<br><br>g. Over 21,000 pages of documents relating to the government of the Kingdom of Saudi Arabia. *Id.* ¶ 26. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 435. Plaintiffs deposed 8 facts witnesses, including Al-Turki, Al-Obaid, and Basha. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 436. Plaintiffs and MWL and IIRO proffered 11 experts who produced reports, rebuttal reports, and declarations, and were deposed. | Undisputed as a general matter for purposes of this motion, and immaterial. |
| 437. Plaintiffs did not take any 30(b)(6) depositions of MWL or IIRO. | Undisputed as a general matter for purposes of this motion, and immaterial. |

SIGNATURE BLOCK ON FOLLOWING PAGE

Dated: October 16, 2026

Respectfully submitted,

By: /s/ *Sean P. Carter*
Sean P. Carter, Esq.
J. Scott Tarbutton, Esq.
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel: (215) 665-2000
Email: scarter1@cozen.com

Counsel for the *Federal Insurance* Plaintiffs

By: /s/ *Robert T. Haefele*
Robert T. Haefele, Esq.
Jodi Westbrook Flowers, Esq.
Donald A. Migliori
MOTLEY RICE, LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel: (843) 216-9000
Email: rhaefele@motleyrice.com

Counsel for the *Burnett* and *Euro Brokers* Plaintiffs

By: /s/ *Steven R. Pounian*
Steven R. Pounian, Esq.
Andrew J. Maloney, III, Esq.
James Gavin Simpson, Esq.
KREINDLER & KREINDLER, LLP
485 Lexington Avenue, 28th Floor
New York, NY 10017
Tel: (212) 804-6935
Email: spounian@kreindler.com

Counsel for the *Ashton* Plaintiffs

By: */s/ Jerry S. Goldman*
Jerry S. Goldman, Esq.
Ethan Greenberg, Esq.
Bruce Strong, Esq.
ANDERSON KILL P.C.
7 Times Square, 15th Floor
New York, NY 10036
Tel: (212) 278-1000
Email: jgoldman@andersonkill.com

Counsel for the *O'Neill* Plaintiffs

By: */s/ Edward M. Pinter*
Edward M. Pinter, Esq.
Janine A. Balzofiore, Esq.
FORD MARRIN ESPOSITO WITMEYER & GLESER, LLP
Wall Street Plaza
88 Pine Street, 16th Floor
New York, NY 10005
Tel: (212) 269-4900
Email: epinter@fordmarrin.com

Counsel for the *Continental Casualty* Plaintiffs

By: */s/ David A. Paul*
David A. Paul, Esq.
CANTOR FITZGERALD
110 East 59th Street, 7th Floor
New York, NY 10022
Tel: (212) 610-2298
Email: dpaul@cantor.com

Counsel for the *Cantor Fitzgerald* Plaintiffs

LEGAL\119013507\1