**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001** | 03-MD-01570 (GBD)(SN)<br><br>ECF Case |

This document relates to:

*Kathleen Ashton, el al. v. Al Qaeda Islamic Army, et al.,* 02-cv-06977
*Gladys H. Salvo, et al. v. Al Qaeda Islamic Army, et al.,* 03-cv-05071
*Federal Insurance Co., et al. v. Al Qaida, et al.,* 03-cv-06978
*Thomas E. Burnett. Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.,* 03-cv-09849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.,* 04-cv-01923
*Continental Casualty Co., et al. v. Al Qaeda, et al.,* 04-cv-05970
*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.,* 04-cv-07065
*Euro Brokers Inc., et al. v. Al Baraka Inv. & Dev. Corp., et al.,* 04-cv-07279
*Maher, et al. v. Islamic Emirate of Afghanistan a/k/a The Taliban, el al.,* 23-cv-02845

**PLAINTIFFS' COUNTERSTATEMENT TO DEFENDANT WORLD ASSEMBLY OF MUSLIM YOUTH'S AND WORLD ASSEMBLY OF MUSLIM YOUTH INTERNATIONAL'S RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGEMENT**

Dated: October 16, 2026

**MOTLEY RICE, LLC**
By: */s/ Robert T. Haefele*
Robert T. Haefele, Esq.
Donald A. Migliori, Esq.
Jodi W. Flowers, Esq.
John M. Eubanks, Esq.
Jade Haileselassie, Esq.
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9000
rhaefele@motleyrice.com
dmigliori@motleyrice.com
jflowers@motleyrice.com
jeubanks@motleyrice.com
jhaileselassie@motleyrice.com

Michael J. Quirk, Esq.
Three Logan Square
1717 Arch Street, Suite 3610
Philadelphia, Pennsylvania 19103
Tel: (267) 267-4740
mquirk@motleyrice.com

Attorneys for *Burnett & Euro Brokers* Plaintiffs

**COZEN O'CONNOR**
By: */s/ Sean Carter*
Sean Carter, Esq.
J. Scott Tarbutton, Esq.
Abby Sher, Esq.
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
Tel: (215) 665-7255
scarter1@cozen.com
starbutton@cozen.com
asher@cozen.com
Attorneys *for Federal* Plaintiffs

**ANDERSON KILL P.C.**
By: */s/ Jerry S. Goldman*
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Hon. Ethan Greenberg (Ret.)
Alexander A. Greene, Esq.
Amy T. Zelen, Esq.
7 Times Square, 15th Floor
New York, NY 10036
Tel.: (212) 278-1000
jgoldman@andersonkill.com
bstrong@andersonkill.com
egreenberg@andersonkill.com
agreene@andersonkill.com
azelen@andersonkill.com

Attorneys for *O'Neill* Plaintiffs

**KREINDLER & KREINDLER LLP**
By: */s/ Megan Wolfe Benett*
Megan Wolfe Benett, Esq.
Justin T. Green, Esq.
Steven R. Pounian, Esq.
Andrew J. Maloney III, Esq.
Gavin Simpson, Esq.
485 Lexington Ave
New York, NY 10017
Tel: (212) 973-3438
mbenett@kreindler.com
jgreen@kreindler.com
spounian@kreindler.com
amaloney@kreindler.com
gsimpson@kreindler.com

Attorneys for *Ashton* Plaintiffs

**SPEISER KRAUSE P.C.**
By: *\/s/ Jeanne M. O'Grady*
Jeanne M. O'Grady, Esq.
Frank H. Granito, III,
800 Westchester Ave, Ste. S-608
Rye Brook, NY 10573
Tel: (914) 220-5333
jog@speiserkrause.com
f3g@speiserkrause.com

Attorneys for *Burlingame* Plaintiffs

**BAUMEISTER & SAMUELS, P.C.**
By: */s/ Dorothea M. Capone*
Dorothea M. Capone, Esq.
Michael Baumeister, Esq.
200 Vesey Street, Suite 24170
New York, NY 10281
Tel: (212) 363-1200
tcapone@baumeisterlaw.com
mbaumeister@baumeisterlaw.com

Attorneys for *Bauer* and *Parker* Plaintiffs

**WIGGINS CHILDS PANTAZIS FISHER GOLDFARB PLLC**
By: */s/ Timothy Brian Fleming*
Timothy Brian Fleming, Esq.
2202 18th Street, N.W., #110
Washington, D.C. 20009
Tel.: (202) 467-4489
tfleming@wigginschilds.com

Attorneys for *Ray* and *Maher* Plaintiffs

Plaintiffs respectfully submit this Counterstatement to the World Assembly of Muslim Youth's and World Assembly of Muslim Youth Internationals' Rule 56.1 Statement of Material Facts in Support of their Motion for Summary Judgment, which is attached as Exhibit 24 (ECF No. 11994).

Plaintiffs cannot here set forth all the evidence in response to each assertion, many of which are quite wide-ranging. We refer World Assembly of Muslim Youth and World Assembly of Muslim Youth International to Plaintiffs' Rule 56.1 Statement of Disputed Facts and Evidence in Support of Plaintiffs' Opposition to the Motion for Summary Judgement of the World Assembly of Muslim Youth and World Assembly of Muslim Youth International and the accompanying exhibits for additional facts not set out here. Exhibits referenced below are referred to in Plaintiffs' Memorandum of Law in Opposition to Motions for Summary Judgment By Defendants Muslim World League, International Islamic Relief Organization, and World Assembly of Muslim Youth as "W Ex.__".

**STATEMENT:**

**I. Conceived From American-Born Ideas and Established by Saudi Royal Decree, WAMY is the Largest Muslim Youth Organization in the World**

**RESPONSE:**

No response necessary.

**STATEMENT:**

1. The World Assembly of Muslim Youth's ("WAMY") genesis began with Muslim students at mostly United States' colleges and universities who envisioned an international entity to help and guide Muslim youth in the Muslim world to develop themselves and serve their countries

through education, social work, understanding their origin, and a better relationship to others. Ex. 11, Jamal Barzinji Dep. Transcript (Excerpts) at 18:5-19:7 (discussing WAMY's foundational mission), at 45:1-18 (Barzinji discussing his involvement in creation of WAMY and its purpose); Ex. 2, Saleh Wohaibi 2026 Declaration at ¶9 (discussing WAMY origins).

**RESPONSE:**

Disputed in that Defendant asserts that WAMY's creation stemmed solely from a student-led initiative by Muslim students in the United States. Plaintiffs contend that WAMY's founding must be understood within the broader framework of Saudi Arabia's religious and foreign policy objectives.

The record contains evidence that the Kingdom advanced its religious and foreign policy objectives through Islamic charities, including WAMY. Evidence demonstrates that the Saudi government is charged with the propagation of Islam. The Kingdom's Basic Law directs the state to "undertake its duty regarding the propagation of Islam (Da'wah)," Saudi Basic Law of Guidance, Article 23 ("the State shall protect the Islamic Creed, apply the Sharia, encourage good and discourage evil, and undertake its duty regarding the Propagation of Islam ('Da'wah')", Ex. 1, Consolidated Amended Complaint ("CAC"), ECF No. 3463, at ¶ 159, citing February 3, 2015 Affirmation of Evan Francois Kohlmann ("Kohlmann Affirmation"), ECF No. 2927-9, ¶ 16, N.2, Ex. 2) and in 1992 King Fahd emphasized that "the Propagation of Islam is one of the most important functions of an Islamic state."Ex. 7 King Fahd's Speech on the Issuance of the Basic Law of Governance, 2 (Consolidated Amended Complaint ("CAC"), ECF No. 3463, at ¶ 107, citing Kohlmann Affirmation ¶17 N. 3). Senior Saudi officials have likewise described the global dissemination of Wahhabi Islam as a core state policy. Ex. 3 Declaration of Abdulaziz H. al Fahad, April 6, 2003, 18 (ECF No. 85-3) ("8. The Supreme Council for Islamic Affairs is an arm of the government of Saudi Arabia, which carries out part of the foreign policy of the Kingdom as

determined by the Council of Ministers. Saudi Arabia is home to the most holy sites of Islam, and a core policy and function of the Kingdom since its founding early in the twentieth century has been to foster and preserve Islamic faith and Islamic law within the Kingdom and abroad."Ex. 1, Consolidated Amended Complaint ("CAC"), ECF No. 3463, at ¶ 108). The 9/11 Commission confirmed that the Saudi government is committed to promoting the Islamic faith, especially the Wahhabi sect prominent in Saudi Arabia. National Commission on Terrorist Attacks Upon the United States, Ex. 4, The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States (2004) ("9/11 Commission Report"), 372 ("dedication of the [Saudi] government to propagating the Islamic faith, particularly the Wahhabi sect that flourishes in Saudi Arabia."). The record also contains evidence that the Kingdom's duty to promote its version of Islam has supported Islamic extremism and militancy. U.S. Government officials have warned that the Kingdom's religious and foreign policy objectives, pursued through the global propagation of Wahhabism, have financed Islamic extremism: "As a core tenet of its foreign policy, Saudi Arabia funds the global propagation of Wahhabism, a brand of Islam that, in some instances, supports militancy by encouraging divisiveness and violent acts against Muslims and non-Muslims alike. We are concerned that this massive spending is helping to create the next generation of terrorists and therefore constitutes a paramount strategic threat to the United States. Through support for madrassas, mosques, cultural centers, hospitals, and other institutions, and the training and export of radical clerics to populate these outposts, Saudi Arabia has spent what could amount to hundreds of millions of dollars around the world financing extremism. Such Saudi financing is contributing significantly to the radicalization of millions of Muslims in places ranging from Pakistan to Indonesia to Nigeria to the United States. Foreign funding of extremist madrassas in Pakistan alone, for example, is estimated in the tens of millions, much of it historically from Saudi Arabia."

Ex. 5, Testimony of Lee Wolosky [former Director for Transnational Threats on the National Security Council under Presidents Clinton and George W. Bush], "Concerning the Second Report of an Independent Task Force on Terrorist Financing Sponsored by the Council on Foreign Relations," U.S. Senate Committee on Governmental Affairs, June 15, 2004. The UN Security Council has further explained that "Al-Qaida supporters and financiers have also established front charity networks whose main purpose is to raise and deliver funds to Al-Qaeda. The roots of these charity networks stem from the anti-Soviet jihad in Afghanistan during the late 1980s. During that time, Al-Qaida could draw on the support of a number of State-assisted charities and other deep-pocket donors that supported the anti-Soviet cause."Ex. 6, UN Security Council Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, enclosing Second report of the Monitoring Group established pursuant to resolution 1363 (2001) and extended by resolutions 1390 (2002) and 1455 (2003), on sanctions against Al-Qaida, the Taliban, and individuals and entities associated with them ("Second Report"), S/2003/1070, 1134-35. A genuine dispute of material fact exists.

**STATEMENT:**

2. In 1972, the Kingdom of Saudi Arabia (“KSA” or “Kingdom”) formerly established WAMY by Royal decree. Ex. 3, WAMYSA1248923 (discussing Royal decree establishment); Ex. 4, Saleh Wohaibi Deposition Transcript (Excerpts) at 42:16-18 (stating that WAMY was established in 1972); Ex. 5, Abdul Wahab Noorwali Dep. Transcript (Excerpts) at 272:18-24 (confirming that WAMY was established under the Royal Decree in 1972 [1392 AH] as an independent organism).

**RESPONSE:**

Disputed in that Defendant asserts that WAMY is an "independent" international Islamic organization. The record shows that, functionally, the Kingdom has controlled and substantially funded WAMY, which serves as the Kingdom's agent or alter ego. Ex. 8, Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States, December 2004, EO 3414-3442 at 3430. The record includes evidence that the Saudi government oversaw and funded WAMY. Historically, WAMY's leadership has included senior Saudi government officials, including the Minister of Islamic Affairs, who served as WAMY's President for more than twenty years. Ex. 9, Deposition of Dr. Saleh al Wohaibi ("Wohaibi Dep.") 28:16-19 (October 23, 2019) (testifying that the president of WAMY is appointed by the Saudi government); Wohaibi Dep. 29:1-30:17 (stating that the Minister of Islamic Affairs served as the president of WAMY from the establishment of the Ministry of Islamic Affairs in 1993, until 2013-2014); Wohaibi Dep. 70:6-72:18 (testifying that WAMY Secretary General Maneh bin Hammad al Johani also served as a member of the Shura Council, the formal advisory body of the Saudi government, also known as the Consultative Assembly of Saudi Arabia). Abdullah Al Turki, who served as MOIA's Minister until 1999, led WAMY. Ex. 10, WAMY SA2444. Additionally, WAMY's Constitution gives the President substantial control over selecting the organization's leadership and directing its operations. The President nominates the organization's Vice President. Decl. of Mohammedi (Dkt. No. 11997), Ex. 6, WAMY-SA E001045-052 ("WAMY Constitution"), Article 7. The General Council must obtain the President's approval for ad hoc meetings outside the general meeting held every four years. WAMY Constitution, Article 9. Appointments and replacements to WAMY's General Council are based on the President's recommendations. WAMY Constitution, Article 11. The President may call emergency meetings on matters of concern to the President. WAMY Constitution, Article 13. The President must

approve all recommendations made by the General Council. WAMY Constitution, Article 14. The President must approve the selection of a General Secretary. WAMY Constitution, Article 15. Any assistant to the General Secretary must be approved by the President. WAMY Constitution, Article 15. The President must approve all rules and regulations related to WAMY's financial and administrative affairs. WAMY Constitution, Article 16. According to WAMY financial director Mutaz Abu Unuq, "WAMY is governed principally by its General Assembly and President, who is appointed by the Saudi Government. The current President of WAMY is the Minister of Islamic Affairs in Saudi Arabia. The daily operations of WAMY are supervised by its Secretary General." Ex. 11, Declaration of Mutaz Saleh Abu Unuq, Financial Director of the World Assembly of Muslim Youth ("Unuq Declaration") at ¶ 2, Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al., No. 1:02CV01616, ECF No. 110-4 (U.S.D.C. January 4, 2003). Between 1995 and 2002, WAMY regularly received annual funding of 5,250,000.00 Saudi riyals ("SR") from the Saudi government. Ex. 9, Wohaibi Dep. 31:2-8, 35:23-36:13. That payment was transmitted by the Minister of Islamic Affairs to WAMY's Secretary General. Ex. 9, Wohaibi Dep. 31:13- 32:8; Ex.12, Wohaibi Dep. Ex. 316 (Letter from the Minister of Islamic Affairs and President of WAMY, Abdullah bin Abdul Mohsen al Turki, to the WAMY Secretary General, enclosing a check for 5,250,000.00 SR, described as "the annual financial support for the World Assembly of Muslim Youth."); Ex.13, Wohaibi Dep. Ex. 317 (February 21, 2001 letter from the Minister of Islamic Affairs and President of WAMY, Saleh bin Abdul Aziz bin Mohamed al Ash-Sheikh, to the WAMY Secretary General, enclosing a check for 5,250,000.00SR, "which represents the annual report for the World Assembly of Muslim Youth."); Ex. 14 Wohaibi Dep. Ex. 318, Letter from the Minister of Islamic Affairs and President of WAMY, Saleh bin Abdul Aziz bin Mohamed al Ash- Sheikh, to the WAMY Secretary General, enclosing a check for

5,250,000.00 SR, described as "the annual financial support for the World Assembly of Muslim Youth."). See also Ex. 15, Wohaibi Dep. Ex. 319 (May 10, 1994 letter indicating that WAMY would report to the Ministry of Islamic Affairs at the end of each fiscal year with a closing statement identifying the amounts spent by the organization.) In addition to yearly government grants, the Ministry of Islamic Affairs provided supplementary financial support to WAMY for da'wah activities, frequently authorized by royal decree. Ex. 16, Wohaibi Dep. Ex. 322, (500,000.00 SR contribution from the Ministry for "Da'wah activities of the World Assembly as approved in the Royal Order No. 9/B/25515"); Ex. 17, Wohaibi Dep. Ex. 323, (indicating that the 500,000.00 SR contribution was the first payment of a 1,000,000.00 SR donation to WAMY). From 1992 to 2002, the Supreme Council for Islamic Affairs also funded WAMY. Ex. 9 Wohaibi Dep. 43:7-44:15. Before the Ministry of Islamic Affairs was established, the Ministry of Higher Education funded WAMY. Ex. 9, Wohaibi Dep. 41:5-42:22. See also Ex. 18, Wohaibi Dep. Ex. 320 (indicating that WAMY received 105,750,000.00 SR from the Saudi government). WAMY also received financial contributions from the Saudi King in support of WAMY's activities. Ex. 19, Wohaibi Dep. Ex. 321 (November 2, 2002 letter from Dr. Saleh bin Soliman al Wohaibi acknowledging receipt of a 400,000.00 SR check from the King in support of a WAMY program); Ex. 17, Wohaibi Dep. Ex. 323 (3,500,000.000 SR financial contribution to WAMY from the King in support of shariah courses); Ex. 9, Wohaibi Dep. 46:15- 47:20 (Dr. Wohaibi testified that there were other contributions to WAMY from the King prior to 2002). Other evidence indicates that, between 1994 and 2001, the Saudi Ministry of Finance provided two grants of 100,000 SAR each to WAMY on the recommendation of the Supreme Council for Islamic Affairs. Ex. 11, Unuq Declaration ¶ 4. Evidence confirmed that “The Government of Saudi Arabia funds a large portion of WAMY's budget.” Ex. 11, Unuq Declaration ¶ 2.

Other evidence in the record shows the Saudi Government's control over WAMY's operations. WAMY officials testified the charity required government approval to establish local offices and carry out activities in the Kingdom. Ex. 20, Deposition of Abdul Wahab Noorwali ("Noorwali Dep.") 106:17-107:10, July 23-24, 2019 (testifying that MOIA approved WAMY's requests "to open local offices, and it allowed us to conduct activities inside the Kingdom with Saudi youth"). As Defendant has described, WAMY's organizational structure places WAMY's international operations under the control and supervision of regional Saudi offices. Ex. 24, Rule 56.1 Statement of Material Facts in Support of Defendants World Assembly of Muslim Youth's and World Assembly of Muslim Youth International's Motion for Summary Judgment ("Defendant's SOF"), ECF No. 11994 at ¶18. Thus, the Saudi government exercised authority over WAMY's domestic and international operations.

Other evidence in the record shows that the Saudi government did not recognize WAMY as an independent organization. A telephone directory from the Saudi Embassy in Washington, D.C., obtained by the FBI in 2002, lists WAMY as one of the Embassy's "additional offices under the title 'Saudi Arabian Offices:' World Assembly of Muslim Youth (WAMY), 4516 Old Columbia Pike, PO Box 8096, Falls Church, VA." Ex. 21, FBI report, Connections to the Attacks of September 11, 2001, July 23, 2021, EO 3478-3608 at 3532-3533. The Saudi government employees attached to the Saudi Embassy in Washington, D.C. worked for WAMY. Ex. 22, Abdullah Awad Binladin 2005 Declaration ¶¶ 3, 6 (" ... I was an administrative officer at the Saudi Arabian Embassy" and "In 1991, I established the World Assembly of Muslim Youth International Inc. ('WAMY-USA') ... "). Additionally, WAMY's lack of independence is evident in its interactions with the Saudi government. WAMY believed it had to clarify to then-Prince Salman the activities involving Adel Batterjee, Lajnat al-Birr al-Islamiah ("LBI"), and Benevolence International Foundation ("BIF"). At the time, Prince Salman headed the Saudi government's

efforts to ostensibly provide Afghan aid relief. When asked why WAMY contacted Prince Salman specifically, WAMY officials said Prince "... was in charge of the relief activities in Afghanistan." Ex. 8 Noorwali Dep. 259:5-260:23. Evidence in the record indicates that WAMY's outreach to then Prince Salman stemmed from the Saudi government's investigation of Batterjee and his association with bin Laden. In designating Adel Batterjee as a Specially Designated Global Terrorist, U.S. Treasury officials revealed that around the time of BIF's incorporation, "a BIF employee in the Sudan traveled to Saudi Arabia attempting to meet Batterjee. Instead, the employee reported he was detained and questioned by Saudi authorities regarding BIF links to UBL. Once released, he returned to the Sudan where he met with UBL and informed him of his detainment. As a result, BIF operations were curtailed for a period of time." Ex. 23, U.S. Dep't of the Treasury, "U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," December 21, 2004. Plaintiffs further note that, for certain relief operations, Saudi government initiatives coordinated and directed WAMY's international activities. WAMY's activities in some conflict zones were coordinated and directed by Saudi High Commissions: "The Saudi Joint Relief Commission ("SJRC") was established on May 19, 1999, pursuant to High Order No.7/B/1863 (the "Albanian High Order") issued by HRM King Fahd bin Abdulaziz upon the recommendation of the Council of Ministers of the Kingdom of Saudi Arabia. The SJRC was made up of the Saudi Red Crescent, the IIRO, the World Assembly of Muslim Youth ("WAMY"), al Haramain Islamic Foundation and the Islamic Endowment Foundation. Julaidan was selected as its executive director." Ex. 25, WJ 022. [Wa'el Julaidan records reviewed by Comras] Additionally, evidence in the record shows a WAMY publication containing calls for violence against non-Muslims was published in coordination with the Saudi government printing press:

"WAMY produces books and pamphlets, some in conjunction with the Saudi government, to spread its message." For example, the Saudi government printed a publication called *Islamic Views* written by WAMY, which included the statement that Islam "is a religion of Jihad," and Jihad "was an answer for the Jews, the liars." "*Islamic Views* is an Arabic language book written by WAMY and printed by the Saudi Government's Armed Forces Printing Press." Ex. 26 , Statement of Steven Emerson to the National Commission on Terrorist Attacks Upon the United States, July 9, 2003, https://govinfo.library.unt.edu/911/hearings/hearing3/witness_emerson.htm Furthermore, Plaintiffs repeat and incorporate their responses to Defendant's ¶ 6. A genuine dispute of material fact exists.

**STATEMENT:**

3. As set forth in its Constitution, WAMY is an "Independent International Islamic Organization and an Islamic Forum that supports the efforts of the Islamic workers of Muslim Youth organizations in the world, their institutions and association." Ex. 6, WAMY-SA E001045-052 and 056 at 045 (Constitution of WAMY at Art. 1); Ex. 7, WAMY SA E001104-112 at 104 ("Authorized English Translation of The Constitution of [WAMY]," noting it incorporates amendments made in January 1993).

**RESPONSE:**

Disputed. Defendant's assertion that WAMY is merely an "Independent International Islamic Organization and an Islamic Forum" supporting "Islamic workers of Muslim Youth organizations" is incomplete and misleading. Although WAMY's Constitution contains the quoted language (Ex. 6, WAMY-SA E001045-052 and 056 at 045; Ex. 7, WAMY-SA E001104-112 at 104), the record shows that WAMY's activities were not limited to innocuous youth support. Evidence shows that

WAMY provided financial, logistical, operational, and recruitment support to al-Qaeda and affiliated terrorist groups across multiple conflict regions, including Afghanistan, Sudan, Chechnya, Bosnia, Kashmir, and Iraq. WAMY also disseminated extremist propaganda, facilitated travel for fighters, and maintained institutional relationships with designated terrorist entities.

I. WAMY's Role Within the Network of al Qaeda Associated Charities

U.S. intelligence concluded that WAMY operated within a network of Islamic charities that supported al Qaeda. The FBI found that "many of these charities were known to have supported AQ… MWL was the organization under which… IIRO and others such as WAMY operated at an international level." Ex. 21, FBI report, Connections to the Attacks of September 11, 2001, July 23, 2021, 3478-3608 at 3541-3542. Former al Qaeda operative Jamal al Fadl stated that bin Laden identified MWL, BIF, and Qatar Charitable Society as primary sources of al Qaeda funding. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 25. Bin Laden explained that charities diverted funds to al Qaeda while recording them as humanitarian expenses. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 25. A U.S. State Department cable warned that IIRO, MWL, and WAMY "continue to send money overseas and, at times, fund extremism overseas." Ex. 28, U.S. State Dept. Cable, Dec. 30, 2009. The record includes evidence that "[c]harities were a source of money and provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization." Ex. 4, 9/11 Commission Report 171.

II. Chechnya: WAMY's Support for al Qaeda-linked Fighters

The CIA assessed that the Chechen conflict increased mujahideen recruitment through al Qaeda-run Afghan camps. Ex. 29, CIA, Sunni Terrorist Threat Growing, Feb. 6, 2001 at 1. Militants trained in Afghanistan were deployed to Chechnya, Kashmir, and Bosnia, including two 9/11 hijackers. Ex. 30, CIA, DCI Report: The Rise of UBL, Mar. 19, 2004 at 11. Al Qaeda operated in

Chechnya through affiliated jihad groups. Ex. 31, Indictment, *U.S. v. Usama bin Laden*, S(9) 98 Cr. 1023 at 6. The 9/11 Commission reported that al Qaeda used NGOs in Chechnya and other regions to "covertly provide financial and other support for terrorism activities." Ex. 4, 9/11 Commission Report 58. Saudi-sponsored charities, including WAMY, were active in Chechnya, raising funds and spreading Wahhabi ideology. Ex. 33 Hahn, Russia's Islamic Threat, 36 (2007). Senior al-Qaeda operative Mahmdouh Salim formed Maram Travel, which was later transferred to Wael Julaidan and Mohamed Bayazid and provided military equipment to BIF for Chechen jihadists. Ex. 38, Kadi 28389; Ex. 35, Turkish Corporate Records DOJ AR 2115-2117; Ex. 36, Turkish Corporate Records DOJ AR 2146-48; Ex. 37, U.S. Treasury Statement on Wael Julaidan, Sept. 2, 2002; Ex. 4, 9/11 Commission Report 58, 437, 521; Ex. 174, Kadi 12168; Ex. 40, Kadi 10778-80; Ex. 41, Kadi 115482; Ex. 42, Kadi 115761. Saif al Islam, an al Qaeda military commander, served as a BIF officer in Chechnya. Ex. 43, U.S. Treasury Designation of BIF, Nov. 19, 2002; Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 27. WAMY's Secretary General Dr. Maneh al Johani publicly stated that Chechen fighters "need money to buy arms and ammunition" and that WAMY had "doubled its efforts" to support them. Ex. 44, FED-PEC 233836-233843 at 233842. Saudi Minister of Islamic Affairs al Sheikh donated funds to WAMY "for the benefit of the Muslims of Chechnya," invoking support for "our mujahideen brothers." Ex. 45, WAMYSA 1249305; Ex. 46, WAMYSA 1249304. Al Johani later confirmed WAMY contacted fighters. Ex. 47, FED-PEC 234243-234244. WAMY representatives justified jihad and encouraged recruitment, including at a 1996 U.S. youth camp where Suleman Ahmer praised jihad in Chechnya and Bosnia; Ex. 48, Suleman Ahmer lecture, July 26, 1996. WAMY's Chechnya office was ordered closed; Ex. 49, FED-PEC 234930-234931. BIF provided support to Chechen mujahideen, including cash, military equipment, anti-mine boots, and an X-ray machine. Ex. 50, Second Superseding Indictment, *U.S. v. Arnaout*, 02 CR 892 (Jan. 22, 2003)

at 13-14. Anwar al Awlaki, linked to WAMY, encouraged a Saudi student to join jihad in Chechnya.

III. Bosnia: WAMY's Support for TWRA, Taibah and BIF

WAMY made financial transfers to TWRA, which conducted terrorist support activities under the guise of charity. Ex. 53, PEC KSA 3656-3718; Ex. 54, WAMYSA 42103. The 9/11 Commission identified TWRA as one of bin Laden's covert offices. Ex. 4, 9/11 Commission Report 58. Fatih el Hassanein simultaneously headed TWRA and WAMY's Austria/Eastern Europe office. WAMY document indices; Ex. 55, FED-PEC 289619; Ex. 56, FED-PEC 218206. Hassanein was identified as an arms dealer with ties to bin Laden. Ex. 58, Washington Post, Sept. 22, 1996. Through WAMY and TWRA, Hassanein funded nameless "specific projects" in conflict zones. Ex. 51, ECF No. 3912 at 36; Ex. 57, WAMY SA 1665-1666. Evidence in the record shows BIF provided support to Bosnian fighters, including boots, uniforms, communications stations, ambulances, and facilitating travel for senior al Qaeda operative Abu Hajer al Iraqi. Ex. 50, Second Superseding Indictment, *U.S. v. Arnaout*, 02 CR 892 (Jan. 22, 2003) at 12-15. Aware their work was illegal, BIF employees attempted to erase archives documenting bin Laden's network, weapons procurement, mujahideen training, and evidnce of wealthy sponsors including Batterjee. Ex. 50, Second Superseding Indictment, *U.S. v. Arnaout*, 02 CR 892 (Jan. 22, 2003) at 15-17. Additional evidence in the record shows WAMY provided funds to the al Qaeda-linked front organization Tabiah International in Sarajevo. Ex. 113, CIA Report, Taibah: Linking Extremists in the Balkans and the United States [REDACTED], December 12, 2002. CIA-SUB_0031-33 at CIA-SUB_0032.

IV. LBI/BIF: WAMY's Welfare Arm Supporting al Qaeda

LBI was founded by Adel Batterjee to support mujahideen in Afghanistan and provided logistical support, travel documents, and financial assistance. Ex. 50, Second Superseding Indictment, *U.S. v. Arnaout*, 02 CR 892 (Jan. 22, 2003) at 1-4. LBI worked with bin Laden and Abdallah Azzam.

Ex. 50, Second Superseding Indictment, *U.S. v. Arnaout*, 02 CR 892 (Jan. 22, 2003) at 1-2. BIF inherited LBI's assets and continued operations in Pakistan, Bosnia, Azerbaijan, and Sudan. Ex. 50, Second Superseding Indictment, *U.S. v. Arnaout*, 02 CR 892 (Jan. 22, 2003) at 4. BIF followed al Qaeda to Sudan in 1991. Ex. 50, Second Superseding Indictment, *U.S. v. Arnaout*, 02 CR 892 (Jan. 22, 2003) at 2-5. BIF personnel procured rockets, mortars, bombs, and explosives for al Qaeda. Ex. 50, Second Superseding Indictment, *U.S. v. Arnaout*, 02 CR 892 (Jan. 22, 2003) at 15-17; Ex. 27, Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 21-22. Documents recovered from BIF offices included organizational charts of al Qaeda, notes from meetings that formed al Qaeda in 1988, mujahideen personnel files, and lists of wealthy sponsors, including Batterjee. Ex. 50, Second Superseding Indictment, *U.S. v. Arnaout*, 02 CR 892 (Jan. 22, 2003) at 15-17.

V. Kashmir: WAMY's Support for LET and JEM

India closed WAMY's offices for financing Lashkar-e-Taiba and Jaish-e-Mohammed. Ex. 63, FED PEC 234023 234024. WAMY official Nazir Qureshi was accused of supplying funds to Kashmiri militants. Ex. 64, Press Trust of India, June 12, 2002. WAMY-affiliated organizations fought under Hizb-e-Islami and Hizbul Mujahideen. Ex. 65, The News, Mar. 25, 2001.

VI. Iraq: WAMY's Links to Ansar al Islam

The U.S. Treasury designated Ansar al Islam as an al Qaeda-linked terrorist group funded by bin Laden. Ex. 68, Treasury Statement, Feb. 20, 2003. A 2002 photograph showed an Ansar commander at a WAMY-sponsored event with WAMY banners. Ex. 69, ayobi.com photo, Aug. 2002.

VII. Hamas: WAMY's Role in the Union of Good

Treasury designated the Union of Good as a Hamas front group. Ex. 70, Treasury Designation, Nov. 12, 2008. WAMY Secretary General Saleh al Wohaibi and Assistant Secretary General

Abdulwahab Noorwali served on its Board of Trustees. Ex. 71, Ex. 71, WAMYSA 1235606; Ex. 72, WAMYSA 1235604. Union of Good leadership included Hamas operatives and SDGTs such as Abd al -Majid al Zindani. Ex. 73, Treasury Designation, Feb. 24, 2004.

VIII. WAMY-Canada: Financial Irregularities and Extremist Literature

A Canadian audit found severe accounting deficiencies at WAMY-Canada, noting that WAMY Saudi Arabia exercised “substantial control” over WAMY Canada’s finances. Ex. 79, FED- PEC 218170-218203. WAMY-Canada shared directors, bank accounts, and funds with BIF-Canada and BIF-USA. Ex. 79, FED-PEC 218170-218203 at 12-14. Canadian auditors found that WAMY distributed literature describing Christians as enemies of Islam and Jews as “humanity’s enemies,” encouraging children to “love taking revenge on the Jews” and “make jihad.” Ex. 79, FED-PEC 218170 218203 at 17-18.

IX. Detainee Evidence and DoD Assessments

Guantanamo detainees reported employment with WAMY in Afghanistan and Pakistan, including managing WAMY’s hospital and distributing supplies. Ex. 119 Set_52_3643 3869 at 37-39. WAMY flew wounded fighters from Bosnia to Saudi Arabia for treatment. Ex. 104, NYT, Dec. 5, 1992. DoD assessed WAMY as a “Tier 1 NGO” which has "demonstrated sustained and active support for terrorist organizations willing to attack U.S. persons or interests" and an “associated force” of al Qaeda. Decl. of Mohammedi (Dkt. No. 11999), Ex. 159, FED-PEC0216815-216831 at 216828-216831; Ex. 106 at 2. WAMY officials stated that the U.S. and Israel “must be destroyed” and supported Palestinian militants. Ex. 109 JTF GTMO Assessments at 2; also see Ex. 105, Ex. 106, Ex. 108.

X. Recruitment, Training, and Funding Transfers

CIA and FBI reporting shows WAMY served as a recruitment conduit for extremist groups, spotting youth, offering scholarships, and sponsoring paramilitary training camps. Decl. of

Mohammedi (Dkt. No. 12001), Ex. 244, CIA Report, Al-Qa'ida Still Well Positioned to Recruit Terrorists [REDACTED], July 1, 2002, CIA_000178-189 at CIA_000186; Decl. of Mohammedi (Dkt. No. 12001), Ex. 245, CIA Report, Saudi-Based Financial Support for Terrorist Organization [REDACTED], November 14, 2002, CIA_000143-158 at CIA_000151; Decl. of Mohammedi (Dkt. No. 12001), Ex. 244, CIA Report, Al-Qa'ida Still Well Positioned to Recruit Terrorists [REDACTED], July 1, 2002, CIA_000178-189 at CIA_000185; Ex. 112, FBI Report, Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States, Dec. 2004, EO 3414 3442 at EO 3437. WAMY officials couriered donations to extremist groups. Ex. 233 at CIA_000744. WAMY provided funding to Hamas, Egyptian Islamic Jihad, Gama'at al Islamiyya, and Kurdish Islamist movements. Ex. 111, CIA Report, Jan. 11, 1999 at 3. FBI reporting confirms WAMY offices funded Hamas-affiliated NGOs such as Interpal. Ex. 112, FBI Report, Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States, Dec. 2004, EO 3414-3442 at Ex. 221, EO 3438.

XI. WAMY USA's Links to al Qaeda and Other Islamic Terrorists

The record shows that WAMY USA and its officials had operational, financial, and personal ties to al Qaeda, Hamas, and individuals directly involved in the September 11 attacks. These connections included WAMY USA personnel, affiliated entities, and organizational relationships that U.S. authorities identified as supporting extremist causes. U.S. authorities determined that Ibrahim S. Abdullah, a WAMY USA official, had associations with al Qaeda and Hamas. Ex. 112, FBI Report, Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States, Dec. 2004, EO 3414-3442 at 3429. WAMY USA also maintained connections to Anwar al Awlaki, a key facilitator and spiritual advisor to the 9/11 hijackers. Evidence shows that Mohammed Rafique Quadir Harunani, associated with a WAMY chapter in Orlando, was under investigation for ties to WAMY and al Qaeda. Ex. 112, FBI Report, Assessment of Saudi

Arabian Support to Terrorism and the Counterintelligence Threat to the United States, Dec. 2004, EO 3414-3442 at 3438. Harunani and Abdullah bin Laden, former president of WAMY USA, were linked through Transcom International and the Discover Islam project. Ex. 112, FBI Report, Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States, Dec. 2004, EO 3414-3442 at 3438.
U.S. authorities linked 9/11 hijacker Marwan al Shehhi to Harunani, including a June 2001 incident in which al Shehhi accompanied Harunani to pick up his children from school. Ex. 75, EO 003453-003608 at 003546. Additional evidence connected Harunani to 9/11 hijacker Mohammed Atta. Ex. 76, Joint Inquiry Report, Part Four, Dec. 2002, at 418. Harunani's company Transcom International, which provided printing services to WAMY USA, received a June 21, 2000 call from a phone associated with Said Bahaji, a member of the Hamburg al Qaeda cell. Ex. 75, EO 003453-003608 at 003546; Decl. of Mohammedi (Dkt. No. 11999), Ex. 166, WAMY Intl E001366-370; Ex. 75, Memo "Updated work plans and detailed list of associates," 9/11 Commission Staff, June 6, 2003 at 8, 43. Deposition testimony confirms that Abdullah bin Laden and WAMY-USA contracted with Transcom. Ex. 77, Abdullah Dep. 113:20 114:16, 117:5 16. Further evidence shows that Abdullah bin Laden had links to six individuals in Portland who attempted to travel to Afghanistan to support the Taliban and al Qaeda. Ex. 112, FBI Report, Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States, Dec. 2004, EO 3414-3442 at 3436. Additional information connects Abdullah bin Laden and WAMY USA to the Northern Virginia branch of the Institute of Islamic and Arabic Sciences of America (IIASA). U.S. authorities determined that IIASA was indoctrinating individuals into Islamic extremist causes, and IIASA officials had connections to Islamic terrorists. Ex. 21, EO 003478-003608 at 003535-003536. During a raid on an al Qaeda safehouse, authorities found an address for an IIASA official listing Abdullah bin Laden as their supervisor. Ex. 75, EO

003453-003608 at 003535-003536. Finally, evidence indicates that Omar al Bayoumi, who assisted 9/11 hijackers Nawaf al Hazmi and Khalid al Mihdhar and was in contact with Anwar al Awlaki, likely had Abdullah bin Laden's Saudi Embassy extension number in his address book. Ex. 78, EO 003050-003608 at 003518. The entry listed: "Islamic Affairs x240, Abdullah Awaad x241…" Ex. 21, EO 003478-003608 at 003518. A genuine dispute of material fact exists.

**STATEMENT:**

4. After initially operating under the Ministry of Higher Education, WAMY operated under the auspices of the Ministry of Islamic Affairs, Endowments, Da'wah and Guidance ("MOIA") from 1993. Ex. 4 at 91:4-94:12 (discussing transition to MOIA); Ex. 8, WAMYSA051643-654 at 646 (1993 Minutes of General Secretariat explaining the switch from Minister of Higher Education to Minister of Islamic Affairs); Ex. 3 (discussing transfer to MOIA).

**RESPONSE:**

Undisputed. Plaintiffs further contend Defendant's admission that it operated under the Ministry of Education and later the Ministry of Islamic Affairs is further evidence of its lack of functional independence from the Saudi Government. Commenting on the transfer of oversight for WAMY operations to MOIA, WAMY officials confirmed it served the government's policies, "due to its specialism in Islamic affairs and given the similar activities." Decl. of Mohammedi (Dkt. No. 11997), Ex. 3, Letter to Ibrahim Suleiman, Noorwali Dep. Ex. 257, WAMYSA1248923 ("The World Assembly's Relationship with Ministry of Islamic Affairs, Endowments, Da'wah, And Guidance"). A genuine dispute of material fact exists.

**STATEMENT:**

5. Though created by Royal Decree, WAMY is an independent not-for-profit charity. Ex. 5 at 272: 9-273:3 (confirming that WAMY was established as an independent organism under the Royal Decree); Ex. 2 at ¶9 (discussing Royal Decree); Ex. 7 at WAMY SA E001104 (WAMY Constitution Preamble: "WAMY will henceforward be an independent international Islamic forum..."); Ex. 6 at WAMY-SA E001045.

**RESPONSE:**

Disputed. Plaintiffs repeat their response to Defendant's claim that WAMY is independent. Plaintiffs incorporate their response to Defendant's ¶¶ 2, 4, 6, and 7, showing that MOIA and other Saudi government commissions have historically exercised extensive control and direct involvement in WAMY's funding, supervision, and operations. A genuine dispute of material fact exists.

**STATEMENT:**

6. WAMY is not an organ or an instrumentality of the Kingdom nor does the Kingdom oversee the day-to-day activities of WAMY. Ex. 5 at 273:1-10 (confirms WAMY operates independently of the Saudi government and that the Saudi government did not operate day-to-day control over WAMY); Ex. 6 at WAMY-SA E001045.

**RESPONSE:**

Disputed. Plaintiffs repeat their objections to Defendant's claim that WAMY is an independent international Islamic organization.

Plaintiffs further dispute Defendant's implication that only the Kingdom's day-to-day control over WAMY would establish that WAMY acted as an agent or instrument of the Kingdom. The record shows that the Kingdom controlled WAMY through Saudi Government oversight, overlapping leadership with Saudi officials, and funding from the Government. See Plaintiffs' Response to

Defendant's ¶¶ 2, 4, and 7. Furthermore, Saudi government oversight of WAMY was extensive, as WAMY officials have testified that they required government approval to establish local offices and carry out activities. Ex. 20, Noorwali Dep. 106:17- 107:10 (testifying that MOIA approved WAMY "to open local offices, and it allowed us to conduct activities inside the Kingdom with Saudi youth"). Defendant admitted that its local Saudi offices oversaw WAMY's international chapters. See also Defendant's ¶ 18. Thus, the Saudi Government exercised extensive control over WAMY's operations locally and abroad. Additionally, WAMY's Constitution requires the organization "to elucidate the true Islamic ideology which should be followed by Muslims." Decl of Mohammedi (Dkt. No. 11997) Ex. 6, WAMY-SA E001045-WAMY-SA E001052 (Article 3). WAMY is not sufficiently independent to advance a version of Islam contrary to the government's policy. Decl of Mohammedi (Dkt. No. 11997) Ex. 6, WAMY-SA E001045-WAMY-SA E001052, Article 3. WAMY officials have also acknowledged that the Kingdom oversaw their operational activities abroad. When asked why WAMY wrote to then-Prince Salman to clarify the activities between IBL and BIF in Afghanistan, WAMY officials said Prince Salman "... was in charge of the relief activities in Afghanistan." Ex. 9, Noorwali Dep. 259:5-260:23. While superficially true, WAMY's outreach to then-Prince Salman was related to the Saudi government's investigation of Adel Batterjee and LBI, including the 1993 detention of a BIF employee from Sudan. In designating Batterjee as a Specially Designated Global Terrorist, U.S. Treasury officials revealed that around the time of BIF's incorporation, "a BIF employee in the Sudan traveled to Saudi Arabia attempting to meet Batterjee. Instead, the employee reported he was detained and questioned by Saudi authorities regarding BIF links to UBL. Once released, he returned to the Sudan where he met with UBL and informed him of his detainment. As a result, BIF operations were curtailed for a period

of time." Ex. 23, U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," December 21, 2004. A genuine dispute of material fact exists.

**STATEMENT:**

7. WAMY is led by a Secretary General who serves as WAMY's representative to international organizations and associations and manages its affairs. Ex. 6 at WAMY-SA E1050 (Art. 15).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendants' assertion regarding WAMY's leadership structure and responsibilities. WAMY is led by a President who oversees a Vice President and a Secretary General. Decl of Mohammedi (Dkt. No. 11997) Ex. 6, Noorwali Dep. Ex. 255, WAMY-SA E001045-WAMY-SA E001052 (Articles 8-11, 15). The Ministers of Islamic Affairs have served as WAMY President for several decades. Ex. 9, October 23, 2019, Deposition of Dr. Saleh al Wohaibi (Wohaibi Dep.) Transcript 28:16-19 (testifying that the president of WAMY is appointed by the Saudi government); id. at 29:1-30:17 (stating that the Minister of Islamic Affairs served as the president of WAMY from the establishment of the Ministry of Islamic Affairs in 1993 until 2013-2014); id. at 70:6-72:18(testifying that WAMY Secretary General, Maneh bin Hammad al Johani, simultaneously served as a member of the Shura Council, the formal advisory body of the Saudi government, also referred to as the Consultative Assembly of Saudi Arabia). Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 2, 4, and 6, regarding the oversight and control WAMY's Presidents exert over the organization. A genuine dispute of material fact exists.

**STATEMENT:**

8. Only the following have served as WAMY's Secretary General: Dr. Abdel Hameed Abu Soliman (1973-1978) Dr. Ahmad Bahafidhallah (1978-1981) Dr. Tawfeeq Ibn Ahmad Al Qusayyer (1981-1986) Dr. Manih ibn Hammad al-Al-Johani (1986-2002) Dr. Saleh S. Al-Wohaibi (2002-2024) Dr. Salih Ibn Ibrahim Babaer (2024 to present) Ex. 4 at 25:12-14 (Wohaibi confirming he has been the Secretary General since 2002); Ex. 5 at 86:4-9 (Noorwali confirming that Wohaibi served as Secretary General after Dr. Al-Al-Johani passed away); Ex. 9, Saleh Wohaibi November 2005 Declaration at ¶16 (providing a list of all Secretary Generals of WAMY since its inception); Ex. 2 at ¶6 (confirming Babaer as new Secretary General).

**RESPONSE:**

Undisputed as to the tenure of former WAMY Secretaries General. Disputed as to any assertion by Defendant that WAMY's Secretaries General held no other positions in the Saudi Government during their tenure.
Plaintiffs repeat and incorporate their response to Defendant's ¶ 7, noting that WAMY's ultimate oversight and control is directed by the President of WAMY and that WAMY officials held contemporaneous positions in the Saudi Government. A genuine dispute of material fact exists.

**STATEMENT:**

9. The Secretary General, along with the Assistant Secretary Generals that report to him, conduct WAMY's day-to-day activities and do so "in accordance with the Constitution and by-laws of WAMY." Ex. 4 at 20:11-18 (Wohaibi confirming the Secretary General is responsible for the

day-to-day direction of WAMY organization), at 145:7-146:9 (confirming that the daily operations of WAMY are supervised by its Secretary General); Ex. 6 at WAMY-SA E001050-051 ("The Assistant Secretary General shall assist the Secretary General in discharging his responsibilities. He shall assign to them any work related to WAMY's aims."); see also Ex. 7 at WAMY SA E001111 ("the Assistant Secretaries will help the Secretary General in fulfilling his responsibilities to achieve WAMY's Objectives…").

**RESPONSE:**

Disputed as to any suggestion by Defendant that only the Kingdom's day- to-day control of WAMY would establish it as an agent or instrument of the Kingdom. Plaintiffs repeat and incorporate their response to Defendant's ¶¶ 2, 4, 6, and 7 regarding Defendant's independence and the control WAMY's President exerts over leadership selection and organizational activities. A genuine dispute of material fact exists.

**STATEMENT:**

10. WAMY has never had a "chairman." Ex. 6 at WAMY-SA E001056 (Article 6 outlining the governing bodies but no chairman is mentioned); see also, Ex. 7 at WAMY SA E001107-111 (outlining the governing bodies but no chairman is mentioned).

**RESPONSE:**

Disputed in part. While Plaintiffs agree that WAMY's Constitution does not literally use the term "chairman" to describe the executive roles, Plaintiffs dispute that, functionally, WAMY's President performs responsibilities and activities typically associated with the top organizational official, which would be consistent with the role and duties commonly associated with a "chairman." Plaintiffs incorporate their response to Defendant's ¶ 2 as to the substantial control WAMY's President exerts on the organization. A genuine dispute of material fact exists.

**STATEMENT:**

11. Adel Batterjee has never been WAMY's Secretary General, an Assistant Secretary General, nor held any position let alone a leadership within WAMY. Ex. 10, Adel Batterjee 2004 Declaration at ¶9 ("Also, I never served as any executive of World Assembly of Muslim Youth let alone Secretary-General"); Ex. 9 at ¶14-16 (Batterjee did not serve as WAMY executive member).

**RESPONSE:**

Disputed as to Defendant's overly narrow assertion that Abel Batterjee held no senior role in WAMY.

Baterjee, LBI, WAMY -BIF is LBI

The record shows that Abdel Batterjee performed executive functions for Lajnat Al-Birr Al-Islamiyyah ("LBI"), a charity he founded and later operated under WAMY's auspices in Pakistan and Afghanistan. Although the record contains conflicting evidence about how the WAMY-LBI subsidiary relationship began, there is no dispute that LBI was a WAMY subsidiary, referred to as its welfare arm, and that Adel Batterjee was LBI's chief executive. As such, Batterjee played a senior role in WAMY. The record includes testimony from WAMY officials that Batterjee, along with other senior WAMY executives, founded LBI. April 3, 2019, Declaration of Dr. Abdul Wahab Noorwali in Support of Defendant World Assembly of Muslim Youth ("Noorwali Declaration"), ¶ 26; Ex. 20, Noorwali Dep. 227:15-24 ("Dr. Maneh Al-Johani invited me to be a member, a board member, board member of Lajnat al-Birr al-Islamiyyah"), 228:1-10 (identifying Al-Johani as LBI's board chairman). Other testimony by WAMY officials confirmed that, from its inception, LBI operated under WAMY's auspices. Ex. 20, Noorwali Dep. 228:11-229:14 (explaining that Al-Johani agreed to Adel Batterjee's request to work with Afghan refugees under WAMY's auspices as LBI; Adel Batterjee came from a wealthy family), 229:15-21 (LBI did not

exist before its collaboration with WAMY in 1991). Additionally, Abdel Batterjee oversaw LBI's activities. Noorwali Declaration ¶¶ 27, 29; Ex. 20, Noorwali Dep. 228:11-229:21. Other evidence in the record indicates that LBI began operations in Pakistan in 1987. Decl. of Mohammedi (Dkt. No. 11997), Ex. 25, WAMYSA028403-414 at WAMYSA028405. Dr. Abdul Wahab Noorwali, a member of LBI's board of directors, later became a senior executive at WAMY and served as Assistant Secretary General in 1996. Dr. Noorwali served on LBI's board and as a WAMY executive. Noorwali Declaration ¶¶ 12, 26, 29. WAMY's Secretary General, Dr. Maneh Al-Jonahi, invited Noorwali to serve on LBI's board at LBI's founding. Ex. 20, Noorwali Dep. 232:9-22.

Dr. Noorwali claimed Dr. Al-Jonahi was LBI's chairman and a co-founder. Ex. 20, Noorwali Dep. 227: 15-24, 228:1-10. According to WAMY officials, LBI was formed sometime in 1989 or 1990 and registered to operate in Pakistan in 1991. Ex. 20, Noorwali Dep. 229:15-21. Other evidence suggests LBI may have operated as early as 1987. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 28. WAMY formed a committee to oversee Abdel Batterjee's work. Ex. 20, Noorwali Dep. Transcript, 232:4-8. WAMY referred to LBI as its "welfare arm." Ex. 20, Noorwali Dep. Transcript, 240:21-241:1. According to WAMY officials, WAMY dismissed Adel Batterjee sometime in 1993. Ex. 116, Noorwali Declaration ¶ 51; Ex. 20, Noorwali Dep. 235:23-236:4; 236:5-23. According to WAMY officials, LBI merged into WAMY in 1996. Ex. 20, Noorwali Dep. 239:7-240:3.

Other evidence in the record, including WAMY documents, contradicts WAMY officials' testimony regarding LBI's formation and leadership. In what appear to be formation documents from 1989, LBI, as "Lajnat Al-Birr Al-Islamiah was established as a sub-organization of the World Assembly of Muslim Youth. Decl of Mohammedi (Dkt. No. 11199) Ex. 101, WAMYSA031288-

WAMYSA031314 at 31300. LBI's founders are identified as: "The Founders are: Dr. Ahmed Bahafthallah, Dr. Hasan Bahafthallah, Mr. Shahir Batterjee, Mr. Adel Batterjee, Dr. Abdul Wahab Noor Wali, Mr. Mazin Baharith, Dr. Mohammad O. Jamjoom, Mr. Yousef Al-Akhdar Al-Quayim." Decl of Mohammedi (Dkt. No. 11199) Ex. 101, WAMYSA031288-WAMYSA031314 at 31300. LBI operations are financed through a mix of private donations: "The estimated project cost is USD 444,622.0. The details of the budgeted costs are given in the attached tables. It is worth noting that this project has started in February 1989 by utilizing existing funds made available through private donations. It is expected that only 40% to 45% funding will be needed." Decl of Mohammedi (Dkt. No. 11199) Ex. 101, WAMYSA031288-WAMYSA031314 at 31301. LBI's General Assembly consisted of 15 members: Mr. Ibrahim Kurdi, Dr. Ahmed Bahafthallah, Dr. Bishr Al-Jabiri, Mr. Jamal Khashoggi, Dr. Hasan Bahafthallah, Dr. Sulaiman Basahl, Mr. Shahir Batterjee, Mr. Adel Batterjee, Mr. Adel Simsim, Dr. Abdallah Juma, Dr. Abdulwahab Noorwali, Mr. Mr. Adnan Kaaki, Mr. Mazin Baharith, Mr. Mohammad O. Jamjoom, Mr. Yousef Al-Akhadar Al-Quayim Decl of Mohammedi (Dkt. No. 11199) Ex. 101, WAMYSA031288-WAMYSA031314 at 31306. LBI's Board of Directors were identified as: Mr. Adel Batterjee-Chairman, Mr. Mazin Baharith -Support Services, Mr. Ibrahim Kurdi - Social Welfare, Dr. Abdallah Juma- Medical Services, Dr. Hasan Bahafthallah-Educational Services, Mr. Yousef Al-Akhdar -Special Education, Mr. Jamal Khashoggi - Public Relations Decl of Mohammedi (Dkt. No. 11199) Ex. 101, WAMYSA031288-WAMYSA031314 at 31306. In its December 21, 2004 designation of Adel Batterjee as a Specially Designated Global Terrorist (SDGT), the U.S. Treasury Department identified that "[i]n the late 1980s, Batterjee founded the precursor to BIF, Lajnat al-Birr al-Islamiah (LBI), in Saudi Arabia and Pakistan." Ex. 116, U.S.

Dep't Treasury, "U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," December 21, 2004. The U.S. Treasury officials determined "BIF and LBI remained one organization with interchangeable assets under Batterjee's control." Ex. 116 U.S. Dep't Treasury, "U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," December 21, 2004. In a 1992 interview with The New York Times, Batterjee identified himself as the "chairman" of WAMY. At the time, Batterjee saw himself as a senior leader of LBI and WAMY operations, which operated as a single organization in Pakistan, Afghanistan, Bosnia, and Sudan. Ex. 104, Chris Hedges, "Muslims From Afar Joining 'Holy War' in Bosnia," New York Times, December 5, 1992, A1. This evidence demonstrates that Adel Battterjee played a leadership role in LDI, the welfare arm of WAMY. Batterjee founded LBI and later operated LBI with WAMY officials under WAMY's auspices. Plaintiffs also contend that Jamal Khashoggi's participation in LBI is additional evidence of LBI's connections to bin Laden. Lawrence Wright, The Looming Tower: Al-Qaeda and the Road to 9/11 (2006) 78, 193, 199, 200, 201. A genuine dispute of material fact exists.

**STATEMENT:**

**A. WAMY's Core Mission: Educating and Uplifting Islamic Youth Worldwide**

**RESPONSE:**

No response necessary.

**STATEMENT:**

12. Education is WAMY's core mission both as a forum connecting different groups working in the field of Islamic youth and student organizations, and through uplifting Muslim youth in

Saudi Arabia and internationally by raising their moral character and safeguarding them from religious extremism. Ex. 2 at ¶¶ 11-16; Ex. 11, Mustafa Ismail 2022 Declaration at ¶12 (attesting to WAMY's non-extremist teaching of Islam and that Islam is a human religion); Ex. 3 (discussing WAMY's role gathering student organizations); Ex. 6 at WAMY-SA E001045-46 (WAMY's Constitution discussing WAMY's aims and objectives); Ex. 12, Ibrahim Anwar Dep. Transcript Excerpt at 132:2-16 (discussing WAMY's educational services relating to behavior and morals).

**RESPONSE:**

Disputed. Defendant asserts WAMY's mission is solely educational. The record shows WAMY conducted charitable work while supporting al-Qaeda and other terrorist groups, funding terrorism, and recruiting for extremist causes. Plaintiffs repeat and incorporate their response to Defendant's ¶¶ 3 and 14 on WAMY's support for these groups and extremist recruitment. A genuine dispute of material fact exists.

**STATEMENT:**

13. Among its many objectives and goals, WAMY is dedicated to "serv[ing] the Islamic Da'wah (calling to Islam) in matters of Aqeedah [belief], Shariah and social behavior among the Muslim youth of the world;" "explain[ing] the role of the Muslim youth in the construction of the Islamic society and its social, economic and scientific institutions, and to eliminate the causes of backwardness, sectarianism and stagnancy in the Muslim societies;" and "coordinat[ing] and cooperat[ing] with institutions and associations that work for the benefit of the Muslim Youth and students all over the world." Ex. 2 at ¶11; Ex. 6 at WAMY-SA E001045-046 (WAMY's Constitution discussing WAMY's aims and objectives); compare with Ex. 7 at WAMY SA E001104-106 (Article 1 detailing the Objectives of WAMY specific

to Muslim youth and the means of obtaining those objectives); Ex. 5 at 58:11-61:22; Ex. 12 at 132:2-133:4 (attesting to the production of educational materials, dawah activities and straightening of moral character as an example of WAMY's objectives being fulfilled).

**RESPONSE:**

Disputed as to any assertion by Defendants that its sole mission was serving the religious needs of Muslim youth. As the record shows, WAMY engaged in the support of Al Qaeda and other terrorist groups.

Plaintiffs repeat and incorporate their objections to Defendant's ¶¶ 3 and 14. A genuine dispute of material fact exists.

**STATEMENT:**

14. WAMY's purpose and basic philosophy is entirely constructive, modernist, and positivist, looking to build a wholesome society in utter contrast with al-Qaeda and Bin Ladinists whose project is entirely destructive. Ex. 6 at WAMY-SA E001045-046 (Article 3 outlines the entirety of WAMY's objectives); Ex. 13, Khalid Blankinship Report at p. 33.

**RESPONSE:**

Disputed. Defendant's assertion that WAMY's "purpose and basic philosophy is entirely constructive, modernist, and positivist" and "in utter contrast with al-Qaeda and Bin Ladinists" merely restates Defendant's expert characterization of WAMY's constitution and is not a statement of fact. Decl. Mohammedi (Dkt. No. 11999), Ex. 13 at 33 ("The whole program is entirely constructive and also rather modernist and positivist, looking to build a wholesome society that can live in the real world. This is in utter contrast with the Bin Ladinists, whose project is on the contrary entirely destructive. At the same time, it is deeply rooted in the classical texts and traditions of Islam.") The cited portion of the report analyzes Article 3 of WAMY's constitution

(Decl. Mohammedi (Dkt. No. 11999), Ex. 6 at WAMY-SA E001045–46), which lists WAMY's stated objectives. Plaintiffs do not dispute that Article 3 lists those objectives. Plaintiffs dispute that Article 3 establishes WAMY's actual "purpose and basic philosophy" or that WAMY's purpose and activities were "entirely constructive" or "in utter contrast" with al-Qaeda. The record contains evidence from which a factfinder could reach a different conclusion, including (a) WAMY's support of Islamic extremists, including al Qaeda; (b) WAMY's own publications; (c) statements by WAMY's officials; (d) WAMY's association with individuals linked to al-Qaeda; and (e) U.S. government assertions concerning WAMY.

Regarding WAMY's support for Islamic extremists and terrorists, Plaintiffs incorporate their responses to ¶ 3.

The record shows that WAMY's own publications contradict Defendant's characterization of its philosophy as constructive or modernist. WAMY's Islam at a Glance states that its goal is to "arm the Muslim youth with full confidence in the supremacy of the Islamic system over other systems," reflecting ideological indoctrination rather than youth development. Ex. 26, Statement of Steven Emerson to the National Commission on Terrorist Attacks Upon the United States, July 9, 2003. WAMY's youth-camp manuals promote jihad as a religious duty. Decl. of Mohammedi (Dkt. No. 19977) Ex. 39, WAMY INTL E002177- WAMY INTL E002141 at WAMY INTL E002231 ("Islamic Camps: Objectives, Program Outlines and Preparatory Steps"); also see Ex. 126, Supplemental Declaration in Support of Pre-Trial Detention 8, *U.S. v. Biheiri*, Case No. 03-365-A, (E. D. Va. September 11, 2003), citing WAMY's Islamic Camps: Objectives, Program Outlines and Preparatory Steps.

The record shows that WAMY publications repeatedly encourage hostility and violence toward Jews, Christians, and other non-Muslims. WAMY's A Handy Encyclopedia describes Jews as "humanity's enemies" and as responsible for "every tragedy that inflicts the Muslims" Ex. 126,

Supplemental Declaration in Support of Pre-Trial Detention 9, *U.S. v. Biheiri*, Case No. 03-365-A, (E. D. Va. September 11, 2003), citing WAMY's "A Handy Encyclopedia of Contemporary Religions and Sects."(WAMY vilifies Jews). WAMY's *Islamic Views* states that Islam "is a religion of Jihad," urges children to "love taking revenge on the Jews," and labels Jews and Christians "infidels." Ex. 26, Statement of Steven Emerson to the National Commission on Terrorist Attacks Upon the United States, July 9, 2003, citing the WAMY publication *Islamic Views*, printed by the Saudi Government's Armed Forces Printing Press. Canadian authorities likewise identified WAMY-distributed materials portraying Christians as enemies. Decl. Mohammedi (Dkt. No. 12001) Ex. 183, EX. 79, FED-PEC 218170-218203 at 0218190. The record shows that WAMY leadership amplified calls for violent jihad. WAMY Secretary General al Johani publicly called for jihad to "free Kashmir," urging moral, physical, and financial support. Ex. 123, "WAMY Calls for Jihad to Free Kashmir," Muslim World News, June 3, 1991, at 15. Kashmiri activist Yaqub praised WAMY's support for mujahideen. Ex. 126, Furqan Ahmed, "Kashmiri leader thanks WAMY for help," Riyadh Daily, December 8, 1995. In 2000, al Johani urged donations "to buy weapons and gear" for Chechen fighters and encouraged children to contribute. Decl. Mohammedi (Dkt. No. 19977), Ex. 52, FED PEC 233836 233843 at 233842. The record shows that WAMY speakers promoted violent jihad as a religious obligation. Sheikh al-Buraik stated that Islam "spread when the blood of its companions was shed" and that religious ideas spread only when "watered with… blood." Ex. 130, Islamweb.net, Sheikh Saad Buraik, "The Martyr of Jihad, Abdullah Azzam"; EX. 129, The Islamic Library - Lessons of Sheikh Saad Buraik, "The Favor of Jihad Over Other Acts" 3091. Saudi charity officials later disavowed his extremist remarks Ex. 61, FED-PEC 220554-220557 at 220555-220556 (Saudi official disavow al Buraik's extremism at summer camps). The record shows WAMY maintained ties with designated terrorists and individuals aligned with

al Qaeda. Maulana Fazlur Rehman Khalil, a signatory of bin Laden's 1998 fatwa and led Harakat ul-Mujahidin (HUM), addressed WAMY in Mecca in 1996. Ex. 117, Peter Dale Scott, US Government Protection of Al-Qaeda Terrorists and the US-Saudi Black Hole, The Asia-Pacific Journal, Vol. 11, Iss. 29. No. 1., July 28, 2103, pp 16-17, citing Peter Dale Scott, Road to 9/11, p. 171 and Rajeev Sharma, Pak Proxy War (New Delhi: Kaveri Books, 2002), pp. 145-46; also see Ex. 67, Animesh Roul, "A Holy Warrior Reborn: Maulana Fazlur Rehman Khalil Enters Pakistan's Mainstream," Militant Leadership Monitor, Volume 9 Issue 4, Jamestown Foundation, https://jamestown.org/a-holy-warrior-reborn-maulana-fazlur-rehman-khalil- enters-pakistans-mainstream/. U.S. authorities designated Harakat ul-Mujahidin (HUM) in 1997 as a Foreign Terrorist Organization (FTO) in 1997 and designated Khalil as SDGT in 2014, noting HUM and Khalil's close ties to al Qaeda. Ex. 160, U.S. Dept. of the Treasury, "Treasury Department Targets Senior Official and Support Networks of Two Pakistan- based Terrorist Groups," September 30, 2014.

The record shows that WAMY maintained ties with Anwar al-Awlaki, a senior al-Qaeda in the Arabian Peninsula figure and spiritual mentor to several 9/11 hijackers. WAMY invited al-Awlaki to lecture at youth camps, distributed his sermons, translated his lectures, and was involved in his hiring at Dar al-Hijrah. Ex. 86 WAMYSA 30079-30081 (WAMY invitation to al-Awlaki); Ex. 132, WAMY INTL 15165-15168 (WAMY distributed al-Awlaki sermons); Ex, 131, WAMY INTL 0249 (WAMY translated al-Awlaki lectures); Ex. 177, Abdullah Dep. 89:12-91:21 (WAMY involved in hiring al-Awlaki).

The record shows that U.S. government assessments contradict Defendant's claim that WAMY's philosophy is constructive or in "utter contrast" to al-Qaeda. The U.S. government states that "WAMY supports terrorist ideals and causes," classifies WAMY as a "Tier One" terrorist support organization, and reports that WAMY may be affiliated with al-Qaeda operations. Ex. 119,

Set_52_3643-3869 at 37; Ex. 120, Unclassified Summary of Evidence for Combatant Status Review Tribunal, Hamed, Adel Hassan, 19 November 2004, PEC- KSA002746; (WAMY may be affiliated with al-Qaeda).) The government further found that "top WAMY officials" said the U.S. and Israel must be destroyed. Ex. 122, Summary of Administrative Review Board Proceedings for ISN 940, undated, FED-PEC 141772; Ex. 121, Unclassified Summary of Evidence for Administrative Review Board in the Case of Ameur, Mammar, 25 July 2005, Department of Defense Office for the Administrative Review of the Detention of Enemy Combatants at US Naval Base Guantanamo Bay, Cuba.
The record shows that WAMY leadership statements after the September 11 attacks further contradict Defendant's characterization. WAMY Secretary General al-Wohaibi defended Saudi charities as victims of a "Western attack" and downplayed terrorism allegations. Ex. 127, FED-PEC 234792-234795. In Al-Hayat, al-Wohaibi described U.S. counterterrorism actions as a Zionist-neoconservative plot. WAMYSA 6034-6039. Noorwali asserted that Palestinian violence was "self-defense," not terrorism. Ex. 128, FED-PEC 235725-235730. A genuine dispute of material fact exists.

**STATEMENT:**

15. For the first 15 years (1972 to about 1989), WAMY operated mainly as an education organization and achieved its objectives and goals by organizing educational events, publishing books, organizing youth camps to uplift the youth, lending material and moral support to the Muslim youth and students' organizations and associations around the world, participating in international assemblies, establishing and funding learning institutions for boys and girls, and giving scholarships and assistance to the Muslim Youth. Ex. 2 at ¶13; Ex. 5 at 61:23-66:24; Ex. 6 at WAMY-SA E001046-047 (WAMY's Constitution discussing the

WAMY's aims and objectives for leading the youth); Ex. 14, Abdul Wahab Noorwali 2019 Declaration at ¶15 (attesting to some of WAMY's project areas: education, youth empowerment and community needs); Ex. 15, WAMY Intl E001543 (WAMY International flyer showing WAMY's objectives); Ex. 16, PEC-WAMY014980-982 (Excerpt of PEC-WAMY014980-993 – WAMY Western Europe website highlighting its aims, means and activities).

**RESPONSE:**

Disputed in that Defendant asserts that WAMY began "as mainly an education organization." Plaintiffs contend that WAMY's activities, whether at its formation or otherwise, must be understood within the broader framework of Saudi Arabia's religious and foreign policy objectives. The record contains evidence that the Kingdom implemented its religious and foreign policy through Islamic charities such as WAMY. Other evidence demonstrates that WAMY provides funds and support to terrorists, using its charitable activities as cover for that support. Plaintiffs repeat and incorporate their responses to Plaintiff's ¶ 1, 3, 14, and 24. A genuine dispute of material fact exists.

**STATEMENT:**

**B. WAMY's Chapters and Operations**

**RESPONSE:**

No response necessary.

**STATEMENT:**

16. WAMY operated five domestic offices in Saudi Arabia at Jeddah, Dammam, Riyadh, Taif, and Abha. Ex. 14 at ¶9 (listing the offices in Saudi Arabia).

**RESPONSE:**

Undisputed as a general matter for purposes of this motion.

**STATEMENT:**

17. In 2016, WAMY consolidated the domestic offices into the Riyadh office. Ex. 14 at ¶9-10 (stating that all domestic offices were consolidated into the main office in 2016).

**RESPONSE:**

Undisputed as a general matter for purposes of this motion.

**STATEMENT:**

18. Prior to the 2016 consolidation, WAMY's five domestic offices presided over twelve regions: Central Asia, Southeast Asia, Indo-Pak Subcontinent, Arab World, West Africa, North Africa, Central & South Africa, West Europe, East Europe, North America, South America, and Australia & Pacific. Ex. 6 at WAMY-SA E001048-049 (1993 Constitution); Ex. 7 at WAMY SA E001110 (1996 Constitution).

**RESPONSE:**

Disputed as to any assertion by Defendant that, because it had organized its operational control of regional offices, it somehow exercised appropriate oversight. The record demonstrates that WAMY channeled funds and provided support to terrorist groups. Plaintiffs repeat and incorporate their response to Defendant's ¶ 3. A genuine dispute of material fact exists.

**STATEMENT:**

19. The domestic offices fund activities and projects at the international branches; all projects had to be approved by the domestic offices. Ex. 14 at ¶10 (stating that each branch gets their funds directly from the Saudi offices and had to get approval for all programs from the overseeing

office); Ex. 6 at WAMY-SA E001049 (Constitution Article 12 directs the General Council to approve the executive plans of WAMY's work and activities).

**RESPONSE:**

Disputed in that Defendant asserts that its policies and oversight were appropriate. The record contains examples of WAMY offices diverting funds and providing support to terrorists. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3, 121-132, and 137-149. A genuine dispute of material fact exists.

**STATEMENT:**

20. WAMY has chapters and charitable projects around the world including the United States (WAMY International), Kashmir, Philippines, Sudan, Pakistan, Kenya, Somalia, Tanzania, South Africa, Malawi, Chad, Cameroon, Nigeria, Niger, Senegal, Gambia, Guinea, Pakistan, Afghanistan, Iraq, Argentina, Australia, Bangladesh, Belgium, Brazil, Germany, Chechnya, Czech Republic, Greece, Hong Kong, India, Kenya, Kosovo, Malaysia, Romania, Russia, Senegal, Thailand, Uganda, and Yemen. Ex. 14 at ¶10 (listing the branches that the main office in Riyadh oversees); Ex. 2 at ¶21 (discussing chapters).

**RESPONSE:**

Disputed as to Defendant's assertions that it was solely engaged in charitable projects. The record demonstrates that WAMY engaged in activities that supported and promoted terrorist activities and causes. Plaintiffs repeat and incorporate their responses to Defendant's ¶ 3 and 14. A genuine dispute of material fact exists.

**STATEMENT:**

21. The international branch offices outside the Kingdom reported to a domestic office in Saudi Arabia; they now report to the consolidated Riyadh headquarters. Ex. 14 at ¶10 (discussing branch office reporting to domestic offices and the change to the Riyadh office).

**RESPONSE:**

Disputed as to Defendant's assertion that, because it had organized its operational control of regional offices, it exercised appropriate oversight. The record contains evidence that WAMY offices, regardless of how they organized their operations, have diverted funds and provided support to terrorist groups. Plaintiffs repeat and incorporate their responses to Plaintiff's ¶ 3, 121-132, 137-149. A genuine dispute of material fact exists.

**STATEMENT:**

22. Far from a clandestine or "shadowy da'wah entity," WAMY's branch offices operate openly in their host countries complying with all the different procedures and requirements to register with the host governments before opening an office. Ex. 14 at ¶11 ("WAMY first obtains permission from the government of the host country to open a branch"); see Ex. 17, WAMYSA051692-698 at 694-695 (1998 general secretariat meeting discussing branch office relationship with local authorities); See, ¶¶222-238, *infra* (discussing Rustum Mahmand as a high level Pakistani official during the relevant time period that to his knowledge WAMY operated transparently and clearly and never did anything outside its charter or mission).

**RESPONSE:**

Disputed as to any assertion by Defendant that, because it may have superficially complied with local charitable rules, it was not engaged in activities intended to support terrorists. The record contains examples of host countries identifying WAMY's terrorist activities within their borders, contrary to its stated charitable purposes. Plaintiffs repeat and incorporate their responses to

Defendant's ¶ 3. Furthermore, Plaintiffs dispute Defendant's assertion that because it operated "openly," it was not engaged in support activities. The record shows that terrorists rely upon charitable organizations to conduct legitimate activities to provide cover for funding and logistical support. Plaintiffs repeat their objections and response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

23. WAMY branches are expected to remain "independent from any political or fractional connections" with organizations in their host country and that the projects WAMY supports are "registered as a charitable endowment and that it is not privately owned." Ex. 17 at WAMYSA051694-695 (1998 general secretariat meeting discussing branch office relationship with local authorities).

**RESPONSE:**

Disputed as to any assertion by Defendant that, simply because WAMY regional offices were expected to remain "independent from political or fractional connections," they did so. The record contains repeated examples of host countries identifying WAMY's terrorist activities within their borders, contrary to its stated charitable purposes. Plaintiffs repeat and incorporate their responses to Plaintiff's ¶¶ 3 and 24. A genuine dispute of material fact exists.

**STATEMENT:**

**II. WAMY's Work to Educate Young Muslims Does Not Provide Any Ideological Foundation For The al-Qaeda Movement nor Advocate for Young Muslims to Take Up Arms and Engage in Acts of Violence Against the United States Instead, Providing Young**

**Muslims, Including Girls, with a Broad Education, Including Math and Science, to Help Them Become Peaceful Contributing Members of Their Communities.**

**RESPONSE:**

Disputed. The record shows that WAMY's leadership, publications, and support for terrorist groups encouraged violence against Jews, Christians, and Westerners, aligning with Al-Qaeda's and Bin Laden's declared objectives. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3, 14, 81, and 106. Plaintiffs further contend that the legitimate humanitarian work conducted by charities like WAMY is necessary to conceal its support for terrorist groups, create goodwill in local communities toward terrorist groups, and provide the reasons for fundraising that is diverted to terrorist groups. Plaintiffs repeat and incorporate their response to Defendant ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

**A. WAMY Schools Provide Broad Education and Do Not Promote al-Qaeda's Extremist Violent Ideology.**

**RESPONSE:**

Disputed. The record shows that WAMY indoctrinates and recruits students for Islamic extremist causes aligned with al Qaeda ideology. Plaintiffs repeat and incorporate their response to Defendant's ¶ 14. A genuine dispute of material fact exists.

**STATEMENT:**

24. WAMY helps operate two school for girls in Afghanistan. Ex. 18, Ibrahim Anwar Declaration at ¶17 (discussing the two schools); Ex. 14 at ¶27 (discussing school for girls).

**RESPONSE:**

Undisputed that WAMY helps operate two schools for girls in Afghanistan; it is disputed to the extent that Defendant claims that its humanitarian and charitable work does not conceal its support activities for terrorists.

Legitimate Activities

U.S. officials have explained the crucial role of charities in supporting terrorism: "International charities naturally focus their relief efforts on areas of conflict, also prime locations for terrorist networks. Such charities provide excellent cover for the movement of personnel and even military supplies to and from high-risk areas." Ex. 134, Testimony of Stuart Levey, Under Secretary, Office of Terrorism and Financial Intelligence, U.S. Department of the Treasury, Before the Senate Committee on Banking, Housing and Urban Affairs, July 13, 2005, https://www.treasury.gov/press-center/press- releases/Pages/js2629.aspx.

U.S. officials have further noted that charities' humanitarian work can generate support for terrorist causes, promote ideologies, and offer recruiting opportunities: "The 'legitimate' activities of these charities, such as the operation of schools, religious institutions, and hospitals, can- if abused - create fertile recruitment grounds, allowing terrorists to generate support for their causes and to propagate terrorist ideologies." Ex. 134, Testimony of Stuart Levey, Under Secretary, Office of Terrorism and Financial Intelligence, U.S. Department of the Treasury, Before the Senate Committee on Banking, Housing and Urban Affairs, July 13, 2005, https://www.treasury.gov/press-center/press-releases/Pages/js2629.aspx.

Furthermore, U.S. officials have explained that charitable causes provide the necessary justification for fundraising for terrorist activities: "Charities attract large numbers of unwitting donors along with the witting, thus increasing the amount of money available to terrorists." Ex. 134, Testimony of Stuart Levey, Under Secretary, Office of Terrorism and Financial Intelligence, U.S. Department of the Treasury, Before the Senate Committee on Banking, Housing and Urban

Affairs, July 13, 2005, https://www.treasury.gov/press-center/press-releases/Pages/js2629.aspx. The charitable work of charities also inhibits authorities from acting against them for their non-charitable activities: "To the extent that these charities provide genuine relief, which nearly all of them do, they benefit from public support and an attendant disinclination by many governments to take enforcement action against them." Ex. 134, Testimony of Stuart Levey, Under Secretary, Office of Terrorism and Financial Intelligence, U.S. Department of the Treasury, Before the Senate Committee on Banking, Housing and Urban Affairs, July 13, 2005, https://www.treasury.gov/press-center/press- releases/Pages/js2629.aspx. The advantage of terrorist financing through charities is significant: "Charitable funds are meant to move in one direction only, accordingly, large purported charitable transfers can move without a correspondent return of value and without arousing suspicion." Ex. 134, Testimony of Stuart Levey, Under Secretary, Office of Terrorism and Financial Intelligence, U.S. Department of the Treasury, Before the Senate Committee on Banking, Housing and Urban Affairs, July 13, 2005, https://www.treasury.gov/press- center/press-releases/Pages/js2629.aspx. A genuine dispute of material fact exists.

**STATEMENT:**

25. Even during the first Taliban rule, the girls' schools matriculated over five thousand students, without interference. Ex. 14 at ¶40 (WAMY's activities include all-female schools in Kabul Afghanistan operated during the Taliban time). Ex. 18 at ¶17 (stating the schools are both in existence).

**RESPONSE:**

Undisputed as to the number of students matriculating. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3 and 24. A genuine dispute of material fact exists.

**STATEMENT:**

26. WAMY also provides assistance to building other schools and contributes to educational programs for young women in other countries. Ex. 19, WAMYSA189661-663 (July 2001 project proposal to sponsor 5 Kurdish students to Sudan, with detailed goals, requirements, travel expenses, housing cost); Ex. 21, WAMYSA175985-6006 ("Ethiopia Al-Mana – Report Trust" – Series of 1994 Ethiopian documents related to a girls sewing program); Ex. 20, WAMYSA399014-028 (1997 document memorializing assistance in construction of the girls college with 900 attendees and documents some of their project requirements); Ex. 22, WAMYSA173386-399 (2001 classroom construction at Umme-E-Kulsoom School Indian elementary school with 76 students); Ex. 23, WAMYSA036043 (2000 article on establishment of girl school in Indonesia).

**RESPONSE:**

Undisputed as to WAMY's assistance to other schools and educational programs. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3 and 24. A genuine dispute of material fact exists.

**STATEMENT:**

27. WAMY also established 24 primary schools, opened 8 educational and professional institutes, established 11 Quran teaching centers, and funded the Imam Malik School and the Khalid bin Waleed School. Ex. 24, WAMYSA065181-185 (LBI over all dissolution document); Ex. 12 at 322:9-324:5.

**RESPONSE:**

Undisputed as to WAMY's claim that it established various schools. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3 and 24. A genuine dispute of material fact exists.

**STATEMENT:**

28. In addition to the girls' schools, WAMY also runs the Abu Hanifa Teachers Training Institute ("Abu Hanifa") that *Lajnat Al-Bir Al-Islamiya* ("LBI"), a former WAMY affiliate, created in 1987 in Pakistan. Ex. 12 at 132:6-133:5 (discussing Abu Hanifa and WAMY goals) and at 316:8-20; Ex. 18 at ¶12 ("Abu Hanifa Institute was initially established by LBI"); Ex. 25, WAMYSA028403-414, at 412 (January 13, 1997 LBI summary report discussing Abu Hanifa and number of graduate from 87-96); Ex. 26, WAMYSA047326-329 (In or about 1996 letter requesting financial transfer of funds to cover salaries); Ex. 14 at ¶15 (teacher training courses as part of WAMY's objectives).

**RESPONSE:**

Disputed in part. Plaintiffs do not dispute WAMY's claims that it operates the Abu Hanifa Teachers Training Institute. Plaintiffs note an inconsistency between WAMY officials' testimony that LBI was founded in 1988 or 1989 and the fact that, from its inception, LBI operated under WAMY's auspices, as well as Defendant's assertion that LBI created the school in 1987. Ex. 20 Noorwali Dep. 229:15-21 (found in 1988 or 1989); Ex. 20, Noorwali Dep. 228:11-229:14 (From its inception, LBI operated under the auspices of WAMY). Plaintiffs repeat and incorporate their response to Defendant's ¶ 11. Furthermore, Plaintiffs repeat and incorporate their responses to Defendant's ¶ 24 regarding the need for charities to conduct legitimate activities to conceal their support for terrorists. A genuine dispute of material fact exists.

**STATEMENT:**

29. Abu Hanifa, which still exists and is now run under WAMY-Pakistan after LBI was dissolved in 1997, graduated 38 students in 1987, 52 in 1988, 63 in 1989, 52 in 1990, 55 in 1991, 86¶ in

1993, 80 in 1994, 77 in 1995 and 53 in 1996, all through the Soviet war and the Afghan civil war. Ex. 12 at 115:16-24 (stating that Abu Hanifa is still present in Peshawar); Ex. 25 at WAMYSA028412 (summary sheet detailing number of graduates); at WAMYSA028403 (January 1997 report discussing future change of LBI to ["WAMY]"). Ex. 27, WAMYSA028040-041 (July 1997 government Pakistan approval of name change); Ex. 28, WAMYSA049368-373 at 373 (check to cover payment of 2001 expenses).

**RESPONSE:**

Disputed as to whether LBI was dissolved or merged into WAMY. Plaintiffs note the inconsistency between WAMY officials' testimony that LBI was incorporated into WAMY in 1996 and Defendant's assertion here. Ex. 20, Noorwali Dep. 239:7-240:3 (LBI merged into WAMY in 1996). Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3, 11 and 24. A genuine dispute of material fact exists.

**STATEMENT:**

30. Afghans who had no access to quality education formed the vast majority of the nearly 220 Abu Hanifa students during that period. Ex. 18 at ¶12 (explaining a great deal of Abu Hanifa's students were Afghan refugees present in Peshawar who had no other access to education).

**RESPONSE:**

Undisputed that most of the students at Abu Hanifa were Afghans during the relevant period. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

31. Abu Hanifa had a complete and varied curriculum, a diverse student population, and required the passing of an entry exam. Ex. 29, Ziaul Haq Amarkhil Declaration at ¶¶4-9 (former Abu Hanifa student; Ex. 30, Assadullah Sahil Declaration at ¶¶13-17, (former student).

**RESPONSE:**

Undisputed that Abu Hanifa may have offered a "complete and varied curriculum" to a diverse student body who were required to pass an entrance exam. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

32. Like any other WAMY run school, Abu Hanifa "follow[ed] a standard curriculum focusing on math, science, philosophy, languages in addition to [basic] religious studies provided by the government of Afghanistan…." Ex. 18 at ¶18.

**RESPONSE:**

Undisputed that Abu Hanifa may have offered a standard curriculum. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

33. Abu Hanifah's private education curriculum mirrors that of the publicly run Peshawar University under which Abu Hanifah operates. Id. at ¶11 (though the schools were privately funded, the curriculum was public), at ¶14 (discussing similarities between Peshawar curriculum and Abu Hanifah); Ex. 25 at WAMYSA028412 ("the syllabus comprises of Islamic studies and Sciences. The medium language of teaching is Arabic.").

**RESPONSE:**

Undisputed that Abu Hanifa's curriculum may have been similar to Peshawar University. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

34. Abu Hanifa's two-year program curriculum of about 22 subjects includes courses in Islam, computers, math, Quran memorization, Islamic jurisprudence or fiqh, English, Arabic, social science, modern Islam, computer studies, newspaper, da'wah, the Quran, hadiths and peace studies. Ex. 29 at ¶6 (explaining Abu Hanifa's curriculum); Ex. 30 at ¶15.

**RESPONSE:**

Undisputed that Abu Hanifa may have had a two-year program offering 22 subjects for study. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

35. Far from a school indoctrinating youth in pro-al Qaeda or al-Qaeda sympathetic views, Abu Hanifa produces productive and law-abiding members of society like Assadullah Sahil ("Sahil") and Ziaul Haq Amarkhil ("Amarkhil"). Ex. 30 at ¶15 (discussing and comparing Abu Hanifa Institute's complete and varied curriculum that far surpassed the violent biased high schools he previously attended); Ex. 29 at ¶9 (explaining that most of Abu Hanifa's graduates got accepted for higher education in Western Countries).

**RESPONSE:**

Disputed. Defendant asserts that schools like Abu Hanifa, which might offer traditional curriculum, cannot otherwise promote ideology supportive of Islamic extremism aligned with al-Qaeda. Plaintiffs repeat that the record includes evidence that charities' humanitarian work can

generate support for terrorist causes, promote ideologies, and offer recruiting opportunities. Plaintiffs repeat and incorporate their objections and responses to Defendant's ¶¶ 14 and 24. A genuine dispute of material fact exists.

**STATEMENT:**

36. Abu Hanifa graduate Sahil, a senior program officer at the United States Institute of Peace ("USIP"), wrote two books, Peaceful Life in Islam and Youth Legal Awareness, and designed and worked on a project for two years in the Naghar Province in Afghanistan furthering these topics. Ex. 30 at ¶¶3-4 (stating he wrote two books in his current occupation as a Senior Program Officer within USIP).

**RESPONSE:**

Undisputed that an Abu Hanifa graduate published two books and worked in Afghanistan's Nangarhar Province. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

37. With USIP, Sahil also worked on Counter Violent Extremism ("CVE"), a program funded by the United States Agency for International Development. Ex. 30 at ¶4 (stating his current project on counter violet extremism is being funded by USAID).

**RESPONSE:**

Undisputed that an Abu Hanifa graduate participated in a USAID Counter Violent Extremism program. Disputed as to Defendant's effort to generalize all WAMY students based on one student's experience at a single school. Plaintiffs repeat and incorporate their response to the Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

38. Sahil, an Afghan refugee, described Taliban run schools, which he escaped by going to Abu Hanifa, as promoting violence and intolerance rather than education; for example, mathematical equations are explained as "1 bullet + 1 bullet = 2 bullets," or "B is for "baba," as in 'My baba has a gun which he uses to fight." Id. at ¶8 (contrasting the education he received in high schools regulated by the Taliban versus the education received in Abu Hanifa).

**RESPONSE:**

Undisputed that an Abu Hanifa student experienced different educational lessons than at a Taliban school. Disputed that WAMY students' experiences can be inferred from a single student's experience at one school. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

39. In stark contrast with a Taliban school, Abu Hanifa students experienced an affable lifestyle and learned Arabic, math, science computer studies, and much more, had a "complete and varied curriculum that far surpassed the violent, biased high schools" Sahil had previously attended. Ex. 30 at ¶¶13-17; See also Ex. 29 at ¶6 (attesting that the curriculum consists of about 22 subjects); Ex. 2 at ¶16 (discussing curricula).

**RESPONSE:**

Undisputed that an Abu Hanifa student experienced different educational lessons than at a Taliban school. Disputed that WAMY students' experiences can be inferred from a single student's experience at one school. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

40. Like Sahil, Abu Hanifa graduate Amarkhil, was also an Afghan refugee. Ex. 29, at ¶3-4 (explaining that his family immigrated to a Pakistan refugee camp during the Afghanistan war); Ex. 18 at ¶12 (Abu Hanifa "provides a comprehensive secondary education to disadvantaged and poverty-stricken youth").

**RESPONSE:**

Undisputed that multiple Abu Hanifa students were Afghan refugees. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

41. Amarkhil, like Sahil, found that Abu Hanifa did not teach students "about infidels or fighting for infidels" nor did it urge students to take up arms against the West but instead advocated peace and respect for all. Ex. 29 at ¶7-8, 13 (explaining there was no teaching about fighting for infidels nor any teachings urging students to take arms against the West); see also Ex. 30 at ¶¶18-19 (discussing that political figures and messages were expressly disallowed and no knowledge of terrorist or violent activities); see, Ex. 11 at ¶12 (attesting to WAMY's non-extremist teaching of Islam); Ex. 2 at ¶17 (discussing WAMY's positive views of the United States).

**RESPONSE:**

Undisputed that an Abu Hanifa student experienced different educational lessons than at a Taliban school. Disputed that WAMY students' experiences can be inferred from a single student's experience at one school. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

42. The majority of Abu Hanifa's graduates go on to higher education in Western countries and "hold senior positions in their respective careers" in places like the United Nations, United States embassies and as academicians. Ex. 29 at ¶9-10 (explaining most of Abu Hanifa's graduates got accepted for higher education in western countries and are now working in the United Nation, U.S. embassies or are teachers and academicians).

**RESPONSE:**

Undisputed that most of Abu Hanifa's graduates go on to higher education and "attain senior positions in their respective careers." WAMY's implied assertion that some students' experiences represent all students, and that some students' success indicates WAMY's innocence, is disputed. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

43. Upon graduation from Abu Hanifa, Amarkhil worked at the United Nations as a police officer, then he returned home to Afghanistan to engage in politics. Id.

**RESPONSE:**

Undisputed that an Abu Hanifa student worked at the UN. WAMY's implied assertion that some students' experiences represent all students, and that some students' success indicates WAMY's innocence, is disputed. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

44. There is no evidence that any person that attended a WAMY school later became a member of al-Qaeda and Plaintiffs cannot show anything to the contrary. See Ex. 31, Jonathan Winer Dep. Transcript (Excerpts) at 219:2-24.

**RESPONSE:**

Disputed. As stated in Plaintiffs' response to Defendant's ¶ 24, humanitarian and charitable activities can disguise support for terrorism and engender goodwill for terrorist causes. The record shows that WAMY promoted violent ideology against non-Muslims and used its humanitarian activities to indoctrinate and recruit extremists. See Plaintiffs' objections and responses to Defendant's ¶ 14 for examples of WAMY publications and statements that encourage hatred and violence against non-Muslims.

Furthermore, the record shows that WAMY recruited through its educational programs. The CIA determined that "WAMY's global reach and influence among Muslim youth has made it an excellent conduit of recruits for many extremist groups." Decl. of Mohammedi (Dkt. No. 12001), Ex. 245, CIA Report, Saudi-Based Financial Support for Terrorist Organization [REDACTED], November 14, 2002, CIA_000143-158 at CIA_000151.

Additionally, the CIA has stated: "In the Balkans, local offices of NGOs such as the World Assembly of Muslim Youth, al-Haramayn, Society for the Revival and Islamic Heritage, and al-Waqf al-Islamiya were actively involved in spotting and assessing suitable terrorist recruits from among young men who seek assistance from humanitarian organizations, [REDACTED]." Decl. of Mohammedi (Dkt. No. 12001), Ex. 244, CIA Report, Al-Qa'ida Still Well Positioned to Recruit Terrorists [REDACTED], July 1, 2002, CIA_000178-189 at CIA_000186. Furthermore, "[g]roups such as the World Association for Muslim Youth observe students in schools and offer scholarships for religious training in the Middle East."). Decl. of Mohammedi (Dkt. No. 12001), Ex. 244, CIA Report, Al-Qa'ida Still Well Positioned to Recruit Terrorists [REDACTED], July 1,

2002, CIA_000178-189 at CIA_000185. Other evidence points to WAMY's recruiting in the U.S where the FBI has investigated WAMY for recruiting at schools and universities: "The FBI is also examining the possibility that al-Qa'ida or other radical Islamic extremists are recruiting at U.S. schools and universities. State-sponsored Islamic student organizations, such as WAMY, are specifically targeting students at Universities and public schools in the United States to promote their Islamic ideology." Ex. 8, FBI Report, Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States, December 2004, 3414-3442 at 3437. Evidence in the record also includes an example of a WAMY-sponsored student being indoctrinated into Wahhabi ideology. Philippine student Zam Amputan revealed that WAMY paid for him to attend a madrassah in Peshawar in 1987, exposing him to Wahhabi ideology. Amputan returned to the Philippines "thinking of ways to create a separate Islamic state in the Southern Philippines." Ex. 135, "The Tenets of Terror," Christian Science Monitor, October 18, 2001. Other news reports confirm that WAMY was being investigated for terrorism financing in the Philippines. Ex. 136, "Forging an Indirect Strategy in Southeast Asia," Washington Quarterly, Spring 2002. Additionally, the record indicates that WAMY sponsored summer camps for students that promoted hatred and violent ideology against non-Muslims. See Plaintiffs' response to Defendant's ¶ 14 concerning WAMY publications and speeches aimed at students, which indoctrinate and encourage hatred and violence against non-Muslims. The public record also identifies a WAMY student who has gone on to commit acts of terrorism. Mohammed Abdirahim Abdullahi, also known as Dulyadin, led an Al-Shabaab terror squad that assassinated 148 students at Garissa University College in Kenya in 2015. He attended a high school founded by WAMY and, according to news accounts, was radicalized at high school along

with other classmates who joined the Islamic State and Al- Shabaab. Abdullahi was killed by Kenyan government forces who raided an Al-Shabaab camp. Ex. 137, Robyn Dixon, "Kenyan air force launches strikes against Shabab militants," Ex. 137, LA Times, April 6, 2015 , available at https://www.latimes.com/world/africa/la-fg-kenyan-air-force-launches- strikes-against-shabab-militants-20150406-story.html

al-Awlaki Recruiter

The record also contains evidence that WAMY-sponsored cleric Anwar Al- Awlaki served as the spiritual guide and a facilitator to 9/11 hijackers. Ex. 4, 9/11 Commission Report 221, 229-230, 517, and 523. Al-Awlaki has also mentored other terrorists, notably the Ft. Hood shooter Maj. Nidal Malik Hassan and the would-be AQAP "Underwear bomber" Umar Farouk Abdulmutallab. In a video interview, Al-Awlaki called Hassan "his student": "Yes, Nidal Hassan is one of my students and that's an honor for me, I feel honored that the likes of Nidal Hassan are from my students, what he did was a heroic job, a wonderful operation, and we ask Allah, the Almighty to grant him steadfastness and protect him and hasten his release, and I support what he did .... I call the Muslims also to take by his way, either they do Jihad by saying or do jihad with the hand, and the example that Nidal Hassan presented is the better example, we ask Allah the Almighty to make it a great opening for several other Muslims to take by his way .... Nidal Hassan changed from an American soldier to a Mujahid who kills the soldiers who served with him one day, and if the American crimes continue, then we will see other Nidal Hassans too. And also there are Mujahideen from the West in Afghanistan and Iraq and this phenomenon will surface even more with the American and Western crimes in the Islamic World." Ex. 66, Al- Malahem Media Foundation. "A Premiere and Exclusive Interview with the Islamic Preacher Sheikh Anwar Al-Awlaki." Al-Qaida in the Arabian Peninsula (AQAP). http://www.alfaloja.ws/vb/showthread?t=117972. May 22, 2010; Ex. 138, Government

Sentencing Memorandum 12-14, U.S. v. Umar Farouk Abdulmutallab, Case No. 2:10-cr-20005, Doc No. 30, (E. D. Mich. February 10, 2012) (Awlaki encouraged Abdulmutallab to conduct a suicide mission); Ex. 139, David Leppard and Dan McDougall, "MI5 knew of Umar Farouk Abdulmutallab's UK extremist links," Sunday Times, January 3, 2010, http://www.thesundaytimes.co.uk/sto/news/uk_news/article194163.ece; Ex. 140, Dan McDougall et al., "Umar Farouk Abdulmutallab: one boy's journey to jihad," Sunday Times, January 3, 2010, http://www.thesundaytimes.co.uk/sto/news/uk_news/article6470.ece (Awlaki met Abdulmutallab at Iman University in Yemen; The University is operated by SDGT Sheikh Abdul Majid Al-Zindani). Also see Plaintiffs' responses to Defendant's ¶ 13 "Hamas" and "Union of the Good".) A genuine dispute of material fact exists.

**STATEMENT:**

45. To the contrary, former Abu Hanifa students confirm that students did not have associations with al-Qaeda and that Abu Hanifa students did not participate in or observe any terrorist or violent activities. See Ex. 30 at ¶ 19; See also Ex. 29 at ¶7 and ¶13.

**RESPONSE:**

Disputed as to Defendant's reliance on an overly narrow basis —a WAMY institution—as the sole measure of WAMY students' associations with al-Qaeda. Plaintiffs repeat their response to Defendant's ¶ 44. A genuine dispute of material fact exists.

**STATEMENT:**

46. Beyond operating schools, WAMY furthers its mission to educate, not indoctrinate, Muslim youth by offering educational scholarships to students all over the world. Ex. 32, Ibrahim Abdullah Dep. Transcript (Excerpts) at 106:9-12 (discussing scholarships); Ex. 33,

WAMYSA031622-031623 (1995 agreement re: WAMY and LBI funded scholarships for over 64 students at Al-Azhar with oversight and renewal).

**RESPONSE:**

Disputed that WAMY's offering of scholarships means it is not involved in indoctrination. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 14 (WAMY publications and statements encouraging Islamic extremism), 24 (legitimate charities and recruiting), and 44 (recruiting at schools and universities). A genuine dispute of material fact exists.

**STATEMENT:**

47. WAMY's worldwide scholarships and assistance program covers such items as tuition, books and cost of living. Ex. 34, WAMYSA058095 (2001 letter from IIASA requesting scholarship); Ex. 35, WAMYSA036431-432 (1994 letter re request in Western Europe for scholarships and asking for detailed plans for the program); Ex. 36, WAMYSA036914 (1999 letter from Turki to Wohaibi re Kosovo projects which includes scholarships and school bags).

**RESPONSE:**

Undisputed that WAMY offers scholarships. Disputed as to any assertion that WAMY was not engaged in indoctrination or support for terrorists because it offered scholarships. Plaintiffs repeat their objections and responses to Defendant's ¶¶ 14, 24, and 44. A genuine dispute of material fact exists.

**STATEMENT:**

48. As with other WAMY projects, the provision of scholarships is monitored to ensure the students receive the funds and are attending the educational programs as intended. See, e.g. Ex. 37, WAMYSA051057-059) (2000 letter asking student to confirm attendance at school in

order to renew scholarship); Ex. 38, WAMYSA031804 (1996 internal memo with financial statement for the scholarship for orphans); Ex. 33 at WAMYSA031622-623 (1995 agreement re: WAMY and LBI funded scholarships for over 64 students at Al-Azhar with oversight and renewal).

**RESPONSE:**

Undisputed that WAMY administers scholarship eligibility. Disputed as to any assertion by Defendant that the use of scholarship funds for schooling is evidence that WAMY was not engaged in indoctrination or support for terrorists. Plaintiffs repeat their objections and responses to Defendant's ¶¶ 14, 24, and 44. A genuine dispute of material fact exists.

**STATEMENT:**

49. Mustafa Ismail benefited from WAMY's scholarship program. Ex. 11 at ¶4 (WAMY helped fund his Ph.D. studies at Bristol University).

**RESPONSE:**

Undisputed that some WAMY students benefit from scholarships. Disputed as to any assertion by Defendant that the experience of one student is representative of all students and that the use of scholarship funds for schooling is evidence that WAMY was not engaged in indoctrination or support for terrorists. Plaintiffs repeat their responses to Defendant's ¶¶ 14, 24, and 44. A genuine dispute of material fact exists.

**STATEMENT:**

50. Mr. Ismail, who graduated from Khartoum University with a Doctorate in Medicine in 1978, went on to become a research lecturer at Bristol University in the United Kingdom, served as Secretary General for the International Islamic Federation of Student Organization (IIFSO),

was a member of WAMY's General Secretary representing IIFSO, and has been involved with the International University of Africa in Khartoum since 2012. Id. at ¶¶3-8, 14-17 (explaining his involvement in IIFSO and the International University of Africa in Khartoum).

**RESPONSE:**

Undisputed that some WAMY students benefit from scholarships. Disputed as to any assertion by Defendant that the experience of one student is representative of all students and that the use of scholarship funds for schooling is evidence that WAMY was not engaged in indoctrination or support for terrorists. Plaintiffs repeat their responses to Defendant's ¶¶ 14, 24, and 44. A genuine dispute of material fact exists.

**STATEMENT:**

**B. WAMY's Summer Camps Encourage Muslim Youth to Be Productive Citizens; Not Engage in Acts of violence or Become Terrorists**

**RESPONSE:**

Dispute. See Plaintiffs' response to ¶¶ 51-67.

**STATEMENT:**

51. Beyond running schools and offering scholarships, WAMY furthers its educational mission by hosting summer youth camps when students are not in school. Ex. 6 at WAMY-SA E001045-047 (WAMY Constitution, Article 4 on education, youth camps and scholarships).

**RESPONSE:**

Undisputed that WAMY hosts summer youth camps. Disputed to the extent Defendant implies it is not engaged in support of terrorists merely because its mission includes educational activities like summer camps. The record contains evidence that propaganda and ideology distributed at

WAMY summer camps promoted hatred and violence toward non-Muslims. The record also shows that charities use legitimate activities as cover for their support. Plaintiffs repeat and incorporate their responses to Defendant's ¶ ¶ 14, 24, and 44. A genuine dispute of material fact exists.

**STATEMENT:**

52. WAMY Youth Camps are well-known and held all over the world with the first one held in Abha, Saudi Arabia in 1977 and others in places like Jordan (1977), Republic of Mali (1979), United States (1980), Turkey (1980), Morocco (1981), Nigeria (1982), Kenya (1984), Brazil (1986), Tanzania (1988), and many more. Ex. 5 at 39:18-40:2 (explaining which countries in Africa he participated in the camps); See, e.g. Ex. 39, WAMY Intl E002177-241 at E002187 (listing Abha year as 1397 Hijri which is 1977), at 237-240 (listing the about 185 successful youth camps from 1976 to 1989).

**RESPONSE:**

Undisputed that WAMY sponsored the referenced summer camps; disputed, however, to the extent Defendant implies it was not engaged in support to terrorists because it hosted summer camps. The record includes evidence that propaganda and ideology distributed at WAMY summer camps promoted hatred and violence toward non-Muslims. Plaintiffs repeat and incorporate their responses to Defendant's ¶ ¶ 14, 24, and 44. A genuine dispute of material fact exists.

**STATEMENT:**

53. Most of the camps are temporary but large youth camp gatherings are held at the WAMY owned permanent camps located in Cyprus, Malaysia, Bangladesh, Saudi Arabia, and

Morocco. EX. 39 at WAMY Intl E002187 (WAMY Youth Camp Handbook listing location of temporary youth camps).

**RESPONSE:**

Undisputed that most camps are temporary and that WAMY maintains permanent camps at the referenced locations; disputed, however, as incomplete. The record contains evidence that propaganda and ideology distributed at WAMY summer camps promoted hatred and violence toward non-Muslims. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 14, 24, and 44. A genuine dispute of material fact exists.

**STATEMENT:**

54. The three main objectives of a WAMY youth camp, which a host nation can always modify to fit the needs of its community are: "(1) to give students and student leaders a chance to know each other, (2) unify the understanding of Islam, and (3) coordinate experiences together." Ex. 11 at ¶9-10 (listing the three objectives of the camps and stating that he is a product of the aim of those camps). Ex. 39 at WAMY Intl at E002191 (listing, generally, the youth camp objectives).

**RESPONSE:**

Disputed. Plaintiffs dispute the stated purpose of WAMY summer camps because it is inconsistent with the record. As previously noted, the record contains examples of propaganda and ideology distributed at WAMY summer camps that promote hatred and violence toward non-Muslims. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 14 and 44. A genuine dispute of material fact exists.

**STATEMENT:**

55. WAMY's worldwide youth camps are outdoors opportunities for the youth to learn, among other things, the correct understanding of Islam, leadership skills, how to discuss challenges facing Muslims worldwide, how to avoid extremism and tribalism and other values derived from lectures and seminars. Ex. 5 at 65:2-10 (acknowledging that WAMY's constitution, article 4 refers to establishing camps and other youth activities; Ex. 39 at WAMY Intl E002186 – 187 (Islamic Camps, Objectives, Program Outlines, Preparatory Steps – explaining the youth camp structure).

**RESPONSE:**

Disputed. Plaintiffs dispute the stated purpose of WAMY summer camps because it is inconsistent with the record. As previously noted, the record contains examples of propaganda and ideology distributed at WAMY summer camps that promote hatred and violence toward non-Muslims. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 14 and 44. A genuine dispute of material fact exists.

**STATEMENT:**

56. WAMY's youth camps come complete with a standardized manual that includes a program, suggested committees, suggested reading materials, "themes," "topics," and activities. Ex. 2 at ¶15; Ex. 5 at 40:21-23 (acknowledging the existence of a curriculum); Ex. 39 at WAMY Intl at E002180-181 (WAMY Youth Camp Pamphlet listing the contents of the pamphlet) and at 234-237 (describing resources and curriculum at the youth camps).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion that only a "standardized manual" for WAMY summer camp programs is presented to campers. The record includes evidence of propaganda and ideology distributed at WAMY summer camps that promote hatred and violence toward non-

Muslims and are not part of a standardized manual. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 14 and 44. A genuine dispute of material fact exists.

**STATEMENT:**

57. The youth camps "[have] nothing to do with military training or any indoctrination," students are not trained in the use of weapons, nor are they provided any weapons." Ex. 11 at ¶10; Ex. 2 at ¶¶15, 23-24 (that WAMY does not call for attacks against the West and discourages terrorism); Ex. 39 at WAMY Intl at E002180-181 (WAMY Youth Camp Pamphlet Contents in which nothing pertains to military training) and at 234-237 (WAMY Youth Camp Pamphlet listing the books read as part of the curriculum).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's claim that WAMY summer camps have "nothing to do with military training or any indoctrination." The record contains examples of WAMY summer camp speakers and literature promoting hatred and violence against non-Muslims. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 14 and 44. A genuine dispute of material fact exists.

**STATEMENT:**

58. Instead, the youth camps – where local language speaking scholars are invited to speak - teach against extremism and produce productive citizens. Ex. 11 at ¶¶10, 12-13 (stating that the camps are used to train the youth to become productive members of their respective society and that WAMY informs students of the real understanding of Islam, that Islam is not an extremist's religion); Ex. 5 at 40:7-18. (attesting that WAMY invites local Islamic scholars to youth camps to give lectures).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's claim that WAMY summer camps "teach against extremism and produce productive citizens." The record contains evidence of WAMY summer camp speakers and other WAMY distributed literature promoting hatred and violence against non-Muslims. Plaintiffs repeat and incorporate their responses to Defendant's ¶3, 14 and 44. The record includes specific evidence that WAMY provided or supported terrorist military training in other contexts in Afghanistan, Bosnia and Sudan. The CIA determined that WAMY has sponsored and funded military training camps for Muslim youth: "[REDACTED] paramilitary training camps [REDACTED] including a large camp near [REDACTED] have offered Muslim youths training. [REDACTED] training at such camps included weapons handling, firing, and explosives [REDACTED]. Training appears to be sponsored by various NGOs, including the World Association of Muslim Youth and the Foundation of Islamic Tarbiya (education). Decl of Mohammedi (Dkt. No. 12001) Ex. 244, CIA report, Al-Qa'ida Still Well Positioned to Recruit Terrorists [REDACTED], July 1, 2002, CIA_000178-189 at CIA_000185. A genuine dispute of material fact exists.

**STATEMENT:**

59. Published in 1987 and translated in 1990, *Islamic Camps: Objectives, Program Outlines, and Preparatory Steps* ("Islamic Camps") is a curriculum manual used as an instructional booklet for WAMY's worldwide youth camps. Ex. 39 at WAMY Intl E002178 and at 181 (publishing/translation date and contents of the instructional booklet).

**RESPONSE:**

Undisputed as a general matter for purposes of this motion.

**STATEMENT:**

60. The Islamic Camps booklet is translated into fifty languages; the content includes topics like "definition of camps," "types of camps," "objective of the camps," "camp follow-up", "camp programmes," "camp doctor," "sports committee," "skills and craft" development, and much more. Id. at WAMY Intl E002180-181 (listing the content of the booklet); Ex. 11 at ¶11 (explaining that WAMY translated its booklets into almost fifty different languages and used them at the camps to teach topics such as salat, zakat, hajj, the Prophet's life and wife, hygiene and fasting).

**RESPONSE:**

Disputed to the extent Defendant implies that the only instruction or indoctrination occurring at WAMY summer camps is limited to its Islamic Camps booklet. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 14 and 44. A genuine dispute of material fact exists.

**STATEMENT:**

61. WAMY achieves its youth camp objectives with a focus on the individual's "spiritual aspect" (reciting the Quran, praying and advising good behavior), "mental and cultural aspect" (lectures, seminars, debates to discuss to guide youth in correct Islamic thought"), "bodily and sporting aspect" (volley, basketball, mountaineering, judo etc.), "behavioral and character aspect" (getting rid of bad habits and encouraging good ones), and "leisure and relaxation aspect" (how to enjoy and maximize value of leisure time without excess). Ex. 39, WAMY Intl at E002196-200.

**RESPONSE:**

Disputed to the extent Defendant implies that the only instruction or indoctrination at WAMY summer camps is limited to its Islamic Camps booklet. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 14 and 44. A genuine dispute of material fact exists.

**STATEMENT:**

62. A few popular songs are included in the booklet including an older song "Youth of the True Religion." Id. at WAMY Intl at E002231-232.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's characterization of the WAMY camp song as old, insinuating that, as an old song, it is irrelevant. Whether old or not, WAMY promoted the song at summer camps. The record shows U.S. investigators cited a portion of the song as evidence to consider for a defendant's pre-trial detention, noting the defendant had connections to senior Hamas officials and WAMY US officials. U.S. officials placed the lyrics into the context of other WAMY statements showing repeated themes of hatred and violence against non-Muslims. The section of the song cited by the U.S. was: "Ask the kuffaar [infidels]: who repelled their tyrants? And ask the mushrikeen [literally polytheists]: who terrified their supporters? Ask the world: who shook its monarchs? * * Hail! Hail! O Sacrificing Soldiers! To Us! To Us! So we may defend the flag on this Day of Jihad, are you miserly with your blood?! And has life become dearer to you? And staying behind sweeter? Is staying in this world of torment more pleasing to us? You are amongst those called upon by Destiny. Come! So we may revive the times the times of our predecessors!" U.S. authorities noted that the book identified these materials as intended for Muslim youth aged 14-18. Ex. 124, September 11, 2003 Affidavit of Senior Customs Agent David C. Kane, *U.S. v. Biheiri* (E.D. Va.), referencing WAMY, Islamic Camps: Objectives, Program Outlines and Preparatory Steps. The U.S. Government set the lyrics in the context of other WAMY

publications, making clear their meaning: "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah." Ex. 124, September 11, 2003 Affidavit of Senior Customs Agent David C. Kane, *U.S. v. Biheiri* (E.D. Va.), referencing WAMY publication *Islamic Views*, as identified in the National Review article online "The Roots of Terror" published December 5, 2002. To emphasize the point, the U.S. Government further cited the WAMY publication Handy Encyclopedia of Contemporary Religions and Sects, which included a section titled "Heroes from Palestine," idolizing individuals who have attacked Israelis; among the "heroes" is Abdel-Hadi Nemim (aka Ghanim), who hijacked and drove a civilian bus over a cliff, killing 14 people. Ex. 124, September 11, 2003 Affidavit of Senior Customs Agent David C. Kane, *U.S. v. Biheiri* (E.D. Va.), referencing WAMY publication Handy Encyclopedia of Contemporary Religions and Sects. Another section, titled "Animosity Toward the Jews," identified the reason why Muslims should hate Jews: "[T]he seed of the Gulf-war was planted by a Jew; the Jews are enemies of the faithful, God and the angels; The Jews are humanity's enemies; they foment immorality in this world; The Jews are deceitful, they say something but mean the exact opposite; Who was behind the biological crisis which became like brainwashing? A Jew; Who was behind the disintegration of family life and values? A Jew; The one that stirred-up hate and turned the individuals against their Muslim governments in the Arab peninsula - a Jew; Who promoted Atheism and made the countries thrive on Muslims' blood? The Jews; Every tragedy that inflicts the Muslims is caused by the Jews." Ex. 124, September 11, 2003 Affidavit of Senior Customs Agent David C. Kane, *U.S. v. Biheiri* (E.D. Va.), referencing WAMY publication Handy Encyclopedia of Contemporary Religions and Sects. By way of completeness, the record contains another WAMY translation of a different passage of the song: "Youth of [Islam] are the guided youth. Come! Come to a final decision: The Prophet has called out and so has the Qur'an. So

blessed is the servant who responds when he is called ... Bring back the glory to it's lions, And restore the zeal to its soldiers. Flatten evil in its cradle, And unsheath the swords ... Hail! Hail! O sacrificing soldiers! To us! To us! So we may defend the flag. On this Day of Jihad, are you miserly with your blood?!" Decl. Mohammedi (Dkt. No.) Ex. 39, Islamic Camps: Objectives, Program Outlines, Preparatory Steps, World Assembly of Muslim Youth (WAMY), Riyadh, Saudi Arabia, prepared by the Camps & Conference Unit of WAMY 1987, translated (with additions) by Abu-Bakr M. Asmal 1990, WAMY Intl E02117-E02241. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 14, 63, 64. A genuine dispute of material fact exists.

**STATEMENT:**

63. The lyrics of this old song in their entirety are:

Youth of the True Deen are the guided youth Come! Come to a final decision: The Prophet has called out and so has the Qur'an. So blessed is the servant who responds when he is called To Allah we supplicate and to Him is the Return To Allah Alone the Lord of creation To the Deen after which there's none To the Chosen (Prophet) whose era we contemplate To the Truth whose love we ask for To the Most Holy and Sacred we ask for repentance Here is Madinah and here is Makkah Here is the Deen that cares and here is honor Here is purity, eminence and virtuosity Here is strength, resoluteness and invincibility So where, where else do we need to go?\! Bring back the glory to its lions And restore the zeal to its soldiers Flatten evil in its cradle And unsheathe the swords And don't be concerned here with difficulties Ask the kuffaar: who repelled their tyrants? And ask the mushrikeen: who terrified their supporters? Ask the world: who shook its monarchs? And ask truth who preserved its authority? You will find in Badr enough for an answer! Ask Uhud and ask Khaibar Ask the blood which reddened the face of the earth Ask King Kisra and ask Caesar Ask Truth for over them both it was all-

conquering Ask the Desert: how many secrets has it uncovered?! Ask ignorance: who has toppled it on this Earth? And ask oppression: who has disciplined it on this planet? Ask the East of this Dominion (Muslim Empire) or its West And ask glorious Baghdad or Cordoba You will see that your Dominion is far above the clouds! Alas, we have forgotten our position here (now) And we've abandoned the shariah and our role Error has built in our territory whatever it is And it has built nothing but weakness and ruin And we nurture nothing but desires and falsehoods! Hail! Hail! O sacrificing soldiers\! To us! To us! So we may defend the flag this Day of Jihad, are you miserly with you blood?! And has life become dearer to you? And staying behind sweeter? Is staying in this world of torment more pleasing to us? You are amongst those called upon by Destiny Come! So we may revive the times of our predecessors And establish Truth amongst the successors Come! Allah forgives that which has passed For Allah never abandons one who supplicates and repents! Id. at E002231-32.

**RESPONSE:**

Undisputed that the quoted lyrics appear at Ex. 145, WAMY Intl E002231-32.

**STATEMENT:**

64. The song makes no reference and has connection to modern day events, nor does it encourage violence against the U.S. or the West let alone 9/11 terrorist act. Id.

**RESPONSE:**

Disputed. The record shows that, in the context of WAMY's other statements and support for terrorists, the lyrics' meaning is relevant to "modern day events." Plaintiffs further dispute Defendant's assertion that a song written and published before the 9/11 attacks could somehow reference them, and the absence of such a reference confirms that the song does not encourage

violence. A close reading of the lyrics does, in fact, reference examples of violence against non-Muslims and exhorts Muslim youth to restore Islam's supremacy over other religions and cultures through violent struggle. Plaintiffs further contend that Defendant's isolated reading intentionally separates the lyrics from the political and historical context that gives them significance for Islamic extremists, such as Al Qaeda and bin Laden, who have long used militant themes, references to early Islamic battles, and calls for armed jihad to justify hatred and violence against non-Muslims. Plaintiffs repeat and incorporate their responses to Defendant's ¶ 14. Additionally, Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 62, 63, 65-67, and 81. A genuine dispute of material fact exists.

**STATEMENT:**

65. *Youth of the True* (*Religion*) mentions ancient medieval battles going back to 622 C.E. Ex. 13 at p. 44 (explaining the context of the songs).

**RESPONSE:**

- Undisputed that the song makes reference to "medieval battles"; disputed, however, to the extent Defendant's preferred reading of the lyrics rebuts the political and historical context that gives the songs meaning and significance for Islamic extremists, like Al Qaeda and bin Laden, who have long used militant themes, references to early Islamic battles, and calls for armed jihad to justify hatred and violence against non-Muslims. Plaintiffs further dispute Defendant's substitution of expert opinion for fact, citing Blankinship's interpretation of WAMY's song. Plaintiffs contend the battles and conquests referenced in the lyrics -- Badr, Uhud, Khaibar, King Kisra and Caesar -- are highly symbolic references to Islamic armed victories over non-Muslims intended to frame their struggle as a continuation of early Islamic battles, inspire recruits, and legitimize violent jihad. The record contains references to the importance of these historical

conflicts to jihadis in Afghanistan. For example, Adel Batterjee reported that Abdullah Azzam described the first group of fighters trained at one of the newly financed mujahideen training camps, Badr Camp. Ex. 161, Basil Muhammad, Al-Ansar al-'Arab fi Afghanistan, The Committee for Islamic Benevolence Publications (1991) at 100. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 14, 62, 63, 66-67 and 81. A genuine dispute of material fact exists.

**STATEMENT:**

66. The song, and others in the booklet, has no more meaning other than “trying to get the youth away from self-centeredness.” Id. at p. 44.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion, which relies on a Defendant’s expert’s subjective reading of the lyrics. Plaintiffs dispute that a reasonable reading of the lyrics suggests that the song calls youth away from their "self-centeredness": "So we may defend the flag this Day of Jihad, are you miserly with you [sic] blood?! And has life become dearer to you? And staying behind sweeter? Is staying in this world of torment more pleasing to us? You are amongst those called upon by Destiny Come! So we may revive the times of our predecessors And establish Truth amongst the successors"; "Here is purity, eminence and virtuosity Here is strength, resoluteness and invincibility So where, where else do we need to go?! Bring back the glory to its lions And restore the zeal to its soldiers Flatten evil in its cradle And unsheathe the swords And don't be concerned here with difficulties Ask the kuffaar: who repelled their tyrants? And ask the mushrikeen: who terrified their supporters? Ask the world: who shook its monarchs? And ask truth who preserved its authority? You will find in Badr enough for an answer! Ask Uhud and ask Khaibar Ask the blood which reddened the face of the earth Ask King Kisra and ask Caesar Ask Truth for over them both it was all-conquering Ask the Desert: how many secrets has it

uncovered?! Ask ignorance: who has toppled it on this Earth? And ask oppression: who has disciplined it on this planet? Ask the East of this Dominion (Muslim Empire) or its West." Ex. 141, WAMY Intl E002231-32. A genuine dispute of material fact exists.

**STATEMENT:**

67. Youth of the True Religion, the WAMY camp song, is no different than patriotic songs of nationalism like the national anthem, *La Marseillaise or Flower of Scotland*, which normally mention past wars and battles. Id. (Dr. Blankinship discussing the context in which the songs must be viewed); Ex. 40, Marc Sageman Report (Excerpts) at p. 110 (discussing the mildness of the song compared to La Marseillaise).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion and Defendant's substitution of expert opinions for facts. Plaintiffs further dispute that Defendant's reference to Excerpts of the Marc Sageman Report, Ex. 40, p. 110, references La Marseillaise. Plaintiffs further dispute that Defendant equates national anthems with Islamic extremists' songs simply because both mention violence. Defendant's comparison fails to distinguish the context and purpose of the violence referenced in national anthems from the violence called for by the WAMY camp song. France's "La Marseillaise" references citizens taking up arms during the French Revolution. Scotland's "Flower of Scotland" recalls a medieval battle against English forces. These are historical narratives, not instructions. By contrast, the WAMY camp song is a call to action, urging youth to commit violence now, framing the killing of non-Muslims as a religious duty, and functioning as recruitment propaganda. National anthems are civic symbols, not recruitment propaganda. The WAMY song is designed to radicalize, recruit, and motivate listeners. By contrast, national anthems are ceremonial and symbolic, embedded in cultural traditions. National anthems do not

instruct citizens to attack specific groups today. Lastly, the target of violence differs fundamentally. National anthems may refer to defending a nation, resisting invasion, or a historical battle between armies, but they do not call for violence against civilians, religious groups, or people defined by cultural identity. The WAMY camp song, in contrast, calls for killing innocent non-believers, frames violence as a duty against non-Muslims, apostates, and infidels, glorifies martyrdom, and dehumanizes enemies. Defendant's comparison fails to recognize that the WAMY camp song is an incitement to violence and not equivalent to the cultural expression of a national anthem. A genuine dispute of material fact exists.

**STATEMENT:**

**III. WAMY Publications and Public Statements by WAMY Officials Do Not Encourage Muslim youth To Join al-Qaeda or Take Up Arms or Engage in Acts of violence Against the United States**

**RESPONSE:**

Disputed. See Plaintiffs' responses to ¶¶ 68-116.

**STATEMENT:**

**A. WAMY Publications**

**RESPONSE:**

No response necessary.

**STATEMENT:**

68. Along with schools, camps and lectures, WAMY also furthered its educational objectives by publishing and reprinting books, conducting research, and producing video and audio

recordings that introduce Islam as an ideology and social system to be distributed among the Muslim youth in the important languages of the world. Ex. 6 at WAMY-SA E001046-047 (Constitution); see also, Ex. 41, WAMYSA1248770 (letter to Prince Fahad asking for publication to be used in research; Ex. 4 at 78:3-17 (explain that the Prince Abdulaziz' Office of Research and Studies was interested in obtaining copies of WAMY publications); Ex. 12 at 132:2-17 (attesting to the production of educational materials as an example of WAMY's objectives being fulfilled).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion that its publications solely "introduce Islam as an ideology and social system to be distributed among the Muslim youth in the important languages of the world." The record includes evidence that WAMY publications also aim to radicalize, recruit, and justify violence against non-Muslims. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 14, 44, and 62-67. A genuine dispute of material fact exists.

**STATEMENT:**

69. WAMY produced pamphlets which concern generally accepted religious literatures produced in the form of Dawah (religious propagation) to the Muslims youth of the world. Ex. 6 at WAMY-SA E001045 (Constitution Art 3(1) and 4[2]); see generally, Ex. 42, WAMYSA1249453 (Letter to Wohaibi re dawah courses and books in South Korea); Ex. 13 at p. 16 ("da'wah is used for missionary activity") and at 37 (WAMY's "literature is meant to promote the religion of Islam and steady adherence to it").

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion that its publications solely promote Islam and steady adherence to it. The record includes evidence that WAMY publications also aim to

radicalize, recruit, and justify violence against non-Muslims. Plaintiffs further dispute Defendant's substitution of expert opinion for fact, citing Blankinship's interpretation of WAMY's da'wah activities. Plaintiffs repeat and incorporate their responses to Defendant's¶¶ 14, 44, and 62-67. A genuine dispute of material fact exists.

**STATEMENT:**

70. Examples of the topics covered in WAMY's pamphlets are "Do you Know this Man," "Prophethood in Islam," "A Note on Fasting and Zakat al-Fitr," "The Concept of God in Islam," "What they Say about Islam," "Human Rights in Islam, "the Concept of Worship in Islam," "What They say About Mohammed," "What they Say about the Quran," and "Muslim-Christian Dialogue;" none encourage the youth to pick up arms against the West or America. See, e.g. Ex. 43, WAMYSA1333-1341 (pamphlet examples).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion that none of its publications encourage youth to take up arms against the West or America. The record includes evidence that WAMY publications contain explicit calls for violence against non-Muslims. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 14, 44, and 62-67. A genuine dispute of material fact exists.

**STATEMENT:**

71. WAMY's da'wah efforts focus on moderate *Islamic Views* with conservative teachings that eschew extremism. Ex. 13 at p. 17 (explaining WAMY's balance of preaching moderate views but holding onto conservative teachings without the influence of outside factors).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion that its missionary outreach "efforts focus on moderate *Islamic Views* with conservative teachings that eschew extremism." The record shows that WAMY's statements and publications promote hatred and violence against non-Muslims. Plaintiffs further dispute Defendant's substitution of expert opinion for fact, citing Blankinship's interpretation of WAMY's da'wah efforts. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 14, 44, and 62-67. A genuine dispute of material fact exists.

**STATEMENT:**

72. The WAMY publication "A Handy Encyclopedia of Contemporary Religions and Sects" and "Islamic Camps: Objectives, Programs Outlines, and Preparatory Steps" does not promote violence and represents a "tiny" sampling of WAMY's much large inventory of publications. Id. at p. 37.

**RESPONSE:**

Disputed. The record repeatedly documents statements by WAMY officials and WAMY publications that promote and call for violence against non-Muslims. As discussed in Plaintiffs' response to Defendant's ¶ 84, Plaintiffs further dispute that Defendant's expert surveyed the broader WAMY publication inventory to determine whether the examples Plaintiffs cite are "tiny" or representative of WAMY's views on non-Muslims. Plaintiffs also dispute Defendant's reliance on expert opinion in place of fact, including Blankinship's interpretation of the intent behind WAMY's publications. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 14, 44, and 62-67. A genuine dispute of material fact exists.

**STATEMENT:**

73. The fact that WAMY's publications are so many and those the plaintiffs have attacked are so few completely refutes the idea that WAMY primarily existed to promote any hidden agenda. Id.

**RESPONSE:**

Disputed. The record includes multiple statements and publications by WAMY that promote and justify violence against non-Muslims. As discussed in Plaintiffs' response to Defendant's ¶ 84, Defendant's expert has not surveyed WAMY's broader publication inventory to determine whether the examples Plaintiffs cite are "tiny" or representative of WAMY's views on non-Muslims. Defendant attempts to present its expert's opinion as fact. Plaintiffs also dispute Defendant's expert's claims and contend that the expert failed to place WAMY's publications in the context of WAMY's other activities supporting terrorists. As previously identified, WAMY has engaged in various forms of terrorist support. Plaintiffs repeat and incorporate their response to Defendant's ¶¶ 3 and 14. Plaintiffs further dispute Defendant's reliance on expert opinion rather than fact, citing Blankinship's opinion and arguments about the intent behind WAMY's publications. WAMY's publications call for violence against non-Muslims. A genuine dispute of material fact exists.

**STATEMENT:**

74. None of WAMY's publications or reprints call for violence against the United States, the Jews or Christians, nor do they urge the youth to do so. Id. at p. 50 (discussing absence of promotion of violence in publications); Ex. 2 at ¶23 (discussing WAMY's belief in religious co-existence).

**RESPONSE:**

Disputed. The record includes multiple statements and publications in which WAMY promotes and justifies violence against non-Muslims. Plaintiffs also dispute Defendant's failure to consider

these statements and publications in the context of WAMY's other activities supporting terrorists. As previously identified, WAMY has supported terrorists in various ways. Plaintiffs further dispute Defendant's reliance on expert opinion rather than facts, including Blankinship's opinions and arguments about the intent behind WAMY's publications; those statements and publications call for violence against non-Muslims. Plaintiffs contend that Defendant's expert fails to assess how Islamic extremists use hate speech and how the text's repeated expressions of hatred toward non-Muslims function as a call to violence. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3, 14, 44, 62-67, and 84-85. A genuine dispute of material fact exists.

**STATEMENT:**

75. Plaintiffs' claim WAMY publication *A Handy Encyclopedia of Contemporary Religions and Sects* is hate literature against Americans, Christians, and Jews and glorifies the hi-jacking of buses and the killing of innocent civilians in Israel. (See e.g. Ashton, Third Amened Consolidated Master Complaint at ¶445).

**RESPONSE:**

Undisputed as to Defendant's interpretation of ¶ 445 of the Third Amended Consolidated Master Complaint; disputed, however, to the extent Defendant implies the Encyclopedia is unconnected to terrorism. Although omitted by Defendant, the record shows that this WAMY publication was found in the possession of Ahmed Ajaj, a convicted conspirator in the 1993 World Trade Center bombing. Ex. 143, Government Exhibit 2800-A, United States V. Usama Bin Laden, et al., 98 Cr. 1023 (LBS) (S.D.N.Y.). For completeness, the Third Amended Consolidated Master Complaint reads: "445. Another manual found in Ahmed Ajaj's possession was hate literature against Americans, Christians, and Jews. This encyclopedia, which glorified the hijacking of buses and the killing of innocent civilians in Israel, was published by WAMY." Ex. 1, Third Amended

Consolidated Master Complaint, ¶ 445. Other items recovered from Ajaj include an Al Qaeda training manual titled "Military Lessons in the Jihad Against the Tyrants," which covered bomb making and the use of covert techniques; another version of the manual was subsequently recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998. Ex. 1, Third Amended Consolidated Master Complaint, ¶¶ 443-445; Ex. 26, Statement of Steven Emerson to the National Commission on Terrorist Attacks Upon the United States, July 9, 2003. Furthermore, the record shows Ajaj was deeply involved with Al Qaeda: "The FBI identified another conspirator, Ahmad Ajaj, who had been arrested by immigration authorities at John F. Kennedy International Airport in September 1992 and charged with document fraud. His traveling companion was Ramzi Yousef, who had also entered with fraudulent documents but claimed political asylum and was admitted. It quickly became clear that Yousef had been a central player in the attack. He had fled to Pakistan immediately after the bombing and would remain at large for nearly two years." --"As a result of the investigations and arrests, the U.S. Attorney for the Southern District of New York prosecuted and convicted multiple individuals, including Ajaj, Salameh, Ayyad, Abouhalima, the Blind Sheikh, and Ramzi Yousef, for crimes related to the World Trade Center bombing and other plots." --"The FBI assembled, and the U.S. Attorney's office put forward, some evidence showing that the men in the dock were not the only plotters. Materials taken from Ajaj indicated that the plot or plots were hatched at or near the Khaldan camp, a terrorist training camp on the Afghanistan-Pakistan border. Ajaj had left Texas in April 1992 to go there to learn how to construct bombs. He had met Ramzi Yousef in Pakistan, where they discussed bombing targets in the United States and assembled a 'terrorist kit' that included bomb-making manuals, operations guidance, videotapes advocating terrorist action against the United States and false identification documents." --"9. On Ajaj's travels to Khaldan and interactions with KSM, see Ex. 144, United States v. Salameh, 152 F.3d at 107-108. Ajaj had

entered the United States on a B-2 tourist visa at New York City on September 9, 1991. Ex. 145, INS alien file, No. A72215823, Sept. 9, 1991." Ex. 4, 9/11 Commission Final Report 72-73 and 472. A genuine dispute of material fact exists.

**STATEMENT:**

76. *A Handy Encyclopedia of Contemporary Religions and Sects* ("Encyclopedia") is "an encyclopedia of world religions," with no connection to Osama bin Ladin, al-Qaeda or the September 11, 2001, attacks. Ex. 44, Khalid Blankinship Dep. Tr. (Excerpts) at 285:13-14.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion that the WAMY publication "A Handy Encyclopedia of Contemporary Religions and Sects" had no "connection to Osama bin Laden, al-Qaeda or the September 11, 2001, attacks." The record indicates the publication was found in the possession of Ahmad Ajaj, an associate of al-Qaeda who had contact with al-Qaeda associates including Ramzi Yousef; Ajaj was convicted of participating in the 1993 bombing of the World Trade Center. Plaintiffs repeat and incorporate their response to Defendant's ¶¶ 74-75. Plaintiffs further dispute Defendant's substitution of expert opinion for fact; Defendant's expert makes no such claim in the cited deposition testimony, namely that the Encyclopedia has "no connection to Osama bin Ladin, al-Qaeda or the September 11, 2001, attacks." The record shows that Defendant's expert testified that the Encyclopedia was filled with hatred, particularly toward Jews, in an "indubitably prejudicial way. And that, I think, is quite plainly not acceptable." He did not further opine in the cited testimony about any connection to al-Qaeda: "Q. Because it includes discussions of the Protocols of the Elders of Zion, correct? A. Well, the truth is, it doesn't include discussions of the Protocols of the Elders of Zion. It includes texts copied from that work, or translated from it, I should say. Q. Using what you've written here on Page 46, the book cites and validates the

notorious anti-Semitic tsarist Russian fabrication of the Protocols of the Elders of Zion; is that correct? A. Yes. Q. And it states, The Blood Libel that Jews mix gentile blood into their matzos for Passover, correct? A. I said that, right? Q. Right. Correct. A. Yes, it does. Q. Why, in your expert opinion, would an organization like WAMY publish a document that was so inflammatory? A. In my opinion, which I did state here, and I believe I was clear, consistent about it sufficiently, I do think this is a very embarrassing document. And I don't think that any amount of explanation will get around the fact that it is both embarrassing and counterfactual in its collocation of Zionism, Freemasonry, the Lions Club, the Rotary club, and so on. But the question of why they would publish such a thing, I did also explain that. In my estimation, this has to do with the clash of the previously isolated Nadjis with the outside world, and that led them to try to validate themselves by invalidating everybody else. And this book, which is an encyclopedia of world religions, not just of Judaism, while the statements about Judaism are indeed objectionable, also contains objectionable material about other groups and religions. And so it makes invidious comparisons that would be undermining to the possibilities of interreligious dialogue. And in that sense, it's very negative in its contribution to world literature. On the other hand, it doesn't express any idea of, therefore, we should have violence against any of these other groups. And it has to be recognized that it is talking about the whole rest of the world versus Saudi Arabia. And so, obviously, there can't be anything here except an attempt to put a mental or intellectual dissidence between the Saudi Arabians and their youth and their children and all of these outside influences that are perceived as threatening their own universe, their own thought universe. And so that is how I would perceive it in that sense. I don't see it as incitement, especially because if one carefully looks at the section about Judaism, one does not really find anything about Zionism or the history of Zionism after Theodor Herzl. One does not find any mention of or denunciation of the state of Israel or any going-on about that. Rather, it is just a going-on about the Jews in this indubitably

prejudicial way. And that is something, I think, that is quite plainly not acceptable. And I said that. But they -- nevertheless, that is my assessment of it." Ex. 110, Deposition of Khalid Blankinship 283:12-287:14. Defendant's expert made the following claims in his report: "Plaintiffs' expert [Jonathan] Winer states that '... material written, published, and/or disseminated by WAMY prior to the 9/11 attacks, provided religious and ideological justification for jihad and Islamic martyrdom, two concepts that were among the foundations for justifying Al Qaeda's program of suicide bombings and terrorist attacks,' as if these few cited references, or the publications in which they are embedded, provided any necessary urging, incitement, or inspiration for al-Qa'idah's depredations, and as if al-Qa'idah needed any such justification. But this is far, far from the truth, and it is most dubious whether the Qa'idah members, operatives, or supporters even had any cognizance of the existence of these works, much less read them or relied on them. Has a single quotation from any WAMY publications by anyone actively in al-Qa'idah been demonstrated? Obviously not. When Bin Ladin went on his long speels explaining and justifying himself, he cited many things, but WAMY publications were not among them." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Report, 48 (citing Winer Report at 12.11.4). Plaintiffs contend that Defendant's expert fails to assess the function of hate speech among Islamic extremists and the role of the text's repeated litany of hatred toward non-Muslims as a call to violence. As previously noted, Ahmad Ajaj, an associate of Al Qaeda, was in possession of WAMY's Encyclopedia, along with bomb-making manuals and instructions on covert activities. Additionally, Anwar al-Awlaki, who was a facilitator and spiritual advisor to several of the 9/11 hijackers, was a WAMY-sponsored cleric and summer camps speaker. Defendant's expert claimed that, despite the associations with al-Qaeda pre-9/11, Awlaki was radicalized after 9/11 and WAMY was "innocent" in its associations with al-Awlaki: "Even if al-Awlaki held the same views from the first, which is not at all apparent, WAMY is still completely innocent in hosting him as a

speaker, because he did not state any such extreme views at the time in 2001-2002, quite the opposite." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Report, p. 49. The record shows that al-Awlaki was in contact with al-Qaeda associates before 9/11. In June 1999, the FBI investigated al-Awlaki due to his telephone contacts with al-Qaeda procurement agent Ziyad Khaleel. Ex. 146, FBI011764. In the U.S. African Embassy bombings trial, Khaleel was identified as the purchaser of a satellite phone for bin Laden. Ex. 147, Trial Transcript 3028-3035, United States v. Usama Bin Laden et al. (S.D.N.Y. 2001, March 27, 2001). Additional evidence presented at the U.S. Embassy bombings trial revealed that the satellite phone purchased by Khaleel and sent to Bin Laden through al Qaeda intermediaries was used by bin Laden to coordinate the bombings. Ex. 148, Trial Transcript, United States v. Usama Bin Laden et al. (S.D.N.Y. 2001), May 1, 2001, p. 5287. Additionally, the record includes evidence that Khaleel was associated with the Islamic African Relief Agency (IARA), a Sudanese charity with offices in the U.S.; as a representative of its Orlando, Florida office, Khaleel provided technical and logistical support to the charity. In October 2004, the U.S. Department of the Treasury designated the charity, stating, "IARA is identified as a non-governmental organization (NGO) formerly affiliated with Maktab Al-Khidamat (MK), which was co-founded and financed by UBL and is the precursor organization of al Qaida." Ex. 125, U.S. Dept. of the Treasury, "Treasury Designates Global Network, Senior Officials of IARA for Supporting bin Laden, Others," October 13, 2004. The designations further stated, "Information available to the U.S. indicates that international offices of IARA provided direct financial support for UBL. IARA, MK and UBL commingled funds and cooperated closely in the raising and expenditure of funds. IARA engaged in a joint program with an institute controlled by UBL that was involved in providing assistance to Taliban fighters." Ex. 125, Id. In 1999, the year the FBI disclosed al-Awlaki was in contact with Khaleel, IARA was funding al-Qaeda through its overseas branches: "Information available to the U.S. shows that the

overseas branches IARA provided hundreds of thousands of dollars to UBL in 1999. In 1997, there was an individual who acted as a liaison between UBL and terrorist-related NGOs, distributing funds from UBL to MK, IARA and others. Later that year, IARA and MK reportedly provided financial support for a group of Arab terrorists planning to travel to Saudi Arabia to conduct unspecified operations against U.S. military personnel." Ex. 125, Id. Other evidence in the record indicates that before 9/11, al-Awlaki was known to speak negatively about the U.S. and its involvement with Israel. Ex. 149, EO14040-002610. The records also show that al-Awlaki was in contact with Omar al-Bayoumi, a Saudi government employee living in Southern California, whom the FBI has identified as a key facilitator for the 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar; phone records show that al-Bayoumi and al-Awlaki, who knew each other personally in San Diego, were in contact during crucial periods of assistance to the 9/11 hijackers. See, e.g., Ex. 150, FBI 1514; Ex. 151, FBI 1518, 3232; Ex. 152, FBI 3238; Ex. 153, FBI 3241; Ex. 154, FBI 3242; Ex. 155, EO 584. Furthermore, Defendant's expert testified that he was not a terrorism expert. Ex. 110, Deposition of Khalid Blankinship, 46:16-18. He did not understand that the United States has a legal definition of terrorism. Ex. 110, Deposition of Khalid Blankinship, 121:17-23. He also did not understand that the U.S. Code defines an act of international terrorism. Ex. 110, Deposition of Khalid Blankinship, 122:1-7. Defendant's expert did not know whether the U.S. Code defines what constitutes providing material support or resources to a designated terrorist organization. Ex. 110, Deposition of Khalid Blankinship, 122:9-16. The record also included evidence that Defendant's attorney may have unduly guided Defendant's expert in preparing his report. Defendant's expert testified that the reliance materials he cited included a "Topics Index for Experts" and referenced numbered "cells" of a document that Defendant's attorney appears to have created, and that he relied on after following the defense attorney's instructions. Ex. 110, Deposition of Khalid Blankinship, 122:9-16, 183:2-185:5, 185:7-24, 186:1-13, 192:4-12.

Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3, 14, 44, 62-67, 81, and 84-85. A genuine dispute of material fact exists.

**STATEMENT:**

77. The Encyclopedia is a compilation of articles written by different authors; primarily the four main authors, Dr. Ibrâhîm ibn Hamad al- Qu‘ayyid, Dr. Tawfîq ibn Ahmad al-Qusayr, Dr. Muhammad Sa‘d Abû Shitâ, and Hamdî ‘Ubayd on mainstream thoughts and ideas, some even mythical. Ex. 13 at p. 45.

**RESPONSE:**

Disputed. Defendant has substituted Defendant's expert's assumptions for facts. Defendant's expert has assumed the main authors of the Encyclopedia based solely on WAMY Secretary General al-Johani's "note of thanks": "Presumably, the writing of this encyclopedia is primarily the work of these four named gentlemen, the first two of whom are Saudis who held important positions in WAMY, despite their lack of specialization in the field of religion." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Report at p. 45. Plaintiffs further dispute Defendant's expert's speculation that although Secretary General al-Johani is identified as the encyclopedia's editor, he "likely" had little to do with its content, writing only an introduction or a note of thanks: "Although WAMY Secretary General Dr. Maneh al-Johani was in charge of the editing and production of this work, he did not author any of it except for the initial note of thanks and the introductions to the various editions (pp. 5-12), and it is doubtful whether he really did any editing of it either, as that is a task he likely would have left to others." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Report at p. 45. The opinion, offered as fact, contradicts the role of an editor, whose choices of content, organization, and tone shape a reader's understanding of a subject. A genuine dispute of material fact exists.

**STATEMENT:**

78. Far from a work espousing an ideology supporting terrorism, the *Encyclopedia* is a historical religious work using examples from history, going back to the eighth century, and applying them to issues present in modern times. Id. at p. 46.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion that the publication is a "historical religious work" and contend Defendant has substituted the expert's speculation for fact. Contrary to Defendant's assertion, Defendant's expert admitted some works were the product of "conspiracy theories": "Unfortunately, the unnamed writers [of the first text] also evidently believe in conspiracy theories about such influences being deliberately plotted with malice aforethought, and this plotting is blamed on the Jews in general, borrowing from and recreating various anti-Semitic tropes, though Emerson's calling the work equivalent to The Protocols of the Elders of Zion is stretching matters a bit." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Report at 45. Plaintiffs further dispute Defendant's characterization of the record: Steven Emerson did not "equate" WAMY's Encyclopedia with The Elders of Zion; he stated that the WAMY publication was "comparable" to The Elders of Zion: "Finally, WAMY produced, A Handy Encyclopedia of Contemporary Religions and Sects, a tract of anti-Semitism comparable to the Protocols of the Elders of Zion." Ex. 26, Statement of Steven Emerson to the National Commission on Terrorist Attacks Upon the United States, July 9, 2003. Plaintiffs contend the text of WAMY's Encyclopedia makes clear its animosity towards non-Muslims: "Al-Sabi'a: these are the followers of Abdullah ibn Sab'a, entered (sic) Islam to destroy it from within"; --"The Rotaries'a Masonic organization dominated by the Jews of the world. The real objective of these organizations is for the Jews to have an opportunity to mingle with others, this would afford them the chance to gather crucial information needed for their economical and political success as well as to influence the

society;"-- "[The] Lions' Club looks like it is a benevolent organization but undoubtedly, it is a member of the Masonic group and the Jewish hands are in it because their objectives are also to dominate the world. They teach Zionist ideology to their members."-- "The Dogha Jews" are "[a] group of Jews [who] have joined Islam but actually they remained Jews at heart; they planned to hurt Islam. They dominate the economy, education, and the media. They took part in undermining the Ottoman state and caliphate." In discussing Freemasonry, "Traditionally the name of a secret Jewish terrorist organization; it is well known and works for the domination of the Jews in the world. It promotes atheism and immorality." The Encyclopedia goes on to state the following about freemasons: "Their ideology includes: Denying God's existence, plotting to being (sic) down all legitimate governments; using women and sex to achieve their objectives, creating divisions among the gentiles in order to better dominate them, working toward controlling the heads of states or changing them, controlling the major media and using it to steer the professional leaders, promoting volunteer vasectomy and pushing for Muslim's birth control, controlling the international organizations such as the UN and other youth and educational entities. The international (Universal) Masonry is the highest of all entities; the Jewish leaders in it are above the World emperors, kings and presidents; they all plan ahead through the organization for the well being of Israel. Masonry is a hunting weapon on (sic) the hands of the Jews to exert their influence over the uneducated people. The Masonry was behind all the woes that plagued the Muslim world. They were behind the French Revolution, Russian revolution and the British. The Masonries have a wide international influence through the world leaders that they have entangled; they became like puppets in the organization's hands. It dominates the major world media. It controls most of the international economic resources. It has many terrorist gangs to carry out the criminal tasks and to eliminate anyone who stands in its way." And lastly, in a section titled "Animosity toward the Jew," the WAMY encyclopedia lists reasons to hate Jews: "[T]he seed of the Gulf-war was

planted by a Jew; the Jews are enemies of the faithful, God and the angels; The Jews are humanity's enemies; they foment immorality in this world; The Jews are deceitful, they say something but mean the exact opposite; Who was behind the biological crisis which became like brain washing? A Jew; Who was behind the disintegration of family life and values? A Jew; The one that stirred-up hate and turned the individuals against their Muslim governments in the Arab peninsula - a Jew; Who promoted Atheism and made the countries thrive on Muslims' blood? The Jews; Every tragedy that inflicts the Muslims is caused by the Jews." Ex. 26, Statement of Steven Emerson to the National Commission on Terrorist Attacks Upon the United States, July 9, 2003. WAMY's statements and publications call for violence against non-Muslims. Plaintiffs contend that Defendant's expert fails to assess the function of hate speech among Islamic extremists and the role of the text's repeated litany of hatred toward non-Muslims as a call to violence. A genuine dispute of material fact exists.

**STATEMENT:**

79. As Islamic scholar and professor of religion, Khalid Blankinship, explains, the work includes an ancient trope concerning a mythical character, Abd Allah ibn Saba, who, according to the myth, attempted to undermine Islam by pretending to be a Muslim in the early days and stirring up civil war between factions in the Muslim community. Id. at pp. 45-46.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's characterization of its expert's opinion. Defendant's expert stated: "Nevertheless, the work does declare true the story of 'Abd Allah ibn Saba' from early Muslim history, which is usually considered mythical by modern research, in order to blame Jews for deliberately trying to undermine Islam by pretending to be Muslims in the early days and stirring up civil war between factions in the Muslim community. This ancient trope from the eighth

century, which I have studied, was originally mainly anti-Shi'i, mentioning the Jewish origin of Ibn Saba' merely in passing in order to insult the Shi'is and demonstrate how their version of Islam was inauthentic, but in modern times, because of the Palestine problem and the modern animosity created by it, the trope has been repurposed to focus mainly on Ibn Saba' as an example of Jewish perfidy, as here. The footnote in the fourth edition here even notes that Shi'is have written to the editors to deny that Ibn Saba' is a figure of importance to them and hence should not be included, but the book's editors or authors still insist on his historical validity, despite all evidence to the contrary." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Report, pgs. 45-46. Defendant's expert made clear the Encyclopedia's editors and authors "still insist on his [Ibn Saba] historical validity, despite all evidence to the contrary." A genuine dispute of material fact exists.

**STATEMENT:**

80. While most scholars regard Ibn Saba as a myth, “many people in the Arab world, even well-educated ones, take the tale if Ibn Saba’ as if it is holy writ… yet it derives from the flagrant early fabricator Safy ibn ‘Umar.” Id. at p. 46.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's characterization of the record and Defendant's substitution of expert opinion for fact. Plaintiffs repeat and incorporate their response to Defendant's ¶ 79. A genuine dispute of material fact exists.

**STATEMENT:**

81. The attack on the Jews in general in the *Encyclopedia* must be understood in the context of the view, admittedly anti-Semitic, that at some point Jews corrupted their religion, became enticed

by materialism, and sought to undermine other religions and to corrupt the morals of non-Jews. Id.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's characterization of the record and Defendant's substitution of expert opinion for fact. The record shows that the relevant context for evaluating the statements made in WAMY publications is the contemporaneous Islamic extremism that promotes hatred and justifies violence against non-Muslims: "Al-Qaeda's most serious challenge to international security lies in its ability to quickly replenish its ranks with dedicated operatives. Underpinning this challenge is an abstract and hate-based ideology of 'jihad.' Based on an absolutist interpretation of Islamic law, and cloaked in a veneer of extremist terminology, this ideology harnesses and directs angry and alienated people in the Muslim world against non-Muslim scapegoats." Ex. 26, Statement of Steven Emerson to the National Commission on Terrorist Attacks Upon the United States, July 9, 2003. The record further explains: "The typical path of indoctrination in the Islamic radical worldview starts at the fundamentalist mosque. Radical imams from Long Beach, California to Long Island, New York use passionate religious rhetoric to criticize the West and proclaim the 'universal victimhood of Islam.' In lectures and study circles, these imams teach students that since Islam is a total system, offering solutions to every problem, the current hardships of Muslim societies are a direct result of Christian or Zionist conspiracies." Id. Additionally: "It should not come as a surprise that educational institutions provide the most effective mechanism to teach, indoctrinate and perpetuate the culture of jihad." Id. As Defendant's expert Marc Sageman told the 9/11 Commission: "And I think that, as Dr. Fandy mentioned, we really need to clamp down on the anti-western and anti-American hate speech. And here I would suggest the establishment of an international anti-defamation league to monitor such speech and work with the press, religious organizations, governments and respective justice systems to

condemn and control it. And there is some indication that now the Saudis, after the May 12th bombings, are starting to do that." Ex. 156, Transcript 11, 9/11 Commission Hearing "Terrorism, Al Qaeda, and the Muslim World," July 9, 2003. A genuine dispute of material fact exists.

**STATEMENT:**

82. This view, expressed in tsarist Russia, includes the belief that Freemasons, the Lions Club, the Rotary Club, the Israeli Herut Party, are part of a nefarious plot that contributed to the downfall of the Ottoman Empire. Id. at p. 46; Ex. 2 at ¶23 (discussing WAMY's belief in religious co-existence).

**RESPONSE:**

Disputed. Plaintiffs repeat and incorporate their responses to Defendant's ¶ 81, namely, that WAMY publications express an animosity towards non-Muslims and that Defendant has substituted expert opinions for facts. Plaintiffs contend Defendant has characterized the record to ignore the relevant context for evaluating the intent of WAMY statements and their promotion and justification of hatred and violence against non-Muslims. A genuine dispute of material fact exists.

**STATEMENT:**

83. These views notwithstanding, "this work does not appear anywhere to prescribe violence of terrorism. Its program rather seems to be to keep the Muslims, especially the upcoming generation, free of influences from outside religions by portraying Islam as superior." Ex. 13 at pp. 47-48; Ex. 2 at ¶24 (that WAMY stands against terrorism).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's characterization of the record and substitution of expert opinion for fact. Plaintiffs repeat and incorporate their objections and responses to Defendant's ¶

81, namely, that WAMY publications speak for themselves and that Defendant has substituted expert opinions for facts. Plaintiffs contend Defendant has characterized the record to ignore the relevant context for evaluating the intent of WAMY statements and their promotion and justification of hatred and violence against non-Muslims. A genuine dispute of material fact exists.

**STATEMENT:**

84. "The idea…that the whole [*Encyclopedia*] is mainly an anti-Jewish work is wrong, for the anti-Jewish polemic, although seriously present in the section on Judaism and scattered in a few other places as well, occupies only a small part of the whole. It cannot be ignored either that the work was produced within the context of the ongoing Palestinian question and occupation of Palestinian land, a problem which seems to exhibit to many Arabs the power of the Israelis, as they have not been able to do anything about that, hence the resort of some to old, generalizing anti-Jewish tropes, including beliefs in conspiracies that last for centuries." Ex. 13 pp. 47-48.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's characterization of the record and substitution of expert opinion for fact. Defendant's expert has ignored the relevant context for evaluating the intent of WAMY statements, which the record shows promote and justify hatred and violence against non-Muslims. Plaintiffs also dispute Defendant's assertions that the hatred expressed in WAMY publications is somehow insufficient in number or does not rise to an adequate level to be considered seriously, claiming WAMY statements in dispute "occup[y] only a small part of the whole." This is an opinion, not an established fact. Defendant's expert admitted he reviewed plaintiffs' expert reports, excerpts of a WAMY official deposition, and the selected WAMY documents presented to him by Defendant's attorneys. Ex. 110, Khalid Blankinship Dep. 107:23-

109:5; 186:1-187:14. There is no testimony or evidence that Defendant's expert conducted a comprehensive literature review of WAMY publications and statements to know whether the other publications expressed hatred toward non-Muslims. Nonetheless, Defendant's expert wrote: "WAMY has a very large number of publications, most of which are normal religious literature. To be sure, this literature is meant to promote the religion of Islam and steady adherence to it, but in doing so it is not very different from other religious literature in other religons [sic]. This means that it presents a particular point of view, but that also is quite normal. At the same time, only a tiny number of which, all discussed below, have been mentioned or criticized by the plaintiffs. If one examines these few items closely, as I do below in detail, it becomes clear that they also do not amount to what the plaintiffs claim. The fact that WAMY's publications are so many and those the plaintiffs have attacked are so few completely refutes the idea that WAMY primarily existed to promote any hidden agenda." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Report, p. 37 (the only reference cited being to Plaintiffs' Expert Report, "Winer Report at 12.11.1.1, 12.11.1.2, 12.11.2.1, 12.11.2.2, 12.11.2.3, and 12.11.3.1"). Defendant's expert's conclusion about the relative extent of WAMY publications expressing hatred within the universe of WAMY publications is speculation and not fact. Defendant's expert suggested the hatred expressed for Jews should be considered in light of "the context of the ongoing Palestinian question and occupation of Palestinian land," further explaining that "they [Arabs] have not been able to do anything about that, hence the resort of some to old, generalizing anti-Jewish tropes, including beliefs in conspiracies that last for centuries." The record shows that Defendant's expert was not aware specifically that Palestinians had engaged in suicide bombings during the Palestinian Intifada, failing to assess that Palestinian supporters of suicide bombers have done far more than resort to old tropes: "Q. Are you aware or not as to whether or not there were what's been referred to as suicide bombings, or by others as martyrdom operations, taking place during

this Palestinian Intifada? A. That was not the main content of it. Q. Okay. But are you aware whether or not those were taking place during this Palestinian Intifada? A. I am aware that violent actions have happened over the history of that whole problem. Q. I'm speaking more specifically about what is colloquially referred to as suicide bombings. Are you aware whether or not those were taking place during this portion of the Palestinian Intifada? A. Not specifically." Ex. 110, Khalid Blankinship Dep. 157:4-158:7. The record shows that Defendant's expert was also unaware of basic facts relevant to the accusations that WAMY provided support to terrorists. Defendant's expert did not know whether any Saudi ministry regulated WAMY. Ex. 110, Khalid Blankinship Dep. 47:8-10. Defendant's expert was likewise unaware of whether the U.S. Government had taken any actions against WAMY. Ex. 110, Khalid Blankinship Dep. 46:17-47:7. The record also shows that Defendant's expert resisted examining why hatred makes violence more likely and how WAMY publications denigrating non-Muslims motivate Muslims to believe that violent action is necessary, permissible, and even morally required; instead, Defendant's expert argued that denigrating Jews is common in the Arab world, with a long-standing history, and did not consider the obvious consequences of hate expressed by a leading Islamic organization with links to a terrorist group as a form of incitement, indoctrination, and encouragement: "Q. And is it surprising that this document [Encyclopedia] was apparently published in 1999? A. You mean as late as 1999? Q. Correct. As late as '99? A. Yes. Q. Because it includes discussions of the Protocols of the Elders of Zion, correct? A. Well, the truth is, it doesn't include discussions of the Protocols of the Elders of Zion. It includes texts copied from that work, or translated from it, I should say. Q. Using what you've written here on Page 46, the book cites and validates the notorious anti-Semitic tsarist Russian fabrication of the Protocols of the Elders of Zion; is that correct? A. Yes. Q. And it states, The Blood Libel that Jews mix gentile blood into their matzos for Passover, correct? A. I said that, right? Q. Right. Correct. A. Yes, it does. Q. Why, in your expert opinion, would an

organization like WAMY publish a document that was so inflammatory? A. In my opinion, which I did state here, and I believe I was clear, consistent about it sufficiently, I do think this is a very embarrassing document. And I don't think that any amount of explanation will get around the fact that it is both embarrassing and counterfactual in its collocation of Zionism, Freemasonry, the Lions Club, the Rotary club, and so on. But the question of why they would publish such a thing, I did also explain that. In my estimation, this has to do with the clash of the previously isolated Nadjis with the outside world, and that led them to try to validate themselves by invalidating everybody else. And this book, which is an encyclopedia of world religions, not just of Judaism, while the statements about Judaism are indeed objectionable, also contains objectionable material about other groups and religions. And so it makes invidious comparisons that would be undermining to the possibilities of interreligious dialogue. And in that sense, it's very negative in its contribution to world literature. On the other hand, it doesn't express any idea of, therefore, we should have violence against any of these other groups. And it has to be recognized that it is talking about the whole rest of the world versus Saudi Arabia. And so, obviously, there can't be anything here except an attempt to put a mental or intellectual dissidence between the Saudi Arabians and their youth and their children and all of these outside influences that are perceived as threatening their own universe, their own thought universe. And so that is how I would perceive it in that sense. I don't see it as incitement, especially because if one carefully looks at the section about Judaism, one does not really find anything about Zionism or the history of Zionism after Theodor Herzl. One does not find any mention of or denunciation of the state of Israel or any going-on about that. Rather, it is just a going-on about the Jews in this indubitably prejudicial way. And that is something, I think, that is quite plainly not acceptable. And I said that. But they -- nevertheless, that is my assessment of it." Ex. 110, Khalid Blankinship Dep. 283:5-287:14. A genuine dispute of material fact exists.

**STATEMENT:**

85. Contrary to Plaintiffs' misleading claims, there is nothing in the Encyclopedia that is an expression or call for violence against other groups including Americans, Christians, and Jews. Ex. 44 at 285: 7-24; 286: 1-24; 287: 1-14.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's characterization of the record and substitution of expert opinion for fact. The record shows that Defendant's expert concluded that WAMY's denigration of Jews carried no meaningful significance because such rhetoric was common in parts of the Arab world and, in the expert's view, the text contained no literal call for violence. From this premise, the expert reasoned that WAMY's statements could not have encouraged or justified terrorists -- such as al-Qaeda, a violent extremist organization calling for violence against non-Muslims, as al-Qaeda did in declaring war on Jews and "Crusaders." According to the expert, unless the publication explicitly instructed readers to commit violence, its content amounted to nothing more than objectionable but culturally familiar hate speech. This reasoning, while fundamentally flawed, is an opinion. The WAMY publications present a sustained, categorical vilification of Jews and non-Muslims, which is not incidental rhetoric but extremist rhetoric that functions as a call for violence. The expert fails to appreciate that hatred need not be phrased as an explicit command to operate as an inducement. A text that repeatedly portrays a group as corrupt, dangerous, subhuman, or existentially threatening does the same work as literal incitement: it frames the target as an enemy whose destruction is justified, necessary, or divinely sanctioned. In this context, the "litany of derogatory statements" is the call for violence. Its length, intensity, and categorical nature supply the moral and ideological predicate that violent extremist organizations routinely rely upon to legitimize aggression and mobilize followers. By reducing this sustained dehumanization to mere "common hate speech," the expert ignores the well-documented role that such rhetoric plays in

extremist propaganda: it prepares audiences for violence by stripping the target of moral standing, framing hostility as righteous, and lowering the psychological barriers to violent action. The Defendant's expert thus misstates both the function and the effect of WAMY's publication. The absence of a literal command does not negate the text's capacity to encourage or justify violence; the publication's expressive structure accomplishes that work on its own. The deposition testimony confirms the expert's refusal to connect WAMY's rhetoric to extremist violence: "Q. During this same time period, again, if you know, had al-Qaeda declared war against the Jews and crusaders? A. It had declared war before that, I believe. It seemed to me the declaration of war, or what was described as the declaration of war, because I don't think it's quite framed in those words in the document, was from 1996, I thought, that seemed to me. Q. Well, there were two documents, one in '96 and one in '98. But in either event, you believe that as of 1999, when this was published, it was likely that al-Qaeda had declared hostilities, shall we say, against Jews and crusaders specifically by those terms? A. I think you could use those terms. Q. And a publication from an organization like WAMY that delegitimizes Jews as a whole would feed into that premise, wouldn't it? A. Well, the thing is that this is not an uncommon type of view in the Arabic-speaking countries. So you cannot say this is something, then, that feeds into or encourages that in particular. I don't see that that has a particular connection with that. Q. But the World Assembly of Muslim Youth, which was one of the largest Islamic charity organizations in the world at this time, with operations in dozens of countries around the world, is not a backwater Muslim organization that could, quote/unquote, get away with making these types of discriminatory claims, would it? A. Well, the views expressed are not unusual, unfortunately. Q. But you would agree that the manner in which this entry on Judaism was expressed was discriminatory? A. I mean, that, I don't think, could be argued against." Ex. 110, Khalid Blankinship Dep., 289:9-290:21. Plaintiffs repeat and incorporate responses to Defendant's ¶¶ 72-85. A genuine dispute of material fact exists.

**STATEMENT:**

**B. Non-WAMY Publications**

**RESPONSE:**

No response necessary.

**STATEMENT:**

1. *Islamic Views*

**RESPONSE:**

No response necessary.

**STATEMENT:**

86. The publication *Islamic Views*, also known by its English translation as *Islamic Guidelines for Individual and Social Reform*, is not a political text but a scholarly dissertation on Islamic jurisprudence. Ex. 13 at pp. 39-40 (explaining that the book is not about politics and is a Wahhabi jurisprudence compendium about correct practices).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's characterization of the record. The record contains no reference, either in Plaintiffs' expert reports or in Steve Emerson's testimony before the 9/11 Commission, that the publication *Islamic Views* was characterized as a "political text." Plaintiffs further dispute any assertion that Defendant's expert's scholarly analysis is the only or correct analysis of the text, particularly in the context of contemporary terrorist ideology. The record also shows that intentionally inflammatory rhetoric, like that contained in *Islamic Views*, benefits terrorist groups like al-Qaeda by justifying violence against non-Muslims and helping recruit potential members. Terrorism experts have testified that: "Al-Qaeda's most serious challenge to

international security lies in its ability to quickly replenish its ranks with dedicated operatives. Underpinning this challenge is an abstract and hate-based ideology of 'jihad.' Based on an absolutist interpretation of Islamic law, and cloaked in a veneer of extremist terminology, this ideology harnesses and directs angry and alienated people in the Muslim world against non-Muslim scapegoats. Al-Qaeda's culture of 'jihad' engenders a breeding ground for new acts of international terrorism. Al-Qaeda and other Islamic terrorist movements are entirely dependent on their potent ideological message to attract fresh recruits. Under the guise of a social program, Islamic radical movements generate moral and political support in Muslim communities worldwide. The jihadist ideology mandates that 'true' believers oppose the 'enemies' of Islam and spread Islamic sovereignty, thus breeding violence and terrorism." Ex. 26, Statement of Steven Emerson to the National Commission on Terrorist Attacks Upon the United States, July 9, 2003. A genuine dispute of material fact exists.

**STATEMENT:**

87. WAMY had nothing to do with the authorship or the early printing of the book but rather came to it very late and only to make a reprint in 1991 or 1992, after many others had already published and reprinted it. Id. at p. 39; Ex. 44 at 204:14-21.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's characterization of the record and the substitution of opinion for fact. Defendant's expert identified an English-language edition of *Islamic Views* titled "Islamic Guidelines for Individual and Social Reform." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Report, at p. 40. That edition is available online; Darussalam published it in 1996, and the Al-Haramain Foundation distributed it freely. In 2008, the U.S. Dept. of the Treasury designated al-Haramain Islamic Foundation (AHF) for "having provided financial and

support to al Qaida, as well as a wide range of designated terrorists and terrorist organizations." Ex. 157, U.S. Dept. of the Treasury, "Treasury Designates Al Haramain Islamic Foundation," June 19, 2008. U.S. authorities determined that AHF's "field offices and representatives operating throughout Africa, Asia and Europe have provided financial and logistical support to the al Qaida network and other terrorist organizations designated by the United States, and, in some cases, included on the UN 1267 Committee's consolidated list of individuals/entities subject to Security Council Sanctions. Some of these organizations include the Egyptian Islamic Jihad (EIJ), Jemaah Islamiyah, Al-Ittihad Al-Islamiya (AIAI), Lashkar E-Taibah, and HAMAS - all of which are designated terrorist organizations and all of which have received funds from AHF, its branches, or local intermediaries." Ex. 158, U.S. Dept. of the Treasury, "Protecting Charitable Organizations." In addition to AHF's headquarters in Saudi Arabia, the terrorist designation covered international offices in Afghanistan, Albania, Bangladesh, Bosnia, Comoros Islands, Ethiopia, Indonesia, Kenya, The Netherlands, Pakistan, Somalia, Tanzania, and the United States. Concerning AHF's Afghanistan office, which U.S. authorities originally designated on June 6, 2004, U.S. authorities determined that "[i]n Afghanistan, prior to the removal of the Taliban from power, AHF supported the cause of Jihad and was linked to the UBL financed Makhtab al-Khidemat (MK), a pre-cursor organization of al Qaida and a Specially Designated Global Terrorist pursuant to the authorities of E.O. 13224. Following the September 11, 2001 terrorist attacks, AHF activities supporting terrorism in Afghanistan continued. In 2002, activities included involvement with a group of persons trained to attack foreigners in Afghanistan. A journalist suspected of meeting with al Qaida and Taliban members in Afghanistan was reportedly transferring funds on behalf of the al Qaida-affiliated AHF and forwarding videotapes from al Qaida leaders to an Arabic language TV network for broadcast." Ex. 255, "Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters," June 2, 2004. Defendant's expert did not consider why

organizations like WAMY and al-Haramain Foundation choose to print, reprint, or otherwise distribute texts like *Islamic Views* (Islamic Guidelines for Individual and Social Reform). Plaintiffs further dispute any assertion by Defendant, based on its expert's opinion, that WAMY's printing or reprinting of *Islamic Views*, early or late, excuses WAMY from its responsibility for the publication's content. A genuine dispute of material fact exists.

**STATEMENT:**

88. The author of the publication is Muhammad bin Jamil Zino (a/k/a Muhammad ibn Jamil Zaynu), a then employee of the Saudi school Dar al-Hadith. Ex. 13 at p. 39[3].

3 Blankinship explains the various editions of *Islamic Views* as follows: The earliest reference to it that I found is in WorldCat (meaning World Catalogue), which is a worldwide database subscribed to by most university libraries and others whose ambition is to document all the library holdings in the world, principally of university libraries but also including public libraries. Thus, it is the most complete resource to discover the publication history of any book. While its coverage of editions of popular Arabic books like this one is not absolutely complete, it nonetheless contains a great many items. The earliest publication date for _Tawjîhât islâmiyyah_ which it has is 1984 in Cairo, Egypt, by Dâr al-‘Ulûm al-Islâmiyyah (417 pp.), which also republished it in 1988. Then it was published by Dâr al-Hadîth at Mecca in 1985 (112 pp.), but this publication is described as its fifth printing. It was also published at Dâr al-Sharq al-‘Arabî in Beirut in the 1980s in what is called the 18th printing or edition (tab‘ah). In his short preface (p. 3), the author notes that the book has been published in very large numbers of copies at Mecca and Jiddah, has also been published in Algeria, Kuwait, and Jordan, and is to be published in Lebanon and Egypt, and none of these would seem to refer to the WAMY edition, which appears to have been much later than all of these; indeed, the date of the preface

would seem necessarily earlier than 1984 because it says the book had not yet then been published in Egypt. The Saudi Armed Forces edition of 1992 (144 pp.) is probably the one which the plaintiffs are referring to, but it is only a reprint. So it might actually be from earlier than 1984, but it is no later than that in date.

**RESPONSE:**

Disputed. Plaintiffs repeat and incorporate their responses to Defendant's ¶ 87. Additionally, Plaintiffs dispute Defendant's substitution of expert opinion for fact. Defendant's Expert stated: "Even though this book is not from WAMY in origin, so that its contents are not as germane to the case as the plaintiffs have alleged, I am going to discuss each of the passages cited by the plaintiffs to demonstrate their lack of connection with terrorism or support for terrorism." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Expert Report, p. 40. Defendant's expert failed to acknowledge that reprinting a book is functionally comparable to authoring it for purposes of responsibility and interpretation. Furthermore, regardless of its printing history, Defendant's expert has falsely concluded that because WAMY was not the original author of the publication, the content is not "germane." The record shows Defendant's expert could not speculate why WAMY reprinted *Islamic Views*, only that it did so: "WAMY often reprinted little books authored by others, and this [*Islamic Views*] is probably one of them." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Expert Report, p. 40. A genuine dispute of material fact exists.

**STATEMENT:**

89. There is no evidence that Zino is a WAMY employee. Id. at 38 (citing Zino but not as a WAMY employee).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendants' characterization of the record and the substitution of expert opinion for fact. Before Defendant's expert report, the record contained no claims that a purported author of *Islamic Views* was a WAMY employee. Plaintiffs dispute any assertion by Defendant that, because the purported original author may or may not be a WAMY employee, this excuses Defendant for the publication's content. Reprinting a book is functionally comparable to authoring it for purposes of responsibility and interpretation. Furthermore, regardless of the purported author's religious affiliations and its printing history, *Islamic Views* contains "offending sentences," which Defendant's expert characterized as "obviously offensive and not politically correct in the American context, and it may be that it should be rooted out of the Arabic context as well." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Expert Report, pp. 39, 40. Defendant's expert chose not to place these "offending sentences" in the context of Islamic extremist and terrorist ideology. A genuine dispute of material fact exists.

**STATEMENT:**

90. In the book, Zino describes several types of jihad, with the seventh kind of jihad as a "struggle against the self" and that he is actually trying to de-emphasize "incitement". Ex. 44 at 202:14-205:17.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's substitution of expert opinion for fact. Defendant's expert provided no factual support for his opinion that the purported author de-emphasized "incitement" of the seven types of jihad by including the jihad that is the "struggle against the self." Within the broader discussion of Jihad in the work, there is no clear effort to "de-emphasize" Jihad. Plaintiffs

repeat and incorporate their responses to Defendant's ¶¶ 91-92. A genuine dispute of material fact exists.

**STATEMENT:**

91. Zino's reference in *Islamic Views* to jihad is a historical reference to "[t]he call of the Prophet and his jihad" and not to any modern-day warfare. Ex. 13 at p. 40.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's substitution of Defendant's expert's opinion for fact. Defendant's expert appeals to "historical oppression" to excuse the plain meaning of the text, particularly in the context of contemporary Islamic extremism. The inflammatory content serves as both justification and encouragement for violence against non-Muslims. Defendant's expert further argued that Emerson mistranslated or misinterpreted the section heading that begins a discussion of "jihad": "The heading here (p. 60) that Emerson has translated as, 'The Prophet asks for Jihad' actually means "The call of the Prophet and his jihad" (da'wat al-rasul wa-jihâduhu), completely different from what Emerson claimed. Indeed, Emerson's construction of it turns a purely historical heading into an ominous one." Defendant's expert has expressed an opinion, not a fact, and whether the translation or interpretation is comparable is a matter of opinion. In fact, Emerson provided a different translation and interpretation than Defendant's expert: "The Prophet Mohammad fought against the infidels and the Jews till he triumphed over them and conducted himself about twenty invasions and he sent tens of regiments led by his companions for Jihad." Ex. 26, Statement of Steven Emerson to the National Commission on Terrorist Attacks Upon the United States, July 9, 2003. Defendant's Expert: "The messenger fought the polytheists and the Jews and defeated them, and he fought himself in about twenty expeditions, and he sent out tens of raids by his Companions for the jihad,

the call to Islam, and the liberation of peoples from oppression and slavery, and he taught them to start with monotheism (tawhîd)." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Expert Report, p. 40. According to the Defendant's expert, this passage, viewed within the historical context of the Palestinian "struggle" and lacking explicit guidance on how to "fight" or whether to do so outside the bounds of "warfare," does not constitute incitement to violence against non-Muslims: "But note that it occurs clearly in the context of the struggle over Palestine, where the Palestinians and other Arab and Muslim peoples normally note the history of the expulsion of 750,000 Palestinians in 1948 and the continuing colonization by Israel after that. And people who believe they are oppressed and wronged, particularly when deprived of the right of self-determination in their own country, usually feel they are justified in resisting and cannot be overly blamed for that when it is a political problem. So this is not an anti-Semitic statement about the Jews in general, but rather is a specific reference to the question of Palestine. Also, while it is a general call for the next generation to be taught not to give up that fight, it also contains no specific program at all for that, and it certainly cannot be taken as a call for indiscriminate violence outside of the rules of warfare." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Expert Report, p. 40. Defendant's expert, while acknowledging the "slur," asked: "The generalization about Jews rather than specifying only Israelis or Zionists could be considered an ethnic slur, and many Arabs and Muslims are not careful to distinguish the religious membership from a particular political attitude, and especially did not do so not long in the past, in 1984 or earlier when Zaynû wrote this. Most of all, how is this terrorism and how has it any connection to 9/11?" As other evidence in the record shows, Defendant's expert is not an expert on terrorism or on what constitutes material support for terrorists. See Ex. 110, Deposition of Khalid Blankinship 46:16-18 (not a terrorism expert); Ex. 110, Deposition of Khalid Blankinship, 121:17-23 (he did not

understand that there is a legal definition of terrorism in the United States); Ex. 110, Deposition of Khalid Blankinship 122:1-7 (he also did not understand that there is a legal definition of an act of international terrorism in the U.S. Code); Ex. 110, Deposition of Khalid Blankinship 122-9-16 (he did not know that U.S. Code defines what constitutes the provision of material support or resources to a designated terrorist organization). Other evidence in the record shows that terrorism experts agree that hate-filled rhetoric, such as that published by WAMY, supports a hate-based ideology that terrorists rely on to justify their activities, directs Muslims against non-Muslims, and helps attract recruits to an ideology that "true" Muslims opposed the "enemies" of Islam: "Al-Qaeda's most serious challenge to international security lies in its ability to quickly replenish its ranks with dedicated operatives. Underpinning this challenge is an abstract and hate-based ideology of "jihad." Based on an absolutist interpretation of Islamic law, and cloaked in a veneer of extremist terminology, this ideology harnesses and directs angry and alienated people in the Muslim world against non-Muslim scapegoats.
Al-Qaeda's culture of "jihad' engenders a breeding ground for new acts of international terrorism. Al-Qaeda and other Islamic terrorist movements are entirely dependent on their potent ideological message to attract fresh recruits. Under the guise of a social program, Islamic radical movements generate moral and political support in Muslim communities worldwide. The jihadist ideology mandates that "true" believers oppose the "enemies" of Islam and spread Islamic sovereignty, thus breeding violence and terrorism." Ex. 26, Statement of Steven Emerson to the National Commission on Terrorist Attacks Upon the United States, July 9, 2003. Defendant's expert has ignored or failed to recognize that the record shows the inflammatory statements are deliberate and serve to promote and justify violence. Defendant's reference to historical oppression does not alter the publication's clear meaning, nor can it transform a prolonged campaign of dehumanization against non-Muslims into objectionable but ultimately harmless cultural

commentary, particularly when viewed in the context of terrorist ideology and WAMY's other activities supporting terrorists. Defendant's expert further opined on another passage from *Islamic Views* cited in the record: Damn from Allah to the Jews who made graves of their prophets as Masjid. Ex. 26, Statement of Steven Emerson to the National Commission on Terrorist Attacks Upon the United States, July 9, 2003. Defendant's expert translated the passage as "God fought against the Jews because they took the tombs of their prophets as a place of worship." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Expert Report, p. 42. Defendant's expert, citing what he claims is the original religious source, stated the passage "…message is simply, "Don't take the tombs of prophets as places of worship," noting that "[t]he occurrence of the Jews in the text is incidental and in any case refers only to the ancient Jews." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Expert Report, p. 42. He further stated that the passage "…is also used as a proof text for the religious doctrine that mosques should not contain tombs within them, a doctrine that is upheld by Saudi Arabian Islam but often ignored elsewhere, as tombs within mosques, both of rulers and saints, are very common." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Expert Report, p. 42. Again, Defendant's expert has ignored or failed to recognize that the record shows the inflammatory statements are deliberate and serve to promote and justify violence against non-Muslims. The reference to "Jews" is not incidental and falls into the larger narrative that non-Muslims are oppressors or evil doers who should be opposed. The record also included the following excerpt from *Islamic Views*: "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah. Ex. 26, Statement of Steven Emerson to the National Commission on Terrorist Attacks Upon the United States, July 9, 2003. According to Defendant's expert, this passage comes

from a section discussing the education of children in *Islamic Views* titled "Jihad and Bravery," which he translated as: "That we plant in the children the love of taking revenge on the Jews and the oppressors, and that our youth will liberate Palestine and Jerusalem when they return to the teachings of Islam and the jihad in the path of God, and they will be victorious with God's permission." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Expert Report, p. 40. While acknowledging the text's violent message is not "politically correct," Defendant's expert is surprisingly ambivalent about whether this encouragement for Muslim children to take violent revenge on Jews should be removed from the "Arab context": "Now, this is obviously offensive and not politically correct in the American context, and it may be that it should be rooted out of the Arabic context as well." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Expert Report, p. 40. This is an opinion, not a fact, and other observers would characterize this statement as "morally objectionable," rather than politically incorrect. Additionally, the record included the following passage from *Islamic Views*: Later, *Islamic Views* says Islam "is a religion of Jihad" and that Jihad "was an answer for the Jews, the liars." Ex. 26, Statement of Steven Emerson to the National Commission on Terrorist Attacks Upon the United States, July 9, 2003. Accusing Emerson of intentionally distorting the quote, Defendant's expert translated this passage Jihad "was an answer for the Jews, the liars" as: "As for His saying, 'Say, God has spoken the truth; therefore follow the sect of Abraham as an upright person' (Qur'ân 3:85), it is a reply to the lying Jews, as shown by the preceding verse, 'And whoever has fabricated a lie about God…' (Qur'ân 3:84)." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Expert Report, p. 42. Defendant's expert argued that "the common practice of concluding any Qur'ân recitation chanted or spoken aloud with the words, 'Almighty God has spoken the truth,' is a reprehensible and sinful

innovation that is contrary to the Prophet's way. Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Expert Report, pp. 42-43. The reference to "Jews" is again "incidental": "Thus, the mention of the Jews here is again entirely incidental and refers likewise in this case only to the Jewish opponents of the Prophet mentioned in the Qur'ân and not to modern Jews. Jihad, warfare, or violence are not mentioned." Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Khalid Blankinship Expert Report, p. 43.
Again, Defendant's expert has ignored or failed to recognize that the record shows the inflammatory statements are deliberate and serve to promote and justify violence against non-Muslims. The reference to "Jews" is not incidental and falls into the larger narrative that non-Muslims are oppressors or evil doers who should be opposed. The record included another passage from *Islamic Views*:
"*Islamic Views* exhorts Muslims to wage "Jihad against the Satan," and that "You should not back the Jews and the Christians and the Communists against the Muslims; the Communists, the Infidels, the Jews, and the Christians, those who do not believe in Mohammed. You should say they are infidels." Ex. 26, Statement of Steven Emerson to the National Commission on Terrorist Attacks Upon the United States, July 9, 2003. These are not incidental inflammatory references, as Defendant's expert argues. A genuine dispute of material fact exists.

**STATEMENT:**

92. Zino distinguishes the various forms of jihad but most importantly notes that even offensive jihad requires permission of a Muslim ruler, like a Saudi state. Id. at pp. 41-42 (describing the various types of meanings ascribed to the word jihad); Ex. 44 at 211:13-23 (Saudi maintains legitimacy by the doctrine not to disobey the leader).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's characterization of the record. As a comparison between the English-language versions of *Islamic Views* identified by Defendant's expert and the text Defendant's expert translated makes clear, there is a difference in interpretation, because the English-language version contains no explicit instruction to obtain permission for "offensive jihad." The section "Jihad (fighting in the cause of Allah)" in the English-language version is translated as: Jihad (Fighting in the cause of Allah) Jihad is obligatory on every Muslim in two ways: by spending one's wealth or offering oneself for fighting on the cause of Allah. It can also be by preaching or defending Islam through tongue or pen. Reward varies for various types of Jihad.

1. Jihad as an Individual Duty
This type of Jihad becomes a must when the enemy of Muslims enters their land, like the Jews who settled in Palestine. Every Muslim will be guilty unless he expels the Jews by money or physical fighting.

2. Jihad as a collective duty:
This type is the one if some people do it, it suffices and no need for all to perform. For example, propagation of Islam, or call to Islam until all countries embrace it and make it their way of life. If someone makes any obstacle in the way of propagation, Muslims are allowed by Allah to fight them until Islam becomes the governing authority. Jihad in this sense will not stop until the Day of Judgment.
When Muslims took to farming and trading, they became subdued. The Prophet [Arabic] said: "If you deal by 'Aniah (selling at a higher price as debit then buying the same for less price in cash) and get content with agriculture abandoning Jihad in the way of Allah, Allah will make you subdued until you return to your religion." (Ahmad).

3. Jihad against Rulers:

This type means advising the good for the sake of the rulers and helping them. The Prophet said, “Religion is sincerity.“ The Companions ask: “To whom, O Messenger of Allah?“ He said: “To Allah and His Book, His Messenger, the Muslim leaders and the Muslim public.“ (Muslim). He also said:

“The best Jihad is a speech of truth in the presence of a tyrant ruler.“ (Abu Dawud and Titmidhi). The rulers must be warned against their deviation from the path of the Shari'ah and asked to repent and make people repent. They should also be asked to correct their beliefs and bring up themselves and their children according to Islam. Let them read:

“Verily Allah will not change the condition of a people as long as they do not change their state themselves.“ (13:11)

A propagator of Islam recently made a comment in this regard, which is as follows:

“If you build the state of Islam in your hearts, it will be built in your land.”

Thus it is inevitable to reform the base-the society- on which we intend to build the aspired Islamic state.(1) Allah, the Exalted says:

“Allah has promised those among you who believe, and do righteous deeds that he will certainly grant them power on the Earth, as he had granted it to those who before them, and he will grant them the authority to practice their religion, which he has chosen for them, and he will surely give them security and exchange to their fear (if) they worship me without associating anything with me. But whoever disbelieve that after this, they are the wicked.“ (24:55)

1 Briefly quoted from Comments on the Explanation of at-Tahdwiyah on Islamic Faith [Arabic] by Al-Albani.

4. Jihad against Disbelievers and Communists:

The Jihad against the disbelievers, communists and the aggressors from Jewish-Christian nations can be either by spending on Jihad or by participating in it in person. The Prophet said:

"Perform Jihad against the polythesis by wealth, body and tongue." (Ahamd).
5. Jihad against Wrongdoers:
"Whoever sees a vice should stop it by hand, if possible, or by tongue or (he should hate it) in heart-this is the lowest (act) of faith." (Muslim).
6. Jihad against the Satan:
This type means that one should disobey the Satan and obey Allah. You can also abandon heeding to the Satan's temptations. Allah, the Exalted says:
"Surely Satan is an enemy to you; so treat him as an enemy. He only invites his followers that they may become the dwellers of the blazing Fire." (35:6)
7. Jihad against One's Self:
The fighting against one's self means stopping all unlawful things and start doing the lawful alone according to the Commands of Allah. Allah the Exalted says on behalf of the wife of the monarch of Egypt:
"And I do not acquit myself. Verily the self is inclined to evil except that (self) on whom my Lord bestows, His Mercy; veril, my Lord is Oft-Forgiving, Most Merciful." (12:53)
O Allah! Make us true Mujahedeen (fighters) in Your cause!
Ex. 159, Muhammad ibn Jamil Zaynu, Islamic guidelines for individual and social reform, translated by Ibrahim M. Kunna (ISBN:9960-740-90-0), Darussalam Publishers & Distributors (1996), https://archive.org/details/islamicguideline0000zayn/mode/2up, pp. 130-134.
Even in this more moderate translation, the work casts Jews, Christian, and non-believers as the enemy that Muslims must forcefully oppose. Other references to Jews or Jihad in the English-language version repeat the message that pious Muslims violently opposed non-Muslims and that only when Islam reigns supreme can Muslims stop. Examples of this message include:
The Factors which nullify Islam

…

21. Assisting the Jews Christians or the communists against Muslims and cooperating [sic] them. Allah the Exhalted says: "Let not the believers take to themselves the disbelievers as 'Auliya (friends) besides the believers, and whoever does that will never be helped by Allah in any way, unless you indeed fear from them a danger…" (3:28)

22. Not considering the communists or infidels who deny Allah's existence or the Jews and Christians who disbelieve in Muhammad [Arabic]. Allah the Exhalted says: "Verily those who disbelieved from among the people of the Scripture and the Mushrikun (associators) will abide in the Fire of Hell. They are the worst of creatures." (98:6) Ex. 159, Muhammad ibn Jamil Zaynu, Islamic guidelines for individual and social reform, translated by Ibrahim M. Kunna (ISBN:9960-740-90-0), Darussalam Publishers & Distributors (1996), https://archive.org/details/islamicguideline0000zayn/mode/2up, p. 35.

Do not Believe the Quacks (Dajjaleen)

The Prophet [Arabic] said: "Whoever approaches a foreteller or a soothsayer and believes him has disbelieved in what was revealed to Muhammad." (Amad).

As it is clear from this Hadith, it is not permissible to believe an astrologer, foreteller, soothsayer, magician and the like because they pretend to know the Unseen and what one might keep as his own secret or something of the past or future. The power of knowing the Unseen is exclusively Allah's. Allah the Exhalted says: "Say: none in the heavens and the earth knows the Ghaib (the Unseen) except Allah…" (27:67) "…and He is the Knower of whatsoever is in the breasts." (57:6) As a matter of fact, what these imposters do is simply guessing and a coincidence may occur. So

some feeble-minded people believe them. The Satan also misguides them. If these frauds are truthful, why do not [sic] they extract the treasure of the earth since most of them are very poor and live on cheating the ignorant. What thus earned is also Haram. If they know the Unseen, let them talk about the secret schemes of the Jews so that we combat them. Ex. 159, Muhammad ibn Jamil Zaynu, Islamic guidelines for individual and social reform, translated by Ibrahim M. Kunna (ISBN:9960-740-90-0), Darussalam Publishers & Distributors (1996), https://archive.org/details/islamicguideline0000zayn/mode/2up, p. 37.
Do not swear by Anyone other than Allah
9. He [Arabic] also will:
"One who takes a false oath by any other religion other than Islam, he would be considered what he said." (Bukhari and Muslim).
This is: if a Muslim swears that should he does a particular deed he is a Jew, then he would be a Jew. If he really respects that religion, he has disbelieved. If his intention is sincere, he will be judged by that intention. If he desires to be known as a Jew, he would be a Jew because the intention of disbelief is disbelief. Or if his intention is to show his aversion to that religion, he is not a disbeliever.

….

4. With regard to the Hadith shown as No. 9 above, Imam An-Nawai [Arabic], says that swearing by any other religion other than Islam is a big sin whether it is a lie or saying: "I sear to a be a Jew or a Christian if that is that." (Sharh Muslims).
Ex. 159, Muhammad ibn Jamil Zaynu, Islamic guidelines for individual and social reform, translated by Ibrahim M. Kunna (ISBN:9960-740-90-0), Darussalam Publishers & Distributors (1996), https://archive.org/details/islamicguideline0000zayn/mode/2up, pp. 39-41.
The Prophet's propagation of Islam and Jihad

…

The Prophet [Arabic] was at last forced to fight against the pagans and the Jews and defeated them. He himself led more than twenty battles besides sending several expeditions under his Companions to free the peoples of his time from oppression and the worship of rulers. He advised his Companions to start preaching the Oneness of Allah.

Ex. 159, Muhammad ibn Jamil Zaynu, Islamic guidelines for individual and social reform, translated by Ibrahim M. Kunna (ISBN:9960-740-90-0), Darussalam Publishers & Distributors (1996), https://archive.org/details/islamicguideline0000zayn/mode/2up, p. 94.

Some Ahadith from the Prophet

…

6. "Allah has cursed the Jews and Christians as they made the graves of their apostles places of worship." (Bukhari)

Ex. 159, Muhammad ibn Jamil Zaynu, Islamic guidelines for individual and social reform, translated by Ibrahim M. Kunna (ISBN:9960-740-90-0), Darussalam Publishers & Distributors (1996), https://archive.org/details/islamicguideline0000zayn/mode/2up, p. 98.

Jihad and Bravery

…

3. Teach your children the love of justice and revenge from the unjust like the Jews and the tyrants. Consequently our youth know that Palestine should be freed and Jerusalem must be for the Muslims. They have to learn about Islam and Jihad as per the Qur'an and the holy fighting of justice is supported by Allah Almightly. Victory is yours if you consult the Qur'an and apply its commands.

Ex. 159, Muhammad ibn Jamil Zaynu, Islamic guidelines for individual and social reform, translated by Ibrahim M. Kunna (ISBN:9960-740-90-0), Darussalam Publishers & Distributors

(1996), https://archive.org/details/islamicguideline0000zayn/mode/2up, p.108. Beating the Iron Rods Neither the Prophet [Arabic] nor his Companions, the best who ever worshipped Allah, never [sic] used any Shish (an iron rod used by Sufis for self-beating)….If these men [Sufis] can make miracles, why do they not fight the Jews who settled down in the Arab lands, killed our children and women and still do more? Ex. 159, Muhammad ibn Jamil Zaynu, Islamic guidelines for individual and social reform, translated by Ibrahim M. Kunna (ISBN:9960-740-90-0), Darussalam Publishers & Distributors (1996), https://archive.org/details/islamicguideline0000zayn/mode/2up, pp. 146-147. A genuine dispute of material fact exists.

**STATEMENT:**

93. The offensive views about Jews expressed in *Islamic Views* is a "reference to the question of Palestine" and not "about Jews in general," is "not an exceptional theme in Arabic writing," nor is it "exclusive to any country or particular group." Ex. 13 at 40; Ex. 44 at 208-2-11.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion and substitution of expert opinion for fact. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 86-92. A genuine dispute of material fact exists.

**STATEMENT:**

94. Ultimately, the circa 1984 book has no links to acts of terrorism or the attacks on 9/11; it offers only an academic explanation of jihad in Islam not advocacy to pick up arms and fight the United States or the West. Ex. 13 at p. 41 (explaining Zaynu's book on jihad and then details

the seven kinds of jihad); Ex. 2 at ¶26 (discussing that WAMY has never been involved in armed conflict).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion. Plaintiffs further dispute Defendant's substitution of expert opinion for fact. The record shows that Defendant's expert concluded that WAMY's denigration of Jews carried no meaningful significance because such rhetoric was common in parts of the Arab world and, in the expert's view, the text contained no literal call for violence. From this premise, the expert reasoned that WAMY's statements could not have encouraged or justified terrorists—such as al-Qaeda, a violent extremist organization calling for violence against non-Muslims, as al Qaeda did so in declaring war on Jews and "Crusaders." According to the expert, unless the publication explicitly instructed readers to commit violence, its content amounted to nothing more than objectionable but culturally familiar hate speech. This reasoning, while fundamentally flawed, is an opinion not fact. The WAMY publication present a sustained, categorical vilification of Jews and non-Muslims, which is not incidental rhetoric but an extremist rhetoric that functions as a call for violence. The expert fails to appreciate that hatred does not need to be phrased as an explicit command to operate as an inducement. A text that repeatedly portrays a group as corrupt, dangerous, subhuman, or existentially threatening does the same work as literal incitement: it constructs the target as an enemy whose destruction is justified, necessary, or divinely sanctioned. In this context, the "offensive views about Jews" is the call for violence. Its length, intensity, and categorical nature supply the moral and ideological predicate that violent extremist organizations routinely rely upon to legitimize aggression and mobilize followers. By reducing this sustained dehumanization to mere "common hate speech," the expert ignores the well-documented role that

such rhetoric plays in extremist propaganda: it prepares audiences for violence by stripping the target of moral standing, framing hostility as righteous, and lowering the psychological barriers to violent action.

Furthermore, Defendant's expert has ignored or failed to recognize that the record shows the inflammatory statements are deliberate and serve to promote and justify violence. Defendant's reference to historical oppression does not alter the publication's clear meaning, nor can it transform a prolonged campaign of dehumanization against non-Muslims into objectionable but ultimately harmless cultural commentary, particularly when viewed in the context of terrorist ideology and WAMY's other activities supporting terrorists.

The Defendant's expert thus misstates both the function and the effect of WAMY's publication. The absence of a literal command does not negate the text's capacity to encourage or justify violence; the publication's expressive structure accomplishes that work on its own. Nor does the Defendant's expert place the publication in the context of contemporary Islamic extremism. A genuine dispute of material fact exists.

**STATEMENT:**

2. *Arab Volunteers/Helpers in Afghanistan ("Arab Volunteers")* is Not a WAMY Publication Nor Does It Promote Terrorism

**RESPONSE:**

Disputed. See Plaintiffs' responses to ¶¶ 95-99.

**STATEMENT:**

95. The book referred to as the Arab Volunteers is not a WAMY publication; WAMY has nothing to do with its authorship, publication, or dissemination. Ex. 45, MR/ARA001079-083 (Exhibit

12 to motion to exclude Kohlmann - copy of cover of Arab Volunteers showing publisher as attached to Kohlmann affidavit in *Burnett v. Al Barak Investment & Development Corp*, et al, 03-CV-9849).

**RESPONSE:**

Disputed. The record shows that Adel Batterjee was an LBI board member and official at its founding in the late 1980s. LBI operated under WAMY's auspices, with WAMY referring to LBI as its welfare arm, and WAMY senior officials also served on LBI's board. Batterjee remained involved in LBI until 1993, when WAMY purported to remove him and assume control of LBI's activities. See Plaintiffs' responses to Defendant's ¶ 11. Arab Volunteers was published in 1991. Decl. of Mohammedi (Dkt. No. 11997), Ex. 45, MR/ARA001079-083. As Defendant's expert noted, Arab Volunteers was published and "Checked and Revised by the Documentation and Studies Administration at Lajnat al-Birr Islamiyyah." Decl. of Mohammedi (Dkt. No. 11997), Ex. 45, MR/ARA001079-083 at MR/ARA001082; Ex. 162, August 6, 2020 Marc Sageman Expert Report ("Sageman Report"), p. 126. Thus, Adel Batterjee was a board member and official at LBI, the welfare arm of WAMY, in 1991 when the book was published. Although the work's authorship has been attributed to multiple individuals, additional evidence confirms that LBI and Batterjee played key roles in its writing, editing, and publication: "On February 23, 2002, defendant Arnaout [former LBI employee and head of BIF-USA] spoke by telephone with Basil Refai. Refai authored a book, published by LBI under LBI's name in furtherance of LBI's mission, recounting experiences of mujahideen in Afghanistan, including Bin Laden, defendant Arnaout and others. Defendant Arnaout coached Refai on the telephone, falsely telling Refai that defendant Arnaout is not the Abu Mahmoud al Suri discussed in the book. Defendant Arnaout also told Refai that he explained to a Chicago Tribune reporter that he is not the person she thinks he is, and he never

knew Bin Laden." Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 100. Furthermore, the record includes evidence that Abdel Batterjee sent "his" book to Plaintiffs' expert at his request, before the present litigation; Plaintiffs' expert has testified that the copy he received from Abdel Batterjee contained the WAMY logo. Ex. 163, August 6, 2021 Deposition of Evan Kohlmann ("Kohlmann Dep."), 640:23-641:24; Ex. 162, Sageman Expert Report, p. 126 (citing FED-PEC0056595-6, FED-PEC0055693, FED-PEC0055486-90). Additionally, the record includes evidence of WAMY's and LBI's logo in materials seized from Ahmad Ajaj, who was convicted for his role in the 1993 World Trade Center bombing. Decl. of Mohammedi (Dkt. No. 11997), Ex. 47, Government Exhibit 2800-A in U.S. v. Salameh at 2, 3. The LBI logo, which depicts two hands reaching across a partial globe, includes "(World Assembly of Muslim)" in parentheses, and that logo is featured on the cover of Arab Volunteers. Basil Mohammed, Arab Volunteers in Afghanistan (2d ed. 1991), Ex. 161, MR/ARA001079-MR/ARA001083, at MR/ARA001079. The 9/11 Commission further confirmed Batterjee's authorship of Al Ansar al Arab fi Afghanistan (The Arab Volunteers in Afghanistan) under the pseudonym Basil Muhammad: "For a particularly useful insight into the evolution of al Qaeda -- written by an early Bin Ladin associate, Adel Batterjee, under a pseudonym -- see Basil Muhammad, Al Ansar al Arab fi Afghanistan (The Arab volunteers in Afghanistan) (Benevolence International Foundation (BIF) and World Association of Muslim Youth, 1991)." Ex. 4 9/11 Commission Report, p. 467 (n.25). More to the point, the record shows Defendant's expert described Arab Volunteers as "invaluable." Ex. 162, Sageman Report, p. 125 ("As intended, Muhammad's book is invaluable and has been used by many scholars, including myself in part II of this report and Kohlmann in his"). Plaintiffs dispute any assertion that Arab Volunteers is not attributable to Batterjee and LBI. A genuine dispute of material fact exists.

**STATEMENT:**

96. The House of Learning Printing Press, not WAMY, published *Al Ansaru'l Arab fi Afghanistan* or Arab Cohorts in Afghanistan (aka "Arab Volunteers") in 1991. Id. at MR/ARA001081 (cover of Arab Volunteers shows "House of Learning printing press Co"); Ex. 40 at 126 (noting that his version of the book states, "Published by House of Learning printing press Co" on the second page).

**RESPONSE:**

Disputed. As Defendant's expert noted, the copy of Arab Volunteers that Adel Batterjee sent to Plaintiffs' expert is an 2nd edition, and the expert was unable to locate a 1st edition. Decl. of Mohammedi (Dkt. No. 11997), Ex. 40, Marc Sageman Report, Excerpts, at p. 126. The second edition listed the House of Learning Printing Press as the printer. Defendant's expert further identified that the copy of Arab Volunteers included "Checked and Revised by the Documentation and Studies Administration at Lajnat al-Birr Islamiyyah." Decl. of Mohammedi (Dkt. No. 11997), Ex. 40, Marc Sageman Report, Excerpts, at p. 126. Plaintiffs repeat and incorporate their response to Defendant's ¶ 95. A genuine dispute of material fact exists.

**STATEMENT:**

97. The Arab Volunteers "is not a biography of Bin Ladin although he figures prominently in the book [;] [i]t is rather a history of the Arab ansar in Pakistan and Afghanistan from its early days in early 1980s to about 1987, when the book ends." Ex. 40 at 125-126.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion that Arab Volunteers is merely "a history of the Arab ansar in Pakistan and Afghanistan from its early days in early 1980s to about 1987, when the

book ends." The record has described the work as "a particularly useful insight into the evolution of al-Qaeda -- written by an early Bin Laden associate, Adel Batterjee, under a pseudonym -- see Basil Mohammed, Al Ansar al Arab fi Afghanistan (The Arab volunteers in Afghanistan) (Benevolence International Foundation (BIF) and World Association of Muslim Youth, 1991)." Decl. of Mohammedi (Dkt. No. 11997), Ex. 40, Marc Sageman Report, Excerpts, at pgs. 125-126; Ex. 4, 9/11 Commission Report 467. Additionally, Adel Batterjee testified that: "I also deny that I had any knowledge of the activities of Osama bin Laden and al Qaeda other than what is generally known through the press. Also, I never wrote a biography of bin Laden as alleged in paragraph 230 [of the Third Amended Complaint]." Ex. 165, April 8, 2004 Declaration of Adel A. J. Batterjee ¶ 10. The Third Amended Complaint ¶ 230 stated his role differently: "230. Batterjee commissioned the writing of a biography specifically about Osama bin Laden and the origins of the al Qaeda network in Arabic. This biography, The Arab Volunteers in Afghanistan, was jointly published in 1991 by the Benevolence International Foundation and the World Assembly of Muslim Youth. The book details Osama bin Laden's life, including the creation of bin Laden's terrorist network, al Qaeda. On the back cover is a written statement that expresses the ideology of the book, 'This is the jihad in Afghanistan. What we see now, it is a blessed river. The Arab people are the people that feed the jihad river.'" Ex. 1, Third Amended Complaint ¶ 230. Additionally, Batterjee's close associate and longtime LBI/BIF senior official, Enaam Arnaout, who features in Arab Volunteers and understood the nature of the evidence presented in the work about him and LBI in the formation of al Qaeda, has lied about being in the book. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 100. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 95-96. A genuine dispute of material fact exists.

**STATEMENT:**

98. Basil Muhammad, the author of Arab Volunteers, is a Syrian journalist; Basil Muhammad is not a pseudonym for Adel Batterjee. Id. at 125 (referring to other Soviet-Afghan war experts' familiarity and use of Basil Muhammad's work the Arab Volunteers).

**RESPONSE:**

Disputed. The record contains additional information crediting Arab Volunteers. While Defendant's expert noted that other experts have relied on Arab Volunteers, the expert did not disclose that, in the case of Thomas Hegghammer, the work was cited as "Basil Muhammad, al-ansar al-'arab fi afghanistan [The Arab Supporters in Afghanistan], 2nd ed. (Riyadh: Lajnat al-Birr al-Islamiyya, 1991)" in Hegghammer's introduction to "The Caravan, Abdallah Azzam and the Rise of Global Jihad." The citation identified Lajnat al-Birr al-Islamiyya as the publisher. Nor did Defendant's expert cite evidence in *U.S. v. Arnaout* indicating a possibly different author. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 95-97. A genuine dispute of material fact exists.

**STATEMENT:**

99. Adel Batterjee did not write Arab Volunteer. Ex. 10 at ¶10.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's claim that Adel Batterjee did not write Arab Volunteers, and repeat and incorporate their objections to Defendant's paragraphs 95-98. Although Defendant attempts to manufacture uncertainty about whether Batterjee was involved in writing, commissioning, or editing the book, the evidence clearly demonstrates his participation in the book's creation through WAMY's welfare division, LBI, which he led. Batterjee's subsequent action of passing the book to Plaintiffs' expert, before the present litigation, further confirms his involvement in the book's creation. Defendant cannot deny responsibility for a publication created

by its own organization, directed by its officer, used by that officer in communications with Plaintiffs' expert, and relied upon by Defendant's expert. Even if Batterjee's exact role during the book's production is uncertain, the evidence shows he helped create it, approved it, and endorsed its findings as a member of Defendant's organization, so the book and its findings are attributable to both him and Defendant. Additionally, evidence in the record indicates Adel Batterjee's role in LBI and BIF changed only in appearance. In its designation of Adel Batterjee, the U.S. Treasury explained the historical and operational links between Batterjee, bin Laden and al Qaeda: "In the late 1980s, Batterjee founded the precursor to BIF, Lajnat al-Birr al-Islamiah (LBI), in Saudi Arabia and Pakistan. LBI provided financial and operational support to mujahideen elements in Afghanistan and around the world, including fighters associated with UBL and Gulbuddin Hekmatyer, who was named a SDGT by the Treasury on February 18, 2003. LBI was affiliated with Maktab Al-Khidamat (MK), which was co-founded and financed by UBL and is the precursor organization of al Qaida. LBI later joined al Qaida upon the dissolution of MK. In the early 1990s, LBI began operating under the name Benevolence International Foundation (BIF) in an effort to widen its appeal to the general public and increase its credibility with other governments. BIF and LBI remained one organization with interchangeable assets under Batterjee's control." Ex. 23, U.S. Dept. of the Treasury, "Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," December 21, 2004. Plaintiffs dispute any assertion that Arab Volunteers is not attributable to Batterjee and LBI. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 95-98. A genuine dispute of material fact exists.

**STATEMENT:**

<u>3. Anwar Ajaj's Manual</u>

**RESPONSE:**

No response necessary.

**STATEMENT:**

100. In 1994, the "U.S. Attorney for the Southern District of New York prosecuted and convicted" Ahmed Ajaj in connection with the 1993 World Trade Center bombings. Ex. 46, 9/11 Commission Report (Excerpts) at p. 72 (discussing conviction); Ex. 40 at p. 153 (discussing trial years).

**RESPONSE:**

Undisputed.

**STATEMENT:**

101. When U.S. officials arrested him, Ajaj's belongings included a manual titled *Military Lessons in Jihad Against Tyrants* (*a/k/a "Military Lessons"* that was allegedly contained inside a WAMY/LBI envelope. See, Ex. 47, Government Exhibit 2800-A in U.S. v. Salameh (which includes, as shown here, the envelope); Ex. 40 at p. 153 (discussing claim that envelope contained the manual).

**RESPONSE:**

Undisputed that U.S. officials found a manual titled "Military Lessons in Jihad Against Tyrants" in Ajaj's belongings; disputed, however, as to Defendant's characterization of the record. In addressing Ajaj and the terrorist manual found in his possession, Defendant's expert asserted: "Ajaj had nothing to do with bin Laden or al Qaeda or the 9/11 terrorists. He came to Pakistan after bin Laden had left the country and he trained at Khalden, which was not an al Qaeda camp." Ex. 166, U.S. v. Salameh et al., S.D.N.Y., S593CR.180 (KTD), January 27, 1994, at 7349. The record demonstrates otherwise: Ajaj was involved with al-Qaeda associates and entered the Khaldan Camp, which trained al-Qaeda operatives. Ajaj entered the United States in September 1991 and

settled in Houston, claiming political asylum on the basis of alleged imprisonment and torture by the Israeli government. After failing to appear for his INS hearing, he returned to Pakistan in April 1992. From Pakistan, he traveled to Dubai and then Saudi Arabia, where he obtained a letter of introduction to the Khaldan terrorist training camp on the Afghanistan-Pakistan border. The letter -- found in Ajaj's possession when detained in 1992 -- stated that Ajaj had come to the "land of Jihad" and was allegedly issued in Saudi Arabia by the "Abdela Azam House." Ex. 167, Foreign Terrorists in America: Five Years After the World Trade Center, Senate Judiciary Committee Subcommittee on Technology, Terrorism, and Government Information, 105th Cong. (1998) (Feb. 24, 1998 Statement of J. Gilmore Childers and Henry J. DePippo); Ex. 168, United States v. Salameh, 54 F. Supp. 2d 236 (S.D.N.Y. 1999) at 300-301. Abdullah Azzam -- bin Laden's early mentor and co-founder of the "Bureau of Services," or Maktab al-Khidmat (MAK), the forerunner to al-Qaeda -- was directly connected to the institution that issued Ajaj's letter. Ex. 4, 9/11 Commission Report 55-56. At Khaldan, Ajaj studied bomb-making. While in Pakistan, he contacted Ramzi Yousef. Yousef and his uncle, Khalid Sheikh Mohammed -- the mastermind of the 9/11 attacks -- were associated with al-Qaeda. Ex. 4, 9/11 Commission Report 59, 145. Ajaj and Yousef agreed to target the United States and assembled a "terrorist kit" of manuals, false identification, and bomb-making notes. They planned to illegally enter the United States to attack U.S. buildings and, on August 31, 1992, flew from Peshawar to Karachi. Ex. 4, 9/11 Commission Report 73. The record further shows that al-Qaeda associate Abu Zubaydah oversaw Khaldan Camp, and trainees from Khaldan were accepted into al-Qaeda's ranks. Ex. 4, 9/11 Commission Report 500. Two of the 9/11 hijackers trained at Khaldan. Ex. 4, 9/11 Commission Report 234. The 1993 investigation of Yousef led the FBI to the al-Farouq Mosque in Brooklyn and to Sheikh Omar Abdul Rahman, the "Blind Sheikh," and a close associate of bin Laden's. Ex. 4, 9/11 Commission Report 72. The mosque hosted the Al-Khalifa Refugee Center, which recruited

individuals for the Afghan jihad on behalf of MAK; some recruits later participated in al-Qaeda attacks, including the 1998 U.S. embassy bombings in East Africa. Ex. 4, 9/11 Commission Report 58-59. Ramzi Yousef's other uncle, Zaid Sheikh, was a charity official in Pakistan. Guantanamo detainee Adel Hassan Hamad testified that Zaid Sheikh was an official with Lajnat Al-Da'wa al-Islamia (LDI). Khalid Sheikh Mohammed allegedly worked with his brother at a refugee camp. Hamad, who worked for LDI, later worked for WAMY. Ex. 122, Summary of Administrative Review Board Proceedings for ISN 940, ARB_Transcript_Set 21260-21276. The United States designated LDI in January 2003 as a Specially Designated Terrorist Group for its connections to al-Qaeda. Ex. 169, U.S. Dept. of the Treasury, "SDGT Designation," January 9, 2003. A genuine dispute of material fact exists.

**STATEMENT:**

102. There is no evidence on how Ajaj came into possession of the WAMY/LBI envelope.

**RESPONSE:**

Disputed. Defendant's assertion that there is no evidence as to how the WAMY/LBI envelope came into Ajaj's possession mischaracterizes the record. The record describes Ajaj's movements and activities leading up to his arrest: "The FBI assembled, and the U.S. Attorney's office put forward, some evidence showing that the men in the dock were not the only plotters. Materials taken from Ajaj indicated that the plot or plots were hatched at or near the Khaldan camp, a terrorist training camp on the Afghanistan-Pakistan border. Ajaj had left Texas in April 1992 to go there to learn how to construct bombs. He had met Ramzi Yousef in Pakistan, where they discussed bombing targets in the United States and assembled a 'terrorist kit' that included bomb-making manuals, operations guidance, videotapes advocating terrorist action against the United States, and false identification documents." Ex. 4 9/11 Commission Report, pp. 73, 472 (and n.9, citing United

States v. Salameh, 152 F.3d at 107-108, on Ajaj's travels to Khaldan and interactions with KSM, and Ajaj's INS alien file No. A72215823 reflecting entry on a B-2 tourist visa at New York City on Sept. 9, 1991). As described above, Ajaj was in contact with individuals in Saudi Arabia, Pakistan, and Afghanistan who were associated with al-Qaeda. Likewise, WAMY was in contact with individuals (Batterjee and Arnaout) associated with al-Qaeda who operated in Saudi Arabia, Pakistan, and Afghanistan. See Plaintiffs' responses to Defendant's ¶ 3. A genuine dispute of material fact exists.

**STATEMENT:**

103. WAMY never published, distributed or had knowledge of the manual. Ex. 2 at ¶31 (that WAMY never prepared a training manual).

**RESPONSE:**

Disputed. Defendant mischaracterizes the record it cites. WAMY's former Secretary General declared only: "WAMY has never knowingly assisted with the movement of fighters during any conflict or funded or established training camps, created training manuals, performed recognizance [sic] missions or served recruitment vehicles, or provided logistic assistance to Al Qaeda, its associated [sic] or intermediaries."Ex. 170, March 12, 2002 Declaration of Saleh al-Wohaibi ("Wohaibi Declaration") ¶ 31. He did not state that WAMY had "never published, distributed or had knowledge of the manual." A genuine dispute of material fact exists.

**STATEMENT:**

104. Nothing on the manual suggests it is a WAMY document and WAMY was never discussed as having published the manual during the trial in which the evidence was entered. Ex. 48, Excerpt of trial testimony in *U.S. v. Salameh* at PEC-WAMY044883 (trial testimony

beginning with short discussion on the envelope); See Ex. 47; Ex. 40 at 155 (discussing *U.S. v. Salameh* exhibit 2800-A).

**RESPONSE:**

Undisputed that the manual itself contains nothing suggesting it was published by WAMY; disputed, however, to the extent Defendant asserts WAMY was not involved in its distribution. The record shows that Defendant's official envelope was used by a 1993 World Trade Center conspirator with links to al-Qaeda associates. The terrorist's physical possession of a terrorist manual inside an envelope bearing WAMY's name is circumstantial evidence of the organization's involvement, and WAMY is responsible for the use of its materials. WAMY envelopes are not freely available and were likely obtained through WAMY personnel or offices. Ahmad Ajaj believed it was appropriate to use a WAMY envelope to contain the training material. WAMY's inability to explain the use of its envelope supports an inference that WAMY or individuals acting on its behalf were involved in the manual's distribution. Decl. of Mohammedi (Dkt. No. 11997), Ex. 48, Excerpt of trial testimony in U.S. v Salameh at PEC-WAMY044883; Decl. of Mohammedi (Dkt. No. 11997), Ex. 47, Government Exhibit 2800-A in U.S. v. Salameh; Decl. of Mohammedi (Dkt. No. 11997), Ex. 40, Marc Sageman Report, Excerpts at 155. A genuine dispute of material fact exists.

**STATEMENT:**

**C. Statements By WAMY Officials Do Not Establish That WAMY Has Ever Provided Material Support to Al Qaeda**

**RESPONSE:**

Disputed. See Plaintiffs' ¶¶ 105-116.

**STATEMENT:**

1. Statements by WAMY Secretary General in Muslim World News

**RESPONSE:**

No response necessary.

**STATEMENT:**

105. According to an article in Muslim World News in 1991, WAMY's then Secretary General Dr. Maneh Al-Johani, in an address to the World Kashmir Freedom Movement, urged that Muslims can support Kashmiri freedom by giving "their moral, physical, and financial support [to] the cause of Jihad." Ex. 49, FED-PEC0250105 (Muslim World News article).

**RESPONSE:**

Undisputed that, in 1991, WAMY's Secretary General Dr. Maneh al-Johani urged Muslims to support the Kashmiri freedom fighters' jihad; disputed, however, as incomplete. Dr. al-Johani's additional statements show his ideological sympathies with Islamic extremists: "Muslims should come forward to wage Jihad to liberate Kashmir, said the Secretary-General of the World Assembly of Muslim Youth, Dr. Maneh al-Johani." The meeting was sponsored by the Riyadh section of the World Kashmir Freedom Movement. "Speaking further, Dr. Johani said that according to the Islamic faith, Jihad could be performed in many forms. Muslims can go to the battlefield to wage a war against the enemies of Islam or they can give their moral, physical and financial support the cause of Jihad. The Muslims in the Kingdom, particularly the Kashmiris, should have a sense of responsibility to help their brethren to secure their freedom through Jihad, he said. 'They can extend financial support, create an awakening among Muslims on the problems of Kashmiris and prepare literature to project the cause of the Kashmiris.'" "Dr. Johani pointed out that there is an organised effort to crush the Muslims in many parts of the world. Some of these

destructive elements could be seen while others cannot be seen, he said. 'Jihad is the only way out for us to get emancipated from these cruel hands,' he added." "'Whatever the case may be, the Muslims in all parts of the world should be united to fight against the atrocities committed against the Muslim minorities,' he said." "WAMY Calls for Jihad to Free Kashmir," Decl. of Mohammedi (Dkt. No. 11997), Ex. 49, FED-PEC0250105. Additionally, the record shows that WAMY's support -- funding, recruiting, mobilizing, and propagandizing for jihadist causes -- advances the operational and ideological objectives of al-Qaeda and its affiliated networks. The absence of explicit references to bin Laden or al-Qaeda in WAMY's materials is immaterial and, if anything, consistent with the concealment practices commonly used by charities linked to extremist groups. The CIA has assessed that militants trained in Afghanistan were subsequently deployed to jihad fronts in Kashmir, Chechnya, and Bosnia, and that upon returning home or migrating abroad, they formed a ready pool of manpower for terrorist operations, noting that "two of the 9/11 hijackers followed this pattern." Ex. 171, DCI Report: The Rise of UBL and Al-Qa'ida and the Intelligence Community Response, Draft CIA Analytic Report (Mar. 19, 2004), available at the National Security Archive. See Plaintiffs' responses to Defendant's ¶ 3 regarding Lashkar-e-Taiba (LET) and Jaish-e-Mohammed (JEM). A genuine dispute of material fact exists.

**STATEMENT:**

106. The undated article does not mention al-Qaeda, Osama Bin Ladin, the United States or the West at all. Id.

**RESPONSE:**

Undisputed that the article does not literally reference al-Qaeda, bin Laden, the United States, or the West; disputed, however, as immaterial and incomplete. Dr. al-Johani does reference an "organised effort to crush Muslims" that is both seen and unseen. As the 9/11 Commission

explained, bin Laden's ideology contains an indirect attack on America: "Bin Laden shares Qutb's stark view, permitting him and his followers to rationalize even unprovoked mass murder as righteous defense of an embattled faith. Many Americans have wondered, 'Why do they hate us?' Some also ask, 'What can we do to stop these attacks?' Bin Laden and al Qaeda have given answers to both of these questions. To the first, they say that America had attacked Islam: America is responsible for all conflicts involving Muslims. Thus Americans are blamed when Israelis fight with Palestinians, when Russians fight with Chechens, when Indians fight with Kashmiri Muslims, and when the Philippine government fights ethnic Muslims in its southern islands. America is also held responsible for the governments of Muslim countries, derided by al Qaeda as 'your agents.' Bin Laden has stated flatly, 'our fight against these governments is not separate from our fight against you.' These charges found a ready audience among millions of Arabs and Muslims angry at the United States because of issues ranging from Iraq to Palestine to America's support for their countries' repressive rulers." Ex. 4, 9/11 Commission Report 51, 466 (citing Bin Laden's "Letter to America," Observer Worldview, Nov. 24, 2002). Plaintiffs dispute any assertion by Defendant that, because the article did not literally invoke bin Laden or al-Qaeda, WAMY has not provided support to al-Qaeda and like-minded groups. Plaintiffs repeat and incorporate their response to Defendant's ¶ 105 and their responses to Defendant's ¶ 3 regarding Lashkar-e-Taiba (LET) and Jaish-e-Mohammed (JEM). A genuine dispute of material fact exists.

**STATEMENT:**

107. In a 1993 article in the Muslim World League Journal by Mozammel Haque on the history of the Bosnian, the genocide and the Muslim world’s response to it, Mr. Haque attributes to Dr. Al-Johani as “strongly support[ing] the resolution of the International Islamic Council for

Dawah and Relief for arming the Bosnian Muslims to enable them to defend themselves." Ex. 50, PEC-WAMY000534-549 at 548 (reference in article to al-Al-Johani and WAMY).

**RESPONSE:**

Undisputed that Dr. al-Johani was quoted as supporting arming Bosnian Muslims to enable them to defend themselves; disputed, however, as incomplete. The quote was originally attributed to the Saudi Gazette (Jeddah) on August 15, 1992, in the footnote Defendant omitted. Decl. of Mohammedi (Dkt. No. 11997), Ex. 50, PEC-WAMY000534-549 at 549, n.48. The article further quoted Dr. al-Johani as saying: "A serious consideration should be given without losing any time to the suggestion of Dr. Maneh al-Johani, who urges on the 'OIC not to lose any more time in calling an emergency meeting of its defence ministers and formulate a unified plan of action. Instead of just begging others to act on their behalf, the OIC states should think of sending troops to join in the Bosnian defence, supply the needed defence equipment to the Republic of Bosnia-Herzegovina and form a Muslim Rapid Deployment Force to meet such situations in the future.'" Decl. of Mohammedi (Dkt. No. 11997), Decl. Mohammedi (Dkt. No. 11997) Ex. 50, PEC-WAMY000534-549 at 549. Plaintiffs repeat and incorporate their responses to Defendant's ¶ 3, Bosnia-TWRA. A genuine dispute of material fact exists.

**STATEMENT:**

108. The attribution to Al-Johani supporting Bosnian people's rights to defend themselves against a genocide makes no mention of antagonism against the West or the United States.[4] Id. (The Muslim World League Journal, Vol 21. No. 2-3, article quoting Dr. Al-Johani as supporting the resolution of the Internal Islamic Council for Dawah and Relief in support of Bosnian Muslim self-defense.

4 Whether Al-Johani made these statements is unknown.

**RESPONSE:**

Disputed. Defendant's assertion that Dr. al-Johani's statement that Bosnians have the right to defend themselves "makes no mention of antagonism against the West or the United States" is contradicted by the article's context. Placing Dr. al-Johani's quote in the wider context of the article, it is clear his comments come in response to criticism of the West's inaction: "The aggression, brutality and genocide in the recently recognised independent republic of Croatia and Bosnia could have been avoided long ago if the Western powers had issued a sincere and real threat of use of force to the Belgrade government. The timely action against Hitler during the world [sic] War II proved beyond doubt that if the aggression of a dictator were to be halted, it should be nipped in the bud. The Western powers also demonstrated in 1990 how the aggression on Kuwait by the Iraqi dictator Saddam Hussein could be stopped by taking action without any delay. But what was the attitude of the Western leaders to the Serbian aggression on Bosnia? What action did they take? The Western leaders made it clear through their actions and utterances that whatever may have taken place in the Balkans, no military action will be taken against the Belgrade government. After receiving such a clear cut 'green signal' from the West, Milosevic and his barbaric armed forces, heavily armed with the modern sophisticated weapons, committed genocide, mass massacre and holocaust and captured two thirds of the territory of Bosnia. ... The West, which could have played an important role to stop this aggression and atrocities, and which claims itself to be the torch-bearer and protector of democracy and humanity, have shown shameless reluctance, unwillingness and silence in the face of the Bosnian genocide. This proves that the humanitarian utterances and slogans of the Western leaders are a mask worn to serve their own interests like Kuwait oil. The continuous peace negotiation in Geneva and intermittent shelling and fighting in Bosnia exposes an entire set of wrong assumptions and outright hypocrisy which have surrounded the peace process." Ex. 172, Dr. Mozammel Haque, "Help Bosnian

Muslims," The Universal Message, Karachi, Vol. 14, No. 7, Dec. 1992; Decl. Mohammedi (Dkt. No. 11997) Ex. 50, PEC-WAMY000534-549 at 549. Set against the complaint about the West's "shameless reluctance" to protect Bosnian Muslims, Dr. al-Johani is then quoted as urging Muslims to be armed. Furthermore, Plaintiffs dispute Defendant's assertion that it is "unknown" whether Dr. al-Johani made the statements in the article. Dr. al-Johani is quoted twice in the piece. The first quote appears in a Saudi Gazette article. The second quote is not attributed to any other publication. Plaintiffs dispute Defendant's attempts to manufacture doubt about Dr. al-Johani's quotes by making the unreasonable claim that two different publications fabricated his statements on the same subject. Additionally, the record contains no evidence that Dr. al-Johani made any contemporaneous efforts to correct the publications. A genuine dispute of material fact exists.

**STATEMENT:**

2. Statements by § Gen al-Al-Johani in Riyadh Daily Article

**RESPONSE:**

No response necessary.

**STATEMENT:**

109. In December 1995, a Riyadh Daily articles reports that Al-Johani met with the Azad Kashmir Council's senator, Chaudhry Mohammad Yaqob, where Yaqob thanked the "Kingdom" for donating "money, blankets, tents and food supplies."[5] Ex. 51, FED-PEC0236400 Riyadh Daily Article titled "Kashmiri Leader Thanks WAMY for Help," dated December 8, 1995, where Chaudhry Mohammad Yaqub is quoted as thanking WAMY and other charitable organizations for providing money, blankets, tents, and food supplies). 5 Whether Al-Johani made these statements is unknown.

**RESPONSE:**

Undisputed that Dr. al-Johani and Chaudhry Mohammad Yaqob met in December 1995 and that Yaqob recognized WAMY's assistance to the mujahideen and the Kingdom's assistance in 1995; disputed, however, as to Defendant's assertion that it is "unknown" whether Dr. al-Johani made the statements in the article. The article does not indicate that Dr. al-Johani made any specific comments: "Kashmiri leader has lauded the efforts of the World Assembly of Muslim Youth (WAMY) and other charitable organizations in helping the mujahideen in their struggle for independence from India. Chaudhry Mohammad Yaqub, a member (senator) of Azad Kashmir Council said here Wednesday evening that WAMY in particular is supporting the cause of Kashmiris through its Kashmir Committee in its Riyadh headquarter. Addressing a press conference at Shalimar Restaurant here Wednesday, Chaudhry Yaqub said he met with the WAMY Secretary General Dr. Maneh H. al-Johani and exchanged views on the present situation in Kashmir and the Indian security forces' alleged high handedness and atrocities against the people struggling for their right of self-determination." Decl. of Mohammedi (Dkt. No. 11997), Ex. 51, FED-PEC0236400. Plaintiffs dispute Defendant's attempts to manufacture doubt about Dr. al-Johani's association with Chaudhry Yaqub. A genuine dispute of material fact exists.

**STATEMENT:**

110. Neither al-Al-Johani nor WAMY ever provided weapons or military equipment to Yaqob nor is Al-Johani reported to have called for violence against the United States in the article. Id.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion that Dr. al-Johani or WAMY never provided weapons or military equipment to Yaqob. The record shows that WAMY funded and equipped Bosnian mujahedeen through TWRA. TWRA's director, Fatih el-Hassanein, concurrently led

WAMY's Austria office and has been identified as a major weapons supplier to Bosnian mujahedeen. Additionally, the record contains evidence of LBI/BIF efforts to purchase weapons for the Bosnian mujahideen. Plaintiffs further dispute Defendant's assertion that only its self-serving, hyper-literal definition of assistance applies. Defendant's claim that WAMY provided no support because Dr. al-Johani did not explicitly call for violence against the United States in a single article misstates the record. The record contains multiple statements by Dr. al-Johani and WAMY that call for violence against non-Muslims, and Defendant cannot ignore that evidence by narrowing the definition of incitement and support to its preferred scope. Plaintiffs repeat and incorporate their response to Defendant's ¶ 3 and their responses to Defendant's ¶ 14 regarding WAMY publications and statements. A genuine dispute of material fact exists.

**STATEMENT:**

111. Al-Johani called for humanitarian aid to Kashmiris, self-determination with the assistance of the U.N. Security Council and implored the use of the U.N. Security Council "plebiscite" to bring about "peace and security in Kashmir as well as the use of the electoral process by Kashmiris living abroad." Id.; see also, Ex. 2 at ¶26 (discussing that WAMY has never been involved in armed conflict or sent employes to fight).

**RESPONSE:**

Disputed. Plaintiffs dispute that Dr. al-Johani made the statements cited by Defendant. The article credits Chaudhry Mohammad Yaqub as making these statements. See Decl. of Mohammedi (Dkt. No. 11997), Ex. 51, FED-PEC0236400; see also Plaintiffs' response to Defendant's ¶ 109. A genuine dispute of material fact exists.

**STATEMENT:**

3. Statements by § Gen. al-Al-Johani in Al Jazeera Article

**RESPONSE:**

No response necessary.

**STATEMENT:**

112. The Chechen war of independence against the Russians from 1994-1996 and from 1999-2009 has been widely "considered by Muslims to constitute a legitimate struggle" to defend Muslim life. Ex. 13 at p. 14 (Blankinship discusses context of article).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's expert's characterization of the Chechen conflict as a "legitimate struggle" that excuses acts of terrorism and support for terrorists. The record shows that bin Laden praised the Chechen terrorists who killed over 150 innocent Moscow theater patrons. "Pakistan Questions Sudan Man About Tape," Associated Press, December 9, 2002. A genuine dispute of material fact exists.

**STATEMENT:**

113. On January 15, 2000, one year into the second Chechen war against Russia, Al Jazeera published al-Al-Johani's article Chechen Tragedy – *The Reality and the Required Role* ("Chechen Tragedy"). Ex. 52, FED-PEC0233836-843 (Al Jazeera Article titled "The Chechen Tragedy – The Reality and the Required Role" by Dr. Al-Johani, where Dr. Al-Johani recounts the "tragedy should not be forgotten").

**RESPONSE:**

Undisputed that Dr. al-Johani published an article titled "Chechen Tragedy -- The Reality and the Required Role" in Al Jazeera around January 15, 2000; disputed to the extent the article is

characterized as expressly published "one year into the second Chechen war against Russia," though that may be the case. Decl. of Mohammedi (Dkt. No. 11997), Ex. 52, FED-PEC0233836 – 843. A genuine dispute of material fact exists.

**STATEMENT:**

114. Addressing the need to liberate Chechnya, the Chechen Tragedy article quotes al-Al-Johani as stating:

The question that arises is: What do the Chechen Muslims need from us today? (1) They need money to buy weapons and gear; (2) They need food, clothing, medicine, and tents; (3) They need propagators and propagation materials for awareness. They are Sunnis who have been alienated from Islam for nearly 70 years and have stuck to it in difficult circumstances, almost like the circumstances of the Inquisition. Today, they show all the love and longing to return to its teachings; (4) They need us to pray for them in praises; (5) They need us to praise their struggle and steadfastness and stop those who try to portray their jihad as national or show that they did not prepare and did not choose the right arrangement; (6) They need a unified Islamic position, starting from the individual and the family to the homeland and the nation as a whole. The young children should know their cause. We should motivate them to donate to them and console them as much as we can. We should reduce the times of entertainment. We should tell our children that this is the lowest emotional participation to this nation which is being annihilated just because they are Muslims. We should boycott any Russian product, and each one should deduct part of their income to support them; (7) The Islamic voice must be raised against the Russian attack at all official and popular levels by urging the Islamic countries and the individuals to protest against the Russian attack at the Russian government, its departments everywhere, and at the international organizations in

the world.

Ex. 52 at FED-PEC0233842 (discussing what Chechens needed).

**RESPONSE:**

Undisputed that the quoted passage appears in the article. Decl. of Mohammedi (Dkt. No. 11997), Ex. 52, FED-PEC0233836 – 843 at FED-PEC0233842.

**STATEMENT:**

115. The *Chechen Tragedy* makes no mention that WAMY provide weapons, gear or military aid to Chechen fighters. Id. at FED-PEC0233841-842 (while the article mentions WAMY provide humanitarian relief, it does not say WAMY provide military relief); see also, Ex. 2 at ¶¶ 26, 31 (discussing that WAMY has never been involved in armed conflict or sent employes to fight or help move fighters or provide other logistics to them).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's claim that Dr. al-Johani's article made no mention of WAMY providing weapons or military aid to Chechens. The article clearly calls for donations to purchase weapons and gear: "The question that arises is: What do the Chechen Muslims need from us today? 1. They need money to buy weapons and gear..." Decl. of Mohammedi (Dkt. No. 11997), Ex. 52, FED-PEC0233836 – 843 at FED-PEC0233842. According to Dr. al-Johani, weapons are the first item of need. Furthermore, al-Johani made clear he was only mentioning "some" of WAMY's assistance and not all: "What did the Islamic agencies offer? The Islamic agencies made some modest efforts to help the Muslims of Chechnya, and I will mention some of what the World Assembly gave as an example of the efforts of the Islamic agencies." Dr. al-Johani further clarified, "In addition, there were other various projects provided by the World Assembly with the help and reconciliation of Allah to the Muslims of Chechnya." Decl. of Mohammedi (Dkt. No. 11997), Ex.

52, FED-PEC0233836 – 843 at FED-PEC0233841. The intent of the article can be further understood through its references to attacks against Islam and the Chechen mujahideen: "The main reason for what is happening in the Islamic world and the boldness of the non-Muslims against us is the weakness of the Islamic nation and the disintegration of its countries. The underlying reason is the Islamic awakening, represented in the desire to return to the teachings of Islam. The West and the East do not want the Muslims who cherish their pure creed and pure Sharia. This would show the stupidity of their atheist, idolatrous doctrines and the baseness of their obscene, materialistic laws. This awakening has annoyed the enemies of Islam so much. They blessed each attack against the Muslims and contributed greatly to fueling the tragedies of the Muslims either by preventing them from defending themselves or by supporting their enemy politically or militarily or both. I would say that this, too, is expected and predictable and does not require us to wonder or to mention evidence." Decl. of Mohammedi (Dkt. No. 11997), Ex. 52, FED-PEC0233836 – 843 at FED-PEC0233840. The article further states, as to how to deal with the tragedy of Chechnya: "First, I emphasize that what is happening in Chechnya, though it is a serious disaster and a heartbreaking tragedy, should not weaken our strength or cause us despair or sense of defeat. The Chechens are struggling in response to the command of Allah the almighty, 'O Prophet, strive against the disbelievers and the hypocrites,' and 'strive for Allah with the striving due to Him,' and in response to the saying of our Messenger, peace be upon him, 'The best actions are faith in Allah and jihad in his cause,' and 'In Jannah there are a hundred grades which Allah has prepared for those who fight in his cause; and the distance between any two of those grades is like the distance between the heaven and the earth.'" Decl. of Mohammedi (Dkt. No. 11997), Ex. 52, FED-PEC0233836 – 843 at FED-PEC0233840. "Secondly, I would stress that these steadfast heroic Muslims, the mujahideen, deserve our support, prayers, and all our energies to support them so that they would defeat the enemies again. They showed great examples that will be recorded in

the history's brightest pages. They faced the enemy of Allah and their enemy with all courage and strength. They were not appalled at their magnitude and military equipment. They fought and inflicted great losses on the Russian ranks, forcing the Russians to withdraw. They will force them again to withdraw in the second round as well, Allah willing. They will defeat them again." Decl. of Mohammedi (Dkt. No. 11997), Ex. 52, FED-PEC0233836 – 843 at FED-PEC0233841. More aptly, Dr. al-Johani's article is evidence of his and WAMY's anti-West ideology that fuels the Islamic extremism endorsed by bin Laden and al-Qaeda. The article serves to promote and justify the support for armed response to embattled Muslims. Furthermore, Dr. al-Johani's article adds to the record of evidence that he called for arming Muslim mujahideen. See Plaintiffs' response to Defendant's ¶ 107. A genuine dispute of material fact exists.

**STATEMENT:**

116. Dr. al-Al-Johani does not ask for any support for the militant or terrorist activities of al-Qaeda anywhere nor does he advocate for any attack against the United States. Ex. 52 at FED-PEC0233841-842.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's claim that Dr. al-Johani does "not ask for any support for the militant or terrorist activities of al-Qaeda anywhere nor does he advocate for any attack against the United States." Defendant's hyper-literal standard of review fails to place Dr. al-Johani's statements into proper context. The record contains evidence that Dr. al-Johani and WAMY shared and promoted the anti-West ideology, like the article, that fuels the Islamic extremism endorsed by bin Laden and al-Qaeda. Considered with al-Johani and WAMY's financial and logistical support to terrorists and al-Qaeda, the promotion of anti-West ideology is an additional call for

further support. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 106-107. A genuine dispute of material fact exists.

**STATEMENT:**

**IV. WAMY's Funding and Financial Controls**

**RESPONSE:**

No response necessary.

**STATEMENT:**

117. As per WAMY's constitution, WAMY receives financial assistance from the following sources "(1) the Government of Saudi Arabia, (2) [a]ny assistance, gifts, donations, endowments and wills that the General Council of WAMY decides to accept; [and] (3) [r]eturns from investments in projects that are in conformity with WAMY's aims." Ex. 6 at WAMY-SA E001052 (The Constitution discussing WAMY's source of financing); Ex. 7 at WAMYSAE001112 (Authorized English Translation of The Constitution of the World Assembly of Muslim Youth [WAMY] [Incorporating amendments made during the Seventh General Assembly in January 1993] at Article V: Finance, describing that WAMY's finance will consist of: 1(A) "the assistance offered to it by the government of Saudi Arabia"; 1(B) "any aid, donation or endowment that the General Secretariat of WAMY decides to accept"; 1(C) "Returns from investments").

**RESPONSE:**

Undisputed as a general matter for purposes of this motion. Plaintiffs do not dispute that WAMY's sources of funding are wide-ranging and largely at the discretion of WAMY's leadership. Decl. of

Mohammedi (Dkt. No. 11997), Ex. 6, WAMY-SA E001045-052 and 056 at WAMY-SA E001052; Decl. of Mohammedi (Dkt. No. 11997), Ex. 7, WAMYSAE001104-112 at WAMYSAE001112.

**STATEMENT:**

118. The Kingdom of Saudi Arabia ("KSA") gave WAMY an annual grant of 5,250,000 riyals from 1972 to 2002. Ex. 5 at 94:24-95:23 (Noorwali explaining KSA's annual grant); Ex. 53, WAMYSA1249537 (Letter discussing total 109,000,000 SAR in this period); Ex. 4 at 42:16-22 (Being questioned about WAMYSA1249537), at 30:18-31:8 (discussing the amount); Ex. 54, WAMYSA1249281 (1994 letter concerning meeting to discuss grant); Ex. 55, WAMYSA1235395 (1994 letter concerning reduction of grant to SAR 5,250,000 riyals); Ex. 56, WAMYSA1235988 (1999 donation).

**RESPONSE:**

Undisputed as a general matter for purposes of this motion. Plaintiffs do not dispute that WAMY officials identified funding from the Kingdom.

**STATEMENT:**

119. KSA's annual financial grant accounted for only about two to three percent of WAMY's budget. Ex. 5 at 88:8-17 (Noorwali attesting that KSA grant amounted to approximately two to three percent of WAMY's annual budget), at 90:11-19 (Noorwali explaining limits on Saudi funding); Ex. 4 at 148:19-150:19 (Wohaibi explains that KSA grant constitutes a tiny fraction of the annual budget).

**RESPONSE:**

Disputed. Plaintiffs dispute that the Kingdom's annual grant to WAMY accounted for only about two or three percent of WAMY's annual budget. WAMY's Financial Director has attested that

"[t]he Government of Saudi Arabia funds a large portion of WAMY's budget." Ex. 11, Unuq Declaration ¶ 2. WAMY has not produced records revealing its annual income by source, and therefore cannot establish the Kingdom's grant as a fixed percentage of a budget it has never documented.

Plaintiffs further dispute WAMY's assertion because the only testimony Defendant offers in support of its claim conflicts with the testimony of WAMY's own Rule 30(b)(6) corporate designee regarding the Kingdom's and the Saudi Royal Family's financial support. Plaintiffs' Rule 30(b)(6) deposition notice directed WAMY to produce a witness "knowledgeable and prepared to testify on behalf of WAMY concerning all information known or reasonably available to WAMY" on, among other topics, "the relationship between WAMY and the Kingdom of Saudi Arabia," including "the Kingdom of Saudi Arabia's funding of WAMY's annual budget" (Area of Inquiry No. 1), and "financial support provided to WAMY by officials of the Saudi government or members of the Saudi Royal family, regardless of whether WAMY claims such contributions were provided in a personal or official capacity" (Area of Inquiry No. 2). Ex. 175, Pls.' Notice of Oral Deposition of WAMY Pursuant to Fed. R. Civ. P. 30(b)(6) (May 22, 2019) (Noorwali Ex. 251) ¶ 3 & Areas of Inquiry Nos. 1-2. The notice expressly warned that WAMY "must conduct a thorough investigation in response to the deposition notice and must prepare a witness to testify to all matters 'known or reasonably available to the organization,'" and that "[a]n inadequately prepared designated witness will amount to an impermissible refusal to answer and a sanctionable failure to appear." Id., ¶ 8.

WAMY designated its long-time Secretary General, Saleh al Wohaibi, as its Rule 30(b)(6) corporate representative on precisely these topics—WAMY's relationship with the Kingdom and all financial support received from the Saudi government and Saudi Royal Family. Ex. 176, WAMY's June 21, 2019 Designation in Response to Plaintiffs' Notice of Oral Deposition

(Noorwali Ex. 252) at 1 (designating Wohaibi for Areas of Inquiry Nos. 1-4). Dr. Wohaibi's deposition, originally noticed for the week of July 9, 2019, in Madrid, Spain, was adjourned an additional three months, to October 23, 2019, affording WAMY roughly five months to investigate and prepare its designee on these subjects. Ex., 177, Order, ECF No. 4611. Despite that obligation and that time, when Plaintiffs' counsel examined Dr. Wohaibi on the scope of funding WAMY received from members of the Saudi Royal Family, he testified that WAMY had conducted no investigation and that he had no information on the subject whatsoever: Q. Prior to today, did WAMY conduct an inquiry to determine the extent of funding it had received between 1992 and 2002 from members of the Saudi Royal Family? A. No. Q. Do you have details on the amount of funding provided by members of the Saudi Royal Family to WAMY for any of those years between 1992 through 2002? A. No. Q. Did WAMY conduct an inquiry, prior to today, to determine the names of any members of the Saudi Royal Family who had provided contributions between 1992 and 2002? A. No.

Ex. 9 Wohaibi Dep. 95:3-20. Having designated Dr. Wohaibi to speak for the organization on WAMY's relationship with the Kingdom and the full scope of Saudi government and Royal Family support, WAMY was bound to prepare him to give "knowledgeable, binding answers" on those topics. Ex. 175, Noorwali Ex. 251 ¶ 8. By his own admission, WAMY did not do so. WAMY cannot evade its binding Rule 30(b)(6) admissions of ignorance by relying instead on the two-to-three-percent figure its designee supplied only in response to after-the-fact, leading questioning by counsel for the Kingdom of Saudi Arabia—the very testimony WAMY now cites as Ex. 4 at 148:19-150:19. That examination did not rest on any investigation WAMY had undertaken; Dr. Wohaibi confirmed on the same record that WAMY had conducted no inquiry into Royal Family funding. Ex. 9, Wohaibi Dep. 95:3-20. And Plaintiffs' counsel objected to the form of the questions through which the "two to three percent" and "tiny fraction"

characterizations were elicited. Ex. 9, Wohaibi Dep. 150:1-10. That examination was aimed at having WAMY's designee repudiate the sworn statement of WAMY's own Financial Director that "the government of Saudi Arabia funds a large portion of WAMY's budget." Ex. 9, Wohaibi Dep. 150:11-16; Ex. 11, Unuq Decl. ¶ 2. At a minimum, this record—an unprepared and uninvestigated corporate designee, a figure produced only through later leading examination by the Kingdom's counsel, and the absence of any produced income-by-source records—creates a genuine dispute of material fact as to whether the Kingdom's grant was a mere "two to three percent" of WAMY's budget. A genuine dispute of material fact exists.

**STATEMENT:**

120. The remainder of WAMY's budget, derives from endowments from the Saudi government, members of the royal family and private donations. Ex. 6 at WAMY-SA E001052 (Constitution describing WAMY's financing); Ex. 4 at 42:23-45:8 (Wohaibi discussing donations from the government of Saudi Arabia for specific projects); Ex. 57, WAMYSA1248831 (letter enclosing a 500,000 SAR donor check for dawah); Ex. 58, WAMYSA1248777–782 (report highlighting donations from the royal family to WAMY).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion that the "remainder" of WAMY's budget is derived solely from ad hoc government grants, royal family donations, or private donations. The record shows that WAMY also served as a broker linking foreign aid recipients with donors. Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at CIA_000744. Additionally, the record suggests WAMY took a percentage of private donations earmarked for other projects that it arranged or managed. Decl. of

Mohammedi (Dkt. No. 11997), Ex. 59, WAMYSA1409-1410. A genuine dispute of material fact exists.

**STATEMENT:**

**B. WAMY's Project Based Fundraising and Reporting**

**RESPONSE:**

No response necessary.

**STATEMENT:**

121. As a youth organization and humanitarian relief charity, WAMY uses its funding to support projects around the world that align with its objectives. Ex. 14 at ¶13 (describing his role managing WAMY's financial operations, overseeing scholarships, organizing projects and supervising publications), at ¶¶15-16 (describing WAMY's project objectives).

**RESPONSE:**

Undisputed that WAMY may have engaged in humanitarian relief charity in various global locations; disputed, however, as immaterial and incomplete. The record includes evidence that charities that provide support to terrorists use their legitimate charitable activities as cover for that support, and that charitable activities garner community support for terrorist ideologies. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

122. WAMY prospective projects are often donor initiated. Ex. 14 at ¶¶15-16. These projects are also supervised for the purpose of reporting on the progress of the project until it is finalized. See, e.g., Ex. 59, WAMYSA1409-410 at 1409 (discussing mechanism protocol and control).

**RESPONSE:**

Undisputed that some of WAMY's projects may have been "donor initiated"; disputed, however, that the record cited by Defendant demonstrates anything more than WAMY's superficial supervision -- "mechanism protocol and control" -- of projects. The example correspondence cited by WAMY with its WAMY-USA affiliate, overseen by Abdullah Bin Laden, does not request project-specific supervision. Instead, WAMY gives WAMY-USA generic instructions to document the project and ensure the donor is publicly acknowledged. Decl. of Mohammedi (Dkt. No. 11997), Ex. 59, WAMYSA1409-1410. A genuine dispute of material fact exists.

**STATEMENT:**

123. WAMY supports projects connected to charitable organizations for specific projects and avoids dealing with privately owned entities. Ex. 17 at WAMYSA051695 (1998 general secretariat minutes recommending work with public charities).

**RESPONSE:**

Undisputed that WAMY supports projects tied to legitimate charities and may have preferred to avoid engaging with private organizations; disputed, however, is the extent to which Defendant claims that WAMY's reluctance to work with private groups stemmed from concerns about potential diversion of funds. Instead, the record shows that WAMY wished "to avoid future problems and disputes, in the event [sic] a dispute among the heirs, resulting in a waste of Muslims' assets." Decl. of Mohammedi (Dkt. No. 11997), Ex. 17, WAMYSA051692-698 at WAMYSA051695. A genuine dispute of material fact exists.

**STATEMENT:**

124. WAMY vets projects and funds it or sends a request to a donor to fund; for instance, the 2001 letter request to Prince Fahd explains WAMY vetting and approval to fund the purchase of

a suitable building for an institute. Ex. 4 at 72:3-74:12 (explaining the RTD to Fahd for IICI building for the institution); See, e.g. Ex. 60, WAMYSA1249556 (October 2001 request to then Prince Abdulazi bin Fahd explaining the reason for the project and the legitimacy of the Chicago based done); Ex. 61, WAMYSA1248744 (December 2001 request to Fahd explaining the reason for the project and the legitimacy of the donee).

**RESPONSE:**

Disputed. Plaintiffs dispute whether WAMY consistently exercised adequate diligence in determining whether projects were legitimate and whether donations were properly used. The record Defendant cites shows the opposite. The record shows that Dr. al-Johani solicited donations from Prince Abdulaziz bin Fahd for the Islamic Information and Culture Institute in Chicago. Dr. al-Johani has served as president of the organization's board of trustees since 1987. There is no indication that Dr. al-Johani recognized the conflict of vetting himself and the organization he oversees. Ex. 9, Wohaibi Dep. 72:11-18. In his assurances to the Prince, he stated that the donation was not for a specific project but rather: "I am aware of the lack of resources of the Institute, its increasing responsibilities, and its doubled role in introducing and defending Islam after the September 11 attacks of 2001. These attacks resulted in an attempt to link Islam and Muslims to extremism and terrorism. I hope that Your Royal Highness may consider supporting the Institute generously in the path of righteousness and piety. This is going to support the significant role undertaken by the Institute in introducing Islam and confront the campaigns insulting Islam in America." Decl. of Mohammedi (Dkt. No. 11997), Ex. 60, WAMYSA1249556. A genuine dispute of material fact exists.

**STATEMENT:**

125. As a second example, WAMY considers funding operations only after receiving recommendations that such projects are legitimate; for instance, WAMY received recommendation and request for funding a project in Ethiopia. Ex. 21 at WAMYSA176002-006 (Ethiopian charity providing recommendations to validate the Ethiopia Al-Manar Welfare Association as a trusted organization).

**RESPONSE:**

Disputed. Plaintiffs dispute that Defendant's example of WAMY's due diligence is sufficient to determine the legitimacy of the recipient and the project. The record WAMY cites does not show that WAMY conducted any independent investigation into the charity, its financing from other donors, its past projects and activities, or the organization's leaders. Instead, WAMY relied on nonspecific recommendations from Islamic scholars and professors. Decl. of Mohammedi (Dkt. No. 11997), Ex. 21, WAMYSA175985-6006 at WAMYSA176002-006. A genuine dispute of material fact exists.

**STATEMENT:**

126. This process of legitimizing a project and host organization/beneficiary usually consists of (1) ensuring that the funds are "disbursed towards specific projects," (2) obtaining video or photo recording of the project, (3) and monitoring and following up with reports supported by "photos, video recordings, and the like." See, e.g., Ex. 59 at WAMYSA1409 (WAMY HQ Ltr. to WAMY USA to verify credibility of beneficiaries; Ex. 62, WAMYSA035241 (1999 letter re request for Pakistan office director to verify authenticity of supervisor at mosque building project along with a detailed report of the project, its stages of completion and remaining costs); Ex. 63, WAMYSA030975 (letter to Abdullah Makki Sadiq requesting information on "students and their needs, and your kind opinion regarding their eligibility

for support"); Ex. 64, WAMYSA1231266 (1997 report on success of projects and the need for a feasibility study on similar projects before implementation); Ex 65, WAMYSA065359-367 at WAMYSA065361 (discussing Sudan office disbursement of funds to students "following a rigorous review of the student's circumstances and verification that they are continuing their studies"); Ex. 66, WAMYSA189733-734 (after reviewing a proposal, WAMY amends the proposal and then requests a cost estimate).

**RESPONSE:**

Disputed. Plaintiffs dispute that Defendant's claimed "process of legitimizing a project and host organization/beneficiary" is sufficient to ensure proper use of funds. The cited record shows no evidence that WAMY reviews a recipient's leadership, audits financial statements, examines project assets or expenditures, conducts performance audits, evaluates other donors, or verifies that the recipient maintains policies and internal controls to safeguard project funds. Nor does WAMY assess how recipients store records, confirm the existence of project plans or milestones, require regular progress reports, investigate prior misuse of funds, evaluate the success of comparable programs, or request and review applicable charity laws to ensure compliance with local requirements. See Decl. of Mohammedi (Dkt. No. 11997), Ex. 59, WAMYSA1409-1410 at WAMYSA1409; Decl. of Mohammedi (Dkt. No. 11997), Ex. 62, WAMYSA035241; Decl. of Mohammedi (Dkt. No. 11997), Ex. 63, WAMYSA030975; Decl. of Mohammedi (Dkt. No. 11997), Ex. 64, WAMYSA1231266; Decl. of Mohammedi (Dkt. No. 11997), Ex. 65, WAMYSA065359-367; Decl. of Mohammedi (Dkt. No. 11997), Ex. 66, WAMYSA189733-734. A genuine dispute of material fact exists.

**STATEMENT:**

127. Project proposals typically contain a detailed expense report on the prospective project by outlining items such as project goals, project cost, living expenses, supplies, travel costs, medical cost, pictures and other matters depending on the project and WAMY does not transfer money unless it is being allocated for a specific approved project or activity. Ex. 19 (project proposal to sponsor 5 Kurdish students to Sudan, with detailed goals, requirements, travel expenses, housing cost), Ex. 66 at WAMYSA189733 (request for estimated cost to complete project and amendments to proposal); Ex. 67, WAMYSA036894-895 (letter from SJRC to Noorwali re proposals to establish camp for refugees and provide shelters with help of Albanian government); Ex. 20 at WAMYSA399014-027 (1997 Islamic school buffalo farm project proposal); Ex. 5 at 67:1-68:10 (declaring WAMY's funding process of funding projects, not organizations, which starts with approval, budgeting, fund transfers and financial funding requirements), at 160:9-12 (testifying to the requirement that funds be sent to a specific project); Ex. 14 at ¶17 (discussing WAMY not sending fund unless they are being allocated to a specific project).

**RESPONSE:**

Disputed. Plaintiffs dispute that the project proposal information "typically," but apparently not always, submitted to Defendant is sufficient to ensure proper use of funds. See Plaintiffs' response to Defendant's ¶ 126. Additionally, the record indicates WAMY does fund organizations for non-specific projects. For example, Dr. al-Johani sought donations for the Islamic Information and Culture Institute in Chicago because al-Johani was: "aware of the lack of resources of the Institute, its increasing responsibilities, and its doubled role in introducing and defending Islam after the September 11 attacks of 2001. These attacks resulted in an attempt to link Islam and Muslims to extremism and terrorism. I hope that Your Royal Highness may consider supporting the Institute generously in the path of righteousness and piety. This is going to support the significant role

undertaken by the Institute in introducing Islam and confront the campaigns insulting Islam in America." Decl. of Mohammedi (Dkt. No. 11997), Ex. 60, WAMYSA1249556. See Plaintiffs' responses to Defendant's ¶ 124. A genuine dispute of material fact exists.

**STATEMENT:**

128. The Finance Department maintains continued oversight into projects because it reviews all invoices, financial documents, and requests for funding. Id. at ¶20 (discussing Finance Department's role).

**RESPONSE:**

Disputed. Plaintiffs dispute that WAMY exercised meaningful or adequate diligence in determining whether projects were legitimate or whether donations were properly used. Although WAMY asserts that its Finance Department "reviews all invoices, financial documents, and requests for funding," the cited record contains no evidence that WAMY, in practice, sufficiently conducted the types of vetting or oversight necessary to ensure proper use of funds. The record shows no evidence that WAMY meaningfully reviews a recipient's leadership, audits financial statements, examines project assets or expenditures, conducts performance audits, evaluates other donors, or verifies that the recipient maintains policies and internal controls to safeguard project funds. Nor does WAMY assess how recipients store records, confirm the existence of project plans or milestones, require regular progress reports, investigate prior misuse of funds, evaluate the success of comparable programs, or request and review applicable charity laws to ensure compliance with local requirements. See Plaintiffs' responses to Defendant's ¶¶ 124, 126, 129. A genuine dispute of material fact exists.

**STATEMENT:**

129. When funds are sent, WAMY oversight monitors spending of its funds through a project-based funding mechanism that tracks (1) requests to fund prospective projects, (2) that the funds reach the target beneficiary, (3) how those funds are spent (ensuring that they are for legitimate charity purposes), (4) evidence to support legitimate use of funds such as pictures and videos, and (5) that WAMY's integrity and transparency is maintained. See, e.g. Ex. 68, WAMYSA584328 (December 1997 letter, one of several sent, outlining key nodes of WAMY's mechanism and oversight of projects); Ex. 69, WAMYSA585072 (WAMY Jeddah 1997 Letter to Burma office encouraging more diligent controls in order to reassure donors and beneficiaries); Ex. 70, WAMYSA585077-78 (similar WAMY Jeddah 997 Letter to Chad and Cameroon office encouraging more diligent controls in order to reassure donors and beneficiaries); Ex. 71, WAMYSA605353 (WAMY Jeddah 1999 Letter to Egypt office encouraging more diligent controls in order to reassure donors and beneficiaries).

**RESPONSE:**

Disputed. Plaintiffs dispute that WAMY's oversight practices were sufficient to prevent the misuse of funds. The examples Defendant cites of WAMY oversight do not demonstrate the systematic rigor needed to ensure WAMY's donations were not diverted and, in fact, suggest the opposite. In a December 1997 letter to Dr. Noorwali, who is purported to head WAMY's India office, a WAMY Jeddah official made the following assessment of WAMY India oversight: "Given what has been observed by some entities in past years on the inaccuracies in disbursing these funds for the benefit of needy Muslim beneficiaries, the carelessness in ensuring that the support reaches its beneficiary, a tolerance for the failure to document this work in photographs, videotapes, and financial reports with supporting documentation and not having trustworthy and experienced people defend this work in reports containing statistics on the materials distributed, number of beneficiaries, distribution sites, and quantities, this suggests that the work in some locations is being carried out

randomly and might cast a certain haze over the integrity of the work itself. WAMY will use the Islamic work done this year as a benchmark on whether or not to engage in future interactions." Decl. of Mohammedi (Dkt. No. 11997), Ex. 68, WAMYSA584328. The office, seemingly under Dr. Noorwali's supervision, has routinely failed to account for fund disbursements, has been "careless" in ensuring beneficiaries received support, has not adequately documented the support, has engaged untrustworthy and inexperienced staff who cannot accurately report financial and performance measures, and has engaged in random work, which casts a "haze over the integrity of the work itself." The corrective action prescribed by WAMY Jeddah was to have WAMY India form two committees that can report on the "financial control and missionary work" of the office, indicating that previously WAMY India did not maintain adequate internal controls necessary to prevent the misuse of funds. The record indicates that WAMY's India office continued to operate until it was closed in 2001 by Indian authorities for assisting terrorist groups. Ex. 63, FED-PEC 234023-234024. Plaintiffs repeat and incorporate their response to Defendant's ¶ 3. Defendant's other example of its oversight practices, involving the WAMY Burma, Chad, and Egypt offices, repeats, in similar language, the deficiencies and warnings identified at WAMY India, indicating that the insufficient internal controls at WAMY local offices were systemic to the organization and not isolated incidents. The letter's copy-and-paste prescription for local offices to form committees to monitor financial and performance work suggests no specific investigations into the offices' deficiencies were taken. Decl. of Mohammedi (Dkt. No. 11997), Ex. 69, WAMYSA585072 (Burma); Decl. of Mohammedi (Dkt. No. 11997), Ex. 70, WAMYSA585077-078 (Chad); Decl. of Mohammedi (Dkt. No. 11997), Ex. 71, WAMYSA605353 (Egypt). Plaintiffs also repeat and incorporate their response to Defendant's ¶ 3 regarding the Canada Revenue Agency's findings that WAMY Canada engaged in significant financial irregularities and deficient accounting practices. Additionally, as far as Plaintiffs can tell, the record does not contain copies

of WAMY's formal written policies governing donor vetting, financial and performance auditing, and other internal controls to safeguard funds. A genuine dispute of material fact exists.

**STATEMENT:**

130. As the stages of a project are completed, WAMY typically requires the production of progress reports at every stage before funding the next stage of a project. WAMY's engages in active oversight of its projects. Ex. 14 at ¶¶21-22 (discussing chapters sending reports and Jeddah office ongoing accounting of incoming funds and deposits; Ex. 5 at 74:23-75:24 (WAMY follows-up with the project to ensure funds transferred are implemented and reports are received until completion of the project); e.g. Ex. 62, (letter from WAMY in Saudi Arabia to the head of WAMY Pakistan stating that request was submitted to the Secretariat General to review and approve the funding to rebuild a Mosque in Pakistan. The letter requested a detailed report including the current stage of the project, the current stage and the remaining cost. The letter also asked the office in Pakistan should make sure that the people handling the project are responsible and credible); Ex. 72, WAMYSA 173786-87 (in response to WAMYSA 035241, the Pakistan office submitted a report addressing these requests. The report included photographs of the project, a summary of the construction progress, the pictures of the mosque, the breakdown of total costs, the amount of funds approved and disbursed, and the remaining balance).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's claim that WAMY required "production progress" in any systematic or comprehensive manner adequate to ensure funds were not diverted. The record contains examples of WAMY's inadequate oversight, which is insufficient to credibly determine

whether it used its funds for the stated projects. As noted, WAMY officials knew program safeguards were severely lacking at several local offices. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3 and 129. Additionally, the record Defendant cites, which purportedly shows the project progress reports from its Pakistani office regarding the "work" on a mosque, is insufficient to determine the reliability of the project's leaders, scope, progress, and costs. First, WAMY asked its local office to gather additional information about the project on August 5, 1999. WAMY Pakistan's purported response, "Project Overview," does not make clear whether it is a final or interim report as requested. The Project Overview is undated and does not include a narrative statement of the project, an address or other contact information, or the project's status. Additionally, the request identifies the project location as "Jarhi Allah Yar Khan," while the progress report lists the village as "Kli -Worsk Tower." The province is identified as Sobe Sarhad, in the Northwest territory bordering Afghanistan. The project estimate of 35,000 riyals has been revised upward to 39,375 riyals (also identified elsewhere as dollars) without explanation. The project request said the funds would be used to construct a roof, yet the undated Project Overview report notes no roofing materials. Similarly, the project proposal called for building a minaret, yet the progress report does not indicate materials for constructing a minaret. The request further sought information about "the credibility and reliability of those responsible for the project." The undated Project Overview does not identify the project managers or contractors. Additionally, the "Financial Report Summary" does not provide sufficient information to determine how much has been spent on the project to date. It does not identify the contractor or the material supplier. Lastly, the "Final photos of the Khalid ibn al-Walid Mosque" in the Project Overview suggest the report reflects a completed project, not the interim assessment WAMY Riyadh requested. The photos, as such, are insufficient to know whether they are of the Khalid ibn al-Walid Mosque and whether all of the "construction of the roof, construction of the external boundary wall, restrooms,

construction of a minaret, construction of three rooms (for a Qur'an memorization school, the imam, and a library) and construction of stairs" occurred. The report does not indicate that WAMY conducted a financial audit of the mosque's records to determine how construction funds were used. Decl. of Mohammedi (Dkt. No. 11997), Ex. 62, WAMYSA035241; Decl. of Mohammedi (Dkt. No. 11997), Ex. 72, WAMYSA173786-87. Incomplete records, like the above, highlight evidence in the record as explained by bin Laden on how al-Qaeda would divert charity funding: "[Al-Fadl] understood from conversations with bin Laden and others in al Qaeda that the charities would receive funds that could be withdrawn in cash and a portion of the money used for legitimate relief purposes and another portion diverted for al Qaeda operations. The money for al Qaeda operations would nevertheless be listed in the charities' books as expenses for building mosques or schools or feeding the poor or the needy." Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) 25. Plaintiffs repeat and incorporate their response to Defendant's ¶ 3. A genuine dispute of material fact exists.

**STATEMENT:**

131. In some instances, as part of the vetting process, WAMY sends a representative to make an in-person assessment of the projects to ensure it complies with WAMY's purpose and mission. Ex. 14 at ¶15 (attesting to the fact that a project must fit WAMY's policies before funding).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's claim that WAMY's vetting process included in-person assessments. The record contains no evidence of in-person visits by WAMY or that it was part of WAMY's vetting process. The evidence cited by Defendant instead claims that WAMY funds projects after receiving, in detail, "why the money is being requested and where it is going

specifically": "WAMY often receives ideas for potential projects from WAMY's overseas offices in various countries. These proposals must detail why the money is being requested and where it is going specifically. WAMY reviews all such proposals closely. If a project fits with WAMY policies, WAMY will seek funding for that project. If not, it is not funded. At times, the cost for the project exceeds what WAMY can allocate to that branch or project type. In this case, WAMY will prioritize the projects that can reach the most people and do the most good in the most cost effective manner. The policies that WAMY seeks to promote through projects include community development according to the needs of the community (wells, mosques), education (schools, scholarships, teacher training courses); and youth empowerment." Ex. 116, Noorwali Declaration ¶ 15. See Plaintiffs' response to Defendant's ¶¶ 124, 126, and 129. A genuine dispute of material fact exists.

**STATEMENT:**

132. In all instances where funds are transferred for a project, WAMY branches are expected to comply with WAMY's reporting requirements. Id. at ¶10 (declaring that branch offices have to report their activities), ¶21 (attesting to WAMY's reporting requirements); see, e.g. Ex. 73, WAMYSA059981-992 (1999 letter from WAMY Kashmir office's Abu Gayth re financial report for years 1995-1997 for Kashmir, outlining achieved activities); Ex. 74, WAMYSA 044943-946 (1998 report from Jakarta office concerning mosque building and documenting first installment payments, request for second installment).

**RESPONSE:**

Disputed. Although Defendant claims it imposed reporting requirements, Plaintiffs dispute that the record shows those policies or that Defendant conducted financial and performance reviews

sufficient to detect or prevent fraud. See Plaintiffs' responses to Defendant's ¶¶ 3, 121-133. A genuine dispute of material fact exists.

**STATEMENT:**

133. Beyond just maintaining project reports, final or otherwise, it has been WAMY's recordkeeping policy to also send project reports to donors in donor funded projects to substantiate use of funds. Ex. 5 at 160:15-161:10 (testifying to project reports and financial statements); Ex. 75, WAMYSA0548428-433 at 432 (1997 letter confirming financial transfer of money for dormitories and academic research and requesting deposit confirmation to show donor as proof; includes financial report; Ex. 68 (December 1997 letter emphasizing the need to verify the delivery of donations to the intended parties/bodies in India through photographs, records, details of the beneficiary or beneficiaries).

**RESPONSE:**

Disputed. Although Defendant claims to have a policy of informing donors about the use of their donations, Plaintiffs dispute that the record contains evidence of those policies or that they were followed. The evidence Defendant cited includes only statements of the purported recordkeeping policy; it is not evidence that the policy was sufficiently followed. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3, 121-132. A genuine dispute of material fact exists.

**STATEMENT:**

**B. WAMY's Reporting System Tracks Project Funding**

**RESPONSE:**

No response necessary.

**STATEMENT:**

134. To track project funding, as an initial matter, WAMY project administrators send funds using banking transactions from Saudi Arabia to the international branches. Ex. 14 at ¶20 (discussing WAMY sending funds from Saudi Arabia to branch offices or the projects); Ex. 5 at 67:17-68:1 (testifying that a Saudi branch must approve every transaction and monies are then sent to the branch office).

**RESPONSE:**

Disputed. Plaintiffs dispute that WAMY provided funds to projects only through banks. The record includes evidence WAMY officials acted as money couriers or accepted cash from couriers. Evidence in the record shows that the CIA determined WAMY has played a role in moving terrorism funds, acting as couriers for private Saudi donations to Islamic groups in Afghanistan and Bosnia. WAMY has also helped connect foreigners seeking assistance directly with receptive Saudi donors. Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804 at CIA_000744; Decl. of Mohammedi (Dkt. No. 12001), Ex. 243, Decl. Of Mohammedi (Dkt. No. 12001), EX. 243, CIA_000807-848 at 827. Additionally, WAMY's internal records show that Fatih el-Hassanein served simultaneously as head of TWRA and as director of WAMY Austria and Eastern Europe. Ex. 178, WAMY document indices (produced March 23, 2012). In a 1996 news article, Hassanein was openly identified as an arms dealer for Islamic movements in Bosnia with significant connections to bin Laden: "Hassanein, who studied medicine in Yugoslavia and set up the Third World Relief Agency in 1987, apparently turned it into the chief broker of black-market weapons deals by Bosnia's Muslim-led government and the agent of money and influence in Bosnia for Islamic movements and governments around the world. A Western banker in Austria referred to Hassanein as the 'bagman' of Bosnian President Alija Izetbegovic. 'If the Bosnian government said we need flour, he ran after flour. If they said we need weapons, he ran after

weapons.' ... [M]ilitants in the terrorist underworld are also believed to have used the relief agency Hassanein's [TWRA] to get money to the Bosnian government, including the wealthy Saudi Arabian emigre Osama Binladen, a suspected sponsor of militant Islamic groups around the Middle East. ... [M]oney began to pour into the Third World Relief Agency. In one month alone, July 1992, $20 million entered its account at the First Austrian Bank. In October of that year, one Saudi Arabian government official strolled into the bank's staid headquarters in downtown Vienna with two suitcases filled with cash. He deposited $5 million. From 1992 to 1995, $350 million passed through the agency's hands, bank officials said." Ex. 58, "Bosnia's Muslims Dodged Embargo," Washington Post, September 22, 1996. Plaintiffs further dispute any assertion by Defendant that its practice of transferring funds to its foreign branches using banks is sufficient to safeguard donations. WAMY has not provided evidence that it sufficiently audited its branches' and project recipients' banking and financial activities to determine whether funds were unaccounted for or possibly diverted. The record includes evidence that, at WAMY Canada, the branch failed to maintain a general ledger or a record of receipts and expenditures, could not provide canceled checks for some entire years, was found to have missing checks, improperly accounted for receipts, and did not maintain deposit slips across several years. The audit materials Defendant provided are sporadic and often rely on assurances from local officials regarding receipts and expenditures. See Plaintiffs' responses to Defendant's ¶¶ 121-132, 142-143. A genuine dispute of material fact exists.

**STATEMENT:**

135. WAMY produced hundreds of reports, including project reports, from Saudi Offices (Jeddah, Medina, Dammam and Abha) and the major branches in Kashmir, Sudan, Pakistan, WAMY-USA, Philippines and Indonesia) as well as many reports from WAMY branches. See, Ex.

76, ECF 4240-1: Statistical Report; Ex. 77, Appendix A: WAMY Financial and Project Documents Produced.

**RESPONSE:**

Undisputed that Defendant produced reports, including "project reports," from its Saudi offices and foreign branches; disputed, however, is the extent to which Defendant asserts that what it has produced is comprehensive across years or projects. According to Defendant, WAMY operates five regional offices in Saudi Arabia that oversee dozens of international offices. See Defendant's ¶¶ 16, 20. According to WAMY's 2003 website, WAMY operated in 66 offices and 122 locations. Ex. 179, WAMY 2003 Website. WAMY has claimed it requires reports for each project it funds, which, across a 10-year period and hundreds of offices, likely amounts to thousands of individual projects, and that WAMY offices were expected to produce monthly and quarterly financial and performance reports. See, e.g., Ex. 116, Noorwali Declaration ¶¶ 21-22; Decl. of Mohammedi (Dkt. No. 11997), Ex. 17, WAMYSA051692-698. Plaintiffs dispute that what Defendant has produced is complete. Furthermore, Plaintiffs dispute any assertion that the number of reports submitted equates to adequate vetting and oversight. The record includes evidence that WAMY was aware that its oversight of projects was inadequate. See Plaintiffs' response to Defendant's ¶ 121-132. A genuine dispute of material fact exists.

**STATEMENT:**

136. Forensic Accountant Jonathan Marks confirms WAMY's reporting requirements and implementations based on his review of voluminous primary source documents. See paragraphs 546-567, *infra*.

**RESPONSE:**

Disputed. Plaintiffs dispute that Defendant's expert, Marks, could sufficiently confirm WAMY's "reporting requirements and implementation" based on reporting irregularities and deficiencies, given that he reviewed only a small sample of audits and financial reports, which were missing crucial years and were from high-risk offices. Additionally, Plaintiffs dispute that what Defendant's expert reviewed was "voluminous." Ex. 180, February 2, 2021 Rebuttal Report of Jonathan M. Winer ("Winer Rebuttal Report"), "Mark's Findings in the Use of Audits and Financial Controls," pp. 2-29. See also Plaintiffs' responses and objections to Defendant's ¶¶ 546-567. A genuine dispute of material fact exists.

**STATEMENT:**

137. WAMY branch office reporting requirements were addressed and summarized including at the meeting of the Members of the General Secretariat in 1998 and included:

a. The offices should send monthly summary reports about the office's activities as well as other detailed quarterly reports, along with photos and film footage (if possible) to each entity to which the office reports in the Kingdom and to the General Secretariat. These reports should be sent on a consistent basis so they can be used in the Assembly's media publications and in the annual report.

b. The offices should systematically and consistently send financial reports that are separate from the activity reports, along with invoices and receipts. The office's budget should also be divided into two parts: The first part would pertain to the office's administrative expenses and the second part would pertain to the sums spent on cultural, da'wa and educational activities. Moreover, administrative expenses should be no higher than 25% of the approved

budget. Ex. 17 at WAMYSA051693-694 (Minutes of the Eighth Meeting of the Seventh Session of Members of the General Secretariat of WAMY, 9/16-17/1998).

**RESPONSE:**

Undisputed that the cited text occurs in a document titled "Minutes of the Eighth Meeting of the Seventh Session of the Members of the General Secretariat of the World Assembly of Muslim Youth held on Wednesday and Thursday, 05/25-26/1419 A.H. [09/16-17/1998 A.D.]"; disputed, however, is whether the reporting requirements, as summarized, are sufficiently robust to prevent or deter the diversion of funds. Plaintiffs note the reference should be WAMYSA051694-695 for the quoted passage. Plaintiffs also contend that the "reporting requirements" do not reflect those in use before September 1998, and the record shows that WAMY offices did not regularly comply with the requirements. See Plaintiffs' responses to Defendant's ¶¶ 121-132. A genuine dispute of material fact exists.

**STATEMENT:**

138. For instance, a 1995 LBI annual report documents several project requests, documents LBI's impending dissolution, and catalogue expenses for salaries, medical needs, and housing allowances for several employees and other expenses. Ex. 78, WAMYSA062981-997 (1994 LBI annual expense report).

**RESPONSE:**

Disputed. Plaintiffs dispute any assertion by Defendant that its reference, Decl. of Mohammedi (Dkt. No. 11997), Ex. 78, WAMYSA062981-997, is self-explanatory and is a "1995 LBI annual report." The report includes no descriptive statement explaining what it is other than a title page stating, "Committee Office - Peshawar Administrative Expenses for the Year 1415 AH: (2,404,410) riyals." The expense reports submitted appear to be monthly reports, "Muharram

1415" (June/July 1994). No other expense reports are included as one might expect in an "annual" report, and no asset or cash flow statement exists. Additionally, the report does not "document LBI's impending dissolution" but rather counts the number of "Islamic Benevolence Committee" documents falling under subject categories as of September 2014. No reference can be found in the document to LBI's "impending dissolution," and no explanation of why a count of documents by subject in 2014 is relevant to an LBI 1995 annual report. Plaintiffs contend Defendant's "1995 LBI annual report" is representative of the superficial and incomplete financial and performance reporting found in WAMY's records. A genuine dispute of material fact exists.

**STATEMENT:**

139. WAMY Saudi Arabia retains local auditors like Abdel Razzak Wali Seit and Mansour Al-Jabrou to examine financial reports of their chapter's donations deposits, financial transfers, expenditures and costs. Ex. 14 at ¶24 (discussing audit reporting); Ex. 5 at 248:8-249:20 (identifying Abdel Razzak Wali Seit as WAMY Jeddah's local accountant); Ex. 79, WAMYSA1233979-984 (letters from Al-Rajhi Bank ("ARB") to Abdel Razzak Wali Seit, WAMY local auditor); Ex. 18 at ¶35 (attesting to internal audits of Pakistan office's financial records).

**RESPONSE:**

Undisputed that WAMY Saudi Arabia may retain auditors as part of its staff; disputed, however, is the extent to which Defendant asserts that WAMY's financial and performance reporting was adequate because it employed auditors. See Plaintiffs' response to Defendant's ¶¶ 136, 140-142. A genuine dispute of material fact exists.

**STATEMENT:**

140. Though audit reports are not required by law in every country or under international financial system for not-for-profit organizations, WAMY headquarters attempts to improve controls by employing the services of external auditors like Sidrat Hyder Qamar Maqbook & Co (an affiliate of the U.S. accounting firm Arthur Anderson), Ahmed Bajnied (a member of British firm Clarke Kenneth Leventhal International) and BM & W (Indonesian CPA office) to conduct WAMY's audit reports. Ex. 12 at 246:24-247:9 (noting the name of the external auditor); Ex. 14 at ¶24 (confirming the use of external audits); Ex. 31 at 294:5-10 (attesting that audit report requirements depends on the law of the land); Ex. 18 at ¶35 (attesting to external audits of Pakistan office's financial records); See, e.g. Ex. 80, WAMYSA018575-755 (Sidat Hyder Qamar Brief Information about WAMY/LBI office activities, 1992 to 2002, Pakistan Audit Report); Ex. 81, WAMYSA061716-726 (WAMY Saudi Arabia 1991-92 audit report by Bajneid); Ex. 82, WAMYSA066972-7030 [Mark Ex. 968 – Indonesia external audit report 1994-1997); See also Ex. 83, WAMYSA066752-802 (Bangladesh Audit report by M. Alamgir &Co and S. Huda & Co for period 200-2002); Ex. 84, WAMYSA067482-515 (Haraf Public Accounting 1999-202 for WAMY Somalia).

**RESPONSE:**

Undisputed that WAMY may have retained external auditors; disputed, however, is Defendant's premise that WAMY's only obligation as a Saudi charity was to satisfy Saudi regulatory requirements. Defendant's assertion ignores that WAMY operated as an international NGO in high-risk regions, where robust financial controls and auditing standards are expected regardless of local legal mandates. The record does not show that WAMY implemented such best-practice safeguards, nor does the existence of isolated external audit reports establish that WAMY maintained adequate or consistent financial oversight across its global operations, and particularly

in high-risk regions. See Plaintiffs' response to Defendant's ¶¶ 136, 141-142. A genuine dispute of material fact exists.

**STATEMENT:**

141. For instance, LBI Pakistan, WAMY Pakistan, WAMY Saudi Arabia audits provide statistical information on WAMY operations. See, Ex. 76 (Statistical Report for Documents by Branch Office), See also Ex. 12 at 138:18-141:7 and 147:22-148:24 (WAMY Pakistan audit report supporting documents were maintained in a warehouse), at 229:14-230:8, 239:2-240:3 (confirming that WAMY Pakistan sent audit reports from 1994-2002); See, Ex. 80.

**RESPONSE:**

Disputed. Plaintiffs dispute that the evidence Defendant cited demonstrates that audits provided "statistical information on WAMY operations" other than providing a count of documents associated with each "branch office." The counts appear to have been created for this litigation -- "Requested by PEC." Statistical information on WAMY operations would include summaries of cash flow and ledger statements, assets and income statements, and performance figures, which are not provided. Decl. of Mohammedi (Dkt. No. 11997), Ex. 76, ECF 4240-1: Statistical Report. See Plaintiffs' response to Defendant's ¶ 142. A genuine dispute of material fact exists.

**STATEMENT:**

142. In the case of WAMY Pakistan, as with many others, the audit report is an analysis of all financial reporting within the custody of the Pakistan office. Ex. 12 at 139:4-141:4 (record turned over to audit are kept in storage).

**RESPONSE:**

Disputed. Plaintiffs dispute that, in the case of WAMY Pakistan and many other offices, "the audit report is an analysis of all financial reporting within the custody of the Pakistan office." The record shows, for example, that WAMY's external auditors relied on assurances from WAMY Pakistan regarding unverified receipts and expenditures: "receipts reflected in the financial statements are based on the amounts so recorded in the books of WAMY. The donations amounting to Rs 58877899 and their intended use for specified projects was not directly confirmed to us by WAMY Saudi Arabia hence remained unverified"; "salaries and allowances etc. have been verified by us only to the approval thereof by the WAMYs management and acknowledgement of the recipient"; "as explained in notes 2.5 and 13.1 in the financial statements undistributed stock of donations in kind comprising of tents food stuff clothes and medicines amounting to Rs 5.244 million as of 30 Zulhijjah 1422 Hijrah was distributed during the current year. The said distribution was not subject to our verification"; "we could not physically verify the inventory of fixed assets as inventory lists were not available for our verification"; "expenditure incurred inside Afghanistan is not susceptible to independent audit verification. It has been verified by us only to the approval thereof by WAMY's Regional Director"; "Without qualifying our report, we draw attention to the fact that in common with many organizations of similar size WAMY's system of internal control is dependent upon close involvement of the Regional Director. Where independent confirmation of the completeness of the accounting record was, therefore, not available, we have accepted assurance from the Regional Director that all WAMY transactions have been reflected in the records." Decl. of Mohammedi (Dkt. No. 11997), Ex. 80, WAMYSA018575-755, at WAMYSA018579-WAMYSA018580. A genuine dispute of material fact exists.

**STATEMENT:**

143. WAMY's record keeping of project reports, project financing reports, receipts, cash receipts, contracts, communications, and other financial papers allowed external auditors to draft the Pakistan audit reports years after the events audited in the report occurred. Id. at 139:4-141:4 (record turned over to auditors are kept in storage); at 229:14-231:24 (acknowledging efforts made to assist auditors in getting documents for the report).

**RESPONSE:**

Disputed. Plaintiffs dispute that WAMY's recordkeeping "allowed external auditors to draft the audits for its Pakistan office years after events" occurred in a reliable manner. While Defendant may have produced audits for its Pakistani office, Plaintiffs dispute the audits' reliability. The record shows that WAMY's external auditors could not independently verify several significant audit items. Audit deficiencies include the receipt of donations, which the auditors accepted based solely on WAMY's books; the receipt of salaries and stipends, which were confirmed only by WAMY; the receipt and distribution of physical goods; the inventory of fixed assets, as no inventory lists were made available; the financial statements that were audited by another firm, where the opening balance statements were based solely on that audit; and expenditures in Afghanistan, which the auditors did not independently verify, accepting WAMY's assurances. Often, the external auditor "accepted the assurances" of WAMY employees about its accounting without meaningful, independent verification. Decl. of Mohammedi (Dkt. No. 11997), Ex. 80, WAMYSA018575-755, at WAMYSA018579-WAMYSA018580. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 136 and 142. A genuine dispute of material fact exists.

**STATEMENT:**

**C. Other Measures Taken by WAMY to Maintain Financial Controls**

**RESPONSE:**

No response necessary.

**STATEMENT:**

144. From 1997-2000, consistent with WAMY's general oversight of financial spending and at auditors' recommendation, WAMY sought to increase its accounting policy by announcing the centralization of its IT system, updating accounting and financing policies, renewing supervision over accounts, reprimanding policy breaking employees, and hiring of more accountants; WAMY's last accounting updates occurred in the late 1990s. See, e.g., Ex. 86, WAMYSA082520-521 (IT centralization letter); See, also Ex. 87, Jonathan Marks Dep. Transcript (Excerpt) at 257:2-259:17 (discussing improvement in 1999 in the form of more technology, hiring and training); Ex. 88, WAMYSA176925-926 (1999 Ltr from WAMY to W. Europe requesting detailed report on spending).

**RESPONSE:**

Disputed. Plaintiffs dispute any claim by Defendant that its 1997 information technology updates were primarily intended to "increase its accounting policy." The record shows that WAMY IT staff believed the update would connect "work between General Secretariat and the [Saudi] branches," unify software programs, establish a record-retention archive, digitize paper correspondence, and use email. No specific accounting or financial policy benefit is identified. The IT proposal does not appear to include WAMY's foreign offices. Decl. of Mohammedi (Dkt. No. 11997), Ex. 86, WAMYSA082520-521. Plaintiffs further dispute that the IT proposal is the purported accounting policy update WAMY claims began in 1997. Additionally, the record does not include the "auditors' recommendation" that Defendant claims initiated the accounting policy changes. Defendant's expert Marks could not identify the auditors' recommendations. Ex. 181, Jonathan

Marks Dep. Transcript, 257:2-20. Lastly, Plaintiffs dispute that the record identified by Defendant demonstrates WAMY "increase[d] its accounting policy" by "updating accounting and financing policies, renewing supervision over accounts, reprimanding policy breaking employees, and hiring of more accountants," nor does it show a request for a "detailed report on spending" required by a new policy. The cited record does not provide a copy of the updated policy, does not reference a policy authorizing reprimands for policy violations, does not explain how or why WAMY renewed its supervision over accounts, and mentions hiring only as a general initiative, along with "more technology" and "training," and does not specifically call for hiring accountants. Ex. 181, Jonathan Marks Dep. Transcript, 257:2-20. The reference to "Ltr from WAMY to W. Europe requesting detailed report on spending" concerns a 750-pound request for assistance for "ongoing expenses" and asks "that you send us a letter acknowledging receipt of the amount and a detailed photo report on how the money was disbursed." The example does not state that it is operating under an "increased accounting policy," and a "detailed photo report" of "ongoing expenses" would seem an inadequate method of auditing, particularly for a 750-pound donation not otherwise specifically identified. Decl. of Mohammedi (Dkt. No. 11997), Ex. 88, WAMYSA176925-926. A genuine dispute of material fact exists.

**STATEMENT:**

145. To preserve sustained excellence in financial reporting compliance and control, in a December 1997 letter, WAMY’s then program director (Ahmed Galbat) encouraged even tighter documentation of the use of funds to continue, including the provision financial reports, photos and video evidence of work performed. Ex. 68 (WAMY Jeddah 1997 Letter to India encouraging more diligent controls to reassure donors and beneficiaries).

**RESPONSE:**

Disputed. Plaintiffs dispute that WAMY's encouragement of "tighter documentation of the use of funds" was prompted by its "sustained excellence in financial reporting compliance and control." The record shows that WAMY identified serious deficiencies and failures in its financial and performance controls that required changes: "Given what has been observed by some entities in past years on the inaccuracies in disbursing these funds for the benefit of needy Muslim beneficiaries, the carelessness in ensuring that the support reaches its beneficiary, a tolerance for the failure to document this work in photographs, videotapes, and financial reports with supporting documentation and not having trustworthy and experienced people defend this work in reports containing statistics on the materials distributed, number of beneficiaries, distribution sites, and quantities, this suggests that the work in some locations is being carried out randomly and might cast a certain haze over the integrity of the work itself. WAMY will use the Islamic work done this year as a benchmark on whether or not to engage in future interactions." Decl. of Mohammedi (Dkt. No. 11997), Ex. 68, WAMYSA584328. See Plaintiffs' response to Defendant's ¶¶ 121-132, 136, and 142. A genuine dispute of material fact exists.

**STATEMENT:**

146. The Galbat 1997 letter called for the creation of a control committee tasked with securing the swift implementation of due diligence to fulfill WAMY's obligation to donors and project recipients. Id. (WAMY Jeddah 1997 Letter to India encouraging more diligent controls to reassure donors and beneficiaries).

**RESPONSE:**

Disputed. Plaintiffs dispute that Defendant's cited evidence supports "the creation of a control committee tasked with securing the swift implementation of due diligence to fulfill WAMY's obligation to donors and project recipients." Rather, the letter instructs the India office

representative, Abdul Wahab Noorwali, a witness in this case, that "[t]wo committees must be formed for financial control and missionary work to give detailed reports on what each committee has done." Decl. of Mohammedi (Dkt. No. 11997), Ex. 68, WAMYSA584328. There is no reference to a "control committee." Plaintiffs further dispute that the identified deficiencies and failings are sufficient guidance to fulfill WAMY's due diligence obligations. See Plaintiffs' response to Defendant's ¶¶ 121-132, 136, and 142. A genuine dispute of material fact exists.

**STATEMENT:**

147. Galbat sent copies of the same 1997 letter to several WAMY offices in both 1997 and 1999. See, e.g. Ex. 69 (1997); Ex. 70 (1997); and Ex. 71 (1999).

**RESPONSE:**

Disputed. Plaintiffs contend that Galbat sent a similar but not identical letter to other WAMY offices. Decl. of Mohammedi (Dkt. No. 11997), Ex. 69, WAMYSA585072; Decl. of Mohammedi (Dkt. No. 11997), Ex. 70, WAMYSA585077-078; Decl. of Mohammedi (Dkt. No. 11997), Ex. 71, WAMYSA605353. A genuine dispute of material fact exists.

**STATEMENT:**

148. To further control of collections, in May of 2000, WAMY's Assistant Secretary General Noorwali directed WAMY's then regional office in Jeddah to ensure only financial and external affairs officers collected donations and not administrative officers. Ex. 89, WAMYSA529024 (May 2000 Noorwali statement).

**RESPONSE:**

Disputed. Plaintiffs dispute that Assistant Secretary General Noorwali's 2000 directives related to donation collection are related to the program oversight deficiencies highlighted in the cited 1996,

1997, and 1999 letters to WAMY foreign offices. Dr. Noorwali stated, "In light of recent observations that some departments have been collecting funds from donors, and given the resulting disruption to operations due to difficulties in submitting reports and communicating with donors, and in order to ensure that work proceeds smoothly in accordance with the principle of specialization, I hereby direct..." Decl. of Mohammedi (Dkt. No. 11997), Ex. 89, WAMYSA529024. Dr. Noorwali does not explicitly state that the directives are designed to ensure proper use of funds; they are intended only to avoid disrupting operations and miscommunication with donors. Furthermore, the deficiency letters Defendant references (¶ 147) do not explicitly discuss problems with the donation collection; instead, they focus on internal reporting and audit controls. Plaintiffs further contend that the date of Dr. Noorwali's letter--Hijri "22 Shaaban 1421"-- corresponds approximately to the Gregorian date of November 18, 2000, not May 2000, and is too remote, and the letter is too vague to reasonably associate with the 1996, 1997, and 1999 letters. See Plaintiffs' response to Defendant's ¶ 129. A genuine dispute of material fact exists.

**STATEMENT:**

149. To raise employee financial awareness and responsibility, WAMY encouraged employees in 2000 to enroll in courses with the National Commercial Bank on topics like anti-fraud and money laundering, detecting forgery and counterfeiting, supervisory skills, communication skills, technical skills, and much more. Ex. 90, WAMYSA528993-997.

**RESPONSE:**

Disputed. Plaintiffs dispute that WAMY offered training classes at the National Commercial Bank specifically to "raise employee financial awareness and responsibility." WAMY stated: "We would like to inform you that one of the most important policies of the Assembly at this time is striving

to develop employees' potential and improve their on-the-job performance. We are therefore enclosing a list of the courses that the National Commercial Bank will be offering in this regard." The list of courses also included "new employee performance evaluation system," "Distinguished Service / Medal," "The Art of Selling Islamic Banking Services," "Technical Skills for Bank Tellers," "Personal Loans," "Cross-Selling," and "Marketing Basics" -- none of which were applicable to the financial awareness and responsibility of charity workers. Furthermore, WAMY asked department heads to identify employees for courses, and the selection may not have included all employees. Decl. of Mohammedi (Dkt. No. 11997), Ex. 90, WAMYSA528993-997. A genuine dispute of material fact exists.

**STATEMENT:**

**V. WAMY's Affiliate Lajnat Al-Bir Al-Islamiya ("LBI"), Provided Humanitarian and Disaster Relief and Provided No Support, Directly or Indirectly, to al-Qaeda**

**RESPONSE:**

Disputed. See Plaintiffs' responses to ¶¶ 150-207. The record includes evidence that "LBI later joined al Qaida..." Ex. 23. A genuine dispute of material fact exists.

**STATEMENT:**

150. While WAMY's educational mission is directed mostly to Muslim youth, its humanitarian aid projects during natural disasters and war-torn areas are directed to society at large. Ex. 2 at ¶22 (discussing humanitarian aid); Ex. 5 at 78:20-79:22.

**RESPONSE:**

Disputed. Plaintiffs dispute that WAMY was solely engaged in educational and humanitarian aid projects. The record shows that WAMY provided funding, ideological support, recruitment, and

other support to terrorists, including al-Qaeda. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3 and 14. A genuine dispute of material fact exists.

**STATEMENT:**

151. WAMY's respected humanitarian and charity projects work hand-in-hand with such international organizations like the United Nations High Commissioner for Refugees (UNHCR), the World Health Organization (WHO), the World Food Organization ("WFP"), the United Nations Children's Fund (UNICEF) and the United Nations Relief and Works Agency for Palestine Refugees ("UNRWA") and other state-run initiatives. Ex. 2 at ¶20 (discussing work with U.N. agencies); Ex. 5 at 79:23-80:5 (attesting to WAMY's humanitarian work primarily originating during the Afghan refugee crises); Ex. 91, Rustum Mahmand Declaration at ¶3-9 (discussing WAMY's work alongside other NGOs in Pakistan under auspices of the United Nations and Government of Pakistan.).

**RESPONSE:**

Undisputed that Defendant engaged in legitimate charitable work; Plaintiffs contend, however, that Defendant's charitable activities were necessary to conceal its support for terrorists and further generated sympathy for terrorist causes. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

152. WAMY's humanitarian relief work includes providing medical aid, temporary shelter, food, youth empowerment and building schools, hospitals, orphanages, wells, mosques and more at the various WAMY branches. Ex. 2, ¶22 (discussing humanitarian aid); Ex. 14 ¶15 (explaining that the policies that WAMY seeks to promote); Ex. 92, WAMYSA038647-655

(Afghanistan agriculture report and polio eradication campaign with the WHO and UNHCR); Ex. 93, WAMYSA035262-282, at 265-266 and 270-271 (Letter from WAMY Pakistan director to Assistant Secretary General Noorwali concerning agreements with World Food Program and WHO, and memo of understanding); Ex. 94, WAMYSA038629-636 at 630 (Chamkani hospital report); Ex. 95, WAMYSA036944 (letter asking to assign WAMY doctors to train Kosovar doctors); Ex. 18 at ¶¶10-11 (discussing U.N. facilitated projects); Ex. 96, WAMYSA038614-620 (WAMY Pakistan projects report, noting relief activities since 1986).

**RESPONSE:**

Undisputed that Defendant provided various forms of aid, shelter, and education as part of its humanitarian relief efforts; Plaintiffs contend, however, that Defendant's legitimate charitable work concealed its financial, ideological, and logistical support to terrorists. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

153. WAMY also maintains a Muslim Doctor/Medical Committee (a/k/a Islamic Medical Association) that publishes a medical bulletin and works in conjunction with the Federation of Islamic Medical Association ("FIMA"). Ex. 97, WAMYSA1235619-621 at 619 (1996 meeting minutes discussing al Balsam bulletin).

**RESPONSE:**

Undisputed that Defendant may publish medical bulletins and work with medical associations; Plaintiffs contend, however, that Defendant's legitimate charitable work concealed its financial and operational support for terrorism and also intended to create local sympathy for terrorist

causes. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

154. The Doctor/Medical Committee held medical camps and ran projects in, for example, Chechnya, Pakistan, and Comoros. Ex. 98, WAMYSA1235779-782 (2000 meeting minutes discussing FIMA meeting in Pakistan and Chechen medical camps); Ex. 99, WAMYSA1235703-708 (1998 meeting minutes about medical camps in Comoros and a clinic in Jordan for Palestinians); See also, see also Ex. 95 (letter asking to assign WAMY doctors to train Kosovar doctors recognizing WAMY's Doctor's Committee); Ex. 100, WAMYSA1235836-841 (2001 meeting minutes about health center for Afghan refugees, Kosovar doctors, and other works).

**RESPONSE:**

Undisputed that Defendant may have provided medical aid in Chechnya, Pakistan, Jordan, and the Comoros; Plaintiffs contend, however, that Defendant's legitimate charitable work concealed its financial and operational support for terrorism and created local sympathy for terrorist causes. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

**A. WAMY's Former Affiliate, LBI, a Charity Providing Medical and Humanitarian Aid, Has No Relationship with or Connection to *Benevolence International Foundation (“BIF”)*, a United States Based Charity Created and Marketed by Adel Batterjee to Deceive Donors into Believing It Was a WAMY Affiliated Charity.**

**RESPONSE:**

Disputed. See Plaintiffs' response to ¶¶ 155-166. The record includes evidence that "BIF and LBI remained one organization with interchangeable assets under Batterjee's control." Ex. 23, U.S. Dept. of the Treasury, "U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," December 21, 2004. A genuine dispute of material fact exists.

**STATEMENT:**

155. In 1987, Adel Batterjee, a merchant, and two other men formed *Lajnat Al-Bir Al-Islamiya* ("LBI") to help Afghan refugees. Ex. 10 at ¶4 (attesting to his profession as a merchant); Ex. 14 at ¶¶ 26-29, 31-42 (discussing Batterjee starting LBI's [at 26] and various humanitarian engagements in Afghanistan/Pakistan as well as in Kosovo); Ex. 5 at 233:2-16 (testifying to LBI's work in Afghanistan that included orphan, healthcare and agricultural projects). Ex. 25 at WAMYSA028405 (Brief information about LBI, memorializing its beginning in 1987); Ex. 101, WAMYSA031288-314 at 031300, 031308 (1989 LBI Organization Achievement discussing LBI objectives).[6]

6 WAMYSA031228-031304 is produced in the form it was received.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's characterization of the record regarding LBI's founding. The record shows that WAMY officials believed Dr. al-Johani co-founded LBI with Adel Batterjee. Additionally, WAMY official Dr. Noorwali was originally a member of the LBI board before becoming a WAMY official. Plaintiffs repeat and incorporate their response to Defendant's ¶ 11. Plaintiffs do not dispute that LBI aided Afghan refugees, but contend that LBI's legitimate charitable work provided cover for its financial and logistical support to bin Laden and al Qaeda.

Plaintiffs repeat and incorporate their response to Defendant's ¶¶ 3 and 24. A genuine dispute of material fact exists.

**STATEMENT:**

156. LBI is also known in English as Islamic Benevolence Committee ("IBC") or Benevolence Islamic Committee ("BIC"). Ex. 14 at ¶55 (discussing LBI as "Benevolence Islamic Committee"); see e.g., Ex. 78 at WAMYSA062986-987 (1995 salary statements for using "Islamic Benevolence Committee").

**RESPONSE:**

Undisputed that LBI in English may be known as Islamic Benevolence Committee ("IBC") or Benevolence Islamic Committee ("BIC").

**STATEMENT:**

157. LBI's most prominent humanitarian work included the aforementioned Abu Hanifa school, running the Chamkani district hospital and conducting refugee work. See, *supra* at paragraphs 28-45 (discussing Abu Hanifa school), see *infra* at paragraph 163, 230, 256-60 (discussing refuges work and Chamkani hospital).

**RESPONSE:**

Undisputed that LBI may have supported the Abu Hanifa school, operated a hospital, or conducted refugee work; disputed, however, to the extent Defendant characterizes this work as LBI's "most prominent" humanitarian work. Plaintiffs contend that LBI's legitimate charitable work provided cover for its financial and logistical support to bin Laden and al Qaeda. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

158. Batterjee's LBI consisted of its founders, a general assembly (the highest constitutional body) and its own operational board of directors (the executive body). Ex. 101 at WAMYSA031306-307 (LBI Organizational bodies).

**RESPONSE:**

Undisputed that the record indicates LBI had founders, a consultative body, and a board of directors; disputed, however, to the extent Defendant asserts LBI was solely founded, operated, or supervised by Batterjee. The record shows that WAMY official Dr. Noorwali believed Dr. al-Johani co-founded LBI with Adel Batterjee. Additionally, WAMY official Dr. Noorwali was originally an LBI board member before becoming a WAMY official. Plaintiffs repeat and incorporate their response to Defendant's ¶ 11. A genuine dispute of material fact exists.

**STATEMENT:**

159. Unlike WAMY, Batterjee's LBI did not have the ability to raise funds or operate legitimately in Saudi Arabia. Ex. 14 at ¶49 (discussing Batterjee misconduct of raising funds); Ex. 2 at ¶2 (discussing WAMY's legitimate and official status as a charity).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's claims that LBI did not have the ability to raise funds or operate legitimately in Saudi Arabia. The record shows LBI intended to fund its activities from private donations from the citizens of Saudi Arabia: "It is worth mentioning that the 1989 budget of LAJNAT AL-BIRR is estimated to be over $8 million. The major part of this budget is expected to be funded through private donations from the citizens of Saudi Arabia." Decl. of Mohammedi (Dkt. No. 11999), Ex. 101, WAMYSA031288-314 at 31308. Additionally, LBI, operating as WAMY (Afghanistan), stated that, in approximately 1997, its orphanage program was funded by

philanthropists mainly from Saudi Arabia: "The main source of receipts is orphanage sponsorship which is collected from philanthropists, mainly from Saudi Arabia through WAMY." Decl. of Mohammedi (Dkt. No. 11999), Ex. 102, WAMYSA018655. Furthermore, Plaintiffs contend that LBI operated in Saudi Arabia, as shown by a June 8, 2002 letter to Dr. Noorwali stating that WAMY had not yet deposited the "dues" to the employees of the Al-Birr Committee in Madinah. Decl. of Mohammedi (Dkt. No. 11999), Ex. 101, WAMYSA031288-314 at 31308. Other evidence points to LBI independently collecting donations in Saudi Arabia: Dr. al-Johani asked Batterjee to provide donation collection figures and the rate at which LBI deducted its administrative fee. Decl. of Mohammedi (Dkt. No. 11999), Ex. 106, WAMYSA032006. Furthermore, Defendant cites no portion of the record that demonstrates LBI did "not have the ability to raise funds or operate legitimately in Saudi Arabia." In fact, WAMY officials have testified to the contrary: "LBI undertook fundraising activities on its own to support its projects. WAMY was not involved in any LBI fundraising." Ex. 116, Noorwali Declaration, ¶ 37; see also Ex. 20, Noorwali Deposition, 228:11-229:11 (stating that LBI would "gather donations" and perform the field work as a condition of working under WAMY's auspices). Furthermore, in July 1992, WAMY's board decided to suspend LBI fundraising for three months to "reach an understanding with the relevant authorities." Decl. of Mohammedi (Dkt. No. 11999), Ex. 108, WAMYSA1235429-434, at 431. And again, in May 1993, Dr. al-Johani requested that Prince Salman permit WAMY and LBI to resume fundraising: "Authorize the assembly, including the Benevolent Committee, to fundraise in public places and mosques, similar to the Relief Authority and other bodies that deliver the contributions of the Kingdom of Saudi Arabia, government and people, to Muslims in need around the world." Decl. of Mohammedi (Dkt. No. 11999), Ex. 107, WAMYSA061345-346 (May 1993 letter to Prince Salman). See Plaintiffs' response to Defendant's ¶¶ 169-171. A genuine dispute of material fact exists.

**STATEMENT:**

160. Thus, in 1989, at Batterjee's request, WAMY agreed to cooperate with LBI in joint humanitarian relief efforts. Ex. 14 at ¶29 (describing how LBI came to partner with WAMY); Ex. 102, WAMYSA018655 (1996 Notes to Accounts with brief history of WAMY/LBI); Ex. 103, WAMYSA029920 (Nov 1994 letter saying LBI is relief/welfare arm of WAMY); Ex. 5 at 228:13-23 (discussing Batterjee's request to work under WAMY's umbrella).

**RESPONSE:**

Undisputed that WAMY and LBI arranged to jointly conduct humanitarian relief efforts under a collaborative agreement; disputed, however, to the extent Defendant suggests the collaborative agreement was needed because LBI could not fundraise or operate legitimately in Saudi Arabia. Plaintiffs repeat and incorporate their response to Defendant's ¶ 159. A genuine dispute of material fact exists.

**STATEMENT:**

161. Prior to 1989, WAMY knew Batterjee because of his charitable work. Ex. 5 at 228:16-229:5 (discussing what WAMY knew about Batterjee).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's characterization of the record. The evidence Defendant cites does not state that WAMY knew about Batterjee's charitable work before 1989. The record merely states that WAMY understood Batterjee came from a wealthy family and approached Dr. al-Johani with the idea of working together: "So he was from a wealthy family, and he came to Dr. Maneh Al-Johani in order to use the WAMY as an umbrella for -- to work with the Afghan refugees. And he came with the idea of Lajnat al-Birr. So the work included to gather donations for the Afghan refugees by ... field work in the Afghan refugee camps. And based on this request,

Dr. Maneh accepted the project and formed a board under the name of Lajnat al-Birr so to work on an independent basis under the name of ... under the umbrella or auspices of WAMY." Ex. 20, Noorwali Deposition, 228:16-229:11. A genuine dispute of material fact exists.

**STATEMENT:**

162. Beginning in or about 1989, WAMY managed its humanitarian work through its affiliation with LBI in the areas of medical assistance, education, social welfare and agricultural and rural development. Ex. 14 at ¶32-34 (attesting to LBI's charity work); Ex. 102 (1996 Notes to Accounts with brief history of WAMY/LBI); Ex. 103 (Nov 1994 letter saying LBI is relief being welfare arm of WAMY).

**RESPONSE:**

Undisputed that WAMY and LBI began public collaboration on various humanitarian work sometime around 1989; Plaintiffs contend, however, that Defendant's records also identified WAMY and the "Benevolence Committee's" work beginning in 1988. Decl. of Mohammedi (Dkt. No. 11997), Ex. 24, WAMYSA065181-185. Plaintiffs further dispute any assertion by Defendant that implies WAMY and LBI engaged solely in humanitarian work, or that Adel Batterjee or LBI did not provide financial and operational support to mujahedeen elements in Afghanistan before the public collaboration with WAMY in 1988 or 1989. The record also includes evidence that LBI was formed in 1987. Ex. 184, "Benevolence Director Indicted for Racketeering Conspiracy; Providing Material Support To Al Qaeda and Other Violent Groups," U.S. Department of Justice Press Release, October 9, 2002. Additionally, evidence shows that during the mid- to late 1980s, LBI was affiliated with Makhtab Al-Khidamat (MAK) operations overseen by Abdullah Azzam and Bin Ladin, and provided logistical support for the mujahideen in Afghanistan, including financial assistance for military training and help obtaining travel and identity documents and

immigration status in Pakistan. Id. MAK was founded in the summer of 1984. Ex. 182, Thomas Hegghammer, *The Caravan: Abdallah Azzam and the Rise of Global Jihad*, p. 205. The U.S. Government identified MAK as the precursor organization to al Qaeda. Ex. 183, U.S. Dept. of the Treasury, "Treasury Department Statement Regarding the Designation of the Global Relief Foundation," October 18, 2002. After MAK's dissolution in the late 1980s, LBI became associated with al-Qaeda: "In the late 1980s, Batterjee founded the precursor to BIF, Lajnat al-Birr al-Islamiah (LBI), in Saudi Arabia and Pakistan. LBI provided financial and operational support to mujahedeen elements in Afghanistan and around the world, including fighters associated with UBL and Gulbuddin Hekmatyer, who was named a SDGT by the Treasury on February 18, 2003. LBI was affiliated with Makhtab Al-Khidamat (MK), which was co-founded and financed by UBL and is the precursor organization of al Qaida. LBI later joined al Qaida upon the dissolution of MK." Ex. 23, U.S. Dept. of the Treasury, "U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," December 21, 2004. See also Plaintiffs' response to Defendant's ¶¶ 3 and 11. A genuine dispute of material fact exists.

**STATEMENT:**

163. Administratively, LBI and Batterjee agreed to remain independent but work under WAMY's auspices, follow WAMY's project-based funding protocols and guidelines, and be held accountable to and reported its projects to the newly formed WAMY/LBI Saudi supervisory board. Ex. 14 at ¶29 and 36 (Noorwali attesting that LBI would operate as an independent entity under WAMY's auspices and charter, on the condition that LBI would follow WAMY policies and protocols); Ex. 5 at 228:11-229:5 (explaining how LBI came under WAMY's umbrella as an independent organization); Ex. 14 at ¶ 27 (LBI's refugee work); Ex. 105,

WAMYSA1235455-459 at 455 (noting LBI's "minutes of the Seventh Meeting of the Charity Committee's Council of Supervisors); Ex. 18 at ¶7 (noting that LBI had its own name but was part of WAMY).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion that LBI expressly agreed to operate under "WAMY's project-based funding protocols and guidelines" or to "be held accountable to and report its projects to the newly formed WAMY/LBI Saudi supervisory board." The cited materials do not support that claim. Dr. Noorwali's declaration describes only a single hospital project for which WAMY conditioned approval on LBI's adherence to WAMY policies -- "WAMY agreed to LBI's hospital project, on the condition that LBI would follow WAMY policies and protocols," Noorwali Declaration, ¶ 36 -- and does not establish that such conditions applied to LBI's other activities. Defendant's deposition citation similarly identifies no specific policies WAMY expected LBI to follow. Defendant's reliance on LBI's July 1993 meeting minutes is also misplaced: the cited portion does not reference any "newly formed WAMY/LBI Saudi supervisory board," but merely reflects a postponed discussion about "the suggestion of forming a Committee to coordinate the World Assembly's committees," which the Executive Director requested be deferred. Decl. of Mohammedi (Dkt. No. 11999), Ex. 105, WAMYSA1235455-459 at WAMYSA1235456, WAMYSA1235458. Defendant further cites Pakistani registration filings, but Dr. Noorwali's testimony -- asserting that the filing reflected a Saudi committee "formed from the WAMY Secretary General's ... Council in order to follow up the work of Lajnat al-Birr with Adel Batterjee" -- is unsupported by the documents themselves, which do not show that LBI agreed to report to or be accountable to such a body. Ex. 20, Noorwali Dep. 232:1-8, 236:24-238:2; Ex.185, Noorwali Dep. Ex. 264, WAMYSA057745-WAMYSA057751 at WAMYSA057748. In short, the record

does not establish the explicit administrative structure Defendant describes. A genuine dispute of material fact exists.

**STATEMENT:**

164. To fulfill its agreement with WAMY, LBI provided reports to the WAMY/LBI supervisory board. Ex. 14 ¶¶26 (discussing Noorwali membership on the board), 28 (discussing Batterjee compliance with providing operational reports), 46 (discussing Batterjee's later failure to provide reports); Ex. 5 at 226:20-227:14 (serving on the LBI board), and 228:24-229:11 (attesting to the formation of the board).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's characterization of the record. While Plaintiffs do not dispute that LBI produced reports, the record does not support the claim that these reports were provided to the "WAMY/LBI supervisory board" or to fulfill compliance requirements under their collaboration agreement. The record cited by Defendant does not state that Adel Batterjee provided reports to "comply" with WAMY requirements, but rather: "Mr. Batterjee routinely provided written operation reports for LBI projects for discussion at annual LBI Board meetings." Ex. 116, Noorwali Declaration, ¶ 28. Furthermore, Dr. Noorwali does not specifically reference oversight by a WAMY/LBI Supervisory Board when discussing "Batterjee's later failure to provide reports," mentioning only LBI's board: "Mr. Batterjee often disregarded these procedures and was not very clear with the operations he conducted. There was a lack of clarity with what he was doing and a lack of reporting to confirm operations (i.e. ambiguity in receivables and expenditures). He routinely started to give the LBI Board incomplete evidence of projects performed or would only report on activities after the fact." Ex. 116, Noorwali Declaration, ¶ 46. While Plaintiffs do not dispute that LBI had an independent board distinct from WAMY (see Plaintiffs' response to

Defendant's ¶ 11), the record cited by Defendant does not support claims that a separate WAMY/LBI supervisory board (¶ 163) operated before WAMY's concerns with Batterjee's activities at LBI. Rather, the record indicated that WAMY's separation from Batterjee had to do with his support of bin Laden and al-Qaeda, which displeased the Saudi government. See Plaintiffs' response to Defendant's ¶ 169. A genuine dispute of material fact exists.

**STATEMENT:**

165. WAMY's then Assistant Secretary General and Secretary General (Dr. Abdul Wahab Noorwali and Dr. al Al-Johani, respectively) initially served on WAMY/LBI's nine-member Saudi based supervisory board, with al-Al-Johani acting as the chairman of the board. Ex. 5 at 227:15-228:5 (testifying to the formation of the board); Ex. 24 at WAMYSA065181-182 (overall dissolution document).

**RESPONSE:**

Undisputed that Dr. al-Johani was likely involved in LBI's formation and that Dr. Noorwali served as a board member; disputed, however, is whether Dr. al-Johani served as an LBI board member, let alone chairman, despite Dr. Noorwali's testimony. Decl. of Mohammedi (Dkt. No. 11999), Ex. 101, WAMYSA031288-314 at 31306; Ex. 20, Noorwali Dep. 227:15-24, 228:1-10 (testifying Dr. al-Johani was a cofounder of LBI and its chairman of the board). Furthermore, the record does not identify members of the WAMY/LBI nine-member Saudi-based supervisory board. According to documents dated 1989, LBI's board consisted of seven members and listed Abdel Batterjee as chairman. Similarly, LBI's General Assembly consisted of 15 members. Decl. of Mohammedi (Dkt. No. 11999), Ex. 101, WAMYSA031288-314 at 31306. Nothing in the record cited by Defendant specifically characterizes the LBI board as the WAMY/LBI nine-member Saudi-based board, nor does it identify the nine members. Plaintiffs further dispute that the undated document

identified by Defendant as Ex. 24, WAMYSA065181-182, "overall dissolution document," describes the specific reasons for dissolution, stating only, "This proposal [to liquidate LBI] was made with reference to the difficulties that the Committee faced in its work and with reference to the memo that the executive director of the Benevolence Committee Dr. Esam Al-Filali submitted to the Minister of Islamic Affairs in this respect." Decl. of Mohammedi (Dkt. No. 11997), Ex. 24, WAMYSA065181-185 at WAMYSA065183. A genuine dispute of material fact exists.

**STATEMENT:**

166. Batterjee held no executive position with WAMY. Ex. 9 at ¶15 (confirming that Batterjee did not hold any official position with WAMY); Ex. 10 at ¶9 (confirming that he "never served as any executive of [WAMY]").

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion that "Batterjee held no executive position with WAMY." The record shows that LBI was formed as a "permanent sub-organization of WAMY," which WAMY called its "welfare arm." Decl. of Mohammedi (Dkt. No. 11999), Ex. 101, WAMYSA031288-314 at 31300; Ex. 20, Noorwali Dep. Transcript, 240:21-241:1. WAMY referred to LBI projects as their own: "In early 1988, World Assembly of Muslim Youth (WAMY) felt the dire need of Afghan people for health care. Therefore it took over the building of the ruined hospital in the year 1988 and immediately started the necessary repair and maintenance." Decl. of Mohammedi (Dkt. No. 11999), Ex. 94, WAMYSA038629-636, at WAMYSA038629. WAMY records identify Adel Batterjee as LBI's chairman and chief executive. Decl. of Mohammedi (Dkt. No. 11999), Ex. 101, WAMYSA031288-314 at WAMYSA31306. At the very least, Abdel Batterjee believed he was a senior executive of WAMY during its operations, even describing himself as "chairman" of WAMY. Ex. 104, Chris Hedges, "Muslims From Afar Joining 'Holy War'

in Bosnia," New York Times, December 5, 1992, A1. See Plaintiffs' response to Defendant's ¶ 11. A genuine dispute of material fact exists.

**STATEMENT:**

**B. WAMY/LBI Removes Batterjee for Disregarding Its Reporting Policies**

**RESPONSE:**

Disputed. See Plaintiffs' responses to ¶¶ 167-174. A genuine dispute of material fact exists.

**STATEMENT:**

167. From 1989, when LBI became a WAMY affiliate, to 1992, Batterjee complied with WAMY's reporting policies and provided reports to the supervisory board. Ex. 14 at ¶¶28.

**RESPONSE:**

Disputed. The record contains various dates when LBI became a subsidiary organization of WAMY. See Plaintiffs' response to Defendant ¶ 11. Plaintiffs further dispute Defendant's assertion that "Batterjee complied with WAMY's reporting policies" between 1989 and 1992. The record Defendant cites does not support this claim; rather, it shows that Batterjee provided reports for board discussion without a time frame: "Mr. Batterjee routinely provided written operation reports for LBI projects for discussion at annual LBI Board meetings." Ex. 116, Noorwali Declaration, ¶ 28. WAMY has not provided copies of its formal, written financial and performance audit and reporting policies for the years of LBI's operations, nor has it produced a sufficient number of LBI reports during its operation under Batterjee to know whether it complied with WAMY reporting policies; more importantly, there is no evidence WAMY physically audited LBI operations under Batterjee. Other evidence in the record indicates Batterjee did not follow proper

reporting and accounting practices before 1993. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 21. A genuine dispute of material fact exists.

**STATEMENT:**

168. Beginning in 1992, however, Batterjee started to violate the transparent reporting mechanism he was requested to fulfill; see, e.g. Id. at ¶45-50 (discussing how WAMY's relation with Batterjee broke down); Ex. 106, WAMYSA032006 (July 1992 Letter from WAMY § Gen Johani noting Batterjee's failure to deliver a report and a request for one).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion that at the beginning of 1992 Batterjee began to disregard Defendant's required "transparent reporting mechanism." Dr. Noorwali's discussion about WAMY's concerns with Batterjee provides no time other than to say, "Over time, as WAMY's relationship with Adel Batterjee and LBI progressed, WAMY had some financial, administrative, and report delivering disagreements with Adel Batterjee." Ex. 16, Noorwali Declaration, ¶ 45. As far as Plaintiffs can tell, Defendant has not produced official copies of its "transparent reporting mechanism" policies. Furthermore, the record contains no evidence that Batterjee understood or agreed to report LBI activities under WAMY policies. The record Defendant cites, "noting Batterjee's failure to deliver a report and a request for one," relates to LBI's collection of public funds. WAMY previously decided to allocate "410 units of public donations" to presumably LBI. Dr. al-Johani requested a report from LBI on funds collected since that meeting and under what percentage the donations were collected: "Since I have not received any report from you regarding the amounts collected during the months following the agreement, nor regarding the preceding period when the percentage was lower than that (i.e., 5%). Therefore, please let me know the amounts collected for this purpose, as the Assembly will feature a number

of outreach projects in Asia and Africa in particular. It intends to support efforts to advance Islamic work in certain regions." Decl. of Mohammedi (Dkt. No. 11999), Ex. 106, WAMYSA032006. There is no further discussion of Batterjee's alleged failures to comply with WAMY reporting policy. A genuine dispute of material fact exists.

**STATEMENT:**

169. For example, Batterjee failed to provide project reports, failed to provide accounting for expenditures, and conducted projects on his own rather than under LBI. Ex. 5 at 238:7-239:6 (testifying about Batterjee's behavior); Ex. 107, WAMYSA061345-346 (May 1993 letter to Prince Salman advising him Batterjee was released due in part to unauthorized work in Sudan and Bosnia and administrative violations).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's claim that Batterjee's administrative failures alone caused its actions against Batterjee. Plaintiffs contend other record evidence indicates Defendant took action against Batterjee because his activities contravened Saudi officials' policies. Dr. al-Johani's May 11, 1993 letter to then Prince Salman references Batterjee's transgressions and how WAMY has adjusted leadership in line with the Kingdom's expectations: "The former Executive Director of the Committee, Sheikh Adel Batterjee, worked hard and carried out some activities in Sudan and Bosnia and Herzegovina that were not approved by the Board of Supervisors. He also carried out some activities related to fundraising at home, which was questioned by officials in Mecca as well as the Ministry of the Interior. The Assembly's Secretariat Council met and took the decision to review the committee's activity and determine the reasons that led to some administrative abuses. A meeting of the Board of Supervisors followed, in which a decision was taken to appoint

a new executive director and to remove Sheikh Adel Batterjee from managing the committee, with a strong focus on the committee's activity to be carried out in coordination with officials in the Kingdom and without conducting any work that goes against the satisfaction of the officials, even if there is an urgent need for it, such as the activity in Sudan or in Bosnia and Herzegovina, except after coordination with the High Authority for Fundraising for Muslims of Bosnia and Herzegovina, which you preside over." Decl. of Mohammedi (Dkt. No. 11999), Ex. 107, WAMYSA061345-346.

Other contemporaneous evidence shows Saudi authorities were investigating Osama bin Laden's activities, and that scrutiny extended to Batterjee, LBI/BIF, and WAMY. By mid-1991, Saudi officials had confined bin Laden in Jeddah due to his public criticism of the royal family, Ex. 4, 9/11 Commission Report, pp. 57, 467; Ex. 186, Bergen, Holy War, Inc., pp. 80-82. During this same period, LBI/BIF published a chronicle documenting bin Laden's transition from Afghan mujahideen to al-Qaeda and the support provided by LBI and others Ex, 141, Basil Muhammad, Al-Ansaru l'Arab fi Afghanistan (1991); Ex. 4, 9/11 Commission Report, p. 467; Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 100), and BIF established itself in Sudan shortly after bin Laden relocated there around 1991. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 22-23. WAMY's own records show that Saudi authorities questioned Batterjee before July 1992, after which WAMY sought a "brief report" from him and suspended LBI fundraising "to reach an understanding with the relevant authorities." Decl. of Mohammedi (Dkt. No. 11999), Ex. 108, WAMYSA1235429-434 at 5431. The suspension did not halt LBI's activities: sometime in 1993, Saudi officials later detained a BIF employee traveling to meet Batterjee, prompting bin Laden's associates to conclude that the government had information linking bin Laden to LBI/BIF. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 26; Ex. 23, U.S. Treasury Press Release, Dec. 21,

2004).

As Defendant claims, in May 1993, WAMY wrote to then-Prince Salman announcing Batterjee's removal, citing unapproved activities in Sudan and Bosnia and fundraising questioned by Saudi officials. Decl. of Mohammedi (Dkt. No. 11999), Ex. 107, WAMYSA061345-346 at 061346. The letter praised Batterjee's successor for deferring to government direction and asked Prince Salman to lift the fundraising ban and "admonish" security authorities not to interfere with WAMY and LBI. Id. The record supports the inference that WAMY understood the government's concern involved bin Laden, not internal bookkeeping: Saudi authorities had already acted against bin Laden (Ex. 4, 9/11 Commission Report, pp. 57, 467; Ex. 186, Bergen, pp. 80-82), questioned Batterjee, (Decl. of Mohammedi (Dkt. No. 11999), Ex. 108, WAMYSA1235429-434 at 5431), received WAMY's letters seeking relief (Decl. of Mohammedi (Dkt. No. 11999), Ex. 107, WAMYSA061345-346 at 061346), and continued to intervene even after Batterjee's removal, including issuing stop-work orders and directing WAMY to deposit LBI funds with MOIA (Decl. of Mohammedi (Dkt. No. 11997), Ex. 24, WAMYSA065181-185). The February 1993 letter Defendant references to Prince Salman was not a cease-and-desist demand but merely cautioned Batterjee about donor confusion. Decl. of Mohammedi (Dkt. No. 11999), Ex. 116, FED-PEC0114420. LBI was not dissolved until mid-1996, after MOIA rejected WAMY's proposal to transfer LBI's assets and continue its programs under a new name. Decl. of Mohammedi (Dkt. No. 11997) Ex. 24, WAMYSA065181-185. Batterjee remained an authorized signatory on LBI accounts through June 1994. Decl. of Mohammedi (Dkt. No. 11997), Ex. 79, WAMYSA1233979-984 at WAMYSA1233979. U.S. authorities later concluded that Batterjee's separation was not genuine and that LBI and BIF "remained one organization, under Batterjee's control," continuing to provide substantial support to bin Laden and al-Qaeda. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 48; Ex. 50, Second Superseding Indictment, *U.S. v.*

*Arnaout*, 02 CR 892 (Jan. 22, 2003) at 4; Ex. 23, U.S. Treasury Press Release, Dec. 21, 2004). A genuine dispute of material fact exists.

**STATEMENT:**

170. Batterjee wanted to be a “one-man show” and engaged in behavior that was “inappropriate and that did not comply with …WAMY’s activities, [such as] gathering donations in public spaces” and not properly accounting for funds disbursed. Ex. 5 at 238:7-239:6 (testifying about Batterjee’s behavior); Ex. 14 at ¶47 (discussing Batterjee’s determination to be a one-man show); Ex. 107 (May 1993 letter to Prince Salman advising him Batterjee was released due in part to unauthorized work in Sudan and Bosnia and administrative violations).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's characterization of Batterjee acting as a "one-man show" and "not properly accounting for funds disbursed." The record cited by Defendant does not independently corroborate Dr. Noorwali's characterization of Batterjee as a "one-man show," nor does it provide examples or specific descriptions of "not properly accounting for funds disbursed." Plaintiffs contend, as Defendant partially acknowledges, that Defendant took action against Batterjee under pressure from Saudi officials displeased with Batterjee's activities. Decl. of Mohammedi (Dkt. No. 11999), Ex. 107, WAMYSA061345-346. See Plaintiffs' response to Defendant's ¶ 169. A genuine dispute of material fact exists.

**STATEMENT:**

171. Consequently, on July 11, 1992, WAMY’s general secretariat met and ratified a three-months pause on LBI funding and, even before Batterjee’s suspension, discussed forming a committee to integrate LBI into WAMY. Ex. 108, WAMYSA1235429-434 at 431 (meeting

minutes showing that on July 6, 1992 WAMY discussed with Batterjee his accountability issues and agreed to (1) suspend LBI from collecting donations for three months, and (2) create a committee consisting of Ibrahim al-Qaeed, Hamad al-Sulaih and Ahmed al-Tuwaijri to oversee controls of the LBI's funds until a final determination is made on the accounting issues).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's characterization of the record. The minutes Defendant cites state that Defendant agreed with Batterjee to "suspend the committee's fundraising activities for a period of three months to reach an understanding with the relevant authorities." The pause was intended to allow negotiations with the authorities. The record shows that about 10 months later, in May 1993, Dr. al-Johani sought Prince Salman's authorization to fundraise on LBI's behalf: "Authorize the assembly, including the Benevolent Committee, to fundraise in public places and mosques, similar to the Relief Authority and other bodies that deliver the contributions of the Kingdom of Saudi Arabia, government and people, to Muslims in need around the world." Dr. al-Johani also sought the Prince's protection from security authorities: "Admonish the security authorities not to interfere with the assembly or its committees, including the Benevolent Committee, and to contact the officials at the assembly when there is any inquiry or follow-up. We, in the assembly, are fully keen to abide by what you direct -- May Allah protect you -- and we seek nothing but first to serve our religion and our country, and second to help our Muslim brothers." Decl. of Mohammedi (Dkt. No. 11999), Ex. 107, WAMYSA061345-346. Furthermore, Plaintiffs dispute that the decision to form an interim committee was "to oversee controls of the LBI's funds until a final determination is made on the accounting issues." The meeting minutes instead state that the interim committee was formed "to propose controls for the committee's full integration into WAMY." Decl. of Mohammedi (Dkt. No. 11999), Ex. 108, WAMYSA1235429-

434. Lastly, WAMY's board meeting (Ex. 108) and Dr. Johani's letter to Batterjee requesting updated donation information (Decl. of Mohammedi (Dkt. No. 11999), Ex. 106, WAMYSA032006) occurred on the same day, contradicting Dr. Noorwali's assertion that "over time" WAMY grew concerned with Batterjee. Ex. 116, Noorwali Declaration ¶ 45. The record suggests WAMY's concerns about Batterjee's "violations" of internal policy were contrived in order for WAMY to deny knowledge of Batterjee's activities supporting bin Laden. See Plaintiffs' response to Defendant's ¶ 169. A genuine dispute of material fact exists.

**STATEMENT:**

172. In early 1993, after the LBI board's January 1993 meeting, Adel Batterjee was removed from his position within LBI or WAMY. Ex. 9 at ¶14 (saying Batterjee dealings with WAMY ended in 1993); Ex. 2 at ¶28 (discussing WAMY's policy of terminating official when there appears to be a lack of transparency); Ex. 5 at 236:19-23 (attesting to WAMY Secretary General's council deciding to remove Batterjee); Ex. 105 at WAMYSA1235458 (July 19, 1993 Meeting Minutes of the Seventh Meeting of LBI's Board of Supervisors, confirming extension of new Executive Director's term for another six months).

**RESPONSE:**

Undisputed that Defendant declared it had publicly separated from Batterjee around 1993; disputed, however, is the reason for Batterjee's "termination" and the claim that Batterjee continued to play a crucial role in LBI/BIF. The record indicates that Batterjee's removal from LBI was not solely for "a lack of transparency" and was because of his association with bin Laden. See Plaintiffs' responses to Defendant's ¶¶ 169-170, noting the lack of corroborating evidence of Batterjee's reporting violations in light of WAMY's communications with Prince Salman and Saudi government investigations. A genuine dispute of material fact exists.

**STATEMENT:**

173. In a letter dated approximately May 11, 1993, from WAMY secretary general Al-Johani to Prince Salman, WAMY's Secretary General stated the reasons and circumstances of Batterjee's dismissal:

There have been some developments in the committee that I would like you—May Allah protect you—to be aware of. The former Executive Director of the Committee, Sheikh Adel Batterjee, worked hard and carried out some activities in Sudan and Bosnia and Herzegovina that were not approved by the Board of Supervisors. He also carried out some activities related to fundraising at home, which was questioned by officials in Mecca as well as the Ministry of the Interior. The Assembly's Secretariat Council met and took the decision to review the committee's activity and determine the reasons that led to some administrative abuses. A meeting of the Board of Supervisors followed, in which a decision was taken to appoint a new executive director and to remove Sheikh Adel Batterjee from managing the committee, with a strong focus on the committee's activity to be carried out in coordination with officials in the Kingdom and without conducting any work that goes against the satisfaction of the officials, even if there is an urgent need for it, such as the activity in Sudan or in Bosnia and Herzegovina, except after coordination with the High Authority for Fundraising for Muslims of Bosnia and Herzegovina, which you preside over. After several meetings, things developed and the current situation is as follows: Sheikh Batterjee no longer has any administrative connection with the Benevolent Committee, but has also resigned from the Board of Supervisors. I recently learned that he has formed a commission that he calls the "International Benevolent Organization. It has offices in several countries abroad, and its logo is close to that of the Benevolent Committee. Its name also suggests this similarity. I wrote to him a letter in which I emphasized that the assembly is not

responsible for this organization; and that the similarities in the two names should not be exploited to carry out any activity that the assembly might be considered liable for, as this organization has no legal presence inside the Kingdom. (a copy of the letter is attached). A temporary executive director of the Islamic Benevolent Committee has been appointed, Dr. Hassan Bahafez Allah, a Professor at King Abdulaziz University and a collaborator with the Muslim World League.

Ex. 107 (May 1993 letter to Prince Salman); Ex. 5 at 238:7-239:6 (testifying that Batterjee wanted to be a "one man show").

**RESPONSE:**

Undisputed that Dr. al-Johani wrote to Prince Salman about WAMY's decision to separate from Batterjee over unapproved fundraising and activities in Sudan and Bosnia; Plaintiffs dispute, however, that the record contains meaningful, corroborating evidence about Batterjee's unapproved conduct or WAMY's concerns about Batterjee before Saudi investigations began. Instead, the record shows that WAMY's non-specific reasons for separating from Batterjee are a pretext designed to distance itself from Batterjee's activities with bin Laden, who had drawn scrutiny from Saudi officials. Plaintiffs also dispute any assertion that Batterjee operated as a "one-man show." The record shows instead that Defendant did not adequately audit or supervise Batterjee's work and now seeks to portray itself as intentionally misled rather than acknowledge its own lack of oversight and complicity. See Plaintiffs' responses to Defendant's ¶¶ 169-170. A genuine dispute of material fact exists.

**STATEMENT:**

174. When WAMY terminated Batterjee in 1993, he relinquished all LBI assets including endowments and property deeds to WAMY. Ex. 105 at WAMYSA1235456 (Noorwali 266-

July 8, 1993, meeting minutes discussing turnover of deeds and other items); Ex. 5 at 244:22-245:17 (confirming tension within LBI that required intervention of some people).

**RESPONSE:**

Disputed. Plaintiffs dispute the assertion that "when WAMY terminated Batterjee in 1993, he relinquished all LBI assets including endowments and property deeds to WAMY." The cited July 8, 1993 meeting minutes (Decl. of Mohammedi (Dkt. No. 11999), Ex. 105, WAMYSA1235455-459) reflect only a discussion of the turnover of deeds and other items, not documentary proof that Batterjee transferred "all LBI assets" or that such a transfer occurred as a condition of termination. Likewise, Dr. Noorwali's testimony (Ex. 5 at 244:22-245:17) describes internal tension within LBI requiring intervention but does not establish that Batterjee relinquished endowments, property deeds, or any other assets to WAMY. The record therefore does not support Defendant's claim that a complete asset turnover occurred in 1993. Plaintiffs point to Batterjee remaining an authorized signatory on an LBI bank account until at least June 1994. Decl. of Mohammedi (Dkt. No. 11997), Ex. 79, WAMYSA1233979-984 at WAMYSA1233979. Plaintiffs further note that WAMY has not fully accounted for the disposition of its LBI inventory assets, and that the assets deposited with the Ministry of Islamic Affairs ("MOIA") do not fully represent LBI's assets. Decl. of Mohammedi (Dkt. No. 11999), Ex. 121, WAMYSA032014-020 at WAMYSA032020 (total of about $26M in LBI assets identified); Decl. of Mohammedi (Dkt. No. 11999), Ex. 129, WAMYSA029901-902 (MOIA return of about $7m in LBI assets to WAMY). See Plaintiffs' responses to Defendant's ¶¶ 187-190. A genuine dispute of material fact exists.

**STATEMENT:**

**C. Batterjee Surreptitiously Creates BIF and Falsely Markets It As an LBI Affiliate.**

**RESPONSE:**

Disputed. See Plaintiffs' responses to ¶¶ 175-186. The record shows that "BIF and LBI remained one organization with interchangeable assets under Batterjee's control." Ex. 23, U.S. Dept. of the Treasury, "U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," December 21, 2004. A genuine dispute of material fact exists.

**STATEMENT:**

175. Unknown to WAMY, Batterjee founded Benevolent International Foundation (BIF), also known as "Munathamat El Birr Doualia," in 1992 while he simultaneously headed LBI. Ex. 14 at ¶55 (attesting to Batterjee's bad acts and that WAMY learned on BIF only in 1993); Ex. 109 WAMYSA034224-245 (BIF statutes); Ex. 110, FEDPEC0157372 at FEDPEC015373 ¶ 2 (Enaam Arnaout Corrected Declaration).

**RESPONSE:**

Undisputed that Batterjee incorporated BIF around 1992; disputed, however, to the extent Defendant claims it did not know of BIF's activities until he was dismissed in 1993. U.S. Treasury officials have determined that "BIF and LBI remained one organization with interchangeable assets under Batterjee's control." Ex. 23, U.S. Dept. of the Treasury, "U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," December 21, 2004. Additionally, the record suggests that LBI/BIF was operational in Sudan before 1992. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 22-23. A genuine dispute of material fact exists.

**STATEMENT:**

176. Batterjee first filed BIF as "an international charity foundation having Liechtenstein as its country of domicile,…[and] its head office in the city of Chicago…" Ex. 109 at WAMYSA034224 (BIF statutes).

**RESPONSE:**

Undisputed that Batterjee formed BIF; Plaintiffs further contend that BIF had offices in Jeddah, Saudi Arabia, and Chicago, Illinois. Decl. of Mohammedi (Dkt. No. 11999), Ex. 109, WAMYSA034224-245 at WAMYSA034224. Furthermore, Plaintiffs contend that, functionally, BIF and LBI were the same entity. Ex. 23, U.S. Dept. of the Treasury, "U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," December 21, 2004. A genuine dispute of material fact exists.

**STATEMENT:**

177. On March 30, 1992, Batterjee incorporated BIF ("BIF-USA") in the State of Illinois, naming himself as one of its officers. Ex. 111, FED-PEC0049416-422 (BIF Illinois registration).

**RESPONSE:**

Undisputed that Batterjee, his brother Sharir, and Marzin H.S. Bahareth, an LBI director, incorporated BIF in Illinois in March 1992.

**STATEMENT:**

178. Batterjee did not inform WAMY or the LBI Board of Supervisors about BIF; WAMY learned of BIF in 1993. Ex. 14 at ¶55 (declaring that WAMY did not know about BIF.); also, Ex. 112, WAMYS057782 (1993 BIF Flyer fax); Ex. 10 at ¶9 (declaring that BIF was never a branch of LBI).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's claim that WAMY was unaware of Batterjee's activities -- whether conducted through BIF or LBI -- until 1993. Plaintiffs further dispute Defendant's assertion that BIF was not functionally a branch of LBI; the record shows that BIF and LBI operated as materially interchangeable arms of Batterjee's charitable network. Ex. 23, U.S. Dept. of the Treasury, "U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," Dec. 21, 2004. The evidence demonstrates that WAMY officials were aware of concerns about Batterjee's activities well before 1993. In 1992, WAMY officials discussed Batterjee's activities with him, which had drawn Saudi authorities' attention. Decl. of Mohammedi (Dkt. No. 11999), Ex. 108, WAMYSA1235429-434 at 431. Additional evidence shows that Saudi authorities detained a BIF employee around the time of BIF's formation and questioned him about BIF's links to bin Laden. According to U.S. Government reporting, the employee subsequently informed Batterjee of the detention, after which Batterjee briefly curtailed operations. Ex. 23, U.S. Dept. of the Treasury, "U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," Dec. 21, 2004. Furthermore, WAMY acknowledged in May 1993 to Prince Salman that it was aware Batterjee had conducted unapproved activities: "The former Executive Director of the Committee, Sheikh Adel Batterjee, worked hard and carried out some activities in Sudan and Bosnia and Herzegovina that were not approved by the Board of Supervisors. He also carried out some activities related to fundraising at home, which was questioned by officials in Mecca as well as the Ministry of the Interior." Decl. of Mohammedi (Dkt. No. 11999), Ex. 107, WAMYSA061345-346. Whether WAMY understood Batterjee to be operating through LBI or BIF is immaterial. The record establishes that WAMY knew of

Batterjee's activities and the scrutiny they had drawn from Saudi authorities well before 1993, contradicting Defendant's implied claim of ignorance. A genuine dispute of material fact exists.

**STATEMENT:**

179. Also, without WAMY's knowledge, Batterjee registered his BIF organization in Peshawar, Pakistan using the 77-D/B Park, Road University Town, Peshawar address he had used to register LBI in March of 1991. Ex. 14 at ¶55 (declaring that WAMY did not know about BIF until about February 1993); Ex. 113, WAMYSA034246 (BIF 1993 registration showing D/B Pak address)

**RESPONSE:**

Undisputed that Batterjee registered BIF in Pakistan using the same address he used to register LBI; Plaintiffs repeat and incorporate their response to Defendant's ¶ 178 as to Defendant's claims that it was unaware of BIF until 1993. A genuine dispute of material fact exists.

**STATEMENT:**

180. WAMY only learned about BIF shortly after dismissing Batterjee from LBI in early 1993. Ex. 14 at ¶55 (Noorwali learned in 1993 that Batterjee started BIF and advised him of the dangers of having an organization with a similar name to LBI).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's implied claims of innocence based on its alleged unawareness of BIF until 1993. Plaintiffs repeat and incorporate their response to Defendant's ¶ 178 as to Defendant's claims it was unaware of BIF until 1993. A genuine dispute of material fact exists.

**STATEMENT:**

181. Through a fax sent in February 1993, WAMY discovered that BIF sought donations using a flyer patterned after an LBI flyer. Ex. 112 (BIF Flyer fax); Ex. 114, WAMY029936-937 (LBI flyer fax); see also Ex. 14 at ¶55 (discussing letter sent to Batterjee concerning BIF); Ex. 5 at 257:5-22 (discussing when WAMY learned of BIF); 267:3-9 (WAMY knew nothing of BIF).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's implied claims of innocence based on its alleged unawareness of BIF's existence until 1993. Plaintiffs repeat and incorporate their response to Defendant's ¶ 178 as to Defendant's claims it was unaware of BIF until 1993. A genuine dispute of material fact exists.

**STATEMENT:**

182. Aside from using similar type print and depicting orphans in its flyer as LBI did, BIF's flyer used a logo that mimicked WAMY's: a globe with interlocking hands over it. Compare Ex. 112 (BIF Flyer fax) and Ex. 114 (LBI flyer fax).

**RESPONSE:**

Undisputed that the Sudan flyers are similar; disputed as to Defendant's implied claims of innocence based on its alleged unawareness of BIF until 1993. Plaintiffs repeat and incorporate their response to Defendant's ¶ 178 as to Defendant's claims it was unaware of BIF until 1993. A genuine dispute of material fact exists.

**STATEMENT:**

183. On February 22, 1993, after learning of Batterjee's deception, WAMY changed LBI's registered Peshawar address from 77-D/B Park Road University Town (the address Batterjee sued) to the new address at 137 J-Z Phase 2 Street-3, Hayat, Abed, Peshawar. Ex. 115, WAMYSA027707 (LBI address change document).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's claim that it undertook the change of address for LBI because of "Batterjee's deception." The record contains no corroborating evidence for the address change beyond the assertion. A genuine dispute of material fact exists.

**STATEMENT:**

184. On February 23, 1993, WAMY's Secretary General Al-Johani, concerned that the similarities in the flyers would confuse donors into thinking there was a relationship between LBI and BIF, sent Batterjee a letter stating:

It gives me pleasure to inform you that the Assembly has learned that you have formed an organization bearing the name of the International Benevolent Organization. Given the close similarity between this organization and the Assembly's Islamic Benevolent Committee, whether in terms of logo or role and function, I hope that your Excellency will take this into consideration in the future, as it may confuse the clients and donors, despite the absence of links between them from an organizational and administrative aspect.

I hope you will alert those cooperating with your organization to take this into account if the organization's logo and name remain as they are. Both the Assembly and it's Benevolent Committee are not responsible for the Organization's activities or announcements.

Further, please advise those cooperating with the Organization not to confuse the Committee with the Organization in case of fundraising inside the Kingdom, due to the importance of

this matter. Ex. 116, FED-PEC0114420 (cease and desist letter from WAMY to Batterjee); Ex. 5 at 257:23-258:7 (attesting to Al-Johani sending and signing the letter to Batterjee).

**RESPONSE:**

Undisputed that Dr. al-Johani wrote to Batterjee on February 23, 1993 about his concerns that LBI and BIF might be confused for fundraising purposes; disputed, however, to the extent Defendant suggests the Sudan flyers prompted the letter. According to the translations, WAMY became aware of the Sudanese flyers several days after Dr. al-Johani's letter. Decl. of Mohammedi (Dkt. No. 11999), Ex. 114, WAMY029936-937 at 936 (February 25, 1993) and Decl. of Mohammedi (Dkt. No. 11999), Ex. 112, WAMYS057782 (February 24, 1993). Plaintiffs further dispute Defendant's characterization of the letter as a "cease and desist" letter. Dr. al-Johani does not ask Batterjee to stop using BIF but rather asks him to inform clients and donors that BIF is not LBI and for BIF employees to identify themselves as not associated with LBI when fundraising in the Kingdom: "Given the close similarity between this organization and the Assembly's Islamic Benevolent Committee, whether in terms of logo or role and function, I hope that your Excellency will take this into consideration in the future, as it may confuse the clients and donors, despite the absence of links between them from an organizational and administrative aspect .... Further, please advise those cooperating with the Organization not to confuse the Committee with the Organization in case of fundraising inside the Kingdom, due to the importance of this matter." Decl. of Mohammedi (Dkt. No. 11999), Ex. 116, FED-PEC0114420. A genuine dispute of material fact exists.

**STATEMENT:**

185. On December 22, 2004, eleven years after WAMY terminated him, OFAC designated Batterjee a Special Designated Global Terrorist (SDGT), Ex. 117, OFAC SDN List April 3, 2026.

**RESPONSE:**

Undisputed that the U.S. designated Batterjee as a Specially Designated Global Terrorist in December 2004; Plaintiffs also do not dispute that WAMY publicly claimed to have separated from Batterjee in 1993, about 11 years earlier. Plaintiffs dispute Defendant's implied assertion that the period between Batterjee's designation as a terrorist and WAMY's public separation is evidence of WAMY's innocence. The record shows that WAMY publicly separated from Batterjee after 1993, and yet Batterjee remained an authorized signatory on the LBI account until at least June 1994. Decl. of Mohammedi (Dkt. No. 11997), Ex. 79, WAMYSA1233979-984, at WAMYSA1233979. Additionally, evidence collected by Canada's Revenue Agency found close links between WAMY-Canada, BIF-Canada, and BIF-USA after 1993. Decl. of Mohammedi (Dkt. No. 12001), Ex. 183, FED-PEC0218170-203 at 12-14. A genuine dispute of material fact exists.

**STATEMENT:**

186. On January 13, 2013, after having designated him in 2004, the U.N. de-listed Batterjee from the al-Qaida Sanctions List. Ex. 118, Press Release, January 15, 2023, U.N. Security Council; Ex. 119, Press Release, U.N. Security Council, December 28, 2004.

**RESPONSE:**

Undisputed that the U.N. delisted Batterjee from its Al-Qaida sanctions list in January 2013; Plaintiffs contend, however, that the U.N.'s delisting did not explain its decision. Additionally, the U.S. continues to designate Batterjee as a SDGT. According to Plaintiffs' expert, "Delisting of someone sanctioned for involvement in terrorism or terrorist finance does not constitute

exoneration. It merely means a finding that listing is no longer necessary because the delisted person or entity no longer presents a terrorist threat." Ex. 180, February 2, 2021 Rebuttal Report of Jonathan M. Winer ("Winer Rebuttal") 48. A genuine dispute of material fact exists.

**STATEMENT:**

**D. WAMY Ultimately Dissolves LBI to Avoid Any Confusion Between It and Batterjee's BIF**

**RESPONSE:**

Disputed. See Plaintiffs' responses to ¶¶ 187-207. The record shows that "BIF and LBI remained one organization with interchangeable assets under Batterjee's control." Ex. 23, U.S. Dept. of the Treasury, "Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," December 21, 2004. A genuine dispute of material fact exists.

**STATEMENT:**

187. Because confusion continued to exist about Batterjee's relationship to WAMY even after his exit in early 1993, WAMY wanted to "ensure that [Batterjee's] activities with [his own organization] were not attributed to or affiliated with WAMY." Ex. 14 at ¶55-56 (attesting to dissolution of LBI to "ensure that [Batterjee's] activities with BIF were not attributed to or affiliated with WAMY").

**RESPONSE:**

Disputed. Plaintiffs dispute that WAMY chose to close LBI to avoid confusion; rather, WAMY was forced to close LBI under government orders that effectively banned LBI from operating. Beginning in July 1995, the Saudi Ministry of Interior (MOI) issued a stop-work order for LBI activities in the Kingdom. In January 1996, Pakistani authorities requested LBI obtain certifications from both the Saudi government and the Saudi Embassy in Pakistan stating that it

was authorized to perform work in Pakistan. In April 1996, WAMY proposed to the Ministry of Islamic Affairs (MOIA) that it transfer LBI's assets to itself, liquidate LBI, and continue performing LBI's work under a different program name. At the end of May 1996, after failing to convince MOIA of its proposal, WAMY's board decided to liquidate. In early June 1996, MOI asked MOIA for an inventory of LBI assets and directed that LBI deposit its funds into MOIA's account. On or about the same day, MOI informed WAMY that it should deposit LBI funds into MOIA's account. Late in June 1996, MOIA issued a stop-work order to LBI. In August 1996, MOIA instructed WAMY to deposit LBI's funds into its accounts. In October 1996, WAMY transferred 8,130,982 SAR representing the "net" funds of LBI to MOIA. In February 1997, WAMY decided to reduce WAMY-Pakistan staff and cancel the Benevolence Industrial Institute, an LBI-sponsored program. At some unspecified date, MOIA returned funds to WAMY to cover commitments to previously approved LBI projects. Decl. of Mohammedi (Dkt. No. 11997), Ex. 24, WAMYSA065181-185 ("An explanation regarding the work and dissolution of the Benevolence Committee"). Plaintiffs further dispute Defendant's characterization of the record and the actions it took in February 1993. Defendant cited Dr. Noorwali's Declaration, ¶¶ 55-56, in support of its claim -- to "ensure that [Batterjee's] activities with [his own organization] were not attributed to or affiliated with WAMY." The evidence for this claim cited by Defendant reads: "55. Around the time of Mr. Batterjee's termination in 1993, WAMY became aware that Adel Batterjee had started an organization named BIF. WAMY sent him a letter on February 26, 1993 advising him that it is inappropriate for him to start this organization. Donors may be confused and think that BIF is affiliated with LBI (Benevolence Islamic Committee), as the names and the logo Batterjee created for BIF are very similar. WAMY did not condone such behavior and demanded that he cease and desist. 56. LBI was eventually dissolved altogether on July 14, 1995 following an administrative decision by the WAMY Board. This was done in order to clearly cut ties with

Adel Batterjee and to ensure that his activities with BIF were not attributed to or affiliated with WAMY." Dr. al-Johani's February 23, 1993 letter (presumably the same letter Dr. Noorwali claimed was sent February 26, 1993) asked only that Batterjee alert clients and donors that BIF was not associated with LBI when conducting its activities. Al-Johani made no demand that BIF stop operating because of any confusion with LBI. Decl. of Mohammedi (Dkt. No. 11999), Ex. 116, FED-PEC0114420. To claim the letter was a "cease and desist" letter, as Dr. Noorwali does, is inaccurate. A genuine dispute of material fact exists.

**STATEMENT:**

188. Through a series of steps beginning in 1995, WAMY dissolved LBI and transferred all its funds and assets into WAMY by 1997. Ex. 14 at ¶56 (discussing LBI dissolution); Ex. 120, WAMYSA027804 (May 1996 LBI meeting minutes – Noorwali 267 – where LBI's board decided to merge "with its main institution [WAMY]" and to name it WAMY going forward); Ex. 24 at WAMYSA065184 (overall dissolution document).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's claim that, of its own volition, it began taking steps in 1995 to dissolve LBI and transfer its funds and assets to WAMY. Dr. Noorwali testified that WAMY's board dissolved LBI on July 14, 1995. Ex. 116, Noorwali Declaration, ¶ 56. Defendant has provided no corroborating evidence to support Dr. Noorwali's assertion that the WAMY board made a decision on or around that date. Instead, Defendant's summary of LBI's dissolution noted that, around July 1995, the Ministry of the Interior ordered a halt to all LBI activities in the Kingdom and at its Saudi Headquarters. Decl. of Mohammedi (Dkt. No. 11997), Ex. 24, WAMYSA065181-185 at WAMYSA065183. Around April 2, 1996, WAMY made a "proposal to the Minister of Islamic Affairs to liquidate the Benevolence Committee and to issue a decision to

create an alternative activity called 'Program for Caring for Muslim Orphans and Youths' and to transfer the funds of the Benevolence Committee to the Assembly. This proposal was made with reference to the difficulties that the Committee faced in its work and with reference to the memo that the executive director of the Benevolence Committee Dr. Esam Al-Filali submitted to the Minister of Islamic Affairs in this respect." Decl. of Mohammedi (Dkt. No. 11997), Ex. 24, WAMYSA065181-185 at WAMYSA065183. The record indicates the Saudi government halted LBI activities in the Kingdom, effectively rendering the charity inoperable. On or about May 26, 1996, the Ministry of Interior requested an inventory of LBI's assets. On or about May 31, 1996, WAMY's board of directors decided to liquidate LBI. On or about June 21, 1996, the Ministry of Islamic Affairs closed LBI. Decl. of Mohammedi (Dkt. No. 11997), Ex. 24, WAMYSA065181-185 at WAMYSA065184. The dissolution summary suggests Saudi Government concerns drove LBI's dissolution. A genuine dispute of material fact exists.

**STATEMENT:**

189. The dissolution process included the transferring of employees and the turning over of endowments and LBI international projects. Ex. 121, WAMYSA032014-020. On or about May 28, 1996, WAMY's executive director made the following final administrative decision:

Lajnat al Bir al Islamiya is to be merged with its main institution (World Assembly of Muslim Youth; The name to be used is World Assembly of Youth; Correspondence should be in the name of the Assistant Secretary General of the World Assembly in Jeddah; all balance sheets and accounts are to be settled with the World Assembly Office in Jeddah; Work on all projects is to be resumed as per the previously set plan; all abroad assets and properties of Lajnat al Birr al Islamiya offices and projects are to be transferred in favor of the World

Assembly into force as of May 28, 1996; all concerned departments are to implement the resolution as relevant to their work. Ex. 120 (Meeting minutes – Noorwali 267); Ex. 5 at 245:18-247:6; Ex. 31 at 232:13-15.

**RESPONSE:**

Undisputed that WAMY decided to merge LBI and its assets into WAMY and assume resumption of LBI projects; disputed, however, to the extent Defendant asserts that the merger and transfer of LBI and its assets occurred in May 1996. The record indicates that the merger was not completed until 1997. Decl. of Mohammedi (Dkt. No. 11997), Ex. 25, WAMYSA028403-414 at WAMYSA028403 (January 1997 report discussing future change of LBI to "WAMY"). A genuine dispute of material fact exists.

**STATEMENT:**

190. With all of LBI's assets and expenses accounted for, on or about October 2, 1996, LBI transferred all of its funds, consisting of SAR 8,130,982 approximately $2,166,818, to the account of the Ministry of Islamic Affairs. Ex. 122, WAMY065184 (overall dissolution document citing transfer of funds); Ex. 123, WAMYSA061342 (1996 follow up letter after transfer).

**RESPONSE:**

Undisputed that WAMY transferred approximately $2 million to the Ministry of Islamic Affairs sometime in October 1996; disputed, however, whether the transfer represented all of LBI's funds and assets. WAMY agreed to continue supporting projects managed by LBI with presumably LBI funds. Decl. of Mohammedi (Dkt. No. 11999), Ex. 120, WAMYSA027804. Additionally, in June 1996, the transfer committee determined that LBI cash balances in its accounts totaled 97,703,205.07 or about $26 million. Decl. of Mohammedi (Dkt. No. 11999), Ex. 121,

WAMYSA032014-020 at WAMYSA032020. Additionally, in August 1997, MOIA officials returned to WAMY 7,703,205.97 SAR held in the name of LBI, representing the "cash balance held at the Ministry from the liquidation of that committee [LBI]." Decl. of Mohammedi (Dkt. No. 11999), Ex. 129, WAMYSA029901-902. A genuine dispute of material fact exists.

**STATEMENT:**

191. On or about December 17, 1996, LBI submitted an application to change its name from LBI to WAMY. Ex. 124, WAMY029513-514 (1996 Change of LBI name); Ex. 164, WAMYSA028295 (Afghan Refugee Commission letter of renewal); Ex. 125, WAMYSA028285 (1996 document to Al-Johani related to operating as Lajnat and getting a no objection letter); Ex. 126, WAMYSA031524 (letter from Rustum Mahmand to Pakistani Secretary requesting change of LBI name to WAMY); Ex. 12 at 60:21-61:16 (testifying to starting work in 1996 and working with LBI only for LBI to fold a few months later).

**RESPONSE:**

Undisputed that LBI in Pakistan took steps to change its name to WAMY beginning in 1996.

**STATEMENT:**

192. As part of the dissolution process, a report was prepared detailing LBI's founding, its activities, its leadership, the total number of projects, the projects undertaken in the past, the ongoing projects, the future plans for the organization, and the reason for changing the organization's name from LBI to WAMY. Ex. 127, WAMYSA0208403-414; see also Ex. 128, WAMSYSA028040-041 (official name change approval).

**RESPONSE:**

Undisputed that LBI provided background information about its current leadership and some of its past activities in support of its request to change its name; Plaintiffs contend, however, that LBI was likely operating in Pakistan as early as 1987, as the background information suggests, and one of its past projects included the "Abdullah Azzam Institute, Yussuf abad, Peshawar." Decl. of Mohammedi (Dkt. No. 11997), Ex. 25, WAMYSA028403-414 at WAMYSA028405, WAMYSA028408. A genuine dispute of material fact exists.

**STATEMENT:**

193. On July 16, 1997, LBI officially changed its name from LBI to WAMY. Id. (Pakistan approves change); Ex. 129, WAMYSA029901-902 (Winer Ex 918); Ex. 130, WAMYSA016310 (letter from WAMY's Assistant Secretary General to the Secretary General that LBI was completely dissolved and LBI name is gone).

**RESPONSE:**

Undisputed that LBI changed its name to WAMY in Pakistan around July 1997.

**STATEMENT:**

194. WAMY-Pakistan, the successor to LBI, assumed control over and continued LBI projects and charity work including, among others, Abu Hanifa school, New Convert programs in Indonesia, orphanages in Kurdistan, agricultural projects, Islamic Center in West Sumatra, and a health care project. Ex. 131, WAMYSA027758-762 (al-Ghamdi letter re projects taken over); Ex. 121 (June 1996 WAMY meeting minutes describing LBI projects WAMY is taking over); Ex. 130 (letter from WAMY's Assistant Secretary General to the Secretary General that LBI was completely dissolved and LBI name is gone); see also Ex. 132, WAMYSA061651 (LBI's Filali confirming merge of LBI with WAMY); Ex. 133,

WAMYSA029787-791 at 788 (1996 letter recognizing activities transferred to WAMY, including Abu Hanifa).

**RESPONSE:**

Undisputed that WAMY-Pakistan assumed projects undertaken by LBI.

**STATEMENT:**

195. WAMY made sure to segregate all of LBI's funds and transferred them to the MOIA before dissolving LBI into WAMY. Ex. 24 at WAMYSA065184 (overall dissolution document).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's claim that the cited evidence -- a chronology of actions taken by the Saudi government and WAMY related to LBI's merger with WAMY and the reclaiming of assets -- indicates that "WAMY made sure to segregate all of LBI's funds before transferring them to MOIA." The cited evidence makes no such claim. A genuine dispute of material fact exists.

**STATEMENT:**

196. In August 1997, MOIA transferred the segregated LBI funds into WAMY's escrow account. WAMYSA029901 (letter with a check made out to WAMY in the amount of 7,703,205 riyals); Ex. 132 (LBI's Filali confirming merge of LBI with WAMY and transfer of assets).

**RESPONSE:**

Undisputed that MOIA transferred funds back to WAMY in August 1997, identified as "cash balance held at the Ministry from the liquidation of that committee [LBI]." Decl. of Mohammedi (Dkt. No. 11999), Ex. 129, WAMYSA029901-902. A genuine dispute of material fact exists.

**STATEMENT:**

197. WAMY did not transfer any of LBI funds, assets or affects to Batterjee or any organization connected to him, including BIF. Ex. 129 (Winer Ex 918) (letter with a check made out to WAMY in the amount of 7,703,205 SAR, approximately $2,053,819).

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's claim that "WAMY did not transfer any of LBI funds, assets or affects to Batterjee or any organization connected to him, including BIF." The evidence cited by Defendant does not indicate what WAMY subsequently did with the money MOIA returned to it. Furthermore, evidence in the record shows that WAMY transferred funds to its Canadian office, which in turn funneled funds to BIF-Canada. Ex. 187, Notice of Audit of the World Assembly of Muslim Youth to its President, Ayman Al-Taher, Canada Revenue Agency, BN: 871966040RR0001, File #3008146, August 23, 2001, Exhibit 181, pp. 12-13, Affirmation of Sean Carter Transmitting Evidence in Support of Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss of the Kingdom of Saudi Arabia and Saudi High Commission for Relief of Bosnia & Herzegovina; Decl. of Mohammedi (Dkt. No. 12001), Ex. 183, FED-PEC0218170-203, pp. 12-14. A genuine dispute of material fact exists.

**STATEMENT:**

198. WAMY has never intentionally or otherwise carried out illegal activities to cause harm to any person. Ex. 9 at ¶¶10 and 20.

**RESPONSE:**

Disputed. The record contains evidence that WAMY provided funding and various forms of support to terrorists who had expressed an intent to violently oppose non-Muslims. Plaintiffs repeat

and incorporate their responses to Defendant's ¶¶ 3 and 14. A genuine dispute of material fact exists.

**STATEMENT:**

199. A 1996 document of unknown provenance incorrectly states that LBI is "probably a subsidiary of the Saudi-based Muslim World League." Ex. 134, BUR-PEC-045900-913.

**RESPONSE:**

Undisputed that LBI was not a formal subsidiary of the Muslim World League (MWL); Plaintiffs contend, however, that LBI and the MWL supported the same mujahideen projects and worked closely with bin Laden. Evidence shows that LBI and MWL supported bin Laden's MAK, the precursor to al Qaeda, through Batterjee's LBI and Wael Julaidan through IIRO, a subsidiary of MWL: "MK [Mekhtab al Khidemat or the 'Office of Services'] also worked with a number of other charitable/relief organizations, especially with Wael Julaidan ('Abu Hassan al Madani') of the International Islamic Relief Organization (hereafter 'IIRO,' sometimes referred to as 'Igatha' based upon its Arabic name 'Hay'at al-Igatha al-Islamiya al-'Alamiyaa'), which was under the umbrella of al Rabita al Alami al Islamiya, also known as the Muslim World League ('MWL')." Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 19 [Footnotes omitted]. Enaam Arnaout, head of BIF, was also an MWL employee before working at LBI. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 19. A genuine dispute of material fact exists.

**STATEMENT:**

200. The document notes an "extremist connection" to "Afghan Veterans". Id.

**RESPONSE:**

Undisputed. LBI supported "Afghan Veterans," some of whom had extremist connections to bin Laden and Abdullah Azzam through MAK. *See also,* Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 19-21. A genuine dispute of material fact exists.

**STATEMENT:**

201. The only support for this claim is that "one Zagreb employee, identified as Syrian-born US citizen Abu Mahmud, was in Pakistan at an unspecified time, according to a foreign government service. He matches the description, provided by a clandestine source, of a man who was allegedly involved in the kidnapping of six westerners in Kashmir in July 1995, and who left Pakistan in early October for Bosnia via the United States. The source said that he worked at various times for LBI, Maktab Al-Khidmat, and Benevolence Foundation International in Pakistan. Lajnat Al-Birr has provided support to a commander of at least one training camp in Afghanistan, according to a clandestine source." Id.

**RESPONSE:**

Disputed. Plaintiffs believe the individual described as a Syrian-born U.S. citizen, who worked at various times at LBI, MAK, and BIF, known as Abu Mahmud, may be Enaam Arnaout. Arnaout's aliases included "Abu Mahmoud al Suri" and "Abu Mahmoud al Hamawi" because he hailed from the town of Hama in Syria. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 19, n.4. Plaintiffs contend LBI did provide support to a commander of at least one training camp in Afghanistan; Arnaout provided significant support to multiple training camps in Afghanistan. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 20-21. A genuine dispute of material fact exists.

**STATEMENT:**

202. This document includes no facts establishing the veracity of the clandestine source or sources nor their basis of knowledge. Id.

**RESPONSE:**

Disputed. The record corroborates that Arnaout, while employed by LBI, provided significant support to Afghan training camps. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 20-21. Plaintiffs repeat and incorporate their response to Defendant's ¶ 3. A genuine dispute of material fact exists.

**STATEMENT:**

203. Until its dissolution in 1997, LBI existed contemporaneously with BIF for about five years, but LBI was never a branch of or associated with BIF and vice versa. Ex. 10 at ¶9 (declaring that BIF was never a branch of LBI).

**RESPONSE:**

Disputed. The record shows that "BIF and LBI remained one organization with interchangeable assets under Batterjee's control." Ex. 23, U.S. Dept. of the Treasury, "Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," December 21, 2004. A genuine dispute of material fact exists.

**STATEMENT:**

204. On November 19, 2002, OFAC designated BIF as an SDGT, naming it's also known as *Al Bir Al Dawalia*, BIF, BIF-USA, and Medzhdunarodnyj Blagotvoritel'nyl. Ex. 117, Office of Foreign Assets Control, *Specially Designated Nationals and Blocked Persons List*, U.S. Dept. of Treas. ("OFAC SDN List April 3, 2026").

**RESPONSE:**

Undisputed as a general matter for purposes of this motion.

**STATEMENT:**

205. Likewise, on November 21, 2002, the U.N. designated BIF as an FTO and lists four also knowns as: *Al Bir Al Dawalia*, BIF, BIF-USA, and _Medzhdunarodnyj Blagotvoritel'nyl_. Ex. 135, U.N. Security Council Consolidated List.

**RESPONSE:**

Undisputed as a general matter for purposes of this motion.

**STATEMENT:**

206. LBI is not named as an "a.k.a." of BIF on either OFAC or the U.N.'s list. Ex. 117; Ex. 135.

**RESPONSE:**

Undisputed that LBI is not identified as an alias of BIF in the terrorist designations issued by OFAC or the U.N.; disputed, however, is the extent to which Defendant implies that because LBI is not listed as an alias of BIF, it was not engaged in providing support to terrorists. The U.S. Dept. of the Treasury stated when it designated Abdel Batterjee that "BIF and LBI remained one organization with interchangeable assets under Batterjee's control." Ex. 23, U.S. Dept. of the Treasury, "Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," December 21, 2004. A genuine dispute of material fact exists.

**STATEMENT:**

207. No sanction regime or government agency has ever designated LBI. Ex. 117.

**RESPONSE:**

Undisputed that LBI has not been designated a Specially Designated Global Terrorist; disputed, however, is the extent to which Defendant implies that only designated individuals or organizations engage in support for terrorists. Furthermore, Plaintiffs contend that the designation of Adel Batterjee, the founder of LBI, and of Enaam Arnaout, a former employee of LBI and BIF and LBI's alter ego, is sufficient evidence that LBI engages in support for terrorists. A genuine dispute of material fact exists.

**STATEMENT:**

**VI. Facts Specific to Certain WAMY Chapters and Individuals.**

**RESPONSE:**

No response is necessary.

**STATEMENT:**

208. "WAMY never knowingly supported terrorists or terrorist causes anywhere including Bosnia, Kashmir, Philippines, Pakistan, Afghanistan, Kosovo, Sudan, South East Asia, Chechnya or the United States." Ex. 2 at ¶28-30 (discussing no support for terror intermediaries and no support for any terror groups).

**RESPONSE:**

Disputed. The record shows Defendant provided funding and other support to terrorists, including al Qaeda. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3 and 14. A genuine dispute of material fact exists.

**STATEMENT:**

**A. WAMY Sudan**

**RESPONSE:**

No response necessary.

**STATEMENT:**

209. There is no evidence that WAMY's work in Sudan had nothing to do with BIF. See, infra, ¶¶20, 26, 127, 128, 136. 170, 171, 174.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's claim that there is no evidence that WAMY's work had "nothing" to do with BIF in Sudan. The record shows that bin Laden moved to Sudan in 1991. Under an agreement with the National Islamic Front (NIF), the political party in power in Sudan at the time, al Qaeda would train Sudanese security forces in exchange for sanctuary and weapons. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 22-23. Around the same time that members of al Qaeda relocated to Sudan, LBI opened its first office in Sudan to support al Qaeda. LBI's office was in Khartoum and provided logistical support and arms to al Qaeda and Sudanese security forces, much as it had in Afghanistan. Al Qaeda senior operative Abu Rida, also known as Mohamed Loay Bayazid, helped set up al Qaeda in Sudan. Bayazid became President of the newly formed BIF in Illinois and served alongside longtime LBI employee Enaam Arnaout. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 23-24. Bayazid obtained an Illinois driver's license using the BIF address. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 24. Additionally, al Qaeda operatives from Sudan met with Fatih Abu Hassanein, an influential member of the NIF. Hassanein was simultaneously head of the Third World Relief Agency ("TWRA") and WAMY's Austrian office serving the Balkans. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 24; Ex. 51, WAMY document indices (produced March 23, 2012) showing WAMY

correspondence with Hassanein; other records show WAMY and TWRA shared an office in Vienna, Austria. Ex. 55, FED-PEC 289619; Ex. 56, FED-PEC 218206. Hassanein was also providing weapons to al Qaeda. Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 24. A genuine dispute of material fact exists.

**STATEMENT:**

210. WAMY's licit work in Sudan consisted of, among other things, providing support for flood victims, sponsoring students, conducting youth camps, providing dawah activities, assisting the Women's committee, operating "caravans" for "war-displaced" people for educational, health and sanitation programs, providing adult education programs, providing female student housing, drilling wells, building mosques and assisting orphanages. Ex. 136, WAMYSA1235460-480 (Report on the main accomplishments of WAMY in Sudan 1993-1994 including relief and educational operations for students and teacher training); Ex. 137, WAMYSA031064 (1999 letter concerning funds for flood victims); Ex. 65 (December 1995 letter to Al-Johani with summary of Sudan achievements in 1994-1995 including eight youth camps, educational and health programs, teacher training courses, organizing a woman's committee to study the Quran, helping for housing for African female students); Ex. 138, WAMYSA031240 (November 2001 thank you letter from Al-Johani to Zair Bashir for providing seats to WAMY sponsored students in "Sudan's prestigious universities"); Ex. 139, WAMYSA031061-062 (2001 letter from WAMY to Sadiq re transfer of funds for orphanage, drilling wells and others).

**RESPONSE:**

Undisputed that WAMY provided humanitarian aid and conducted charitable projects in Sudan; Plaintiffs contend, however, that Defendant's legitimate charitable work was necessary to conceal

its support of terrorists. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

211. WAMY Sudan performed some of its work in collaboration with Sudan's then Minister of Higher Education. Ex. 138, (November 2001 thank you letter from Al-Johani to Zair Bashir, Sudan Minister of Higher Education).

**RESPONSE:**

Undisputed that WAMY provided humanitarian aid and conducted charitable projects in Sudan; Plaintiffs contend, however, that Defendant's legitimate charitable work was necessary to conceal its support of terrorists. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

212. WAMY approved and tracked its budgeting for its Sudan office expenditures and project. See, e.g., Ex. 140, WAMYSA031232 (June 1995 letter from Sudan office to WAMY Secretary General submitting budgets for six months); Ex. 141, WAMYSA031231 (April 1995 office expenditure); Ex. 142, WAMYSA031233-239 (office budget expenditures ranging from December 1994 to May 1995); Ex. 139 (2001 letter from WAMY to Sadiq re transfer of funds for orphanage, drilling wells and others).

**RESPONSE:**

Undisputed that WAMY provided humanitarian aid and conducted charitable projects in Sudan and would have records of those activities; Plaintiffs contend, however, that Defendant's legitimate

charitable work was necessary to conceal its support of terrorists. Plaintiffs repeat and incorporate their response to Defendant's ¶ 24. A genuine dispute of material fact exists.

**STATEMENT:**

**B. WAMY Pakistan**

**RESPONSE:**

No response necessary.

**STATEMENT:**

213. Before WAMY consolidated its Saudi offices were consolidated into the Riyadh office, the Jeddah office, which Dr. Noorwali headed as Assistant Secretary General from 1996, oversaw the Pakistan and Afghanistan branch office. Ex. 14 at ¶¶10, 12 (discussing the Jeddah offices coverage and his start date); Ex. 5 at 155:4-156:14 (discussing office in Pakistan Kashmir).

**RESPONSE:**

Undisputed that Dr. Noorwali may have overseen WAMY's Pakistani and Afghan regional offices from about 1996; disputed, however, is the extent to which Defendant asserts Dr. Noorwali's oversight was adequate, either as an LBI board member or as a WAMY senior executive. Dr. Noorwali has testified that his oversight of Batterjee and LBI, particularly regarding financial matters, was limited. Ex. 116, Noorwali Declaration ¶ 47. A genuine dispute of material fact exists.

**STATEMENT:**

214. WAMY Pakistan's Peshawar branch office, overseen by the Jeddah office, supervised WAMY's activities in Afghanistan and Pakistan. Ex. 14 at ¶10 (discussing Jeddah offices'

coverage which includes Pakistan and Afghanistan); Ex. 12 at 317:16-320:24 (discussing WAMY Pakistan's requirement for permission to enter and leave Afghanistan from designated ports); Ex. 91 at ¶8 (discussing WAMY working out of Peshawar).

**RESPONSE:**

Undisputed that Defendant's WAMY Pakistan office in Peshawar oversaw WAMY's activities in Afghanistan and Pakistan beginning in 1996 or 1997; Plaintiffs note, however, that before that, LBI was the registered charity representing WAMY in Pakistan and Afghanistan. Decl. of Mohammedi (Dkt. No. 11997), Ex. 25, WAMYSA028403-414; Decl. of Mohammedi (Dkt. No. 11997), Ex. 27, WAMYSA028040-041. A genuine dispute of material fact exists.

**STATEMENT:**

215. WAMY Pakistan work from Peshawar "involved in the healthcare sector, water supply sector, and education[,]" orphan programs, rehabilitation, healthcare, human resources, construction and other charity activities. Ex. 91 at ¶8 (discussing WAMY's work); Ex. 18 at ¶4 (attesting to the project divisions); Ex. 96 at WAMYSA038614-616 (documenting some of WAMY Pakistan projects list, including Abu Hanifa school); Ex. 143, WAMYSA038604-613 at WAMYSA038604 (WAMY Pakistan report with picture of WAMY office and list of activities); Ex. 24 at WAMYSA065182-183 (LBI overall dissolution document outlining LBI's activities).

**RESPONSE:**

Undisputed that WAMY Pakistan engaged in various humanitarian and charitable projects initiated by LBI; Plaintiffs repeat and incorporate their response to Defendant's ¶ 24, which explains that legitimate charitable aid is necessary to conceal support for terrorists and to promote sympathy for terrorists and their causes.

**STATEMENT:**

216. When WAMY registered the Pakistan office in 1987 with the Commissioner of Afghan refugees in Peshawar, Pakistan, most of its refugee work was "facilitated by the United Nation ("UN"), the Pakistan government Ministry, and the Agency Coordinating Body of Afghan Relief (ACBAR)…" Ex. 18 at ¶9 (discussing Anwar's work with refugees while at WAMY-Pakistan as its director); Ex. 96 at WAMYSA038614 and 618 (discussing registration).

**RESPONSE:**

Disputed. Plaintiffs dispute that WAMY registered in 1987 with the Commissioner of Afghan refugees. Plaintiffs contend that LBI registered as a subsidiary of WAMY in 1987, and that WAMY registered in 1997 after LBI changed its name to WAMY-Pakistan. Decl. of Mohammedi (Dkt. No. 11999), Ex. 164, WAMYSA028295; Decl. of Mohammedi (Dkt. No. 11999), Ex. 125, WAMYSA028285; Decl. of Mohammedi (Dkt. No. 11999), Ex. 126, WAMYSA031524. A genuine dispute of material fact exists.

**STATEMENT:**

217. WAMY Pakistan's orphan program in Afghanistan, a large part of WAMY's social welfare sector, involved sponsoring thousands of orphans and widows in both Afghanistan and Pakistan. Ex. 80 at WAMYSA018624, WAMYSA018635, WAMYSA018647, WAMYSA018659, WAMYSA018671, and WAMYSA018683 (outlining spending in social welfare); Ex. 12 at 262:2-19 (testifying to the existence of six to ten orphanages in Afghanistan during his term); Ex. 80 at WAMYSA18684-690 (list of WAMY employees-includes list of employees at orphanage); Ex. 91 at ¶8 (LBI/WAMY worked with Save the Children Fund).

**RESPONSE:**

Undisputed that WAMY-Pakistan provided humanitarian and charitable aid to orphans and widows in Afghanistan and Pakistan; Plaintiffs repeat and incorporate their response to Defendant's ¶ 24, which explains that legitimate charitable aid is necessary to conceal support to terrorists and promote sympathy for terrorists and their causes. Furthermore, the record shows that WAMY's external auditors could not independently verify the stipends and other aid reportedly distributed in Pakistan and Afghanistan; instead, the auditors relied on assurances from WAMY's local staff about distributing inventory and funds. Decl. of Mohammedi (Dkt. No. 11997), Ex. 80, WAMYSA018575-755, at WAMYSA018579-WAMYSA018580. A genuine dispute of material fact exists.

**STATEMENT:**

218. In a collaborative effort involving UNICEF and the Afghan government, WAMY fulfilled its education objectives by running a collaborative U.N. approved and funded private boys' and girls' school for orphan refugees from 1996-2017. Ex. 18 at ¶11.

**RESPONSE:**

Undisputed that WAMY collaborated with UNICEF and the Afghan Government to provide schooling for orphans; Plaintiffs repeat and incorporate their response to Defendant's ¶ 24, which discusses how legitimate charitable aid is necessary to conceal support to terrorists as well as promote sympathy for terrorists and their causes. A genuine dispute of material fact exists.

**STATEMENT:**

219. "The bulk of the refugee work was done under the auspices of the United Nations and the Government of Pakistan, [where] the work happened in the tribal areas of Pakistan." Ex. 91

at ¶4; Ex. 18 at ¶9 (discussing Anwar's work with refugees while at WAMY-Pakistan as its director); see also, Ex. 96 at WAMYSA038618.

**RESPONSE:**

Undisputed that WAMY collaborated with UNICEF and the Afghan Government to provide schooling for orphans; Plaintiffs repeat and incorporate their response to Defendant's ¶ 24, which discusses how legitimate charitable aid is necessary to conceal supportto terrorists as well as promote sympathy for terrorists and their causes. A genuine dispute of material fact exists.

**STATEMENT:**

220. In addition to its collaborative work with international agencies in Afghanistan, WAMY coordinated its own independent projects with the Islamic Coordination Institute ("ICI"). Ex. 18 at ¶21.

**RESPONSE:**

Undisputed that WAMY coordinated its activities with the Islamic Coordination Institute ("ICI"); Plaintiffs repeat and incorporate their response to Defendant's ¶ 24, which discusses how legitimate charitable aid is necessary to conceal supportto terrorists as well as promote sympathy for terrorists and their causes. A genuine dispute of material fact exists.

**STATEMENT:**

221. In fulfilling its function, the ICI did not create a joint project but instead coordinated the work of different relief organizations to avoid duplication of relief work in Afghanistan. Ex. 18 at ¶21.

**RESPONSE:**

Undisputed as to how the Islamic Coordination Institute ("ICI") coordinates its work with different relief organizations; Plaintiffs repeat and incorporate their response to Defendant's ¶ 24, which discusses how legitimate charitable aid is necessary to conceal supportto terrorists as well as promote sympathy for terrorists and their causes. A genuine dispute of material fact exists.

**STATEMENT:**

222. For example, "WAMY placed 2,000 Afghan orphans in various schools, educational projects, religious projects, and week-long camps serving 80-100 student." Ex. 18 at ¶16; see also, Ex. 96 (project list document).

**RESPONSE:**

Undisputed that WAMY provided schooling and religious opportunities for Afghan orphans; Plaintiffs repeat and incorporate their response to Defendant's ¶ 24, which discusses how legitimate charitable aid is necessary to conceal supportto terrorists as well as promote sympathy for terrorists and their causes. A genuine dispute of material fact exists.

**STATEMENT:**

223. From 1990 to 1996, WAMY Pakistan (at the time WAMY/LBI) provided services in the health service (including running a hospital), social welfare (orphanages), human resources, educational, rural development and emergency relief sectors. Ex. 18 at ¶19 (discussing WAMY Pakistan hospital projects); Ex. 12 at 261:11-264:21 (discussing WAMY orphanage and hospital projects); Ex. 25 at WAMYSA028409-414 (WAMY/LBI summary sheet); Ex. 144, WAMYSA041410-413 at WAMYSA041410-412 (1993 LBI health sector report); Ex. 145, WAMYSA035413-417 (1993 memo referring to attachment of report re hospitals, including Chamkani, in Pakistan and health services carried out in Pakistan in March 1993).

**RESPONSE:**

Undisputed that WAMY-Pakistan's predecessor, LBI, provided social welfare aid, humanitarian and other charitable relief; Plaintiffs repeat and incorporate their response to Defendant's ¶ 24, which discusses how legitimate charitable aid is necessary to conceal supportto terrorists as well as promote sympathy for terrorists and their causes. Furthermore, Plaintiffs contend that LBI began its activities in 1987. Decl. of Mohammedi (Dkt. No. 11997), Ex. 25, WAMYSA028403-414 at WAMYSA028405, WAMYSA028408. Evidence in the record further shows that some WAMY hospital employees were associated with Islamic extremists adn al Qaeda trainign camps. See Plaintiffs' response to Defendant's ¶ 247. A genuine dispute of material fact exists.

**STATEMENT:**

224. WAMY Pakistan was obligated to abide by, and did abide by, Pakistani law and rules. Ex. 91 at ¶¶9-11 (describing that WAMY's was never alleged to have engaged in wrongdoing); Ex. 146, WAMYSA031831 (1993 letter for example, advising employees to comply with residency requirements).

**RESPONSE:**

Disputed. Plaintiffs dispute any assertion by Defendant implying that because its local Pakistani office was obligated to abide by Pakistani laws and regulations, it did not engage in support of terrorists. The record indicates that WAMY-Pakistan staff provided support to bin Laden and al-Qaeda. Ex. 188, "Pakistan Questions Sudan Man About Tape," Associated Press, December 9, 2002. Plaintiffs also repeat and incorporate their response to Defendant's ¶ 3. A genuine dispute of material fact exists.

**STATEMENT:**

225. Rustum Shah Mahmand ("Mahmand"), a former Home Secretary of Pakistan (1989-1991) and former Ambassador of Pakistan to Afghanistan (2002-2005), worked as the Commissioner of Afghan refugees. Ex. 91 at ¶2. (Mahmand declares that he was the Commissioner for Afghan refugees in Pakistan from 1983 to 1985 and from 1992-1996).

**RESPONSE:**

Undisputed as to the background information related to Rustum Shah Mahmand.

**STATEMENT:**

226. In his capacity as Commissioner of Afghan refugees from 1983 to 1985 and 1992-1996, Mahmand "had a lot of interaction with non-governmental organizations ("NGOs") that were providing refugee assistance in Pakistan, including World Assembly Muslim Youth ("WAMY") and Lajnat Al-Birr Al-Islamiyyah ("LBI")." Id at ¶3.

**RESPONSE:**

Undisputed as to Mahmand's tenure overseeing NGOs engaged in Afghan refugee efforts.

**STATEMENT:**

227. During Mahmand's tenure as Commissioner for Afghan refugees and after, he never heard or received any negative report about WAMY doing anything outside their charter/mission. There were never any allegations of WAMY funding mujahedeen or al-Qaeda or being associated with them in any manner. WAMY was still operating in Pakistan in 2000-2001, providing relief assistance. Id at ¶9.

**RESPONSE:**

Disputed. Plaintiffs dispute Mahmand's claim "[t]here were never any allegations of WAMY funding mujahedeen or al-Qaeda or being associated with them in any manner." As Mahmand disclosed, he served on WAMY's Advisory Board in Pakistan for three years, though he does not

specify which years. Decl. of Mohammedi (Dkt. No. 11999), Ex. 91, Rustum Mahmand Declaration at 13. Mahmand's association with WAMY-Pakistan calls his testimony into question; at the very least, it would be embarrassing for Mahmand, as a member of WAMY-Pakistan's board, to be unaware of WAMY-Pakistan/LBI connections to al-Qaeda. Furthermore, in January 1996, the Pakistani government required LBI to obtain separate approval from the Saudi government and the Saudi embassy in Pakistan to operate in Pakistan and Afghanistan. Decl. of Mohammedi (Dkt. No. 11997), Ex. 24, WAMYSA065181-185 ("An explanation regarding the work and dissolution of the Benevolence Committee"). Mahmand does not address this fact or its reasons. Additionally, the record contains evidence that LBI/WAMY provided support to mujahedeen and al-Qaeda. In 2002, Pakistani security officials and the FBI raided WAMY-Pakistan's office, and WAMY-Pakistani staff were questioned about their connections to al-Qaeda and bin Laden after staff couriered video footage of bin Laden praising recent terrorist attacks. Ex. 188, "Pakistan Questions Sudan Man About Tape," Associated Press, December 9, 2002. The record also shows that, after the Soviet invasion of Afghanistan, Pakistan's political interests aligned with the Afghan mujahideen, which it aided; thus, Pakistan was likely to view NGOs aiding the Afghan mujahideen sympathetically, overlooking NGO activities in support of Islamic militants. Ex. 4, 9/11 Commission Report 56. Plaintiffs repeat and incorporate their response to Defendant's ¶ 3, "LBI, WAMY-Peshawar, Pakistan." A genuine dispute of material fact exists.

**STATEMENT:**

228. The Pakistan refugee Commission had officials and intelligence agencies in the field to monitor what was happening and provide daily reports; anything out of the ordinary was reported. Id at ¶5.

**RESPONSE:**

Undisputed that the Pakistan refugee Commission had access to monitoring of activities in the field; Plaintiffs repeat and incorporate their response to Defendant's ¶ 227. A genuine dispute of material fact exists.

**STATEMENT:**

229. WAMY's Peshawar Pakistan offices were never raided nor was a Sudanese employee ever questioned for delivering a Bin Ladin audio tape. Ex. 12 at 291:4-292:19 (rejecting the claim that FBI and Pakistani intelligence "raided" WAMY's Peshawar office and has no knowledge of the claim that a WAMY Sudanese employee was questioned about hand-delivering a Bin Ladin message to local media); Ex. 147, Adel Hamad Declaration, at ¶40 (had nothing to do with the delivery of a tape from Bin Ladin to al Jazeera); Ex. 4 at 123:18-123:22; Ex. 91 at ¶10.

**RESPONSE:**

Disputed. The excerpts from Ibrahim Anwar Ibrahim's November 7, 2019 deposition (Ex. 12), pages 291-292, cited by Defendant, do not appear in the exhibit. Public reports indicated that Pakistani and FBI officials raided WAMY's offices, and that a WAMY employee was subsequently questioned about his involvement in transferring an al-Qaeda audio message to the news media. Ex. 188, "Pakistan Questions Sudan Man About Tape," Associated Press, December 9, 2002; Ex. 189, Joel Roberts, "Osama Tape Delivery Guy Nabbed?", CBS News, December 5, 2002. Furthermore, Plaintiffs contend that some evidence given by WAMY witness Adel Hassan Hamad is unreliable (Decl. of Mohammedi (Dkt. No. 11999), Ex. 147, Adel Hamad Declaration). The U.S. Department of Defense determined Hamad: "Detainee is an Islamic extremist with ties to LDI, WAMY, the Muslim Brotherhood and likely Al Gamaat Al Islamiyaa (a radical offshoot from the Muslim Brotherhood), and possibly Al-Qaida and or the Taliban. Although the detainee

has not admitted to it, it is suspected that he assisted extremists entering and exiting Afghanistan and Pakistan. It is suspected that the detainee also assisted in the facilitation of money and supplies between Al-Qaida and fighters based on the various positions he held during his 20-year employment tenure within the NGOs." Decl. of Mohammedi (Dkt. No. 11999), Ex. 147, Adel Hamad Declaration at p. 8. A genuine dispute of material fact exists.

**STATEMENT:**

230. WAMY operated without issues in Pakistan. Id.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion that it operated "without issues in Pakistan." The claim is too vague to warrant a response, and it is unclear which source Defendant cites. If Defendant relies on the testimony of Mahmand, Plaintiffs repeat and incorporate their response to Defendant's ¶ 227. A genuine dispute of material fact exists.

**STATEMENT:**

231. WAMY never violated any laws while operating in Pakistan and its records were transparent and clear. Id at ¶11.

**RESPONSE:**

Disputed. Plaintiffs assume Defendant is citing the testimony of Mahmand; if so, Plaintiffs repeat and incorporate their response to Defendant's ¶ 227. A genuine dispute of material fact exists.

**STATEMENT:**

232. Anwar Ibrahim headed WAMY's Peshawar Pakistan office from 1996 to 2002 where he was in charge of WAMY's orphans' program. Ex. 12 at 61:6-62:9 (testifying to working in

Peshawar from 1996 to 2002 and Islamabad from 2002 to the present); 85:16-86:15 (explaining his field of work beginning in 1996 to 2002).

**RESPONSE:**

Undisputed as to Anwar Ibrahim's work history with WAMY-Pakistan; Plaintiffs further contend that sometime in 1996 Ibrahim was employed by LBI, and before that by the International Islamic Relief Organization (IIRO) beginning in 1990: "I started my employment with WAMY Pakistan in Hijri Year 1416 (1996) with the Orphans Division. The organization I first worked for was called Lajnat Al-Birr Al-Islamiyyah ('LBI') which, while it had its own name, was part of WAMY. At the time, I was in charge of Kunar Province, Afghanistan. One year later, I became responsible for the social department which deals with feeding orphans in all provinces of Afghanistan."Ex. 190, April 3, 2019 Declaration of Ibrahim Anwar Ibrahim, ¶ 7; Ex. 190, November 7, 2019 Deposition of Ibrahim Anwar Ibrahim, 61:6-62:9, 60:5-13. A genuine dispute of material fact exists.

**STATEMENT:**

233. From 2002 to onward Ibrahim headed WAMY's Pakistan branch from Islamabad, Pakistan. Id.

**RESPONSE:**

Undisputed that Ibrahim worked at WAMY-Pakistan's branch in Islamabad beginning around 2002.

**STATEMENT:**

234. When Ibrahim served as a WAMY employee in Pakistan, there were never any media reports accusing WAMY of funding terrorism, providing logistics for terrorists, sending youth for

terror training in Pakistan. Ex. 12 at 290:1-291:3 (Ibrahim testifying that there were no media reports of WAMY funding terrorists or funding training camps).

**RESPONSE:**

Disputed. Defendant's reliance on a single WAMY employee's personal lack of awareness of media reporting does not establish that such reporting did not exist, nor does it exonerate WAMY. Ibrahim's testimony reflects only his limited knowledge and says nothing about what was publicly reported, what WAMY leadership knew, or what occurred within WAMY's operations in Pakistan. A witness's subjective unawareness is not competent evidence of the absence of media coverage, nor does it rebut the extensive record evidence showing that WAMY engaged in support to extremist organizations, particularly when that witness may have engaged in furtherance of the acts. Defendant cannot convert an employee's ignorance into proof of institutional innocence. Ex. 60, "Pakistan Questions Sudan Man About Tape," Associated Press, December 9, 2002; Ex. 189, Joel Roberts, "Osama Tape Delivery Guy Nabbed?", CBS News, December 5, 2002. A genuine dispute of material fact exists.

**STATEMENT:**

235. WAMY-Pakistan’s work was government regulated and not clandestine. See, Ex. 146 (1993 letter to LBI office regarding rules for residence permits for foreign workers). Ex. 91 at 9-11 (describing that Pakistani intelligence was aware of WAMY and WAMY was never alleged to engage in wrongdoing).

**RESPONSE:**

Disputed. Defendant's claim that WAMY-Pakistan's work was "government regulated" and "not clandestine" is not supported by the cited materials and fails to rebut the record evidence of WAMY's involvement in extremist networks. A 1993 letter about residence-permit rules for

foreign workers does not establish that WAMY's operations were meaningfully supervised, monitored, or vetted by Pakistani authorities. Likewise, testimony that Pakistani intelligence was "aware" of WAMY and did not allege wrongdoing merely reflects the absence of public accusations, not the absence of illicit activity. Government awareness is not government oversight, and the lack of formal allegations is not evidence of compliance. Defendant cannot rely on bureaucratic immigration paperwork and a witness's generalized impressions to negate substantial evidence showing that WAMY operated in proximity to, and in coordination with, entities engaged in extremist activity. See Plaintiffs' responses to Defendant's ¶¶ 3, 229, 247. A genuine dispute of material fact exists.

**STATEMENT:**

236. WAMY Pakistan never provided travel documents, equipment, or monetary aid for anyone not directly affiliated with WAMY, LBI, or their projects; especially not for those with terroristic or militaristic aims. Ex. 18 at ¶30.

**RESPONSE:**

Disputed. The record contains evidence that WAMY-Pakistan's predecessor, LBI, provided support to Islamic extremists, including al Qaeda. Plaintiffs repeat and incorporate their response to Defendant's ¶ 3. Additional evidence in the record shows WAMY employees, who were detained after the 9/11 attacks, were associated with Islamic extremists and had connections to al Qaeda. See Plaintiffs' response to Defendant's ¶ 247. A genuine dispute of material fact exists.

**STATEMENT:**

237. WAMY Pakistan was never involved in "jihad training" and "simply involved in the education and relief work for poor civilians." Id. at ¶¶ 9-19, 30.

**RESPONSE:**

Disputed. An employee's self-serving description of WAMY-Pakistan as "never involved in jihad training" and "simply" engaged in education and relief work is not competent evidence of the organization's actual activities. It reflects only the witness's personal account of WAMY's mission, not a factual finding, and does not rebut the record showing that LBI and WAMY, including its Pakistan branch, operated within networks that facilitated extremist activity and recruitment. Defendant cannot use conclusory assurances from its own personnel to overcome documentary evidence, contemporaneous reporting, and testimony that demonstrate WAMY's support for militant causes. A witness's benign portrayal of WAMY's work neither establishes the absence of jihad-related activity nor insulates WAMY from the broader evidentiary record linking it to extremist organizations. Plaintiffs repeat and incorporate their response to Defendant's ¶¶ 3 and 247. A genuine dispute of material fact exists.

**STATEMENT:**

1. Financial Reporting and Controls

**RESPONSE:**

No response necessary.

**STATEMENT:**

238. To comply with WAMY's reporting policies, WAMY Pakistan regularly sent annual budget requests to WAMY headquarter. Id. at ¶31 (discussing annual budget").

**RESPONSE:**

Disputed. Defendant has not produced any written WAMY reporting policies, nor has it produced complete sets of annual budget submissions from either LBI or WAMY-Pakistan. Ex. 180, Winer

Rebuttal Report, 6-7 (discussing missing reports and audits) and 22 (discussing that no documents were cited by Defendant or Defendant's expert for the distribution policies allegedly followed). In the absence of those materials, Defendant's claim that WAMY-Pakistan "regularly sent annual budget requests" in compliance with WAMY's reporting protocols is unsupported. A genuine dispute of material fact exists.

**STATEMENT:**

239. WAMY-Pakistan regularly performs a yearly full annual financial audit. Id. at ¶35 ("In order to further ensure sound financial practices, a full financial audit of WAMY Pakistan is performed every year.

**RESPONSE:**

Disputed. Defendant has not produced any written internal audit policies for WAMY-Pakistan, nor has it produced complete annual audit reports or underlying audit workpapers. Without those materials, Defendant's claim that WAMY-Pakistan "performs a yearly full annual financial audit" is unsubstantiated. See Plaintiffs' response to Defendant's ¶¶ 238 and 240. A genuine dispute of material fact exists.

**STATEMENT:**

240. WAMY performs internal audits and external audits of donations, deposits, financial transfers, expenditures, and project costs. Ex. 18 at ¶35; Ex. 12 at 137:10-139:16 (describing that audit reports are sent to headquarters); See, e.g. Ex. 148, WAMYSA9760-770 (2001 Pakistan office audit report – Winer 934); Ex. 149, WAMYSA429154-167 (1993 LBI project and expenditure report for projects in places like Philippines, Gambia, Afghanistan for 1992-1994); see, e.g. Ex. 80 (Brief Information 1992 to 2002 Audit Reports).

**RESPONSE:**

Disputed. Plaintiffs dispute any implication that the mere existence of internal or external audits demonstrates that WAMY did not support terrorists and Islamic extremists. The record shows that Defendant has not produced a comprehensive set of financial or performance reports for WAMY's foreign offices. Moreover, external audits of WAMY operations in Pakistan and Afghanistan do not independently verify key elements of WAMY's financial activities or inventory; instead, they rely on uncorroborated assurances from local staff, findings of other auditors, and unverified banking information from the branch office. Decl. of Mohammedi (Dkt. No. 11997), Ex. 80, WAMYSA018575-755, at WAMYSA018579-WAMYSA018580. The record also contains examples of LBI support to Osama bin Laden and al Qaeda that were not identified in any audit or report: "In or about 1991, defendant ARNAOUT, while employed by LBI, worked with others, including members of al Qaeda, to purchase rockets and assorted rifles in large quantities and distribute them to various mujahideen camps, including camps operated by al Qaeda." Ex. 50, Second Superseding Indictment, *U.S. v. Arnaout*, 02 CR 892 (Jan. 22, 2003) at 6. Additionally, "In or about 1992, defendant ARNAOUT assisted in delivering, assembling and operating a satellite telephone for use in Afghanistan by Gulbuddin Hekmatyar and Hezb-e-Islami." Id. 12. Other evidence shows that LBI employee Arnaout provided supplies to mujahideen, including a "February 1992 letter to ARNAOUT requesting assistance with food and clothing for 1200 mujahideen." Id. 16. External auditors specifically noted that they were unable to verify the distribution of LBI's inventory of food and hard goods. Decl. of Mohammedi (Dkt. No. 11997), Ex. 80, WAMYSA018575-755, at WAMYSA018579-WAMYSA018580. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3, 136, 142, and 238. A genuine dispute of material fact exists.

**STATEMENT:**

241. WAMY Pakistan's audit report accounts for its budgeting expenses in WAMY's, target areas of social welfare, education, health and agriculture. Id. at WAMYSA018624, 635, 647, 659, 671, and 683.

**RESPONSE:**

Disputed. Plaintiffs dispute any implication that the mere existence of internal or external audits demonstrates that WAMY did not support terrorists and Islamic extremists. The record shows that Defendant has not produced a comprehensive set of financial or performance reports for WAMY's foreign offices. Moreover, internal and external audits of WAMY operations in Pakistan and Afghanistan do not independently verify key elements of WAMY's financial activities or inventory; instead, they rely on uncorroborated assurances from local staff, other auditors' findings, and unverified banking information from the branch office. Decl. of Mohammedi (Dkt. No. 11997), Ex. 80, WAMYSA018575-755, at WAMYSA018579-WAMYSA018580. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3 ("LBI, WAMY Peshawar, Pakistan"), 136, 142, 238, and 240. A genuine dispute of material fact exists.

**STATEMENT:**

242. The expenses in each target area accounts for, among other things: salaries, utilities, communication, student welfare within that area, ICI membership, orphan allowances, staff welfare and training, vehicle up-keep, and more. Id.

**RESPONSE:**

Disputed. Plaintiffs dispute any implication that the mere existence of internal or external audits demonstrates that WAMY did not support terrorists and Islamic extremists. The record shows that Defendant has not produced a comprehensive set of financial or performance reports for WAMY's

foreign offices. Moreover, internal and external audits of WAMY operations in Pakistan and Afghanistan do not independently verify key elements of WAMY's financial activities or inventory; instead, they rely on uncorroborated assurances from local staff, other auditors' findings, and unverified banking information from the branch office. Decl. of Mohammedi (Dkt. No. 11997), Ex. 80, WAMYSA018575-755, at WAMYSA018579-WAMYSA018580. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3 ("LBI, WAMY Peshawar, Pakistan"), 136, 142, 238, and 240. A genuine dispute of material fact exists.

**STATEMENT:**

243. From 2000 forward, the audit reports provided even greater detail of expenses associated with education and social welfare programs. Id. at WAMYSA018612, 600, and 588.

**RESPONSE:**

Disputed. Plaintiffs dispute any implication that the mere existence of internal or external audits demonstrates that WAMY did not support terrorists and Islamic extremists. The record shows that Defendant has not produced a comprehensive set of financial or performance reports for WAMY's foreign offices. Moreover, external audits of WAMY operations in Pakistan and Afghanistan do not independently verify key elements of WAMY's financial activities or inventory; instead, they rely on uncorroborated assurances from local staff, findings of other auditors, and unverified banking information from the branch office. Decl. of Mohammedi (Dkt. No. 11997), Ex. 80, WAMYSA018575-755, at WAMYSA018579-WAMYSA018580. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3 ("LBI, WAMY Peshawar, Pakistan"), 136, 142, 238, and 240. A genuine dispute of material fact exists.

**STATEMENT:**

244. WAMY submits a yearly financial report to the Pakistani government and no report has ever resulted in a finding of wrongdoing. Ex. 18 at ¶30 (attesting that WAMY submits yearly reports in order to continue its status as a charitable organization), ¶38 (acknowledging familiarity to Rustum Shah Mahmand Pakistan's Minister of Internal Affairs, who reviewed WAMY projects), ¶39 (showing that in 2019 WAMY once again received approval to continue operations in Pakistan after receiving a go-ahead from the Pakistan Army, intelligence and police both of which are government by the Ministry of the Interior and the Ministry of Defense).

**RESPONSE:**

Disputed. Plaintiffs dispute any assertion by Defendant that, because it may have superficially complied with local charitable rules, it was not engaged in activities intended to support terrorists. The record contains repeated examples of host countries identifying WAMY's terrorist activities within their borders, contrary to its stated charitable purposes. Plaintiffs repeat and incorporate their objections to Defendant's ¶ 3. Furthermore, Plaintiffs dispute Defendant's assertion that, because it operated "openly," it was not engaged in support activities. The record shows that terrorists rely on charitable organizations to conduct legitimate activities that provide cover for funding and logistical support. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 24 and 227. A genuine dispute of material fact exists.

**STATEMENT:**

245. There is no evidence that any of the funds accounted for in the audit report went to OBL or Al Qaeda. Ex. 80 at WAMYSA018624, 635, 647, 659, 671, and 683 (LBI audit reports).

**RESPONSE:**

Disputed. Plaintiffs dispute any implication that the mere existence of internal or external audits demonstrates that WAMY did not support terrorists and Islamic extremists. The record shows that Defendant has not produced a comprehensive set of financial or performance reports for WAMY's foreign offices. Moreover, internal and external audits of WAMY operations in Pakistan and Afghanistan do not independently verify key elements of WAMY's financial activities or inventory; instead, they rely on uncorroborated assurances from local staff, other auditors' findings, and unverified banking information from the branch office. Decl. of Mohammedi (Dkt. No. 11997), Ex. 80, WAMYSA018575-755, at WAMYSA018579-WAMYSA018580. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3 ("LBI, WAMY Peshawar, Pakistan"), 136, 142, 238, and 240. A genuine dispute of material fact exists.

**STATEMENT:**

2. WAMY Employee Adel Hamad

**RESPONSE:**

No response necessary.

**STATEMENT:**

246. WAMY employed Adel Hamad (“Hamad”), a Sudanese national, at its Peshawar Pakistan Office in 2000. Ex. 147 at ¶13; Ex. 150, WAMYSA E001088-091 (Hamad Employment Contract).

**RESPONSE:**

Undisputed that WAMY employed Abdel Hamad, who worked in the Peshawar office; disputed, however, as to when Hamad began work for WAMY in 2000. WAMY-Pakistan official Ibrahim Anwar Ibrahim has claimed that Hamad began working as an administrative manager at WAMY's

hospital on May 19, 2000. April 3, 2019 Declaration of Ibrahim Anwar Ibrahim, ¶ 27. Hamad's employment contract is dated on or about August 29, 2000 (19/5/1421). Decl. of Mohammedi (Dkt. No. 11999), Ex. 150, WAMYSAE001088-091 at WAMYSAE001088. A genuine dispute of material fact exists.

**STATEMENT:**

247. Hamad was never a member of al-Qaeda or its affiliates or a member of any terror group. Ex. 147 at ¶38, 42 (disclaiming involvement with any terror group); Ex. 151, WAMYSA571177-186 at 178 (disavowing membership in terror group); Ex. 2 at ¶¶26, 31 (discussing that WAMY has never been involved in armed conflict or sent employes to fight help or move fighters or provide other logistics to them); Ex. 151 at WAMYSA571179-180 (Summarized unclassified statement of Adel Hamad referring to self as a "simple employee [] not capable of supporting terrorists financially...").

**RESPONSE:**

Disputed. The record includes evidence that Hamad worked with individuals linked to al Qaeda and other Islamic extremists. Before working at WAMY, Hamad worked for Lajnat al Daawa al Islamiya ("LDI") in Afghanistan and Pakistan from 1986 to 1999. Decl. of Mohammedi (Dkt. No. 11999), Ex. 157, JTF-GTMO Hamad Detainee Assessment, pp. 2, 5. The U.S. designated LDI as a Specially Designated Terrorist Group on January 9, 2003. Ex. 169, U.S. Dept. of the Treasury, "SDGT Designation," January 9, 2003. The director of LDI's main office in Peshawar was Zahid Al Sheikh Mohammed, who is the brother of 9/11 conspirator Khalid Sheikh Mohammed. Decl. of Mohammedi (Dkt. No. 11999), Ex. 157, JTF-GTMO Hamad Detainee Assessment, p. 2. Hamad was arrested on July 18, 2002, at a suspected al-Qaeda safehouse. Id. at 2. The Department of Defense concluded Hamad, who lived in Egypt, had not fully disclosed his association with the

Muslim Brotherhood or Al Gama'a al Islamiyya (Islamic Group). Before living in Egypt, Hamad lived in Sudan where he joined the Muslim Brotherhood. Id. at 3. At the time of his arrest, Hamad's possessions included a letter from the Muslim Brotherhood, which he initially denied as his. Id. at 4. The Department of Defense concluded Hamad "was likely using his employment in NGOs to facilitate funds and/or personnel for Al-Qaida and/or its global terrorist network. Detainee has consistently associated with groups that espoused radical violent views, or with groups that assisted or had close dealings with Al-Qaida, UBL and Gulbuddin Hekmatyar. It has been assessed that detainee is using an Al-Qaida counter interrogation cover story." Id. at 4. Furthermore, Hamad's tenure and position at LDI likely showed: "Detainee was employed with LDI holding various positions for a period of about 10 years. Due to his placement and access, detainee was likely facilitating the use of funds and possibly personnel towards Al-Qaida and/or the Taliban." Id. at 4. Hamad's work at LDI included assisting at the Jalozai and Shamshatoo refugee camps just outside of Peshawar. Hamad admitted that Khalid Sheikh Mohammed sponsored an education center within the Shamshatoo camp: "This center recruited and indoctrinated 18-30 year old men into the jihad. The center was staffed with experienced Mujahideen. The attendees of the center were referred to as 'The Death Squad.'" Id. at 4. Additional information about the Shamshatoo camp indicated a connection to Gulbudin Hekmatyar: "The Shamshatoo Refugee Camp was known to be operated by Gulbudin Hekmatyar (head of the Hezb-e-Islami Gulbuddin (HIG)) behind the scenes. Reporting indicates that the camp served as a known refuge for Islamic radicals seeking to hide. There is also reporting of a HIG and Al-Qaida meeting occurring at the camp. Furthermore, there is reporting of an Al-Qaida ran training camp just outside of the refugee camp." Id. at 4. On February 19, 2003, the U.S. designated Gulbuddin Hekmatyar as a Specially Designated Global Terrorist for participating in and supporting terrorist acts committed by al-Qaeda. Ex. 192, U.S. Department of State, "Designation of Gulbuddin Hekmatyar as a Terrorist,"

February 19, 2003. The Department of Defense further determined that other detainees with radical links "transited through the Jalozai Refugee Camp, specifically the Hira Institute, where Hamad worked. Detainees associated with the Hira Institute include Lakhdar Boumedien, who also claimed to work at the Institute. Boumedien was a member of a group of Algerian detainees arrested in Bosnia for their involvement in a terrorist plot against the U.S. Embassy in Sarajevo. Boumedien was a close associate of al Qaeda facilitator and detainee Bensayah Belkacem." Id. at 4-5. Another detainee associated with the Hira Institute is Hussein Muhammed Abdullahm, who also worked at the Hira Institute from 1986-1988. Abdullahm was also associated with the Revival Islamic Heritage Society (RIHS) and is the father-in-law of Mohammed Sulaymon Barre, who has links to NGOs with radical ties; Barre was an operator for a terrorist-affiliated money transfer office in Pakistan. Id. at 5. The Department of Defense also determined that Hamad, as an accountant at LDI in the late 1990s, would have been aware of the funding LDI received from bin Laden. Id. at 5. At the time of Hamad's arrest in 2002, the Department of Defense assessed LDI as a Tier 2 NGO that has "demonstrated the intent and willingness to support terrorist organizations willing to attack US persons or interest." Id. at 5. The assessment was based in part on evidence that in June 1997 LDI official Ahmed Barakat and other NGOs met with bin Laden in "Kandahar, Afghanistan (AF) to discuss monetary contributions and possible relocation of UBL to Mali from Afghanistan for his safety. UBL agreed to donate $6 million US dollars and two vehicles to be used as ambulances to the Pakistani and Afghan NGOs represented in the meeting." Hamad has admitted that Barakat was a coworker for about six years. Id. at 5. Hamad has further admitted that while at WAMY he drove ambulances to pick up supplies and pay salaries for employees. The Department of Defense was aware that LDI vehicles and warehouses were used to store and transfer weapons and supplies to Taliban and mujahideen in the late 1990s. Id. at 5. Hamad was arrested with Mammar Ameur, another WAMY employee identified as an al Qaeda facilitator who

traveled extensively throughout the Middle East. Detainee Abdirashid Aidid Ahmed further identified Hamad by his alias "Abu Dujana al Sudani." Ahmed is a known Somali Al-Qaida courier, who was employed with Al Haramayn and was operating out of Pakistan around the same time frame Hamad was working with WAMY. Hamad also acknowledged knowing several individuals associated with the Revival Islamic Heritage Society (RIHS), which, like WAMY, was identified as "having demonstrated sustained and active support for terrorist organizations willing to attack US persons or interests." Id. at 5-6, 6-7. One of Hamad's acquaintances at RIHS was director Abdul Muhsin Al Libi, a known bin Laden associate. Id. at 7. The Department of Defense concluded that: "Detainee [Hamad] is an Islamic extremist with ties to LDI, WAMY, the Muslim Brotherhood and likely Al Gamaat Al Islamiyaa (a radical offshoot from the Muslim Brotherhood), and possibly Al-Qaida and or the Taliban. Although the detainee has not admitted to it, it is suspected that he assisted extremists entering and exiting Afghanistan and Pakistan. It is suspected that the detainee also assisted in the facilitation of money and supplies between Al-Qaida and fighters based on the various positions he held during his 20-year employment tenure within the NGOs." Id. at 7. A genuine dispute of material fact exists.

**STATEMENT:**

248. No sanctions regime or government entity has designated Hamad, before or after WAMY employed him. Ex. 117.

**RESPONSE:**

Undisputed that no sanctions regime or government entity has formally designated Hamad; Plaintiffs contend, however, that the absence of a formal designation does not establish that Hamad did not engage in support activities for terrorists or extremist networks. Many individuals and organizations who facilitate or assist terrorist organizations are never formally designated, and

designation decisions often reflect security and political considerations rather than the full scope of an individual's conduct. Accordingly, Hamad's lack of designation does not rebut the evidence of his support activities. Ex. 192, February 1, 2021 Expert Report of Jimmy Gurulé ("Gurulé Expert Report") 7-8; Ex. 74, Winer Expert Report 125, 130-131. Plaintiffs repeat and incorporate their response to Defendant's ¶ 247. A genuine dispute of material fact exists.

**STATEMENT:**

249. Hamad started work with WAMY in 2000 as a hospital administrative manager, under the supervision of Dr Najib in Chamkani, Afghanistan. Ex. 18 at ¶19 ("Another WAMY project was a hospital established by LBI in the Paktika [sic] Province in Afghanistan"), at ¶28 (Mr. Hamad was an administrative manager for the WAMY hospital from May 19, 2000 to May 7, 2002"); Ex. 147 at ¶¶13-14 (discussing Najib and his duties as manager of the hospital); Ex. 143 (report on WAMY office and Chamkani hospital); Ex. 150 (Hamad Employment contract); Ex. 152, WAMYSA E001084 (Letter from Ibrahim Anwar recounting Hamad employment and pay).

**RESPONSE:**

Undisputed that Hamad served as an administrative manager at Chamkani Hospital from 2000 to 2002 under Dr. Najib; disputed, however, is the extent to which Defendant implies this establishes that he was not also engaged in support activities. Hamad's administrative role at a WAMY-affiliated hospital does not establish that he was not also engaged in support activities. Indeed, Hamad and other terrorist supporters needed cover roles in ostensibly humanitarian or administrative positions to assist extremists or facilitate their operations. The record confirms that terrorists routinely use humanitarian or charity work as cover for funding, travel, and material support: "In addition, beginning in or around 1988, Usama Bin Laden and al Qaeda received

funding from various non-governmental organizations, and relied on various non-governmental organizations including charitable organizations to transfer money and provide cover for traveling al Qaeda members and associates." Ex. 50, Second Superseding Indictment, *U.S. v. Arnaout*, 02 CR 892 (Jan. 22, 2003) at 3. Plaintiffs repeat and incorporate their response to Defendant's ¶ 247. A genuine dispute of material fact exists.

**STATEMENT:**

250. WAMY renovated this already well-established hospital in 1989 and operated it for ten years to provide healthcare to the people of the Chamkani district and the neighboring Paktia province. Ex. 94 at WAMYSA038629-630 (Chamkani hospital report); Ex. 18 at ¶19 (after ten years of doing so, WAMY stopped operating the hospital due to budgetary restriction).

**RESPONSE:**

Undisputed that WAMY renovated the hospital and operated it; disputed, however, is the extent to which Defendant implies this establishes that Hamad or WAMY was not also engaged in support activities. Renovating and operating a WAMY-affiliated hospital does not establish that Hamad or WAMY was not also engaged in support activities. Indeed, Hamad and other terrorist supporters needed cover roles in ostensibly humanitarian or administrative positions to assist extremists or facilitate their operations. The record confirms that terrorists routinely use humanitarian or charity work as cover for funding, travel, and material support: "In addition, beginning in or around 1988, Usama Bin Laden and al Qaeda received funding from various non-governmental organizations, and relied on various non-governmental organizations including charitable organizations to transfer money and provide cover for traveling al Qaeda members and associates." Ex. 50, Second Superseding Indictment, *U.S. v. Arnaout*, 02 CR 892 (Jan. 22, 2003) at 3. Plaintiffs repeat and incorporate their response to Defendant's ¶ 247. A genuine dispute of material fact exists.

**STATEMENT:**

251. The Chamkani district hospital ("Al-Nadwah hospital") apparatus includes: two ambulances, staff of 40 including a medical doctor, a surgeon, gynecologist, medical officers, technicians, and administrator that cared after male, female, and pediatric wards. Ex. 94 at WAMYSA038631-632 (Chamkani hospital renamed "Abdul Mohsin bin Abdul Aziz KSA"); Ex. 144 (LBI health sector report); Ex. 145 (report discussing Chamkani); Ex. 152 (Anwar letter noting name as Al-Nadwah).

**RESPONSE:**

Undisputed that the Chamkani Hospital would include staff and equipment necessary to offer healthcare services. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 249-251. A genuine dispute of material fact exists.

**STATEMENT:**

252. The Al-Nadwah hospital staffed workers in the outpatient department, internal department (surgical, Obgyn, pediatric, x-ray, ultrasound, lab, major operations), pharmacy department as well as personnel that worked with UNICEF. Ex. 147 at ¶18; Ex. 94 at WAMYSA038631-632 (Chamkani hospital report highlighting departments).

**RESPONSE:**

Undisputed that the Al-Nadwah surgical hospital would include staff and equipment necessary to provide medical services and assistance to Afghan refugees. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247-251. A genuine dispute of material fact exists.

**STATEMENT:**

253. As a hospital administrator at Al-Nadwah's surgical hospital, Hamad provided medical and food aid to refugees in Afghanistan, administered a 24-hour medical care facility ran a gynecology, surgical, dental, pediatric, x-ray and ultra sound department, entered into contracts with World Health Organization and World Food Program to obtain medical care and food, followed up with work orders and liaised with UNHCR and WHO personnel that visited the hospital. Ex. 147 at ¶11-18; Ex. 18 at ¶19 (WAMY "provided healthcare for women, surgery, preventive care and general medicine); Ex. 94 at WAMYSA038629 (WAMY Chamkani Report discussing department in hospital); Ex. 4 at 126:2-128:19 (discussing Hamad aid distribution duties and a "normal employee," "a clerk"); Ex. 151 at WAMYSA571179-180 (Summarized unclassified statement of Adel Hamad referring to self as a "simple employee [] not capable of supporting terrorists financially…").

**RESPONSE:**

Undisputed that Hamad provided medical and food aid in his capacity with WAMY. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247-251. A genuine dispute of material fact exists.

**STATEMENT:**

254. Hamad was known as "humble, peaceful man devoted to his family." Ex. 18 at ¶29.

**RESPONSE:**

Undisputed that Hamad may have been regarded as a "humble, peaceful man devoted to his family"; disputed, however, to the extent Defendant offers this to show he was not engaged in support activities. Personal character assessments of this nature do not establish that an individual was not otherwise engaged in support activities. Evidence in the record placed Hamad in and around al Qaeda associates and Islamic extremists. Defendant's reliance on subjective character

descriptions does not rebut the evidence indicating that Hamad, like other WAMY personnel, participated in or facilitated support activities for terrorist actors. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247-251. A genuine dispute of material fact exists.

**STATEMENT:**

255. In 2000, Dr. Najibullah increased Adel Hamad's salary due to a positive performance review. Ex. 153, WAMYSA056757 (December 2000 letter approving wage increase).

**RESPONSE:**

Undisputed that Hamad may have received a salary increase; disputed, however, is the extent to which Defendant offers this to show he was not engaged in support activities. The personnel decision does not establish that an individual was not otherwise engaged in support activities. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247-251. A genuine dispute of material fact exists.

**STATEMENT:**

256. Soon after September 2001, due to insecurity connected to increased violence in the Afghan civil war, Hamad stopped working at WAMY hospital in Chamkani and instead worked at WAMY's office in Peshawar, Pakistan. Ex. 147 at ¶¶23-25.

**RESPONSE:**

Undisputed that after September 2001, Hamad may have moved his work location from Afghanistan to Pakistan; disputed as to the reasons why Hamad left Afghanistan. Hamad testified he left Afghanistan soon after September 2001 because of "military action" and made no mention of an Afghan civil war: "I did so because it was not safe for me due to military action." Ex. 147 at ¶ 24. Defendant has provided no evidence of the "increased violence" related to an Afghan civil

war. Plaintiffs contend that Hamad relocated offices to avoid U.S. military operations that began in October 2001 and targeted al Qaeda and the Taliban. Ex. 4, 9/11 Commission Report 363-364. A genuine dispute of material fact exists.

**STATEMENT:**

257. Other than the funds allotted to him for monthly allowance, for which Hamad provided receipts, Hamad was an administrative clerk with no access to WAMY funds. Ex. 4 at 126:2-8; Ex. 147 at ¶22.

**RESPONSE:**

Disputed. Hamad has admitted that he had access to WAMY funds. He told U.S. forces that part of his administrative duties included driving an ambulance to deliver employees' salaries. Furthermore, at LDI he was an accountant, and it is reasonable to assume that, in his administrative duties, he performed accounting tasks. Decl. of Mohammedi (Dkt. No. 11999), Ex. 157, JTF-GTMO Hamad Detainee Assessment, p. 5. A genuine dispute of material fact exists.

**STATEMENT:**

258. There is no evidence Adel Hamd diverted aid under his control to other parties; his tasks "...were very specific, and they were assigned or destined to hospitals, to schools, food supplies, agricultural programs, and he was committed to these programs. Ex. 4 at 128:20-129:5 (discussing WAMY's findings during an investigating following his detention).

**RESPONSE:**

Undisputed that WAMY's internal review may have concluded that there was "no evidence" Hamad diverted aid under his control and that his assigned tasks related to hospitals, schools, food supplies, and agricultural programs; disputed, however, is the extent to which Defendant offers

this to show he was not engaged in support activities. The absence of diversion identified in a WAMY-conducted investigation does not establish that Hamad was not otherwise engaged in support activities. The record contains evidence linking Hamad to individuals associated with al Qaeda, and numerous individuals who have assisted extremist organizations have simultaneously performed humanitarian or administrative duties. Defendant's reliance on WAMY's internal characterizations of Hamad's job responsibilities does not rebut evidence that WAMY personnel -- including Hamad -- maintained relationships with al Qaeda-connected associates and may have facilitated support activities outside the narrow scope of their formal assignments. A genuine dispute of material fact exists.

**STATEMENT:**

259. In June 2002, still employed with WAMY, Hamad travelled to Sudan with his family to visit his wife's ailing father. Ex. 147 at ¶28-29 (discussing his trip to Sudan); Ex. 152.

**RESPONSE:**

Undisputed that Hamad traveled to see his family in Sudan.

**STATEMENT:**

260. On July 18, 2002, after his return from Sudan, Pakistani forces, abducted Hamad from the second-floor apartment he rented in Peshawar. Ex. 147 at ¶26, 30-31 (discussing his return to Pakistan and his detention); Ex. 152 (Ibrahim Anwar confirming Hamad's travel to Sudan and employment till July 2002); Ex. 154, Col. Lawrence Wilkerson 2020 Declaration. at ¶10(b) (US forces relied on Pakistani forces to apprehend people).

**RESPONSE:**

Undisputed that Hamad was initially detained by Pakistani authorities; disputed, however, that he was unlawfully abducted.

**STATEMENT:**

261. After his abduction, Hamad would spend the next six and a half months imprisoned in Pakistan, then detained for some time at the U.S. air base in Bagram, Afghanistan. Ex. 147 at ¶32.

**RESPONSE:**

Undisputed that Hamad was initially detained by Pakistani authorities and transferred to U.S. authorities; disputed, however, that Hamad was unlawfully detained. A genuine dispute of material fact exists.

**STATEMENT:**

262. At Bagram, guards tortured Hamad, including by hanging and electric shock, nearly killing him. Ex. 147 at ¶32.

**RESPONSE:**

Undisputed that Hamad has alleged he was tortured at Bagram, including hanging and electric shock; disputed, however, to the extent Defendant's assertion shows he was not engaged in support activities. A detainee's report of mistreatment does not establish that he was not otherwise engaged in support activities or associated with extremist actors. Allegations of abuse -- whether true or not -- do not negate the record of evidence linking Hamad to individuals associated with al Qaeda or demonstrating his involvement in WAMY operations in regions where extremist networks were active. Defendant's reliance on Hamad's claimed mistreatment does not rebut the evidence that WAMY personnel, including Hamad, maintained relationships with al Qaeda-connected actors and may have facilitated support activities independent of the circumstances of his detention. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247, 257. A genuine dispute of material fact exists.

**STATEMENT:**

263. Hamad was offered release from Bagram if he paid back the ransom agents paid Pakistani authorities for his capture but could not get the money. Ex. 147 at ¶34-35 (discussing his inability to secure his release).

**RESPONSE:**

Undisputed that Hamad has alleged he was offered release from Bagram if he repaid money agents purportedly paid Pakistani authorities for his capture, and that he was unable to secure those funds; disputed, however, to the extent this is offered to establish he lacked connections to al-Qaeda-associated individuals. Allegations of extortion or coercive demands during detention do not establish that Hamad lacked connections to al-Qaeda-associated individuals or that he was not otherwise engaged in support activities. Detainees may face coercion, abuse, or improper demands and still maintain relationships with extremist actors or facilitate their operations. Defendant's reliance on the circumstances surrounding Hamad's attempted release does not rebut the record evidence linking Hamad to individuals associated with al Qaeda or demonstrating his involvement in WAMY operations in regions where extremist networks were active. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247, 257. A genuine dispute of material fact exists.

**STATEMENT:**

264. In 2003 Bagram transferred Hamad to the detention facility in Guantanamo Bay, Cuba ("Guantanamo"). Ex. 147 at ¶32.

**RESPONSE:**

Undisputed that Hamad was transferred to the detention facility at Guantanamo Bay, Cuba.

**STATEMENT:**

265. Hamad spent the next four years (2003 – 2007) at Guantanamo until U.S. authorities finally repatriated him to Sudan in 2007, where he now lives peacefully with his wife and five daughters. Ex. 147 at ¶36; Ex. 155, WAMYSA571217 (repatriation letter from Sudan).

**RESPONSE:**

Undisputed that Hamad was detained at Guantanamo from 2003 to 2007 and was ultimately repatriated to Sudan, where he now resides with his family; disputed, however, to the extent this is offered to establish he lacked connections to al-Qaeda-associated individuals. A detainee's release or subsequent peaceful life does not establish that he lacked connections to al-Qaeda-associated individuals or that he was not otherwise engaged in support activities. Many individuals with documented ties to extremist actors have been repatriated or released for diplomatic or policy reasons unrelated to a determination of innocence. Defendant's reliance on Hamad's repatriation and current circumstances does not rebut the record evidence linking him to individuals associated with al Qaeda or demonstrating his involvement in WAMY operations in regions where extremist networks were active. Plaintiffs repeat and incorporate their responses to Defendant’s ¶¶ 247, 257. A genuine dispute of material fact exists.

**STATEMENT:**

266. While working for WAMY, Hamad did not knowingly communicate with any al-Qaeda member or terrorist, nor did he know WAMY to do so. Ex. 147 at ¶36 (discussing his and WAMY’s non-contact with terror groups).

**RESPONSE:**

Disputed. Plaintiffs dispute Hamad's self-serving statements. The record contains evidence that Hamad had ties to al Qaeda and Islamic extremists while working at LDI and WAMY. Plaintiffs

repeat and incorporate their responses to Defendant's ¶¶ 247-251. A genuine dispute of material fact exists.

**STATEMENT:**

267. About WAMY, Hamad states: "I never knew WAMY to have any connection with or give any support to Al Qaeda. No one that I ever worked with at the WAMY run hospital was not a legitimate worker. As far as the people that I worked with while with WAMY, no one was using WAMY as a cover to conduct any terrorist activity. Everyone did the jobs they were supposed to and everyone seemed to be a legitimate employee. I knew every single employee at the hospital. There were not a lot of employees. Ther were approximately forty employees. All of the employees had legitimate jobs and positions." Ex. 147 at ¶41.

**RESPONSE:**

Disputed. Plaintiffs dispute Hamad's personal impressions and self-serving statements, which do not establish that WAMY personnel were not otherwise engaged in support activities or that WAMY lacked connections to al-Qaeda-associated individuals. Evidence in the record shows that Hamad's statements to U.S. forces followed an Al-Qaeda counter-interrogation cover story. Decl. of Mohammedi (Dkt. No. 11999), Ex. 157, JTF-GTMO Hamad Detainee Assessment, p. 4. Numerous individuals who have assisted extremist organizations have simultaneously maintained benign reputations, including through work at charities and relief organizations. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247, 257. A genuine dispute of material fact exists.

**STATEMENT:**

268. At all times during his employ with WAMY, Hamad always knew WAMY to be "a charity organization that works to help the Afghan refugees providing them with food, medicine, clothes, and education, building charter schools which is made [for] and orphanage, educational training, and also works in the health department by establishing hospitals, small clinics, and also digging waters wells, building mosques, [for]the Afghan refugees." Ex. 151 at_WAMYSA571178 (Summarized unclassified statement of Adel Hamad).

**RESPONSE:**

Disputed. Plaintiffs dispute Hamad's subjective characterization of WAMY's charitable mission. Hamad's subjective statements do not establish that WAMY personnel were not otherwise engaged in support activities or that WAMY lacked connections to al-Qaeda-associated individuals. Evidence in the record shows that WAMY personnel engage in supportfor terrorist organizations and Islamic extremists. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3, 14, and 247-251. A genuine dispute of material fact exists.

**STATEMENT:**

*i. _Adel Hamad's wrongful arrest and detention is consistent with the cases of others who were wrongfully detained on unfounded terrorism related allegations_*

**RESPONSE:**

Disputed. Characterization of Hamad's detention experience does not establish that Hamad lacked connections to al Qaeda or other terrorists, or that he was not otherwise engaged in support activities. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247, 257. A genuine dispute of material fact exists.

**STATEMENT:**

269. Lawrence B. Wilkerson, a retired Colonel of the United States Army, has personal knowledge of the circumstances surrounding post-9/11 detention and repatriation of individuals later detained at Guantanamo. Ex. Col. Lawrence Wilkerson 2010 Declaration at ¶4 (discussing employment with US Army), ¶7-9 (discussing knowledge of detention and repatriation). Ex. 154 at ¶¶8-10 (knowledge of detention and repatriation).

**RESPONSE:**

Undisputed that retired Colonel Lawrence B. Wilkerson has general knowledge of post-9/11 detention and repatriation practices; disputed, however, to the extent Defendant offers his testimony as to Hamad specifically. Col. Wilkerson has no personal knowledge of Hamad, his activities, or the specific allegations concerning his connections to al-Qaeda-associated individuals. Any understanding of Hamad and his experience as a detainee was conveyed to Col. Wilkerson: "I am informed that Mr. Hamad has stated that he was an innocent man wrongfully detained by Pakistani and U.S. forces in Pakistan and later subjected to physical mistreatment at Bagram Airbase in Afghanistan, and that he was then transferred to the Guantanamo Bay detention facility. I understand that Mr. Hamad was detained for over five and a half years before finally being transferred to Sudan subject to a conditional transfer agreement." Decl. of Mohammedi (Dkt. No. 11999), Ex. 154, Col. Lawrence Wilkerson 2020 Declaration at 2. General observations about detention policy do not establish that Hamad lacked such connections to al Qaeda or other terrorists, or that he was not otherwise engaged in support activities. A genuine dispute of material fact exists.

**STATEMENT:**

270. Col. Wilkerson had the highest level of access to classified documents and "as a senior official of the State Department from 2002-2005," routinely attended former "Secretary of State Powell's morning briefing" during that period. Ex. 154 at ¶6-7.

**RESPONSE:**

Undisputed that Col. Wilkerson served as a senior official at the State Department and that he had the highest level of access to classified documents; Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247 and 269, and reiterate that Col. Wilkerson had no independent, direct knowledge of Hamad or the allegations against Hamad, and cannot speak to Hamad's connections to al-Qaeda or the support provided to terrorists. A genuine dispute of material fact exists.

**STATEMENT:**

271. At these meetings, where "50 to 55 senior State Department officials" were present, the Secretary of State discussed Guantanamo detainees and questioned officials on "information about specific progress in negotiating detainee releases. Id. at ¶8.

**RESPONSE:**

Undisputed that meetings at the State Department "discussed Guantanamo detainees and questioned officials on 'information about specific progress in negotiating detainee releases'"; Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247 and 269, and reiterate that Col. Wilkerson had no independent, direct knowledge of Hamad or the allegations against Hamad, and cannot speak to Hamad's connections to al-Qaeda or the support provided to terrorists. A genuine dispute of material fact exists.

**STATEMENT:**

272. During these meeting and other official duties – including his investigations into the Abu Ghraib prison - Col. Wilkerson learned the details around detainee capture and treatment. Id. At ¶¶6-13.

**RESPONSE:**

Undisputed that during meetings at the State Department Col. Wilkerson learned "the details around detainee capture and treatment," including the investigation into Abu Ghraib prison; Plaintiffs dispute any assertion implying that Hamad was interned at Abu Ghraib prison. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247 and 269, and reiterate that Col. Wilkerson had no independent, direct knowledge of Hamad or the allegations against Hamad, and cannot speak to Hamad's connections to al-Qaeda or the support provided to terrorists. A genuine dispute of material fact exists.

**STATEMENT:**

273. In August 2002, just a month after Hamad's capture in Pakistan, Col. Wilkerson learned from his interaction with military and foreign service personnel that many of the detainees in Guantanamo were, in fact, "victims of incompetent battlefield vetting." Id. at ¶10(a).

**RESPONSE:**

Undisputed that Col. Wilkerson "learned from his interaction with military and foreign service personnel that many of the detainees in Guantanamo were, in fact, 'victims of incompetent battlefield vetting'"; disputed, however, to the extent this is offered as to Hamad. The timing or nature of Col. Wilkerson's general observations about detention practices does not support the specific circumstances of Hamad's detention and alleged treatment. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247 and 269, and reiterate that Col. Wilkerson had

no independent, direct knowledge of Hamad, his activities, or the allegations concerning his connections to al-Qaeda-associated individuals. Col. Wilkerson's broad commentary on post-9/11 detention policy cannot speak to whether Hamad engaged in support activities or maintained relationships with extremist actors. A genuine dispute of material fact exists.

**STATEMENT:**

274. Many detainees were turned over for the wrong reasons, particularly for bounties and other incentives. Id. at ¶10(b).

**RESPONSE:**

Undisputed that Col. Wilkerson may believe "[m]any detainees were turned over for the wrong reasons, particularly for bounties and other incentives"; disputed, however, that Col. Wilkerson's observations about detention practices support the specific circumstances of Hamad's detention and alleged treatment. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247 and 269, and reiterate that Col. Wilkerson had no independent, direct knowledge of Hamad, his activities, or the allegations concerning his connections to al-Qaeda-associated individuals. Col. Wilkerson's broad commentary on post-9/11 detention policy cannot speak to whether Hamad engaged in support activities or maintained relationships with extremist actors. A genuine dispute of material fact exists.

**STATEMENT:**

275. Many of the prisoners in Guantanamo had been taken into custody without regard to whether they were truly enemy combatants, or in fact whether many of them were enemies at all. Id. at ¶10(a).

**RESPONSE:**

Undisputed that Col. Wilkerson may believe that "[m]any of the prisoners in Guantanamo had been taken into custody without regard to whether they were truly enemy combatants"; disputed, however, to the extent this is offered as to Hamad. Col. Wilkerson's general observations about detainee vetting do not rebut the specific allegations concerning Hamad. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247 and 269, and reiterate that Col. Wilkerson had no independent, direct knowledge of Hamad, his activities, or the allegations regarding his connections to al-Qaeda-associated individuals. Col. Wilkerson's commentary on post-9/11 detention policy cannot speak to whether Hamad engaged in support activities or maintained relationships with Islamic extremists. A genuine dispute of material fact exists.

**STATEMENT:**

276. There was no meaningful way to determine whether detainees were terrorists, Taliban, or simply innocent civilians picked up on a very confused battlefield or in the territory of another state such as Pakistan. Id.

**RESPONSE:**

Disputed to the extent offered as to Hamad. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247, 269, and 275, and reiterate that Col. Wilkerson had no independent, direct knowledge of Hamad, his activities, or the allegations regarding his connections to al-Qaeda-associated individuals. Col. Wilkerson's commentary on post-9/11 detention policy cannot speak to whether Hamad engage in support activities or maintained relationships with Islamic extremists. A genuine dispute of material fact exists.

**STATEMENT:**

277. The U.S. government deliberately spirited detainees like Hamad away to Guantanamo in order to "place them outside the jurisdiction of the U.S. Legal system," but not because they were in fact guilty of any wrongdoing. Ex. 154 at ¶¶9(c), 11(a-d); Ex. 156, Col. Lawrence Wilkerson 2010 Declaration at ¶¶10(c), 12(a-d) (both references discussing how prisoners whose wrongdoing had never been determined were simply sent to Guantanamo for holding).

**RESPONSE:**

Undisputed that Col. Wilkerson holds opinions about the U.S.'s post-9/11 detention policy; disputed, however, to the extent offered as to Hamad. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247, 269, and 275, and reiterate that Col. Wilkerson had no independent, direct knowledge of Hamad, his activities, or the allegations regarding his connections to al-Qaeda-associated individuals. Col. Wilkerson's commentary on post-9/11 detention policy cannot speak to whether Hamad engage in support activities or maintained relationships with Islamic extremists. A genuine dispute of material fact exists.

**STATEMENT:**

278. Many Guantanamo detainees were innocent, or at a minimum their guilt was impossible to determine let alone prove in any court of law, civilian or military. Ex. 154 at ¶10(d).

**RESPONSE:**

Undisputed that Col. Wilkerson may believe that "[m]any Guantanamo detainees were innocent, or at a minimum their guilt was impossible to determine, let alone prove in any court of law, civilian or military"; disputed, however, that Col. Wilkerson's general views on detainee innocence or guilt rebut the specific allegations concerning Hamad. Plaintiffs repeat and

incorporate their responses to Defendant's ¶¶ 247 and 269, and reiterate that Col. Wilkerson had no independent, direct knowledge of Hamad, his activities, or the allegations regarding his connections to al-Qaeda-associated individuals. Col. Wilkerson's views on detainee innocence or guilt cannot speak to whether Hamad engage in support activities or maintained relationships with Islamic extremists. A genuine dispute of material fact exists.

**STATEMENT:**

279. While Mr. Hamad was brought to Guantanamo after August 2002, there is no reason to believe that any more thorough process was used to determine whether his seizure or transfer to Guantanamo was justified. Id. at ¶11.

**RESPONSE:**

Disputed. The record includes sufficient evidence related to Hamad, his work, and his connections to al Qaeda associates that demonstrated: "Detainee [Hamad] is an Islamic extremist with ties to LDI, WAMY, the Muslim Brotherhood and likely Al Gamaat Al Islamiyaa (a radical offshoot from the Muslim Brotherhood), and possibly Al-Qaida and or the Taliban. Although the detainee has not admitted to it, it is suspected that he assisted extremists entering and exiting Afghanistan and Pakistan. It is suspected that the detainee also assisted in the facilitation of money and supplies between Al-Qaida and fighters based on the various positions he held during his 20-year employment tenure within the NGOs." Decl. of Mohammedi (Dkt. No. 11999), Ex. 157, JTF-GTMO Hamad Detainee Assessment, p. 7. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247 and 269, and reiterate that Col. Wilkerson had no independent, direct knowledge of Hamad, his activities, or the allegations regarding his connections to al-Qaeda-associated individuals. Col. Wilkerson's general views on detainee investigations cannot

speak to whether Hamad engaged in support activities or maintained relationships with Islamic extremists. A genuine dispute of material fact exists.

**STATEMENT:**

280. Hamad's capture and torture is consistent with the experience of other innocent people Afghan and Pakistani forces abducted at a ransom of "$5000 per head." Id. at ¶9(b), 10, 11(a-c); Ex. 156 at ¶¶10(b), 11, 12(a-c).

**RESPONSE:**

Undisputed that Col. Wilkerson believes that "Hamad's capture and torture is consistent with the experience of other innocent people Afghan and Pakistani forces abducted" for money; disputed, however, that Col. Wilkerson's general views on the practices of detainee arrests and alleged mistreatment in detention rebut the specific allegations concerning Hamad. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 247 and 269, and reiterate that Col. Wilkerson had no independent, direct knowledge of Hamad, his activities, the allegations regarding his connections to al-Qaeda-associated individuals, Hamad's capture, or treatment in detention. Col. Wilkerson's views on detainee arrests and detention cannot speak to whether Hamad engage in support activities or maintained relationships with Islamic extremists. A genuine dispute of material fact exists.

**STATEMENT:**

*ii. _No reliable evidence related to Adel Hamad establishes WAMY provided any support, directly or indirectly, to al-Qaeda_*

**RESPONSE:**

Disputed. "Detainee [Hamad] is an Islamic extremist with ties to LDI, WAMY, the Muslim Brotherhood and likely Al Gamaat Al Islamiyaa (a radical offshoot from the Muslim Brotherhood), and possibly Al-Qaida and or the Taliban. Although the detainee has not admitted to it, it is suspected that he assisted extremists entering and exiting Afghanistan and Pakistan. It is suspected that the detainee also assisted in the facilitation of money and supplies between Al-Qaida and fighters based on the various positions he held during his 20-year employment tenure within the NGOs." Decl. of Mohammedi (Dkt. No. 11999), Ex. 157, JTF-GTMO Hamad Detainee Assessment, p. 7. Plaintiffs repeat their responses to Defendant's ¶¶ 247, 257. A genuine dispute of material fact exists.

**STATEMENT:**

281. In Hamad's March 2005 detainee assessment (Joint Task Force Guantanamo Ex. 157, JTF-GTMO Hamad Detainee Assessment; Ex. 158, FED-PEC0197473.

**RESPONSE:**

Undisputed to the limited extent the statement is comprehensible: Plaintiffs agree that Hamad was a detainee at Guantanamo Bay, Cuba, and that a threat assessment of Hamad was conducted. Otherwise, Defendant's assertion is unclear.

**STATEMENT:**

282. "Tier 1 NGOs are defined as having a demonstrated sustained and active support for terrorist organizations willing to attack US persons or interests." Id. (Hamad June 2005 Assessment).

**RESPONSE:**

Undisputed that the U.S. government applied a threat matrix to evaluate NGOs for their roles in supporting terrorists, defining a "Tier One NGO" as an organization that has "demonstrated sustained and active support for terrorist organizations willing to attack US persons or interests." Ex. 112, Kohlmann 2020 Rpt. ¶¶158-159; Ex. 74, Winer Rpt. § 12.10.3 (citing Ex, 105, U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) (Jun. 28, 2006); Decl. of Mohammedi (Dkt. No. 11999), Ex. 157, JTF-GTMO Hamad Detainee Assessment; Ex. 119, Ex. 227, Set 52_3643-3869 at 37; Decl. of Mohammedi (Dkt. No. 11999), Ex. 159, FED-PEC0216815. A genuine dispute of material fact exists.

**STATEMENT:**

283. However, the Tier 1 classification process is not adversarial, does not involve due process and is not challengeable. Ex. 31 at 201:6-203:23 (conceding that a “Tier 1 NGO” classification is the result of a no due process, non-adversarial, and non-challengeable administrative process).

**RESPONSE:**

Disputed. Plaintiffs object that the evidence cited by Defendant (Decl. of Mohammedi (Dkt. No. 11997), Ex. 31, Jonathan Winer Dep. Transcript Excerpts) appears incomplete and mixes testimony from different proceedings. Assuming Defendant is relying on Jonathan Winer's July 13, 2021 deposition at 201:6-203:23, Plaintiffs dispute the claim that a Tier 1 classification is unreliable simply because the process is non-adversarial. As Plaintiffs' expert explained, Tier 1 classifications are still reliable indicators of government risk assessments. The Threat Matrix and Tiering system is a structured review used to evaluate intelligence priorities and organizational risk based on available intelligence, operational history, and known associations. Ex. 180, Winer Rebuttal Report, pp. 49-50 (describing WAMY and IIRO Tier I designations as an "accurate

statement of the U.S. government's view of WAMY" and IIRO); Ex. 193 Winer Deposition 201:15-24 (explaining that national-security designations typically undergo extensive legal review across multiple agencies). Although Tier 1 designations do not include notice or an opportunity to challenge them, many national-security assessments -- such as watchlisting and vetting -- operate the same way and are still relied on for their accuracy. A Tier 1 designation reflects the government's consolidated judgment, based on both classified and open-source information, that an organization presents elevated security concerns. Ex. 193, Winer Deposition, 199:6-13 ("The way in which the U.S. government works, when it talks about something like a Tier 1 NGO, and its definition, or a statement about an organization like WAMY in connection with Guantanamo is it's taking essentially a summary of findings, which can be at various levels of certainty, but are finding that someone is a Tier 1 NGO, it has a particular national security implication."). The lack of an adversarial process does not diminish its value as evidence of risk, associations, or the context in which Defendant's activities were evaluated. A genuine dispute of material fact exists.

**STATEMENT:**

284. A Tier 1 NGO label is based on a summary of findings with varying "levels of certainty;" no certainty level is given in the assessment for DOD labeling WAMY as a "Tier 1 NGO." Ex. 31 at 199:6-13

**RESPONSE:**

Disputed. Plaintiffs argue that information in Hamad's detainee assessment is the type of evidence considered in WAMY's Tier 1 threat assessment. They further assert that labeling WAMY as a Tier 1 threat confirms that sufficient reliable evidence existed to support this classification. A genuine dispute of material fact exists.

**STATEMENT:**

285. No factual basis is given for DOD labeling WAMY as a “Tier 1 NGO." Ex. 158.

**RESPONSE:**

Disputed. Plaintiffs contend that the information in Hamad's detainee assessment is the type of evidence that would factor into WAMY's Tier 1 threat assessment, as would other evidence from detainees and other sources of intelligence. That other evidence is described by the U.S. government to include, among other factors: "Details of the detainee's capture," "combat activities, though support for such activities constitutes participation in hostilities," "detainee's affiliation or membership in an organization," "detainee's membership or affiliation with al-Qaida" and "associated forces," which include "organizations with which al-Qaida, the al-Qaida network, or the Taliban had or has an established working, supportive, or beneficiary relationship for the achievement of common goals. Associated forces are identified in intelligence reports and US government terrorism lists." Those include the Department of State list of designated Foreign Terrorist Organizations (FTOs); Department of State Country Reports on Terrorism, which include the FTO and the Other Groups of Concern list; the Patriot Act Terrorist Exclusion List, also published by the Department of State; the Department of the Treasury Office of Foreign Assets Control Specially Designated Nationals (SDN) list; additional guidance provided by the National Intelligence Priorities Framework (NIPF); and other terrorist organizations, terrorist support entities, and individuals identified in assessments, intelligence reporting, and US Government designated terrorism lists. Decl. of Mohammedi (Dkt. No. 11999), Ex. 159, FED-PEC0216815, at FED-PEC0216819-FED-PEC0216829. Furthermore, the U.S. government has stated: "The following is a list of terrorist and terrorist support entities identified as associate forces. This list is not all inclusive but provides the primary organizations encountered in the

reporting from and about JTF-GTMO detainees. Through associations with these groups and organizations, a detainee may have provided support to al-Qaida or the Taliban, or engaged in hostilities against US or Coalition forces." The list includes "Benevolence International Foundation (Lajnat Al-Bir Al-Islami) NGO [BIF]" and "World Assembly of Muslim Youth NGO [WAMY]." Decl. of Mohammedi (Dkt. No. 11999), Ex. 159, FED-PEC0216815 at FED-PEC0216829-FED-PEC0216831. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3, 14, and 24, noting the evidence of WAMY/LBI's various support for terrorists and statements in support of terrorist causes. A genuine dispute of material fact exists.

**STATEMENT:**

286. Joint Task Force Guantanamo ("JTF-GTMO") detainee assessments are based on (1) the detainee himself provides acknowledgment of a fact; (2) another detainee, document, government, etc. provides an identification of the detainee; and (3) analysis of the detainee's timeline, activities, and association. Ex. 159, FED-PEC0216815 (Matrix of Threat).

**RESPONSE:**

Disputed. Plaintiffs dispute that the U.S. government relies on only three sources of information when assessing a detainee. The government identified a fourth method for obtaining information for a few select detainees: "[a] fourth method may be available for a few select detainees in their SCI addendum, where special intelligence provides more specific information about a detainee." Decl. of Mohammedi (Dkt. No. 11999), Ex. 159, FED-PEC0216815. A genuine dispute of material fact exists.

**STATEMENT:**

287. The JTF-GTMO assessments often contain “unreliable information” as they are the product of torture and inaccurate information and because “[d]etainees also have a strong motivation to implicate other prisoners in hopes of better treatment [as] some who provide information received comfort items and preferential treatment”). Ex. 160, Human Rights First (HRF) December 2016 Fact Sheet.

**RESPONSE:**

Disputed. Plaintiffs dispute Defendant's assertion that any "unreliable information" renders all information inaccurate. The U.S. Government advised that threat indicators are used in assessments in concert with each other and need to be read in the context in which they are placed within an assessment: "While some individual indicators may be sufficient alone to provide an accurate assessment of the detainee's threat, others may require additional indicators or multiple occurrences of the same indicator for reliability and confidence. In all, the indicators are designed to point to the threat a detainee would pose if he were to be released from custody, and the intelligence that a detainee potentially possesses, not as evidence to prove a detainee's guilt or innocence." Decl. of Mohammedi (Dkt. No. 11999), Ex. 159, FED-PEC0216815. A genuine dispute of material fact exists.

**STATEMENT:**

288. Information obtained through torture is unreliable and should not form the basis of any expert opinion. Ex. 31 at 440:16-18 (Plaintiffs’ expert Winer agrees that “...torture is something that the United States government should ever have anything to do with, period nonstop.”); at 438-13-439:1 (Winer finds information derived from torture as unreliable and rejects torture “across the board”).

**RESPONSE:**

Undisputed that information obtained through torture can be unreliable; disputed, however, that Defendant's assertion accurately reflects the record. Plaintiffs' expert did not base any opinion on statements derived from torture. His analysis relies on independent intelligence reporting, organizational records, and corroborated government assessments -- not coerced statements. The expert's rejection of torture "across the board" simply confirms that such material was not used and does not undermine the reliability of the opinions actually offered in this case: "The question is whether the abusive interrogations taint all documentation from Guantanamo, so that none of it should be relied on for any purpose whatsoever. Sageman takes this position. My view is that one needs to look carefully at the particular documents and the particular case and assess them. It is appropriate to rely, as I have here, on U.S. government documents when the information in them reflects an assessment made by a U.S intelligence agency of the status of an organization as a terrorist financier, based on all-source intelligence and evidence." Ex. 180, Winer Rebuttal Report 49. A genuine dispute of material fact exists.

**STATEMENT:**

**C. WAMY Int'l and WAMY Canada.**

**RESPONSE:**

No response necessary.

**STATEMENT:**

1. WAY Int'l's First Volunteer, Abdullah Bin Ladin, is Not Evidence of Any Support, Direct or Indirect, of al-Qaeda

**RESPONSE:**

Disputed. See Plaintiffs' responses to ¶¶ 289-294. A genuine dispute of material fact exists.

**STATEMENT:**

289. In 1991, Abdullah Bin Ladin ("ABL") incorporated WAMY-USA in the Commonwealth of Virginia. Ex. 161, Abdullah Bin Ladin 2005 Declaration at ¶6 (discussing the establishment of WAMY-USA in 1991 in Virginia); Ex. 162, WAMY Intl E00718-720 (WAMY-International Articles of Incorporation – Section Eighth).

**RESPONSE:**

Undisputed that Abdullah Bin Ladin incorporated WAMY-USA in Virginia on or about 1991.

**STATEMENT:**

290. ABL worked as a volunteer for WAMY-USA; he had no knowledge about WAMY's offices in Pakistan, the Balkans, Australia or Asia. Ex. 161 at ¶6-7.

**RESPONSE:**

Disputed. Plaintiffs dispute that ABL "had no knowledge about WAMY's offices in Pakistan, the Balkans, Australia or Asia." The record shows ABL, as WAMY's North American representative, was expected to attend WAMY board meetings where WAMY global operations were discussed. Decl. of Mohammedi (Dkt. No. 11997), Ex. 8, WAMYSA051643-654 at WAMYSA051644. Plaintiffs further contend ABL was an employee of the Saudi Government attached to the Saudi Embassy in Washington, D.C. Ex. 194, FED-PEC0108836-FED-PEC01088369, Decl. of Mohammedi (Dkt. No. 11999), Ex. 161, Abdullah Bin Ladin 2005 Declaration, ¶ 6. Accordingly, the Saudi government paid ABL. A genuine dispute of material fact exists.

**STATEMENT:**

291. ABL left WAMY in 1999 and has lived in Saudi Arabi since then. Id. at ¶4 (discussing being in Saudi prior to event of 9/11); Ex. 163, Ibrahim Abdullah 2018 Declaration at ¶5 (Abdullah taking over in 1999).

**RESPONSE:**

Disputed. ABL testified that he left the U.S. in September 2000 and has lived in Jeddah, Saudi Arabia, since then. Ex. 194, FED-PEC0108836-FED-PEC01088369, Decl. of Mohammedi (Dkt. No. 11999), Ex. 161, Abdullah Bin Ladin 2005 Declaration, ¶ 3. ABL has not testified (at ¶ 5 or elsewhere) in his declaration that he left WAMY-USA in 1999. A genuine dispute of material fact exists.

**STATEMENT:**

292. ABL is the half-nephew of Osama Bin Ladin (OBL), whom ABL had not seen since about 1990 and has no other connection to OBL in this matter. Ex. 161 at ¶2. (in 2005 affidavit discussing not seeing OBL in 15 years).

**RESPONSE:**

Undisputed that ABL is the half-nephew of Osama bin Laden; Plaintiffs do not dispute that ABL has testified that he had not seen his half-uncle for about 15 years. A genuine dispute of material fact exists.

**STATEMENT:**

293. ABL has never provided material support or any support to al-Qaeda or any terrorist organization, nor does he know WAMY to have done the same. Ex. 161 at ¶¶8, 11.

**RESPONSE:**

Disputed. The record includes evidence that WAMY-Canada, which ABL oversaw as part of WAMY-USA, transferred funds to BIF-Canada and BIF. The Canadian government's review found that WAMY-Canada was closely associated with Benevolence International Fund (BIF)-Canada and that it funded the U.S.-based Benevolence International Foundation (BIF-USA). WAMY-Canada's president Mohamed Khatib also served as BIF-Canada's secretary. The audit stated: "BIF-Canada and WAMY shared a common director and contact information"; "BIF-Canada and WAMY shared a Canadian bank account" ("World Assembly of Muslim Youth o/a BIF"); and "WAMY provided funding to BIF-USA," including $50,256 for its Orphan Program. Enaam Arnaout, a co-director of BIF-USA and BIF-Canada, pled guilty to U.S. racketeering charges and admitted BIF financially assisted people involved in overseas violence. Ex. 59, Levitt Rpt. § IV.7, n.96; Ex. 112, Kohlmann 2020 Rpt. 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. 192-193 (citing Ex. 79, CRA Audit and Revocation, FED-PEC 218170-218203 at 175-179, 184-185, 189; Ex. 80, WAMYSA 1745-1768; Ex. 81, WAMYSA 1785; Ex. 82, WAMYSA 1865- 1872; Ex. 83, WAMYSA 1885-1887; Ex. 84, WAMYSA 1889; Ex. 90, WAMYSA 4443). Furthermore, the record contains evidence connecting WAMY USA to al Qaeda and other Islamic terrorists. In addition to WAMY-USA's connections to Anwar al Awlaki, U.S. authorities determined that Ibrahim S. Abdullah, a WAMY USA official, had links to al Qaeda and Hamas. Ex. 206, FBI Report, Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States, Dec. 2004, EO 3414 3442 at 3429. Additional evidence shows that Mohammed Rafique Quadir Harunani, associated with a WAMY chapter in Orlando, was under investigation for ties to WAMY and al Qaeda. Harunani and Abdullah bin Laden, former president of WAMY USA, were linked through Harunani's company Transcom and the Discover Islam project. Ex. 112, FBI Report, Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States, Dec. 2004,

EO 3414 3442 at 3438. U.S. authorities also linked 9/11 hijacker Marwan al Shehhi to Harunani, including a June 2001 instance in which al-Shehhi accompanied Harunani to pick up his children from school in Falls Church, Virginia. Ex. 75, EO 003453 003608 at 003546. Other evidence connected Harunani to 9/11 hijacker Mohammed Atta. Ex. 76, Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001, Part Four, Dec. 2002, at 418. Harunani's company, Transcom International, which provided printing services to WAMY USA received a June 21, 2000 call from a member of the al Qaeda Hamburg, Germany cell. The call is believed to have come from Said Bahaji, a member of the Hamburg al Qaeda cell. Ex. 75, EO 003453 003608 at 003546; Ex. 75, Memo "Updated work plans and detailed list of associates," 9/11 Commission Staff, June 6, 2003, 8, 43, https://www.archives.gov/files/declassification/iscap/pdf/2012-048-doc17.pdf; (confirming Said Bahaji of the Hamburg al Qaeda cell called Transcom in June 2000); Ex. 78, WAMY INTL E001366-E001370 (link to a-Shehhi and call from Hamberg al Qaeda cell); Ex. 77, Oct. 21, 2019 Deposition of Ibrahim Abdullah ("Abdullah Dep.") 113:20 114:16, 117:5 16 (confirming Abdullah Bin Laden and WAMY-USA contracted with Harunani's company.) Further evidence indicates that Abdullah bin Laden had links to six individuals in Portland who attempted to travel to Afghanistan to support the Taliban and al Qaeda. Ex. 112, FBI Report, Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States, Dec. 2004, EO 3414 3442 at 3436. Other information links Abdullah bin Laden and WAMY-USA to the Northern Virginia branch of the Institute of Islamic and Arabic Sciences of America (IIASA). U.S. authorities determined that IIASA was indoctrinating individuals into Islamic extremist causes. Other evidence points to IIASA officials' connections to Islamic terrorists. During a raid on an al Qaeda safehouse, an address was found for an IIASA official who listed IIASA as their employer and Abdullah bin

Laden as their supervisor. Ex. 75, EO 003453-003608 at 003535-003536. Other information indicates that Omar al-Bayoumi, who provided crucial assistance to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar in Southern California and was also in contact with Anwar al-Awlaki, had Abdullah Bin Laden's Saudi Embassy extension number in his address book. Ex.78, EO 003050-EO 003608 at 003518 (Listed in Al-Bayoumi's phone book were the following names and telephone numbers: …Islamic Affairs x240, Abdullah Awaad x241…) A genuine dispute of material fact exists.

**STATEMENT:**

294. This court dismissed all claims against ABL in this MDL action; specifically for Plaintiff's failure to "demonstrate that the claimed wrongful acts of the entity were performed with knowledge and consent of the officer and the officer must have exercised control over the corporation in the transaction." *In re Terrorist Attacks on September 11, 2001*, 718 F. Supp.2d 456, 486 (S.D.N.Y June 17, 2010).

**RESPONSE:**

Disputed. The Court's prior dismissal of claims against ABL does not limit the evidence in this case or bar Plaintiffs from relying on ABL-related facts to show the broader network of support at issue in Defendant's conduct. The ruling addressed corporate-control requirements for ABL's liability, not whether ABL's conduct, relationships, or activities may be considered part of the evidentiary record. Plaintiffs repeat and incorporate their response to Defendant's ¶¶ 289-293. A genuine dispute of material fact exists.

**STATEMENT:**

2. WAMY Int'l's Work and Activities in The United States Does Not Demonstrate Any Support, Direct or Indirect, for al-Qaeda or the Terrorist Attacks of September 11, 2001

**RESPONSE:**

Disputed. See Plaintiffs' responses to ¶¶ 293, 295-300. A genuine dispute of material fact exists.

**STATEMENT:**

295. WAMY International's (WAMY-USA) purpose is to (a) support and foster cooperation and understanding among all humanitarian and Islamic entities, (b) educate Muslims about Islamic thought, (c) promote public dialogue about Islam, and (d) maintain funds. Ex. 162 at WAMY Intl E000718 (WAMY International Articles of Incorporation).

**RESPONSE:**

Undisputed that WAMY-USA publicly described its mission as supporting humanitarian and Islamic organizations, educating Muslims, promoting dialogue, and maintaining funds; disputed, however, is whether these stated goals reflect how the organization operated. Public mission statements reflect what an organization claims to do, not whether it ever used or redirected its activities to support extremists. Evidence in the record shows that WAMY-USA has sponsored organizations affiliated with al Qaeda. Plaintiffs repeat and incorporate their responses to Defendant's ¶¶ 3, 293. A genuine dispute of material fact exists.

**STATEMENT:**

296. WAMY Int'l activities included participating in Islamic conferences, hosting summer youth camps, assisting in the establishment of a Quran society in America, organizing sports and youth activities and publishing a newsletter. Ex. 32 at 61:6-15 (Abdullah testifying to WAMY projects that include publications, printing and distribution of books, Quran and

educational audio material), at 119:15-120:12 (Abdullah testifying about WAMY printing pamphlets on Islam to distribute at mosques and Islamic schools); Ex. 165, WAMY Intl E000263 (sample WAMY-USA 2001 activity report showing activities that include sports, prayers, meeting, lectures and location of events); Ex. 166, WAMY Intl E001366-370 (1996 contract with Transcom to print various WAMY-USA pamphlets on Islam); Ex. 167, WAMY Intl E007022 (2000 invoice from Transcom for printing).

**RESPONSE:**

Undisputed that WAMY-USA engaged in the activities described in the cited exhibits, including conferences, youth camps, publications, sports programs, and the distribution of religious materials; Plaintiffs contend, however, that these community and educational programs do not address, let alone rebut, evidence of WAMY's associations with extremist actors. Plaintiffs repeat and incorporate their response to Defendant's ¶¶ 3, 24, 293. A genuine dispute of material fact exists.

**STATEMENT:**

297. Far from supporting al-Qaeda ideology, the message of A Friendly Note from Your Neighbor, one of WAMY's pamphlets, states in parts that "Islam and democracy are compatible and complementary," "Muslims must assume personal responsibility for relatives, neighbors and others in need," Islam eulogizes moderation and abhors *extremism, terrorism, fanaticism, oppression* and *subjugation*," and "American Muslims love their country." Ex. PEC-WAMY030080-081 (A Friendly Note From Your Neighbor); see also, Ex. 168, WAMYSA061127 (2002 letter from late Representative Paul Findley to WAMY-USA for providing pamphlet).

**RESPONSE:**

Undisputed that the cited WAMY pamphlet promotes moderation, civic responsibility, and opposition to extremism; disputed, however, that the content of a single public-facing pamphlet resolves whether WAMY promoted violence against non-Muslims and advanced terrorist causes in other publications or statements. The record includes evidence of WAMY's other publications and statements promoting violence against non-Muslims and advancing terrorist causes. Plaintiffs repeat and incorporate their response to Defendant's ¶¶ 3, 14 and 239. A genuine dispute of material fact exists.

**STATEMENT:**

298. Ibrahim Abdullah ("Abdullah) succeeded ABL as director of WAMY International 1999. Ex. 163 at ¶5 (Abdullah declaring that he took over from ABL in 1999 when ABL resigned).

**RESPONSE:**

Undisputed that Abdullah succeeded ABL as director of WAMY International on or around 1999.

**STATEMENT:**

299. Abdullah worked for WAMY as a volunteer for five years; having only two paid employees and several volunteers during his time. Id. at ¶¶5, 7; Ex. 32 at 210:20-211:4.

**RESPONSE:**

Plaintiffs object that the cited references to pages 210 and 211 in the excerpts of Abdullah Ibrahim's October 21, 2019 deposition are missing. Plaintiffs do not dispute, however, that Abdullah was a volunteer at WAMY, worked for about five years, and may have overseen a handful of paid and unpaid staff.

**STATEMENT:**

300. After completing his Ph.D. program in 2004, Abdullah resigned from WAMY-USA. Id. at ¶40.

**RESPONSE:**

Undisputed that Abdullah resigned from WAMY at some point.

**STATEMENT:**

3. WAMY Int'l's Limited Association With Anwar Awlaki, Then Known As a Moderate Islamic Scholar, Does Not Demonstrate Any Support for al-Qaeda or Its Terrorist Ideology

**RESPONSE:**

Disputed to the extent this asserts WAMY's association with Awlaki was "limited" or that Awlaki was "then known as a moderate Islamic scholar." Well before 9/11 Awlaki was a committed Salafi extremist and proponent of violent jihad whom the FBI had identified as a radical Sunni extremist with direct ties to al-Qaeda and placed under investigation in June 1999. Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 445, 1123 (citing Ex. 171, FBI 011752-767 at 764; Ex. 173, EO 2804). WAMY's association with Awlaki was also far from "limited": WAMY's U.S. branch brokered (and possibly funded) Awlaki's appointment as Imam of the Dar al Hijrah Mosque, and "Aulaqi's contract with the Dar Al Hijrah Islamic Center for the Imam position was found in WAMY's records." Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-W; Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 1834, 1863 (citing Ex. 174, WAMY Intl 015165-68).WAMY hosted Anwar al-Awlaki -- the al-Qaeda figure and spiritual advisor to three 9/11 hijackers -- at its camps: "Awlaki himself was hired to speak at WAMY Islamic Studies camps in College Park, Texas in June 2002 and Irving, Texas in July 2002," and WAMY

translated his lecture series into Chinese. Ex. 112, Kohlmann 2020 Rpt. ¶ 186 (citing Ex. 174, Ex. 132, WAMY Int 15165-68; Ex. 131, WAMY Int 0249; Ex. 195, WAMY INT E000170, and Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001), WAMYSA 30079-81; Ex. 77,Dep. of Ibrahim Abdullah (10/21/2019) at 71:21-73:4, 75:19-78:24, 82:4-17, 87:18-88:19; Ex. 196, WAMYSA 1519). Plaintiffs repeat and incorporate their responses toWAMY's 56.1 Statements at ¶¶ 301-314 below. A genuine dispute of material fact exists.

**STATEMENT:**

301. Ibrahim Abdullah, WAMY-USA's then deputy director, learned about Anwar Al-Awlaki sometime after he arrived in Virginia and became the Imam of the nearby Dar al-Hijrah Mosque. Ex. 32 at 64:12-65:2 (identifying Awlaki as the Imam of the mosque in Falls Church)

**RESPONSE:**

Disputed. This statement implies Awlaki was an obscure or newly-encountered local imam and that WAMY's involvement merely post-dated his arrival in Virginia; both are wrong. Before Dar al-Hijrah, Awlaki had been imam of the al-Ribat mosque in San Diego, where 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar "greatly respected Awlaki as a religious figure and developed a close relationship with him," and Awlaki served as their "spiritual advisor," holding "closed-door meetings" with them. Ex. 4, 9/11 Comm'n Report at 221; Ex. 198, FBI000208-222; "A New Home," LA Times (Jan. 10, 1997); Ex.76, U.S. House and U.S. Senate, Report of the Joint Inquiry (Dec. 2002) at 178-179. Moreover, WAMY's own U.S. branch arranged Awlaki's move to the Dar al Hijrah Mosque from San Diego: his "new position [as Imam of the Dar al Hijrah Mosque] was brokered (and possibly funded) by the Riyadh-based World Assembly of Muslim Youth, (WAMY)," and "Aulaqi's contract with the Dar Al Hijrah Islamic Center for the

Imam position was found in WAMY's records." Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-W (citing Ex. 174, WAMY Intl 015165); Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 1834, 1863 (citing Ex. 174, WAMY Intl 015165-68). The WAMY U.S. branch that arranged the position was run by Saudi Embassy/MOIA officer Abdullah Bin Laden, a nephew of Osama Bin Laden. Ex. 148, Pls.' Averment of Facts ¶ 1836 (citing Ex. 199, WAMYSA 2444; Ex. 22, Aff. of Abdullah Awad Binladin (Nov. 19, 2005) at p. 1). WAMY's involvement thus caused, rather than post-dated, Awlaki's arrival in Virginia. A genuine dispute of material fact exists.

**STATEMENT:**

302. Abdullah regularly attended the Dar al-Hijrah Mosque and would hear his Friday sermons. Ex. 32 at 64:3-21 (testifying about hearing Al-Awlaki's Friday prayers); at 66:6-67:23 (2000 invitation to Awlaki), at 80:20-22 (Abdullah knew Al-Awlaki from sermons for only a few months), at 84:11-85:15 15 (testifying about first meeting Awlaki at the mosque).

**RESPONSE:**

Disputed to the extent it implies WAMY's connection to Awlaki was casual and limited to hearing Friday sermons, and to the extent it portrays that exposure as innocuous. WAMY's relationship with Awlaki also went well beyond hearing sermons: WAMY brokered Awlaki's Dar al Hijrah appointment, retained his Imam contract in its records, invited him to lecture at WAMY youth camps on multiple occasions, and distributed audiotapes of his sermons. Ex. 112, Kohlmann 2020 Rpt. ¶ 186; Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 1834, 2116 (citing Ex. 132, WAMY Int 15165-68, Ex. 131, WAMY Int 0249, Ex. 195, WAMY Int 170, and Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001), WAMYSA 30079-81, Ex. 77,Dep. of

Ibrahim Abdullah (10/21/2019) at 71:21-73:4, 75:19-78:24, 82:4-17, 87:18-88:19; Ex. 196, WAMYSA 1519). A genuine dispute of material fact exists.

**STATEMENT:**

303. Abdullah, on behalf of WAMY, invited Al-Awlaki, as the Imam of Dar al Hijrah and the chairman of its cultural committee, to attend a WAMY event. Ex. 32 at 65:7-71:7 (testifying about a 2000 letter to Awlaki as head of the cultural committee inviting him to an event); Ex. 169, Ex. 196, WAMYSA 1519 (letter inviting Awlaki, as chairman of Dar al Hijrah, to attend and event).

**RESPONSE:**

Disputed as incomplete and to the extent it characterizes the invitation as benign. The Dar al-Hijrah mosque Awlaki led was the same mosque to which hijackers Hazmi and Hanjour traveled cross-country in April 2001, and the 9/11 Commission "share[d] th[e] suspicion" that Awlaki "may have tasked" an associate "to help Hazmi and Hanjour." Ex. 4, 9/11 Comm'n Report at 230. The relationship also extended well beyond a single event invitation: WAMY brokered (and possibly funded) Awlaki's very appointment as Dar al Hijrah Imam—his contract "was found in WAMY's records"—and WAMY invited Awlaki to lecture at its summer camps on multiple occasions and distributed audiotapes of his sermons. Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-W (citing Ex. 174, WAMY Intl 015165);, Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 1834, 1863, 2116 ( (citing Ex. 132, WAMY Int 15165-68, Ex. 131, WAMY Int 0249, Ex. 195, WAMY Int 170, and Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001), WAMYSA 30079-81, Ex. 77, Dep. of Ibrahim Abdullah (10/21/2019) at 71:21-73:4, 75:19-78:24, 82:4-17, 87:18-88:19; Ex. 196, WAMYSA 1519). A genuine dispute of material fact exists.

**STATEMENT:**

304. Abdullah was unaware that Al-Awlaki had been an Imam in San Diego and only learned of this fact during the course of this litigation. Ex. 32 at 64:23-65:2, 66:6-13, 82:4-84:10.

**RESPONSE:**

Disputed and immaterial. Awlaki's tenure as the San Diego imam was central to his facilitation of the 9/11 hijackers: it is well documented that Hazmi and Mihdhar developed a close relationship with Awlaki in San Diego, where he was their "spiritual advisor" and held "closed-door meetings" with them, and worked with Saudi agent Omar al-Bayoumi to support them. Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 445, 1718, 2116 (citing Ex. 132, , WAMY Int 15165-68, Ex. 131, WAMY Int 0249, Ex. 195, WAMY Int 170, and Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001), WAMYSA 30079-81, Ex. 77,Dep. of Ibrahim Abdullah (10/21/2019) at 71:21-73:4, 75:19-78:24, 82:4-17, 87:18-88:19; Ex. 196, WAMYSA 1519). Phone records reflect that, days before the hijackers arrived, Saudi diplomat Fahad al-Thumairy called Awlaki, and a confidential witness reported that Thumairy "personally asked Awlaki to assist Hazmi and Mihdhar." Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 445 (citing Ex. 92, FBI 000548-58 at 56; Ex. 200, FBI 000512-21 at 19). Awlaki was under FBI investigation as an al-Qaeda-linked extremist from June 1999: "Islamic extremist Anwar al Aulaqi played a direct role in the plot" and was "a radical extremist with ties to Al Qaeda and other terror groups," and the FBI opened Awlaki as an investigative subject in 1999 "as a result of his telephonic contacts with members of HAMAS and AL QAEDA." Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-H (citing Ex. 173, EO 2804; Ex. 190, Ex. 190, FBI 11752-767 at 764; Ex. 4, 9/11 Commission Report at 517 n.33). WAMY's U.S. branch itself brokered Awlaki's

relocation from San Diego to Dar al Hijrah. Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 1834, 1863 (citing Ex. 174, WAMY Intl 015165-68). A genuine dispute of material fact exists.

**STATEMENT:**

305. WAMY-USA's relationship with the Falls Church Mosque (Dar al Hijrah) was to cooperate and partner in projects, that's all. Ex. 32 at 90:17-24.

**RESPONSE:**

Disputed. WAMY-USA's relationship with Dar al-Hijrah was far more than "to cooperate and partner in projects, that's all." Dar al-Hijrah was the Virginia mosque Awlaki led, and the mosque to which hijackers Hazmi and Hanjour traveled cross-country, arriving April 3, 2001; an associate helped set them up in an apartment, and the 9/11 Commission stated, "some [FBI] investigators suspect that Aulaqi may have tasked Rababah to help Hazmi and Hanjour. We share that suspicion, given the remarkable coincidence of Aulaqi's prior relationship with Alhazmi." Ex. 4, 9/11 Commission Report at 230, EO 1470-MDL. WAMY brokered (and possibly funded) the appointment of Dar al Hijrah's Imam, Anwar Awlaki, and retained his Imam contract in its records; WAMY also repeatedly hosted Awlaki as a camp lecturer and distributed recordings of his sermons. Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-W (citing Ex. 174, WAMY Intl 015165-68); Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 1834, 1863, 2116 (citing Ex. 132, WAMY Int 15165-68, Ex. 131, WAMY Int 0249, Ex. 195, WAMY Int 170, and Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001), WAMYSA 30079-81, Ex. 77,Dep. of Ibrahim Abdullah (10/21/2019) at 71:21-73:4, 75:19-78:24, 82:4-17, 87:18-88:19; Ex. 196, WAMYSA 1519). WAMY's U.S. branch "was in Falls Church, VA and run by a Saudi Embassy officer, Abdullah Bin Laden, a nephew of Osama Bin Laden," and "WAMY's U.S. vice president was Ibrahim Abdullah," who was "known to the FBI as being 'associated with subjects

of FBI al-Qa'ida and Islamic Resistance Movement (HAMAS) investigations through his WAMY activities and phone records.'" Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-H (citing Ex. 173, EO 2804; Ex. 190, FBI 11752-767 at 764; Ex. 4, 9/11 Commission Report at 517 n.33; Ex. 76, U.S. House and U.S. Senate, Report of the Joint Inquiry (Dec. 2002) at 178-179). A genuine dispute of material fact exists.

**STATEMENT:**

306. Known for his charisma, Anwar Al-Awlaki eventually "became one of the most sought-after Muslim speakers in the country." Ex. 40 at p. 177.

**RESPONSE:**

Disputed as misleading and to the extent offered to show Awlaki's moderation. Awlaki's popularity was as a Salafi preacher whose recorded lectures "justified the use of suicide bombings by adopting the same arguments crafted by al-Qaeda leadership figures," and who, "in lectures shortly after 9/11," told audiences that "the conduct itself, of a person giving up his own life for Allah is a valid one." Ex. 224, Awlaki, "The Life of Mohammed: The Meccan Period". His public prominence coexisted with his role as a committed Salafi extremist and proponent of violent jihad, as Vice President/California representative of the Charitable Society for Social Welfare (a front for funding terrorists), and as an FBI investigative subject with direct al-Qaeda ties before 9/11. Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 445, 930-932, 934 (citing Ex. 190, FBI 11752-67 at 64; Ex. 173, EO 2804; Ex. 92, FBI 000548-58 at 56; Ex. 200, FBI 000512-21 at 19; Ex. 4, 9/11 Comm'n Report at 517 n. 33; Ex. 76, U.S. House and U.S. Senate, Report of the Joint Inquiry (Dec. 2002) at 178-179; Ex. 201 U.S. v. Mafhahi, 03 CR 0412 (Feb. 17, 2004) transcript at 460; Ex. 202, 1999 Form 990, Charitable Society for Social Welfare (May 14, 2000) at p. 4). A genuine dispute of material fact exists.

**STATEMENT:**

307. He spoke at the U.S. Capitol in July of 2001 and after the September 11, 2001, attacks, he spoke at the Pentagon in February of 2002. Id. (citing *Scott Shane, "The Lessons of Anwar al-Awlaki" at 91, 101-102*).

**RESPONSE:**

Disputed as immaterial and incomplete, and to the extent offered to show moderation. Awlaki's July 2001 Capitol and February 2002 Pentagon appearances post-date his 2000 role facilitating the 9/11 hijackers in San Diego and coincide with post-9/11 sermons reflecting "continuing support for extreme and conspiratorial views … in line with al-Qaeda's ideology." Ex. 162, Sageman Rpt. at pp. 177, 179 (citing Scott Shane, *Objective Troy* (2015) at pp. 99, 101-102); Ex. 266, EO 0593; Ex. 267, EO 0598; Ex. 209, FBI 3232; Ex.264 FBI0345; Ex.584, EO 0584. Prior to 9/11, Awlaki was in contact with al-Qaeda and terror-group fundraisers, had been under FBI investigation since June 1999, and served as Vice President/California representative of the Charitable Society for Social Welfare, a front for funding terrorists. Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 445, 930-932 (citing Ex. 190, FBI 11752-67 at 64; Ex. 173, EO 2804; Ex. 92, FBI 000548-58 at 56; Ex. 200, FBI 000512-21 at 19; 9/11 Comm'n Report at 517 n. 33; U.S. House and U.S. Senate, Report of the Joint Inquiry (Dec. 2002) at 178-179; U.S. v. Mafhahi, 03 CR 0412 (Feb. 17, 2004) transcript at 460; 1999 Form 990, Charitable Society for Social Welfare (May 14, 2000) at p. 4). See also Plaintiffs' response to WAMY's 56.1 Statement at ¶ 306. A genuine dispute of material fact exists.

**STATEMENT:**

308. When the terrorist attacks of September 11, 2001, occurred, Al-Awlaki condemned them absolutely. Ex. 13 at p. 48.

**RESPONSE:**

Disputed. Awlaki's lectures directly after 9/11 showed "evidence of a continuing support for extreme and conspiratorial views about Islam and the threats faced by Muslims which are in line with al-Qaeda's ideology and worldview," (pointing to a March 2002 Dar al-Hijrah sermon), and "in lectures shortly after 9/11" Awlaki justified "suicide bombers … the conduct itself, of a person giving up his own life for Allah is a valid one." Ex. 224, Awlaki, "The Life of Mohammed: The Meccan Period". Awlaki's conduct further contradicts any absolute condemnation: he served as spiritual adviser to at least three 9/11 hijackers, worked with Saudi agent al-Bayoumi to support Hazmi and Mihdhar in San Diego, was suspected by the 9/11 Commission of tasking Nabil al-Rababah to assist the hijackers in Virginia, and justified suicide bombings. Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 934, 1718, 1862, 2116 (citing Decl. of Ratchford (May 29, 2021) ¶¶ 6, 8; 9/11 Comm'n Report at 221, 230; Ex. 77, Dep. of Ibrahim Abdullah (10/21/2019) at 71:21-73:4, 75:19-78:24, 82:4-17, 87:18-88:19; WAMY Intl 1519; WAMY Intl 15165-68). Awlaki's post-9/11 condemnation was not genuine: "He condemned the attacks in front of a certain audience, yes, but then he said something else to other people," and "the fact that he denied it publicly is just a reflection of the fact that he was sophisticated enough not to tell this to the Washington Post … you have to be very careful about taking that … at face value." Ex. 163, Dep. of Kohlmann (Aug. 6, 2021) at 623:13-625:6. A genuine dispute of material fact exists.

**STATEMENT:**

309. In or about May 2002, due to his publicly known ability in "storytelling," giving lectures, and "communicating with [the] youth" about Islamic and religious teachings, WAMY invited Al-Awlaki to speak to students at a youth camp. Ex. 32 at Abdullah Dep at 71:22-

73:4 (testimony about Awlaki being invited to speak at youth camps based on his storytelling skills); Ex. 13 at p. 48 (demonstrating that Awlaki appealed to the youth despite having no formal religious training); Ex. 170, WAMYSA030079-081 (Camp information listing Awlaki as speaker).

**RESPONSE:**

Disputed as incomplete and misleading. When WAMY invited Awlaki to address students in or about May 2002, he was "already a committed Salafi extremist and a proponent of violent jihad," who "in lectures shortly after 9/11" justified "suicide bombers," and who "had already expressed similar views on suicide bombing prior to 9/11." Ex. 224, Awlaki, "The Life of Mohammed: The Meccan Period". By 2002, Awlaki was already an FBI-investigated extremist with al-Qaeda ties: "Islamic extremist Anwar al Aulaqi played a direct role in the plot" and was "a radical extremist with ties to Al Qaeda and other terror groups," and the FBI had opened Aulaqi as an investigative subject in 1999 "as a result of his telephonic contacts with members of HAMAS and AL QAEDA." Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-H; Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 445, 934 (citing Ex. 173, EO 2804; Ex. 190, FBI 11752-767 at 764; Ex. 4, 9/11 Commission Report at 517 n.33; U.S. House and U.S. Senate, Report of the Joint Inquiry (Dec. 2002) at 178-179; Ex. 92, FBI 000548-58 at 56; Ex. 200, FBI 000512-21 at 19). WAMY invited Awlaki to lecture at its youth camps on multiple occasions, and WAMY camps were used to advocate violent jihad—e.g., a WAMY operations manager lectured campers on Ex. 48, "Jihad, The Misunderstood Word," and WAMY employee Sheikh Saleh al Buraik urged Muslims to wage or finance jihad. Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 2115, 2116, 2117 (citing Ex. 48, "Jihad, The Misunderstood Word," a lecture by Suleman Ahmer, WAMY Okeechobee, FL Summer Dawah Camp (Jul. 26, 1996); Ex. 212, FED-

PEC 210330-210331; Ex. 77,Dep. of Ibrahim Abdullah (10/21/2019) at 71:21-73:4, 75:19-78:24, 82:4-17, 87:18-88:19; Ex. 196, WAMYSA 1519; WAMY Intl 15165-68; "The Islamic Library, Lessons of Sheikh Saad Buraik," The Favor of Jihad Over Other Acts, p. 3091; "Saudis Spread Hate Speech in the U.S.," Frontpage Magazine (Sep. 16, 2002)). A genuine dispute of material fact exists.

**STATEMENT:**

310. WAMY invited Al-Awlaki to speak at one or more summer camps due to his story telling ability and as he represented Dar al Hijrah mosque. Ex. 32 at 71:21-72:13; 80:10-19 (inviting Awlaki to program as a Dar al Hijrah representative); Ex. 170 (Camp information listing Awlaki as speaker).

**RESPONSE:**

Disputed as incomplete and misleading. Awlaki was the leader of the Dar al-Hijrah mosque to which hijackers Hazmi and Hanjour traveled, and "a committed Salafi extremist and a proponent of violent jihad" who had "acted as a facilitator for three of the 9/11 hijackers." Ex. 4, 9/11 Comm'n Report at 230; EO 1470-MDL). WAMY's ties to Awlaki were not incidental representation: WAMY had brokered his Dar al Hijrah appointment—his contract "was found in WAMY's records"—and WAMY camps served as venues for jihadist advocacy. Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-W (citing Ex. 174, WAMY Intl 015165-68); Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 1834, 1863, 2115, 2117 (citing Ex. 132, WAMY Int 15165-68, Ex. 131, WAMY Int 0249, Ex. 195, WAMY Int 170, and Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001), WAMYSA 30079-81, Ex. 77,Dep. of Ibrahim Abdullah (10/21/2019) at 71:21-73:4, 75:19-78:24, 82:4-17, 87:18-88:19; Ex. 196, WAMYSA 1519; Ex. 48, “Jihad, The Misunderstood Word," a lecture by Suleman Ahmer, WAMY

Okeechobee, FL Summer Dawah Camp (Jul. 26, 1996); Ex. 212, FED-PEC 210330-210331; "The Islamic Library, Lessons of Sheikh Saad Buraik," The Favor of Jihad Over Other Acts, p. 3091; "Saudis Spread Hate Speech in the U.S.," Frontpage Magazine (Sep. 16, 2002)). A genuine dispute of material fact exists.

**STATEMENT:**

311. When Al-Awlaki spoke at WAMY summer camps, he was definitely a moderate Salafi. Ex. 13 at p. 49.

**RESPONSE:**

Disputed. Evidence in the record establishes that by 2000 Awlaki "was already a committed Salafi extremist and a proponent of violent jihad," that "[f]rom early on in his career, Awlaki … preached violent jihad … and justified the use of suicide bombings," that "in lectures shortly after 9/11" he justified "suicide bombers," and that "he had already expressed similar views on suicide bombing prior to 9/11." Ex. 224, Awlaki, "The Life of Mohammed: The Meccan Period;" Awlaki, "Constants on the Path of Jihad" (2005). The FBI opened an investigation into Awlaki in June 1999 based on his contact with an al-Qaeda agent. Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-H; Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 445, 1123 (citing Ex. 173, EO 2804; Ex. 190, FBI 11752-767 at 764; Ex. 173, EO 2804; Ex. 4, 9/11 Commission Report at 517 n.33; U.S. House and U.S. Senate, Report of the Joint Inquiry (Dec. 2002) at 178-179). Plaintiffs' expert Evan Kohlmann testified that it is "not the consensus" that Awlaki radicalized only after leaving the United States: "There is widespread belief now that al-Awlaki had already been radicalized by the late 1990s," and that he "was already associated with people that were engaged in extremist conduct as early … as … 1995." Ex 163, Dep. of Kohlmann (Aug. 6, 2021) at 617:15-620:13. A genuine dispute of material fact exists.

**STATEMENT:**

312. WAMY would later gift, not sell, a few copies of recordings of Al-Awlaki's sermons to translators WAMY had used in another project. Ex. 32 at 96:13-18; 98:15-100:15 (testifying about WAMY's gift to Chinese translators); Ex. 171, WAMY Intl E000249 (Abdullah Ex. 286) (documenting Awlaki's otherwise publicly sold lectures); Ex. 40 at 178.

**RESPONSE:**

Disputed as materially incomplete and to the extent it characterizes WAMY's distribution of Awlaki's recordings as benign. The recorded lectures Awlaki produced "justified the use of suicide bombings by adopting the same arguments crafted by al-Qaeda leadership figures," and included post-9/11 lectures in which he told audiences that "the conduct itself, of a person giving up his own life for Allah is a valid one." Ex. 224, Awlaki, "The Life of Mohammed: The Meccan Period;" Awlaki, "Constants on the Path of Jihad" (2005). Beyond any single gift, WAMY "distributed audio tapes featuring Al Awlaki's sermons" as part of its ongoing promotion of Awlaki, whom WAMY also repeatedly hosted as a camp lecturer. Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 2116 (citing Ex. 77, Dep. of Ibrahim Abdullah (10/21/2019) at 71:21-73:4, 75:19-78:24, 82:4-17, 87:18-88:19; Ex. 196, WAMYSA 1519; WAMY Intl 15165-68). A genuine dispute of material fact exists.

**STATEMENT:**

313. Al-Awlaki did not begin to show much political radicalism until after 2003 and he did not call for attacks against the U.S. until after his imprisonment in 2006-2007. Ex. 13 at p. 49.

**RESPONSE:**

Disputed. Record evidence shows Awlaki was "already a committed Salafi extremist and a proponent of violent jihad" in 2000, that "[f]rom early on in his career, Awlaki … preached violent jihad … and justified the use of suicide bombings," that his post-9/11 lectures reflected "continuing support for extreme and conspiratorial views … in line with al-Qaeda's ideology," and that "he had already expressed similar views on suicide bombing prior to 9/11." Ex. 124, Awlaki, "The Life of Mohammed: The Meccan Period;" Awlaki, "Constants on the Path of Jihad" (2005)). Awlaki had numerous 1999-2000 contacts with al-Qaeda and terror-group fundraisers and had been under FBI investigation since June 1999. Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-H; Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 445, 930-932, 934, 1123 (citing Ex. 173, EO 2804; Ex. 190, FBI 11752-767 at 764; Ex. 173, EO 2804; Ex. 4, 9/11 Commission Report at 517 n.33; U.S. House and U.S. Senate, Report of the Joint Inquiry (Dec. 2002) at 178-179). Plaintiffs' expert Evan Kohlmann testified that it is "not the consensus" that Awlaki radicalized only after leaving the United States: "There is widespread belief now that al-Awlaki had already been radicalized by the late 1990s," and that he "was already associated with people that were engaged in extremist conduct as early … as … 1995." Ex. 163, Dep. of Kohlmann (Aug. 6, 2021) at 617:15-620:13. A genuine dispute of material fact exists.

**STATEMENT:**

314. Abdullah had no knowledge of Awlaki's radical views or alleged association with the 9/11 hijackers after the attacks until long after the terrorist attacks of 9/11. Ex. 163 at ¶16 (discussing knowledge of Awlaki's association with hijackers after 9/11).

**RESPONSE:**

Disputed. Whatever Abdullah's asserted subjective knowledge, the objective record establishes that Awlaki's radicalism and his ties to the 9/11 hijackers were contemporaneous: he was "already a committed Salafi extremist and a proponent of violent jihad" who "acted as a facilitator for three of the 9/11 hijackers," was the hijackers' "spiritual advisor" in San Diego, and led the Dar al-Hijrah mosque to which Hazmi and Hanjour relocated. Ex. 4, 9/11 Comm'n Report at 221; Ex. 198, FBI000208-222, "A New Home," LA Times (Jan. 10, 1997); Ex. 76, U.S. House and U.S. Senate, Report of the Joint Inquiry (Dec. 2002) at 178-179. WAMY's U.S. branch—which Abdullah directed—brokered Awlaki's appointment as Dar al Hijrah Imam (WAMY produced his contract), and WAMY hosted Awlaki as a camp lecturer and distributed his sermons. Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-W (citing Ex. 174, WAMY Intl 015165); \Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 1834, 1863, 2116 (citing Ex. 132, WAMY Int 15165-68, Ex. 131, WAMY Int 0249, Ex. 195, WAMY Int 170, and Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001), WAMYSA 30079-81, Ex. 77, Dep. of Ibrahim Abdullah (10/21/2019) at 71:21-73:4, 75:19-78:24, 82:4-17, 87:18-88:19; Ex. 196, WAMYSA 1519). WAMY's U.S. branch "was in Falls Church, VA and run by a Saudi Embassy officer, Abdullah Bin Laden, a nephew of Osama Bin Laden," and "WAMY's U.S. vice president was Ibrahim Abdullah," who was "known to the FBI as being 'associated with subjects of FBI al-Qa'ida and Islamic Resistance Movement (HAMAS) investigations through his WAMY activities and phone records.'" Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-H (citing Ex. 173, EO 2804; Ex. 190, FBI 11752-767 at 764; Ex. 4, 9/11 Commission Report at 517 n.33; U.S. House and U.S. Senate, Report of the Joint Inquiry (Dec. 2002) at 178-179). Abdullah himself acknowledged learning after 9/11 that Awlaki "was associated with the hijackers." Decl. of Mohammedi (Dkt. No. 11999), Ex. 163, Ibrahim Abdullah 2018 Declaration, ¶ 16. Plaintiffs' expert Evan Kohlmann testified that Awlaki's extremism "didn't seem to come

out of nowhere," questioning "why didn't anyone at Dar al-Hijrah or anyone else who was working with al-Awlaki … notice anything," and noting that, per Awlaki's own writings, "it wasn't a sudden flip … he had been going on this trajectory for some time and he didn't make a secret out of it." Ex. 163, Dep. of Kohlmann (Aug. 6, 2021) at 617:15-620:13. A genuine dispute of material fact exists.

**STATEMENT:**

<u>4. WAMY Int'l's Funding and Relationship With WAMY Canada</u>

**RESPONSE:**

No response necessary.

**STATEMENT:**

315. WAMY International receives its operation funding from WAMY Saudi Arabia's bi-annual budget for North America: WAMY International and WAMY-Canada. See, Id. at ¶21 (declaring that operation funds come from Saudi Arabia); Ex. 32 at 58:16-59:21 (Abdullah testifying to WAMY-Saudi Arabia funding WAMY International and the need to follow guidelines), and 129:20-130:1 (discussing the bi-annual nature of the operation funds that is then divided with WAMY-USA).

**RESPONSE:**

Not disputed that WAMY International's operating funds originate with WAMY-Saudi Arabia; disputed to the extent the statement implies WAMY International (U.S.), rather than WAMY-Saudi Arabia, controls North American operations or that WAMY-Saudi Arabia's role was that of a passive funder. The Canada Revenue Agency ("CRA"), based on WAMY's own documents, found "no apparent separation between the activities of WAMY (Saudi Arabia) and WAMY

[Canada], with all related financial and operating positions being made by WAMY (Saudi Arabia)," that WAMY-Saudi Arabia "maintains substantial control" over WAMY's finances, and that it "provides substantially all of WAMY's operational funds." Ex. 112, Kohlmann 2020 Rpt. ¶ 192; Ex. 112, Kohlmann 2020 Rpt. ¶ 76; Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 145-146 (citing EX. 79, FED-PEC 218170-218203, at 1745-176). WAMY's own financial officers concede the Saudi government funds a large portion of WAMY's budget. Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 137 (citing Prince Sultan Bin Abdulaziz Al-Saud's Motion to Dismiss (Dkt. No. 110), Case. No. 02-cv-1616-JR (DDC), Ex. 4, Decl. of Mutaz Saleh Abu Unuq (Apr. 1, 2003) at p. 2; Al-Jazirah, Riyadh (Jan. 12, 2001)). WAMY's own Fed. R. Civ. P. 30(b)(6) designee, Dr. Abdul Wahab Noorwali, admitted that he "did not review information about [the Canada chapter of WAMY] in detail" and "specifically did not review records relating to the Canadian branch," including its bank-account records. Ex. 20, Dep. of Noorwali (Jul. 24, 2019) at 263:8-264:2, 265:5-21. A genuine dispute of material fact exists.

**STATEMENT:**

316. WAMY International supervises WAMY-Canada. Id. at 124:13-16 (Abdullah agreeing that WAMY-USA supervises WAMY-Canada); Ex. 172, WAMYSA 4484 (1999 letter discussing WAMY-USA's supervision over WAMY).

**RESPONSE:**

Disputed to the extent it implies supervision of WAMY-Canada ran only through WAMY International. The CRA found that WAMY-Saudi Arabia—not the U.S. branch—"maintained substantial control" over WAMY-Canada, such that WAMY-Canada had "little or no independent function" and made "no attempt to distinguish itself from WAMY (Saudi Arabia),"

with "all related financial and operating positions [were] being made by WAMY (Saudi Arabia)" and no "apparent separation." Ex. 112, Kohlmann 2020 Rpt. ¶ 192; Kohlmann Aff. ¶¶ 145-146 (citing EX. 79, FED-PEC 218170-218203, at 174-176). WAMY-Canada's own directors dealt directly with WAMY-Saudi Arabia: director Mohammed Al Khatib "communicated directly with, and 'regularly submitted reports to,' WAMY Secretary General Manel al-Johani and other senior WAMY officials" in Saudi Arabia and contacted Riyadh directly for budget matters, and Talhah Al Jarad attested that WAMY Canada "only received its funding from WAMY Saudi Arabia through wire transfer." Ex. 112, Kohlmann 2020 Rpt. ¶ 78 (citing WAMYSA 4400-4401, 4455-4456, 4579-4580); Decl. of Mohammedi (Dkt. No. 11999), Ex. 175, Decl. of Talha Al-Jarad (Mar. 2, 2019), ¶ 14. WAMY's own Fed. R. Civ. P. 30(b)(6) designee, Dr. Abdul Wahab Noorwali, admitted that he "did not review information about [the Canada chapter of WAMY] in details" and "specifically did not review records relating to the Canadian branch," including its bank-account records. Dep. of Noorwali (July 24, 2019) at 263:8-264:2, 265:5-21. A genuine dispute of material fact exists.

**STATEMENT:**

317. WAMY International divides the operational funding from Saudi Arabia between itself and WAMY-Canada based on allocated budgeting for each chapter. Ex. 163 at ¶21 (declaring that WAMY-USA divides funds between it and WAMY-Canada); Ex. 32 at 126:14-20 (Abdullah testifying that WAMY-Canada gets financing for its office operations as well as funding for projects from WAMY-USA); at 129:20-130:1 (discussing the bi-annual nature of the operation funds that is then divided with WAMY-USA).

**RESPONSE:**

Disputed to the extent it implies WAMY International, rather than WAMY-Saudi Arabia, controlled the allocation of funds to WAMY-Canada. The CRA found that "WAMY (Saudi Arabia) exercised a significant amount of control over their expenses," that "all related financial and operating positions [were] being made by WAMY (Saudi Arabia)" with no "apparent separation," and that WAMY-Saudi Arabia provided "substantially all" of WAMY-Canada's operational funds. Ex. 112, Kohlmann 2020 Rpt. ¶ 192; Ex. 112, Kohlmann 2020 Rpt. ¶ 76; Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 146 (citing EX. 79, FED-PEC 218170-218203, at 174-176). WAMY-Canada's director attested it "only received its funding from WAMY Saudi Arabia through wire transfer and, on a few occasions, from WAMY USA," and that WAMY-Saudi Arabia sent donor-directed funds by wire directly for Canadian projects—indicating direct Saudi funding rather than a clean division by the U.S. branch. Decl. of Mohammedi (Dkt. No. 11999), Ex. 175, Decl. of Talha Al-Jarad (Mar. 2, 2019), ¶¶ 14, 16. WAMY's own Fed. R. Civ. P. 30(b)(6) designee, Dr. Abdul Wahab Noorwali, admitted that he "did not review information about [the Canada chapter of WAMY] in details" and "specifically did not review records relating to the Canadian branch," including its bank-account records. Dep. of Noorwali (July 24, 2019) at 263:8-264:2, 265:5-21. A genuine dispute of material fact exists.

**STATEMENT:**

318. WAMY-Canada’s annual operating budget is small, between $10,000 and $15,000. Ex. 173, Mohammed Khatib 2018 Declaration at ¶14 (discussing WAMY-Canada’s operational budget); Ex. 32 at 147:8-17 (Abdullah testifying to WAMY-Canada’s operational budget as about $12,000 during the period he headed WAMY-USA).

**RESPONSE:**

Disputed. The assertion that WAMY-Canada's budget was only "between $10,000 and $15,000" is contradicted by evidence that director Khatib "received checks and wire transfers for hundreds of thousands of dollars from … WAMY Headquarters in Saudi Arabia, as well as WAMY's North America base of operations in Washington D.C. for the office's budget and expenses, including projects approved by WAMY Headquarters." Ex. 112, Kohlmann 2020 Rpt. ¶ 79 (citing WAMYSA 1748, 1946, 1948-1954, 1957-1958, 4407; FED-PEC 217320-217332, 217346-217358, 217359-217370). In 2001 alone WAMY-Canada provided funding to the Benevolence International Foundation in the United States (BIF-USA)— $50,246 —and it shared a common director, contact information, and bank account with BIF-Canada, entities the UN Security Council's Al-Qaida and Taliban Sanctions Committee designated on November 21, 2002. Ex. 112, Kohlmann 2020 Rpt. ¶ 193 (citing EX. 79, FED-PEC 218170-218203, at 181-183). Either transfer is irreconcilable with the claimed $10,000-$15,000 annual budget. The CRA further found WAMY-Canada's books so deficient—no general ledger, missing cancelled cheques and bank deposit slips—that the stated figures cannot be verified. Ex. 112, Kohlmann 2020 Rpt. ¶ 191 (citing EX. 79, FED-PEC 218170-218203, at 171-172). A genuine dispute of material fact exists.

**STATEMENT:**

319. As with other chapters, donations and other funding for North American project proposals also came from Saudi Arabia. Ex. 163 at ¶11-12 (declaring that WAMY Saudi Arabia sent funds for projects such as youth camps, sports programs and publication printing and that WAMY USA did no fundraising of its own).

**RESPONSE:**

Undisputed that WAMY's North American funding flowed from WAMY (Saudi Arabia); disputed to the extent WAMY asserts otherwise. The CRA found that WAMY-Saudi Arabia provided "substantially all" of the funds and that the chapter had "little or no independent function." Ex. 112, Kohlmann 2020 Rpt. ¶ 192; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 145-146 (citing EX. 79, FED-PEC 218170-218203, at 174-176). The "no fundraising" claim is nonetheless contradicted: the CRA audit found that WAMY-Canada issued official donation receipts—it was "unable to provide copies of official donation receipts 30 through 82 for the fiscal year ending December 31, 2002"—reflecting that the office received donations and issued receipts, and WAMY-Canada also coordinated fundraising-type activities, organizing multiple years of Umra trips in cooperation with WAMY-Saudi Arabia. Ex. 112, Kohlmann 2020 Rpt. ¶ 191; Ex. 112, Kohlmann 2020 Rpt. ¶ 76 (citing EX. 79, FED-PEC 218170-218203, at 171-172). WAMY-Canada's accounts were also not confined to WAMY-sourced project funds: director Al Khatib deposited non-WAMY funds into WAMY-Canada's accounts and used WAMY-Canada's address and accounts for BIF. Decl. of Mohammedi (Dkt. No. 11999), Ex. 163, Decl. of Ibrahim Sulayman Abdullah (Mar. 29, 2018), ¶ 35; Ex. 173, Decl. of Mohammed Khatib (Mar. 29, 2018), ¶¶ 24-25; Ex. 174, WAMY-Canada application, WAMYSA057575-79; Ex. 176, WAMY-Canada Application for Tax Registration, WAMYSA057580-81; Ex. 179, Bank of Montreal Account Records, PEC-WAMY031318-430; Ex. 180, Bank of Montreal Account Statement, WAMYSA061885. A genuine dispute of material fact exists.

**STATEMENT:**

320. Typically, WAMY International directly funds WAMY-Canada's operational costs and also funds WAMY-Canada's small projects from its North American budget. Ex. 172

(discussing WAMY-USA's obligation to WAMY-Canada re North American budget); Ex. 32 at 126:14-127:5. (discussing WAMY-Canada general funding process).

**RESPONSE:**

Disputed. WAMY-Canada was funded and financially controlled by WAMY headquarters in Saudi Arabia, not merely by WAMY International out of a North American budget. Based on WAMY's own documents, the CRA found "no apparent separation between the activities of WAMY (Saudi Arabia) and WAMY [Canada]," that WAMY-Saudi Arabia "provides substantially all of WAMY's operational funds" and "maintains substantial control" over WAMY-Canada's finances, and that WAMY-Canada had "little or no independent function." Ex. 112, Kohlmann 2020 Rpt. ¶ 192; Ex. 112, Kohlmann 2020 Rpt. ¶ 76; Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 145-146 (citing EX. 79, FED-PEC 218170-218203, at 174-176). WAMY-Canada's director attested it "only received its funding from WAMY Saudi Arabia through wire transfer." Decl. of Mohammedi (Dkt. No. 11999), Ex. 175, Decl. of Talha Al-Jarad (Mar. 2, 2019), ¶ 14. Khatib likewise "received checks and wire transfers for hundreds of thousands of dollars from … WAMY Headquarters in Saudi Arabia, as well as WAMY's North America base of operations in Washington D.C.," including for "projects approved by WAMY Headquarters." Ex. 133, Kohlmann 2020 Rpt. ¶ 79 (citing WAMYSA 1748, 1946, 1948-1954, 1957-1958, 4407; FED-PEC 217320-217332, 217346-217358, 217359-217370). The "small projects" characterization also omits that WAMY's Canadian account was used to route $50,246 to BIF-USA in 2001. CRA Audit of WAMY-Canada, EX. 79, FED-PEC 218170-218203. A genuine dispute of material fact exists.

**STATEMENT:**

321. If a WAMY-Canada's project is too large for WAMY International to fund it, WAMY International petitions WAMY-Saudi Arabia for additional funding that is sent to WAMY International or WAMY-Canada directly. Id. at 127:6-12.

**RESPONSE:**

Disputed to the extent the statement implies WAMY-Saudi Arabia's role was confined to funding oversized projects on WAMY International's petition. The CRA found that WAMY-Saudi Arabia "provides substantially all of WAMY's operational funds," "exercised a significant amount of control over their expenses," and that "[t]he audit findings did not reveal any apparent separation between the activities of WAMY (Saudi Arabia) and WAMY [Canada], with all related financial and operating positions being made by WAMY (Saudi Arabia)." Ex. 112, Kohlmann 2020 Rpt. ¶ 192; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 145-146 (citing EX. 79, FED-PEC 218170-218203, at 174-176). WAMY-Canada's directors dealt directly with WAMY-Saudi Arabia, not solely through WAMY International: Mohammed Khatib "contacted WAMY Saudi Arabia directly" for budget matters, and Talhah Al Jarad confirmed WAMY-Canada received its funding "from WAMY Saudi Arabia through wire transfer." Decl. of Mohammedi (Dkt. No. 11999), Ex. 173, Decl. of Mohammed Khatib (Mar. 29, 2018), ¶ 19; Decl. of Mohammedi (Dkt. No. 11999), Ex. 175, Decl. of Talha Al-Jarad (Mar. 2, 2019), ¶ 14. Moreover, WAMY's own Fed. R. Civ. P. 30(b)(6) corporate designee, Dr. Abdul Wahab Noorwali, admitted that he "did not review information about [the Canada chapter of WAMY] in details" and "specifically did not review records relating to the Canadian branch," including "documents relating to bank accounts held by the Canadian chapter of WAMY." Dep. of Abdul Wahab Noorwali (July 24, 2019) at 263:8-264:2, 265:5-21. A genuine dispute of material fact exists.

**STATEMENT:**

322. WAMY International, not WAMY-KSA, fields all proposals to fund WAMY-Canada projects. Id. at 127:13-128:2; Ex. 163 at ¶22 (declaring that WAMY-Canada had to send proposals to WAMY International for funding for WAMY International to determining how to fund a project).

**RESPONSE:**

Disputed. The CRA found "no apparent separation" between WAMY-Saudi Arabia and WAMY-Canada, "with all related financial and operating positions being made by WAMY (Saudi Arabia)," and that WAMY-Saudi Arabia "maintains substantial control over WAMY's finances." Ex. 112, Kohlmann 2020 Rpt. ¶ 192; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 145-146 (citing EX. 79, FED-PEC 218170-218203, at 174-176). Khatib "communicated directly with, and 'regularly submitted reports to,' WAMY Secretary General Manel al-Johani and other senior WAMY officials [in Saudi Arabia] concerning WAMY Canada's annual budget," and, "[a]t the request of senior WAMY officials in Saudi Arabia," provided headquarters with detailed information about WAMY-Canada's bank accounts. Ex. 133, Kohlmann 2020 Rpt. ¶¶ 78-79 (citing WAMYSA 4400-4401, 4455-4456, 4579-4580; WAMYSA 4442-4443, 4480); Decl. of Mohammedi (Dkt. No. 11999), Ex. 173, Decl. of Mohammed Khatib (Mar. 29, 2018), ¶ 19 (Khatib contacted WAMY-Saudi Arabia directly regarding funding). A genuine dispute of material fact exists.

**STATEMENT:**

323. WAMY-Canada reported its project spending to WAMY International. Id. at ¶¶22, 36, 27; Ex. 32 at 125:15-20 (discussing WAMY-Canada's reporting to WAMY International under WAMY's policy).

**RESPONSE:**

Disputed to the extent Defendant implies reporting ran only to WAMY International rather than directly to WAMY-Saudi Arabia. Khatib "communicated directly with, and 'regularly submitted reports to,' WAMY Secretary General Manel al-Johani and other senior WAMY officials" in Saudi Arabia concerning WAMY-Canada's annual budget and the office's "activities and achievements in Canada." Ex. 133, Kohlmann 2020 Rpt. ¶¶ 78-79 (citing WAMYSA 4400-4401, 4455-4456, 4579-4580; WAMYSA 4442-4443, 4480); Decl. of Mohammedi (Dkt. No. 11999), Ex. 173, Decl. of Mohammed Khatib (Mar. 29, 2018), ¶ 19. The CRA audit likewise found that WAMY-Canada "provides annual reports to WAMY (Saudi Arabia) regarding the organizations that it funds and the amounts it disburses," because WAMY-Saudi Arabia "wanted to know what it was responsible for supporting." Ex. 112, Kohlmann 2020 Rpt. ¶ 192; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 145-146 (citing EX. 79, FED-PEC 218170-218203, at 174-176). That any reporting to WAMY International occurred is further belied by the CRA audit, which found WAMY-Canada's books and records "inadequate," with "only ... bank statements" available and "no other books and records." CRA Audit of WAMY-Canada,EX. 79, FED-PEC 218170-218203. Moreover, WAMY's own Fed. R. Civ. P. 30(b)(6) corporate designee, Dr. Abdul Wahab Noorwali, admitted that he "did not review information about [the Canada chapter of WAMY] in detail" and "specifically did not review records relating to the Canadian branch," including "documents relating to bank accounts held by the Canadian chapter of WAMY." Dep. of Abdul Wahab Noorwali (July 24, 2019) at 263:8-264:2, 265:5-21. A genuine dispute of material fact exists.

**STATEMENT:**

324. WAMY International reported its project spending, along with that of WAMY-Canada, to WAMY-Saudi Arabia. Ex. 32 at 60:20-61:5 (Abdullah testifying to requirement that WAMY International report to WAMY-Saudi Arabia and producing financial reports to them), and 125:21-126:7 (Abdullah agreeing that WAMY International reporting both WAMY-Canada and WAMY International 's reports to WAMY-Saudi Arabia).

**RESPONSE:**

Not disputed that reporting ran to WAMY-Saudi Arabia; disputed to the extent Defendant suggests WAMY-Canada did not also report directly to WAMY-Saudi Arabia. The CRA audit found that WAMY-Saudi Arabia "maintains substantial control over WAMY's finances" and that WAMY-Canada had "little or no independent function," "with all related financial and operating positions being made by WAMY (Saudi Arabia)" and no "apparent separation." Ex. 112, Kohlmann 2020 Rpt. ¶ 192; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 145-146 (citing EX. 79, FED-PEC 218170-218203, at 174-176). WAMY-Canada reported directly to Saudi headquarters, as Khatib "communicated directly with, and 'regularly submitted reports to,' WAMY Secretary General Manel al-Johani and other senior WAMY officials." Ex. 133, Kohlmann 2020 Rpt. ¶¶ 78-79 (citing WAMYSA 4400-4401, 4455-4456, 4579-4580; WAMYSA 4442-4443, 4480); Decl. of Mohammedi (Dkt. No. 11999), Ex. 173, Decl. of Mohammed Khatib (Mar. 29, 2018), ¶ 19. It is further disputed to the extent the statement implies effective oversight: the CRA assessed WAMY's control risk as "high," found no board minutes, and could not trace $60,698.17 in cheques drawn on WAMY's Canadian account. CRA Audit of WAMY-Canada,EX. 79, FED-PEC 218170-218203. A genuine dispute of material fact exists.

**STATEMENT:**

5. Conflict Between WAMY Canada's Director, Mohammed Khatib, and WAMY Int'l

**RESPONSE:**

No response necessary.

**STATEMENT:**

325. Beginning in 1997 and ending in 2001, Mohammed Khatib served as WAMY-Canada's director. Ex. 173 at Decl. ¶6 (explaining the terms of his director position with WAMY-Canada).

**RESPONSE:**

Disputed. As to the end date of Khatib's tenure, he did not cease his role in 2001; he "remained a member of WAMY Canada's Board of Directors through at least the end of 2003." Ex. 133, Kohlmann 2020 Rpt. ¶ 80 (citing WAMYSA 1873-1878). Moreover, throughout the period of his directorship Khatib simultaneously served as Secretary/director of Benevolence International Foundation (BIF-Canada) while a board member of WAMY—entities the CRA found "shared a common director and contact information." CRA Audit of WAMY-Canada, EX. 79, FED-PEC 218170-218203. BIF-Canada was later designated by the UN Security Council's Al-Qaida and Taliban Sanctions Committee on November 21, 2002. EX. 79, FED-PEC 218170-218203; see also PEC-WAMY031459. A genuine dispute of material fact exists.

**STATEMENT:**

326. On November 20, 1997, Khatib incorporated WAMY-Canada and used his 19 Varna Drive, North York, Ontario home address as WAMY-Canada's address. Ex. 174, WAMYSA057575-579 (November 1997 application and December letters of patent approval); Ex. 32 at 152:13-17 (acknowledging that Khatib used his home address to

register WAMY); Ex. 173 at ¶9 (explaining that he used his home address to register WAMY-Canada); Ex. 175, Talha Al-Jarad 2019 Declaration at ¶13 (acknowledging that Khatib ran WAMY-Canada from his home because it did not have an office at the time).

**RESPONSE:**

Disputed as materially incomplete. The same 19 Varna Drive, North York home address Khatib used to incorporate WAMY-Canada was also used to incorporate BIF-Canada—which was later designated a Specially Designated Global Terrorist—and appeared on WAMY's Canadian bank account; the CRA found that WAMY and BIF-Canada "shared a common director and contact information." Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶ 193; Ex. 74, Winer Rpt. § 12.12.12 (citing EX. 79, FED-PEC 218170-218203, at 181-183; EX. 80, WAMYSA 1745-1768, 1785, 1865-1872, 1885-1887, 1889, 4443). A genuine dispute of material fact exists.

**STATEMENT:**

327. In June 1998, Khatib, on WAMY-Canada's behalf, retained a Canadian Barrister to file an application for tax-exempt status with the Canada Revenue Agency ("CRA"); the application did not get approved until 2000. Ex. 176, WAMYSA057580-81 (tax free registration); Ex. WAMYSA057559 (tax exempt approval letter, finding WAMY-Canada "qualifie[d] for tax exempt status as a registered charity under paragraph 149(1) of the Income Tax Act [] ",..."effective January 1, 1999").

**RESPONSE:**

Disputed as incomplete and to the extent the statement implies WAMY-Canada operated as a compliant, legitimate registered charity. WAMY-Canada's charitable status was later revoked by the CRA, which issued a Notice of Intention to Revoke on January 5, 2012. CRA Audit of

WAMY-Canada, EX. 79, FED-PEC 218170-218203. The CRA moved to revoke after finding "grave financial improprieties and irregularities," an inability to determine how funds were actually spent, "extensive ties to terrorist groups," hate-speech messaging, and violation of "three core requirements of Canadian charity laws." Ex. 74, Winer Rpt. §§ 10.3.6-10.4, 10.3.8; Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶¶ 190-191 (citing CRA Notice of Audit of WAMY-Canada, EX. 79, FED-PEC 218170-218203). The audit found the books and records "inadequate," control risk "high," and that WAMY allowed BIF-Canada to use WAMY's charitable registration and bank account. CRA Notice of Audit of WAMY-Canada, EX. 79, FED-PEC 218170-218203. Khatib himself "allow[ed] BIF to use WAMY Canada's charitable organization designation." Decl. of Mohammedi (Dkt. No. 11999), Ex. 173, Decl. of Mohammed Khatib (Mar. 29, 2018), ¶ 32. A genuine dispute of material fact exists.

**STATEMENT:**

328. From among his many roles, WAMY tasked Khatib with opening bank accounts and maintaining books, but at no time did WAMY permit him to fundraise. Ex. 173 at ¶¶10-11 (declaring responsibility to fund raise and prohibition from fundraising); Ex. 175 at ¶14 (Khatib's successor confirming that under his leadership WAMY-Canada never received donations).

**RESPONSE:**

- Disputed. The premise that WAMY-Canada "never received donations" is contradicted by the CRA audit, which found that WAMY-Canada issued official donation receipts—it was "unable to provide copies of official donation receipts 30 through 82 for the fiscal year ending December 31, 2002," but presumably provided copies of at least donation receipts 1-29. Ex. 112, Kohlmann 2020 Rpt. ¶ 191 (citing, EX. 79, FED-PEC 218170-218203, at

pp. 171-172). Khatib opened a Bank of Montreal account (#8086-611) titled "World Assembly of Muslim Youth o/a BIF," which WAMY-Canada shared with BIF-Canada and which the CRA found WAMY "allowed BIF-Canada to maintain control over ... from January 2001 to June 2001 ... and to use the funds in this bank account at its discretion." Ex. 59, Ex. 59, Levitt Rpt. § IV-7, n.96; , Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex, 74, Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; Ex. 80, WAMYSA 1745-1768; Ex. 801, WAMYSA 1785; Ex. 82, WAMYSA 1865 - 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). WAMY provided funding in that amount of $50, 246 to BIF-USA's Orphan Program in fiscal year 2001. Ex. 59, Ex. 59, Levitt Rpt. § IV-7, n.96, Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872, EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). Khatib fundraised for BIF using WAMY-Canada's registration and account, and also coordinated fundraising-type activities, organizing multiple years of Umra trips in cooperation with WAMY-Saudi Arabia. Decl. of Mohammedi (Dkt. No. 11999), Ex. 173, Decl. of Mohammed Khatib (Mar. 29, 2018), ¶¶ 24, 30, 32; Ex. 112, Kohlmann 2020 Rpt. ¶ 77 (citing http://web.archive.org/web/19991110025809/http://www.interlog.com:80/~ wamy/wamy_activities.html; http://web.archive.org/web/19991003195727/http://www.interlog.com:80/~wamy/umra_announcement_1999.html). The assertion that WAMY-Canada "never received donations" is further contradicted by deposits into the WAMY o/a BIF account and by Abdullah's admission that Khatib "deposited non-WAMY funds into WAMY Canada's accounts." Decl. of Mohammedi (Dkt. No. 11999), Ex. 163, Decl. of Ibrahim Sulayman Abdullah

(Mar. 29, 2018), ¶ 35. The premise that WAMY maintained "strict" financial reporting and controls is separately disputed by plaintiffs' expert Jonathan Winer, who found "not … documentary evidence that an audit was conducted by WAMY or LBI to reconstruct the actual uses of the funds" and that "the evidence that exists suggests that WAMY did not track" how funds were spent—noting that WAMY's own Noorwali conceded prior LBI management "had not been transparent, and one could not track sources or funds or expenditures." Ex. 180, Winer Rebuttal Rpt. §§ 2.17.5-2.17.6.1 (citing WAMY Pakistan Office audits, Ex. 256, WAMYSA018575 at WAMYSA018624. A genuine dispute of material fact exists.

**STATEMENT:**

329. Khatib however did not follow WAMY’s strict finance reporting requirements as he failed to “send regular reports of activities to WAMY USA.” Ex. 173 at Decl. ¶¶16-17 (Khatib discussing lack of reporting).

**RESPONSE:**

Disputed and materially incomplete. Khatib did report to headquarters: he "communicated directly with, and 'regularly submitted reports to,' WAMY Secretary General Manel al-Johani and other senior WAMY officials" concerning WAMY-Canada's budget, "activities and achievements," and, at headquarters' request, furnished detailed bank-account information. Ex. 133, Kohlmann 2020 Rpt. ¶¶ 78-79 (citing WAMYSA 4400-4401, 4455-4456, 4579-4580; WAMYSA 4442-4443, 4480). The premise that WAMY maintained "strict" financial reporting requirements is separately disputed: the CRA found WAMY-Canada failed to maintain a general ledger, minute book, board meetings, adequate receipt accounting, and bank deposit slips, assessed control risk as "high," and could not trace $60,698.17 in cheques drawn on the account. Ex. 59, Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Ex. 74,

Winer Rpt. § 12.12.12; Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785, EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). Any reporting gap is significant because, during the same period, WAMY's Canadian bank account was retitled "World Assembly of Muslim Youth o/a BIF" and used to route funds to a later UN-designated al-Qaeda-associated entity, without WAMY's controls detecting it. Ex. 59, Ex. 59, Levitt Rpt. § IV-7, n.96, Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing, CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785, EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887, EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). There was "no … documentary evidence that an audit was conducted by WAMY or LBI to reconstruct the actual uses of the funds" and that "the evidence that exists suggests that WAMY did not track" how funds were spent—noting that WAMY's own Noorwali conceded prior LBI management "had not been transparent, and one could not track sources or funds or expenditures." Ex. 180, Winer Rebuttal Rpt. §§ 2.17.5-2.17.6.1 (citing Decl. of Mohammedi (Dkt. No. 11997), Ex. 80, WAMYSA018575-755, WAMY Pakistan Office audits, at WAMYSA018624 and WAMYSA018635). A genuine dispute of material fact exists.

330. In 1999, ABL terminated Khatib as WAMY-Canada's director for reporting deficiencies. Ex. 163 at ¶25 (acknowledging ABL fired Khatib in 1999).

**RESPONSE:**

Disputed as incomplete, and to the extent it asserts a for-cause termination. WAMY's conduct is inconsistent with a for-cause termination of Khatib in 1999: WAMY continued to fund Khatib's office with hundreds of thousands of dollars in checks and wire transfers from Saudi headquarters and Washington, D.C., and when Khatib left, WAMY headquarters sent a letter of "gratitude and appreciation for the good efforts and fruitful generosity you provided during your management," and he "remained a member of WAMY Canada's Board of Directors through at least the end of 2003, Ex. 112, Kohlmann 2020 Rpt. ¶¶ 79-80 (citing Ex. 80, WAMYSA 1748; Ex. 93, WAMYSA1946; Ex. 94, WAMYSA 1948-1954; Ex. 95, WAMYSA1957-1958; Ex. 96, WAMYSA 4407; Ex. 97, FED-PEC 217320-217332; Ex. 98, FED-PEC 217346-217358; Ex. 99 FED-PEC 217359-217370; Ex. 100, WAMYSA 4517; Ex. 101 WAMYSA 1873-1878). Notwithstanding the claimed 1999 termination, WAMY rehired Khatib in 2000, after which WAMY's Canadian account was retitled "World Assembly of Muslim Youth o/a BIF" and WAMY provided $50,246 to BIF-USA in fiscal year 2001. Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865-1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). A genuine dispute of material fact exists.

**STATEMENT:**

331. After Ibrahim Abdullah took over for ABL in 1999, Abdullah wanted to give al Khatib a second chance and asked Khatib to return as WAMY-Canada's director in spring 2000, believing that despite Khatib's earlier termination, he was an experienced "good person"

who would do nothing to harm WAMY. Ex. 173 at ¶6 (acknowledging his position as director from 1997 to 2001); Ex. 163 at ¶25 (attesting to his belief about Khatib).

**RESPONSE:**

Disputed. WAMY's decision to reinstate Khatib placed an individual who was simultaneously the director/Secretary of BIF-Canada—part of the terrorist-designated Benevolence International network—in control of WAMY-Canada's finances; the CRA and plaintiffs' expert found WAMY and BIF shared a common director, contact information, and a joint bank account, and that WAMY funneled funds to BIF-USA. Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). During the renewed tenure, WAMY's Canadian bank account was retitled "World Assembly of Muslim Youth o/a BIF" and WAMY funded BIF-USA. Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). WAMY's own farewell letter praising Khatib and his continued board membership through 2003 further contradict the narrative of an earlier for-cause termination. Ex. 133, Kohlmann 2020 Rpt. ¶ 80 (citing Ex. 100, WAMYSA 4517; Ex. 101 WAMYSA 1873-1878). A genuine dispute of material fact exists.

**STATEMENT:**

332. Abdullah believed that Khatib's experience would benefit WAMY-Canada's office. Ex. 32 at 148:5-152:12 (discussing Khatib's experience); at 158:13-19 (noting that he retained Khatib back in Spring of 2000).

**RESPONSE:**

Disputed to the extent that it is suggested WAMY (Saudi Arabia) was not involved in the decision. WAMY headquarters praised Khatib's "good efforts and fruitful generosity" in a written farewell letter, retained him on WAMY-Canada's Board of Directors through at least the end of 2003, and maintained a direct reporting relationship with him throughout his tenure. Ex. 133, Kohlmann 2020 Rpt. ¶¶ 78, 80 (citing Ex. 87, WAMYSA 4400-4401; Ex. 88, WAMYSA 4455-4456; Ex. 89, WAMYSA 4579-4580; Ex. 100, WAMYSA 4517; Ex. 101, WAMYSA 1873-1878). Whatever Abdullah's stated belief about Khatib's "experience," that experience included concurrently directing BIF-Canada; after the reinstatement WAMY's Canadian account was used for BIF and WAMY provided $50,246 to BIF-USA's Orphan Program. Ex. 74, Winer Rpt. § 12.12.12 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 181-183). A genuine dispute of material fact exists.

**STATEMENT:**

333. Not long after Khatib resumed his director role of WAMY-Canada, he fell back into his pattern of not reporting projects and expenditures. Ex. 163 at ¶27 (discussing Khatib's renewed failure in reporting how funds were spent); Ex. 173 at ¶40 (acknowledging WAMY's "displeasure" with his failure to send reports as required).

**RESPONSE:**

Disputed and materially incomplete. Khatib "regularly submitted reports to" WAMY-Saudi Arabia's Secretary General Manel al-Johani and senior WAMY officials on the office's budget and activities, and provided detailed bank-account information at headquarters' request. Ex. 133, Kohlmann 2020 Rpt. ¶¶ 78-79 (citing Ex. 87, WAMYSA 4400-4401; Ex. 88, WAMYSA 4455-4456; Ex. 89, WAMYSA 4579-4580; Ex. 90, WAMYSA 4442-4443; Ex. 91, WAMYSA 4480). During the period of Khatib's alleged non-reporting, WAMY's Bank of Montreal account was retitled "World Assembly of Muslim Youth o/a BIF" (January 2001), WAMY provided $50,246 to BIF-USA in fiscal year 2001, and the CRA could not trace $60,698.17 in cheques drawn on that account. Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). A genuine dispute of material fact exists.

**STATEMENT:**

334. Because Khatib failed to send operational and financial reports, WAMY International stopped funding to WAMY-Canada at least from in or about September 2000 until April 2001. Ex. 163 at ¶¶27-29, 37-39 (discussing WAMY International's freezing of WAMY-Canada's funding and Khatib's complaint to WAMY Saudi Arabia and when funding returned); Ex. 32 at 165:4-166:23 (testifying to the freezing of WAMY-Canada lasted for about 8 months until Khatib's termination in March 2001); Ex. 173 at ¶18 (acknowledging that WAMY International stopped funding WAMY-Canada).

**RESPONSE:**

Disputed. Contrary to the assertion that funding to WAMY-Canada was frozen from about September 2000 to April 2001, the record shows that Khatib "received checks and wire transfers for hundreds of thousands of dollars from … WAMY Headquarters in Saudi Arabia, as well as WAMY's North America base of operations in Washington D.C. for the office's budget and expenses, including projects approved by WAMY Headquarters." Ex. 133, Kohlmann 2020 Rpt. ¶ 79 (citing Ex. 80, WAMYSA 1748; Ex. 93, WAMYSA1946; Ex. 94, WAMYSA 1948-1954; Ex. 95, WAMYSA1957-1958; Ex. 96, WAMYSA 4407; Ex. 97, FED-PEC 217320-217332; Ex. 98, FED-PEC 217346-217358; Ex. 99 FED-PEC 217359-217370). The CRA also found "WAMY (Saudi Arabia) provides substantially all of WAMY's operational funds;" even accepting a WAMY International funding pause, WAMY's Canadian bank account was active and retitled "World Assembly of Muslim Youth o/a BIF" during this exact window—opened October 24, 2000, renamed in January 2001, and closed June 12, 2001 with an untraced $19,377.86 draft—and WAMY provided $50,246 to BIF-USA in fiscal year 2001. Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). Furthermore, Talhah Al Jarad confirmed WAMY-Canada received its funding "from WAMY Saudi Arabia through wire transfer." Decl. of Mohammedi (Dkt. No. 11999), Ex. 175, Decl. of Talha Al-Jarad (Mar. 2, 2019), ¶ 14. Funds thus continued to move through WAMY's Canadian identity notwithstanding the claimed freeze. A genuine dispute of material fact exists.

**STATEMENT:**

335. With no funds coming to WAMY-Canada from WAMY International, Khatib then set out to secretly work for other organizations without WAMY's permission or knowledge. Ex. 32 166:24-167:4 (Abdullah testifies to learning Khatib was working for MWL and other organizations and that Khatib admitted to it).

**RESPONSE:**

Disputed as materially incomplete. Khatib's work with the Benevolence International Foundation was not secret or unknown to WAMY: the CRA and plaintiffs' expert found that Khatib "simultaneously served as the Secretary of BIF-Canada," that WAMY and BIF-Canada shared a common director and contact information and a joint Canadian bank account ("World Assembly of Muslim Youth o/a BIF"), and that WAMY itself "provided funding to BIF-USA" in the amount of $50,246. Ex. 59, Levitt Rpt. § IV.7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). The "other organizations" centrally included BIF—an entity the UN Security Council designated on November 21, 2002 as associated with al-Qaeda, whose common director Enaam Arnaout pled guilty to racketeering and admitted diverting charity funds to fighters in Chechnya and Bosnia. CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203. Khatib registered BIF-Canada at WAMY-Canada's address and operated BIF through WAMY's own bank account and charitable registration. CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203; Decl. of Mohammedi (Dkt. No. 11999), Ex. 173, Decl. of Mohammed Khatib (Mar. 29, 2018), ¶¶ 24-25, 32. WAMY's professed lack of knowledge is disputed by the account being held in WAMY's name and WAMY's $50,246

payment to BIF-USA reported on its own tax return. CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203. A genuine dispute of material fact exists.

**STATEMENT:**

336. WAMY forced Khatib to resign from his WAMY-Canada post after Abdullah "learned that Mohammed al Khatib, while representing WAMY Canada, was wearing many hats and was confusing the public [sic] which organization he was representing" as "he was representing the Muslim World League ("MWL") and confusing the two organizations when he spoke to people and conducted activities." Ex. 163 at ¶31 (explaining the reasons for the firing); Ex. 32 at 168:23-169:3, at 213:8-24 (discuss the discovery of Khatib working for four organizations); Ex. 177, WAMYSA9972 (Letter from Ibrahim Suleiman Abdullah to Babaer regarding Muhammad Khatib's resignation because he was running four different Muslim organizations, leading to duplicity, resulting in a bad reputation for WAMY in Canada).

**RESPONSE:**

Disputed as materially incomplete. Far from disavowing or sanctioning Khatib, when he left in May 2001 WAMY headquarters sent him a letter expressing "our gratitude and appreciation for the good efforts and fruitful generosity you provided during your management of the World Assembly Muslim Youth Office in Canada and your appreciated and valued role in the official registration of the Assembly with the Canadian authorities," asked him to stay in contact with the new director, and Khatib "remained a member of WAMY Canada's Board of Directors through at least the end of 2003." Ex. 133, Kohlmann 2020 Rpt. ¶ 80 (citing WAMYSA 4517; WAMYSA 1873-1878). This evidence directly disputes that WAMY "forced Khatib to resign." WAMY's stated reason for the resignation—Khatib's representation of the Muslim World League

"confusing the public"—also omits the BIF nexus: the CRA found WAMY and BIF-Canada shared a director, address, and bank account, and that WAMY provided $50,246 to BIF-USA. CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203. A genuine dispute of material fact exists.

**STATEMENT:**

337. Khatib admits that "WAMY was not happy with me, as Director of WAMY Canada, representing other organizations in general. They felt this may cause confusion in the community about who I represent and for whom I am fundraising. WAMY did not feel comfortable that a director of WAMY would represent different organizations at the same time, as this could create a possible conflict of interest for WAMY." Ex. 173 at ¶42; Ex. 32 at 167:23-168:4 (Abdullah testified that working for WAMY and other charities simultaneously "create[s] a confusion to the people receiving the information or participating in the occasions").

**RESPONSE:**

Disputed. WAMY's contemporaneous farewell letter praised Khatib's "good efforts and fruitful generosity" and his "appreciated and valued role" in registering the Assembly, undercutting the claim that WAMY was displeased with him; Khatib remained a WAMY-Canada director through at least the end of 2003; and he reported directly to WAMY-Saudi Arabia's leadership throughout his tenure. Ex. 133, Kohlmann 2020 Rpt. ¶¶ 78, 80 (citing WAMYSA 4400-4401, 4455-4456, 4579-4580; WAMYSA 4517; WAMYSA 1873-1878). The relationship was also not merely a reputational "conflict of interest:" Khatib concurrently directed BIF-Canada while a WAMY board member, and WAMY's Canadian bank account and charitable registration were used for BIF, which included a $50,246 payment to BIF-USA's Orphan Program. CRA Audit and

Revocation, EX. 79, FED-PEC 218170-218203. BIF-Canada and BIF-USA were UN-designated as associated with al-Qaeda on November 21, 2002. EX. 79, FED-PEC 218170-218203. A genuine dispute of material fact exists.

**STATEMENT:**

338. In a March 2001 letter to Abdullah, Khatib explains his resignation as follows: "I thank you for your frankness and submit my resignation from representing the Assembly in Canada, to give space to Brother Talhat Aljarad to achieve the job duties..." Ex. 178 at WAMYSA9976-978 at 78 (March 2001 letter from Khatib to Abdullah resigning); Ex. 173 at ¶43 ("I sent my resignation letter to Ibrahim Abdullah on March 20, 2001"); Ex. 163 at ¶¶33-34 (explaining that WAMY sent a March 17, 2001, letter to Khatib asking him to resign).

**RESPONSE:**

Disputed as to the timing and finality of Khatib's departure. Khatib "left his role at WAMY Canada in May 2001" (not March), WAMY responded with a letter of "gratitude and appreciation" rather than treating it as a resignation under pressure, and Khatib "remained a member of WAMY Canada's Board of Directors through at least the end of 2003." Ex. 133, Kohlmann 2020 Rpt. ¶ 80 (citing WAMYSA 4517; WAMYSA 1873-1878). Khatib's resignation also did not undo the commingling: the "World Assembly of Muslim Youth o/a BIF" account remained open until June 12, 2001, ultimately closing with an untraced $19,377.86 bank draft, and WAMY provided $50,246 to BIF-USA in fiscal year 2001; the CRA subsequently revoked WAMY-Canada's charitable status. Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80,

WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). A genuine dispute of material fact exists.

**STATEMENT:**

339. Khatib did not "disclose the issue of [his] employment with MWL to WAMY." Ex. 173 at ¶¶21 (explaining that he worked for MWL).

**RESPONSE:**

Disputed as materially incomplete. WAMY's characterization of Khatib as a self-directed volunteer whose outside affiliations were concealed from WAMY is contradicted by evidence that WAMY-Canada operated under close supervision by, and continuous reporting to, WAMY headquarters. The CRA audit found that WAMY (Saudi Arabia) "maintains substantial control" over WAMY-Canada's finances and that WAMY-Canada "provides annual reports to WAMY (Saudi Arabia) regarding the organizations that it funds and the amounts it disburses." Ex. 133, Kohlmann 2020 Rpt. ¶ 76 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203). Khatib "regularly submitted reports to" WAMY Secretary General Manel al-Johani and other senior WAMY officials concerning WAMY-Canada's budget and activities. Ex. 133, Kohlmann 2020 Rpt. ¶ 78 (citing on WAMYSA 4400-4401, 4455-4456, 4579-4580). Khatib's undisclosed simultaneous roles were also not limited to the Muslim World League: he concurrently served as Secretary/director of Benevolence International Foundation Canada (BIF-Canada)—an entity the UN Security Council designated on November 21, 2002 as associated with al-Qaeda—which he operated through WAMY's own bank account and charitable registration, and WAMY's own 2001 tax return (T3010) reported $50,246 provided to BIF-USA.

CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203. A genuine dispute of material fact exists.

**STATEMENT:**

340. Khatib was forced to resign as the director of WAMY Canada due to his representing WAMY and other organizations at the same time, his poor reporting on WAMY Canada's activities, and related performance issues. Ex. 177 (Abdullah letter to WAMY Assistant Secretary General Babaer May 2001 letter to WAMY regarding reasons for Khatib forced resignation).

**RESPONSE:**

Disputed as materially incomplete. The claim that Khatib was "forced to resign" over poor performance and reporting is contradicted by WAMY's own conduct at his departure. When Khatib left WAMY-Canada in May 2001, WAMY headquarters did not disavow or sanction him, but instead sent him a letter expressing "our gratitude and appreciation for the good efforts and fruitful generosity you provided during your management of the World Assembly Muslim Youth Office in Canada and your appreciated and valued role in the official registration of the Assembly with the Canadian authorities," and asked him to remain in contact with the incoming director. Ex. 133, Kohlmann 2020 Rpt. ¶ 80 (citing on WAMYSA 4517; WAMYSA 1873-1878). Khatib also "remained a member of WAMY Canada's Board of Directors through at least the end of 2003." Ex. 133, Kohlmann 2020 Rpt. ¶ 80 (citing on WAMYSA 1873-1878). WAMY's stated reasons for the resignation also omit the central fact that Khatib concurrently directed BIF-Canada and operated it through WAMY's own bank account (titled "World Assembly of Muslim Youth o/a BIF") and charitable registration, and that WAMY's own tax return reported $50,246 to BIF-USA. Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer

Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). See also Plaintiffs' response to WAMY's 56.1 Statement at ¶ 336. A genuine dispute of material fact exists.

**STATEMENT:**

341. WAMY dismissed Khatib because he violated WAMY's policies, not because he engaged in illicit activity. Id. (Abdullah second May 2001 letter to WAMY explaining reasons for dismissal).

**RESPONSE:**

Disputed. WAMY's assertion that Khatib was dismissed only for policy violations and engaged in no illicit activity is contradicted by both WAMY's treatment of him and the nature of the BIF ties he facilitated. Rather than sanctioning Khatib, WAMY headquarters sent him a letter of "gratitude and appreciation for the good efforts and fruitful generosity" and his "valued role in the official registration" of WAMY in Canada, and he remained on WAMY-Canada's Board through at least the end of 2003. Ex. 133, Kohlmann 2020 Rpt. ¶ 80 (citing WAMYSA 4517, 1873-1878). The CRA found WAMY "allowed BIF-Canada to maintain control over its Bank of Montreal account ... and to use the funds in this bank account at its discretion," that WAMY provided $50,246 to BIF-USA's Orphan Program, and that WAMY "maintained close relationships with and provided funding to organizations that were engaged in providing resources to entities engaged in terrorist activities." Ex. 74, Winer Rpt. § 12.12.12 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203) (WAMY-Canada "closely associated" with BIF-Canada and WAMY funded BIF-USA). BIF-Canada and BIF-USA were

UN-designated as associated with al-Qaeda, and BIF's principals Adel Batterjee and Enaam Arnaout are designated terrorism financiers; Arnaout pleaded guilty to racketeering conspiracy for diverting BIF funds to armed jihadists in Bosnia and Chechnya. CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203; Winer Rebuttal Rpt. §§ 3.28, 3.30 (citing on U.S. Treasury designation of Batterjee (Dec. 21, 2004) and A.G. Ashcroft statement (Feb. 10, 2003)). Winer testified that Batterjee ran LBI—the entity WAMY funded and later absorbed—relying on the Arnaout-case evidentiary proffer prepared by U.S. Attorney Patrick Fitzgerald and on Noorwali's deposition testimony. Dep. of Winer (Jul. 13, 2021) at 220:15-222:1; Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003). Levitt testified that the CRA's foundational concern was WAMY's ties to terrorist or extremist groups and that the CRA found WAMY-Canada had financial relationships with entities tied to al Qaeda. Dep. of Levitt (Apr. 8, 2021) at 498:14-500:4. The Saudi government acknowledged that the misuse of Islamic charities including WAMY financed terrorism, on-site inspections of WAMY offices in 2016 led to closures for "several administrative and financial violations," and a December 2009 U.S. State Department cable found that WAMY "continue[d] to send money overseas and, at times, fund[ed] extremism overseas." Ex. 133, Kohlmann 2020 Rpt. ¶¶ 46-47, 55; Ex. 74, Winer Rpt. § 12.19.2 (citing "Saudi Arabia Announces Counter-Terrorism Measures," Saudi Embassy (Dec. 3, 2002); "Saudi Arabia and Counterterrorism Fact Sheet: Combating Terrorist Financing," Saudi Embassy (May 2017); "Combating Terrorist Financing," Saudi Embassy (Jan. 2019); Saudi Anti-Money Laundering authority, Mutual Evaluation Report (Sep. 2018) at p 99; U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 336 & 340. A genuine dispute of material fact exists.

**STATEMENT:**

342. Without WAMY's knowledge, Khatib also represented, worked with and formed BIF-Canada at the suggestion of Enaam Arnaout (BIF-USA's head) while he was acting as WAMY Canada's director. Ex. 173 at ¶¶22-25 (explaining how he met BIF head Enaam Arnaout and agreed to work for BIF); Ex. 175 at ¶12 (discussing knowing Khatib as a leader of several organizations).

**RESPONSE:**

Disputed. The assertion that Khatib formed and ran BIF-Canada "without WAMY's knowledge" is contradicted by CRA findings that WAMY and BIF-Canada were institutionally intertwined. The CRA found that Khatib "simultaneously served as the Secretary of BIF-Canada," that "BIF-Canada and WAMY used the same residential mailing address," and that "BIF-Canada and WAMY shared a Canadian bank account, which functioned as a joint account" (titled "World Assembly of Muslim Youth o/a BIF"), as well as "a common director and contact information." Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). WAMY's own 2001 tax return reported $50,246 to BIF-USA. Ex. 112, Kohlmann 2020 Rpt. ¶ 193 (citing CRA Audit, EX. 79, FED-PEC 218170-218203 at 185, 187). Because WAMY headquarters "maintain[ed] substantial control" over WAMY-Canada and Khatib reported to and supplied headquarters with detailed bank-account information, whether these BIF activities were unknown to WAMY is genuinely disputed. Ex. 133, Kohlmann 2020 Rpt. ¶¶ 76, 78-79 (citing CRA audit EX. 79, FED-PEC 218170-218203;

WAMYSA 4400-4401; 4442-4443; 4480; 4455-4456; 4579-4580). Kohlmann testified that Batterjee held himself out as WAMY's chairman and "founded an organization that is under WAMY's control, and it shares addresses with WAMY, and post office boxes with WAMY," and confirmed that WAMY-Canada and BIF-Canada shared a common director and contact information. Ex. 163, Dep. of Kohlmann (Aug. 6, 2021) at 638:20-640:19, 641:5-642:10. Winer testified that Batterjee ran LBI, relying on the Arnaout-case proffer and Noorwali's deposition. Ex. 193, Dep. of Winer (Jul. 13, 2021) at 220:15-222:1; Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003). A genuine dispute of material fact exists.

**STATEMENT:**

343. Khatib did not inform WAMY of his "relationship with Enaam Arnaout or BIF." Ex. 173 at ¶26 (Khatib explaining that he did not tell WAMY of his work with BIF because he believed it was unnecessary because he was only a volunteer).

**RESPONSE:**

Disputed. The assertion that Khatib never informed WAMY of his relationship with Arnaout or BIF is contradicted by the documented WAMY-BIF connection. The CRA found that WAMY "provided funding to BIF-USA," and that BIF-Canada and WAMY "shared a common director and contact information," and a joint Canadian bank account titled "World Assembly of Muslim Youth o/a BIF." Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). These are institutional flows and shared identifiers, not a purely personal undertaking hidden from WAMY. Combined with

WAMY headquarters' substantial financial control over WAMY-Canada, a genuine dispute exists as to WAMY's knowledge. Ex. 133, Kohlmann 2020 Rpt. ¶¶ 76, 78 (citing CRA audit EX. 79, FED-PEC 218170-218203; WAMYSA 4400-4401; 4455-4456; 4579-4580). Kohlmann testified that the WAMY-BIF relationship was openly known—Saudi media (Arab News) described BIF/Lajnat al-Birr as "an affiliate of WAMY," such that "even in Saudi Arabia, this relationship is a known thing"—and confirmed that WAMY-Canada and BIF-Canada shared a common director and contact information. Dep. of Kohlmann (Aug. 6, 2021) at 638:20-640:19, 641:5-642:10. A genuine dispute of material fact exists.

**STATEMENT:**

344. Beginning in 1999, Khatib agreed, without WAMY's knowledge, to separately head and establish BIF-Canada to raise funds specifically for orphans in Kashmir, Chechnya and Bosnia. Id. at ¶¶22-27 (attesting to meeting with Arnaout and agreeing to open BIF-Canada to help raise funds for orphans).

**RESPONSE:**

Disputed. WAMY's claim that Khatib established and headed BIF-Canada beginning in 1999 "without WAMY's knowledge" is contradicted by evidence of institutional entanglement and funding between WAMY and BIF. The CRA found WAMY and BIF-Canada shared a common director (Khatib, who "simultaneously served as the Secretary of BIF-Canada"), shared contact information and a residential mailing address, and "shared a Canadian bank account, which functioned as a joint account" bearing WAMY's name; that BIF-Canada used WAMY's charitable registration; and that WAMY "provided funding to BIF-USA." Ex. 112, Kohlmann 2020 Rpt. ¶ 193; Ex. 74, Winer Rpt. § 12.12.12 (citing CRA Audit of WAMY-Canada EX. 79, FED-PEC 218170-218203 at 181-182). Notably, BIF-USA's founder Adel Batterjee was

identified as the then-Chairman of WAMY (Saudi Arabia). RA Audit of WAMY-Canada EX. 79, FED-PEC 218170-218203. Given WAMY headquarters' substantial control over WAMY-Canada's finances and Khatib's direct reporting, whether the BIF-Canada undertaking was truly unknown to WAMY is genuinely disputed. Ex. 133, Kohlmann 2020 Rpt. ¶¶ 76, 78-79 (citing EX. 79, FED-PEC 218170-218203; WAMYSA 4400-4401; 4442-4443; 4480). Kohlmann testified that BIF was "under WAMY's control" and shared WAMY's addresses and post-office boxes, and was publicly described as a WAMY affiliate. Ex. 163, Dep. of Kohlmann (Aug. 6, 2021) at 638:20-640:19, 641:5-642:10. Winer testified that Batterjee ran LBI (funded and later absorbed by WAMY), relying on the Arnaout-case proffer and Noorwali's deposition. Ex. 193, Dep. of Winer (Jul. 13, 2021) at 220:15-222:1; Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003). Furthermore, the CRA audit found that WAMY (Saudi Arabia) "maintains substantial control" over WAMY-Canada's finances and that WAMY-Canada "provides annual reports to WAMY (Saudi Arabia) regarding the organizations that it funds and the amounts it disburses." Ex. 112, Kohlmann 2020 Rpt. ¶ 76 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203). A genuine dispute of material fact exists.

**STATEMENT:**

345. On behalf of BIF Khatib registered BIF-USA without WAMY's knowledge, using his domicile, which is also the same address he used to register WAMY-Canada. Id. at ¶25 (acknowledging the use of his home address to register BIF-Canada without WAMY's knowledge); Ex. 175 at ¶13 (noting that Khatib used his home address to register WAMY-Canada because at the time WAMY did not have an office). Ex. 176 at WAMYSA057580 (1998 WAMY-Canada tax exemption application using Khatib's 19 Varna Drive address as WAMY-Canada's address).

**RESPONSE:**

Disputed in part. WAMY concedes the shared 19 Varna Drive address, which is itself evidence of the WAMY-BIF connection rather than of concealment: the CRA found that "BIF-Canada and WAMY used the same residential mailing address" in dealings with the CRA and that the two "shared a common director and contact information." Ex. 112, Kohlmann 2020 Rpt. ¶ 193; Ex. 74, Winer Rpt. § 12.12.12 (citing CRA Audit of WAMY-Canada EX. 79, FED-PEC 218170-218203 at 181-182). The contention that the BIF registration was accomplished "without WAMY's knowledge" is disputed by evidence that Khatib "provided Headquarters with detailed information about WAMY Canada bank accounts" at senior WAMY officials' request, while WAMY headquarters "maintain[ed] substantial control" over WAMY-Canada. Ex. 133, Kohlmann 2020 Rpt. ¶¶ 76, 78-79 (citing CRA Audit of WAMY-Canada EX. 79, FED-PEC 218170-218203; WAMYSA 4400-4401; 4442-4443; 4480). Kohlmann testified that BIF "shares addresses with WAMY, and post office boxes with WAMY," and confirmed that WAMY-Canada and BIF-Canada shared a common director and contact information—the shared address being evidence of the connection, not of concealment. Ex. 163, Dep. of Kohlmann (Aug. 6, 2021) at 638:20-640:19, 641:5-642:10. Furthermore, the CRA audit found that WAMY (Saudi Arabia) "maintains substantial control" over WAMY-Canada's finances and that WAMY-Canada "provides annual reports to WAMY (Saudi Arabia) regarding the organizations that it funds and the amounts it disburses." Ex. 112, Kohlmann 2020 Rpt. ¶ 76 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203). A genuine dispute of material fact exists.

**STATEMENT:**

346. Khatib registered BIF-Canada as a charity, borrowing WAMY Canada’s Canadian registration until he received the new Tax ID for BIF-Canada; all of Al Khatib’s actions

were unknown to WAMY. Ex. 173 at ¶¶32 and 38 (acknowledging that he allowed BIF-Canada to use WAMY-Canada's tax-exempt status without WAMY's knowledge).

**RESPONSE:**

Disputed. The claim that Khatib let BIF-Canada borrow WAMY-Canada's charitable registration "unknown to WAMY" is contradicted by CRA findings that the two organizations shared a joint bank account bearing WAMY's own name—"World Assembly of Muslim Youth o/a BIF"—and shared a common director and contact information, and that WAMY itself "allowed BIF-Canada to maintain control over its Bank of Montreal account ... and to use the funds ... at its discretion" while Khatib was "a common director of both WAMY and BIF-Canada."Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). WAMY's own 2001 tax return reported $50,246 to BIF-USA.. Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 185, 187). WAMY headquarters exercised substantial control over WAMY-Canada and received Khatib's detailed reports and bank-account information, raising a genuine dispute as to WAMY's knowledge. Ex. 133, Kohlmann 2020 Rpt. ¶¶ 76, 78-79 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203; WAMYSA 4400-4401; 4442-4443; 4480). Kohlmann confirmed that WAMY-Canada and BIF-Canada shared a common director and contact information, and testified that BIF operated "under WAMY's control" and shared WAMY's addresses and post-office boxes. Ex. 163, Dep. of Kohlmann (Aug. 6, 2021) at 638:20-640:19, 641:5-642:10. A genuine dispute of material fact exists.

**STATEMENT:**

347. Since BIF did not have not-for-profit status in Canada, Khatib decided on his own, and without WAMY's knowledge, to use WAMY Canada's charitable organization designation for BIF, until BIF received a charitable organization designation from Canadian authorities. Id. at ¶¶32 and 39 (acknowledging that he allowed BIF-Canada to use WAMY-Canada's tax-exempt status without WAMY's knowledge).

**RESPONSE:**

Disputed. That Khatib "decided on his own, and without WAMY's knowledge," to place BIF under WAMY-Canada's charitable designation is contradicted by evidence that WAMY and BIF shared organizational identity and finances, and the use of WAMY's charitable designation for BIF is treated by the CRA as WAMY's own conduct. The CRA found a shared joint Canadian bank account styled "World Assembly of Muslim Youth o/a BIF," a common director, and shared contact information; that WAMY "allowed BIF-Canada" to control and use WAMY's Bank of Montreal account for an extended period of time; that WAMY provided funding to BIF-USA; and that WAMY "maintained close relationships with and provided funding to organizations that were engaged in providing resources to entities engaged in terrorist activities." Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). WAMY headquarters "maintain[ed] substantial control" over WAMY-Canada and received regular reports and bank-account information from Khatib, creating a genuine dispute as to whether this use of WAMY's charitable status was unknown to WAMY.

Ex. 133, Kohlmann 2020 Rpt. ¶¶ 76, 78-79 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203; WAMYSA 4400-4401; 4442-4443; 4480). Kohlmann testified that BIF was "under WAMY's control" and shared WAMY's addresses and post-office boxes, and confirmed that WAMY-Canada and BIF-Canada shared a common director and contact information. Ex. 163, Dep. of Kohlmann (Aug. 6, 2021) at 638:20-640:19, 641:5-642:10. A genuine dispute of material fact exists.

**STATEMENT:**

348. Without WAMY's knowledge, Khatib raised funds for BIF-USA using BIF-USA flyers that "...indicated [that] checks should be made out to WAMY/BIF," "so that donors to BIF could get the tax deduction" until BIF got its own tax exemption. Id. at ¶¶37, 39 (attesting to using the BIF flyers with reference to WAMY's name and doing so without WAMY's permission).

**RESPONSE:**

Disputed. The use of flyers directing that "checks should be made out to WAMY/BIF" so BIF donors "could get the tax deduction" reflects direct commingling of WAMY's name and BIF fundraising, corroborated by the record, and one could not deduce that WAMY had no knowledge of this. The CRA found that WAMY and BIF-Canada "shared a Canadian bank account, which functioned as a joint account" (styled "World Assembly of Muslim Youth o/a BIF") and that WAMY provided funding to BIF-USA's Orphan Program, and that WAMY "allowed BIF-Canada to maintain control over" that account. Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 187, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865-

1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). BIF publicly held itself out as connected to WAMY: when 1993 World Trade Center bombing conspirator Ahmed Ajaj was arrested with Arabic terrorist training manuals, they were in an envelope on BIF letterhead noting that BIF is a branch of the "World Assembly of Muslim Youth." Ex. 112, Kohlmann 2020 Rpt. ¶ 195 (citing *U.S. vs. Usama bin Laden*, 98 CR 1023, Gov't Ex. 2800-A, found at Decl of Mohammedi (Dkt. No. 11997), Ex. 47. These facts raise a genuine dispute as to WAMY's knowledge. Kohlmann testified that BIF and LBI were "the same organization," that the 1993 World Trade Center bombing materials were in an envelope bearing BIF's letterhead and logo, and that Saudi media publicly described BIF as a WAMY affiliate. Ex. 163, Dep. of Kohlmann (Aug. 6, 2021) at 649:15-650:17, 731:20-733:9. Furthermore, the CRA audit found that WAMY (Saudi Arabia) "maintains substantial control" over WAMY-Canada's finances and that WAMY-Canada "provides annual reports to WAMY (Saudi Arabia) regarding the organizations that it funds and the amounts it disburses." Ex. 133, Kohlmann 2020 Rpt. ¶ 76 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203). A genuine dispute of material fact exists.

**STATEMENT:**

349. After Khatib's forced resignation, Talhah Al-Jarad ("Al-Jarad") agreed to become the director of WAMY Canada as an unpaid volunteer for a maximum of two years. Ex. 175 ¶¶7-8.

**RESPONSE:**

Undisputed that Talhah Al-Jarad succeeded Khatib as WAMY-Canada's director; disputed, however, as to the predicate that Khatib underwent a "forced resignation" and to any implication that WAMY-Canada's finances were thereafter orderly and segregated. Plaintiffs repeat and

incorporate their responses to WAMY's 561. Statements at ¶¶ 336, 340, 341. A genuine dispute of material fact exists.

**STATEMENT:**

350. Al-Jarad did not know, when he took over from Khatib, what bank accounts Khatib had opened for WAMY or where they were. Ex. 175 at ¶17.

**RESPONSE:**

Disputed as to any implication of orderly financial controls, and as to the assertion that the accounts were unknown to WAMY. Even if Al-Jarad personally did not know what accounts existed, the record shows WAMY as an organization did: "[a]t the request of senior WAMY officials in Saudi Arabia, Khatib ... provided Headquarters with detailed information about WAMY Canada bank accounts." Ex. 133, Kohlmann 2020 Rpt. ¶ 79 (citing WAMYSA 4442-4443, 4480). The CRA audit further documented the WAMY-Canada / BIF joint account styled "World Assembly of Muslim Youth o/a BIF." Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). That the incoming director did not know what bank accounts existed also underscores the deficiency of WAMY's oversight: the CRA assessed WAMY's control risk as "high," found no board minutes, deemed the books and records "inadequate," and found WAMY had allowed BIF-Canada to control a WAMY-named bank account. CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203. Furthermore, the CRA audit found that WAMY (Saudi Arabia) "maintains substantial control" over WAMY-Canada's finances and that WAMY-Canada "provides annual reports to

WAMY (Saudi Arabia) regarding the organizations that it funds and the amounts it disburses." Ex. 133, Kohlmann 2020 Rpt. ¶ 76 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203). A genuine dispute of material fact exists.

**STATEMENT:**

351. Though unknown to Al-Jarad or WAMY, Khatib had opened a Canada Trust account and a Bank of Montreal account. Ex. PEC-WAMY031300-311 (Canada Trust account); Ex. 179, PEC-WAMY031318-430 (Montreal Bank account).

**RESPONSE:**

Disputed as materially incomplete, and as to the assertion that the accounts were "unknown to ... WAMY." The Bank of Montreal account #8086-611 was titled "World Assembly of Muslim Youth o/a BIF," which the CRA found WAMY "allowed BIF-Canada to maintain control over ... from January 2001 to June 2001," and from which $60,698.17 in cheques could not be traced. Ex. 59, Levitt Rpt. § IV.7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). The claim of ignorance is contradicted by evidence that Khatib "provided Headquarters with detailed information about WAMY Canada bank accounts" at senior WAMY officials' request, and by the CRA's documentation that WAMY and BIF-Canada shared a Canadian bank account functioning as a joint account. Ex. 133, Kohlmann 2020 Rpt. ¶ 79 (citing WAMYSA 4442-4443, 4480); Ex. 112, Kohlmann 2020 Rpt. ¶ 193; Ex. 74, Winer Rpt. § 12.12.12 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 181-182). Furthermore, the CRA audit found that WAMY (Saudi Arabia) "maintains

substantial control" over WAMY-Canada's finances and that WAMY-Canada "provides annual reports to WAMY (Saudi Arabia) regarding the organizations that it funds and the amounts it disburses." Ex. 133, Kohlmann 2020 Rpt. ¶ 76 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203). The existence of undisclosed accounts reflects the failure of WAMY's financial controls, and a genuine dispute exists as to WAMY's knowledge. On deposition, Kohlmann confirmed that WAMY-Canada and BIF-Canada shared a common director and contact information. Kohlmann Dep. (Aug. 5-6, 2021) at 718. A genuine dispute of material fact exists.

**STATEMENT:**

352. When Al-Jarad took over as director, he learned that Khatib only had a "few hundred dollars left in the [WAMY-Canada] accounts and [those funds were] used to cover any remaining expenses." Ex. 175 at ¶18.

**RESPONSE:**

Disputed as materially incomplete. The claim that only "a few hundred dollars" remained in the WAMY-Canada accounts cannot be verified and is inconsistent with the documented fund flows. The CRA found that WAMY-Canada failed to maintain a general ledger, minute book, bank deposit slips, and cancelled cheques, and that its accounting of receipts was inadequate—deficiencies "typical of charities that are hiding bad conduct" that made it impossible to determine how funds were actually used. Ex. 112, Kohlmann 2020 Rpt. ¶ 191; Ex. 74, Winer Rpt. §§ 10.3.8, 10.4 (citing CRA audit, EX. 79, FED-PEC 218170-218203). The "World Assembly of Muslim Youth o/a BIF" Bank of Montreal account was closed on June 12, 2001 with an untraced $19,377.86 bank draft, and WAMY provided funding to BIF-USA through an account documented as a joint WAMY/BIF account. Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann

2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). A genuine dispute of material fact exists.

**STATEMENT:**

353. Hoping to start his director position with a clean slate, Al-Jarad asked Khatib to “close all of the existing bank accounts.” Id. at ¶17.

**RESPONSE:**

Disputed as to the implied "clean slate." The record is clear on the documented state of WAMY-Canada's books. The CRA audit of WAMY-Canada operations for the period of Jan. 1, 2000 to Dec. 31, 2003 found WAMY-Canada kept no general ledger, no minute book, and no bank deposit slips, and could not account for numerous cancelled cheques and donation receipts—precluding reconstruction of the accounts. Ex. 112, Kohlmann 2020 Rpt. ¶ 191; Ex. 74, Winer Rpt. §§ 10.3.8, 10.4 (citing CRA audit, EX. 79, FED-PEC 218170-218203). Closing the operating accounts also did not undo the commingling: the "World Assembly of Muslim Youth o/a BIF" account remained open until June 12, 2001, closing with an untraced $19,377.86 draft, and $60,698.17 in cheques from that account could not be traced by the CRA—a joint WAMY/BIF account through which WAMY funded BIF-USA. Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA

4443). Winer confirmed that the CRA investigation found WAMY-Canada "failed to comply with basic bookkeeping and accounting requirements" and that the WAMY branch was stripped of its charitable status. Winer Dep. (July 13-14, 2021) at 273. A genuine dispute of material fact exists.

**STATEMENT:**

354. The WAMY-Canada's Bank of Montreal account is account # 2422-8094-951. Ex. 179 at PEC-WAMY031328 (WAMY-Canada Bank of Montreal account).

**RESPONSE:**

Undisputed for the general purposes of this motion that account #2422-8094-951 was a WAMY-Canada Bank of Montreal account.

**STATEMENT:**

355. Al-Jarad would later open two new accounts with Bank of Montreal: account #2670 8303-221 and #2670 4600-543. Ex. 179 PEC-WAMY-031332-031430 (PEC-WAMY031337 showing WAMY and Al-Jarad on account #543 and PEC-WAMY31384 showing same on account #221).

**RESPONSE:**

Undisputed that Al-Jarad opened Bank of Montreal accounts #2670 8303-221 and #2670 4600-543; disputed as to any implication that WAMY-Canada's banking was isolated from BIF or subject to effective WAMY oversight. The CRA documented a shared WAMY/BIF joint account and WAMY funding to BIF-USA, and WAMY headquarters possessed detailed information about WAMY-Canada's bank accounts. Ex. 112, Kohlmann 2020 Rpt. ¶ 193; Ex. 74, Winer Rpt. § 12.12.12 (citing CRA audit, EX. 79, FED-PEC 218170-218203); Ex. 133, Kohlmann 2020 Rpt.

¶ 79 (relying on WAMYSA 4442-4443, 4480). The CRA further found WAMY's books "inadequate," that Al-Jarad remained an authorized signatory on WAMY accounts after his October 2003 resignation, and that he could provide no information regarding WAMY's receipting procedures; WAMY-Canada's failure to maintain deposit slips, cancelled cheques, and a general ledger precludes verification of how these accounts were used. Kohlmann Rpt. ¶ 191 (citing CRA audit, EX. 79, FED-PEC 218170-218203). Winer confirmed that the CRA investigation found WAMY-Canada "failed to comply with basic bookkeeping and accounting requirements"—deficiencies that preclude verifying how the accounts operated. Winer Dep. (July 13-14, 2021) at 273. A genuine dispute of material fact exists.

**STATEMENT:**

356. Khatib had used the “few hundred” dollars in the account he had opened to pay expenses and therefore “there was no carry over of funds from the accounts [Khatib] maintained for WAMY-Canada and the accounts [Al-Jarad later] opened” for WAMY-Canada. Ex. 175 at ¶18.

**RESPONSE:**

Disputed as materially incomplete. The assertion that there was "no carry over of funds" between Khatib's and Al-Jarad's WAMY-Canada operating accounts cannot be verified and is inconsistent with the documented fund flows. WAMY-Canada's books were so deficient—no general ledger, no deposit slips, missing cancelled cheques and donation receipts—that the CRA could not determine how its funds were actually used. Ex. 112, Kohlmann 2020 Rpt. ¶ 191; Ex. 74, Winer Rpt. §§ 10.3.8, 10.4 (citing CRA audit, EX. 79, FED-PEC 218170-218203). The absence of "carry over" also does not address the separate "World Assembly of Muslim Youth o/a BIF" account (#8086-611), from which the CRA could not trace $60,698.17 in cheques and which

closed with an untraced $19,377.86 draft in June 2001, and through which WAMY funded BIF-USA in the amount of $50,246, as noted on WAMY's own tax return. Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). Winer confirmed that the CRA investigation found WAMY-Canada "failed to comply with basic bookkeeping and accounting requirements" and that the WAMY branch was stripped of its charitable status. Winer Dep. (July 13-14, 2021) at 273. A genuine dispute of material fact exists.

**STATEMENT:**

357. WAMY first learned that Khatib opened another account at Bank of Montreal with account number account # 0430 8086-611 under the name “World Assembly of Muslim Youth o/a BIF” during the course of this litigation. Ex. 32 at 169:4-22 (Abdullah testifying that “while preparing this deposition, I learned that” Khatib was raising money for BIF); Ex. 163 at ¶35 (declaring that he learned about the secret accounts “in this litigation”).

**RESPONSE:**

Disputed. The claim that WAMY "first learned" of the "World Assembly of Muslim Youth o/a BIF" account only during this litigation is contradicted by the 2011 CRA audit, which identified that very account as a joint account shared by WAMY and BIF-Canada; and WAMY's own 2001 tax return reporting $50,246 provided to BIF-USA, reflecting the BIF relationship in WAMY's own filings years before this litigation. Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA

Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). Furthermore, the CRA audit found that WAMY (Saudi Arabia) "maintains substantial control" over WAMY-Canada's finances and that WAMY-Canada "provides annual reports to WAMY (Saudi Arabia) regarding the organizations that it funds and the amounts it disburses." Ex. 133, Kohlmann 2020 Rpt. ¶ 76 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203). A genuine dispute of material fact exists.

**STATEMENT:**

358. BIF funds were deposited into this account without WAMY's knowledge or involvement. Ex. 173 at ¶44-45 (Khatib describing how he received large sum of money into the secret account); Ex. 32 at 159:10-160:14, at 211:9-24 (testifying that he did not know about the subaccount nor that Khatib ever approach him about opening the subaccount), at 162:20-163:3 (testifying that he did not know where the money was coming from), at 173:11-174:14 (testifying that he does not know about the $50,246 deposit or what happened to the money deposited in Canada in 2001).

**RESPONSE:**

Disputed. The CRA audit found that WAMY (Saudi Arabia) "maintains substantial control" over WAMY-Canada's finances and that WAMY-Canada "provides annual reports to WAMY (Saudi Arabia) regarding the organizations that it funds and the amounts it disburses." Ex. 133, Kohlmann 2020 Rpt. ¶ 76 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203). Upon review of its own 2001 tax return showing a $50,246 donation to BIF-USA, WAMY should have realized a relationship with BIF existed. CRA Audit and Revocation, EX.

79, FED-PEC 218170-218203. The claim of ignorance is contradicted by evidence that Khatib "provided Headquarters with detailed information about WAMY Canada bank accounts" at senior WAMY officials' request. Ex. 133, Kohlmann 2020 Rpt. ¶ 79 (citing WAMYSA 4442-4443, 4480). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 315-324, 328, 329, 342, 344-348. A genuine dispute of material fact exists.

**STATEMENT:**

359. On March 20, 2001, BIF-USA transferred $50,293.13 into the BIF Bank of Montreal account # 0430 8086-611, not into the WAMY-Canada Bank of Montreal account# 2422-8094-951 or any other WAMY account. Ex. 173 at ¶44 (discussing the receipt of the $50,293.13 from BIF on March 20, 2001 during his stepping down process); Ex. 180, WAMYSA061885 (Montreal Bank account # 0430 8086-611, statement showing transfer of $50,293.13 on March 20, 2001); Ex. 32 at 165:4-166:23 (testifying to the freezing of WAMY-Canada funds from 2001 until after WAMY fired Khatib in March 2001).

**RESPONSE:**

Disputed. Account #0430 8086-611 was itself a WAMY account, not a separate "BIF account." The CRA, reviewing the bank statements, found that "WAMY's Bank of Montreal Account # 8086-611 was opened on October 24, 2000 and according to the bank statement had the name 'World Assembly of Muslim Youth,'" with the name changing to "World Assembly of Muslim Youth o/a BIF" starting with the January 2001 statement. Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865-1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443).

WAMY-Canada and BIF-Canada shared a single Canadian bank account titled "World Assembly of Muslim Youth o/a BIF" that "functioned as a joint account," that WAMY-Canada's president Mohamed Khatib simultaneously served as Secretary of BIF-Canada, that the two used the same mailing address, and that WAMY provided funding in the amount of $50, 246 to BIF-USA's Orphan Program. Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). In fact, Khatib admits he opened the account "under the name 'World Assembly of Muslim Youth o/a BIF'" and used WAMY-Canada's charitable registration. Decl. of Mohammedi, (Dkt. No.11999), Ex. 173, Decl. of Mohammed Khatib (Mar. 29, 2018), ¶¶ 32, 35. WAMY headquarters was, moreover, directly aware of and controlled WAMY-Canada's bank accounts: at headquarters' request Khatib provided detailed bank-account information and "received checks and wire transfers for hundreds of thousands of dollars" from WAMY headquarters in Saudi Arabia and WAMY's Washington, D.C. office. Ex. 133, Kohlmann 2020 Rpt. ¶ 79 (citing WAMYSA 4442-4443, 4480, 1748, 1946, 1948-1954, and FED-PEC 217320-217370). A genuine dispute of material fact exists.

**STATEMENT:**

360. During the same period when BIF deposited $50,293.13 in the BIF-Canada account (#0430 8086-611), WAMY-Canada’s account (#2422-8094-951) does not reflect a $50,293.13 wire transfer. Compare, Ex. 180 and Ex. 179 at PEC-WAMY031332.

**RESPONSE:**

Disputed. Whether WAMY-Canada's account #2422-8094-951 reflects the transfer is immaterial and unreliable because the CRA found WAMY-Canada operated a single shared Canadian bank account with BIF-Canada titled "World Assembly of Muslim Youth o/a BIF" that functioned as a joint account, controlled by Khatib, who was simultaneously WAMY-Canada's president and BIF-Canada's Secretary. Ex. 59, Levitt Rpt. § IV.7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). The receiving account #0430 8086-611 was itself titled in WAMY's name, so the absence of a mirror entry in account #2422-8094-951 does not establish that WAMY did not receive the funds. Decl. of Mohammedi (Dkt. No. 11999), Ex. 173, Decl. of Mohammed Khatib (Mar. 29, 2018), ¶ 35. Moreover, the purported comparison is unreliable because WAMY failed to maintain records permitting any reconciliation: the CRA found WAMY kept no general ledger and no bank deposit slips and was "unable to reconcile the revenue reported to deposits in the corporate bank account for the 2001 and 2002 taxation years." Ex. 74, Winer Rpt. § 10.3.1 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203). WAMY headquarters itself held detailed information about WAMY-Canada's bank accounts. Ex. 133, Kohlmann 2020 Rpt. ¶ 79 (citing WAMYSA 4442-4443, 4480, 1748, 1946, 1948-1954, and FED-PEC 217320-217370). A material dispute of fact exists.

**STATEMENT:**

361. There is no evidence that this wire transfer of $50,293.13 came from WAMY Saudi Arabia, WAMY Int’l/USA, or that it even originated from Saudi Arabia. See, Ex. 180.

**RESPONSE:**

Disputed. The CRA made the opposite directional finding, based on WAMY's own tax filings: for its fiscal year ending December 31, 2001, WAMY provided $50,246 to the Orphan Program of BIF-USA, at a time when Khatib was a board member of WAMY and Secretary of BIF-Canada. CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203. The CRA further found that BIF "appears to have been established by Mr. Batterjee as an affiliate of WAMY (Saudi Arabia)," operating from the same Peshawar address, and that BIF-USA's founder Adel Batterjee was "the then-Chairman of WAMY (Saudi Arabia)." Id. PEC-WAMY031460. Plaintiffs' experts, relying on the CRA audit, further establish that WAMY (Saudi Arabia) "maintains substantial control over WAMY's finances" in Canada, provides substantially all of WAMY-Canada's operational funds, and that the audit revealed no separation between WAMY-Canada and the Saudi headquarters. Ex. 112, Kohlmann 2020 Rpt. ¶ 192; Ex. 74, Winer Rpt. § 10.3.4; Ex. 59, Levitt Rpt. ¶ 294; Ex. 133, Kohlmann 2020 Rpt. ¶ 76 (citing EX. 79, FED-PEC 218170-218203, at 174-176). WAMY-Canada's director also received checks and wire transfers for hundreds of thousands of dollars directly from headquarters. Ex. 133, Kohlmann 2020 Rpt. ¶ 79 (citing WAMYSA 4442-4443, 4480, 1748, 1946, 1948-1954, and FED-PEC 217320-217370). A genuine dispute of material fact exists.

**STATEMENT:**

362. “This $50,200 was not WAMY funds, to be used for WAMY Canada activities and operations.” Ex. 173 at ¶45 (attesting that “”); ¶34-35 (declaring that WAMY had no knowledge of Khatib raising funds for BIF or accepting funds for BIF).

**RESPONSE:**

Disputed. This characterization by an interested declarant is contradicted by his own admissions and by the CRA. The funds were stored in the "World Assembly of Muslim Youth o/a BIF" account that Khatib opened under WAMY's name and charitable registration, and donations were solicited on flyers bearing WAMY's name, with checks "made out to 'WAMY/BIF'" so donors "could get the [WAMY] tax deduction"—conduct Khatib concedes was "an abuse of my corporate responsibility towards WAMY Canada." Decl. of Mohammedi (Dkt. No. 11999), Ex. 173, Decl. of Mohammed Khatib (Mar. 29, 2018), ¶¶ 32, 35, 37, 39, 45. The CRA found the funds moved through a joint bank account held in WAMY's own name and that WAMY (not BIF) "provided $50,246 to the Orphan Program of BIF-USA." Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶ 193 (citing EX. 79, FED-PEC 218170-218203, at 181-183; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). Moreover, WAMY-Canada was funded almost entirely by and financially controlled by WAMY (Saudi Arabia). Ex. 112, Kohlmann 2020 Rpt. ¶ 192 (citing EX. 79, FED-PEC 218170-218203 at 174-176); Ex. 133, Kohlmann 2020 Rpt. ¶ 79 (citing WAMYSA 4442-4443, 4480, 1748, 1946, 1948-1954, and FED-PEC 217320-217370). A genuine dispute of material fact exists.

**STATEMENT:**

363. Khatib did not comingle the funds from WAMY's account #2422-8094-951 with the BIF Canada funds in account #0430 8086-611. Id. at ¶¶32-33, 47 (attesting to BIF and WAMY funds never being comingled), at ¶35 (declaring that WAMY did not know Khatib deposited funds into WAMY-Canada's account nor that Khatib was working for BIF).

**RESPONSE:**

Disputed. WAMY's no-commingling assertion rests solely on an interested declarant and is directly contradicted by the CRA's findings. The CRA found that WAMY-Canada and BIF-Canada "shared a Canadian bank account, which functioned as a joint account," titled "World Assembly of Muslim Youth o/a BIF," and that the two entities shared a common director and mailing address. Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). The account holding the BIF funds was legally a WAMY account funded through "WAMY/BIF" donation checks, commingling WAMY's charitable identity, registration, and donor receipts with BIF's. Decl. of Mohammedi (Dkt. No. 11999), Ex. 173, Decl. of Mohammed Khatib (Mar. 29, 2018), ¶¶ 35, 37. Furthermore, it would be difficult for WAMY to confirm there was no comingling of funds since the CRA found WAMY maintained no general ledger and no deposit slips and could not reconcile reported revenue to bank deposits for 2001-2002, and that the missing records prevented it from determining "the nature and intended purpose of WAMY's business dealings, what relationships have been developed, and who, effectively, exercises ultimate control over the arrangements or transactions." CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203. In addition, the record shows that entire charities were penetrated such that al-Qaeda operatives had "access to bank accounts." Winer Rebuttal § 4.8.1 (citing 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 21). A genuine dispute of material fact exists.

**STATEMENT:**

364. Khatib had sole control of all WAMY-Canada accounts, including the BIF Canada account and that of another company he also represented. Id. at ¶46 (declaring the closure of the account).

**RESPONSE:**

Disputed in part and immaterial. That WAMY-Canada's own executive director—whom the CRA identified as "WAMY President, Mr. Mohamed Khatib"—controlled the accounts confirms WAMY's control, not BIF's, and confirms the accounts were intertwined: the CRA found the WAMY and BIF-Canada accounts were a single joint account ("WAMY's Bank of Montreal Account # 8086-611") controlled by Khatib, who simultaneously served as WAMY-Canada's president and BIF-Canada's Secretary. Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶ 193 (citing EX. 79, FED-PEC 218170-218203; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). The claim of Khatib's "sole control" is contradicted by the CRA's finding that WAMY (Saudi Arabia) exercised substantial control over WAMY-Canada's finances and by evidence that Khatib reported to headquarters and received funds from it. Ex. 112, Kohlmann 2020 Rpt. ¶ 192; Ex. 133, Kohlmann 2020 Rpt. ¶ 76 (citing EX. 79, FED-PEC 218170-218203, at 174-176); Ex. 133, Kohlmann 2020 Rpt. ¶ 78 (Khatib "regularly submitted reports to" WAMY Secretary General Manel al-Johani; citing WAMYSA 4400-4401, 4455-4456, 4579-4580); Ex. 133, Kohlmann 2020 Rpt. ¶ 79 (citing WAMYSA 4442-4443, 4480, 1748, 1946, 1948-1954, and FED-PEC 217320-217370). The CRA further found it could not determine "who, effectively, exercises ultimate control over the arrangements or transactions" because WAMY failed to keep required books and records. CRA Audit and Revocation, EX. 79,

FED-PEC 218170-218203. Control over the accounts and funds is a disputed material fact. A genuine dispute of material fact exists.

**STATEMENT:**

365. The funds Khatib deposited and received into the BIF Canada account were received or deposited exclusively in connection to his activities with BIF-USA and BIF-Canada's purported orphan projects. Id. at ¶¶32-33, 45, 47 (attesting that he opened the account for BIF purposes, that BIF and WAMY funds never comingled, and that the $50,293.13 were intended for and orphans project).

**RESPONSE:**

Disputed. The claim that the funds related "exclusively" to legitimate BIF orphan projects is contradicted both by the account's character and by evidence that BIF's relief work was a cover for funding armed fighters. The CRA found the account was a joint WAMY/BIF account and that WAMY funded BIF-USA's Orphan Program. Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶ 193 (citing EX. 79, FED-PEC 218170-218203; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). BIF advertised itself as a "trustworthy hand for the support of [both] the mujahideen and refugees," and its "unwritten law" was "no matter how poor/sick - first priority is for mujahideen." Decl. of Tarbuttion (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 193-194; Ex. 112, Kohlmann 2020 Rpt. ¶ 197 (citing Aff. of Robert Walker in *U.S. v. BIF*, 02 CR 0414 (Apr. 29, 2002); Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 57). BIF director Enaam Arnaout's plea admitted BIF concealed that donations solicited for "orphans" and "refugees" were used to support fighters overseas—"anti-mine boots, uniforms, tents and even an ambulance… purchased with funds that donors thought

were going for peaceful purposes." CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 185-186; Winer Rebuttal Rpt. §§ 3.29, 3.30.5 (citing "Transcript of Attorney General John Ashcroft Regarding Guilty Plea by Enaam Arnaout," (Feb. 10, 2003)). BIF-Canada and BIF-USA were UN 1267-listed as al-Qaeda-associated entities. CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203. A genuine dispute of material fact exists.

**STATEMENT:**

366. Khatib's work with BIF was not related to WAMY or his work for WAMY. Id. at ¶21-26 (declaring the work he did exclusively for BIF at Enaam Arnaut's direction without consultation with WAMY).

**RESPONSE:**

Disputed. Khatib performed his BIF activities through WAMY-Canada: he used WAMY-Canada's address, WAMY-Canada's charitable registration, WAMY's name on fundraising flyers, and a WAMY-named bank account. Decl. of Mohammedi (Dkt. No. 11999), Ex. 173, Decl. of Mohammed Khatib (Mar. 29, 2018), ¶¶ 25, 32, 35, 37. The CRA found Khatib's BIF role and WAMY role were inseparable—he served as WAMY-Canada's president and BIF-Canada's Secretary at the same time, and WAMY-Canada and BIF-Canada shared a joint bank account, a common director, and a mailing address—and that Khatib was "a board member of WAMY and Secretary of BIF-Canada" when WAMY funded BIF-USA. Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶ 193 (citing EX. 79, FED-PEC 218170-218203; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). BIF publicly held itself out as "a branch of the 'World Assembly of Muslim Youth'" (per letterhead on an envelope seized from 1993 World Trade Center bomber Ahmed Ajaj), and WAMY and BIF shared the

same Peshawar P.O. Box that OFAC lists as a BIF address. Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 192 (citing Hedges, "Muslims from afar joining 'Holy War' in Bosnia," NYT (Dec. 5, 1992); Basaddiq, "Islamic Charity Committee moves to new premises," Arab News (May 21, 1994); OFAC SDN list (Dec. 3, 2002) at p. 4)). Khatib was no rogue actor: he reported directly to WAMY's Secretary General and received hundreds of thousands of dollars from headquarters, and when he left in 2001 WAMY sent a letter of "gratitude and appreciation" and kept him on WAMY-Canada's Board through 2003. Ex. 133, Kohlmann 2020 Rpt. ¶¶ 78, 79, 80 (citing WAMYSA 4400-4401, 4455-4456, 4579-4580, 4442-4443, 4480, 4517, 1873-1878). More broadly, BIF was an outgrowth of WAMY's own affiliate: BIF's precursor, Lajnat al-Birr al-Islamiya (LBI), was funded by WAMY and merged into WAMY, and BIF was "formed as an extension of Lajnat al-Birr." Ex. 74, Winer Rpt. § 12.12.1-2; Winer Rebuttal § 2.38.9 (citing Administrative Resolution No. 37 (May 28, 1996), WAMYSA 027804, Ex. 267 to Dep. of Noorwali (Jul. 24, 2019); Winer Rebuttal § 2.38.9. WAMY's own forensic-accounting expert conceded he saw no evidence WAMY investigated Batterjee's activities. Marks Dep. (July 22, 2021) at 182:3-17. A genuine dispute of material fact exists.

**STATEMENT:**

367. When Talha Al-Jarad became executive director of WAMY Canada in the spring of 2001, he asked that the former executive director, Khatib, to close all of the existing bank accounts as he did not know what accounts Khatib had or where they were. Ex. 175 at ¶ 17.

**RESPONSE:**

Disputed. That WAMY-Canada's incoming executive director did not know what bank accounts the organization held reflects precisely the absence of oversight and recordkeeping the CRA found: no general ledger, no cancelled cheques for FY2001, missing cheques for FY2002, no

minute book or board meetings, and no bank deposit slips for any audited year—leaving even the CRA unable to identify WAMY's accounts, transactions, and relationships. Ex. 74, Winer Rpt. § 10.3.1; Ex. 112, Kohlmann 2020 Rpt. ¶ 191 (citing EX. 79, FED-PEC 218170-218203). Yet WAMY headquarters itself held detailed information about WAMY-Canada's bank accounts, underscoring that the accounts were known at the top even if the new local director was not briefed. Ex. 133, Kohlmann 2020 Rpt. ¶ 79 (citing WAMYSA 4442-4443, 4480, 1748, 1946, 1948-1954, and FED-PEC 217320-217370). WAMY's own counsel has admitted that its branch officers were "recalcitrant" and failed to maintain records. Winer Rebuttal Rpt. §§ 2.34-2.37 (citing Plaintiffs' Reply Memo. of Law in Support of the Motion to Compel WAMY to Produce Responsive Documents (Dkt. No. 3962); Ltr. from MDL 1570 Plaintiffs' Exec. Cmte to Omar T. Mohammedi and Frederick J. Goetz (Mar. 30, 2018) regarding Mar. 19, 2018 meet-an-confer. A genuine dispute of material fact exists.

**STATEMENT:**

368. Khatib represented to Al-Jarad he would take care of this and said WAMY only had a few hundred dollars in its accounts. Id. at ¶18.

**RESPONSE:**

Disputed by contemporaneous bank records and CRA findings. The WAMY-named account #0430 8086-611 received a wire of approximately $50,200 on or about March 20, 2001—before Khatib's departure—far exceeding "a few hundred dollars." Decl. of Mohammedi (Dkt. No. 11999), Ex. 173, Decl. of Mohammed Khatib (Mar. 29, 2018), ¶ 44. Khatib controlled the joint WAMY/BIF account through which WAMY funded BIF-USA's Orphan Program, and he "received checks and wire transfers for hundreds of thousands of dollars" from WAMY headquarters and its Washington, D.C. office. Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann

2020 Rpt. ¶ 193; Ex. 133, Kohlmann 2020 Rpt. ¶ 79 (citing EX. 79, FED-PEC 218170-218203; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). The CRA found the account held a balance sufficient to require a $19,377.86 closing draft when closed in June 2001, with the "final destination for this amount…unknown," and that WAMY's missing records—no general ledger, cancelled cheques, or deposit slips—made its true balances unverifiable. Ex. 74, Winer Rpt. §§ 10.3.1-10.3.2 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203). A genuine dispute of material fact exists.

**STATEMENT:**

369. When Khatib left WAMY-Canada in March 2001, he transferred all BIF-Canada funds held in the BIF Canada account to BIF-USA. Ex. 173 at ¶¶33, 36 (attesting to having sent all BIF-Canada funds raised to BIF-USA), at ¶46 ("...all BIF funds, which did not belong to WAMY Canada, were sent to BIF in Chicago").

**RESPONSE:**

Disputed. This statement concedes that WAMY-Canada's executive director transferred funds to BIF-USA—an entity the United Nations and U.S. Treasury identified as an al-Qaeda-linked terrorist organization. The CRA audit found that WAMY funded BIF-USA through the joint "World Assembly of Muslim Youth o/a BIF" account. Ex. 59, Levitt Rpt. § IV.7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). Khatib's uncorroborated assertion that he sent "all" BIF funds to BIF-USA is contradicted by the CRA,

which found the account was closed in June 2001 with a $19,377.86 bank draft whose "final destination…is unknown," and that WAMY's missing ledgers and deposit slips made the amounts and destinations of transfers unverifiable. CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203. And BIF was no ordinary charity: "At one point, UBL confirmed to an associate that BIF was one of the non-governmental organizations providing funds to al Qaida," (Winer Rebuttal § 3.30.5 (citing U.S. Treasury designation of Batterjee (Dec. 21, 2004))), and Arnaout "defrauded donors by using their money to fund Jihad fighters in Chechnya and Bosnia." Winer Rebuttal § 3.29 (citing "Transcript of Attorney General John Ashcroft Regarding Guilty Plea by Enaam Arnaout," (Feb. 10, 2003)). A genuine dispute of material fact exists.

**STATEMENT:**

370. During his time as WAMY Canda's executive director, Al-Jarad confirmed WAMY Canada only received funds from WAMY Saudi Arabia and WAMY USA. Ex. 175 at ¶¶ 14-16.

**RESPONSE:**

Disputed. Even accepting that WAMY-Canada received funds from WAMY (Saudi Arabia) and WAMY-USA, the CRA found that WAMY-Canada was "indistinguishable from" the Saudi headquarters, that WAMY (Saudi Arabia) provided substantially all of its operational funds and controlled its finances, and that WAMY-Canada in turn funded BIF-USA through a joint WAMY/BIF account. Ex. 74, Winer Rpt. § 10.3.4; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193; Ex. 133, Kohlmann 2020 Rpt. ¶ 76 (citing EX. 79, FED-PEC 218170-218203, at 5-7, 12-14; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; WAMYSA 4442-4443; WAMYSA 4442-4443; 4480; 1946; 1948-1954; FED-PEC 217320-217370). The sources of WAMY-Canada's funds, and the flow of WAMY (Saudi Arabia)/WAMY-USA funds are disputed material facts.

**STATEMENT:**

371. Al-Jarad never heard of BIF during his time heading up WAMY Canada and only heard of this entity in 2004 when advised by the CRA. Al-Jarad directed the CRA to ask Khatib about BIF as he knew nothing about it. Id. at ¶20.

**RESPONSE:**

Disputed. The professed unawareness of BIF is contradicted by objective evidence that BIF operated through WAMY-Canada's own charitable registration and a WAMY-named bank account while WAMY-Canada's directors were responsible for it: the CRA found WAMY-Canada shared a bank account literally titled "World Assembly of Muslim Youth o/a BIF," a common director (Khatib, also BIF-Canada's Secretary), and a mailing address with BIF-Canada. Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). The CRA concluded WAMY "maintained close relationships with and provided funding to" BIF and related terrorist-linked entities—including WAMY's $50,246 payment to BIF-USA's Orphan Program in 2001—inconsistent with the organization's claimed ignorance of BIF. CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203. At the organizational level, WAMY was aware of BIF no later than 1993 and complained to then-Prince Salman that BIF was "formed as an extension of Lajnat al-Birr," WAMY's own affiliate. Decl of Dr. Abdul Wahab Noorwali (Mar. 30, 2018), Ex. 254 to Dep. of Noorwali (Jul. 23, 2019). Khatib—who created the joint account—remained on WAMY-Canada's Board of Directors through at least the end of 2003, overlapping Al-Jarad's tenure. Ex.

133, Kohlmann 2020 Rpt. ¶ 80 (citing WAMYSA 4517, 1873-1878). A genuine dispute of material fact exists.

**STATEMENT:**

372. Al-Jarad then spoke with Khatib, told him to contact the CRA, and was informed by Khatib that he also was a director of BIF and received funds for a special program for orphans and was going to be used to buy shoes for the needy. Id. at ¶21.

**RESPONSE:**

Disputed. Khatib's explanation that BIF's funds were for an orphan program and "shoes for the needy" mirrors the very cover story Plaintiffs' experts show BIF used to disguise support for armed fighters. As Attorney General Ashcroft explained after BIF director Arnaout's guilty plea, "Arnaout defrauded donors by using their money to fund Jihad fighters in Chechnya and Bosnia. He provided fighters with anti-mine boots, uniforms, tents and even an ambulance. All of these were purchased with funds that donors thought were going for peaceful purposes." Winer Rebuttal § 3.29 (citing "Transcript of Attorney General John Ashcroft Regarding Guilty Plea by Enaam Arnaout," (Feb. 10, 2003)). BIF's internal "unwritten law" was that "first priority is for mujahideen," (Ex. 112, Kohlmann 2020 Rpt. ¶ 197); Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 193-196 (citing Aff. of Robert Walker in *U.S. v. BIF*, 02 CR 0414 (Apr. 29, 2002); Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 57, 67-69; "Review of the Information on Activities of the Persons from Afro-Asian Countries Directly Before the War and During the war in the Territory of BIH Republic." Report written by the BIH Administration of the Military Security Service— Department for Analytical and Informative Affairs. Sarajevo (May 6, 1995))), and BIF was an al-Qaeda financial and logistical front whose relief activities masked support for armed fighters. Ex. 240, Pls.' Corrected

Averment (Dkt. No. 9764)) ¶¶ 129-130 (citing CIA_000143-158 at 149; U.S. Treasury designates Batterjee (Dec. 21, 2004). Arnaout, BIF-USA's head, "pled guilty to racketeering charges, and admitted that the charity had provided financial assistance to individuals engaged in violent activities overseas," including boots, uniforms, tents, and an ambulance. Winer Rebuttal Rpt. § 3.30.12; Ex. 112, Kohlmann 2020 Rpt. ¶ 198 (citing Plea Agreement, *U.S. v. Arnaout*, 02 CR 892 (Feb. 10, 2003) at 3-4; Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 67-69); CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203. A genuine dispute of material fact exists.

**STATEMENT:**

373. WAMY Int'l would never allow a WAMY account to be used by another organization. Ex. 163, ¶36 (attesting that WAMY would never permit their account to be used by BIF nor should Khatib have allowed it to happen).

**RESPONSE:**

Disputed. WAMY-Canada's charitable registration and a WAMY-named account ("World Assembly of Muslim Youth o/a BIF") were used for BIF, with donations solicited as "WAMY/BIF," and the CRA found WAMY-Canada shared that single joint account, a common director, and a mailing address with BIF-Canada. Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). The CRA found WAMY "provided $50,246 to the Orphan Program of BIF-USA" and "maintained close relationships with and provided funding to organizations that were engaged in providing

resources to entities engaged in terrorist activities," and that BIF was "an affiliate of WAMY (Saudi Arabia)" whose founder chaired WAMY (Saudi Arabia). CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203. The record establishes that there are a number of Islamic charities in which al-Qaeda operatives had "access to bank accounts," (Ex. 180, Winer Rebuttal § 4.8.1 (citing Ex. 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 21))—and that LBI and BIF "remained one organization with interchangeable assets under Batterjee's control." Winer Rebuttal § 3.30.4 (citing Ex. 244, U.S. Treasury designation of Batterjee (Dec. 21, 2004)). A genuine dispute of material fact exists.

**STATEMENT:**

374. While neither WAMY Saudi Arabia or WAMY Int'l have any relationship with or connection to BIF or BIF USA, the evidence does not show that BIF provided material support, directly or indirectly, to al-Qaeda. See *U.S. v. Arnaout*, 282 F.2d 838, 845 (N.D. Ill. 2003) –Kohlmann exhibit 922, ("government has not established that the Bosnian and Chechen recipients of BIF aid were engaged in a federal crime of terrorism, nor that Arnaout intended the donated boots, uniforms, blankets, tents, x-ray machine, ambulances, nylon and walkie-talkies to be used to promote a federal crime of terrorism."); *U.S. v. Arnaout*, 431 F.3d 994, 1002 (7th Cir 2005) (affirming District Court's decision not to apply the terrorism enhancement under U.S.S.G. § ¶3A1.4).

**RESPONSE:**

Disputed as to both assertions. (a) WAMY's relationship with BIF: The CRA found BIF "appears to have been established by Mr. Batterjee as an affiliate of WAMY (Saudi Arabia)," operating from the same Peshawar address; that BIF-USA founder Adel Batterjee was "the then-Chairman of WAMY (Saudi Arabia)"; and that WAMY "provided $50,246 to the Orphan Program of BIF-

USA" in 2001. CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203. BIF held itself out as "a branch of the 'World Assembly of Muslim Youth,'" (Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 192 (citing Hedges, "Muslims from afar joining 'Holy War' in Bosnia," NYT (Dec. 5, 1992); Basaddiq, "Islamic Charity Committee moves to new premises," Arab News (May 21, 1994); OFAC SDN list (Dec. 3, 2002) at p. 4)), and WAMY Secretary General al-Wohaibi's sworn assertion that "WAMY has never had any connection with [BIF]" is completely false; Batterjee claimed to be a former WAMY chairman and founded BIF as an affiliate branch of WAMY, OFAC lists WAMY offices as BIF addresses, and a BIF envelope seized from 1993 World Trade Center conspirator Ahmed Ajaj was marked that BIF is "a branch of the 'World Assembly of Muslim Youth.'", Ex. 112, Kohlmann 2020 Rpt. ¶¶ 188-189, 195 (citing Mem. of Law in Support of WAMY's Motion to Dismiss (Dkt. No. 1462), Ex. B, Declaration of Saleh Al-Wohaibi (Oct. 30, 2005); Hedges, "Muslims from afar joining 'Holy War' in Bosnia," NYT (Dec. 5, 1992); Basaddiq, "Islamic Charity Committee moves to new premises," Arab News (May 21, 1994), Ex. 226, WAMYSA 57760; Ex. 222, WAMYSA 61323; Ex. 185 WAMYSA 57745; Decl of Mohammedi (Dkt. No. 11997), Ex. 47, *U.S. vs. Usama bin Laden*, 98 CR 1023, Gov't Ex. 2800-A. BIF's precursor, LBI, was funded by WAMY and merged into WAMY, and the U.S. Treasury found "BIF and LBI remained one organization with interchangeable assets under Batterjee's control." Ex. 74, Winer Rpt. § 12.12.1-2 (citing Administrative Resolution No. 37 (May 28, 1996), Ex. 267 to Dep. of Noorwali (7/24/2019)); Winer Rebuttal § 3.30.4 (citing U.S. Treasury designation of Batterjee (Dec. 21, 2004)); see also Winer Rebuttal §§ 3.30.9-3.30.11. (b) BIF's al-Qaeda support: BIF-USA and BIF-Canada were UN 1267-listed as entities associated with al-Qaeda (Nov. 21, 2002); Arnaout pled guilty to racketeering and admitted BIF financed fighters overseas; and Batterjee was UN 1267-listed and designated by the U.S. Treasury as "one of the world's foremost terrorist financiers," with

LBI/BIF operating "as one of al Qaeda's most… important financial, logistical, and operational fronts." RA Audit and Revocation, EX. 79, FED-PEC 218170-218203; Winer Rebuttal § 3.30.5; Ex. 59, Levitt Rpt. ¶ 294; Pls.' Corrected Averment (Dkt. No.9764) at ¶¶ 129-131 (citing CIA_000143-158 at 149; U.S. Treasury designation of Batterjee (Dec. 21, 2004); Winer Rebuttal §§ 3.29, 3.30.12 (citing "Transcript of Attorney General John Ashcroft Regarding Guilty Plea by Enaam Arnaout," (Feb. 10, 2003)); Ex. 112, Kohlmann 2020 Rpt. ¶¶ 197-202 (citing Aff. of Robert Walker in *U.S. v. BIF*, 02 CR 0414 (Apr. 29, 2002); Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003)). WAMY was assessed by the U.S. government as a terrorism-supporting entity: JTF-GTMO "listed [WAMY] as a Tier 1 NGO," defined as having "demonstrated sustained and active support for terrorist organizations willing to attack US persons or interests." Ex. 112, Kohlmann 2020 Rpt. ¶¶158-159; Ex. 74, Winer Rpt. § 12.10.3 (citing U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) (Jun. 28, 2006); Decl. of Mohammedi (Dkt. No. 11999), Ex. 157, JTF-GTMO Hamad Detainee Assessment. Ex. 227, Set 52_3643-3869 at 37; Decl. of Mohammedi (Dkt. No. 11999), Ex. 157, JTF-GTMO Hamad Detainee Assessment.. Saudi da'wa charities including WAMY were known to Saudi officials to be "directly supporting al-Qa'ida's ongoing jihad." Ex. 238, Nakhleh Rpt. ¶ 106. A December 2009 U.S. diplomatic cable named WAMY among charities that "continue to send money overseas and, at times, fund[] extremism overseas." Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). WAMY's U.S. branch was run by Saudi Embassy officer Abdullah Bin Laden (a nephew of Osama Bin Laden), its U.S. vice president--Ibrahim Abdullah--was known to the FBI as associated with "al-Qa'ida and Islamic Resistance Movement (HAMAS) investigations through his WAMY activities and phone records," (Ex. 5 to (Corrected) Decl. of Haefele (Dkt.

No. 9541), Youssef Rpt. § IV-W, n.919-922 (citing Awlaki's Dar al Hijrah contract found in WAMY's records, Ex. 174, WAMY Intl 015165; FBI 1845-55; Aff. of Awad Binladin (Nov. 19, 2005) at 1; WAMY International, Inc. Corporate Document - June 2000 Statement of Change of Registered Agent form signed by Ibrahim Abdullah as "Vice President"; EO 3429)), and WAMY held (and may have funded) the Dar al-Hijrah employment contract of Anwar al-Awlaki, ideological mentor to at least three 9/11 hijackers. Ex. 132, WAMY Int 15165-68. A genuine dispute of material fact exists.

**STATEMENT:**

6. The Canada Revenue Agency's Audit and Revocation of WAMY Canada's Charitable Tax-Exempt Status in 2011 Does Not Establish That WAMY Provided any Material Support, Directly or Indirectly, to al-Qaeda

**RESPONSE:**

Disputed. The CRA audit and 2011 revocation are affirmative evidence supporting the opposite inference—that a reasonable factfinder could conclude WAMY provided material support to al-Qaeda. After auditing WAMY-Canada, the CRA revoked its charitable registration and found that WAMY kept no proper books or records, "does not operate for charitable purposes," and "maintained close relationships with and provided funding to organizations that were engaged in providing resources to entities engaged in terrorist activities"—specifically BIF, which was listed as associated with al-Qaeda under UN-1267. EX. 79, FED-PEC 218170-218203; PEC-WAMY031447-448, 031460. The CRA found WAMY-Canada and BIF-Canada shared a joint bank account titled "World Assembly of Muslim Youth o/a BIF," a common director, and a mailing address, and that WAMY funded BIF-USA. Ex. 59, Levitt Rpt. § IV.7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Ex. 112, Kohlmann 2020

Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). BIF is a U.N.-listed and U.S. Treasury-designated al-Qaeda entity. Ex. 74, Winer Rpt. § 11.5.1; U.S. Treasury designation of BIF (Nov. 19, 2002); UN designation of BIF (Nov. 21, 2002). The CRA also found WAMY (Saudi Arabia) "maintains substantial control over WAMY's finances" in Canada and that WAMY-Canada was "indistinguishable from" its Saudi headquarters, tying the Canadian conduct to WAMY's global organization. Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶ 192; Ex. 74, Ex. 74, Winer Rpt. § 10.3.4; Ex. 133, Kohlmann 2020 Rpt. ¶¶ 76, 79 (citing EX. 79, FED-PEC 218170-218203 at 177-179; WAMYSA 4442-4443, WAMYSA 4480, WAMYSA 1748, WAMYSA 1946, WAMYSA 1948-1954). The CRA found "massive deficiencies"—no general ledger, cancelled cheques, minute book, or bank deposit slips—that prevented it from verifying who received WAMY-Canada's funds; as Plaintiffs' expert explains, "[f]or charities linked to terrorism, bad books and records become the means of hiding terrorist support." Ex. 74, Winer Rpt. §§ 10.3.1-.4 (citing EX. 79, FED-PEC 218170-218203 at 174). This Canadian conduct is consistent with the broader record: JTF-GTMO listed WAMY as a "Tier 1 NGO" providing "sustained and active support for terrorist organizations," Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶¶ 158-159; Ex. 74, Winer Rpt. § 12.10.3 (citing Ex. 105, U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) (Jun. 28, 2006); Decl. of Mohammedi (Dkt. No. 11999), Ex. 157, JTF-GTMO Hamad Detainee Assessment.; Ex. 227, Set 52_3643-3869 at 37; U.S. Dept. of Defense JTF-GTMO Matrix of Threat Indicators for Enemy Combatants). Batterjee, a "former WAMY/BIF official," is named on al-Qaeda's "Golden Chain" list depicting key al Qaeda donors, and Saudi-financed charities including WAMY were known to be "directly supporting al-Qa'ida's

ongoing jihad." Ex. 133, Kohlmann 2020 Rpt. ¶¶ 2, 20; Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 27-28 & Ex. 5; Ex. 238, Nakhleh Rpt. ¶ 106. A genuine dispute of material fact exists.

**STATEMENT:**

375. The Canada Revenue Agency ("CRA") is the Canadian government agency "administers tax, benefits, and related programs for the Government of Canada and for most provinces and territories." Ex. 181, Canadian Revenue Authority Website Homepage; Ex. 182, PEC-WAMY031447-468, at 447-448 (2011 Audit letter to Al-Taher, WAMY Canada president).

**RESPONSE:**

Undisputed that the CRA is the Canadian federal tax authority; but disputed as to any implication that WAMY's CRA audit was a routine tax matter unrelated to terrorism or that the CRA's role was limited. The same audit letter WAMY cites sets out the CRA's findings that WAMY failed to maintain books and records, "does not operate for charitable purposes," and "maintained close relationships with and provided funding to organizations that were engaged in providing resources to entities engaged in terrorist activities," including BIF. EX. 79, FED-PEC 218170-218203 at 175, 186. The same audit found that WAMY-Canada shared a joint bank account with, and funded, BIF, that WAMY (Saudi Arabia) controlled WAMY-Canada's finances, and that WAMY-Canada was linked to terrorism-connected entities. Ex. 74, Winer Rpt. § 12.12.12; Ex. 133, Kohlmann 2020 Rpt. ¶¶ 78, 79, 80 (citing EX. 79, FED-PEC 218170-218203; WAMYSA 4400-4401, 4455-4456, 4579-4580, 4442-4443, 4480, 4517, 1873-1878). A genuine dispute of material fact exists.

**STATEMENT:**

376. CRA's audit of WAMY Canada began in March 2004 with an interview of Khatib and Al-Jarad. Id. at PEC-WAMY031452 (discussing procedures).

**RESPONSE:**

Undisputed that the CRA audit commenced in 2004 and involved interviews of WAMY-Canada personnel. Plaintiffs dispute WAMY's implicit framing of the audit as merely procedural. One of the interviewees, Mohamed Khatib, was himself simultaneously WAMY-Canada's president and BIF-Canada's Secretary, reported directly to WAMY's Secretary General, received hundreds of thousands of dollars from WAMY headquarters, and remained on WAMY-Canada's Board through at least the end of 2003. Ex. 74, Winer Rpt. § 12.12.12; Ex. 133, Kohlmann 2020 Rpt. ¶¶ 78-80 (citing EX. 79, FED-PEC 218170-218203; WAMYSA 4400-4401; WAMYSA 4455-4456; WAMYSA 4579-4580; WAMYSA 4442-4443; WAMYSA 4480; WAMYSA 1748; WAMYSA 1946; WAMYSA 1948-1954; WAMYSA 1957-1958; WAMYSA 4407; FED-PEC 217320-217332; FED-PEC 217346-217358; FED-PEC 217359-2173704517; WAMYSA 1873-1878). The audit examined WAMY-Canada's relationships with BIF and terrorist-linked entities, found WAMY-Canada shared a joint bank account with BIF-Canada and funded BIF-USA, and culminated in revocation of WAMY-Canada's charitable status for cause. Ex. 112, Kohlmann 2020 Rpt. ¶ 193 (citing EX. 79, FED-PEC 218170-218203; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). A genuine dispute of material fact exists.

**STATEMENT:**

377. In an August 23, 2011, letter to WAMY Canada, CRA communicated that it conducted an "…audit related to the operations of [WAMY-Canada] for the period from January 1, 2000,

to December 31, 2003" in connection with alleged "non-compliance with core requirements of the Income Tax Act…" Id. at PEC-WAMY031447 (August 23, 2011, letter to Taher, WAMY-Canada President).

**RESPONSE:**

Undisputed that the CRA's August 23, 2011 letter identified the audit period as January 1, 2000 to December 31, 2003 and referenced non-compliance with the Income Tax Act. Plaintiffs dispute any suggestion that the non-compliance was merely technical. The CRA's identified non-compliance included WAMY's failure to keep books and records AND its "close relationships with and provided funding to organizations that were engaged in providing resources to entities engaged in terrorist activities"—including WAMY's $50,246 payment to BIF-USA—leading to revocation for cause. Ex. 74, Winer Rpt. §§ 10.3.1-.4 (citing EX. 79, FED-PEC 218170-218203 at 702, 713-716). The CRA found "massive deficiencies"—no general ledger, missing cancelled cheques, no minute book, and no bank deposit slips—that "prevented [CRA] from verifying" who received WAMY-Canada's funds; that WAMY-Canada was "indistinguishable from" its Saudi headquarters and transferred funds to "non-qualified donees"; and that WAMY-Canada shared a joint bank account with, and provided funding to, BIF. Ex. 74, Winer Rpt. §§ 10.3.1-.4, 12.12.12; Ex. 59, Levitt Rpt. ¶ 294 (citing EX. 79, FED-PEC 218170-218203 at 702, 705-707, 713). The CRA further found that WAMY's Saudi headquarters "maintains substantial control" over WAMY-Canada's finances and funded it with hundreds of thousands of dollars. Ex. 133, Kohlmann 2020 Rpt. ¶¶ 76, 79 (citing EX. 79, FED-PEC 218170-218203 at 705-707; WAMYSA 4442-4443, 4480, 1748, 1946, 1948-1954, and FED-PEC 217320-217370). "For charities linked to terrorism, bad books and records become the means of hiding terrorist support." Ex. 74, Winer Rpt. § 10.4. A genuine dispute of material fact exists.

**STATEMENT:**

378. The tax agency's audit concerned whether WAMY-Canada can continue to maintain its charity tax-exempt status pursuant to subsection 168(1) of the tax code. Id. (August 2011 letter to Al-Taher).

**RESPONSE:**

Disputed. The CRA audit was not a narrow tax-status inquiry but a substantive investigation that showed WAMY-Canada's links to terrorism and to its Saudi parent. Section 2.2 of the CRA report is titled "Activities Contrary to Public Policy – Links to Terrorism," and the CRA expressly examined WAMY-Canada's connection to BIF and its control by WAMY (Saudi Arabia), "which has been alleged to support terrorism." CRA audit, EX. 79, FED-PEC 218170-218203. Based on WAMY's own documents, the CRA concluded that WAMY (Saudi Arabia) "maintains substantial control over WAMY[-Canada]'s finances" and "uses this control to carry out its objectives in Canada." Ex. 112, Kohlmann 2020 Rpt. ¶ 192; Ex. 133, Kohlmann 2020 Rpt. ¶ 76 (citing EX. 79, FED-PEC 218170-218203 at 705-707). The same audit documented WAMY-Canada's financial ties to BIF, a UN-designated al-Qaeda entity. Ex. 112, Kohlmann 2020 Rpt. ¶ 193 (citing EX. 79, FED-PEC 218170-203 at 712-714; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). A genuine dispute of material fact exists.

**STATEMENT:**

379. On or about January 5, 2012, the CRA issued a financial audit report that WAMY-Canada "failed to comply with or contravened any sections 230(2) of the Act; ceased to comply with the requirements of the Act for continued registration; and failed to file an information

return as required under the Act." Ex. 183, FED-PEC0218170-203 at 170 (excerpt from report).

**RESPONSE:**

Disputed. The CRA report did not recount a mere failure to file required documents; it set out three independent statutory grounds for revocation under paragraphs 168(1)(b), (c), and (e) of the Income Tax Act, and concluded that WAMY "maintained close relationships with and provided funding to organizations that were engaged in providing resources to entities engaged in terrorist activities," finding "sufficient grounds for revocation" for each reason stated, including its terrorism-links findings. Ex. 74, Winer Rpt. §§ 10.3-10.4 (citing EX. 79, FED-PEC 218170-218203). The recordkeeping failures were themselves significant and obscured WAMY-Canada's fund flows: the audit uncovered "significant financial irregularities and deficient accounting practices," including "failure to maintain a general ledger," missing cancelled cheques, and inability to produce donation receipts, such that "WAMY's failure to maintain essential books and records" limited the CRA's ability "to verify the nature and recipients of payments." Ex. 112, Kohlmann 2020 Rpt. ¶ 191 (citing EX. 79, FED-PEC 218170-218203 at 174-175). The same audit separately documented WAMY-Canada's shared bank account and director with BIF-Canada and a transfer to BIF-USA in the amount of $50,246. Ex. 112, Kohlmann 2020 Rpt. ¶ 193 (citing EX. 79, FED-PEC 218170-203 at 184-185, 187, 192; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). WAMY "has not retained audits of any activities it funded of Batterjee and LBI prior to 1994, and does not appear to have ever conducted any such audits," which suggest a "clear pattern of deficiencies in controls

on WAMY's activities." Winer Rebuttal Rpt. §§ 2.38.8, 2.39. A genuine dispute of material fact exists.

**STATEMENT:**

380. CRA noticed WAMY Canada of its intent to revoke its tax-exemption registration, the consequences of which include a) the Organization will no longer be tax-exempt as a registered charity and will no longer be permitted to issue official donation receipts; b) by the Organization may be required to pay a tax; and c) the Organization will no longer qualify as a charity for Canada tax purposes. Ex. 183 at FED-PEC0218171-72.

**RESPONSE:**

Undisputed as to the consequences stated in the CRA report, but disputed to the extent this statement implies the consequences flowed from a mere technical default. The tax consequences WAMY recites do not capture the audit's substantive findings: the CRA imposed those consequences because it found WAMY-Canada functioned as an arm of its Saudi parent—which "maintains substantial control" over WAMY-Canada and used it "to carry out its objectives in Canada"—and was connected to BIF-Canada and BIF-USA, entities added to the UN Security Council's Al-Qaida and Taliban Sanctions Committee list on November 21, 2002, such that WAMY's relationships were "contrary to Canadian public policy." Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193; Ex. 133, Kohlmann 2020 Rpt. ¶ 76 (citing EX. 79, FED-PEC 218170-203 at 177-179, 184-186; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). The CRA stated these "allegations cannot be ignored in the context of the public benefit test for a registered charity." Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193; Ex. 133, Kohlmann 2020 Rpt. ¶ 76 (citing EX. 79, FED-PEC 218170-203 at 191). A genuine dispute of material fact exists.

**STATEMENT:**

381. The CRA's action was based on WAMY Canada's 1) failure to comply with or contravene any section of 230 to 231.5 of the Tax Act; 2) ceasing to comply with the requirements of the Act for continued registration; and 3) failure to file an information return as and required under the Act. Ex. 182 at PEC-WAMY031447; see also, Ex. 183 at FED-PEC0218170.

**RESPONSE:**

Disputed to the extent this statement implies that the CRA's findings as to WAMY's public-policy and terrorism links were not also a basis for the its actions. The CRA found WAMY-Canada shared a director, address, and bank account with BIF-Canada and funded BIF-USA, and was controlled by a Saudi parent "alleged to support terrorism," concluding WAMY "maintained close relationships with and provided funding to organizations that were engaged in providing resources to entities engaged in terrorist activities." Ex. 59, Levitt Rpt. § IV.7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-181, 184-185, 187, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865-1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). The recordkeeping failures on which the CRA acted were themselves substantial and obscured WAMY-Canada's fund flows, limiting the CRA's ability "to verify the nature and recipients of payments." Ex. 112, Kohlmann 2020 Rpt. ¶ 191 (citing EX. 79, FED-PEC 218170-218203 at 174-175). The audit's substantive findings—Saudi HQ control and BIF financial ties—supply a genuine dispute the recited procedural grounds omit. Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193; Kohlmann Rebuttal Rp.t ¶ 76 (citing EX. 79, FED-PEC 218170-203 at 705-707, 712-714; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83,

WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). This tracks a broader pattern: WAMY "likely did not conduct audits of any of the activities it undertook in Afghanistan prior to 1994," reflecting a "clear pattern of deficiencies in controls on WAMY's activities." Winer Rebuttal Rpt. §§ 2.38.8, 2.39. A genuine dispute of material fact exists.

**STATEMENT:**

382. The CRA's Conclusion included the following:

> Our analysis of the Organization's (WAMY Canada's) operations has led the CRA to believe that the Organization, which has been inactive since at least 2005, was established to support the goals and operations of its parent organization located in Saudi Arabia, which has been alleged to support terrorism. Our analysis particularly noted that the Organization shared a common director, contact information, and a bank account with the Benevolence International Fund in Canada (BIF-Canada), and provided $50,246 to the Benevolence International Foundation in the United States (BIF-USA) in 2001. On November 21, 2002, BIF-Canada and BIF-USA were added to the Consolidated List of the United Nations Security Council's Al-Qaida and Taliban and Sanctions Committee, as entities belonging to, or associated with, Al-Qaida. Id.

**RESPONSE:**

Undisputed. In addition, BIF-Canada and BIF-USA shared a common director -- Enaam Arnaout -- who pled guilty to racketeering and admitted diverting charity funds to fighters in Bosnia and Chechnya, and BIF founder Adel Batterjee, a former Chairman of WAMY (Saudi Arabia), was added to the UN 1267 list on December 24, 2004. EX. 79, FED-PEC 218170-203 at 713-714. WAMY-Canada's own director admitted Khatib deposited non-WAMY funds and opened BIF

sub-accounts under WAMY-Canada's accounts. Decl. of Mohammedi (Dkt. No. 11999), Ex. 163, Ibrahim Abdullah 2018 Declaration, at ¶ 35. WAMY funded LBI, "the precursor to BIF," which "provided financial and operational support to mujahideen elements in Afghanistan and around the world, including fighters associated with UBL," and BIF/LBI "remained one organization with interchangeable assets under [Adel] Batterjee's control"; BIF was designated a Specially Designated Global Terrorist in November 2002 for "its support to al Qaida and UBL." Ex. 74, Winer Rpt. §§ 12.12.4-.5; Winer Rebuttal Rpt. §§ 2.38.6-.8, 3.30.1-.12 (citing WAMY-Pakistan audits, Decl. of Mohammedi (Dkt. No. 11997), Exs. 78-82; "Muslims From Afar Joining 'Holy War' in Bosnia," NYT (Dec. 5, 1992); U.S. Treasury Designation of Batterjee (Dec. 21, 2004)). A genuine dispute of material fact exists.

**STATEMENT:**

383. The CRA did not make any finding that WAMY Saudi Arabia or WAMY Canada provided any support to Al-Qaida, directly or indirectly. Id. at FED-PEC0218170-172.

**RESPONSE:**

Disputed. While the CRA did not render an ultimate legal finding of terrorism support, it expressly found terrorism-related conduct and its factual findings directly connect WAMY-Canada to al-Qaeda-designated entities. The CRA concluded WAMY "maintained close relationships with and provided funding to organizations that were engaged in providing resources to entities engaged in terrorist activities"; found WAMY-Canada shared a director, contact information, and a bank account with BIF-Canada and funded BIF-USA's Orphan Program —both BIF entities listed under UN 1267 on November 21, 2002, as associated with Al-Qaida; and determined that WAMY-Canada "was established to support the goals and operations of its parent organization located in Saudi Arabia, which has been alleged to support

terrorism." Ex. 112, Kohlmann 2020 Rpt. ¶ 193; Ex. 133, Kohlmann 2020 Rpt. ¶ 76 (citing EX. 79, FED-PEC 218170-218203; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). WAMY-Canada also distributed WAMY-Saudi Arabia literature that "appears to… advocate violence against… non-Muslims." Ex. 112, Kohlmann 2020 Rpt. ¶ 194 (citing EX. 79, FED-PEC 218170-218203 at 189-190). Independent CIA reporting names WAMY as "an excellent conduit" for terrorist funds and "recruits for many extremist groups." Decl. of Mohammedi (Dkt. No. 12001), Exs. 243 & 245 (CIA_000807-000848 at 816-817, 820-821, 826-827; CIA_ 000143-000158 at 151). Furthermore, WAMY funded LBI—"the precursor to BIF"—whose senior board included two WAMY officers, and BIF "provided financial and operational support to mujahideen fighters worldwide, including members of al Qaida in Afghanistan, the Sudan, Bosnia-Herzegovina and Chechnya," with "UBL confirm[ing]… that BIF was one of the non-governmental organizations providing funds to al Qaida." Ex. 74, Winer Rpt. §§ 12.12.4-.5; Winer Rebuttal Rpt. §§ 2.38.6-.8, 3.30.1-.12 (citing WAMY-Pakistan audits, Decl. of Mohammedi (Dkt. No. 11997), Exs. 78-82; "Muslims From Afar Joining 'Holy War' in Bosnia," NYT (Dec. 5, 1992); U.S. Treasury Designation of Batterjee (Dec. 21, 2004)). A genuine dispute of material fact exists.

**STATEMENT:**

384. The CRA did not make any finding as to the reliability or veracity of the allegations that WAMY Saudi Arabia supported "terrorism" instead noting the existence of "Adverse Reporting on WAMY and its Affiliates." Id. at FED-PEC0218181-184.

**RESPONSE:**

Disputed. The CRA treated the terrorism links as a substantive audit concern, devoting an entire section -- Section 2.2 ("Activities Contrary to Public Policy – Links to Terrorism") -- to them and relying on governmental sources—including U.S. Department of Justice court briefs quoting Usama bin Laden's identification of WAMY (through al Qaeda defector Jamal al-Fadl) as a primary source of al Qaeda financing, and a sworn affidavit of DHS Senior Special Agent David Kane. EX. 79, FED-PEC 218170-218203 at 179-186. The CRA found WAMY-Canada's control by WAMY (Saudi Arabia), which has "provided support to terrorist organizations" "particularly concerning" and material to the public-benefit test. EX. 79, FED-PEC 218170-218203 at 179-186. The "Adverse Reporting" the CRA compiled is corroborated by WAMY's documented financial ties to BIF, an entity designated under UN 1267 as associated with al-Qaeda, (Ex. 112, Kohlmann 2020 Rpt. ¶ 193 (citing EX. 79, FED-PEC 218170-218203 at 184-186; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443), and WAMY Secretary General Maneh al-Johani's own published solicitation of funds for Chechen "mujahideen" to "buy weapons and gear." Ex. 112, Kohlmann 2020 Rpt. ¶ 166 (citing al-Johani, “The Chechen Tragedy,” Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843). A genuine dispute of material fact exists.

**STATEMENT:**

385. This “Adverse Reporting” includes newspaper and online articles from questionable sources and statements including those by plaintiffs’ retained expert Evan Kohlmann, someone who has worked for the plaintiffs’ lawyers in this case since 2003. Id. at FED-PEC0218181-183, Ex. 184, Evan Kohlmann Dep. Transcript (Excerpt) at 8:24-25, 9:1-7.

**RESPONSE:**

Disputed. The adverse reporting the CRA relied upon included official and sworn governmental sources—not merely media. The testimony cited in the CRA audit is the "[t]estimony of Matthew Epstein *with* Evan Kohlmann." (emphasis added), EX. 79, FED-PEC 218170-218203 at 183, n. 39. Epstein's testimony noted that "[f]rom 1993 to 1999, BIF [USA] collected over $12 million by way of personal checks, wire transfers and stock donations. Moneys were then transferred overseas by wire to al-Qaeda-controlled accounts and ultimately withdrawn in cash to support al-Qaeda operations." "Progress Since 9/11: The Effectiveness of the U.S. Anti-Terrorist Financing Efforts," Hrg. Before the Subcmte. on Oversight and Investigations, Cmte. on Financial Services, U.S. House of Rep. (Mar. 11, 2003) at p. 30. The focus of this hearing was on "the activities of various groups and charities in the U.S. which have been raising money on behalf of terrorist groups such as al-Qaeda" and named WAMY's close affiliate - BIF - as one such charity. "Progress Since 9/11: The Effectiveness of the U.S. Anti-Terrorist Financing Efforts," Hrg. Before the Subcmte. on Oversight and Investigations, Cmte. on Financial Services, U.S. House of Rep. (Mar. 11, 2003) at p. 4. Further testimony cited a report published by the Council on Foreign Relations -- a nonpartisan American nonprofit organization focused on U.S. foreign policy and international relations since its founding in 1921 -- stating, "Saudi Arabian-based charities have been the most important source of funds for al-Qaeda, and that for years Saudi officials have been turning a blind eye to this problem." "Progress Since 9/11: The Effectiveness of the U.S. Anti-Terrorist Financing Efforts," Hrg. Before the Subcmte. on Oversight and Investigations, Cmte. on Financial Services, U.S. House of Rep. (Mar. 11, 2003) at p. 16; "Terrorist Financing: Report of an Independent Task Force," Council on Foreign Relations (2002) at pp. 13-14. A genuine dispute of material fact exists.

**STATEMENT:**

386. The CRA report is not an intelligence report nor a law enforcement report, it is a tax authority agency. Ex. 31 at 263:25-264:5 (Winer conceding that CRA not a law enforcement or intelligence agency).

**RESPONSE:**

Disputed as immaterial. That the CRA is a tax authority does not undercut its findings, which incorporated law-enforcement and intelligence-derived, government materials and were drawn from WAMY's own records establishing Saudi control and WAMY-Canada's financial ties to BIF, a UN-designated al-Qaeda entity. Ex. 112, Kohlmann 2020 Rpt. ¶ 193; Ex. 133, Kohlmann 2020 Rpt. ¶ 76 (citing CRA audit, EX. 79, FED-PEC 218170-218203; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). Independent intelligence and law-enforcement records in this same litigation reach the same conclusions: CIA reporting names WAMY as a terrorism-recruitment conduit and identifies the Saudi Joint Relief Committee as coordinating charities "tied to terrorist and mujahidin activity including ... WAMY," (Decl. of Mohammedi (Dkt. No. 12001), Ex. 245, CIA_000143-158 at 151); and the U.S. Treasury/UN designated BIF. Ex. 112, Kohlmann 2020 Rpt. ¶¶ 189-190; U.S. Treasury designation of BIF (Nov. 19, 2002); UN designation of BIF (Nov. 21, 2002). A genuine dispute of material fact exists.

**STATEMENT:**

387. The CRA did not freeze WAMY-Canada's bank accounts. Ex. 31 at 264:4-22 (recounting that CRA only revoke not-for-profit status of WAMY-Canada); 265:14-16 (no reason to believe CRA froze WAMY's bank account); Ex. 185, PEC-WAMY031431-441 (Excerpt

from CRA Investigative file, at 436: "A NITR was issued on January 5th, 2011, with a February11, 2012 date to be published in the Canada Gazette revoking the charity status").

**RESPONSE:**

Disputed as immaterial and incomplete. Under a compliance proceeding for potential suspension or revocation of a registered charity, the CRA has no asset-freezing function, so the absence of a freeze says nothing about WAMY's conduct and does not negate the CRA's substantive findings linking WAMY to terrorists. Moreover, there was no active account to freeze: WAMY's Bank of Montreal account #8086-611 had already been renamed "WAMY o/a BIF" and was closed on June 12, 2001 with a $19,377.86 bank draft whose "final destination ... is unknown," and with $60,698.17 in cheques drawn on the account left unidentified. EX. 79, FED-PEC 218170-218203. The material dispute lies in the audit's substantive findings—WAMY's (Saudi Arabia) control over WAMY-Canada and its financial ties to BIF, a U.S. & UN -designated al-Qaeda entity. Ex. 59, Levitt Rpt. § IV.7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). A genuine dispute of material fact exists.

**STATEMENT:**

388. The CRA did not revoke WAMY-Canada's corporate registration in Canada. Ex. 31 at 264:13-22 (Winer conceding that CRA did not revoke WAMY-Canada's corporate registration).

**RESPONSE:**

Disputed as immaterial and inaccurate. Corporate and nonprofit registration in Canada is handled by Corporations Canada at the federal level; the CRA (a tax authority) does not administer corporate registrations.The CRA revoked WAMY-Canada's charitable registration precisely because of its substantive findings, including its terrorism-links and BIF findings. Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 112, Kohlmann 2020 Rpt. ¶ 193 (citing EX. 79, FED-PEC 218170-218203 at 184-186; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). Furthermore, the cited testimony does not support Defendants' statement. Winer's testimony is as follows:

Q. What type of registration that WAMY Canada was -- CRA was trying to invoke (sic) WAMY Canada?

A. I believe it was its registration for charter.

Q. It's fair to say its not-for-profit status; correct?

A. Yes.

Q. So not revoking registration of WAMY Canada altogether, just not-for-profit status; correct?

A. I'd have to look at it again to address that issue.

Q. Okay. I guarantee that's what happened.

A. I accept your representation on that.

See Decl. of Mohammedi (Dkt. No. 11997), Ex. 31 at 264:9-22. A genuine dispute of material fact exists.

**STATEMENT:**

389. The CRA did not impose any criminal charges against WAMY-Canada arising from its investigation. Ex. 182 at PEC-WAMY031447 (citing that WAMY-Canada’s charitable tax

status was revoked for failure to maintain books and records properly, failure to "comply with the requirements of the [Income Tax] Act for continued registrations," and failure to "file and information return as required under the [Income Tax] Act").

**RESPONSE:**

Disputed as immaterial. The CRA is a tax regulator and can investigate criminal tax violations, but cannot does not have the authority to bring criminal charges, so the absence of charges proves nothing and does not exonerate WAMY. The basis of CRA's audit and decision to revoke WAMY-Canada's registration included activities "contrary to Canadian public policy" tied to terrorism links. EX. 79, FED-PEC 218170-218203. In the U.S., criminal liability did attach to WAMY-connected BIF entities: Enaam Arnaout, common director of BIF-Canada and BIF-USA, pled guilty to racketeering and admitted diverting charitable funds to fighters in Bosnia and Chechnya. EX. 79, FED-PEC 218170-218203 at 185-186. The audit's substantive findings—WAMY's (Saudi Arabia) control over WAMY-Canada, WAMY-Canada's shared bank account with BIF-Canada, and serious financial irregularities (including a $50,246 transfer to BIF-USA)—establish a genuine dispute of material fact. Ex. 112, Kohlmann 2020 Rpt. ¶¶ 191-193 (citing EX. 79, FED-PEC 218170-203; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443).

**STATEMENT:**

390. The CRA did not recommend WAMY-Canada for any administrative sanctions or penalties. Ex. 185 at PEC-WAMY031440 (noting that WAMY-Canada was not selected for sanctions) and at PEC-WAMY031435 (indicating that since 2005 WAMY-Canada was inactive).

**RESPONSE:**

Disputed as immaterial. WAMY-Canada was inactive since 2005 and had no assets to sanction -- with respect to WAMY-Canada, the audit report noted: "[t]he organization has no assets in Canada. Has indicated in the 2009 T3010 that it has capital assets in the amount of $1,255.00 outside of Canada; however, no further details are available. Organization has not operated since before 2005." Decl. of Mohammedi (Dkt. No. 12001), Ex. 185 at PEC-WAMY031440. The entities to which WAMY-Canada was connected were in fact sanctioned: BIF-Canada and BIF-USA were added to the UN 1267 Al-Qaida list on November 21, 2002, and BIF founder / former WAMY (Saudi Arabia) Chairman Adel Batterjee was designated a Specially Designated Global Terrorist by OFAC on December 21, 2004. Ex. 112, Kohlmann 2020 Rpt. ¶¶ 189-190; Winer Rebuttal Rpt. § 2.38.12.1 (citing U.S. Treasury designation of Batterjee (Dec. 21, 2004); U.S. Treasury designation of BIF (Nov. 19, 2002); UN designation of BIF (Nov. 21, 2002)). WAMY (Saudi Arabia) also declined to sanction its WAMY-Canada president--who also served as Secretary of BIF-Canada--Mohamed Khatib, instead sending a letter of gratitude and keeping him on WAMY-Canada's Board through 2003. Ex. 74, Winer Rpt. § 12.12.12; Ex. 133, Kohlmann 2020 Rpt. ¶ 80, nn.110-111 (citing EX. 79, FED-PEC 218170-218203 at 184-185; WAMYSA 4517, WAMYSA1873-1878). A genuine dispute of material fact exists.

**STATEMENT:**

**D. WAMY's Provision of Humanitarian Aid to Refugees Under the Coordination of The Saudi Joint Relief Committee Did Not At All Support al-Qaeda**

**RESPONSE:**

Disputed. The record contradicts the assertion that WAMY's SJRC-coordinated Balkans relief "did not at all support al-Qaeda." CIA reporting describes the Saudi Joint Relief Committee as a

Saudi state-sponsored coordinating body for Islamic charities in Kosovo and Chechnya "some of which have been tied to terrorist and mujahidin activity including al-Haramain, al-Waqf al-Islami, IIRO, and WAMY," with bin Laden associate and al Qaeda founder Wa'el Jelaidan as the Saudi-government-appointed head of the SJRC's Kosovo office. Decl. of Mohammedi (Dkt. No. 12001), Ex. 245, CIA_000143-158 at 151. Jelaidan "may have used his position and influence at these organizations to divert funds and resources to al Qaida." Decl. of Mohammedi (Dkt. No. 12001) Ex. 234, OFAC evidentiary memo, TREASURY00001-121 at 62. The SJRC—of which WAMY was a constituent member—was led by executive director Wa'el Jelaidan, jointly designated by the United States and Saudi Arabia as a Specially Designated Global Terrorist and al-Qaeda supporter, and the U.N. mission in Kosovo reported the SJRC's Pristina office was "in fact, a cover for al Qaeda operatives." Ex. 246, Comras Rpt. pp. 27, 29-30, 31, nn. 102, 112-115, 122 (citing WJ 022; U.S. Treasury Statement (Sep. 6, 2002), FED-PEC 203469-470; U.N. 1267 Narrative Summary QI.J.79.02, FED-PEC 213923-929). Saudi officials knew that Saudi-financed charities "such as al-Haramayn, IIRO, WAMY, and the Muslim World League" were "directly supporting al-Qa'ida's ongoing jihad," and Saudi charities were "aligned" with al Qaeda "in supporting wars of redemption in areas where Muslims lived, such as Afghanistan, Bosnia, Chechnya, and Kashmir." Ex. 238, Nakhleh Rpt. ¶ 106; Winer Rebuttal Rpt. § 4.11 (citing Hegghammer, *Jihad in Saudi Arabia: Violence and Pan-Islamism since 1979* (2010)). A genuine dispute of material fact exists.

**STATEMENT:**

391. In 1999, then King Fahad bin Abdul Aziz of KSA issued an order establishing the Saudi Joint Relief Committee (SJRC), a multi-organizational relief committee concerned with Saudi Arabian led relief to Albanian refugees of the then ongoing conflict in the former

Yugoslavia (now Kosovo and Bosnia). See Ex. 186, ECF 2775-1, Declarations of Abdul Rahman Al Suwailem and supporting materials, p. 23, Al Suwailem January 10, 2005 Decl. at ¶2, ¶3 and 5 (Kingdom established SJRC in 1999 in response to humanitarian crisis and civil war in Yugoslavia that affected Albanians in Kosovo), at Exhibit B to Suwailem Decl. (1999 order by King Fahd Abdul Aziz establishing committee for Kosovars and naming members of the committee 1999).

**RESPONSE:**

Undisputed that King Fahd established the SJRC in 1999; disputed as incomplete and misleading. The same SJRC was a coordinating body for charities "some of which have been tied to terrorist and mujahidin activity including al-Haramain, al-Waqf al-Islami, IIRO, and WAMY," and its Kosovo office was headed by al Qaeda founder and financier Wa'el Jelaidan. Decl. of Mohammedi (Dkt. No. 12001), Ex. 245, CIA_000143-158 at 151. Jelaidan simultaneously held senior positions at the IIRO, MWL, SJRC, and Saudi Red Crescent and two other bin Laden-affiliated charities, and "may be using his position ... to divert funds and resources to al-Qa'ida." Pls.' Corrected Averment, (Dkt. No. 9541), ¶ 2085 (citing CIA_000500-563 at 525, 544). Jelaidan was jointly designated by the United States and Saudi Arabia as a Specially Designated Global Terrorist and "associate of Usama bin Laden." Ex. 246, Comras Rpt. pp. 29-30, nn. 112-113 (citing U.S. Treasury Statement (Sept. 6, 2002), FED-PEC 203469-470). The CIA and Albanian authorities concluded the SJRC was "actively building a terrorist network" in Albania and Kosovo, and the U.N. Kosovo mission reported its Pristina office was "in fact, a cover for al Qaeda operatives." Ex. 246, Comras Rpt. pp. 28, 31, nn. 105-107 (citing Testimony of Evan F. Kohlmann before the Senate Judiciary Cmte. (Jul. 14, 2010), citing “Islamic Organizations in the Balkans.” A Joint Research Project by the Governments of the United States and the United

Kingdom (Aug. 2003); Testimony of Evan F. Kohlmann Before the Senate Cmte. on the Judiciary, Subcommittee on Crime and Drugs "Evaluating The Justice Against Sponsors of Terrorism Act, S. 2930," (Jul. 14, 2010); FED-PEC 97363-65; KADI 5129-32; KADI 2910-12; Eduart Bala, Deputy Director of Defense Intelligence Agency, "Financing of Terrorism-Case study, Albania," MILITARY REVIEW, Security and Defense Review Training and Doctrine Command Second Edition, (Dec. 2013) at p. 129). The Balkans were an active al-Qaeda theater during the SJRC's operations: 9/11 hijackers al-Hazmi and al-Mihdhar "had traveled together to fight in Bosnia in a group that journeyed to the Balkans in 1995." Ex. 133, Kohlmann Rebuttal Rpt. ¶ 81 (citing Ex. 4, 9/11 Comm'n Report at 156). The U.N. 1267 Monitoring Group recognized that charities' "humanitarian programmes" in Kosovo and Bosnia coexisted with terrorist support. Winer Rebuttal Rpt. § 4.4.3 (citing U.N. Letter S/2003/1070 (Dec. 2, 2003)). A genuine dispute of material fact exists.

**STATEMENT:**

392. King Fahad's 1999 Order directed SJRC to include representatives from "the National Guard, the Ministry of Defense and Aviation, the Ministry of Interior, the Presidency of Intelligence, the Ministry of Finance and National Economy, the Ministry of Information, and the Ministry of Labor and Social Affairs…." Id. at p. 24, Al Suwailem January 10, 2005, Decl. at ¶7 and pg. 35.

**RESPONSE:**

Undisputed that the order named Saudi government ministries; disputed as to its exculpatory import. The stated composition confirms the SJRC operated as a Saudi state instrumentality under the Minister of Interior, Prince Nayef bin Abdulaziz—the same official whom the CIA assessed was "aware of and condoned Al Haramain's global support for terrorism." Ex. 148, Pls.'

Corrected Averment, (Dkt. No. 9541) ¶ 1980; Decl. of Mohammedi (Dkt. No. 12001), Ex. 243, CIA_00807-848). Al Haramain, an SJRC participant, "is part of the Saudi Joint Relief Committee, which is headed by the Minister of Interior, Prince Nayif; the SJRC reported to Prince Nayef and its operations were "kept under tight control by the Saudi government." Pls.' Corrected Averment (Dkt. No. 9541) ¶ 1980, Decl. of Mohammedi (Dkt. No. 12001), Ex. 243, CIA_00807-848); Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 166 (citing Decl. of Alan R. Kabat (Dkt. No. 2775), Ex. 3, Decl. of Abdul Rahman Al-Swailem (Jan. 10, 2005)). The SJRC was "largely staffed with members of Saudi Arabia's economic and foreign affairs agencies," and its executive director Jelaidan was a designated al-Qaeda financier. Ex. 246, Comras Rpt. p. 27, 29-30, n. 102 (citing WJ 022; U.S. Treasury designation of Jelaidan (Sep. 6, 2002), FED-PEC 203469-470). Saudi government control of these charities is confirmed in that the MOIA "support[ed]" da'wa organizations "such as the Muslim World League, (IIRO), (WAMY), and al-Haramayn—financially and operationally," requiring them to report their activities to headquarters in Saudi Arabia. Ex. 238, Nakhleh Rpt. ¶ 69 (citing PEC-KSA000235-266). A genuine dispute of material fact exists.

**STATEMENT:**

393. King Fahad's order structured the SJRC "under the supervision of His Royal Highness the Minister of Interior," and required "a representative from each Saudi society or charitable foundation that participates in relief work, namely, International Islamic Relief Organization, World Assembly of Muslim Youth, al-Haramain Charitable Foundation, Islamic Endowment Foundation.". Id.

**RESPONSE:**

Undisputed as to the SJRC's composition; disputed as incomplete. The very charities designated to participate in the SJRC—WAMY, the IIRO, and Al-Haramain—are the organizations that U.S. intelligence and the U.S. Treasury tied to al Qaeda, and WAMY was a constituent member under an entity led by designated al-Qaeda financier Wael Jelaidan. Ex. 246, Comras Rpt. p. 27, n. 102 (citing WJ 022). The Bosnia branch of Al-Haramain was designated a Specially Designated Global Terrorist and referred to the UN 1267 Committee for financing terrorism, and its Bosnia and Somalia offices were jointly designated by the United States and Saudi Arabia on March 11, 2002 for al-Qaeda funding. Decl. of Mohammedi (Dkt. No. 12001) Ex. 234, OFAC evidentiary memo, TREASURY00001-121 at 19; Winer Rebuttal Rpt. § 4.4.5 (citing U.N. Letter S/2003/1070 (Dec. 2, 2003)). The IIRO diverted charitable funds to extremists, and WAMY itself was described by the CIA as "an excellent conduit of recruits for many extremist groups" and, with al-Haramain, as "actively involved in spotting and assessing suitable terrorist recruits" in the Balkans. Decl. of Mohammedi (Dkt. No. 12001) Ex. 241, 9/11 Comm'n Terrorist Financing Monograph at 226, 214. The SJRC's constituent charities were MOIA instruments: the MOIA supported "the Muslim World League, (IIRO), (WAMY), and al-Haramayn—financially and operationally," requiring them to report their activities to headquarters in Saudi Arabia. Ex. 238, Nakhleh Rpt. ¶ 69 (citing PEC-KSA000235-266). A genuine dispute of material fact exists.

**STATEMENT:**

394. SJRC’s aims to “unify Saudi efforts,” “promote and coordinate Saudi aid activities,” “highlight Saudi efforts in providing the people of Kosovo with relief and humanitarian aid, generally provide refugees and the displaced with medical care and relief aid,” “provide refugees with their basic need, including food, clothes, equipment…etc.,” and “comfort[]

refugees and guide[] them religiously and culturally." Id., at p. 25, Al Suwailem January 10, 2005, Decl. at ¶11 and pg. 34-35, 46-47.

**RESPONSE:**

Disputed as incomplete. The SJRC's stated humanitarian aims coexisted with documented diversion and exploitation, and are belied by its operational reality. Its Kosovo chief, Wa'el Jelaidan, "provided support since the 1990s to Muslims in Bosnia and Chechnya—hotbeds of mujahidin activity—and may have used his position and influence at these organizations to divert funds and resources to al Qaida." Decl. of Mohammedi (Dkt. No. 12001) Ex. 234, OFAC evidentiary memo, TREASURY00001-121 at 62. SJRC employees conducted surveillance of U.S. facilities, Italian KFOR raided its Pristina office on April 1, 2000, and U.N. peacekeeping forces were advised its officials used the SJRC to help bin Laden "move money and men to and from the Balkans." Ex. 246, Comras Rpt. p. 28, nn. 105-106 (citing Testimony of Evan F. Kohlmann before the Senate Judiciary Committee (Jul. 14, 2010), citing "Islamic Organizations in the Balkans." A Joint Research Project by the Governments of the United States and the United Kingdom (Aug. 2003); Testimony of Evan F. Kohlmann Before the Senate Committee on the Judiciary, Subcommittee on Crime and Drugs "Evaluating The Justice Against Sponsors of Terrorism Act, S. 2930," (Jul. 14, 2010); FED-PEC 97363-65). In the Balkans, local NGO offices—including WAMY's—"were actively involved in spotting and assessing suitable terrorist recruits from among young men who seek assistance from humanitarian organizations," (Decl. of Mohammedi (Dkt. No. 12001) Ex. 241, 9/11 Comm'n Terrorist Financing Monograph at 214); and the "religious guidance" mission mirrors how affiliated relief was conditioned on ideology—BIF offered families of dead soldiers money to accept Islam. Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 196 (citing "Review of the Information on

Activities of the Persons from Afro-Asian Countries Directly Before the War and During the war in the Territory of BIH Republic." Report written by the BIH Administration of the Military Security Service— Department for Analytical and Informative Affairs. Sarajevo (May 6, 1995)). The U.N. 1267 Monitoring Group recognized that such charities' "humanitarian programmes" in Kosovo coexisted with terrorist support. Winer Rebuttal Rpt. § 4.4.3 (citing U.N. Letter S/2003/1070 (Dec. 2, 2003)). A genuine dispute of material fact exists.

**STATEMENT:**

395. KSA paid for the committee's employees, paid for headquarters and branch offices operations, and provided funding for some of the charitable work. Id., at p. 25, Al Suwailem January 10, 2005, Decl. at. ¶¶9, 10-12 (describing the role of Saudi in funding SJRC and its staff).

**RESPONSE:**

Undisputed that the Kingdom funded the SJRC; disputed as to its exculpatory significance. The SJRC "functioned as a political subdivision, agency, or instrumentality of the Kingdom of Saudi Arabia" and its mission "was largely subsidized by the Kingdom," with King Fahd donating 5,000,000 Saudi Riyals and civil servants seconded and paid by the government. Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 13-164 (citing Decl. of Alan R. Kabat (Dkt. No. 2775), Ex. 3, Decl. of Abdul Rahman Al-Swailem (Jan. 10, 2005)). This same Saudi-government sponsorship extended to charities the United States designated for financing al Qaeda, demonstrating state entanglement rather than exculpation. The 9/11 Commission found that "the Saudi government turned a blind eye to the financing of al Qaeda," (Ex. 246, Comras Rpt. p. 16, n. 45 (citing 9/11 Commission Staff Monograph on Terrorist Financing, Decl. of Mohammedi (Dkt. No. 12001) Ex. 241, at 24)), and Saudi-based charities and al Qaeda were

"aligned in supporting wars of redemption in areas where Muslims lived, such as Afghanistan, Bosnia, Chechnya, and Kashmir." Winer Rebuttal Rpt. § 4.11 (citing Hegghammer, *Jihad in Saudi Arabia: Violence and Pan-Islamism since 1979* (2010)). Saudi government control of the SJRC is confirmed by its supervision under the Minister of the Interior, and the MOIA supported charities including WAMY "financially and operationally," while Saudi officials knew such charities were "directly supporting al-Qa'ida's ongoing jihad." Ex. 246, Comras Rpt. p. 27, n. 102 (citing WJ 022); Ex. 238, Nakhleh Rpt. ¶ 106 (citing PEC-KSA000235-266). A genuine dispute of material fact exists.

**STATEMENT:**

396. SJRC's functions and responsibilities included healthcare service, dividing into administrating healthcare institutions, supplying medical resources, nutrition, and maintenance and cleaning; social services, including educational and awareness programs for refugees, as well as supplemental services to aid the relief work. Id. at pp. 46-47.

**RESPONSE:**

Disputed as incomplete. Healthcare, social-service, and educational/awareness (dawah) programs were precisely the categories through which Balkan and Kosovo charities diverted resources, and the existence of genuine relief functions does not disprove concurrent terrorist abuse. CIA reporting found that Balkans NGO offices "exist solely to support a militant cause, such as the Afghan or Bosnian mujahedin" and were used to recruit for extremist groups. Decl. of Mohammedi (Dkt. No. 12001) Ex. 241, 9/11 Comm'n Terrorist Financing Monograph at 240, 214. Al-Haramain, an SJRC participant, disguised diverted funds as "intended to be used for orphanage projects or the construction of Islamic schools and mosques," (Decl. of Mohammedi (Dkt. No. 12001) Ex. 234, OFAC evidentiary memo, TREASURY00001-121 at 30), and even

ostensibly legitimate charity activity was assessed to be "undertaken with the goal of creating an environment conducive to militancy." Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 2000 (citing CIA_000675-679 at 675). The U.N. 1267 Monitoring Group recognized that charities operating in Kosovo, Bosnia, and Chechnya funded "humanitarian programmes" while being "used, or abused, for purposes of supporting terrorism," (Winer Rebuttal Rpt. § 4.4.3 (citing U.N. Letter S/2003/1070 (Dec. 2, 2003))), and the U.N. Kosovo mission reported the SJRC's Pristina office was "in fact, a cover for al Qaeda operatives," with the Balkans hosting active al-Qaeda operations during this period. Ex. 246, Comras Rpt. p. 31, n. 122 (citing Testimony of Evan F. Kohlmann Before the Senate Committee on the Judiciary, Subcommittee on Crime and Drugs "Evaluating The Justice Against Sponsors of Terrorism Act, S. 2930," (Jul. 14, 2010); FED-PEC 97363-65); Ex. 133, Kohlmann 2020 Rpt. ¶ 81 (citing 9/11 Comm'n Report at 488-489, 156, 222). A genuine dispute of material fact exists.

**STATEMENT:**

397. SJRC's mission is incompatible with concepts of extremism and terrorism. Id., at p. 26, Al Suwailem January 10, 2005, Decl. at ¶16.

**RESPONSE:**

Disputed. WAMY was a constituent member of the SJRC, whose Kosovo office was headed by Wa'el Hamza Jelaidan—identified by the U.S. Treasury as one of the original founders of al-Qaeda and bin Laden's "logistics chief," and jointly designated by the United States and Saudi Arabia on September 6, 2002 as a Specially Designated Global Terrorist under Executive Order 13224, described as "an associate of Usama bin Laden and a supporter of al-Qa'ida terror" who headed NGOs "providing financial and logistical support to the al-Qa'ida network." Decl. of Mohammedi (Dkt. No. 12001) Ex. 234, OFAC evidentiary memo, TREASURY00001-121 at 1-

4; Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 177 (citing U.S. Treasury designation of Jelaidan (Sep. 6, 2002)); Ex. 246, Comras Rpt. pp. 27, 29-30, nn. 102, 112-115 (citing WJ 022; U.S. Treasury designation of Jelaidan (Sep. 6, 2002), FED-PEC 203469-470; U.N. 1267 Narrative Summary QI.J.79.02, FED-PEC 213923-929).. The CIA assessed that Jelaidan held high-level positions including at the SJRC and "may be using his position and influence at these organizations to divert funds and resources to al-Qa'ida." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 125; Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541), ¶ 2047 (citing CIA_000500-563 at 544; DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 823). The CIA and Albanian authorities concluded the SJRC was "actively building a terrorist network" in Albania and Kosovo, and the U.N. mission in Kosovo reported that the SJRC office in Pristina was "in fact, a cover for al Qaeda operatives." Ex. 246, Comras Rpt. pp. 28, 31, nn. 105-107 (citing Testimony of Evan F. Kohlmann before the Senate Judiciary Committee (Jul. 14, 2010), citing "Islamic Organizations in the Balkans." A Joint Research Project by the Governments of the United States and the United Kingdom (Aug. 2003); Testimony of Evan F. Kohlmann Before the Senate Committee on the Judiciary, Subcommittee on Crime and Drugs "Evaluating The Justice Against Sponsors of Terrorism Act, S. 2930," (Jul. 14, 2010); FED-PEC 97363-65; KADI 5129-32; KADI 2910-12; Eduart Bala, Deputy Director of Defense Intelligence Agency, "Financing of Terrorism-Case study, Albania," MILITARY REVIEW, Security and Defense Review Training and Doctrine Command Second Edition, (Dec. 2013) at p. 129). Saudi government officials knew that Saudi-financed charities "such as al-Haramayn, IIRO, WAMY, and the Muslim World League, were not only engaging in propagation but also in directly supporting al-Qa'ida's ongoing jihad against the 'infidels,' including the United States." Ex. 238, Nakhleh Rpt. ¶ 106. A genuine dispute of material fact exists.

**STATEMENT:**

398. SJRC's "operated solely as a charitable and humanitarian entity, and none of the funds or other aid distributed by the SJRC was provided for commercial purposes. Id. at p. 23, Al Suwailem January 10, 2005, Decl. at ¶4.

**RESPONSE:**

Disputed. The assertion rests on the SJRC president's own declaration and is contradicted by record evidence that Saudi charities operating within the SJRC framework used ostensibly humanitarian relief as cover to move funds to fighters. Per a U.S. Department of Justice brief quoting al-Qaeda defector Jamal al-Fadl, charities diverted a portion of funds to al-Qaeda operations while the money "would nevertheless be listed in the charities' books as expenses for building mosques or schools or feeding the poor or the needy," and the 9/11 Commission Terrorist Financing Monograph found that "al Qaeda relied on diversions from Islamic charities." Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 167, 169 (citing Set_45_3065-3095 at 1; Govt' Evidentiary Proffer, *U.S. v. Arnaout*, 02 CR 0892 at 28-29); Decl. of Mohammedi (Dkt. No. 12001) Ex. 241, 9/11 Comm'n Terrorist Financing Monograph at 16. The SJRC's own operations bore this out: in September 1999 and again in March and April 2000, SJRC employees were caught conducting surveillance of U.S. and other peacekeeping facilities in Kosovo; on April 1, 2000 Italian KFOR troops raided the SJRC's Pristina offices; and U.N. peacekeeping forces were advised that SJRC officials were associates of Osama bin Laden using the SJRC to help him "move money and men to and from the Balkans." Ex. 246, Comras Rpt. pp. 28, 31, nn. 105-107 (citing Testimony of Evan F. Kohlmann before the Senate Judiciary Committee (Jul. 14, 2010), citing "Islamic Organizations in the Balkans." A Joint Research Project by the Governments of the United States and the United Kingdom (Aug. 2003);

Testimony of Evan F. Kohlmann Before the Senate Committee on the Judiciary, Subcommittee on Crime and Drugs "Evaluating The Justice Against Sponsors of Terrorism Act, S. 2930," (Jul. 14, 2010); FED-PEC 97363-65; KADI 5129-32; KADI 2910-12; Eduart Bala, Deputy Director of Defense Intelligence Agency, "Financing of Terrorism-Case study, Albania," MILITARY REVIEW, Security and Defense Review Training and Doctrine Command Second Edition, (Dec. 2013) at p. 129). The U.N. 1267 Monitoring Group confirms that charities used or abused to support terrorism "have also funded important humanitarian programmes in Afghanistan, Bosnia and Herzegovina, Chechnya (Russian Federation), Kosovo (Serbia and Montenegro), Pakistan, Somalia and the Sudan." Winer Rebuttal Rpt. § 4.4.3 (citing U.N. Letter S/2003/1070 (Dec. 2, 2003)). A genuine dispute of material fact exists.

**STATEMENT:**

399. WAMY, acting under the auspices of SJRC, engaged in relief efforts consistent with its own objectives. See, e.g., Ex. 187, WAMYSA036741-745 (expense report of relief provided for SJRC relief in Kosovo for clothing, hygiene, mattresses, blankets etc.); Ex. 188, WAMYSA036716 (1999 Letter concerning SJRC being assigned to care for refugees); Ex. 189, PEC-WAMY008110 (Chechnya SJRC flyer with WAMY named asking for help for orphans and refugees); Ex. 67 (1999 letter from Noorwali to SJRC re proposals to establish camp for refugees and provide shelters with help of Albanian government).

**RESPONSE:**

Disputed as incomplete. WAMY's relief activity in the Balkans cannot be treated as undisputedly benign. From the early days of the Balkan conflicts WAMY was "deeply involved" in supporting Saudi jihadists, and money raised for relief "has been turned over to the Bosnians for weapons." Ex. 112, Kohlmann 2020 Rpt. ¶ 162 (citing "Muslims From Afar Joining Holy War in Bosnia,"

NYT (Dec. 5, 1992)). The CIA assessed that in the Balkans, "local offices of NGOs such as the World Assembly of Muslim Youth, al-Haramayn, Society for the Revival and Islamic Heritage, and al-Waqf al-Islamiya were actively involved in spotting and assessing suitable terrorist recruits from among young men who seek assistance from humanitarian organizations," and that WAMY officials "couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia." Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 2102, 2104; Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 99 (citing CIA_000143-158 at 151; CIA_000178-189 at 185-186; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4.at 744; DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 827; Ex. 2 to (Corrected) Decl. of Haefele (Dkt. No. 9541), EO 3414-3442 at 3438). Al-Haramain officials also "couriered funds to Chechnya for both [WAMY] and [IIRO]." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 103. WAMY operated within the SJRC—an entity whose executive director was a designated al-Qaeda financier and whose Kosovo office the U.N. mission reported was "a cover for al Qaeda operatives." Ex. 246, Comras Rpt. pp. 27, 29-30, 31, nn. 102, 112-115, 122 (citing WJ 022; U.S. Treasury Statement (Sep. 6, 2002), FED-PEC 203469-470; U.N. 1267 Narrative Summary QI.J.79.02, FED-PEC 213923-929). Saudi-sponsored charities were "aligned" with al Qaeda "in supporting wars of redemption in areas where Muslims lived, such as Afghanistan, Bosnia, Chechnya, and Kashmir," and that Saudi officials knew charities including WAMY were "directly supporting al-Qa'ida's ongoing jihad." Winer Rebuttal Rpt. § 4.11 (citing Hegghammer, *Jihad in Saudi Arabia: Violence and Pan-Islamism since 1979* (2010)); Ex. 238, Nakhleh Rpt. ¶ 106. A genuine dispute of material fact exists.

**STATEMENT:**

400. WAMY also donated financially to SJRC project efforts and WAMY memorialized spending during its collaboration with SJRC. Ex. 190, WAMYSA036860-862 (1999 letter indicating WAMY financial assistance); Ex. 191, WAMYSA184530-542 (pages of WAMY letters concerning projects and related costs with SJRC).

**RESPONSE:**

Undisputed as to WAMY's financial entanglement with the SJRC, but disputed as to its innocent character; WAMY's evidence that it "memorialized spending" does not establish where the funds ultimately went. WAMY channeled Balkans "relief" through Taibah International—whose Bosnia branch was designated a Specially Designated Global Terrorist on May 6, 2004 for funneling money to al-Qaeda—including a 220,450 Saudi Riyal check "allocated as a first installment for relief for Muslims in the Balkans," as to which WAMY's own auditor found the funds were "not entirely spent for the designated purpose." Decl. of Mohammedi (Dkt. No. 12001) Exs. 220 & 225. The CIA reported the Sarajevo Taibah office "received approximately $140,000 from WAMY-Jeddah ... in May 2001" and that "WAMY is suspected of supporting terrorists." Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 2105. The SJRC's Balkan financial operations were opaque and subject to diversion: SJRC executive director Jelaidan moved money through ostensibly charitable companies, with transfers of roughly $300,000 left unaccounted for and "loans" never repaid,( Ex. 246, Comras Rpt. pp. 30-31 (citing OFAC Statement ¶¶ 158, 162)), and Saudi charity funds nominally raised for Balkan relief were "turned over… for weapons." Ex. 112, Kohlmann 2020 Rpt. ¶ 162 (citing "Muslims From Afar Joining Holy War in Bosnia," NYT (Dec. 5, 1992)). WAMY's own audits "illustrate the mechanics of how such support is disguised" through unverified "student welfare," "social welfare," and "stipends" categories, reflecting the "commingling of charity activities with the support for armed conflict and terrorist

group activities, including that of al Qaeda." Winer Rebuttal Rpt. § 4.5 (citing WAMY Pakistan Office audits, WAMYSA 18575-18755 and WAMYSA 9690-9738). A genuine dispute of material fact exists.

**STATEMENT:**

401. No sanctions regime or government entity designated or sanctioned SJRC. Ex. 117.

**RESPONSE:**

Disputed and immaterial. The SJRC's Kosovo office chief, Wa'el Hamza Jelaidan, was jointly designated by the United States and Saudi Arabia on September 6, 2002, noted as an al-Qaeda founder and financier. Decl. of Mohammedi (Dkt. No. 12001) Ex. 234, OFAC evidentiary memo, TREASURY00001-121 at 1-4;; Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶¶ 122, 124 (citing U.S. Treasury designation of Jelaidan (Sep. 6, 2002); PEC-KSA002014-2114 at 2031); Ex. 246, Comras Rpt. pp. 29-30 (citing U.S. Treasury designation of Jelaidan (Sept. 6, 2002), FED-PEC 203469-470; U.N. 1267 Comm. Narrative Summary QI.J.79.02, FED-PEC 213923-929). The charities constituting the SJRC were likewise designated: the Bosnia branch of Al-Haramain (designated March 11, 2002; reopened as "Vazir" and designated again on December 22, 2003) and Taibah International-Bosnia (designated May 6, 2004). Decl. of Mohammedi (Dkt. No. 12001) Ex. 234, OFAC evidentiary memo, TREASURY00001-121 at 19, 31. The absence of a formal SJRC designation reflects U.S. diplomatic deference and Saudi inaction; the 9/11 Commission found that "the Saudi government turned a blind eye to the financing of al Qaeda" and did not crack down until after the May 2003 Riyadh attacks. Ex. 246, Comras Rpt. p. 16, n. 45 (citing 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001) Ex. 241 at 24). A genuine dispute of material fact exists.

**STATEMENT:**

402. WAMY's relief work with SJRC did not provide nor was it intended to provide support or aid to Osama Bin Ladin, al-Qaeda or the September 11, 2001, attacks and Plaintiffs provide no evidence to the contrary. Ex. 186, at p. 26, Al Suwailem January 10, 2005, Decl. at. ¶16 (denying that SJRC was involved in terrorist activities).

**RESPONSE:**

Disputed. The CIA described WAMY as "an excellent conduit of recruits for many extremist groups" whose Balkans offices were "actively involved in spotting and assessing suitable terrorist recruits," and found WAMY officials "couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia." Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 2102, 2104; Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 99 (citing CIA_000143-158 at 151; CIA_000178-189 at 185-186; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; Decl. of Mohammedi (Dkt. No. 12001), Ex. 243, CIA_00807-848. Ex. 2 to (Corrected) Decl. of Haefele (Dkt. No. 9541), EO 1404-MDL at 3438). The SJRC office in Pristina was reported by the U.N. Kosovo mission to be "a cover for al Qaeda operatives" used to help bin Laden "move money and men to and from the Balkans," and its executive director Jelaidan was a designated al-Qaeda financier. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 125 (citing CIA_000500-563 at 544; Decl. of Mohammedi (Dkt. No. 12001) EX. 243, CIA_000807-848 at 823); Ex. 246, Ex. 246, Comras Rpt. pp. 28, 29-30, 31, nn. 106-107, 113-114, 122-123 (citing Ex. 245, Testimony of Evan F.Kohlmann Before the Senate Committee on the Judiciary, Subcommittee on Crime and Drugs "Evaluating the Justice Against Sponsors of Terrorism Act, S. 2930," (Jul. 14, 2010), Ex. 247, FED-PEC 97363-65; KADI 5129-5132; U.S. Treasury designation of Jelaidan (Sep. 6, 2002),

FED-PEC 203469-470; UN Security Council 1267 Cmte Narrative Summaries, QI.J.79.02, FED-PEC 213923-929). WAMY routed Balkans relief through the later-designated Taibah International, and WAMY's own Secretary General solicited funds so Chechen "mujahideen" could "buy weapons and gear." Decl. of Mohammedi (Dkt. No. 12001) Exs. 220; Ex. 112, Kohlmann 2020 Rpt. ¶ 166 (citing al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843). Saudi charities and al Qaeda were "aligned in supporting wars of redemption in areas where Muslims lived, such as Afghanistan, Bosnia, Chechnya, and Kashmir," and the Balkans were an active al-Qaeda theater to which 9/11 hijackers al-Hazmi and al-Mihdhar "traveled together to fight… in 1995." Ex. 180, Winer Rebuttal Rpt. § 4.11 (citing Hegghammer, *Jihad in Saudi Arabia: Violence and Pan-Islamism since 1979* (2010)); Ex. 133, Kohlmann Rebuttal Rpt.. ¶ 81 (citing Ex. 4, 9/11 Comm'n Report at 488-489, 156, 222). A genuine dispute of material fact exists.

**STATEMENT:**

403. SJRC assisted Kosovars during the 1990 Eastern European conflicts with the provision of mattresses, food, temporary housing, cultural programs, medical and psychological health care, clothing, and tents for refugees, not fighters. Ex. 14 at ¶42 (speaking generally about WAMY's involvement with SJRC in Kosovo); Ex. at 187 (relief work under SJRC); Ex. 192, WAMYSA036754-759 (preliminary report of Kosovo refugee assistance); Ex. 193, WAMYSA036781-786 (1999 meeting minutes and budget for SJRC projects for projects such as "relief, education and rehabilitation, Islamic and public schools).

**RESPONSE:**

Disputed. Saudi relief charities operating in the Balkans, including within the SJRC framework, supported fighters, not only refugees. Per the U.S. Department of Defense and Bosnian security

services, the Saudi High Commission "facilitated movement of mujahidin during the fighting in Bosnia" and "provided funds to mujahidin," and its admitted-al-Qaeda-member employee testified it "frequently transported mujihadeen and al Qaida members ... in Saudi High Commission vehicles bearing the mark of the [UNHCR]." Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 214, 219-220 (citing "Islamic Organizations in the Balkans." A Joint Research Project by the Governments of the United States and the United Kingdom (Aug. 2003)). BIF supplied boots, uniforms, and an ambulance to Bosnian fighters, and the CIA found Balkans NGO offices including WAMY's were "spotting and assessing suitable terrorist recruits" among aid-seekers. Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 195 (citing Ex. 27, Gov't Evidentiary Proffer, *U.S. v. Arnaout*, 02 CR 0892, (Jan. 7, 2003) pp. 67-69); Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 2102 (citing CIA_000143-158 at 151; CIA_000178-189 at 186). The SJRC's Kosovo operation was contemporaneously assessed as a terrorist-support platform, not solely refugee relief: the U.N. Kosovo mission reported the SJRC's Pristina office was "in fact, a cover for al Qaeda operatives"; SJRC employees conducted surveillance of U.S. facilities; and the CIA and Albanian authorities concluded the SJRC was "actively building a terrorist network" in Albania and Kosovo. Ex. 246, Ex. 246, Comras Rpt. pp. 28, 29-30, 31, nn. 106-107, 113-114, 122-123 (citing Testimony of Evan F. Kohlmann Before the Senate Committee on the Judiciary, Subcommittee on Crime and Drugs "Evaluating the Justice Against Sponsors of Terrorism Act, S. 2930," (Jul. 14, 2010), FED-PEC 97363-65; KADI 5129-5132; U.S. Treasury designation of Jelaidan (Sep. 6, 2002), FED-PEC 203469-470; UN Security Council 1267 Cmte Narrative Summaries, QI.J.79.02, FED-PEC 213923-929). The U.N. 1267 Monitoring Group lists Kosovo among the theaters where charities' "humanitarian programmes" coexisted with terrorist support. Winer Rebuttal Rpt. § 4.4.3 (citing U.N. Letter S/2003/1070 (Dec. 2, 2003)). A genuine dispute of material fact exists.

**STATEMENT:**

404. The U.N. High Commissioner (UNHCR) assisted SJRC in many of its initiatives, including the building of schools, mosques, and homes. Ex. 194, WAMYSA036765 (List of schools being renovated by UNHCR in Kosovo); Ex. 195, WAMYSA036766 (Statement of completed programs construction programs including with UNHCR assistance).

**RESPONSE:**

Disputed as immaterial. UNHCR cooperation does not establish benign purpose; Saudi relief charities in the Balkans exploited UN/UNHCR credentials and vehicles as cover for terrorist logistics. A former Saudi High Commission employee and admitted al-Qaeda member testified that the SHC "frequently transported mujihadeen and al Qaida members throughout Bosnia-Herzegovina, in Saudi High Commission vehicles bearing the mark of the United Nations High Commission for Refugees (UNHCR)," enabling them to pass checkpoints, and contemporaneous reporting found Islamic NGOs in the former Yugoslavia used UNHCR/UN credentials while facilitating terrorism. Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 170-171, 219-220 (citing Dugger, "Anti-U.S. Plot in India is Foiled; Militant Islamist Intended to Bomb 2 Consulates, Police Say," NYT (Jan. 21, 1999); 9/11 Comm'n Report at 171; Jan. 1996 CIA Report; Aff. of Senior Special Agent David Kane, *U.S. v. Biheiri*, 03-365-A (Aug. 14, 2003); "Islamic Organizations in the Balkans." A Joint Research Project by the Governments of the United States and the United Kingdom (Aug. 2003)). Even if UNHCR cooperated on discrete projects, that does not rebut contemporaneous evidence that the SJRC's Kosovo operation functioned as an al-Qaeda cover led by a designated terrorist financier: the U.N. mission in Kosovo reported that the SJRC office in Pristina was "in fact, a cover for al Qaeda operatives," and Italian KFOR raided that office on April 1, 2000 after warnings that SJRC officials were bin

Laden associates helping him "move money and men to and from the Balkans." Ex. 246, Comras Rpt. pp. 28, 29-30, 31, nn. 106-107, 113-114, 122-123 (citing Testimony of Evan F.Kohlmann Before the Senate Committee on the Judiciary, Subcommittee on Crime and Drugs "Evaluating the Justice Against Sponsors of Terrorism Act, S. 2930," (Jul. 14, 2010), FED-PEC 97363-65; KADI 5129-5132; U.S. Treasury designation of Jelaidan (Sep. 6, 2002), FED-PEC 203469-470; UN Security Council 1267 Cmte Narrative Summaries, QI.J.79.02, FED-PEC 213923-929). That charities ran genuine "humanitarian programmes" in Kosovo does not disprove concurrent terrorist abuse; the U.N. 1267 Monitoring Group recognizes the same charities did both in Kosovo, Bosnia, and Chechnya. Winer Rebuttal Rpt. § 4.4.3 (citing U.N. Letter S/2003/1070 (Dec. 2, 2003)). A genuine dispute of material fact exists.

**STATEMENT:**

405. For its part, WAMY helped house refugees with Albanian families or at SJRC run refugee camps. Ex. 14 at ¶42 (declaring that in Kosovo WAMY's efforts provided housing at refugee camps); Ex. 196, WAMYSA036746-753 at 747-748 (media center report on families and camps hosting refugees); Ex. 67 (letter from Noorwali to SJRC re proposals to establish camp for refugees and provide shelters with help of Albanian government).

**RESPONSE:**

Disputed. The same WAMY Balkans operations were assessed by the CIA as recruitment and diversion vehicles, "spotting and assessing suitable terrorist recruits from among young men who seek assistance from humanitarian organizations." Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 2102 (citing CIA_000143-158 at 151; CIA_000178-189 at 186). WAMY's own charitable-activities operations manager, Suleman Ahmer, publicly praised the "dramatic entrance of mujahideen fighters into the Bosnian conflict" and described his time in Bosnia and

Chechnya "where we have active wars going on." Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 2115; Ex. 112, Kohlmann 2020 Rpt. ¶ 161 (citing videotape of the lecture, July 26, 1996; Ex. 212, FED-PEC 210330-210331). WAMY's Balkan relief apparatus doubled as support for fighters: a WAMY representative told the New York Times that if a relief worker "decides that he wants to join the fighting forces, we would not stop him," and Saudi officials acknowledged that "men who volunteer for the relief work often end up as soldiers." Ex. 112, Kohlmann 2020 Rpt. ¶ 162 (citing "Muslims From Afar Joining Holy War in Bosnia," NYT (Dec. 5, 1992)). WAMY housed refugees within the SJRC structure: the UN reported that the SJRC Kosovo office served as "a cover for al Qaeda operatives" with the Balkans hosting active al Qaeda operations during this period, and the U.N. 1267 Monitoring Group confirms that charities' Kosovo "humanitarian programmes" coexisted with terrorist support. Ex. 246, Comras Rpt. p. 31, n. 122 (citing Testimony of Evan F. Kohlmann Before the Senate Committee on the Judiciary, Subcommittee on Crime and Drugs "Evaluating The Justice Against Sponsors of Terrorism Act, S. 2930," (Jul. 14, 2010); FED-PEC 97363-65); Ex. 133, Kohlmann 2020 Rpt. ¶ 81 (citing 9/11 Comm'n Report at 488-489, 156, 222); Winer Rebuttal Rpt. § 4.4.3 (citing U.N. Letter S/2003/1070 (Dec. 2, 2003)). A genuine dispute of material fact exists..

**STATEMENT:**

406. When Kosovars who had fled to Albania returned to their country, WAMY, under SJRC auspices, assisted their repatriation with construction of residential complexes. Ex. 36 (1999 letter from Turki to Wohaibi re WAMY proposed projects in Kosovo in the Ferizaj region and cost of project); Ex. 197, WAMYSA036812 (list of WAMY related and future SJRC works that include educational programs, rehabilitation and reconstruction, relief, social in Ferizaj).

**RESPONSE:**

Disputed. WAMY's SJRC-channel Kosovo funding requests were part of a Saudi da'wah operation that embedded proselytization in its relief (the SJRC distributed 110,000 to 300,000 Islam booklets in Albanian) and were routed through intermediaries tied to al-Qaeda financing. Decl. of Mohammedi (Dkt. No. 12001), Ex. 192, WAMYSA036754-59 at 56. The benign "construction of residential complexes" characterization is further undercut by evidence that SJRC executive director Jelaidan used ostensibly charitable Balkan construction ventures (e.g., KA Stan, formed "to build houses, a mosque, a school and student housing") as vehicles for terrorist financing, with unexplained cash infusions and unaccounted-for funds. Ex. 246, Comras Rpt. pp. 30-32, nn. 114-115, 122-123, 125, 127 (citing U.N. 1267 Narrative Summary QI.J.79.02, FED-PEC 213923-929; "Saudi Arabia and U.S. Track Down Assets of Bin Ladin Operative," Saudi Arabia Embassy (DC) (Sep. 10, 2002); Testimony of Evan F. Kohlmann Before the Senate Committee on the Judiciary, Subcommittee on Crime and Drugs "Evaluating the Justice Against Sponsors of Terrorism Act, S. 2930," (Jul. 14, 2010), FED-PEC 97363-65; OFAC Statement ¶¶ 158, 162; KADI 122337; KADI 125792; KADI 126079; KADI 73949-950). The construction work occurred under the auspices of an SJRC that the U.N. Kosovo mission reported was "a cover for al Qaeda operatives." Ex. 246, Comras Rpt. p. 31, nn. 122, 106-107 (citing Testimony of Evan F. Kohlmann Before the Senate Committee on the Judiciary, Subcommittee on Crime and Drugs "Evaluating the Justice Against Sponsors of Terrorism Act, S. 2930," (Jul. 14, 2010), FED-PEC 97363-65; KADI 5129-132). Charitable spending and records were used as the "mechanics of how… support is disguised" in funding al Qaeda and other terror networks, with charity activities commingled with support for armed conflict. Winer Rebuttal Rpt. § 4.5 (citing U.N. Letter S/2003/1070 (Dec. 2, 2003)). A genuine dispute of material fact exists..

**STATEMENT:**

407. WAMY's direct contribution to returning Kosovars also included provision of doctors to train Kosovar doctors at Saudi hospitals. Ex. 95 (letter asking to assign WAMY doctors to train Kosovar doctors); Ex. 198, WAMYSA036945-46 (letter attaching names of Saudi hospitals to implement the training).

**RESPONSE:**

Disputed as incomplete. The Kosovar-doctor training project was operated under the supervision of Interior Minister Prince Nayef bin Abdulaziz, the "General Supervisor of the Saudi Joint Committee"—the same official whom the CIA assessed was "aware of and condoned Al Haramain's global support for terrorism" and "aware of al-Haramain's illicit activities in the Balkans." Decl. of Mohammedi (Dkt. No. 11999), Ex. 95, WAMYSA036944; Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 1980. Moreover, WAMY's Balkan medical services extended to combatants, not only civilians: WAMY "flies back wounded Saudi fighters and provides free medical care in the Saudi German hospital," where "several rooms hold wounded Saudi fighters." Ex. 112, Kohlmann 2020 Rpt. ¶ 163 (citing "Muslims From Afar Joining Holy War in Bosnia," NYT (Dec. 5, 1992)). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 391-406. A genuine dispute of material fact exists..

**STATEMENT:**

408. In June of 2000 SJRC ended its relief work in Kosovo. Ex. 199, WAMYSA036717 (letter discussing closing ceremony).

**RESPONSE:**

Disputed as immaterial. The end date of the SJRC's Kosovo operations says nothing about whether SJRC funds or its participating charities supported al-Qaeda while operations were ongoing, and the wind-down followed counterterrorism enforcement, not mere completion of a humanitarian mission. Italian KFOR raided the SJRC's Pristina office on April 1, 2000; Jelaidan and the SJRC secretary were declared personae non gratae and barred from Albania and Kosovo; and the SJRC's offices in Albania were closed after authorities concluded the SJRC was "actively building a terrorist network." Ex. 246, Comras Rpt. pp. 28-29, nn. 105-108, 113-115 (citing Testimony of Evan F. Kohlmann before the Senate Judiciary Cmte. (Jul. 14, 2010), citing "Islamic Organizations in the Balkans." A Joint Research Project by the Governments of the United States and the United Kingdom (Aug. 2003); Testimony of Evan F. Kohlmann Before the Senate Cmte. on the Judiciary, Subcommittee on Crime and Drugs "Evaluating The Justice Against Sponsors of Terrorism Act, S. 2930," (Jul. 14, 2010); FED-PEC 97363-65; KADI 5129-32; KADI 2910-12; Eduart Bala, Deputy Director of Defense Intelligence Agency, "Financing of Terrorism-Case study, Albania," MILITARY REVIEW, Security and Defense Review Training and Doctrine Command Second Edition, (Dec. 2013) at p. 129; U.S. Treasury designation of Jelaidan (Sep. 6, 2002), FED-PEC 203469-470; U.N. 1267 Narrative Summary QI.J.79.02, FED-PEC 213923-929; "Saudi Arabia and U.S. Track Down Assets of Bin Ladin Operative," Saudi Arabia Embassy (DC) (Sep. 10, 2002)). The SJRC's Kosovo chief, Wa'el Jelaidan, diverted funds to al-Qaeda and was designated a Specially Designated Global Terrorist in September 2002, (Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)), ¶ 125 (citing CIA_000500-563 at 544; DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 823); Decl. of Mohammedi (Dkt. No. 12001) Ex. 234, OFAC evidentiary memo, TREASURY00001-121 at 1-4)), and the designated Taibah International-Albania continued disbursing funds for "Kosovo missions" into late 2001. Decl. of Mohammedi (Dkt.

No. 12001) Ex. 223, WAMYSA1232830-833; Decl. of Mohammedi (Dkt. No. 12001) Ex. 234, OFAC evidentiary memo, TREASURY00001-121 at 19, 31. A genuine dispute of material fact exists..

**STATEMENT:**

409. WAMY's activity in Kosovo in the form of relief work did not support or aid to Osama Bin Ladin, al-Qaeda or the September 11, 2001, attacks and Plaintiffs provide no evidence to the contrary.

**RESPONSE:**

Disputed. The CIA named WAMY among Balkans NGOs "actively involved in spotting and assessing suitable terrorist recruits" and "an excellent conduit of recruits for many extremist groups." Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 2102; Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 99 (citing CIA_000143-158 at 151; CIA_000178-189 at 185-186). The "Stalk of Goodness" NGO founded by WAMY members in Albania/Macedonia was shut down in February 1995 for channeling funds from Al-Haramain, the IIRO, and Waqf al-Islami to spread Islamic fundamentalism, (Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 2104 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; Decl. of Mohammedi (Dkt. No. 12001), Ex. 243, CIA_000807-848 at 827; Ex. 2 to (Corrected) Decl. of Haefele (Dkt. No. 9541), EO 3414-3442 at 3438)), and WAMY routed Kosovo/Balkans funds through the later-designated Taibah International. Decl. of Mohammedi (Dkt. No. 12001) Ex. 223, WAMYSA1232830-833; Decl. of Mohammedi (Dkt. No. 12001) Ex. 234, OFAC evidentiary memo, TREASURY00001-121 at 19, 31. The SJRC's Kosovo operation was reported by the U.N. Kosovo mission to be "a cover for al Qaeda operatives" used to help bin Laden "move money and men to and from the Balkans";

its executive director Jelaidan was a designated al-Qaeda financier; and WAMY's own Balkans relief operations channeled "money raised for relief… for weapons." Ex. 246, Comras Rpt. pp. 28, 29-30, 31 Ex. 246, Comras Rpt. pp. 28, 29-30, 31, nn. 106-107, 113-114, 122-123 (citing Testimony of Evan F.Kohlmann Before the Senate Cmte. on the Judiciary, Subcommittee on Crime and Drugs "Evaluating the Justice Against Sponsors of Terrorism Act, S. 2930," (Jul. 14, 2010), FED-PEC 97363-65; KADI 5129-5132; U.S. Treasury designation of Jelaidan (Sep. 6, 2002), FED-PEC 203469-470; UN Security Council 1267 Cmte Narrative Summaries, QI.J.79.02, FED-PEC 213923-929); Ex. 112, Kohlmann 2020 Rpt. ¶ 162 (citing "Muslims From Afar Joining Holy War in Bosnia," NYT (Dec. 5, 1992)). The Balkans were an active al-Qaeda theater: 9/11 hijackers al-Hazmi and al-Mihdhar "had traveled together to fight in Bosnia in a group that journeyed to the Balkans in 1995," Ex. 133, Kohlmann Rebuttal Rpt.. ¶ 81 (citing 9/11 Comm'n Report at 488-489, 156, 222). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 391-408. A genuine dispute of material fact exists.

**STATEMENT:**

410. WAMY's SJRC work in Chechnya consisted of relief work for Chechen refugees, not Chechen fighters. Ex. 188 (1999 Letter concerning SJRC being assigned to care for refugees); see Ex. 189 (Chechnya SJRC flyer with WAMY named asking for help for orphans and refugees).

**RESPONSE:**

Disputed. Al-Haramain officials "couriered funds to Chechnya for both [WAMY] and [IIRO]." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 102; Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 2004, 2005. WAMY's own Chechnya materials praised and prayed for "our mujahideen brothers in Chechnya and Dagestan" to achieve "victory" over "the enemies." Decl.

of Mohammedi (Dkt. No. 11997), Ex. 52, FED-PEC02333836-43 at 841, 843. WAMY's Secretary General, Dr. Maneh al-Johani, published a January 2000 editorial in the Al-Jazeera newspaper on the "Chechen Tragedy" declaring that the Chechen "mujahideen… deserve our support" and asking, "What do the Chechen Muslims need from us today? They need money to buy weapons and gear." Ex. 112, Kohlmann 2020 Rpt. ¶ 166 (citing al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843). That same month the Saudi Minister of Islamic Affairs sent al-Johani a 20,000-riyal check "to the benefit of the Muslims of Chechnya… support our mujahideen brothers," which al-Johani confirmed, and a WAMY delegation "made contact with the fighters." Ex. 112, Kohlmann 2020 Rpt. ¶ 167 (citing WAMYSA 1249304-305; Ex. 47, FED-PEC 234243-244; FED-PEC 234930-931). Saudi charities including WAMY were "active in Chechnya… raising funds for the Chechen resistance," Ex. 74, Winer Rpt. § 12.8.2 (citing Gordon M. Hahn, Russia's Islamic Threat at 36), and WAMY's Rule 30(b)(6) designee confirmed WAMY's extensive Chechnya operations and that his account was drawn from al-Johani's "Chechen Tragedy" article. Dep. of Noorwali (Jul. 24, 2019) at 213:6-216:14. Al-Qaeda deputy Ayman al-Zawahiri traveled to Chechnya in 1996 believing "conditions… were excellent" to establish a new base; and future 9/11 hijackers al-Hazmi and al-Mihdhar "decided to fight in Chechnya against the Russians." Ex. 133, Kohlmann 2020 Rpt. ¶¶ 81-84 (citing 9/11 Comm'n Report at 488-489, 156, 222, 149, 160, 166; Higgins & Cullison, "Saga of Dr. Zawahri Sheds Light on the Roots of al Qaeda Terror," WSJ (Ju. 2, 2002); "Airstrike kills al-Qaida-linked commander in Syria," AP (Oct. 3, 2016); "Death of Senior Egyptian Islamic Jihad (EIJ) Member Mahmud Hisham al-Hennawi Reported in the Caucasus," Glabal Terrer Alert (Apr. 17, 2005)). The "fighting in Kashmir and Chechnya… enjoyed wide legitimacy within the Kingdom," (Winer Rebuttal Rpt. § 4.9.4 (citing "The U.S.-Saudi Arabia counterterrorism relationship," Testimony, Daniel L. Byman, House Cmte. on Foreign Affairs'

Subcommittee on Terrorism, Nonproliferation, and Trade (May 24, 2016))), Batterjee's BIF (successor to WAMY's welfare affiliate LBI) diverted purported relief funds "to pay for supplies to armed jihadists in Bosnia and Chechnya," (Ex. 180, Winer Rebuttal Rpt. § 3.30.12 (citing U.S. Treasury designation of Batterjee (Dec. 21, 2004))), and Awlaki, who had documented ties to WAMY, "encouraged a Saudi student to travel to Chechnya to take part in the jihad against the Russians." Ex. 92, FBI 555;. A genuine dispute of material fact exists.

**STATEMENT:**

411. Similar to its work in Kosovo, SJRC provided food, blankets, medicines, clothing, tents, emergency assistance, housing camps, and much more. Ex. 200, WAMYSA036796-797 (proposed work program for Chechen attaching quotes for tents, blankets, food and provisions).

**RESPONSE:**

Disputed as incomplete. The listed relief items coexisted with fighter support. BIF's Chechnya operations, conducted under orphan/relief cover, supplied 2,900 pairs of steel-reinforced anti-mine boots to Chechen fighters and installed an al-Qaeda Shura Council member as a BIF officer in Chechnya, with BIF altering its books "to make support for an injured Bosnian fighter appear as aid to an orphan." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 104, 106). The same Chechnya relief apparatus was used to raise money for Chechen fighters: WAMY Secretary General al-Johani solicited funds so the Chechen "mujahideen" could "buy weapons and gear," (Ex. 112, Kohlmann 2020 Rpt. ¶ 166 (citing al-Johani, “The Chechen Tragedy,” Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843)), and Gulf State Islamic charities, specifically including WAMY, were "active in Chechnya… raising funds for the Chechen resistance," (Ex. 74, Winer Rpt. § 12.8.2 (citing Hahn, Russia's

Islamic Threat at 36)). That the aid consisted of relief goods does not establish civilian use: as U.S. Attorney General Ashcroft explained of Batterjee's BIF (successor to WAMY's affiliate LBI), "Arnaout defrauded donors by using their money to fund Jihad fighters in Chechnya and Bosnia. He provided fighters with anti-mine boots, uniforms, tents and even an ambulance. All of these were purchased with funds that donors thought were going for peaceful purposes." Winer Rebuttal Rpt. § 3.29 (citing "Transcript of Attorney General John Ashcroft Regarding Guilty Plea by Enaam Arnaout," (Feb. 10, 2003)). The U.N. 1267 Monitoring Group likewise lists Chechnya among the theaters where charities' "humanitarian programmes" coexisted with terrorist support. Winer Rebuttal Rpt. § 4.4.3 (citing U.N. Letter S/2003/1070 (Dec. 2, 2003)). A genuine dispute of material fact exists.

**STATEMENT:**

412. The Russian government accepted and welcomed the Saudi relief aid in Chechnya, as the then Russian Ambassador noted, "this would underline the bright image of Saudi humanitarian relief aid and dismiss attempts in the media to distort the Saudi image and its ties with Russia." Ex. 186, ECF 2775-1, Declarations of Abdul Rahman Al Swailem and supporting materials at p. 40.

**RESPONSE:**

Disputed as immaterial. A diplomatic courtesy from a Russian ambassador does not establish that Saudi charitable relief in Chechnya was untainted or establish the actual nature or destination of the funds, and is contradicted by Russia's own intelligence findings. The Russian FSB found that Al-Haramain—a Saudi relief charity operating in the same theatre—"actively provided financial support to Dagestani, Chechen and Ingush religious extremist groups," using funds "officially ... intended for religious events" to "purchase weapons, uniforms, medicine,

communication devices, vehicles, and to pay religious extremists' salaries," and intercepts captured its director-general arranging shipments of RPGs and Kalashnikovs to Chechen warlord Khattab. Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ (citing Interview by Deputy Chief of the 3rd Department of Russian FSB Investigative Division, Lieutenant Colonel of Justice V.V. Romanovskiy of former FSB operative Sergey Nikolayevich Ignatchenko. Moscow, Russia; (Dec. 3, 2008 / Jan. 26, 2009 tr.); *U.S. v. Usama bin Laden*, 98 CR 1023, Gov't Exs GX-207 to GX-364). Contemporaneous evidence shows WAMY's Secretary General solicited money so Chechen "mujahideen" could "buy weapons and gear," (Ex. 112, Kohlmann 2020 Rpt. ¶ 166 (citing al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843)), and that Gulf charities including WAMY were "active in Chechnya… raising funds for the Chechen resistance." Ex. 74, Winer Rpt. § 12.8.2 (citing Hahn, Russia's Islamic Threat at 36). The "fighting in Kashmir and Chechnya… enjoyed wide legitimacy within the Kingdom," (Winer Rebuttal Rpt. § 4.9.4 (citing "The U.S.-Saudi Arabia counterterrorism relationship," Testimony, Daniel L. Byman, House Cmte. on Foreign Affairs' Subcommittee on Terrorism, Nonproliferation, and Trade (May 24, 2016))), and al-Qaeda's Zawahiri sought to base operations in Chechnya amid local Islamic organizations that "received funding from Saudi Arabia." Ex. 133, Kohlmann 2020 Rpt. ¶¶ 82-83 (citing Higgins & Cullison, "Saga of Dr. Zawahri Sheds Light on the Roots of al Qaeda Terror," WSJ (Ju. 2, 2002); "Airstrike kills al-Qaida-linked commander in Syria," AP (Oct. 3, 2016); "Death of Senior Egyptian Islamic Jihad (EIJ) Member Mahmud Hisham al-Hennawi Reported in the Caucasus," Glabal Terrer Alert (Apr. 17, 2005)). A genuine dispute of material fact exists..

**STATEMENT:**

413. WAMY's activity in Chechnya in the form of relief work did not support nor was it intended to provide support or aid to Osama Bin Ladin, al-Qaeda or the September 11, 2001, attacks and Plaintiffs provide no evidence to the contrary.

**RESPONSE:**

Disputed. Al-Haramain officials "couriered funds to Chechnya for both [WAMY] and [IIRO]." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 102. WAMY's Chechnya materials praised the mujahideen. Decl. of Mohammedi (Dkt. No. 11997), Ex. 52, FED-PEC02333836-43 at 843. WAMY Secretary General al-Johani publicly advocated "the need to support the Chechen struggle for liberation," (Decl. of Mohammedi (Dkt. No. 11997), Ex. 13, Blankinship Rpt. at C-2) urged funding so the Chechen "mujahideen" could "buy weapons and gear," and confirmed a donation "for the benefit of the Muslims of Chechnya… support our mujahideen brothers," with a WAMY delegation making "contact with the fighters." Ex. 112, Kohlmann 2020 Rpt. ¶¶ 166-167 (citing al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843; WAMYSA 1249304-305; Ex. 47, FED-PEC 234243-244; FED-PEC 234930-931). Saudi charities including WAMY raised funds "for the Chechen resistance." Ex. 74, Winer Rpt. § 12.8.2 (citing Hahn, Russia's Islamic Threat at 36). Al-Qaeda's Zawahiri sought to establish a Chechnya base in 1996, and future 9/11 hijackers al-Hazmi and al-Minhdhar "decided to fight in Chechnya against the Russians." Ex. 133, Kohlmann 2020 Rpt. ¶¶ 81-84 (citing 9/11 Comm'n Report at 488-489, 156, 222, 149, 160, 166; Higgins & Cullison, "Saga of Dr. Zawahri Sheds Light on the Roots of al Qaeda Terror," WSJ (Ju. 2, 2002); "Airstrike kills al-Qaida-linked commander in Syria," AP (Oct. 3, 2016); "Death of Senior Egyptian Islamic Jihad (EIJ) Member Mahmud Hisham al-Hennawi Reported in the Caucasus," Glabal Terrer Alert (Apr. 17, 2005)). Batterjee's BIF (WAMY affiliate LBI's successor) diverted relief funds "to pay for supplies to

armed jihadists in Bosnia and Chechnya," Winer Rebuttal Rpt. § 3.30.12 (citing U.S. Treasury designation of Batterjee (Dec. 21, 2004)). A genuine dispute of material fact exists.

**STATEMENT:**

414. In 2005 the House of Representatives passed a resolution to honor the victims of the 1995 Srebenica genocide and condemned the atrocities. Ex. 201, H. Res. 134 of the 109th Congress.

**RESPONSE:**

Disputed as immaterial. House Resolution 134 honors the victims of the 1995 Srebrenica genocide and condemns those atrocities; it says nothing about WAMY, the SJRC, or whether WAMY's Balkans charities diverted funds to al-Qaeda. The Bosnian conflict is the very theatre in which the CIA and U.S. Treasury found Saudi charities—including WAMY by name—funding, recruiting for, and facilitating the movement of mujahideen. Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 2102 (citing CIA_000143-158 at 151; CIA_000178-189 at 185-186). During the Bosnian conflict WAMY was "deeply involved" in supporting Saudi jihadists and relief funds were "turned over to the Bosnians for weapons." Ex. 112, Kohlmann 2020 Rpt. ¶¶ 162-163 (citing "Muslims From Afar Joining Holy War in Bosnia," NYT (Dec. 5, 1992)). Adel Batterjee was "chairman of the World Assembly of Muslim Youth," and Balkan relief workers "often end up as soldiers" and "most of the money raised for relief has been turned over to the Bosnians for weapons." Winer Rebuttal Rpt. § 2.38.2 (citing "Muslims From Afar Joining Holy War in Bosnia," NYT (Dec. 5, 1992)). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 391-408. A genuine dispute of material fact exists.

**STATEMENT:**

415. As the atrocities waged, WAMY offered aid to Bosnians during the 1992 to 1995 conflict before SJRC's establishment and later, in collaboration with SJRC, during the Chechen and Kosovar conflicts that began in 1998. Ex. 202, WAMYSA062007 (1993 circular regarding work in Bosnia); Ex. 275, WAMYSA027610-611 (1999 letter from Hamidi to Babaer re transfer of $133K to WAMY in Albania); see also Ex. 203, WAMYSA057615 (1992 letter to ARB from Al-Johani re transferring funds to account for Bosnian conflict).

**RESPONSE:**

Disputed. From the early days of the Bosnian war WAMY was "deeply involved" in supporting Saudi jihadists; a WAMY representative told the New York Times it would not stop a relief worker who chose "to join the fighting forces," and Saudi officials acknowledged "men who volunteer for the relief work often end up as soldiers" and that "most of the money raised for relief has been turned over to the Bosnians for weapons." Kohlmann 2020 Rpt. ¶ 162 (citing "Muslims From Afar Joining Holy War in Bosnia," NYT (Dec. 5, 1992)). members of mujahideen that were wounded during the conflict in the Balkans" and to "an ambulance intended for ... soldiers in Bosnia-Herzegovina," (Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 195 (citing Ex. 27, Gov't Evidentiary Proffer, *U.S. v. Arnaout*, 02 CR 0892, (Jan. 7, 2003) pp. 67-69)); and al-Johani "strongly support[ed] ... arming the Bosnian Muslims." See WAMY Rule 56.1 Statement ¶ 107, 108 and Pls.' responses to same. Saudi charities coordinated by the Saudi High Commission—expressly including WAMY—poured funds into Bosnia "in support of the Bosniaks and mujahidin jihadists who had come to fight," as al-Qaeda operatives "infiltrated or networked with these charities." Ex. 246, Comras Rpt. pp. 42-43 (citing Witness Statement of Ali Ahmad Ali Hamad); Winer Rebuttal Rpt. § 2.38.2 (citing "Muslims From Afar Joining Holy War in Bosnia," NYT (Dec. 5, 1992)). The audit of the Third World

Relief Agency—bin Laden's Bosnia relief vehicle—names WAMY, Taibah, and Jelaidan among its donors. Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854. Bosnia was an active al-Qaeda theater: 9/11 hijackers al-Hazmi and al-Mihdhar "traveled together to fight in Bosnia… in 1995," and California-based extremists "traveled from California to Bosnia… to be part of the same Islamic fundamentalist army as Al Qaeda members Nawaf al Hazmi and Khalid al Mihdhar." Ex. 133, Kohlmann Rebuttal Rpt.. ¶ 81 (citing 9/11 Comm'n Report at 488-489, 156, 222); Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § II-B (citing *U.S. v. Jayyousi*, 04 CR 3565, Complaint ¶ 8). Batterjee's BIF (successor to WAMY affiliate LBI) diverted relief funds to "armed jihadists in Bosnia and Chechnya." Ex. 180, Winer Rebuttal Rpt. § 3.30.12 (citing U.S. Treasury designation of Batterjee (Dec. 21, 2004)). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 391-408, 414. A genuine dispute of material fact exists.

**STATEMENT:**

416. With the approval of the Saudi government, WAMY also offered humanitarian relief to refugees in Bosnia in 2000. Ex. 204, WAMYSA1248468 (letter from MOIA to WAMY re role and activities in Bosnia and Austria). Ex. 14 at ¶42 (speaking generally about WAMY's involvement with SJRC in Albania).

**RESPONSE:**

Disputed as immaterial. Saudi government approval is not exculpatory: the 9/11 Commission found that "the Saudi government turned a blind eye to the financing of al Qaeda." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 24. The Ministry of Islamic Affairs that authorized WAMY's Bosnia role was the same ministry that funded WAMY (5,250,000 Saudi Riyals annually, 1995-2002) and supervised Al-Haramain,

whose Bosnia branch was designated a Specially Designated Global Terrorist. Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 2096, 1980; Dep. of Wohaibi (Oct. 23, 2019) at 31:2-8, 35:23-36:13, 31:13-32:8 and Ex. 316, WAMYSA1235988; Ex. 317, WAMYSA1235392-93; Ex. 318, WAMYSA1235422; Ex. 319, WAMYSA124281-82). WAMY's Bosnia relief ran alongside its funding of the later-designated Taibah International; the CIA assessed WAMY's Balkans offices as recruitment and diversion vehicles. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)), ¶¶ 99 (citing CIA_000178-189 at 186); Decl. of Mohammedi (Dkt. No. 12001) Ex. 234, OFAC evidentiary memo, TREASURY00001-121 at 31. WAMY's eastern-European operations were intertwined with the Third World Relief Agency (TWRA)—a charity cover for arms smuggling and terrorist financing that the 9/11 Commission found bin Laden used to "covertly provide financial and other support for terrorist activities"; WAMY's Austria/Eastern Europe office was directed by TWRA's founder El Fatih Hassanein, shared TWRA's office space, and WAMY transferred approximately US$37,000 to TWRA. Ex. 112, Kohlmann 2020 Rpt. ¶ 174 (citing 9/11 Comm'n Report at 58; FED-PEC 289619, 218206; PEC-KSA 3656-3718, WAMYSA 42103). Saudi government control of these charities is confirmed in that the MOIA "support[ed]" da'wa organizations "such as the Muslim World League, (IIRO), (WAMY), and al-Haramayn—financially and operationally," requiring them to report their activities to headquarters in Saudi Arabia. Ex. 238, Nakhleh Rpt. ¶ 69 (citing PEC-KSA000235-266). Plaintiffs' rebuttal expert further opines that the Saudi government and its charities were "aligned" with al Qaeda in supporting the Bosnia jihad. Winer Rebuttal Rpt. § 4.11 (citing Hegghammer, *Jihad in Saudi Arabia: Violence and Pan-Islamism since 1979* (2010)). A genuine dispute of material fact exists.

**STATEMENT:**

417. WAMY's collaborative relief work with local organizations such as the United Muslim Youth of Albania and the League of Islamic Youth in Albania in no way involved support for terrorism, Bin Ladin or al-Qaeda. Ex. 205, WAMYSA175144-196 (1995 annual report projects in Albania. Lists WAMY's collaboration with youth organizations).

**RESPONSE:**

Disputed. WAMY's Eastern Europe relief cannot be treated as undisputedly unconnected to al-Qaeda. The CIA assessed that in the Balkans, "local offices of NGOs such as the World Assembly of Muslim Youth ... were actively involved in spotting and assessing suitable terrorist recruits from among young men who seek assistance from humanitarian organizations." Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 2102; Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 99 (citing CIA_000143-158 at 151; CIA_000178-189 at 185-186). WAMY officials "couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia," (Pls.' Corrected Averment (DKt. No. 9764, ¶ 561 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4.at 744)), and the "Stalk of Goodness" NGO founded by WAMY members in Albania and Macedonia was shut down in February 1995 for channeling funds from Al-Haramain, the IIRO, and Waqf al-Islami to spread Islamic fundamentalism. Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 2104 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; Decl. of Mohammedi (Dkt. No. 12001) Ex. 243, CIA_000807-848 at 827; Ex. 2 to (Corrected) Decl. of Haefele (Dkt. No. 9541), EO 3414-3442 at 3438). The Saudi charities' Balkan relief operations were used as cover for, and overlapped with, support to al-Qaeda: humanitarian and terror-support activities "substantially overlapped," and relief in conflict zones "helped to legitimize and provide a cover for[] the extremist and terrorist

activities." Ex. 74, Winer Rpt. §§ 13.1, 5.3.3, n.24. "[I]n early 2000, IIRO's shared office in Kosovo with the Saudi Joint Relief Committee (SJRC)"—the same SJRC with which WAMY collaborated—"was raided in an attempt to thwart potential attacks on U.S. interests," and IIRO's Tirana, Albania offices were searched in 2001 and 2003. Ex. 112, Kohlmann 2020 Rpt. ¶ 88 (citing FED-PEC 97363-97365; IIRO 41030; IIRO 39085-39086; IIRO 39278; IIRO 122181-122181; IIRO 122181-12218; IIRO 42360; IIRO 42373; IIRO 122003). A December 2009 State Department cable found WAMY "at times, fund[ed] extremism overseas." Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). A genuine dispute of material fact exists.

**STATEMENT:**

418. During an eastern European visit, WAMY representatives met with SJRC members to discuss building mosques, the refugee situation, da'wah, and also paid a visit to a WAMY school and a center. Ex. 206, WAMYSA524798-807 (Report documenting trip to Poland, Albania, Kosovo and Montenegro in 2001 re SJRC); Ex. 204 (letter from MOIA to WAMY re role and activities in Bosnia and Austria).

**RESPONSE:**

Disputed as incomplete, and to the extent it implies WAMY's eastern European work with the SJRC was purely benign. The SJRC that WAMY coordinated with was, per U.S. intelligence, a coordinating body for charities "tied to terrorist and mujahidin activity including al-Haramain, al-Waqf al-Islami, IIRO, and WAMY," whose Kosovo office was headed by al-Qaeda founder Wa'el Jelaidan, (Decl. of Mohammedi (Dkt. No. 12001), Ex. 245, CIA_000143-158 at 151), and whose shared Kosovo office was raided in early 2000 "in an attempt to thwart potential attacks

on U.S. interests." Ex. 112, Kohlmann 2020 Rpt. ¶ 88 (citing FED-PEC 97363-97365; IIRO 41030; IIRO 39085-39086; IIRO 39278; IIRO 122181-122181; IIRO 122181-12218; IIRO 42360; IIRO 42373; IIRO 122003). WAMY's own Kosovo report flagged blurred organizational lines with the Tayba (Taibah) Foundation—later designated a Specially Designated Global Terrorist in its Bosnia branch—operating under WAMY's name. Decl. of Mohammedi (Dkt. No. 12001), Ex. 206, WAMYSA524798-807 at 804. The da'wah and relief activities of Saudi charities including WAMY "merged with recruitment activities to produce Islamic fighters," including provision of office space, false identification, travel facilitation, and arms, and that humanitarian and terror-support activities "substantially overlapped." Ex. 74, Winer Rpt. §§ 13.1, 5.3.3, n.24. Saudi officials knew charities including WAMY were "directly supporting al-Qa'ida's ongoing jihad," (Ex. 238, Nakhleh Rpt. ¶ 106), and WAMY headquarters exercised "substantial control" over its branch offices and their activities. Ex. 133, Kohlmann 2020 Rpt. ¶¶ 75-77 (citing CRA audit, EX. 79, FED-PEC 218170-218203). A genuine dispute of material fact exists.

**STATEMENT:**

**E. WAMY's Relief Work in Eastern Europe Concerned Charity Work To Benefit War Torn Peoples**

**RESPONSE:**

Disputed. WAMY's Eastern Europe operations were not confined to charity; U.S. intelligence and Plaintiffs' experts assessed them as a conduit for extremist recruitment and funding. The CIA called WAMY "an excellent conduit of recruits for many extremist groups" whose Balkans offices were "spotting and assessing suitable terrorist recruits" among aid-seekers. Decl. of Mohammedi (Dkt. No. 12001), Ex. 245, CIA_000143-158 at 151; Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 99 (citing CIA_000178-189 at 185-186). WAMY's Eastern Europe

representative, Elfatih Hassanein, simultaneously directed the Third World Relief Agency (TWRA)—an entity a German Federal Office of Criminal Investigation report prepared for the ICTY Prosecutor found operated "under the cover of humanitarian aid" as a "cover" for weapons dealings, and that Kohlmann describes as "a thinly-veiled charity cover for arms smuggling, money laundering, and terrorist financing" that bin Laden used to "covertly provide financial and other support for terrorist activities," with WAMY's operations "deeply intertwined" with TWRA and "shar[ing] the same office space as TWRA in Vienna." Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854 at 52-53; Ex. 112, Kohlmann 2020 Rpt. ¶ 174 (citing 9/11 Comm'n Report at 58; FED-PEC 289619, 218206; PEC-KSA 3656-3718, WAMYSA 42103); see also WAMY Rule 56.1 Statements at ¶¶ 437-438 and Plaintiffs' responses. Humanitarian and terror-support activities "substantially overlapped" and relief "helped to legitimize and provide a cover for[] the extremist and terrorist activities." Ex. 74, Winer Rpt. §§ 13.1, 5.3.3, n. 24. In Chechnya, "Saudi government-sponsored Islamic charities such as the International Islamic Relief Organization (IIRO), the World Assembly of Muslim Youth (WAMY), ... were active in Chechnya and elsewhere in Russia raising funds for the Chechen resistance," (Ex. 74, Winer Rpt. § 12.8.2 (citing Hahn, Russia's Islamic Threat)), and in January 2000 the Saudi Minister of Islamic Affairs sent WAMY Secretary General al-Johani a check "to the benefit of the Muslims of Chechnya ... I ask Allah the almighty to support our mujahideen brothers," which al-Johani confirmed receiving. Ex. 112, Kohlmann 2020 Rpt. ¶ 167 (citing Ex. 45, WAMYSA 1249305, 1249304; Ex. 47, FED-PEC 234243-244). The SJRC's shared Kosovo office was raided in early 2000, (Ex. 112, Kohlmann 2020 Rpt. ¶ 88 (citing FED-PEC 97363-97365; IIRO 41030; IIRO 39085-39086; IIRO 39278; IIRO 122181-122181; IIRO 122181-12218; IIRO 42360; IIRO 42373; IIRO 122003)); Saudi officials knew charities including WAMY were "directly supporting al-Qa'ida's ongoing jihad," Ex. 238, Nakhleh Rpt. ¶

106; and the Balkans and Caucasus were active al-Qaeda theaters, with future 9/11 hijackers al-Hazmi and al-Mihdhar fighting in Bosnia in 1995 and al Qaeda member al-Zawahiri traveling to Chechnya in 1996 to "establish a new base of operations." Ex. 133, Kohlmann 2020 Rpt. ¶¶ 81-84 (citing 9/11 Comm'n Report at 488-489, 156, 222, 149, 160, 166; Higgins & Cullison, "Saga of Dr. Zawahri Sheds Light on the Roots of al Qaeda Terror," WSJ (Ju. 2, 2002); "Airstrike kills al-Qaida-linked commander in Syria," AP (Oct. 3, 2016); "Death of Senior Egyptian Islamic Jihad (EIJ) Member Mahmud Hisham al-Hennawi Reported in the Caucasus," Glabal Terrer Alert (Apr. 17, 2005). WAMY "at times, fund[ed] extremism overseas." Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). A genuine dispute of material fact exists.

**STATEMENT:**

419. WAMY also engaged in humanitarian work separate from its work with SJRC such as, for example, providing emergency care, establishing schools for Kosovar children in Albania, establishing a refugee camp and setting up prayer areas at refugee camps. See, e.g., Ex. 207, WAMYSA524838-842 (Kosovo refugees in Albania project report 1999 which cost of project); see also, Ex. 208, WAMYSA488388 (Update letter re WAMY Kosovar refugees for education and summer camps).

**RESPONSE:**

Disputed as incomplete. WAMY's schools and scholarships in the Balkans were among the very programs the CIA identified as recruitment mechanisms—WAMY was found to "observe students in schools and offer scholarships" while its Balkans offices spotted terrorist recruits among aid-seekers, (Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 2102 (citing

CIA_000143-158 at 151; CIA_000178-189 at 185-186))—and WAMY routed Balkans funds through the later-designated Taibah International. Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 2105 (citing U.S. Treasury designation of Taibah In't Aid Assoc. (May 6, 2004). Humanitarian and terror-support activities "substantially overlapped" and that relief "helped to legitimize and provide a cover for[] the extremist and terrorist activities," (Ex. 74, Winer Rpt. §§ 13.1, 5.3.3, n.24), that the SJRC's shared Kosovo office was raided in early 2000 "in an attempt to thwart potential attacks on U.S. interests," and IIRO's Tirana, Albania offices were searched in 2001 and 2003. Ex. 112, Kohlmann 2020 Rpt. ¶ 88 (citing FED-PEC 97363-97365; IIRO 41030; IIRO 39085-39086; IIRO 39278; IIRO 122181-122181; IIRO 122181-12218; IIRO 42360; IIRO 42373; IIRO 122003). A genuine dispute of material fact exists.

**STATEMENT:**

420. WAMY has invested charity efforts to support mosques, Quran learning centers, provision of drinking water, home heating programs, building elementary schools, and providing food baskets for Chechen refugees in Georgia. Ex. 209, WAMYSA044850-851 (2000 project agreement for Chechen refugees' relief in Georgia).

**RESPONSE:**

Disputed as incomplete. WAMY's Chechnya-directed funds were couriered into Chechnya—a mujahidin theatre—by Al-Haramain officials "for both [WAMY] and [IIRO]." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 102.The "refugee"/"orphan" humanitarian categories were the documented cover for diversion: WAMY-affiliated BIF, operating in the same Chechen theatre, "fraudulently solicited and obtained donations by falsely representing that the funds would be used solely for humanitarian purposes, while concealing that some of the donated funds were used to support armed fighters," supplied 2,900 pairs of steel-reinforced anti-mine boots to

Chechen fighters, and "altered its books to make support for an injured Bosnian fighter appear as aid to an orphan." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 104, 106). "Saudi government-sponsored Islamic charities such as the International Islamic Relief Organization (IIRO), the World Assembly of Muslim Youth (WAMY), ... and other Saudi front organizations were active in Chechnya and elsewhere in Russia raising funds for the Chechen resistance and spreading Wahhabist ideas." Ex. 74, Winer Rpt. § 12.8.2 (citing Gordon M. Hahn, *Russia's Islamic Threat*). In January 2000 the Saudi Minister of Islamic Affairs sent WAMY Secretary General al-Johani a check for 20,000 Saudi Riyals "as a donation ... to the benefit of the Muslims of Chechnya ... I ask Allah the almighty to support our mujahideen brothers," which al-Johani confirmed receiving. Ex. 112, Kohlmann 2020 Rpt. ¶ 167 (citing Ex. 45, WAMYSA 1249305, 1249304; Ex. 47, FED-PEC 234243-244). Chechnya was an active al-Qaeda theater: al-Qaeda deputy al-Zawahiri traveled there in 1996 believing "conditions ... were excellent" to "establish a new base of operations," Ex. 133, Kohlmann 2020 Rpt. ¶¶ 81-84 (citing 9/11 Comm'n Report at 488-489, 156, 222, 149, 160, 166; Higgins & Cullison, "Saga of Dr. Zawahri Sheds Light on the Roots of al Qaeda Terror," WSJ (Ju. 2, 2002); "Airstrike kills al-Qaida-linked commander in Syria," AP (Oct. 3, 2016); "Death of Senior Egyptian Islamic Jihad (EIJ) Member Mahmud Hisham al-Hennawi Reported in the Caucasus," Glabal Terrer Alert (Apr. 17, 2005). A genuine dispute of material fact exists.

**STATEMENT:**

421. To monitor WAMY operations in Eastern European countries affected by war, WAMY representatives visited Kosovo, Albania, Poland and Montenegro and to evaluate WAMY's operations and activities in these countries. Ex. 206 (2001 visit report).

**RESPONSE:**

Disputed as immaterial and incomplete. Internal monitoring visits do not establish that WAMY's Eastern Europe operations were benign. The same operations were assessed by the CIA as recruitment and diversion conduits—WAMY's Balkans offices "actively involved in spotting and assessing suitable terrorist recruits from among young men who seek assistance from humanitarian organizations." Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 2102; Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 99 (citing CIA_000143-158 at 151; CIA_000178-189 at 185-186). The Saudi charities operating in these theaters—including the SJRC with which WAMY collaborated—had offices raided over terrorism concerns, including the SJRC's shared Kosovo office raided in early 2000 "in an attempt to thwart potential attacks on U.S. interests." Ex. 112, Kohlmann 2020 Rpt. ¶ 88 (citing FED-PEC 97363-97365; IIRO 41030; IIRO 39085-39086; IIRO 39278; IIRO 122181-122181; IIRO 122181-12218; IIRO 42360; IIRO 42373; IIRO 122003). Humanitarian and terror-support activities "substantially overlapped" and that relief "helped to legitimize and provide a cover for[] the extremist and terrorist activities," (Ex. 74, Winer Rpt. §§ 13.1, 5.3.3, n.24), and WAMY headquarters exercised "substantial control" over its branch offices, undercutting any suggestion that these regional operations were autonomous or unmonitored charity activity. Ex. 133, Kohlmann 2020 Rpt. ¶¶ 75-77 (citing CRA audit, EX. 79, FED-PEC 218170-218203). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 391-408, 414-420. A genuine dispute of material fact exists.

**STATEMENT:**

422. As late as 2000, WAMY continued its efforts in bringing attention to the plight of Kosovars by hosting a United Nations Conference of Non-Governmental Organizations workshop entitled “Psychological Rehabilitation for Girls Who Were Raped in Kosovo.” Ex. 210,

WAMYSA061135-140 (request to transfer $5000 to cover expenses of Psychosocial Rehabilitation of Girls who had been raped in Kosovo).

**RESPONSE:**

Not disputed that WAMY hosted the described 2000 UN NGO workshop on rehabilitation of Kosovar rape victims; disputed as to any implication that WAMY's broader eastern European and Balkan operations were confined to such humanitarian work. A single UN-affiliated event does not establish that WAMY's Balkans conduct was benign. WAMY was "also serving as a key conduit for support to al Qaeda." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). Plaintiffs otherwise incorporate their responses to Statements 417-421 and 435-442. A genuine dispute of material fact exists.

**STATEMENT:**

**F. WAMY's 1990s Involvement With TWRA, a Charitable Entity That Folded In The 1990s, Concerned Educational and Humanitarian Relief Projects**

**RESPONSE:**

Disputed. WAMY's involvement with TWRA was not limited to educational and humanitarian relief. A German Federal Office of Criminal Investigation report prepared for the ICTY Office of the Prosecutor concluded that TWRA, "under the cover of humanitarian aid or humanitarian aid organization, to a large degree served as a financial support to the political leadership of

Bosnia and their goals," and that "there are heavy doubts as to whether the financial means of the TWRA were exclusively used for humanitarian aid." Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854. TWRA was "a thinly-veiled charity cover for arms smuggling, money laundering, and terrorist financing" that bin Laden used to "covertly provide financial and other support for terrorist activities," that WAMY's eastern European operations were "deeply intertwined" with TWRA, and that WAMY "shared the same office space as TWRA in Vienna." Ex. 112, Kohlmann 2020 Rpt. ¶ 174 (citing 9/11 Comm'n Report at 58; FED-PEC 289619, 218206; PEC-KSA 3656-3718, WAMYSA 42103). Plaintiffs' evidence identifies TWRA as "an important al Qaeda front during the early 1990's" that Osama bin Laden "made use of." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)), ¶¶ 460-461 (citing 9/11 Commission Final Report at 58). WAMY's own Austria/Eastern Europe representative, Elfatih (Fatih) Hassanein, was TWRA's director. Ex. 74, Winer Rpt. § 12.12.14 (citing WAMY internal chart, Decl. of Tarbutton (Dkt. No. 3912), Ex. 36); *see* WAMY's Rule 56.1 Statements at ¶¶ 437-438 and Plaintiffs' responses to same. The Balkans and Caucasus were active al-Qaeda theaters during the mid-1990s when WAMY and TWRA operated there; future 9/11 hijackers al-Hazmi and al-Mihdhar fought in Bosnia in 1995, and al-Zawahiri traveled to Chechnya in 1996 to establish a base. Ex. 133, Kohlmann 2020 Rpt. ¶¶ 81-84 (citing 9/11 Comm'n Report at 488-489, 156, 222, 149, 160, 166; Higgins & Cullison, "Saga of Dr. Zawahri Sheds Light on the Roots of al Qaeda Terror," WSJ (Ju. 2, 2002); "Airstrike kills al-Qaida-linked commander in Syria," AP (Oct. 3, 2016); "Death of Senior Egyptian Islamic Jihad (EIJ) Member Mahmud Hisham al-Hennawi Reported in the Caucasus," Global Terrer Alert (Apr. 17, 2005). A genuine dispute of material fact exists.

**STATEMENT:**

423. The Third World Relief Agency ("TWRA") is a "humanitarian assistance" organization that worked with the Bosnian government and is authorized to receive donations in Bosnia-Herzegovina and to deliver "food stuff, clothes, [blankets], tents, [medicine], medical equipment, and [pocket] money on behalf of refugees. Ex. 211, FED-PEC028912 (1992 letter from Bosnian Mission certifying that Hassanein is the director of TWRA and is authorized to receive donations and pay for demands of refugees and deliver food clothes, blankets, tents and medicine); Ex. 212, FED-PEC0213792-854 (MR/GER049963 (describing TWRA).

**RESPONSE:**

Disputed. The investigative record shows TWRA financed weapons under a humanitarian cover. It was "a thinly-veiled charity cover for arms smuggling, money laundering, and terrorist financing," and the 9/11 Commission concluded bin Laden used TWRA to "covertly provide financial and other support for terrorist activities." Ex. 112, Kohlmann 2020 Rpt. ¶ 174 (citing 9/11 Comm'n Report at 58; FED-PEC 289619, 218206; PEC-KSA 3656-3718, WAMYSA 42103). TWRA's principal donations account carried inflows and outflows "amounting to over USD 200 million each," including "over USD 80 million" in cash "whose intended purpose is not known"; a USD 3,513,281.82 transfer booked "[f]or wheat to Albania for Bosnian refugees" in fact corresponded to a fax offering "weapons and munitions" and "the delivery of cesium 137"; and documented deliveries included a DM 1,004,000 list of "ammunition, mines and other weapons" personally approved by President Izetbegovic and an USD 18 million weapons contract signed by the Bosnian Foreign Minister. Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854 at 818-819, 851-852). A genuine dispute of material fact exists.

**STATEMENT:**

424. WAMY funded some of TWRA's projects. Ex. 213, WAMYSA042102-105 (1997 request to WAMY to fund Nigerian TWRA project that includes a clinic project, women crafts project, Islamic women project with cost of projects of which WAMY funded a women/visual program and a training course); Ex. 214, WAMYSA586734, 736-737 (1999 letter to support TWRA efforts in Nigeria, includes WAMY checks for 200,000 SRA [$53,000] and payment voucher).

**RESPONSE:**

Undisputed that WAMY funded TWRA projects, but disputed as to any implication that WAMY funded solely humanitarian projects through TWRA. WAMY's own Eastern Europe director, Fatih Hassanein, was TWRA's director. *See* WAMY Rule 56.1 Statements at ¶¶ 437-438 and Plaintiffs' responses to same. TWRA was "a thinly-veiled charity cover for arms smuggling, money laundering, and terrorist financing" used by bin Laden, and WAMY "made significant financial donations or transfers to TWRA." Ex. 112, Kohlmann 2020 Rpt. ¶ 174 (citing 9/11 Comm'n Report at 58; FED-PEC 289619, 218206; PEC-KSA 3656-3718, WAMYSA 42103). The German TWRA audit prepared for the ICTY names WAMY among TWRA's donors alongside "a host of other prominent al Qaeda donor and financial facilitators, including Wa'el Jelaidan [and] Taibah International," (Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 462; Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854), and WAMY's funds—including 399,067.15 Austrian schillings wired from Jeddah to TWRA—entered the same TWRA account network the investigation tied to arms procurement and to multimillion-dollar transactions with al-Qaeda financier Wa'el Jelaidan. Ex. 74, Winer Rpt. § 10.5.10; Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854

at 804-806, 849. WAMY did not track the actual uses of the funds it provided. Ex. 74, Winer Rpt. §§ 12.12.7-12.12.8. A genuine dispute of material fact exists.

**STATEMENT:**

425. In or about 1993, the Office of Munich I State Attorney ("Munich I") commissioned the Bavarian State Office of Criminal Investigation (BLKA) to investigate TWRA. Ex. 212, FED-PEC0213792-0213854 (MR/GER049960-50022 at 963-969 (investigative background)).

**RESPONSE:**

Undisputed for the general purposes of this motion.

**STATEMENT:**

426. The investigation was "directed against a Yugoslavian/Albanian group of perpetrators who are suspected of, among other things, having violated the Armaments Act (WaffG) and the Weapons of War Control Act (KWKG). Id. at FED-PEC0213795

**RESPONSE:**

Undisputed for the general purposes of this motion.

**STATEMENT:**

427. After seizing "extensive documents" from TWRA in 1996, Munich suspended its investigation in 1998 for failure to "establish sufficient criminal suspicion." Id. at FED-PEC0213796.

**RESPONSE:**

Disputed as misleading. The 1998 suspension under Section 170(2) StPO was a procedural closure "because it was not possible to establish sufficient criminal suspicion"—not a finding of innocence or exoneration. Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854 at 796. The matter did not end there: the ICTY Prosecutor took up the seized materials, and the German Federal Office of Criminal Investigation's later financial report concluded TWRA operated "under the cover of humanitarian aid" as a probable "cover" for weapons dealings and forwarded its results "to the OTP with the request for examination." Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854 at 852-853. The 2002 ICTY Office of the Prosecutor Expert Report—based on the TWRA banking records seized in 1996—documented that more than $7 million of TWRA funds went to al-Qaeda financier Wael Julaidan, that transactions were falsely labeled to disguise arms, and that TWRA "systematically hid its provision of arms" while "support[ing] Al Qaeda and bin Ladin through Julaidan." Ex. 74, Winer Rpt. §§ 10.5.1-10.5.9, 10.7; ICCJ Expert Report, Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, FED-PEC0213792-213854. A genuine dispute of material fact exists.

**STATEMENT:**

428. While investigating alleged violations of humanitarian international law during the Bosnian conflict of the 1990s, the Office of the Prosecutor (OTP) of the International Court of Criminal Justice for the Former Yugoslavia (ICCJ) came across BLKA's investigation and looked into TWRA's activities during this period. Id. at FED-PEC0213795.

**RESPONSE:**

Undisputed for the general purposes of this motion.

**STATEMENT:**

429. In 2002, ICCJ produced a report of its investigation into TWRA. Ex. 212.

**RESPONSE:**

Undisputed for the general purposes of this motion.

**STATEMENT:**

430. The ICCJ looked extensively into TWRA's bank accounts, its transactions, including "transfers, checks credits and deposits" from 1992 to 1995. Id. at FED-PEC0213801-802. (discussing ICCJ's review of documents, including transactions).

**RESPONSE:**

Undisputed that the ICTY Office of the Prosecutor examined TWRA's bank accounts and transactions from 1992 to 1995; disputed to the extent WAMY suggests this investigation cleared it. The report found account inflows and outflows "amounting to over USD 200 million each," including "over USD 80 million" in cash "whose intended purpose is not known"; multimillion-dollar transfers to and from al-Qaeda financier Wa'el Jelaidan (on the UN "Al-Qaeda list" and the "Golden Chain List as a recipient of contributions to Al-Qaeda"); and an arms-procurement payment disguised as refugee wheat. Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854 at 805, 819, 852. The review found more than $120 million contributed to TWRA (including by Saudi Prince Salman), more than $7 million routed to Jelaidan, more than $4.5 million to founder Hassanein (Director of the Office of WAMY in Austria and Eastern Europe), and transactions falsely labeled to disguise arms purchases (e.g., "wheat"; "delivery of cesium 137"). Ex. 74, Winer Rpt. §§ 10.5.1, 10.5.3, 10.5.5, 12.12.14, n.212; citing ICCJ Expert Report, Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, FED-PEC0213792-213854; Ex. 112, Kohlmann 2020 Rpt. ¶ 174 (citing 9/11 Comm'n Report at 58; WAMY

document indices (produced Mar. 23, 2017), Decl. of Tarbutton (Dkt. No. 3912), Ex. 36). A genuine dispute of material fact exists.

**STATEMENT:**

431. The ICCJ found that WAMY transferred 399,067.15 Austrian Shillings ($32,000) to TWRA on March 25, 1992, nearly a decade before the 9/11 Attacks. Id. at FED-PEC0213849 (noting the transfer from WAMY to TWRA).

**RESPONSE:**

Undisputed that WAMY made the transfer, but the timing does not make it benign, and the framing as "nearly a decade before the 9/11 Attacks" is immaterial given al-Qaeda's long financing build-up. The report catalogued WAMY's ATS 399,067.15 transfer—for which "No posting text was entered"—among TWRA's "Identified Links to other Organizations," i.e., into the same TWRA donor network and accounts the investigation tied to weapons procurement and to al-Qaeda financier Julaidan. Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854 at 849; Ex. 74, Winer Rpt. § 10.5.10 (WAMY wired 399,067.15 Austrian schillings from Jeddah to TWRA). TWRA was a conduit that "systematically hid its provision of arms" while "support[ing] Al Qaeda and bin Ladin through Julaidan," (Ex. 74, Winer Rpt. § 10.7; Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854 at 849), and WAMY's operations were "deeply intertwined" with TWRA, to which WAMY "made significant financial donations or transfers." Ex. 112, Kohlmann 2020 Rpt. ¶ 174 (citing 9/11 Comm'n Report at 58; FED-PEC 289619, 218206; PEC-KSA 3656-3718, WAMYSA 42103). WAMY's own Eastern Europe representative, Hassanein, was TWRA's director, (*see* WAMY Rule 56.1 Statement at ¶¶ 437-438 and Plaintiffs' responses to same), and the TWRA audit lists WAMY among TWRA donors alongside al-Qaeda financiers Jelaidan and Taibah. Decl. of

Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854 at 849. A genuine dispute of material fact exists.

**STATEMENT:**

432. WAMY was described as an "organization active as an aid organization in Bosnia during the war there." Id. at FED-PEC0213849 (ICCJ's finding as to WAMY's purpose and relationship with Bosnia).

**RESPONSE:**

Disputed. The quoted phrase is the report's neutral cataloguing of WAMY as a TWRA donor in its section "Identified Links to other Organizations," not a finding that WAMY's funds were used for benign purposes. Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854. Independent evidence describes WAMY's wartime Bosnia activity. Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 391-408, 414-424, 4301-431. A genuine dispute of material fact exists.

**STATEMENT:**

433. There is no evidence that the 399,067.15 Austrian Shillings transferred to TWRA went to anything other than the type of projects WAMY routinely supports, namely humanitarian and student youth relief. Id. at FED-PEC0213849 (ICCJ's finding only that WAMY is registered as an aid organization in Bosnia); see, e.g. Ex. 213 (1996 report with detail of Nigerian TWRA project that includes a clinic project, women crafts project, Islamic women project with cost of projects).

**RESPONSE:**

Disputed. The WAMY transfer bore "No posting text," so its application is not documented as humanitarian, (Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854.), and the asserted absence of contrary "evidence" reflects the overlap of humanitarian and terror-support activity and WAMY's failure to track fund uses—not proof of purely humanitarian use. The investigation found "heavy doubts as to whether the financial means of the TWRA were exclusively used for humanitarian aid," given TWRA's commingled accounts (over USD 200 million in flows, over USD 80 million in cash of unknown purpose) and arms purchases disguised as refugee relief. Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854 at 819, 852, 853). WAMY's funds entered that commingled network, and the TWRA audit lists WAMY among TWRA donors alongside al-Qaeda financiers Wa'el Jelaidan and Taibah International. Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854 at 804-806, 837, 849. For charities such as WAMY it is "not possible to estimate the amounts or percentages" of humanitarian versus terror-support activity because the charities "did not provide sufficient, and sufficiently accurate, documentation," and because the two "substantially overlapped," (Ex. 74, Winer Rpt. § 13.1; 5.3.3), that TWRA disguised weapons purchases as humanitarian goods (e.g., "wheat"), (Ex. 74, Winer Rpt. § 10.5.5), and that WAMY did not track the actual uses of the funds it provided. Ex. 74, Winer Rpt. §§ 12.12.7-12.12.8. A 2018 Saudi Anti-Money Laundering report reflects that 2016 on-site inspections of WAMY (and IIRO) offices led to offices being shuttered for "several administrative and financial violations," further undercutting reliance on the absence of records. Ex. 133, Kohlmann 2020 Rpt. ¶ 47 (citing Saudi Anti-Money Laundering authority, Mutual Evaluation Report (Sep. 2018) at p 99). A genuine dispute of material fact exists.

**STATEMENT:**

434. TWRA dissolved in the 1990s. Ex. 31 at 353: 9-11 (conceding to TWRA's dissolution).

**RESPONSE:**

Disputed as immaterial. TWRA's later dissolution—amid criminal investigations and the 1996 seizure of its records—does not bear on whether WAMY's early-1990s funds supported an entity that a German Federal Office of Criminal Investigation report prepared for the ICTY Prosecutor found operated "under the cover of humanitarian aid" as a probable weapons-financing "cover," and that Plaintiffs' evidence identifies as "an important al Qaeda front during the early 1990's." Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854; Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)), ¶ 460. During its operation, TWRA functioned as an al-Qaeda financing and arms-smuggling conduit that WAMY funded. Ex. 112, Kohlmann 2020 Rpt. ¶ 174 (citing 9/11 Comm'n Report at 58; FED-PEC 289619, 218206; PEC-KSA 3656-3718, WAMYSA 42103); Ex. 74, Winer Rpt. §§ 10.5-10.7; ICCJ Expert Report, Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, FED-PEC0213792-213854. A genuine dispute of material fact exists.

**STATEMENT:**

435. The 9/11 Commissions report noted, without details, that between 1988-1992, Bin Laden "made use of the already-established Third World Relief Agency (TWRA)." Ex. 46 at p.58.

**RESPONSE:**

Undisputed that the stated quote appears in the 9/11 Commission report; disputed to the extent WAMY suggests the Commission's finding was isolated or "without details." The report states Usama bin Laden used TWRA to "covertly provide financial and other support for terrorist activities," and WAMY's own eastern European operations were "deeply intertwined" with TWRA, which functioned as "a thinly-veiled charity cover for arms smuggling, money

laundering, and terrorist financing." Ex. 112, Kohlmann 2020 Rpt. ¶ 174 (citing 9/11 Comm'n Report at 58; FED-PEC 289619, 218206; PEC-KSA 3656-3718, WAMYSA 42103. The record of evidence establishes that "[t]he TWRA was an important al Qaeda front during the early 1990's," and that bin Laden used TWRA to support terrorist activities. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)), ¶¶ 460, 461 (citing 9/11 Comm'n Report at 58). The German Federal Office of Criminal Investigation's audit of TWRA's finances, prepared for the ICTY Prosecutor, documented donations to TWRA from prominent al Qaeda financiers—including Wa'el Jelaidan, Taibah International, and WAMY—and identified transfers to TWRA of nearly $300,000 and over 5.7 million Austrian Schillings (~$460,000) in 1992. Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854 at 804-806, 837, 849.. Financial investigators for the ICTY Office of the Prosecutor found that more than $7 million of TWRA's funds went to bin Laden associate and al-Qaeda financier Wael Julaidan, and more than $4.5 million went to TWRA's founder Elfatih Hassanein. Ex. 74, Winer Rpt. §§ 10.5.1, 10.5.3; Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854. A genuine dispute of material fact exists.

**STATEMENT:**

436. No international or U.S. sanction regime ever designated TWRA before or after working with WAMY. Ex. 117.

**RESPONSE:**

Disputed as immaterial and misleading. The absence of a formal designation does not establish that TWRA did not fund al Qaeda or act as a terrorist-financing conduit. TWRA was the subject of a criminal financial investigation—the audit conducted by Germany's Federal Office of Criminal Investigation at the request of the ICTY Prosecutor concerning TWRA's finances.

(Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854). TWRA was "an important al Qaeda front" funded in part by WAMY (Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶¶ 460, 462; Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854), and that TWRA "systematically hid its provision of arms to the Bosnians ... and ... at the same time supported Al Qaeda and bin Ladin through Julaidan." Ex. 74, Winer Rpt. § 10.7; Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854. Jelaidan—recipient of more than $7 million in TWRA funds—was jointly designated by the United States and Saudi Arabia in 2002 as a bin Laden associate and as head of NGOs providing financial and logistical support to al-Qaeda. Decl. of Mohammedi (Dkt. No. 12001) Ex. 234, OFAC evidentiary memo, TREASURY00001-121 at 1-4; Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 177 (citing U.S. Treasury designation of Jelaidan (Sep. 6, 2002)); Ex. 246, Comras Rpt. pp. 27, 29-30, nn. 102, 112-115 (citing WJ 022; U.S. Treasury designation of Jelaidan (Sep. 6, 2002), FED-PEC 203469-470; U.N. 1267 Narrative Summary QI.J.79.02, FED-PEC 213923-929). A genuine dispute of material fact exists.

**STATEMENT:**

1. WAMY Used Fatih Hassanein to Serve as Its Eastern European Representative

**RESPONSE:**

Disputed as incomplete, to the extent this characterizes WAMY's use of Fatih Hassanein as benign. Hassanein did not merely serve as WAMY's Eastern European representative; he simultaneously headed TWRA and functioned as an arms broker and al-Qaeda facilitator while serving as WAMY's regional director. Ex. 74, Winer Rpt. § 12.12.14 (citing WAMY document indices (produced Mar. 23, 2017), Decl. of Tarbutton (Dkt. No. 3912), Ex. 36) (WAMY internal

chart identifying "Fateh Ali Hussein" as "Director of the Office of WAMY office in Austria and Eastern Europe"); "Bosnia's Muslims Dodged Embargo," WP (Sep. 22, 1996); Ex. 112, Kohlmann 2020 Rpt. ¶ 174 (citing 9/11 Comm'n Report at 58; FED-PEC 289619, 218206; PEC-KSA 3656-3718, WAMYSA 42103). Plaintiffs incorporate their counterstatements to ¶¶ 437-442. A genuine dispute of material fact exists.

**STATEMENT:**

437. Dr. Fatih Hassanein ("Hassanein") is the director of the Islamic Council of Eastern Europe (ICEE) and served as WAMY's representative in Eastern Europe. Ex. 215, WAMYSA1235382 (1994 correspondence from Al-Johani to Hassanein describing Hassanein as Representative in Austria); Ex. 216, WAMYSA1235383 (1994 letter from Hassanein as ICEE Executive Director).

**RESPONSE:**

Disputed. Fatih Hassanein did not merely serve as WAMY's Eastern Europe representative; he was WAMY's director of its office in Austria and Eastern Europe and simultaneously the "Third World Relief Agency [TWRA] chief." Ex. 74, Winer Rpt. § 12.12.14 (citing WAMY document indices (produced Mar. 23, 2017), Decl. of Tarbutton (Dkt. No. 3912), Ex. 36) (WAMY internal chart identifying "Fateh Ali Hussein" as "Director of the Office of WAMY office in Austria and Eastern Europe"); "Bosnia's Muslims Dodged Embargo," WP (Sep. 22, 1996); Ex. 112, Kohlmann 2020 Rpt. ¶ 174 (citing 9/11 Comm'n Report at 58; FED-PEC 289619, 218206; PEC-KSA 3656-3718, WAMYSA 42103). TWRA "was an important al Qaeda front during the early 1990's." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 460, 461 (citing 9/11 Comm'n Report at 58). WAMY thus made the head of an al Qaeda funding conduit its regional director. WAMY headquarters in Saudi Arabia exercised control over its branch offices and their

representatives; the CRA found that WAMY (Saudi Arabia) "maintains substantial control" over branch finances and "uses this control to carry out its objectives." Ex. 133, Kohlmann 2020 Rpt. ¶¶ 75-77 (citing CRA audit, EX. 79, FED-PEC 218170-218203). A genuine dispute of material fact exists.

**STATEMENT:**

438. Dr. Hassanein is also the Director of the TWRA in Vienna, Austria, having formed and registered it in 1987. Ex. 217, WAMYSA1235384 (Hassanein 1994 communication to WAMY as TWRA head); Ex. 212 at FED-PEC0213795, 798 (TWRA formed in 1987).

**RESPONSE:**

Disputed as incomplete, though immaterial to the concession it contains: WAMY's own statement acknowledges that its Eastern Europe representative simultaneously headed TWRA. That Hassanein founded and directed TWRA is significant precisely because TWRA "was an important al Qaeda front during the early 1990's," (Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)), ¶ 460, 461 (citing 9/11 Comm'n Report at 58)), and "a thinly-veiled charity cover for arms smuggling, money laundering, and terrorist financing" used by bin Laden to support terrorist activities. Ex. 112, Kohlmann 2020 Rpt. ¶ 174 (citing 9/11 Comm'n Report at 58; FED-PEC 289619, 218206; PEC-KSA 3656-3718, WAMYSA 42103); Ex. 74, Winer Rpt. §§ 10.5-10.7; Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854. Per the German/ICTY TWRA Audit, TWRA's donors included WAMY and Taibah International. Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854. Hassanein held this TWRA role at the same time he directed WAMY's Austria/Eastern Europe office. Ex. 74, Winer Rpt. § 12.12.14. A genuine dispute of material fact exists.

**STATEMENT:**

439. Hassanein had strong ties with the Bosnian government that allowed him and other charity coordinators to manage a "Fund for the Assistance of the Muslims of Bosnia and Herzegovina" with the approval of the Bosnian chairman of the Presidency. Ex. 212, at FED-PEC0213800 (noting that a letter from Alija Izetbegovic authorized the fund).

**RESPONSE:**

Disputed as immaterial. Governmental approval of a Bosnia relief fund does not establish that the funds were not diverted; Hassanein's Bosnian-government ties were used to broker illegal weapons and channel funds, not merely to administer humanitarian relief. Contemporaneous reporting relied on by Winer describes Hassanein as the "bagman" of Bosnian President Izetbegovic who turned TWRA into "the chief broker of black-market weapons deals," with some $350 million passing through TWRA from 1992 to 1995, at least half used to purchase weapons illegally. Ex. 74, Winer Rpt. § 12.12.14 & n.213 (citing "Bosnia's Muslims Dodged Embargo," Washington Post, Sept. 22, 1996). ICTY investigators found TWRA transactions falsely labeled (e.g., "wheat") that in fact covered military equipment, including one referencing "the delivery of cesium 137." Ex. 74, Winer Rpt. § 10.5.5; Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854. Hassanein/TWRA operated within the Vienna-Balkans charity hub that U.S. intelligence linked to terrorism: a 1996 American intelligence report found that "nearly one third of the Islamic NGOs in the Balkans have facilitated the activities of Islamic groups that engage in terrorism," and bin Laden left standing orders to keep charity transactions in cash, using NGOs as a "secret laundry," with former employees estimating up to 50% of funding was diverted to al Qaeda. Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 170, 171 (citing Duggar, "Anti-U.S. Plot in India Is Foiled; Militant Islamist Intended to

Bomb 2 Consulates, Police Say," NYT (Jan. 21, 1999); 9/11 Comm'n Report at 171; Jan. 1996 CIA Report; Aff. of Senior Special Agent David Kane, *U.S. v. Biheiri*, 03-365-A (Aug. 13, 2003) at p. 2). The IIRO's Vienna management team—which included Hassanein's brother—was tied to organizations suspected of aiding armed militant groups. Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 182 (citing Minutes of Austrian police interview with Sukarno Ali Hassanein following search of premises belonging to El Fatih Hassanein (Sep. 5, 1995). The Bosnia theater in which Hassanein operated was the same jihad theater to which future 9/11 hijackers al-Hazmi and al-Mihdhar "traveled together to fight ... in 1995." Ex. 133, Kohlmann Rebuttal Rpt.. ¶ 81 (citing Ex. 4, 9/11 Comm'n Report at 156). A genuine dispute of material fact exists.

**STATEMENT:**

440. Dr. Fatih Hassanein was never a WAMY director or employee. Ex. 215 (1994 document re representative of Austria).

**RESPONSE:**

Disputed. WAMY's own internal records identify Hassanein as a WAMY director, not a mere volunteer: a WAMY internal chart identifies "Fateh Ali Hussein" as the "Director of the Office of WAMY office in Austria and Eastern Europe," with the notation "paying amounts of money to associations for specific projects." Ex. 74, Winer Rpt. § 12.12.14 (citing WAMY document indices (produced Mar. 23, 2017), Decl. of Tarbutton (Dkt. No. 3912), Ex. 36); Ex. 112, Kohlmann 2020 Rpt. ¶ 174 (Hassanein "simultaneously served as the 'Director of the Office of WAMY office in Austria and Eastern Europe'"). In any event, whether Hassanein was formally a "director or employee," WAMY concedes he acted as its Eastern Europe representative, WAMY Stmt ¶¶ 437, 441, and he did so while serving as chief of TWRA, "an important al Qaeda

front." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 460, 461 (citing 9/11 Comm'n Report at 58); Decl. of Tarbutton (DKt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 182; Ex. 112, Kohlmann 2020 Rpt. ¶ 92 (citing Minutes of Austrian police interview with Sukarno Ali Hassanein following search of premises belonging to El Fatih Hassanein (Sep. 5, 1995), FED-PEC 224262, 224273-280). A genuine dispute of material fact exists.

**STATEMENT:**

441. WAMY used Hassanein's personal services to act as a WAMY representative in Eastern Europe. Compare, Ex. 215 (1994 document re representative of Austria) and Ex. 217.

**RESPONSE:**

Disputed. The evidence characterizes Hassanein as WAMY's regional Director with authority over disbursements ("paying amounts of money to associations for specific projects"), not as a provider of ad hoc "personal services." Ex. 74, Winer Rpt. § 12.12.14 (citing WAMY document indices (produced Mar. 23, 2017), Decl. of Tarbutton (Dkt. No. 3912), Ex. 36); Ex. 112, Kohlmann 2020 Rpt. ¶ 174. The "personal services" WAMY obtained from Hassanein were the services of the sitting chief of TWRA, an entity that "was an important al Qaeda front during the early 1990's" and to which WAMY itself was a donor per the German/ICTY TWRA Audit. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶¶ 460-462 (citing 9/11 Comm'n Report at 58; Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854). WAMY headquarters exercised substantial control over its branch offices and their representatives, directing their activities and requiring reporting. Ex. 133, Ex. 133, Kohlmann Rebuttal Rpt.. ¶¶ 75-77 (citing CRA audit, EX. 79, FED-PEC 218170-218203). Hassanein's "multiple roles were inextricably intertwined, with his charitable roles providing a cover to arms smuggling activities to Bosnian jihadists." Ex. 74, Winer Rpt. § 12.12.14. A genuine dispute of material fact exists.

**STATEMENT:**

442. No international or U.S. sanction agency ever designated Hassanein.

**RESPONSE:**

Disputed as immaterial. That no agency "designated" Hassanein does not establish the absence of wrongdoing or terrorist ties. Austrian police searched El Fatih Hassanein's premises and interviewed the Hassaneins on September 5, 1995 in a weapons-smuggling and terrorism-financing investigation. Decl. of Tarbutton (DKt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 182; Ex. 112, Kohlmann 2020 Rpt. ¶ 92 (citing Minutes of Austrian police interview with Sukarno Ali Hassanein following search of premises belonging to El Fatih Hassanein (Sep. 5, 1995), FED-PEC 224262, 224273-280). Record evidence establishes he headed TWRA—an al Qaeda front funded in part by WAMY—while directing WAMY's Austria/Eastern Europe office, and functioned as an arms broker and al-Qaeda facilitator. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶¶ 460-462 (citing 9/11 Comm'n Report at 58; Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854); Ex. 74, Winer Rpt. § 12.12.14 (citing "Bosnia's Muslims Dodged Embargo," WP (Sep. 22, 1996); Ex. 112, Kohlmann 2020 Rpt. ¶ 174. A genuine dispute of material fact exists.

**STATEMENT:**

**G. WAMY's Providing Support to Taibah-Bosnia for Humanitarian Projects for Bosnian Refugees Did Not Support, Directly or Indirectly, al-Qaeda**

**RESPONSE:**

Disputed. The record—including WAMY's own financial exhibits—establishes a genuine dispute of material fact as to whether WAMY's support to Taibah in Bosnia (and the affiliated

Taibah offices through which that support flowed) directly or indirectly supported al-Qaeda. (1) WAMY funded Taibah in Bosnia and Albania: a Bosnian recipient acknowledged receiving "from the World Assembly of Muslim Youth, through Taibah International Charity, 42,000 German Marks" (Decl. of Mohammedi (Dkt. No. 12001), Ex. 219); WAMY disbursed a "check in the amount of 220,450 Saudi Riyals" to "Taibah Charity Association ... as a first installment for relief for Muslims in the Balkans" (Decl. of Mohammedi (Dkt. No. 12001), Ex. 220); and WAMY made 2001-2002 transfers to Taibah's Albania office, including "one hundred thirty-five thousand Saudi riyals" and 32,250 SAR for "Kosovo student missions." Decl. of Mohammedi (Dkt. No. 12001), Exs. 222-224. (2) Taibah's Bosnia branch was designated a Specially Designated Global Terrorist on May 6, 2004 "for funneling money to al Qaeda." Ex. 148, Pls.' Averment of Facts, (Dkt. No. 9541) ¶ 2105 (citing U.S. Treasury designation of Taibah Int'l Aid Assoc.); OFAC SDN listing, Decl. of Mohammedi (Dkt. No. 12001), Ex. 117 (at 377). (3) The CIA reported that Taibah's Sarajevo office "received regular funding from banks and individuals with ties to al-Qa'ida" and "approximately $140,000 from WAMY-Jeddah ... in May 2001," adding that "WAMY is suspected of supporting terrorists." Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 2105 (citing U.S. Treasury designation of Taibah Int'l Aid Assoc.). (4) OFAC's designation states that Taibah "has significant ties to GRF, which initially operated in Bosnia under the auspices of Taibah" (Decl. of Mohammedi (Dkt. No. 12001), Ex. 225); the Global Relief Foundation was itself a designated al-Qaeda financier that advocated armed jihad and was funded by the al-Qaeda precursor Makhtab al-Khidamat (MAK). 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (DKt. No. 12001), Ex. 241 at 87-89, 106; Ex. 74, Winer Rpt. § 6.6.11.6. (5) Taibah's Falls Church, Virginia branch "was co-founded by Abdullah bin Laden, Osama bin Laden's nephew," and "had extensive ties to al Qaeda." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 423. (6) The CIA found WAMY's Balkans offices were

"actively involved in spotting and assessing suitable terrorist recruits" and that WAMY officials "couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia." Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶¶ 2102, 2104 (citing CIA_000143-158 at 151; CIA_000178-189 at 185-186). (7) WAMY's own eastern European operations were "deeply intertwined" with TWRA—a cover for arms smuggling and terrorist financing that bin Laden used—with WAMY sharing TWRA's Vienna office and making transfers to TWRA (approximately US$37,000 per a German criminal investigation), and WAMY's director for Austria and Eastern Europe, Hassanein, simultaneously headed TWRA and brokered black-market weapons for Bosnian jihadists while TWRA funneled more than $7 million to al-Qaeda financier Wael Julaidan. Ex. 112, Kohlmann 2020 Rpt. ¶ 174 (citing 9/11 Commission Final Report at 58); Ex. 74, Winer Rpt. §§ 10.5.1-10.5.3, 10.5.10, 12.12.13, 12.12.14; Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854; "Bosnia's Muslims Dodged Embargo," WP (Sep. 22, 1996). (8) The "humanitarian projects" framing does not resolve the dispute: Winer opines that humanitarian and terrorist-support activities "substantially overlapped" and that the humanitarian activities "helped to legitimize and provide a cover for[] the extremist and terrorist activities," Ex. 74, Winer Rpt. §§ 13.1, 5.5.3, and charity-based terrorist financing is concealed precisely because the money goes to "an overseas office of the charity or an affiliated charity," where diversions are not apparent. 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 53-54). A December 2009 State Department cable found WAMY "at times, fund[ed] extremism overseas," (Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009))); and the Balkans were an active al-Qaeda theater to which future 9/11 hijackers al-Hazmi and al-Mihdhar "traveled together to fight ... in

1995," Ex. 133, Kohlmann Rebuttal Rpt.. ¶ 81 (citing 9/11 Comm'n Report at 156). A genuine dispute of material fact exists.

**STATEMENT:**

443. WAMY's Western Europe objectives include publishing dawah material, brochures, publications for libraries, financially supporting pilgrimages, providing scholarships, developing relationship with Islamic organizations, and running youth camps. Ex. 218, WAMYSA036333-337 (2000 seminar symposium outlining WAMY Western Europe's objectives, goals and projects).

**RESPONSE:**

Disputed to the extent it implies WAMY's Western Europe/Balkans operations were purely benign. The CIA found that in the Balkans, local offices of NGOs such as WAMY "were actively involved in spotting and assessing suitable terrorist recruits from among young men who seek assistance from humanitarian organizations." Ex. 148, Pls.' Averment of Facts, (Dkt. No. 9541), ¶ 2102 (citing CIA_000143-158 at 151; CIA_000178-189 at 185-186). WAMY officials "couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia" and brokered donor requests where WAMY had "an ideological interest," (Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541), ¶ 2104 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4. at 744; Decl. of Mohammedi (Dkt. No. 12001). Ex. 243, CIA_000807-848 at 827; Ex. 2 to (Corrected) Decl. of Haefele (Dkt. No. 9541), EO 3414-3442 at 3438)); a WAMY-member NGO, "Stalk of Goodness," had its Macedonia office shut in February 1995 for channeling funds to spread Islamic fundamentalism, (Pls.' Averment of Facts (Dkt. No. 9541), ¶ 2104 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; Decl. of

Mohammedi (Dkt. No. 12001) Ex. 243, CIA_000807-848 at 827; Ex. 2 to (Corrected) Decl. of Haefele (Dkt. No. 9541), EO 3414-3442 at 3438)); and a WAMY youth-camp lecture praised the mujahideen in Bosnia and Chechnya. Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 2115 (citing videotape of the lecture, July 26, 1996; Ex. 212, FED-PEC 210330-210331). WAMY's European operations were also "deeply intertwined" with TWRA—a cover for arms smuggling and terrorist financing—and WAMY shared TWRA's Vienna office space. Ex. 112, Kohlmann 2020 Rpt. ¶ 174 (citing 9/11 Comm'n Report at 58; FED-PEC 289619, 218206; PEC-KSA 3656-3718, WAMYSA 42103). The dawah and relief activities of Saudi charities including WAMY "merged with recruitment activities to produce Islamic fighters," including provision of office space, false identification, travel facilitation, and arms. Ex. 74, Winer Rpt. §§ 13.3-13.4. The Balkans were an active jihad theater to which future 9/11 hijackers al-Hazmi and al-Mihdhar "traveled together to fight ... in 1995," (Ex. 133, Kohlmann Rebuttal Rpt.. ¶ 81 (citing 9/11 Comm'n Report at 156)); and a December 2009 State Department cable found WAMY "continue[d] to send money overseas and, at times, fund[ed] extremism overseas." Ex. 133, Kohlmann Rebuttal Rpt.. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). A genuine dispute of material fact exists.

**STATEMENT:**

444. WAMY supported the following Taibah-Bosnia projects to assist the needs of Bosnians and Kosovars who were victims or ethnic cleansing: student scholarship, Muslim holiday animal sacrifice, proselytization, Ramadan breakfast, mosque building, pilgrimage visits, and education. Ex. 219, WAMYSA1231298-299 (1997 support for schools (42,000 German Marks) in Bosnia with receipts); Ex. 220, WAMYSA1231313-314 (1997 letter

confirming disbursement of 220,450 SAR ($58,740 approx..) for education, youth camps, relief for distressed individual with check from WAMY to Taibah for Muslim of the Balkans); Ex. 64 (1997 WAMY support for refugees and education camps, sponsoring govt and religious schools, printing Islamic books in Bosnia); Ex. 221, WAMYSA1231294 (1997 letter from Taibah International-USA to WAMY Jeddah acknowledging receipt of check 220,450 SAR to help Muslims in Balkans and requesting second installment); Ex. 222, WAMYSA1232834 (2002 transfer of funds from WAMY to Taibah International Albania Office and list of WAMY funded institutions), Ex. 223, WAMYSA1232830 (2001-2002 transfer of funds to Taibah International Albania office); Ex. 224, WAMYSA1232840 (2001 transfer of funds to Taibah International Aid Albania Office for education).

**RESPONSE:**

Disputed. Part of WAMY's funding to Taibah supported an entity the United States designated as a terrorist: Taibah International's Bosnia branch was designated a Specially Designated Global Terrorist on May 6, 2004 "for funneling money to al Qaeda." Ex. 148, Pls.' Averment of Facts, (Dkt. No. 9541), ¶ 2105 (citing U.S. Treasury designation of Taibah Int'l Aid Assoc.). The CIA reported that "[t]he Sarajevo Taibah office has received regular funding from banks and individuals with ties to al-Qa'ida" and "received approximately $140,000 from WAMY-Jeddah ... in May 2001," adding that "WAMY is suspected of supporting terrorists." Ex. 148, Pls.' Averment of Facts, (Dkt. No. 9541), ¶ 2105 (citing U.S. Treasury designation of Taibah Int'l Aid Assoc.). Taibah's Falls Church branch was co-founded by Osama bin Laden's nephew Abdullah and "had extensive ties to al Qaeda," (Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)), ¶ 423), and Taibah International appears among TWRA's al Qaeda-linked donors in the

German/ICTY TWRA Audit, (Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 462 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854). Winer opines that for charities such as WAMY it is "not possible to estimate the amounts or percentages" of humanitarian versus terror-support activity because the charities "did not provide sufficient, and sufficiently accurate, documentation," and because the two types of activity "substantially overlapped." Ex. 74, Winer Rpt. §§ 13.1, 13.3-13.4. A December 2009 State Department cable found WAMY "at times, fund[ed] extremism overseas," Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). (Plaintiffs' experts do not separately analyze each specific Taibah-Bosnia transfer itemized in this statement.) A genuine dispute of material fact exists.

**STATEMENT:**

445. On or about May 6, 2004, the Department of Treasury designated Taibah's Bosnia Branch under E.O 13224 under the Specially Designated Nationals and Blocked Persons List. Ex. 225, PEC-WAMY014754 (Treasury 2004 press release); Ex. 117.

**RESPONSE:**

Undisputed for the general purposes of this motion.

**STATEMENT:**

446. According to OFAC's press release: "Information shows this entity has significant ties to GRF, which initially operated in Bosnia under the auspices of Taibah. A former employee of Taibah International was a member of Ayadi Chafiq Bin Muhammad's network, who

was designated by the Treasury Department on October 12, 2001." Ex. 225 (Treasury 2004 press release).

**RESPONSE:**

Not disputed that OFAC issued the quoted press release; disputed as to any inference that WAMY's support of Taibah was thereby innocuous. The Global Relief Foundation (GRF) referenced by OFAC is itself among the terror-linked Islamist "charities" and was funded by Makhtab al-Khidamat (MAK), the al-Qaeda precursor organization. Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 212 (at 72); Ex. 74, Winer Rpt. § 6.6.11.6 (citing U.S. Treasury that MAK "provided funds and other support to several charities, including ... the Global Relief Foundation"). The CIA tied Taibah's Sarajevo office both to al Qaeda-linked funders and to WAMY-Jeddah funding, stating "WAMY is suspected of supporting terrorists." Ex. 148, Pls.' Averment of Facts, (Dkt. No. 9541), ¶ 2105 (citing U.S. Treasury designation of Taibah Int'l Aid Assoc.). A genuine dispute of material fact exists.

**STATEMENT:**

447. According to OFAC's designation, Taibah International Bosnia's branch addresses are: Avde Smajlovic, Sarajevo, BiH and 26 Tabhanska Street, Visko, BiH. Ex. 117.

**RESPONSE:**

Undisputed as to the Bosnia branch addresses stated in OFAC's designation, but disputed as to any implication that the Bosnia branch was insulated from WAMY's support. The Sarajevo Taibah office was the entity that, per the CIA, "received approximately $140,000 from WAMY-Jeddah ... in May 2001" and "received regular funding from banks and individuals with ties to al-Qa'ida," and the branch was designated SDGT on May 6, 2004 for funneling money to al

Qaeda. Ex. 148, Pls.' Averment of Facts, (Dkt. No. 9541), ¶ 2105 (citing U.S. Treasury designation of Taibah Int'l Aid Assoc.). A genuine dispute of material fact exists.

**STATEMENT:**

448. Taibah International USA's 1998 tax form 990-EZ and the 1999 tax form 990 both list Virginia as the address for Taibah International-USA. Ex. 226, PEC-WAMY014834-841.

**RESPONSE:**

Undisputed as to the Virginia addresses listed on Taibah International-USA's 1998 and 1999 tax filings, but disputed as misleading. The Falls Church, Virginia address ties Taibah to the bin Laden network, not to benign operations. Taibah's Falls Church branch "was co-founded by Abdullah bin Laden, Osama bin Laden's nephew," and "Taibah [] had extensive ties to al Qaeda." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)), ¶ 423. It received an apparent contribution traceable to al Qaeda financier Suleiman al Rajhi via ARB and the SAAR Foundation, (Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)), ¶ 422 (citing NL 15043-15046)), and WAMY's own U.S. branch was likewise incorporated in 1992 by Abdullah bin Laden in Falls Church, Virginia. Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 190 (citing IRS Form 1023 Appication for WAMY (Nov. 9, 1992); Ex. 148, Pls.' Averment of Facts, (Dkt. No. 9541), ¶ 2107 (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 826). A genuine dispute of material fact exists.

**STATEMENT:**

449. There is no reliable evidence that Zayat transferred more than two million dollars on behalf of WAMY to Taibah International or Taiba branches in Bosnia or Albania.

**RESPONSE:**

Disputed. Whether or not a specific amount is quantified, the record establishes that WAMY funneled substantial funds to the terrorist-designated Taibah, and to the extent WAMY relies on an asserted absence of "reliable evidence," that absence reflects WAMY's own deficient record-keeping and incomplete production. The CIA documented that Taibah's Sarajevo office "received approximately $140,000 from WAMY-Jeddah ... in May 2001," (Ex. 148, Pls.' Averment of Facts, (Dkt. No. 9541), ¶ 2105), and Taibah International's Bosnia branch was designated SDGT on May 6, 2004 for funneling money to al Qaeda.Ex. 148, Pls.' Averment of Facts, (Dkt. No. 9541), ¶ 2105 (citing U.S. Treasury designation of Taibah Int'l Aid Assoc.). WAMY's own exhibits confirm large transfers to Taibah, including a 220,450 SAR check for the "Muslims of the Balkans" and 2001-2002 transfers to Taibah International's Albania office. *see* WAMY 56.1 Statement at ¶ 444 and Plaintiffs' response to same; *see also* Decl. of Mohammedi (Dkt. No. 12001), Exs. 220-224. The charities' discovery responses were "improbably thin" and that "additional documentation" very likely exists, (Ex. 74, Winer Rpt. § 12.20), and that WAMY "failed to provide any audits for numerous WAMY offices," evidencing "systemic issues relating to missing documents." Winer Rebuttal Rpt. §§ 2.9, 2.13.4. A 2018 Saudi Anti-Money Laundering report reflects that 2016 on-site inspections of WAMY (and IIRO) offices led to offices being shuttered for "several administrative and financial violations." Ex. 133, Kohlmann 2020 Rpt. ¶ 47 (citing Saudi Anti-Money Laundering authority, Mutual Evaluation Report (Sep. 2018) at p 99). A genuine dispute of material fact exists.

**STATEMENT:**

**H. WAMY's Work in Kashmir Did Not Provide Support, Directly or Indirectly, to al-Qaeda.**

**RESPONSE:**

Disputed. The record establishes a genuine dispute of material fact as to whether WAMY's Kashmir operations supported al-Qaeda, directly or indirectly. WAMY concedes Kashmir is one of its "major branches" and characterizes its Kashmir work as charity and da'wah (*see* WAMY Rule 56.1 Statement at ¶¶ 450-451 and Plaintffs' responses to same), but that framing is controverted. (1) WAMY's Kashmir/Pakistan operations sat within the Saudi-charity network that funded designated Kashmiri militant groups: Al Haramain funds were transferred from an al-Rajhi Bank account to "an al-Ansar Welfare Trust in Kashmir," which "is a front for Lashkar-e-Tayyiba (LT) and Tehrik ul-Mujahideen," U.S.-listed terrorist groups, (Ex. 148, Pls.' Averment of Facts, (Dkt. No. 9541), ¶ 2005); Al Haramain's Pakistan office "provided financial support to Executive Order 13224 SDGTs Jamiat al Dawa ('JUD') and Laskhar E-Taibah ('LET')," (Ex. 148, Pls.' Averment of Facts, (Dkt. No. 9541), ¶¶ 1959-1960 (Decl. of Mohammedi (Dkt. No. 12001) Ex. 234, OFAC evidentiary memo, TREASURY00001-121 at 14-16; U.S. Treasury designation of four branches of Al Haramain (Jan. 22, 2004)), and Levitt notes the al-Qaeda-linked al-Haramain Foundation "in Pakistan also supports the designated terrorist organization, Lashkar E-Taibah (LET)," (Ex. 59, Levitt Rpt. pp. 42-43, n.167 (citing U.S. Treasury designation of four branches of Al Haramain (Jan. 22, 2004))); Lashkar-e-Taiba is a designated FTO and SDGT whose aliases include "MOVEMENT FOR FREEDOM OF KASHMIR" and "KASHMIR RESISTANCE FRONT," (OFAC SDN listing, Decl. of Mohammedi (Dkt. No. 11999), Ex. 117 (at 1038). (2) The CIA tied WAMY itself to that infrastructure: al-Haramain officials "couriered funds to Chechnya for both World Assembly for Muslim Youth and the International Islamic Relief Organization," (Pls.' Averment of Facts (Dkt. No. 9541), ¶ 2104 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4. at 744; Decl. of Mohammedi (Dkt. No. 12001), Ex. 243, CIA_00807-848.at 827; Ex. 2 to (Corrected) Decl. of Haefele (Dkt. No. 9541), EO 3414-3442 at 3438)); WAMY

"facilitated the transfer of money to overseas destinations in support of the proliferation of Islamic extremism," (Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541), ¶ 2104 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; Decl. of Mohammedi (Dkt. No. 12001), Ex. 243, CIA_00807-848.at 827; Ex. 2 to (Corrected) Decl. of Haefele (Dkt. No. 9541), EO 1440-3442 at 3438)); and WAMY "has long been alleged to be a financier of Islamic extremists," funding HAMAS, Egypt's Islamic Jihad and Gama'at al-Islamiyya, and "an Islamic movement in Kurdistan," (Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541), ¶ 2005). (3) The CIA found WAMY's youth-oriented work functioned as a recruitment and training pipeline: WAMY's reach "has made it an excellent conduit of recruits for many extremist groups," (Pls.' Averment of Facts (Dkt. No. 9541), ¶ 2102 (citing CIA_000143-158 at 151; CIA_000178-189 at 185-186)), and WAMY "has sponsored and funded military training camps for Muslim youth" at which "training ... included weapons handling, firing, and explosives." Pls.' Averment of Facts (Dkt. No. 9541), ¶ 2103 (citing CIA_000178-189 at 185). "WAMY was involved in both religious and jihadi training for its member organizations in Pakistan," whose affiliate "undertook jihad in Kashmir from 1990 through 1993," and that the Afghan training camps that trained all nineteen 9/11 hijackers were the same "common infrastructure" used "by Pakistani insurgent groups seeking to gain control over Kashmir," Ex. 74, Winer Rpt. §§ 8.2.3, 8.5.2, 12.13.2 (citing 9/11 Comm'n Staff Statement No. 15 (Jun. 16, 2004) at pp. 9-10; Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003)). (4) WAMY's own 30(b)(6) designee was examined on a July 11, 2001 WAMY letter from Secretary General Al-Johani inviting the "Prince of Lashkar-e-Taiba" to WAMY's Kashmir youth camp, and on a 1999 WAMY letter referring the "Prince of the Hizb-ul-Mujahideen organization" to the head of Saudi intelligence—conduct the witness conceded was "inappropriate." Dep. of Noorwali (Jul. 23, 2019) 171:1-24, 172:13-173:9, 176:17-

177:24 & Exs. Noorwali-260, Noorwali-261. (5) The Saudi-charity milieu openly urged armed support for Kashmiri militants—the Muslim World League called on Muslims to supply Kashmiris "with material and moral support, including money, military hardware and men." Pls.' Averment of Facts (Dkt. No. 9541), ¶ 2031 (citing "Imam of Holy Haram Calls for Assistance to Kashmiris," Al Alam Al Islami (Aug.-Sep. 1993)). In November 2001 the Indian government shuttered WAMY's offices for allegedly financing banned terrorist groups "including Lashkar-e-Taiba (LET) and Jaish-e-Mohammed (JEM)." Ex. 112, Kohlmann 2020 Rpt. ¶ 175 (citing FED-PEC 234023-024). A genuine dispute of material fact exists.

**STATEMENT:**

450. Kashmir is one of WAMY's major branches. Ex. 5 at 154:9-155:3 (discussing location of Kashmir office); see Ex. (Statistical Report).

**RESPONSE:**

Not disputed that WAMY maintained a major branch in Kashmir; disputed to the extent WAMY suggest that presence is immaterial because Saudi charities' Kashmir/Pakistan operations funded U.S.-designated militant groups and because WAMY's Kashmir operations extended to designated militant organizations. WAMY's Secretary General publicly linked WAMY to the Kashmir jihad, telling Kashmiri expatriates that Muslims may "go to the battlefield to wage a war again[st] the enemies of Islam, or they can give their moral, physical and financial support [to] the cause of Jihad." Ex. 59, Levitt Rpt. § IV-6, n.91 (citing "WAMY Calls for Jihad to Free Kashmir," Muslim World News (Jun. 3, 1991)). SJRC member (along with WAMY) Al Haramain funds were transferred from an al-Rajhi Bank account to the al-Ansar Welfare Trust in Kashmir, "a front for Lashkar-e-Tayyiba (LT) and Tehrik ul-Mujahideen," both U.S.-listed terrorist groups. Ex. 148, Pls.' Averment of Facts, (Dkt. No. 9541), ¶ 2005; Ex. 240, Pls.'

Corrected Averment (Dkt. No. 9764)), ¶ 103. Al Haramain's Pakistan office funded LeT and JUD, both SDGTs, (Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541), ¶¶ 1959-1960; Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 80 (Decl. of Mohammedi (Dkt. No. 12001) Ex. 234, OFAC evidentiary memo, TREASURY00001-121 at 14-16; U.S. Treasury designation of four branches of Al Haramain (Jan. 22, 2004)), and al-Haramain officials "couriered funds to Chechnya for both World Assembly for Muslim Youth and the International Islamic Relief Organization," Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 103. A genuine dispute of material fact exists.

**STATEMENT:**

451. WAMY's Kashmir branch office's charity activities concern feeding the poor and fasting people, mosque renovations, digging wells, educational camps, social services charitable work and da'wah. Ex. 5 at 128:8-12; 170:16-20; Ex. 12 at 216:3-8; 216:20-24; Ex. 276, WAMYSA037743-744 (2001 letter from WAMY to Kashmir WAMY re report for education and youth camps); Ex. 227, WAMYSA040883-888 (1999 letter re feeding fasting people and charity given); Ex. 73 (1999 letter from Abu Gayth to WAMY re financial report for years 95-97 for Kashmir, outlining achieved activities); Ex. 228, WAMYSA040889 (1999 report from WAMY Kashmir office's Abu Gayth re digging wells for a mosque and school construction project).

**RESPONSE:**

Disputed. WAMY's Kashmir activities extended well beyond feeding the poor, wells, and da'wah, and the CIA found that the same "charitable"/da'wah profile masked recruitment and extremist funding: "WAMY's global reach and influence among Muslim youth has made it an excellent conduit of recruits for many extremist groups," (Ex. 148, Pls.' Averment of Facts, (Dkt.

No. 9541), ¶ 2102 (citing CIA_000143-158 at 151; CIA_000178-189 at 185-186)); WAMY "has sponsored and funded military training camps for Muslim youth" at which training included "weapons handling, firing, and explosives," (Ex. 148, Pls.' Averment of Facts, (Dkt. No. 9541), ¶ 2103 (citing CIA_000178-189 at 185)); and "WAMY has long been alleged to be a financier of Islamic extremists," providing funding for HAMAS, Egyptian Islamic Jihad, Gama'at al-Islamiyya, and an Islamic movement in Kurdistan. Ex. 148, Pls.' Averment of Facts, (Dkt. No. 9541), ¶ 2104 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; Decl. of Mohammedi (Dkt. No. 12001), EX. 243, CIA_000807-848 at 827; Ex. 2 to (Corrected) Decl. of Haefele (Dkt. No. 9541), EO 3414-3442 at 3438)). In the Kashmir/Pakistan theater, Saudi-charity funds flowed to LeT/JUD fronts, including the al-Ansar Welfare Trust in Kashmir. Ex. 148, Pls.' Averment of Facts, (Dkt. No. 9541), ¶¶ 1959-1960, 2005 (citing U.S. Treasury designation of four branches of Al Haramain (Jan. 22, 2004; *see also* Decl. of Mohammedi (Dkt. No. 12001) Ex. 234, OFAC evidentiary memo, TREASURY00001-121 at 14-16). WAMY produced a July 11, 2001 letter from Secretary General Al-Johani to "Mr. Zaki Al-Rahman, Prince of Lashkar-e-Taiba," inviting him to WAMY's "Muslim Kashmir Youth Committee's sixth proselytization and education camp in Free Kashmir," which WAMY's 30(b)(6) witness conceded would have been "inappropriate." Dep. of Noorwali (Jul. 23, 2019) 171:1-24; 172:13-173:9 Ex. Noorwali-260. WAMY also produced a 1999 letter from Al-Johani to Prince Turki al-Faisal, head of Saudi intelligence, advising that Sayed Seif El-Din, "the Prince of the Hizb-ul-Mujahideen organization," was in Jeddah and encouraging a meeting; the witness described WAMY's role as serving as a "liaison" for such persons. Dep. of Noorwali (Jul. 23, 2019) 176:17-177:24 & Ex. Noorwali-261. In November 2001 the Indian government shuttered WAMY's offices for allegedly financing banned terrorist groups "including Lashkar-e-Taiba (LET) and Jaish-e-Mohammed (JEM)." Ex.

112, Kohlmann 2020 Rpt. ¶ 175 (citing FED-PEC 234023-024). A December 2009 State Department cable found WAMY "at times, fund[ed] extremism overseas," Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). A genuine dispute of material fact exists.

**STATEMENT:**

452. WAMY documents its relief work, operations, and education in Kashmir. See, e.g., Ex. 277, WAMYSA059929-930 (Oct 1995 funding to Kashmir operations); Ex. 229, WAMYSA059993-60000 (Report of funds received and how spent in Kashmir, 1998-1999); Ex. 230, WAMYSA060026-032 (1999 report on stages of well construction); Ex. 228 (1999 report from WAMY Kashmir office's Abu Gayth re financial report for years 95-97 for Kashmir, outlining achieved activities including digging wells).

**RESPONSE:**

Disputed to the extent WAMY implies that its Kashmir activity was purely charitable and unconnected to armed jihad. WAMY's Secretary General, Dr. Maneh al-Johani told Kashmiri expatriates that Muslims can "give their moral, physical and financial support [to] the cause of Jihad" — advocating jihad in Kashmir and Chechnya and soliciting "money to buy weapons and gear." Ex. 112, Kohlmann 2020 Rpt. ¶166 (citing al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843).Ex. 59, Levitt Rpt. IV-6, n. 91, Ex. 112, Kohlmann 2020 Rpt. ¶ 164 (citing Muslim World News, Vol. 26, No. 1216, June 3, 1991). Following a December 1995 meeting with al-Johani, Kashmiri activist Chaudhry Yaqub "lauded the efforts of the World Assembly of Muslim Youth (WAMY) ... in helping the mujahideen," noting WAMY "is supporting the cause of Kashmiris through its Kashmir Committee in its

Riyadh headquarters." Kohlmann 2020 Rpt. ¶ 161 (citing "Kashmiri leader thanks WAMY for help," Riyadh Daily (Dec. 8, 1995)). CIA reporting further states that WAMY officials "have couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶ 160 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). A genuine dispute of material fact exists.

**STATEMENT:**

453. WAMY Kashmir's 1995, 1996, 1997 and 1998 operational report shows legitimate Kashmir office projects in, for example, restoring mosques, feeding the poor during and outside Ramadan, educational camp outreach, and Quran memorization. See, Ex. 231, WAMYSA523714-725 (1990s Kashmir operational reports of funds and expenses).

**RESPONSE:**

Disputed to the extent WAMY implies these reports establish that its Kashmir operations were exclusively legitimate or that no funds were diverted; the existence of humanitarian projects does not exclude diversion. The 9/11 Commission's terrorist-financing monograph found that charities' "lax oversight and ... ineffective financial controls, particularly over transactions in remote regions of the world, made it easy for al Qaeda operatives to divert money from charitable uses." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 24. WAMY's relief and educational activities in conflict zones such as Kashmir "merged with recruitment activities to produce Islamic fighters;" WAMY's record-keeping cannot be taken at face value because WAMY "did not provide sufficient, and sufficiently accurate, documentation on what they were doing," so that "[f]or charities linked to terrorism, bad books and records become the means of hiding terrorist support." Winer Report §§ 10.4,

13.1, 13.3. WAMY's own Secretary General, moreover, solicited funds for jihad in Kashmir, including "money to buy weapons and gear." Ex. 112, Kohlmann 2020 Rpt. ¶166 (citing al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843); Ex. 59, Levitt Rpt. IV-6, n. 91, Ex. 112, Kohlmann 2020 Rpt. ¶ 164 (citing Muslim World News, Vol. 26, No. 1216, June 3, 1991). A genuine dispute of material fact exists.

**STATEMENT:**

454. WAMY's activity in the 1990s has no connection to terror groups, al-Qaeda, Bin Ladin or the 9/11 attacks. Ex. 5 at 123:3- 134:10; at 128:3-129:5, 130:19-134:10 (discussing knowledge of Kashmir office activities).

**RESPONSE:**

Disputed. This assertion rests on the testimony of WAMY's own Rule 30(b)(6) designee, Dr. Noorwali — an interested witness whose denials do not resolve the dispute — and is contradicted by record evidence. WAMY provided funds to, and channeled donations to, al-Qaeda and affiliated jihadist groups: WAMY "provided funds to al Qaeda ... [and] channeled donated funds to al Qaeda and [associated] organizations and movements," (Winer Report § 3.11.3); WAMY is named among Saudi charities that "helped support Al-Qaida" and is described as a "shadowy Saudi charitable entit[y] that ha[s] helped support Al-Qaida," (Kohlmann Rpt. ¶ 17 (citing Ex. 27, Gov't Evidentiary Proffer, *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003)); Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 189-199); and Saudi officials knew charities "such as al-Haramayn, IIRO, WAMY, and the Muslim World League, were ... directly supporting al-Qa'ida's ongoing jihad." Ex. 238, Nakhleh Rpt. ¶ 106. WAMY is identified as one of al Qaeda's "most important charity fronts and partners" that "played an extensive role in supporting al Qaeda," and its Secretary General advocated jihad in Kashmir and Chechnya. Ex. 240, Pls.'

Corrected Averment (Dkt. No. 9764)) ¶¶ 71, 73, 132 (citing CIA_0008070-848 at 827; CIA_000178-189 at 185; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). CIA reporting ties WAMY to Osama bin Laden funding: "Osama bin Laden has funded offices of Lajnat al Bir al Islamiya, which is closely affiliated with WAMY." Ex. 148, Pls.' Averment of Facts (Dkt. No. 9541) ¶ 2106, (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826). WAMY-USA also served as a platform for Anwar al-Awlaki, a facilitator of 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar — hosting him at its Islamic Studies camps and possessing his Dar al-Hijrah employment contract, (, Ex. 132, WAMY Int 15165; Ex. 131, WAMY Int 0249; Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001); Ex. 195, WAMY Int 170). — and its vice president Ibrahim Abdullah was, per the FBI, "associated with subjects of FBI al-Qa'ida and Islamic Resistance Movement (HAMAS) investigations through his WAMY activities and phone records." Youssef Report § IV-W, n.921 (citing WAMY International, Inc. Corporate Document - June 2000 Statement of Change of Registered Agent form signed by Ibrahim Abdullah as "Vice President"). A genuine dispute of material fact exists.

**STATEMENT:**

455. There is no reliable evidence that WAMY provided support to Lashkar-e-Taiba ("LET").

Id. at 125:23-127:9 (discounting association with LET).

**RESPONSE:**

Disputed. WAMY's denial rests on the testimony of its own Rule 30(b)(6) designee, which does not eliminate the factual dispute. Plaintiffs' experts and government reporting connect WAMY to Lashkar-e-Taiba (LET). In November 2001 the Indian government shuttered WAMY's offices "for allegedly financing banned terrorist groups, including Lashkar-e-Taiba (LET) and Jaish-e-

Mohammed (JEM)." Ex. 112, Kohlmann Rpt. ¶ 175 (citing Ex. 63, FED-PEC 234023-234024). The Canada Revenue Agency's audit likewise found WAMY funded a banned Indian student group whose leader had "links to another terrorist group, Laskhar-e-Tayyiba." Ex. 74, Winer Report § 10.3.6.1 (citing CRA audit, EX. 79, FED-PEC 218170-218203). WAMY's Secretary General, Maneh al Johani, advocated jihad in Kashmir — where Lashkar-e-Taiba is a principal jihadist group — and solicited "money to buy weapons and gear." Ex. 112, Kohlmann 2020 Rpt. ¶166 (citing al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843); Ex. 59, Levitt Rpt. IV-6, n. 91, Ex. 112, Kohlmann 2020 Rpt. ¶ 164 (citing Muslim World News, Vol. 26, No. 1216, June 3, 1991). The record shows al Qaeda "relied on diversions from Islamic charities," (9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16), and identifies WAMY as one of al Qaeda's "most important charity fronts and partners" Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 64, 73, 132 (citing Ex. 38 at 7, 12, 13, 18, 20, 25-27, 30-41; Ex. 45, CIA_000143-158 at 147; Ex. 46, CIA_000193-199 at 194; Ex. 47, CIA_000659-667 at 661; Ex. 66, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 827; Ex. 68, CIA_000178-189 at 185 and Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

456. WAMY has no connection or ties to the designated group Hizb-ul-Mujahideen. Id. at 134:11- 22 (denying knowledge of WAMY connection to Hizb-ul Mujahideen).

**RESPONSE:**

Disputed to the extent WAMY relies solely on the denial of its own Rule 30(b)(6) designee, a self-interested assertion that does not resolve the dispute. WAMY supported the Kashmiri jihad and its associated militant groups. WAMY's affiliate Jamiat Taleba Arabia "undertook jihad in Kashmir from 1990 through 1993." Winer Report § 12.13.2 (citing Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul. 9, 2003)). WAMY's Secretary General advocated jihad in Kashmir and solicited "money to buy weapons and gear," (Ex. 112, Kohlmann 2020 Rpt. ¶166 (citing al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843)); WAMY has a documented role as an al Qaeda charity front. (Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 64, 73, 132 (citing Ex. 38 at 7, 12, 13, 18, 20, 25-27, 30-41; Ex. 45, CIA_000143-158 at 147; Ex. 46, CIA_000193-199 at 194; Ex. 47, CIA_000659-667 at 661; Ex. 66, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 827; Ex. 68, CIA_000178-189 at 185 and Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744)); and WAMY's Indian offices were closed in November 2001 for financing banned Kashmir-focused terrorist groups. Kohlmann 2020 Rpt. ¶ 175 (FED-PEC 234023-234024). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

457. WAMY does not operate in India and has no connection to the designated Indian group Students Islamic Movement (SIMI). Id. at 134:23-136:2 (denying connection to SIMI).

**RESPONSE:**

Disputed. WAMY's assertion that it "does not operate in India" is contradicted by the record: in November 2001 the Indian government "shuttered WAMY's offices in that country for allegedly

financing banned terrorist groups, including Lashkar-e-Taiba (LET) and Jaish-e-Mohammed (JEM)." Kohlmann 2020 Rpt. ¶ 175 (Ex. 63, citing FED-PEC 234023-234024). The Canada Revenue Agency audit further found WAMY funded a banned Indian student group tied to the July 2006 Mumbai bombings and to Lashkar-e-Tayyiba. Ex. 74, Winer Report § 10.3.6.1 (citing CRA audit, EX. 79, FED-PEC 218170-218203). WAMY's Secretary General advocated for jihad in Kashmir and solicited funds "to buy weapons and gear," (Ex. 112, Kohlmann 2020 Rpt. ¶166 (citing al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843)), and WAMY has a documented role as an al Qaeda charity front, (Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 64, 73, 132 (citing Ex. 38 at 7, 12, 13, 18, 20, 25-27, 30-41; Ex. 45, CIA_000143-158 at 147; Ex. 46, CIA_000193-199 at 194; Ex. 47, CIA_000659-667 at 661; Ex. 66, Decl. of Mohammedi (Dkt. NO. 12001), EX. 243, CIA_000807-848 at 827; Ex. 68, CIA_000178-189 at 185 and Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744)); all bear on WAMY's involvement with South Asian jihadist networks regardless of its formal presence in India. A genuine dispute of material fact exists.

**STATEMENT:**

1. Nazir Qureshi

**RESPONSE:**

No response necessary.

**STATEMENT:**

458. WAMY employed Nazir Qureshi ("Qureshi") in the 1990s at WAMY's Jeddah office. Id. at 136:21-137:19 (Qureshi continued to be an employee during Noorwali's time at [WAMY's] Jeddah office).

**RESPONSE:**

Undisputed as a general matter for the purposes of this motion.

**STATEMENT:**

459. Qureshi was a "simple employee" at WAMY's Jeddah office. Ex. 5 at 136:21-138:4.

**RESPONSE:**

Disputed to the extent WAMY characterizes Qureshi as a mere "simple employee" to imply he lacked any capacity to divert funds. The characterization rests solely on WAMY's interested Rule 30(b)(6) designee, Dr. Noorwali. WAMY "did not maintain effective controls in its branch offices for the period prior to the 9/11 attacks," so an employee's title does not establish the absence of diversion. Winer Rebuttal Rpt. §§ 2.28, 2.37. The characterization is further disputed in light of the reported allegation that Qureshi funneled money to al-Qaida-associated groups in Kashmir — which prompted Saudi Ambassador-level attention. *See* WAMY Rule 56.1 Staements at. ¶ 460-463 and Plaintiffs' responses to same. A genuine dispute of material fact exists.

**STATEMENT:**

460. WAMY transferred funds to WAMY Kashmir "on an official basis through banks;" Nazir Qureshi played no role in these undertakings. Id. at 138:12-139:8 (explaining that Qureshi had no access to funds).

**RESPONSE:**

Disputed to the extent WAMY relies on the testimony of its own Rule 30(b)(6) designee to establish that funds flowed only "on an official basis through banks" and that Qureshi "played no role." That WAMY transferred funds "through banks" is not inconsistent with diversion — the 9/11 Commission's terrorist-financing monograph found that charities used banks "as a means to move money for terrorists" and were "used as conduits to transfer funds ... to al Qaeda leaders." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 26, 28-29. WAMY's financial controls were deficient and its records could not be independently verified — its auditors could not independently verify expenditures, and "expenditure incurred inside Afghanistan is not susceptible to independent audit verification." Winer Rebuttal Rpt. §§ 2.17.1, 2.28 (citing 2002 WAMY/LBI Peshawar audit, M. Almas & Co., Ex. 242, WAMYSA0195478--79). A genuine dispute of material fact exists.

**STATEMENT:**

461. Qureshi did not review WAMY's proposals, program or project reports from WAMY's international branches. Id. at 138:17-139:8. 9 (WAMY's authorized department reviewed proposals not Qureshi).

**RESPONSE:**

Disputed to the extent it rests solely on WAMY's interested Rule 30(b)(6) designee and is not independently corroborated. WAMY's project- and proposal-review processes were not reliably documented or implemented and WAMY's records were incomplete and unverified, so the division of internal responsibilities cannot be confirmed from WAMY's own account; deficient books and records obscure how a charity's funds were actually handled. Winer Rebuttal Rpt. §§ 2.28, 2.37; Winer Report § 10.4 (citing CRA audit, EX. 79, FED-PEC 218170-218203). *See*

WAMY Rule 56.1 Statement ¶ 463 and Plaintiffs' response to same. A genuine dispute of material fact exists.

**STATEMENT:**

462. Qureshi did not receive any funds from WAMY and did not send any money to Kashmir while employed by WAMY. Id. at 145:13-146:10, 147:14-21 (special investigation was conducted by auditors); 149:6-7 (confirming that Qureshi did not receive any funds that could have been transferred for illicit purposes).

**RESPONSE:**

Disputed. This assertion rests entirely on WAMY’s own internal "special investigation" by its auditors and the testimony of its Rule 30(b)(6) designee — self-generated evidence entitled to no weight in resolving a summary-judgment dispute. WAMY’s audits and financial records were deficient, untimely, and "not verified," and relied on management "assurance" rather than independent confirmation — the auditor "accepted assurance from the Regional Director" and expenditures were "not susceptible to independent audit verification" — so a WAMY audit cannot establish that no funds were diverted. Winer Rebuttal Rpt. §§ 2.17.1, 2.28 (citing Ex. 242, WAMYSA0195478--79). Indeed, Winer opines, "you would not expect to see evidence of support for terrorism in the charity records." Dep. of Winer (Jul. 14, 2021) at 298:4-299:13. The underlying allegation that Qureshi provided money to al-Qaida-associated Kashmir groups, (*see* WAMY Rule 56.1 Statement at ¶ 463 and Plaintiffs' response), together with record evidence that WAMY’s Secretary General solicited funds for jihad in Kashmir, (Ex. 112, Kohlmann 2020 Rpt. ¶166 (citing al-Johani, “The Chechen Tragedy,” Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843)), creates a genuine dispute of material fact.

**STATEMENT:**

463. WAMY's audit investigation into an Indian newspaper allegation that Qureshi provided "money to al-Qaida associated groups in Kashmir" found that Qureshi's activities were not "uncompliant with the normal procedures" nor did the audit find any irregularities. Ex. 233, WAMY SA 1488 (referencing initial contact from Saudi Ambassador); Ex. 5 at 139:9-141:11 (discussing letter to the Ambassador and findings); at 142:12-145:23 (WAMY did not dismiss the article but investigated); 149:8-15 (discussing how WAMY discovered the article); Ex. 2 at ¶¶26, 31 (discussing that WAMY has never been involved in armed conflict or sent employes to fight or help move fighters or provide other logistics to them).

**RESPONSE:**

Disputed. WAMY's audit "investigation" into the Indian newspaper allegation that a WAMY Jeddah employee provided "money to al-Qaida associated groups in Kashmir" was self-serving and not independent WAMY's audits were deficient and unverified, and "[f]or charities linked to terrorism, bad books and records become the means of hiding terrorist support." Winer Report § 10.4; Winer Rebuttal Rpt. §§ 2.17.1, 2.28 (citing Ex. 242, WAMYSA0195478--79). The broader record independently ties WAMY to Kashmiri militant groups and to al-Qaeda: India shuttered WAMY's offices for financing LET and JEM, (Ex. 112, Kohlmann 2020 Rpt. ¶ 175 (citing FED-PEC 234023-234024)); the CRA found WAMY funded a banned Indian group linked to Lashkar-e-Tayyiba, (Ex. 74, Winer Report § 10.3.6.1 (citing CRA audit, , EX. 79, FED-PEC 218170-218203)); WAMY's Secretary General called for financial support of the Kashmir jihad and solicited "money to buy weapons and gear," (Ex. 112, Kohlmann 2020 Rpt. ¶166 (citing al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843)); and WAMY functioned as an al Qaeda charity front. Ex. 240, Pls.' Corrected

Averment (Dkt. No. 9764)) at ¶¶ 64, 73, 132 (citing Ex. 38 at 7, 12, 13, 18, 20, 25-27, 30-41; Ex. 45, CIA_000143-158 at 147; Ex. 46, CIA_000193-199 at 194; Ex. 47, CIA_000659-667 at 661; Ex. 66, Decl. of Mohammedi (DKT. NO. 12001), EX. 243, CIA_000807-848 at 827; Ex. 68, CIA_000178-189 at 185 and Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744)). A genuine dispute of material fact exists.

**STATEMENT:**

464. After the investigation, WAMY wrote to the Saudi Ambassador in India "that [the allegations] were completely groundless, and that the whole content of the news is fabricated lies that the Indian press has always published and repeated. Ex. 233, WAMY SA 1488 (2000 the letter from WAMY Assistant Secretary General that the news report is groundless); Ex. 5 at 139:9-141:11 (discussing letter to the Ambassador); at 143:24-144:4 (discussing letter to Ambassador).

**RESPONSE:**

Disputed. Again, WAMY's internal investigation and letter to the Saudi Ambassador declaring the allegations "completely groundless" is self-serving — not an independent finding. Plaintiffs' experts opine, on government and documentary evidence, that WAMY did support Kashmiri and other jihadist activity, contradicting WAMY's blanket denial: WAMY's Kashmir Committee was lauded for "helping the mujahideen," and India shuttered WAMY's offices for financing LET and JEM, (Ex. 112, Kohlmann 2020 Rpt. ¶¶ 161, 175 (citing "Kashmiri leader thanks WAMY for help," Riyadh Daily, Dec. 8, 1995; Ex. 63, FED-PEC 234023-234024)), WAMY's affiliate undertook jihad in Kashmir from 1990 to 1993, and the CRA found WAMY funding tied to Lashkar-e-Tayyiba. Ex. 74, Winer Report §§ 12.13.2, 10.3.6.1 (citing Ex. 26, Statement

of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003); CRA audit, EX. 79, FED-PEC 218170-218203). The underlying report that a WAMY employee provided money to al-Qaida-associated groups in Kashmir, (*see* WAMY Rule 56.1 Statement ¶ 463 and Plaintiffs' response to same), combined with record evidence of WAMY Secretary General's Kashmir jihad advocacy and fundraising, (Ex. 112, Kohlmann 2020 Rpt. ¶166 (citing Ex. 44, al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843); Ex. 59, Levitt Rpt. IV-6, n. 91, Ex. 112, Kohlmann 2020 Rpt. ¶ 164 (citing Muslim World News, Vol. 26, No. 1216, June 3, 1991), and WAMY's role as an al Qaeda charity front, (Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 64, 73, 132 (citing Ex. 38 at 7, 12, 13, 18, 20, 25-27, 30-41; Ex. 45, CIA_000143-158 at 147; Ex. 46, CIA_000193-199 at 194; Ex. 47, CIA_000659-667 at 661; Ex. 66, Decl. of Mohammedi (DKT. NO. 12001), EX. 243, CIA_000807-848 at 827; Ex. 68, CIA_000178-189 at 185 and Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744)), creates a genuine dispute of material fact.

**STATEMENT:**

**VII. United States Investigations into WAMY Have Not Yielded Any Evidence That WAMY Provided Material Support To al-Qaeda**

**RESPONSE:**

Disputed to the extent this statement asserts that U.S. investigations yielded no evidence that WAMY provided material support to al Qaeda. On the contrary, U.S. government assessments yielded significant evidence of WAMY's material support of al-Qaeda. The Department of Defense classified WAMY as a "Tier 1" counterterrorism NGO target — "having demonstrated sustained and active support for terrorist organizations" — and stated "WAMY supports terrorist

ideals and causes" and "may be affiliated with Usama Bin Laden and al Qaida operations." Ex. 112, Kohlmann 2020 Rpt. ¶¶158-159; Ex. 74, Winer Rpt. § 12.10.3; Winer Rebuttal Rpt. §§ 3.20-3.22 (citing U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) (May 27, 2005 & Jun. 28, 2006); U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Adel Hassan Hamed (ISN No. 940) (Mar. 25, 2005); Ex. 227, Set 52_3643-3869 at 37; U.S. Dept. of Defense JTF-GTMO Matrix of Threat Indicators for Enemy Combatants). A December 30, 2009 State Department cable named WAMY among charities that continued "to send money overseas and, at times, fund extremism overseas." Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). The June 2004 search of WAMY's Virginia office was conducted "in connection with a terrorism-related investigation." Kohlmann Rpt. ¶ 176; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 190 (citing Markon, "U.S. Raids N. Va. Office of Saudi-Based Charity," WP (Jun. 2, 2004)). WAMY-USA's own personnel drew FBI terrorism scrutiny: its vice president Ibrahim Abdullah was "associated with subjects of FBI al-Qa'ida and ... HAMAS investigations." Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-W, n.921-922 (citing WAMY Int'l, Inc. Corp. Document, Commonwealth of VA, Stmt of Change of Registered Agent form (June 2000); EO 3429). WAMY-USA served as a platform for al-Qaeda facilitator Anwar al-Awlaki. Ex. 132, WAMY Int 15165; Ex. 131, WAMY Int 0249;, Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001); Ex. 195, WAMY Int 170). WAMY provided material support to al-Qaeda and was one of its "most important charity fronts and partners." Winer Report § 3.11.3; Kohlmann Rpt. ¶ 17; Ex. 238, Nakhleh Rpt. ¶ 106. Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 510, 511, 515, 516, 531, 565 and heading IX. A material dispute of fact exists.

**STATEMENT:**

**A. WAMY Has Never Been Designated as a Support of Terrorism By any Entity, Including OFAC**

**RESPONSE:**

Disputed as misleading. The absence of an OFAC designation is not evidence that WAMY did not support terrorism; non-designation reflects the discretionary, diplomacy-driven nature of the designation process, not an adjudication. "No one should conclude that a person or entity who has not been designat[e]d under EO 13224 therefore has been in any sense 'cleared;'" the U.S. pursued reform of Saudi charities "such as the IIRO, MWL, and WAMY" through diplomacy rather than designation. Winer Report §§ 16.1, 16.2.1.1. With respect to terrorist financing, OFAC Director Newcomb testified that WAMY "[a]long with the whole variety of charitable organizations operating head offices in Saudi are ogranizations that we are looking at...." and that there is a "Policy Coordinating, PCC process, where all the equities of the government come to the table" when considering designations under EO 13224. Testimony of R. Richard Newcomb Before the Cmte. on Governmental Affairs, U.S. Senate (Jul. 31, 2003) at 11-12. He also noted that terrorist "[d]onors provide money to a variety of intermediaries often acting on behalf of charitable organizations to collect funds. The charitable organizations in turn use the funds both for legitimate humanitarian efforts but also, either wittingly or unwittingly, allow some funds to be siphoned off by facilitators who serve as the conduit to the extremist groups. Facilitators frequently are employees of the charitable organizations with close ties to the extremist groups or members of the extremist group with responsibility for liaising with charitiable organizations." Testimony of R. Richard Newcomb Before the Cmte. on Governmental Affairs, U.S. Senate (Jul. 31, 2003) at 9-10. The 9/11 Commission's monograph found that post-9/11 asset freezes serve

as "useful diplomatic tools." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 17-18. And other government actions did target WAMY: a) the Department of Defense assessed WAMY as a "Tier 1" counterterrorism NGO target (Ex. 112, Kohlmann 2020 Rpt. ¶¶158-159; Ex. 74, Winer Rpt. § 12.10.3 (citing U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) (Jun. 28, 2006); U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Adel Hassan Hamed (ISN No. 940) (Mar. 25, 2005); Ex. 227, Set 52_3643-3869 at 37; U.S. Dept. of Defense JTF-GTMO Matrix of Threat Indicators for Enemy Combatants)); b) a December 30, 2009 State Department cable named WAMY among charities that continued "to send money overseas and, at times, fund extremism overseas" (Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009))); and in 2016 Saudi Arabia's own Anti-Money Laundering authority shuttered WAMY offices for "several administrative and financial violations" Ex. 133, Kohlmann 2020 Rpt. ¶ 47 (citing Saudi Anti-Money Laundering authority, Mutual Evaluation Report (Sep. 2018) at p 99). A genuine dispute of material fact exists.

**STATEMENT:**

465. Following the 911 Attacks, on September 23, 2001, President Bush issued Executive Order 13224 ("E.O. 13224" or "the E.O.") – Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism ("the Order") - to address acts of terrorism. Ex. 234, U.S. Dept. of Treasury, OFAC Memorandum 00001-2 (providing an introduction to E.O 13224 and OFAC's mandate under Director R. Richard Newcomb).

**RESPONSE:**

Undisputed that President Bush issued EO 13224 on September 23, 2001, but disputed to the extent WAMY implies the E.O.'s existence or WAMY's non-designation under it establishes that WAMY did not support terrorism. Designation under the Order is a discretionary executive action, not a judicial adjudication, and non-designation is not exoneration. Winer Report §§ 3.13, 16.1. Plaintiffs identify WAMY as an al Qaeda charity front. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶¶ 73, 132 (citing Ex. 38 at 31-41; Ex. 66, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 827; Ex. 68, CIA_000178-189 at 185 and Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

466. "In general terms, the Order provides a means by which to disrupt the financial support network for terrorists and terrorist organizations by authorizing the U.S. government to designate and block the assets of foreign individuals and entities that commit, or pose a significant risk of committing, acts or terrorism." Ex. 235, United States Department of State Website re: E. O. 13224.

**RESPONSE:**

Undisputed as a description of EO 13224's general purpose, but disputed to the extent WAMY implies that not being designated means it posed no significant risk. The government "does not designate all of the people and entities about whom it has collected information showing them to have engaged in the material support of terrorism," for national-security, policy, and diplomatic reasons. Winer Report §§ 3.15, 16.3. Non-designation thus reflects executive discretion, not

innocence. Furthermore, Saudi charities such as WAMY were part of the very "financial support network for terrorists" EO 13224 targets. The record shows al Qaeda "relied on diversions from Islamic charities," (9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16), and identifies WAMY as one of al Qaeda's "most important charity fronts and partners" Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 64, 73, 132 (citing Ex. 38 at 7, 12, 13, 18, 20, 25-27, 30-41; Ex. 45, CIA_000143-158 at 147; Ex. 46, CIA_000193-199 at 194; Ex. 47, CIA_000659-667 at 661; Ex. 66, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 827; Ex. 68, CIA_000178-189 at 185 and Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

467. "In addition, because of the pervasiveness and expansiveness of the financial foundations of foreign terrorists, the Order authorizes the U.S. government to block the assets of individuals and entities that provide support, services, or assistance to, or otherwise associate with, terrorists and terrorist organizations designated under the Order, as well as their subsidiaries, front organizations, agents, and associates." Id.

**RESPONSE:**

Undisputed as a description of E.O. 13224's reach, but disputed to the extent WAMY implies its non-designation shows it did not "provide support, services, or assistance to, or otherwise associate with" designated terrorists — because the Order describes conduct the record attributes to WAMY. A December 30, 2009 State Department cable named WAMY among charities that

continued to "fund extremism overseas." Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). WAMY's affiliate Lajnat al-Birr al-Islamiyyah (LBI) became Benevolence International Foundation (BIF), a designated al Qaeda front (Decl. of Mohammedi (Dkt. No. 12001), Ex. 243 at CIA_000820, and Ex. 245 at CIA_000151; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 190, 193 (citing EX. 79, FED-PEC 218170-218203; EX. 80, WAMYSA 1745-68; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865-72; EX. 83, WAMYSA 1885-87; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443); Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 192 (citing Hedges, "Muslims from afar joining 'Holy War' in Bosnia," NYT (Dec. 5, 1992); Basaddiq, "Islamic Charity Committee moves to new premises," Arab News (May 21, 1994); OFAC SDN list (Dec. 3, 2002) at p. 4)), and WAMY functioned as an al Qaeda charity front and conduit. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶¶ 73, 132 (citing Ex. 66, Decl. of Mohammedi (Dkt. No. 12001) Ex. 243, CIA_000807-848 at 827; Ex. 68, CIA_000178-189 at 185 and Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4. at 744). That WAMY was not ultimately designated reflects the discretionary, diplomacy-driven designation process — under which the government frequently "refrains from designating people and entities under EO 13224 for a variety of national security, political, and policy reasons" — not an absence of supporting conduct. Winer Report § 16.3. A genuine dispute of material fact exists.

**STATEMENT:**

468. Pursuant to E.O. 13224, the Secretary of Treasury, in consultation with the Secretary of Homeland Security and the Attorney General's Office, may designate an individual or

entity (defined to mean partnerships, associations, corporations, or other organizations, groups, or subgroups) determined: (1) to be owned or controlled by, or act for on behalf of, persons subject to the E.O., (2) to "assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of acts of terrorism or individuals or entities designated in or under the Order," or (3) "to be otherwise associated with certain individuals or entities designated in or under the Order." Ex. 235 (describing designation Criteria); Ex. 234 (Describing E.O 13224's authorization for the Secretary of Treasury to designate persons meeting enumerated criteria).

**RESPONSE:**

Undisputed that E.O. 13224 authorizes the described designation criteria, but disputed to the extent WAMY implies that its non-designation shows it did not support terrorism. Designation is a discretionary executive action, not a judicial adjudication, and its absence does not establish that WAMY did not provide material support to al Qaeda. Plaintiffs' expert Jonathan Winer opines that the designation program is discretionary and preventative — sanctions "are only applied to those who have already engaged in terrorism or material support to terrorists, but they are not applied to everyone who has done those things" — and that the United States "does not designate all of the people and entities about whom it has collected information showing them to have engaged in the material support of terrorism." Winer Report §§ 3.13, 3.15. The record affirmatively ties WAMY to al Qaeda as one of its charity fronts. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶¶ 73, 132 (citing Ex. 38 at 31-41; Ex. 66, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 827; Ex. 68, CIA_000178-189 at 185 and Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744); Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex.

9, Kohlmann Aff. ¶¶ 189-199 (citing Set_12_1179-1239, p. 16; "Respondent's (Moving Party) Motion Record," *The Minister of Citizenship and Immigration and Mahmoud Jaballah*, Dkt. No. DES-6-99 (Jun. 2, 1999) at pp 10, 61-62; *Islamic Camps: Objectives, Program Outlines, Preparatory Steps*, WAMY (1987 / 1990 tr.); U.S. IRS Form 1023, WAMY (Nov. 9, 1992); "Pakistan Questions Sudan Man About Tape," AP (Dec. 9, 2002); Markon, "U.S. Raids N.VA Office Of Saudi-Based Charits," WP (Jun. 2, 2004); Hedges, "Muslims from afar joining 'Holy War' in Bosnia," NYT (Dec. 5, 1992); Basaddiq, "Islamic Charity Committee moves to new premises," Arab News (May 21, 1994); OFAC SDN list (Dec. 3, 2002) at p. 4; *U.S. v. Usama bin Laden*, 98 CR 1023, Gov't Ex. 2800-A; Ex. 27, Gov't Evidentiary Proffer, *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at pp. 28-29, 53, 54, 57, 67-69, 74; Aff. of Special Agent Robert Walker, *U.S. v. BIF*, 02 CR 0414 (Apr. 29, 2002) at pp. 10, 29; Whitmore, "Bosnian Charities Tied to Terror," Boston Globe (Jul. 2, 2002); Set_52_3643-3869 at pp. 37-39). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 472-478, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

469. An entity does not have to have committed an act of terrorism to be considered for designation nor does the government have to show that a target individual or entity intended to support terrorism for it to be designated under E.O 13224. Ex. 236, Jimmy Gurule Dep. Transcript (Excerpt) at 84:8-21 (Gurule confirming requirements for designation pursuant to E.O. 13224).

**RESPONSE:**

Undisputed that designation does not require commission of a terrorist act or proof of intent to support terrorism — a standard confirming that designation is a broad, discretionary, non-adjudicative tool, so that non-designation reflects executive discretion and is not a finding of innocence. Disputed to the extent that WAMY implies that non-designation proves it does not support terrorism. Winer opines that "[n]o one should conclude that a person or entity who has not been designat[e]d under EO 13224 therefore has been in any sense 'cleared' as not involved in providing material support for terrorism," and that "[t]here are multiple reasons for not designating even when the evidence to justify designating the person or entity for material support of terrorism under EO 13224 is clear." Winer Report § 16.1. The record affirmatively ties WAMY to al Qaeda. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶¶ 73, 132 (citing, Decl. of Mohammedi (Dkt. No. 12001), EX. 243, CIA_000807-848 at 827; Ex. 68, CIA_000178-189 at 185 and Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744); Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189 (citing Set_12_1179-1239, p. 16; "Respondent's (Moving Party) Motion Record," The Minister of Citizenship and Immigration and Mahmoud Jaballah, Dkt. No. DES-6-99 (Jun. 2, 1999) at pp 10, 61-62; Islamic Camps: Objectives, Program Outlines, Preparatory Steps," WAMY (1987 / 1990 tr.); U.S. IRS Form 1023, WAMY (Nov. 9, 1992); "Pakistan Questions Sudan Man About Tape," AP (Dec. 9, 2002); Markon, "U.S. Raids N.VA Office Of Saudi-Based Charits," WP (Jun. 2, 2004); Hedges, "Muslims from afar joining 'Holy War' in Bosnia," NYT (Dec. 5, 1992); Basaddiq, "Islamic Charity Committee moves to new premises," Arab News (May 21, 1994); OFAC SDN list (Dec. 3, 2002) at p. 4; *U.S. v. Usama bin Laden*, 98 CR 1023, Gov't Ex. 2800-A; Ex. 27, Gov't Evidentiary Proffer, *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at pp. 28-29, 53, 54, 57, 67-69, 74; Aff. of Special Agent Robert Walker, *U.S. v. BIF*, 02 CR 0414 (Apr. 29, 2002) at pp. 10, 29; Whitmore, "Bosnian Charities Tied to

Terror," Boston Globe (Jul. 2, 2002); Set_52_3643-3869 at pp. 37-39). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 472-478, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

470. E.O 13224's scope is broad and is intended to prevent the use of funds to fuel or further terrorist attacks. Id. at 84:25-85:11 (explaining the scope of the designation process).

**RESPONSE:**

Undisputed that E.O. 13224's scope is broad and preventative, but disputed to the extent WAMY implies that such breadth means every terrorism supporter is designated — the opposite inference follows. That WAMY was not designated despite the broad criteria reflects the political and diplomatic character of the designation process, not WAMY's innocence; the government often "refrains from designating people and entities under EO 13224 for a variety of national security, political, and policy reasons, including its need to obtain continuing cooperation from other countries." Winer Report §§ 3.13, 16.3. Furthermore, WAMY remained a serious, continuing U.S. concern despite non-designation as confirmed by a December 30, 2009 State Department cable warning that "organizations such as the International Islamic Relief Organization (IIRO), Muslim World League (MWL), and the World Assembly of Muslim Youth (WAMY)" continued "to send money overseas and, at times, fund extremism overseas." Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). A genuine dispute of material fact exists.

**STATEMENT:**

471. Designation is an administrative, not civil, process and therefore it's standard of review for designation is below the preponderance of evidence and can be referred to as "reasonable basis." Id. at 91:23-92:18 (explaining the standard of review of the designation process).

**RESPONSE:**

Undisputed that designation is an administrative process governed by a "reasonable basis" standard; disputed to the extent that WAMY implies that non-designation is a merits acquittal or that whether WAMY was administratively designated determines its civil liability. The opposite is true, which turns on the record and is governed by the civil preponderance-of-the-evidence standard. The "reasonable basis"/"rational basis" standard is the ordinary standard for lawful government action and that OFAC designations are the product of "intensive interagency consultation" and multiple rounds of legal review, making them probative. Winer Rebuttal Rpt. §§ 3.6, 3.7 (citing Zarate, Treasury's War (2013), p. 28). The process is a "robust interagency process" in which "many more entities are considered for designation than those that are ultimately designated." Ex. 59, Levitt Rpt. § IV-2; Dep. of Levitt (Apr. 7, 2021) at 85:8-88:8. There are times, in fact, "that because of sensitivities about diplomatic equities and diplomatic relations, entities, including entities that might have been nominated for designation, might not ultimately be designated," and the U.S. sometimes withholds designation to build diplomatic leverage, "especially if the entity is closely tied to the government and its rulers." Dep. of Levitt (Apr. 8, 2021) at 463:23-464:21, 466:5-468:2. WAMY was one of al Qaeda's "most important charity fronts and partners" that "played an extensive role in supporting al Qaeda."Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶¶ 73, 132 (citing Ex. 38 at 31-41; Ex. 66, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 827; Ex. 68, CIA_000178-

189 at 185 and Ex. 9, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744); Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189 (citing Set_12_1179-1239, p. 16; "Respondent's (Moving Party) Motion Record," The Minister of Citizenship and Immigration and Mahmoud Jaballah, Dkt. No. DES-6-99 (Jun. 2, 1999) at pp 10, 61-62; Islamic Camps: Objectives, Program Outlines, Preparatory Steps," WAMY (1987 / 1990 tr.); U.S. IRS Form 1023, WAMY (Nov. 9, 1992); "Pakistan Questions Sudan Man About Tape," AP (Dec. 9, 2002); Markon, "U.S. Raids N.VA Office Of Saudi-Based Charits," WP (Jun. 2, 2004); Hedges, "Muslims from afar joining 'Holy War' in Bosnia," NYT (Dec. 5, 1992); Basaddiq, "Islamic Charity Committee moves to new premises," Arab News (May 21, 1994); OFAC SDN list (Dec. 3, 2002) at p. 4; *U.S. v. Usama bin Laden*, 98 CR 1023, Gov't Ex. 2800-A; Ex. 27, Gov't Evidentiary Proffer, *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at pp. 28-29, 53, 54, 57, 67-69, 74; Aff. of Special Agent Robert Walker, *U.S. v. BIF*, 02 CR 0414 (Apr. 29, 2002) at pp. 10, 29; Whitmore, "Bosnian Charities Tied to Terror," Boston Globe (Jul. 2, 2002); Set_52_3643-3869 at pp. 37-39). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 472-478, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

472. Even under this low designation standard, neither OFAC nor any other sanctions regime has designated WAMY as an SDGT or a supporter of any SDGT; nor blocked any WAMY assets or otherwise sanctioned WAMY or any of its branches for providing support, services, or assistance to, or otherwise associating with, terrorists and terrorist organizations designated under the Order, including specifically al-Qaeda, or any SDGT subsidiary, front organization, agents, or associates. Ex. 117.

**RESPONSE:**

Disputed. The absence of an OFAC designation or blocked assets is not evidence that WAMY did not support terrorism; non-designation reflects the discretionary, diplomacy-driven nature of the OFAC process, not an adjudication. Winer opines that "[n]o one should conclude that a person or entity who has not been designat[e]d under EO 13224 therefore has been in any sense 'cleared,'" because there are "multiple reasons for not designating even when the evidence to justify designating... is clear." Winer Report § 16.1. As to WAMY specifically, the United States pursued diplomacy rather than designation: Winer identifies "the continuing discussions between the U.S. and Saudi Arabia on how to reform charities that had not been designated, such as the IIRO, MWL, and WAMY." Winer Report § 16.2.1.1 (citing U.S. Treasury, "Joint Action with Saudi Arabia Against Four Branches of Al-Haramain," Jan. 22, 2004). The State Department continued to encourage Saudi Arabia to "restrict the overseas flow of funds from Saudi-based charities;" however these restrictions did not include "the International Islamic Relief Organization (IIRO), Muslim World League (MWL), and the World Assembly of Muslim Youth (WAMY)" who continued "to send money overseas and, at times, fund extremism overseas," which thwarted the "primary U.S. goal of obtaining Saudi acknowledgement of the scope of this problem and a commitement to take decisive action." Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009) at pp. 3-4). The 9/11 Commission's Terrorist Financing Monograph likewise found that pre-9/11 U.S. and UN efforts to freeze terrorist assets were "generally ineffective," that the Department of Justice "had little success developing criminal cases against suspected terrorist fund-raisers," and that post-9/11 asset freezes serve as "useful diplomatic tools." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 17-18. The Department of Defense assessed

WAMY as a "Tier 1" counterterrorism NGO target that "supports terrorist ideals and causes." Ex. 112, Kohlmann 2020 Rpt. ¶¶158-159; Ex. 74, Winer Rpt. § 12.10.3; Winer Rebuttal Rpt. §§ 3.20-3.22 (citing U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) (Jun. 28, 2006); U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Adel Hassan Hamed (ISN No. 940) (Mar. 25, 2005); Ex. 227, Set 52_3643-3869 at 37; U.S. Dept. of Defense JTF-GTMO Matrix of Threat Indicators for Enemy Combatants). "Saudi government officials knew that Saudi-financed Islamic charities, such as al-Haramayn, IIRO, WAMY, and the Muslim World League, were... directly supporting al-Qa'ida's ongoing jihad." Ex. 238, Nakhleh Rpt. ¶ 106. Designation is not a prerequisite to civil liability, and the record affirmatively ties WAMY to al Qaeda. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

473. Far from being designated as an SDGT, a supporter of any SDGT, or having any assets blocked for providing any material support to any SDGT, there is no evidence that WAMY was ever even recommended for such designation by OFAC. Ex. 237, Testimony of OFAC Director R. Richard Newcomb, Senate Governmental Affairs Committee hearing on Terrorism Financing, July 31, 2003, at User Clip: Terrorism Financing Hearing 2003 | C-

SPAN.org; (https://www.c-span.org/video/?c4938961/user-clip-terrorism-financing-hearing-2003); Ex. 31 at 210:3-215:4 (transcript of relevant portion of the hearing read into the record).

**RESPONSE:**

Disputed as misleading. That OFAC may not have formally "recommended" WAMY for designation does not mean WAMY was cleared; the government routinely declines to designate entities it has evidence against, for foreign-policy, intelligence, and law-enforcement reasons. Winer Report §§ 16.1, 16.2.2, 16.2.3 (Winer "personally participated in discussions... in which foreign policy considerations were major factors... and in which persons or entities were not sanctioned although the evidence was absolutely clear that they had engaged in an act defined as terrorism under U.S. law"). With respect to terrorist financing, OFAC Director Newcomb testified that WAMY "[a]long with the whole variety of charitable organizations operating head offices in Saudi are ogranizations that we are looking at...." and that there is a "Policy Coordinating, PCC process, where all the equities of the government come to the table" when considering designations under EO 13224. Testimony of R. Richard Newcomb Before the Committee on Governmental Affairs, U.S. Senate (Jul. 31, 2003) at 11-12. He also noted that terrorist "[d]onors provide money to a variety of intermediaries often acting on behalf of charitable organizations to collect funds. The charitable organizations in turn use the funds both for legitimate humanitarian efforts but also, either wittingly or unwittingly, allow some funds to be siphoned off by facilitators who serve as the conduit to the extremist groups. Facilitators frequently are employees of the charitable organizations with close ties to the extremist groups or members of the extremist group with responsibility for liaising with charitable organizations." Testimony of R. Richard Newcomb Before the Committee on Governmental Affairs, U.S. Senate

(Jul. 31, 2003) at 9-10. The absence of a public designation recommendation reflects a discretionary and diplomatically constrained policy process — consistent with the 9/11 Commission Monograph's findings that the U.S. government "did not make this issue a priority" and that Saudi Arabia "resisted cooperating" on al Qaeda financing (9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 15) — not an assessment that WAMY did not support terrorism. Levitt confirms the U.S. sometimes withholds designation to build diplomatic leverage, "especially if the entity is closely tied to the government and its rulers." Dep. of Levitt (Apr. 8, 2021) at 466:5-468:2. That WAMY remained a concern years later is shown by the December 30, 2009 State Department cable identifying WAMY among charities that continued to "fund extremism overseas" (Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009))), and the record independently ties WAMY to al Qaeda. Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 465-472, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

474. On July 31, 2003, nearly two years after the 9/11 attacks, the then-Director of the OFAC, R. Richard Newcomb, appeared before the Senate Governmental Affairs Committee for a hearing on Terrorism Financing ("Newcomb Hearing"). Id. at 210:3-215:4 (transcript of relevant portion of the hearing read into the record).

**RESPONSE:**

Undisputed that Director Newcomb testified before the Senate Governmental Affairs Committee on July 31, 2003, but disputed to the extent WAMY implies the hearing exonerated it; the

substance of that testimony is equivocal and, in part, inculpatory. Director Newcomb testified that WAMY "[a]long with the whole variety of charitable organizations operating head offices in Saudi are ogranizations that we are looking at...." and that there is a "Policy Coordinating, PCC process, where all the equities of the government come to the table" when considering designations under EO 13224. Testimony of R. Richard Newcomb Before the Committee on Governmental Affairs, U.S. Senate (Jul. 31, 2003) at 11-12. He also noted that terrorist "[d]onors provide money to a variety of intermediaries often acting on behalf of charitable organizations to collect funds. The charitable organizations in turn use the funds both for legitimate humanitarian efforts but also, either wittingly or unwittingly, allow some funds to be siphoned off by facilitators who serve as the conduit to the extremist groups. Facilitators frequently are employees of the charitable organizations with close ties to the extremist groups or members of the extremist group with responsibility for liaising with charitable organizations." Testimony of R. Richard Newcomb Before the Committee on Governmental Affairs, U.S. Senate (Jul. 31, 2003) at 9-10. Winer explains that non-designation of Saudi charities such as WAMY reflected a deliberate policy choice to pursue reform through diplomacy rather than designation. Winer Report § 16.2.1.1; Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 472-473 & 475-477. A genuine dispute of material fact exists.

**STATEMENT:**

475. In questioning by the late Senator Arlen Specter, Dir. Newcomb was asked to “amplify” his advice to Congressional staff that “a good many of [his] recommendations for sanctions [were] rejected.” Id. at 210:7-11.

**RESPONSE:**

Undisputed that Senator Specter asked Director Newcomb to amplify his statement that a "good many" of his sanctions recommendations were rejected; but disputed to the extent WAMY implies that Newcomb's testimony did anything other that demonstrate that non-designation reflected higher-level policy rejection rather than a lack of evidence or an evidentiary determination of innocence. Testimony of R. Richard Newcomb Before the Committee on Governmental Affairs, U.S. Senate (Jul. 31, 2003). Designation "may be legally justified... but not found to advance the U.S. government's overall objective" when "the political and foreign policy costs of designating the person would impair cooperation from a foreign country." Ex. 74, Winer Report § 16.2.1. This is evidenced by the State Department's continued encouragement of Saudi Arabia to "restrict the overseas flow of funds from Saudi-based charities;" however these restrictions did not include "the International Islamic Relief Organization (IIRO), Muslim World League (MWL), and the World Assembly of Muslim Youth (WAMY)" who continued "to send money overseas and, at times, fund extremism overseas," which thwarted the "primary U.S. goal of obtaining Saudi acknowledgement of the scope of this problem and a commitment to take decisive action." Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009) at pp. 3-4). A genuine dispute of material fact exists.

**STATEMENT:**

476. Sen. Specter asked Director Newcomb to "focus very sharply" on "recommendations which [Newcomb] [had] made for [economic] sanctions as to Saudi organizations which have been rejected" by the administration. Id. at 210:16-211:18

**RESPONSE:**

Undisputed that Senator Specter asked Director Newcomb to focus on recommendations for sanctions against Saudi organizations that were rejected; but disputed as incomplete. Newcomb's full testimony underscores that non-designation of Saudi charities was driven by foreign-policy considerations, not the absence of evidence or a determination that the organizations were free of terrorist ties. Decl. of Mohammedi (Dkt. No. 12001), Ex. 237, Testimony of OFAC Director R. Richard Newcomb, Senate Governmental Affairs Committee hearing on Terrorism Financing, July 31, 2003, at User Clip: Terrorism Financing Hearing 2003 | C-SPAN.org; (https://www.c-span.org/video/?c4938961/user-clip-terrorism-financing-hearing-2003). Furthermore, "foreign policy considerations would provide an overriding reason not to designate," and that as to Saudi

charities the State Department and the U.S. Embassy in Riyadh "would be consulted" and weigh the consequences of designation. Ex. 74, Winer Report §§ 16.2.3, 16.2.3.1. Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 472-475 & 477. A genuine dispute of material fact exists.

**STATEMENT:**

477. Senator Specter then asked Director Newcomb specifically whether WAMY was an entity as to which there had been recommendation for designation which was rejected:

Q: Were there recommendations for sanctions against the World Assembly of Muslim Youth?

A: There, as in others, these are issues that we looked at and examined very carefully. There was no recommendation out of our office on either of those.

Q: Well, what conclusions did you come to on the World Assembly of Muslim Youth?

A: That, along with the whole variety of charitable organizations operating head offices in Saudi or organizations that we're looking at, as well as the whole range of several hundred or so possible organizations that may be funding terrorist activities, rising to the level of a recommendation is a complicated practice.

Q: Well, I'm not concerned about several hundred others. I'd like to know what about the World Assembly of Muslim Youth. Were they funding terrorist organizations subject to economic sanctions without any action being taken?

A: I can't conclude that in this hearing. It is an organization that we—

Q: You say you can't conclude it—

A: Cannot. Cannot.

Q: --at this hearing today?

A: Well, we did not conclude that in our deliberations, so I can't say that that was a recommendation of our office.
Q: Well, when you look at it very carefully, how long have you been looking at it up until now?
A: Certainly since immediately in the aftermath of 9/11.
Q: Well, that's almost two years. How long will it take you to come to a conclusion?
A: We can recommend and we can designate, but there is a policy process which takes into account all of the variety of—
Q: I've for 16 second left. Have you recommended this to any of the organizations I've mentioned to you, some tough economic sanctions which were turned down by higher officials implicitly because they were Saudi organizations.
A: I can't say it's because they were Saudi organizations.
Id. at 210:3-215:9 (full video transcript).

**RESPONSE:**

Undisputed that this exchange occurred, but disputed to the extent WAMY offers it as evidence that it did not fund terrorism. In full, Senator Specter asked: "Had you recommended this to any of the organizations I've mentioned to you, some tough economic sanctions which were turned down by higher officials implicitly because they were Saudi organizations?" — and Newcomb responded: "I can't say it's because they were Saudi organizations ... I can say there have been some charities and other organizations that we've considered, we've had at the table, and that have been deferred for other actions which I would deem as appropriate." Testimony of R. Richard Newcomb Before the Cmte. on Governmental Affairs, U.S. Senate (Jul. 31, 2003) at 11-12. Furthermore, Director Newcomb testified that WAMY "[a]long with the whole variety of

charitable organizations operating head offices in Saudi are organizations that we are looking at...." and that there is a "Policy Coordinating, PCC process, where all the equities of the government come to the table" when considering designations under EO 13224. Decl. of Mohammedi (Dkt. No. 12001), Ex. 237, Testimony of OFAC Director R. Richard Newcomb, Senate Governmental Affairs Committee hearing on Terrorism Financing, July 31, 2003, at User Clip: Terrorism Financing Hearing 2003 | C-SPAN.org; (https://www.c-span.org/video/?c4938961/user-clip-terrorism-financing-hearing-2003). Winer opines that the government's failure to recommend or issue a designation "helps explain why a pe[r]son or entity who has engaged in significant material support of terrorism has not been sanctioned," and does not mean the entity was cleared. Ex. 74, Winer Report §§ 3.15, 16.1. Levitt confirms "many more entities are considered for designation than those that are ultimately designated," and that deferral often reflects diplomatic leverage against a host government. Ex. 59, Levitt Rpt. § IV-2; Dep. of Levitt (Apr. 8, 2021) at 466:8-468:2. Far from clearing WAMY, this testimony supports the inference that non-designation reflected diplomatic accommodation of Saudi entities — consistent with the Monograph's findings (9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 15) — and the record independently ties WAMY to al Qaeda. Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 465-476, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

478. To date, OFAC has not designated WAMY. Ex. 117.

**RESPONSE:**

Disputed as misleading. WAMY's continued non-designation does not establish that it did not support terrorism; non-designation reflects the discretionary, diplomatically constrained nature of the process, not an adjudication -- non-designation is not exoneration. Winer Report § 16.1. The U.S. pursued reform of WAMY through diplomacy rather than designation, and even entities with clear evidence against them go undesignated for policy reasons — e.g., the Saudi-based Muwafaq Foundation, for which "there is substantial information about [its] use... for supporting al Qaeda," was not designated because it was "largely out of business by the time of the 9/11 attacks." Winer Report §§ 16.2.1., 16.2.4 (citing U.S. Treasury designation of Al Haramain (Jan. 22, 2004); State Dept. cable 06STATE99426 (Jun. 16, 2006), PEC-KSA001453-54; U.S. Treasury designation of IIRO & director (Aug. 3, 2006); "More Assets Frozen in Terrorism Fight," WP (Oct. 14, 2001)). The 9/11 Commission Monograph found pre-9/11 asset-freezing "generally ineffective" and post-9/11 freezes to be "useful diplomatic tools." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 17-18. OFAC Director Newcomb testified that WAMY "[a]long with the whole variety of charitable organizations operating head offices in Saudi are ogranizations that we are looking at...." and that there is a "Policy Coordinating, PCC process, where all the equities of the government come to the table" when considering designations under EO 13224. Testimony of R. Richard Newcomb Before the Cmte. on Governmental Affairs, U.S. Senate (Jul. 31, 2003) at 11-12. The Department of Defense assessed WAMY as a "Tier 1" counterterrorism NGO target (Winer Rebuttal Rpt. §§ 3.20-3.22 (citing DoD JTF-GTMO Summary of Evidence, Balkhair (May 27, 2005); PEC-KSA 002737)); a December 30, 2009 State Department cable named WAMY among charities that continued to "fund extremism overseas" (Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009))); and in 2016 Saudi Arabia's own Anti-

Money Laundering authority shuttered WAMY offices for "several administrative and financial violations." Ex. 133, Kohlmann 2020 Rpt. ¶ 47 (citing Saudi Anti-Money Laundering authority, Mutual Evaluation Report (2018)). Designation is not a prerequisite to civil liability, and the record ties WAMY to al Qaeda. Ex. 238, Nakhleh Rpt. ¶ 106; Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 465-477, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

**B. Execution of Search Warrant of WAMY's U.S. Office Did Not Result In any Charges or Sanctions**

**RESPONSE:**

Disputed. Although this heading contains no factual assertion, to the extent it implies that the execution of the search warrant cleared WAMY of terrorism ties, Plaintiffs dispute that implication. The failure to charge or sanction WAMY following the search does not disprove civil material support, which turns on a different standard than criminal prosecution or administrative designation. The May 2004 search was itself terrorism-related: federal agents from the FBI, ICE, and the Joint Terrorism Task Force "raided... WAMY['s] office in Virginia, allegedly 'in connection with a terrorism-related investigation,'" "seized all of the files and computer hard drives," and a WAMY board member "was arrested on immigration charges." Kohlmann Rpt. ¶ 176; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 190 (citing Markon, "U.S. Raids N. Va. Office of Saudi-Based Charity," WP (Jun. 2, 2004)). WAMY-USA served as a platform for Anwar al-Awlaki — a facilitator of 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar — hosting him at WAMY Islamic studies camps and possessing his Dar al-

Hijrah employment contract, "which suggests that WAMY either had prior knowledge of Awlaki's employment or even funded the contract." Ex. 132, WAMY Int 15165; Ex. 131, WAMY Int 0249; Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001); Ex. 195, WAMY Int 170). WAMY-USA's U.S. vice president Ibrahim Abdullah was, per the FBI, "associated with subjects of FBI al-Qa'ida and Islamic Resistance Movement (HAMAS) investigations through his WAMY activities and phone records." Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-W, n.921-922 (citing WAMY Int'l, Inc. Corp. Document, Commonwealth of VA, Stmt of Change of Registered Agent form (June 2000); EO 3429). And two of the 9/11 hijackers left bags at the Ayah Islamic Center, run by a WAMY employee. Youssef Report p.231 & n.957 (WAMY Int 163-164, 1535, 12439; FBI Timeline at 273). The record independently ties WAMY to al Qaeda. Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 479-482, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

479. In May of 2004 the U.S. Customs Service of the Bureau of Immigration & Customs Enforcement executed a search warrant at WAMY International's Virginia office. Ex. 238, Warrant and search inventory in case no 04-190-MG.

**RESPONSE:**

Undisputed as a general matter for purposes of this motion.

**STATEMENT:**

480. Following the search, no WAMY Int'l, WAMY, or any WAMY employee was ever charged with any offense, let alone any terrorism related offense, as a result of the execution of this

search warrant. Ex. 2 at ¶15, 18-19 (that WAMY continues to operate in the US despite the execution of the warrant and WAMY has no connection to al-Qaeda).

**RESPONSE:**

Disputed as misleading. The absence of criminal charges does not establish that WAMY did not provide material support to al-Qaeda; criminal prosecution requires proof beyond a reasonable doubt, a far higher standard than civil liability, and non-prosecution here reflects prosecutorial discretion and the well-documented obstacles to terrorism-financing prosecutions. Winer Report §§ 3.13, 15.6 (designation and enforcement decisions are discretionary and do not turn on proving guilt "beyond a reasonable doubt"). Non-prosecution may reflect diplomatic considerations, not innocence. Depo. of Levitt (Apr. 8, 2021) at 384:9-385:5. The 9/11 Commission Monograph found the Department of Justice "had little success developing criminal cases against suspected terrorist fund-raisers" because of the "wall" between criminal and intelligence matters, and that obtaining foreign financial records "was often a practical impossibility." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 17-18, 34-35. WAMY and its personnel supported al-Qaeda's network — e.g., WAMY employees at Guantanamo were assessed as facilitating "funds and personnel for Al-Qaida," and WAMY-USA served as a platform for al-Qaeda facilitator Anwar al-Awlaki. Kohlmann Rpt. ¶¶ 172, 186 (citing JTF-GTMO Detainee Assessment, Ameur ISN 939; WAMYSA 30079-30081); Ex. 132, WAMY Int 15165; Ex. 131, WAMY Int 0249; Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001); Ex. 195, WAMY Int 170. Notably, the sole post-2004 charge was a visa violation against WAMY-USA vice president Ibrahim Abdullah — the same official the FBI described as "associated with subjects of FBI al-Qa'ida and... HAMAS investigations through his WAMY activities and phone records." Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-W, n.921-

922 (citing WAMY Int'l, Inc. Corp. Document, Commonwealth of VA, Stmt of Change of Registered Agent form (June 2000); EO 3429). Evidence shows WAMY's ties to al Qaeda and its identification as one of al Qaeda's "most important charity fronts and partners." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

481. No sanction was ever taken against WAMY, WAMY, or any WAMY employee related to the execution of this search warrant. Ex. 2 at ¶15, 18-19 (that WAMY continues to operate in the US, has no connection to al-Qaeda).

**RESPONSE:**

Disputed as misleading. *See* Plaintiffs' response to WAMY's 56.1 Statement at ¶ 480. A genuine dispute of material fact exists.

**STATEMENT:**

482. WAMY's Virginia office was not closed after execution of the search warrant. To date WAMY maintains its annual registration in Virginia. Ex. 85, Winer Ex 913 (2021 Annual Report, Commonwealth of Virginia, State Corporation Commission, WAMY International, Inc. registration document).

**RESPONSE:**

Undisputed that WAMY's Virginia office remained open and registered, but disputed as to its significance: continued corporate registration is a formality and continued operation and non-designation are not exoneration. Winer Report § 16.1. The U.S. often refrains from designating entities it has evidence against for national-security, policy, and diplomatic reasons. Winer Report §§ 16.2.2, 16.2.3, 16.3. That the office continued operating is not probative of innocence given that it was raided in a terrorism-related investigation. WAMY's U.S. branch was "targeted by U.S. authorities for its ties to al Qaeda, Islamic extremism, and recruitment" (Ex. 148, Pls.' Averment (Dkt. No. 9541) ¶ 2107, Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 826), and WAMY's own personnel were tied to FBI terrorism investigations and to al-Qaeda facilitator Anwar al-Awlaki. Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-W, n.921-922 (citing WAMY Int'l, Inc. Corp. Document, Commonwealth of VA, Stmt of Change of Registered Agent form (June 2000); EO 3429); Ex. 132, WAMY Int 15165; Ex. 131, WAMY Int 0249; Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001); Ex. 195, WAMY Int 170. WAMY provided material support to al-Qaeda notwithstanding its continued operation. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, Decl. of Mohammedi (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

**C. The 9/11 Commission Did Not Find That WAMY Provided Material Support Leading to The Terrorist Attacks of September 11, 2001, specifically or to al-Qaeda generally**

**RESPONSE:**

Disputed. Although this heading contains no factual assertion, to the extent it asserts the 9/11 Commission found WAMY provided no material support, Plaintiffs dispute that assertion. The Commission's silence on WAMY is not a finding that WAMY provided no support; the Commission did not adjudicate the civil liability of individual charities and was, in Winer's words, "reticent on the identity of" the charities that diverted funds, but still found a "likelihood that charities with significant Saudi government's sponsorship diverted funds to al-Qaeda." Dep. of Winer (Jul. 13, 2021) at 145:7-146:8, 147:6-17. The Commission expressly "does not exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda" — which includes WAMY. Winer Report § 5.3.4; Winer Rebuttal Rpt. §§ 4.17.6-4.18; Ex. 133, Kohlmann 2020 Rpt. ¶ 59 (citing 9/11 Comm'n Report at 171). WAMY did provide material support to al-Qaeda. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 483-503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

483. Congress tasked the National Commission on Terrorist Attacks Upon the United States ("The 9/11 Commission") to: "(1) examine and report on the facts and causes relating to

the terrorist attacks of September 11, 2001; (2) ascertain, evaluate, and report on the evidence developed by all relevant governmental agencies regarding the facts and circumstances surrounding the attacks; (3) build upon the investigations of other entities, and avoid unnecessary duplication, by reviewing the findings conclusions, and recommendations of [other government inquiries]; (4) make full and complete accounting of the circumstances surrounding the attacks, and the extent of the United States' preparedness for, and immediate response to, the attacks; and (5) investigate and report to the President and Congress on its findings, conclusions, and recommendations for corrective measures that can be taken to prevent acts of terrorism." Pub. Law 107-306, Title VI, section 602 (Purpose).

**RESPONSE:**

Undisputed as a general matter for purposes of this motion.

**STATEMENT:**

484. The 9/11 Commission published its 585-page Final Report of the National Commission on Terrorist Attacks Upon the United States ("9/11 Commission Report"). Ex. 46.

**RESPONSE:**

Undisputed as a general matter for purposes of this motion.

**STATEMENT:**

485. The 9/11 Commission Report mentions WAMY only once, in the following context with no connection to 9/11 terrorist attack or any other terrorist activity: While Saudi domestic charities are regulated by the Ministry of Labor and Social Welfare, charities and international relief agencies, such as the World Assembly of Muslim Youth

(WAMY), are currently regulated by the Ministry of Islamic Affairs. This ministry uses zakat and government funds to spread Wahhabi beliefs throughout the world, including in mosques and schools. Often these schools provide the only education available; even in affluent countries, Saudi-funded Wahhabi schools are often the only Islamic schools. Some Wahhabi-funded organizations have been exploited by extremists to further their goal of violent jihad against non-Muslims. One such organization has been the al Haramain Islamic Foundation; the assets of some branch offices have been frozen by the U.S. and Saudi governments.

Ex. 46 at 372.

**RESPONSE:**

Disputed as misleading. WAMY — a Saudi-government-controlled dawah charity with significant government sponsorship — is precisely the type of "chart[y] with significant Saudi government sponsorship" the Commission found "likel[y]" to have "diverted funds to al Qaeda." Ex. 74 Winer Report § 5.3.4, Ex. 180, Winer Rebuttal Rpt. §§ 4.17.6-4.18 (citing 9/11 Comm'n Report at 171); Ex. 133, Kohlmann 2020 Rpt. ¶ 59 (citing Ex. 4, 9/11 Comm'n Report at 171); Ex. 237, Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. at ¶¶ 30-31, 33, 130 (citing Motion to Dismiss of Abdullah Muhsen Al Turki (Dkt. No. 85), Ex. 2, Decl. of Abdulaziz H. al Fahad at ¶ 11; Ex. 269, Kingdom of Saudi Arabia, Ministry of Foreign Affairs, "Serving Islam and Muslims (www.mofa.gov.sa); Prince Sultan Bin Abdulaziz Al-Saud's Motion to Dismiss (Dkt. No. 110), Case. No. 02-cv-1616-JR (DDC), Ex. 4, Decl. of Mutaz Saleh Abu Unuq (Apr. 1, 2003) at p. 2). The 9/11 Commission's decision to mention WAMY only once reflects its reticence on naming specific charities, not a finding of WAMY's innocence. Dep. of Winer (Jul. 13, 2021) at 145:7-146:8, 147:6-17. WAMY was among "MOIA's affiliated 'charities'" that

reported their activities to their Saudi headquarters, and the Saudi clerics' Memorandum of Advice named WAMY among the charities the state was to support "financially and operationally." Ex. 238, Nakhleh Rpt. ¶¶ 69-d, 201 (citing PEC-KSA000235-266)). The 9/11 Commission's findings independently establish that Saudi-sponsored charities diverted funds to al Qaeda (9/11 Commission Report at 171; 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16, 24), and the evidentiary record identifies WAMY specifically as one of al Qaeda's "most important charity fronts and partners." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Ex. 237, Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 483-503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

**VIII. WAMY is Not Part of al-Qaeda's Funding Network**

**RESPONSE:**

Disputed. This heading asserts a conclusion squarely contradict by the evidentiary record. Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

**A. Al-Qaeda's Funding Source Did Not Include WAMY**

**RESPONSE:**

Disputed. Al-Qaeda's funding sources did include WAMY and the network of Saudi charities of which it was a part. Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

486. The 9/11 Commission found that "Bin Ladin and his aides did not need a very large sum to finance their planned attack on American." Ex. 46 at p. 169.

**RESPONSE:**

Undisputed that the 9/11 Commission Report contains this quotation but disputed to the extent WAMY offers it to imply that WAMY was not a source of al-Qaeda's funds. Diverted charitable funds moved in cash were an adequate and difficult-to-trace source: the Commission's Terrorist Financing Monograph found al Qaeda "relied on diversions from Islamic charities and on well-placed financial facilitators," and "can apparently still draw on ... sympathizers who divert charitable donations to it." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16, 25. Al-Qaeda was "funded, to the tune of approximately $30 million per year, by diversions of money from Islamic charities" (Winer Rebuttal Rpt. § 4.7, n.69 (citing 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 4, 13, 19)) — an amount more than sufficient to finance an attack costing $400,000–$500,000. And such funds — kept in cash to render al-Qaeda's network "virtually invisible" — moved through charities "used as conduits to transfer funds from donors to al Qaeda leaders." Ex. 237, Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 170 (citing Ex. 171, Dugger, "Anti-U.S. Plot in India Is Foiled; Militant Islamist Intended to Bomb 2 Consulates, Police Say,"

NYT (Jan. 21, 1999); Ex. 4, 9/11 Comm'n Report at 171); 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 28-29). The record identifies WAMY among al Qaeda's charity fronts. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Ex. 237, Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189, Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

487. "The 9/11 plotters eventually spent somewhere between $400,000 and $500,000 to plan and conduct their attack." Id.

**RESPONSE:**

Undisputed that the Report so states but disputed to the extent it implies the attack's cost exceeded what diversions from Saudi-based charities like WAMY could supply. *See* Plaintiffs' response to WAMY's 56.1 Statement ¶ 486.

**STATEMENT:**

488. The origin of the funds remains unknown though the 9/11 Commission developed a "general idea of how al Qaeda financed itself during the period leading up to 9/11." Id.

**RESPONSE:**

Disputed. That the origin of specific dollars "remains unknown" reflects the concealment inherent in charity-based financing and WAMY's own deficient records. One "would not expect

to see evidence of support for terrorism in the charity records" because terrorism is not a lawful charitable purpose, so charities supporting it "are not going to be" recording it. Winer Dep. (Jul. 13, 2021) at 298:4-299:13; Winer Report § 3.12. The Commission's inability to trace specific origins likewise reflects opacity: the Commission's Terroristm Financing Monograph found pre-9/11 intelligence produced "an incomplete understanding of al Qaeda's methods to raise, move, and store money" and that it is "far more difficult to show that a suspected NGO ... actually funds terrorist groups." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16–17, 18. The Commission's general understanding of al-Qaeda financing expressly included diversions from Islamic charities. Winer Rebuttal Rpt. § 4.7, n.69 (citing 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 4, 13, 19). Affirmative record evidence ties WAMY to al Qaeda funding, including CIA reporting that WAMY officials "couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia" (Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶ 160 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744) and that "Osama bin Laden has funded offices of Lajnat al Bir al Islamiya (LBI), which is closely affiliated with WAMY." Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821). A genuine dispute of material fact exists.

**STATEMENT:**

489. "Al Qaeda relied primarily on a fund-raising network developed over time." Id.

**RESPONSE:**

Undisputed as a general matter for the purposes of this motion.

**STATEMENT:**

490. However, Bin Laden used multiple funding sources so much so that "it remained difficult [for the CIA] to distinguish al Qaeda's financial transactions among the vast sums moving in the international financial system." Ex. 46 at 170 and 186 (Describing al-Qaeda's funding sources and difficulty in distinguishing them).

**RESPONSE:**

Undisputed that al-Qaeda used multiple funding sources difficult to distinguish but disputed to the extent it implies WAMY was not among them. The difficulty is a product of the very charity mechanism Plaintiffs attribute to WAMY — anonymous cash movement with minimal audit trails. Saudi-based charities "were a source of anonymous cash that left minimal audit trails, and thereby moved more easily to terrorists"). Winer Report § 6.7.4 (referencing Testimony of Asst. Secr. of State for Econ. & Bus. Affairs E. Anthony Wayne Before the Senate Cmte. on Banking, Housing and Urban Affairs (Jul. 13, 2005)). Al Qaeda left "standing orders ... to keep all transactions involving the charitable groups in cash only," using the NGOs "as a secret laundry to make Al-Qaida's financial network virtually invisible" (Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 170 (citing Dugger, "Anti-U.S. Plot in India Is Foiled; Militant Islamist Intended to Bomb 2 Consulates, Police Say," NYT (Jan. 21, 1999); 9/11 Comm'n Report at 171); 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 28-29)), and "[c]harities were also used as conduits to transfer funds from donors to al Qaeda leaders." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 28–29). WAMY's Pakistan/Afghanistan (Peshawar/LBI) office exemplifies this: its auditors reported that an "expenditure incurred inside Afghanistan is not susceptible to independent audit verification." Winer Rebuttal Rpt. § 2.17.1, n.6 (citing 2002 WAMY/LBI

Peshawar audit, M. Almas & Co., Ex. 242, WAMYSA0195478--79). These lax controls put al-Qaeda sympathizers such as Batterjee "in the position where they could divert funds for the support of armed conflict and terrorism." Winer Rebuttal Rpt. § 4.18. A genuine dispute of material fact exists.

**STATEMENT:**

491. Al-Qaeda had the ability to raise money from different sources, its "financial facilitators raise money from witting and unwitting donors, mosques and sympathetic imams, and nongovernment organizations such as charities". Ex. 241, National Commission on Terrorist Attacks Upon the United States, Monograph on Terrorist Financing, Staff Report to the Commission ("Staff Monograph") at pp. 17-19 (Describing the "elusive network" which al Qaeda developed to support itself and its operations); See also Ex. 242, CIA00377-384, at 379 Central Intelligence Agency, Intelligence Report, DCI Counterterrorist Center, "Pursuing the Bin Ladin Financial Target," April 12, 2001, at p. 3 (noting "Bin Ladin's extensive financial network uses a number of mechanisms to transfer funds necessary to conduct al-Qa'ida's activities. Among these are [REDACTED] underground bankers known as hawala dealers, money couriers, and financial lieutenants who oversee financial transfers, open bank accounts, and ensure that funds arrive at their appropriate destination. In addition, numerous supporters and sympathizers of al-Qa'ida take advantage of their positions with non-governmental organizations (NGOs) and charitable organizations to secretly divert funds to Bin Ladin and his associated without the knowledge of senior NGO officials.").

**RESPONSE:**

Undisputed that al-Qaeda's financial facilitators raised money from NGOs such as charities but disputed to the extent WAMY implies it was not such a charity. The CIA reporting on which the Commission relied identifies Saudi-based NGOs as diversion channels: al-Qaeda "was able to exploit several Saudi-based NGOs and divert funds to al-Qa'ida" and relied on Saudi Arabia "for the bulk of its fundraising for several years." Levitt Rpt. § IV-3, nn. 63-67 (citing CIA, "Identifying al-Qa'ida's Donors and Fundraisers" (Feb. 27, 2002); CIA, Directorate of Intelligence, "Saudi-Based Financial Support for Terrorist Organizations" (Nov. 14, 2002)); Ex. 133, Kohlmann 2020 Rpt. ¶¶ 49–50 (citing CIA reports, CIA_000182-196 and CIA_000285-300). Moreover, WAMY was a Saudi-government-controlled charity headed by the Minister of Islamic Affairs (Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 30-31, 33, 130, (citing Motion to Dismiss of Abdullah Muhsen Al Turki (Dkt. No. 85), Ex. 2, Decl. of Abdulaziz H. al Fahad at ¶ 11; Kingdom of Saudi Arabia, Ministry of Foreign Affairs, "Serving Islam and Muslims (www.mofa.gov.sa); Prince Sultan Bin Abdulaziz Al-Saud's Motion to Dismiss (Dkt. No. 110), Case. No. 02-cv-1616-JR (DDC), Ex. 4, Decl. of Mutaz Saleh Abu Unuq (Apr. 1, 2003) at p. 2); its Secretary General Maneh al-Johani (a position WAMY's own Financial Director stated was in charge of WAMY's daily operations) solicited "money to buy weapons and gear" for jihad. Ex. 112, Kohlmann 2020 Rpt. ¶166 (citing al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843). A WAMY booklet endorsing violent jihad was published by the Saudi Armed Forces Printing Press. Aff. of Tarbuttion (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 140 (citing *Islamic Views*, Saudi Armed Forces Printing Press). The 9/11 Commission's Terrorist Financing Monograph also found that "entire charities from the top down may have known of and even participated in the funneling of money to al Qaeda." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 24. A genuine dispute of material fact exists.

**STATEMENT:**

492. With respect to charities as a source of al-Qaeda funds, the 9/11 Commission found:

> Al Qaeda also collected money from employees of corrupt charities. It took two approaches to using charities for fund-raising. One was to rely on al Qaeda sympathizers in specific foreign branch offices of large, international charities particularly those with lax external oversight and ineffective internal controls, such as the Saudi-based al Haramain Islamic Foundation. Smaller charities in various parts of the globe were funded by these large Gulf charities and had employees who would siphon the money to al Qaeda. Ex. 46 at p. 170.

**RESPONSE:**

Undisputed that the Report so states but disputed to the extent WAMY implies this model does not apply to it. The "large, international charities" whose "foreign branch offices" with "lax external oversight and ineffective internal controls" siphoned money to al-Qaeda are IIRO, MWL, and WAMY. Ex. 193, Winer Dep. (Jul. 13, 2021) at 143:3–144:3 (testifying the Commission's "such as" language is not limited to al-Haramain and refers to "IIRO, the Muslim World League, and WAMY") (referring to Ex. 4, 9/11 Comm'n Report at 171); Ex. 180, Winer Rebuttal Rpt. § 4.18 (WAMY, IIRO, and MWL were the "Saudi religious charities which had lax external oversight and ineffective internal controls"); Ex. 112, Kohlmann Rpt. ¶ 20 (citing Ex. 4, 9/11 Comm'n Report at 170-171). The al-Haramain example is illustrative, not exhaustive; the Commission also found that "entire charities, such as the al Wafa organization, may have wittingly participated in funneling money to al Qaeda," with al Qaeda operatives controlling "the entire organization, including access to bank accounts." Op. & Order (Dkt. No. 9060) at 23 (citing 9/11 Commission Report at 170–171). WAMY exhibited exactly the profile the Commission

described: audits of its Peshawar/LBI office could not verify Afghanistan expenditures (Winer Rebuttal Rpt. § 2.17, n.6 (citing Ex. 242, WAMYSA0195478--79)), and WAMY funded the smaller charity LBI, which supported al-Qaeda. Ex. 74, Winer Report § 12.12.1 (LBI "funded by WAMY," later "merged into WAMY") (citing Ex. 20, Dep. of Noorwali (Jul. 24, 2019), Ex. 267, Admin. Resolution No. 37 (May 28, 1996), WAMYSA0276804)). The record identifies WAMY as one of al Qaeda's "most important charity fronts and partners." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Ex. 237, Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing, Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

493. The 9/11 Commission also found that:

> Saudi Arabia has long been considered the primary source of al Qaeda funding, but we have found no evidence that the Saudi government as an institution or senior Saudi officials individually funded the organization. (This conclusion does not exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda.) Id. at p. 171.

**RESPONSE:**

Undisputed that the Report contains this quotation but disputed to the extent WAMY omits the parenthetical's force — a critical admission. The Commission expressly "does not exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al

Qaeda" (9/11 Commission Report at 171), and WAMY is such a charity. WAMY was significantly Saudi-government sponsored: established by Saudi royal decree and funded, supervised, and controlled by the Kingdom and headed by the Saudi Minister of Islamic Affairs (Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 27, 30-31, 33, 130, 137 (citing Motion to Dismiss of Abdullah Muhsen Al Turki (Dkt. No. 85), Ex. 2, Decl. of Abdulaziz H. al Fahad at ¶ 11; Kingdom of Saudi Arabia, Ministry of Foreign Affairs, "Serving Islam and Muslims (www.mofa.gov.sa); Prince Sultan Bin Abdulaziz Al-Saud's Motion to Dismiss (Dkt. No. 110), Case. No. 02-cv-1616-JR (DDC), Ex. 4, Decl. of Mutaz Saleh Abu Unuq (Apr. 1, 2003) at p. 2; *Al-Jizirah*, Riyadh (Jan. 12, 2001)); "regulated by the Ministry of Islamic Affairs" (Ex. 59, Levitt Rpt.Rpt. § IV-7; Winer Report § 5.3.3 (citing 9/11 Comm'n Report at 372)); one of "MOIA's affiliated 'charities'" reporting to Saudi headquarters (Ex. 238, Nakhleh Rpt. ¶ 210); named in the Saudi clerics' Memorandum of Advice among the charities the state was to support "financially and operationally" (Ex. 238, Nakhleh Rpt. ¶ 69.d (citing Memorandum of Advice, PEC-KSA000235-266)); and "a Saudi Government funded charity which, like Al Haramain, was led by the Saudi Minister of Islamic Affairs." Youssef Report § IV-W. The record documents that WAMY diverted or channeled support to al Qaeda. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Ex. 237, Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189, Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826); 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16. Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

494. The 9/11 Commission made no finding that WAMY, directly or indirectly through any other charity or entity, provided funds to al-Qaeda. Id. at pp. 170-71.

**RESPONSE:**

Disputed. The absence of a WAMY-specific finding in the 9/11 Commission Report is not a finding that WAMY did not support al-Qaeda. The Commission did not make charity-by-charity findings, was "reticent on the identity of" the charities, and did not purport to clear WAMY. Ex. 193, Dep. of Winer (Jul. 14, 2021) at 145:7–146:8. Its finding that it "does not exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda" (Ex. 4, 9/11 Commission Report at 171) applies to WAMY, a charity regulated by the Saudi Ministry of Islamic Affairs. Ex. 59, Levitt Rpt. Rpt. § IV-7 (citing 9/11 Comm'n Report at 372); Ex. 238, Nakhleh Rpt. ¶ 210; Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 27, 30-31, 33, 130, (citing Motion to Dismiss of Abdullah Muhsen Al Turki (Dkt. No. 85), Ex. 2, Decl. of Abdulaziz H. al Fahad at ¶ 11; Kingdom of Saudi Arabia, Ministry of Foreign Affairs, "Serving Islam and Muslims (www.mofa.gov.sa); Prince Sultan Bin Abdulaziz Al-Saud's Motion to Dismiss (Dkt. No. 110), Case. No. 02-cv-1616-JR (DDC), Ex. 4, Decl. of Mutaz Saleh Abu Unuq (Apr. 1, 2003) at p. 2). Other government findings specifically implicate WAMY: the Department of Defense classified WAMY as a "Tier 1 Counterterrorism NGO target" that "provides financial support" and "supports terrorist ideals and causes" (Kohlmann Rpt. ¶¶ 158–159 (citing JTF-GTMO Detainee Assessments; Ex. 227, Set 52_3643-3869 at 37); Winer Report § 12.10.3 (citing Unclassified Summary of Evidence for Combatant Status Review Tribunal, Adel Hassan (Nov. 19, 2004),PEC-KSA002746; Unclassified Summary of Evidence for Administrative Review Board, Mammar Ameur (Jul. 25, 2005))); a December 30, 2009 State Department cable named WAMY among charities that "continue to send money overseas and, at

times, fund extremism overseas" (Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009))); and Saudi Arabia's own Anti-Money Laundering authority reported that 2016 inspections of IIRO and WAMY offices led to offices being shuttered for "several administrative and financial violations." Ex. 133, Kohlmann 2020 Rpt. ¶ 47 (citing Saudi Anti-Money Laundering authority, Mutual Evaluation Report (2018)). CIA reporting further describes WAMY as pursuing "an extremist agenda" and couriering Saudi donations to Islamic groups in Afghanistan and Bosnia (Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 160 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744)), ties WAMY to bin Laden funding (Ex. 148, Pls.' Averment (Dkt. No. 9541) ¶ 2106 (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826)), and identifies WAMY as one of al Qaeda's "most important charity fronts and partners." Pls.' Corrected Averment (Dkt. No. 9764) ¶ 132 (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 827; CIA_000178-189 at 185; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). WAMY did provide funds to al-Qaeda. Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX.

**STATEMENT:**

495. The 9/11 Commission made no finding that any WAMY foreign branch office, directly or indirectly through any other charity, provided funds to al-Qaeda. Id. at pp. 170-71.

**RESPONSE:**

Disputed. The Commission made no finding exonerating any WAMY branch office; it made no charity- or branch-specific findings, was "reticent" on charity names (Ex. 193, Dep. of Winer

(Jul. 14, 2021) at 145:7–146:8), and expressly recognized the likelihood that Saudi-government-sponsored charities diverted funds. Ex. 4, 9/11 Commission Report at 171. WAMY's branch offices are directly implicated by the record. WAMY's Peshawar/LBI office, covering the Pakistan-Afghanistan border, had audits that could not verify Afghanistan expenditures and omitted roughly half of one year's donations. Ex. 180, Winer Rebuttal Rpt. §§ 2.17, 2.17.2.3 (citing Decl. of Mohammedi (Dkt. No. 11997), Ex. 80, WAMYSA018575-755 at WAMYSA018576; WAMYSA018603-755, Ex. 242, WAMYSA0195478--79; WAMYSA018593). WAMY's Pakistan branch — which was one and the same with LBI — was funded by Osama bin Laden; WAMY's own audits of its Pakistan operation, from 1994 through 2002, refer to the entity throughout as the "WAMY/LBI Office." Ex. 180, Winer Rebuttal Rpt. § 2.38.7; WAMY-Pakistan audits from 1994-2002, Decl. of Mohammedi (Dkt. No. 11997), Exs. 78-82. WAMY-Canada was stripped of its charitable status after the CRA found it funded UN-sanctioned, al-Qaeda-tied BIF and was controlled by its Saudi parent, which "maintains substantial control over WAMY Canada's finances" and "has been alleged to support terrorism." Ex. 74, Winer Report §§ 10.3–10.3.1; Ex. 112, Kohlmann Rpt. ¶¶ 190–193; Ex. 133, Kohlmann 2020 Rpt. ¶¶ 76–80 (citing CRA audit, EX. 79, FED-PEC 218170-218203; Ex. 87, WAMYSA 4400-4401, Ex, 88, WAMYSA 4455-4456, Ex. 89, 4579-4580; Ex. 80, WAMYSA 1748, 1946). WAMY's Balkan offices were "actively involved in spotting and assessing suitable terrorist recruits" (Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 99 (citing CIA_000178-189 at 186)), and GTMO assessments describe WAMY employees in Afghanistan/Pakistan as al-Qaeda facilitators. Ex. 112, Kohlmann Rpt. ¶¶ 168–172 (citing Ex. 119 Set_52_3643-3869 at pp. 37-39; WAMYSA1088-1091; Ex. 103, WAMYSA 1084; Ex. 107, FED-PEC 141770-141786; FED-PEC 197472-197479; U.S. Dept. of Defense JTF-GTMO Detainee Assessment, Mammar Ameru (ISN NO. 939) (Apr. 13, 2005)). In addition, WAMY's Peshawar and Virginia offices were

raided in terrorism investigations. Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 190, (citing "Pakistan Questions Sudan Man About Tape," AP (Dec. 9, 2002); Markon, "U.S. Raids N. VA Office of Saudi-Based Charity," WP (Jun. 2, 2004)). See also Plaintiffs' reponse to WAMY's 56.1 Statement at heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

496. The 9/11 Commission made no finding that there was any likelihood that WAMY or any WAMY foreign branch, directly or indirectly through any other charity, provided funds to al-Qaeda. Id. at pp. 170-71.

**RESPONSE:**

Disputed. The Commission's own report states the opposite of the assertion: its conclusion "does not exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda." 9/11 Commission Report at 171. Because WAMY was a charity with significant Saudi government sponsorship — regulated by the Ministry of Islamic Affairs (Winer Report § 5.3.3; Ex. 59, Levitt Rpt. § IV-7 (citing 9/11 Comm'n Report at 372)), one of "MOIA's affiliated 'charities'" (Ex. 238, Nakhleh Rpt. ¶ 210), and established, funded, and controlled by the Kingdom of Saudi Arabia (Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 27, 30-31, 33, 130, (citing Motion to Dismiss of Abdullah Muhsen Al Turki (Dkt. No. 85), Ex. 2, Decl. of Abdulaziz H. al Fahad at ¶ 11; Kingdom of Saudi Arabia, Ministry of Foreign Affairs, "Serving Islam and Muslims (www.mofa.gov.sa); Prince Sultan Bin Abdulaziz Al-Saud's Motion to Dismiss (Dkt. No. 110), Case. No. 02-cv-1616-JR (DDC), Ex. 4, Decl. of Mutaz Saleh Abu Unuq (Apr. 1, 2003) at p. 2)) — the Commission's recognized "likelihood" encompasses WAMY. Other government findings specifically implicate WAMY: the Department of Defense classified WAMY as a "Tier 1 Counterterrorism NGO target" that

"provides financial support" and "supports terrorist ideals and causes" (Kohlmann Rpt. ¶¶ 158–159 (citing JTF-GTMO Detainee Assessments; Ex. 227, Set 52_3643-3869 at 37); Winer Report § 12.10.3 (citing Unclassified Summary of Evidence for Combatant Status Review Tribunal, Adel Hassan (Nov. 19, 2004),PEC-KSA002746; Unclassified Summary of Evidence for Administrative Review Board, Mammar Ameur (Jul. 25, 2005)); a December 30, 2009 State Department cable named WAMY among charities that "continue to send money overseas and, at times, fund extremism overseas" (Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009))); and Saudi Arabia's own Anti-Money Laundering authority reported that 2016 inspections of IIRO and WAMY offices led to offices being shuttered for "several administrative and financial violations." Ex. 133, Kohlmann 2020 Rpt. ¶ 47 (citing Saudi Anti-Money Laundering authority, Mutual Evaluation Report (2018)). The record affirmatively establishes the likelihood — indeed, evidence — that WAMY provided support to al Qaeda. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

497. The 9/11 Commission cites a CIA analytic report, "Identifying al-Qa'ida's Donors and Fundraisers: A Status Report," Feb 27, 2002, in support of its findings as to al-Qaeda's funding sources. Id. at p. 170, fn 117, 119.

**RESPONSE:**

Undisputed that the Commission cited this CIA report but disputed to the extent WAMY implies the cited source excludes charity diversion by Saudi NGOs. The February 27, 2002 CIA report found that al-Qaeda's funds flow "through middlemen — including nongovernmental organizations (NGOs), mosques, fundraisers, and businessmen," and is relied on in the record for the proposition that "wealthy individuals in the Arabian Peninsula and grassroots supporters from around the world are critical sources for al-Qa'ida" and that al Qaeda relied on diverted charity funds. Ex. 59, Levitt Rpt. § IV-3, n. 64; Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 64 (citing CIA_000193-199 at 194; 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 4; CIA_000659-667 at 661). A companion CIA report found al-Qaeda "was able to exploit several Saudi-based NGOs and divert funds to al-Qa'ida." Ex. 59, Levitt Rpt. § IV-3, n. 67; Ex. 133, Kohlmann 2020 Rpt. ¶ 50 (citing CIA_000143-158 at 147; CIA 285-300). The report addresses al Qaeda's donors and fundraisers generally and does not exonerate any particular charity, and the record ties WAMY to that funding network. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460,

486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

498. The unredacted sections of the Feb. 27, 2002, do not include any finding that WAMY specifically or charities supported by the Kingdom of Saudi Arabia generally were a funding source for al-Qaeda. See Ex. 239 (CIA00370-376 Central Intelligence Agency, Directorate of Intelligence, "Identifying al-Qa'ida's Donors and Fundraisers: A Status Report," Feb 27, 2002).

**RESPONSE:**

Disputed. That the unredacted portions of the February 27, 2002 CIA report do not name WAMY proves nothing, given the report's redactions and its affirmative findings; the redactions cannot establish the absence of WAMY as a funding source. The report states that al-Qaeda channels money "through middlemen — including nongovernmental organizations (NGOs)" to hide donors' roles. CIA_000193-199. The contemporaneous CIA report "Saudi-Based Financial Support for Terrorist Organizations" (Nov. 14, 2002) expressly found "Saudi Arabia is a key base of financial support for al-Qa'ida" and that al-Qaeda "was able to exploit several Saudi-based NGOs and divert funds." Ex. 59, Levitt Rpt. § IV-3; Ex. 133, Kohlmann 2020 Rpt. ¶ 50 (citing CIA_000143-158 at 147; CIA 285-300). Other CIA reporting specifically implicates WAMY: it describes WAMY as pursuing "an extremist agenda" and couriering Saudi donations to Islamic groups in Afghanistan and Bosnia (Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 160 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744), as "an excellent conduit of recruits for many extremist groups" (Decl. of Mohammedi (Dkt. No. 12001), Ex. 245, CIA_000143-158 at 151), and ties WAMY to bin Laden funding. Ex. 148, Pls.'

Averment (Dkt. No. 9541) ¶ 2106 (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826). The Monograph confirms that proving an NGO "actually funds terrorist groups" is inherently difficult. 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 18. WAMY in included among the exploited Saudi NGOs. See Plainitffs' response to WAMY's 56.1 Statement at heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

499. The 9/11 Commission also cites a January 1999 CIA analytic report, "How Bin Ladin Commands a Global Terrorist Network," Ex. 46 at p. 170 fn. 118 [at p. 498].

**RESPONSE:**

Undisputed that the Commission cited this January 1999 CIA report but disputed to the extent WAMY implies the report excludes charity/NGO involvement. That CIA report found that, to finance al Qaeda's costs, Bin Ladin "taps into the resources of some international Islamic nongovernmental organizations (NGOs) for financial and logistical support," and that "[e]mployees … of a few NGO branch offices have diverted resources to benefit Bin Ladin and his associates." Ex. 59, Levitt Rpt. § IV-3, n. 61; Ex. 133, Kohlmann 2020 Rpt. ¶ 49 (citing CIA 182-196). The record further contains extensive evidence tying WAMY to Osama bin Laden, including that "Osama bin Laden has funded offices of Lajnat al Bir al Islamiya, which is closely affiliated with WAMY," and describing "WAMY Chairman Abdallah al Muhaidib as a supporter of Usama Bin Ladin." Pls.' Averment ¶ 2106, (Dkt. No. 9541) (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826). See also Plaintiffs' response to WAMY's 56.1 Statement at heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

500. Though the report notes Bin Ladin's exploitation of some international Islamic nongovernmental organizations for financial and logistical report, the unredacted sections of the CIA analytic report do not include WAMY, any WAMY official, or any WAMY employee, as part of Bin Ladin's terrorist network. See Ex. 240 (CIA00182-00196 Central Intelligence Agency, Directorate of Intelligence, "How Bin Ladin Commands a Global Terrorist Network," 27 January 1999).

**RESPONSE:**

Disputed. The absence of WAMY's name in the unredacted portions of the January 1999 CIA report is not exculpatory given the report's affirmative finding that Bin Ladin exploited "some international Islamic nongovernmental organizations for financial and logistical" support. Ex. 59, Levitt Rpt. § IV-3, n. 61; Ex. 133, Kohlmann 2020 Rpt. ¶ 49 (citing CIA 182-196). Other evidence in the record affirmatively ties WAMY to bin Laden: "Osama bin Laden has funded offices of Lajnat al Bir al Islamiya, which is closely affiliated with WAMY," and it identifies "WAMY Chairman Abdallah al Muhaidib as a supporter of Usama Bin Ladin." Pls.' Averment ¶ 2106, (Dkt. No. 9541) (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826). CIA reporting also describes WAMY as pursuing "an extremist agenda" and couriering Saudi donations to Islamic groups in Afghanistan and Bosnia. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 160 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). Still other U.S. government records tie WAMY and its personnel to al-Qaeda: the Department of Defense assessed a GTMO detainee as "an Al-Qaida facilitator due to his associations and employment with WAMY," and found WAMY employees "likely using [their] employment in Non-Government Organizations (NGOs) to

facilitate funds and personnel for Al-Qaida." Kohlmann Rpt. ¶¶ 171–172 (citing FED-PEC 197472-197479; JTF-GTMO Detainee Assessment, Mammar Ameur (ISN 939) (Apr. 13, 2005 & Jul. 25, 2005)). A December 30, 2009 State Department cable likewise named WAMY among charities continuing to "fund extremism overseas." Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). The Monograph explains that intelligence on charity financing was "incomplete" and confirms that proving an NGO "actually funds terrorist groups" is inherently difficult. 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 17-18.

**STATEMENT:**

501. The 9/11 Commissions “Terrorist Financing Staff Monograph” recognized the challenges in determining al Qaeda’s actual funding sources and urged caution in accepting a funding theory as fact noting “[i]n many cases, one or two threads of information make such theories tantalizing; but after careful review of all of the evidence available to us, including some of the most sensitive information held by the U.S. government, we have judged that such theories cannot be substantiated.” Ex. 241, Staff Monograph at p. 19.

**RESPONSE:**

Undisputed that the Monograph counseled caution about unsubstantiated funding theories but disputed to the extent WAMY implies the Monograph doubted charity diversion; the "caution" language concerns specific conspiracy theories the Commission could not substantiate and did not retract the Monograph’s affirmative findings. The same Monograph found al-Qaeda was funded roughly "$30 million per year, by diversions of money from Islamic charities" (Winer Rebuttal Rpt. § 4.7, n.69 (citing 9/11 Comm'n Terrorist Financing Monograph, Decl. of

Mohammedi (Dkt. No. 12001), Ex. 241 at 4, 13, 19)), that al Qaeda "relied on diversions from Islamic charities" (9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16), and that "entire charities from the top down may have known of and even participated in the funneling of money to al Qaeda." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 24. The WAMY-specific evidence — CIA and other government intelligence reporting, WAMY's own governance documents and financial records — contain evidence of WAMY's support of terrorism. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶¶ 132, 160; Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

502. The Monograph notes the perils on relying on information provided by detainees of captured al-Qaeda members:

> Detainees may provide misinformation and may misrepresent or mischaracterize their roles or the roles of others. As a result, corroborating their information, through other custodial interviews, documentary evidence, or other intelligence collection, is critical in assessing that we know about al Qaeda financing.
>
> Id.

**RESPONSE:**

Undisputed that the Monograph cautions about reliance on detainee statements but disputed as immaterial to the documented evidence against WAMY. Plaintiffs' evidence is grounded in WAMY's own audits and financial records, the CRA audit, U.S. Treasury designations, U.S. and Saudi government reporting, and contemporaneous records. E.g., Winer Rebuttal Rpt. §§ 2.17,

2.17.2.3; Ex. 180, Winer Rebuttal Rpt. § 2.38.7 (citing WAMYSA018576; WAMYSA018603-755; Ex. 242, WAMYSA0195478--79; WAMYSA018593; WAMY-Pakistan audits from 1994-2002, Decl. of Mohammedi (Dkt. No. 11997), Exs. 78-82).; Winer Report §§ 10.3–10.3.1 (CRA audit, EX. 79, FED-PEC 218170-218203); Ex. 112, Kohlmann Rpt. ¶¶ 190–193 (citing EX. 79, FED-PEC 218170-218203); Ex. 133, Kohlmann 2020 Rpt. ¶¶ 47, 55, 76–80 (citing Saudi Anti-Money Laundering authority, Mutual Evaluation Report (2018); U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). The record likewise rests on CIA intelligence reports (e.g., Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848; CIA_000143-158 at 151; CIA_000178-189). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

503. While the 9/11 Commission Staff Monograph notes charities were a source of al-Qaeda's funds, it clarified that:

Al Qaeda's charities' strategy before 9/11 had two prongs. In some instances, al Qaeda penetrated specific foreign branch offices of large, internationally recognized charities. In many cases, lax oversight and the charities' own ineffective financial controls, particularly over transactions in remote regions of the world, made it easy for al Qaeda operatives to divert money from charitable uses. These large international Gulf charities donated money to end recipients, usually smaller in-country charities, whose employees may have siphoned off money for al Qaeda. In the second class of cases, entire charities from the top down may have known of and even participated in

the funneling of money to al Qaeda. In those cases, al Qaeda operatives had control over the entire organization including access to bank accounts. Id at p. 21; See also Ex. 239, CIA_00370-00376 (Central Intelligence Agency, Directorate of Intelligence, "Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report," February 27, 2002).

**RESPONSE:**

Undisputed that the Monograph so describes al-Qaeda's two-pronged charity strategy but disputed to the extent WAMY implies neither prong applies to it — WAMY fits both. Prong one (penetration of branch offices with "lax oversight" and "ineffective financial controls"): WAMY's Peshawar/LBI office had audits that could not verify Afghanistan expenditures and omitted about half of one year's donations. Winer Rebuttal Rpt. §§ 4.8.1, 2.17.1, 2.17.2.3, nn.6, 8 (citing 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 21; Ex. 242, WAMYSA0195478--79, WAMYSA018593). These charities — "WAMY, IIRO and MWL" — "put al Qaeda sympathizers, such as Batterjee, in the position where they could divert funds for the support of armed conflict and terrorism." Winer Rebuttal Rpt. § 4.18.
Prong two (whole charities knowingly funneling money, with al Qaeda operatives having "control over the entire organization, including access to bank accounts"). LBI — funded by WAMY and merged into WAMY on May 28, 1996 — "provided financial and operational support to mujahideen elements in Afghanistan … including fighters associated with UBL" and "later joined al Qaida." Winer Report § 12.12.1 & 12.12.5 (citing U.S. Treasury SDGT designation of Adel Batterjee, JS2164 (Dec. 21, 2004); Admin. Resolution No. 37, WAMYSA0276804); Kohlmann Rpt. ¶¶ 187–190 (citing Mem. of Law in Support of WAMY's

Motion to Dismiss (Dkt. No. 1462), Ex. B, Declaration of Saleh Al-Wohaibi (Oct. 30, 2005); Hedges, "Muslims from afar joining 'Holy War' in Bosnia," NYT (Dec. 5, 1992); Basaddiq, "Islamic Charity Committee moves to new premises," Arab News (May 21, 1994); IRS 990 forms for WAMY for Fiscal Years 1993-1999; Ex. 226, WAMYSA 57760; Ex. 222, WAMYSA 61323; Ex. 185, WAMYSA 57745; KADI 222029; FED-PEC 21870-281203). The record places WAMY within the group of Saudi charities exploited by al Qaeda: WAMY was Saudi-government-controlled, is identified as one of al Qaeda’s "most important charity fronts and partners," is described by the CIA as "an excellent conduit of recruits for many extremist groups," and its Secretary General solicited funds for jihad. Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 30-31, 33, 130 (citing Motion to Dismiss of Abdullah Muhsen Al Turki (Dkt. No. 85), Ex. 2, Decl. of Abdulaziz H. al Fahad at ¶ 11; Kingdom of Saudi Arabia, Ministry of Foreign Affairs, "Serving Islam and Muslims (www.mofa.gov.sa); Prince Sultan Bin Abdulaziz Al-Saud's Motion to Dismiss (Dkt. No. 110), Case. No. 02-cv-1616-JR (DDC), Ex. 4, Decl. of Mutaz Saleh Abu Unuq (Apr. 1, 2003) at p. 2); CIA_000143-158 at 151. A genuine dispute of material fact exists.

**STATEMENT:**

504. While a 1999 CIA Intelligence Report noted that WAMY “personnel often pursue an extremist agenda, support Islamic groups in Afghanistan and Bosnia, and “puts foreigners requesting aid in direct contact with Saudi donors who are looking for worthwhile Islamic causes;” there was no finding, conclusion, or evidence that WAMY provided financial support, directly or indirectly, to al-Qaeda. Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744 CIA Intelligence Report, Office of Transnational Issues, Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions.

**RESPONSE:**

Disputed. The claim that there is 'no finding, conclusion, or evidence' that WAMY supported al-Qaeda is contradicted by the record, and the very CIA report WAMY cites describes WAMY officials as having "couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶¶ 160 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). The U.S. Department of Defense assessed WAMY as "a Tier 1 Counterterrorism NGO target," defined as an organization that has "demonstrated sustained and active support for terrorist organizations willing to attack US persons or interests," and as "affiliated" and "associated with Usama Bin Ladin and al Qaeda operations." Kohlmann Rpt. ¶ 159 (citing JTF-GTMO Detainee Assessments of Rashed Awad Khalaf Balkhair (ISN 186), Adel Hassan Hamed (ISN 940), and Mammar Ameur (ISN 939)); Winer Report § 12.10.3 (citing Unclassified Summary of Evidence for CSRT, Adel Hassan Hamed (Nov. 19, 2004), PEC-KSA002746). The 1999 CIA report's own observation that WAMY personnel "pursue an extremist agenda [and] support Islamic groups in Afghanistan and Bosnia" is corroborated by extensive evidence that WAMY was "deeply involved" in supporting armed jihad in Bosnia. Kohlmann Rpt. ¶¶ 162-163 (citing Hedges, "Muslims From Afar Joining Holy War in Bosnia," NYT (Dec. 5, 1992)). Plaintiffs' expert Dr. Emile Ex. 238, Nakhleh, a former CIA Senior Intelligence Service officer, opines that "Saudi government officials knew that Saudi-financed Islamic charities, such as al-Haramayn, IIRO, WAMY, and the Muslim World League, were not only engaging in propagation but also in directly supporting al-Qa'ida's ongoing jihad against the 'infidels,' including the United States." Ex. 238, Nakhleh Rpt. ¶ 106. Former FBI counterterrorism agent Bassem Youssef notes that WAMY's U.S. vice president, Ibrahim Abdullah, was "known to the FBI as being 'associated with subjects of FBI al-Qa'ida and Islamic Resistance Movement (HAMAS) investigations through his WAMY activities and phone

records."' Youssef Report § IV (citing EO 3429). Other CIA reporting affirmatively ties WAMY to Osama bin Laden (Ex. 148, Pls.' Averment (Dkt. No. 9541) ¶ 2106 (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826), and the 9/11 Commission Monograph explains that it is "far more difficult to show that a suspected NGO ... actually funds terrorist groups," so the absence of an express "finding" is not proof of absenc. (9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 18. *See also* Plaintiffs' response to WAMY's 56.1 Statement at heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

505. Another CIA Intelligence Report from 1999 did not include WAMY amongst those Saudi NGOs "with the strongest links to Usama (Bin Ladin)" and indeed noted that ties between WAMY and "Usama Bin Ladin" were questionable. Ex. 243, CIA_00807-848 at 809 (Usama Bin Ladin: Some Saudi Financial Ties Probably Intact, January 11, 1999).

**RESPONSE:**

Disputed. Later U.S. Government assessments — and the cited January 11, 1999 report — affirmatively tie WAMY to Osama bin Laden. The record states that "Osama bin Laden has funded offices of Lajnat al Bir al Islamiya, which is closely affiliated with WAMY," describes "WAMY Chairman Abdallah al Muhaidib as a supporter of Usama Bin Ladin," and notes the "WAMY has long been alleged to be a financier of Islamic extremists." Ex. 148, Pls.' Averment (Dkt. No. 9541) ¶ 2106 (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826. A March 24, 2008 U.S. State Department diplomatic cable identifies WAMY as having ties to terrorist organizations. Kohlmann Rpt. ¶ 69 (citing State Dept. cable (Mar. 24, 2008), PEC-KSA 1446-1450). A December 30, 2009 cable from Secretary of

State Clinton found that reforms had failed to stop "organizations such as the International Islamic Relief Organization (IIRO), Muslim World League (MWL), and the World Assembly of Muslim Youth (WAMY)" from "continu[ing] to send money overseas and, at times, fund[ing] extremism overseas." Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). The Dept. of Defense further classified WAMY among al-Qaeda's "associated forces." Kohlmann Rpt. ¶ 159 (citing JTF-GTMO Matrix of Threat Indicators). The U.S. branch of WAMY in Falls Church, VA is "run by Saudi Embassy officer, Abdullah Bin Laden, a nephew of Osama Bin Laden," and WAMY's U.S. vice president was "associated with subjects of FBI al-Qa'ida and ... (HAMAS) investigations." Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV (citing EO 3429). See also Plaintiffs' response to WAMY's 56.1 Statement at heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

506. The January 11, 1999, report notes that "the Bin Ladin family probably contributes to WAMY;" that Abdallah Bin Ladin, wrongly named as "Usama's half-brother;" "heads the WAMY office in Falls Church, Virginia; and that "WAMY Chairman Abdallah Al-Muhaidib as a supporter of Usama Bin Ladin." Id. at CIA_000826-827.

**RESPONSE:**

Disputed insofar as WAMY implies the report's findings are baseless; the report's statements are probative of WAMY's ties to bin Laden and al Qaeda, not exculpatory, and are corroborated by extensive evidence in the record. WAMY's U.S. branch "was incorporated in 1992 by Usama Bin Laden's own nephew Abdullah in Falls Church, Virginia," who was "seconded to WAMY after being appointed to his position by the Ministry of Islamic Affairs," made "key personnel

decisions," was identified in WAMY's 1998 General Secretariat minutes as a "Board Member and the Assembly's Representative in North America," and elsewhere as "President" of WAMY-USA with signatory authority; per his successor, "all funding came from WAMY Saudi Arabia." Kohlmann Rpt. ¶ 173 (citing WAMY IRS Form 1023 (Nov. 9, 1992); Affidavit of Abdullah Awad Bin Laden (Nov. 19, 2005); WAMYSA 51692-51698; WAMY INTL 13864; WAMY INTL 1366-1370; Declaration of Ibrahim Sulayman Abdullah (Mar. 29, 2019)). "The U.S. branch of WAMY was in Falls Church, VA and run by a Saudi Embassy officer, Abdullah Bin Laden, a nephew of Osama Bin Laden;" WAMY's U.S. vice president Ibrahim Abdullah was known to the FBI as being "associated with subjects of FBI al-Qa'ida and ... (HAMAS) investigations through his WAMY activities and phone records." Youssef Report § IV (citing EO 3429; WAMY International, Inc. Virginia corporate filing signed by Ibrahim Abdullah as Vice President). WAMY's Peshawar and Virginia offices were raided in terrorism investigations, and the record states that WAMY's U.S. branch, "headed by Abdullah bin Laden, has been targeted by U.S. authorities for its ties to al Qaeda, Islamic extremism, and recruitment." Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 190; Ex. 148, Pls.' Averment (Dkt. No. 9541) ¶ 2107 (citing "Pakistan Questions Sudan Man About Tape," AP (Dec. 9, 2002); Markon, "U.S. Raids N. VA Office of Saudi-Based Charity," WP (Jun. 2, 2004); DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 826). *See also* Plaintiffs' response to WAMY's 56.1 Statement at heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

507. The Bin Ladin family is a large family with at least 60 members. Id. at CIA000836.

**RESPONSE:**

Undisputed as a general matter for purposes of this motion.

**STATEMENT:**

508. WAMY has never had a chairman position and Abdallah Al-Muhaidib has never held any leadership position within WAMY. See, *supra*, Ex. 6 at WAMYSA E001056 (outlining the governing bodies but no chairman is mentioned); Ex. 7 at WAMY SA E001108 (outlining the governing bodies but no chairman is mentioned).

**RESPONSE:**

Disputed. The assertion that WAMY 'never had a chairman position' is contradicted by evidence in the record. WAMY's own 30(b)(6) designee confirmed that WAMY's welfare arm, Lajnat al-Birr al-Islamiyyah (LBI), had a "board chairman" -- WAMY Secretary General Dr. Maneh Al-Johani, "the one who constituted it." Dep. of Noorwali (Jul. 24, 2019) at 228:1-10. A contemporaneous December 5, 1992 *New York Times* article quoted Adel A. Batterjee identifying himself as "the chairman of the World Assembly of Muslim Youth." Winer Rebuttal Rpt. § 2.38.1-2.38.2 (citing 'Muslims From Afar Joining Holy War in Bosnia,' NYT (Dec. 5, 1992)). CIA intelligence reporting likewise identifies "WAMY Chairman Abdallah al Muhaidib" as "a supporter of Usama Bin Ladin," (Ex. 148, Pls.' Averment (Dkt. No. 9541) ¶ 2106 (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 826), reflecting that the government understood WAMY to have a chairman. WAMY also used "vice chairman" as common nomenclature: Abdullah al-Naseef "has also served as the Vice Chairman of WAMY." Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 133 (citing IIASA Symposium (Nov. 1999)). A genuine dispute of material fact exists.

**STATEMENT:**

509. The unredacted portions of the January 11, 1999, report do not include any facts or information that WAMY has ever provided any financial or other support to al-Qaeda, directly or indirectly. Ex. 243 at CIA_000826-827.

**RESPONSE:**

Disputed to the extent WAMY implies that the January 11, 1999 report proves that WAMY has not "provided any financial or other support to al-Qaeda, directly or indirectly;" the broader record shows otherwise. In its unredacted portions, the same report states that "Osama bin Laden [] funded offices of Lajnat al Bir al Islamiya, which is closely affiliated with WAMY," and identifies "WAMY Chairman Abdallah al Muhaidib as a supporter of Usama Bin Ladin." Ex. 148, Pls.' Averment (Dkt. No. 9541) ¶ 2106 (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826). The cited report found that bin Ladin "taps into the resources of some international Islamic nongovernmental organizations (NGOs)," whose employees "ranging from accountants to directors ... have diverted resources to benefit Bin Ladin." Ex. 133, Kohlmann 2020 Rpt. ¶ 49 (citing CIA_000182-196). The U.S. branch of WAMY in Falls Church, VA is "run by Saudi Embassy officer, Abdullah Bin Laden, a nephew of Osama Bin Laden," and WAMY's U.S. vice president was "associated with subjects of FBI al-Qa'ida and ... (HAMAS) investigations." Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV (citing EO 3429). The record of evidence establishes WAMY's support for al Qaeda. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Ex. 237, Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189, Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826); 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16. Plaintiffs repeat and incorporate their responses to

WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

510. This January 11, 1999, report notes that Lajnat al-Bir al Islamiya (LBI) was founded in 1988; is a "close affiliate" of WAMY; maintains offices in Afghanistan, Pakistan, Russia, Azerbaijan, Tajikistan, Uzbekistan, Kazakhstan, and Turkmenistan; and that "Usama has funded LBI's offices in Afghanistan and probably Pakistan." Id. at CIA_000821.

**RESPONSE:**

Undisputed that LBI was a close WAMY affiliate. WAMY's 30(b)(6) designee testified that LBI operated "directly under the umbrella of WAMY," that WAMY Secretary General Dr. Maneh Al-Johani founded and chaired LBI, and that in 1996 LBI "was closed down" and "all the work of Lajnat al-Birr was transferred to WAMY," with the surviving name being "World Assembly of Muslim Youth." Dep. of Noorwali (Jul. 24, 2019) at pp. 227:21-229:21, 239:7-240:10, 245:2-247:6. Plaintiffs contend that "[o]ne of the three major charities that bin Ladin and al Qaeda relied on, LBI, was funded by WAMY, eventually actually merged into WAMY." Winer Report § 12.12.1 (citing Administrative Resolution No. 37 (May 28, 1996), WAMYSA0276804). The report's statement that Usama funded LBI's Afghanistan and Pakistan offices ties WAMY, through LBI, to bin Laden funding. (Ex. 148, Pls.' Averment (Dkt. No. 9541) ¶ 2106 (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821)), and is corroborated by the U.S. Treasury's finding that LBI "provided financial and operational support to mujahedeen elements in Afghanistan ... including fighters associated with UBL." Winer Report § 12.12.5 (citing U.S. Treasury Designation js2164 (Dec. 21, 2004)). The close WAMY-LBI connection is further documented in the audits of WAMY-Pakistan from 1994-2002 which

refer to the organization throughout as the "WAMY/LBI Office,"' and that the WAMY-LBI records show "WAMY funding not only specific projects ... [but] funding general overhead for LBI headquarters in Pakistan," including office building, living quarters, vehicles, and utilities. Winer Rebuttal Rpt. §§ 2.38.7, 2.30.6.6-2.30.6.8 (citing WAMY-Pakistan audits from 1994-2002, Decl. of Mohammedi (Dkt. No. 11997), Exs. 78-82; WAMYSA031289-031292). LBI was the precursor to Benevolence International Foundation (BIF), which was an "affiliate" branch of WAMY tied to al Qaeda and the 1993 World Trade Center bombing (Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 192 (citing Hedges, "Muslims from afar joining 'Holy War' in Bosnia," NYT (Dec. 5, 1992); Basaddiq, "Islamic Charity Committee moves to new premises," Arab News (May 21, 1994); IRS 990 forms for WAMY for Fiscal Years 1993-1999; *U.S. v. Usama ~~Bin~~bin Laden*, 98 CR 1023, Gov't Ex. 2800-A)), and whose Sarajevo office held "transcripts of communications between BIF management and senior commanders of Al-Qaida." Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 198 (citing Whitmore, "Bosnian Charities Tied to Terror," Boston Globe (Jul. 2, 2002); Aff. of FBI Special Agent Robert Walker, *U.S. v. BIF*, 02 CR 0414 (Apr. 29, 2002) at p. 10). The U.S. Treasury found that "BIF and LBI remained one organization with interchangeable assets under Batterjee's control." Winer Rebuttal Rpt. § 3.30.4 (citing U.S. Treasury Designation js2164 (Dec. 21, 2004)). A genuine dispute of material fact exists.

**STATEMENT:**

511. The unredacted sections of the Report do not include any facts that LBI provided any financial support to al-Qaeda nor further information about the claim that "Usama" funded LBI's Afghanistan or Pakistan offices including the factual basis for the claim, the source of the information, or when and how the information was acquired. Id. at CIA_000820-821

**RESPONSE:**

Disputed. Absence of detail in the unredacted portions is not proof that WAMY did not support al-Qaeda or terrorism. The report's own statement that "Usama has funded LBI's offices in Afghanistan and probably Pakistan" ties LBI (under WAMY's umbrella) to bin Laden funding. Pls.' Averment (Dkt. No. 9541) ¶ 2106 (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821). The U.S. Treasury found that Adel Batterjee "founded the precursor to BIF, LBI, in Saudi Arabia and Pakistan[;] LBI provided financial and operational support to mujahedeen elements in Afghanistan and around the world, including fighters associated with UBL ...[;] LBI was affiliated with Makhtab Al-Khidamat (MK), which was co-founded and financed by UBL and is the precursor organization of al Qaida[;] LBI later joined al Qaida upon the dissolution of MK." Winer Report § 12.12.5; Winer Rebuttal Rpt. § 3.30 (citing U.S. Treasury Designation js2164 (Dec. 21, 2004)). Batterjee, LBI's head under WAMY, was designated a bin Laden/al Qaeda financier. U.S. Treasury Designation of Batterjee (Dec. 21, 2004). When 1993 World Trade Center conspirator Ahmed Ajaj was arrested with Arabic terrorist training manuals, the envelope bore BIF letterhead "with a notation explaining that BIF is a branch of the 'World Assembly of Muslim Youth.'" Kohlmann Rpt. ¶ 195 (citing *U.S. v. Usama bin Laden*, 98 CR 1023, Gov't Ex. 2800-A). WAMY's designee acknowledged that Batterjee was "one of the designated people as a global terrorist." Dep. of Noorwali )Jul. 24, 2019) at 226:4-19. The U.S. Government's evidentiary proffer in *United States v. Arnaout* stated that "[i]n or about 1991 ... the LBI/BIF organization ... opened its first office in Sudan specifically to support al Qaeda and the mujaheddin in the Sudan," and that "BIF's collaboration with al Qaeda in the Sudan mirrored how LBI worked in Afghanistan." Winer Rebuttal Rpt. § 2.38.10 (citing Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 23). LBI operated under WAMY's umbrella and became BIF, which communicated with senior al

Qaeda commanders. Dep. of Noorwali (Jul. 24, 2019) at pp. 227:21-229:21, 239:7-240:10, 245:2-247:6; Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 198, (citing Whitmore, "Bosnian Charities Tied to Terror," Boston Globe (Jul. 2, 2002); Aff. of FBI Special Agent Robert Walker, *U.S. v. BIF*, 02 CR 0414 (Apr. 29, 2002) at p. 10). The 9/11 Commission Monograph confirms that showing a charity 'actually funds terrorist groups' is inherently difficult given intelligence limitations. 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 18. A genuine dispute of material fact exists.

**STATEMENT:**

512. While a July 1, 2002, CIA Report claims that WAMY is one of various NGOs that “appears to” sponsor a paramilitary training camp, no factual support is given for the claim, the source of the information behind the claim is not given, nor is any information provided has to how or when the purported information was received. Ex. 244, CIA_000178-189 at 185 (“Al-Qa’ida Still Well Positioned to Recruit Terrorists,” July 1, 2002).

**RESPONSE:**

Disputed. WAMY's 'no factual support/source' objection goes to the weight of the CIA's assessment, not its existence, and the record supplies ample factual support for WAMY's involvement with paramilitary/jihadi training. WAMY published a training manual containing an officially sanctioned camp song urging youth to "unsheath the swords" and asking, "[o]n this Day of Jihad, are you miserly with your blood?!" Kohlmann Rpt. ¶ 160 (citing Islamic Camps Objectives, Program Outlines, Preparatory Steps, WAMY, 1987 / 1990 tr.). At WAMY's July 1996 Okeechobee, Florida youth camp, a WAMY operations manager delivered a lecture promoting jihad, and WAMY's Secretary General conceded it was "not possible to control" camp content. Ex. 112, Kohlmann 2020 Rpt. ¶ 161 (citing videotape of the lecture, July 26, 1996; Ex.

212, FED-PEC 210330-210331). WAMY "was involved in both religious and jihadi training" through its Pakistani affiliate. Winer Report § 12.13.2 (citing Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003)). WAMY hosted Anwar al-Awlaki -- the al-Qaeda figure and spiritual advisor to three 9/11 hijackers -- at its camps: "Awlaki himself was hired to speak at WAMY Islamic Studies camps in College Park, Texas in June 2002 and Irving, Texas in July 2002," and WAMY translated his lecture series into Chinese. Ex. 112, Kohlmann 2020 Rpt. ¶ 186 (citing Ex. 132, WAMY Int 15165-68, Ex. 131, WAMY Int 0249, Ex. 195, WAMY Int 170, and Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001), WAMYSA 30079-81, Ex. 77,Dep. of Ibrahim Abdullah (10/21/2019) at 71:21-73:4, 75:19-78:24, 82:4-17, 87:18-88:19. The record independently establishes that "WAMY has sponsored and funded military training camps for Muslim youth" (Ex. 148, Pls.' Averment (Dkt. No. 9541) ¶ 2103 (citing CIA_000178-189 at 185)); a WAMY training booklet endorsing violent jihad was published by the Saudi government's Armed Forces Printing Press (Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 140 (citing *Islamic Views*, Saudi Armed Forces Printing Press)); the Pentagon, describing a Guantanamo detainee employed by WAMY, stated that "WAMY supports terrorist ideals and causes" (Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 199 (citing Set_52_3643-3869 at p. 37)); and the 9/11 Commission Monograph explains that sourcing on charity-terror links is inherently limited. 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 18. A genuine dispute of material fact exists.

**STATEMENT:**

513. Similarly, while the report states that “local offices of NGOs such as the World Assembly of Muslim Youth, al-Haramayn, Society for the Revival and Islamic Heritage, and al-Waqf

al-Islamiya were actively involved in spotting and assessing suitable terrorist recruits from among young me who seek assistance from humanitarian organizations," no factual support is given for the claim, the source of the information behind the claim is not given, nor is any information provided has to how or when the purported information was received. "Id. at CIA_000185.

**RESPONSE:**

Disputed. WAMY's "no attribution" objection goes to weight, not to the existence of the CIA assessment. WAMY's global reach "established the organization as a prominent recruiting hub for Islamic extremists," and "[i]n the Balkans, local offices of NGOs such as the World Assembly of Muslim Youth... were actively involved in spotting and assessing suitable terrorist recruits." Ex. 148, Pls.' Averment (Dkt. No. 9541) ¶ 2102 (citing CIA_000143-158 at 151; CIA000178-189 at 185-186). The report's findings are corroborated by other U.S. Government reporting and by the DOD's assessments of WAMY personnel. The April 1999 CIA report "Islamic Terrorists: Using Nongovernmental Organizations Extensively" found that "[i]n a few instances, entire NGO offices, including senior management positions, are staffed by extremists," and that "Bin Ladin apparently has created his own NGOs and planted members of his organization, al-Qaida, in others." Ex. 133, Kohlmann 2020 Rpt. ¶¶ 51-52 (citing CIA_000385-411). The DOD assessed that WAMY-employed Guantanamo detainees were "likely using [their] employment in Non-Government Organizations (NGOs) to facilitate funds and personnel for Al-Qaida and its global terrorist network." Kohlmann Rpt. ¶¶ 171-172 (citing DOD JTF-GTMO Detainee Assessment of Mammar Ameur (ISN 939); FED-PEC 197472-197479). WAMY-USA's own senior officials engaged directly with al-Awlaki: a letter to al-Awlaki came from "Ibrahim Bin Suleiman Abdullah, the Deputy Director of the WAMY USA office," and WAMY "translated Awlaki's

lecture series 'The Hereafter' into Chinese." Ex. 112, Kohlmann 2020 Rpt. ¶ 186 (citing Ex. 132, WAMY Int 15165-68, Ex. 131, WAMY Int 0249, Ex. 195, WAMY Int 170, and Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001), WAMYSA 30079-81, Ex. 77,Dep. of Ibrahim Abdullah (10/21/2019) at 71:21-73:4, 75:19-78:24, 82:4-17, 87:18-88:19. The U.N. 1267 Monitoring Group found that al-Qaeda relied on charities as "a very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support." Winer Rebuttal Rpt. § 4.4.1 (citing U.N. Letter S/2003/1070). A genuine dispute of material fact exists.

**STATEMENT:**

514. SAMA, Saudi Arabia's central bank and chief financial agency, has overseen efforts to freeze and seize terrorist-linked assets. See also Ex. 245, CIA_000143-158, at 145 (Central Intelligence Agency, Directorate of Intelligence, "Saudi-Based Financial Support for Terrorist Organizations," November 14, 2002).

**RESPONSE:**

Disputed to the extent WAMY implies that SAMA's oversight was comprehensive or that the non-freezing of an entity's assets establishes its innocence; SAMA is an arm of the Saudi government, whose pre-9/11 record on terrorist financing was one of resistance and inaction. The 9/11 Commission Terrorist Financing Monograph found the Saudi government "resisted cooperating with the United States on the al Qaeda financing problem" and "delegated the regulation of charities to the government's religious establishment and did little to address the problem of al Qaeda fund-raising in the Kingdom." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 15, 42-43. The Council on Foreign Relations found that "[f]or years, individuals and charities based in Saudi Arabia have

been the most important source of funds for al Qaeda[,] [a]nd for years, Saudi officials have turned a blind eye to this problem." Ex. 59, Levitt Report § IV-1 (citing "Terrorist Financing: Report of an Independent Task Force," Council on Foreign Relations (2002) at pp. 13-14). Plaintiffs' expert opines that 'No one should conclude that a person or entity who has not been designated ... therefore has been in any sense "cleared,"' and that the United States declined to designate charities such as WAMY, MWL, and IIRO for 'overriding political and security' reasons -- including the Saudi Royal Family's sponsorship of these organizations -- rather than for lack of evidence; the Saudi Government itself sponsored and funded these charities. Winer Report §§ 16.1-16.2, 12.21. WAMY was an instrument of the Saudi state rather than an entity meaningfully policed by it: the 1992 Memorandum of Advice called for "Supporting propagation (da'wa ...) organizations and Islamic 'charities'-such as the Muslim World League, the International Islamic Relief Organization (IIRO), the World Assembly of Muslim Youth (WAMY), and al-Haramayn -financially and operationally," and "the Islamic 'charities' were funded by the Saudi government and wealthy Saudis," with the King having "knowingly and willfully turned a blind eye... that the entire da'wa operation overseas was managed by representatives of the Ministry of Islamic Affairs operating, mostly under diplomatic cover, out of Saudi embassies and consulates across the globe." Ex. 238, Nakhleh Rpt. ¶¶ 69, 95-96 (citing PEC-KSA000235-266). CIA reporting shows "foreign offices of several Saudi-based NGOs have been infiltrated by al-Qa'ida operatives," resulting in diversion of Saudi NGO funds to al Qaeda," and that "[t]errorists typically penetrate NGOs by finding individual sympathizers who divert resources in support of the group, but in a few instances, entire NGO offices, including senior management positions, are staffed by extremists;" "[t]hose of greatest concern include the International Islamic Relief Organization (IIRO), Al-Haramayn Islamic Foundation, [WAMY affiliated] Lajnat Al-Birr Al-Islamiya (LBI), and the Muwafaq Foundation." Ex. 148, Pls.'

Averment (Dkt. No. 9541) at ¶¶ 1997, 2083 (citing CIA_000210-236 at 210-211, 217; DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 808, 811, 817-818). A genuine dispute of material fact exists.

**STATEMENT:**

515. Al Qaida was able to exploit several Saudi-based NGOs by diverting funds from legitimate activities to finance al-Qa'ida. Id. at CIA 000150.

**RESPONSE:**

Undisputed that al-Qaeda exploited several Saudi-based NGOs by diverting funds; disputed to the extent WAMY suggests that it was not one of the exploited NGOs. The November 14, 2002 CIA report "Saudi-Based Financial Support for Terrorist Organizations" found that "Saudi Arabia is a key base of financial support for al-Qaida," that most money came from wealthy individuals, fundraisers, "and diversions from non-governmental organizations (NGOs)," and that al-Qaida "exploit[ed]" several Saudi-based NGOs ... by diverting funds from legitimate activities." Ex. 112, Kohlmann 2020 Rpt. ¶ 50; Ex. 59, Levitt Report § IV-3 (citing CIA_000285-300). The 9/11 Commission Monograph found al Qaeda "relied on diversions from Islamic charities."' ( Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16). WAMY is an NGO whose "global reach and influence among Muslim youth has made it an excellent conduit of recruits for many extremist groups," (Decl. of Mohammedi (Dkt. No. 12001), Ex. 245, CIA_000143-158. at 151); and the record identifies WAMY as "one of al Qaeda's most important charity fronts and partners" that "played an extensive role in supporting al Qaeda." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Ex. 237, Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826;

Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

516. There is no evidence that WAMY was one of these NGOs nor has its assets been frozen or seized by SAMA. See Ex. 246, Mohammad Al-Juhani 2022 Declaration.

**RESPONSE:**

Disputed. Substantial evidence identifies WAMY as one of the Saudi NGOs exploited to support al-Qaeda, and the fact that its assets were not frozen does not establish otherwise. A December 30, 2009 State Department cable stated that WAMY (with IIRO and MWL) "continue[s] to send money overseas and, at times, fund[s] extremism overseas." Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). The CRA found that WAMY "provided thousands of dollars to U.N.-sanctioned Benevolence International Foundation (BIF)," an entity "tied to al Qaeda." Ex. 59, Levitt Report § IV-7 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203). Winer explains that non-designation "is [not] in any sense 'cleared,'" as WAMY was left undesignated for political reasons, not lack of evidence. Ex. 74, Winer Report §§ 16.1, 12.21. WAMY's own Secretary General, Dr. Maneh Al-Johani, publicly called for and solicited funds for armed jihad. Ex. 112, Kohlmann Rpt. ¶¶ 164, 166-167; Ex. 74, Winer Report § 12.13.3 (citing "WAMY Calls for Jihad to Free Kashmir," Muslim World News (Jun. 3, 1991) at p. 15); Johani, "The Chechen Tragedy," Al Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-843; Ex. 45, Ex. 45, WAMYSA 1249305, Ex. 47, FED-

PEC 234243-244; WAMYSA 1249304, FED-PEC 234930-931). Youssef ties WAMY directly to the hijackers: on September 9, 2001, 9/11 hijackers Hazmi and Mihdhar "left bags at the Ayah Islamic Center in Laurel MD," a mosque "run by the MOIA-led World Assembly of Islamic Youth," with a note reading "a gift for the brothers." Youssef Report § IV (citing WAMY Int 163-164, 1535, 12439). The Saudi government itself specifically determined that the misuse of Saudi-based charities and their branches were used to support "terrorist activities and terrorist organizations such as Al-Qaeda." Ex. 112, Kohlmann 2020 Rpt. ¶46 (citing "Saudi Arabia Announces Counter-Terrorism Measures," Saudi Embassy (Dec. 3, 2002); "Saudi Arabia and Counterterrorism Fact Sheet: Combating Terrorist Financing," Saudi Embassy (May 2017); "Combating Terrorist Financing," Saudi Embassy (Jan. 2019)). A European Parliament report, quoted in congressional testimony by 9/11 Commission senior staffer Daniel Byman, listed WAMY among the charities that "were linked to terrorist groups like Al Qaeda." Winer Rebuttal Rpt. § 4.9.3. (citing "The U.S.-Saudi Arabia counterterrorism relationship," Testimony of Danile L. Byman before the House Cmte. on Foreign Affairs' Subcmte. on Terrorism, Nonproliferation, and Trade (May 24, 2016). CIA reporting ties WAMY to bin Laden funding through its "close affiliate" LBI, and describes WAMY as "an excellent conduit of recruits for many extremist groups." Ex. 148, Pls.' Averment (Dkt. No. 9541) ¶ 2106, (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 245, CIA_000143-158. at 151). SAMA's failure to freeze WAMY's assets reflects the Saudi government's documented inaction on al Qaeda charity financing. 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 42-43. The record identifies WAMY as one of al Qaeda's "most important charity fronts and partners." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex.

79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

517. Without factual support or attribution of the source of the claim, the November 14, 2002, Report notes that WAMY "is a major subsidiary of the Muslim World League" (which it is not) whose "global reach and influence among Muslim youth has made it an excellent conduit of recruits for many extremist groups." The Report also notes that "this activity is peripheral to WAMY's main purposes_ proselytization through publishing, building schools and mosques, running youth camps, and offering educational course on Islamic issues, [REDCATED] and is probably engaged in by a small number of officials acting without the knowledge or authorization of senior officials." Ex. 245 at CIA_000151.

**RESPONSE:**

Disputed. The claim that any support was "peripheral" and undertaken "by a small number of officials acting without the knowledge or authorization of senior officials" is contradicted by the record. The CRA found that "WAMY (Saudi Arabia) maintains substantial control over WAMY's finances, and uses this control to carry out its own objectives," providing "substantially all" operational funds and requiring annual reporting, with "no apparent separation" between WAMY-Saudi Arabia and its branches. Ex. 112, Kohlmann Rpt. ¶¶ 190, 192-193 and Ex. 133, Kohlmann Rebuttal. ¶¶ 75-76 (citing EX. 79, FED-PEC 218170-218203). WAMY's Secretary General personally solicited jihad and weapons funding, including "money to buy weapons and

gear." Kohlmann Rpt. ¶¶ 164, 166-167; Winer Report § 12.13.3 (citing "WAMY Calls for Jihad to Free Kashmir," Muslim World News (Jun. 3, 1991) at p. 15; Ahmed, "Kashmiri leader thanks WAMY for hel," (Dec. 8, 1995); Johani, "The Chechen Tragedy," Al Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-843; Ex. 45, WAMYSA 1249305, Ex. 47, FED-PEC 234243-244; WAMYSA 1249304, FED-PEC 234930-931). WAMY was a Saudi-government-controlled charity headed by the Minister of Islamic Affairs; and the Saudi Armed Forces Printing Press printed a WAMY booklet endorsing jihad. Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 30-31, 33, 130, 140, (citing Motion to Dismiss of Abdullah Muhsen Al Turki (Dkt. No. 85), Ex. 2, Decl. of Abdulaziz H. al Fahad at ¶ 11; Kingdom of Saudi Arabia, Ministry of Foreign Affairs, "Serving Islam and Muslims (www.mofa.gov.sa); Prince Sultan Bin Abdulaziz Al-Saud's Motion to Dismiss (Dkt. No. 110), Case. No. 02-cv-1616-JR (DDC), Ex. 4, Decl. of Mutaz Saleh Abu Unuq (Apr. 1, 2003) at p. 2); Decl. of Mohammedi (Dkt. No. 12001), Ex. 245, CIA_000143-158. at 151; *Islamic Views*, Saudi Armed Forces Printing Press). The report's characterization of WAMY as "an excellent conduit of recruits for many extremist groups" is corroborated by WAMY's identification as a "prominent recruiting hub for Islamic extremists," (Pls.' ) and its recruit-spotting role in the Balkans. Ex. 148, Pls.' Averment (Dkt. No. 9541) ¶ 2102; Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 99 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 245, CIA_000143-158. at 151; CIA_000178-189 at 186). WAMY is one of the "MOIA's affiliated 'charities'" that "expanded their activities in many countries ... and ... report[ed] frequently on these activities to their headquarters in Saudi Arabia" -- reports Ex. 238, Nakhleh personally read in government service. Ex. 238, Nakhleh Rpt. ¶ 210. Saudi officials knew WAMY was "directly supporting al-Qa'ida's ongoing jihad." Ex. 238, Nakhleh Rpt. ¶ 106. A European Parliament report, quoted in congressional testimony by 9/11 Commission senior staffer Daniel Byman, listed WAMY among the charities that "were linked

to terrorist groups like Al Qaeda." Winer Rebuttal Rpt. § 4.9.3. (citing "The U.S.-Saudi Arabia counterterrorism relationship," Testimony of Danile L. Byman before the House Cmte. on Foreign Affairs' Subcmte. on Terrorism, Nonproliferation, and Trade (May 24, 2016). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

518. Mohammad Al-Juhani worked for SAMA for over thirty-seven years, from 1975 to 2013. Starting as an accountant in SAMA's investment department, Al-Juhani eventually became the head of the investment department and then the head of the accounting section at SAMA. Id at ¶¶5-7.

**RESPONSE:**

Disputed as immaterial and as to significance. Mohammad Al-Juhani's 37-year career at SAMA (Saudi Arabia's central bank) is not disputed as biography, but it provides no personal knowledge of WAMY's overseas field operations in Pakistan, Afghanistan, Bosnia, and Chechnya, where the diversion and support at issue occurred, and his declaration does not rest on any review of WAMY's field records. To the contrary, WAMY's own auditors could not verify WAMY's field expenditures, relying instead on the "assurance" of WAMY officials "year, after year, after year." Ex. 180, Winer Rebuttal Rpt. §§ 2.33, 2.17 (citing Ex. 241, WAMYSA0186609-83; Ex. 242, WAMYSA0195478--79). A SAMA official's general endorsement therefore does not establish the absence of the field-level support the record documents. Winer Report § 12.12 (citing Administrative Resolution No. 37 (May 28, 1996), WAMYSA0276804; "Muslims From Afar Joining 'Holy War' in Bosnia," NYT (Dec. 5, 1992); WAMY Memo. of Law in Opposition to

Plaintiffs' Motion to Compel (Dkt. No. 3949), Ex. Y, Decl. of Noorwali (Mar. 30, 2018) at ¶¶ 28-42, 47-52; U.S. Treas. press release (Dec. 21, 2004); "Benevolence DIrector Indicted for Racketeering Conspiracy; Providing Material Support to Al Qaeda And Other Violent Groups," U.S. Dept. of Justice press release (Oct. 9, 2002); EX. 79, FED-PEC 218170-218203; Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854; "Bosnia Asking U.N. For Peace Forces, " NYT (Mar. 28, 1992); WAMY document indices (produced Mar. 23, 2017), Decl. of Tarbutton (Dkt. No. 3912), Ex. 36). The premise that WAMY warranted no scrutiny is contradicted by the Saudi government's own admissions. Former Saudi Ambassador and Foreign Minister Adel al-Jubeir acknowledged that "in the past, we may have been naive in our giving and did not have adequate controls over all of our donations[;] [a]s a consequence, some may have taken advantage of our charity and generosity," and the Saudi government "specifically determined that the misuse of Saudi-based charities and their branches was used to support 'terrorist activities and terrorist organizations such as Al-Qaeda.'" Ex. 133, Kohlmann 2020 Rpt. ¶ 46 (citing "Saudi Arabia Announces Counter-Terrorism Measures," Saudi Embassy (Dec. 3, 2002); "Saudi Arabia and Counterterrorism Fact Sheet: Combating Terrorist Financing," Saudi Embassy (May 2017); "Combating Terrorist Financing," Saudi Embassy (Jan. 2019). The 9/11 Commission Monograph found that the Saudi government -- of which SAMA is the central bank -- "'resisted cooperating" with the United States on al Qaeda financing and "did little to address the problem of al Qaeda fund-raising in the Kingdom" before 9/11. 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 42-43. The record independently establishes WAMY's support for al Qaeda. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of

Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

519. Al-Juhani has personal knowledge of WAMY and its work. He knows WAMY to be a "credible charity and its operations in the Kingdom of Saudi Arabia and abroad are well documented." Id. at ¶25.

**RESPONSE:**

Disputed. The characterization of WAMY as a 'credible charity' whose operations are 'well documented' is contradicted by the documentary record. WAMY's 2001 Peshawar audit reflects that approximately 50% of the donations to that office "were not reflected on WAMY's financial records," in "the very time" the Pakistan-Afghanistan border region "was one of the centers for Al Qaeda." Ex. 180 Winer Rebuttal Rpt. § 2.17.2 (citing Ex. 241,WAMYSA0186609-83). The 2002 Peshawar audit states that donations of Rs 58,877,899 "remained unverified" and that "expenditure incurred inside Afghanistan is not susceptible to independent audit verification." Ex. 180, Winer Rebuttal Rpt. § 2.17 (citing Ex. 242, WAMYSA0195478--79). WAMY's counsel admitted that "many WAMY branch offices and branch office managers had historically ignored the directives and requirements of WAMY headquarters ... and likely failed to maintain records required by WAMY's own rules," as late as 2018. Ex. 180, Winer Rebuttal Rpt. §§ 2.35-2.37 (citing Plaintiffs' Reply ISO Motion to Compel (Dkt. No. 3962), Apr. 13, 2018, at pp. 2, 5, 6 & Ex. 6). A 2018 Saudi Anti-Money Laundering report found that 2016 inspections of WAMY offices led to offices being shuttered for "several administrative and financial violations." Ex.

133, Kohlmann Rebuttal 2020 Rpt. ¶ 47 (citing Saudi Arabia AML Mutual Evaluation Report (2018)). The "credible/well-documented" characterization is further undercut by Saudi officials' own admissions of inadequate controls: al-Jubeir conceded the Kingdom "did not have adequate controls over all of our donations," and Crown Prince Mohammed bin Salman in 2017 acknowledged the extremism problem and that the Kingdom enacted "new laws to ensure that charitable contributions are sent only to legitimate humanitarian organizations," Ex. 133, Kohlmann 2020 Rpt. ¶¶ 46, 64-65 (citing "Saudi Arabia Announces Counter-Terrorism Measures," Saudi Embassy (Dec. 3, 2002); "Saudi Arabia and Counterterrorism Fact Sheet: Combating Terrorist Financing," Saudi Embassy (May 2017); "Combating Terrorist Financing," Saudi Embassy (Jan. 2019); Chulov, "I will return Saudi Arabia to moderate Islam, says crown prince," Guardian (Oct. 24, 2017); White Paper: Kingdom of Saudi Arabia and Counterterrorism (May 2016) at 24, 25, 32, 39, 75). The characterization is also contradicted by CIA reporting describing WAMY as pursuing "an extremist agenda," and as "an excellent conduit of recruits for many extremist groups." Ex. 240 Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 160 citing (Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4); Decl. of Mohammedi (Dkt. No. 12001), Ex. 245, CIA_000143-158. at 151. Likewise, the Pentagon's statement that "WAMY supports terrorist ideals and causes," and the record's identification of WAMY as one of al Qaeda's "most important charity fronts and partners." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189, 199; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; Set_52_3643-3869 at pp. 37-39). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶

342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

520. While he is aware of organizations being involved in improper financial transactions, including money laundering for the support of terrorists, WAMY was never investigated or suspected of being involved in any improper transfer of funds. Id. at ¶27.

**RESPONSE:**

Disputed. The assertion that "WAMY was never investigated or suspected of being involved in any improper transfer of funds" is directly contradicted by the record of investigations and enforcement actions against WAMY. In November 2001, India shut WAMY's offices "for allegedly financing banned terrorist groups, including Lashkar-e-Taiba (LET) and Jaish-e-Mohammed (JEM);" in November 2002, WAMY's Peshawar office was raided in a joint FBI-Pakistani operation; and in June 2004, FBI, ICE, and JTTF agents "raided Abdullah Bin Laden's WAMY office in Virginia ... in connection with a terrorism-related investigation," seizing all files and hard drives and arresting a WAMY board member. Kohlmann Rpt. ¶¶ 175-176; Winer Report § 12.13.1; Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 190 (citing FED-PEC 234023-234024; "Pakistan Questions Sudan Man About Tape," AP (Dec. 9, 2002); Markon, "U.S. Raids N. Va. Office Of Saudi-Based Charity," WP (Jun. 2, 2004). WAMY's U.S. branch "has been targeted by U.S. authorities for its ties to al Qaeda, Islamic extremism, and recruitment." Ex. 148, Pls.' Averment (Dkt. No. 9541) ¶ 2107 (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 826). A 2018 Saudi Anti-Money Laundering report found that on-site inspections of WAMY offices in 2016 led to offices being shuttered for financial violations. Ex. 133, Kohlmann 2020 Rpt. ¶ 47 (citing Saudi Arabia

AML Mutual Evaluation Report (2018)). The record further documents WAMY served as "a key conduit for support to al Qaeda." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189, 199; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; Set_52_3643-3869 at pp. 37-39). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

521. The 9/11 Commission Staff Monographs urged caution in assessing the alleged role of Saudi charities in terrorist financing noting that the context in which Saudi charities exist: Much has been made of the role of charities, particularly Saudi charities, in terrorist financing. A little context is necessary here. Charitable giving, known as zakat, is one of the five pillars of Islamic faith. It is broader and more pervasive than Western ideas of charity, in that it also functions as a form of income tax, educational assistance, foreign aid, and political influence. The Western notion of the separation of civic and religious duty does not exist in Islamic cultures. The Saudi government has declared that the Koran and the Sunna (tradition) of Muhammad are the country's constitution, and the clergy within Saudi Arabia wield enormous influence over the cultural and social life of the country. Funding charitable works is ingrained into Saudi Arabia's culture, and Saudi zakat has long provided much-needed humanitarian relief in the Islamic world. In addition, a major goal of Saudi charities is to spread Wahhabi beliefs and culture throughout the world. Thus Saudi

efforts have funded mosques and schools in other parts of the world, including Pakistan, Central Asia, Europe, and even the United States. In some poor areas these schools alone provide education; and even in affluent countries, Saudi-funded Wahhabi schools are often the only Islamic schools available.
Ex. 241 at p. 21

**RESPONSE:**

Disputed to the extent WAMY invokes the 9/11 Commission for a general "caution" while omitting the Commission's affirmative findings; the zakat-context passage does not exonerate any particular charity. The same Commission found that "Al Qaeda and its friends took advantage of Islam's strong calls for charitable giving, zakat," (Ex. 59, Levitt Report § IV-5 (citing 9/11 Commission Report at 170)), that charities "played a critical role in financing al Qaeda," including "full and witting terror financiers," (Ex. 59, Levitt Report § IV-5 (citing 9/11 Commission Report at 170-171)), and that WAMY "operated under ... official Saudi government oversight, regulated by the Ministry of Islamic Affairs," Ex. 59, Levitt Report § IV-7 (citing 9/11 Commission Report at 372). The 9/11 Commission confirmed the "likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda" and described the Kingdom as a "problematic ally." Ex. 133, Kohlmann 2020 Rpt. ¶ 59 (citing 9/11 Commission Report at 171, 122, 371). The 9/11 Commission's own terrorist-financing monograph found that "al Qaeda was funded, to the tune of approximately $30 million per year, by diversions of money from Islamic charities," that al Qaeda "relied on diversions from Islamic charities and on well-placed financial facilitators," (9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16), and that in some cases "entire charities from the top down may have known of and even participated in the funneling of money to al Qaeda."

Winer Rebuttal Rpt. §§ 4.7-4.8.1 (citing 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 13, 19, 21, 24, 42-43). The Commission expressly qualified its no-direct-government-funding finding: "(This conclusion does not exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda.)" Winer Rebuttal Rpt. § 4.17.6 (citing 9/11 Commission Report at 171). A genuine dispute of material fact exists.

**STATEMENT:**

522. A CIA Intelligence Report from April 9, 1999, noted that "although there are more than 6,000 Islamic NGOs and charities, only a few dozen support terrorists." Ex. 247, CIA_000210-236 at 210, 213 (Central Intelligence Agency, Intelligence Report, DCI Counterterrorist Center, "Islamic Terrorists: Using Nongovernmental Organizations Extensively," April 9, 1999,).

**RESPONSE:**

Disputed to the extent WAMY implies that "only a few dozen" Islamic NGOs support terrorists excludes WAMY from that group. The April 9, 1999 CIA report on which WAMY relies found that the NGOs used by terrorists included '(2) large, internationally active NGOs based in Saudi Arabia or one of the Persian Gulf States that are exploited by individual employees with ties to extremists' -- a category matching WAMY. Ex. 59, Levitt Report § IV-3; Ex. 133, Kohlmann 2020 Rpt. ¶¶ 51-52 (citing CIA_000210-236; CIA_000385-411) (noting "entire NGO offices, including senior management positions, are staffed by extremists" and that "Bin Ladin ... planted members of his organization, al-Qaida," in NGOs). A separate 1996 CIA report found that "approximately one third of ... Islamic NGOs support terrorist groups or employ individuals who are suspected of having terrorist connections." Kohlmann Rpt. ¶¶ 21, 24 (citing Jan. 1996 CIA

Report; "Second report of the Monitoring Group on sanctions against AlQaida, the Taliban and individuals and entities associated with them," (est. pursuant to resolution 1363 and extended by resolutions 1390 & 1455), U.N. Security Council (Dec. 2, 2003) at 15). The U.N. 1267 Monitoring Group found that "[f]rom its inception Al-Qaida has relied heavily on charities" as "a very useful international channel" for its funding and logistics. Winer Rebuttal Rpt. § 4.4.1 (citing U.N. Letter S/2003/1070 (Dec. 2, 2003)). CIA reporting describes WAMY as "an excellent conduit of recruits for many extremist groups," and ties WAMY to bin Laden funding. Ex. 148, Pls.' Averment (Dkt. No. 9541) ¶ 2106 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 245, CIA_000143-158. at 151; DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826). A genuine dispute of material fact exists.

**STATEMENT:**

523. As to large internationally active NGOs based in Saudi Arabia or one of the Persian Gulf states, they may be exploited by individual employees with ties to extremists. “Terrorist abuse of such NGOs takes place at the local branch office rather than at the organizations’ headquarters. Senior NGO leaders usually are unwitting of the activity and willing to take corrective action when apprised of the abuse.” Id. at CIA000213.

**RESPONSE:**

Disputed. The April 1999 CIA report found that "entire NGO offices, including senior management positions, are staffed by extremists," and that Gulf-state remedial measures were "ineffective ... because the steps taken do not address the diversion of resources at the branch offices." Ex. 133, Kohlmann 2020 Rpt. ¶ 51 (citing CIA_000385-411). WAMY's material support "was conducted with the awareness and knowledge of the senior officials who headed" it. Kohlmann Report Summary ¶ 17. The CRA found WAMY-Saudi Arabia "maintains

substantial control" over its branches and approved and monitored their disbursements. Ex. 133, Kohlmann 2020 Rpt. ¶¶ 75-80 (citing EX. 79, FED-PEC 218170-218203). Far from taking corrective action, WAMY's counsel admitted that WAMY branch offices "historically ignored the directives and requirements of WAMY headquarters ... with apparent impunity," as late as 2018. Winer Rebuttal Rpt. §§ 2.35-2.37 (citing Plaintiffs' Reply ISO Motion to Compel (Dkt. No. 3962), Apr. 13, 2018, at pp. 2, 5, 6 & Ex. 6). The November 2002 CIA report likewise found some financiers "knowingly donate funds to al-Qa'ida and are witting." Levitt Report § IV-3 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 245, CIA_000143-158.). The 9/11 Commission Monograph found that abuse was not always confined to local employees: "entire charities from the top down may have known of and even participated in the funneling of money to al Qaeda." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 24, 42-43). The charities' da'wa and bin Ladin's "violent jihad ... [were] being similarly supported and promoted from the platform of the Saudi Ministry of Islamic Affairs," Ex. 238, Nakhleh Rpt. ¶ 169 (citing EO 0556-MDL). The U.N. 1267 Monitoring Group likewise found al-Qaeda "relied heavily on ... charities" for recruitment, training, and logistics. Winer Rebuttal Rpt. § 4.4.1 (citing U.N. Letter S/2003/1070 (Dec. 2, 2003)). As to WAMY specifically, the record reflects organization-level conduct, not merely rogue local employees: WAMY was a Saudi-government-controlled charity headed by the Minister of Islamic Affairs, its Secretary General al-Johani solicited "money to buy weapons and gear" for jihad, and a WAMY booklet endorsing violent jihad was published by the Saudi Armed Forces Printing Press. Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 30-31, 33, 130, 140 (citing Motion to Dismiss of Abdullah Muhsen Al Turki (Dkt. No. 85), Ex. 2, Decl. of Abdulaziz H. al Fahad at ¶ 11; Kingdom of Saudi Arabia, Ministry of Foreign Affairs, "Serving Islam and Muslims (www.mofa.gov.sa); Prince Sultan Bin Abdulaziz Al-Saud's Motion to Dismiss (Dkt. No. 110),

Case. No. 02-cv-1616-JR (DDC), Ex. 4, Decl. of Mutaz Saleh Abu Unuq (Apr. 1, 2003) at p. 2; *Islamic Views*, Saudi Armed Forces Printing Press); Ex. 112, Kohlmann 2020 Rpt. ¶166 (citing al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843). A genuine dispute of material fact exists.

**STATEMENT:**

524. WAMY is not named in the unredacted portions of this CIA report as an NGO which has provided financial or other support to terrorists including "al Qa'ida" nor is any WAMY official named as an al Qa'ida supporter. Id. at CIA000210-236.

**RESPONSE:**

Disputed. WAMY's absence from the unredacted portions of a single, heavily redacted CIA report does not establish that WAMY did not support terrorism. U.S. intelligence findings show Saudi-based charities including WAMY were exploited to finance al Qaeda: The 1996 CIA report on Islamic charities in Bosnia found "approximately one third of these Islamic NGOs… support terrorist groups or employ individuals… [are] suspected of having terrorist connections," "several Saudi-based NGOs that al-Qaida has been able to exploit by diverting funds from legitimate activities to finance al-Qa'ida," and "entire NGO offices, including senior management positions, are staffed by extremists." Ex. 74, Winer Rpt. §§ 6.6–6.6.1; Ex. 133, Kohlmann 2020 Rpt. ¶¶ 50–52; Ex. 59, Levitt Rpt. § IV-3, nn.65–67 (citing Jan. 1996 CIA Report; Decl. of Mohammedi (Dkt. No. 12001), Ex. 245, CIA_000143-158. at 150-151; CIA_000285-300; CIA_000385-411). A December 30, 2009 State Department cable from Secretary Clinton reported that reforms had failed to stop "the World Assembly of Muslim Youth (WAMY)" and other charities from "continu[ing] to send money overseas and, at times, fund[ing] extremism overseas." Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State

Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). Other CIA reporting in the record affirmatively names WAMY: a November 20, 1997 CIA report states that WAMY officials "have couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia" and describes WAMY as "a Saudi NGO where personnel often pursue an extremist agenda" (Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶¶ 160, 559 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744)); a July 1, 2002 CIA report identifies WAMY among Balkans NGOs "actively involved in spotting and assessing suitable terrorist recruits," (Pls.' Corrected Averment (DKt. No. 9764) ¶ 99 (citing CIA_000178-189 at 186)); and a January 11, 1999 CIA report discusses the involvement of IIRO, AHIF, MWL, "and WAMY in supporting al Qaeda." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764) ¶¶ 147-148, (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 807, 809, 810). The record of evidence identifies WAMY as "a Saudi-based charity, which played an extensive role in supporting al Qaeda" and one of al Qaeda's "most important charity fronts and partners." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189, 199; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; Set_52_3643-3869 at pp. 37-39). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

525. The 9/11 Commission Staff Monograph did not note WAMY as a charity identified as providing funds to al-Qaeda, directly or indirectly, or one suspected of doing so. Ex. 241.

**RESPONSE:**

Disputed. The 9/11 Commission Staff Monograph did not purport to identify every charity that funded al Qaeda. "The 9/11 Commission did not identify all of the charities or charity officials that funneled money and other support to al Qaeda… it identified a few examples… using the phrase 'such as.'" Ex. 74, Winer Rpt. § 6.5 (citing 9/11 Comm'n Report at 170-171); Dep. of Winer (Jul. 13, 2021) at 143:20-144:3, 145:6-25. The Monograph found: that "al Qaeda relied on diversions from Islamic charities and on well-placed financial facilitators," to the tune of approximately $30 million per year, (9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16), that "entire charities from the top down may have known of and even participated in the funneling of money to al Qaeda," (9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 24), and that "charities were also used as conduits to transfer funds from donors to al Qaeda leaders." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at at 28-29. The Monograph expressly cautioned that pre-9/11 intelligence was "incomplete," that "gaps appear to remain," and that "it is far more difficult to show that a suspected NGO or individual actually funds terrorist groups." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16, 18. The Commission expressly found its Saudi-government conclusion "does not exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda," and WAMY, IIRO and MWL had "lax external oversight and ineffective internal controls" that "put al Qaeda sympathizers, such as Batterjee, in the position where they could divert funds." Winer Rebuttal Rpt. §§ 4.17.6, 4.18

(citing 9/11 Comm'n Report at 171). The Commission itself acknowledged its work "was limited and conducted under a deadline" and that "[n]ew information inevitably will come to light." Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § V (citing 9/11 Commission Report, at xvii; EO 03483). Record evidence identifies WAMY as one of al Qaeda's "most important charity fronts and partners." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189, 199; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; Set_52_3643-3869 at pp. 37-39). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

526. The FBI's investigation into the terrorist attacks of 11 September 2001, internally named PENTTBOM, included the cooperation of local, state, and other federal agencies. Ex. 248, EO14040-000001- EO14040-000014 (FBI Memorandum To Administratively Close Case dated May 27, 2021).

**RESPONSE:**

Undisputed that the FBI's PENTTBOM investigation involved cooperation of multiple agencies. Disputed to the extent WAMY implies the PENTTBOM investigation examined or exonerated WAMY. The FBI memorandum administratively closing PENTTBOM did not assess or clear WAMY's charitable-financing conduct. "Support for al Qaeda… was not something any of them [IIRO, WAMY, MWL] stated in any publicly disclosed financial records. These activities were

covert, not overt." Ex. 74, Winer Rpt. §§ 9.7, 9.7.2; see also Ex. 74, Winer Rpt. § 9.1 (citing Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003)). WAMY's own Pakistan/Afghanistan audits show its controls in al Qaeda's heartland were "minimal to non-existent," with expenditures inside Afghanistan "not susceptible to independent audit verification," suggesting a total lack of documentation. Winer Rebuttal Rpt. §§ 2.16, 2.17.1.4 (citing Ex. 242, WAMYSA0195478-79). The Monograph confirms the point: "the FBI did not systematically gather and analyze the information its agents developed" and "never gained a systematic or strategic understanding" of al Qaeda fund-raising (9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16-17, 35); once al Qaeda's money "moved overseas—… the agents were at a dead end" and obtaining foreign financial records was "often a practical impossibility." (9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 30); and the government's pre-9/11 efforts to freeze bin Laden's assets and identify funding sources were "generally ineffective" and hampered by a "lack of usable intelligence." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 17-18, 40). A genuine dispute of material fact exists.

**STATEMENT:**

527. In June 2007, the FBI's New York field office (NYO) opened a subfile under the PENTTBOM investigation file to obtain a greater understanding of 9/11 hijackers Nawaf al-Hazmi's and Khalid al-Midhar's past interaction with and connectivity to the Southern California Muslim community in an attempt to explain how they may have gained assistance after their arrival in Los Angeles in January 2000. Id. at 000002

**RESPONSE:**

Disputed to the extent WAMY implies this investigation examined or exonerated WAMY. By its own terms, the June 2007 New York field office PENTTBOM subfile addressed the 9/11 hijackers' support network in Southern California — understanding al-Hazmi's and al-Midhar's "interaction with and connectivity to the Southern California Muslim community" after their January 2000 arrival in Los Angeles — not the overseas charitable-financing infrastructure through which WAMY supported al Qaeda, and thus neither examined nor exonerated WAMY. Moreover, information post-dating the 9/11 Commission has been declassified regarding potential Saudi-official support. Depo of Levitt (Apr. 8, 2021) at 419:4–424:11. The Southern California/East Coast support network in fact reached WAMY through Anwar al-Awlaki, the hijackers' spiritual advisor. WAMY produced in this litigation the employment contract between Awlaki and the Dar al-Hijrah mosque, "which suggests that WAMY either had prior knowledge of Awlaki's employment or even funded the contract;" WAMY hired Awlaki to speak at its 2002 Islamic Studies camps in Texas; and December 2001 FBI surveillance of Awlaki tracked a contact to the WAMY USA office and to the home of WAMY USA Director Fadil Soliman. Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-W (citing Ex. 132, WAMY Int 15165; Ex. 131, WAMY Int 0249; Ex. 86, FBI Awlaki Surveillance Log, (Dec. 18, 2001); Ex. 195, WAMY Int 170; FBI 1845-55). Record evidence independently identifies WAMY as one of al Qaeda's "most important charity fronts and partners" that "played an extensive role in supporting al Qaeda," and materially supported al Qaeda and affiliated groups. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189, 199; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; Set_52_3643-3869 at pp. 37-39); Ex. 74, Winer Rpt. § 12.14; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 158–159 (citing U.S.

Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) (Jun. 28, 2006); U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Adel Hassan Hamed (ISN No. 940) (Mar. 25, 2005); Ex. 227, Set 52_3643-3869 at 37; U.S. Dept. of Defense JTF-GTMO Matrix of Threat Indicators for Enemy Combatants). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

528. Under casefile named "Operation Encore," the NYO served as an enterprise counterterrorism investigation into a possible network of individuals who were suspected of providing assistance to the hijackers and as an intelligence gathering operation into AQ's tactics and tradecraft. Id. at 000003.

**RESPONSE:**

Disputed to the extent WAMY implies this investigation examined or exonerated WAMY. "Operation Encore" was, by its own description, an enterprise investigation into "a possible network of individuals who were suspected of providing assistance to the hijackers" and an intelligence operation into al Qaeda's "tactics and tradecraft." Decl. of Mohammedi (Dkt. No. 12001), Ex. 248, EO 0001-14 at 0003. It was not an investigation of WAMY's global charitable operations and does not address, much less clear, the material support attributed to WAMY. The U.S. government assessed WAMY as a "Tier 1 NGO," defined as "having demonstrated sustained and active support for terrorist organizations willing to attack US persons or interests," and one that "may be affiliated with Usama Bin Laden and al Qaida operations." Ex. 74, Winer Rpt. § 12.10.3, nn.195–197; Winer Rebuttal Rpt. §§ 3.20–3.20.4; Ex. 112, Kohlmann 2020 Rpt.

¶ 159, nn.229–232 (citing Unclassified Summary of Evidence for CSRT, Hamed (Nov. 19, 2004), PEC-KSA002746; ARB Summary, Ameur, July 25, 2005; ARB Proceedings, ISN 940, FED-PEC 141772; U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) (Jun. 28, 2006); U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Adel Hassan Hamed (ISN No. 940) (Mar. 25, 2005); Ex. 227, Set 52_3643-3869 at 37; U.S. Dept. of Defense JTF-GTMO Matrix of Threat Indicators for Enemy Combatants). On September 9, 2001, hijackers Hazmi and Mihdhar left bags marked “a gift for the brothers” at the Ayah Islamic Center in Laurel, Maryland — “a mosque in Laurel, MD run by the MOIA-led World Assembly of Islamic Youth” and operated by a WAMY employee. Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-Y, nn. 956-958 (citing FBI Timeline Report at 250, WAMY Int 163-164, 1535, 12439; 9/11 Comm'n Monograph on Terror Finance, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 101). Separately, the 9/11 Commission Monograph documents that the FBI's terrorist-financing investigation was systemically incomplete and “never gained a systematic or strategic understanding” of al Qaeda fund-raising. 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 35. A genuine dispute of material fact exists.

**STATEMENT:**

529. The investigation spanned from 2007 to 2016 and included the review of financial records, telecommunication records, travel records, hundreds of interviews, and the execution of search warrants of various residences in Southern California. Id at 000008.

**RESPONSE:**

Disputed to the extent WAMY implies this investigation examined or exonerated WAMY. The 2007–2016 investigation was geographically and substantively confined to Southern California

records, residences, and interviews concerning the hijackers' local support — its financial-record, telephone, travel, interview, and search-warrant activity was directed at "various residences in Southern California" (Decl. of Mohammedi (Dkt. No. 12001), Ex. 248 at EO 0001-14 at 0008), not WAMY or Saudi-based charity financing. Its scope does not reach the conduct Plaintiffs allege: WAMY's covert diversion of charitable funds to al Qaeda and aligned groups, which by design left no ordinary financial trail. Ex. 74, Winer Rpt. §§ 9.7, 9.7.2, 13.8 ("I would not expect documents maintained by the charities to document use for activities labeled as 'terrorism'"). Operation Encore "was conducted to gather intelligence and confidential sources to guard against future attacks, not bring criminal charges," and was closed "because it had accomplished its intelligence goal," with any "criminal indictments … viewed as a potential harm to U.S. national security and foreign relations interests." Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § V (citing EO 0001-14; EO 0798). That domestic investigation therefore did not reach — and could not clear — WAMY's covert charitable financing: WAMY's Pakistan/Afghanistan audits "illustrate the mechanics of how such support is disguised" through unverified "student welfare," "social welfare," and "stipends" categories. Winer Rebuttal Rpt. § 4.5 (citing WAMY Pakistan Audits 1994–2000). The 9/11 Commission Monograph confirms that tracing al Qaeda's overseas charity financing was beyond the government's pre-9/11 reach, with agents reaching "a dead end" once funds moved overseas and unable to obtain foreign financial records. 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 30. The record evidence independently documents WAMY's role as a conduit for support to al Qaeda. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189, 199; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233,

CIA_000720-804.4 at 744; Set_52_3643-3869 at pp. 37-39). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

530. "After nearly twenty years after the attack, the FBI has not identified additional groups or individuals responsible for the attack other than those currently charged, which is consistent with the final conclusion of the 9/11 Commission Report which stated that 'no new information to date that would alter the original findings of the 9/11 Commission regarding the individuals responsible for the 9/11 attacks of for supporting those responsible for the attacks.'" Id. at 000011.

**RESPONSE:**

Disputed. The FBI's statement that it "has not identified additional groups or individuals" is the absence of a charging conclusion, not a finding that WAMY provided no support. The 9/11 Commission itself did not identify every charity financier, (Ex. 74, Winer Rpt. § 6.5), and did not address where al Qaeda's pre-9/11 funding originated, (Dep. of Levitt (Apr. 8, 2021) at 415:5-416:15); since the report, additional information has been declassified regarding potential Saudi-official support. Depo of Levitt (Apr. 8, 2021) at 419:4–424:11. An administrative decision not to charge is not a finding of no support. "The FBI decided not to pursue charges against the Saudi Government officials … based on national security, foreign relations, diplomatic, and political concerns," using its investigations "to collect intelligence and obtain confidential sources … rather than … to gather evidence for use in criminal prosecutions." Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § V (citing 2005 FBI/CIA Joint Assessment, EO 0491). The FBI's own July 2021 review found "much available information from subsequent and

ongoing investigations was not noted in the Commission's Report." Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § V (citing EO 3483). The FBI's statement reflects the acknowledged limits of the government's terrorist-financing investigation: the Monograph found that "it is far more difficult to show that a suspected NGO or individual actually funds terrorist groups" and that "gaps appear to remain" such that al Qaeda financing "will remain a hard target for the foreseeable future" (9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16, 18), and that the FBI "never gained a systematic or strategic understanding" of al Qaeda fund-raising. 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 35. The record reflects that WAMY was among al Qaeda's most important charity fronts and "helped support Al-Qaida." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189, 199; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; Set_52_3643-3869 at pp. 37-39). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

531. Neither WAMY, any WAMY branch or office, any WAMY official, nor any WAMY employee were found to have any responsibility for the 9/11 attacks or for supporting, directly or indirectly, those responsible for the attacks. Id.

**RESPONSE:**

Disputed. Plaintiffs' experts and the underlying record establish that WAMY, its branches, officials, and employees supported al Qaeda and affiliated terrorists. The U.S. government assessed WAMY as a "Tier 1 NGO," defined as "having demonstrated sustained and active support for terrorist organizations willing to attack US persons or interests," and one that "may be affiliated with Usama Bin Laden and al Qaida operations." Ex. 74, Winer Rpt. § 12.10.3, nn.195–197; Winer Rebuttal Rpt. §§ 3.20–3.20.4; Ex. 112, Kohlmann 2020 Rpt. ¶ 159, nn.229–232 (citing Unclassified Summary of Evidence for CSRT, Hamed (Nov. 19, 2004), PEC-KSA002746; ARB Summary, Ameur, July 25, 2005; ARB Proceedings, ISN 940, FED-PEC 141772; U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) (Jun. 28, 2006); U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Adel Hassan Hamed (ISN No. 940) (Mar. 25, 2005); Ex. 227, Set 52_3643-3869 at 37; U.S. Dept. of Defense JTF-GTMO Matrix of Threat Indicators for Enemy Combatants). WAMY's U.S. branch was incorporated by Usama Bin Laden's nephew Abdullah, (Ex. 112, Kohlmann 2020 Rpt. ¶ 173, nn.254–258 (citing 9/11 Comm'n Report at 58; WAMY IRS Form 1023 Application (Nov. 9, 1992); Ex. 148, Pls.' Averment (Dkt. No. 9541), Ex. 333, Aff. of Abdullah Awad Bin Laden (Nov. 19, 2005); WAMYSA 51692-98; WAMY INTL 13864, 1366-70; PEC-KSA 3656-3718; WAMYSA 42103)), and associated with Anwar al-Awlaki, the spiritual mentor to three 9/11 hijackers. Ex. 112, Kohlmann 2020 Rpt. ¶ 186, nn.280–282 (citing WAMYSA 30079-30081; Ex. 77, Dep. of Ibrahim Abdullah (Oct. 21, 2019) at 71:1-72, 75:1-78, 82, 87:1-88; Ex. 132, WAMY Int 15165-168; Ex. 196, WAMYSA 1519; PEC-KSA 666-669; PEC-KSA 691-693; Ex. 131, WAMY Int 0249; Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001); Ex. 195, WAMY Int 170). WAMY funded and was affiliated with LBI, "which LBI used to provide material support to bin Ladin," and the U.S. Treasury found that LBI "provided financial and operational support to mujahideen elements … including fighters associated with

UBL" and "later joined al Qaida," while its successor BIF was one "of the non-governmental organizations providing funds to al Qaida." Winer Rebuttal Rpt. §§ 2.38.11.1, 3.30.3, 3.30.5 (citing U.S. Treasury Designation of Batterjee (Dec. 21, 2004). A former WAMY figure, Adel Batterjee, founded BIF as an "affiliate" branch of WAMY, and materials from the 1993 World Trade Center bombing were marked with BIF letterhead noting BIF as a branch of WAMY. Decl of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 192 (citing Hedges, "Muslims from afar joining 'Holy War' in Bosnia," NYT (Dec. 5, 1992); Basaddiq, "Islamic Charity Committee moves to new premises," Arab News (May 21, 1994); IRS 990 forms for WAMY for Fiscal Years 1993-1999; *U.S. v. Usama* ~~Bin~~*bin* *Laden*, Gov't Ex. 2800-A)); WAMY offices in Peshawar and Virginia were raided in terrorism-related investigations. Decl. of Tarbutton (DKt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 190; Ex. 148, Pls.' Averment (Dkt. No. 9541) ¶ 2107 (citing "Pakistan Questions Sudan Man About Tape," AP (Dec. 9, 2002); Markon, "U.S. Raids N. VA Office of Saudi-Based Charity," WP (Jun. 2, 2004); DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 826). The CRA found WAMY funded U.N.-sanctioned BIF, (Ex. 59, Levitt Rpt. § IV-7, n.96; Ex. 74, Winer Rpt. § 12.12.12 (citing EX. 79, FED-PEC 218170-218203)), and that WAMY's Saudi headquarters "maintains substantial control" over WAMY Canada and "provides substantially all of [its] operations funds." Ex. 133, Kohlmann 2020 Rpt. ¶ 76 (citing CRA audit, EX. 79, FED-PEC 218170-218203). WAMY's U.S. vice president Ibrahim Abdullah was known to the FBI as "associated with subjects of FBI al-Qa'ida and … (HAMAS) investigations," and WAMY brokered al Qaeda facilitator Anwar al-Awlaki's imam position. Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IX (citing Ex. 132, WAMY Int 15165; FBI 1845-55; Ex. 22, Aff. of Abdullah Awad Binladin (Nov. 19, 2005); EO 3429). Saudi authorities themselves acknowledged WAMY's misconduct: a 2018 Saudi Anti-Money Laundering report described WAMY offices "shuttered" after 2016 inspections for

"administrative and financial violations," Ex. 133, Kohlmann 2020 Rpt. ¶¶ 47, 55; Ex. 74, Winer Rpt. § 12.19.2 (citing Saudi Anti-Money Laundering authority, Mutual Evaluation Report (2018)). a December 30, 2009 State Department cable named WAMY among charities that "continue to send money overseas and, at times, fund extremism overseas." Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). WAMY was, in any event, a Saudi-state "charit[y]" supported "financially and operationally" through the Ministry of Islamic Affairs. Ex. 238, Nakhleh Rpt. ¶ 69(d) (citing PEC-KSA000235-266). CIA reporting states WAMY officials "have couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia" (Pls.' Corrected Averment (DKt. No. 9764) ¶¶ 160, 559 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744)) and that WAMY offices in the Balkans were "actively involved in spotting and assessing suitable terrorist recruits." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 99 (citing CIA_000178-189 at 186). Upon interrogating a Guantanamo detainee allegedly "employed by [WAMY]", the Pentagon stated that "WAMY supports terrorist ideals and causes." Kohlmann Aff. ¶ 199, (citing Set_52_3643-3869 at pp. 37-39). WAMY is described as one of "the shadowy Saudi charitable entities that have helped support Al-Qaida" and among the most important state-affiliated charities "enmeshed in the sponsorship of terrorism." Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189 (citing Islamic Camps: Objectives, Program Outlines, Preparatory Steps, WAMY (1987 / 1990 tr.); Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶ 132 (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 827; CIA_000178-189 at 185; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744). A genuine dispute of material fact exists.

**STATEMENT:**

**B. Bin Laden's Antagonism Towards the Kingdom of Saudi Arabia and Government Aligned and Supported Charities Such as WAMY and Active Opposition to Using Saudi government Aligned Charities As an Al Qaeda Funding source.**

**RESPONSE:**

Disputed to the extent this heading asserts that Osama Bin Laden's antagonism toward the Saudi state meant WAMY was not used to fund al Qaeda. Bin Laden's political rupture with the Saudi royal family did not stop charitable funds from reaching al Qaeda; al Qaeda exploited charities at the branch and employee level. Ex. 74, Winer Rpt. § 9.7; Ex. 59, Levitt Rpt. ¶ 242, n.77 (citing 9/11 Comm'n Report 170–171); Ex. 112, Kohlmann 2020 Rpt. ¶¶ 20–21. Bin Laden would not openly identify which charities to use — "that's not how terrorist organizations work, that would be… playing poker with an open hand." Dep. of Levitt (Apr. 8, 2021) at 277:3-15. The 9/11 Commission found its no-institutional-funding conclusion "does not exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda." Winer Rebuttal Rpt. § 4.17.6 (citing 9/11 Comm'n Report at 171). Saudi officials themselves acknowledged "that the misuse of Saudi-based charities and their branches was used to support terrorist activities and terrorist organizations such as Al-Qaeda." Ex. 133, Kohlmann 2020 Rpt. ¶ 46 (citing "Saudi Arabia Announces Counter-Terrorism Measures" (Dec. 3, 2002); "Saudi Arabia and Counterterrorism, Fact Sheet: Combating Terrorist Financing" (May 2017)). And the Ministry of Islamic Affairs — which oversees WAMY — was "part and parcel of the state machinery of the Kingdom," bringing "the da'wa of the charities" under a state roof. Ex. 238, Nakhleh Rpt. ¶¶ 50, 169 (citing EO 0556-MDL). Plaintiffs dispute the heading's characterization

for the further reasons set forth in the responses to ¶¶ 532-542 below. A genuine dispute of material fact exists.

**STATEMENT:**

532. In the years before September 11, 2001, Osama Bin Laden made clear his opposition to the Saudi Royal family, the government of the Kingdom of Saudi Arabia, and government aligned charities such as WAMY. Ex. 249, Winer Deposition Ex 908, West Point's Combatting Terrorism Center's Harmony Database ("Harmony Database").

**RESPONSE:**

Disputed. The West Point Harmony letters reflect Bin Laden's political rupture with, and financial grievances against, the Saudi government and royal family — not proof that Saudi-aligned charities were not complicit in supporting al Qaeda; the materials are "Letters From Bin Laden," which were "designed to motivate support." They reflect the period "when Osama bin Laden was facing financial pain… trying to… grab direct control of resources rather than have to rely on what he could get indirectly," (Dep. of Winer (Jul. 13, 2021) at 158:18–159:4), and that the letters are partly "propaganda by Bin Laden," because the charities he claimed were dissolved "remained open," e.g., al-Haramain. Dep. of Winer (Jul. 13, 2021) at 159:5–161:2. Bin Laden would not openly name charities; terrorist finance "is not static," shifting routes as authorities crack down. Dep. of Levitt (Apr. 8, 2021) at 270:11–272:6, 276:22-277:15. Meanwhile WAMY's funds and infrastructure continued to reach al Qaeda-aligned causes. Ex. 74, Winer Rpt. §§ 12.12.13–12.12.14, 12.13.3 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854; "Bosnia Asking U.N. For Peace Forces," NYT (Mar. 28, 1992); WAMY document indices (produced Mar. 23, 2017), Decl. of Tarbutton (Dkt. No. 3912), Ex. 36); Bosnia's Muslims Dodged Embargo," WP (Sep. 22, 1996)). The record shows

"Al Qaeda and a range of Saudi interests, including Saudi-based charities, were aligned in supporting wars of redemption … such as Afghanistan, Bosnia, Chechnya, and Kashmir." Winer Rebuttal Rpt. § 4.11 (citing Hegghammer, *Jihad in Saudi Arabia: Violence and Pan-Islamism since 1979* (2010)). A European Parliament report lists "the World Assembly of Muslim Youth" among Saudi charities that "were linked to terrorist groups like Al Qaeda and became an important part of the organization, particularly before 9/11." Winer Rebuttal Rpt. § 4.9.3 (citing "The U.S.-Saudi Arabia counterterrorism relationship," Testimony of Danile L. Byman before the House Cmte. on Foreign Affairs' Subcmte. on Terrorism, Nonproliferation, and Trade (May 24, 2016)). Bin Laden's public criticism of the Saudi royal family is not inconsistent with WAMY functioning as an al Qaeda funding conduit; around 1993 bin Laden himself identified "several prominent international Muslim charities as the primary sources of Al-Qaida financial and fundraising activity." Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 168-170, 173, (citing Ex. 27, Gov't Evidentiary Proffer, *U.S. v. ~~Enaam~~ Arnaout,* 02 CR 0892 (Jan. 7, 2003) at p. 25, 28-29; Jan. 1996 CIA Report; Aff. of Senior Special Agent David Kane, *U.S. v. Soliman Biheiri*, 03 CR 0365-A (Aug. 14, 2003) at p. 2; 9/11 Comm'n Report at 170-171; Dugger, "Anti-U.S. Plot in India is Foiled; Militant Islamist Intended to Bomb 2 Consulates, Police Say," NYT (Jan. 21, 1999)). The 9/11 Commission Monograph found al Qaeda "relied on diversions from Islamic charities." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16. Record evidence identifies WAMY as one of al Qaeda's "most important charity fronts and partners." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189, 199; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; Set_52_3643-3869 at pp. 37-39). Plaintiffs repeat and

incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

533. In April 1994, responding to the Kingdom's request that he return home, Bin Laden wrote to King Fahd that he will not return to the Kingdom because, "we were prevented from travelling, our money was frozen in foreign banks accounts, a defamation campaign was waged against us in the local and international press, and finally, you attempted to cut our ties with the homeland by confiscating our passports [therefore], your actions indicate to us what your intentions are for us." Ex. 249.

**RESPONSE:**

Undisputed as to the quoted passage but disputed as immaterial and to the extent WAMY offers this as proof it does not support terrorism. This April 12, 1994 open letter "To: King Fahd … and the people of Saudi Arabian Peninsula" concerns Bin Laden's personal grievances against the Saudi state (frozen assets, confiscated passports) — not WAMY, and not the use of charities to fund al Qaeda. It corroborates only Bin Laden's financial distress in this period — Dep. of Winer (Jul. 13, 2021) at 158:18–159:4 (Bin Laden family money frozen 1993–1994) — which explains his effort to obtain funds directly, not any cessation of charity support for al Qaeda. That is consistent with the 9/11 Commission Monograph's finding that bin Laden "did not have access to any significant amounts of personal wealth" and "did not personally fund al Qaeda" — "rather, al Qaeda relied on diversions from Islamic charities." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16. Bin Laden's personal financial distress says nothing about WAMY, which remained "a Saudi Government funded

charity which … was led by the Saudi Minister of Islamic Affairs," and Saudi-based charities' alignment with al Qaeda-linked jihad continued throughout this period. Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IX; Winer Rebuttal Rpt. § 4.11 (citing Hegghammer, *Jihad in Saudi Arabia: Violence and Pan-Islamism since 1979* (2010)). The letter does not disprove WAMY's role as a conduit for support to al Qaeda. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; CIA_000178-189 at 185); Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 168-170, 173, (citing Ex. 27, Gov't Evidentiary Proffer, *U.S. v. Arnaout*, 02 CR 0892 (Jan. 7, 2003) at p. 25, 28-29; Jan. 1996 CIA Report; Aff. of Senior Special Agent David Kane, U.S. v. Soliman Biheiri, 03 CR 0365-A (Aug. 14, 2003) at p. 2; 9/11 Comm'n Report at 170-171; Dugger, "Anti-U.S. Plot in India is Foiled; Militant Islamist Intended to Bomb 2 Consulates, Police Say," NYT (Jan. 21, 1999)). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

534. In a June 7 1994 letter, Osama Bin Ladin openly criticized King Fahd writing "Enormous crimes and massacres were committed against the Muslim people of Bosnia and Herzegovina [] due to a global crusader conspiracy that is anti-Muslim, they were obstructed from receiving weapons, which prevented them from defending themselves[;] [t]his all occurred through the sword of the United Nations." Ex. 249, at 7-June 1994.

**RESPONSE:**

Disputed as immaterial. This June 7, 1994 statement is bin Laden's political criticism of the Saudi regime's Bosnia policy, part of a body of letters “designed to motivate support," and says nothing about WAMY's own conduct. During the Bosnia conflict WAMY was materially supporting the jihad there: WAMY (Jeddah) wired approximately $34,254 to the Third World Relief Agency (TWRA) — the arms-smuggling conduit the 9/11 Commission tied to Bin Laden — and WAMY's director for Austria/Eastern Europe, El Fatih Hassanein, simultaneously ran TWRA. Ex. 74, Winer Rpt. §§ 12.12.13–12.12.14 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854; "Bosnia Asking U.N. For Peace Forces," NYT (Mar. 28, 1992); WAMY document indices (produced Mar. 23, 2017), Decl. of Tarbutton (Dkt. No. 3912), Ex. 36); Bosnia's Muslims Dodged Embargo," WP (Sep. 22, 1996); Ex. 112, Kohlmann 2020 Rpt. ¶¶ 162–163 (citing “Muslims From Afar Joining Holy War in Bosnia,” NYT (Dec. 5, 1992)). A contemporaneous report quoted “Adel A. Batterjee, the chairman of the World Assembly of Muslim Youth,” amid accounts that Saudi relief money “has been turned over to the Bosnians for weapons.” Winer Rebuttal Rpt. § 2.38.1 (citing “Muslims From Afar Joining 'Holy War' in Bosnia,” NYT (Dec. 5, 1992)). Future 9/11 hijackers Hazmi and Mihdhar themselves “had traveled together to fight in Bosnia in a group that journeyed to the Balkans in 1995.” Ex. 133, Kohlmann Rebuttal Rpt.. ¶ 81 (citing 9/11 Comm'n Report at 156). WAMY offices in the Balkans were “actively involved in spotting and assessing suitable terrorist recruits,” (Pls.' Corrected Averment (Dkt. No. 9764) ¶ 99 (citing CIA_000178-189 at 186)), and Gulf charities provided “weapons, guesthouses, and travel papers” to the al Qaeda movement. Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 167 (citing Muhammad, Basil, The Arab Volunteers in Afghanistan, Cmte. for Islamic Benevolence and World Assembly of Muslim Youth (1991); Set_45_3065-3095). A genuine dispute of material fact exists.

**STATEMENT:**

535. On July 19, 1994, Bin Ladin stated that "the Saudi government has used all the witchcraft powers it has and the full deception powers of the media to justify its shameless stands against Islam and its preachers while supporting the unbelievers and their guardians." Id. at 14-July 1994.

**RESPONSE:**

Disputed as immaterial. This July 19, 1994 statement is political propaganda, part of statements "designed to motivate support." It does not mention WAMY or address al Qaeda's funding sources. Rhetoric against the Saudi state does not establish that WAMY did not fund or ceased funding al Qaeda; al Qaeda's charity financing shifted routes but continued. Dep. of Levitt (Apr. 8, 2021) at 270:11–272:6, 276:22-277:15. Rhetoric against the Saudi state does not exonerate WAMY; which the Saudi government later acknowledged had continued to violate rules against terrorist financing, "shutter[ing]" WAMY offices after 2016 inspections for "administrative and financial violations." Ex. 133, Kohlmann 2020 Rpt. ¶ 47 (citing Saudi Anti-Money Laundering report (2018)). Record evidence establishes that WAMY nonetheless served as an al Qaeda charity front. Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189, 199; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; Set_52_3643-3869 at pp. 37-39). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

536. Bin Ladin criticized what he perceived to be the Saudi government's oppression of scholars called Muslim Youth to action against the government. Id. at September 12, 16, and 19 and October 15, 1994 letters.

**RESPONSE:**

Disputed as immaterial. These 1994 letters are incitement statements addressed to scholars and calling "Muslim youth … to action" against the Saudi regime; they are political mobilization, not evidence of WAMY's conduct. Similarly, WAMY openly solicited moral, physical, and financial support for armed jihad during this period: WAMY Secretary General Dr. Maneh al-Johani stated Muslims "can give their moral, physical, and financial support [to] the cause of Jihad" in Kashmir, including "money to buy weapons and gear." Ex. 112, Kohlmann 2020 Rpt. ¶¶ 164–165; Ex. 59, Levitt Rpt. § IV-6, n.91 (citing "WAMY Calls for Jihad to Free Kashmir," Muslim World News (Jun. 3, 1991); Ahmed, "Kashmiri leader thanks WAMY for help," Riyadh Daily (Dec. 8, 1995). Contrary to any suggestion WAMY stood apart from the Kingdom, WAMY operated as a vector of Saudi state da'wa through the Ministry of Islamic Affairs, and Kashmir jihad in particular "enjoyed wide legitimacy within the Kingdom." Ex. 238, Nakhleh Rpt. ¶¶ 169–170; Winer Rebuttal Rpt. § 4.9.4 (citing "The U.S.-Saudi Arabia counterterrorism relationship," Testimony of Danile L. Byman before the House Cmte. on Foreign Affairs' Subcmte. on Terrorism, Nonproliferation, and Trade (May 24, 2016)). A genuine dispute of material fact exists.

**STATEMENT:**

537. Bin Ladin escalated his condemnation of the Saudi government in subsequent letters; in a December 29, 1994, letter to Sheikh Bin Baz, Saudi's top cleric, Bin Ladin accused the

scholar of an abomination by permitting "the crusader and the Jewish alliance" to occupy the country in the name of liberating Kuwait." Id. at 29 December 1994.

**RESPONSE:**

Disputed as immaterial. This December 29, 1994 letter to Sheikh Bin Baz is religious and political polemic directed at the Saudi Grand Mufti, part of statements "designed to motivate support;" It does not concern, and cannot disprove, WAMY's material support to al Qaeda and aligned groups, including WAMY's solicitation and receipt of funds to buy "weapons and gear" for the Chechen mujahideen. Ex. 112, Kohlmann 2020 Rpt. ¶¶ 164–165; Ex. 59, Levitt Rpt. § IV-6, n.91 (citing "WAMY Calls for Jihad to Free Kashmir," Muslim World News (Jun. 3, 1991); Ahmed, "Kashmiri leader thanks WAMY for help," Riyadh Daily (Dec. 8, 1995). While Bin Laden attacked the Saudi cleric, Saudi-based charities were funding the Chechen jihad WAMY openly solicited support for. Attorney General Ashcroft announced that the LBI/BIF charity network's chief "defrauded donors by using their money to fund Jihad fighters in Chechnya and Bosnia," providing "anti-mine boots, uniforms, tents and even an ambulance." Winer Rebuttal Rpt. § 3.29; Winer Rebuttal Rpt. § 4.11 (citing "Transcript of AG John Ashcroft Regarding Guilty Plea by Enaam Arnaout," (Feb. 10, 2003); Hegghammer, *Jihad in Saudi Arabia: Violence and Pan-Islamism since 1979* (2010)). The letter creates no inference that WAMY refrained from supporting al Qaeda, which the record independently establishes. Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

538. In the same December 29, 1994, letter Bin Laden criticized Sheikh Bin Baz, writing "[w]hen the King hung the cross upon his chest and appeared with it before the world, happy and smiling, you justified his action and permitted his abomination, and permitted him although this act is clearly infidelity." Id. at 29 December 1994.

**RESPONSE:**

Disputed as immaterial. This passage from the December 29, 1994 letter is religious/political rhetoric criticizing King Fahd and Sheikh Bin Baz; it is public messaging "designed to motivate support" and does not bear on WAMY's charitable financing of al Qaeda. Bin Laden's condemnation of the monarch does not bear on WAMY, which the U.S. government assessed as a "Tier 1" NGO that "may be affiliated with Usama Bin Laden and al Qaida operations." Ex. 112, Kohlmann 2020 Rpt. ¶¶158-159; Ex. 74, Winer Rpt. § 12.10.3; Winer Rebuttal Rpt. §§ 3.20–3.20.4 (citing U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) (Jun. 28, 2006); U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Adel Hassan Hamed (ISN No. 940) (Mar. 25, 2005); Ex. 227, Set 52_3643-3869 at 37; U.S. Dept. of Defense JTF-GTMO Matrix of Threat Indicators for Enemy Combatants). WAMY's role as an al Qaeda funding conduit is established through other evidence. Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 532-537, 539-540, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

539. In February 1995, Bin Ladin accused the Saudi government of misappropriating "large amounts of money collected from donations for people in Bosnia," and states "Besides the regime's political and ideological blockade, it also exercised a harsh economic and

financial (policy) as well. Part of this policy was dissolving charitable organizations that used to deliver donations directly to needy people inside and outside the country. It replaced them with organizations and foundations subservient to the Royal Family members and particularly, Prince Salman." Ex. 249 at 12 February 1995.

**RESPONSE:**

Disputed. This February 1995 statement is bin Laden's political narrative. Bin Laden's claim that the Saudi regime dissolved direct-delivery charities and replaced them with royal-family-controlled organizations is partly "propaganda" contradicted by the record — the charities Bin Laden claimed were dissolved "remained open," e.g., al-Haramain. Dep. of Winer (Jul. 13, 2021) at 159:5–161:2. WAMY is a Saudi government-established, funded, and controlled charity whose president is the Saudi Minister of Islamic Affairs. Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 27, 30-31, 33, 130, 137 (citing Motion to Dismiss of Abdullah Muhsen Al Turki (Dkt. No. 85), Ex. 2, Decl. of Abdulaziz H. al Fahad at ¶ 11; Kingdom of Saudi Arabia, Ministry of Foreign Affairs, "Serving Islam and Muslims (www.mofa.gov.sa); Prince Sultan Bin Abdulaziz Al-Saud's Motion to Dismiss (Dkt. No. 110), Case. No. 02-cv-1616-JR (DDC), Ex. 4, Decl. of Mutaz Saleh Abu Unuq (Apr. 1, 2003) at p. 2; Al-Jazirah, Riyadh (Jan. 12, 2001)). A 2011 CRA audit of WAMY's Canadian branch found "little or no independent function" from WAMY (Saudi Arabia). Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 146 (citing EX. 79, FED-PEC 218170-218203); Ex. 59, Levitt Rpt. ¶ 293, n.95 (citing AIVD, "Saudi Influences in the Netherlands" (Jun. 1, 2005). WAMY is listed among the Kingdom's da'wa "charities" supported "financially and operationally" by the Kingdom. Ex. 238, Nakhleh Rpt. ¶ 69(d) (citing PEC-KSA000235-266). WAMY's Saudi headquarters exercised "substantial control" even over its foreign branches. Ex. 133, Kohlmann 2020 Rpt. ¶ 76 (citing

EX. 79, FED-PEC 218170-218203 at 174-176). Bin Laden's complaint that the regime controlled charities does not show WAMY refrained from funding al Qaeda; the record shows al Qaeda "relied on diversions from Islamic charities." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16. WAMY served as an al Qaeda charity front. Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

540. Bin Laden encouraged donors not to give to Saudi affiliated charities when he wrote that "[i]t is known that these leaders cannot be trusted. There are other safe ways you that [sic] can assist in delivering funds to those who deserve them. Among them are, benevolence foundations in Kuwait, Jordan, Yemen, Sudan, and others. To assure that the funds transfer to these foundations' bank accounts, we draw your attention to the importance of transferring these funds outside the peninsula away of the pursuing regime's spies." Ex. 249 at 12 February 1995; Ex. 2 at ¶¶32-33 (discussing WAMY oppositional view to al-Qaeda's ideology and how supporting al-Qaeda amounts to treason).

**RESPONSE:**

Disputed. The cited Bin Laden document identifies no charities by name; so, "we can't conclude based on this what organizations this is referring to, because it lists none." Dep. of Levitt (Apr. 8, 2021) at 272:23–274:24. Bin Laden would not openly name trusted charities; such financing "is not static" and shifts routes as authorities crack down. Dep. of Levitt (Apr. 8, 2021) at 270:11-272:6, 277:3-15. Plaintiffs' expert Winer characterizes the letters as Bin Laden "expressing his rage and trying to get funds for himself." Dep. of Winer (Jul. 13, 2021) at 159:5-161:2. The

February 1995 exhortation to route donations outside the Arabian Peninsula is public propaganda reflecting his conflict with the Saudi regime. Because Bin Laden named no charity, the passage cannot exempt WAMY, and Saudi officials themselves later admitted "the misuse of Saudi-based charities and their branches … to support … Al-Qaeda." Ex. 133, Kohlmann 2020 Rpt. ¶46 (citing "Saudi Arabia Announces Counter-Terrorism Measures," Saudi Embassy (Dec. 3, 2002); "Saudi Arabia and Counterterrorism Fact Sheet: Combating Terrorist Financing," Saudi Embassy (May 2017); "Combating Terrorist Financing," Saudi Embassy (Jan. 2019)). The record contradicts any inference that al Qaeda avoided Saudi charities: al Qaeda "relied on diversions from Islamic charities," primarily from the Gulf and especially Saudi Arabia. 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 16, 23-24. WAMY was among al Qaeda's "most important charity fronts and partners" that "played an extensive role in supporting al Qaeda," and WAMY officials "have couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189, 199; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; Set_52_3643-3869 at pp. 37-39); Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶¶ 160, 559 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744)). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

541. Bin Ladin prohibited donations to Saudi charities because: "It is no longer hidden that the Saudi regime persistently sought to block all the abilities and capabilities of the ummah by placing control over it. but the regime was not satisfied with its unjust policies; it had to go further by imposing control on the minds and politics of the nation. Moreover, the regime sought to impose economic control. This resulted in the closure of charitable organizations that delivered the contributions of the benefactors from this country to its deserving lawful owners. The regime replaced these charitable organizations with associations and organizations that were supervised by members of the ruling family, such as Prince Sultan and Prince Salman. This revealed a scheme by which they monopolized the charitable contributions in such a way that it prevented Islam and the Muslims from benefiting from them. The regime used the contributions the same way it used the money of the afghani mujahidin. That money was used to pressure the mujahidin and influence their policies in a way that would benefit the interests of the West. Sometimes these contributions were used for private interests of the princes. Ex. 249 at 11 August 1995; Ex. 2 at ¶¶32-33 (discussing WAMY oppositional view to al-Qaeda's ideology and how supporting al-Qaeda amounts to treason).

**RESPONSE:**

Disputed. As with ¶ 539, Bin Laden's assertion that the regime closed direct-delivery charities and replaced them with organizations supervised by Princes Sultan and Salman is partly propaganda contradicted by the fact that such charities remained open. Dep. of Winer (Jul. 13, 2021) at 159:5–161:2. This August 1995 statement is bin Laden's political messaging. Bin Laden identifies no charities by name; so, "we can't conclude based on this what organizations this is referring to, because it lists none." Dep. of Levitt (Apr. 8, 2021) at 272:23–274:24. It does not

disprove that WAMY channeled support to al Qaeda; the record shows WAMY served as "a key conduit for support to al Qaeda," and one of al Qaeda's "most important charity fronts and partners." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189, 199; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; Set_52_3643-3869 at pp. 37-39). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 532-540, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

542. Bin Ladin thereafter continued to warn donors that: "We are drawing their attention to the risk of forwarding those contributions through the ruling regime and its organizations. We are advising them to deliver their contributions directly to the people through safe hands of individuals, organizations, and societies that are trusted, such as the charitable societies in Qatar, Kuwait, Sudan, Yemen and Jordan. We are advising them to be careful that their contributions stay away from the pursuit of the servant of the two holy mosques and his agents, and to make sure that the money will reach the people it is intended for." Id. at 11 August 1995.

**RESPONSE:**

Disputed. This August 1995 statement is public propaganda warning donors to route contributions away from the "ruling regime and its organizations" Bin Laden's shifting instructions reflect the non-static nature of terrorist finance as authorities cracked down, and his refusal to openly designate trusted charities. Dep. of Levitt (Apr. 8, 2021) at 270:19-272:6,

277:10-15. WAMY continued providing material support to al Qaeda and aligned groups. Ex. 74, Winer Rpt. §§ 12.13.3, 12.14 (citing al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-43). Al Qaeda continued to rely "heavily on those charities to facilitate and mask the collection and movement of its funds," regardless of Bin Laden's public warnings, and continued to draw on diverted charitable donations. 9/11 Comm'n Report at 25; Winer Rebuttal Rpt. § 4.4.2 (citing U.N. Letter S/2003/1070 (Dec. 2, 2003)). WAMY functioned as an al Qaeda conduit (Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) ¶¶ 132, 517 (citing DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 827; CIA_000178-189 at 185; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744)), and WAMY-affiliated figure Adel Batterjee founded BIF as a WAMY "affiliate" branch, whose raided Sarajevo headquarters uncovered "transcripts of communications between BIF management and senior commanders of Al-Qaida based in Afghanistan" — demonstrating that Saudi-charity-linked entities in fact channeled support to al Qaeda notwithstanding bin Laden's public statements. Ex. 237, Decl. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 192, 198 (citing Hedges, "Muslims from afar joining 'Holy War' in Bosnia," NYT (Dec. 5, 1992); Basaddiq, "Islamic Charity Committee moves to new premises," Arab News (May 21, 1994); OFAC SDN list (Dec. 3, 2002) at p. 4; *U.S. v. Usama ~~Bin~~bin Laden*, 98 CR 1023, Gov't Ex. 2800-A; Whitmore, "Bosnian Charities Tied to Terror," Boston Globe (Jul. 2, 2002); Aff. of Special Agent Robert Walker, *U.S. v. BIF*, 02 CR 0414 (Apr. 29, 2002) at p. 10). This statement does not disprove that WAMY channeled support to al Qaeda; the record shows WAMY served as "a key conduit for support to al Qaeda," and one of al Qaeda's "most important charity fronts and partners." Ex. 240, Pls.' Corrected Averment (Dkt. No. 9764)) at ¶¶ 73, 132; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 173, 189, 199; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2106 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243,

CIA_000807-848 at 820-821, 826; Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 744; Set_52_3643-3869 at pp. 37-39). Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 532-540, 565 and heading IX. A genuine dispute of material fact exists.

**STATEMENT:**

543. Bin Laden did not issue his first "public fatwa" against the United States until 1996. Ex. 46 at 59.

**RESPONSE:**

Undisputed as to the existence of Bin Laden's 1996 fatwa. Disputed to the extent WAMY implies that Osama bin Laden's hostility toward, and campaign against, the United States began only in 1996. Plaintiffs' expert Evan Kohlmann opines that bin Laden's anti-U.S. operational and procurement network long predated his 1996 declaration: Ziyad Khaleel "[f]rom approximately 1993 to 1999" served as "a key procurement agent and technical support advisor" for al-Qaeda. Ex. 150-A to (Corrected) Decl. of Haefele (Dkt. No. 9541), Kolhmann 2022 Rpt. ¶38, n.49 (citing U.S. Treasury IARA SDGT designation (Oct. 13, 2004); *see also* EO 0628-636-UPDATED at 632-633). Bin Laden declared his fatwa for jihad "privately in 1992 but publically in 1996" and "was tremendously successful in recruiting followers," Ex. 238, Nakhleh Rpt. ¶102. Osama Bin Laden describes the U.S. and the western nations as "the attacking crusader and the Jewish alliance," the "western and crusader countries ... [and] the infidel western countries," and the United Nations as "an instrument in the hands of the Jews and the crusaders to exterminate and rob the wealth of Muslims." The West Point Harmony letters, Letters from Bin Laden at p

17 (Jun. 7, 1994 ltr.), p 40 (Dec. 29, 1994 ltr.), and pp 71-72 (Aug. 3, 1995 ltr.) A material dispute of fact exists.

**STATEMENT:**

544. As a November 2, 2000, Intelligence Report of the DCI Counterterrorist Center noted:

> Bin Ladin's fatwas carry no formal authority outside of his own organization, and many Islamic religious scholars view his justifications for terrorism as simplistic and flawed, failing to address the numerous Islamic injunctions prohibiting violence against innocents-including Christians and Jews, who are traditionally tolerated as "Peoples of the Book." Instead, Bin Ladin attempts to appeal to Muslims who are not familiar with the finer points of Islamic jurisprudence but are convinced that their civilization must fend off an assault of Western military power and cultural values.
> Ex. 250, DCI Counterterrorist Center, Intelligence Report, "Bin Ladin's Terrorist Operations: Meticulous and Adaptable," November 2, 2000.

**RESPONSE:**

Disputed. Bin Laden's fatwas and his aligned rhetoric in fact radicalized and mobilized followers, including those who carried out and celebrated the 9/11 attacks. Osama Basnan described bin Laden "as a great authority figure who would change the world for the benefit of Islam" and endorsed suicide bombings. Ex. 150-A to (Corrected) Decl. of Haefele (Dkt. No. 9541), Kolhmann 2022 Rpt. ¶71 (citing FBI011761). Guantanamo detainee Sulayman al-Khalidi and Abdelaziz al-Khalidi decided to fight with the mujahideen after reading a fatwa from Saudi cleric Shaykh Hammoud Bin Uqla Ash-Shuaibi endorsing the Taliban; the shaykh was inspired by Bin Laden and had "helped raise money for [him] until [his] death [] in 2001." Ex. 264, Kohlmann 2022 Rpt. ¶63 (citing U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Salman

Saad al-Khadi Mohammed (ISN No. 121) (Apr. 21, 2006); U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Abdul Aziz Saad Al-Khaldi (ISN No. 112) (May 1, 2007)). Sunni Saudi cleric Ali Khudayr Fahd al-Khudayr (former student of Shaikh Ash-Shuaibi) issued numerous fatwas before and after 9/11 calling for jihad and justifying the 9/11 hijackings as "legitimate revenge." Ex. 150-A to (Corrected) Decl. of Haefele (Dkt. No. 9541), Kolhmann 2022 Rpt. ¶50-51 (citing Malik, "Saudi Cleric's Followers Face Charges," AP (May 31, 2003); https://web.archive.org/web/20100219183253/http://www.tawhed.ws/r?i=xbx73ruy; "39 Ways to Serve and Participate in Jihad," Al-Qaida in Saudi Arabia (2003)). Anwar al-Awlaki's pre-9/11 teaching was "very closely in line with the al-Qaeda approach" reflected in the 1998 "Jihad Against Jews and Crusaders" statement, delivered while Awlaki was "in direct contact with three of the hijackers," and "would ... have preserved and reinforced the hijackers' extremist beliefs." "Jihad Against Jews and Crusaders," World Islamic Media Front (Feb. 23, 1998). Saudi Wahhabi clerics "justify terrorism ... as a legitimate and effective tool." Ex. 238, Nakhleh Rpt. ¶35. Bin Laden "greatly benefitted from the religious legitimacy conferred on him by" Sheikh Omar Abdel Rahman, "a well-known religious authority who was revered by Sunni extremists." Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § II-A (citing State Dept. INR Weekend Edition (Aug. 21, 1993)). A material dispute of fact exists.

**STATEMENT:**

545. Osama Bin Ladin presented himself as a challenger to the Saudi Arabia's existing government system. Ex. 251, Matthew Levitt Dep. Transcript (Excerpt) at 436:7-438:12 (Levitt explains that Bin Ladin was a challenger to Saudi Arabia's existing form of governance, and that for some within the Saudi system, that made him a pure enemy, requiring that Saudi Arabia take a harder line).

**RESPONSE:**

Undisputed that bin Laden positioned himself as a challenger to Saudi Arabia's existing system of governance; disputed to the extent it is implied that Saudi state-sponsored dawah organizations such as WAMY were therefore adverse to al-Qaeda or withheld support from it. WAMY provided material support to al-Qaeda notwithstanding bin Laden's opposition to the Saudi government. Ex. 112, Kohlmann 2020 Rpt. ¶204, ¶206; Ex. 74, Winer Rpt. §12.14. Despite denunciation by "palace 'ulama," bin Laden "continued to receive millions of dollars from supporters and wealthy donors in Saudi Arabia," and "Saudi government officials knew that Saudi-financed Islamic charities, such as al-Haramayn, IIRO, WAMY, and the Muslim World League, were not only engaging in propagation but also in directly supporting al-Qa'ida's ongoing jihad against ... the United States." Ex. 238, Nakhleh Rpt. ¶106; Ex. 133, Kohlmann 2020 Rpt. ¶46 (citing "Saudi Arabia Announces Counter-Terrorism Measures," Saudi Embassy (Dec. 3, 2002); "Saudi Arabia and Counterterrorism Fact Sheet: Combating Terrorist Financing," Saudi Embassy (May 2017); "Combating Terrorist Financing," Saudi Embassy (Jan. 2019)). WAMY's own Secretary General, Dr. Maneh al-Johani, told Kashmiri expatriates that Muslims "can give their moral, physical and financial support [to] the cause of Jihad." Ex. 59, Levitt Rpt. § IV.6, n.91; Ex. 112, Kohlmann 2020 Rpt. ¶164 (citing "WAMY Calls for Jihad to Free Kashmir," Muslim World News (Jun. 3, 1991) at 15). WAMY is "another example of the shadowy Saudi dawah/charitable entities that have helped support Al-Qaida," and was found by the U.S. Department of Defense to be "a Tier 1 Counterterrorism NGO target" who exhibits "sustained and active support for terrorist organizations willing to attack U.S. persons or interests." Ex. 112, Kohlmann 2020 Rpt. ¶¶158-159; Ex. 74, Winer Rpt. § 12.10.3 (citing U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) (Jun. 28, 2006); U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Adel Hassan

Hamed (ISN No. 940) (Mar. 25, 2005); Ex. 227, Set 52_3643-3869 at 37; U.S. Dept. of Defense JTF-GTMO Matrix of Threat Indicators for Enemy Combatants). In January 2000, WAMY Secretary General al-Johani published an editorial supporting the Chechen mujahideen and emploring his followers to support the jihad, stating "they need money to buy weapons and gear," Ex. 112, Kohlmann 2020 Rpt. ¶166 (citing al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843). A material dispute of fact exists.

**STATEMENT:**

546. On April 20, 1998, President William J. Clinton added "Usama bin Muhammad Awad bin Ladin" and "Islamic Army (a.k.a. Al-Qaida…)" to the "Terrorists Who Threaten To Disrupt the Middle East Peace Process" List. Ex. 252, Executive Order 13099.

**RESPONSE:**

Undisputed that Executive Order 13099 designated bin Laden and al-Qaeda in 1998; disputed to the extent WAMY implies that the absence of a formal U.S. designation of WAMY establishes that WAMY did not support al-Qaeda. Non-designation reflects diplomatic and policy considerations, not a lack of evidence: the United States "does not designate individuals and organizations for sanctions even when it has sufficient evidence to do so," and instead "continued in dialog with the Saudi government in an effort to 'fix'" WAMY, IIRO, and MWL. Ex. 74, Winer Rpt. §12.21. A December 30, 2009 State Department cable states that WAMY, IIRO, and MWL "continue to send money overseas and, at times, fund extremism overseas." Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). The U.S. Department of Defense assessed WAMY to be a "Tier 1 Counterterrorism NGO target" who exhibits "sustained and active support for terrorist organizations willing to attack U.S. persons or

interests." Ex. 112, Kohlmann 2020 Rpt. ¶¶158-159; Ex. 74, Winer Rpt. § 12.10.3 (citing U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) (Jun. 28, 2006); U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Adel Hassan Hamed (ISN No. 940) (Mar. 25, 2005); Ex. 227, Set 52_3643-3869 at 37; U.S. Dept. of Defense JTF-GTMO Matrix of Threat Indicators for Enemy Combatants). A November 2002 CIA report found al Qaeda "was able to exploit several Saudi-based NGOs and divert funds to al-Qa'ida." Levitt 2020 Rpt. § IV-3, n.67 (citing CIA report "Saudi-Based Financial Support for Terrorist Organizations" (Nov. 14, 2002)). Saudi officials knew WAMY and other Islamic charities were "directly supporting al-Qa'ida's ongoing jihad;" and that al Qaeda was "largely funded and otherwise supported by money and other support (for example, safe haven, travel documents, access to operatives, training, etc.) that were channeled to Al-Qaida through Saudi-based Islamic "charitable," or dawah organizations," including WAMY. Ex. 238, Nakhleh Rpt. ¶106; Ex. 133, Kohlmann 2020 Rpt. ¶46 (citing "Saudi Arabia Announces Counter-Terrorism Measures," Saudi Embassy (Dec. 3, 2002); "Saudi Arabia and Counterterrorism Fact Sheet: Combating Terrorist Financing," Saudi Embassy (May 2017); "Combating Terrorist Financing," Saudi Embassy (Jan. 2019)). A material dispute of fact exists.

**STATEMENT:**

**IX. Expert Review Confirms the Lack of Evidence That WAMY Provided Material Support To or The Ideological Foundation For al-Qaeda.**

**RESPONSE:**

Disputed. The record establishes that WAMY provided material, financial, and logistical support to al-Qaeda and its affiliates and authored and disseminated ideological materials that furnished a foundation for al-Qaeda's program of violent jihad, creating a genuine dispute of material fact.

WAMY funded, and formally merged with, the Saudi charity Lajnat al-Birr al-Islamiyya (LBI) -- one of the three charities on which Usama bin Ladin and al-Qaeda principally relied -- and both entities were headed by Adel Batterjee, later designated a SDGT by the U.S. Treasury and sanctioned by the U.N. Security Council for his central role in raising funds for al-Qaeda. Ex. 74, Winer Rpt. §§ 7.7.3.1, 12.12.1-12.12.2, 12.12.10 (citing Ex. 271, Aff. of Robert Walker in *U.S. v. BIF*, 02 CR 0414 (Apr. 29, 2002); Ex. 184, "Benevolence Director Indicted For Racketeering Conspiracy, Providing Material Support to Al Qaeda and Other Violent Groups," U.S. DOJ press release (Oct 9, 2002); Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 25; WAMY Administrative Resolution No. 37 (May 28, 1996), Ex. 267 to Noorwali Dep. (7/24/2019), WAMYSA0276804; Ex. 170, PEC-KSA002135-43; Ex. 23 U.S. Treasury press release (Dec. 21, 2004). WAMY's own records confirm the merger -- Administrative Decision No. 37 (Sept. 7, 1996) resolved that "[t]he Islamic Benevolence Committee will be merged into its parent organization (the World Assembly of Muslim Youth)" effective May 28, 1996, with "[a]ll abroad assets and properties of [LBI] offices and projects are to be transferred in favor of the [WAMY]," and WAMY records describe WAMY as "the umbrella of (LBI)." Ex. 121, WAMY Administrative Resolution No. 37 (May 28, 1996), Ex. 267 to Noorwali Dep. (7/24/2019), WAMYSA0276804; Decl. of Mohammedi (Dkt. No. 11999), Ex. 131, WAMYSA027758; Ex. 110, Dep. of Noorwali (7/24/2019) at 228:6-229:11, 239:7-240:3. The U.S. Government likewise records that LBI "is a close affiliate of the Saudi World Assembly of Muslim Youth (WAMY)" and "a subsidiary of the World Assembly of Muslim Youth and the 'parent' NGO of Benevolence International Foundation (BIF)." Decl. of Mohammedi (Dkt. No. 12001), Ex. 243 at CIA_000820, and Ex. 245 at CIA_000151. LBI, founded by Adel Batterjee in Saudi Arabia and Pakistan, provided financial and operational support to mujahedeen associated with bin Ladin, was affiliated with Makhtab al-Khidamat (the al-Qaeda precursor bin

Ladin co-founded and financed), and later joined al-Qaeda, and in 1991 LBI employee Enaam Arnaout worked with al-Qaeda members to purchase rockets and rifles in large quantities and distribute them to mujahedeen camps, including some operated by al-Qaeda Ex. 74, Winer Rpt. §§ 12.12.9-12.12.10 ( U.S. Dep't of Justice press release, Oct. 9, 2002; Ex. 23, U.S. Treasury press release (Dec. 21, 2004). WAMY's own Pakistan audits from 1994 through 2002 refer to that office throughout as the "WAMY/LBI Office." Ex. 180, Winer Rebuttal Rpt. § 2.38.7; WAMY-Pakistan audits from 1994-2002, Decl. of Mohammedi (Dkt. No. 11997), Exs. 78-82. WAMY was closely associated with BIF, sharing with BIF-Canada a common director (Mohamed Khatib, who simultaneously served as Secretary of BIF-Canada), a mailing address, and a joint Canadian bank account, and it provided funding to BIF-USA, whose director Arnaout pled guilty to racketeering and admitted BIF financed violence overseas., Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 190, 193 (citing , EX. 79, FED-PEC 218170-218203, EX. 80, WAMYSA 1745-68; , Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865-72; EX. 83, WAMYSA 1885-87; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). WAMY's Peshawar P.O. Box 1055 is listed by OFAC as a known BIF address, and an envelope of Arabic-language terrorist training manuals seized from 1993 World Trade Center bombing conspirator Ahmed Ajaj bore BIF letterhead noting that BIF is a branch of the "World Assembly of Muslim Youth.", Ex. 112, Kohlmann 2020 Rpt. ¶ 195 (citing Ex. 79, FED-PEC 218170-218203) and Ex. 237, Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 192, 199 (citing Ex. 104 Hedges,"Muslims from afar joining 'Holy War' in Bosnia," NYT (Dec. 5, 1992); Basaddiq, "Islamic Charity Committee moves to new premises," Arab News (May 21, 1994); IRS 990 forms for WAMY for Fiscal Years 1993-1999, *U.S. v. Usama bin Laden*, Gov't Ex. 2800-A; Set_52_3643-3869 at p. 37-39), U.S. Treasury OFAC list). On March 25, 1992, WAMY wired 399,067.15 Austrian schillings (approx. $34,254) from its Jeddah account to the Third World

Relief Agency (TWRA) -- the entity central to funding weapons purchases for fighters in Bosnia -- and WAMY's director for Austria and Eastern Europe, Fatih el-Hassanein, simultaneously headed TWRA during its provision of arms. Ex. 74, Winer Expert Rpt. §§ 10.5.10, 12.12.13-12.12.14 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854; Ex. 51 WAMY document indices (produced Mar. 23, 2017), Decl. of Tarbutton (Dkt. No. 3912), Ex. 36; "Bosnia's Muslims Dodged Embargo," WP (Sep. 22, 1996)). The 9/11 Commission found bin Ladin used TWRA to covertly provide financial and other support for terrorist activities, and WAMY's U.S. branch was incorporated in 1992 by bin Ladin's nephew Abdullah bin Laden. Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶¶ 173-174 (citing Ex. 4, 9/11 Comm'n Report at 58; WAMY IRS Form 1023 Application (Nov. 9, 1992); Ex. 148, Pls.' Averment (Dkt. No. 9541), Ex. 333, Aff. of Abdullah Awad Bin Laden (Nov. 19, 2005); WAMYSA 51692-98; WAMY INTL 13864, 1366-70, PEC-KSA 3656-3718, WAMYSA 42103). In January 2000, the Saudi Minister of Islamic Affairs sent WAMY Secretary General Maneh al-Johani a check for 20,000 Saudi Riyals "to the benefit of the Muslims of Chechnya" and "to support our mujahideen brothers," and al-Johani confirmed receipt on WAMY's behalf. Ex. 112, Kohlmann 2020 Rpt. ¶ 167 (citing Ex. 45 WAMYSA 1249305; Ex. 47, FED-PEC234243-44; Ex. 46, WAMYSA 1249304; Ex. 49, FED-PEC 234930-31). Guantanamo detainee Adel Hassan Hamad was employed by WAMY in Afghanistan and Pakistan, co-captured detainee Mammar Ameur was assessed as an al-Qaeda facilitator due to his employment with WAMY, and the U.S. Department of Defense assessed that WAMY-employed detainees were likely using their NGO employment to facilitate funds and personnel for al-Qaeda; DOD classified WAMY as a "Tier 1" counterterrorism NGO target that has demonstrated sustained and active support for terrorist organizations, is affiliated and associated with bin Ladin and al-Qaeda operations, and "supports terrorist ideals and causes." Ex. 112, Kohlmann 2020 Rpt. ¶¶

159, 168, 171-172; Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶ 199; and Ex. 74, Winer Rpt. § 12.10.3; Ex. 180, Winer Rebuttal Rpt. §§ 3.20 (citing JTF-GTMO Detainee Assessments of Rashed Balkhair (ISN 186) (Jun. 28, 2006), Adel Hamed (ISN 940) (Mar. 25, 2005), and Mammar Ameur (ISN 939) (Apr. 13, 2005 & Jul. 25, 2005); Set_52_3643-3869 at p. 37-39; JTF-GTMO Matrix of Threat Indicators for Enemy Combatants; Ex. 102, WAMYSA 1088-1091; FED-PEC 197472-197479; Ex. 227, Set 52_3643-3869 at 37; FED-PEC0175632). CIA and FBI reporting released under Executive Order 14040 further documents WAMY's role in terrorism recruiting, training, and fund movement: the CIA assessed that "WAMY's global reach and influence among Muslim youth has made it an excellent conduit of recruits for many extremist groups" and that WAMY's Balkans offices were "actively involved in spotting and assessing suitable terrorist recruits." Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2102 (citing CIA, "Saudi-Based Financial Support for Terrorist Organization," Nov. 14, 2002, Ex. 609, Decl. of Mohammedi (Dkt. No. 12001), Ex. 245, CIA_000143-158. at 000151; CIA, "Al-Qa'ida Still Well Positioned to Recruit Terrorists," July 1, 2002, Ex. 615, CIA_000178-189 at 000185-186). WAMY "sponsored and funded military training camps for Muslim youth" where "training included weapons handling, firing, and explosives." Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2103 (citing Ex. 615, CIA_000178-189 at 000185). "WAMY officials have couriered private Saudi donations to Islamic groups in Afghanistan and Bosnia." Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2104 (citing CIA, "Funding Islamic Extremist Movements," Ex. 78, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4 at 000744). WAMY-Jeddah sent approximately $140,000 in May 2001 to the Taibah International Aid Association, later designated a SDGT for funneling money to al-Qaeda. (Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2105 (citing Ex. 578, U.S. Treasury press release; CIA, "Taibah: Linking Extremists in the Balkans and the United States," (Dec. 12, 2002) CIA-SUB_0031-33 at 0032)). CIA reporting

also tied WAMY directly to bin Ladin -- reporting that bin Ladin funded offices of LBI, "which is closely affiliated with WAMY," and describing WAMY Chairman Abdallah al-Muhaidib "as a supporter of Usama Bin Ladin" -- and stated that "WAMY has long been alleged to be a financier of Islamic extremists" and "provides funding for the Palestinian Islamic Resistance Movement (HAMAS), Egypt's Islamic Jihad, and Gama'at al-Islamiyya, and an Islamic movement in Kurdistan" Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶¶ 2104, 2106 (citing Ex. 79, CIA, "Usama Bin Ladin: Some Saudi Financial Ties Probably Intact," (Jan. 11, 1999) DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 000820-821, 000826-827; Ex. 2, EO 3414-3442 at 3438); Ex. 112, Kohlmann 2020 Rpt. ¶¶ 178-179 (citing WAMY funding of Hamas via the U.S.-designated "Union of Good," U.S. Treasury press release HP-1267 (Nov. 12, 2008); WAMYSA 1235604; WAMYSA 1235605-607). WAMY's U.S. branch had direct ties to al-Qaeda-connected figures: WAMY's Falls Church office was run by Abdullah bin Laden -- a nephew of Osama bin Laden and through whom "[t]he Bin Ladin family probably contributed to WAMY." Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. at 220; Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶¶ 1836, 2107 (citing Ex. 333, Ex. 22, Aff. of Abdullah Awad Binladin (Nov. 19, 2005); Ex. 79, CIA, "Usama Bin Ladin: Some Saudi Financial Ties Probably Intact," (Jan. 11, 1999) DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 000826). WAMY's U.S. vice president Ibrahim Abdullah was known to the FBI as "associated with subjects of FBI al-Qa'ida and Islamic Resistance Movement (HAMAS) investigations through his WAMY activities and phone records" Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. at 220 and Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2109 (citing WAMY International, Inc. corporate filing June 2000, signed by Ibrahim Abdullah as "Vice President", EO 3414-3442 at 3429). Anwar al-Awlaki -- a senior al-Qaeda in the Arabian Peninsula figure and spiritual mentor to the 9/11 hijackers -- had his imam position

at the Dar al-Hijrah Mosque in Falls Church, Virginia brokered by WAMY, which invited him to lecture at WAMY-USA summer camps in Texas in June and July 2002 and distributed audio tapes of his sermons. Ex. 112, Kohlmann 2020 Rpt. ¶ 186; Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. at 220; and Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶¶ 1834, 2116 (citing Ex. 77, Dep. of Ibrahim Abdullah (Oct. 21, 2019) at 71:1-72, 75:1-78, 82, 87:1-88; Ex. 174, WAMY Intl 015165 (Awlaki-Dar al-Hijrah contract in WAMY's records); WAMY SA 1519; WAMY INTL 0249; WAMY INTL 0170; Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001)). WAMY's own audits confirm that its funds were susceptible to diversion: for its highest-risk Peshawar (Pakistan-Afghanistan) office, auditors accepted the Regional Director's assurances without independent verification and stated that "expenditure incurred inside Afghanistan is not susceptible to independent audit verification;" left Rs 58,877,899 in 2002 donations unverified; and, in 2001, omitted approximately 50% of that year's donations (a Rs 44.761 million in-kind donation from WAMY Jeddah) from the financial statements such that the disbursements could have gone to anyone for any purpose during the period the region served as a center for al-Qaeda's preparations for the 9/11 attacks. Winer Rebuttal Rpt. §§ 2.16, 2.17.1-2.17.2 (citing WAMYSA018593; WAMY audits, Decl. of Mohammedi (Dkt. No. 11997), Exs. 78-82). WAMY produced audits for only ten of the 66 offices and 122 locations listed on its own 2003 website and produced none for its offices in Kashmir, Kenya, the Philippines, Russia, Sudan, the United Kingdom, the United States, and Yemen -- locations important to terrorist finance, recruitment, and operations. Winer Rebuttal Rpt. §§ 2.9, 2.13.4 (citing WAMY website, FEDPEC0218834-36). WAMY also authored, published, and disseminated ideological materials underpinning violent jihad: its youth-camp manual Islamic Camps: Objectives, Program Outlines and Preparatory Steps (for youth aged 14-18) exhorted campers, "on this Day of Jihad, are you miserly with your blood?!" and to "unsheath the swords," while its publication *Islamic Views*

(printed by the Saudi Government's Armed Forces Printing Press) taught that Islam "is a religion of Jihad" and to love taking revenge on the Jews -- material that provided the religious and ideological justification for jihad and Islamic martyrdom that were among the foundations for al-Qaeda's program of suicide bombings Ex. 74, Winer Rpt. §§ 12.11.1-12.11.4; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 160, 164; and Aff. of Tarbutton (Dkt. No. 3783), Ex. 9, Kohlmann Aff. ¶¶ 140, 189 (citing Aff. of Senior Customs Agent David C. Kane, *U.S. v. Biheiri* (Sept. 11, 2003); Islamic Camps: Objectives, Program Outlines, Preparatory Steps, WAMY 1987/1990 trans.; Steven Emerson testimony before the 9/11 Commission (July 9, 2003); *Islamic Views*, Saudi Armed Forces Printing Press)). At a July 1996 WAMY youth camp in Okeechobee, Florida overseen by senior WAMY officials, WAMY charitable-activities operations manager Suleman Ahmer delivered a lecture titled Ex. 48, "Jihad, The Misunderstood Word" presenting jihad in Bosnia and Chechnya as "motivational;" and WAMY employee Sheikh Saleh al-Buraik gave anti-American lectures at WAMY youth camps urging Muslims to wage or financially support jihad. Ex. 112, Kohlmann 2020 Rpt. ¶¶ 161, 183-185 and Pls.' Averment (Dkt. No. 9541) at ¶¶ 2115, 2117 (citing Ex. 48, "Jihad, The Misunderstood Word," a lecture by Suleman Ahmer, WAMY Okeechobee, FL Summer Dawah Camp (Jul. 26, 1996); Ex. 212, FED-PEC 210330-210331; The Islamic Library, Lessons of Sheikh Saad Buraik, at 3091). WAMY Secretary General al-Johani publicly called for jihad to free Kashmir, urging Muslims to give "moral, physical, and financial support [to] the cause of Jihad" because "Jihad is the only way out." Ex. 112, Kohlmann 2020 Rpt. ¶¶ 164, 166 and Ex. 59, Levitt Rpt. at 28 (citing "WAMY Calls for Jihad to Free Kashmir," Muslim World News (Jun. 3, 1991) at 15; al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843). A genuine dispute of material fact exists.

**STATEMENT:**

**A. The Opinions and Conclusions of Forensic Accountant Jonathan Marks**

**RESPONSE:**

No response necessary.

**STATEMENT:**

547. Jonathan Marks ("Marks") is a certified public accountant with certifications in financial forensics, information technology, and fraud examination; he also teaches forensic accounting. See Ex. 253, ECF 7351-4 (Jonathan T. Marks, Curriculum Vitae).

**RESPONSE:**

Undisputed that Marks holds the listed accounting credentials; disputed to the extent WAMY implies that Marks possesses expertise relevant to terrorist financing or the significance of WAMY's conduct. Marks conceded at deposition that he is "not a terrorism expert" and that his experience is limited to anti-money-laundering-type fraud investigations., Marks Dep. (7/22/2021) at 36:4-11. A material dispute of fact exists.

**STATEMENT:**

548. This court has qualified Marks to "review WAMY's financial records for signs of diversion" and whether based on his review of financial documents he found "any suspect transactions or signs that would be consistent with fraud or misappropriation." Ex. 254, ECF 9060 at 32-34.

**RESPONSE:**

Disputed to the extent WAMY implies that Marks personally performed, or is qualified to perform, a review capable of detecting terrorist financing. Marks conceded he is "not a terrorism

expert." Marks Dep. (7/22/2021) at 36:4-6. Marks is also prevented from testifying as to whether WAMY intentionally supported terrorism or knowingly supported terrorism. A material dispute of fact exists.

**STATEMENT:**

549. Marks and his team reviewed "tens of thousands of primary source documents and information produced in connection with this matter, [and] did "not uncover evidence to support a finding of financial mismanagement or misconduct indicative of terrorist financing activities on behalf of WAMY." Ex. 255, Jonathan Marks Report (Excerpt) at p. 6; Ex. 87 at 78:9-20 ("we reviewed a lot of documents").

**RESPONSE:**

Disputed. Marks's own deposition contradicts the premise that he reviewed "tens of thousands" of documents and found no indicia of terrorist financing. Marks testified that his personal document-review time was 14 hours (Marks Dep. (7/22/2021) at 77:14-78:7); that "I wouldn't say I reviewed tens of thousands of documents" (Marks Dep. (7/22/2021) at 78:9-79:4); that he relied on his team's verbal summaries with "nothing ... in writing" (Marks Dep. (7/22/2021) at 79:5-19, 80:13-82:2); that he does not read Arabic and his team "walked us through" the Arabic Pakistan and Eastern Province audits (Marks Dep. (7/22/2021) at 201:2-202:5); and that he was "not tasked to conduct due diligence on the audit work done by others" and did not reconstruct the underlying payments (Marks Dep. (7/22/2021) at 103:1-104:14). WAMY's minimally documented, deficient records are "not a bug, but a feature" used to conceal terrorist support, so documentation cannot establish innocence. WAMY's "financial irregularities and atypical accounting practices… reflect typical terrorist financing modes and methodologies" and "are not bugs, but rather features." Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶ 17; Ex. 74, Ex. 74, Winer

Rpt. ¶¶ 9.6.1, 10.4, 10.5 (citing EX. 79, FED-PEC 218170-218203). The covert nature of charity support to al Qaeda means it would not appear in a charity's records: donors "channel money ... through middlemen ... rather than giving funds directly," a practice that "hides the donors' role." Ex. 59, Levitt Rpt. § IV.3 & n.64 (citing CIA, "Identifying Al-Qai'da's Donors and Fundraisers," Feb. 27, 2002). Al Qaeda exploited charities "with lax external oversight and ineffective internal controls," whose employees "would siphon the money to al Qaeda." Ex. 59, Levitt Rpt. § IV.5, n.77 (9/11 Commission Report 170-171). The CRA revoked WAMY's Canadian registration after finding "WAMY provided thousands of dollars to U.N.-sanctioned Benevolence International Foundation (BIF)." Ex. 59, Levitt Rpt. § IV.7, n.96 (citing EX. 79, FED-PEC 218170-218203). Clean-looking books do not exclude diversion: per the U.S. Department of Justice, al Qaeda understood the charities would receive funds, "a portion" of which was "diverted for al Qaeda operations" but "would nevertheless be listed in the charities' books as expenses for building mosques or schools or feeding the poor;" and that bin Laden ordered all charity transactions kept in cash to make the network "virtually invisible," with false documentation. Per former employees "upwards of 50% of their total funding was secretly diverted directly to Al-Qaida." Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶¶22-23, nn.12-14 (citing the Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 28-29; Dugger, "Anti-U.S. Plot in India is Foiled," NYT (Jan 21, 1999); 9/11 Comm'n Report at 171). A material dispute of fact exists.

**STATEMENT:**

550. Specifically, Mark's team reviewed (1) audit reports, (2) bank statements, (3) bank reports, (4) receipts, (5), financial reports, (6), project reports, (6) operational reports, and (7)

communications regarding operations and financial documents.” [sic] Ex. 255 at p. 2; Ex. 256, Jonathan Marks Reliance Material.

**RESPONSE:**

Disputed to the extent WAMY implies that the materials reviewed were reliable audits establishing the integrity of WAMY's finances. Plaintiffs' expert Winer testified that the materials Marks/Baker Tilly relied on "were not actual audits," "were financial -- unaudited financial statements," or "backup materials," and that he "was left unable to replicate" the Baker Tilly work. Winer Dep. (7/13/2021) at 284:9-12, 284:21-285:19. He also testified the WAMY annual financial reports he received were "of a very general nature" and that documents "characterized as audits were not audits." Winer Dep. (7/13/2021) at 285:20-286:2, 286:21-287:16. Undated audits, or audits carried out more than six months after the covered period, do not conform to international auditing standards and "affect[] the quality and reliability of the report." Winer Dep. (7/13/2021) at 288:21-289:11; Winer Rebuttal Rpt §2.4). Marks himself conceded that WAMY audit reports (e.g., Indonesia and 1995) were likely not prepared until after June 8, 2010, and that he could not confirm their issuance dates. Marks Dep. (7/22/2021) at 238:5-241:15. A material dispute of fact exists.

**STATEMENT:**

551. After review of “hard evidence,” Marks is of the opinion that WAMY’s financial audit observation do not indicate participation in or support of terrorist activities. Ex. 255 at pp. 9-20. The basis for this opinion includes that:

**RESPONSE:**

Disputed. Based on the primary-source record, WAMY's sources and uses of funds are indicative of support for terrorism. Marks admits he "is not a terrorism expert," has "never been involved in an investigation that has led to anything related to terrorist financing," and has no al-Qaeda or counterterrorism background. Marks Dep. (7/22/2021) at 41:9-42:17. Winer testified the basis for attributing WAMY support to terrorism includes "the material deficiencies in the controls, the presence in the location, the nature of the people who were being served, the fact that they're foreign fighters ... [and] the provision of travel documents and facilitation." Winer Dep. (7/13/2021) at 326:5-327:21. CIA reporting described WAMY as "a Saudi NGO whose personnel often pursue an extremist agenda" and found WAMY "has long been alleged to be a financier of Islamic extremists." Pls.' Averment (Dkt. 9541) at ¶ 2104 (citing Ex. 78, CIA 000744; Ex. 79, CIA 000827). The wealthy Gulf charities, under cover of aiding refugees, "provided weapons, guesthouses, and travel papers to needy members of the quickly-coalescing Al-Qaida movement;" "dawa" and "charity work" are "common al-Qaida cover stories." Ex. 112, Kohlmann 2020 Rpt. ¶19, nn.5-6 (citing Muhammad's Al-Ansaru l'Arab fi Afghanistan, (1991) at 187; Set_45_3065-3095 at 1; U.S. Department of Defense JTF-GTMO Matrix of Threat Indicators for Enemy Combatants). WAMY's minimally documented, deficient records are "not a bug, but a feature" used to conceal terrorist support, so documentation cannot establish innocence. WAMY's "financial irregularities and atypical accounting practices… reflect typical terrorist financing modes and methodologies" and "are not bugs, but rather features." Ex. 112, Kohlmann 2020 Rpt. ¶ 17; Ex. 74, Winer Rpt. ¶¶ 9.6.1, 10.4, 10.5 (citing EX. 79, FED-PEC 218170-218203). A December 30, 2009 State Department cable found WAMY "continue[s] to send money overseas and, at times, fund[s] extremism overseas." Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)). The Canada

Revenue Agency revoked WAMY-Canada's registration after finding WAMY "provided thousands of dollars to U.N.-sanctioned Benevolence International Foundation (BIF), an entity on the U.N.'s list of entities tied to al Qaeda." Ex. 59, Levitt Rpt. § IV.7, n.96 (citing EX. 79, FED-PEC 218170-218203). A material dispute of fact exists.

**STATEMENT:**

552. WAMY's project-based funding mechanism is a form of "absolute control" over its funding process. Ex. 87 at 157:10-159:19 (Marks opinion after review of "hard evidence"); Ex. 87 at 156:7-14 (attesting to having reviewed a Georgia report as an example of WAMY's reporting mechanism); Ex. 255 at p. 10 (citing to Ex. 209 which is a "..document that includes the relief contract and sets out the agreement of support and amounts for each part, also requires the recipient party (Georgia) to support expenditure with periodic reports"); Ex. 255 at p. 11 (Marks review of the documents produced confirmed WAMY's established funding and reporting processes).

**RESPONSE:**

Disputed. The record does not support that WAMY exercised "absolute control" over its funds. Plaintiffs' expert Jonathan Winer notes that "[t]he lack of controls and accounting integrity became means to facilitate flexibility for the uses of the funds, without tracking mechanisms." Ex. 74, Winer Rpt. § 9.16, nn.103-104 (citing CRS and FATF reports on Saudi charity oversight). The CRA audit of WAMY found "massive deficiencies," including "[f]ailure to maintain a general ledger," missing cancelled cheques, and "[f]ailure to maintain bank deposit slips." Ex. 74, Ex. 74, Winer Rpt. § 10.3.1; Ex. 112, Kohlmann 2020 Rpt. ¶191 (citing EX. 79, FED-PEC 218170-218203). WAMY's own Assistant Secretary General Noorwali conceded that WAMY funded Adel Batterjee/LBI and Batterjee "often disregarded these procedures" with a "lack of

reporting ... which resulted in ambiguity in receivables and expenditures," and Winer found no audit ever reconstructed the uses of those funds. Ex. 74, Winer Rpt. §12.12.4, §§12.12.5-.7 (citing WAMY Memo. of Law in Opposition to Plaintiffs' Motion to Compel (Dkt. No. 3949), Ex. Y, Decl. of Noorwali (Mar. 30, 2018); U.S. Tres. press release (Dec. 21, 2004)). Al Qaeda exploited charities "particularly those with lax external oversight and ineffective internal controls," where sympathetic employees "would siphon the money to al Qaeda." Ex. 59, Levitt Rpt. § IV.5 & n.77 (citing CRA Notice of Intention to Revoke WAMY (Jan. 5, 2012), EX. 79, FED-PEC 218170-218203). The CRA found that the WAMY office in Saudi Arabia "maintains substantial control over WAMY's finances [in Canada], and uses this control to carry out its own objectives in Canada," while WAMY nonetheless funded U.N.-sanctioned BIF. Levitt 2020 Rpt. § IV.7, n.96 (citing EX. 79, FED-PEC 218170-218203). WAMY's operations were "deeply intertwined" with the Vienna-based Third World Relief Agency (TWRA) — an arms-smuggling/terror-financing cover whose founder El Fatih Hassanein simultaneously served as Director of WAMY's Austria and Eastern Europe office — and that WAMY transferred at least approximately US$37,000 to TWRA. Ex. 112, Kohlmann 2020 Rpt. ¶174, nn.259-263 (citing 9/11 Comm'n Report at 58; WAMY doc indices produced Mar 23, 2012; FED-PEC 289619, 218206; WAMYSA 1665-66; PEC-KSA 3656-3718; WAMYSA 42103). WAMY workers were "likely using their employment in NGOs to facilitate funds and personnel for Al-Qaida." Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶¶168-172, nn.246-253 (citing Set_52_3643-3869, at 37-39; Ex. 102, WAMYSA 1088-1091; Ex. 103, WAMYSA 1084; FED-PEC 197472-79; U.S. Department of Defense, JTF-GTMO Detainee Assessment, Detainee Mammar Ameur (ISN No. 939) (April 13, 2005)). A material dispute of fact exists.

**STATEMENT:**

553. WAMY's project reporting requirements allow it to have a level of oversight and control over its branches. Ex. 87 at 167:11-20 ("The structure and behavior that WAMY put in place are indicative of a control-based group and not a group that ran without control over its local branch).

**RESPONSE:**

Disputed. The record shows WAMY lacked effective oversight of its branches. The CRA found WAMY Canada "indistinguishable from the headquarters of WAMY in Saudi Arabia, had little or no independent function, and had transferred funds for 'non-charitable purposes.'" Ex. 74, Ex. 74, Winer Rpt. §10.3.4 (citing EX. 79, FED-PEC 218170-218203). WAMY also failed to track funds it channeled to Batterjee/LBI. Ex. 74, Ex. 74, Winer Rpt. §12.12.5-.7 (citing U.S. Treas. press release (Dec. 21, 2004); WAMY Memo. of Law in Opposition to Plaintiffs' Motion to Compel (Dkt. No. 3949), Ex. Y, Decl. of Noorwali (Mar. 30, 2018)). "The lack of controls and accounting integrity" exhibited by WAMY "became means to facilitate flexibility for the uses of the funds, without tracking mechanisms." Ex. 74, Ex. 74, Winer Rpt. § 9.16, nn.103-104 (citing CRS and FATF reports on Saudi charity oversight). WAMY even had little-to-no control over its activites as noted by WAMY Secretary General al-Wohaibi who admitted it is "not possible to control" the content presented at WAMY youth camps. Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶161, n.237 (citing Ex. 212, FED-PEC 210330-31). A material dispute of fact exists.

**STATEMENT:**

554. WAMY's policy of funding projects on a project-by-project basis and requiring that its branches provide project reports reduces the likelihood of excess funds accumulating. Ex. 255 at pp. 11-12 (discussing how WAMY's project-based funding reduces excess funds and that it is a form of control); Ex. 69 (1998 Letter to Burma, Chad and others for stricter

financial controls), Ex. 70 (similar WAMY Jeddah 997 Letter to Chad and Cameroon office encouraging more diligent controls in order to reassure donors and beneficiaries), Ex. 71 (WAMY letter to Egypt for stricter controls in 1999).

**RESPONSE:**

Disputed. The record shows WAMY funds in conflict zones were neither controlled nor traceable. WAMY and comparable charities "operated with minimal record-keeping" as a deliberate "feature." Ex. 74, Ex. 74, Winer Rpt. §9.6.1. Winer testified that WAMY-Pakistan's "student welfare" line item was "a slush fund ... [and] there are no controls; [t]here's a complete lack of controls. There's no evidence of any controls on the actual uses" of funds. Ex. 193, Winer Dep. (7/13/2021) 319:21-320:15; Ex. 180, Winer Rebuttal Rpt.§2.17.5 (citing WAMYSA 018635). He testified these suspicious categories appeared only in WAMY's conflict-zone audits, not in non-conflict-zone offices. Ex. 193, Winer Dep. 321:10-322:6. Donors deliberately "channel money ... through middlemen -- including nongovernmental organizations (NGOs)-- ... rather than giving funds directly to Bin Ladin ... or al-Qa'ida," to "hide[] the donors' role." Ex. 59, Levitt Rpt. § IV.3 & n.64 (citing CIA report "Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report," Feb. 27, 2002). Charities with "lax external oversight and ineffective internal controls" were used to "siphon ... money to al Qaeda," Ex. 59, Ex. 59, Levitt Rpt. § IV.5 & n.77 (citing Ex. 4, 9/11 Comm'n Report at 170-171). Bin Laden ordered charity transactions kept in cash to render the network "virtually invisible," with false documentation and roughly half of funding "secretly diverted directly to Al-Qaida" — concealment that project-based paperwork would not detect. Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶¶22-23 & nn.12-14 (citing Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 28-29; Dugger, "Anti-

U.S. Plot in India is Foiled," NYT (Jan 21, 1999); Ex. 4, 9/11 Comm'n Report at 171). A material dispute of fact exists.

**STATEMENT:**

555. WAMY Pakistan audits that contained "disclaimers" is "not out of place or a sign of terrorist funding" and "does not equate to guilt." Ex. 255 at 14 (discussing the reasons behind the disclaimer).

**RESPONSE:**

Disputed. Plaintiffs' expert Winer testified that the WAMY-Pakistan audits bearing disclaimers were unreliable and raised terrorism-financing red flags: the auditors "accepted assurance" from management without independent field testing of "whether what was reported is what was actually spent;" and the audit flagged WAMY's own failure to report the donation-in-kind value of "tent, food stuff, clothes, and medicine," a "very substantial" discrepancy occurring "when the ... Pakistan/Afghanistan border regions[] w[ere] one of the centers for al-Qaeda in its preparation for attacks in the United States," Winer Dep. (7/13/2021) at 315:12-318:16 (citing Winer Dep. Ex. 934). Notably, Marks himself conceded the Afghanistan disclaimer arose because the auditors were "unable to verify the use of funds" Marks Rpt. at §III.A.1. A charity's "clean image" does not preclude terrorist diversion; al Qaeda's NGO fronts "covertly provided financial and other support for terrorism activities" that would not appear on the books. Ex. 59, Levitt Rpt. §§ IV.2, IV.3, n.68 (citing 9/11 Comm'n Report at 58). A material dispute of fact exists.

**STATEMENT:**

556. Despite the disclaimer, WAMY Pakistan's audit reports did not contain any "misstatements and faithfully represent the financial performance and position of [WAMY]." Ex. 255. at

p. 14 (discussing the soundness of the Pakistan audit reports); Ex. 18 at ¶35, Ex. 12 at 239:8-15 (denying existence of financial irregularities).

**RESPONSE:**

Disputed. The WAMY-Pakistan audits themselves reflect material bookkeeping failures. The 2002 audit covering operations directed from WAMY's Peshawar office found: "donations amounting to Rs 58877899 and their intended use for specified projects was not directly confirmed to us by WAMY Saudi Arabia hence remained unverified" and "undistributed stock of donations in kind comprising of tents food stuff clothes and medicines amounting to Rs 5.244 million as of 30 Zulhijjah 1422 Hijrah was distributed during the current year [but] said distribution was not subject to our verification, we could not physically verify the inventory of fixed assets as inventory lists were not available for our verification," which shows little proof that effective controls were in place for WAMY's operations in Pakistan and Afghanistan. Winer Rebuttal Rpt. §§ 2.17.1-2.17.1.7 (citing WAMYSA 0195478079). With respect to the significant donation-in-kind, Winer testified that "we don't know what went where based on the report. What we know is that the discrepancy is very substantial in terms of ... the sheer amount. As a percentage of the total." Winer Dep. (7/13/2021) at 317:9-15. Considering other WAMY branches, the CRA found WAMY's failure to maintain "essential books and records" prevented verification of "who received donations, the nature and purpose of WAMY's actual business dealings, and who exercised ultimate control." Ex. 74, Winer Rpt. §10.3.2 (citing EX. 79, FED-PEC 218170-218203). Unremarkable-looking charity records do not exclude diversion, because al Qaeda's charity support was "covertly provided" and routed through middlemen to hide it. Ex. 59, Levitt Rpt. §§ IV.2-IV.3, nn.64, 68 (citing CIA report

"Identifying Al-Qa'ida's Donors and Fundraisers: A Status Report," Feb. 27, 2002; 9/11 Comm'n Report at 58). A material dispute of fact exists.

**STATEMENT:**

557. Commenting on the same 1992-2002 audit report as well as others, Marks opines that, overall, the auditors would not have given WAMY an unqualified opinion if they distrusted the representations made to them by WAMY's senior leadership. Ex. 87 and 212:5-12 and 218:10-15; see also, Id. at 242:20-245:15 (discussing preparation of reports years after the event is not uncommon and auditors "issu[ing] clean audit opinions" at 24:15-21); Ex. 255 at 7-18 (discussing Marks's review of WAMY audit reports for Pakistan, Saudi and other regions).

**RESPONSE:**

Disputed. Plaintiffs' expert Winer opines that the late preparation of WAMY's audits undermines their reliability rather than confirming clean books: undated audits and audits carried out more than six months after the covered period do not conform to international auditing standards and reflect "an inconsistency of what is considered to be best practice." Winer Dep. (7/13/2021) at 288:21-289:11. He testified that many materials "were not actual audits," that he was "left unable to replicate" the Baker Tilly work, and that integrity issues arose in connection with the WAMY audits. Winer Dep. (7/13/2021) at 284:9-12, 284:21-285:19; Winer Rebuttal Rpt. §§ 2.6, 2.16, 2.17 (citing WAMYSA 018575-018755). Marks himself conceded that WAMY audits (e.g., Indonesia, 1995) were likely not prepared until after June 8, 2010 — years after the covered periods — and that he could not confirm their issuance dates. Marks Dep. (7/22/2012) at 239:4-8, 239:14-241:24. A charity's "clean image" does not preclude terrorist diversion; al Qaeda's NGO fronts "covertly provided financial and other support for terrorism activities" that would

not appear on the books. Ex. 59, Levitt Rpt. §§ IV.2, IV.3, n.68 (citing Ex. 4, 9/11 Comm'n Report at 58). A material dispute of fact exists.

**STATEMENT:**

558. Marks reviewed documents related to WAMY Canada, including primary sources related to the engagement and dismissal of Mohamed Khatib as director, and concluded that the defunding of WAMY Canada and removal of Khatib were in line with "what steps should be taken to prevent terrorists from succeeding, and they are not actions of a problematic organization or one ignoring misconduct." Id. at pp. 20-21.

**RESPONSE:**

Disputed. The Canada Revenue Agency, an official government body, revoked WAMY's Canadian charitable registration after finding that "WAMY provided thousands of dollars to U.N.-sanctioned Benevolence International Foundation (BIF)," an entity "on the U.N.'s list of entities tied to al Qaeda," and that the Saudi headquarters of WAMY "maintains substantial control over WAMY's finances" in Canada. Ex. 59, Levitt Rpt. § IV.7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). The CRA found WAMY Canada's president, Mohamed Khatib, "simultaneously served as the Secretary of BIF-Canada," that "BIF-Canada and WAMY used the same residential mailing address," that they "shared a Canadian bank account, which functioned as a joint account," and that "WAMY provided funds to BIF-USA." Ex. 59, Levitt Rpt. § IV.7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶ 193 (citing CRA Audit and

Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). This shared account was titled "World Assembly of Muslim Youth o/a BIF," and used by WAMY to make a "$50,256 transfer to BIF-USA's Orphan Program." Levitt Rpt. § IV.7, n.96; Ex. 133, Kohlmann 2020 Rpt. ¶ 76; Ex. 74, Winer Rpt. § 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 192-193 (citing CRA Audit and Revocation, EX. 79, FED-PEC 218170-218203 at 175-179, 184-185, 189; EX. 80, WAMYSA 1745-1768; Ex. 80, WAMYSA 1785; EX. 82, WAMYSA 1865- 1872; EX. 83, WAMYSA 1885-1887; EX. 84, WAMYSA 1889; EX. 90, WAMYSA 4443). Marks's own report acknowledges WAMY Canada and BIF Canada "shared an account at the Bank of Montreal ... 8086-611," which Khatib renamed in January 2001 to "World Assembly of Muslim Youth o/a BIF." Marks Rpt. §III.C, at 20, 25. When 1993 World Trade Center bombing conspirator Ahmed Ajaj was arrested, authorities seized Arabic terrorist training manuals "marked with the letterhead of BIF, with a notation explaining that BIF is a branch of the World Assembly of Muslim Youth," Ex. 112, Kohlmann 2020 Rpt. ¶195, n.295 (citing Gov't Ex. 2800-A, *U.S. v. Usama* ~~Bin~~*bin Laden*, et al., 98 Cr. 1023). A material dispute of fact exists.

**STATEMENT:**

559. Marks reviewed primary source documents related to the transfer of $50,293.13 into and out of Bank of Montreal account number 8086-611(the BIF Canada account) and concluded that WAMY Canada did not transmit funds to BIF USA. Id. at pp. 22-30.

**RESPONSE:**

Disputed. Plaintiffs' experts and the CRA conclude WAMY funds did reach BIF-USA. The CRA audit found WAMY made a "$50,256 transfer to BIF-USA's Orphan Program." Ex. 112,

Kohlmann 2020 Rpt. ¶193 (citing EX. 79, FED-PEC 218170-218203, at 12-14). Marks's own report acknowledges that a "$50,246 ... related to the orphan program was reflected in WAMY Canada's 2001 T3010 Registered Charity Information Return, WAMY's unaudited financial statements, the WAMY Canada bank statements, and the CRA 2001 audit report," which lists "$50,246 to the Benevolence International Fund Orphan Program." Marks Rpt. §III.C.1. Whether that payment was made by WAMY (as CRA and plaintiffs' experts conclude) or, as Marks contends, "from a source other than WAMY," is a disputed material fact.

**STATEMENT:**

560. Marks opines that WAMY does not have a lack of systematic record keeping issues. Id. at pp. 31.

**RESPONSE:**

Disputed. Plaintiffs' experts and Marks's own concessions establish systematic record-keeping failures. The CRA audit of WAMY itemized "[f]ailure to maintain a general ledger," missing cancelled cheques, no minute book, and "[f]ailure to maintain bank deposit slips." Ex. 74, Winer Rpt. §10.3.1.1-10.3.1.7 (citing EX. 79, FED-PEC 218170-218203). The CRA revoked WAMY's Canadian registration after finding recordkeeping and control failures and that WAMY funded U.N.-sanctioned BIF. Ex. 59, Levitt Rpt. § IV.7, n.96 (citing EX. 79, FED-PEC 218170-218203). Al Qaeda exploited Saudi charities "with lax external oversight and ineffective internal controls." Levitt 2020 Rpt. § IV.5, n.77 (citing 9/11 Comm'n Report at 170-171). The Canadian audit found "no apparent separation" between WAMY Saudi Arabia and WAMY-Canada and that WAMY (Saudi Arabia) "maintains substantial control over WAMY's finances," Ex. 112, Kohlmann 2020 Rpt. ¶192, n.292 (citing EX. 79, FED-PEC 218170-203), and that charities such as WAMY used cash transactions and false documentation to keep diversions "virtually invisible." Ex. 112,

Kohlmann 2020 Rpt. ¶¶22-23, nn.12-14 (citing the Ex. 27, Gov't Evidentiary Proffer in *U.S. v. Arnaout*, 02 CR 892 (Jan. 7, 2003) at 28-29; Dugger, "Anti-U.S. Plot in India is Foiled," NYT (Jan 21, 1999); 9/11 Comm'n Report at 171). A material dispute of fact exists.

**STATEMENT:**

561. Marks opines that WAMY's sources and use of funds were sufficiently supported and were not indicative of participating in or supporting terrorist activities. Id. at pp. 32-36.

**RESPONSE:**

Disputed. Based on the primary-source record, WAMY's sources and uses of funds are indicative of support for terrorism. Marks admits he "is not a terrorism expert," has "never been involved in an investigation that has led to anything related to terrorist financing," and has no al-Qaeda or counterterrorism background. Marks Dep. (7/22/2021) at 41:9-42:17. Winer testified the basis for attributing WAMY support to terrorism includes "the material deficiencies in the controls, the presence in the location, the nature of the people who were being served, the fact that they're foreign fighters ... [and] the provision of travel documents and facilitation." Winer Dep. 326:5-327:21. CIA reporting described WAMY as "a Saudi NGO whose personnel often pursue an extremist agenda" and found WAMY "has long been alleged to be a financier of Islamic extremists." Pls.' Averment (Dkt. 9541) ¶ 2104 (citing Ex. 78, CIA 000744; Ex. 79, CIA 000827). The wealthy Gulf charities, under cover of aiding refugees, "provided weapons, guesthouses, and travel papers to needy members of the quickly-coalescing Al-Qaida movement;" "dawa" and "charity work" are "common al-Qaida cover stories." Ex. 112, Kohlmann 2020 Rpt. ¶19, nn.5-6 (citing Muhammad's Al-Ansaru l'Arab fi Afghanistan, (1991) at 187; Set_45_3065-3095 at 1; U.S. Department of Defense JTF-GTMO Matrix of Threat Indicators for Enemy Combatants). WAMY's minimally documented, deficient records are "not a bug, but a feature" used to conceal

terrorist support, so documentation cannot establish innocence. WAMY's "financial irregularities and atypical accounting practices… reflect typical terrorist financing modes and methodologies" and "are not bugs, but rather features." Ex. 112, Kohlmann 2020 Rpt. ¶ 17; Ex. 74, Winer Rpt. ¶¶ 9.6.1, 10.4, 10.5 (citing EX. 79, FED-PEC 218170-218203). A December 30, 2009 State Department cable found WAMY "continue[s] to send money overseas and, at times, fund[s] extremism overseas."Ex. 133, Kohlmann 2020 Rpt. ¶ 55; Ex. 74, Winer Rpt. § 12.19.2 (citing U.S. State Dept. Cable "Terrorist Finance: Action Request For Senior Level Engagement On Terrorism Finance" (Dec. 30, 2009)).The Canada Revenue Agency revoked WAMY-Canada's registration after finding WAMY "provided thousands of dollars to U.N.-sanctioned Benevolence International Foundation (BIF), an entity on the U.N.'s list of entities tied to al Qaeda." Ex. 59, Levitt Rpt. § IV.7, n.96 (citing EX. 79, FED-PEC 218170-218203). A material dispute of fact exists.

**STATEMENT:**

562. The basis for this opinion includes that, based on review of tens of thousands of documents produced in the case, Marks found that WAMY's activities and projects had sufficient documentary support such that donor funds were not diverted to fund terrorist activities as claimed but instead spent on legitimate charitable activities. Id. at p. 32.

**RESPONSE:**

Disputed. The record shows WAMY funds were diverted to non-charitable and terrorism-linked purposes and that WAMY's documentation was too deficient to establish otherwise. The 9/11 Commission's terrorist-financing monograph found that al Qaeda penetrated charity branch offices where "lax oversight and the charities' own ineffective financial controls ... made it easy for al Qaeda operatives to divert money from charitable uses," and that terror financing is

concealed to "look to the bank like a charity sending money to troubled parts of the world." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 21, 54. The Canada Revenue Agency's 2011 audit of WAMY (FY 2000-2003) found WAMY kept no general ledger, no cancelled cheques (FYE 2001), no minute book, and no bank deposit slips, and that these failures made it impossible to verify who received donations or how funds were spent, including "money transfers to non-qualified donees" for "non-charitable purposes." Ex. 74, Winer Rpt. ¶¶ 10.3-10.3.2, 10.3.4; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 191-193 (citing EX. 79, FED-PEC 218170-218203; PEC-WAMY031447-31468 at 1451 & 1456). WAMY made a $50,256 transfer to the U.S. Benevolence International Foundation (a designated global terrorist entity) and shared a Canadian bank account with BIF-Canada. Ex. 112, Kohlmann 2020 Rpt. ¶ 193; Ex. 74, Winer Rpt. ¶ 12.12.12 (citing EX. 79, FED-PEC 218170-218203). WAMY funds reached the SDGT Taibah International (approximately $140,000 from WAMY-Jeddah in May 2001). Pls.' Averment (Dkt. 9541) ¶ 2105 (citing Ex. 222, CIA-SUB_0031-33 at 32). U.S. intelligence found al Qaeda "exploit[ed]" Saudi NGOs "by diverting funds from legitimate activities." Ex. 133, Kohlmann 2020 Rpt. ¶¶ 49-52 (CIA reports, CIA 182-196, 285-300, 385-411). Levitt explains that charities gave terrorist fundraising "a veil of legitimacy," were "vulnerable to abuse as money laundering mechanisms," and that donors deliberately routed money through NGOs and middlemen precisely so the paper trail would "hide the donors' role and allow[] them to deny knowing funds went to terrorists." Ex. 59, Levitt Rpt. §§ IV.2-3, n.43, 64 (citing Watson Memorandum (FBI), Nov. 5, 2001; CIA, "Identifying Al-Qai'da's Donors and Fundraisers: A Status Report," Feb. 27, 2020). As to WAMY, Levitt cites the CRA's finding that WAMY funded U.N.-sanctioned BIF and that WAMY's Saudi office "maintains substantial control over WAMY's finances [in Canada], and uses this control to carry out its own objectives in Canada." Ex. 59, Levitt Rpt. § 7, n.96 (citing CRA Notice of Intention to Revoke WAMY,

Jan. 5, 2012). WAMY's Pakistan audits carried qualified "except for" opinions and stated that "expenditure incurred inside Afghanistan is not susceptible to independent audit verification" and was "verified ... only to the approval thereof by WAMY's Regional Director," with donations of Rs. 58,877,899 that "remained unverified." Decl. of Omar Mohammedi (Dkt. No. 11997), Ex. 80, M. Almas & Co. audit for FY 1423H, exceptions (c), (e), (h). A material dispute of fact exists.

**STATEMENT:**

563. Marks concludes herein that "[w]hile WAMY has been accused by non-accountants of using charitable activities as a cover-up for terrorist-supporting activities, my analysis determined that 98.8% of the projects reviewed have been supported with a detailed plan and documentation as evidence of their operations and use of funds." Id. at pp. 32-33.

**RESPONSE:**

Disputed. WAMY and the other charities "did not provide sufficient, and sufficiently accurate, documentation… to enable one to make such a break-down by amount or by percentage," and that WAMY's discovery production is "improbably thin" and "cannot possibly represent all the actual documentation." Ex. 74, Winer Rpt. ¶¶ 13.1-13.2, 12.20. The 9/11 Commission monograph explains that terror financing is deliberately disguised as ordinary charity — donors "will not include pro-Jihad comments on the memo line of their checks" and "[t]he fund-raising operation will look to the bank like a charity." 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 54. Diversion occurred precisely where charities had "ineffective financial controls," and commingling of terrorist money with legitimate funds defeats records-based innocence. 9/11 Comm'n Terrorist Financing Monograph (Dkt. No. 12001), Ex. 241 at 21. The CRA audit found WAMY's records so deficient that it "could not adequately determine what it was actually spending its funds on." Ex. 74, Winer Rpt. ¶ 10.3.8;

Ex. 112, Kohlmann 2020 Rpt. ¶ 191 (citing EX. 79, FED-PEC 218170-218203). Al Qaeda specifically exploited charity branch offices “with lax external oversight and ineffective internal controls;” “[s]ome charities are founded with the express purpose of financing terror, while others are infiltrated by terrorist operatives … and are co-opted from within.” Ex. 59, Levitt Rpt. § IV.2 (citing Amb. Francis X. Taylor, “Patterns of Global Terrorism 2001,” U.S. Dep't of State, May 21, 2002; 9/11 Commission Report at 170-171). A material dispute of fact exists.

**STATEMENT:**

564. While 1.2% of WAMY funding was not supported, Marks concluded that ‘[b]ased on the low rate of unsupported funding and the required reports for WAMY funded projects, I did not find evidence of any patterns of funding terrorism, neither hidden nor apparent.” Id. at p. 34.

**RESPONSE:**

Disputed as a "low rate of unsupported funding” proves nothing because terror support is often concealed as legitimate expense. It was “standard practice for charities that provided support to al Qaeda to hide what they were doing, such as by listing military and terrorist support activities as expenses for legitimate activities.” Ex. 74, Winer Rpt. ¶¶ 3.8, 9.1-9.2, 9.6.1. Specific WAMY money flows include a March 25, 2002 transfer of 399,067.15 Austrian schillings from “WAMY in Jeddah” to the Third World Relief Agency, a Bosnia arms-funding front whose director also directed WAMY's Austria/Eastern Europe office. Ex. 74, Winer Rpt. ¶¶ 12.12.13-12.12.14 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 212, ICCJ Report, FED-PEC0213792-854; WAMY document indices (produced Mar. 23, 2017), Decl. of Tarbutton (Dkt. No. 3912), Ex. 36); Ex. 112, Kohlmann 2020 Rpt. ¶ 174 (approx. US $37,000 in WAMY-to-TWRA transfers; citing 9/11 Comm'n Report at 58). WAMY-Jeddah sent approximately $140,000 in May 2001 to

the Sarajevo office of Taibah International, a charity that was designated as a Specially Designated Global Terrorist on May 6, 2004 for funneling money to al Qaeda. Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2105 (citing Ex. 578, Treasury press release; Ex. 222, CIA-SUB_0031-33 at 32). CIA reporting found WAMY "sponsored and funded military training camps for Muslim youth" where training "included weapons handling, firing, and explosives." Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2103 (citing Ex. 615, CIA_000185). In January 2000 the Saudi Minister of Islamic Affairs sent WAMY Secretary General al-Johani 20,000 Saudi Riyals "for the benefit of the Muslims of Chechnya… to support our mujahideen brothers," which al-Johani acknowledged receiving for WAMY. Ex. 112, Kohlmann 2020 Rpt. ¶ 167 (citing WAMYSA 1249304-1249305). Certain donations to WAMY were made payable to Secretary General al-Johani personally (e.g., a $120,000 check and a 112,500-riyal check). Pls.' ARB Averment (Dkt. No. 9764) at ¶¶ 419, 560-561 (citing Ex. 29, NL 15044-10546; Ex. 185, NL 10068, NL 10384; Ex. 186, NL 10333; see also Ex. 9, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804 at 0744). WAMY "provided thousands of dollars to U.N.-sanctioned Benevolence International Foundation (BIF)," an entity connected to al Qaeda. Ex. 59, Levitt Rpt. § 7, n.96 (citing CRA Notice of Intention to Revoke WAMY, Jan. 5, 2012). WAMY Secretary General Dr. Maneh al-Johani told Kashmiri expatriates that Muslims "can go to the battlefield to wage a war again[st] the enemies of Islam, or they can give their moral, physical and financial support [to] the cause of Jihad." Ex. 112, Kohlmann 2020 Rpt. ¶ 164; Ex. 59, Levitt Rpt. §IV.6, n.91 (citing Muslim World News, Vol. 26, No. 1216 (June 3, 1991), at 15). A material dispute of fact exists.

**STATEMENT:**

565. Marks therefore concluded that "I did not observe any financial document indicating material support of terrorist activity, let alone the 9/11 attacks, and the amounts of the expenditures reviewed were not indicative of material support of terrorism or support to Al-Qaida." Id. at p. 35.

**RESPONSE:**

Disputed. WAMY funded and shared a bank account with the Benevolence International Foundation (BIF), and transferred $50,256 to BIF-USA, whose director pled guilty to concealing that donations financed fighters overseas. Ex. 74, Winer Rpt. ¶ 12.12.12; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 190, 193 (citing EX. 79, FED-PEC 218170-218203). WAMY's affiliate LBI merged into WAMY, and both were chaired by Adel Batterjee, designated by the U.S. Treasury on Dec. 21, 2004 as "one of the world's foremost terrorist financiers." Ex. 74, Winer Rpt. ¶¶ 12.12-12.12.2, 12.12.9-12.12.10 (citing Admin. Resolution No. 37 (May 28, 1996); Noorwali Dep. (7/24/2019), Ex. 267 - WAMYSA0276804; U.S. Treasury Press Release, Dec. 21, 2004). Furthermore, Al Rajhi Bank account statements for al Rajhi charity nominee accounts (committee/foundation officials) contain notations showing transfers involving WAMY and other charities "closely associated with al Qaeda." Pls.' ARB Averment (Dkt. 9764) at ¶ 258 (citing Ex. 129, ARB 40860-41153 at 40901). WAMY appears in the TWRA Audit among recipients listed alongside "prominent al Qaeda donor[s] and financial facilitators." Pls.' ARB Averment (Dkt. 9764) at ¶ 462 (citing Ex. 113, TWRA Audit at 58). WAMY-Jeddah's approximately $140,000 transfer to the SDGT Taibah International is documented in CIA reporting. Pls.' Averment (Dkt. 9541) at ¶ 2105 (citing Ex. 578, Treasury Press Release (5/6/2004) and Ex. 222, CIA-SUB_0031-33 at 32. The Saudi Minister of Islamic Affairs' 20,000-Riyal donation to Chechnya "mujahideen" ran through WAMY. Ex. 112, Kohlmann 2020 Rpt. ¶

167 (citing WAMYSA 1249304-1249305). Terror financiers deliberately channel money through NGOs so as to leave no direct documentary trail. Ex. 59, Levitt Rpt. § IV.3, n. 63, 64 (citing CIA, "Identifying Al-Qai'da's Donors and Fundraisers," Feb. 27, 2002). The CRA found that WAMY transferred "thousands of dollars" to U.N.-sanctioned BIF. Ex. 59, Levitt Rpt. § IV.7, n.96 (citing CRA Notice of Intention to Revoke WAMY, Jan. 5, 2012). Bassem Youssef (former FBI counterterrorism agent) noted that WAMY "brokered (and possibly funded)" al Qaeda facilitator Anwar al-Awlaki's installation as Imam of the Dar al-Hijrah Mosque, through WAMY-USA (Falls Church, VA), which was run by Abdullah Bin Laden, a nephew of Osama Bin Laden. Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-W n.919, 920 (citing Aulaqi's Dar al Hijrah contract found in WAMY's records, Ex. 174, WAMY Intl 015165 and FBI1845-55; Ex. 22, Aff. of Abdullah Awad Binladin (Nov. 19, 2005) at 1). A material dispute of fact exists.

**STATEMENT:**

566. Marks also concluded that as an organization, WAMY did not lack financial controls. Id. at pp.36-37.

**RESPONSE:**

Disputed. Multiple government audits and plaintiffs' experts found WAMY lacked adequate financial controls. The CRA audit found WAMY maintained no general ledger, no cancelled cheques, no minute book, no board meetings, inadequate receipts, and no bank deposit slips for any year. Ex. 74, Winer Rpt. ¶¶ 10.3-10.3.1.7; Ex. 112, Kohlmann 2020 Rpt. ¶ 191 (citing EX. 79, FED-PEC 218170-218203). The 9/11 Commission monograph found Saudi charity regulation consisted of "very loose rules whose enforcement was doubtful" that "exempted all charities set up by royal decree" — and WAMY was established by royal decree. 9/11 Comm'n

Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 116. A 2018 Saudi Anti-Money-Laundering report found 2016 on-site inspections led to WAMY offices being shuttered for "several administrative and financial violations." Ex. 133, Kohlmann 2020 Rpt. ¶ 47 (Saudi AML MER 2018). U.S. intelligence found NGO "accountants to directors… diverted resources" to bin Laden. Ex. 133, Kohlmann 2020 Rpt. ¶ 49 (citing CIA 182-196). Marks himself conceded -- with respect to WAMY"s financials -- that pre-1997 "there were some deficiencies in the controls," that key audit exceptions existed (salaries verified only by management approval; Afghanistan expenditures "not susceptible to independent audit verification"), and that he lacked the auditors' work papers. Marks Dep. (7/22/2021) at 113:19-114:14, 208:3-212:21. The CRA found WAMY funded U.N.-sanctioned BIF and that WAMY's Saudi office "maintains substantial control over WAMY's finances [in Canada], and uses this control to carry out its own objectives in Canada." Ex. 59, Levitt Rpt. § IV.7, n.96 (citing EX. 79, FED-PEC 218170-218203). A material dispute of fact exists.

**STATEMENT:**

567. The basis for this opinion included the finding that WAMY's methods of control includes "transparency, proactive improvements and controls, increased spend[ing] on Audit, increased IT controls, amplified reporting, robust requirements for Audits and Reports, [a]countability from senior leadership in WAMY, [e]nforced mechanisms of control that were used proactively, [] defund[ing] areas that did not follow control and accounting policies, []funding for good causes, [u]se of top audit firms, [l]eadership and control over rogue individuals, and [a]ccounting practices of well-run corporations." Id. at p. 37 (outlining all the ways WAMY implemented solid financial control mechanisms).

**RESPONSE:**

Disputed. WAMY's purported control mechanisms did not function as described. Marks conceded a "recurrent pattern of deficient controls," pre-1997 deficiencies, audit exceptions in which salaries were "verified… only to the approval… by WAMY management" and Afghanistan expenditures were "not susceptible to independent audit verification." Marks Dep. (7/22/2021) at 113:19-114:14, 208:3-212:21. Many WAMY "audit" reports were not even prepared contemporaneously; 1995 and 1996 audits reference a June 8, 2010 MOU, which Marks agreed was a "very, very good indication" the audits were prepared after 2010. Marks Dep. (7/22/2021) at 238:5-241:15. The CRA found WAMY's Saudi headquarters "maintains substantial control" over WAMY-Canada's finances, provided "substantially all" of its funds, and approved its projects. Ex. 74, Winer Rpt. §§ 10.3.2-.4; Ex. 133, Kohlmann 2020 Rpt. ¶¶ 75-80 (citing EX. 79, FED-PEC 218170-218203; WAMYSA 4400-4401, 4442-4443, 4517). "WAMY operated under the official Saudi government oversight, regulated by the Ministry of Islamic Affairs." Ex. 59, Levitt Rpt. § IV.7, n.96, 97 (citing EX. 79, FED-PEC 218170-218203; 9/11 Commission Report at 372). A material dispute of fact exists.

**STATEMENT:**

568. "An organization seeking to hide illegal contributions to terrorist organizations does not heavily invest in top-flight accounting firms, and costly IT controls." Id. at p. 8.

**RESPONSE:**

Disputed. This is not a factual finding, and it is contradicted by plaintiffs' experts and by Marks's own admissions. Charities supporting al Qaeda deliberately "operated with minimal record-keeping" -- "failure to document support for terrorism was not a bug, but a feature" -- so that the absence of records could later be used to "prove" nothing was wrong. Ex. 74, Winer Rpt. ¶¶ 9.6.1, 10.4 ("Inadequate and fraudulent books and records are typical of charities that are hiding

bad conduct"). The 9/11 Commission monograph establishes that terror-financing charities operate so as to "look to the bank like a charity," concealing support within ordinary-looking transactions. 9/11 Comm'n Terrorist Financing Monograph, Decl. of Mohammedi (Dkt. No. 12001), Ex. 241 at 53-54. Marks conceded WAMY did in fact have control deficiencies and audit exceptions. Marks Dep. (7/22/2021) at 113:19-114:14, 208:3-212:21. Terror financiers route funds through NGOs and middlemen specifically to "hide the donors' role" and "deny knowing funds went to terrorists." Ex. 59, Levitt Rpt. § IV.3, n. 63, 64 (citing CIA, "Identifying Al-Qai'da's Donors and Fundraisers," Feb. 27, 2002). Levitt notes that "charities are subjected to lesser regulatory requirements than other entities" which make them "vulnerable to terrorist financing, and the absence of a WAMY designation does not signal innocence, because the designation process is "appropriately robust, vigorous, and errs on the side of caution," such that "many more entities are considered for designation than those … ultimately designated." Ex. 59, Levitt Rpt. § IV.2, n.54 (citing FATF Report Combating the Abuse of Non-Profit Organizations (June 2015). A material dispute of fact exists.

**STATEMENT:**

**B. The opinions and Conclusions of Religion Professors and Islamic Scholars**

**RESPONSE:**

No response necessary.

**STATEMENT:**

569. Fluent in Arabic, Dr. Khalid Blankinship (Blankinship) is a professor at Temple University who lived in the Middle East for eleven years and provides expert testimony on Islam and understanding Islamic terminology in a historical context. Ex. 13 at p. 1; Ex. 44 at 20:13-

21:14 (professorship at Temple and scope of his expert testimony), 197:21-198:3 (testifying that some of the documents he reviewed were Arabic documents), 247:16-249:17 (discussing interest in learning Arabic and when he started speaking Arabic).

**RESPONSE:**

Undisputed as to Dr. Blankinship's credentials. Disputed to the extent this paragraph implies Blankinship's testimony reliably establishes that WAMY's beliefs are non-extremist. Blankinship conceded that he was not even familiar with the term "quietist Wahhabi" central to the defense framing ("I can't say that I've heard that collocation of words before"), that the "actual system of religious commitments… inside… Saudi Arabia is complicated and makes it difficult to generalize," and that Wahhabism has multiple "strains." Ex. 110, Blankinship Dep. (6/22/2021) at 68:21-70:22, 174:16-21. Plaintiffs' experts squarely dispute the reliability of Blankinship's non-extremist characterization of WAMY's beliefs. Dr. Emile Ex. 238, Nakhleh (former CIA Senior Intelligence Service officer and expert on political Islam) opines that "at the heart of Wahhabism lies the duty of all Muslims to do jihad against the perceived 'enemies' of Islam," including the United States, and the "Wahhabi Islam as practiced by Saudi Arabia's religious elite includes violent jihad against non-believers as one of its foundational tenets.", Ex. 238, Nakhleh Rpt. ¶¶ 29-30. A material dispute of fact exists.

**STATEMENT:**

570. Sherman Jackson ("Jackson"), an Islamic expert for Defendant MWL whose opinions have not been challenged, is a scholar of Islamic law, legal history, legal theory and theology and the King Faisal Chair in Islamic Thought and Culture at the University of Southern California. Ex. 257, Sherman Jackson Report (Excerpt)at p. 3 (qualifications).

**RESPONSE:**

Disputed to the extent this paragraph is offered to support WAMY. Sherman Jackson was retained by co-defendant Muslim World League, not WAMY, and his report addresses MWL rather than WAMY's specific conduct. Decl. of Omar Mohammedi, Ex. 257, Jackson Rpt. at 3. Moreover, Jackson concedes the existence of "Jihadi" Salafis alongside "Quietist" and "Activist" Salafis. Decl. of Omar Mohammedi, Ex. 257, Jackson Rpt. at 20-21. Blankinship himself relied on Jackson's concept of "proactive jihad"—i.e., offensive jihad—confirming that offensive jihad exists within the doctrine. Ex. 110, Blankinship Dep. (6/22/2021) at 102:7-103:4. Ex. 238, Nakhleh's analysis independently contradicts any benign reading of the Wahhabi/Salafi doctrine Jackson describes, opining that Salafi Wahhabis "view violent jihad as a permissible route to political change" and "support acts of violent jihad … as an acceptable means of combatting the 'enemies' of Islam." Ex. 238, Nakhleh Rpt. ¶ 34 (citing Freedom House, "Saudi Publications on Hate Ideology Invade American Mosques" (2005), at 40; ¶¶ 55-61, ¶ 188; Pls.' Averment (Dkt. 9541) ¶ 32 (citing Ex. 528, Ex. 208, FBI 004139-45 "THE BOOK OF (Jihad)"). A material dispute of fact exists.

**STATEMENT:**

571. Far from providing the ideological foundation for al-Qaeda, Prof. Blankinship opines that Mainstream Saudi beliefs, which WAMY espouses are inconsistent with al-Qaeda's beliefs as first, al-Qaeda's call for the overthrow of Al Saud contradicts Wahhabi doctrine and practice; second, al-Qaeda's call for jihad against the West is illegitimate according to Wahhabi doctrine, which maintains that only a sovereign ruler may declare jihad. Ex. 13 at p. 53.

**RESPONSE:**

Disputed. WAMY's officers and publications repeatedly endorsed and funded violent jihad, contradicting the claim that WAMY's beliefs are incompatible with al Qaeda's. WAMY Secretary General Dr. Maneh al-Johani publicly "call[ed] for Jihad to free Kashmir," stating "Jihad is the only way out," and published a January 2000 editorial urging donations so Chechen "mujahideen" could "buy weapons." Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶¶ 164, 166 (citing Muslim World News, June 3, 1991, at 15; al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843). WAMY camp materials and lecturers preached violent jihad ("This religion will only spread by Jihad"). Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶¶ 160-161, 183-185 (citing Islamic Camps: Objectives, Program Outlines, Preparatory Steps, WAMY 1987/tr. 1990; Ex. 211, FED-PEC 234957-234961, Ex. 212, FED-PEC 210330-210331). A 2005 joint FBI/CIA report found jihadists "adhere to and interpret" the Wahhabi-Salafi sect's beliefs "to justify their actions." Kohlmann (citing Executive Summary, 2005 Joint FBI/CIA Intelligence Report, "Assessing the Nature and Extent of Saudi Government Support of Terrorism"). Blankinship conceded a violent form of jihad exists and that Wahhabi-funded organizations can be "exploited by extremists… [for] violent jihad." Ex. 110, Blankinship Dep. (6/22/2021) at 65:23-67:17. Wahhabism itself contains "the obligatory, external, combative jihad," that Salafi Wahhabis "view violent jihad as a permissible route to political change," and that Saudi officials knew charities "such as al-Haramayn, IIRO, WAMY, and the Muslim World League" were "directly supporting al-Qa'ida's ongoing jihad" against the United States, Ex. 238, Nakhleh Rpt. ¶¶ 30, 34, 106 (citing Majmu'at al-Fatawa li Ibn Taymiyya, Vol. 14, pp. 369-373; "Saudi Publications on Hate Ideology Invade American Mosques," Freedom House (2005) at 40). Youssef, drawing on the FBI's 2021 EC, describes a "Saudi (Wahhabi) / Salafi / militant network … created, funded, directed and supported by the KSA and its affiliated organizations and diplomatic personnel within the U.S." Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541),

Youssef Rpt. "Summary of My Opinions" (citing Ex. 2 to (Corrected) Decl. of Haefele (Dkt. No. 9541), EO14040-003480-MDL). A material dispute of fact exists.

**STATEMENT:**

572. The basis for this opinion includes that WAMY rejects Bin Ladin's statements delegitimizing Saudi rulers. Ex. 13 at pp. 52-53 (Blankinship, quotes an excerpt from the scholar David Commins stating that the ideology of al-Qaeda is not Wahhabi, as it calls for the overthrow of Al Saud, and that al-Qaeda's call for jihad against the West is illegitimate according to Wahhabi doctrine; Ex. 44 at 211:13-23 (Blankinship confirms that the Saudi government adheres to the Wahhabi teaching that the political ruler must be obeyed as long as he upholds Islam); Ex. 2 at ¶¶32-33 (discussing WAMY oppositional view to al-Qaeda's ideology and how supporting Al Qaeda amounts to treason).

**RESPONSE:**

Disputed. WAMY's senior officers openly promoted violent jihad, including after 9/11, undermining the claim that WAMY's ideology is antithetical to al Qaeda's. WAMY Secretary General al-Johani solicited money for Chechen "mujahideen" to "buy weapons," and WAMY Assistant Secretary General Abdulwahab Noorwali defended jihad in the press after the 9/11 attacks. Ex. 112, Kohlmann 2020 Rpt. ¶¶ 166, 182 (citing al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843; Ex. 128, FED-PEC 235725-235730). Anwar al-Awlaki—the al Qaeda cleric who mentored three 9/11 hijackers—"had a close association with WAMY's branch office in the United States," which invited him to lecture at WAMY camps and distributed his sermons. Ex. 112, Kohlmann 2020 Rpt. ¶ 186 (citing WAMYSA 30079-30081; Ex. 132, WAMY Int 15165-15168); Ex. 131, WAMY Int 0249; Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001);, Ex. 195, WAMY Int 170. A 2005 joint

FBI/CIA report found the Saudi government and individuals "support the propagation of the conservative Wahhabi-Salafi sect… [which] [j]ihadists adhere to and interpret… to justify their actions." Ex. 133, Kohlmann 2020 Rpt. ¶ 61, n.83 (citing Executive Summary, 2005 Joint FBI/CIA Intelligence Report, "Assessing the Nature and Extent of Saudi Government Support of Terrorism"). CIA reporting stated bin Laden funded offices of Lajnat al-Birr al-Islamiya ("LBI") "closely affiliated with WAMY" and described "WAMY Chairman Abdallah al Muhaidib as a supporter of Usama Bin Ladin." Pls.' Averment (Dkt. 9541) at ¶¶ 2106-2107 (citing Ex. 79, CIA 000820-821, 826). Ex. 238, Nakhleh opines that "there was a marked and unprecedented convergence of views between bin Ladin and Saudi religious authorities … regarding the waging of jihad against the United States," and that bin Ladin's jihad doctrine "w[as] part and parcel of the Hanbali-Ibn Taymiyya-Wahhabi doctrine of jihad." Ex. 238, Nakhleh Rpt. ¶¶ 118-119, 130. WAMY "brokered (and possibly funded)" Anwar al-Awlaki's Imam position, and WAMY was run in the U.S. by Saudi Embassy officer Abdullah Bin Laden (nephew of Osama bin Laden), with WAMY-USA vice president Ibrahim Abdullah known to the FBI as associated with "al-Qa'ida and Islamic Resistance Movement (HAMAS) investigations through his WAMY activities and phone records." Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. § IV-W, n.919-922 (citing Awlaki's Dar al Hijrah contract found in WAMY's records, Ex. 174, WAMY Intl 015165; FBI 1845-55; Aff. of Awad Binladin (Nov. 19, 2005) at 1; WAMY International, Inc. Corporate Document - June 2000 Statement of Change of Registered Agent form signed by Ibrahim Abdullah as "Vice President"; EO 3429). A material dispute of fact exists.

**STATEMENT:**

573. In Wahhabi Islam, the official Saudi interpretation of Islam which WAMY follows, "obedience to the rulers and the order of the state is required." Ex. 46 at p. 52; Ex. 13 at p. 53 (Blankinship opines on the incompatibility of al-Qaeda's ideology and Wahhabi Islam, as Wahhabi Islam requires obedience to rulers and the order of the state); Ex. 44 at 211:13-23 (Blankinship confirms that the Saudi government adheres to the Wahhabi teaching that the political ruler must be obeyed as long as he upholds Islam); Ex. 2 at ¶¶32-33 (discussing WAMY oppositional view to al-Qaeda's ideology and how supporting Al Qaeda amounts to treason).

**RESPONSE:**

Disputed. Blankinship testified he was unfamiliar with the term "quietist Wahhabi," that Wahhabism has multiple "strains," that non-quietist "activism" exists and that Saudi rulers "might not be able… to push back very hard" against the religious establishment, and that the Saudi religious system is too complex to generalize. Ex. 110, Blankinship Dep. (6/22/2021) at 68:21-70:22, 174:16-21, 176:1-177:1. Regardless of doctrinal "obedience," WAMY officers in fact called for and funded armed jihad abroad. Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶¶ 164-167 (citing Muslim World News, "WAMY Calls for Jihad to Free Kashmir" (June 3, 1991); "Kashmiri leader thanks WAMY for help," Riyadh Daily, Dec. 8, 1995); al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843; Ex. 46, WAMYSA 1249304-05, Ex. 47, FED-PEC 234243-44; Ex. 49, FED-PEC 234930-31. A 2005 joint FBI/CIA report tied the Wahhabi-Salafi sect propagated with Saudi support to jihadist justification for violence., Ex. 133, Kohlmann 2020 Rpt. ¶ 61, n.83 (citing Executive Summary, 2005 Joint FBI/CIA Intelligence Report, "Assessing the Nature and Extent of Saudi Government Support of Terrorism"). Wahhabism is not monolithically quietist: Muhammad Surur

"transitioned Wahhabi ideology out of quietism into bold activism" ("Sururi-Qutbi Wahhabism"), and "the Kingdom of Saudi Arabia … embodies within it the extremist tendencies ascribed to many of its 'ulama." , Ex. 238, Nakhleh Rpt. ¶¶ 42, 49 (citing FBI/CIA Joint Assessment, Dec. 2004, Ex. 2 to (Corrected) Decl. of Haefele (Dkt. No. 9541), EO14040_003413-003442 at 003417). A material dispute of fact exists.

**STATEMENT:**

574. Outside of Saudi Arabia, the Wahhabi movement is known as Salaf. Ex. 13 at p. 20 (defining Salafism).

**RESPONSE:**

Disputed as incomplete and misleading. Salafism is not monolithic and that a Salafi strand, when fused with Islamist political activism and Qutbist ideology, produced the global jihad movement. XXX, Qutb, Milestones (2006), at 26-27. Salafism/Wahhabism absorbed violent-jihad ideology rather than remaining apolitical: Sayyid Qutb's "near enemy/far enemy" rubric (far enemy including the United States) "had a totemic bearing on Wahhabi jihadist thinking," and "Qutbism infused Wahhabism." Ex. 238, Nakhleh Rpt. ¶¶ 37, 39 (citing Qutb, Milestones). Levitt likewise ties the Salafi framework to al Qaeda's ideology, noting bin Laden identified Salafist thinkers (Azzam, Ibn Taymiyah, al-Awdah, al-Hawali) as ideological influences. Ex. 59, Levitt Rpt. § IV.4, n.71 (citing John Esposito's Islam: The Straight Path (1988); CRS Report RL32759, Feb. 4, 2005; Wiktorowicz & Kaltner, "Killing in the Name of Islam: Al-Qaeda's Justification for September 11," Middle East Policy 10, no. 2 (2003)). A material dispute of fact exists.

**STATEMENT:**

575. Salafis are closely related to Wahhabis but not identical; what they share in common is that "armed struggle is simply not the major concern of these trends, which are far more concerned with correct belief [] and practice." Ex. 13 at p. 21 (noting the distinction between Hanbalis, Salafis and Wahhabis).

**RESPONSE:**

Disputed. Armed struggle is central—not peripheral—to the Salafi-jihadi current at issue. WAMY-affiliated Awlaki "characterised claims regarding the primacy of non-violent jihad as representing deviations," aligning with "Salafi-jihadists, for whom violent, physical jihad forms a key part of their ideology," and that he endorsed suicide bombing by relying on the "modern Salafi-jihadi" ideologue Yusuf al-Uyayree. Ex. 229, al-Awlaki, "The Story of Ibn al-Akwa: Shaykh Noor al-Din Shahaada," Dar Ibn al-Mubarak (2003). Blankinship conceded a violent form of jihad exists. Ex. 110, Blankinship Dep. (6/22/2021) at 67:9-21. Levitt cites the Dutch AIVD's warning that dawa groups' choice of non-violent activities "does not always imply that they are non-violent on principle"—they may "simply … not yet consider armed jihad expedient." Ex. 59, Levitt Rpt. § IV.5 (citing AIVD, "From Dawa to Jihad: The Various Threats from Radical Islam to the Democratic Legal Order" (Dec. 2004) at 7, 27). Salafi Wahhabi clerics "have long preached that violent jihad is the only recourse available to Muslims" and "justify terrorism … as a legitimate and effective tool." Ex. 238, Nakhleh Rpt. ¶ 34-35 (citing "Saudi Publications on Hate Ideology Invade American Mosques," Freedom House (2005) at 40). A Saudi Ministry of Islamic Affairs publication ("The Book of Jihad," recovered from Omar al-Bayoumi's office) instructed foreigners to carry out violent jihad including suicide missions, stating that Jews, Christians and Magians face "embrace Islam, pay the jizya or the war." Ex.

148, Pls.' Averment (Dkt. No. 9541) at ¶¶ 4, 24 (citing Ex. 2, EO 3416; Ex. 528, Ex. 208, FBI 004139-45 "THE BOOK OF (Jihad)"). A material dispute of fact exists.

**STATEMENT:**

576. Salafis who are "committed to doctrinal purification and eschew violence and even oppose involvement in politics" are known as "Quietist Salafis." Ex. 257 at pp. 20-21 (distinguishing the three types of Salafis: Quietist, Activist and Jihadis).

**RESPONSE:**

Disputed as incomplete. Plaintiffs' experts opine that the Salafi-jihadi strand treats violent jihad as central and that WAMY-affiliated Awlaki, a "committed Salafi extremist," endorsed suicide bombing relying on Salafi-jihadi ideologues. Ex. 229, al-Awlaki, "The Story of Ibn al-Akwa: Shaykh Noor al-Din Shahaada," Dar Ibn al-Mubarak (2003). WAMY's own officers and camp lecturers fell outside any "quietist" category, calling for and funding armed jihad. Ex. 112, Kohlmann 2020 Rpt. ¶¶ 160-161, 164, 166, 183-185 (citing Islamic Camps: Objectives, Program Outlines, Preparatory Steps, WAMY 1987/tr. 1990; Ex. 48, "Jihad, The Misunderstood Word," a lecture by Suleman Ahmer, WAMY Okeechobee, FL Summer Dawah Camp (July 26, 1996); FED-PEC210330-31; Muslim World News, "WAMY Calls for Jihad to Free Kashmir,"(June 3, 1991), at p. 15; al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843; Ex. 211, FED-PEC 234957-234961; Ex. 212, FED-PEC 210330-210331; Ex. 213,FED-PEC 218854-218865; Ex. 71, WAMYSA 1235606; The Islamic Library – Lessons of Sheikh Saad Buraik, "The Favor of Jihad Over Other Acts,"at p. 3091; Islamweb.net, "The Martyr of Jihad, Abdullah Azzam,"Sheikh Saad Buraik; FED-PEC 220554-220557.). Levitt cites the Dutch AIVD's caution that a dawa group's present non-violence "does not always imply that they are non-violent on principle." Ex. 59, Levitt Rpt. § IV.5 (citing AIVD, "From Dawa to Jihad:

The Various Threats from Radical Islam to the Democratic Legal Order" (Dec. 2004) at 7, 27). Wahhabi ideology transitioned "out of quietism into bold activism." Ex. 238, Nakhleh Rpt. ¶ 42. A material dispute of fact exists.

**STATEMENT:**

577. Blankinship describes religious quietism "within the Wahhabi point of view" as "concentrating on one's own self, one's own self-cultivation, one's own religion and religiosity and [] not bother[ing] others." Ex. 44 at 175:7-14.

**RESPONSE:**

Disputed. Blankinship's "religious quietism" characterization is undercut by his own testimony that he was not familiar with the term "quietist Wahhabi," that non-quietist religious "activism" exists within Saudi Islam, and that Wahhabi-funded organizations can be "exploited by extremists… [for] violent jihad." Ex. 110, Blankinship Dep. (6/22/2021) at 66:7-17, 174:16-21, 176:1-177:1. WAMY's conduct was not quietist: its officers publicly called for jihad in Kashmir and Chechnya and funded fighters. Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶¶ 164, 166-167 (citing Muslim World News, June 3, 1991; al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843; Ex. 46, WAMYSA 1249304-1249305). Ex. 238, Nakhleh directly contradicts the quietist framing, opining that the architecture of the Saudi state "has served up a built-in support system" for those who purvey Wahhabi doctrine and "their waging of violent jihad," and that Wahhabi ideology moved "out of quietism into bold activism." Ex. 238, Nakhleh Rpt. ¶¶ 42, 45. Levitt cites the Dutch AIVD's warning that non-violent dawa activity "does not always imply" non-violence "on principle." Ex. 59, Levitt Rpt.§ IV.5 (citing AIVD, "From Dawa to Jihad: The Various Threats from Radical Islam to the Democratic Legal Order" (Dec. 2004)). A material dispute of fact exists.

**STATEMENT:**

578. WAMY's Wahhabi beliefs are not extreme but "rather they are representative of a significant and widespread religious orientation inside Islam shared by millions of Muslims who are not doing anything violent nor hatching conspiracies against the United States." Ex. 13 at p. 22.

**RESPONSE:**

Disputed. WAMY-specific evidence shows the promotion of extremist, violence-advocating content, not benign mainstream belief. An English-language WAMY youth-camp training manual included an "officially sanctioned song" urging "On this Day of Jihad, are you miserly with your blood?!" and "unsheath the swords." Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶ 160 (citing Islamic Camps: Objectives, Program Outlines, Preparatory Steps, WAMY 1987/1990 trans.). WAMY is described as "a controlled agent and alter-ego of the Kingdom of Saudi Arabia ... for the purpose of spreading the conservative form of Wahhabi Islam." Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2094 (citing Ex. 2, EO 3430). WAMY youth camps in the U.S. were "used to advocate for violent extremism and jihad," and WAMY employee Sheikh Saleh al-Buraik "urged Muslims to engage in violent jihad." Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶¶ 2115-2117 (citing Ex. 150B, Ex. 112, Kohlmann 2020 Rpt. ¶ 183; Ex. 528 (Ex. 208, FBI 004139-45, "THE BOOK OF (Jihad)"; see also Ex. 211, FED-PEC 234957-61, Ex. 212, FED-PEC 210330-31). The CRA found WAMY "distributing literature… [that] appears to promote intolerance of, and/or advocate violence against, non-Muslims." , Ex. 112, Kohlmann 2020 Rpt. ¶ 194 (citing EX. 79, FED-PEC 218170-218203, at 17-18). A 2005 joint FBI/CIA report tied the Wahhabi-Salafi sect propagated with Saudi support to jihadist justification for violence. Ex. 133, Kohlmann 2020 Rpt. ¶ 61, n.83 (citing Executive Summary, 2005 Joint FBI/CIA Intelligence

Report, "Assessing the Nature and Extent of Saudi Government Support of Terrorism"). Blankinship conceded Wahhabi-funded organizations can be exploited by extremists for violent jihad. Ex. 110, Blankinship Dep. (6/22/2021) at 66:7-17. WAMY specifically propagated the militant strain, not a benign mainstream one -- WAMY is a MOIA-affiliated da'wa charity spreading “the Saudi Salafi-Wahhabi doctrine,” whose propagators were selected for “commitment to and belief in the concept of jihad against the ‘infidels'”—with the United States viewed as such an enemy—and Saudi officials knew WAMY was “directly supporting al-Qa'ida's ongoing jihad.”, Ex. 238, Nakhleh Rpt. ¶¶ 106, 209-210, 212. Levitt cites the Dutch AIVD's finding that WAMY, al-Haramain, MWL, and IIRO are “primarily focused on propagating the Salafist interpretation of Islam.” Ex. 59, Levitt Rpt. § IV.7, n.95 (citing Ex. 219, AIVD, “Saudi Influences in the Netherlands” (June 1, 2005)). Youssef ties WAMY-USA to installing al Qaeda facilitator Anwar al-Awlaki as Imam of the Dar al-Hijrah Mosque. Ex. 5 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Youssef Rpt. n.919 (citing Ex. 174, WAMY Intl 015165 & FBI 1845-55). A material dispute of fact exists.

**STATEMENT:**

579. Bin Ladinism is quite antithetical to Wahhabism. Id. at p. 36.

**RESPONSE:**

Disputed. Plaintiffs' experts and U.S. and Saudi government sources tie the Wahhabi-Salafi ideology promoted by WAMY and propagated with Saudi support directly to al Qaeda. A 2005 joint FBI/CIA report found the Saudi government and individuals “support the propagation of the conservative Wahhabi-Salafi sect… [which] [j]ihadists adhere to and interpret… to justify their actions.” Ex. 133, Kohlmann 2020 Rpt. ¶ 61, n.83 (citing Executive Summary, 2005 Joint FBI/CIA Intelligence Report, "Assessing the Nature and Extent of Saudi Government Support of

Terrorism"). The 9/11 Commission found the Kingdom "fully embraced a radical view of Islam and sought to export it around the globe." Ex. 133, Kohlmann 2020 Rpt. ¶ 60 (citing 9/11 Comm'n Report at 52). Ex. 238, Nakhleh notes bin Ladin "was the primary propagator of th[e] Wahhabi jihadist view globally," his statements on jihad "were part and parcel of the Hanbali-Ibn Taymiyya-Wahhabi doctrine," and the 9/11 Commission traced bin Ladin's "long tradition of extreme intolerance" "from at least Ibn Taymiyya – through the founders of Wahhabism – … to Sayyid Qutb." Ex. 238, Nakhleh Rpt. ¶¶ 111, 118, 121 (citing 9/11 Comm'n Report at 362); Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶¶ 54-55 (citing 9/11 Comm'n Report at 362, Ex. 2, EO 3417). Levitt similarly identifies bin Laden's own stated Salafist/Wahhabi ideological influences (Ibn Taymiyah, Azzam, al-Awdah, al-Hawali). Ex. 59, Levitt Rpt. § IV.4, n.71 (citing John Esposito's Islam: The Straight Path (1988); CRS Report RL32759, Feb. 4, 2005; Wiktorowicz & Kaltner, "Killing in the Name of Islam: Al-Qaeda's Justification for September 11," Middle East Policy 10, no. 2 (2003)). WAMY's own chairman was described by the CIA as "a supporter of Usama Bin Ladin." Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶ 2107 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848). A material dispute of fact exists.

**STATEMENT:**

580. Bin Ladin and al-Qaeda believe in the indiscriminate killing of civilians, Muslim or otherwise. Ex. 46 at 47 (Describing generally the contents of Bin Ladin's proclamation claiming that America has declared war against God, calling for the murder of any American, anywhere on earth); Ex. 258, CIA Intelligence Report titled "Bin Ladin's Terrorist Operations: Meticulous and Adaptable, dated November 2, 2000 CIA_000021 (Describing Bin Ladin's February 1998 fatwa, proclaiming that all Muslims have a

religious duty "to kill Americans and their allies, both civilian and military" worldwide); Ex. 13 at p. 55 ("Bin Ladinists" are murderers); Ex. 2 at ¶¶32-33 (discussing WAMY oppositional view to al-Qaeda's ideology and how supporting al-Qaeda amounts to treason).

**RESPONSE:**

Disputed to the extent this statement implies WAMY held a view opposed to al-Qaeda's ideology of violent jihad. WAMY and its officials publicly promoted armed jihad. WAMY Secretary General Dr. Maneh al-Johani urged that Muslims "can go to the battlefield to wage a war again[st] the enemies of Islam, or they can give their moral, physical and financial support [to] the cause of Jihad." Ex. 112, Kohlmann 2020 Rpt. ¶ 164; Ex. 59, Levitt Rpt. § IV.6, n.91 (citing "WAMY Calls for Jihad to Free Kashmir," Muslim World News, Vol. 26, No. 1216 (June 3, 1991), at 15; PEC-WAMY000615). U.S. Department of Defense assessments state "WAMY supports terrorist ideals and causes" and classify WAMY as a "Tier 1" counterterrorism target with "sustained and active support for terrorist organizations willing to attack US persons or interests," adding that "both the United States and Israel must be destroyed." Ex. 112, Kohlmann 2020 Rpt. ¶¶158-159; Ex. 74, Winer Rpt. § 12.10.3 (citing U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) (Jun. 28, 2006); U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Adel Hassan Hamed (ISN No. 940) (Mar. 25, 2005); Ex. 227, Set 52_3643-3869 at 37; U.S. Dept. of Defense JTF-GTMO Matrix of Threat Indicators for Enemy Combatants). Furthermore, the Pentagon found that "WAMY supports terrorist ideals and causes;" and the U.S. Department of Defense classified WAMY as among the "Associated forces" of al-Qaida, "with which al-Qaida, the al-Qaida network, or the Taliban had or has an established working, supportive, or beneficiary relationship

for the achievement of common goals... Through associations with these groups and organizations a detainee may have provided support to al-Qaida or the Taliban or engaged in hostilities against U.S. or Coalition forces." Ex. 112, Kohlmann 2020 Rpt. ¶ 72, n.92 (citing U.S. Department of Defense, JTF-GTMO Matrix of Threat Indicators for Enemy Combatants). The US government has also stated that "WAMY is a non-government organization operating in Afghanistan that may be affiliated with Usama Bin Laden and Al Qaida operations." Ex. 112, Kohlmann 2020 Rpt. ¶ 159 (citing Set_52_3643-3869, at p. 37; U.S. Department of Defense, JTF-GTMO Matrix of Threat Indicators for Enemy Combatants); Ex. 74, Winer Rpt. § 12.10.3 (citing Unclassified Summary of Evidence for Administrative Review Board in the Case of Ameur, Mammar, 25 July 2005, Department of Defense Office for the Administrative Review of the Detention of Enemy Combatants at US Naval Base Guantanamo Bay, Cuba). In approximately 1993, Bin Ladin identified WAMY as one of three Muslim charities that were "the primary sources of Al-Qaida financial and fundraising activity." CRA August 2011 analysis of WAMY, Winer Dep. (7/13/2021), Ex. 925; Decl. of Omar Mohammedi (Dkt. No. 12001), Ex. 183; FED-PEC0218170 -0218203 at 8183-84. CIA reporting states "WAMY provides funding for the Palestinian Islamic Resistance Movement (HAMAS), Egypt's Islamic Jihad and Gama'at al-Islamiyya," and ties WAMY to Bin Ladin. Pls. Averment (Dkt. No. 9541) at ¶¶2104-2107 (citing Ex. 78, CIA_000744 and Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 820-827). A material dispute of fact exists.

**STATEMENT:**

581. Though not a religious figure and his organization is not religious, "Bin Ladin's terrorist operations are grounded in his extreme interpretation of Islamic law, which sanctions

attacks against a wide variety of targets worldwide." Ex. 258 (discussing Bin Ladin's extreme interpretations).

**RESPONSE:**

Undisputed that Bin Ladin's operations rest on an extreme interpretation of Islamic law, but disputed to the extent that WAMY seeks to distance itself from that ideology as WAMY personnel promoted the same violent-jihad ideology. WAMY employee Sheikh Saleh/Saad al-Buraik lectured that "Jihad is the pillar and peak of religion" and that "no idea spreads unless its people water it with their own blood" Ex. 112, Kohlmann 2020 Rpt. ¶¶ 183-184 (citing "The Favor of Jihad Over Other Acts," The Islamic Library – Lessons of Sheikh Saad Buraik, at 3091; Ex. 211, FED-PEC 234957-234961). WAMY's own book Islamic Camps: Objectives, Program Outlines and Preparatory Steps exhorts youth (identified as intended for ages 14-18): "Hail! Hail! O Sacrificing Soldiers! … on this Day of Jihad, are you miserly with your blood?!" Ex. 74, Winer Rpt. § 12.11 (citing Ex. 216, Aff. of Sr. Customs Agent David C. Kane, *U.S. v. Biheiri* (E.D. Va. Sept. 11, 2003); Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003); EX. 79, FED-PEC 218170-218203). In addtion, a WAMY/Muslim-World-League-circulated article, "Child Upbringing in Islam," likewise taught that jihad "can be done by sacrificing one's life and wealth" Ex. 59, Levitt Rpt. § IV.6, n.92 (citing MWL Journal, Vol. 21, No. 8 (Feb. 1994), at 34). Furthermore, Plaintiffs' evidence shows a 20th-century doctrinal evolution in Wahhabism toward violent extremism that the Saudi religious establishment embraced, and that the Saudi government (including the Ministry of Islamic Affairs) published and distributed violent jihadist literature. Pls. Averment (Dkt. No. 9541) at ¶¶ 20-24 (citing Ex. 238, Ex. 238, Nakhleh Rpt. ¶¶ 36-43, 55-60 (citing Ex. 232, Qutb, Milestones; Surur, The Age of the Majus Has Come: the history, doctrine, and politics of the Iranian

Revolution, 10th Ed.; Ex. 2 to (Corrected) Decl. of Haefele (Dkt. No. 9541), Ex. 2 to (Corrected) Decl. of Haefele (Dkt. No. 9541), EO14040 003465-3472-MDL); EO 3604; Ex. 208, FBI 004139-45 "THE BOOK OF (Jihad)"). A material dispute of fact exists.

**STATEMENT:**

582. Bin Ladin's indiscriminate killing, as in the attacks of September 11, 2001, is murderous and a "rebell[ion] against God's command…" Ex. 13 at p. 51 (describing the instances of Islamic warfare and how Bin Ladinists exceed the permissibility of these instances).

**RESPONSE:**

Undisputed that the September 11 killings were murderous but disputed to the extent this statement implies WAMY and its personnel uniformly rejected the glorification of armed jihad and martyrdom. WAMY employee Sheikh al-Buraik, featured at WAMY's camps, taught that "Islam spread when the blood of its companions was shed on the land of Jihad" and that "no idea spreads unless its people water it with their own blood." Ex. 112, Kohlmann 2020 Rpt. ¶184 (citing Islamweb.net, "The Martyr of Jihad, Abdullah Azzam,"Sheikh Saad Buraik.). WAMY's officially sanctioned camp song, printed in an English-language WAMY training manual, exhorts youth: "Hail! Hail! O Sacrificing Soldiers! … on this Day of Jihad, are you miserly with your blood?!"— as intended for youth aged 14-18. Ex. 74, Winer Rpt. § 12.11; Ex. 112, Kohlmann 2020 Rpt. ¶ 160 (citing Ex. 216, Islamic Camps Objectives, Program Outlines, Preparatory Steps, WAMY 1987/tr. 1990, Aff. of Sr. Customs Agent David C. Kane, *U.S. v. Biheiri* (E.D. Va. Sept. 11, 2003); Ex. 26, Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003); Ex. 79, FED-PEC 218170-218203). WAMY "recruited young Muslims ... including to become martyrs for Islam." Ex. 74, Winer Rpt. §12.13-.14 (citing "Muslims From Afar Joining 'Holy War' in Bosnia," NYT (Dec. 5, 1992); Ex. 60, "Pakistan Questions Sudan

Man About Tape," AP (Dec. 8, 2002), Ex. 26, Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003); al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843; Ex. 128, FED-PEC 235725-5729). WAMY's own 1991 publication Twajihat Islamiya (*Islamic Views*) exhorts readers to "teach our children to love taking revenge on the Jews and the oppressors" and to "make jihad for the sake of Allah." Ex. 237, Aff. of Evan Kohlmann (Dkt. No. 3783) at ¶140 (citing *Islamic Views*). WAMY-circulated publications glorified "sacrificing one's life and wealth" in jihad. Ex. 59, Levitt Rpt. § IV.6, n.92 (citing MWL Journal (Feb. 1994), at 34). A material dispute of fact exists.

**STATEMENT:**

583. Jihad linguistically means "striving," with the "greater jihad [being] the internal struggle of a Muslim against the self…" Id. at p. 8 (defining jihad linguistically); Ex. 44 at 151:8-152-17.

**RESPONSE:**

Disputed to the extent this statement implies WAMY confined "jihad" to an internal or spiritual struggle. WAMY Secretary General Dr. Maneh al-Johani used "jihad" to mean armed warfare, stating Muslims "can go to the battlefield to wage a war again[st] the enemies of Islam" Ex. 112, Kohlmann 2020 Rpt. ¶ 164; Ex. 59, Levitt Rpt. § IV.6, n.91 (citing Muslim World News, Vol. 26, No. 1216 (June 3, 1991), at 15). WAMY's publishing arm disseminated materials that "included calls for jihad against non-Muslim groups." Ex. 74, Winer Rpt. § 12.11 (citing Ex. 216, Aff. of Sr. Customs Agent David C. Kane, *U.S. v. Biheiri* (E.D. Va. Sept. 11, 2003); Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003); EX. 79, FED-PEC 218170-218203). WAMY engaged in "religious and jihadi training" for its Pakistan affiliate. Ex. 74, Winer Rpt. § 12.13.2 (citing Ex. 26, Statement of Steven

Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003)). Anwar al-Awlaki—whose Dar al-Hijrah employment contract WAMY produced in this litigation, and with whom the WAMY USA office corresponded—in his own works rejected the primacy of non-violent, internal jihad, characterising such claims as "deviations from the teachings of the Qur'an and hadith." Ex. 131, WAMY Int 0249, Ex. 132, WAMY Int 15165-68; Ex. 229, Anwar al-Awlaki, "The Story of Ibn al-Akwa: Shaykh Noor al-Din Shahaada," Dar Ibn al-Mubarak (2003). A material dispute of fact exists.

**STATEMENT:**

584. The aggressive warfare of jihad was truly constrained to the early centuries of the spread of Islam and is not at all prevalent today; in fact, there has been no declaration of jihad by a Muslim state since 1914. Ex. 44 at 151:8-152-17.

**RESPONSE:**

Disputed. WAMY officials and publications actively invoked and called for armed jihad in contemporary conflicts. A WAMY address was reported under the headline "WAMY Calls for Jihad to Free Kashmir." Ex. 112, Kohlmann 2020 Rpt. ¶ 164; Ex. 59, Levitt Rpt. § IV.6, n.91 (citing Muslim World News, Vol. 26, No. 1216 (June 3, 1991), at 15). WAMY's Pakistani affiliate Jamiat Taleba Arabia was involved in the Afghan conflict "from the very beginning" and "undertook jihad in Kashmir from 1990 through 1993." Ex. 74, Winer Rpt. § 12.13.2 (citing Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003)). During the Chechen war WAMY Secretary General Maneh al-Johani urged Muslims to "go to the battlefield to wage a war against the enemies of Islam," and in a January 2000 editorial in the Al-Jazeera newspaper wrote that the "Mujihadeen ... deserve to receive our support" and that the Chechens "need money to buy arms and ammunition" Ex. 74, Winer Rpt. § 12.13.3; Ex.

112, Kohlmann 2020 Rpt. ¶ 166 (citing al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843). The Saudi Ministry of Islamic Affairs published "THE BOOK OF (Jihad)" (1997-1998), directing violent jihad against all non-believers, including suicide missions, and stating that Jews, Christians and Magians face "three choices: embrace Islam, pay the jizya or the war." Pls. Averment (Dkt. No. 9541) at ¶24 (citing Ex. 528, Ex. 208, FBI 004139-45 at 4144-45). A material dispute of fact exists.

**STATEMENT:**

585. "Jihad," when used in the sense of a "just war," includes inherent distinctions between combatants and non-combatants in which "non-combatants are not to be harmed;" non-combatants being made up of categories which "cover the entire civilian population." Ex. 13 at p. 9 (articulating the terms and conditions of a just war in Islam); Ex. 44 at 149:8-150:12 (Blankinship confirms that the classical Muslim doctrine of war does not allow for harm to genuine noncombatants).

**RESPONSE:**

Disputed. This statement is contradicted by record evidence that WAMY provided weapons and support for armed jihad without regard to combatant/non-combatant limits. WAMY's *Islamic Views* instructs believers to "teach our children to love taking revenge on the Jews and the oppressors … and make Jihad for the sake of Allah." Ex. 74, Winer Rpt. §12.11.2.2 (citing Ex. 26, Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003)). WAMY's own retained expert conceded that a challenged WAMY publication described an "aggressive, proactive" jihad, "[o]ffensive as opposed to defensive." Ex. 110, Blankinship Dep. (6/22/2021) at 201:18-202:22. WAMY's director for Bosnia, Fatih Hassanein, "engaged in the massive provision of weapons to Islamic jihadists in Bosnia," and WAMY "provided

weapons to al Qaeda, as well as Islamic soldiers and terrorists," and "disseminated hate speech against Christians and Jews designed to ... legitimize violent jihad against 'infidels.'" Ex. 74, Winer Rpt. §§ 12.13.3, 12.14 (citing Ex. 44 al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843). CIA reporting states WAMY funds HAMAS and Egypt's Islamic Jihad, and that WAMY offices "are directly funding HAMAS-affiliated NGOs, including the UK-based charity Interpal and the Palestinian zakat committees." Ex. 148, Pls. Averment (Dkt. No. 9541) at ¶2104 (citing Ex. 79, Decl. of Mohammedi (Dkt. No. 12001), EX. 243, CIA_000807-848 at 827; Ex. 2 to (Corrected) Decl. of Haefele (Dkt. No. 9541), EO 3414-3442 at 3438). The Saudi jihad pamphlet distributed as da'wa material endorsed war against all non-believers. Ex. 148, Pls. Averment (Dkt. No. 9541) at ¶24 (citing Ex. 528, Ex. 208, FBI 004139-45). A material dispute of fact exists.

**STATEMENT:**

586. Using "jihad" to mean "holy war" "is inaccurate and misleading because it is a term of abuse used to defame the other and never attributed to the self." Ex. 13 at p. 13.

**RESPONSE:**

Disputed to the extent this statement implies WAMY did not use "jihad" to mean armed warfare. WAMY's Secretary General al-Johani used "jihad" precisely in the sense of armed war — Muslims "can go to the battlefield to wage a war again[st] the enemies of Islam." Ex. 112, Kohlmann 2020 Rpt. ¶ 164, at 49-50; Ex. 59, Levitt Rpt. § IV.6, n.91 (citing Muslim World News (June 3, 1991), at 15) — and WAMY publications contained "calls for jihad against non-Muslim groups" and "calls to jihad against Christians and Jews." Ex. 74, Winer Rpt. §§ 12.11, 7.7.3.7 (citing Ex. 216, Aff. of Sr. Customs Agent David C. Kane, *U.S. v. Biheiri* (E.D. Va. Sept. 11, 2003); Ex. 26, Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the

U.S. (Jul 9, 2003); EX. 79, FED-PEC 218170-218203). WAMY's own 1991 publication Twajihat Islamiya (*Islamic Views*) trumpets Islam as "a religion of Jihad" and endorses violent jihad as "an answer for the Jews, the liars." Aff. of Evan Kohlmann (Dkt. 3783) at ¶140 (citing *Islamic Views*). WAMY's camp songbook cast campers as "sacrificing soldiers" on "this Day of Jihad." Ex. 112, Kohlmann 2020 Rpt. ¶160 (citing Islamic Camps: Objectives, Program Outlines, Preparatory Steps, WAMY 1987/tr. 1990). A material dispute of fact exists.

**STATEMENT:**

587. Under Wahhabi doctrine, only the ruler may declare jihad and thus, "from the Saudi government point of view, completely freelancing attacks or campaigns by private individuals cannot be construed as jihad and are not permissible." Id. at p. 20.

**RESPONSE:**

Disputed. WAMY itself promoted and materially supported armed jihad by non-state actors. WAMY was "deeply involved" in supporting Saudi jihadists in Bosnia, where relief funds were "turned over to the Bosnians for weapons." Ex. 112, Kohlmann 2020 Rpt. ¶¶ 162-164, 166 (citing C. Hedges, "Muslims From Afar Joining 'Holy War' in Bosnia," NYT (Dec. 5, 1992); "WAMY Calls for Jihad to Free Kashmir," Muslim World News (Jun 3, 1991) at p. 15; "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843). WAMY's director for Bosnia provided "massive" weapons to jihadists, and WAMY "helped recruit and facilitate the movement of Islamic fighters and terrorists into conflict zones." Ex. 74, Winer Rpt. §§ 12.13.3, 12.14 (citing al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), Ex. 44, FED-PEC 233836-233843). WAMY also funded non-state militant groups such as HAMAS and Egypt's Islamic Jihad. Pls. Averment (Dkt. No. 9541) at ¶2104 (citing Ex. 79, DECL. OF MOHAMMEDI (DKT. NO. 12001), EX. 243, CIA_000807-848 at 827). A material dispute of fact exists.

**STATEMENT:**

588. Wahhabism and Salafism, though quite conservative in religious practice, “are by no means violent or supporters of violence.” Id. at p. 21.

**RESPONSE:**

Disputed to the extent WAMY asserts its Wahhabi/Salafi orientation was not supportive of violence. WAMY provided “ideological” support to al Qaeda, that its publications “included calls for jihad against non-Muslim groups” and were designed to “legitimize violent jihad against ‘infidels,’” and that WAMY “urged young Muslims to take up arms.” Ex. 112, Kohlmann 2020 Rpt. ¶ 204. WAMY-connected Awlaki relied on Saudi Salafi-jihadi ideologue Yusuf al-Uyayree to justify suicide bombing and to command “violent attacks in the Homeland.” Ex. 229, al-Awlaki, "The Story of Ibn al-Akwa: Shaykh Noor al-Din Shahaada," Dar Ibn al-Mubarak (2003); Ex. 230, U.S. Dept. of Homeland Security, “Countering Radicalization: Popular Lecture Encourages Violence in the Homeland,” (Sep 15, 2008). Ambassador Dore Gold testified that Saudi charities founded to “spread Wahhabi Islam”—the three most prominent being IIRO, MWL, and WAMY—“became penetrated by prominent individuals from al-Qaeda’s global jihadi network.” Ex. 74, Winer Rpt. §9.4.4.5 (citing Ex. 231, Testimony of Dr. Dore Gold, Senate Committee on Government Affairs (Jul 31, 2003)). Plaintiffs' evidence shows Wahhabi doctrine evolved toward violent extremism ("Sururi-Qutbi Wahhabism") embraced by the Saudi establishment, and that Saudi Wahhabi textbooks and pamphlets promoted violent jihad. Ex. 148, Pls. Averment (Dkt. No. 9541) at ¶¶ 20-24 (citing Ex. 149, Ex. 238, Nakhleh Rpt. ¶¶ 36-43, 55-60 (citing Ex. 232, Qutb, Milestones; Surur, The Age of the Majus Has Come: the history, doctrine, and politics of the Iranian Revolution, 10th Ed.; EO14040 003465-3472-MDL); Ex. 2, EO 3604; Ex. 528, Ex. 208, FBI 004139-45 "THE BOOK OF (Jihad)"). Quoting Jamaluddin B.

Hoffman's Guide to Wahhabi Organizations in North America, WAMY (Saudi Arabia) is described as "the youth [wing] of the transnational extremist movement." Decl. of Mohammedi (Dkt. No. 12001), Ex. 182, PEC-WAMY031447-31468 at 1456-57). The U.S. Department of Defense classified WAMY as a "Tier 1" counterterrorism target that "demonstrated sustained and active support for terrorist organizations" and "supports terrorist ideals and causes" Ex. 112, Kohlmann 2020 Rpt. ¶¶158-159; Ex. 74, Winer Rpt. § 12.10.3 (citing U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) (Jun. 28, 2006); U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Adel Hassan Hamed (ISN No. 940) (Mar. 25, 2005); Ex. 227, Set 52_3643-3869 at 37; U.S. Dept. of Defense JTF-GTMO Matrix of Threat Indicators for Enemy Combatants). A material dispute of fact exists.

**STATEMENT:**

589. The U.S. made the term mujahideen (sing. mujahid), a derivative of jihad meaning the struggler, fashionable during the Soviet Afghan war (1979-1989) until it became unfashionable in 1992 when the Afghan communist regime fell. Id. at p. 13 (explaining how mujahideen was not a heavily used term because of the modern state but regain traction during the Soviet Afghan war).

**RESPONSE:**

Disputed to the extent this statement implies WAMY's invocation of "mujahideen" was a benign, dated usage. The origin of the term 'mujahideen' does not bear on WAMY's liability, and WAMY's own personnel invoked and glorified 'mujahideen' as armed fighters well after 1992. During the Chechen war, Secretary General al-Johani praised the Chechen "mujahideen" as "steadfast heroic Muslims" who "deserve our support ... and all our energies," and solicited funds

so the Chechens could "buy arms and ammunition." Ex. 112, Kohlmann 2020 Rpt. ¶ 166; Ex. 74, Winer Rpt. § 12.13.3 (citing Ex. 44, al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), FED-PEC 233836-233843). Following a December 1995 meeting with WAMY Secretary General al-Johani, Kashmiri activist Chaudhry Yaqub publicly "lauded the efforts of the World Assembly of Muslim Youth (WAMY) … in helping the mujahideen in their struggle," through WAMY's "Kashmir Committee" in its Riyadh headquarters. Ex. 112, Kohlmann 2020 Rpt. ¶ 165 (citing "Kashmiri leader thanks WAMY for help," Riyadh Daily, Dec. 8, 1995). A WAMY operations manager, lecturing at a 1996 WAMY youth camp, praised the "dramatic entrance of mujahideen fighters into the Bosnian conflict" as demonstrating "how it establishes Islam." Ex. 148, Pls. Averment (Dkt. No. 9541) at ¶2115 (citing Ex. 112, Kohlmann 2020 Rpt. ¶ 161, Ex. 48, "Jihad, The Misunderstood Word," a lecture by Suleman Ahmer, WAMY Okeechobee, FL Summer Dawah Camp (Jul. 26, 1996)). A material dispute of fact exists.

**STATEMENT:**

590. "Mujahideen" has been conflated with the colloquial usage of terrorists or jihadists. Id. at 13 (mujahedeen today denotes terrorists or jihadists or Muslim terrorists); Ex. 259, Sherman Jackson Dep. Transcript Excerpt at 83:7-84:16 (noting that Plaintiffs' expert conflates the terms so much so that "jihad, no matter how justified it might be as a defensive mechanism even" [i.e. Afghan mujahideen], ends up associated with wanton violence and terrorism.").

**RESPONSE:**

Disputed to the extent this statement implies WAMY used "mujahideen" only in a non-violent sense conflated with terrorism by others. WAMY praised armed "mujahideen" fighting the Russians in Chechnya and urged Muslims to fund their purchase of "arms and ammunition." Ex.

112, Kohlmann 2020 Rpt. ¶ 166; Ex. 74, Winer Rpt. § 12.13.3 (citing Ex. 44, al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), FED-PEC 233836-233843). At a 1996 WAMY youth camp, a WAMY operations manager who claimed to have "spent some time in Chechnya where we have active wars going on" urged campers that "without jihad the evil forces will overwhelm you." Ex. 148, Pls. Averment (Dkt. No. 9541) at ¶2115 (citing Ex. 112, Kohlmann 2020 Rpt. ¶ 161; Ex, 48, "Jihad, The Misunderstood Word," a lecture by Suleman Ahmer, WAMY Okeechobee, FL Summer Dawah Camp (Jul. 26, 1996)). A pre-9/11 Pakistani news report translated by the U.S. Foreign Broadcast Information Service (FBIS) states WAMY was involved in "both religious and jihadi training" and that its Pakistani affiliate fought "on behalf of the mujahidin" and undertook "jihad in Kashmir" from 1990 through 1993. Ex. 74, Winer Rpt. §12.13.2 (citing Ex. 26, Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003)). A material dispute of fact exists.

**STATEMENT:**

591. Though terrorism/terrorist, used colloquially and academically, has no universal definition, it is not jihad/mujahideen.; Jihād is a legally sanctioned and legally regulated institution in Islam and is unanimously recognized as neither being equal to nor as sanctioning terrorism. Ex. 13 at pp. 14-15 (wrestling with the definition of terrorism, even among scholars); Ex. 44 at 124:15-125:10 (explaining that there are differences in the academic definition of terrorism, even among Islamophobes); Ex. 257 at p. 12 (highlighting differences between the words academically as well as how Islam views jihad).

**RESPONSE:**

Disputed to the extent this statement is offered to sever WAMY's promotion of jihad from terrorism. Plaintiffs' expert opines that in WAMY's field operations "the line between 'terrorism'

and 'self-defense' disappear[ed]," and that WAMY acted as the "'mother' of organizations such as IIRO and Benevolence and others who provided ongoing direct support to al Qaeda." Ex. 74, Winer Rpt. § 12.13.5 (citing Ex. 44, al-Johani, "The Chechen Tragedy," Al-Jazeera (Jan. 15, 2000), FED-PEC 233836-233843). WAMY Assistant Secretary General Noorwali equated jihad with "self-defense," which—coupled with treating all non-Islamic governments as "occupiers"—means "the line between 'terrorism' and 'self-defense' disappears." Ex. 74, Winer Rpt. §§12.13.4-12.13.5 (citing Ex. 128, Noorwali interview, Saudi Gazette (Nov. 20, 2001), FED-PEC0235725-29). In his own works, Awlaki rejected non-violent interpretations of jihad as "deviations" and endorsed the "religious legitimacy of the tactic of 'suicide bombing.'" Ex. 229, al-Awlaki, "The Story of Ibn al-Akwa: Shaykh Noor al-Din Shahaada," Dar Ibn al-Mubarak (2003). Furthermore, WAMY-Jeddah sent approximately $140,000 to the Sarajevo office of Taibah International (designated a Specially Designated Global Terrorist for funneling money to al Qaeda), and the CIA states "WAMY is suspected of supporting terrorists." Ex. 148, Pls. Averment (Dkt. No. 9541) at ¶2105 (citing [AU TRADE OUT EXHIBIT] (Treasury designation) & Ex. 222, CIA-SUB_0031-33 at 32). A material dispute of fact exists.

**STATEMENT:**

592. To assuage individual actors from relying on *jihad* as a basis to overthrow the state, Saudi Arabian law, which WAMY obeys, makes it clear that the "ruler must also be obeyed, and rebellion against him is not permissible under any circumstances." Ex. 13 at p. 12 (Blankinship opines that an important feature of Islamic just war doctrine is that jihad may only be declared by a ruler of a state and not by private individuals). Ex. 44 at 104:19-105:1 (Blankinship confirms that one who attempts to co-opt the concept of jihad without authority is acting outside of Islam).

**RESPONSE:**

Disputed. Notwithstanding the asserted prohibition on private, non-ruler jihad, WAMY supported non-state armed struggles abroad: it provided weapons to jihadists in Bosnia. Ex. 74, Winer Rpt. § 12.13.3; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 162-163 (citing Ex. 104, Chris Hedges, 'Muslims From Afar Joining Holy War in Bosnia,' N.Y. Times, Dec. 5, 1992). WAMY also engaged in "jihadi training" for its Pakistan affiliate, which "undertook jihad in Kashmir," and "provided weapons" and "helped recruit and facilitate the movement of Islamic fighters and terrorists into conflict zones." Ex. 74, Winer Rpt. § 12.13.2 (citing Ex. 26, Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003)); (Ex. 74, Winer Rpt. § 12.14). WAMY's own retained expert conceded doctrine recognizes an "aggressive, proactive" and "[o]ffensive as opposed to defensive" jihad. Ex. 110, Blankinship Dep. (6/22/2021) at 202:14-22. A material dispute of fact exists.

**STATEMENT:**

593. A WAMY official's use of the word jihad is therefore in no way a declaration of support for terrorism but instead an articulation of a just war. Ex. 13 at 9 (articulating the terms and conditions of a just war in Islam); Ex. 44 at 149:8-150:12 (Blankinship confirms that the classical Muslim doctrine of war does not allow for harm to genuine noncombatants).

**RESPONSE:**

Disputed. WAMY officials' use of "jihad" went beyond an abstract "just war" and expressly called for armed warfare and weapons funding. Secretary General al-Johani urged Muslims to "go to the battlefield to wage a war again[st] the enemies of Islam," and, during the Chechen war, solicited money so the fighters could "buy arms and ammunition." Ex. 74, Winer Rpt. § 12.13.3; Ex. 112, Kohlmann 2020 Rpt. ¶¶ 164, 166; Ex. 59, Levitt Rpt. § IV.6, n.91 (citing Ex. 44, , FED-

PEC 233836-233843; Muslim World News (June 3, 1991), at 15). WAMY-employed camp cleric al-Buraik glorified fighting and dying as a "martyr." Ex. 112, Kohlmann 2020 Rpt. ¶¶ 183-184 (citing Ex. 211, FED-PEC 234957-234961). WAMY youth-camp speakers, including operations manager Suleman Ahmer and WAMY employee al Buraik, urged campers to engage in violent jihad or to financially support it. Pls. Averment (Dkt. No. 9541) at ¶¶2115, 2117 (citing Ex. 112, Kohlmann 2020 Rpt. ¶¶ 161-162, Ex. 48, "Jihad, The Misunderstood Word," a lecture by Suleman Ahmer, WAMY Okeechobee, FL Summer Dawah Camp (Jul. 26, 1996)). WAMY Assistant Secretary General Noorwali defended violent "jihad" after 9/11. Ex. 112, Kohlmann 2020 Rpt. ¶182 (citing Ex. 128, FED-PEC 235725-235730). WAMY also funded non-state armed movements. Ex. 148, Pls. Averment (Dkt. No. 9541) at ¶¶2104-2105 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4.at 744; Decl. of Mohammedi (Dkt. No. 12001), Ex. 243, CIA_00807-848.at 827; Ex. 2 to (Corrected) Decl. of Haefele (Dkt. No. 9541), EO-3442 at 3438; Ex. 222, CIA-SUB_0031-33 at 32). A material dispute of fact exists.

**STATEMENT:**

594. Prof. Blankinship concludes that "the charge of 'extremism' made against WAMY …cannot be upheld." Ex. 13 at p. 21.

**RESPONSE:**

Disputed. Prof. Blankinship's conclusion is directly contradicted by the record. WAMY "endorsed the concept of violent jihad, ha[s] pushed young Muslims to join violent jihadist organizations, and ha[s] provided critical support and resources to al Qaeda." Ex. 112, Kohlmann 2020 Rpt. ¶ 204). WAMY youth camps were used for "violent extremist indoctrination." Ex. 112, Kohlmann 2020 Rpt. ¶ 161 (citing Ex. 212, FED-PEC 210330-210331). WAMY "urged

young Muslims to take up arms" and disseminated materials to "legitimize violent jihad against 'infidels'." Ex. 74, Winer Rpt. §§ 12.11, 12.14 (citing Ex. 216, Aff. of Sr. Customs Agent David C. Kane, *U.S. v. Biheiri* (E.D. Va. Sept. 11, 2003); Ex. 26, Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003); EX. 79, FED-PEC 218170-218203). DOD classified WAMY a "Tier 1" target that "supports terrorist ideals and causes." Ex. 112, Kohlmann 2020 Rpt. ¶¶158-159; Ex. 74, Ex. 74, Winer Rpt. § 12.10.3 (citing Ex. 105, U.S. Dept. of Defense, JTF-GTMO Detainee Assessment, Detainee Rashed Awad Khalaf Balkhair (ISN No. 186) (Jun. 28, 2006); Decl. of Mohammedi (Dkt. No. 11999), Ex. 157, JTF-GTMO Hamad Detainee Assessment. Ex. 227, Set 52_3643-3869 at 37. The CRA audit found WAMY literature "appears to promote intolerance of, and/or advocate violence against, non-Muslims.", Ex. 74, Winer Rpt. § 10.3.7; Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶ 194 (citing EX. 79, FED-PEC 218170-218203). Quoting Jamaluddin B. Hoffman's Guide to Wahhabi Organizations in North America, WAMY (Saudi Arabia) is described as "the youth [wing] of the transnational extremist movement." Decl. of Omar Mohammedi (Dkt. No. 12001), Ex. 182, PEC-WAMY031447-31468 at 1456-57). A March 24, 2008 U.S. State Department cable identifies WAMY as having ties to terrorist organizations., Ex. 112, Kohlmann 2020 Rpt. ¶ 69 (citing Ex. 228, PEC-KSA 1446-1450). A material dispute of fact exists on the extremism charge.

**STATEMENT:**

595. Prof. Blankinship finds that WAMY's support for schools in Pakistan is not evidence of extremism or promoting extremist views as "religious schools provide an important service educating children" in the region given the weakness and poverty of the public school system and that the Deobandi seminaries "are strongly traditionalist, meaning the support

the full practice of traditional Islam, including a moderate form of Sufism and the application of the Shari'ah according to the Hanafi school of law….." Id. at p. 22.

**RESPONSE:**

Disputed. Prof. Blankinship's opinion is contradicted by record evidence concerning WAMY's Pakistan operations. WAMY was "involved in both religious and jihadi training for its member organizations in Pakistan," and its Pakistani affiliate Jamiat Taleba Arabia "undertook jihad in Kashmir from 1990 through 1993." Ex. 74, Winer Rpt. § 12.13.2 (citing Ex. 26, Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003)). WAMY (Saudi Arabia) published and distributed Sayyid Abul Ala Maududi's Towards Understanding Islam, which contains an "extremist, militant interpretation of the concept of jihad;" Maududi also authored Jihad for the Sake of God and founded Jamaat-i-Islami, whose militant wing Hizbul Mujahideen is a listed terrorist entity. EX. 79, FED-PEC 218170-218203 at 190. WAMY invited Jamaat-i-Islami chief Qazi Hussain Ahmad to its convention. EX. 79, FED-PEC 218170-218203 at 183. WAMY's Peshawar mailing address (PO Box 1055) is listed by OFAC as an address of SDGT Benevolence International Foundation. Ex. 112, Kohlmann 2020 Rpt. ¶ 189 (citing Ex. 225, OFAC SDN list (Dec. 12, 2002); Ex. 226, WAMYSA 57760). The Canada Revenue Agency review found WAMY provided funds to the U.N.-sanctioned al Qaeda entity BIF, and cited "adverse reporting" linking WAMY and its affiliates to terrorist organizations. Ex. 74, Winer Rpt. §§ 10.3.3, 10.3.6; Ex. 59, Levitt Rpt. § IV.7, n.96 (citing EX. 79, FED-PEC 218170-218203). A Guantanamo detainee assessment showed that a WAMY Pakistan employee had earlier worked for SDGT entity Lajnat al-Da'awa al-Islamiya (LDI) and met Khalid Sheikh Mohammed at an LDI-run refugee camp. Ex. 112, Ex. 112, Kohlmann 2020 Rpt. ¶¶ 168-169 (citing Ex. 227, Set 52_3643-3869 at 37-39; Ex. 102, WAMYSA 1088-1091; Ex. 103,

WAMYSA 1084; Ex. 109, FED-PEC 181049-051; Ex. 107, FED-PEC 141770-786). A material dispute of fact exists.

**STATEMENT:**

596. Prof. Blankinship further observes that "[a]s scholars will attest, religious schools in Saudi Arabia and Pakistan are certainly not training camps for 'terrorist' nor for mujahideen. Rather, they provide a curriculum that tries to bridge the spread between medieval Muslim and modern knowledge, by giving a good grounding in the religion, as a Catholic school in the United States will try to do for Catholicism, as well as providing a modern education enabling the student to live in the modern world." Id. at p. 28.

**RESPONSE:**

Disputed. Prof. Blankinship's conclusion is contradicted by plaintiffs' experts. WAMY summer youth camps were used for "violent extremist indoctrination," and Secretary General al-Wohaibi admitted that it was "not possible to control" the content disseminated at the camps. \, Ex. 112, Kohlmann 2020 Rpt. ¶ 161 (citing Ex. 48, "Jihad, The Misunderstood Word," a lecture by Suleman Ahmer, WAMY Okeechobee, FL Summer Dawah Camp (July 26, 1996); Ex. 212, FED-PEC 210330-210331). WAMY also engaged in "jihadi training" for its Pakistan affiliate, and a WAMY/MWL-circulated child-rearing article taught that jihad "can be done by sacrificing one's life and wealth." Ex. 74, Winer Rpt. § 12.13.2 (citing Ex. 26, Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003)); Ex. 59, Levitt Rpt. § IV.6, n.92 (citing MWL Journal (Feb. 1994), at 34). The Saudi Ministry of Islamic Affairs' own da'wa pamphlet, "THE BOOK OF (Jihad)," instructed foreigners to carry out violent jihad against all non-believers, including suicide missions. Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶24 (citing, Ex. 208, FBI 004139-45 at 4144-45). Finally, WAMY cleric al-Buraik lectured at WAMY camps

glorifying jihad and martyrdom. Ex. 112, Kohlmann 2020 Rpt. ¶¶183-184 (citing Ex. 211, FED-PEC 234957-961, Ex. 212, FED-PEC 210330-331, Ex. 213, FED-PEC 218854-865, Ex. 71, WAMYSA 1235606, The Islamic Library - Lessons of Sheikh Saad Buraik, "The Favor of Jihad Over Other Acts, " at p. 3091, Islamweb.net, "The Martyr of Jihad, Abdullah Azzam, "Sheikh Saad Buraik). A material dispute of fact exists.

**STATEMENT:**

597. Prof. Blankinship also concludes that "WAMY stands with the traditional Hanbali Wahhabi scholars of Saudi Arabia who universally ruled against suicide bombings in no uncertain terms in a number of religious rulings." Id. at p. 23. WAMY never supported the loss of innocent lives; it believes there is no justification for tragic attacks of September 11, 2001." Ex. 9 at ¶7.

**RESPONSE:**

Disputed. WAMY "recruited young Muslims ... including to become martyrs for Islam" and disseminated materials designed to "legitimize violent jihad against 'infidels'." Ex. 74, Winer Rpt. § 12.14. WAMY employee al-Buraik glorified dying "in the land of ... Jihad" as joining "the martyrs," and a WAMY/MWL-circulated article stated that jihad "can be done by sacrificing one's life and wealth" and that "running away from the battle field is a great sin." Ex. 112, Kohlmann 2020 Rpt. ¶ 184 (citing Ex. 211, Ex. 211, FED-PEC 234957-234961); Ex. 59, Levitt Rpt. § IV.6, n.92 (citing MWL Journal (Feb. 1994), at 34). WAMY-connected Awlaki endorsed the religious legitimacy of suicide bombing. Ex. 224, Awlaki, "The Life of Mohammed: The Meccan Period"). In November 2001 the Saudi Gazette quoted WAMY officials continuing to defend violent "Jihad" after 9/11. Ex. 112, Kohlmann 2020 Rpt. ¶ 812 (citing Ex. 128, FED-PEC 235725-235730). WAMY funds HAMAS (which conducts suicide bombings) and directly funds

"HAMAS-affiliated NGOs, including the UK-based charity Interpal and the Palestinian zakat committees." Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶2104 (citing, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804 at 744; Decl. of Mohammedi (Dkt. No. 12001), EX. 243, CIA_000807-848 at 827; Ex. 221, EO 3438). WAMY-Jeddah sent approximately $140,000 to Taibah International, later designated a SDGT for funneling money to al Qaeda. Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶¶2104-2105 (citing, Decl. of Mohammedi (Dkt. No. 12001), Ex. 233, CIA_000720-804.4.4. at 744; Decl. of Mohammedi (DKT. NO. 12001), EX. 243, CIA_000807-848 at 827, Ex. 221, EO 3438; Ex. 223, U.S. Treas. press release (May 6, 2004); Ex. 222, CIA-SUB_0031-33 at 32). A material dispute of fact exists.

**STATEMENT:**

598. Rather than providing the ideological foundation for al-Qaeda and actively advocating for young Muslims to take up arms and engage in a violent jihad against the United States, Prof. Blankinship concludes that no actions by WAMY "can be reasonably shown or even supposed to have had any influence on furthering the 9/11 attacks whatsoever." Ex. 13 at p. 50.

**RESPONSE:**

Disputed. Contrary to Prof. Blankinship's conclusion, the record ties WAMY's U.S. office to Anwar al-Awlaki — spiritual mentor to 9/11 hijackers Nawaf al-Hazmi and Khalid al-Mihdhar. WAMY produced in this litigation al-Awlaki's Dar al-Hijrah employment contract, which "suggests that WAMY either had prior knowledge of Awlaki's employment or even funded the contract;" al-Awlaki was "hired to speak at WAMY Islamic Studies camps in College Park, Texas in June 2002 and Irving, Texas in July 2002;" and WAMY translated his lecture series into Chinese. (Ex. 112, Kohlmann 2020 Rpt. ¶ 186) (citing Ex. 132, WAMY Int 15165,

Ex. 131, WAMY Int 0249, Ex. 195, WAMY Int 170, and Ex. 86 Ex. 86, FBI Awlaki Surveillance Log (Dec. 18, 2001), WAMYSA 30079-81; Ex. 77, Dep. of Ibrahim Abdullah (10/21/2019) at 71:21-73:4, 75:19-78:24, 82:4-17, 87:18-88:19. The U.S. branch of WAMY was headed by Abdullah bin Laden, Usama's nephew, and was targeted by U.S. authorities -- the CIA described WAMY's chairman as "a supporter of Usama Bin Ladin." Ex. 148, Pls.' Averment (Dkt. No. 9541) at ¶¶2106-2107 (citing Decl. of Mohammedi (Dkt. No. 12001), Ex. 243, CIA_000807-848 at 820-826). Saudi charitable support "incubated al Qaeda's ability to strike globally, including its ability to attack the United States ... on 9/11." Ex. 74, Winer Rpt. § 7.2.3 (Plaintiffs repeat and incorporate their responses to WAMY's 56.1 Statements at ¶¶ 342, 358, 374, 382, 383, 460, 486, 490, 492, 495, 503, 510, 511, 515, 516, 531, 565 and heading IX). A material dispute of fact exists.

**STATEMENT:**

599. The writings published and circulated by WAMY do not demonstrate any support for violence against others at all." Id.

**RESPONSE:**

Disputed. WAMY's own publications promoted armed jihad. WAMY "distributed articles containing calls to jihad against Christians and Jews" and its publishing arm disseminated materials that "included calls for jihad against non-Muslim groups." Ex. 74, Winer Rpt. §§ 7.7.3.7, 12.11 (citing Ex. 216, Aff. of Sr. Customs Agent David C. Kane, *U.S. v. Biheiri* (E.D. Va. Sept. 11, 2003); Ex. 26, Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003); EX. 79, FED-PEC 218170-218203). WAMY's officially sanctioned camp song, printed in an English-language WAMY training manual, exhorts youth: "Hail! Hail! O Sacrificing Soldiers! … on this Day of Jihad, are you miserly with your

blood?!"—from the WAMY book Islamic Camps: Objectives, Program Outlines and Preparatory Steps identified in the affidavit of U.S. Senior Customs Agent David C. Kane (filed in *U.S. v. Biheiri*, E.D. Va. Sept. 11, 2003) as intended for youth aged 14-18. Ex. 74, Winer Rpt. § 12.11; Ex. 112, Kohlmann 2020 Rpt. ¶ 160 (citing Ex. 216, Islamic Camps Objectives, Program Outlines, Preparatory Steps, WAMY 1987/tr. 1990, Aff. of Sr. Customs Agent David C. Kane, *U.S. v. Biheiri* (E.D. Va. Sept. 11, 2003); Ex. 26, Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003); EX. 79, FED-PEC 218170-218203). A WAMY address was reported under the headline "WAMY Calls for Jihad to Free Kashmir" Ex. 112, Kohlmann 2020 Rpt. ¶ 164; Ex. 59, Levitt Rpt. § IV.6, n.91) (citing Muslim World News (June 3, 1991), at 15). A WAMY/MWL-circulated article instructed children that jihad "can be done by sacrificing one's life and wealth" Ex. 59, Levitt Rpt. § IV.6, n.92 (citing MWL Journal (Feb. 1994), at 34). WAMY's A Handy Encyclopedia states "The Jews are humanity's enemies," and WAMY's *Islamic Views* urges Muslims to "love taking revenge on the Jews … and make Jihad." Ex. 74, Winer Rpt. §§12.11.1.2, 12.11.2.2 (citing Ex. 216, Aff. of Sr. Customs Agent David C. Kane, *U.S. v. Biheiri* (E.D. Va. Sept. 11, 2003); Ex. 26, Statement of Steven Emerson to the Nat'l Comm'n on Terrorist Attacks Upon the U.S. (Jul 9, 2003); *Islamic Views*). The Canada Revenue Agency likewise noted WAMY-distributed literature "appears to promote intolerance of, and/or advocate violence against" others. CRA July 2011 Supp. to Audit Report of WAMY, Kohlmann Dep. (7/6/2021), Ex. 1024; Ex. 112, Kohlmann 2020 Rpt. ¶ 194; Ex. 74, Winer Rpt. §§ 10.3.7-.8 (citing EX. 79, FED-PEC 218170-218203 at 189-190). A material dispute of fact exists.

**STATEMENT:**

**X. Burnett Complaint Must Separately Be Dismissed Pursuant To Fed. R. Civ. P. 12(b)(5) And Fed. R. Civ. P. 4(m)**

**RESPONSE:**

Disputed as a legal conclusion and argument, not a statement of material fact, and therefore requires no response under Local Civil Rule 56.1. To the extent a response is required, Plaintiffs dispute it. The Burnett Plaintiffs personally served WAMY on December 23, 2002 at WAMY International's registered Virginia business/service address, and served WAMY again by first-class mail on December 24, 2002, and the Court's subsequent denial of WAMY's motion to dismiss disposed of the service issue. Decl. of Omar Mohammedi (Dkt. No. 12001), Ex. 264 at PEC-WAMY001073, 1074, 1076, 1077-79; Ex. 214, Pltfs.' Consol. Mem. of Law in Opp. to WAMY MTD (Dkt. No. 1635) at 21-25.

**STATEMENT:**

600. On November 22, 2002, the Burnett Plaintiffs in *Burnett et al v. Al Baraka Investment and Development, et al* Case No. 02 cv 1616, filed their third amended complaint against "World Assembly Muslim Youth a/k/a WAMY International, Inc." See, ECF No. 29.

**RESPONSE:**

Undisputed as a general matter for purposes of this motion.

**STATEMENT:**

601. World Assembly Muslim Youth is organized and registered in Saudi Arabia. See, *supra* at ¶¶2-3.

**RESPONSE:**

Undisputed as a general matter for purposes of this motion.

**STATEMENT:**

602. WAMY International, according to public records, is organized and registered in the Commonwealth of Virginia, USA. See, e.g. Ex. 274 December 23, 2002, Commonwealth of Virginia, State Corporation Commission, Statement of Registered Agent; see also, supra at ¶ (WAMY International Articles of Incorporation).

**RESPONSE:**

Undisputed. Plaintiffs note that WAMY International's registration in the Commonwealth of Virginia establishes that WAMY maintained a registered business/service address in Virginia (5134 Leesburg Pike, Alexandria, VA), the very address at which the Burnett Plaintiffs served process on December 23, 2002. *See* Decl. of Omar Mohammedi (Dkt. No. 12001), Ex. 264 at PEC-WAMY001074, 1076; Ex. 214, Pltfs.' Opp. to WAMY MTD (Dkt. No. 1635) at 21-22.

**STATEMENT:**

603. Before being substituted by the Law Firm of Omar Mohammedi, LLC, Maher Hanania, a Virginia attorney WAMY had retained, attests to the following a declaration submitted in the Burnett case:

> Counsel for Defendant informed Plaintiff Counsel that he did not serve WAMY and that they have not served the Third Amended Complaint. Counsel for Plaintiff informed Counsel for Defendant that the Third Amended Complaint will be served. Counsel for Defendant informed Counsel for Plaintiff that an answer will be filed on time

once the Complaint is served.
Ex. 260, Maher Hanania 2004 Declaration at ¶¶6-8.

**RESPONSE:**

Disputed. The declaration of WAMY's former counsel, Maher Hanania, is a self-serving, after-the-fact statement that does not negate the contemporaneous, sworn proofs of service establishing that WAMY was validly served on December 23, 2002 - before the 2004 communications Hanania describes. An independent process server personally served the summons and amended complaint at WAMY's registered Virginia address (5134 Leesburg Pike) on Caroline Sodder, who identified herself as "normally authorized to accept legal documents." Decl. of Omar Mohammedi (Dkt. No. 12001), Ex. 264 at PEC-WAMY001074, 1076. WAMY was also served by mail on December 24, 2002. Decl. of Omar Mohammedi (Dkt. No. 12001), Ex. 264, Declaration of Nelson Tucker at PEC-WAMY001078-79. That WAMY's counsel was discussing the complaint at all confirms WAMY had actual notice of the suit. Ex. 214, Pltfs.' Opp. to WAMY MTD (Dkt. No. 1635) at 24 (WAMY "obviously received actual notice of the suit"). A genuine dispute of material fact exists.

**STATEMENT:**

604. Following a phone conversation with Burnetts' counsel, WAMY's new counsel, Law Firm of Omar Mohammedi, LLC (Mohammedi), alerted Burnett Plaintiffs in an April 8, 2004 letter that though "no Plaintiff in this matter has sought to properly serve WAMY either locally or overseas," "WAMY will consent to a thirty-day extension for the purposes of proper service." See, Ex. 261, April 8, 2004, Omar Mohammedi letter.

**RESPONSE:**

Disputed. The assertion in Mohammedi's April 8, 2004 letter that "no Plaintiff ... has sought to properly serve WAMY" is WAMY counsel's litigation argument, not competent evidence, and is directly contradicted by the sworn record. The Burnett Plaintiffs personally served WAMY on December 23, 2002 and served WAMY by mail on December 24, 2002 at WAMY's registered Virginia address. Decl. of Omar Mohammedi (Dkt. No. 12001), Ex. 264 at PEC-WAMY001074, 1076, 1078. WAMY's offer of a 30-day extension is not evidence that prior service was defective; it reflects WAMY's awareness of, and actual notice of, the pending litigation. Ex. 214, Pltfs.' Opp. to WAMY MTD (Dkt. No. 1635) at 24. A genuine dispute of material fact exists.

**STATEMENT:**

605. The Mohammedi April 8, 2004 letter offered Burnett Plaintiffs to serve by giving them 30 days extension to serve. Id.

**RESPONSE:**

Disputed to the extent the statement implies service had not already been accomplished. The Burnett Plaintiffs had no obligation to re-serve or to accept a 30-day extension because WAMY had already been validly served on December 23, 2002 (personal) and December 24, 2002 (mail). Decl. of Mohammedi (Dkt. No. 12001), Ex. 264 at PEC-WAMY001074, 1076, 1078. WAMY's offer of an extension further demonstrates its actual notice of the suit. Ex. 214, Pltfs.' Opp. to WAMY MTD (Dkt. No. 1635) at 24. A genuine dispute of material fact exists.

**STATEMENT:**

606. In a letter of June 29, 2004, WAMY's counsel again informed Burnett Plaintiffs that it had yet to serve WAMY. See Ex. 262, June 29, 2004, Omar Mohammedi letter.

**RESPONSE:**

Disputed. The June 29, 2004 letter merely repeats WAMY counsel's unilateral assertion that WAMY had not been served; it does not create a factual dispute and is contradicted by the sworn proofs of service showing valid personal service on December 23, 2002 and mail service on December 24, 2002 at WAMY's registered Virginia address. Decl. of Mohammedi (Dkt. No. 12001), Ex. 264 at PEC-WAMY001074, 1076, 1078. A genuine dispute of material fact exists.

**STATEMENT:**

607. In a September 7, 2004, purported letter[7], Burnett Plaintiffs' counsel wrote to WAMY's counsel that "[w]e believe your client World Assembly of Muslim Youth was properly served personally on December 23, 2002, and then again via mail on December 24, 2002.

Accordingly, we find you in default;" Motely Rice, Burnett Plaintiffs' counsel enclosed in the letter the Reynolds proof of service and affidavit. See, Ex. 263, September 7, 2004 Motley Rice letter; see also, Ex. 264, June 30, 2011 Motley Rice letter at PEC-WAMY001073. As discussed below, WAMY never received this letter.

**RESPONSE:**

Not disputed that the September 7, 2004 letter was sent; disputed to the extent WAMY claims it did not receive said letter. In that letter, Plaintiffs' counsel informed WAMY that WAMY "was properly served personally on December 23, 2002, and then again via mail on December 24, 2002," enclosed the Certificate/Proof of Service and the Reynolds affidavit, and stated that WAMY was in default. Decl. of Mohammedi (Dkt. No. 12001), Ex. 263, Sept. 7, 2004 Motley Rice Ltr.; Ex. 264 at PEC-WAMY001073. Plaintiffs dispute WAMY's footnote that it "never received" the letter: the letter was transmitted by facsimile to Mohammedi's office, and Plaintiffs' counsel confirmed transmission. Decl. of Mohammedi (Dkt. No. 12001), Ex. 266, Dec. 1, 2004

HCBS Ltr. In any event, the enclosed sworn proofs independently establish valid service regardless of receipt of the cover letter. Decl. of Mohammedi (Dkt. No. 12001), Ex. 264, Affidavit of Robert Reynolds at PEC-WAMY001076. A genuine dispute of material fact exists.

**STATEMENT:**

608. In a November 29, 2004 letter addressing "service issues," WAMY's counsel insisted that as to Burnett Plaintiffs it "will not agree to accept service" because, (1) due to their failure contact WAMY counsel after WAMY counsel extended their time to serve WAMY (2) due to their failure to correct the defect in their December 23, 2002 attempted service, (3) due to their attorneys' failure to contact WAMY's counsel about correcting service after personally meeting with WAMY and promising to make contact to resolve service issues, and (4) Burnett Plaintiffs had failed to make a good faith showing that they were entitled to serve by publication as per Judge Casey's September 15, 2005 Order on service by publication. See, Ex. 273, November 29, 2004, Omar Mohammedi letter; Ex. 265, Judge Casey's September 15, 2005 Order for service by publication; see also, supra, Ex. 261 and Ex. 262 (April 8 and June 29 2004, Omar Mohammedi letters).

**RESPONSE:**

Disputed. WAMY's refusal to "agree to accept service" cannot undo service already validly completed on December 23-24, 2002. Decl. of Mohammedi (Dkt. No. 12001), Ex. 264 at PEC-WAMY001074, 1076, 1078.. Notably, in the very same November 29, 2004 letter, WAMY agreed to accept service in *Federal Insurance Co. v. Al Qaeda* and in *O'Neil v. Al Baraka* - singling out only the Burnett Plaintiffs for refusal. Decl. of Mohammedi (Dkt. No. 12001), Ex. 273, Nov. 29, 2004 Mohammedi Ltr. at 2. WAMY's four stated "reasons" are contested litigation positions that do not negate the sworn proofs of service; the papers were tendered at WAMY's

registered service address and WAMY had actual notice. Ex. 214, Pltfs.' Opp. to WAMY MTD (Dkt. No. 1635) at 22-25. A genuine dispute of material fact exists.

**STATEMENT:**

609. In responses to the November 29, 2004 Mohammedi letter, Burnett Plaintiffs' December 1, 2004 letter accused WAMY of never responding to their September 7, 2004 letter, defended the purported December 23, 2002 service of process and, insisted that "it is our intention to seek a default judgment against [WAMY];" there is no evidence in the record that Burnett Plaintiffs even opted to serve WAMY by publication. See, Ex. 266, December 1, 2004, Hanly Conroy Bierstein & Sheridan (HCBS) letter.

**RESPONSE:**

Not disputed. In the December 1, 2004 letter, Plaintiffs' counsel maintained that WAMY had been properly served on December 23, 2002, that WAMY was in default, and that the September 7, 2004 letter enclosing the Certificate of Service and process-server affidavit had gone unanswered. Decl. of Mohammedi (Dkt. No. 12001), Ex. 266, Dec. 1, 2004 HCBS Ltr. Plaintiffs did not need to serve by publication precisely because personal and mail service had already been completed. Decl. of Mohammedi (Dkt. No. 12001), Ex. 264, Affidavit of Robert Reynolds at PEC-WAMY001076; Ex. 264, Declaration of Nelson Tucker at PEC-WAMY001078.

**STATEMENT:**

610. WAMY's counsel's December 6, 2004 response letter denied ever receiving the September 7, 2004 letter but also insisted that WAMY's "documented" history of communications and follow-up indicates WAMY's willingness to address the service issues. See, Ex. 267, December 6, 2004, Omar Mohammedi letter.

**RESPONSE:**

Disputed. WAMY's claim that it "never received" the September 7, 2004 letter is contested; Plaintiffs' counsel confirmed the letter was faxed to Mohammedi's office. Decl. of Mohammedi (Dkt. No. 12001), Ex. 266, Dec. 1, 2004 HCBS Ltr. Regardless, WAMY's own "documented history" of communications and follow-up demonstrates that WAMY had actual notice of the Burnett action. Decl. of Mohammedi (Dkt. No. 12001), Ex. 267, Dec. 6, 2004 Mohammedi Ltr.; Ex. 214, Pltfs.' Opp. to WAMY MTD (Dkt. No. 1635) at 24. The valid service is established by the sworn proofs, not by whether WAMY received a courtesy cover letter. Decl. of Mohammedi (Dkt. No. 12001), Ex. 264, Affidavit of Robert Reynolds at PEC-WAMY001076. A genuine dispute of material fact exists.

**STATEMENT:**

611. Following a HCBS's December 30, 2004 letter that memorializes several communications between WAMY and Burnetts Plaintiffs' counsel, Judge Casey endorsed the letter with a January 3, 2005 order directing the parties to "work out a briefing schedule for a motion to dismiss." See, Ex. 268, December 30, 2004 HCBS endorsed letter.

**RESPONSE:**

Not disputed that the December 30, 2004 letter and Judge Casey's January 3, 2005 endorsement exist; Plaintiffs dispute any inference that service was improper. The December 30, 2004 letter records Plaintiffs' position that service was proper and states that WAMY's sole remedy was a noticed motion under Fed. R. Civ. P. 12(b)(5), which "cannot be sought, nor obtained, by letter." Decl. of Mohammedi (Dkt. No. 12001), Ex. 268, Dec. 30, 2004 HCBS Ltr. at 2.

**STATEMENT:**

612. By letter dated June 26, 2005, WAMY noticed Burnett Plaintiffs of its intention to move to dismiss for defective service and requested that the parties enter into a briefing schedule; two weeks later Burnett Plaintiffs had still not responded to the briefing schedule request. Ex. 269, June 26, 2005 and July 15, 2005 Omar Mohammedi letters.

**RESPONSE:**

Disputed insofar as the statement implies the Burnett Plaintiffs were dilatory. Plaintiffs agreed to every briefing schedule WAMY proposed; the only point of disagreement was WAMY's insistence that Plaintiffs waive WAMY's default as a condition of any schedule. Ex. 215 Sept. 6, 2005 A. Bierstein Ltr. to Judge Casey at 1-2. It was WAMY, not Plaintiffs, that delayed: WAMY waited roughly 15 months (until April 2004) to raise a service objection and never moved to dismiss or sought an extension of its time to respond. Ex. 215, Sept. 6, 2005 A. Bierstein Ltr. to Judge Casey at 2. A genuine dispute of material fact exists.

**STATEMENT:**

613. Hearing nothing from Burnett Plaintiffs as to WAMY's June 26, 2005 and July 15, 2005 letters, WAMY's counsel followed up in a July 28, 2005 letter advising HCBS that WAMY will be compelled to file a "Stipulation and Briefing Schedule with the court, along with a letter explaining why you have not signed it." see, Ex. 270, July 28, 2005 Omar Mohammedi letter.

**RESPONSE:**

Disputed. Plaintiffs were amenable to any reasonable briefing schedule and even offered to respond to WAMY's motion without a schedule; the parties' disagreement was solely WAMY's demand that Plaintiffs waive WAMY's default. Ex. 215, Sept. 6, 2005 A. Bierstein Ltr. to Judge

Casey at 1-3. Plaintiffs' consistent position throughout was that WAMY had been properly served on December 23-24, 2002. Decl. of Mohammedi (Dkt. No. 12001), Ex. 264, Affidavit of Robert Reynolds at PEC-WAMY001076, 1078. A genuine dispute of material fact exists.

**STATEMENT:**

614. After Burnett Plaintiffs refused to enter into a briefing schedule for WAMY's motion to dismiss, on September 1, 2005, WAMY petitioned this court for approval to file a motion to dismiss without the briefing schedule the court ordinarily requires. See, Ex. 271, September 1, 2005 Omar Mohammedi letter without enclosures.

**RESPONSE:**

Disputed. Plaintiffs did not "refuse" to enter a briefing schedule; they repeatedly agreed to a schedule and offered to respond even without one, refusing only WAMY's coercive demand that Plaintiffs waive WAMY's default. Ex. 215, Sept. 6, 2005 A. Bierstein Ltr. to Judge Casey at 1, 3. WAMY did not need a briefing schedule or court permission to file its motion - under the Federal Rules it could move at any time - underscoring that WAMY's delay was of its own making. Ex. 215 Sept. 6, 2005 A. Bierstein Ltr. to Judge Casey at 2. A genuine dispute of material fact exists.

**STATEMENT:**

615. On September 9, 2005, Judge Casey issued the following order: In light of the increase in recent correspondence regarding briefing schedules on motions to dismiss by Defendants who claim they have been served improperly, the Court believes these Defendants should include their objections to service in their motions to dismiss so

that those Defendants who are not properly in the case are ferreted out. See, Ex. 265.

**RESPONSE:**

- Not disputed that Judge Casey issued the September 9, 2005 order; the order supports Plaintiffs' position. The order directed that defendants claiming improper service raise those objections in their motions to dismiss. WAMY did so, and the Court denied WAMY's motion to dismiss - thereby disposing of the service issue - after which WAMY answered the Third Amended Complaint and litigated on the merits. Decl. of Mohammedi (Dkt. No. 12001), Ex. 265, Sept. 9, 2005 Order; Ex. 264, June 30, 2011 Motley Rice Ltr. at PEC-WAMY001073; Def. WAMY Answer to Third Am. Compl. (Dkt. No. 2370).

**STATEMENT:**

616. In a June 30, 2011 letter to WAMY's counsel, Burnett's counsel attached documents purportedly evidencing service of process: (1) September 7, 2004 Motley Rice letter, (2) December 23, 2002 proof of service from Robert Reynolds, (3) May 27, 2003 letter from Nelson Tucker of Process Service Network, (4) May 23, 2003 affidavit of Robert Reynolds, (5) March 14, 2003 declaration of Nelson Tucker. See, Ex. 264.

**RESPONSE:**

Not disputed that these documents were produced; they affirmatively establish valid service. The produced materials - the September 7, 2004 Motley Rice letter, the December 23, 2002 Proof of Service by Robert Reynolds, the Reynolds affidavit, and the Nelson Tucker declaration/mailing confirmation - show personal service on December 23, 2002 and mail service on December 24, 2002. Decl. of Mohammedi (Dkt. No. 12001), Ex. 264 at PEC-WAMY001074, 1076, 1077-79.

In the same June 30, 2011 letter, Plaintiffs stated that service was effective and "disposed of as a result of the Court's denial of the motions to dismiss," and asked that WAMY not "single out the Burnett plaintiffs" as the only case in which it refused to acknowledge service. Decl. of Mohammedi (Dkt. No. 12001), Ex. 264, June 30, 2011 Motley Rice Ltr. at PEC-WAMY001073.

**STATEMENT:**

617. A December 23, 2002 proof of service purports that process server Robert Reynolds served process of a “Summons & Amended Complaint” on “World Assembly of Muslim Youth a/k/a WAMY International., a/k/a World Association of Muslim Youth” by personally serving Caroline Sodder at “4:10 pm” at “5134 Leesburg, Alexandria, Virginia, 22302;” Sodders is described as “Person in Charge Authorized to Accept Service.” See, Ex. 264, that includes PEC-WAMY001073-79 at 1074.

**RESPONSE:**

Not disputed. This Proof of Service establishes that the summons and amended complaint were personally served on December 23, 2002 at 4:10 p.m. at 5134 Leesburg, Alexandria, Virginia 22302 - WAMY's registered business/service address - upon Caroline Sodder, identified as the "Person in Charge Authorized to Accept Service." Decl. of Mohammedi (Dkt. No. 12001), Ex. 264, Proof of Service at PEC-WAMY001074. That address is the one WAMY itself identified to the Virginia State Corporation Commission for service of process. Ex. 214, Pltfs.' Opp. to WAMY MTD (Dkt. No. 1635) at 21-22.

**STATEMENT:**

618. According to the proof of service, on December 23, 2002, Reynolds also mailed a copy of the "Summons & Amended Complaint" to the 5134 Leesburg address from "Los Angeles, CA." See, Id. at PEC-WAMY001074.

**RESPONSE:**

Not disputed that a copy of the summons and amended complaint was also mailed; the additional mailing reinforces valid service. The California Proof of Service form reflects a mailing to the 5134 Leesburg address. Decl. of Mohammedi (Dkt. No. 12001), Ex. 264, Proof of Service at PEC-WAMY001074. Plaintiffs note that Nelson Tucker's declaration and the accompanying U.S. Postal Service Delivery Confirmation date of the mailing postmarked "DEC 24 2002" to WAMY's registered address. Decl. of Mohammedi (Dkt. No. 12001), Ex. 264, Declaration of Nelson Tucker at PEC-WAMY001078; Ex. 264 at PEC-WAMY001079.

**STATEMENT:**

619. On December 24, 2002, Nelson Tucker, the president of Process Service Network, purports to have mailed a copy of the summons and amended Burnett pleadings to the 5134 Leesburg address. Id. at PEC-WAMY001078-79.

**RESPONSE:**

Not disputed. Nelson Tucker - the president of Process Service Network and a qualified expert on service of process - mailed a copy of the summons and Burnett pleadings on December 24, 2002 to WAMY's registered 5134 Leesburg address, confirmed by a U.S. Postal Service Delivery Confirmation postmarked December 24, 2002. Decl. of Mohammedi (Dkt. No. 12001), Ex. 264, Declaration of Nelson Tucker at PEC-WAMY001077-79.

**STATEMENT:**

620. Reynolds would later attest in his 2003 affidavit that, On December 23, 2002, I arrived at the above-mentioned address and attempted to enter the premises. I could not open the front door to the unit since it was locked. I knocked on the door once and a female employee came to the door. I advised her that I had legal papers from the above-named defendant and she advised me that she would not accept them and that the documents had to be delivered to their attorney. Upon inquiry, she identified herself as Caroline Sodder and advised me that she was normally authorized to accept legal documents but not on this case. She attempted to close the door and I threw the papers inside. She picked them up and threw them back outside. Id. at PEC-WAMY001076.

**RESPONSE:**

Not disputed as to the affidavit's content; it establishes valid service and defeats WAMY's position. Reynolds attests that Sodder "identified herself as Caroline Sodder and advised me that she was normally authorized to accept legal documents but not on this case," and that when she attempted to close the door he "threw the papers inside." Decl. of Mohammedi (Dkt. No. 12001), Ex. 264, Affidavit of Robert Reynolds at PEC-WAMY001076. A defendant is validly served when papers are tendered at its place of business to a person who holds herself out as authorized to accept service; the server may reasonably rely on that representation and need only tender the papers. Ex. 214, Pltfs.' Opp. to WAMY MTD (Dkt. No. 1635) at 23. Sodder's statement that service in "this case" had to go to counsel demonstrates that WAMY had actual notice and was attempting to evade service.

**STATEMENT:**

621. WAMY International's registered agent on December 23, 2002 at their 5134 Leesburg Pike address was Fadel Soliman; Soliman succeeded Ibrahim Abdullah as WAMY

International's registered agent. See Ex. 272, FED-PEC0217659 (WAMY public registered agent inquiry naming Fadel Soliman); See also, Ex. 274, (December 23, 2002 statement of registered agent showing change of registered agent from Abdullah to Fadel Soliman on December 23, 2002).

**RESPONSE:**

Disputed insofar as WAMY implies service was invalid because it was not made on the named registered agent. Under Fed. R. Civ. P. 4(h) and 4(e)(1), service on a corporation is proper when made at its registered place of business upon a person who appears authorized to accept service, and is also proper under New York (CPLR 311) and Virginia law where reasonably calculated to give the corporation fair notice. Ex. 214, Pltfs.' Opp. to WAMY MTD (Dkt. No. 1635) at 22-23. Sodder held herself out as authorized to accept legal documents at the 5134 Leesburg address. Decl. of Mohammedi (Dkt. No. 12001), Ex. 264, Affidavit of Robert Reynolds at PEC-WAMY001076. That WAMY changed its registered agent on the very day of service (December 23, 2002) underscores the flux surrounding its service address and does not defeat service on a person with apparent authority. Decl. of Mohammedi (Dkt. No. 12001), Ex. 274, Dec. 23, 2002 Va. SCC Statement of Registered Agent. A genuine dispute of material fact exists.

**STATEMENT:**

622. Sodder was never a WAMY employee, director, officer or registered agent to accept service of process for any WAMY entity. See, Ex. 104 Ibrahim Abdullah 2026 Declaration at ¶15.

**RESPONSE:**

Disputed. Whether Sodder held a formal WAMY title is genuinely contested and does not defeat service: the sworn, contemporaneous process-server affidavit establishes that Sodder identified

herself as "normally authorized to accept legal documents" at WAMY's registered business address. Decl. of Mohammedi (Dkt. No. 12001), Ex. 264, Affidavit of Robert Reynolds at PEC-WAMY001076. A corporation cannot defeat service by later disavowing an employee who represented she was authorized; a process server may reasonably rely on such a statement. Ex. 214, Pltfs.' Opp. to WAMY MTD (Dkt. No. 1635) at 23. The cited 2026 Abdullah declaration is a self-serving statement prepared decades later that conflicts with the 2002-2003 sworn service record, creating a genuine dispute of material fact.

**STATEMENT:**

623. Sodder is not an officer, director, managing or general agent, cashier or assistant cashier or any agent authorized by or appointed of law to receive service for any WAMY entity. See, Id. at ¶¶10-15.

**RESPONSE:**

Disputed for the reasons stated as to Plaintiffs' response to paragraph 622. Service was valid under Fed. R. Civ. P. 4(h) and 4(e)(1), and independently under New York (CPLR 311) and Virginia law, which permit service on an agent "authorized by appointment or by law" and validate service reasonably calculated to give the corporation fair notice. Ex. 214, Pltfs.' Opp. to WAMY MTD (Dkt. No. 1635) at 22-23. Sodder held herself out as authorized, the papers were tendered at WAMY's registered service address, and WAMY received actual notice of the suit. Decl. of Mohammedi (Dkt. No. 12001), Ex. 264, Affidavit of Robert Reynolds at PEC-WAMY001076; Ex. 214, Pltfs.' Opp. to WAMY MTD (Dkt. No. 1635) at 24. WAMY's belated 2026 declaration does not negate the contemporaneous sworn proofs of service and, at most, raises a disputed issue of fact precluding summary judgment.