# EXHIBIT 214

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

This document relates to:

*Kathleen Ashton, et al v. Al Qaeda Islamic Army, et al.* No. 02-CV-6977
*Burnett, et al. v. Al Baraka Invest. & Develop. Corp., et al.*, No. 03-CV-5738, 03-CV-9849
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka., et al.*, No. 04-CV-1923

**THE PERSONAL INJURY PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO THE JOINT MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH BELIEF MAY BE GRANTED OF THE WORLD ASSEMBLY OF MUSLIM YOUTH SAUDI ARABIA AND THE WORLD ASSEMBLY OF MUSLIM YOUTH INTERNATIONAL**

January 23, 2006

# TABLE OF CONTENTS


**TABLE OF CONTENTS ........................................................................................ i**

**TABLE OF AUTHORITIES ................................................................................ ii**

**I. INTRODUCTION ........................................................................................ 1**

**II. SUMMARY OF FACTUAL ALLEGATIONS AGAINST WAMY ........................... 1**

**III. APPLICABLE LEGAL STANDARDS ........................................................ 10**

**IV. LEGAL ARGUMENT ................................................................................ 11**

**A. Plaintiffs' September 30, 2005 Pleadings Comply With The Letter And Spirit Of the Federal Rules And Case Management Order No. 2 ........................... 12**

**B. Plaintiffs Have Stated Claims Against WAMY In Accordance With The Notice Pleading Requirements Of The Federal Rules Of Civil Procedure.... 13**

**1. Plaintiffs Have Satisfied The Liberal Pleading Requirements Of The Federal Rules .................................................................................. 14**

**2. Plaintiffs' Claims Do Not Abridge On Any Rights Protected By The First Amendment ............................................................................ 16**

**C. Plaintiffs Properly Alleged The Elements Of Their Individual Causes Of Action Against WAMY ................................................................... 17**

**1. Plaintiffs State A Valid Claim Against WAMY Under The Anti-Terrorism Act ................................................................................. 17**

**2. Plaintiffs State Valid Claims Against WAMY Under Their Common Law Theories Of Liability .............................................................. 17**

**3. Plaintiffs State A Valid Claim Against WAMY Under The Alien Tort Claims Act ...................................................................................... 19**

**4. Plaintiffs' Conspiracy, Aiding And Abetting And Punitive Damages Counts Should Not Be Dismissed ................................................... 19**

**5. Plaintiffs' RICO Claims Should Not Be Dismissed ............................ 19**

**D. Burnett Plaintiffs Have Properly Served WAMY ..................................... 21**

**V. CONCLUSION ......................................................................................... 25**

## TABLE OF AUTHORITIES

### Cases

*Alfa Corp. v Alfagres, S.A.*, 385 F. Supp. 2d 1230 (M.D. Ala. 2005) ........................................ 23

*Benny v. Piples*, 799 F.2d 489 (9th Cir. 1986), *amended*, 807 F.2d 485 (6th Cir. 1987), *cert. denied*, 484 U.S. 870 (1987) ........................................................................................ 22

*Brunn v. Xtra Superfood Centers, Inc.*, 2001 WL 180136 (D. Virgin Islands Jan. 4. 2001)........ 23

*Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998) .................................................................. 11

*Citadel Management Inc. v. Telesis Trust, Inc.*, 123 F. Supp. 2d 133 (S.D.N.Y. 2000) .............. 23

*Conley v. Gibson*, 355 U.S. 41 (1957) ........................................................................... 10, 11

*Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005)............................................................................. 20

*Fashion Page, Ltd. v. Zurich Ins. Co.*, 428 N.Y.S.2d 890 (N.Y. Ct. App. 1980)......................... 23

*Friday v. U.S. Dept of Justice*, 1993 WL 430547 (D. Or. Oct. 21, 1993) .................................. 22

*Gleason v. McBride*, 869 F.2d 688 (2d Cir. 1989) .................................................................... 21

*Henderson v. United States*, 517 U.S. 654 (1996) ...................................................................... 22

*Heritage House Frame & Molding Co. v. Boyce Highlands Furniture Co.*, 88 F.R.D. 172 (E.D.N.Y. 1980)........................................................................................................................ 24

*In Re Terrorist Attacks on September 11, 2001*, 349 F. Supp.2d 765 (S.D.N.Y. 2005)... 15, 16, 18

*KLM – Royal Dutch Airlines v. Curtiss-Wright Corp.*, 17 F.R.D. 49 (S.D.N.Y. 1955) ............... 23

*Leatherman v. Tarrant County*, 507 U.S. 163 (1993)................................................................ 11

*Linde, et al v. Arab Bank, PLC*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005)..................................... 11

*Lutin v. New Jersey Field Corp.*, 1996 WL 636037 (S.D.N.Y. Nov. 1, 1996)............................ 22

*Maryland National Bank v. M/V Tanicorp I,* 796 F. Supp 188 (D. Md. 1992) ........................... 22

*McLaughlin v. Anderson*, 962 F. 2d 187 (2d Cir. 1992)........................................................... 12

*Michaelson v. Hudson*, 530 N.Y.S.2d 225 (App. Div. 2nd Dept. 1988)................................ 22, 24

*Moses v. Martin*, 360 F. Supp. 2d 533 (S.D.N.Y. 2004) .......................................................... 12

*Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005) ..................................................... 11

*Phelps v. Kapnolas*, 308 F.3d 180 (2d Cir. 2002)............................................................... 10, 11

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002)........................................................................... 11

*Twombly v. Bell Atlantic Corp.*, 425 F.3d 99 (2d Cir. 2005)...................................................... 11

*Warren v. District of Columbia*, 353 F.3d 36 (D.C. Cir. 2004).................................................. 11

Case 1:03-md-01570-GBD-SN Document 2165 Filed 01/20/06 Page 4 of 30

*Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001) ........................................ 10

*Wynder v. McMahon*, 360 F.3d 73 (2d Cir. 2004)............................................................................ 10

**Statutes**

18 U.S.C. § 2339(A) ........................................................................................................................ 17

18 U.S.C. §2339................................................................................................................................. 18

28 U.S.C. § 1350.......................................................................................................................... 17, 19

Fed. R. Civ. P. 10(b) ........................................................................................................................ 12

Fed. R. Civ. P. 10(c) ........................................................................................................................ 13

Fed. R. Civ. P. 12(b)(6)............................................................................................................ 1, 10, 16

Fed. R. Civ. P. 4(e)(1)....................................................................................................................... 22

Fed. R. Civ. P. 4(h) .......................................................................................................................... 22

Fed. R. Civ. P. 8........................................................................................................................ 12, 18, 20

Fed. R. Civ. P. 8(a)(2)....................................................................................................................... 11

Fed. R. Civ. P. 9(b) .......................................................................................................................... 11

N.Y McKinney's CPLR § 311............................................................................................................ 23

## I. INTRODUCTION

The World Assembly of Muslim Youth (WAMY)[1] has moved to dismiss the above-referenced Complaints pursuant to Fed. R. Civ. P. 12(b)(6). While WAMY's Motion professes to raise several distinct legal grounds for dismissal, a single argument lies at the core of virtually all of the theories WAMY advances: that the allegations set forth in the pleadings against WAMY are conclusory and fail to present sufficient facts to state a claim upon which relief can be granted. As will be demonstrated below, that argument rests on fundamentally erroneous constructions of the applicable pleading requirements and standards of review, as well as a transparent mischaracterization of the allegations presented against WAMY. Accordingly, WAMY's Motion to Dismiss should be denied.

## II. SUMMARY OF FACTUAL ALLEGATIONS AGAINST WAMY[2]

WAMY is a multi-national organization which has been at the forefront of the global *jihadist* movement for more than twenty years. Headquartered in Saudi Arabia and with more than sixty offices throughout the world, WAMY publicly claims to be an Islamic "humanitarian and relief" organization, focusing on the needs of Islamic communities, and in particular the needs of Muslim youth. In reality, WAMY is an extremist organization, dedicated to spreading a

---

1 In the Motion to Dismiss, WAMY draws a distinction between WAMY of Saudi Arabia (WAMY S.A.), WAMY of the United States (WAMY U.S.A.) and WAMY International. In their Complaints, plaintiffs expressly alleged that WAMY operates as a single international organization, and that all of its activities are conducted under the direction and supervision of the headquarters in Saudi Arabia. Given these detailed factual allegations regarding WAMY's organizational structure, WAMY's efforts to distinguish among its various offices can do no more than raise a factual dispute, and therefore should be ignored for purposes of deciding the present Motion to Dismiss. As used in this Opposition, the term WAMY refers to all international offices and operational arms of WAMY, including the offices located in Saudi Arabia and the United States of America.

2 The allegations against WAMY in each of the cases are quite extensive, and a complete recitation of the allegations against WAMY cannot be accomplished within this brief given the applicable page limitations. The representative summary set forth herein is derived from the *O'Neill* More Definite Statement/Additional Allegations as to WAMY at Exhibit A. <u>See also</u> the *O'Neill* First Consolidated Complaint ("FCC") ¶¶ 50, 94, 111, 118-125; and Appendix 1 – *O'Neill* Summary of Pleadings References to WAMY, attached hereto as Exhibit 1. Similar allegations regarding WAMY's misconduct appear in the Ashton 6th Amended Complaint at ¶¶ 198-200, 203, 211, 233, 264, 269, 300, 348, 382 and the Burnett 3rd Amended Complaint at ¶¶ 156, 172, 229, 231-233, 244, 362.

radical and virulently anti-Western and anti-democratic ideology throughout the world, and to supporting violent Islamic terrorist organizations and associated separatist movements.

For more than a decade, WAMY has knowingly and intentionally used its international infrastructure as a tool for supporting the al Qaida movement, on both the ideological and military fronts. In furtherance of those objectives, WAMY has, for a period of many years: (1) raised and laundered funds on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaida; (2) channeled donated funds to Islamic terrorist organizations, fighters and associated separatist movements, including al Qaida; (3) provided financial and logistical support and physical assets to Islamic fighters and terrorists, including al Qaida; (4) permitted Islamic fighters and terrorists to use ostensible employment with WAMY as a vehicle for gaining access to conflict regions, thereby allowing those individuals to carry out militant and terrorist activities in those areas; (5) performed reconnaissance within conflict regions on behalf of Islamic terrorist organizations and separatist movements, including al Qaida; (6) funded and facilitated shipments of arms and supplies to Islamic terrorist organizations and associated separatist movements, including al Qaida; (7) funded camps used by al Qaida and associated jihadist organizations to train soldiers and terrorists; (8) actively recruited Muslim youths on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaida; (9) served as a distribution channel for transmitting information and documentation within Islamic terrorist organizations and associated separatist movements, including al Qaida, and from Islamic terrorist organizations and separatist movements to the media; (10) disseminated publications designed to advance al Qaida's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and (11) openly advocated for young Muslims to take up arms against Western and democratic societies.

WAMY's dedication to al Qaida's global jihadist agenda is evident in the organization's own publications, and the statements of its senior officials. According to a WAMY policy statement, "[a] Christian should be asked to repent. If he does not he must be killed." Similarly, the WAMY book *Islamic Views* says, "The Prophet Mohammad fought against the infidels and the Jews till he triumphed over them and conducted himself about twenty invasions and he sent tens of regiments led by his companions for Jihad…Damn from Allah to the Jews who made graves of their prophets as Masjid." Later, *Islamic Views* says Islam "is a religion of Jihad" and that jihad "was an answer for the Jews, the liars." "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah." *Islamic Views* further exhorts Muslims to wage "Jihad against the Satan," and that "You should not back the Jews and the Christians and the Communists against the Muslims; the Communists, the Infidels, the Jews, and the Christians, those who do not believe in Mohammed. You should say they are infidels."

Consistent with its extremist agenda, WAMY has immersed itself deeply in the militant endeavors of the global jihadist movement, actively supporting the militant and terrorist activities of al Qaida and associated organizations in Bosnia, Chechnya, Kosovo, Kashmir, Pakistan, South East Asia, the United States and elsewhere. WAMY's support for al Qaida's militant and terrorist activities has taken many forms, and has continuously adapted to serve the expanding jihadist movement. Under the guise of charity and humanitarian relief, WAMY has, among other things: raised and laundered funds for militant and terrorist activities; funded and facilitated al Qaida training camps as well as the movement of fighters, arms and other supplies to conflict regions; performed reconnaissance on behalf of al Qaida and associated groups; and operated as a recruiting vehicle for al Qaida and associated groups. Through these criminal activities, WAMY has helped al Qaida to expand its sphere of influence throughout the globe.

WAMY's pervasive involvement in supporting al Qaida fighters and associated local jihadist groups in regional conflicts was well documented before September 11, 2001. On December 5, 1992, the *New York Times* identified WAMY as a front for armed Islamic jihad in Bosnia. According to the article:

> In the last few weeks, the conflict has lured several hundred militants, many of them veterans of the war in Afghanistan, to volunteer for the Bosnian forces….
>
> The volunteers are sponsored by a variety of militant religious organizations and often have their expenses and plane fare covered…. Despite formal denials from the relief organizations, Saudi officials say an increasing amount of the charity on behalf of the Bosnians is now used to provide arms and logistical support for Arab volunteers.
>
> "Since August, most of the money raised for relief has been turned over to the Bosnians for weapons," a Saudi official….
> The World Assembly of Muslim Youth, which organized relief operations in Afghanistan and is now deeply involved in the conflict in the Balkans, flies back wounded Saudi fighters and provides free medical care in the Saudi German hospital.

Within the same article, Adel Batterjee, the then chairman of WAMY, acknowledged the organization's role in supporting armed Islamic jihad in Bosnia: "if a relief worker decides that he wants to join the fighting forces, we would not stop him…." Following the September 11, 2001 attack, Adel Batterjee was formally designated as a terrorist sponsor and supporter pursuant to Executive Order 13224.

In May of 2000, Russian officials similarly accused the SJRC, the committee through which WAMY conducted activities in Chechnya, of financing and otherwise supporting Islamic terrorists and separatists in that region. According to a May 19, 2000 article in the Russian newspaper *ITAR-TASS*:

> The aid to Chechens fighting against Russia, is delivered from the organization of humanitarian assistance to Muslims of Kosovo and Chechnya (the SJRC)….

> Officially, the money is sent to Chechnya to be used for religious events and Islamic feasts, but is actually used to finance rebel troops [a representative of the Russian Federal Security Service (FSB)].
>
> According to available information, part of the money is transferred to banking accounts of some warlords, including Shamil Basayev and Khattab…
>
> Russia's security services are aware that these people are financing rebel forces, overseeing arms, food and medicine deliveries, as well as arranging treatment for the wounded and paying allowances to guerillas.

Significantly, Amir Khattab, one of the individuals who received financing directly from WAMY and the SJRC, is a senior al Qaida member who was deployed to Chechnya by Osama bin Laden to organize al Qaida's operations in that area. According to a 1998 Department of Defense Intelligence Report:

> In 1995, Khattab appeared in Chechnya to carry out a special mission assigned to him by Usama ben Laden to organize training camps for international terrorists…. Khattab organized three training camps in the Vedeno and Nojai-Urt areas of the forested mountain zone.

By no later than 1999, the details of bin Laden's direct links to Khattab and the Chechen mujihadeen were widely reported in the mainstream media. For instance, in August of 1999, NBC News reported that "Osama bin Laden is financing the Chechen operation in Dagestan…" The report, which was based on information provided by senior U.S. intelligence officials, explained that the "key bin Laden connection" to the Chechen jihadists was Amir Khattab, and that their relationship was so close that bin Laden was considering relocating from Afghanistan to areas of Chechnya under Khattab's control.

Before the September 11th Attack, WAMY officials made little effort to conceal their involvement in sponsoring armed jihad in Chechnya. For example, in a January 15, 2000 article, Dr. Maneh al Jahari, the Secretary General of WAMY, wrote:

> [I] want to stress that these heroic Moslems, the Mujihadeen who are standing strong, deserve to receive our support and we must invest all of our energy in aiding them when they are being fed the taste of defeat once again. … It should be pointed out that WAMY has doubled its efforts and has placed all of its branches inside and outside of the Kingdom on alert to serve the Chechen issue and to implement the aid program for the Chechen refugees.
>
> 1. The question that must be asked is: What do the Chechen Muslims need from us today?
>
> 2. ***They need money to buy arms and ammunition. (emphasis supplied)***
>
> I request Allah for our brothers Mujihadeen in Chechnya and Dagestan, stability, reinforcements and victory.

Significantly, al Jahari published his call for Muslims to donate funds to WAMY to buy "arms and ammunition" for the "mujihadeen" in Chechnya and Dagestan well after the direct and close relationship between those militants and al Qaida had been widely detailed in the media and elsewhere. The timing and character of al Jahari's statements thus confirm that WAMY is a front for al Qaida's militant activities, and fundamentally undermine the organization's efforts to cast itself as a peaceful humanitarian and relief organization.

Philippine officials also publicly implicated WAMY in the financing of terrorist activities in Southeast Asia in the years before the September 11th Attack. For example, in January of 1999, the government of the Philippines accused WAMY's Australian branch of financing the Moro Islamic Liberation Front (MILF), a terrorist organization seeking to establish a separate Islamic state on the Philippine island of Mindanao. In January of 1999, MILF bombed and attacked several remote Philippine villages, forcing 400 civilians to flee. In February of 1999, MILF Chief Hashim Salamat publicly confirmed that MILF had received funds from Osama bin Laden.

Statements by government officials and press reports in the years preceding the September 11th attack also reveal WAMY's extensive role in supporting al Qaida activities in

Kashmir. In 1995, a leader of an al Qaida affiliated military faction in Kashmir publicly thanked WAMY during a press conference for "helping the Mujihadeen in their struggle for independence from India." Other articles published before September 11, 2001 reveal that WAMY funneled support to the Students' Islamic Movement of India (SIMI), Lashkar-e-Taibah and Hizb ul Mujahideen, three violent jihadist groups operating under the al Qaida umbrella. Well before September 11, 2001, SIMI head Safdar Nagori publicly confirmed his organization's allegiance to al Qaida:

> Q: In your conferences, you have openly eulogized Osama bin Laden.
> A: Not once, but dozens of times. We believe he has shown great character in standing up to the Americans, the biggest terrorists in the World.

In March of 2003, al Qaida military chief Abu Zubaydah was arrested at a Lahkar-e-Taibah safehouse in Islamabad, confirming the depth of collaboration and reciprocal support between those two terrorist organizations.

WAMY's sponsorship of jihadist activity in Kashmir was channeled through its offices in Pakistan, which sponsored al Qaida activity in that country as well. In connection with a crackdown on terrorist activity prompted by the September 11th Attack, Pakistani authorities deported 89 employees of ostensible NGOs in October of 2001, based on their suspected ties to terrorism. WAMY was among the organizations whose "employees" were specifically targeted by the measure. Pakistani intelligence officials, operating in conjunction with United States FBI agents, raided WAMY's Pakistani offices approximately one year later, as part of ongoing counter-terrorism efforts. WAMY's close ties to senior al Qaida cells in Afghanistan and Pakistan were revealed just one week after the raid, when an employee of WAMY hand-delivered a recorded message from Osama bin Laden to an Arab television network in Islamabad.

That incident did not represent the first occasion on which WAMY was involved in transferring information on behalf of al Qaida. During the investigation into the 1993 World Trade Center bombing, U.S. officials discovered an al Qaida training manual in the possession of Ahmed Ajaj, who was later convicted for his role in that attack. The manual, entitled "*Military Lessons In The Jihad Against The Tyrants*," was distributed to Ajaj by WAMY and detailed how to establish and maintain clandestine operational sales. The same manual was later recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998.

Until shortly after the September 11th Attack, WAMY also maintained a physical presence in the United States, from which the organization channeled material support and resources to al Qaida. WAMY's U.S. offices were established in Falls Church, VA in 1992 by Abdullah bin Laden and Omar bin Laden, blood nephews of al Qaida leader Osama bin Laden. Under Abdullah bin Laden's leadership, WAMY's U.S. branch was deeply involved in the terrorist activities of the SAAR Network of businesses and charities. Federal authorities raided WAMY's U.S. offices in 2002, in connection with an ongoing investigation of the SAAR Network's role in sponsoring al Qaida.

Despite the increased scrutiny of WAMY's operations following the September 11th Attack, the organization continues to sponsor al Qaida and associated terrorist organizations and separatist movements to this day, demonstrating the organization's deep and longstanding commitment to al Qaida's global jihad.

In June of 2002, Indian authorities arrested two men under the Prevention of Terrorism Act, after determining that they had transferred funds to Sayed Ali Shah Geelani, the leader of the Fundamentalist Jamaat-e-Islami party. According to sources within India's government, the two men, Farooq Ahmed and Mohammed Maqbool, were given funds by Nazir Qureshi, a senior WAMY official, to be covertly delivered to Geelani. Geelani previously had been arrested under

the Prevention of Terrorism Act based on his involvement in transferring money to militant organizations in Kashmir.

In September of 2003, Romanian intelligence officials implicated WAMY in an al Qaida plot to hijack a plane departing from Romania and crash it into Heathrow Airport in London. The plot was being coordinated by al Qaida affiliated members of the Muslim Brotherhood in Romania, which, according to Romanian intelligence officials, receives most of its funds from WAMY.

Recent statements by Treasury Department officials, testifying before Congress, further confirm that WAMY continues to serve as a front for al Qaida and other terrorist organizations. During a recent hearing before the U.S. Senate Committee on Banking, Housing, and Urban Affairs on July 13, 2005, Treasury Under Secretary Stuart Levey asserted that “wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and the ideology that fuels the terrorists’ agenda… Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq.” Levey expressed particular concern about the continued involvement of WAMY, the IIRO and MWL in the financing of terrorist activities throughout the globe.

For many years before the September 11th Attack, senior WAMY officials were expressly aware of WAMY’s pervasive sponsorship of terrorist organizations and associated separatist movements throughout the world. To begin with, as detailed above, the misconduct of WAMY’s offices throughout the world was widely reported in the media before September 11, 2001. Given the senior leadership’s close supervision of the activities of the regional offices, high ranking WAMY officials were certainly aware of the media reports implicating those regional offices in the sponsorship of terrorist organizations and associated separatist movements.

In fact, the available evidence reveals that the senior leadership of WAMY directly orchestrated and participated in the support provided to al Qaida and affiliated militants through the regional offices. Adel Batterjee's statements in 1992, in which he acknowledged WAMY's role in channeling recruits to the Bosnian mujihadeen, confirm the direct involvement of senior WAMY leadership in supporting Islamic militants in the Balkans. Maneh al Jahari's 2000 *al Jazeera* article, in which he openly solicited funds and reinforcements for the Chechen mujihadeen, similarly reveal that WAMY leadership in Saudi Arabia directly orchestrated the organization's support for Islamic radicals in Chechnya. WAMY leadership also directly participated in the sponsorship of Kashmiri military groups, as evidenced by the Indian Intelligence Service's finding that Nazir Qureshi, a senior WAMY official, personally sought to channel funds to Sayed Ali Shah Geelani.

## III. APPLICABLE LEGAL STANDARDS

WAMY moves to dismiss the personal injury complaints pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim. Such a motion must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Wynder v. McMahon, 360 F.3d 73, 78 n.8 (2d Cir. 2004); Phelps v. Kapnolas, 308 F.3d 180, 184 (2d Cir. 2002) (*per curiam*).

In evaluating whether Plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the Complaints and RICO Statements and draw all reasonable inferences in Plaintiffs' favor. Wynder, 360 F.3d at 77; Phelps, 308 F.3d at 184. Plaintiffs are not required to prove their case at the pleading stage. Indeed, the Second Circuit has cautioned that "[t]he pleading of evidence should be avoided." Woodford v. Community Action Agency, 239 F.3d 517 (2d Cir. 2001). The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims."

Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998), *aff'd on appeal after remand,* 159 F.3d 1345 (2d Cir. 1998).

A Rule 12(b)(6) motion is analyzed in the context of the requirements of Fed. R. Civ. P. 8(a)(2), which is extremely permissive. Swierkiewicz v. Sorema, 534 U.S. 506, 512-13 (2002). Indeed, Rule 8(a)(2) provides that a complaint need only include only "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Id. (quoting Conley, 355 U.S. at 47 (1957)). Further, in the absence of averments of fraud or mistake, which must be pled with particularity pursuant to Fed. R. Civ. P. 9(b), a federal court is prohibited from imposing more demanding requirements than those proscribed under Rule 8(a). *See, e.g.,* Leatherman v. Tarrant County, 507 U.S. 163, 168-69 (1993). In keeping with this concept, Rule 9 expressly provides that "malice, intent, knowledge and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b).

The Second Circuit has consistently and uniformly held that the notice pleading standards do not require a plaintiff to plead particularized facts regarding a defendant's state of mind in its post-Swierkiewicz era. Phelps v. Kapnolas, 308 F.3d 180, 184 (2d Cir. 2002); Pelman v. McDonald's Corp., 396 F.3d 508 (2d Cir. 2005). See also Warren v. District of Columbia, 353 F.3d 36 (D.C. Cir. 2004); Linde, et al v. Arab Bank, PLC, 384 F. Supp. 2d 571 (E.D.N.Y. 2005). Similarly, the Second Circuit has recently clarified that no heightened pleading requirement applies to civil conspiracy claims. Twombly v. Bell Atlantic Corp., 425 F.3d 99 (2d Cir. 2005).[3]

## IV. LEGAL ARGUMENT

[3] For further discussion of these decisions, please see Property Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Defendant WAMY.

### A. Plaintiffs' September 30, 2005 Pleadings Comply With The Letter And Spirit Of the Federal Rules And Case Management Order No. 2

As a preliminary matter, WAMY argues that the pleadings filed by the *Burnett* and *O'Neill* plaintiffs on September 30, 2005 do not comply with the Federal Rules or requirements of Case Management Order #2.[4] In particular, WAMY argues that the *Burnett* and *O'Neill* plaintiffs were not permitted to use RICO Statements as a means to amend their pleadings, reasoning that CMO #2 affords that right only to the *Federal* plaintiffs. Further, WAMY argues that Fed. R. Civ. P. 8 and Fed. R. Civ. P. 10(b) bar the *Burnett* and *O'Neill* plaintiffs from incorporating by reference prior pleadings or exhibits into their Complaints. Both of these arguments lack merit.

WAMY's argument that the plaintiffs were not permitted to amend their pleadings via RICO Statement is frivolous, at best.[5] Pursuant to a Stipulation between WAMY and plaintiffs, endorsed by this Court on July 26, 2005, WAMY expressly "STIPULATED AND AGREED that plaintiffs pursuing claims for relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO") shall serve their respective RICO Statements concerning WAMY, on or before August 31, 2005." At the time the parties entered into that agreement, there can be no doubt that both WAMY and plaintiffs understood that any such RICO Statements would serve to augment and amend the allegations against WAMY, as evidenced by the fact that WAMY was not required to file its Motion to Dismiss until after the deadline for submission of RICO Statements. Regardless, judicial precedent uniformly hold that RICO Statements should be treated as part of the pleadings. <u>See</u>, <u>e.g.</u>, <u>McLaughlin v. Anderson</u>, 962 F. 2d 187, 195 (2d Cir. 1992); <u>Moses v. Martin</u>, 360 F. Supp. 2d 533, 539 n. 22 (S.D.N.Y. 2004); <u>Allen v. New World Coffee, Inc.</u>, 2001 U.S. Dist. LEXIS 3269, n. 3 (S.D.N.Y. 2001). Having stipulated to the filing

---

[4] WAMY does not argue that the *Ashton* plaintiffs' September 30, 2005 filing was improper.

[5] On September 30, 2005, *prior* to filing the FCC, the *O'Neill* plaintiffs filed numerous More Definite Statements/Additional Allegations ("MDS") pursuant to CMO 2, para 13. The substance of such allegations were incorporated into exhibits and the FCC pursuant to such provision. WAMY was Exhibit Y. <u>See</u> FCC, para. 127(y).

of the relevant RICO Statements, WAMY should not be permitted to side step its agreement with plaintiffs and contest the validity of those pleadings on collateral grounds.

Moreover, the incorporation of the RICO and MDS into plaintiffs' Complaints, by reference or attachment as Exhibits, is expressly authorized by the Federal Rules. Fed. R. Civ. P. 10(c), which WAMY notably avoids reference to, provides:

> Statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion. A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.

Fed. R. Civ. P. 10(c). In view of the plain language of Rule 10(c), plaintiffs' incorporation of the RICO and MDS into their Complaints, by reference or attachment as exhibits, complies with both the letter and spirit of the Federal Rules.[6]

**B. Plaintiffs Have Stated Claims Against WAMY In Accordance With The Notice Pleading Requirements Of The Federal Rules Of Civil Procedure**

WAMY also urges this Court to find that the complaints fail to state a claim upon which relief can be granted, and should therefore be dismissed. In support of that argument, WAMY asserts that the plaintiffs' pleadings are conclusory and fail to present factual allegations sufficient to establish WAMY's mental state and proximate cause. In addition, focusing only on a partial and unspecified group of the allegations against it, WAMY suggests that plaintiffs' claims are somehow barred by the First Amendment to the U.S. Constitution. As will be demonstrated below, WAMY ignores the relevant pleading standards and applies a fundamentally improper test for causation. Moreover, the First Amendment does not serve as a substantive legal bar to plaintiffs' claims because : (1) WAMY fails to meet its burden to establish, even as a preliminary matter, that plaintiffs' claims implicate any protected speech or

[6] Even if the pleadings did deviate from the requirements of the Rules or CMO #2 in some technical respect, dismissal would be a harsh and inappropriate sanction.

activity; and (2) the First Amendment does not immunize WAMY for speech or activity used to further a conspiracy or to further conduct in violation of valid criminal statute.

### 1. Plaintiffs Have Satisfied The Liberal Pleading Requirements Of The Federal Rules

WAMY's contention that plaintiffs have failed to adequately plead WAMY's mental state and the causation element of their claims is factually and legally flawed.

Contrary to WAMY's assertion, plaintiffs' pleadings do contain competent allegations regarding WAMY's knowing and intentional participation in al Qaida's conspiracy to attack America.[7] For example, plaintiffs allege that "[f]or more than a decade, WAMY has knowingly and intentionally used its international infrastructure as a tool for supporting the al Qaida movement, on both the ideological and military fronts," and that "[f]or many years prior to the September 11th Attack, senior WAMY officials were expressly aware of WAMY's pervasive sponsorship of terrorist organizations and associated separatist movements throughout the world." These direct allegations regarding WAMY's knowledge and intent are themselves particularized factual allegations, and satisfy the relevant pleading standards applicable to plaintiffs' claims.

While plaintiffs are not required to provide more detailed factual allegations regarding WAMY's knowledge and intent, they have done so here. The pleadings detail the widespread media reporting, prior to September 11, 2001, of WAMY's partnership with al Qaida and associated militant Islamic extremists, and set forth specific evidence that WAMY's senior leadership closely monitored the activities of all WAMY offices and the media reports discussing their activities. Plaintiffs also present detailed allegations regarding the direct involvement of senior WAMY officials, such as designated terrorist sponsor and long time

---

[7] Under the relevant pleading standards, as articulated by the 2nd Circuit, plaintiffs respectfully submit that they would sufficiently state a claim against WAMY merely by ***alleging*** that WAMY knowingly and intentionally provided material support and resources to al Qaida, both directly and indirectly.

WAMY official Adel Batterjee, in WAMY's terrorist activities. Moreover, the Complaints and other relevant pleadings present factual allegations from which it is logical to infer that officials of the Saudi government would have raised concerns about the involvement of the organization in extremist and terrorist activity with senior WAMY officials. Even under the erroneous pleading standard WAMY advocates, these allegations are more than sufficient to establish the scienter element of plaintiffs' claims.

WAMY's contention that plaintiffs have failed to sufficiently allege proximate cause is equally unconvincing. As this Court has recognized, "[i]n light of Al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda." <u>In Re Terrorist Attacks on September 11, 2001</u>, 349 F. Supp.2d 765, 826 (S.D.N.Y. 2005). Consistent with this holding, plaintiffs' consistent and specific averments of WAMY's knowing and intentional sponsorship of al Qaida are, in and of themselves, sufficient to establish causation at this stage of the litigation.

Even if more specific allegations of causation were required, plaintiffs have met that burden. For example, the *Federal* plaintiffs allege that "[a]bsent the material support and resources provided by the co-defendants, both directly and indirectly, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th Attack." *O'Neill* FCC 159-63, 177-80; *Ashton* 6AC at 478. Similarly, the plaintiffs assert that al Qaida's training "camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan in preparation for the September 11, 2001 Attacks. None of this would have been possible without the funds and sponsorship supplied by participants and conspirators

including the World Assembly of Muslim Youth." Thus, although unnecessary, the plaintiffs' pleadings specifically allege that al Qaida could not have successfully carried out the September 11th Attack absent the support of WAMY.

Finally, that WAMY *maintains* that it was not specifically aware of the September 11th plot, or that it did not directly participate in the Attack itself, is irrelevant. As this Court has previously recognized, "Plaintiffs do not have to allege that Defendants knew specifically about the September 11 attacks or that they committed any specific act in furtherance of that attack." In re Terrorist Attacks on September 11, 2001, 349 F. Supp.2d at 829.

For the foregoing reasons, WAMY's argument that plaintiffs have failed to meet the simple notice pleading requirements of the Federal Rules is manifestly devoid of merit. Stated simply, plaintiffs have alleged the existence of a conspiracy (the existence of which is beyond dispute), WAMY's knowing and intentional participation in that conspiracy, and the forms of material support WAMY provided in furtherance of the conspiracy's objectives. These allegations serve to provide WAMY with "fair notice" of the claims against it.

**2. Plaintiffs' Claims Do Not Abridge On Any Rights Protected By The First Amendment**

WAMY's First Amendment defense also fails as a grounds for dismissal pursuant to Rule 12(b)(6). Plaintiffs have addressed this argument in the Property Damage Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Defendant WAMY. Rather than repeat that argument here, the Personal Injury Plaintiffs instead respectfully refer the Court to, and incorporate by reference, that discussion.

### C. Plaintiffs Properly Alleged The Elements Of Their Individual Causes Of Action Against WAMY[8]

#### 1. <u>Plaintiffs State A Valid Claim Against WAMY Under The Anti-Terrorism Act</u>

For purposes of these proceedings, plaintiffs state a claim against a defendant under the Anti-Terrorism Act (ATA) by alleging that the defendant knowingly conspired with, aided and abetted or provided material support or resources to al Qaida. The ATA defines the term material support and resources to include, among other things: funds in any form; financial services; personnel; weapons; communication equipment; safehouses; and false identification. 18 U.S.C. § 2339(A). Plaintiffs' pleadings regarding WAMY's support of al Qaida specifically allege that WAMY knowingly provided funds and financial services to al Qaida. Plaintiffs further allege that WAMY knowingly provided al Qaida members with documents falsely identifying them as WAMY aid workers, to assist those al Qaida operatives to gain access to conflict regions. Given these and other allegations, and for the reasons stated above, plaintiffs have asserted valid claims against WAMY under the ATA.

#### 2. <u>Plaintiffs State Valid Claims Against WAMY Under Their Common Law Theories Of Liability</u>

WAMY's arguments in favor of dismissal of plaintiffs' common law theories are, in large part, derivative of the general arguments it raises regarding the sufficiency of plaintiffs' allegations regarding WAMY's knowledge and intent and causation. In this vein, WAMY asserts that plaintiffs' intentional infliction of emotional distress, assault and battery, wrongful death, and survival claims should be dismissed on the grounds that plaintiffs have failed to allege facts sufficient to establish WAMY's knowing and intentional support of al Qaida, or facts sufficient to establish a causal link between WAMY's conduct and the September 11th Attack.

---

[8] Plaintiffs do not currently intend to pursue their claims under the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350, against this defendant. Plaintiffs reserve the right to replead this claim against WAMY should additional information become available in discovery demonstrating it acted "under actual or apparent authority or color of law, of any foreign nation" in connection with its support of al Qaida.

See WAMY's Memorandum of Law at pp. 16-19. However, this Court has already found that plaintiffs state valid common law causes of action under these theories by alleging that a defendant knowingly conspired with, or aided and abetted, al Qaida. In re Terrorist Attacks on September 11, 2001, 349 F. Supp.2d at 829-30. For the reasons set forth above, plaintiffs have more than met the pleading requirements applicable to the concerted action theories advanced against WAMY, and have therefore stated valid claims under intentional infliction of emotional distress, assault and battery, wrongful death and survival theories.

Moreover, contrary to the defendant's assertion, plaintiffs' claims for assault and battery and for intentional infliction of emotional distress are not demonstrably time-barred. On this point, plaintiffs respectfully refer the Court to the discussion of this issue on pages 19-20 of Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Dr. Abdullah al Turki, incorporated herein by reference.

Plaintiffs have stated a valid claim in negligence against WAMY under the liberal pleading requirements of Rule 8 as well. International terrorism is a serious and deadly problem that threatens the health, safety and welfare of people throughout the world, and the vital interests of the United States. *See* 18 U.S.C. §2339(b) n.(a)(1). Given that fact, it is clear that WAMY owed a duty to refrain from materially supporting al Qaida, as reflected in the ATA and numerous international agreements. Plaintiffs have alleged that WAMY breached that duty by providing material support to al Qaida, and that their injuries were the foreseeable and proximate result of WAMY's conduct. In view of these allegations, plaintiffs have stated a valid cause of action in negligence against WAMY, the resolution of which is not appropriate in the context of a motion to dismiss.

**3. Plaintiffs State A Valid Claim Against WAMY Under The Alien Tort Claims Act**

WAMY contends that the plaintiffs' claims under the Alien Tort Claims Act ("ATCA"), 28 U.S.C. § 1350, should be dismissed because WAMY is not a state actor and did not engage in "egregious forms of misconduct." However, the ATCA does not require that the defendant act under color of law and "egregious forms of misconduct" is not the test for when a plaintiff may assert a claim under the ATCA. Plaintiffs have addressed this argument in Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Faisal Islamic Bank-Sudan. Rather than repeat that argument here, Plaintiffs instead respectfully refer the Court to, and incorporate by reference, that discussion.

**4. Plaintiffs' Conspiracy, Aiding And Abetting And Punitive Damages Counts Should Not Be Dismissed**

WAMY correctly argues that no independent causes of action exist under New York law for conspiracy, aiding and abetting or punitive damages. However, at this stage of these proceedings, the substantive law governing each of plaintiffs' individual claims remains to be determined. Thus, it would be premature to dismiss those causes of action at this time. Moreover, there can be little dispute that plaintiffs' have alleged that WAMY conspired with and aided and abetted al Qaida, or that plaintiffs are entitled to recover punitive damages in the event that they prevail against this defendant under the theories advanced. Under these circumstances, dismissal of the conspiracy, aiding and abetting and punitive damages counts would be inappropriate.

**5. Plaintiffs' RICO Claims Should Not Be Dismissed**

WAMY first challenges the standing of the *O'Neill* Plaintiffs to pursue RICO claims, arguing that these Plaintiffs lack standing as their injuries are personal injuries.[9] WAMY's

---

[9] Defendant challenges the standing of the *Burnett* Plaintiffs to pursue RICO claims. Those Plaintiffs do not intend to pursue those claims at this time, and therefore do no address the defendant's standing argument herein.

argument is flawed. The *O'Neill* Plaintiffs, in the FCC, specifically alleged that the Defendants intended to cause damage to business and property, and did in fact intend to cause damage to business and property. *See O'Neill* FCC ¶¶176, 178-80. The Plaintiffs further detailed certain elements of the damages: "including a. Economic damages, including but not limited to pecuniary losses, past and future wage losses, loss of support, loss of prospective inheritance …." *See O'Neill* FCC ¶ 146; Exhibit Y, ¶¶ 14-5. Furthermore, in their MDS and RICO statements, the *O'Neill* Plaintiffs elaborated on the various factual elements of such damages, which we submit are not required for Rule 8(f) notice pleadings, to include direct pecuniary losses, past and future wage losses and profits, losses of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. FCC Exhibit Y, ¶¶ 14-5. *See also* RICO Statement, Para 15-16.[10] [11] Accordingly, such allegations have not only met, but exceeded the pleading threshold set in <u>Diaz v. Gates</u>, 420 F.3d 897 (9th Cir. 2005) (e.g., damages to tangible personal property), and the *O'Neill* Plaintiffs have established standing.

In further support of its argument that plaintiffs' RICO claims should be dismissed, WAMY argues that plaintiffs fail to adequately allege (1) investment or racketeering income in the enterprise; (2) active management or operation of the enterprise; (3) that WAMY was a central figure in the enterprise; or (4) causation. Fairly read, plaintiffs' pleadings allege that WAMY knowingly acted as one of al Qaida's primary fronts for raising and distributing funds, arms and other physical assets. Plaintiffs' further allege that WAMY fraudulently raised funds throughout the world on behalf of al Qaida, through international mail and other communications

---

[10] For a more extensive discussion of this issue, *see* "O'Neill Plaintiffs' Memorandum of Law In Opposition to Al Haramain Islamic Foundation, Inc's Motion to Dismiss Pertaining to Certain RICO Issues Only," Docket No. 810, pp. 13-17.

[11] Alternatively, the *O'Neill* Plaintiffs seek leave to amend to specifically provide such detail as to such losses.

vehicles, under the guise of charity. In these respects, WAMY's role in the enterprise closely mirrors that of Al Haramain Islamic Front (AHIF), one of al Qaida's other principal charity fronts. Accordingly, plaintiffs respectfully refer the Court to the discussion of RICO liability set forth on pp. 13-17 of the Property Damage Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Al Haramain Islamic Foundation, Inc., incorporated herein by reference.

### D. Burnett Plaintiffs Have Properly Served WAMY[12]

Although WAMY recites the applicable rules for service of process, WAMY omits information showing the lengths to which it went to ignore and evade service of process. These efforts are similar to those tried by other defendants but which the Court rejected and described as "a bit of a dance" and an attempt to put "form over substance." Exhibit 2, Affirmation of Robert T. Haefele, Exhibit A, hereinafter "Haefele Aff., Exhibit __". Here, an independent process server served process at WAMY's self-recognized office address, namely 5134 Leesburg Pike, Alexandria, Virginia – the address that WAMY itself has identified to the Virginia Secretary of State as the address for service of process, Haefele Aff., Exh. D – by successfully serving a copy of the summons and complaint upon a person who acknowledged both that she

---

[12] It is also worth reiterating that both WAMY SA and WAMY International are one and the same. Although it is significant for this service issue that they both share the same counsel and the same address, *cf*. Gleason v. McBride, 869 F.2d 688, 693 (2d Cir. 1989) (in rule 15 context, where two defendants share attorney and attorney has reason to believe second defendant will be added, second defendant is presumed to be on notice), the interchangeability runs much deeper. For example, WAMY's current website explains that it is headquartered in Saudi Arabia, and has various branches outside Saudi Arabia. Those in the United States interested in contacting either WAMY SA or WAMY International, although once instructed to do so by contacting WAMY at the same Falls Church, Virginia address counsel has identified as belonging to WAMY International, are now instructed to do so by contacting the Saudi Arabia headquarters. (Compare attached printouts of contact information printed from www.waybackmachine.org for www.wamy.org, Haefele Aff., Exh. E, and www.wamyusa.org, Haefele Aff., Exh. F, with printouts from another current WAMY site, Haefele Aff. Exh. G.) Similarly, both the WAMY SA and WAMY International website registrations evidence that, while WAMY SA is the registrant for both internet sites, WAMY USA (listing the Virginia post office box address and telephone number) is the administrator for the WAMY SA site and WAMY SA (listing the Saudi Arabian address and telephone number) is the administrator for the WAMY USA site. (Compare attached WHOIS printouts for WAMY.ORG and WAMYUSA.ORG from Register.com., Haefele Aff., Exh. H.)

had some familiarity with the litigation and that she was generally someone authorized to accept service of legal documents for WAMY. Haefele Aff., Exhibit B. WAMY does not contest that this is its principle place of business in the United States. Moreover, service was thereafter sent to WAMY at this same self-recognized office address via the United States Postal Service, demonstrated by delivery confirmation. Haefele Aff., Exhibit C. Despite all efforts to ignore and evade service, WAMY has obviously received actual notice of the suit, no rights have been prejudiced, and WAMY should not be rewarded for its efforts to ignore and evade process.

The proper rules governing service of process on corporations are found in Fed. R. Civ. P. 4(h). Rule 4 is a flexible rule intended to be construed liberally to ensure fulfillment of the real purpose of the rule; namely, to ensure that a party receives sufficient notice of the complaint. Friday v. U.S. Dept of Justice, 1993 WL 430547 (D. Or. Oct. 21, 1993) (quoting Benny v. Piples, 799 F.2d 489, 492 (9th Cir. 1986), amended, 807 F.2d 485, 493 (6th Cir. 1987), cert. denied, 484 U.S. 870 (1987)); see also Henderson v. United States, 517 U.S. 654, 672 (1996), Michaelson v. Hudson, 530 N.Y.S.2d 225, 271 (App. Div. 2nd Dept. 1988) (The core function of service is to ensure that the corporation is given notice that a suit has commenced so that the defendant has a fair opportunity to answer the complaint). Where the defendant has actual notice, not every technical violation of the service rules, or failure of strict compliance with the rules, will invalidate service of process. See Lutin v. New Jersey Field Corp., 1996 WL 636037 (S.D.N.Y. Nov. 1, 1996) (quoting Maryland National Bank v. M/V Tanicorp I, 796 F. Supp 188, 190 (D. Md. 1992)).

Although WAMY cited to the appropriate rule for service of process, Rule 4(h), pursuant to Rule 4 (e)(1), service was also permitted "pursuant to the law of the state in which the district court is located, or in which service is effected…;" thus, here, service was permitted pursuant to either New York or Virginia law. The New York rule explicitly extends the list of those who

may be served to include "an officer, director, managing or general agent, or cashier or assistant cashier or to any other agent authorized by appointment or by law to receive service." N.Y McKinney's CPLR § 311. Consistent with the real purpose of ensuring that the defendant is given fair notice that suit has commenced, New York law recognizes service is proper where service was done "in a manner which, objectively considered, is calculated to give the corporation fair notice of the suit." Citadel Management Inc. v. Telesis Trust, Inc., 123 F. Supp. 2d 133, 145 (S.D.N.Y. 2000).

Two independent, non-party process servers have attested to their efforts to serve process on Defendants. According to the process server who went to defendants business address to serve process, when he knocked on the door, the person who answered the door identified herself as someone generally authorized to accept service of legal documents, thus holding herself out to the process server as someone who held a position capable of ensuring that the documents served would be forwarded to the proper authorities within defendant's organization. See KLM – Royal Dutch Airlines v. Curtiss-Wright Corp., 17 F.R.D. 49, 51 (S.D.N.Y. 1955); Brunn v. Xtra Superfood Centers, Inc., 2001 WL 180136 (D. Virgin Islands Jan. 4. 2001). The process server, who cannot be expected to know WAMY's internal practices, should be permitted reasonably to rely upon her own acknowledgement that she is generally someone who has accepted service in the past. Fashion Page, Ltd. v. Zurich Ins. Co., 428 N.Y.S.2d 890, 893-894 (N.Y. Ct. App. 1980).

Instead of acknowledging service, counsel for WAMY, though obviously aware that WAMY was sued and familiar with the fact that process was served at WAMY's place of business, insists on raising alleged technical flaws. But the objective facts support the truth that WAMY was served, and any alleged flaw caused no prejudice and is therefore harmless error. See Alfa Corp. v Alfagres, S.A., 385 F. Supp. 2d 1230, 1239 (M.D. Ala. 2005) ("The court finds

that service of process … was in substantial compliance with the Federal and [state] Rules of Civil Procedure and that any defects in service of process have not prejudiced [the defendant] and are therefore harmless error.")

Moreover, the alleged flaws that counsel has raised, instead of proving that Defendants' due process has been prejudiced, do more to highlight Defendants efforts to ignore and evade service of process. For example, according to the process server, although the person who answered the door confirmed that she is generally authorized to accept service, she advised that she had been told not to accept service in this case and, when she was given the papers, she threw them back at the process server. See Heritage House Frame & Molding Co. v. Boyce Highlands Furniture Co., 88 F.R.D. 172, 174-175 (E.D.N.Y. 1980) (the process server must merely "tender" the summons, which includes hand delivery *near*, *but not necessarily to*, a person who *appears* to be a "managing or general agent"). Similarly, although she insisted that, in this case, service of process had to be made upon Defendants' counsel; counsel has flat out refused to accept service in the *Burnett* matter – notwithstanding that counsel has accepted service of process by other plaintiffs in other cases. Instead, in this case, counsel insisted that service be made via mail to a post office box. Plaintiffs assert that personal service at an address identified to the Virginia Secretary of State for service of process, followed by confirmed postal service at the same address, must be considered eminently more reasonable efforts to serve Defendants than a simple mailing to a post office box. See, e.g., Michaelson v. Hudson, 530 N.Y.S.2d 225 (2nd Dept 1988) (service of process was defective where it consisted solely of mailing to a P.O. Box with no explanation to suggest why process was not affixed to the defendant's door).

Because the process servers acted reasonably in serving process at Defendants' business address, which Defendants have identified as the proper place for legal service, upon a person

who the process server had a reasonable basis to believe was an employee of Defendants generally authorized to accept service of legal documents and capable of ensuring the documents were given to the proper persons within the organization, and service was followed up by sending an additional copy of the document to the Defendants' address via the United States Postal Service, Plaintiffs request that service be upheld.

**V. CONCLUSION**

For the foregoing reasons, the Personal Injury Plaintiffs respectfully request that WAMY's Motion to Dismiss be denied in all respects, with prejudice.

Respectfully submitted,

| | |
|---|---|
| <br><br>Dated: January 23, 2006 | MOTLEY RICE LLC<br><br>BY: _____/s/________________________<br>Ronald L. Motley, Esq. (RM-2730)<br>Jodi Westbrook Flowers, Esq.<br>Donald A. Migliori, Esq.<br>Michael Elsner, Esq. (ME-8337)<br>Robert T. Haefele (NJ-58293, PA-57937)<br>Justin Kaplan (TN-022145)<br>MOTLEY RICE LLC<br>28 Bridgeside Boulevard<br>P.O. Box 1792<br>Mount Pleasant, South Carolina 29465<br>Telephone: (843) 216-9000 |

| | |
|---|---|
| | Paul J. Hanly, Jr., Esq. (PH-5486)<br>Jayne Conroy, Esq. (JC-8611)<br>Andrea Bierstein, Esq. (AB-4618)<br>HANLY CONROY BIERSTEIN &<br>SHERIDAN, LLP<br>415 Madison Avenue<br>New York, NY 100 17-11 1 1<br>Telephone: (212) 401-7600<br><br>Attorneys for *Burnett* Plaintiffs |
| | James P. Kreindler, Esq. (JK7084)<br>Justin T. Green, Esq. (JG0318)<br>Andrew J. Maloney III, Esq. (AM8684)<br>Vincent Ian Parrett, Esq. (VP5092)<br>KREINDLER & KREINDLER LLP<br>100 Park Avenue<br>New York, NY 10017-5590<br>(212) 687-8181<br><br>Attorneys for *Ashton* Plaintiffs |
| | Jerry S. Goldman (JG8445)<br>LAW OFFICES OF JERRY S. GOLDMAN<br>AND ASSOCIATES, P.C.<br>111 Broadway, 13th Floor<br>New York, New York 10006<br>Tel.: (212) 385-1005<br>Fax: (212) 346-4665<br><br>Attorney for *O'Neill* Plaintiffs |

# EXHIBIT 1

# APPENDIX I:

# O'NEILL SUMMARY OF PLEADINGS REFERENCES TO WORLD ASSEMBLY OF MUSLIM YOUTH, *A/K/A* WAMY INTERNATIONAL, INC., *A/K/A* WORLD ASSOCIATION FOR MUSLIM YOUTH *AND* WORLD ASSEMBLY OF MUSLIM YOUTH OF SAUDI ARABIA *AND* WORLD ASSEMBLY OF MUSLIM YOUTH (RIYADH, SAUDI ARABIA) *AND* WORLD ASSEMBLY OF MUSLIM YOUTH (JEDDAH, SAUDI ARABIA) *AND* WORLD ASSEMBLY OF MUSLIM YOUTH (LONDON, UNITED KINGDOM) *AND* WORLD ASSEMBLY OF MUSLIM YOUTH (FALLS CHURCH, VIRGINIA, USA)

## The Conspiracy[1, 2, 3]

1. On September 11, 2001, approximately 3,000 individuals were murdered in New York, Virginia and Pennsylvania. The attacks of September 11, 2001, were not isolated incidents, but rather were the culmination of a conspiracy among the al Qaida network and the Defendants to attack the United States and murder United States citizens and to disrupt economic activities within the United States and of the victims of the attacks. Burnett 228, Continental Casualty 27, 429, Federal Ins. First Amended Complaint ("FAC") 72; N.Y. Marine Second Amended Complaint ("NYMSAC") 44, 45, 508; O'Neill Al Baraka First Consolidated Complaint ("FCC" or "O'Neill Al Baraka FCC" or "Al Baraka FCC") ¶¶ 1, 6-10 22-5, Tremsky ¶ 120, WTC ¶ 365.

2. The conspirators consist of the defendants named in the in the three O'Neill actions (Estate of John P. O'Neill, Sr., *et al.* v. Al Baraka Investment & Development Corporation, *et al.*, 04 CV 1923 (RCC), Estate of John P. O'Neill, Sr., *et al.* v. Kingdom of Saudi Arabia, *et al.*, 04 CV 1922 (RCC), Estate of John P. O'Neill, Sr., *et al.* v. Republic of Iraq, *et al.*, 04- CV 1076) ("O'Neill Iraq")

---

[1] The pleadings consist of the O'Neill First Consolidated Complaint ("FCC"), filed on September 30, 2005, as may be amended, from time to time, pursuant to Fed. R. Civ. Proc. 15. Incorporated into the First Consolidated Complaint are various other pleadings filed in the matter, such as the O'Neill RICO Statement and the More Definite Statements/Additional Allegations (MDS). These items, all separately docketed, were, in substance, physically appended to the hard copy of the FCC filed with the clerk on the evening of September 30, 2005, and emailed to counsel of record. Paragraph 127 of the FCC lists these various Exhibits. The More Definite Statement/Additional Allegations pertaining to the instant Defendant was, pursuant to FCC ¶ 127 (Y), appended as Exhibit (P) (hereinafter cited as "MDS" or "Exhibit Y").

[2] There are references preceding the various substantive causes of actions in the FCC incorporating the various paragraphs in the pleadings without setting them forth at length. See, e.g., FCC ¶134.

[3] References herein to "FCC" or *Al Baraka FCC* or *O'Neill Al Baraka FCC* are to the First Consolidated Complaint in *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Investment and Development Corp., et al.* filed on September 30, 2005.

(with such complaints also including 'John Does'), as well as in the cases brought by the other plaintiffs in *In Re Terrorist Attacks of September 11, 2001,* 03-MDL-1570 (RCC), and others. Exhibit Y, ¶ 2.[4]

3. The complaint lists certain John Doe Defendants who performed acts which resulted in acts of terrorism, including September 11. O'Neill Al Baraka FCC ¶27.

4. On the morning of September 11, 2001, certain of the conspirators hijacked four (4) aircraft flying within the United States, causing the damages described in the Complaint. O'Neill Al Baraka FCC ¶¶ 6-9.

5. All 19 hijackers were members of the al Qaida network. O'Neill Al Baraka ¶¶6-9.

6. All of the hijackers received sponsorship, funding, training and other support through the al Qaida network. FCC ¶10.

7. The Defendants unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate in unlawful and tortious acts pursuant to a common course of conduct, resulting in the death and injury of Plaintiffs. Burnett ¶¶ 649, 650, 654, O'Neill Iraq ¶¶ 23, 38, 41, 63, 83, 250, 251; O'Neill Al Baraka FCC ¶¶ 22-4, 25, 144, 158-9, 162. Continental Casualty ¶ 26, Federal Insurance FAC ¶ 622.

8. The Defendants conspired with and agreed to provide material support, funding, sponsorship and/or resources to al Qaida, Osama bin Laden, and the sponsors of terror. Continental Casualty ¶¶ 26, 603, Federal Insurance FAC ¶¶ 66, 632; NYMSAC ¶ 509

9. Absent the material support and resources provided by the co-defendants, both directly and indirectly, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th Attack. Federal Insurance FAC ¶ 74.

10. The Defendants engaged in common, concerted and conspiratorial acts, efforts, transactions, and activities designed and intended to cause a terrorist attack on the United States, its citizens and society, and attack those foreign citizens found within the United States, resulting in the harm to Plaintiffs, which was done pursuant to and furtherance of this common scheme. Burnett, Introduction, page

---

[4] Paragraph 127 of the FCC pleads as follows:

> Attached hereto as Exhibit and incorporated herein as if set forth at length are the following More Definite Statements/Additional Allegations/RICO Statements:
>
> A) More Definite Statements/Additional Allegations- Victims List
>
> ...
>
> Y) More Definite Statement/Additional Allegations- World Assembly of Muslim Youth (Wamy).

217; Continental Casualty ¶¶ 605, 613, 617; Federal Insurance FAC ¶¶ 615, 616, 617, 619, 620; NYMSAC ¶¶ 509-511; O'Neill Iraq FCC ¶ 252; O'Neill Al Baraka FCC ¶ 144.

11. Defendants' concert of action and conspiracy to support and promote Osama bin Laden and al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett, ¶ 649; Continental Casualty ¶¶ 605, 613, 617; Federal Insurance FAC ¶¶ 594, 608, 617, 620, 622, 623, 624, 634; NYMSAC ¶¶ 511, 515, 518, 531; O'Neill Iraq FCC ¶ 253; O'Neill Al Baraka FCC ¶ 144.

12. Certain of the conspirators are banks, financial organizations, and companies, located throughout the world, who conspired with Osama Bin Laden a/k/a Usama bin Laden (OBL) and al Qaida in order to support and finance their terrorist activities, including, without limitation, the September 11, 2001 attacks. O'Neill Iraq ¶ 38; O'Neill Al Baraka FCC ¶22

13. Certain of the conspirators are businessmen, individuals, bankers, financiers, organizations, and/or operatives who conspired with OBL and al Qaida to raise, launder, transfer, distribute, and hide funds for OBL and al Qaida in order to support and finance their terrorist activities including, but not limited to, the September 11 attacks or otherwise assisted them in their terrorist activities. O'Neill Al Baraka FCC ¶ 23.

14. Certain of the conspirators are charities and charitable foundations which are used as terrorist fronts to mask money transfers and to provide cover for terrorist operations and operatives. O'Neill Iraq FCC ¶¶ 38, 41; O'Neill Al Baraka FCC ¶ 24.

15. The conspirators conspired with each other, including OBL and al Qaida to raise, launder, transfer, distribute, and hide funds for conspirators in order to support and finance their terrorist activities, including, but not limited to the September 11 attacks. O'Neill Iraq FCC ¶¶ 38, 41; O'Neill Al Baraka FCC ¶ 25.

16. The complaint lists certain John Doe Defendants who performed acts which resulted in acts of terrorism, including September 11. O'Neill Al Baraka FCC ¶27.

17. The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Burnett, ¶ 662; Federal Insurance FAC ¶ 620; O'Neill Al Baraka FCC ¶ ¶177-180.

18. As set forth in the pleadings, all of the Defendants conspired to commit acts of international terrorism against the United States, its nationals and allies, which conspiracy included the provision of material support and resources to al Qaida, Osama bin Laden, the hijackers, and affiliated foreign states, FTO's, persons, organizations, commercial entities and other parties. O'Neill Iraq FCC ¶¶ 19, 23, 251; O'Neill Al Baraka FCC ¶157.

19. As set forth in the pleadings, all of the Defendants engaged in concerted efforts and activities designed to attack the United States and inflict harm on U.S. citizens and property. O'Neill Iraq FCC ¶¶ 250-2; O'Neill Al Baraka FCC ¶158.

20. As set forth in the pleadings, the conspiracy resulted in the September 11, 2001 terrorist attacks. O'Neill Iraq FCC ¶ 253; O'Neill Al Baraka FCC ¶159.

21. The September 11th attack was a direct, foreseeable, and intended product of the conspiracy among the Defendants, as set forth in the pleadings, to commit acts of international terrorism against the United States, its nationals and allies. Federal Insurance 629, 631; O'Neill Iraq FCC ¶ 272; O'Neill Al Baraka FCC ¶160, 163, 167.

22. As a result of the Defendants' conspiracy, Plaintiffs and the Class have suffered damages as fully set forth in the paragraphs preceding Al Baraka FCC ¶ 161, which were incorporated by reference. O'Neill Al Baraka FCC ¶161; O'Neill Iraq FCC ¶¶ 254, 270, 271.

23. Through the material support and resources provided to al Qaida, the defendants aided and abetted al Qaida, OBL, and the other conspirators in their campaign to commit acts of international terrorism against the United States, its nationals and allies. O'Neill Iraq FCC ¶ 63; O'Neill Al Baraka FCC ¶ 162.

24. OBL and the hijackers acted in concert with the other co-conspirators. O'Neill Al Baraka FCC ¶165; O'Neill Iraq FCC ¶¶ 223, 228, 242.

25. The conspiracy among the Defendants to commit acts of international terrorism against the United States, its nationals and allies, included the provision of material support and resources to al Qaida, Osama bin Ladin, the hijackers, affiliated foreign states, foreign terrorist organizations, persons, organizations, commercial entities, and other parties. Al Baraka FCC ¶168; Iraq FCC ¶251.

26. By virtue of their participation in the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001 attack, the Defendants negligently, intentionally, recklessly, willfully and wantonly breached duties of care owed to the Plaintiffs, the Class, and Decedents. Federal Insurance 642; Al Baraka FCC ¶169.

27. In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the Defendants engaged in a pattern of racketeering activity which included, without limitation: acts of murder, kidnapping, arson, robbery, and extortion; dealing in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud. Federal Insurance 628; O'Neill Al Baraka FCC ¶177; O'Neill Iraq FCC ¶267.

28. The conspirators intended to cause damage to business and property and did in fact cause damage to business and property, and the damages suffered were the direct and proximate result of the pattern of racketeering activity of the

Defendants, acting individually and in concert with each other. Burnett ¶ 662, O'Neill Al Baraka FCC ¶ ¶178-180; O'Neill Iraq FCC ¶¶ 267, 272.

29. The Defendants aided and abetted al Qaida, OBL and the hijackers in their campaign to commit acts of international terrorism against the US, its nationals and allies. Federal Insurance FAC ¶ 622, O'Neill Al Baraka FCC ¶162; O'Neill Iraq FCC ¶63.

30. The 9/11 attacks were the direct, intended and foreseeable product of aiding and abetting. Federal Insurance FAC ¶ 623; O'Neill Al Baraka FCC ¶163.

31. All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries. Burnett ¶ 674; Continental Casualty ¶ 604; Federal Insurance FAC ¶ 606; O'Neill Al Baraka FCC ¶ 152.

32. The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent. Burnett ¶ 673; Federal Insurance FAC ¶ 633; O'Neill Al Baraka FCC ¶¶ 152, 169.

33. The Enterprise is alternatively pled as Radical Muslim Terrorism, al Qaida or the International Islamic Front for the Jihad Against Jews and Crusaders. O'Neill Al Baraka, Exhibit P ¶ 6a; O'Neill Iraq FCC ¶¶ 263-5.

34. The attacks of September 11, which caused the deaths and damages to the Plaintiffs, constitutes an act of international terrorism within the meaning of 18 U.S.C. Sec. 2331. Al Baraka FCC ¶¶ 139, 172.

**The Relationship between the World Assembly of Muslim Youth (as defined herein) and the Conspiracy**

35. Defendants International Islamic Relief Organization a/k/a Islamic Relief Organization a/ka International Relief Organization, … World Assembly of Muslim Youth a/k/a WAMY International, Inc. a/k/a World Association For Muslim Youth (including World Assembly of Muslim Youth of Saudi Arabia, as well as any and all subsidiary, affiliate, related and/or branch offices thereof, including without limitation, World Assembly of Muslim Youth (Riyadh, Saudi Arabia), World Assembly of Muslim Youth (Jeddah, Saudi Arabia), World Assembly of Muslim Youth (London, United Kingdom) and World Assembly of Muslim Youth (Falls Church, Virginia, USA) (collectively "World Assembly of Muslim Youth" or "WAMY")) … and and Muwaffaq Foundation a/k/a Blessed Relief Foundation a/k/a Blessed Relief are all charities and charitable foundations which are used as terrorist fronts to mask money transfers and provide cover for terrorist operatives and operations. O'Neill Al Baraka FCC ¶ 24.

36. Defendant Adel Batterjee was also chairman of a Saudi charity, the World Assembly of Youth ("WAMY"), which is the subject of an F.B.I, investigation for terrorist activities. O'Neill Al Baraka FCC ¶ 50.[5]

37. In 2000, Defendant Saudi American Bank participated in the fund raising campaign in Saudi Arabia for collecting donations to the "heroes of the Al Quds uprising" (Intifada) by providing a bank account and facilities to receive donations for a committee of charity organizations including Defendants WAMY, IIRO[6] and the al Haramain Foundation.[7] O'Neill Al Baraka FCC ¶ 67.

38. Defendant IIRO works in concert with other charities, including Defendants BIF and WAMY, to fund and support al Qaeda. O'Neill Al Baraka FCC ¶ 94.

39. Defendant al-Haramain is a charity front for al Qaeda and Osama bin Laden and provides direct material support to al Qaeda. In December 1999, al-Haramain conducted a joint fundraising event with Defendants ERG and WAMY in Riyadh. O'Neill Al Baraka FCC ¶ 111.

40. Defendant Benevolence International Foundation ("BIF"), was originally founded in the 1980's by a wealthy Saudi Arabian, Adel Abdul Jalil Batterjee, an associate of Osama bin Laden. It is headquartered in Palos Hills, Illinois, and has offices in numerous Asian countries. It purports to be an international charity, but is actually an al Qaeda affiliate engaged in support of terrorist activities. O'Neill Al Baraka FCC ¶ 118.[8]

41. One of BIF's directors is Defendant Adel Abdul Jalil Batterjee; Defendant Enaam Arnaout, a known associate of Osama bin Laden's, has also been affiliated with BIF. O'Neill Al Baraka FCC ¶ 119.[9]

42. Defendant BIF is tightly connected with Defendant WAMY, sharing the same leadership and working together on many projects, including support for al Qaeda and its terrorist operations. One such project was the publication of a biography of Osama bin Laden and the origins of the al Qaeda network. O'Neill Al Baraka FCC ¶ 120.

43. Defendant BIF has been deeply involved in financing, supporting, and facilitating al Qaeda terror operations through provision of money, equipment, and information, and by concealing and fabricating information and evidence concerning same. O'Neill Al Baraka FCC ¶ 121.

44. Defendant BIF's involvement in support and financing for al Qaeda terrorist

---

[5] See More Definite Statement/Additional Allegations – Saudi American Bank, O'Neill Al Baraka FCC Exhibit V, as set forth at length; See also O'Neill Al Baraka FCC ¶ 65-7.

[6] See More Definite Statement/Additional Allegations – International Islamic Relief Organization (IIRO), O'Neill Al Baraka FCC Exhibit B, as if set forth at length.

[7] See More Definite Statement/Additional Allegations – Al Haramain Islamic Foundation, Inc., et al., O'Neill Al Baraka FCC Exhibit I.

[8] See generally, O'Neill Al Baraka FCC ¶¶ 117-122 re BIF.

[9] See generally, O'Neill Al Baraka FCC ¶¶ 109-116 regarding Al Haramain.

operations is disguised as charitable activities. O'Neill Al Baraka FCC ¶ 122.

45. As referred to herein, World Assembly of Muslim Youth a/k/a WAMY International, Inc. a/k/a World Association For Muslim Youth includes World Assembly of Muslim Youth of Saudi Arabia, as well as any and all subsidiary, affiliate, related and/or branch offices thereof, including without limitation, World Assembly of Muslim Youth (Riyadh, Saudi Arabia), World Assembly of Muslim Youth (Jeddah, Saudi Arabia), World Assembly of Muslim Youth (London, United Kingdom) and World Assembly of Muslim Youth (Falls Church, Virginia, USA) (collectively "World Assembly of Muslim Youth" or "WAMY"). O'Neill Al Baraka FCC ¶ 123.

46. Defendant World Assembly of Muslim Youth ("WAMY") is tightly connected with Defendant BIF, sharing the same leadership and working together on many projects, including support for al Qaeda and its terrorist operations. One such project was the publication of a biography of Osama bin Laden and the origins of the al Qaeda network. O'Neill Al Baraka FCC ¶ 124.

47. Defendant WAMY is an al Qaeda front. In particular, it is involved in the production and/or distribution of al Qaeda training manuals, propaganda, and hate literature aimed against Americans, Christians, and Jews. O'Neill Al Baraka FCC ¶ 125.

48. WAMY has long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. WAMY conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. WAMY conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Al Baraka FCC Exhibit Y, ¶20.

49. World Assembly of Muslim Youth (WAMY) is a multi-national organization which hasbeen at the forefront of the global jihadist movement for more than twenty (20) years. Headquartered in Saudi Arabia and with more than sixty (60) offices throughout the world, WAMY publicly claims to be an Islamic "humanitarian and relief" organization, focusing on the needs of Islamic communities, and in particular to the needs of Muslim youth. In reality, WAMY is an extremist organization, dedicated to spreading a radical and virulently anti-Western and anti-democratic ideology throughout the world, and to supporting violent Islamic terrorist organizations and associated separatist movements. Al Baraka FCC Exhibit Y, ¶21.

50. In furtherance of those objectives, WAMY has, for a period of many years: (1) raised and laundered funds on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaida; (2) channeled donated funds to Islamic terrorist organizations, fighters and associated separatist movements, including al Qaida; (3) provided financial and logistical support and physical

assets to Islamic fighters and terrorists, including al Qaida; (4) permitted Islamic fighters and terrorists to use ostensible employment with WAMY as a vehicle for gaining access to conflict regions, thereby allowing those individuals to carry out militant and terrorist activities in those areas; (5) performed reconnaissance within conflict regions on behalf of Islamic terrorist organizations and separatist movements, including al Qaida; (6) funded and facilitated shipments of arms and supplies to Islamic terrorist organizations and associated separatist movements, including al Qaida; (7) funded camps used by al Qaida and associated jihadist organizations to train soldiers and terrorists; (8) actively recruited Muslim youths on behalf of Islamic terrorist organizations and associated separatist movements, including al Qaida; (9) served as a distribution channel for transmitting information and documentation within Islamic terrorist organizations and associated separatist movements, including al Qaida, and from Islamic terrorist organizations and separatist movements to the media; (10) disseminated publications designed to advance al Qaida's radical Islamist ideology throughout the Muslim world and legitimize violent jihad against Christians and Jews on the grounds that they are "infidels" who do not deserve to live; and (11) openly advocated for young Muslims to take up arms against Western and democratic societies. Al Baraka FCC Exhibit Y, ¶22.

**WAMY'S ORGANIZATIONAL STRUCTURE**

51. Founded in 1972, WAMY is one of several Islamic institutions operating within the Muslim World League (MWL).[10] Other organizations operating under the auspices of the MWL include the International Islamic Relief Organization (IIRO),[11] and Rabita Trust.[12] Headquartered in Riyadh, Saudi Arabia, WAMY has a physical and operational presence in at least 56 countries worldwide. In addition, WAMY conducts activities in many countries in which it does not maintain a formal physical presence, through its association and membership in other Islamic organizations and committees, including its membership in the

---

[10] Specific misconduct regarding Muslim World League. ("MWL"), a co-defendant herein, has been provided via More Definite Statement Applicable to MWL. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to MWL, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC), FCC Exhibit C. See also, O'Neill Al Baraka FCC ¶¶ 96-9.

[11] Specific misconduct regarding International Islamic Relief Organization. ("IIRO"), a co-defendant herein, has been provided via More Definite Statement Applicable to IIRO. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to IIRO, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC), O'Neill Al Baraka FCC Exhibit B..

[12] Specific misconduct regarding Rabita Trust, a co-defendant herein, has been provided via More Definite Statement Applicable to Rabita Trust. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to Rabita Trust, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC), O'Neill Al Baraka FCC Exhibit V.

Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC). Al Baraka FCC Exhibit Y, ¶23.

52. Although WAMY claims non-governmental organization (NGO) status, WAMY is in fact an agency, instrumentality or organ of the Kingdom of Saudi Arabia. WAMY was established by MWL, itself an agency, instrumentality or organ of the Kingdom, with the formal approval of high ranking officials of the Kingdom. The vast majority of WAMY's funding is provided by the Kingdom. In addition, WAMY's leadership is dominated by high ranking officials of the Kingdom. For example, Dr. Maneh el Johani simultaneously served as both the Secretary General of WAMY and a member of the Kingdom's Shura Council. The Shura Council, known formerly as the Majlis al Shura, is a consultative body which provides advice to the King on issues of importance to the Kingdom. While head of the Ministry of Islamic Affairs, Saleh bin Abdul Aziz al Sheikh also served as a chairman of WAMY and al Haramain Islamic Foundation.[13] Al Baraka FCC Exhibit Y, ¶24.

53. The Kingdom extensively supervises and controls WAMY's activities. On the macrolevel, the Kingdom exercises supervisory control over WAMY through the Supreme Council for Islamic Affairs, established in 1994 to centralize, supervise and review aid requests from Islamic groups, including WAMY. The Supreme Council determines the extent of WAMY's public funding, as well as the causes to which private and public funds are applied by WAMY. WAMY's operations also fall under the supervision of the Ministry of Islamic Affairs, Endowments, Dawa and Guidance. The Ministry of Islamic Affairs is, among other things, responsible for the dissemination and propagation of Wahhabi Islam throughout the world. Al Baraka FCC Exhibit Y, ¶25.

54. Outside of Saudi Arabia, the operations of WAMY's branch offices are directed and closely supervised by local Saudi embassies. According to Dr. Abdullah Wahab Noorwali, Assistant Secretary General of WAMY, the Kingdom "provides us with protection abroad through Saudi embassies and consulates, in addition to financial support." In testimony during Canadian court proceedings, Arafat el Asahi, a representative of MWL and IIRO, made clear that the Saudi embassies closely monitor the activities of the Saudi-based charities and persons associated with those charities, including any press reports relating to those organizations:

> If I give any statement in the Canadian papers that goes against the policy of my organization, I would not stay in my office 11 years as I did. That gives me an indication that everybody is within – there is also an embassy in every country. In Pakistan there is a

[13] Specific misconduct regarding Al Haramain Islamic Foundation. ("Al Haramain"), a co-defendant herein, has been provided via More Definite Statement Applicable to Al Haramain. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which will be contained within its More Definite Statement Applicable to Al Haramain, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC), O'Neill Al Baraka FCC, Exhibit I.

> Saudi embassy that knows what happens not only in Saudi organizations but with Saudi individuals. They know who does what.
>
> Al Baraka FCC Exhibit Y, ¶26.

55. The operations of WAMY's branch offices are closely supervised and directed by WAMY's central leadership in Saudi Arabia as well, and functionally operate as agents of the central organization. WAMY's central authority in Saudi Arabia uses a variety of mechanisms to rigidly control the branch offices. WAMY's General Assembly and Board of Trustees in Saudi Arabia set policies and procedures for all WAMY branch offices, and hand-pick the officials who run those branch offices. WAMY headquarters also selects the projects and causes for which funds are to be raised by the WAMY offices throughout the world. Funds raised by the branch offices are transferred back to the organization's headquarters, which then redistributes those funds to the regional offices, to be applied to projects and causes selected by WAMY's central leadership. WAMY's branch offices are required to submit detailed reports of their activities and finances to the central leadership in Saudi Arabia, for review and approval. High ranking WAMY officials from Saudi Arabia also conduct periodic inspections of the branch offices. In addition, by virtue of its close relationship with the Kingdom's government, WAMY is able to use the Kingdom's governmental apparatus throughout the world, including the embassies, to monitor the day to day activities of the branches. Al Baraka FCC Exhibit Y, ¶27.

**THE AL QAIDA MOVEMENT'S OBJECTIVES AND TACTICS**

56. Osama bin Laden's al Qaida organization is the self-proclaimed vanguard of the global jihadist movement. While al Qaida's terrorist activities garner the most attention, terrorist attacks represent but one of many vehicles through which al Qaida seeks to undermine U.S. and democratic interests, in pursuit of the establishment of the Pan-Islamic Caliphate. Indeed, al Qaida views the confrontation with the West to have two distinct, but equally important fronts:(1) cultural; and (2) military. In the cultural arena, the global jihadists use Dawa activities (the propagation of the radical Islamic ideology), conducted primarily through ostensible Islamic "charities," as a means to attack Western and democratic ideas and political structures. As the Dutch Intelligence Service explained in a recent report regarding threats to the Western democratic order posed by radical Islamic movements:

> The groups focusing on Dawa follow a long-term strategy of continuous influencing based on extreme puritanical, intolerant and anti-Western ideas. They want Muslims in the West to reject Western values and standards, propagating extreme isolation from western society and often intolerance towards other groups in society. They also encourage these Muslims to (covertly) develop parallel structures in society and to take the law into their own

> hands. What they mean is that Muslims in the West should turn their backs on the non-Islamic government and instead set up their own autonomous power structures based on specific interpretation of the Sharia.

*From Dawa to Jihad – The Various Threats From Radical Islam to the Democratic LegalOrder,* General Intelligence and Security Service of the Netherlands, December 2004. Al Baraka FCC Exhibit Y, ¶28.

57. As a compliment to the extensive proselytizing activities carried out with the assistance and support of ostensible charities, al Qaida engages in militant and violent operations throughout the World. Al Qaida's military activities are by no means limited to terrorist attacks. In fact, in establishing al Qaida, Osama bin Laden sought to create a multi-national Islamic army to challenge the perceived domination of the democratic West, and engage in armed combat wherever Muslim communities were perceived to be under duress. Although high profile terrorist attacks are an important aspect of that campaign, al Qaida's military efforts have focused largely on supporting armed jihad in conflict regions and fostering Islamic separatist movements throughout the World. In this context, al Qaida has been deeply involved in military campaigns, involving both traditional forms of combat and terrorist activities, in Bosnia, Chechnya, Kosovo, Sudan, Kashmir, Pakistan, Afghanistan, Turkey, Indonesia, Malaysia, Algeria, the Philippines, Somalia, Palestine, Yemen, Kenya, Tanzania and Egypt. Al Qaida's participation in these regional conflicts takes many forms. Al Qaida provides funding and logistical assistance to local extremist organizations, in support of their military and terrorist activities. In addition, al Qaida deploys members to train and fight alongside local Muslims, and to assist in the planning and execution of terrorist attacks. Al Baraka FCC Exhibit Y, ¶29.

58. Through its military activities in these "regional" conflicts, al Qaida aims to establish and support radical Islamic regimes, a critical component of al Qaida's long-term strategy. In describing the importance of those regional military campaigns within the overall context of al Qaida's campaign against the West, a recently de-classified 1998 Department of Defense Intelligence Report states:[al Qaida] seeks to establish a worldwide Islamic state capable of directly challenging the US, China, Russia, and what it views as judeo-Christian and Confucian domination. The means by which the above goals are to be met are via terror, ethnic cleansing, "latent penetration" (NEI), and control over nuclear and biological weapons (Jikhad). Further, radical Islamic(predominantly Sunni) regimes are to be established and supported everywhere possible, including Bosnia, Albania, Chechnya, Dagestan, the entire northern Caucasus "from Sea to Sea," central Asian Republics, Tatarstan, Bashkortostan, all of Russia, Afghanistan, Pakistan, Turkey, Indonesia, Malaysia, Algeria, Morocco, Egypt, Tunisia, Sudan, and the states of the Persian Gulf.

*Swift Night Report Concerning Terrorist Activities of Sheikh Usam Ben Muhammad Ben Avad Ben Laden,* United States Department of Defense, October 1998 ("1998 Defense Department Report"). Al Baraka FCC Exhibit Y, ¶30.

59. Al Qaida also derives significant short-term benefits from its active participation in these regional conflicts. Among other things, these operations bolster the organization's image among local Muslim communities, and represent an integral component of al Qaida's ongoing recruiting and fundraising efforts. Al Qaida's involvement in these militant campaigns also affords the organization a vehicle to provide new members with battle experience, in preparation for terrorist operations and the anticipated military conflict with the West. In fact, several of the September11 hijackers were chosen for that attack, at least in part, because they had previous combat experience in Bosnia. The importance of these "regional" conflicts to al Qaida's growth and development cannot be overstated. Perhaps more than any other factor, al Qaida's participation in these "regional" conflicts has enabled al Qaida to extend its sphere of influence throughout the globe. Al Baraka FCC Exhibit Y, ¶31.

**WAMY'S ROLE IN ADVANCING THE AL QAIDA MOVEMENT**

60. For more than a decade, WAMY has knowingly and intentionally used its international infrastructure as a tool for supporting the al Qaida movement, on both the ideological and military fronts. As a result of the Kingdom of Saudi Arabia's extensive patronage, WAMY possesses a multi-million dollar annual budget. WAMY dedicates a significant portion of that budget to the publication and worldwide dissemination of literature calculated to promote the global jihadist agenda, convince young Muslims to reject the United States and democratic ideas as evil and non-Muslim, demonize Christians, Jews and non-Wahhabi Muslims, and convince young Muslims to engage in violent jihad against the West and Israel. Al Baraka FCC Exhibit Y, ¶32.

61. Virulently anti-American, anti-Semitic and pro-jihadist propaganda pervade WAMY's "educational" publications. For example, under the heading "The Prophet asks for Jihad," the WAMY book *Islamic Views* says, "The Prophet Mohammad fought against the infidels and the Jews till he triumphed over them and conducted himself about twenty invasions and he sent tens of regiments led by his companions for Jihad…Damn from Allah to the Jews who made graves of their prophets as Masjid." Later, *Islamic Views* says Islam "is a religion of Jihad" and that jihad "was an answer for the Jews, the liars." "[T]each our children to love taking revenge on the Jews and the oppressors, and teach them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah." *Islamic Views* further exhorts Muslims to wage "Jihad against the Satan," and that "You should not back the Jews and the Christians and the Communists against the Muslims; the Communists, the Infidels, the Jews, and the Christians, those who do not believe in Mohammed. You should say they are infidels." Al Baraka FCC Exhibit Y, ¶33.

62. The jihad WAMY advocates in its publications is intensely violent. According to a WAMY policy statement, "[a] Christian should be asked to repent. If he does not he must be killed." *See Written Statement of James B. Jacobsen, President of Christian Solidarity International,* submitted to the Sub-Committee of International Relations and Human Rights, Hearing on Persecution of Christians Worldwide, February 15, 1996. The book *Islamic Camps: Objectives, Program Outlines and Preparatory Steps*, prepared by WAMY's Camps and Conferences Unit and intended to serve as a manual for Islamic youth camps, suggests that youths attending WAMY camps be led in the following refrain:

> Hail! Hail! O Sacrificing Soldiers! To Us! To Us! So we may defend the flag on this Day of Jihad, are you miserly with your blood?! And has life become dearer to you? And staying behind sweeter? Is staying in this world of torment more pleasing to us? You are amongst those called upon by Destiny. Come! So we may revive the times the times of our predecessors!
>
> Al Baraka FCC Exhibit Y, ¶34.

63. Through these and other WAMY publications, as well as the madrassas, camps, Islamic Centers, mosques, conferences and other events it sponsors, WAMY has provided the ideological foundation for the al Qaida movement, and actively advocated young Muslims to take up arms and engage in violent jihad against the United States. In this regard, WAMY has played a critical role in al Qaida's cultural assault on the United States and democratic institutions throughout the world. Al Baraka FCC Exhibit Y, ¶35.

64. Consistent with the extremist agenda it advocates, WAMY has immersed itself deeply in the militant endeavors of the global jihadist movement as well, actively supporting the militant and terrorist activities of al Qaida and associated organizations in Bosnia, Chechnya, Kosovo, Kashmir, Pakistan, South East Asia, the United States and elsewhere. WAMY's support for al Qaida's militant and terrorist activities has taken many forms, and continuously adapted to the serve the needs of the expanding jihadist movement. Under the guise of charity and humanitarian relief, WAMY has, among other things: raised and laundered funds for militant and terrorist activities; funded and facilitated al Qaida training camps as well as the movement of fighters, arms and other supplies to conflict regions; performed reconnaissance on behalf of al Qaida and associated groups; and operated as a recruiting vehicle for al Qaida and associated groups. Through these criminal activities, WAMY has further helped al Qaida to expand its sphere of influence throughout the globe. Al Baraka FCC Exhibit Y, ¶36.

65. WAMY's pervasive involvement in supporting al Qaida fighters and associated local jihadist groups in regional conflicts was well documented prior to September 11, 2001. On December 5, 1992, the *New York Times* identified WAMY as a front for armed Islamic jihad in Bosnia. According to the article:

> The conflict between Serbs and Muslims in Bosnia and Herzegovina… has been adopted by Islamic fundamentalists as the newest holy war against Christian infidels bent on the destruction of Islam.
>
> In the last few weeks, the conflict has lured several hundred militants, many of them veterans of the war in Afghanistan, to volunteer for the Bosnian forces….
>
> The volunteers are sponsored by a variety of militant religious organizations and often have their expenses and plane fare covered…. Despite formal denials from the relief organizations, Saudi officials say an increasing amount of the charity on behalf of the Bosnians is now used to provide arms and logistical support for Arab volunteers.
>
> "Since August, most of the money raised for relief has been turned over to the Bosnians for weapons," a Saudi official….The World Assembly of Muslim Youth, which organized relief operations in Afghanistan and is now deeply involved in the conflict in the Balkans, flies back wounded Saudi fighters and provides free medical care in the Saudi German hospital.
>
> *Muslims From Afar Joining "Holy War" in Bosnia, New York Times*, December 5, 1992.
>
> Al Baraka FCC Exhibit Y, ¶37.

66. Within the same article, Adel Batterjee, the then chairman of WAMY, acknowledged the organization's role in supporting armed Islamic jihad in Bosnia: "if a relief worker decides that he wants to join the fighting forces, we would not stop him…." Following the September 11,2001 attack, Adel Batterjee was formally designated as a terrorist sponsor and supporter pursuant to Executive Order 13224. Al Baraka FCC Exhibit Y, ¶38.

67. In May of 2000, Russian officials similarly accused the SJRC, the committee through which WAMY conducted activities in Chechnya, of financing and otherwise supporting Islamic terrorists and separatists in that region. According to a May 19, 2000 article in the Russian newspaper *ITAR-TASS*:

> The aid to Chechens fighting against Russia, is delivered from the organization of humanitarian assistance to Muslims of Kosovo and Chechnya (the SJRC)….
>
> Officially, the money is sent to Chechnya to be used for religious events and Islamic feasts, but is actually used to finance rebel troops [a representative of the Russian Federal Security Service(FSB)].

> According to available information, part of the money is transferred to banking accounts of some warlords, including Shamil Basayev and Khattab…
>
> Russia's security services are aware that these people are financing rebel forces, overseeing arms, food and medicine deliveries, as well as arranging treatment for the wounded and paying allowances to guerillas.

*Chechen Separatists Said Funded by Several Foreign Sources, ITAR-TASS*, May 19, 2000. Al Baraka FCC Exhibit Y, ¶39.

68. Significantly, Amir Khattab, one of the individuals who received financing directly from WAMY and the SJRC, is a senior al Qaida member who was deployed to Chechnya by Osama bin Laden to organize al Qaida's operations in that area. According to the 1998 Department of Defense Intelligence Report:

> In 1995, Khattab appeared in Chechnya to carry out a special mission assigned to him by Usama ben Laden to organize training camps for international terrorists…. He was a colonel, fought as a field commander, and was wounded in the hand. Khattab organized three training camps in the Vedeno and Nojai-Urt areas of the forested mountain zone. Graduation is held at the three camps every two months. They are very equipped, with firing range facilities and capabilities to create models of "sites of diversion," as well as classes for sappers and snipers.
>
> 1998 Defense Department Report.
>
> Al Baraka FCC Exhibit Y, ¶40.

69. By no later than 1999, the details of bin Laden's direct links to Khattab and the Chechen mujihadeen were the subject of widespread reporting in the mainstream media. For instance, in August of 1999, NBC News published a report stating that "Osama bin Laden is financing the Chechen operation in Dagestan…" *U.S. Links bin Laden to Chechnya, MSNBC.com*, August 15,1999. The article, which was based on information provided by senior U.S. intelligence officials, explained that the "key bin Laden connection" to the Chechen jihadists was Amir Khattab, and that their relationship was so close that bin Laden was considering relocating from Afghanistan to areas of Chechnya under Khattab's control. *Id.* Al Baraka FCC Exhibit Y, ¶41.

70. Prior to the September 11th Attack, WAMY officials made little effort to conceal their involvement in sponsoring armed jihad in Chechnya. To the contrary, at least within the Arabic press, WAMY officials openly acknowledged that the organization was deeply involved in sponsoring militant activities in Chechnya. For example, in a January 15, 2000 article published in *Al Jazeera* newspaper, Dr. Maneh al Jahari, the Secretary General of WAMY, wrote as follows:

> [I] want to stress that these heroic Moslems, the Mujihadeen who are standing strong, deserve to receive our support and we must invest all of our energy in aiding them when they are being fed the taste of defeat once again. … It should be pointed out that WAMY has doubled its efforts and has placed all of its branches inside and outside of the Kingdom on alert to serve the Chechen issue and to implement the aid program for the Chechen refugees.
>
> 1. The question that must be asked is: What do the Chechen Muslims need from us today?
>
> 2. ***The need money to buy arms and ammunition. (emphasis supplied)***
>
> The Islamic awakening, which is growing, praise be to Allah, is that which worries the Communist East and Heretic West, and they are afraid they will awaken one day and the Muslims will demand payment of a poll tax.
>
> Triumph is coming and Islam will remain and Allah will rise and be victorious. I request Allah for our brothers Mujihadeen in Chechnya and Dagestan, stability, reinforcements and victory. *The Chechen Tragedy –*

*The Reality and the Required Role*, Dr. Maneh al Jahari, *al Jazeera*, January 15, 2000. Al Baraka FCC Exhibit Y, ¶42.

Significantly, al Jahari published his call for Muslims to donate funds to WAMY to buy "arms and ammunition" for the "mujihadeen" in Chechnya and Dagestan well after the direct and close relationship between those militants and al Qaida had been widely detailed in the media and elsewhere. The timing and character of al Jahari's statements thus confirm that WAMY is a front for militant activity, and fundamentally undermine the organization's efforts to cast itself as a peaceful humanitarian and relief organization.

Al Baraka FCC Exhibit Y, ¶43.

71. Philippine officials also publicly implicated WAMY in the financing of terrorist activities in Southeast Asia in the years prior to the September 11th Attack. According to a January 19,1999 article in the *Australian General News*, the government of the Philippines accused WAMY's Australian branch of financing the Moro Islamic Liberation Front (MILF), a terrorist organization seeking to establish a separate Islamic state on the Philippine island of Mindanao. *Philippines Suspect Australian Group of Helping Rebels, Australian General News*, January 15,1999. MILF was responsible for several bombings and attacks on remote villages in the Philippines that forced 400 civilians to flee in January of 1999. In February of 1999, MILF Chief Hashim Salamat publicly confirmed that

MILF had received funds from Osama bin Laden. *Patterns of Global Terrorism – 1999*, United States Department of State, April 2000. Al Baraka FCC Exhibit Y, ¶44.

72. Statements by government officials and press reports in the years preceding the September 11th attack also reveal WAMY's extensive role in supporting al Qaida activities in Kashmir. According to a December 8, 1995 article in the periodical *Money Clips*, a Kashmiri leader publicly thanked WAMY during a press conference for "helping the Mujihadeen in their struggle for independence from India." *Kashmiri Leader Thanks WAMY for Help, Money Clips*, December 8, 1995. Separate articles published prior to September 11, 2001 reveal that WAMY funneled support to the Students' Islamic Movement of India (SIMI), Lashkar-e-Taibah and Hizbul Mujahideen, three violent jihadist groups operating under the broader al Qaida umbrella. *See SIMI: Nursery of Hate, India Today*, April 2, 2001; *ISI Twin Plan – Attack Christians, Defame Hindu Outfits, The Economic Times of India*, July 15, 2000; *Kashmir: Hizb-Ul-Mojahedin Chief Explains Reasons Behind Cease Fire, BBC Worldwide Monitoring*, August 23, 2000; *Pakistani Behind Church Blast Say Police, The Statesmen (India)*, July 14, 2000. In an interview contained in one of the articles, SIMI head Safdar Nagori publicly confirmed his organization's allegiance to al Qaida:

> Q: In your conferences, you have openly eulogized Osama bin Laden.
>
> A: Not once, but dozens of times. We believe he has shown great character in standing up the Americans, the biggest terrorists in the World. *SIMI: Nursery of Hate, India Today*, April 2, 2001.
>
> Al Baraka FCC Exhibit Y, ¶45.

73. In March of 2003, al Qaida military chief Abu Zubaydah[14] was arrested at a Lahkar-e-Taibah safe house in Islamabad, confirming the depth of collaboration and reciprocal support between those two terrorist organizations. Al Baraka FCC Exhibit Y, ¶46.

74. WAMY's sponsorship of jihadist activity in Kashmir was channeled through its offices in Pakistan, which sponsored al Qaida activity in that country as well. In connection with a crackdown on terrorist activity prompted by the September 11th Attack, Pakistani authorities deported 89 employees of ostensible NGOs in October of 2001, based on their suspected ties to terrorism. WAMY was among the organizations whose "employees" were specifically targeted by the measure. Pakistani intelligence officials, operating in conjunction with agents of the Federal Bureau of Investigations of the United States, raided WAMY's Pakistani offices approximately one year later, as part of ongoing counter-terrorism efforts. WAMY's close ties to senior al Qaida cells in Afghanistan and Pakistan were

---

[14] Abu Zubaydah is a Defendant in O'Neill v. Republic of Iraq, et al., See, e.g. Iraq FCC ¶¶ 38, 41.

revealed just one week after the raid, when an employee of WAMY hand delivered a recorded message from Osama bin Laden to an Arab television network in Islamabad. *Pakistan Questions Sudan Man About Tape, Associated Press Online*, December 9, 2002. Al Baraka FCC Exhibit Y, ¶47.

75. That incident did not represent the first occasion on which WAMY was involved in transferring information on behalf of al Qaida. During the investigation into the 1993 World Trade Center bombing, U.S. officials discovered an al Qaida training manual in the possession of Ahmed Ajaj, who was later convicted for his role in that attack. The manual, entitled "*Military Lessons In The Jihad Against The Tyrants,*" was distributed to Ajaj by WAMY and detailed how to establish and maintain clandestine operational sales. The same manual was subsequently recovered from the London apartment of African embassy bomber Khalid al-Fawwaz in 1998. Al Baraka FCC Exibit Y, ¶48.

76. Until shortly after the September 11th Attack, WAMY also maintained a physical presence in the United States, from which the organization channeled material support and resources to al Qaida. WAMY's U.S. offices were established in Falls Church, VA in 1992 by Abdullah bin Laden and Omar bin Laden, blood nephews of al Qaida leader Osama bin Laden. Under Abdullah bin Laden's leadership, WAMY's U.S. branch was deeply involved in the terrorist activities of the SAAR Network of businesses and charities. Federal authorities raided WAMY's U.S. offices in 2002, in connection with an ongoing investigation of the SAAR Network's role in sponsoring al Qaida. Al Baraka FCC Exhibit Y, ¶49.

77. Despite the increased scrutiny of WAMY's operations following the September 11th Attack, the organization continues to sponsor al Qaida and associated terrorist organizations and separatist movements to this day, demonstrating the organization's deep and longstanding commitment to al Qaida's global jihad. Al Baraka FCC Exhibit Y, ¶50.

78. In June of 2002, Indian authorities arrested two men under the Prevention of Terrorism Act, after determining that they had transferred funds to Sayed Ali Shah Geelani, the leader of the Fundamentalist Jamaat-e-Islami party. According to sources within India's government, the two men, Farooq Ahmed and Mohammed Maqbool, were given funds by Nazir Qureshi, a senior WAMY official, to be covertly delivered to Geelani. Geelani previously had been arrested under the Prevention of Terrorism Act based on his involvement in transferring money to militant organizations in Kashmir. *Geelani Case: Two Detained in Srinagar*, June 11, 2002. Al Baraka FCC Exhibit Y, ¶51.

79. In September of 2003, Romanian intelligence officials implicated WAMY in an al Qaida plot to hijack a plane departing from Romania and crash it into Heathrow Airport in London. According to an article published by the *Global New Wire* on September 5, 2003, the plot was being coordinated by al Qaida affiliated members of the Muslim Brotherhood in Romania. Quoting information obtained from Romanian intelligence officials, the article asserts that the Romanian wing of the

Muslim Brotherhood acts under the cover of various humanitarian organizations, and receives most of its funds from WAMY. *Intelligence Service "Alert" Watches Egypt's "Muslim Brothers" in Romania, Global News Wire*, September 5, 2003. Al Baraka FCC Exhibit Y, ¶52.

80. Recent statements by Treasury Department officials, testifying before Congress, further confirm that WAMY continues to serve as a front for al Qaida and other terrorist organizations. During a recent hearing before the U.S. Senate Committee on Banking, Housing, and Urban Affairs, Treasury Under Secretary Stuart Levey asserted that "wealthy Saudi financiers and charities have funded terrorist organizations and causes that support terrorism and the ideology that fuels the terrorists' agenda... Even today, we believe that Saudi donors may still be a significant source of terrorist financing, including for the insurgency in Iraq." Levey expressed particular concern about the continued involvement of WAMY, the IIRO and MWL in the financing of terrorist activities throughout the globe.[15] *Prepared Testimony of Stuart Levey, Under Secretary Office of Terrorism and Financial Intelligence, U.S. Department of the Treasury*, Submitted to the Senate Committee on Banking, Housing, and Urban Affairs, Hearing on Money Laundering and Terror Financing Issues in the Middle East, July 13, 2005. Al Baraka FCC Exhibit Y, ¶53.

**WAMY'S KNOWLEDGE**

81. For many years prior to the September 11th Attack, senior WAMY officials were expressly aware of WAMY's pervasive sponsorship of terrorist organizations and associated separatist movements throughout the world. To begin with, as detailed above, the misconduct of WAMY's offices throughout the world was widely reported in the media prior to September 11,2001. Given the senior leadership's close supervision of the activities of the regional offices, there can be no question that high ranking WAMY officials were aware of the media reports implicating those regional offices in the sponsorship of terrorist organizations and associated separatist movements. Al Baraka FCC Exhibit Y, ¶54.

82. In fact, the available evidence reveals that the senior leadership of WAMY directly orchestrated and participated in the support provided to al Qaida and affiliated militants through the regional offices. Adel Batterjee's statements in 1992, in which he acknowledged WAMY's role in channeling recruits to the Bosnian mujihadeen, confirm the direct involvement of senior WAMY leadership in supporting Islamic militants in the Balkans. Maneh al Jahari's 2000 *al Jazeera* article, in which he openly solicited funds and reinforcements for the Chechen mujihadeen, similarly reveal that WAMY leadership in Saudi Arabia directly orchestrated the organization's support for Islamic radicals in Chechnya. WAMY leadership also directly participated in the sponsorship of Kashmiri military

[15] Under Congressional procedures, the full transcript of this hearing will not be available for approximately five months. Plaintiffs believe that the full transcript may contain further details regarding WAMY's involvement in the sponsorship of al Qaida and other fundamentalist organizations, and reserve their right to supplement the record with a copy of that transcript as soon as it is available.

groups, as evidenced by the Indian Intelligence Service's finding that Nazir Qureshi, a senior WAMY official, personally sought to channel funds to Sayed Ali Shah Geelani. Al Baraka FCC Exhibit Y, ¶55.

83. Given the close ties between WAMY's senior leadership and high level officials of the Kingdom,[16] it is also reasonable to infer that WAMY's leaders received warnings regarding their organization's illegal activities through official governmental channels. In this regard, it is important to note that officials of the Kingdom received numerous warnings regarding the Saudi charities' involvement in sponsoring Islamic terrorists and militants in the years leading up to September 11th. During a 1994 meeting with senior officials of the Kingdom, French Interior Minister Charles Pasqua expressed the French government's deep concerns regarding the pervasive involvement of the Saudi charities in the sponsorship and funding of terrorist organizations. Pasqua specifically mentioned the MWL, WAMY's parent organization, during that meeting. At a conference of Arab interior ministers in 1998, the Egyptian Minister of Interior similarly expressed specific concerns about the involvement of Saudi charities in the sponsorship of terrorist activities to Saudi Prince Naif. In 1999 and 2000, delegations from the U.S. government met with senior officials of the Kingdom, to address the U.S. government's concerns regarding the extensive involvement of Saudi charities in the sponsorship of terrorism. As WAMY had been implicated in the sponsorship of terrorist activities by numerous governments prior to those meetings, it is only reasonable to assume that U.S. authorities would have specifically discussed WAMY at those meetings. In all likelihood, Saudi officials would have received multiple warnings regarding WAMY's involvement in the sponsorship of Islamic terrorist and militants from the U.S. government well before those meetings, as a joint intelligence sharing program relating to terrorist activities existed between the two nations from1997 forward. Al Baraka FCC Exhibit Y, ¶56.

84. The evidence strongly suggests that Saudi officials received similar warnings from officials of other governments as well. In the years leading up to the September 11th Attack, officials from the Russian, Philippine, Indian, and Pakistani governments all publicly implicated WAMY in the financing of terrorists and extremist activities throughout the World. Thus, there can be little doubt that officials of these nations voiced their concerns regarding WAMY's misconduct during official discussions with Saudi authorities as well. Al Baraka FCC Exhibit Y, ¶57.

85. A review of United Nations' Resolutions relating to the financing of terrorism supports this conclusion. U.N. Resolution 51-210, adopted by the General Assembly in 1996, contains a specific provision calling upon all states "to take steps to prevent and counter-act, through appropriate domestic measures, the financing of terrorist and terrorist organizations, ***whether such financing is direct or indirect through organizations which also have or claim to have charitable, social or cultural goals....***" (emphasis supplied). The *International Convention*

[16] The Kingdom is a Defendant in O'Neill v. Kingdom of Saudi Arabia.

*for the Suppression of the Financing of Terrorism,* adopted by the General Assembly as Resolution54-109 on December 9, 1999, contains the same language. The inclusion of specific language addressing the role of charitable organizations in the financing of terrorism in these U.N. Resolutions makes clear that that the involvement of Islamic charities in the sponsorship of terrorist organizations was a subject of particular interest and discourse within the international community in the years prior to the September 11th Attack. Al Baraka FCC Exhibit Y, ¶58.

86. In view of the foregoing, it is clear that WAMY knowingly and intentionally used its international infrastructure as a tool for channeling financial, logistical and ideological support to al Qaida and affiliated groups, for a period of many years leading up to the September 11thAttack. Al Baraka FCC Exhibit Y, ¶59.

87. As the foregoing demonstrates, WAMY thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of WAMY's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Al Baraka FCC Exhibit Y, ¶60.

**Certain Additional Allegations Material to the RICO Counts, and Otherwise, in the Complaint.**

88. At all relevant times, all defendants were associated with an enterprise engaged in, and whose activities affected, interstate commerce. That enterprise, which is the association-in-fact of defendants, functioned as a continuing unit and had an existence prior to, and separate from, perpetration of the predicate acts herein alleged. Continental Casualty ¶609.

89. At all times relevant hereto, each of defendants conducted or participated in, directly or indirectly, the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (1) and (5) and §1962 (c). This pattern of racketeering activity entailed at least two acts of racketeering activity by each defendant, one of which occurred after the 1970 effective date of RICO, and the last of which occurred within ten years after the commission of a prior act of racketeering activity. Continental Casualty ¶610.

90. In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the defendants engaged in a pattern of racketeering activity which included, without limitation: acts of murder, kidnapping, arson, robbery, and extortion; dealings in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations;

and financial institution and mail fraud. Federal Insurance ¶619; O'Neill Al Baraka FCC ¶177; O'Neill Iraq FCC ¶267.

91. The acts of racketeering activity (predicate acts) include:

a. acts that involve murder arson and robbery which are chargeable under State Law and punishable by imprisonment for more than one year and are within the scope of 18 U.S.C. § 1961(l)(B);

b. acts that are indictable under 18 U.S.C. § 1028 (relating to fraud in connection with identification documents), 18 U.S.C. § 1341 (relating to mail fraud), 18 U.S.C. § 1343 (relating to wire fraud), 18 U.S.C. § 1344 (financial institution fraud), 18 U.S.C. § 371 (government fraud) and are within the scope of 18 U.S.C. § 1961(1)(B);

c. acts that are indictable under 18 U.S.C. §§ 1542, 1543, 1544 and 1546 (relating to forgery, fraud and misuse of passports) and are within the scope of 18 U.S.C. § 1961(l)(B);

d. acts that are indictable under 18 U.S.C. §§ 1956 and 1957 (relating to money laundering) and are within the scope of 18 U.S.C. § 1961(1)(B);

e. acts indictable under 18 U.S.C. § 1952 and are within the scope of 18 U.S.C. § 1961

f. acts that are indictable under 18 U.S.C. § 2314 (relating to interstate transportation of stolen property) and are within the scope of 18 U.S.C. § 1961(1)(B);

g. act indictable under 26 U.S.C. § 7212(a), 26 U.S.C. § 7206 (1), (2) (tax) and are within the scope of 18 U.S.C. § 1961;

h. acts that are indictable under 18 U.S.C. §§ 1512 and 1951 (relating to obstruction of justice and extortion) and are within the scope of 18 U.S.C. § 1961(l)(B); and

i. acts that are indictable under 18 U.S.C. §§ 2332b, 2339A and 2339B (relating to acts of terrorism and providing material support to terrorism) and are within the scope of 18 U.S.C. §1961(1)(B).

Al Baraka FCC Exhibit Y, ¶5(a); Continental Casualty ¶611.

92. Each of defendants' racketeering activities was taken for the purpose of furthering defendants' common scheme to commit acts of terrorism against the United States, its nationals and its allies. Each racketeering act had similar purposes, involving the same or similar participants and methods of commission and had similar results. Continental Casualty 612. The pattern of racketeering is more fully set forth in Exhibit Y, ¶¶5(b), (f), and (g)

93. As a direct and proximate result of the foregoing, plaintiffs have been damaged in their business and property in an amount to be determined at trial but believed to be in excess of $212,500,000 and such damages are trebled pursuant to 18 U.S.C. § 1964. Continental Casualty ¶613.

94. The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Federal Insurance ¶620; O'Neill Iraq FCC ¶ 272; O'Neill Al Baraka FCC ¶ 180..

95. The enterprise ("Radical Muslim Terrorism") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. *Alternatively*, the enterprise ("al Qaida") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. *Alternatively*, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. *See e.g.,* Exhibit Y, ¶ 6.

96. The Enterprise is described, at length, in Exhibit Y, ¶¶ 6(b) and (c).

97. The activities of the Enterprise relate to the commission of world-wide terrorism. The Defendant's activities help in the funding of such Enterprise, which culminated in the Attack. The usual activities of the Enterprise includes recruitment, provisioning, operating of training camps, all of which were funded by the Racketeering activities complained of. Exhibit Y, ¶¶ 7-10.

98. Allegations relative to 18 U.S.C. Sec. 1962(c) are specifically set forth in ¶ 12 of Exhibit Y.

99. The conspiracy relating to 18 U.S.C. Sec. 1962(d) is described further in ¶ 13 of Exhibit Y.

**Consequences of the Conspiracy**

100. Defendants' concert of action and conspiracy to support and promote Osama bin Laden and Al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett, Introduction, page 217; Continental Casualty ¶¶ 605, 613, 617; FAC ¶¶ 594, 608, 617, 620, 622, 623, 624,

634; NYMSAC ¶¶ 511, 515, 518, 531; O'Neill Iraq FCC ¶¶ 253, 272; O'Neill Al Baraka FCC ¶¶ 140, 144, 170, 173.[17]

101. These Defendants, located all over the world, conspired with Osama bin Laden, al Qaida, Iraq, and the Taliban to raise, launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaida in order to support and finance their terrorist activities including but not limited to, the September 11th attacks. Some of the banks, companies, and charities operate legitimately but also maintain a secret dual role as al Qaida front organizations and actively support its terrorist activities and goals. Some of those organizations are purely a front for al Qaida. Federal Insurance ¶¶80, 118, 187, 234, 361, 459, 501; O'Neill Al Baraka FCC ¶25.

102. All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries. Federal Insurance FAC ¶606; O'Neill Al Baraka FCC ¶152.

103. The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent. O'Neill Al Baraka FCC ¶153; O'Neill Iraq FCC ¶ 275.

104. The damages suffered by plaintiffs, as described in greater detail in the pleadings, were the direct and proximate result of the aforesaid pattern of racketeering activity by the defendants, acting individually and in concert with one another. Federal Insurance FAC ¶620; O'Neill Iraq FCC ¶272; O'Neill Al Baraka FCC ¶¶ 137, 140, 144-6, 150, 154, 161, 164, 170, 174, 180.

105. The Defendants intended to cause damage to business and property. O'Neill Al Baraka FCC ¶178; O'Neill Iraq FCC ¶ 271.

106. Plaintiffs suffered damage to business and property as a result of the Defendants actions. Al Baraka FCC ¶¶ 179-180; O'Neill Iraq FCC ¶¶ 270, 271.

107. The resulting injuries to Plaintiffs' business or property resulting include pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal and real property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households. Al Baraka FCC ¶ 146; Exhibit Y ¶¶ 14-15; O'Neill Iraq FCC ¶ 271.

[17] A list of the decedents is contained within Exhibit A of the FCC. See, FCC ¶ 127 (a).

X:\Clients\ONeill v. Saudi arabia\Motions\Motions to Dismiss\Wamy\WAMY Facts Appendix draft JSG 12.05.05.doc

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE TERRORIST ATTACKS ON SEPTEMBER 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |
| *This document relates to:* | |

*Kathleen Ashton, et al v. Al Qaeda Islamic Army, et al. No. 02-CV-6977*
*Burnett, et al. v. Al Baraka Invest. & Develop. Corp., et al., No. 03-CV-5738, 03-CV-9849*
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka., et al., No. 04-CV-1923*

**AFFIRMATION OF ROBERT T. HAEFELE IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS FILED BY DEFENDANT WORLD ASSEMBLY OF MUSLIM YOUTH INTERNATIONAL AND WORLD ASSEMBLY OF MUSLIM YOUTH SAUDI ARABIA**

Robert T. Haefele, an attorney admitted pro hac vice to practice before this Court, under penalty of perjury, affirm as follows:

*1.* I am an Associate at the firm of Motley Rice, LLC, counsel for Plaintiffs in *Euro Brokers, et al. v. Al Baraka, et al., 04 CV 7279 (RCC); World Trade Center Properties LLC, et al. v. Al Baraka, et al., 04 CV 7280 (RCC)*, and *Burnett v. Al Baraka 03 CV 9489, 03 CV 5738* (RCC). I submit this Declaration in support of Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss filed by defendant World Assembly of Muslim Youth Saudi Arabia and World Assembly of Muslim Youth International.

2. Exhibit A is a true and accurate copy of several pages from the transcript of a hearing conducted by this Court in *In Re: Terrorist Attacks on September 11, 2001*,

on May 12, 2004.

3. Exhibit B is a true and accurate copy of the Affidavit of Robert Reynolds.

4. Exhibit C is a true and accurate copy of the Affidavit of Nelson Tucker.

5. Exhibit D is a true and accurate copy of a printout regarding WAMY International, Inc., from Westlaw's Database of Corporate Records and Business Registrations.

6. Exhibit E is a true and accurate copy of several archived website pages of a WAMY website, http://www.wamy.org, catalogued by and downloaded from http://www.waybackmachine.org.

7. Exhibit F is a true and accurate copy of several archived website pages of a WAMY website, http://www.wamyusa.org, catalogued by and downloaded from http://www.waybackmachine.org.

8. Exhibit G is a true and accurate copy of a printout of a page from a WAMY website, http://www.wamy.co.uk, current as of January 22, 2006.

9. Exhibit H is a true and accurate copy of a printout of several pages of information regarding WAMY downloaded from http://www.register.com, identifying registration and administration information regarding the websites registered as http://www.wamy.org and http://www.wamyusa.org.

Affirmed in Mount Pleasant, South Carolina, on January 23, 2006.

Robert T. Haefele

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

IN RE: TERRORIST ATTACKS ON
SEPTEMBER 11, 2001 03 MDL 1570 (RCC)

------------------------------x

May 12, 2004
2:20 p.m.

Before:

HON. RICHARD CONWAY CASEY

District Judge

APPEARANCES

MOTLEY RICE, LLC
Attorneys for Plaintiff
BY: RONALD L. MOTLEY
DONALD A. MIGLIORI
MICHAEL E. ELSNER
JUSTIN KAPLAN

KREINDLER & KREINDLER
Attorneys for Plaintiff
BY: JAMES P. KREINDLER
ANDREW MALONEY
COZEN O'CONNOR
Attorneys for Plaintiff
BY: ELLIOTT FELDMAN
SEAN CARTER
MARK MULLEN

DAVID N. KELLEY
United States Attorney for the
Southern District of New York
BY: SARAH S. NORMAND
Assistant United States Attorney

is considered sufficient.

THE COURT: You don't think it reasonable to expect they would go to this mail drop, which is in effect what they did do?

MS. BERNABEI: I don't think it is, no.

THE COURT: That's how they got the actual notice, right?

MS. BERNABEI: Well, only one individual, one individual whose residence --

THE COURT: Was it good enough for him, do you think?

MS. BERNABEI: No, I think that it's very clear under Oregon law that that is not sufficient. And, you know, regardless of the arguments about the legal --

THE COURT: Isn't this sort of -- you talk about a dance. Isn't this a bit of a dance? You maintain this mail drop, or your client does, they go and get it, they are notified of it, they in fact pick and choose, knowing exactly what's there, and refuse to pick up the other?

MS. BERNABEI: Well, first of all, there is only one individual that actually --

THE COURT: Isn't that putting the form over the substance?

MS. BERNABEI: Well, service is intended to do exactly that.

THE COURT: Is that what it is?

MS. BERNABEI: It affords reasonable notice. That's what the federal rules say, and that's what the Oregon courts have said, that reasonable notice is something different than actual notice.

If in fact all that was needed was actual notice or some facsimile of that, we could dispense with all these rules. And the courts over and over again --

THE COURT: Is that right? That's an interesting concept.

MS. BERNABEI: But the Oregon courts -- and I can cite your Honor to a number of cases, including by the Oregon Supreme Court, Edwards v. Edwards, a 1990 case that says no Oregon case upholds service of summons by mail is adequate unless receipt is acknowledged by the defendant." So it's very clear that actual notice and even the circumstances go beyond that.

THE COURT: Isn't it acknowledging it by the fact that you are here?

MS. BERNABEI: Your Honor, I also represent the charities.

THE COURT: Of which they are the officers.

MS. BERNABEI: That's correct. But service upon individuals who happen to be officers of a corporation have never been considered to be served simply by service upon the corporation itself. There is a ream of cases, some of which we

Case 1:03-md-01570-GBD-SN Document 11405-12 Filed 01/27/26 Page 65 of 86



this list. We don't have it, so it's easy to disregard. We will get the actual list tomorrow. Is that right?

MR. CARTER: Correct, your Honor.

THE COURT: Okay. Anything else? Going, going, gone. Good, people. Thank you very much. I will see you I guess in two weeks, is it?

\- - -

# EXHIBIT B

## Affidavit of Robert Reynolds

I, Robert Reynolds, declare under penalty of perjury, that the following is true and correct, that I have personal knowledge as to the facts stated, and that I could competently testify, if called, that:

I am a professional process server, am over the age of 18 years, and not a party to the within-named action. I have been a process server since 1981. I regularly serve, or cause to be served, legal documents in the Northern Virginia/Washington, D.C. area.

I received a request from Process Servers Network to serve documents in Alexandria, Virginia of documents related to the matter Burnett v. Al Baraka, case number 1-02-01616-JR. I was instructed to serve World Assembly of Muslim Youth a/k/a WAMY International, Inc. a/k/a World Association for Muslim Youth at their business address of 5134 Leesburg, Alexandria, Virginia 22302.

On December 23, 2002, I arrived at the above-mentioned address and attempted to enter the premises. I could not open the front door to the unit since it was locked. I knocked on the door once and a female employee came to the door. I advised her that I had legal papers for the above-named defendant and she advised me that she would not accept them and that the documents had to be delivered to their attorney. Upon inquiry, she identified herself as Caroline Sodder and advised me that she was normally authorized to accept legal documents but not on this case. She attempted to close the door and I threw the papers inside. She picked them up and threw them back outside.

I immediately called Nelson at Process Service Network in California and advised him as to what had happened. He requested that I also mail a copy to the same defendant but I could not since I did not have an extra copy of the documents. He advised me that he would mail a copy to the defendant.

I declare and can competently testify, under penalty of perjury of the laws of the United States of America, that the foregoing is true and correct. Executed on May 23, 2003, at Falls Church, Virginia.

[signature]

Robert Reynolds

# EXHIBIT C

Declaration of Nelson Tucker

I, Nelson Tucker, declare under penalty of perjury of the laws of the United States of America, that the following is true and correct, that I have personal knowledge as to the facts stated, and that I could competently testify, if called, that:

1. I am the President of *Process Service Network*, an international service of process firm, am over the age of 18 years, and not a party to the within-named action. I have been a Registered Process Server and owner of an attorney service since 1978. I have authored two (2) books on service of process, investigations and court filing procedures and have conducted training seminars for the past 18 years. I regularly serve, or cause to be served, legal documents domestically and worldwide and supervise all international service assignments. I currently teach Service of Process and Court Filing Procedures at *Los Angeles Valley College* and Service of Process at *Legal Services Institute*. I have conducted MCLE courses for attorneys, as qualified by the State Bar of California, on service of process. I am a Life Member of the *National Association of Investigative Specialists* and the *International Process Servers Association*. I am qualified as an expert witness on the following subjects: service of process, international service of process, and court filing procedures.

2. This Declaration is made related to international service of process upon World Assembly of Muslim Youth a.k.a. Wamy International, Inc. a.k.a. World Association for Muslim Youth, related to the matter of *Burnett, et al. v. Al Baraka Investment, et al.*, case No. 1-02-01616-JR, filed in the United States District Court, District of Columbia.

3. On or about November 4, 2002, I forwarded an assignment from the law firm of Young Riley Dudley & DeBrota, to a private process server in Washington, D.C. with instructions to serve World Assembly of Muslim Youth at 5134 Leesburg, Alexandria, VA.

4. On or about December 23, 2002, I received a phone call from the process server who advised me that service had been completed by substituted service. However, it was my understanding that the service was actually personal service since it was served on a person who identified herself as being authorized to accept service.

5. Since there was a question as to the method of service, I also mailed a copy of the documents on December 24, 2002, from Los Angeles, CA by first-class mail, postage fully pre-paid to the defendant at the same address where documents were served (see attached U.S. Postal Service Delivery Confirmation Receipt).

I declare and can competently testify, under penalty of perjury of the laws of the United States of America, that the foregoing is true and correct. Executed on March 14, 2003, at Los Angeles, CA.

Nelson Tucker

**U.S. Postal Service Delivery Confirmation Receipt**

DELIVERY CONFIRMATION NUMBER: 0302 0940 0002 5924 2482

Postage and Delivery Confirmation fees must be paid before mailing.

Article Sent To: (to be completed by mailer)
(Please Print Clearly)

World Assembly of Muslim Youth
5134 Leesburg
Alexandria, VA 22302

Postmark Here

CHATSWORTH CA. DEC 2 4 2002 USPS

**POSTAL CUSTOMER:**
Keep this receipt. For Inquiries:
Access internet web site at
www.usps.com
or call 1-800-222-1811

CHECK ONE (POSTAL USE ONLY)

☒ Priority Mail®
☐ Package Services

PS Form 152, January 2001 (See Reverse)

# EXHIBIT D

18144732994

## CORPORATE RECORDS & BUSINESS REGISTRATIONS

| | |
|---|---|
| This Record Last Updated: | 07/05/2005 |
| Database Last Updated: | 01-20-2006 |
| Update Frequency: | WEEKLY |
| Current Date: | 01/22/2006 |
| Source: | AS REPORTED BY THE SECRETARY OF STATE OR OTHER OFFICIAL SOURCE |

## COMPANY INFORMATION

| | |
|---|---|
| Name: | **WAMY** INTERNATIONAL, INC. |
| Address: | PO BOX 8096<br>FALLS CHURCH, VA 22041-8096 |

## FILING INFORMATION

| | |
|---|---|
| Identification Number: | 0388361 |
| Filing Date: | 02/19/1992 |
| State of Incorporation: | VIRGINIA |
| Date Incorporated: | 02/19/1992 |
| Duration: | PERPETUAL |
| Status: | ACTIVE |
| Status Attained Date: | 06/02/2005 |
| Corporation Type: | NOT AVAILABLE |
| Business Type: | CORPORATION |
| Address Type: | BUSINESS |
| Where Filed: | STATE CORPORATE COMMISSION<br>1220 BANK ST<br>RICHMOND, VA 23219 |

## REGISTERED AGENT INFORMATION

| | |
|---|---|
| Name: | FADEL SOLIMAN |
| Address: | 5134 LEESBURG PIKE<br>ALEXANDRIA, VA 22302 |
| Appointed Date: | 12/31/2002 |

## PRINCIPAL INFORMATION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Name: HAJJAJ, ANWAR
Title: DIRECTOR

**ADDITIONAL DETAIL INFORMATION**

Additional Details: INDUSTRY: GENERAL

Call Westlaw CourtExpress at 1-877-DOC-RETR (1-877-362-7387)
to order copies of documents related to this or other matters.
Additional charges apply.

THE PRECEDING PUBLIC RECORD DATA IS FOR INFORMATION PURPOSES ONLY AND IS NOT THE OFFICIAL RECORD. CERTIFIED COPIES CAN ONLY BE OBTAINED FROM THE OFFICIAL SOURCE.

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT E

Home Go Back Feedback Contents Search

# Contact Info

you're welcome

## Contact Information

### Main Office:

P.O. Box 10845, Riyadh 11443 Saudi Arabia

Telephone: (01)464-1663 / 464-1669 Fax: (01) 464-1710

### U.S.A. Office (host office):

**Telephone**
703-916-0924
**FAX**
703-916-0925
**Postal address**
P.O. Box 8096 Falls Church, Virginia 22041 USA
**Electronic mail**
General Information: wamy@wamy.org
Sales: 703-916-0924

Webmaster: wamy@wamy.org

Counter: 00001

**Send mail to wamy@wamy.org with questions or comments about this web site.**

# World Assembly of Muslim Youth

USA Office



WAMY is the first International Islamic Organization dealing specially with youth affairs embracing over 450 Islamic youth / students organization in the five continents

P.O. Box 8096
Falls Church, VA
22041, USA

(703) 820-6656,
(703) 820-6494 office
(703) 783-8409 Voice
(703) 783-8410 · fax
info@wamyusa.org

This site is sponsored by infocomcorp

**Download power point presentation:**

Islam In Brief (with voice) 17.34MB
[click here to download]

Islam In Brief (no voice) 2.99MB
[click here to download]

El Islam en Breve (no voice) 3.96MB
[click here to download]

----->Read More about it

# WAMY international

World Assembly of Muslim Youth

**Home**
**Missions**
**What's New**
**About WAMY**
**Camps**
**Projects**
**Publications**
**WAMY & UN**
**Islam - An Overview**



WAMY is the first International Islamic Organization dealing specially with youth affairs embracing over 450 Islamic youth / students organization in the five continents

*P.O. Box 8096*
*Falls Church,*
*VA 22041, USA*

*office*
*(703) 820-6656,*
*(703) 820-6494*
*Voice*
*(703) 783-8409*
*fax*
*(703) 783-8410*
*info@wamyusa.org*

**Islamic Audio Programs via streaming Mp3! [Click Here]**

**Download power point presentation:**

Islam In Brief (no voice) 3.74MB
[click here to download]

El Islam en Breve (no voice) 3.96MB
[click here to download]

----->Read More about it

Concurso de Jesus y Maria

Entre Aqui!

# EXHIBIT F

Home | Go Back | Feedback | Contents | Search

Contact Info

you're
welcome

# Contact Information

## Main Office:

P.O. Box 10845, Riyadh 11443 Saudi Arabia

Telephone: (01)464-1663 / 464-1669 Fax: (01) 464-1710

## U.S.A. Office (host office):

**Telephone**
Voice Mail: 703-783-8410
Direct: 703-820-6656, 703-820-6494

**FAX**
703-783-8409

**Postal address**
P.O. Box 8096 Falls Church, Virginia 22041 USA

**Electronic mail**
General Information: info@wamyusa.org
Sales: 703-916-0924

Webmaster: support@wamyusa.org

Counter: Hit Counter

**Send mail to info@wamyusa.org with questions or comments about this web site.**

# EXHIBIT G

WAMY
WORLD ASSEMBLY OF MUSLIM YOUTH

عربي

HOME FEEDBACK E-MAIL

CONATCT
ABOUT US
SERVICES
ACTIVITIES
PUBLICATIONS
PRESS RELEASES
ASK THE SCHOLARS
HUMANITARIAN AID

CONTACT WAMY

LONDON

WAMY UK
46 Goodge Street
London W1T 4LX
United Kingdom
Tel: +44 (0) 20 7636 7010
Fax: +44 (0) 20 7636 7080
Email: wamy@wamy.co.uk
website: www.wamy.co.uk

RIYADH

WAMY Head Office
P.O. Box 10845
Riyadh 11443
Saudi Arabia

Tel: + 9661 205 0000
Fax: + 9661 205 0011

Website: www.wamy.org
Email: info@wamy.org

JEDDAH

WAMY Jeddah
P.O. Box 8856
Jeddah 21492
Saudi Arabia
Tel: + 9622 660 1878
Fax: + 9622 664 0286
Email: jeddah@wamy.org

NORTH AMERICA

Contact via Riyadh office

# EXHIBIT H

NOTICE: Access to .ORG WHOIS information is provided to assist persons in determining the contents of a domain name registration record in the Public Interest Registry registry database. The data in this record is provided by Public Interest Registry for informational purposes only, and Public Interest Registry does not guarantee its accuracy. This service is intended only for query-based access. You agree that you will use this data only for lawful purposes and that, under no circumstances will you use this data to: (a) allow, enable, or otherwise support the transmission by e-mail, telephone, or facsimile of mass unsolicited, commercial advertising or solicitations to entities other than the data recipient's own existing customers; or (b) enable high volume, automated, electronic processes that send queries or data to the systems of Registry Operator or any ICANN-Accredited Registrar, except as reasonably necessary to register domain names or modify existing registrations. All rights reserved. Public Interest Registry reserves the right to modify these terms at any time. By submitting this query, you agree to abide by this policy.

Domain ID:D19500337-LROR
Domain Name:WAMY.ORG
Created On:09-Feb-2000 18:38:35 UTC
Last Updated On:08-Jun-2005 06:48:29 UTC
Expiration Date:09-Feb-2008 18:38:35 UTC
Sponsoring Registrar:Network Solutions LLC (R63-LROR)
Status:CLIENT TRANSFER PROHIBITED
Registrant ID:20712614-NSI
Registrant Name:WAMY
Registrant Organization:WAMY
Registrant Street1:P.O. Box 10845 Riyadh 11443
Registrant Street2:
Registrant Street3:
Registrant City:Riyadh
Registrant State/Province:RY
Registrant Postal Code:11443
Registrant Country:SA
Registrant Phone:+1.96614641669
Registrant Phone Ext.:
Registrant FAX:
Registrant FAX Ext.:
Registrant Email:office@wamy.org
Admin ID:34258638-NSI
Admin Name:WAMYUSA
Admin Organization:WAMYUSA
Admin Street1:P.O.Box 8096
Admin Street2:
Admin Street3:
Admin City:Falls Church
Admin State/Province:VA
Admin Postal Code:22041
Admin Country:US
Admin Phone:+1.7038206656
Admin Phone Ext.:
Admin FAX:
Admin FAX Ext.:
Admin Email:info@wamyusa.org
Tech ID:34258680-NSI
Tech Name:WAMY Riyadh
Tech Organization:WAMY Riyadh
Tech Street1:P.O.Box 10845
Tech Street2:
Tech Street3:
Tech City:Riyadh
Tech State/Province:
Tech Postal Code:11443
Tech Country:SA
Tech Phone:+1.7038206656
Tech Phone Ext.:
Tech FAX:
Tech FAX Ext.:
Tech Email:info@wamy.org
Name Server:NS1.4WDNS.COM

NOTICE: Access to .ORG WHOIS information is provided to assist persons in determining the contents of a domain name registration record in the Public Interest Registry registry database. The data in this record is provided by Public Interest Registry for informational purposes only, and Public Interest Registry does not guarantee its accuracy. This service is intended only for query-based access. You agree that you will use this data only for lawful purposes and that, under no circumstances will you use this data to: (a) allow, enable, or otherwise support the transmission by e-mail, telephone, or facsimile of mass unsolicited, commercial advertising or solicitations to entities other than the data recipient's own existing customers; or (b) enable high volume, automated, electronic processes that send queries or data to the systems of Registry Operator or any ICANN-Accredited Registrar, except as reasonably necessary to register domain names or modify existing registrations. All rights reserved. Public Interest Registry reserves the right to modify these terms at any time. By submitting this query, you agree to abide by this policy.

Domain ID:D19814309-LROR
Domain Name:WAMYUSA.ORG
Created On:14-Feb-2000 14:43:25 UTC
Last Updated On:19-Oct-2004 19:37:51 UTC
Expiration Date:14-Feb-2008 14:43:25 UTC
Sponsoring Registrar:Network Solutions LLC (R63-LROR)
Status:CLIENT TRANSFER PROHIBITED
Registrant ID:20712614-NSI
Registrant Name:WAMY
Registrant Organization:WAMY
Registrant Street1:P.O. Box 10845 Riyadh 11443
Registrant Street2:
Registrant Street3:
Registrant City:Riyadh
Registrant State/Province:RY
Registrant Postal Code:11443
Registrant Country:SA
Registrant Phone:+1.96614641669
Registrant Phone Ext.:
Registrant FAX:
Registrant FAX Ext.:
Registrant Email:office@wamy.org
Admin ID:20712614-NSI
Admin Name:WAMY
Admin Organization:WAMY
Admin Street1:P.O. Box 10845 Riyadh 11443
Admin Street2:
Admin Street3:
Admin City:Riyadh
Admin State/Province:RY
Admin Postal Code:11443
Admin Country:SA
Admin Phone:+1.96614641669
Admin Phone Ext.:
Admin FAX:
Admin FAX Ext.:
Admin Email:office@wamy.org
Tech ID:20712614-NSI
Tech Name:WAMY
Tech Organization:WAMY
Tech Street1:P.O. Box 10845 Riyadh 11443
Tech Street2:
Tech Street3:
Tech City:Riyadh
Tech State/Province:RY
Tech Postal Code:11443
Tech Country:SA
Tech Phone:+1.96614641669
Tech Phone Ext.:
Tech FAX:
Tech FAX Ext.:
Tech Email:office@wamy.org
Name Server:NS2.RACKSPACE.COM