# EXHIBIT 237

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN)<br>ECF Case |

This document relates to:

*All Actions*

**AFFIRMATION OF EVAN FRANCOIS KOHLMANN**

I, Evan Francois Kohlmann, being duly sworn, affirm and state as follows

## I. Pedigree

1. My full name is Evan Francois Kohlmann. I am a private International Terrorism Consultant who specializes in tracking Al-Qaida and other contemporary terrorist movements.

2. I hold a degree in International Politics from the Edmund A. Walsh School of Foreign Service (Georgetown University), and a Juris Doctor (professional law degree) from the University of Pennsylvania Law School. I am also the recipient of a certificate in Islamic studies from the Prince Alwaleed bin Talal Center for Muslim-Christian Understanding (CMCU) at Georgetown University. I currently work as the co-founder and Chief Innovation Officer at Flashpoint Global Partners, a New York-based business risk intelligence firm with branch offices in Washington D.C. and Dublin, Ireland. I additionally serve as an on-air analyst for NBC News in the United States. I am author of the book Al-Qaida's Jihad in Europe: the Afghan-Bosnian Network (Berg/Oxford International Press, London, 2004) which has been used as a teaching text in graduate-level terrorism courses offered at such educational institutions as Harvard University's Kennedy School of Government, Princeton University, and the Johns Hopkins School of Advanced International Studies (SAIS).

3. As part of my research beginning in approximately 1997, I have traveled overseas to interview known terrorist recruiters and organizers (such as Abu Hamza al-Masri) and to attend underground conferences and rallies; I have reviewed thousands of open source documents; and, I have amassed one of the largest digital collections of terrorist multimedia and propaganda in the world. The open source documents in my collection include sworn legal affidavits, original court exhibits, video and audio recordings, text communiqués, eyewitness testimonies, and archived Internet websites. I have also personally developed computer software and database applications in PHP/MYSQL format designed to draw out this data and provide statistical trends and models to human analysts.

4. I have testified on twelve occasions as an expert witness in jurisdictions beyond the United States—including the United Kingdom, Denmark, Australia, Switzerland, and Bosnia-Herzegovina.

5. I have testified three times as an approved expert witness in U.S. civil cases—Gates v. Syrian Arab Republic and Amduso v. Sudan, before the U.S. District Court for the District of Columbia, as well as Linde et al. v. Arab Bank PLC, before the U.S. District Court for the Eastern District of New York.

6. I have additionally testified as an approved expert witness on behalf of the prosecution in United States federal and military courts in thirty-five criminal cases, including:

- United States v. Sabri Benkhala (Eastern District of Virginia, 2004)
- United States v. Ali Timimi (Eastern District of Virginia, 2005)
- United States v. Uzair Paracha (Southern District of New York, 2005)
- United States v. Ali Asad Chandia (Eastern District of Virginia, 2006)
- United States v. Yassin Aref (Northern District of New York, 2006)
- United States v. Sabri Benkhala (Eastern District of Virginia, 2007)
- United States v. Rafiq Sabir (Southern District of New York, 2007)
- United States v. Emaddedine Muntasser (District of Massachusetts, 2007)
- United States v. Hassan Abu Jihaad (District of Connecticut, 2008)
- United States v. Mohammed Amawi et al. (Northern District of Ohio, 2008)
- United States v. Salim Hamdan (Guantanamo Bay Military Commissions, 2008)
- United States v. Ali Hamza al-Bahlul (Guantanamo Bay Military Commissions, 2008)
- United States v. Mohamed Shnewer et al. (District of New Jersey, 2008)
- United States v. Oussama Kassir (Southern District of New York, 2009)
- United States v. Syed Haris Ahmed (Northern District of Georgia, 2009)
- United States v. Ehsanul Sadequee (Northern District of Georgia, 2009)
- United States v. Pete Seda et al. (District of Oregon, 2010)
- United States v. Betim Kaziu (Eastern District of New York, 2011)
- United States v. Daniel Boyd et al. (Eastern District of North Carolina, 2011)
- United States v. Barry Walter Bujol Jr. (Southern District of Texas, 2011)
- United States v. Tarek Mehanna et al. (District of Massachussetts, 2011)
- United States v. Patrick Nayyar (Southern District of New York, 2012)
- United States v. Adis Medunjanin (Eastern District of New York, 2012)
- United States v. Anes Subasic (Eastern District of North Carolina, 2012)
- United States v. Mohammed Nisar Khan (Western District of Texas, 2012)
- United States v. Mohamed Mohamud (District of Oregon, 2013)
- United States v. Abdel Hameed Shehadeh (Eastern District of New York, 2013)
- United States v. Sulaiman Abu Ghaith (Southern District of New York, 2014)
- United States v. Mustafa Kamel (Southern District of New York, 2014)
- United States v. Sami Osmakac (Middle District of Florida, 2014)
- United States v. Soheil Kabir et al. (Central District of California, 2014)
- United States v. Abid Naseer (Eastern District of New York, 2015)
- United States v. Fazliddin Kurbanov (District of Idaho, 2015)
- United States v. Abdul Malik Abdul Kareem (District of Arizona, 2016)
- United States v. Ibrahim Suleiman Adnan Adam Harun (Eastern District of New York, 2017)

7. In United States v. Uzair Paracha, Federal District Judge Sidney Stein held a Daubert hearing on my qualifications as an expert witness and issued a ruling concluding: "Evan Kohlmann has sufficient education, training, and knowledge to be qualified as an expert, and... Kohlmann's methodology—that is, his process of gathering sources, including a variety of original and secondary sources, cross-checking sources against each other, and subjecting his opinions and conclusions to peer review—is sufficiently reliable to meet the standards for admissibility of expert testimony set by the Federal Rules of Evidence."

8. In United States v. Hassan Abu Jihaad, Federal District Judge Mark Kravitz held a Daubert hearing on my qualifications as an expert witness and issued a ruling concluding, "Mr. Kohlmann is certainly qualified to provide expert testimony. . . . Mr. Kohlmann is qualified by means of his education, training, background, and experience to testify as an expert on terrorism. . . . Mr. Kohlmann has conducted first-hand interviews of several leaders of terrorist organizations and has reviewed reams of information about al Qaeda . . . and the other subjects on which he will offer testimony. Indeed . . . it is apparent that these subjects are Mr. Kohlmann's life work, and he has, therefore, acquired a considerable amount of information and documentation on these subjects. . . . Mr. Kohlmann's work receives a considerable amount of peer review from academic scholars and others, and by all accounts, Mr. Kohlmann's work is well regarded."

9. During United States v. Syed Haris Ahmed, Federal District Judge William S. Duffey, Jr., held a Daubert hearing on my qualifications as an expert witness, and noted in his published ruling, "Kohlmann has developed an understanding of terrorist organization structures, operations, and membership, allowing him to speak with authority about Al-Qaeda in Iraq, Lashkar-e-Taiba, and Jaish-e-Mohammed. His research and experience have provided him a base of understanding far greater, and far more sophisticated, than of the Court or of jurors. . . . A person lacking Kohlmann's advanced knowledge of JeM and LeT essentially would not be able to recognize the information on Khan's hard drive as information that might link a person to JeM or LeT."

10. Most recently, on February 4, 2011, the United States Circuit Court of Appeals, Second Circuit, issued a formal ruling regarding the admissibility of my testimony during United States v. Rafiq Sabir (2007), stating: "Kohlmann has, in fact, been qualified as an expert on al Qaeda and terrorism in a number of federal prosecutions. . . . Kohlmann's proposed expert testimony had a considerable factual basis. . . . We conclude that the district court acted well within its discretion in concluding that Kohlmann's testimony satisfied the enumerated requirements of Rule 702. . . . Such testimony was plainly relevant to mens rea."

## II. Scope of the Assignment

11. Based on my knowledge, experience, review of thousands of open-source documents and documents produced in discovery (including hundreds of pages of documents produced from inside the files of Saudi dawah organizations at issue), and using the methodology and principles described above, I have been asked to provide expert testimony concerning:

a) the role of Islam in the Saudi state and the role of dawah organizations in fulfilling Islamic obligations of the Saudi state, including my opinion as to the degree to

which the Saudi state was able to and did exert control over the dawah organizations;

b) the degree to which various Saudi government-controlled dawah organizations (including the Saudi High Commission) were involved in financing and directing terrorist activities, and

c) the degree to which the money, direction, and other forms of material support provided to Al-Qaida through the dawah organizations managed and financed by the Kingdom of Saudi Arabia were a cause of the attacks on September 11, 2001.

## III. Research and Archival Methodology

12. The social science methodology I have employed to formulate my expert opinion is known as comparative analysis, which "holds a central place in social science research."[1] Terrorism is generally a rare phenomenon comprised of a small number of incidents and a fringe group of secretive actors. In the absence of a large pool of reliable data points or controls, strict statistical or quantitative social science methods can often be of uncertain reliability and can even produce misleading results. In contrast, my research methodology is "case-oriented," with the aim to juxtapose "rich descriptions of a few instances of a certain phenomenon" and to distill a common, accepted narrative.[2] However, this approach is not "just a second-best one imposed by the availability of data; rather, it is justified by its capacity to go beyond descriptive statistical measures, towards an in-depth understanding of historical processes and individual motivations."[3]

13. In order to create the most accurate historical narrative, information is weighted according to the credibility of its source: primary, secondary, or tertiary:

- In the study of terrorism, an example of a primary source would be directly witnessing a terrorist attack or interviewing a representative of a terrorist organization. Quite obviously, such sources would be few and far between, so researchers such as myself often are also compelled to rely heavily on secondary sources.

- An example of a secondary source in my field would be a video-recorded speech by a terrorist leader obtained through official sources, internal organizational records, original magazines published by the official media wing of a terrorist organization, or the official website of such a group. While not quite the same as witnessing an event live, secondary sources provide a rich, highly compelling level

---

[1] Della Porta, Donatella and Michael Keating. Approaches and Methodologies in the Social Sciences. Cambridge University Press. 2008. Page 198.

[2] Della Porta, Donatella and Michael Keating. Approaches and Methodologies in the Social Sciences. Cambridge University Press. 2008.Page 198.

[3] Della Porta, Donatella and Michael Keating. Approaches and Methodologies in the Social Sciences. Cambridge University Press. 2008.Page 202.

of detail directly from the voices of actors who are centrally involved in the events we actively study. In the field of terrorism, secondary sources can also be relatively challenging to obtain, in that they can require specialized knowledge of the communications mechanisms employed by extremists; however, they are generally far more available for access and study by savvy researchers.

- Tertiary sources would include newspaper and magazine articles written by outside observers, topical papers published by academics, and other relevant commentary from experts in the field. While such materials can be undoubtedly helpful to establish general context or to identify issues of scholarly debate, researchers generally avoid relying wholesale on the content of tertiary sources, absent some supporting primary or secondary source information.

14. Upon classifying research material according to its credibility, analysts must still also assess information contained therein for potential issues of bias. Obviously, no matter how authentic a speech by a terrorist leader may be, this is still not an absolute guarantee that the facts or perspectives provided in the speech are a completely accurate depiction of reality.

15. The methodology of comparative analysis as described above is employed by countless other researchers in the field of terrorism—as well as a wide variety of other subjects. As stated by Judge Brian Cogan of the Eastern District of New York, formulating conclusions based on "reviewing primary, secondary, and tertiary sources, and then exercising judgment about which are corroborated or otherwise believed to be credible, and which should not be accepted… seems to me no different than, for example, the exercise a historian would undertake to determine the precise location of the Battle of Hastings, or the troop size or unit strength of the combatants." In other words, according to Judge Cogan, our essential "methodology strikes me as little, if at all, different than most qualitative political science research."[4]

16. During a May 2009 Daubert hearing before Judge William S. Duffey Jr. in the Northern District of Georgia, I explained the process of "comparative analysis" and how I rely upon it when making determinations of fact. This testimony was subsequently summarized by Judge Duffey in his own published ruling qualifying me as an expert:

> The basis for Kohlmann's testimony, generally, is his years of research and tracking of terrorist information, through websites, primary interviews, books, news articles, and journals, and other information. His testimony essentially synthesizes these concepts, and through the use of the comparative analysis methodology, Kohlmann has developed an understanding of terrorist organization structures, operations, and membership… Kohlmann testified in detail regarding the methodology of comparative analysis, how it is relied upon by experts in social sciences, and how the particular information he gathers allows him to perform reliable analysis. He specifically testified to how he gathers and analyses information

[4] Order by Judge Brian M. Cogan resulting from Daubert hearing for Evan Kohlmann. United States v. Adnan Ibrahim Harun A Hausa. U.S. District Court for the Eastern District of New York (EDNY). February 10, 2017.

> from primary, secondary, and tertiary sources, and he explained the difference between the sources and why and how he relies on each differently. He further explained how comparative analysis is performed, assimilating the relevant information and comparing and contrasting sources against one another to form a cohesive whole. The sources Kohlmann uses and the methodology he employs to analyze those sources, are identical to those used by other experts in his field. Kohlmann explained his methodology and how he used the methodology to arrive at his opinions in this case. The defendants did not offer any evidence at the hearing or subsequent to it to suggest that Kohlmann's methodology is not sound or is not the same methodology typically relied upon by other social scientists… Mr. Kohlmann's ability to synthesize that information through comparative analysis establishes his qualification as an expert.

## IV. Summary of Professional Opinions and Conclusions

17. Based on the methodology and principles described above, and available evidence, my professional opinions, to a reasonable degree of certainty, are as follows:

- A core policy and function of the Saudi state is the global propagation of Islam – namely, the Wahhabi variant of Islam. To fulfil this self-professed duty, the Kingdom established, directed, and supported Islamic "charitable," or dawah organizations.

- In the period before the September 11, 2001 terrorist attacks, Al-Qaida was largely funded and otherwise supported by Saudi government money and other support (for example, safe haven, travel documents, access to operatives, training, etc.) that were channeled to Al-Qaida through Saudi government supported Islamic "charitable," or dawah organizations that the Saudi government established, directed, and supported.

- The money and other support that was channeled to Al-Qaida through Saudi government supported dawah organizations fueled Al-Qaida's development – that is, the Saudi government funding was the essential fuel for Al-Qaida's engine. Without this fuel, Al-Qaida would not have been a global threat, nor capable of executing sophisticated, elaborate terrorist attacks on a global scale.

- The support that was channeled through Saudi state-run charitable/dawah organizations was applied by Al-Qaida directly to plan and execute the September 11, 2001 terrorist attacks.

## V. Discussion of Professional Opinions and Conclusions

18. My professional opinions, as an International Terrorism Consultant who specializes in tracking Al-Qaida and other contemporary terrorist movements, regarding the role of Islam in

the Saudi state and the role of dawah organizations in fulfilling Islamic obligations of the Saudi state, the degree of control the Kingdom of Saudi Arabia exerted over such charitable and dawah organizations, and the links between those organizations and international terrorism, all of which I hold to a reasonable degree of certainty, are outlined in the sections and paragraphs that follow in this Affirmation.

## VI. The role of Islam in the Saudi state and the role of dawah organizations in fulfilling Islamic obligations of the Saudi state

19. Before addressing the relationship between the Kingdom of Saudi Arabia and the various dawah entities, it is necessary to understand the role of Islam in the Saudi state, and the role of Dawah organizations in fulfilling Islamic obligations of the Saudi state.

20. The Kingdom of Saudi Arabia is an Islamic state, and its Constitution is the Quran and the Sunna (Traditions) of the Prophet Mohammed.[5]

21. The Kingdom itself was founded through an alliance between the al-Saud family and conservative Wahhabi clerics who viewed themselves as the true custodians of Islam. The alliance began in the 18th Century with a pact forged between Muhammad Ibn al Saud, the head of the al Saud tribe in Arabia, and Muhammad Ibn Abd al Wahhab, a Muslim scholar from the Najd region of Arabia.

22. Ibn Abd al Wahhab's views of Islam form the basis of the Islamic school commonly called Wahhabism and are the ideological based for al Qaeda, which found inspiration and justification for its acts in "a long tradition of extreme intolerance" flowing "through the founders of Wahhabism."[6]

23. As a result of the alliance between the al-Sauds and the Wahhabi clerics, from its inception, a core function of the Saudi government has been the advancement of a Wahhabi ideology both inside and outside the borders of the Arabian Peninsula. The Basic Law of Governance expressly provides that the Propagation of Islam (Dawah) is an essential function and duty of the Saudi government.[7]

24. In his speech on the issuance on the Basic Laws of Governance in 1992, then-King Fahd bin Abdulaziz identified the nine bases for the foundation of the modern Saudi state, including "the undertaking of the Propagation of Islam (Dawah) and its dissemination, since the Propagation of Islam is one of the most important functions of an Islamic state."[8]

---

[5] See Saudi Basic Law of Governance, Article 1.

[6] Final Report of the National Commission on Terrorist Attacks upon the United States ("9/11 Commission Report") at 362.

[7] See Saudi Basic Law of Governance, Article 23 ("the State shall protect the Islamic Creed, apply the Sharia, encourage good and discourage evil, and undertake its duty regarding the Propagation of Islam (Da'wah"); see also 9/11 Commission Report at 372 (noting the "dedication of the Saudi government to propagating the Islamic faith, particularly the Wahhabi sect that flourishes in Saudi Arabia."

[8] King Fahd's Speech on the Issuance of the Basic Law of Governance, at p.2.

25. In an affidavit filed in this litigation, Abdulaziz H. al Fahad, a member of the Saudi Council of Ministers, similarly affirmed that "Saudi Arabia is home to the most holy sites of Islam, and a core policy and function of the Kingdom since its founding in the early twentieth century has been to foster and preserve Islamic faith and Islamic law within the Kingdom and abroad."[9]

26. According to the General Manager for External Relations in the Ministry of Islamic Affairs, Abdul Majid bin Muhammad al-Omari, "The most prominent characteristic of the Kingdom of Saudi Arabia's role in spreading Islamic missionary work is that it has made it one of the goals of the country. This means that this is a role that has been adopted by the state and is part of its plans. The government provides it with the necessary financial and human resources."[10]

27. To carry out its self-described duty to propagate Islam globally, the Kingdom of Saudi Arabia has created a government proselytizing apparatus that is comprised of three components funded, directed, overseen, and controlled by the government. These components are the Supreme Council for Islamic Affairs, the Ministry of Islamic Affairs Endowment, Da'wah and Guidance, and individual dawah organizations — such as the Muslim World League (MWL), International Islamic Relief Organization (IIRO), the Al-Haramain Islamic Foundation, the World Assembly of Muslim Youth (WAMY), the Saudi High Commission for Relief of Bosnia & Herzegovina (SHC), the Saudi Joint Relief Committee for Kosovo and Chechnya (SJRC), the Saudi Red Crescent Society (SRC), the Al-Haramain al-Masjid al-Aqsa Foundation, and others.

28. Dr. Saleh bin Hussein al-Ayed, the Secretary General for Islamic Affairs, described the differing functions of the Supreme Council for Islamic Affairs and the Ministry of Islamic Affairs in an interview with al Riyadh Daily newspaper.[11] Dr. al-Ayed explained that the Supreme Council for Islamic Affairs "is responsible for the Islamic work by the Kingdom abroad, including providing in-kind and financial assistance to Islamic centers as well as Islamic organizations and associations abroad, and coordinating Saudi activities undertaken by the organizations, whether at the official or individual levels, all of which fall under the responsibility of the Supreme Council." Dr. al-Ayed further explained that the "Supreme Council is not an executive authority, but rather a planning body." In contrast, other authorities "such as the Ministry of Islamic Affairs" serve as the operational bodies that "execute its [the Supreme Council for Islamic Affairs'] decisions." Because the Supreme Council for Islamic Affairs is a planning body, and the Ministry of Islamic Affairs is an operational arm of the government, Dr. al-Ayed affirmed that "there is no duplication" between their work.

29. The overview of the Ministry of Islamic Affairs' role in the propagation of Islam outside of the Kingdom, from its own website, reinforces that the dawah activities undertaken by the Kingdom outside of Saudi Arabia are an essential function of the Kingdom as an Islamic state, and affirms the Ministry of Islamic Affairs' role as an operational body tasked with implementing those activities. The website explains that propagating and calling people to Islam "is the essential

---

[9] Declaration of Abdulaziz H. al Fahad, at para.8 (ECF No. 85-3).

[10] Interview with General Manager for External Relations in the Ministry of Islamic Affairs, Abdul Majid bin Muhammad Al Omari.

[11] ECF No. 2927-16.

cornerstone of its [the Kingdom's] system, duties and obligations, to which it pays due attention." The website also notes that dawah is one of the "outstanding pillars and essential parts of the Kingdom," and that the Kingdom has "established, sponsored, supported, and developed large organizations for this purpose." The overview then explains that "this effort was crowned with success when Royal Decree No. 3-A of 20-1-1414 A. H. was issued to establish the Ministry of Islamic Affairs, Endowments, Da'wah, and Guidance to be in charge of matters relating to Islam, endowments, mosques, guidance, and Da'wah."[12]

30. The individual dawah organizations—such as MWL, IIRO, Al-Haramain, WAMY, SHC, SJRC, and SRC—serve as the primary (although not exclusive) governmental arms through which the Kingdom performs its dawah activities globally and fulfills its state obligation. They act pursuant to policies set by the government, with funding from the government, under supervision by the government (through the Ministry of Islamic Affairs and local embassies and consulates), subject to approvals of the government, and under the leadership of the "government officials who head those organizations."[13]

31. The government of the Kingdom has consistently and repeatedly described the actions of the Saudi dawah organizations globally as achievements of the State itself.[14] According to a document posted on multiple official Saudi government websites touting their work in the "Service of Islam and Muslims", one of the chief such contributions was cited as the creation of "Saudi Relief Agencies": "Since the era of King Abdulaziz—may Allah be merciful to him—Kingdom of Saudi Arabia gave the top priority to support and help the Muslims all over the world. Kingdom of Saudi Arabia made available of this support through specialized agencies established for this reason as follows: International Islamic Relief Organization, World Assembly for Muslim Youth, Saudi Commission for Fundraising."[15] An alternative version of this text posted on the official website of the Saudi Embassy in New Zealand also included the "Al-Haramain Foundation" on the list of "specialized agencies" established by the Kingdom to "support Muslims all over the world."[16] As noted by Saudi Minister of Islamic Affairs Saleh al-Shaykh, "this work was not at an individual level, but rather conducted through institutions and committees and special entities headed by… state officials."[17]

---

[12] http://www.moia.gov.sa/eng/Menu/Pages/About.aspx

[13] Fahad Declaration at para. 11.

[14] *See, e.g., id.* (government oversight of dawah organizations is exercised through government officials who head those organizations).

[15] http://www.mofa.gov.sa/sites/mofaen/EServ/VisitingSaudiArabia/aboutKingDom/Pages/ServingIslam36145.aspx, http://www.mohe.gov.sa/en/studyinside/aboutKSA/Pages/service-of-Islam-and-Muslims.aspx?AspxAutoDetectCookieSupport=1,
http://www.mohe.gov.sa/ar/studyinside/aboutksa/pages/service-of-islam-and-muslims.aspx?aspxautodetectcookiesupport=1

[16] http://embassies.mofa.gov.sa/sites/NewZealand/AR/AboutKingdom/KingdomAchievments/Pages/default.aspx

[17] Lecture of Sheikh Saleh bin Abdel Aziz Al Sheikh, Minister of Religious Affairs

Efforts of the Servant of the Two Holy Mosques in Advocacy and the Service of Islam and Muslims

32. In sworn testimony in this litigation, the Kingdom has attested that "[t]he Saudi High Commission is an arm of the Saudi Arabian government. Actions taken by the Saudi High Commission may be viewed as actions of the government of Saudi Arabia. Actions by the Saudi High Commission are taken in keeping with the foreign and domestic governmental policies of the Kingdom of Saudi Arabia." [18]

33. The Saudi dawah organizations, themselves, have attested to their close, controlled relationship as part of the Saudi government. Al Haramain's General Manager testified that it "operates under the supervision of the Saudi Minister of Islamic Affairs, who appoints its Board of Directors and senior management personnel."[19] IIRO's Canadian director, who was also a Muslim World League employee, testified under oath in Canadian immigration proceedings that "the Muslim World League, which is the mother of IIRO, is a fully government funded organization. In other words, I work for the government of Saudi Arabia. I am an employee of that government." He continued, explaining that, "the IIRO . . . is . . . controlled in all of [its] activities and plans by the government of Saudi Arabia . . . and has to abide by the policy of the Government of Saudi Arabia."[20] WAMY's finance director testified under oath that WAMY's president, who principally governs the organization, is the Saudi Minister of Islamic Affairs.[21] The president of the Saudi Joint Relief Committee (SJRC) swore under oath that the SJRC was established by the Kingdom of Saudi Arabia, "has always functioned as a political subdivision, agency, or instrumentality of the Kingdom of Saudi Arabia," and is "supervised by the Minister of the Interior of the Kingdom of Saudi Arabia."[22] The president of the Saudi Red Crescent Society (SRC) swore under oath that the Kingdom "sponsors and supervises" the SRC, which "performs essential core government functions and is a Saudi Government instrumentality."[23]

34. I have reviewed thousands of open-source documents, as well as hundreds of pages of documents exchanged in the discovery proceedings in the *In re Terrorist Attacks on September 11, 2001* litigation, including many from the internal files of the Saudi dawah organizations at issue in this case.

35. Consistent with its self-described dawah obligation, the evidence as contained in the documents that I have reviewed and as outlined below reflects that the Saudi state apparatus has funded, supervised, directed, and controlled the dawah organizations, both internally and externally, to fulfill the Kingdom of Saudi Arabia's core function of propagating Islam.

---

[18] Declaration of Dr. Mutlib bin Abdullah al Nafissa, Member of the Council of Ministers, January 31, 2004. (03-md-1570, ECF No. 141-5, Exh 222 in Index of Evidence)

[19] Affidavit of Khalid bin Obaid Azzahri, ECF No. 104-2, at para. 3.

[20] Testimony of Arafat El Asahi, Minister of Citizenship and Immigration v. Mahmoud Jaballah, Federal Court of Canada, Docket DES-6-99 (03-md-1570, Exh 122 in Index of Evidence).

[21] Declaration of Mutaz SalehAbu Unuq, Apr. 1, 2003 (*Burnett v. Al Baraka Inv. & Dev. Corp.*, Dkt. No. 1:02cv01616 (D.D.C.).

[22] Declaration of Abdulrahman A. Al-Suwailem, Jan. 10, 2005, ECF No. 631-3, at paras. 2, 3, 5, 7.

[23] Declaration of Abdul Rahman Al Swailem, Apr. 2, 2004, ECF No. 96-2 (Exh. 240 in Index of Evidence), paras. 9.

### A. Muslim World League (MWL)

36. My review of the documents, many from the files of the dawah organizations, including Muslim World League (MWL), provides evidence of a substantial and controlling relationship between the Kingdom of Saudi Arabia and the Saudi dawah organizations, including the MWL.

37. The multi-million dollar MWL, founded in 1962 to "promote Islamic unity," is one of the largest of the Saudi Islamic dawah organizations.[24] In May 1962, in an effort to strengthen Saudi presence in regional affairs and dilute Egypt's influence, King Faysal of Saudi Arabia sponsored a pan-Islamic conference in Mecca. The objectives of the conference were to (1) promote cooperation among Muslim states, (2) counter Soviet and communist threats in the Arab world, and (3) mobilize the Muslim world to oppose the state of Israel. The Mecca meeting resulted in the creation of the Muslim World League (*rabitat al-'alam al-Islami*).[25]

38. Since its inception, the MWL has operated as an arm of the Saudi government through which the Kingdom's dawah activities are implemented. In fact, in their own court papers, MWL's lawyers have asserted that the organization "is an instrumentality of the government of the Kingdom of Saudi Arabia."[26]

39. According to former Secretary General of MWL, Dr. Abdullah Naseef: "The establishment [of MWL] came in a decision approved by the first General Islamic Conference held under the auspices of Saudi Arabia in Makkah in Dhul-Hijjah, 1381/1962. The conference was attended by a large number of Islamic leaders, Ulema [clerics], and intellectuals from various countries and continents."[27] Naseef explained in a media interview, "There was no one who wanted to do something for the Muslims as One Ummah . . . . To fill this vacuum, the Kingdom, being the seat of two Holy Harams, took the initiative and founded the League."[28]

40. On its own Internet website, consistent with the objective of the Kingdom, MWL has listed its main objectives as "to disseminate Islamic Dawah and expound the teachings of Islam. To defend Islamic causes in a manner that safeguards the interests and aspirations of Muslims, solves their problems, refutes false allegations against Islam, and repels inimical trends and dogma which the enemies of Islam seek to exploit in order to destroy the unity of Muslims and to sow seeds of doubt in our Muslim brethren."[29]

---

[24] "Saudi Arabian Information Resources: Muslim World League." http://www.saudinf.com/main/k312.htm. March 1, 2003.

[25] Al-Rasheed, Madawi. A History of Saudi Arabia. Cambridge University Press; © 2002. Page 132.

[26] Defendant Muslim World League's Answer to Plaintiffs First Amended Complaint. In Re: Terrorist Attack on September 11, 2001 (Federal Insurance Company et al. v. Al-Qaida et al.). United States District Court for the Southern District of New York. Case No: 02 CV 6978 (RCC).

[27] http://www.wamy.org/english/conferences/speech3.htm. July 1, 2003.

[28] "More Dynamic Role for MWL: Dr. Abdullah Omar Nasseef." The Muslim World League Journal. Vol. 11; Nos. 5 and 6. Jumada I&II 1404 (February-March 1984). Mecca, Saudi Arabia. Page 65.

[29] "About the Muslim World League." http://www.arab.net/mwl/about.htm.

41. Since its founding, the MWL has functioned as a religious missionary and propaganda arm of the Saudi Kingdom. In 1997, the Governor of Mecca province attended a meeting of the MWL Constituent Council in Saudi Arabia and delivered a speech on behalf of the King:

> Since its unification under King Abdel Aziz, may God grant him mercy, the kingdom of Saudi Arabia has devoted its concern to Muslim affairs, and proffered its hand to assist Muslims wherever they may be....the kingdom has sponsored many such conferences and meetings. Foremost amongst them, is the Muslim World League which today we regard—thanks be to God—as an outstanding Muslim body devoted to the spreading of the Islamic call.[30]

42. The Chairman of the Saudi Shura Council, Muhammad Ibn Ibrahim Ibn Uthman Ibn Jubair[31], was also a member of the MWL Jurisprudence Council until he died in January 2002.[32] The Deputy Chairman of the Saudi Shura Council, Dr. Abdullah Naseef, is a former Secretary General of the MWL.[33]

43. According to Ali Muhammad al-Kamal, Manager of the MWL Financial Affairs Administration: "The MWL's policies are established by its Constitutive Council, which is chaired by the Grand Mufti of Saudi Arabia. The MWL's daily operations are conducted and supervised by its General Secretariat, which is headed by a Secretary General appointed by the Constitutive Council based on a nomination by the Saudi Government."[34]

44. The closely intertwined relationship between MWL and the Saudi regime—and particularly the Ministry of Islamic Affairs—is well-illustrated by a sworn statement filed by former MWL Secretary General Abdullah al-Obaid:

> I was the Secretary-General of the Muslim World League from 1995 until 2000. The Muslim World League is a charity that is sponsored and financially supported by the Saudi government. As Secretary-General, I was also one of eight members of the Supreme Council for Islamic Affairs, established by King Fahd by Royal Decree No. 296/8 (1994). The Supreme Council has responsibility for Saudi Arabia's Islamic policies in other countries... In 2001, I was

---

[30] "At the Opening of the Muslim World League Meeting: The Custodian of the Two Holy Places Calls for Islamic Solidarity to Overcome Obstacles." Ain al-Yaqeen. December 15, 1997.

[31] http://www.saudiembassy.net/gov_profile/consult.html.

[32] http://www.saudiembassy.net/gov_profile/consult.html.

[33] http://www.saudia-online.com/Shura%20Council.htm.

[34] Declaration of Ali Muhammad al-Kamal, Manager for Financial Affairs Administration of the Muslim World League. Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al. United States District Court for the District of Columbia. Civil Action No. 1:02CV01616.

appointed by Royal Decree to the Saudi Majlis-ash-Shura, which is the legislative body of the Saudi government.[35]

45. A similar understanding of the relationship between MWL and the Saudi Kingdom was also offered in a sworn deposition by Arafat el-Asahi, a full-time MWL organizer based in the group's regional branch in Canada. According to el-Asahi, "The Muslim World League... is a fully government funded organization. In other words, I work for the Government of Saudi Arabia. I am an employee of that government."[36]

46. A review of internal and other documents about the MWL indicates that the dawah organization relies almost exclusively on the enormous financial support from the Kingdom of Saudi Arabia. MWL's own regulations, as published at the MWL Constituent Council's 37th Session in 2002, state that the MWL's revenues consist of "aid provided by the government of the Kingdom of Saudi Arabia and other Islamic countries."[37] In a February 1984 interview, former MWL Secretary General Dr. Abdullah Omar Naseef explained that the MWL was the beneficiary of "an annual budget of SR 130 million allocated by the Government of Saudi Arabia."[38] Expressing appreciation for the Kingdom's support to the MWL, MWL's Deputy Secretary General explained that the Kingdom supports the MWL not only by funding the organization's annual budget, but also by funding myriad individual projects.[39] In a February 1992 address, MWL Secretary General Naseef, recognized the Kingdom's "generosity" in increasing the organization's budget by 40%, enabling MWL to expand its work.[40] MWL internal documents show that, through the 1990s, the Kingdom continued to fund MWL with *annual* subsidies of anywhere from 80 million to 1 billion Saudi Riyals[41] In a speech by Abd Allah Bin al-Muhsin at-Turki, MWL Secretary General and head of the IIRO Executive Board, Turki acknowledged that the Saudi King had provided the dawah organization more than one hundred million riyals.[42] In March 1997, Secretary General Abdullah Al-Obaid thanked the King for his continued support, noting that the Saudi government had officially provided more than $1.33 billion in financial aid to MWL since 1962.[43] More recently, in a sworn declaration, MWL financial manager Ali Muhammad al-Kamal

---

[35] Declaration of Abdullah Bin Saleh al-Obaid. Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al. United States District Court for the District of New York. 03 CV 9849 (RCC).

[36] "Reasons for Order." The Minister of Citizenship and Immigration and Mahmoud Jaballah. Docket: DES-6-99. Federal Court of Canada. November 2, 1999. Pages 81-88.

[37] MWL 05138; *see also* JT-MWL00127

[38] "More Dynamic Role for MWL: Dr. Abdullah Omar Nasseef." The Muslim World League Journal. Vol. 11; Nos. 5 and 6. Jumada I&II 1404 (February-March 1984). Mecca, Saudi Arabia. Page 65.

[39] Al-Alam Al-Islami, July 27th 1992, page 3.

[40] Al-Alam Al-Islami, February 3rd 1992, page 4

[41] MWL005365-5366; MWL005346, MWL005354-55; MWL005350-51;

[42] MWL058868

[43] Monthly Newsletter of the Royal Saudi Embassy in Washington D.C. March 1997. http://www.saudiembassy.net/publications/news_letter/NL_97/nl_97_03.html.

has indicated, "the MWL's annual budget is 80 million Saudi Riyals, which is funded by an annual grant from the Saudi Government."[44]

47. In addition to the huge annual infusions of money, the Kingdom regularly provided the MWL and other dawah organizations with funds to perform tasks valuable toward fulfilling the Kingdom's dawah obligation. For example, the Kingdom regularly paid MWL hundreds of thousands of dollars to fund Islamic schools and cultural centers worldwide.[45] In a May 27, 2001 letter from the MWL Secretary General to the Saudi King, the MWL Secretary General acknowledged that the Kingdom "sponsor[s] financially and morally" MWL-supervised Islamic centers throughout the world.[46] In a 1991 interview of a MWL manager within its World Supreme Council for Mosques, the manager emphasized that, since the Council was established, it "has been blessed with constant support from the [Saudi King]."[47] At times, the Kingdom's financial support to MWL included allocations for the entire budget of a MWL-supervised Islamic center.[48]

48. Other examples of financial support to MWL to fulfil the Kingdom's dawah obligation, though certainly not an exhaustive list, include the Kingdom's funding of a MWL program to print and distribute copies of the Quran[49] or millions distributed through MWL purportedly for relief programs[50]

49. These funds appear to be allocated to MWL by the "Special Committee of the Council of Ministers": "Disbursements of funds by the Special Committee have included grants to Islamic charitable organizations, which are directed by Prince Sultan in furtherance of the national policy of Saudi Arabia as determined by the Council of Ministers... Grants by the special committee... are paid from government bank accounts with government funds."[51]

50. Review of MWL's own internal documents also shows that, when the Kingdom allocates funds to fulfil its obligations through the dawah organizations, it has also used its embassies around the world to move the money for the organizations.[52]

---

[44] Declaration of Ali Muhammad al-Kamal, Manager for Financial Affairs Administration of the Muslim World League. *Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al.* United States District Court for the District of Columbia. Civil Action No. 1:02CV01616.

[45] MWL008574, MWL 051264, MWL 051698, Letter from Saudi Foreign Minister Saud al-Faisal; IIRO284220, IIRO284221 and IIRO284223.

[46] MWL 058614

[47] IIRO35077 – IIRO35081.

[48] *See, e.g.*, Letter from Saudi Foreign Minister Saud al-Faisal

[49] MWL051339

[50] IIRO35077 – IIRO35081 (a million dollars purportedly for flood relief); Al-Alam Al-Islami, May 3rd 1993, page 1 (20 million dollars for aid to Muslims in Bosnia and Herzegovina).

[51] Declaration of Abdulaziz H. Al-Fahad. Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al. United States District Court for the District of Columbia. Civil Action No. 1:02CV01616.

[52] *See, e.g.*, IIRO280607-IIRO280611 (MWL requests Foreign Ministry undersecretary to transfer funds for IIRO expenses through Saudi embassy bank accounts worldwide); JT-MWL 00753 (dispatching check from Saudi

51. The bylaws of MWL, as enunciated in April 2002, make clear the degree to which senior MWL officials in the Kingdom of Saudi Arabia retain tight administrative and financial control over MWL branch offices and affiliates around the world.

52. The bylaws provide for the headquarters' strict administrative control of all aspects of the branch offices. Article 17 of the bylaws enunciates the principle that the MWL Secretary General is responsible for supervising the work of the branch offices and is responsible for approving the League's General Secretariat structure and that of its offices. Article 20 states that it is the General Secretariat in Saudi Arabia that is responsible for the opening of offices overseas, in accordance with the interests and the budget.[53] The Secretary General is also vested with the authority to appoint employees at overseas offices and that the employees need to report to the Secretary General on their work. MWL overseas offices are required to submit a report on their activity every three months to the Secretary General.[54] Furthermore, Article 19 of the MWL Employee Regulations mandates that an annual evaluation report on every employee will be filed annually with MWL's leadership in Saudi Arabia.[55]

53. The bylaws are even more specific—and strict—as applied to financial obligations and responsibilities.

- Article 14 requires that the MWL Secretary General publish an annual memorandum containing the principles and goals that should be taken into account when the various mechanisms, including the overseas offices, are planning the annual budget. [56]

- Article 18 requires the Secretary General to publish a register at the start of each fiscal year containing the allocations to all of the MWL overseas offices and Islamic centers it is running.[57]

- Article 125 requires MWL external supervisors at various branch offices to submit reports every quarter to the Secretary General in Saudi Arabia on the MWL's accounts. Article 131 further states, no overseas office may take upon itself financial undertakings without approval.[58]

- Article 11 mandates that funds transferred from MWL headquarters in Saudi Arabia to overseas branch offices cannot be used for anything other than the objectives for

---

Foreign Ministry to MWL through Saudi embassy in Moscow); IIRO284220-23 (transfer of funds through Saudi embassies in Argentina, Thailand and Brazil.

[53] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

[54] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

[55] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

[56] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

[57] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

[58] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

which they were allocated. In order to ensure that the correct sums of money are being received and disbursed overseas, Article 13 also requires branch offices to send copies of their bank statements each month to the General Secretary so they can be reviewed. Article 18 further requires each overseas office to send a monthly detailing of its expenses to the General Secretary. This responsibility extends to forwarding original receipts to MWL headquarters in Saudi Arabia for any local financial disbursements on a monthly basis.[59]

- Article 19 explicitly forbids overseas branch offices of MWL from spending even their own independently-raised donations on any project unless based on the instructions provided by the authorized entity within the General Secretariat.[60]

54. The bylaws are clear and specific in stating, the overseas office manager cannot make a decision entailing a financial undertaking, not stated in the annual budget, without written consent from the authorized entity within the General Secretariat. Funds beyond the scope determined in the annual budget cannot be spent without written consent from the authorized entity within the General Secretariat.[61] In other words, all significant financial decisions or undertakings by MWL overseas branch offices are typically reviewed and approved at the highest levels of the organization inside the Kingdom of Saudi Arabia.

55. The Kingdom's control over the dawah organizations is also apparent by the Kingdom's involvement at every level of the organization's governance. The Secretary General of MWL holds a position equivalent to a "Minister" in the Saudi government.[62] The Kingdom appoints the senior officials of the dawah organizations.[63] Saudi government officials, who often hold senior posts in the government, dominate leadership positions throughout the dawah organizations.[64]

56. The dawah organizations operate under significant supervision, guidance, and regulation of senior members of the Saudi government. For example, MWL officials report to senior Saudi officials, including in certain instances, to the King, concerning their operations and

---

[59] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

[60] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

[61] MWL regulations as published by the MWL Constituent Council (April 10-11, 2002).

[62] MWL059176

[63] *see, e.g.*, MWL059172 (Saudi Grand Mufti letter advising of the King's nomination of new MWL Secretary General).

[64] *See, e.g.*, MWL059354 (decision of MWL Secretary General regarding secondment of Education Ministry member to MWL to direct Madrid Islamic Center); MWL059236 (decision of action MWL Secretary General regarding moving Education Ministry member from directing MWL office in Mozambique to directing the MWL office in Tashkent); MWL059241 (decision of MWL Secretary General regarding secondment of Education Ministry member to direct MWL office in Jakarta; MWL059276 (decision of MWL Secretary General regarding secondment of Education Ministry member to MWL as "Director of the Da'awa Department); IIRO287458 - IIRO287463 (discussing possible secondment of Islamic Affairs Ministry member to dawah's Russia office); and MWL 030818 (co-chair of dawah includes Saudi Royal family prince).

activities.[65] The dawah organizations submit their resolutions to Saudi government officials for review and approval.[66] Saudi government officials exercise authority over the activities and projects undertaken by the dawah organizations, including the collection and transferring of funds.[67] Internal correspondence of the dawah organizations shows that the Saudi embassies and the committees of overseas offices monitor aid distributed by the organizations.[68] The dawah organizations also seek government approval, including from the Ministry of Islamic Affairs, to establish delegations to visit foreign countries.[69]

57. The Saudi government routinely directs the dawah organizations' projects and activities.[70] Saudi government officials oversee the approval process for aid the dawah organizations provide, at times with Ministry officials participating directly in the decisions.[71]

---

[65] *See, e.g.*, Letter from Foreign Minister Saud Al-Faisal to Chief of Royal Court (committee created by royal decree, comprised of Saudi Ministry and MWL officials to travel to Brazil, study the MWL-managed Islamic Center, and report its findings to the Saudi government); Letter from Saudi Foreign Minister Saud Al-Faisal to MWL Secretary General (committee created by royal decree, comprised of Saudi embassy and MWL officials to travel to Edinburgh, study the MWL-managed Islamic Center, and report its findings to the Saudi government); IIRO277786-277787 (Saudi Council of Ministers directs that all refugee relief operations be coordinated by the SRC Society and a committee, under the supervision of the Interior Ministry, comprised of various Saudi Ministry officials and officials from MWL, IIRO, and Al Haramain); IIRO278760 (MWL Secretary General report to Saudi King regarding Guinea relief efforts in cooperation with Saudi Embassy in Guinea).

[66] *See, e.g.*, MWL039323 (MWL Secretary General report to Saudi Crown Prince and Vice Prime Minister, presenting MWL resolutions and recommendations for review and approval); MWL039324 (Saudi Crown Prince and Vice Prime Minister approving MWL resolutions and recommendations)

[67] *See, e.g.*, JT-MWL-4515 (Correspondence for the Saudi General Auditing Bureau to MWL referencing MWL's obligation as a "governmental bod[y] subject to [the Kingdom's General Auditing Bureau's] auditing," to provide "the branch's final balance sheet for the year . . . and independent other monthly accounts to enable the Bureau to complete its review and audit procedures. . ."); JT-MWL-4514 (Memo from the Kingdom's General Auditing Bureau advising of Saudi resolution regarding audit showing violations of obligation to report donations); IIRO 283369 (Ministry of Islamic Affairs Eastern Province instructed dawah organizations to "remove all donation collection kiosks (and mobile offices) located in front of shops, malls and bakeries. Donation collection is limited to the offices' headquarters and bank accounts").

[68] *See, e.g.*, JT-MWL 004822; JT-MWL 004833; JT-MWL 00530, IIRO280607-IIRO280611, JT-MWL 00753, Letter from MWL Secretary General Turki to Minister of Foreign Affairs.

[69] *See, e.g.*, MWL 052935 (MWL request to Ministry of Islamic Affairs to approve a joint delegation to visit Bulgaria to assess the status of the Muslim minority there); MWL069959-60, MWL069961, and MWL069970 (Exchanges of "Confidential" and "Very Urgent" telegrams between the Saudi King and the MWL Secretary General regarding the "noble approval" of a delegation headed by the MWL Secretary General to travel to various countries to "contribute in affecting Western opinion, particularly in the United States of America," just months after the 9/11 attacks); *see* also MWL069962 (MWL delegation to Chad); MWL069963 (MWL delegation to Sudan); MWL069984 and MWL069986 (MWL delegations to Germany and the U.S.).

[70] *See, e.g.*, MWL051310 (MWL Secretary General, asking the Ministry of Islamic Affairs for its decision regarding renovations of existing mosques and construction of several new mosques in the Balkans); MWL 051331 (MWL Secretary General soliciting guidance from Saudi Minister of State and Head of Cabinet of Council of Ministers).

[71] *See, e.g.*, JT-MWL 00616 (Saudi ambassador and Treasury, Foreign, and Islamic Affairs Ministries participate in MWL meeting resulting in a decision to recommend aid of sixty thousand riyals, through the Saudi embassy, to renovate a Brussels mosque); IIRO280442 (Saudi Islamic Affairs Minister provides approval to MWL Secretary General to provide non-cash assistance to a number of Islamic institutions abroad); Letter from MWL

58. The Saudi Supreme Council for Islamic Affairs issues guidelines concerning various relief activities the dawah organizations undertake.[72]

59. Local Saudi embassies direct, closely supervise, and participate in the operations of the dawah organizations' overseas branch offices.[73]

60. The Saudi government often purchases or leases property to house the operations of the dawah organizations.[74]

61. The operations of the dawah organizations outside of the Kingdom are often performed by committees comprised of members of the Saudi government and officers of the dawah organization.[75]

---

Secretary General Turki to Minister of Foreign Affairs (MWL Secretary General referring to Saudi decree approving budget for Madrid Islamic center and asking Saudi Foreign Minister to direct transfer of monies).

[72] *See, e.g.*, IIRO 280172-178 (Supreme Council recommendations regarding Burmese refuges in Bangladesh); Letter from Foreign Minister Saud al-Faisal to the Secretary of the Saudi King, with a copy to the King (Saudi Foreign Minister referring to the support of the Saudi embassy in Yemen for "a strategic plan by the Supreme Council for Islamic Affairs" regarding dawah efforts in Yemen); IIRO278760 (MWL Secretary General referring to relief aid for Sierra Leone approved by the Supreme Council for Islamic Affairs).

[73] *See, e.g.*, JT-MWL 00482 (Letter to MWL Deputy Secretary General directing that money be sent to the Kingdom's ambassador in Jakarta for deposit into an account to build a mosque, but stating "[i]f [the Ambassador] believes that there is a more worthy body, the matter is at his discretion."); MWL 007033-42 (deed of trust for MWL London office, including signatures of members of the Saudi embassy in London); JT-MWL 00616 (meeting minutes identifying the Saudi ambassador's participation in a MWL meeting resulting in decision to recommend aid to renovate mosque in Brussels); JT-MWL 00645 (minutes of meeting MWL General Secretariat Permanent Coordination Committee of Mosques, identifying the Saudi ambassador's participation in a meeting about mosque construction in France); MWL 052523 (MWL Secretary General's request to Saudi ambassador to Denmark to provide aid to new manager of MWL office in Denmark); MWL 052287 (MWL Deputy General emphasizing to Saudi ambassador to Madrid the need to assemble trustees for Islamic center in Spain, and advising that the MWL-managed Islamic center in Spain will be held in the name of the Saudi government).

[74] *See, e.g.*, MWL 007033-42 (deed of trust for MWL London office, including signatures of members of the Saudi embassy in London); JT-MWL-4556 to -4557 ("urgent" fax requesting transfer of ownership of land and building of Islamic center in Thailand into MWL's name, noting that the property certificate of ownership is at the Saudi embassy in Thailand); MWL051436 (regarding MWL coordination with Saudi Foreign Minister to establish mosque and Islamic center in Bern).

[75] *See, e.g.*, IIRO277786-277787 (Council of Ministers direction for all relief operations for Albanian refugees from Kosovo be coordinated by the Saudi Red Crescent Society and a committee comprised of officials from multiple Saudi ministries, along with MWL, IIRO, and AL Haramain); Al Jazeera, Order for Financial Assistance (July 31, 2001) (available at http://archive.al-jazirah.com.sa/2001jaz/jul/31/fr2.htm) (in addition to including MWL and WAMY members, King-decreed committee to coordinate educational efforts to "spread Sharia Science among Muslim minorities" included officials of the Education, Foreign, and Islamic Affairs Ministries); Letter from Foreign Minister Al-Faisal to Chief of Royal Court (Royal Order created a committee comprised of officials from MWL and the Saudi Ministries of Finance and Foreign Affairs to study and report back to the Kingdom regarding concerns about the MWL-managed Islamic Center in Brazil); Letter from Saudi Foreign Minister Al-Faisal to MWL Secretary General) (Royal decree created committee comprised of officials from MWL and the Saudi embassy to travel to Edinburgh, study the MWL-managed Islamic Center, and report its findings to the Saudi government); JT-MWL 00645 (Saudi ambassador and officers of Foreign and Islamic Affairs Ministries participate in committee meeting regarding mosque construction in France); MWL 051698 (MWL Secretary

62. The documents reviewed also demonstrate that the dawah organizations, themselves, have characterized the organizations as part of the Saudi government, and their activities as being undertaken on behalf of the Kingdom. The MWL Secretary General has expressed it this way: "[The King] and his government extend assistance and relief measures to Muslims . . . through the charitable institutions and organizations receiving state sponsorship, such as IIRO, WAMY, Al-Haramain, Saudi High Commission, [and others]."[76] Even the Taliban characterized the work of the dawah organizations as being on behalf of the Saudi government when the Taliban praised the King for aid to the Taliban through the MWL and IIRO.[77]

63. They routinely ask host countries to grant the dawah organizations diplomatic status, including requests for diplomatic passports and diplomatic license plates for vehicles used by the organizations.[78] Other nations have routinely granted the Kingdom's requests and extended diplomatic status to the dawah organization employees.[79]

**B. International Islamic Relief Organization (IIRO)**

64. As with my review of the MWL documents, my review of the documents, many from IIRO's own files, provides evidence of a substantial and controlling relationship between the Kingdom of Saudi Arabia and IIRO.

65. Though the Muslim World League conducts a variety of Islamic missionary and similar activities worldwide, according to former MWL Secretary General Dr. Ahmed Mohammed Ali, the MWL provides "humanitarian assistance" through the arms of a sub-branch of the group known as the International Islamic Relief Organization (IIRO) (a.k.a. Hayat al-Ighatha al-Islamiya, Islamic Relief Organization, IGASA).[80] The IIRO was established in 1978 and is headquartered in Jeddah, Saudi Arabia.[81] According to senior IIRO officials, the group operates more than 100 branch offices worldwide.[82]

---

General suggests to Chair of the Supreme Council for Islamic Affairs to form a committee comprised of officials from MWL, the Saudi embassy in Bern, and the Saudi Finance Ministry, to establish a mosque in Bern).

[76] MWL058868

[77] IIRO 096108, IIRO 096075-076, IIRO 096114

[78] See, e.g., MWL056784 (MWL Secretary General asks the Saudi King to grant diplomatic passports to managers of multiple MWL offices worldwide); MWL023251-23252 (MWL Secretary General asking Romanian President to recognize MWL's "diplomatic privileges on equal footing with its offices spread in Europe and Asia. . . .").

[79] See, e.g., MWL15878 (Philippine Foreign Affairs Secretary recognizing the MWL has "full diplomatic immunity identical to those you have in Malaysia and Indonesia"); MWL015876 (Philippine Foreign Affairs Secretary recognizing that MWL staff and offices enjoy diplomatic immunity).

[80] Ahmed, Iftikhar. "Counter anti-Islam propaganda, says MWL sec-general." Moneyclips. May 6, 1995.

[81] "IIRO – Welcome." http://www.arab.net/iiro.

[82] Declaration of Saleh Abdullah Al Saykhan, Manager of Financial Administration of the International Islamic Relief Organization. Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al. United States District Court for the District of Columbia. Civil Action No. 1:02CV01616.

66. The closely intertwined relationship between MWL and IIRO is a matter of extensive public record. MWL Secretary General Abdullah al-Obaid describes IIRO in his own sworn statement as "a subsidiary of the Muslim World League."[83] MWL employee and director of IIRO operations in Canada Arafat el-Asahi explained to Canadian investigators that MWL "is the mother organization of what is called IIRO, the Relief branch of the Muslim World League."[84] According to el-Asahi, "What happens is that sometimes the IIRO and the Muslim World League office is one, but sometimes they have two different offices, although the umbrella organization is the same, which is the Muslim World League."[85]

67. Similarly, the IIRO "annual report" for 2001-2002 notes, "the Board of Directors of IIROSA is headed by… [the] Secretary General of the Muslim World League. The IIROSA serves as the [MWL's] arm in matters relating to humanitarian activities such as relief, development, health care, education, and social welfare throughout the Muslim world . . . . The Secretariat General of IIROSA . . . submits periodic progress reports to the Constituent Council of the Muslim World League."[86]

68. IIRO is governed by a board of directors chaired by the Secretary General of MWL — who himself, according to IIRO financial manager Saleh al-Saykhan, "is nominated by the Saudi Arabian government."[87] In March 1999, IIRO Secretary General Adnan Basha specifically issued a directive to IIRO branch office managers in foreign countries that "close ties, cooperation, and collaboration should be kept with the Saudi embassy."[88]

69. In court papers, IIRO's lawyers have asserted that — exactly like its MWL corporate parent — the organization "is an instrumentality of the government of the Kingdom of Saudi Arabia."[89] When pressed on the issue of IIRO's precise relationship with the Kingdom of Saudi Arabia, Arafat el-Asahi repeatedly insisted:

> The IIRO is the relief branch of that organization [MWL] which means that we are controlled in all our activities and plans by the

---

[83] Declaration of Abdullah Bin Saleh al-Obaid. Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al. United States District Court for the District of New York. 03 CV 9849 (RCC).

[84] "Reasons for Order." The Minister of Citizenship and Immigration and Mahmoud Jaballah. Docket: DES-6-99. Federal Court of Canada. November 2, 1999. Pages 81-88.

[85] "Reasons for Order." The Minister of Citizenship and Immigration and Mahmoud Jaballah. Docket: DES-6-99. Federal Court of Canada. November 2, 1999. Pages 81-88.

[86] "Annual Report: 2001-2002." International Islamic Relief Organization (Muslim World League). The Kingdom of Saudi Arabia.

[87] Declaration of Saleh Abdullah Al Saykhan, Manager of Financial Administration of the International Islamic Relief Organization. Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al. United States District Court for the District of Columbia. Civil Action No. 1:02CV01616.

[88] "Memo to the External Offices Managers." March 16, 1999. IIRO in the Saudi Arabian Kingdom; the Secretary General's Office. Department: 1729.

[89] Defendant International Islamic Relief Organization's Amended Answer to Plaintiffs First Amended Complaint. In Re: Terrorist Attack on September 11, 2001 (Federal Insurance Company et al. v. Al-Qaida et al.). United States District Court for the Southern District of New York. Case No: 02 CV 6978 (RCC).

> Government of Saudi Arabia. Keep that in mind, please… I am paid by my organization which is funded by the [Saudi] government. Let me tell you one little thing. Whenever the Saudi Embassy in Ottawa required anything, to ask about any Muslim project all over Canada, they come to us. They ask us about the people who are doing this project. Whatever we say is acceptable, fully acceptable, by the Saudi Embassy and by the government of Saudi Arabia… The Government of Saudi Arabia, I am stating, is our government. We work for it. Whatever the government does and its attitude toward Ossama Bin Laden and other people, that is our attitude, too.[90]

70. Several Guantanamo Bay detainees have also testified before the Pentagon's Administrative Review Board that they had worked as "government employee[s] of a charitable organization . . ., the IIRO, International Islam Relief Organization."[91] In the summer of 2001, Saudi Guantanamo detainee Ghanim Abdul Rahman al-Harbi reportedly worked in IIRO's finance department in the city of Dammam. According to al-Harbi, "I worked as an official worker there . . . . I was employed by the [Saudi] government under training there."[92] Likewise, when questioned about his knowledge of charitable organizations, Somali Guantanamo detainee Mohammed Hussein Abdallah acknowledged working on behalf of "Haiat Al-Ighata [a/k/a IIRO], which is another organization that belongs to the Saudi government."[93]

71. Guantanamo detainee Abdullah Ibrahim al-Rushaydan told Pentagon officials during his own ARB hearing:

> I was an employee of the International Aid Organization (Al Hayaa Al Ighathiya)… under the [Saudi] Ministry of the Interior… it is a government organization managed by Dr. Adnan Basha who holds the rank of Minister. And Al Hayaat Al Ighatha Al Islamiya Al Aalamiya [IIRO] is a government organization under the Islamic World League [MWL] and all charity organizations are under the Senior Director for charity organizations… who is the Saudi Minister of Interior… it is official and governmental.[94]

72. Just as with MWL, documents produced in this litigation by IIRO and other defendants, along with other available documents about IIRO, show that – like the umbrella organization over IIRO – IIRO is nearly exclusively dependent on the Kingdom of Saudi Arabia for its financial support.

---

[90] "Reasons for Order." The Minister of Citizenship and Immigration and Mahmoud Jaballah. Docket: DES-6-99. Federal Court of Canada. November 2, 1999. Pages 81-88.

[91] http://www.dod.gov/pubs/foi/operation_and_plans/Detainee/csrt_arb/Set_44_2922-3064.pdf. Pages 103-104.

[92] http://www.dod.mil/pubs/foi/operation_and_plans/Detainee/csrt_arb/ARB_Transcript_Set_7_20497-20750.pdf. Pages 46-47.

[93] http://www.dod.gov/pubs/foi/operation_and_plans/Detainee/csrt_arb/Set_15_1318-1362.pdf. Pages 4-5.

[94] http://www.defenselink.mil/pubs/foi/detainees/csrt/ARB_Transcript_Set_2_585-768.pdf. Page 85.

73. According to IIRO financial manager Saleh al-Saykhan, "since 1987 . . . the IIRO has received an annual grant of 1 million Saudi Riyals (in two semi-annual installments of SR 500,000) from the Special Committee of the Council of Ministers, which I understand to be a department of the Saudi Arabian government chaired by Prince Sultan . . . . The Special Committee extended three additional grants to the IIRO in 1998, totaling 5 million Saudi Riyals . . . . These three grants were directed to the IIRO through the Office of the Western Command of the Saudi military."[95]

74. Indeed, according to IIRO Canada branch office director Arafat el-Asahi, as of 1999, IIRO reportedly received 70% of its charitable funding directly from the Saudi government.[96] In the words of former MWL Secretary General Dr. Ahmad Muhammad Ali as published in a 1995 media interview, "[M]uch of [IIRO's] funding has been made possible by financial assistance from the Saudi government."[97] The 2001-2002 IIRO annual report trumpets the "wholehearted support and encouragement" the charity has received "from the people of Saudi Arabia, above all, King Fahd, the Custodian of the Two Holy Mosques, HRH Crown Prince, Prince Abdullah, the Deputy Premier and Commander of the National Guard, HRH Prince Sultan, the Second Deputy Premier and Minister of Defense and Aviation, the entire royal family."[98]

75. Between 1992 and 1998, IIRO held numerous high profile fundraising events in Saudi Arabia, along with IIRO's own internal investment arm Sanabel al-Kheer. As suggested above, many of the largest donations to the two charities reportedly came directly from the Saudi royal family:

- In July 1992, IIRO sponsored a fundraising drive in Jeddah for the Muslims of Bosnia. The conference was inaugurated by the acting Governor of Mecca, who was also the acting chairman of Sanabel al-Kheer. Over SR19 million was collected in one day. The largest single donors reportedly included the governor himself and Bakr Bin Laden. Several months later, Sanabel al-Kheer reported that it had transferred SR12 million collected on July 5 directly to IIRO to underwrite its "charitable operations" in the Balkans.[99]

- In December 1993, IIRO held another yearly fundraising drive inside Saudi Arabia to help support embattled Bosnian Muslims. IIRO collected an additional SR15 million, which put the organization on a base capital level of nearly SR82 million.

---

[95] Declaration of Saleh Abdullah Al Saykhan, Manager of Financial Administration of the International Islamic Relief Organization. Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al. United States District Court for the District of Columbia. Civil Action No. 1:02CV01616; IIRO 227909-910; IIRO 277919.

[96] "Reasons for Order." The Minister of Citizenship and Immigration and Mahmoud Jaballah. Docket: DES-6-99. Federal Court of Canada. November 2, 1999. Page 13.

[97] "Prince Salman Opens Fundraising Campaign for IIRO." Info-Prod Research (Middle East) Ltd. – Middle East News Items. February 28, 1995.

[98] "Annual Report: 2001-2002." International Islamic Relief Organization (Muslim World League). The Kingdom of Saudi Arabia.

[99] "Islamic Intn'l Relief Organization receives SR12m for Bosnia fund." The Saudi Gazette. February 11, 1993.

The Governor of Mecca spoke again as an honorary trustee and noted "the continuous support and encouragement of the Custodian of the Two Holy Mosques King Fahd" in promoting IIRO operations.[100]

- In February 1994, IIRO organized another annual Sanabel Al-Kheer fundraising convention in Riyadh. During the traditional opening speech, the Governor of Riyadh told of how he had personally solicited "donations from a number of benevolent Saudi people" for Sanabel and IIRO totaling SR6,979,462.[101] Over SR3.7 million was raised in the Saudi Cultural Festival Palace for IIRO/Sanabel. The royal function was attended by Shaykh Abdulaziz bin Baz (General Mufti of Saudi Arabia).[102] A few months later, IIRO officials stated that in the year 1994, the charity had raised more than SR90 million from wealthy benefactors in Saudi Arabia.[103]

- On February 23, 1995, IIRO held its eighth annual charity festival in Riyadh in conjunction with Sanabel al-Kheer. Donations totaling SR8 million ($2.13 million) included SR1 million from the Governor of Riyadh and at least another SR1 million from other senior Saudi officials.[104]

- On February 5, 1996, the IIRO and Sanabel Al-Kheer annual fundraising drive raised more than SR6 million at the Cultural Palace in Riyadh. Large donations included: SR1 million from the Governor of Riyadh; SR1 million from the Deputy Governor of Riyadh; and, SR10,000 from Shaykh Abdulaziz Bin Baz.[105]

- In December 1998, at the 12th annual Sanabel al-Kheer/IIRO charity drive, IIRO netted over SR6 million, including: SR5 million from the Saudi Second Deputy Premier and Saudi Defense Minister; SR1 million from the Governor of Riyadh; and, SR10,000 from Shaykh Abdulaziz bin Baz.[106]

76. Nor did Saudi government relationship with IIRO slacken in the immediate wake of the September 11, 2001 terrorist attack and allegations that the charity had helped support Al-Qaida's operations globally. The 2001-2002 IIRO annual report confirms the continued involvement of numerous Saudi government officials in the funding and operations of myriad IIRO offices.[107]

---

[100] Bashir, Abdul Wahab. "IIRO raises SR15m in-funds." Arab News. December 22, 1993.

[101] "Saudis back fund-raising for Bosnian Muslims." The Saudi Gazette. February 26, 1994.

[102] Hassan, Javid. "Riyadh Governor Prince Salman donates SR1m to IIRO." Arab News. February 23, 1994.

[103] "IIRO marks eight anniversary." Riyadh Daily. January 12, 1995.

[104] Saberi, Mahmood. "SR8 million raised for IIRO at Sanabel Al-Khair drive." Saudi Gazette. February 23, 1995.

[105] Awkasho, Rashad. "SR6m raised in three hours at Sanabel Al-Khair drive." Saudi Gazette. February 5, 1996.

[106] Khan, M. Ghazanfar Ali. "SR6m collected at Sanabel Al-Khair." Arab News. December 24, 1998.

[107] "Annual Report: 2001-2002." International Islamic Relief Organization (Muslim World League). The Kingdom of Saudi Arabia.

77. IIRO officials in both Saudi Arabia and elsewhere have gone out of their way to insist that IIRO is highly centralized and that branch offices are rendered incapable of independent action, especially if it appears to violate the Saudi government's agendas. The 2001-2002 annual report characterizes IIRO globally as "an indivisible entity and its secretariat general, domestic and external branch offices are guided by the designated mission, policies, aims, regulations, and rules."[108]

78. The close coordination between IIRO's headquarters in Saudi Arabia and its various branches is demonstrated by the history of its regional office in the U.S., founded in July 1991 in Falls Church, Virginia. The branch was officially established by Dr. Sulaiman bin Ali al-Ali, a member of IIRO's Executive Committee in Saudi Arabia and a member of the ruling Shura (Consultative) Council of the Kingdom of Saudi Arabia.[109]

79. According to associates of al-Ali later interviewed by U.S. Immigration and Customs Enforcement (ICE) agents, when al-Ali arrived in the United States, he "was working for the Saudi Arabian government."[110] The application for tax exemption filed by IIRO's American branch with the IRS explains that al-Ali was employed by IIRO in Saudi Arabia as a "fulltime fundraiser" starting in June 1990. According to the application, "We are very fortunate to have as our Executive Director Mr. Suliman Al-Ali . . . . Mr. Al-ali's most recent pledge program for International Islamic Relief Organization (IIRO) netted about $500,000."[111] The application also specifies the previous program spearheaded by al-Ali was "supported in part by the Saudi government."[112]

80. IIRO's regional director in Canada Arafat el-Asahi grew adamant after being asked whether all of the charity's offices subscribed to the same tenets and governance: "I know about the general policy and the rules and objectives of the organization which nobody is allowed to go beyond. Everybody has to abide by the rules and the principles of Islam and is contrary to the principles of Islam... The [IIRO] office, like any other office in the world, here or in the Muslim World League, has to abide by the policy of the Government of Saudi Arabia. If anybody deviates from that, he would be fired; he would not work at all with IIRO or with the Muslim World League."[113]

---

[108] "Annual Report: 2001-2002." International Islamic Relief Organization (Muslim World League). The Kingdom of Saudi Arabia.

[109] IIRO was originally organized as International Relief Organization in the U.S on July 22, 1991. On February 18, 1992, International Islamic Relief Organization was formed. The two organizations are one-and-the-same, and therefore will be referred to as IIRO herein. Virginia Secretary of State, Corporate Record, International Relief Organization and International Islamic Relief Organization. See also: http://www.saudiembassy.net/gov_profile/shura00.html. November 6, 2002.

[110] ICE interview of Soliman Biheiri by S.A. David Kane. June 15, 2003.

[111] Application for Recognition of Exemption under Section 501(c)(3) of Internal Revenue Code. International Relief Organization, Inc. October 25, 1991.

[112] Application for Recognition of Exemption under Section 501(c)(3) of Internal Revenue Code. International Relief Organization, Inc. October 25, 1991.

[113] "Reasons for Order." The Minister of Citizenship and Immigration and Mahmoud Jaballah. Docket: DES-6-99. Federal Court of Canada. November 2, 1999. Pages 81-88.

81. El-Asahi's understanding of the tightly-knit relationship between IIRO's headquarters in Saudi Arabia and its various worldwide branch offices is also reflected in a March 1999 50-point memo to "External Offices Managers" from then-IIRO Secretary General Adnan Basha. On the administrative side, Basha's memo instructs branch managers to file "monthly reports on the office's performance, plans, projects, and employees" with the General Secretary in Riyadh.[114] IIRO employees are flatly forbidden from attending "any convention, course, or activity without receiving prior written permission from the Secretary General, and one must undertake to submit a written report when receiving permission to attend."[115] The Secretary General insisted that even IIRO branch office contracts limited merely to "moral obligations" must nonetheless be authorized "with the prior written consent of the Secretary General."[116]

82. As with the Muslim World League, the rules laid down by IIRO's senior leadership in Saudi Arabia for overseas branch office managers are even more explicit and strict in issues of finance and fund disbursements. Any written requests for financial aid received by branch offices must be sent along to the General Secretary, along with any recommendations from the branch manager.[117] Branch offices are also forbidden from opening any bank account or withdrawing any office funds or capital "for any reason, without prior written consent from the IIRO Secretary General."[118] Like MWL, these rules apply equally to funds dispatched from IIRO headquarters in Saudi Arabia, as well as any "income funds from projects that finance themselves" or "local donations" contributed directly to the branch office.[119]

83. In examining the internal corporate documents about IIRO, as with MWL, I found the documents to evidence not only that IIRO was controlled by the Saudi government by its financial dependence, but other factors evidenced the substantial and controlling relationship between the Kingdom of Saudi Arabia and IIRO.

84. Just as with MWL, the IIRO documents indicate that when the Kingdom allocates funds to IIRO, it is government funds from government accounts. In a demonstrative example of the familiarity with how funds are transferred from Saudi embassy accounts to IIRO accounts, the IIRO branch manager asked the Ministry of Islamic Affairs' local representative at the Saudi

---

[114] "Memo to the External Offices Managers." March 16, 1999. IIRO in the Saudi Arabian Kingdom; the Secretary General's Office. Department: 1729.

[115] "Memo to the External Offices Managers." March 16, 1999. IIRO in the Saudi Arabian Kingdom; the Secretary General's Office. Department: 1729.

[116] "Memo to the External Offices Managers." March 16, 1999. IIRO in the Saudi Arabian Kingdom; the Secretary General's Office. Department: 1729.

[117] "Memo to the External Offices Managers." March 16, 1999. IIRO in the Saudi Arabian Kingdom; the Secretary General's Office. Department: 1729.

[118] "Memo to the External Offices Managers." March 16, 1999. IIRO in the Saudi Arabian Kingdom; the Secretary General's Office. Department: 1729.

[119] "Memo to the External Offices Managers." March 16, 1999. IIRO in the Saudi Arabian Kingdom; the Secretary General's Office. Department: 1729.

embassy in Jakarta to quickly transfer funds from an embassy account to IIRO's account so that IIRO could make timely payments to contractors performing renovations there. [120]

85. IIRO documents also show that the Kingdom exerts control over IIRO through its involvement at every level of the organization's governance.

86. The Kingdom appoints senior officers of IIRO as well as officials in the local offices. In a series of documents about the appointment of Farid Qurashi as IIRO's new Secretary General, the documents show that the Saudi King and ministers not only approved Qurshi's initial secondment to IIRO (he was also a member of the Education Council at King Abdul Aziz University), but also issued a royal decree renewing his secondment to IIRO.[121]

87. The Ministry of Islamic Affairs, which has primary responsibility for supervising and directing operations and activities of IIRO and other dawah organizations, appoints individuals to managing positions of IIRO.[122] In addition to controlling the most senior posts in IIRO, the Saudi government is able to dominate local leadership by controlling the candidates considered for posts.[123] In some instances – for example, in the case of 'Abd as-Samd Muhammad al-Barada'ei al-Ansari, who was appointed to head IIRO's office in Albania – the appointment resulted not just from the Ministry of Islamic Affairs' recommendation. The Ministry seconded al-Ansari, agreeing to pay his salaries and allowances while he worked for IIRO.[124]

88. Senior Saudi government officials are also embedded within IIRO's governing bodies, both in the Kingdom and locally. For example, IIRO's Board includes senior Saudi government officials, such as Sheikh Mostafabin Mohamed Idris, a Royal Court Advisor and Acting head of the Special Committee of the Council of Ministers.[125] Its control on the local level is similar. For example, the religious affairs attaché at the Saudi Embassy in Addis Ababa chairs the committee supervising the IIRO's branch office in Ethiopia;[126] and the chancellor at the Pakistan embassy directs the local IIRO office.[127]

89. As with MWL, Saudi embassies, under the supervision of the embassies' Islamic Affairs division, direct and supervise IIRO's overseas activities. IIRO carries out much of its

---

[120] IIRO 277332 – 277333; 277336

[121] *See* IIRO 0338581, 338582, 338583, 338585, 338586, 338587, 338588.

[122] IIRO 287527-36 (candidate proposed to manage IIRO office in Mecca because he was recommended by the Ministry of Islamic Affairs); IIRO 280436 (Ministry of Islamic Affairs proposes candidate to manage "Islamic Center named after King Faisal").

[123] *See, e.g.*, IIRO 284778; IIRO 284811 (the charge d 'affairs at the Saudi embassy in Thailand also heads the IIRO's office in Thailand); IIRO 284663 (the religious affairs attaché at the Saudi Embassy in Addis Ababa is the chair of the committee supervising IIRO's branch office in Ethiopia); IIRO 111814-15 (the chancellor at the Saudi embassy in Pakistan is also Director of the local IIRO office there).

[124] IIRO 287341

[125] MWL IIRO 16233-37 and 16243-46

[126] IIRO 284663

[127] IIRO 111814-15

activities with the cooperation of the Saudi embassy and typically through a joint committee. The committee invariably consists of IIRO, embassy personnel, and often with Saudi Ministry involvement.[128] IIRO Secretary General Adnan Basha has explained that, when IIRO cooperates as part of a joint committee with the Saudi embassy, it operates under the supervision of the Saudi embassy.[129] In a letter from IIRO's Director of the Overseas Offices Administration, the IIRO director wrote to all managers of IIRO overseas offices to remind them "of the necessity of cooperation and coordination with the brothers in charge" in the host country, including the religious attaché within the Saudi Embassy, the Muslim World League representative or manager, and the director, envoy, or representative of the Al Imam Muhammad Bin Saud Islamic University.[130]

90. Saudi government supervision, guidance, and regulation exerted over IIRO is the same as described for MWL.[131] As with MWL, the Saudi government regulated all aspects of its operations, including, for example, when and where it could collect donations[132] or perform dawah activities,[133] and even whether to open or close IIRO offices.[134]

91. The Kingdom also exercise authority over the activities and projects undertaken by the IIRO. For example, one IIRO report references an aid project that IIRO executed per the King's directive to "distribute relief items to the needy Afghanis," authorizing the IIRO to perform the task "under the supervision of [the Saudi] embassy in Afghanistan (Kabul)."[135] Another royal decree approved a recommendation of the Saudi Supreme Council for Islamic Affairs that the IIRO operate the Islamic College in Thailand.[136]

---

[128] IIRO 120169; see also IIRO 129743-44 (IIRO Secretary General administrative decision establishing a committee to manage the office in Mauritania, including on the committee the embassy supervisor of Islamic Affairs); IIRO 287198 (committee to manage activities at IIRO's office in Chad included supervisor or the Islamic "File" [sic] at the Saudi embassy").

[129] IIRO 120169.

[130] IIRO288031]

[131] *See, e.g.*, IIRO277786-277787 (Saudi Council of Ministers directing all relief operations to Albanian refugees from Kosovo to be coordinated by a committee that includes officials of multiple Saudi Ministries and MWL, IIRO, Al Haramain, and the Saudi Red Crescent Society).

[132] IIRO 283369 (Ministry of Islamic Affairs Eastern Province instructed all dawah organizations, including IIRO, to "remove all donation collection kiosks (and mobile offices) located in front of shops, malls and bakeries. Donation collection is limited to the offices' headquarters and bank accounts");

[133] IIRO 283387 (Instruction from the Ministry of Islamic Affairs to the IIRO not to carry out dawah activities in mosques).

134 IIRO 280045 (Saudi Embassy initiating inquiry to IIRO Secretary General regarding opening an IIRO office in Yemen); IIRO 284660 (inquiry into opening office in Jordan from Saudi ambassador in Palestine); IIRO 96423 (letter from IIRO Secretary General Adnan Basha to Deputy Foreign Minister of Political Affairs Supervisor, regarding the shutdown of the IIRO's branch office in Makhachkala).

[135] IIRO 14955-57

[136] IIRO 280522.

92. In IIRO's own documents, IIRO officials recognize that IIRO's actions are the Kingdom's actions. IIRO Secretary General Basha has explained that IIRO's activities are based on institutional activity, under the supervision of boards, and that IIRO has "no room for personal initiative."[137] In a letter from Secretary General Basha to the Saudi Minister of Islamic Affairs, emphasizing the value in coordinating IIRO's activities with the Ministry, Basha acknowledged that the efforts of IIRO are attributable to the Kingdom, just as are the actions of the Ministry.[138] Abd Allah Bin al-Muhsin at-Turki, MWL Secretary and head of IIRO's board, similarly recognized that sentiment. At a conference, Turki attributed the work of IIRO and other dawah organizations to the Kingdom, commenting that *the Saudi government extended aid and relief to Muslims through charitable institutions* and organizations receiving state sponsorship, such as the IIRO and others.[139]

93. IIRO's documents include assertions, just as MWL did, that IIRO offices are entitled to diplomatic status. For example, Secretary General Basha made requests for diplomatic plates on IRO vehicles, "similar to the exemption granted by the Ministry of Foreign Affairs to the WAMY office in India."[140] IIRO's 1998 Annual Report included reference to certain IIRO overseas branches receiving diplomatic status in the host country.[141] In a letter to the MWL office manager in Mauritania, IIRO General Supervisor Dr. Fareed Yaseen Qurashi advised that, "under the agreement between the venerable government of Mauritania and the [IIRO], all foreign employees at [IIRO] have diplomatic protection.[142]

### C. Al-Haramain Islamic Foundation (Al-Haramain)

94. As with my review of the documents pertaining to other dawah organizations, the available information pertaining to Al Haramain suggests that its relationship with the Kingdom of Saudi Arabia was not significantly different from the relationship seen pertaining to MWL and IIRO – namely, Al Haramain was substantially funded by the Kingdom and the same control mechanisms appears to have applied to Al Haramain as to MWL and IIRO.[143]

95. The Al-Haramain Islamic Foundation was a Saudi non-profit dawah organization that has engaged in various forms of religious propagation and related work around the world. At the height of its operations, it had over 40 international branches working in over fifty countries,

---

[137] IIRO 285033.

[138] IIRO 112079

[139] MWL 058868

[140] IIRO 285013

[141] IIRO 000199

[142] IIRO 001185,

[143] The volume of documents from Al Haramain's headquarters in Riyadh relative to the issue of the organization's relationship with the Kingdom was modest when compared to the volume for other dawah organizations, like MWL and IIRO. This was, no doubt, a consequence of the Al Haramain's headquarters' office in Saudi Arabia being closed and all of its documents being seized by the Saudi government. Counsel for plaintiffs have advised me that none of the documents seized from the Al Haramain headquarters in Riyadh have been produced in discovery, and that the headquarters has defaulted in the litigation.

and in 1999 spent more than $61 million on various projects worldwide.[144] Al-Haramain also maintained a presence and local offices in the continental United States; primarily, in the states of Missouri and Oregon.

96. All Al-Haramain offices are officially closed. In a series of moves that included the United States, the United Nations, and the Kingdom of Saudi Arabia, initially only certain offices were shut down. But eventually, by June 2004 the Kingdom agreed to shutter and dissolve the headquarters office in Saudi Arabia. That is, itself, indicative of the Kingdom's control over the organization. The United States office, after facing criminal charges in Oregon federal court, eventually agreed to terms related to the proceedings that resulted in the formal shell of the U.S.-branch office of Al Haramain formally dissolving on July 27, 2016.

97. An overwhelming degree of evidence indicates that Al-Haramain was controlled by the Saudi Ministry of Islamic Affairs and funded by the Saudi government and Saudi officials. Indeed, in annual reports filed by Al Haramain' s Bangladesh office in 2001 and 2002, Al Harmain states "The Organization is operating under the supervision of the Saudi Ministry of Islamic Affairs."[145]

98. According to Al-Haramain's former website www.alharamain.org, the "superintendent of all Foundation activities" is Shaykh Saleh Ibn Abdul-'Azeez Aali Shaykh, the Saudi Minister of Islamic Affairs, Endowments, Call and Guidance.[146] In a sworn affidavit, senior Al-Haramain official Khalid bin Obaid Azzahri confirmed, "Al-Haramain operates under the supervision of the Saudi Minister of Islamic Affairs, who appoints its Board of Directors and senior management personnel."[147]

99. The 9/11 Commission staff assigned to the investigate of the September 11, 2001 terrorist attacks on the United States concluded in their monograph on terrorist financing, "Although both the Saudi government and al Haramain say that it is a private organization, al Haramain has considerable ties to the Saudi government. Two government ministers have supervisory roles (nominal or otherwise) over al Haramain, and there is some evidence that low-level Saudi officials had substantial influence over various [Al-Haramain] offices outside of Saudi Arabia."[148]

100. The former "General Director" of Al-Haramain, Shaykh 'Aqeel Ibn 'Abdul-'Aziz Al-'Aqeel stated on several occasions that Al-Haramain operates only with the explicit permission

---

[144] "Saudi Arabia's top Islamic charity denies any of its assets frozen." Agence France Presse. March 13, 2002.

[145] AH 00596-639 and AH 00599.

[146] http://www.alharamain.org/alharamain/eng/inner.asp?order=1&num=1. See also: http://www.alharamain.org/english/ourobjectives.htm. January 27, 2002.

[147] Affidavit of Khalid bin Obaid Azzahri. In Re: Terrorist Attack on September 11, 2001 (Thomas E. Burnett Sr. et al. v. Al Baraka Investment and Development Corporation). United States District Court for the Southern District of New York. Case No: 03 CV 9849 (RCC).

[148] Roth, John, Douglas Greenburg, and Serena Wille. "Monograph on Terrorist Financing: Staff Report to the Commission." National Commission on Terrorist Attacks upon the United States.

and the Islamic mandate of the Kingdom of Saudi Arabia. Interviewed in the Washington Post, Al-'Aqeel explained, "We work under the supervision of the Saudi government."[149] Promotional materials and Al-Haramain's own website offer examples of how the Saudi government has used its influence to assist and guide the charity.

101. In a letter dated May 1, 1999, published under the official letterhead of the Saudi embassy in Albania and addressed to Saudi Minister of Islamic Affairs, Shaykh Saleh Shaykh offers "appreciation and praise for the efforts of Al-Haramain Foundation in the Albanian Republic . . . We thank you for the cooperation of the Foundation in Albania with the Embassy of the Custodian of the Two Holy Mosques, King Fahd Ibn Abdul-Aziz — may Allah preserve him. If anything, this indicates the deep ties among Saudi society both governmentally and with its people."[150]

102. Likewise, on August 25, 2002, Al-Haramain's website published an article on the charity's activities in East Africa, highlighting the key role played by local Saudi diplomats: "The Africa Committee in Al-Haramain Charity Foundation conducts numerous urgent relief projects in Kenya . . . under direct supervision from the Embassy of the Servant of the Land of The Two Holy Mosques in Kenya."[151]

103. Al-Haramain's own lawyer has similarly confirmed that Al-Haramain's activities, including those outside of the Kingdom, were directed by Saudi officials, explaining that funds that Al-Haramain "collected and transferred on behalf of the Chechnya refugees were part of a Saudi government project" approved "at the highest levels" of the Saudi government.[152]

104. Available information also reveals that meetings of senior Al-Haramain officials were conducted at government offices of the Saudi Ministry of Islamic Affairs. For example, in March 2003, Al-Haramain announced on its official website the "establishment of an Administrative Board which held its first meeting on Tuesday 24 of Dhul-Hijjah in the office of his eminence the Minister of Islamic Affairs, Endowments, Call and Guidance and the General Supervisor of the Foundation and under his chairmanship. This was announced by [Al-Haramain's] Director General, Sh. 'Aqeel Al-'Aqeel."[153]

105. It is also inescapable that Al-Haramain was funded almost entirely through donations from inside the Kingdom of Saudi Arabia, including from government grants and contributions of Saudi officials. Former Al-Haramain chief Aqeel al-Aqeel openly acknowledged

---

[149] "How Jihad Made Its Way to Chechnya Secular Separatist Movement Transformed by Militant Vanguard." Washington Post. April 26, 2003.

[150] "REPORT NO: 12 - A Letter of Commendation." Report from the Al-Haramain Foundation; Tirana, Albania. May 1, 1999. http://kosova.hypermart.net/harameen.html.

[151] http://www.alharamain.org/AR/Contents.aspx?AID=746&HL=1&Q=. February 2003.

[152] Letter from Lynne Bernabei (Bernabei & Katz, PLLC) to R. Richard Newcomb (Office of Foreign Assets Control, U.S. Treasury Department). Dated May 14, 2004. Subject: "Re: Al-Haramain Islamic Foundation, Inc. SDG #305 (License Request Pending)."

[153] http://www.alharamain.org/alharamain/eng/inner.asp?order=1&num=1. April 2003.

in an interview with Asharq al-Awsat that over 95% of Al-Haramain's funding was coming directly from Saudi Arabia.[154] Much of this funding ran through senior Saudi government officials. On November 12, 2002, a fundraising event in Riyadh co-sponsored by Al-Haramain was attended by, among others: the Governor of the Riyadh region, the Grand Mufti of Saudi Arabia, the Minister of Islamic Affairs, and Al-Haramain director Shaykh 'Aqeel Ibn 'Abdul-'Aziz Al-'Aqeel.[155] Less than two weeks later, the Governor of the Mecca Region, pledged a contribution of approximately $40,000 during another joint fundraiser organized by Al-Haramain.[156] During the same month, the Governor of the Eastern region of Saudi Arabia was reportedly a featured guest at yet another joint charitable function organized in November 2002 by Al-Haramain, where he pledged a donation of over $250,000 and delivered a speech to attendees congratulating the assistance "given by the government of the Kingdom of Saudi Arabia under the leadership of...King Fahd Ibn Abdul Aziz, Crown Prince Abdullah Ibn Abdul Aziz and Prince Sultan Ibn Abdul Aziz, Second Deputy Prime Minister and Commander of the National Guard to charities and charitable deeds."[157]

106. Al-Haramain has posted endorsements from at least two prominent Saudi religious officials on its English-language website. Among these, an "attestation" written by the former supreme religious authority in Saudi Arabia, Shaykh Abdulaziz Bin Baz, dated April 15, 1999: "I attach for you a check in the amount of 10,000 Riyals to assist [Al-Haramain] in its charitable work. May Allah accept your efforts, multiply your reward and bless you in your work for indeed He is Most Generous and Most Kind."[158] Similarly, Shaykh Mohammed Al-Uthaimeen, a lecturer at the Imam Muhammad bin Saud Islamic University and a member of the Council of Senior Scholars of the Kingdom of Saudi Arabia wrote in an endorsement dated October 22, 1998: "I was very pleased with what the Foundation has done both domestically and internationally just as I was pleased with the opening of the breasts of the brothers who accepted Islam. I ask Allah (SWT) to make all of them firm and to provide us with sincerity and correct action."[159]

107. Al-Haramain's own employees have also confirmed their understanding that al Haramain was a governmental arm, and that they were themselves Saudi government employees in their roles working for Al-Haramain.

108. Detainees captured in Afghanistan and transferred to U.S. military custody in Guantanamo Bay, Cuba have repeatedly insisted that, as Al-Haramain employees, they were working in the direct employ of the Kingdom of Saudi Arabia. For example, Guantanamo Bay detainee Yemeni national Jamal Mohammed Alawi Mar'i complained bitterly during a Pentagon Administrative Review Board hearing, "The Al Haramayn organization is a governmental agency.

---

[154] "Interview with Aqil al-Aqil, general manager of the charitable Al-Haramayn Foundation." Al-Sharq al-Awsat (London). March 16, 2002.

[155] "Prince Salman patronizes charity ceremony." Saudi Press Agency. November 12, 2002.

[156] Ain Al-Yaqeen. November 29, 2002.

[157] Ain Al-Yaqeen. November 29, 2002.

[158] http://www.alharamain.org/english/ourobjectives.htm. January 27, 2002.

[159] http://www.alharamain.org/english/ourobjectives.htm. January 27, 2002.

How [can] it [be] classified as non-governmental and the person in charge is the Minister of the Muslim Association [Islamic Affairs]."[160] Another Jordanian national held in Guantanamo was equally indignant when it came to charges that Al-Haramain was involved in supporting terrorist activities: "If you consider al-Haramayn as a terrorist organization you should [be] talking to Saudi Arabia, because Saudi Arabia was the country that established al-Haramayn… This is something you need to take up with Saudi Arabia."[161]

109. Yet another Guantanamo prisoner from Saudi Arabia, Wasm Awaad al-Wasm al-Omar, offered a similar excuse for "cooperating" with Al-Haramain "in my country [Saudi Arabia]."[162] Al-Omar insisted, "Al Haramain is an official governmental organization, registered under the administration of the government in the Kingdom of Saudi Arabia. It is officially registered and included in the Humanitarian Aid Association, and under the Administration of Internal Affairs, led by the Minister of Internal Affairs… so why are they called a non-governmental organization?"[163]

110. In addition to the evidence indicating that the Saudi state funded and controlled Al-Haramain, the evidence also indicates that Al-Haramain's headquarters office in Saudi Arabia controlled the various branch offices worldwide, with Al-Haramain functioning as a single worldwide organization.

111. Al Haramain's headquarters in Saudi Arabia and the various branch offices held themselves out as being a single entity. For example, dozens of different publications produced by Al-Haramain were marked with both the logo and address of the U.S. office of the charity, as well as its Saudi headquarters.

112. In public interviews, Al-Haramain's longtime "General Director" Shaykh Aqeel al-Aqeel has repeatedly insisted that the activities of the charity were "under tight administrative and financial control."[164]

113. According to the U.S. Treasury Department, "activities within the branches" of Al-Haramain "took place under the control of Aqeel Abdulaziz Al-Aqil, the founder and long-time leader of [Al-Haramain]… As [Al-Haramain]'s founder and leader, Al-Aqil controlled [Al-Haramain] and was responsible for all [Al-Haramain] activities."[165]

114. In 2003, an Arabic-language post appeared on Alsaha.fares.net purporting to be a letter from former senior Al-Haramain official Mansour al-Kadi. Al-Kadi's public statement

---

[160] http://www.dod.gov/pubs/foi/detainees/csrt_arb/Set_4_0320-0464.pdf. Page 131.

[161] http://www.dod.gov/pubs/foi/detainees/csrt_arb/Set_26_1848-1900.pdf. Pages 21-22.

[162] http://www.dod.gov/pubs/foi/detainees/csrt_arb/Set_49_3298-3380_Revised.pdf. Page 26.

[163] http://www.dod.gov/pubs/foi/detainees/csrt_arb/Set_49_3298-3380_Revised.pdf. Pages 21, 23.

[164] "Noose tightens around Islamic charities in Gulf." Agence France Presse. October 3, 2001.

[165] "Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters; Treasury Marks Latest Action in Joint Designation with Saudi Arabia." Office of Public Affairs; U.S. Treasury Department. June 2, 2004.

lambasted "the autocratic administration in power" within Al-Haramain's headquarters in Saudi Arabia that has "caused problems and handicaps."[166] According to al-Kadi:

> The main reason behind [my] resignation was the autocratic and centralist governance of the organization. Despite the growth and spread of the organization, all benefits are centered solely in the hands of one man Sheikh Aqil bin abdul Aziz al-Aqil the General Manager of the foundation and due to this there has been several administrative and financial mistakes. Therefore as result of this centralistic order (and it must be added that the General Manager is the only individual with final decision making on spending)... I myself headed the African committee for six years, then the Asian Committee for about two years, and we used to always be warned in meetings of the committee (usually attended by 8-12 members) to format the requests in a way to the liking of the General Manager so they would not be denied!! The General Manager has repeatedly withheld the release of funds as he pleased.[167]

115. Al-Kadi grumbled, "It got to a point where I had to write to the General Manager to convince him to allow the Asian committee to hire only one employee for 150,000 riyal!!"[168] He repeated, "I again state that the General Manager bears the sole responsibility in this lack as he is the one with the authority to hire employees, even if it is just a janitor."[169] One of the reasons cited for al-Aqeel being eventually dismissed from his position as head of Al-Haramain in 2004 was his "absolute centralization" of Al-Haramain.[170]

116. Evidence of the Saudi headquarters' control over the U.S. branch office of Al-Haramain is demonstrative. In October 1997, Al-Haramain "General Director" Aqeel al-Aqeel signed a Power of Attorney writ on behalf of Al-Haramain's Saudi headquarters appointing Soliman al-Buthe as the "true and lawful attorney for and in Alharamain Foundation's name, place and stead, to purchase, lease, or procure any and all property (real estate, rental etc.), equipment, materials, personnel, assistance or otherwise as deemed necessary by him for the express purpose of support and maintenance of the goals and objectives of Alharamain Foundation activities in the United States of America."[171]

---

[166] http://alsaha.fares.net. June 25, 2003. As cited in U.S. Treasury public document recovered on March 24, 2004 (PUBLIC-AR0258 to PUBLIC-AR0269).

[167] http://alsaha.fares.net. June 25, 2003. As cited in U.S. Treasury public document recovered on March 24, 2004 (PUBLIC-AR0258 to PUBLIC-AR0269).

[168] http://alsaha.fares.net. June 25, 2003. As cited in U.S. Treasury public document recovered on March 24, 2004 (PUBLIC-AR0258 to PUBLIC-AR0269).

[169] http://alsaha.fares.net. June 25, 2003. As cited in U.S. Treasury public document recovered on March 24, 2004 (PUBLIC-AR0258 to PUBLIC-AR0269).

[170] "Head of Al-Haramayn Charity Foundation Dismissed." Al-Hayat. January 8, 2004.

[171] "Power of Attorney" document signed by Aqeel Bin Abdel-Aziz Al-Aqeel on behalf of "Al-Haramain Islamic Foundation; Head Office – Riyadh" dated October 22, 1997 (AHIF 000914).

117. Later in the same month, Al-Haramain established a branch inside the U.S. "when Pete SEDA and Soliman ALBUTHE registered it with the Oregon Secretary of State."[172] Officers of the branch entity included Aqeel al-Aqeel, Mansour al-Kadi, and Soliman al-Buthe—all either officers or otherwise answerable to the Saudi headquarters. A letter to the IRS from the accountant of Al-Haramain's new office in Ashland, Oregon confirmed that "the founders or leaders have a background in religious matters. Copies of certificates (King Saud University) are attached. Copies of the world wide foundation's web page are attached. The United States foundation is part of the world wide foundation."[173]

118. Mr. al-Buthe and other representatives of Al-Haramain's operations in the Kingdom of Saudi Arabia repeatedly visited Oregon to oversee plans for the charity in the United States. Al-Buthe himself visited Ashland from his home in Saudi Arabia on eight separate occasions, including December 30, 1997; August 13, 1998; February 7-14, 1999; March 7, 2000; April 5-6, 2000; May 17-21, 2000; November 10-17, 2000; and April 24-29, 2001.[174] "General Director" Aqeel al-Aqeel and the onetime head of Al-Haramain's Africa and Asia sub-committees Mansour al-Kadi both visited Ashland at least once each, in April 2000 and August 1998, respectively.[175]

119. The administrator for the Al-Haramain branch office in Oregon reported monthly to the Saudi headquarters. In an August 1999 monthly report signed by branch office administrator Pete Seda-Ghaty, on a letterhead that read "Al-Haramain Islamic Foundation – Head Office – Riyadh", offered thanks to those in the Riyadh headquarters "for your support of the Ashland [Oregon] Office… We were blessed to have Brother Abdul-Qaadir Abdul-Khaaliq with us for part of this month… In addition to Brother Abdul-Qaadir, Brother Ahmed Ezzat and Brother Abdullah Al-Najashi flew to Oregon to help." According to Seda-Ghaty, the three men sent to Oregon from Saudi Arabia assisted in delivering religious sermons and producing media projects with an independent camera crew. Seda-Ghaty noted in the report, "We previously sent you the contract that we signed with them to give you an idea of the services they provided. If you would like us to send it again, please let us know… Brother Abdullah will do the post-production in Saudi Arabia… Alhamdulillah, all of our Brothers in Saudi Arabia were very supportive of the project."[176]

---

[172] Affidavit by I.R.S. Special Agent Colleen Anderson in support of search warrant application for 3800 S. Highway 99, Ashland, Oregon dated February 23, 2004. United States District Court; District of Oregon (AHIF 001537).

[173] Letter from Thomas J. Wilcox, CPA to Jennifer Nicolin #95152, Internal Revenue Service, re: "Al-Haramain Islamic Foundation Inc. #93-1231083." Dated August 17, 2000.

[174] "Defendant Al-Haramain Islamic Foundation, Inc.'s Responses to Plaintiffs' Interrogatories." Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al. United States District Court for the District of Columbia. Civil Action No. 1:03CV9849 (RCC).

[175] "Defendant Al-Haramain Islamic Foundation, Inc.'s Responses to Plaintiffs' Interrogatories." Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al. United States District Court for the District of Columbia. Civil Action No. 1:03CV9849 (RCC).

[176] Al-Haramain Islamic Foundation (Ashland, Oregon). "Monthly Report: August 1999." Signed by "Abu Yunus, Director, Ashland Office of Al-Haramain Islamic Foundation, U.S.A."

120. Evidence suggests that a similar pattern existed in other Al-Haramain branch offices outside Saudi Arabia and the United States. Information unearthed by the Dutch government indicated that Shaykh Aqeel al-Aqeel and "his deputy" Mansour al-Kadi were both listed as "board members of [Al-Haramain] in The Netherlands."[177] Al-Haramain's headquarters in Riyadh also provided explicit instructions to the local office in Bosnia-Herzegovina in 2003 "for the disposition of [Al-Haramain] assets."[178] Indeed, according to an internal memo from the U.S. Treasury Department, "the [Al-Haramain] headquarters, under Al-Aqil's leadership, provided funding and instructions that governed the activities of [Al-Haramain] throughout the world including in Bosnia, Albania, Iraq, the United States, and elsewhere."[179] Moreover, U.S. government investigators have concluded "resources regularly flow from the head office to the branches."[180]

121. A study of the financial relationship between Al-Haramain's Saudi headquarters and the Ashland, Oregon branch reveal a complex web of transactions involving senior officials from both offices. These transactions began with the establishment of the Ashland office in late 1997, when Soliman al-Buthe "brought into the U.S. from Saudi Arabia over $206,000 in Visa Travelers checks issued by the Al Rajhi Bank in Saudi Arabia, which he used to purchase 3800 S. Highway 99 in Ashland, Oregon." Information provided by an accountant for the U.S. branch office shows that 380 S. Highway 99 appears to be "the main facility" in the U.S. in which Al-Haramain "conduct[ed] its business activities."[181] Almost three years later, in March 2000, after a wealthy Egyptian donor wired several hundred thousand dollars to the bank account of Al-Haramain's branch office in Ashland, Oregon, al-Buthe traveled from Riyadh to Oregon to withdraw $130,000 from the same account in American Express traveler's checks. During his time at the bank, al-Buthe was accompanied by the son of Al-Haramain local branch administrator Pete Seda-Ghaty. As noted by an IRS-CI agent in a sworn affidavit, "soon after obtaining the travelers checks, ALBUTHE departed the United States with those traveler's checks."[182] Federal investigators have since recovered a legal agreement indicating that al-Buthe "received

---

177 Al-Haramain Islamic Foundation (Ashland, Oregon). "Monthly Report: August 1999." Signed by "Abu Yunus, Director, Ashland Office of Al-Haramain Islamic Foundation, U.S.A."

178 "Additional Al-Haramain Branches, Former Leader Designated by Treasury as Al Qaida Supporters; Treasury Marks Latest Action in Joint Designation with Saudi Arabia." Office of Public Affairs; U.S. Treasury Department. June 2, 2004.

179 "Designation of AL-HARAMAIN FOUNDATION (AHF) branches in Afghanistan, Albania, Bangladesh, Ethiopia, and The Netherlands, and AHF's leader AL-AQIL pursuant to the authorities of E.O. 13224." Memorandum for R. Richard Newcomb, Director, Office of Foreign Assets Control (U.S. Treasury Department). Dated: June 2, 2004.

180 Roth, John, Douglas Greenburg, and Serena Wille. "Monograph on Terrorist Financing: Staff Report to the Commission." National Commission on Terrorist Attacks upon the United States.

181 Affidavit by I.R.S. Special Agent Colleen Anderson in support of search warrant application for 3800 S. Highway 99, Ashland, Oregon dated February 23, 2004. United States District Court; District of Oregon (AHIF 001537).

182 Affidavit by I.R.S. Special Agent Colleen Anderson in support of search warrant application for 3800 S. Highway 99, Ashland, Oregon dated February 23, 2004. United States District Court; District of Oregon (AHIF 001537).

$186,644.70… and contains the notation 'I deposit the amanet in Alharamain head office for Chechnya Refugees', and appears to have been signed a second time by ALBUTHE."[183]

122. Soliman al-Buthe was also personally responsible for bringing funds into the United States from Saudi Arabia in order to purchase a mosque property in Springfield, Missouri on behalf of the Ashland, Oregon branch run by Pete Seda-Ghaty.[184] In other words, Al-Haramain's head office was intermingling funds with the branch office in the United States.

123. The reports that the U.S. branch administrator Mr. Seda-Ghaty sent to Al-Haramain's headquarters in Saudi Arabia reinforce the close financial relationship with the office in Ashland. On May 5, 1999, Seda-Ghaty wrote to his colleagues in Riyadh:

> Dear Brothers at Alharamain Islamic Foundation, Your brothers in Islam at your Ashland Office hope this proposal finds you in the best of health and Iman, InshaAllah. Dear Brothers, the purpose of this proposal is to update you on the cost of repairing the electrical system in the Masala at the Ashland Office, InshaAllah… Photos regarding the matter were provided to Brother Soliman [al-Buthe].[185]

124. On July 23, 1999, Seda-Ghaty wrote a new letter addressed to al-Buthe directly: "Dear Brother Soliman… InshaAllah, we hope that you are pleased with the efforts of the Ashland Office, and we pray that all of our Brothers in Saudi Arabia feel that their money was well spent."[186]

125. Shortly after U.S. military operations began in Afghanistan in October 2001, Seda-Ghaty wrote a new letter addressed to Al-Haramain's "General Director" in Saudi Arabia, Aqeel al-Aqeel.

> "I am writing you with an urgent request and proposal regarding the dire situation of famine and war in Afghanistan with the approaching harsh winter. I am asking for your financial approval to supply a convoy of approximately 100 trucks… I will adjust my proposed purchase according to the need I find and consult with you regarding the findings… I will take full responsibility to Allah and

---

[183] Affidavit by I.R.S. Special Agent Colleen Anderson in support of search warrant application for 3800 S. Highway 99, Ashland, Oregon dated February 23, 2004. United States District Court; District of Oregon (AHIF 001537).

[184] Affidavit by I.R.S. Special Agent Colleen Anderson in support of search warrant application for 3800 S. Highway 99, Ashland, Oregon dated February 23, 2004. United States District Court; District of Oregon (AHIF 001537).

[185] Al-Haramain Islamic Foundation (Ashland, Oregon). "Emergency Proposal Regarding Repairs to the Electrical System in the Ashland Office's Masjid." Dated: May 5, 1999.

[186] Letter from Pete Seda-Ghaty (a.k.a. "Abu Yunus") to Soliman Albuthe (a.k.a. "Brother Soliman"). "Distribution of literature." Dated: July 23, 1999.

> to Al-Haramain Islamic Foundation for the Muslim's money, make a detailed report to you, and keep you informed throughout the journey… InshaAllah, if I can I will be transmitting live footage for uploading to your website and fundraising using a laptop computer, camera, and a satellite phone. Your immediate response to my request is much needed and appreciated.[187]

126. Days later, Seda-Ghaty sent another plea addressed to "the USA Committee in Riyadh", praising "you brothers and sheikhs" for "approv[ing] many great projects": "You approved half a million dollars to be taken to Afghani refugees on the Iranian side of the border with Afghanistan… You also approved half a million dollars to be taken to the refugees in Palestine… You have spent hundreds of thousands of dollars in the U.S. for purchasing buildings, salaries for da'ees, shipping books, food for Ramadhan and many other projects."[188] Not only were large sums of money being regularly transferred by Al-Haramain's headquarters to its branch offices, but moreover, Seda-Ghaty's messages suggest that administrators in the Kingdom of Saudi Arabia were intimately aware of exactly how those funds were being spent.

127. As demonstrated above, Al-Haramain's Oregon branch office was overseen by the most senior administrators at the charity's headquarters in Saudi Arabia. Large sums of money were regularly transferred back and forth between Riyadh and Ashland, wired or couriered personally by senior Saudi Al-Haramain officials. Projects undertaken by Al-Haramain branches, such as in Oregon, were typically approved directly by the "autocratic" al-Aqeel back in Riyadh. In light of this overwhelming evidence, the sworn affidavit of "General Director" Aqeel al-Aqeel dated December 21, 2003—in which Mr. Aqeel asserted that Al-Haramain's Saudi headquarters "has neither financial dealings with nor exerts control over any group in the US"—is not the least bit accurate or credible.[189] This affidavit is also quite ironic in light of separate comments that al-Aqeel made in 2002 to Arabic-language media, where he contended that Al-Haramain has, in fact, retained "tight control" over its affiliates and flatly denied that any branch office of the charity could be operating independently of the Saudi central headquarters. Al-Aqeel contended:

> The offices' directors are employees who follow the directions of the main office with regards to hiring workers at the offices and making any decisions on cooperation with any party. In the main office, there are 19 auditors. Each of the foundation's specialized committees has an auditor. There are monthly, quarterly, and yearly reports on the foundation's revenue and expenditure.[190]

---

[187] Letter from Pete Seda-Ghaty (a.k.a. "Abu Yunus Sedaghaty") to Shaykh Aqeel al-Aqeel. "Urgent relief for Afghani refugees." Dated: October 21, 2001.

[188] Letter from Pete Seda-Ghaty (a.k.a. "Abu Yunus") to "the USA Committee in Riyadh." "Expanding Da'wa Efforts." Dated: October 27, 2002.

[189] Affidavit of Al-Haramain Islamic Foundation "General Manager" Aqeel al-Aqeel. Dated: December 31, 2003.

[190] "Interview with Aqil al-Aqil, general manager of the charitable Al-Haramayn Foundation." Al-Sharq al-Awsat. March 16, 2002.

128. Nothing in the information that I have seen about Al Haramain suggests that the control the Kingdom asserted over the MWL and IIRO did not also apply to Al Haramain. In fact, documents produced by the other organizations suggest that Al Harmain was subject to the same control and regulation as the other dawah organizations. For example, IIRO documents evidence that Al Haramain was subject to directives from the Saudi government.[191] And when MWL Secretary General 'Abd Allah Bin al-Muhsin at-Turki, spoke at a conference about the work that the dawah organizations performed, he included Al Haramain as among the organizations through which the Saudi government performed its "assistance and relief measures." [192]

**D. World Assembly of Muslim Youth (WAMY)**

1. Based on my review of the information available pertaining to WAMY, including documents produced from WAMY's own files, there is evidence of a substantial and controlling relationship between the Kingdom of Saudi Arabia and WAMY.

2. The Riyadh-based World Assembly of Muslim Youth (WAMY) advertises itself as the world's largest Muslim youth organization. It was first established by a royal decree issued by King Fahd in 1972.[193] WAMY's goal, according to its own outreach materials, is to "arm the Muslim youth with full confidence in the supremacy of the Islamic system over other systems."[194]

129. WAMY claims on its website to run "66 regional, local offices and representatives in the five continents," including offices in London, Washington DC, Kuala Lampur, Auckland, Dhaka, Nairobi, Dakar, Moscow, and Cordoba (Argentina).[195]

130. According to WAMY financial director Mutaz Abu Unuq, "WAMY is governed principally by its General Assembly and President, who is appointed by the Saudi Government. The current President of WAMY is the Minister of Islamic Affairs in Saudi Arabia. The daily

[191] *See, e.g.*, IIRO 277786-87 (Saudi Council of Ministers direction to all dawah organizations, including Al Haramain, that all refugee relief operations be coordinated by the SRC Society and a committee, under the supervision of the Interior Ministry, comprised of various Saudi Ministry officials and officials from MWL, IIRO, and Al Haramain); IIRO 283369 (Letter from the Ministry of Islamic Affairs' branch office in the Eastern Province to Al Haramain and other da'awa organizations, regarding "the creation of a field supervisory committee for immediate withdrawal of the donation boxes in the shops, malls, pharmacies, mosques, hospitals and health centers without delay." The letter further directs the charities to "remove all donation collection kiosks (and mobile offices) located in front of shops, malls and bakeries. Donation collection is limited to the offices' headquarters and bank account.").

[192] MWL058868.

[193] Declaration of Mutaz Saleh Abu Unuq, Financial Director of the World Assembly of Muslim Youth. Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al. United States District Court for the District of Columbia. Civil Action No. 1:02CV01616.

[194] http://www.wamyusa.org/publications/islaam_at_glance.htm.

[195] http://www.wamyusa.org/about.about%20wamy.htm.

operations of WAMY are supervised by its Secretary General."[196] The fact that WAMY's Board of Trustees is headed by the Saudi Minister of Islamic Affairs has been repeatedly advertised by the group's leaders in Saudi media[197] and on the group's Arabic-language website.[198]

131. In media interviews, Dr. Abdul Wahab Noorwali, Assistant Secretary General of WAMY, characterized "Saudi Arabia's support" as "enormous since the establishment of WAMY .... The Kingdom provides us with a supportive environment that allows us to work openly within the society to collect funds and spread activities. It also provides us with protection abroad through Saudi embassies and consulates, in addition to financial support."[199]

132. Major media publications—including the Wall Street Journal—have characterized WAMY as "a Saudi government-backed group."[200]

133. Until his death in August 2002, Saudi national Maneh ibn Hammad al-Johani served as WAMY's Secretary General. Al-Johani was also a member of the ruling Saudi Shura Council, and an "active member of the 120-member consultative body."[201] According to other senior WAMY officials, al-Johani "contributed immensely to the activities of WAMY over the years."[202] In an interview following al-Johani's death, WAMY's Assistant Secretary General Saleh al-Wohaibi noted that he intended "to brief" the Crown Prince "on the organization's activities. He was going to update the regent on WAMY's upcoming ninth international."[203] Shura council Vice Chairman Abdullah al-Naseef has also served as the Vice Chairman of WAMY. Al-Naseef has even publicly praised "the kings of of [sic] Saudi Arabia" for supporting the establishment of WAMY.[204]

134. Senior representatives of the Saudi government and royal family have regularly attended conferences and seminars organized by WAMY. In October 1998, "His Royal Highness" Prince Ghazi addressed the Eighth International Conference of the World Assembly of Muslim Youth in October 1998.[205] The following year, the Saudi Crown Prince "received guests of the ninth international conference of the World Assembly of Muslim Youth and its officials who came to greet him on the occasion of the end of the conference, which was held here under the auspices

---

196 Declaration of Mutaz Saleh Abu Unuq, Financial Director of the World Assembly of Muslim Youth. Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al. United States District Court for the District of Columbia. Civil Action No. 1:02CV01616.

197 Al-Jazirah (Riyadh). March 10, 2001.

198 http://www.wamy.org/index.cfm?method=home.conPrint&contentid=17&fa=Content&simple=0.

199 "WAMY Team in Afghanistan Risks Life to Deliver Aid." Middle East Newsfile. November 20, 2001.

200 "Reports Link Charity to an Al-Qaeda Front." Wall Street Journal. September 20, 2003.

201 "WAMY chief Johani dies in car crash." Arab News. August 5, 2002.

202 "Dr. Maneh Al-Johani – WAMY Chief Dies in Car Mishap." Riyadh Daily. August 5, 2002.

203 "WAMY chief Johani dies in car crash." Arab News. August 5, 2002.

204 http://www.iiasa.org/researchcenter/symposium.htm.

205 "Jordan's Prince Ghazi Addresses Muslim Youth Conference." Amman Times. October 21, 1998.

of the crown prince."[206] The Saudi Premier told his visitors, "Not only Saudi Arabia, Iraq, the Sudan or any other country . . . But rather Islam is the target."[207]

135. Internal documents produced by WAMY in discovery further reflect the involvement of Saudi government officials in the day-to-day administrative aspects of WAMY's operations.[208] The degree to which senior Saudi government officials have taken action to guide, assist, and co-manage WAMY is evidenced by the history of WAMY's branch office in the Washington D.C. area. In October 1987, WAMY Secretary General Dr. Maneh al-Johani sent a letter to the head of the Islamic Affairs bureau at the Saudi Embassy in Washington identifying the projects WAMY wished to carry out in the United States.[209] Four years later, in December 1991, al-Johani sent another letter to the Saudi Embassy, this time directed at the Saudi Ambassador himself, offering praise and thanks to the embassy for its support of WAMY's activities in the United States.[210] A second July 1992 letter from al-Johani to the Ambassador explained that WAMY desired an office in Washington in order to be close to the embassy and enjoy its support. Al-Johani specifically asked for assistance from the Ambassador in purchasing the office and budgetary assistance of $2 million for WAMY's first year of activity.[211] Within days, the head of the Islamic Affairs office at the Saudi Embassy sent a note back to al-Johani confirming that they are searching for an appropriate building in D.C. for the new WAMY office.[212]

136. Further correspondence between al-Johani and senior Saudi officials suggests that the Saudi Ministry of Islamic Affairs played a leading, hands-on role in facilitating the appointment of Abdullah Bin Laden as the supervisor for the WAMY branch office in Washington D.C. in 1996. A January 1996 letter from al-Johani addressed to the Saudi Minister of Islamic Affairs requests that the Ministry provide assistance and intervene in a dispute over the

---

[206] "Saudi Crown Prince Receives Dignitaries, says Islam Targeted." BBS. November 2, 2002.

[207] "Saudi Crown Prince Receives Dignitaries, says Islam Targeted." BBS. November 2, 2002.

[208] *See* WAMYSA2444 (letter from WAMY Secretary General to Saudi Minister of Islamic Affairs, asking the minister to personally engage on WAMY's behalf to encourage the Al-Imam University to reverse a decision to refuse Abdullah Binladen's appointment to head WAMY's office in Washington, D.C.); WAMYSA2683 (letter from Washington, D.C. representative of the Ministry of Islamic Affairs, advising WAMY Secretary General of the Saudi ambassador's personal efforts to aid WAMY in purchasing a building for WAMY's office in Washington, D.C., commenting that the government will consider purchasing the building and providing for WAMY's operating budget.); WAMYSA2894 (letter from WAMY Secretary General to WAMY U.S> office supervisor, requesting his presence in Riyadh), WAMYSA2973 (letter from WAMY Secretary General to Minister of Islamic Affairs regarding the Ministry's decision to second Abdullah Binladen's to head WAMY's office in Washington, D.C).

[209] February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

[210] February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

[211] February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

[212] February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

appointment of Abdullah Bin Laden.[213] Months later, al-Johani received a reply from the Minister of Islamic Affairs requesting that the current manager of the WAMY office in Washington D.C. come to Riyadh for several weeks to discuss a number of matters.[214] Less than a month later, the dispute was apparently resolved and al-Johani wrote back to the Minister of Islamic Affairs to confirm that Abdullah bin Laden has been appointed as the new supervisor of the WAMY office in Washington D.C.[215]

137. In January 2001, during an interview with a Saudi news journal, Maneh al-Johani acknowledged to reporters that WAMY's main source of financing for its activities is the annual budget of the Saudi government.[216] WAMY's financial director Mutaz Abu Unuq has likewise conceded in a sworn statement, "the Government of Saudi Arabia funds a large portion of WAMY's budget."[217] Between 1994 and 2001, according to Abu Unuq, WAMY received at least "two grants of 100,000 Saudi Riyals each from the Saudi Ministry of Finance upon the recommendation of the Supreme Council for Islamic Affairs, which I understand to be a department of the Saudi Arabian government headed by Prince Sultan."[218]

138. Media reports from Saudi journalists suggest that the aggregate funds provided by the Kingdom and the royal family to WAMY are far greater than even the numbers cited by Abu Unuq.

- During a 1999 joint fundraiser for WAMY, IIRO, and Al-Haramain, the Governor of Riyadh reportedly donated SR1.5 million.[219]
- Two years later, during another joint fundraising drive in November 2001, the Governor of Riyadh allegedly contributed SR 1.5 million, "while his deputy... donated SR 1 million."[220]

---

[213] February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

[214] February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

[215] February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

[216] Al-Jazirah (Riyadh). January 12, 2001.

[217] Declaration of Mutaz Saleh Abu Unuq, Financial Director of the World Assembly of Muslim Youth. Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al. United States District Court for the District of Columbia. Civil Action No. 1:02CV01616.

[218] Declaration of Mutaz Saleh Abu Unuq, Financial Director of the World Assembly of Muslim Youth. Thomas Burnett et al. v. Al Baraka Investment and Development Corporation et al. United States District Court for the District of Columbia. Civil Action No. 1:02CV01616.

[219] "Salman donates SR1.5m in a Major Fund-Raising Event." Middle East Newsfile. December 16, 2001.

[220] "Fund Raising Event Generates SR6.5 million." Middle East Newsfile. November 29, 2001.

- On November 12, 2002, a charitable event in Riyadh co-sponsored by WAMY and two other charities was attended by, among others: the Governor of Riyadh, the Grand Mufti of Saudi Arabia, and the Minister of Islamic Affairs.[221]
- Less than two weeks later, the Governor of Mecca pledged a contribution of approximately $40,000 during a joint ceremony organized by Al-Haramain and WAMY.[222]
- Elsewhere, the Governor of the Eastern region of Saudi Arabia, was a featured guest at yet another joint charitable function organized in November 2002 by IIRO, WAMY, and Al-Haramain.[223] After pledging a donation of over $250,000, the governor delivered a speech to attendees congratulating the assistance "given by the government of the Kingdom of Saudi Arabia... to charities and charitable deeds."[224]
- In July 2003, the King of Saudi Arabia was reported in Saudi media to be funding Muslim pilgrims on Hajj trips organized and "supervised" by WAMY.[225]

139. The Saudi government, and particularly the Ministry of Islamic Affairs, has also used other means to provide in-kind support to WAMY. According to Saudi media, Saudi Minister of Islamic Affairs Shaykh Saleh al-Shaykh announced in March 2001 that "Custodian of the Two Holy Mosques King Fahd bin Abdul Aziz has issued directives to provide some of the governmental authorities and Saudi embassies and a number of Islamic organizations inside and outside the Kingdom of Saudi Arabia with 1.6 million copies of the Holy Quran and its meanings in various languages. Minister al-Shaykh specified, "in line with monarch's directives... the World Assembly for Muslim Youth . . . will be provided with copies of the Holy Quran and its translations."[226]

140. The Saudi government's Armed Forces Printing Press has also published at least one controversial Arabic-language booklet on behalf of WAMY, "Islamic Views." Under the heading "The Prophet asks for Jihad," the WAMY booklet explains, "The Prophet Mohammad fought against the infidels and the Jews till he triumphed over them and conducted himself about twenty invasions and he sent tens of regiments led by his companions for Jihad . . . . Damn from Allah to the Jews who made graves of their prophets as Masjid."[227] Later, further on in the booklet, Islam is trumpeted as "a religion of Jihad" and violent jihad is endorsed as "an answer for the Jews, the liars": "[T]each our children to love taking revenge on the Jews and the oppressors, and teach

---

[221] "Prince Salman patronizes charity ceremony." Saudi Press Agency. November 12, 2002.

[222] Ain Al-Yaqeen. November 29, 2002.

[223] Ain Al-Yaqeen. November 29, 2002.

[224] Ain Al-Yaqeen. November 29, 2002.

[225] "European and Canadian pilgrims arrive in Jiddah." Saudi Press Agency. June 2, 2003.

[226] "Copies of the Holy Quran to be distributed." Saudi Press Agency. March 31, 2001.

[227] Islamic Views. Saudi Armed Forces Printing Press.

them that our youngsters will liberate Palestine and al-Quds when they go back to Islam and make Jihad for the sake of Allah."[228]

141. As with the other dawah organizations, WAMY's branch offices maintain a closely intertwined, coordinated relationship with the charity's headquarters in Saudi Arabia. The website for WAMY's chapter in the United States explains (in English), "Whether you are an organization, a society, a youth circle, or an individual we are here to help you. For further information or inquiries please contact: Head Office. PO Box 10845, Riyadh 11443, Saudi Arabia."[229] The website also notes:

> "The Projects Committee of WAMY receives dozens of requests every month from all over the world seeking financial assistance to implement various religious, educational, social, vocational and economic projects. All such requests are carefully studied, evaluated and authenticated by the Projects Committee. These projects are later forwarded to various philanthropists with WAMY 's letters of recommendation. Funds received for various projects are passed on to the concerned projects. The Committee also ensures that the projects are executed satisfactorily and honestly."[230]

142. Likewise, WAMY's website for its branch office in the United Kingdom lists contact information for the U.S. bureau described above, the "WAMY Western Europe Office" in London, the WAMY office in Jeddah, and the "WAMY Head Office" in Riyadh.[231]

143. According to former WAMY Secretary General Maneh al-Johani, WAMY's worldwide activities are "decided upon" by a Board of Trustees in Saudi Arabia: "The Board of Trustees, comprised of 23 members, supervises [WAMY activity overseas]. Everyone on the board of Trustees supervises a region around the world, divided into several sectors . . . . These arrangements are made through the active system tied to the General Secretariat in Riyadh."[232] When asked by Saudi journalists to explain how WAMY's head office was tracking the activities of its overseas branch offices, al-Johani replied, "Through several conducts—here, at the General Secretariat, there is an assistant to the Secretary General for Office Affairs, whose role is to supervise, administer, and be in contact with the offices. Furthermore, there are field visits on the part of senior members, whether by the assistant to the Secretary General or other senior members of the board of trustees."[233]

---

[228] Islamic Views. Saudi Armed Forces Printing Press.

[229] http://www.wamyusa.org/About/serverd_by_wamy.htm.

[230] http://www.wamyusa.org/About/social_economic_uplift.htm.

[231] http://www.wamy.co.uk/bd_contact.htm.

[232] Al-Jazirah (Riyadh). March 10, 2001.

[233] Al-Jazirah (Riyadh). March 10, 2001.

144. Several of the members of the Board of Trustees are also simultaneously listed by WAMY as chiefs of various overseas WAMY offices—such as the head of the "Arab world" office Dr. Awish bin Harbi al-Ghamidi, the head of the North America office Dr. Anwar al-Hajjaj, and the head of the South America office Ali Muhammad al-Abduni.[234]

145. An internal document produced by WAMY in discovery and marked "confidential" further evidences the control and supervision over WAMY's overseas branch offices by WAMY headquarters in Riyadh. In February 2000, WAMY published specific regulations for branch offices as laid down by the Secretary General and approved by the Board of Trustees in Riyadh. According to those regulations, the Secretary General is personally responsible for appointing regional and branch offices managers in coordination with WAMY's representatives in the region. Moreover, a member of the WAMY Board of Trustees may be assigned to assume the executive management of any WAMY office in his area.[235] WAMY's central office in Saudi Arabia insisted on having the sole authority to create websites for each branch office, therefore, each office is required to send the WAMY General Secretariat anything it wishes to display on the website in addition to the required details, such as address, means of contacting it, activity plan, bank accounts, suggestions and more.[236] Furthermore, the regulations stipulate, any conditioned contribution must not be accepted without a written approval from WAMY's Secretary General.[237]

146. In 2011, the Canada Revenue Authority (CRA) conducted an audit of WAMY's branch office in Canada in order to determine whether it reasonably qualified for tax-exempt charitable status. The CRA concluded in a letter sent to WAMY officials, "the audit findings did not reveal any apparent separation between the activities of WAMY (Saudi Arabia) and WAMY [Canada], with all related financial and operating positions being made by WAMY (Saudi Arabia). This leads to a reasonable inference that WAMY has little or no independent function."[238] According to the CRA:

> It is logical and reasonable to assume that WAMY was established to support the goals and operations of the parent organization WAMY (Saudi Arabia), and as a result, the objects and activities of WAMY cannot be viewed in isolation from those of WAMY (Saudi Arabia)... WAMY (Saudi Arabia) maintains substantial control over WAMY's finances, and uses this control to carry out its own objectives in Canada... WAMY (Saudi Arabia) provides

---

234 http://www.buraydahcity.net/vb/showpost.php?s=837f02cf3010abbe8aab392e113ea14c&p=893992&postcount=6.

235 February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

236 February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

237 February 11, 2000 WAMY "Offices Regulations" approved by WAMY Board of Trustees in Riyadh. WAMY Control Docs.pdf

238 "Audit of the World Assembly of Muslim Youth." Letter to World Assembly of Muslim Youth, 70-3024 Cedarglen Gate, Mississauga ON L5C 4S3. Canada Revenue Agency (CRA). Dated August 23, 2011.

> substantially all of WAMY's operational funds; WAMY representatives advised the CRA during the audit that WAMY (Saudi Arabia) exercised a significant amount of control over their expenses; WAMY provides annual reports to WAMY (Saudi Arabia) regarding the organizations that it funds and the amounts that it disburses to these organizations. The reason provided to our auditor was that the WAMY (Saudi Arabia) wanted to know what it was responsible for supporting... WAMY [in Canada] has made no attempt to distinguish itself from WAMY (Saudi Arabia).[239]

**E. Saudi Red Crescent Society (SRC)**

147. The Saudi Red Crescent Society was first established in June 1963 by a royal decree issued by the King of Saudi Arabia.[240] According to the official website of SRC, the establishment of the charity was "based on the Geneva Conventions and the principles adopted by the Conference of the International Red Cross and Crescent."[241] During the same year, SRC was formally recognized by the International Red Cross and Red Crescent Movement. The charity advertises its purpose as "to mitigate disasters and human suffering, without discrimination or segregation", including supporting "victims of war, both civilian and military personnel, under the conditions set forth in the Geneva Conventions."[242] At present, SRC maintains at least 14 offices inside the Kingdom of Saudi Arabia alone and a work force of nearly 3,000.[243]

148. According to the President of the Saudi Red Crescent, Dr. Abdulrahman al-Suwailem, "the government of the Kingdom of Saudi Arabia sponsors and supervises the Saudi Red Crescent, and appoints its directors . . . . Thus, the Saudi Red Crescent performs essential core governmental functions and is a Saudi Government instrumentality."[244] In a separate, second sworn declaration, al-Suwailem once again insisted, "The Kingdom of Saudi Arabia sponsors and supervises the Saudi Arabian Red Crescent Society, and the Saudi government appoints all of its directors."[245]

149. Looking at the example of one meeting of the SRC's management committee in 1999, it included appearances by the Saudi Minister of Health Dr. Osama Shobokshi, Secretary-

---

[239] "Audit of the World Assembly of Muslim Youth." Letter to World Assembly of Muslim Youth, 70-3024 Cedarglen Gate, Mississauga ON L5C 4S3. Canada Revenue Agency (CRA). Dated August 23, 2011.

[240] http://www.srca.org.sa/OurServices.aspx.

[241] http://www.srca.org.sa/OurServices.aspx.

[242] http://www.srca.org.sa/OurServices.aspx.

[243] http://www.ifrc.org/docs/profiles/saprofile.pdf.

[244] Affidavit of Abdul Rahman Al Swailem. In Re: Terrorist Attack on September 11, 2001 (Thomas E. Burnett Sr. et al. v. Al Baraka Investment and Development Corporation). United States District Court for the Southern District of New York. Case No: 03 CV 9849 (RCC).

[245] Second Affidavit of Abdul Rahman Al Swailem. In Re: Terrorist Attack on September 11, 2001 (Thomas E. Burnett Sr. et al. v. Al Baraka Investment and Development Corporation). United States District Court for the Southern District of New York. Case No: 03 CV 9849 (RCC).

General of the Riyadh Chamber of Commerce and Industry Dr. Fahd Al-Harithy, Ministry of Labor and Finance delegate Muhammad al-Thumaiji, and Saudi Shura Council member Dr. Abdulaziz Al-Mulhem.[246]

150. SRC President Dr. al-Suwailem has also affirmed that much of its operations "are funded by the Saudi government."[247] Even Arab mujahideen commanders fighting in Afghanistan during the 1980s recognized the contributions of the Saudi Kingdom to the cause had come, at least in part, through its agency, the SRC.

151. When asked in a 1989 interview "Who donates to the mujahideen?", Shaykh Abdullah Azzam replied:

> Saudi Arabia is in truth the only country that has stood beside the Afghan Jihad as a government and as a people... The Saudi Red Crescent and the Saudi Relief Agency headed by [Prince] Salman Abdel 'Aziz, has a budget of 100 million riyal per year. These two Saudi organizations are under one headed [by] Wael Jalaidan, who happens to be head of the Red Crescent as well. He was a representative of the University of King Abdel Aziz in Saudi Arabia in the United States, and left it to become the head of the Red Crescent . . . . There is the [Saudi] government support and this support is many times and many times higher than these amounts and it is given to the government of Pakistan to support the mujahideen and the people.[248]

152. The annual budget statement from the Saudi Ministry of Finance details the revenues and expenditures of public corporations whose budgets are annexed to the Saudi national budget—including the Saudi Red Crescent. According to the budget statement for 1998, the revenues and expenditures of the Saudi Red Crescent Society totaled SR 206,840,000;[249] for the year 2000 the total was SR 238,346,000;[250] for the year 2002 the total was SR 249,055,000.[251]

---

[246] Hassan, Javid. "10,000 volunteers trained by SRCS: Al Suwailem." Arab News. June 16, 1999.

[247] Affidavit of Abdul Rahman Al Swailem. In Re: Terrorist Attack on September 11, 2001 (Thomas E. Burnett Sr. et al. v. Al Baraka Investment and Development Corporation). United States District Court for the Southern District of New York. Case No: 03 CV 9849 (RCC).

[248] Videotaped interview of Shaykh Abdullah Azzam. 1989.

[249] "Budget Statement from Ministry Of Finance." Ministry of Finance of the Kingdom of Saudi Arabia. December 29, 1998.

[250] "Budget for Fiscal Year 2000." Ministry of Finance and National Economy of the Kingdom of Saudi Arabia. December 20, 1999.

[251] "Budget for Fiscal Year 2002." Ministry of Finance and National Economy of the Kingdom of Saudi Arabia. December 8, 2001.

## F. Saudi High Commission (SHC)

153. In 1993, the Saudi government established the Saudi High Commission for Relief in Bosnia-Herzegovina (SHC), which claims to have provided more than $400 million in assistance to the Muslim community in the Balkans.[252] The SHC was founded by Saudi Prince Salman bin Abdul-Aziz, mayor of Riyadh and son of Abdul Aziz ibn Saud, the founder of Saudi Arabia.[253] According to the Director of the Executive Office of the SHC, Saud bin Mohammad al-Roshood:

> The Saudi High Commission was formed in 1993 by Decision No. 17419 of the President of the Council of Ministers of Saudi Arabia, dated 2/12/1412 (1993) . . . . The Saudi High Commission is currently, and has been since its inception, headed by His Royal Highness Prince Salman bin Abdulaziz Al Saud, who is the Governor of the Riyadh Province and a member of the Saudi Royal Family. In Decision No. 17419, the President of the Council of Ministers appointed Prince Salman bin Abdulaziz President of the Saudi High Commission. As President, Prince Salman bin Abdulaziz is the head of both the Executive Committee and the Supreme Commission. Prince Salman bin Abdulaziz has filled all of the above-listed roles continuously over the approximately eleven years since the Saudi High Commission was formed.[254]

154. Within a short period of time, the SHC "evolved into the primary instrument of Saudi foreign policy towards Bosnia-Herzegovina, due largely to the leadership of Prince Salman bin Abdulaziz."[255] SHC Executive Office director al-Roshood explained, "The Saudi High Commission engages in specific, government-sanctioned fundraising activities, including a campaign promoted as the 'Campaign of the Custodian of the Two Holy Mosques,' referring to the King of Saudi Arabia."[256] A separate legal declaration submitted by Dr. Mutlib al-Nafissa, a member of the Council of Ministers of the Kingdom of Saudi Arabia confirms, "the Saudi High Commission is an arm of the Saudi Arabian government."[257]

---

[252] "Islamic Organizations in the Balkans." A Joint Research Project by the Governments of the United States and the United Kingdom. August 2003.

[253] "US, Saudis Plan to Shut Down Charity's Branches." USA Today. March 11, 2002.

[254] "Declaration of Saud bin Mohammad al-Roshood." In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570. Dated: February 17, 2004.

[255] "Declaration of Saud bin Mohammad al-Roshood." In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570. Dated: February 17, 2004.

[256] "Declaration of Saud bin Mohammad al-Roshood." In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570. Dated: February 17, 2004.

[257] "Declaration of Dr. Mutlib bin Abdullah al Nafissa." In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570. Dated: January 31, 2004.

155. Indeed, no credible source has ever disputed the existential nature of the relationship between the SHC to the Kingdom of Saudi Arabia. In his capacity as Saudi Minister of State, al-Nafissa describes SHC as a "government agency" and a "government entity":

> "The Saudi High Commission is an arm of the Saudi Arabian government. Actions taken by the Saudi High Commission properly are viewed as actions of the government of Saudi Arabia. Actions taken by the Saudi High Commission necessarily are in keeping with the foreign and domestic governmental policies of the Kingdom of Saudi Arabia . . . . A government commission, such as the Saudi High Commission, always is chaired or presided over by a government official and conducts its affairs in accordance with the domestic or foreign policy objectives of the Kingdom of Saudi Arabia . . . . Prince Salman bin Abdulaziz was appointed President of the Saudi High Commission by Decision No. 17419, the same Decision of the President of the Council of Ministers that formed the Saudi High Commission. Prince Salman bin Abdulaziz is a high-ranking government official of the Kingdom of Saudi Arabia.[258]

156. According to SHC official Saud al-Roshood, "the largest source of funding for the Saudi High Commission is the treasury of the Kingdom of Saudi Arabia, which has provided approximately 30% of the total funds used and distributed by the Saudi High Commission."[259]

157. Aside from direct funding, the Saudi government also provides in-kind financial support to SHC by loaning out free services provided by "civil servant employees of the Kingdom of Saudi Arabia."[260] Al-Roshood described how "many Saudi High Commission staffers are detailed from other government ministries and other administrative organs of the Kingdom of Saudi Arabia. Staffers on detail from other government offices are paid by their respective ministries and administrative organs, rather than by the Saudi High Commission."[261]

158. As for the question of how closely SHC's activities outside of Saudi Arabia were being managed by administrators and members of the royal family back in the Kingdom, Dr. Mutlib al-Nafissa has insisted:

> Decisions regarding causes to support and recipients for Saudi High Commission funds are within the discretion of the Executive Committee, the Supreme Commission, and Prince Salman bin

---

[258] "Declaration of Dr. Mutlib bin Abdullah al Nafissa." In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570. Dated: January 31, 2004.

[259] "Declaration of Saud bin Mohammad al-Roshood." In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570. Dated: February 17, 2004.

[260] "Declaration of Saud bin Mohammad al-Roshood." In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570. Dated: February 17, 2004.

[261] "Declaration of Saud bin Mohammad al-Roshood." In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570. Dated: February 17, 2004.

> Abdulaziz . . . . The decisions of the Executive Committee, the Supreme Committee, and Prince Salman bin Abdulaziz, by virtue of the Prince's status as a high-ranking government official, reflect the foreign policy of the Kingdom of Saudi Arabia toward the country where the relief effort or foreign aid is directed – in most instances, Bosnia-Herzegovina.[262]

### G. Saudi Joint Relief Committee (SJRC)

159. Much as the Saudi High Commission was formed by the Kingdom in connection with events in Bosnia-Herzegovina, the Saudi royal family adopted a similar approach when confronted with a parallel crisis in 1999 concerning Serbs and Muslims in the tiny province of Kosovo. Under the chairmanship of the Saudi Interior Minister, the Kingdom formed the "Saudi Joint Relief Committee for Kosovo and Chechnya" (SJRC) in order to better "coordinate Saudi charitable work abroad."[263] A key function of the SJRC was to coordinate for the Kingdom the efforts of other Wahhabi-style missionary groups with loose ties to the Saudi government.[264] The founders of the SJRC were also intent on using the new charity entity "to document the assistance that is provided by the Kingdom with International Organizations and Commissions."[265]

160. The royal order that created the SJRC on May 18, 1999 is signed by King Fahd (on behalf of the President of the Saudi Council of Ministers) and is copied to the Saudi Interior Minister, Defense Minister, Deputy President of the National Guard, the Minister of Foreign Affairs, the President of General Intelligence, the Minister of Islamic Affairs, the Minister of Health, the Minister of Information, the Minister of Labor, the Minister of Finance, and the Secretary General of the Muslim World League.[266]

161. The "Albanian High Order" was issued in response to a Saudi Ministerial Committee meeting, during which the King was advised by his cabinet to centralize the Kingdom's efforts to support Muslims in Kosovo by forming "a Committee under the chairmanship of his Excellency the President of the Society and a membership of representatives of high rank from the Presidency of the National Guard, the Ministry of Defense and Aviation, the Ministry of Interior, the Presidency of General Intelligence, the Ministry of Finance and National Economy, the Ministry of Information, the Ministry of Labor and Social Affairs and a representatives from each Saudi society or charitable foundation that participates in relief work, namely: International

---

[262] "Declaration of Dr. Mutlib bin Abdullah al Nafissa." In re: "Terrorist Attacks on September 11, 2001." United States District Court for the Southern District of New York; Case No. 03-MDL-1570. Dated: January 31, 2004.

[263] "Islamic Organizations in the Balkans." A Joint Research Project by the Governments of the United States and the United Kingdom. August 2003.

[264] "Islamic Organizations in the Balkans." A Joint Research Project by the Governments of the United States and the United Kingdom. August 2003.

[265] Telegram No. 7/B/1863 from Fahad bin Abdul Aziz, President of Council of Ministers Kingdom of Saudi Arabia. Dated: 3/2/1420 (May 18, 1999).

[266] Telegram No. 7/B/1863 from Fahad bin Abdul Aziz, President of Council of Ministers Kingdom of Saudi Arabia. Dated: 3/2/1420 (May 18, 1999).

Islamic Relief Organization, World Assembly of Muslim Youth, Al-Haramain Charitable Foundation, Islamic Endowment Foundation."[267] Though the "Albanian High Order" explicitly names the Saudi Interior Minister as the SJRC's chairman, Saudi media also reported that another member of the royal family had also served as a chair of the group, "His Highness Prince Turki Bin Fahd Bin Jalawi", due to "his experience in charity work. He oversees the offices of the International Islamic Relief Commission in the Eastern Region and chairs the Emergency Relief Committee."[268] It appears that "International Islamic Relief Commission" is merely an alternative translation for the previously-discussed Saudi charity IIRO.

162. Saudi government officials made no secret of its close relationship with, and its endorsement of, the activities of the SJRC. In February 2003, the Saudi Interior Minister publicly "expressed his thanks for the efforts exerted by members of the [SJRC] . . . . For his part Dr. Al-Suwailam expressed his gratitude to . . . the Minister of the Interior and Supervisor of the Saudi Joint Committee for the Relief of Kosovo and Chechnya and stressed that his support is always behind the success of the members of the committee in their mission."[269] Similarly, in June 2003, the head of Saudi Arabia's General Intelligence Directorate openly applauded "the Saudi relief aid provided to the people of Kosovo and Chechen refugees . . . . In a cable addressed to the Head of the Saudi Red Crescent and Head of the Saudi Joint Committee Dr. Abdul Rahman Ibn Abdul Aziz Al Suwailam, Prince Nawaf lauded the efforts of the Saudi Relief Committee to both people and wished the Committee success in the future."[270]

163. According to Dr. al-Suwailem, SJRC president and a former Deputy Minister for Executive Affairs for the Kingdom of Saudi Arabia, "Beginning with its formation in 1999, the [SJRC]has always functioned as a political subdivision, agency, or instrumentality of the Kingdom of Saudi Arabia."[271] In a sworn statement, al-Suwailem emphasized that King Fahd's "Albanian High Order" in May 1999 "specified that... the SJRC must include high-ranking representatives from agencies of the Kingdom."[272]

164. Dr. al-Suwailem has also acknowledged in a sworn statement that "the SJRC's mission was largely subsidized by the Kingdom of Saudi Arabia."[273] According to al-Suwailem,

---

[267] Telegram No. 7/B/1863 from Fahad bin Abdul Aziz, President of Council of Ministers Kingdom of Saudi Arabia. Dated: 3/2/1420 (May 18, 1999).

[268] "Relief aid committee set up for Chechen Muslims." Al-Madinah (Jeddah). December 4, 1999.

[269] "In Brief." Ain al-Yaqeen. February 28, 2003.

[270] "In Brief." Ain al-Yaqeen. June 6, 2003.

[271] Declaration of Dr. Abdulrahman A. Al-Suwailem. In Re: Terrorist Attack on September 11, 2001 (Federal Insurance Company et al. v. Al-Qaida et al.). United States District Court for the Southern District of New York. Case No: 02 CV 6978 (RCC).

[272] Declaration of Dr. Abdulrahman A. Al-Suwailem. In Re: Terrorist Attack on September 11, 2001 (Federal Insurance Company et al. v. Al-Qaida et al.). United States District Court for the Southern District of New York. Case No: 02 CV 6978 (RCC).

[273] Declaration of Dr. Abdulrahman A. Al-Suwailem. In Re: Terrorist Attack on September 11, 2001 (Federal Insurance Company et al. v. Al-Qaida et al.). United States District Court for the Southern District of New York. Case No: 02 CV 6978 (RCC).

"On March 9, 2000, HRM King Fahd bin Abdulaziz issued a Royal Decree donating 5,000,000 Saudi Riyals to support the SJRC's relief work . . . . Through the end of 2003, the SJRC received 3,000,000 Saudi Riyals from the Kingdom's initial donation through the Ministry of Finance. In addition, the Kingdom of Saudi Arabia routinely provided critical logistical support for the SJRC's humanitarian efforts in Kosovo and Chechnya."[274]

165. As with the SHC, the Saudi government has provided additional support to the SJRC by loaning out free services performed by employees of the state. Dr. al-Suwailem confirmed, "the Kingdom of Saudi Arabia paid the salaries and expenses for most of the civil servants seconded to work for the SJRC. The Organizational Charter adopted by the SJRC expressly provided that employees seconded from the government would be subject to the laws applicable to government civil servants. Accordingly, seconded government employees of the SJRC are treated as civil servants, rather than private hires, under Saudi law."[275]

166. Also akin to the SHC, given the limited purpose for which it was created, the SJRC retained far fewer branch offices outside Saudi Arabia than other charitable organizations described in this report. It remains a fairly centralized organization. Nonetheless, SJRC President Dr. Abdulrahman al-Suwailem has insisted that operations were still kept under tight control by the Saudi government and "the SJRC submitted regular financial and performance reports to the Minister of the Interior, HRH Prince Nayef Bin Abdulaziz Al-Saud."[276]

## VII. Evidence of the Involvement of Saudi "Charities" in Financing and Directing Terrorist Activities

167. The roots of the contemporary Al-Qaida terrorist financing network can be directly traced back to lessons learned by Arab-Afghan fighters during the early days of the Soviet-Afghan jihad nearly two decades ago. As the 1980s drew to a close, thousands of idealistic Islamic fundamentalist volunteers arrived in Pakistan, often with no local guide or requisite accommodations. At the time, several wealthy Arabian Gulf charitable organizations, under the guise of aiding Afghan and Pakistani refugees, stepped forward to help channel the jihadi recruits where they were most needed. These wealthy NGOs—sponsored by a number of prominent Gulf businessmen—provided weapons, guesthouses, and travel papers to needy members of the quickly-coalescing Al-Qaida movement. Medical ambulances belonging to the Saudi Red Crescent and other fundamentalist-run relief groups were even diverted to bring Arab mujahideen

---

[274] Declaration of Dr. Abdulrahman A. Al-Suwailem. In Re: Terrorist Attack on September 11, 2001 (Federal Insurance Company et al. v. Al-Qaida et al.). United States District Court for the Southern District of New York. Case No: 02 CV 6978 (RCC).

[275] Declaration of Dr. Abdulrahman A. Al-Suwailem. In Re: Terrorist Attack on September 11, 2001 (Federal Insurance Company et al. v. Al-Qaida et al.). United States District Court for the Southern District of New York. Case No: 02 CV 6978 (RCC).

[276] Declaration of Dr. Abdulrahman A. Al-Suwailem. In Re: Terrorist Attack on September 11, 2001 (Federal Insurance Company et al. v. Al-Qaida et al.). United States District Court for the Southern District of New York. Case No: 02 CV 6978 (RCC).

("holy warriors") back and forth from combat operations.[277] By clothing their militant activity with charitable ideals, Arab-Afghan leaders including Usama Bin Laden discovered that they were able to slip below the radar of many global intelligence agencies. According to U.S. Defense Department officials, "the guise [of] intend[ing] to assist in relief efforts for the Afghani people" is "a known al Qaida cover story."[278]

168. The efficiency and success of the Afghan jihad financing model was quite an accomplishment for Usama Bin Laden and his international allies—so much so that operations continued even after the end of the Soviet-Afghan war and the expulsion of Bin Laden from the region. In approximately 1993, in conversations with former senior Al-Qaida lieutenant Jamal Ahmed Al-Fadl, Usama Bin Laden identified several prominent international Muslim charities as the primary sources of Al-Qaida financial and fundraising activity.[279] In 1996, a since declassified U.S. government report—attributed by the Wall Street Journal to the Central Intelligence Agency (CIA)—alleged that "approximately one third of... Islamic NGOs support terrorist groups or employ individuals who are suspected of having terrorist connections."[280] The final report of the U.S. Congressional 9/11 Commission concluded that "entire charities" under the control of "al Qaeda operatives... may have wittingly participated in funneling money to al Qaeda."[281]

169. These organizations served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to Bin Laden and his sympathetic patrons in the Arabian Gulf, providing employment and travel documents to Al-Qaida personnel worldwide, and helping "to move funds to areas where al Qaeda was carrying out operations."[282] According to a U.S. Justice Department brief on the subject:

> [Al-Fadl] understood from conversations with Bin Laden and others in al Qaeda that the charities would receive funds that could be withdrawn in cash and a portion of the money used for legitimate relief purposes and another portion diverted for al Qaeda operations. The money for al Qaeda operations would nevertheless be listed in

---

[277] Muhammad, Basil. *Al-Ansaru l'Arab fi Afghanistan*. The Committee for Islamic Benevolence Publications; ©1991. *Page 187.*

[278] Set_45_3065-3095. Page 1.

[279] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Page 25.*

[280] January 1996 CIA Report on "International Islamic NGOs" and links to terrorism. *Page 1.* See also: Affidavit by Senior Special Agent David Kane (Bureau of Immigration and Customs Enforcement, Department of Homeland Security). United States of America v. Soliman S. Biheiri. United States District Court for the Eastern District of Virginia, Alexandria Division. Case #: 03-365-A. August 14, 2003. *Page 2.*

[281] The 9/11 Commission Report. Final Report of the National Commission on Terrorist Attacks Upon the United States. July 22, 2004. *Page 170.*

[282] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Pages 28-29.*

the charities' books as expenses for building mosques or schools or feeding the poor or the needy.[283]

170. Standing orders were left by Bin Laden to keep all transactions involving the charitable groups in cash only; by this method, these NGOs were manipulated as a secret laundry to make Al-Qaida's financial network virtually invisible. The charities would then create false documentation for the benefit of unwary donors, purportedly showing that the money had actually been spent on orphans or starving refugees. According to some former employees of these organizations, upwards of 50% of their total funding was secretly diverted directly to Al-Qaida and Usama Bin Laden.[284] The 9/11 Commission also found evidence that such would-be charities had "provided significant cover... enabl[ing] [Al-Qaida] operatives to travel undetected."[285]

171. Meanwhile, in Europe and North America, Muslim NGOs would come to serve an additional role in indoctrinating new generations of international jihadists. According to a 1996 French intelligence memorandum, "these charities—screens for Islamic groups like... the Egyptian Al-Gama`at al-Islamiyya... permitted a very large recruitment among young volunteers; under the notion of jihad, they provided 'humanitarian' support for the indoctrination of the youth [and it worked] so well that numerous French converts to Islam joined the ranks of Islamic extremists."[286] A 1996 American intelligence report alleged that "nearly one third of the Islamic NGOs in the Balkans have facilitated the activities of Islamic groups that engage in terrorism, including the Egyptian Al-Gama`at Al-Islamiyya, Palestinian Hamas, and Lebanese Hizballah." The report added that "some of the terrorist groups, such as Al-Gama`at, have access to credentials for the UN High Commission for Refugees and other UN staffs in the former Yugoslavia."[287]

172. Even the operational mastermind of the 9/11 terrorist attacks in the United States—Khalid Sheikh Mohammed (KSM)—was involved with the activities of suspect Islamic humanitarian groups as early as 1988.[288] KSM's brother Zahid Sheikh Mohammed (a.k.a. Abu Hafs al-Baluchi) was responsible for overseeing at least two such NGOs active in Pakistan: the Kuwaiti Lajnat al-Dawa al-Islamiyya (officially designated as a terrorist front group by the U.S.

---

[283] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Pages 28-29.*

[284] Dugger, Celia W. "Anti-U.S. Plot in India Is Foiled; Militant Islamist Intended to Bomb 2 Consulates, Police Say." The New York Times. January 21, 1999. *Page 4.*

[285] The 9/11 Commission Report. Final Report of the National Commission on Terrorist Attacks Upon the United States. July 22, 2004. *Page 171.*

[286] "La Formation Des Volontaires Pour Le Djihad En Camps D'Entrainement." Confidential memorandum issued by UCLAT (French Central Anti-Terrorism Unit). December 27, 1996.

[287] January 1996 CIA Report on "International Islamic NGOs" and links to terrorism. Page 1. See also: Affidavit by Senior Special Agent David Kane (Bureau of Immigration and Customs Enforcement, Department of Homeland Security). United States of America v. Soliman S. Biheiri. United States District Court for the Eastern District of Virginia, Alexandria Division. Case #: 03-365-A. August 14, 2003. Page 2.

[288] The 9/11 Commission Report. Final Report of the National Commission on Terrorist Attacks Upon the United States. July 22, 2004. *Page 147*

government[289]) and Mercy International.[290] When KSM's nephew Ramzi Yousef—the explosives expert behind the 1993 World Trade Center bombing in New York—was training at an Al-Qaida camp in eastern Afghanistan, he "visited" the office of Lajnat al-Dawa in Jalalabad.[291] Likewise, Mercy International's lawyer in Islamabad admitted that Pakistani police had investigated his client in 1994-5 "because [Ramzi] Yousef had made a phone call to the Mercy offices [in Pakistan]."[292]

**173.** Much of the funding responsible for underwriting international Muslim charities has originated from the Arabian Peninsula—and in particular, the Kingdom of Saudi Arabia. The most important state-affiliated charities to become enmeshed in the sponsorship of terrorism include the Muslim World League, the International Islamic Relief Organization, Al Haramain, World Assembly of Muslim Youth, and the Saudi High Commission, among others.

### A. The Muslim World League (MWL)

174. The multi-million dollar Muslim World League (MWL), founded in 1962 to "promote Islamic unity," is one of the largest of the Saudi Islamic evangelical charities.[293] On its current website, MWL lists its main objectives as "to disseminate Islamic Dawah and expound the teachings of Islam. To defend Islamic causes in a manner that safeguards the interests and aspirations of Muslims, solves their problems, refutes false allegations against Islam, and repels inimical trends and dogma which the enemies of Islam seek to exploit in order to destroy the unity of Muslims and to sow seeds of doubt in our Muslim brethren."[294] In 1997, Prince Majid bin Abdel Aziz, emir of the Mecca province, attended a meeting of the MWL Constituent Council in Saudi Arabia and delivered a speech on behalf of King Fahd. During his lecture, he called MWL "an outstanding Muslim body" that "has devoted its concern to Muslim affairs, and… the spreading of the Islamic call in accordance with the Islamic rite."[295]

---

289 http://www.ustreas.gov/offices/eotffc/ofac/sanctions/terror.txt. September 2004.

290 Azzam Publications. "What Sheikh Abdullah Azzam said about Khalid Ash-Sheikh Muhammad." Azzam Publications news update carried by IslamicAwakening.com. http://www.as-sahwah.com/discus/messages/3079/3079.html. March 4, 2003; see also The 9/11 Commission Report. Final Report of the National Commission on Terrorist Attacks Upon the United States. July 22, 2004. *Pages 146-147.* See also: "After Debriefing Report [on ABDUL HAKIM ALI HASHIM MURAD]." Philippine National Police Criminal Investigation Command; Camp Crame, Quezon City. February 18, 1995 (1400hrs-1535hrs).

291 The 9/11 Commission Report. Final Report of the National Commission on Terrorist Attacks Upon the United States. July 22, 2004. *Page 488.*

292 Pallister, David and Jamie Wilson. "Muslim relief groups caught in crossfire." Guardian (London). September 26, 2001. http://society.guardian.co.uk/disasterresponse/story/0,1321,558348,00.html

293 "Saudi Arabian Information Resources: Muslim World League." http://www.saudinf.com/main/k312.htm. March 1, 2003.

294 "About the Muslim World League." http://www.arab.net/mwl/about.htm

295 "AT THE OPENING OF THE MUSLIM WORLD LEAGUE MEETING: THE CUSTODIAN OF THE TWO HOLY PLACES CALLS FOR ISLAMIC SOLIDARITY TO OVERCOME OBSTACLES." *Ain al-Yaqeen.* December 15, 1997. http://www.ain-al-yaqeen.com/issues/19971215/feat1en.htm.

175. As part of this mission over the past two decades, MWL has also secretly provided critical financial and organizational assistance to Islamic militants loyal to Al-Qaida and Usama Bin Laden. According to credible Al-Qaida sources, Bin Laden's original jihad mentor, Shaykh Abdallah Yousif Azzam, was first sponsored by the Muslim World League to open and head a branch office in Peshawar, Pakistan, in order to aid arriving Arab-Afghan volunteer fighters starting in the early 1980s. The Peshawar office was financed by Usama Bin Laden, and later was subsidized by large donations from the Kingdom of Saudi Arabia.[296] Simultaneously, the Egyptian MWL branch office served as the "third route to the Al-Ansar House in Jedda." The Al-Ansar House was one of Bin Laden's "guest houses" used to funnel recruits to terrorist training camps.[297] International law enforcement investigators later recovered a copy of a report written on an MWL/IIRO letterhead documenting "a meeting between Abu Abdallah/Dr. Abdallah Naseef/Sheikh Abdel Majeed Zindani and Dhiaul Haq" to establish a "secret" agreement seeking "an open license for the borders... in a way that League offices will be opened as (illegible) for the Pakistanis, and the attacks will be launched from them (these offices), and that there are no gatherings inside the cities which will attract attention."[298] Mujahideen supporters were advised to "pursue finding an umbrella which you can stay under, other than the Crescent... I prefer the name of the [Muslim World] League because Dr. Naseef is one of the brothers."[299] Dr. Abdullah Omar Naseef served as Secretary General of the Muslim World League from 1983 to 1993.

176. The Peshawar, Pakistan MWL branch office was taken over for a time by Wael Hamza Jalaidan (a.k.a. Abu Al-Hasan Al-Madani), an old friend of Usama Bin Laden and Abdallah Azzam, and one of the original founders of Al-Qaida.[300] In a 1999 interview with Qatar-based Al-Jazeera television, Bin Laden discussed the assassination of Abdallah Azzam ten years earlier and the founding of Al-Qaida. He recalled, "We were all in one boat, as is known to you, including our brother, Wa`el Julaidan."[301] Jalaidan also served as the veteran director of the Saudi Red Crescent in Pakistan during the critical years of the Soviet-Afghan jihad.[302] In February 2000, Jalaidan was appointed to the Board of Trustees of the Rabita Trust (another financial arm of MWL in Pakistan) and served as its Director General.[303] Soon thereafter, U.S. officials sent a confidential memorandum to UN police forces in southeastern Europe titled "Secret: US office only-Release

---

[296] Muhammad, Basil. *Al-Ansaru l'Arab fi Afghanistan*. The Committee for Islamic Benevolence Publications; ©1991. *Page 193.*

[297] Sharaf-ad-din, Nabil. "Usama BinLaden - A Millionair[sic] Finances Extremism in Egypt and Saudi Arabia." *Rose Al-Yusif*. No. 3388. May 17, 1993.

[298] United States v. Enaam Arnaout. Document name: /TAREEKHOSAMA/49/Tareekh Osama.121.

[299] United States v. Enaam Arnaout. Document name: /TAREEKHOSAMA/49/Tareekh Osama.121.

[300] Sharaf-ad-din, Nabil. "Usama BinLaden - A Millionair[sic] Finances Extremism in Egypt and Saudi Arabia." *Rose Al-Yusif*. No. 3388. May 17, 1993. See also: Muhammad, Basil. *Al-Ansaru l'Arab fi Afghanistan*. The Committee for Islamic Benevolence Publications; ©1991. *Page 26.*

[301] Office of Public Affairs, United States Treasury Department. "Treasury Department Statement on the Designation of Wa'el Hamza Julidan." September 6, 2002. Document #PO-3397.

[302] Muhammad, Basil. *Al-Ansaru l'Arab fi Afghanistan*. The Committee for Islamic Benevolence Publications; ©1991. *Page 187.*

[303] Office of Public Affairs, United States Treasury Department. "Treasury Department Statement on the Designation of Wa'el Hamza Julidan." September 6, 2002. Document #PO-3397.

to UNMIK [the U. N. administration in Kosovo]." The document named MWL representative Wael Jalaidan as an associate of Usama Bin Laden and stated that Jalaidan had directly assisted Bin Laden to "move money and men to and from the Balkans."[304] Finally, in the wake of September 11, the MWL's Rabita Trust itself was officially designated by the U.S. government as an organization that provided illegal logistical and financial support to Al-Qaida.[305]

177. U.S. authorities have also alleged personal contacts between Jalaidan and senior military lieutenants of Bin Laden, including Dr. Ayman al-Zawahiri and now captured terrorist mastermind Abu Zubaydah. Under interrogation by U.S. authorities, the latter claimed that he accompanied Jalaidan from Pakistan to Kandahar, Afghanistan during the summer of 2000. Moreover, according to Abu Zubaydah, upon his arrival in Kandahar, Jalaidan met personally with Usama bin Laden and former Al-Qaida military chief Mohammed Atef (a.k.a. Abu Hafs al-Masri). As a result, on September 6, 2002, the U.S. and Saudi governments announced an unprecedented joint action to freeze Jalaidan's assets and to specially designate him as a supporter of international terrorism.[306]

### B. The International Islamic Relief Organization (IIRO)

178. The Jeddah-based charity International Islamic Relief Organization (IIRO) (Hay`at al-Ighatha al-Islamiyya al-`Alamiyya), known locally as "Ighatha", "IGASA", or "IGASE", was founded in 1978 as a branch of the Muslim World League (MWL). Over the last thirty years, IIRO has become quite infamous for its often direct and inexplicable links to violent jihadists, including Al-Qaida and Usama Bin Laden. Following the 1998 Embassy bombings in East Africa, the group's chapter in Nairobi was deregistered by the government of Kenya for its alleged connection to the terrorists responsible for the devastating blasts. In the wake of the American retaliation for the suicide bombings, Indian police arrested a number of suspects charged in a successive attempted attack on the US consulates in Madras and Calcutta. This terrorist cell was led by a Bangladeshi national, Sayed Abu Nasir, acting on orders from, among others, Shaykh Ahmed al-Gamdin, director of IIRO operations in Asia.[307]

179. According to the Philippine military's southern command, the IIRO local office in Zamboanga City is the prime coordinating center for the Abu Sayyaf Group, a coalition of secessionist Islamic militants in the southern region of the Philippines linked to *Al-Qaida*. The Zamboanga office, established in 1992, was under the direct control and guidance of Mohammad Jamal Khalifa, the 37-year-old brother-in-law of Usama Bin Laden. Khalifa, known to be close to Usama, was detained by American law enforcement officials as he attempted to return from San Francisco to the Philippines on December 16, 1994. Travelling with Khalifa on this occasion was

---

[304] Cited in news report by British Broadcasting Company (BBC). April 3, 2000.

[305] Office of Public Affairs, United States Treasury Department. "Treasury Department Statement on the Designation of Wa'el Hamza Julidan." September 6, 2002. Document #PO-3397.

[306] Office of Public Affairs, United States Treasury Department. "Treasury Department Statement on the Designation of Wa'el Hamza Julidan." September 6, 2002. Document #PO-3397.

[307] Dugger, Celia W. "Anti-U.S. Plot in India Is Foiled; Militant Islamist Intended to Bomb 2 Consulates, Police Say." The New York Times. January 21, 1999. *Page 4*.

Mohamed Loay Bayazid (a.k.a. Abu Rida al-Suri), one of the founders and key international operatives of *Al-Qaida*. After searching Khalifa's electronic organizer and personal address book, agents found entries for two telephone numbers of intimate associates of Ramzi Yousef, the convicted bombmaker in the February 1993 World Trade Center attack. They also discovered documents on Khalifa "referring to the assassination of bishops and bombings of churches (at a time when evidence gathered in the investigation indicates that... others were planning to kill the Pope during a planned January 1995 visit to the Philippines and after churches had already been bombed in the Philippines in the preceding year)."[308] Four days later, a State Department cable to the American Embassy in Khartoum, Sudan referred to IIRO administrator Khalifa as a "known financier of terrorist operations."[309]

180. Dr. Farid Qurashi, IIRO's former "general supervisor," has publicly boasted that "IIRO was the first relief organization to enter Bosnia-Herzegovina and the Balkan region. From the very beginning of the Bosnia war, we were there to help."[310] According to the Bosnian Muslim Army's Military Intelligence Service, IIRO's employees seemed to oddly "fluctuate... in and out of the humanitarian organization. They successively communicate with the members of the squad 'El-Mudzahidin' (Tesanj) and are the bearers of a so-called Pan-Arabian idea... They tend to change traditional living and religious norms of behavior of Bosnians-Moslems. This culminates through various reactions and confrontations, fights within the community."[311] In an exclusive prison interview, former American mujahideen recruit Randall Todd Royer (a.k.a. Ismail Royer), who participated in the Bosnian jihad, acknowledged that IIRO's reputation was "well-known" in the Balkans: "it was well known that they helped get 'people' into Bosnia." Royer explained that another mujahideen fighter in Zenica had openly discussed his efforts to use IIRO in order to obtain identity cards for fellow jihadis.[312]

181. A United Nations Security Council report noted that, in the summer of 1992, "troops from Saudi Arabia allegedly killed three Serbian Territorial Defence members and placed the victims' severed heads on poles near the 'Tesanj turret.'"[313] In September 1992, Balkan press agencies published photos depicting the severed heads of Serb soldiers killed by foreign mujahideen collected in boxes. The photos had been seized from the belongings of fallen Saudi Arabian nationals fighting with local Muslim forces in July and August near Tesanj. Also confiscated alongside the images were business cards for companies in the Persian Gulf and an

---

[308] Sworn affidavit of FBI Special Agent Robert Walker. United States of America v. Benevolence International Foundation, Inc. April 29, 2002. District of Illinois, Eastern Division. Case number: 02CR0414.

[309] Sworn affidavit of FBI Special Agent Robert Walker. United States of America v. Benevolence International Foundation, Inc. April 29, 2002. District of Illinois, Eastern Division. Case number: 02CR0414.

[310] "IIRO saves forty thousand Bosnians from starvation." Moneyclips. July 4, 1993.

[311] "Disruption of the enemy's activities." Memorandum dispatched from Zenica by Colonel Ramiz Dugalic, commander of the Ministry of Defense Security Administration Republic of Bosnia and Herzegovina. Army of Bosnia and Herzegovina (ARBiH) Security Service Department. Classified No. 258-33. September 14, 1994.

[312] Interview with Randall Todd Royer (a.k.a. "Ismail Royer") at the Alexandria Detention Center; Alexandria, VA. June 30, 2004.

[313] Final Report of the United Nations Commission of Experts Established Pursuant to Security Council Resolution 780 (1992): Annex III.A: Special Forces. May 27, 1994. EX: 0027-7184-0027-7441.

IIRO humanitarian worker identification card. The recovered card was labeled with the name and photo of "Khalil Abdel Aziz," a teacher from Saudi Arabia, and indicated that it had been printed by the Peshawar, Pakistan office of IIRO.[314] The discovery of the identification card in Bosnia was no coincidence: until he moved to Europe in the early 1990s, the Egyptian Islamic radical Abu Talal al-Qasimy had personally been in charge of the very same IIRO issuing office in Peshawar.[315]

182. By mid-1993, the operations of the International Islamic Relief Organization in Bosnia-Herzegovina were under the primary oversight of a Palestinian national known as Abdelaziz Zaher (a.k.a. Abu Anas, Abu Enes) and his deputy, an Algerian national, Djamel Lamrani (a.k.a. Abu Musab al-Djazairi). Zaher was expelled from his former residence in Belgrade at the beginning of 1993 after being tied by Serbian authorities to various organizations suspected of aiding armed fundamentalist militant groups, including IIRO.[316] In the aftermath of his expulsion from Yugoslavia, Zaher moved his base of operations to Vienna and Zagreb.[317] One the IIRO's initial management team in Vienna in 1992, Sukarno Ali Hassanein (brother of Third World Relief Agency [TWRA] chief El Fatih Hassanein) recalled during a later interview with Austrian police, "I know him as Zaher Abdelaziz, [he] works for IGASA/IIRO. He might be the boss for Vienna or Zagreb. He is one of our successors at IGASA." As to what he meant by "successors," Sukarno explained, "we haven't been representing this organization for a year and half already since the Main Office in Saudi Arabia sent their own people to Vienna."[318]

183. Zaher was an eyewitness, and a possible accessory to, the 1994 murder of British aid worker Paul Goodall near Zenica—acknowledged by the Bosnian Muslim Army at the time as "one of the most serious incidents caused by the members of the [El-Mujahidin] unit."[319] On January 27, 1994, three Britons—Simon King, David Court, and Paul Goodall—working for their government's Overseas Development Administration (ODA), were traveling through Zenica at night in a UN-marked Land Rover. After being chased and forced off the road, five Arabic-speaking "bearded gunmen" in combat fatigues quickly alighted from a Volkswagen Golf. Instead

---

314 Compass Newswire. November 1, 1995. See also: Emerson, Steven. "An Investigation into the Modus Operandi of Terrorist Networks in the United States: The Structure of Osama Bin Laden, Al-Qaeda, Hamas and other Jihadist Organizations in the United States." Testimony given before the House Subcommittee on National Security, Veterans Affairs and International Relations of the House Committee on Government Reform. October 11, 2001.

315 Compass Newswire. November 1, 1995.

316 Vujicic, D. "Bombs in the Name of the Almighty: Part II." *Vecernje Novosti* (Belgrade). September 27, 2001. Page 13.

317 According to a report from the Bosnian MUP police service, "in those days", four other individuals were known to work alongside Zaher in the IIRO's regional headquarters: Saudi national Dr. Abdala Alabdan, "Abdalin", Palestinian national Muhamed Salah, and Syrian national Mustafa Hamami. See: "Subject: ABDEL RAHMAN MAMDOUH – Operative Data." Internal memorandum from the BiH FMUP Special Detachment, Department for the Tuzla Canton; #12/2-3-356/04. Dated: April 5, 2005.

318 Minutes of Austrian police interview with Sukarno Ali Hassanein following search of premises belonging to El Fatih Hassanein. September 5, 1995.

319 "Review of the Information on Activities of the Persons from Afro-Asian Countries Directly Before the War and During the War in the Territory of BIH Republic." Report written by the BIH Administration of the Military Security Service– Department for Analytical and Informative Affairs." Sarajevo; May 6, 1995.

of holding the Westerners hostage, their assailants confiscated their coats and wallets, and forced them to lie on the ground. Within twenty minutes, another unidentified car arrived with two more gunmen. After a "short discussion," one of the men suddenly turned and shot Paul Goodall twice at short range in the back of his head.[320] A Bosnian police checkpoint near the crime scene noticed the Volkswagen Golf as it later passed by and marked its license number. Two days later, local authorities located the Golf and arrested three men inside: Saudi national Abdul Hadi al-Qahtani (a.k.a. Abdul Hadi al-Gahtani), "Abu Khulud al-Yemeni", and "Abu Enes" (a.k.a. IIRO chief Abdelaziz Zaher). At the time of his arrest, al-Qahtani was carrying an identification card issued by the Zenica office of the Saudi High Commission for Relief.[321] Dzemaludin Mutapcic, the deputy prosecutor of Zenica, announced to reporters that al-Qahtani had come to Bosnia "to fight in the way of God, to save Bosnia's Muslims."[322]

184. When shown a photograph of al-Qahtani, both King and Court allegedly identified him as the lead assailant behind the murder of Paul Goodall.[323] Asim Fazlic, then-chief of police in Zenica, commented, "One of the strangest elements is that we still do not know the exact identity of [those]... we hold in Zenica. They are very uncooperative and so far still insist, in spite of their car, uniform and weapons, that they are humanitarian aid workers helping privately funded organisations."[324] In a letter dated January 30, 1994, deputy commander of the El-Mudzahid Unit Dr. Abul-Harith al-Liby appealed to "authorized individuals" in the BiH Military Police and security services to release the two "mujahideen" arrested alongside Abdulhadi al-Qahtani:

> We came to Zenica together on Friday [January 28] of this year and spent the whole day in Trokuce, i.e. in the Command of the Detachment. In the evening of the same day [January 28] these two Mujahedins left, together with Abdulhadi Alkahtani, [a] person who was in our unit until one month ago, when he left the unit and went to work at the Saudi Organisation 'IGASE.' However, [Al-Qahtani] continued to visit our premises, just like this Friday... [On] Friday evening him and the two Mujahedins (Abu Hulud and Abu Enes) went towards Mehuric in a vehicle owned by a brother from 'IGASE.' Therefore, I confirm that these two brothers Mujahedins have nothing to do with the event that happened on [January 27]... I am personally responsible for them and their actions... In the name of all the Mujahedins, I request the two Mujahedins to be released... We want complete co-operation with the authorised organs for establishing peace and order in the Republic of Bosnia and

[320] Stephen, Chris. "Shots First then the Questions." The Guardian (London). June 16, 1994. Page T4.

[321] Higgins, Andrew et al. "Assault on Charities is Risky Front for U.S." The Wall Street Journal. October 16, 2001.

[322] Stephen, Chris. "No Justice over Murdered British Aid Worker as Suspect Languishes Behind Prison Bars." The Guardian (London). March 23, 1994. Page 1.

[323] Stephen, Chris. "No Justice over Murdered British Aid Worker as Suspect Languishes Behind Prison Bars." The Guardian (London). March 23, 1994. Page 1.

[324] Loyd, Anthony. "3 held for Goodall murder." The Times (London). February 2, 1994.

Herzegovina... [which] will be held responsible in case of ill-treatment of brothers Mujahedins.[325]

185. It should be noted that, in his letter, the deputy commander of the mujahideen identified both "Abu Enes" (Zaher) and his colleague Abdulhadi al-Qahtani interchangeably as "mujahideen" and as "employees" of IIRO ("IGASE"), who were detained by BiH authorities as part of a murder investigation while traveling in an IIRO employee-owned vehicle. Following the end of the war in Bosnia-Herzegovina in late 1995, Abdelaziz Zaher and IIRO continued their operations in the Balkans. The same year, "with the financial help of Selim Ben Mafuz, the executive director of 'Igasa' in Vienna", Zaher and other local IIRO organizers founded two commercial enterprises, "Sahara" and "Isra-Trade" which allegedly were the recipient of suspicious financial transfers from "residential accounts of the H.O. 'Igasa.'"[326]

186. The list of connections between IIRO and terrorism continued to grow in the late 1990s. According to a guidebook on Islamic charitable organizations printed by NATO, in April 1995, "the regional financial accountant for the IIRO, an Egyptian named Hossam Meawad Mohammad Ali, was detained by Croatian authorities in a raid in Zagreb" for his involvement in alleged criminal activity.[327] Years later, Fayez Ahmed Alshehri, one of the September 11 airline hijackers, told his father he was going to go work for the IIRO and never saw his family again.[328] Even Mohammed al-Zawahiri, leader of the Egyptian Islamic Jihad's military wing and the brother of Dr. Ayman al-Zawahiri (Bin Laden's personal physician and top advisor), worked and traveled around the world on behalf of IIRO.[329]

187. During subsequent testimony before the Pentagon's Administrative Review Board, Guantanamo Bay enemy combatant detainees have made a number of references to their involvement in IIRO—such as a Saudi national from Dammam who identified himself as "a [Saudi] government employee of a charitable organization... the IIRO, International Islam Relief Organization" and insisted that Al-Qaida's Al-Farouq training camp in Afghanistan—where at least seven of the 9/11 suicide hijackers were trained—was a "charity-funded camp."[330] Another detainee—an unnamed Algerian who "voluntarily traveled from Mauritania, Africa to Islamabad,

---

[325] Letter from Dr. Abul-Harith al-Liby. Dated: January 30, 1994. International Prosecutors v. Rasim Delic. International Criminal Tribunal for the Former Yugoslavia (ICTFY). Exhibit 0403-3847-0403-3847.

[326] "Subject: ABDEL RAHMAN MAMDOUH – Operative Data." Internal memorandum from the BiH FMUP Special Detachment, Department for the Tuzla Canton; #12/2-3-356/04. Dated: April 5, 2005.

[327] January 1996 CIA Report on "International Islamic NGOs" and links to terrorism. Page 1. See also: Affidavit by Senior Special Agent David Kane (Bureau of Immigration and Customs Enforcement, Department of Homeland Security). United States of America v. Soliman S. Biheiri. United States District Court for the Eastern District of Virginia, Alexandria Division. Case #: 03-365-A. August 14, 2003. Page 2.

[328] Ba-Isa, Molouk Y. and Saud Al-Towaim. "Another Saudi ' hijacker' turns up in Tunis." Middle East Newsfile. September 18, 2001.

[329] "Official sources deny reports on UAE's extradition of Islamist." Al-Hayat. June 7, 2000.

[330] Set_44_2922-3064. Pages 103-104.

Pakistan in 1987 to work for [IIRO]"—likewise admits that he "received weapons training on the Kalashnikov rifle while working for the IRO… near the border town of Peshawar."[331]

188. As a result of the overwhelming evidence assembled against IIRO, the Canadian government (among others) has classified it as "secretly fund[ing] terrorism," officially branding it a terrorist charity.[332] According to Canadian court documents, Mahmoud Jaballah, a suspected Egyptian Al-Jihad militant jailed in Canada and accused of having contact with Al-Qaida operatives, spent three years working for the International Islamic Relief Organization in Pakistan. The Canadian Security and Intelligence Service CSIS "believes that Jaballah continues to actively support [Al-Jihad's] terrorist agenda." As a result of their investigation, CSIS concluded that "the degree of Jaballah's dedication to the cause is such that Jaballah would resort to violence and would direct others to resort to violence if he was ordered to do so by leaders such as Osama Bin Laden or Dr. Ayman Al-Zawaheri."[333] Among others, Jaballah was suspected of cooperating with senior Canadian Al-Qaida lieutenant Ahmad Saeed Khadr (a.k.a. Abdel Rahman Al-Kanadi), considered to be a highly influential figure in the international terrorist financing network.[334]

### C. World Assembly for Muslim Youth (WAMY)

189. The Jeddah-based World Assembly for Muslim Youth (WAMY) is a poignant example of the shadowy Saudi charitable entities that have helped support Al-Qaida over the past two decades. Founded in 1972, WAMY claims to be the world's largest Muslim youth organization.[335] WAMY sponsors various "humanitarian" causes, including religious youth camps around the world—including in Western Europe and North America. The following is an excerpt from an officially sanctioned song to be performed by campers, as printed in an English-language WAMY training manual obtained in the United Kingdom:

> Youth of [Islam] are the guided youth. Come! Come to a final decision: The Prophet has called out and so has the Qur'an. So blessed is the servant who responds when he is called… Bring back the glory to it's lions, And restore the zeal to its soldiers. Flatten evil in its cradle, And unsheath the swords… Hail! Hail! O sacrificing soldiers! To us! To us! So we may defend the flag. On this Day of Jihad, are you miserly with your blood?![336]

---

331 Set_12_1179-1239. Page 16.

332 Evidence introduced by the Canadian government in the trial of Mahmoud Es-sayy Jaballah

333 "Respondent's (Moving Party) Motion Record." The Minister of Citizenship and Immigration and Mahmoud Jaballah. Docket: DES-6-99. June 2, 1999. *Pages 61-62.*

334 "Respondent's (Moving Party) Motion Record." The Minister of Citizenship and Immigration and Mahmoud Jaballah. Docket: DES-6-99. June 2, 1999. *Page 10.*

335 http://www.wamyusa.org/about/about%20wamy.htm, as of December 10, 2002.

336 "Islamic Camps Objectives, Program Outlines, Preparatory Steps." World Assembly of Muslim Youth (WAMY); Riyadh, Saudi Arabia. Prepared by the Camps & Conference Unit of the World Assembly of Muslim Youth 1987. Translated (with additions) by Abu-Bakr M. Asmal 1990. Obtained at the WAMY Western Europe Office; 46 Goodge Street; London, UK.

190. There are numerous other connections linking WAMY to international terrorist organizations and terrorist financing. In fact, the U.S. branch of WAMY was incorporated in 1992 by Usama Bin Laden's own nephew Abdullah in Falls Church, Virginia.[337] In November 2001, international media reported that WAMY's Peshawar office was raided in a joint FBI-Pakistani intelligence operation.[338] A WAMY employee was subsequently questioned for allegedly hand delivering a recorded message from Usama Bin Laden to local media.[339] In that tape, bin Laden praised various terrorist attacks—including the Bali nightclub bombing that killed over 200 people and the Chechen takeover of a theatre in Moscow that led to over 150 deaths. In June 2004, federal agents from the Federal Bureau of Investigation (FBI), the Bureau of Immigration and Customs Enforcement (ICE), and the Joint Terrorism Task Force (JTTF) raided Abdullah Bin Laden's WAMY office in Virginia, allegedly "in connection with a terrorism-related investigation." Agents seized all of the files and computer hard drives in WAMY's offices. Additionally, a WAMY board member was arrested on immigration charges.[340]

191. WAMY continues to fund numerous "charitable" projects—including in neighboring Iraq, where donations in 2004 alone totaled over $200,000. In late 2002, an Internet website affiliated with the Ansar al-Islam terrorist organization in northern Iraq released a photo showing Ali Bapir—a detained Ansar al-Islam commander—at a public event sponsored by WAMY and featuring banners emblazoned with the WAMY logo.[341] During the spring of 2003, the U.S. military launched several cruise missile attacks on terrorist targets in Kurdistan, including several of Bapir's "compounds" in the foothills near the town of Khurmal. Bapir surrendered, and several days later was taken with other surviving members of his group to the town of Ranya. Bapir was subsequently re-arrested by U.S. military forces on July 10, 2003 for allegedly supporting Ansar al-Islam. As of last report, Bapir remains in the custody of the American military.

192. WAMY's corporate structure has hidden other, darker secrets as well—such as the benignly-named Benevolence International Foundation (BIF), a.k.a. Lajnat al-Birr al-Islamiyya. Lajnat Al-Birr, the precursor to BIF, was established in 1987 in Pakistan and Saudi Arabia by Shaykh Adel Batterjee, a powerful Saudi business magnate in Jeddah. Batterjee (designated as a terrorist by the U.S. government in December 2004) claims to be a former "chairman" of WAMY and reportedly founded BIF as an "affiliate" branch of WAMY.[342] The connections between the two organizations are numerous and troubling. According to a Pakistani Government website, the

---

[337] United States Internal Revenue Service (IRS) Form 1023 Application by WAMY for Recognition of Exemption, filed November 9, 1992.

[338] "Pakistan Questions Sudan Man About Tape." Associated Press. December 9, 2002.

[339] "Pakistan Questions Sudan Man About Tape." Associated Press. December 9, 2002.

[340] Markon, Jerry. "U.S. Raids N.Va. Office Of Saudi-Based Charity." Washington Post. June 2, 2004.

[341] http://www.ayobi.com/photo/isl_17.jpg. August 2002.

[342] Hedges, Chris. "Muslims from afar joining 'Holy War' in Bosnia." The New York Times. December 5, 1992. See also: Basaddiq, Omar. "Islamic Charity Committee moves to new premises." Arab News. May 21, 1994. See also: IRS 990 forms for the "World Assembly of Muslim Youth" submitted for Fiscal Years 1993 through 1999.

local mailing address for WAMY is P.O. Box 1055 in Peshawar.[343] The U.S. Treasury Department's Office of Foreign Assets Control (OFAC) lists the same post office box in Peshawar as a known address of the Benevolence International Foundation (BIF).[344] When 1993 World Trade Center bombing conspirator Ahmed Ajaj was arrested in New York, authorities seized an envelope from him containing Arabic-language terrorist training manuals. The envelope was marked with the letterhead of BIF, with a notation explaining that BIF is a branch of the "World Assembly of Muslim Youth."[345]

193. From its inception, the Benevolence International Foundation (BIF) served as a means for pious, wealthy Muslims to secretly contribute to the jihad in Afghanistan. The Jeddah-based charitable group went to great lengths to protect the reputation of its prestigious donors. In 1993, Adel Batterjee publicly stepped down as head of BIF in exchange for a more behind-the-scenes role. Several years afterwards, the individual who took over Benevolence from Batterji, Enaam Arnaout (a.k.a. Abu Mahmoud Al-Hamawi), instructed his staff to disavow any knowledge of the "founders": "[t]ell him that all we know about them is that they are Saudi Business men and that they left the organization in May 93. Donot[sic] disclose any other information."[346]

194. By 1993, it was hardly a secret that BIF was involved in more than just charitable activities. The entity openly advertised itself in its Arabic-language fundraising appeals as a "trustworthy hand for the support of [both] the mujahideen and refugees" in Bosnia.[347] Similarly, documents taken from BIF's U.S.-based offices in December 2001 included handwritten Arabic notations explaining that its headquarters in Croatia was established "for relief operations and support of jihad in Bosnia-Herzegovina... Contribute with your mujahideen brothers to repel the Crusader-Zionist attack on Muslim lands."[348] Another handwritten note found in Illinois by investigators revealed BIF's supreme "unwritten law": "no matter how poor/sick – first priority is for mujahideen."[349]

195. The raid of BIF's Illinois office by American investigators also turned up a number of other documents directly related to the war in Bosnia: a receipt dated July 21, 1994, from the "Black Swans" Bosnian Muslim commando brigade for 300 blankets and 200 pairs of boots

---

[343] http://www.epb.gov.pk/epb/jsp/ngo.jsp. December 12, 2002.

[344] http://www.treas.gov/offices/enforcement/ofac/sanctions/terrorism.html. December 12, 2002.

[345] United States v. Usama Bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. Government Exhibit 2800-A.

[346] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Pages 28-29.*

[347] Institute for Study and Documentation. "The Balkan War." Video produced by the Committee for Islamic Benevolence, Saudi Arabia (*Lajnat al-Birr al-Islamiyya*).

[348] Sworn affidavit of FBI Special Agent Robert Walker. United States of America v. Benevolence International Foundation, Inc. April 29, 2002. District of Illinois, Eastern Division. Case number: 02CR0414. *Page 29.*

[349] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Page 57.*

obtained from BIF; a receipt from the BiH army dated June 3, 1994, for 2,000 uniforms, 2,000 pairs of shoes, and ten "mass communication stations" donated by BIF to "this military unit"; a request dated December 31, 1994, from the Bosnian military for a combat ambulance (later delivered as promised in January 1995); and, a memorandum to BIF director Enaam Arnaout dated November 17, 1995 describing the recent contribution of 200 tents to the Muslim army.[350]

196. The relationship between BIF and militants fighting in Bosnia went beyond mere financing. The Military Security Service of the Bosnian Muslim Army warned its superiors in May 1995 that known members of the Arab-Afghan mujahideen in the Balkans were "connected with the activists from Arab humanitarian organization 'Benevolence International Foundation.'" The Bosnian Army's Military Security Service further complained that it had received information "indicating that [BIF] abused the humanitarian aid, in a way that they condition the acceptance of the same with the acceptance of [Islam]." According to its own May 1995 internal memorandum:

> In order to win as many as possible followers among the population, so these patrons of the 'new' approach to religion, are visiting the families of soldiers killed in war and offer them aid 100-200 KM in case they accept their way of religion, if not they tell them that their killed member will not be 'sehid' [a martyr]. In their positions they go that far to recommend that closest family relations should be renounced if they do not accept their way of religion and practicing of the same. The consequence of this is the already present polarization between Bosnian-Muslim population and that could have far reaching damaging consequences.[351]

197. A number of employees working at BIF's office in Illinois could not help but notice the glaring inconsistencies in their supposed "humanitarian" work. In a handwritten note recovered by the FBI, a BIF employee wrote unhappily: "That is our mission – Lying to the people."[352] However, some of BIF's other staff members openly embraced the jihadi philosophy espoused by Al-Qaida. Suleman Ahmer, BIF's former operations manager in the United States, was an unabashed supporter of cooperation with radical Islamic movements around the world. In an October 1997 letter to other BIF administrators, Ahmer expressed surprise that the organization would even claim to sponsor relief activities: "we have never worked in the countries which are affected by natural disasters and… we may never work in this area. But somehow in so many of our publications we have that BIF works in areas affected by wars and natural disasters. I wonder

[350] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Pages 67-69.*

[351] "Review of the Information on Activities of the Persons from Afro-Asian Countries Directly Before the War and During the War in the Territory of BIH Republic." Report written by the BIH Administration of the Military Security Service– Department for Analytical and Informative Affairs." Sarajevo; May 6, 1995.

[352] "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Page 57.*

where it came from and so on."[353] Ahmer managed to convince his colleagues to create two separate BIF mission statements, one detailing supposed relief work for public consumption and a second internal document that emphasized "making Islam supreme" for the benefit of the extremist board members.[354]

198. In the aftermath of the September 11 terrorist attacks, the U.S. government froze the assets of BIF and commenced legal action against one of its principle directors and founders, Illinois-resident Enaam Arnaout. In February 2002, Arnaout worriedly contacted his brother "Dr. Hisham" to discuss how "they" had taken the former director of BIF's office in Bosnia "in a special plane... [t]o Cuba." Arnaout, convinced of his own inevitable fate, explained to Hisham how he would attempt to shoulder the blame and exonerate BIF's Saudi founders. He somberly reflected, "It means, we, I mean, there is death that we will be swallowing. Meaning, the razor will fall on us, but we do not know how."[355] Less than a month later, the razor did fall; Bosnian police raided BIF's regional headquarters in Sarajevo and detained its manager, Munib Zahiragic, a former intelligence officer affiliated with the Bosnian Foreign Ministry. Zahiragic reportedly turned over nearly 100 top-secret documents about suspected fundamentalist terrorists operating in Bosnia, including transcripts of communications between BIF management and senior commanders of Al-Qaida based in Afghanistan.[356] Also found were three firearms, a ski mask, numerous military manuals on topics including small arms and explosives, fraudulent passport materials, and photographs of Usama Bin Laden.[357]

199. Several Guantanamo Bay detainees have made references to their work for or association with the World Assembly of Muslim Youth (WAMY) and its now defunct "relief" branch BIF. One of these men, Sudanese national Adel Hassan Hamad was allegedly "employed by the World Assembly of Muslim Youth (WAMY) in Afghanistan and Pakistan for approximately one and one half years until the time of his capture [on] 18 July 2002."[358] The Pentagon charged further, "WAMY supports terrorist ideals and causes."[359] Hamad admitted

---

353 "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Page 53.*

354 "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Page 54.*

355 "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements." United States of America v. Enaam M. Arnaout. United States District Court Northern District of Illinois, Eastern Division. Case #: 02 CR 892. January 31, 2003. *Page 74.*

356 Whitmore, Brian. "Bosnian Charities Tied to Terror." The Boston Globe. July 2, 2002. Page 1.

357 Sworn affidavit of FBI Special Agent Robert Walker. United States of America v. Benevolence International Foundation, Inc. April 29, 2002. District of Illinois, Eastern Division. Case number: 02CR0414. *Page 10.*

358 Set_52_3643-3869. Page 37.

359 Set_52_3643-3869. Page 37.

being employed by WAMY in Pakistan as the "manager of the Assembly hospital" and the person responsible for "distribut[ing] aid supplies to the refugee camps in Pakistan."[360]

**D. Al-Haramain Islamic Foundation (Al-Haramain)**

200. The Al-Haramain Charitable Foundation was a Saudi non-profit Islamic proselytizing organization that engaged in relief works around the world. It had more than 40 international branches working in over fifty countries, and in 1999 spent more than $61 million on various projects worldwide.[361] Al-Haramain also maintained a presence and local offices in the continental United States, primarily in Missouri and Oregon. When asked in Arab news interviews whether Al-Haramain retained "tight control" over its affiliates, the charity's Director-General in Saudi Arabia Shaykh Aqeel Abdulaziz al-'Aqeel responded:

> Yes, of course. The offices' directors are employees who follow the directions of the main office with regards to hiring workers at the offices and making any decisions on cooperation with any party. In the main office, there are 19 auditors. Each of the foundation's specialized committees has an auditor. There are monthly, quarterly, and yearly reports on the foundation's revenue and expenditure.[362]

201. Since the mid-1990s, Al-Haramain has come under official investigation by a variety of international governments and law enforcement agencies. In January 1995, the Committee for the Defense of Legitimate Rights (CDLR), a Saudi dissident group aligned with Usama Bin Laden, reported that Saudi authorities were scrutinizing the activities of Al-Haramain. According to CDLR, "[a]ttacks on voluntary work still continue after the closure of many voluntary or organisations. [King] Fahd has now turned his beady attention to the Al-Haramain institution."[363] When Italian counterterrorism police raided a suspected Al-Gama`at Al-Islamiyya terrorist guesthouse and headquarters in Milan in 1995, they discovered a confidential letter sent to wanted Egyptian terrorist Shaykh Anwar Shaaban from Albania detailing efforts to distribute Al-Gama`at's official magazine, Al-Murabitoun, amongst the personnel working at the Al-Haramain charitable organization in the Balkans.[364]

202. Even the Bosnian Muslim Army's own military intelligence service began issuing warnings about the local charitable activities of the Al-Haramain Foundation. In May 1995, the service sent a lengthy analytical report to senior Bosnian Army commanders regarding the foreign

---

360 Set_52_3643-3869. Pages 38-39.

361 "Saudi Arabia's top Islamic charity denies any of its assets frozen." Agence France Presse. March 13, 2002.

362 Al-Qudayhi, Anis. "Interview with Aqil al-Aqil, general manager of the charitable Al-Haramayn Foundation." Al-Sharq al-Awsat (London). March 16, 2002.

363 The Committee for the Defense of Legitimate Rights (CDLR). "Your Right to Know." CDLR Monitor. No. 30; January 13, 1995.

364 DIGOS (Italy) Anti-Terrorism Report. "Searches at the Islamic Cultural Center, Viale Jenner 50, Milano, 6/26/1995." Dated September 15, 1997.

mujahideen, warning about the "so-called humanitarians, that are in charge of propaganda of the ideas, that these persons are approaching with, with mainly religious teaching – called 'DAWA' (spreading of the religion in the manner of 'vehabijski mesheb')... They manly act through the work of humanitarian organizations 'Islamic Balkan's Center', 'Organization for the Regeneration of Islamic Thought, Kuwait' and 'Al-Haramain.'"[365] The Bosnian Muslim military was cautioned that these organizations were "abus[ing] the humanitarian aid, in a way that they condition the acceptance of the same with the acceptance of 'DAWA'":

> In order to win as many as possible followers among the population, these patrons of the 'new' approach to religion, are visiting the families of soldiers killed in war and offer them aid 100-200 KM in case they accept their way of religion, if not they tell them that their killed member will not be 'sehid' (killed Muslim soldier)... The consequence of this is the already present polarization between Bosnian-Muslim population and that could have far reaching damaging consequences in the next period. These consequences were also pointed by one source from the Military security service, from the category of persons that come from Afro-Asian countries and who said: 'You will deal easily with Arabs, you will expel them at one moment, but you will have your youth indoctrinated youth.' To support these claims, the source pointed out that the activities of the followers (vehabije) in Afghanistan, Pakistan, Kashmir and on Philippines resulted in mutual confrontations of Moslems from different 'meshebs'... This leads to polarization between Bosniaks-Moslems, that could in future have wider scale, and it could even bring to the open mutual confrontations of the followers of the traditional approach to religion and those that accept the 'new' approach.[366]

203. A separate analytical chart issued by the Bosnian-Muslim military intelligence service in November 1995 depicting the hierarchy of the Mujahideen Brigade identified "H.O. 'AL HARAMAIN'" as one of the chief "Foreign Donors to 'El Mudzahidin.'"[367] On March 11, 2002, the U.S. Treasury moved to freeze the assets of the Al-Haramain branch in Bosnia-Herzegovina, charging that it was providing financing to foreign terrorist organizations. Investigators suggested that Al-Haramain's Bosnia office had been linked to the terrorist group

---

[365] "Review of the Information on Activities of the Persons from Afro-Asian Countries Directly Before the War and During the War in the Territory of BIH Republic." Report written by the BIH Administration of the Military Security Service– Department for Analytical and Informative Affairs." Sarajevo; May 6, 1995.

[366] "Review of the Information on Activities of the Persons from Afro-Asian Countries Directly Before the War and During the War in the Territory of BIH Republic." Report written by the BIH Administration of the Military Security Service– Department for Analytical and Informative Affairs." Sarajevo; May 6, 1995.

[367] "Foreign Donors to 'El Mudzahidin" ("Donatori Jedinice 'El Mudzahidin'"). "Shema Hijerarhijskih Odnosa OpO 'Vazal.'" Memorandum issued by the Army of the Republic of Bosnia-Herzegovina (ARBiH) Military Security Service. November 28, 1995.

Al-Gama`at Al-Islamiyya, and that Saudi citizen Wael Jalaidan (a close friend and aide of Usama Bin Laden) was authorized to withdraw money from its local bank account.[368]

204. Al-Haramain was officially banned in Kenya shortly after the devastating U.S. Embassy bombings in August 1998 because the charity was believed to have had a role in the attack.[369] At the time, John Etemesi, chairman of the Kenyan Non-Governmental Coordinating Board, explained that Al-Haramain "had been found to be working against the interests of Kenyans in terms of security... Our investigations reveal that the operations of these organizations are inconsistent with the reasons for which they were registered."[370] Wadih El-Hage, Usama Bin Laden's personal secretary, was a principle convicted conspirator in the 1998 embassy bombings. El-Hage's book of business cards exhibited at the federal trials in New York contains a card for "Mansour A. Al-Kadi" as the "Deputy General Director and Head of Africa-Committee of Al Haramain Islamic Foundation."[371] "Mansuor [sic] Al-Kadi" is also listed as the Vice President of Al-Haramain's Ashland, Oregon office on IRS 990 Forms from fiscal year 2000.[372] Al-Haramain's English-language website further identifies Al-Kadi as a member of its global Board of Trustees.[373]

205. Regarding the U.S. presence in the Muslim world, two months after the 1998 East Africa Embassy bombings, the Al-Haramain English-language newsletter read:

> "The war of the Christian Crusaders is today at its most intense... The Muslim whose mind has not been corrupted cannot bear to see the unbelievers wielding authority, and ordering and prohibiting in his own country. Therefore such a Muslim strives his utmost to expel and distance them - even if he has to sacrifice his own life, or his most cherished possession, for this cause."[374]

206. Likewise, in May 1999, the Al-Haramain English newsletter carried an article endorsing the position of noted Muslim lecturer Jamal al-Din Zarabozo: "What we need are Muslims who are totally committed to Islam... People who are willing to sacrifice for Allah's sake and not fear the harm of anyone. This is what we need. We need a real commitment to Islam. We must strive to support the Muslims and jihads throughout the world with our lives and our

---

[368] Hecimovic, Esad. "Blockading Young Muslims' Way—Misuse of Humanitarian Funds To Support Terrorism." Dani (Sarajevo). November 22, 2002. Pages 36-39.

[369] Jeannine Aversa. "U.S. blocks assets of Islamic charity's operations in Bosnia and Somalia." Associated Press. March 11, 2002.

[370] "Kenya bans six Islamic aid agencies after U.S. Embassy bombing." Associated Press. September 9, 1998.

[371] U.S. v. Usama bin Laden, et al. United States District Court for the Southern District of New York. 116 F. Supp. 2d 489; 2000 U.S. Dist. LEXIS 14507. October 5, 2000, Decided. October 5, 2000, Filed. Government exhibits GX-207 to GX-364.

[372] IRS 990 Form fiscal year 2000 for the "Al-Haramain Foundation."

[373] http://www.alharamain.org/alharamain/eng/inner.asp?order=1&num=1

[374] Shaykh Abdul-Aziz Ibn Baz. "The Ideological Attack." Al-Haramain Newsletter. Vol. 2; No. 10. October 1998.

wealth."[375] In the February 2000 Al-Haramain newsletter, a columnist wrote, "Jihaad is a religious obligation in Islaam. Its aim is to fight oppression and injustice and to remove obstacles which prevent the spread of Islaam. This is accomplish[ed] either by weakening or destroying the disbelieving prevalent political powers so that Muslims can prevent anyone from persecuting their brother Muslims wherever they may be."[376]

207. The official Al-Haramain website carried regularly updated reports on the "The Jihaad In Chechnya" in the form of copies of communiqués issued to "the President of the Asian committee" of Al-Haramain from its representative in Chechnya, Abdul-Lateef Ad-Diraan.[377] Likewise, in a leaked internal memo, the Russian FSB security service accused the Al-Haramain Foundation of transferring $1 million to Chechen Muslim rebels in 1999 and additionally arranging the purchase on their behalf of 500 "heavy weapons" from the Taliban in Afghanistan. According to the Washington Post, the memo quoted purported written exchanges between Arab-Afghan military commanders in Chechnya and Al-Haramain's "director" back in the Saudi Kingdom: "Today, Al-Haramain has $50 million for the needs of the mujaheddin… The reason al Haramain provides assistance a little bit at a time is because it is afraid of the accusations it is assisting the jihad."[378]

208. During the early months of 2000, the Arabic-language version of the Al-Haramain website specifically advertised "sponsoring instructors at the Kavkaz Institute, as well as 25 judges in the Shariah courts."[379] Both the Arabic and English versions of the site also offered scanned copies of two fatwahs endorsing the act of providing financing to the mujahideen in Chechnya issued by Shaykh Abdullah ibn Jibreen and Abu Umar al-Saif's former clerical mentor, Shaykh Mohammed ibn Uthaimeen.[380] According to the fatwah from Shaykh ibn Jibreen, titled "The Situation of the Mujahideen, and the Duties of Muslims Towards Them":

> It is no secret that which has come to exist recently in the country of Chechnya and Daghestan in terms of the communist aggression and that which has occurred as a result of it in killing, displacement, destruction and oppressive harm… It is obligatory upon the Muslims to firstly, supplicate for their Brothers (and Sisters) in that land for victory to overcome their enemies. Secondly, to supply them with weapons and real power with which they are able to strive and kill their enemies (on the battlefield). And, thirdly, to strengthen them with financial donations, as they are in desperate need of food, clothing and all such things… No doubt, the Jihad with money is

---

[375] http://www.alharamain.org/english/newsletter/issue23/feature23.htm. May 1999.

[376] Mosher, A. "Jihaad." Al-Haramain Newsletter. Vol. 4; No. 3. February 2000.

[377] http://www.alharamain.org/alharamain/chechniya/chech_eng01.html. October 2000. See also: http://www.alharamain.org/alharamain/chechniya/chech_eng04.html. October 2000.

[378] LaFraniere, Sharon. "How Jihad Made Its Way to Chechnya Secular Separatist Movement Transformed by Militant Vanguard." The Washington Post. April 26, 2003. Page A01.

[379] http://www.alharamain.org/alharamain/chechniya/arabic/page01.htm. May 2000.

[380] http://www.alharamain.org/alharamain/chechniya/english/page06.htm. October 2000.

> from that which is rewarded and Allah has recommended Jihad with oneself in many verses… We ask Allah to assist His Religion and raise His Word and grant the Mujahideen victory in every land and make firm their foothold.[381]

209. In his own fatwah published on the Al-Haramain website, Shaykh Mohammed ibn Uthaimeen was asked for his "judgment regarding spending charities and Zakat to Muslims" in the Caucasus region "supporting them by self and by wealth." The cleric responded, "giving charity and Zakat for Muslims in the Caucasus, and especially in Chechnya, is permitted, as zakat will be for the Mujahideen and the poor."[382] The fatwah of Shaykh ibn Uthaimeen posted on Alharamain.org appears to be the identical same fatwah also posted on the website Qoqaz.com ("Voice of the Caucasus"), the official website of the Chechen mujahideen.[383] Likewise, the main English-language section of the Al-Haramain website about the "Jihad in Chechnya" contains a prominent and direct "Chechnya web link" to http://www.qoqaz.com.[384]

210. The U.S. Attorney's Office for the District of Oregon has provided me with a series of evidentiary documents, including the affidavit of an agent with the Russian Federal Police Service (FSB), Sergey Nikolayevich Ignatchenko. According to Ignatchenko, "Al-Haramain actively provided financial support to Dagestani, Chechen and Ingush religious extremist groups, followers of Wahhabi ideology":

> These groups were aiming to overthrow the existing constitutional system in those republics, secede from Russia and create a so-called Islamic state in the North Caucasus region of the Russian Federation. We found out that large sums of money in the form of foreign currency were received by… the so-called Kavkaz Islamic Institute (village of Serzhen-Yurt, Chechen Republic). The money was received through one of the branches of the foundation, located in the city of Baku (Azerbaijan)… Despite the fact that officially the funds were intended for religious events of Muslim holiday celebrations, the money was used to support terrorist organizations—to purchase weapons, uniforms, medicine, communication devices, vehicles, and to pay religious extremists' salaries.[385]

---

381 http://www.alharamain.org/images/ibn-jibreen.jpg. October 2000. See also: http://www.alharamain.org/english\images/ ibn-jibreen.jpg. October 2000.

382 http://www.alharamain.org/images/sk-uthaymin.jpg. October 2000. See also: http://www.alharamain.org/english/images/sk-uthaymin.jpg. October 2000.

383 http://www.qoqaz.com/fatwa.jpg. March 2000. See also: http://www.qoqaz.com/fatwa.htm. March 2000.

384 http://www.alharamain.org/alharamain/chechniya/english/page05.htm. March 2000.

385 Interview by Deputy Chief of the 3rd Department of Russian FSB Investigative Division, Lieutenant Colonel of Justice V.V. Romanovskiy of former FSB operative Sergey Nikolayevich Ignatchenko. Moscow, Russia; December 3, 2008. (Transcribed January 26, 2009). File #: 315N PD 45427. Job #: 883.

211. Ignatchenko specifically reported "Chechen separatists" receiving 480,000 Saudi Riyals "through Al-Haramain channels from someone by the name of Mansur bin Abd-al-Rahman Al-Qadi."[386] It should be recalled that, at the time, Mansour al-Kadi was the "Deputy General Director and Head of Africa-Committee of Al Haramain Islamic Foundation."[387] The FSB agent also accused "leaders of Al-Haramain" with knowingly providing illicit financing to the mujahideen in the Caucasus: "the leaders didn't want to expose their improper activities, but did not decline the cooperation of Chechen militants either. This message sent to Chechnya in February of 2000 provides a good illustration: 'Al-Haramain will provide assistance in small installments to avoid accusations of supporting Jihad.'"[388] Ignatchenko identified at least two examples of such behavior by Al-Haramain Director-General Shaykh Aqeel al-Aqeel: "In February of 2000 an emissary from Chechnya (name unknown) informed Sheikh 'Aqil bin 'Abd-al-'Aziz al-'Aqil about preparing major terrorist operations against Russian troops during the presidential elections campaign. Tomorrow night you will receive a fax from us with the outlines of 'Argun' and 'Groznyy' operations. Review and discuss it."[389] Later, Ignatchenko added:

> We intercepted a message from abroad that, according to our data, was sent by 'Aqil Bin-'Abd-al-'Aziz al-'Aqil to Taj (warlord Khattab): 'The cargo is ready to be shipped: RPGs and rounds of ammunition for them, along with rounds for other systems; machine guns, Kalashnikov assault rifles, sniper rifles. We purchased 1000 rounds of ammunition, AGS, one PTUR 'Fagot', 500 [bulletproof] vests.' In response, Khattab asks to immediately send 500 sets of summer and winter weight uniforms, sleeping bags and shoes: 'I don't care how much you have to pay—1,000, 2,000, or 5,000. Make an urgent delivery by car... We are in dire need of tents.[390]

212. It should be noted that the behavior described above by FSB agent Ignatchenko is remarkably analogous to similar fraudulent activities in the Caucasus by other Islamist "charities" (such as the Benevolence International Foundation, the Global Relief Foundation, and the Qatar Charitable Society). It is also consistent with matching irregularities that have surfaced in Al-

---

[386] Interview by Deputy Chief of the 3rd Department of Russian FSB Investigative Division, Lieutenant Colonel of Justice V.V. Romanovskiy of former FSB operative Sergey Nikolayevich Ignatchenko. Moscow, Russia; December 3, 2008. (Transcribed January 26, 2009). File #: 315N PD 45427. Job #: 883.

[387] U.S. v. Usama bin Laden, et al. United States District Court for the Southern District of New York. 116 F. Supp. 2d 489; 2000 U.S. Dist. LEXIS 14507. October 5, 2000, Decided. October 5, 2000, Filed. Government exhibits GX-207 to GX-364.

[388] Interview by Deputy Chief of the 3rd Department of Russian FSB Investigative Division, Lieutenant Colonel of Justice V.V. Romanovskiy of former FSB operative Sergey Nikolayevich Ignatchenko. Moscow, Russia; December 3, 2008. (Transcribed January 26, 2009). File #: 315N PD 45427. Job #: 883.

[389] Interview by Deputy Chief of the 3rd Department of Russian FSB Investigative Division, Lieutenant Colonel of Justice V.V. Romanovskiy of former FSB operative Sergey Nikolayevich Ignatchenko. Moscow, Russia; December 3, 2008. (Transcribed January 26, 2009). File #: 315N PD 45427. Job #: 883.

[390] Interview by Deputy Chief of the 3rd Department of Russian FSB Investigative Division, Lieutenant Colonel of Justice V.V. Romanovskiy of former FSB operative Sergey Nikolayevich Ignatchenko. Moscow, Russia; December 3, 2008. (Transcribed January 26, 2009). File #: 315N PD 45427. Job #: 883.

Haramain Foundation operations and financing in other conflict zones, such as Bosnia-Herzegovina and Kosovo.

### E. Saudi High Commission (SHC)

213. The headquarters of the Saudi High Commission in Bosnia is located inside the Islamic Cultural Center attached to the Saudi-funded King Fahd Mosque in Sarajevo. The impact of the mosque's religious missionary work is obvious within only steps of its front door. On multiple occasions over the past five years, I have purchased hardcore jihad propaganda videos openly on sale in vendor stalls set up outside the mosque entrance. In October 2009, the items for sale included a crudely-made DVD labeled on one side, "Microsoft Flight Simulator: World Trade Center Edition"—and on the other, emblazoned with images of Usama Bin Laden and the World Trade Center, along with the title (in Bosnian), "The Truth about September 11."

214. The 1996 CIA report on Islamic charities noted with interest that the Saudi High Commission's offices in Bosnia were "staffed by Saudis, Syrians, Algerians, Moroccans, and Jordanians."[391] Likewise, an internal classified memorandum from the Muslim Army of Bosnia-Herzegovina Security Service in September 1994 acknowledged, "what is interesting regarding the humanitarian organization Saudi-Arabian High Commissariat in Zenica, is that they employ members of the El-Mujahidin Unit."[392] The ARBiH document added "Salem H.A. Hamdi, director of the High Saudi Arabian Commissariat... has well-established cooperation with... 'El-Mujahidin' units in Middle Bosnia."[393] According to an official NATO/SFOR guidebook to "The Islamic Organizations in the Balkans," the Saudi High Commission "facilitated movement of mujahidin during the fighting in Bosnia from 1992 to 1995" and "provided funds to mujahidin who remained in Bosnia."[394] Other original documents recovered by the International Criminal Tribunal for the Former Yugoslavia (ICTFY) indicate that Saudi High Commission resources were used throughout the 1990s to provide weapons and financing directly to foreign mujahideen fighters trained in Afghanistan and elsewhere. The U.S. Department of Defense has concluded, "the Saudi High Commission for Relief... provided financial support to former Arab Mujahedin in Bosnia. The types of financial support included... travel to Chechnya and Afghanistan."[395]

---

[391] January 1996 CIA Report on "International Islamic NGOs" and links to terrorism. Page 1. See also: Affidavit by Senior Special Agent David Kane (Bureau of Immigration and Customs Enforcement, Department of Homeland Security). United States of America v. Soliman S. Biheiri. United States District Court for the Eastern District of Virginia, Alexandria Division. Case #: 03-365-A. August 14, 2003. Page 2.

[392] "Disruption of the enemy's activities." Memorandum dispatched from Zenica by Colonel Ramiz Dugalic, commander of the Ministry of Defense Security Administration Republic of Bosnia and Herzegovina. Army of Bosnia and Herzegovina (ARBiH) Security Service Department. Classified No. 258-33. September 14, 1994.

[393] "Disruption of the enemy's activities." Memorandum dispatched from Zenica by Colonel Ramiz Dugalic, commander of the Ministry of Defense Security Administration Republic of Bosnia and Herzegovina. Army of Bosnia and Herzegovina (ARBiH) Security Service Department. Classified No. 258-33. September 14, 1994.

[394] "Islamic Organizations in the Balkans." A Joint Research Project by the Governments of the United States and the United Kingdom. August 2003.

[395] http://www.dod.gov/pubs/foi/detainees/csrt_arb/ARB_Round_2_Factors_900-1009.pdf. Pages 994-995.

215. In January 1994, a British humanitarian aid worker named Paul Goodall was kidnapped near the Bosnian town of Zenica and then brutally executed by five Arabic speaking "bearded gunmen" wearing combat fatigues. At the time, Goodall's murder was privately acknowledged by the Bosnian Muslim Army to be "one of the most serious incidents caused by the members of the [El-Mujahidin] unit."[396] A coroner involved in the UK inquest of Goodall's death commented that the Briton's fate was "most horrid and unnecessary... It is hard to grasp how any human beings can behave in such a fashion to fellow human beings."[397] Two days later, Bosnian police detained Saudi Arabian national Abdul Hadi al-Qahtani for his alleged role in the murder. At the time of his arrest, al-Qahtani, a foreign fighter in his early thirties, was reportedly carrying an identification card issued by the Zenica office of the Saudi High Commission for Relief.[398] Al-Qahtani was quickly able to escape police custody under suspicious circumstances, and was sighted soon thereafter by Bosnian military intelligence back at the main foreign mujahideen base of operations in Zenica.

216. This pattern of activity continued even long after the end of the war in Bosnia-Herzegovina and the signing of the Dayton Peace Accord. On September 18, 1997, a Volkswagen Golf, packed with 80 kilograms of mixed explosives (including anti-tank mines) strapped to a timer, exploded in the western district of Mostar, Croatia. The attack, which took place in the vicinity of the central police building, caused extensive damage and injured about 50 people, 23 seriously.[399] Within months, Bosnian investigators issued arrest warrants for 19 men wanted in connection with the Mostar bombing and several other incidents in the Zenica area. The list of suspects included Saber Lahmar—an Algerian Arabic-language teacher in his mid-thirties working with the Saudi High Commission for Relief—and Ali Ahmed Ali Hamad (a.k.a. Ali Hamed Ubeid, Abu Ubaidah al-Bahraini), another former employee at the Saudi High Commission who had been tasked with "the distribution... of books."[400] After making a number of detentions and searches, in a public statement, the BiH federal prosecutor's office announced the confiscation of "24 rifles, 10 pistols, 30 hand bombs, four hand grenade launchers, three hand rocket launchers, three machine-guns, 15 grenades, five hand grenades, 95 antitank mines (PT-6, PT-1, PT-3 and PT-4), one container with a rocket for rocket launcher, more than seven thousand pieces of ammunition of various calibres, 100 metres of slow-burning fuse with initial caps and much more." According to the federal prosecutor's office, "Before carrying out their terrorist acts, the suspects observed

---

396 "Review of the Information on Activities of the Persons from Afro-Asian Countries Directly Before the War and During the War in the Territory of BIH Republic." Report written by the BIH Administration of the Military Security Service– Department for Analytical and Informative Affairs." Sarajevo; May 6, 1995.

397 Wilkinson, Paul. "Anger at Bosnia death." The Times (London). July 30, 1994.

398 Higgins, Andrew et al. "Assault on Charities is Risky Front for U.S." The Wall Street Journal. October 16, 2001.

399 "SPATE OF ATTACKS AGAINST BOSNIAN CROATS GOES UNNOTICED." Communiqué issued by the Croatian Mission to the United Nations. September 22, 1997.

400 Karic, Eldin. "Trial to Jihad Warriors Soon." AIM (Alternative Information Network) Press. http://www.aimpress.org. December 28, 1997. See also: Hedges, Stephen J. "Extremism lingers after Balkan wars." The Chicago Tribune. November 25, 2001. See also: "Abu Hamza has wings." *Dani* (Sarajevo). April 24, 1998.

the targets of their attacks for days, which indicates that they are an organized group which prepared and committed classic terrorist acts."[401]

217. An unclassified summary of evidence against Saudi High Commission employee Saber Lahmar published by the U.S. military indicates that Lahmar was convicted and sentenced to a five-year prison term "for the armed robbery of an American citizen in Zenica, Bosnia. He was also involved in a shootout with Zenica police. The detainee was released from a Bosnian prison after serving two years for his role in some 1997 explosions in Mostar, Bosnia." Furthermore, according to the U.S. military, local authorities in Bosnia-Herzegovina believe that Lahmar was also "involved" in other bombings that took place in the towns of Travnik and Mostar in 1997.[402] Despite his apparent role in various paramilitary activities, Lahmar was eventually released by Bosnian authorities—only to be re-arrested in October 2001 as a "suspected terrorist" and transferred to the custody of the U.S. military in Guantanamo Bay, Cuba.[403]

218. Similarly, the former Saudi High Commission employee from Bahrain, Ali Ahmed Ali Hamad, was convicted by a local court for his role in the September 1997 Mostar car bombing.[404] However, following the events of September 11, 2001, Hamad agreed to cooperate with international authorities and provide information about his terrorist affiliations in Bosnia-Herzegovina and beyond. In a sworn affidavit dated March 2008, Hamad admitted being recruited by Al-Qaida at the age of 17 and having received instruction at an "Al-Qaida training camp in Afghanistan." While in Afghanistan, Hamad reportedly "met Osama bin Laden on numerous occasions, and swore an oath to al Qaida in Osama bin Laden's presence… At the inception of the Bosnian war, Osama bin laden and the al Qaida leadership decided that al Qaida should actively participate in that conflict, and began sending al Qaida members, including myself, to Bosnia to fight as mujihadeen."

219. As a former employee of the Saudi High Commission in Bosnia-Herzegovina, Ali Hamad had much to say about the role of the organization in allegedly financing militant activity:

> I can attest from personal knowledge that representatives of the Saudi High Commission provided extensive financial support and food to the mujihadeen forces, and also permitted the mujihadeen and al Qaida members in Bosnia to use the Saudi High Commission's offices and rented houses. In addition to providing food, money and shelter to support al Qaida's operations in Bosnia, the Saudi High Commission frequently transported mujihadeen and al Qaida members throughout Bosnia-Herzegovina, in Saudi High Commission vehicles bearing the mark of the United Nations High

---

[401] Karic, Eldin. "Trial to Jihad Warriors Soon." AIM (Alternative Information Network) Press. http://www.aimpress.org. December 28, 1997.

[402] http://www.dod.gov/pubs/foi/detainees/csrt_arb/ARB_Round_1_Factors_000895-000943.pdf. Page 916.

[403] "Islamic Organizations in the Balkans." A Joint Research Project by the Governments of the United States and the United Kingdom. August 2003.

[404] "Islamic Organizations in the Balkans." A Joint Research Project by the Governments of the United States and the United Kingdom. August 2003.

> Commission for Refugees (UNHCR), thereby allowing those mujihadeen and al Qaida members to pass military and police checkpoints. I was personally transported by the Saudi High Commission in a vehicle bearing UNHCR marks in late 1994 or early 1995, along with another wounded mujihadeen, from Bosnia-Herzegovina to Zagreb, Croatia. On the occasion of that trip, a representative of the Saudi High Commission also provided me with money for further travel expenses. During the Bosnian war, the Saudi High Commission appointed a number of former mujihadeen fighters to serve as officers or directors of its branch offices in Bosnia-Herzegovina… After the conclusion of the Bosnian War, the Saudi High Commission provided ostensible employment to a number of foreign fighters and al Qaida members who had fought in the War.

220. Hamad took pains to emphasize the significant logistical advantages conferred to foreign mujahideen fighters in maintaining a relationship with the Saudi High Commission: "I myself received official documentation, certified by the stamp of the Saudi High Commission and bearing the signature of the Director of the Saudi High Commission's Mostar office, indicating that I was an employee of the Saudi High Commission. At the time the director of the Mostar office of the Saudi High Commission provided me with that documentation, he was aware that I was a member of al Qaida. In addition to the documentation described above, following the Bosnian War, the Saudi High Commission provided me access to vehicles with diplomatic car registrations, and vehicles registered to the UNHCR, which enabled me to move freely throughout Bosnia-Herzegovina." According to an official NATO/SFOR guidebook to "The Islamic Organizations in the Balkans", one such vehicle "registered" to the Saudi High Commission was "involved in surveillance of [the] US Embassy in Sarajevo in Fall 2000."[405]

221. In September 2001, shortly before the arrest and extradition of Algerian employee Saber Lahmar to Guantanamo Bay, the offices of the Saudi High Commission were likewise raided by soldiers from the SFOR (the NATO Stabilization Force in Bosnia-Herzegovina). According to SFOR, investigators recovered a wealth of suspicious documents "such as maps and photos that suggested preparations for terrorist attacks."[406] The material reportedly included photographs of the World Trade Center, sketches of military bases, photographs of military ships, civilian airplanes, and other sensitive facilities. The same year, in 2001, local authorities in Bosnia-Herzegovina also arrested yet another Saudi High Commission employee Mahed Abu Kharrub "for suspected involvement in terrorism."[407]

---

405 "Islamic Organizations in the Balkans." A Joint Research Project by the Governments of the United States and the United Kingdom. August 2003.

406 "Islamic Organizations in the Balkans." A Joint Research Project by the Governments of the United States and the United Kingdom. August 2003.

407 "Islamic Organizations in the Balkans." A Joint Research Project by the Governments of the United States and the United Kingdom. August 2003.

## VIII. Saudi Government Funding was the Fuel for Al Qaida's Engine

222. It is difficult to overstate the critical importance of the money, direction, and other forms of material support provided to Al-Qaida by charitable organizations managed and financed by the Kingdom of Saudi Arabia. In messages directed at supporters, the treasurer of Al-Qaida, Shaykh Mustafa Abu al-Yazid (a.k.a. Sheikh Saeed) has consistently appealed that, above all else, the group "needs financial support to further our cause."[408] With the various privately-held bank accounts of Usama Bin Laden blocked or mostly depleted by the mid-1990s, Al-Qaida was almost entirely dependent on cash infusions laundered by such charities, along with occasional individual donations by wealthy Saudi officials. The financing provided by Saudi government-run charities was instrumental in allowing Al-Qaida to carry out terrorist attacks (including the September 11, 2001 attacks), to maintain necessary global infrastructure such as training camps and safehouses, and to provide salaries to Al-Qaida members and their families who lack any other form of income or support.

223. The planning, coordination, and successful conduct of a sophisticated terrorist plot like the September 11th attacks quite obviously requires significant and sustained funding. By 2005, due to the closure and/or blacklisting of major Saudi government-run Islamic charities, Al-Qaida faced a major cash crunch and senior Al-Qaida leaders publicly complained that the group was no longer able to carry out major terrorist attacks due to its shortage of financing. In May 2007, Al-Qaida treasurer and Shura Council member Mustafa Abu al-Yazid warned Al-Qaida supporters, "As for the needs of the Jihad in Afghanistan, the first of them is financial. The Mujahideen of the Taliban number in the thousands, but they lack funds. And there are hundreds wishing to carry out martyrdom-seeking operations, but they can't find the funds to equip themselves. So funding is the mainstay of Jihad."[409]

224. Once again, in June 2010, Mustafa Abu al-Yazid appealed to jihadists around the world, "we say to our blessed Muslim Ummah: its mujahideen in Afghanistan... are not short of men as much as they are short on money, which would allow them to continue their jihad against the enemies of Allah and to attack them as highly as they possibly can; as there are hundreds of Muslim people in Afghanistan and Pakistan and others who are offering themselves to the leaders of the mujahideen in order to prepare them for jihad, but there aren't capabilities to carry them over, and many of the anticipated and well-studied operations are stagnate because of the shortage of money."[410]

225. Indeed, without deep pocketed sponsors in the form of Saudi state-run charities, Al-Qaida would not have had the wherewithal to manage safehouses around the world, nor the essential jihadist training camps in Afghanistan that allowed Al-Qaida to recruit and groom the 9/11 hijackers. As previously noted in this report, Al-Qaida's most important such camp—the sprawling Al-Farouq camp near Kandahar, Afghanistan, where at least seven of the September 11,

[408] 2008-07-22.geo.tv.transcript of geo tv news interview – English "Geo News exclusive interview with Sheikh Saeed, Al-Qaida leader"

[409] 2007-05-26.alhesbah.org.As-Sahab presents meeting with Shaykh Abu Mustafa Abu Yazid - 130663 - arabic

[410] He Who Prepared a Battler Has Waged Battle. 2010-06-15.alfaloja.ws.As-Sahab presents Mustafa Abu al-Yazid on gas of invaders - 122689 - arabic

2001 suicide hijackers were trained—was a "charity-funded camp."[411] The cost of maintaining this sophisticated and essential infrastructure was considerable. The 9/11 Commission concluded that Al-Qaida's annual budget in the period before the September 11th attacks approached $30 million, and that Al-Qaida's payments to the ruling Taliban alone were approximately $20 million annually. Absent those payments, Al-Qaida would not have had access to the safe haven in Afghanistan to plan the attacks, nor would camps like Al-Farouq have existed themselves.

226. As demonstrated by examples such as the 1994 murder of British aid worker Paul Goodall (among many others), Saudi state-run charities were also able to provide Al-Qaida and allied jihadist terror groups with office space, equipment, and identification credentials that allowed them to enter and exit conflict zones without suspicion, as well as to avoid scrutiny by international law enforcement or security forces.

227. The financing provided by Saudi state-run charities was also absolutely necessary to cover the living expenses of Al-Qaida members, for whom waging violent jihad was a full-time profession. The occasional failure of Al-Qaida to provide sufficient salaries and support to its members often came at a very high cost to the organization. For example, one sworn member of the group, a Moroccan national named L'Houssaine Kherchtou, became a key informant for the FBI and a prosecution witness in U.S. federal court after growing deeply disillusioned over the failure of Al-Qaida to pay a hospital bill for his pregnant wife.

228. During testimony in the later criminal trial of Usama Bin Laden in New York, Kherchtou recalled his conversation with Mustafa Abu al-Yazid: "He told me, oh, there is no money. We can't give you anything, and, why you don't take your wife to the Muslim hospital... I knew that if I take my wife there she will die the first day. And I told him, if it was your wife or your daughter, you would take her there?" Al-Yazid's indifference stunned Kherchtou: "I told him that when... they were saying before that they were sending the Egyptian[s] to renew their passports or to get a new passport... they were paying their transport; they were paying their sitting there in Yemen to stay for a whole month so as to get that passport, and everything was paid by al Qaeda. But when I was needed that five hundred bucks, he gave me another story."[412] When later asked in court how he felt about Mustafa Abu al-Yazid after he had "turned down your request for the money", Kherchtou replied, "Well, I was about—if I had a gun I would shoot him at that time."[413]

229. Though some support to Al-Qaida was also provided by non-Saudi charitable fronts for terrorism, there was simply no other source that was even remotely close to being as prolific and consistent as entities that were funded and managed by the Kingdom of Saudi Arabia. In a widely quoted September 11, 2007, appearance on ABC, Treasury undersecretary Stuart Levey stated: "If I could somehow snap my fingers and cut off the funding from one country [for terrorism], it would be Saudi Arabia."

---

[411] Set_44_2922-3064. Pages 103-104.

[412] United States v. Usama bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. Trial Transcript, February 22, 2001. Pages 1283-1284.

[413] United States v. Usama bin Laden, et al. S(7) 98 Cr. 1023 (LBS). United States District Court, Southern District of New York. Trial Transcript, February 22, 2001. Page 1284.

230. As former U.S. Deputy National Security Advisor Juan Zarate[414] has observed, "the Saudis had built an extensive global network for spreading a certain brand of religious thought, but in so doing they had provided a platform for al Qaeda and its like-minded adherents, who benefited greatly from this network both financially and in terms of growth... Many of the Wahhabi institutions funded out of Saudi Arabia serve as way stations for al Qaeda operatives and fundraising. Distinguishing between some of the international Wahhabi organizations and terrorist support networks was nearly impossible, especially when support for al Qaeda and support for spreading Wahhabi beliefs seem to blend together so seamlessly. This was true in the work of some of the branches of Saudi-based institutions, such as the International Islamic Relief Organization (IIRO). For us, cutting off flows of funds to al Qaeda thus meant much more than just targeting a few select individuals or institutions. It was ultimately about challenging a fundamental element of Saudi policy by constricting how the Saudis and their institutions funded activities abroad."[415]

231. Thus, for the Kingdom of Saudi Arabia, the dawah organizations and charities were not merely a vehicle to launder money destined for illicit causes, but more importantly, a means to directly influence Al-Qaida itself. An unnamed Yemeni national captured in Afghanistan and held as an enemy combatant in Guantanamo Bay, Cuba noted that even Al-Qaida officials suspected that some state-run Saudi charities working in Afghanistan were "spying for Saudi Arabia, because some friends in Saudi Arabia support them financially... [they were] getting support from the Saudi government."[416] When asked by a U.S. Defense Department Administrative Review Board whether this meant that such state-run charities were serving as "a facilitator to the Saudi government," the Yemeni responded "Yes."[417]

232. Consistent with Juan Zarate's observations, it is my professional opinion that Saudi government money was the fuel for Al-Qaida's engine in the period leading up to the September 11th attacks, and that Al-Qaida could not have successfully planned and carried out the attacks without that Saudi government funding. As the evidence described above confirms, the principal Islamic charitable and dawah organizations providing that funding and other support to Al-Qaida were established by the government of Saudi Arabia to propagate the Wahhabi variant of Islam globally. The overwhelming source of funding for those organizations was the government of Saudi Arabia, and it was those very funds that were diverted to support Al-Qaida's operations.

I certify under penalty of perjury that the foregoing is true and correct.

Evan Francois Kohlmann

Executed this 9th day of November, 2017.

---

[414] Mr. Zarate has served as U.S. Deputy Assistant to the President, U.S. Deputy National Security Advisor for Combating Terrorism and U.S. Assistant Secretary of the Treasury for Terrorist Financing and Financial Crimes.

[415] Juan C. Zarate, Treasury's War: The Unleashing Of A New Era Of Financial Warfare 69 (PublicAffairs 2013).

[416] ARB_Transcript_Set_7_20497-20750. Page 231.

[417] ARB_Transcript_Set_7_20497-20750. Page 231.