# EXHIBIT 238

EXPERT REPORT OF DR. EMILE A. NAKHLEH

**Dr. Emile A. Nakhleh**

**Expert Report**

**In re Terrorist Attacks on September 11th, 2001 (03-1570-GBD-SN)**

## TABLE OF CONTENTS


**Introduction and Scope of Work** ........................................................... 1

**Research and Analytical Methodology** ................................................... 2

**Expert Credentials** ........................................................................ 7

**Elaboration of Expert Opinions** ........................................................ 10

**A. Salafi Wahhabi Islam as the state religion of Saudi Arabia: Analysis of the religious and ideological foundations of the Saudi state** .............................. 10

**i. Tenets of Salafi Wahhabi Islam in engaging with the wider world in the context of jihad** ........................................................................ 12

**ii. Particularization of the ideological and operational approaches to jihad within Wahhabism** ............................................... 14

**B. Architecture of the Saudi state built on Wahhabi polity** .................................... 18

**i. Saudi '*ulama*'s exercise of a religious power base *within* the Kingdom of Saudi Arabia** ........................................................ 19

**ii. Saudi religious education: a force multiplier for Wahhabi jihadi doctrine** ........................................................................ 21

**iii. The Islamic Awakening and its demands vis-à-vis King Fahd** ............... 27

**iv. al-Qa'ida's leader Usama bin Ladin as capacitator and conduit for the coherent articulation and propagation of Wahhabi jihadist causes** ........ 39

**C. Further particularization of the ideological and operational approaches to jihad within Wahhabism: the "New Crusader War"** ......................................... 46

**D. Saudi failures in counter-terrorism and the connection between Wahhabi polity *within* the Kingdom of Saudi Arabia and violent jihadist attacks ............ 51**

**E. Deficits and distortions in the evidential record caused by the deliberate non-cooperation and deceit of Saudi Arabia's witnesses .................................. 54**

**i. Case study: the testimony of Shaykh Fahd al-Thumayri in the present proceedings, *In re Terrorist Attacks on September 11, 2001* ...................... 57**

**F. The Ministry of Islamic Affairs of Saudi Arabia, its pre-eminent *da'wa* function and the role of propagators in advancing Wahhabi polity .................... 63**

**i. *Da'wa* case study 1: how Saudi Arabia's Wahhabi polity was implemented by officials of the Ministry of Islamic Affairs in the U.S. prior to the 9/11 Attacks ....................................................... 64**

**ii. *Da'wa* case study 2: propagator's path of Abdullah A S Al-Jaythin ....... 68**

**iii. *Da'wa* case study 3: propagator's path of Fahd Al-Thumayri ............... 74**

**G. The "operational" role of propagators and other officials of the Kingdom of Saudi Arabia in the support network for the 9/11 attacks .................................. 82**

## ANNEXES

**Annex A – Curriculum Vitae**

**Annex B – Publications**

**Annex C – Materials Considered**

**Annex D – Glossary of Transliterated Arabic Names**

**Dr. Emile A. Nakhleh**

**Expert Report**

**In re Terrorist Attacks on September 11th, 2001 (03-1570-GBD-SN)**

## Introduction and Scope of Work

1. My name is Dr. Emile A. Nakhleh. My up-to-date curriculum vitae is attached to this report at Annex A. I have been engaged by the Plaintiffs in this litigation as an expert on political Islam, on the ideological and operational approaches to jihad within Wahhabism, and, specifically, on the potential role played by the Kingdom of Saudi Arabia in aiding, abetting and supporting the terrorist attacks of September 11th, 2001 ("9/11").

2. This report is informed by my experiences as a long-serving Senior Intelligence Service (SIS) officer in the Directorate of Intelligence at the Central Intelligence Agency (CIA), which I joined in 1990. I was the founding Director and Senior Analyst of the CIA's Political Islam Strategic Analysis Program, in which role I was heavily relied upon to brief senior policymakers, up to and including the President of the United States.

3. I retired from the US Government on June 30, 2006 having received multiple senior commendations and medals for my service, including the Distinguished Career Intelligence Medal and the CIA Director's Medal. From 2006 to present, I have been consulting with different U.S. government entities and departments on national security issues, particularly with respect to Islamic radicalization, terrorism, and the Arab states of the Middle East. I hold a PhD in international relations and am a life member of the Council on Foreign Relations. I am currently a Research Professor and the founding Director of the Global & National Security Policy Institute at the University of New Mexico.

4. I have not testified at any trials or depositions in any jurisdiction in the last four years. I am being compensated at a rate of $250 per hour for my work in this case.

**Research and Analytical Methodology**

5. Throughout my career in academia and in government, I have used an interdisciplinary approach to hone my expertise on political Islam. I accepted the basic assumption that political Islam, Islamic activism, and Islamization in general did not develop in a vacuum divorced from the social, cultural, historical, linguistic, economic, educational, and political environment of a particular country or region in which this phenomenon emerges. In graduate schools I read books and journal articles on Islam as a religion, a community of faith, and a driver of social policy. Publications on the different historical narratives, politics, and society helped me greatly understand the role of Islamization in the governing process of different countries and the cultural drivers in Muslim majority and Muslim minority countries across the Muslim world. My research and reports in my graduate courses on the role of political Islam in the Middle East, the region of the world I focused on in graduate school, reflected a keen awareness of the efficacy of an interdisciplinary approach to the understanding of the intermingling of religion (in this case, Islam) and society and of religion and nationalism.

6. While in academia, I was awarded two senior Fulbright grants to study the intersection of Islam and the political process in two countries—Bahrain and Israel (where I focused on political Islam in Israel and the Palestinian areas of the West bank and Gaza). In Bahrain, I focused on the making of the new state through the lens of its ruling Sunni minority and often suppressed Shia majority.

7. Following my full academic year in Bahrain, I published a book titled Bahrain: Political Development in a Modernizing Society. It was originally published by Lexington Books, D.C. Heath and Company in 1976, translated into Arabic and published in Beirut, Lebanon, in 1996, and republished following the Arab Spring also by Lexington Books in 2011. The book includes an analysis of Bahrain's education, history, labor, media, the promulgation of a new constitution, and the resulting parliamentary elections. The research was based on extensive interviews with Bahraini Sunni and Shia leaders and activists, political societies, especially al-Wifaq (Shia) and al-Wa'ad (Sunni), government officials, human rights activists, and members of the numerous

non-governmental organizations in that country. My research also involved reading many primary and secondary reports and publications on Bahrain in English and Arabic. My fluency in Arabic allowed access to different people who felt comfortable speaking Arabic and not through interpreters. The book remains until this day a seminal and original work on Bahrain. My Fulbright research in Bahrain was followed by more in-depth multi-year research on other parts of the Persian Gulf, which Gulf Arabs call the Arabian Gulf. The interdisciplinary research on politics, society, history, culture, foreign policy and Islamic activism in the region resulted in several publications, including: Arab-American Relations in the Persian Gulf (1975), The United States and Saudi Arabia (1975), the Persian Gulf and American policy (1982), and the Gulf Cooperation Council: Policies, Problems, and Prospects (1986).

8. My research in Israel (at the Hebrew University) included many interviews in Israel, the West Bank and Gaza—I visited nearly every town and large village in both Palestinian areas and interviewed city and town officials, academics, corporate employees, political activists, and leaders and members of the two largest Islamic parties in Israel and the West Bank and Gaza—the Islamic Movement in Israel and Hamas in Palestinian territories. My research on politics, Islam, and society in Israel and the Palestinians resulted in several academic books and articles, including the following: The West Bank and Gaza: Toward the Making of a Palestinian State (1975), "The West Bank and Gaza: Twenty Years later," (1988), "the Palestinians and the Future: peace through Realism," (1989), and "Palestinians and Israelis; Options for Coexistence," (1993).

9. The interdisciplinary approach, through a thorough reading of the literature available during my graduate school years, made me realize that there was no such a thing as one Muslim world, one political Islam, or one model of Islamization. There were indeed many Muslim worlds, many facets of political Islam, and many metrics and visions of Islamization. This methodology, which I imported with me into the US Government when I joined the CIA, helped the Agency develop a more coherent approach to the nurturing of expertise on political Islam and the hiring of the right analysts for the right positions.

10. As I wrote in my post-CIA book, A Necessary Engagement: Reinventing America's Relations with the Muslim World (2009), I was in charge of developing the expertise in political Islam globally at CIA. The methodology we used to deepen such expertise consisted of several steps: engaging with academic experts in this country and from overseas on political Islam in different parts of the world; going on extended research visits to Muslim majority and Muslim minority countries across the globe; researching and interviewing Islamic activists in Islamic political parties globally (my analysts and I studied and interviewed activists in over 100 Islamic political parties, movements, and political organizations); reading classified and unclassified public opinion polls focusing on the Muslim world (Pew, Gallup, BBC, the University of Maryland, etc.), participating in academic seminars conducted by experts in this country and overseas, analyzing the influence of political Islam on economic, educational, judicial and other aspects of public policy in numerous Muslim countries as well as the religious/sectarian conflicts within the Muslim world and even in Muslim minority countries in Europe, Asia, Africa, and elsewhere.

11. The vibrant academic outreach program which I developed at the CIA helped enhance our expertise on political Islam greatly, thus assisting us in providing our senior policy makers with evidence-based, knowledgeable briefings that utilized all-source intelligence—ranging from open source to highly classified reports. The academic outreach program that I developed at the CIA consisted of three parts:

   a. an annual two-day academic conference in which two dozen academics participated and represented different academic disciplines and points of view (economics, anthropology, religion, history, education, Islamic banking, social media, politics, law, sociology, psychology, public opinion methodology, terrorism, Islamic radicalism and radical ideologies, psychology of radicalization, and leadership). The annual conferences, which were open to US Government intelligence and policy analysts, hosted political Islam academic experts on countries in the greater Middle East, Europe, North, West, and East Africa, Central, South, and Southeast Asia, the Balkans, China, Russia and the Caucuses. The annual conference was established under my direction in 1994.

b. Monthly symposia at the Agency in which one or two academic experts lectured on a particular aspect of political Islam in a specific country or region. My analysts and other political Islam analysts in other offices usually attended these sessions. The two academics often times had different academic views on the subject, which frequently widened the analytical horizons of our analysts

c. The third leg of the academic engagement I led at the Agency consisted of an annual one-week course titled "Political Islam Realities," which our analysts attended. Either I or one of my senior analysts would introduce the annual conference, the monthly symposium, and the annual one-week Political Islam Realities course.

12. As a result of this well-structured interdisciplinary approach, the Political Islam Strategic Analysis Program, which I founded and directed (until I retired from the Agency), became the repository of expertise on political Islam for the US Government. I am also happy to say that the three legs of expertise building (the annual conference, the annual one-week course, and the monthly lectures), which I started early on in my career at CIA, have all remained in place to the present day and are considered a "gold standard" of this methodology for nurturing, testing and sharing expertise.

13. My citation for the CIA's Distinguished Career Intelligence Medal included the following statement: "Dr. Nakhleh has been cited throughout his career for his expertise on Islamic and Middle Eastern issues, his intellectual leadership, and his commitment to excellence. His analytic insights, customer focus, teaching, and mentoring skills embodied the best of what the Directorate of Intelligence has to offer. His aggressive outreach effort with leading U.S. academics and other private sector experts was without equal. His vision, persistence, and consummate interpersonal skills were key to the establishment of the Senior Analytical Service and the Political Islam Strategic Analysis Program." Upon my retirement from government service, I received a personal letter of commendation from President George W. Bush in which he recognized my "commitment to high standards" in my role at the CIA.

14. My expertise in academic research and outreach was the basis for my receipt of the CIA's Intelligence Commendation Medal in 1996. The citation stated: "Dr. Nakhleh has developed an academic outreach program that is without peer in the US government. As a scholar of international renown he has enabled the [Directorate of Intelligence] to attract distinguished academics from around the world to participate in DI events and share their expertise and insights in ways that would simply not occur otherwise."

15. Since I left the Agency June 30, 2006, in recognition of my expertise in political Islam, Islamic activism, and radicalization, I have been called upon to undertake a variety of roles in government and private-sector consulting, to publish, to give lectures, and to participate in expert conferences. In 2010, I gave a public briefing to the Senate Foreign Relations Committee titled "Turmoil in Yemen: How Understanding the Challenges Can Help the U.S. Undermine al-Qa'ida and the Radical Paradigm." In 2009, I served on the Chicago Council on Global Affairs' Task Force on "Religion and the Making of U.S. Foreign Policy" and participated in the writing of the Task Force report titled "Engaging Religious Communities Abroad: A new Imperative for U.S. Foreign Policy" (Chicago Council, 2010). In recent years, I have regularly published articles containing my expert analysis on LobeLog, Responsible Statecraft, and The Cipher Brief blogs. My full list of publications in their principal categories is attached to the present report at Annex B.

16. At Annex C to this report, I have attached a comprehensive list of the materials I have considered in rendering my analysis and forming my expert opinions. I should note that I was provided access, via a secure online file-share site, to the full collection of audio-video recorded depositions taken in the present litigation, as well as all the deposition transcripts and deposition exhibits. I do not profess to have viewed every deposition video or read every transcript, but I have reviewed and considered the content of those depositions most relevant to my expert assignment. In particular, this included watching the video recordings of the depositions of Fahd al-Thumayri and Omar al-Bayumi, as well as reading transcripts of the depositions of other MOIA propagators, as listed in Annex C.

17. Since my retention as an expert in this matter in May 2021, there has been a vast amount of documentary production in the litigation, notably pursuant to President Biden's Executive Order 14040. I have been provided access to each of the EO productions as they have been released, and have received and reviewed many documents extracted from the ongoing FBI productions from which redactions have been lifted, upon my request. Similarly I have scrutinized the indexes for other large productions in this case – including from the Kingdom of Saudi Arabia, the CIA, and the Metropolitan Police Service (MPS) – and have conducted dedicated analysis of portions of those productions to assist me in forming my expert opinions.

18. In addition I have relied upon my own vivid personal recollections - which I have regularly refreshed in the course of my engagement – of my own wealth of relevant professional experience, during my government service and since.

**Expert Credentials**

19. In drafting this report I have drawn upon my deep expertise and acknowledged authority in political Islam, my analysis of global trends including the rise and evolution of Islamization in the past three decades, my thorough knowledge of Arab and Muslim cultures, including in Saudi Arabia, and my extensive engagement and discussions with Muslim interlocutors around the world. By virtue of my position as the CIA's pre-eminent expert on these matters at the time of the Terrorist Attacks of September 11th, 2001 ("9/11") and their aftermath, I held discussions on the subjects addressed in my report with many government officials, religious authorities, and representatives of the intelligence services and law enforcement agencies of countries around the world.

20. Over the course of more than 20 years, up to my retirement from U.S. government service, I interviewed over 500 Islamic activists and scores of Imams, as well as dozens of Islamic political party leaders, prominent thinkers, and purveyors of emergent political ideologies.[1] I also interacted with representatives of Muslim groups in Muslim-

---

[1] I developed long-standing contacts with political parties and popular movements including but not limited to the Muslim Brotherhood in Egypt, Refah and AKP in Turkey, the Islamic Action Front in Jordan, PAS in Malaysia, the

minority countries, notably in Europe, across the African continent, and in Australia. Among my principal professional objectives in canvassing views on Qur'anic teachings was to learn first-hand about the beliefs and perceptions of jihadists, including radical Salafis from Saudi Arabia and elsewhere. I had what can be regarded as the enormous advantage of being fluent in Arabic,[2] which enabled me to talk with my interlocutors on an entirely different plane and to read numerous Arabic language pamphlets and publications written by Saudi jihadists and radical clerics, without the need for interpreters or translators.

21. Time and again I have encountered Islamic activists who were especially proud, indeed honored, to speak Arabic with me because they consider it to be the language of God. The prevailing belief in this regard, reiterated in the Hanbali (8th century), Ibn Taymiyya (13-14th century) and Wahhabi (18th century) interpretations of Islam, is that the Angel Jibril delivered to the Prophet Muhammad every *sura*, every *'aya* – that is every chapter, every verse, as dictated by God – in the Arabic language. Therefore, when you read the Qur'an in Arabic, according to Ibn Hanbal, Ibn Taymiyya and Ibn Abd al-Wahhab, you experience *Tawhid* ("oneness"), as if God had come down to be with you.

22. My native Arabic language skills were thus pivotal in gaining and maintaining trust with my interlocutors over a period of two decades. If the community you are seeking to engage with does not trust or respect you, then its members – not to mention its opinion-leaders – will refuse to talk to you, let alone tell you about changing patterns of behavior or their attitudes towards other Muslims and non-Muslims. Conversely, I discovered that once your Muslim interlocutors could be convinced of your objective expertise in the matters under discussion, they would open up to you regardless of your background, profession, or country of origin. Nor did they trust interpreters because

Islamic Movement in Uzbekistan, PKS in Indonesia, the Islamic Party in Kenya, Hamas in Palestine, the Islamic Movement in Israel, and al-Nahda in Tunisia.

[2] When I was at the CIA, I tested 5,5,5 in Arabic (the highest professional level in the US Government) and as such during that time I was the only 5,5,5 Arabic speaker in the entire Agency.

they invariably viewed them as "spies" for their government. In my experience, interlocutors have a tendency to clam up when they see a local interpreter at a meeting.

23. Furthermore I have visited dozens of mosques, Islamic Centers, madrassas and other educational establishments across the Muslim world, and acquired copious amounts of their literature, including textbooks on language, culture, history, and Islamic and Qur'anic studies. I have devoted special efforts to obtaining and conducting analysis of extremist publications, as well as materials related to sermons or lectures given by radical Muslim preachers. In my time at the Agency, we collected large quantities of books, magazines, and pamphlets from the field – from mosques, bookstores, libraries, kiosks, directly from their authors, or from booksellers on the streets, or on campuses of religious colleges and universities.

24. My analysis of political Islam has benefitted greatly from engaging with the original literature produced and circulated in mosques and other places of congregation. Importantly I have been able to read and understand the nuances in Arabic writings and associated speech – of which there are many. In the context of this, my lifelong pursuit, I have rendered my expert opinions and conclusions in the present report upon the maximum amount of factual material and declassified investigative product made available to me for review in the 9/11 multi-district litigation.[3]

[3] At the time of writing, the Declassification Reviews of information collected and generated in the United States Government's investigation of the 9/11 terrorist attacks, as mandated by the President Biden's Executive Order 14040 of September 3, 2021, have not yet been completed. Although I do not anticipate that my principal findings or the tenor of my underlying analysis would change were I to review further materials, I respectfully reserve my right to modify, augment or supplement my expert report once I have had the opportunity to review the documents released subsequently by US Government departments and agencies.

**Elaboration of Expert Opinions**

| | |
|---|---|
| **A.** | **Salafi Wahhabi Islam as the state religion of Saudi Arabia:**<br>**Analysis of the religious and ideological foundations of the Saudi state** |

25. Islam in Saudi Arabia has principally followed the Hanbali School of Jurisprudence—one of four such Schools in Sunni Islam[4]—as espoused by Ahmad Ibn Hanbal (780-855 CE) and expanded further by Ibn Taymiyya (1263-1328 CE). Ibn Hanbal taught that the *Qur'an* ("divine revelation") was created by God, and that the Qur'an and the *Hadith* (the sayings of the Prophet Muhammad) should be read literally. According to the Hanbali School, the only path to salvation is a return to the *Salaf* (the early ancestors of Islam) – namely, living according to the *Sunna* (norms or traditions) of the Prophet himself and the original quartet of *Rashidun* ("rightly guided") caliphs who succeeded him.[5]

26. Muhammad ibn Abd Al-Wahhab (1703-1792 CE), a religious scholar in the Arabian Peninsula, adopted this purist interpretation of Islam and developed it as a new *Tawhidi* ("oneness of God and the universe") doctrine, incorporating the practice of *takfir* (declaring other Muslims unbelievers). "Wahhabism" describes the narrow, exclusivist, and particularly Sunni view of Islam that emerged: intolerant of any deviation from orthodoxy; accommodating no glorification or deification of the individual; and defined by a strict and rigid interpretation of the Qur'an, divined from the exegeses in the margins of the *suras* contained in the text. Wahhabism became the prevalent ideological

[4] The three other Schools are: the Hanafi School founded by Abu Hanifa (700-776 CE); the Maliki School founded by Malik Ibn Anas (716-795 CE); and the Shafi'i School founded by Muhammad Ibn Idris Al-Shafi'i (767-820 CE).
[5] The term *Rashidun* (meaning "rightly guided") is applied to the first four caliphs of Islam, often referred to as the patriarchal caliphs: Abu Bakr (ruled 632–634 CE); Umar (ruled 634–644 CE); Uthman (ruled 644–656 CE); and Ali (ruled 656–661 CE).

foundation of Islam in the Arabian Peninsula; while adherents tend to call themselves Salafis[6] or neo-Salafis, they are referred to by others as Wahhabis.[7]

27. Wahhabism flourished first in the Arabian territories whose leaders had held out longest in resisting the control of the Ottoman Empire. It was adopted by Muhammad ibn Saud (1687-1765 CE), an influential local *emir* (chief) who ruled the Najdi settlement of Dir'iyah, where ibn Abd al-Wahhab came to live. In 1744 CE, ibn Saud and ibn Abd al-Wahhab signed the religious-political pact that created the first Saudi state, named the Emirate of Dir'iyah. As its founding leader, "Imam" Muhammad ibn Saud, progenitor of the al-Saud dynasty, aggressively pursued political and military expansion in tandem with the propagation of the Saudi state's (and his own) religion, Wahhabism.[8]

28. This "Dir'iyah Pact" established the Saudi state according to a covenant that has endured beyond the September 11, 2001 attacks: the al-Saud would rule politically and militarily as they saw fit, while the al Ash-Shaykh (descendants of ibn Abd al-Wahhab) would control the norms of Saudi religious, moral, educational, and cultural life. Upon its ideological foundations in religious theorizing from the 9th century (Ibn Hanbal) and the 13th / 14th centuries (Ibn Taymiyya), revived by a reform movement in the 18th century (ibn Abd Al-Wahhab), Wahhabism was firmly established as the state religion of Saudi Arabia, and has remained so ever since. Saudi Arabia was thus born out of a common religious-political commitment to establishing and protecting the "true" Islam in the new state and to spreading it throughout the region and beyond.

---

[6] The term Salafi derives from *salaf* (meaning the early "pious ancestors" of Islam), and in this context denotes the "directness" of connection to the Prophet, the *Ansar* (his companions), and the *Rashidun* (his immediate successors).

[7] The term Wahhabi is not actually used in modern Saudi Arabia, although outsiders, especially those in the West, use the term as a form of shorthand to denote followers of the doctrine espoused by Ibn Abd al-Wahhab. The Saudis regard the term as pejorative because it appears to characterize "their" Islam as merely one branch or version of Islam, as opposed to the Saudi belief that Wahhabism is *the only Islam* and represents Islam *in its entirety*. One can often hear it said among scholars of Islam, in relation to such designations: every Wahhabi is a Salafi, but not every Salafi is a Wahhabi.

[8] Upon attempting to conquer new territory, "Imam" Muhammad ibn Saud was said to demand three times that its inhabitants lay down their arms and adopt his religion, Wahhabism (the Tawhidi doctrine), as a condition for their surrender. If the people did not accede to Saud's demand, he would attack and kill them. By this means, the majority of the Najdi people were converted to Wahhabism in the era of the first Saudi state.

| A. i. | **Tenets of Salafi Wahhabi Islam in engaging with the wider world in the context of jihad** |
|---|---|

29. Proponents of the Wahhabi Tawhidi doctrine shun the "infidels" (even though Christians and Jews are described in the Qur'an as the ''People of the Book'') and discourage their followers from interacting with them. Wahhabis believe that these "infidels" – including citizens of the United States and its allies, Israelis, and pro-American Arab and Muslim leaders – have waged a war on Islam and therefore stand to be regarded as the "enemies" of Islam.

30. Like Ibn Taymiyya before him, Ibn Abd Al-Wahhab focused on particularizing the concept and practice of jihad in relation to such "enemies." Jihad refers essentially, and most generically, to the struggle of Muslims to do what is right by their religion, and to defend against all that is wrong. Most other interpretations of Islam lay emphasis on *jihad al-nafs* – the voluntary, internal, passive jihad one does for oneself and for one's soul, to become a "better Muslim."[9] Prominent in the teachings of Ibn Abd Al-Wahhab, however, is *jihad fardi* or *jihad al-Qital* – the obligatory, external, combative jihad that signifies a pious Muslim's fight against the *adu'* (the enemy).[10] Accordingly, at the heart of Wahhabism lies the duty of all Muslims to do jihad against the perceived "enemies" of Islam.[11]

31. Wahhabis subscribe to the notion of a millenarian violent struggle for the soul and survival of Islam, set to continue until the "end of days" when Islam will emerge victorious. While their hostility towards "infidels" is patent, Wahhabis are equally intolerant of "secular" or "modernist" sects within Islam, and of Muslim communities that engage in *bid'a* (innovation[12]) – all of which they cast as threatening. They do not

[9] Note on definitions: *Jihad al-nafs* – the voluntary / personal jihad one does for oneself and for one's soul; *jihad fardi or jihad al-Qital* – the obligatory or fighting jihad that means you are fighting the enemy; the enemy = *adu'*.
[10] Those who could not physically fight used their money to support the cause known as *jihad bil maal*.
[11] Majmu'at al-Fatawa li Ibn Taymiyya, Vol. 14, (al-Ziyara wa al-Jihad); The Oxford Encyclopedia of the Modern Islamic World, Vol. 2, pp. 369-373.
[12] The term *bid'a* denotes interpretations or practices of Islam that are, in the eyes of Wahhabis, deviant innovations, heresy or unorthodoxy, even heterodoxy.

hesitate to brand their co-religionists *kuffar* (plural of *kafir*, meaning unbelievers) or apostates. As such, Wahhabis' perception of "enemies" encompasses a broad spectrum of both Muslims and non-Muslims, alleged polytheists, and apostates.

32. Ardent, purist Wahhabis view the world antagonistically as divided between *Dar al-Islam* (the Abode of Peace) and *Dar al-Harb* (the Abode of War). The phrases are used, broadly speaking, to denote: on the one hand, the territories on which Islam is ascendant, i.e. Muslim-majority countries or *Dar al-Islam*; and, on the other hand, the territories living in relative darkness, or ignorance, into which Islam should and could expand, i.e. Muslim-minority countries or *Dar al-Harb.* Peaceful coexistence between the two is possible only when states residing in *Dar al-Harb* conclude amity covenants, or *'ahd*, with *Dar al-Islam*.

33. Otherwise, the Salafi-Wahhabi view is that the two realms are irreconcilable: *Dar al-Harb* represents enmity, whereby individuals, groups, or states within it are perceived to be attacking Islam – either as a faith (*din*), or as a territory, in the sense of *Dar al-Islam*.

34. To counter such enmity, Salafi Wahhabis believe jihad must be done by every possible means, from the pen to the sword and with money from their pockets. In particular, if they should find themselves living inside a state in *Dar al-Harb*, they should behave as if on a "mission behind enemy lines."[13] They view violent jihad as a permissible route to political change, to bring about a global caliphate or Islamic state that resembles the Islamic State established by the Prophet Muhammad in Medina in the 620s CE. While Wahhabis preach against *hiraba*, which they equate with terrorism in in the Qur'anic sense of the word, they support acts of violent jihad – which the rest of the world labels

[13] See Center for Religious Freedom ("Freedom House"), "Saudi Publications on Hate Ideology Invade American Mosques", published by Freedom House, Washington, DC, 2005; at p.40. The Wahhabi worldview on the "mission behind enemy lines" is elaborated as follows: "Either they are there to acquire new knowledge and make money that can later be employed in the jihad against the infidels, or they are there to proselytize the infidels to convert them to Islam. Any other reason for lingering among the unbelievers in their lands is illegitimate, and a true Muslim must exit as quickly as possible."

unambiguously "terrorism" – as an acceptable means of combatting the "enemies" of Islam.[14]

35. Indeed, Salafi Wahhabi clerics – almost exclusively members of the religious establishment of Saudi Arabia – have long preached that violent jihad is the *only* recourse available to Muslims if they are to prevail in their existential struggle with the "enemies" of Islam. They justify terrorism, especially spreading fear in the ranks of the "enemy", as a legitimate and effective tool in rectifying specific religious grievances and fighting on behalf of Islam in a febrile and fractious world.

| | |
|---|---|
| **A. ii.** | **Particularization of the ideological and operational approaches to jihad within Wahhabism** |

36. In the course of the last century, Salafi Wahhabis have embraced further particularization of the concept of jihad, specifically through elaboration of the acceptable terms of engagement in violent jihad. This represents one of the key trends in Islamic radicalization I grappled with in my career in government, a doctrinal evolution in Wahhabism that was inspired, at least in part, by the influence of foreign radical thinkers whom the Saudi religious establishment came to regard as their own. As other Arab regimes cracked down brutally on opposition movements, such as the Muslim Brotherhood or its affiliates, whose ideologies were branded dangerous, those ideologies and their followers "immigrated" into and were welcomed to take root in the Kingdom of Saudi Arabia and incorporated by the Saudi government into the state's educational and religious infrastructures.

[14] In this light it is futile, I think, to question Saudi Wahhabis about their view of terrorism, because if you ask them, as I have done over the years, they will readily tell you that they oppose "terrorism", which is pleasing to our ears. In fact, they oppose *hiraba* (which comes from *harb* or war), and not the universally accepted definition of terrorism, which they view as a form of "jihad." Therein lies the reason why so many Saudi jihadist thinkers and clerics cheered the terrorist attacks on September 11th, 2001 ("9/11").

37. The Egyptian theorist Sayyid Qutb (1906-1966 CE), who represented the radical extreme of the Muslim Brotherhood, had a totemic bearing on Wahhabi jihadist thinking. In his book *Ma'alim fi al-Tariq* (translated into English as "Signposts" or "Milestones"[15]), Qutb introduced the rubric of the "near enemy" and the "far enemy," juxtaposed rhetorically but practically interdependent within the concept of the "enemies of Islam." The "far enemy" encompassed examples of "infidel" states, including the United States, the United Kingdom, France, and Israel. The "near enemy" manifested in nominally Muslim regimes whose behavior was "un-Islamic." Qutb denounced leaders who do not govern strictly in accordance with the dictates of Islam, preaching that they were causing their nations to live in a state of *jahiliyya* (ignorance of the true faith). Since such ignorance would lead Muslim nations into *Dar al-Harb* (the "Abode of War"), Qutb advocated that the "near enemy" should be fought just as vigorously as the "far enemy": such leaders should be removed from power by all means, including by force.

38. Sayyid Qutb's works of the 1950s and 1960s[16] began directing currents of fierce criticism from Muslims *towards the US* and its "near enemy" allies in the Arab world. Extremist Muslim Brotherhood activists (and jihadists) fleeing from Egyptian President Nasser's crackdown came in droves to Saudi Arabia, thus importing the "Qutbi" brand of anti-Americanism and intolerance for supine leadership into Saudi religious discourse.

39. The radical *Ikhwan* (the phrase denoting brethren) of the Muslim Brotherhood converged comfortably with the Wahhabi *Ikhwan* (the phrase carrying strong connotations of the military conquests under Ibn Saud that had led to the unification of the Arabian Peninsula in 1932), and Qutbism infused Wahhabism, ultimately finding its most significant amplification in Saudi Arabia.

---

[15] Sayyid Qutb, *Ma'alim fi al-Tariq* [Arabic]; Translated into English as "Milestones" by the International Islamic Federation of Student Organizations ( Beirut, Lebanon: The Holy Koran Publishing House, 1978)

[16] See, for example, Sayyid Qutb's 1951 publication "The America I Have Seen." Note that a copy of this publication was found among the documents recovered from Usama bin Ladin's compound in Abbottabad, Pakistan, see: https://www.cia.gov/library/abbottabad-compound/3F/3F56ACA473044436B4C1740F65D5C3B6_Sayyid_Qutb_-_The_America_I_Have_Seen.pdf

40. After Sayyid Qutb was arrested, detained and executed in Egypt in 1966, his brother Muhammad, who had been imprisoned in Egypt but was eventually released, took up residence in Saudi Arabia. Like many other exiled Egyptian theologians and academics of the period, Muhammad Qutb was warmly welcomed by the Saudi monarchy and given a faculty position as a Professor at King Abdulaziz University in Jeddah.[17] He was able to get his brother's books published and widely circulated. Saudi 'ulama, clerics, and graduates of the Kingdom's Islamic universities became well versed in Sayyid Qutb's radical teachings.

41. Another similarly seminal shift in Wahhabi jihadi paradigms was effected by Muhammad Surur (1938-2016 CE), a rabid anti-Shia cleric who lived in Saudi Arabia for a decade beginning in 1965, having fled from his native Syria. Surur's ideological and operational posture was shaped by his experiences as a member of the Syrian Muslim Brotherhood, and of anti-regime militancy in the face of oppression under the regime of the first President Assad.[18] Assad's heavy-handed, punitive crackdown on protests and opposition from Syria's majority Sunni population,[19] as well as the passage of martial law to impose death sentences on Muslim Brotherhood members, precipitated an exodus of political opposition activists and theological firebrands from Syria, many of whom arrived in Saudi Arabia. Surur, who published (in Arabic) a provocative anti-Shia treatise on "The Age of the Majus,"[20] beloved of senior Sunni and Wahhabi *'ulama*, was among the Kingdom's most cherished immigrants of the period. After

---

[17] Note that Usama bin Ladin attended Muhammad Qutb's lectures at King Abdul Aziz University. Omar al-Bayumi also attended there in the 1980s; see Omar al-Bayumi's CV, produced in the present case.

[18] Hafez al-Assad became President of Syria in 1971, having served for a year as Prime Minister. By concentrating decision-making powers that had been collegial under former Ba'athist rule into his own hands, and by co-opting the military, security and intelligence services under the control of Alawites, his own minority Shia Muslim sect, Assad turned the Presidency into an effective dictatorship. Upon his death in 2000, his son Bashar al-Assad took up the Presidency.

[19] Among President Assad's most destructive acts was the ordering of tanks and airstrikes to crush a February 1982 Muslim Brotherhood uprising in Hama (a city I visited in the immediate aftermath and found to have been levelled), which was known to have enraged Surur.

[20] Muhammad Surur, *wa ja'a dawr al-Majus: al-ab'ad al-tarikhiyya wa al-'aqa'idiyya wa-al-siyasiyya lil-thawrah al-iraniyya* [The Age of the Majus Has Come: the history, doctrine, and politics of the Iranian Revolution], 10th Ed., accessible via https://surour net/. The first edition had been published under Surur's pseudonym, Abd Allah Muhammad Al-Gharib, in Cairo in 1981. Surur appropriated "Majus," originally a Persian word referring to magicians, to cast Shia Muslims as charlatans, not true or proper Muslims, and (politically) agents of Iran. Shaykh Abdul-Aziz bin Baz, on behalf of the Saudi *'ulama*, ordered thousands of copies of Surur's book for dissemination in the Kingdom.

initially residing in Buraydah, Surur became a Professor at Um al-Qura University in Mecca.

42. Surur's allure to Saudi Salafi-Wahhabis – intellectuals and jihadis alike – derived from his creativity in advocating that the characteristically strict organizational discipline of the Muslim Brotherhood should be an essential facet of operationalizing jihad. Surur espoused methodologies analogous to those of the military in nature and hierarchy: regional and local units of the overarching movement; compartmentalization through secrecy; and the adoption of anti-surveillance and other tradecraft to thwart detection or disruption efforts by enemy authorities. I refer to Surur as someone who had "politics in his DNA," and who unsurprisingly injected a more overtly politicized thrust into Wahhabis' worldview. Surur, building on Qutb's legacy, transitioned Wahhabi ideology out of quietism into bold activism. This extremist ideology in Saudi Arabia in the early 1990s was referred to as "Sururi-Qutbi Wahhabism."

43. In my expert opinion, Saudi jihadists embraced Sururism for its very particular organizational framework by which to operate in jihad against the enemies of Islam. I find it highly credible that by the end of the 1990s, Saudi "Sururi" extremists[21] operating within platforms established by the Saudi state were forming an integral vanguard in southern California in support of an al-Qa'ida plot to attack the United States.[22]

[21] EO14040 003465-003472-MDL (subject to FBI Protective Order), FBI investigative Synopsis dated September 2, 2003; entitled "Source reporting on various Los Angeles subjects and the SOROORI / SURURI movement" [includes analysis of extremist organizations inside and outside Saudi Arabia; provides profiles of the extremist ideologies and activities of individuals including Fahd al-Thumayri]

[22] Ibid at 3469:"*al-THUMAIRY was part of the al-Qa'ida linked extremist Suroori network in Saudi Arabia*." I will address the grounds that give me confidence in this expert opinion in a later section of my report, focussed on the role and contributions of Fahd al-Thumayri.

| B. | **Architecture of the Saudi state built on Wahhabi polity** |
|---|---|

44. In seeking accurately to convey the essential character of the nation-state of Saudi Arabia that has evolved – and endured – out of the religious-political Dir'iyah pact, I find it is apt to speak of a Wahhabi polity. My decades-long expert engagement has repeatedly demonstrated to me that for Saudi Wahhabis, no bond is stronger than that which ties them to the puritanical, Salafi practice of their faith. As in worship, so in state politics: the al-Saud royal family depends on Wahhabism for its exercise and retention of authority, because the al-Saud's legitimacy to govern has been underwritten by the Wahhabi '*ulama*, the scholars of the religious establishment.

45. As I have personally experienced and observed, Saudi Wahhabis are prepared to subordinate, even put at risk, other important relationships, for example with their international allies, in their immutable allegiance to their religious brethren, their *Ikhwan*. The architecture of the Saudi state itself, certainly in the period before the 9/11 attacks, has served up a built-in support system for "brothers" who purvey Wahhabi doctrine through the teaching of their strict Tawhidi orthodoxy, their *da'wa*[23] in the name of the Prophet ("*Muhammad is the messenger of Allah*"), and yes – where religious justifications are proffered – their waging of violent jihad.

46. The Dir'iyah pact anointed the al Ash-Shaykh – keepers of the Wahhabi faith – as the moral guides and guardians of the Saudi state and society, domestically and globally. The al Ash-Shaykh have led the '*ulama* class and dominated the religious (Islamic) institutions of the Kingdom in a *de facto* power-sharing arrangement with the al-Saud.

47. The balance of power in this relationship has always favored the royal leaders of the al-Saud; but reformist trends that have seemed to challenge Wahhabi polity, whether at

[23] *Da'wa* literally translates as the "call" to embrace Islam. However, as a manifestation of Wahhabi polity, and as a core mission in Saudi Arabia's foreign policy, *da'wa* is understood to mean the "propagation", or proselytization, of Wahhabism throughout the world.

home or abroad, have continually reiterated the interdependence of religious and political leadership as dually necessary underpinnings of the Saudi state.

48. Whenever the royal family seemed to have faltered in their commitment to the Wahhabi Tawhidi doctrine of Islam,[24] the religious establishment, led by activist ‘*ulama*, made demands of the al-Saud through protests, petitions, and sometimes violence, to rekindle the al-Saud's financial and institutional commitment to the Wahhabi "straight path" in Saudi statehood.

| | |
|---|---|
| **B. i.** | **Saudi ‘*ulama*'s exercise of a religious power base *within* the Kingdom of Saudi Arabia** |

49. Successive Saudi monarchs frequently capitulated to threats of force as well as actual acts of violence by Wahhabi activists initially cast as "extremists," such as the siege of Mecca and the Grand Mosque in 1979. In order to extinguish any designs on religious revolution or more dramatic transformation of the state architecture, the al-Saud have acceded degrees of latitude to permit the ‘*ulama* to exercise their power base with embellished state resources, or through new religious institutions. I would see it as mistaken, however, to regard such recalibrations, made largely on expedient grounds, as any sort of relinquishment of Saudi state power, far less the heralding, as is sometimes suggested, of any kind of *parallel state* of religious extremism. The Kingdom of Saudi Arabia remains intact and embodies *within it* the extremist tendencies ascribed to many of its ‘*ulama*. Indeed, the underlying symbiosis *within the state* remains its defining feature: Wahhabi polity uniquely begat Saudi statehood, just as it is, and ever was, only

[24] In my time at the CIA, as reflected in the 2004 FBI-CIA Joint Assessment, source reporting frequently indicated that Saudi Wahhabis "perceive[d] the royal family as increasingly corrupt, westernized, and less devoted to Islam. This [was] due in part to the presence of Western military, particularly American forces, in the Kingdom with the blessing of the Al Saud;" see Document EO14040_003413-003442-MDL (subject to FBI Protective Order): "Assessment of Saudi Arabian Support to Terrorism and the Counterintelligence Threat to the United States;" Joint intelligence Report prepared by the Federal Bureau of Intelligence (FBI) and the Central Intelligence Agency (CIA); dated December 2004; at 003417.

Saudi state action that can really determine, shape, enable or constrain what is done in the name of Wahhabism.

50. It is in this light that the creation of the Saudi Ministry of Islamic Affairs, Endowments and *Da'wa* (MOIA) in 1993 stands to be regarded. Inarguably, the scope, reach, power and influence of *da'wa* operations to propagate Wahhabism was massively expanded; but just as unambiguously, the MOIA was brought into existence, and its operations have been conducted, as part and parcel of the state machinery of the Kingdom of Saudi Arabia.

51. The elevated prominence of the al Ash-Shaykh, from whose family most of the Ministers of Islamic Affairs himself would invariably be drawn, must be set against the fact that the true figurehead of the historically grandiose *da'wa* platform was King Fahd bin Abdulaziz al-Saud. In King Fahd's name, the state printing complex published millions of Islamic texts, and after him were named some of the most important edifices – including the King Fahd Mosque in Los Angeles, CA – erected to glorify Saudi Wahhabism and counter its perceived enemies.

52. MOIA employees were assigned new, broader remits, and were posted – often as full-fledged diplomats – to Saudi Embassies and Consulates in major cities around the world, notably in Washington, D.C.[25] and Los Angeles.[26] Yet their employment, their functions, and the diplomatic and special passports they carried, were of course derivative of their status – as official state representatives of the Kingdom of Saudi Arabia.

53. The inception of the Ministry of Islamic Affairs, in 1993, occurred during a period of seismic shifts in world affairs, including several more of the key trends in Islamic radicalization to which I have devoted in-depth analysis throughout my career. I believe that the driving forces behind the plot to commit the 9/11 terrorist attacks, as well as my

[25] See KSA 2609: Khalid al-Suwalim, MOIA's Director for Europe, America, and Australia, was posted to Washington, D.C. in order to direct MOIA's operations in the United States.
[26] See KSA 8509 (entered into evidence as Exhibit 433): Fahd al-Thumayri, selected to be a MOIA propagator and Imam at (first) the Ibn Taymiyya Mosque and (then) the King Fahd Mosque, was posted to Los Angeles.

expert opinion regarding the role played by Saudi Arabia in that plot, can best be elucidated by focusing on three particular trends, as follows:

a. Doctrinal intolerance and inflexibility in Saudi religious education, from grade school upwards;

b. The Islamic Awakening and its Demands vis-a-vis King Fahd; and

c. The emergence of al-Qa'ida and the populist mobilization platform developed by Usama bin Ladin ("UBL"), after the Soviets were ousted from Afghanistan.

| **B. ii.** | **Saudi religious education: a force multiplier for Wahhabi jihadi doctrine** |
|---|---|

54. Education has emerged as the most tangible means by which the Wahhabi religious establishment has exercised its influence on Saudi life and worldview. School curricula and textbooks at all educational levels, from grade schools to universities, have for decades reflected a hostile intolerance towards followers of all non-Wahhabi belief systems, whether other Muslims (Shia, Sufis, and other sects), secularists, Christians or Jews.

55. One of my key areas of expertise in the field of political Islam has been the strategic analysis of textbooks and other educational materials used in Muslim-majority countries, as a means of divining the prevailing cultures of socialization to which children and youth in those countries are exposed. I was one of the early analysts who, in my professional capacity, identified the Saudi Arabian education system as the instrument of a state agenda to inculcate Wahhabi religious doctrine into the minds of Saudis from a young age.[27] Across my career, I acquired and studied close to 300 Saudi

[27] See EO14040_003603-003606-MDL (subject to FBI Protective Order), ''**Saudi Arabian Student Population**'' – monograph from within the FBI EC dated July 23, 2021; citing an unclassified report by the Central Intelligence Agency (CIA), to reflect a concern that "the youngest and most impressionable segment of Saudi society will still have been exposed to… incitement to religious hatred and violence, and many will have already internalized these teachings;" at 003604.

Arabian textbooks, principally monotheism texts from middle school and high school level with names like "*Hadith and Islamic Culture.*" I authored two important studies on the subject of Saudi textbooks during my time at the Agency, the contents of which remain classified.[28] Like other bodies with sufficient access to books to be able to conduct similar studies before and since,[29] however, I can say that I found school textbooks to channel the same currents of hatred and preparedness to employ violence against the "enemies" of Islam as I would often hear advocated by Wahhabi jihadists in other settings.[30]

56. The extremist bent in these textbooks is especially significant because all of them, without exception, are published under the official state imprimatur of the Kingdom of Saudi Arabia. The Ministry of Education hires certain Wahhabi educators to write the text; the draft then goes to the Ministry of Islamic Affairs, whose sign-off must be procured before the book can be sent to print. Each official publication accordingly bears the endorsement of the MOIA in the form of a stamp or comment in its preface.

57. What has struck respected sociologists and psychologists who have analyzed this phenomenon – some of whom worked for me and with me at the CIA when I was writing my own reports on educational curricula – is the Saudi insistence on infusing even entry-level, elementary school textbooks with the Wahhabi jihadi doctrine. It is this express effort at early-years socialization that led my CIA colleagues to comment, in their unclassified conclusions, that: "even if the Saudis [were to] moderate some of the offensive passages in the higher-grade textbooks, the youngest and most impressionable segment of Saudi society will still have been exposed to… incitement to

[28] The political rationale for classifying my reports in this area was linked to the fact that the studies were comparative: they built their analysis on the study of school systems in at least five other Muslim-majority countries, not all of which were informed of the terms, aims or outcomes of the project.

[29] See, for example, Center for Religious Freedom, with the Institute for Gulf Affairs, "Saudi Arabia's Curriculum of Intolerance: Excerpts from Saudi Ministry of Education Textbooks for Islamic Studies", published by Freedom House, 2006; at p.11: "an ideology of hate toward the 'unbeliever'… is introduced in a religion textbook in the first grade and reinforced and developed in following years of the public education system, culminating in the twelfth grade, where a text instructs students that it is a religious obligation to do "battle" against infidels in order to spread the faith."

[30] The unclassified CIA report mentioned above also noted that such texts "teach hatred as part of the doctrine of disavowal," and "stress the theme of religious violence."

religious hatred and violence, and many will have already internalized these teachings."[31]

58. According to my expertise, children are socialized into their respective societies – the symbolism of their environment, the political, cultural and historical tenets by which their people live – by the time they are in fifth grade, i.e. completing their elementary school education. Thus, elementary school textbooks, more so than high school equivalents, are pivotal, determinative vectors in radicalizing young minds. Saudi grade-school teachers are bound by state regulation to teach strictly and exclusively what is contained in the textbooks: I was told by the teachers I interviewed that their non-deviation is secured by the terms of their employment contracts. Furthermore, as I found through my explorations in Saudi Arabia, the bulk of grade-school teachers are themselves mere high-school graduates. Teachers who are not required to possess any advanced qualifications or complete any intensive preparatory training are scarcely equipped to go beyond the core teaching materials they work from, which further reinforces the inherent importance of the textbooks themselves.

59. As to teaching content, I found it astonishing to note the prevalence of unitary theories, beginning with creationism, through the life of the Prophet Muhammad, to the practice of rituals and duties, based upon a singular metric, whatever your discipline or field of study, of attaining greater closeness to Allah and becoming a better Muslim. Whereas systems that subscribe to the other larger Schools of Jurisprudence in Sunni Islam have tended to accommodate reason and even scientific discovery in their curricula, all this is subordinated in Saudi Arabian education to the inflexible Salafi-Tawhidi attachment to only the Hanbali Wahhabi school of thought.

60. There has been considerable outcry, including via bilateral channels between the United States and Saudi Arabia, that Saudi claims and promises to reduce, alter or remove the most offensive material from its textbooks, such as the hate-fueled teaching on jihad,

[31] See Document EO14040_003603-003606-MDL, Ibid., at 003604.

had effected no change whatsoever in the decade after the 9/11 attacks. To my mind this Saudi intransigence was entirely unsurprising.

61. Based on my expert studies, I had myself emphasized in government the profound importance of addressing the realm of elementary school, since these textbooks had become the primary tools of both formal education and socialization, releasing the effluvia of Wahhabi jihadi extremism into the Saudi mainstream. I have been party also to the stock Saudi response to such admonishment: fierce resistance to diluting the doctrine, characterized by a refrain that Saudi Arabia must be free from external interference in the sacred pursuit of its religious education. Saudi officials have thus preserved and led children to drink from a poisonous reservoir of radical intolerant ideologies and violent jihadist tendencies, the products and by-products of which have flowed far and wide.

62. At the university level, Imam Muhammad ibn Saud University in Riyadh, including its branch campuses in Buraydah, Qassim, Abha in ‘Asir, and other regions of Saudi Arabia, together with Um al-Qura University in Mecca, and the Islamic University in Medina, have become the spiritual strongholds of Wahhabi teachings regarding the Qur’an, the Hadith, and Islamic life of the country. As I have reflected throughout this report, many of the most prominent Wahhabi clerics, educators, imams, and propagators have graduated from and/or held faculty positions at Imam Muhammad University, while many Saudi Government ministers, officials and diplomats are also among its alumni.[32] The common bonds of Saudi Arabians to their Islamic universities have done much, in both spiritual and practical terms, to burnish Wahhabi polity at the heart of Saudi state foreign policy.

63. Furthermore, by bringing students from other Muslim countries in Asia, Africa, and elsewhere and educating them free of charge on government scholarships at Imam Muhammad University, Saudi Arabia made the university an important force multiplier in spreading the Wahhabi doctrine and its concept of jihad across the globe.

[32] It is a distinction shared with many of those implicated in the 9/11 terrorist attacks, including several of the hijackers and prominent members of the US-based Saudi support network.

Unprecedented state finances have been ploughed into propagation, a vital expression of Saudi power, since the late King Faysal's undertaking, in the late 1960s, to make Islamic *da'wa* a cardinal principle of Saudi foreign policy.

64. Since its inauguration by Royal Decree in 1974, Imam Muhammad University has sat at the center of *da'wa* activities in the realm of theological education, supported by other proxy organizations *within* the Wahhabi polity of the Saudi state. I have witnessed first-hand through my visits to Arab and non-Arab Muslim majority and Muslim minority countries how the mechanisms of Saudi proselytization take effect:

a. The International Islamic Relief Organization, IIRO, for example, would come into a particular community to establish what would be called an "Islamic Center," but which was often a rudimentary, one-room structure in the middle of a village;

b. At the same time, a representative of either IIRO or Al-Haramayn (or another Saudi proxy) would come to those locations in order to teach Qur'anic studies, and would then parade out their students who had memorized and could recite *suras* from the Qu'ran by heart. From among the regular attendees of the religious education, certain "students of promise" would be identified to be sent on full scholarships to study further in Saudi Arabia, primarily at Imam Muhammad University;

c. The students would then return to their home countries and communities as teachers and preachers, espousing the very radical doctrine, the Salafi-Wahhabi interpretation, at the heart of the Saudi state religion; hence, the thrust of Saudi Arabia's investment in the first student's education would be multiplied, sometimes exponentially;

d. Through this means, communities that had predominantly comprised practitioners of moderate, "civic," or "cultural" Islam, have been "converted" (i.e. radicalized) by the Saudis; in a process referred to as "converting Muslims to true Islam."[33]

65. Based on my first-hand observations, the degree to which the attendees of a particular Islamic Center espoused radical viewpoints, or were devoted to extremist interpretations of Islam, could be determined in almost direct proportion to the extent of Saudi influence over their location. In my successive visits to, for example, Dar al-Ulum, the largest Deobandi Islamic University in the world, near New Dehli (India), Islamic Centers in Tashkent (Uzbekistan), Lahore (Pakistan) Mombassa (Kenya), Kanu (northern Nigeria), Jakarta (Indonesia), Kuala Lumpur (Malaysia), Tirana (Albania), Ashkabad (Turkmenistan), and Tashkent (Uzbekistan), to name but a few, I noted consistently that the greater the amount of funds received from, and influence exerted by delegates of, the Kingdom of Saudi Arabia, the more hardened their adherence to the Wahhabi doctrine espoused by Saudi propagators.

66. The Saudis recognized that they required to co-opt legitimate local actors from within these communities to be their conduits, or mouthpieces, for radical interpretations of Islam; this model constituted a highly effective means of infusing Wahhabism into foreign target communities, and in turn generating a wider recruitment pool for Saudi religious institutions around the world, including foreign employees for its Ministry of Islamic Affairs. The collateral effect is that successive generations of Saudi students,[34] and increasingly Saudi-educated foreigners, have emerged out of this educational system highly susceptible to the case for violent jihad against the United States and the other

[33] The Saudis have espoused Wahhabi Islam as the only true Islam, and have sought to overcome and eliminate local interpretations, and indeed local cultural practices in Muslim worship, such as veneration of saints, visits to supposedly holy places, praying differently including by incorporating local practices / variations on timings, etc., forgoing the fasting rituals. The Saudis have conversely insisted upon the adoption of strict adherence to true Islamic rituals, such as praying punctually five times a day. I observed the Wahhabi curtailment of local practices on my visits to villages in northern Nigeria, Turkmenistan, Indonesia, and other places.

[34] It has become commonplace for FBI analysis to cite to a disproportionately high number of terrorism investigations directed at the Saudi student population as evidence of the radicalizing tendencies of Saudi Arabia's education system. See Document EO14040_003603-003606-MDL (subject to FBI Protective Order), ''**Saudi Arabian Student Population**'' – monograph from within the 2021 FBI EC on how Saudi students represented a recruiting pool for al-Qa'ida; traces links to violent jihadists among the Saudi student population in the US; at 003603.

"enemies" of Islam. On the one hand, the case based on Wahhabi jihadi doctrine would be drilled home by Imams and preachers in Saudi mosques, which also proliferated under the intensified *da'wa* drive; on the other hand, the fertile field of Saudi-educated students would be expressly targeted – not least on their campuses – by the purveyors of other trends in Islamic radicalization, from the "literati" of the Islamic Awakening, to the "recruiters" for global terrorism.

| B. iii. | The Islamic Awakening and its demands vis-à-vis King Fahd |
|---|---|

67. The Memorandum of Advice (Muthakkarat al-Nasiha)[35] was signed in July 1992 by 107 Saudi clerics, religious activists, and intellectuals as a list of demands to the Saudi King to strengthen the role of religion in Saudi Arabia and overseas.

68. More than three dozen of the 107 signatories were affiliated with Imam Muhammad University, either as graduates or professors. Others were affiliated with the Islamic University in Medina or Umm al-Qura in Mecca. This is particularly significant because Imam Muhammad University is the principal institution of higher learning in Saudi Arabia with expertise in the teaching of the core religious principles, as well as Arabic Grammar – as it applies to the Qur'an, and the *tafsir* (exegesis, or explanations of critical interpretations) of the Qur'an.

69. The 47-page Memorandum[36] called for, among other demands:

a. Strengthening of religious ulama, clerics, and their institutions and charities, including the Supreme Council of *'ulama*.

b. Assigning to embassies and consulates abroad the role of propagating Islam and encouraging non-Muslims to convert to Islam.

---

[35] See PEC-KSA000235-266, The Memorandum of Advice (in Arabic), accompanied by an extract from Fandy, Mamoun; ''Saudi Arabia and the Politics of Dissent'' (Palgrave, New York, 2001).
[36] PEC-KSA000235-266,

c. Supporting embassies in that role with qualified religious propagators and preachers, and religious scholars who would be placed there as appointees from the religious apparatus but with a diplomatic status. Khalid al-Suwaylim's position in Washington DC is the best example.[37]

d. Supporting propagation (*da'wa* or proselytization) organizations and Islamic "charities"—such as the Muslim World League, the International Islamic Relief Organization (IIRO), the World Assembly of Muslim Youth (WAMY), and al-Haramayn —financially and operationally.

e. Establishing classes and courses for propagation (*da'wa*) and religious studies and supporting them financially and administratively.

f. Implementing Islamic law or Sharia in all facets of society.

g. Diversification of arms purchases from different countries without depending on one source of arms (by implication, the United States).

h. Reliance on experts and advisers from Muslim countries and not only Western (non-Muslim and by implication "infidel") countries.

70. The Memorandum of Advice revealed that an agenda of intolerance and hostility toward the West existed among Saudi religiously-educated Islamic activists. Although some of the signatories came from different social, religious, and educational groups in the country, the strict fundamentalists (*usulis*) or Salafis dictated most of the religious demands or "advice" expressed in the Memorandum.

71. The Memorandum followed on from a peaceful petition in 1990 and the Letter of Demands[38] in 1991, both of which were driven by fairly "mainstream" Islamists. Nonetheless, this group could not have been regarded as being pro-democratic secular reformists in the Western sense, since they were largely advocates for a reform

---

[37] See EO14040_003478-003608, at 3582-3: "Khaled Alsowailem."
[38] See PEC-KSA000231-234, The Letter of Demands (in Arabic), accompanied by an extract from the Egyptian newspaper 'Al Sha'ab, dated May 21, 1991; also accompanied by an extract from Jerichow, Anders, "The Saudi File'' (Curzon Survey 1998).

grounded in Sharia law. Their "reformist" demands carried with them the implicit criticism that the government had deviated from its commitment and adherence to Sharia law. These demands included the following:

a. Establishing a consultative council, with legislative powers, independent of any government influence;

b. Creating a fairer economic distributive system;

c. Building a strong national army devoted to the defense of Muslim jihad;

d. Creating an independent and unified judiciary; and

e. Protecting the rights of individuals (as long as they conform to religious imperatives).

72. A year later, however, the Memorandum of Advice reflected the views of hardline Islamic scholars - educated domestically and affiliated with Imam Muhammad University - who were markedly more hostile to the West and Western notions of democracy. To them the "West" included Christians, the new Crusaders (America), and Zionism (Israel). Furthermore, these hardliners viewed Western educated Muslims and pro-Western Muslim leaders as "Muslims in name" who exhibit "un-Islamic" behavior and therefore are part of the perceived "enemies" of Salafi Wahhabi Islam.

73. The Memorandum of Advice was discussed extensively in Middle Eastern and Western circles at the time, often depicting its confrontational nature vis-à-vis the King.[39] An Egyptian newspaper had described the Letter of Demands, which preceded the Memorandum of Advice, as the "most dangerous political document in the history of Saudi Arabia."[40]

74. Such was the publicity and clamor around this apparent tension between the religious and political impulses of Wahhabi polity, it's inconceivable that any student at, or a

[39] See, for example: Murphy, Caryl, "Conservative Clergy Attack Saudi Government," *The Washington Post*, September 28, 1992.
[40] *Al-Sha'b*, Cairo, May 21, 1991.

graduate of, Imam Muhammad University in the early 1990s could have remained unaware of this "Islamic Awakening" trend, did not support it, or did not learn in detail about the controversies underpinning the Memorandum of Advice, especially as over three dozen of its signatories had affiliations with Imam Muhammad University. In my expert opinion, Fahd al-Thumayri, a student at Imam Muhammad University and theologian-in-training at the time,[41] would have had to be conversant in its principal themes and supportive of its activist thrust.

75. Among the signatories whose names have been published in academic discussion of the Memorandum, I am personally familiar with several of them from my career's work on political Islam, for example:

a. Safar al-Hawali --received his doctorate in Islamic theology from Umm al-Qura University, Mecca in 1986. He became a leader of the *al-Sahwa al-Islamiyya* (Islamic Awakening) movement in 1990-1991, and brought to bear a clear influence of the teachings of Sayyid Qutb. He was arrested later in the 1990s for preaching against the Saudi government;

b. Salman al-Awda – received his Master's degree from Imam Mohammed University in the 1980s; served until September 1992 as lecturer in the Department of Sunna Principles at Imam Muhammad University; but upon participating in *al-Sahwa*, he was fired by the university for having criticized the Saudi government;

c. Abdallah bin Sulayman al-Mas'ari—a retired judge from Riyadh and founder of the Committee for the Defense of Legitimate Rights (CDLR);

[41] See Fahd al-Thumayri's CV as produced in this litigation by KSA. Al-Thumayri graduated from his Bachelor's degree in 1992 and his Master's degree in 1995, both from Imam Muhammad University. It is worth noting that several other Saudi MOIA propagators whose profiles I have analyzed in this case were also Imam Muhammad University graduates, including Abdullah al-Jaythin, Adel al-Sadhan and Mutaib al-Sudairy.

d. Abdallah bin Abd al-Rahman al-Jabrayn—the only signatory who served on the Supreme Council of the 'Ulama. He and his friend Abdallah al-Tuwayjiri (another signatory) graduated from Imam Muhammad University in 1987;

e. 'Ayidh bin Abdallah al-Qurni – former lecturer in the Department of Sunna Principles at Imam Muhammad University campus in Abha, the capital of the 'Asir region (the ancestral place of al- Qurni tribe). He was censured after signing the Letter of Demands in 1991;

f. Sa'id bin Mubarak al-Zuwayr – received his PhD in Communications from Imam Mohammad University in 1986, a year before al-Tuwayjiri and al-Jabrayn graduated;

g. Abdallah bin Hammud al-Tuwayjiri – graduated with a PhD from the Department of Sunna from Imam Muhammad University in 1987, together with al-Jabrayn, – and both men are believed to have been involved in drafting all three religious petitions; both were founding members of CDLR;

h. Sa'ad al-Faqih – medical doctor, earned a doctorate degree in keyhole surgery from Exeter University in the UK, considered to be a moderate in the context of the reformist movement;

i. Abd al-Rahman Ali Salih al-Suhaybani –an Assistant Professor with the Dept of Education at Imam Muhammad University, College of Social Science in Riyadh;

j. Hamdan bin Muhammad al-Hamdan—Chairman of the Islamic Culture Department in the King Saud University College of Education;

k. Abd al-Wahhab bin Nasir al-Turayri – serves as lecturer in the College of Religious Principles at Imam Muhammad University in Riyadh, having earned his MA degree in Religious Principles from there, graduated in 1988. He was a prominent leader of the "Awakening" and was a fiery speaker and a strong critic of the Arab-Israeli peace agreement;

l. Salih bin Muhammad bin Sulayman al-Sultan – serves as Assistant Professor in the Dept of Islamic Jurisprudence, College of Islamic and Religious Principles at Imam Muhammad University campus in Qassim earned PhD in Islamic Jurisprudence from Imam Mohammed U in 1990;

m. Sa'id bin Nasir al-Ghamdi – lecturer in the Dept of Theology in the College of Sharia and Religious Principles at Imam Muhammad University campus in Abha having earned his MA in Theology from Imam Muhammad in 1980. He was a signatory of both the Letter of Demands and the Memorandum of Advice;

n. Ahmad Ibrahim al-Zarawi – Asst Professor / Head of Dept of Islamic Jurisprudence, College of Sharia and Religious Principles at Imam Muhammad University campus in Abha; earned MA in 1979, and PhD in 1985 from Imam Muhammad University;

o. Awdh bin Muhammad bin Sa'ad al-Qurni – lecturer in the Dept of Islamic Jurisprudence and Religious Principles at Imam Muhammad University campus in Abha. Al-Qurni signed both the Letter of Demands in 1991 and the Memorandum of Advice in 1992;

p. Hassan bin Salih al-Hammid – lecturer at Dept of Quranic Studies at Imam Mohammed University campus in Qassim (Buraydah), earned MA degree in Arabic Grammar from Imam Muhammad University;

q. Abd al-Aziz Al-Wuhaybi—is Professor of nuclear physics at King Saud University, College of Science, in Riyadh;

76. When Saudi Shaykh Ibn Baz, then Head of the Presidency of the Council of the Senior *'Ulama*, came out in opposition to the Memorandum of Advice, it was interpreted as act of allegiance to the Al-Saud, the result of pressure from the Saudi government, which wanted to downplay the scale of discontent in the hope that the matter would simply disappear. Ibn Baz had performed a similar function for the royals in issuing a *fatwa* for the basing of U.S. troops on Saudi soil.

77. Ibn Baz and the others on the Supreme Council of the Ulama criticized the signatories of the Memorandum on the basis of their "foreign connections", presumably with "infidel" non-Muslims– a typical charge made against those who have studied overseas, alleging that they had lost their authenticity, their closeness to the cultural and religious orientation of the state; and that they were seeking to bring in secular, foreign ideas – which by implication, threatened Islam and the Sunna (the purity and juridical foundations of Islam). These criticisms were largely personal attacks on the signatories.

78. The critique was in fact inspired by and produced under pressure from the Al-Saud, indeed from the King; ibn Baz knew that his Council was not unified on the matter (ultimately only 10 out of 17 members subscribed to his position), and would not have issued the critique had it not been for the government's pressure on the Council (which the Government chose as its mouthpiece because of its standing as a credible religious authority). Although in reality "*quasi independent*," the Council is the moral praetorian guard of the doctrine of Islam and endeavours not to become involved in the politics of ruling the state. Its public criticism of the Memorandum and the personal attacks on the signatories of the Memorandum under pressure from the King significantly undercut its standing among the majority of Saudi clerics.

79. The critique did not in fact take issue with the doctrinal substance of the Memorandum, nor did it seek to rebut the arguments on merit; the tactic aimed at discrediting the initiative was to go after the characters of the signatories.

80. The driving forces of *al-Sahwa al-Islamiyya* ("the Islamic Awakening") were both religious and mainstream activists[42], encompassing a broad spectrum of reformist views. The faction that predominated, that prevailed, i.e. they succeeded in marginalizing the demands of the mainstreamers regarding government and institutional reform and accountability (e.g. independence of the parliament), which they did because they were

[42] Including those who were Western educated and who were educated in and taught subjects outside of the sphere of religion, including, for example, a Professor of Nuclear Physics at King Saud University, Abdulaziz al-Wuhaybi, and a medical doctor with a PhD in keyhole surgery.

more interested in strengthening and enhancing the power of the religious factions within the government.

81. How did the factions prevail? They first marginalized the demands of the mainstreamers essentially by ignoring them. They believed that the balance that had held under the pact between Ibn al-Wahhab and Ibn al-Saud for generations had now become skewed in favour of the political classes against the religious establishment (represented in the modern day by al Ash Shaikh, descendants of ibn Abd al-Wahhab). They wanted to restore that equilibrium by increasing the influence of the religious constituency in society and by making state public policy reflect the dictates of Sharia and be in line with those dictates. The radical clerics in effect succeeded in their demands in that the King acquiesced in increasing the active role played by the Saudi government in propagating Islam (*da'wa*) overseas.

82. According to al-Wa'ie magazine (a publication of Hizb al-Tahrir),[43] the Memorandum of Advice was submitted to King Fahd with more than 100 *'ulama* signatures.. About half of the 17 members of the Council of Senior Ulama supported the Memorandum without signing it; and seven (7) out of the 17 did not support the critique rendered by the Council. Al-Waie reported that King Fahd wrote personal letters to each of these seven (7) *'ulama* on December 2, 1992, relieving them of their membership on the Council.[44] Before doing so, on November 30, 1992, King Fahd appointed 10 new members (pre-emptively) to replace the seven, which raised the membership of the Council to 21.

83. In the second week of December 1992, the news media reported that there were conflicts between the '*Ulama* and the Royal court. King Fahd held a meeting on

[43] Al-Wa'ie Issue No 69 of Year 6, dated January 8, 1993; online at: www.al-waie.org/archives/article/9543 (Hizb al-Tahrir Central Media Office). Note that Hizb al-Tahrir is a group focused on creating a Shar'ia-based society and restoring the Islamic Caliphate; operating in Central Asia, Southeast Asia, and the Middle East, it is close in both ideological and operational terms to the global jihad paradigm.

[44] The seven (7) members removed from the Council of the *'Ulama* were the following: Shaykh Ibrahim bin Muhammad al-Shaykh; Shaykh Sulayman bin Ubayd; Shaykh Abdulaziz bin Salih; Shaykh Abd al-Razzaq Afifi; Shaykh Abdallah Khayyat; Shaykh Abd al-Majid Hassan; and Shaykh Salih bin Ghusun.

December 19, 1992 at his palace in Medina in an effort to show that there was no such conflict and warned against:

a. Sending advice publicly to the King

b. Using the pulpit in the mosque to disseminate views that disagree with state policy.

84. At that meeting, King Fahd said, "We have begun to see in the last few years, but especially in the last two years, matters arising that did not exist previously in the Kingdom."

85. Al-Waie wrote the following in its commentary on the Memorandum: "What the King has begun to see in the last two years is the deep anger against the policy of the King and his government, especially after the Gulf War, and the appearance that the Kingdom of Saudi Arabia has become the property of Americans and not of Muslims. It is difficult to see how the King can, while the Americans are on top of him, survive without being swept away by the burgeoning Islamic current. The Memorandum of Advice is a clear indicator of the direction that the people of Hijaz and Najd and the rest are moving towards."

86. Al-Waie, in the same commentary, also directed advice to the authors of the Memorandum: "They themselves have written an advice that was shy and incomplete, and failed to address the root solution to the problems that exist in Saudi Arabia; the solution would be to abolish the monarchy and establish an Islamic caliphate." Al-Waie added: " The Memorandum of Advice did not address the American control of the country and everything in it; it's true there is a monarchy here, but the monarchical system is not in the hands of the King, the government or the people of this country; the real power is in America's hands, and therefore it's a useless effort."

87. Al-Waie'e commentary continued: "The signers of the Memorandum are also certain that the Memorandum's recipients are not going to pay any attention to it. The real duty on them (the signers) and on us (the magazine and the media) and all Muslims, is to

return Islam to Muslims and restore to Saudi Arabia true Islamic rule in accordance with the five tenets of *'aqida* (faith), Sharia, *hukm* (divine rule), *da'wa* and jihad."

88. What follows is my attempt at divining a metric of the "success" (or otherwise) of the Memorandum of Advice and associated demands. The principal outcome of the Memorandum—the most concrete evidence of the success of the radical clerics—was the creation of the "Ministry of Islamic Affairs and Waqf (Islamic Endowment), *Da'wa* (Propagation), and *Irshad* (Guidance). Other metrics of success included: spending substantially more money on Islamic charities; building more mosques overseas; propagation activities (*da'wa*) overseas, with a particular focus on supporting these activities in Muslim-minority countries, including in the United States and in other European and Western countries. Collectively ,these amounted to a massive investment in favour of the the agenda of the radical clerics, supported by government resources and infrastructures.

**<u>The King's response and the outcomes of "*al-Sahwa*" demands</u>**

89. Even though the King sought publicly to reject the demands – not least through his pressuring of bin Baz to issue a critique of the MoA – he did come to accept that the viewpoints and grievances therein were widely held. He didn't appear to feel any great compulsion or urgency to respond to the demands for democratization and political reforms inside the Kingdom. His response to the reformers' demands was largely perfunctory.

90. On the other hand, King Fahd's response to the religious demands in the Memorandum of Advice was tangible by enhancing *da'wa* globally. This well-funded role—the power to do *da'wa* globally—was principally assigned to the newly created Ministry of Islamic Affairs.

91. The King of course continued to rely on American defense and military presence, weaponry, technology and expertise (in the shape of advisors). In this regard, quite starkly, the King had rejected the clerics' demands regarding the continued infidel presence, the diversification of the sources of weapons, and the pursuit of alliances with

other Muslim countries (as compared to Western countries). He told the signatories, especially members of Council of Senior Ulama, that he did not want to hear demands that contradicted state policy. Usama bin Ladin was the immediate beneficiary of the King's intransigent stance. UBL continued to articulate his well-rehearsed criticisms of the King and the Saudi government.

92. Bin Ladin effectively got a "win-win" out of this ferment: first, in the shape of the MOIA, he now had an exceptionally well-resourced Saudi state vehicle that would effectively lend support to his ambitions to do *da'wa* and indeed to wage jihad globally (and in particular against the United States); second, through the King's failures to address the "infidel" presence domestically, UBL retained a jihadist "cause" around which he could rally potential recruits to al-Qa'ida, especially from within Saudi Arabia.

93. The King's response can best be understood as having been motivated by expediency. He rejected those reforms that contradicted existing state policy, but he needed to throw a bone to the religious establishment, in recognition of the breadth and potency of *al-Sahwa*, and he did so by appeasing them in respect of their demands to enhance and fund *da'wa*. This response also allowed the King to retain some measure of credibility, because he could represent to his people that he was acceding *only* to this request because *da'wa* was already an essential tenet of state policy. He needed to do that because it was the only way that he could then continue ruling the Kingdom in the manner he saw fit. He hoped that this concession would take the sting out of the opposition to the continued presence of "infidels" in the Land of the Two Holy Mosques.

94. Strategically, the other benefit the King hoped for from this "pact" with the religious '*ulama* was that the doing of *da'wa*, and by virtue of the prominence afforded to bin Ladin's pronouncements, the waging of jihad, would change in focus by exporting it outside of the Kingdom's borders. In return for granting the '*ulama* a license to propagate more actively overseas, through the Ministry of Islamic Affairs, the King had

hoped, perhaps naively, that violent jihad would be kept away from the Kingdom and that the Al-Saud would not be branded with a radical image.

95. The Al-Saud, however, must have known that the Salafi Wahhabi *da'wa* overseas was done with a Saudi state imprimatur, using Saudi-produced Qu'rans (printed by the King Fahd Printing Complex in Medina) and Saudi religious literature. The King necessarily knew, or at the least knowingly and willfully turned a blind eye to the reality, that the entire *da'wa* operation overseas was managed by representatives of the Ministry of Islamic Affairs operating, mostly under diplomatic cover. out of Saudi embassies and consulates across the globe.

96. The Saudi government in effect could not extricate itself from the responsibility of doing *da'wa* and by extension violent jihad in other countries. The inconvenient truth is that propagators were paid by the Saudi government, the Islamic "charities" were funded by the Saudi government and wealthy Saudis, the Qur'ans and other *da'wa* literature were printed in Saudi government printing shops, mosques were funded and built, especially in the case of King Fahd Mosques in Los Angeles, by the Saudi government, and visiting propagators and other Saudi radical activists were often funded and supported by agencies of the Saudi government.

97. Based on the best analytical product available to us in U.S. government, much of which I had overseen personally in its production, we told the Saudis at that time that committing to jihad overseas did not mean that jihad would not be committed inside their own borders. And so it came to pass: any illusion that domestic security had been secured in some way was shattered when, unfortunately for Saudi Arabia, acts of terrorism also hit the Kingdom in the years after 9/11.

98. In my expert opinion, UBL purposely used the perception of enmity, and the realizable threat of violence, vis-à-vis the Saudi government to reinforce the religious arguments he advanced to win support for his violent global jihad. If bin Ladin could attach the Qutbi characterization of the "near enemy" to the rulers of his own country, Saudi Arabia – especially by highlighting the "un-Islamic" behavior of Saudi leaders, and casting them as willing participants in their own subjugation to an "infidel" occupier –

then UBL could far more readily make the case that the occupier in question, the United States, was a legitimate "far enemy" to be attacked, and that it was the religious duty of every Wahhabi to join in the jihad against America.

99. Usama bin Ladin talked of the "soft words and very diplomatic style" (meant sarcastically) of the Memorandum, while Hizb al-Tahrir described it in similar terms as "bashful and incomplete."[45] Yet the ultimate settlement to the internal dispute embodied by "*al-Sahwa*" – the establishment of the Saudi Ministry of Islamic Affairs (MOIA) – was in my opinion actually a concession to the Wahhabi religious faction among the signatories, serving al-Qa'ida's and other jihadists' agenda in the long term, rather than any kind of accommodation of the positions taken by the "secular" reformists.

| B. iv. | **al-Qa'ida's leader Usama bin Ladin as a capacitator and conduit for the coherent articulation and propagation of Wahhabi jihadist causes** |
|---|---|

100. In the 1980s, with a focus on Afghanistan, most of the jihad was done in respect of the Soviet presence in that country. The jihad in Afghanistan was a fairly unique situation – against a foreign occupying power that was waging war on a Muslim country inside its own borders – in which the US and others also participated in supporting the mujahidin forces.

101. From 1991 onwards, a new emphasis emerged – the basing of US military assets on the Kingdom's territory had inflamed extremist sentiment and coalesced religious and political opposition to the Saudi monarchy and its perceived American protector.

102. Part of my responsibilities in the CIA was to analyze statements made by international terrorist leaders and prepare briefings for senior US government policymakers, up to and including the President. The leader with whose voice, oratory and citations to

[45] Both positions cited in Al-Wa'ie Issue No 69 of Year 6, dated January 8, 1993; Ibid.

scripture I became most familiar was undoubtedly Usama bin Ladin.[46] Bin Ladin was the first voice among the radical wing to declare a fatwa for jihad (which he did privately in 1992 but publically in 1996) in the context of a global jihadist movement that espoused the oneness of jihadist causes around the world – and he was tremendously successful in recruiting followers both from within and outside the Kingdom. Previously disparate "local" jihadist causes – including Kashmir, Bosnia, Chechnya, Palestine, etc. – which had been overshadowed by Afghanistan as the primary, predominant, and indeed effectively the sole, magnet for jihadism on behalf of Islamic causes (faith and geography).

103. Before bin Ladin and the Wahhabis, the plights and causes of Muslim peoples in places such as Palestine, Kashmir, Chechnya and Iraq were quite disparate and distinct. The "oneness" of Islamic causes came from the application of Wahhabist doctrine, as articulated by UBL, whereby these causes were unified as a single cause against *Dar al-Harb*, the "Abode of War". The characterization of Islam at the heart of an existential, global struggle made bin Ladin's message carry much greater resonance, and in turn his task in recruiting aggrieved extremists to al-Qa'ida became much simpler (in just the same manner as the leaders of the Islamic State, al-Baghdadi and others, were able to appropriate much of bin Ladin's rhetoric as the basis for a prolific recruitment drive some 15 years later).

104. Following the Soviet withdrawal from Afghanistan (which jihadists viewed as "victory"), international jihadists rushed into that geographic area in the belief that a single Islamic cause was underway, characterized by bin Ladin as facets of a global jihad against Islam's perceived enemies. Bin Ladin's logical premise was that if Islam is being attacked on a global scale, then Muslims owe a duty to wage a global jihad in response. The dynamic went from the local territories to global confrontations. It is similar, in the modern day, to the manner in which the Taliban and their jihadist supporters have viewed the American withdrawal from Afghanistan in 2021: as both a "victory" and an incentive to continue their jihad against their perceived enemies.

[46] This is the correct transliteration and was the basis for the acronym UBL employed by the CIA.

105. Two significant developments occurred at the end of the 1980s: the Soviet withdrawal from Afghanistan ("defeat"), signaling the failure of the Soviet project in Afghanistan; and the collapse of the Soviet Union itself. In an era of fragmentation, jihadists and their leaders latched on to the perception that they could defeat a major "enemy." They showed that a non-state actor, led by a charismatic, non-credentialled person such as bin Ladin, could also declare a *fatwa* (religious edict) to do jihad and mobilize jihadists and recruits from across the Muslim world.

106. Officials or state-appointed religious figures or imams who dismissed bin Ladin as unqualified to issue fatwas failed to undermine his appeal among his zealous followers and potential recruits. These recruits listened to him, believed in his message, and followed his orders to do jihad against the "infidels" and the "new crusaders." They saw in him a leader who could muster a return to the "golden age" of Islam. It is interesting to note that despite his denunciation by "palace '*ulama*," bin Ladin continued to receive millions of dollars from supporters and wealthy donors in Saudi Arabia and other Gulf states. In my expert opinion, Saudi and other Gulf governments were aware of this fact. Saudi government officials knew that Saudi-financed Islamic charities, such as al-Haramayn, IIRO, WAMY, and the Muslim World League, were not only engaging in propagation but also in directly supporting al-Qa'ida's ongoing jihad against the "infidels," including the United States.

107. Bin Ladin did not appear vulnerable to a refrain from jihadists, in a pejorative sense, that he was a "palace jihadist;" he had, after all, operated on the ground in Afghanistan, and he had put his own resources into the jihad. These aspects of his personal appeal raised his stature among his followers as a symbol of jihad despite the fact that he was not a scholar of Islamic theology or '*alim* (plural '*ulama*).

108. The collapse of the Soviet Union had opened the gate for jihadists to look for foreign enemies beyond the Soviets. The presence of "infidel" American soldiers in Saudi Arabia that began in January 1991 (following Saddam Husayn's invasion of Kuwait on August 2, 1990) provided the jihadists with the first concrete premise to regard America as the enemy. Even though the Senior Council of the *'Ulama* issued a fatwa to authorize

the House of Saud to invite foreign troops to be based on Saudi soil. Because these troops were considered "infidels," the Saudi King asked for a fatwa almost as a permission to allow American troops to stay in Saudi Arabia. Many radical clerics and 'ulama, however, opposed the decision on the grounds that "infidels" must not be allowed to be stationed in the "Land of the Two Holy Mosques." The jihadist *'ulama* saw the decision as a major affront to their religious sensibilities, especially as "Guardian of the Two Holy Mosques" is one of the three main titles of the Saudi King—the other two being Head of the Al-Saud and Head of the Saudi state.

109. The United States, by basing American troops on Saudi soil, had inadvertently provided the "cause" around which Saudi jihadists coalesced. Bin Ladin effectively portrayed this basing as evidence of the Saudi state's reliance on an infidel partner for its survival. The thread can be drawn directly from bin Ladin's pronouncements on this issue to the inclusion in the Memorandum of Advice of a statement that Saudi Arabia should seek support in the wider world from fellow Muslim countries, and categorically not from infidel states like the U.S.

110. Bin Ladin's position appealed to many Saudi Salafi Wahhabis who believed that the presence of "infidel" troops in Saudi Arabia defiled the Prophet's Hadith, which according to their claim, stated that only one religion shall exist in the Land of the Two Holy Mosques (I heard this claim from numerous Saudi and other jihadists I spoke with over the years. They cite this Hadith, supposedly attributed to Muhammad on his deathbed, as an article of faith even though its authenticity has been questioned by other Muslims).

111. Bin Ladin's view on the presence of U.S. assets on Saudi territory was widely shared among the senior *'ulama* in Saudi Arabia, as it was arguably a view that had already been prevalent before UBL became its most prominent advocate. Bin Ladin didn't create or invent these views – he was a populist and an articulator, who boasted rhetoric, language, presentation, and grasp of Qur'anic citations from scripture in an Arabic that enabled him to cast himself as a learned scholar. He therefore didn't need to work very hard to convince Saudis of his position, because he was articulating views that they

already held. In effect UBL was the primary propagator of this Wahhabi jihadist view globally. He repeated his propagation message frequently and clearly, which was readily understood even by high school drop-outs.

112. The crux of UBL's message comprised a few points that were easy to memorize and repeat by rote: 1) Islam as a faith and territory is under attack; 2) the United States because of its global economic and military might was the enemy waging this war; 3) it is the duty of all Muslims to participate in jihad against this enemy and inflict as many casualties as possible on the enemy in retaliation of the death and destruction the enemy has inflicted on Muslims; and 4) this battle does not end until the end of time when Islam vanquishes its enemies and emerges as victorious. These themes permeated UBL's messages from the early 1990s until his demise in 2011.

113. The doing of global jihad had as its pinnacle, an attack against the infidel United States on American soil, which was in line with accepted jihadist doctrine at the time about taking the war to the enemy's territory if the enemy has attacked Muslim territory.

114. U.S. "presence" in Saudi Arabia was portrayed through three principal prisms: military and economic, in the physical presence of U.S. military hardware on Saudi soil; U.S. influence over Saudi foreign policy decision-making; and the U.S. being Saudi Arabia's main economic ally in the world.[47]

115. Bin Ladin was able to claim that he had fulfilled a religious duty to wage global jihad in the form of the 9/11 attacks against the United States, thereby channeling the doctrine of Ibn Taymiyya, who responded to the destruction done to the heart of the Islamic world (i.e. Baghdad, Middle East) by the moguls in the thirteenth century, by saying that when Islam is under attack then you must respond by waging jihad, by all your means. In

[47] It is no coincidence that bin Ladin would later present the symbolic importance of having attacked the World Trade Center and the Pentagon as the principal economic and military bastions of the United States. UBL and other Saudi jihadists argued that the 9/11 attacks were reciprocal and proportionate because in their view the United States had inflicted thousands of deaths on Iraqi, Palestinian, and other Muslim children. The "innocent civilian" Americans who were killed, argued UBL and other jihadists, were as culpable as their government in the "crimes" their government committed against Muslims because they elected their national leaders. Bin Ladin's efforts in the wake of 9/11 to "rationalize" the attacks were attempts to appeal to a broader constituency within mainstream Muslim public opinion and to elevate the victimization of Muslims in Muslim countries at the hands of the "American crusader."

some characterizations, bin Ladin's pronouncements in respect of jihad were the latest embodiment of Ibn Taymiyya's own teachings, which simply stated that if Islam were attacked as both a faith and a territory, the response should be jihad against the attacker.

116. In respect of Afghanistan, the enemy had been very clear—the Soviet attacker present in the borders of a Muslim country had to be repelled by jihad, as a self-defense and an instrument to expel the attacker from Muslim lands. After the Soviet "defeat" in Afghanistan, the global enemy had become an anti-Muslim "Crusader / Zionist" bloc (the far enemy) with which Islam was engaged in an existential struggle; giving rise to a widely-held conviction that violent jihad was the only recourse available to Muslims if they hoped to win this struggle. Like the Soviet occupation of Afghanistan, UBL argued that the far enemy is no longer far; in fact, it was occupying parts of Dar al-Islam—Palestine, Afghanistan, Iraq, Saudi Arabia, and other places. His message to his followers and potential recruits after the American-led coalition expelled Saddam Husayn from Kuwait by March 1991 was that a far more dangerous alignment has been formed between the far and the near enemy (Arab and other Muslim rulers), which in his view, aimed at cementing the crusader physical presence (military and economic) in Muslim lands. In this regard, the United States' invasion of Iraq in March, 2003 (barely a year and a half after 9/11) was a major bonanza for bin Ladin and the cause of global jihad, which he effectively used to further the cause of his anti-American jihad.

117. Following in the footsteps of Ibn Taymiyya, UBL argued that the jihad he was calling for was defensive and reactive because it was driven by the presence of American and other "infidel" troops in Muslim lands. Both Ibn Taymiyya and bin Ladin maintained that Muslims wage *jihad Qital* (fighting jihad) only if their territory is attacked and pillaged and their people are killed. Although Dar al-Harb and Dar al-Islam are diametrically opposed, Muslims should not declare jihad lightly against any country in *Dar al-Harb*, whether such a country is or is not in a covenant with *Dar al-Islam*. Jihad becomes a duty when a country or a group of countries wage a war against *Dar al-Islam* or engage in plotting to weaken or harm Muslims and Islam. Bin Ladin presented his obligatory jihad as a continuation of Ibn Taymiyya's definition and practice of jihad. He argued, for example, that the Zionist "pillaging" of Palestine and the American invasion

of Muslim lands are a continuation of what the Mongols did when they invaded the Levant in the thirteenth century, and what the European Crusaders did when they invaded the region in the preceding two centuries.

118. The jihad that Ibn Taymiyya called for then was embodied in the teachings of Muhammad ibn Abd al-Wahhab in the 18th century and implemented as a state religious doctrine in the Saudi state after the signing of the pact between ibn Saud and ibn Abd al-Wahhab in the 1740s. Bin Ladin's many statements on jihad against the Soviets in Afghanistan in the 1980s and against the Americans and Israelis in the 1990s and the first decade of this century were part and parcel of the Hanbali-Ibn Taymiyya-Wahhabi doctrine of jihad. That was a main reason why UBL found it easy to recruit jihadists and potential "martyrs" in Saudi Arabia.

119. That was also the reason why so many Saudis who worked for the Ministry of Islamic Affairs and who were educated at Imam Muhammad University believed in this cause of jihad and in helping jihadists, especially those who were embarking on violent and "spectacular" attacks against the American symbols of power.

120. Bin Ladin's statements in the late 1990s reflected his (and Abdullah Azzam's[48]) portrayal of the enemy: you must attack, and indeed kill, your perceived enemies wherever you find them[49]. In this context, attacking the enemy on its own soil through suicide missions would be characterized as the "ultimate expression of jihad", sacrificing oneself in the performance of jihad against the enemy. The killing of innocent civilians could be justified, bin Ladin argued, either by virtue of their presence in this larger battlefield, or, as I mentioned above, based on the theory of their "indirect

[48] Azzam traced the ideology of "reactive" or "defensive" jihad to Ibn Taymiyya, whom he attributed with having said that in case an enemy decided to attack, all Muslims must react whether they were the target or not. He explains that by saying when infidels control the land of Muslims, the nation becomes endangered in its religion and doubts in its ideology, thus mobilizing Muslims to fight is crucial until the land is liberated. Combatting Terrorism Center, US Military Academy, West Point; https://www.ctc.usma.edu/wp-content/uploads/2010/06/Atlas-ResearchCompendium1.pdf, at p.42.

[49] As such, the venue of the attacks on American soil was of secondary importance: in UBL's characterization, the enemy had become more amorphous and diffuse, therefore you should attack them whenever you can do it (as long as the attacks were directed principally against Americans and Jews).

culpability", especially in a democracy where they elect leaders who engage in un-Islamic behavior and are therefore seen as waging war against Islam.

121. The 9/11 Commission assessed that Usama bin Ladin had drawn upon "a long tradition of extreme intolerance" that dated back "from at least Ibn Taymiyya – through the founders of Wahhabism – through the Muslim Brotherhood – to Sayyid Qutb."[50]

| C. | **Further particularization of the ideological and operational approaches to jihad within Wahhabism: the "New Crusader War"** |
|---|---|

122. Radicalized Saudi Wahhabis were quite unique, certainly the most extreme, in the Muslim world in depicting the "Crusades" as a phenomenon that continued to exist in the modern day. By this belief, any infidel force that attacks Islam became almost a direct continuation of the threat posed by the Crusaders in Palestine in the tenth, eleventh and twelfth centuries (ended by Saladin's victory over the Crusaders in the battle of Hattin in Palestine in 1187).

123. Bin Ladin depicted the U.S. "presence" in Saudi Arabia as an encroachment on and violation of an autonomous Saudi foreign policy. More important, though, he represented it as the "violation," occupation, desecration, and defilement of the Sacred Land of the Two Holy Mosques. This reproach resonated especially because, after 1979, in order to reburnish or illuminate his Islamic credentials, the King had taken on a third title[51] as the "Guardian of the Two Holy Mosques." Yet here was the specter of an infidel foreign power entering Saudi Arabia and defiling this sacred territory, in the process undermining the sanctity of the new title of the King.

[50] See 9/11 Commission Report, at p.362. See also the sub-section in Section A of the present report on 'particularization of the approaches to jihad' for more detail on the contribution of Sayyid Qutb.
[51] Previously, the King of Saudi Arabia had held the tribal title of Shaykh al-Shuyukh, as well as the ruling and governing title of King. The third leg of the stool on which he sat would be this new title reflecting his stature as a religious leader.

124. Opposition to the U.S. presence in the Kingdom was lent a greater sense of indignation and urgency by virtue of persistent radical teaching and preaching, relying on widespread subscription to a *hadith* pronounced by the Prophet Muhammad on his death bed, that only one religion shall exist in Arabia, i.e. in the Land of the Two Holy Mosques. This controversial *hadith* is cited to as the theological justification for opposing U.S. presence, but there were also social taboos (e.g. women wearing pants and intermingling with their male colleagues, and widespread resistance to the notion that women had come to the country to "defend" Saudis), as well as sovereignty, economic and foreign policy dimensions to the opposition that contributed to an enormous groundswell of anger and indignation against the U.S. presence. Islam was perceived as having been trodden down under the military boots of the American "infidels".

125. While Bin Ladin was not the inventor, creator, or even earliest adopter of oppositional views to a U.S. presence on Saudi soil, his pronouncements on the issue were perceived as novel, original, authentic and believable. Bin Ladin's pronouncements were precise, articulate and grounded in accurate (albeit selective) citations of *suras* from the Qur'an – backed up by references to Islamic scholars and Shaykhs, and his clean delivery in the language of such importance to Muslims, i.e. in Arabic.

126. Bin Ladin's followers gave him enormous credence, and he brought a large cohort of willing recruits along with him – especially from Saudi Arabia, one of his prime targets, and notably from Abha and the 'Asir region – because he served as a conduit for many of their grievances. Also, bin Ladin gained significant standing among Saudis, including the *'ulama*, for his successful campaign as an organizer (mobilizer of a large influx of Arab jihadists), and public capacitator (as well as a facilitator and financier of the training camps in support) of the jihad in Afghanistan. Notwithstanding a degree of exaggeration of his own credentials, Usama bin Ladin was viewed publicly as having led a successful jihad there.

127. Bin Ladin did come first in one respect, which was in articulating the case for the 'next jihad' to be waged against the United States specifically, based on his depiction of the

U.S. as the new crusader, the new enemy of Islam, and the "head of the snake", caricaturing the U.S. as being at the vanguard of this bloc of Crusader and Zionist elements.

128. Saddam's invasion of Kuwait precipitated a possible threat to Saudi Arabia, at which point bin Ladin (buoyed by the public acclaim he had received for his efforts in Afghanistan) audaciously offered the Saudi Minister of Defense, al-Sultan, a veritable army of jihadists (mostly mujahidin from Afghanistan) who could be put at the service of the defense of Saudi Arabia. Sultan's rejection of this offer was cast as a major affront by bin Ladin, which was then greatly exacerbated when the King turned to the United States to establish a base inside Saudi Arabia for the purpose of "protecting Islam."

129. Despite bin Ladin's questionable theological credentials, many *'Ulama* shared bin Ladin's views that the U.S. presence in Saudi Arabia – the ceding of territory to a crusader infidel force on the premise of protecting Islam – was an "insult" to the sanctity of the state and its religion, Islam, which warranted the waging of jihad in response. I can attest personally to the strength and depth of animosity among many Saudi 'ulama towards the Saudi ruling classes, and particularly the anti-American passions that had been aroused in this regard. My perspectives were enriched on my visits to Saudi Arabia in the material period, by the conversations I held personally with scores of Saudis from all sectors of society, by the discourse with and among Saudi jihadists (as well as jihadists of other nationalities) to which I was privy – including those I monitored through intelligence channels, read in Arabic literature, and both generated and received in the form of analytical product in my professional functions at the CIA.

130. At this juncture it is apt to reflect that there was a marked and unprecedented convergence of views between bin Ladin and Saudi religious authorities, including many *'ulama*, regarding the waging of jihad against the United States.

131. In my expert opinion, the radical treatise set out by Yusuf al-'Uyayri in his 2001 text heralding "The Truth about the New Crusader War"[52] can in fact be regarded as representative of Saudi jihadist thinking at the time.

132. While al-'Uyayri's text was clearly published (in both editions) after 9/11, in its retrospective justifications for attacking the United States and killing "innocent" civilians, it accurately captures what I vividly recall as the prevailing view shared and articulated by the vast majority of faculty and graduate students at the Imam Muhammad University and other educational establishments – the "literati class" – in Saudi Arabia at the time. In radical religious circles I encountered vast support for Usama bin Ladin's jihad against the United States, most of it premised largely on foundations similar to al-'Uyayri's argument that the United States, as a "*Bilad Harb*" (country of war), was waging wars against the Muslim world and therefore it deserved what it got on 9/11.

133. This prevailing view once again found voice in response to the inquiries conducted by myself and many other colleagues in U.S. government in the wake of the 9/11 Attacks: it was put forward as at least one part of the explanation as to why this terrorist act against the United States was hailed by so many Saudi jihadi thinkers (notwithstanding the perfunctory denunciations of the 9/11 attacks from several prominent "official" Saudi clerics, many of which were made at the behest of their government).

134. Importantly, the prevailing view of the "justness" of jihad against the United States also offered the most viable rationale upon which Saudi officials, most of them operating under the Ministry of Islamic Affairs – whether in Riyadh, Washington DC, or Los

[52] First edition published as an article under the title "*Haqiqat al-Harb al-Salibiyya al-Jadida" / The Truth about the New Crusader War*, printed Rajab, 1422—September 2001; attributed to the radical Saudi jihadist Yusuf al-'Uyayri; cited in Combatting Terrorism Center, US Military Academy at West Point, "Militant Ideology Atlas – Research Compendium", November 2006; https://www.ctc.usma.edu/wp-content/uploads/2010/06/Atlas-ResearchCompendium1.pdf, at p.83; second edition – expanded into a book of 112 pages – bearing the same title and by the same author, Yusuf al-'Uyayri, uses a pseudonym and bears no date of publication. The second edition, according to the author, includes a few grammatical corrections plus several substantive additions, including references to articles by "the leaders of the Crusaders in which they call for fighting Islam and the Islamic awakening."

Angeles – willingly provided support to the 9/11 hijackers.[53] Ministry officials and employees stationed at or affiliated with Saudi Embassies and Consulates in many countries, including in the United States, not only espoused this view, but also propagated it and disseminated literature in which it featured, in fulfilment of what was a core mission in Saudi foreign policy.

135. In justifying the 9/11 attacks, al-'Uyayri claims that the United States was never a "covenant" state, that is a state from *Dar al-Harb* that had entered a covenant or a treaty with *Dar al-Islam*.[54] Even if it were a "covenant" state in the past, it has reneged on that covenant by "aiding the Jews more than 50 years ago in capturing Palestine and the displacement of its people. America is also a *bilad harb* (country of war) because it attacked Iraq, Sudan, and Afghanistan and committed crimes against Muslims."[55] "Muslims agree that the United States is a *bilad harb* and, therefore, it would be permissible for Muslims to attack it and cause harm to it and its people."[56] Al-'Uyayri also maintains that America represents the new Crusade war against Islam, and it is the duty of all Muslims to repel these attacks by waging collective *jihad fard* (obligatory jihad), in the best jihadist tradition of Ibn Taymiyya.[57]

136. Al-'Uyayri concludes this section of the book with the following statement: "The death and destruction that befell the United States in the September attacks can only be viewed as a punishment from God for the injustice that it has committed against the peoples of the world, but especially against Muslims. America deserves what it got."[58] In my expert opinion and based on my extensive interviews with Saudi Islamic mainstream activists and radicals, the view of the United States as an "enemy" of Islam

---

[53] I believe that because of incomplete or inadequate knowledge of the structure of the Saudi government at the time, the 9/11 Commission Report concluded (wrongly in my expert opinion) that the Saudi government was not involved in the hijacking plot. See EO14040-003478-MDL: "Much of the publically known information regarding the 9/11/2001 terrorist attacks was documented in the 9/11 Commission Report which was published in 2004. Thus much available information from subsequent and ongoing investigations was not noted in the Commission's Report. In addition, the classified "28 pages" was subsequently de-classified and investigations since 2004 shed additional light on the information that was contained within these 28 pages which were created in 2004 as part of the original Commission Report."

[54] Al-'Uyayri, *The Truth about the New Crusader War*, p.6

[55] Al-'Uyayri, Ibid., pp.6 and 19

[56] Al-'Uyayri, Ibid., p.6

[57] Al-'Uyayri, Ibid., p.11

[58] Al-'Uyayri, Ibid., p.14

and the requirement to do jihad against it was at the time prevalent and widely accepted in Saudi Arabia.

137. In a three-part series of articles in the *Boston Globe* in 2002,[59] Charles M. Sennott echoed much of the analysis that was arrived at by U.S. law enforcement and intelligence agencies when he wrote that the ease with which UBL found ready jihadist recruits in Saudi Arabia was a direct outcome of the Saudi education system. Anti-Americanism and enmity to the "Crusaders" were taught in Saudi schools at all levels, and had achieved such widespread traction among the Saudi public, as to give UBL's message an almost automatic resonance.

| | |
|---|---|
| **D.** | **Saudi failures in counter-terrorism and the connection between Wahhabi polity *within* the Kingdom of Saudi Arabia and violent jihadist attacks** |

138. The Khobar Towers in 1996, as well as the bombings in Riyadh in 2002 and 2003, were the starkest demonstrations of the fallacy of the King's position when confronted with the Memorandum of Advice. King Fahd was exposed as having been incredibly short-sighted, the dividends of his state-sponsored export of jihad coming home to roost.

139. The Khobar Towers in 1996 was an attack on Americans, but it took place inside the borders of the Kingdom. I personally visited Saudi Arabia in the immediate wake of those attacks, surveyed the site of the bombings and held discussions with many Saudis from different walks of life, including government officials. The argument they consistently made to me was that no Saudis had been killed. They were intent on maintaining the myth that it was not an attack on Saudi Arabia; rather, that Saudis were

[59] See the following trilogy of articles: Sennott, Charles M., "Why bin Laden relied on Saudi hijackers," Boston Globe, March 3, 2002; Sennott, Charles M., "Saudi Schools fuel anti-US anger," Boston Globe, March 4, 2002; and Charles M. Sennott, "Doubts are cast on the viability of Saudi monarchy for long term," Boston Globe, March 5, 2002.

doing jihad overseas, but not against the Saudi state or its own institutions. The more sinister implication of their argument at the time, I thought, was that killing non-Saudi "infidels" could be more tolerable and even acceptable than killing "innocent" Saudis. Their vehement insistence that no Saudis had lost their lives in the Khobar Towers was shortly thereafter proven false, because later investigations showed that several dozen Saudis had been killed in that attack. When they were confronted with the results of the investigation about the killing of Saudis, they quickly claimed that the terrorist act must therefore have been perpetrated by non-Saudis. I found their argument on the Khobar Towers bombing to be completely specious, and it proved to be unsustainable, in light of the Riyadh bombings in 2002 and 2003. In the effort to lay the blame for the attacks on foreign radical groups, such as Hizbullah, there was a clear impulse to bury their heads in the sand.

140. In the wake of Khobar, the King increased his efforts vis-à-vis the U.S. to get the Clinton administration to intervene in the "other" Muslim causes that bin Ladin was championing, e.g. the millions of Iraqi children who were suffering and dying under the sanctions, and in Palestine, especially in Gaza. The King was constantly pleading with the U.S. to place more stock on those issues (which were feeding into bin Ladin's narrative), not least because he wanted to undercut the wide appeal and traction that bin Ladin's message was getting inside Saudi Arabia.

141. Through the escalation of violent terrorist attacks in the late 1990s — the 1998 Embassy bombings in East Africa serving as another stark example — coupled with the growing tide of Saudi youth drawn to UBL's message, the Kingdom came to understand the intent and capability of UBL and al-Qa'ida, both as a threat and as a conduit for elements of Wahhabi polity. Bin Ladin's jihad was more prevalent, more potent and more lethal than the Saudis had initially appreciated; the Kingdom was repeatedly put on notice as to what UBL and his followers were capable of, in terms of recruiting Saudis to the cause, al-Qa'ida's organizational ability, the planning of sophisticated, large-scale attacks, and the immediacy of the terrorist threat. Yet, in their response, the Saudi government opted for denial of the true characteristics of the attackers – even vis-à-vis their closest allies, the United States government and its intelligence agencies.

142. The Saudis persistently and implausibly downplayed the link between the Kingdom's own *da'wa* activities and violent jihad. As a seasoned expert who had closely followed the evolution of bin Ladin's jihad, conscious of the catalytic effect of the Kingdom's *da'wa* activities in furthering (violent) jihad, and observing that bin Ladin's messages were becoming ever more entrenched, I immediately realized attacks like the one at Khobar were a harbinger of what was to come. Al-Qa'ida's attacks clearly *required* planning, resources, committed adherents to the ideology; and they clearly *benefitted from* Saudi Wahhabi polity and the government's posture on countering terrorism. My "trends analysis" assessed that this combination of factors – a potent violent jihadist organization aided and abetted by a state infrastructure – would in a short time be likely to precipitate even more devastating attacks, on the United States and other potential targets.

143. I saw al-Qa'ida's attacks as a logical and direct outcome, and a culmination of the Saudi state's Wahhabi polity and approach to *da'wa*. The Saudi government had provided the financial and institutional means to the most radical Wahhabi jihadi activists within its official structures to continue expanding their power base and operations, both at home and overseas.

144. If I may offer expert elucidation through literary analogy, Saudi Arabia's state sponsorship of terror, and particularly its support for the violent jihadism that led to the 9/11 attacks, is best understood through the prism of Stevenson's "strange case:" Wahhabism is fundamental to the very being, the very essence of the Saudi state, and it is capable of projecting itself in guises akin to both Dr. Jekyll and Mr. Hyde.[60]

145. In the pre-911 period, when quite frankly the U.S. most needed trustworthy allies whose officials were fearlessly prepared to break down terrorist cells, Saudi Arabia failed to listen to its better angels and take decisive positive action. And in the same period, Saudi Arabia furnished a network of avowed jihadists inside the United States with the facilities –principally in the form of mosques – significant resources, and official cover

[60] Stevenson, Robert Louis,"The Strange Case of Dr. Jekyll and Mr. Hyde," (London: Longmans, Green & Co, 1886).

to create and sustain new operational cells. This network was nurtured to support a virulently anti-American and pro-jihadist agenda, and activated to assist the vanguards of al-Qa'ida's hijacker cohort, al-Hazmi and al-Mihdhar, in assimilating into United States society and gaining a foothold here from which to plot the weaponizing of commercial aircraft. The resultant attacks of 9/11 were inexorably an impulse *from within* the Saudi state, *of* the Saudi state, and manifested the *Hydean* side of Saudi Wahhabi polity to the most devastating effect.

| E. | **Deficits and distortions in the evidential record caused by the deliberate non-cooperation and deceit of Saudi Arabia's witnesses** |
|---|---|

146. In the context of the present proceedings, it is important to consider whether witnesses, particularly the known jihadists, would not respect the U.S. court oath they took to tell the truth. Stated another way, under their interpretation of Islam, could the oath be disregarded, and was it their obligation to hide the truth or lie about the facts of what they had done, particularly to protect their mission in the name of jihad? According to what framework should we interpret this apparent disregard for judicial oaths on the part of certain witnesses?

147. To most Salafi Wahhabis and radical jihadists, any governing system that is not grounded in or governed by *Shar'ia* (the corpus of Islamic jurisprudence) and the Qur'an is illegitimate and must not be obeyed. This would be the prevailing view held towards, for example, Western parliaments, ruling bodies, or the judiciary. This is also the principal reason why Saudi Arabia has no constitution and instead relies on the Qur'an and *Shar'ia* as the basis of Saudi rule.

148. It follows that the Saudi national *Majlis al-Shura* (Consultative Assembly), which Saudi rulers view as akin to Western parliaments, is not in fact a legislative body. Legislation

can only be made by *Shari'a* scholars and 'ulama or with their approval. The main purpose of *Majlis al-Shura*, which acts as the voice of religious scholars, is not to propose legislation, but rather to advise the ruler on social, religious, and political issues.

149. The basic principle is that *Dar al-Islam* – the Abode or Realm of Islam – which in practice means the world of Muslim-majority countries, should be ruled according to Shari'a. In classical Islam, the ruler of the country is also known as *Amir al-Mu'minin* (Commander of the Faithful). The ruler is both a temporal and a religious leader of his country.[61]

150. In the Muslim Sunni *umma* or community, the concept is that *Hukm* (divine rules, or "rules made by God") is supreme and takes precedence over man-made rules and laws, as well as over man-made democratic systems. Whenever the ruler, irrespective of how secular his own religious tendencies, is confronted with serious problems, he turns to the religious leaders for legitimacy, validation, and support.[62]

151. The Salafi Wahhabi views on the supremacy of Hukm were articulated by the Hanbali School of Jurisprudence, Ibn Taymiyya, Ibn Abd al-Wahhab and by Wahhab's descendants, the al-Ash-Shaykh. Sayyid Qutb, the radical religious theorist of the Muslim Brotherhood and the inspiration of many Saudi clerics and ulama in the second half of the last century, linked the concept of disobeying man-made laws with the very type of "defensive" or "reactive" jihad[63] that spawned the convergence of Saudi

---

[61] By way of illustration, in 2021, the Taliban renamed Afghanistan as the Islamic Emirate of Afghanistan (I.E.A.), with the clear implication that the ruler will be called "*Amir*," or Commander of the Faithful.

[62] The following examples are illustrative: (1) Before the Saudi King in 1991 invited American troops to deploy to Saudi Arabia in order to defend the monarchy against the perceived threat from Saddam Husayn, he sought and got a *fatwa* from the senior Saudi *'ulama*; (2) When the secular military leader of Iraq, Saddam Husayn, wanted the support of his own Sunni religious *'ulama* against Shia Iran and other perceived enemies, he inscribed "*Allahu Akbar*" (God is Great) on the Iraqi flag, which remains until today; and (3) When the secular military leader Gamal Abdel Nasser's land confiscation laws in Egypt in the mid-1950s met a widespread opposition from landlords and feudalists, Nasser sought and received a fatwa from the chief Imam of al-Azhar in support of his policies.

[63] Sayyid Qutb put a new emphasis on the concept of jihad focusing more on the "Lesser Jihad" ("*jihad al-Qital*" or fighting jihad) against the perceived near and far enemies and less on the "Greater jihad" or *jihad al-nafs*, or personal or self-jihad. The Qur'an makes references to jihad in 24 *'ayas* or *suras* (verses and chapters), but most of them are found in Medina revelations when Muhammad was waging wars in the pursuit and development of his "Islamic state." Like Ibn Taymiyya, Sayyid Qutb saw an urgency in waging *jihad al-Qital* (violent jihad) against the

religious doctrine and bin Ladin's prospectus for al-Qa'ida. Indeed it was in reliance on the Salafai-Wahhabi-Qutbi teachings that radical Saudi clerics and *'ulama* began to extol the virtues of jihad against both the far enemy and the near enemy.[64]

152. Sayyid Qutb's teachings[65] said that if an infidel country attacking Islam were to attempt to subordinate you to its laws, then you would do your Islamic duty by disobeying or disrupting the proceedings.

153. Jihadists who adhere to these beliefs view any and all judicial processes and legal proceedings that are not based on *Shar'ia* as illegitimate. If they are compelled to appear before such proceedings, they will go through the required motions – such as appearing before a court – without feeling obliged to abide by the rules and protocols governing such proceedings.

154. Saudi jihadists appearing in the present proceedings would therefore lie, deny, obfuscate, dissimulate, feign ignorance or memory lapses, etc. without any remorse or compunction, because they view such proceedings as a charade. Nor do they feel governed by whatever agreements their government, or its representatives, may have reached with an "infidel" regime located in *Dar al-Harb* (realm of war), which is not in *'ahd* (covenant) with *Dar al-Islam*. The depositions of most of the Saudi government witnesses and other Saudi nationals appearing in the present proceedings before the United States District Court have proven to be a case in point.

---

perceived enemies. This teaching became the foundation of Bin Ladin's and al-Qa'ida's plotting and attacks against the United States and other "infidel" targets.

[64] Usama Bin Ladin's messages in the late 1990s and early 2000s frequently and simultaneously targeted un-Islamic Muslim leaders – including the rulers of Saudi Arabia, Egypt, Egypt, and Pakistan (i.e. the near enemy) – as well as the Crusaders-Zionists (i.e. the far enemy).

[65] Sayyid Qutb argued in his book *Ma'alim fi al-Tariq* (Signposts or Milestones) that the world outside *Dar al-Islam*, including some Muslim countries that are ruled by nominally Muslim (which he describes as those Muslim leaders whose behavior is un-Islamic), lives in *jahiliyya*, or ignorance. That is ignorance of the word of God as revealed to Muhammad and his Sunna (Straight Path) and therefore doing jihad against them is legitimate. By including these "un-Islamic" Muslim leaders in his *jahiliyya* construct, Sayyed Qutb created a new target for jihadists to attack, which came to be known as the "near enemy." The "Crusader-Zionist" enemy was viewed as the "far enemy."

| E. i | **Case study: the testimony of Shaykh Fahd al-Thumayri in the present proceedings, *In re Terrorist Attacks on September 11, 2001*** |
|---|---|

155. I have carried out a thorough review and analysis of the audio-video recording provided to me by counsel of the deposition of Fahd al-Thumayri in these proceedings.[66] I have carefully reviewed al-Thumayri's answers, utterances, and body language across the entirety of this deposition – scrutinizing his responses in Arabic to counsel's questions in English, as well as reading the translated transcript in English of everything that was said.[67]

156. I am an acknowledged thematic expert on several of the topics on which al-Thumayri was questioned. In addition, during my time at the CIA, I was accustomed to conducting interviews and debriefings specifically of jihadists, suspected terrorists, and other sensitive subjects, in locations such as mosques, educational institutions, and detention facilities including the U.S. Naval Base at Guantanamo Bay. I have monitored, reviewed, reported, and followed up on testimonial product from thousands of such interviews. Accordingly, I consider myself to have good standing and material knowledge upon which to render my analysis and opinions as to what al-Thumayri's deposition responses might tell the Court.

157. It is my expert opinion that al-Thumayri was deliberately uncooperative with this Court during his deposition: I believe he made a conscious choice to answer questions in a manner that was dishonest and misleading.

158. Al-Thumayri's deceit revealed itself to me, in particular, during his questioning regarding Wahhabi religious doctrine. I believe that I possess a valid professional yardstick against which to assess whether a witness with al-Thumairy's education and pedigree would have familiarity with matters such as jihad, the *Hadith*, or the

[66] Videotaped Deposition of "Fahad al-Thumairy," Volumes I to III, June 28-30, 2021.
[67] Transcript of the Deposition of "Fahad al-Thumairy," Volumes I to III, June 28-30, 2021.

dichotomization of the world into *Dar al-Harb* and *Dar-al-Islam*. I reasonably expected answers that were insightful and well-informed, since "Shaykh" Fahd al-Thumayri is, after all, a highly-qualified Islamic scholar, preacher and theologian, not to mention a long-standing employee of the government of Saudi Arabia, appointed to positions of significant responsibility in its Ministry of Islamic Affairs.

159. Al-Thumayri's responses to Plaintiffs' counsel's questions on these issues, however, were not credible.

160. When asked by Plaintiffs' counsel whether it is correct to state that "the jihadi Salafi doctrine perceives the world as a division between *Dar al-Harb* and *Dar al-Islam*," al-Thumayri claimed that his studies "were not related to that kind of subject."[68]

a. My analysis: Both the undergraduate and graduate curricula of study pursued by al-Thumayri at Imam Muhammad University in the 1990s[69] included such topics as what is permissible in jihad (for example, *jihad Qital* or fighting jihad against the perceived enemies of Islam) and what is not permissible (for example, *Hiraba*). I possess detailed first-hand knowledge of this thematic coverage, because I visited Imam Muhammad University in the 1990s and I reviewed the content of these very curricula. Issues concerning *Dar al-Harb* and *Dar al-Islam*, so integral to the Wahhabi worldview, are covered as standard in courses dealing with the *Qur'an*, the *Hadith*, with *fiqh* (Islamic jurisprudence), and *tafsir* (exegesis).

161. When asked to tell the Court "what is meant by *Dar al-Harb* and *Dar al-Islam*," al-Thumayri answered: "No, I don't know. I don't know."[70]

---

[68] Ibid., Vol.III, June 30, 2021, at pp.476-477.
[69] Ibid., Vol.III, June 30, 2021, at p.473-474. Al-Thumayri stated that he graduated from a course in "Islamic Studies" at Imam Muhammad Ibn Saud Islamic University, and referred to specific courses he studied there as follows: "Islamic jurisprudence, *Tawhid* of jurisprudence from the mentors, Hadith, and other Islamic disciplines." He further stated that the focus of his Masters studies was "Islamic studies in comparison with legal studies, or law," and that his dissertation subject was "the usage of the permissible within the *Sharia* [i.e. under Islamic law]."
[70] Ibid., Vol.III, June 30, 2021, at p.477.

a. My analysis: the particularization of the concepts of jihad, and the permissibility of jihad against the perceived "enemies" of Islam are, as I have explained in this report, matters foundational to the advanced curricula al-Thumayri has studied and are expounded comprehensively in the courses from which al-Thumayri graduated at Imam Muhammad University. It should also be recalled that the topic asked about here is so elementary as to be all-pervasive in official textbooks in Saudi Arabia, spanning from the high school level up to and including graduate school. Al-Thumayri's professed lack of knowledge of the topic is patently unbelievable, serving to discredit him and cause a sense of discomfort for any fellow scholar of political Islam who hears this answer. While giving this part of his testimony, al-Thumayri's body language clearly exhibited to me his own stress and unease with this line of questioning.

162. Plaintiffs' counsel questioned al-Thumayri about whether the United States and Russia were considered "*bilad harb,*" and whether that categorization of the U.S. as *bilad harb* might be used to justify jihad against the U.S., and specifically "violent attacks of the kind that were carried out on 9/11." Al-Thumayri again replied: "I don't know about that thing… I don't know about that terminology at all, and I'm not interested in it."[71] He continued: "I don't know about that kind of justification. But any justification that anyone can come up with is incorrect, because in Islam we criminalize aggressions against anyone. And we criticized that act [9/11] back then, at the time."[72]

a. My analysis: Al-Thumayri's statement was, once more, transparently disingenuous and sought to create a false, "sanitized" portrayal of Wahhabi teachings. As described earlier in my report, the prevailing view among Saudi Salafi jihadists in the early 1990s and into the 2000s was that the United States specifically was a "*bilad harb*" and that its troops in Saudi Arabia were considered "infidels." The curriculum at Imam Muhammad University, where al-Thumayri studied and graduated with both a BA and an MA, focuses heavily on the Ibn Taymiyya doctrine of jihad, from which these concepts originate. In fact,

[71] Ibid., Vol.III, June 30, 2021, at pp.477-478.
[72] Ibid., Vol.III, June 30, 2021, at pp.478-479.

Volume 14 of Ibn Taymiyya's 20-volume encyclopedia of Fatwas (*Majmu'at al-Fatawa li Ibn Taymiyya*), often cited to in Saudi teaching materials, is dedicated to the study of jihad. Al-Thumayri must certainly have been intimately familiar with the works of Ibn Taymiyya and the particular justifications of jihad advanced therein.

b. Furthermore, Sayyid Qutb's teachings on jihad against the perceived "far" and "near " enemies of Islam were also being taught at Imam Muhammad University and other Islamic colleges and universities in Saudi Arabia in the 1990s. Sayyid Qutb's book *Ma'alim fi al-Tariq* (Signposts), which focuses, among other things, on the "ignorance" or *jahiliyya* in countries that comprise *Dar al- Harb*, as well as on the perceived "enemies" of Islam, was widely read by Saudi college students and professors at that time. My judgment as to what al-Thumayri would have known is based on my analysis of the Islamic studies curriculum of Imam Muhammad University in the 1990s and on my personal discussions with many members of university faculty, as well as other Islamic activists and jihadists.

163. Plaintiffs' counsel further questioned al-Thumayri about his familiarity with the *Hadith* attributed to the Prophet Muhammad on his deathbed, which many Salafi Wahhabis accept as truth and an article of faith, that "only one religion shall exist in the Land of the Two Holy Mosques." Al-Thumayri's answer: "I don't know it."[73] When pressed, al-Thumayri offered: "I don't know if that attribution of *Hadith* is correct or incorrect"; and, as to whether the *Hadith* could be interpreted to "permit jihad against foreign forces in the Kingdom of Saudi Arabia, "I don't know about such justification."[74]

a. My analysis: This *Hadith*, irrespective of its authenticity, is universally-held, basic knowledge among Salafi Wahhabi students with far less elaborate educational records than al-Thumayri, and even among Saudi kids. In fact, the *Hadith* was cited in popular discourse as the very basis for criticizing the presence of American soldiers in Saudi Arabia in the early 1990s. It underpinned the

[73] Ibid., Vol.III, June 30, 2021, at pp.479.
[74] Ibid., Vol.III, June 30, 2021, at pp.480.

jihadist demands in the 1992 Memorandum of Advice; and it is worth recalling that the Memorandum was signed by more than three-dozen Wahhabi Islamic scholars and professors associated with Imam Muhammad University, including seven members of the Council of Senior Ulama in the Kingdom. It is illogical for al-Thumayri to deny any knowledge of this *Hadith*; even the most cursory analysis of his educational history and socialization would show he has engaged with it, and he had inevitably studied with some of the activist *Sahwa* professors who espoused it while he was a student at the same university.

164. By proffering curt denials that fly in the face of reason, al-Thumayri convinced me of his deceitful tactic to evade accountability (his own, or that of Saudi Arabia) for even the remotest connection to jihad. The problem is that to do so, he would be forced to reinvent himself, on videotape, as a Wahhabi Muslim with little knowledge of jihad and even less interest in it, incapable of doctrinal nuance. Such an implausible, pathetic self-portrayal could hardly be compatible, simultaneously, with al-Thumayri's dramatic ascent through the ranks of Saudi Arabia's Ministry of Islamic Affairs and his appointment, at the age of 27, to a senior supervisory role over all the official propagators in the cherished *da'wa* territory of California.

165. In my analysis of this part of his deposition – during which some of the specific questions regarding Wahhabi doctrine appeared to broadside him and evoke visceral discomfort – I see al-Thumayri clinging to an underlying strategy – to "deny everything, while saying nothing," commonly deployed as a form of resistance. Al-Thumayri's demeanor is indicative of what I recognize as a fear of admitting the extent of one's knowledge, or one's involvement in any kind of wrongdoing – even comprehension of how such wrongdoing might *theoretically* be justified – lest there should be adverse consequences attached to such admission. I have detected and documented such fear harbored by many interviewees, particularly those being interrogated by hostile captors, and those accused credibly of involvement in conspiracy to commit terrorist attacks (some fit both categories). By contrast, in my encounters – of which I vividly remember several in my government career – with innocent Muslim individuals detained wrongfully upon suspicions of involvement in terror that turned out to be false, I

documented a distinguishably lesser tendency to dissemble and deny basic doctrinal tenets.

166. At the culmination of this section of his deposition, when the Plaintiffs' counsel questioned him about whether he is "familiar with the jihadi Salafi doctrine that was espoused by Ibn Taymiyya", al-Thumayri answered: "No, I don't have knowledge about that."[75]

a. My analysis: Herein emerged al-Thumayri's most telling lie. Ibn Taymiyya's doctrine of *jihad* is central to university education at Imam Muhammad University and other Islamic universities in Saudi Arabia. Furthermore, one reads Ibn Taymiyya's name and message in high school textbooks, in college textbooks, and certainly in graduate school, especially where the self-proclaimed focus of one's studies was in Islamic disciplines.

b. Al-Thumayri's falsely professed ignorance of Ibn Taymiyya's doctrine is especially bewildering in light of concessions to the truth he had to make earlier in his deposition: namely, Al-Thumayri confirmed that for his first posting to work as a propagator for the Ministry of Islamic Affairs, he chose to go to the "Ibn Taymiyya Mosque;"[76] and he identified Ibn Taymiyya as being a "well-known scholar," "an Islamic scholar with many Islamic studies."[77] These concessions render all the more ridiculous al-Thumayri's impulse to deny knowing about "Ibn Taymiyya's concept of jihad."[78] when his posting to the eponymous mosque in Los Angeles would mean: "I would be the one to answer people's questions regarding religion-related matters."[79]

c. Not one Saudi jihadi Salafi Wahhabi, among the many I spoke with over the years, ever claimed not to have heard of Ibn Taymiyya's concept of jihad. Even Saudi high school students I spoke with during my government service were

[75] Ibid., Vol.III, June 30, 2021, at pp.482-483.
[76] Ibid., Vol.I. June 28, 2021, at p.62-63.
[77] Ibid., Vol.I. June 28, 2021, at p.64-65.
[78] Ibid., Vol.I. June 28, 2021, at p.65-66.
[79] Ibid., Vol.I. June 28, 2021, at p.61.

comfortably familiar with Ibn Taymiyya's doctrine and its significance to the Wahhabi brand of jihad. Fahd al-Thumayri, the Imam of the King Fahd Mosque to whom I have devoted considerable hours of detailed analysis, could not plausibly have been oblivious to Wahhabi jihadi doctrine, and in my expert opinion, the contemptuous fictions he sought to present in his deposition bear no relation to his actual knowledge, religious beliefs, or jihadi zeal.

167. It is my conclusion that al-Thumayri testified in this deceitful manner not because of how little he knows, but because of his acute awareness of the stark ramifications of his actual knowledge. In his preparedness to lie, deny, and engage in obfuscation and diversion, al-Thumayri actually drew my attention to the equities he was seeking to protect: his miscalculation ultimately, therefore, shone a spotlight on his actual role in providing material support to the 9/11 hijackers in southern California, and his Wahhabi jihadi justifications for doing so.

| | |
|---|---|
| **F** | **The Ministry of Islamic Affairs of Saudi Arabia [its pre-eminent *da'wa* function and the role of propagators in advancing Wahhabi polity]** |

168. As I mentioned above, the Ministry of Islamic Affairs, which emerged from al-Sahwa, was the vehicle that gave empowerment to the religious classes, including bringing to fruition their demands that *da'wa* and jihad should be intensified, and should be done through Saudi Embassies and Consulates overseas.

169. The Ministry of Islamic Affairs brought under the roof of a state Ministry what were previously only loosely-connected interests: the *da'wa* of the state; with the *da'wa* of the charities and other "force multipliers." Acting as a third pillar, and running in parallel, was the violent *jihad* of bin Ladin, which had converged ever more closely

with those other interests and in many respects was being similarly supported and promoted from the platform of the Saudi Ministry of Islamic Affairs.[80]

170. The Kingdom of Saudi Arabia was injecting far larger funding not only into the *da'wa* activities overseas, but also into the *da'wa* inside the Kingdom. This internal aspect was also accomplished through the Ministry of Islamic Affairs, with the publishing and distribution of textbooks to schools, universities, and other educational institutions, mosque-building, financing more events at mosques, and affording ever greater power and prominence to the propagators who became the vessels of the state policy.

| | |
|---|---|
| **F. i.** | ***Da'wa* case study 1: how Saudi Arabia's Wahhabi polity was implemented by officials of the Ministry of Islamic Affairs in the U.S. prior to the 9/11 Attacks** |

171. Significant insights into the manner by which *da'wa* activities were implemented by MOIA officials in the United States can be gained from one of the Arabic-language documents recovered from an FBI search of a residence associated with Omar al-Bayumi: Al-Daawah Magazine[81] – a monthly Islamic magazine about contemporary social, political and cultural issues, as well as religious recommendations and a selection of fatwas. Found in al-Bayumi's residence in San Diego, dated July 16, 1998,[82] Al-Daawah is a publication of the MOIA described as being "considered representative of official Saudi Islamic thought."[83]

---

[80] See EO14040 000556-MDL: "the foreign power involved could be AQ, Saudi Arabia, specifically the Ministry of Islamic Affairs, or both;" hence the FBI's investigation contemplated "a collaboration of AQ operatives and certain radical elements within the Ministry of Islamic Affairs for mutually beneficial goals."

[81] "Published in Riyadh, Saudi Arabia, this official monthly publication of the Ministry of Islamic Affairs includes articles about Islamic practice and the status of Muslims in various parts of the world, as well as a section dedicated to fatwas"; see Oxford Bibliographies Online Research Guide, "Wahhabism" (USA: Oxford University Press, May 1, 2010); p.3.

[82] See FBI 004548-004615. The front cover states, in Arabic, that the magazine is: "Issued by the Journalistic Islamic Society for *Da'wa*, printed in Saudi Arabia."

[83] Oxford Bibliographies Online Research Guide, "Wahhabism" (USA: Oxford University Press, May 1, 2010); p.3.

172. Al-Daawah magazine offered various descriptions of *da'wa* projects financed and pursued by the Kingdom in different parts of the United States, as well as elsewhere in the wider world.[84] These included:

a. Within five years of its creation, the MOIA had established projects in 100 countries, 1500 mosques, 1000 academic institutions and schools, 210 Islamic Centers, and numerous academic chairs at large universities across the world, for the purpose of supporting Islamic studies (e.g. Center for the Study of Islamic *Shar'ia* at Harvard; academic chairs at University of London and University of Moscow);

b. Up to the end of 1416 Hijri, 111.7 million copies of the Qur'an were printed by the King Fahd Complex for the Printing of the Holy Qur'an.[85]

c. By way of evidence of the full extent of *da'wa* and Saudi support for *da'wa* inside the United States: Islamic Centers created in the United States by 1998 included the Islamic Cultural Center in New York,[86] and Islamic Centers in Washington, D.C., Los Angeles, CA, Toledo, OH, Chicago, IL, Fairfax, VA, Raleigh, NC, and East Lansing, MI. A donation of $100,000 USD was made to an Islamic Center in New England, and similar support was provided to Islamic Centers in Maryland, and Orange County, CA. Donations were also made to create the Dar es-Salaam Foundation, and to purchase a building for the Islamic College in Chicago.

d. The Kingdom of Saudi Arabia, through its Embassy in Washington, D.C., participated in over 120 Islamic meetings and conferences in the American continent. The Islamic Affairs Department in the Kingdom's Embassy in

---

[84] See FBI 004548-004615: "The Generosity of the Protector of the Two Holy Mosques in the Service of Muslims continues all over the World."
[85] Ibid, p.56.
[86] Ibid, pp.55-54.In the year 1412 Hijra (i.e. 1991-1992), the Kingdom offered support to the Islamic Cultural Center in New York in the amount of $2million USD.

Washington, D.C.[87] contributed more than $30million USD to support societies doing Islamic activism on the American continent.

173. Perhaps of greatest significance, the specific copy of the magazine recovered from al-Bayoumi was essentially a commemorative issue marking the inauguration of the King Fahd Mosque (KFM)[88] in Culver City, Los Angeles, in July 1998. The magazine described it, on the eve of its opening, as “the first mosque-building project that was completed with total King Fahd financial support from beginning to end”. It is clear that the Saudi government regarded and heralded the KFM as the veritable jewel in the crown of the Saudi religious project in the United States.

174. The King Fahd Mosque was opened by Prince Abdulaziz bin Fahd, Minister of State and Member of the Council of Minister, who said in a statement to the Saudi news agency that this mosque was one of hundreds of mosques that the KSA has established to “serve Muslim minorities in countries that are not Islamic.”[89]

175. The complex of the King Fahd Mosque was described as comprising 44,000 square feet, boasting a capacity for 2,000 worshippers, including an auditorium for teaching and lectures with capacity for 900 persons, parking lot for 150 cars, a school for girls called ‘‘Zamzam’’, a center for research, a bookshop, a library, and a creche for infants. The King Fahd Mosque was built to serve Muslims in the greater Los Angeles metropolitan area, believed to comprise 250,000 Muslims.[90]

176. The City of Los Angeles had, by the summer of 1998, a total of 26 mosques, most of which were small and housed in rented properties. Hence the KFM in the Culver City neighborhood of the metropolis of Los Angeles, would be considered the principal

---

[87] EO14040-003480-MDL: “there was located within the EKSA the offices of the Islamic Affairs Department and the office of Dawa (or Propagation).” The report continues: “Investigation of the 9/11 hijackers and their support networks identified significant connections to these offices either directly or via the Saudi Arabian Consulate in Los Angeles.”

[88] FBI 004548-004615, Front Cover (at 4615): “God is Great – On the Coast of the Pacific Ocean!” (Arabic: *La Ilaha illa Llah ‘Ala Sahil al-Muhit al-Hadi*) / The Inauguration of the King Fahd Mosque in Los Angeles / The Kingdom’s solid strategy to support Muslim minorities.

[89] Ibid, p.63: description of the grand opening of the KFM.

[90] Ibid, p.65: Al-Dawaah magazine’s editorial – describing the significance of the opening of the KFM.

mosque in the region, and in fact ranked as the fourth-largest in any city in the country at the time of its opening.

177. In July 1998, Dr. Abdullah bin Mohsen al Turki, the Minister of Islamic Affairs – in words which epitomized the mission of his Ministry – said that the KFM in Los Angeles, which was singularly funded in all of its expenses by the King, was of "particular importance because of its unique geographic location; it is located in the heart of the city, which comprises many Islamic communities – a city which is famous for its economy, its media sector and its universities." Muslims in the United States generally, and in Los Angeles in particular, were said to be elated that the King had decided to erect this Islamic edifice to serve Muslims and Islam, as it would become "one of the most important means by which to spread the Islamic *da'wa*" in Los Angeles.

178. In a separate statement, the Saudi Minister of Education described the KFM as the best and latest example of the support given to Muslims in Muslim-minority countries through the building of mosques.

179. Observations made regarding the King Fahd Mosque point to its scale and significance, even centrality, in the Kingdom's propagation project. The Mosque was an opportunity to have designates of the Ministry of Islamic Affairs doing *da'wa* in a densely-populated American city, in a geographically "important" location, with abundant opportunities to conduct training and education, and to enable those individuals so designated to deal with and provide assistance to those who would come into their orbit, and who were intent on doing violent jihad. The forms of possible assistance contemplated could range from housing and accommodation, right through to "operational assistance." The persons designated to lead *da'wa* thus included in their briefs not only the inherent intelligence functions associated with Saudi propagators, but also the support of violent jihadists.[91]

[91] See EO14040 documents: 003478-003608, at 3480, 3487, 3489-90; 001797-2815, at 2802; and 003470-3471.

180. In his status as Imam at the King Fahd Mosque, Fahd al-Thumayri was the leader and organizer of the *da'wa* in all of its facets in California, from the holding of prayers right through to providing support for violent jihad.

181. Indeed, all of the fanfare around the KFM speaks to the stature attached to the role of Imam at the Mosque, which can only be described as one of the most important Imamates in the United States. The range of activities and facilities administered by the Mosque, and the kudos associated with the visiting dignitaries, further elevate the importance of al-Thumayri's platform. And such a position brings with it enormous reach – even well beyond its sizeable congregation – not to mention commensurate financing for all the activities under its aegis. *Da'wa* is an exceedingly powerful tool – and in the case of Fahd al-Thumayri, the Saudi imam at the King Fahd Mosque in Los Angeles, it had been placed into the hands of a man acknowledged by the FBI to be an AQ-affiliated extremist, and one of the key enablers of violent terrorism.

| | |
|---|---|
| **F. ii.** | ***Da'wa* case study 2: propagator's path of Abdullah A S Al-Jaythin** |

182. Individual documents from the Kingdom of Saudi Arabia's own production enabled me to reconstruct a "monograph" of one particular propagator's career path: namely, that of Abdullah A. S. Al-Jaythin.

183. Al-Jaythin was recommended to serve as a propagator in the MOIA by Shaykh Muhammad bin Saleh Al Uthaymeen who, until his death in 2001, was one of Saudi Arabia's most prominent and influential religious leaders, scholars, authors, theologians, teachers, and interpreters of Wahhabi-Salafi-Hanbali Islam. His books, treatises, and sermons (*khutbas*) touched on almost every aspect of the Qur'an, the Hadith, Islamic jurisprudence, and religious prayers, rites, and practices.

184. Al-Uthaymeen's belief in the Wahhabi-Salafi doctrine based on ibn Hanbal and ibn Taymiyya gave added credence to the narrow, intolerant, exclusivist interpretation of

Sunni Islam, which rejects other interpretations and other non-Wahhabi-Salafi adherents to Islam, including Shia Muslims and, of course, Christians, Jews, and others. His theological attitude toward these other groups is confrontational, not accommodationist.

185. Al-Uthaymeen would not, for example, reject the claim that the non-Muslim "Crusader" West is in a constant state of war against Islam and therefore, in response, Muslims must recommit themselves to jihad against those who wage war against Islam. He did emphasize, however, that for Muslims, jihad should first and foremost be a jihad of the self to make one a better Muslim. Yet, al-Uthaymeen's theology is a logical extension of Ibn Taymiyya's call for a comprehensive, even violent, jihad that extends beyond one's self.

186. This is the kind of theology and Qur'anic exegesis that Abdullah bin Ali al-Jaythin studied under the tutelage of his mentor al-Uthaymeen at the Sharia Faculty of Imam Muhammad University in Qassim. Obviously, al-Uthaymeen recommended him for a position at MOIA because he saw him as a faithful transmitter of this intolerant, narrow-minded interpretation of Islam.

187. Al-Uthaymeen's short but precise letter of recommendation was thus written by **one of the most influential Wahhabi-Salafi theologians in the country**, which was expected to elicit a positive response from the recipients at MOIA. Al-Jaythin expected, correctly so in my opinion, that the recommendation would generate much respect among his peers as a faithful disciple, defender, preacher, and propagator of Wahhabi-Salafi Islam. Those who espouse extremist views, whether inside the MOIA, or in the field—as far away as Los Angeles—would feel comfortable and trusting in dealing with him regarding whatever "jihadist" cause they have in mind.

188. In a 2005 report, the Center for Religious Freedom ("Freedom House") referred to a significant number of **Saudi publications** that espouse and support extremist Islamic doctrine. Among them was an official publication of the Saudi Ministry of Islamic Affairs found at the King Fahd Mosque in Los Angeles in a search that took place on December 4, 2004. The publication dates back to 1995, well before the 9/11 attacks. It

is a sermon of Shaykh bin al-Uthaymeen preaching the policy that all non-Muslims should be put to death, in the following terms:

> "*[O]ur doctrine states that if you accept any religion other than Islam, like Judaism or Christianity, which are not acceptable, you become an unbeliever. If you do not repent, you are an apostate and you should be killed because you have denied the Qur'an.*"[92]

189. Muslims who convert out of Islam, of course, are apostates too, and, under Saudi law, they are to be put to death. An Urdu-language publication (Document No. 55), published by the Saudi Ministry of Religious Affairs and gathered from the King Fahd Mosque, quotes Shaykh Bin al-Uthaymeen preaching this policy: "*[O]ur doctrine states that if you accept any religion other than Islam, like Judaism or Christianity, which are not acceptable, you become an unbeliever. If you do not repent, you are an apostate and you should be killed because you have denied the Qur'an.*" [Document No. 55]

190. Based on this reference from a solid theological background, al-Jaythin's placement as a propagator reflected the anomalous, non-merit-based process by which appointments and postings were dished out. The typed letter of deployment showing his destination was changed by a hand-written annotation.[93] The change in the letter from Kismayo, Kenya to Minneapolis, USA (incidentally, I couldn't decipher for sure the word Minneapolis in the Arabic hand-written word; "America" is definitely there) possibly reflects two reasons: first, that a posting as a propagator to the US is more significant than a posting to Kenya; and second, someone within the MIOA had a reason to send Shaykh al-Jaythin to the US as part of a bigger and more sinister plot to prepare for the arrival of the two hijackers. In this case, al-Jaythin would join others in California as an "advance team."

191. What gives credence to the "advance team" suggestion is that when al-Jaythin traveled together with Majed al-Mersal to the US in December 1999, they met with Omar al-

---

[92] bin Uthaymeen, Shaykh; The Belief of Ahl Assuna wal Jammaat (The People of the Way and Community of the Prophet). Riyadh: The Ministry of Islamic Religious Affairs, 1995. (Published in Urdu) Collected from King Fahd Mosque, Culver City, CA, December 4, 2004. As quoted in Freedom House, 2005.
[93] Document KSA 9538.

Bayumi and others in southern California. There would have been no need for such meetings, were al-Jaythin just an "innocent" propagator being sent to the heartland of America to preach during Ramadan of that year.

192. In his deposition, al-Jaythin did not remember Minneapolis at all, nor did he "see" it written on the fax he received about the change of venue. It's almost incredulous to view this whole process as a mere innocent assignment. Al-Jaythin's denials, memory lapses, and obfuscation during his deposition undermine his credibility and the "innocence" suggestion about the assignment, especially in the context of their claim that they place propagators "with diligent accuracy."

193. Al- Jaythin was one of 32 Saudi Shaykhs who signed a March 2003 statement published on the website "Islam Today"[94]. The statement read that "*the nation is faced with an alliance devoted to aggression and injustice, led by the government of the United States of America,*" that "*jihad is the highest honor in Islam,*" and that "*for any individual or government to cooperate with the American government in its aggression, whether directly or indirectly, is an act recognized as a major sin*".

194. I recall when this edition of Islam Today was first published in March 2003, including the list of signatories. The list of signatories included Salman al-Awda (publisher of the magazine) and Safar al-Hawali (a colleague of Salman al-Awda and a fellow activist in the Islamic Awakening—*al-Sahwa al-Islamiyya*—and a fellow signer of the Memorandum of Advice).

195. The statement against the United States was written at the time as a protest against the American invasion of Iraq, which mainstream jihadists—for example, the Muslim Brotherhood to which al-Awda was accused of belonging—viewed the American-lead Iraq war as an attack on Islam and Muslim countries, regardless of how much they loathed Saddam Hussain.

196. Analyzing the state of mind of the signers of the document leads one to conclude, as my analysts and I concluded at the time, that although they called for jihad against the

[94] Islam Today Anti-American Manifesto – www.IslamToday.net, March 2003.

United States specifically because of Iraq, they in fact sowed the seeds of future jihad to come, not only against the United States but against all perceived enemies of Islam.

197. On Iraq and on future "causes" of jihad, there was no daylight between Muslim Brotherhood mainstream jihadists and radical jihadists including bin Ladin and al-Qa'ida (and later ISIS).

198. Many signers of the March 2003 statement in Islam Today were influential members of the Saudi clerical establishment and reflected Saudi public opinion about the American invasion of Iraq. In fact, wealthy Saudis donated huge sums of money to "jihadists" in Iraq and thousands of Saudis with the blessings of their individual imams and shaykhs, and even some government officials, went to Iraq to do jihad against the Americans and other foreign troops in that country (and their Shia supporters).

199. Radical Saudi clerics also blamed the United States for waging a war against Sunni Islam and for creating a "Shia Crescent" that in their view engulfed Syria, Iraq, and Iran. The anti-Shia jihad in Iraq—supported by many Wahhabi-Salafi Saudi clerics and al-Qa'ida Central (bin Ladin), al-Qa'ida in Iraq—became the first and most bloody phase of the Iraqi insurgency against the United States.

200. Furthermore, many of the signatories either remained silent regarding the 9/11 attacks against the United States or justified them. That was the reason why Usama bin Ladin's jihadist message was so readily accepted in Saudi Arabia in the 1990s and the first decade of this century.

201. Abdullah Al-Jaythin, according to a document produced in this litigation by the Kingdom of Saudi Arabia,[95] was accused of supporting the Muslim Brotherhood (MB) and of retweeting statements by "detained persons." The MB is anathema to Saudi Wahhabi-Salafis. The two groups belong to two different Schools of Jurisprudence in Sunni Islam.

[95] KSA 8875.

202. The MB tends to be more pragmatic about Islam and politics and in fact ran for elections in several Muslim-majority states, including Egypt, Jordan, Morocco, Kuwait, Malaysia, and others. The Wahhabi-Salafi doctrine espouses a rigid view of politics and rejects man-made rule. The divine rule or *hukm* is the only legitimate form of governing. This is why Saudi Arabia has no constitution and no independent parliament. The Qur'an is the constitution of Saudi Arabia, and their national assembly is only an advisory body (*majlis shura*) with no legislative powers.

203. If these two transgressions are the real reason behind al-Jaythin's ideological banishment in 2018, which is somewhat unlikely, then in the eyes of the Wahhabi-Salafi establishment he had moved from the Wahhabi-Salafi rigid position to the more "moderate" MB end of the theological spectrum. Retweeting messages by "detained persons" is a state thing, not part of the Wahhabi-MB ideological divide.

204. The fact that the MOIA recommended the termination of al-Jaythin's academic activities but kept his registration with the imamate and with preaching (*khutbas*) meaning that he could be cut loose without being branded an ideological pariah or an outcast of the Wahhabi-Salafi doctrine.[96]

205. Finally, having carefully reviewed the depositions of Abdullah al-Jaythin and Majed Mersal in the present case, I am firmly convinced that their travels to Los Angeles and San Diego prior to 9/11 reflected deliberate planning on the part of certain high-level officials within the MOIA to have them act as an "advance team" in anticipation of the two hijackers' arrival in Los Angeles, and their need for reliable safe harbor in southern California.

[96] The timing of this measure, in 2018, is somewhat puzzling to me, but may in fact be connected to domestic politics and the changing relationship between the Crown Prince and *de facto* ruler of Saudi Arabia, Muhammad bin Salman, also known as MBS, and the Wahhabi-Salafi religious establishment.

| F. iii. | ***Da'wa* case study 3: propagator's path of Fahd Al-Thumayri** |
|---|---|

206. The dissection of the official recommendation and appointments process demonstrated in the al-Jaythin case study above also exposes the implausibility of Fahad al-Thumayri's claim in his deposition that he selected Los Angeles as his destination on his own, without officially being sent to that location by the Ministry of Islamic Affairs (MOIA).

207. Throughout the 1990s and the early part of 2000s, the MOIA selected and sent propagators to other countries, in collaboration with the Ministry of Foreign Affairs (primarily) and the Ministry of the Interior (secondarily). Itinerant or short-term propagators—that is to say, propagators who travel to several countries within a short space of time, for example, during the Holy Month of Ramadan—customarily travel on a regular Saudi passport. Appointments to a specific country and for a specific time duration of one or more years—much like al-Thumayri's appointment in Los Angeles—usually involves a more rigorous process.

208. In my travels to Muslim majority and Muslim minority countries—from India to Central Asia and from West Africa to Indonesia—during that period (1990s to mid-2000s), I came across the two kinds of propagators, and also spoke to some of them.

209. If in a certain country, the Saudi-supported Muslim community is the focus of ideological competition from other countries, such as Iran, Turkey, or Libya (for example, in Nigeria in West Africa, Chad in the Sahel, Uzbekistan, Kazakhstan, and Turkmenistan in Central Asia, and Albania and Bosnia-Herzegovina in the Balkans), the MOIA usually devotes added attention to the selection and appointment of the propagators it places there. Such competition could also manifest between the radical Saudi brand of Islam and the more "moderate" or mainstream brands of Islam, such as the Muslim Brotherhood, the Nahda movement of Tunisia, the Deobandi Islamic brand

of India, or the Nahdlatul Ulama of Indonesia. I often witnessed such competition unfolding, primarily in Muslim minority countries, including the United States, France, Spain, England, Canada, India, and Indonesia. In countering what it regarded as antagonistic challenges to the Salafi-Wahhabi Islamic narrative, the MOIA sent millions of Saudi-printed Qur'ans to these countries, distributed thousands of publications and pamphlets explaining different aspects of the Qur'an according to Salafi-Wahhabism, opened hundreds of Qur'anic schools, and financed the building of mosques—from single-room places of worship to the most elaborate mosques in such strategic locations as Los Angeles, Abuja (Nigeria), Rabbat (Morocco), Almaty (Kazakhstan), and Madrid, Malaga, and Cordova (Spain).

210. In pushing *da'wa* globally, the MOIA was focused on advancing the Saudi Salafi-Wahhabi doctrine systematically and methodically. In addition to publications and the building of mosques, MOIA's affiliated "charities" at the time—such as the Muslim World League, the International Islamic Relief Organization (IIRO), al-Haramayn, and the World Assembly of Muslim Youth (WAMY)— expanded their activities in many countries and communities across the globe and to report frequently on these activities to their headquarters in Saudi Arabia. Important propagators and imams also reported on the success of their *da'wa* or propagation to the MOIA. On a couple of occasions during my government employment, I had the opportunity to read some of these reports. They included a treasurer's report on the income and expenditures during the reporting period, plus such other items as:

- How many people they were able to "convert" to Islam during the reporting period (including, among other things, their nationality, race, and country of origin)
- How many meals they provided during Ramadan in a particular town or village and the number of attendees
- How many cows they slaughtered during Ramadan and the number of attendees from the local community during the Eid festivities during the reporting period
- What community activities a particular mosque conducted or engaged in during the reporting period

211. Appointing an important propagator to a significant location—for example, as in the case of al-Thumayri and Los Angeles—is a serious process to which the MOIA devotes care and prior planning. Once the MOIA agrees that a place like Los Angeles holds a significant standing for *da'wa*, senior MOIA officials begin the process of designating and vetting a qualified propagator for such an appointment. The selected person is interviewed and designated by senior Ministry officials for the task (akin to a "command assignment"). If the MOIA decides to give the designee an official position at an embassy or consulate in a particular country, it contacts the Ministry of Foreign Affairs to specify a particular position at the consulate—such as administrative assistant or similar title, which in most cases operates more like a form of "cover" or a "ghost" title than an actual job—and issue a diplomatic passport. The Saudi ambassador in that country is usually alerted to the appointment because, at least theoretically, all MOIA-appointed propagators in that country come under the purview of the Ambassador.[97]

212. Other than the candidate's academic credentials (mostly degrees from Imam Muhammad University) and personal connections, the most critical qualification for such an appointment is the candidate's knowledge of the Salafi-Wahhabi Tawhidi doctrine of Islam and commitment to and belief in the concept of jihad against the "infidels" and the perceived enemies of Islam, especially those who live in *Dar al-Harb* and have no peaceful "covenant" with *Dar al-Islam*. The prevailing view among Saudi Salafi-Wahhabi jihadists, including many academics associated with Imam Muhammad University and many MOIA employees, in the 1990s and early 2000s, was that the United States was that type of "enemy."

213. Once the designated propagator is *in situ* at the specified location—in Los Angeles, at the Ibn Taymiyya Foundation, or at King Fahd Mosque—he is not left to fend for himself. The MOIA doesn't for a moment cut him loose to do as he pleases. Rather, the propagator is expected to report back to the MOIA on his activities during the assignment period. His report will customarily cover matters of finances, the number of "converts," attendance at prayers, especially the Friday prayers and *khutba* (sermon),

[97] See KSA 1253, admitted into evidence as Exhibit 41.

and other ‘‘jihad-related” activities. He is also supposed to provide whatever assistance needed to any visitor engaged or planning to engage in jihad, in its broadest meaning (ranging from *jihad al-nafs* or self-jihad to j*ihad Qital* or fighting jihad). Visiting or “guest” propagators usually do not come to the mosque where the Ministry-appointed propagator works, haphazardly and without a prior notice.

214. As the person appointed as the “supervisor” for all the propagators in California, al-Thumayri was expected to interact with all of them and to report on their activities to more senior officials at the Ministry.

215. I interpret al-Thumayri’s appointment (upon nomination by al-Suwaylim[98]) to be in charge of the “*du’at*” (i.e. the plural of *da’i*) in California as placing him in the role of supervisor, or overseer, of all those officials doing *da’wa* in California, irrespective of the timeframe, the transience, the permanency or otherwise of their presence in California. If a person is appointed, authorized or sent to do *da’wa* in California, then that person would come under al-Thumayri’s supervision – and al-Thumayri would be notified of that person’s presence and purpose.

216. This analysis appears to be backed up by the content of the depositions – since all the propagators who are known to have visited during successive Holy Months of Ramadan – Abdullah al-Jaythin and Majed Mersal (1419), as well as Mutaib al-Sudayri and Adel al-Sadhan (1420) first went to meet with al-Thumayri when they arrived in California. Their footsteps, to a minute level of detail in terms of locations and sequencing, would be followed in the early months of the following year, 2000 CE, by the arriving hijackers al-Hazmi and al-Mihdhar.

217. Ordinarily, if a *da’i* were to be sent to assist a particular Imam, then in addition to notifying the particular *da’i*, a copy of the notification would also have to be sent to al-Thumayri. This we know because when the Director of *Da’wa* for all of Europe, America, and Australia approved and confirmed al-Suwaylim’s nomination of al-

[98] See KSA 8503.

Thumayri as *Mushrif* (i.e. supervisor),[99] the notification was copied to all the *du'at* concerned by means of a handwritten annotation at the foot of the letter.

218. For Al-Thumayri to claim, as he did in his deposition, that he didn't know the other propagators in California – let alone in the rest of the United States – didn't report to the MOIA on his activities, didn't meet, interact with, or assist the two hijackers Hazmi and Mihdhar—who did not speak English and knew nothing about life in America—is the height of dishonesty, deception, and dissimulation. I have conducted detailed analysis of the deposition testimony of Fahd al-Thumayri in these proceedings [see Section E.a of the present report] and arrived at the conclusion that he was primed to tell even the most implausible of lies, to distort the truth about even the most basic of facts. If he would lie under oath with such apparent ease about matters of religion, I find it highly likely that his testimony with regard to his knowledge of and involvement in the 9/11 plot was also dishonest.

219. According to cultural and religious rites, an Imam holding an event (for example a private dinner) would invite persons according to: stature and religious rank (i.e. in the Middle East, the concept of rank is highly important) – known credentials (sometimes they "speak for themselves" whether political appointment / government official, visiting Prince or other member of the royal family and in addition, a recommendation from the Embassy, the Consulate, or back in Saudi Arabia from either the MOIA or the MFA – which would stipulate who exactly was coming, their title, and which services you are required to provide. Often the request would simply ask that you would "provide any assistance required."

220. The receiving aspect: Before the visit of any *da'i* to an Imamate, an advance notice would have to be issued to the Imam in which specific details of the *da'i*'s capabilities and suitability (e.g. whether they are fit to perform Friday prayers, to lead other prayers, to teach in the Islamic school, or to perform other religious duties), the specific dates of the visit (albeit that it may simply state for Ramadan – in which case the Imam already knows the dates), the composition of the travelling party, especially where it is more

[99] See Document KSA 8502.

official. It is certainly a much more formal and onerous process of notification, certification and preparation than any of the principal deponents, notably Shaykh al-Thumayri, would have us believe.

221. There is of course a different process at play for "walk-ins" / accidental visitors, for which the protocols may not apply – or be dispensed with entirely, because that process depends on the interaction and discretion of the Imam, who may extend an invitation to the visitor to lead a prayer, and often to the house for a meal. Examples of walk-ins could include a visiting *da'i* from another city – who in any case might already know the Imam on the basis of a common background at Imam Muhammad University (which is known as a training ground for *da'is*, religious educators, Professors and teachers) – akin to burnishing one's connections with fellow members of an alumni network, as one might encounter at an Ivy League university.

222. On the aspect of being sent: the visitor would derive his credentials from an authorization / letter / official message sent from an appropriate authority.

223. In any case, the sole purpose of sending a *da'i* to another city or region of the world is to engage in activities that constitute *da'wa*. Any *da'i* sent in this capacity to the United States would have to be sent or attached to a particular Imam, at whose discretion the program of the visit and the activities would be determined.

224. By the same token, however, it is unlikely that the assignment letter from the MOIA would specify the individual functions the *da'i* would be expected to perform – that particular degree of organizational detail would fall to the local Imam, who would be best placed to decide upon the needs of the Imamate[100] at the given times. Areas of activity could encompass a broad range of sectors, whether delivering sermons at the mosque, leading Friday prayers, giving public lectures, *Qur'anic tafsir* – explaining

[100] Note that the 'Imamate' refers to the institution of the Imam (and not really to the Imam's region of coverage) – interesting side note, historically the area of coverage of a mosque would be determined by how far the call to prayer from its minaret could be heard.

certain *suras* (chapters) and '*ayas* (verses) to students, sitting in an Islamic bookstore to speak to casual readers, etc.

225. The visits of a particular cadre of Saudi personalities[101] to Los Angeles were demonstrative of a hardened belief that the USA was in the realm of *dar al harb* and that it should be visited by those who would preach, propagate and do jihad in strict accordance with the Wahhabi characterization.

226. As a direct consequence of the intensified focus on *da'wa*, by the mid- to late-1990s, more Saudi youth had become mobilized around the concept of jihad, and Friday sermons became ever more strident as Wahhabi clerics first focused on da'wa, then took up the cause of global jihad.

227. The MOIA had the ability to hand-pick and appoint people to be the "face of *da'wa*" at Saudi Embassies and Consulates overseas, drawn from the three major Islamic Universities in the country, but principally from Imam Muhammad University, which was the largest, had the most branches across the country. In fact, it had a branch in Burayda, the capital of Qassim, and the very heart and birthplace of Wahhabi Islam.

228. Imam Muhammad University – as demonstrated by the conspicuously rapid rise of Fahd al-Thumayri– was a kind of a "feeder school" for the Ministry of Islamic Affairs: these were two sides of a triangle, on which the third axis was the Kingdom's state policy of *da'wa*. Prior to the creation of the MOIA, jihad and *da'wa* activities overseas were primarily performed by Islamic charities. Even though these were supported by the government, they were NOT government organs – which was, of course, the case with the newly-created Ministry.

229. According to the doctrine and fatwas of Ibn Taymiyya, once the enemy attacks Islam and Muslim countries, it is the religious duty of all Muslims to do violent jihad against that enemy. Several Qur'anic *suras* talk about the duty to do violent jhad or *jihad al-*

---

[101] I am referring to individuals such as Osman Kaldirim, Dr. Khalil al-Khalil, Shaykh Saad al-Buraik, Khalid al-Assaf, Shaykh Abdulrahman al-Sudais, and Shaykh Abdulaziz al-Ammar, all of whom my review demonstrated had visited California in the material period during which Saudi officials were building their base of operations.

*Qital* (fighting jihad) against the enemy that is attacking or threatening Islam as a faith and a territory. So the Ministry of Islamic Affairs –by funding *da'wa*, building and funding the locations at which *da'wa* is done, funding, mandating (appointing with specific responsibilities) and empowering the persons – as state officials – who do the *da'wa* – the *da'wa* begins to feed into the different facets of jihad: from the passive to the violent. We're not talking about just any interpretation of Islam; but actually the very Wahhabi Islam that is the state religion of Saudi Arabia. To Muslims who adhere to the other Schools of Sunni jurisprudence (for example, the Hanafi, Maliki, and Shafi'i Schools), the concept of violent jihad might be unfamiliar and only with rare cases of war; but to Saudis—from primary school through to government service—it is part and parcel of their religious belief. There is no disconnect, no break in the causal chain, between *da'wa* and violent jihad. *Da'wa* first, yes, but when the enemy is identified and in your sights, Islam demands that Muslims wage jihad. In this sense, at a minimum, the MOIA through its aggressive *da'wa* programs also aided, abetted and sponsored the plots to carry out violent jihad.

230. The religious characterization of jihad was in fact an extension of *da'wa* – and in the Wahhabi view, this meant not only 'passive' jihad, but also 'violent' jihad against the enemies of Islam.

231. In my analysis throughout my career, I searched in vain for a dividing line separating the doing of *da'wa* in the way the MOIA did it, and the waging of violent jihad. Based on so many interviews I conducted across the Muslim world, I drew a straight line between the Islamization of Muslim youth, the radicalization of many of them, and the waging of violent jihad.

232. The nexus that exists in this realm between the actions of murderous jihadists like the 9/11 hijackers and their doctrinal inspirations should not be overlooked: radical Islamic activists usually sought guidance for their jihad, including even for *specific jihadist operations*, from Wahhabi clerics or religious scholars, many of whom are graduates of the Imam Muhammad University in Riyadh, the Islamic University in Medina, or the Um al-Qura in Mecca. These clerics – a category encompassing, unmistakably, Fahd al-

Thumayri, as well as Anwar al-Awlaqi – are known as *fuqaha' al-jihad* (scholars of jihad), and represented the ultimate convergence between al-Qa'ida's terrorist operatives and the support they received from Saudi ideological extremists.

233. This coupling of Wahhabi jihadi ideology and fierce criticism of American policy not only characterized the global propaganda of al-Qa'ida in the material period, but also figured concretely in the actions of members of the Saudi 9/11 support network in the United States – most notably, Omar al-Bayumi, Smayl Manna, Fahd al-Thumayri, Abdullah al Jaythin, Mohdar Abdullah, and Anwar al Aulaqi – and in the administrative cover, support and resources provided to this network from the more senior Saudi officials who oversaw them.

234. Having carefully assessed the evidence regarding the 9/11 plot, I would describe al-Thumayri, a radical scholar and cleric who was hand-picked to be in charge of all the propagators in California, as having been the "enabler"[102] of the violent jihad waged by the hijackers al-Hazmi and al-Mihdhar. Through his sermons, extremist literature he provided, and through in-person counsel offered to Hazmi and Mihdhar at the King Fahd Mosque, al-Thumayri provided a religious justification for the al-Qa'ida terrorist attacks of which the men were part.

| G. | **The "operational'' role of propagators and other officials of the Kingdom of Saudi Arabia in the support network for the 9/11 attacks** |
|---|---|

235. In this section I have set out to offer my expert opinion on the ''operational'' aspects of Saudi Wahhabi *da'wa* in the material period, in particular the scale, structure and objectives of propagation efforts as they concerned the United States. For this purpose I have reviewed a large amount of available documentary and testimonial material produced in the present litigation. I have assessed correspondence and testimony about the career paths that propagators followed within the Ministry structures and on

[102] For the author's own analytical basis, see: A Necessary Engagement, p.117.

overseas official platforms as they existed at the time; and I have applied my analysis in particular to the ideological and operational ties revealed between these propagators, insofar as these can be shown to have created relationships of association and indicate unity of purpose.

236. The materials I have reviewed in order to offer my expert opinion on the connections between Saudi propagators and the plot to commit the 9/11 attacks include the following:

- original documents produced by the Kingdom of Saudi Arabia (which I have reviewed in Arabic as well as their English translations);
- documents produced by the FBI, particularly those released in the context of the ongoing Declassification Review under Executive Order 14040;
- documents recovered in law enforcement searches conducted at locations associated with persons of interest in both the United States and the United Kingdom, as produced in these proceedings; and
- deposition testimony in the present litigation by witnesses who are current or former officials (including Ministers, diplomatic appointees, and propagators) of the Saudi Ministry of Islamic Affairs.

237. Based on my detailed review, it is my expert analysis that several propagators and higher officials employed by the Kingdom of Saudi Arabia were among the officials who provided material support to the 9/11 plot, including in the plot's advance planning, making practical arrangements to host and harbor the two hijackers, Nawaf al-Hazmi and Khalid al-Mihdhar, during their time in southern California, and in providing all-important spiritual support and kinship as a means of reinforcing their extremist religious beliefs. It is my expert opinion that in providing such support, these Saudi Arabian government officials knew that they were assisting terrorist operatives of the al-Qa'ida organization who were preparing to commit acts of violent jihad inside the United States. Furthermore, I have concluded that they reported on their actions to one another, and to more senior officials in the Saudi government hierarchy. All of this was done in the name of Wahhabi polity, as I discussed earlier in this report.

238. In the case of the two most "significant"[103] visitors, Hazmi and Midhar, I am of the opinion that they would fall under a different procedure from the directly deployed Saudi propagators who were in the "advance teams," such as al-Sadhan and al-Sudairy.[104] I am familiar with the protocol by which, customarily, a message would be conveyed stating that a named delegate, or designated pair or group of individuals, or someone whose identity or mission is known to both parties in the exchange, would be coming to a particular location, and that all necessary reception, facilitation, and other forms of practical assistance should be provided. There wouldn't need to be any elaborate language used in this kind of message – and the actual instruction might be reduced to a simple line asking the recipient to do the action he's been waiting to do – or, in the case of a written message: **"**Please direct your relevant official to take the necessary actions."[105]

239. Based on everything I know, including my numerous meetings and discussions with *du'at* (propagators) in countries around the world, there is no conceivable scenario according to which al-Thumayri or al-Bayumi, considering the senior positions they held, the stature they enjoyed among their fellow Muslims, and who were so well-known in their respective religious communities, would have offered or provided special help to these visiting jihadists on their own initiative. Such a suggestion is patently implausible. Rather they would have received some form of advance notification to announce that these persons, Hazmi and Mihdhar, were coming. They would also have required planning input and assurance from more senior Saudi officials, to enable al-Bayumi and al-Thumayri to perform their roles with the cover and latitude of their respective hierarchies.

240. Similarly, in my expert opinion, there is no conceivable scenario according to which al-Bayumi and al-Thumayri would not have known that these individuals were embarking

[103] This is the phrase attributed to al-Thumayri in the FBI's reporting on its information from a Confidential Human Source (CHS); see EO14040_000110-000114, at 111.

[104] EO14040_000582-000587-MDL; EO14040_000588-000600-MDL.

[105] In the productions in this case, particularly those from the Kingdom of Saudi Arabia, examples are rife of the type of writing by which Saudis pour forth pleasantries, "laying it on thick," before reducing the actual instruction to a single line or paragraph (the meaning of which is itself sometimes lost). By way of illustration, see Document KSA 1302 in which al-Suwaylim uses this language.

on some sort of violent jihadist action. According to documents released by the FBI under EO 14040, al-Thumayri is reported to have received a referral call "from Malaysia" (where it is known that an al-Qa'ida planning summit was taking place in December 1999), was informed in advance of the arrival of the "two brothers", and made plans for them to be hosted and harbored, as follows:

*"Around… the end of 1999, the KFM received a phone call from an individual in Malaysia… [who] wanted to speak with AL-THUMAIRY. [T]his phone call was regarding the imminent arrival of 'two brothers… who needed their assistance.' Those 'two brothers' were, according to CHS, Nawaf AL-HAZMI and Khalid AL-MIHDHAR.*

*[…] Prior to the arrival of AL-HAZMI and AL-MIHDHAR, AL-THUMAIRY provided* [redacted] *their flight information.* [redacted] *picked AL-HAZMI and AL-MIHDHAR up from the airport and brought them to the KFM, where they first met AL-THUMAIRY.*

*[…] During AL-HAZMI and AL-MIHDHAR's time in Los Angeles,* [redacted] *was asked by AL-THUMAIRY to provide assistance to them in whatever capacity they should need it."*[106]

241. Hazmi and Mihdhar would not necessarily have had to articulate the precise nature of the mission they arrived to perform in the United States; the evidence of their purpose would manifest in their careful following of a clear plan, as well as the "legends" they built around themselves, the types of assistance they were seeking and receiving, and the discipline – including the religious discipline – with which they and those who supported them conducted themselves. These characteristics would have been evident to anyone who would encounter them, especially those receiving them in an official capacity.

242. The most recent FBI investigative documents released under the EO, including credible reporting from an FBI Confidential Human Source (CHS),[107] definitively show, according to an eye witness, that [redacted] picked up the two hijackers Nawaf

[106] EO14040_000518-000523-MDL, containing FBI reporting on its Confidential Human Source.
[107] EO14040_000518-000523-MDL.

al-Hamzi and Khalid Mihdhar at the LAX airport, at the behest and request of Fahd al-Thumayri, a Saudi government official serving at the time as an MOIA official attached to the Saudi Consulate in Los Angeles and the Saudi embassy in Washington, DC. Al-Thumayri provided [redacted] with the flight information of the two hijackers prior to their arrival in Los Angeles. Al-Thumayri described the two visitors as "significant."

243. Omar al-Bayumi, in close coordination with Fahd al-Thumayri, also met with the two hijackers and assisted them in relocating to a more established base of operations, finding and paying for housing, and achieving introductions into the Muslim communities of southern California.

244. After picking them up from the airport, al-Thumayri instructed [redacted] to provide the two hijackers with whatever assistance they needed —including housing, guidance to local stores and places to eat, and means of traveling between suburbs and cities using public transport. All of these elements demonstrate to me that assisting the two hijackers was not a haphazard, accidental, on the spot operation. It was well-planned in advance, with the finer points of operational planning arranged by a series of phone calls involving Saudi officials on the ground, and various members of their support networks in Los Angeles, and Washington, DC.

245. Nor were the Saudi government officials involved rogue operatives acting without the knowledge or approval of Saudi government officials at the KSA embassy in Washington, DC, including Musaid al-Jarrah who was in charge of the Islamic Affairs office at the Saudi embassy,[108] and Khalid al-SOWAYLIM, whom al-Thumayri and other officials reported to directly.

246. The Saudi government (MOIA) officials from Riyadh to Washington, DC., and Los Angeles must have known in advance that the two visitors from Malaysia were not any ordinary "two brothers." They must have also known in advance that these "two brothers" (al-Hamzi and al-Mihdhar) were coming to the US on a mission that was not humanitarian, educational, or propagational.

[108] EO104040_000004-000005-MDL.

247. The secrecy the Saudi officials exhibited in assisting the two hijackers and their repeated denials and lies in their depositions amount in my opinion to evidence that they were employing "tradecraft," and leads to the unmistakable conclusion that these officials knew in advance that the two hijackers' mission was egregious, and involved a terrorist operation against the United States.

248. As confirmed in the EO1040 documents, the MOIA officials who assisted the two hijackers were sympathetic and supportive of the Wahhabi-Salafi concept of jihad, including violent jihad, against the United States, as a perceived enemy of Islam.

249. Usama bin Ladin's argument that this type of jihad should target the major economic and military symbols of the "crusader snake" (America) fell on sympathetic ears among many adherents of the Wahhabi-Salafi doctrine. Attacking the Twin Towers in New York (the heart of America's economic power) and the Pentagon in Washington (the pinnacle of America's military power) was considered by many Saudi Wahhabi-Salafi extremists as a justifiable form of jihad against the "head of the infidels."

250. In addition to al-Jarrah, the Saudi MOIA also funded other pro-al-Qa'ida Saudis persons, including Adel al-Sadhan and Mutaib al-Sudairy. These two individuals plus Omar al-Bayumi acted as an "advance team" preparing the ground for a support network on which the two hijackers upon their arrival to Los Angeles would rely.[109]

251. A further CHS for the FBI, whose information is reported in a recent EO release,[110] was clearly close to al-Thumayri and a member of the extremist circle that congregated at the "*Dar al-Qu'ran*" (DQ) Mosque in Los Angeles. Accordingly, the CHS' most reliable knowledge would appear to relate to the community around the King Fahad Mosque (KFM) from which the DQ mosque emerged, al-Thumayri himself, and the other members of that circle. CHS' pertinent reporting on al-Thumayri includes the following statements:

[109] EO14040_000582-000587-MDL; EO14040_000588-000600-MDL.
[110] EO14040_003612-003616-MDL.

- "*ALTHUMAIRY knew who 'the guys' were and was sympathetic to Al-Qaeda's cause*";

- "*ALTHUMAIRY was very smart and everything he did was camouflaged. MOHAMMAD ALMUHANNA was trained by ALTHUMAIRY, but was not as savvy. MUHANNA was very outspoken and aggressive.*"; and

- *ALTHUMAIRY interacting with [senior AQ operative] 'KHALLAD' BIN ATTASH, whom CHS identified as an 'important person' present at the KFM in the summer of 2000 on an occasion when THUMAIRY was serving lunch after prayer.*[111]

252. The two expressions used in this reporting, "the guys" and "significant", are further revelatory of al-Thumayri's "operational" involvement. Al-Thumayri must have known who "the guys" were before they arrived in Los Angeles and therefore he must have organized the logistical team that provided the two hijackers with logistical support. Once they arrived, the logistical team sprang into action expeditiously and without delay, upon al-Thumayri's express directions – which he clearly reported up the chain.

253. To describe the visitors as "significant" — when they clearly were not well-known imams, theologians, senior government officials, renowned scientists, writers, or Noble laureates — indicates that al-Thumayri must have known who they were and how "valuable" they were. I also judge that operationally he must have had a clear idea they were embarking on an important jihadist mission in and against the United States.

254. No matter the degree to which al-Thumayri's actions were "camouflaged," the FBI reports clearly show that he was himself a "significant" operational participant in the terrorist plot in which al-Hazmi and al-Mihdhar were involved. The observation that al-THUMAYRI was adept at "camouflaging" his actions becomes especially pertinent in light of FBI findings that he belonged to a Sururi extremist network.

---

[111] EO14040_003612-003616-MDL, at 3613-3614.

255. Having carefully gone through the relevant documents in the FBI production,[112] and applied the analytical techniques upon which much of my career's work has been based, it is my opinion that al-Thumayri was indeed involved in the plot operationally, and as part of a sophisticated, joined-up network of similarly trained and like-minded operatives installed in their respective locations, or bases, by the government of Saudi Arabia.

256. It is this analysis, animated by the expert opinions I have threaded through this report, that gives credence to and enables me to agree with the characterization arrived at by the FBI in July 2021, after almost 20 years of investigating the 9/11 attacks, of:

> "*[a] Saudi(Wahhabi)/Salafi/militant network that was created, funded, directed and supported by the KSA and its affiliated organizations and diplomatic personnel within the U.S.*"[113]

257. In what amounts to an authoritative 'last word' on the previously-unacknowledged scale and systematicity of official Saudi support, the FBI's following logical supposition is entirely concordant with my expert opinion:

> "*As Saudi government officials and intelligence officers were directly operating and supporting the entities involved with this network, their involvement with the activities of these organizations/individuals would logically be supposed to have the knowledge or concurrence of the KSA government.*
>
> *This knowledge and/or concurrence by the SAG [Saudi Arabian Government] is related to the 9/11 investigation not only be [sic] the direct involvement of some personnel but also via the creation of a larger network for such activities.*"[114]

258. Based on the evidential review and analysis I have undertaken during my engagement, it is my expert opinion, to a reasonable degree of certainty, that the Kingdom of Saudi Arabia precipitated the 9/11 attacks through its ideological and operational support for

[112] With particular reference to EO14040_003612-003616-MDL, and EO14040_000110-000114-MDL.
[113] See FBI EC of July 2021, beginning at EO14040_003478; at 3480.
[114] Ibid, at 3480.

violent jihad in the name of Wahhabism. An ardent corps of avowed Wahhabi jihadists flourished within the ranks of the Saudi government, and found traction in southern California to establish a platform from which to attack the United States. A plethora of Saudi officials performed vital roles in this support network, including: a Sururi extremist Imam in Los Angeles, Fahd al-Thumayri; a senior operative in San Diego, Omar al-Bayumi; MOIA propagators such as Abdi Muhammad, al-Jaythin, Mersal, al-Sadhan, and al-Sudairy, who carried out advance planning, intelligence gathering and networking, and senior Saudi officials, among them Khalid al-Suwaylim, at whose direction the plot was carried out, and to whom – indeed through whom – an official line of reporting was maintained.

259. When the first 9/11 hijackers arrived on "enemy" soil in the U.S., it is my clear conviction that they did not pursue their path alone: Al-Hazmi and al-Mihdhar were hosted, harbored, supported and enabled in their violent jihad by Saudi state operatives and resources.

Dated April 1, 2022

Emile Nakhleh

______________________________

Dr. Emile A. Nakhleh

**Dr. Emile A. Nakhleh**

**Annex A – Curriculum Vitae**

**In re Terrorist Attacks on September 11th, 2001 (03-1570-GBD-SN)**

## CURRENT POSITION

- Dr. Nakhleh is a retired Senior Intelligence Service Officer, a Research Professor and Founding Director of the Global and National Security Policy Institute at the University of New Mexico, an IC/National Intelligence Council Associate, and a life member of the Council on Foreign Relations. Since retiring from the US Government in 2006, he has been consulting with different US government entities and departments on national security issues, particularly Islamic radicalization, terrorism, and the Arab states of the Middle East. He has published frequently on the LobeLog, Responsible Statecraft, and The Cipher Brief Blogs. He has also worked at UNM as a part-time consultant/employee since 2011.

## EXPERIENCE

- Researching, consulting, strategic thinking on issues and programs relating to political Islam, Islamic radicalism, Islamic extremist and violent ideologies, intelligence, the Middle East, and programs focusing on Muslim world outreach and engagement.

- Advising senior policymakers and senior program managers on policy projects dealing with the Middle East and other Muslim countries, Muslim public opinion, Islamic groups, political parties, organizations, and NGOs, and the impact of the activities of these groups on our homeland and national security.

- Traveling to Muslim majority and Muslim minority countries, including the Greater Middle East, Western Europe, Central Asia, West Africa, East Africa, South Asia, Southeast Asia, Thailand, China, and the Balkans, and engaging Muslim interlocutors on different facets of Islamic activism, ideological debates and radical narratives within the Islamic world, and their relations with the non-Muslim world, including the United States, and their specific views of the United States. Visited dozens of mosques and engaged with dozens of imams and ulama across the Muslim world on different Islamic narratives with a special emphasis on Wahhabi Islam and the role Of Saudi Islam in spreading radical interpretations of jihad across many Muslim countries.

- Interacting with dozens of intelligence services across the world on political Islam, radical interpretations of Islam, mainstream interpretations, jihad/terrorism, and youth recruitment.

## CAREER PROFILE

- Central Intelligence Agency (CIA): 1990 – 2006 Senior Intelligence Service Officer—Scholar in Residence (1990-1991), consultant (1991-1993), and full-time employee (1993-2006)

- Professor of Government and International Studies, Mount St. Mary's University, 1967-1993

- Expertise in political Islam—Islamic activism and radicalism, Islamic radical ideologies, and Islamic political parties in the Middle East and the rest of the Muslim world—as well as in political and educational reform, regime stability, and governance in the greater Middle East.

- Advised senior CIA leadership on Middle East regional issues; briefed senior US government policymakers on Middle East politics and Islamic radicalism; represented the Agency at NSC interagency meetings on Muslim world outreach, and analyzed statements by international terrorist leaders (Bin Ladin, Zawahiri, and Zarqawi) for senior policymakers.

- Life member of the Council on Foreign Relations

## LANGUAGES

- Arabic (Native proficiency, 5/5/5), Hebrew (Moderate), and Farsi (Elementary)

## KEY POSITIONS AT CIA

- Founding Director of the Political Islam Strategic Analysis Program in the Directorate of Intelligence at the Central Intelligence Agency.

- Established and managed the Regional Analysis Unit in the Office of Near Eastern and South Asian Analysis at CIA (1997-2004)

- Served as a Senior Analyst, Scholar in Residence, and Consultant at CIA (1990-1993)

- Senior Analyst and founding member of the CIA Senior Analytic Service; chaired the first SAS Council.

- Developed and managed week-long training set of courses for the USG workforce on "Middle East Realities" and "Political Islam Realities" (taught by expert academics from across the country)

- Developed and managed a two-day annual academic outreach symposium on different facets of political and Islamization across the Muslim world in which nearly two dozen academics lectured. On the 10th anniversary of the symposium, senior CIA and distinguished academics judged the symposium and the wider academic outreach program "without peer in the U.S. government."

## KEY POSITIONS SINCE LEAVING CIA

- Established and directed the Global and National Security Policy Institute in the provost Office at the University of New Mexico as a result of collaboration with Los alamos National Lab, Sandia National Laboratories, the Air Force Research Lab, and the national security community in Albuquerque, New Mexico.

- Established and directed a new interdisciplinary online Professional Master of Science in Global and National Security degree (PMSGNS) for working professionals.

## EDUCATION

- **Ph.D**., The American University, Washington, DC (International Relations, 1968)

- **M.A**., Georgetown University (Political Science, 1966)

- **B.A.,** Saint John's University, Minnesota (Political Science and philosophy, 1963)

- Graduate of the Kellogg PINNACLE Leadership course (2006); the Harvard University National Security Seminar (2004); the Aspen Institute Executive Leadership Seminar (2001); and the Harvard University's Intelligence Fellows Program (2000)

## AWARDS

- The Distinguished Career Intelligence Medal (2006, for "exceptional achievement and meritorious service"); the William L. Langer Award (2004 for "support of the DI mission"); the Director's Award (2004 for "extraordinary fidelity and essential service"); Unit Citation Award (2004, for producing the Political Islam Primer); and the Intelligence Commendation Medal (1997 for developing an academic outreach program that is "without peer in the U.S. government")

## PRE-CIA POSITIONS

- John L. Morrison Professor of International Studies and a Department Chair at Mount St. Mary's University, Maryland, USA; Professor for 26 years.

- Fulbright Senior Research Fellow (Bahrain, 1972-73 and Jerusalem, summer 1987); a visiting professor at Bir Zeit University (summer 1977); a Woodrow Wilson Guest Scholar (summer 1979); and a National Endowment for the Humanities Research Fellow (1979-80, with residency at the American Enterprise Institute in Washington, D.C.).

- Traveled extensively in the Middle East and the Muslim world**;** lectured widely both in the United States and overseas; and wrote and contributed to many books and journals on

Middle East politics, state formation, US policy in the region, the Arab states of the Persian Gulf, and political Islam, Islamization, and Islamic radicalism.

- Conducted field research and interviews from 1972-1992 in the Middle East, North Africa, and the Arab states of the Persian Gulf focusing on Political Islam and the state, religious and ethnic minorities, democratization in the Arab world, national political and legal institutions, state formation (especially in the new Arab states of the Persian Gulf), the intersection of Islam and nationalism in the Arab world, Turkey, and Iran, national leadership and state institutions, different narratives—from mainstream to radical—within Islam, regional developments, Israel, the Occupied Territories, and the rise of Hamas, and the influence of politics on nation building.

**Dr. Emile A. Nakhleh**

**Annex B – Publications**

**In re Terrorist Attacks on September 11th, 2001 (03-1570-GBD-SN)**

# PUBLICATIONS

*Books*

Nakhleh, E. A. (1977) *The Arabs in Israel and Their Role in a Future Arab-Israeli Conflict: A Perception Study*. Alexandria, VA: Abott Associates.

Nakhleh, E. (1975) *The United States and Saudi Arabia: A Policy Analysis*. American Enterprise Institute for Public Policy Research, Washington, D.C.

Nakhleh, E. (1975) *The West Bank and Gaza: Toward the Making of a Palestinian State*. American Enterprise Institute for Public Policy Research, Washington, D.C.

Nakhleh, E. A. (1975) *Arab-American Relations in the Persian Gulf*. American Enterprise Institute for Public Policy Research, Washington, D.C.

Nakhleh, E. A. (1982) *The Persian Gulf and American Policy*. Westport, CT: Praeger Publishers.

Nakhleh, E. A. (1986) *The Gulf Cooperation Council: Policies, Problems and Prospects*. Westport, CT: Praeger Publishers.

Nakhleh, E. A. (1991) *The Arab World after the Gulf War: Challenges and Prospects*. University of Western Australia: Indian Ocean Centre for Peace Studies.

Nakhleh, E. (2011) *Bahrain: Political Development in a Modernizing Society*. Lanham, MD: Lexington Books (Translated into Arabic and published in 1996, and reprinted as is in English in 2011).

Nakhleh, E. (2008) *A Necessary Engagement: Reinventing America's Relations with the Muslim World*. Princeton, NJ: Princeton University Press

Nakhleh, E. (2009) Intelligence Sharing and Co-operation: Opportunities and Pitfalls. In S. Tsang (Ed.), *Combating Transnational Terrorism: Searching for a New Paradigm* Westport, CT: Praeger Publishers.

*Journals*

Nakhleh, E. (1970) Wells of Bitterness: A Survey of Israeli-Arab Political Poetry. *Critical Perspectives on Modern Arabic Literature*, 244-262.

Nakhleh, E. A. (1971) The Anatomy of Violence: Theoretical Reflections on Palestinian Resistance. *Middle East Journal, 25*(2), 180-200.

Nakhleh, E. A. (1977) Labor Markets and Citizenship in Bahrayn and Qatar. *Middle East Journal, 31*(2), 143-156.

Nakhleh, E. A. (1981) The Palestine Conflict and US Strategic Interests in the Persian Gulf. *Parameters, 11*(1), 71.

Nakhleh, E. A. (1988) The West Bank and Gaza: Twenty Years Later. *The Middle East Journal*, 209-226.

Nakhleh, E. A. (1989) The Palestinians and the Future: Peace through Realism. *Journal of Palestine Studies, 18*(2), 3-15.

Nakhleh, E. A. (1993) Palestinians and Israelis: Options for Coexistence. *Journal of Palestine Studies, 22*(2), 5-16.

Nakhleh, E. A., Sakurai, K., & Penn, M. (2008) Islam in Japan: A Cause for Concern? *Asia Policy,* 5, 61-104.

Nakhleh, E. (2009) "Moderates" Redefined: How to Deal with Political Islam. *Current History, 108*(722), 402.

Nakhleh, E. (2013) Propaganda and Power in the Middle East. *Current History, 112*(758), 356.

Nakhleh, E. A. (2015) "Political Participation and the Constitutional Experiments in the Arab Gulf: Bahrain and Qatar." *Social and Economic Development in the Arab Gulf (RLE Economy of Middle East)*, 161.

*Reports*

Nakhleh, E. (2010). *Turmoil in Yemen: How Understanding the Challenges can Help the U.S. Undermine al-Qa'ida and the Radical Paradigm*. Senate Foreign Relations Committee.

In 2009 Dr. Nakhleh served on The Chicago Council on Global Affairs' Task Force on "Religion and the Making of U.S. Foreign Policy" and participated in the writing of the Task Force report titled *Engaging Religious Communities Abroad: A New Imperative for U.S. Foreign Policy* (The Chicago Council, 2010); Co-edited by Appleby, R. S., Cizik, R., Wright, T.

***Articles on Responsible Statecraft by Nakhleh, Emile***:

A New Social Contract for Arab States (1/21/2022)

The Rise and Fall of Political Islam in the Middle East (11/4/2021)

How the UAE-Israel deal serves bilateral relations, not larger issues (8/24/2020)

The world watches Lebanon on the brink of collapse (4/5/2021)

How will Saudi pro-reform activists respond to Biden's new approach to MBS? (3/16/2021)

How Biden should engage Bahrain (1/5/2021)

The Biden administration and Muslim world engagement (12/15/2020)

Could Bahrain's new prime minister chart a new path toward reform? (11/19/2020)

How will a Biden administration engage the Middle East? (11/14/2020)

The domestic and regional implications of Bahrain normalizing relations with Israel (9/16/2020)

Lebanon's government has resigned, now what? (8/11/2020)

How reorienting US Middle East policy can work in a post-Trump era (7/27/2020)

Bahrain and the politics of COVID-19 (5/28/2020)

How the coronavirus is impacting the Middle East (4/23/2020)

Could Mohammed bin Salman's power grab unravel Al Saud rule? (3/31/2020)

We need community engagement, not Us troops, to combat terrorism in West Africa and the Sahel (3/10/2020)

Trump's 'peace plan' Is the Death Knell of the Two-State Paradigm (2/7/2020)

Qassem Soleimani's Killing Puts the Middle East on Edge (1/14/2020)

Resolving Lebanon's Crisis (12/27/2019)

Lebanon's 'Arab Spring' Shakes Iran and the Region (11/5/2019)

***Articles on LobeLog (lobelog.com) by Nakhleh, Emile***:

Media and State Control in the Middle East (12/19/2019)

Al-Baghdadi's Demise and Legacy (10/28/2019)

Syrian Withdrawal a Dangerous Regional Gambit (10/15/2019)

Iran and the Middle East Amid Shifting Alliances (9/26/2019)

The Gathering threat of Domestic Terrorism (8/15/2019)

Mohammad Bin Salman's Waning Influence (8/5/2019)

Resetting America's Mideast Policy Through Deals on Iran and Palestine (7/11/2019)

Trump's Middle East Policy in Tatters (6/7/2019)

Trump's Disastrous Plan for the Muslim Brotherhood (5/3/2019)

Signs of Redemption Amidst Arab Political Upheavals in the Age of Trump (4/23/2019)

Hawks Clamoring to Attack Iran (3/28/2019)

The Islamic Revolution's Impact on Political Islam and the Middle East (2/6/2019)

The Middle East After Pompeo's Cairo Speech (1/16/2019)

Qatar Repels Saudi-Led Blockade (1/10/2019)

How the Saudis with U.S. Help Made The Middle East "A Very Dangerous Place" (11/26/2018)

American-Saudi Strategic Partnership: Time to Reset (11/16/2018)

Bahrain's Unending Shia Repression (11/6/2018)

MbS: the new Saddam of Arabia? (10/30/2018)

Saudi Arabia's Bogus Claims and the Fate on Mohammad Bin Salman (10/18/2018)

Khashoggi's Disappearance Belies Saudi Reform Narrative (10/11/2018)

Trump's Colonial Palestinian Policy Is Doomed to Failure (9/18/2018)

Trump's War Hysteria Against Iran Ignores Middle East Realities (8/1/2018)

Supreme Court's Decision Affirms Trump's Animus Toward Muslims (7/2/2018)

The Middle East in Trump's Wake (6/14/2017)

Trump's Destructive Policies In the Mideast (5/23/2018)

President Trump, Remove Assad from Power, Or You're Just like Obama (4/13/2018)

Inauspicious Anniversaries and Lessons Unlearned (4/2/2018)

Pompeo's Appointment Bodes Ill for the Middle East (3/19/2018)

Bahrain: Another year of Deep State Repression (2/1/2018)

Selling Trumpism to Skeptical Arabs (1/23/2018)

Trump's National Security Strategy And the Middle East: A Bridge to Nowhere (12/29/2017)

The Challenge of Saudi-Israeli Intelligence Sharing (11/28/2017)

Tillerson's Vanishing Act While The Middle East Is Burning (11/9/2017)

Arab Wars and Enduring disarray (10/10/2017)

Washington and Riyadh: Fading Memory Of 9/11? (9/13/2017)

The Israeli-Palestinian conflict: A Way Forward? (9/5/2017)

What Europe Can Do To Prevent Terror Attacks (8/21/2017)

Stoking War with Iran Courts Disaster (8/9/2017)

It's Time For Washington and Riyadh to Diffuse the War Hysteria (7/8/2017)

Bahrain's Assault On Free press (7/19/2017)

Saudi Bullying of Qatar: A Spurious Game Of Thrones Crumbling (6/20/2017)

Saudi Arabia and Qatar: Tribal Feud With Regional And Global Implications (6/7/2017)

Aligning with Iran Necessary To Combat Sunni Extremism (6/5/2017)

Trump's Alignment With Sunni Autocrats Masks Shallow Understanding of Region (5/24/2017)

Designating the Muslim brotherhood A Terrorist Organization Is Bad For America (2/27/2017)

Trump's Travel Ban Signals a Dystopian Vision Of America (2/3/2017)

Trump and Bin Ladin: Messaging Wizards (1/18/2017)

***Seleced Articles on LobeLog in 2016, 2015, 2014, and 2013 by Nakhleh, Emile***:

Trump's national Security Advisor: A Troubling Appointment (12/8/2016)

What Have We Learned About Combating Terrorism After 9/11? (9/13/2016)

The Islamic State and Arab Muslim Regimes: Time For Another Look (7/19/2016)

Obama Is right Not To Say "Radical Islam" (6/29/2016)

Did Omar Mateen Fall Through The Cracks? (6/15/2016)

Trump's Attacks On Islam: Dangerous and Way Off The Mark (3/16/2016)

Arab Mayhem and Tyranny: How to break The Cycle (2/23/2016)

Malik And Farook: Mass Killers, Not Jihadists (12/7/2015)

Terror In Paris (11/14/2015)

The Druze: Latest Minority To Suffer From Sunni Extremists (8/17/2015)

Why Is The Islamic State So Resilient? (6/5/2015)

Political Earthquake Hits Saudi Arabia? (5/4/2015)

The Islamic State and Boko Haram Merger (3/18/2015)

Countering Violent Extremism: Déjà vu All Over Again (3/2/2015)

America And The Middle East After The Islamic State (2/17/2015)

Looking Two Steps Ahead Into Saudi Arabia (1/26/2015)

Islamic Reformation: the Antidote To Terrorism (1/13/2015)

Political Islam and US Policy In 2015 (1/5/2015)

The Islamic State's Ideology Is Grounded In Saudi Education (10.27.2014)

How Obama Should Beat ISIS (9/25/2014)

Fighting ISIS And The Morning After (9/17/2014)

Islamic State In Iraq: Confronting The threat (8/11/2014)

Nigerian Terrorism: Causes and Solutions (7/18/2014)

The Two-State Solution is Dead: Time For new thinking (5/4/2014)

How Bin Ladin's Message Lures The Vulnerable (4/30/2013)

Radical Salafis Overrunning The Syrian Revolution (8/31/2013)

**Dr. Emile A. Nakhleh**

**Annex C – Materials Considered**

**In re Terrorist Attacks on September 11th, 2001 (03-1570-GBD-SN)**

# MATERIALS CONSIDERED BY EXPERT

(Non-classified material)

Wahhabi Salafi Islam in Saudi Arabia and Violent Jihadist (terrorist) Outcomes

Bradley, John R., "Al Qaeda and the House of Saud: Eternal Enemies or Secret Bedfellows?" The Washington Quarterly, Volume 28, Part 4; Pages 139-152 (Autumn 2005)

Center for Religious Freedom, Saudi Publications On Hate Ideology Invade American Mosques (Washington, D.C.: Freedom House, 2005)

Delong-Bas, Natana J., Wahhabi Islam: From Revival and Reform to Global Jihad (New York, Oxford University Press, 2004)

Ghattas, Kim, Black Wave (New York: Henry Holt and Company, 2020)

Glasse, Cyril, The Concise Encyclopedia of Islam (San Francisco: Harper & Row, Publishers, 1989)

Groiss, Arnon, (ed.), The West, Christians and Jews in Saudi Arabian Schoolbooks (Washington, D.C.: The Center for Monitoring the Impact of Peace, January 2003)

Ibn Taymiyya, Collection of Fatwas, Full 21 Volume Collection in the author's possession - Especially Vol. 5 on Jihad, Compiled and Produced by Amer al-Jazzar and Anwar al-Baz (Cairo, 2001) [Arabic]

Mamoun Fandy, 'Saudi Arabia and the Politics of Dissent' (Palgrave, New York, 2001)

Memorandum Of Advice (Saudi Arabia, June 1992). Signed by 107 Saudi Islamic activists and reformists.

Murphy, Caryle, "Conservative Clergy Attack Saudi Government," The Washington Post, September 28, 1992

Nakhleh, Emile A, A Necessary Engagement: Reinventing America's Relations with the Muslim World (Princeton, NJ: Princeton University Press, 2009)

Qutb, Sayyid, Ma'alim fi al-Tariq [Arabic]; Translated into English as Milestones by the International Islamic Federation of Student Organizations and published in Beirut, Lebanon (The Holy Koran Publishing House, 1978)

Sennott, Charles M., "Why bin Laden relied on Saudi hijackers," The Boston Globe, 3/3/2002

Sennott, Charles M., "Saudi Schools fuel anti-US anger," The Boston Globe, 3/4/2002

Shea, Nina, "Teaching Hate, Inspiring Terrorism: Saudi Arabia's Educational Curriculum (Testimony Before the United States House Committee on Terrorism, Nonproliferation, and Trade: Washington, D.C., July 19, 2007)

The 9/11 Commission Report, Authorized Edition (New York: W.W. Norton & Company)

The Oxford Encyclopedia of the Modern Islamic World; John Esposito, Editor-in-Chief (New York: Oxford University press, 1995). Four Volumes.
[Includes: Emile A Nakhleh, Bay'ah ("Allegiance" / "The Contract of Fealty between the Ruler and the Ruled"), Volume 1, pp.205-206]

The Truth About the New Crusade, 2nd Edition (Saudi Arabia: 2003? Authored by Salah al-Din Al-Ayubi—Saladin, a pseudonym—and dedicated to Abdallah Azzam (A radical Islamist treatise in justification of the 9/11 terrorist attacks against the United States)

Additional Sources on Political Islam (Beyond Violent Jihadist Literature)
I read during my professional life and revisited in forming my opinions

Al-Anani, Khalil, Inside the Muslim Brotherhood: Religion, Identity & Politics (Oxford: Oxford University Press, 2016)

Ayubi, Nazih, Political Islam: Religion and Politics in the Arab World (London: Routledge, 1991).

Bayat, Asef, Making Islam Democratic: Social Movements and the Post-Islamist Turn (Palo Alto: Stanford University Press, 2007)

Bayat, Asef, Post-Islamism: The Changing Face of Political Islam (Oxford: Oxford University Press, 2013)

Beinin, Joel and Stork, Joe, Political Islam: Essays from Middle East Report (Berkley: University of California Press, 1996)

Brown, Nathan, When Victory is Not an Option: Islamist Movements in Arab Politics (Ithaca: Cornell University Press, 2012)

Brown, Nathan, Arguing Islam After the Revival of Arab Politics (Oxford: Oxford University Press, 2016)

Cesari, Jocelyne, What is Political Islam? (Boulder: Lynne Rienner, 2017)

Eickelman, Dale F. & Piscatori, James, Muslim Politics (Princeton: Princeton University Press, 1996)

Euben, Roxanne L. and Zaman, Muhammad Qasim (eds.), Princeton Readings in Islamist Thought: Texts and Contexts from al-Banna to Bin Laden (Princeton: Princeton University Press, 2009)

Hamid, Shadi, Temptations of Power: Islamists and Illiberal Democracy in a New Middle East (Oxford: Oxford University Press, 2014)

Hamid, Shadi and McCants, William, (eds.), Rethinking Political Islam (Oxford: Oxford University Press, 2017).

Mandaville, Peter, Islam and Politics (New York & London: Routledge, 2007; 2nd edition, 2014)

Martin, Richard C. and Barzegar, Abbas, (eds.), Islamism: Contested Perspectives on Political Islam (Palo Alto: Stanford University Press, 2009)

Mitchell, Richard P., The Society of the Muslim Brothers (Oxford: Oxford University Press, 1993; orig. 1969)

Moaddel, Mansoor and Talatoff, Kamran (eds.), Modernist and Fundamentalist Debates in Islam: A Reader (New York: Palgrave, 2003)

Rosefsky, Carrie Wickham, The Muslim Brotherhood: Evolution of an Islamist Movement (Princeton: Princeton University Press, 2013)

Roy, Olivier, The Failure of Political Islam (London: I.B. Tauris, 1994; reissued 1998 by Harvard University Press)

Roy, Olivier, Globalized Islam (New York: Columbia University Press, 2004)

Schwedler, Jillian, Faith in Moderation: Islamist Parties in Jordan and Yemen (Cambridge: Cambridge University Press, 2007)

Volpi, Frédéric, Political Islam Observed (London: Hurst, 2010)

Wiktorowicz, Quintan, (ed.), Islamic Activism: A Social Movement Theory Approach (Indianapolis: Indiana University Press, 2003)

Selected Arabic Language Books read and consulted


Fahmy Huwaydi, Al-Islam wa al-Dimuqratiyya [Islam and Democracy] (Cairo, 1993)

Fuad Husayn, al-Zarqawi: Al-Jil al-Thani li al-Qai'da [Zarqawi: the Second Generation of al-Qa'ida] (Beirut, 2005)

Kamil al-Tawil, Al-Qa'ida wa Akhawatuha: Qissat al-Jihadiyyin al-Arab [Al-Qa'ida and Its Sisters: The Story of Arab Jihadists] (Beirut, 2007)

Sayyid al-Qumni, Ahl al-Din wa al-Dimuqratiyya [People of Faith and Democracy] (Cairo, 2005)


Selected documents from the 9/11 litigation
provided to me by counsel upon my request and reviewed in forming my expert opinions

CIA 2(c) Production - Document 7, CIA Analytic Report, "Saudi-Based Financial Support for Terrorist Organizations," Nov. 14, 2002

CIA 2(c) Production - Document 13, "Islamic Terrorists: Using Nongovernmental Organizations Extensively," Apr. 9, 1999

CIA 2(c) Production - Document 51, CIA Analytic Report, Paper on al Haramain, Mar. 22, 2002

CIA 2(c) Production - Document 55, CIA Analytic Report, "Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions," Dec. 1997

CIA 2(c) Production - Document 56, CIA Analytic Reports, "Usama Bin Laden: Some Saudi Financial Ties Probably Intact," Jan. 11, 1999

EO14040_000004-000005-MDL (subject to FBI Protective Order)
EO14040_000110-000114-MDL (subject to FBI Protective Order)
EO14040_000488-000491-MDL (subject to FBI Protective Order)
EO14040_000518-000523-MDL (subject to FBI Protective Order)
EO14040_000588-000600-MDL (subject to FBI Protective Order)
EO14040_000582-000587-MDL (subject to FBI Protective Order)
EO14040_000651-000655-MDL (subject to FBI Protective Order)
EO14040_000673-000679-MDL (subject to FBI Protective Order)
EO14040_000637-000642-MDL (subject to FBI Protective Order)
EO14040-000699 through EO14040-000714 FBI Initiating Memorandum
EO14040_001620-001623 (public version, contains "P" redactions)
EO14040_001832-001833 (public version, contains "P" redactions)
EO14040_001876-001877 (public version, contains "P" redactions)

EO14040_002582-002584 (public version)
EO14040_002570-002574 (public version, contains "P" redactions)
EO14040_002638-002643 (public version)
EO14040_003413-003442 (public version)
EO14040_003465-003472-MDL (subject to FBI Protective Order)
EO14040_003465-003484-MDL Extract 1 (subject to FBI Protective Order)
EO14040_003603-003606-MDL Extract 2 (subject to FBI Protective Order)
EO14040_003612-003616-MDL (subject to FBI Protective Order)

Exhibit 53
Exhibit 178
Exhibit 186
Exhibit 194
Exhibit 195
Exhibit 208
Exhibit 412
Exhibit 717

FBI Electronic Communication "ENCORE Investigation Update" – lesser redacted version filed subject to FBI Protective Order, dated April 4, 2016
FBI001338 (* subject to FBI Protective Order *)
FBI 4121-4138
FBI 4139-4145
FBI 4517-4518
FBI 4548-4615
FBI 4678-7332

KSA 001168-1173
KSA 2412
KSA 2641
KSA 6644-6645
KSA 7362
KSA 8044
KSA 8397
KSA 8570
KSA8783
KSA 8875
KSA 8877-8879
KSA 8927
KSA 8930
KSA 9538

KFM 0100
KFM 0393
KFM 0412

PEC-KSA000235-266 The Memorandum of Advice -, 24 pages, including cover, displaying the memorandum; accompanied by an extract from the 'Saudi Arabia and the Politics of Dissent' by Mamoun Fandy (Palgrave, New York, 2001)

PEC-KSA000231-234 The Letter of Demands - extract from the Egyptian newspaper 'Al Sha'ab, dated May 21, 1991; accompanied by a chapter extracted from the 'The Saudi File' by Anders Jerichow (Curzon Survey 1998)

Transcript of the Deposition of Osman Kaldirim in the present case, dated June 12, 2019
Transcript of the Deposition of Khalil al-Khalil in the present case, dated June 14, 2019
Transcript of the Deposition of Saud bin Abdullah bin Abdulrahman Al-Ghudaian in the present case, dated February 23, 2021
Transcript of the Deposition of Saleh bin Abdulaziz al Ash-Sheikh in the present case, Vol. I and II, dated March 23 & 24, 2021
Transcript of the Deposition of Abdullah al-Jaithen in the present case, dated April 7, 2021
Transcript of the Deposition of Majed al-Mersal in the present case, dated May 27, 2021
Transcript of the Deposition of Adel al-Sadhan in the present case, dated March 30, 2021
Transcript of the Deposition of Mutaeb al-Sudairy in the present case, dated April 1, 2021
Transcript of the deposition of Omar al-Bayoumi, Vol. I, II and III, dated June 9-11, 2021
Transcript of the deposition of Fahad al-Thumairy, Vol. I, II and III, dated June 28-30, 2021

*******************

Wikipedia entry on the "Permanent Committee for Scholarly Research and IFTA", last updated May 10, 2021

Post from the website Fatwa-Online (www.fatwa-online.com) on the "Permanent Committee for Islaamic Research and Verdicts", undated

Book entitled "Ibn Taymiyyah Expounds on Islam – Selected Writings of Ibn Taymiyyah on Islamic Faith, Life and Society", recovered in a search at the King Fahad Mosque in Los Angeles, CA; book is dated 1421 A.H. – 2000 A.D.

Documents produced by the US Department of Justice in relation to Omar Abdi Mohamed, a propagator who worked for the Ministry of Islamic Affairs in San Diego, including his correspondence with the Ministry of Islamic Affairs, in which Fahad al-Thumairy is referenced (various dates)

Further documents in relation to Omar Abdi Mohamed, including court documents relating to immigration proceedings (United States v. Omar Abdi Mohamed) in the State of California, culminating in a verdict on March 30, 2005

Staff Report of the 9/11 Commission entitled "9/11 and Terrorist Travel" [containing numerous references to "indicators" of terrorist affiliation found in passports of foreign nationals who entered the United States; and multiple source documents in the category "CIA analytic report" cited in footnotes]; dated August 21, 2004

Extracted page 516 of the 9/11 Commission Report [including a reference, in partial footnote 19 at the top of the page, to the passport of Omar al-Bayoumi]

Document SD00103A, copy of a passport issued by the Kingdom of Saudi Arabia, held by Nawaf al-Hazmi

JTF-GTMO Detainee Assessment in respect of detainee ISN 262, a Saudi national named Abdullah al-Wafti [including a reference, at page 5, to certain "notable markers" identified in the detainee's passport]; dated June 27, 2007

Twitter Post by Khalid Mojib, featuring a poem dedicated to Khalid al-Assaf, Advisor in the court of the Royal Diwan, dated November 15, 2015 [40a is the original; 40b is a rough English translation of the title]

Statement published on the website "Islam Today", featuring an anti-American manifesto signed up to by a group of extremist clerics (names of signatories listed), including Abdullah al-Jaithen; dated March 17, 2003 [Arabic original, followed by English translation]

Metropolitan Police Service (MPS), London, UK – EXHIBIT PSS/113: Copy of USA Passport seized from BAYOUMI's garage at 34 Dymoke Street, Birmingham, UK. Passport in name of Forge William HAMERMAN containing 3 month visa to Saudi Arabia dated 19/09/1996. Also included are the following documents: Medical reports for HAMERMAN from 1996; Graduation notification of HAMERMAN dated 09/06/1996 from San Diego State University; Acknowledgement of Muslim faith signed by HAMERMAN and dated 17/09/1992.

Order of Judge Daniels dated March 28, 2018 [includes summary of procedural history of the lawsuit and sets out the basis for the case to proceed in respect of specific factual allegations]

Declaration of former FBI Special Agent Stephen K. Moore, dated September 15, 2017 [setting out recollected findings of FBI investigations regarding support and facilitation provided to the hijackers]

Declaration of former FBI Special Agent Catherine M. Hunt, dated October 26, 2018 [setting out results of independent document review, analysis and investigation regarding support and facilitation provided to the hijackers]

3rd Supplementary Declaration of former FBI Special Agent Catherine M. Hunt, dated August 5, 2019 [containing additional analysis pursuant to the production of further documents]

Affidavit of former FBI Section Chief Michael T. Rochford, dated November 7, 2017 [containing analysis of relevant facts and evidence from the perspective of a counterespionage and counterintelligence specialist]

FBI Report In Re Terrorist Attacks on September 11, 2001, as updated in 2012 and released in a revised form on April 25, 2019 [describing relevant updates and initiatives]

Plaintiffs' Pleading of Facts and Evidence in respect of Defendants Saudi Arabia and the Saudi High Commission for Relief of Bosnia & Herzegovina, dated September 15, 2014 [including a section, circa paras. 87 through 130, framing religious politics in the Kingdom of Saudi Arabia in the 1990s]

Declaration (accompanied by Exhibits) of Usman Madha in the present case, dated May 28, 2021

Document ECF 7605 (filed under seal, subject to FBI Protective Order), "Ashton Plaintiffs' Reply to Saudi Arabia's Opposition to and in further support of Plaintiffs' Motion to Compel", filed January 14, 2022; setting forth Plaintiffs' case in respect of three propagators (Adel al-Sadhan, Mutaeb al-Sudairy, and Omar Abdi Mohamed) in respect of whom further fact discovery is sought

Chapter 7 of the 9/11 Commission Report [describing the first arrivals of hijackers in the US and their contacts in California]

**Dr. Emile A. Nakhleh**

**Annex D – Glossary of Transliterated Arabic Names**

**In re Terrorist Attacks on September 11th, 2001 (03-1570-GBD-SN)**

# TRANSLITERATIONS

Throughout my report, I have used spellings of names, places and phrases that accord with the correct transliteration of Arabic. I commonly used this system of transliteration during my time in the Political Islam Strategic Analysis Program at the Central Intelligence Agency (CIA). Indeed, I attempted to instil this correct transliteration practice across government, albeit with varying degrees of success.

In the table below, I have matched my transliterations (in bold, left) with the alternative spellings for these names, places and phrases that most commonly arise (right). I have encountered these alternatives spellings in many documents produced in the 9/11 litigation, including in reports and interviews by the FBI, transcripts of depositions, as well as in media articles and foreign language (non-Arabic) literature. Where I have directly quoted such documents in my expert report, I have retained the original spelling used. I am providing this comparative table to the parties and this Court as part of the body of this document not least for the purpose of ensuring that any digital searches for common alternative spellings will nonetheless generate a 'hit' on my Expert Report.

| Transliteration used in Expert Report | Common Alternative Spellings |
|---|---|
| **Prophet Muhammad** | Mohammad, Mohamed, Mohammed |
| **Ahmad Ibn Hanbal (780-855 CE)** | Ibn Hanbal, Hanbali |
| **Ibn Taymiyya (1263-1328 CE)** | Ibn Taymiyyah |
| **Muhammad ibn Abd Al-Wahhab (1703-1792 CE)** | Abd al-Wahhab, Wahhabi |
| **Abu Hanifa (700-776 CE)** | Abu Hanifa |
| **Malik Ibn Anas (716-795 CE)** | Ibn Anas |

| | |
|---|---|
| **Muhammad Ibn Idris Al-Shafi'i (767-820 CE)** | Shafi'i, |
| **Abu Bakr (ruled 632–634 CE)** | Abu Bakr, Abubakar |
| **Umar (ruled 634–644 CE)** | Omar |
| **Uthman (ruled 644–656 CE)** | Othman |
| **Ali (ruled 656–661 CE)** | Ali |
| **Muhammad ibn Saud (1687-1765 CE)** | Ibn Saud, ibn Saud, bin Saud |
| **Imam Muhammad ibn Saud University** | Imam Muhammad University |
| **Um al-Qura University** | Umm al-Qura |
| **Al-Haramayn (Islamic Foundation)** | Al-Haramain |
| **Muthakkarat al-Nasiha** | Muzakkarat al-Nasiha |
| **Sayyid Qutb (1906-1966 CE)** | Sayyid Qutb |
| **Muhammad Surur (1938-2016 CE)** | Muhammad Surur, Sooroor |
| **Usama bin Ladin (also referred to as "UBL")** | Osama bin Ladin, Osama bin Laden |
| **Yusuf al-'Uyayri** | Yusuf al-Urayri, Yusuf al-Urairy, Yusuf al-Orairi |
| **Saddam Husayn** | Saddam Hussein |
| **Nawaf al-Hazmi** | Nawaf Alhazmi |
| **Khalid al-Mihdhar** | Khaled al-Mihdhar |
| **Omar al-Bayumi** | Omar al-Bayoumi, Albayoumi |

| | |
|---|---|
| **Khalid al-Suwaylim** | Khaled al-Swalem, al-Sowailim, al-Sowaylim, al-Sowailem, Asswailem |
| **Fahd al-Thumayri** | Fahad al-Thumairy, Althumairy |
| **Abdullah al-Jaythin** | Abdullah al-Jaithin, Abdullah al-Jathen, al-Jaithen, al-Jraithen |
| **Majed al-Mersal** | Majed Mersal |
| **Adel al-Sadhan** | Adel Sadhan, Adil al-Sadhan |
| **Mutaib al-Sudayri** | Mutaib al-Sudairy, Mutaeb al-Sudairy, Mit'ab Sudairy |
| **Abdallah al-Turki** | Abdullah al-Turki |
| **Salman al-Awda** | Salman al-Oada, Salman al-Ouda |
| **Safar al-Hawali** | Safar al-Hawali |
| **Abdallah bin Sulayman al-Mas'ari** | Abdullah bin Sulaiman al-Masaari |
| **Abdallah bin Abd al-Rahman al-Jabrayn** | Abdullah bin Abd al-Rahman al-Jabrain, Abdullah bin Abd al-Rahman al-Jabreen |
| **'Ayidh bin Abdallah al-Qurni** | Ayedh bin Abdallah al-Qurni |
| **Sa'id bin Mubarak al-Zuwayr** | Said bin Mubarak al-Zuwair |
| **Abdallah bin Hammud al-Tuwayjiri** | Abdallah bin Hamoud al-Tuwaijry, Abdullah bin Hamud al-Tuwaijri |
| **Sa'ad al-Faqih** | Saad al-Faqih |
| **Abd al-Rahman Ali Salih al-Suhaybani** | Abd al-Rahman Ali Saleh al-Suhaibani |
| **Hamdan bin Muhammad al-Hamdan** | Hamdan bin Mohammed al-Hamdan |

| | |
|---|---|
| **Abd al-Wahhab bin Nasir al-Turayri** | Abd al-Wahhab bin Nasser al-Turairy |
| **Salih bin Muhammad bin Sulayman al-Sultan** | Salih bin Muhammad bin Sulaiman al-Sultan, Saleh bin Muhammad bin Suleiman al-Sultan |
| **Sa'id bin Nasir al-Ghamdi** | Said bin Nasser al-Ghamdi, Saeed bin Nasser al-Gamdi |
| **Ahmad Ibrahim al-Zarawi** | Ahmed Ibrahim al-Zarawi |
| **Awdh bin Muhammad bin Sa'ad al-Qurni** | Audh bin Muhammed bin Said al-Qurni |
| **Hassan bin Salih al-Hammid** | Hassd bin Saleh al-Hameed |
| **Abd al-Aziz Al-Wuhaybi** | Abd al-Aziz al-Wuhaibi |
| **Shar'ia** | Sharia |
| **Qu'ran** | Koran |
| **Al-Qa'ida** | Al-Qaeda, al-Qaeda, "AQ" |